*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| *Kathleen Arnold and* | § |  |
| *Timothy A. Cotten, Creditors* | § | |
| *9543 North Side Drive* | § | |
| *Owings, Maryland  20736* | § | |
| *Phone: 410.257.5283* | § | |
|  | § | |
|  | § | |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

|  |  |  |
|---|---|---|
| **IN RE:** | § | **Chapter 11** |
|  | § | |
| **LEHMAN HOLDINGS INC. et al.** | § | |
| Debtor, | § | **Jointly Administered** |
|  | § | **Under Case No. 08-13555 (JMP)** |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

## COMPLAINT FOR UCC § 3-407 ALTERATION, UCC § 3-202 NEGOTIABLE INSTRUMENTS AND UCC § 3-204(a)(b) AFFIXATION, QUIET TITLE, TRUTH IN LENDING, AND RELATED CAUSES OF ACTION AGAINST DEBTOR, LEHMAN BROTHERS HOLDINGS INC., et al.

Dear Honorable Clerk of Court:

Enclosed please find an Adversary Complaint to be filed in the above debtor's case.  I have attached the original complaint and a $ 250.00 money order made payable to "Clerk, U. S. Bankruptcy Court."

I am enclosing a self addressed, pre-postage paid priority mail envelop so that you may date stamp the complete copy of the adversary complaint, including all Exhibits and this correspondence filed with your office in this matter.

I have taken the liberty of affixing to the top of the adversary complaint, Form JS044, Civil Case Intake Form, in the event my research was conclusively wrong, concluding there appears to be no such requirement under Federal Bankruptcy Rules to attach this form.  I have provided a completed form in any event and will await the issuance of summons.

Respectfully Submitted,

Kathleen Arnold, Pro Se

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **Kathleen Arnold and** | § | Case No. _____ |
| **Timothy A. Cotten, Creditors** | § | |
| **9543 North Side Drive** | § | |
| **Owings, Maryland  20736** | § | |
| **Phone: 410.257.5283** | § | |
| | § | |
| | § | |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

| | | |
|---|---|---|
| | § | |
| **IN RE:** | § | **Chapter 11** |
| | § | |
| **LEHMAN HOLDINGS INC. et al.** | § | |
| **Debtor,** | § | **Jointly Administered** |
| | § | **Under Case No. 08-13555 (JMP)** |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§


## MULTI COUNT ADVERSARY COMPLAINT


## ADVERSARY COMPLAINT U.C.C. § 3-202 NEGOTIABLE INSTRUMENTS AND U.C.C. § 3-204(a)(b) AFFIXATION VIOLATIONS, QUIET TITLE, TRUTH IN LENDING, AND RELATED CAUSES OF ACTION AGAINST DEBTOR, LEHMAN BROTHERS HOLDINGS INC., et al.


TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:


## *I. PRELIMINARY STATEMENT*


1.      These causes of action arise out of, and relate back to, plaintiff Creditor Consumers,

Kathleen Arnold and Timothy A. Cotten, and their Compulsory, Truth in Lending Rescission

Complaint filed in affirmative defense against the debtor, and is subject the September 15,

2003 refinanced loan secured by plaintiff creditors home and residential real property.

1

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

2.     On or about July of 2006, upon purchasing and reading the National Consumer Law Center, Debtor Library, Federal Truth in Lending Act, plaintiffs discovered "Material Disclosure Violations" that would allow them to rescind the debtors loan.

3.     Upon reasonable reliance on the debtors "Disclosures" made, plaintiffs identified "Material Violations" that extended their rights under TILA rescission.

4.     Plaintiff creditor consumers then timely exercised their extended rights of rescission on August 7, 2006 for "Material Disclosure Violations".

5.     This loan transaction closed on September 15, 2003.

6.     Lehman Brothers Bank, FSB, (LBFS), purports, to have been the loan originator of with the loan instrument being secured by plaintiff creditors real property and purporting to be a "Securitized" financial transaction subject to Uniform Commercial Code Fixation And Negotiable Instrument Requirements pursuant to U.C.C. Sec. § 3-201(3) and U.C.C. Sec. § 3-204(a)(c).

7.     Plaintiffs alternately declare, claims under U.C.C. Sec. § 3-202 - Negotiations Subject to Rescission.

8.     The instrument complained of purports to be "Order Paper" from debtor.

9.     The loan was purported to have been negotiated and assigned at some time after closing to debtor Aurora Loan Services, (ALS), who upon information and belief, then assigned the instruments to LBHI in securitized pools of loans to be sold to Wall Street.

10.     The loan instrument or recordings in the plaintiffs county land recorders office bears no indelible testament it was ever negotiated pursuant to U.C.C. § 3-204(a)(d).

11.     Debtors originated loans that were purportedly sold as securities to Wall Street with these securities transactions funded and guaranteed by debtor LBHI during the period in

2

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

which the loan was originated, the year being 2003.

12.     Debtor LBHI benefited from his subordinate thrifts and servicing agents frauds and received as a direct and proximate result thereto, the "Fruits of these Frauds".

13.     Upon information and belief, at some unknown time and date, prior to the September 15, 2003 loan closing, an Interim Flow Servicing Agreement was executed by defendants during and after the closing of the loan in which the loan was transferred/sold multiple times, (according to debtor ALS, April 21, 2004 Correspondence, See Attached Exhibit No. 3, ALS Letter), (all Exhibits are incorporated by reference hereinafter).

14.     Upon information and belief, debtor LBSF then transferred plaintiffs loan to their master servicer, ALS, for repacking and re-sale as a special investment vehicle, "SIV" and for debtor LBHI to resell on Wall Street as Credit Default Swap, CDOs.

15.     Upon Plaintiffs closing of the refinanced consumer loan and over the course of time, debtors LBSF and ALS, Altered the loan documents and terms in which they executed backdated, forged documents and TILA "Material Loan Disclosures".

16.     Debtor ALS, created these September 15, 2003 backdated and forged documents in their name, regardless to their later claims of having "*not been a party to the closing of plaintiffs loan and that they had only purchased plaintiffs loan on September 30, 2003*", some fifteen days after the closing of the loan:

      a.     by fact and by the debtors own undisputed admissions, debtor ALS was never a party to the loan closing and had professed in writing to have never been a party to the loan closing, (See Attached Exhibits No. 3b, ALS April 21, 2004, plaintiff Reply Letter), and is undisputed;

      b.     ALS insisted they had only "acquired" or purchased plaintiff creditors loan on

3

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

September 30, 2003, post closing of the loan.

These undisputable facts foreclose the remote possibility the backdated disclosures could ever have been given as of the closing of the loan on September 15, 2003, sustaining plaintiff's fraud allegations as to the note, disclosures and, loan documents being forged after the closing of plaintiffs loan. It is upon information and belief, fraud accounts for the only rational way, these disclosures could possibly be in the name of debtor ALS, and bear the loan closing date of September 15, 2003, a date that is some 14 days before they claimed to have "Acquired" Plaintiffs loan.

17.      Defendant LBHI patently had notice as to these "Material Disclosures Violations and Material Loan Alterations" made to plaintiffs, regarding the real loan plaintiffs were placed into and, as a direct and proximate result of the loan "Alterations" and "Forgeries" plaintiffs have sustained injuries and damages.

18.      During debtor ALS servicing of plaintiffs loan, debtor ALS purported to have assigned and transferred plaintiffs loan servicing to their affiliate servicing entity CitiMortgage Inc.. No evidence as to capacity and authority exist as to debtor ALS. No indorsements or Pooling and Servicing Agreements necessary to have effectuated such assignments and or transfers of plaintiffs loan to their affiliate servicer.

19.      Material Alterations to the loan Deed of Trust, Note and related "Loan Documents" took place during the servicing of the loan by debtors ALS.

20.      These Alterations were furthered by their agents and affiliated servicing entities and, CitiMortgage Inc., however none of these, or any properly executed indorsements and assignments, were indorsed on the loan instrument itself at the time of closing, or permanently affixed to the instrument and note thereafter, pursuant to Uniform Commercial

4

Code § 3-204(a)(c).

21.    These undisclosed "Material Alterations" made significant changes to the refinanced loan plaintiffs were disclosed and that which induced them into canceling a mortgage loan closed with a completely unrelated lender to accept the debtors loan proffered.

22.    Had plaintiffs known the truth about the loan they were placed in, as well as, had they known the true cost of the loan, and that the loan was designed to ensure default and that they would end up losing their property to a fraudulent foreclosure scheme, plaintiffs never would have canceled the unrelated, closed loan to accept the debtors loan and therefore reasonably relied on the loan disclosures.

23.    Plaintiffs reasonably relied on the disclosures made by debtors and acted with prudence and reliance when rearranging their financial affairs in accord.

24.    The alterations added terms, charges and cost never disclosed and accepted by plaintiffs and to that which these alterations, "*significantly*" affect the loans "Material Disclosures" as they relate to Annual Interest Rate, Amount Financed, Total Cost of Credit, Payment Amounts and Payment Schedules.    These "Material Alterations" consequently resulted in significant changes in the loans terms, those which were never disclosed.  As a direct and proximate result of these "Alterations", plaintiff consumers have sustained damages and continue to be damaged.

25.    The "Material Alterations" to the loan terms and documents, were exacted by defendant debtors, collectively when intending to extort by illegal conversion plaintiffs property by torturous and malicious slander of title, the scheme element, to accomplish these illegal ends.

26.    Defendants scheme was furthered upon having their servicing agents file illegal

5

foreclosure actions against plaintiffs property despite no default in mortgage payments and or contract, doing so on January 14, 2005 and again on or about June 10, 2006.

27.    In the process of debtor defendant executing this illegal property conversion scheme against plaintiffs credit, home and real property, debtors, and their subsequent loan servicing agent CitiMortgage Inc., made no mandatory disclosures as required by TILA and state laws as to the new, and materially altered loan terms, or did they re-issue the "Notice of Right to Cancel" as mandated by TILA as to these Altered terms.

28.    By fact, plaintiff consumers never received the "Mandated", "Material Truth in Lending Disclosures" contained in Subpart B, Regulation Z, as to the loans correct Interest Rate, Amount Financed, Payments, Payment Schedules and Total Cost of Credit, as of the September 15, 2003 closing of the loan secured by plaintiff consumers residence.

29.    The disclosures made were defective disclosures that did not accurately disclose the real loan terms and cost being offered plaintiffs and could not have disclosed the forged loan disclosures that were backdated and otherwise never issued, but clearly not given, in violation of TILA.

30.    Plaintiff Creditor Borrowers statutory TILA remedy of rescission and relief, cannot be avoided by the debtors filing of bankruptcy given that Statutory and Regulatory remedies of this nature are expressly not protected by the bankruptcy code, therefore making these debts expressly non-dischargeable under law.

31.    Plaintiff Arnold and Cotten, are the "legal owners" of the residential property known as, and located at, 9543 North Side Drive, Owings, Maryland 20736, more particularly described as Lot 20, Plat 4, Section 1, Clearview North, (hereinafter "the property"), and loan number, No. 0016108615, assigned to the loan on September 15, 2003, see Attached

6

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

Exhibits No. 1, Instruments. The purported Second loan number assigned sometime after the loan closing, and contains 'Alterations" recorded in the plaintiffs county recorders office of Calvert County, the purported appointment and assignment of substitute trustee, Loan No. 0626414260, Deed of Trust, see Attached Exhibits No. 6.b.

32.    Plaintiffs rightfully rescinded their loan under the Federal Truth in Lending Act but declare they are not limited to this form of rescission, expressly because their right to rescind and repudiate the fraudulent transaction alternately exist, under U.C.C. § 3-202, Negotiations Subject to Rescission and Alteration U.C.C. § 3-407.

33.    Plaintiffs, pursuant to TILA rescission remedies, make their demand for statutory damages in this complaint under the federal Truth-in-Lending Act, 15 U.S.C. §§1601 *et. seq.* ("TILA"), and, the regulations promulgated there under, 12 C.F.R. §§226.1 *et. seq.* ("Regulation Z").

34.    The Creditor Plaintiffs seek affirmative damages, damages by way of recoupment, punitive damages, costs, attorneys fees and, or, such all other relief due and further plead in each count against Defendant debtor LBHI pursuant to:

    a.    U.C.C. § 3-202, Instrument Not Instrument of Negotiation and Violates U.C.C. § 3-204(a)(c) Fixation Requirements;

    b.    U.C.C. § 3-407 Alteration with Fraudulent Intent to Convert Property - Instrument Extinguished;

    c.    Quiet Title;

    d.    Truth In Ownership - 15 U.S.C. § 1641(g)(1);

    e.    Truth in Lending Rescission - 15 U.S.C.§ 1635(b), or, Alternately, U.C.C. § 3-202, Negotiations Subject to Rescission;

7

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

    f.      Truth in Lending Damages - 15 U.S.C. §1640;

    g.      Truth in Lending Recoupment - 15 U.S.C.§ 1640 (e),

    h.      Plaintiffs be Deemed Secured Creditors and Due Priority Treatment of Claims;

    i.      Creditor Claims Exempted From Discharge Pursuant to §523(a)(2)(A)

## II. JURISDICTION

35.    Jurisdiction of the bankruptcy court is provided by 28 U.S.C. §1334, §157 and § 1367 over state law claims.

36.    This proceeding is a core proceeding. *See* 28 U.S.C. §157(b) (2) (A), (B), (K), (O).

37.    The instrument subject to this adversary complaint further is deemed a "Sealed Mortgage/Deed of Trust Instrument and Note" secured by a real property mortgage.

38.    Non-Bankruptcy Statutes tolled pursuant to 11 U.S.C.§ 362(a) by debtors filing of Bankruptcy on September 14, 2008; the contract subject this litigation was entered into by the parties on September 15, 2003.

39.    Non-Bankruptcy Statutes tolled during plaintiff Arnolds Bankruptcy case from February 14, 2005, thru February 12, 2007.

## III. PARTIES

40.    Plaintiff Creditors are Consumers, Kathleen Arnold and Timothy A. Cotten, are natural persons who are consumer creditors in the above-captioned bankruptcy case and reside at 9543 North Side Drive, Owings Maryland 20736, ("the Property and Residence").

41.    Defendant Lehman Brothers Holding Inc., is a corporation formed under New York Laws, with Corporate Offices located in New York, NY Lehman Brothers Holding Inc. 745 7th Ave. in New York, NY 10019.  To be served on legal agent of record, Weil Gotshal's.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. –Multi Count Complaint*

## IV. BACKGROUND

42.     Plaintiff creditors loan transaction is subject to LBSF 1992, Master Agreement and LBHI guarantees or "the Guarantee"; LBHI guaranteed and funded LBSF loans that were originated for re-sale as securities by LBHI, the defendant hereafter.

43.     Beginning on September 15, 2008 and periodically thereafter, LBHI and certain of its affiliates, (collectively, the "Debtors"), commenced voluntary cases under chapter 11 of Title 11 of the United States Bankruptcy Code, in the Bankruptcy Court for Southern District of New York.

44.     These Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b), the Federal Rules of Bankruptcy Procedures.

45.     Because LBHI provided the funding credit and source for LBSF to extend the plaintiff consumers loan, LBHI was the guarantor of LBSF originated loans, those that where hedged against, and sold as Credit Default Swaps by the defendant.

46.     Pursuant to this Courts Order, Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order Authorizing the Debtors to Implement Claims Hearings Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors, dated as of March 17, 2010, all information of plaintiffs had been submitted in connection with the Proofs of Claim and Questionnaires that are part of the record, therefore plaintiffs need not resubmit them.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. – Multi Count Complaint*

## V. FACTUAL ALLEGATIONS

47.    The purported "Securitized Mortgage" loan transaction complained of, was created by the closing of a consumer credit refinancing transaction between plaintiffs and debtor, LBSF on September 15, 2003.

48.    Plaintiff Arnold had filed for Bankruptcy Protection 1 year and 150 days after the September 15, 2003 loan closing.

49.    Arnold was forced to file bankruptcy on February 14, 2005, and, emerged from Bankruptcy on February 12, 2007, with all non-bankruptcy statute of limitations, (not, statutes of repose), stayed and suspended during the pendency of both creditors and debtors Bankruptcy Actions.

50.    Upon information and belief, sometime after the closing of the loan subject this complaint, plaintiffs loan was transferred from originator debtor LBFS to debtor ALS.

51.    Upon information and belief, the transfer of the loan from originator to servicer, is believed to have been accomplished thru some kind of Flow Interim Servicing Agreement ("FISA") wherein debtor LBHI provided the funding credit for these loans originated.

52.    On information and belief, LBHI agreed to resell these loans originated, including, plaintiffs loan, as securities, bundled and packaged for sale as derivative securities, CDO, to Wall Street.

53.    This Loan complained of purports to be a Securitized Transaction Negotiated at the closing of the loan or very shortly thereafter, in compliance with the Federal Securities and Exchange Act and New York State laws and regulations thereto.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. – Multi Count Complaint*

54.    Upon information and belief, after the closing of the loan, debtor LBSF transferred the instrument to master servicer debtor ALS who acted as an interim Note holder while defendants presumably located a buyer for the "Note", accomplishing these transactions through their in-house investment manager, BFS-Eastern, Investment Management, and head thrift defendant, LBHI.

55.    The defendant LBSF recorded the instrument in the plaintiff creditors county land records, (see Attached Exhibit No. 1, Deed of Trust); evidence in the land records and the instrument recorded reflect no negotiations or assignments have materialized.

56.    The recorded instrument evidences no such negotiations have occurred whatsoever, or, have plaintiffs been provided any such proof of the instrument having been negotiated with no such indorsements that have been so permanently affixed to the instrument itself.

57.    Upon information and belief, and also based on the assignment of a second and distinct loan number, also recorded in plaintiffs county land records, it seems plaintiffs Note has been parsed and separated from the deed of trust and subsequently sold separately, and, maybe even sold multiple times, with their being unidentified, multiple owners or claimants, these facts being the oxygen of this adversary action.

58.    Debtor ALS, during said time they serviced plaintiffs mortgage instrument, caused knowing, "Material Alterations" to be made to plaintiffs Deed of Trust, Note and Allonges to the instruments thereto and that these alterations affected the "Material Loan Terms", pursuant to UCC § 3-407.

59.    These "Material Alterations" were motivated and furthered by acts of forgery with a scheme designed and intended to fraudulently deprive the plaintiff creditors of their property by illegal means.

11

60.    The "Material Alterations" added a new loan number and signature pages, the necessary vehicles to carry out and further these alterations, and purported, multiple assignments of the loan and servicing, as did the later recording of the purported Substitute Trustees Appointment and purported assignment of the deed of trust.

61.    The Alterations were furthered by the debtors affiliate servicers when upon transferring plaintiffs loan to the debtors affiliated servicing agent, they agreed among themselves to assign a new and distinctly, different Transfer from ALS to Affiliated Servicer, that which materially altered and also added materially different loan terms therefore serving to "Materially Alter" the loan without authority of same conditions of the loan agreed to and closed on by plaintiffs, at the loan closing on September 15, 2003, "New Loan Number", (No. 0626414260, see Attached Exhibits No. 6.b).

62.    On information and belief, these "Material Alterations" were exacted against plaintiff creditors with the knowing of the debtor LBHI under his BFS Eastern Investment Management Division.

63.    Upon information and belief, debtors aided and abetted each other in carrying out these frauds to alter the instruments and disclosures after the loan closing, doing so to illegally convert plaintiffs real property, and doing so to intentionally and illegally deprive plaintiffs of their home by these fraudulent alterations and actions to enforce the materially altered instrument and terms and doing said further in the debtors assignment to their affiliated servicer and other agents with instructions to enforce the altered loan terms.

64.    These acts of aiding and abetting were accomplished by, with, and thru having the debtors employees, agents, and assigns employed deceptive and malicious means that included, misrepresenting the need for plaintiff Arnold to cause her to execute a signature

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

affidavit, doing so for false reasons that include, but are not limited to, the actions taken against plaintiffs to date that are, 1) fraudulent prosecution and declaration of default, 2) slander of title against a 3) fraudulently manufactured default and, 4) all acts necessary to meet these illegal and fraudulent ends intended to deprive plaintiffs of their property without legal and valid causes.

65.    The Debtor received immense benefit from these frauds and, relied on these frauds, if not even possibly orchestrating these frauds for market share, advantage and gain and of course, profits.

66.    Debtor ALS purported "assignment of the purported security" or, the Note in parsed fashion form from the Deed of Trust, facts the debtor had full knowing of said purported loan default upon debtor ALS declaring of their false default prior any assignment and transfer to their affiliate servicing agents CitiMortgage Inc. on or about June 10, 2004 and again, when allowing their affiliate assign a new and distinct loan number, facts the debtor had full knowing of and participated in as late as plaintiffs rescission notice on August 7, 2006, when at this as well of the sale of the security, the debtor would have opportunity and cause to inspect plaintiffs mortgage file prior their refusal to rescind correspondence dated on August 23, 2006, (see Attached Exhibit No. 4).

67.    Debtors affiliate servicer could never have taken plaintiffs loan as a "Holder In Due Course" due to among other reasons, debtors ALS false declaration of Default and Fraudulent Reporting of the Default by Public Reporting to Credit Agencies on or about March of 2004 therefore making all purported transfers subject these public records those that would not be exempted by any such "Good Faith Purchaser" transfers or claims.

68.    Debtor LBHI had knowing ALS did not make the altered PMI Disclosure and first payment and escrow disclosures at the closing of plaintiffs, hence participating in the deceptions at all times thereto and, material alterations to the loan and servicing terms. Upon information and belief, debtor LBHI relied on those altered PMI insurance disclosures so to allow the debtor hedge against it in the Default Credit Swap markets.

69.    These acts of alteration were furthered by defendants affiliated servicing agents participation in the acts of fraud and alteration upon following the debtors instructions to fraudulently accelerate the plaintiffs loan and declare a default of the mortgage when by law and fact, no default existed.

70.    The debtor employed creative accounting tricks and manipulations to manufacture false defaults accomplishing further these deeds by not only altering the loan and loan terms but computing the loan interest wrong, refusing to apply payments, assessing sham and junk fees and charges not owed and due.

71.    Upon information and belief and reasonable reliance upon said, the debtor and their affiliate agents, intended to deprive plaintiffs of their once good credit, home and property upon taking action to do so by extortion and illegal conversion of plaintiff creditors property, and doing so for gains, profits, increased servicing fees, sales against hedged credit default swaps on high return tranches, and the lucrative sale of plaintiffs parsed and altered note to other entities so that these illegal alterations could be enforced to meet the illegal schemes ends.

72.    Thru U.C.C., debtors schemed to assign the servicing of plaintiffs loan post implementation of the altered terms and did so the debtors could presumably insulate

14

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. – Multi Count Complaint*

themselves against the frauds exacted against plaintiff creditors and to further shed their liabilities for the forged instruments, disclosures and fraudulently imposed altered terms.

73.     Plaintiffs have suffered substantial damage and harm to their credit, property title and substantial loss of opportunities by the debtors malfeasances and torturous injuries.

74.     Debtors LBHI, by, with, and through debtors agents, LBSF and ALS and servicing agents, all shared in and acquiesced in these fraudulent alterations and forgeries made by their agents after the closing of plaintiffs loan and did so as late as August 23, 2006.

75.     Pursuant the Anton Valukas, Report, the debtor aided and abetted furtherance of these frauds as the record reflects, upon refusing to act upon plaintiff creditors timely exercise of rescission, issued in the creditor plaintiffs compulsory defensive actions brought against them for their second fraudulent foreclosure action.

76.     Notably, debtor as guarantor to LBFS and ALS, would have made the final decision whether to mount a knowingly frivolous defense or to repurchase the plaintiffs loan and carry out the rescission tender requirements under "The Act", "15 U.S.C.  § 1635(b)"; considering the extent of the debtors agents involvement and the debtors own reliance on these fraudulent alterations and the benefits derived from said, it is unimaginable debtors would have chosen to refuse to rescind the loan.

77.     Debtor LBHI acted in consort and with knowing of the fraudulent alterations made by his agents because the very PMI insurance LBHI depended on and needed to hedge his bets against shorts on Insurance Credit Default Swaps, are obvious and apparent as to put any reasonable, managing thrift and savvy investor such as LBHI on notice of the fraudulent actions of his subordinate, agents and those far reaching and serious consequences associated with these acts and the debtors knowing and reliance on them for profits.

15

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

78.     Fact is, LBHI could not ignore the fact their very agent, ALS backdated and named themselves in disclosures that were purportedly issued at the closing of plaintiff creditors loan, yet, in stark contrast as professed in debtors ALS April 29, 2004 correspondence to plaintiffs, they purport to have only just purchased plaintiffs loan on September 30, 2003, some fourteen days after...the September 15, 2003, closing of the loan, thus making these backdated, forged purported disclosures, patent frauds on which debtor LBHI knowingly relied on and accepted the fruits of these frauds.

79.     Plaintiff creditors object to any authenticity claims as to any documents presented by the debtors wherein they purport to have issued Federal and State Mandated Loan Disclosure Notices; with particularity, the debtors August 23, 2006 Notice of Denial and Refusal to Rescind plaintiffs timely rescission.

80.     Debtors attempt to purport their signed Notice of Right to Cancel was issued, however, this too fails, as again, the Notice presented was subject to being Altered and Forged itself. Moreover, this purported Notice of Right to Cancel cannot represent the post closing disclosures arising from the new terms imposed by those fraudulent debtor, Alterations to the instrument and terms.

81.     Plaintiffs properly make a presumptive rebuttal arguably based on the extent of the material loan "Alterations, Forgeries of Documents sustained, and the Imposing of Illegal Loan Terms" subsequent the closing of plaintiffs loan that were accomplished by and through the debtors servicing agents for the debtor.

82.     Plaintiff Creditors had no hand in the making of the altered loan documents and were induced by guile, deception and acts of fraud to offer up a signature affidavit in support of

16

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

plaintiff Arnolds initialed signature, see Attached Exhibit, Fax from Ms. Patterson at LBHI

investment division desk, BFS-Eastern Investment Management.

83.    Plaintiff creditor Arnold was never disclosed, or did she suspect, the affidavit request

made by debtors was going to be used to forge, and, or, forge and alter, post closing,

additional notes, allonges, first payment and escrow disclosures, all that were, back-dated to

the closing of the loan and all other documents necessary to "Materially" Alter and Change

the loan and terms, just as they so very well did, (see Attached Exhibits Loan Alterations,

No. 5.b thru 5).

## VI.  STATEMENT OF CLAIMS

### First Claim- Not Instrument of Negotiation UCC § 3-202, And, Violation of UCC Fixation Requirements,  § 3-204(a))b)

84.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth

in the foregoing paragraphs 1 through 83 of this Adversary Complaint as if fully set forth

herein.

85.    The loan instrument subject this adversary litigation purports to be a Securitized

Transaction.  This is strengthened by ALS, who purports to have "Only Acquired" plaintiffs

loan instrument on September 30, 2003, some fourteen days after the closing of the obligors

loan on September 15, 2003, (see Attached Exhibit, No. 3.b, April 21, 2004, ALS Letter).

86.    Plaintiffs have valid, legal concerns they will be threatened with double liability

resulting from other, unknown Indorsees to the instrument in question.

87.    Plaintiffs allege and complain, debtors failed to file in plaintiffs county land recorders

office, properly attached and permanently affixed to the loan instruments, all indorsements to

the instrument, and to have further recorded these indorsements and assignments along with

17

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

all other contracts or, the Pooling and Servicing Agreement, (PSA), (See Attached Exhibits

No. 1, Deed of Trust and Note,(these instruments contain some of the alterations).

88.    Obligors, Arnold and Cotten, posses a just and very real interests in determining

whether the person(s) demanding enforcement and payment on their loan and note are

actually the real owners and "Holder in Due Course" since the loan instruments, the deed of

trust and note, contain no such indorsements to this effect or are any such documents

recorded in the land records where the obligors property is located.

89.    The plaintiffs county land records contain no such recording of any such

indorsements to the instrument that would have occurred through purported negotiation and

assignment, necessary pursuant to U.C.C. § 3-204(a)(b), vital to execute the Contract.

90.    Debtors agents purport to have assigned and or sold plaintiffs loan yet there is no

evidence of these facts in any recording or instrument to date filed in the county land records

or provided plaintiff creditors.

91.    In fact, no assignments or indorsements are affixed to the instrument yet debtor ALS

purports to have legally acquired plaintiffs loan instruments thru some reputed negotiation,

and then again presumed to negotiate the transfer yet even still further of plaintiffs loan

instrument to their affiliate servicing agent, CitiMortgage Inc., thus making this purported

transfer as to servicing on or about June 21, 2004, (see Attached Exhibits No. 6.b, Debtor

ALS and servicer CitiMortgage Inc., purport to be transferring Servicing of plaintiffs Loan

from debtor ALS, to their affiliate agent.

92.    There is no writing, contract or other documents substantiating any assignments or

indorsements, affixed to the recorded instrument or any other writing or contracts to

18

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

substantiate transfers from LBSF to debtor ALS and then, from debtor ALS, to affiliate

servicing agent CitiMortgage Inc.; no evidence as to these proffers exist.

93.     Plaintiffs allege the PSA contract declaring the duties of all parties to the purported,

securitized transaction, the certificate of trust and their interest and duties and, as the extent

of those limitations in depositing plaintiffs loan into the trust have never been made known

the plaintiffs.

94.     The PSA contract is a necessary contract to the loan as it defines the authority of each

party to perform a specific act in the servicing of plaintiffs loan and further serves to preserve

and maintain the plaintiffs property chain of title, another valid and legitimate concern

plaintiffs have in their need to discover the PSA contracts.

95.     Plaintiffs allege affixation requirements under U.C.C. serves the utilitarian function of

preserving a traceable chain of title, thus furthering the Uniform Commercial Code's goal of

free and unimpeded negotiability of instruments, citing courts have declared it

"indispensably necessary" negotiable instruments "should carry within them the indicia by

which their ownership is to be determined; otherwise, their value as a circulating medium

would be largely curtailed, if not entirely destroyed." Haug v. Riley, 101 Ga. 372, 29 S.E. 44,

46 (1897). See also Crosby, 16 Wis. at 627 (permanently attached Indorsements to the

instrument "travel with it wherever it might go"). Chancellor Hawkland writes that it would

be "unreasonable to impose upon the indorsee the risk that the present holder or a prior

holder had negotiated the instrument to someone not in the apparent chain of title by virtue of

a separate document." 4 W. Hawkland & L. Lawrence, Uniform Commercial Code Series

Sec.§ 3-202:05 (1984).

96.    Plaintiffs just reasons for seeking compliance with the U.C.C. Indorsement requirements is that they allege their notes were procured by acts of fraud and that material alterations were made to both instruments and disclosures after the loan closed on September 15, 2003 and that these frauds have continued over a course of time and that the debtor had knowing knowledge of these frauds and alterations and benefited from these alterations and deceptions.

97.    These Alterations were achieved by illegally obtaining a signature affidavit from plaintiff Arnold for patently deceptive, false and misleading reasons as in fact, the affidavit was used to defraud plaintiffs by allowing defendants to fraudulently proliferate forged documents and subsequent instruments and mandatory loan disclosures after the closing of the loan and that these frauds, were perpetrated over a course of time and benefited the debtor as plead above.

98.    These acts of fraud are exactly what the U.C.C. Attachment provisions aim and attempt to stem off when they embodied in the statute these requirements; that is followed New York State Law, the Attachment provisions are to stem and prevent frauds when ensuring the chain of title record complies with U.C.C. requirements, thus U.C.C. is more equally served when applying those requirements here in this verified complaint.

99.    Plaintiffs rightfully seek to identify and resolve doubt as to when the instruments were negotiated and identify exactly the whereabouts of those indorsements and corporate power of attorney and assignment affidavits granting capacity and, all those contracts in defeasance of the transaction, and who, exactly is the true holder in due course is.

100.    Holder in Due Course status is governed by U.C.C. § 3-302.

20

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

101.    A transferee obtains that status only if the promissory note, a) is negotiated to a person who, b) takes it for value, and, in good faith, and without knowledge of the defenses of a party.

102.    Defendants ALS could never have taken the instrument as a "Holders in Due Course as they possessed dirty hands and first hand, insider knowledge of the frauds employed to induce plaintiffs into closing the loan and then subsequently attaining thru bald-faced misrepresentations and acts of fraud, coercing plaintiff to sign signature affidavits used in furtherance of these schemes. Debtors LBHI knew and relied on these frauds, (See Attached Exhibits No. 2 Fax Header from Ms. Patterson and that details the deception.

103.    All debtors, either participated in the actual frauds or relied on the frauds in benefit from the fruits of the frauds of the forged documents and disclosures and acted in, knowing of these deceptive ations.

104.    LBHI had first hand knowledge of these frauds because they knew, ALS was in fact not a party to the loan closing of plaintiffs loan on September 15, 2003.

105.    LBHI knew by fact, ALS could never have made the forged and back dated PMI, payment schedule, monthly payment and escrow disclosures necessary to otherwise meet these illegal ends, knowing implicitly of these frauds and that they had to have been fraudulently fabricated disclosures and documents procured by deception, forgery and alterations and that, are material alterations. One need to only look to the actual Note recorded that was a fraud in and of itself because it is clear the document had been cut up as will be discussed below.

106.    The debtors were motivated by the fact the alterations not only served to increase returns but were to obtain the plaintiffs property by fraudulent foreclosure.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

107.    Interpreting the U.C.C. Attachment Requirements, the courts "have historically been of one mind" finding the lack of an indorsing signature on the instrument itself, or on a sheet "firmly affixed" to the instrument, is fatal to holdership. See, e.g., Bailey v. Mills, 257 Ala. 239, 58 So.2d 446, 447 (1952); Lopez v. Puzina, 239 Cal.App.2d 708, 49 Cal.Rptr. 122, 124-25 (1966); Lamson, 531 P.2d at 968; Shepherd Mall State Bank v. Johnson, 603 P.2d 1115, 1118 (Okla.1979); Estrada, 550 S.W.2d at 725; Crossland Sav. Bank FSB v. Constant, 737 S.W.2d 19 (Tex.Ct.App.--Corpus Christi 1987); Crosby, 16 Wis. at 627.

108.    The courts historical, sound policy in these types of matters has been to require the indorsements be on the instrument." R. Hillman, J. McDonnell, & S. Nickles, Common Law and Equity Under the Uniform Commercial Code p 11.02[b], at 11-18 (1985).

109.    Plaintiffs instruments present no indorsements resulting from negotiation.

110.    Plaintiffs have suffered injury and harm as a direct and proximate result of the defendants scheme to purport to have negotiated the instrument several times, yet, the instrument and land records exhibit no such negotiations with no substantiating indorsements and assignments affixed to the loan documents, pursuant to U.C.C. § 3-204(a)(b).

111.    These indorsements were to have insulated the trust and to have ultimately placed the instrument into a trust through the proper fixation of these indorsements and assignments of all parties in interest to the ***instruments***.

112.    These indorsements and assignments to the trust had to have occurred at a minimum, at the closing of this loan transaction, or, immediately thereafter and would have had to have been recorded with the instrument, and permanently affixed to the instrument so as to be a part thereto of the instrument.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

113.    All documents serving as a contract Defeasance to the subject loan contract were due to be disclosed to plaintiff obligors and to be recorded, (the later necessary to reach perfection and to take legal effect); no such contracts of defeasances, or, any such PSA or indorsements or assignments have been recorded in the land records where the subject property is located, Calvert County Maryland. In fact, the recorded instrument evidences no properly affixed and executed indorsements and assignment to the obligors loan instrument pursuant to U.C.C. § 3-204(a)(b).

**WHEREFORE PLAINTIFFS**, pray the deed of trust and note be declared Null and Void, Deemed Unenforceable as an Instrument of Negotiation, and Declare the Chain of Title Broken, and that the courts find for an award for attorney fees and punitive damages award of treble the value of the instrument.

### *Second Claim-.U.C.C. Alteration § 3-407*

114.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    Plaintiffs have provided supporting evidence and logical linkage to the Debtor LBHI and that they are entitled to a presumption of *prima facie* of their claims and that this Evidence includes the Altered Instrument Recorded in the plaintiffs county land records recorders office and that is prima facie, unquestionable evidence of these alterations, deceptions and frauds, see Attached Exhibits No. 5.b thru f, "Evidence of Post Closing, Alterations of Instruments and Disclosures In Varying Stages of Alteration and Forgery".

116.    Material Alterations were made to the loan instrument and terms.

23

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

117.    Disclosures purporting to have been issued by defendant were Created, Altered and or Forged and Altered after the closing of plaintiffs loan and are subject to U.C.C. § 3-407 Alteration Claims.

118.    The post closing Alterations having been accomplished by extorting from plaintiff Arnold thru patently materially misleading reasons to obtain her signature affidavit.

119.    The deceptively extracted affidavit was employed for other purposes then affirming Arnolds "Initialed Signature", but was instead diverted and used to Alter plaintiffs loan just as planned.

120.    Debtor LBSF and ALS obtained plaintiff Arnolds signature by misleading and false pretenses proffered to plaintiff Arnold, indicating *"the signature affidavits were needed in substantiation.....of Arnolds "initialed signature"*, see Attached Exhibits, Fax from BFS-Easter at LBSF and defendant debtor LBHI relied on these deceptive and misleading acts.

121.    Defendant debtor LBHI owed plaintiffs a Fiduciary Duty and knew they were not sophisticated consumers therefore Owed Plaintiffs Consumers A Duty of Good Faith and Fair Dealing.  Plaintiffs trusted the defendant debtor LBHI and had no reason or cause to suspect the debtors would use the affidavits for illegal and fraudulent purposes, those being post closing of the loan, forgery of loan documents and disclosures and those of which LBHI in fact relied and benefited from financially.

122.    Defendant LBHI stood to gain from his agents fraudulently inducing Arnold to give them her signature in affidavit form and in which form was then used to defraud plaintiffs as part of a larger patent scheme that which entailed illegally converting plaintiffs property by fraudulent slander of title and malicious prosecution upon authorizing their servicing agents to proceed with a sham foreclosure and slander of title action against plaintiffs property.

123.    By the preponderance of prima facie evidence, No disclosures were legally made to plaintiffs regarding the illegal charging of forced placed PMI insurance by debtors ALS; the debtors did so upon fabricating and backdating those disclosures resulting ina "Material Alteration" to the loan and terms.

124.    Debtors LBHI knew their agents had illegally imposed the PMI, memorializing said knowing in ALS April 24, 2004 letter to plaintiff creditors, wherein they admit openly on page two, second paragraph, to this material Alteration of force placing the PMI never disclosed in the mandated Truth in Lending Disclosures HUD-1, see Attached Exhibits No. 3.b. The fraudulent imposition of this forced placed PMI insurance, not only constitutes a *"Material Alteration to the Loan Terms"* but was for fraudulent purposes, that included, extortion of plaintiffs property by using these and the other plead alterations, and PMI charges that are knowingly fraudulent. The debtor knew or had cause to know when relying on these forged and altered disclosures and documents the substantial harm that would be caused to plaintiffs upon imposing charges not disclosed prior to plaintiffs closing of the loan and as mandated by TILA and that doing said amounted to "Material Alterations" as did creating notes and all other documents and disclosures after plaintiffs closing of the loan on September 15, 2003.

**WHEREFORE PLAINTIFFS** seek the instrument be declared Forged and Altered and as such, Extinguished and that the courts find for an award of attorney fees and punitive damages award of treble the value of the instrument.

### *Third Claim -Quiet Title*

125.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

in the foregoing paragraphs 1 through 124 of this Complaint as if fully set forth herein.

126.    Plaintiff creditors bring this action to quiet title against the property in which they are in possession of and which they hold superior title, located at 9543 North Side Drive, Owings, Maryland 20736, more particularly described as, Lot 20, Plat 4, Section 1, Clearview North, defendants loan number, No. 0016108615,(see Deed of Trust Exhibit Attached), assigned to the loan on September 15, 2003. Second loan number assigned after loan 'Alterations" recorded in land records of Calvert County Land Records in assignment to substitute trustee, Loan No. 0626414260, purported Substitution of Trustee Deed of Trust.

127.    Defendants LBHI, with, thru and by all debtors/their subordinate thrifts, employees and agents, including "John Doe and Jane Doe", have made ownership claims to title and have created clouds against plaintiffs property title in which those claims were made with the intent to fraudulently deprive plaintiffs unlawfully of their title and ownership rights to said property.

128.    Plaintiffs have legal right to have their title quieted so as to all dispense with all uncertainty and resolve doubt, purging by quieting the title these clouds created by defendants broken chain of title, and purported indorsements, assignments and any supposed sales to undisclosed third party vendees and or, John and Jane Doe as otherwise plead above.

129.    Plaintiffs have suffered significant loss of opportunities, delay and damages as a direct and proximate result as to defendants wonton claims against plaintiffs title and the clouds created thereto that include the debtors two fraudulent foreclosure actions taken against plaintiffs property at debtors direction to their servicing agents, and those purported assignments of Substitution of Trustee filed on or before July 2006 as evidenced in plaintiffs land records, see Attached Exhibit, Appointment of Substitute Trustee, recorded in Calvert

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. -Multi Count Complaint*

County Land Records.

 **WHEREFORE PLAINTIFFS**, pray for an Order quieting plaintiffs title and declaring it quieted and further Order plaintiffs attorney fees, cost and all other relief this court deems just and due plaintiffs

### Fourth Claim- Federal Truth in Ownership 15 USC § 1641(g)(1)

130. Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 129 of this Complaint as if fully set forth herein.

131. Pursuant to Section 131 of the Truth in Lending Act (15 U.S.C. § 1641)("TILA"), a new provision under (Section 131(g)) and 15 U.S.C. § 1641(g)(1), the recent implementation thereto, plaintiffs now seek by this complaint to identify the Real Truth in Holder of Plaintiffs loan.

132. Defendants LBSF was the last recorded holder of plaintiffs mortgage with no other contracts of defeasance or other indorsements or assignments having been recorded with the deed of trust or thereafter.

133. Debtor has responded for their purported Servicing Agent, see Attached Exhibit, ALS August 23, 2006, letter of denial to rescind plaintiff creditors loan that which was months after the recorded, Substitute of Trustee Assignment thus plaintiffs seek out to identify just exactly who is the Owner of Plaintiffs loan is?  Plaintiffs contend by statutory process, it is was LBHI, upon rescission and repurchase.

 **WHEREFORE PLAINTIFFS,** pray Defendants be made to "Prove Up" All Assignments and Transfers since the closing of plaintiffs loan on September 15, 2003 and that the debtor Prove-Up the Chain of Title and real owner of plaintiffs loan and all other relief this courts deems just and due.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

### *Fifth Claim-Rescission*

134.   Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.   The following cases relate back to plaintiffs claims against the debtor LBHI:

a) Second Illegal Attempt to Extort Property by Debtors Servicing Agents, see Case No. 55-06253-(bk), Docket No. 130, 06/19/2006, in Bk. Case No. 05-13246 TJC, CitiMortgage Inc., vs. Arnold and Cotten, Defendants, 2nd Illegal Complaint to Foreclose & Lift Stay Action filed by debtors Servicing Agent, CitiMortgage;

b) Case No. 06-2056-(bk), 12/14/2006, Counter Defendant, Cotten in reply to Case No. 55-06253, Docket No. 130, 06/19/2006, Bk. Case No. 05-13246 TJC;

c) First Illegal Attempt to Foreclose by Servicer for Debtor: Case No. 04-0-05-000046 FC, CitiMortgage Inc. et. al., vs. Arnold and Cotten, 01/14/2005, Calvert County Circuit Court.

136.   Plaintiff consumer creditors more then reasonably relied on the disclosures given to induce plaintiff creditors to accept the loan closed on September 15, 2003.

137.   Plaintiff consumer creditors sustained injuries when canceling an unrelated, closed loan to, accept the loan proffered by debtors agents.

138.   Truth in Lending Act derives its authority from Title 12, Banks and Banking, Chapter II-Federal Reserve System, Subchapter A - Board of Governors of the Federal Reserve System, Part 226.1, and Authority. This regulation, known as Regulation Z, is issued by the Board of Governors of the Federal Reserve System to implement the federal Truth in Lending Act, which is contained in title I of the Consumer Credit Protection Act, as amended, 15 U.S.C. § 1601 *et seq., and* implements title XII, section 1204 of the

28

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

Competitive Equality Banking Act of 1987 (Pub. L. 100--86, 101 Stat. 552), and has the

(b) *Purpose* promote the informed use of consumer credit by requiring disclosures about its

terms and cost. The regulation also gives consumers the right to cancel certain credit

transactions that involve a lien on a consumer's principal dwelling, and provides a means for

fair and timely resolution of credit billing disputes.

139.    Defendants fraudulent alteration to material loan disclosures, those which occurred

over a span and course of time and that included imposition of undisclosed, forced placed

PMI insurance, constituting a "***Material Alteration to the Loan Terms***" but indisputably

represents "Material Disclosure Violations" under TILA as do all other like violations as

plead above in this adversary complaint.

140.    Debtor was charged with knowing the required and mandated disclosures had been

procured and fabricated by the debtors agents acts of fraud and that these documents were

forged and or forged and altered after the closing of the loan and could not have been given

as plead.

141.    The debtor knew or had cause to know they were imposing illegal loan cost never

disclosed as mandated by TILA and clearly failed to make these mandated disclosures at the

closing of the loan and that doing said would cause undue hardship and confusion to say the

least but clearly represents a Wonton, Willful, Non-Disclosure Event as defined by TILA

pursuant to 15 U.S.C. § 1607, and that the debtor and their agents acted at all times to

intentionally Not Disclose the loan as these actions so very well did. The debtors are liable

to plaintiffs under the "Act" for their "Willful and Knowing Refusal to Make Mandated

TILA Disclosures".

142.    The fraudulent imposition of the forced placed PMI insurance constitutes a *"Material Alteration to the Loan Terms"* and, was clearly for the fraudulent purposes of extorting plaintiffs property upon executing these alterations therefore represents the charges were further patently false.

143.    The forged and altered documents are incapable of providing clear, conspicuous and meaningful disclosure of the real cost of the loan being offered and the true loan terms as otherwise Mandated by the "Act".

144.    Debtors would not have been exempt from providing the PMI, First Payment and Escrow Disclosures prior to the loan closing or, at minimum, at the closing itself.  These disclosures were never made prior to accepting the loan and amount to undisclosed interest and real cost of the loan not otherwise disclosed prior to closing on September 15, 2003 and therefore is in violation of TILA.

145.    These forged documents attempt to place debtor ALS at the closing as of September 15, 2003 however, and of course, this being impossible; by their own admission, they did not acquire the loan until September 30, 2003, therefore, ALS could never have made the backdated and forged disclosures.  Debtor LBHI relied on these frauds and benefited from these frauds and wonton, willful violations of TILA Mandates.

146.    Plaintiff creditors have received some of the forged disclosures piecemeal over a span of several years time; this process of disclosure, if it can even be called that, is in direct conflict with the debtors obligations and duties under the "Act".

147.    Plaintiffs justly maintain all the true cost of the loan were never disclosed and also assert the APR, Amount Finance, Total of Payments and Payment Schedules and Total Cost of the Credit, were incorrectly disclosed.

148.   Debtor LBHI had knowing of these frauds and alterations at a minimum, upon inspection of the mortgage file and further again upon, timely issuance of Plaintiffs rescission on August 7, 2006 and the debtors refusal to rescind.

149.   Upon plaintiffs issuance of their just rescission on August 7, 2006, less then three years from the closing of the loan, and in defensive reply to violations discovered upon the debtors second fraudulent action to fraudulently deprive plaintiffs of their property.

150.   On information and belief based on the Anton Valukas Report, Plaintiffs loan was placed on the debtors ALS, LBSFB daily asset and liabilities reports sent to LBHI Corporate Office, indicating the asset had become a liability and that LBHI would have to repurchase and remove the loan from the investment trust pool in which it had been purportedly sold into.

151.   Debtor LBHI controlled the daily business activities of his junior thrifts investment divisions, guaranteeing and funding credit accounts for his junior thrifts to originate loans for LBHI to resell on the secondary market and upon information and belief and the Anton Valukas Report, the debtor was responsible to manage and instruct his agents, employees, junior thrifts and servicers to file the canceling documents on or about August 23, 2006, and to make tender there after of all cost and interest, and anything given or taken in consideration of the loan with these charges being due to be applied to plaintiffs principal loan balance through at a minimum recoupment.

152.   The debtor refused to make tender.

153.   Plaintiffs have sustained substantial, continued injuries as a direct and proximate result of debtors failure to provide the consumer plaintiffs with all "Material Disclosures" as to the true "Schedule of Payments", the correct "Payment Schedules and Amounts", "Annual

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

Percentage Rate of Interest", the "Amount Financed" and the "Total Cost of Credit" and All Consumer Mandated Notices therein.

154.   Based on the Altered Documents set out above in this adversary complaint, plaintiff creditors were entitled to receive additional, New Notice of Right of Rescission for the loan terms imposed by the debtors acts of "forgery and alteration" and as otherwise prescribed by law and for all these reasons and the above plead reasons, plaintiffs were justified in issuing their Notice of Rescission of the Transaction on August 7, 2006.

155.   Plaintiffs at all times relevant thereto aggressively sought out a payoff balance from defendants reflecting the affects of the rescission so that the plaintiffs could tender any balance, if any that may be remaining to the debtors.

156.   The debtors refused to ever issue a payoff statement or the required canceling documents presumably, at instruction of the corporate offices instructions, defendant debtor LBHI.   Given the debtor was more then made aware of the rescission on the daily Asset and Liabilities Reports sent to LBHI Corporate Offices and very well knew the consequences for their frivolous refusal to rescind.

157.   Debtors failure to take action to reflect the termination of the security interest in the plaintiffs Residence within twenty (20) days of the rescission of the Transaction, releases the plaintiff creditor consumers from any liability whatsoever to LBHI or any of their agents.

158.   Pursuant to 15 U.S.C. §1625(b), the debtor and his agents were mandated to either rescind the loan transaction and take necessary steps to reflect the termination of the loan, or alternately, by way of filing an injunctive relief action wherein the objecting creditor seeks out a ruling from the courts as to the validity of the consumers complaints to rescind; the debtors decision to forego this vital creditor mandated remedy bars the defendants from

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

raising those waived defenses, (though in light of this cases circumstance and the extent of the loan alterations, any defense would be totally frivols based and clearly lacking in merit).

**WHEREFORE, (Prayer for Relief is Consolidated with Claims Six and Sevens Prayer of Relief)**;

### Sixth Claim —TILA Damages

159.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 158 of this Complaint as if fully set forth herein.

160.    The extended right of rescission lasts 3 years from the date of the closing of the loan or until actual disclosures are made. 12 C.F.R. 226.23(a)(3). *Semar v. Platte Valley Fed. S&L. Assn.*, 791 F.2d 699 (9th Cir. 1986).

161.    Debtor by and thru his agents, failed to ensure necessary mandated TILA Disclosures were made and that the steps of rescission were taken to terminate the debtors security interest in the plaintiffs Residence or, to otherwise comply with the August 7, 2006 Rescission Notice. These inactions of the debtors and their refusal to rescind violated TILA.

162.    The defendants meet the knowing violation standard rule under the "Act".

163.    The debtors willful refusal to carry out the mandates under TILA are criminal violations in and of itself of the Act pursuant to 15 U.S.C. §1611.

164.    The debtor is civilly liable to these consumers under 15 U.S.C. §1640.

165.    15 U.S.C. §1640 is not a statute of repose therefore equitable tolling must be read into the application of this statue and thus is amenable to equitable tolling for the failure to comply with the Truth-In-Lending Act following receipt of the August 7, 2006 Rescission Letter.

**WHEREFORE, (Prayer for Relief is Consolidated with Claims Sevens Prayer of Relief)**;

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

### *Seventh Claim- TILA Recoupment*

166.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 165 of this Complaint as if fully set forth herein.

167.    Due to the debtors refusal and systematic failure to provide all of the required, Material TILA disclosures, including the Notice of Right of Rescission, described above, (as distinguished, from the defendants violation of TILA by failing to comply with the August 7, 2006 Rescission Letter), the Plaintiffs are entitled to recoup the statutory civil penalties provided by 15 U.S.C. §1640 against any claim which may be allowed in favor of the plaintiffs.

168.    However, even though a party could be barred by the passage of time from making a claim as an affirmative assertion, an allegedly injured consumer may, under certain circumstances meet when plaintiffs rescinded the loan and, when plaintiffs filed their first affirmative, compulsory Counter Complaint, thus asserting that claim as a defense by way of recoupment.

169.    Pursuant to 15 U.S.C. § 1640 (e), "counterclaims to recover damages under TILA are timely to the extent such damages might offset any remaining sums after the application of timely rescission" and awards for damages for creditor violations.

170.    Pursuant to New York C.P.L.R. 203 § (d), claims and defenses that arise out of the same transaction as a claim asserted in the complaint are not barred by the Statute of Limitations, even though an independent action by defendant might have been time-barred at the time the action was commenced, (though no bar exist upon apply the relation back to requirements). The provisions of C.P.L.R. 203 § (d), is to allow a defendant to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint.

34

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

**WHEREFORE THE CONSUMER PLAINTIFF CREDITORS,** request this court:

1. Assumes jurisdiction over this case and these claims.

2. Declare that:

    a. Plaintiff Consumers validly rescinded the Transaction by their Rescission Letter and Did So Timely;

    b. The Plaintiff Consumers are not liable for any finance charge or other charges arising from the transaction;

    c. The Plaintiff Consumers have no liability whatsoever arising from the transaction due to debtor LBHI failure to take timely, appropriate action in response to the Rescission Letter;

3. Order Defendant to terminate the security interest in the Residence;

4. Enter judgment in favor of the Plaintiff Consumers against LBHI in the amount of $2,000 pursuant to 15 U.S.C. §1640;

5. Declare that the Debtor is entitled to recoup the statutory civil penalty of $2,000 provided by 15 U.S.C. §1640(a) (2);

6. Award the Plaintiff Consumers Civil Penalties of Treble Damages for Knowing Violations of the Act ;

7. Award Plaintiff Consumers reasonable attorney fees and cost;

9. Award the Plaintiff Consumers any and all other such relief the court deems proper and in the interest of justice.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. – Multi Count Complaint*

## Ninth Claim - Plaintiffs be Deemed Secured Creditors and
## Due Priority Treatment of Claims

171.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth in the foregoing paragraphs 1 through 170 of this Complaint as if fully set forth herein.

172.    The purported instruments secured by plaintiff creditors home constitutes a Secured Claim under the Bankruptcy Code.

173.    Secured claims are defined as including "liens," 11 U.S.C. § 101(37), "security," 11 U.S.C. § 101(49), "security interest," 11 U.S.C. § 101(51), "security agreement" 11 U.S.C. § 101(50), and "secured claim," 11 U.S.C. § 506(a).

174.    Plaintiff creditors declare their claims as being ones that are secured by a lien on the subject property and in which event the estate has an interest that cannot be avoided, and that is subject to setoff, therefore is, a "secured claim" to the extent of the value of plaintiff creditor's interest, which is the estate's interest in the property, or the amount subject to setoff. 11 U.S.C. § 506(a).

175.    A secured claim carries the right to "adequate protection" of collateral. 11 U.S.C. §§ 361-364; see United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365 (1988).

176.    As a direct and proximate result of debtors fraudulent "Material Alterations", they failed to make "All Mandated and Necessary Consumer Material Truth in Lending Disclosures as Mandated", therefore Arnold and Cotten timely exercised their extended right of rescission of the mortgage.

**WHEREFORE THE CONSUMER PLAINTIFF CREDITORS,** pray for an Order Declaring Plaintiffs as Secured Creditors and granting their claims priority and adequate protections thereof and all other relief this court deems just and proper.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. -- Multi Count Complaint*

## Ninth Claim - Plaintiff Creditors Claims Are Exempted
## From Discharge Pursuant to §523(a)(2)(A)

177.    Plaintiffs repeat, re-allege and incorporate herein by reference the allegations set forth

in the foregoing paragraphs 1 through 176 of this Complaint as if fully set forth herein.

178.    Plaintiff maintain pursuant to FBR §523(a)(2)(A), exception from discharge, all

liability arising from fraud, and imposes treble damages (plus attorney's fees and costs), and

are due to be awarded on account of the debtor's fraud, falling within the scope of the

exception. The most straightforward reading of §523(a)(2)(A) is that it prevents discharge of

"any debt" respecting "money, property, services, or … credit" that the debtor has

fraudulently obtained. See *Field* v. *Mans,* 516 U.S. 59, 61, 64.

179.    Moreover, §523(a)'s various exceptions from discharge reflect Congress' conclusion

that the creditors' interest in recovering full payment of debts in these categories outweighs

the debtors' interest in a complete fresh start, see *Grogan* v. *Garner,* 498 U.S. 279, 287.  Pp.

4—10.106 F.3d 52, affirmed. O'Connor, delivered the opinion for a unanimous Court.

180.    The parties to a contract and all assigns and party of interest, have a duty to honor

their obligations therein and as direct result of the nature of their business, one of Banking

and Investment Business, plaintiff creditors were owed and due an implied "duty of good

faith and fair dealing" in their dealings with the debtor.

181.    Purchasers of the Deeds of Trust or Mortgage Notes or security interest therein, that

liability for frauds in the making of the altered loan over the course of time, as here, where

the originators were the debtor and their agents, servicers etc..

182.    Plaintiffs loans involved money, credit, services and property in that their loans were

originated for resale by debtor LBHI and his investment banking division BFS Eastern

37

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Adult Count Complaint*

Investment Management Division at Lehman Bank, therefore clearly extending liability, from the lender to a third Party and when, as in this instant case, ***those parties knowingly accepts the "fruits of the fraud."*** as all debtor here clearly had when each accepted the others alterations to the loan terms and instruments and the benefits they received therefore accepting further those frauds fruits.

182.    The Supreme Court of the United States has ruled, "It is not only the actual value of the "money, property, services, or . . . credit" the debtor obtained through fraud that is non-dischargeable in bankruptcy, but also treble "punitive damages", attorneys fees and costs related to the fraud. The honorable supreme courts made this painfully clear when handing down their ruling on March 25, 1998 and contained in their decision in <u>Cohen v. de la Cruz</u>, citing particularly, "Debts which can't be discharged in bankruptcy….(1) Debts incurred due to false statements and made with the intent to deceive, (2) Fraud committed in a fiduciary capacity, such as embezzlement or larceny and (3) Punitive damage claims for "willful and malicious" acts. The Defendant meets the requirements here.

**WHEREFORE PLAINTIFFS,** pray this court finds plaintiffs claims are exempted from discharge and that this court awards Treble Punitive Damages on all claims except the Fourth Claim in this Adversary complaint, and find an award of court cost, attorney fees, and all other such relief as deemed to be just and due.


Respectfully Submitted,

Kathleen Arnold and Timothy A. Cotten, Pro Se,
Plaintiff Creditors

38

## VERIFICATION

We the Plaintiff Creditors, Pro Se, Kathleen Arnold and Timothy A. Cotten, have read the foregoing Complaint, and are informed and thereon believe and allege the matters stated in it are true, and are of our own knowledge. We declare under the penalty of perjury under the laws that the foregoing facts are true and correct.

Kathleen Arnold and Timothy A. Cotten, Pro Se,
Plaintiff Creditors

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

*Kathleen Arnold and* &sect;
*Timothy A. Cotten, Creditors* &sect;
*9543 North Side Drive* &sect;
*Owings, Maryland 20736* &sect;
*Phone: 410.257.5283* &sect;
&sect;
&sect;



&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;
&sect;
**IN RE:** &sect;   **Chapter 11**
&sect;
**LEHMAN HOLDINGS INC. et al.** &sect;
**Debtor,** &sect;   **Jointly Administered**
&sect;   **Under Case No. 08-13555 (JMP)**
&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;&sect;

## MULTI COUNT ADVERSARY COMPLAINT

## ADVERSARY COMPLAINT U.C.C. § 3-202 NEGOTIABLE INSTRUMENTS AND U.C.C. § 3-204(a)(b) AFFIXATION VIOLATIONS, QUIET TITLE, TRUTH IN LENDING, AND RELATED CAUSES OF ACTION AGAINST DEBTOR, LEHMAN BROTHERS HOLDINGS INC., et al.

## EXHIBITS

1.  Recorded Deed of Trust, Note-Post Closing and With Alterations;
2.  January 4, 2004 Fax Transmission From Ms Patterson of BFS-Eastern, Lehman Bank Purporting to Request Affirmation of Arnolds Signature;
3.  Letter From Aurora Loan Services Confirming PMI was Never Disclosed **And,**
    b.  Substantiates Aurora Loans Services Was Note Owner of Note at Closing and Could Never Have Made Forged and Backdated Purported PMI Disclosures;
4.  Rescission Letter Within 3 Year Extended Right of Rescission, Or **Alternately,** § U.C.C. 3-202;
5.  Alterations of Instruments and Disclosures; In Contrast to Recorded Instrument Which Purports to Have Used FNMA Form 3138 1/01,(This Exhibits form is 3520), And Goes Right to No. 4, Interest Rate and Monthly Payment Changes and Has No # 5,(This form undertakes No. 1 thru 3 First and has No. 5 Type-Over and Only bears Arnolds signature); **And,**

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - MultiCount Complaint*

    b.   Addendum to Note,( Recorded is Addendum to Adjustable Rate Rider),Which Has No Min No. And Only Has Purported Initial of Arnold, No Cotten, No Witness of Constance Wallace and Date of 9/15/2003;

    c.   Interest Only Addendum To Adjustable Rate Promissory Note, Has Payment as $ 1,542.19 and Contains Signature that Does Not Resemble to Plaintiff Arnold, (The Recorded Document Contains Arnold and Cottens Signatures And Evidences Arnolds was cut and pasted in using computer software);

    d.   ALS Purported First Payment Letter Adds PMI and Changes Payment Amount Again, (ALS Could Not Make Disclosure on 9/15/2003), and Signature and Date Applied by Alteration);

    e.   ALS Purported Escrow Disclosures on 9/15/2003 and Changes Payment Amount Again, (ALS Could Not Make Disclosure on 9/15/2003);

    f.   LBFS Purported Initial PMI Disclosure - Again Signature Applied, Noting all and any disclosing containing 9/15/2003 is believed to have been forged using deceptively obtained, Arnolds Signature Affidavit;

6.    ALS purporting to transfer to servicer, CitiMortgage Inc. **And,**

    b.   Exhibits Alteration to Loan Number Changing From ALS, 0016108615 to, New CitiMortgage Inc. New Loan Number 0626414260;

7.    Recorded Purported Appointment of Substitute Trustee and Assignment to Trustee **And,**

    b.   Exhibits Alteration of New Loan Number Assigned, 626414260.

*Cotten & Arnold et. al., Creditors v. Lehman Brothers Holding Inc. - Multi Count Complaint*

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ***Kathleen Arnold and*** §<br>***Timothy A. Cotten, Creditors*** §<br>***9543 North Side Drive*** §<br>***Owings, Maryland  20736*** §<br>***Phone: 410.257.5283*** §<br>§<br>§ | |

§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§
§
**IN RE:**                                  §   **Chapter 11**
§
**LEHMAN HOLDINGS INC. et al.** §
                              Debtor,   §   **Jointly Administered**
                                            §   **Under Case No. 08-13555 (JMP)**
§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§§

## MULTI COUNT ADVERSARY COMPLAINT

## ADVERSARY COMPLAINT U.C.C.  § 3-202 NEGOTIABLE INSTRUMENTS AND U.C.C. § 3-204(a)(b) AFFIXATION VIOLATIONS, QUIET TITLE, TRUTH IN LENDING, AND RELATED CAUSES OF ACTION AGAINST DEBTOR, LEHMAN BROTHERS HOLDINGS INC., et al.

## EXHIBITS

1.      Recorded Deed of Trust, Note-Post Closing and With Alterations;

BK 0 2 0 0 1 P 0 0 3 8

Return To:  **AURORA LOAN SERVICES INC.**
**601 5TH AVENUE, P.O. BOX 4000**
**SCOTTSBLUFF, NE 69363**

Prepared By:  **RICHARD THORNTON**
**AURORA LOAN SERVICES**
**400 PROFESSIONAL DRIVE, SUITE 100**
**GAITHERSBURG, MD 20879**

ESCROW #:
LOAN #: 0016108615

———————— [Space Above This Line For Recording Data] ————————

REFINANCE

# DEED OF TRUST

MIN  **100025440001219846**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated  **September 15, 2003**
together with all Riders to this document.
(B) "Borrower" is  **KATHLEEN ARNOLD** and Timothy A. Cotten

Borrower is the trustor under this Security Instrument.
(C) "Lender" is  **LEHMAN BROTHERS BANK, FSB, A FEDERAL SAVINGS BANK**

Lender is a  **Corporation**
organized and existing under the laws of  **UNITED STATES OF AMERICA**

**MARYLAND**-Single Family- Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT WITH MERS**    Form 3021 1/01

-6A(MD) (0005)

Page 1 of 15        Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

**Martin C. Dennis**
ATTORNEY-AT-LAW
P. O. Box 151
Dunkirk, Maryland 20754

Lender's address is    **400 PROFESSIONAL DRIVE, SUITE 100 , GAITHERSBURG, MD 20879**

**(D) "Trustee"** is  **RICK SKOGG**

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated  **September 15, 2003**
The Note states that Borrower owes Lender

**THREE HUNDRED FIFTEEN THOUSAND & 00/100**                                    Dollars
(U.S. $        **315,000.00**   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    **October 1, 2033**
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☒ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |
| | | **PREPAY/** |
| | | **REFINANCE ADDENDUM** |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

-6A(MD) (0005)                          Page 2 of 15          Initials: _____          Form 3021  1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County                                  of    Calvert                                  :
   [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]

**All that tract or parcel of land as shown on Schedule "A" attached
hereto which is incorporated herein and made a part hereof.**

This deed of trust is being made to payoff the existing deed of trust secured by the within described property which deed of trust is recorded among the Land Records of Calvert County, Maryland in Liber 1034, Folio 280 , and the aforesaid borrowers are the original grantors on said deed of trust. The remaining principal balance of the present deed of trust as of the date hereof is $135,090.26 *     . The property described herein is the principal residence of the within borrowers. This deed of trust is not being made as part of a commercial or business transaction.

*and a deed of trust recorded at Liber 1551, Folio 80, having a remaining principal balance of $55,437.97.

Parcel ID Number:                                    which currently has the address of
   **9543 NORTH SIDE DRIVE**                                                [Street]
   **OWINGS**                          [City], Maryland      **20736**    [Zip Code]
("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(MD) (0005)                    Page 3 of 15                    Form 3021  1/01

Initials: ___

CV CIRCUIT COURT (Land Records) [MSA CE 4-2120] KPS 2001, p. 0040. Printed 02/18/2011. Online 05/11/2004.

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any

-6A(MD) (0005)                        Page 4 of 15                Initials: _____                    Form 3021  1/01

or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within

CV CIRCUIT COURT (Land Records) [MSA CE 4-2120] KPS 2001, p. 0042. Printed 02/18/2011. Online 05/11/2004.

10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to

-6A(MD) (0005)    Page 6 of 15    Initials: _____    Form 3021  1/01

Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys'

Initials: _Jac_ _V_

-6A(MD) (0005)                    Page 7 of 15                    Form 3021  1/01

fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6A(MD) (0005)                    Page 8 of 15                    Initials: _____    Form 3021  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

CV CIRCUIT COURT (Land Records) [MSA CE 4-2120] KPS 2001, p. 0046. Printed 02/18/2011. Online 05/11/2004.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(MD) (0005)    Page 10 of 15    Initials: _____    Form 3021 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection

with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the**

CV CIRCUIT COURT (Land Records) [MSA CE 4-2120] KPS 2001, p. 0049. Printed 02/18/2011. Online 05/11/2004.

default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale, assent to decree, and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall mail or cause Trustee to mail a notice of sale to Borrower in the manner prescribed by Applicable Law. Trustee shall give notice of sale by public advertisement and by such other means as required by Applicable Law. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale and by notice to any other persons as required by Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, Trustee's fees of 5                        % of the gross sale price and reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

Borrower, in accordance with Title 14, Chapter 200 of the Maryland Rules of Procedure, does hereby declare and assent to the passage of a decree to sell the Property in one or more parcels by the equity court having jurisdiction for the sale of the Property, and consents to the granting to any trustee appointed by the assent to decree of all the rights, powers and remedies granted to the Trustee in this Security Instrument together with any and all rights, powers and remedies granted by the decree. Neither the assent to decree nor the power of sale granted in this Section 22 shall be exhausted in the event the proceeding is dismissed before the payment in full of all sums secured by this Security Instrument.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender or Trustee, shall release this Security Instrument and mark the Note "paid" and return the Note to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Possession of the Property.** Borrower shall have possession of the Property until Lender has given Borrower notice of default pursuant to Section 22 of this Security Instrument.

-6A(MD) (0005)                    Page 13 of 15          Initials: _____        Form 3021  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                        KATHLEEN ARNOLD        -Borrower

_____        _____ (Seal)
                                        Timothy A. Cotten      -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                                    -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                                    -Borrower

_____ (Seal)    _____ (Seal)
                   -Borrower                                    -Borrower

⬭ -6A(MD) (0006)              Page 14 of 15              Form 3021  1/01

**STATE OF MARYLAND,**    Calvert    County ss:

I Hereby Certify, That on this    15th    day of Sept., 2003    , before me, the subscriber, a Notary Public of the State of Maryland, in and for the County aforesaid personally appeared    Kathleen Arnold and Timothy A. Cotten

known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledge that he/she/they executed the same for the purposes therein contained.

AS WITNESS: my hand and notarial seal.

My Commission Expires:    7-1-04

Notary Public    Martin C. Dennis

**STATE OF**    Maryland    ,    Calvert    County ss:

I Hereby Certify, That on this    15th    day of    Sept., 2003    ,before me, the subscriber, a Notary Public of the State of    Maryland    and for the County aforesaid personally appeared    Martin C. Dennis

the agent of the party secured by the foregoing Deed of Trust, and made oath in due form of law that the consideration recited in said Deed of Trust is true and bona fide as therein set forth and that the actual money advanced at the closing transaction by the secured party was paid over and disbursed by the parties secured by the Deed of Trust to the Borrower or to the person responsible for disbursement in the closing transaction or their respective agent at a time not later than the execution and delivery of the Borrower of this Deed of Trust; and also made oath that he is the agent of the party or parties and is duly authorized to make this affidavit.

AS WITNESS: my hand and notarial seal.

My Commission Expires:    6-1-04

Notary Public Deborah C. Cox

This is to certify that the within instrument was prepared  by Lehman Brothers Bank, one of the parties hereto.

Martin C. Dennis, Agent

-6A(MD) (0005)    Page 16 of 16    Initials:    Form 3021  1/01

## EXHIBIT "A"

BEING KNOWN AND DESIGNATED AS Lot Numbered Twenty (20), as shown on the plat entitled "PLAT FOUR - SECTION ONE, CLEARVIEW NORTH", as per plat recorded among the Land Records of Calvert County, Maryland in Liber 4, Folio 311.

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this **15th** day of **September, 2003**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
**LEHMAN BROTHERS BANK, FSB**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **9543 NORTH SIDE DRIVE, OWINGS, MARYLAND 20736**

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of **5.875** %. The Note provides for changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of **October , 2008**, and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**MULTISTATE ADJUSTABLE RATE RIDER-LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -Single Family-Fannie Mae Uniform Instrument**

**838R** (0006)      Form 3138 1/01
Page 1 of 4        Initials:
VMP MORTGAGE FORMS - (800)521-7291

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND 25 HUNDREDTHS** percentage points ( **2.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **11.875** % or less than **2.250** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage points ( **2.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **11.875** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

Initials: _____

838R (0006)          Page 2 of 4          Form 3138 1/01

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials: _____

838R (0006)                    Page 3 of 4                    Form 3138 1/01

CV CIRCUIT COURT (Land Records) [MSA CE 4-2120] KPS 2001, p. 0056. Printed 02/18/2011. Online 05/11/2004.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
KATHLEEN ARNOLD          -Borrower

_____ (Seal)
Timothy N. Cotten         -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

-838R (0006)                    Page 4 of 4                    Form 3138 1/01

# PREPAYMENT RIDER
## *(Multi-state)*

This Prepayment Rider is made this __15__ day of ___September___, 2003 and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to __LEHMAN BROTHERS BANK, FSB__ (the "Lender") of the same date and covering the property described in the Security Instrument and located at __9543 NORTH SIDE DRIVE OWINGS, MARYLAND 20736__ (the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

**If, within the __3__ -year period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any twelve (12)-month period that exceeds 20% of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a six (6)-month period on the amount prepaid that exceeds 20% of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first __0__ year(s) of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____(Seal)              _____(Seal)
Borrower **KATHLEEN ARNOLD**                    Borrower Timothy A. Cotten

_____(Seal)              _____(Seal)
Borrower                                        Borrower

## INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NUMBER:    **0016108615**

PROPERTY ADDRESS: **9543 NORTH SIDE DRIVE
OWINGS, MARYLAND 20736**

THIS ADDENDUM is made this **15th** day of **September**, 2003            and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this Addendum executed by the undersigned and payable to **LEHMAN BROTHERS BANK, FSB, 400 PROFESSIONAL DRIVE, SUITE 100, GAITHERSBURG, MD 20879**
(the Lender).

THIS ADDENDUM supersedes Section 4(C) of the Rider.  None of the other provisions of the Note are changed by this Addendum.

### 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES
####    (C)    Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding **2.25**            percentage point(s) ( **2.25** %) to the Current Index for such Change Date.  The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During the Interest-Only Period, the Note Holder will then determine the amount of the monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly payments over the remaining term of the Note.  The result of this calculation will be the new amount of my monthly payment.  After the end of the Interest-Only Period, my payment amount will not be reduced due to voluntary prepayments.

Dated:    **9/15/03**

KATHLEEN ARNOLD

Timothy A. Cotten

## ADDENDUM TO ADJUSTABLE RATE RIDER

This addendum is made  **September 15 , 2003**  and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:
**9543 NORTH SIDE DRIVE , OWINGS , MARYLAND 20736**

**AMENDED PROVISIONS**

In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

### ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than  **11.875** % or less than  **2.250**  %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than  **TWO**  percentage point(s) (  **2.000**  %) from the rate of interest I have been paying for the preceding six (6) months. My interest rate will never be greater than  **11.875**  %. My interest rate will never be less than  **2.250**  %.

### TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

In Witness Thereof, Trustor has executed this addendum.

_Constance R. Wallace_
Witness

_9/15/03_
Date

_9/15/03_
Date

_Date_

_Date_

KATHLEEN ARNOLD

Timothy A. Cotten

JS 44 (Rev. 12/07)    **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Timothy A. Cotten and Kathleen Arnold, Pro Se, Phone No.(410).257.5283 543 North Side Drive, Owings, Maryland 20736 | Lehman Brothers Holding Inc. 745 7th Ave. in New York, NY 10019 |

**(b)**  County of Residence of First Listed Plaintiff   Calvert County Maryland
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New York, New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)
Proceeding Pro Se

Attorneys (If Known)

**II. BASIS OF JURISDICTION**   (Place an "X" in One Box Only)

☒ 1   U.S. Government Plaintiff
☐ 2   U.S. Government Defendant
☐ 3   Federal Question (U.S. Government Not a Party)
☐ 4   Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☒ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage - | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN**   (Place an "X" in One Box Only)

☒ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from another district (specify)
☐ 6   Multidistrict Litigation
☐ 7   Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Fed. Bkr Rule 7001 Adversary Proceeding
Brief description of cause:
U.C.C. 3-407 Alteration of Instrument, U.C.C. 3-202 Negotiable Instrument and TILA Violations and Other Claims

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**   (See instructions):
JUDGE   Honorable. James M. Peck
DOCKET NUMBER   Case No. 08-13555 (JMP)

DATE   02/23/2011
SIGNATURE OF ATTORNEY OF RECORD   Kathleen Arnold, Pro Se

FOR OFFICE USE ONLY

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____