**Hearing Date and Time (Only if Objection Filed):  March 23, 2011 at 10:00 a.m.**
**Objection Deadline:  March 16, 2011 at 4:00 p.m.**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert C. Micheletto
Benjamin Rosenblum

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Carl E. Black

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                        :
In re:                                  :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    Case No. 08-13555 (JMP)
                                        :
                Debtors.                :    (Jointly Administered)
                                        :
------------------------------------------------------------x
```

## NOTICE OF MOTION OF DEBTORS AND DEBTORS
## IN POSSESSION, PURSUANT TO SECTIONS 105 AND 363
## OF THE BANKRUPTCY CODE AND FEDERAL RULES
## OF BANKRUPTCY PROCEDURE 2002, 6004 AND 9014, FOR AN
## ORDER APPROVING THE SALE OF SHARES OF QUADRANT STRUCTURED
## PRODUCTS COMPANY, LTD. AND GRANTING CERTAIN RELATED RELIEF

**PLEASE TAKE NOTICE** that a hearing on the annexed Motion of Debtors and Debtors

in Possession, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of

Bankruptcy Procedure 2002, 6004 and 9014, for an Order Approving the Sale of Shares of

Quadrant Structured Products Company, Ltd. and Granting Certain Related Relief

(the "Motion"), all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **March 23, 2011 at 10:00 a.m. (Prevailing Eastern

Time)** (the "Hearing").

     **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in

writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the

Bankruptcy Court for the Southern District of New York, shall set forth the name of the

objecting party, the basis for the objection and the specific grounds thereof, shall be filed with

the Bankruptcy Court electronically in accordance with General Order M-242 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing

system and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document

Format (PDF), Microsoft Word, or any other Windows-based word processing format (with two

hard copies delivered directly to Chambers), and shall be served upon (i) the Chambers of the

Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601;

(ii) Jones Day, 222 East 41st Street, New York, New York 10017 (Attn:  Robert C. Micheletto

and Benjamin Rosenblum) and Jones Day, North Point, 901 Lakeside Avenue, Cleveland, Ohio

44114 (Attn:  Carl E. Black) attorneys for the Debtors; (iii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York 10004 (Attn:  Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and

Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza,

New York, New York 10005 (Attn:  Dennis F. Dunne, Dennis O'Donnell, and Evan Fleck)

attorneys for the official committee of unsecured creditors appointed in these cases; and

(v) Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017

(Attn: Juliet Cain and Timothy Graulich), attorneys for Quadrant Structured Products

Company, Ltd., so as to be received no later than **March 16, 2011 at 4:00 p.m. (Prevailing**

**Eastern Time)** (the "Objection Deadline").

      **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received

by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy

Court may enter an order granting the relief sought without a hearing.

      **PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the

Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:    February 28, 2011           Respectfully submitted,
          New York, New York

                                        /s/ Benjamin Rosenblum
                                        Robert C. Micheletto
                                        Benjamin Rosenblum
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York  10017
                                        Telephone:  (212) 326-3939
                                        Facsimile:  (212) 755-7306

                                        and

                                        Carl E. Black
                                        JONES DAY
                                        North Point
                                        901 Lakeside Avenue
                                        Cleveland, Ohio  44114
                                        Telephone:  (216) 586-3939
                                        Facsimile:  (216) 579-0212

                                        ATTORNEYS FOR DEBTORS AND
                                        DEBTORS IN POSSESSION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert C. Micheletto
Benjamin Rosenblum

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Carl E. Black

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                              :
In re:                                                        :    Chapter 11
                                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :    Case No. 08-13555 (JMP)
                                                              :
                                          Debtors.     :    (Jointly Administered)
                                                              :
-------------------------------------------------------------x

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO
SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL
RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 9014, FOR AN
ORDER APPROVING THE SALE OF SHARES OF QUADRANT STRUCTURED
PRODUCTS COMPANY, LTD. AND GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc.

("LCPI"), as debtors and debtors in possession (together with their affiliated debtors in the

above-captioned chapter 11 cases, the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman"), respectfully represent as follows:

## Background

1.      Commencing on September 15, 2008 (the "Petition Date") and periodically thereafter, the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases (collectively, the "Bankruptcy Cases") have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner").  By order dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.  On March 11, 2010, the Examiner filed its report with the Court [Docket No. 7531].

5.      On January 25, 2011, the Debtors filed their first amended joint chapter 11 plan [Docket No. 14150] and disclosure statement for their first amended joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 14151].

6.      Additional information regarding the Debtors' businesses, capital structures and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## **Jurisdiction**

7.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## **Relief Requested**

8.      Pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, LBHI and LCPI (collectively, the "Selling Debtors") hereby seek authority to consummate the sale (the "Sale") of 80,000 voting, participating shares, par value U.S. $0.01 per share, of Quadrant Structured Products Company, Ltd. (the "Purchaser"), a Cayman Islands exempted company, designated as Class A Shares (collectively, the "Shares"), to the Purchaser pursuant to a purchase agreement substantially in the form attached hereto as Exhibit A (the "Purchase Agreement"), for $90,000,000 in cash consideration and certain related relief.[1]  A declaration of Andrew Grapkowski, Managing Director - Private Equity and Principal Investments of LAMCO LLC, a subsidiary of LBHI, describing LBHI's investment in the

---

[1]      The proceeds of the Sale will be paid to the Selling Debtors jointly and will be held by the Selling Debtors pending the resolution of the rights of each Selling Debtor to such proceeds.

Purchaser and the Selling Debtors' decision to enter into the Purchase Agreement is attached hereto as Exhibit B (the "Grapkowski Declaration").

**Proposed Sale of the Shares**

9.      LBHI and Magnetar MQ Ltd. ("Magnetar") formed the Purchaser, a credit derivatives product company, in October 2007.  In return for an investment of $80 million, LBHI received 80,000 Class A Shares of the Purchaser, representing an approximate 20 percent equity stake in the company.[2]  Magnetar, in turn, contributed $320 million in capital to the Purchaser for which it received an approximate 80 percent interest in the company in the form of 320,000 Class A Shares.  See Grapkowski Declaration ¶ 4.  The balance of the equity in the Purchaser is held by certain members of Purchaser's management (collectively, the "Management Shareholders").  Although the Purchaser's Articles of Association provide for the Purchaser to engage in any business not prohibited by law, the Purchaser was generally created for one purpose; namely, to engage in the business of selling credit protection in the form of credit default swaps.  Id.

10.     In late 2007 or early 2008, shortly after the Purchaser was formed, writing credit protection through credit default swaps, as the Purchaser was established to do, ceased to be a viable business as a consequence of the credit crisis.  At that point, credit derivatives product companies were functionally frozen with their existing portfolios and were unable to sell any new credit protection.  See Grapkowski Declaration ¶ 5.  This remains the case today.  Id. Instead of writing credit protection, the Purchaser subsequently acquired another credit derivatives product company which already had a $25.5 billion credit protection portfolio from another entity.  Id.  Currently, the Purchaser is considering refocusing its business to purchase

---

[2]      Prior to the Petition Date, LBHI transferred an interest in the Shares to LCPI, while retaining record ownership.

additional credit protection portfolios with risk profiles unknown to LBHI, instead of writing credit protection as originally contemplated by LBHI.  Id.

11.     Pursuant to a Shareholders' Agreement (the "Shareholders' Agreement"), dated as of October 3, 2007, among the Purchaser, Magnetar, LBHI and the Management Shareholders (collectively, the "Parties"), each of the Parties maintains certain rights.  On the one hand, the minority shareholder protections embodied in the Shareholders' Agreement provide, inter alia, that LBHI's consent is required for the Purchaser to make certain changes in its business.  See Grapkowski Declaration ¶ 6.  On the other hand, should LBHI seek to sell the Shares, the Shareholders' Agreement provides for certain rights of first refusal in favor of Magnetar and the Purchaser which would continue after any such sale.  Id.

12.     Given (a) the rights of the Parties under the Shareholders' Agreement, (b) the nature of the investment (i.e., a position as a minority holder in a closely-held corporation), (c) the credit risk exposure and leverage (approximately 59 times total capital) in the Purchaser's existing portfolio, (d) the transitioning nature of the Purchaser's business (e) uncertainties related to certain ongoing litigation between one of the Purchaser's subsidiaries and one of that subsidiary's contract counterparties (the "Litigation") and (f) the Debtors' ongoing efforts to liquidate and monetize assets in their estates in an orderly and value-maximizing fashion, the Selling Debtors concluded that (x) it was in their best interest to dispose of the Shares prior to a potential shift in the Purchaser's business focus and (y) the Purchaser would be the most natural buyer.  See Grapkowski Declaration ¶ 7.  After extensive arm's-length negotiations, the Selling Debtors determined that the sale of the Shares to the Purchaser pursuant to the Purchase Agreement would be in the best interests of their estates and creditors.  Id.

## Principal Terms of the Purchase Agreement

13.     The Purchase Agreement provides, in summary, as follows:[3]

- **Purchase Price:**  The Purchaser will acquire all of the Shares (and all interests of the Selling Debtors therein), free and clear of any Encumbrances (as such term is defined in the Purchase Agreement) in exchange for $90,000,000 in cash (the "Purchase Price"), payable at closing.  See Purchase Agreement §§ 2.1, 2.2.

- **Escrow:**  No later than 5:00 p.m. on the third business day after execution of the Purchase Agreement, the Purchaser will deposit the Purchase Price into escrow.  If the closing occurs, the Purchase Price will be delivered to the Selling Debtors (with the investment income thereon being delivered to the Purchaser).  If the Purchase Agreement is terminated, the Purchase Price (along with any investment income thereon) will be returned to the Purchaser.  See Purchase Agreement § 2.3.

- **Modification Agreement:**  In connection with the execution of the Purchase Agreement, LBHI and each of the other shareholders of the Purchaser will enter into an agreement (the "Modification Agreement") to (a) waive any and all rights any party may have with respect to the purchase of the Shares by the Purchaser under the Purchase Agreement and (b) implement procedures whereby LBHI's representative on the Purchaser's board would be replaced by a representative of the Purchaser's majority shareholder in the event that LBHI's board representative resigns.  If the Purchase Agreement is terminated, the Modification Agreement will expire and LBHI will be entitled to redesignate a board representative (in the event that LBHI's representative resigns).  See Purchase Agreement §§ 3.2(b); 3.4(d); Exhibit A.

- **Forbearance from Exercise of Certain Minority Consent Rights:**  Upon the deposit of the Purchase Price into escrow, LBHI has agreed to forbear from exercising certain minority protection rights granted to LBHI under the following sections of the Shareholders' Agreement: (a) 2.11(a)(iv) (any material change in nature and scope of the business of the Purchaser or its subsidiaries); (b) 2.11(a)(vii) (any material acquisition by the Purchaser or any of its subsidiaries); (c) 2.11(a)(ix) (relating to appointment of directors, but only to the extent consistent with paragraphs 3 and 4 of the Modification Agreement); (d) 2.11(a)(ii) (material amendment or repeal of any constituent documents, but only as it

---

[3]     This summary of the Purchase Agreement is intended only to assist the Court and parties in interest in understanding the key aspects thereof and is qualified in its entirety by reference to the Purchase Agreement, as the same may be modified or amended pursuant to any order approving the Sale (any such order, the "Sale Order") or otherwise.  In the event of any inconsistency between this description and the Purchase Agreement, the terms of the Purchase Agreement shall govern.

relates to certain actions taken under sections 2.11(a)(iv), 2.11(a)(vii) or 2.11(a)(ix) of the Shareholders' Agreement); and (e) 2.11(a)(xii) (committing or agreeing to an action covered by the above-referenced sections of the Shareholders' Agreement).  This forbearance will expire upon the termination of the Purchase Agreement; provided, however, that such expiration will not impact actions that the Purchaser has taken or committed or agreed to undertake prior to the termination of the Purchase Agreement.  See Purchase Agreement § 6.3.

- **Releases:**  The Purchase Agreement contemplates that, at the closing of the Sale, the Selling Debtors, Magnetar, the Purchaser and their respective controlled affiliates will exchange mutual releases for any claims arising out of the Selling Debtors' ownership of interests in the Purchaser and their activities in connection therewith.  See Purchase Agreement §§ 3.2(c); 3.3; 3.4(e); Exhibit C.

- **Termination:**  The Purchase Agreement may be terminated:  (a) by the mutual written consent of the Purchaser and the Selling Debtors; (b) by either the Purchaser or the Selling Debtors, upon written notice, if the Sale has not been consummated prior to May 1, 2011; (c) by the Purchaser, upon written notice to the Selling Debtors, if either of the Selling Debtors has breached, or if there is any order or other action modifying, (i) the terms of the Purchase Agreement relating to LBHI's forbearance from the exercise of its minority rights under the Shareholders' Agreement or (ii) the Modification Agreement; (d) by the Selling Debtors, upon written notice, if the Purchaser has not timely deposited the Purchase Price with the escrow agent; or (e) by the Purchaser, upon written notice to the Selling Debtors, if the Selling Debtors have not provided written notice to the Purchaser by 5:00 p.m. Eastern Time, on March 15, 2011 that the LBHI Board of Directors has approved the transactions contemplated by this Agreement.  See Purchase Agreement § 8.1.

- **Indemnification:**  Until the third anniversary of the closing of the Sale, the Selling Debtors shall indemnify, defend and hold the Purchaser (and each of its shareholders, officers, directors, employees, agents, affiliates, representatives, managers, administrators, trustees and attorneys and their respective successors and assigns) (collectively, the "Indemnitees") harmless from and against any damages, losses, liabilities or expenses incurred by any of the Indemnitees (including, but not limited to, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding and any incidental, indirect or consequential damages, losses, liabilities, lost profits or diminution in value associated therewith) as a result, or arising out of a breach, of the representations and warranties set forth in Section 4.5 of the Purchase Agreement, up to a maximum amount equal to the Purchase Price (such indemnity obligations, collectively, the "Indemnification Obligations"), provided that the Selling Debtors shall not be responsible

for the fees and expenses of more than one separate law firm (in addition to Cayman counsel) for all Indemnitees.  Any Indemnification Obligations due and owing under the Purchase Agreement shall be allowed as an administrative expense claim against the bankruptcy estates of each of the Selling Debtors pursuant to section 503(b) of the Bankruptcy Code (any such administrative expense, an "Indemnity Claim").  Any Indemnity Claim shall be payable by the Selling Debtors in the ordinary course of business without the need for (a) the Indemnitees to file an administrative proof of claim or (b) further order of the Court.  Except as expressly provided in the Purchase Agreement or the Sale Order, the Indemnification Obligations shall survive, and shall not be modified, impaired or discharged by:  (x) the entry of an order (i) converting the Bankruptcy Case of either of the Selling Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) dismissing any Bankruptcy Case, (iii) terminating the joint administration of the Bankruptcy Cases or (iv) confirming a chapter 11 plan in either of the Selling Debtors' Bankruptcy Cases; or (y) any other act or omission.  The Selling Debtors have agreed to waive any discharge as to any Indemnification Obligations, as set forth at Section 6.5(b) of the Purchase Agreement, pursuant to section 1141(d)(4) of the Bankruptcy Code.  See Purchase Agreement § 6.5.

- **Maintenance of Certain Insurance Coverage:**  The Purchaser will not, for a period of three years following the closing of the Sale, significantly modify its directors' and officers' liability insurance and fiduciary liability insurance coverage.  See Purchase Agreement § 6.4.

14.    For the reasons described herein, the Selling Debtors believe that the terms of the Purchase Agreement are fair and reasonable.  Further, under the circumstances, the Selling Debtors respectfully submit that their entry into the Purchase Agreement and the consummation of the Sale is in the best interests of the Selling Debtors' estates and represents the sound exercise of the Selling Debtors' business judgment.

## Extraordinary Provisions Under the Guidelines

15.    The following items in the Purchase Agreement and the Sale Order may be considered Extraordinary Provisions under the "Guidelines for the Conduct of Asset Sales" promulgated pursuant to General Order M-383:

(a)    Private Sale/No Competitive Bidding.  The Selling Debtors have not conducted an auction for the Shares because they do not believe that

marketing the Shares is likely to produce a better result for the Selling Debtors and their estates for a variety of reasons. <u>See</u> Grapkowski Declaration ¶ 8. First, the Selling Debtors believe that the esoteric nature of the Purchaser's business, the required risk tolerance to invest in that business and the Litigation are likely to deter potential bidders. <u>Id.</u> Second, the Shares are minority interests in a closely-held corporation in which Magnetar has a controlling interest, and the Shareholders' Agreement provides a right of first refusal to the Purchaser and Magnetar. <u>Id.</u> Third, the business of the Purchaser is in a transitional phase. As a result, any entity interested in acquiring a minority interest likely would apply an unacceptable discount to any offer to purchase the Shares to reflect the uncertainties discussed above. <u>Id.</u> Further, prior to and during their negotiations with the Purchaser, the Selling Debtors conducted informal "no-name" market checks with various independent parties familiar with the class of assets held by Quadrant and, as a result of such discussions and their own analysis, concluded that the discount rate that any independent third party buyer would apply to the Shares likely would yield consideration less than the Purchase Price. <u>Id.</u> at ¶ 9. Finally, because the Purchase Price was reached through extensive negotiation and represents the maximum amount the Purchaser is willing to pay for the Shares, the Selling Debtors believe that it is unlikely that the Purchaser would be willing to offer the Purchase Price as a "floor" for any auction. <u>Id.</u> As a result, any auction process pursued by the Selling Debtors likely would have a "floor," to the extent any floor was established, much lower than the Purchase Price and, given (i) the anticipated downward pressures on any offer by a third party buyer discussed above and (ii) the results of the Selling Debtors' market check, would likely yield consideration lower than the Purchase Price, while imposing additional costs and expenses on the Selling Debtors' estates. <u>Id.</u> Thus, the Selling Debtors believe that the consideration to be received by the Selling Debtors under the Purchase Agreement exceeds any amount that would be generated through an auction process. <u>See</u> Grapkowski Declaration ¶ 9.

(b)   <u>Insider Status</u>. The Purchase Agreement contemplates the sale of the Shares by the Selling Debtors to the Purchaser. Because ownership of the Shares is sufficient to technically make the Purchaser an "affiliate" of the Selling Debtors as that term is defined in section 101(2) of the Bankruptcy Code, the Sale appears to constitute a transaction with an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. However, neither the Purchaser nor any of its affiliates has influenced the Selling Debtors, their management or their advisors in any manner that could give rise to an appearance that the negotiations were not conducted at arm's-length or involved self-dealing. <u>See</u> Grapkowski Declaration ¶¶ 13-14. Moreover, as the effect of the transaction is to divest the Selling Debtors of any further financial interest in the Purchaser, the Selling Debtors have no incentive to accept anything other than an arm's length price for the Shares, despite the Purchaser's status as an "insider" prior to (but not after)

the transaction.  As a result, (i) the Purchaser's technical status as an "insider" of the Selling Debtors has not impacted the Selling Debtors' ability or intent to maximize the value of this transaction and (ii) the Selling Debtors believe the negotiation of the Sale has been completely fair.

(c)     <u>Successor Liability</u>.  The proposed Sale Order contains findings and provisions that provide that the Purchaser will have no successor liability for the liabilities of the Selling Debtors by virtue of its purchase of the Shares.  Given that the Shares are simply a single asset among the numerous assets held by the Selling Debtors and reflect only a minority ownership interest in the Purchaser, the Debtors believe that a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code.  The Selling Debtors believe that providing notice of this Motion as set forth herein is adequate for purposes of providing parties with notice of the Sale Order's findings with respect to successor liability.

(d)     <u>Relief from Bankruptcy Rule 6004(h)</u>.  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Purchaser has informed the Selling Debtors that it is contemplating certain transactions in the near term that would otherwise require the consent of LBHI under the Shareholders' Agreement and it is important for Purchaser's pursuit of such transactions that the Purchaser have certainty with respect to LBHI's rights under the Shareholders' Agreement as soon as possible after the entry of the Sale Order.  Accordingly, the Selling Debtors submit that such relief is appropriate under the circumstances.

**<u>Basis for Relief Requested</u>**

16.     Section 363 of the Bankruptcy Code provides, in relevant part, "that a [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and elsewhere, in applying this section, have required that a sale outside of the ordinary course of the debtor's business be based upon a good business reason.  <u>See</u> <u>Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)</u>, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) motion must find from the evidence presented a good business reason to grant such motion); <u>Comm. of</u>

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)

(same).

17.    In considering the "good business reason" for pursuing a sale outside of

the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, the debtor's

business judgment is the focus of the inquiry.  See Chateaugay, 973 F.2d at 143; Lionel,

722 F.2d at 1070-71.  A showing of a legitimate business justification gives rise to a presumption

that the debtor's decision was made "on an informed basis, in good faith and in the honest belief

that the action was taken in the best interests of the company." In re Integrated Res., Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

(Del. 1985)), app. dismissed, 3 F.3d 49 (2d Cir. 1993).  As courts in this district have stated,

"[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct." Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re

Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

18.    Furthermore, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in

the ordinary course of business may be by private sale or by public auction."  As is the case here,

courts have previously permitted a chapter 11 debtor to sell assets outside the ordinary course of

business by private sale when the debtor demonstrates that the sale is permissible pursuant to

section 363(b) of the Bankruptcy Code.  See, e.g., In re Loral Space & Communications Ltd.,

Case No. 03-41710 (RDD) [Docket. No. 2393] (Bankr. S.D.N.Y. Sep. 30, 2005) (authorizing

private sale of debtor's minority equity interest in third party holding company to majority equity

holder free and clear of any liens, claims and encumbrances, pursuant to section 363 of the

Bankruptcy Code); Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619

(D.P.R. 1999) (upholding prior bankruptcy court approval of private sale conducted by a

chapter 11 debtor); In re Wieboldt Stores, Inc., 92 B.R. 309 (N.D. Ill. 1988) (affirming right of

chapter 11 debtor to transfer assets by private sale) (citing In re Youngstown Steel Tank Co., 27

B.R. 596, 598 (W.D. Pa. 1983)); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998)

(approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b)

were met); In re Naron & Wagner, Chartered, 88 B.R. 85, 89 (Bankr. D. Md. 1988) (approving

chapter 11 debtor's request to sell by a private sale pursuant to 11 U.S.C. § 363(b) its wholly

owned subsidiary to insiders of the subsidiary).

19.     The Selling Debtors' decision to sell the Shares to the Purchaser pursuant

to the Purchase Agreement represents a sound exercise of the Selling Debtors' business

judgment.  As discussed above and in the Grapkowski Declaration, the Purchase Agreement

represents the culmination of extensive arm's-length negotiations between the Purchaser and the

Selling Debtors.  The Selling Debtors believe that the resulting Purchase Price – $90 million,

representing a premium of approximately 12.5 percent above invested capital – is fair and

reasonable.  See Grapkowski Declaration ¶ 12.

20.     Moreover, the Selling Debtors believe that now is the prudent time to

liquidate the investment in the Shares given the risk exposure and leverage of the Purchaser's

business.  As business entities obliged to take into account the safety of their investments and as

debtors in bankruptcy with an obligation to maximize value for their stakeholders, the Selling

Debtors believe that it is prudent to liquidate the investment now to:  (a) avoid the incurrence of

potential losses in the existing portfolio and taking on risks that are unknown to the Selling

Debtors in light of the currently fluid and transitional nature of the Purchaser's business and the

Litigation; and (b) take advantage of an increase in the fundamental value of the Shares caused

by the material improvement in the credit markets since the height of the credit crisis.  See
Grapkowski Declaration ¶ 10.

21.     The Selling Debtors further submit that the Purchaser is the natural buyer
of the Shares and that the Purchase Price is the highest and best under the circumstances.  As
described above, the Shares represent a minority position in a closely-held corporation in which
the overwhelming majority of remaining shares are held by a single entity (i.e., Magnetar).  The
Selling Debtors believe that any third-party purchaser thus would apply a minority discount to
the Shares significant enough to reduce the estate's recovery below the amount of the Purchase
Price.  Moreover, the Selling Debtors believe that the fact that the Purchaser's business is
highly-levered, subject to Litigation and currently in a transitional phase would also serve to
depress third-party offers.  Consequently, the Purchaser, which has an interest in consolidating
ownership of the Shares as it refocuses its business, emerged as the natural buyer and has offered
what the Selling Debtors' believe is the best price for the Shares under the circumstances.  See
Grapkowski Declaration ¶ 11.

22.     In addition, as stated above, the Shareholders' Agreement purports to
provide a right of first refusal to the Purchaser and Magnetar.  Although the Selling Debtors
maintain that this right of first refusal is a de facto anti-assignment provision that may not be
enforced pursuant to section 365(f) of the Bankruptcy Code,[4] they understand that the Purchaser
and Magnetar do not share that view, and anticipate that the Purchaser and Magnetar would seek
to enforce their asserted rights of first refusal if the Selling Debtors sought to sell the Shares, and

---

[4]      See In re Mr. Grocer, Inc., 77 B.R. 349, 352 (Bankr. D.N.H. 1987) (finding right of first refusal granted to
landlord in a commercial lease provision was unenforceable under section 365(f) of the Bankruptcy Code);
see also Ramco-Gershenson Props., L.P. v. Service Merch. Co., 293 B.R. 169, 174 (M.D. Tenn. 2003)
(affirming the bankruptcy court's ruling that purchase option was "an explicit, intentional restriction on
assignment in contravention of § 365(f)."). But see In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45
(Bankr. M.D.N.C. 2003) (enforcing right of first refusal and finding provision permitting holder of right of
first refusal the opportunity to outbid other offers did not chill bidding).

LBHI assign the Shareholders' Agreement, to a third party.  The Selling Debtors believe that the

Purchaser and Magnetar's assertion of the right of first refusal, regardless of its enforceability,

would negatively impact the purchase price available from third parties.  See In re Adelphia

Commc'ns Corp., 359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) (explaining that rights of first

refusal can "impair[] the estate's ability to maximize value for its creditors when it markets its

assets. . . .").

        23.       Accordingly, for the reasons discussed herein, the Selling Debtors

respectfully submit that an auction of the Shares would not generate an offer higher than the

Purchase Price and that the proposed Sale pursuant to the Purchase Agreement is an exercise of

their sound business judgment that will maximize value for the Selling Debtors' estates and all

parties in interest.

## Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

        24.       The Selling Debtors request that the Shares be sold free and clear of any

liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy

Code.  Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of

the estate "free and clear of any interest in such property of an entity other than the estate" if

(a) applicable nonbankruptcy law permits the sale of such property free and clear of such

interest, (b) such entity consents, (c) such interest is a lien and the price at which such property is

to be sold is greater than the aggregate value of all liens on such property, (d) such interest is in

bona fide dispute, or (e) such entity could be compelled, in a legal or equitable proceeding, to

accept a money satisfaction of such interest.  See 11 U.S.C. § 363(f)(1)–(5).  This provision is

supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may

issue any order, process or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]."  11 U.S.C. § 105(a); see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

25.    Any lien asserted against the Shares will attach to the proceeds of the Sale with the same force, effect and priority as such liens would then have on the Shares, subject to the rights and defenses, if any, of the Selling Debtors and any party in interest with respect thereto.  Moreover, the Selling Debtors believe that any party holding a lien against the Shares (and the Selling Debtors are not aware of any such party) could be compelled to accept a monetary satisfaction of its interest.  In addition, if the holder of a lien, claim, encumbrance or other interest receives notice of this Motion and does not object within the prescribed time period, the Selling Debtors submit that such holder may be deemed to have consented to the proposed Sale.  Accordingly, the Selling Debtors submit that the proposed Sale of the Shares free and clear of liens, claims, encumbrances and interests satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### The Purchase Agreement Is the Product of Good Faith Negotiations and Contains Fair Consideration

26.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of

the appeal, unless such authorization and such sale . . . were stayed
pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code "affords finality to judgments by

protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy

judgments in making their offers and bids." Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.),

No. 92 CIV. 7054, 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (citations and internal

quotations omitted); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("[s]ection 363(m) . . . provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of

the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990)

("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale

on appeal unless there is a stay pending appeal").

       27.     In certain circumstances involving proposed transactions with insiders,

courts have applied heightened scrutiny.  See, e.g., Official Comm. of Unsecured Creditors of

Enron Corp. v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have

held that transactions that benefit insiders must withstand heightened scrutiny before they can be

approved under § 363(b)."); C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),

92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (finding that insider transactions under section 363(b) of

the Bankruptcy Code have the possibility of abuse and thus are necessarily subjected to

heightened scrutiny).  Although the Purchaser is an "insider" of the Selling Debtors, as defined in

section 101(31) of the Bankruptcy Code, the Purchase Agreement provides the Purchaser with no

unfair, non-arm's-length benefits.  Indeed, as the Selling Debtors are divesting themselves of any

continuing financial interest in the Purchaser pursuant to the Sale, the Selling Debtors have no

incentive to confer any such unfair benefits upon the Purchaser (which entity, following the Sale,

will <u>not</u> be an insider of the Selling Debtors, and will have independent financial interests that diverge from the Selling Debtors).  Unsurprisingly, the Sale is the product of arm's-length, good-faith negotiations between the Selling Debtors and the Purchaser.  <u>See</u> Grapkowski Declaration ¶¶ 13-14.  Based upon the Grapkowski Declaration, the Selling Debtors intend to request a finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)

28.     Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after the entry of such an order.  <u>See</u> Fed. R. Bankr. P. 6004(h). The Purchaser has informed the Selling Debtors that it is contemplating certain transactions in the near term that would otherwise require the consent of LBHI under the Shareholders' Agreement and it is important for Purchaser's pursuit of such transactions that the Purchaser have certainty with respect to LBHI's rights under the Shareholders' Agreement as soon as possible after the entry of the Sale Order.  Accordingly, the Selling Debtors request a waiver of the 14-day stay under Bankruptcy Rule 6004(h) allowing the Sale Order to be effective immediately.

### Notice

29.     No trustee has been appointed in these chapter 11 cases.  In accordance with section II.C.1 of General Order M-383 and the procedures set forth in the order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635], notice of this Motion has been given to:  (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney for the Southern District of New York; (f) the Purchaser; (g) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other

interest in the Shares; (h) all parties who have requested notice in these chapter 11 cases pursuant

to Bankruptcy Rule 2002; and (i) all other parties required to receive notice of the Motion

pursuant to section II.C.1 of General Order M-383 of this Court.

30.     No previous request for the relief sought herein has been made by the

Selling Debtors to this or any other court.

WHEREFORE, the Selling Debtors respectfully request that the Court enter the

Sale Order, substantially in the form attached hereto as <u>Exhibit C</u>, and grant such other and

further relief as it deems just and proper.


Dated:  February 28, 2011                         Respectfully submitted,
        New York, New York


                                                  /s/  Benjamin Rosenblum
                                                  Robert C. Micheletto
                                                  Benjamin Rosenblum
                                                  JONES DAY
                                                  222 East 41st Street
                                                  New York, New York  10017
                                                  Telephone:  (212) 326-3939
                                                  Facsimile:  (212) 755-7306

                                                  and

                                                  Carl E. Black
                                                  JONES DAY
                                                  North Point
                                                  901 Lakeside Avenue
                                                  Cleveland, Ohio  44114
                                                  Telephone:  (216) 586-3939
                                                  Facsimile:  (216) 579-0212

                                                  ATTORNEYS FOR DEBTORS AND
                                                  DEBTORS IN POSSESSION