# EXHIBIT A

**(Purchase Agreement)**

NYI-4351025v1

**Executed Copy**

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (the "Agreement") is dated as of February 28, 2011, by and among Lehman Brothers Holdings Inc., a Delaware corporation ("LBHI") and Lehman Commercial Paper Inc., a New York corporation ("LCPI" and, together with LBHI collectively, the "Lehman Entities"), and Quadrant Structured Products Company, Ltd., a Cayman Islands exempted company (the "Buyer").

## RECITALS

A.    On and after September 15, 2008, LBHI and certain of its affiliates (collectively, the "Debtors") commenced the Bankruptcy Cases (as defined below) in the Bankruptcy Court (as defined below).

B.    LBHI is the record owner of 80,000 Class A Shares (the "Shares") of the Buyer.

C.    LCPI holds an interest in the Shares.

D.    The Lehman Entities desire to sell, and the Buyer desires to purchase, all of the Shares on the terms and subject to the conditions contained in this Agreement.

E.    The members of the Company have approved an amendment to the Articles of Association of the Buyer (the "Articles") to authorize the Buyer to repurchase its own shares and to authorize the purchase of the Shares by the Buyer in the manner and on the terms of this Agreement.

G.    The Buyer, LBHI and each of the other shareholders of the Buyer entered into a Shareholders Agreement dated as of October 3, 2007 (the "Shareholders Agreement") and each of the parties to that agreement (other than the Buyer) have entered into an agreement to waive any rights they might otherwise have had under the Shareholders Agreement to the transactions contemplated by this Agreement and to memorialize certain other agreements among the parties (the "Modification Agreement"), a copy of which is attached hereto as Exhibit A.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth herein, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement:

"Affiliate" means, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with such Person.

"Agreement" has the meaning set forth in the preamble.

"<u>Bankruptcy Cases</u>" means the chapter 11 cases of each of the Debtors, which have been administratively consolidated in Case No. 08-13555 in the United States Bankruptcy Court for the Southern District of New York.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

"<u>Buyer</u>" has the meaning set forth in the preamble.

"<u>Class A Shares</u>" means the voting, participating shares, with a par value of $0.01 per share, of the Buyer designated as Class A Shares.

"<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 3.1</u>.

"<u>Encumbrances</u>" means claims, liens, pledges, offsets, set-offs, recoupments, charges, successor, product, environmental, tax, and other liabilities (whether secured or unsecured, contingent or absolute, liquidated or unliquidated, perfected or unperfected, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded), taxes, security interests, mortgages, restrictions, indentures, loans, credit agreements, other agreements, interests under any agreements (including repurchase agreements), instruments, contracts, judgments, and orders of any court or governmental department, commission, board, agency, or instrumentality, domestic or foreign, and any actions and proceedings of any kind or nature, but excluding any restrictions on the Shares imposed by the Shareholders Agreement.

"<u>Escrow Agent</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Escrow Agreement</u>" means the Escrow Agreement of even date herewith among the Buyer, the Lehman Entities and the Escrow Agent.

"<u>Escrow Amount</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Escrow Deadline</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Escrow Instruction</u>" means the joint written instructions contemplated by Section 3(b) of the Escrow Agreement instructing the Escrow Agent to deliver the Purchase Price as specified in <u>Section 2.3(a)</u> of this Agreement.

"<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which the time to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure or any motion for a new trial, reargument or rehearing has been resolved by the court in which such motion was filed; provided, however, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

"Indemnitee" has the meaning set forth in Section 6.5.

"Lehman Board" means the board of directors of LBHI.

"Motion" means a motion to the Bankruptcy Court seeking approval of this Agreement and entry of the Sale Order, which motion will be in substantially the form attached hereto as Exhibit B.

"Order" means any order, judgment, ruling, injunction, assessment, award, decree or writ of any Governmental Authority.

"Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, unincorporated society or association, trust or other legal entity or Governmental Authority.

"Purchase Price" has the meaning set forth in Section 2.2.

"Release" means a mutual release in substantially the form attached hereto as Exhibit C.

"Sale Order" means an order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby in substantially the form attached hereto as Exhibit D, with any revisions, in form and substance reasonably satisfactory to the Buyer.

"Shares" has the meaning set forth in the recitals.

"Tax Matters Partner" shall mean Martin Nance or any successor Tax Matters Partner of the Buyer pursuant to the Buyer's articles of association.

## ARTICLE II
## PURCHASE AND SALE

2.1    Purchase and Sale of the Shares.  On the terms and subject to the conditions contained in this Agreement, at the Closing, the Buyer will purchase from the Lehman Entities, and the Lehman Entities will sell, transfer, assign, convey and deliver to the Buyer, free and clear of all Encumbrances, the Shares and all interests therein held by the Lehman Entities, for the consideration described in Section 2.2.

2.2    Consideration.  The purchase price for the Shares is $90.0 million (the "Purchase Price"), payable in cash at the Closing as set forth herein.

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

2.3     Purchase Price Escrow.  No later than 5:00 p.m. on the third business day after execution of this Agreement (the "Escrow Deadline"), pursuant to the terms of the Escrow Agreement, the Buyer will deposit with U.S. Bank National Association, in its capacity as escrow agent (the "Escrow Agent"), the sum of $90.0 million by wire transfer of immediately available funds (the "Escrow Amount"), to be released by the Escrow Agent and delivered to either the Buyer or the Lehman Entities, in accordance with the provisions of the Escrow Agreement.  Pursuant to the Escrow Agreement, the Escrow Amount and all accrued investment income thereon will be distributed as follows:

(a)     if the Closing occurs, the Escrow Amount will be delivered to the Lehman Entities in payment of the Purchase Price at the Closing and all accrued investment income thereon will be delivered to the Buyer at the Closing.

(b)     if this Agreement is validly terminated pursuant to Section 8.1, the Escrow Amount and all accrued investment income thereon will be delivered to the Buyer, without the need of any further Order of the Bankruptcy Court.

2.4     Cancellation of Shares.  The Shares purchased shall be cancelled upon the Closing and the amount of the Company's issued share capital shall be diminished by the nominal value of the Shares.

## ARTICLE III
## CLOSING AND DELIVERIES

3.1     Closing.  The closing of the transactions contemplated hereby (the "Closing") will take place at the offices of Jones Day, 222 East 41st Street, New York, New York 10017, as soon as possible, but in no event later than two (2) business days, after satisfaction or waiver of the conditions set forth in Article VII (other than those conditions that are to be satisfied at the Closing) or on such other date or at such other time and place as the parties mutually agree in writing (the "Closing Date").  All actions to be taken and all documents to be executed and delivered by all parties at the Closing will be deemed to have been taken and executed simultaneously and no actions will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

3.2     Deliveries by LBHI.  At the Closing, LBHI will deliver to the Buyer the following items:

(a)     a duly executed Escrow Instruction;

(b)     a duly executed Modification Agreement, dated as of the date hereof; and

(c)     a duly executed Release, dated as of the Closing Date.

3.3     Deliveries by LCPI.  At the Closing, LCPI will deliver to the Buyer the following items:

(a)     a duly executed Escrow Instruction; and

(b)    a duly executed Release, dated as of the Closing Date.

3.4    <u>Deliveries by the Buyer</u>.  At the Closing, the Buyer will deliver to the Lehman Entities the following items:

(a)    a certified copy of resolutions of the shareholders amending the Articles and authorizing the repurchase of the Shares on the terms of this Agreement;

(b)    a certified copy of resolutions of the directors authorizing the transactions contemplated hereby;

(c)    a duly executed Escrow Instruction;

(d)    a duly executed Modification Agreement, dated as of the date hereof; and

(e)    a duly executed Release, dated as of the Closing Date.

## ARTICLE IV
## <u>REPRESENTATIONS AND WARRANTIES OF THE LEHMAN ENTITIES</u>

Each of the Lehman Entities represents and warrants to the Buyer:

4.1    <u>Organization and Power</u>.  Each of the Lehman Entities is a corporation duly incorporated, validly existing and in good standing under the Laws of the state of its incorporation.  Subject to entry of the Sale Order, each of the Lehman Entities has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

4.2    <u>Authorization</u>.  Subject to the approval of the Lehman Board and the entry of the Sale Order, this Agreement has been duly authorized, executed and delivered by each of the Lehman Entities and no additional proceedings on the part of either of the Lehman Entities or any Affiliate thereof are necessary to authorize the consummation of this Agreement or the transactions contemplated hereby.

4.3    <u>Binding Effect</u>.  Subject to the approval of the Lehman Board and the entry of the Sale Order, this Agreement constitutes a valid and binding agreement of each of the Lehman Entities, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

4.4    <u>Noncontravention</u>.  Subject to the approval of the Lehman Board and the entry of the Sale Order, the execution, delivery and performance by each of the Lehman Entities of this Agreement and the consummation of the transactions contemplated hereby do not and will not (a) violate the organizational documents of either of the Lehman Entities, or of any of the terms, conditions or provisions of any judgment, Order, injunction, decree, agreement or instrument to which the Lehman Entities is a party, (b) violate any applicable law, or (c) require any consent or other action by any person or entity that has not already been obtained by the Lehman Entities.

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

4.5     Title.  (i) The Lehman Entities are the legal and beneficial owners of the Shares, which they own free and clear of any Encumbrances that will not be removed by the entry of the Sale Order.  (ii) There are no Encumbrances of any kind upon the Shares that will not be removed by the entry of the Sale Order and before the Closing under this Agreement.  No person has claimed or would be entitled to claim to have the benefit of any Encumbrance in respect of the Shares.  (iii) Upon payment in full therefor by the Buyer at the Closing, the Lehman Entities will transfer and deliver to the Buyer, or cause to be transferred and delivered to the Buyer, valid title to the Shares and all interests therein, free and clear of all Encumbrances (other than Encumbrances that arise by action of or with respect to the Buyer).

4.6     Litigation.  Other than the Bankruptcy Cases, there is no action, suit, investigation or proceeding pending against, or to the knowledge of either of the Lehman Entities, threatened against or affecting, either of the Lehman Entities before any arbitrator or any governmental authority which, individually or in the aggregate, if determined or resolved adversely in accordance with the plaintiff's demands, could in any manner prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

4.7     Independent Investigation.  Each of the Lehman Entities acknowledges that it has made the decision to sell the Shares and/or all interests therein held by such Lehman Entity for the Purchase Price based upon its independent analysis of the Buyer and after carefully considering all factors and variables involved.  Each of the Lehman Entities acknowledges that no representations or warranties have been made by the Buyer or any other person, including any officers, directors, employees, shareholders, representatives or affiliates of the Buyer on behalf of the Buyer regarding the financial and/or business condition or prospects of the Buyer and that the Buyer disclaims any responsibility or obligation for disclosure to the Lehman Entities of any of the Buyer's future plans or prospects.  Each of the Lehman Entities has had an opportunity to ask questions of and request additional information concerning the Buyer from representatives of the Buyer concerning the transactions contemplated by this Agreement and has received all answers and information requested. Each of the Lehman Entities has had a reasonable opportunity to consult with counsel of its own choosing (as well as tax and financial advisors of his own choosing) regarding this Agreement and the transactions contemplated hereby.

4.8     No Other Representations and Warranties. EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE IV, NEITHER OF THE LEHMAN ENTITIES MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SHARES OR THE BUYER OR ANY OF THE BUYER'S AFFILIATES OR ANY OF THEIR RESPECTIVE ASSETS, LIABILITIES OR OPERATIONS, INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.  THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS ARTICLE IV AND EXCEPT IN THE CASE OF FRAUD OR INTENTIONAL MISREPRESENTATION, THE BUYER IS ACQUIRING THE SHARES ON AN "AS IS, WHERE IS" BASIS.

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Lehman Entities as follows:

5.1     Organization and Power.  The Buyer is an exempted company duly formed, validly existing and in good standing under the laws of the Cayman Islands.  The Buyer has all requisite corporate power and authority to enter into this Agreement and to perform its obligations hereunder.

5.2     Authorization.  This Agreement has been duly authorized, executed and delivered by the Buyer and no additional proceedings on the part of the Buyer or any Affiliate thereof are necessary to authorize the consummation of this Agreement or the transactions contemplated hereby.

5.3     Binding Effect.  This Agreement constitutes a valid and binding agreement of the Buyer, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

5.4     Noncontravention.  The execution, delivery and performance by the Buyer of this Agreement and the consummation of the transactions contemplated hereby do not and will not (a) violate in any material respect the organizational documents of such party or (b) violate in any material respect any applicable law.

5.5     Litigation.  There is no action, suit, investigation or proceeding pending against, or to the knowledge of the Buyer, threatened against or affecting, the Buyer before any arbitrator or any governmental authority which, individually or in the aggregate, if determined or resolved adversely in accordance with the plaintiff's demands, could in any manner prevent, enjoin, alter or materially delay the transactions contemplated by this Agreement.

## ARTICLE VI
## COVENANTS

6.1     Commercially Reasonable Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement and applicable law, including the exercise of the Lehman Entities' fiduciary duties, the Buyer and the Lehman Entities will use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate the transactions contemplated by this Agreement.

6.2     Sale Order.  As promptly as practicable following the execution of this Agreement, the Lehman Entities will file the Motion with the Bankruptcy Court and, subject to the terms and conditions of this Agreement and applicable law, including the exercise of the Lehman Entities' fiduciary duties, the Lehman Entities will thereafter pursue diligently the entry of the Sale Order.  The Buyer agrees that it will promptly take such actions as are reasonably requested by the Lehman Entities to assist in obtaining entry of the Sale Order.  If the entry of the Sale Order is appealed, subject to the terms and conditions of this Agreement and applicable

7

law, including the exercise of the Lehman Entities' fiduciary duties, the Lehman Entities will use their reasonable best efforts to defend such appeal and the Buyer agrees that it will promptly take such actions as are reasonably requested by the Lehman Entities to assist in defending such appeal.

6.3    <u>Minority Rights</u>.  Effective upon the deposit by the Buyer of the Escrow Amount with the Escrow Agent:

(a)    LBHI hereby agrees to forbear from exercising any approval right granted to LBHI under subparagraphs (iv) and (vii) of Section 2.11(a) of the Shareholders Agreement with respect to any actions to be taken by the Buyer.

(b)    LBHI agrees to forbear from exercising any approval right granted to LBHI under subparagraph (ix) of Section 2.11(a) of the Shareholders Agreement with respect to any action to be taken by the Buyer pursuant to Paragraph 3 and Paragraph 4 of the Modification Agreement.

(c)    LBHI hereby agrees to forbear from exercising its approval right under subparagraph (ii) of Section 2.11(a) of the Shareholders Agreement with respect to any modification of the Constituent Documents (as defined in the Shareholders Agreement) in furtherance of any action permitted to be taken without approval of LBHI under (a) and (b) of this Section 6.3 and not otherwise inconsistent with the Shareholders Agreement.

(d)    LBHI hereby agrees to forbear from exercising its approval right under subparagraph (xii) of Section 2.11(a) of the Shareholders Agreement with respect to any action permitted to be taken by the Buyer without approval of LBHI under (a), (b) and (c) of this Section 6.3.

The provisions of this Section 6.3 will terminate upon the termination of this Agreement, *provided* that LBHI agrees to forbear from exercising any approval right granted to LBHI under subparagraphs (ii), (iv), (vii), (ix) and (xii) of Section 2.11(a) or from disavowing the effectiveness of the Modification Agreement with respect to any action (or related group of actions) by the Buyer which the Buyer has committed or agreed to undertake pursuant to this Section 6.3 prior to the termination of this Agreement.  LCPI hereby confirms that it is not a party to, and has no rights under, the Shareholders Agreement.

6.4    <u>D&O Insurance</u>.  The Buyer agrees that it will not, for a period of 3 years following the Closing, significantly modify its directors' and officers' liability insurance and fiduciary liability insurance coverage.

6.5    <u>Indemnification</u>.

(a)    The Lehman Entities hereby agree, jointly and severally, to indemnify, defend and hold Buyer and each of its shareholders, officers, directors, employees, agents, affiliates, representatives, managers, administrators, trustees and attorneys and their respective successors and assigns (collectively, the "<u>Indemnitees</u>") harmless from and against any damages, losses, liabilities or expenses incurred by any of the

8

Indemnitees (including, but not limited to, reasonable expenses of investigation and reasonable attorneys' fees and expenses in connection with any action, suit or proceeding whether involving a third party claim or a claim solely among the parties hereto and any incidental, indirect or consequential damages, losses, liabilities or expenses, and any lost profits or diminution in value) ("Losses") as a result of or arising out of a breach of the representations and warranties set forth in Section 4.5 of this Agreement, up to a maximum aggregate amount equal to the Purchase Price.  If any action or proceeding is instituted or demand made involving any Indemnitee for which indemnification is to be sought hereunder by such Indemnitee, then such Indemnitee will promptly notify the Lehman Entities of the commencement of any such action or proceeding; provided, however, that the failure so to notify the Lehman Entities will not relieve the Lehman Entities from any liability that they may have to such Indemnitee pursuant to this Agreement except to the extent that the Lehman Entities have been materially prejudiced by such failure.  Following such notification, the Lehman Entities shall be entitled to participate in any such action or proceeding and may elect to control and appoint lead counsel for such action or proceeding, in each case at their own expense, in accordance with the provisions of this Section 6.5 and with counsel reasonably satisfactory to the Indemnitee.  Prior to assuming control of such action, the Lehman Entities must acknowledge that the Lehman Entities would have an indemnity obligation for any Losses resulting from such action as provided under this Section 6.5 and furnish the Indemnitee with reasonable evidence that the Lehman Entities have adequate resources to defend the action and fulfill any indemnity obligations hereunder.  Upon any such election to assume control of such action or proceeding, the Lehman Entities will not be liable for any legal costs or expenses subsequently incurred by such Indemnitee (other than reasonable costs of investigation, providing evidence and monitoring the action or proceeding) in connection therewith, unless (i) the Lehman Entities have failed to provide counsel reasonably satisfactory to such Indemnitee in a timely manner, (ii) counsel provided by the Lehman Entities reasonably determines that its representation of such Indemnitee would present it with a conflict of interest, or (iii) the Indemnitee reasonably determines that there are or may be legal defenses available to it which are different from or in addition to those available to the Lehman Entities, in which case the Indemnitee shall have the right to select other counsel reasonably acceptable to the Lehman Entities to represent the Indemnitee and such other counsel shall be required to coordinate with counsel representing the Lehman Entities.  The Lehman Entities shall not settle any pending or threatened proceeding in respect of which any Indemnitee is a party or for which indemnification hereunder could have been sought without such Indemnitee's written consent unless such settlement includes an unconditional release of the Indemnitee from all liability arising out of such proceeding and such settlement does not impose any injunctive or other equitable relief against such Indemnitee.  If the Lehman Entities have elected to control any action or proceeding in accordance with this Section 6.5, the Lehman Entities shall not be liable for any settlement of any such action or proceeding effected without their written consent.  In connection with any one action or proceeding, the Lehman Entities will not be responsible for the fees and expenses of more than one separate law firm (in addition to Cayman counsel) for all Indemnitees.

(b)    The Lehman Entities' obligations under this Section 6.5 hereof to indemnify the Indemnitees (the "Indemnification Obligations") shall constitute an

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

allowed administrative expense claim in the Bankruptcy Case of each of the Lehman Entities pursuant to section 503(b) of title 11 of the United States Code (the "Bankruptcy Code") and shall be payable by the Lehman Entities in the ordinary course without the need for (i) further Order of the Bankruptcy Court or (ii) the Indemnitees to file an administrative proof of claim.  Except as expressly provided in the Sale Order or in this Agreement, the Indemnification Obligations and all rights and remedies of the Indemnitees granted herein shall survive, and shall not be modified, impaired or discharged by (i) the entry of an Order converting the Bankruptcy Case of either of the Lehman Entities to a case under chapter 7, dismissing any Bankruptcy Case, terminating the joint administration of the Bankruptcy Cases or by any other act or omission or (ii) the entry of an Order confirming a chapter 11 plan in the Bankruptcy Case of either of the Lehman Entities and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Lehman Entities have waived any discharge as to any remaining Indemnification Obligations.  The terms and provisions of this Section 6.5 shall continue in the Bankruptcy Cases, in any successor cases if the Bankruptcy Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Indemnification Obligations and all other rights and remedies of the Indemnitees granted by the Section 6.5 hereof shall continue in full force and effect until the third anniversary of the Closing.

6.6     U.S. Tax Matters.  The Buyer agrees that for U.S. federal income tax purposes, the Lehman Entities' share of the income, gain, loss, and deductions for the taxable year of the Buyer that includes the Closing Date shall be determined on the basis of an interim closing of the books of the Buyer on the Closing Date as reasonably determined by the Tax Matters Partner and shall not be based on a proration of such items for the entire taxable year.

ARTICLE VII
CONDITIONS TO CLOSING

7.1     Conditions to Obligations of the Lehman Entities.  The obligations of the Lehman Entities to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable law) at or prior to the Closing of each of the following conditions:

(a)     The representations and warranties of the Buyer set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date.

(b)     Each of the agreements and covenants of the Buyer to be performed and complied with by the Buyer pursuant to this Agreement prior to the Closing Date shall have been duly performed and complied with in all material respects.

(c)     The Buyer shall have delivered to the Lehman Entities the items required by Section 3.4 of this Agreement.

(NY) 17152/001/MISC10/Lehman.PA.doc
NYI-4259344v19

(d)     The Sale Order shall have been entered by the Bankruptcy Court and the Sale Order shall not have been reversed, vacated, stayed, restrained or enjoined.

(e)     None of the parties hereto shall be subject to any Order of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.

7.2     <u>Conditions to Obligations of the Buyer</u>.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver (if permitted by applicable law) at or prior to the Closing of each of the following conditions:

(a)     The representations and warranties of the Lehman Entities set forth in this Agreement shall be true and correct in all material respects as of the Closing Date as though made on and as of the Closing Date, except for any representation or warranty of the Lehman Entities under Section 4.5 of this Agreement, which shall be true and correct in all respects as of the Closing Dates as though made on and as of the Closing Date.

(b)     Each of the agreements and covenants of the Lehman Entities to be performed and complied with by the Lehman Entities pursuant to this Agreement prior to the Closing Date shall have been duly performed and complied with in all material respects.

(c)     The Lehman Entities shall have delivered to the Buyer the items required by <u>Section 3.2</u> of this Agreement.

(d)     The Sale Order shall have been entered by the Bankruptcy Court, the Sale Order shall not have been reversed, vacated, stayed, restrained or enjoined and the Sale Order shall be a Final Order.

(e)     There shall have been no Order or other action by a government authority which in any way modifies, amends, or alters the terms of Section 6.3 hereof.

(f)     None of the parties hereto shall be subject to any Order of a court of competent jurisdiction that prohibits the consummation of the transactions contemplated by this Agreement.

ARTICLE VIII
TERMINATION OF AGREEMENT

8.1     <u>Right to Terminate</u>.  This Agreement may be terminated at any time prior to the Closing Date:

(a)     by the mutual written consent of the Buyer and the Lehman Entities;

(b)     by either the Lehman Entities or the Buyer, upon written notice to the other party, if the transactions contemplated by this Agreement have not been consummated on or prior to May 1, 2011;

11

(c)    by the Buyer, upon written notice to the Lehman Entities, if either of the
Lehman Entities has breached or violated the terms of Section 6.3 of this Agreement or
the Modification Agreement or if there is any Order or other action by a government
authority which in any way modifies, amends, or alters the terms of Section 6.3 hereof or
the Modification Agreement;

(d)    by the Lehman Entities, upon written notice to the Buyer, if the Buyer has
not deposited the Escrow Amount with the Escrow Agent prior to the Escrow Deadline;
or

(e)    by the Buyer, upon written notice to the Lehman Entities, if the Lehman
Entities have not provided written notice to the Buyer by 5:00 p.m. Eastern Time, on
March 15, 2011 that the Lehman Board has approved the transactions contemplated by
this Agreement.

8.2    <u>Effect of Termination</u>.  If this Agreement is validly terminated as provided herein,
except as otherwise provided in <u>Section 6.3</u> hereof, each of the parties will be relieved of its
duties and obligations arising under this Agreement after the date of such termination and such
termination shall be without liability to the Buyer or the Lehman Entities; provided, however,
that the nothing in this <u>Section 8.2</u> will be deemed to release any party from liability for any
breach of its obligations under this Agreement in any material respect.

ARTICLE IX
<u>MISCELLANEOUS AND GENERAL</u>

9.1    <u>Publicity</u>.  None of the parties hereto will issue any press release concerning this
Agreement or the transactions contemplated hereby without obtaining the prior written approval
of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in
the judgment of the Buyer or the Lehman Entities, disclosure is otherwise required by applicable
law or by the Bankruptcy Court, <u>provided</u> that the party intending to make such release will use
commercially reasonable efforts consistent with such applicable law or Bankruptcy Court
requirement to consult with the other party with respect to the text thereof.

9.2    <u>Expenses</u>.  Whether or not the transactions contemplated by this Agreement are
consummated, all costs and expenses (including all legal, accounting, broker, finder or
investment banker fees) incurred in connection with this Agreement and the transactions
contemplated hereby are to be paid by the party incurring such expenses.  If any party hereto
brings an action or proceeding hereunder to enforce the terms hereof, the prevailing party will be
entitled to recover from the other party all of such prevailing party's attorneys' fees, costs and
expenses incurred in such action or proceeding.

9.3    <u>Joint and Several Liability; Reliance</u>.  Each Lehman Entity shall be jointly and
severally liable for all obligations of any of the Lehman Entities arising under this Agreement.
The Buyer shall be entitled to deal with and rely conclusively on any Lehman Entity as provided
herein as if, and with the same effect as if, such Lehman Entity constituted both of the Lehman
Entities.

12

9.4    Successors and Assigns.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns, but is not assignable by any party without the prior written consent of the other party hereto.

9.5    Third Party Beneficiaries.  Each party hereto intends that this Agreement does not benefit or create any right or cause of action in or on behalf of any Person other than the parties hereto.

9.6    Further Assurances.  The parties will execute such further instruments and take such further actions as may reasonably be necessary to carry out the intent of this Agreement. Each party hereto will cooperate affirmatively with the other party, to the extent reasonably requested by such other party, to enforce rights and obligations herein provided.

9.7    Notices.  Any notice or other communication provided for herein or given hereunder to a party hereto must be in writing, and sent by facsimile transmission (electronically confirmed), delivered in person, mailed by first class registered or certified mail, postage prepaid, or sent by Federal Express or other overnight courier of national reputation, addressed as follows:

If to either Lehman Entity:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas, 38th Floor
New York, NY 10020
Attention:  Andrew Grapkowksi
Fax No.:  (917) 210-4011

with a copy (which will not constitute notice) to:

Jones Day
222 E. 41st Street
New York, New York 10017
Attention:  Robert C. Micheletto
            John K. Kane
Fax No.: (212) 755-7306

If to the Buyer:

Quadrant Structured Products Company, Ltd.
c/o Quadrant Structured Investment Advisers LLC
301 Merritt 7
Norwalk, CT 06851
Attention: Martin Nance
Fax No.:  203-663-8990

with a copy (which will not constitute notice) to:

13

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attention: Juliet Cain
Fax No.: (212) 450-3800

or to such other address with respect to a party as such party notifies the other in writing as
above provided.

9.8    Complete Agreement.  This Agreement and the schedule and exhibits hereto and
the other documents delivered by the parties in connection herewith contain the complete
agreement between the parties hereto with respect to the transactions contemplated hereby and
thereby and supersede all prior agreements and understandings between the parties hereto with
respect thereto.

9.9    Captions.  The captions contained in this Agreement are for convenience of
reference only and do not form a part of this Agreement.

9.10    Amendment; Waiver; Modifications.  This Agreement may be amended, waived,
or modified only by an instrument in writing duly executed by the Lehman Entities and the
Buyer.

9.11    Governing Law.  This Agreement and all disputes or controversies arising out of
or relating to this Agreement or the transactions contemplated hereby will be governed by, and
construed in accordance with, the laws of the State of New York, without regard to any other
applicable conflict of law provisions (except Section 5-1401 of the New York General
Obligations Law and any successor statute thereto).

9.12    Exclusive Jurisdiction.  The Buyer and the Lehman Entities agree that all disputes
arising hereunder will be resolved by the Bankruptcy Court which will have exclusive personal
and subject matter jurisdiction over all disputes and other matters relating to the interpretation
and enforcement of this Agreement or any ancillary document executed pursuant hereto, and
Buyer expressly consents to and agrees not to contest such exclusive jurisdiction.  If the
Bankruptcy Court declines to exercise, or abstains from exercising, such jurisdiction, the Buyer
and each of the Lehman Entities expressly consent to and agree not to contest the non exclusive
personal and subject matter jurisdiction of the state and federal courts sitting in the County of
New York, in the State of New York.

9.13    Non Recourse.  No past, present or future director, officer, employee,
incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of the
parties hereto will have any liability for any obligations or liabilities of such party under this
Agreement of or for any claim based on, in respect of, or by reason of, the transactions
contemplated hereby.

9.14    Severability.  Any term or provision of this Agreement that is invalid or
unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of such
invalidity or unenforceability without rendering invalid or unenforceable the remaining terms

14

and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only so broad as is enforceable.

9.15    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which will constitute but one instrument.

9.16    <u>No Survival of Representations and Warranties</u>.  The representations and warranties contained in this Agreement will not survive the Closing hereunder and none of the parties will have any liability to each other after the Closing for any breach thereof; *provided* that, notwithstanding the foregoing, all representations and warranties of the Lehman Entities in Section 4.5 hereof will survive until the third anniversary of the Closing; *provided further* that if a claim for indemnification pursuant to Section 6.5 hereof has been made prior to the third anniversary of the Closing, the representation or warranty that is the subject of such claim shall survive until such claim is finally determined.

[Signatures on Following Page]

15

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of
the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name: William Fox
    Title: Executive Vice President

LEHMAN COMMERCIAL PAPER INC.

By: _____
    Name: William Fox
    Title: Executive Vice President

QUADRANT STRUCTURED PRODUCTS
COMPANY, LTD.

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name: William Fox
    Title: Executive Vice President

LEHMAN COMMERCIAL PAPER INC.

By: _____
    Name: William Fox
    Title: Executive Vice President

QUADRANT STRUCTURED PRODUCTS COMPANY, LTD.

By: _____
    Name: MARTIN NANCE
    Title: COO & CFO

[Signature Page to the Share Purchase Agreement]

EXHIBIT A

## MODIFICATION AGREEMENT

This MODIFICATION AGREEMENT (this "Agreement") dated as of February 28, 2011 under the Shareholders' Agreement (the "Shareholders' Agreement") dated October 3, 2007, among Quadrant Structured Products Company, Ltd., a Cayman Islands exempted company (the "Company"), and the shareholders named therein.  Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Shareholders' Agreement.

Reference is made hereby to the Share Purchase Agreement, dated as of the date hereof, by and among the Company, Lehman Brothers Holdings Inc., a Delaware corporation and Lehman Commercial Paper Inc., a Delaware corporation (the "Share Purchase Agreement").

1. Each of the parties hereto hereby waives, to the fullest extent permitted by applicable law, any and all rights such party may have under the Shareholders' Agreement with respect to the purchase of the Shares (as defined in the Share Purchase Agreement) by the Company on the terms and conditions of the Share Purchase Agreement.

2. For the purposes of Section 2.11 of the Shareholders' Agreement, Article 49 of the Articles of Association of the Company (the "Articles") and for all other purposes the parties hereby approve and consent to: (i) the amendment to the Articles contemplated by the written resolutions of the shareholders of the Company to be passed on or about the date hereof; and (ii) the repurchase by the Company of its shares on the terms of the Share Purchase Agreement.

3. For the purposes of Sections 2.02, 2.03, 2.05 and 2.08 of the Shareholders' Agreement, each of the parties hereto agrees: (1) upon any vacancy on the Board resulting from the death, disability, retirement, resignation, removal or otherwise of any Director solely or jointly designated by the Lehman Class A Shareholders, the Lehman Class A Shareholders waive any right the Lehman Class A Shareholders may have to solely or jointly designate another Director to serve on the Board in his or her place; (2) the Magnetar Class A Shareholders shall have the sole right to nominate, appoint and designate a Director (a "Lehman Substitute Director") to serve on the Board in the place of any Director solely or jointly designated by the Lehman Class A Shareholders; and (3) any such Lehman Substitute Director shall have all the rights and powers granted under the Shareholders' Agreement and applicable law to any Director solely or jointly designated by the Lehman Class A Shareholders.

4. For the purposes of Section 2.10 of the Shareholders' Agreement, each of the parties hereto agrees: (1) upon any vacancy on the board of directors of any Subsidiary of the Company (including without limitation the Bankruptcy Remote Subsidiary) resulting from the death, disability, retirement, resignation, removal or otherwise of any director solely or jointly designated to serve on the board of directors of such Subsidiary by the

Lehman Class A Shareholders, the Lehman Class A Shareholders waive any right the Lehman Class A Shareholders may have to solely or jointly designate a director to serve on the board of directors of such Subsidiary in his or her place; (2) the Magnetar Class A Shareholders shall have the sole right to nominate, appoint and designate another director (a "Lehman Substitute Subsidiary Director") to serve on the board of directors of such Subsidiary in the place of any director solely or jointly designated by the Lehman Class A Shareholders; and (3) any such Lehman Substitute Subsidiary Director shall have all the rights and powers granted under the Shareholders' Agreement and applicable law to any director solely or jointly designated by the Lehman Class A Shareholders to serve on the board of directors of such Subsidiary.

5. The provisions of Paragraph 3 and Paragraph 4 hereof shall terminate and cease to be of further effect upon the earlier of the Closing (as defined in the Share Purchase Agreement) or the termination of the Share Purchase Agreement pursuant to Article VIII of the Share Purchase Agreement. Upon the termination of the Share Purchase Agreement pursuant to Article VIII of the Share Purchase Agreement, the Magnetar Class A Shareholders and the Company shall take all necessary actions to cause the resignation or removal of any Lehman Substitute Director or any Lehman Subsidiary Substitute Director and to appoint in his or her place a director designated by the Lehman Class A Shareholders pursuant to the Shareholders' Agreement.

6. The Shareholders' Agreement shall be interpreted in a manner consistent with this Agreement.

7. Each party hereto agrees, upon the reasonable request of the Company or any other party hereto, at any time and from time to time, promptly to execute and deliver all such further documents, and promptly to take or forbear from all such action as may be reasonably necessary or appropriate in order to confirm or carry out the provisions of this Agreement.

8. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of laws rules of such state.

9. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed signature page to this Agreement by facsimile or other means of electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

QUADRANT STRUCTURED
PRODUCTS COMPANY, LTD.

By: _____
Name:
Title:

MAGNETAR MQ, LTD

By: _____
Magnetar Financial LLC, its
Investment Manager
By:    Name:
Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: William Fox
Title: Executive Vice President

LEHMAN BROTHERS COMMERCIAL
PAPER INC.

By: _____
Name: William Fox
Title: Executive Vice President

_____
Eugene S. Park

_____
Martin J. Nance

[Signature Page to the Modification Agreement]

_____
Jason T. Morris

[Signature Page to the Modification Agreement]

EXHIBIT B

## BANKRUPTCY COURT MOTION

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert C. Micheletto
Benjamin Rosenblum

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
Carl E. Black

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                      :
In re:                                :    Chapter 11
                                      :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :   Case No. 08-13555 (JMP)
                                      :
                   Debtors.           :    (Jointly Administered)
                                      :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS AND DEBTORS IN POSSESSION, PURSUANT TO**
**SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL**
**RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 9014, FOR AN**
**ORDER APPROVING THE SALE OF SHARES OF QUADRANT STRUCTURED**
**PRODUCTS COMPANY, LTD. AND GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc.

("LCPI"), as debtors and debtors in possession (together with their affiliated debtors in the

above-captioned chapter 11 cases, the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman"), respectfully represent as follows:

**Background**

1.      Commencing on September 15, 2008 (the "Petition Date") and periodically thereafter, the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases (collectively, the "Bankruptcy Cases") have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA is administering LBI's estate.

4.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner").  By order dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.  On March 11, 2010, the Examiner filed its report with the Court [Docket No. 7531].

5.      On January 25, 2011, the Debtors filed their first amended joint chapter 11 plan [Docket No. 14150] and disclosure statement for their first amended joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 14151].

6.      Additional information regarding the Debtors' businesses, capital structures and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

7.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

8.      Pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014, LBHI and LCPI (collectively, the "Selling Debtors") hereby seek authority to consummate the sale (the "Sale") of 80,000 voting, participating shares, par value U.S. $0.01 per share, of Quadrant Structured Products Company, Ltd. (the "Purchaser"), a Cayman Islands exempted company, designated as Class A Shares (collectively, the "Shares"), to the Purchaser pursuant to a purchase agreement substantially in the form attached hereto as Exhibit A (the "Purchase Agreement"), for $90,000,000 in cash consideration and certain related relief.[1]  A declaration of Andrew Grapkowski, Managing Director - Private Equity and Principal Investments of LAMCO LLC, a subsidiary of LBHI, describing LBHI's investment in the

---

[1]      The proceeds of the Sale will be paid to the Selling Debtors jointly and will be held by the Selling Debtors pending the resolution of the rights of each Selling Debtor to such proceeds.

Purchaser and the Selling Debtors' decision to enter into the Purchase Agreement is attached

hereto as Exhibit B (the "Grapkowski Declaration").

**Proposed Sale of the Shares**

9.    LBHI and Magnetar MQ Ltd. ("Magnetar") formed the Purchaser, a credit

derivatives product company, in October 2007.  In return for an investment of $80 million, LBHI

received 80,000 Class A Shares of the Purchaser, representing an approximate 20 percent equity

stake in the company.[2]  Magnetar, in turn, contributed $320 million in capital to the Purchaser

for which it received an approximate 80 percent interest in the company in the form of 320,000

Class A Shares.  See Grapkowski Declaration ¶ 4.  The balance of the equity in the Purchaser is

held by certain members of Purchaser's management (collectively, the "Management

Shareholders").  Although the Purchaser's Articles of Association provide for the Purchaser to

engage in any business not prohibited by law, the Purchaser was generally created for one

purpose; namely, to engage in the business of selling credit protection in the form of credit

default swaps.  Id.

10.    In late 2007 or early 2008, shortly after the Purchaser was formed, writing

credit protection through credit default swaps, as the Purchaser was established to do, ceased to

be a viable business as a consequence of the credit crisis.  At that point, credit derivatives

product companies were functionally frozen with their existing portfolios and were unable to sell

any new credit protection.  See Grapkowski Declaration ¶ 5.  This remains the case today.  Id.

Instead of writing credit protection, the Purchaser subsequently acquired another credit

derivatives product company which already had a $25.5 billion credit protection portfolio from

another entity.  Id.  Currently, the Purchaser is considering refocusing its business to purchase

---

[2]    Prior to the Petition Date, LBHI transferred an interest in the Shares to LCPI, while retaining record
ownership.

additional credit protection portfolios with risk profiles unknown to LBHI, instead of writing credit protection as originally contemplated by LBHI.  Id.

11.    Pursuant to a Shareholders' Agreement (the "Shareholders' Agreement"), dated as of October 3, 2007, among the Purchaser, Magnetar, LBHI and the Management Shareholders (collectively, the "Parties"), each of the Parties maintains certain rights.  On the one hand, the minority shareholder protections embodied in the Shareholders' Agreement provide, inter alia, that LBHI's consent is required for the Purchaser to make certain changes in its business.  See Grapkowski Declaration ¶ 6.  On the other hand, should LBHI seek to sell the Shares, the Shareholders' Agreement provides for certain rights of first refusal in favor of Magnetar and the Purchaser which would continue after any such sale.  Id.

12.    Given (a) the rights of the Parties under the Shareholders' Agreement, (b) the nature of the investment (i.e., a position as a minority holder in a closely-held corporation), (c) the credit risk exposure and leverage (approximately 59 times total capital) in the Purchaser's existing portfolio, (d) the transitioning nature of the Purchaser's business (e) uncertainties related to certain ongoing litigation between one of the Purchaser's subsidiaries and one of that subsidiary's contract counterparties (the "Litigation") and (f) the Debtors' ongoing efforts to liquidate and monetize assets in their estates in an orderly and value-maximizing fashion, the Selling Debtors concluded that (x) it was in their best interest to dispose of the Shares prior to a potential shift in the Purchaser's business focus and (y) the Purchaser would be the most natural buyer.  See Grapkowski Declaration ¶ 7.  After extensive arm's-length negotiations, the Selling Debtors determined that the sale of the Shares to the Purchaser pursuant to the Purchase Agreement would be in the best interests of their estates and creditors.  Id.

**Principal Terms of the Purchase Agreement**

13.    The Purchase Agreement provides, in summary, as follows:[3]

- **Purchase Price:**  The Purchaser will acquire all of the Shares (and all interests of the Selling Debtors therein), free and clear of any Encumbrances (as such term is defined in the Purchase Agreement) in exchange for $90,000,000 in cash (the "Purchase Price"), payable at closing.  See Purchase Agreement §§ 2.1, 2.2.

- **Escrow:**  No later than 5:00 p.m. on the third business day after execution of the Purchase Agreement, the Purchaser will deposit the Purchase Price into escrow.  If the closing occurs, the Purchase Price will be delivered to the Selling Debtors (with the investment income thereon being delivered to the Purchaser).  If the Purchase Agreement is terminated, the Purchase Price (along with any investment income thereon) will be returned to the Purchaser.  See Purchase Agreement § 2.3.

- **Modification Agreement:**  In connection with the execution of the Purchase Agreement, LBHI and each of the other shareholders of the Purchaser will enter into an agreement (the "Modification Agreement") to (a) waive any and all rights any party may have with respect to the purchase of the Shares by the Purchaser under the Purchase Agreement and (b) implement procedures whereby LBHI's representative on the Purchaser's board would be replaced by a representative of the Purchaser's majority shareholder in the event that LBHI's board representative resigns. If the Purchase Agreement is terminated, the Modification Agreement will expire and LBHI will be entitled to redesignate a board representative (in the event that LBHI's representative resigns).  See Purchase Agreement §§ § 3.2(b); 3.4(d); Exhibit A.

- **Forbearance from Exercise of Certain Minority Consent Rights:**  Upon the deposit of the Purchase Price into escrow, LBHI has agreed to forbear from exercising certain minority protection rights granted to LBHI under the following sections of the Shareholders' Agreement: (a) 2.11(a)(iv) (any material change in nature and scope of the business of the Purchaser or its subsidiaries); (b) 2.11(a)(vii) (any material acquisition by the Purchaser or any of its subsidiaries); (c) 2.11(a)(ix) (relating to appointment of directors, but only to the extent consistent with paragraphs 3 and 4 of the Modification Agreement); (d) 2.11(a)(ii) (material amendment or repeal of any constituent documents, but only as it

---

[3]    This summary of the Purchase Agreement is intended only to assist the Court and parties in interest in understanding the key aspects thereof and is qualified in its entirety by reference to the Purchase Agreement, as the same may be modified or amended pursuant to any order approving the Sale (any such order, the "Sale Order") or otherwise.  In the event of any inconsistency between this description and the Purchase Agreement, the terms of the Purchase Agreement shall govern.

relates to certain actions taken under sections 2.11(a)(iv), 2.11(a)(vii) or
2.11(a)(ix) of the Shareholders' Agreement); and (e) 2.11(a)(xii)
(committing or agreeing to an action covered by the above-referenced
sections of the Shareholders' Agreement).  This forbearance will expire
upon the termination of the Purchase Agreement; provided, however, that
such expiration will not impact actions that the Purchaser has taken or
committed or agreed to undertake prior to the termination of the Purchase
Agreement.  See Purchase Agreement § 6.3.

- **Releases:**  The Purchase Agreement contemplates that, at the closing of
the Sale, the Selling Debtors, Magnetar, the Purchaser and their respective
controlled affiliates will exchange mutual releases for any claims arising
out of the Selling Debtors' ownership of interests in the Purchaser and
their activities in connection therewith.  See Purchase Agreement
§§ 3.2(c); 3.3; 3.4(e); Exhibit C.

- **Termination:**  The Purchase Agreement may be terminated:  (a) by the
mutual written consent of the Purchaser and the Selling Debtors; (b) by
either the Purchaser or the Selling Debtors, upon written notice, if the Sale
has not been consummated prior to May 1, 2011; (c) by the Purchaser,
upon written notice to the Selling Debtors, if either of the Selling Debtors
has breached, or if there is any order or other action modifying, (i) the
terms of the Purchase Agreement relating to LBHI's forbearance from the
exercise of its minority rights under the Shareholders' Agreement or
(ii) the Modification Agreement; (d) by the Selling Debtors, upon written
notice, if the Purchaser has not timely deposited the Purchase Price with
the escrow agent; or (e) by the Purchaser, upon written notice to the
Selling Debtors, if the Selling Debtors have not provided written notice to
the Purchaser by 5:00 p.m. Eastern Time, on March 15, 2011 that the
LBHI Board of Directors has approved the transactions contemplated by
this Agreement.  See Purchase Agreement § 8.1.

- **Indemnification:**  Until the third anniversary of the closing of the Sale,
the Selling Debtors shall indemnify, defend and hold the Purchaser (and
each of its shareholders, officers, directors, employees, agents, affiliates,
representatives, managers, administrators, trustees and attorneys and their
respective successors and assigns) (collectively, the "Indemnitees")
harmless from and against any damages, losses, liabilities or expenses
incurred by any of the Indemnitees (including, but not limited to,
reasonable expenses of investigation and reasonable attorneys' fees and
expenses in connection with any action, suit or proceeding and any
incidental, indirect or consequential damages, losses, liabilities, lost profits
or diminution in value associated therewith) as a result, or arising out of a
breach, of the representations and warranties set forth in Section 4.5 of the
Purchase Agreement, up to a maximum amount equal to the Purchase
Price (such indemnity obligations, collectively, the "Indemnification
Obligations"), provided that the Selling Debtors shall not be responsible

for the fees and expenses of more than one separate law firm (in addition to Cayman counsel) for all Indemnitees. Any Indemnification Obligations due and owing under the Purchase Agreement shall be allowed as an administrative expense claim against the bankruptcy estates of each of the Selling Debtors pursuant to section 503(b) of the Bankruptcy Code (any such administrative expense, an "Indemnity Claim"). Any Indemnity Claim shall be payable by the Selling Debtors in the ordinary course of business without the need for (a) the Indemnitees to file an administrative proof of claim or (b) further order of the Court. Except as expressly provided in the Purchase Agreement or the Sale Order, the Indemnification Obligations shall survive, and shall not be modified, impaired or discharged by: (x) the entry of an order (i) converting the Bankruptcy Case of either of the Selling Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) dismissing any Bankruptcy Case, (iii) terminating the joint administration of the Bankruptcy Cases or (iv) confirming a chapter 11 plan in either of the Selling Debtors' Bankruptcy Cases; or (y) any other act or omission. The Selling Debtors have agreed to waive any discharge as to any Indemnification Obligations, as set forth at Section 6.5(b) of the Purchase Agreement, pursuant to section 1141(d)(4) of the Bankruptcy Code. See Purchase Agreement § 6.5.

- **Maintenance of Certain Insurance Coverage:** The Purchaser will not, for a period of three years following the closing of the Sale, significantly modify its directors' and officers' liability insurance and fiduciary liability insurance coverage. See Purchase Agreement § 6.4.

14.    For the reasons described herein, the Selling Debtors believe that the terms of the Purchase Agreement are fair and reasonable. Further, under the circumstances, the Selling Debtors respectfully submit that their entry into the Purchase Agreement and the consummation of the Sale is in the best interests of the Selling Debtors' estates and represents the sound exercise of the Selling Debtors' business judgment.

### Extraordinary Provisions Under the Guidelines

15.    The following items in the Purchase Agreement and the Sale Order may be considered Extraordinary Provisions under the "Guidelines for the Conduct of Asset Sales" promulgated pursuant to General Order M-383:

(a)    Private Sale/No Competitive Bidding. The Selling Debtors have not conducted an auction for the Shares because they do not believe that

marketing the Shares is likely to produce a better result for the Selling
Debtors and their estates for a variety of reasons. <u>See</u> Grapkowski
Declaration ¶ 8. First, the Selling Debtors believe that the esoteric nature
of the Purchaser's business, the required risk tolerance to invest in that
business and the Litigation are likely to deter potential bidders. <u>Id.</u>
Second, the Shares are minority interests in a closely-held corporation in
which Magnetar has a controlling interest, and the Shareholders'
Agreement provides a right of first refusal to the Purchaser and Magnetar.
<u>Id.</u> Third, the business of the Purchaser is in a transitional phase. As a
result, any entity interested in acquiring a minority interest likely would
apply an unacceptable discount to any offer to purchase the Shares to
reflect the uncertainties discussed above. <u>Id.</u> Further, prior to and during
their negotiations with the Purchaser, the Selling Debtors conducted
informal "no-name" market checks with various independent parties
familiar with the class of assets held by Quadrant and, as a result of such
discussions and their own analysis, concluded that the discount rate that
any independent third party buyer would apply to the Shares likely would
yield consideration less than the Purchase Price. <u>Id.</u> at ¶ 9. Finally,
because the Purchase Price was reached through extensive negotiation and
represents the maximum amount the Purchaser is willing to pay for the
Shares, the Selling Debtors believe that it is unlikely that the Purchaser
would be willing to offer the Purchase Price as a "floor" for any auction.
<u>Id.</u> As a result, any auction process pursued by the Selling Debtors likely
would have a "floor," to the extent any floor was established, much lower
than the Purchase Price and, given (i) the anticipated downward pressures
on any offer by a third party buyer discussed above and (ii) the results of
the Selling Debtors' market check, would likely yield consideration lower
than the Purchase Price, while imposing additional costs and expenses on
the Selling Debtors' estates. <u>Id.</u> Thus, the Selling Debtors believe that the
consideration to be received by the Selling Debtors under the Purchase
Agreement exceeds any amount that would be generated through an
auction process. <u>See</u> Grapkowski Declaration ¶ 9.

(b)    <u>Insider Status</u>. The Purchase Agreement contemplates the sale of the
Shares by the Selling Debtors to the Purchaser. Because ownership of the
Shares is sufficient to technically make the Purchaser an "affiliate" of the
Selling Debtors as that term is defined in section 101(2) of the Bankruptcy
Code, the Sale appears to constitute a transaction with an "insider" as that
term is defined in section 101(31) of the Bankruptcy Code. However,
neither the Purchaser nor any of its affiliates has influenced the Selling
Debtors, their management or their advisors in any manner that could give
rise to an appearance that the negotiations were not conducted at arm's-
length or involved self-dealing. <u>See</u> Grapkowski Declaration ¶¶ 13-14.
Moreover, as the effect of the transaction is to divest the Selling Debtors
of any further financial interest in the Purchaser, the Selling Debtors have
no incentive to accept anything other than an arm's length price for the
Shares, despite the Purchaser's status as an "insider" prior to (but not after)

the transaction.  As a result, (i) the Purchaser's technical status as an "insider" of the Selling Debtors has not impacted the Selling Debtors' ability or intent to maximize the value of this transaction and (ii) the Selling Debtors believe the negotiation of the Sale has been completely fair.

(c)    <u>Successor Liability</u>.  The proposed Sale Order contains findings and provisions that provide that the Purchaser will have no successor liability for the liabilities of the Selling Debtors by virtue of its purchase of the Shares.  Given that the Shares are simply a single asset among the numerous assets held by the Selling Debtors and reflect only a minority ownership interest in the Purchaser, the Debtors believe that a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code.  The Selling Debtors believe that providing notice of this Motion as set forth herein is adequate for purposes of providing parties with notice of the Sale Order's findings with respect to successor liability.

(d)    <u>Relief from Bankruptcy Rule 6004(h)</u>.  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Purchaser has informed the Selling Debtors that it is contemplating certain transactions in the near term that would otherwise require the consent of LBHI under the Shareholders' Agreement and it is important for Purchaser's pursuit of such transactions that the Purchaser have certainty with respect to LBHI's rights under the Shareholders' Agreement as soon as possible after the entry of the Sale Order.  Accordingly, the Selling Debtors submit that such relief is appropriate under the circumstances.

**<u>Basis for Relief Requested</u>**

16.    Section 363 of the Bankruptcy Code provides, in relevant part, "that a [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and elsewhere, in applying this section, have required that a sale outside of the ordinary course of the debtor's business be based upon a good business reason.  <u>See</u> <u>Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)</u>, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) motion must find from the evidence presented a good business reason to grant such motion); <u>Comm. of</u>

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983)

(same).

17.     In considering the "good business reason" for pursuing a sale outside of

the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code, the debtor's

business judgment is the focus of the inquiry.  See Chateaugay, 973 F.2d at 143; Lionel,

722 F.2d at 1070-71.  A showing of a legitimate business justification gives rise to a presumption

that the debtor's decision was made "on an informed basis, in good faith and in the honest belief

that the action was taken in the best interests of the company."  In re Integrated Res., Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872

(Del. 1985)), app. dismissed, 3 F.3d 49 (2d Cir. 1993).  As courts in this district have stated,

"[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a

decision made arbitrarily or capriciously), courts will generally not entertain objections to the

debtor's conduct."  Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re

Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

18.     Furthermore, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in

the ordinary course of business may be by private sale or by public auction."  As is the case here,

courts have previously permitted a chapter 11 debtor to sell assets outside the ordinary course of

business by private sale when the debtor demonstrates that the sale is permissible pursuant to

section 363(b) of the Bankruptcy Code.  See, e.g., In re Loral Space & Communications Ltd.,

Case No. 03-41710 (RDD) [Docket. No. 2393] (Bankr. S.D.N.Y. Sep. 30, 2005) (authorizing

private sale of debtor's minority equity interest in third party holding company to majority equity

holder free and clear of any liens, claims and encumbrances, pursuant to section 363 of the

Bankruptcy Code); Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.), 233 B.R. 619

(D.P.R. 1999) (upholding prior bankruptcy court approval of private sale conducted by a

chapter 11 debtor); In re Wieboldt Stores, Inc., 92 B.R. 309 (N.D. Ill. 1988) (affirming right of

chapter 11 debtor to transfer assets by private sale) (citing In re Youngstown Steel Tank Co., 27

B.R. 596, 598 (W.D. Pa. 1983)); In re Condere Corp., 228 B.R. 615 (Bankr. S.D. Miss. 1998)

(approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b)

were met); In re Naron & Wagner, Chartered, 88 B.R. 85, 89 (Bankr. D. Md. 1988) (approving

chapter 11 debtor's request to sell by a private sale pursuant to 11 U.S.C. § 363(b) its wholly

owned subsidiary to insiders of the subsidiary).

19.    The Selling Debtors' decision to sell the Shares to the Purchaser pursuant

to the Purchase Agreement represents a sound exercise of the Selling Debtors' business

judgment.  As discussed above and in the Grapkowski Declaration, the Purchase Agreement

represents the culmination of extensive arm's-length negotiations between the Purchaser and the

Selling Debtors.  The Selling Debtors believe that the resulting Purchase Price – $90 million,

representing a premium of approximately 12.5 percent above invested capital – is fair and

reasonable.  See Grapkowski Declaration ¶ 12.

20.    Moreover, the Selling Debtors believe that now is the prudent time to

liquidate the investment in the Shares given the risk exposure and leverage of the Purchaser's

business.  As business entities obliged to take into account the safety of their investments and as

debtors in bankruptcy with an obligation to maximize value for their stakeholders, the Selling

Debtors believe that it is prudent to liquidate the investment now to:  (a) avoid the incurrence of

potential losses in the existing portfolio and taking on risks that are unknown to the Selling

Debtors in light of the currently fluid and transitional nature of the Purchaser's business and the

Litigation; and (b) take advantage of an increase in the fundamental value of the Shares caused

by the material improvement in the credit markets since the height of the credit crisis.  See

Grapkowski Declaration ¶ 10.

21.    The Selling Debtors further submit that the Purchaser is the natural buyer

of the Shares and that the Purchase Price is the highest and best under the circumstances.  As

described above, the Shares represent a minority position in a closely-held corporation in which

the overwhelming majority of remaining shares are held by a single entity (i.e., Magnetar).  The

Selling Debtors believe that any third-party purchaser thus would apply a minority discount to

the Shares significant enough to reduce the estate's recovery below the amount of the Purchase

Price.  Moreover, the Selling Debtors believe that the fact that the Purchaser's business is

highly-levered, subject to Litigation and currently in a transitional phase would also serve to

depress third-party offers.  Consequently, the Purchaser, which has an interest in consolidating

ownership of the Shares as it refocuses its business, emerged as the natural buyer and has offered

what the Selling Debtors' believe is the best price for the Shares under the circumstances.  See

Grapkowski Declaration ¶ 11.

22.    In addition, as stated above, the Shareholders' Agreement purports to

provide a right of first refusal to the Purchaser and Magnetar.  Although the Selling Debtors

maintain that this right of first refusal is a de facto anti-assignment provision that may not be

enforced pursuant to section 365(f) of the Bankruptcy Code,[4] they understand that the Purchaser

and Magnetar do not share that view, and anticipate that the Purchaser and Magnetar would seek

to enforce their asserted rights of first refusal if the Selling Debtors sought to sell the Shares, and

---

[4]    See In re Mr. Grocer, Inc., 77 B.R. 349, 352 (Bankr. D.N.H. 1987) (finding right of first refusal granted to
landlord in a commercial lease provision was unenforceable under section 365(f) of the Bankruptcy Code);
see also Ramco-Gershenson Props., L.P. v. Service Merch. Co., 293 B.R. 169, 174 (M.D. Tenn. 2003)
(affirming the bankruptcy court's ruling that purchase option was "an explicit, intentional restriction on
assignment in contravention of § 365(f)."). But see In re E-Z Serve Convenience Stores, Inc., 289 B.R. 45
(Bankr. M.D.N.C. 2003) (enforcing right of first refusal and finding provision permitting holder of right of
first refusal the opportunity to outbid other offers did not chill bidding).

LBHI assign the Shareholders' Agreement, to a third party.  The Selling Debtors believe that the Purchaser and Magnetar's assertion of the right of first refusal, regardless of its enforceability, would negatively impact the purchase price available from third parties.  See In re Adelphia Commc'ns Corp., 359 B.R. 65, 85-86 (Bankr. S.D.N.Y. 2007) (explaining that rights of first refusal can "impair[] the estate's ability to maximize value for its creditors when it markets its assets. . . .").

23.    Accordingly, for the reasons discussed herein, the Selling Debtors respectfully submit that an auction of the Shares would not generate an offer higher than the Purchase Price and that the proposed Sale pursuant to the Purchase Agreement is an exercise of their sound business judgment that will maximize value for the Selling Debtors' estates and all parties in interest.

### Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

24.    The Selling Debtors request that the Shares be sold free and clear of any liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code.  Under section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if (a) applicable nonbankruptcy law permits the sale of such property free and clear of such interest, (b) such entity consents, (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (d) such interest is in bona fide dispute, or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  See 11 U.S.C. § 363(f)(1)–(5).  This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions

of [the Bankruptcy Code]."  11 U.S.C. § 105(a); see also Volvo White Truck Corp. v.

Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D.

Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when

necessary to carry out the provisions of Title 11.").

           25.     Any lien asserted against the Shares will attach to the proceeds of the Sale

with the same force, effect and priority as such liens would then have on the Shares, subject to

the rights and defenses, if any, of the Selling Debtors and any party in interest with respect

thereto.  Moreover, the Selling Debtors believe that any party holding a lien against the Shares

(and the Selling Debtors are not aware of any such party) could be compelled to accept a

monetary satisfaction of its interest.  In addition, if the holder of a lien, claim, encumbrance or

other interest receives notice of this Motion and does not object within the prescribed time

period, the Selling Debtors submit that such holder may be deemed to have consented to the

proposed Sale.  Accordingly, the Selling Debtors submit that the proposed Sale of the Shares free

and clear of liens, claims, encumbrances and interests satisfies the statutory prerequisites of

section 363(f) of the Bankruptcy Code.

**The Purchase Agreement Is the Product of Good
Faith Negotiations and Contains Fair Consideration**

           26.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from a debtor notwithstanding that the sale conducted under

section 363(b) of the Bankruptcy Code is later reversed or modified on appeal.  Specifically,

section 363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b) of the Bankruptcy Code] . . . does not affect the
> validity of a sale . . . to an entity that purchased . . . such property
> in good faith, whether or not such entity knew of the pendency of

> the appeal, unless such authorization and such sale . . . were stayed
> pending appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code "affords finality to judgments by

protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy

judgments in making their offers and bids."  Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.),

No. 92 CIV. 7054, 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (citations and internal

quotations omitted); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994)

("[s]ection 363(m) . . . provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of

the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990)

("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale

on appeal unless there is a stay pending appeal").

　　　　　27.　　　In certain circumstances involving proposed transactions with insiders,

courts have applied heightened scrutiny.  See, e.g., Official Comm. of Unsecured Creditors of

Enron Corp. v. Enron Corp. (In re Enron Corp.), 335 B.R. 22, 28 (S.D.N.Y. 2005) ("Courts have

held that transactions that benefit insiders must withstand heightened scrutiny before they can be

approved under § 363(b).");  C & J Clark Am., Inc. v. Carol Ruth, Inc. (In re Wingspread Corp.),

92 B.R. 87, 93 (Bankr. S.D.N.Y. 1988) (finding that insider transactions under section 363(b) of

the Bankruptcy Code have the possibility of abuse and thus are necessarily subjected to

heightened scrutiny).  Although the Purchaser is an "insider" of the Selling Debtors, as defined in

section 101(31) of the Bankruptcy Code, the Purchase Agreement provides the Purchaser with no

unfair, non-arm's-length benefits.  Indeed, as the Selling Debtors are divesting themselves of any

continuing financial interest in the Purchaser pursuant to the Sale, the Selling Debtors have no

incentive to confer any such unfair benefits upon the Purchaser (which entity, following the Sale,

will <u>not</u> be an insider of the Selling Debtors, and will have independent financial interests that

diverge from the Selling Debtors).  Unsurprisingly, the Sale is the product of arm's-length, good-

faith negotiations between the Selling Debtors and the Purchaser.  <u>See</u> Grapkowski Declaration

¶¶ 13-14.  Based upon the Grapkowski Declaration, the Selling Debtors intend to request a

finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m)

of the Bankruptcy Code.

<u>**Waiver of 14-Day Stay Under Bankruptcy Rule 6004(h)**</u>

28.    Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise,

all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are

automatically stayed for 14 days after the entry of such an order.  <u>See</u> Fed. R. Bankr. P. 6004(h).

The Purchaser has informed the Selling Debtors that it is contemplating certain transactions in

the near term that would otherwise require the consent of LBHI under the Shareholders'

Agreement and it is important for Purchaser's pursuit of such transactions that the Purchaser have

certainty with respect to LBHI's rights under the Shareholders' Agreement as soon as possible

after the entry of the Sale Order.  Accordingly, the Selling Debtors request a waiver of the 14-

day stay under Bankruptcy Rule 6004(h) allowing the Sale Order to be effective immediately.

<u>**Notice**</u>

29.    No trustee has been appointed in these chapter 11 cases.  In accordance

with section II.C.1 of General Order M-383 and the procedures set forth in the order entered on

June 17, 2010 governing case management and administrative procedures for these cases

[Docket No. 9635], notice of this Motion has been given to:  (a) the U.S. Trustee; (b) counsel to

the Creditors' Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue

Service; (e) the United States Attorney for the Southern District of New York; (f) the Purchaser;

(g) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other

interest in the Shares; (h) all parties who have requested notice in these chapter 11 cases pursuant

to Bankruptcy Rule 2002; and (i) all other parties required to receive notice of the Motion

pursuant to section II.C.1 of General Order M-383 of this Court.

30.    No previous request for the relief sought herein has been made by the

Selling Debtors to this or any other court.

WHEREFORE, the Selling Debtors respectfully request that the Court enter the

Sale Order, substantially in the form attached hereto as Exhibit C, and grant such other and

further relief as it deems just and proper.

Dated:  February 28, 2011                         Respectfully submitted,
        New York, New York

                                                  /s/  Benjamin Rosenblum
                                                  Robert C. Micheletto
                                                  Benjamin Rosenblum
                                                  JONES DAY
                                                  222 East 41st Street
                                                  New York, New York  10017
                                                  Telephone:  (212) 326-3939
                                                  Facsimile:  (212) 755-7306

                                                  and

                                                  Carl E. Black
                                                  JONES DAY
                                                  North Point
                                                  901 Lakeside Avenue
                                                  Cleveland, Ohio  44114
                                                  Telephone:  (216) 586-3939
                                                  Facsimile:  (216) 579-0212

                                                  ATTORNEYS FOR DEBTORS AND
                                                  DEBTORS IN POSSESSION

# EXHIBIT A

## (Purchase Agreement)

*[Intentionally Omitted]*

# EXHIBIT B

## (Grapkowski Declaration)

*[Intentionally Omitted]*

# EXHIBIT C

## (Proposed Sale Order)

*[Intentionally Omitted]*

EXHIBIT C

## MUTUAL RELEASE

Pursuant to Sections 3.2 (c) and 3.3(c) of that certain Stock Purchase Agreement, dated as of _____ __, 2011 (the "Purchase Agreement"), by and among Lehman Brothers Holdings Inc., a Delaware corporation and Lehman Commercial Paper Inc., a Delaware corporation ("LCPI" and, together with LBHI collectively, the "Seller"), and Quadrant Structural Products Company, Ltd., a Cayman Islands exempted company (the "Buyer"), this Mutual Release (the "Release"), dated as of _____ __, 2011, is being entered into by the Seller, on behalf of itself and its Affiliates, on the one hand, and Magnetar MQ, Ltd., a company limited by shares organized under the laws of the Cayman Islands ("Magnetar"), on behalf of itself and its Affiliates (including the Buyer), on the other hand.  Except as otherwise defined herein, terms used herein with initial capital letters are so used with the meanings ascribed thereto in the Purchase Agreement.

Each of the Seller, on behalf of itself and its Affiliates, on the one hand, and Magnetar, on behalf of itself and its Affiliates, on the other hand, hereby irrevocably and unconditionally releases and forever discharges the other, each of their respective Affiliates and each of their and their respective Affiliates' respective successors, directors, officers, employees and agents from each and all direct and indirect liabilities, obligations, claims, losses, damages, deficiencies, costs and expenses, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise ("Liabilities") arising out of the Seller's ownership of an interest in the Buyer and any acts or omissions of the Buyer in connection therewith, including without limitation any Liabilities arising out of the Shareholders' Agreement dated as of October 3, 2007 among the Buyer, the Seller and the other parties named therein.

Each of the Seller and Magnetar hereby irrevocably covenants to, and shall cause its respective Affiliates to, refrain from, directly or indirectly, asserting or commencing, instituting or causing to be commenced, any claim for Liabilities of any nature whatsoever based upon any matter covered by this Release.

For avoidance of doubt, nothing in this Release shall limit in any manner the ability of any party to the Purchase Agreement and the agreements entered into in connection with the transactions contemplated thereby, excluding this Release (collectively, the "Repurchase Documents"), from asserting or commencing, instituting or causing to be commenced, any claim for Liabilities of any nature whatsoever arising out of the Repurchase Documents.  In addition, nothing in this Release shall release or discharge the parties to the Repurchase Documents, their respective Affiliates or their and their respective Affiliates' respective successors, directors, officers, employees and agents from any Liabilities arising out of the Repurchase Documents.

Each of the Seller and Magnetar, on behalf of itself and its respective Affiliates, hereby expressly waives any rights it may have under any statute, law, rule or regulation applicable to the Liabilities released hereby.  Each of the Seller and Magnetar, on behalf of itself and its

respective Affiliates, assumes the risk of the subsequent discovery or understanding of any matter, fact or law which, if known or understood, would in any respect have affected the releases and waivers made herein.

[Signature Page Follows]

2

IN WITNESS WHEREOF, the undersigned has duly executed this Mutual Release as of the date first written above.

MAGNETAR MQ, LTD

By: _____
      Magnetar Financial LLC, its
       Investment Manager
By:  Name:
     Title:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
     Name:  William Fox
     Title:   Executive Vice President

LEHMAN BROTHERS COMMERCIAL
    PAPER INC.

By: _____
     Name:  William Fox
     Title:   Executive Vice President

EXHIBIT D

SALE ORDER

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :    Case No. 08-13555 (JMP)
                                                        :
                                  Debtors.               :    (Jointly Administered)
                                                        :
---------------------------------------------------------------x

### ORDER, PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 9014, APPROVING THE SALE OF SHARES OF QUADRANT STRUCTURED PRODUCTS COMPANY, LTD. AND GRANTING CERTAIN RELATED RELIEF

This matter having come before the Court on the motion, dated February 28, 2011,

(the "**Motion**")[1] of Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc.

(together, the "**Debtors**"), as debtors and debtors in possession, for the entry of an order pursuant

to sections 105 and 363 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

(the "**Bankruptcy Code**") and rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**"):  (i) authorizing the Debtors to sell 80,000 Class A Shares

(collectively, the "**Shares**") of Quadrant Structured Products Company, Ltd. (the "**Purchaser**")

to Purchaser, free and clear of all liens, claims, encumbrances and other interests (the "**Sale**"),

(ii) approving the Purchase Agreement, dated as of February 28, 2011, between the Debtors and

the Purchaser, substantially in the form attached as Exhibit A to the Motion (the "**Purchase**

**Agreement**") and authorizing the Debtors' execution and delivery of, and performance under,

the Purchase Agreement and (iii) granting related relief; a hearing (the "**Hearing**") having been

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

held before the Court on March 16, 2011, at which time all parties in interest were afforded an

opportunity to be heard with respect to the Motion; and the Court having reviewed and

considered the Motion, the Declaration of Andrew Grapkowski in support thereof and the

objections thereto, if any, and related pleadings, and having heard testimony and arguments of

counsel and received evidence with respect to the proposed Sale;

NOW, THEREFORE, based upon all of the evidence, including affidavits, proffered or

adduced at the Hearing, memoranda, objections and arguments of counsel in connection with the

Hearing, and upon the entire record of the Hearing; and after due deliberation thereon; and good

cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.      This Court has jurisdiction to hear and determine the Motion, and over the

property of the Debtors, including the Shares to be sold pursuant to the Purchase Agreement,

pursuant to 28 U.S.C. §§ 157 and 1334.

B.      Venue of this case and the Motion in this district is proper pursuant to

28 U.S.C. §§ 1408 and 1409.

C.      Determination of the Motion is a core proceeding under 28 U.S.C.

§  157(b)(2)(A), (N) and (O).  The statutory predicates for the relief requested herein are

sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014.

D.      In accordance with section II.C.1 of General Order M-383 and the

procedures set forth in the order entered on June 17, 2010 governing case management and

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact when appropriate.  See Fed R. Bankr. P. 7052.

administrative procedures for these cases [Docket No. 9635], proper, timely, adequate and

sufficient notice of the Motion has been given to:  (1)  the U.S. Trustee; (2) counsel to the

Creditors' Committee; (3) the Securities and Exchange Commission; (4) the Internal Revenue

Service; (5) the United States Attorney for the Southern District of New York; (6) the Purchaser;

(7) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other

interest in the Shares; (8) all parties required to receive notice in these chapter 11 cases pursuant

to Bankruptcy Rule 2002; and (9) all other parties required to receive notice of the Motion

pursuant to section II.C.1 of General Order M-383 of this Court.  No other or further notice need

be provided.

E.    The Debtors have demonstrated and proven to the satisfaction of this

Court that approval of the Purchase Agreement and consummation of the Sale at this time are in

the best interests of the Debtors, their creditors, their estates and all other parties in interest in

their chapter 11 cases, and that the Sale represents a sound and prudent exercise of the Debtors'

business judgment.  The Debtors have articulated good, sufficient and sound business

justifications and compelling circumstances for a sale of the Shares pursuant to section 363(b) of

the Bankruptcy Code.

F.    The consideration to be provided by the Purchaser for the Shares pursuant

to the Purchase Agreement is (1) the highest and best offer for the Shares under the

circumstances, (2) is fair and reasonable and (3) and constitutes reasonably equivalent value and

fair consideration under the Bankruptcy Code and under the other laws of the United States, any

state, territory or possession thereof and the District of Columbia.  The terms and conditions of

the Purchase Agreement are also fair and reasonable.

G.     As a condition to the Sale, the Purchaser requires that the Shares must be sold free and clear of any and all claims, liens, pledges, offsets, setoffs, recoupments, charges, successor, product, environmental, tax and other liabilities (whether secured or unsecured, contingent or absolute, liquidated or unliquidated, perfected or unperfected, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded), taxes, security interests, mortgages, restrictions, indentures, loans, credit agreements, other agreements, interests under any agreements (including repurchase agreements), instruments, contracts, judgments and any actions and proceedings of any kind or nature, but excluding any restrictions on the Shares imposed by the Shareholders' Agreement (collectively, "**Liens and Claims**").  The Purchaser would not enter into the Purchase Agreement or consummate the Sale, thus adversely affecting the Debtors' estates, if the Sale were not to be free and clear of all Liens and Claims.

H.     The Debtors may sell the Shares free and clear of all Liens and Claims, because one or more of the requirements set forth in sections 363(f) of the Bankruptcy Code has been satisfied.  Holders of Liens and Claims who did not object, or who withdrew their objections, to the sale of the Shares and the Motion are deemed to have consented to such sale free and clear of all Liens and Claims pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Liens and Claims who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Liens and Claims, if any, attach to the proceeds of the sale of the Shares with the same priority that such Liens and Claims had on the Shares, if any, subject to the rights and defenses, if any, of the Debtors and any party in interest with respect thereto.

I.     The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to the protections afforded thereby in that:  (1) while

the Purchaser is an "affiliate" of the Debtors within the meaning of section 101(2)(B) of the

Bankruptcy Code because the Debtors control approximately 20 percent of the outstanding

voting securities of the Purchaser, after the Sale, the Purchaser will not be an "affiliate" or

"insider" of the Debtors (in each case, as defined in the Bankruptcy Code) and will otherwise be

unrelated to the Debtors; (2) the Purchaser, the Debtors and their respective counsel and financial

advisors engaged in good faith, arm's length negotiations to determine the terms and conditions

of the Purchase Agreement; and (3) the Debtors and the Purchaser have entered into the Purchase

Agreement in good faith and without collusion.

J.    No party has alleged any conduct that would constitute improper

agreements or conduct under section 363(n) of the Bankruptcy Code.  No party has engaged in

any conduct that would permit the avoidance of the Sale, the recovery of excess value and other

costs, fees or expenses or the imposition of punitive damages pursuant to section 363(n) of the

Bankruptcy Code.

K.    Upon the entry of this Sale Order:  (1) the Debtors have full corporate

power and authority to execute, deliver and perform the Purchase Agreement and all other

agreements, instruments and other documents contemplated thereby, including without limitation

the Modification Agreement (the "**Transaction Documents**") and to consummate the Sale in

accordance with the terms and conditions thereof; (2) the execution, delivery and performance by

the Debtors of the Purchase Agreement and the other Transaction Documents and the

consummation of the Sale have been duly and validly authorized by all necessary corporate

action on the part of the Debtors; and (3) no other consents or approvals, other than those

expressly provided for in the Purchase Agreement, are required for the Debtors to consummate

the Sale.

L.      The Debtors hold good title to the Shares as of the Closing Date (as

defined in the Purchase Agreement) and, accordingly, the transfer of the Shares:  (1) will be a

legal, valid and effective transfer of property of the Debtors' estates to the Purchaser; and

(2) will vest the Purchaser with all right, title and interest of the Debtors in and to the Shares,

free and clear of any Liens and Claims, pursuant to sections 363(f) and 105 of the Bankruptcy

Code.

M.      The Purchaser is not, and will not become by virtue of the Sale, the

successor of or to the Debtors, and the transfer of the Shares to the Purchaser does not and will

not subject the Purchaser or any of its affiliates, successors or assigns or any of their respective

affiliates, agents, representatives, counsel or advisors to any (1) liability, (2) duty,

(3) responsibility, (4) obligation for any liens, claims or administrative expenses or (5) other

liabilities, in each case against the Debtors, by reason of such transfer under the laws of the

United States, any state, territory or possession thereof or the District of Columbia applicable to

such transactions.

N.      The Purchaser would not have entered into the Purchase Agreement and

would not consummate the Sale, thus adversely affecting the Debtors, their estates and their

creditors, if the Debtors, on behalf of themselves and their affiliates, did not, upon the occurrence

of the Closing (as defined in the Purchase Agreement) and pursuant to the Release attached to

the Purchase Agreement as Exhibit C (the "**Release**"), irrevocably and unconditionally release

and forever discharge Magnetar MQ, Ltd. ("**Magnetar**"), the majority shareholder of the

Purchaser, and each of its affiliates (including the Purchaser), and each of its and its affiliates'

respective successors, directors, officers, employees and agents from all direct and indirect

liabilities, obligations, claims, losses, damages, deficiencies, costs and expenses, whether known

or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise (collectively, "**Liabilities**") arising out of the Debtors' ownership of an interest in the Purchaser and any acts or omissions of the Purchaser in connection therewith, other than any Liabilities arising out of the Purchase Agreement or any other Transaction Documents.

O.     Time is of the essence in closing the Sale and the Debtors and the Purchaser intend to close the Sale as soon as practicable.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.     The relief requested in the Motion is GRANTED in its entirety.

2.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits, with prejudice.

### Authorization and Approval of the
### Sale and the Purchase Agreement

3.     The Purchase Agreement and the other Transaction Documents, and in each case all of the terms and conditions contained therein, are hereby approved in all respects, and the Sale pursuant to the Purchase Agreement is hereby authorized under sections 363(b) and (f) of the Bankruptcy Code.  The omission from this Sale Order of specific reference to any provision of the Purchase Agreement or any other Transaction Document shall not impair or diminish the efficacy, propriety or approval of any such provision, it being the intent of this

Court that the Purchase Agreement and the other Transaction Documents are hereby authorized and approved in their entireties.

4.      By the issuance of this Sale Order, the Debtors (including their officers, employees and agents) are hereby authorized and directed to execute, deliver, consummate, implement and fully perform under the Purchase Agreement and the other Transaction Documents, in each case in accordance with the terms and conditions thereof, together with all additional agreements, instruments and other documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the other Transaction Documents, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser the Shares or as may otherwise be necessary or appropriate for the performance of the Debtors' obligations under the Purchase Agreement and the other Transaction Documents and the consummation of the Sale.

5.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, upon satisfaction (or waiver to the extent permitted by the Purchase Agreement) of the conditions to the Closing, the Shares shall be transferred to the Purchaser at the Closing, free and clear of all Liens and Claims of any kind or nature whatsoever.  Notwithstanding paragraph 8 below or anything to the contrary in this Sale Order, all such Liens and Claims released, terminated and discharged as to the Shares shall attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they would then have against the Shares, subject to any defenses, counterclaims, rights of avoidance and rights under section 506(c) of the Bankruptcy Code that the Debtors may have with respect thereto.

6.      The transfer of the Shares to the Purchaser pursuant to the Purchase Agreement shall constitute a legal, valid and effective transfer, assignment and conveyance of

the Shares, and shall vest the Purchaser with all right, title (which shall be good, clear and

marketable) and interest of the Debtors in and to the Shares, free and clear of all Liens and

Claims.

7.      All persons, including, but not limited to, all debt security holders, equity

security holders, federal, state or local governmental, tax, environmental and regulatory

authorities or agencies, lenders, trade and other creditors, holding Liens or Claims of any kind or

nature whatsoever against or in the Debtors or the Shares (whether legal or equitable, secured or

unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated) arising

under or out of, in connection with or in any way relating to the Debtors, the Shares, the

operation of the Debtors' businesses prior to the Closing Date or the transfer of the Shares to the

Purchaser are hereby forever barred, estopped and permanently enjoined from asserting,

prosecuting or otherwise pursuing any interest of any kind or nature whatsoever that any such

person had, has or may have against the Debtors, the Shares or any other assets or operations of

the Debtors or any of the Debtors' predecessors or affiliates against the Purchaser or any of its

affiliates, successors or assigns or any of their respective affiliates, the Shares or any other assets

or operations of the Purchaser or any of its affiliates, successors or assigns or any of their

respective affiliates, agents, representatives, counsel or advisors.  No such person shall assert

against the Purchaser or any of its successors in interest any liability, debt, claim or obligation

relating to or arising from the ownership of the Shares or any liabilities calculable by reference to

the Debtors or the Debtors' assets or operations.

## Release of Liens and Claims

8.      This Sale Order shall operate to release of all Liens and Claims on and

against the Shares, upon the occurrence of the Closing.  At or prior to the Closing, each person is

authorized and directed to execute such documents and take all other actions as may be

necessary or appropriate to release its Liens and Claims on or against the Shares, as such Liens

and Claims may have been recorded or may otherwise exist.  If any person that has filed any

mortgages, deeds of trust, financing statements or other documents or agreements evidencing any

Liens and Claims on or against the Shares shall not have delivered to the Debtors prior to the

Closing, in proper form for filing and executed by the appropriate parties, termination

statements, instruments of satisfaction, releases and/or other documents required to release all

Liens and Claims that the person has with respect to the Shares, each of the Debtors and the

Purchaser is hereby authorized and directed to execute and file such statements, instruments,

releases and other documents on behalf of such person with respect to the Shares.  Without

limiting the effect of the foregoing, each of the Debtors and the Purchaser is hereby authorized to

file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered

or otherwise recorded, shall constitute conclusive evidence of the release of all Liens and Claims

on or against the Shares.  The foregoing notwithstanding, the provisions of this Sale Order

authorizing the Sale free and clear of Liens and Claims shall be self-executing, notwithstanding

any failure of the Debtors, the Purchaser or any other party to execute, file or obtain termination

statements, instruments of satisfaction, releases, assignments, consents or other documents to

effectuate, consummate and/or implement the provisions hereof or of the Purchase Agreement

with respect to the Sale of the Shares, and all Liens and Claims on or against the Shares shall be

deemed unconditionally released, discharged, terminated, void and unenforceable with respect to

the Shares upon the occurrence of the Closing.

**Good Faith Purchaser**

9.      The Purchaser is a purchaser in good faith of the Shares and is entitled to

all of the protections afforded by section 363(m) of the Bankruptcy Code.  The sale of the

Shares, and the Debtors' entry into the Purchase Agreement and the other Transaction

Documents, may not be avoided, and costs may not be recovered or punitive damages awarded,

pursuant to section 363(n) of the Bankruptcy Code.

10.      In the absence of a stay pending appeal, the Purchaser will be acting in

good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the Sale as

contemplated by the Purchase Agreement and the other Transaction Documents at any time after

the entry of this Sale Order and, accordingly, such closing in the face of an appeal will not

deprive the Purchaser of its status as a good faith purchaser.

**Additional Provisions**

11.      From and after entry of this Sale Order, neither the Debtors nor any other

person shall take or cause to be taken any action that would adversely affect or interfere with the

transfer of the Shares to the Purchaser in accordance with the terms and conditions of the

Purchase Agreement and this Sale Order.

12.      The terms and conditions of the Purchase Agreement and the Transaction

Documents, together with the terms and provisions of this Sale Order, shall be binding upon the

Debtors, their affiliates, successors and assigns and their respective affiliates, agents,

representatives, counsel and advisors, any trustee that may be appointed in the Debtors'

chapter 11 cases or in any case under chapter 7 of the Bankruptcy Code to which such cases may

be converted, their estates, their creditors, the Purchaser, its affiliates, successors and assigns and

their respective affiliates, agents, representatives, counsel and advisors and any other affected

third parties, all persons asserting any Liens and Claims against the Shares and all other persons,

including without limitation all filing agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies,

governmental departments, secretaries of state, federal, state and local officials, and all other

persons who may be required by operation of law or by the duties of their office or contract to

accept, file, register or otherwise record or release any documents or instruments, or who may be

required to or insure title or state of title in or to the Shares.

13.     As of the time of the Closing, all agreements of any kind whatsoever and

all orders of this Court entered prior to the date hereof shall be deemed amended or otherwise

modified to the extent required to permit the consummation of the Sale.

14.     Any of the terms and conditions of the Purchase Agreement or the other

Transaction Documents may be waived, modified, amended or supplemented by the parties

thereto in accordance with the terms thereof, without further order of the Court; <u>provided</u>,

<u>however</u>, that any such modification, amendment or supplement does not materially change the

terms of the Purchase Agreement or modify the express terms of this Sale Order.

15.     Upon the occurrence of the Closing, pursuant to the Release, Magnetar, its

affiliates (including the Purchaser), and its and its affiliates' respective successors, directors,

officers, employees and agents are hereby released by the Debtors, on behalf of themselves and

their affiliates, from any and all Liabilities arising out of the Debtors' ownership of an interest in

the Purchaser and any acts or omissions of the Purchaser in connection therewith, other than any

Liabilities arising out of the Purchase Agreement or any other Transaction Documents.

16.     In accordance with the terms and conditions of Section 6.5 of the Purchase

Agreement, until the third anniversary of the Closing, the Debtors shall indemnify, defend and

hold the Indemnitees harmless from and against any damages, losses, liabilities or expenses

incurred by any of the Indemnitees (including, but not limited to, reasonable expenses of

investigation and reasonable attorneys' fees and expenses in connection with any action, suit or

proceeding and any incidental, indirect or consequential damages, losses, liabilities, lost profits

or diminution in value associated therewith) as a result, or arising out of a breach, of the

representations and warranties set forth in Section 4.5 of the Purchase Agreement, up to a

maximum amount equal to the Purchase Price (as such term is defined in the Purchase

Agreement) (such indemnity obligations, the "**Indemnification Obligations**"), provided that the

Debtors shall not be responsible for the fees and expenses of more than one separate law firm (in

addition to Cayman counsel) for all Indemnitees.

17.     Any Indemnification Obligation due and owing under the Purchase

Agreement shall be allowed as an administrative expense claim against the bankruptcy estates of

each of the Debtors pursuant to section 503(b) of the Bankruptcy Code (any such administrative

expense, an "**Indemnity Claim**").  Any Indemnity Claim shall be payable by the Debtors

without the need for (a) the Indemnitees to file an administrative proof of claim or (b) further

order of the Court.  Except as expressly provided in the Purchase Agreement or herein, the

Indemnification Obligations shall survive, and shall not be modified, impaired or discharged by:

(a) the entry of an order (i) converting the bankruptcy case of either of the Debtors (together,

the "**Bankruptcy Cases**") to a case under chapter 7 of the Bankruptcy Code, (ii) dismissing

either Bankruptcy Case or the bankruptcy case of any of the Debtors' affiliated debtors and

debtors in possession (collectively with the Debtors, the "**Lehman Debtors**"), (iii) terminating

the joint administration of the Lehman Debtors' bankruptcy cases or (iv) confirming a chapter 11

plan in either of the Bankruptcy Cases; or (b) any other act or omission.

18.     The Debtors' waiver of any discharge as to any Indemnification

Obligations, as set forth at Section 6.5(b) of the Purchase Agreement, is hereby approved

pursuant to section 1141(d)(4) of the Bankruptcy Code.

19.     This Court retains jurisdiction to (a) interpret, enforce and implement the

terms and provisions of the Purchase Agreement and the other Transaction Documents, all

amendments thereto and any waivers and consents thereunder; (b) compel delivery of the Shares

to the Purchaser; (c) resolve any disputes arising under or related to the Purchase Agreement or

the other Transaction Documents; (d) interpret, enforce and implement the provisions of this Sale

Order; (e) resolve any disputes relating to the receipt, use, application or retention of the

proceeds of the Sale and any Liens and Claims thereon; and (f) protect the Purchaser against all

Liens and Claims.

20.     Nothing contained in any plan of reorganization or liquidation confirmed

in either Debtors' chapter 11 case or in any order of confirmation confirming any plan of

reorganization or liquidation entered in either Debtors' chapter 11 case, nor any order dismissing

or converting either of the Debtors' chapter 11 cases to a chapter 7 liquidation or any further

order of this Court shall conflict with or derogate from the provisions of the Purchase Agreement

or the terms of this Sale Order.

21.     Except as otherwise provided herein or in the Purchase Agreement and the

other Transaction Documents with respect to the Purchaser, nothing contained herein shall be

deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits

or remedies that the Debtors may have or choose to assert on behalf of their respective estates

under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including

against each other or third parties and the Debtors are hereby authorized and directed to execute

such further documents to evidence these reservations.

22.     The stay otherwise imposed by Bankruptcy Rule 6004(h) is hereby waived

and the terms of this Sale Order shall be immediately effective and enforceable upon its entry.

23.     All of the provisions of this Sale Order are nonseverable and mutually

dependent.

Dated:   New York, New York
         _____, 2011


_____
UNITED STATES BANKRUPTCY JUDGE