## **EXHIBIT B**

**(Grapkowski Declaration)**

NYI-4351025v1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re:                                                                    :    Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :    Case No. 08-13555 (JMP)
:
　　　　　　　　　　　Debtors.              :    (Jointly Administered)
:
---------------------------------------------------------------x

# **DECLARATION OF ANDREW GRAPKOWSKI**

　　　　　I, Andrew Grapkowski, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

　　　　　1.　　I am over the age of 18 years and, except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents and/or consultation with, among others, employees of Lehman Brothers Holdings Inc. ("LBHI"), LBHI's subsidiaries, professionals retained by the above-referenced debtors and debtors in possession (collectively, the "Debtors"). If called upon to testify, I could and would testify competently to the facts set forth herein.

　　　　　2.　　I submit this declaration in support of the Motion of Debtors and Debtors in Possession, Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002, 6004 and 9014, for an Order Approving the Sale of Shares of Quadrant Structured Products Company, Ltd. and Granting Certain Related Relief (the "Sale Motion").[1]

　　　　　3.　　I am Managing Director in the Private Equity and Principal Investments group of LAMCO LLC, a position I have held since January 1, 2011. Prior to January 1, 2011, I

---

[1]　　Capitalized terms used but not otherwise defined herein have the meanings given to them in the Sale Motion.

was a Senior Vice President in the Private Equity and Principal Investments group of LAMCO LLC, a position I had held since May 2010, prior to which I was the Senior Vice President - Private Equity and Principal Investments of Lehman Brothers Holdings Inc. ("LBHI," and together with Lehman Commercial Paper Inc., the "Selling Debtors"), a position I had held since October 2008. Up until March 1, 2011, I was also member of the board of directors of Quadrant Structured Products Company, Ltd. (the "Purchaser"). In those capacities, I am generally familiar with the Debtors' private equity and principal investment businesses and, in particular, LBHI's investment in 80,000 voting, participating shares, par value US $0.01 per share, of the Purchaser, designated as Class A Shares (the "Shares").

        4.      LBHI and Magnetar MQ Ltd. ("Magnetar") formed the Purchaser, a credit derivatives product company, in October 2007. In return for an investment of $80 million, LBHI received the Shares, representing an approximate 20 percent equity stake in the Purchaser.[2] Magnetar, in turn, contributed $320 million in capital to the Purchaser for which it received an approximate 80 percent interest in the company in the form of 320,000 Class A Shares. The balance of the equity in the Purchaser is held by certain members of Purchaser's management (collectively, the "Management Shareholders"). Although the Purchaser's Articles of Association provide for it to engage in any business not prohibited by law, the Purchaser was generally created for one purpose; namely, to engage in the business of selling credit protection in the form of credit default swaps.

        5.      In late 2007 or early 2008, shortly after the Purchaser was formed, writing credit protection through credit default swaps, as the Purchaser was established to do, ceased to be a viable business as a consequence of the credit crisis. At that point, credit derivatives

---

[2] Prior to the Petition Date, LBHI transferred an interest in the Shares to LCPI, while retaining record ownership of the Shares.

product companies were functionally frozen with their existing portfolios and were unable to sell any new credit protection. This remains the case today. Instead of writing credit protection, the Purchaser, subsequently acquired another credit derivatives product company which already had a $25.5 billion credit protection portfolio from another entity. Currently, the Purchaser is considering refocusing its business to purchase additional credit protection portfolios with risk profiles unknown to LBHI, instead of writing credit protection as originally contemplated by LBHI.

6. Pursuant to a Shareholders' Agreement (the "Shareholders' Agreement"), dated as of October 3, 2007, among the Purchaser, Magnetar, LBHI and the Management Shareholders (collectively, the "Parties"), each of the Parties maintains certain rights. On the one hand, the minority shareholder protections embodied in the Shareholders' Agreement provide, inter alia, that LBHI's consent is required for the Purchaser to make certain changes in its business. On the other hand, should LBHI seek to sell the Shares, the Shareholders' Agreement provides for certain rights of first refusal in favor of Magnetar and the Purchaser which would continue after any such sale.

7. Given (a) the rights of the Parties under the Shareholders' Agreement, (b) the nature of the investment (i.e., a position as a minority holder in a closely-held corporation), (c) the credit risk exposure and leverage (approximately 59 times total capital) in the Purchaser's existing portfolio, (d) the transitioning nature of the Purchaser's business (e) uncertainties related to certain ongoing litigation between one of the Purchaser's subsidiaries and one of that subsidiary's contract counterparties (the "Litigation"), and (f) the Debtors' ongoing efforts to liquidate and monetize assets in their estates in an orderly and value-maximizing fashion, the Selling Debtors concluded that (x) it was in their best interest to dispose

of the Shares prior to a potential shift in the Purchaser's business focus and (y) the Purchaser would be the most natural buyer. After extensive arm's-length negotiations, the Selling Debtors determined that the sale of the Shares to the Purchaser pursuant to the Purchase Agreement would be in the best interests of their estates and creditors.

8. I believe that the marketing of the Shares (e.g., at auction) is unlikely to produce a better result for the Selling Debtors and their estates than that achieved by the Purchase Agreement for a variety of reasons. First, the esoteric nature of the Purchaser's business, the required risk tolerance to invest in that business and the Litigation are likely to deter potential bidders. Second, the Shares are minority interests in a closely-held corporation in which Magnetar has a controlling interest and the Shareholders' Agreement provides a right of first refusal to the Purchaser and Magnetar. Third, the business of the Purchaser is in a transitional phase. As a result, any entity interested in acquiring a minority interest likely would apply an unacceptable discount to any offer to purchase the Shares to reflect the uncertainties discussed above.

9. Further, prior to and during their negotiations with the Purchaser, the Selling Debtors, at my direction, conducted informal "no-name" market checks with various independent parties familiar with the class of assets held by Quadrant and, as a result of such discussions and their own analysis, the Selling Debtors concluded that the discount rate that any independent third party buyer would apply to the Shares likely would yield consideration less than the Purchase Price. Finally, because the Purchase Price was reached through extensive negotiation and represents the maximum amount the Purchaser is willing to pay for the Shares, I believe that it is unlikely that the Purchaser would be willing to offer the Purchase Price as a "floor" for any auction. As a result, any auction process pursued by the Selling Debtors likely

would have a "floor," to the extent any floor was established, much lower than the Purchase Price and, given (a) the anticipated downward pressures on any offer by a third party buyer discussed above and (b) the results of the Selling Debtors' market check, would likely yield consideration lower than the Purchase Price, while imposing additional costs and expenses on the Selling Debtors' estates.  Thus, I believe the consideration to be received by the Selling Debtors under the Purchase Agreement exceeds any amount that would be generated through an auction process.

10.    Moreover, now is the prudent time to liquidate the investment in the Shares given the risk exposure and leverage of the Purchaser's business.  As business entities obliged to take into account the safety of their investments and as debtors in bankruptcy with an obligation to maximize value for their stakeholders, I believe it is prudent for the Selling Debtors to liquidate their investment now to:  (a) avoid the incurrence of potential losses in the existing portfolio and taking on risks that are unknown to the Selling Debtors in light of the currently fluid and transitional nature of the Purchaser's business and the Litigation; and (b) take advantage of an increase in the fundamental value of the Shares caused by the material improvement in the credit markets since the height of the credit crisis.

11.    As described above, the Shares represent a minority position in a closely-held corporation in which the overwhelming majority of remaining shares are held by a single entity (i.e., Magnetar).  Any third-party purchaser thus would apply a minority discount to the Shares significant enough to reduce the Debtors' estates' recovery below the amount of the Purchase Price.  Moreover, the fact that the Purchaser's business is highly-levered, subject to Litigation and currently in a transitional phase would also serve to depress third-party offers.  Consequently, the Purchaser, which has an interest in consolidating ownership of the Shares as it

refocuses its business, emerged as the natural buyer and has offered what the Selling Debtors believe is the best price for the Shares under the circumstances.

12. Accordingly, for the reasons discussed herein, I believe that an auction of the Shares would not generate an offer higher than the Purchase Price and that the proposed Sale pursuant to the Purchase Agreement is an exercise of the Selling Debtors' sound business judgment, and that the resulting Purchase Price – $90 million, representing a premium of approximately 12.5 percent above invested capital – is fair, reasonable and will maximize value for the Selling Debtors' estates and all parties in interest.

13. I have been informed that, because ownership of the Shares is sufficient to technically make the Purchaser an "affiliate" of the Selling Debtors as that term is defined in section 101(2) of the Bankruptcy Code, the Sale appears to constitute a transaction with an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. Nonetheless, for the reasons set forth below, I believe the Purchase Agreement provides the Purchaser with no unfair, non-arm's-length benefits.

14. Neither the Purchaser nor any of its affiliates has influenced the Selling Debtors, their management or their advisors in any manner that could give rise to an appearance that the negotiations were not conducted at arm's-length or involved self-dealing. Moreover, as the effect of the transaction is to divest the Selling Debtors of any further financial interest in the Purchaser, the Selling Debtors have no incentive to accept anything other than an arm's length price for the Shares, despite the Purchaser's status as an "insider" prior to (but not after) the transaction. As a result, I believe that (a) the Purchaser's technical status as an insider of the Selling Debtors has not impacted the Selling Debtors' ability or intent to maximize the value of

this transaction and (b) the negotiation of the Sale has been at arm's length, in good faith and completely fair.

        15.     For the reasons described in the Sale Motion and in this Declaration, I respectfully submit that (a) the Selling Debtors have demonstrated a sufficient basis and compelling circumstances requiring consummation of the Sale and (b) the actions contemplated thereunder are appropriate exercises of the Selling Debtors' sound business judgment and in the best interests of the Selling Debtors, their estates and all stakeholders in their chapter 11 cases.

*[Signature Page Follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on February 28, 2011

Andrew Grapkowski
Managing Director - Private Equity and
 Principal Investments
LAMCO LLC

*[Grapkowski Declaration – Signature Page]*