Hearing Date and Time: March 23, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: March 16, 2011 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                          :        Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,       :        08-13555 (JMP)
                                               :
                              Debtors.         :        (Jointly Administered)
----------------------------------------------------------------x

## NOTICE OF LBHI'S MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF TWO NOTE PURCHASE AGREEMENTS WITH THE INSOLVENCY ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Holdings Inc., pursuant to sections 105 and 363 of the Bankruptcy Code, for approval of two note purchase agreements with the Insolvency Administrator of Lehman Brothers Bankhaus Aktiengesellschaft (*in Insolvenz*), all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **March 23, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq. and Maurice Horwitz, Esq., attorneys for the Debtors;

(iii) SNR Denton, 1221 Avenue of the Americas, New York, New York 10020, Attn:  D. Farrington Yates, Esq. and Patrick C. Maxcy, Esq., attorneys for the Insolvency Administrator of Lehman Brothers Bankhaus Aktiengesellschaft (in Insolvenz); (iv) the Office of the United States Trustee for Region 2 (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Elisabetta G. Gasparini, Esq., Andrea B. Schwartz, Esq., and Tracy Hope Davis, Esq.; and (v) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases, so as to be so filed and received by no later than **March 16, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  March 2, 2011
      New York, New York

                /s/ Richard P. Krasnow
                Richard P. Krasnow

                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone: (212) 310-8000
                Facsimile: (212) 310-8007

                Attorneys for Debtors
                and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
In re                                          :       Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,       :       08-13555 (JMP)
                                               :
                         Debtors.              :       (Jointly Administered)
----------------------------------------------------------------x

## MOTION OF LBHI PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF TWO NOTE PURCHASE AGREEMENTS WITH THE INSOLVENCY ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (together, the "Debtors"), submit this motion (the "Motion") and respectfully represent:

### Preliminary Statement

1.       This Motion seeks approval of two note purchase agreements, each dated March 1, 2011 (the "SASCO Agreement" and the "Spruce-Verano Agreement" and, together, the "Note Purchase Agreements"), and attached hereto at "Exhibit A" and "Exhibit B," respectively, between LBHI and Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) (the "LBB InsAdmin") of Lehman Brothers Bankhaus Aktiengesellschaft

(in Insolvenz) ("Bankhaus"), a wholly owned subsidiary of LBHI, pursuant to which LBHI

would purchase certain notes from Bankhaus in the aggregate outstanding principal amount of

approximately $1,543 million (the "Notes"), free and clear of all liens, claims, and

encumbrances, for an aggregate purchase price of $957 million.

       2.      From time to time prior to the Commencement Date, in order to increase

liquidity, the Debtors sold or participated portions of certain real estate and commercial loans

and, in some cases, equity positions (the "Underlying Assets") to various special purpose

entities, including SASCO 2008-C2 Ltd. ("SASCO"), Spruce CCS, Ltd. ("Spruce") and Verano

CCS, Ltd. ("Verano" and, together with SASCO and Spruce, the "Issuers"). The Issuers, in turn,

issued securities (comprised of both notes evidencing debt of the Issuers and equity interests in

the Issuers) secured by such assets and the cash flow therefrom (the "Notes"). Each issuance of

Notes has different interest rates and payment priorities.

       3.      LCPI and LBHI acquired certain of the Notes. In addition, prior to the

Commencement Date, (i) certain Debtors and/or LBI pledged certain of the Notes to J.P.Morgan

Chase Bank, N.A. ("JPMorgan") to secure certain obligations of the Debtors and (ii) certain

Debtors and/or LBI also sold certain of the Notes to LBI, which sold such Notes to Bankhaus, in

each case pursuant to a repurchase agreement. Pursuant to the Collateral Disposition Agreement

entered into with JP Morgan, and approved by the Court on March 24, 2010 [Docket No. 7785],

certain of the Notes were transferred to LBHI.

       4.      As a result of the foregoing transactions, ownership of the Notes is spread

out among LBHI, LCPI, and Bankhaus. LBHI has determined, in the exercise of its business

judgment, that considerable value could be realized by purchasing the Notes held by Bankhaus

pursuant to the Note Purchase Agreements at a $586 million discount to the principal amount

outstanding thereunder, thereby offering LBHI the opportunity to realize significant recoveries in the long term.  LBHI has also concluded that maximum value can only be achieved through active management of the Underlying Assets, and such management currently is impeded or otherwise made difficult by the Issuers' ownership of the Underlying Assets and Bankhaus's ownership of certain of the Notes.  Thus, in addition to the upside potential on account of the purchase price, LBHI would be a strategic purchaser of the Notes held by Bankhaus because the purchase will enable LBHI, together with LCPI, to control 100% of the capital structures of the Issuers and to unwind or dissolve the Issuers if appropriate.  This strategic benefit will enable LBHI and LCPI to realize value more efficiently and effectively not only from the Notes, but more importantly, also from the Underlying Assets.

5.       As more fully set forth below, LBHI's decision to enter into the Note Purchase Agreements in order to achieve the Debtors' overall business plan for the Underlying Assets represents a reasonable exercise of LBHI's business judgment, and is in the best interests of its estate and creditors.  Accordingly, the relief requested in this Motion should be granted.

## Background

6.       Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

8.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

9.      On November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "Bankhaus Proceeding"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main opened insolvency proceedings and appointed Dr. Michael C. Frege as the LBB InsAdmin.

10.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report") [Docket No. 7531]

11.     On May 22, 2009, the Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and For Additional Relief Under section 1521 of the Bankruptcy Code.  *See In re Lehman Brothers Bankhaus AG (*in Insolvenz*)*, Case No. 09-10583 (the "Chapter 15 Case") [Docket No. 25].

12.     On March 15, 2010, the Debtors filed their joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 7572].  On April 14, 2010, the Debtors filed their revised joint chapter 11 plan [Docket No. 8330] and disclosure statement for their

revised joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 8332].

13.    On January 25, 2011, the Debtors filed their first amended joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 14150] and disclosure statement for their first amended joint chapter 11 plan pursuant to section 1125 of the Bankruptcy Code [Docket No. 14151].

## Jurisdiction

14.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Lehman's Business

15.    Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

16.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## The Debtors' Current Positions In The Issuers

17.    The outstanding principal amount of the Notes issued by Spruce (the "Spruce Notes"), Verano (the "Verano Notes"), and SASCO (the "SASCO Notes"), and the

Debtors' interests in each of the Issuers, are set forth in the table below.[1]  Notably, as illustrated below, both LBHI and LCPI already hold a significant position in the capital structures of the Issuers.  The shaded boxes indicate the portions of the Issuers' capital structure that LBHI seeks authority to acquire through the Note Purchase Agreements.

| | Spruce | Verano | SASCO |
|---|---|---|---|
| **Aggregate Outstanding Principal Amount of Notes and Preferred Interests[2]** | $725 million Senior Notes<br><br>$275 million Mezzanine Notes<br><br>$168 million Subordinated Notes | $1,099 million Senior Notes<br><br>$198 million Mezzanine Notes<br><br>$271 million Subordinated Notes | $1,513 million Notes<br><br>$1,385 million Preferred Interests |
| **Percentage of Aggregate Outstanding Notes Owned by LBHI** | 94.7% of Senior Notes | 100% of Senior Notes | None |
| **Percentage of Aggregate Outstanding Notes Owned by LCPI** | 5.3% of Senior Notes<br><br>100% of Subordinated Notes | 100% of Subordinated Notes | 29.3% of Notes<br><br>100% of Preferred Interests |
| **Percentage of Aggregate Outstanding Notes Owned by Bankhaus** | 100% of Mezzanine Notes | 100% of Mezzanine Notes | 70.7% of Notes |

18.    As reflected in the table above, both LBHI and LCPI hold positions in the capital structures of Spruce and Verano, but only LCPI holds a position in SASCO.

---

[1]    The amounts set forth in the table below exclude any interest accrued and unpaid after October 15, 2010.

[2]    Represents balances reported by the trustee as of their closest reporting date to January 31, 2011.  Amounts are not reflective of cash collected by the Debtors as servicer on the Underlying Assets that is reported in restricted cash and has not been remitted to the trustee.  Amounts are reflective of accrued interest as of October 15, 2010, if there is a capitalization of interest feature on the applicable Note.

Nevertheless, LBHI's purchase of Bankhaus's Notes would confer complete control over the Issuers to LBHI and LCPI, thereby allowing the Debtors to pursue their strategic goals with respect to the Underlying Assets more efficiently.  The strategic goal of obtaining full control over the Issuers could also be accomplished if LCPI, rather than LBHI, purchased Bankhaus's Notes.  However, it is more appropriate for LBHI, rather than LCPI, to purchase the Notes held by Bankhaus because, as set forth below, the sale of the Notes necessarily impacts one of the claims that Bankhaus holds against LBHI.

### The Relationship Between The Notes And The SCA Claim

19.    The Note Purchase Agreements, and in particular, the purchase price for the Notes held by Bankhaus, are directly related to an amended and restated settlement agreement, dated as of March 1, 2011, among the Debtors and certain of their non-debtor affiliates on the one hand, and the LBB InsAdmin on the other (the "Plan Settlement Agreement"), a copy of which is attached hereto as "Exhibit C," which primarily provides for the settlement of the amounts of claims among Bankhaus and certain of the Debtors and their non-debtor affiliates.  Over the past two years, the Debtors and Bankhaus have engaged in extensive, arm's-length negotiations in an effort to arrive at a consensual resolution of the intercompany claims between their respective estates, resulting in the execution of the Plan Settlement Agreement.  A significant portion of these discussions has focused on that portion of Bankhaus's claim against LBHI (the "SCA Claim"), which is based on the Security & Collateral Agreement between LBHI and Bankhaus, dated August 15, 2002 (the "SCA").  In summary, pursuant to the SCA, LBHI agreed to post cash collateral to Bankhaus in respect of any losses suffered by Bankhaus if either an asset decreases in value below a certain level, or a borrower fails to make a payment when due and payable.

20.    The Notes held by Bankhaus are among the assets covered by the SCA. Accordingly, a portion of the SCA Claim relates to these Notes and arises from the shortfall in value that Bankhaus suffers on account of such Notes.  As this shortfall increases, that portion of the SCA Claim that relates to the Notes increases, and *vice-versa*.  Absent a sale of the Notes, LBHI and the LBB InsAdmin must agree on a valuation of the Notes in order to determine the allowed amount, if any, of Bankhaus's SCA claim in respect of the Notes.

21.    As stated above, LBHI has concluded that there is considerable value in the Underlying Assets that secure the Notes and, therefore, considerable value in the Notes themselves.  Consequently, in the context of the negotiations over the SCA Claim, and particularly the portion of the SCA Claim that relates to the Notes, LBHI concluded that if LBHI and Bankhaus could agree on a price that is fair and reasonable with respect to the Notes held by Bankhaus, it would be beneficial for LBHI to purchase the Notes, thereby not only fixing the amount of that portion of the SCA Claim relating to the Notes, but also affording LBHI the benefit of the upside in the Notes' value and the strategic benefits of owning 100% of the Issuers' capital structures.

22.    In this context, LBHI and Bankhaus have agreed on a purchase price of $332 million for Bankhaus's interest in the Spruce Notes and Verano Notes (the "Spruce-Verano Purchase Price"), and $625 million for Bankhaus's interest in the SASCO Notes (the "SASCO Purchase Price" and, together with the Spruce-Verano Purchase Price, the "Purchase Price"), subject to an increased payment of $100 million under certain post-closing conditions described below.  Furthermore, because the Purchase Price represents a substantial discount to the outstanding principal amount of the Notes, pursuant to the Plan Settlement Agreement, LBHI has agreed that Bankhaus will have an allowed, non-priority, general unsecured claim in respect of

the Spruce Notes, Verano Notes, and SASCO Notes, in the amount of $10 million, $7 million, and $256 million respectively.

23.    **By this Motion, the Debtors are neither seeking approval of the Plan Settlement Agreement, nor requesting the allowance of any claims against their respective estates.**  The Plan Settlement Agreement is subject to the Debtors and Bankhaus each obtaining the requisite approvals, and certain other conditions.  The Plan Settlement Agreement currently contemplates that the Debtors will seek approval of that agreement, and the settlements contained therein, at a later date in connection with the approval of the Debtors' joint chapter 11 plan.

24.    Notably, however, the effectiveness of the Plan Settlement Agreement is conditioned on the confirmation of an amended joint chapter 11 plan that is proposed by the Debtors and that incorporates the terms of the Plan Settlement Agreement.  This condition to effectiveness demonstrates how integral the terms of the Plan Settlement Agreement are to agreement between LBHI and the LBB InsAdmin on the Purchase Price.  In particular, the discount that the LBB InsAdmin has agreed to with respect to the SASCO Notes is premised entirely on the fact that in return, the LBB InsAdmin is able to fully resolve all of Bankhaus's claims against the Debtors and certain of their non-debtor affiliates pursuant to the Plan Settlement Agreement.  Consequently, as described more specifically below, the SASCO Agreement provides that if a chapter 11 plan incorporating the terms of the Plan Settlement Agreement is not ultimately confirmed on or before December 31, 2012, LBHI will pay an additional $100 million dollars to the LBB InsAdmin in connection with the sale of the SASCO Notes.

## The Note Purchase Agreements

25.     The salient terms of the Note Purchase Agreements are set forth below.[3]

***Purchased Spruce-Verano Notes***

Bankhaus will sell, and LBHI will purchase, on the Closing Date, all of Bankhaus's right, title and interest in and to the following Notes:

- Initial Face Amount U.S.$243,670,000.00 Mezzanine Notes, due 2017, issued pursuant to that certain Indenture, dated as of April 28, 2008, by and among Spruce CCS, Ltd., Spruce CCS, Corp. and U.S. Bank National Association, CUSIP Number: 852079AA0; and

- Initial Face Amount U.S.$180,400,000 Mezzanine Notes, due 2016, issued pursuant to that certain Indenture, dated as of July 25, 2008, by and among Verano CCS, Ltd., Verano CCS, Corp. and U.S. Bank National Association, CUSIP Number: 92336PAB2 (collectively, the "Purchased Spruce-Verano Notes").

On the Closing Date, (i) LBHI shall pay Bankhaus an amount equal to the Spruce-Verano Purchase Price, and (ii) Bankhaus shall deliver, or cause to be delivered, the Purchased Spruce-Verano Notes to LBHI.

***Purchased SASCO Notes***

Bankhaus will sell, and LBHI will purchase, on the Closing Date, all of Bankhaus's right, title and interest in and to the following Notes:

- Initial Face Amount U.S.$1,450,000,000.00 Floating Rate Term Notes Due 2038 issued pursuant to that certain Indenture, dated as of May 22, 2008, by and among SASCO 2008-C2, LLC, Wachovia Bank, National Association and Wells Fargo Bank, National Association, CUSIP Number: 78403WAA6 (the "Purchased SASCO Notes" and, together with the Purchased Spruce-Verano Notes, the "Purchased Notes").

On the Closing Date, (i) LBHI shall pay Bankhaus an amount equal to the SASCO Purchase Price, and (ii) Bankhaus shall deliver, or cause to be delivered, the Purchased SASCO Notes to LBHI.

---

[3]     This summary, as well as the other descriptions of the Note Purchase Agreements contained in the Motion (the "Summary") are qualified in their entirety by the provisions of the Note Purchase Agreements. This Summary is intended to be used for information purposes only and shall not, in any way, affect the meaning or interpretation of the Note Purchase Agreements. Capitalized terms used, but not otherwise defined herein, have the meanings ascribed to such terms in the Note Purchase Agreements.

| | |
|---|---|
| ***Purchase Price Adjustment*** | LBHI shall pay Bankhaus an additional $100,000,000 (the "Purchase Price Adjustment") for the Purchased SASCO Notes in the event that the Confirmation Order, as defined in the Plan Settlement Agreement, is not entered on or before December 31, 2012, *provided, however,* that LBHI shall not be required to remit the Purchase Price Adjustment to Bankhaus |

(i) in the event that the LBB InsAdmin terminates the Plan Settlement Agreement on account of (x) a breach of the Plan Settlement Agreement by the Debtors or certain of their affiliates who are parties to the Plan Settlement Agreement, or (y) termination of the Tolling Agreement as defined by the Plan Settlement Agreement; or

(ii) in the event that one of the Debtors or their affiliates who are parties to the Plan Settlement Agreement ("Lehman US") terminates the Plan Settlement Agreement because the LBB InsAdmin has failed to obtain approval of the Plan Settlement Agreement from the Bankhaus creditors' committee (*Gläubigerausschuss*) ("Bankhaus Creditors Committee") and the Bankhaus creditors' assembly (*Gläubigerversammlung*);

*provided*, *further*, that in the event that Lehman US terminates the Plan Settlement Agreement because the LBB InsAdmin has allowed and provided for materially different treatment of claims held by other creditors of Bankhaus that are factually and legally similar to the claims of Lehman US that are allowed pursuant to the Plan Settlement Agreement (the "Allowed US Claims") that results in such other creditors having a recovery entitlement in respect of said claims that is materially higher than the recovery entitlement in respect of the Allowed US Claims (a "Materially Different Treatment"), the Purchase Price Adjustment shall be reduced by an amount equal to the difference between the actual recoveries realized in the Bankhaus Proceeding in respect of the Allowed US Claims and the recoveries that would have been realized in the Bankhaus Proceeding in respect of the Allowed US Claims if the LBB InsAdmin did not allow and provide for a Materially Different Treatment.

| | |
|---|---|
| ***Power of Attorney*** | On the Execution Date, the LBB InsAdmin shall deliver to LBHI an executed power of attorney, enabling LBHI to manage the Underlying Assets from the Execution Date until the Closing Date |
| ***Conditions to Closing*** | The closing for the Notes to be sold on the Closing Date shall be subject to, among other things: |

- LBHI and Bankhaus having executed and delivered all closing documentation,

- LBHI and Bankhaus having complied with all requirements under the related Indenture with respect to the transfer and exchange of the Notes,

- The Bankhaus Creditors Committee and the Bankhaus Creditors Assembly authorizing and approving the execution and delivery of the Note Purchase Agreements, and the performance of the obligations of the LBB InsAdmin under the Note Purchase Agreements; and the LBB InsAdmin providing LBHI with the relevant portions of the minutes of the meetings at which the Bankhaus Creditors Committee and Bankhaus Creditors Assembly provided such authorization and approval,

- Entry by the Bankruptcy Court of an order in the Chapter 15 Case (the "Chapter 15 Order"), which order shall provide, *inter alia*, that the Purchased Notes shall be transferred to LBHI free and clear of all liens and claims, and that such liens and claims shall attach to the Purchase Price.[4]

- Entry by the Bankruptcy Court of an order in LBHI's case substantially in the form attached hereto as "Exhibit D,"

- no Title Defects (defined below) having been identified with respect to any of the Purchased Spruce-Verano Notes and Purchased SASCO Notes, or the Underlying Assets,

- Approval of LBHI's board of directors (or executive committee thereof), and

- *With respect to the Spruce-Verano Agreement*, the sale of the Purchased SASCO Notes to LBHI having been consummated.

***Repurchase Obligation With Respect To Notes***

In the event that LBHI determines that any Note is subject to a lien, claim or interest of any other person other than any interest of LBHI (a "Title Defect"), LBHI may deliver to the LBB InsAdmin notice of such Title Defect, accompanied by evidence of such Title Defect reasonable acceptable to the LBB InsAdmin.

Provided that the LBB InsAdmin receives such notice no later than six months after the Closing Date (such six month period, the "Repurchase Period"), the LBB InsAdmin shall refund to LBHI, not later than ninety (90) days after receipt of such notice and evidence

---

[4]       Contemporaneously with the filing of this Motion, the LBB InsAdmin will be filing a motion in the Chapter 15 Case seeking approval of the Note Purchase Agreements and the Chapter 15 Order.  It is contemplated that the hearing to consider that motion will be held concurrently with the hearing to consider this Motion.

of the Title Defect, the Purchase Price for the applicable Note, less (i) any principal payments received by LBHI in respect of the applicable Note and not required to be disgorged by LBHI as a result of such Title Defect, plus (ii) an amount, which may be a negative number, equal to (x) interest on the Purchase Price for the applicable Note (less any principal payments received by LBHI in respect of the applicable Note) from the Closing Date until the date of repayment at a rate equal to the interest rate that LBHI would have obtained had it not purchased the related Note from the LBB InsAdmin (provided, that in no event shall such interest rate exceed the rate at which interest accrues on the applicable Note), plus (y) all reasonable costs and expenses incurred in connection with the reconveyance of the applicable Note to the LBB InsAdmin (collectively, the "Repurchase Price") (provided, that in no event shall the Repurchase Price (exclusive of interest) exceed the Purchase Price) and LBHI shall reconvey such Note to the LBB InsAdmin (without any recourse to LBHI) simultaneously therewith.

*Reimbursement Obligation With Respect To Specified Underlying Assets*

In the event that LBHI determines that any of the Underlying Assets in which Bankhaus had a right, title or interest prior to the transfer to the relevant Issuer (the "Specified Underlying Assets"), is subject to a Title Defect, LBHI may deliver to the LBB InsAdmin notice of the same, accompanied by evidence of such Title Defect reasonably satisfactory to the LBB InsAdmin.

Provided that the LBB InsAdmin receives notice of the Title Defect prior to the end of the Repurchase Period, and the parties are not able to cure such Title Defect within sixty (60) days thereafter, the LBB InsAdmin, unless otherwise agreed, shall pay the LBHI the lesser of (i) the loss paid, suffered or incurred by LBHI as a result of such Title Defect and (ii) fifty percent of the pro-rata share of the Purchase Price allocable to the related Specified Underlying Asset on the Closing Date, which pro-rata share shall be in the same proportion that the market value of such Specified Underlying Asset bears to the aggregate market value of the Underlying Assets on the Closing Date, as agreed between the LBB InsAdmin and LBHI; provided that if the LBB InsAdmin and LBHI cannot agree upon either the pro-rata share or the market value by the expiration date of the sixty (60) day cure period, then such pro-rata share or market value, as the case may be, shall be determined by Eastdil Secured, LLC, Cushman & Wakefield, Inc., CB Richard Ellis Group, Inc. or any other independent third party valuation agent of national reputation selected by the LBB InsAdmin and reasonably approved by LBHI (whose fees shall be paid one-half by Seller and one-half by Purchaser) (such amount, the "Specified Underlying Asset Loss"); provided, further, that the LBB InsAdmin shall only be required to pay LBHI Specified Underlying Asset Losses up to an

amount, in the aggregate, equal to the relevant Purchase Price.

| | |
|---|---|
| ***Payment of Repurchase Price or Specified Underlying Asset Loss*** | Payment of the applicable Repurchase Price or the Underlying Asset Loss shall be made by Bankhaus to LBHI without deductions or offset against any other claim by set-off, recoupment, retention or any other theory.  To the extent that the parties are unable to resolve any dispute relating to the foregoing, then the parties agree that such dispute shall be resolved by the Bankruptcy Court. |
| ***Deemed Repurchase*** | Notwithstanding the foregoing, LBHI shall not be required to reconvey a Note to the LBB InsAdmin if the applicable structure shall have been dissolved or unwound (either event, an "Unwind"). In such event, promptly after payment of the Repurchase Price (the "Deemed Repurchase") for such Note (the "Deemed Repurchased Note") the LBHI shall provide an accounting of the proceeds of the Underlying Assets formerly securing the Deemed Repurchased Note (the "Deemed Repurchased Note Assets") received between the Closing Date and the Repurchase Date and shall remit such proceeds, and thereafter on a monthly basis shall remit the proceeds of the Deemed Repurchased Note Assets, to the LBB InsAdmin to the extent such proceeds would have been paid to the LBB InsAdmin if the Deemed Repurchased Note had remained outstanding and there had been no Unwind. |

## The Note Purchase Agreements Represent
## An Appropriate Exercise of The Debtors' Business Judgment

26.    Ample authority exists for approval of the proposed Note Purchase Agreements.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  LBHI is seeking approval of the Note Purchase Agreements under section 363 of the Bankruptcy Code insofar as the Note Purchase Agreements contemplate the purchase of the Purchased Spruce-Verano Notes and Purchased SASCO Notes.

27.    While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition or other use of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*,

14

973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

28.    LBHI has determined, in its sound business judgment, that the Notes held by Bankhaus offer substantial value for LBHI's estate and creditors.  Furthermore, as set forth in the Declaration of Daniel J. Ehrmann dated March 1, 2011 attached to the Motion as "Exhibit E" (the "Ehrmann Decl."), LBHI has closely analyzed the Notes and the Underlying Assets, *see* Ehrmann Decl. ¶¶ 5 – 7, and has determined that the Purchase Price provides a substantial potential for profit on the upside for LBHI.  With respect to the Purchased Spruce-Verano Notes, the Spruce-Verano Purchase Price represents a 30% discount to the outstanding principal and accrued interest amounts of the Purchased Spruce-Verano Notes.  This discount accounts for the fact that the Mezzanine Notes issued by both Spruce and Verano, and held by Bankhaus, are currently illiquid, and will not realize any principal payments (and likely no interest payments) until the Senior Notes issued by Spruce and Verano and currently held by LBHI are paid in full.  Accordingly, it is not likely that the Mezzanine Notes will have any material debt repayment for two to three years.  In addition, despite the risk and long term nature of this repayment, the Mezzanine Notes carry nominal rates of interest, that do not meet current commercial standards (LIBOR + 275 in the case of Verano, and LIBOR + 350 in the case of Spruce, with no LIBOR floor).  Because of these factors, LBHI has concluded that a 30% discount to the outstanding notional and accrued interest amounts of the Purchased Spruce-Verano Notes represents a fair and reasonable price that will offer LBHI the ability to realize a considerable profit in the long term.  *See* Ehrmann Dec. ¶ 12.

29.    With respect to Purchased SASCO Notes, the SASCO Purchase Price represents approximately a 42% discount to the outstanding principal amount of the Purchased SASCO Notes.[5]  From LBHI's perspective, and based on LBHI's analysis of the Underlying Assets, the SASCO Purchase Price is fair and reasonable, and affords LBHI the opportunity for substantial profit from the cash flows generated by the Underlying Assets.  *See* Ehrmann Decl. ¶ 13.

30.    In addition to the upside potential to LBHI on account of the Purchase Price, LBHI has determined that purchasing the Purchased Notes is the best means of maximizing the value of the Underlying Assets, which LBHI and LCPI believe offer a considerable value to their respective estates and creditors, because outright ownership of the Underlying Assets is far more valuable than indirect ownership through the Spruce, Verano, and SASCO securitization structures.  *See* Ehrmann Decl. ¶¶ 14 – 16.  By purchasing the Purchased Notes, when combined with their current holdings of 100% the Senior and Subordinated Notes of Spruce and Verano, and 29.3% of SASCO Notes, LBHI and LCPI will obtain control over 100% of the capital structure of Spruce, Verano, and SASCO, thereby enabling the Debtors to dissolve the Issuers and directly realize upon the value of the Underlying Assets.

31.    For example, as more fully set forth in the Ehrmann Decl., many of the Underlying Assets are part of larger real estate projects in which LBHI has other debt and/or equity positions, consolidation of which, through the purchase of the Purchased SASCO Notes, greatly increases LBHI's ability to execute certain asset plans with respect to such positions.  *See* Ehrmann Decl. ¶ 15.  With respect to Spruce and Verano, 100% control over these structures

---

[5]    The 42% discount does not take into account distributions that LBHI would make to Bankhaus over time on account of the resulting claims that Bankhaus will have against LBHI pursuant to the Plan Settlement Agreement, or alternatively, the Purchase Price Adjustment, if the Plan Settlement Agreement is terminated under the circumstances set forth above.

would allow restricted funds to be released to LBHI as the holder of the Senior Notes, and would

permit LBHI to modify the indentures and, *inter alia*, eliminate the approval procedures

currently in place to the sale of the Underlying Assets.  *See* Ehrmann Decl. ¶ 16.  For all the

foregoing reasons, entry into the Note Purchase Agreements therefore represents an exercise of

LBHI's sound business judgment, is in the best interest of LBHI's estate and creditors, and all

other parties in interest, and should be approved.

### Waiver of Fourteen Day Stay

32.    Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after

the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  LBHI

submits that cause exists for the Court to exercise its discretion and abrogate the 14-day stay

provided for by Rule 6004(h), because the transactions contemplated by the Note Purchase

Agreements are time-sensitive and must close shortly after the approval of the Motion.

### Notice

33.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; (vi) all other parties

entitled to notice in accordance with the procedures set forth in the second amended order

entered on June 17, 2010 governing case management and administrative procedures for these

cases [Docket No. 9635].  The Debtors submit that no other or further notice need be provided.

34.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  March 2, 2011
        New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

**SASCO Agreement**

EXECUTION VERSION

## NOTE SALE AGREEMENT

THIS NOTE SALE AGREEMENT is dated as of March 1, 2011 (the "Agreement"), by and between LEHMAN BROTHERS HOLDINGS INC., ("LBHI" or "Purchaser") and Dr. Michael C. Frege, in his capacity as insolvency administrator (*Insolvenzverwalter*) (the "LBB InsAdmin" or "Seller") over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*) ("Bankhaus").

## RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of Lehman Brothers Holdings Inc. and certain of its Affiliates commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "Chapter 11 Cases" and each a "Chapter 11 Case");

WHEREAS, on November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "Bankhaus Proceeding"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "German Insolvency Court") opened insolvency proceedings and appointed the LBB InsAdmin (local court of Frankfurt/Main, case no. 810 IN 1120/08 L);

WHEREAS, on April 29, 2009, the LBB InsAdmin on behalf of Bankhaus filed his Verified Petition under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. Section 1521 [Docket No. 2], *In re Lehman Brothers Bankhaus AG (in Insolvenz)*, Case No. 09-12704 (JMP) (Bankr. S.D.N.Y.) (the "Bankhaus Chapter 15 Case"), and on May 22, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 [Docket No. 25] in the Bankhaus Chapter 15 Case;

WHEREAS, Purchaser has provided to Seller any and all information in respect of the Notes and/or the Underlying Assets in the possession of Purchaser or any of its Affiliates, together with any reports, analyses, compilations, memoranda, notes and any other writings or electronic media that contain, reflect or are based upon such information that has a substantial impact on the valuation of the Notes and/or any of the Underlying Assets, unless Purchaser is prohibited from providing such information because of any duty of confidentiality pursuant to any contractual agreement or any applicable law in effect as of the date hereof (subject to any exceptions, exclusions, carve-outs and other provisions permitting disclosure under circumstances which Purchaser has used commercially reasonable efforts to utilize); provided, that such information excludes all correspondence and in-process discussions, drafts and unexecuted documents, publicly available information, information received by Purchaser in its capacity as the holder of other interests in the issuer of an Underlying Asset (or in the related project owner or collateral), forward looking information (including, but not limited to business plans), internal appraisals, information and analysis (including correspondence with third party asset managers or special servicers) and any internal valuations of the Purchaser or any of its Affiliates;

WHEREAS, in accordance with the terms and conditions hereof, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, certain Notes as further identified on <u>Schedule I</u> attached hereto;

NOW, THEREFORE, in consideration of the recitals stated above, and the promises, mutual agreements, and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

SECTION 1.    <u>Definitions</u>. For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below. Any capitalized term used but not defined herein shall have the meaning assigned to such term in the Indenture.

"<u>Affiliate</u>" means, with respect to any person, any person directly or indirectly controlling, controlled by or under direct or indirect common control with, such person. A person will be deemed to control another person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise. For purposes of clarity, neither Bankhaus nor any entity that is the subject of a U.S. or non-U.S. bankruptcy, reorganization, liquidation, administration or similar proceeding (in each case, other than the Chapter 11 Cases) shall be considered to be an Affiliate of Purchaser.

"<u>Bankhaus Creditors' Approval</u>" means the Bankhaus Creditors' Committee and the Bankhaus Creditors' Assembly having each approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement.

"<u>Bankhaus Creditors' Assembly</u>" means the Bankhaus creditors' assembly (*Gläubigerversammlung*).

"<u>Bankhaus Creditors' Committee</u>" means the Bankhaus creditors' committee (*Gläubigerausschuss*).

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

"<u>Chapter 11 Sale Order</u>" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Purchaser to consummate the transactions contemplated hereby.

"<u>Chapter 15 Sale Order</u>" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Notes sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties

10435692\V-12

without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 19 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller.

"Closing Date" shall mean April 20, 2011, or such other date as Purchaser and Seller may mutually agree.

"Debt Service Payments" shall mean any payments in respect of principal, interest (including default rate interest), late fees, exit fees, prepayment premiums or penalties, and all other payments made under an Underlying Asset.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to LBHI or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any court, tribunal or arbitrator, and any self-regulatory organization.

"Indenture" shall mean the Indenture, dated as of May 22, 2008, by and among SASCO 2008-C2, LLC, Wachovia Bank, National Association and Wells Fargo Bank, National Association.

"Issuer" means SASCO 2008-C2, LLC.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Notes" shall mean the Floating Rate Term Notes Due 2038 and identified on Schedule I attached hereto.

"Purchase Price" shall mean an amount equal to six hundred twenty-five million dollars in U.S. currency (U.S.$625,000,000).

"Purchase Price Adjustment" shall mean one hundred million dollars in U.S. currency (U.S.$100,000,000).

"Settlement Agreement" shall mean that certain Settlement Agreement, dated as of January 14, 2011, by and among the Debtors and certain of their Non-Debtor Affiliates (each as defined in the Settlement Agreement) (collectively, "Lehman US"), and the LBB InsAdmin., as said agreement may be amended, modified, supplemented or restated from time to time.

"Specified Underlying Assets" shall mean present or past Underlying Assets in which Bankhaus had a right, title or interest in, to or under at any time prior to the origination of the SASCO 2008-C2, LLC transaction.

"Spruce Notes" shall mean the Mezzanine Notes, due 2017 and identified on Schedule II attached hereto.

"Third Party Appraiser" shall mean Eastdil Secured, LLC, Cushman & Wakefield, Inc., CB Richard Ellis Group, Inc. or any other independent third party valuation agent of national reputation selected by Seller and reasonably approved by Purchaser.

"Underlying Agreements" shall mean all promissory notes, mortgages, deeds of trust, pledge agreements, indentures, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties and other documents and agreements evidencing, securing, guaranteeing or otherwise relating to any of the Underlying Assets.

"Underlying Assets" has the meaning set forth in Section 7.

"Verano Notes" shall mean the Mezzanine Notes, due 2016 and identified on Schedule II attached hereto.

SECTION 2.   Purchase and Sale of Notes.

(a)   (i)   Subject to the terms and conditions hereof, Seller agrees to sell, and Purchaser agrees to purchase, on the Closing Date, all of Seller's right, title and interest in and to the Notes.

(ii)   In the event that the Confirmation Order (as defined in the Settlement Agreement) is not entered on or before December 31, 2012, Purchaser shall be required to remit the Purchase Price Adjustment to Seller in accordance with Section 2(b)(i) herein; provided, however, that Purchaser shall not be required to remit the Purchase Price Adjustment to Seller (x) in the event that the LBB InsAdmin terminates the Settlement Agreement pursuant to Sections 11.3(a) or 11.3(d) thereof, or (y) in the event that Lehman US terminates the Settlement Agreement pursuant to Section 11.2(c) thereof; provided, further that in the event that Lehman US terminates the Settlement Agreement pursuant to section 11.2(d) thereof, the Purchase Price Adjustment shall be reduced by an amount equal to the difference between the actual recoveries realized in the Bankhaus Proceeding in respect of the Allowed US Claims (as defined in the Settlement Agreement) and the recoveries that would have been realized in the Bankhaus Proceeding in respect of the Allowed US Claims if the LBB InsAdmin did not allow and provide for materially different treatment of claims held by other creditors of Bankhaus that are factually and legally similar to the Allowed US Claims that results in such other creditors having a recovery entitlement in respect of said claims that is materially higher than the recovery entitlement in respect of the Allowed US Claims. The additional payment of the Purchase Price Adjustment shall be an administrative expense of the Purchaser's Chapter 11 Case.

(iii)    Seller and Purchaser hereby acknowledge and agree that Seller shall be entitled to retain any and all payments, whether principal, interest or otherwise, received by Seller in respect of the Notes prior to the Closing Date.

(b)    On the Closing Date, subject to the satisfaction or waiver of the conditions set forth herein:

(i)    Purchaser shall pay to Seller an amount equal to the Purchase Price for the Notes in immediately available funds by wire transfer to the following account of Seller:

>FRNYUS33
>Federal Reserve Bank of New York, New York, NY
>ABA (Fed Wire No.) 021084018
>Acc:    021084018
>         MARKDEFF
>         Deutsche Bundesbank
>Acc:    5041034066
>         MARKDEFF
>FFC:    SLBSDEFP
>         Lehman Brothers Bankhaus AG;
>
>In addition, if required pursuant to the conditions of Section 2(a) hereof, Purchaser also shall pay to Seller on or prior to the tenth business day following December 31, 2012, an amount equal to the Purchase Price Adjustment in immediately available funds by wire transfer to the above-referenced account of Seller; and

(ii)    Seller shall deliver the Notes or cause the Notes to be delivered to Purchaser. At Seller's option, the closing shall be either: confirmed by fax or letter or wire, or conducted in person, in accordance with the instructions or at such place as Purchaser and Seller shall agree.

(c)    It is the intention of the parties that Purchaser is purchasing, and Seller is selling, the Notes, and not a debt instrument of Seller or other security. Accordingly, each party intends to treat the transaction for U.S. federal income tax purposes as a sale by Seller, and a purchase by Purchaser, of the Notes.

SECTION 3.    Closing Documents. The closing documents with respect to the sale of the Notes on the Closing Date shall consist of the following original documents:

(a)    this Agreement, duly executed by authorized representatives of Seller and Purchaser; and

(b)    a transferee certificate with respect to the SASCO Notes, duly executed by an authorized representative of Purchaser, in the form of Exhibit E-2 attached to the Indenture.

SECTION 4.    Conditions to Closing. The closing for the Notes to be sold on the Closing Date shall be subject to each of the following conditions precedent:

5

(a)     unless such condition is waived by the non-defaulting party, Seller and Purchaser shall have executed and delivered all Closing Documents as specified in Section 3 of this Agreement, duly executed by all signatories as required pursuant to the respective terms thereof;

(b)     unless such condition is waived by the non-defaulting party, Seller and Purchaser shall have complied with all requirements under the Indenture with respect to the transfer and exchange of the Notes;

(c)     The Bankhaus Creditors' Committee and the Bankhaus Creditors' Assembly shall have authorized and approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under this Agreement by the LBB InsAdmin and the transactions contemplated herein, which approval be in full force and effect as of the Closing Date;

(d)     The Board of Directors of the Purchaser shall have authorized and approved the execution, delivery and performance of this Agreement;

(e)     the Bankruptcy Court shall have issued and entered the Chapter 11 Sale Order which shall have become a Final Order and be in full force and effect as of the Closing Date;

(f)     the Bankruptcy Court shall have issued and entered the Chapter 15 Sale Order which shall have become a Final Order and be in full force and effect as of the Closing Date;

(g)     unless such condition is waived by Purchaser, the sale of the Spruce Notes and the Verano Notes by Seller to Purchaser shall have been consummated on or prior to the Closing Date;

(h)     unless such condition is waived by the non-defaulting party, no Title Defects (as defined below) shall have been identified by the parties to this Agreement with respect to any of the Notes or Underlying Assets; and

(i)     all other terms and conditions of this Agreement shall have been complied with, and all representations and warranties hereunder shall be true and correct (unless waived by Seller and/or Purchaser, as applicable).

If Seller or Purchaser shall not have satisfied one or more of the conditions precedent set forth in this Section 4 on or prior to the Closing Date, and such condition has not been waived, the non-defaulting party shall be entitled to terminate this Agreement by written declaration to the other party. In such event all rights and duties with respect to this Agreement shall be terminated except that the provisions of Sections 8, 10, 12, 18, 20 and 21 herein shall survive such termination.

SECTION 5.   Representations, Warranties and Covenants. The parties make the following representations, warranties and covenants which shall be true, correct and complete as of the date hereof and as of the Closing Date:

(a)     Seller represents and warrants to Purchaser that: (i) Bankhaus is a stock corporation duly established under the laws of Germany; (ii) subject to Sections 4(c) and (e) hereof, Seller has the requisite power and authority to enter into and perform this Agreement; (iii) insolvency proceedings have been commenced over the assets of Lehman Brothers Bankhaus AG (Local Court of Frankfurt am Main, case no. 810 IN 1120/08 L); (iv) the LBB InsAdmin has been duly appointed as the insolvency

6

administrator of Bankhaus by the Local Court Frankfurt am Main, Insolvency Court as set forth in the order dated as of November 13, 2008, issued by the Local Court Frankfurt am Main, Insolvency Court; (v) subject to Sections 4(c) and (f) hereof, this Agreement has been duly authorized by all necessary action on the part of Bankhaus, its creditors, the LBB InsAdmin and any Governmental Authority with jurisdiction over the insolvency proceedings of Bankhaus; (vi) subject to Section 4(c) hereof, this Agreement has been duly executed by one or more duly authorized representatives of Seller; (vii) subject to Sections 4(c) and (f) hereof, this Agreement is the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and to general principles of equity (regardless of whether considered by a court in equity or at law); (viii) Seller is a sophisticated buyer and seller of securities, claims, notes and other rights such as the Notes and has adequate information concerning the Notes to enable it to make an informed decision regarding the sale of the Notes; (ix) Seller has independently and without reliance upon Purchaser, and based on such information as it deemed appropriate, made its own credit and legal analysis of, and decision to sell, the Notes; and (x) at least at all times since the commencement of the Bankhaus Proceeding the Notes have been located in the United States.

(b)    (i) Seller represents and warrants to Purchaser that: (x) from and after the date of the Bankhaus Proceeding, it has not obtained any information in respect of any third party rights relating to the Notes or any Specified Underlying Asset and (y) it has not transferred or assigned the Notes or any Specified Underlying Asset or any interest therein to any party other than pursuant to the Settlement Agreement, dated December 15, 2009, among others, Purchaser and Seller. (ii)  It is the intention of the parties hereto that the Seller is assigning, transferring and conveying to the Purchaser and the Purchaser is relying upon Bankhaus having good and valid title to and being the sole owner of the Notes (and the Issuers having sole beneficial ownership of the Specified Underlying Assets), free and clear of any Lien, claim or interest of any other person other than any interest of the Purchaser (any such Lien, claim, interest or other defect or condition that would cause the state of title to deviate from the foregoing being referred to as a "<u>Title Defect</u>" with such term excluding (x) any Lien, claim, interest, or other defect or condition that (1) was created by or on behalf of the Purchaser or any of Purchaser's Affiliates (or in the case of the Specified Underlying Assets, the relevant issuer, trustee or servicer), (2) has actually been known to the Purchaser after September 15, 2008 or (3) first arose or was created after the Closing Date; (y) Liens, claims, interests, conditions or other defects terminated, relinquished and quitclaimed under this Agreement or terminated or extinguished by the Chapter 15 Sale Order; and (z) Liens, claims, interests, conditions or other defects that do not affect the ownership of Bankhaus in or the title of Bankhaus to the Notes or, in the case of the Specified Underlying Assets, the beneficial ownership by the relevant Issuer). (iii)  In the event the Purchaser determines that any Note is subject to a Title Defect, the Purchaser may deliver to the LBB InsAdmin notice of such Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin. Provided that the LBB InsAdmin receives such notice no later than six months after the Closing Date (such six month period, the "<u>Repurchase Period</u>"), the LBB InsAdmin shall refund to the Purchaser, not later than ninety days after receipt of such notice and evidence of the Title Defect, (v) the Purchase Price for the applicable Note, less (w) any principal payments received by the Purchaser in respect of the applicable Note and not required to be disgorged by the Purchaser as a result of such Title Defect, plus (x) an amount, which may be a negative number, equal to (A) interest on the Purchase Price for the applicable Note (less any principal payments received by the Purchaser in respect of the applicable Note) from the Closing Date until the date of repayment at a rate equal to the interest rate that Purchaser would have obtained had it not purchased the related Note from the Seller (provided, that in

7

no event shall such interest rate exceed the rate at which interest accrues on the applicable Note), minus (B) the amount of any interest payments received by the Purchaser on the applicable Note since the Closing Date, plus (y) all reasonable costs and expenses incurred in connection with the reconveyance of the applicable Note to the LBB InsAdmin (collectively, the "Repurchase Price") (provided, that in no event shall the Repurchase Price (exclusive of interest) exceed the Purchase Price) and the Purchaser shall reconvey such Note to the LBB InsAdmin (without any recourse to the Purchaser) simultaneously therewith. (iv) In the event the Purchaser determines that any Specified Underlying Asset is subject to a Title Defect, the Purchaser may deliver to the LBB InsAdmin notice of the same, accompanied by evidence of such Title Defect reasonably satisfactory to the LBB InsAdmin. The LBB InsAdmin and the Purchaser shall cooperate in an effort to cure, or reduce the losses resulting from, such Title Defect. Provided that the LBB InsAdmin receives notice of the Title Defect prior to the end of the Repurchase Period, and the parties are not able to cure such Title Defect within 60 days thereafter, the LBB InsAdmin, unless otherwise agreed, shall pay the Purchaser the lesser of (x) the loss paid, suffered or incurred by the Purchaser as a result of such Title Defect and (y) fifty percent of the pro-rata share of the Purchase Price allocable to the related Specified Underlying Asset on the Closing Date which pro-rata share shall be in the same proportion that the market value of such Specified Underlying Asset bears to the aggregate market value of the Underlying Assets on the Closing Date, as agreed between the LBB InsAdmin and Purchaser; provided, that if the LBB InsAdmin and Purchaser cannot agree upon either the pro-rata share or the market value by the expiration date of the 60 day cure period, then such pro-rata share or market value, as the case may be, shall be determined by a Third Party Appraiser (whose fees shall be paid one-half by Seller and one-half by Purchaser) (such amount, the "Specified Underlying Asset Loss"); provided, further, that Seller shall only be required to pay Purchaser Specified Underlying Asset Losses up to an amount, in the aggregate, equal to the Purchase Price. (v) Payment of the applicable Repurchase Price or the Specified Underlying Asset Loss shall be made by the Seller to the Purchaser without deductions and the Seller shall not be permitted off-set against the applicable Repurchase Price or Specified Underlying Asset Loss any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin may have against the Purchaser.

The parties will cooperate in good faith to resolve, as soon as possible, any dispute arising under or with respect to any matters described in this Section 5(b). To the extent that the parties are unable to resolve such dispute, then the parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto.

(c)      Notwithstanding the foregoing, the Purchaser shall not be required to reconvey a Note if the applicable structure shall have been dissolved or unwound (either event, an "Unwind"). In such event, promptly after payment of the Repurchase Price (the "Deemed Repurchase") for such Note (the "Deemed Repurchased Note") the Purchaser shall provide an accounting of the proceeds of the Underlying Assets formerly securing the Deemed Repurchased Note (the "Deemed Repurchased Note Assets") received between the Closing Date and the Repurchase Date and shall remit such proceeds, and thereafter on a monthly basis shall remit the proceeds of the Deemed Repurchased Note, to the Seller to the extent such proceeds would have been paid to the Seller if the Deemed Repurchased Note had remained outstanding and there had been no Unwind. If an Unwind occurs, then during the Repurchase Period, and after a Deemed Repurchase, the Purchaser shall service and administer the related Underlying Assets with the same care, skill, prudence and diligence with which the Purchaser services or administers similar investments owned by it, with a view to the timely recovery of principal and interest on a net present value basis. The rights created by this clause (c) shall preserve for the

10435692\V-12

LBB InsAdmin the economic value that it would have enjoyed had the Unwind not occurred and had it repurchased the relevant Note, and this clause (c) shall be construed accordingly. To that end, if an Unwind occurs, Purchaser shall take or omit, as the case may be, any actions, or exercise any instructions, unless such actions or instructions are unreasonable, vis-à-vis any issuer, trustee or servicer to ensure that Seller is economically in the same position as it would have been had the Unwind not occurred. The Purchaser shall have the burden of establishing reasonableness in connection with the preceding sentence. The Purchaser shall pay to the LBB InsAdmin fifty percent of any losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by the LBB InsAdmin as a result of any third-party allegations of harm or loss resulting from an Unwind.

(d)     Purchaser represents and warrants to Seller that: (i) subject to Sections 4(d) and (e) hereof, it has the requisite power and authority to enter into and perform this Agreement; (ii) subject to Sections 4(d) and (e) hereof, this Agreement has been duly authorized by all necessary action; (iii) subject to Sections 4(d) hereof, this Agreement has been duly executed by one or more duly authorized officers; and (iv) subject to Sections 4(d) and (e) hereof, this Agreement is the valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and to general principles of equity (regardless of whether considered by a court in equity or at law).

(e)     Purchaser is (i) a QIB and a Qualified Purchaser, (ii) is aware that the sale of the Notes to it is being made in reliance on the exemption from registration provided by Rule 144A, and (iii) is acquiring the Notes for its own account or for one or more accounts, each of which is a QIB and a Qualified Purchaser, and as to each of which the Purchaser exercises sole investment discretion, in a principal amount of not less than $100,000, for each such account.

(f)     Purchaser understands that the Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and shall not be registered under the Securities Act, and, if in the future the Purchaser decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may only be offered, resold, pledged or otherwise transferred in accordance with the Indenture and the applicable legend on such Notes set forth in Exhibits A and B of the Indenture, as applicable. Purchaser acknowledges that no representation is made by the Issuer, or the Initial Purchaser, as the case may be, as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes.

(g)     Purchaser is not purchasing the Notes with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. Purchaser understands that an investment in the Notes involves certain risks, including the risk of loss of all or a substantial part of its investment under certain circumstances. Purchaser has had access to such financial and other information concerning the Issuer and the Notes as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Notes, including an opportunity to ask questions of and request information from the Administrative Agent and the Issuer.

(h)     No part of the funds being used to pay the purchase price for the Notes constitutes an

I0435692\V-12

asset of any "employee benefit plan" (as defined in section 3(3) of ERISA) or "plan" (as defined in section 4975(e)(1) of the Code) that is subject to ERISA or section 4975 of the Code or any other plan which is subject to any federal, state or local law that is substantially similar to section 406 of ERISA or section 4975 of the Code (each a "Benefit Plan" and funds of such a Benefit Plan. "Plan Assets"), or an entity whose underlying assets include Plan Assets of any such Benefit Plan.

(i)     Purchaser represents and warrants to Seller that: (x) Purchaser is a sophisticated buyer and seller of securities, claims, notes and other rights such as the Notes and has adequate information concerning the Notes to enable it to make an informed decision regarding the purchase of the Notes and (y) Purchaser has independently and without reliance upon Seller, and based on such information as it deemed appropriate, made its own credit and legal analysis of, and decision to purchase, the Notes.

(j)     Purchaser represents and warrants to Seller that it is not aware of any third party rights relating to the Notes or any Underlying Asset.

(k)     Purchaser, in its capacity as a transferee of the Notes, represents that it is in compliance with any and all transfer restrictions contained in the Notes and the Indenture.

(l)     Purchaser hereby represents and warrants to Seller that none of Purchaser nor any of its Affiliates has within one year prior to the date hereof (a) agreed to defer or postpone, to the Closing Date or a date following the Closing Date, any scheduled Debt Service Payments (other than Debt Service Payments related to any Underlying Asset that has been restructured or as to which a default has occurred and that is listed on Exhibit B hereto, with respect to which the Purchaser has provided the Seller all material written agreements or other documentation related to such deferral or postponement) that are otherwise required to be made pursuant to the terms of the applicable Underlying Agreements on or prior to the Closing Date, or (b) sought to delay or postpone, to a date following the Closing Date, any prepayments of any Debt Service Payments with respect to which the applicable borrower(s) have given written notice to Purchaser or any of its Affiliates would be made on or prior to the Closing Date. The exercise by a borrower of an extension option included in an Underlying Agreement shall not breach this clause. Notwithstanding the preceding sentence, neither Purchaser nor any of its Affiliates has agreed to any deferrals, postponements or restructurings on, or taken any other action in connection with, any Underlying Assets for the purpose of prevent the receipt of payments by Bankhaus.

(m)     The Purchaser hereby represents and warrants to Seller that it has provided to Seller any and all information in respect of the Notes and/or the Underlying Assets in the possession of Purchaser or any of its Affiliates, together with any reports, analyses, compilations, memoranda, notes and any other writings or electronic media that contain, reflect or are based upon such information that has a substantial impact on the valuation of the Notes and/or any of the Underlying Assets, unless Purchaser is prohibited from providing such information because of any duty of confidentiality pursuant to any contractual agreement or any applicable law in effect as of the date hereof (subject to any exceptions, exclusions, carve-outs and other provisions permitting disclosure under circumstances which Purchaser has used commercially reasonable efforts to utilize); provided, that such information excludes all correspondence and in-process discussions, drafts and unexecuted documents, publicly available information, information received by Purchaser in its capacity as the holder of other interests in the issuer of an Underlying Asset (or in the related project owner or collateral), forward looking

information (including, but not limited to business plans), internal appraisals, information and analysis (including correspondence with third party asset managers or special servicers) and any internal valuations of the Purchaser or any of its Affiliates.

(n)    On the date of this Agreement, the Seller shall deliver to the Purchaser an executed power of attorney in the form of Exhibit A hereto.

SECTION 6.   Covenants.

(a)    Each of Purchaser and Seller covenants and agrees to comply with the reasonable requests of the Trustee with respect to, and perform all actions necessary or required to, transfer the Notes to Purchaser hereunder.

(b)    Purchaser agrees on its own behalf and on behalf of any account for which it is purchasing the Notes to offer, sell or otherwise transfer such Notes only (i) in the required minimum denomination, and (ii)(A) in the form of an interest in a Rule 144A Global Mezzanine Note to a Qualified Purchaser that Purchaser reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts, each of which is a Qualified Purchaser that Purchaser reasonably believes is a Qualified Institutional Buyer, in accordance with Rule 144A, and none of which is (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis in not less than $25,000,000 in securities of issuers that are not affiliated to it, (y) a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan or (z) formed for the purpose of investing in the related Issuer (except where each beneficial owner is a Qualified Purchaser), (B) in the U.S., in the form of an interest in a Certificated Mezzanine Note to a Qualified Purchaser that is an Accredited Investor (*provided*, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the Trustee and the related Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act) or (C) outside the U.S. in the form of an interest in a Regulation S Global Mezzanine Note to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act. Purchaser understands and agrees that neither a U.S. Person nor a U.S. Resident may hold an interest in a Note in the form of a Regulation S Global Mezzanine Note at any time. Purchaser agrees to provide notice of such transfer restrictions to any subsequent transferee.

(c)    Purchaser hereby covenants with the LBB InsAdmin that none of Purchaser nor any of its Affiliates shall, without the consent of the LBB InsAdmin, agree or consent to any delay or postponement of any scheduled Debt Service Payments that are required to be made pursuant to the applicable Underlying Agreements, or any prepayments with respect to which the applicable borrower(s) have given written notice to Purchaser or any of its Affiliates would be made, in either case, after the date hereof and on or prior to the Closing Date. For the avoidance of doubt, the exercise by a borrower of an extension option included in an Underlying Agreement shall not breach this clause.

(d)     The Purchaser on or prior to the Closing Date shall remit to the Trustee the sum of $30,909,774.97 representing interest and principal payments on the Underlying Assets known as Tuxedo and Related Company. In the event that the Purchaser (or its assignee) receives any resulting principal payment on the Notes on or after the Closing Date, it shall promptly remit to the LBB InsAdmin the portion thereof that the LBB InsAdmin would have received had it not sold the Note to the Purchaser pursuant to this Agreement. The Purchaser represents and warrants that, other than in connection with Tuxedo and Related Company, neither Purchaser nor any of its Affiliates is holding funds that it is required to remit to the Issuer or the related trustee.

(e)     Purchaser hereby covenants with the LBB InsAdmin that in the event Purchaser amends, restates, supplements or otherwise modifies (in each case, other than in connection with an Unwind) the terms and conditions of the Indenture during the Repurchase Period (such amendment, restatement, supplement or other modification, a "Supplemental Indenture"): (i) Purchaser shall provide the LBB InsAdmin with prompt notice of any such Supplemental Indenture and (ii) such Supplemental Indenture shall therein contain a condition subsequent which provides that such Supplemental Indenture shall cease to be of any force or effect, and shall be canceled, annulled or otherwise terminated on the date upon which Seller is required to repurchase the Notes in accordance with Section 5 hereof.

(f)     Seller hereby covenants with Purchaser that it shall provide Purchaser with a copy of relevant portions of the minutes of the meeting(s) at which the Bankhaus Creditors' Approval was obtained reflecting the approval of this Agreement promptly after such minutes are made available.

SECTION 7.    Notes Sold "AS IS".    Purchaser acknowledges and agrees that, except for representations, warranties and covenants set forth in this Agreement, Seller has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Notes or any of the Underlying Assets, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Purchaser with respect to any and all Notes is sold, transferred, assigned and conveyed to Purchaser on an "AS IS, WHERE IS" basis WITH ALL FAULTS. Notwithstanding the foregoing, it is the intention of the parties hereto that each of the issuers of the Notes should have ownership of the assets purportedly owned by it (the "Underlying Assets"). Accordingly, the Seller hereby releases and assigns to the Purchaser, effective on the Closing Date, any interest that it or Bankhaus may have in any Underlying Asset and agrees not to assert any interest in any Underlying Asset after the Closing Date. The Seller will deliver to the Purchaser any original documents in its possession or control with respect to any Underlying Asset and will execute any assignments, endorsements or other documents reasonably requested by the Purchaser to effectuate the intent of this paragraph. The preceding two sentences will cease to be of any effect with respect to Underlying Assets related to a Note with respect to which a repurchase or Deemed Repurchase under Section 5 occurs; provided, that the Purchaser shall pay to the LBB InsAdmin fifty percent of any losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid suffered or incurred by the LBB InsAdmin as a result of the LBB InsAdmin's release and assignment of its interest in any Underlying Asset to the Purchaser.

SECTION 8.    No Personal Liability for the LBB InsAdmin. The parties hereto (and solely for the purposes of this Section 8, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as the members of the Bankhaus Creditors' Committee, and to the extent any such personal liability existed, the parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisers and members of the Bankhaus Creditors' Committee personally. The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of the Purchaser and to the extent any such personal liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons. Unless otherwise provided by German mandatory law, any claim by a party hereto against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a Party against the Purchaser arising under or relating to this Agreement shall only be satisfied out of the assets of the Purchaser.

SECTION 9.    Limitation of Set-Off. The parties hereto agree that any rights to set-off between them shall be limited to rights and claims related to, or arising from, this Agreement and that no other claims and rights between the parties hereto will be affected by this Agreement. The parties hereto acknowledge that they have entered into various other agreements between each other and agree that nothing provided for in this Agreement shall lead to, result in, or imply a right to set-off under claims existing or arising under any such other agreements.

SECTION 10. Costs. Each of Seller and Purchaser shall each pay its own expenses, including but not limited to any commissions due its salesmen and legal fees and expenses of its attorneys.

SECTION 11. Amendments. This Agreement may not be modified, amended, altered or supplemented, except upon the execution and delivery of a written agreement by the parties hereto.

SECTION 12. Notices. Except as may be otherwise agreed between the parties, all communications hereunder shall be made in writing to the relevant party by personal delivery or by courier or first-class registered mail, or the closest local equivalent thereto, by electronic mail or by facsimile transmission confirmed by personal delivery or by courier or first-class registered mail or electronic mail as follows:

10435692\V-12

To Purchaser:

        1271 Avenue of the Americas, 39th Floor
        New York, New York 10020
        U.S.A.
        Attn: John Suckow and Daniel J. Ehrmann
        Facsimile: (646) 834-0874

        With a copy (which shall not constitute notice) to:

        Weil, Gotshal & Manges LLP
        767 Fifth Avenue
        New York, New York 10153
        U.S.A.
        Attn: Richard P. Krasnow
        Email: Richard.Krasnow@weil.com
        Facsimile: (212) 310-8007

To Seller:

        c/o CMS Hasche Sigle
        Barckhausstraße 12-16
        60325 Frankfurt am Main
        Germany
        Attention: Dr. Michael C. Frege
        Telephone: 011-49-69-717-01-300
        E-mail: Michael.Frege@cms-hs.com
        Fax: 011-49-69-717-01-367

        With a copy (which shall not constitute notice) to:

        SNR Denton US LLP
        1221 Avenue of the Americas
        New York, New York 10020
        U.S.A.
        Attn: Walter G. Van Dorn Jr.
        E-mail: walter.vandorn@snrdenton.com
        Facsimile: (212) 768-6800

or to such other address, telephone number or facsimile number or e-mail addresses as either party may notify to the other in accordance with the terms hereof from time to time.  Any communications hereunder shall be effective upon receipt.

10435692\V-12

SECTION 13. <u>Successors</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and, solely with respect to Purchaser, its successors and permitted assigns, and no other person shall have any right or obligation hereunder. Neither party may assign its rights under this Agreement without the written consent of the other party.

SECTION 14. <u>Severability</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

SECTION 15. <u>Headings</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

SECTION 16. <u>Entire Agreement</u>. This Agreement embodies the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or oral agreement or understanding relating to the subject matter hereof.

SECTION 17. <u>Further Assurances</u>. Seller and Purchaser shall from time to time execute such financing or continuation statements, documents, security agreements, reports and other documents, or deliver such instruments, certificates of title or other documents as may be reasonably necessary to perfect or otherwise evidence Purchaser's right, title and the interest in and to the Notes and/or the Underlying Assets.

SECTION 18. <u>Governing Law</u>. This Agreement shall be deemed to have been made in the State of New York. This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, without regard to principles of conflicts of law (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law or any successor provisions which shall govern).

SECTION 19. <u>Venue</u>. To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any party hereto bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement and/or any actions or proceedings arising hereunder or thereunder, then the parties hereto agree that venue shall be in any court in the State of New York having proper jurisdiction. Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding to enforce the Underlying Assets or otherwise relating to the Underlying Assets against any borrower or other obligor thereunder or the collateral securing such Loans in the court of any jurisdiction. Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement with the Bankruptcy Court or

15

with any other state or federal court located within the County of New York in the State of New York; and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 12 hereof. Nothing in this Agreement will affect the right, or requirement, of any party to this Agreement to serve process in any other manner permitted or required by law.

SECTION 20. Seller Indemnity. Seller shall indemnify Purchaser (which, for purposes of this Section 20 shall include its officers, directors, advisors and attorneys) against and in respect of any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Purchaser as a result of the breach of an express representation or warranty made by the Seller hereunder. Any claims by Purchaser for indemnification under this Section 20 must be made in writing. The obligation of the Seller to indemnify the Purchaser as provided in this Section 20 constitutes the sole remedy of the Purchaser under this Agreement with respect to the breach of an express representation or warranty by the Seller hereunder. Nothing contained in this Section 20 shall in any way affect or impair the Purchaser's rights to require that all requirements of Section 4 be satisfied in connection with the Closing Date.

SECTION 21. Purchaser Indemnity. Purchaser shall indemnify Seller against and in respect of any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Seller as a result of the breach of an express representation or warranty made by the Purchaser hereunder. Any claims by Seller for indemnification under this Section 21 must be made in writing. The obligation of the Purchaser to indemnify the Seller as provided in this Section 21 constitutes the sole remedy of the Seller under this Agreement with respect to the breach of an express representation or warranty by the Purchaser hereunder. Nothing contained in this Section 21 shall in any way affect or impair the Seller's rights to require that all requirements of Section 4 be satisfied in connection with the Closing Date.

SECTION 22. Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A

10435692\V -12

TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 22 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

SECTION 23. <u>Specific Performance</u>. Without limiting or waiving any rights or remedies under this Agreement now existing or hereafter arising at law, in equity or by statute, each party hereto acknowledges that there is no adequate remedy at law for a breach of the covenants and obligations of the parties under this Agreement and each party hereto agrees that, except as otherwise expressly provided in this Agreement, the other party shall be entitled to specific performance of this Agreement as a remedy to any such breach, and each party hereto hereby waives any legal or equitable defense to the granting thereof, including, without limitation, the requirement of posting a bond.

SECTION 24. <u>Survival</u>. The representations, warranties, covenants and agreements made by the parties in this Agreement shall survive the Closing Date.

SECTION 25. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement. The parties agree that this Agreement, any documents to be delivered pursuant to this Agreement and any notices hereunder may be transmitted between them by email and/or by facsimile. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties.

SECTION 26. <u>Effectiveness of Agreement</u>. This Agreement shall be effective upon execution by the parties hereto, subject only to the Chapter 11 Sale Order, the Chapter 15 Sale Order and the Bankhaus Creditors' Approval.

[Signature Page Follows]

I0435692\V-12

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (i. Ins), Seller

By: _____ 646

Name: Dr. Michael C. Frege
Title:   Insolvency Administrator (*Insolvenzverwalter*)


LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)


By: _____

Name:  Daniel J. Ehrmann
Title:  Vice President

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*), Seller

By: _____
Name: Dr. Michael C. Frege
Title:   Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

## SCHEDULE I

### SCHEDULE OF NOTES

1. Initial Face Amount U.S.$1,450,000,000.00 Floating Rate Term Notes Due 2038 issued pursuant to that certain Indenture, dated as of May 22, 2008, by and among SASCO 2008-C2, LLC, Wachovia Bank, National Association and Wells Fargo Bank, National Association, CUSIP Number: 78403WAA6.

## SCHEDULE II

### SPRUCE AND VERANO NOTES

1. Initial Face Amount U.S.$243,670,000.00 Mezzanine Notes, due 2017, issued pursuant to that certain Indenture, dated as of April 28, 2008, by and among Spruce CCS, Ltd., Spruce CCS, Corp. and U.S. Bank National Association, CUSIP Number: 852079AA0.

2. Initial Face Amount U.S.$180,400,000.00 Mezzanine Notes, due 2016, issued pursuant to that certain Indenture, dated as of July 25, 2008, by and among Verano CCS, Ltd., Verano CCS, Corp. and U.S. Bank National Association, CUSIP Number: 92336PAB2.

Exhibit A

FORM OF POWER OF ATTORNEY

**EXECUTION VERSION**

## LIMITED POWER OF ATTORNEY
### (SASCO Notes)

**LIMITED POWER OF ATTORNEY** (this "Agreement") dated as of March 1, 2011, by and between LEHMAN BROTHERS HOLDINGS INC. ("LBHI" or "Purchaser") and Dr. Michael C. Frege, in his capacity as insolvency administrator (*Insolvenzverwalter*) (the "LBB InsAdmin" or "Seller") over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*) ("Bankhaus"). Defined terms used herein and not otherwise defined shall have the meanings ascribed in the Note Sale Agreement, dated as of March 1, 2011 (the "Effective Date"), between Seller and Purchaser (the "Note Sale Agreement").

**WHEREAS**, on November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "Bankhaus Proceeding"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "German Insolvency Court") opened insolvency proceedings and appointed the LBB InsAdmin (local court of Frankfurt/Main, case no. 810 IN 1120/08 L);

**WHEREAS**, pursuant to the Note Sale Agreement, Seller agreed to sell and Purchaser agreed to purchase, on the Closing Date, subject to the terms and conditions set forth therein, all of Seller's right, title and interest in and to the Notes;

**WHEREAS**, Seller and Purchaser have agreed that during the period from and after the Effective Date and prior to the Closing Date, except as otherwise set forth herein, Purchaser shall have the authority otherwise possessed under the Indenture by Seller to vote and to give consents and approvals as more particularly set forth herein; and

**WHEREAS**, Seller and Purchaser wish to execute this Agreement in order to effectuate the foregoing agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual representations warranties, covenants and agreements set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1. Power of Attorney. Seller, by this Agreement, does hereby constitute and appoint Purchaser, during the Term (as hereinafter defined) hereof, as such Seller's true and lawful attorney in fact and proxy, for and in its name, place and stead, for the limited purpose of voting and giving consents and approvals under the terms of the Indentures with respect to the discounted payoff, restructuring or other similar action (including, without limitation, any waiver, release, amendment, forebearance or other similar action) relating to the Underlying Assets, and for no other purpose. This Power of Attorney does not cover any agreement whatsoever to terminate, amend, modify or alter in any manner the terms of the Indenture.

Section 2. Term. This proxy and limited power of attorney is coupled with an interest and irrevocable during the Term hereof. The "Term" shall begin on the Effective Date and end upon the earliest to occur of the following: (i) the Closing Date; (ii) default by Purchaser under the terms of the Note Sale Agreement; (iii) termination of the Note Sale Agreement; and (iv) the first anniversary of the Effective Date.

Section 3. <u>Indemnification</u>. Purchaser hereby agrees to defend, indemnify, and hold harmless Seller (which, for purposes of this <u>Section 3</u> shall include its officers, directors, advisors and attorneys) (each an "<u>Indemnified Party</u>"), from and against any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Seller as a result of any third-party claims brought against an Indemnified Party due to Purchaser's exercise of the powers granted hereunder. The provisions of this Section 3 shall continue in full force and effect and shall survive notwithstanding the termination of the Note Sale Agreement and this Agreement.

Section 4. <u>Notices</u>. Except as may be otherwise agreed between the parties, all communications hereunder shall be made in writing to the relevant party by personal delivery or by courier or first-class registered mail, or the closest local equivalent thereto, by electronic mail or by facsimile transmission confirmed by personal delivery or by courier or first-class registered mail or electronic mail as follows:

To Purchaser:

> 1271 Avenue of the Americas, 39th Floor
> New York, New York 10020
> U.S.A.
> Attn: John Suckow and Daniel J. Ehrmann
> Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> U.S.A.
> Attn: Richard P. Krasnow
> E-mail: richard.krasnow@weil.com
> Facsimile: (212) 310-8007

To Seller:

> c/o CMS Hasche Sigle
> Barckhausstraße 12-16
> 60325 Frankfurt am Main
> Germany
> Attention: Dr. Michael C. Frege
> Telephone: 011-49-69-717-01-300
> E-mail: Michael.Frege@cms-hs.com
> Fax: 011-49-69-717-01-367

10435975\V-5

With a copy (which shall not constitute notice) to:

> SNR Denton US LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> U.S.A.
> Attn: Walter G. Van Dorn Jr.
> E-mail: walter.vandorn@snrdenton.com
> Facsimile: (212) 768-6800

or to such other address, telephone number or facsimile number or e-mail addresses as either party may notify to the other in accordance with the terms hereof from time to time. Any communications hereunder shall be effective upon receipt.

Section 5. <u>Successors</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and, solely with respect to Purchaser, its successors and permitted assigns, and no other person shall have any right or obligation hereunder. Neither party may assign its rights under this Agreement without the written consent of the other party.

Section 6. <u>Headings</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 7. <u>Governing Law</u>. This Agreement shall be deemed to have been made in the State of New York. This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, without regard to principles of conflicts of law (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law or any successor provisions which shall govern). The parties hereby agree that all disputes arising hereunder shall be submitted to and hereby subject themselves to the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

Section 8. <u>Specific Performance</u>. The parties hereto agree that irreparable damages would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

Section 9. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which, taken together, shall constitute one and the same agreement.

Section 10. <u>No Personal Liability for the LBB InsAdmin</u>. The parties hereto (and solely for the purposes of this Section 10, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as the members of the Bankhaus Creditors Committee, and to the extent any such personal liability existed, the parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisers and members of the Bankhaus

Creditors Committee personally. The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of Purchaser and to the extent any such personal liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons. Any claim by a party hereto against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a party against Purchaser arising under or relating to this Agreement shall only be satisfied out of the assets of Purchaser.

*[Signature Page Follows]*

10435975\V-5

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*), Seller

By:    _____

Name: Dr. Michael C. Frege

Title:   Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:  _____

Name:  Daniel J. Ehrmann

Title:  Vice President

[Limited Power of Attorney (SASCO)]

Exhibit B

Section 5(l)

- Archstone
- Hotel Portfolio (Hilton)
- Ritz Kapalua
- 237 Park
- Commons of Mclean
- Innkeepers
- Related Companies
- Lehman Hotel Portfolio
- Tuxedo
- Sienna
- Innkeepers Anaheim
- 301 Howard Jr. Mezz
- Strathallen
- The Point
- Guilford Ctr. Greensboro
- Montauk Yacht Club

## Exhibit B

**Spruce-Verano Agreement**

**EXECUTION VERSION**

## NOTE SALE AGREEMENT

THIS NOTE SALE AGREEMENT is dated as of March 1, 2011 (the "Agreement"), by and between LEHMAN BROTHERS HOLDINGS INC., ("LBHI" or "Purchaser") and Dr. Michael C. Frege, in his capacity as insolvency administrator (*Insolvenzverwalter*) (the "LBB InsAdmin" or "Seller") over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*) ("Bankhaus").

RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of Lehman Brothers Holdings Inc. and certain of its Affiliates commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "Chapter 11 Cases" and each a "Chapter 11 Case");

WHEREAS, on November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "Bankhaus Proceeding"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "German Insolvency Court") opened insolvency proceedings and appointed the LBB InsAdmin (local court of Frankfurt/Main, case no. 810 IN 1120/08 L);

WHEREAS, on April 29, 2009, the LBB InsAdmin on behalf of Bankhaus filed his Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. Section 1521 [Docket No. 2], *In re Lehman Brothers Bankhaus AG (in Insolvenz)*, Case No. 09-12704 (JMP) (Bankr. S.D.N.Y.) (the "Bankhaus Chapter 15 Case"), and on May 22, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 [Docket No. 25] in the Bankhaus Chapter 15 Case;

WHEREAS, Purchaser has provided to Seller any and all information in respect of the Notes and/or the Underlying Assets in the possession of Purchaser or any of its Affiliates, together with any reports, analyses, compilations, memoranda, notes and any other writings or electronic media that contain, reflect or are based upon such information that has a substantial impact on the valuation of the Notes and/or any of the Underlying Assets, unless Purchaser is prohibited from providing such information because of any duty of confidentiality pursuant to any contractual agreement or any applicable law in effect as of the date hereof (subject to any exceptions, exclusions, carve-outs and other provisions permitting disclosure under circumstances which Purchaser has used commercially reasonable efforts to utilize); provided, that such information excludes all correspondence and in-process discussions, drafts and unexecuted documents, publicly available information, information received by Purchaser in its capacity as the holder of other interests in the issuer of an Underlying Asset (or in the related project owner or collateral), forward looking information (including, but not limited to business plans), internal appraisals, information and analysis (including correspondence with third party asset managers or special servicers) and any internal valuations of the Purchaser or any of its Affiliates;



WHEREAS, in accordance with the terms and conditions hereof, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, certain Notes as further identified on <u>Schedule I</u> attached hereto;

NOW, THEREFORE, in consideration of the recitals stated above, and the promises, mutual agreements, and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

SECTION 1.   <u>Definitions</u>. For purposes of this Agreement the following capitalized terms shall have the respective meanings set forth below.  Any capitalized term used but not defined herein shall have the meaning assigned to such term in the Indentures, respectively.

"<u>Affiliate</u>" means, with respect to any person, any person directly or indirectly controlling, controlled by or under direct or indirect common control with, such person.  A person will be deemed to control another person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, partnership interests or other equity interests, by contract or otherwise.  For purposes of clarity, neither Bankhaus nor any entity that is the subject of a U.S. or non-U.S. bankruptcy, reorganization, liquidation, administration or similar proceeding (in each case, other than the Chapter 11 Cases) shall be considered to be an Affiliate of Purchaser.

"<u>Bankhaus Creditors' Approval</u>" means the Bankhaus Creditors' Committee and the Bankhaus Creditors' Assembly having each approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement.

"<u>Bankhaus Creditors' Assembly</u>" means the Bankhaus creditors' assembly (*Gläubigerversammlung*).

"<u>Bankhaus Creditors' Committee</u>" means the Bankhaus creditors' committee (*Gläubigerausschuss*).

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

"<u>Chapter 11 Sale Order</u>" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Purchaser to consummate the transactions contemplated hereby.

"<u>Chapter 15 Sale Order</u>" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to consummate the transactions contemplated hereby.  Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Notes sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of 363(m) of the

2



Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 19 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller.

"Closing Date" shall mean April 20, 2011, or such other date as Purchaser and Seller may mutually agree.

"Debt Service Payments" shall mean any payments in respect of principal, interest (including default rate interest), late fees, exit fees, prepayment premiums or penalties, and all other payments made under an Underlying Asset.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to LBHI or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, any entity, authority or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, any court, tribunal or arbitrator, and any self-regulatory organization.

"Indenture" shall mean, (i) with respect to the Spruce Notes, the Indenture, dated as of April 28, 2008, by and among Spruce CCS, Ltd., Spruce CCS, Corp. and U.S. Bank National Association, and (ii) with respect to the Verano Notes, the Indenture, dated as of July 25, 2008, by and among Verano CCS, Ltd., Verano CCS, Corp. and U.S. Bank National Association, collectively, the "Indentures".

"Issuers" means Spruce CCS, Ltd. and Verano CCS, Ltd.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Notes" shall mean, collectively, the Spruce Notes and the Verano Notes.

10433117V-21

"Purchase Price" shall mean three hundred thirty two million dollars in U.S. currency (U.S.$332,000,000) and apportioned between the Spruce Notes and Verano Notes as follows Spruce Notes: U.S.$193,039,675; Verano Notes: U.S.$138,960,325.

"SASCO Notes" shall mean the Floating Rate Term Notes Due 2038 and identified on Schedule II attached hereto.

"Specified Underlying Assets" shall mean present or past Underlying Assets in which Bankhaus had a right, title or interest in, to or under at any time prior to the origination of the Spruce CCS, Ltd. and Verano CCS, Ltd. transactions.

"Spruce Notes" shall mean the Mezzanine Notes, due 2017 and identified on Schedule I attached hereto.

"Third Party Appraiser" shall mean Eastdil Secured, LLC, Cushman & Wakefield, Inc., CB Richard Ellis Group, Inc. or any other independent third party valuation agent of national reputation selected by Seller and reasonably approved by Purchaser.

"Underlying Agreements" shall mean all promissory notes, mortgages, deeds of trust, pledge agreements, indentures, loan agreements, credit agreements, security agreements, environmental indemnities, guaranties and other documents and agreements evidencing, securing, guaranteeing or otherwise relating to any of the Underlying Assets.

"Underlying Assets" has the meaning set forth in Section 7.

"Verano Notes" shall mean the Mezzanine Notes, due 2016 and identified on Schedule I attached hereto.

SECTION 2.   Purchase and Sale of Notes.

(a)      Subject to the terms and conditions hereof, Seller agrees to sell, and Purchaser agrees to purchase, on the Closing Date, all of Seller's right, title and interest in and to the Notes.  Seller and Purchaser hereby acknowledge and agree that Seller shall be entitled to retain any and all payments, whether principal, interest or otherwise, received by Seller in respect of the Notes prior to the Closing Date.

(b)      On the Closing Date, subject to the satisfaction or waiver of the conditions set forth herein:

(i)      Purchaser shall pay to Seller an amount equal to the Purchase Price for the Notes in immediately available funds by wire transfer to the following account of Seller:

FRNYUS33
Federal Reserve Bank of New York, New York, NY
ABA (Fed Wire No.) 021084018
Acc:      021084018
    MARKDEFF
    Deutsche Bundesbank

Acc:       5041034066
           MARKDEFF
FFC:       SLBSDEFP
           Lehman Brothers Bankhaus AG;

(ii)     Seller shall deliver the Notes or cause the Notes to be delivered to Purchaser. At Seller's option, the closing shall be either: confirmed by fax or letter or wire, or conducted in person, in accordance with the instructions or at such place as Purchaser and Seller shall agree.

(c)     It is the intention of the parties that Purchaser is purchasing, and Seller is selling, the Notes, and not a debt instrument of Seller or other security. Accordingly, each party intends to treat the transaction for U.S. federal income tax purposes as a sale by Seller, and a purchase by Purchaser, of the Notes.

SECTION 3.   Closing Documents. The closing documents with respect to the sale of the Notes on the Closing Date shall consist of the following original documents:

(a)     this Agreement, duly executed by authorized representatives of Seller and Purchaser;

(b)     a transferee certificate with respect to the Spruce Notes, duly executed by an authorized representative of Purchaser, in the form of Exhibit G-2 attached to the related Indenture; and

(c)     a transferee certificate with respect to the Verano Notes, duly executed by an authorized representative of Purchaser, in the form of Exhibit G-2 attached to the related Indenture.

SECTION 4.   Conditions to Closing. The closing for the Notes to be sold on the Closing Date shall be subject to each of the following conditions precedent:

(a)     unless such condition is waived by the non-defaulting party, Seller and Purchaser shall have executed and delivered all Closing Documents as specified in Section 3 of this Agreement, duly executed by all signatories as required pursuant to the respective terms thereof;

(b)     unless such condition is waived by the non-defaulting party, Seller and Purchaser shall have complied with all requirements under the related Indenture with respect to the transfer and exchange of the Notes;

(c)     The Bankhaus Creditors' Committee and the Bankhaus Creditors' Assembly shall have authorized and approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under this Agreement by the LBB InsAdmin and the transactions contemplated herein, which approval be in full force and effect as of the Closing Date;

(d)     The Board of Directors of the Purchaser shall have authorized and approved the execution, delivery and performance of this Agreement;

(e)     the Bankruptcy Court shall have issued and entered the Chapter 11 Sale Order which shall have become a Final Order and be in full force and effect as of the Closing Date;

5

(f)    the Bankruptcy Court shall have issued and entered the Chapter 15 Sale Order which shall have become a Final Order and be in full force and effect as of the Closing Date;

(g)    unless such condition is waived by Purchaser, the sale of the SASCO Notes by Seller to Purchaser shall have been consummated on or prior to the Closing Date;

(h)    unless such condition is waived by the non-defaulting party, no Title Defects (as defined below) shall have been identified by the parties to this Agreement with respect to any of the Notes or Underlying Assets; provided, that if any Title Defects have been identified by the parties to this Agreement with respect to any Note (or Underlying Assets related thereto), the Purchaser may elect, in its sole and absolute discretion, to include or exclude such Note and proceed to purchase  such other Note by paying  the applicable Purchase Price; and

(i)    all other terms and conditions of this Agreement shall have been complied with and all representations and warranties hereunder shall be true and correct (unless waived by Seller and/or Purchaser, as applicable).

If Seller or Purchaser shall not have satisfied one or more of the conditions precedent set forth in this Section 4 on or prior to the Closing Date, and such condition has not been waived, the non-defaulting party shall be entitled to terminate this Agreement by written declaration to the other party.  In such event all rights and duties with respect to this Agreement shall be terminated except that the provisions of Sections 8, 10, 12, 18, 20 and 21 herein shall survive such termination.

SECTION 5.   Representations, Warranties and Covenants.  The parties make the following representations, warranties and covenants which shall be true, correct and complete as of the date hereof and as of the Closing Date:

(a)    Seller represents and warrants to Purchaser that: (i) Bankhaus is a stock corporation duly established under the laws of Germany; (ii) subject to Sections 4(c) and (f) hereof, Seller has the requisite power and authority to enter into and perform this Agreement; (iii) insolvency proceedings have been commenced over the assets of Lehman Brothers Bankhaus AG (Local Court of Frankfurt am Main, case no. 810 IN 1120/08 L); (iv) the LBB InsAdmin has been duly appointed as the insolvency administrator of Bankhaus by the Local Court Frankfurt am Main, Insolvency Court as set forth in the order dated as of November 13, 2008, issued by the Local Court Frankfurt am Main, Insolvency Court; (v) subject to Sections 4(c) and (f) hereof, this Agreement has been duly authorized by all necessary action on the part of Bankhaus, its creditors, the LBB InsAdmin and any Governmental Authority with jurisdiction over the insolvency proceedings of Bankhaus; (vi) subject to Section 4(c) hereof, this Agreement has been duly executed by one or more duly authorized representatives of Seller; (vii) subject to Sections 4(c) and (f) hereof, this Agreement is the valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and to general principles of equity (regardless of whether considered by a court in equity or at law); (viii) Seller is a sophisticated buyer and seller of securities, claims, notes and other rights such as the Notes and has adequate information concerning the Notes to enable it to make an informed decision regarding the sale of the Notes; (ix) Seller has independently and without reliance upon Purchaser, and based on such information as it deemed appropriate, made its own credit and legal analysis of, and decision to sell, the Notes; and (x) at least at all times since the

6

commencement of the Bankhaus Proceeding the Notes have been located in the United States.

(b)   (i) Seller represents and warrants to Purchaser that: (x) from and after the date of the Bankhaus Proceeding, it has not obtained any information in respect of any third party rights relating to the Notes or any Specified Underlying Asset and (y) it has not transferred or assigned the Notes or any Specified Underlying Asset or any interest therein to any party other than pursuant to the Settlement Agreement, dated December 15, 2009, among others, Purchaser and Seller. (ii) It is the intention of the parties hereto that the Seller is assigning, transferring and conveying to the Purchaser and the Purchaser is relying upon Bankhaus having good and valid title to and being the sole owner of the Notes (and the Issuers having sole beneficial ownership of the Specified Underlying Assets), free and clear of any Lien, claim or interest of any other person other than any interest of the Purchaser (any such Lien, claim, interest or other defect or condition that would cause the state of title to deviate from the foregoing being referred to as a "Title Defect" with such term excluding (x) any Lien, claim, interest, or other defect or condition that (1) was created by or on behalf of the Purchaser or any of Purchaser's Affiliates (or in the case of the Specified Underlying Assets, the relevant issuer, trustee or servicer), (2) has actually been known to the Purchaser after September 15, 2008 or (3) first arose or was created after the Closing Date; (y) Liens, claims, interests, conditions or other defects terminated, relinquished and quitclaimed under this Agreement or terminated or extinguished by the Chapter 15 Sale Order; and (z) Liens, claims, interests, conditions or other defects that do not affect the ownership of Bankhaus in or the title of Bankhaus to the Notes or, in the case of the Specified Underlying Assets, the beneficial ownership by the relevant Issuer). (iii) In the event the Purchaser determines that any Note is subject to a Title Defect, the Purchaser may deliver to the LBB InsAdmin notice of such Title Defect, accompanied by evidence of such Title Defect reasonably acceptable to the LBB InsAdmin. Provided that the LBB InsAdmin receives such notice no later than six months after the Closing Date (such six month period, the "Repurchase Period"), the LBB InsAdmin shall refund to the Purchaser, not later than ninety days after receipt of such notice and evidence of the Title Defect, (v) the Purchase Price for the applicable Note, less (w) any principal payments received by the Purchaser in respect of the applicable Note and not required to be disgorged by the Purchaser as a result of such Title Defect, plus (x) an amount, which may be a negative number, equal to (A) interest on the Purchase Price for the applicable Note (less any principal payments received by the Purchaser in respect of the applicable Note) from the Closing Date until the date of repayment at a rate equal to the interest rate that Purchaser would have obtained had it not purchased the related Note from the Seller (provided, that in no event shall such interest rate exceed the rate at which interest accrues on the applicable Note), minus (B) the amount of any interest payments received by the Purchaser on the applicable Note since the Closing Date, plus (y) all reasonable costs and expenses incurred in connection with the reconveyance of the applicable Note to the LBB InsAdmin (collectively, the "Repurchase Price") (provided, that in no event shall the Repurchase Price (exclusive of interest) exceed the Purchase Price) and the Purchaser shall reconvey such Note to the LBB InsAdmin (without any recourse to the Purchaser) simultaneously therewith. (iv) In the event the Purchaser determines that any Specified Underlying Asset is subject to a Title Defect, the Purchaser may deliver to the LBB InsAdmin notice of the same, accompanied by evidence of such Title Defect reasonably satisfactory to the LBB InsAdmin. The LBB InsAdmin and the Purchaser shall cooperate in an effort to cure, or reduce the losses resulting from, such Title Defect. Provided that the LBB InsAdmin receives notice of the Title Defect prior to the end of the Repurchase Period, and the parties are not able to cure such Title Defect within 60 days thereafter, the LBB InsAdmin, unless otherwise agreed, shall pay the Purchaser the lesser of (x) the loss paid, suffered or incurred by the Purchaser as a result of such Title Defect and (y)

10433117.V-21



fifty percent of the pro-rata share of the Purchase Price allocable to the related Specified Underlying Asset on the Closing Date which pro-rata share shall be in the same proportion that the market value of such Specified Underlying Asset bears to the aggregate market value of the Underlying Assets on the Closing Date, as agreed between the LBB InsAdmin and Purchaser; provided, that if the LBB InsAdmin and Purchaser cannot agree upon either the pro-rata share or the market value by the expiration date of the 60 day cure period, then such pro-rata share or market value, as the case may be, shall be determined by a Third Party Appraiser (whose fees shall be paid one-half by Seller and one-half by Purchaser) (such amount, the "Specified Underlying Asset Loss");  provided, further, that Seller shall only be required to pay Purchaser Specified Underlying Asset Losses up to an amount, in the aggregate, equal to the Purchase Price. (v) Payment of the applicable Repurchase Price or the Specified Underlying Asset Loss shall be made by the Seller to the Purchaser without deductions and the Seller shall not be permitted off-set against the applicable Repurchase Price or Specified Underlying Asset Loss any other claim, whether by set-off, recoupment, retention or any other theory, that the LBB InsAdmin may have against the Purchaser.

The parties will cooperate in good faith to resolve, as soon as possible, any dispute arising under or with respect to any matters described in this Section 5(b). To the extent that the parties are unable to resolve such dispute, then the parties agree that such dispute shall be resolved by the Bankruptcy Court upon and following the filing of an appropriate motion with respect thereto.

(c)      Notwithstanding the foregoing, the Purchaser shall not be required to reconvey a Note if the applicable structure shall have been dissolved or unwound (either event, an "Unwind"). In such event, promptly after payment of the Repurchase Price (the "Deemed Repurchase") for such Note (the "Deemed Repurchased Note") the Purchaser shall provide an accounting of the proceeds of the Underlying Assets formerly securing the Deemed Repurchased Note (the "Deemed Repurchased Note Assets") received between the Closing Date and the Repurchase Date and shall remit such proceeds, and thereafter on a monthly basis shall remit the proceeds of the Deemed Repurchased Note, to the Seller to the extent such proceeds would have been paid to the Seller if the Deemed Repurchased Note had remained outstanding and there had been no Unwind. If an Unwind occurs, then during the Repurchase Period, and after a Deemed Repurchase, the Purchaser shall service and administer the related Underlying Assets with the same care, skill, prudence and diligence with which the Purchaser services or administers similar investments owned by it, with a view to the timely recovery of principal and interest on a net present value basis. The rights created by this clause (c) shall preserve for the LBB InsAdmin the economic value that it would have enjoyed had the Unwind not occurred and had it repurchased the relevant Note, and this clause (c) shall be construed accordingly. To that end, if an Unwind occurs, Purchaser shall take or omit, as the case may be, any actions, or exercise any instructions, unless such actions or instructions are unreasonable, vis-à-vis any issuer, trustee or servicer to ensure that Seller is economically in the same position as it would have been had the Unwind not occurred. The Purchaser shall have the burden of establishing reasonableness in connection with the preceding sentence.   The Purchaser shall pay to the LBB InsAdmin fifty percent of any losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by the LBB InsAdmin as a result of any third-party allegations of harm or loss resulting from an Unwind.

(d)      Purchaser represents and warrants to Seller that: (i) subject to Sections 4(d) and (e)

8

hereof, it has the requisite power and authority to enter into and perform this Agreement; (ii) subject to Sections 4(d) and (e) hereof, this Agreement has been duly authorized by all necessary action; (iii) subject to Section 4(d) hereof, this Agreement has been duly executed by one or more duly authorized officers; and (iv) subject to Sections 4(d) and (e) hereof, this Agreement is the valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject, as to enforceability, to bankruptcy, insolvency, receivership, conservatorship, reorganization, moratorium and other laws relating to or affecting creditors' rights generally and to general principles of equity (regardless of whether considered by a court in equity or at law).

(e)     Purchaser represents and warrants to Seller that Purchaser: (i) is both an Accredited Investor and a Qualified Purchaser, acquiring the Notes for its own account or one or more accounts with respect to which Purchaser exercises sole investment discretion, each of which is both an Accredited Investor and a Qualified Purchaser, pursuant to an exemption from the registration requirement of the Securities Act; (ii) is acquiring the Notes for investment purposes and not with a view to the distribution thereof; and (iii) was not formed for the purpose of investing in any Issuer.

(f)     Purchaser represents and warrants to and covenants with Seller, so long as it holds any interest in the Notes, that Purchaser: (i) is not a "Benefit Plan Investor" (as such term is defined in Section 3(42) of ERISA); (ii) either (A) is not a governmental plan or other plan subject to applicable law that is substantively similar or of similar effect to Section 406 of ERISA or Section 4975 of the Code or (B) its acquisition and holding of the Notes will not constitute or result in a violation of such applicable law and will not cause the underlying assets of any Issuer or any Co-Issuer to be treated as plan assets under such applicable law; and (iii) will not sell, pledge or otherwise transfer such Notes in violation of the foregoing. Any purported transfer of a Note or interest therein that does not comply with the foregoing requirements shall be null and void *ab initio*.

(g)     Purchaser represents and warrants to Seller that: (i) Purchaser is a sophisticated buyer and seller of securities, claims, notes and other rights such as the Notes and has adequate information concerning the Notes to enable it to make an informed decision regarding the purchase of the Notes and (ii) Purchaser has independently and without reliance upon Seller, and based on such information as it deemed appropriate, made its own credit and legal analysis of, and decision to purchase, the Notes.

(h)     Purchaser represents and warrants to Seller that it is not aware of any third party rights relating to the Notes or any Underlying Asset.

(i)     Purchaser, in its capacity as a transferee of the Notes, represents that it is in compliance with any and all transfer restrictions contained in the Notes and the related Indentures.

(j)     Purchaser hereby represents and warrants to Seller that none of Purchaser nor any of its Affiliates has within one year prior to the date hereof (a) agreed to defer or postpone, to the Closing Date or a date following the Closing Date, any scheduled Debt Service Payments (other than Debt Service Payments related to any Underlying Asset that has been restructured or as to which a default has occurred and that is listed on Exhibit B hereto, with respect to which the Purchaser has provided the Seller all material written agreements or other documentation related to such deferral or postponement) that are otherwise required to be made pursuant to the terms of the applicable Underlying Agreements on or prior to the Closing Date, or (b) sought to delay or postpone, to a date

10433117\V-21



following the Closing Date, any prepayments of any Debt Service Payments with respect to which the applicable borrower(s) have given written notice to Purchaser or any of its Affiliates would be made on or prior to the Closing Date. The exercise by a borrower of an extension option included in an Underlying Agreement shall not breach this clause. Notwithstanding the preceding sentence, neither Purchaser nor any of its Affiliates has agreed to any deferrals, postponements or restructurings on, or taken any other action in connection with, any Underlying Assets for the purpose of prevent the receipt of payments by Bankhaus.

(k)     The Purchaser hereby represents and warrants to Seller that it has provided to Seller any and all information in respect of the Notes and/or the Underlying Assets in the possession of Purchaser or any of its Affiliates, together with any reports, analyses, compilations, memoranda, notes and any other writings or electronic media that contain, reflect or are based upon such information that has a substantial impact on the valuation of the Notes and/or any of the Underlying Assets, unless Purchaser is prohibited from providing such information because of any duty of confidentiality pursuant to any contractual agreement or any applicable law in effect as of the date hereof (subject to any exceptions, exclusions, carve-outs and other provisions permitting disclosure under circumstances which Purchaser has used commercially reasonable efforts to utilize); provided, that such information excludes all correspondence and in-process discussions, drafts and unexecuted documents, publicly available information, information received by Purchaser in its capacity as the holder of other interests in the issuer of an Underlying Asset (or in the related project owner or collateral), forward looking information (including, but not limited to business plans), internal appraisals, information and analysis (including correspondence with third party asset managers or special servicers) and any internal valuations of the Purchaser or any of its Affiliates.

(l)     On the date of this Agreement, the Seller shall deliver to the Purchaser an executed power of attorney in the form of Exhibit A hereto.

SECTION 6.   Covenants.

(a)     Each of Purchaser and Seller covenants and agrees to comply with the reasonable requests of the Trustee with respect to, and perform all actions necessary or required to, transfer the Notes to Purchaser hereunder.

(b)     Purchaser agrees on its own behalf and on behalf of any account for which it is purchasing the Notes to offer, sell or otherwise transfer such Notes only (i) in the required minimum denomination, and (ii)(A) in the form of an interest in a Rule 144A Global Mezzanine Note to a Qualified Purchaser that Purchaser reasonably believes is a Qualified Institutional Buyer, purchasing for its own account or one or more accounts, each of which is a Qualified Purchaser that Purchaser reasonably believes is a Qualified Institutional Buyer, in accordance with Rule 144A, and none of which is (x) a dealer of the type described in paragraph (a)(1)(ii) of Rule 144A unless it owns and invests on a discretionary basis in not less than $25,000,000 in securities of issuers that are not affiliated to it, (y) a participant-directed employee plan, such as a 401(k) plan, or any other type of plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, unless investment decisions with respect to the plan are made solely by the fiduciary, trustee or sponsor of such plan or (z) formed for the purpose of investing in the related Issuer (except where each beneficial owner is a Qualified Purchaser), (B) in the U.S., in the form of an interest in a Certificated Mezzanine Note to a Qualified

Purchaser that is an Accredited Investor (*provided*, that in the case of any such transfer, either (x) the transferor or the transferee has certified that the transfer is being made pursuant to Rule 144 under the Securities Act or (y) the transferor or the transferee has provided an opinion of nationally recognized counsel to each of the related Trustee and the related Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act) or (C) outside the U.S. in the form of an interest in a Regulation S Global Mezzanine Note to a person that is neither a U.S. Person nor a U.S. Resident in an offshore transaction in accordance with Regulation S under the Securities Act. Purchaser understands and agrees that neither a U.S. Person nor a U.S. Resident may hold an interest in a Note in the form of a Regulation S Global Mezzanine Note at any time. Purchaser agrees to provide notice of such transfer restrictions to any subsequent transferee.

(c)      Purchaser hereby covenants with the LBB InsAdmin that none of Purchaser nor any of its Affiliates shall, without the consent of the LBB InsAdmin, agree or consent to any delay or postponement of any scheduled Debt Service Payments that are required to be made pursuant to the applicable Underlying Agreements, or any prepayments with respect to which the applicable borrower(s) have given written notice to Purchaser or any of its Affiliates would be made, in either case, after the date hereof and on or prior to the Closing Date.  For the avoidance of doubt, the exercise by a borrower of an extension option included in an Underlying Agreement shall not breach this clause.

(d)      Purchaser hereby covenants with the LBB InsAdmin that in the event Purchaser amends, restates, supplements or otherwise modifies (in each case, other than in connection with an Unwind) the terms and conditions of any Indenture during the Repurchase Period (such amendment, restatement, supplement or other modification, a "Supplemental Indenture"): (i) Purchaser shall provide the LBB InsAdmin with prompt notice of any such Supplemental Indenture and (ii) such Supplemental Indenture shall therein contain a condition subsequent which provides that such Supplemental Indenture shall cease to be of any force or effect, and shall be canceled, annulled or otherwise terminated on the date upon which Seller is required to repurchase the related Notes in accordance with Section 5 hereof.

(e)      Seller hereby covenants with Purchaser that it shall provide Purchaser with a copy of relevant portions of the minutes of the meeting(s) at which the Bankhaus Creditors' Approval was obtained reflecting the approval of this Agreement promptly after such minutes are made available.

SECTION 7.   Notes Sold "AS IS".  Purchaser acknowledges and agrees that, except for representations, warranties and covenants set forth in this Agreement, Seller has not and does not represent, warrant or covenant the nature, accuracy, completeness, enforceability or validity of any of the Notes or any of the Underlying Assets, and, subject to the terms of this Agreement, all documentation, information, analysis and/or correspondence, if any, which is or may be sold, transferred, assigned and conveyed to Purchaser with respect to any and all Notes is sold, transferred, assigned and conveyed to Purchaser on an "AS IS, WHERE IS" basis WITH ALL FAULTS. Notwithstanding the foregoing, it is the intention of the parties hereto that each of the issuers of the Notes should have ownership of the assets purportedly owned by it (the "Underlying Assets"). Accordingly, the Seller hereby releases and assigns to the Purchaser, effective on the Closing Date, any interest that it or Bankhaus may have in any Underlying Asset and agrees not to assert any interest in any Underlying Asset after the Closing Date.  The Seller will deliver to the Purchaser any original documents in its possession or control with respect to any Underlying Asset and will execute any

11

assignments, endorsements or other documents reasonably requested by the Purchaser to effectuate the intent of this paragraph. The preceding two sentences will cease to be of any effect with respect to Underlying Assets related to a Note with respect to which a repurchase or Deemed Repurchase under Section 5 occurs; provided, that the Purchaser shall pay to the LBB InsAdmin fifty percent of any losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid suffered or incurred by the LBB InsAdmin as a result of the LBB InsAdmin's release and assignment of its interest in any Underlying Asset to the Purchaser.

SECTION 8.  No Personal Liability for the LBB InsAdmin. The parties hereto (and solely for the purposes of this Section 8, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as the members of the Bankhaus Creditors Committee, and to the extent any such personal liability existed, the parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisers and members of the Bankhaus Creditors Committee personally. The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of the Purchaser and to the extent any such personal liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons. Unless otherwise provided by German mandatory law, any claim by a party hereto against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a Party against the Purchaser arising under or relating to this Agreement shall only be satisfied out of the assets of the Purchaser.

SECTION 9.  Limitation of Set-Off. The parties hereto agree that any rights to set-off between them shall be limited to rights and claims related to, or arising from, this Agreement and that no other claims and rights between the parties hereto will be affected by this Agreement. The parties hereto acknowledge that they have entered into various other agreements between each other and agree that nothing provided for in this Agreement shall lead to, result in, or imply a right to set-off under claims existing or arising under any such other agreements.

SECTION 10. Costs. Each of Seller and Purchaser shall each pay its own expenses, including but not limited to any commissions due its salesmen and legal fees and expenses of its attorneys.

SECTION 11. Amendments. This Agreement may not be modified, amended, altered or supplemented, except upon the execution and delivery of a written agreement by the parties hereto.

SECTION 12. Notices. Except as may be otherwise agreed between the parties, all communications hereunder shall be made in writing to the relevant party by personal delivery or by courier or first-class registered mail, or the closest local equivalent thereto, by electronic mail or by facsimile transmission confirmed by personal delivery or by courier or first-class registered mail or electronic mail as follows:

10433117\\:-21

To Purchaser:

> 1271 Avenue of the Americas, 39th Floor
> New York, New York 10020
> U.S.A.
> Attn: John Suckow and Daniel J. Ehrmann
> Facsimile: (646) 834-0874

> With a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> U.S.A.
> Attn: Richard P. Krasnow
> Email: Richard.Krasnow@weil.com
> Facsimile: (212) 310-8007

To Seller:

> c/o CMS Hasche Sigle
> Barckhausstraße 12-16
> 60325 Frankfurt am Main
> Germany
> Attention: Dr. Michael C. Frege
> Telephone: 011-49-69-717-01-300
> E-mail: Michael.Frege@cms-hs.com
> Fax: 011-49-69-717-01-367

> With a copy (which shall not constitute notice) to:

> SNR Denton US LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> U.S.A.
> Attn: Walter G. Van Dorn Jr.
> E-mail: walter.vandorn@snrdenton.com
> Facsimile: (212) 768-6800

or to such other address, telephone number or facsimile number or e-mail addresses as either party may notify to the other in accordance with the terms hereof from time to time.  Any communications hereunder shall be effective upon receipt.



10433117.V-21

SECTION 13.  Successors.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and, solely with respect to Purchaser, its successors and permitted assigns, and no other person shall have any right or obligation hereunder.  Neither party may assign its rights under this Agreement without the written consent of the other party.

SECTION 14.  Severability.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

SECTION 15.  Headings. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

SECTION 16.  Entire Agreement. This Agreement embodies the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or oral agreement or understanding relating to the subject matter hereof.

SECTION 17. Further Assurances. Seller and Purchaser shall from time to time execute such financing or continuation statements, documents, security agreements, reports and other documents, or deliver such instruments, certificates of title or other documents as may be reasonably necessary to perfect or otherwise evidence Purchaser's right, title and the interest in and to the Notes and/or the Underlying Assets.

SECTION 18.  Governing Law. This Agreement shall be deemed to have been made in the State of New York.  This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, without regard to principles of conflicts of law (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law or any successor provisions which shall govern).

SECTION 19.  Venue.  To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any party hereto bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court. Each of the parties hereto agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by law.  If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement and/or any actions or proceedings arising hereunder or thereunder, then the parties hereto agree that venue shall be in any court in the State of New York having proper jurisdiction.  Nothing in this Agreement shall affect any right that any party hereto may otherwise have to bring any action or proceeding to enforce the Underlying Assets or otherwise relating to the Underlying Assets against any borrower or other obligor thereunder or the collateral securing such Loans in the court of any jurisdiction.  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement with the Bankruptcy Court or

10433117\V-21



with any other state or federal court located within the County of New York in the State of New York; and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 12 hereof. Nothing in this Agreement will affect the right, or requirement, of any party to this Agreement to serve process in any other manner permitted or required by law.

SECTION 20. <u>Seller Indemnity</u>. Seller shall indemnify Purchaser (which, for purposes of this Section 20 shall include its officers, directors, advisors and attorneys) against and in respect of any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Purchaser as a result of the breach of an express representation or warranty made by the Seller hereunder. Any claims by Purchaser for indemnification under this Section 20 must be made in writing. The obligation of the Seller to indemnify the Purchaser as provided in this Section 20 constitutes the sole remedy of the Purchaser under this Agreement with respect to the breach of an express representation or warranty by the Seller hereunder. Nothing contained in this Section 20 shall in any way affect or impair the Purchaser's rights to require that all requirements of Section 4 be satisfied in connection with the Closing Date.

SECTION 21. <u>Purchaser Indemnity</u>. Purchaser shall indemnify Seller against and in respect of any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Seller as a result of the breach of an express representation or warranty made by the Purchaser hereunder. Any claims by Seller for indemnification under this Section 21 must be made in writing. The obligation of the Purchaser to indemnify the Seller as provided in this Section 21 constitutes the sole remedy of the Seller under this Agreement with respect to the breach of an express representation or warranty by the Purchaser hereunder. Nothing contained in this Section 21 shall in any way affect or impair the Seller's rights to require that all requirements of Section 4 be satisfied in connection with the Closing Date.

SECTION 22. <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE ANCILLARY DOCUMENTS AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A

15



TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 22 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

SECTION 23. Specific Performance.  Without limiting or waiving any rights or remedies under this Agreement now existing or hereafter arising at law, in equity or by statute, each party hereto acknowledges that there is no adequate remedy at law for a breach of the covenants and obligations of the parties under this Agreement and each party hereto agrees that, except as otherwise expressly provided in this Agreement, the other party shall be entitled to specific performance of this Agreement as a remedy to any such breach, and each party hereto hereby waives any legal or equitable defense to the granting thereof, including, without limitation, the requirement of posting a bond.

SECTION 24. Survival.  The representations, warranties, covenants and agreements made by the parties in this Agreement shall survive the Closing Date.

SECTION 25. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one and the same agreement.  The parties agree that this Agreement, any documents to be delivered pursuant to this Agreement and any notices hereunder may be transmitted between them by email and/or by facsimile. The parties intend that faxed signatures and electronically imaged signatures such as .pdf files shall constitute original signatures and are binding on all parties.

SECTION 26. Effectiveness of Agreement.  This Agreement shall be effective upon execution by the parties hereto, subject only to the Chapter 11 Sale Order, the Chapter 15 Sale Order and the Bankhaus Creditors' Approval.

[Signature Page Follows]



IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*), Seller

By: _____ 643

Name: Dr. Michael C. Frege

Title:   Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

Name:  Daniel J. Ehrmann

Title:  Vice President

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*), Seller

By: _____

Name: Dr. Michael C. Frege

Title:   Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

Name:  Daniel J. Ehrmann

Title:  Vice President

[Note Sale Agreement (Spruce and Verano)]

## SCHEDULE I

## SCHEDULE OF NOTES

1. Initial Face Amount U.S.$243,670,000.00 Mezzanine Notes, due 2017, issued pursuant to that certain Indenture, dated as of April 28, 2008, by and among Spruce CCS, Ltd., Spruce CCS, Corp. and U.S. Bank National Association, CUSIP Number: 852079AA0.

2. Initial Face Amount U.S.$180,400,000.00 Mezzanine Notes, due 2016, issued pursuant to that certain Indenture, dated as of July 25, 2008, by and among Verano CCS, Ltd., Verano CCS, Corp. and U.S. Bank National Association, CUSIP Number: 92336PAB2.

## SCHEDULE II

## SASCO NOTES

1. Initial Face Amount U.S.$1,450,000,000.00 Floating Rate Term Notes Due 2038 issued pursuant to that certain Indenture, dated as of May 22, 2008, by and among SASCO 2008-C2, LLC, Wachovia Bank, National Association and Wells Fargo Bank, National Association, CUSIP Number: 78403WAA6.

10433117\V-21

Exhibit A

FORM OF POWER OF ATTORNEY

## LIMITED POWER OF ATTORNEY
### (Spruce and Verano Notes)

**LIMITED POWER OF ATTORNEY** (this "<u>Agreement</u>") dated as of March 1, 2011, by and between LEHMAN BROTHERS HOLDINGS INC. ("<u>LBHI</u>" or "<u>Purchaser</u>") and Dr. Michael C. Frege, in his capacity as insolvency administrator (*Insolvenzverwalter*) (the "<u>LBB InsAdmin</u>" or "<u>Seller</u>") over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*) ("<u>Bankhaus</u>"). Defined terms used herein and not otherwise defined shall have the meanings ascribed in the Note Sale Agreement, dated as of March 1, 2011 (the "<u>Effective Date</u>"), between Seller and Purchaser (the "<u>Note Sale Agreement</u>").

**WHEREAS,** on November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "<u>Bankhaus Proceeding</u>"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "<u>German Insolvency Court</u>") opened insolvency proceedings and appointed the LBB InsAdmin (local court of Frankfurt/Main, case no. 810 IN 1120/08 L);

**WHEREAS,** pursuant to the Note Sale Agreement, Seller agreed to sell and Purchaser agreed to purchase, on the Closing Date, subject to the terms and conditions set forth therein, all of Seller's right, title and interest in and to the Notes;

**WHEREAS,** Seller and Purchaser have agreed that during the period from and after the Effective Date and prior to the Closing Date, except as otherwise set forth herein, Purchaser shall have the authority otherwise possessed under the Indentures by Seller to vote and to give consents and approvals as more particularly set forth herein; and

**WHEREAS,** Seller and Purchaser wish to execute this Agreement in order to effectuate the foregoing agreement.

**NOW, THEREFORE,** in consideration of the premises and the mutual representations warranties, covenants and agreements set forth herein, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1. <u>Power of Attorney</u>. Seller, by this Agreement, does hereby constitute and appoint Purchaser, during the Term (as hereinafter defined) hereof, as such Seller's true and lawful attorney in fact and proxy, for and in its name, place and stead, for the limited purpose of voting and giving consents and approvals under the terms of the Indentures with respect to the discounted payoff, restructuring or other similar action (including, without limitation, any waiver, release, amendment, forebearance or other similar action) relating to the Underlying Assets, and for no other purpose. This Power of Attorney does not cover any agreement whatsoever to terminate, amend, modify or alter in any manner the terms of the Indentures.

Section 2. <u>Term</u>. This proxy and limited power of attorney is coupled with an interest and irrevocable during the Term hereof. The "<u>Term</u>" shall begin on the Effective Date and end upon the earliest to occur of the following: (i) the Closing Date; (ii) default by Purchaser under the terms of the Note Sale Agreement; (iii) termination of the Note Sale Agreement; and (iv) the first anniversary of the Effective Date.

Section 3. <u>Indemnification</u>. Purchaser hereby agrees to defend, indemnify, and hold harmless Seller (which, for purposes of this <u>Section 3</u> shall include its officers, directors, advisors and attorneys) (each an "<u>Indemnified Party</u>"), from and against any and all losses, liabilities, damages, fines, penalties, fees, amounts paid in settlement, taxes, reasonable costs (including costs of investigation or enforcement), reasonable expenses and claims (including, without limitation, interest, reasonable fees and disbursements of counsel, witness fees and court costs) that are paid, suffered or incurred by Seller as a result of any third-party claims brought against an Indemnified Party due to Purchaser's exercise of the powers granted hereunder. The provisions of this Section 3 shall continue in full force and effect and shall survive notwithstanding the termination of the Note Sale Agreement and this Agreement.

Section 4. <u>Notices</u>. Except as may be otherwise agreed between the parties, all communications hereunder shall be made in writing to the relevant party by personal delivery or by courier or first-class registered mail, or the closest local equivalent thereto, by electronic mail or by facsimile transmission confirmed by personal delivery or by courier or first-class registered mail or electronic mail as follows:

To Purchaser:

> 1271 Avenue of the Americas, 39th Floor
> New York, New York 10020
> U.S.A.
> Attn: John Suckow and Daniel J. Ehrmann
> Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> U.S.A.
> Attn: Richard P. Krasnow
> E-mail: richard.krasnow@weil.com
> Facsimile: (212) 310-8007

To Seller:

> c/o CMS Hasche Sigle
> Barckhausstraße 12-16
> 60325 Frankfurt am Main
> Germany
> Attention: Dr. Michael C. Frege
> Telephone: 011-49-69-717-01-300
> E-mail: Michael.Frege@cms-hs.com
> Fax: 011-49-69-717-01-367

With a copy (which shall not constitute notice) to:

> SNR Denton US LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> U.S.A.
> Attn: Walter G. Van Dorn Jr.
> E-mail: walter.vandorn@snrdenton.com
> Facsimile: (212) 768-6800

or to such other address, telephone number or facsimile number or e-mail addresses as either party may notify to the other in accordance with the terms hereof from time to time. Any communications hereunder shall be effective upon receipt.

Section 5. <u>Successors</u>. This Agreement shall inure to the benefit of and be binding upon the parties hereto and, solely with respect to Purchaser, its successors and permitted assigns, and no other person shall have any right or obligation hereunder. Neither party may assign its rights under this Agreement without the written consent of the other party.

Section 6. <u>Headings</u>. The headings of the various Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 7. <u>Governing Law</u>. This Agreement shall be deemed to have been made in the State of New York. This Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with the laws of the State of New York, without regard to principles of conflicts of law (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law or any successor provisions which shall govern). The parties hereby agree that all disputes arising hereunder shall be submitted to and hereby subject themselves to the jurisdiction of the courts of competent jurisdiction, state and federal, in the State of New York.

Section 8. <u>Specific Performance</u>. The parties hereto agree that irreparable damages would occur in the event any provision of this Agreement was not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or in equity.

Section 9. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which, taken together, shall constitute one and the same agreement.

Section 10. <u>No Personal Liability for the LBB InsAdmin</u>. The parties hereto (and solely for the purposes of this Section 10, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as the members of the Bankhaus Creditors Committee, and to the extent any such personal liability existed, the parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisers and members of the Bankhaus

Creditors Committee personally. The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of Purchaser and to the extent any such personal liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons. Any claim by a party hereto against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a party against Purchaser arising under or relating to this Agreement shall only be satisfied out of the assets of Purchaser.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be duly executed and delivered as of the day and year first above written.

Dr. Michael C. Frege, in his capacity as insolvency administrator over the assets of LEHMAN BROTHERS BANKHAUS AG (*i. Ins.*), Seller

By: _____

Name: Dr. Michael C. Frege

Title: Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

Name: Daniel J. Ehrmann

Title: Vice President

[Limited Power of Attorney (Spruce/Verano)]

Exhibit B

Section 5(j)

- HMH Education Media
- Aveos
- Hilite Int'l

## <u>Exhibit C</u>

**Plan Settlement Agreement**

US_ACTIVE:\43620526\05\58399.0008

EXECUTION COPY

## AMENDED AND RESTATED SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and entered into as of March 1, 2011 (the "Execution Date"), by and among the Debtors[1] and certain of their Non-Debtor Affiliates[2] (collectively, "Lehman US"), and Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) (the "LBB InsAdmin") of Lehman Brothers Bankhaus AG (*in Insolvenz*) ("Bankhaus"). Lehman US and Bankhaus, acting through the LBB InsAdmin, shall each be referred to individually as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, on September 15, 2008 and on various dates thereafter, each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which cases are being jointly administered under Case Number 08-13555 (JMP) (the "Chapter 11 Cases" and each a "Chapter 11 Case");

WHEREAS, on November 12, 2008, the German banking regulator filed insolvency proceedings against Bankhaus (the "Bankhaus Proceeding"), and on November 13, 2008, the local court (*Amtsgericht*) of Frankfurt am Main (the "German Insolvency Court") opened insolvency proceedings and appointed Dr. Michael C. Frege as the LBB InsAdmin;

WHEREAS, on April 29, 2009, the LBB InsAdmin on behalf of Bankhaus filed his Verified Petition Under Chapter 15 of the Bankruptcy Code for Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. Section 1521 [Docket No. 2], *In re Lehman Brothers Bankhaus AG (in Insolvenz)*, Case No. 09-12704 (JMP) (Bankr. S.D.N.Y.) (the "Bankhaus Chapter 15 Case"), and on May 22, 2009, the Bankruptcy Court entered an Order Granting Recognition of Foreign Representative and Foreign Main Proceeding and for Additional Relief Under 11 U.S.C. § 1521 [Docket No. 25] in the Bankhaus Chapter 15 Case;

WHEREAS, Bankhaus has filed or is the owner of the proofs of claim listed on Schedule A attached hereto against certain Debtors (collectively, the "Proofs of Claim");

WHEREAS, Lehman US has filed the claims listed on Schedules B-1 and B-2 attached hereto against Bankhaus (the "Liquidation Claims");

---

[1]    As used herein, "Debtors" means Lehman Brothers Holdings Inc. ("LBHI"); Lehman Brothers Special Financing Inc. ("LBSF"); Lehman Commercial Paper Inc. ("LCPI"); Lehman Brothers Commercial Corporation ("LBCC"); Lehman Brothers Financial Products Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Commodity Services Inc. ("LBCS"); Lehman Scottish Finance L.P.; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; Luxembourg Residential Properties Loan Finance S.a.r.l; BNC Mortgage LLC; Structured Asset Securities Corporation; LB Rose Ranch LLC; LB 2080 Kalakaua Owners LLC; Merit LLC; LB Somerset LLC; LB Preferred Somerset LLC; LB 745 LLC; PAMI Statler Arms LLC.

[2]    As used herein, "Non-Debtor Affiliates" means LB3 GmbH, Lehman Brothers Europe Inc., LB 1 Group Inc., Lehman Brothers International Services Inc., Lehman Brothers Offshore Partners Ltd., Luxembourg Finance S.à.r.l., PAMI Harbour Park, and Property Asset Management Inc.

WHEREAS, the Parties have entered into that certain amended tolling agreement with respect to the US Avoidance Actions and German Avoidance Actions, dated as of September 24, 2010 (the "Tolling Agreement"); and

WHEREAS, pursuant to an order of the Bankruptcy Court entered on January 14, 2010 [Docket No. 6665], authorizing and approving that certain settlement agreement with the LBB InsAdmin dated December 15, 2009 (the "Initial Bankhaus Settlement"), which order was supplemented by a stipulation so ordered by the Bankruptcy Court on August 5, 2010 [Docket No. 10642], a portion of the LBB InsAdmin's claim against LBHI, Claim No. 0000058233, was allowed in the amount of $1,380,900,000 (subject to certain adjustments) (the "Initially Allowed LBHI SCA Claim"), and a portion of the LBB InsAdmin's claim against LCPI, Claim No. 0000059006, was allowed in the amount of $1,015,500,000 (the "Initially Allowed LCPI SCA Claim");

WHEREAS, the Parties are desirous of resolving all disputes and all other outstanding issues between the Parties and avoiding extensive and expensive litigation;

WHEREAS, on January 25, 2011, the Debtors filed the First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors [Docket No. 14150] (the "Plan") and the Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Docket No. 14151] (the "Disclosure Statement"); and

WHEREAS, the Debtors will file an amended chapter 11 plan that will incorporate the terms and conditions of this Agreement (said plan and any amendments, modifications, and supplements thereto, the "Amended Plan");

NOW, THEREFORE, in consideration of the recitals stated above, the agreements, promises and warranties set forth below and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    ***Definitions***

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement.

"Allowed Bankhaus Claims" has the meaning ascribed to it in section 2.1(e).

"Allowed US Claims" has the meaning ascribed to it in section 2.1(e).

"Amended Plan" has the meaning ascribed to it in the Recitals.

"Asset Sale" means the sale to LBHI of (i) Spruce and Verano for the Spruce-Verano Purchase Price; and (ii) SASCO for the SASCO Purchase Price.

"Assigned BH Interest" has the meaning ascribed to it in section 3.5(b).

"Assigned US Interest" has the meaning ascribed to it in section 4.4(b).

"Bankhaus Chapter 15 Case" has the meaning ascribed to it in the Recitals.



"Bankhaus Creditor Groups" has the meaning ascribed to it in section 2.3(b)(2)

"Bankhaus Creditors Assembly" has the meaning ascribed to it in section 2.3(b)(2)

"Bankhaus Creditors Committee" has the meaning ascribed to it in section 2.3(b)(2)

"Bankhaus Proceeding" has the meaning ascribed to it in the Recitals.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals.

"BH Claim Transferee" has the meaning ascribed to it in section 3.5(b).

"Chapter 11 Case" has the meaning ascribed to it in the Recitals.

"Chapter 15 Order" means an order of the Bankruptcy Court entered in the Bankhaus Chapter 15 Case (i) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (ii) authorizing the LBB InsAdmin to take all necessary corporate actions to consummate the transactions contemplated by this Agreement.

"Confirmation Date" means the date of the entry of the Confirmation Order by the Bankruptcy Court.

"Confirmation Order" means an order of the Bankruptcy Court (i) confirming the Amended Plan or an Other Plan pursuant to section 1129 of the Bankruptcy Code; (ii) approving, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and applicable provisions of the Bankruptcy Code, the terms of this Agreement; and (iii) authorizing the Debtors to take all necessary corporate actions to consummate the transactions contemplated by this Agreement.

"Effective Date" means the date that the Amended Plan or an Other Plan becomes effective as provided for therein.

"German Avoidance Actions" means all avoidance actions and causes of action against Lehman US pursuant to sections 129, *et seq.*, of the German Insolvency Code (*Insolvenzordnung*).

"German Insolvency Court" has the meaning ascribed to it in the Recitals.

"Initial Bankhaus Settlement" has the meaning ascribed to it in the Recitals.

"Initially Allowed LBHI SCA Claim" has the meaning ascribed to it in the Recitals.

"Initially Allowed LCPI SCA Claim" has the meaning ascribed to it in the Recitals.

"Insolvency Plan" has the meaning ascribed to it in section 2.3(c).

"LB Banque Claim" has the meaning ascribed to it in section 2.2(a)(1).

"LBCCA ISDA Claim" has the meaning ascribed to it in section 2.1(a)(4).

"LCPI 7th Avenue Claim" has the meaning ascribed to it in 2.1(c).



"Liquidation Claims" has the meaning ascribed to it in the Recitals.

"LPS Claim" has the meaning ascribed to it in 2.1(a)(3).

"Other Plan" means a chapter 11 plan or plans, proposed by parties other than the Debtors, that incorporate the settlements provided for in this Agreement.

"Proofs of Claim" has the meaning ascribed to it in the Recitals.

"Remaining LBHI SCA Claim" has the meaning ascribed to it in section 2.1(a)(2).

"SASCO" means the security with ISIN 78403WAA6.

"SASCO Purchase Price" means an amount equal to $625,000,000 subject to a payment of an additional $100,000,000 in the event that the Confirmation Order is not entered on or before December 31, 2012; provided, however, that such additional payment shall not be required to be paid (i) in the event that the LBB InsAdmin terminates this Agreement pursuant to sections 11.3(a) or 11.3(d), or (ii) in the event that Lehman US terminates this Agreement pursuant to section 11.2(c); provided, further, that in the event that Lehman US terminates this Agreement pursuant to section 11.2(d), such additional payment shall be reduced by an amount equal to the difference between the actual recoveries realized in the Bankhaus Proceeding in respect of the Allowed US Claims and the recoveries that would have been realized in the Bankhaus Proceeding in respect of the Allowed US Claims if the LBB InsAdmin did not allow and provide for materially different treatment of claims held by other creditors of Bankhaus that are factually and legally similar to the Allowed US Claims that results in such other creditors having a recovery entitlement in respect of said claims that is materially higher than the recovery entitlement in respect of the Allowed US Claims.

"Secured 7th Avenue Claims" has the meaning ascribed to it in section 2.1(b).

"Secured 7th Avenue Series 3 Claim" has the meaning ascribed to it in section 2.1(b).

"Secured 7th Avenue Series 4 Claim" has the meaning ascribed to it in section 2.1(b).

"Series 3 Swap Collateral Proceeds" has the meaning ascribed to it in section 2.1(b).

"Series 4 Swap Collateral Proceeds" has the meaning ascribed to it in section 2.1(b).

"Spruce" means the securities with ISIN 852079AA0.

"Spruce-Verano Purchase Price" means an amount equal to $332,000,000.

"Swap Collateral Proceeds" has the meaning ascribed to it in section 2.1(b).

"Tolling Agreement" has the meaning ascribed to it in the Recitals.

"Total 7th Avenue Series 3 Claim" has the meaning ascribed to it in section 2.1(b).

"Total 7th Avenue Series 4 Claim" has the meaning ascribed to it in section 2.1(b).

"Unsecured 7th Avenue Claims" has the meaning ascribed to it in section 2.1(b).

"Unsecured 7th Avenue Series 3 Claim" has the meaning ascribed to it in section 2.1(b).



"Unsecured 7th Avenue Series 4 Claim" has the meaning ascribed to it in section 2.1(b).

"US Avoidance Actions" all actions under chapter 5 of the Bankruptcy Code or similar actions under applicable state law.

"US Claim Transferee" has the meaning ascribed to it in section 4.4(b).

"Verano" means the securities with ISIN 92336PAB2.

2.    *Settlement of Claims.*

    2.1.    *The LBB InsAdmin's Claims Against the Debtors.*

    (a)    *Claim Against LBHI.*

        (1)    That portion of the LBB InsAdmin's claim against LBHI, Claim No. 0000058233, that relates to intercompany foreign exchange swap trades will be allowed and accepted as a non-priority, non-senior, unsecured claim in an aggregate amount of $7,867,140.

        (2)    The balance of the LBB InsAdmin's claim against LBHI, Claim No. 0000058233, that relates to the Security & Collateral Agreement, net of the amount of the Initially Allowed LBHI SCA Claim, will be allowed in an aggregate amount of $6,425,000,000 (the "Remaining LBHI SCA Claim") as a non-priority, unsecured claim.

        (3)    The LBB InsAdmin's claim against LBHI, Claim No. 0000058241, that is based in whole or in part on LBHI's guarantee of Lehman Programs Securities (the "LPS Claim") will be allowed as a non-priority, unsecured claim in an aggregate amount of $19,191,840.

        (4)    That portion of the LBB InsAdmin's claim against LBHI, Claim No. 0000058233, on account of any and all claims arising under that certain ISDA Master Agreement & Credit Support Annex with Lehman Brothers Commercial Corporation Asia Ltd. (the "LBCCA ISDA Claim") will be allowed as a non-priority, non-senior unsecured claim in an aggregate amount of $16,256,461.

    (b)    *7th Avenue Claims Against LBSF*: The LBB InsAdmin's claim against LBSF, Claim No. 0000027947, on account of that certain Multi-Structure Note Programs for 7th Avenue and Master Trust Deed, dated September 12, 2002, will be allowed (A) in an aggregate amount of $200,000,000 (the "Total 7th Avenue Series 3 Claim") as follows: (i) as a secured claim against LBSF (the "Secured 7th Avenue Series 3 Claim"), in an amount equal to the net proceeds realized (less reasonable expenses incurred in connection with the collection of such proceeds) from the swap agreements listed on Schedule C1 hereto (the "Series 3 Swap Collateral Proceeds"), and to the extent that the Series 3 Swap Collateral Proceeds do not fully satisfy the Total 7th Avenue Series 3 Claim, (ii) as a non-priority, non-senior unsecured claim against LBSF in an amount equal to the Total 7th Avenue Series 3 Claim less the Series 3 Swap Collateral Proceeds (the "Unsecured 7th Avenue Series 3 Claim"); and (B) in an aggregate amount of $1,000,000,000 (the "Total 7th Avenue Series 4 Claim") as follows: (i) as a secured claim against LBSF (the "Secured 7th Avenue Series 4 Claim" and, together with the Secured 7th Avenue Series 3 Claim, the "Secured 7th Avenue Claims"), in an amount equal to the net proceeds realized (less reasonable expenses incurred in connection with the collection of such proceeds) from the swap agreements listed on Schedule C2 hereto (the "Series 4 Swap Collateral Proceeds" and, together with the Series 3 Swap Collateral Proceeds, the "Swap Collateral Proceeds"), and to the extent that the Series 4 Swap Collateral Proceeds do not fully satisfy the Total 7th Avenue Series 4 Claim, (ii) as a non-



priority, non-senior unsecured claim against LBSF in an amount equal to (x) the Total 7th Avenue Series 4 Claim less the Series 4 Swap Collateral Proceeds (the "<u>Unsecured 7th Avenue Series 4 Claim</u>" and, together with the Unsecured 7th Avenue Series 3 Claim, the "<u>Unsecured 7th Avenue Claims</u>") less (y) the $320,904,908 representing the amount of LBSF's allowed claims against Bankhaus referred to in section 2.2(b) below.

(1)    As soon as practicable following the Effective Date, but no later than 30 days following the Effective Date, LBSF shall make a distribution to LBB InsAdmin of the Swap Collateral Proceeds collected and held by LBSF as of the Confirmation Date, with periodic distributions six months after the Effective Date, and every six months thereafter, of received and collected Swap Collateral Proceeds, if any, provided that a distribution will be made as promptly as possible if at any time after the Effective Date, (i) the amount of Swap Collateral Proceeds received and collected, but not yet distributed, either is equal to or greater than $1,000,000, or (ii) represents the final amount of the collected Swap Collateral Proceeds. To the extent that either the Secured 7th Avenue Series 3 Claim or the Secured 7th Avenue Series 4 Claim is satisfied in full from the Series 3 Swap Collateral Proceeds or the Series 4 Swap Collateral Proceeds, respectively, all liens of the LBB InsAdmin in respect of any proceeds securing such fully satisfied claim or claims shall be deemed released and discharged.

(2)    For the purpose of establishing distribution reserves, as of the Confirmation Date, (i) the Unsecured 7th Avenue Series 3 Claim shall be estimated in an amount equal to the Total 7th Avenue Series 3 Claim less the Series 3 Swap Collateral Proceeds received and collected by LBSF as of the Confirmation Date, and (ii) the Unsecured 7th Avenue Series 4 Claim shall be estimated in an amount equal to the Total 7th Avenue Series 4 Claim less the Series 4 Swap Collateral Proceeds received and collected by LBSF as of the Confirmation Date. That estimate shall be reduced as and when additional amounts of the Swap Collateral Proceeds are distributed to LBB InsAdmin. The amounts of the Unsecured 7th Avenue Series 3 Claim and Unsecured 7th Avenue Series 4 Claim shall be determined and fixed in amount and allowed in that amount, and thereafter, LBSF will make a distribution to LBB InsAdmin in accordance with the terms of the Amended Plan as to each such finally allowed claim when, with respect to the Unsecured 7th Avenue Series 3 Claim, all Series 3 Swap Collateral Proceeds have been distributed to LBB InsAdmin and, with respect to the Unsecured 7th Avenue Series 4 Claim, all Series 4 Swap Collateral Proceeds have been distributed to LBB InsAdmin, or the Parties have agreed on fixed amounts for the Secured 7th Avenue Claims and Unsecured 7th Avenue Claims, based upon total collections and the LBB InsAdmin's waiver in respect of its liens on any unpaid balances. LBSF currently estimates that the ultimate aggregate amount of the Series 3 Swap Collateral Proceeds may total at least $209,000,000, and the ultimate aggregate amount of the Series 4 Swap Collateral Proceeds may total $479,000,000, it being understood that this estimate is not Lehman US's guarantee of such amount nor a commitment of any kind whatsoever. The Debtors will provide the LBB InsAdmin with periodic, and in any event, on the 15th of January and June of each year, information on the amounts of collected Swap Collateral Proceeds and unpaid balances on an ongoing basis.

(c)    *7th Avenue Claim Against LCPI:*  The LBB InsAdmin's claim against LCPI, Claim No. 0000059006, on account of that certain master repurchase agreement dated October 16, 1998, as amended from time to time, between, *inter alia*, Bankhaus and LCPI will be allowed as a non-priority unsecured claim in an amount equal to the amount of (i) $1,279,401,572 less the Swap Collateral Proceeds and all distributions received by Bankhaus with respect to the Unsecured 7th Avenue Claims under the Amended Plan (the "<u>LCPI 7th Avenue Claim</u>"); less (ii) the $69,344,378, representing the amount of LCPI's allowed claims against Bankhaus referred to in section 2.2(e) below. For the purpose of establishing distribution reserves, as of the Confirmation Date, the LCPI 7th Avenue Claim shall be estimated in an amount to be determined based on the amount of Swap Collateral Proceeds as of the date immediately preceding the Confirmation Date. That estimated amount shall be reduced as and when further distributions of the Unsecured 7th Avenue Claims are made. The amount of the LCPI 7th Avenue



Claim shall be finally determined and fixed in such amount and allowed in that amount, and an appropriate distribution made pursuant to the Amended Plan as to said claim, contemporaneously with all distributions made based on the allowed Unsecured 7th Avenue Claims or when the Parties have agreed on fixed amounts for the Secured 7th Avenue Claims and the Unsecured 7th Avenue Claims as provided in section 2.1(b)(2).

(d)     Other than the claims to be allowed as set forth in section 2.1(a)-(c) hereof, the Initially Allowed LBHI SCA Claim and the Initially Allowed LCPI SCA Claim, all other claims asserted or held by Bankhaus or the LBB InsAdmin against Lehman US, including without limitation, those claims that are reflected in <u>Schedule A</u> annexed hereto, will be deemed expunged.

(e)     The allowed claims of the LBB InsAdmin as set forth in this section 2.1 (the "<u>Allowed Bankhaus Claims</u>") shall not, except as otherwise specifically provided for herein, be subject to further objections or defenses, whether by way of netting, set off, recoupment, counterclaim or otherwise, or any claim under section 510 of the Bankruptcy Code or otherwise which would have the effect of subordinating such claims to the claims of other general unsecured creditors; provided that in the event that any party objects to any of the claims of Lehman US that are allowed pursuant to this Agreement (the "<u>Allowed US Claims</u>"), until such time as such Allowed US Claims are allowed by the German courts or otherwise settled in a manner acceptable to the Parties, Lehman US shall be entitled to withhold from distributions that would otherwise be made under the Amended Plan in respect of the Allowed Bankhaus Claims an amount that is equal to the amount of distributions that would otherwise be made with respect to the Allowed US Claims that are the subject of an objection.

2.2.    *Lehman US's Claims Against Bankhaus.*

(a)     *LBHI*

(1)     LBHI has acquired a claim against Bankhaus from Lehman Brothers Banque S.A. (the "<u>LB Banque Claim</u>"). LBHI acknowledges the LBB InsAdmin's intent to treat the LB Banque Claim as a subordinated claim within the meaning of § 39 German Insolvency Code (*Insolvenzordnung*). LBHI will not challenge such treatment of the LB Banque Claim.

(2)     As provided in the Initial Bankhaus Settlement, (i) LBHI agrees that any cash collateral provided by LBHI to the LBB InsAdmin under the Security & Collateral Agreement shall remain with the LBB InsAdmin, and the LBB InsAdmin and Bankhaus shall under no circumstance be required to repay such cash collateral to LBHI, and (ii) LBHI expressly waives all of its rights with respect to such cash collateral including, but not limited to, all rights pursuant to the doctrines of set-off, recoupment, retention or any other legal or equitable theory.

(b)     *LBSF*: The claims asserted by LBSF (Claimant No. 432) against Bankhaus will be allowed in an aggregate amount of $320,904,908, which will be satisfied by reducing the LBB InsAdmin's claim against LBSF by such allowed amount, as provided in section 2.1(b) hereof.

(c)     *LBCC*: The claims asserted by LBCC (Claimant No. 456) against Bankhaus will be allowed as non-priority, non-senior, unsecured claims (§ 38 German Insolvency Code (*Insolvenzordnung*)) in an aggregate amount of $101,979,146.

(d)     *LBCS*: The claims asserted by LBCS (Claimaint No. 457) against Bankhaus will be allowed as non-priority, non-senior, unsecured claims (§ 38 German Insolvency Code (*Insolvenzordnung*)) in an aggregate amount of $149,747,293.



(e)    *LCPI:*  The claims asserted by LCPI (Claimant No. 435) against Bankhaus will be allowed in an aggregate amount of $69,344,378, which w ill be satisfied by reducing the LBB IndAdmin's claim against LCPI by such allowed amount, as provided in section 2.1(c) hereof.

(f)    *Luxembourg Finance S.à.r.l.:*  Luxembourg Finance S.à.r.l. acknowledges the LBB InsAdmin's intent to treat the claim asserted by Luxembourg Finance S.à.r.l. in an amount equal to €273,546,795.05 (Claimant No. 433) (the "Lux Finance Claim") as a subordinated claim within the meaning of § 39 German Insolvency Code (*Insolvenzordnung*). Luxembourg Finance S.à.r.l. will not challenge such treatment of the Lux Finance Claim.

(g)    Lehman US acknowledges the LBB InsAdmin's intent to treat the claims set forth on Schedule B-2 as subordinated claims within the meaning of § 39 German Insolvency Code (*Insolvenzordnung*). All other claims asserted or held by Lehman US against Bankhaus, including without limitation those claims that are set forth in Schedule B-1 annexed hereto, will be deemed expunged.

(h)    The allowed claims of Lehman US as set forth in this section 2.2 shall not, except as otherwise specifically provided for in section 2.2(a)(1), be subject to further objections or defenses by the LBB InsAdmin, whether by way of netting, set off, recoupment, counterclaim or otherwise, or any claim that would have the effect of subordinating such claims to the claims of other general unsecured creditors.

2.3.    *Plan Support.*

(a)    *The Debtors' Obligations.*  Within a reasonable period of time following the Execution Date, the Debtors will (a) file with the Bankruptcy Court and prosecute (i) the Amended Plan, (ii) the approval of a disclosure statement with respect to the Amended Plan and establishing voting procedures, and (iii) entry of a Confirmation Order with respect to the Amended Plan, and (b) seek approval of the settlements provided for under this Agreement and defend any objections thereto.

(b)    *The LBB InsAdmin's Obligations.*  The LBB InsAdmin agrees to perform and comply with the following obligations as to the Amended Plan, which obligations shall become effective upon the Execution Date notwithstanding the terms and conditions of section 10 below, or any other provisions of this Agreement:

(1)    The LBB InsAdmin shall not commence any proceeding or otherwise prosecute, join in, or support any objection to, or oppose or object to, the Amended Plan, and will not consent to, support, or participate in the formulation of any other chapter 11 plan in the Chapter 11 Cases, provided that entry of the Confirmation Order has not been denied with prejudice or this Agreement is otherwise terminated pursuant to section 11 of this Agreement.

(2)    The LBB InsAdmin shall promptly seek authority from the Bankhaus creditors' committee (*Gläubigerausschuss*) ("Bankhaus Creditors Committee") and the Bankhaus creditors' assembly (*Gläubigerversammlung*) ("Bankhaus Creditors Assembly" and, together with the Bankhaus Creditors Committee, the "Bankhaus Creditor Groups") to perform all of the obligations set forth in this Agreement prior to the deadline for voting on the Amended Plan.

(3)    Subject to having obtained authority only from the Bankhaus Creditor Groups, the LBB InsAdmin shall timely vote to accept the Amended Plan; provided, that he has been solicited pursuant to section 1125 of the Bankruptcy Code.

(4)     Subject to having obtained authority from the Bankhaus Creditor Groups, the LBB InsAdmin shall support, and use good faith diligent efforts to promote, the confirmation and consummation of the Amended Plan, and shall recommend that creditors of Bankhaus who have filed claims against the Debtors and have been solicited pursuant to section 1125 of the Bankruptcy Code timely vote to accept the Amended Plan.

(5)     The LBB InsAdmin shall not object to or contest the claims asserted against any Lehman US entity by other affiliates of the Debtors that have entered into agreements with the Debtors settling claims and receivables among such parties.

(c)     This Agreement is not and shall not be deemed to be a solicitation for consents to the Amended Plan. The acceptance of the LBB InsAdmin will not be solicited until the LBB InsAdmin has received a Disclosure Statement in respect of the Amended Plan that has been approved by the Bankruptcy Court.

(d)     *Intended German Insolvency Plan.* The LBB InsAdmin may consider proposing an insolvency plan in the Bankhaus Proceeding (the "Insolvency Plan"). *Provided* that the Debtors are afforded an opportunity to review, at a minimum, a summary of the salient terms of the Insolvency Plan a reasonable and appropriate time, but in no event not less than 30 days prior to submission of the Insolvency Plan to the German Insolvency Court, and are reasonably satisfied that the Insolvency Plan is consistent with the terms of this Agreement and does not materially impact the Debtors' interests and recoveries in the Bankhaus Proceeding from what it could expect in a German insolvency proceedings, and treats creditors consistent with German insolvency law, and knowing that the LBB InsAdmin will not be guaranteeing any specific recovery amount under the Insolvency Plan; the Debtors will (i) support, use good faith efforts to promote, the confirmation and consummation of the Insolvency Plan in the Bankhaus Proceeding, (ii) not commence any proceeding, otherwise prosecute, join in, support an objection to, or oppose or object to the Insolvency Plan; (iii) *provided* that they have been properly solicited and are entitled to a voting right, timely vote to accept the Insolvency Plan; (iv) *provided* that the creditors of the Debtors who are also creditors of Bankhaus have been properly solicited and are entitled to a voting right, ask that all such creditors timely vote to accept the Insolvency Plan; and (v) seek authority, to the extent necessary, from the Bankruptcy Court, to perform all of the foregoing prior to the deadline for the voting on the Insolvency Plan.

3.     ***The LBB InsAdmin's Representations and Warranties***. In order to induce Lehman US to enter into and perform their obligations under this Agreement, the LBB InsAdmin hereby represents, warrants and acknowledges as follows:

3.1.     *Authority.* Subject to the Bankhaus Creditor Groups each having approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the transactions contemplated herein (i) the LBB InsAdmin has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery and performance by the LBB InsAdmin of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of the LBB InsAdmin and no other proceedings on the part of the LBB InsAdmin are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

3.2.     *Validity.* Subject to the Bankhaus Creditor Groups each having approved the execution and delivery of, and the performance of the obligations of the LBB InsAdmin under, this Agreement and the transactions contemplated herein, this Agreement has been duly executed and



delivered by the LBB InsAdmin and constitutes the legal, valid and binding agreement of the LBB InsAdmin, enforceable against the LBB InsAdmin in accordance with its terms.

       3.3.    *Authorization of Governmental Authorities and Creditors.*   No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by the LBB InsAdmin pursuant to this Agreement other than as set forth in section 3.1 above.

       3.4.    *No Reliance.*  The LBB InsAdmin (i) is a sophisticated party with respect to the subject matter of this Agreement, (ii) has been represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and without reliance upon any Debtor or any Non-Debtor Affiliate or any of their affiliates or any officer, employee, agent or representative thereof, and based on such information as the LBB InsAdmin has deemed appropriate, made his own analysis and decision to enter into this Agreement, except that the LBB InsAdmin has relied upon each Debtor's and each Non-Debtor Affiliate's express representations, warranties and covenants in this Agreement, the LBB InsAdmin acknowledges that it has entered into this Agreement voluntarily and of his own choice and not under coercion or duress.

       3.5.    *Title; No Prior Transfer of Claims.*

       (a)    Other than the Initially Allowed LBHI SCA Claim and the Initially Allowed LCPI SCA Claim, which were previously sold and assigned, the LBB InsAdmin (i) owns the Proofs of Claim free and clear of any and all liens, claims, set-off rights, security interests, participations, or encumbrances created or incurred by the LBB InsAdmin, (ii) is not aware of any third party rights with respect to the Proofs of Claim as of the Execution Date, and (iii) has not transferred or assigned to any other person any of the Proofs of Claim, in whole or in part.

       (b)    The LBB InsAdmin may only convey, transfer, assign, or participate any of the claims or receivables that are the subject of this Agreement, or any rights or interests arising thereunder, in whole or in part, after the earlier of the Effective Date or December 31, 2011 (in each case, an "Assigned BH Interest"), to any party or parties (in each case, a "BH Claim Transferee") provided that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides (i) that the terms and provisions of this Agreement shall be binding in all respects upon the BH Claim Transferees, and any successor transferees, and shall govern their acts, and (ii) that the LBB InsAdmin shall retain all rights with respect to the Assigned BH Interests, to vote on any chapter 11 plan proposed in the Chapter 11 Cases in his sole discretion and in a manner that is consistent with the terms of this Agreement. No such conveyance, transfer, assignment, or participation shall be valid unless (i) Lehman US receives a copy of said written agreement executed by the transferor and the transferee and (ii) Lehman US does not object to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the foregoing provisions; provided, however, that the foregoing restriction on objections shall not apply with respect to any objections premised on any orders entered in the Chapter 11 Cases relating to the trading of claims. Any such conveyance, transfer, assignment, or participation shall not relieve the LBB InsAdmin of any of his obligations under this Agreement.

    4.    ***Lehman US's Representations and Warranties***.  In order to induce the LBB InsAdmin to enter into and perform its obligations under this Agreement, each Debtor and each Non-Debtor Affiliate hereby represents, warrants and acknowledges as follows:

4.1.    *Authority.*

(a)    Subject to the occurrence of the Effective Date, (i) each signatory Debtor has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery and performance by such Debtor of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such Debtor and no other proceedings on the part of such Debtor are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

(b)    (i) Each Non-Debtor Affiliate has the power and authority to execute, deliver and perform its obligations under this Agreement, and to consummate the transactions contemplated herein and (ii) the execution, delivery and performance by such Non-Debtor Affiliate of this Agreement and the consummation of the transactions contemplated herein have been duly authorized by all necessary action on the part of such Non-Debtor Affiliate and no other proceedings on the part of such Non-Debtor Affiliate are necessary to authorize and approve this Agreement or any of the transactions contemplated herein.

4.2.    *Validity.*

(a)    Subject to the occurrence of the Effective Date, this Agreement has been duly executed and delivered by each Debtor and constitutes the legal, valid and binding agreement of each Debtor, enforceable against each Debtor in accordance with its terms.

(b)    This Agreement has been duly executed and delivered by each Non-Debtor Affiliate and constitutes the legal, valid and binding agreement of each Non-Debtor Affiliate, enforceable against each Non-Debtor Affiliate in accordance with its terms.

4.3.    *Authorization of Governmental Authorities.*    No action by (including any authorization, consent or approval), in respect of, or filing with, any governmental authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by each Debtor and each Non-Debtor Affiliate of this Agreement, other than entry of the Confirmation Order.

4.4.    *Title; No Transfer of Claims.*

(a)    Lehman US (i) owns the Liquidation Claims free and clear of any and all liens, claims, set-off rights, security interests, participations, or encumbrances created or incurred by Lehman US, (ii) is not aware of any third party rights with respect to the Liquidation Claims as of the Execution Date, and (iii) has not transferred or assigned to any other person any of the Liquidation Claims, in whole or in part.

(b)    Lehman US may only convey, transfer, assign, or participate any of the claims or receivables that are the subject of this Agreement, or any rights or interests arising thereunder, in whole or in part, after the earlier of the Effective Date or December 31, 2011 (in each case, an "Assigned US Interest"), to any party or parties (in each case, a "US Claim Transferee") provided that any such conveyance, transfer, assignment, or participation is consummated pursuant to a written agreement that provides that the terms and provisions of this Agreement shall be binding in all respects upon the US Claim Transferees, and any successor transferees, and shall govern their acts. No such conveyance, transfer, assignment, or participation shall be valid unless (i) the **LBB** InsAdmin receives a copy of said written agreement executed by the transferor and the transferee and (ii) the LBB InsAdmin does not



object to the proposed conveyance, transfer, assignment, or participation, based on the failure of said written agreement to contain the foregoing provisions. Any such conveyance, transfer, assignment, or participation shall not relieve Lehman US of any of its obligations under this Agreement.

       4.5.   *No Reliance.* Each Debtor and each Non-Debtor Affiliate (i) is a sophisticated party with respect to the matters that are the subject of this Agreement, (ii) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (iii) has adequate information concerning the matters that are the subject of this Agreement, and (iv) has independently and (except for the information provided to the LBB Ins Admin or Bankhaus, respectively, by LBSF and/or by or through LAMCO acting on its behalf under the Cash Segregation Stipulation with respect to (i) the amount of funds collected from 7th Avenue Series 3 and Series 4 counterparties and (ii) any factual circumstances in writing (including electronic text communication) when seeking LBB Ins Admin's agreement to any settlements or any alternative dispute resolution results with any counterparty) without reliance upon the LBB InsAdmin, and based on such information as such Debtor or such Non-Debtor Affiliate has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that such Debtor or such Non-Debtor Affiliate has relied upon the LBB InsAdmin's express representations, warranties and covenants in this Agreement, which it enters, or as to which it acknowledges and agrees, voluntarily and of its own choice and not under coercion or duress.

     5.   ***Due Diligence on Avoidance Actions.*** The Parties will perform the necessary due diligence with respect to US Avoidance Actions and German Avoidance Actions and will complete such diligence prior to entry of an order by the Bankruptcy Court approving the disclosure statement related to the Amended Plan, but in no event earlier than April 30, 2011. The Parties will cooperate with each other during the due diligence period and work together in a working-group. The Parties will examine the transactions between the Parties that occurred in the period of one year prior to September 15, 2008. The contractual understanding of the Parties is that this examination takes place in an appropriate time period and on a cooperative, transparent way. Promptly upon the completion of such diligence, the Parties will either commence any Avoidance Actions or provide notice to the other Party that, subject to the effectiveness of this Agreement, such Party will not commence any Avoidance Actions against any other Party.

     6.   ***Asset Sale.*** The LBB InsAdmin will sell to LBHI (i) Spruce and Verano for the Spruce-Verano Purchase Price, and (ii) SASCO for the SASCO Purchase Price, subject to the Parties entering into definitive documentation and obtaining requisite approvals, which shall be obtained as soon as reasonably possible prior to the Effective Date. The obligation of the LBB InsAdmin to sell to LBHI and of LBHI to purchase SASCO, Spruce and Verano shall survive the termination of this Agreement.

     7.   ***Surviving Contracts.*** The contracts and any non-binding agreements listed in <u>Schedule D</u> shall survive the execution, consummation or termination of this Agreement. All other contracts between Lehman US and the LBB InsAdmin or Bankhaus that are not included on <u>Schedule D</u> shall be rejected pursuant to Section 365 of the Bankruptcy Code in accordance with the Amended Plan. Any claims that arise from the rejection of contracts between Lehman US and the LBB InsAdmin are deemed to be satisfied in full by the claims allowed pursuant to section 2 hereof.

     8.   ***Cooperation.*** The Parties will continue to exchange data relating to the respective bankruptcy cases and insolvency proceedings based on the data sharing agreement and the cross border international protocol in order to assist each other in resolving claims of affiliates and other creditors and in order for the LBB InsAdmin to reasonably monitor the Swap Collateral Proceeds collection.



9. **Releases.**

9.1. *Lehman US's Releases.* Upon the occurrence of the Effective Date, and except as to (i) the allowed claims set forth in section 2 hereof, (ii) Lehman US's distribution entitlements in the Bankhaus Proceeding, (iii) the agreements, promises, settlements, representations and warranties set forth in this Agreement, and (iv) the performance of the obligations set forth herein, (v) the agreements, promises, settlements, representations and warranties set forth in the Initial Bankhaus Settlement, (vi) the claims, if any, arising under the surviving contracts set forth on Schedule D, and (vii) the duties and obligations of the LBB InsAdmin as Insolvency Administrator (*Insolvenzverwalter*) of Bankhaus, and subject to the effectiveness of this Agreement in accordance with section 10 below, and in consideration of the foregoing and the LBB InsAdmin's execution of this Agreement, each Debtor and each Non-Debtor Affiliate on behalf of itself, its estate (where applicable), its successors and assigns, will fully and forever release, discharge and acquit the LBB InsAdmin, and his respective financial advisors, accountants and attorneys, from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (excluding intentional torts, fraud, recklessness, gross negligence or willful misconduct) or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, including all US Avoidance Actions and any claims based upon an asserted right of subrogation, including but not limited to any such subrogation claims in connection with distribution to Bankhaus'creditors based upon a guarantee or similar document by LBHI or any of its affiliates.

9.2. *LBB InsAdmin's Releases.* Upon the occurrence of the Effective Date, and except as to (i) the allowed claims set forth in section 2 hereof, (ii) the LBB InsAdmin's distribution entitlements in the Chapter 11 Cases, (iii) the agreements, promises, settlements, representations and warranties set forth in this Agreement, and (iv) the performance of the obligations set forth herein, and (v) the agreements, promises, settlements, representations and warranties set forth in the Initial Bankhaus Settlement, and (vi) the claims, if any, arising under the surviving contracts set forth on Schedule D, and subject to the effectiveness of this Agreement in accordance with section 10 below, and in consideration of the foregoing and each Lehman US entity's execution of this Agreement, the LBB InsAdmin, the Bankhaus estate, and their successors and assigns, will fully and forever release, discharge and acquit each Lehman US entity, and their respective financial advisors, accountants and attorneys, from all manners of action, causes of action, judgments, executions, debts, demands, rights, damages, costs, expenses, and claims of every kind, nature, and character whatsoever, whether at law or in equity, whether based on contract (including, without limitation, quasi-contract or estoppel), statute, regulation, tort (excluding intentional torts, fraud, recklessness, gross negligence or willful misconduct) or otherwise, accrued or unaccrued, known or unknown, matured or unmatured, liquidated or unliquidated, certain or contingent, including, without limitation, (i) any administrative expense claims arising under section 503 of the Bankruptcy Code, and (ii) all German Avoidance Actions. The LBB InsAdmin agrees that he will not bring or assert any claims against Lehman US pursuant to sections 117 and 311 of the German Stock Corporation Act (*Aktiengesetz*).

10. **Effectiveness of Agreement.** This Agreement shall be effective upon the Execution Date, <u>provided</u> that effectiveness of this Agreement, with the exception of sections 2.3, 5, 6, and 8 above, and section 11 below, and as long as this Agreement has not been terminated pursuant to section 11 below, is subject to (i) the Effective Date having occurred, (ii) the LBB InsAdmin's procurement of the necessary authority stated above in section 3.1 hereof, (iii) the consummation of the Asset Sale, and (iv) entry of the Chapter 15 Order, provided that entry of the Chapter 15 Order shall not be a prerequisite to the LBB InsAdmin voting in respect of the Amended Plan, so long as the requirements of section 2.3(b)(3) are satisfied; and this entire Agreement shall be null and void, and each of the Parties' respective interests

rights, remedies and defenses shall be restored without prejudice as if this Agreement had never been executed, except as to this section 10, if the entry of the Confirmation Order is denied with prejudice.

11. ***Termination.***

11.1. *Automatic Termination.* This Agreement shall automatically terminate on any date on which (i) the Debtors file a chapter 11 plan that provides for the substantive consolidation of one or more Debtor and Bankhaus, (ii) the Bankruptcy Court denies the motion seeking the Confirmation Order with prejudice, (iii) the Amended Plan is not confirmed on or before December 31, 2012, or (iv) the LBB InsAdmin is unable, after good faith efforts, to obtain the authority necessary to perform its obligations under this Agreement prior to the deadline for submitting votes on the Amended Plan.

11.2. *Lehman US's Right to Terminate.* Each Debtor and each Non-Debtor Affiliate shall have the right, at its election, to terminate this Agreement by written notice to the LBB InsAdmin if (a) there is a breach, in any material respect, of the representations, warranties and/or covenants of the LBB InsAdmin hereunder, taken as a whole, and the LBB InsAdmin shall fail to cure such breach within ten (10) days following written notice of such breach from Lehman US, (b) the LBB InsAdmin terminates the Tolling Agreement, (c) the LBB InsAdmin fails to obtain approval of this Agreement from the Bankhaus Creditor Groups, or (d) other than as set forth herein, the LBB InsAdmin allows and provides for materially different treatment of claims held by other creditors of Bankhaus that are factually and legally similar to the Allowed US Claims that results in such other creditors having a recovery entitlement in respect of said claims that is materially higher than the recovery entitlement in respect of the Allowed US Claims.

11.3. *The LBB InsAdmin's Right to Terminate.* The LBB InsAdmin shall have the right, at his election, to terminate this Agreement by written notice to Lehman US if (a) there is a breach, in any material respect, of the representations, warranties and/or covenants of Lehman US hereunder, taken as a whole, and Lehman US shall fail to cure such breach within ten (10) days following written notice of such breach from the LBB InsAdmin; (b) the Debtors make a material modification to the structure, classification or distribution scheme under the Amended Plan that would materially reduce the recovery estimates set forth in the Disclosure Statement with respect to classes that include the Allowed Bankhaus Claims; (c) the Amended Plan provides for materially different treatment of claims held by other creditors that are factually and legally similar to the claims of the LBB InsAdmin allowed hereunder that results in such other creditors having a recovery entitlement in respect of said claims that is materially higher than the recovery entitlement provided for in the Amended Plan in respect of the LBB InsAdmin's allowed claims; provided, however, that with respect to sections 11.3(b) and 11.3(c), (i) the Debtors are not guaranteeing or committing to any specific recovery amount under the Amended Plan, and (ii) modifications to the projected recovery amounts set forth in the disclosure statement approved by the Bankruptcy Court with respect to the Amended Plan that are based upon revised projections of asset values shall not constitute material modifications to the Amended Plan; or (d) any Debtor terminates the Tolling Agreement; provided, further, that the termination right in section 11.3(d) must be exercised no later than ten (10) business days prior the hearing for approval of the disclosure statement with respect to the Amended Plan. The Parties have agreed to amend section 11.3(b) of this Agreement to replace the Contemplated Recoveries with the recovery estimates in the proposed disclosure statement with respect to the Amended Plan provided such recovery estimates are consistent with the Contemplated Recoveries.

11.4. *Effect of Termination.* In the event that this Agreement is terminated in accordance with its terms by any Party, then neither this Agreement, nor any motion or other pleading filed in the Bankruptcy Court with respect to the approval of this Agreement or confirmation of the Amended Plan, shall have any *res judicata* or collateral estoppel effect or be of any force or effect, each of the Parties' respective interests, rights, remedies and defenses shall be restored without prejudice as if



this Agreement had never been executed and the Parties hereto shall be automatically relieved of any further obligations hereunder.    Except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver of or prejudice to the Parties rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other.

12.    *Venue and Choice of Law.*

12.1.    *Venue.* To the maximum extent permissible by law, the Parties expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over any actions or proceedings relating to the enforcement or interpretation of this Agreement and any Party bringing such action or proceeding shall bring such action or proceeding in the Bankruptcy Court; provided that, any actions or proceedings arising out of disputes in the amount or validity of the Liquidation Claims or the German Avoidance Actions shall be the exclusive jurisdiction of the German courts. Each of the Parties agrees that a final judgment in any such action or proceeding, including all appeals, shall be conclusive and may be enforced in other jurisdictions (including any foreign jurisdictions) by suit on the judgment or in any other manner provided by applicable law. If the Bankruptcy Court refuses or abstains from exercising jurisdiction over the enforcement of this Agreement and/or any actions or proceedings arising hereunder or thereunder, then the Parties agree that venue shall be in any other state or federal court located within the County of New York in the State of New York having proper jurisdiction. Each Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (i) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement with the Bankruptcy Court or with any other state or federal court located within the County of New York in the State of New York, or with the German courts, solely relating to any actions or proceedings arising out of disputes in the amount or validity of the Liquidation Claims or the German Avoidance Actions, and (ii) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party irrevocably consents to service of process in the manner provided for notices in section 13 hereof. Nothing in this Agreement will affect the right, or requirement, of any Party to this Agreement to serve process in any other manner permitted or required by applicable law.

12.2.    *Choice of Law.* This Agreement and all claims and disputes arising out of or in connection with this Agreement, shall be governed by and construed in accordance with the laws of the State of New York and the Bankruptcy Code, without regard to choice of law principles to the extent such principles would apply a law other than that of the State of New York or the Bankruptcy Code; provided, however, that any claims and disputes arising out of the Liquidation Claims and the German Avoidance Actions shall be governed by and construed in accordance with German law except as otherwise provided in the underlying agreements.

13.    *Notices.*    All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient, and if not so confirmed, then on the next Business Day, (c) three days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent:

To any Debtor at:

1271 Avenue of the Americas, 39th Floor
New York, New York 10020



U.S.A.
Attn: John Suckow and Daniel J. Ehrmann
Facsimile: (646) 834-0874

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
U.S.A.
Attn: Lori R. Fife, Esq. and Richard P. Krasnow, Esq.
Facsimile: (212) 310-8007

To the LBB InsAdmin at:

To LBB InsAdmin at:
Lehman Brothers Bankhaus AG i. Ins.
c/o CMS Hasche Sigle
Barckhausstraße 12-16
60325 Frankfurt a.M.
Germany
Attn:  Dr. Michael Frege
Facsimile:  00-49-69-717-01-40410

With a copy (which shall not constitute notice) to:

SNR Denton US LLP
1221 Avenue of the Americas
New York, New York,  10020
U.S.A.
Attn:  D. Farrington Yates
Facsimile:  (212) 768-6800

or to such other address as may have been furnished by a Party to each of the other Parties by notice given
in accordance with the requirements set forth above.

14.    ***Expenses***.  The fees and expenses incurred by each Party (including the fees of any
attorneys, accountants, investment bankers, financial advisors or any other professionals engaged by such
Party) in connection with this Agreement and the transactions contemplated hereby, whether or not the
transactions contemplated hereby are consummated, will be paid by such Party.

15.    Intentionally deleted.

16.    ***Accounting***.  The Parties will consider evaluation of the potential accounting treatment
relating to the Security & Collateral Agreement.

17.    ***No Admission of Liability***.  Each Party acknowledges that this Agreement effects a
settlement of potential claims and counterclaims that are denied and contested, and that nothing contained
herein shall be construed as an admission of liability or wrongdoing.



18.     *Entire Agreement*.  This Agreement constitutes the entire and only agreement of the Parties concerning the subject matter hereof.  This Agreement supersedes and replaces any and all prior or contemporaneous verbal or written agreements between the Parties concerning the subject matter hereof, and to the extent of any conflicts between the Amended Plan and the terms of this Agreement, the terms of this Agreement shall control.  The Parties acknowledge that this Agreement is not being executed in reliance on any verbal or written agreement, promise or representation not contained herein.

19.     *No Oral Modifications*.  This Agreement may not be modified or amended orally.  This Agreement only may be modified or amended by a writing signed by a duly authorized representative of each Party hereto.  Any waiver of compliance with any term or provision of this Agreement on the part of Lehman US must be provided in a writing signed by the LBB InsAdmin.  Any waiver of compliance with any term or provision of this Agreement on the part of the LBB InsAdmin must be provided in a writing signed by each Debtor and each Non-Debtor Affiliate.  No waiver of any breach of any term or provision of this Agreement shall be construed as a waiver of any subsequent breach.

20.     *Construction*.  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

21.     *Binding Effect; Successor and Assigns*.  Any declaration or statement of the LBB InsAdmin shall only be made in his capacity and function as LBB InsAdmin as Insolvency Administrator (*Insolvenzverwalter*) of Bankhaus, and shall in no circumstance be construed as being a declaration or statement of the LBB InsAdmin on his own and personal behalf.  This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; *provided, however*, that no Party may assign its rights or obligations under this Agreement without the written consent of the other Party, which consent shall not be unreasonably withheld or delayed, and any assignment not in accordance with the terms hereof shall be null and void *ab initio*.

22.     *Counterparts*.  This Agreement may be executed in counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.  The signatures of all of the Parties need not appear on the same counterpart.

23.     *Headings; Schedules and Exhibits*.  The headings utilized in this Agreement are designed for the sole purpose of facilitating ready reference to the subject matter of this Agreement.  Said headings shall be disregarded when resolving any dispute concerning the meaning or interpretation of any language contained in this Agreement.  References to sections, unless otherwise indicated, are references to sections of this Agreement.  All Schedules to this Agreement are hereby made a part hereof and incorporated herein by reference for all purposes.  Reference to any Schedule herein shall be to the Schedules attached hereto.

24.     *No Personal Liability*.  The Parties (and solely for the purposes of this section 25, including the LBB InsAdmin also acting on his own and personal behalf) accept and agree that this Agreement and all actions and measures contained herein do not give rise to any personal liability on the part of the LBB InsAdmin, his firm and its partners and employees, and his representatives or other professional advisors as well as members of the Bankhaus Creditors Committee, and to the extent any such personal liability existed, the Parties explicitly waive any and all potential rights and claims against him, his firm and its partners and employees, and his representatives and other professional advisors and members of the Bankhaus Creditors Committee, personally.  The LBB InsAdmin further accepts and agrees that this Agreement and all transactions and measures contained herein do not give rise to any personal liability on the part of any of the officers, directors, employees, members, consultants, asset managers, representatives or professional advisors of Lehman US and to the extent any such personal

liability existed, the LBB InsAdmin explicitly waives any and all potential rights and claims against all of the aforementioned persons. Any claim by a Party against the LBB InsAdmin or Bankhaus arising under or relating to this Agreement shall only be satisfied out of the assets of the insolvency estate of Bankhaus, and any claim by a Party against Lehman US arising under or relating to this Agreement shall only be satisfied out of the assets of such Debtor or such Non-Debtor Affiliate.

25.   ***Severability and Construction.***  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

26.   ***Waiver of Jury Trial.***  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR IN ANY WAY RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE). THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF THE PARTIES HERETO IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 27 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER. THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.



IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) of Lehman Brothers Bankhaus AG (in Insolvenz)

By: _____ _640_

Name: Dr. Michael C. Frege

By: _____

Name: Daniel J. Ehrmann
Title: Vice President

Title: Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS SPECIAL FINANCING INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

LEHMAN COMMERCIAL PAPER INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN     BROTHERS     COMMERCIAL CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

LEHMAN BROTHERS FINANCIAL PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

IN WITNESS WHEREOF, each Party by his or its duly authorized representative has executed this Agreement as of the date first written above:

LEHMAN BROTHERS HOLDINGS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____

Name:  Daniel J. Ehrmann
Title:  Vice President

Dr. Michael C. Frege in his capacity as Insolvency Administrator (*Insolvenzverwalter*) of Lehman Brothers Bankhaus AG (in Insolvenz)

By: _____

Name:  Dr. Michael C. Frege

Title:  Insolvency Administrator (*Insolvenzverwalter*)

LEHMAN BROTHERS SPECIAL FINANCING INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN COMMERCIAL PAPER INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS COMMERCIAL CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS FINANCIAL PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEMAN BROTHERS OTC DERIVATIVES INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS DERIVATE PRODUCTS INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS COMMODITY SERIVCES INC., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LEHMAN BROTHERS SCOTTISH FINANCE L.P. as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its general partner Property Asset Management Inc.

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION V LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

CES AVIATION IX LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

EAST DOVER LIMITED, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Duly Authorized Officer

LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE S.A.R.L., as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Manager

BNC MORTGAGE LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: William J. Fox
Title: Authorized Signatory

STRUCTURED ASSET SECURITIES CORPORATION, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB ROSE RANCH LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Authorized Signatory

LB 2080 KALAKAUA OWNERS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

MERIT LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its Manager Lehman Commercial Paper Inc.

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB PREFERRED SOMERSET LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP), by its managing member PAMI LLC

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB 745 LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

PAMI STATLER ARMS LLC, as Debtor and Debtor in Possession in its chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By: _____
Name: Daniel J. Ehrmann
Title: Authorized Signatory

LB3 GMBH

By: _____
Name: Daniel J. Ehrmann
Title: Director

LEHMAN BROTHERS EUROPE INC.

By: _____
Name: Daniel J. Ehrmann
Title: Vice President

LB I GROUP INC.

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS INTERNATIONAL SERVICES INC.

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

LEHMAN BROTHERS OFFSHORE PARTNERS LTD.

By: _____
Name:  William J. Fox
Title:  Director

LUXEMBOURG FINANCE S.À.R.L.

By: _____
Name:  Daniel J. Ehrmann
Title:  Manager

PAMI HARBOUR PARK

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

PROPERTY ASSET MANAGEMENT INC.

By: _____
Name:  Daniel J. Ehrmann
Title:  Vice President

**Schedule A**

<u>Proofs of Claim</u>

| Claim Number | Debtor Against Which Claim is Asserted | Claim Amount |
|---|---|---|
| 0000019847 | LBSF | $200,000,000 plus interest and costs |
| 0000024293 | LBSF | $1,000,000,000 plus interest and costs |
| 0000024366 | LBHI | $1,000,000,000 plus interest and costs |
| 0000025792 | LBHI | $200,000,000 plus interest and costs |
| 0000027946 | LBHI | $1,200,000,000 plus interest |
| 0000027947 | LBSF | $1,200,000,000 plus interest |
| 0000058232 | LBSF | Not less than $395,691.74 |
| 0000058233 | LBHI | Not less than $3,459,204,038.33 |
| 0000058241 | LBHI | $21,354,000 |
| 0000058242 | LBCC | Not less than $1,136,979.22 |
| 0000059006 | LCPI | Not less than $1,243,497,721.16 |

**Schedule B-1**

Liquidation Claims

| Claimant | Claimant No. | Claim Amount | Accrued Interest |
|---|---|---|---|
| Lehman Brothers Commercial Corporation | 456 | 1.00 EUR | - |
| Lehman Brothers Commodity Services Inc. | 457 | 1.00 EUR | - |
| Lehman Brothers Holdings Inc. | 445 | 1,697,721,757.08 EUR | - |
|  |  | 6,064,103.28 EUR | - |
|  |  | 29,069.83 EUR | - |
|  |  | 5,092,500.00 EUR | 290,896.67 EUR |
|  |  | 1,456,000.00 EUR | 17,298.86 EUR |
|  |  | 1,397,828,022.00 EUR | - |
| Lehman Brothers Special Financing Inc. | 432 | 43,542,146.13 EUR | - |
| Lehman Commercial Paper Inc. | 435 | 169,724,643.66 EUR | - |
|  |  | 10,166,476.38 EUR | - |
|  |  | 134,114,400.00 EUR | - |
| Lehman Commercial Paper Inc. | *435* | *152,675,248.21 EUR* | - |
|  |  | *(191,250,467.50 USD)* | - |
|  |  | *57,991,847.58 EUR* | - |
|  |  | *48,534,500.00 EUR* | - |
|  |  | *(35,000,000.00 GBP)* | - |
| Luxembourg Finance S.à r.l. | 433 | 273,546,795.05 EUR | - |

In addition to the entities listed in the table above, claims have also been filed for (i) Lehman Brothers Luxembourg Equity Finance SA in the amount of EUR 39,855.00 and (ii) Lehman Brothers Services SNC in the amount of EUR 1,063.63. Since Lehman Brothers Luxembourg Equity Finance SA is under Luxembourg insolvency administration and Lehman Brothers Services SNC is the 100% subsidiary of Lehman Brothers France which is under French liquidation, the authority to dispose of assets of these entities is with the respective administrator/liquidator. Thus, these claims cannot be waived by a Party to this settlement agreement.

**Schedule B-2**

## Subordinated Claims

| Claimant | Claimant No. | Claim Amount | Accrued Interest |
|---|---|---|---|
| LB3 GmbH | 439 | 16,857444.00 EUR | 140,064.28 EUR |
| Lehman Brothers Europe Inc. | 442 | 1,371,897.34 EUR | - |
| Lehman Brothers 1 Group Inc. | 447 | 434,492.45 EUR | - |
| Lehman Brothers International Services Inc. | 440 | 16,401.47 EUR | - |
| Lehman Brothers Offshore Partners Ltd | 436 | 1,261.01 EUR | - |
| Pami Harbour Park | 438 | 1,158.33 EUR | - |
| Property Asset Management Inc. | 437 | 6,987.52 EUR | - |

Schedule C

## Swap Agreements

| CP/Master ID | Counterparty Name |
|---|---|

**Series 3 :**

| CP/Master ID | Counterparty Name |
|---|---|
| 112702LBRE | LEHMAN BROTHERS REAL ESTATE PARTNERS LP |
| 091002PH02 | PHOENIX SERIES 2002-2 |
| 071802PHOE | PHOENIX SERIES 2002-1 |
| 122401LCOR | LCOR ALEXANDRIA LLC - PATENT A ND   TRADEMARK OFFICE PROJECT |
| 0109032WCA | ADVENTIST HEALTH SYSTEM SUNBELT HEALTHCARE CO |
| 120997AMV | ASBURY ATLANTIC INC |
| 021398GU | GEORGETOWN UNIVERSITY |
| 70311EKSP | EKSPORTFINANS ASA |
| 070302VICM | ONE MADISON INVESTMENTS (CAYCO) LIMITED |
| 090398LKC | LOUISVILLE AND JEFFERSON COUNTY METROPOLITAN SEWER DISTRICT |
| 120803BCRA | BUCK INSTITUTE FOR AGE RESEARCH |
| 22223MBT | MASSACHUSETTS BAY TRANSPORTATION AUTHORITY |
| 71593CCPA | HSBC FRANCE |
| 102598NABL | NATIONAL AUSTRALIA BANK LTD |
| 72893SWLB | LANDESBANK BADEN-WUERTTEMBERG |
| 122398ENIF | ENI SPA |
| 50598DDBK | DANSKE BANK A/S |
| 060295WLGF | WGZ-BANK WESTDEUTSCHE GENOSSENSCHAFTS-ZENTRALBANK AG |

**Series 4 :**

| CP/Master ID | Counterparty Name |
|---|---|
| 051094KDBS | KOREA DEVELOPMENT BANK |
| 021904CPER | CALIFORNIA PUBLIC EMPLOYEES RETIREMENT SYSTEM |
| 72707SSBT | STATE STREET BANK AND TRUST COMPANY |
| 041207LEHM | THE SERIES 2007-1 TABXSPOKE SEGREGATED PORTFOLIO |
| 050500PIMF | PUTNAM INCOME FUND |
| 110105PUTN | PUTNAM U.S. GOVT INCOME TR |
| 71693CWOM | COMMONWEALTH OF MASSACHUSETTS |
| 110493ROUC | REGENTS OF THE UNIVERSITY OF CALIFORNIA |
| 082100UNOP | UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH** |
| 121800CLPU | CLARK COUNTY PUBLIC UTILITY DISTRICT #1 |
| 060607ALAB | POWERSOUTH ENERGY COOPERATIVE |
| 110993AMHF | AMERICAN HONDA FINANCE CORPORATION |
| 92893MTAU | METROPOLITAN TRANSPORTATION AUTHORITY |
| 051906SAIN | SAINT JOSEPH'S UNIVERSITY |
| 042794RMH | ROCKFORD MEMORIAL HOSPITAL |
| 65187NCHB | THE NORINCHUKIN BANK |
| 012395STIN | STAPLES INC. |
| 050902GELI | GENWORTH LIFE AND ANNUIT Y INSURANCE COMPANY |
| 082495KEY | KEYCORP |
| 60394NBNC | BANK OF AMERICA NATIONAL ASSOCIATION |
| 65994DBAG | DEUTSCHE BANK AG |
| 71499MLCS | MERRILL LYNCH CAPITAL SERVICES INC |
| 071700BNPP | BNP PARIBAS SA |
| 073107GIAN | GIANTS STADIUM, LLC |
| 50862KRED | KREDITANSTALT FUER WIEDERAUFBAU |
| 69836FHBA | FEDERAL HOME LOAN BANK OF ATLANTA |
| 50111FNMA | FEDERAL NATIONAL MORTGAGE ASSOCIATION |
| 30690HP | HEWLETT-PACKARD COMPANY |
| 36090FUNC | WACHOVIA BANK NATIONAL ASSOCIATION |
| 042994BBL | ING BELGIUM SA/NV |
| 11593BLBM | BAYERISCHE LANDESBANK |
| 61803RNBN | HSBC BANK USA, NATIONAL ASSOCIATION |
| 35716RNPU | RABOBANK NEDERLAND |
| 36166TORD | TORONTO-DOMINION BANK (THE) |
| 61843SNBK | KEYBANK NATIONAL ASSOCIATION |
| 010501PMAR | MARSH MCLENNAN CO US RET PLAN-LONG DURATION FXD IN |
| 112598RHF | RETIREMENT HOUSING FOUNDATION |
| 052907FINA | FSA INC A/C FSA CPT 265 |
| 040594INCM | ING CAPITAL MARKETS LLC |
| 061799BHFU | PB CAPITAL CORPORATION |
| 070104MGFL | MICROSOFT GLOBAL FINANCE |

**Schedule D**

<u>Surviving Contracts</u>

1. Settlement Agreement, dated as of December 15, 2009, by and among Lehman Brothers Holdings Inc., Lehman Brothers ALI, Inc., Lehman Commercial Paper Inc. and Dr. Michael C. Frege in his capacity as insolvency administrator over the assets of Lehman Brothers Bankhaus Aktiengesellschaft i. Ins.

2. That certain Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies dated as of May 12, 2009.

3. Any data sharing agreements entered into by the LBB InsAdmin and one or more of the Debtors subsequent to November 13, 2008.

4. Stipulation And Order Restricting Use of Alleged Cash Collateral Pursuant To 11 U.S.C. §363(c)(2) and (4) And Bankruptcy Rule 4001(d) Between Lehman Brothers Special Financing Inc. And Dr. Michael C. Frege In His Capacity As Insolvency Administrator (Insolvenzverwalter) Over The Assets of Lehman Brothers Bankhaus Aktiengesellschaft I. Ins. [Docket No. 6824].

5. Note Sale Agreement to be entered into by and between Lehman Brothers Holdings Inc. and Dr. Michael C. Frege in his capacity as Insolvency Administrator *(Insolvenzverwalter)* over the assets of Lehman Brothers Bankhaus AG *(i. Ins.)*, with respect to the sale of Spruce and Verano.

6. Note Sale Agreement to be entered into by and between Lehman Brothers Holdings Inc. and Dr. Michael C. Frege in his capacity as Insolvency Administrator *(Insolvenzverwalter)* over the assets of Lehman Brothers Bankhaus AG *(i. Ins.)*, with respect to the sale of SASCO.

**<u>Exhibit D</u>**

**Proposed Order**

US_ACTIVE:\43620526\05\58399.0008

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                       :
In re                                                  :      **Chapter 11 Case No.**
                                                       :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,           :      **08-13555 (JMP)**
                                                       :
                           **Debtors.**                :      **(Jointly Administered)**
                                                       :
                                                       :
---------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF TWO NOTE PURCHASE AGREEMENTS WITH THE INSOLVENCY ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)

Upon the motion, dated March 2, 2011 (the "<u>Motion</u>"), of Lehman Brothers

Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "<u>Debtors</u>" and, together with their non-

debtor affiliates, "<u>Lehman</u>") pursuant to sections 105 and 363 of the Bankruptcy Code, for

approval of two note purchase agreements with the Insolvency Administrator of Lehman

Brothers Bankhaus Aktiengesellschaft (*in Insolvenz*), all as more fully described in the Motion;

and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635]; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that objections, if any, to the Motion, that have not been resolved or withdrawn, are overruled; and it is further

ORDERED that, the Court having determined and found that the proposed transactions set forth in the Note Purchase Agreements are reasonable and appropriate, and consummation of the transactions contemplated by the Note Purchase Agreements are in the best interests of LBHI and its estate, the Motion is granted; and it is further

ORDERED that pursuant to sections 105 and 363(b) of the Bankruptcy Code, the Note Purchase Agreements are approved and LBHI is duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers and to take any and all actions reasonably necessary or appropriate to consummate the Note Purchase Agreements and perform any and all obligations contemplated therein; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(h) are waived and the terms of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising

from or related to the implementation of this Order and the Agreement.

Dated: _____, 2011
　　　　New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit E</u>**

**Declaration of Daniel J. Ehrmann**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                                                :
**In re**                                                       :        **Chapter 11 Case No.**
                                                                :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                    :        **08-13555 (JMP)**
                                                                :
                                          **Debtors.**          :        **(Jointly Administered)**
                                                                :
                                                                :
----------------------------------------------------------------x

**DECLARATION OF DANIEL J. EHRMANN IN**
**SUPPORT OF LBHI'S MOTION PURSUANT TO SECTIONS 105**
**AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF TWO**
**NOTE PURCHASE AGREEMENTS WITH THE INSOLVENCY**
**ADMINISTRATOR OF LEHMAN BROTHERS BANKHAUS AG (IN INSOLVENZ)**

Pursuant to 28 U.S.C. § 1746, I, Daniel J. Ehrmann, declare:

1.       I am over the age of 18 years and make these statements of my own personal

knowledge, my review of the business records of Lehman Brothers Holdings Inc. ("LBHI")

and/or my consultation with employees of LBHI and Alvarez & Marsal North America, LLC

("A&M"), which was retained by the Debtors, pursuant to this Court's approval, to advise and

assist the Debtors in connection with, among other things, their restructuring, managing their

assets, and maximizing the realization of their assets.  *See* Order entered on December 17, 2008

[Docket No. 2278].  If called to testify, I could testify to the truth of the matters set forth herein.

2.      I submit this Declaration in support of the *Motion of LBHI Pursuant To Sections 105 and 363 of The Bankruptcy Code For Approval of Two Note Purchase Agreements With The Insolvency Administrator of Lehman Brothers Bankhaus AG (In Insolvenz)* (the "<u>Motion</u>").

## <u>Qualifications And Background</u>

3.      I am a Managing Director with A&M.  I was assigned to the Lehman matter in September 2008.  One of my primary areas of responsibility is the management of all international and foreign matters of the Debtors.[1]  I began my career as an attorney practicing law in France for five years.  I have specialized in turnaround and restructuring with A&M since 2000, serving in a variety of interim management, advisory, and financial restructuring roles.

## <u>Familiarity With The Note Purchase Agreements And Motion</u>

4.      On behalf of the Debtors, I lead negotiations with the LBB InsAdmin that resulted in the Note Purchase Agreements that are the subject of the Motion, as well as the Plan Settlement Agreement.  Copies of the Note Purchase Agreements and the Plan Settlement Agreement are attached to the Motion as Exhibits A, B, and C.  Prior to its filing, I also reviewed and approved the Motion, and I adopt the representations contained in the Motion, as if set forth in full and at length in this Declaration.

## <u>Familiarity With Bankhaus And The Notes</u>

5.      I first became involved with Bankhaus soon after the Commencement Date, participating in discussions through the months of October and November 2008 with respect to a potential transaction that, if successful, might have avoided the commencement of Bankhaus's liquidation proceeding.  While Bankhaus's liquidation proceeding could not be avoided, I have continued to focus on Bankhaus's assets in light of the intercompany claims that the Debtors and

---

[1]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

Bankhaus have against each other.  Over the past two years, I have led the Debtors in extensive, arm's length negotiations with the LBB InsAdmin in an effort to arrive at a consensual resolution of the intercompany claims between our respective estates.

6.      As a result of the discussions that led to the execution of the Plan Settlement Agreement, I and Lehman's real estate and commercial loan teams have become familiar with various of Bankhaus's assets, including Bankhaus's interest in the Purchased Notes.  The Debtors already had familiarity with SASCO, Spruce, and Verano, because of LBHI's current holdings of (i) 94.7% of Senior Notes issued by Spruce and (ii) 100% of Senior Notes issued by Verano, and LCPI's current holdings of (i) 29.3% of senior notes issued by SASCO, (ii) 5.3% of Senior Notes and 100% of Subordinated Notes issued by Spruce, and (iii) 100% of Subordinated Notes issued by Verano.

7.      At the time of SASCO's issuance, the Underlying Assets participated to SASCO consisted of 51 unique positions, encompassing corporate loans or first lien mortgages and mezzanine loans secured by real estate.  Since issuance, some of the collateral has been foreclosed upon, and nine positions have been eliminated, resulting in 42 unique positions that collateralize the structure.  A significant portion of the value in the SASCO's Underlying Assets is concentrated in a few transactions, some of which involve multiple positions.  With respect to Spruce and Verano, the Underlying Assets are interests in corporate loans participated by LCPI: 56 loans were participated to Spruce, and 64 loans to Verano, some of which were subsequently sold or paid off.  As of February 25, 2011, 15 loans were participated to Spruce, and 43 to Verano.

8.      With respect to the Underlying Assets that are primarily real estate assets, Lehman's real estate team has developed a detailed understanding of the value of every

Underlying Asset, and has confirmed this understanding, and developed a conclusion as to the value of the relevant Purchased Notes, by applying an appropriate, risk-adjusted rate of return to the projected cash flows from such assets. With respect to the Underlying Assets that are commercial loans, Lehman's commercial loan team has developed a deep understanding of the value of such loans through the evaluation of market trading values associated with such loans.

### Negotiations With Bankhaus

9.    The past two years of negotiations with the LBB InsAdmin have resulted in the execution of the Plan Settlement Agreement. **By the Motion, the Debtors are neither seeking approval of the Plan Settlement Agreement, nor requesting the allowance of any claims against their respective estates.** The Plan Settlement Agreement currently contemplates that the Debtors will seek approval of that agreement, and the settlements contained therein, at a later date in connection with the approval of the Debtors' joint chapter 11 plan. However, the Note Purchase Agreements, and in particular, the purchase price for the Notes held by Bankhaus, are directly related to the Plan Settlement Agreement, for the reasons set forth below.

10.    The SCA Claim is a significant component of the Plan Settlement Agreement. It is my understanding that pursuant to the SCA, LBHI agreed to post cash collateral to Bankhaus in respect of any losses suffered by Bankhaus if either an asset decreases in value below a certain level, or a borrower fails to make a payment when due and payable. It is also my understanding that the Notes held by Bankhaus are among the assets covered by the SCA, and that a portion of the SCA Claim arises from the shortfall in value that Bankhaus suffers on account of such Notes.

11.    Based on the understanding that Lehman has developed of the Underlying Assets, I concluded, in the context of negotiations over the SCA Claim, and particularly that portion of the SCA Claim that relates to the Notes, that if LBHI and Bankhaus could agree on a fair price

for the Notes, the Notes could hold considerable value for LBHI's estate.  In my considered business judgment, it would be extremely beneficial for LBHI to purchase the Notes for the Purchase Price, thereby not only fixing that portion of the SCA Claim relating to the Notes, but also affording LBHI the benefit of both (a) the upside in the Notes' value and (b) the strategic ability to deal directly with the Underlying Assets as a result of obtaining 100% control of the capital structure of these through the Purchased Notes and the Debtors' existing holdings of Spruce, Verano, and SASCO.

### The Purchase Price

12.    In my considered business judgment, the Purchase Price is both fair and reasonable, and offers LBHI the ability to realize a considerable profit in the long term.  The Spruce-Verano Purchase Price represents a 30% discount to the outstanding principal and accrued interest amounts of the Purchased Spruce-Verano Notes.  This discount accounts for the fact that the Mezzanine Notes issued by both Spruce and Verano, and held by Bankhaus, are currently illiquid, and will not realize any principal payments (and likely no interest payments) until the Senior Notes issued by Spruce and Verano currently held by LBHI and LCPI are paid in full.  Accordingly, it is not likely that the Mezzanine Notes will be paid in full, including interest, for two to three years.  In addition, despite the risk and long term nature of this repayment, the Mezzanine Notes carry nominal rates of interest, that do not meet current commercial standards (LIBOR + 275 in the case of Verano, and LIBOR + 350 in the case of Spruce, with no LIBOR floor).  Because of these factors, I have concluded, in consultation with the Lehman commercial loan team, that a 30% discount to the outstanding notional amount of the Spruce and Verano Mezzanine Notes represents a fair and reasonable price.

13.     With respect to the Purchased SASCO Notes, the SASCO Purchase Price represents approximately a 42% discount to the outstanding principal amount of the Purchased SASCO Notes.[2]  I have concluded, in my business judgment and in consultation with the Lehman real estate team, that the SASCO Purchase Price is fair and reasonable, and affords LBHI the opportunity for substantial profit from the cash flows generated by the Underlying Assets.

### The Strategic Benefits

14.     In addition to the upside potential to LBHI on account of the Purchase Price, it is my understanding, based on my consultation with Lehman's real estate and commercial loan teams, that purchasing the Purchased Notes is the best means for LBHI, as a strategic purchaser, to maximize the value of the Underlying Assets.  By purchasing the Purchased Notes, when combined with their current holdings of 100% the Senior and Subordinated Notes of Spruce and Verano, and 29.3% of SASCO Notes, LBHI and LCPI will obtain control over 100% of the capital structure of Spruce, Verano, and SASCO, thereby enabling the Debtors to dissolve the Issuers and directly realize upon the value of the Underlying Assets.  For the reasons set forth below, outright ownership of the Underlying Assets is far more valuable than indirect ownership through the Spruce, Verano, and SASCO securitization structures.

15.     Specifically, with respect to SASCO, unwinding the structure would enhance the value of the Underlying Assets because many of the Underlying Assets are part of larger real estate projects in which LBHI already has other debtor or equity positions.  The purchase of the Purchased SASCO Notes would confer to the Debtors the control necessary to consolidate these

---

[2]     The 42% discount does not take into account distributions that LBHI would make to Bankhaus over time on account of the resulting claims that Bankhaus will have against LBHI pursuant to the Plan Settlement Agreement, or alternatively, the Purchase Price Adjustment, if the Plan Settlement Agreement is terminated under the circumstances set forth in the Motion.

Underlying Assets with non-SASCO positions in the same capital structures, further enhancing

the prospect for recoveries and control, and increasing LBHI's ability to execute certain asset

plans with respect to such positions.  LBHI's purchase of the Purchased SASCO Notes would

also result in savings to the Debtors, because interest due on the Notes would no longer accrue to

the benefit of Bankhaus, and the Debtors would be able to eliminate special servicing fees that

are mandated by the structures.

16.     With respect to Spruce and Verano, obtaining 100% control over the Senior,

Mezzanine, and Subordinated positions of the structures would eliminate the need for special

restricted cash, allowing all restricted funds to be released into the Spruce and Verano trusts,

which would immediately be repaid to LBHI and LCPI as the holders of the Senior Notes.

Control over the structures would also allow for a mechanism to modify the indentures so as to

maximize recoveries from the Underlying Assets.  Currently, the indentures do not allow the sale

of the Underlying Assets, unless such sales are at par, and approval procedures involving the

indenture trustee and the trust issuer are cumbersome.  With these obstacles removed, it is

expected that the principal and accrued interest of the Mezzanine Notes in Spruce and Verano

will be fully realizable in cash by the end of 2014.

### The Motion Should Be Approved

17.     For the reasons set forth above, I have concluded that LBHI's decision to acquire

the Purchased Notes pursuant to the Note Purchase Agreements represents an exercise of prudent

business judgment on the part of LBHI.  The Purchase Price is fair and reasonable, and affords

LBHI the opportunity to realize substantial upside gain.  Furthermore, LBHI would realize a

significant increase in value from unwinding the Issuers, and this is only possible once LBHI,

together with LCPI, obtain 100% control over the Issuers' capital structures.  For all the

foregoing reasons, therefore, I believe that the Note Purchase Agreements are in the best interests

of LBHI's estate and creditors, and should be approved.


I declare under penalty of perjury under the laws of the United States that the foregoing is true

and correct to the best of my knowledge.

Executed on this 1st day of March, 2011.

/s/ Daniel J. Ehrmann

Daniel J. Ehrmann