**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
           :

In re               :       **Chapter 11**
           :

**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :    **Case No. 08-13555 (JMP)**
           :

      **Debtors.**     :    **(Jointly Administered)**
           :

-------------------------------------------------------------------x
           :

In re               :
           :

**LEHMAN BROTHERS INC.**     :    **Case No. 08-01420 (JMP) SIPA**
           :

      **Debtor.**     :
           :

-------------------------------------------------------------------x

### STIPULATION AND AGREED ORDER WITH RESPECT TO ACCESS AMENDMENT TO TRANSITION SERVICES AGREEMENTS

WHEREAS, commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its Affiliates[1] commenced cases before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), which cases are proceeding under jointly administered case number 08-13555 (JMP) (the "Chapter 11 Cases", and the debtors in such cases, the "Chapter 11 Debtors");

WHEREAS, Barclays Capital Inc. ("BarCap"), LBHI, Lehman Brothers Inc. ("LBI"), and LB 745 LLC entered into an Asset Purchase Agreement dated September 16, 2008 (as clarified and amended, the "APA"), pursuant to which BarCap, LBI and LBHI each agreed, among other things, (i) to preserve and keep records held by it or their Affiliates relating to the

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the TSA Access Amendment (as defined below).

Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and to make such records and personnel available to the other as may be reasonably required by such party (such provision of such records or personnel, the "Access") and (ii) to use commercially reasonable efforts to enter into a transition services agreement.  Capitalized terms used in this paragraph have the meanings ascribed to such terms in the APA;

WHEREAS, pursuant to the Order of the United States District Court for the Southern District of New York, dated September 19, 2008 (the "LBI Order"), James W. Giddens has been appointed as trustee (the "Trustee") for the liquidation of LBI under the Securities Investor Protection Act ("SIPA");

WHEREAS, pursuant to the LBI Order, the SIPA liquidation proceeding for LBI was removed to the Bankruptcy Court, and remains pending under case number 08-1420 (JMP) (the "LBI Case");

WHEREAS, BarCap and LBHI have entered into that certain Transition Services Agreement, dated September 22, 2008 (the "LBHI TSA") that was authorized by the Bankruptcy Court pursuant to the Sale Order;

WHEREAS, BarCap and the Trustee have entered into that certain Transition Services Agreement, dated December 23, 2009 (the "LBI TSA", and together with the LBHI TSA, the "TSAs") that was approved by the Bankruptcy Court on March 23, 2010 (LBI Docket No. 2883);

WHEREAS, the TSAs are shortly due to expire by their terms;

WHEREAS, the parties hereto, subject to Bankruptcy Court approval hereof, seek to amend the TSAs to provide a protocol for Access in the periods following expiration of the

TSAs, pursuant to the terms and conditions of that certain TSA Amendment No. 1, dated as of

February 23, 2011, attached hereto as <u>Exhibit 1</u> (the "<u>TSA Access Amendment</u>").

**THE PARTIES, SUBJECT TO BANKRUPTCY COURT APPROVAL HEREOF, BY
AND THROUGH THEIR RESPECTIVE ATTORNEYS, HEREBY STIPULATE, AGREE
AND, UPON ENTRY BY THE BANKRUPTCY COURT, IT SHALL BE ORDERED
THAT:**

1.     Upon entry of this Stipulation and Agreed Order, the TSA Access Amendment is

approved, and to the extent required, the Trustee and Chapter 11 Debtors, as applicable, are

further authorized to deliver, implement, and perform any and all obligations, instruments,

documents and papers and to take any and all actions reasonably necessary or appropriate to

consummate the TSA Access Amendment and perform any and all obligations contemplated

therein.

2.     For the avoidance of doubt, with respect to Access requested by the Trustee or the

Chapter 11 Debtors under the TSA Access Amendment, claims asserted by BarCap arising under

the Access Amendment shall constitute costs and expenses of the administration of the relevant

Counterparty's or Counterparties' estate(s) pursuant to Sections 503(b) and 507(a)(2) of the

Bankruptcy Code and solely with respect to the LBI estate, pursuant to 15 U.S.C. § 78fff(e).

3.     The provisions of the TSA Access Amendment constitute reasonable procedures

and appropriate measures to maintain and preserve information within the meaning of paragraph

31 of the Sale Order.

4.     For the avoidance of doubt, each of the parties may terminate or renew the TSA

Access Amendment in accordance with its terms without other or further order or relief from the

Bankruptcy Court.

5.     Nothing in this Stipulation and Agreed Order or the TSA Access Amendment

shall (a) bind, be collateral estoppel, res judicata or otherwise prejudice any matter in the Chapter

3

11 Cases or in the LBI Case (other than the matters expressly addressed in the TSA Access

Amendment and the performance thereof); (b) impair or modify the rights and remedies of

BarCap (or any Affiliate of BarCap) or any defenses of the Trustee, LBI or any of the Chapter 11

Debtors or their Affiliates in respect of any claims that have been asserted, or may be asserted,

by BarCap (or any Affiliates of BarCap) against LBI (or the Trustee as trustee for LBI), the

Chapter 11 Debtors, their respective present or former Affiliates, or any third parties, with

respect to any matter (other than the matters expressly addressed in the TSA Access Amendment

and the performance thereof) in the Chapter 11 Cases or in the LBI Case, and for the avoidance

of doubt, all rights of BarCap and its Affiliates to (i) seek the dismissal, denial or other relief

with respect to the Rule 60 Motions and/or dismissal or other relief in connection with the

Adversary Proceedings, or (ii) seek enforcement of the Sale Order and secure delivery of any

allegedly undelivered assets thereunder, including without limitation, pursuant to the

Enforcement Motion, are hereby reserved; (c) impair or modify any rights and remedies of the

Trustee, LBI or any of the Chapter 11 Debtors or any defenses of BarCap or its Affiliates in

respect of or arising out of any claims that have been asserted or may be asserted against BarCap

(or any Affiliates of BarCap), and related recoveries, including, for the avoidance of doubt, (i)

any claims and recoveries that are the subject of, related to or arise out of one or more of the

Rule 60 Motions, (ii) any claims that are the subject of, related to or arise out of any of the

Adversary Proceedings, or (iii) any claims relating to claimed shortfalls in LBI's compliance

with customer protection rules.

6.       The failure to specifically describe or include in this Stipulation and Agreed Order

any particular provision of the TSA Access Amendment shall not diminish or impair the

effectiveness of such provision, it being the intent of the Bankruptcy Court and the parties that

4

the Trustee and the Chapter 11 Debtors, as applicable, are authorized to perform under the TSA

Access Amendment in its entirety.

7.      Each person who executes this Stipulation and Agreed Order on behalf of a party

hereto represents that he or she is duly authorized to execute this Stipulation and Agreed Order

on behalf of such party.

8.      This Stipulation and Agreed Order shall be binding on all parties in interest and

their respective successors and assigns, including without limitation, any Chapter 7 or Chapter

11 trustees, any successor trustee appointed pursuant to SIPA, and any plan agent, administrator

or trustee no matter how denominated.

9.      Notwithstanding anything to the contrary in the Federal Rules of Bankruptcy

Procedure (including without limitation Rule 6004(h)), this Stipulation and Agreed Order shall

take effect immediately upon entry.

10.      This Stipulation and Agreed Order shall be interpreted, construed, and enforced

exclusively in accordance with the laws of the State of New York, except to the extent that the

Bankruptcy Code or SIPA applies.

11.      The Bankruptcy Court shall retain jurisdiction to resolve any disputes or

controversies arising from or related to this Stipulation and Agreed Order and the TSA Access

Amendment.

**AGREED TO:**

Dated: February 23, 2011
      New York, New York

/s/ Lori R. Fife
Lori R. Fife, Esq.
Garrett Fail, Esq.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for the Chapter 11 Debtors
and Debtors in Possession*

/s/ Lindsee P. Granfield
Lindsee. P. Granfield, Esq.
Lisa M. Schweitzer, Esq.

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Attorneys for Barclays Capital, Inc.*

/s/ Jeffrey S. Margolin
James B. Kobak, Jr., Esq.
Jeffrey S. Margolin, Esq.

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for James W. Giddens, Trustee
for SIPA Liquidation of Lehman
Brothers Inc.*

**SO ORDERED:**

Dated: New York, New York
      March 2, 2011

                *s/ James M. Peck*
              HONORABLE JAMES M. PECK
              UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

EXECUTION VERSION

## TSA AMENDMENT NO. 1

THIS  TSA AMENDMENT NO. 1 (this "**Amendment**") is made as of February 23, 2011 (the "**Execution Date**") and is effective as of the Effective Date by and between Barclays Capital Inc., a Connecticut corporation ("**BarCap**") and each of: (a) James W. Giddens, as Trustee (the "**Trustee**") for the liquidation of the assets of Lehman Brothers Inc., a Delaware corporation ("**LBI**"), under the Securities Investor Protection Act ("**SIPA**"); and (b) Lehman Brothers Holdings Inc., a Delaware corporation ("**LBHI**" and together with the Trustee, the "**Counterparties**" and each, a "**Counterparty**").  Initially capitalized terms in this Amendment shall have the meanings ascribed to them in-place or in Exhibit 1.

## WITNESSETH:

WHEREAS, commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its Affiliates have commenced cases before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), which are proceeding under jointly administered case number 08-13555 (JMP) (the "**Chapter 11 Cases**");

WHEREAS, BarCap, LBHI, LBI, and LB 745 LLC have entered into an Asset Purchase Agreement, dated September 16, 2008 (as clarified and amended, the "**APA**"), pursuant to which BarCap, LBI and LBHI each agreed, among other things, (i) to preserve and keep records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and to make such records and personnel available to the other as may be reasonably required by such party (such provision of such records or personnel, the "**Access**") and (ii) to use commercially reasonable efforts to enter into a transition services agreement.  Capitalized terms used in this paragraph have the meanings ascribed to such terms in the APA;

WHEREAS, pursuant to the Order of the United States District Court for the Southern District of New York, dated September 19, 2008 (the "**LBI Order**"), the Trustee has been appointed as trustee for the liquidation of LBI under SIPA;

WHEREAS, pursuant to the LBI Order, the SIPA liquidation proceeding for LBI was removed to the Bankruptcy Court, and remains pending under case number 08-1420 (JMP) (the "**LBI Case**");

WHEREAS, BarCap and LBHI have entered into that certain Transition Services Agreement, dated September 22, 2008 (the "**LBHI TSA**");

WHEREAS, BarCap and the Trustee have entered into that certain Transition Services Agreement, dated December 23, 2009 (the "**LBI TSA**", and together with the LBHI TSA, the "**TSAs**");

WHEREAS, the TSAs are shortly due to expire by their terms;

WHEREAS, subject to approval by the Bankruptcy Court as set forth herein, the parties to this Amendment seek to amend the TSAs to provide a protocol for Access in periods

1

following expiration of the TSAs;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to approval by the Bankruptcy Court as set forth herein, the parties hereto hereby agree as follows:

1.    <u>Purpose</u>.  Following each Counterparty's respective Effective Date, if any Counterparty seeks to make a request for Access, the Counterparty may do so in accordance with the request process described in this Section 1 and otherwise in accordance with the terms of this Amendment.

a)    To the extent a Counterparty seeks to request Access, it may do so in the form of or to (1) copies of electronic records on systems ("**<u>Data</u>**"), (2) copies of electronic records on tapes or other electronic media ("**<u>Tapes</u>**"), (3) hardcopy records or copies thereof (all such records or copies, whether or not contained in boxes, "**<u>Boxes</u>**"), or (4) a BarCap employee whose knowledge is reasonably required by such Counterparty to respond to such Counterparty's specific factual questions regarding the Business and systems and processes related to the Business, and only to the extent such person is actively employed by BarCap (each such employee, an "**<u>SME</u>**"), provided however, that BarCap is under no obligation to continue to employ any person that may act as an SME.

b)    Each Counterparty shall make any request for such Access by having an Authorized Requestor for such Counterparty submit an email to the BarCap Request Team at an email address designated by BarCap (or such other address as BarCap may notify the Counterparties from time to time) that contains information substantially consistent with that required by BarCap for similar Access requests pursuant to past practice under the TSAs.  A list of each Counterparty's Authorized Requestors is contained in <u>Schedule A</u> attached hereto.  Each Counterparty may amend <u>Schedule A</u> with respect to its own Authorized Requestors in writing from time to time on notice to BarCap to substitute but not increase the number of Authorized Requestors.

c)    Each Counterparty agrees not to submit a request for Data or records from Tapes, to the extent that, to its knowledge after reasonable due diligence (as more fully described below), such request seeks Data or records from Tapes that are duplicative, in whole or in relevant part, of any Data or records from Tapes, a copy of which was previously provided by BarCap to such Counterparty and which remains reasonably available in usable form to such Counterparty (such Data or records from Tape(s), "**<u>Available Information</u>**") (except that if a Counterparty has previously received some but not all records from a Tape, an otherwise permitted Access to the Tape shall not be considered duplicative solely by virtue of the Counterparty's request to copy the entirety of such Tape).  As part of such due diligence, the requesting Counterparty shall use reasonable efforts to ascertain whether it already has reasonably available to it in usable form the Data and/or records from Tapes being requested.  In addition, in the case of a request for an SME, a Counterparty shall use commercially reasonable efforts to not submit such request if expertise substantially similar to the expertise being sought already resides with the personnel of the requesting Counterparty.  If BarCap discovers that a request by a Counterparty seeks Available Information, BarCap (i) shall have no obligation to

2

fulfill such request to the extent such request seeks Available Information and (ii) the requesting Counterparty shall pay for the costs incurred and for the time spent in connection with such request in accordance with <u>Schedule D</u>.

d)    For the avoidance of doubt, BarCap shall have no obligation to fulfill any request for Access under this Amendment that is not submitted in accordance with this Section 1.

e)    Each Counterparty agrees that it will use commercially reasonable efforts to prevent any person associated with it or its Affiliates that is not an Authorized Requestor (an "**Unauthorized Requestor**") from making any request of BarCap for Access.  For the avoidance of doubt, BarCap shall have no obligation or right under this Amendment to fulfill requests made by any Unauthorized Requestor.

f)    The BarCap Request Team shall review each request for completeness, and as necessary, obtain clarification regarding the request from the Authorized Requestor, track and coordinate requests and, when reasonably requested, advise each Counterparty of the status of any of its requests.

g)    LBHI may make requests for Access on behalf of its Affiliates and shall cause any Affiliates that receive access to Data, Tapes, Boxes or information from SMEs made available hereunder to act in accordance with this Amendment and comply with the obligations and restrictions applicable to LBHI under this Amendment with respect to such Data, Tapes, Boxes and/or information from SMEs, from and after the time of such receipt, irrespective of whether such Affiliate remains an Affiliate of LBHI, <u>provided</u>, for the avoidance of doubt, this Section 1(g) is not intended to limit Section 2(c) in any manner.

h)    With respect to any request by a Counterparty for Tapes, BarCap and each Counterparty agree to the additional terms and conditions set forth in <u>Schedule B</u> (Tapes).

i)    With respect to any request by a Counterparty for Boxes, BarCap and each Counterparty agree to the additional terms and conditions set forth in <u>Schedule C</u> (Boxes).

j)    In the event that a Counterparty seeks access to Post-Close Data that is owned by such Counterparty or its Affiliates or to information not related to the Business hereunder, it may make such request therefor as if it was a request for Access and if BarCap elects to fulfill such request, then such request and fulfillment shall constitute Access for the purposes of this Amendment.  If BarCap preliminarily elects not to fulfill such request, then the relevant Counterparty and BarCap agree to discuss such request in good faith to determine whether such request will be fulfilled under this Amendment as Access.  If the Counterparty and BarCap are unable to agree after such good faith discussion, each party reserves all rights and remedies that may be available to it, including under Section 12(b).

k)    Each Counterparty acknowledges and agrees that all processes referenced in this Amendment are reasonable procedures and constitute appropriate measures to maintain and preserve information within the meaning of paragraph 31 of the Sale Order.

l)    Either Counterparty may ask questions of one or more SMEs to determine whether prior requests by such Counterparty for Data or records from Tapes that were

3

purportedly completely fulfilled were in fact completely fulfilled and such Counterparty and BarCap shall reasonably cooperate to facilitate such determination. If the determination is that the prior request was not completely fulfilled, the requesting Counterparty may request that the prior request be completely fulfilled and, if BarCap does so, such Counterparty shall pay for such additional Access in accordance with the pricing set forth in Schedule D. If the determination is that the prior request was completely fulfilled or substantially completely fulfilled, the Counterparty shall also pay for the work done in making that determination, in accordance with the pricing set forth in Schedule D; conversely, if the determination is that the prior request was not substantially completely fulfilled, the requesting Counterparty shall have no obligation to pay for the work done in making that determination, provided, for the avoidance of doubt, (A) the work done in determining the extent of any lack of any substantial completeness and (B) the rectification of any lack of completeness shall be paid for by the requesting Counterparty (to the extent requested) in accordance with the pricing set forth in Schedule D.

2.    Use of Third Party Suppliers. Following each Counterparty's respective Effective Date, pursuant to Schedules B and C, in certain instances, to more efficiently facilitate the Access, a Counterparty may request that BarCap make available one or more Boxes or Tapes to a third party supplier selected by such Counterparty and approved by the other Counterparty and BarCap in order that such Supplier may more efficiently copy and/or analyze records contained in certain Boxes or Tapes on behalf of the Counterparty (each, a "**Third Party Process**").

a)    In addition to the foregoing, the following are pre-conditions to a Counterparty receiving Access pursuant to a Third Party Process:

i)    The existence of a "custody" agreement executed by BarCap and the applicable Supplier that provides BarCap with substantially similar protections (but, with respect to Applicable Copy Suppliers, with modifications as reasonably appropriate for Boxes, given the differences between hard copies and electronic data) as those afforded BarCap under the custody agreements entered into by BarCap with the Tape Suppliers (as defined in Schedule B);

ii)    The existence of an enforceable signed agreement between the applicable Supplier and the requesting Counterparty for the contemplated copying or analysis;

iii)    The non-requesting Counterparty has provided the requesting Counterparty with written approval to use such Supplier for the applicable services, which approval shall not be unreasonably withheld.

b)    With respect to any Third Party Process, each Counterparty hereby agrees that:

i)    When it submits a request for a Third Party Process or provides an approval as described in Section 2(a)(iii) above, it thereby agrees and represents that it considers the applicable Supplier to be a vendor of sufficiently high quality and reputation in relation to the type of services associated with the request; and

4

ii)       BarCap's releasing of the applicable Tapes and/or Boxes to the applicable Supplier is at the request of a Counterparty and the Supplier is not under the control of BarCap.

c)       From and after such time as this Amendment is in effect with respect to any Counterparty, both Counterparties hereby (i) expressly and irrevocably waive (A) any and all claims against BarCap and any of its Affiliates in connection with the Access that result directly or indirectly, from any action(s) or omission(s) of any Supplier or Transportation Provider (as defined in <u>Schedule B</u>) who received or transported any Box(es) and/or Tape(s) to facilitate the request of either Counterparty made by an Authorized Requestor, including without limitation any claim arising out of such Counterparty's inability to access information or that any information has been lost, damaged or destroyed (collectively, "**<u>Related Claims</u>**"), and (B) the benefit of any statutory provision or common law rule that provides that a waiver or release does not extend to claims which a party does not know or suspect to exist in its favor at the time of execution, including without limitation, the provisions of California Civil Code Section 1542 (any provision or rule described in this clause (B), an "**<u>Unknown Claims Rule</u>**") to the extent such Unknown Claims Rule would otherwise impair the waiver and release of a Related Claim, and (ii) covenant that they will not at any time hereafter, either directly or indirectly, initiate, assign, maintain or prosecute, or in any way knowingly aid or assist in the initiation, maintenance or prosecution of any claim, demand or cause of action at law or otherwise, against BarCap or any of its Affiliates, for Losses of any kind arising from, related to, or in connection with any Related Claim. If any of LBHI's Affiliates asserts any Related Claims or, in any event, prior to any LBHI Affiliate ceasing to be an Affiliate of LBHI, LBHI shall promptly cause each such Affiliate to expressly and irrevocably waive any and all Related Claims and the benefit of any Unknown Claims Rule, and indemnify and hold harmless BarCap and its Affiliates for any and all Losses sustained by BarCap or any of its Affiliates arising from, related to, or in connection with any such Related Claim. For the avoidance of doubt, the foregoing waivers and covenants (x) expressly exclude any claims for breach of this Amendment, and (y) continue to apply with full force and effect to both Counterparties and their Affiliates, even where this Amendment otherwise remains in effect only with respect to one Counterparty.

3.       <u>Confidentiality; Non-Access; Non-Use; Non-Disclosure</u>.

a)       LBHI agrees that in no event will it use any data created prior to September 22, 2008 that relates to the Business and that is made available to it directly or indirectly as part of the Access other than for wind-down, liquidation or administration of the LBHI estate. LBHI further acknowledges and agrees that notwithstanding any expiration of the LBHI TSA, the following provisions shall apply with respect to any Access provided hereunder *mutatis mutandis* and shall survive termination of the LBHI TSA and apply with respect to any Services provided thereunder: (i) Section 9.04 of the LBHI TSA; and (ii) each of Sections 1, 2, 3, 4, 5 and 6 of the LBHI DAA (<u>provided</u>, that with respect to the Access, any references to Data Copies in such Sections shall be deemed to refer to Data, Tapes, Boxes and SMEs).

b)       The Trustee acknowledges and agrees that the following provisions shall apply with respect to any Access provided hereunder *mutatis mutandis* and shall survive termination of the LBI TSA: Sections 3.12(a), 9.04 and 9.09(a) of the LBI TSA (<u>provided</u>, that with respect to the Access, any references to Mixed Systems in such Sections shall be deemed to

refer to Data, Tapes, Boxes and SMEs) and any provisions of the Disclaimer Agreement to the extent related to non-access, non-use and/or non-disclosure of any information.

c)    Each Counterparty further agrees that it shall cause any of its Suppliers, to the extent such Suppliers receive Tapes, Boxes, Data or other information in connection with the provision of Access, (i) to comply with the restrictions and obligations applicable to such Counterparty set forth in this Section 3, and (ii) to use such Tapes, Boxes, Data or other information solely for purposes of providing services to the requesting Counterparty.

4.    Access to Iron Mountain Digital Archives.  Nothing herein is intended to modify Section 2.07 of the LBI TSA (which survives the LBI TSA by its terms) or Section 1(b) of that certain letter agreement by and between BarCap and LBHI dated November 17, 2009 relating to the Iron Mountain Agreement (the "**Bill Gordon Letter**").

5.    Disclaimer / Limitation of Liability.

a)    Except as expressly set forth herein, the parties hereto acknowledge and agree that the Access is provided as-is, and that the applicable Counterparty assumes all risks and liabilities arising from or relating to its use of and reliance upon the Access and that neither BarCap nor any of its Affiliates makes any representation or warranty with respect thereto.

b)    EXCEPT AS EXPRESSLY SET FORTH HEREIN, BARCAP AND ITS AFFILIATES HEREBY EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE ACCESS, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

c)    Notwithstanding anything else to the contrary contained herein, BarCap and its Affiliates shall have no liability in contract, tort or otherwise, for or in connection with any provision of Access provided hereunder, or any actions or inactions in connection therewith, except to the extent a Counterparty or any of its Affiliates suffers a Loss that results from BarCap's or its Affiliates' gross negligence or willful misconduct.  This provision is not intended to limit Section 12(b).

6.    Court Approval.  Promptly following execution hereof, each of LBHI and the Trustee shall seek entry by the Bankruptcy Court of a stipulated order, in form and substance reasonably acceptable to BarCap and each Counterparty, providing, among other things, (i) authorization and approval for LBHI and the Trustee to enter into and perform under this Amendment, (ii) that the parties may terminate or renew this Amendment in accordance with its terms without other, or further, order or relief from the Bankruptcy Court and (iii) that the provisions of this Amendment constitute reasonable procedures and constitute appropriate measures to maintain and preserve information within the meaning of paragraph 31 of the Sale Order (such stipulated order, the "**Approval Order**").  For the avoidance of doubt, such Approval Order may be submitted to the Bankruptcy Court on notice of presentment.  Each of the parties shall cooperate, assist and consult with one another in connection with such efforts to obtain entry of the Approval Order.  Notwithstanding any provision of this Amendment to the

contrary, the obligations of the parties under this Section 6 are binding and effective on and from the Execution Date. If approval of this Amendment is denied by the Bankruptcy Court, or the Approval Order is not entered on or before March 16, 2011, each of the parties reserves all of its respective rights regarding the subject matter hereof, and this Amendment shall be void ab initio, with no further force and effect.

7.    Costs.

a)    With respect to Access requested by any Counterparty, such Counterparty shall pay the costs for the requested Access as set forth in Schedule D (such charges, "Access Charges"). The Approval Order shall provide that all amounts payable hereunder by each Counterparty shall constitute costs and expenses of the administration of the Chapter 11 Debtors' (as defined below) or LBI's respective estates pursuant to (i) Section 503(b) and 507(a)(2) of the Bankruptcy Code and (ii) solely with respect to the LBI estate, 15 U.S.C. § 78fff(e).

b)    BarCap shall deliver an invoice to each Counterparty for the charges it owes under this Amendment on a monthly basis (or, at the option of BarCap, at such other frequency as is consistent with the basis on which the charges are determined), and (i) LBHI shall pay the amount of such invoice within thirty (30) days and (ii) the Trustee shall pay the amount of such invoice within ten (10) days (each Counterparty's period for payment, a "**Pay Period**"), in each case, of the date of receipt of such invoice by wire transfer or check to such account as BarCap designates. Each Counterparty shall promptly notify BarCap of any objection in respect of any invoice received by such Counterparty. Each Counterparty may withhold any invoiced amounts to which such Counterparty objects in good faith, pending resolution of such objection (provided, that such Counterparty shall (i) provide notice of any such objection within its applicable Pay Period and (ii) timely pay all undisputed amounts). If a Counterparty fails to pay any undisputed amount by the end of its applicable Pay Period, such Counterparty shall be obligated to pay BarCap, in addition to the amount due, interest at an interest rate of 1-1/2% per month over the Prime Rate (as defined in each TSA), compounded monthly, accruing from the date the payment was due through the date of actual payment.

8.    Effect on TSA and APA and other Agreements between the Parties. Except as otherwise expressly amended herein, (a) each of the TSAs shall expire in accordance with its terms and any terms of the TSAs stated to survive such expiration shall so survive (provided that Section 9.10 of each TSA is replaced by Sections 14 and 16 hereof), (b) the APA and the Disclaimer Agreement, as applicable, shall remain in full force and effect, provided that this Amendment shall not be construed to grant (i) any additional rights to any applications, data or services to LBHI or the Trustee or (ii) any rights to any other entity to receive or use any applications, data or services. For the avoidance of doubt, the respective indemnification provisions of the LBI TSA and LBHI TSA shall survive their respective terminations in accordance with their terms, but shall not apply to this Amendment or Access hereunder.

9.    Term. Subject to Section 10, the initial term of this Amendment will be from the Execution Date until September 22, 2015. Upon expiration of such initial term, this Amendment shall automatically renew for successive one-year periods; provided however, that each party shall have the ability to (i) terminate for breach pursuant to Section 10(a), or (ii) in its sole discretion, not renew the Amendment as to itself by providing written notice to all other parties

7

as to which this Amendment is then in effect at least sixty (60) days prior to the expiration of the then-current term.  For the avoidance of doubt, BarCap may elect not to renew with respect to one or both Counterparties.

10.    <u>Termination.</u>

a)    In the event of a material breach of this Amendment by a Counterparty or BarCap, BarCap or a Counterparty, as applicable, may (reserving cumulatively all other remedies and rights at law and in equity) terminate this Amendment, in whole or in part, by giving the breaching party thirty (30) days' prior written notice (such thirty (30) days, measured from receipt of such notice) of termination thereof; <u>provided</u>, that such termination will not be effective if such breach is curable and the breaching party has cured such breach prior to the expiration of such thirty (30) day notice period (except, in the case of any failure to pay any Access Charges, cured such breach within five (5) days after the breaching party received notice of the breach).

b)    Any termination or expiration of this Amendment in respect of a Counterparty and BarCap shall not cause a termination or expiration of this Amendment in respect of the other Counterparty and BarCap.  Sections 1(g), 1(k), 2(c), 3, 4, 5, 7, 8, 10, 11, 12, 13, 16, 17, 18, 19, 20, 21 and paragraph 5 of <u>Schedule B</u> and paragraph 3(d) of <u>Schedule C</u>, shall survive any termination or expiration of this Amendment.

11.    <u>Governing Law; Submission to Jurisdiction.</u>

a)    This Amendment (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction, except to the extent that the laws of the State of New York are superseded by SIPA (in the case of the Trustee) or the Bankruptcy Code (in the case of either Counterparty).

b)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Amendment and to decide any claims or disputes which may arise or result from, or be connected with, this Amendment, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 13</u> hereof; <u>provided</u>, that if the LBI Case or the Chapter 11 Cases have been closed or the Bankruptcy Court abstains from or determines that it does not have jurisdiction, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim

or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

c)      Each of the parties hereto hereby consents to process being served by any party to this Amendment in any suit, action or proceeding arising or relating to this Amendment by delivery of a copy thereof in accordance with the provisions of Section 13.

12.   Reservation of Rights.

a)      Nothing in this Amendment shall (i) bind, be collateral estoppel, res judicata or otherwise prejudice any matter in the Chapter 11 Cases or in the LBI Case (other than the matters expressly addressed in this Amendment and the performance thereof); (ii) impair or modify the rights and remedies of BarCap (or any Affiliate of BarCap) or any defenses of the Trustee, LBI or any of the Chapter 11 Debtors (as defined below) or their Affiliates in respect of any claims that have been asserted, or may be asserted, by BarCap (or any Affiliates of BarCap) against LBI (or the Trustee as trustee for LBI), the debtors in the Chapter 11 Cases (the "**Chapter 11 Debtors**"), their respective present or former Affiliates, or any third parties, with respect to any matter (other than the matters expressly addressed in this Amendment and the performance thereof) in the Chapter 11 Cases or in the LBI Case, and for the avoidance of doubt, all rights of BarCap and its Affiliates to (A) seek the dismissal, denial or other relief with respect to the Rule 60 Motions and/or dismissal or other relief in connection with the Adversary Proceedings, or (B) seek enforcement of the Sale Order and secure delivery of any allegedly undelivered assets thereunder, including without limitation, pursuant to the Enforcement Motion, are hereby reserved; (iii) impair or modify any rights and remedies of the Trustee, LBI or any of the Chapter 11 Debtors or any defenses of BarCap or its Affiliates in respect of or arising out of any claims that have been asserted, or may be asserted against BarCap (or any Affiliates of BarCap), and related recoveries, including, for the avoidance of doubt, (A) any claims and recoveries that are the subject of, related to or arise out of one or more of the Rule 60 Motions, (B) any claims that are the subject of, related to or arise out of any of the Adversary Proceedings, or (C) any claims relating to claimed shortfalls in LBI's compliance with customer protection rules.

b)      This Amendment is not intended to waive the attorney work product protection or any privilege with respect to any Data, Tapes or Boxes.  Notwithstanding anything herein to the contrary, nothing in this Amendment will limit any rights any party or other entity may have to possession of and access to books and records, in each case under a court order, its investigatory or subpoena powers, or (in the case of the Trustee) under the LBI Order, or otherwise, or limit any rights, obligations or defenses of any party or other entity under Section 8.7 of the APA or Section 9.03 of each TSA, or any other agreement, or preclude any party or other entity from asserting any defenses or objections to any such rights or powers that any party or other entity may have the right to assert or limit the rights of any party or other entity to seek discovery under the applicable rules and court orders in connection with pre-litigation investigations, contested matters and/or adversary proceedings, in each case, outside the scope of this Amendment; provided, that each Counterparty acknowledges that the foregoing is not

9

intended to permit any party or any of its Affiliates to assert any such rights or powers for the purpose of avoiding or in an effort to avoid the provisions of this Amendment (including Access Charges) where BarCap is providing (or has provided) the relevant Access.

13.    Notices.  Except as set forth in Section 1, all notices, requests, claims, demands and other communications relating to this Amendment shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 13):  (a) in the case of LBHI, to Lehman Brothers Holdings Inc., 1271 Sixth Avenue, New York, NY, 10020, Attention:  Martha Solinger with a copy to Mark Kindy c/o Lehman Brothers Holdings Inc., 1271 Sixth Avenue, New York, NY, 10020; (b) in the case of the Trustee, to James W. Giddens, Trustee for the Liquidation of Lehman Brothers Inc. under the Securities Investor Protection Act, 100 Wall Street, 17th Floor, New York, NY 10005, Attention: Arthur Ainsberg; and (c) in the case of BarCap, to Barclays Capital Inc., Attention: Head of Commercial Legal Team, 745 Seventh Avenue, New York, NY 10019 with a copy to Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attention:  Lindsee P. Granfield and Leonard C. Jacoby.

14.    Assignment.  Neither this Amendment nor either TSA, notwithstanding anything to the contrary in Section 9.10 of each TSA, may be assigned by (a) any Counterparty without the express written consent of BarCap or (b) BarCap without the express written consent of each Counterparty (which consent shall in each instance only apply in respect of such Counterparty). Notwithstanding the foregoing, (i) the Trustee may assign this Amendment to a successor trustee appointed pursuant to SIPA, (ii) LBHI may assign this Amendment to a single successor or Affiliate pursuant to a chapter 11 plan with the written consent of BarCap, which consent shall not be unreasonably withheld, and (iii) BarCap may assign this Amendment without the prior written consent of any Counterparty in connection with any merger, consolidation, reorganization, or sale of substantially all of the assets relating to the Business, provided that such assignee agrees in writing to be bound by the terms and conditions of this Amendment (including as it relates to the rights granted to, and obligations of, each Counterparty referenced herein).  Notwithstanding the foregoing, nothing in this provision shall be deemed to affect any prior assignments of either TSA made in accordance with the respective provisions thereof.

15.    Superseding Provisions.  BarCap shall not be required hereunder to take any action (including by providing any Access) that would constitute, or that BarCap reasonably believes would constitute, (i) a violation of applicable law, including any requirement of any Governmental Body, the Bankruptcy Code and the orders of the Bankruptcy Court and, in the case of the Trustee, specifically including SIPA, (ii) a breach of BarCap's contractual obligations, or (iii) any other violation of a third party's rights; provided, that in each of the foregoing circumstances, BarCap shall so notify the applicable Counterparty in writing of the impediment and the parties shall use commercially reasonable efforts to work around the impediment promptly so as to enable BarCap (if such impediment were removed) to provide Access and otherwise perform its obligations under this Amendment in a manner that does not violate applicable law, contractual obligations or third party rights.

10

16.     <u>Third Party Beneficiaries</u>.  This Amendment is for the sole benefit of the parties hereto and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Amendment.  Notwithstanding the foregoing, BarCap's Affiliates are expressly acknowledged to be third-party beneficiaries of this Amendment, and BarCap shall cause its Affiliates to comply with the terms and conditions of this Amendment.

17.     <u>Regulatory Approval and Compliance</u>.  Each party hereto shall be responsible for its own compliance with any and all laws applicable to its performance under this Amendment; <u>provided</u>, that the parties shall, subject to reimbursement of out-of-pocket expenses by the requesting party, cooperate and provide one another with all reasonably requested assistance (including the execution of documents and the provision of relevant information) required by the requesting party to ensure compliance with all applicable laws in connection with any regulatory action, requirement, inquiry or examination related to this Amendment or the Access.

18.     <u>Further Assurances</u>.  Each party hereto covenants and agrees that, without any additional consideration, it shall execute and deliver any further legal instruments and perform any acts that are or may become reasonably necessary to effectuate this Amendment.

19.     <u>Entire Agreement</u>.  Except as expressly set forth herein, this Amendment, together with the provisions of the TSAs, the Disclaimer Agreement, the Bill Gordon Letter, the APA, and the LBHI DAA referenced or incorporated herein, constitute the entire agreement and understanding between the parties hereto in respect of its subject matter and supersedes all prior understandings, agreements, and representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof or the transactions contemplated hereby.

20.     <u>Enforcement</u>.  The parties agree that irreparable damage may result, and that the parties may not have any adequate remedy at law, if any of the provisions of this Amendment were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached.  It is accordingly agreed that if either party breaches its obligations under this Amendment, the non-breaching party shall be entitled to seek equitable relief, in addition to all other remedies available to the parties at law or in equity as a remedy for any such breach or threatened breach.

21.     <u>Miscellaneous</u>.  If any term, provision or part of this Amendment is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of this Amendment will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.  Headings in this Amendment are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.  Unless the context requires otherwise, in any part of this Amendment (a) "including" and any of its derivative forms (e.g. "includes") means including but not limited to, (b) use of the singular imports the plural and vice versa, and (c) any reference to "days" means calendar days.  Except for the waiver provisions in Sections 2 and 11(b) of this Amendment, a waiver of rights under this Amendment will not be effective unless it is in a separate writing and signed by an authorized representative of the party that is waiving the rights.  At no time will any failure or delay on the part of any

party in exercising any right or remedy provided in this Amendment operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.  The waiver by any party of any breach shall not prevent a subsequent exercise of such right or be deemed a waiver of any subsequent breach of the same or any other provision of the Amendment.  No amendment (including any modification or supplement) to this Amendment, or any part thereof, will be valid unless it is in writing and signed by authorized representatives of all Counterparties as to which this Amendment is then in effect. Each party has participated in the negotiation and drafting of this Amendment and if an ambiguity or question of interpretation should arise, this Amendment shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions and any of this Amendment.

22.    Signatures.  This Amendment may be executed in one or more counterparts, all of which, with respect to a particular document, shall be considered one and the same instrument and an original.  An electronic copy of a signature received in Portable Document Format (PDF) or a copy of a signature received via a fax machine shall be deemed to be of the same force and effect as an original signature on an original executed document.

The undersigned parties have caused this Amendment to be executed by their respective duly authorized representatives.

**BARCLAYS CAPITAL INC.**

By: _____
    Name: IAN LOWITT

    Title: MANAGING DIRECTOR


**JAMES W. GIDDENS, AS TRUSTEE FOR THE LIQUIDATION OF LEHMAN BROTHERS INC. UNDER THE SECURITIES INVESTOR PROTECTION ACT**


By: _____
    Name:

    Title:


**LEHMAN BROTHERS HOLDINGS INC.**


By: _____
    Name:

    Title:

[SIGNATURE PAGE TO TSA AMENDMENT NO. 1]

The undersigned parties have caused this Amendment to be executed by their respective duly authorized representatives.

**BARCLAYS CAPITAL INC.**

By: _____

      Name:

      Title:

**JAMES W. GIDDENS, AS TRUSTEE FOR THE LIQUIDATION OF LEHMAN BROTHERS INC. UNDER THE SECURITIES INVESTOR PROTECTION ACT**

By: HUGHES HUBBARD & REED LLP, Counsel to the Trustee

By: *Ellen Friedenberg*

      Name: Ellen Friedenberg

      Title: Partner and Authorized Signatory

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

      Name:

      Title:

[SIGNATURE PAGE TO TSA AMENDMENT NO. 1]

The undersigned parties have caused this Amendment to be executed by their respective duly authorized representatives.

**BARCLAYS CAPITAL INC.**


By: _____
Name:

Title:


**JAMES W. GIDDENS, AS TRUSTEE FOR
THE LIQUIDATION OF LEHMAN
BROTHERS INC. UNDER THE
SECURITIES INVESTOR PROTECTION
ACT**


By: _____
Name:

Title:


**LEHMAN BROTHERS HOLDINGS INC.**


By: _Steven J Cohn_
Name: STEVEN COHN

Title: Senior Vice President

## EXHIBIT 1

*Glossary of Defined Terms*

a)      "<u>Adversary Proceedings</u>" shall mean, collectively, those cases proceeding before the Bankruptcy Court under case numbers Adv. Pro. 09-01732 (JMP), Adv. Pro. 09-01731 (JMP) and 09-01733 (JMP).

b)      "<u>Affiliate</u>" means, with respect to any party, any person or entity that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such party.  For the purposes of this definition, "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise; <u>provided</u> that such other entity shall no longer be deemed an Affiliate once such control ceases.

c)      "<u>Authorized Requestor</u>" shall mean those individuals set forth on <u>Schedule A</u> hereto, as amended from time to time in accordance with Section 1(b).

d)      "<u>BarCap Request Team</u>" means those persons identified by BarCap as being members of the BarCap Request Team from time to time.

e)      "<u>Business</u>" has the meaning set forth in the APA.

f)      "<u>Disclaimer Agreement</u>" shall mean that certain Letter Agreement re: Disclaimer in respect of Information Provided to the Trustee between the Trustee and BarCap dated July 10, 2009.

g)      "<u>Effective Date</u>" shall mean, <u>provided</u> that the Approval Order has been entered, (i) with respect to the Trustee, March 16, 2011, and (ii) with respect to LBHI, March 22, 2011.

h)      "<u>Enforcement Motion</u>" shall mean the Motion of BCI to Enforce the Sale Order and Secure Delivery of All Undelivered Assets, dated as of January 29, 2010 (docket entry 6814 in the Chapter 11 Cases and docket entry 2581 in the LBI Case), together with any other pleadings filed or otherwise submitted by BarCap in support thereof.

i)      "<u>Governmental Body</u>" shall mean any government or governmental, regulatory, judicial or administrative body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

j)      "<u>LBHI DAA</u>" shall mean that certain Letter Agreement regarding data access and services provided under the LBHI TSA between Lehman Brothers Holdings Inc. and BarCap dated September 18, 2009.

14

k)      "<u>Loss</u>" shall mean any and all losses, liabilities, claims, damages or expenses together with, documented, out-of-pocket expenses, including reasonable attorney fees.

l)      "<u>Post-Close Data</u>" shall mean any data created after 8:00 AM September 22, 2008 and contained in or on any Tape, Box, or Data.

m)      "<u>Rule 60 Motions</u>" shall mean the motions of the Trustee, LBHI and the Official Committee of Unsecured Creditors of LBHI for relief pursuant to Fed. R. Civ. P. 60 or otherwise with respect to the Sale Orders, comprised of (i) docket entries 5148, 5149, 5150, 5151, 5154, 5156, 5169, 5170, 5171, 5172, and 5173 in the Chapter 11 Cases, and (ii) docket entries 1682, 1683,1684, 1685, 1686, 1687, 1688, 1689, and 1702 in the LBI Case.

n)      "<u>Sale Order</u>" shall mean, collectively, (i) that certain Order Under 11 U.S.C. Sections 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, entered by the Bankruptcy Court on September 20, 2008 at Docket Item 258 in Case No. 08-13555 (JMP), and (ii) that certain Order Approving and Incorporating by Reference for the Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings, Inc. Chapter 11 Proceeding, entered by the Bankruptcy Court on September 20, 2008 at Docket Item 69 in Case No. 08-1420 (JMP).

o)      "<u>Supplier</u>" shall mean, collectively (i) the Tape Suppliers and (ii) each Applicable Copy Supplier, as defined in <u>Schedule B</u> or <u>C</u>, as applicable.

**Schedule A**

**Authorized Requestors**

**LBHI Authorized Requestors**

Mark Kindy
Henna Saleem
Alexander Ong
Leonard Cohen
Jeremy Tilsner
Savvas Mavridis

**Trustee Authorized Requestors**

Arthur Ainsberg
Gina Greer
Felicia Sokalski
Todd Scarpino
Michael McCabe
Carol Tannous

**Schedule B**

**Tapes**

1.    (a) Each requesting Counterparty has, or will have, directly entered into an agreement with Trusted Data Solutions, LLC ("**TDS**") and/or eMag Solutions, LLC (collectively with TDS and any alternative tape supplier identified pursuant to the last sentence of this paragraph 1(a) and agreed between the parties, "**Tape Suppliers**" and each, a "**Tape Supplier**"), for the purpose of having each Tape Supplier provide analysis of and/or copy records contained on Tapes (such analysis and/or copying, "**Data Services**"). In the event that neither TDS nor eMag can satisfactorily perform the Data Services, the parties will cooperate in good faith to identify an alternative tape supplier of similar quality who can satisfactorily perform the Data Services.

(b) Tapes are or will be located at the facilities of Iron Mountain Information Management, Inc. ("**Iron Mountain**") and/or Vital Records Inc. ("**VRI**, and together with Iron Mountain, "**Tape Storage Vendors**").

(c) Except as set forth in clause (d) below, each Counterparty requests BarCap to have Iron Mountain (or such other vendor as BarCap and Counterparties may subsequently agree in writing (each of Iron Mountain and any such other vendor, the "**Transportation Provider**")) conduct the delivery and return transport of Tapes to and from Iron Mountain's facilities and the Tape Suppliers' facilities (instead of having a Tape Supplier conduct such transport) because it considers such Transportation Provider to be a vendor of sufficiently high quality and reputation in relation to such transport and has determined that the Transportation Provider provides better transport security and efficiency than either Tape Supplier.

(d) For Tapes located at VRI that a Counterparty has requested to be made available to TDS ("**VRI-Located TDS-Processed Tapes**"), each Counterparty has selected TDS to conduct the retrieval and return transport of such Tapes to and from VRI's facility and TDS's facility because each Counterparty has determined this to be a more secure and efficient transport procedure than having the Transportation Provider conduct such transport.

2.    Upon a Counterparty's request made in accordance with this Amendment, and subject to the approval (which may be by electronic mail) of the applicable Tape Supplier with whom Counterparty has entered into an agreement for Data Services (the "**Applicable Tape Supplier**"), BarCap will instruct (a) VRI to make the requested Tapes available for pick up by TDS at VRI's facility for VRI-Located TDS-Processed Tapes where TDS is the Applicable Tape Supplier, or (b) for all other Tapes, the Transportation Provider to deliver the requested Tapes to the Applicable Tape Supplier.

3.    After BarCap provides an instruction described in Section 2 above, the requesting Counterparty shall cause the Applicable Tape Supplier to take temporary custody of such Tapes (and, in the case of VRI-Located TDS-Processed Tapes where TDS is the Applicable Tape Supplier, retrieve such Tapes) solely for the purpose of providing the permitted Data Services to the requesting Counterparty.  Each Counterparty agrees to cooperate with BarCap in the event that any issues arise in respect of an Applicable Tape Supplier's custody of any Tapes, including without limitation by taking reasonable steps to enforce, or aid in the

enforcement, of (i) such Counterparty's agreement with the Applicable Tape Supplier and/or (ii) BarCap's custody agreement with such Applicable Tape Supplier.

4.   Unless BarCap expressly agrees to an alternative time period, each Counterparty shall use commercially reasonable efforts to (i) for VRI-Located TDS-Processed Tapes, cause TDS to return the Tapes to VRI, or (ii) for all other Tapes, cause such Tape Supplier to make such Tapes available for return transport by the Transportation Provider, in each case within forty-eight (48) hours of the Applicable Tape Supplier completing the Data Services performed in respect of any individual Tape and, in any event, within the period identified in the table below as from the date the Applicable Tape Supplier obtains custody of the Tapes:

| Total No. of Tapes[1] | Total No. of Days |
|---|---|
| < 100 | 3 |
| 100-249 | 4 |
| 250-499 | 8 |

5.   Without limiting Section 3 of this Amendment, each Counterparty and its Representatives (as defined in the LBI TSA or LBHI DAA, as applicable) shall not cause any Applicable Tape Supplier to breach the custody agreement between BarCap and such Applicable Tape Supplier. Further, each Counterparty will cooperate with BarCap to take reasonable steps to cause such Applicable Tape Supplier to comply with the custody agreement between BarCap and such Applicable Tape Supplier.

---

[1] Total number of Tapes released to Supplier on a single calendar day.

**Schedule C**

**Boxes**

1.  Box Requests**.**  When a Counterparty submits any request for any Box(es), it shall specify in such request the email address, physical address and contact details of the requesting individual(s) at such Counterparty.  Such request shall also specify whether the Counterparty prefers access to such Boxes pursuant to the (i) "On Site" procedures set forth in Section 2 below, or (ii) the "Third Party Copy Supplier" procedures set forth in Section 3 below.

2.  On Site Procedures.  Where a Counterparty specifies "On Site" access to Boxes in its Request:

a)   Upon receipt of Counterparty's request, made in accordance with this Amendment, Barclays shall arrange for the individual(s) requesting review of such Boxes to gain access to either BarCap's midtown Manhattan or Jersey City, New Jersey facility where such Boxes are located, or such other BarCap facility as mutually agreed upon by BarCap and the requesting Counterparty (each facility, a "**BarCap Site**").  Counterparty shall be notified when the requested Boxes are available for review at the pertinent BarCap Site.

b)   Counterparty shall be permitted to copy and/or scan original Boxes at any BarCap Site, and BarCap shall ensure that each BarCap Site includes resources and equipment for the review and copying of Boxes.  If a Counterparty seeks to scan Boxes, such Counterparty shall be solely responsible for supplying the requisite resources and equipment to facilitate scanning at the pertinent BarCap Site.  For the avoidance of doubt, under no circumstance shall BarCap be obligated to permit a Counterparty to utilize its networks in connection with its review.

c)   BarCap is entitled to have a BarCap representative present while a Counterparty reviews original Boxes.  When "On Site" review is specified, neither Counterparty shall be permitted to remove any original Boxes from any BarCap Site.

d)   Once a Counterparty notifies BarCap that it has completed its review of the Boxes, BarCap shall coordinate the return of the Boxes to its archive, located at the facility of Iron Mountain or another vendor of BarCap or any of its Affiliates (each, a "**Box Storage Vendor**").

3.  Third Party Copy Supplier Procedures.  Where a Counterparty specifies "Third Party Copy Supplier" Access to Boxes in its request, and the Third Party Process is followed, such Counterparty hereby agrees as follows:

a)    Upon receipt of Counterparty's request, made in accordance with this Amendment, subject to the approval (which may be by electronic mail) of the applicable Supplier with whom Counterparty has entered into an agreement for copying (the "**Applicable Copy Supplier**"), BarCap will arrange for Boxes to be made available at a BarCap Site.

b)    After BarCap makes such arrangements contemplated by Section 3(a), the requesting Counterparty shall cause the Applicable Copy Supplier (i) to retrieve such Boxes from the applicable BarCap Site (unless a Transportation Provider is used to transport, as described below) and (ii) take temporary custody of such Boxes solely for the purpose of providing the permitted copying to the requesting Counterparty.  Each Counterparty agrees to cooperate with BarCap in the event that any issues arise in respect of an Applicable Copy Supplier's custody of any Boxes, including without limitation by taking reasonable steps to enforce, or aid in the enforcement, of (x) such Counterparty's agreement with the Applicable Copy Supplier and/or (y) BarCap's custody agreement with such Applicable Copy Supplier.

c)    The requesting Counterparty shall use commercially reasonable efforts to cause the Applicable Copy Supplier to (i) return such Boxes to such BarCap Site as designated by BarCap or (ii) if a Transportation Provider is used to transport (as described below), make such Boxes available for pick-up by such Transportation Provider, in each case as reasonably required by BarCap and generally in accordance with the Applicable Copy Supplier's custody agreement with BarCap.

d)    Without limiting Section 3 of this Amendment, each Counterparty and its Representatives (as defined in the LBI TSA or LBHI DAA, as applicable) shall not cause any Applicable Copy Supplier to breach the custody agreement between BarCap and such Applicable Copy Supplier. Further, each Counterparty will cooperate with BarCap to take reasonable steps to cause such Applicable Copy Supplier to comply with the custody agreement between BarCap and such Applicable Copy Supplier.

4.  **Possible Transport by Transportation Provider.**  Upon the request of a Counterparty and at BarCap's sole option, the transportation of Box(es) between such location as BarCap may designate and an Applicable Copy Supplier may be conducted by Iron Mountain or another Transportation Provider.  Both Counterparties acknowledge that no such transportation may occur until BarCap or one of its Affiliates has entered into an agreement with the applicable Transportation Provider for such transportation acceptable to BarCap.  Each Counterparty hereby agrees that it considers Iron Mountain and each other Transportation Provider upon which the parties may agree in writing to be a vendor of sufficiently high quality and reputation in relation to secure transportation of Boxes.  For the avoidance of doubt, BarCap has no obligation to use any Transportation Provider for any transportation described in this paragraph.

**Schedule D**

**<u>Costing Methodology</u>**

**<u>General Methodology</u>:**

Access charges for "standard" requests will be based on the following costing framework.  To the extent there are larger Access projects being contemplated where it is likely that external vendors will be used, the requesting Counterparty may seek to treat such project as "non-standard" and shall so notify BarCap.  BarCap has no obligation to act on any "non-standard" request until the costing methodology for such "non-standard" request has been agreed upon by BarCap and the requesting Counterparty.  In the absence of such Counterparty request, all requests will be treated as "standard".

**<u>Definitions</u>**

"**<u>BarCap Personnel</u>**" means employees and/or onsite consultants/contractors of BarCap and/or any of its Affiliates.

"**<u>FTE Day</u>**" means eight (8) hours of time spent by one or more members of the BarCap Personnel.

"**<u>Request</u>**" means each individual request made by a Counterparty for Access.  For the avoidance of doubt, (a) if a Counterparty makes more than one Request related to the same subject matter, each such Request shall be counted as a separate Request and (b) a single Request that simultaneously requests BarCap to (i) perform file mapping and (ii) either (A) extract the Data that is the subject of such file mapping or (B) retrieve the Tapes from which such Data can be extracted, shall be treated as a single Request.

**<u>Costing Framework for Standard Requests - Electronic Data and Tapes</u>:**

1.   $2,500 per FTE Day per Request, billed in full FTE Day increments ($2,500), with a minimum of one (1) FTE Day billed per Request, even if less than a full FTE Day is worked for such Request.

2.   No charge for requests requiring *de minimis* BarCap Personnel time, consistent with past practice.

3.   Actual vendor costs, as incurred, for any other services including off-site third-party personnel, transport and recovery, copying of electronic materials, mainframe, software and/or hardware, postage and/or delivery charges.

21

**Costing Framework for Standard Requests - Boxes:**

1.   The Access Charges for Boxes shall include both:

   a)   Per Box Charge (includes retrieval/refiling charges, transportation and handling, BarCap labor for Box handling); and

| Retrieval – Regular | Retrieval – Rush | Refile |
|---|---|---|
| $7.50 | $9.00 | $5.50 |

   b)   Per Order Charge (includes delivery and pick-up charges, BarCap labor for order handling)

| Retrieval – Regular | Retrieval – Rush | Refile |
|---|---|---|
| $32.50 | $121.00 | $23.00 |

2.   Chaperoning at BarCap Site (requires 24-hour advance notice) - $150 per hour with a 4 hour minimum.

3.   Copier click rate (self-service use of designated copiers only) - $0.05 per copy.

4.   Actual vendor costs as incurred for any other services including copy of hardcopy records.

**Costing Framework for Standard Requests – SME's:**

1.   No charge for an SME request that only requires a *de minimis* amount of such SME's time consistent with past practice.

2.   $2,000 per FTE Day per Request, billed in full FTE Day increments ($2,000), with a minimum of one (1) FTE Day billed per Request, even if less than a full FTE Day is worked for such Request.

*********************************

All costs for Access as set out above will be subject to an inflationary increase annually in the month of March at a rate equal to the increase in the Consumer Price Index for all Urban Consumers (CPI-U) US City Average All Items from the prior year over the index value of such prior year, expressed as a percentage.

For the avoidance of doubt, neither BarCap nor any of its Affiliates has any obligation to pay for any fees, costs, expenses or other obligations related to the provision of any services by any Supplier or Transportation Provider under this Amendment including without limitation any fees, costs, expenses or other obligations related to any Data Services, or services by an Applicable Copy Supplier or Transportation Provider.  All such fees, costs, expenses and other obligations shall be borne solely by the Counterparty that requested such services and BarCap

22

shall not be liable for any payment or reimbursement of any kind related thereto.  To the extent a Counterparty elects to have a Supplier or Transportation Provider provide services with respect to any Boxes or Tapes, each Counterparty agrees to promptly reimburse BarCap for any and all fees, costs, expenses and other obligations that BarCap may incur in making such Boxes or Tapes available, including the Per Box Charge (as set forth in 1(a) of this <u>Schedule D</u>) and Per Order Charge (as set forth in 1(b) of this <u>Schedule D</u>) and any out-of-pocket fees or costs BarCap or any of its Affiliates may be charged by any Tape Storage Vendor, Box Storage Vendor or Transportation Provider in connection with this Amendment (including any fees for retrieval and/or transport of Boxes and/or Tapes).