Objection Deadline: March 16, 2011 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: March 23, 2011 at 10:00 a.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
:
**In re**                                              :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,           :        **08-13555 (JMP)**
:
**Debtors.**             :        **(Jointly Administered)**
:
-----------------------------------------------------------------x

**NOTICE OF MOTION OF BNC MORTGAGE LLC PURSUANT**
**TO SECTIONS 105(a), 363 AND 503 OF THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO (I) ENTER INTO**
**INTERCOMPANY SERVICES AGREEMENT WITH AURORA BANK FSB, AND**
**(II) REIMBURSE AURORA BANK FSB FOR CERTAIN ADMINISTRATIVE EXPENSES**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of
BNC Mortgage LLC ("BNC," together with its affiliated debtors in the above-referenced chapter
11 cases, as debtors and debtors in possession, the "Debtors"), pursuant to sections 105(a), 363,
and 503 of title 11 of the United States Code and Rule 6004 of the Federal Rules of Bankruptcy
Procedure (the "Bankruptcy Rules") for authorization to (i) enter into intercompany services
agreement with Aurora Bank FSB ("Aurora"), and (ii) reimburse Aurora for certain
administrative expenses, all as more fully described in the Motion, will be held before the
Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy
Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,
New York 10004 (the "Bankruptcy Court"), on **March 23, 2011 at 10:00 a.m. (Prevailing**
**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall
be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy
Court for the Southern District of New York, shall set forth the name of the objecting party, the
basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court
electronically in accordance with General Order M-242 (which can be found at
www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by
all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),
WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon: (i) the Chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq., and (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Evan Fleck, Esq., and Dennis O'Donnell, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; so as to be so filed and received by no later than **March 16, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: March 2, 2011
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                  :

In re                            :       Chapter 11 Case No.
                                  :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :      **08-13555 (JMP)**
                                  :

               **Debtors.**       :       **(Jointly Administered)**
                                  :

---------------------------------------------------------------x

**MOTION OF BNC MORTGAGE LLC PURSUANT
TO SECTIONS 105(a), 363 AND 503 OF THE BANKRUPTCY CODE
AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO (I) ENTER INTO
INTERCOMPANY SERVICES AGREEMENT WITH AURORA BANK FSB, AND
(II) REIMBURSE AURORA BANK FSB FOR CERTAIN ADMINISTRATIVE EXPENSES**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        BNC Mortgage LLC ("BNC")[1] and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively

with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

---

[1] BNC was originally organized under the laws of Delaware as a corporation under the name "BNC
Mortgage, Inc."  On or about January 13, 1998, BNC changed its corporate form from a corporation to a
limited liability company under the name "BNC Mortgage LLC."  BNC is still referred to as "BNC
Mortgage Inc." in those states in which it is registered to conduct business under its former name.

**Preliminary Statement**

1.       BNC is a wholly-owned subsidiary of Aurora Bank FSB ("Aurora").[2] Aurora is a wholly owned subsidiary of Lehman Brothers Bancorp Inc., a wholly owned non-debtor subsidiary of Lehman Brothers Holdings Inc.   Historically, BNC was the Lehman enterprise's primary originator of residential subprime mortgage loans with branch offices located throughout the country.  BNC operated as a mortgage wholesaler – it did not deal with borrowers directly, but instead offered residential mortgage loans through a network of third party mortgage brokers (the "Brokers").

2.       As a result of the collapse of the subprime lending market in late 2007, Lehman determined to wind down BNC's business.  By the time it filed its chapter 11 case on January 9, 2009 (the "BNC Commencement Date"), BNC had no employees and no ongoing business.  It did, however, retain significant legacy obligations with respect to its former operations.  These obligations include maintaining certain loan origination files and maintaining certain employee records and human resources files, as well as liability for certain representation and warranty claims on residential mortgage loans originated prior to 2004.

3.       BNC's primary remaining asset is an intercompany receivable that it holds from Aurora (the "Receivable").  The Receivable originated during the winding up of BNC's businesses and is comprised of amounts that were transferred to Aurora from BNC's legacy bank accounts, certain tax benefits that BNC had accrued prior to the wind down, and other miscellaneous funds.  As of the BNC Commencement Date, the amount of the payable was $17,184,322.16.

---

[2] Aurora Bank FSB was formerly known as Lehman Brothers Bank, FSB.  The name change occurred on April 27, 2009.

4.      During the interval between the decision to wind down of BNC's businesses in 2007 and the BNC Commencement Date, Aurora, as BNC's direct parent, managed the wind down and provided the services necessary for BNC to comply with its legacy obligations.  These services generally included reviewing and responding to requests for loan documents from various federal and state agencies in connection with litigation against certain of the Brokers, providing releases or requesting corrections where BNC erroneously appears on local property records or the MERS record, retaining local counsel and managing litigation where BNC was directly named in state court litigation, closing down BNC's former offices (including subleasing office space and disposing of furniture and fixtures), addressing various issues relating to BNC's former employees, overseeing the retention of BNC's loan and employment files at third party document storage facilities, and other back-office type services.  Aurora's general practice, prior to the BNC Commencement Date, had been to deduct its direct cost for these services from the Receivable.

5.      The commencement of BNC's chapter 11 case did not eliminate BNC's obligations with respect to many of the above-described activities.  In particular, state and federal authorities have continued to contact Aurora with respect to their ongoing investigations and litigations involving the Brokers, costs have continued to be incurred with respect to document management and storage, and certain back-office tasks such as reviewing and responding to BNC correspondence have continued to be required.  Aurora has continued to provide these services, notwithstanding the fact that BNC's bankruptcy has prevented it from seeking reimbursement from the Receivable.

6.      The Debtors believe that these services are essential to the administration of BNC's chapter 11 case, and also recognize that Aurora, which is a regulated entity, cannot be

expected to continue to provide such services without a formal mechanism for reimbursement.

Accordingly, Alvarez & Marsal North America ("A&M"), the Debtors' restructuring advisors,

and Aurora began discussions in the fall of 2010 with respect to formalizing the arrangement

between BNC and Aurora.  After several months of negotiation, those discussion resulted in that

certain Intercompany Services Agreement (the "ISA") between and among BNC and Aurora.  A

copy of the ISA in substantially final form is attached hereto as Exhibit A.

7.    The ISA sets forth the terms under which Aurora will continue to provide

the Services (as defined below) and establishes a mechanism for A&M oversight over the

Services and the costs and expenses incurred by Aurora with respect thereto.

8.    Further, as discussed in greater detail below, the costs and expenses

incurred by Aurora (the "Post-Petition Expenses") in connection with its provision of certain

services to BNC in the period between the BNC Commencement Date and the effective date of

the ISA were actual and necessary expenses of the administration of BNC's chapter 11 case and,

accordingly, Aurora is entitled to payment with respect thereto as an administrative expense,

which will be effected by a reduction of the Receivable.

## Background

9.    Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), the Debtors commenced with this Court voluntary cases

under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors'

chapter 11 cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

10.     On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

11.     On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

12.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. The Examiner filed its report with the Court on March 11, 2010 [Docket No. 7531].

13.     On January 25, 2011, the Debtors filed their First Amended Joint Chapter 11 Plan [Docket No. 14150] and the Disclosure Statement to the Debtors' First Amended Joint Chapter 11 Plan [Docket No. 14151].

14.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

15.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

16.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Debtors request approval of the ISA and authorization for BNC to perform its obligations thereunder.

The Debtors also request authority, pursuant to section 503 of the Bankruptcy Code, to reimburse Aurora for the Post-Petition Expenses by reduction of the Receivable. Finally, the Debtors request a waiver of the 14-day stay provided by Bankruptcy Rule 6004(h).

17.    Aurora projects that the total cost for the Services will be $1,131,955 for 2011, $260,074 for 2012, $196,456 for 2013, $146,261 for 2014, $102,390 for 2015, and $115,861 for 2016.[3]  A summary of Aurora's cost estimate is attached hereto as Exhibit B.  The largest component of the costs, by a significant margin, is attributable to the Iron Mountain Plan (as defined below).  In particular, during the first year of the Iron Mountain Plan, Aurora expects to incur significant expenses in connection with the completion of an inventory of all of BNC's mortgage loan documents held by Iron Mountain – a necessary prerequisite to the formulation of a plan for the storage and destruction of such documents.  After 2011, the vast majority of the expenses are expected to continue to be in connection with the retention and destruction of documents held by Iron Mountain.  These projected costs have not undergone the A&M Review (as defined below) and, accordingly, may be reduced.

## The ISA

18.    The ISA is intended to formalize Aurora's provision of the Services and to allow Aurora to be compensated with respect thereto.  As described below in more detail, A&M will maintain oversight of the Services and the amounts for which Aurora seeks reimbursement. The ISA will also ensure that BNC is able to continue to discharge its responsibilities with respect to responding to document requests from federal and state agencies, updating MERS and

---

[3] The projected costs for the Services contained in the preceding sentence have been prepared for illustrative purposes.  The actual costs for the Services may vary depending on the Services that are actually provided by Aurora to BNC.

other property records, and overseeing the retention and secure destruction of BNC's loan and

employment files, in compliance with applicable law.

19.    Pursuant to the ISA, Aurora has agreed to provide BNC with the following

services (collectively, the "Services"):

| | |
|---|---|
| ***Legal / Compliance*** | Aurora will provide BNC with legal representation in the prosecution or defense of actions, the negotiation and preparation of contracts and other documents, the filing of policies and forms, governmental relations, advising on regulatory compliance and rendering opinions, in each case, subject to Court approval where appropriate and in consultation with BNC's bankruptcy counsel. |
| ***Iron Mountain Plan*** | Aurora will continue to maintain BNC's loan files at a third party storage facilities operated by Iron Mountain, Inc. ("Iron Mountain").  Aurora will work with Iron Mountain to inventory all of BNC's documents, develop a retention plan in compliance with applicable law, and provide for the secure destruction of BNC's documents, as appropriate (the "Iron Mountain Plan"). |
| ***Systems and Operations*** | Aurora will provide the administration, management and control of BNC's electronic records. |
| ***Humans Resources / Employee Benefits*** | Aurora will maintain BNC's human resource and personnel records which are delivered to Aurora for a period of three years from delivery and will comply with applicable laws with respect to confidentiality and use of such information. |
| ***General Back Office, Administrative and Corporate*** | Aurora will (i) process mail addressed to BNC, (ii) provide document support services, (iii) respond to inquiries from servicers, customers, attorneys, MERs and others, requesting direction regarding current or last known ownership of loans originated by BNC, (iv) withdraw or cancel LLC filings, (v) update MERS records, and (vi)  facilitate document preparation and execution. |
| ***Due Diligence / Claims Processing*** | In consultation with A&M, Aurora will perform due diligence investigations in connection with proofs of claim filed against BNC in connection with BNC's chapter 11 case. |
| ***Incidental Services*** | Aurora will perform all other services incidental to the Services as A&M, on behalf of BNC, shall reasonably request. |

20.    The following is a summary[4] of the other salient terms of the ISA:

| | |
|---|---|
| ***Compensation of Aurora*** | Aurora will invoice BNC for Aurora's direct costs and expenses incurred in connection with the provision of the Services.  Aurora will not make a profit on the Services, but will instead merely be seeking reimbursement for such amounts, including a pro-rated portion of the employee benefits of the Aurora employees providing the Services. |
| ***Compensation Procedures*** | At the beginning of each month, the Cost Oversight Committee[5] will provide the A&M Committee with a report setting forth an estimate of the total amount of disbursements and direct out-of-pocket costs and expenses incurred in connection with the provision of the Services by Aurora during the preceding month, and the total Employee Service Charges for such month (the "Proposed Expense Amount"). |

The A&M Committee will then have fifteen days to notify the Cost Oversight Committee of any disagreements with the Proposed Expense Amount.

If the A&M Committee objects to the Proposed Expense Amount, the A&M Committee and Aurora will attempt in good faith to resolve such disagreement and, if such disagreement is not resolved within 15 days, either party will have the right to submit the determination to an independent accountant whose decision will be final.

If the A&M Committee does not object to the Proposed Expense Amount, or if the independent accountant determines that Aurora is due the Proposed Expense Amount or some portion thereof, Aurora is authorized to deduct such Proposed Expense Amount or portion thereof, as applicable, from the Receivable.

(The review process described herein shall be referred to as the "A&M Review")

| | |
|---|---|
| ***The Receivable*** | The Cost Oversight Committee will provide the A&M Committee with a report showing activity in, and the remaining balance of, the Receivable each month. |
| ***Preservation of BNC's Books and Records*** | To the extent that such records are in Aurora's possession as of the Effective Date, Aurora will maintain and preserve records and files related to BNC's origination of mortgage loans for a period of five years from the date such loans were sold to third parties.  Such records may include data related to |

---

[4]  The contents of this summary are qualified entirely by the terms of the ISA.  In case of any conflict between the summary and the ISA, the terms of the ISA shall govern.

[5] Capitalized terms that are used herein, but not defined, have the meanings ascribed to them in the ISA.

the origination and underwriting process, hard copy or imaged files of origination documents, or evidence of the sale of the loan to a third party.

| | |
|---|---|
| ***Term / Termination*** | The ISA will continue until the earlier of (i) completion of the Services, or (ii) termination by Aurora or BNC upon the material breach by the other party of any term hereof, which breach remains uncured for a period of 10 days.  If the ISA is terminated, Aurora must reasonably cooperate with BNC in obtaining an alternative service provider and transitioning the Services to such alternative service provider. |
| ***Indemnification*** | BNC agrees to indemnify and hold harmless Aurora and its directors, officers, agents and employees from and against any and all Costs that may be imposed on, incurred by, or asserted against it or them in any way relating to or arising out of the ISA or any action taken or not taken by it or them hereunder unless such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements were imposed on, incurred by or asserted against Aurora because of the breach by Aurora of its obligations hereunder, which breach was caused by gross negligence, lack of good faith or willful misconduct on the part of Aurora or any of its directors, officers, agents or employees. The foregoing indemnification obligations survive the termination of the ISA, but cannot exceed the Receivable. |

## Approval of the ISA
## Is in the Best Interests of the Debtors and Their Estates and Creditors

21.    Ample authority exists for approval of the ISA.  Section 363 of the

Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §

363(b)(1).  While section 363 of the Bankruptcy Code does not set forth a standard for

determining when it is appropriate for a court to authorize the sale, disposition or other use of a

debtor's assets, courts in the Second Circuit and others, in applying this section, have required

that it be based upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*,

973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must

find from the evidence presented a good business reason to grant such application); *Comm. of*

*Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)

(same).

22.     The Debtors entered into the ISA in the exercise of their sound business judgment and with a reasonable basis.  The Services are essential to the administration of BNC's chapter 11 case.  While bids from third parties with respect to the provision of the Services were not solicited, the Debtors believe that terms of the ISA are fair and reasonable for the following reasons: (i) Aurora has agreed to provide the Services at cost – it will merely pass along its out-of-pocket costs and direct expenses to BNC, and (ii) Aurora personnel are already very familiar with BNC and its business – indeed some are former BNC employees – and such institutional knowledge allows greater efficiency and efficacy, which is ultimately more cost-effective to BNC's estate.

23.     It is, therefore very unlikely that BNC could obtain the Services from a third party on comparable terms.  Further, since Aurora has already been providing the Services, BNC will not be saddled with transition expenses or experience a period of interruption or delay while a third party gets up to speed.  Finally, the A&M Review will ensure that there is oversight over the Services and Aurora's reimbursement in connection therewith.  For all the foregoing reasons, entry into the ISA represents an exercise of the BNC's sound business judgment, is in the best interests of BNC's estate and creditors, and should be approved.

## The Post Petition Services

24.     As discussed above, Aurora has continued to provide certain services and to pay certain expenses that were essential to the administration of BNC's estate following the BNC Commencement Date.  These services (collectively, the "Post Petition Services") can roughly be divided into four categories:

- ▪ <u>Iron Mountain Storage</u>.  Includes the actual costs charged by Iron Mountain for access, storage and destruction of the 83,420 boxes containing BNC's loan and personnel files.

- ▪ <u>Legal Administration</u>.  Includes (i) responding to requests from state and federal agencies for BNC documents in connection with litigation against the Brokers and otherwise; (ii) reviewing, responding and, where appropriate, taking remedial action in connection with requests from third parties for corrections to the MERS or other property records; (iii) reviewing and responding to BNC correspondence, and (iv) coordinating with outside counsel with respect to state court litigation where BNC is a named defendant.

- ▪ <u>Master Servicing</u>.  In situations where BNC is still the master servicer of record for a particular loan, master servicing includes responding to inquiries from borrowers or other parties and identifying and communicating with the relevant subservicer.

- ▪ <u>Regulatory Affairs</u>.  Includes taking certain actions to comply with BNC's obligations under the various state and local business licensing schemes in states in where BNC formerly conducted its businesses.

25.    The Post-Petition Expenses, which Aurora incurred in connection with the

Post Petition Services, are as follows:

| Service | 2009 | 2010 | Total |
|---|---|---|---|
| Iron Mountain Storage | $182,218.01 | $219,392.04 | $401,610.05 |
| Legal Administration | $30,455.88 | $30,455.88 | $60,911.76 |
| Master Servicing | $17,187.48 | $20,121.59 | $37,309.07 |
| Regulatory Affairs | $0.00 | $2,250.00 | $2,250.00 |
| Outside Counsel | $0.00 | $2,374.36 | $2,374.36 |
| Total: | $231,870.37 | $276,603.87 | $504,455.24 |

**Treatment of the Post-Petition Expenses**
**As Administrative Expenses Is Justified Because the Post-Petition**
**<u>Expenses Were Actual and Necessary Costs and Expenses of Preserving BNC's Estate</u>**

26.    Section 503(b)(1)(A) of the Bankruptcy Code defines an administrative

expense as "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C.

§503(b)(1)(A).  Congress enacted the administrative expense provision to induce creditors to

continue their business relationship with the debtor for the purpose of facilitating the

rehabilitation of a debtor's business "for the benefit of all the estate's creditors."  *Trustees of*

*Amalgamated Insurance Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 953 (1st Cir. 1976)).

27.     The Second Circuit has developed a stringent test under which "'an expense is administrative only if it arises out of a transaction between the creditor and the . . . debtor in possession, and only to the extent that the consideration supporting the claimant's right to payment was *both supplied to and beneficial to the debtor-in-possession in the operation of the business*.'"   *In re Bethlehem Steel Corp.*, 479 F.3d 167, 172 (2d Cir. 2007) (quoting *McFarlin's*, 789 F.2d at 101) (emphasis added).

28.     "[I]nclusion of the words 'actual' and 'necessary' in section 503(b)(1)(A) requires that the estate receive a 'real benefit from the transaction.'"   *In re Enron Corp.*, 279 B.R. 79, 86 (Bankr. S.D.N.Y. 2002).  The "actual" requirement obligates the moving party to demonstrate "actual use of the creditor's property by the debtor-in-possession."  *Id.*  (citing *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 36 (Bankr. N.D.N.Y. 1989)).   In order to be considered beneficial to the debtor-in-possession in the operation of its business, the purported benefit must have been "a 'concrete, actual benefit' conferred, and not simply a 'potential' benefit contingent on a future event."  *In re Refco, Inc.*, 2008 WL 140956 *6 (S.D.N.Y. 2008) *affirmed on appeal* 331 F.App'x. 12, 13 (2d Cir. 2009).

29.     As discussed above, Aurora provided the Post Petition Services directly to BNC, at BNC's request, and for BNC's benefit.  Had Aurora not provided the Post Petition Services, BNC would have been unable to assist the Federal and State Agencies with their investigations, would have been unable to comply with its obligations with respect to its loan and personnel files, and would have created significant impediments for homeowners and other parties with interests in real properties where BNC was erroneously listed in the property

records.  For these reasons, BNC's decision to pay Aurora for its direct expenses incurred in

connection with the Post Petition Services is in the best interest of its estate and creditors and

represents a reasonable exercise of its business judgment.  Moreover, rather than seek payment in

cash, Aurora has agreed to effect payment for the Post-Petition Expenses through reduction of

the Receivable, conferring further benefit on BNC's estate.

### Other Deductions from the Receivable

30.    Subsequent to the BNC Commencement Date and prior to the date hereof,

the Receivable was reduced by $295,246.36, to its current balance of $16,889,075.80.[6]  In

connection with their review of the Receivable during the negotiation of the ISA, the Debtors

have determined that certain amounts were erroneously deducted from the Receivable in the

confusion following the BNC Commencement Date (the "Post-Petition Deductions").  The

majority of the Post-Petition Deductions relate to postpetition rent that BNC was required to pay

prior to the rejection of its leases and that Aurora paid on behalf of BNC and then deducted from

the Receivable.[7]  Certain of the Post-Petition Deductions, however, appear to relate to prepetition

activity or require further inquiry.  The Debtors and Aurora are in the process of reconciling

BNC's books and records and, to the extent that any of the Post-Petition Deductions were

improper, such Post-Petition Deductions will be reversed.  The Post-Petition Deductions are not

included in the defined term Post-Petition Expenses and are not the subject of the relief requested

in this Motion.

---

[6] This amount reflects certain credits that have been made to the Receivable following the BNC
Commencement Date.

[7] This Court entered an order approving the rejection of BNC's leases on February 24, 2009 [Docket No.
2914].

## Waiver of Bankruptcy Rule 6004(h)

31.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property…is stayed until expiration of 14 days after entry of the order, unless the Court orders otherwise."  Fed. R. Bank. P. 6004(h).  BNC's need for the Services is ongoing. Thus the sooner BNC is able to formalize its relationship with Aurora, the sooner both BNC and Aurora will have certainty with respect to Aurora's reimbursement for the Services. Accordingly, and in order to avoid any disruption in the Services, a waiver of the stay is requested.

## Notice

32.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) Aurora, and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635].  The Debtors submit that no other or further notice need be provided.

33.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated:  March 2, 2011
      New York, New York

                           /s/ Jacqueline Marcus
                           Jacqueline Marcus

                           WEIL, GOTSHAL & MANGES LLP
                           767 Fifth Avenue
                           New York, New York 10153
                           Telephone: (212) 310-8000
                           Facsimile: (212) 310-8007

                           Attorneys for Debtors
                           and Debtors in Possession

# EXHIBIT A
### (The ISA)

INTERCOMPANY SERVICES AGREEMENT


between


AURORA BANK FSB


and


BNC MORTGAGE LLC


Dated as of March [], 2011

INTERCOMPANY SERVICES AGREEMENT

AGREEMENT (this "Agreement") dated as of March [], 2011 by and between Aurora Bank FSB, a federal savings bank, and BNC Mortgage LLC, a Delaware limited liability company ("BNC").

WHEREAS, on January 9, 2009, BNC filed a voluntary petition for relief (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, BNC currently has no employees;

WHEREAS, BNC desires to obtain certain general back office and administrative support services, and other support services, in each case from or through Aurora, and Aurora desires to provide such services, either directly or through one or more of its subsidiaries;

WHEREAS, Aurora owes BNC a payable amounting to approximately $17,184322 in the aggregate as of January 9, 2009 (the "Payable"), and BNC has agreed to periodically reduce the Payable in accordance with the terms hereof as compensation for the Services to be provided by Aurora hereunder; and

WHEREAS, the parties hereto desire to set forth their agreement concerning such Services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties contained herein, the parties hereto agree as follows:

ARTICLE I.

DEFINITIONS

The following terms are defined as follows:

Agreement: has the meaning set forth in the preamble.

A&M: means Alvarez and Marsal.

A&M Committee: means a committee comprised of Arjun Lal, Ron Dooley, Steve Kotarba and such other appointees nominated by A&M from time to time.

Aurora: means Aurora Bank, FSB and each of its wholly-owned subsidiaries that provide Services hereunder, as the context requires.

Bankruptcy Code: has the meaning set forth in the preamble.

Bankruptcy Court: has the meaning set forth in the preamble.

BNC: has the meaning set forth in the preamble.

Chapter 11 Case: has the meaning set forth in the preamble.

Confidential Information: has the meaning set forth in Section 5.02.

Cost Oversight Committee: means a committee comprised of (i) Arjun Lal and (ii) Karen Tankersley, Bob Leist, Tracy McKinnell, Dale Fauss, Teresa Salerno and such other appointees nominated by Aurora from time to time.

Costs: means, with respect to any Person, any claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses of such Person.

Effective Date: means the date on which this Agreement is approved pursuant to an order of the Bankruptcy Court.

Employee Service Charges: means, in any given month during the Term, with respect to each applicable Aurora employee, (i) the percentage of such employee's time spent, in the course of performance of his or her duties as an employee of Aurora, performing the Services during such month, **multiplied by** (ii) such employee's gross monthly salary (excluding benefits) paid by Aurora, **multiplied by** (iii) 1.25 (to account for the cost of providing employee benefits).

Independent Auditor: has the meaning set forth in Section 2.03(d).

Iron Mountain Plan: means the plan to inventory, store and arrange for the destruction of BNC's files held by Iron Mountain Inc., in each case as appropriate and in compliance with applicable Laws.

Law: means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

Loan: means any loan to which the Services hereunder are applicable.

Monthly Expense Amount: means the monthly final expense amount determined in accordance with Section 2.03(c) and/or Section 2.03(d) (as applicable).

Payable: has the meaning set forth in the preamble.

Person: means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or

agency or political subdivision thereof or any other entity.

Plan: has the meaning set forth in Section 5.17.

Proposed Expense Amount: has the meaning set forth in Section 2.03(b).

Services: has the meaning set forth in Section 2.04.

Term: has the meaning set forth in Section 3.01.

ARTICLE II.

BNC'S ENGAGEMENT OF AURORA TO PERFORM
CERTAIN SERVICES; EFFECTIVE DATE; BOOKS AND RECORDS

Section 2.01 Engagement of Aurora.

(a)  Upon the Effective Date, BNC agrees to engage Aurora to perform certain Services (as defined in Section 2.04 hereof) in accordance with the terms and conditions herein set forth, and Aurora hereby agrees to perform and provide such Services in accordance with such terms and conditions.

(b)  Aurora covenants and agrees that all Services shall be performed or provided in accordance with all applicable Laws.

Section 2.02    Independent Contractor. Aurora shall at all times be engaged as an independent contractor, and not as an employee or agent of BNC. The parties acknowledge and agree that such an independent contractor relationship is hereby established and that neither party will hold itself out as able to contract for or in any way bind the other in any matter.

Section 2.03 Compensation of Aurora. (a)  BNC and Aurora hereby acknowledge and agree that (i) as compensation for the Services provided by Aurora hereunder, the Payable will be reduced on a monthly basis by the amount of the Monthly Expense Amount, as determined each month in accordance with Section 2.03(c) and/or Section 2.03(d) (as applicable), and (ii) the Payable shall also be reduced by any and all amounts approved by the A&M Committee and the Bankruptcy Court as compensation for the services provided by Aurora to BNC during the period from January 9, 2009 to the Effective Date.

(b)  No later than:

(i)    the fifth (5th) day of each month during the Term, the Cost Oversight Committee shall submit to the A&M Committee a report setting forth the Cost Oversight Committee's good faith estimate of the total amount of disbursements and direct out-of-pocket costs and expenses incurred or made in connection with the provision of the Services by Aurora during the preceding

month, and the total Employee Service Charges for such month (the "Proposed Expense Amount"), together with reasonable supporting documentation;

(ii) the twentieth (20th) day of each month during the Term, the Cost Oversight Committee shall submit to the A&M Committee a report showing activity in, and the remaining balance of, the Payable as of the end of the preceding month.

(c) The A&M Committee will have a period of fifteen (15) days following the delivery of the report setting forth the Proposed Expense Amount to notify the Cost Oversight Committee of any disagreements with such calculation. If no such notification of disagreement is given within such period, the Proposed Expense Amount shall be the Monthly Expense Amount. In the event the A&M Committee notifies the Cost Oversight Committee of any disagreement, any and all undisputed amounts shall be deducted from the Payable in accordance with Section 2.03(a). No disputed amount may be deducted from the Payable unless and until the dispute resolution mechanism in Section 2.03(d) is complied with and the amount to be deducted (if any) is finally determined in accordance therewith.

(d) In the event that the A&M Committee timely notifies the Cost Oversight Committee of its disagreement with any portion of the Proposed Expense Amount, A&M, on behalf of BNC, and Aurora may attempt in good faith to resolve such disagreement for a period of up to fifteen (15) days following the Cost Oversight Committee's receipt of the notification by the A&M Committee of such disagreement.  If within such 15 day period the parties are unable to resolve such disagreement, either A&M (on behalf of BNC), on the one hand, or Aurora, on the other hand, shall have the right to submit the determination of such matters to an independent accountant of national standing reasonably acceptable to A&M and Aurora (the "Independent Auditor"), whose decision shall be final, binding and non-appealable on the parties.   The parties shall instruct the Independent Auditor to render its reasoned written decision as promptly as practicable but in no event later than fifteen (15) days after its selection.  The cost of the Independent Auditor shall be borne equally by BNC and Aurora. Notwithstanding anything herein to the contrary, the dispute resolution mechanism contained in this Section 2.03(d) shall be the exclusive mechanism for resolving disputes regarding the Monthly Expense Amount, if any.

(e) In the event that the A&M Committee notifies the Cost Oversight Committee of its disagreement with any portion of the Proposed Expense Amount pursuant to Section 2.03(c), and Aurora and A&M, on behalf of BNC, mutually agree that such amount shall not be deducted from the Payable, the parties hereby acknowledge and agree that the specific Services (or portion thereof) corresponding to such amount shall be immediately terminated without further action by any party hereto, unless the parties mutually agree in writing that such Service shall continue to be provided hereunder.

Section 2.04   Services by Aurora. During the Term, Aurora shall perform or cause to be performed, the following services and such other support services as shall be reasonably requested from time to time by A&M on behalf of BNC (the "Services"):

(a)      Legal/Compliance.  As and to the extent requested by A&M on behalf of BNC,

Aurora shall provide legal representation, including, where appropriate, outside counsel, for BNC in the prosecution or defense of actions, the negotiation and preparation of contracts and other documents, the   filing of policies and forms, governmental relations, advising on regulatory compliance and rendering opinions, in each case, subject to Bankruptcy Court approval where appropriate and in consultation with BNC's bankruptcy counsel.

(b)    <u>Systems and Operations</u>. As and to the extent requested by A&M on behalf of BNC, Aurora shall provide the administration, management and control of BNC's electronic records. In connection therewith, Aurora shall use best efforts to ensure that all data transmitted via public telecommunications networks are secure, and in compliance with Gramm-Leach-Bliley, Safeguarding of Customer Information requirements where applicable, in that such data will be cryptographically coded by sender in conformance with applicable industry and regulatory standards. Aurora's systems used to perform the Services hereunder shall incorporate such safeguards as are reasonably necessary to protect the integrity and availability of the data of BNC for such regulatory purposes to which BNC may be subject.

(c)    <u>Human Resources/Employee Benefits</u>.  Aurora will maintain and preserve BNC's human resource and personnel records which are in Aurora's possession for the greater of (i) a period of three (3) years from the date of delivery to Aurora, and (ii) the period required by applicable Law. Aurora will comply with applicable Laws with respect to confidentiality and use of such information.

(d)    <u>General Back Office, Administration and Corporate</u>.  As and to the extent requested by A&M on behalf of BNC, Aurora shall:

(i)   provide support for receipt of mail addressed to BNC, including forwarding of items to last known servicer or owner of related loan.  If applicable, mail which cannot be identified will be discarded or destroyed following prior written notice to BNC.

(ii)  provide document support services, including, without limitation, printing, forms management, distribution, mailings and bulk handling.

(iii)  respond to inquiries from servicers, customers, attorneys, MERs and others, requesting direction regarding current or last known ownership of loans originated by BNC.

(iv) withdraw or cancel LLC filings.

(v)  implement the Iron Mountain Plan.

(vi) update MERS Records.

(vii)  facilitate document preparation and execution.

(e)    <u>Due Diligence</u>. Aurora will perform for or on behalf of BNC, as and to the extent requested by A&M on behalf of BNC, all due diligence investigations in connection with proofs of

claim filed against BNC in connection with the Chapter 11 Case, including requesting additional documentation from the claimant party.

(f)    <u>Incidental Services</u>.  Aurora shall perform for BNC such additional services as A&M shall reasonably request on behalf of BNC, from time to time.

Section 2.05 <u>Effectiveness</u>. This Agreement shall take effect on the Effective Date.

Section 2.06 <u>Books and Records</u>.

(a) Aurora shall maintain complete and accurate records with respect to the Services performed hereunder, including such records with respect to the Services as are required under applicable Law and BNC's contractual obligations.

(b)  To the extent that such records are in Aurora's possession as of the Effective Date, Aurora shall maintain and preserve records and files related to BNC's origination of mortgage loans for the greater of (i) a period of five (5) years from the date such loans were sold to third parties, and (ii) the period required by applicable Law.  Such records may include data related to the origination and underwriting process, hard copy or imaged files of origination documents, or evidence of the sale of the loan to a third party.

(c) Except as otherwise expressly set forth in this Agreement, Aurora shall retain the records described in paragraph (a) for the longer of (x) a period of three (3) years from the date of final payment under this Agreement and (y) the record retention period mandated under the Laws and regulations of the jurisdiction or regulatory bodies to which BNC is subject.

(d) Aurora and BNC agree that all records referred to in this Section 2.06 shall be subject to examination and audit as required by applicable Law. BNC shall have access to such records for purposes of examination and audit during normal business hours during the period in which Aurora is required by the terms of this Section 2.06 to maintain such records. Aurora will cooperate with BNC to gather, produce and provide access to any documents or records generated or maintained by Aurora in providing Services to BNC hereunder, in response to a court order or the request or order of any regulatory authority.

(e) All information contained in the records referred to in this Section 2.06 shall be subject to Section 5.02 (Non-Disclosure), and shall be used only in accordance with, and for purposes permitted by, applicable Laws, including Laws relating to rights of privacy, and this Agreement.

(f) Aurora acknowledges that BNC shall have the sole discretion as to who, other than Aurora, may be granted access to BNC's files, subject, however, to Aurora's reasonable needs to perform the Services hereunder and to operate in Aurora's normal course of business.

ARTICLE III.

TERM; TERMINATION, ANNUAL REVIEW

Section 3.01 <u>Term</u>. The term (the "<u>Term</u>") of this Agreement shall commence as of the Effective Date and continue until the earlier of (i) completion of the Services, or (ii) termination of this Agreement by Aurora or BNC in accordance with Section 3.02 hereof.

Section 3.02 <u>Termination</u>. Each party shall have the right to terminate this Agreement upon the material breach by the other party of any term hereof, which breach remains uncured for a period of ten (10) days, provided, that, in the event of any such termination, Aurora must reasonably cooperate with BNC in obtaining an alternative service provider and transitioning the Services to such alternative service provider.

Section 3.03   <u>Effect of Termination</u>.

(a) Upon the termination or expiration of this Agreement in accordance with this Article III, each party shall have no further responsibility to the other party under this Agreement except as provided in Section 3.03(b).

(b) The provisions of Sections 2.03, 2.06, 3.03, 5.03, 5.04, 5.06, 5.08, 5.09, 5.15, 5.16 and 5.17  of this Agreement shall survive the termination or expiration of this Agreement.

ARTICLE IV.

REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 4.01  <u>Representations and Warranties of Aurora</u>.

Aurora hereby makes the following representations and warranties to BNC:

(a)  <u>Due Organization and Authority</u>.  Aurora is a federally chartered savings bank, is duly organized, validly existing and in good standing in the jurisdiction of its formation and has all licenses necessary to carry on its business as now being conducted in each state where the nature of the property owned by it or the activities conducted by it require such licensing. Aurora has full power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement by Aurora and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of Aurora and all requisite action has been taken by Aurora to make this Agreement valid and binding upon Aurora in accordance with its terms.

(b)  <u>Ordinary Course of Business</u>.  The Services to be rendered by Aurora pursuant to the terms of this Agreement and all other transactions contemplated hereby are in the ordinary course of business of Aurora.

(c)  No Conflicts. Neither the execution and delivery of this Agreement by Aurora, nor the performance of its obligations hereunder, nor the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of Aurora's organizational or governing documents or any agreement or instrument to which Aurora is a party or by which Aurora or its assets or properties are bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any Law, order, judgment or decree to which Aurora or its property is subject, or impair the ability of Aurora to perform its obligations hereunder.

(d)  Ability to Perform. Aurora does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant of Aurora contained in this Agreement.

(e)  No Litigation Pending. There is no action, suit, proceeding or investigation pending or, to Aurora's knowledge, threatened against Aurora which, individually or in the aggregate, would be reasonably likely to impair materially the ability of Aurora to carry on its business substantially as now conducted or to perform under the terms of this Agreement.

(f)  No Consent Required. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by Aurora of or compliance by Aurora with this Agreement which has not been obtained.

(g)  No Commissions to Third Parties. Aurora has not dealt with any broker or agent or any other Person who might be entitled to a fee or commission in connection with this Agreement and the transactions contemplated hereby other than BNC.

Section 4.02 Representations and Warranties of BNC.

BNC hereby makes the following representations and warranties to Aurora:

(a) Due Organization and Authority. BNC is a limited liability company duly organized under the laws of the State of Delaware.  Subject to approval of the Bankruptcy Court of the terms and conditions hereof, BNC has the full corporate power and authority to execute and deliver this Agreement and to perform its obligations in accordance herewith; the execution, delivery and performance of this Agreement by BNC and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of BNC; and all requisite corporate action has been taken by BNC to make this Agreement valid and binding upon BNC in accordance with its terms.

(b)  No Conflicts. Subject to approval of the Bankruptcy Court of the terms and conditions hereof, neither the execution and delivery of this Agreement by BNC, nor the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement by BNC, will conflict with or result in a breach of any of the terms, conditions or provisions of BNC's charter or by-laws or similar governing documents or any agreement or instrument to which BNC is now a party or by which it is bound, or constitute a

default or result in an acceleration under any of the foregoing, or result in the violation of any Law, order, judgment or decree to which BNC or its property is subject.

(d)   <u>Ability to Perform</u>. BNC does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant of BNC contained in this Agreement.

(e)   <u>No Litigation Pending</u>. There is no action, suit, proceeding or investigation pending or, to BNC's knowledge, threatened against BNC which, individually or in the aggregate, would be reasonably likely to impair materially the ability of BNC to perform under the terms of this Agreement.

(f)   <u>No Consent Required</u>. Other than approval of the Bankruptcy Court, no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by BNC of or compliance by BNC with this Agreement.

(g)   <u>No Commissions to Third Parties</u>. BNC has not dealt with any broker or agent or any other Person who might be entitled to a fee or commission in connection with this Agreement and the transactions contemplated hereby other than Aurora.

ARTICLE V.

MISCELLANEOUS PROVISIONS

Section 5.01 <u>Costs</u>.

Except as otherwise expressly provided for herein, each party shall pay its own fees and expenses in connection with the preparation, execution and delivery of this Agreement, including without limitation all attorneys', accountants' and outside advisers' fees and disbursements.

Section 5.02   <u>Non-Disclosure</u>. All confidential information ("<u>Confidential Information</u>") disclosed hereunder or in connection with the Services shall remain the exclusive and confidential property of the disclosing party. The receiving party shall not disclose the Confidential Information of the disclosing party and will use at least the same degree of care, discretion and diligence in protecting the Confidential Information of the disclosing party as it uses with respect to its own confidential information. The receiving party will not use the Confidential Information for any purpose not specifically contemplated by this Agreement without the prior written consent of the disclosing party. The receiving party will limit access to Confidential Information to its employees with a need to know such Confidential Information and will instruct such employees to keep such information confidential. Notwithstanding the foregoing, the receiving party may disclose Confidential Information to the extent necessary to comply with any Law applicable to it, provided that, to the extent legally permissible, the receiving party notifies the disclosing party prior to any such disclosure. Upon the request of the disclosing party, the receiving party will return or destroy all Confidential Information of the disclosing party that is in its possession. The provisions of this Subsection 5.02 will survive the

termination of this Agreement.

Section 5.03 <u>Notices</u>.

All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given when sent by facsimile, registered mail, email or delivered personally (including, without limitation, delivery by any courier service), addressed as follows (or to such other address as may hereafter be furnished to the other party by like notice):

(a) if to BNC:

BNC Mortgage LLC
c/o Alvarez & Marsal North America, LLC
1271 Avenue of the Americas, 38th Floor
New York, NY 10020
Attn: Ron Dooley; Arjun Lal
Email: rdooley@alvarezandmarsal.com; alal@alvarezandmarsal.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Jacqueline Marcus
Email: jacqueline.marcus@weil.com
Facsimile: 212 310 8007

(b) if to Aurora:

Aurora Bank FSB
1271 Avenue of the Americas
46th Floor
New York, NY  10020
Attn:  Chief Legal Officer
Facsimile: 866-662-5792

Section 5.04  <u>Severability</u>.

Any part of or provision, covenant, representation or warranty set forth in this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining parts and provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable Law, the parties hereto waive any provision of

Law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part of or provision, covenant, representation or warranty set forth in this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

Section 5.05 Counterparts.

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 5.06 Governing Law; Jurisdiction

Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided, however, that if the Bankruptcy Court does not have or abstains from exercising such jurisdiction, the parties hereto agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court having jurisdiction over an appeal from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the laws of the State of New York, including all matters of construction, validity and performance, in each case without reference to any conflict of law principles that might lead to the application of the laws of any other jurisdiction, except to the extent that the laws of the State of New York are superseded by the Bankruptcy Code.

Section 5.07 Further Agreements.

BNC and Aurora each agree to execute and deliver to the other such additional documents, instruments or agreements, and to do such acts or things, as may be reasonably necessary or appropriate to effectuate the purposes of this Agreement.

Section 5.08 <u>General Indemnity</u>.

Each party shall be liable for and shall indemnify and hold harmless the other from and against any and all Costs arising out of or resulting from any grossly negligent or willful act or omission by or on behalf of the respective party resulting in any violation of this Agreement.

Section 5.09 <u>Indemnification by BNC</u>.

BNC agrees to indemnify and hold harmless Aurora and its directors, officers, agents and employees from and against any and all Costs that may be imposed on, incurred by, or asserted against it or them in any way relating to or arising out of this Agreement or any action taken or not taken by it or them hereunder unless such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements were imposed on, incurred by or asserted against Aurora because of the breach by Aurora of its obligations hereunder, which breach was caused by gross negligence, lack of good faith or willful misconduct on the part of Aurora or any of its directors, officers, agents or employees. The foregoing indemnification obligation shall survive any termination of this Agreement, and shall in no event exceed the Payable.

Section 5.10 <u>Successors and Assigns; Assignment of this Agreement</u>.

This Agreement shall bind and inure to the benefit of and be enforceable by Aurora and BNC and the respective successors and permitted assigns of Aurora and BNC. Neither BNC nor Aurora shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other party, and any attempted assignment in violation of this sentence shall be void.

Section 5.11 <u>Waivers</u>.

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced. No failure on the part of any party to exercise or delay in exercising any right hereunder shall be deemed a waiver thereof, nor shall any single or partial exercise preclude any further or other exercise of such right or any other right.

Section 5.12 <u>Exhibits</u>.

The exhibits to this Agreement are hereby incorporated herein by reference and made a part hereof and are an integral part of this Agreement.

Section 5.13 <u>General Interpretive Principles</u>.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be

deemed to include the other gender;

(b)  accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)   references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)  a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)  the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall be deemed to be followed by the phrase "without limitation".

Section 5.14 <u>Standard of Care</u>. In performing the Services hereunder, Aurora shall use the same standard of care as it uses or would use in performing similar services and functions for its own account.

Section 5.15 <u>Ownership of Certain Property</u>. If in connection with performing its obligations hereunder, Aurora shall be in possession of any mortgage loan files, servicing files, or mortgage loan, insurance or claim proceeds which are owned by BNC, all such files and funds shall be held by Aurora, at BNC's discretion, for the sole purpose of performing the Services pursuant to this Agreement, and are and shall be held in trust by Aurora for the benefit of BNC, and such retention and possession by Aurora shall be in a custodial capacity only. The ownership of each mortgage note, mortgage, and the contents of each mortgage loan file and servicing file shall be vested in BNC as the owner thereof and the ownership of all records and documents with respect to the related mortgage loans prepared by or which come into the possession of Aurora shall immediately vest in BNC as the owner thereof and shall be retained and maintained, in trust, by Aurora at the will of the owner thereof in such custodial capacity only. The portion of any mortgage loan file, servicing file, or mortgage loan, insurance or claim proceeds held or retained by Aurora pursuant to this Agreement shall be segregated from the other books and records and funds of Aurora and shall be appropriately marked to clearly reflect the ownership of the related mortgage loan by the owner thereof.

Section 5.16 <u>Limitation on Liability</u>. Neither Aurora nor any of its directors, officers, agents or employees, shall be liable for any action taken or omitted to be taken by it or them hereunder or in connection herewith in good faith and believed by it or them to be within the purview of this Agreement, provided that in no event shall such limitation of liability apply to the gross negligence or willful misconduct of Aurora. In no event shall any party hereto be held liable for any special or consequential damages hereunder, unless awarded to a third party.

     Section 5.17  <u>Availability of Payable</u>. The parties hereby acknowledge and agree that, in the event that BNC confirms a plan of liquidation or reorganization pursuant to chapter 7 or 11 of the Bankruptcy Code (the "<u>Plan</u>"), which provides for the return of the remaining balance of the Payable to BNC, they will cooperate in good faith to agree on an alternative mechanism for compensating Aurora for the Services.

(Signatures on following page)

IN WITNESS WHEREOF, Aurora and BNC have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

BNC MORTGAGE LLC (BNC)

By: _____

Name: _____
Title: _____

Aurora Bank FSB (Aurora)

By: _____

Name: _Karen Cornell-Tankersley_____
Title: _ Executive Vice President & General ___
          Counsel_

## **EXHIBIT B**
**(Cost Estimate)**

US_ACTIVE:\43555865\07\58399.0003

| Cost Components | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Totals |
|---|---|---|---|---|---|---|---|
| Iron Mountain Storage | $180,000 | $108,580 | $81,436 | $61,077 | $45,808 | $22,371 | $499,272.00 |
| Iron Mountain Destruction | $158,525 | $53,966 | $40,474 | $30,356 | $22,767 | $68,301 | $374,389.00 |
| Iron Mountain Inventory Project | $646,605 | $0 | $0 | $0 | $0 | $0 | $646,605.00 |
| Iron Mountain Time & Materials | $35,000 | $0 | $0 | $0 | $0 | $0 | $35,000.00 |
| Legal Admin Services | $30,456 | $25,888 | $21,319 | $15,228 | $9,137 | $6,091 | $108,119.00 |
| Master Servicing Support | $18,729 | $14,580 | $10,432 | $9,720 | $8,298 | $8,298 | $70,057.00 |
| Claims Administration | $8,640 | $5,760 | $4,320 | $2,880 | $2,880 | $0 | $24,480.00 |
| Outside Counsel | $54,000 | $51,300 | $38,475 | $27,000 | $13,500 | $10,800 | $195,075.00 |
| **Totals** | **$1,133,966.00** | **$262,086.00** | **$198,469.00** | **$148,275.00** | **$104,405.00** | **$117,877.00** | **$1,952,997.00** |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
                                                    :
In re                                               :        **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,        :        **08-13555 (JMP)**
                                                    :
                           **Debtors.**             :        **(Jointly Administered)**
                                                    :
---------------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a),**
**363 AND 503 OF THE BANKRUPTCY CODE AND BANKRUPTCY**
**RULE 6004 AUTHORIZING BNC MORTGAGE LLC TO (I) ENTER INTO**
**INTERCOMPANY SERVICES AGREEMENT WITH AURORA BANK FSB, AND**
**(II) REIMBURSE AURORA BANK FSB FOR CERTAIN ADMINISTRATIVE EXPENSES**

Upon the motion, dated March 2, 2011 (the "Motion"), of BNC Mortgage

LLC ("BNC") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their

non-debtor affiliates, "Lehman"), for authorization to enter into a and perform under that

certain Intercompany Services Agreement (the "ISA") with Aurora Bank, FSB

("Aurora"), pursuant to section 105(a), 363 and 503 of title 11 of the United States Code

(the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy

Procedure, all as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157

and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984

(Ward, Acting C.J.); and consideration of the Motion and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before

this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the

Motion having been provided to (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; and (iii) all other parties entitled to notice in accordance with the procedures

set forth in the second amended order entered on June 17, 2010 governing case

management and administrative procedures for these cases [Docket No. 9635]; and a

hearing (the "Hearing") having been held to consider the relief requested in the Motion;

and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates and creditors, and all parties in interest and that

the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that pursuant to sections 105(a) and 363 of the Bankruptcy

Code, the ISA is approved; and it is further

ORDERED that BNC is authorized to perform any and all of its

obligations under the ISA and to execute, deliver, implement and fully perform any and

all instruments, documents and papers and to take any and all actions reasonably

necessary or appropriate in connection with the implementation of the ISA, and perform

any and all obligations contemplated therein, including entering into any amendments to

the Agreement without further order from the Court, and all obligations of BNC

thereunder shall be deemed allowed administrative expense claims under section 503(b)

of the Bankruptcy Code against BNC; and it is further

ORDERED that the failure to specifically describe or include any

particular provisions of the ISA shall not diminish or impair the effectiveness of such

provision, it being the intent of the Court that BNC is authorized to perform under the

ISA in its entirety; and it if further

ORDERED that pursuant to sections 105(a), 363(b)(1) and 503 of the

Bankruptcy Code, BNC is authorized, but not directed, to effect payment of $504,455.24

to Aurora in full and final satisfaction of the Post Petition Services through a reduction of

the Receivable;[1] and it is further

ORDERED that, notwithstanding Rule 6004(h) of the Federal Rules of

Bankruptcy Procedure, this Order shall take effect immediately; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order; and it is further

Dated: _____, 2011
         New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

---

[1] Capitalized terms that are used herein, but not defined, have the meanings ascribed to them in the Motion.