CFN # 105554465, OR BK 40964 Page 784, Page 1 of 30, Recorded 11/28/2005 at
10:11 AM, Broward County Commission, Deputy Clerk 3270

EXECUTION COPY

**LEHMAN BROTHERS INC.,**

-and-

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

-and-

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED**

-and-

**MERRILL LYNCH CAPITAL SERVICES, INC.**

-and-

**NAHTEF BOND FUND I – 2005, L.P.**

SUBORDINATION AGREEMENT

Dated as of November 10, 2005

PREPARED BY AND UPON RECORDATION RETURN TO:

Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue
New York, New York 10103

Attention: Al Sawyers, Esq.

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 785, Page 2 of 30

## SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT (this "**Agreement**") made as of the [10th] day of November, 2005 by and among Merrill Lynch Capital Services, Inc., and Merrill Lynch, Pierce, Fenner & Smith Incorporated, each having an office at 250 Vesey Street, North Tower, World Financial Center, 9th Floor, New York, New York 10281 ("**MLPFS**" as holder of the Series A Bonds and "**MLCS**" as a party to the Merrill Swap Agreement), Lehman Brothers Inc. and Lehman Brothers Special Financing Inc., each having an office at 745 Seventh Avenue, 4th Floor, New York, New York 10019 (collectively, "**Lehman**"), and NAHTEF Bond Fund I – 2005, L.P., having an office at 2895 Ella Lane, Minnetonka, Minnesota 55305 ("**NAHTEF**" and collectively with Lehman, the "**Subordinate Lenders**").

### W I T N E S S E T H :

WHEREAS, the Capital Trust Agency (the "**Issuer**") is issuing the following series of bonds (together, the "**Bonds**"):

Multifamily Housing Revenue Bonds (Brittany Bay Apartments, Waterman's Crossing Apartments, Mariner's Pointe Apartments, Brampton Court Apartments, Village Lakes Apartments), Series A in the aggregate principal amount of $62,030,000 (the "**Senior Bonds**") pursuant to that certain Indenture of Trust of the Issuer dated as of November 1, 2005 (as amended and supplemented from time to time, the "**Indenture**"); and

Multifamily Housing Revenue Bonds (Brittany Bay Apartments, Waterman's Crossing Apartments, Mariner's Pointe Apartments, Brampton Court Apartments, Village Lakes Apartments), Subordinate Series B in the aggregate principal amount of $20,680,000 (the "**Subordinate Series B Bonds**"), Subordinate Series C in the aggregate principal amount of $20,680,000 (the "**Subordinate Series C Bonds**") and Subordinate Series D in the aggregate principal amount of $1,915,000 (the "**Subordinate Series D Bonds**" and collectively, with the Series B Bonds and the Series C Bonds, the "**Subordinate Bonds**") pursuant to the Indenture.

WHEREAS, the Issuer is loaning the proceeds of the Senior Bonds and the Subordinate Bonds to AHF – Bay Fund, LLC (the "**Borrower**"), the sole member of which is Atlantic Housing Foundation, Inc., a South Carolina nonprofit corporation, pursuant to a Loan Agreement dated as of November 1, 2005, between the Issuer and the Borrower (as amended from time to time, the "**Loan Agreement**") to acquire certain multifamily housing projects (the "**Project**") as more particularly described on Exhibit A hereto; and

WHEREAS, the Issuer, U.S. Bank National Association (the "**Trustee**" or "**Senior Trustee**" in its capacity as Trustee under the Senior Mortgage Documents (as defined below) or "**Subordinate Trustee**" in its capacity as Trustee under the Subordinate Mortgage Documents (as defined below)), and Borrower have entered into that certain Land Use Restriction Agreement, dated as of November 1, 2005 (the "**LURA**"), pursuant to which the Borrower is obligated to fulfill certain covenants to maintain the exemption from taxation of interest on the Bonds; and

DOCSNY1:1164781.6
41535-45 KPM/KFM

CFN # 105554465, OR BK  40964  PG  786,  Page  3 of 30

WHEREAS, the obligations of the Borrower under the Indenture, the Loan Agreement and the LURA with respect to the Senior Bonds (such obligations are referred to herein as the "**Senior Obligations**") are evidenced by that certain Promissory Note of the Borrower in the principal amount of $62,030,000, dated November 1, 2005 (the "**Project Senior Note**" or "**PSN**") and are secured by that certain First Mortgage, Security Agreement and Fixture Filing, dated as of November 1, 2005, executed by the Borrower in favor of the Issuer and assigned to the Trustee which conveys security title to the Project as security for the Borrower's obligations under the PSN (the "**Senior Bond Mortgage**") as more particularly described in Exhibit B-1 annexed hereto (collectively with the PSN, the Senior Mortgage, certain other documents executed in connection therewith, and the Indenture, the Loan Agreement and the LURA with respect to the Senior Obligations, the "**Senior Bond Mortgage Documents**"); and

WHEREAS, MLCS and the Borrower have entered into that certain ISDA Master Agreement, Schedule and Credit Support Annex thereto and Confirmation thereunder, each dated as of November 10, 2005, and that certain Master Financing Agreement dated as of November 1, 2005, as amended from time to time (collectively, the "**Merrill Credit Agreement**" and collectively, the "**Merrill Swap Agreement**" ), which is secured, in part, by that certain Second Mortgage, Security Agreement and Fixture Filing, dated as of November 1, 2005, executed by the Borrower in favor of MLCS which conveys security title to the Project as security for the Borrower's obligations under the Merrill Credit Agreement (the "**Merrill Credit Agreement Mortgage**") as more particularly described in Exhibit B-2 annexed hereto (collectively with the Merrill Credit Agreement Mortgage, certain other documents executed in connection therewith and the Merrill Credit Agreement, the "**Merrill Credit Agreement Mortgage Documents**") covering the Project; and

WHEREAS, the obligations of the Borrower under the Indenture, the Loan Agreement and the LURA with respect to the Subordinate Bonds (such obligations are referred to herein as the "**Subordinate Obligations**") are evidenced by the certain Promissory Notes of the Borrower in the principal amounts of $20,680,000, $20,680,000, and $1,915,000, each dated as of November 1, 2005 (collectively, the "**Project Junior Notes**" or "**PJN**") and are secured, in part, by that certain Third Mortgage, Security Agreement and Fixture Filing, dated as of the November 1, 2005 and that certain Fifth Mortgage, Security Agreement and Fixture Filing, each dated as of the Closing Date, executed by the Borrower in favor of the Issuer which conveys security title to the Project as security for the Borrower's obligations under the PJN (the "**Subordinate Bond Mortgages**") as more particularly described in Exhibit C-1 annexed hereto (collectively with the PJN, the Subordinate Mortgage, certain other documents executed in connection therewith, and the Indenture, the Loan Agreement and the LURA with respect to the Subordinate Obligations, the "**Subordinate Bond Mortgage Documents**") covering the Project; and

WHEREAS, Lehman and the Borrower have entered into that certain ISDA Master Agreement, dated as of November 1, 2005, Schedule and a Confirmation thereunder each dated as of November 10, 2005 (collectively the "**Lehman Swap Agreement**") which is secured, in part, by that certain Fourth Mortgage, Security Agreement and Fixture Filing, dated as of the November 1, 2005, executed by the Borrower in favor of Lehman Brothers Inc. which conveys security title to the Project as security for the Borrower's obligations under the Lehman Swap Agreement (the "**Lehman Swap Agreement Mortgage**" and together with the Subordinate

DOCSNY1:1164781.6
41535-45 KFM/KFM

Bond Mortgages, the "**Subordinate Mortgages**") and certain other documents executed in connection with said Lehman Swap Agreement Mortgage as more particularly described in Exhibit C-2 (collectively, together with certain other documents executed in connection therewith and together with the Lehman Swap Agreement, the "**Lehman Swap Agreement Mortgage Documents**") covering the Project; and

WHEREAS, the Senior Bond Mortgage, the Merrill Credit Agreement Mortgage, the Subordinate Bond Mortgages and the Lehman Swap Agreement Mortgage are being recorded in that order immediately prior to this Agreement in the counties in which the Project is located; and

WHEREAS, MLPFS, in its capacity as initial purchaser of the Senior Bonds, and MLCS (together, the "**Senior Lender**" (which shall include all successors and assigns of MLPFS and Merrill)) are unwilling to consent to Borrower entering into the Subordinate Bond Mortgage Documents or the Lehman Swap Agreement Mortgage Documents (collectively, the "**Subordinate Mortgage Documents**") unless the Subordinate Mortgage Documents are subordinated to the Senior Bond Mortgage Documents and the Merrill Credit Agreement Mortgage Documents (collectively, the "**Senior Mortgage Documents**") in the manner hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the Subordinate Lenders and the Senior Lender hereby agree as follows:

1)  The Subordinate Mortgage Documents are hereby, and shall continue to be, subject and subordinate in priority and payment to the lien of the Senior Mortgage Documents and all advances thereunder without regard to the application of such proceeds, together with all interest and all other sums due under the Senior Mortgage Documents and all of the terms, covenants and conditions of the Senior Mortgage Documents, and to any extensions, substitutions, modifications, amendments, renewals, refinancings, replacements and consolidations thereof; provided however so long as no Default Period is in effect, any (a) change to the term thereof, (b) increasing or, other than resulting from payment at stated maturity, decreasing of the stated principal amount of the Senior Mortgage Documents, or (c) change to the stated interest rate thereof, shall require the prior written consent of the Subordinate Lenders.

2)  From and after the date that a Subordinate Lender has received written notice that (a) amounts due and payable under the Senior Mortgage Documents have not been paid or (b) that a default exists under any of the Senior Mortgage Documents; and until notice from the Senior Lender (which notice, if requested by a Subordinate Lender, shall not be unreasonably withheld by Merrill if such default has been cured) has been given that no defaults exist under the Senior Mortgage Documents (such period of time is herein defined as a "**Default Period**"): (y) Subordinate Lenders will not ask for, demand, sue for, take, receive or retain, from Borrower, by setoff or in any other manner, payment of all or any part of any of the amounts evidenced and/or secured by the Subordinate Mortgage Documents or otherwise, and any such amounts (including, without limitation, any amounts received relating to title insurance) delivered to a Subordinate Lender shall be held in trust for the benefit of, and shall be paid over

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 788, Page 5 of 30

or delivered to Merrill in the form received by such Subordinate Lender within five (5) business days of such Subordinate Lender's receipt of such sums and (z) each Subordinate Lender agrees that all sums (including, without limitation, any amounts received relating to title insurance) held in, under, or in connection with any accounts created under the Indenture and the Lehman Swap Agreement, unless expressly provided for in the Indenture, shall in no event be applied against the obligations of Borrower to such Subordinate Lender without the prior written consent of Merrill, it being understood that at such time all such sums shall be held by such Subordinate Lender in trust for the benefit of the Senior Lender, and, upon the request of Merrill, shall be paid over or delivered to Merrill in the form received by such Subordinate Lender to be first applied to Borrower's obligations under the Senior Mortgage Documents and then to Borrower's obligations under the Subordinate Mortgage Documents. Other than during a Default Period, the Subordinate Lenders may collect and receive all payments required or permitted for it to collect and receive in accordance with the Subordinate Mortgage Documents, including, but not limited to, payments of interest and principal on the Subordinate Bonds or the Lehman Swap Agreement and payment from the Borrower for services, legal fees, taxes and assessments, or other expenses that the Subordinate Trustee is entitled for reimbursement under the terms of the Subordinate Mortgage Documents. Each Subordinate Lender hereby grants to Senior Lender a first lien on all amounts held in any accounts created under the Indenture and the Lehman Swap Agreement (including, without limitation, any amounts received relating to title insurance) which shall be held in trust for the benefit of Senior Lender and the Senior Trustee.

(a)     The Subordinate Lenders shall simultaneously send to Merrill notices of all defaults under the Subordinate Mortgage Documents and copies of all notices required to be delivered to the Borrower under the Subordinate Mortgage Documents. Notice under the Subordinate Mortgage Documents shall not be deemed effective until such notice has been sent in accordance with Paragraph 11 to Merrill. The Senior Lender shall have the right, but shall not have the obligation, to cure any such default within ten (10) days after the expiration of the applicable grace period permitted to the Borrower thereunder, if any, unless any such defaults with reasonable effort are incapable of being cured within any such period or unless no such period is provided, in which event the Senior Lender shall be entitled to a reasonable period of time to cure such defaults, provided the Senior Lender gives the Subordinate Lenders written notice of its intention to cure any such defaults within fifteen (15) days after the Senior Lender has received notice thereof and, provided further, that the Senior Lender diligently proceeds to commence and thereafter expeditiously and continuously proceeds to complete such cure.

(b)     The Subordinate Lenders shall not, without the prior written consent of Merrill, declare a default under the Subordinate Mortgage Documents or accelerate the indebtedness secured by the Subordinate Mortgage Documents or commence any action to foreclose the Subordinate Mortgages against the Project or file any motion or take any other action against the Project or the Borrower under any Subordinate Mortgage Documents or otherwise to enforce the Subordinate Mortgage Documents as a result of a default or otherwise until the earlier to occur of (i) payment in full of all sums due and owing pursuant to the Senior Mortgage Documents and (ii) acquisition by the Subordinate Lenders of all of the loans and obligations secured by the Senior Mortgage Documents. The Subordinate Lenders shall not, without the prior written consent of Merrill, accept any prepayment of principal or interest under the Subordinate Mortgage Documents; provided, however, that the Subordinate Lenders may

DOCSNY1:1164781.6
41555-45 KPM/KFM

CFN # 105554465, OR BK 40964 PG 789, Page 6 of 30

accept prepayment of principal or interest under the Subordinate Mortgage Documents without consent of the Senior Lender so long as (y) no Default Period is in effect and (z) (I) such payment is expressly permitted under the Loan Agreement or the Indenture after taking into account any required consents thereunder or (II) at least ten days prior to the date of such prepayment, the Subordinate Lenders have provided written notice to Merrill identifying the amount of the pending prepayment, the Project or Projects to which the prepayment relates and the proposed prepayment date.  Nothing contained in this Section 2(b) shall be construed as prohibiting the Subordinate Lenders from bidding the amount of indebtedness due from the Borrower to such Subordinate Lender as a credit in any foreclosure initiated by such Subordinate Lender, subject to the indebtedness secured by the Senior Mortgage Documents.

(c)    With respect to tenants of the Project which are not in arrears in the payment of rent or any other sums due under their respective leases, the Subordinate Lenders shall not without the prior written consent of Merrill name any tenant under a lease of the Project as a party defendant in any action or proceeding to foreclose either of the Subordinate Mortgages; nor will any other action be taken with respect to all or any portion of the Project, the effect of which would be to terminate any tenant of any portion of the Project whose payment of rent and any other sums due under the lease is current without the prior written consent of Merrill.

(d)    During any Default Period, the Senior Lender shall be entitled to take any action the Senior Lender deems necessary or appropriate without the consent of the Subordinate Lenders.  During any Default Period, the Subordinate Lenders shall not make any election or give any consent with respect to the Borrower, the Project or the Subordinate Mortgage Documents without the prior written consent of Merrill.  During any Default Period, at the request of the Senior Lender, the Subordinate Lenders shall consent to any action by or against the Borrower resulting from such declaration of a default, including, without limitation, the issuance of additional indebtedness by the Borrower and/or the sale of the Project to another entity, including, but not limited to, a for profit entity.  The Subordinate Lenders hereby agree that, upon the request of Merrill or the Senior Trustee, the Subordinate Lenders shall do, execute, acknowledge and deliver to Merrill or the Senior Trustee all and every such further acts, deeds, conveyances and instruments as Merrill or the Senior Trustee may request for the better assuring and evidencing of the foregoing consent.  During any Default Period, the Subordinate Lenders hereby expressly consent to and authorize the release by the Senior Lender or the Senior Trustee of all or any portion of the Mortgaged Property from the lien, operation, and effect of the Senior Mortgage Documents.  During any Default Period, the Subordinate Lenders hereby waive to the fullest extent permitted by law, all equitable or other rights they may have (i) in connection with any release of any portion of the Mortgaged Property, (ii) to require the separate sales of any portion of the Mortgaged Property or to require the Senior Lender to exhaust its remedies against any portion of the Mortgaged Property or any combination of portions of the Mortgaged Property or any other collateral, or (iii) to require the Senior Lender or the Senior Trustee to proceed against the Borrower, any other party (including any general partner of the Borrower if the Borrower is a partnership), any portion of the Mortgaged Property or combination of portions of the Mortgaged Property or any other collateral, before proceeding against all or such portions or combination of portions of the Mortgaged Property as the Senior Lender or the Senior Trustee determines.  During any Default Period, the Subordinate Lenders hereby expressly consent to and authorize, at the option of the Senior Lender, the sale, either separately or together, of all or

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 790, Page 7 of 30

any portion of the Mortgaged Property.  During any Default Period, the Subordinate Lenders acknowledge that without notice to the Subordinate Lenders and without affecting any of the provisions of this Agreement, the Senior Lender or the Senior Trustee may (i) extend the time for or waive any payment or performance under the Senior Mortgage Documents, and (ii) modify, exchange, surrender, release and otherwise deal with any additional collateral for the indebtedness evidenced by the Senior Mortgage Documents (the "**Senior Indebtedness**").

(e)    Concurrent with providing any notice of default or demand to post collateral to Borrower under the Merrill Credit Agreement Mortgage Documents, Merrill shall provide a copy of such notice to the Subordinate Lenders.  The Subordinate Lenders shall have the right to cure any such default for which money can cure such default or to post additional collateral demanded.  The Subordinate Lenders shall have the same current period of time to cure such default(s) as Borrower has pursuant to the Merrill Credit Agreement Mortgage Documents. The foregoing shall apply only to notices of default and rights to cure under the Merrill Credit Agreement Mortgage Documents and shall not apply or be deemed to apply to any defaults, notices or rights to cure under the Senior Bond Mortgage Documents.

(f)    (i)    If, after receiving the consent of Merrill, any action or proceeding shall be brought to foreclose either of the Subordinate Mortgages, no portion of the rents, issues and profits of the Project shall be collected except through a receiver appointed by the court in which such foreclosure action or proceeding is brought, after due notice of the application for the appointment of such receiver shall have been given to the Senior Lender and that the rents, issues and profits so collected by such receiver shall be applied first to the payment of maintenance of the Project, and then to the payment of principal and interest due and owing on the Senior Mortgage Documents prior to the payment, if any, of any principal or interest due and owing on the Subordinate Mortgage Documents.

(ii)    If, during the pendency of any such foreclosure action or proceeding, an action or proceeding shall be brought by the Senior Lender or the Senior Trustee for the judicial foreclosure of the applicable Senior Mortgage Documents, and an application is made by the Senior Lender or the Senior Trustee for an extension of such receivership for the benefit of the Senior Lender or the Senior Trustee, all such rents, issues and profits held by such receiver as of the date of such application shall be applied by the receiver solely for the benefit of the Senior Lender and the Senior Trustee, and the Subordinate Lenders shall not be entitled to any portion thereof until all sums due and owing pursuant to the Senior Mortgage Documents have been paid in full.

(g)    For so long as the Senior Bond Mortgage Documents are in effect, the Senior Mortgage Documents shall control the collection and application of all the proceeds under policies of insurance thereon, and/or any awards or other compensation made for damages, losses or compensation for other rights by reason of a taking in eminent domain (collectively, the "**Proceeds**") with respect to the Project, and Subordinate Lenders hereby consent to (i) Senior Trustee acting as depositary of such Proceeds and (ii) the application of such Proceeds by Senior Trustee in accordance with the Senior Bond Mortgage Documents; provided, however, no Proceeds shall be released to Borrower upon completion of the applicable restoration without Subordinate Lenders' prior consent; provided, further, however, if the Senior Bond Mortgage Documents are no longer in effect, the Merrill Credit Agreement Mortgage Documents shall

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK  40964  PG  791,  Page  8 of 30

control the collection and application of all the Proceeds and Subordinate Lenders hereby consent to (i) Merrill acting as depositary of such Proceeds and (ii) the application of such Proceeds by Merrill in accordance with the Merrill Credit Agreement Mortgage Documents. In the event the Senior Trustee, or Merrill, as applicable, shall release, for the purposes of restoration of all or any part of the improvements on or within the Project, its right, title and interest in and to the Proceeds under policies of insurance thereon, and/or its right, title and interest in and to any awards, or its right, title and interest in and to other compensation made for any damages, losses or compensation for other rights by reason of a taking in eminent domain, the Subordinate Lenders shall release for such purpose all of its right, title and interest, if any, in and to all such insurance proceeds or awards and the Subordinate Lenders agree that the balance of such proceeds remaining shall be applied first to the reduction of principal under the Senior Mortgage Documents.

(h)    Any assignment of rents or leases contained in any of the Subordinate Mortgage Documents, shall be in all respects subject and subordinate to any assignment of rents or leases contained in any of the Senior Mortgage Documents.

(i)    The Subordinate Lenders shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in the Project which is or may be prior in right to the Senior Mortgage Documents.

(j)    If the Subordinate Lenders, by indemnification, subrogation or otherwise, shall acquire any lien, estate, right or other interest in any of the Project, that lien, estate, right or other interest shall be fully subject and subordinate to the receipt by the Senior Trustee and Merrill of payment in full of the Senior Indebtedness, and to the Senior Mortgage Documents, to the same extent as the Subordinate Mortgage Documents are subordinate pursuant to this Agreement.

(k)    Each Subordinate Lender hereby waives any and all rights it may acquire by subrogation or otherwise to the lien of the Senior Mortgage Documents or any portion thereof except in the event that all unpaid principal, accrued interest and all other sums due under the Senior Mortgage Documents shall have been paid.

(l)    Each Subordinate Lender shall have the right to (i) pledge, assign, hypothecate, transfer, convey or sell the Subordinate Mortgage Documents or any interest in the Subordinate Mortgage Documents or (ii) modify, waive or amend any of the terms or provisions of the Subordinate Mortgage Documents, with ten (10) days prior written notice to the Senior Lender and in each such case, subject to the terms hereof and of the Senior Mortgage Documents, and provided that any such modifications, waivers and amendments that affect any defined term or section in such documents that are referenced herein or that may have an adverse effect on the Senior Lender's rights hereunder shall be subject to the prior written consent of Merrill.

3)    To further evidence the subordinations and agreements referred to herein, each Subordinate Lender agrees that, within five (5) business days after request by Merrill, such Subordinate Lender shall do, execute, acknowledge and deliver all and every such further acts,

DOCSNY1:1164781.6
41535-45 KPM/KFM

CFN # 105554465, OR BK 40964 PG 792, Page 9 of 30

deeds, conveyances and instruments (in recordable form if requested) as Merrill may reasonably request for the better assuring and evidencing of the foregoing subordinations and agreements.

4)    If either the Senior Lender or the Subordinate Lenders shall have received notice from the other that such party is curing or attempting to cure any default on the part of Borrower under the Senior Mortgage Documents or Subordinate Mortgage Documents, as applicable, such as, for example, paying delinquent real estate taxes or obtaining proper insurance coverage, the Subordinate Lenders or Senior Lender, as applicable, agree to forebear from availing itself of any similar "self-help" remedies granted under the Subordinate Mortgage Documents or Senior Mortgage Documents, as applicable.

5)    (a)    This Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case by or against the Borrower under Title 11 of the United States Code, as amended from time to time, any successor statute or rule promulgated thereto (collectively, the "**Bankruptcy Code**") and all references herein to the Borrower shall be deemed to apply to the fee title owner of the Project as a debtor-in-possession and to any trustee in bankruptcy for the estate of the fee title owner of the Project.

(b)    In the event the Senior Lender or the Senior Trustee is required under any bankruptcy or other law to return to the Borrower, the estate in bankruptcy thereof, any third party or any trustee, receiver or other similar representative of the Borrower any payment or distribution of assets, whether in cash, property or securities, including, without limitation any Project or any proceeds of the Project previously received by the Senior Lender or the Senior Trustee on account of the Senior Mortgage Documents (a "**Reinstatement Distribution**"), then to the maximum extent permitted by law, this Agreement and the subordination of the lien of the Subordinate Mortgages in such Project or proceeds shall be reinstated with respect to any such Reinstatement Distribution.  The Senior Lender shall not be required to contest its obligation to return such Reinstatement Distribution.

(c)    Without limiting the complete subordination of the Subordinate Mortgage Documents to the payment in full of the Senior Mortgage Documents, in any bankruptcy proceeding, upon any payment or distribution (whether in cash, property, securities, or otherwise) to creditors (i) the Senior Indebtedness shall first be paid in full in cash before the Subordinate Lenders shall be entitled to receive any payment or other distribution on account of or in respect of the Subordinate Mortgage Documents and (ii) until all of the Senior Indebtedness is paid in full in cash, any payment or distribution to which the Subordinate Lenders would be entitled but for this Agreement (whether in cash, property, or other assets) shall be made to the Senior Trustee or Merrill, as the case may be.

(d)    The Subordinate Lenders hereby agree that the Subordinate Lenders shall not make any election, give any consent, file any motion or take any other action in any case by or against the Borrower under the Bankruptcy Code without the prior written consent of the Senior Lender; provided, however, the Subordinate Lenders shall be entitled to file proofs of claims subject to the Senior Mortgages.

6)    The subordination of the Subordinate Mortgage Documents shall apply and continue notwithstanding (i) the actual date and time of execution, delivery, recording, filing

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 793, Page 10 of 30

or perfection of the Senior Bond Mortgage, the Merrill Credit Agreement Mortgage and other Senior Mortgage Documents and of the Subordinate Mortgage Documents, and (ii) the availability of any collateral to the Senior Lender or the Senior Trustee, including the availability of any collateral other than the property subject to the Senior Bond Mortgage or the Merrill Credit Agreement Mortgage.

7)    Whenever the Subordinate Mortgage Documents give Subordinate Lenders approval or consent rights with respect to any matter, and a right of approval or consent with regard to the same or substantially the same matter is also granted to the Senior Lender or the Senior Trustee, during a Default Period, the Senior Lender's or the Senior Trustee's approval or consent or failure to approve or consent, as the case may be, shall be binding on the Subordinate Lenders. None of the other provisions of this Agreement are intended to be in any way in limitation of the provisions of this Section.

8)    Within ten (10) days after request by a Senior Lender or a Subordinate Lender, the other shall furnish the requesting party with a statement, duly acknowledged and certified setting forth the then-current amount and terms of the indebtedness evidenced by the Subordinate Mortgage Documents related to such Subordinate Lender or Senior Mortgage Documents, as applicable, that there exists no default under the Subordinate Mortgage Documents or Senior Mortgage Documents, as applicable (or describing any default that does exist), and such other information with respect thereto as such party may reasonably request.

9)    This Agreement shall be construed in accordance with and governed by the laws of the State where the Project is located.

10)    This Agreement shall be the whole and only agreement with regard to the subordination of the lien or charge of the Subordinate Mortgage Documents to the lien or charge of the Senior Mortgage Documents and shall control in the event of a conflict with any prior agreements as to such subordination, including, but not limited to, those provisions, if any, contained in the Subordinate Mortgage Documents, which provide for the subordination of the lien or charge to another deed or deeds of trust or to another mortgage or mortgages.

11)    All notices, demands, requests and other communications made hereunder shall be in writing and shall be properly given and deemed delivered on the date of delivery if sent by personal delivery or nationally recognized overnight courier and on the third business day following mailing if sent by certified or registered mail, postage prepaid, return receipt requested, as follows:

If to Merrill:                        At the address first written above for Merrill

with a copy to:                   Kutak Rock LLP
                                          Suite 2100
                                          225 Peachtree Street, NE
                                          Atlanta, Georgia 30303
                                          Attn: David A. Nix, Esq.

If to MLPFS:                     At the address first written above for Merrill

DOCSNY1:1164781.6
41535-45 KFM/KPM

CFN # 105554465, OR BK  40964  PG  794,  Page  11 of 30

| | |
|---|---|
| If to Lehman: | At the address first written above for the Lehman |
| with a copy to: | Orrick, Herrington & Sutcliffe LLP<br>666 Fifth Avenue<br>New York, NY  10103<br>Attn: Al Sawyers |
| If to NAHTEF: | At the address first written above for NAHTEF<br>Attn: Rick Kahn |
| With a copy to: | 11823 Southwest 78 Terrace<br>Miami, FL  33183<br>Attn: Ed Hibshman |

or to such other addresses as any party hereto may request by notice served as required hereunder.

12)    This Agreement may not be changed, terminated or modified except by an agreement in writing, signed by each of the parties hereto.

13)    No person or entity (including, without limitation, the Borrower) is intended to be a third party beneficiary of, and no one other than the Senior Lender, the Subordinate Lenders and their respective successors and assigns shall have any rights under this Agreement.

14)    The Senior Lender at its expense may at any reasonable time following reasonable advance notice to a Subordinate Lender examine or copy any non-privileged documentation in the possession or control of such Subordinate Lender or its agent relating to or connected with the Project, the Subordinate Mortgage Documents and/or the Lehman Swap Agreement Mortgage Documents and collections under either of the foregoing. The Subordinate Lenders shall have the same right with respect to the Senior Bond Mortgage Documents and/or the Merrill Credit Agreement and collections under either of the foregoing.

15)    This Agreement shall be binding upon and shall inure to the benefit of the Senior Lender, the Subordinate Lenders and their respective successors and assigns.

16)    The provisions of this Agreement are solely for the purposes of defining the relative rights of Senior Lender, on the one hand, and Subordinate Lenders, on the other hand.  Senior Lender shall not be prejudiced in the right to enforce subordination of the Subordinate Indebtedness by any act or failure to act by the Borrower or anyone in custody of its assets or property.  Nothing herein shall impair, as between the Borrower and Subordinate Lenders, the obligation of the Borrower, which is unconditional and absolute, to pay to the Subordinate Lenders the principal of and interest on the Subordinate Indebtedness as and when the same shall become due in accordance with their terms, nor shall anything herein prevent Subordinate Lenders from exercising all remedies otherwise permitted by applicable law upon default under the Subordinate Mortgage Documents, subject, however, to the provisions of this Agreement and the rights of the Senior Lender to the extent provided herein.

DOCSNY1:1164781.6
41535-45 KFM/KFM

17)    Merrill agrees that the Subordinate Lenders shall have the right to direct Borrower to exercise its right to direct the optional redemption of the Senior Bonds in accordance with the Indenture. Such right shall only be exercised with respect to all, but not less than all of the Senior Bonds concurrently. Such redemption of all Senior Bonds shall not occur, unless all amounts then due under the Senior Mortgage Documents are paid in full. Merrill further agrees that, regardless of whether an Event of Default has occurred under the Indenture, the Loan Agreement, the Senior Mortgage Documents or the Subordinate Mortgage Documents, the Subordinate Lenders have the right pursuant to the Loan Agreement to direct the Borrower to replace the Manager of the Project subject to the Senior Lender's right to consent to the replacement Manager which consent shall not be unreasonably withheld or delayed.

18)    This Agreement may be executed in any number of separate counterparts, each of which, when so executed and delivered, shall be deemed an original, and all of which together shall constitute one instrument.

[Remainder of page intentionally left blank]

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 796, Page 13 of 30

[SIGNATURE PAGE TO SUBORDINATION AGREEMENT, DATED NOVEMBER 10, 2005]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
Marianne K. Carl
Authorized Signatory

_____
Witness
Printed Name Bielka M. Tortorelli

_____
Witness
Printed Name Edward G. Stasen

MERRILL LYNCH CAPITAL SERVICES, INC.

By: _____
Marianne K. Carl
Authorized Signatory

_____
Witness
Printed Name Bielka M. Tortorelli

_____
Witness
Printed Name Edward G. Stasen

CFN # 105554465, OR BK 40964 PG 797, Page 14 of 30

[NOTARY PAGE TO SUBORDINATION AGREEMENT, DATED AS OF NOVEMBER 10, 2005]

STATE OF  New York )
                                          ) ss.
COUNTY OF  New York )

       The foregoing instrument was acknowledged before me on November 10, 2005 by Marianne K. Carl, the Authorized Signatory of MERRILL LYNCH CAPITAL SERVICES, INC. He/She is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:

_____

Carmen Basulto
NOTARY PUBLIC, State of New York
No. 43-4849133
Qualified in Richmond County
Commission Expires June 30, 2006

DOCSNY1:1164781.5
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 798, Page 15 of 30

[NOTARY PAGE TO SUBORDINATION AGREEMENT, DATED AS OF NOVEMBER 10, 2005]

STATE OF  New York    )
                      ) ss.
COUNTY OF  New York   )

    The foregoing instrument was acknowledged before me on November 10, 2005 by Marianne K. Carl, the Authorized Signatory of MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED . He/she is personally known to me or has produced a driver's license as identification.

_Carmen Basulto_
Notary Public

My Commission Expires:

_____

Carmen Basulto
NOTARY PUBLIC. State of New York
No. 43-4849133
Qualified in Richmond County
Commission Expires June 30, 2006

DOCSNY1:1164781.5
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 799, Page 16 of 30

[SIGNATURE PAGE TO SUBORDINATION AGREEMENT, DATED AS OF NOVEMBER 10, 2005]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

Witness
Printed Name    James F. Robin

Witness
Printed Name    Richard L. Ren, Jr.


LEHMAN BROTHERS INC.

By: _____
Michael Whang
Senior Vice President


Witness
Printed Name    James F. Robinson

Witness
Printed Name    Richard L. Ren, Jr.


LEHMAN BROTHERS SPECIAL FINANCING Inc.

By: _____
Michael Whang
Senior Vice President

CFN # 105554465, OR BK 40964 PG 800, Page 17 of 30

[NOTARY PAGE TO SUBORDINATION AGREEMENT, DATED AS OF NOVEMBER 10, 2005]

STATE OF New York )
                       ) ss.
COUNTY OF New York )

The foregoing instrument was acknowledged before me on November 10, 2005 by Michael Whang, the Senior Vice President of Lehman Brothers Inc. He/she is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:

_____

LAURA CARLOS
Notary Public, State of New York
No. 01CA6085737
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Dec. 8, 2007

CFN # 105554465, OR BK  40964  PG  801,  Page  18 of 30

[NOTARY PAGE TO SUBORDINATION AGREEMENT, DATED AS OF NOVEMBER 10, 2005]

STATE OF *New York* )
                                        ) ss.
COUNTY OF *New York* )

The foregoing instrument was acknowledged before me on November *10*, 2005 by *Michael Whang*, the *Senior Vice President* of *Lehman Brothers Special Financing Inc.* He/she is personally known to me or has produced a driver's license as identification.

_____
Notary Public

My Commission Expires:

_____

LAURA CARLOS
Notary Public, State of New York
No. 01CA6069737
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires Dec. 8, 2007

CFN # 105554465, OR BK  40964  PG  802,  Page  19 of 30

[SIGNATURE PAGE TO SUBORDINATION AGREEMENT, DATED NOVEMBER 10, 2005]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

NAHTEF BOND FUND I – 2005, L.P.

Witness
Printed Name: Smitha Sundar

Witness
Printed Name: Homma Rafi

By: _____
Name: Richard S. Kahn
Title: Managing Partner

STATE OF GEORGIA        )
                        ) ss.
COUNTY OF FULTON        )

The foregoing instrument was acknowledged before me on November ___, 2005 by Richard S. Kahn, the Managing Partner of NAHTEF Holdings Inc. He/she is personally known to me or has produced a driver's license as identification.

_____
Notary Public

CFN # 105554465, OR BK 40964 PG 803, Page 20 of 30

STATE OF GEORGIA        )
                        ) ss.
COUNTY OF FULTON        )

    The foregoing instrument was acknowledged before me on November ___, 2005 by _Richard S. Kahn_, the _Managing Partner_ of _NAHTEF Holdings Inc._ He/she is personally known to me or has produced a driver's license as identification.

_Henry K. Murry_
Notary Public

My Commission Expires:
12 Feb 07

CFN # 105554465, OR BK  40964  PG  804,  Page  21 of 30

EXHIBIT A

LEGAL DESCRIPTION

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 805, Page 22 of 30

## Waterman's Crossing

Beginning at the Northwest corner of Tract 1 of WISHART'S REPLAT, as recorded in Plat Book 27, Page 107, of the Public Records of Hillsborough County, Florida, thence South 89 degrees 52 minutes 57 seconds East along the North line of said Tract 1 a distance of 1000.00 feet to Point "A" returning to the POINT OF BEGINNING; thence South 01 degrees 37 minutes 21 seconds West along the East right of way line of Rome Avenue, a distance of 828.00 feet; thence leaving said right-of-way North 35 degrees 51 minutes 51 seconds East a distance of 316.12 feet; thence South 54 degrees 08 minutes 09 seconds East a distance of 351.23 feet to the mean high water line of Hillsborough River; thence Northeasterly along mean high water line to said Point A.

CFN # 105554465, OR BK 40964 PG 806, Page 23 of 30

## Village Lakes

A portion of Section 2, Township 20 South Range 30 East, Seminole County, Florida, described as follows:

From the Southeast corner of said Section 2, run North 89 degrees 56 minutes 53 seconds West along the South line of said Section 2 a distance of 2022.24 feet; thence departing said line, run North 0 degrees 07 minutes 29 seconds West a distance of 700.22 feet to the Northerly right of way line of Airport Blvd., an 80 foot right of way, and the POINT OF BEGINNING; thence run along said right of way line South 89 degrees 56 minutes 14 seconds West a distance of 160.16 feet to the P.C. of a curve, concave Northerly, having a radius of 1869.86 feet, central angle of 19 degrees 11 minutes 42 seconds, and a chord bearing of North 80 degrees 27 minutes 55 seconds West; thence run Westerly along the arc of said curve a distance of 626.43 feet; thence departing said line, run North 19 degrees 07 minutes 22 seconds East along the centerline of Masters Cove Road, a 60 foot right of way as described in Official Records Book 1001, Pages 1609 through 1612 of the Public Records of Seminole County, Florida, a distance of 210.12 feet to the P.C. of a curve, concave Westerly, having a radius of 850.00 feet a central angle of 12 degrees 43 minutes 18 seconds, and a chord bearing of North 12 degrees 45 minutes 43 seconds East; thence run Northerly along the arc of said curve a distance of 188.73 feet; thence departing said centerline, run South 76 degrees 16 minutes 49 seconds East a distance of 289.11 feet; thence North 89 degrees 51 minutes 47 seconds East a distance of 382.61 feet; thence North 00 degrees 09 minutes 29 seconds West, a distance of 190.23 feet; thence South 89 degrees 52 minutes 08 seconds East a distance of 419.96 feet; thence South 00 degrees 08 minutes 32 seconds East a distance of 199.91 feet; thence South 89 degrees 52 minutes 18 seconds East a distance of 59.91 feet; thence South 00 degrees 10 minutes 38 seconds East a distance of 424.19 feet to a point on the arc of a curve, and the Northerly right of way line of said Airport Blvd., said curve having a radius of 1185.92 feet, central angle of 9 degrees 56 minutes 46 seconds, and a chord bearing of North 85 degrees 05 minutes 23 seconds West said curve being concave Southerly; thence run Westerly along the arc of said curve and said Northerly right of way line a distance of 205.87 feet; thence South 89 degrees 56 minutes 14 seconds West a distance of 275.15 feet to the POINT OF BEGINNING.  (LESS AND EXCEPT the Southerly 10.00 feet thereof.)

TOGETHER WITH a non-exclusive as set forth in that certain Easement for Private Road recorded in Official Records Book 1001, Page 1609 and as contained in that certain Reciprocal Easement Agreement recorded in Official Records Book 1755, page 417, Public Records of Seminole County, Florida.

Contains 563,347 square feet or 12.9327 acres, more or less.

DOCSNY1:1164781.6
41535-45 KPM/KPM

CFN # 105554465, OR BK 40964 PG 807, Page 24 of 30

**Brittany Bay**

A parcel or tract of land lying in Pinellas County, Florida and being more particularly described as follows:

Commence at the Southwest corner of the Northeast Quarter of Section 3, Township 30 South, Range 15 East, and run South 89 degrees 14 minutes 57 seconds East, 50.00 feet along the South boundary of the aforementioned Northeast Quarter; thence North 00 degrees 08 minutes 58 seconds East, 869.34 feet along the East right of way line of Alternate U.S. Highway 19 to the POINT OF BEGINNING; thence North 00 degrees 08 minutes 58 seconds East, 520.00 feet along the aforementioned East right of way line; thence South 89 degrees 14 minutes 57 seconds East, 1290.89 feet; thence South 00 degrees 40 minutes 19 seconds West, 1339.26 feet along the East boundary of the West Half of the Northeast Quarter of Section 3; thence North 89 degrees 14 minutes 57 seconds West, 588.50 feet along a line 50 feet North of and parallel to the South boundary of the Northeast Quarter of Section 3; thence North 00 degrees 45 minutes 03 seconds East, 212.17 feet; thence along a curve to the left that has a radius of 200 feet, an arc length of 116.33 feet, a chord length of 114.70 feet, and a chord bearing of North 15 degrees 54 minutes 44 seconds West; thence North 32 degrees 34 minutes 30 seconds West, 473.73 feet; thence along a curve to the left that has a radius of 230 feet, an arc length of 229.92 feet, a chord length of 220.46 feet and a chord bearing of North 61 degrees 12 minutes 46 seconds West; thence North 89 degrees 51 minutes 02 seconds West, 211.04 feet to the POINT OF BEGINNING.

TOGETHER WITH a non-exclusive easement for ingress and egress over the lands described in Official Records Book 4499, Page 2045, of the Public Records of Pinellas County, Florida.

TOGETHER WITH a non-exclusive easement for ingress and egress over the lands described in Official Records Book 4366, Page 902, of the Public Records of Pinellas County, Florida.

Containing 28.750 acres, more or less.

DOCSNY1:1164781.6
41535-45 KPM/KFM

CFN # 105554465, OR BK 40964 PG 808, Page 25 of 30

### Mariner's Pointe

**PARCEL I**

A portion of Lot 1, Block A, according to the Plat of PINELLAS POINT ARMS, as recorded in Plat Book 67, Page 18, of the Public Records of Pinellas County, Florida, being more particularly described as follows:

Commencing at the Northeast corner of aforesaid Lot 1, as a POINT OF BEGINNING; run thence South 00 degrees 00 minutes 20 seconds East, along the East line of said Lot 1, 617.65 feet; thence North 89 degrees 34 minutes 26 seconds West, 212.60 feet; thence South 02 degrees 49 minutes 23 seconds West, 44.73 feet; thence North 89 degrees 38 minutes 33 seconds West, 62.68 feet; thence North 00 degrees 18 minutes 01 seconds East, 62.28 feet; thence North 28 degrees 56 minutes 43 seconds West, 77.52 feet; thence South 86 degrees 57 minutes 59 seconds West, 9.72 feet; thence North 01 degrees 32 minutes 10 seconds East, 110.46 feet; thence North 88 degrees 14 minutes 38 seconds West, 110.12 feet; thence South 01 degrees 44 minutes 27 seconds West, 111.07 feet; thence South 89 degrees 59 minutes 29 seconds West, 313.40 feet to an intersection with the West line of said Lot 1; thence North 00 degrees 03 minutes 36 seconds West, along said West line 525.17 feet to the Northwest corner of Lot 1; thence North 89 degrees 49 minutes 40 seconds East, along the North line of Lot 1, 748.75 feet to the POINT OF BEGINNING.

**PARCEL II**

A portion of Lot 1, Block A, according to the Plat of PINELLAS POINT ARMS, as recorded in Plat Book 67, Page 18, of the Public Records of Pinellas County, Florida, being more particularly described as follows:

Commencing at the Northeast corner of aforesaid Lot 1, run thence South 00 degrees 00 minutes 20 seconds East, along the East line of said Lot 1, 617.65 feet to the POINT OF BEGINNING; thence continue South 00 degrees 00 minutes 20 seconds East, 618.12 feet to the Southeast corner of said Lot 1; thence North 89 degrees 59 minutes 20 seconds West, along the South line of said Lot 1, 747.57 feet to the Southwest corner thereof; thence North 00 degrees 03 minutes 36 seconds West, along the West line of Lot 1, 707.60 feet; thence North 89 degrees 59 minutes 29 seconds East, 313.40 feet; thence North 01 degrees 44 minutes 27 seconds East, 111.07 feet; thence South 88 degrees 14 minutes 38 seconds East, 110.12 feet; thence South 01 degrees 32 minutes 10 seconds West, 110.46 feet; thence North 86 degrees 57 minutes 59 seconds East, 9.72 feet; thence South 28 degrees 56 minutes 43 seconds East, 77.52 feet; thence South 00 degrees 18 minutes 01 seconds West, 62.28 feet; thence South 89 degrees 38 minutes 33 seconds East, 62.68 feet; thence North 02 degrees 49 minutes 23 seconds East, 44.73 feet; thence South 89 degrees 34 minutes 26 seconds East, 212.60 feet to the POINT OF BEGINNING.

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 809, Page 26 of 30

### Brampton Court

That certain property, located in the City of Lauderhill, County of Broward, State of Florida, described as follows:

A portion of the Southeast Quarter of Section 25, and the Northeast Quarter of Section 36, Township 49 South, Range 41 East, being more particularly described as follows:

Commence at the Southeast corner of said Section 25; thence run North 0 degrees 54 minutes 00 seconds West along the East line of said Section 25, for a distance of 15.71 feet to a point; thence run South 89 degrees 05 minutes 30 seconds West for a distance of 910.00 feet to the point of curvature of a circular curve to the left; thence run Southwesterly along the arc of said circular curve to the left, having for its elements a radius of 4,915.00 feet and a central angle of 8 degrees 20 minutes 45 seconds for a distance of 715.93 feet to a point on a curve and the POINT OF BEGINNING of the tract of land hereinafter described; thence continue Southwesterly along the arc of said circular curve to the left, a distance of 480.50 feet to a point of reverse curvature; thence run Southwesterly along the arc of said circular curve to the right having for its elements a radius of 1,585.00 feet and a central angle of 12 degrees 08 minutes 32 seconds, for a distance of 335.90 feet to a point on a curve; thence run Northerly along the arc of a circular curve to the right having for its elements a radius of 3,250.00 feet and a central angle of 12 degrees 41 minutes 02 seconds for a distance of 719.47 feet to a point on curve; thence run South 76 degrees 31 minutes 55 seconds East, radial to the last mentioned curve, for a distance of 30.00 feet to a point; thence run East a distance of 677.17 feet to a point; thence run South a distance of 519.41 feet to a point; thence run South 9 degrees 15 minutes 15 seconds East, radial to the first mentioned curve in this description, to the POINT OF BEGINNING, lying and being in Broward County, Florida, LESS AND EXCEPT the Southerly 35 feet, the Westerly 30 feet, and the Easterly 25 feet for road right of way purposes.

The above-described property is also described as: Tract "A", GALA GATE TOWERS, according to the Plat thereof, as recorded in Plat Book 77, Page 9, in the Public Records of Broward County, Florida.

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 810, Page 27 of 30

EXHIBIT B-1

SENIOR BOND MORTGAGE DOCUMENTS

1.    Second Mortgage, Security Agreement and Fixture Filing

2.    Second Assignment of Leases and Rents

3.    Second Assignment of Service Contracts

4.    UCC Financing Statements for Second Lien Security Documents

5.    Mortgage Policies of Title Insurance (Second Deed of Trust)

6.    Second Assignment and Subordination of Management Agreement to Senior Bond Purchaser

7.    Environmental Compliance & Indemnification Agreement

DOCSNY1:1164781.6
41535-45 KFM/KFM

EXHIBIT B-2

MERRILL CREDIT AGREEMENT MORTGAGE DOCUMENTS

1.    ISDA Master Agreement

2.    Multicurrency Cross-Border Schedule to ISDA Master Agreement

3.    Credit Support Annex to ISDA Master Agreement

4.    Confirmation Letter to ISDA Master Agreement

5.    Merrill Guarantee

6.    Master Financing and Guaranty Agreement

7.    Second Assignment of Service Contracts

8.    Secretary's Certificate

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 812, Page 29 of 30

EXHIBIT C-1

SUBORDINATE BOND MORTGAGE DOCUMENTS

1.    Third Mortgage, Security Agreement and Fixture Filing and Fifth Mortgage, Security Agreement and Fixture Filing

2.    Third Assignment of Leases and Rents and Fifth Assignment of Leases and Rents

3.    Third Assignment of Service Contracts and Fifth Assignment of Service Contracts

4.    UCC Financing Statements for Third Lien Security Documents and Fifth Lien Security Documents

5.    Mortgage Policies of Title Insurance (Third Deed of Trust and Fifth Deed of Trust)

6.    Third Assignment and Subordination of Management Agreement and Fifth Assignment and Subordination of Management Agreement

7.    Environmental Compliance & Indemnification Agreements

8.    Borrower's Certificate as to Representations and Warranties

9.    Assignment, Acknowledgement, Release and Restatements

DOCSNY1:1164781.6
41535-45 KFM/KFM

CFN # 105554465, OR BK 40964 PG 813, Page 30 of 30

EXHIBIT C-2

LEHMAN SWAP AGREEMENT MORTGAGE DOCUMENTS

1.   ISDA Master Swap Agreement

2.   Multicurrency Cross-Border Schedule to ISDA Master Agreement

3.   Confirmation Letter to ISDA Master Agreement

4.   Lehman Brothers Holdings Inc. Guarantee

5.   Fourth Mortgage, Security Agreement and Fixture Filing

6.   Fourth Assignment of Leases and Rents

7.   Fourth Assignment of Service Contracts

8.   UCC Financing Statements for Fourth Lien Security Documents

9.   Mortgage Policies of Title Insurance (Fourth Deed of Trust)

10.  Fourth Assignment and Subordination of Management Agreement

11.  Environmental Compliance & Indemnification Agreement

12.  Borrower's Certificate as to Representations and Warranties

13.  Assignment, Acknowledgement, Release and Restatements

DOCSNY1:1164781.6
41535-45 KFM/KFM