**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE OF DEBTORS' ONE HUNDRED FOURTEENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL, MARK BERNSTEIN, AT (212) 310-8778.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | |
|---|---|
| In re | : |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : |
| | : |
| Debtors. | : |

Chapter 11 Case No.

08-13555 (JMP)

(Jointly Administered)

------------------------------------------------------------------x

### NOTICE OF HEARING ON DEBTORS' ONE HUNDRED FOURTEENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY LPS CLAIMS)

**PLEASE TAKE NOTICE** that on March 14, 2011, Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), filed their One Hundred Fourteenth omnibus objection to claims (the "Debtors' One Hundred Fourteenth Omnibus Objection to Claims"), and that a

hearing (the "Hearing") to consider the Debtors' One Hundred Fourteenth Omnibus Objection to

Claims will be held before the Honorable James M. Peck, United States Bankruptcy Judge, in

Courtroom 601 of the United States Bankruptcy Court for the Southern District of New York,

One Bowling Green, New York, New York 10004, on **April 28, 2011 at 10:00 a.m. (Eastern**

**Time),** or as soon thereafter as counsel may be heard.

      **PLEASE TAKE FURTHER NOTICE** that any responses to the Debtors' One

Hundred Fourteenth Omnibus Objection to Claims must be in writing, shall conform to the

Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall

be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399

(which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's

filing system, and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable

Document Format (PDF), WordPerfect, or any other Windows-based word processing format

(with a hard copy delivered directly to Chambers), in accordance with General Order M-182

(which can be found at www.nysb.uscourts.gov), and served in accordance with General Order

M-399, and on (i) the chambers of the Honorable James M. Peck, One Bowling Green, New

York, New York 10004, Courtroom 601; (ii) attorneys for the Debtors, Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Shai Waisman, Esq. and Mark

Bernstein, Esq.); (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street,

21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini,

Esq. and Andrea B. Schwartz, Esq.); and (iv) attorneys for the official committee of unsecured

creditors appointed in these cases, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan

Plaza, New York, New York 10005 (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and

Evan Fleck, Esq.); so as to be so filed and received by no later than **April 13, 2011 at 4:00 p.m.**

**(Eastern Time)** (the "Response Deadline").

                    **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Debtors' One Hundred Fourteenth Omnibus Objection to Claims or

any claim set forth thereon, the Debtors may, on or after the Response Deadline, submit to the

Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Debtors' One Hundred Fourteenth Omnibus Objection to Claims, which order may be entered

with no further notice or opportunity to be heard offered to any party.

Dated: March 14, 2011
       New York, New York

                           /s/ Shai Y. Waisman
                           Shai Y. Waisman

                           WEIL, GOTSHAL & MANGES LLP
                           767 Fifth Avenue
                           New York, New York 10153
                           Telephone: (212) 310-8000
                           Facsimile: (212) 310-8007

                           Attorneys for Debtors
                           and Debtors in Possession

HEARING DATE AND TIME: April 28, 2011 at 10:00 a.m. (Eastern Time)
RESPONSE DEADLINE: April 13, 2011 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :    08-13555 (JMP)
                                         :
                   Debtors.              :    (Jointly Administered)
-------------------------------------------------------------------x
```

### DEBTORS' ONE HUNDRED FOURTEENTH OMNIBUS
### OBJECTION TO CLAIMS (NO LIABILITY LPS CLAIMS)

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM. PARTIES RECEIVING THIS ONE HUNDRED FOURTEENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL, MARK BERNSTEIN, AT (212) 310-8778.**

---

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors, in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), respectfully represent as follows:

**Relief Requested**

1.      The Debtors file this One Hundred Fourteenth omnibus objection to claims (the "One Hundred Fourteenth Omnibus Objection to Claims"), pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and this Court's order approving procedures for the filing of omnibus objections to proofs of claim filed in these chapter 11 cases (the "Procedures Order") [Docket No. 6664], seeking the disallowance and expungement of the claims listed on Exhibit A annexed hereto.

2.      The proofs of claim identified on Exhibit A (collectively, the "No Liability LPS Claims") are claims seeking to recover losses for securities that are neither issued nor guaranteed by any of the Debtors in these chapter 11 cases.  The Debtors have no liability for the No Liability LPS Claims and therefore request they be disallowed and expunged in their entirety.

3.      The Debtors reserve all their rights to object on any basis to any No Liability LPS Claim as to which the Court does not grant the relief requested herein.

**Jurisdiction**

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

5.        Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.        On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

7.        On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as Examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.  The Examiner has filed his report pursuant to section 1106(b) of the Bankruptcy Code [Docket No. 7531].

8.        On July 2, 2009, the Court entered its Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form (the "Bar Date Order").  The Bar Date Order set forth specific alternative claim filing procedures (the "Lehman Programs Securities Procedures") that apply to the "filing of any and all claims (including claims under a related Guarantee) against the Debtors arising from securities issued by the Debtors or any of the Debtors' affiliates [to investors] located outside of the United States, solely to the extent identified on http://www.lehman-docket.com under the heading 'Lehman Programs Securities' (any such security, a 'Lehman Program Security') . . . ."

(Bar Date Ord. at 12.)  The Lehman Programs Securities Procedures resulted from extensive

negotiations among the Debtors, the Creditors' Committee, the issuers of Lehman Programs

Securities, Euroclear Bank, Clearstream Bank, and a large group of creditors.

9.      On January 14, 2010, the Court entered the Procedures Order, which

authorizes the Debtors, among other things, to file omnibus objections to no more than 500

claims at a time, on various grounds, including those set forth in Bankruptcy Rule 3007(d) and

those additional grounds set forth in the Procedures Order.

### The Capital Raising GmbH Securities

10.      The securities that are the subject of the No Liability LPS Claims are

issued by Capital Raising GmbH, an entity entirely unaffiliated with the Debtors.  According to

the Preliminary Offering Circular (attached hereto as <u>Exhibit B</u>) for the securities with an

International Securities Identification Number of DE0007490724 (the "<u>Capital Raising</u>

<u>Securities</u>"), Capital Raising GmbH is "a company incorporated in accordance with German law

with registered office in Norderfriedrichskoog [which] shall use the proceeds from the issue of

the Capital Notes to participate in the commercial enterprise of IKB Deutsche Industriebank

Aktiengesellschaft."  See Preliminary Offering Circular attached hereto as <u>Exhibit B</u>.  The

Preliminary Offering Circular does not provide for any liability on behalf of any Debtor for the

Capital Raising Securities.  Neither Capital Raising GmbH nor IKB Deutsche Industriebank

Aktiengesellschaft are Debtors in these chapter 11 cases or affiliated with the Debtors.

### The No Liability LPS Claims Should Be Disallowed and Expunged

11.      In their review of the claims filed on the claims register in these chapter 11

cases and maintained by the Court-appointed claims agent, the Debtors have identified the claims

on <u>Exhibit A</u> as claims for which the Debtors have no liability because they seek to recover for

Capital Raising Securities that were neither issued nor guaranteed by the Debtors.

12.     The source of confusion with respect to these securities likely results from the fact that the Capital Raising Securities were inadvertently included on the list of Lehman Programs Securities posted by the Debtors on their website www.lehman-docket.com.  The purpose of the list of Lehman Programs Securities was to provide an exclusive list of securities for which alternative claim filing procedures included in the Bar Date Order applied.  The inclusion of any security on the list of Lehman Programs Securities is not an admission of liability and does not create any liability on the part of the Debtors.

13.     As part of the accommodation regarding the alternative claim filing procedures for certain securities, the Bar Date Order included established procedures for the creation of the list of Lehman Programs Securities.  Pursuant to such procedures, dozens of parties submitted thousands of securities to the Debtors for inclusion on the list.  The final list of Lehman Programs Securities was created over the period of only a few days and during which time, the Debtors were unable to review every one of the more than 6,700 securities included on the final list to confirm that such security was a valid obligation of the Debtors.

14.     Subsequent to the posting of the final Lehman Programs Securities list, representatives of Capital Raising GmbH contacted the Debtors and informed them that the Capital Raising Security was erroneously included on the list of Lehman Programs Securities, and such inclusion was causing a disruption in Capital Raising GmbH's business.  Following a review by the Debtors and a determination that the Capital Raising Security was not an obligation of any Debtor, in order avoid any further disruption in Capital Raising GmbH's business, the Debtors added a footnote to the list of Lehman Programs Securities which provides: "The security with ISIN DE0007490724 was erroneously included on the Lehman Programs Securities list. Neither Capital Raising Gmbh, the issuer of such security, nor Lehman Brothers

Holdings Inc. are aware of any obligation of Lehman Brothers Holdings Inc. or any of its affiliated debtors in chapter 11 cases with respect to such security." See Excerpted Page of List of Lehman Programs Securities annexed as Exhibit C.

15.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim. *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000). Moreover, Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1).

16.    The holders of the No Liability LPS Claims seek recovery for the Capital Raising Securities but fail to articulate any legal or factual justification for asserting a claim against the Debtors in these cases. The Capital Raising Securities were neither issued nor guaranteed by the Debtors. If the No Liability LPS Claims remain on the claims register, the potential exists for recoveries by parties who do not hold valid claims against the Debtors' estates. Accordingly, the Debtors respectfully request the Court disallow and expunge in their entirety the No Liability LPS Claims listed on <u>Exhibit A</u>.

## **Notice**

17.    No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this One Hundred Fourteenth Omnibus Objection to Claims on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) each claimant listed on <u>Exhibit A</u>; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [Docket No. 9635]. The Debtors submit that no other or further notice need be provided.

18.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated:  March 14, 2011
      New York, New York

                                      /s/ Shai Y. Waisman
                                      Shai Y. Waisman

                                      WEIL, GOTSHAL & MANGES LLP
                                      767 Fifth Avenue
                                      New York, New York 10153
                                      Telephone: (212) 310-8000
                                      Facsimile: (212) 310-8007

                                      Attorneys for Debtors
                                      and Debtors in Possession

# EXHIBIT A

IN RE LEHMAN BROTHERS HOLDINGS, INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 114: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS |
|---|---|---|---|---|---|---|
| 1 | ABDALLAH, ANIS<br>C/O SOCIETE FINANCIERE DE BEYROUTH<br>109 TAMARI BLDG - ALLENBY STREET<br>P.O. BOX: 11-1254 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/18/2009 | 16044 | $20,000.00 |
| 2 | ALTENRATH, WILHELM AND DORIS<br>STRESEMANNSTR. 11<br>BRUCHKOEBEL, D-63486<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/30/2009 | 35590 | $7,694.61 |
| 3 | AUGUST, BAERT<br>LOOFSTRAA T G1<br>KORTRIJK, 8500<br>BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/01/2009 | 35927 | Undetermined |
| 4 | AUMANN, JOHANN<br>MUHLSTR 9A<br>ANDECHS, D-82346<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/24/2009 | 34807 | $1,427.50 |
| 5 | BAINES, JACK<br>VIJVERLAAN 2A<br>ANTWERPEN, 2020<br>BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51710 | $357,500.00 |
| 6 | BAUS, PHILIPP & BAUS, JORG<br>SCHNEEGLOCKCHEN WEG 2<br>06118 HALLE,<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/07/2009 | 36877 | $7,000.00 |
| 7 | BRAEM, JOHAN<br>HANDZAAMSE NIEUWSTRAAT 7<br>HANDZAME, 8610<br>BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51708 | Undetermined |
| 8 | CLAUSSEN, H.C. PROF. DR.<br>IN PARK 11<br>MEERBUSCH, 40.667<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/05/2009 | 36368 | Undetermined |

IN RE LEHMAN BROTHERS HOLDINGS, INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 114: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS |
|---|---|---|---|---|---|---|
| 9 | CYLAIR INVESTMENT CORP SCOTIABANK BUILDING 3RD FLOOR SUITE 302, RAWSON SQUARE BAY STREET NASSAU, BAHAMAS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/2009 | 49663 | $35,607.46 |
| 10 | DE BERTOUCH-LEYN, PAUL LITO 76 SONDERGADE ARHUS C, 8000 DENMARK | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/16/2009 | 40674 | $435,850.80 |
| 11 | DE BOSSCHER-VERSCHELDEN, MARC STEENWEG 76/2 ASPER-GAVERE, 3890 BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51706 | $8,564.04 |
| 12 | DEBBANE, YOUSSEF ATOMIUM TOWER APT. 10A PRESIDENT ELIAS SARKIS AVENUE ACHRAFIEH, BEIRUT, LEBANON | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/17/2009 | 15448 | $427,020.00 |
| 13 | ERLEBACH, ROLAND STEINERBERG 38 BUSECH, 35418 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/06/2009 | 36552 | $8,492.64 |
| 14 | GAEBLER, ERFRIED TALSTR 31 OCKENFELS, 53545 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/01/2009 | 35864 | $18,994.93 |
| 15 | GASTEL, PETER ROMERSTRASSE 87 FILDERSTADT, D70794 GERMANY | | Lehman No Case Asserted/All Cases Asserted | 10/16/2009 | 40816 | $28,302.00 |

IN RE LEHMAN BROTHERS HOLDINGS, INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 114: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS |
|---|---|---|---|---|---|---|
| 16 | GILLIS, DIDIER & YANNICK VOETBALSTRAAT 26 GENTBRUGGE, 3050 BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51704 | $8,564.14 |
| 17 | GOETVINCK, AN A. BLEREGEMSTRAAT 152 HEKELGEM - AFFLIGEM, 1790 BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51705 | $17,128.18 |
| 18 | HERRMANN, NILS CHIEMGAUSTR. 64A MUNCHEN, 81549 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/13/2009 | 37613 | $2,938.58 |
| 19 | HOFFMANN, ANDRE GOERLITZER STR. 62 HORKA, D-02923 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/15/2009 | 40436 | $2,978.64 |
| 20 | HOYZER, BIRGIL HINTER PASTORS HOFE 9A ISEMHAGEN, 30916 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/16/2009 | 13387 | $7,099.00 |
| 21 | INTEGRALE LUXEMBOORG SA 63, BD PRINCE FELIX LUXEMBOURG, 1513 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/09/2009 | 37296 | Undetermined |
| 22 | IWERSEN, DIETER MUHLENTOR 2 BADLBURG, 49186 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/29/2009 | 35494 | $42,453.00 |
| 23 | KINDL, GERTRUDE WEINFELDSTRASSE 17 WIESBADEN, 65187 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/02/2009 | 36091 | $7,118.00 |

**IN RE LEHMAN BROTHERS HOLDINGS, INC., ET AL., CASE NO: 08-13555 (JMP)**

## OMNIBUS OBJECTION 114: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS |
|---|---|---|---|---|---|---|
| 24 | KRAUSE, JUTTA<br>BARSTR. 31<br>BERLIN, 10713<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/05/2009 | 36167 | $14,700.00 |
| 25 | KUHN, GUNTHER AND WALTRAUD<br>VERDENER STR. 79<br>OTTESBERG, 28870<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/05/2009 | 36201 | $15,684.00 |
| 26 | METZ, BEARND<br>VON BODELSCGHWINJH STR. 6<br>PULHEIM, 50259<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/13/2009 | 37435 | $2,868.21 |
| 27 | PATT, FRANZ JOSEF<br>AN DER KRAUTWIESE 37<br>EITORF, 53783<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/2009 | 41486 | $11,323.20 |
| 28 | PONET, THIERRY<br>16 ALDERBROOK ROAD<br>LONDON, SWIR 8AE<br>UNITED KINGDOM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/2009 | 41494 | $1,569.00 |
| 29 | RIALP BONO, MARIA LUISA<br>BALMES 176-2-2<br>BARCELONA, 08006<br>SPAIN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/28/2009 | 35201 | $25,000.00 |
| 30 | ROYAL BANK OF SCOTLAND PLC, THE<br>C/O RBS SECURITIES INC.<br>ATTN: PIA FRIIS<br>600 WASHINGTON BOULEVARD<br>STAMFORD, CT 06901 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/30/2009 | 59674 | Undetermined |
| 31 | SCHINNERER, GUNTER<br>FREIHEITSTR. 3A<br>ZIRNDORF, D-90513<br>GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/02/2009 | 36143 | $21,262.50 |

IN RE LEHMAN BROTHERS HOLDINGS, INC., ET AL., CASE NO: 08-13555 (JMP)

### OMNIBUS OBJECTION 114: EXHIBIT A – NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | TOTAL CLAIM DOLLARS |
|---|---|---|---|---|---|---|
| 32 | SCHINNERER, GUNTER FREIHEISTRA 3A ZIRNDORF, 90513 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/28/2009 | 35229 | $21,262.50 |
| 33 | SCHMETZ, ROLAND SCHWANENTRASSE 16 KLEVE, D-47533 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/01/2009 | 35875 | $14,151.00 |
| 34 | SCHNIEDER, KLAUS KIRCHWEG 3 OSTERCAPPELN, 49179 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/29/2009 | 35493 | $28,302.00 |
| 35 | SCHUSSLER, HANS FREIHEITSSTR. 76 DORSTEN, D-46284 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/09/2009 | 37253 | $4,350.00 |
| 36 | SOLLWEDEL, ANDREN AND WILFRIED WARTEMBERG ELISABETHSTRASSE 24A BERLIN, 12307 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/13/2009 | 37520 | $5,678.00 |
| 37 | UNSLEBER, JULIAN AM LAGBERG 29 SULZTHAL, 97717 GERMANY | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/13/2009 | 37490 | $7,118.00 |
| 38 | VERSTRAETE, JULIANA POPERINGESTRAAT 80 A WOESTEN, 8640 BELGIUM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/2009 | 51709 | Undetermined |
| | | | | | TOTAL | $1,618,001.93 |

# EXHIBIT B

# Capital Raising GmbH

Norderfriedrichskoog, Federal Republic of Germany

Preliminary Offering Circular for
€ • Perpetual Fixed Rate Capital Notes
with the payment of interest and principal
conditional upon receipt of
profit participations and repayment under
a Silent Participation in the commercial enterprise of

# IKB Deutsche Industriebank

Düsseldorf and Berlin

– WKN 749 072 –
of Capital Raising GmbH

Capital Raising GmbH, a company incorporated in accordance with German law with registered office in Norderfriedrichskoog (the "Issuer") shall use the proceeds from the issue of the Capital Notes to participate in the commercial enterprise of IKB Deutsche Industriebank Aktiengesellschaft, Düsseldorf and Berlin, Federal Republic of Germany, as a typical silent partner by making a capital contribution with a nominal value of € •.

The admission of the Capital Notes for trading on the official market (amtlicher Markt) of the Frankfurt Stock Exchange and the Official Segment of Euronext Amsterdam N.V. will be applied for.

The Capital Notes will be represented at all times by a global certificate in bearer form without interest coupons which will be deposited with Clearstream Banking AG, Frankfurt am Main. The Capital Notes may be transferred in the form of co-ownership shares in accordance with the applicable rules of Clearstream Banking AG.

Issue Price: 100 %

**The Capital Notes have not been, and will not be, registered under the United States Securities Act of 1933 (the "Securities Act"). Accordingly, the Capital Notes may not be offered or sold in the United States or to US Persons except in accordance with Regulation S under the Securities Act, or pursuant to an exemption from registration requirements of the Securities Act.**

**BNP PARIBAS**                    **Deutsche Bank**

# Contents

**General Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Summary of the Offer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Appropriation of Issue Proceeds** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Risk Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Description of Offering Structure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
   Terms and Conditions of Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   Silent Partnership Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   Confirmation by IKB Deutsche Industriebank Aktiengesellschaft and Capital Raising GmbH . . 34
   Fiduciary Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   Material Provisions of the Receivables Purchase Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
   Material Provisions of the Agreement of the Reimbursement of Expenses . . . . . . . . . . . . . . . . 39

**General Information on the Issuer** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**General Information on IKB Deutsche Industriebank Aktiengesellschaft** . . . . . . . . . . . . . . . . . . . . 42

**Selected Financial Information on IKB Deutsche Industriebank Aktiengesellschaft** . . . . . . . . . . . 47
   Audited Financial Information for the fiscal years 1998/1999, 1999/2000, 2000/2001
     and 2001/2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
   Unaudited Financial Information as at 30 June 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**The Business of IKB Deutsche Industriebank Aktiengesellschaft** . . . . . . . . . . . . . . . . . . . . . . . . . . 52

**Recent Developments and Outlook of IKB Deutsche Industriebank Aktiengesellschaft** . . . . . . . . 56

**Taxation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**Underwriting and Sale** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

**Financial Information on IKB Deutsche Industriebank Aktiengesellschaft** . . . . . . . . . . . . . . . . . . . F-1

# General Information

**Responsibility for Content of Information Memorandum**

Capital Raising GmbH (the "Issuer"), BNP PARIBAS – Frankfurt/Main Branch – and Deutsche Bank Aktiengesellschaft, Frankfurt/Main, ("Deutsche Bank") are responsible under German law in accordance with Sec. 13 of the German Securities Sales Prospectus Act *(Wertpapier-Verkaufsprospektgesetz)* in conjunction with Sec. 44 et seq. of the German Stock Exchange Act *(Börsengesetz)* and hereby confirm that, to the best of their knowledge, the information contained in this preliminary offering circular ("Information Memorandum") dated 6 November 2002 is correct and that no material information has been omitted.

The Issuer has not permitted any person to make any disclosures or representations that are not contained in this Information Memorandum, or in other documents agreed upon in connection with the issue of the capital notes or in other disclosures made by the Issuer or in publicly available information, and that do not correspond to the content of any such documents, disclosures or information. Where any such disclosures or representations were made, the Issuer does not accept any responsibility.

The delivery of the Information Memorandum or the offer, sale or delivery of the capital notes does not mean, under any circumstances, that the information contained in the Information Memorandum will continue to apply after the publication date of the Information Memorandum or that the financial condition of the Issuer or IKB Deutsche Industriebank Aktiengesellschaft has not deteriorated since the Information Memorandum date.

**Subject Matter of Information Memorandum**

The subject matter of the Information Memorandum is a total issue of € • comprising • Perpetual Fixed Rate Capital Notes 2002 of € • each, vesting claims to interest payment and redemption subject to certain conditions (the "Capital Notes").

**Inspection of Documents**

The documents mentioned in this Information Memorandum, that refer to the Issuer and IKB Deutsche Industriebank Aktiengesellschaft, may be inspected during normal office hours at the offices of the Issuer, Koogstraat 4, 25870 Norderfriedrichskoog, as well as the offices of Deutsche Bank Aktiengesellschaft, Große Gallusstraße 10–14, 60272 Frankfurt/Main.

**Description of IKB Deutsche Industriebank Aktiengesellschaft and IKB Group**

Any references in this Information Memorandum to the "Issuer" are references to Capital Raising GmbH. Any references to "IKB AG" are references to IKB Deutsche Industriebank Aktiengesellschaft. Any references to the "IKB Group" are references to IKB Deutsche Industriebank Aktiengesellschaft and its consolidated subsidiaries unless the context requires otherwise. For a detailed discussion of the company's history, see "General Information on IKB Deutsche Industriebank Aktiengesellschaft".

**Disclosure Regarding Forward-looking Statements**

The statements included herein regarding future financial performance and results and other statements that are not historical facts are forward-looking statements. The words "believes", "expects", "predicts", "estimates" and similar expressions are also intended to identify forward-looking statements. Such statements are made on the basis of assumptions which, although reasonable at this time, may prove to be erroneous. The risks and uncertainties which the Issuer and IKB AG face with respect to their future development and the factors that might influence the correctness of such forward-looking statements are considered, as a general rule, throughout this Information Memoran-

3

dum. Such factors include, inter alia, the factors discussed in "Risk Factors", "Recent Developments and Outlook of IKB Deutsche Industriebank Aktiengesellschaft" and "Financial Information on IKB Deutsche Industriebank Aktiengesellschaft". Actual results could differ significantly from those contemplated in the forward-looking statements contained herein if one or more of any such risks and uncertainties materialise or the facts, upon which these forward-looking statements have been based, prove to be incorrect.

**Currency Presentations**

In this Information Memorandum, references to "euro", "EUR" and "€" are references to the common currency of the member states of the European Economic and Monetary Union, which as of 1 January 1999 replaced the respective national currencies of the relevant countries. References to "Deutsche Mark", "DEM" or "DM" are references to the former national currency of the Federal Republic of Germany prior to the introduction of the euro. References to "US$", "USD" and "US dollars" are references to the dollar of the United States of America. IKB AG publishes its financial statements in euro.

**Definitions**

Capitalised terms used and not defined herein shall have the meaning given to them in the Terms and Conditions of Issue, the Silent Partnership Agreement and the Fiduciary Agreement reproduced under "Description of Offering Structure" in this Information Memorandum.

4

## Summary of the Offer

This summary of the transaction will, in its entirety, be qualified and supplemented by reference to the detailed information as set out elsewhere in this Information Memorandum, in particular in the following Terms and Conditions of Issue and the Silent Partnership Agreement. In case of any deviations between this Summary and the detailed information as set out elsewhere in this Information Memorandum, the latter shall prevail.

| | |
|---|---|
| **Issuer:** | Capital Raising GmbH with registered office in Norderfriedrichskoog, Germany. The Issuer is a limited liability company (GmbH), incorporated under German law, which is neither affiliated nor consolidated with IKB AG and participates in the commercial enterprise of IKB AG as a typical silent partner (see "Description of Offering Structure" – "Silent Partnership Agreement"). |
| | The Issuer is not entitled to create any liabilities other than the Capital Notes issued to refinance the Silent Participation (see "Description of Offering Structure" – "Silent Partnership Agreement"), except for liabilities which are absolutely necessary to keep its business in operation. See "General Information on the Issuer". |
| **IKB AG:** | IKB Deutsche Industriebank Aktiengesellschaft, Düsseldorf and Berlin, Germany. See "General Information on IKB Deutsche Industriebank Aktiengesellschaft". |
| **Joint Arrangers and Joint Lead Managers:** | BNP PARIBAS and Deutsche Bank Aktiengesellschaft, Frankfurt am Main, Germany, acting through its London Branch, Deutsche Bank Aktiengesellschaft London. |
| **Principal Paying Agent:** | Deutsche Bank Aktiengesellschaft, Frankfurt am Main, Germany. |
| **Dutch Paying Agent:** | Deutsche Bank Aktiengesellschaft, acting through its Amsterdam Branch. |
| **Capital Notes:** | € • Perpetual Fixed Rate Capital Notes with conditional obligation to pay interest and principal conditional upon receipt of Profit Participations and repayment under a Silent Participation (see "Description of Offering Structure" – "Silent Partnership Agreement") in the commercial enterprise *(Handelsgewerbe)* of IKB AG in the nominal amount of € • per Capital Note. |
| **Use of Proceeds:** | The Issuer will use the proceeds from the issue of the Capital Notes to make a capital contribution for the purposes of the Silent Participation. |
| **Silent Participation:** | The Issuer participates in the commercial enterprise *(Handelsgewerbe)* of IKB AG as a typical silent partner by making a capital contribution in the nominal amount of € •. The Capital Contribution is to serve as regulatory capital (Tier 1 Capital) within the meaning of the German Banking Act ("KWG") and the capital adequacy recommendations established by the Basle Committee on Banking Supervision. The nominal amount of the Capital Contribution (see "Description of Offering Structure" – "Silent Partnership Agreement") is equal to the nominal amount of the Capital Notes. |
| | The Silent Participation is established for an indefinite period of time. It is subject to German law. |
| **Ranking of the Silent Partner's Claims:** | Claims of the Issuer against IKB AG under the Silent Participation are subordinated to claims of all existing and future creditors of IKB AG (including the claims under profit-participation rights *(Genussrechte)* or subordinated debt within the meaning of § 10 (5), (5a) and (7) KWG). |

5

**Participation of the Issuer in the Profits of IKB AG:** For each Profit Period, the Issuer is entitled to a Profit Participation at a rate equal to • % of the Nominal Contribution Amount for a Payment Period starting on a Distribution Date and ending on the next Distribution Date, calculated on the basis of the actual number of days in this Period divided by 365 or 366, as the case may be. "Payment Period" shall mean the period commencing upon payment of the Capital Contribution and ending on the first Distribution Date or commencing on a Distribution Date and ending on the next following Distribution Date.

No Profit Participation is payable if and to the extent that such payment would cause or increase a balance sheet loss within the meaning of § 158 (1) No. 5 German Stock Corporation Act ("AktG"). Further, pursuant to the general provision of § 301 sentence 1 AktG no profit participation is payable if and to the extent the amount payable pursuant to the Silent Partnership Agreement and other partial profit transfer agreements *(Teilgewinnabführungsverträge)* exceeds the annual net income *(Jahresüberschuss)* of IKB AG adjusted for losses carried forward from the previous financial year, transfers to the statutory reserve *(gesetzliche Rücklage)* and transfers from other revenue reserves *(andere Gewinnrücklagen)* accrued during the term of the Silent Partnership Agreement. Furthermore, payment of a Profit Participation requires full replenishment of the Capital Contribution in the event that its Book Value has been decreased below the Nominal Contribution Amount as a result of any loss participation.

If IKB AG pays a dividend (as described in Section 2(5) of the Silent Partnership Agreement) for the relevant Fiscal Year or makes payments in respect of Other Tier 1 Capital Instruments (see "Description of Offering Structure" – "Silent Partnership Agreement"), IKB AG is under the obligation to, despite there being a Balance Sheet Loss, withdraw amounts from revenue reserves within the meaning of § 301 sentence 2 AktG in order to avoid any Reduction or to replenish any reduced Book Value of the Capital Contribution, as the case may be, if and to the extent that such reserves are existing. The obligation to replenish or to avoid any Reduction and to pay Profit Participations by withdrawing amounts from revenue reserves pursuant to § 301 sentence 2 AktG only exists if and to the extent the solvency ratio of IKB AG remains at least 9 % on an individual as well as on a consolidated basis. When paying Profit Participations, the limitations contained in § 301 sentence 1 AktG, as described above, must be observed. Capital reserves cannot be used for the purpose of servicing the Silent Participation. Where any Other Tier 1 Capital Instruments ranking pari passu in relation to the Capital Contribution are serviced only in part, the Profit Participation, within § 301 sentence 2 AktG, must be paid on a pro rata basis. In the event that any Other Tier 1 Capital Instruments which are subordinated to the Capital Contribution are serviced only in part, the Profit Participation, within § 301 sentence 2 AktG, is to be paid in full. IKB AG will not make payment of the Profit Participation in respect of a Profit Period if and to the extent that the German Financial Services Supervisory Agency *(Bundesanstalt für Finanzdienstleistungsaufsicht)* has prohibited the Bank to do so. If, due to the fact that the annual accounts have not yet been approved, IKB AG pays the Profit Participation only after the Due Date, interest shall be payable on the Profit Participation at a rate of 5 % above the then applicable base rate (see "Risk Factors – Profit Participation and Payments in respect of the Capital Notes" regarding the non-obligation of the Issuer to pay Profit Participations).

The Issuer may request that the Profit Participation be increased if and to the extent that, as a result of any tax-related changes, the Silent Partner incurs higher refinancing costs or any additional liability.

There is no obligation to subsequently pay any Profit Participations that were not paid.

6

| | |
|---|---|
| **Participation of the Issuer in any Losses of IKB AG:** | In the event of a Balance Sheet Loss, the Book Value of the Capital Contribution will be reduced on a pro rata basis with the total book value of other loss-participating components of IKB AG's regulatory capital. Future balance sheet profits shall be used to replenish the Capital Contribution up to the Nominal Contribution Amount. |
| **Termination of the Silent Partnership:** | Termination by the Issuer is excluded. |
| | IKB AG may terminate the Silent Partnership by giving two years' prior notice with effect as of the end of a Fiscal Year, and, in the event of certain tax or regulatory changes, with effect at the end of a calendar month, but in no event earlier than with effect from 31 March 2013 (see "Risk Factors" – "No fixed Termination Date" and "Description of Offering Structure" – "Overview" – "Silent Partnership Agreement"). Termination requires the prior consent of the German Financial Services Supervisory Agency. |
| | Should the Capital Contribution no longer qualify as Tier 1 Capital within the meaning of the KWG, IKB AG may terminate the Silent Partnership at any time by giving 30 day's notice with effect as of the end of month. |
| | If the Book Value of the Capital Contribution is decreased below the Nominal Contribution Amount, the Silent Partnership will be deemed not terminated until the Capital Contribution has been fully replenished up to the Nominal Contribution Amount. |
| | In the event the Silent Partnership is terminated during a Fiscal Year, interest shall be payable on the Silent Partnership at the then applicable rate of the Profit Participation from the Termination Date until the end of the Fiscal Year in which the Silent Partnership is terminated. |
| | Except for the obligation to pay interest in the event of termination of the Silent Partnership during a Fiscal Year, no interest shall be payable on the Repayment Amount which is due upon termination of the Silent Partnership for the period between the Termination Date and the Repayment Date. |
| **Receivables Purchase Agreement:** | Upon distribution of the Profit Participation to the Issuer or the replenishment of the Capital Contribution following a Reduction of its Book Value, IKB AG is obliged to withhold amounts on account of investment income tax *(Kapitalertragsteuer)* payable on the distributed amounts and/or on the amount of replenishment pursuant to § 43 (1) No. 3 German Income Tax Act (EStG), unless the tax authorities have granted a tax exemption for payments to the Issuer. The Withholding will be credited as a prepayment against the corporate income tax liability of the Issuer. To the extent that any such prepayment exceeds the definitive amounts of corporate income tax payable by the Issuer, the Issuer will have a refund claim against the tax authorities. |
| | Pursuant to a Receivables Purchase Agreement between the Issuer and IKB AG, the Issuer sells and assigns to IKB AG its Tax Refund Claims against the tax authorities. As consideration, the Issuer will have payment claims against IKB AG, which claims become due for payment in the amount of the respective Withholding at the time of the distribution of the Annual Profit Participation. The Profit Participation, after deduction of investment income tax, plus the Purchase Price paid for the Tax Refund Claims equals the gross amount of the Profit Participation. |
| **Fiduciary Agreement:** | Pursuant to a Fiduciary Agreement entered into between the Issuer, IKB AG and the Fiduciary for the benefit of the noteholders (hereinafter the "Investors"), the Issuer has assigned to the Fiduciary all present and future Profit Par- |

7

ticipation Claims, Delayed Payment Interest Claims, Payment Claims and Termination Claims against IKB AG as security for the claims of the noteholders.

**Fiduciary:** Deutsche Bank Aktiengesellschaft, Frankfurt am Main, Germany.

**Status of the Capital Notes:** The Capital Notes represent unsecured (except for the security under the Fiduciary Agreement) and unsubordinated liabilities of the Issuer ranking *pari passu* among themselves and with all other unsecured and unsubordinated liabilities of the Issuer, except for liabilities which rank senior as a matter of law.

**Other Tier 1 Capital Instruments:** IKB AG reserves the right to enter into agreements on Other Tier 1 Capital Instruments (see "Description of Offering Structure" – "Silent Partnership Agreement") on identical or different terms. Claims of any future silent partners (or of holders of security provided for Tier 1 Capital Instruments of subsidiaries of IKB AG) may not rank senior to the claims of the Issuer under the Silent Partnership.

**Repayment of the Capital Notes:** The Capital Notes have no fixed maturity.

The Issuer may terminate the Capital Notes for early redemption for the first time with effect from 15 July 2013 or at any time for tax reasons, provided that the financing of the repayment of the Capital Notes plus any interest accrued is ensured by the issue of similar debt securities or in any other way.

In the event of a breach by the Issuer of obligations under the Terms and Conditions of Issue, the noteholders are entitled to early termination of the Capital Notes subject to the Terms and Conditions of Issue.

In all other circumstances, the Capital Notes will be redeemed upon repayment of the Capital Contribution in the amount of the Capital Contribution repaid by IKB AG.

**Payment of Interest:** Annually, at a rate equal to • % p.a. of the Nominal Contribution Amount if and to the extent that the Fiduciary has effectively received the necessary amounts for the account of the Issuer. The interest rate corresponds to the Profit Participation of the Issuer under the Silent Partnership less a margin of •% p.a. of the Nominal Contribution Amount, which margin will be retained by the Issuer as its own income if and to the extent that the Annual Profit Participation together with the Purchase Price paid for the Tax Refund Claims exceeds the amount of interest payable to the Investors. IKB AG has undertaken with the Issuer to reimburse the Issuer for current expenses relating to and required in respect of the holding and the administration of the Capital Contribution as well as the issue of the Capital Notes.

**Interest Payment Days:** 15 July of the Fiscal Year following the relevant Fiscal Year of IKB AG; if such day is not a Business Day, interest shall be paid immediately on the Business Day following 15 July; no additional interest shall be payable in the event of such postponement.

In the event that the annual accounts of the relevant Fiscal Year of IKB AG have not yet been approved on the relevant Due Date, payment will be postponed until the first Business Day following the day on which the annual accounts of IKB AG have been approved. The Issuer will pay any amounts of Delayed Payment Interest which the Fiduciary has received from IKB AG as additional interest on the Capital Notes.

**Profit Period:** The First Profit Period (see "Description of Offering Structure" – "Silent Partnership Agreement") is the period commencing on (and including) the date on which payment of the Capital Contribution is made and ending on (and

8

including) 31 March 2003. Each following Profit Period corresponds with the Fiscal Year of IKB AG commencing on (and including) 1 April and ending on (and including) 31 March of each year, unless the Profit Period shall end early due to effective termination of the Silent Partnership.

**Payment Period:**

The First Payment Period (see "Description of Offering Structure" – "Silent Partnership Agreement") commences on (and includes) the date of payment of the Capital Contribution and ends on (and excludes) the first Distribution Date. Each following Payment Period commences on (and includes) a Distribution Date and ends on (and excludes) the next following Distribution Date.

The relevant Profit Participation will be calculated in respect of each Payment Period on the basis of the effective number of days in that Payment Period divided by 365 and/or 366.

**Gross Interest Clause:**

Under certain circumstances (see "Description of the Offering Structure" – "Terms and Conditions of Issue"), the Issuer is obliged to pay Additional Amounts to the noteholders if and to the extent due to any future changes in legislation, payments on the Capital Notes may become subject to any withholding tax (except for interest income tax *(Zinsabschlag)* or any comparable tax) or deductions by the Issuer.

In such case, or if the tax liability of the Issuer increases due to a change in trade income taxation or the introduction of an other income or property tax, IKB AG shall increase the Profit Participation accordingly.

**Applicable Law:**

German Law.

**Envisaged Listings of the Capital Notes:**

Frankfurt am Main (Official Market) and Euronext Amsterdam N.V. (Official Segment).

9

## Appropriation of Issue Proceeds

The Issuer will use the proceeds from the issue of the Capital Notes to participate in the commercial enterprise of IKB AG as a typical silent partner by making a capital contribution of € • in accordance with the Silent Partnership Agreement included in this Information Memorandum.

10

# Risk Factors

***Potential Investors should thoroughly read the following summary of certain risk factors prior to any investment in the Capital Notes. The discussion of risk factors set out below does not comprise all potential risks. Interested investors should consider all information in this Information Memorandum and, where appropriate, should contact their professional advisers for further advice.***

## Risk Factors associated with the Structure of the Issue

### Liability

The Capital Notes represent obligations of the Issuer only and will not in any case be deemed to constitute claims or obligations of the Managers, the Fiduciary, IKB AG or affiliated companies of the Issuer or other individuals or legal entities. None of these persons or entities assumes any liability in respect of the Capital Notes in the event the Issuer fails to comply with its payment obligations thereunder.

### Conditional Payment Obligation under the Capital Notes

The obligation of the Issuer to make payments under the Capital Notes depends on the receipt of the necessary amounts payable by IKB AG under the Silent Partnership Agreement and the Receivables Purchase Agreement.

### Profit Participation and Payments in respect of the Capital Notes

The Issuer will make interest payments on the Capital Notes from the Annual Profit Participation (see "Description of Offering Structure" – "Terms and Conditions of Issue") and the Amount of the Purchase Price effectively received by the Fiduciary for the account of the Issuer. In the event the amounts paid by IKB AG are not sufficient, the amount of interest payments will be reduced accordingly. No interest will be payable if and for so long as the Capital Contribution following any Reduction of its Book Value due to a loss participation of the Silent Partner has not been fully replenished to the Nominal Contribution Amount. In addition, no interest will be payable if and to the extent payment of the Profit Participation for the relevant Profit Period would result in, or increase, any balance sheet loss within the meaning of § 158 (1) No. 5 AktG of IKB AG. § 301 AktG limits the maximum amount of profit participations payable by IKB AG for each Profit Period pursuant to the Silent Partnership Agreement and other partial profit transfer agreements *(Teilgewinnabführungsverträge)* to the amount of the annual net income *(Jahresüberschuss)* of IKB AG adjusted for losses carried forward from the previous financial year, transfers to the statutory reserve *(gesetzliche Rücklage)* and transfers from other revenue reserves *(andere Gewinnrücklagen)* accrued during the term of the Silent Partnership Agreement. If, in case that the payment of the Profit Participation would result in, or increase, any Balance Sheet Loss, dividends are paid to the shareholders of IKB AG or if in such case any other payments on Other Tier 1 Capital Instruments are made, IKB AG is under the obligation to, in compliance with § 301 sentence 2 AktG, withdraw amounts from existing revenue reserves in order to avoid any Reduction or fully replenish any reduced Book Value, as the case may be, and subject to the provisions of § 301 AktG, by payment of a Profit Participation, provide for a payment of interest on the Capital Notes by the Issuer if and to the extent that IKB AG's solvency ratio remains at least 9 % on an individual as well as on a consolidated basis. In accordance with § 301 AktG, only such revenue reserves may be withdrawn which have been contributed to other revenue reserves within the meaning of § 158 (1) No. 4 AktG during the term of the Silent Partnership. If such revenue reserves do not exist, no Profit Participation will be paid on the Silent Partnership. Capital reserves cannot be used for the purpose of paying Profit Participation on the Silent Partnership. Where any Other Tier 1 Capital Instruments ranking pari passu are serviced only in part, the Profit Participation, within § 301 AktG, is to be paid on a pro rata basis. In the event that any subordinated Other Tier 1 Capital Instruments are serviced only in part, the Profit Participation, within § 301 AktG, is to be paid in full. IKB AG will not make any payment of the Profit Participation in respect of a Profit Period if and to the extent that the German Financial Services Supervisory Agency has prohibited the Bank to do so.

Neither the Issuer nor the Investors may require IKB AG to make distributions from revenue reserves. However, in the event IKB AG should not make withdrawals from revenue reserves, IKB AG has undertaken not to make any payments on any Other Tier 1 Capital Instruments unless it is under the obligation to do so. Missed interest payments will not be made subsequently.

The Issuer is of the opinion that, pursuant to currently applicable law, it will not be obliged to with-hold any capital income tax from payments made on the Capital Notes. However, it cannot be excluded that the tax authorities may decide otherwise. In any case, the Issuer will only pay Addi-tional Amounts to the holders of the Capital Notes as compensation for any withholding effected by the Issuer if and to the extent that any such withholding is required by law in the future due to a change in legislation (i. e. particularly any changes in applicable laws or regulations), however, no payment will be made if the present applicable legal situation remains unchanged.

### Unlimited Power of Attorney of the Managing Directors (Geschäftsführer) of the Issuer

The purpose of the business of the Issuer as specified in its Articles of Associaton is limited to the participation in the commercial enterprise of a bank as silent partner, the issue of notes and the engagement in any ancillary business relating hereto. Under German law, however, the unrestricted power of the managing directors of the Issuer to enter into transactions which are outside the scope of the statutory purpose remains unaffected. As a consequence, should the managing directors, in violation of their duties and in breach of the Articles of Association, disregard the above restrictions and limitations, any obligations of the Issuer assumed as a result thereof would in normal circum-stances be legally effective. If and to the extent such obligations are not borne by IKB AG under the Agreement on the Reimbursement of Expenses between IKB AG and the Issuer, such obligations could adversely affect the ability of the Issuer to make payments on the Capital Notes in accordance with the Terms and Conditions of Issue.

### Ranking of the Capital Notes and the Silent Participation

The Capital Notes represent unsecured (except for the security under the Fiduciary Agreement) and unsubordinated liabilities of the Issuer ranking *pari passu* among themselves and with all other un-secured and unsubordinated liabilities of the Issuer, except for liabilities which rank senior as a mat-ter of law.

However, the claims of the Issuer against IKB AG under the Silent Partnership Agreement represent unsecured liabilities of IKB AG and are *subordinated* to claims of all existing and future creditors of IKB AG (including claims under profit participation rights and, where applicable, Tier 2 Capital Instru-ments as well as all other subordinated liabilities pursuant to § 10 (5), (5a) and (7) KWG), rank *pari passu* with all claims under existing and future silent partnerships and with all Other Tier 1 Capital Instruments which, in accordance with their terms and conditions, rank *pari passu* with profit partici-pation rights in the form of silent partnerships, and rank *senior* to all claims under shares of IKB AG. The replenishment of the Capital Contribution following a Reduction takes priority over the replenish-ment of the share capital, payment of dividends or allocation to reserves (except for statutory reserves). The obligation to replenish the Capital Contribution ranks *pari passu* with Other Tier 1 Capital Instruments and is subordinated to similar obligations under profit participation rights unless the terms and conditions of such rights provide for *pari passu* ranking.

The subordinated claims under the Silent Partnership Agreement represent substantially all assets of the Issuer. Accordingly, the ability of the Issuer to make any payments on the Capital Notes depends on the receipt of payments under such subordinated claims.

### No Direct Claims of Investors against IKB AG

The Investors have no direct rights or claims for any Profit Participation or any other claims under the Silent Partnership Agreement and the other agreements against IKB AG. This applies also if the Capi-tal Notes are not repaid at full nominal value on the Repayment Date due to a reduced Book Value of the Capital Contribution.

12

### *No Fixed Repayment Date*

There is no fixed date for the repayment of the Capital Notes.

The Capital Notes may be terminated early (i.e. prior to repayment of the Capital Contribution) in whole, but not in part, and redeemed, including any interest accrued on the Capital Notes, for the first time with effect at 15 July 2013, and for certain tax reasons with effect at the end of each month, by giving no less than 30 and no more than 60 days' notice. The Investors are entitled only to such amounts of interest accrued until the day on which the Capital Notes are effectively terminated. The Issuer may terminate the Capital Notes early only if the financing of the redemption of the Capital Notes plus any accrued interest is secured by the issue of similar debt securities or in any other way.

In all other cases, redemption of the Capital Notes depends on the repayment of the Capital Contribution. The Capital Contribution is to be repaid, in particular, in the event of a termination of the Silent Partnership Agreement. Any such termination may be declared by IKB AG no earlier than with effect at 31 March 2013. Whether IKB AG will exercise its right of termination with effect at 31 March 2013 or with effect at a later date will depend on a number of bank internal and external factors which will be taken into account by IKB AG in its decision on the exercise of its right of termination. Such factors include for example the regulatory capital and the refinancing options of IKB AG, the assessment of the Capital Contribution under bank regulatory aspects, the required prior consent of the German Financial Services Supervisory Authority as well as the general interest environment and capital markets conditions at the time of the relevant termination.

In any case, repayment of the Capital Contribution is excluded to the extent the Book Value of the Capital Contribution has been reduced by reason of a previous loss participation and has not been fully replenished up to the Nominal Contribution Amount.

### *Limited Secondary Market*

There is no established secondary market for the Capital Notes and it is not possible to predict whether a secondary market for the Capital Notes will develop or continue. The ability of Investors to sell the Capital Notes as well as the expected price will depend, among other factors, primarily on the development of any such secondary market.

## Description of Offering Structure

### Overview

This overview will, in its entirety, be qualified and supplemented by reference to the detailed information as set out elsewhere in this Information Memorandum, in particular in the following Terms and Conditions of Issue and the Silent Partnership Agreement. In the event of any inconsistencies between this overview and the detailed information as set out elsewhere in this Information Memorandum, the latter shall prevail.



Sole shareholder of the Issuer is Deutsche International Corporate Services Limited, with its registered office in Jersey, acting as trustee of the Capital Raising Charitable Trust, an independent non-profit trust domiciled in Jersey.

### *Silent Partnership Agreement*

The Issuer will use the proceeds from the issue of the Capital Notes for the purpose of participating in the commercial enterprise of IKB AG as typical silent partner by means of a capital contribution in the nominal amount of € •. The Capital Contribution will be used by IKB AG as regulatory capital within the meaning of the KWG. Under the Silent Partnership Agreement, the Issuer is entitled to an Annual Profit Participation in a rate equal to • % p. a. of the Nominal Contribution Amount in respect of the relevant Payment Period.

Payments of the Profit Participation are not made if and to the extent that any such payment would result in a balance sheet loss within the meaning of § 158 (1) No. 5 AktG of IKB AG (see "Risk Factors – Profit Participation and Payment in respect of the Capital Notes regarding the non-obligation of IKB AG to pay Profit Participations"). Missed Profit Participations will not be paid subsequently. In case of a Balance Sheet Loss, the Capital Contribution of the Silent Partner will be reduced on a pro rata basis together with other components of the regulatory capital of IKB AG participating in the losses. Replenishment of the Capital Contribution will be made out of future balance sheet profits.

Termination by the Silent Partner is excluded. IKB AG may terminate the Silent Partnership Agreement by giving two years' prior notice, but in no event earlier than with effect at March 2013. Termination requires the prior consent of the German Financial Services Supervisory Agency.

### *Receivables Purchase Agreement*

Upon distribution of the Profit Participation to the Issuer or the replenishment of the Capital Contribution following a Reduction of its Book Value, IKB AG has to withhold amounts on account of invest-

14

ment income tax *(Kapitalertragsteuer)* payable on the distributed amounts and/or on the amount of replenishment pursuant to § 43 (1) No. 3 German Income Tax Act *(EStG)*, unless the tax authorities have granted a tax exemption for payments to the Issuer. The Withholding is treated as a prepayment towards the corporate income tax liability of the Issuer. To the extent that any such prepayment exceeds the definitive amounts of corporate income tax payable by the Issuer, the Issuer will have a refund claim against the tax authorities.

Pursuant to the Receivables Purchase Agreement, the Issuer sells and assigns to IKB AG its Tax Refund Claims against the tax authorities. As consideration, the Issuer will have payment claims against IKB AG, which claims become due for payment in the amount of the respective Withholding at the time of the distribution of the Annual Profit Participation. The Profit Participation following the withholding of investment income tax, plus the Purchase Price paid for the Tax Refund Claims, equals the gross amount of the Profit Participation.

### Capital Notes

On each Due Date, the Issuer will make interest payments on the Capital Notes to the Investors from the Annual Profit Participation (see "Description of Offering Structure" – "Terms and Conditions of Issue") and the Amount of the Purchase Price received by the Fiduciary for the account of the Issuer, at a rate of • % p. a. of the Nominal Contribution Amount, provided that the interest payment is not reduced due to a lower amount of Profit Participation. The interest rate corresponds to the Profit Participation of the Issuer reduced by a margin of • % p. a. of the Nominal Contribution Amount retained by the Issuer as its own income. The Issuer realises such income only and to the extent that the Annual Profit Participation together with the Amount of the Purchase Price exceeds the amount of interest payable to the Investors. The Issuer shall not be under the obligation to subsequently make any missed interest payments.

No date has been fixed for redemption of the Capital Notes. Redemption of the Capital Notes will be effected upon repayment of the Capital Contribution if and to the extent the Capital Contribution is repaid by IKB AG (see "Description of Offering Structure" – "Silent Partnership Agreement"). Any redemption of the Capital Notes is excluded for so long as the Capital Contribution is reduced by a previous loss participation and has not been fully replenished.

### Fiduciary Agreement

In accordance with the Fiduciary Agreement between the Issuer, IKB AG and the Fiduciary for the benefit of the Investors, the Issuer has assigned to the Fiduciary any and all present and future claims for Profit Participation, Delayed Payment Interest as well as Payment and Termination Claims against IKB AG as security for the claims of the Investors under the Capital Notes. If, on the relevant Due Date, payments to be made on the Assigned Claims (see "Description of Offering Structure" – "Fiduciary Agreement") are not made, the Fiduciary will assert the claims promptly against IKB AG. The Fiduciary is entitled to take judicial and extra-judicial action in the interest of the Investors.

### Agreement on the Reimbursement of Expenses

In a separate agreement IKB AG has undertaken to reimburse to the Issuer the current expenses related to and necessary in respect of the holding and the administration of the Capital Contribution as well as the issue of the Capital Notes.

# Terms and Conditions of Issue

*The German text of the Terms and Conditions of Issue is legally binding. The English translation is for convenience only.*

## Emissionsbedingungen

### § 1
### Stückelung, Verbriefung, Clearing

(1) *Stückelung.* Die Emission der Capital Raising GmbH (die „**Emittentin**") im Gesamtnennbetrag von € • (in Worten: Euro •) (der „**Nennbetrag**") ist eingeteilt in • untereinander gleichrangige Teilschuldverschreibungen mit einem Nennbetrag von jeweils € • (die „**Teilschuldverschreibungen**").

(2) *Verbriefung.* Die Teilschuldverschreibungen werden durch eine auf den Inhaber lautende Globalurkunde (die „**Globalurkunde**") ohne Zinsscheine verbrieft. Effektive Urkunden über einzelne Teilschuldverschreibungen und Zinsscheine werden nicht ausgegeben. Eine Kopie der Globalurkunde ist für die Inhaber der Teilschuldverschreibungen (jeweils ein „**Investor**") bei den Geschäftsstellen der Zahlstelle (§ 12) kostenlos erhältlich.

(3) *Clearing System.* Die Globalurkunde wird bis zur vollständigen Erfüllung sämtlicher Verpflichtungen der Emittentin aus den Teilschuldverschreibungen von der Clearstream Banking AG, Frankfurt am Main (das „**Clearing System**"), verwahrt. Die Teilschuldverschreibungen sind durch entsprechende Depotbuchungen gemäß den jeweiligen Bestimmungen des Clearing Systems und, außerhalb der Bundesrepublik Deutschland, Clearstream Banking S.A., Luxemburg, und Euroclear Bank S.A./N.V., Brüssel, übertragbar.

### § 2
### Stille Beteiligung, Treuhand, Forderungskauf

(1) *Beteiligungsvertrag.* Den Erlös aus der Ausgabe der Teilschuldverschreibungen wird die Emittentin ausschließlich zu dem Zweck verwenden, nach Maßgabe des Vertrags über die Errichtung einer Stillen Gesellschaft vom • 2002 (der „**Beteiligungsvertrag**") zwischen der Emittentin und der IKB Deutsche Industriebank Aktiengesellschaft, Düsseldorf und Berlin, (die „**Bank**"), eine stille Beteiligung (die „**Stille Beteiligung**") in Höhe von € • (Euro •) (der „**Einlagenennbetrag**") an der Bank zu begründen, die bei dieser als haftendes Eigenkapital dienen soll. Nach Maßgabe des Beteiligungsvertrags steht der Emittentin während der Dauer des Beteiligungsvertrags als Gegenleistung für ihre Einlage eine Gewinnbeteiligung in jedem Gewinnzeitraum (die „**Gewinnbeteiligung**") zu. Die Gewinnbeteiligungen werden jeweils jährlich nach Maßgabe des Beteiligungsvertrags ermittelt und ausgeschüttet (nach Abzug des Einbehalts gemäß § 2(3) jeweils eine „**Jährliche Gewinnbeteiligung**"). Die Ausschüttung der Jährlichen Gewinnbeteiligung erfolgt am jeweiligen Fälligkeitstag gemäß § 3(1) des Beteiligungsvertrags (jeweils der „**Fälligkeitstag**"). Erfolgt die Ausschüttung nach dem jeweiligen Fälligkeitstag wegen verspäteter Feststellung des für die Ermittlung der jeweiligen Jährlichen Gewinnbeteiligung maßgeblichen Jahresabschlusses, wird die Jährliche Gewinnbeteiligung nach Maßgabe des Beteiligungsvertrags verzinst (die „**Verspätungszinsen**") [1]. Die Bestimmungen des Beteiligungsvertrags werden diesen Emissionsbedingungen sowie der Globalurkunde als Anlage beigefügt und bilden mit diesen jeweils eine Einheit. Eine

---

[1]  Vgl. in diesem Prospekt „Beschreibung der Emissionsstruktur" – „Vertrag über eine Stille Beteiligung".

## Terms and Conditions of Issue

### Section 1
### Denomination, Form, Clearing

(1) *Denomination.* The issue by Capital Raising GmbH (the "**Issuer**") in the aggregate nominal amount of € • (in words: Euro • ) (the "**Nominal Amount**") is divided into • capital notes, ranking *pari passu* among themselves, in the nominal amount of € • each (the "**Capital Notes**").

(2) *Form.* The Capital Notes will be represented by a global bearer certificate (the "**Global Certificate**") without interest coupons. Definitive certificates representing individual Capital Notes and interest coupons will not be issued. A copy of the Global Certificate will be available to the holders of the Capital Notes (each an "**Investor**") at the offices of the Paying Agent (Section 12) without charge.

(3) *Clearing System.* The Global Certificate will be held in custody by Clearstream Banking AG, Frankfurt am Main, (the "**Clearing System**"), until all obligations of the Issuer under the Capital Notes have been fully satisfied. The Capital Notes will be transferable by book entry in accordance with the applicable rules of the Clearing System and, outside the Federal Republic of Germany, the rules of Clearstream Banking S.A., Luxembourg, and Euroclear Bank S.A./N.V., Brussels.

### Section 2
### Capital Contribution, Fiduciary Agreement, Purchase of Receivables

(1) *Silent Partnership Agreement.* The proceeds from the issue of the Capital Notes will be used by the Issuer solely for the purpose of making a capital contribution (the "**Capital Contribution**") in the amount of € • (Euro •) (the "**Nominal Contribution Amount**") to IKB Deutsche Industriebank Aktiengesellschaft, Düsseldorf and Berlin, (the "**Bank**") in accordance with the Agreement on the Establishment of a Silent Partnership dated • 2002, (the "**Silent Partnership Agreement**"), entered into between the Issuer and the Bank. The Capital Contribution is to serve the Bank as regulatory capital. Pursuant to the Silent Partnership Agreement and as consideration for its contribution, the Issuer is entitled to a profit participation in each Profit Period (the "**Profit Participation**") for the term of the Silent Partnership Agreement. The Profit Participations accruing in each Profit Period will be calculated and distributed on an annual basis in accordance with the Silent Partnership Agreement (after deduction of the withholding as per Section 2(3) below, each an "**Annual Profit Participation**"). The Annual Profit Participation shall be distributed on the relevant due date pursuant to Section 3(1) of the Silent Partnership Agreement (each such date a "**Due Date**"). In the event the distribution is made after the relevant Due Date due to a delayed approval of the annual accounts relevant to the calculation of the respective Annual Profit Participation, the Annual Profit Participation shall bear interest in accordance with the terms of the Silent Partnership Agreement (the "**Delayed Payment Interest**") [1]. The terms of the Silent Partnership Agreement are attached hereto and to

---

[1]  See in this Information Memorandum "Structure of the Issue" – "Silent Partnership Agreement".

16

Kopie des Beteiligungsvertrags in seiner jeweils gültigen Fassung liegt zur Einsichtnahme in den Geschäftsstellen der Zahlstelle (§ 12) aus. Soweit nicht anders bestimmt, haben Begriffe in diesen Emissionsbedingungen dieselbe Bedeutung wie im Beteiligungsvertrag.

(2) *Rechtsverhältnis.* Durch den Beteiligungsvertrag werden keine Rechte der Investoren gegenüber der Bank begründet. Die Bank übernimmt gegenüber den Investoren keine Haftung für die Weiterleitung von gegenüber der Emittentin geschuldeten Zahlungen.

(3) *Forderungskaufvertrag.* Bei der Ausschüttung der Gewinnbeteiligung an die Emittentin oder einer Auffüllung der Stillen Beteiligung nach Herabsetzung ihres Buchwerts behält die Bank gemäß § 43 Abs. 1 Nr. 3 EStG Kapitalertragsteuer zuzüglich Solidaritätszuschlag auf die ausgeschütteten Beträge bzw. den Betrag der Wiederauffüllung ein, falls die Finanzverwaltung für Zahlungen an die Emittentin keine Befreiung erteilt hat. Dieser Einbehalt (der „**Einbehalt**") wird als Vorauszahlung auf die von der Emittentin geschuldete Körperschaftsteuer angerechnet. In der Höhe, in der diese Vorauszahlung die tatsächliche Körperschaftsteuerschuld der Emittentin übersteigt, steht der Emittentin jeweils ein Rückerstattungsanspruch gegen die Finanzbehörden zu (der „**Steuererstattungsanspruch**"). Die Emittentin und die Bank haben am • 2002 einen Vertrag über den Erwerb der Steuererstattungsansprüche der Emittentin durch die Bank abgeschlossen (der „**Forderungskaufvertrag**")[2]), durch den die Emittentin ihre Steuererstattungsansprüche gegen die Finanzbehörden an die Bank verkauft und abtritt. Als Gegenleistung stehen der Emittentin Zahlungsansprüche gegen die Bank zu, die jeweils zum Zeitpunkt der Ausschüttung der Jährlichen Gewinnbeteiligung und in Höhe des jeweiligen Einbehalts zur Zahlung fällig werden (jeweils ein „**Kaufpreisbetrag**"). Bei einem Einbehalt, der aufgrund einer Auffüllung der Stillen Beteiligung nach Herabsetzung ihres Buchwerts erfolgt, ist der Kaufpreisbetrag für die Auffüllung der Stillen Beteiligung zu verwenden, indem er nicht ausgezahlt, sondern der Stillen Beteiligung gutgeschrieben wird. Die Bestimmungen des Forderungskaufvertrags werden diesen Emissionsbedingungen sowie der Globalurkunde als Anlage beigefügt und bilden mit diesen jeweils eine Einheit. Eine Kopie des Forderungskaufvertrags liegt zur Einsichtnahme in den Geschäftsstellen der Zahlstelle (§ 12) aus.

(4) *Treuhandvertrag.* Die Emittentin, die Bank und Deutsche Bank Aktiengesellschaft, Frankfurt am Main, (die „**Treuhänderin**") haben am • 2002 einen Treuhandvertrag abgeschlossen (der „**Treuhandvertrag**")[3]). Nach dem Treuhandvertrag hat die Emittentin alle ihre derzeitigen und künftigen Ansprüche auf die Jährlichen Gewinnbeteiligungen und eventuelle Verspätungszinsen sowie die ihr bei Beendigung der Stillen Beteiligung zustehenden Ansprüche auf Rückzahlung des Einlagenennbetrags und auf Zahlung der eventuell angefallenen Gewinnbeteiligung bzw. Zinsen unter dem Beteiligungsvertrag und ihre Ansprüche auf Zahlung der Kaufpreisbeträge unter dem Forderungskaufvertrag zur Sicherung der Zahlungen von Kapital und Zinsen unter diesen Emissionsbedingungen abgetreten. Die Treuhänderin wird die abgetretenen Ansprüche nach Maßgabe des Treuhandvertrags treuhänderisch für die

the Global Certificate and shall be an integral part hereof and thereof. A copy of the Silent Partnership Agreement, as amended from time to time, is available for inspection at the offices of the Paying Agent (Section 12). Unless stated otherwise, terms used in these Terms and Conditions of Issue shall have the same meaning as in the Silent Partnership Agreement.

(2) *Legal Relationship.* The Silent Partnership Agreement does not give rise to any rights of the Investors vis-à-vis the Bank. The Bank does not assume any liability vis-à-vis the Investors with respect to the forwarding of payments owed to the Issuer.

(3) *Receivables Purchase Agreement.* Upon distribution of the Profit Participation to the Issuer or the replenishment of the Capital Contribution following reduction of its Book Value, the Bank is obliged to withhold investment income tax plus solidarity surcharge on the distributed amounts and/or on the amount of replenishment, pursuant to § 43 (1) No. 3 of the German Income Tax Act *(EStG)*, unless the tax authorities have granted a tax exemption for payments to the Issuer. This Withholding (the "**Withholding**") will be credited as a prepayment against the corporate income tax liability of the Issuer. To the extent any such prepayment exceeds the actual amount of corporate income tax liability of the Issuer, the Issuer will have a refund claim vis-à-vis the tax authorities (the "**Tax Refund Claim**"). On • 2002, the Issuer and the Bank entered into an agreement on the purchase by the Bank of the Tax Refund Claims of the Issuer (the "**Receivables Purchase Agreement**")[2]), under which the Issuer sells and assigns its Tax Refund Claims against the tax authorities to the Bank. As consideration therefor, the Issuer will have payment claims against the Bank, which claims become due at the time of distribution of the Annual Profit Participation and are payable in the amount of the respective Withholding (each an "**Amount of the Purchase Price**"). In the event of a Withholding due to replenishment of the Capital Contribution after reduction of its Book Value, the Amount of the Purchase Price shall not be paid to the Issuer but credited to the Capital Contribution and thus used towards its replenishment. The terms of the Receivables Purchase Agreement are attached hereto and to the Global Certificate and shall be deemed to constitute one document. A copy of the Receivables Purchase Agreement is available for inspection at the offices of the Paying Agent (Section 12).

(4) *Fiduciary Agreement.* On • 2002, the Issuer, the Bank, and Deutsche Bank Aktiengesellschaft, Frankfurt am Main, (the "**Fiduciary**") have entered into a fiduciary agreement (the "**Fiduciary Agreement**")[3]). Pursuant to the Fiduciary Agreement, the Issuer has assigned all of its present and future claims for Annual Profit Participations and Delayed Payment Interest, if any, as well as its claims for repayment of the Nominal Contribution Amount upon termination of the Silent Partnership Agreement, including any claims for Profit Participation payable and/or interest which may be accrued under the Silent Partnership Agreement, as well as its claims for payment of the Amounts of the Purchase Price under the Receivables Purchase Agreement, in order to secure payment of capital and interest hereunder. The Fiduciary will hold the assigned claims in trust in accordance with the Fiduciary Agreement for the

---

[2]) Vgl. in diesem Prospekt „Beschreibung der Emissionsstruktur" – „Wesentliche Bestimmungen des Forderungskaufvertrags". Von einem Abdruck des gesamten Vertrages wurde abgesehen.

[3]) Vgl. in diesem Prospekt „Beschreibung der Emissionsstruktur" – „Treuhandvertrag".

[2]) See in this Information Memorandum "Description of Offering Structure" – "Material Provisions of the Receivables Purchase Agreement". The Agreement has not been included in its entity.

[3]) See in this Information Memorandum "Description of Offering Structure" – "Fiduciary Agreement".

Investoren halten. Die Bestimmungen des Treuhandvertrags werden diesen Emissionsbedingungen sowie der Globalurkunde als Anlage beigefügt und bilden mit diesen jeweils eine Einheit. Eine Kopie des Treuhandvertrags liegt zur Einsichtnahme in den Geschäftsstellen der Zahlstelle (§ 12) aus.

(5) *Aufwendungsersatzvereinbarung.* Nach Maßgabe einer zwischen der Emittentin und der Bank am • 2002 abgeschlossenen Aufwendungsersatzvereinbarung hat die Bank sich gegenüber der Emittentin verpflichtet, der Emittentin eine jährliche Aufwandsentschädigung für bestimmte laufende und zur Aufrechterhaltung ihres Geschäftsbetriebs notwendige Aufwendungen zu zahlen.

### § 3
### Status, Bindung

(1) *Status.* Die Teilschuldverschreibungen begründen nicht besicherte (mit Ausnahme der Sicherung durch den Treuhandvertrag) und nicht nachrangige Verbindlichkeiten der Emittentin, die untereinander und mit allen anderen nicht besicherten und nicht nachrangigen Verbindlichkeiten der Emittentin gleichrangig sind, mit Ausnahme von Verbindlichkeiten, die nach geltenden Rechtsvorschriften vorrangig sind.

(2) *Bindung.* Die Teilschuldverschreibungen verbriefen die Verpflichtung der Emittentin, den Erlös aus der Ausgabe der Teilschuldverschreibungen zur Begründung der Stillen Beteiligung zu verwenden und die Jährlichen Gewinnbeteiligungen oder die Rückzahlung des Einlagenennbetrags sowie darauf eventuell aufgelaufener Zinsen, welche der Emittentin nach Maßgabe des Beteiligungsvertrags zustehen, sowie die Kaufpreisbeträge, welche der Emittentin nach Maßgabe des Forderungskaufvertrags zustehen, nach Abzug der von ihr zu tragenden Steuern zu verwenden, um ihre Zahlungsverpflichtungen gegenüber den Investoren nach Maßgabe dieser Emissionsbedingungen zu erfüllen. Die Emittentin ist unter keinen Umständen verpflichtet, Zahlungen an die Investoren zu leisten, wenn nicht die Treuhänderin die entsprechenden, der Emittentin nach Maßgabe des Beteiligungsvertrags oder des Forderungskaufvertrags zustehenden Beträge zuvor tatsächlich erhalten hat.

(3) *Vertragsänderungen.* Die Emittentin darf Änderungen des Beteiligungsvertrags und des Forderungskaufvertrags nur zustimmen, wenn dadurch die Rechte der Investoren nicht beeinträchtigt werden und die Treuhänderin der Änderung vorher schriftlich zugestimmt hat.

### § 4
### Zinsen

(1) *Fälligkeit.* An jedem Fälligkeitstag wird die Emittentin aus der Jährlichen Gewinnbeteiligung und dem Kaufpreisbetrag, die die Treuhänderin für Rechnung der Emittentin jeweils tatsächlich erhalten hat, Zinsen auf die Teilschuldverschreibungen an die Investoren zahlen. Reichen die von der Bank gezahlten Beträge nicht aus, um nach Abzug der von der Emittentin zahlbaren Steuern Zinsen in Höhe von • % p. a. des Einlagenennbetrags zu zahlen, vermindert sich die Zinszahlung entsprechend. Die Emittentin ist nicht verpflichtet, entfallene Zinszahlungen nachzuholen. Erfolgt die Zahlung der an die Investoren zahlbaren Beträge nach dem jeweiligen Fälligkeitstag, weil am Fälligkeitstag der Jahresabschluß der Bank für das für die Ermittlung der Jährlichen Gewinnbeteiligung maßgebliche Geschäftsjahr noch nicht festgestellt war, wird die Emittentin an die Investoren den Betrag aus den Verspätungszinsen, den die Treuhänderin tatsächlich erhalten hat, als Zinsen auf die Teilschuldverschreibungen zahlen. Auf die

benefit of the Investors. The terms of the Fiduciary Agreement are attached hereto and to the Global Certificate and shall be an integral part hereof and thereof. A copy of the Fiduciary Agreement will be available for inspection at the offices of the Paying Agent (Section 12).

(5) *Agreement on the Reimbursement of Expenses.* Pursuant to an Agreement on the Reimbursement of Expenses entered into between the Issuer and the Bank on • 2002, the Bank has assumed the obligation vis-à-vis the Issuer to pay to the Issuer an annual reimbursement in coverage of certain recurring expenses required for the continuance of its business operations.

### Section 3
### Status, Commitment

(1) *Status.* The Capital Notes represent unsecured (except for the security under the Fiduciary Agreement) and unsubordinated liabilities of the Issuer which rank *pari passu* among themselves and with all other unsecured and unsubordinated liabilities of the Issuer, except for liabilities which rank senior by operation of mandatory provisions of applicable law.

(2) *Commitment.* The Capital Notes represent the undertaking of the Issuer to use the proceeds from the issue for the purpose of making the Capital Contribution, and to use the Annual Profit Participations or the amounts from the repayment of the Nominal Contribution Amount, including any interest accrued thereon to which the Issuer may be entitled under the Silent Partnership Agreement, as well as the Amounts of the Purchase Price payable to the Issuer under the Receivables Purchase Agreement, after deduction of any applicable tax payable by the Issuer, to satisfy its payment obligations towards the Investors under these Terms and Conditions of Issue. In no event shall the Issuer be under any obligation to make payments to the Investors unless and until the Fiduciary has effectively received the relevant amounts due to the Issuer under the Silent Partnership Agreement or the Receivables Purchase Agreement.

(3) *Amendments.* The Issuer may not consent to amendments to the Silent Partnership Agreement and the Receivables Purchase Agreement, unless such amendments will not adversely affect the rights of the Investors and have been approved in writing by the Fiduciary.

### Section 4
### Interest

(1) *Payment.* The Issuer shall pay on each Due Date interest on the Capital Notes to the Investors from the Annual Profit Participations and the Amount of the Purchase Price effectively received by the Fiduciary for the account of the Issuer from time to time. In the event that, after deduction of the tax payable by the Issuer, the amounts paid by the Bank are not sufficient to pay interest equal to a rate of • % p.a. of the Nominal Contribution Amount, the interest payment shall be reduced accordingly. The Issuer shall not be under the obligation to subsequently make up for interest which has not been paid. If payment of the amounts due to the Investors is made after the respective Due Date due to the fact that, on the Due Date, the annual accounts of the Bank for the fiscal year relevant to the calculation of the Annual Profit Participation were not yet approved, the Issuer shall pay to the Investors interest on the Capital Notes in the amount of Delayed Payment Interest effectively received by the Fiduciary. A pro rata

18

einzelne Teilschuldverschreibungen entfällt ein jeweils verhältnismäßiger Anteil aller vorstehend genannten zahlbaren Beträge (auf den nächsten vollen Cent abgerundet).

(2) *Anpassung des Gewinnbeteiligungssatzes.* Die Emittentin wird form- und fristgerecht von jeder Möglichkeit Gebrauch machen, den für die Berechnung der Gewinnbeteiligung unter dem Beteiligungsvertrag herangezogenen Gewinnbeteiligungssatz (der „Gewinnbeteiligungssatz") nach Maßgabe des Beteiligungsvertrags zu ihren Gunsten anpassen zu lassen. Der Gewinnbeteiligungssatz kann nach Maßgabe des Beteiligungsvertrags erhöht werden, falls die Emittentin zusätzliche Beträge (wie in § 8 definiert) zu zahlen hat.

(3) *Bekanntmachung der Anpassung des Gewinnbeteiligungssatzes.* Die Emittentin wird Anpassungen des Gewinnbeteiligungssatzes unverzüglich gegenüber den Investoren gemäß § 11 bekannt machen.

### § 5
### Rückzahlung

(1) *Rückzahlung.* Am Rückzahlungstag der Stillen Beteiligung (wie im Beteiligungsvertrag definiert) wird die Emittentin die Rückzahlung der Stillen Beteiligung sowie die darauf eventuell angefallene Gewinnbeteiligung bzw. eventuell aufgelaufene Zinsen auf die Stille Beteiligung, die ihr nach Maßgabe des Beteiligungsvertrags zustehen und die die Treuhänderin für Rechnung der Emittentin jeweils tatsächlich erhalten hat, zur Rückzahlung der Teilschuldverschreibungen bzw. zur Zahlung aufgelaufener Zinsen auf die Teilschuldverschreibungen an die Investoren verwenden. Durch die Zahlung eines Betrags in Höhe der Rückzahlung der Stillen Beteiligung sowie der darauf eventuell angefallenen Gewinnbeteiligung bzw. der eventuell aufgelaufenen Zinsen auf die Stille Beteiligung an die Investoren gelten das Kapital der Teilschuldverschreibungen als vollständig zurückgezahlt und alle Ansprüche der Investoren als erloschen. Erfolgt die Rückzahlung der Stillen Beteiligung sowie die Zahlung der darauf eventuell angefallenen Gewinnbeteiligung bzw. eventuell aufgelaufener Zinsen auf die Stille Beteiligung an die Emittentin nach dem Rückzahlungstag, weil am Rückzahlungstag der Jahresabschluß der Bank für das zur Ermittlung der Höhe der Rückzahlung maßgebliche Geschäftsjahr noch nicht festgestellt war, werden die vorstehend genannten Beträge nach Maßgabe des Beteiligungsvertrags verzinst. Die Emittentin wird an die Investoren den Betrag aus dieser Verzinsung, den die Treuhänderin tatsächlich erhalten hat, zahlen. Auf die einzelnen Teilschuldverschreibungen entfällt ein jeweils verhältnismäßiger Anteil aller vorstehend genannten zahlbaren Beträge (auf den nächsten vollen Cent abgerundet).

(2) *Bekanntmachung.* Die Emittentin wird die Beendigung der Stillen Beteiligung und den Rückzahlungstag gegenüber den Investoren durch Mitteilung gemäß § 11 mit einer Frist von nicht weniger als 30 und nicht mehr als 60 Tagen bekanntmachen.

### § 6
### Zahlungen

(1) *Zahlungen auf Kapital und Zinsen.* Zahlungen auf Kapital und Zinsen auf die Teilschuldverschreibungen erfolgen am jeweiligen Fälligkeitstag auf Anweisung der Treuhänderin und der Emittentin durch die Bank an die Zahlstelle (§ 12) zur Weiterleitung an das Clearing System oder dessen Order zur Gutschrift auf den Konten der jeweiligen Kontoinhaber bei dem Clearing System.

(2) *Erfüllung.* Die Emittentin wird durch Leistung der Zahlung an das Clearing System oder dessen Order in Höhe

share of the above amounts payable (rounded down to the next full cent) shall be allocated to each Capital Note.

(2) *Adjustment of the Profit Participation Rate.* The Issuer shall make use of each opportunity, in due time and form, to have the Profit Participation Rate used for the calculation of the Profit Participation under the Silent Partnership Agreement (the "Profit Participation Rate") adjusted for its benefit, as provided in the Silent Partnership Agreement. Pursuant to the Silent Partnership Agreement, the Profit Participation Rate may be increased in the event the Issuer has to pay Additional Amounts (as defined in Section 8).

(3) *Publication of the Adjustment of the Profit Participation Rate.* The Issuer shall give notice to Investors of any adjustments of the Profit Participation Rate by publication in accordance with Section 11.

### Section 5
### Repayment

(1) *Repayment.* On the Repayment Date of the Capital Contribution (as defined in the Silent Partnership Agreement), the Issuer will use the repayment of the Capital Contribution, as well as any Profit Participation and/or any interest accrued on the Capital Contribution to which the Issuer may be entitled pursuant to the Silent Partnership Agreement and which have been effectively received by the Fiduciary for the account of the Issuer, for the repayment of the Capital Notes and/or the payment of interest accrued on the Capital Notes to the Investors. Upon payment to the Investors of an amount equal to the amount of repayment of the Capital Contribution as well as any Profit Participation and/or any interest accrued on the Capital Contribution, the principal of the Capital Notes shall be deemed to be fully repaid and all claims of the Investors shall be deemed to have ceased. If the repayment of the Capital Contribution as well as the payment of any Profit Participation and/or any interest accrued on the Capital Contribution is made to the Issuer later than on the Repayment Date due to the fact that, on the Repayment Date, the annual accounts of the Bank for the fiscal year relevant to the calculation of the amount to be repaid had not yet been approved, the above amounts payable shall bear interest in accordance with the provisions of the Silent Partnership Agreement. The Issuer shall pay to the Investors the amount of interest effectively received by the Fiduciary. A pro rata share of the above amounts payable (rounded down to the next full cent) shall be allocated to each Capital Note.

(2) *Publication.* The Issuer shall give not less than 30 nor more than 60 days' notice to Investors of the termination of the Silent Partnership Agreement and the Repayment Date by publication in accordance with Section 11.

### Section 6
### Payments

(1) *Payments of Principal and Interest.* Payments of principal and interest on the Capital Notes shall be made by the Bank on the relevant Due Date upon instruction by the Fiduciary and the Issuer to the Paying Agent (Section 12) for subsequent transfer to the Clearing System or to its order in Euro for credit to the accounts of the respective account holders at the Clearing System.

(2) *Fulfilment.* Upon effective payment to the Clearing System or to its order, the Issuer shall be released from its

19

der geleisteten Zahlungen von ihren Zahlungsverpflichtungen aus den Teilschuldverschreibungen befreit.

(3) *Bezugnahmen auf Kapital und Zinsen.* Bezugnahmen in diesen Emissionsbedingungen auf das Kapital der Teilschuldverschreibung bezeichnen die folgenden Beträge: den Einlagenennbetrag bzw. den gegebenenfalls geringeren Buchwert sowie darauf nach Maßgabe des Beteiligungsvertrags eventuell aufgelaufene Zinsen. Bezugnahmen in diesen Emissionsbedingungen auf Zinsen auf die Teilschuldverschreibung bezeichnen die folgenden Beträge: die der Emittentin nach Maßgabe des Beteiligungsvertrags zustehenden Beträge aus den Jährlichen Gewinnbeteiligungen in der den Investoren nach § 4(1) zustehenden Höhe und den eventuell entstandenen Verspätungszinsen sowie die der Emittentin nach Maßgabe des Forderungskaufvertrags zustehenden Kaufpreisbeträge.

(4) *Hinterlegung von Kapital und Zinsen.* Die Emittentin ist berechtigt, beim Amtsgericht Frankfurt am Main Zins- oder Kapitalbeträge zu hinterlegen, auf die von einem Investor nicht innerhalb von zwölf Monaten nach dem vorgesehenen Fälligkeitstag Anspruch erhoben worden ist. Soweit die Emittentin auf das Recht zur Rücknahme der hinterlegten Beträge verzichtet hat, erlöschen die jeweiligen Ansprüche der Investoren gegen die Emittentin.

## § 7
### Vorzeitige Kündigung und Rückzahlung

(1) *Vorzeitige Kündigung und Rückzahlung.* Die Teilschuldverschreibungen können insgesamt, jedoch nicht teilweise, gegenüber den Investoren durch Mitteilung gemäß § 11 mit einer Frist von nicht weniger als 30 und nicht mehr als 60 Tagen zum 15. Juli eines jeden Jahres, erstmalig zum 15. Juli 2013, vorzeitig gekündigt und zuzüglich aufgelaufener Zinsen auf die Teilschuldverschreibungen zurückgezahlt werden.

(2) *Vorzeitige Kündigung und Rückzahlung aus Steuergründen.* Die Teilschuldverschreibungen können ferner insgesamt, jedoch nicht teilweise, gegenüber den Investoren durch Mitteilung gemäß § 11 mit einer Frist von nicht weniger als 30 und nicht mehr als 60 Tagen zum Monatsende vorzeitig gekündigt und zuzüglich aufgelaufener Zinsen auf die Teilschuldverschreibungen zurückgezahlt werden, falls die Emittentin als Folge einer Änderung oder Ergänzung der Steuer- oder Abgabengesetze und -vorschriften der Bundesrepublik Deutschland oder deren politischen Untergliederungen oder Steuerbehörden oder als Folge einer Änderung oder Ergänzung der Anwendung oder der offiziellen Auslegung dieser Gesetze und Vorschriften (vorausgesetzt diese Änderung oder Ergänzung wird am oder nach dem Tag, an dem diese Teilschuldverschreibungen begeben werden, wirksam) am nächstfolgenden Fälligkeitstag zur Zahlung von zusätzlichen Beträgen (wie in § 8 definiert) verpflichtet sein wird und diese Verpflichtung nicht durch das Ergreifen vernünftiger, der Emittentin zur Verfügung stehender Maßnahmen vermieden werden kann.

(3) *Zulässigkeit der vorzeitigen Kündigung.* Die vorzeitige Kündigung gemäß § 7(1) oder (2) durch die Emittentin ist nur zulässig, sofern die Finanzierung der Rückzahlung der Teilschuldverschreibungen zuzüglich der aufgelaufenen Zinsen auf die Teilschuldverschreibungen durch Ausgabe vergleichbarer Schuldverschreibungen oder auf andere Weise gesichert ist.

(4) *Kündigungserklärung.* Im Falle des § 7(2) darf eine solche Kündigung (i) nicht früher als 90 Tage vor dem frühestmöglichen Termin erfolgen, an dem die Emittentin verpflichtet wäre, zusätzliche Beträge im Sinne des § 8 zu zahlen, falls eine Zahlung auf die Teilschuldverschreibungen

payment obligations under the Capital Notes in the amount of the respective payment.

(3) *References to Capital and Interest.* All references in these Terms and Conditions of Issue to the principal of the Capital Notes shall be deemed references to the following amounts: the lower of the Nominal Contribution Amount and the Book Value as well as any interest accrued thereon in accordance with the Silent Partnership Agreement. All references made herein to interest payments on the Capital Notes shall refer to the following amounts: the amounts from the Annual Profit Participations in the amount payable to the Investors pursuant to Section 4(1) and the amounts of Delayed Payment Interest, if any, due to the Issuer under the Silent Partnership Agreement and the Amounts of the Purchase Price due to the Issuer pursuant to the Receivables Purchase Agreement.

(4) *Deposit of Principal and Interest.* The Issuer may deposit with the Local Court *(Amtsgericht)* Frankfurt am Main amounts of principal or interest not claimed by the Investors within twelve months from the determined Due Date. If and to the extent the Issuer has waived its right to reclaim the deposited amounts, the respective claims of the Investors against the Issuer shall expire.

## Section 7
### Early Termination and Repayment

(1) *Early Termination and Repayment.* The Issuer may terminate the Capital Notes, in whole but not in part, with effect from 15 July of each year (however, no earlier than with effect from 15 July 2013), and redeem the Capital Notes plus any interest accrued, by giving not less than 30 nor more than 60 days' notice to the Investors pursuant to Section 11.

(2) *Early Termination and Repayment for Tax Reasons.* In addition, the Issuer may terminate the Capital Notes, in whole but not in part, with effect from the end of each month and redeem the Capital Notes plus any interest accrued, by giving not less than 30 nor more than 60 days' notice to the Investors pursuant to Section 11, in the event that, on the next Due Date, the Issuer will be liable to payment of Additional Amounts (as defined in Section 8) due to a change in or an amendment to tax law or other tax-related laws and regulations of the Federal Republic of Germany or its political subdivisions or tax authorities, or as a result of a change in or an amendment to the application or official interpretation of such laws and regulations (provided such change or amendment becomes effective on or after the issue day of the Capital Notes), provided that such liability cannot be avoided by the Issuer by taking reasonable measures available to it.

(3) *Permissibility of Early Termination.* The Issuer may terminate the Capital Notes pursuant to Section 7(1) or (2) only if it has ensured the financing of the repayment of the Capital Notes plus any interest accrued by the issue of similar debt securities or in any other way.

(4) *Termination Notice.* In case of Section 7(2), such termination (i) may not be effected earlier than 90 days prior to the earliest possible termination date on which the Issuer would be liable to the payment of Additional Amounts within the meaning of Section 8 if a payment on the Capi-

dann fällig sein würde, oder (ii) nicht mehr erfolgen, wenn zu dem Zeitpunkt, zu dem die Kündigung erfolgt, die Verpflichtung zur Zahlung von zusätzlichen Beträgen nicht mehr wirksam ist. Die Kündigung ist unwiderruflich und muß eine zusammenfassende Erklärung enthalten, welche die Rückzahlungsrecht der Emittentin begründenden Umstände darlegt. Die vorzeitige Kündigung wird unwirksam, wenn am bekanntgemachten Rückzahlungstag die Teilschuldverschreibungen zuzüglich der aufgelaufenen Zinsen auf die Teilschuldverschreibungen nicht vollständig zurückgezahlt werden.

(5) *Zinszahlung.* Für den Anspruch auf Zinsen auf die Teilschuldverschreibungen gilt § 4 mit der Maßgabe, daß den Investoren Zinsen nur bis zu dem Zeitpunkt zustehen, zu dem die Teilschuldverschreibungen wirksam gekündigt werden.

tal Notes were then due, and (ii) may no longer be effected if, at the time of termination, the obligation to pay Additional Amounts is no longer effective. Notice of termination is irrevocable and must include a summary statement describing the circumstances justifying the right of the Issuer to redeem the Capital Notes. Any early termination becomes void if, on the announced Repayment Date, the Capital Notes, plus any interest accrued, are not repaid in full.

(5) *Interest Payment.* Section 4 shall apply to any claims for payment of interest on the Capital Notes provided that interest shall accrue to the Investors only for the period until the Capital Notes are effectively terminated.

§ 8
**Steuern**

Section 8
**Taxation**

Sämtliche auf die Teilschuldverschreibungen zu zahlenden Beträge sind ohne Einbehalt oder Abzug von oder aufgrund von gegenwärtigen oder zukünftigen Steuern oder sonstigen Abgaben gleich welcher Art zu leisten, die von oder in der Bundesrepublik Deutschland oder für deren Rechnung oder von oder für Rechnung einer politischen Untergliederung oder Steuerbehörde der oder in der Bundesrepublik Deutschland auferlegt oder erhoben werden, es sei denn, ein solcher Einbehalt oder Abzug ist gesetzlich vorgeschrieben. Wird ein solcher Einbehalt oder Abzug nach einer Rechtsänderung zukünftig gesetzlich vorgeschrieben, wird die Emittentin diejenigen zusätzlichen Beträge (die „**zusätzlichen Beträge**") zahlen, die erforderlich sind, damit die den Investoren zufließenden Nettobeträge nach einem solchen Einbehalt oder Abzug jeweils den Beträgen von Kapital und Zinsen auf die Teilschuldverschreibungen entsprechen, die ohne einen solchen Einbehalt oder Abzug von den Investoren empfangen worden wären; die Verpflichtung zur Zahlung solcher zusätzlichen Beträge besteht jedoch nicht für solche Steuern und Abgaben, die:

Any payments to be made in respect of the Capital Notes shall be made without withholding or deducting on account of any present or future taxes or other duties of whatever nature, levied or imposed by or in or for the account of the Federal Republic of Germany, or by or for the account of any political subdivision or tax authority of or in the Federal Republic of Germany, unless such withholding or deduction is required by law. If such withholding or deduction is required in the future upon a change in legislation, the Issuer will pay such additional amounts (the "**Additional Amounts**") as are necessary in order that the net amounts received by the Investors after such deduction or withholding shall equal the respective amounts which they would have received as payment of principal and interest on the Capital Notes if no such withholding or deduction had been required, except that no Additional Amounts will be payable on account of any taxes or duties which:

(a) auf andere Weise als durch einen von der Emittentin durchzuführenden Einbehalt oder Abzug auf Zahlungen, die die Emittentin an die Investoren zu leisten hat, also insbesondere im Falle des Zinsabschlags, zu entrichten sind; oder

(a) are payable otherwise than by the Issuer's withholding or deducting of such amounts from payments to be made by the Issuer to the Investors, in particular in case of interest income tax *(Zinsabschlag)*; or

(b) wegen einer gegenwärtigen oder früheren persönlichen oder geschäftlichen Beziehung des Investors zur Bundesrepublik Deutschland zu zahlen sind, und nicht allein deshalb, weil Zahlungen auf die Teilschuldverschreibungen aus Quellen in der Bundesrepublik Deutschland stammen (oder für Zwecke der Besteuerung so behandelt werden) oder dort besichert sind; oder

(b) are payable by reason of the Investor having, or having had, a personal or business relationship with the Federal Republic of Germany, and not only due to the fact that the payments on the Capital Notes originate from sources within the Federal Republic of Germany (or are treated as such for tax purposes) or are secured in the Federal Republic of Germany; or

(c) aufgrund (i) einer Richtlinie oder Verordnung der Europäischen Union betreffend die Besteuerung von Zinserträgen oder (ii) einer zwischenstaatlichen Vereinbarung über deren Besteuerung, an der die Bundesrepublik Deutschland oder die Europäische Union beteiligt ist, oder (iii) einer gesetzlichen Vorschrift, die diese Richtlinie, Verordnung oder Vereinbarung umsetzt oder befolgt, einzubehalten oder abzuziehen sind; oder

(c) are withheld or deducted pursuant to (i) a Directive or Regulation of the European Union relating to the taxation of interest income, or (ii) an international agreement on the taxation of such income to which the Federal Republic of Germany or the European Union is a party, or (iii) a legal provision implementing or complying with such Directive, Regulation or agreement; or

(d) wegen einer Rechtsänderung zu zahlen sind, welche später als 30 Tage nach Fälligkeit der betreffenden Zahlung wirksam wird und die Zahlstelle die notwendigen Geldmittel erhalten hat.

(d) are payable by reason of a change in legislation that becomes effective more than 30 days after the relevant payment becomes due and the necessary funds have been received by the Paying Agent.

21

§ 9
**Kündigung**

(1) *Kündigungsgründe.* Jeder Investor ist berechtigt, seine Teilschuldverschreibungen zu kündigen und deren Rückzahlung zum Nennbetrag zuzüglich aufgelaufener Zinsen auf seine Teilschuldverschreibungen zu verlangen, falls:

(a) Kapital oder Zinsen, die nach §§ 4 und 5 an die Investoren weiterzuleiten sind, nicht innerhalb von 30 Tagen nach dem betreffenden Fälligkeitstag gemäß § 6(1) weitergeleitet wurden; oder

(b) die Emittentin die ordnungsgemäße Erfüllung irgendeiner anderen Verpflichtung aus den Teilschuldverschreibungen unterläßt und diese Unterlassung länger als 60 Tage fortdauert, nachdem die Emittentin hierüber eine Benachrichtigung von einem Investor erhalten hat; oder

(c) die Emittentin aufgelöst oder liquidiert wird, unabhängig davon, ob dies aufgrund eines Beschlusses ihrer Gesellschafter oder auf sonstige Weise erfolgt, es sei denn, die Auflösung oder Liquidation erfolgt im Zusammenhang mit einer Verschmelzung oder einer anderen Form des Zusammenschlusses, die zum Ergebnis hat, daß alle Vermögenswerte und Verbindlichkeiten auf die verbleibende Gesellschaft im Wege der Universalsukzession übergehen; oder

(d) die Emittentin ihre Zahlungen einstellt und dies länger als 60 Tage fortdauert oder ihre Zahlungsunfähigkeit bekanntgibt; oder

(e) ein Insolvenzverfahren gegen die Emittentin eröffnet wird, sofern dieses Verfahren nicht binnen 60 Tagen nach der Eröffnung endgültig oder vorläufig eingestellt wird, oder die Emittentin einen Antrag auf Eröffnung eines solchen Verfahrens stellt oder eine Umstrukturierung ihrer Verbindlichkeiten anbietet oder durchführt.

Das Recht zur Kündigung der Teilschuldverschreibungen erlischt, falls der Kündigungsgrund vor Ausübung des Rechts geheilt wurde.

(2) *Benachrichtigung.* Eine Benachrichtigung, einschließlich einer Kündigung der Teilschuldverschreibungen gemäß § 9(1), ist schriftlich in deutscher Sprache gegenüber der Emittentin zu erklären und persönlich oder per Einschreiben zu übermitteln. Der Benachrichtigung ist ein Nachweis beizufügen, aus dem sich ergibt, daß der betreffende Investor zum Zeitpunkt der Abgabe der Benachrichtigung Inhaber der Teilschuldverschreibungen ist. Der Nachweis kann durch eine Bescheinigung der Depotbank (§ 13(4)) oder auf andere geeignete Weise erbracht werden.

(3) *Wirksamkeit.* In den Fällen des § 9(1)(b) wird eine Benachrichtigung, durch welche die Teilschuldverschreibungen gekündigt werden, erst wirksam, wenn bei der Emittentin Kündigungserklärungen von Investoren eingegangen sind, die insgesamt ein Zehntel des Gesamtnennbetrags der zu diesem Zeitpunkt ausstehenden Teilschuldverschreibungen darstellen, sofern nicht bei deren Eingang zugleich einer der in § 9(1)(a), (c), (d) oder (e) bezeichneten Fälle, der die Investoren zur Kündigung ihrer Teilschuldverschreibungen berechtigt, vorliegt und fortdauert.

(4) *Zinszahlung.* Für den Anspruch auf Zinsen auf die Teilschuldverschreibungen gilt § 4 mit der Maßgabe, daß den Investoren die Zinsen nur bis zu dem Zeitpunkt zustehen, zu dem die Teilschuldverschreibungen wirksam gekündigt werden.

Section 9
**Termination**

(1) *Events.* Each Investor may terminate his/her Capital Note and of Default request repayment thereof at its nominal amount plus any accrued interest on his/her Capital Note in the event that:

(a) the amounts of principal and interest to be paid to the Investors pursuant to Sections 4 and 5 are not paid in accordance with Section 6(1) within 30 days following the relevant Due Date; or

(b) the Issuer fails to duly comply with any other of its obligations under the Capital Notes and such failure continues for a period of more than 60 days following receipt of a respective notice by an Investor; or

(c) the Issuer is liquidated or dissolved, whether upon a shareholders' resolution or otherwise, unless the dissolution or liquidation is effected in connection with a merger or any other form of combination as a result of which all assets and liabilities are transferred to the surviving company by universal succession; or

(d) the Issuer generally ceases to make payments for a period of more than 60 days, or announces insolvency; or

(e) insolvency proceedings are initiated against the Issuer and are not temporarily or permanently dismissed within 60 days from initiation, or the Issuer files an insolvency petition or offers or implements a restructuring in respect of its liabilities.

The right to terminate the Capital Notes ceases if the cause for the termination is remedied prior to exercise of the right.

(2) *Notification.* Any notice, including a notice of termination of the Capital Notes pursuant to Section 9(1), shall be made in writing in the German language to the Issuer and shall be delivered personally or via registered mail. The notice must include evidence of the ownership by the Investor of his/her Capital Note at the time of delivery. The required evidence may be in the form of a confirmation issued by the Custodian (Section 13(4)) or in any other appropriate form.

(3) *Effectiveness.* In the event specified in Section 9(1)(b), a notice terminating the Capital Notes shall become effective only upon receipt of notices of termination of an aggregate number of Investors representing one tenth of the aggregate nominal amount of the Capital Notes then outstanding, provided that, at the time of receipt of such notices, neither of the events specified in Section 9(1)(a), (c), (d) or (e), which entitles the Investors to terminate the Capital Notes, has occurred and is continuing.

(4) *Interest Payments.* With respect to the entitlement to interest payments on the Capital Notes, Section 4 shall apply provided that the Investors shall only be entitled to interest until the date on which the Capital Notes are validly terminated.

## § 10
### Ersetzung

(1) *Ersetzung.* Die Emittentin ist jederzeit berechtigt, sofern sie sich nicht mit einer Zahlung von Kapital oder Zinsen auf die Teilschuldverschreibung in Verzug befindet, ohne Zustimmung der Investoren eine andere Gesellschaft an ihrer Stelle als Hauptschuldnerin und Hauptgläubigerin (die „**Nachfolgerin**") für alle Verpflichtungen und Rechte aus und im Zusammenhang mit den Teilschuldverschreibungen, dem Beteiligungsvertrag, dem Forderungskaufvertrag und dem Treuhandvertrag sowie sonstigen, mit diesen Verträgen zusammenhängenden Verträge einzusetzen, vorausgesetzt, daß:

(a) die Nachfolgerin alle Rechte und Verpflichtungen der Emittentin in bezug auf die Teilschuldverschreibungen übernimmt;

(b) die Emittentin und die Nachfolgerin alle erforderlichen Genehmigungen erlangt haben und berechtigt sind, die zur Erfüllung der Zahlungsverpflichtungen aus den Teilschuldverschreibungen zahlbaren Beträge in Euro zu zahlen, ohne verpflichtet zu sein, jeweils in dem Land, in dem die Nachfolgerin oder die Emittentin ihren Sitz oder Steuersitz haben, erhobene Steuern oder andere Abgaben jeder Art abzuziehen oder einzubehalten;

(c) die Nachfolgerin sich verpflichtet hat, die Investoren hinsichtlich solcher Steuern, Abgaben oder behördlichen Lasten freizustellen, die den Investoren bezüglich der Ersetzung auferlegt werden;

(d) die Treuhändern der Ersetzung vorher schriftlich zugestimmt hat;

(e) die Ersetzung nicht zu einer erhöhten Belastung der Nachfolgerin mit Kapitalertrag- oder sonstiger Abzugssteuer, etwaiger Vermögenssteuer oder der Gewerbeertrag- oder sonstiger Ertragsteuer führt.

(2) *Bekanntmachung.* Jede Ersetzung ist unverzüglich gegenüber den Investoren gemäß § 11 bekannt zu machen.

(3) *Änderung von Bezugnahmen.* Im Fall einer Ersetzung gilt jede Bezugnahme in diesen Bedingungen auf die Emittentin ab dem Zeitpunkt der Ersetzung als Bezugnahme auf die Nachfolgerin und jede Bezugnahme auf das Land, in dem die Emittentin ihren Sitz oder Steuersitz hat, gilt ab diesem Zeitpunkt als Bezugnahme auf das Land, in dem die Nachfolgerin ihren Sitz oder Steuersitz hat. Im Fall einer Ersetzung gilt eine alternative Bezugnahme in § 8 und in § 7(2) auf die Bundesrepublik Deutschland als aufgenommen (zusätzlich zu der Bezugnahme nach Maßgabe des vorstehenden Satzes auf das Land, in dem die Nachfolgerin ihren Sitz oder Steuersitz hat).

## § 11
### Mitteilungen

(1) *Veröffentlichungen.* Alle die Teilschuldverschreibung betreffenden Mitteilungen werden in einem überregional erscheinenden Pflichtblatt der Frankfurter Wertpapierbörse, voraussichtlich der *Börsen-Zeitung,* veröffentlicht. Jede derartige Mitteilung gilt mit dem Tag der Veröffentlichung (oder bei mehreren Veröffentlichungen mit dem Tag der ersten solchen Veröffentlichung) als wirksam erfolgt.

(2) *Mitteilungen an das Clearing System.* Die Emittentin ist berechtigt, eine Zeitungsveröffentlichung nach § 11(1) durch eine Mitteilung an das Clearing System zur Weiterleitung an die Investoren zu ersetzen, vorausgesetzt, daß in Fällen, in denen die Teilschuldverschreibungen an einer Börse notiert sind, die Regeln dieser Börse diese Form der

## Section 10
### Substitution

(1) *Substitution.* The Issuer may, at any time and without the consent of the Investors, substitute another company for the Issuer as principal debtor and creditor (the "**Successor**") in respect of all obligations and rights under and in connection with the Capital Notes, the Silent Partnership Agreement, the Receivables Purchase Agreement and the Fiduciary Agreement as well as any other agreements related thereto, provided the Issuer is not in default of payment of principal and interest on the Capital Notes, and further provided that:

(a) the Successor assumes all rights and obligations of the Issuer under the Capital Notes;

(b) the Issuer and the Successor have obtained all necessary permits and are authorised to comply with the payment obligations under the Capital Notes by paying the amounts due in Euro without being obliged to withhold or deduct applicable tax or other duties of any kind in the respective country in which the Successor or the Issuer is domiciled or resident for tax purposes;

(c) the Successor has agreed to indemnify the Investors against such taxes, duties or other governmental charges as may be imposed on the Investors in connection with the substitution;

(d) the Fiduciary has given its prior written consent to the substitution;

(e) the Substitution does not result in an increase in investment income tax or any other withholding tax, property tax, if applicable, trade income or any other income tax payable by the Successor.

(2) *Announcement.* Notice of substitution shall be given to Investors promptly in accordance with Section 11 hereof.

(3) *Change in Reference.* Upon substitution, all references in these Terms and Conditions of Issue to the Issuer shall be deemed references to the Successor, and any references to the country of domicile or tax residence of the Issuer shall be deemed references to the country of domicile or tax residence of the Successor, in each case with effect from the substitution date. Upon substitution, an alternative reference to the Federal Republic of Germany shall be deemed to be included in Sections 8 and 7(2) (in addition to the reference to the country of domicile or tax residence of the Successor pursuant to the foregoing sentence).

## Section 11
### Notices

(1) *Notices.* All notices relating to the Capital Notes shall be published in a newspaper with national distribution designated by the Frankfurt Stock Exchange, expected to be the *Börsen-Zeitung.* Any such notice shall be deemed to be duly effected on the day of publication (or, in case of more than one publication, on the day of the first publication).

(2) *Notices to the Clearing System.* The Issuer may, in lieu of a publication pursuant to Section 11(1), send a notice to the Clearing System to be forwarded to the Investors, provided that in cases where the Capital Notes are listed on a stock exchange this procedure of notification is permitted by the regulations of such stock exchange. Any such

23

Mitteilung zulassen. Jede derartige Mitteilung gilt am siebten Tag nach dem Tag der Mitteilung an das Clearing System als den Investoren mitgeteilt.

(3) *Bekanntmachungen.* Die Emittentin wird einen vom Einlagenennbetrag abweichenden Buchwert und dessen jeweilige Veränderung jeweils unverzüglich gemäß diesem § 11 bekanntmachen, sobald sie davon Kenntnis erlangt. Die Emittentin wird alle ihr unter dem Beteiligungsvertrag zustehenden Rechte zur Erlangung einer solchen Kenntnis form- und fristgerecht ausüben. Die Emittentin wird Finanzinformationen der Bank, die sie im Zusammenhang mit der Stillen Beteiligung erhält, unverzüglich an die Zahlstelle (§ 12) weiterleiten, in deren Geschäftsstellen diese Finanzunterlagen zur Einsichtnahme ausgelegt werden.

### § 12
### Zahlstellen

(1) *Zahlstellen.* Die Deutsche Bank Aktiengesellschaft, Frankfurt am Main, ist die anfängliche Hauptzahlstelle (die **„Hauptzahlstelle"**) und die Deutsche Bank Aktiengesellschaft – Zweigniederlassung Amsterdam – ist die anfängliche niederländische Zahlstelle (die **„Niederländische Zahlstelle"**; die Hauptzahlstelle und die Niederländische Zahlstelle zusammen die **„Zahlstellen"** und einzeln eine **„Zahlstelle"**).

(2) *Änderung der Bestellung oder Abberufung.* Die Emittentin behält sich das Recht vor, jederzeit die Bestellung einer Zahlstelle zu ändern oder zu beenden und zusätzliche oder andere Zahlstellen zu bestellen, wobei die Emittentin jederzeit (i) eine Hauptzahlstelle unterhalten wird, (ii) eine Zahlstelle (welche die Hauptzahlstelle sein kann) mit Niederlassung in der Bundesrepublik Deutschland unterhalten wird, und (iii) für die Dauer der Börsennotierung der Teilschuldverschreibungen an der Euronext Amsterdam N. V. und/oder jeder anderen Börse, eine Zahlstelle (welche die Hauptzahlstelle sein kann) mit Niederlassung in den Niederlanden und/oder an solchen anderen Orten unterhalten wird, welche die Regeln dieser anderen Börse verlangen. Eine Änderung, Abberufung oder Bestellung oder ein sonstiger Wechsel wird nur wirksam (außer im Fall der Insolvenz einer Zahlstelle, in dem eine solche Änderung sofort wirksam wird), sofern den Investoren dies gemäß § 11 vorab unter Einhaltung einer Frist von mindestens 30 und nicht mehr als 45 Tagen angezeigt wurde.

(3) *Beauftragte der Emittentin.* Die Zahlstellen handeln ausschließlich als Beauftragte der Emittentin und übernehmen keinerlei Verpflichtungen gegenüber den Investoren und es wird kein Auftrags- oder Treuhandverhältnis zwischen ihnen und den Investoren begründet.

### § 13
### Verschiedenes

(1) *Anwendbares Recht.* Form und Inhalt der Teilschuldverschreibungen sowie die Rechte und Pflichten der Investoren und der Emittentin bestimmen sich in jeder Hinsicht nach deutschem Recht.

(2) *Gerichtsstand.* Ausschließlicher Gerichtsstand für alle Rechtsstreitigkeiten aus den in diesen Emissionsbedingungen geregelten Angelegenheiten ist, soweit gesetzlich zulässig, Frankfurt am Main.

(3) *Erfüllungsort.* Erfüllungsort ist Frankfurt am Main.

(4) *Gerichtliche Geltendmachung.* Jeder Investor kann in Rechtsstreitigkeiten gegen die Emittentin oder in Rechts-

notice shall be deemed to be duly made to the Investors on the seventh day following the day of notice to the Clearing System.

(3) *Announcements.* The Issuer shall publish without delay, in accordance with this Section 11, any deviations of the Book Value from the Nominal Contribution Amount as well as any changes of the Book Value, as soon as the Issuer has received notice of such deviation and/or changes. The Issuer shall exercise all rights to which it is entitled under the Silent Partnership Agreement in order to obtain such information in due time and form. The Issuer shall promptly deliver to the Paying Agent (Section 12) any financial information relating to the Capital Contribution provided to it by the Bank; such financial documents to be made available for inspection at the offices of the Paying Agent.

### Section 12
### Paying Agents

(1) *Paying Agents.* Deutsche Bank Aktiengesellschaft, Frankfurt am Main, shall be the principal paying agent (the **"Principal Paying Agent"**) and Deutsche Bank Aktiengesellschaft – Amsterdam Branch – shall be the Dutch paying agent (the **"Dutch Paying Agent";** the "Principal Paying Agent" and the **"Dutch Paying Agent"** together the **"Paying Agents"** or each a **"Paying Agent"**).

(2) *Change or Termination of Appointment.* The Issuer reserves the right at any time to vary or terminate the appointment of any Paying Agent and to appoint additional or other Paying Agents provided that the Issuer will at all times maintain (i) a Principal Paying Agent, (ii) a Paying Agent (which may be the Principal Paying Agent) with a specified office in the Federal Republic of Germany; (iii) so long as the Capital Notes are listed on Euronext Amsterdam N. V.and/or any other stock exchange, a Paying Agent (which may be the Principal Paying Agent) with a specified office in The Netherlands and/or in such other place as may be required by the rules of such other stock exchange. Any modification, termination or other change shall only become effective (except in the event of insolvency of a Paying Agent where such change shall have immediate effect) upon not less than 30 nor more than 45 days' prior notice thereof to the Investors in accordance with Section 11.

(3) *Agents of the Issuer.* The Paying Agents shall act exclusively as agents of the Issuer and shall not have any obligations to the Investors. There will be no agency or fiduciary relationship between the Paying Agents and the Investors.

### Section 13
### Miscellaneous

(1) *Applicable Law.* Form and content of the Capital Notes as well as the rights and duties of the Investors and the Issuer shall in all respects be governed by German law.

(2) *Place of Jurisdiction.* Exclusive place of jurisdiction for all disputes arising in connection with these Terms and Conditions of Issue shall be, to the extent permitted by law, Frankfurt am Main, Federal Republic of Germany.

(3) *Place of Performance.* Place of performance shall be Frankfurt am Main, Federal Republic of Germany.

(4) *Legal enforcement.* Each Investor may, in any legal dispute with the Issuer or in any legal dispute to which an

24

streitigkeiten, an denen ein Investor oder die Emittentin beteiligt ist, im eigenen Namen seine Rechte aus den von ihm gehaltenen Teilschuldverschreibungen geltend machen und durchsetzen auf der Grundlage (a) einer Bescheinigung seiner Depotbank (wie nachstehend definiert), die (i) den vollen Namen und die volle Anschrift des Investors enthält, (ii) den Gesamtnennbetrag der Teilschuldverschreibungen, die am Ausstellungstag dieser Bescheinigung dem bei dieser Depotbank unterhaltenen Depot des Investors gutgeschrieben sind, angibt, und (iii) bestätigt, daß die Depotbank dem Clearing System und der Zahlstelle (§ 12) eine schriftliche Mitteilung gemacht hat, welche die Angaben gemäß (i) und (ii) enthält und Bestätigungsvermerke des Clearing Systems und des betreffenden Kontoinhabers trägt, und (b) einer Kopie der Globalurkunde, deren Übereinstimmung mit dem Original der Globalurkunde von einem Vertretungsberechtigten des Clearing Systems bestätigt wird. Im Sinne der vorstehenden Bestimmungen bedeutet „**Depotbank**" eine Bank oder ein anderes Finanzinstitut mit einer Genehmigung für das Wertpapier-Depotgeschäft, bei dem der Investor ein Wertpapierdepot unterhält, auf dem Teilschuldverschreibungen verbucht sind; dieser Begriff schließt das Clearing System, Clearstream Banking S. A., Luxemburg, und Euroclear Bank S. A./N. V., Brüssel, ein.

(5) *Teilunwirksamkeit.* Sollte eine der Bestimmungen dieser Emissionsbedingungen ganz oder teilweise unwirksam oder undurchführbar sein oder werden, so bleibt die Wirksamkeit oder Durchführbarkeit der übrigen Bestimmungen hiervon unberührt. In diesem Fall soll anstelle der unwirksamen Bestimmung, soweit rechtlich möglich, eine dem Sinn und wirtschaftlichen Zweck dieser Emissionsbedingungen zum Zeitpunkt der Begebung der Teilschuldverschreibungen entsprechende Bestimmung treten. Sollten diese Emissionsbedingungen eine Lücke enthalten, ist eine ergänzende Auslegung, die dem Sinn und Zweck dieser Emissionsbedingungen entspricht, unter angemessener Berücksichtigung der berechtigten Interessen der beteiligten Parteien vorzunehmen.

(6) *Sprache.* Allein der deutsche Wortlaut dieser Emissionsbedingungen ist rechtsverbindlich. Übersetzungen in die englische Sprache dienen lediglich der Information.

Investor or the Issuer is a party, in his/her own name assert and enforce his/her rights under the Capital Notes held by such Investor on the basis of (a) a confirmation of his/her Custodian (as defined below) which (i) includes the full name and address of the Investor, (ii) states the aggregate nominal amount of the Capital Notes held in the Investor's securities account with such Custodian as per the date of the confirmation, and (iii) confirms that the Custodian has given written notice to the Clearing System and the Paying Agent (Section 12) including the information pursuant to (i) and (ii) above and bearing written confirmation notes of the Clearing System and the respective account holder, and on the basis of (b) a copy of the Global Certificate, the conformity of which with the original Global Certificate is confirmed by an authorised representative of the Clearing System. For the purpose of the aforementioned provisions, the term "**Custodian**" shall refer to a bank or any other financial institution licensed to engage in the business of securities custody, with which the Investor keeps a securities account in which Capital Notes are held; the term shall include the Clearing System, Clearstream Banking S. A., Luxembourg, and Euroclear Bank S. A./N. V., Brussels.

(5) *Severability.* Should any of the provisions hereof be or become ineffective or impracticable in whole or in part, this shall not affect effectiveness or practicability of the remaining provisions. In this case, the ineffective provision shall be replaced by a provision which comes as close as legally permissible to the intent and economic purpose of these Terms and Conditions of Issue at the time of issue of the Capital Notes. In the event these Terms and Conditions of Issue lack any provision, they shall be interpreted in accordance with their intent and purpose, taking reasonably into account the legitimate interests of the parties involved.

(6) *Language.* Only the German version of these Terms and Conditions of Issue shall be legally binding. Any translation into the English language, including this translation, is for convenience only.

# Silent Partnership Agreement

*The German text of the Silent Partnership Agreement is legally binding. The English translation is for convenience only.*

*The provisions of the following agreement will be attached to, and shall be deemed to constitute one document together with, the Terms and Conditions of Issue and the Global Certificate, respectively.*

*Die Bestimmungen des folgenden Vertrags werden den Emissionsbedingungen sowie der Globalurkunde als Anlage beigefügt und bilden mit dieser jeweils eine Einheit.*

**Silent Partnership Agreement** (the "**Silent Partnership**") (Partial Profit Transfer Agreement *(Teilgewinnabführungsvertrag)* within the meaning of § 292 (1) No. 2 German Stock Corporation Act *(AktG)*) entered into between **Capital Raising GmbH** (the "**Silent Partner**") and **IKB Deutsche Industriebank Aktiengesellschaft** (the "**Bank**").

## Präambel:

Die Parteien dieses Vertrages beabsichtigen den Abschluß eines Stillen Gesellschaftsvertrages, mit dem sich der Stille Gesellschafter am Handelsgewerbe der Bank durch Leistung einer Stillen Einlage beteiligt. Die Stille Einlage soll bei der Bank auf Dauer als haftendes Eigenkapital (Kernkapital) im Sinne des deutschen Kreditwesengesetzes (KWG) und der Eigenmittelempfehlungen des Baseler Ausschusses für Bankenaufsicht dienen. Der Stille Gesellschafter wird die Stille Einlage durch die Emission von Teilschuldverschreibungen (die "**Teilschuldverschreibungen**"), die beim Anlegerpublikum breit plaziert werden sollen, refinanzieren.

Die Parteien haben sich sowohl über die Höhe der Stillen Einlage als auch über die von dem Stillen Gesellschafter zu beanspruchende Gewinnbeteiligung innerhalb nachfolgend definierter Ober- bzw. Untergrenzen verständigt. Die endgültigen Beträge sind jedoch von den Kapitalmarktverhältnissen im Zeitpunkt der Plazierung der Teilschuldverschreibungen abhängig und werden von den Parteien gemeinsam vor Leistung der Stillen Einlage festgelegt bzw. genehmigt.

Dies vorausgeschickt, schließen die Parteien nachfolgenden

**Vertrag über eine Stille Beteiligung.**

## § 1
### Vertragsgegenstand

1. Der Stille Gesellschafter ist berechtigt, sich am Handelsgewerbe der Bank als typischer stiller Gesellschafter mit einer Vermögenseinlage (die "**Stille Einlage**") in Höhe von mindestens € 150.000.000,– (Euro einhundertfünfzig Millionen) und höchstens € 250.000.000,– (Euro zweihundertfünfzig Millionen) zu beteiligen. Die Stille Beteiligung beginnt mit Leistung der Stillen Einlage (das "**Anfangsdatum**"). Der "**Einlagenennbetrag**" bezeichnet die Stille Einlage in der tatsächlich geleisteten Höhe, die den vorstehend in Satz 1 genannten Mindestbetrag nicht unterschreiten darf. Die Feststellung des Einlagenennbetrags durch die Vertragsparteien bedarf der schriftlichen Bestätigung[1] der Vertragsparteien. Die schriftliche Bestätigung ist diesem Beteiligungsvertrag als Anlage beizufügen und wird der Anmeldung dieses Beteiligungsvertrags als Teilgewinnabführungsvertrag zur Eintragung in das Handelsregister der Bank beigefügt.

---

[1] Siehe in diesem Prospekt „Beschreibungen der Emissionsstruktur" – „Bestätigungserklärung der IKB Deutsche Industriebank Aktiengesellschaft und der Capital Raising GmbH".

## Recitals:

It is the intention of the parties hereto to conclude an agreement on a silent partnership under which the Silent Partner participates in the commercial enterprise *(Handelsgewerbe)* of the Bank by making a capital contribution *(Stille Einlage)*. The capital contribution is to serve the Bank permanently as regulatory capital (Tier 1 Capital - *(Kernkapital)*) within the meaning of the German Banking Act ("**KWG**") and the capital adequacy recommendations established by the Basle Committee for Banking Supervision. The Silent Partner will refinance the capital contribution by issuing capital notes (the "**Capital Notes**") which will be broadly placed with investors.

The parties have agreed both on the amount of the capital contribution and the profit participation payable to the Silent Partner within the upper and lower limits hereinafter defined. The definite amounts, however, depend on the condition of the capital markets at the time the Capital Notes are placed and will be determined and/or approved jointly by the parties prior to making the capital contribution.

Now therefor, the parties enter into the following

**Agreement on a Silent Partnership.**

## Section 1
### Subject of the Agreement

1. The Silent Partner shall be entitled to participate in the commercial enterprise *(Handelsgewerbe)* of the Bank as a typical silent partner with an asset contribution (the "**Capital Contribution**") in the amount of not less than € 150,000,000 (one hundred fifty million Euro) and not more than € 250,000,000 (two hundred and fifty million Euro). The Silent Partnership commences as from the date payment of the Capital Contribution is made (the "**Start Date**"). "**Nominal Contribution Amount**" means the Capital Contribution in the amount actually paid which shall not be less than the minimum amount mentioned in sentence 1. The determination of the Nominal Contribution Amount by the parties shall require the written confirmation[1] of the parties hereto. Such written confirmation is to be annexed to this Silent Partnership Agreement and will be attached to the application for the entry of this Silent Partnership Agreement as Partial Profit Transfer Agreement into the Commercial Register for the Bank.

---

[1] See in this Information Memorandum "Description of Offering Structure" – "Confirmation by IKB Deutsche Industriebank Aktiengesellschaft and Capital Raising GmbH".

2. Die Stille Einlage wird in bar erbracht. Die Stille Einlage geht in das Vermögen der Bank über. Sie soll bei der Bank auf Dauer als haftendes Eigenkapital (Kernkapital) im Sinne des KWG und der Eigenmittelempfehlungen des Baseler Ausschusses für Bankenaufsicht dienen.

3. Die Bank wird dem Stillen Gesellschafter fernmündlich mit anschließender schriftlicher Bestätigung die Eintragung dieses Beteiligungsvertrags als Teilgewinnabführungsvertrag in das Handelsregister der Bank mitteilen. Sie wird die vorstehende Mitteilung unverzüglich nach Erhalt der Eintragungsnachricht des Handelsregisters vornehmen.

### § 2
### Gewinnbeteiligung

1. Als Gegenleistung für die Stille Einlage stehen dem Stillen Gesellschafter vom Anfangsdatum bis zu dem Tag (einschließlich), an dem die Beteiligung des Stillen Gesellschafters am Handelsgewerbe der Bank endet bzw. nach § 6(5) Satz 2 als beendet gilt (der „**Beendigungstag**"), Gewinnbeteiligungen zu, die nach Maßgabe des § 2(2) bzw. des § 2(3) berechnet werden. „**Gewinnzeitraum**" bezeichnet den Zeitraum, für den eine Gewinnbeteiligung ermittelt wird. Der erste Gewinnzeitraum beginnt am Anfangsdatum und dauert bis zum 31. März 2003 (jeweils einschließlich) (der „**Erste Gewinnzeitraum**"). Danach dauert ein Gewinnzeitraum jeweils vom 1. April bis zum 31. März eines Jahres (jeweils einschließlich) (dieser Zeitraum wird als das „**Geschäftsjahr**" bezeichnet), sofern er nicht infolge wirksamer Beendigung dieses Beteiligungsvertrags vorher endet.

2. Vorbehaltlich § 3 ist für einen Gewinnzeitraum eine Vergütung in Höhe eines festen annualisierten Prozentsatzes des Einlagenennbetrags zu zahlen (die „**Gewinnbeteiligung**"). Der Zinssatz wird durch die mit der Emission der Teilschuldverschreibungen beauftragte Bank nach dem im Zeitpunkt der Emission aktuellen Kapitalmarktverhältnissen festgestellt und darf 6,80% p. a. nicht unterschreiten und 7,90% p. a.[2] nicht überschreiten. Die Feststellung des Zinssatzes bedarf der schriftlichen Genehmigung der Vertragsparteien. Die schriftliche Genehmigung[3] ist diesem Beteiligungsvertrag als Anlage beizufügen und wird der Anmeldung dieses Beteiligungsvertrags als Teilgewinnabführungsvertrag zur Eintragung in das Handelsregister der Bank beigefügt.

Die Gewinnbeteiligung für ein Geschäftsjahr wird jeweils für einen Zahlungszeitraum (der „**Zahlungszeitraum**") berechnet, den der Zeitraum vom Anfangsdatum (einschließlich) bis zum ersten Ausschüttungstag (ausschließlich) (der „**Erste Zahlungszeitraum**") bzw. einem Ausschüttungstag (einschließlich) bis zum nächstfolgenden Ausschüttungstag (ausschließlich) (jeweils ein „**Nachfolgender Zahlungszeitraum**") entspricht. Die Berechnung der jeweils zahlbaren Gewinnbeteiligung erfolgt, auch im Falle der Nachfolgenden Zahlungszeiträume, auf Grundlage der tatsächlichen Anzahl der Tage in diesem Zahlungszeitraum, dividiert durch 365 bzw. 366.

3. Sollte während des Bestehens dieses Beteiligungsvertrags eine Änderung der Gewerbeertragsteuer oder eine Einführung einer sonstigen Ertrag- oder Vermögensteuer beim Stillen Gesellschafter zur Erhöhung seiner Steuerschuld führen, oder hat der Stille Gesellschafter aufgrund

---

[2] Siehe hierzu „Zusammenfassung des Angebots" – „Beteiligung der Emittentin am Gewinn der IKB AG".

[3] Siehe in diesem Prospekt „Beschreibungen der Emissionsstruktur" – „Bestätigungserklärung der IKB Deutsche Industriebank Aktiengesellschaft und der Capital Raising GmbH".

---

2. The Capital Contribution will be made in cash. The Capital Contribution becomes the property of the Bank. It is to serve the Bank permanently as regulatory capital (Tier 1 Capital *(Kernkapital)*) within the meaning of the KWG and the capital adequacy recommendations established by the Basle Committee for Banking Supervision.

3. The Bank will notify the Silent Partner by telephone – followed by a written confirmation – of the entry of this Silent Partnership Agreement as Partial Profit Transfer Agreement into the Commercial Register for the Bank. The Bank will make such notification immediately after receipt of the entry notice given by the Commercial Register.

### Section 2
### Profit Participation

1. In consideration for the Capital Contribution, the Silent Partner shall be entitled to profit participations calculated in compliance with Section 2(2) or Section 2(3) hereof from the Start Date up to (and including) the date the participation of the Silent Partner in the commercial enterprise of the Bank terminates or is deemed to be terminated pursuant to Section 6(5) sentence 2 hereof (the "**Termination Date**"). "**Profit Period**" means the period for which a profit participation is determined. The first Profit Period commences on (and includes) the Start Date and lasts until (and includes) 31 March 2003 (the "**First Profit Period**"). Thereafter, a Profit Period starts (and includes) 1 April and ends (and includes) 31 March of each year (this period is referred to as the "**Fiscal Year**"), unless terminated before that date by way of effective termination of this Silent Partnership Agreement.

2. Subject to Section 3, a consideration shall be payable for a Profit Period in the amount of a fixed annualised percentage of the Nominal Contribution Amount (the "**Profit Participation**"). The interest rate shall be determined by the Bank underwriting the Capital Notes in line with the conditions on the capital markets prevailing at the time of issue and shall not be less than 6.8% p.a. and not more than 7.9% p.a.[2]. Determination of the interest rate requires the written consent[3] of the parties hereto. Such written consent is to be annexed to this Silent Partnership Agreement and will be attached to the application for the entry of this Silent Partnership Agreement as Partial Profit Transfer Agreement into the Commercial Register for the Bank.

The Profit Participation for a Fiscal Year will be calculated in each case for a payment period (the "**Payment Period**") corresponding to the period from (and including) the Start Date up to (and excluding) the first Distribution Date (the "**First Payment Period**") or, as the case may be, the period from (and including) a Distribution Date up to (and excluding) the next Distribution Date (each a "**Subsequent Payment Period**"). Calculation of the Profit Participation payable from time to time shall be made on the basis of the actual number of days in that Payment Period divided by 365 or 366, as the case may be; this calculation method shall also apply to any Subsequent Payment Periods.

3. In the event that, during the term hereof, changes in trade income tax or the introduction of any other income or property tax leads to a higher tax liability of the Silent Partner, or if the Silent Partner, on account of investment income tax or any other withholding tax in respect of

---

[2] See "Summary of the Offer" – "Participation of the Issuer in the Profits of IKB AG".

[3] See in this Information Memorandum "Description of Offering Structure" – Confirmation by IKB Deutsche Industriebank Aktiengesellschaft and Capital Raising GmbH".

einer Kapitalertrag- oder sonstigen Abzugssteuer in bezug auf Zinszahlungen für die von ihm zur Refinanzierung der Stillen Einlage begebenen Teilschuldverschreibungen zusätzliche Beträge an die Inhaber der Teilschuldverschreibungen zu leisten, wird die prozentuale Gewinnbeteiligung gemäß § 2(2) auf Verlangen des Stillen Gesellschafters (soweit zulässig rückwirkend, andernfalls für künftige Gewinnzeiträume) soweit erhöht, daß durch die Erhöhung die zusätzliche Belastung des Stillen Gesellschafters (einschließlich etwaiger Zwischenfinanzierungskosten) vollständig ausgeglichen wird. Das Anpassungsverlangen muß vom Stillen Gesellschafter bei Steueränderungen innerhalb von 30 Tagen ab deren Wirksamwerden mit eingeschriebenem Brief gegenüber der Bank geltend gemacht werden. Ein entsprechendes Recht auf Anpassung der prozentualen Gewinnbeteiligung steht der Bank bei einer Verminderung der Belastung des Stillen Gesellschafters aufgrund einer Änderung der in Satz 1 dieses § 2 (3) genannten Steuern zu.

4. Eine Gewinnbeteiligung für einen Gewinnzeitraum entfällt, solange die Stille Einlage nach einer Herabsetzung des Buchwerts der Stillen Einlage gemäß § 5(1) (die „**Herabsetzung**") noch nicht wieder vollständig gemäß § 5(3) aufgefüllt wurde.

5. [*]) Die Gewinnbeteiligung für einen Gewinnzeitraum entfällt ferner ganz oder teilweise, soweit durch sie in bezug auf einen Gewinnzeitraum ein Bilanzverlust bei der Bank entsteht oder sich erhöht. „**Bilanzverlust**" bezeichnet einen etwaigen Bilanzverlust der Bank im Sinne des § 158 Abs. 1 Nr. 5 AktG. Außer in dem im nachfolgenden Satz geregelten Fall, ist die Bank nicht verpflichtet, einen Bilanzverlust durch die Auflösung von Gewinnrücklagen oder anderen Rücklagen zu vermeiden. Wird in dem in Satz 1 genannten Fall an die Aktionäre der Bank eine Dividende ausgeschüttet oder werden bezogen auf einen Gewinnzeitraum Zahlungen auf (a) andere Kernkapitalinstrumente der Bank, (b) nachrangige Garantien, Patronatserklärungen oder ähnliche von der Bank gestellte Sicherheiten (Gewährleistungen) für Kernkapitalinstrumente von Tochtergesellschaften oder (c) Kernkapitalinstrumente von Tochtergesellschaften, deren Bedienbarkeit maßgeblich von der Ertrags – oder Vermögenssituation der Bank bestimmt wird, erbracht (zusammen „**Andere Kernkapitalinstrumente**"), so muß die Bank nach Maßgabe von § 301 Satz 2 AktG aus vorhandenen Gewinnrücklagen die erforderlichen Beträge entnehmen, um in maßgeblichen Gewinnzeitraum eine etwaige Herabsetzung zu vermeiden oder einen etwaigen herabgesetzten Buchwert der Stillen Einlage vollständig wieder aufzufüllen. Für die Regelung des vorstehend genannten Buchstaben c) ist diejenige Zahlung maßgeblich, die an die Ertrags – oder Vermögenssituation der Bank in dem jeweiligen Gewinnzeitraum, für den die Gewinnbeteiligung ermittelt wird, anknüpft. Nachdem ein etwaiger herabgesetzter Buchwert wieder vollständig aufgefüllt ist, ist hieran anschließend die Gewinnbeteiligung für den betreffenden Gewinnzeitraum zu zahlen. Eine Verpflichtung zur Wiederauffüllung bzw. Vermeidung der Herabsetzung und Zahlung von Gewinnbeteiligungen durch Auflösung von Gewinnrücklagen nach § 301 Satz 2 AktG besteht nur, wenn und soweit ein Solvabilitätskoeffizient der Bank auf Instituts- und Gruppenebene von mindestens 9% erhalten bleibt. Werden gleichrangige Andere Kernkapitalinstrumente nur teilweise bedient, so ist die Gewinnbeteiligung im Rahmen des § 301 Satz 2 AktG zum gleichen Teil zu zahlen. Werden nachrangige Andere Kernkapitalinstrumente nur teilweise

interest payments on the Capital Notes issued by it for the purpose of refinancing the Capital Contribution, has to pay additional amounts to the holders of the Capital Notes, the percentage of the Profit Participation pursuant to Section 2(2) hereof will, at the request of the Silent Partner, be increased (with retroactive effect, if and to the extent that this is permissible, and otherwise for future Profit Periods) to the extent that, as a result of such increase, any additional liability of the Silent Partner (including any interim financing costs) is fully covered. In the event of any such taxation-related changes, the Silent Partner shall, within a period of 30 days from the date of effectiveness of such changes, request the Bank by registered mail to adjust its Profit Participation. Similarly, the Bank shall be entitled to have the Profit Participation adjusted if the burden of the Silent Partner is reduced due to any changes in the taxes specified in sentence 1 of this Section 2(3).

4. No Profit Participation shall be payable for a Profit Period until the Capital Contribution has been replenished in full pursuant to Section 5(3) subsequent to a reduction of the Book Value of the Capital Contribution in accordance with Section 5(1) (the "**Reduction**").

5. [(*)] In addition, a Profit Participation shall not be payable, in whole or in part, for a Profit Period if and to the extent that, in respect of a Profit Period, such payment would cause or increase a balance sheet loss *(Bilanzverlust)* with the Bank. "**Balance Sheet Loss**" means any balance sheet loss of the Bank within the meaning of § 158 (1) No. 5 German Stock Corporation Act ("**AktG**"). Save for the exception provided for in the following sentence, the Bank shall not be obliged to avoid a Balance Sheet Loss by dissolving revenue reserves or any other reserves. If, in the case stipulated in sentence 1, dividends are paid to the shareholders of the Bank, or if payments relating to a Profit Period are made in respect of (a) other Tier 1 Capital instruments of the Bank, (b) subordinated guarantees, support undertakings or similar security instruments (warranties) provided by the Bank for Tier 1 Capital instruments of subsidiaries, or (c) Tier 1 Capital instruments of subsidiaries, the serviceability of which depends to a material extent on the income or asset position of the Bank (hereinafter collectively referred to as "**Other Tier 1 Capital Instruments**"), the Bank shall be under the obligation, in compliance with § 301 sentence 2 AktG, to withdraw the required amounts from existing revenue reserves in order to avoid any Reduction in the relevant Profit Period or to fully replenish any reduced Book Value of the Capital Contribution, as the case may be. For the purposes of the above lit. c), the relevant payment shall be the payment linked to the income or asset position of the Bank in the respective Profit Period for which the Profit Participation is calculated. Following full replenishment of any reduced Book Value, the Profit Participation for the relevant Profit Period is payable subsequent thereto. The obligation to replenish or to avoid any Reduction and to pay Profit Participations by dissolving revenue reserves pursuant to § 301 sentence 2 AktG only exists if and to the extent the solvency ratio of the Bank on a consolidated and individual basis remains at least 9%. Where any Other Tier 1 Capital Instruments ranking *pari passu* are serviced only in part, the Profit Participation, within § 301 sentence 2 AktG, is to be paid on a pro rata basis. In the event that any subordinated Other Tier 1 Capital Instruments are serviced only in part, the Profit Participation, within § 301 sentence 2 AktG, is to be

---

[*])  Siehe zum Wegfall der Verpflichtung zur Zahlung von Gewinnbeteiligungen auch „Risikofaktoren – Gewinnbeteiligung und Zahlungen auf die Teilschuldverschreibungen".

[(*)]  See "Risk Factors – Profit Participation and Payments in respect of the Capital Notes" regarding the nonobligation of IKB AG to pay Profit Participations.

28

bedient, so ist die Gewinnbeteiligung im Rahmen des § 301 Satz 2 AktG voll zu zahlen. Kauft die Bank Aktien (ausgenommen Aktienrückäufe im Rahmen einer zulässigen Kurspflege oder eines zulässigen Eigenhandels) oder Andere Kernkapitalinstrumente vor deren ursprünglich vorgesehener Fälligkeit zurück oder zahlt sie diese vor Fälligkeit zurück, so gilt dies als Ausschüttung einer Dividende bzw. volle Zahlung auf Andere Kernkapitalinstrumente im betreffenden Gewinnzeitraum.

Ungeachtet der vorstehenden Regelung wird die Bank in bezug auf einen Gewinnzeitraum keine Gewinnbeteiligung zahlen, wenn und soweit ihr die Zahlung durch die Bundesanstalt für Finanzdienstleistungsaufsicht (die „BAFin") untersagt wurde.

Für den Fall, daß die Gewinnbeteiligung auf die Stille Gesellschaft auch nach Maßgabe der vorstehenden Bestimmung nicht gezahlt werden kann, verpflichtet sich die Bank keine Zahlungen auf Andere Kernkapitalinstrumente zu erbringen, sofern die Bank nicht zu solchen Zahlungen verpflichtet ist.

6. Die Bank ist nicht verpflichtet, entfallene Gewinnbeteiligungen nachzuzahlen.

paid in full. If the Bank buys back stock (with the exception of stock buybacks effected for the purposes of permissible price-support measures or permissible own-account trading) or redeems Other Tier 1 Capital Instruments prior to their originally stipulated due dates, or in the event that the Bank redeems them prior to maturity, this shall be deemed a distribution of dividends and/or a full payment on Other Tier 1 Capital Instruments in the relevant Profit Period.

Regardless of the above provisions, the Bank will not make payment of the Profit Participation in respect of a Profit Period if and to the extent that the *Bundesanstalt für Finanzdienstleistungsaufsicht* ("*BAFin*") has prohibited the Bank to do so.

In the event that the Profit Participation payable in respect of the Silent Partnership cannot be paid in accordance with the above provision, the Bank undertakes not to make any payments on any Other Tier 1 Capital Instruments unless the Bank is legally required to make such payments.

6. The Bank is not obliged to subsequently pay any Profit Participations that were not paid.

### § 3
### Zahlung der Gewinnbeteiligung

1. Gewinnbeteiligungen werden am 15. Juli des Geschäftsjahres, welches auf das dem Gewinnzeitraum entsprechende Geschäftsjahr der Bank folgt (der „**Ausschüttungstag**"), zur Auszahlung fällig. Handelt es sich bei diesem Tag nicht um einen Geschäftstag (wie nachfolgend definiert), werden Gewinnbeteiligungen am ersten auf den 15. Juli folgenden Geschäftstag fällig (der jeweils nach diesem Satz und Satz 1 dieses § 3 (2) einschlägige Tag der „**Fälligkeitstag**"), wobei für diese Verschiebung keine zusätzlichen Zinsen zu zahlen sind. Sollte am jeweiligen Fälligkeitstag der Jahresabschluß der Bank für das dem Gewinnzeitraum entsprechende Geschäftsjahr noch nicht festgestellt sein, verschiebt sich die Auszahlung der Gewinnbeteiligung auf den ersten Geschäftstag nach dem Tag der Feststellung des Jahresabschlusses der Bank für das dem Gewinnzeitraum entsprechende Geschäftsjahr. „**Geschäftstag**" bezeichnet jeden Tag, an dem das Trans-European Automated Real-Time Gross Settlement Express Transfer-Zahlungssystem („**TARGET**") geöffnet ist und Geschäftsbanken und Devisenmärkte in Frankfurt im allgemeinen Geschäftsverkehr Zahlungen abwickeln.

2. Erfolgt die Zahlung der Gewinnbeteiligung nach dem Fälligkeitstag, weil am Fälligkeitstag der Jahresabschluß der Bank für das dem Gewinnzeitraum entsprechende Geschäftsjahr noch nicht festgestellt war, ist die Gewinnbeteiligung vom Fälligkeitstag (einschließlich) bis zum Tag der tatsächlichen Auszahlung (ausschließlich) mit 5% p.a. über dem jeweils gültigen Basiszinssatz im Sinne des § 288 BGB zu verzinsen.

### Section 3
### Payment of Profit Participation

1. Profit Participations shall become due for payment on 15 July of the Fiscal Year following the Fiscal Year of the Bank which corresponds to the Profit Period (the "**Distribution Date**"). If this day is not a Business Day (as hereinafter defined), Profit Participations shall be due and payable on the first Business Day following 15 July (the relevant date as per this sentence and sentence 1 of this Section § 3(2) are each referred to as "**Due Date**") with no additional interest being payable in respect of such postponement. If, at the relevant Due Date, the annual accounts of the Bank for the Fiscal Year corresponding to the Profit Period have not yet been approved, payment of the Profit Participation shall be postponed to the first Business Day following the day on which the annual accounts of the Bank for the Fiscal Year corresponding to the Profit Period are approved. "**Business Day**" means any day on which the Trans-European Automated Real-Time Gross Settlement Express Transfer System ("**TARGET**") is operating, and payments are settled by commercial banks and foreign currency markets in Frankfurt in the ordinary course of business.

2. If payment of the Profit Participation is made after the Due Date on account of the fact that the annual accounts of the Bank for the Fiscal Year corresponding to the Profit Period had not yet been approved on the Due Date, interest shall be payable at a rate of 5% p.a. above the then applicable base rate within the meaning of § 288 of the German Civil Code ("**BGB**") on the Profit Participation from (and including) the Due Date up to (but excluding) the actual payment date.

### § 4
### Rangstellung der Stillen Einlage

Forderungen gegenüber der Bank aufgrund dieses Beteiligungsvertrages:

(a) sind nachrangig gegenüber Forderungen aller bestehenden und künftigen Gläubiger der Bank (einschließlich Forderungen aus Genußrechten und ggf. anderen Kapitalinstrumenten des Ergänzungskapitals sowie sonstige nachrangige Verbindlichkeiten gemäß § 10 Abs. 5, Abs. 5a und Abs. 7 KWG);

### Section 4
### Ranking of the Capital Contribution

Claims against the Bank hereunder shall:

(a) be subordinated to claims of any existing and future creditors of the Bank (including claims under profit participation rights *(Genussrechte)* and, where applicable, any Tier 2 Capital Instruments *(Ergänzungskapital)* as well as any other subordinated debt pursuant to § 10 (5), (5a) and (7) KWG);

29

(b) sind (prozentual zum fälligen Betrag) mindestens gleichrangig mit allen Forderungen aus bestehenden und künftigen stillen Gesellschaften sowie mit Anderen Kernkapitalinstrumenten, die nach Maßgabe ihrer Bedingungen gleichrangig mit Gewinnbeteiligungen in Form von stillen Gesellschaften sind;

(c) sind vorrangig vor allen Forderungen aus Aktien der Bank.

### § 5
### Verlustbeteiligung, stille Reserven

1. An einem Bilanzverlust nimmt der Stille Gesellschafter im Verhältnis des Buchwerts der Stillen Einlage zum Gesamtbuchwert des haftenden Eigenkapitals der Bank, das am Verlust teilnimmt, (das „**Haftkapital**") teil. „**Buchwert**" bezeichnet dabei den Buchwert der Stillen Einlage nach Maßgabe der Bilanz der Bank für das jeweilige Geschäftsjahr. Wenn sich bei Aufstellung der Bilanz der Bank die Entstehung eines Bilanzverlust abzeichnet, so wird dieser Bilanzverlust anteilig nach Maßgabe dieses § 5 vom Buchwert abgezogen.

Somit nehmen alle stillen Gesellschafter, alle Inhaber von Genußrechten und alle Aktionäre der Bank am Bilanzverlust mit dem gleichen Prozentsatz des Buchwertes ihrer Einlagen bzw. ihrer Rückzahlungsansprüche oder des sonstigen ausgewiesenen Eigenkapitals teil.

2. Die Gesamtverlustbeteiligung des Stillen Gesellschafters ist auf seine Vermögenseinlage beschränkt.

3. Nach einer etwaigen Herabsetzung wird die Stille Einlage in den der Herabsetzung nachfolgenden Geschäftsjahren der Bank bis zur vollständigen Höhe des Einlagennennbetrags wieder aufgefüllt, wenn und soweit hierdurch kein Bilanzverlust entsteht oder erhöht würde. § 2 (5) bleibt unberührt.

Die Auffüllung der Stillen Einlage nach einer Herabsetzung geht der Auffüllung des Grundkapitals, der Zahlung von Dividenden und Einstellungen in Rücklagen (außer gesetzlich zu bildender Rücklagen) vor. Im Verhältnis zu Anderen Kernkapitalinstrumenten erfolgt die Auffüllung gleichrangig und im gleichen Verhältnis wie die Verlustbeteiligung. Im Verhältnis zu Genußrechten (§ 10 Abs. 5 KWG) ist die Auffüllung nachrangig, soweit die Genußrechtsbedingungen nicht einen Gleichrang vorsehen.

4. Auf die vor oder während der Laufzeit der Stillen Gesellschaft gebildeten stillen Reserven hat der Stille Gesellschafter kein Anrecht.

5. Die Bank ist nicht verpflichtet, stille Reserven aufzudecken, um eine Gewinnbeteiligung gemäß § 2 auszahlen zu können oder eine Verlustbeteiligung zu vermeiden.

### § 6
### Dauer der stillen Gesellschaft, Kündigung

1. Dieser Beteiligungsvertrag wird auf unbestimmte Zeit abgeschlossen.

2. Die Kündigung dieses Beteiligungsvertrags durch den Stillen Gesellschafter ist ausgeschlossen. Für den Fall der Unwirksamkeit des Kündigungsausschlusses wird vereinbart, daß die Kündigung nur mit vorheriger Zustimmung der BAFin erfolgen kann. Für den Fall der Unwirksamkeit des vorstehenden Zustimmungsvorbehaltes wird vereinbart, daß die Kündigung des Stillen Gesellschafters mit

(b) rank at least *pari passu* (pro rata to the amount payable) with all claims under any existing and future silent partnerships as well as with Other Tier 1 Capital Instruments which, in accordance with their terms, rank *pari passu* with profit participations in the form of silent partnerships;

(c) rank senior to all claims under shares of the Bank.

### Section 5
### Loss Participation, Hidden Reserves

1. The Silent Partner shall participate in a Balance Sheet Loss in the proportion which the Book Value of the Capital Contribution bears in relation to the aggregate Book Value of all loss-participating components of the Bank's regulatory capital (the "**Regulatory Capital**"). "**Book Value**" means the Book Value of the Capital Contribution in accordance with the balance-sheet of the Bank for the relevant Fiscal Year. When, in the course of preparing the balance-sheet of the Bank, it becomes apparent that there will be a Balance Sheet Loss, such loss will be deducted from the Book Value on a pro rata basis in accordance with this Section 5.

Accordingly, all silent partners, all holders of profit participation rights *(Genussrechte)* as well as all shareholders of the Bank participate in any Balance Sheet Loss with the same percentage of the book value of their contributions, repayment claims or any other stated equity capital, respectively.

2. The Silent Partner's aggregate loss participation shall be limited to his asset contribution.

3. Subsequent to a Reduction, if any, the Capital Contribution shall be replenished during the Fiscal Years of the Bank following any such Reduction until the Nominal Contribution Amount has been replenished in full if and to the extent that such replenishment would not cause or increase any Balance Sheet Loss. The above shall be without prejudice to Section 2(5).

Any replenishment of the Capital Contribution subsequent to a Reduction shall take priority over the replenishment of the share capital, the payment of dividends as well as any allocations to reserves (with the exception, however, of statutory reserves). In relation to Other Tier 1 Capital Instruments, any such replenishment shall be effected on a *pari passu* basis and in the same proportion as the loss participation. In relation to profit participation rights *(Genussrechte)* (§ 10 (5) KWG), any such replenishment shall be effected on a subordinated basis unless the terms and conditions of the profit participation rights provide for a *pari passu* ranking.

4. The Silent Partner shall not be entitled to a share in the hidden reserves created prior to or during the term of the Silent Partnership.

5. The Bank shall not be obliged to disclose any hidden reserves in order to pay a Profit Participation in accordance with Section 2 hereof or to avoid a loss participation.

### Section 6
### Duration of the Silent Partnership, Termination

1. This Silent Partnership Agreement shall be concluded for an indefinite period of time.

2. The Silent Partner shall be precluded from terminating this Silent Partnership Agreement. In the event such preclusion is invalid, the parties agree that this Agreement may only be terminated with the prior consent of the BAFin. Should the above consent requirement be invalid, the parties agree that the Silent Partner may terminate this Agreement by giving two years' prior notice, no earlier,

einer Frist von zwei Jahren, erstmals jedoch zum Ende des Geschäftsjahres 2032 erfolgen kann.

3. Die Bank kann diesen Beteiligungsvertrag gegenüber dem Stillen Gesellschafter mit einer Frist von zwei Jahren zum Ende jeden Geschäftsjahres kündigen, wobei eine Kündigung keinesfalls vor dem 31. März 2013 wirksam wird und zu ihrer Wirksamkeit der vorherigen Zustimmung durch die BAFin bedarf. Wenn eine Veränderung gemäß § 11 eintritt, kann die Bank diesen Beteiligungsvertrag unbeschadet des ersten Satzes dieses § 6(3) jederzeit mit einer Frist von zwei Jahren zum Monatsende gegenüber dem Stillen Gesellschafter kündigen mit der Maßgabe, daß eine Kündigung keinesfalls vor dem 31. März 2013 wirksam wird und zu ihrer Wirksamkeit der vorherigen Zustimmung durch die BAFin bedarf. Falls die Stille Einlage nicht mehr als haftendes Eigenkapital (Kernkapital) im Sinne des KWG anerkannt wird, kann die Bank diesen Beteiligungsvertrag jederzeit mit einer Frist von 30 Tagen zum Monatsende kündigen.

4. Endet dieser Beteiligungsvertrag im Laufe eines Geschäftsjahres, ist die Stille Einlage vom Beendigungstag (ausschließlich) bis zum Ende des Geschäftsjahres (einschließlich), in dem die Beendigung erfolgt, in Höhe der nach Maßgabe des § 2(2) für das laufende Geschäftsjahr bereits festgesetzten und ggf. gemäß § 2(3) erhöhten Gewinnbeteiligung zu verzinsen.

5. Die Kündigung dieses Beteiligungsvertrags bedarf der Schriftform. Der Stille Gesellschafter behält bis zum Wirksamwerden einer Kündigung seine vollen Rechte unter diesem Beteiligungsvertrag. Unterschreitet der Buchwert den Einlagenennbetrag, gilt der Beteiligungsvertrag im Falle einer Kündigung erst dann als beendet, wenn die Stille Einlage nach § 5(3) bis zur vollständigen Höhe des Einlagenennbetrags wieder aufgefüllt ist.

6. Am Rückzahlungstag zahlt die Bank an den Stillen Gesellschafter den Rückzahlungsbetrag sowie die eventuell entstandene Gewinnbeteiligung bzw. Zinsen gemäß § 6(4). „**Rückzahlungstag**" bezeichnet dabei den Fälligkeitstag in dem Geschäftsjahr, welches auf das Geschäftsjahr der Bank folgt, in das der Beendigungstag fällt bzw. – im Fall der Wiederauffüllung der Stillen Einlage bis zum vollen Einlagenennbetrag – den Fälligkeitstag in dem Geschäftsjahr, welches auf das Geschäftsjahr der Bank folgt, zu dessen Ende sich ein Bilanzgewinn ergibt, der zur Wiederauffüllung der Stillen Einlage führt. „**Rückzahlungsbetrag**" bezeichnet den Buchwert der Stillen Einlage zum Ende des Geschäftsjahrs, in dem die Stille Beteiligung endet. § 6(5) Satz 2 bleibt unberührt. Vorbehaltlich der Regelung in § 6(4) wird die Stille Einlage bzw. der Rückzahlungsbetrag für den Zeitraum vom Beendigungstag bis zum Rückzahlungstag nicht verzinst. Erfolgt die Zahlung des Rückzahlungsbetrags sowie der eventuell entstandenen Gewinnbeteiligung bzw. gemäß § 6(4) eventuell aufgelaufener Zinsen nach dem Rückzahlungstag, weil am Rückzahlungstag der Jahresabschluß der Bank für das (zur Ermittlung des Rückzahlungsbetrags maßgebliche) Geschäftsjahr noch nicht festgestellt war, sind der Rückzahlungsbetrag sowie die eventuell entstandene Gewinnbeteiligung bzw. eventuell gemäß § 6(4) aufgelaufene Zinsen vom Rückzahlungstag (einschließlich) bis zum Tag der tatsächlichen Zahlung (ausschließlich) mit 5% p.a. über dem jeweils gültigen Basiszinssatz im Sinne des § 288 BGB zu verzinsen.

however, than with effect from the end of the Fiscal Year 2032.

3. The Bank may terminate this Silent Partnership Agreement by giving two years' notice to the Silent Partner with effect from the end of each Fiscal Year provided that any such termination shall not become effective prior to 31 March 2013, and shall require the prior consent of the BAFin. In the event that any changes referred to in Section 11 hereof shall occur, the Bank may terminate this Silent Partnership Agreement at any time, notwithstanding the first sentence of this Section 6(3), by giving two years' prior notice to the Silent Partner with effect from the end of any month provided that any such termination shall not under any circumstances become effective before 31 March 2013, and shall require the prior consent of the BAFin. In case the Capital Contribution no longer qualifies as regulatory capital (Tier 1 Capital) as defined in the KWG, the Bank may terminate this Silent Partnership Agreement at any time by giving 30 days' notice with effect from the end of any month.

4. In the event that this Silent Partnership Agreement shall terminate during a Fiscal Year, interest shall be payable on the Capital Contribution from (but excluding) the Termination Date up to (and including) the end of the Fiscal Year during which the Silent Partnership Agreement terminates, in an amount equal to the Profit Participation, as determined for the current Fiscal Year in accordance with Section 2(2) and, where applicable, as increased pursuant to Section 2(3).

5. Any termination of this Silent Partnership Agreement shall be made in writing. The Silent Partner shall retain its rights hereunder without any limitation until the termination becomes effective. If and for so long as the Book Value is less than the Nominal Contribution Amount, this Silent Partnership Agreement shall not be deemed to be terminated until the Capital is replenished pursuant to Section 5(3) hereof up to the full Nominal Contribution Amount.

6. On the repayment date, the Bank shall pay to the Silent Partner the Repayment Amount, the Profit Participation which may have accrued and/or any interest in accordance with Section 6(4). "**Repayment Date**" means the Due Date in the Fiscal Year following the Fiscal Year of the Bank in which the Termination Date has occurred, or – in the event the Capital Contribution needs to be replenished up to the full Nominal Contribution Amount – the Due Date in the Fiscal Year following the Fiscal Year of the Bank as of the end of which a balance sheet profit is reported which results in the complete replenishment of the Capital Contribution. "**Repayment Amount**" means the Book Value of the Capital Contribution as of the end of the Fiscal Year in which the Silent Partnership terminates. The above shall be without prejudice to Section 6(5) sentence 2. Subject to the provisions contained in Section 6(4), no interest will be payable on the Capital Contribution and/or the Repayment Amount for the period commencing on the Termination Date and ending on the Repayment Date. Where payment of the Repayment Amount, the Profit Participation which may have accrued and/or any interest accrued pursuant to Section 6(4) is made after the Repayment Date because, on the Repayment Date, the annual accounts of the Bank for the Fiscal Year (relevant for determining the Repayment Amount) had not yet been approved, interest shall be payable from (and including) the Repayment Date up to (but excluding) the actual payment date on the Repayment Amount, the Profit Participation which may have accrued and/or any interest accrued pursuant to Section 6(4) at a rate of 5% p.a. above the then applicable base rate within the meaning of § 288 BGB.

7. Von Maßnahmen nach dem Umwandlungsgesetz, (Teil-)Vermögensübertragungen, Änderungen der Rechtsform oder des Grundkapitals der Bank bleibt die Stille Gesellschaft unberührt.

8. Im Falle der Insolvenz oder Liquidation der Bank wird der Rückzahlungsbetrag der Stillen Einlage erst nach Befriedigung aller Gläubiger der Bank einschließlich der Inhaber von Genußrechten sowie der Gläubiger von längerfristigen nachrangigen Verbindlichkeiten und kurzfristigen nachrangigen Verbindlichkeiten, jedoch vor der Rückzahlung von Grundkapital zugunsten der Aktionäre ausgezahlt.

### § 7
### Gesellschafterrechte

1. Der Stille Gesellschafter ist berechtigt, (i) eine Abschrift des Jahresabschlusses der Bank (Bilanz mit Gewinn- bzw. Verlustrechnung sowie Anmerkungen) einschließlich Lagebericht sowie Konzernabschluß und Konzernlagebericht zu verlangen und (ii) den Prüfungsbericht durch einen Wirtschaftsprüfer oder vereidigten Buchprüfer überprüfen zu lassen.

2. Zusammen mit dem Jahresabschluß erhält der Stille Gesellschafter eine Aufstellung über seine Gewinn- und Verlustbeteiligung. Auf Anfrage des Stillen Gesellschafters hat die Bank hierzu weitere Auskünfte zu erteilen.

3. Weitere Gesellschafterrechte stehen dem Stillen Gesellschafter nicht zu.

### § 8
### Hinweis gemäß § 10 Abs. 4 Satz 1 Ziffer 6 KWG

Nach Abschluß dieses Vertrages können (i) weder die Verlustbeteiligung zum Nachteil der Bank verändert, (ii) noch die Nachrangigkeit eingeschränkt noch (iii) die Laufzeit oder Kündigungsfrist verkürzt werden.

Eine vorzeitige Rückzahlung ist der Bank ohne Rücksicht auf entgegenstehende Vereinbarungen zurückzugewähren, sofern nicht das Kapital durch die Einzahlung anderen, zumindest gleichwertigen haftenden Eigenkapitals ersetzt worden ist oder die BAFin der vorzeitigen Rückzahlung zustimmt.

### § 9
### Begebung weiteren Haftkapitals

Die Bank behält sich das Recht vor, Verträge über Andere Kernkapitalinstrumente zu gleichen oder anderen Bedingungen, insbesondere mit einer anderen Gewinnbeteiligung, oder Verträge über Genußrechte oder andere Verbindlichkeiten einzugehen, die Eigenmittel im Sinne des KWG und/oder der Eigenmittelempfehlungen des Baseler Ausschusses für Bankenaufsicht sind oder nachrangige bzw. mit dieser Stillen Gesellschaft gleichrangige Garantien, Patronatserklärungen oder andere Gewährleistungen (Sicherheiten) für entsprechende Instrumente von Tochtergesellschaften der Bank einzugehen. Forderungen künftiger stiller Gesellschafter (bzw. der Inhaber von Sicherheiten für Kernkapitalinstrumente bei Tochtergesellschaften) dürfen den Forderungen des Stillen Gesellschafters aus diesem Beteiligungsvertrag nicht im Rang vorgehen.

### § 10
### Übertragungsrechte des Stillen Gesellschafters

1. Jede Abtretung oder anderweitige Verfügung (z.B. durch Verpfändung) über Forderungen des Stillen Gesellschafters aus diesem Beteiligungsvertrag bedarf der vorherigen schriftlichen Zustimmung der Bank. Die Abtretung oder anderweitige Verfügung darf nicht zu einer erhöhten Belastung des Stillen Gesellschafters mit Kapitalertrag –

7. Any corporate action taken in compliance with the German Transformation Act *(Umwandlungsgesetz)*, any (partial) asset transfers, changes in the legal form or the share capital of the Bank shall not affect the Silent Partnership.

8. In the event of an insolvency or liquidation of the Bank, the Repayment Amount of the Capital Contribution will not be paid until all creditors of the Bank, including the holders of profit participation rights *(Genussrechte)* as well as the holders of long-term and short-term subordinated debt have been fully satisfied; however, payment of the Repayment Amount will be made prior to repayment of share capital for the benefit of the shareholders.

### Section 7
### Partnership Rights

1. The Silent Partner shall be entitled (i) to request a copy of the annual accounts of the Bank (balance-sheet, profit and loss account and notes) including the directors' report, as well as the consolidated accounts and the consolidated directors' report, and (ii) to have the auditors' report reviewed by an auditor or a chartered accountant.

2. The Silent Partner shall, together with the annual accounts, receive a statement of his profit/loss participation. Upon request by the Silent Partner, the Bank shall furnish further information in this respect.

3. The Silent Partner shall have no further partnership rights.

### Section 8
### Notice in accordance with § 10(4) sentence 1 No. 6 KWG

Subsequent to conclusion hereof, (i) the loss participation may not be amended to the detriment of the Bank, (ii) the subordination may not be restricted, and (iii) the term or the notice period may not be shortened.

Any early repayment must be repaid to the Bank regardless of any agreements to the contrary unless the capital has been replaced by other regulatory capital of least equal quality, or the BAFin agrees to such early repayment.

### Section 9
### Issue of Additional Regulatory Capital

The Bank reserves the right to conclude agreements on Other Tier 1 Capital Instruments on identical or different terms, in particular with a different profit participation, or to enter into agreements on profit participation rights *(Genussrechte)* or other liabilities qualifying as regulatory own funds within the meaning of the KWG and/or of the capital adequacy recommendations published by the Basle Committee for Banking Supervision, or to issue guarantees, support undertakings or any other warranties (security instruments) subordinated to or ranking *pari passu* with this Silent Partnership for corresponding instruments of subsidiaries of the Bank. Claims of any future silent partners (or of holders of security provided for Tier 1 Capital Instruments of subsidiaries) may not rank prior to the claims of the Silent Partner hereunder.

### Section 10
### Silent Partner's Transfer Rights

1. Any claims of the Silent Partner hereunder may only be assigned or otherwise disposed of (e.g. by way of a pledge) with the prior written consent of the Bank. Any such assignment or other disposal may not result in any increased liability of the Silent Partner on account of investment income tax or other withholding tax or any

oder sonstiger Abzugssteuer, etwaiger Vermögensteuer, Gewerbeertrag- oder sonstiger Ertragsteuer führen.

2. Im Falle einer Änderung des Geschäftsjahres der Bank werden die Parteien diesen Vertrag anpassen, soweit dies erforderlich ist, um der Änderung des Geschäftsjahres Rechnung zu tragen. Dabei ist der Ausschüttungstag jeweils so anzupassen, daß als Zeitpunkt für den Ausschüttungstag der 15. Tag des 4. Monats nach Ende des betreffenden Geschäftsjahres bzw. Rumpfgeschäftsjahres festzulegen ist.

property, trade income or any other income tax.

2. In case of any changes made to the Fiscal Year of the Bank, the parties shall amend this Agreement if and to the extent required to reflect the changes made to the Fiscal Year. In any such case, the Distribution Date shall be adjusted to be the 15th day of the fourth month following the end of the relevant Fiscal Year or, where applicable, short Fiscal Year.

### § 11
### Änderungen steuerlicher oder aufsichtsrechtlicher Vorgaben

Im Falle wesentlicher Änderungen in der steuerlichen oder aufsichtsrechtlichen Behandlung der Einlagen und ihrer Gewinn- und Verlustbeteiligung oder im Falle einer Erhöhung der Gewinnbeteiligung gem. § 2(3) werden die Parteien dieses Beteiligungsvertrages in einvernehmliche Verhandlungen zum Zweck einer Anpassung dieses Beteiligungsvertrages an die veränderte Rechtslage eintreten, sofern die Bank diesen Beteiligungsvertrag nicht wirksam gem. § 6(3) Satz 2 kündigt.

### Section 11
### Changes of Tax or Regulatory Requirements

In the case of material changes in relation to the tax or regulatory treatment of the contributions and their profit and loss participation, or in the event of any increase in the Profit Participation in accordance with Section 2(3) of this Silent Partnership Agreement, the parties hereto shall enter into *bona fide* negotiations with a view to amending this Agreement to reflect the changes in the legal situation, unless this Silent Partnership Agreement is effectively terminated by the Bank pursuant to Section 6(3) sentence 2.

### § 12
### Besteuerung

Alle aufgrund dieses Vertrages fälligen Zahlungen werden ohne Einbehaltung oder Abzug aufgrund derzeitiger oder künftiger Steuern oder Abgaben gleich welcher Art geleistet, die durch Einbehaltung oder Abzug durch die oder im Auftrag der Bundesrepublik Deutschland, ihrer politischen Untergliederungen oder der zur Erhebung von Steuern befugten Behörden auferlegt oder erhoben werden, es sei denn, die Einbehaltung oder der Abzug sind gesetzlich vorgeschrieben.

### Section 12
### Taxation

All amounts due and payable hereunder shall be made without any withholding or deduction for or on account of any present or future taxes or duties of whatever nature imposed or levied by way of withholding or deduction by or on behalf of the Federal Republic of Germany or any political subdivision or any authority thereof or therein having power to tax unless such withholding or deduction is required by law.

### § 13
### Geltendes Recht, Erfüllungsort und Gerichtsstand

Das Gesellschaftsverhältnis und alle sich aus diesem Beteiligungsvertrag ergebenden Rechte und Pflichten unterliegen ausschließlich dem Recht der Bundesrepublik Deutschland. Erfüllungsort und Gerichtsstand ist Frankfurt am Main.

### Section 13
### Applicable Law, Place of Performance and Jurisdiction

The Silent Partnership as well as all rights and obligations arising from this Silent Partnership Agreement shall exclusively be governed by German law. Place of performance and jurisdiction shall be Frankfurt am Main, Federal Republic of Germany.

### § 14
### Salvatorische Klausel

Sollte eine Vertragsbestimmung ganz oder teilweise unwirksam oder unvollständig sein oder werden, so wird hierdurch die Wirksamkeit der übrigen Bestimmungen nicht berührt. Anstelle der unwirksamen oder unvollständigen Bestimmung tritt eine Regelung, die dem wirtschaftlichen Zweck der unwirksamen Bestimmung in rechtlich zulässiger Weise am nächsten kommt bzw. die Bestimmung in Übereinstimmung mit dem mutmaßlichen Parteiwillen so gut wie möglich ergänzt.

### Section 14
### Severability

In the event that any provision hereof is or becomes ineffective or incomplete in whole or in part, the effectiveness of the remaining provisions shall not be affected thereby. Any such ineffective or incomplete provision shall be replaced by a provision which, to the extent permitted by law, comes as close as possible to the economic purpose of the ineffective provision or best supplements the provision in accordance with the presumed intentions of the parties hereto.

33

### Confirmation by IKB Deutsche Industriebank Aktiengesellschaft and Capital Raising GmbH

*The German text of the Confirmation by IKB Deutsche Industriebank Aktiengesellschaft and Capital Raising GmbH is legally binding. The English translation is for convenience only.*

The undersigned IKB Deutsche Industriebank Aktiengesellschaft, Düsseldorf and Berlin, Federal Republic of Germany, and Capital Raising GmbH, Norderfriedrichskoog, Federal Republic of Germany, refer to the Silent Partnership Agreement entered into between the aforementioned companies on • 2002 under which Capital Raising GmbH participates in the commercial enterprise of IKB Deutsche Industriebank Aktiengesellschaft as a typical silent partner (the **"Silent Partnership Agreement"**). Capital Raising GmbH refinances the Capital Contribution to be made by issuing Capital Notes which have meanwhile been placed with the investors.

In accordance with the Recitals as well as Sections 1 (1) and 2 (2) of the Silent Partnership Agreement, the Parties agreed both on the amount of the Capital Contribution (the **"Nominal Contribution Amount"**) and the Profit Participation to be claimed by the Silent Partner within the fixed upper and lower limits; the amounts which are definitely determined, however, are to be confirmed by the Parties in conformity with capital market conditions prevailing at the time the Capital Notes are placed prior to making the Capital Contribution.

In accordance with the capital market conditions prevailing at the time the Capital Notes are placed, the Nominal Contribution Amount has now been determined to total € • (in words: Euro •), and the interest rate relevant to the amount of the Profit Participation has been fixed at • %.

Pursuant to Sections 1 (1) and 2 (2) of the Silent Partnership Agreement, we hereby confirm the Nominal Contribution Amount and the interest rate as determined and fixed above.

This confirmation is to be attached to the application for the entry of the Silent Partnership Agreement as Partial Profit Transfer Agreement into the Commercial Register for IKB Deutsche Industriebank Aktiengesellschaft.

34

# Fiduciary Agreement

*The German text of the Fiduciary Agreement is legally binding. The English translation is for convenience only.*

*The provisions of the following contract will be attached to, and shall be an integral part of, the Terms and Conditions of Issue and the Global Certificate, respectively.*

**Fiduciary Agreement** entered into between **Capital Raising GmbH** (the **"Silent Partner"**), Deutsche Bank Aktiengesellschaft (the **"Fiduciary"**) and **IKB Deutsche Industriebank Aktiengesellschaft** (the **"Bank"**)

### Recitals

1.  On • 2002, the Silent Partner and the Bank have entered into an Agreement on the establishment of a Silent Partnership (the **"Silent Partnership Agreement"** which is attached to this Fiduciary Agreement as *Annex 1)* under which the Silent Partner makes a capital contribution (the **"Capital Contribution"**) to the Bank. The contribution is to serve the Bank as regulatory capital. Pursuant to the Silent Partnership Agreement and as consideration for its contribution, the Silent Partner shall be entitled to a profit participation in each Profit Period (the **"Profit Participation"**) for the term of the Silent Partnership Agreement. The Profit Participations accruing in each Profit Period shall be calculated annually and distributed on the relevant Due Date in accordance with the Silent Partnership Agreement (after deduction of the withholding as per No. 2 below, each an **"Annual Profit Participation"**). In the event the distribution of the Annual Profit Participation is effected after the relevant Due Date due to delayed approval of the annual accounts relevant for the calculation of the respective Annual Profit Participation, the Silent Partner shall, in accordance with the Silent Partnership Agreement, have a claim against the Bank for interest on the Annual Profit Participation (the **"Delayed Payment Interest Claim"**). Upon termination of the Silent Partnership Agreement, the Silent Partner shall, pursuant to the terms of the Silent Partnership Agreement, have a claim against the Bank for repayment of his contribution, for payment of any Profit Participation and/or interest which may have accrued in accordance with Section 6(4) of the Silent Partnership Agreement (the **"Termination Claims"**).

2.  Upon distribution of the Profit Participation to the Silent Partner or the replenishment of the Capital Contribution following a reduction of its Book Value, the Bank is obliged to withhold investment income tax plus solidarity surcharge on the distributed amounts and/or on the amount of replenishment pursuant to § 43(1) No. 3 German Income Tax Act *(EStG).* This withholding (the **"Withholding"**) is credited as prepayment against the corporate income tax liability of the Silent Partner. To the extent any such prepayment exceeds the actual income tax liability of the Silent Partner, the Silent Partner may claim refund from the tax authorities (each a **"Tax Refund Claim"**). On • 2002, the Silent Partner and the Bank have entered into an agreement on the purchase of the Tax Refund Claims of the Silent Partner by the Bank (the **"Receivables Purchase Agreement"** which is attached to this Fiduciary Agreement as *Annex 2)* pursuant to which the Silent Partner sells and assigns to the Bank its Tax Refund Claims against the tax authorities. In consideration thereof, the Silent Partner is entitled to payments from the Bank, which payments become due at the time of the distribution of the Annual Profit Participation and equal the amount of the respective Withholding (the **"Payment Claims"**).

3.  To finance his contribution, the Silent Partner issues capital notes (the **"Capital Notes"**). Pursuant to the Terms and Conditions of Issue (the **"Terms and Conditions of Issue"** which are attached hereto as *Annex 3),* the holders of the Capital Notes (the **"Investors"**) shall be entitled to interest on the Capital Notes (the **"Interest Claims"**). Upon repayment of the Capital Contribution and/or termination of the Capital Notes, the Investors may claim, pursuant to the Terms and Conditions of Issue, repayment of the Capital Notes and payment of any interest which may have accrued on the Capital Notes as well as, in case of repayment of the Contribution, payment of any interest which may have accrued pursuant to Section 6(4) of the Silent Partnership Agreement (the **"Repayment Claims"**).

4.  To secure payments in respect of the Interest Claims and the Repayment Claims payable to Investors under the Capital Notes, the Silent Partner shall assign to the Fiduciary all present and future

claims for the Annual Profit Participations (the **"Profit Participation Claims"**) to the extent as described in the following, Delayed Payment Interest Claims, Payment Claims and Termination Claims which the Silent Partner has against the Bank in accordance with the terms hereof. Such claims shall be held in trust by the Fiduciary for the benefit of the Investors. On the relevant Due Date, the amounts paid in respect of the respective claims will be paid to the Investors pursuant to the Terms and Conditions of Issue.

<strong>The Parties now agree as follows:</strong>

<h3 style="text-align:center">Section 1<br/>Definitions</h3>

Unless otherwise stipulated, the terms used in this Fiduciary Agreement shall have the same meaning as used in the Silent Partnership Agreement, the Receivables Purchase Agreement or in the Terms and Conditions of Issue.

<h3 style="text-align:center">Section 2<br/>Assignment</h3>

1. The Silent Partner hereby assigns to the Fiduciary all (present and future, conditional and unconditional) Profit Participation Claims, Delayed Payment Interest Claims, Payment Claims and Termination Claims which the Silent Partner has against the Bank. If and to the extent that the Annual Profit Participation together with the respective Payment Claim and any Delayed Payment Interest Claim exceeds the Interest Claim of the Investors for the relevant Payment Period, the assignment of the respective Profit Participation Claim is reduced by the excess amount.

2. Upon entering into this Fiduciary Agreement, any existing Profit Participation Claims (to the extent as set forth in Section 2(1) sentence 2 above) and any existing Payment Claims shall pass to the Fiduciary. Any and all future Profit Participation Claims, Delayed Payment Interest Claims, Payment Claims and Termination Claims shall pass to the Fiduciary upon their accrual (and, with respect to the Profit Participation Claims, to the extent as set forth in Section 2(1) sentence 2).

<h3 style="text-align:center">Section 3<br/>Security</h3>

The assignment of claims as provided in Section 2 above shall serve to secure the Interest Claims and Repayment Claims of the Investors under the Capital Notes.

<h3 style="text-align:center">Section 4<br/>Legal Status of the Fiduciary</h3>

1. The Fiduciary shall hold the claims assigned to it in accordance with Section 2 (the **"Assigned Claims"**) in trust for the benefit of the Investors to secure payments to be made to Investors in respect of the Interest Claims and Repayment Claims under the Capital Notes.

2. Subject to the provisions hereof, the Fiduciary shall not dispose of the Assigned Claims without the prior written consent of the Silent Partner and the Bank.

3. The Fiduciary shall provide assistance to the effect that the payments to be made in respect of the Assigned Claims on the relevant Due Date are properly effected to the Investors in accordance with the Terms and Conditions of Issue. In particular, the Fiduciary shall, in due time and form, give all notices as well as take all steps necessary to properly effect the payments to be made in respect of the Assigned Claims through the Paying Agent to the Investors pursuant to Section 6(1) of the Terms and Conditions of Issue. In case the payments due in respect of the respective Assigned Claims are not made on the relevant Due Date, the Fiduciary shall immediately assert any such Claims against the Bank.

36

4. The Fiduciary shall be entitled to take judicial and extra-judicial action relating to the Assigned Claims which serve the security purpose described in Section 3 hereof.

5. The Fiduciary does not assume any obligations towards the Investors other than expressly stipulated in this Fiduciary Agreement.

6. The Fiduciary shall be liable to perform its obligations hereunder with the due care of a prudent businessman.

## Section 5
## Legal Status of the Silent Partner

1. Subsequent to the execution of this agreement, the Silent Partner shall not dispose of the Assigned Claims. In particular, the Silent Partner shall not encumber the Assigned Claims with any third-party rights and shall not take any action which might adversely affect or jeopardise the Assigned Claims.

2. The Silent Partner shall immediately notify the Fiduciary in writing in the event that the rights of the Fiduciary with respect to the Assigned Claims are adversely affected or jeopardised by any third-party acts. In addition, the Silent Partner shall make available to the Fiduciary any and all information and documentation required by the Fiduciary to protect its rights. The Silent Partner shall notify any such third parties in writing about the rights of the Fiduciary with respect to the Assigned Claims.

3. The Silent Partner shall permit the Fiduciary to inspect at any time all documents relating to the Assigned Claims and available to the Silent Partner.

4. The Silent Partner retains the right to claim an increase of its Profit Participation in accordance with Section 2(3) of the Silent Partnership Agreement.

5. The Silent Partner shall provide assistance to secure that payments to be made to Investors in respect of the Assigned Claims on the relevant Due Date are duly effected in conformity with the Terms and Conditions of Issue. In particular, the Silent Partner shall, in due time and form, give all notices and take all steps necessary to duly effect the payments to be made to Investors in respect of the Assigned Claims through the Paying Agent pursuant to Section 6(1) of the Terms and Conditions of Issue.

## Section 6
## Warranties of the Silent Partner

The Silent Partner warrants and guarantees towards the Fiduciary by way of an independent guarantee *(selbständiges Garantieversprechen)* that

(a) the Silent Partner is the absolute owner of the Assigned Claims and that the Silent Partner may freely dispose of the Assigned Claims unless otherwise stipulated herein;

(b) the Assigned Claims have not already been assigned or pledged to a third party, and that no third-party rights or claims exist in respect of the Assigned Claims.

## Section 7
## Pleas and Defences

The Silent Partner and the Bank hereby expressly waive the defenses of voidability and set-off as well as any other pleas and defences which the Silent Partner or the Bank might have in connection with the Assigned Claims.

## Section 8
## Costs

The Silent Partner undertakes to indemnify the Fiduciary against any and all costs and expenses incurred by the Fiduciary in connection with enforcing and exercising any rights hereunder on condition that the Fiduciary provides evidence thereof to the Silent Partner by submitting a receipt.

37

**Section 9**
**Legal Succession**

Neither party shall be entitled to assign its rights hereunder without the prior written consent of the other parties. Any disposals made in respect of the Capital Notes shall not affect this Fiduciary Agreement.

**Section 10**
**Severability**

In the event that any provision of this Fiduciary Agreement is or becomes void or ineffective in whole or in part, the other provisions hereof shall remain unaffected thereby. Any such void or ineffective provision shall be replaced by a valid provision coming as close as possible to the economic purpose of the void or ineffective provision. The same shall apply in case this Fiduciary Agreement lacks certain provisions which would have been included herein by the parties, however, if they had been aware of any such lacking provisions at the time they entered into this Fiduciary Agreement.

**Section 11**
**Miscellaneous**

1.  This Fiduciary Agreement shall be governed by German law.

2.  The District Court *(Landgericht)* Frankfurt am Main shall have jurisdiction in respect of all lawsuits or court proceedings arising from or in connection with this Fiduciary Agreement.

3.  Any amendment to this Fiduciary Agreement must be made in writing.

4.  Only the German version of this Fiduciary Agreement shall be legally binding. Any translation into the English language is for convenience only.

**Annexes**

Annex 1: Silent Partnership Agreement [1]

Annex 2: Receivables Purchase Agreement [2]

Annex 3: Terms and Conditions of Issue [3]

---

[1]  See in this Information Memorandum "Structure of the Issue" – "Silent Partnership Agreement".

[2]  See in this Information Memorandum "Structure of the Issue" – "Material Provisions of the Receivables Purchase Agreement". The Agreement has not been included in its entirety in this Information Memorandum.

[3]  See in this Information Memorandum "Structure of the Issue" – "Terms and Conditons of Issue".

## Material Provisions of the Receivables Purchase Agreement

The Receivables Purchase Agreement will be attached to, and shall be an integral part of the Terms and Conditions of Issue and the Global Certificate, respectively. A copy of the Receivables Purchase Agreement is available for inspection at the offices of the Paying Agents.

Upon distribution of the Profit Participation to the Issuer or the replenishment of the Capital Contribution following a Reduction of its Book Value, IKB AG is obliged to withhold amounts on account of investment income tax *(Kapitalertragsteuer)* payable on the distributed amounts and/or on the amount of replenishment pursuant to § 43 (1) No. 3 German Income Tax Act *(EStG),* unless the tax authorities have granted a tax exemption for payments to the Issuer.

The Withholding will be credited as a prepayment against the corporate income tax liability of the Issuer. To the extent that any such prepayment exceeds the definitive amounts of corporate income tax payable by the Issuer, the Issuer will have a refund claim against the tax authorities.

On • 2002, the Issuer and IKB AG have entered into an agreement on the purchase by IKB AG of Tax Refund Claims of the Issuer pursuant to which the Issuer sells and assigns to IKB AG its Tax Refund Claims against the tax authorities.

As consideration therefor, the Issuer will have payment claims against IKB AG, which claims become due for payment in the amount of the respective Withholding at the time of the distribution of the Annual Profit Participation. Where a Withholding is effected at the time the Capital Contribution is replenished following Reduction of its Book Value, the Amount of the Purchase Price is to be used for the purpose of replenishing of the Capital Contribution and will directly be credited to the Capital Contribution.

If the tax authorities shall deduct corporate income tax payable by the Issuer from the amount of tax to be refunded, the Issuer must repay the relevant amount to IKB AG.

## Material Provisions of the Agreement on the Reimbursement of Expenses

The business operations of the Silent Partner will be restricted to the holding and administration of the Silent Participation as well as to such activities as may be required in the context of the issue of the Capital Notes.

Pursuant to the Agreement on the Reimbursement of Expenses entered into on • 2002 between the Issuer and IKB AG, IKB AG has undertaken with the Issuer to make an annual payment (payable in twelve equal monthly instalments) to the Issuer in reimbursement of certain current expenses required for the continuation of its business operations. Payments of the Silent Partner on the Capital Notes are not deemed expenses to be reimbursed under this agreement.

In the event of any unexpected additional costs, the Issuer may demand adjustment of the monthly instalments. The Silent Partner has agreed to conduct its business operations in an economically responsible and efficient way.

# General Information on the Issuer

### Incorporation, Registered Office, Duration and Object

Capital Raising GmbH was established on 13 December 2001 under the name "BIBO VIERTE Vermö-gensverwaltungsgesellschaft mbH" with its registered office at Eschborn and registered with the Commercial Register in Frankfurt am Main, Germany, under No. HRB 54004, on 29 January 2002. It is established for an indefinite period of time.

By resolution of its shareholders' meeting on 8 July 2002, the Issuer has changed its name to "Capital Raising GmbH". The name change has been registered with the Commercial Register of the Local Court in Frankfurt am Main on 10 July 2002. By shareholders' resolution on 1 August 2002 the Issuer has transferred its registered office from Eschborn to Norderfriedrichskoog, Germany. The transfer of the registered office to Norderfriedrichskoog has been registered with the Commercial Register of the Local Court in Husum, Germany, under No. 8 HRB 1810 on 8 October 2002.

The business object of the Issuer is, pursuant to its Articles of Association, to participate as silent partner in the business of a credit institution within the meaning of § 1 KWG and, for this purpose, to raise funds by the issue of capital notes. The Issuer is further entitled to engage in any ancillary busi-nesses which promote the business object of the company.

### Share Capital

The share capital of the Issuer amounts to € 25,000.

### Shareholder

Sole shareholder of the Issuer is Deutsche International Corporate Services Limited, with its regis-tered office in Jersey acting as trustee of the Capital Raising Charitable Trust, an independent non-profit trust domiciled in Jersey. The shareholder has acquired from Deutsche Bank all shares of the Issuer pursuant to an agreement dated 27 August 2002.

### Principal Activities

The principal activities of the Issuer correspond with the business object stipulated in the Issuer's Articles of Association. The Issuer has no employees.

### Management

The Issuer acts through its managing directors *(Geschäftsführer)*. The managing directors always act jointly. The current managing directors are:

| Name | Age | Function |
|------|-----|----------|
| Margret Dircks | 49 | Geschäftsführerin (managing director) |
| Dr. Hans-Joachim Winter | 57 | Geschäftsführer (managing director) |

The managing directors can be contacted at the address of the Issuer, Koogstraat 4, 25870 Norder-friedrichskoog, Germany.

### Fiscal Year

The fiscal year of the company corresponds to the calendar year.

40

**Auditors**

The auditors of the Issuer are NORD-TAX Revisions- und Treuhandgesellschaft mbH Wirtschaftsprü-fungsgesellschaft, Rathausplatz 15, 24937 Flensburg.

**Litigation**

The Issuer is not involved in any litigation or arbitration proceedings which may have any material adverse effect on the financial position of the Issuer's business since 31 December 2001. Furthermore, the Issuer is not aware that any such litigation or arbitration proceedings are imminent or threatened.

**Material Changes**

Unless otherwise stated in this Information Memorandum, the financial position of the Issuer has not materially changed since 31 December 2001.

**Opening Balance Sheet as per 13 December 2001**

| Assets | 13.12.2001 | Liabilities | 13.12.2001 |
|---|---|---|---|
| | EUR | | EUR |
| A. Outstanding capital contri- | | | |
| butions . . . . . . . . . . . . . . . . . . | 25,000.00 | A. Capital | |
| thereof called on . . . . . . . . . . | 25,000.00 | I. Subscribed capital . . . . . | 25,000.00 |
| | 25,000.00 | | 25,000.00 |

**Annual Balance Sheet as per 31 December 2001**

| Assets | 31.12.2001 | Liabilities | 31.12.2001 |
|---|---|---|---|
| | EUR | | EUR |
| A. Outstanding capital contri- | | | |
| butions . . . . . . . . . . . . . . . . . . | 25,000.00 | A. Capital . . . . . . . . . . . . . . . | 24,950.00 |
| thereof called on . . . . . . . . . . | 25,000.00 | I. Subscribed capital . . . . | 25,000.00 |
| | | V. Balance sheet profit . . . | – 50.00 |
| | | B. Accruals . . . . . . . . . . . . . . | 50.00 |
| | 25,000.00 | | 25,000.00 |

**Profit and Loss Account for the period from 13 December 2001 until 31 December 2001**

| | 2001 |
|---|---|
| | EUR |
| 1. Other operating expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – 50,00 |
| 2. Results from ordinary business activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – 50,00 |
| 3. Annual net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – 50,00 |

# General Information on IKB Deutsche Industriebank Aktiengesellschaft

### Corporate History, Registered Office, Duration and Object

IKB AG is a German bank organized as a stock corporation *(Aktiengesellschaft)*. Its activities date back to 30 September 1924 when IKB AG was first incorporated in Berlin as "Bank für deutsche Industrie-obligationen" to manage the reparation payments owed by German companies pursuant to the Treaty of Versailles. In 1931, IKB AG moved on to provide trade and long-term fixed rate investment financing, initially to the agricultural sector and later to medium sized companies. Although a private bank, IKB AG is a leading arranger of public programme loans funded by government promotion agencies. On 29 March 1949 IKB AG was incorporated in Düsseldorf and is registered today in Düsseldorf and Berlin for an indefinite period of time as a stock corporation under the laws of Germany. IKB AG is registered in the Commercial Registers of the Local Court of Düsseldorf under No. HRB 1130 and of the Local Court of Berlin-Charlottenburg under No. HRB 8860.

IKB AG has its registered offices at Wilhelm-Bötzkes-Strasse 1, D-40474 Düsseldorf, and at Bismarck-strasse 105, D-10625 Berlin.

According to the Articles of Association, the object of IKB AG is the engagement in the promotion of industry and commerce, in particular by the provision of medium- and long-term debt finance or equity and/or equity surrogates as well as leasing finance. IKB AG primarily targets companies (usually owned by single persons or families) with an annual turnover of between EUR 10 million and EUR 500 million, i. e. the so-called German *Mittelstand.*

### Capital Structure

The issued and fully paid share capital of IKB AG presently amounts to EUR 225,280,000 and is divided into 88 million bearer shares of no par value *(Stückaktien),* each of which confers one vote. Pursuant to IKB AG's Articles of Association, the Board of Directors *(Vorstand),* with the approval of the Supervisory Board *(Aufsichtsrat),* is authorized to increase the share capital by up to EUR 76,800,000 until 30 August 2007 *(genehmigtes Kapital).* In addition, the shareholders of IKB AG voted at the Annual General Meeting on 3 September 1999 to conditionally increase the capital of IKB AG, by an amount of up to EUR 22,528,000 by the issue of up to 8,800,000 bearer shares. The conditional capital increase will be executed only to the extent that the holders of bonds or bonds with warrants attached issued until 3 September 2004 exercise their conversion or option right or holders of bonds issued until 3 September 2004 fulfil their obligation to convert such bonds. Further, the shareholders of IKB AG voted at the Annual General Meeting on 30 August 2002 to conditionally increase the capi-tal of IKB AG by an amount of up to EUR 22,528,000 by the issue of up to 8,800,000 bearer shares. The conditional capital increase will be executed only to the extent that the holders of profit participation rights with conversion or option rights issued until 30 August 2007 exercise their conversion or option right or holders of convertible profit participation rights issued until 30 August 2007 fulfil their obligation to convert such profit participation rights. These shareholder resolutions took effect upon entry in the Commercial Register.

In addition, as of 31 March 2002, IKB AG had outstanding EUR 623.8 million fully paid non-voting profit participation certificates *(Genussscheine).* Profit participation certificates are issued in bearer form and participate in profits and losses of IKB AG.

After the acquisition a 34.1 % stake in IKB AG, Kreditanstalt für Wiederaufbau *(KfW),* the public-owned German promotional bank, is now the largest single shareholder. Another major shareholder cur-rently is the German Trust for Industry Research *(Stiftung Industrieforschung)* (11.66 %). The remain-ing shares are widely distributed among institutional and private shareholders.

The shares of IKB AG have been admitted for trading and official quotation an the stock exchanges of Berlin, Düsseldorf, Frankfurt am Main, Hamburg, Munich and Stuttgart and through the XETRA TradingSystem.

**Branches, Subsidiaries and Major Shareholdings**

IKB Group's business is conducted primarily in Germany but also includes activities abroad. Apart from its operations in Düsseldorf and Berlin, IKB AG maintains branches in Frankfurt am Main, Hamburg, Leipzig, Munich, Stuttgart and in Luxembourg. IKB AG further maintains branches in London and Paris and a representative office in Hong Kong.

IKB AG has a banking subsidiary in Luxembourg (IKB International S.A.) and finance subsidiaries in New York, Delaware, Paris and Amsterdam (IKB Capital Corporation, IKB Funding LCC I, IKB Financière France S.A. and IKB Finance B.V.). Through its consolidated subsidiary IKB Private Equity GmbH, Düsseldorf, IKB AG provides private equity and mezzanine instruments to medium- and small-sized companies, to the latter generally in co-operation with *Kreditanstalt für Wiederaufbau (KfW)*. The consolidated subsidiaries of IKB further include IKB Immobilien Leasing GmbH, Düsseldorf, a property leasing company, IKB Leasing GmbH, Hamburg, and IKB Leasing Berlin GmbH, Erkner, and IKB Autoleasing GmbH, Hamburg, which all concentrate on equipment and machinery leasing, ILF Immobilien-Leasing-Fonds Verwaltung GmbH & Co. Objekt Uerdinger Strasse KG, Düsseldorf, MORSUS Immobilien GmbH & Co. Objekt Wilhelm-Bötzkes-Strasse KG, Düsseldorf, IKB Grundstücks GmbH & Co. Objekt Degerloch KG, Düsseldorf, IKB Grundstücks GmbH & Co. Objekt Holzhausen KG, Düsseldorf, and AIVG Allgemeine Verwaltungsgesellschaft mbH, Düsseldorf. In accordance with German law and generally accepted acounting principles, IKB AG does not consolidate a number of its subsidiaries.

### *Certain Subsidiaries*

*IKB Private Equity GmbH,* 100 % owned by IKB AG and *IKB Venture Capital GmbH,* 100 % owned by IKB Private Equity GmbH, both with registered offices at Wilhelm-Bötzkes-Strasse 1, D-40474 Düsseldorf, are active in providing mezzanine, equity capital and shareholder loans to established companies as well as in financing innovative technology-oriented companies through silent participations or subordinated capital (especially in the sectors of telecommunications and data processing). At the balance sheet date 31 March 2002 IKB Private Equity GmbH and its subsidiary IKB Venture Capital GmbH, were fully consolidated for the first time, and the previous year's figures adjusted accordingly.

*IKB Leasing GmbH,* with its registered office at Heidenkampsweg 79, D-20097 Hamburg, *IKB Leasing Berlin GmbH,* with its registered office at Friedrichstrasse 1–3, 15537 Erkner and *IKB Autoleasing GmbH* with its registered office at Heidenkampsweg 79, D-20097 Hamburg, all 100 % owned by IKB AG, focus on equipment leasing operations; their leasing portfolios are dominated by printing machines, machine tools, injection molding machines, processing centers and industrial lorries and cars.

*IKB Immobilien Leasing GmbH,* with its registered office at Uerdinger Strasse 90, D-40474 Düsseldorf, 100 % owned by IKB AG, is active in real estate leasing. Operations focus primarily on production facilities, office buildings and commercial property. Real estate and large-scale plant leasing funds are launched by *IKB Fonds GmbH.*

*IKB Capital Corporation,* with its registered office at 555 Madison Avenue, New York, NY 10022, USA, 100 % owned by IKB AG, is active in the New York market for leveraged financing and participates in large-scale transactions either as co-underwriter or participant.

### Supervision

In common with all other enterprises that are engaged in one or more of the financial activities defined in the German Banking Act *(Gesetz über das Kreditwesen, KWG)* as "banking business", IKB AG is subject to the licensing requirements and other provisions of the KWG. Notably, IKB AG is subject to supervision by the German Financial Services Supervisory Agency *(Bundesanstalt für Finanzdienstleistungsaufsicht).*

43

**Capital Adequacy**

German capital adequacy rules provide for capital adequacy requirements dealing with counterparty risk and market risk. In relation to the former, each bank must maintain a ratio (its "solvency ratio") of regulatory banking capital to risk-adjusted assets of at least 8% on a daily basis. The risk-adjusted assets of a bank (the sum of which is the denominator of the solvency ratio) is computed as follows: Assets are assigned to one of five basic categories of relative credit risk (0%, 10%, 20%, 50% and 100%) depending on the debtor or the type of collateral, if any, securing the respective assets. The balance sheet value of each asset item is multiplied by the percentage weight applicable to its risk category to arrive at the risk-adjusted value. Off-balance sheet items, such as financial guarantees, letters of credit, swaps and other financial derivatives, are subject to a two-tier adjustment. First their value (in the case of guarantees and letters of credit, their amount, and in each case of swaps and other derivatives, their value computed on a market or time basis) is adjusted according to their risk classification (20%, 50% and 100%) depending on the type of instrument. Then the off-balance sheet items are assigned, like balance sheet assets, to the credit risk categories depending on the type of the counterparty or the debtor or the type of collateral, if any, securing the respective assets and multiplied by the applicable percentage weight.

The market risk positions of a bank are comprised of (i) its foreign exchange position; (ii) its commodities position; (iii) its trading book positions, including some positions involving counterparty risk, as well as interest rate and equity market risk; and (iv) its options transactions position. The market risk positions are net positions, risk-adjusted in accordance with detailed rules. As of the close of each business day, the sum of the net risk-adjusted market risk positions of a bank must not exceed the sum of (i) the difference between its regulatory capital and 8% of its aggregate amount of risk-adjusted risk assets and (ii) its Tier 3 capital. ("Tier 3 capital" consists of (i) net profits, i.e., the proportionate profit of a bank which would result from closing all trading book positions at the end of given day, less (a) all foreseeable expenses and distributions and (b) all losses arising from the banking book which are likely to arise upon a liquidation of the bank and (ii) short-term subordinated debt meeting certain requirements.)

**Executive Bodies**

***Supervisory Board and Board of Directors***

Like all German stock corporations, IKB AG has a two-tier board system. The Board of Directors *(Vorstand)* is responsible for the management of IKB AG and the representation of IKB AG vis-à-vis third parties, while the Supervisory Board *(Aufsichtsrat)* appoints and removes the members of the Board of Directors and supervises the activities of the Board of Directors. The Supervisory Board may not make management decisions, but under the Articles of Association *(Satzung)* of IKB AG, the Board of Directors must obtain the approval of the Supervisory Board for certain actions.

In accordance with the German Works Constitution Act of 1952 *(Betriebsverfassungsgesetz 1952),* two thirds of IKB AG's Supervisory Board consist of representatives elected by the shareholders and one third consists of representatives elected by the employees. Members are elected for three-year terms, and re-election is possible. The members of the Supervisory Board elect the chairman and the deputy chairman of the Supervisory Board. The chairman, who is typically a representative of the shareholders, has the deciding vote in the event of a deadlock.

44

The current composition of the Supervisory Board and the Board of Directors of IKB AG is as follows:

*Supervisory Board*

Dr. h. c. Ulrich Hartmann
Düsseldorf
*Chairman of the Board of Directors of E.ON AG*
*Chairman of the Board*

Hans W. Reich
Frankfurt am Main
Speaker of the Board of Directors of
Kreditanstalt für Wiederaufbau
*Deputy Chairman of the Board*

Prof. Dr.-Ing. E. h. Hans-Olaf Henkel
Berlin
President of WGL Wissenschaftsgemeinschaft
Gottfried Wilhelm Leibnitz e. V.
*Deputy Chairman of the Board*

Dr. Jürgen Behrend
Managing Partner of Hella KG Hueck & Co.

Jörg Bickenbach
Düsseldorf
State Secretary of the Ministry of Economy,
Medium-Sized Businesses,
Energy and Transportation of
Northrhine-Westphalia

Hermann Franzen
Düsseldorf
Personal liable partner of
Porzellanhaus Franzen KG

Herbert Hansmeyer
Munich
Former Member of the Board of Directors of
Allianz Aktiengesellschaft

Dr. Jürgen Heraeus
Hanau
Chairman of the Supervisory Board of
Heraeus Holding GmbH

Gunnar John
Berlin
Head of Subdivision VII A of Ministry of Finance

Roland Oetker
Düsseldorf
Managing Partner of
ROI Verwaltungsgesellschaft mbH

Dr. Ing. E. h. Eberhard Reuther
Hamburg
Chairman of the Supervisory Board of
Körber Aktiengesellschaft

Randolf Rodenstock
Munich
Managing Partner of Optische Werke
G. Rodenstock GmbH

Dr. Michael Rogowski
Berlin
President of the Federal Association of
German Industry e. V.

Prof. Dr. h. c. Reinhold Würth
Künzelsau
Chairman of the Advisory Board
of the Würth Group

*Employees' Representatives on the Supervisory Board*

Wolfgang Boucé
Düsseldorf
IKB Deutsche Industriebank
Aktiengesellschaft

Roswitha Loeffler
Berlin
IKB Deutsche Industriebank
Aktiengesellschaft

Wilhelm Lohscheidt
Düsseldorf
IKB Deutsche Industriebank
Aktiengesellschaft

Jürgen Metzger
Hamburg
IKB Deutsche Industriebank
Aktiengesellschaft

Rita Röbel                                  Dr. Carola Steingräber
Leipzig                                     Berlin
IKB Deutsche Industriebank                  IKB Deutsche Industriebank
Aktiengesellschaft                          Aktiengesellschaft

Ulrich Wernecke
Düsseldorf
IKB Deutsche Industriebank
Aktiengesellschaft

*Board of Directors*

|  | Date Appointed | Current Term Expires |
| --- | --- | --- |
| Dr. Markus Guthoff | 1 April 2001 | 31 March 2007 |
| Claus Momburg | 12 November 1997 | 11 November 2005 |
| Joachim Neupel | 1 July 1989 | 30 June 2004 |
| Stefan Ortseifen | 1 November 1994 | 31 October 2007 |
| Dr. Alexander v. Tippelskirch | 1 April 1984 | 31 March 2004 |

*Chairman*

All Members of the Supervisory Board and the Board of Directors can accept service of process at the business address of IKB AG.

*Advisory Board*

In addition, IKB AG maintains an Advisory Board which is appointed by the Board of Directors with consent of the Supervisory Board to enhance contacts with industry and commerce. The members of the Advisory Board assist IKB AG's management by providing consultancy support.

*Corporate Governance*

During the fiscal year 2001/2002 IKB AG focused much attention on the German Corporate Governance Codex developed by a government commission and formulated draft corporate governance principles of IKB AG. Following approval by the Supervisory Board these principles will be implemented by IKB AG and be published via Internet.

**Auditors**

The auditors of IKB AG for the business year 2002/2003 are KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft Wirtschaftsprüfungsgesellschaft, Am Bonneshof 35, D-40474 Düsseldorf. KPMG Deutsche Treuhand-Gesellschaft Aktiengesellschaft Wirtschaftsprüfungsgesellschaft has audited the financial statements of IKB AG and the IKB Group for the fiscal years ended 31 March 2001 and 2002 and in each case issued unqualified opinions *(uneingeschränkter Bestätigungsvermerk)*.

46

## Selected Financial Information
## on IKB Deutsche Industriebank Aktiengesellschaft

**Audited Financial Information for the fiscal years 1998/1999, 1999/2000, 2000/2001 and 2001/2002**

The selected consolidated balance sheet and profit and loss account data for the fiscal years ended 31 March 1999, 31 March 2000, 31 March 2001 and 31 March 2002 are derived from the audited consolidated financial statements of IKB AG. The selected consolidated audited financial data set forth below have been prepared in accordance with German GAAP and should be read in conjunction with the audited consolidated financial statements for 2000/2001 and 2001/2002 and the auditor's reports thereon incorporated herein. In accordance with German GAAP, IKB AG's subsidiaries are consolidated, except as otherwise stated herein. For the non-consolidated subsidiaries the dividends received therefrom are reflected in IKB AG's financial statements. At 31 March 2002, IKB Private Equity GmbH (formerly IKB Beteiligungsgesellschaft mbH) and its subsidiary, IKB Venture Capital GmbH, were fully consolidated for the first time and in the interest of comparability the previous year's figures adjusted accordingly. The most significant changes in the adjusted consolidated accounts from the previous year were the increase in the portfolio of other assets of EUR 75 million and the decline in claims on customers by EUR 56 million. Due to existing profit and loss transfer agreements net income for the fiscal year 2000/2001 did not change.

47

**Consolidated Balance Sheet Data**

| | 1999 | 2000 [1] | 2001 [2] | 2002 |
|---|---|---|---|---|
| | | Year ended 31 March | | |
| | | (Amounts in EUR millions, audited) | | |
| **Assets** | | | | |
| Liquid funds | 171 | 12 | 1 | 11 |
| Claims on banks | 2,274 | 1,650 | 804 | 1,605 |
| Claims on customers | 22,188 | 22,635 | 24,276 | 24,600 |
| Debentures | 1,629 | 2,652 | 3,814 | 4,928 |
| Investment and holdings in associated and subsidiary companies | 176 | 91 | 44 | 47 |
| Fixed assets | 223 | 214 | 212 | 215 |
| Leasing assets | 462 | 2,114 | 2,239 | 2,346 |
| Other assets | 538 | 573 | 1,050 | 1,122 |
| **Total assets** | 27,661 | 29,941 | 32,440 | 34,874 |
| | | | | |
| **Liabilities and shareholder's equity** | | | | |
| Liabilities to banks | 13,990 | 13,181 | 15,182 | 15,436 |
| Liabilities to customers | 2,501 | 2,414 | 2,411 | 2,250 |
| Securitized liabilities | 8,280 | 10,803 | 10,825 | 12,975 |
| Provisions | 237 | 266 | 282 | 301 |
| Subordinated liabilities | 472 | 582 | 803 | 868 |
| Participation certificate capital | 419 | 439 | 439 | 624 |
| Fund for general bank risks | 77 | 80 | 80 | 80 |
| Equity capital (without net income for the year) | 1,049 | 1,142 | 1,243 | 1,281 |
| Other liabilites including profit of the year | 636 | 1,034 | 1,175 | 1,059 |
| **Total liabilities and shareholder's equity** | 27,661 | 29,941 | 32,440 | 34,874 |

**Consolidated Profit and Loss Data**

| | 1999 | 2000 [1] | 2001 [2] | 2002 |
|---|---|---|---|---|
| | | Year ended 31 March | | |
| | | (Amounts in EUR millions, audited) | | |
| Interest income from loan operations and money market transactions, fixed interest securities and government-inscribed debt, earnings form leasing operations | 2,334.3 | 2,524.3 | 3,097.6 | 3,215.2 |
| Earnings form securities and holdings | 12.9 | 36.7 | 2.7 | 4.8 |
| Interest expenditure, expenditure and standard depreciation relating to leasing operations | 1,953.7 | 2,141.3 | 2,661.6 | 2,748.7 |
| **Net interest income** | 393.5 | 419.7 | 438.7 | 471.3 |
| Commission income | 12.7 | 13.1 | 18.0 | 44.8 |
| Commission expenditure | 3.9 | 5.4 | 5.7 | 5.3 |
| **Net commission income** | 8.8 | 7.7 | 12.3 | 39.5 |
| Net income from financial operations | 6.6 | − 2.6 | 2.5 | 1.9 |
| Personnel expenditure | 87.4 | 107.2 | 117.2 | 133.4 |
| Other administrative expenditure | 51.3 | 59.1 | 66.0 | 73.1 |
| **Administrative expenditure** | 138.7 | 166.3 | 183.2 | 206.5 |
| Balance of other operating income and expenditure | − 3.5 | 77.8 | 91.8 | 29.3 |
| Provision of risk | 88.4 | 165.5 | 187.2 | 175.2 |
| **Result from ordinary activities** | 178.3 | 170.8 | 174.9 | 160.3 |
| Other income/expenditure | − 3.1 | − 10.0 | − 1.5 | – |
| Taxes | 84.3 | 85.3 | 87.5 | 77.2 |
| **Net income for the year** | 90.9 | 75.5 | 85.9 | 83.1 |

[1]  Since 31 March 2000 figures including Immobilien Leasing-Group.
[2]  Since 31 March 2001 figures including IKB Private Equity-Group.

**Capitalisation of the IKB Group**

| | Year ended 31 March | | | |
| --- | --- | --- | --- | --- |
| | 1999 | 2000 [1] | 2001 [2] | 2002 |
| | (Amounts in EUR millions, audited) | | | |
| Subscribed share capital . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 225 | 225 | 225 | 225 |
| Silent participations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | – | 100 | 170 | 170 |
| Capital reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 568 | 568 | 568 | 568 |
| Revenue reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 256 | 249 | 280 | 318 |
| Fund for general bank risks . . . . . . . . . . . . . . . . . . . . . . . . . . | 77 | 80 | 80 | 80 |
| Participation certificate capital . . . . . . . . . . . . . . . . . . . . . . . | 419 | 439 | 439 | 624 |
| Subordinated liabilites . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 472 | 582 | 803 | 868 |
| **Total shareholder's funds** . . . . . . . . . . . . . . . . . . . . . . . . . | 2,017 | 2,243 | 2,565 | 2,853 |
| Short-term liabilites [2] | | | | |
|    Liabilities to banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,070 | 3,713 | 4,559 | 4,999 |
|    Liabilities to non-banks . . . . . . . . . . . . . . . . . . . . . . . . . . . | 322 | 267 | 173 | 226 |
| Total short-term liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6,392 | 3,980 | 4,732 | 5,225 |
| Medium-term liabilities [3] | | | | |
|    Liabilities to banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,133 | 1,401 | 1,430 | 1,301 |
|    Liabilities to creditors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 260 | 107 | 182 | 111 |
| Total medium-term liabilities . . . . . . . . . . . . . . . . . . . . . . . . . | 1,393 | 1,508 | 1,612 | 1,412 |
| Long-term liabilities [4] | | | | |
|    Liabilities to banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,190 | 4,612 | 4,685 | 5,138 |
|    Liabilities to non-banks . . . . . . . . . . . . . . . . . . . . . . . . . . . | 599 | 1,295 | 1,130 | 1,147 |
| Total long-term liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . | 4,789 | 5,907 | 5,815 | 6,285 |
| More than five years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,597 | 3,455 | 4,508 | 3,998 |
|    Liabilities to banks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,320 | 746 | 926 | 766 |
|    Liabilities to non-bank creditors . . . . . . . . . . . . . . . . . . . . . . | 3,917 | 4,201 | 5,434 | 4,764 |
| Provisions and other liabilities . . . . . . . . . . . . . . . . . . . . . . . . | 9,153 | 12,102 | 12,282 | 14,335 |
| **Total capitalisation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 27,661 | 29,941 | 32,440 | 34,874 |

[1] Since 31 March 2000 figures including IKB Immobilien-Leasing Group; since 31 March 2001 figures including IKB Private Equity-Group.

[2] *Year ended 31 March 1999, year ended 31 March 2000, year ended 31 March 2001 and year ended 31 March 2002:* Short-term debt has a maturity or period of notice of up to three months.

[3] *Year ended 31 March 1999, year ended 31 March 2000, year ended 31 March 2001 and year ended 31 March 2002:* Medium-term debt has a maturity or period of notice of more than three months up to one year.

[4] *Year ended 31 March 1999, year ended 31 March 2000, year ended 31 March 2001 and year ended 31 March 2002:* Long-term debt has a maturity or period of notice of more than one year up to five years.

On 19 July 2002, IKB AG has issued Trust Preferred Securities in the amount of EUR 250 million through a special purpose vehicle with the effect of a corresponding increase in IKB Groups Tier 1 capital.

Save as disclosed herein, there has been no material adverse change in the capitalisation of the IKB Group since 31 March 2002.

49

**Unaudited Financial Information as at 30 June 2002**

**Consolidated Interim Balance Sheet of IKB Deutsche Industriebank as at 30 June 2002**

| | 30.6.2002 | 31.3.2002 | Changes | |
|---|---|---|---|---|
| | (EUR millions) | | (EUR millions) | (%) |
| **Assets** | | | | |
| Claims on banks ........................... | 1,840 | 1,605 | 235 | 15 |
| payable on demand ..................... | 663 | 311 | 352 | > 100 |
| other claims ............................ | 1,177 | 1,294 | – 117 | – 9 |
| of which: 4 years or longer............. | 215 | 235 | – 20 | – 9 |
| Claims on customers ...................... | 24,619 | 24,600 | 19 | 0 |
| with agreed maturity or period of notice up to | | | | |
| 4 years............................. | 2,695 | 2,568 | 127 | 5 |
| 4 years or longer ...................... | 21,924 | 22,032 | – 109 | 0 |
| Debentures and other fixed interest securities.... | 4,826 | 4,928 | – 102 | – 2 |
| Shares and other non-fixed interest securities.... | 34 | 38 | – 4 | – 11 |
| Investments, holdings in associated and | | | | |
| subsidiary companies ..................... | 47 | 47 | 0 | 0 |
| Fixed assets ............................... | 215 | 215 | 0 | 0 |
| Leasing items ............................. | 2,366 | 2,346 | 20 | 1 |
| Deferred items............................. | 136 | 139 | – 3 | – 2 |
| Outstanding capital of minority shareholders .... | 49 | 49 | – | – |
| Other assets............................... | 399 | 481 | – 82 | – 17 |
| Claims from collection items ................. | 318 | 426 | – 108 | – 25 |
| **Total assets** ............................. | 34,849 | 34,874 | – 25 | 0 |
| | | | | |
| **Liabilities** | | | | |
| Liabilities to banks ........................ | 15,400 | 15,436 | – 36 | 0 |
| payable on demand ..................... | 1,368 | 754 | 614 | 81 |
| with agreed maturity or period of notice....... | 14,032 | 14,682 | – 650 | – 4 |
| of which: 4 years or longer............. | 10,450 | 10,395 | 55 | 1 |
| Liabilities to customers ..................... | 2,200 | 2,250 | – 50 | – 2 |
| payable on demand ..................... | 40 | 61 | – 21 | – 19 |
| with agreed maturity or period of notice....... | 2,160 | 2,189 | – 29 | – 1 |
| of which: 4 years or longer............. | 1,973 | 1,972 | 1 | 0 |
| Securitised liabilities ...................... | 13,040 | 12,975 | 65 | 1 |
| Provisions ................................ | 305 | 301 | 4 | 1 |
| Special items including reserves .............. | 8 | 8 | 0 | 0 |
| Subordinated liabilities ..................... | 868 | 868 | – | – |
| Participation certificate capital | | | | |
| *(Genussrechtskapital)*...................... | 624 | 624 | – | – |
| Fund for general bank risks .................. | 80 | 80 | – | – |
| Participations of minority shareholders ......... | 12 | 14 | – 2 | – 14 |
| Equity capital.............................. | 1,332 | 1,311 | 21 | 2 |
| Subscribed share capital ................... | 225 | 225 | – | – |
| Silent capital ........................... | 170 | 170 | – | – |
| Reserves ............................... | 887 | 887 | 0 | 0 |
| Group profit............................. | 50 | 29 | 21 | 72 |
| Deferred items............................. | 479 | 469 | 10 | 2 |
| Other liabilities ........................... | 501 | 538 | – 37 | – 7 |
| **Total liabilities** ......................... | 34,849 | 34,874 | – 25 | 0 |
| | | | | |
| Endorsement liabilities .................... | 0 | 0 | – | – |
| Liabilities arising from guarantees, etc. ......... | 1,735 | 1,748 | – 13 | – 1 |
| Business volume............................ | 36,584 | 36,622 | – 38 | 0 |

**Consolidated Income Statement of IKB Deutsche Industriebank
for the Period 1 April 2002 to 30 June 2002\*)**

|  | 30.6.2002 | 31.3.2002 | Changes | |
|---|---|---|---|---|
|  | (EUR millions) | | (EUR millions) | (%) |
| Interest income from loan and money market operations, fixed interest securities and government-inscribed debt, income from leasing operations  . . . . | 783.8 | 833.0 | – 49.2 | – 5.9 |
| Current income from shares, other non-fixed interest securities and investments (¹) . . . . . . . . . . . . . . . . . . . . . | 0.3 | 0.4 | – 0.1 | – 25.0 |
| Interest expenses, expenditure and scheduled depreciation relating to leasing operations . . . . . . . . | 673.1 | 722.3 | – 49.2 | – 6.8 |
| Net interest income . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 111.0 | 111.1 | – 0.1 | – 0.1 |
| Commission income . . . . . . . . . . . . . . . . . . . . . . . . . . | 9.8 | 4.0 | 5.8 | >100.0 |
| Commission expenditure . . . . . . . . . . . . . . . . . . . . . | 1.1 | 1.0 | 0.1 | 10.0 |
| Net commission income . . . . . . . . . . . . . . . . . . . . . . . | 8.7 | 3.0 | 5.7 | >100.0 |
| Net result from financial operations . . . . . . . . . . . . . . . | 0.0 | 0.3 | – 0.3 | – 100.0 |
| Salaries and wages  . . . . . . . . . . . . . . . . . . . . . . . . . . | 25.8 | 24.3 | 1.5 | 6.2 |
| Social security contributions and expenditure for retirement benefits . . . . . . . . . . . . . . . . . . . . . . . . . . | 8.1 | 7.7 | 0.4 | 5.2 |
| Personnel expenditure  . . . . . . . . . . . . . . . . . . . . . . . . | 33.9 | 32.0 | 1.9 | 5.9 |
| Other administrative expenses (²) . . . . . . . . . . . . . . . . . | 20.1 | 16.5 | 3.6 | 21.8 |
| Administrative expenditure  . . . . . . . . . . . . . . . . . . . . . | 54.0 | 48.5 | 5.5 | 11.3 |
| Balance of other operating income/expenses . . . . . . . . | 10.2 | 5.6 | 4.6 | 82.1 |
| Risk provisioning balance . . . . . . . . . . . . . . . . . . . . . . | – 39.8 | – 36.6 | 3.2 | 8.7 |
| **Result from ordinary activities**  . . . . . . . . . . . . . . . . . . | 36.1 | 34.9 | 1.2 | 3.4 |
| Profit before tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36.1 | 34.9 | 1.2 | 3.4 |
| Property taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 0.8 | 0.9 | – 0.1 | – 11.1 |
| Taxes on income  . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 16.1 | 16.0 | 0.1 | 0.6 |
| **Profit after tax** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19.2 | 18.0 | 1.2 | 6.7 |
| Profit (–) and Loss (+) attributable to other shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2.0 | 1.8 | 0.2 | 11.1 |
| **Group profit**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 21.2 | 19.8 | 1.4 | 7,1 |

(¹) Includes income from profit pooling agreements, profit transfer agreements and partial profit transfer agreements.
(²) Includes current depreciation on fixed assets.
(\*) For the first time, the Group income statement and segment report include the consolidated figures of the Private Equity Division in an interim report; previous year's figures were adjusted by adding a quarter of Private Equity's figures for the financial year 2001/2002.

51

## The Business of IKB Deutsche Industriebank Aktiengesellschaft

**Business Units**

The IKB Group offers a selected range of commercial and investment banking services to its customers with the specific exception of deposit taking. IKB AG has reorganised its business activities in five divisions:

– Corporate Lending

– Structured Finance

– Private Equity

– Real Estate Finance

– Treasury

*Corporate Lending*

IKB AG's core competence is the extension of medium- and long-term loans to a diverse range of companies in all industry sectors with an annual turnover of between EUR 10 million and EUR 500 million (typically independent and individually or family-owned and managed accordingly), i.e. the so-called German *Mittelstand*. The *Mittelstand* represents the backbone of the German economy and includes a number of world market leaders in specialist niche products, with export ratios of up to 80%. Loans are generally extended at fixed interest rates with maturities of up to ten years. About 90% of IKB AG's lending is secured by collateral, usually mortgages on land and buildings and/or the transfer of equipment for security purposes.

The IKB Group offers advisory and consultancy services to its customers, in particular in the areas of structuring investments and identifying relevant public programme loans funded by *KfW, Deutsche Ausgleichsbank, Bayerische Landesanstalt für Aufbaufinanzierung* and *European Investment Bank* and others through subsidized public loan programmes. IKB AG matches such subsidised public programme loans with its own debt financing products in order to offer tailor-made financing solutions for its customers. Furthermore, in March 2002, IKB AG agreed on a EUR 500 million global loan with *KfW* for financing medium-sized companies. The global loan can be drawn on for individual loans to medium-sized companies which are not bound by a uniform margin but instead are risk-adjusted in accordance with the credit worthiness of the customer.

As at 31 March 2002, about 88% of the IKB Group's lending was domestic. Lending was split among over 8,146 customers with an average loan size of EUR 3.13 million.

The following table sets forth the structure of the Corporate Lending division's disbursement by sector for the financial years 2000/2001 and 2001/2002 at the respective balance sheet date, 31 March.

52

**Disbursements of the Corporate Lending Division by Sectors**

| Sectors | Disbursements 2000/2001 | Disbursements 2001/2002 |
|---|---|---|
| | (Data in %) | |
| Producing Industry | 73.4 | 71.1 |
| Basic and producer goods industries | 24.3 | 27.0 |
| Capital goods industries | 33.8 | 26.6 |
| Consumer goods industries | 15.4 | 17.5 |
| Services | 17.1 | 19.7 |
| Distributive trades | 9.5 | 9.2 |
| Total | 100.0 | 100.0 |

*Structured Finance*

The structured finance division covers domestic project finance as well as all international activities, i.e. international investment finance, Hermes-covered export finance, international project finance and participation in syndicated loans at international financial centres (London, Paris, New York).

*Private Equity*

The equity finance division comprises the provision of senior loans, mezzanine and equity capital to established medium-sized companies. Moreover, IKB AG finances innovative technology-oriented companies, especially in the sectors of biotechnology, telecommunications and data processing.

*Real Estate Finance*

The real estate finance division contains cash-flow oriented long-term financing of commercial property, closed-end real estate funds or structured projects by means of loans; leasing is also available. Moreover, IKB provides consulting services as well as assistance in realizing real estate projects.

*Treasury*

The treasury division comprises the areas of funding and liquidity management, fixed income, asset and liability management of the loan portfolio and proprietary trading. IKB AG started to outplace risks emanating from loans to its customers with a pilot transaction based an a reference portfolio of syndicated US loans in the financial year 1999/2000. Following up this project a securitised transaction with a volume of EUR 2.5 billion was executed and concluded in the financial year 2000/2001 and a securitised transaction with a volume of EUR 3.6 billion was executed and concluded in the financial year 2001/2002. In co-operation with *KfW*, IKB AG made use for the second time of *KfW's* framework programme "PROMISE" in order to securitise a portfolio of public promotional loans which IKB has extended to medium-sized companies.

Risk management fully complies with the relevant requirements. The fixed income portfolio is permanently evaluated on a mark to market basis. Risk is also measured by using a value-at-risk approach.

**Lending**

*Credit Policies and Procedures*

IKB AG has established detailed credit policies and lending guidelines applicable to all of IKB AG's financing activities. The entire loan approval process is supported by sophisticated IT-systems. IKB AG uses a scoring system, which incorporates quantitative and qualitative information derived from

IKB AG's thorough knowledge of its core customer group, which has proven accurate over a number of years.

IKB AG has a sophisticated monitoring system for following the loans from the application process through to repayment, which allows for continuous oversight of individual loans and the identification of potential problem loans by a number of key indicators, extracted from an extensive database.

*Problem and Non-Performing Loans*

Problem and non-performing loans are tracked in a standardized process with automated procedures by a centralised loan recovery department. They are subject to timely provisioning at a conservative and prudent level. Recoveries from collateral have historically been good. A somewhat different procedure is followed for syndicated loans.

*Asset and Liability Management of the Loan Book*

It is IKB AG's policy to match assets and liabilities to a fairly high degree. The funds borrowed from government promotion agencies are automatically matched with the loans provided to the customers. Loans funded in the capital markets are steered accordingly. The mismatch limits in place are limited.

Foreign currency exposure emanating from international loan business are hedged to a large extent.

**Funding and Liquidity Management**

In accordance with its Articles of Association, IKB AG does not take deposits. IKB AG funds its activities primarily through the issuance of medium- and long-term bearer bonds, the granting of loans evidenced by transferable certificates of indebtedness *(Schuldscheindarlehen)* and borrowings from other banks, in part in combination with interest rate and/or exchange rate hedging via long-term swaps with top-rated German and foreign banks. The core of interbank funding is provided to IKB AG on a loan by loan basis by instrumentalities serving public policy objectives such as *KfW, Deutsche Ausgleichsbank, Bayerische Landesanstalt für Aufbaufinanzierung* and *European Investment Bank* under their respective programmes. The funds thus received by IKB AG are at preferential rates and are on-lent to its customers within the framework of such programmes.

**Fixed Income**

Fixed income management focuses on the stabilisation of interest surplus emanating from the position of the liquidity book as well as an the long-term creation of evaluation reserves.

Generally IKB AG invests in top rated bonds, especially in floating rate notes, which with the use of swaps are being transformed into fixed interest rates. In addition, various optional elements are embedded for further improvement of interest rate cash flows.

**Proprietary Trading**

IKB AG is active in interest rate and stock market trading. Although proprietary trading is not of strategic relevance to IKB AG's earnings, it is run as a profit centre and has produced stable profits over the years.

Risk is monitored online on a mark to market basis. A value-at-risk approach is also applied.

54

**Rating**

The long-term unsecured senior debt of IKB AG has been assigned a rating of A+ by Fitch IBCA and A1 by Moody's.

**Employees**

At 31 March 2002, IKB AG's total number of employees in the group was 1,429. Of these, 569 were assigned to market units and 429 to headquarter departments. 431 employees worked for subsidiaries.

Management considers relations with its employees to be good. There has been no material disruption of work as a result of labor unrest in recent years.

**Litigation**

No legal, arbitration, administrative or other proceedings which could have a significant effect on the business or financial position of the Bank or IKB Group, or had such an effect in the last two years, have been pending, nor is IKB AG aware, to the best of its knowledge, of any such proceedings now pending or threatened.

# Recent Developments and Outlook of
# IKB Deutsche Industriebank Aktiengesellschaft

In the financial year ended 31 March 2002, net interest income increased by 7.4% to EUR 471 million and net commission income rose by EUR 27 million to EUR 40 million. In line with IKB AG's planning, administrative expenditure increased by 12.7% to EUR 207 million. Due to the unfavourable macro-economic conditions – in particular the economic downturn and the depressed stock markets – gross provisioning had to be raised by EUR 13 million to EUR 252 million. The decline of risk provisioning balance by EUR 12 million to EUR 175 million resulted from a high release of former risk provisions (EUR 48 million) and an improvement of the result from securities in the liquidity reserve to EUR 29 million.

As a consequence of these developments, the result from ordinary activities decreased by 8.3% to EUR 160 million for the financial year ended 31 March 2002. The cost-income ratio was at 38.1% (previous year: 37.8%); the return on equity (before tax) reached 15.0% (previous year: 16.8%).

IKB AG entered into securitisation transactions in December 2000 and March 2002. As a result, the solvability ratios of IKB Group improved. The total solvability ratio of IKB Group as at 31 March 2002 stood at 12.1% while the tier 1 capital ratio of IKB Group was 6.4%.

On 25 October 2002, IKB AG published its preliminary result for the first half of the current financial year (1 April to 30 September 2002). Pursuant to these preliminary figures, IKB Group generated a result from ordinary activities of EUR 75 million, up 1.6% compared to the same period in the previous financial year. Net interest income decreased slightly by 0.7% to EUR 222 million, whereas net commission income rose by EUR 17 million to EUR 23 million. Administrative expenditure increased by 10.8% to EUR 109 million. Other operating result declined by EUR 10 million to EUR 14 million. The risk provisioning balance was reduced by 8% to EUR 75 million. IKB AG expects to publish its final interim report for the first six months of the financial year 2002/2003 on 21 November 2002.

For the remainder of the current financial year, IKB AG intends to continue its strictly risk-adjusted credit pricing policy which has already lead to an increase of the bank's average interest margin on its new business generated in recent time. IKB AG also continues to see significant potential for new business given its strategic alliance with *KfW,* in particular for its Corporate Lending, Structured Finance and Private Equity divisions.

In January 2002, Moody's raised IKB AG's long-term rating by Moody's – against the general trend in the banking sector – from A2 to A1 ("positive outlook").

As regards the financial year 2002/2003, IKB AG expects – despite the highly dissatisfying economic situation – a slight growth in the operational results. Eventually, it will be decisive that there arises no necessity to increase risk provisions to an amount in excess of the volume currently planned.

56

# Taxation

**Taxation in the Federal Republic of Germany**

This chapter "Taxation in the Federal Republic of Germany" contains a summary of some important German fiscal provisions that are relevant in connection with the acquisition, the holding and the sale or redemption of capital notes. This summary is not intended to be a comprehensive and complete representation of all aspects under tax law that could be relevant to investors. This summary is based on German tax law in force at the time of preparing the Information Memorandum; it may be subject to changes at short notice which may even have a retrospective effect. We strongly recommend that potential investors seek advice from their professional tax consultant with regard to the tax implications of the acquisition, the holding and the sale or redemption of capital notes.

**Investors resident within Germany**

As a rule, all interest payments made by the Issuer to Investors domiciled within Germany are subject to income or corporate tax plus a solidarity surcharge in the amount of 5.5% of the relevant income or corporate tax liabilities. Where capital notes are held as assets of a German business, these interest payments are also subject to trade tax *(Gewerbesteuer)*. Where capital notes are held in the custody of a domestic bank (including the German branches of foreign banks), interest income tax *(Zinsabschlag)* in the amount of 30% (plus a 5.5% solidarity surcharge on the tax amount, i.e. a total of 31.65%) will be withheld. The amount of withholding tax will be set off against the final income or corporate tax debt of the noteholder.

Profits from the sale or redemption of capital notes, including the profits achieved by a second or subsequent purchaser, are deemed to be interest income and are subject to personal income or corporate tax plus solidarity surcharge. Where these assets are held as part of a German business, they are also subject to trade tax.

Where capital notes are held in the custody of a domestic bank or financial services provider (including the German branches of foreign banks), the paying agent will be required to withhold interest income tax in the amount of 30% (plus a 5.5% solidarity surcharge) on the difference between the sale or redemption amount and purchase price of the note if said note has been in the custody of the relevant bank or financial services provider since its acquisition. If the paying agent has changed since acquisition of the capital note, the advance deduction of interest income tax *(Zinsabschlag)* will be 30% on the sale or redemption proceeds. The advance deduction will in turn be set off against the personal income or corporate tax debt of the investor.

**Investors domiciled outside Germany**

Investors domiciled outside Germany are not subject to German taxation and there is no advance deduction of interest income tax (even if capital notes are held in the custody of a German bank or financial services provider), unless the capital notes are held as business assets of a German branch of the noteholder.

**Inheritance and Gift Tax**

In accordance with German law, inheritance or gift tax is not charged if, in the case of inheritance tax, neither the deceased nor the beneficiary is domiciled within Germany or, in the case of gift tax, neither the donor nor the donee is domiciled within Germany and the capital note does not form part of German business assets for which an operation is being maintained within Germany or for which a permanent representative has been appointed in Germany. Exceptions apply to certain former tax residents.

57

**Proposed EU Interest Taxation Directives**

In accordance with a proposal which is currently being reviewed by the European Union as part of a larger set of measures, as of 2004 all EU member states may be required to direct, by national privilege, the paying agencies within the meaning of the Directive, that are based in the relevant EU member state, to withhold either (a) a tax deduction of 15%, and as of 2007 of 20%, on interests, issuing discounts or redemption premiums paid to individuals who are tax residents of another EU member state for their account, or (b) to notify that member state of such payment in which the payee is a tax resident. As of 2010, only notification as per (b) would be required and would replace any tax deduction as outlined under (a). As the implementation of this proposal depends on whether certain non-EU countries and associated overseas territories and non-self-governing territories of non-EU countries will also introduce a tax deduction or agree to provide information, it is currently not foreseeable whether, and in what form, the draft proposal will ultimately be implemented.

58

## Underwriting and Sale

Pursuant to an underwriting agreement dated • 2002, a banking consortium consisting of BNP PARIBAS, Deutsche Bank AG London and • (together the "Underwriting Banks") have agreed to underwrite and place with investors the Capital Notes of the Issuer in the aggregate nominal amount of € • at a price of • % of the Nominal Amount. IKB AG has agreed to pay to the Underwriting Banks a management, underwriting and placement fee in the amount of • % of the aggregate nominal amount of the Capital Notes to be underwritten.

The Issuer agreed to indemnify the Underwriting Banks against certain liability risks in connection with the underwriting and offer of the Capital Notes. Under certain circumstances, the Underwriting Banks are entitled to cancel the underwriting agreement prior to the underwriting of the Capital Notes and payment of the issue price.

### Sales Restrictions

*United States of America*

The Capital Notes have not been, and will not be, registered under the United States Securities Act of 1933 (the "Securities Act"). Accordingly, the Capital Notes may not be offered or sold in the United States or to US Persons except in accordance with Regulation S under the Securities Act or pursuant to an exemption from registration requirements of the Securities Act.

*United Kingdom*

This document may only be delivered, and delivery of this document may only be arranged for, in circumstances in which Section 21(1) of the Financial Services and Markets Act 2000 does not apply.

The Issuer has not authorised any public offer of Capital Notes in the United Kingdom which provide for a term of maturity of one year or more within the meaning of the Public Offers of Securities Regulations of 1995 (as amended) (the "Regulations"). Such Capital Notes may not be offered or sold to any person in the United Kingdom unless in circumstances where such offer or sale does will not result in a Public Offer in the United Kingdom within the meaning of the Regulations, or where such Capital Notes are otherwise offered or sold in accordance with all the requirements of such Regulations.

*General*

In jurisdictions where the sale or the distribution of the Capital Notes offered by this Information Memorandum is subject to legal restrictions, the Capital Notes may only be sold and/or distributed in compliance with such restrictions.

*Stabilisation*

Deutsche Bank AG London shall be entitled to take measures in order to maintain a certain market price of the Capital Notes which deviates from the price which would otherwise prevail. Any such measures may be terminated at any time and will only be taken in Germany in accordance with German law and market practice, which may differ significantly from the rules and market practices customarily applied in other countries in connection with the stabilisation of market prices.

*Delivery of the Capital Notes*

The Capital Notes are represented for their entire life by a global certificate in bearer form without interest coupons attached (the "Global Certificate"). The Global Certificate will be deposited for the entire life of the Capital Notes with Clearstream Banking AG, Frankfurt am Main, Germany, ("Clearstream Frankfurt"). The Global Certificate will also be held in custody by Clearstream Frankfurt on

behalf of the holders of such Capital Notes which are held through Clearstream Banking S.A., Luxembourg, or Euroclear Bank S.A./N.V. in their capacity as operator of the Euroclear System. The Global Certificate will be personally signed by the management of the Issuer.

The Capital Notes may be transferred in book-entry form in accordance with the applicable rules of Clearstream Frankfurt. Delivery of the Capital Notes by book-entry against payment is envisaged to take place on • 2002. Definite Capital Notes representing individual Capital Notes or coupons will not be issued. A copy of the Global Certificate may be obtained free of charge at the Paying Agent specified below.

*Admission to Official Listing*

The Capital Notes shall be admitted to listing on the official market of the Frankfurt Stock Exchange and Euronext Amsterdam N.V. (Official Segment).

# Financial Information on IKB Deutsche Industriebank Aktiengesellschaft

## Index on financial information

**Financial Statements**

Consolidated Balance Sheet and Consolidated Income Statement for the fiscal year 2001/2002
  of IKB Deutsche Industriebank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-2

Balance Sheet and Income Statement for the fiscal year 2001/2002 of
  IKB Deutsche Industriebank AG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-4

Notes to the Consolidated and the AG's Financial Statements for the fiscal year 2001/2001 . . . . .    F-10

The Performance of the IKB Group and AG for the fiscal year 2001/2002 in Brief . . . . . . . . . . . . . .    F-32

Auditor's Report for the fiscal year 2001/2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-54

Consolidated Balance Sheet and Consolidated Income Statement for the fiscal year 2000/2001
  of IKB Deutsche Industriebank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-55

Balance Sheet and Income Statement for the fiscal year 2000/2001 of
  IKB Deutsche Industriebank Aktiengesellschaft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-60

Auditor's Report for the fiscal year 2000/2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-64

## Consolidated Balance Sheet of IKB Deutsche Industriebank

| Assets | EUR thousand* | | March 31, 2002<br>EUR thousand | March 31, 2001<br>EUR thousand |
|---|---|---|---|---|
| **Liquid funds** | | | | |
| a)  Cash | | | 127 | 42 |
| b)  Balances with the central banks | | | 10 445 | 810 |
| of which: with the Deutsche Bundesbank | 10 225 | (12) | | |
| c)  Balances on postal giro accounts | | | 7 | 16 |
| | | | **10 579** | **868** |
| | | | | |
| **Claims on banks** | | | | |
| a)  payable on demand | | | 311 321 | 247 249 |
| b)  other claims | | | 1 293 626 | 556 873 |
| | | | **1 604 947** | **804 122** |
| **Claims on customers** | | | **24 600 308** | **24 276 426** |
| of which: loans to public authorities | 1 799 696 | (1 891 272) | | |
| **Debentures and other fixed interest securities** | | | | |
| a)  Bonds and debentures | | | | |
| *aa) from government issuers* | | | *–* | *–* |
| *ab) from other issuers* | | | *4 782 165* | *3 737 924* |
| | | | 4 782 165 | 3 737 924 |
| of which: eligible as collateral for<br>advances from the Deutsche Bundesbank | 3 710 931 | (2 738 485) | | |
| b)  own bonds | | | 145 598 | 75 795 |
| face value | 140 225 | (74 027) | | |
| | | | **4 927 763** | **3 813 719** |
| **Shares and other non-fixed interest securities** | | | **37 691** | **36 139** |
| **Investments** | | | **38 878** | **38 907** |
| of which: in banks | 37 269 | (37 269) | | |
| of which: in financial services companies | – | (–) | | |
| **Shares in subsidiary companies** | | | **8 068** | **4 698** |
| of which: in banks | – | (–) | | |
| of which: in financial services companies | – | (–) | | |
| **Trust assets** | | | **6 018** | **6 800** |
| of which: loans on a trust basis at third party risk | 4 574 | (5 308) | | |
| **Tangible fixed assets** | | | **214 706** | **211 511** |
| **Leasing items** | | | **2 346 384** | **2 239 422** |
| **Outstanding capital of minority shareholders** | | | **48 465** | **49 184** |
| **Treasury shares** | | | **–** | **529** |
| nominal amount | – | (86) | | |
| **Other assets** | | | **891 325** | **803 979** |
| **Deferred items** | | | **138 868** | **153 301** |
| | | | | |
| **Total assets** | | | **34 874 000** | **32 439 605** |

* in parentheses: Previous year's figures

F-2

## as at March 31, 2002

| Liabilities | EUR thousand* | March 31, 2002 EUR thousand | March 31, 2001 EUR thousand |
|---|---|---|---|
| **Liabilities to banks** | | | |
| a)  payable on demand | | 754 273 | 507 708 |
| b)  with agreed maturity or period of notice | | 14 682 012 | 14 674 054 |
| | | **15 436 285** | **15 181 762** |
| **Liabilities to customers** | | | |
| Other liabilities | | | |
| a)  payable on demand | | 61 014 | 18 647 |
| b)  with agreed maturity or period of notice | | 2 189 432 | 2 392 023 |
| | | **2 250 446** | **2 410 670** |
| **Securitised liabilities** | | | |
| Bonds and notes | | **12 975 080** | **10 825 073** |
| **Trust liabilities** | | **6 018** | **6 800** |
| of which: loans on a trust basis at third party risk  4 574 | (5 308) | | |
| **Other liabilities** | | **531 493** | **567 647** |
| **Deferred items** | | **469 180** | **514 090** |
| **Provisions** | | | |
| a)  for pensions and similar obligations | | 123 494 | 111 012 |
| b)  tax provisions | | 131 644 | 117 560 |
| c)  other provisions | | 45 517 | 52 976 |
| | | **300 655** | **281 548** |
| **Special items including reserves** | | **7 570** | **8 935** |
| **Subordinated liabilities** | | **868 413** | **803 413** |
| **Participation certificate (Genussschein) capital** | | **623 759** | **439 259** |
| of which: with remaining | | | |
| maturities of less than two years | 51 129  (–) | | |
| **Fund for general banks risks** | | **80 000** | **80 000** |
| **Participations of minority shareholders** | | **14 483** | **26 508** |
| **Equity** | | | |
| a)  subscribed capital | | 225 280 | 225 280 |
| contingent capital: | 22 528  (48 128) | | |
| b)  silent capital | | 170 000 | 170 000 |
| c)  capital reserves | | 567 416 | 567 416 |
| d)  revenue reserves | | | |
| *da) statutory reserves* | | *2 399* | *2 399* |
| *db) reserves for treasury shares* | | *–* | *529* |
| *dc) other revenue reserves* | | *316 292* | *277 425* |
| | | 318 691 | 280 353 |
| e)  consolidated profit | | 29 231 | 50 851 |
| | | **1 310 618** | **1 293 900** |
| **Total liabilities** | | **34 874 000** | **32 439 605** |
| | | | |
| **Contingent liabilities** | | | |
| a)  contingent liabilities arising from rediscounted bills of exchange | | 459 | 396 |
| b)  contingent liabilities arising from guarantees and indemnity agreements | | 1 747 709 | 988 856 |
| | | **1 748 168** | **989 252** |
| **Other obligations** | | | |
| Irrevocable loan commitments | | **5 800 047** | **2 309 366** |

* in parentheses: Previous year's figures

F-3

# Consolidated Income Statement of IKB Deutsche Industriebank

| Expenses                                                                 EUR thousand* | 2001/2002 EUR thousand | 2000/2001 EUR thousand |
|---|---|---|
| **Interest expenses** | **2 424 069** | **2 334 815** |
| **Commission expenses** | **5 303** | **5 654** |
| **General operating expenses** | | |
| a)   Personnel expenses | | |
| *aa) Salaries and wages* | *101 088* | *89 635* |
| *ab) Social security contributions and employee* | | |
| *benefit and pension expenditure* | *32 343* | *27 553* |
| *of which: for pensions*            19 509      (15 673) | | |
| | 133 431 | 117 188 |
| b)   other administrative expenses | 54 889 | 49 978 |
| | 188 320 | 167 166 |
| **Depreciation and value adjustments on intangible and tangible fixed assets** | **20 214** | **18 242** |
| **Depreciation of leasing items** | **312 777** | **312 246** |
| **Rental expenditure on leasing items and other service related expenses** | **11 869** | **14 462** |
| **Other operating expenses** | **38 494** | **27 787** |
| **Write-downs and value adjustments to claims and securities, plus transfer to provisions for possible loan losses** | **175 186** | **187 216** |
| **Write-downs and value adjustments on investments, holdings in subsidiary companies and securities treated as long-term investments** | **–** | **87** |
| **Expenditure for loss takeovers** | **–** | **–** |
| **Allocations to special items including reserves** | **2 651** | **–** |
| **Transfer to the fund for general bank risks** | **–** | **–** |
| **Taxes on income and earnings** | **73 508** | **83 209** |
| **Other taxes not entered under "other operating expenses"** | **3 681** | **4 292** |
| **Profits transfered on the basis of a profit pool, a profit transfer agreement or a partial profit transfer agreement** | **–** | **–** |
| **Net income for the year** | **83 129** | **85 911** |
| **Total expenses** | **3 339 201** | **3 241 087** |
| | | |
| **Net income for the year** | **83 129** | **85 911** |
| **Attributable to other partners** | | |
| Profit | **–4 360** | **–2 831** |
| Loss | 9 845 | 17 637 |
| **Loss carried forward from the previous year** | **–17 433** | **–10 161** |
| | 71 181 | 90 556 |
| **Release of revenue reserves** | | |
| of revenues for own shares | **529** | **–** |
| of other revenue reserves | **–** | |
| **Allocation to revenue reserves** | | |
| to revenues for own shares | **–** | **–315** |
| to other revenue reserves | **–42 479** | **–39 390** |
| **Unappropriated profit** | **29 231** | **50 851** |

\* in parentheses: Previous year's figure

F-4

## for the Period April 1, 2001 to March 31, 2002

| Income | 2001/2002 EUR thousand | 2000/2001 EUR thousand |
|---|---|---|
| **Interest income from** | | |
| a)  lending and money market operations | 2 541 512 | 2 487 358 |
| b)  fixed interest securities and government-inscribed debt | 211 029 | 178 815 |
| | **2 752 541** | **2 666 173** |
| **Current income from** | | |
| a)  shares and other non-fixed interest securities | 730 | 318 |
| b)  investments | 4 071 | 1 373 |
| c)  holdings in subsidiary companies | – | – |
| | **4 801** | **1 691** |
| **Income from profit pooling, profit transfer, and partial profit transfer agreements** | **–** | **–** |
| **Income from investments in associated companies** | **–** | **987** |
| **Commission income** | **44 800** | **17 977** |
| **Net income from finance operations** | **1 939** | **2 540** |
| **Earnings from write-ups relating to investments, holdings in subsidiary companies, and securities treated as fixed assets** | **–** | **8 507** |
| **Income from leasing operations** | **462 689** | **431 360** |
| **Earnings from the release of special items including reserves** | **283** | **1 118** |
| **Other operating income** | **72 148** | **110 734** |
| **Total income** | **3 339 201** | **3 241 087** |

# Balance Sheet of IKB Deutsche Industriebank AG

| Assets | EUR thousand* | | March 31, 2002 EUR thousand | March 31, 2001 EUR thousand |
|---|---|---|---|---|
| **Liquid funds** | | | | |
| a) Cash | | | 120 | 35 |
| b) Balances with central banks | | | 10 338 | 119 |
| of which: with the Deutsche Bundesbank | 10 225 | (–) | | |
| c) Balances on postal giro accounts | | | 6 | 3 |
| | | | **10 464** | **157** |
| **Claims on banks** | | | | |
| a) payable on demand | | | 878 219 | 276 892 |
| b) other claims | | | 5 942 494 | 4 906 587 |
| | | | **6 820 713** | **5 183 479** |
| **Claims on customers** | | | **22 200 570** | **22 238 574** |
| of which: loans to public authorities | 1 799 696 | (1 891 272) | | |
| **Debentures and other fixed interest securities** | | | | |
| a) Bonds and debentures | | | | |
| *aa) from government issuers* | | | – | – |
| *ab) from other issuers* | | | *4 635 500* | *3 570 639* |
| | | | 4 635 500 | 3 570 639 |
| of which: eligible as collateral for advances from the Deutsche Bundesbank | 3 608 056 | (2 614 081) | | |
| b) own bonds | | | 145 598 | 75 795 |
| face value | 140 225 | (74 027) | | |
| | | | **4 781 098** | **3 646 434** |
| **Shares and other non-fixed interest securities** | | | **15 411** | **13 477** |
| **Investments** | | | **923** | **1 091** |
| of which: in banks | 294 | (294) | | |
| of which: in financial services companies | – | (–) | | |
| **Shares in subsidiary companies** | | | **367 915** | **353 786** |
| of which: in banks | 164 839 | (164 839) | | |
| of which: in financial services companies | – | (–) | | |
| **Trust assets** | | | **6 018** | **6 800** |
| of which: loans on a trust basis at third party risk | 4 574 | (5 308) | | |
| **Tangible fixed assets** | | | **52 977** | **53 443** |
| **Treasury shares** | | | **–** | **529** |
| nominal amount | – | (86) | | |
| **Other assets** | | | **756 399** | **689 056** |
| **Deferred items** | | | **131 331** | **147 574** |
| **Total assets** | | | **35 143 819** | **32 334 400** |

* in parentheses: Previous year's figures

## as at March 31, 2002

| Liabilities | EUR thousand* | March 31, 2002 EUR thousand | March 31, 2001 EUR thousand |
|---|---|---|---|
| **Liabilities to banks** | | | |
| a)  payable on demand | | 1 299 105 | 652 355 |
| b)  with agreed maturity or period of notice | | 15 261 825 | 15 281 457 |
| | | **16 560 930** | **15 933 812** |
| **Liabilities to customers** | | | |
| Other liabilities | | | |
| a)  payable on demand | | 72 580 | 36 327 |
| b)  with agreed maturity or period of notice | | 2 053 322 | 2 301 678 |
| | | **2 125 902** | **2 338 005** |
| **Securitised liabilities** | | | |
| Bonds and notes | | **12 919 627** | **10 770 794** |
| **Trust liabilities** | | **6 018** | **6 800** |
| of which: loans on a trust basis at third party risk  4 574 | (5 308) | | |
| **Other liabilities** | | **399 438** | **435 208** |
| **Deferred items** | | **131 886** | **153 935** |
| **Provisions** | | | |
| a)  for pensions and similar obligations | | 108 833 | 98 147 |
| b)  tax provisions | | 114 853 | 107 624 |
| c)  other provisions | | 39 073 | 30 667 |
| | | **262 759** | **236 438** |
| **Subordinated liabilities** | | **868 413** | **803 413** |
| **Participation certificate (Genussschein) capital** | | **623 759** | **439 259** |
| of which: with remaining | | | |
| maturities of less than two years | 51 129 | (–) | |
| **Fund for general bank risks** | | **80 000** | **80 000** |
| **Equity** | | | |
| a)  subscribed capital | | 225 280 | 225 280 |
| contingent capital: | 22 528 | (48 128) | |
| b)  capital reserves | | 567 416 | 567 416 |
| c)  revenue reserves | | | |
| *ca) statutory reserves* | | *2 399* | *2 399* |
| *cb) reserves for treasury shares* | | *–* | *529* |
| *cc) other revenue reserves* | | *302 232* | *273 352* |
| | | 304 631 | 276 280 |
| d) distributable profit | | 67 760 | 67 760 |
| | | **1 165 087** | **1 136 736** |
| **Total liabilities** | | **35 143 819** | **32 334 400** |
| **Contingent liabilities** | | | |
| a)  contingent liabilities arising from rediscounted bills of exchange | | 459 | 396 |
| b)  contingent liabilities arising from guarantees and indemnity agreements | | 4 000 936 | 2 901 674 |
| | | **4 001 395** | **2 902 070** |
| **Other obligations** | | | |
| Irrevocable loan commitments | | **4 981 719** | **1 704 910** |

* in parentheses: Previous year's figures

F-7

# Income Statement of IKB Deutsche Industriebank AG

| Expenses                                                               EUR thousand* | | | 2001/2002<br>EUR thousand | 2000/2001<br>EUR thousand |
|---|---|---|---|---|
| **Interest expenses** | | | **2 448 583** | **2 380 995** |
| **Commission expenditure** | | | **2 090** | **3 420** |
| **General operating expenses** | | | | |
| a)  Personnel expenditure | | | | |
| aa) *Salaries and wages* | | | *73 878* | *67 349* |
| ab) *Social security contributions and employee* | | | | |
| *benefit and pension expenditure* | | | *27 351* | *22 700* |
| *of which: for pensions* | *17 997* | *(13 885)* | | |
| | | | 101 229 | 90 049 |
| b)   other administrative expenses | | | 47 618 | 42 861 |
| | | | **148 847** | **132 910** |
| **Depreciation and value adjustments on intangible**<br>**and tangible fixed assets** | | | **13 865** | **12 125** |
| **Other operating expenses** | | | **10 330** | **12 438** |
| **Write-downs and value adjustments**<br>**to claims and securities, plus transfers**<br>**to provisions for possible loan losses** | | | **141 228** | **164 751** |
| **Write-downs and value adjustments on investments,**<br>**holdings in subsidiary companies and securities treated**<br>**as long-term investments** | | | **–** | **87** |
| **Expenditure for loss takeovers** | | | **42 922** | **9 458** |
| **Taxes on income and earnings** | | | **63 734** | **79 691** |
| **Other taxes not entered under**<br>**"other operating expenses"** | | | **478** | **958** |
| **Net income for the year** | | | **96 110** | **98 065** |
| **Total expenses** | | | **2 968 187** | **2 894 898** |
| | | | | |
| **Net income for the year** | | | **96 110** | **98 065** |
| **Release of revenue  reserves** | | | | |
| of revenues for own shares | | | **529** | **–** |
| **Allocation to revenue reserves** | | | | |
| to reserves for own shares | | | **–** | **315** |
| to other revenues reserves | | | **28 879** | **29 990** |
| **Unappropriated profit** | | | **67 760** | **67 760** |

\* in parentheses: Previous year's figure

F-8

# for the Period April 1, 2001 to March 31, 2002

| Income | 2001/2002 EUR thousand | 2000/2001 EUR thousand |
|---|---:|---:|
| **Interest income from** | | |
| a)  lending and money market operations | 2 616 921 | 2 568 269 |
| b)  fixed interest securities and government-inscribed debt | 203 042 | 169 270 |
| | **2 819 963** | **2 737 539** |
| **Current income from** | | |
| a)  shares and other non-fixed interest securities | 730 | 318 |
| b)  investments | 52 071 | 3 109 |
| c)  holdings in subsidiary companies | 5 323 | 5 871 |
| | **58 124** | **9 298** |
| **Income from profit pooling, profit transfer, and partial profit transfer agreements** | **15 416** | **26 458** |
| **Commission income** | **55 993** | **29 523** |
| **Net income from finance operations** | **1 940** | **2 250** |
| **Earnings and write-ups relating to investments, holdings in subsidiary companies, and securities treated as fixed assets** | **–** | **8 507** |
| **Other operating income** | **16 751** | **81 323** |
| **Total income** | **2 968 187** | **2 894 898** |

# Notes to the Consolidated
# and the AG's Financial Statements

## Legal Basis and Accounting Principles

The consolidated Group accounts and the financial statements of IKB Deutsche Industriebank AG are prepared in accordance with regulations contained in the German Commercial Code (*HGB*), in conjunction with the accounting regulations for financial institutions *(RechKredV)*, as well as with the relevant provisions of German Company Law. Furthermore the financial statements of the IKB Deutsche Industriebank Group are drawn up in accordance with the Seventh Council Directive of June 13, 1983 based on the Article 54 (3) (g) of the Treaty on consolidated accounts (83/349/EEC) and Council Directive of December 8, 1986 on the annual accounts and consolidated accounts of banks and other financial institutions (86/635/EEC).

The notes to the financial statements of IKB Deutsche Industriebank AG and the Group accounts have been presented together in accordance with Article 298, Section 3, HGB.

Consolidated Companies

Apart from the parent company, twelve domestic and four foreign companies are included in the consolidated financial statements at March 31, 2002. In accordance with Article 285, No. 11 of the German Commercial Code (HGB) and Article 313, Section 2, HGB we have entered the consolidated companies in the List of Investments under "A.", while in accordance with Articles 325 and 287, HGB the list of 417 real estate special purpose entities, as well as 27 corporate participations held by IKB Private Equity GmbH and IKB Venture Capital GmbH respectively will be filed with the Commercial Register in a separate schedule. Partnerships eligible for exemption in accordance with Article 264 b HGB are listed in a separated category.

IKB Private Equity GmbH, as well as it's subsidiary IKB Venture Capital GmbH were included in the Group accounts for the first time. The objective of IKB Private Equity GmbH to acquire, to manage and to sell participations in medium-sized companies *(Mittelstand)*. Moreover these companies are to be supported to gain access to the stock market. The main focus of IKB Venture Capital GmbH is to purchase and to sell shares in primarily innovative, growth-oriented enterprises.

In the interests of comparability, the consolidated figures from the previous year were correspondingly adapted in accordance with Article 294, Section 2, HGB. The most significant changes in the adjusted consolidated accounts from the previous year were the increase in the portfolio of other assets by EUR 75 million and the decline in claims on customers by EUR 56 million. As both subsidiaries are exclusively funded by the parent company, the consolidation of IKB Private Equity GmbH and IKB Venture Capital GmbH caused no significant change in the Group's balance sheet total. Due to existing profit and loss transfer agreements net income for the financial year 2000/2001 didn't change.

Pursuant to Article 296, Section 2, HGB, we have not included other subsidiary companies (List of Investments under "B.") in the consolidated Group accounts due to their minor impact of the Group's assets, liabilities, financial and income position.

F-10

## Principles of Consolidation

The Group accounts were prepared in strict accordance with IKB Deutsche Industriebank AG accounting and valuation methods contained in the following section. The financial statements of the companies included were adapted to conform with the accounting and valuation regulations of the parent company.  The subsidiary IKB Capital Corporation, New York, draws up the balance according to the accounting principles of US-GAAP. As far as substantially necessary we adopted the subsidiary's accounts to HGB-regulations by offsetting and reconciliation.

Capital consolidation was carried out in accordance with the book value method. For Group companies, the cost of investment is set against the Group's share of equity at the date of acquisition or first-time consolidation. Debit differences amounted to EUR 41.6 million, and credit differences EUR 6.3 million. The balance of these differences, which is EUR 35.3 million, were set off with revenue reserves.

The claims and liabilities as well as expenditure and income between consolidated companies, are eliminated on consolidation.

Normally the financial statements of consolidated companies and those of the parent company are drawn up at the same accounting date. Differing from this rule the annual financial statements of the companies listed below are dated December 31, 2001:

- AIVG Allgemeine Verwaltungsgesellschaft mbH
- IKB Capital Corporation
- IKB Financière France S.A.
- IKB Immobilien Leasing GmbH
- IKB Private Equity GmbH
- ILF Immobilien-Leasing-Fonds Verwaltung GmbH & Co. Objekt Uerdinger Straße KG.

In the case of IKB Capital Corporation, we prepared interim accounts at March 31, 2002 in accordance with Article 299, Section 3 HGB.

## Accounting and Valuation Methods

Claims on banks and customers are shown at their nominal value, less provisions for bad and doubtful debts. Differences between amounts actually paid and nominal values are included in deferred income and credited to the income statement according to plan.

We have provided for potential loan loss risks by building reserves in the form of general provision for bad and doubtful debts. We calculated the general provision for bad and doubtful debts based on our past experience and weighted amounts.

Securities, which are disclosed under the heading "Debentures and other fixed interest securities", as well as "Shares and other non-fixed interest securities" are valued in accordance with the lower of cost principle applying to current assets, i. e. the purchase price or the lower market price. Pursuant to Article 280 of the German Commercial Code (HGB), we were obliged to write up the value of securities written down in previous years at the current market value, the maximum amount of which is the historical purchase price. Fixed asset securities are not included in the portfolio.

Investments in subsidiary companies and companies in which the bank has a participatory interest are shown at the purchase price currently adjusted.

Fixed assets and leasing items are valued at price of purchase or manufacturing cost, reduced by scheduled depreciation and – as the case may be – (fiscally permissible) special depreciation. When a permanent diminution in value is expected, unscheduled depreciation is applied. Low-value assets are completely written off during the year of purchase.

Liabilities are stated at redemption amount. To the extent that proceeds vary from the redemption amount, the difference is shown on the assets side as a deferred item and charged to income according to plan.

Provisions for pension and similar obligations are computed in accordance with actuarial principles, based on the new *Heubeck* actuarial tables and a 6 % rate of interest and using the German *Teilwert* method for current and ex-employees and the net present value of current pensions. Provisions for taxes and uncertain liabilities are stated at amounts which are likely to be incurred. In accordance with the tax regulations, we discounted provisions for cash payments with 5.5 %.

Derivative transactions (swaps, futures, options) need not be disclosed in the balance sheet. Depending on the purpose trading in derivatives is entered either under trading operations or hedging transactions, whereby positions in trading operations can have hedging functions. If derivative operations are considered trading operations they are then valued in accordance with the imparity and realisation principle. If they are part of a hedging operation, valuation units are formed. Profits and losses resulting from these transactions are offset. Provisions are formed for remaining valuation losses, while remaining valuation profits are not realized.


Currency Conversion

Balance sheet and non-balance sheet amounts denominated in foreign currency are converted in accordance with Article 340 h, HGB. In the case of foreign currency-denominated fixed assets that are not specifically hedged, we have calculated the historic cost of exchange rates.

All other foreign currency-denominated assets, liabilities and other outstanding spot transactions are converted at the reference rate of the ECB at balance sheet date. Premiums or discounts on the spot exchange rate resulting from interest hedging operations on balance sheet items are included in net interest income pro rata temporis. Hedged expenses or profits are converted at the contracted forward rate.

In the income statement only expenses from currency conversion according to Article 340 h, Section 2, HGB are taken into account.

F-12

# Notes to the Balance Sheet and Income Statement

Breakdown of Maturities of Selected Balance Sheet Items

| | Group | | AG | |
|---|---|---|---|---|
| in EUR million | March 31, 2002 | March 31, 2001 | March 31, 2002 | March 31, 2001 |
| **Other claims on banks** | **1 294** | **557** | **5 942** | **4 907** |
| with a remaining maturity | | | | |
| – up to three months | 477 | 101 | 4 873 | 4 308 |
| – more than three months up to one year | 592 | 239 | 798 | 335 |
| – more than one year up to five years | 183 | 153 | 248 | 221 |
| – more than five years | 42 | 64 | 23 | 43 |
| **Claims on customers** | **24 600** | **24 276** | **22 201** | **22 239** |
| with a remaining maturity | | | | |
| – up to three months | 3 615 | 3 314 | 3 444 | 3 095 |
| – more than three months up to one year | 2 587 | 2 404 | 2 304 | 2 306 |
| – more than one year up to five years | 11 330 | 10 878 | 9 975 | 9 899 |
| – more than five years | 7 068 | 7 680 | 6 478 | 6 939 |
| **Liabilities to banks** | | | | |
| **with agreed maturity or period of notice** | **14 682** | **14 674** | **15 262** | **15 282** |
| with a remaining maturity | | | | |
| – up to three months | 4 245 | 4 051 | 5 338 | 5 188 |
| – more than three months up to one year | 1 301 | 1 430 | 1 273 | 1 426 |
| – more than one year up to five years | 5 138 | 4 685 | 5 072 | 4 628 |
| – more than five years | 3 998 | 4 508 | 3 579 | 4 040 |
| **Other liabilities to customers** | | | | |
| **with agreed maturity or period of notice** | **2 189** | **2 392** | **2 053** | **2 302** |
| with a remaining maturity | | | | |
| – up to three months | 165 | 154 | 151 | 77 |
| – more than three months up to one year | 111 | 182 | 84 | 158 |
| – more than one year up to five years | 1 147 | 1 130 | 1 078 | 1 114 |
| – more than five years | 766 | 926 | 740 | 953 |

Of the debentures and other fixed interest securities in the Group EUR 180 million and in the AG EUR 179 million will mature next year. Of the issued debentures included in the balance sheet under securitised liabilities, EUR 2,239 million will come due next year in the Group and in the AG.

Treasury Shares

At the General Meetings held on September 8, 2000 and September 7, 2001, we obtained authorisation to acquire our own shares for the purpose of securities trading (max. 5 % of share capital).

During the 2001/2002 financial year, we purchased 3,841,236 treasury shares. Including the beginning balance of 33,620 shares on April 1, 2001, the average purchasing price was EUR 13.90. A total of 3,874,856 shares were sold at an average price of EUR 14.17. The resulting revenues of EUR 1,080 thousand are included in the net result from financial operations. The highest daily balance of treasury shares amounted to 1.28 % of subscribed capital. Our affiliates did not engage in the sale or purchase of IKB shares. As at the balance sheet date no treasury shares were hold by the bank.

In order to enable our employees to acquire shares under employee purchase schemes during the year under review we purchased 23,527 shares at an average price of EUR 12.04, of which we then sold 17,577 to the employees of the AG at a preferential rate of EUR 6.02. A further 5,950 shares were acquired under the same conditions from employees of the Group.

Fixed Asset Schedule

| in EUR million | Group | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Cost of acquisition | Additions | Disposals | Accumulated depreciation | Depreciation financial year | Net book value March 31, 2002 | Net book value March 31, 2001 |
| Tangible fixed assets | 346.5 | 26.2 | 6.1 | 151.9 | 20.2 | 214.7 | 211.5 |
| Investments | 40.7 | 0.1 | 0.2 | 1.7 | – | 38.9 | 38.9 |
| Shares in subsidiary companies | 4.7 | 3.5 | – | 0.1 | – | 8.1 | 4.7 |
| Leasing items | 2 965.2 | 701.5 | 532.8 | 787.5 | 312.8 | 2 346.4 | 2 239.4 |

| in EUR million | AG | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Cost of acquisition | Additions | Disposals | Accumulated depreciation | Depreciation financial year | Net book value March 31, 2002 | Net book value March 31, 2001 |
| Tangible fixed assets | 127.5 | 13.4 | 0.9 | 87.0 | 13.9 | 53.0 | 53.4 |
| Investments | 2.4 | 0.0 | 0.2 | 1.3 | – | 0.9 | 1.1 |
| Shares in subsidiary companies | 413.0 | 64.1 | 50.0 | 59.2 | – | 367.9 | 353.8 |

On March 31, 2002, the book value of the Group's land and buildings used by the Group amounted to EUR 186.0 million, and those of the AG to EUR 31.1 million. The principle item in the Group was the headquarters building in Düsseldorf.

On the Group balance sheet, equipment and furniture, amount to EUR 24.0 million, and for that of the AG, to EUR 20.6 million. They are included in "Tangible fixed assets".

Negotiable Securities

The negotiable securities contained in the balance sheet captions listed below are differentiated as follows:

| in EUR million | Group | | | AG | | |
|---|---|---|---|---|---|---|
| | Total | Listed | Not Listed | Total | Listed | Not Listed |
| Debentures and other fixed interest securities | 4 907.7 | 4 823.2 | 84.5 | 4 761.0 | 4 676.5 | 84.5 |
| Shares and other non-fixed interest securities | 0.2 | 0.2 | − | 0.2 | 0.2 | − |
| Investments | 37.3 | 37.3 | − | − | − | − |
| Shares in subsidiary companies | − | − | − | 151.9 | − | 151.9 |

Receivables and Payables Relating to Subsidiary and Related Companies

| in EUR million | Group | | AG | |
|---|---|---|---|---|
| | Subsidiary companies | Related companies | Subsidiary companies | Related companies |
| Claims on banks | − | 45.9 | 5 432.7 | 1.2 |
| Claims on customers | 82.0 | − | 2 204.5 | − |
| Debentures and other fixed interest securities | − | 1.5 | − | 1.5 |
| Liabilities to banks | − | 6.4 | 2 035.9 | − |
| Liabilities to customers | 0 | − | 84.4 | − |

Trust Transactions

| in EUR million | Group | | AG | |
|---|---|---|---|---|
| | March 31, 2002 | March 31, 2001 | March 31, 2002 | March 31, 2001 |
| Claims on customers | 4.6 | 5.3 | 4.6 | 5.3 |
| Investments | 1.4 | 1.5 | 1.4 | 1.5 |
| **Trust assets** | **6.0** | **6.8** | **6.0** | **6.8** |
| Liabilities to customers | 6.0 | 6.8 | 6.0 | 6.8 |
| **Trust liabilities** | **6.0** | **6.8** | **6.0** | **6.8** |

Subordinated Assets

Subordinated assets are included in the following balance sheet items:

| in EUR million | Group | AG |
|---|---|---|
| Claims on customers | 127.1 | 8.7 |
| Shares and other non-fixed interest securities | 0.5 | 0.5 |
| Shares in subsidiary companies | – | 71.6 |

Foreign Currency Assets and Liabilities

Currency amounts converted into euro are presented in the following table. The differences between assets and liabilities are covered by currency hedging transactions.

| in EUR million | Group | | AG | |
|---|---|---|---|---|
| | March 31, 2002 | March 31, 2001 | March 31, 2002 | March 31, 2001 |
| Assets | 5 326 | 5 055 | 5 170 | 4 698 |
| Liabilities | 2 420 | 2 665 | 2 425 | 2 620 |

Other Assets and Other Liabilities

For both the Group and the AG, the largest single item in "Other assets" are amounts due from direct debits totalling EUR 425 million. These direct debits could not be credited to our LZB account, as the balance sheet date (March 31, 2002) was not a workday. A further significant item contained here is the pro rata interest earned on interest rate swap and interest rate and currency swap transactions (Group with EUR 281 million/AG with EUR 284 million). The remaining amount relates besides participations in companies held by IKB Private Equity GmbH and it's subsidiary primarily to trade receivables and claims for reimbursement.

In both the Group and AG financial statements, the amounts distributed on the participation rights capital for 2001/2002 (EUR 36 million), the pro rata interest for the subordinated liabilities with EUR 18 million, as well as the interest expenditure for the silent capital in the Group with EUR 5 million, are entered under "Other liabilities". The pro rata interest from interest rate swap agreements constitute the largest item in the Group (EUR 219 million) and AG (EUR 211 million). Other significant items include trade payables, containing EUR 56 million and EUR 3 million respectively.

Accrued and Deferred Income

Prepaid expenses of the Group and AG, amounting to EUR 126 million and EUR 125 million respectively relate to differences pursuant to Article 250, Section 3 of the German Commercial Code and Article 340 e, Section 2, Sentence 3 of the German Commercial Code (Disagios from the nominal value of liabilities reported in the balance sheet).

Deferred income of the Group amounting to EUR 134 million (AG: EUR 125 million) was posted, which show differences pursuant to Article 250, Section 2 of the German Commercial Code and Article 340 e, Section 2, Sentence 2 of the German Commercial Code (Disagios from the nominal value of claims reported in the balance sheet).

Special Items including Reserves

The special items including reserves absorbed by the Group from the special purpose entities of IKB Immobilien Leasing GmbH represent with EUR 1.7 million a reserve in accordance with Article 6b of the German Income Tax Act and with EUR 5.9 million investment grants. Two special purpose entities, which stated special items including reserves at an amount of EUR 3.7 million, have left the company group. This outflow is not included in the item "Earnings from the release of special items including reserves" in the consolidated income statement.

Subordinated Liabilities

The subordinated liabilities qualify under the German Banking Act as liable capital. An early repayment is not possible. In case of bankruptcy or liquidation they will be repaid only after non-subordinated creditors have been satisfied.

Individual items which exceed 10 % of the total amount:

| Year of issue | Book value EUR million | Issue Currency | Interest rate in % | Maturity |
|---|---|---|---|---|
| 1992/93 | 90.8 | NLG | 8.00 | Jan. 08, 2003 |
| 1995/96 | 90.8 | NLG | 7.75 | June 16, 2005 |
| 1999/00 | 125.0 | EUR | 5.00 | Dec. 28, 2007 |
| 2000/01 | 150.0 | EUR | 6.00 | Feb. 27, 2009 |

Subordinated liabilities in the Group and AG amount to EUR 868.4 million. Interest expense on this amount during the financial year came to EUR 60.6 million (2000/2001: EUR 47.7 million).

Participation Rights Capital

The issued participation rights capital of EUR 623.8 million meets the requirements set out in Article 10, Section 5 of the German Banking Act at an amount of EUR 570.2 million and serve to strengthen the bank's liable capital. The entire amount is liable in the event of a loss. Interest payments are made solely on the basis of unappropriated profits for the year. The claims of holders of participation rights to repayment of the capital are subordinate to those of other creditors. Participation rights capital includes in detail:

| Year of issue | Book value EUR million | Issue Currency | Interest rate in % | Maturity |
|---|---|---|---|---|
| 1991/92 | 51.2 | DM | 9.10 | March 31, 2003 |
| 1993/94 | 92.0 | DM | 7.30 | March 31, 2005 |
| 1994/95 | 92.0 | DM | 6.45 | March 31, 2006 |
| 1995/96 | 81.8 | DM | 8.40 | March 31, 2007 |
| 1997/98 | 102.3 | DM | 7.05 | March 31, 2009 |
| 1999/00 | 20.0 | EUR | 7.23 | March 31, 2010 |
| 2001/02 | 100.0 | EUR | 6.50 | March 31, 2012 |
| 2001/02 | 10.0 | EUR | 6.62 | March 31, 2012 |
| 2001/02 | 74.5 | EUR | 6.55 | March 31, 2012 |
| | **623.8** | | | |

Payments for the 2001/2002 financial year, amounting to EUR 35.9 million, are contained in interest expenses.

Changes in Subscribed, Authorised and Contingent Share Capital

Subscribed share capital amounted to EUR 225,280,000.00 on March 31, 2002 and is divided into 88,000,000 shares.

The company is authorised to issue further share capital amounting to EUR 76.7 million until September 5, 2002.

In order to grant conversion privileges or option rights to the bearers of convertible bonds and warrant-linked bonds with an aggregate nominal value of EUR 300 million issued before September 3, 2004, contingent capital of EUR 22.5 million exists.

Silent participations stated as "Silent capital" in our balance sheet comply with the provisions of Article 10, Section 4 of the German Banking Act, and thus counts as tier 1 capital.

Equity

| in EUR million | Group |
|---|---|
| As at April, 2001 | 1 293.9 |
| Distribution of unappropriated profits of the AG for the financial year 2000/2001 | − 67.8 |
| Transfer to other revenue reserves from the Group's net income for the financial year 2001/2002 | 42.0 |
| Asset-related differences due to newly consolidated companies | − 3.7 |
| Unappropriated profit of the AG for the financial year 2001/2002 | 67.8 |
| Unappropriated profits and losses of consolidated subsidiaries (net) | − 21.6 |
| As at March 31, 2002 | **1 310.6** |

| in EUR million | AG |
|---|---|
| As at April 1, 2001 | 1 136.7 |
| Distribution of unappropriated profits for the financial year 2000/2001 | − 67.8 |
| Transfer to other revenue reserves from net income of the AG for the financial year 2001/2002 | 28.4 |
| Unappropriated profit for the financial year 2001/2002 | 67.8 |
| As at March 31, 2002 | **1 165.1** |

Key Figures relating to Bank Regulatory Requirements

The risk-weighted assets in EUR million, as well as capital and Principle I ratios in the Group, break down as follows at the balance sheet date:

| at March 31, 2002 in EUR million | Attributable amounts in % | | | | |
|---|---|---|---|---|---|
| | 100 | 50 | 20 | 10 | Total |
| Balance sheet transactions | 15 447 | 2 064 | 503 | 330 | 18 344 |
| Non-balance sheet transactions | 1 471 | 640 | 45 | | 2 156 |
| Derivative transactions in the investment portfolio | | 42 | 254 | | 296 |
| **Weighted risk assets, total** | **16 918** | **2 746** | **802** | **330** | **20 796** |
| Amount attributable for market risk | | | | | 350 |
| **Total of items obligatory for inclusion** | | | | | **21 146** |
| Liable capital [1] | | | | | 2 556 |
| Capital eligible for inclusion [1] | | | | | 2 559 |
| Tier 1 capital ratio (in %) | | | | | 6.4 |
| Equity ratio (in %) | | | | | 12.1 |

[1] Following adaption of the annual financial statements

| at March 31, 2001 in EUR million | 100 | 50 | 20 | 10 | Total |
|---|---|---|---|---|---|
| | | Attributable amounts in % | | | |
| Balance sheet transactions | 16 624 | 2 759 | 339 | 233 | 19 955 |
| Non-balance sheet transactions | 837 | 667 | 23 | | 1 527 |
| Derivative transactions in the investment portfolio | | 45 | 138 | | 183 |
| **Weighted risk assets, total** | **17 461** | **3 471** | **500** | **233** | **21 665** |
| Amount attributable for market risk | | | | | 175 |
| **Total of items obligatory for inclusion** | | | | | **21 840** |
| Liable capital | | | | | 2 347 |
| Capital eligible for inclusion | | | | | 2 347 |
| Tier 1 capital ratio (in %) | | | | | 6.1 |
| Equity ratio (in %) | | | | | 10.7 |

The improvement in the Principle I ratio was due first of all to our CLO transaction, which resulted in a reduction in risk assets in terms of bank regulatory requirements.

Contingent Liabilities / Other Obligations

| Contingent liabilities in EUR million | Group | AG |
|---|---|---|
| Guarantees | 1 506 | 3 759 |
| Liabilities from security for third-parties | 242 | 242 |
| **Total** | **1 748** | **4 001** |

| Other obligations in EUR million | Group | AG |
|---|---|---|
| Loan commitments up to one year | 4 578 | 3 924 |
| Loan commitments more than one year | 1 222 | 1 058 |
| **Total** | **5 800** | **4 982** |

At the balance sheet date our "Contingent liabilities" also comprise credit derivative contracts in the form of a Credit Default Swap (guarantors) within the item "Guarantees and indemnity agreements" amounting to EUR 767 million (2000/2001: EUR 117 million). In this context we have taken over credit risks of certain credit portfolios for well-defined incidences within the credit engagements. More than two third of the single portfolios are rated in the best rating classes Aaa to A by the independent rating agency Moody's.

The item "Other obligations" comprises six loan commitments to special entities at an amount of EUR 3.2 billion, which only take effect in the case of short-term liquidity squeeze.

Notes to the Cash flow Statement

The cash flow statement shows the status and development of the bank's cash flow. In conformity with its sources, the development of cash flow is divided into three parts: operating activities, investment activities and financing activities. The cash flow from investment activities primarily comprises the revenue from the sale and the payment for financial assets and

| Cash flow Statement in EUR million | 2001/2002 | 2000/2001 |
|---|---|---|
| **Net income for the year** | **83** | **86** |
| ***Non-cash items contained in net income for the year and leading*** | | |
| ***into the cash flow from operating activities*** | | |
| Changes of risk provisioning | 227 | 209 |
| Depreciation of tangible fixed assets, leasing items, and investments | 333 | 331 |
| Profit/loss attributable to other partners | 5 | 15 |
| Changes in other non-cash items (primarily change of provisions) | 85 | 70 |
| Result from the sale of investments and fixed assets | −35 | −63 |
| Other adjustments (primarily reallocation of received or paid interest | | |
| including profits for leasing transactions and paid income tax) | −767 | −709 |
| **Subtotal** | **−69** | **−61** |
| ***Changes in assets and liabilities from operating activities after corrections*** | | |
| ***for non-cash components*** | | |
| Claims | | |
| on banks | −702 | 912 |
| on customers | −387 | −1 745 |
| Debentures and other fixed interest securities | −1 135 | −1 164 |
| Shares and other non-fixed interest securities | −3 | −23 |
| Leasing items | −301 | −384 |
| Other assets from operating activities | 60 | −265 |
| Liabilities | | |
| to banks | 125 | 1 847 |
| to customers | −160 | 22 |
| Securitised liabilities | 2 150 | 22 |
| Other liabilities from operating activities | −340 | −78 |
| Participations of minority shareholders | −11 | −7 |
| Interest and dividends received | 3 101 | 3 037 |
| Interest paid | −2 436 | −2 348 |
| Payment of income taxes | − 69 | −92 |
| **Cash flow from operating activities** | **−177** | **−327** |
| Proceeds from the sale of | | |
| Investments | 8 | 7 |
| Tangible fixed assets | 30 | 35 |
| Payments for the purchase of | | |
| Investments | −3 | −16 |
| Tangible fixed assets | −19 | −19 |
| Effects of the sale of associated companies | − | 86 |
| Effects of the change in the set of companies to be consolidated | −11 | − |
| **Cash flow from investment activities** | **5** | **93** |
| Dividend payments | −68 | −68 |
| Changes in liquid funds deriving from other financing activities (balance) | 250 | 291 |
| **Cash flow from financing activities** | **182** | **223** |
| **Balance of liquid funds at the end of the previous period** | **1** | **12** |
| Cash flow from operating activities | −177 | −327 |
| Cash flow from investment activities | 5 | 93 |
| Cash flow from financing activities | 182 | 223 |
| **Balance of liquid funds at the end of the period** | **11** | **1** |

tangible fixed assets. Under financial activities all cash flows from transactions relating to equity and silent capital, as well as subordinated and participation rights capital are shown. In accordance with international practice all other cash flows are assigned to the operating activities.

Cash flow status corresponds to the balance sheet item "Liquid funds", and contains balances held with Central Banks and cash.

# Further Information

## Other Financial Commitments

Outstanding obligations to pay up share capital, and company investments and investments in related companies amounted on March 31, 2002, to EUR 1.3 thousand for the Group and the AG.

The bank has a pro rata additional funding obligation to Liquiditäts-Konsortialbank GmbH of Frankfurt. In addition, we bear a proportional contingent liability for fulfilling the funding obligations of other partners in the Federation of the Association of German Banks. In addition, pursuant to Article 5, Section 10 of the Statutes for the Deposit Insurance Fund, the bank has committed itself to protect the Association of German Banks from any losses arising due to measures favouring banks in which it owns a majority interest.

At its balance sheet date December 31, 2001, the IKB Immobilien Leasing Group had incurred EUR 183 million in financial obligations arising from contracted leases not yet contained in the balance sheet leasing assets.

## Declaration of Backing

In accordance with Article 285, No. 11 HGB/Article 313, Section 2 HGB, IKB ensures, excluding political risk, that the wholly-owned subsidiary companies appearing on the list of investments of IKB Deutsche Industriebank AG and marked as covered by the declaration of backing will be able to meet their contractual liabilities. On behalf of its subsidiaries IKB Finanz Leasing AG, Budapest, and IKB Leasing Hungaria GmbH, Budapest, IKB Leasing GmbH of Hamburg issued letters of comfort to Commerzbank Rt., Budapest.

## Forward Contracts

While the IKB Group engages in forward contracts (swaps, forward rate agreements, and futures), these are carried out almost exclusively for hedging balance sheet-relevant transactions. Trading volume in these instruments is kept within narrow limits. Operational volume is restricted by the use of overall exposure, contractual and product-related limits, and are subject to permanent monitoring by our risk management.

**Breakdown of Product Groups and Remaining Maturities as of March 31, 2002**

| | Group | | | | | | | | Credit risk |
|---|---|---|---|---|---|---|---|---|---|
| | Nominal amount | | | | Credit equivalent | | | | |
| in EUR million | up to 1 year | 1 up to 5 years | longer than 5 years | Total | up to 1 year | 1 up to 5 years | longer than 5 years | Total | Total |
| **1. Interest-rate based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Forward rate agreements | – | – | – | **–** | – | – | – | **–** | **–** |
| Interest swaps | 1 885 | 4 367 | 8 254 | **14 506** | 11 | 45 | 958 | **1 014** | **868** |
| Interest options | 61 | 652 | 3 951 | **4 664** | 1 | 3 | 61 | **65** | **2** |
| Forward bonds | – | 8 | 211 | **219** | – | 0 | 23 | **23** | **20** |
| **2. Currency-based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Currency futures | 2 382 | 11 | – | **2 393** | 25 | 1 | – | **26** | **2** |
| Cross-currency swaps | 455 | 1 648 | 1 494 | **3 597** | 27 | 120 | 141 | **288** | **97** |
| Currency options | 54 | – | – | **54** | 3 | – | – | **3** | **2** |
| **3. Index-based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Share index options | 2 | – | – | **2** | 0 | – | – | **0** | **0** |
| Index swaps | – | 20 | – | **20** | – | 2 | – | **2** | **0** |
| **Total** | **4 839** | **6 706** | **13 910** | **25 455** | **67** | **171** | **1 183** | **1 421** | **991** |

| | AG | | | | | | | | Credit risk |
|---|---|---|---|---|---|---|---|---|---|
| | Nominal amount | | | | Credit equivalent | | | | |
| in EUR million | up to 1 year | 1 up to 5 years | longer than 5 years | Total | up to 1 year | 1 up to 5 years | longer than 5 years | Total | Total |
| **1. Interest-rate based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Forward rate agreements | – | – | – | **–** | – | – | – | **–** | **–** |
| Interest swaps | 1 915 | 4 814 | 8 264 | **14 993** | 13 | 83 | 967 | **1 063** | **915** |
| Interest options | 28 | 454 | 3 974 | **4 456** | 0 | 1 | 64 | **65** | **4** |
| Forward Bonds | – | 8 | 5 | **13** | – | 0 | 0 | **0** | **0** |
| Forward forward deposits | – | 121 | – | **121** | – | 0 | – | **0** | **0** |
| **2. Currency-based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Currency futures | 2 315 | 13 | – | **2 328** | 24 | 1 | – | **25** | **1** |
| Cross-currency swaps | 455 | 1 465 | 1 446 | **3 366** | 27 | 117 | 135 | **279** | **102** |
| Currency options | 54 | – | – | **54** | 3 | – | – | **3** | **2** |
| **3. Index-based operations** | | | | | | | | | |
| Over-the-counter-products (OTCs) | | | | | | | | | |
| Share index options | 2 | – | – | **2** | 0 | – | – | **0** | **0** |
| Index swaps | – | 20 | – | **20** | – | 2 | – | **2** | **–** |
| **Total** | **4 769** | **6 895** | **13 689** | **25 353** | **67** | **204** | **1 166** | **1 437** | **1 024** |

Some 95 % of the Group and 93 % of the AG derivatives operations are with OECD banks with first-class ratings. The remainder consists essentially of contracts with customer companies. The greater part of the bank's derivatives business volume related with an amount of EUR 19.4 billion (AG: EUR 19.6 billion) to interest rate transactions, with interest swap transactions forming the dominant product.

In order to illustrate the Group's credit risk, the table shows, in addition to the nominal volumes, the credit-based weightings as credit equivalents and the so-called positive market values (credit risk) of the forward transactions are presented, based on the bank oversight regulations (derived from the figures for Principle I). Defined as the sum of all positive market values, the credit risk amounted to EUR 991 million (AG: EUR 1,024 million) at the balance sheet date, representing 5 % of the nominal value. Existing netting agreements, which, in case of insolvency, enable the setting off of existing claims and liabilities to counterparties, are not taken into account.


Segment Report

The segment report is aligued with the divisions of the bank. These divisions operate at the market as independent units. Segment information is presented to show the divisions as independent enterprises responsible for their own earnings and costs, and with their own capital resources. The operational divisions are:

- Corporate Lending
- Real Estate Financing
- Structured Financing
- Private Equity (former Equity)
- Leasing.

The basis for the segment reports are the internal, controlling-oriented division accounts, which form part of IKB's management information system. This procedure corresponds to the recommendations of the German Accounting Standards Committee e.V. (DRSC) for banks.

The figures of the Private Equity Division correspond with the statement of the sub-group IKB Private Equity GmbH according to commercial law.

Income and expenses of the other divisions are assigned in accordance with their respective responsibility.  The interest income from loan business is posted for the units using the market interest method; it also comprises the investment income from economic capital resources. This investment income is allocated to the respective divisions in line with the assigned average tier 1 capital. In doing so a 4.8 %-tier 1 capital ratio based on the risk assets is allocated to the divisions. The benefits resulting from the CLO transactions are maintained in the head office and not assigned to the individual divisions. Whenever they could be assigned on the basis of causation, personnel and material expenses of the head office were credited to the divisions.

The allocation of loan exposure risk costs to the divisions adheres to the method of standard risk costs using the "Expected loss" technique. The risk costs of the head office derive from the difference between the standard risk costs calculated for the units and the risk provisioning balance from the Group profit and loss accounts.

The result of each segment is shown using the result from ordinary activities for the individual division. Moreover, we measure the results generated by the divisions by means of the return on equity and cost/income ratio figures. The return on equity is based on the ratio of the result from ordinary activities to the average assigned tier 1 capital. We determine the cost/income ratio from the quotient of administrative expenses to earnings.

**Segment Report by Business Division for the Financial Year 2001/2002**

| in EUR million | Corporate Lending | | Real Estate Financing | | Structured Financing | | Private Equity | | Leasing | | Head Office | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 |
| Net interest and commission income | 232.3 | 230.6 | 78.5 | 73.1 | 101.7 | 84.8 | 3.3 | 8.2 | 38.1 | 37.5 | 56.9 | 16.8 | 510.8 | 451.0 |
| Administrative expenses | 61.9 | 61.1 | 23.3 | 22.0 | 27.6 | 21.9 | 7.3 | 6.6 | 22.8 | 19.4 | 63.6 | 52.2 | 206.5 | 183.2 |
| *Personnel expenses* | *47.5* | *46.4* | *16.8* | *15.2* | *18.6* | *14.2* | *4.0* | *3.0* | *15.4* | *13.5* | *31.1* | *24.9* | *133.4* | *117.2* |
| *Other administrative expenses* | *14.4* | *14.7* | *6.5* | *6.8* | *9.0* | *7.7* | *3.3* | *3.6* | *7.4* | *5.9* | *32.5* | *27.3* | *73.1* | *66.0* |
| Other operating result [1] | 0.0 | 0.0 | −0.6 | 0.0 | 0.2 | 0.0 | −14.2 | 9.2 | 10.6 | −1.0 | 35.2 | 86.1 | 31.2 | 94.3 |
| Risk provisioning balance | 64.5 | 60.5 | 22.8 | 26.6 | 20.2 | 14.6 | 24.7 | 3.7 | 2.6 | 1.1 | 40.4 | 80.7 | 175.2 | 187.2 |
| Result from ordinary activities | 105.9 | 109.0 | 31.8 | 24.5 | 54.1 | 48.3 | −42.9 | 7.1 | 23.3 | 16.0 | −11.9 | −30.0 | 160.3 | 174.9 |
| Ø Allocated tier 1 capital | 636 | 615 | 220 | 196 | 187 | 159 | 24 | 24 | 123 | 116 | −118 | −67 | 1 072 | 1 043 |
| Loan volume at balance sheet date March 31 | 16 266 | 16 584 | 5 355 | 5 097 | 4 191 | 3 978 | 204 | 237 | 2 550 | 2 398 | 319 | −574 | 28 885 | 27 720 |
| Cost/income ratio in % | 26.6 | 26.5 | 29.9 | 30.1 | 27.1 | 25.8 | − | 37.9 | 46.8 | 53.2 | | | 38.1 | 37.8 |
| Return on equity in % | 16.7 | 17.7 | 14.5 | 12.5 | 28.9 | 30.4 | − | 29.6 | 18.9 | 13.8 | | | 15.0 | 16.8 |
| Ø Number of staff | 325 | 335 | 121 | 113 | 103 | 84 | 44 | 35 | 58 | 57 | 699 | 651 | 1 350 | 1 275 |
| Volume of new business | 2 274 | 2 621 | 793 | 528 | 1 399 | 1 182 | 55 | 58 | 710 | 835 | 859 | 170 | 6 090 | 5 394 |

[1] incl. net result from financial operations

## Segment Report by geographical Region

Assignment of the segments by geographical region occurs in accordance with the respective location of our offices or Group companies.

| in EUR million | Germany | Europe, other | America | Head Office | Total |
|---|---|---|---|---|---|
| Net interest and commission income | 343.8 | 103.1 | 7.0 | 56.9 | 510.8 |
| Administrative expenses | 126.7 | 12.1 | 4.1 | 63.6 | 206.5 |
| Other operating result [1] | −4.4 | 0.3 | 0.1 | 35.2 | 31.2 |
| Risk provisioning balance | 140.0 | 29.4 | 5.8 | | 175.2 |
| **Result from ordinary activities** | **72.7** | **61.9** | **−2.8** | **28.5** | **160.3** |

[1] incl. net result from financial operations

With this presentation we simultaneously fulfil the requirement of EU accounting regulations for banks, which calls for a regional breakdown of earnings.

Allocations/Releases of Risk Provisioning at Group Level

| in EUR million | Group | |
|---|---|---|
| | 2001/2002 | 2000/2001 |
| Allocation to specific provisions for bad and doubtful debts/ direct depreciation less payments received on claims  written off | 248 | 235 |
| Allocation to general provisions for bad and doubtful debts | 4 | 4 |
| Release of provisions for bad and doubtful debts | 48 | 29 |
| **Net risk provision** | **204** | **210** |
| Result from securities in the liquidity reserve | 29 | 23 |
| **Risk provisioning balance** | **175** | **187** |

Risk Provisioning Status at Group Level

| in EUR million | Group | | | | |
|---|---|---|---|---|---|
| | As at April 1, 2001 | Utilisation | Release | Allocation | As at March 31, 2002 |
| Specific provisions for bad and doubtful debts/ provisions for contingent liabilities | 793 | 138 | 48 | 229 | 836 |
| General provisions for bad and doubtful debts | 35 | – | – | 4 | 39 |
| **Total risk provisioning status** | **828** | **138** | **48** | **233** | **875** |

Administrative Services

We engage in administrative services relating to our loan and deposit operations, the earnings from which are contained in commission income.

Remuneration of the Organs of the Bank and its Advisory Board

| in EUR thousand | Group | AG |
|---|---|---|
| Members of the Board of Managing Directors | 4 728 | 4 547 |
| Members of the Supervisory Board | 878 | 878 |
| Members of the Advisory Board | 710 | 710 |
| Former Members of the Board of Managing Directors and their surviving dependents | 1 949 | 1 949 |

An amount of EUR 19.8 million was set aside for pension obligations to former members of the Board of Managing Directors and their surviving dependents.

Loans extended to Members of the Organs

| in EUR thousand | Group/AG |
|---|---|
| Board of Managing Directors | 978 |
| Supervisory Board | 131 |

Average Number of Staff during the Financial Year
(calculated on the basis of fulltime workers; previous year's figures adjusted)

| | Group | | AG | |
|---|---|---|---|---|
| | 2001/2002 | 2000/2001 | 2001/2002 | 2000/2001 |
| Male | 797 | 752 | 563 | 548 |
| Female | 553 | 523 | 392 | 381 |
| | **1 350** | **1 275** | **955** | **929** |

Supervisory Board

**Chairman**
Dr. h. c. Ulrich Hartmann, Düsseldorf
Chairman of the Board of Managing Directors
E.ON AG

*a) Group mandates persuant to article 100 section 2,*
*sentence 2 of the German Company Act (AktG)*
*are marked with●*

*E.ON Energie AG● (Chairman)*
*VEBA Oel AG● (Chairman)*
*Münchener Rückversicherungs-Gesellschaft*
*(Chairman)*
*RAG Aktiengesellschaft (Chairman)*
*Deutsche Lufthansa AG*
*Hochtief AG*

*b) Henkel KGaA*
*ARCELOR*

**Deputy Chairman (until December 21, 2001)**
Herbert Hansmeyer, Munich
Former Member of the Board of Managing Directors
Allianz Aktiengesellschaft

*a) Karlsruher Lebensversicherung AG*
*(Vice-Chairman)*
*Karlsruher Versicherung AG (Vice-Chairman)*
*Dresdner Bank Lateinamerika AG*
*VEBA Oel AG*

**Deputy Chairman**
Prof. Dr.-Ing. E. h. Hans-Olaf Henkel, Berlin
President
Wissenschaftsgemeinschaft Gottfried Wilhelm Leibniz e.V.

*a) IBM Deutschland GmbH*
*econia AG*
*Continental AG*
*European Aeronautics and Defense System AG*
*SMS AG*

*b) ETF Group*
*Orange S.A.*
*Ringier AG*

**Deputy Chairman (from January 1, 2002)**
Hans W. Reich, Frankfurt (Main)
Chairman of the Board of Managing Directors
Kreditanstalt für Wiederaufbau

*a) ALSTOM GmbH*
*DePfa Deutsche Pfandbrief Bank AG*
*Deutsche Telekom AG*
*RAG Aktiengesellschaft*
*Thyssen Krupp Steel AG*

*b) DePfa Holding plc.*
*Haftpflicht-Unterstützungs-Kasse kraftfahrender*
*Beamter Deutschlands a.G.*
*HUK-COBURG Holding*

Dr. Jürgen Behrend, Lippstadt
Managing Partner
Hella KG Hueck & Co.

Jörg Bickenbach, Düsseldorf
Undersecretary of State, North Rhine-Westphalia
Ministry for Economics and Medium-Sized Firms,
Energy and Transport

*a) Messe Düsseldorf GmbH*

*b) KölnMesse- und Ausstellungsgesellschaft m. b. H.*
*Gesellschaft für Wirtschaftsförderung mbH (Chairman)*
*Japan K.K.*
*NRW S. E. Asia Pte. Ltd.*
*ZENIT GmbH*

Thomas Bleher, Düsseldorf * (until September 7, 2001)
IKB Deutsche Industriebank AG

Wolfgang Bouché, Düsseldorf *
IKB Deutsche Industriebank AG

Hermann Franzen, Düsseldorf
Personally Liable Partner
Porzellanhaus Franzen KG

*a) NOVA Allgemeine Versicherung AG (Vice-Chairman)*

*b) BBE-Unternehmensberatung GmbH (Chairman)*
*IDUNA Vereinigte Lebensversicherung aG*
*für Handwerk, Handel und Gewerbe*

* Elected by the staff
*a) Membership in other legally required supervisory boards*
*b) Membership in comparable domestic and foreign supervisory bodies*

F-27

Dr. Jürgen Heraeus, Hanau
Chairman of the Supervisory Board
Heraeus Holding GmbH

*a) Group mandates persuant to article 100 section 2,*
*sentence 2 of the German Company Act (AktG)*
*are marked with* •

*Heraeus Holding GmbH* • *(Chairman)*
*Heraeus Tenevo AG* • *(Chairman)*
*Messer Griesheim GmbH (Chairman)*
*Buderus AG*
*EPCOS AG*
*Heidelberger Druckmaschinen AG*

*b) Argor-Heraeus S.A. (Chairman)*

Gunnar John, Berlin
Head of Department VII A
Federal Ministry of Finance

Roswitha Loeffler, Berlin*
IKB Deutsche Industriebank AG

Wilhelm Lohscheidt, Düsseldorf *
IKB Deutsche Industriebank AG

Jürgen Metzger, Hamburg* (from September 7, 2001)
IKB Deutsche Industriebank AG

Roland Oetker, Düsseldorf
Managing Partner
ROI Verwaltungsgesellschaft mbH

*a) Mulligan BioCapital AG (Chairman)*
*Degussa AG*
*Volkswagen AG*

*b) E.ON Venture Partners GmbH*
*Gamma Holding N.V.*
*Scottish Widows Pan European*
*Smaller Companies OEIC*
*Dr. August Oetker-Gruppe*

Dr.-Ing. E. h. Eberhard Reuther, Hamburg
Chairman of the Supervisory Board
Körber Aktiengesellschaft

*a) Körber AG (Chairman)*
*Hermes Kreditversicherungs-Aktiengesellschaft*
*Vereins- und Westbank AG*

Randolf Rodenstock, Munich
Managing Partner
Optische Werke G. Rodenstock KG

*a) E.ON Energie AG*

Rita Röbel, Leipzig*
IKB Deutsche Industriebank AG

Dr. Carola Steingräber, Berlin*
IKB Deutsche Industriebank AG

Dipl.-Ing. Hans Peter Stihl, Waiblingen
Personally Liable Partner and Chairman of
the Board of Managing Directors
STIHL AG

*a) Robert Bosch GmbH*

*b) Robert Bosch Industrietreuhand KG*

Ulrich Wernecke, Düsseldorf *
IKB Deutsche Industriebank AG

Prof. Dr. h. c. Reinhold Würth, Künzelsau
Chairman of the Advisory Council
Würth Group

*a) Würth Group (Chairman)*
*Waldenburger Versicherung AG (Chairman)*

*b) Robert Bosch Stiftung GmbH*
*Würth Dänemark A/S*
*Würth Finance International B. V.*
*Würth Frankreich S. A.*
*Würth Italien S. r. l.*
*Würth Nederland B. V.*
*Würth Neuseeland Ltd.*
*Würth Österreich m. b. H.*
*Würth Schweiz AG*
*Würth Spanien S. A.*
*Würth Group of North America Inc.*
*Würth South Africa*
*Würth Canada*

* Elected by the staff

*a) Membership in other legally required supervisory boards*

*b) Membership in comparable domestic and foreign supervisory bodies*

Board of Managing Directors

Dr. Markus Guthoff

*a) MetaDesign AG*

*b) IKB Private Equity GmbH (Chairman)*
   *IKB Venture Capital GmbH (Chairman)*

Claus Momburg

*b) IKB Immobilien Leasing GmbH (Vice-Chairman)*
   *IKB International S. A.*

Joachim Neupel

*b) IKB Immobilien Leasing GmbH (Chairman)*
   *IKB Immobilien Management GmbH (Chairman)*
   *IKB Leasing GmbH (Vice-Chairman)*
   *IKB Leasing Berlin GmbH (Vice-Chairman)*
   *IKB International S. A.*
   *IKB Private Equity GmbH*
   *IKB Venture Capital GmbH*

Stefan Ortseifen

*a) Dura Tufting GmbH*

*b) IKB International S. A. (Chairman)*
   *IKB Capital Corporation (Chairman)*
   *Lohmann GmbH & Co. KG*
   *Rich. Hengstenberg GmbH & Co.*

Georg-Jesko v. Puttkamer (until March 31, 2002)

*a) Vivanco Gruppe AG (Vice-Chairman)*

*b) Honsel Management GmbH*

Dr. Alexander v. Tippelskirch

*a) Deutsche Gelatine-Fabriken Stoess AG (Chairman)*

*b) IKB Capital Corporation (Vice-Chairman)*
   *IKB International S. A. (Vice-Chairman)*
   *IKB Leasing GmbH (Chairman)*
   *IKB Leasing Berlin GmbH (Chairman)*
   *IKB Private Equity GmbH (Vice-Chairman)*
   *IKB Venture Capital GmbH (Vice-Chairman)*
   *Johanniter-Krankenhaus Rheinhausen (Chairman)*
   *Hako Holding GmbH & Co. (from April 30, 2002)*
   *Hans Martin Wälzholz-Junius Familienstiftung*
   *Kreditanstalt für Wiederaufbau*
   *nobilia-Werke J. Stickling GmbH & Co.*
   *Wirtschaftsförderung Berlin GmbH*

Employees of
IKB Deutsche Industriebank AG

Information persuant to article 340 a, section 4,
number 1, HGB

Günter Czeczatka
   *Schöck AG*

Klaus Neumann
   *CURANUM AG*

Klaus Reineke
   *GKD Gebr. Kufferath AG*

Claus-Dieter Wagner
   *Gauss Interprise AG*

List of Investments as required by Article 285 No. 11 HGB / Article 313, Section 2, HGB

| | Declaration of backing | Share of capital in % | Equity in EUR thousand | Profit/Loss in EUR thousand |
|---|---|---|---|---|
| **A. Consolidated Subsidiaries** | | | | |
| **1. Foreign banks** | | | | |
| IKB International S.A., Luxembourg | x | 100 | 300 314[4] | 13 600 |
| **2. Other domestic companies** | | | | |
| IKB Facility Management GmbH, Düsseldorf | x | 100 | 1 290 | 290 |
| IKB Grundstücks GmbH, Düsseldorf | x | 100 | 25 | 1 |
| IKB Grundstücks GmbH & Co. Objekt Degerloch KG, Düsseldorf | x | 100 | 1 494 | −6 |
| IKB Grundstücks GmbH & Co. Objekt Holzhausen KG, Düsseldorf | x | 100 | −448 | −474 |
| IKB Immobilien Leasing GmbH, Düsseldorf | x | 100 | 5 194 | − [1] |
| IKB Leasing GmbH, Hamburg | x | 100 | 10 481 | − [1] |
| IKB Leasing Berlin GmbH, Erkner | x | 100 | 2 031 | − [1] |
| IKB Private Equity GmbH, Düsseldorf | x | 100 | 24 035 | − [1] |
| IKB Venture Capital GmbH, Düsseldorf | x | 100 | 1 000 | − [1] [3] |
| ILF Immobilien-Leasing Fonds Verwaltung GmbH & Co. Objekt Uerdinger Straße KG, Düsseldorf | x | 100 | 56 945 | 50 139 [5] |
| MORSUS Immobilien GmbH & Co. Objekt Wilhelm-Bötzkes-Straße KG, Düsseldorf | x | 100 | 50 040 | −2 277 [5] |
| AIVG Allgemeine Verwaltungsgesellschaft mbH, Düsseldorf | x | 100 | 675 | 150 |
| **3. Other foreign companies** | | | | |
| IKB Financière France S.A., Paris | x | 100 | 72 732 | 2 046 |
| IKB Finance B.V., Amsterdam | x | 100 | 6 953 | 205 |
| IKB Capital Corporation, New York | | 100 | 17 040 | −3 066 |
| **B. Other Investments** [2] | | | | |
| **1. Domestic** | | | | |
| IKB Projektentwicklung GmbH, Düsseldorf | x | 100 | 522 | −146 |
| Linde Leasing GmbH, Wiesbaden | | 25 | 2 443 | 522 [3] |
| MORSUS Immobilien GmbH, Düsseldorf | x | 100 | 471 | 3 |
| **2. Foreign** | | | | |
| IKB Finanz Leasing AG, Budapest | x | 100 | 452 | 270 [3] |
| IKB Leasing Hungaria GmbH, Budapest | x | 100 | 539 | −672 [3] |
| IKB Leasing Polska GmbH, Posen | x | 100 | 723 | −829 [3] |

[1] Profit and loss transfer agreement exists
[2] Not included in the Group accounts, pursuant Article 296, Section 2, HGB
[3] Indirect holding
[4] Incl. silent capital
[5] Company has shown no Notes to the Financial Statement according to Article 264 b, HGB

In accordance with Articles 325 and 287, HGB, our complete investment portfolio, including the listing by name of the 417 special purpose entities of IKB Immobilien Leasing GmbH and its partnership companies as well as 27 participations of IKB Private Equity GmbH and IKB Venture Capital GmbH, is on file in the commercial registers of the Municipal Courts of Düsseldorf (HRB 1130) and Berlin-Charlottenburg (HRB 8860); if required, we can provide a copy of the list at no charge.

Collateral Items given for Own Liabilities

The following table shows the liabilities of the Group and of the AG, for which assets totaling EUR 8 669,9 million were pledged as security.

| in EUR million | |
|---|---:|
| Liabilities to banks | 8 652.5 |
| Liabilities to customers | 17.4 |
| **Total** | **8 669.9** |

These collateral items relate largely to loans from the Kreditanstalt für Wiederaufbau, as well as to similar institutions, which require these collateral items for the granting of loans.


Transfer of Collateral for Own Liabilities (Information pursuant to Article 35, Section 5 of RechKredV)

EUR 3,424 million in fixed interest securities is deposited with the Deutsche Bundesbank to serve as collateral for the tendering operations of the European Central Bank (collateral pool). At the balance sheet date, recourse had been made to credit facilities totalling EUR 1,749 million. For margin obligations within the framework of futures trading on the EUREX Deutschland exchange, securities with a face value of EUR 5 million are pledged to BHF-BANK AG, Frankfurt. For our securities trading operations in Luxembourg, we placed a negotiable instrument with a nominal value of EUR 7 million with Clearstream Banking, Luxembourg to serve as a security deposit.

For a EUR 50 million global loan facility obtained from Bayerische Landesanstalt für Aufbaufinanzierung (LfA), the bank pledged a negotiable instrument with a nominal value of EUR 51.1 million in favour of LfA.

Within the framework of the emission of credit-linked notes with a nominal value of US$ 534 million (before amortisation), we deposited at the balance sheet date securities from Kreditanstalt für Wiederaufbau nominally valued at US$ 240 million with a trustee.

Düsseldorf, May 21, 2002

IKB Deutsche Industriebank AG

The Board of Managing Directors

# The Performance of the IKB Group and AG in Brief

# 1. An Overview of the Financial Year

During the period under review, the bank's entry into a partnership with Kreditanstalt für Wiederaufbau (KfW) represents a decision of major strategic importance. By purchasing the shares held by Allianz AG and Munich Re Group, KfW now holds a 34 % stake in the share capital of IKB. This partnership is dedicated to supporting Germany's *Mittelstand* of small and medium-sized companies through long-term lending and equity financing. Because KfW will continue in future to offer its industrial development programmes to all banks and savings banks at the same terms, the partnership will have a neutral impact in terms of competition. Closer cooperation between IKB and KfW will strengthen the competitiveness of the German *Mittelstand* both at home and abroad.

IKB and KfW have a corresponding approach to corporate financing: our target Groups are largely identical, as are the sort of projects we finance; moreover, our product ranges are complementary. Thus, despite the difficult underlying economic conditions, we see in our strategic partnership with KfW considerable potential for growth and value enhancement in coming years. This view is shared by the rating agencies. Accordingly – and contrary to the general trend in the banking sector – Moody's has upgraded our long-term rating from A2 to A1, noting a "positive outlook" in this connection.

We intend to continue and expand our joint operations with our previous cooperation partner, Allianz AG, in the fields of life insurance, company pension schemes and property insurance. In future, we will also cooperate with ERGO-Versicherungsgruppe AG in the domain of asset management. Here, we see considerable business potential in our entrepreneurial client base.

During the 2001/2002 financial year, developments in the IKB Group were dominated by an appreciable rise in net interest and commission income on the one hand, and a clear increase in administrative costs on the other, coupled with high provisions for risk. Furthermore, it should be noted that at the balance sheet date (March 31, 2002) IKB Private Equity GmbH (formerly IKB Beteiligungsgesellschaft mbH) and its subsidiary, IKB Venture Capital GmbH, were fully consolidated for the first time, and the previous year's figures adjusted accordingly.

The fundamental data concerning the IKB Group and the AG for the past financial year are as follows:

- net interest income rose by 7.4 % to EUR 471 million (AG: by 13.4 % to EUR 445 million);

- an EUR 27 million-rise in net commission income to EUR 40 million (AG: EUR 28 million to EUR 54 million);

- a widening of the interest margin on new lendings to 1.44 %  (2000/2001: 1.32 %);

- administrative expenditure rose by 12.7 % to EUR 207 million (AG: by 12.2 % to EUR 163 million);

- an EUR 63 million-decline in other operating results to EUR 29 million;

- a reduction of the risk provisioning balance by EUR 12 million to EUR 175 million (AG: by EUR 24 million to EUR 141 million) with an increase in gross risk provisions, as well as an appreciably higher release of former risk provisions and a higher securities trading result.

This led to an 8.3 %-decline in the result of ordinary activities to EUR 160 million; for the AG, the figure was also EUR 160 million, the result of an 11 % decline. The Group's cost/income ratio came to 38.1 % (2000/2001: 37.8 %); the return on equity before tax was 15.0 % (2000/2001: 16.8 %).

The Board of Managing Directors has proposed to the Supervisory Board the payment of an unchanged dividend to shareholders of EUR 0.77 per share for the financial year 2001/2002. To reinforce the bank's equity base, EUR 42 million are transferred to reserves from Group net income for the year (AG: EUR 28 million).

Lending Operations and Asset Items

The volume of new loan accommodations during the period under review, including leasing activities, came to EUR 6.1 billion (2000/2001: EUR 5.4 billion). Disbursements by the AG amounted to EUR 5.1 billion (EUR 4.5 billion). Compared to the corresponding figure for the previous year, Group lending volume at March 31, 2002 had risen by 4.2 % to EUR 28.9 billion. Claims on customers, which account for a good 70 % of the balance sheet total, increased by 1 % to EUR 24.6 billion.

The moderate increase in claims on customers reflects the weakness of the overall economy. Specifically, in 2001 gross domestic product in Germany rose by a mere 0.6 %. The level of corporate investment was 5 % lower than the previous year, with the decline in the last quarter surpassing 10 %. The situation in the stock markets was equally difficult, which – particularly after the terror attacks of September 11 – plummeted to new depths. Conversely, economic growth in certain foreign markets especially relevant to our business, namely France, the UK, Eastern Central Europe, and parts of Asia, was considerably stronger.

Accordingly, the bank's individual business divisions developed along diverse lines; while disbursements by the Corporate Lending Division declined as a result of the weak domestic economy and falling levels of investment in machinery and equipment, Real Estate Financing and – in particular – Structured Financing experienced a considerable rise in earnings. Conversely, our Private Equity Division – as was true of the sector as a whole – generated substantial losses.

In close alignment with our claims on customers, liabilities from guarantees (appearing beneath the balance sheet total) rose by EUR 0.8 billion to EUR 1.7 billion. This increase primarily reflects our involvement in foreign loan portfolio structures. Specifically, during the period under review we invested primarily in international portfolios with AAA to BBB ratings, achieving an average margin of 1.5 %. Our foreign investments are always rated and represent a partial compensation of our risk outplacement.

On account of the balance sheet date, claims on banks doubled by EUR 0.8 billion to EUR 1.6 billion. The increase focused on short- and medium-term maturities, whereas longer-term maturities continued to decline.

**IKB Group Credit Volume**

| | March 31, 2002 in EUR million | March 31, 2001 in EUR million [1] | Change in EUR million | in % |
|---|---|---|---|---|
| Loans to customers | 24 600 | 24 276 | 324 | 1.3 |
| Loans to banks | 191 | 216 | −25 | −11.6 |
| Leasing items | 2 346 | 2 239 | 107 | 4.8 |
| Guarantees | 1 748 | 989 | 759 | 76.7 |
| **Group credit volume** | **28 885** | **27 720** | **1 165** | **4.2** |

**Summarised IKB Group Balance Sheet**

| | March 31, 2002 in EUR million | March 31, 2001 in EUR million [1] | Change in EUR million | in % |
|---|---|---|---|---|
| **Assets** | | | | |
| Liquid funds | 11 | 1 | 10 | >100 |
| Claims on banks | 1 605 | 804 | 801 | 99.6 |
| Claims on customers | 24 600 | 24 276 | 324 | 1.3 |
| Debentures | 4 928 | 3 814 | 1 114 | 29.2 |
| Shares and other non-fixed interest securities | 38 | 36 | 2 | 5.6 |
| Investments and holdings in subsidiary companies | 47 | 44 | 3 | 6.8 |
| Tangible fixed assets | 215 | 212 | 3 | 1.4 |
| Leasing items | 2 346 | 2 239 | 107 | 4.8 |
| Outstanding capital of minority shareholders | 49 | 49 | − | − |
| Other assets | 1 035 | 965 | 70 | 7.3 |
| **Total assets** | **34 874** | **32 440** | **2 434** | **7.5** |
| **Liabilities** | | | | |
| Liabilities to banks | 15 436 | 15 182 | 254 | 1.7 |
| Liabilities to customers | 2 250 | 2 411 | −161 | −6.7 |
| Securitised liabilities | 12 975 | 10 825 | 2 150 | 19.9 |
| Provisions | 301 | 282 | 19 | 6.7 |
| Subordinated liabilities | 868 | 803 | 65 | 8.1 |
| Participation certificate capital (Genussrechtskapital) | 624 | 439 | 185 | 42.1 |
| Fund for general bank risks | 80 | 80 | − | − |
| Participations of minority shareholders | 14 | 27 | −13 | −48.1 |
| Equity capital | 1 281 | 1 243 | 38 | 3.1 |
| Other liabilities | 1 045 | 1 148 | −103 | −9.0 |
| **Total liabilities** | **34 874** | **32 440** | **2 434** | **7.5** |

[1] Figures since March 31, 2001 adjusted due to the first consolidation of IKB Private Equity GmbH and IKB Venture Capital GmbH

We increased our portfolio of debentures by 29 % to EUR 4.9 billion; it consists almost exclusively of top-rated floating bonds. This portfolio serves as security for our tendering operations with the European Central Bank, as well as for our collateral management in future interbank transactions. The volume of our portfolio of leasing items expanded by 5 % to EUR 2.3 billion, reflecting the positive trend in equipment leasing.

The Group balance sheet total increased by 8 % or EUR 2.4 billion to EUR 34.9 billlion; in the AG, the balance sheet total increased by 9 % to EUR 35.1 billion.

## Funding

We funded our operations primarily by issuing bearer debentures; accordingly, the item "Securitised liabilities" rose by 20 % to EUR 13.0 billion. Specifically, we placed five tranches worth EUR 2.7 billion, as well as EUR 1.6 billion in tap issues; these were balanced by redemptions amounting to EUR 2.1 billion. The EUR 0.3 billion increase in liabilities to banks reflects the rather modest rise in claims on customers.

## Equity

With respect to equity our objective is to expand our business without increasing the share capital. Instead, the emphasis is on reducing the amount of risk assets. Accordingly, after two CLO transactions in 2000/2001, we outplaced a further EUR 3.65 billion in credit risks during the year under review. Moreover, we increased subordinated liabilities by EUR 65 million to EUR 868 million, and added EUR 185 million in participation rights capital, which rose to EUR 624 million. Additionally, reserves increased by EUR 38 million to EUR 886 million, meaning that equity at March 31, 2002 reached EUR 2.9 billion, up from EUR 2.6 billion the previous year. For the AG, the corresponding figure for the year under review was EUR 2.7 billion (2000/2001: EUR 2.4 billion).

At March 31, 2002, the Group fulfilled the banking regulatory capital requirement (Principle I) with 12.1 % (2000/2001: 10.7 %); the tier 1 capital ratio was 6.4 % (6.1 %). In the AG, the Principle I figure came to 11.9 % (10.7 %); the tier 1 capital ratio amounted to 6.0 % (5.7 %). We thus attained our goal of exceeding the core capital ratio of 6 % in the Group.

## Earnings

During the 2001/20002 financial year, net interest income in the Group rose by 7.4 % to EUR 471 million. This positive development was due in large measure to the expanded margin in our domestic and foreign loan operations, as well as to successful interest management. Especially gratifying was the increase in net commission income, which rose by EUR 27 million to EUR 40 million, largely the result of the investments in international loan portfolio structures mentioned above.

**IKB Group Total Liable Funds**

| | March 31, 2002 in EUR million | March 31, 2001 in EUR million | Change in EUR million | in % |
|---|---|---|---|---|
| Subscribed share capital | 225 | 225 | – | – |
| Silent capital | 170 | 170 | – | – |
| Capital reserves | 568 | 568 | – | – |
| Revenue reserves | 318 | 280 | 38 | 13.6 |
| Fund for general bank risks | 80 | 80 | – | – |
| Tier 1 capital | 1 361 | 1 323 | 38 | 2.9 |
| Participation certificate capital (Genussrechtskapital) | 624 | 439 | 185 | 42.1 |
| Subordinated liabilities | 868 | 803 | 65 | 8.1 |
| **Total liable funds** | **2 853** | **2 565** | **288** | **11.2** |

**IKB Group Operating Results**

| | April 1, 2001 to March 31, 2002 in EUR million | April 1, 2000 to March 31, 2001 in EUR million [1] | Change in EUR million | in % |
|---|---|---|---|---|
| Interest income from loan operations and money market transactions, fixed interest securities and government-inscribed debt, and earnings from leasing operations | 3 215.2 | 3 097.6 | 117.6 | 3.8 |
| Earnings from securities and holdings | 4.8 | 2.7 | 2.1 | 77.8 |
| Interest expenditure, expenditure and scheduled depreciation relating to leasing operations | 2 748.7 | 2 661.6 | 87.1 | 3.3 |
| Net interest income | 471.3 | 438.7 | 32.6 | 7.4 |
| Commission income | 44.8 | 18.0 | 26.8 | >100 |
| Commission expenditure | 5.3 | 5.7 | −0.4 | −7.0 |
| Net commission income | 39.5 | 12.3 | 27.2 | >100 |
| Net result from financial operations | 1.9 | 2.5 | −0.6 | −24.0 |
| Personnel expenditure | 133.4 | 117.2 | 16.2 | 13.8 |
| *Salaries and wages* | *101.1* | *89.6* | *11.5* | *12.8* |
| *Social security contributions/expenditure for retirement benefits and pensions* | *32.3* | *27.6* | *4.7* | *17.0* |
| Other administrative expenditure | 73.1 | 66.0 | 7.1 | 10.8 |
| Administrative expenditure | 206.5 | 183.2 | 23.3 | 12.7 |
| Balance of other operating income and expenditure | 29.3 | 91.8 | −62.5 | −68.1 |
| Provisions für risk | −175.2 | −187.2 | −12.0 | −6.4 |
| **Result from ordinary activities** | **160.3** | **174.9** | **−14.6** | **−8.3** |

[1] Figures since 2000/2001 adjusted due to the first consolidation of IKB Private Equity GmbH and IKB Venture Capital GmbH

Despite difficult conditions in the stock markets and capital markets, our net result from financial operations remained more or less constant at EUR 2 million. A slightly negative result in bond trading was offset by positive results from trading in shares and certificates or indebtedness *(Schuldscheindarlehen)*.

Administrative expenses rose by 12.7 % (or EUR 23 million) to EUR 207 million. A good two-thirds of this increase fall to personnel expenditure, which grew by 13.8 % to EUR 133 million. Three factors contributed to this development: last year's increase in the number of staff by an average of 75 employees, a result of the new Group structure, higher salaries and an above-average rise in social contributions and expenditure on retirement benefits and pensions (+17.0 %). Other operating expenses rose by 10.8 % to EUR 73 million. Figuring prominently here were write-downs on computer hardware and software, higher spending on office space and maintenance, the introduction of a new advertising concept, and higher costs relating to the expansion of our information management and data processing systems.

Other operating income contracted by EUR 63 million to EUR 29 million. The high figure attained the previous year resulted from the sale of our stake in National-Bank AG. During the period under review, other operating income was determined first and foremost by the sale of our former headquarters building in Düsseldorf, as well as value adjustments of the shareholdings of IKB Private Equity GmbH and IKB Venture Capital GmbH.

In the AG, other operating income came to EUR –37 million (EUR 69 million). This dip was due to the aforementioned sale of our stake in National-Bank, as well as taking over the losses generated by IKB Private Equity GmbH.

Risk Situation

Contrary to our expectations at the beginning of 2001, there was no improvement on the risk front during the period under review. A weak world economy, economic slowdown in Germany, rising unit labour costs and increasingly rigid regulations in the labour market have combined to produce a surge of corporate insolvencies, which rose to 32,000 in 2001, up from 28,000 the year before.

All of these things contributed to making 2001 the most difficult year for the banking sector for the past three decades, according to the Association of German Banks. As a result, charges for bad and doubtful debts last year had to be increased considerably in many cases. In part, this led to a substantial reduction in the results from ordinary activities, as well as declining dividends.

The IKB Group was unable to shield itself completely from these very difficult economic conditions. Thus, gross provisions for risk during the year under review continued to move at a high level, rising by EUR 13 million to EUR 252 million driven above all by write-downs on mezzanine financings. On the other hand, at EUR 48 million, the volume of release of provisions for bad and doubtful debts and payments received on loans written off considerably exceeded the previous year's level (EUR 29 million). Moreover, the securities trading result (EUR 29 million) also surpassed last year's figure.

Accordingly, we succeeded in reducing Group net provisions for risk by EUR 6 million to EUR 204 million (AG: by EUR 17 million to EUR 170 million). The Group's risk provisioning balance declined by EUR 12 million to EUR 175 million (AG: by EUR 24 million to EUR 141 million).

A detailed analysis of our allocations to risk provisions reveals that roughly 45 % of this expenditure – but only 20 % of aggregate exposure – related to corporate and real estate financing in Eastern Germany. At issue here are loans which we made prior to the mid 1990s. With respect to Western Germany, the opposite situation pertains: it accounts for 60 % of loan volume, but only 30 % of write-downs.

Our Structured Finance Division accounted for 10 % of write-downs, and 15 % of aggregate exposure. Private Equity, conversely, had 15 % of the write-downs while accounting for just 1 % of aggregate exposure. This illustrates once again the difficulties experienced by the Private Equity Division during last year's process of restructuring.

At March 31, 2002, Group provisions for specific and general bad and doubtful debts totalled EUR 875 million (2000/2001: EUR 828 million), and in the AG to EUR 788 million (2000/2001: EUR 779 million).

## Result from Ordinary Activities

The result from ordinary activities in the Group and the AG came to EUR 160 million, i.e. EUR 15 million or 8.3 % below the previous year's figure (AG: –11 % or EUR –20 million).

## Proposal for the Appropriation of Profits

Group net income for the year for the period under review amounted to EUR 83.1 million (EUR 85.9 million). A loss brought forward from the previous year 2000/2001 primarily results from the consolidation of the special purpose entities of IKB Immobilien Leasing GmbH. This result derived from leasing-typical patterns of expenditure and earnings during the early years of these companies. Following the allocation of EUR 42 million to other revenue reserves, unappropriated earnings in the Group came to EUR 29.2 million.

Net income for the year in the AG amounted to EUR 96.1 million (EUR 98.1 million). After the allocation of EUR 28.3 million to other revenue reserves, unappropriated earnings came to EUR 67.8 million. We propose to the General Meeting that this profit be disbursed in the form of an unchanged dividend of EUR 0.77 per share.

# 2. Risk Report

## A. Objectives, Strategies and the Organisation of Risk Management

### Objectives and Strategies

With a corporate culture, that is characterised by a conservative risk policy, IKB's risk management is based on fundamental rules defined by the Board of Managing Directors assessing the bank's ability to bear risks. These rules are governed by the principle, that the bank should only take risks in line with the target rating of AA-. Our risk strategy entails the continuous identification, measurement and monitoring of all risks arising from our business activities, and embedding the findings in the bank's risk and profit management.

The successful management of risk is based on achieving an even balance between risk and return. In this process, continuously monitoring and reporting on the risk situation of the bank is particularly important. The overriding objective is to identify and circumscribe potential risks at an early stage. In doing so, we create the scope necessary to secure the bank's existing and the creation of new potential for success.

### Risk Organisation

The clearly defined functional organisation of our risk management system guarantees the functionality and effectiveness of the bank's risk management process. The delimitation of tasks and areas of responsibility is documented in a risk management handbook. Embracing all bank-internal and legal requirements, this regulation lays down guidelines, which, in connection with specific organisational directives, establish the principles of the IKB risk management system. Analogously, this applies to all subsidiaries of IKB.

In connection with the concepts of the Basle Committee on Banking Supervision regarding the determination of minimum capital requirements for banks (Basle II), which is expected to come into force in 2006, principles relating to the management of credit risks were published, a key component of the new regulations. On this basis, the German Federal Financial Supervisory Agency is elaborating Minimum Requirements for Lending by Banks. A central element in these minimum standards is a stricter organisational separation of market and after-market units. In a disciplinary and functional sense, IKB has long kept its risk management specialists separate from its market units. Whereas the customer relationship-officers act as the primary point of contact for our customers on all questions of loan operations, the risk management unit carries out an objective and independent analysis of each individual loan commitment, as well as assessing its creditworthiness.

The organisational separation of customer service elements and credit risk monitoring up to just below Board of Managing Directors' level specified by the minimum requirements, corresponds to the separa-

tion of risk management and risk controlling already defined in the IKB risk management handbook. Different members of the Board of Managing Directors are responsible for each of these. A close intermeshing of the expertise embodied in these departments is guaranteed while at the same time maintaining different points of emphasis regarding the respective tasks. The main areas of the bank's risk management are described in the following:

Board of Managing Directors. The entire Board of Managing Directors is responsible for IKB's risk management, assessing the risk policy in terms of a clear definition of strategy, the types of business, and the acceptable aggregate risk within the framework of the bank's ability to bear risk.

Risk Committees. The setting up of specific committees for combining and monitoring risk-relevant decisions (asset/liability management, investment, credit risk and product committees) supports the risk management activities and decision-making process of the Board of Managing Directors. These committees are responsible both for fundamental questions of policy and decisions on specific transactions, based on the parameters defined by the Board. They are composed of members of the Board and the operational divisions and representatives of the Risk Management and Risk Controlling Departments.

Risk Management. The Risk Management Department is responsible for the implementation and compliance of Group-wide risk standards in the divisions and departments, as well as for loan portfolio management. Among the basic tasks of the Risk Management Department is, in particular, the entire loan granting process, in which it exercises its own loan approval competence. Risk Management is also responsible for calculating and recommending an appropriate risk provision for identified risks.

Risk Controlling. Under the aegis of the bank's central Controlling Department, Risk Controlling is responsible for implementing the risk policy decisions of the Board of Managing Directors, for producing reports on internal and external risk, as well as for the neutral monitoring of loan, market and operational risks. As an instance independent of the market units, Risk Controlling ensures that all measured risks remain within the parameters determined by the Board of Managing Directors. Within the framework of the risk controlling process, the core responsibilities of Controlling include the daily calculation, analysis and reporting of market price risks as well as topical, continuous monitoring of credit risks. A further point of emphasis is the development of guidelines and procedures for handling market, credit and operational risks, as well as methods of calculating them.

Apart from creating this risk transparency and monitoring the aggregate risk of the bank, Controlling is responsible for the ongoing development and implementation of the risk/profits-based overall management of the bank. Within the framework of strategic planning as well as the operational budget process, Controlling supports the Board of Managing Directors in allocating capital to the divisions.

Internal Auditing. The Group's Internal Auditing unit is organised as an autonomous part of the risk management system. It is subordinate to the entire Board of Managing Directors, to which it directly reports. On the basis of process-oriented inspections, all operational and business flows within the Group are examined, whereby, from the standpoint of risk, the emphasis is placed on the qualitative and quantitative processes and methods as well as data processing flows in the bank's lending and trading operations.

Thanks to this systematic division of responsibilities within the framework of operational risk management, the quality standards called for in the Minimum Requirements for Trading Operations by Banks imposed by the regulatory authorities are also met.

Along with the afore mentioned departments, the individual divisions are bound up in the operational risk management structure. They also ensure the management of operational risks in cooperation with the bank's central Controlling, Organisation and Internal Auditing Departments. Risk policy is coordinated at regular meetings of the division heads.

Basle II

The objective of the new Basle Agreement on regulatory capital requirements (Basle II) is to safeguard the stability of the banking system and promote a stronger, quality-oriented bank supervisory system. Basle II rests on three pillars:

1. Risk-adjusted determination of the required capital for credit risks and operational risks

2. Improvement of the risk management procedures used by banks in monitoring and managing risks

3. Improving market transparency through expanded disclosure obligations.

On the whole, IKB sees in the Basle II regulations a confirmation of its policy of risk-categorised examination of its operations and of continuing to develop its recently started portfolio management operations. Last year, a bank-wide Basle II-project was launched in cooperation with all of the divisions and departments to coordinate implementation of the requirements; regular reports will be submitted to a steering committee in which the Board of Managing Directors is represented.

## B.   Risk Management Process

Customer Default Risk

Regarding the risk of customer default, we differentiate between credit risk and counterparty risk. A credit risk occurs when the failure of a customer prevents a loan from being paid back fully. Counterparty risk entails the compensation for hedges or reinvestments respectively, or the fact that a profit not yet realised cannot be recovered. On account of the special significance of loan operations as the core business of the bank, credit risk is subject to exceptionally careful scrutiny.

In controlling the risk of customer default, we rely primarily on the following elements: risk policy guidelines governing the acquisition of new business, authorisation of single loans, portfolio monitoring based on comprehensive portfolio analysis, and internal auditing.

Risk Policy Requirements. The point of departure for the risk management process in the lending business is joint planning by the Board of Managing Directors and the divisions, supported by the Corporate Development and Controlling Departments. Based on the bank's ability to bear risk and its growth and earnings targets, risk is explicitly included in the planning process. The objectives derived from this include not only the volume of new business, net interest and commission income and expenditure on material and personnel, but also the costs of risk and equity. In planning the risk costs, the creditworthiness and collateral structure is agreed so as to be able to exercise a sustained influence on the sourcing of new business and the care of existing customers. It is not only the agreed risk policy objectives which count when acquiring new business, but also the credit calcula-

tion of the respective transaction taking into account the directly attributable costs, especially the standard risk costs. The volume, yield and risk figures deriving from new business are compared on a timely basis with the target figures, and form the subject of a monthly report submitted to the Board of Managing Directors and the divisions. It is the task of Controlling in this context to identify, analyse and elucidate any discrepancies.

Loan Approval Process. Of crucial importance in the loan process is the Risk Management Department, which operates independently of the divisions, thereby fulfilling the requirement to keep the acquisition of new business separate from the loan decision-making process. The management of customer default risk is based on a loan approval process which takes into account the financial standing of the individual customer company and the sector it operates in, as well as the appropriateness of the planned volume of business. In the case of company groups also the creditworthiness and the whole loan volume of the group are included into the decision. Also increasingly important within the framework of the loan approval process are portfolio considerations, the aim being to support the divisions in optimising the loan portfolio. Within the framework of a graduated system of decision-making authority categorised by rating and volume, individual loan decisions are made based on the volume of existing group loan exposure (on the basis of the borrower unit as defined in Article 19(2) of the German Banking Act), the creditworthiness of the borrower and collateral, either decentrally by the respective division or centrally by the loan units in the Risk Management Department, or by the Board of Managing Directors. Thus, the principle of dual control is invariably maintained. Likewise, loan and contract processing is taken care of by the bank's legal personnel, who also operate independently of the divisions.

Portfolio Monitoring and Controlling. In monitoring and controlling the existing exposure, having an overview of the bank's entire loan portfolio is of crucial importance. Taking into account the corporate groups to which they belong, all loan risks are regularly collected and portfolio-oriented by country, division, rating class and sector monitored by Risk Controlling. To ensure the early detection of risks, the divisions regularly gather up-to-date information on our customers. This enables timely evaluation by the bank of the creditworthiness of borrowers and hence of the risk structure of our loan portfolio. The study of individual industries and market alterations is conducted by the bank's Economics Department.

The point of departure for determining portfolio factors, which are oriented to the bank's business policy objectives and risk policy guidelines, is a regular inspection of the portfolios by the Risk Management Department. Here, the risk structure of the loan portfolios and their alteration over time, which are pointed out by Risk Controlling, and the sector risks and business cycle influences on individual industries identified by the Economics Department, are transformed at portfolio level into risk-control measures by the Risk Management Department. Discrepancies from the planned portfolio structure or undesired concentrations are thus subject to early detection, allowing countermeasures to be taken. The Board of Managing Directors decides on portfolio limit settings based on proposals made by Risk Management.

Managing High-Risk Loans. The management of high-risk cases – separated into foreign and domestic categories – is performed by special teams. By calling these units in at an early stage and involving loan officers with special expertise, it is aimed to introduce measures capable of preserving a company's status as a going concern or, should these efforts fail, to limit substantially the ensuing degree of economic damage.

Rating Process and Rating Techniques. The central element of the overall loan process is the evaluation of our customers' creditworthiness. As a specialist bank with a strong focus on long-term customer and credit relationships with medium-sized companies, in selecting our business partners we impose exceptionally stringent criteria with regard to the creditworthiness and the recoverability of collaterals of our exposure. In doing so we place particularly great emphasis on a sustained, positive earnings performance on the part of our customers. Corresponding credit guidelines concretise this commitment to quality.

In assessing creditworthiness, we make use of computer-supported rating procedures tailored to the customer's industry and the specific form of financing. The customer's various creditworthiness characteristics are correspondingly weighted and subsequently applied to a 10-point scale ranging in steps of 0.5 from 1.0 (the best rating) to 6.0 (default).

An individual "probability of insolvency" is calculated for each rating level and regularly subjected to back testing. Analysis reveals that our internal rating procedures are an accurate means of classifying risk.

In our corporate lending operations we apply a customer rating scheme, which, based on core financial data derived from past and projected economic data, also takes into account the individual characteristics of the company. Particular aspects of project finance and other special forms of financing are subject to a different rating process in which greater significance is attached to cash flow requirements. The rating system used in the bank's real estate finance operations assesses creditworthiness based on specific property and investor information.

Today, these systems already form the core of our internal, risk-based loan risk management system, and will form the basis of the Basle Accord on risk-based minimum capital requirements for lending by banks, which will probably come into force in 2006.

Quantifying Credit Risk. In recent years, credit risk models have gained new importance in the internal management of risk. Here, loss distribution of the loan portfolio – the central item of concern – is divided into two categories: "expected loss" and "unexpected loss". While the "expected loss", as a statistical expectancy value (standard risk cost), is covered by the risk premium included in the loan calculation, the "unexpected loss" represents the potential risk that, based on a specified confidence interval, could be greater than the "expected loss". The coverage of this risk is backed up by the ability to bear risks and is satisfied by an equity premium, which is calculated within the framework of the credit calculation system. To quantify these risks we use our own credit risk model, which we are continuing to develop, and which will be introduced during the course of 2002. Our calculations show that the risks will be covered even at a confidence interval of 99.95 %.

During the course of regular reports on performance, special attention is paid to the risk situation. This way, in the event of conspicuous changes occurring, adequate countermeasures can be adopted on a timely basis.

Quality Assurance. As a part of a benchmarking project carried out last year, not only the system for assessing creditworthiness was scrutinised, but also the approval, monitoring and control processes of our loan operations. The results obtained form the basis for the ongoing refinement of the loan process, taking into account the afore mentioned Minimum Requirements for Lending by Banks and Basle II.

Internal Auditing. Another important step in safeguarding the quality of our loan portfolio are the regular inspections carried out by the internal auditing unit. These audits focus on examining internal flows and especially on adherence to key guidelines when granting loans, as well as on the standards of quality and security of the loan approval process. Moreover, the financial standing and economic content of the loan portfolio is checked by means of regular and representative random audits of individual loans.

## Market Price and Liquidity Risks

The group of market price risks plays a further role. Among others, these include interest rate risks, currency risks, and price change risks for shares and other assets. Management of these risks within the framework of the risk management process conforms to the "Minimum Requirements for Trading Operations".

Liquidity Risk. We define liquidity risk as the risk of present or future payment commitments not being able to be made on time or in full. This liquidity management takes place under adherence of external basic conditions. Treasury conducts regular liquidity analyses and cash flow forecasts in order to guarantee solvency at all times. To ensure adequate liquidity we also hold marketable, floating interest rate securities that can be sold or lent against at any time. This eliminates short-term liquidity risk. Furthermore, it is our policy to avoid maturity-related risks by funding our assets largely at matching maturities.

Limit System. The key element in managing market price risk is a sophisticated limit system, which is primarily focused on a market value-oriented limitation of the price or exchange rate risk of interests, derivatives, shares and currencies and is taking profit and loss targets into account. Based on the ability of the bank to bear risk, the limits are agreed between the Board of Managing Directors and Treasury.

Based on this limit system and taking into account the rules of minimum requirements stated in our own general framework – which include limiting ourselves to permissible products – Treasury implements its market expectations in its investment and funding strategies. IKB differentiates its trading for

own account, equity investment and asset funding. The trading for own account and equity investment positions are evaluated daily. Their risk content is measured by means of a value-at-risk system. Based on this evaluation and the risk ratios, the degree of utilisation of the risk and loss limits is calculated for both normal and worst case scenarios. The normal case scenarios both for cash value- and interest income-oriented risk measurements are determined for a ten-day period and a confidence level of 99 %. On account of the minor significance of share price risk, the standard procedure is applied here in accordance with Principle I of the German Banking Act. The worst case scenarios are calculated based on an historical analysis of the past 20 to 30 years. Our back testing demonstrates that the actual changes in results in both trading for own account and equity investment are accurately revealed by our value-at-risk estimates. The following graph shows that the two divergences observed in our trading for own account operations lie within the permissible fluctuation limits.

Asset and Liability Management. Other market price risks can arise from mismatched maturities in loan funding operations and equity investments. In order to quantify and limit these risks, IKB utilises its own asset and liability management system. With the help of this system, daily balances of interest fixations are set for asset transactions, including loan approvals and their subsequent funding, as well as for equity investments. Interest free positions are included in line with historical experience. On the basis of these balances of interest fixations, Risk Controlling determines the interest income that can be attained without risk during the current and coming financial years. In addition, an "interest at risk" for normal and worst case scenarios is calculated. These two factors, the interest income attainable for the various financial years and interest at risk, are set against interest income limits, so that the minimum income requirements of the bank are assured. For the new financial year, a cash value-oriented value-at-risk system is employed for the items relating to loan funding with corresponding limits.

Reporting. In order to monitor market price risks and support the market price risk management, the Managing Directors in charge and Treasury receive comprehensive daily reports on the earnings and risk situation in the afore mentioned portfolios. Once a month, the member of the Board responsible for Controlling reports to the entire Board of Managing Directors on market developments, results and the risk situation of these positions.

**Back Testing in the Course of the Financial Year 2001/2002**

Interest Risks: 99% Confidence Level, Share Risks: Standard Method
1-day Holding Period

EUR million



+ Value-at-risk
- Value-at-risk
● Back testing Profit and Loss

Country Risk

The basis for evaluating and managing country risk is our country rating system, which involves six risk categories: (country risk class 1: no recognisable country risk; country risk class 6: high country risk). In assessing individual countries, a wide array of economic, social and political factors are all taken into account. Within the framework of a contemporary reporting system a regular report is made on the utilization of the limits, which are fixed by the board of Managing Directors based on analysis by the Economics Department and the recommendation of the Risk Management Department. At the balance sheet date after deduction of risks covered by credit insurances (i.e. Hermes) only 1 % of the credit volume was allocated to the country risk classes 2 to 5.

Operational Risks

Regulations of Basle II. According to the definition of the Basle Committee for Bank Supervision, "operational risk" refers the danger of losses occurring as a result of inappropriateness or failure of internal procedures, persons and systems, or which arise due to external events.

The new Basle Accord of minimum capital requirements envisages the use of several methods for calculating the capital requirements for operational risks. IKB is already preparing to meet these new standards.

Management of Operational Risks. The divisions, central departments and subsidiaries are responsible for the analysis, evaluation and reporting of operational risks, with the emphasis on regular analysis and iden-

tification of shortcomings and ways of optimising all business flows and processes. The operational risks are to be minimised or optimised through continuous improvements of the internal control system, taking into account the economic efficiency or the cost/benefit ratio respectively.

In light of this development, IKB has assigned decentralised risk managers for operational risks. Their task is to identify regularly occurring operational risks in their area of responsibility, and to examine them from the following standpoints:

- possibilities of early recognition,
- measures aimed at minimising the probability of a risk occurring,
- measures aimed at minimising the impact of risk,
- precautions and conduct in emergency situations.

Since the beginning of the current financial year, officers responsible for operational risk have been collecting data relating to cases of damage occurring. These include events relating to

- external criminal activity,
- internal errors (e.g. internal criminal or unauthorised conduct, processing errors and violations of operating, health or safety regulations),
- processing flows,
- damage to property,
- interruption of business operations/system failures, as well as,
- obligingness or legal liability.

The Controlling department coordinates the entire process by entering all cases of damage into a central incident database, which forms the basis for regular evaluations and reports.

Internal Auditing plays a particularly important role in managing operational risks, since within the framework of its process-oriented audits it monitors the internal control system for proper functioning.

Within the framework of risk analysis carried out so far, we have determined that the bank faces no operational risks that pose a threat to its existence. For each of the risks identified, measures for avoidance and possibilities of early recognition of undesirable developments and emergency precautions now exist or have been appropriately insured against.

Legal Risks. In the category of operational risk we also subsume legal risk, i.e. the risk of losses occurring due to the introduction of new legal regulations and of changes and or interpretations to existing laws that are disadvantageous to the bank. Limiting legal risk is the task of the bank's Legal Department, which – when necessary – also draws on external legal advice from leading law firms. All contracts are continuously monitored to determine if amendments are necessary in order to conform to changes in the law or legal practice.

## Strategic Risks and Reputation Risk

Strategic risks relate to the threat posed to the long-term success of the bank. These can take the form of changes in the underlying legal and corporate environment, but can also come from changing market and competition conditions, or from our customers or funding partners. Since there is nothing routine about strategic risks, they are hard to collect using an integrated system. They thus come under the special review of the Board of Managing Directors and selected central departments and are analysed on a regular basis.

This entails a regular review of the divisions' strategies within the framework of a systematic planning process, as well as the resulting strategic initiatives and investments.

Reputation risks relates to direct and indirect losses due to a deterioration in the image of the bank among shareholders, customers, employees, business partners and the public at large. All measures affecting the bank's image are carefully identified by the Corporate Development unit, and evaluated in close consultation with the Board of Managing Directors in order to contain the impact of these risks.

## C.  Risk Reporting and Risk Communication

To enable us to recognise risks at an early stage, and then to analyse and control them, all relevant information from the trading and lending units, as well as the accounting, personnel and other departments, is prepared at least once a month and presented and explained to the Board of Managing Directors and/or the relevant heads of divisions.

During the past financial year, the reporting instruments necessary for managing credit risk were further expanded; they depict the essential control parameters and risk information. In this context, special significance was also attached to loan portfolio reporting. The earnings and risk figures of our loan business, including a comparison with planning and target figures, are regularly and promptly reported to the Board of Managing Directors and the heads of the divisions, enabling divergences to be detected at an early stage and appropriate action to be taken. As a result, the necessary information is made available to the divisions and central departments timely and comprehensively.

In the framework of the reporting on the Minimum Requirements for Trading Operations, Risk Controlling produces a daily report for the Board of Managing Directors, the Treasury and other involved units containing an evaluation of the bank's trading for own account positions, the liquidity status, interest income from the funding of asset operations, and equity investments. This report also features a statement of cash-value risk under normal case and worst case scenarios. In analogous fashion, the risk of change in the bank's net interest income is also reported on in both scenario variants. This report discusses the utilisation of market price limits, as well as containing commentary on special developments.

## D.  Outlook

The past financial year once again showed that the methods and measuring systems we use in monitoring and managing risk are an adequate mean of depicting the afore mentioned risks, and thus form a solid foundation for the professional risk management engaged in by IKB. In the current financial year, we will focus on the continued expansion of our portfolio-oriented risk and profit management operations. In the process, we will be paying special attention to the development of the banking regulatory requirements in accordance with Basle II as well as the anticipated standards of the Minimum Requirements for Lending by Banks.

# 3. Performance of the Divisions

During the period under review, the *Corporate Lending Division* disbursed EUR 2.3 billion (see table), a figure below the previous year's EUR 2.6 billion. The main reasons for this were the afore mentioned weakness in corporate investment activities, as well as our approach to risk selection, which remains stringent. Thanks to the improved margin, the division's net interest and commission income, which came to EUR 232 million, actually improved slightly (EUR 231 million). Because the standard risk costs based on the expected loss rose to EUR 65 million from EUR 61 million, the result from ordinary activities declined to EUR 106 million (2000/2001: EUR 109 million). During the period under review, the cost/income ratio came to 26.6 % (26.5 %). The return on equity was 16.7 % (17.7 %).

For the current financial year, we expect the result from ordinary activities of the Corporate Lending Division to be EUR 97 million, once again somewhat below the previous year's figure. This estimate is based on the assumption that, although economic growth in Germany is expected to pick up this year, the volume of investment will decline again. On the other hand, on account of our strategic partnership with KfW, we already expect to see an additional EUR 235 million in new business this year.

In the *Real Estate Financing Division*, net interest and commission income during the period under review rose to EUR 79 million, up from EUR 73 million the year before. Because we were able at the same time to reduce the standard risk costs from EUR 27 million

**Segment Report by Business Division for the Financial Year 2001/2002**

| in EUR million | Corporate Lending | | Real Estate Financing | | Structured Financing | | Private Equity | | Leasing | | Head Office | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 | 1.4.01 – 31.3.02 | 1.4.00 – 31.3.01 |
| Net interest and commission income | 232.3 | 230.6 | 78.5 | 73.1 | 101.7 | 84.8 | 3.3 | 8.2 | 38.1 | 37.5 | 56.9 | 16.8 | 510.8 | 451.0 |
| Administrative expenses | 61.9 | 61.1 | 23.3 | 22.0 | 27.6 | 21.9 | 7.3 | 6.6 | 22.8 | 19.4 | 63.6 | 52.2 | 206.5 | 183.2 |
| *Personnel expenses* | *47.5* | *46.4* | *16.8* | *15.2* | *18.6* | *14.2* | *4.0* | *3.0* | *15.4* | *13.5* | *31.1* | *24.9* | *133.4* | *117.2* |
| *Other administrative expenses* | *14.4* | *14.7* | *6.5* | *6.8* | *9.0* | *7.7* | *3.3* | *3.6* | *7.4* | *5.9* | *32.5* | *27.3* | *73.1* | *66.0* |
| Other operating result [1] | 0.0 | 0.0 | −0.6 | 0.0 | 0.2 | 0.0 | −14.2 | 9.2 | 10.6 | −1.0 | 35.2 | 86.1 | 31.2 | 94.3 |
| Risk provisioning balance | 64.5 | 60.5 | 22.8 | 26.6 | 20.2 | 14.6 | 24.7 | 3.7 | 2.6 | 1.1 | 40.4 | 80.7 | 175.2 | 187.2 |
| Result from ordinary activities | 105.9 | 109.0 | 31.8 | 24.5 | 54.1 | 48.3 | −42.9 | 7.1 | 23.3 | 16.0 | −11.9 | −30.0 | 160.3 | 174.9 |
| Ø Allocated tier 1 capital | 636 | 615 | 220 | 196 | 187 | 159 | 24 | 24 | 123 | 116 | −118 | −67 | 1 072 | 1 043 |
| Loan volume at balance sheet date March 31 | 16 266 | 16 584 | 5 355 | 5 097 | 4 191 | 3 978 | 204 | 237 | 2 550 | 2 398 | 319 | −574 | 28 885 | 27 720 |
| Cost/income ratio in % | 26.6 | 26.5 | 29.9 | 30.1 | 27.1 | 25.8 | – | 37.9 | 46.8 | 53.2 | | | 38.1 | 37.8 |
| Return on equity in % | 16.7 | 17.7 | 14.5 | 12.5 | 28.9 | 30.4 | – | 29.6 | 18.9 | 13.8 | | | 15.0 | 16.8 |
| Ø Number of staff | 325 | 335 | 121 | 113 | 103 | 84 | 44 | 35 | 58 | 57 | 699 | 651 | 1 350 | 1 275 |
| Volume of new business | 2 274 | 2 621 | 793 | 528 | 1 399 | 1 182 | 55 | 58 | 710 | 835 | 859 | 170 | 6 090 | 5 394 |

[1] incl. net result from financial operations

to EUR 23 million, the result from ordinary activities increased to EUR 32 million (EUR 25 million). This positive development was made possible above all by the systematic implementation of a marketing strategy developed the year before, which led to an increase in new business volume of EUR 0.8 billion (EUR 0.5 billion). Thanks to this positive trend we succeeded in further improving the cost/income ratio to 29.9 % (30.1 %), while the return on equity rose from 12.5 % to 14.5 %.

During the current financial year we expect this positive trend to continue. Of course, on account of cyclical and structural problems (e.g. substantial overcapacity in Eastern Germany), the real estate market will develop along divergent lines this year and in the foreseeable future. Even so, given our expanded range of real estate-related services and the reinforced structuring of project developments, including their financing, we expect to be able to increase the result from ordinary activities to EUR 39 million.

For our *Structured Financing Division,* the 2001/2002 financial year proved to be a continuation of a long period of unbroken growth. Specifically, the division succeeded in increasing net interest and commission income to EUR 102 million (EUR 85 million). On the other hand, owing to the dynamic expansion of business volume (disbursements increased from EUR 1.2 billion to EUR 1.4 billion), the standard risk costs rose to EUR 20 million, while an increase in the number of staff resulted in heightened administrative expenditure. This led to an increase in the result from ordinary activities, which rose to EUR 54 million (EUR 48 million). The cost/income ratio came to 27.1 % (25.8 %), the return on equity, to 28.9 % (30.4 %).

The expansion of new business volume and the increase in earnings were mainly due to the division's success both at home and abroad in surpassing last year's strong performance in the field of acquisition finance. Conversely, business was less dynamic in the project finance sector.

For the 2002/2003 financial year, we expect to see a further increase in the result from ordinary activities to EUR 66 million. This is because we are currently advising a considerable number of promising consultancy clients in the field of international project finance, which will lead to additional structuring commissions in the coming months. Moreover, we are confident of gaining a greater share in the domestic and international market for acquisition financing, which will be a further source of income. Furthermore, our new strategic partnership with KfW will already lead this year to EUR 230 million in additional business.

Our *Private Equity Division* was hit particularly hard by the plunge in share prices and the significant loss of attractiveness of the market for corporate transactions. Already at a low ebb last summer due to the downturn in the world economy, share prices crashed dramatically in the wake of the terror attacks of September 11. Accordingly, none of the companies in our portfolio of participatory investments was able to go through with the initial public offerings originally planned for the period under review. At the same time, corporate buyout plans were delayed in anticipation of the effects of Germany's 2002 tax reform. This led to a decline in the net interest and commission income of our Private Equity Division to EUR 3 million (2000/2001: EUR 8 million).

Besides this decline the fact, that in the course of the crash on the stock markets and economic difficulties quite a number of participations in our Private Equity portfolio had to be written down, had the most profound impact on the division's result. For companies planning an IPO on Germany's *Neuer Markt* it was difficult under these circumstances to get follow-up financing. Provisions for risk in the field of mezzanine finance rose to EUR 25 million (EUR 4 million). In addition, a further EUR 21 million in value adjustments relating to investments in companies are contained in the Private Equity division's other operating results. Accordingly, the result from ordinary activities was a loss of EUR 43 million; the year before the division posted a profit of EUR 7 million.

This year, the Private Equity Division finds itself confronted with special challenges. Despite the ongoing weakness of the stock markets, however, it is planned to return the division to break even.

Our *Leasing* activities, which embraces our equipment and real estate leasing operations, once again generated EUR 38 million in net interest and commission income during the period under review. Other operating results amounted to EUR 11 million (EUR −1 million). This improvement in earnings was due to exit income following the termination of leasing contracts. Thus, the result from ordinary activities grew to EUR 23 million, up from EUR 16 million the year before. The cost/income ratio also improved, dropping from last year's 53.2 % to 46.8 %. The return on equity rose to 18.9 % (2000/2001: 13.8 %).

During the period under review, the volume of new business at IKB Leasing came to EUR 410 million, just slightly below the previous year's figure (EUR 414 million). To be sure, this has less to do with the state of the economy as a whole than with the fact that the underlying conditions for leasing in Eastern Germany have worsened. In concrete terms, EU restrictions on granting investment subsidies for hirepurchase investments in this part of Germany have brought this business almost to a standstill.

In the field of real estate leasing, the volume of new business came to EUR 300 million (2000/2001: EUR 421 million). The bulk of our exposure is in production and warehousing facilities, office buildings and commercial properties. The share of new building in the new business amounts to 54 %, a major portion of which materialised with the aid of the expert staff of IKB Immobilien Management GmbH. Moreover, we structured more than EUR 100 million in investments, a welcome source of commission income. The structuring of investments in new building is the core competence of IKB Immobilien Leasing GmbH.

For the 2002/2003 financial year, we expect the Leasing Division again to make a positive contribution to earnings, whose size of course will depend on leasing-specific expenditure and income flows. Our equipment leasing business is set to benefit from the forthcoming implementation of Basle II. In a trend already observable in the year under review, Basle II will encourage companies to finance their equipment investments by leasing rather than by loans.

# 4. Outlook

For the 2002/2003 financial year – after settlement of the head office costs – we expect the result from ordinary activities in the Group to be EUR 165 million. Contributing decisively here – and this applies to our operations in the Group and AG alike – will be the growth in earnings generated by our Structured Financing and Real Estate Financing Divisions, at least as things stand at present. We are also looking forward to a significant rise in income from activities relating to our investments in and the management of international portfolio structures. Conversely, we expect the Corporate Lending Division to grow at a slower pace for several months to come, the result of lingering economic weakness and the accompanied reluctance of the corporate sector to invest. We also expect to see a return to break even in the Private Equity Division.

We assume that administrative expenditure will rise by 6 %. This increase is substantially lower than that of the previous year, indicting that our recent restructuring of the Group was largely completed by the 2001/2002 financial year.

If we exclude the expected decline in risk provisions in the Private Equity Division, the level of gross risk provisions for the current financial year will probably reach the same level as the figure for the period under review. This development is likely to correspond to the trend throughout the banking sector.

Given the very difficult banking year 2001 IKB came off appreciably better compared to the sector as a whole. We attribute this to our clear strategic focus on the profitable, expansion-oriented and innovative companies of Germany's *Mittelstand*. Furthermore,

thanks to our stringent risk selection policy, we also succeeded in further improving the rating structure of our new loan engagements. Whereas in the 2000/2001 financial year, a good two-thirds of our loans fell into the categories of very good to satisfactory, in the year under review it was nearly 70 %. This indicates that our credit evaluation and credit monitoring system, which we have been steadily refining over the years, turns to account to an increasing degree. Particularly gratifying is the fact that we were able to release a substantial volume of provisions.

Against this background, we expect over the next few years to see considerable improvement in the bank's performance. Both at home and abroad, our strategic partnership with KfW is enabling us to reach target groups and offer products that would not have been possible before. On the one hand, this includes gaining large corporations as clients in the domain of international acquisition finance and project finance; on the other, it involves being able to market such attractive products as global loans and certificates of indebtedness *(Schuldscheindarlehen)*. In line with our special strategic position, we thus expect to see double-digit rates of growth in our results from ordinary activities starting in the 2003/2004 financial year.

## Auditors' Report

We have audited the annual financial statements, together with the bookkeeping system, of IKB Deutsche Industriebank Aktiengesellschaft as well as the consolidated financial statements and its report on the position of the Company and the Group prepared by the Company for the business year from April 1, 2001 to March 31, 2002. The preparation of these documents in accordance with German commercial law are the responsibility of the company's management. Our responsibility is to express an opinion on the annual financial statements, together with the bookkeeping system, as well as on the consolidated financial statements and the report on the position of the Company and the Group based on our audit.

We conducted our audit of the annual and consolidated financial statements in accordance with §317 HGB (*Handelsgesetzbuch*/German Commercial Code) and the German generally accepted standards for the audit of financial statements promulgated by the German *Institut der Wirtschaftsprüfer* (*IDW*). Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the annual and the consolidated financial statements in accordance with German principles of proper accounting and in the report on the position of the Company and the Group are detected with reasonable assurance. Knowledge of the business activities and the economic and legal environment of the Company and the Group and evaluations of possible misstatements are taken into account in the determination of audit procedures. The effectiveness of the internal control system relating to the accounting system and the evidence supporting the disclosures in the books and records, the annual and consolidated financial statements and the report on the position of the Company and the

Group are examined primarily on a test basis within the framework of the audit. The audit includes assessing the accounting and consolidation principles used and significant estimates made by management, as well as evaluating the overall presentation of the annual and the consolidated financial statements and the report on the position of the Company and the Group. We believe that our audit provides a reasonable basis for our opinion.

Our audit has not led to any reservations.

In our opinion, the annual and the consolidated financial statements give a true and fair view of the net assets, financial position and results of operations of the Company and the Group, respectively, in accordance with German principles of proper accounting. On the whole the report on the position of the Company and the Group provides a suitable understanding of the Company's and the Group's position and suitably presents the risks of future development.

Düsseldorf, May 28, 2002

KPMG Deutsche Treuhand-Gesellschaft
Aktiengesellschaft
Wirtschaftsprüfungsgesellschaft

Wohlmannstetter          Pukropski
German Public Auditor     German Public Auditor

Consolidated Balance Sheet of IKB Deutsche Industriebank
as at March 31, 2001

## Consolidated Balance Sheet of IKB Deutsche Industriebank

| Assets | EUR | EUR | EUR | March 31, 2000 EUR thousand |
|---|---|---|---|---|
| **Liquid funds** | | | | |
| a)  Cash | | 42 431.10 | | 127 |
| b)  Balances with the central banks | | 809 737.75 | | 11 526 |
| of which:    with the Deutsche Bundesbank EUR 12 071.96 | | | | (11 022) |
| c)  Balances on postal giro accounts | | 15 317.31 | | 7 |
| | | | 867 486.16 | 11 660 |
| **Claims on banks** | | | | |
| a)  payable on demand | | 245 510 297.35 | | 721 115 |
| b)  other claims | | 556 872 684.17 | | 928 926 |
| | | | 802 382 981.52 | 1 650 041 |
| **Claims on customers** | | | 24 332 098 790.61 | 22 634 938 |
| of which: loans to public authorities   EUR 1 891 271 872.28 | | | | (989 124) |
| **Debentures and other fixed interest securities** | | | | |
| a)  Bonds and debentures | | | | |
| aa)  from government issuers | – | | | – |
| ab)  from other issuers | 3 737 923 794.13 | 3 737 923 794.13 | | 2 445 007 |
| including: eligible as collateral for advances from the Deutsche Bundesbank    EUR 2 738 485 390.50 | | | | 2 445 007 |
| | | | | (2 167 282) |
| b)  own bonds | | 75 795 135.01 | | 207 355 |
| face value  EUR 74 026 540.12 | | | | (206 353) |
| | | | 3 813 718 929.14 | 2 652 362 |
| **Shares and other non-fixed interest securities** | | | 36 138 907.56 | 13 392 |
| **Investments** | | | 38 906 427.56 | 29 214 |
| of which: in banks          EUR 37 268 659.67 | | | | (26 758) |
| of which: in financial services companies          EUR – | | | | (–) |
| **Investments in associated companies** | | | – | 35 641 |
| of which: in banks          EUR – | | | | (35 641) |
| of which: in financial services companies          EUR – | | | | (–) |
| **Shares in subsidiary companies** | | | 28 732 931.97 | 26 446 |
| of which: in banks          EUR – | | | | (–) |
| of which: in financial services companies          EUR – | | | | (–) |
| **Trust assets** | | | 6 800 388.02 | 7 381 |
| of which: loans on a trust basis at third party risk          EUR  5 307 777.63 | | | | (5 868) |
| **Fixed assets** | | | 211 502 171.58 | 213 788 |
| **Leasing items** | | | 2 239 422 373.41 | 2 113 904 |
| **Outstanding capital of minority shareholders** | | | 49 183 800.62 | 60 945 |
| **Treasury shares** | | | 528 717.48 | 213 |
| nominal amount  EUR 86 067.20 | | | | (32) |
| **Other assets** | | | 728 830 390.52 | 327 021 |
| **Deferred items** | | | 153 298 539.19 | 164 363 |
| **Total assets** | | | 32 442 412 835.34 | 29 941 309 |

F-56

# as at March 31, 2001

| Liabilities | EUR | EUR | EUR | March 31, 2000<br>EUR thousand |
|---|---|---|---|---|
| **Liabilities to banks** | | | | |
| a)  payable on demand | | 501 559 297.50 | | 85 040 |
| b)  with agreed maturity or period of notice | | 14 674 054 092.57 | | 13 095 628 |
| | | | 15 175 613 390.07 | 13 180 668 |
| **Liabilities to customers** | | | | |
| Other liablities | | | | |
| a)  payable on demand | | 43 942 026.89 | | 39 510 |
| b)  with agreed maturity or period of notice | | 2 392 022 656.13 | | 2 374 160 |
| | | | 2 435 964 683.02 | 2 413 670 |
| **Securitised liabilities** | | | | |
| Bonds and notes | | | 10 825 072 402.72 | 10 802 912 |
| **Trust liabilities** | | | 6 800 388.02 | 7 381 |
| of which: loans on a trust basis | | | | |
| at third party risk    EUR 5 307 777.63 | | | | (5 868) |
| **Other liabilities** | | | 563 526 912.91 | 409 743 |
| **Deferred items** | | | 514 089 276.58 | 497 804 |
| **Provisions** | | | | |
| a)  for pensions and<br>     similar obligations | | 110 404 026.72 | | 101 014 |
| b)  tax provisions | | 117 560 087.85 | | 117 188 |
| c)  other provisions | | 41 365 682.90 | | 47 875 |
| | | | 269 329 797.47 | 266 077 |
| **Special items including reserves** | | | 8 935 324.99 | 10 053 |
| **Subordinated liabilities** | | | 803 413 276.13 | 582 358 |
| **Participation certificate (Genussschein) capital** | | | 439 259 342.59 | 439 259 |
| of which: with maturities of less than two years    EUR – | | | | (–) |
| **Fund for general bank risks** | | | 80 000 000.00 | 80 000 |
| **Participations of minority shareholders** | | | 26 508 051.65 | 45 295 |
| **Equity** | | | | |
| a)  subscribed capital | | 225 280 000.00 | | 225 280 |
| contingent capital: EUR 48 128 000.00 | | | | (48 128) |
| b)  silent capital | | 170 000 000.00 | | 100 000 |
| c)  capital reserves | | 567 415 527.13 | | 567 416 |
| d)  revenue reserves | | | | |
| da)    statutory reserves | 2 398 573.84 | | | 2 399 |
| db)    reserves for treasury shares | 528 717.48 | | | 213 |
| dc)    other revenue reserves | 277 426 607.28 | | | 246 275 |
| | | 280 353 898.60 | | 248 887 |
| e)  consolidated profit | | 50 850 563.46 | | 64 506 |
| | | | 1 293 899 989.19 | 1 206 089 |
| **Total liabilities** | | | 32 442 412 835.34 | 29 941 309 |
| **Contingent liabilities** | | | | |
| a)  contingent liabilities arising<br>     from rediscounted bills of exchange | | 395 820.25 | | 285 |
| b)  contingent liabilities arising<br>     from guarantees and indemnity agreements | | 988 856 406.61 | | 803 066 |
| | | | 989 252 226.86 | 803 351 |
| **Other obligations** | | | | |
| Irrevocable loan commitments | | | 2 309 365 809.78 | 1 996 410 |

F-57

# Consolidated Income Statement of IKB Deutsche Industriebank

| Expenses | EUR | EUR | EUR | 1999/2000 EUR thousand |
|---|---|---|---|---|
| Interest expenses | | | 2 333 897 440.29 | 1 831 422 |
| Commission expenses | | | 4 854 630.92 | 5 365 |
| Net expenses from finance operations | | | – | 2 594 |
| General operating expenses | | | | |
| a)  Personnel expenses | | | | |
|    aa) Salaries and wages | 87 099 123.61 | | | 83 292 |
|    ab) Social security contributions and employee benefit and pension expenditure | 27 053 085.35 | | | 24 037 |
|    of which: for pensions   EUR 15 673 386.54 | | | | (13 315) |
| | | 114 152 208.96 | | 107 329 |
| b)  other administrative expenses | | 46 405 921.64 | | 43 827 |
| | | | 160 558 130.60 | 151 156 |
| Depreciation and value adjustments on intangible and fixed assets | | | 18 236 497.50 | 26 542 |
| Depreciation of leasing items | | | 312 245 418.41 | 300 605 |
| Rental expenditure on leasing items and other service related expenses | | | 14 462 158.82 | 9 303 |
| Other operating expenses | | | 24 155 287.57 | 14 346 |
| Write-downs and value adjustments to claims and securities, plus transfer to provisions for possible loan losses | | | 183 465 103.90 | 165 546 |
| Write-downs and value adjustments on investments, holdings in subsidiary companies and securities treated as long-term investments | | | 87 256.95 | 228 |
| Expenditure for loss takeovers | | | – | 136 |
| Allocations to special items including reserves | | | – | 1 022 |
| Transfer to the fund for general bank risks | | | – | 3 306 |
| Taxes on income and earnings | | | 83 208 406.57 | 80 268 |
| Other taxes not entered under "other operating expenses" | | | 4 291 936.03 | 5 050 |
| Profits transfered on the basis of a profit pool, a profit transfer agreement or a partial profit transfer agreement | | | – | 6 706 |
| Net income for the year | | | 85 911 327.65 | 75 456 |
| Total expenses | | | 3 225 373 595.21 | 2 679 051 |
| Net income for the year | | | 85 911 327.65 | 75 456 |
| Attributable to other partners | | | | |
|    Profit | | | -2 831 285.71 | -2 638 |
|    Loss | | | 17 637 317.00 | 10 800 |
| Loss carried forward from the previous year (profit carried forward) | | | -10 161 291.60 | 10 563 |
| | | | 90 556 067.34 | 94 181 |
| Release of revenue reserves | | | | |
| of revenues for own shares | | | – | 347 |
| Allocation to revenue reserves | | | | |
| to revenues for own shares | | | -315 469.32 | – |
| to other revenue reserves | | | -39 390 034.56 | -30 022 |
| Unappropriated profit | | | 50 850 563.46 | 64 506 |

F-58

# for the Period April 1, 2000 to March 31, 2001

| Income | EUR | EUR | 1999/2000 EUR thousand |
|---|---|---|---|
| **Interest income from** | | | |
| a)   lending and money market operations | 2 477 456 426.53 | | 2 037 521 |
| b)   fixed interest securities and government-inscribed debt | 178 814 679.81 | | 70 503 |
| | | 2 656 271 106.34 | 2 108 024 |
| **Current income from** | | | |
| a)   shares and other non-fixed interest securities | 318 424.97 | | 4 554 |
| b)   investments | 1 372 954.78 | | 884 |
| c)   holdings in subsidiary companies | – | | 36 |
| | | 1 691 379.75 | 5 474 |
| **Income from profit pooling, profit transfer, and partial profit transfer agreements** | | 7 107 141.56 | 27 018 |
| **Income from investments in associated companies** | | 986 736.58 | 4 191 |
| **Commission income** | | 17 862 386.81 | 13 053 |
| **Net income from finance operations** | | 2 539 566.12 | – |
| **Earnings from write-ups relating to investments, holdings in associated companies, and securities treated as fixed assets** | | 8 506 772.14 | 2 |
| **Income from leasing operations** | | 431 360 020.04 | 416 263 |
| **Earnings from the release of special items including reserves** | | 1 117 726.54 | – |
| **Other operating income** | | 97 930 759.33 | 105 026 |
| **Total income** | | 3 225 373 595.21 | 2 679 051 |

# Balance Sheet of IKB Deutsche Industriebank AG

| Assets | EUR | EUR | EUR | March 31, 2000 EUR thousand |
|---|---|---|---|---|
| **Liquid funds** | | | | |
| a)  Cash | | 35 607.44 | | 120 |
| b)  Balances with central banks | | 118 949.70 | | 11 321 |
|     of which:  with the Deutsche Bundesbank | | | | |
|          EUR – | | | | (11 022) |
| c)  Balances on postal giro accounts | | 2 602.11 | | 3 |
| | | | 157 159.25 | 11 444 |
| **Claims on banks** | | | | |
| a)  payable on demand | | 276 891 996.95 | | 1 439 029 |
| b)  other claims | | 4 906 586 529.47 | | 3 822 502 |
| | | | 5 183 478 526.42 | 5 261 531 |
| **Claims on customers** | | | 22 238 573 937.94 | 20 845 949 |
| of which: | | | | |
| loans to public authorities   EUR 1 891 271 872.28 | | | | (989 124) |
| **Debentures and other fixed interest securities** | | | | |
| a)  Bonds and debentures | | | | |
|     aa) from government issuers | – | | | – |
|     ab) from other issuers | 3 570 639 379.55 | | | 2 275 463 |
|     of which: eligible as collateral | | 3 570 639 379.55 | | 2 275 463 |
|     for advances from the | | | | |
|     Deutsche Bundesbank    EUR 2 614 080 529.82 | | | | (2 037 549) |
| b)  own bonds | | 75 795 135.01 | | 207 355 |
|     face value   EUR 74 026 540.12 | | | | (206 353) |
| | | | 3 646 434 514.56 | 2 482 818 |
| **Shares and other non-fixed interest securities** | | | 13 477 453.18 | 10 613 |
| **Investments** | | | 1 091 010.11 | 21 203 |
| of which: in banks          EUR 293 570.67 | | | | (20 296) |
| of which: in financial services companies | | | | |
|          EUR – | | | | (–) |
| **Shares in subsidiary companies** | | | 353 786 018.14 | 315 713 |
| of which: in banks          EUR 164 839 454.84 | | | | (164 839) |
| of which: in financial services companies | | | | |
|          EUR – | | | | (–) |
| **Trust assets** | | | 6 800 388.02 | 7 381 |
| of which: loans on a trust basis | | | | |
| at third party risk          EUR 5 307 777.63 | | | | (5 868) |
| **Fixed assets** | | | 53 442 816.49 | 54 943 |
| **Treasury shares** | | | 528 717.48 | 213 |
| nominal amount   EUR 86 067.20 | | | | (32) |
| **Other assets** | | | 689 055 731.90 | 290 662 |
| **Deferred items** | | | 147 573 610.97 | 160 231 |
| **Total assets** | | | 32 334 399 884.46 | 29 462 701 |

## as at March 31, 2001

| Liabilities | EUR | EUR | EUR | March 31, 2000 EUR thousand |
|---|---|---|---|---|
| **Liabilities to banks** | | | | |
| a) payable on demand | | 652 354 704.98 | | 722 772 |
| b) with agreed maturity or period of notice | | 15 281 457 413.27 | | 12 678 112 |
| | | | 15 933 812 118.25 | 13 400 884 |
| **Liabilities to customers** | | | | |
| Other liabilities | | | | |
| a) payable on demand | | 36 327 422.53 | | 44 688 |
| b) with agreed maturity or period of notice | | 2 301 677 830.45 | | 2 239 801 |
| | | | 2 338 005 252.98 | 2 284 489 |
| **Securitised liabilities** | | | | |
| Bonds and notes | | | 10 770 793 333.43 | 10 794 596 |
| **Trust liabilities** | | | 6 800 388.02 | 7 381 |
| of which: loans on a trust basis | | | | |
| at third party risk    EUR 5 307 777.63 | | | | (5 868) |
| **Other liabilities** | | | 435 207 225.40 | 366 707 |
| **Deferred items** | | | 153 934 882.56 | 174 142 |
| **Provisions** | | | | |
| a) for pensions and similar obligations | | 98 146 948.35 | | 90 274 |
| b) tax provisions | | 107 623 563.04 | | 107 587 |
| c) other provisions | | 30 667 368.00 | | 28 593 |
| | | | 236 437 879.39 | 226 454 |
| **Subordinated liabilities** | | | 803 413 276.13 | 582 358 |
| **Participation certificate (Genussschein) capital** | | | 439 259 342.59 | 439 259 |
| of which: with maturities of less than two years    EUR – | | | | (–) |
| **Fund for general bank risks** | | | 80 000 000.00 | 80 000 |
| **Equity** | | | | |
| a) subscribed capital | | 225 280 000.00 | | 225 280 |
| contingent capital: EUR 48 128 000.00 | | | | (48 128) |
| b) capital reserves | | 567 415 527.13 | | 567 416 |
| c) revenue reserves | | | | |
| ca) statutory reserves | 2 398 573.84 | | | 2 399 |
| cb) reserves for treasury shares | 528 717.48 | | | 213 |
| cc) other revenue reserves | 273 353 367.26 | | | 243 363 |
| | | 276 280 658.58 | | 245 975 |
| d) distributable profit | | 67 760 000.00 | | 67 760 |
| | | | 1 136 736 185.71 | 1 106 431 |
| **Total liabilities** | | | 32 334 399 884.46 | 29 462 701 |
| **Contingent liabilities** | | | | |
| a) contingent liabilities arising from rediscounted bills of exchange | | 395 820.25 | | 286 |
| b) contingent liabilities arising from guarantees and indemnity agreements | | 2 901 673 769.14 | | 2 551 643 |
| | | | 2 902 069 589.39 | 2 551 929 |
| **Other obligations** | | | | |
| Irrevocable loan commitments | | | 1 704 910 226.49 | 1 799 395 |

# Income Statement of IKB Deutsche Industriebank AG

| Expenses | EUR | EUR | EUR | 1999/2000 EUR thousand |
|---|---|---|---|---|
| Interest expenses | | | 2 380 994 777.60 | 1 834 206 |
| Commission expenditure | | | 3 420 153.31 | 2 835 |
| Net expenses from finance operations | | | – | 2 626 |
| General operating expenses | | | | |
| a)  Personnel expenditure | | | | |
|    aa) Salaries and wages | 67 348 989.72 | | | 65 820 |
|    ab) Social security contributions and employee benefit and pension expenditure | 22 699 722.75 | | | 20 324 |
|     of which: for pensions    EUR 13 884 878.97 | | | | (11 945) |
| | | 90 048 712.47 | | 86 144 |
| b)  other administrative expenses | | 42 860 913.18 | | 41 926 |
| | | | 132 909 625.65 | 128 070 |
| Depreciation and value adjustments on intangible and fixed assets | | | 12 124 575.73 | 10 832 |
| Other operating expenses | | | 12 438 464.97 | 12 974 |
| Write-downs and value adjustments to claims and securities, plus transfers to provisions for possible loan losses | | | 164 751 037.45 | 158 597 |
| Write-downs and value adjustments on investments, holdings in subsidiary companies and securities treated as long-term investments | | | 87 256.95 | 225 |
| Expenditure for loss takeovers | | | 9 457 665.19 | 7 498 |
| Transfer to the fund for general bank risks | | | – | 3 306 |
| Taxes on income and earnings | | | 79 690 538.03 | 72 348 |
| Other taxes not entered under "other operating expenses" | | | 958 343.01 | 1 464 |
| Net income for the year | | | 98 065 503.88 | 88 141 |
| Total expenses | | | 2 894 897 941.77 | 2 323 122 |
| Net income for the year | | | 98 065 503.88 | 88 141 |
| Release of revenue reserves of revenues for own shares | | | – | 347 |
| Allocation to revenue reserves to reserves for own shares | | | 315 469.32 | – |
| to other revenue reserves | | | 29 990 034.56 | 20 728 |
| Unappropriated profit | | | 67 760 000.00 | 67 760 |

## for the Period April 1, 2000 to March 31, 2001

| Income | EUR | EUR | 1999/2000 EUR thousand |
|---|---|---|---|
| **Interest income from** | | | |
| a) lending and money market operations | 2 568 268 552.13 | | 2 093 570 |
| b) fixed interest securities and government-inscribed debt | 169 269 856.97 | | 65 166 |
| | | 2 737 538 409.10 | 2 158 736 |
| **Current income from** | | | |
| a) shares and other non-fixed | | | |
| interest securities | 318 424.97 | | 4 554 |
| b) investments | 3 108 694.30 | | 3 978 |
| c) holdings in subsidiary companies | 5 871 147.06 | | 5 830 |
| | | 9 298 266.33 | 14 362 |
| **Income from profit pooling, profit transfer, and partial profit transfer agreements** | | 26 458 227.89 | 36 016 |
| **Commission income** | | 29 523 279.43 | 24 452 |
| **Net income from finance operations** | | 2 249 661.50 | – |
| **Earnings and write-ups relating to investments, holdings in associated companies, and securities treated as fixed assets** | | 8 506 772.13 | 2 |
| Other operating income | | 81 323 325.39 | 89 554 |
| **Total income** | | 2 894 897 941.77 | 2 323 122 |

# Auditors' Report

We have audited the annual financial statements, together with the bookkeeping system, of IKB Deutsche Industriebank Aktiengesellschaft as well as the consolidated financial statements and its report on the position of the Company and the Group prepared by the Company for the business year from April 1, 2000 to March 31, 2001. The preparation of these documents in accordance with German commercial law are the responsibility of the company's management. Our responsibility is to express an opinion on the annual financial statements, together with the bookkeeping system, as well as on the consolidated financial statements and the report on the position of the Company and the Group based on our audit.

We conducted our audit of the annual and consolidated financial statements in accordance with § 317 HGB (*Handelsgesetzbuch*/German Commercial Code) and the German generally accepted standards for the audit of financial statements promulgated by the German *Institut der Wirtschaftsprüfer (IDW)*. Those standards require that we plan and perform the audit such that misstatements materially affecting the presentation of the net assets, financial position and results of operations in the annual and the consolidated financial statements in accordance with German principles of proper accounting and in the report on the position of the Company and the Group are detected with reasonable assurance. Knowledge of the business activities and the economic and legal environment of the Company and the Group and evaluations of possible misstatements are taken into account in the determination of audit procedures. The effectiveness of the internal control system relating to the accounting system and the evidence supporting the disclosures in the books and records, the annual and consolidated financial statements and the report on the position of the Company and the Group are examined primarily on a test basis within the framework of the audit. The audit includes assessing the accounting and consolidation principles used and significant estimates made by management, as well as evaluating the overall presentation of the annual and the consolidated financial statements and the report on the position of the Company and the Group. We believe that our audit provides a reasonable basis for our opinion.

Our audit has not led to any reservations.

In our opinion, the annual and the consolidated financial statements give a true and fair view of the net assets, financial position and results of operations of the Company and the Group, respectively, in accordance with German principles of proper accounting. On the whole the report on the position of the Company and the Group provides a suitable understanding of the Company's and the Group's position and suitably presents the risks of future development.

Düsseldorf, June 6, 2001

KPMG Deutsche Treuhand-Gesellschaft
Aktiengesellschaft
Wirtschaftsprüfungsgesellschaft

Wohlmannstetter                    Pukropski
German Public Auditor    German Public Auditor

# EXHIBIT C

| SERIES NUMBER | ISIN | ISSUER | DESCRIPTION | MATURITY DATE | CURRENCY |
|---|---|---|---|---|---|
| | XS0292212270 | ANTHRACITE RTD INV LTD | | | USD |
| | DE0007490724* | CAPITAL RAISING GMBH | | 4/6/2009 | EUR |
| | CH0024724582 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | BANK GUARANTY | 3/20/2010 | USD |
| | CH0026079142 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | 7/25/2008 | EUR |
| | LU0308577047 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | 6/29/2008 | CHF |
| | LU0353378812 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0355730549 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0358991387 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0360097215 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0360147176 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0366122074 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0366125416 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0366126141 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0370517566 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | 7/9/2008 | EUR |
| | LU0370518531 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | 7/9/2008 | EUR |
| | LU0378183643 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | 8/21/2008 | EUR |
| | LU0386088198 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0388238924 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | LU0388579327 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | XS0299011980 | LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A | | | |
| | IE0003479346 | LEHMAN BROTHERS ALPHA FUND PLC - GLOBAL VALUE FUND | | | |
| | DE000A0KQYR7 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | DE000A0MGTT0 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | DE000A0MGTU8 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | DE000A0MJH02 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | DE000A0MJHZ6 | LEHMAN BROTHERS BANKHAUS AG | | | |
| MTN2411 | XS0205801789 | LEHMAN BROTHERS BANKHAUS AG | HYPO ALPE ADRIA | 11/11/2008 | EUR |
| | XS0210716170 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0211795231 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0212035215 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0212035561 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0212035645 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0212035896 | LEHMAN BROTHERS BANKHAUS AG | | | |
| MTN3040A | XS0227325288 | LEHMAN BROTHERS BANKHAUS AG | HIGH YIELD SYNTHETIC CDO CREDIT LINKED NOTE | 6/20/2011 | ILS |
| | XS0229090534 | LEHMAN BROTHERS BANKHAUS AG | | | |
| | XS0229864144 | LEHMAN BROTHERS BANKHAUS AG | | | |
| MTN3842A | XS0246469471 | LEHMAN BROTHERS BANKHAUS AG | USD FX BASKET KNOCK IN FORWARD RATE | 3/6/2010 | USD |
| MTN4657 | XS0260339345 | LEHMAN BROTHERS BANKHAUS AG | | 9/20/2011 | USD |
| MTN4740 | XS0262486391 | LEHMAN BROTHERS BANKHAUS AG | 10YR FIXED RATE NOTE | 6/28/2016 | EUR |
| MTN5318 | XS0271941337 | LEHMAN BROTHERS BANKHAUS AG | EMTN COUPN 95% 10Y SWAP CURVE PAID ANNUALLY | 10/24/2016 | EUR |
| MTN5395 | XS0274026409 | LEHMAN BROTHERS BANKHAUS AG | EMTN 96.85% 10YR SWAP CURVE ANNUAL | 11/10/2016 | EUR |
| MTN6043A | XS0285486568 | LEHMAN BROTHERS BANKHAUS AG | 6YR AREVO STRATEGY NOTE | 2/8/2013 | EUR |
| | XS0301952130 | LEHMAN BROTHERS BANKHAUS AG | | | |
| MTN8729 | XS0326086633 | LEHMAN BROTHERS BANKHAUS AG | 10YR CAP PROTECT CPPI NOTE | 10/31/2017 | EUR |
| MTN9947 | XS0346081481 | LEHMAN BROTHERS BANKHAUS AG | 10YR TARGET 6 NOTE | 3/7/2018 | EUR |
| MN10117 | XS0350719380 | LEHMAN BROTHERS BANKHAUS AG | 10YR MTN | 4/6/2018 | EUR |
| MN10527 | XS0358400108 | LEHMAN BROTHERS BANKHAUS AG | 7 YEAR ELN CAPITAL PROTECTED NOTE | 5/6/2015 | USD |
| | ANN521333404 | LEHMAN BROTHERS FINANCE S.A | | 12/16/2008 | |
| | ANN521335979 | LEHMAN BROTHERS FINANCE S.A | | | |
| | ANN521336399 | LEHMAN BROTHERS FINANCE S.A | | | |
| | ANN5213N2138 | LEHMAN BROTHERS FINANCE S.A | | | |
| | ANN5214R6506 | LEHMAN BROTHERS FINANCE S.A | | 9/21/2009 | USD |
| | CH0015586842 | LEHMAN BROTHERS FINANCE S.A | BANK GUARANTY | 4/20/2009 | EUR |
| | CH0021004319 | LEHMAN BROTHERS FINANCE S.A | | 2/24/2011 | |
| | CH0022133257 | LEHMAN BROTHERS FINANCE S.A | | 12/23/2009 | |
| | CH0025953040 | LEHMAN BROTHERS FINANCE S.A | | 9/24/2012 | |
| | CH0027120804 | LEHMAN BROTHERS FINANCE S.A | | 3/2/2010 | CHF |
| | KYG6679T1638 | LEHMAN BROTHERS FINANCE S.A | | 1/26/2015 | |
| | XS0207361865 | LEHMAN BROTHERS FINANCE S.A | CERTIFICATE PLUS ON NASDAQ 100 INDEX | 12/23/2009 | USD |
| | XS0293708342 | LEHMAN BROTHERS FINANCE S.A | | 3/30/2010 | USD |
| | XS0293710082 | LEHMAN BROTHERS FINANCE S.A | | 3/30/2010 | USD |
| | ANN5214R5938 | LEHMAN BROTHERS HOLDINGS INC | | | |
| MTN4410 | CA524908PR55 | LEHMAN BROTHERS HOLDINGS INC | 5 YEAR CAD FIXED BOND | 6/1/2011 | CAD |
| MTN4917 | CA524908TV22 | LEHMAN BROTHERS HOLDINGS INC | 4.85% SEP-13 MAPLE BOND | 9/3/2013 | CAD |
| MTN6703 | CA524908VR81 | LEHMAN BROTHERS HOLDINGS INC | 2YR FRN | 2/5/2009 | CAD |
| MTN5000 | CH0026915527 | LEHMAN BROTHERS HOLDINGS INC | 3YR CHF FRN | 9/28/2009 | CHF |
| MTN5011 | CH0026985082 | LEHMAN BROTHERS HOLDINGS INC | CHF 200M 2.5% OCT'10 | 10/13/2010 | CHF |
| EB10 | JP584117A3C0 | LEHMAN BROTHERS HOLDINGS INC | JAPANESE SAMURAI YEN BOND | 12/19/2008 | JPY |
| EB15 | JP584117A5A9 | LEHMAN BROTHERS HOLDINGS INC | JPY SAMURAI BOND | 10/26/2010 | JPY |
| EB19 | JP584117A762 | LEHMAN BROTHERS HOLDINGS INC | 5YR FIXED RATE SAMURAI | 6/5/2012 | JPY |
| EB21 | JP584117B760 | LEHMAN BROTHERS HOLDINGS INC | 10YR FIXED RATE SAMURAI | 6/5/2017 | JPY |
| EB20A | JP584117C768 | LEHMAN BROTHERS HOLDINGS INC | 5YR FLOATING RATE SAMURAI | 6/5/2012 | JPY |
| | XS0066391359 | LEHMAN BROTHERS HOLDINGS INC | | | |
| MTN0340 | XS0073472606 | LEHMAN BROTHERS HOLDINGS INC | Fixed Rate Note | 3/24/2009 | JPY |
| | XS0078505228 | LEHMAN BROTHERS HOLDINGS INC | COMPANY GUARANTY | 7/30/2004 | USD |
| | XS0078877528 | LEHMAN BROTHERS HOLDINGS INC | COMPANY GUARANTY | 8/4/2008 | ITL |
| | XS0081083403 | LEHMAN BROTHERS HOLDINGS INC | Zero Coupon Bond due October 16, 2009 Series 437 | 10/16/2009 | ITL |
| MTN0451EURMTFX | XS0082350587 | LEHMAN BROTHERS HOLDINGS INC | 30 YEAR ZERO COUPON NOTE | 12/6/2027 | EUR |
| | XS0107687567 | LEHMAN BROTHERS HOLDINGS INC | COMPANY GUARANTY | 6/30/2008 | EUR |
| MTN1159 | XS0128857413 | LEHMAN BROTHERS HOLDINGS INC | 10 YEAR FIXED RATE SYNDICATE NOTE | 5/10/2011 | EUR |
| MTN1328 | XS0138439616 | LEHMAN BROTHERS HOLDINGS INC | FLOATING RATE NOTE | 11/22/2011 | EUR |
| MTN1519 | XS0151868444 | LEHMAN BROTHERS HOLDINGS INC | 7 YEAR LOW COUPON BOND | 7/17/2009 | EUR |
| MTN1718 | XS0167792026 | LEHMAN BROTHERS HOLDINGS INC | 6 YEAR ZERO COUPON BOND | 6/23/2009 | EUR |
| MTN1834 | XS0178222179 | LEHMAN BROTHERS HOLDINGS INC | US INFLATION LINKED BOND | 11/13/2009 | USD |
| MTN1840 | XS0179304869 | LEHMAN BROTHERS HOLDINGS INC | 5 YEAR FLOATING RATE NOTE | 11/3/2008 | EUR |
| MTN1887A | XS0181712364 | LEHMAN BROTHERS HOLDINGS INC | FIXED RATE MEDIUM TERM NOTE | 12/16/2011 | JPY |
| MTN1937 | XS0183944643 | LEHMAN BROTHERS HOLDINGS INC | 4.75% NOTE | 1/16/2014 | EUR |
| MTN1961 | XS0185590139 | LEHMAN BROTHERS HOLDINGS INC | 30 YEAR NON-CALL 5 YEAR FIXED RATE NOTE | 2/9/2034 | JPY |
| MTN2058 | XS0189741001 | LEHMAN BROTHERS HOLDINGS INC | 7 YEAR FLOATING RATE NOTES | 4/5/2011 | EUR |

* The security with ISIN DE0007490724 was erroneously included on the Lehman Programs Securities list. Neither Capital Raising Gmbh, the issuer of such security,
nor Lehman Brothers Holdings Inc. are aware of any obligation of Lehman Brothers Holdings Inc. or any of its affiliated debtors in chapter 11 cases with respect to such security.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                            :        **Chapter 11 Case No.**
                                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*     :        **08-13555 (JMP)**
                                                 :
                          **Debtors.**           :        **(Jointly Administered)**
------------------------------------------------------------------x

## ORDER GRANTING DEBTORS' ONE HUNDRED FOURTEENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY LPS CLAIMS)

Upon the One Hundred Fourteenth objection to claims, dated March 14, 2011 (the "One Hundred Fourteenth Omnibus Objection to Claims"),[1] of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"), pursuant to section 502(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim [Docket No. 6664] (the "Procedures Order"), seeking disallowance and expungement of the No Liability LPS Claims on the grounds that they assert claims for which the Debtors have no liability, all as more fully described in the One Hundred Fourteenth Omnibus Objection to Claims; and due and proper notice of the One Hundred Fourteenth Omnibus Objection to Claims having been provided to (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for Region 2; (vi) the claimants listed on Exhibit A attached to the One Hundred Fourteenth Omnibus Objection to Claims; and (vii) all other parties entitled to notice in accordance with the procedures set forth in the second amended

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' One Hundred Fourteenth Omnibus Objection to Claims.

order entered on June 17, 2010 governing case management and administrative procedures for

these cases [Docket No. 9635]; and the Court having found and determined that the relief sought

in the One Hundred Fourteenth Omnibus Objection to Claims is in the best interests of the

Debtors, their estates, creditors, and all parties in interest and that the legal and factual bases set

forth in the One Hundred Fourteenth Omnibus Objection to Claims establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the One Hundred Fourteenth Omnibus

Objection to Claims is granted to the extent provided herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the claims

listed on Exhibit 1 annexed hereto (collectively, the "No Liability LPS Claims") are disallowed

and expunged in their entirety with prejudice; and it is further

ORDERED that this Order supersedes all previous orders regarding the No

Liability LPS Claims listed on Exhibit 1 annexed hereto; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2011
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE