# EXHIBIT 1

B10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT **SOUTHERN** DISTRICT OF **NEW YORK** | PROOF OF CLAIM |
|---|---|

Name of Debtor:
In re Lehman Brothers Derivative Products Inc.

Case Number:
(jointly adm. w/08-13555

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): LINC-Redondo Beach Seniors, Inc.

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
LINC-Redondo Beach Seniors, Inc.
c/o Penelope Parmes, Esq., Rutan & Tucker, LLP
611 Anton Boulevard, Fourteenth Floor, Costa Mesa, CA 92626
Telephone number: (714) 641-5100

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):




Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**    $ *see attached*

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

                    Damages based on
                    termination of rate cap
**2. Basis for Claim:** agreement
(See instruction #2 on reverse side.)

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

**3. Last four digits of any number by which creditor identifies debtor:** _____

   **3a. Debtor may have scheduled account as:** _____
      (See instruction #3a on reverse side.)

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

**4. Secured Claim (See instruction #4 on reverse side.)**
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
**Describe:**

**Value of Property:** $_____  **Annual Interest Rate** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**
if any: $_____  **Basis for perfection:** _____

**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(_____).

**Amount entitled to priority:**

$_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain: See attached

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

FILED / RECEIVED

MAY 29 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

EXHIBIT ___/___, PAGE___6___

American LegalNet, Inc.
www.FormsWorkflow.com

**In re Lehman Brothers Holdings Inc. (08-13555) and other jointly administered debtors including Lehman Brothers Derivative Products Inc. (08-13899)**

**Claimant:  LINC-Redondo Beach Seniors, Inc.**

**Attachment to Proof of Claim**

Claimant and Lehman Brothers Derivative Products Inc. ("Lehman") previously entered into a Rate Cap Agreement, a copy of which is attached hereto as Exhibit A and incorporated herein by this reference.

By letter dated September 19, 2008, Lehman provided notice to Claimant of a Trigger Event and terminated the Rate Cap Agreement.  A copy of the termination letter is attached hereto as Exhibit B and incorporated herein by this reference.

On or about December 11, 2008, Claimant entered into a new rate cap agreement with SMBC Capital Markets, Inc., as agent for SMBC Derivative Products Limited.  A copy of this SMBC rate cap agreement is attached hereto as Exhibit C and incorporated herein by this reference.

As a result of Lehman's early termination of the Exhibit A agreement, Claimant was forced to obtain a new agreement at a higher price of $140,000.  In addition, Claimant incurred $2,500 in costs to obtain the new agreement (see Exhibit D attached hereto and incorporated herein by this reference) and has incurred and will continue to incur legal fees and other costs.

Claimant reserves the right to amend this Proof of Claim to add additional information and costs incurred.

EXHIBIT ___/___, PAGE ___8___

# EXHIBIT A

EXHIBIT ___1___, PAGE ___9___

# LEHMAN BROTHERS

<u>CONFIRMATION</u>

<u>TRANSACTION</u>

LINC-Redondo Beach Seniors, Inc.
415 Diamond Street
Redondo Beach, CA 90277

Global ID: 3661206

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

This Confirmation is subject to and incorporates the terms of the 1992 version of the preprinted multicurrency cross-border form of Master Agreement published by the International Swaps and Derivatives Association, Inc. ("ISDA Form") (the "Agreement"), but without regard to any modifications or elections that the parties may be entitled to make pursuant to a Schedule except as provided in the Additional Provisions paragraph herein. All provisions contained in, or incorporated by reference to, the Agreement shall govern this Confirmation except as expressly modified below. In addition, this Confirmation shall itself evidence a complete and binding agreement between you and us as to the terms and conditions of the Transaction to which this Confirmation relates.

Party A and Party B each represents that entering into the Transaction is authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party and that, upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

The definitions and provisions contained in the 2006 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between the Definitions and the terms of this Confirmation, this Confirmation will govern. For the purpose of the Definitions, references herein to a "Transaction" shall be deemed to be references to a "Swap Transaction".

1.    The terms of the particular Transaction to which this Confirmation relates are as follows:

Party A:                          LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

Party B:                          LINC-REDONDO BEACH SENIORS, INC.


Notional Amount:                  $ 6,670,000

EXHIBIT _A_ PAGE 4

EXHIBIT _1_, PAGE _10_

| | |
|---|---|
| Trade Date: | February 20, 2008 |
| Effective Date: | February 25, 2008 |
| Termination Date: | February 1, 2018 |

FIXED AMOUNTS

| | |
|---|---|
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Date: | February 25, 2008 |
| Fixed Amount: | $70,000 |

FLOATING AMOUNTS

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Monthly, on the last Friday of each calendar month, commencing on March 28, 2008, subject to adjustment according to the Following Business Day convention. |
| Floating Rate Payer Period End Dates: | Monthly, on the last Friday of each calendar month, commencing on March 28, 2008. No Adjustment shall apply to Period End Dates. |
| Floating Rate Option: | USD-SIFMA Municipal Swap Index |
| Floating Rate Reset Dates: | Weekly, every Thursday (or any other day specified by The Securities Industry and Financial Markets Association), or if any Thursday is not a U.S. Government Securities Business Day, the next succeeding U.S. Government Securities Business Day. |
| Cap Rate: | 6.00% |
| Floating Rate Day Count Fraction: | Actual/Actual |
| Method of Averaging: | Weighted Average |
| Compounding: | Inapplicable |
| Calculation Agent: | Party A |
| Business Days: | New York |

2

Deal ID: 3661206    / Effort ID: 1913892

Deal ID: 3661206    / Effort ID: 1913892

EXHIBIT _A_ PAGE _5_
EXHIBIT _1_, PAGE _11_

Account for Payments for Party A:          JPMorgan Chase
                                           ABA # 021000021
                                           A/C of Lehman Brothers Derivative Products Inc.
                                           A/C # 066-902622

Account for Payments for Party B:

                                           Escrow Bank USA
                                           6955 Union Park Center, Suite 300
                                           Midvale, UT 84047
                                           ABA#: 124084737
                                           Account#: 18478043
                                           Beneficiary:
                                           Capmark/Citi Loan Servicing
                                           Reference: SEASONS at Redondo Beach Citi # AHD 00617


2.        **Miscellaneous.**

(a)       *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:


Address for notices or communications to Party A:—

Address:       1271 Avenue of the Americas, New York, NY 10020
               <u>Attention</u>: Municipal Financial Products - Capital Markets Contracts Legal
               Facsimile No.: 646-885-9558
               Telephone No.: 646-333-8479

Address for notices or communications to Party B:—

               LINC - Redondo Beach Seniors, Inc.
               110 Pine Avenue, Suite 500
               Long Beach, CA 90802
               Attention: President
               Telephone: (562) 684-1100
               Facsimile: (562) 684-1137

with a copy to:

               U.S. Bank National Association ("Lender")
               633 West Fifth Street, 24th Floor
               LM-CA-T24T
               Los Angeles, California 90071
               Attention:  Corporate Trust
               Reference:  RDA City of Redondo Beach (Season at Redondo Beach)
               Fax: (213) 615-6197

and to:

3

EXHIBIT  _A_  PAGE _6_

EXHIBIT  _1_, PAGE _12_

Citicorp Municipal Mortgage Inc.
390 Greenwich Street, 2nd Floor
New York, New York 10013
Attn: Manager, Short-Term Finance Group
Fax: (212) 723-8939

and to:

Citicorp Funding, Inc.
c/o Capmark Financial Inc.
116 Welsh Road
Horsham, Pennsylvania 19044
Attn: Servicing Account Manager
Fax: (215) 328-3478

**Other Provisions.** The Master Agreement incorporated by this Confirmation shall be modified by the inclusion of a Schedule incorporating the following provisions:

**Part 1. Termination Provisions**

In this Agreement:-

(a)    **"Specified Entity"** means in relation to Party A for the purpose of:-

Section 5(a)(v), Not applicable.

Section 5(a)(vi),    Not applicable.

Section 5(a)(vii),    Not applicable.

Section 5(b)(iv),    Not applicable.

and in relation to Party B for the purpose of:-

Section 5(a)(v), Not applicable.

Section 5(a)(vi),    Not applicable.

Section 5(a)(vii),    Not applicable.

Section 5(b)(iv),    Not applicable.

(b)    **"Specified Transaction"** will have the meaning specified in Section 14 of the ISDA Form.

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will not apply to Party A and will not apply to Party B.

(d)    **Additional Termination Event** will apply.  The occurrence of a Trigger Event shall constitute an Additional Termination Event:-

(i)    **Trigger Events.** Each of the following events shall constitute a Trigger Event:

4

(1)    **Downgrade**.  Party A ceases to maintain a Single A Quality financial program, counterparty or similar rating from both of the Relevant Rating Agencies;

(2)    **Failure To Deliver Collateral**.  The occurrence of an Event of Default under the ISDA Master Agreement dated July 16, 1998 between Party A and LBSF (the "Offsetting Transaction Master Agreement") as a result of LBSF's failure to deliver, or procure delivery of, collateral to Party A in the amounts and within the time required (subject to any applicable cure period) thereunder and under the terms of any applicable Credit Support Document, as such may be amended from time to time without the consent of, or notice to, Party B, provided such amendments are consistent with the requirements of Party A's financial program as represented to the relevant rating agencies.

(3)    **Bankruptcy**.  Lehman Brothers Holdings Inc. ("Holdings"), or LBSF: (A) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (C) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (E) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) through (G) inclusive; or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; and

(4)    **Capital Requirement**.  Party A shall fail to maintain capital in the amount consistent with its financial program as represented to the relevant rating agencies.

(e)    **Event of Default or Other Termination Event After Trigger Event**.  If a Trigger Event shall have occurred and an event or circumstance which would otherwise constitute or give rise to (1) an Event of Default with Party A as the Defaulting Party (other than an Event of Default pursuant to Sections 5(a)(vii) or 5(a)(ix)); or (2) a Termination Event other than a Trigger Event;, such Trigger Event will prevail and such other event or circumstance will not constitute an Event of Default, a Termination Event.

5

EXHIBIT  A  PAGE  8

EXHIBIT  1  PAGE  14

(c)    **Effect of Trigger Event.** Notwithstanding anything to the contrary contained in this Agreement, if a Trigger Event occurs the following provisions shall apply:

(1)    **Notice.** Party A shall, within one Business Day of becoming aware of such occurrence, notify Party B by facsimile transmission or electronic messaging system (the date such notice is transmitted, the "**Notice Date**"), specifying the nature of the Trigger Event and designating the Early Termination Date in respect of all Transactions. The Early Termination Date so designated shall be no later than the fifth Universal Business Day following such Notice Date. The Early Termination Date so designated shall be subject to change as specified in paragraph (f)(4)(a) below and, in the case of affected Transactions only, as specified in paragraph (f)(4)(b) below.

(2)    **Market Quotation.** For the purposes of determining the Settlement Amount pursuant to Section 6(e)(ii)(3), the "**Market Quotation**" of a Terminated Transaction (which may be positive or negative) shall be the amount determined by Party A, using Market Rates and Volatilities and by polling the Dealer Group as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date. Party A shall perform such determinations in good faith in accordance with its usual operating procedures and pursuant to industry standards. For purposes of this definition, if the Market Quotation of a Terminated Transaction represents an amount payable to Party A, it shall be expressed as a negative number, and if the Market Quotation represents an amount payable to Party B, it shall be expressed as a positive number. For purposes of determining the Settlement Amount, Unpaid Amounts (which shall be determined by Party A) in respect of the Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after the Early Termination Date is to be included. Party A shall notify Party B of the Market Quotation of each Terminated Transaction, the Settlement Amount and the Termination Currency Equivalent of any Unpaid Amounts within two Business Days following the Early Termination Date.

(3)    **Payment Date.** The amount calculated as being due as a result of a Termination Event that arises as a result of a Trigger Event pursuant to Section 6(e)(ii)(3) will be payable, in the case of an amount due and owing to Party A, within five Universal Business Days following the Early Termination Date, and in the case of an amount due and owing to Party B, within ten Universal Business Days following the Early Termination Date. Party A and Party B agree that the party that is required to pay such amount shall be required to pay interest on such amount for the period from (and including) the Early Termination Date to (but excluding) the date payment is required to be made, at the Agreed Interest Rate. If either party fails to pay such amount on the due date, such failure shall constitute a breach of this Agreement, but shall not constitute an Event of Default (including an Event of Default pursuant to Section 5(a)(i) or 5(a)(ii)) for purposes of this Agreement. In the event of any such failure by either party, such party shall be required to pay interest on such overdue amount for the period from (and including) such due date to (but excluding) the date of actual payment, at the default rate, which is the Agreed Interest Rate plus 3% per annum. Interest payable under this paragraph will be calculated on the basis of daily compounding and the actual number of days elapsed divided by 360.

6

EXHIBIT A PAGE 9
EXHIBIT 1 PAGE 15

(4)  **Effect of Market Disruption Event.**  (a)  In the event that a Market Disruption Event exists on any Early Termination Date, such date shall not be an Early Termination Date for any outstanding Transaction.  In such event Party A shall notify Party B and the earlier to occur of (i) the next succeeding Universal Business Day on which a Market Disruption Event does not exist and (ii) the eighth Universal Business Day following the day on which notice of the occurrence of a Trigger Event was given shall be considered the Early Termination Date for all outstanding Transactions and a Settlement Amount shall be obtained for that Early Termination Date in accordance with the terms set forth in this paragraph (f).  As used herein, "**Market Disruption Event**" means any of the following events, the existence of which shall be determined by Party A:  (i) any suspension or material limitation of trading (excluding daily settlement limits in the normal course of trading) on the New York Stock Exchange, London Stock Exchange or other recognized stock exchange the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (ii) the declaration of a banking moratorium by the Bank of England, United States federal authorities, New York State or other recognized international, national or regional banking authority authorities to the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (iii) the occurrence of any outbreak or escalation of hostilities or a declaration by the United States of a national emergency or war the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, or (iv) the occurrence of any other calamity or crisis or any other event the effect of which, in the view of Party A and a majority of eleven randomly selected unaffiliated Qualified Counterparties of Party A (who are not Affiliates of Party A) whose Settlement Amounts otherwise would have been determined on such Early Termination Date, makes it impracticable or inadvisable to proceed with the determination of such Settlement Amounts on such Early Termination Date.

(b)  If on an Early Termination Date as to which there is no Market Disruption Event, there are conditions in a local market that, in the judgment of Party A, materially would impede its ability to determine the Market Quotation for certain Transactions in that market (a "**Local Market Disruption Event**"), Party A shall notify Party B of those conditions no later than one hour prior to the scheduled time for determining the Market Quotation for such affected Transactions on that date.  Upon receipt of such notice, Party B shall have the right to delay the Early Termination Date for the affected Transactions (without affecting the Early Termination Date for any other Transactions under this Agreement) by notifying Party A in writing within one hour of its election to exercise that right.  In such event, the Early Termination Date for each such affected Transaction shall be the next day on which Party A and Party B agree that the Local Market Disruption Event ceases to exist, but in any case not later than the due date for Settlement Amount payments owed to Party A with respect to unaffected Transactions as provided in paragraph (f)(3).  Market Quotations so obtained for any affected Transaction shall be included in the calculation of the Settlement Amount to be paid as provided in paragraph (f)(3).  No delay in the Early Termination Date for any affected Transaction as provided above shall affect the days on which payments would otherwise be required to be made pursuant to paragraph (f)(3) had no such delay occurred, it being understood, however, that interest shall begin to accrue pursuant to

7

Deal ID: 3661206   / Effort ID: 1913802

such paragraph with respect to any such affected Transaction only from (and including) the delayed Early Termination Date.

(5)   **Payments on Early Termination**.  This Agreement shall be amended by adding the following new subsection (3) to Section 6(e)(ii):

"(3) **Trigger Event**.  If an Early Termination Date results from a Trigger Event, Party A shall determine the Settlement Amount of all Terminated Transactions on such date, and the amount payable will be equal to (A) the Settlement Amount in respect of the Terminated Transactions plus (B) the Termination Currency Equivalent of Unpaid Amounts owing to Party B minus (C) the Termination Currency Equivalent of Unpaid Amounts owing to Party A.  If that amount is a positive number, Party A will pay it to Party B; if it is a negative number, Party B will pay the absolute value of that amount to Party A.  For purposes of determining the Settlement Amount under this subsection, clause (b) of the definition of Settlement Amount shall not apply."

(f)   **Additional Definitions**.

As used in this Schedule, the following terms shall have the following meanings:

"**Agreed Interest Rate**" for any day means the overnight ask rate in effect for such day, as set forth opposite the caption "ON" under the heading "Euro-Dollar" on Telerate Page 4756 (or any successor page thereto), as of 11:00 a.m., New York time, on such day.

"**Business Day**" means any day other than a Saturday or Sunday on which banks in New York are not required or authorized by law to be closed.

"**Dealer Group**" means the following entities and such other entities as may be selected by Party A from time to time:  JPMorgan Chase Bank, Citibank, N.A., Barclays Bank PLC, Merrill Lynch Capital Services, Inc., Deutsche Bank AG, BNP Paribas, Goldman Sachs Capital Markets L.P., Credit Suisse First Boson International, SMBC Capital Markets Inc., Bank of Tokyo-Mitsubishi Limited.

Notwithstanding the definition of Dealer Group, (i) for U.S. dollar and Canadian dollar information, the dealers that may be polled shall be JPMorgan Chase Bank, Citibank, N.A., Merrill Lynch Capital Services, Inc. and Goldman Sachs Capital Markets L.P. and (ii) for European currency information, the dealers that may be polled shall be those listed in clause (i) of this paragraph and, in addition, Barclays Bank PLC, Deutsche Bank AG and BNP Paribas.

"**LBSF**" means Lehman Brothers Special Financing Inc.

"**Market Rates and Volatilities**" means, in the case of interest rates and volatilities, the interest rates and volatilities obtained from the Telerate and Reuters screens where practicable and from polling the Dealer Group and, in the case of foreign exchange rates and volatilities and other pricing parameters, the foreign exchange rates and volatilities or pricing parameters obtained from polling the Dealer Group.  In each case, for all rates, volatilities or other parameters obtained, at least five members of the Dealer Group shall be polled, the highest and lowest of such returns (including, in the case of interest rates and volatilities, the rates and volatilities obtained from the Telerate and Reuters screens, if any) shall be discarded and the simple mathematical average of the remaining values shall be used to perform the applicable determination.

EXHIBIT  A   PAGE  11
EXHIBIT  1  PAGE  11

Deal ID: 3661206    / Effort ID: 1913892

"**Moody's**" means Moody's Investors Service, Inc.

"**Person**" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"**Relevant Rating Agencies**" means, S&P and Moody's, or such of them as then assigns a financial program, counterparty or similar rating to Party A at Party A's request, or any other nationally recognized rating agency then rating Party A at Party A's request (each, individually, a Relevant Rating Agency).

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

"**Single A Quality**" means, in the case of S&P, A, in the case of Moody's, A, and, in the case of any other Relevant Rating Agency, a designation of similar quality.

"**Universal Business Day**" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Frankfurt, London, New York, Tokyo and the city in which Party B's head or home office is located.

## Part 3. Agreement to Deliver Documents.

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:-

(a)     Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A | Tax Forms | Promptly upon the earlier of (i) reasonable demand by Party B or (ii) learning that the form or document is required. |
| Party B | Tax Forms | Promptly upon the earlier of (i) reasonable demand by Party A or (ii) learning that the form or document is required. |

(b)     Other documents to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | Evidence reasonably satisfactory to Party B | (i) Upon execution of this Agreement, (ii) if | Yes |

9

EXHIBIT _A_  PAGE _12_
EXHIBIT _1_, PAGE _18_

| | | | |
|---|---|---|---|
| | of (i) the authority of Party A to enter into this Agreement and the relevant Confirmation of a Transaction and (ii) the authority and genuine signature of the signatory of Party A who executes the same. | requested by Party B, as soon as practicable after execution of any Confirmation of any other Transaction, and (iii) with respect to each Transaction not covered by evidence previously furnished hereunder, within five Local Business Days of the applicable Trade Date. | |
| Party B | Annual Report of Party B and Party B's Credit Support Provider, if any, containing audited consolidated financial statements for each fiscal year certified by independent certified public accountants for each such fiscal year. | As soon as available and in any event within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |

(c)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

**Part 5. Other Provisions.**

Miscellaneous:

(a)    **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(b)    **Waiver of Right to Trial by Jury.** Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this section.

10



EXHIBIT  A  PAGE  13
EXHIBIT  L  PAGE  19

(c) **Right To Assign.** Party A shall have the right to assign this Transaction to any counterparty with a rating of, at least, AA, as determined by Standard and Poor's Rating Services or, Aa2 as determined by Moody's Investors Services, Inc. with regard to its long term unsecured, unsubordinated debt securities. Such assignment may occur at any time after the Effective Date herein upon notice of such assignment by Party A to Party B.

(d) **Additional Representations.** For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (c) thereof:

> (d) **No Reliance.** Party A and Party B each represents that entering into the Transaction is within its capacity, is duly authorized and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party. Party A and Party B each represents that (a) it is not relying on the other party in connection with its decision to enter into this Transaction, and neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction regardless of whether the other party provides it with market information or its views; (b) it understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives. Party A and Party B each represents that upon due execution and delivery of this Confirmation, it will constitute a legally valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable principles of bankruptcy and creditors' rights generally and to equitable principles of general application.

> (h) **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

> (i) **Eligible Contract Participant.** It is an "eligible contract participant" as defined in the Commodity Futures Modernization Act of 2000.

> (j) **Financial Institution.** It is a "financial institution" as defined in the FDIC Improvement Act of 1991 and Regulation EE promulgated by the Federal Reserve Board thereunder."

(h) **Setoff.** Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments and deliveries under this Agreement shall be made without setoff or counterclaim and will not be subject to any conditions except as provided in Section 2(c) of this Agreement, provided however, that:

Following the occurrence of a Termination Event or Event of Default, each party will have the right to set off, counterclaim or withhold payment or delivery in respect of any payment due by the other party under this Agreement or any other transaction between the parties to this Agreement (including any guarantee issued by one party to the other party), whether matured or unmatured, regardless in each case of the office or branch through which a party is acting, and the relevant party's obligations hereunder shall be deemed to be satisfied and discharged to the extent of such setoff, counterclaim or withholding.

11

EXHIBIT A PAGE 14

EXHIBIT 1 PAGE 20

Upon the exercise by one party of any such right of setoff, counterclaim or withholding of payment or delivery, notice of such exercise shall be provided promptly to the other party (and in any event, not later than one Local Business Day prior to the date such payment is due).

(i)    **Transfer.** Section 7 of the Agreement is hereby modified by inserting the following after the word "party" but before the comma in the third line thereof:

", provided, however, that such consent shall not be unreasonably withheld"

(j)    **Tax Forms** means any form or document that may be required or reasonably requested in order to allow the other party to make a payment under the Transaction without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CONFIRMATION OR THE ISDA MASTER AGREEMENT, PARTY A SHALL BE UNDER NO OBLIGATION TO MAKE ANY SCHEDULED PAYMENT WITH RESPECT TO THIS TRANSACTION UNTIL PARTY B HAS EXECUTED AND DELIVERED THIS CONFIRMATION TO PARTY A.

EXHIBIT A PAGE 15
EXHIBIT 1 PAGE 21

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

By: _____

Name:   T. Courtney Jenkins
Title:    Vice President

Confirmed as of the
date first above written

LINC-REDONDO BEACH SENIORS, INC.

By: _____
Name:
Title:

13

EXHIBIT  A  PAGE /6
EXHIBIT ___ L PAGE 22

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us.

Yours sincerely,

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

By:_____
Name: T. Courtney Jenkins
Title: Vice President

Confirmed as of the
date first above written

LINC-REDONDO BEACH SENIORS, INC.

By:_____
Name:
Title:

13

EXHIBIT _A_ PAGE _17_
EXHIBIT _1_ PAGE _23_

# EXHIBIT B

EXHIBIT ___/___, PAGE ___24/___

# LEHMAN BROTHERS

### NOTICE OF TRIGGER EVENT

September 19, 2008

LINC-Redondo Beach
Fax: (562) 684-1137

Re:    <u>Trigger Event</u>

Ladies and Gentlemen:

Reference is made to the trade confirmation(s) ("Confirmations") relating to the one or more interest rate caps by and between LINC-Redondo Beach and Lehman Brothers Derivative Products Inc. ("LBDP"). Terms defined in the Confirmations shall have the same meaning when used herein, except as otherwise provided.

You are hereby notified that pursuant to LBDP's Operating Guidelines, a Trigger Event (as defined in such Operating Guidelines) has occurred as a result of Lehman Brothers Holdings Inc.'s filing of a petition under Chapter 11 of the U.S. Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York. Accordingly, September 23, 2008 has been designated as an Early Termination Date in respect of all Transactions.

Nothing in this letter shall be construed as a waiver of any rights we may have with respect to the Confirmation(s).

If you have any specific questions, please contact our Client Relationship Manager, Jayana Desai at (212) 320-6620.

Very truly yours,

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

By:  Lorna Brown
     ~~Authorized Signatory~~
Name: Lehman Brothers Derivatives Products
Title:

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019

EXHIBIT  B , PAGE 18
~~EXHIBIT  I , PAGE 25~~

# EXHIBIT C

EXHIBIT ___/___, PAGE ___24

# SMBC DERIVATIVE PRODUCTS LIMITED



Sumitomo Mitsui Banking Corporation Group

## CONFIRMATION

Date:        December 11, 2008

To:          LINC – Redondo Beach Seniors, Inc.
             110 Pine Avenue, Suite 500
             Long Beach, CA  90802
             Attention: Karen Maeshima
             Telephone:   (562) 684-1107
             Telefax: (562) 684-1137

From:        SMBC Capital Markets, Inc. as Agent for SMBC Derivative Products Limited
             Derivative Products Group
             277 Park Avenue, Fifth Floor
             New York, New York 10172

cc:          Documentation Contact:  Danny Boodram
             Tel: 212.224.5066
             Fax: 212.224.4959
             Email: confirms@smbc-cm.com

Re:          USD Rate Protection Transaction, dated as of December 11, 2008 between SMBC Derivative Products
             Limited ("Party A") and LINC – Redondo Beach Seniors, Inc. ("Party B").

             Our Reference Number: DPA807697

        The purpose of this letter agreement is to confirm the terms and conditions of the Interest Rate Cap Agreement entered into between Party A and Party B on the Trade Date specified below (the "Rate Protection Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the ISDA Form specified below. This document supersedes all previous confirmations and amendments with respect to the above referenced transaction.

        The parties agree that the Transaction to which this Confirmation relates shall be governed by an ISDA Master Agreement, in the pre-printed form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) published by ISDA (the 'ISDA Form'), and that such ISDA Form, as amended, supplemented or modified by this Confirmation, is incorporated by reference herein and deemed to have been entered into by the parties on or prior to the Trade Date for the purpose of governing only the Transaction evidenced by this Confirmation. Copies of the ISDA Form are available upon request.

        This Confirmation incorporates by reference the definitions and provisions contained in the 2006 ISDA Definitions (the "Definitions") as published by the International Swaps and Derivatives Association, Inc. ("ISDA"),  Such definitions and provisions are incorporated by reference herein.  In the event of any inconsistency between this Confirmation and the Definitions or the ISDA Form, this Confirmation will govern.

**1. Notice to Counterparty**.

Party A is solely responsible for its contractual obligations and commitments; none of Sumitomo Mitsui Banking Corporation, SMBC Capital Markets, Inc., SMBC Capital Markets Limited, nor any other affiliate of Party A shall be responsible for the contractual obligations or commitments of Party A.

Party A is not a bank and is separate from any affiliated bank, and the obligations of Party A are not deposits, are not insured by the United States of America or any agency thereof, are not guaranteed by an affiliated bank, and are not otherwise an obligation of an affiliated bank.

Party A is regulated by Financial Services Authority.  The time of execution of the transaction is available upon request.

## 2. Terms of Rate Protection Transaction.

| | |
|---|---|
| Party A: | SMBC Derivative Products Limited |
| Party B: | LINC – Redondo Beach Seniors, Inc. |
| Trade Date: | December 11, 2008 |
| Effective Date: | December 19, 2008 |
| Termination Date: | December 1, 2013 |
| Notional Amount: | USD 6,205,000.00 which amount shall change in accordance with Annex A attached hereto |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | Party A |
| Initial Floating Rate Calculation Period: | The initial Floating Rate Calculation Period will be from and including the Effective Date to but excluding January 1, 2009, with No Adjustment for Period End Dates. |
| Floating Rate Calculation Periods: | The Floating Rate Calculation Periods will be the initial Floating Rate Calculation Period and thereafter from and including the first (1st) day of each month to but excluding the first (1st) day of the following month and continuing up to but excluding the Termination Date, with No Adjustment for Period End Dates. |
| Floating Rate Payer Payment Dates: | The first (1st) day of each month beginning with January 1, 2009, continuing up to and including December 1, 2013, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate for the initial calculation Period: | To be determined |
| Floating Rate Option: | USD-SIFMA Municipal Swap Index |
| Reset Dates: | Weekly |

EXHIBIT _C_, PAGE _20_

| | |
|---|---|
| Method of Averaging: | Weighted |
| Spread: | Inapplicable |
| Floating Rate Day Count Fraction: | Actual/Actual |
| Compounding: | Inapplicable |
| Cap Rate: | 6.00000% (per cent) per annum |
| **Fixed Amounts:** | |
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Date: | December 19, 2008 |
| Fixed Amount: | USD 63,990.00 |
| Business Days for Payments by both parties: | New York |
| Calculation Agent: | SMBC Capital Markets, Inc. ("SMBC-CM"), acting as Agent for Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction. |

**3.   Additional Provisions.**

(a) "Specified Entity" will not apply to Party A and will not apply to Party B.

(b) Specified Transaction will have the meaning specified in Section 14 of the ISDA Form.

(c) The "Cross Default" provisions of Section 5(a)(vi) of the ISDA Form will not apply to Party A or Party B.

(d) The "Credit Event Upon Merger" provisions of Section 5(b)(iv) of the ISDA Form will not apply to Party A or Party B.

(e) The "Automatic Early Termination" provision of Section 6(a) of the ISDA Form will not apply to Party A or Party B.

(f) Payments on Early Termination.  For the purpose of Section 6(e) of the ISDA Form:

   (i)       Market Quotation will apply; provided, however, if Market Quotation cannot be determined, then Loss will apply.

   (ii)      The Second Method will apply.

(g) "Termination Currency" means U.S. Dollars.

(h) "Additional Termination Event" will not apply to Party A and will not apply to Party B.

(i)   Tax Representations:

EXHIBIT _C_, PAGE 21

DPA807697

(a)  Payer Representation.  For the purposes of Section 3(e) of the ISDA Form, Party A and Party B each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of the ISDA Form) to be made by it to the other party under this Confirmation. In making this representation, it may rely on: (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of the ISDA Form; (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of the ISDA Form and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of the ISDA Form; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of the ISDA Form.

(b)  Payee Representation.

(i)  For the purposes of Section 3(f) of the ISDA Form, Party A and Party B each make the following representations:

(1)  The following representation will apply to Party A:

It is entering into the Transaction in the ordinary course of its trade as, and is, either (I) a recognized U.K. bank or (II) a recognized U.K. swaps dealer (in either case (I) or (II), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and it will bring into account payments made and received in respect of the Transaction in computing its income for United Kingdom tax purposes.

(2)  The following representation will apply to Party B:

Party B is a California nonprofit public benefit corporation with principal place of business in the State of California and its Taxpayer ID Number is 33-0677510.

(ii)  Other Payee Representations: None.

(j)  Agreement to Deliver Documents.

For the purposes of Section 4(a)(i) and (ii) of the ISDA Form, each party agrees to deliver the following documents, as applicable:

(a)  Tax forms, documents or certificates to be delivered are: as needed.

(b)  Other documents to be delivered are:

EXHIBIT  C , PAGE 22

| Party Required to Deliver Document | Form / Document / Certificate | Date By Which To Be Delivered | Covered by 3(d) |
|---|---|---|---|
| Party A & Party B | Certificate of signing authority and specimen signatures of each individual executing this Confirmation | Upon execution of and delivery of this Confirmation | Yes |
| Party A | Certified copies of all corporate resolutions authorizing the execution of this Confirmation | Upon execution of and delivery of this Confirmation | Yes |
| Party A | An opinion of counsel concerning this Confirmation | Upon execution and delivery of this Confirmation | No |

(k)   Addresses for Notices.

For the purpose of Section 12(a) of the ISDA Form:

Address for notices or communications to Party A:

**SMBC Derivative Products Limited**
99 Queen Victoria Street
London EC4V 4EH

Attention: Swaps Administration
Tel:  44.207.786.1400
Fax:  44.207.786.1419

with a copy to:

**SMBC Capital Markets, Inc.**
c/o Derivative Products Group
277 Park Avenue, Fifth Floor
New York, New York 10172

Attention: President
Tel:  212.224.5065
Fax:  212.224.4959, 212.224.5111 (for payment and reset notices)

For the purposes of Section 5 and Section 6 of the ISDA Form:

**SMBC Capital Markets, Inc.**
277 Park Avenue, Fifth Floor
New York, New York 10172

Attention: President
Tel:  212.224.5021

EXHIBIT _C_, PAGE _23_

DPA807697

---

     Fax:  212.224.4948, 212.224.5111 (for payment and reset notices)

     Address for notices or communications to Party B:

For all purposes:

To:       **LINC – Redondo Beach Seniors, Inc.**
        110 Pine Avenue, Suite 500
        Long Beach, CA  90802
        Attention: Karen Maeshima
        Telephone:   (562) 684-1107
        Telefax: (562) 684-1137

Cc:       U. S. Bank National Association
        633 West Fifth Street, 24th Floor
        LM-CA-T24T
        Los Angeles, California 90071
        Attention:  Corporate Trust
        Reference: RDA City of Redondo Beach (Season at Redondo Beach)
        Fax: 213.615.6197

Cc:       Citicorp Municipal Mortgage Inc.
        390 Greenwich Street, 2nd Floor
        New York, NY 10013
        Attention:  Manager, Short-Term Finance Group
        Fax: 212.723.8939

Cc:       Citicorp Funding, Inc.
        c/o Capmark Financial Inc.
        116 Welsh Road
        Horsham, Pennsylvania 19044
        Attention:  Servicing Account Manager
        Fax: 215.38.3478

(l)  Process Agent.   For the purpose of Section 13(c) of the ISDA Form:

     Party A appoints as its Process Agent:

        **SMBC Capital Markets, Inc.**
        277 Park Avenue, Fifth Floor
        New York, New York 10172

        Attention: President
        Fax:  212.224.4948, 212.224.5111 (for payment and reset notices)
        Tel: 212.224.5020

     Party B appoints as its Process Agent:

EXHIBIT _C_, PAGE __24__

Not applicable

(m) Offices. The provisions of Section 10(a) of the ISDA Form will not apply to this Confirmation.

(n) Multibranch Party. For the purpose of Section 10(c) of the ISDA Form:

      Party A is not a Multibranch Party.

      Party B is not a Multibranch Party.

(o) Credit Support Document. Details of any Credit Support Document:

    With respect to Party A, Credit Support Document means: none.

    With respect to Party B, Credit Support Document means: none.

(p) Credit Support Provider.

    With respect to Party A, Credit Support Provider means: none.

    With respect to Party B, Credit Support Provider means: none.

(q) **Governing Law**. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(r) Netting of Payments. Subparagraph (ii) of Section 2(c) of the ISDA Form will apply to this Transaction in each case starting from the date of this Confirmation.

(s) "Affiliate" will have the meaning specified in Section 14 of the ISDA Form, provided that Party A shall have, or be deemed to have, no Affiliates for the purposes of this Confirmation.

(t) Waiver of Jury Trial. Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action, or proceeding relating to this Confirmation or any Credit Support Document. Each party (1) certifies that no representative, agent, or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (2) acknowledges that it and the other party have been induced to enter into this Confirmation and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this Section.

(u) The parenthetical clause in Section 4(a)(iii) of the ISDA Form will not apply to either Party A or Party B.

(v) For the purpose of Section 6(e), Set-off will not apply. Additionally, in consideration of the execution and delivery hereof by Party A, Party B waives, as it may apply to Party A only, any applicable right to Set-off or similar right to withhold payment set forth in the Interest Rate Currency Exchange Agreement or similar master agreement between Party B and SMBC Capital Markets, Inc.

(w) Notification of Recording of Telephone Conversations. Each party hereby notifies the other that telephone conversations between the parties will be recorded, and each party consents to such recording and to such recording being produced in evidence in court proceedings.

EXHIBIT _C_, PAGE _25_

(x) Fully-paid Transactions.

    (i) The condition precedent in Section 2(a)(iii)(1) of the ISDA Form does not apply to a payment and delivery owing by a party if the other party shall have satisfied in full all its payment or delivery obligations under Section 2(a)(i) of the ISDA Form and shall at the relevant time have no further payment or delivery obligations, whether absolute or contingent under Section 2(a)(i) of the ISDA Form.

    (ii) Notwithstanding the terms of Section 5 and 6 of the ISDA Form if at any time and so long as one of the parties to this Confirmation ("X") shall have satisfied in full all its payment and delivery obligations under Section 2(a)(i) of the ISDA Form and shall at the time have no future payment or delivery obligations, whether absolute or contingent under such Section, then unless the other party ("Y") is required pursuant to appropriate proceedings to return to X or otherwise returns to X upon demand of X any portion of any such payment or delivery, (a) the occurrence of an event described in Section 5(a) of the ISDA Form with respect to X any Credit Support Provider of X or any Specified Entity of X shall not constitute an Event of Default or a Potential Event of Default with respect to X as the Defaulting Party and (b) Y shall be entitled to designate an Early Termination Date pursuant to Section 6 of the ISDA Form only as a result of the occurrence of a Termination Event set forth in Section (5)(b)(i) of the ISDA Form with respect to Y as the Affected Party.

    (iii) This agreement (including, without limitation, the ISDA Form incorporated herein for the purpose of governing only the Transaction evidenced by this Confirmation) shall govern only the Transaction evidenced by this Confirmation.

(y) Additional Representations.  Section 3(a) of the ISDA Form is hereby amended by the deletion of "and" at the end of sub-clause (iv), the insertion of a semicolon in place at the end of sub-clause (v) thereof and the addition of the following new subclauses:

    (vi)    *Agency*. It is entering into this Confirmation and the Transaction as principal and not as agent of any person;

    (vii)    *Non-Reliance*. It is acting for its own account, and has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction;

    (viii)    *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction;

    (ix)    *Status of Parties*. The other party is not acting as a fiduciary for or an advisor to it in respect of the Transaction; and

    (x)    *Eligible Contract Participant*. It is an "eligible contract participant" as defined in the U.S. Commodity Exchange Act.

(bb) Collateral Assignment. Party A consents to a collateral assignment of this Confirmation and the transaction evidenced thereby (if requested) and agrees to execute separate consents as may be reasonably requested by the parties to such agreements.

EXHIBIT C , PAGE 26

(cc) Assignment. Upon prepayment, in whole or in part, of the underlying financing, Party B can assign its position in the transaction (in whole or in part) to any other third party with Party A's consent, which will not unreasonably be withheld or delayed.

4.    **Payment Instructions.**

Payments to Party A of USD amounts:

| | |
|---|---|
| Depository: | JPMorgan Chase Bank, N.A. New York Branch |
| ABA Routing No.: | 021000021 |
| Account No.: | 400035413 |
| In Favor Of: | SMBC Derivative Products Limited |

Please contact Larry Weissblum of our Operations Group if you have any questions concerning SMBC Derivative Products Limited's payment instructions referenced above (Telephone: 212-224-5061; Telefax: 212-224-5111).

Payments to Party B of USD amounts:

| | |
|---|---|
| Depository: | Escrow Bank USA |
| | 6955 Union Park Center, Suite 300 |
| | Midvale, UT 84047 |
| ABA #: | 124084737 |
| Account #: | 18478043 |
| Beneficiary: | Capmark/Citi Loan Servicing |
| Reference: | SEASONS at Redondo Beach Citi # AHD 00617 |

5.    **Counterparts.** This Confirmation may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one and the same agreement and may be executed by facsimile.

EXHIBIT _C_, PAGE _27_

Please confirm that the foregoing correctly sets forth the terms of the agreement between you and us by executing this Confirmation and returning it to the documentation contact above.

Yours Sincerely,

**Party A:**

**By: SMBC Derivative Products Limited**

By:  SMBC Capital Markets, Inc.
Its:  Agent

By: _____
     Name:  Irma Bababekov
     Title:  Officer

By: _____
     Name:  Danny Boodram
     Title:  Vice President

**Party B:**

**By:** LINC – Redondo Beach Seniors, Inc.

     By: _____
     Name:
     Title:

EXHIBIT 1 PAGE 26

EXHIBIT ___C___, PAGE 28

DPA807697

### ANNEX A - NOTIONAL AMOUNTS

Floating Notional: ( PARTY A )

USD 6,205,000.00 which shall change to the following amounts on the following dates:
USD 5,964,866.00 on December 1, 2009;
USD 5,709,813.00 on December 1, 2010;
USD 5,438,820.00 on December 1, 2011;
USD 5,150,969.00 on December 1, 2012;
USD -0- on December 1, 2013;
No Adjustment for Period End Dates

EXHIBIT _C_, PAGE _29_

# EXHIBIT D

EXHIBIT __1__, PAGE 38



December 19, 2008


Kent Davis
Senior Vice President / COO
LINC Housing
110 Pine Avenue, Suite 500
Long Beach, CA 90802


RE:  SMBC Derivative Products Limited Interest Rate Cap
       LINC – Redondo Beach Seniors, Inc.
       2008 Multifamily Housing Revenue Bonds


Dear Kent:

This invoice is being submitted to LINC Housing for services rendered in connection with the
execution of the interest rate cap on December 19, 2008 with SMBC Derivative Products
Limited, in connection with the above captioned project.

Our total fee is **$2,500** and may be either paid by check or wired to the following account:

Account #:        0370 054681
Routing #:        122000496
Bank:             Union Bank of California


Regards,


Jason P. Richter
*Associate Director*
**Gardner, Underwood & Bacon LLC**

EXHIBIT  D , PAGE  30

EXHIBIT 1 PAGE 30



# INTEREST RATE CAP

## COMPETITIVE BID SUMMARY

**Issue:**             City of Redondo Beach
                       Multifamily Housing Revenue Bonds
                       (SEASONS at Redondo Beach), 2008 Series A

**PURPOSE:**           LINC – Redondo Beach Seniors, Inc. Interest Rate Cap

**BID TIME / DATE:**   December 11, 2008 at 3:00 p.m. (Eastern Time)

**SETTLEMENT:**        December 19, 2008

Gardner, Underwood & Bacon LLC, on behalf of LINC Housing, the City of Redondo Beach and the Redondo Beach Unified School District solicited bids for the purchase of an interest rate cap in connection with the Redevelopment Agency of the City of Redondo Beach's Multifamily Housing Revenue Bonds (SEASONS at Redondo Beach), 2008 Series A, according to the terms set forth within the Request for Bids. The table below contain lists of the firms that were solicited to place bids for the delivery of the interest rate cap and the responses that those firms submitted on December 11, 2008. Additionally, please find attached to this memo scanned copies of the actual bids that were submitted by the responding firms.

| **Bidder** | **Cost of 5 Year Interest Rate Cap** | **Cost of 9.2 Year Interest Rate Cap** |
|---|---|---|
| SMBC Derivative Products<br>Aaron Stelzer<br>(212) 224-5106 | **$63,990** | **$250,000** |
| The Bank of New York Mellon<br>Casey Kutner<br>(212) 804-2137 | $78,000 | $140,000 |
| Bank of America<br>(415) 622-9430 | Pass | Pass |
| Wells Fargo<br>(415) 222-1213 | Pass | Pass |

Gardner, Underwood & Bacon LLC

Bid Results - 1