Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10                  Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                  U.S. Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  October 7, 2010

19                  9:06 AM

20

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    CONTINUED EVIDENTIARY HEARING re 60(b) Motions

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Transcribed By:   Ellen Kolman

24

25

Page 3

1

2  A P P E A R A N C E S :

3  BOIES, SCHILLER & FLEXNER LLP

4        Attorneys for Barclays Capital, Inc.

5        575 Lexington Avenue

6        7th Floor

7        New York, NY 10022

8

9  BY:   HAMISH HUME, ESQ.

10        JONATHAN D. SCHILLER, ESQ.

11

12  JONES DAY

13        Attorneys for the Movant, LBHI

14        222 East 41st Street

15        New York, NY  10017

16

17  BY:   ROBERT W. GAFFEY, ESQ.

18        JAYANT W. TAMBE, ESQ.

19

20

21

22

23

24

25

1

2   STUTMAN TREISTER & GLATT LLP

3          Attorneys for Elliott Management

4          1901 Avenue of the Stars

5          12th Floor

6          Los Angeles, CA 90067

7

8   BY:    ANTHONY ARNOLD, ESQ. (TELEPHONICALLY)

9          MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 5 of 194

Page 5

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Be seated, please.  Good morning.

 3            MR. TAMBE:  Good morning.

 4            MR. HUME:  Good morning, Your Honor.

 5            MR. TAMBE:  Jay Tambe for Jones Day for Lehman

 6   Brothers Holdings.  May I approach?

 7            THE COURT:  Yes.

 8            PAUL PFLEIDERER, WITNESS, PREV. SWORN

 9                    CROSS-EXAMINATION

10   BY MR. TAMBE:

11   Q    Good morning, Professor Pfleiderer.

12   A    Good morning.

13   Q    Okay.  Let's start where we finished yesterday.

14        At the end of the day yesterday, I believe Mr. Hume was

15   asking you a question about BCI 292, and it was an e-mail

16   exchange between Mr. Ricci and Mr. Clackson.  Do you see that?

17   A    Yes, I do.

18   Q    And it has a subject line, scared to death.  Do you see

19   that?

20   A    Yes.

21   Q    And, in fact, Mr. Hume asked you, Professor Pfleiderer, do

22   you believe that Barclays had good reason to be concerned about

23   the risk that they had taken in acquiring all of these illiquid

24   assets in the middle of the worst financial crisis since the

25   Great Depression.  Do you remember that question?
```

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 8 of 194

Page 6

1   A    I do.

2   Q    And you generally agreed with that, that they had reason

3   to be concerned, correct?

4   A    I did, yes.

5   Q    And similarly, Professor Pfleiderer, did Barclays have

6   good reason to believe it had the deal of the century, as

7   Patrick Clackson said in response?

8   A    Perhaps they did, because this was a big deal.  Obviously,

9   it was something that was going to, if it worked out, allow

10  them to achieve some strategic objectives, which I think was to

11  establish a foothold or a presence in the North American

12  market, which Barclays did not have.

13  Q    And, in fact, that's the way it has turned out, correct?

14  A    I would believe that they'd probably characterize it as

15  that, but.

16  Q    Let's some step back to some bigger things that you

17  touched on yesterday.  You spent a fair amount of time in your

18  seven hours of direct, talking about the complexity of the

19  instruments at issue in the transaction, right?

20  A    I did, yes.

21  Q    And your basic opinion as a financial economist is that

22  these are very difficult to value in the best of times, and in

23  September 2008, they were particularly difficult to value,

24  correct?

25  A    My opinion is that a good part of the assets that were

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 7 of 194

Page 7

1    acquired were difficult to value, and they were particularly

2    difficult at the time because of the market turmoil, or the

3    market turmoil added to the difficulty.

4    Q    And, in fact, I recall you saying you had a spectrum, the

5    green to black spectrum, from level one to level three, and

6    your view was, the level threes are certainly difficult to

7    value, a lot of subjectivity, correct?

8    A    That is correct, yes.

9    Q    So are the levels two a little bit better, but still a lot

10   of subjectivity, correct?

11   A    Again, I would just qualify this by saying the marks that

12   -- excuse me, the classifications that were used were Lehman

13   classifications, and they weren't necessarily according to the

14   difficulty that would be involved in those.  But on a

15   conceptual level, definitely as we move across that spectrum,

16   things get more difficult to value.

17   Q    Well, can we then agree whether it's Lehman classifying

18   them or Barclays classifying them, there were level one, level

19   two, and level three assets in the deal, correct?

20   A    Yes, that's correct.

21   Q    Okay.  And using that as our base, level three assets

22   you'd say require a lot of judgment, a lot of subjectivity to

23   value, correct?

24   A    That is generally correct, yes.

25   Q    And you could reasonably expect a range of valuations to

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 8 of 194

Page 8

1    come out of a level three valuation, correct?

2    A    Because judgment is involved, that would generally be

3    true, yes.

4    Q    And that's your view with respect to level two, as well,

5    it requires judgment, maybe perhaps not all the same degree of

6    judgment and discretion, but some judgment and subjectivity

7    with respect to level two assets, correct?

8    A    There's judgment involving those as well, generally

9    speaking.

10   Q    And therefore, you could get a range of reasonable

11   numbers, that's your opinion?

12   A    That is my opinion, yes.

13   Q    And, in fact, you would say even on level one, I think you

14   said a few times yesterday, it's not all automatic.  Even in

15   level one, things that are classified as level one, may from

16   time to time, have some small level of subjectivity, correct?

17   A    In particular, the need to mark level one assets to an

18   exit price involved some judgment.  So even if we observed the

19   actual transaction prices that are occurring in the market,

20   there's still some judgment involved in determining how to mark

21   those to an exit price.  So even judgment is involved there,

22   yes.

23   Q    And so when you collect all of these ranges and judgments

24   for level one, level two, and level three, you can, in your

25   opinion, have a fairly significant range of possible valuations

Page 9

1    that come into play, correct?

2    A    It could be significant, yes.

3    Q    And in the time that was available the week of September

4    the 15th through the closing day on September 22nd, your view

5    is that no line-by-line CUSIP valuation could have been done

6    with any great precision; is that right?

7    A    I think that's definitely true, yes.

8    Q    So if you're looking at this as a financial economist and

9    trying to figure out the economics of the deal at the moment,

10   not with the benefit of four, five, or six months of due

11   diligence, but at the moment, if you want to fairly describe

12   the economics of the transaction, you ought to be describing

13   this range of uncertainty and range of reasonableness, correct?

14   A    I assume that the question is how the question is asked of

15   what you're actually getting, and the best way I think to

16   describe it, is to give some sort of notion as to what the

17   value might be, and then to indicate that there's great

18   uncertainty about that.

19   Q    Right.  And, in fact, I mean, we spent a good part of

20   yesterday talking about the types of uncertainties that

21   surround these assets, correct?

22   A    Yes, we did, in particular, for example, with Pine.

23   Q    Yeah, hours of testimony, detailed testimony, asset class

24   by asset class, as to the range of values and the range of

25   considerations, some of them very subjective, that could come

1    into play, correct?

2    A    Yes, that was correct.

3    Q    Okay.  And so if you are in the midst of that week of

4    September 15th, and you're talking about the transaction, and

5    you as a financial economist were listening to this, you'd want

6    to know, you know, what are these uncertainties, what is the

7    range of reasonableness so I can make an informed decision

8    about the economics of the transaction, wouldn't you, sir?

9    A    You know, as I said, I think the characterization that

10   would probably be most appropriate is to give some notion of

11   what the level of valuation is, and then to indicate that

12   there's a tremendous amount of uncertainty around that, and

13   that the person that's acquiring the portfolio is because of

14   that, taking some risk, but give a notion as to what the value

15   is, and what the range of uncertainty is, in the sense of just

16   saying that there's a fairly large amount of uncertainty.

17   Q    Now --

18   A    I think it's difficult to quantify.  So if you're looking

19   at a question, could one put a confidence interval and say with

20   90 percent of confidence it'll be between X and Y, I don't even

21   think that was possible at this time.

22   Q    You had a discussion I think with Mr. Hume about some of

23   the -- I think you referred to them as publicly available

24   information or public disclosures that were made during the

25   week.  And, in particular, I think he drew your attention to

Page 11

1    the analyst call that was hosted by senior management of

2    Barclays.  Do you remember that?

3    A    I do.

4    Q    Okay.

5         MR. TAMBE:  So if we could pull that up.  And I

6    believe that is BCI Exhibit 110.

7    Q    And it ought to be in the binder that was given to you,

8    but we could read it on the screen.  It may be faster.

9         And in particular, I want to draw your attention to the

10   third paragraph on page two.

11        MR. TAMBE:  And if you could blow that up, please.

12   Q    Now, this is a description by senior management by Mr.

13   Varley, right, Group Chairman of Barclays describing this

14   transaction to analysts.  And that second -- the third sentence

15   he states, we are acquiring trading assets with a current

16   estimated value of seventy-two billion dollars, and trading

17   liabilities with a current estimated value of sixty-eight

18   billion dollars, for a cash consideration of 250 million

19   dollars.

20        Do you see that?

21   A    I do, yes.

22   Q    And you have reviewed this analyst transcript before,

23   correct?

24   A    I've read this, yes.

25   Q    And you see no extended discussion in this transcript

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 12 of 194

Page 12

1  about the great, tremendous amount of uncertainty about these

2  assets, and about the large number of level two and level three

3  assets, and all of the subjectivity involved in coming up with

4  values.  There's no such discussion in this analyst call, is

5  there, sir?

6  A    Certainly not in this paragraph, no.

7  Q    Okay.  Well, you have reviewed the transcript, correct?

8  A    Yes.

9  Q    All right.  And you haven't located any other spot in this

10  transcript where there's an extended discussion about the

11  tremendous amount of uncertainty, as you phrase it, about the

12  valuation of these assets, was there, sir?

13  A    I'd probably want to go back and refresh my memory by

14  reading the entire transcript, but I don't remember any

15  particular discussion, for example, of level one, level two, or

16  level three in this conference call.

17  Q    Nor do you recall any specific discussion of a tremendous

18  amount of uncertainty with respect to the valuation of the

19  assets, correct?

20  A    Again, I'd want to go back and read it carefully, but

21  sitting here now, I don't remember those words being used, but

22  they may have been at some point in the question and answers

23  that followed, just not sure.

24  Q    There was discussion about steps taken to de-risk or

25  mitigate the risks of the transaction.  Do you remember that

Page 13

1    being a topic discussed in the analyst call?

2    A    Yes, I do.

3    Q    Okay.  So if we'd go to page three and at the bottom of

4    page three, and you may want to --

5         MR. TAMBE:  If you can pull that up.  And actually,

6    the question that is a few lines above that from Mike.  Right

7    there.

8    Q    The question from Mike, yes, the second question was just

9    trying to get a sense of good assets, bad assets, and

10   impairments that have -- that would've already been taken

11   either through the P&L or to AFS, on the assets that you are

12   acquiring.

13        And the answer is given by Chris, and you see -- you know

14   that that's a reference to the Group CFO, Chris Lucas, correct?

15   A    Uh-huh, yes.

16   Q    See a guy at the bank.

17   A    Yes, I would believe so, yes.

18   Q    And what he says is, he's talking about a seventy-two

19   billion dollar number, and he says, I would say I have a total

20   -- out of the total of 72.7, which is a net number, the vast

21   majority of those assets are quoted equity government and

22   agency paper.

23        Do you see that?

24   A    Yes, I do.

25   Q    And he wasn't incorrect in describing it in those terms,

Page 14

1    correct?

2    A     Well, I -- actually, when you look at what was acquired,

3    vast majority, may be a little bit too strong a statement,

4    because many of the assets again, speaking about what we looked

5    at yesterday were at level two and level three, the vast

6    majority of -- I shouldn't say the vast majority, but the

7    majority were level two and level three.

8    Q     And then he goes on to say, there's a small amount of

9    mortgage paper, which has been heavily written down and

10   included in those numbers.

11         Do you see that?

12   A     Yes, I do.

13   Q     So you see there a reference to the writing down of values

14   on certain assets that were being acquired, correct?

15   A     In terms of the mortgages, yes.

16   Q     Okay.  And then he goes on to say, so we've been through a

17   process where we took the original marks, reviewed them, and

18   then took some further write-downs, but that is against a very

19   small portion, less than five percent of that book.

20         Do you see that?

21   A     I believe the mortgages would probably be less than five

22   percent.  I'd have to go back and calculate, and it would

23   depend upon whether you start with it before the write-down or

24   after the write-down in calculating that percentage.  So I'd

25   have to go back and make sure that that calculation was done

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 15 of 194

Page 15

1    correctly.

2    Q    Right.  But you and I can agree that certainly there's

3    nothing in that answer from Mr. Lucas that says, we're at a

4    72.7, but it could be plus or minus five billion dollars

5    because of the tremendous amount of uncertainty?

6    A    It's clearly not stated in that way.

7    Q    Okay.  Let's go to page four, in the first paragraph on

8    page four to see how the description of the transaction

9    continues.

10        And that same question is thrown over to Bob, anything

11   further you want to add, Bob, and that's a reference to Bob

12   Diamond, correct, President of Barclays Capital?

13   A    I believe so, yes.

14        MR. TAMBE:  And if you could go to the -- start

15   highlighting at the word first and foremost, all the way down

16   to the end.

17   Q    And what Mr. Diamond says is, first and foremost, as Chris

18   said, we've got to choose which inventory came with the deal,

19   and primarily we chose things that were important to the

20   underlying businesses, he says.  So for example, many of the

21   positions we took in equities had to do with our cash equities

22   business.  I think the second thing that was important is we

23   had just completed seventy-two hours of due diligence on every

24   position, so when it came time to make the decision on what

25   came, we personally had been doing due diligence and were able

1    to establish the marks.

2        Do you see that?

3    A    Yes, I do.

4    Q    And you don't think Mr. Diamond was making that up when he

5    said that on the analyst call, was he?

6    A    I certainly don't think he was making it up.  I don't know

7    what he means by established the marks, and I don't know

8    whether when he said that he was doing it on every CUSIP that

9    he actually meant that it was on a CUSIP by CUSIP basis, as

10   opposed to breaking the portfolio down and analyzing it more in

11   classes that would cover every CUSIP, so.

12   Q    He certainly didn't give that explanation or qualification

13   to his answer saying, well, we did this, but we didn't do this

14   on a CUSIP by CUSIP level, we did this on an asset.

15       None of those qualifications were in his answer, correct?

16   A    No, there's no clarification of that sort, but I am

17   wondering how in seventy-two hours you could've analyzed 12,000

18   CUSIPs, and so I'm trying to reconcile what he might have meant

19   by saying what he's saying here, with what I think is almost a

20   physical impossibility of doing a CUSIP by CUSIP analysis on so

21   many assets.

22   Q    Okay.  And you see no disclaimers in Mr. Diamond's answer

23   about well, we did all of this, and we did this due diligence,

24   but at the end of it, there may be a swing of plus or minus

25   five billion dollars, because of the tremendous amount of

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 17

1   uncertainty?

2   A    No, he's not saying that here.

3   Q    Now, let's go to page 13, and towards the bottom of that

4   page, it's the answer from Chris Lucas.

5         MR. TAMBE:   In fact, let's start with the second

6   sentence, start highlighting it.

7   Q    And with reference to mortgage assets, he says, those are

8   marked down and then marked again through the due diligence

9   process.

10        Do you see that?

11  A    Yes, I do.

12  Q    And he says, so I think to do any direct comparisons are

13  actually very difficult for the reasons we have said before,

14  and the fact that the vast majority of the book is very high

15  quality, easily tradable assets and liabilities.

16        Do you see that?

17  A    Yes, I do.

18  Q    Okay.  So here you see no description of the tremendous

19  amount of uncertainty about values that you described in your

20  testimony yesterday, correct?

21  A    No, I do not.

22  Q    Now, this was not the only set of disclosures being made,

23  correct?  There were disclosures being made to this Court about

24  values in the transaction, right?

25  A    Yes, I believe so.

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 18 of 194

Page 18

1    Q    And then the Court was being asked to weigh some economic

2    values in terms of the benefit to the estate, right?

3    A    I believe that was the situation, yes, indeed.

4    Q    And one of the documents through which the Court was first

5    apprised of some of the values was the asset purchase

6    agreement, which was submitted with the motion seeking the

7    establishment of processes for the sale, correct?

8    A    I believe so, yes.

9    Q    Right.  And that's the -- you're familiar with the asset

10    purchase agreement, correct?

11    A    I am, yes.

12    Q    And that's the document that has the approximately seventy

13    billion dollars of long positions, approximately sixty-nine

14    billion dollars of short positions, correct?

15    A    That's correct.

16    Q    And we can go to the document, but you didn't see any

17    discussion in that document, other than the use of the word

18    approximately off, there was a tremendous amount of uncertainty

19    about the seventy billion, it could be seventy-five, it could

20    be sixty-five, it could be fifty, there were no such

21    disclaimers about those valuations in that document, correct?

22    A    I don't believe so, no.

23    Q    And in addition to documents that were submitted to the

24    Court there were hearings held, correct?

25    A    Yes, that is correct.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 19

1   Q     And in particular, there was a hearing held on the evening

2   of Friday, the 19th, right?

3   A     Yes, I believe that was -- and I think it even spilled

4   over into Saturday.

5   Q     The early hours of Saturday morning.  And that was the

6   hearing at which the Court was asked to approve the

7   transaction, correct?

8   A     I believe that's correct, yes.

9   Q     And there were some representations made to the Court at

10  that time about the value of the trading assets, correct?

11  A     Yes.

12  Q     And you recall Ms. Fife saying at that hearing --you've

13  read the transcript, correct?

14  A     Yes, I did.

15  Q     Okay.  And she describes the transactions, we're only

16  selling assets that have a value of 47.4 billion dollars.  Do

17  you remember that?

18  A     That's my recollection, yes, of what I read.

19  Q     Okay.  And in that description, you had not seen Ms. Fife

20  or anyone else in the courtroom stand up and say, well, wait a

21  second, those are a lot of level two and level three assets in

22  there, there's a tremendous amount of uncertainty, it could be

23  47.4, it could be fifty-five, it could be forty, there's a big

24  zone of uncertainty, Judge, you should know that, because you

25  may want to take that into account in deciding the financial

1   economics of this transaction?

2   A    Well, I have two observations.  First of all, I think what

3   you did is give a point estimate, and as I sit here and reflect

4   on what you're saying, and think about my economic opinions,

5   basically what's being represented here, if you just read this

6   in both the conference call here and in court, if there's no

7   mention of the uncertainty, which I do believe from what I have

8   analyzed was there, then basically, outside bidders should've

9   been much more inclined to bid, if they didn't think there was

10  much uncertainty there.

11       So I think that actually reinforces my economic opinion

12  that even if the deal is characterized as not having a lot of

13  risk, which I think it did, the fact that no bidders came to --

14  alternative bidders came to bid on it, either indicates that

15  they didn't want to take this transaction even with a little

16  bit of risk, or they realized that there was a lot of risk

17  there.  So --

18  Q    We'll come back, sir, to what other bidders may have

19  thought.  I was actually focused on what representations were

20  made to the Court, what the Court thought about what

21  transaction it was being asked to approve.

22  A    In that case, I think all that was given was a point

23  estimate.

24  Q    Now, in all the documents and transcripts you reviewed,

25  you haven't seen any discussion where the lawyers, Ms. Fife,

Page 21

1    Mr. Miller, who was speaking in court were advised, there's a

2    great deal of uncertainty, a tremendous amount of uncertainty

3    for the valuation of these assets.  In fact, there could be

4    swings of five billion dollars each way in the valuation,

5    before you make any representations to the Court, be aware of

6    the following facts.

7        Did you see any documents like that, sir?

8    A    Well, I think that one thing that I did, and I'd have to

9    recall precisely how it was said, but I think when Ms. Fife was

10   speaking, she was saying that because of tremendous uncertainty

11   and a lot of tumultuous outcome over the week, the deal had

12   changed substantially from what it was on Tuesday to what she

13   was reporting.

14       So that in itself, I think, would indicate that there was

15   a fair amount of uncertainty.  But again, it wasn't qualified

16   or quantified, I should say, by giving a range of values, at

17   the 90 percent confidence level, but I think in the context,

18   and I've have to go back and read exactly what she said, or

19   perhaps it was Harvey Miller.  There was some language, I

20   believe, indicating how much had changed and basically that

21   there was a lot of variability that was occurring over the few

22   days.

23       Part of it in terms of presumably what assets were

24   available, but also in terms of potentially what they were

25   valued at.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 22

1    Q    Well, why don't we just look at what she said, because you

2    seem to have some uncertainty as to what she may have said, and

3    how she may have qualified the 47.4 billion dollar number.

4          MR. TAMBE:  M-261, please.  That's the 9/19 hearing

5    transcript at pages 46 to 47.  I believe it begins at the

6    bottom of 46 on to 47.

7    Q    That's the entirety of her description on the 47.4, and

8    what she says is that changes in the market, from the time the

9    transaction was actually entered into till now, the markets

10   dropped, and the value of the securities dropped as well.

11         So originally, we were selling assets that had a value of

12   seventy, approximately seventy billion, and today, Your Honor,

13   we're selling -- only selling assets that have a value of 47.4

14   billion dollars, correct?

15   A    Yes.  It --

16   Q    It didn't say, they have a value of 47.4 billion dollars,

17   plus or minus 5 billion even today?

18   A    No, this is precisely what I was remembering.  I think I

19   actually remembered it rather well here.  What she was saying

20   was that the value in just a few days had changed substantially

21   from seventy to 47.4, and if anything, indicates a fairly large

22   amount of uncertainty and risk, I would think it would be that.

23         So again, she didn't quantify -- excuse me, quantified

24   around a point estimate, but one would read this and certainly

25   come to the conclusion that because of market conditions,

Page 23

1    there's a fair amount of uncertainty here.

2    Q    So someone reading this, in your view, could have come

3    away with the conclusion that, it could be 47.4, or it could

4    still be seventy billion, or it could be thirty billion.  Is

5    that what you thought she was conveying by using --

6    A    No, I don't think that's what she was conveying at all.  I

7    think what she did convey here is very simple.  A few days ago,

8    it was seventy billion, markets have changed, and now it's

9    47.4.  That's a fairly big delta in just a few days.  I think

10   some of that, of course, is due to some assets not being

11   available, but it was also market value changes, and I think in

12   this context, it certainly indicates there's a large amount of

13   uncertainty.

14       Again, she's given a point estimate here without a ninety

15   percent confidence in her -- some confidence and her go around

16   it, but the context is one certainly that gives a notion of

17   great uncertainty.

18   Q    And, in fact, you made a very good point.  The point is,

19   the difference from seventy billion down to 47.4, you know it

20   wasn't simply because of market movements, right?  There were

21   assets that were no longer available.

22   A    That's right.  I said --

23   Q    It was substantial.  There were tens of billions of

24   dollars of assets that were no longer available.  It wasn't

25   market forces driving down the value, it was the lack of

Page 24

1   availability of assets that was responsible for a lot of that

2   movement, correct?

3   A     It was both.  I believe that that's what she's indicating

4   here.

5   Q     Now, in any of the court records that you reviewed, did

6   you find prior to the Court being asked to approve the

7   transaction, any discussion, broad disclaimer that the numbers

8   that are in the APA, the numbers that have been offered, the

9   hearing, that these are subject to a tremendous amount of

10  uncertainty, large swings in value, the deal could be worth

11  five billion more for Barclays or five billion less for

12  Barclays, anything like that?

13  A     I'd have to go back and review it all, to say anything

14  with complete confidence.  In sitting here right now, I don't

15  remember a specific discussion that began to quantify a

16  confidence interval or give a risk range of this work that you

17  just said.  But there may be, I just don't remember, sitting

18  here today.

19  Q     And to the contrary, I think one of the descriptions or

20  one of the pieces of evidence that was offered to the Court,

21  was a suggestion that there had been a line by line valuation

22  done, correct?

23  A     You'd have to point me to that.  I don't recall that right

24  now.  It may --

25          MR. TAMBE:  Will you go back to the transcript,

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 25

1    please, the 9/19 transcript at page 109, line 5?  It's 109,

2    line 5.  Yeah.

3    Q    And this is Mr. McDade's Q and A.

4         On the absence of a closing balance sheet having been

5    prepared, can you prepare -- can you please describe for the

6    Court how it is that the debtor determined that fair value was

7    being realized for the sale of these assets?  For the assets?

8    Yes.  The individual assets in the balance sheet, the trading

9    inventory was bottom-up, meaning individual line item detail

10   processed through all of our individual risk business units in

11   coordination with the normal finance professionals who are

12   incorporated in the valuation process.

13        Do you see that?

14   A    Yes, I do.

15   Q    Had you considered that testimony as part of rendering

16   your opinion, sir?

17   A    Well, the context that I would consider that in, is how

18   the APA value of seventy billion was calculated, which seems to

19   come from the books.  So I'm not sure whether that was from the

20   books of GFS, for example, with the notion that what was

21   carried on the books was subject to the process that he's

22   talking about, or whether he's talking about corrections to

23   values that were in GFS.

24   Q    Well --

25   A    So I don't know how to interpret it.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 26

1    Q    You're not interpreting.

2    A    That's correct.

3    Q    Mr. McDade obviously knew what he was talking about, he

4    swore under oath as to what he was talking about, correct?

5    A    He was talking about some process.  What I don't know,

6    sitting here, is whether that was a process that basically was

7    filtering through GFS, which is from what I can see, presumably

8    the source for the seventy billion that was in the APA, or

9    whether there was some other process that went beyond the GFS

10   book value.  That I don't know.

11   Q    Going back to the 47.4 that you described by Ms. Fife as a

12   point estimate.

13        Do you know one way or the other, sir, whether the number

14   that Ms. Fife gave the Court included any liquidation values in

15   it?

16   A    No, I do not.

17   Q    And the fact of the matter is, as you sit here, you have

18   no idea where the 47.4 number comes from, correct?

19   A    No.  Because in her testimony, she didn't, at least I

20   didn't see it, a description of how she'd calculated that, no.

21   Q    Let's switch gears to a topic you spent some time talking

22   about yesterday morning, which was the five billion dollar

23   discount at inception, the GFS process that you took the Court

24   through.

25        MR. TAMBE:  And if you could start perhaps in the

Page 27

1    Barclay demonstratives, if we could pull those up, and we could

2    start with slide 11, please.

3    Q    That's a slide you prepared, correct?

4    A    That is correct, yes.

5         MR. TAMBE:  Steve, is it possible to just enlarge it

6    slightly?

7    Q    If you don't mind losing the heading, we'll focus on

8    numbers.

9    A    Sure.

10   Q    And just so I understand what you have here, is you have a

11   series of numbers at the bottom, which you have drawn from your

12   analysis of the GFS data, correct?

13   A    That is correct.

14   Q    Right.  And that's the GFS data as of each of those dates

15   at the top of the column, correct?

16   A    That is calculated based upon the GFS data that was

17   available for each of those dates.

18   Q    And you make two adjustments at the bottom, and I guess

19   you're doing it to make sure you're comparing apples to apples.

20   A    That is correct.  I'm subtracting off the mortgages, which

21   were not included in the long positions in the APA, and then

22   adding in the short-term agreements, collateralized short-term

23   agreements, which were.

24   Q    And so by making those adjustments, now you're comparing

25   apples to apples across the GFS system, and you come up with a

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 28

1    series of numbers, the highest of which is 65.8, correct?

2    A    That is correct, yes.

3    Q    And on slide 12 --

4         MR. TAMBE:  Again, if we could focus on the numbers,

5    please.

6    Q    -- you take the last three columns or three of those

7    numbers from the previous slide, correct, the 65.8, the 64.4,

8    and 62.57, correct?

9    A    That is correct.

10   Q    Right.  And your view was when properly normalized, that's

11   what GFS shows the value of the long position to be as of each

12   of those dates, correct?

13   A    If you mean properly normalized to mean subtracting off

14   the mortgages and include --

15   Q    That's exactly what I mean.

16   A    Very good, yes.

17   Q    The process that you suggest.  And then on the left side,

18   what you're comparing it to, I guess, are three other

19   spreadsheets, correct?  For example, you've compared to the

20   Steve Berkenfeld schedule, which has also been similarly

21   normalized, my word, right?

22   A    If I could interject, I don't necessarily characterize

23   those as spreadsheets.  It may have been in the form of a

24   spreadsheet, but I've never seen the spreadsheet.  I've just

25   seen a hard copy, photocopy, if you will, of that schedule that

1    Mr. Berkenfeld signed.  It may have been in spreadsheet form,

2    but it may not have been.

3    Q    That's right.  I mean M-2, the Berkenfeld schedule with

4    his initials on top, that's a document that you have never seen

5    any spreadsheet back-up for, correct?

6    A    I don't believe I have, no.

7    Q    Okay.  So just working off of that one-page document,

8    again, you made those adjustments, minus 2.7 plus 10, again,

9    you're comparing apples to apples, correct?

10   A    Well, I'm basically taking the data from GFS on the right-

11   hand side, and comparing it, according to the classifications

12   that were on the Berkenfeld documents.  So in that sense, it's

13   an apples to apples comparison.

14   Q    All right.  And one of the reasons why you made those

15   adjustments to the Berkenfeld schedule is to compare it to the

16   seventy billion dollar long position described in the APA,

17   correct?

18   A    The subtraction, for example, the 2.7 and the addition

19   again in the ten, yes.

20   Q    Right.  And in your view, your opinion is, that that gets

21   very close to the seventy billion dollar number that's in the

22   APA, correct?

23   A    69.3 is relatively close to seventy, yes.

24   Q    Okay.  And you conclude from this analysis that reviewing

25   the GFS data doesn't show any mark down off the Lehman's values

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 30 of 194

Page 30

1    to arrive at the seventy billion dollar number, correct,

2    because all these values are less than seventy billion dollars?

3    A    That is correct.

4    Q    When you finished this analysis, did you stop and ask

5    yourself a question?

6    A    Just --

7    Q    Did you ask yourself, why none of this adds up to seventy,

8    why does the GFS data in the 9/12 column, the 9/15 column, the

9    9/16 column fall short of seventy billion dollars, by close to

10   five billion dollars, more than five billion dollars as you go

11   on, not close to seventy?

12   A    That's correct.

13   Q    Did that cross your mind, sir?

14   A    It did indeed.

15   Q    And what's your answer?

16   A    That the values that are on the APA are above what was in

17   GFS.

18   Q    Well, values in the APA are greater than GFS.  To do that,

19   you'd have to mark up the assets on Lehman's books, to go from

20   Lehman's valuations to the values that appear on the APA,

21   right?

22   A    Well, again, in the APA what it said was approximately

23   seventy billion.  And again, I'm not a lawyer or an attorney,

24   so I don't know how these contracts are drawn up, but I would

25   interpret it as a layperson to be giving a value, a notional

Page 31

1    value almost of -- I shouldn't use notional because that has

2    other meanings, but a value that gives some notion of what the

3    scale is.

4        The question that I addressed here was a simple question,

5    and the question is, is that a markdown of five billion dollars

6    or more from what was on the books, and when one goes back and

7    looks at the books, one finds that it's not.

8    Q    Well, you suggested that maybe what's happening here, is

9    that the assets are being written up to be included in the APA

10   description, right?  That's one way you can get to seventy when

11   the GFS data gets you only to 65.8, correct?

12   A    Well, I don't know if I'd use the term written up.  I

13   think the contract simply gave a value, and the question that I

14   addressed is whether that value was understated.

15   Q    Well, it did more than just give a value, right?  It used

16   the phrase book value in connection with the seventy billion.

17   A    Correct.

18   Q    That didn't say, we just picked a number out of thin air,

19   it said seventy billion dollars book value, right?  So the

20   impression was that that seventy billion dollars came from

21   Lehman's books.  There's an alternate explanation, correct,

22   sir, for the disconnect here?

23   A    I --

24   Q    Right?

25   A    I basically did an exercise of simply looking at what was

1    in GFS books and comparing it with what was in the APA.

2    Q    No, I know what you --

3    A    But I didn't try to come up with an explanation other than

4    to ask the question, the very simple question is whether the

5    APA understated what was on Lehman's books, which it did not.

6    Q    And then you answer that question --

7    A    Right.

8    Q    -- but the analysis you did actually raises another

9    question, which is, why is this falling five billion dollars

10   short?  If it's coming from Lehman's books, why is it off by

11   five billion?  Are there assets that are not captured by GFS,

12   sir, is that what's going on?

13   A    Again, if we look at what Barclays actually got, we see

14   that very little of it was not in GFS, and I talked about the

15   matching.  So I assume certainly there are assets in GFS that

16   are not part of LBI, but the filter that's used is to look at

17   the assets that are in LBI.

18   Q    Well, one thing we can rule out, right, is there's been no

19   testimony, no evidence, that people from Barclays and Lehman's

20   sat around conference room tables saying, oh, Lehman, you've

21   got that marked too low, let's mark it up.  That didn't happen,

22   no evidence of that, right?

23   A    I don't believe so.

24   Q    In fact, all the evidence that has come in, in forms of

25   testimony, when people have talked about the Monday and the

Page 33

1    Tuesday, has been about marking down the values that appeared

2    on Lehman's books, correct?  Lots of testimony about that,

3    correct?

4    A    I believe that those words were used, and of course, we

5    see that the marks on the books are declining over time.

6    Again, to reflect changes, as we talked about before, in market

7    values potentially as well as the assets that are there.

8    Q    I'm not talking about declining in values because of the

9    passage of time.  What Mr. Varley talked about and what senior

10   management of Barclays talked about in that analyst call, we've

11   marked down assets.

12   A    But you have to be very careful there.  The assets that

13   were marked down that were mentioned in that conference call

14   were the mortgages, and the mortgages are being taken out of

15   this calculation.

16   Q    But still no explanation of a marking up process that

17   would've increased the values from the GFS values to the

18   seventy billion?

19   A    I don't believe I've seen any testimony to that effect,

20   no.

21   Q    Now, you analyzed a couple of other documents in

22   connection with your work.

23            MR. TAMBE:  Let's take a look at M-264, please.  And

24   can you just blow that up?

25   Q    Are you familiar with this e-mail, and there's a

Page 34

1    collection of spreadsheets that appear behind it?

2    A    Yes, I believe so.

3            MR. TAMBE:  And if you could just scroll through those

4    spreadsheets to the last one.  If you can increase that.

5    Q    You see here a spreadsheet that has different values on it

6    than in M-2 of the Steve Berkenfeld document, although the

7    layout and format is similar to the Berkenfeld document.  Do

8    you see that?

9    A    It certainly has a similar form to the Berkenfeld

10   document, at least the assets that are here on the left-hand

11   side, I believe.

12   Q    And this document has seventy-seven billion dollars in

13   total assets on the left-hand side, eighty-one billion dollars

14   of total liabilities on the right-hand side.  And you have, in

15   the course of your work, looked at some handwritten notations

16   that were made on various versions of these types of documents,

17   correct?

18   A    I have looked at those, yes.

19   Q    And I think you talked about one of them yesterday, if we

20   can go back to the Barclays' slide, slide 9, which is BCI 1103

21   is the exhibit number.

22        And you did some analysis of what was appearing on those

23   handwritten notations.

24            MR. TAMBE:  If you could just increase the size of

25   those handwritten notations.  In fact, why don't you pull up

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 35 of 194

Page 35

1    Movant's Exhibit 15, because that's what that document is.

2    Q    And you did some analysis of those handwritten notations

3    to try and reconcile these numbers that are in excess of 70

4    billion dollars with the analysis that you had done, the GFS

5    analysis that you had done, correct?

6    A    Well, the 77.4 you need to subtract again the mortgages to

7    6.5, and as I explained yesterday, you also need to subtract

8    2.3, which relates to those entries for other assets and

9    investment in consolidated subs, and you need to subtract the

10   goodwill and you get less than seventy.

11   Q    Okay.  And so you did that analysis on that document.

12   None of the slides you presented yesterday provided any

13   analysis of what was going on on the liabilities side of this,

14   correct?

15   A    No.  Because I was focused on the APA and the seventy

16   billion in long asset calculation.

17   Q    And at least conceivably one of the ways that there could

18   be losses after Lehman's marks is either by writing down the

19   value of long positions, or writing up the value of short

20   positions, correct?

21   A    Can you restate the question, please?

22   Q    When you think about the concept lost to our marks, that's

23   a phrase you've seen, a common one?

24   A    Yes.

25   Q    A loss to our marks, of Lehman's marks, can come about in

```
 1   two ways.  You take the long positions and value them down, or
 2   you take short positions, and you mark them up.
 3   A    That would also -- well, I would be careful about saying
 4   lost to marks.  I need to understand what the process is by
 5   which you're writing these up or writing down.  If what you're
 6   doing is basically updating those to get better marks, than I
 7   don't know that I'd characterize it as a loss to marks.
 8        But certainly if the liabilities go up, the net value is
 9   going to go down.
10   Q    And no part of your analysis looked to see what kinds of
11   changes were being made on the GFS data, which also carry short
12   positions on the valuation of the short positions?
13   A    No, that's correct.
14   Q    I believe one of the conclusions you have drawn from your
15   analysis of various spreadsheets and GFS data is that at no
16   time during the week of the 15th did you see any GFS data or
17   spreadsheets that put the value of Lehman's long positions over
18   seventy billion dollars, correct?
19   A    That is correct.
20        MR. TAMBE:  If we could pull up Movant's Trial Exhibit
21   190, please.  And if we could just enlarge the e-mail chain.
22   Q    Is this an e-mail chain that you've seen before?
23   A    I believe so.
24   Q    You have?
25   A    I believe so.  I may need to -- I remember when -- from
```

Page 37

1    James Hassler (ph), I'm not sure how you pronounce his name.  I

2    believe I've seen this, yes.

3    Q    Okay.  And there's a spreadsheet attached to this,

4    correct?

5    A    If it's the one I'm thinking of, I believe, yes.

6    Q    And there's a reference to market data and GFS data in

7    this document, correct?

8    A    Yes.

9    Q    Okay.  And it says, Bill's going to retrieve the GFS

10   market values for the list.  Do you see that in the middle of

11   that e-mail chain?

12   A    Yes, I do.

13   Q    Right.  And then Bill Parrinello responds, here's the

14   file, found a price for all CUSIPs.  Do you see that?

15   A    Yes.

16   Q    And then at the top of the e-mail, it says with marks in

17   -- within quotes, K.  Do you see that?

18   A    Yes.

19   Q    Okay.

20        MR. TAMBE:  And let's go to the spreadsheet if we can.

21   I think we have it in native format, correct?

22        UNIDENTIFIED SPEAKER:  Excuse me.  I am just

23   wondering, is this in the binder here?

24        MR. TAMBE:  I'm not sure if it's in the binder.  I

25   don't have a tab number.  It's a previously marked exhibit.  If

Page 38

 1    it's not, we can get you a copy.  We're going to look at the

 2    spreadsheet, so I'm not sure if you want to look at --

 3              UNIDENTIFIED SPEAKER:  I just would've liked to have

 4    seen the whole e-mail.

 5              MR. TAMBE:  Oh, sure.

 6              UNIDENTIFIED SPEAKER:  If you could get it to us,

 7    that'd be good.

 8    BY MR. TAMBE:

 9    Q    When you reviewed this document, Movant's Exhibit 190, and

10    the spreadsheet that was attached to it, did you pull up the

11    spreadsheet and see what the values were in this spreadsheet?

12    A    I don't recall personally doing that.  Staff may have done

13    that.  My analysis was based upon going to GFS and pulling down

14    the actual data from GFS.

15    Q    And if you'd roll over to column K on this spreadsheet,

16    you'll see that's the column that was referenced in the e-mail,

17    column K says market value.

18    A    Yes.

19    Q    Did you ever sum up the amount that appears in the market

20    value column of this spreadsheet?

21    A    Again, I personally did not.

22    Q    Would it surprise you that it's in excess of seventy

23    billion dollars, approximately seventy-three billion dollars?

24    A    Well, again, does this include the mortgages?

25    Q    You saw the spreadsheet before.  Do you know?

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 39 of 194

Page 39

```
 1    A    I saw the spreadsheet, I didn't look to see if it included

 2    mortgages.  If it includes mortgages, one has to subtract off

 3    the mortgages, one has to subtract any other assets that were

 4    not part of the loan inventory, so in fact, it wouldn't

 5    surprise me at all, because we saw that there are certainly

 6    situations, we just looked at one, where the value is seventy-

 7    seven, but once you make the adjustments to compare apples to

 8    apples instead of apples to oranges then it's under seventy.

 9         So what this may be is an orange, and it has to be

10    converted into an apple before you can actually compare it with

11    the 70.

12    Q    Okay.  But you don't know as you sit here, whether that

13    exercise was ever done by you or your staff, with respect to

14    this spreadsheet which purports to be based on GFS data?

15    A    All I can say sitting here, is that I did not personally

16    do it.

17    Q    Now, we'd spoken a little bit earlier about adjustments to

18    marks or marking assets to value, to market values, correct, in

19    the context of the analyst call?

20    A    In terms of the adjustment to the mortgages, I believe

21    that's --

22    Q    Yes.

23    A    -- what you were referring to, yes.

24    Q    And you are familiar with testimony that's been given in

25    this case by Mr. Varley and others about the concern that
```

1    Barclays had for a buffer and for appropriate valuation of the

2    assets, correct?

3    A    Yes.  Certainly the discussion about the buffer and the

4    importance of maintaining the buffer is an important

5    consideration for Barclays.

6         MR. TAMBE:  If we can pull up the Barley trial

7    transcript of June 22nd, 2010, and starting with his answer,

8    line 5, of page 102.  Just scroll over to the next page and

9    let's read this page, and then we'll move over.

10   Q    Mr. Barley was testifying about negative goodwill and the

11   buffer in general, and he starts by saying, and, at line 8, if

12   I then think about the transaction that was announced, and I

13   know we're going to come to it in due course, on the

14   transaction that was announced on the following date, when of

15   course, we were armed with more contemporary information,

16   because it was the nature of the transaction that was being

17   announced the following day, there was indeed a mismatch or

18   buffer between the number of assets and the number of

19   liabilities.

20        Do you see that?

21   A    Yes.

22   Q    And he goes on to describe the buffer, correct?  And let's

23   go to page 103.  And the question and answer, starting on line

24   2 down to line 17.

25        And one of the way you accomplish that, putting a

Page 41

1    condition precedent on it, was to insist that there be a

2    discount to the asset valuation, as to the assets that Barclay

3    was taking on in Lehman 2; is that right?

4         See that question?

5    A    Yes, I do.

6    Q    And you understand Lehman 2 to be a reference to a deal

7    that was announced and that was the subject of a sale order

8    motion, correct?

9    A    I understand that to be the sale of LBI instead of LBHI,

10   yes.

11   Q    And his answer is, he doesn't quite like the word

12   discount, but he answers it as follows, no, it's not how I

13   think of it.  I tried to be precise in answering your question

14   earlier, because I do think of -- I see differently the

15   assessment of realistic valuation through the mark to market,

16   and then a buffer between assets and liabilities.

17        Do you see that?

18   A    I do.

19   Q    Okay.  And do you understand that Mr. Barley was

20   describing two scenarios.  One is, you first mark the assets to

21   what he would believe the appropriate value, and then you

22   ensure there's a buffer between those assets as valued, and the

23   liabilities, correct?

24   A    I believe that's what he's saying here, but I would

25   qualify that, I'd like to go back before I say anything

Page 42

1    definitively to read it in the broader context and make sure

2    that I'm properly interpreting what he's saying.  But I believe

3    that's what he is saying.

4    Q    And, in fact, if you go on in his answer, I think he turns

5    back to that issue, I would actually, just as a term of art, as

6    opposed to a term of science, describe the realistic valuation

7    as the mark to market.  That's what we were seeking to do.

8    Then having established a mark to market valuation of assets,

9    we were then seeking to ensure that there was a buffer between

10   assets and liabilities to create a positive capital outcome,

11   not a discount, I don't see it as a discount, I see it as a

12   buffer.

13        Do you see that?

14   A    I do.

15   Q    And again, a discussion of these dual processes, one is

16   the mark to market, and then ensuring there's a buffer between

17   the properly marked assets and liabilities, correct?

18   A    Again, just reading this page that would be my

19   interpretation of what he's saying.

20   Q    And it was your understanding in terms of what people were

21   doing in those first couple of weeks -- first couple of days of

22   that week, the Monday and the Tuesday of the week of the 15th,

23   is trying to come up with realistic values for the assets that

24   were being acquired, and then making sure that there was some

25   kind of a buffer between the financial assets being acquired

Page 43

1    and the liabilities being acquired, correct?

2    A    I don't know that that is a proper characterization of all

3    the activities that were being done.  But I think that overall,

4    there was a concern, first of all that the assets that they

5    were getting, if they used the Lehman marks, were over valued

6    relative to what they were actually worth.  And then there is

7    the very legitimate concern, and I spoke about this yesterday,

8    that you're acquiring a large portfolio, and you're putting

9    yourself in a position of risk, and that buffer is basically to

10   offer some protection, given the risk that you're taking on.

11   Q    And the process that was described of establishing values,

12   that was not a process to mark up values, it was to mark down

13   values, correct?  The concern was that Lehman's valuations were

14   overly optimistic?

15   A    Well, I wouldn't characterize it quite that way.  I would

16   characterize it as a process to mark the values that were on

17   Lehman's books to the values that were reflected in the market.

18   So that's not a process of either marking it up or down, it's a

19   process of marking them to what they are in the market.

20        It turns out that over this week, market values were

21   declining, so the process of marking it to market would mean

22   generally speaking, that you'd be marking them down.  But I

23   would distinguish going in and saying we're going to look at

24   the marks that are on the books, and look at where the market

25   is, and adjust the marks to where the market is, as opposed to

Page 44

1    just simply going in and saying, we're going to look at the

2    marks on the books and mark them down, without looking at what

3    the market is doing.

4        So I would characterize it in the way that I did, and not

5    simply saying that they were marking them down.

6    Q    Okay.  And this process of marking was a process -- it

7    wasn't just Lehman doing it by itself, it was Lehman doing it

8    across the table from Barclays, correct?

9    A    Again, all I have to go on here is the testimony that I

10   read in some depositions.  I wasn't there at the time, so I

11   don't know exactly how the bargaining, if you will, or the

12   process of negotiating this deal was done.

13   Q    And you certainly defer to the people who were actually at

14   the table negotiating the deal, to describe the mechanics of

15   what it is that they were doing, correct?

16   A    I wasn't there, they were, so they have a distinct

17   advantage over me, I would say that.

18   Q    And we could take a look at the trial transcript of Mr.

19   Lowett.  Mr. Lowett testified about that process sitting in the

20   very chair that you're sitting in.  You read his testimony,

21   correct?

22   A    I believe I did, yes.

23   Q    And it was the April 29th transcript of Ian Lowett's

24   testimony on page 92, line 19.

25        And, in fact, Mr. Lowett was describing what was a process

LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 45 of 194

Page 45

1    to get at a number that Barclays was willing to pay, a

2    negotiated figure.  The question he's asked is, now you agree,

3    sir, that the difference between the amount reflected on

4    Lehman's books and the amount that Barclays would pay was a

5    negotiated figure, correct.

6        Answer, well, I don't know if it was.  If it was, it was a

7    number that emerged as a result of the activities of the

8    various traders determining what value was aggregated together.

9    And then that was, again my understanding, approved by the

10   negotiators of the trade.

11       Over on the next page.

12       Okay.  And in the end, it was what was agreed to between

13   the parties in their negotiation sessions, correct?  Again, I

14   wasn't a party to those negotiation sessions, so I don't know

15   what that was, but certainly my understanding was that the

16   traders were meeting with their counter parties and agreeing

17   what was the appropriate value for those securities, given the

18   nature of the environment, and the market that we're dealing

19   with.

20       MR. TAMBE:  And if you'd continue at the next Q and A.

21   Q   And you understood the difference was in the range of five

22   billion dollars between the amount shown on the books and the

23   agreed price, correct.

24       Answer, I understood that there was a difference between

25   what was on our books, and what was the outcome of that

212-267-6868          www.veritext.com          516-608-2400

Page 46

1    process, yes, and that was -- my understanding was that there

2    was around five billion dollars, but I didn't know that, but I

3    understood that.

4         Do you see that?

5    A    Yes, I do.

6    Q    And you have no reason to believe that Mr. Lowett wasn't

7    accurately describing his understanding of the negotiations

8    process?

9    A    Well, I would just make two observations.  First of all,

10   he's in somewhat of a similar position to me because he said

11   that he wasn't there observing it.  But secondly what he

12   described was basically a process of, as I read his testimony

13   here, of doing exactly what I said, which is taking the marks

14   and marking them to where the market is.

15        So that was exactly what I thought that would be the

16   notion of the appropriate thing to do.  If the marks are stale,

17   you're marking at an asset at a hundred, and the market has

18   moved, and it's now ninety, then using that hundred is

19   misleading when the market price is ninety.

20        So he mentioned about traders adjusting prices to reflect

21   where the market is, that was in sum and substance what I think

22   he was saying.

23   Q    And in all your years, have you ever heard of a broker-

24   dealer marking its own assets and its own books in negotiations

25   with a counter party, sir?

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 47 of 194

Page 47

1    A    Well, in a sense that's exactly what is done, because when

2    they're marking their books, they're marking it to transactions

3    that are occurring in the market that they themselves may have

4    made, so when you buy an asset -- when a broker-dealer buys an

5    asset, there's a negotiation oftentimes that will happen in

6    that transaction between the broker-dealers, the buyer, and

7    someone who's a seller.  And that could be a negotiated deal.

8    And then when the asset comes on the books, it comes on the

9    books at whatever that negotiated price was.

10        So this is different because obviously it's not a run of

11   the day occurrence that you're in a situation like this, when

12   you're marking a portfolio.  But when you look at it on the

13   micro level, that actually does occur.

14   Q    Yeah.  Well, this wasn't on a micro level, this was on a

15   macro level, fifty billion dollars' worth of --

16   A    That's right.  But I'm saying that the macro level has the

17   same sort of characteristics of what happens on the micro

18   level.

19   Q    Let's turn to a different topic.  Let's turn to the issue

20   of the JPM inventory.  You were asked about Professor

21   Zchemiasky's (ph) valuation of the JPM inventory yesterday.  Do

22   you remember that?

23   A    Yes, I do.

24   Q    Okay.  And just to make sure we're all on the same page,

25   I'm going to just have the rough transcript pulled up from

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 48 of 194

Page 48

1  yesterday.  I'm going to ask you some questions about the

2  answer you gave.

3  A    Sure.

4        MR. TAMBE:  It's page 8648 off the rough, please.  And

5  it's towards the bottom, line 17.  8648.  8648.

6        (Pause)

7  Q    All right.  Starting on line 17, you were asked --

8        MR. TAMBE:  If we could just increase the size of

9  that, please?

10 Q    -- and what is your understanding of Professor

11 Zchemiasky's valuation difference with respect to those

12 securities, the JPM securities, and does it make sense to you

13 as a financial economist.

14      And you say, my understanding is that he, and I believe

15 other movants as well, but he's asserting they should be valued

16 as of the 19th of September, several months before.  And

17 usually I don't state things as strongly as I'm -- next page --

18 going to state this, but I have to confess makes absolutely no

19 sense to me as an economist whatsoever, and gives rise to all

20 kinds of really perverse outcomes that make no economic sense

21 to me.

22      Do you see that?

23 A    I do, yes.

24 Q    Okay.  And if we can go on and read the rest of the

25 answer, you go on to explain, I guess, why you feel so strongly

1    about it.

2    A    Uh-huh.

3    Q    So that's a rather strongly worded statement, but I just

4    can't make sense of that as an economist.  But that would make

5    sense as a way to value a claim that was delivered at a point

6    because it was then -- it makes a great deal of difference as

7    to what was delivered at the time Barclays -- if you do that

8    type of accounting, would've taken, say, two million dollars in

9    security's worth on December 22 if those two million had been

10   worth 14 million in September, because then it would've had a

11   bigger, bigger gain, and of course, that's absurd, because it's

12   not going to take two million when it can take five million.

13        And so you come up with all kinds of absurd, absurd

14   results with the type of calculation on that basis, so it

15   doesn't make any sense to me as an economist.  In fact, I

16   would, just to maybe strengthen my statement --

17             MR. TAMBE:  And scroll down, Steve, to the next page.

18   Q    I would love to live in a world where you could do that

19   type of trading, because that would almost create an arbitrage

20   like machine.  It doesn't make any sense.

21        Does it make any sense to think about this transaction,

22   the settlement that was approved by the Court as 1.5 billion

23   dollars in cash consideration, along with the securities that

24   were going to be delivered, was intended to compensate Barclays

25   for the diminution in value over time of those securities, such

Page 50

1    that what Barclays was receiving was the same seven billion

2    dollars in value that it would have received if the transaction

3    had been consummated as contemplated in September?  Is that a

4    fair way of thinking about it?

5             MR. HUME:  Objection, Your Honor, just for the record.

6    I think it misstates the amount of cash in the settlement, the

7    1.25.

8             MR. TAMBE:  1.25 billion.

9             THE COURT:  Let's get the question right.

10            MR. TAMBE:  It is 1.25 billion.

11            MR. HUME:  I think you said -- well, the transcript

12   says 1.5.

13            THE COURT:  It says 1.5.  Go ahead.

14            MR. TAMBE:  Read the question back with that

15   correction, please?

16        (Reporter reads back question)

17             THE WITNESS:  I would say it's not a fair way of

18   thinking about it, because the settlement, as I understand it,

19   involves some cash and some securities.  So the position that

20   you would have to take is two positions.

21            One is that on the 22nd of September, Barclays would

22   have known with great certainty what it was going to get in the

23   settlement, the cash and the securities, and would've had an

24   opportunity to hedge all those securities that it wasn't going

25   to take possession of until a few months later.

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 51 of 194

Page 51

1          Both of those were not true on December -- excuse me,

2     on September the 22nd.  So I would say no, it absolutely does

3     not make sense to think of it in that way.  The premise of your

4     question is asking us to hypothetically think of a situation in

5     September that wasn't at all true, at least, as I understand

6     it.  Barclays had no way of knowing exactly what that

7     settlement was going to be.

8          What you might try to do, but I don't think this would

9     get very far, is to think about, and I did mention this in my

10     report, think about Barclays as having a claim, in some sense,

11     an indeterminate claim against JPMorgan, and trying to sell

12     that claim to some buyer on Monday, the 22nd of September.  And

13     I don't think there's any way that one could establish what a

14     price for that claim would've been, but my knowledge as a

15     financial economist would say that that claim would sell for a

16     substantial discount from whatever you might have expected to

17     get, if you could get determine what that is, because of a

18     substantial amount of risk.

19     BY MR. TAMBE:

20     Q    So -- but the way I described, the way of thinking about

21     the claim as if basically giving them the value they would've

22     received, had they consummated back in September, you're saying

23     that's not a fair way to think about it, correct?

24     A    Well, as I understood the question, and maybe I

25     misunderstood it, but I understood the question to be asking

Page 52

```
 1    what would Barclays' value the claim that it got in actuality,

 2    the settlement, I should say, I shouldn't say claim, the

 3    settlement that it got in December, what it would have valued

 4    that in September, presuming that it knew that it was going to

 5    get 1.25 million (sic) in cash -- excuse me, I misspoke, 1.5

 6    million (sic) in cash, and a certain set of securities.

 7         And everything that I've read indicates to me that that

 8    was unknowable at the time.

 9    Q    My question is actually a very precise one and I want you

10    to keep it in mind.  In thinking about the December settlement,

11    and how to value what Barclays received, would it be fair to

12    think about the 1.25 billion dollars in cash consideration

13    along with the securities that were identified, that that was

14    intended to compensate Barclays for the diminution in value

15    over time of those securities, such that Barclays is receiving

16    the same seven billion dollars in value, assuming it's

17    approved, and that the settlement is approved, that it would

18    have received if the transaction had been consummated as

19    contemplated in September.

20         Is that a fair way of thinking about it?

21    A    With all due respect, I'm afraid I can't parse the

22    question you're asking.  I don't really understand.  If what

23    you're asking is, had it received seven billion dollars in

24    September, which it had a claim for seven billion dollars, what

25    would that have been worth in December.  That would've been
```

Page 53

1   worth seven billion dollars of cash put into the treasury

2   market.  It would've been worth a little bit more than seven

3   billion.

4        Barclays didn't get, as I understand it, seven billion

5   plus interest in December.  So if that's the premise, and I may

6   be misinterpreting your question, then I don't quite understand

7   how that fits into the fact that they didn't get seven billion

8   plus interest, but rather, and I think I misspoke when I said

9   it last, now it is 1.25 billion in cash, and a certain set of

10  securities.

11  Q   Well, what Barclays was settling in December was the fact

12  that they had a claim against JP Morgan and LBI for not

13  receiving seven billion dollars in cash or securities, as of

14  the closing date in September, correct, that's what they're

15  settling?

16  A   That's what I believe the settlement was for, yes.

17  Q   But -- and they're also settling some of the stuff on the

18  side, correct?

19  A   I'm not sure what you're referring to.

20  Q   Well, there was a pending litigation between Barclays and

21  JP Morgan that was also resolved as part of the settlement?

22  A   I believe that's the case.

23        MR. HUME:  Objection.  I have an objection, I think it

24  assumes -- well, it's a question.  I'll let the question stand,

25  but I think it assumes facts not in evidence.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 54

1          THE COURT:  Are you referring to the separate

2    litigation as part of the question?

3          MR. HUME:  Yes.

4          THE COURT:  I don't know about the separate

5    litigation.

6    BY MR. TAMBE:

7    Q    Do you know about the separate litigation, Mr. --

8    Professor Pfleiderer?

9    A    Yeah, I'm afraid I don't -- I'm not sure I understand

10   what's being referred to, so I probably should retract what I

11   said and just say that I don't understand exactly what's being

12   referred to.  My understanding was simply that there was seven

13   billion dollars in cash that was supposed to be delivered that

14   wasn't delivered, and later it was settled in December,

15   December 22nd for 1.25 billion in cash, plus a certain set of

16   securities.  That's my understanding.

17   Q    Right.  And then when that settlement was arrived at and

18   presented to the Court, do you know what representations were

19   made to the Court about how the Court should be construing that

20   settlement?

21   A    That I don't believe I know in full, no.

22   Q    Okay.

23          MR. TAMBE:  So can we go to the 12/22 hearing

24   transcript, 12/22/08 hearing transcript on the settlement.  And

25   it's page 41.  M-262, and it's page 41, line 21.  And you can

Page 55

1    start on line -- actually, start on line 15, please.  This is

2    the Court asking a question and making a statement.

3        (Pause)

4    Q    Sit down.  You may not be the right person to answer this

5    question and Mr. Laraca (ph) might be.  And I just want to know

6    that before we close the record as to this aspect of the

7    morning agenda, I would like greater clarity than I currently

8    have on a valuation question.  And this is not just addressed

9    to you, it is addressed to anybody who can answer it.

10        I believe if I'm understanding the transaction correctly,

11    that the working premise of it is that the 1.25 billion dollars

12    in cash consideration, which is going to Barclays, upon

13    approval, along with the securities that have been identified,

14    is intended to compensate Barclays for the diminution in value

15    over time of those securities, such that Barclays is receiving

16    the same seven billion dollars in value, assuming it's approved

17    today and consummated tomorrow, that it would have received if

18    the transaction had been consummated as contemplated in

19    September.  Am I right in understanding that?  That's a premise

20    that I have, I just want to confirm it, and assuming -- and

21    then assuming that's correct, I want to know what the current

22    value of the transaction is.

23        Do you see that?

24    A    Yes, I do.

25    Q    What is your answer to that question as a financial

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 56 of 194

Page 56

1    economist?  Was the Court correct in its premise of

2    understanding the structure of the settlement?

3    A    Well, again, I wasn't there at the time, and I don't know

4    how this settlement was determined, and I don't know what the

5    intention of it was.  What I do know, as an economist, is

6    something of the following, which I can say to put some color

7    on it.

8         If I had, say, borrowed a hundred dollars from you in

9    January, and had failed to pay it in, say, July, and then I

10   come to you in December and say, here let me give you some

11   securities that are today worth twenty dollars, but in July

12   were worth 500 dollars, you should be happier to get that than

13   what you should to get a hundred dollars, because you'd be

14   valuing it at the time that it was owed in July.

15        And from an economic point of view, that doesn't make any

16   sense.  Now, it may be that the characterization of the

17   settlement in terms of how the actual value of it was

18   determined, was determined with some notion of what that was,

19   but as I would understand it at that time, JPMorgan could've

20   simply written a check to Barclays for the total value of those

21   securities, plus the 1.25, and Barclays would've been as happy

22   or probably happier with that, because cash is better than the

23   securities, because it doesn't have a liquidated risk and

24   things of that sort of associated with it --

25   Q    It takes two to settle, right?  I mean, JPMorgan could've

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 57

1    written the cash, Barclays would've been happy to get the cash,

2    but the reality was they were involved in a dispute, and this

3    is how Barclays resolved the dispute.  It elected to resolve

4    this dispute by getting this cash and getting those securities,

5    correct?

6    A    But what I'm saying is that the value of what they got in

7    the settlement is the value of what they got in December.  And

8    so if you look at what the claim actually paid off, as in terms

9    of value, it was the value that was received in December, which

10   could've been delivered in various ways.  That's the point I'm

11   making.

12        The value that was delivered could've been delivered as

13   securities, it could've been delivered as cash.  It could've

14   been delivered in a number of different forms.  And so the

15   value that Barclays actually got, as a consequence of that

16   claim, was what it got.

17        Now, the interpretation of how much they get could be

18   along the lines that the Court was asked to understand here.

19   So the Court's interpretation of how the settlement process

20   worked is quite likely to be the correct one.  But if you, as a

21   financial economist, asks what was it that they got on December

22   the 22nd, they got a certain value.  And what that was worth in

23   September is immaterial to what it was worth in December.

24   Q    Okay.  A couple of other follow-up questions.  If they

25   had, in fact, gotten all of these same securities in September,

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 58 of 194

Page 58

1    you do agree with me that these securities declined

2    substantially in value between September and December, did they

3    not, sir?

4    A    But here you have a very important distinction.  Had they

5    gotten those in December -- excuse me, I misspoke, September,

6    they would've been able to trade those, they would've been able

7    to hedge those.  It's the uncertainty about what this claim was

8    going to be in September that makes it, in my mind,

9    inappropriate, among some other reasons, to value it as of

10   September 22nd or September 19th.

11   Q    Just focusing on my question and the securities.  If they

12   had gotten the securities in September, and held onto those

13   securities, those securities would've declined substantially in

14   value by December, correct?

15   A    I think many of them would.

16   Q    And well, it's not just many of them would, those were

17   representations that were made to the Court in December, that

18   the value of this collateral has declined substantially between

19   September and December, correct?

20   A    In the aggregate, I believe that that's true.  And that's

21   why I qualified and said, many of them would, some of them may

22   have gone up, I don't know.

23   Q    And those are not the only representations that were made

24   to the Court to get approval of the December settlement.  There

25   were also representations made about how the Fed had valued

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 59 of 194

Page 59

1    those securities as of September, correct?

2    A    I believe so.  Again, I don't recall the actual testimony,

3    but I think I may have seen it at some point, but I, sitting

4    here now, don't recall the details.

5    Q    And before we leave the issue of the JPM securities, you

6    do understand that there are contractual and regulatory

7    provisions that govern how someone like JPM values securities

8    when it's dealing with the Fed, correct?

9    A    I believe that's true, but I don't know all the details,

10   no.

11   Q    Right.  And there's specific definitions of what is market

12   value for purposes of their transaction, correct?

13   A    Again, I believe that's the case, but I don't know all the

14   details.

15   Q    Okay.

16            MR. TAMBE:  If we could pull up M-705, please.

17            THE COURT:  While we're waiting for that to come up,

18   since we started early today, I'm going to suggest that we

19   consider a break sometime in the next ten to fifteen questions.

20            MR. TAMBE:  Right after this set of questions would be

21   perfect.

22            Chris, just enlarge the top of the page and it'll give

23   us some context of what this document is.

24       (Pause)

25   BY MR. TAMBE:

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 60

1    Q    You'll see there's an e-mail exchange between Shari

2    Leventhal and Jonathan Hughes and you can scroll down, and I

3    believe it may be on the second page.  Turn to the second page,

4    right.  This is an e-mail from Shari Leventhal to Jonathan

5    Hughes, the subject line is Barclays Chase, and what she's

6    advising Mr. Hughes of is, this is the definition of market

7    value used in the PDCF program.  Do you see that?

8    A    Yes, I do.

9    Q    All right.  And that's the Fed program, right, the

10   Prime --

11   A    Primary Dealer's Credit Facility, yes.

12   Q    And that's the definition.  Market value, the most

13   recently available closing bid price for the particular

14   security, as made available to the bank by a recognized pricing

15   service which bank uses for pricing such security in the

16   ordinary course of business, plus with respect to debt

17   securities, any accrued interest on such securities, to the

18   extent not reflected in such pricing, notwithstanding the

19   foregoing cash shall be valued at face value.

20        Do you see that?

21   A    Yes, I do.

22   Q    And you have no reason to believe that that's not the

23   operative definition of market value that related to the

24   transaction that JPM was valuing assets for the Fed, correct?

25   A    I have no reason to believe that that's not true, no.

Page 61

1              MR. TAMBE:  Your Honor, now's a good time for a break.

2              THE COURT:  Let's break for 15 minutes.

3    (Recessed at 10:25 a.m.; reconvened at 10:53 a.m.)

4              THE COURT:  Be seated, please.

5    BY MR. TAMBE:

6    Q    Professor Pfleiderer, if you could turn back in the

7    Barclays' demonstrative binder to slide 11, that's the GFS

8    analysis.  I just want to go back for a moment there.

9              MR. TAMBE:  It's BCI 1103, page 11.  And if you could

10   just enlarge the numbers.

11   Q    And just so -- so if I'm reading this right, what you're

12   showing is the long positions in GFS are declining steadily

13   from the 12th through the 19th, correct?

14   A    In total, although I should note that, for instance,

15   governments and agencies go up from, for instance, the 17th to

16   the 18th, 36.44 to 38.19.  But in the aggregate, if you look at

17   the bottom line, they're generally declining, although even

18   there, if you look at the 17th versus the 18th, you see it goes

19   from 61.07, I'm looking at the bottom line now, to 61.44.

20        So it's not as we would say, monotonically declining, but

21   it's generally declining.

22   Q    And as a financial economist might say, the trend line is

23   downward sloping?

24   A    If you were to draw a trend line, it would be downward

25   sloping here, yes.

1   Q    All right.  And again, I guess you'd agree with me that

2   there are a couple of reasons for that.  One is values may be

3   falling, and assets may no longer be shown on the GFS

4   inventory, correct?

5   A    That would be the two major reasons that this would be

6   occurring.

7   Q    And by your calculations, according to GFS, as of 9/17 and

8   9/18, the total long position is about 61 billion dollars,

9   correct?

10  A    That is correct.

11  Q    Now, one of the documents I'd ask you to look at was M-

12  190.  Remember that spreadsheet with the GFS data, that one?

13  A    I believe so, yes.

14  Q    We can enlarge it.  We looked at that this morning, and

15  this is Bill Parrinello sending back the GFS data, column K.

16  Do you remember that?

17  A    Yes.

18  Q    All right.  But this is being sent around on the 19th, the

19  morning of the 19th, correct?  So -- do you see that?

20  A    Yes, that is the -- at the top, it says the 19th at 10:40.

21  Q    Right.  And so you have no reason to believe that on the

22  morning of the 19th, the data that's being pulled from GFS is

23  data as of the 12th, you'd expect the data to be pulled from

24  GFS to be data as of the 17th, maybe the 18th, correct?

25  A    I don't know precisely what was pulled, but I assume that

Page 63

1    there was an attempt to pull whatever was latest.

2    Q    Right, correct.  And the table that we were just looking

3    at, whatever was latest, if you were pulling on the morning of

4    Friday the 19th, would be what, based on your understanding of

5    GFS?

6    A    Well, this would be -- the latest that was complete, as I

7    understand it, would've been the 17th.

8    Q    Right.  And the reason you say that is, close of business

9    17th, open for adjustments through the day on the 18th, T plus

10   1, 6:00 p.m. on the 18th, you close down the numbers for the

11   17th, correct?

12   A    That is my understanding, yes.

13   Q    And therefore, if you're pulling the numbers on the 19th,

14   that's what you're pulling?

15   A    That would be my presumption, yes.

16   Q    And so going back to your slide 11, as of the 17th, that

17   number is 61 billion according to your calculations, correct?

18   A    We do need to be very careful, we've taken out mortgages

19   here, and added in the collateralized struction (ph)

20   agreements, but that is what you get when you go to GFS on that

21   date, taking basically the T plus 1 adjustments, subtract

22   mortgages, and add in or keep in the collateralized mortgage or

23   the collateralized search agreements.

24   Q    And so just looking at the math then, if M-190 is adding

25   up to about seventy-three billion and it's pulling data that is

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 64

1   as of the 17th or later, that's almost a twelve billion dollar

2   delta from what you're calculating in GFS.  You could add in

3   the mortgages, you could subtract the mortgages, you're still

4   going to have a pretty big difference there, aren't you, sir?

5   A    I'd have to go back and look at what M-190 is precisely

6   given -- gives, I should say, to put it in the context of what

7   we're looking at here.

8   Q    Now, going back to your comment about T plus 1, if I

9   understand that correctly then, would it be correct, sir, that

10  the prices that were as of the close of business on the 12th

11  would not get locked down in GFS at the end of this process you

12  described until Monday, 6:00 p.m.; is that right?

13  A    That's my understanding, yes, correct.

14  Q    Did you look to see and compare September 12th to

15  September 11th, sir?

16  A    I personally did not.  I'm not sure that was done, no.  It

17  may have been done, but I did not look at that, no.

18  Q    Okay.  As you sit here today, you have no knowledge of

19  that ever having been done by you or your staff, correct?

20  A    I have no knowledge one way or another.

21  Q    Okay.  Let's move to a different topic.  There was some

22  discussion about equities yesterday.  Do you remember that?

23  A    Yes, I do.

24  Q    All right.  And in terms of the valuation difference,

25  you'd agree with me that there are two drivers of the valuation

Page 65

1    difference on the equities portfolio, correct?

2    A    Two major drivers, yes, correct.

3    Q    Two major drivers are date selection, 19th versus 22nd,

4    correct?

5    A    That's correct.

6    Q    And the other is, what's the right liquidity adjustment.

7    A    That is also correct.

8    Q    Okay.  And let's start first with the date issue, and you

9    had a view on that, you expressed that yesterday in the

10   transcript, you can go to the rough transcript 8585, I want to

11   show you what you said, and then ask you some questions about

12   that.

13          MR. TAMBE:  And we may want to go up a page, please.

14   Q    Starting with this question, line 8 down.  You were asked

15   a question, do you have an opinion as a financial economist of

16   whether the September 22 closing prices was a reasonable way to

17   measure the value of what Barclays actually received in the

18   transaction.  And you say it struck you as reasonable.  And

19   you're talking about the economics, and you said you were not

20   commenting on the accounting, and what the appropriate

21   accounting measure would be, correct?

22   A    That's correct.

23   Q    You go on to say Barclays did not have the ability to

24   trade these until after, certainly after the open of the

25   markets, and so the 19th was quite some time away from that,

Page 66

1    and the ability to go back and trade something in past history

2    when you didn't have possession of it, is something I don't

3    quite understand, in particular, and I may just not understand

4    the legal niceties of this, but as I would understand it, the

5    possession would actually occur at the close of the transaction

6    and --

7              MR. TAMBE:  Scroll down.

8    Q    -- not before, and I don't recall particularly exactly the

9    time, but I think that was more like -- more 8:00 o'clock in

10   the morning or so.

11        So from an economic point of view, I would think that you

12   couldn't start trading these securities until then.

13        And you go on to say, now I may have the legal niceties

14   there wrong, given how things are stated in the contract, and

15   if I understand that better, I might change my economic

16   opinion.  But my understanding would be that they couldn't

17   actually start trading things until the transaction had closed.

18        When did, in your view, Barclays get possession of the

19   equities that are at issue in this case?

20   A    Well, my understanding is, and again, I'm qualifying this

21   and I actually having this read back, regret using the term

22   legal niceties, because I don't mean that in any pejorative

23   sense, but my understanding of the transaction is that until it

24   closed, you wouldn't have operative possession of the

25   securities and be able to trade them.  That is my

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 67 of 194

Page 67

1    understanding.

2    Q    And maybe you're signaling something to me here by talking

3    about operative possession.  You know physical transfer of the

4    equities took place Thursday night, the 18th, correct?

5    A    That is correct.

6    Q    Okay.  So that's when the DTC transfers took place, that's

7    when Barclays, as we've used the phrase, stepped into the shoes

8    of the Fed, correct?

9    A    That is my understanding, yes.

10   Q    And, in fact, you have a slide that tries to identify the

11   quantum of what moved over on the 18th, correct?  And that's

12   your slide 89.  That's BCI Exhibit 1103, slide 89.  And one of

13   the things you break out there is the September 18th and 19th

14   transfers, and you've got the Thursday transfers separated from

15   the Friday transfers.  The Thursday transfers, and again, I

16   take your point, you were using nominal values, notionals, not

17   market values here.  Some ninety billion dollars of market

18   value gets transferred Thursday night, correct?

19   A    Again, not market value but notional value.

20         MR. HUME:  Objection to --

21         THE WITNESS:  I'm sorry.

22         THE COURT:  There's an objection.  What was the

23   objection?

24         MR. HUME:  I think Mr. Tambe just misstated market

25   value, when he meant to say notional value.

Page 68

```
 1    BY MR. TAMBE:

 2    Q    It's only meant to show notional value.

 3    A    Yeah.  That was --

 4    Q    90 billion in notional value --

 5    A    What I was trying to say as well, it's ninety billion

 6    dollars or 90.6 billion dollars in notional value.

 7    Q    Okay.  And you have tracked the transfer of the equities,

 8    haven't you, sir?  You know the equities, eight billion or so

 9    of them came over Thursday night.

10    A    That's my recollection, yes.

11    Q    Okay.  Now, your concern, and I guess this may be the

12    question about legal niceties, is your concern is, well, they

13    may have physical possession of it, but until the transaction

14    closes, they don't have legal possession of it.  Is that a

15    question in your mind, sir?

16    A    No.  That's not what I'm actually --

17    Q    What do you mean by operative possession then?

18    A    No, that was not actually what I had in mind.  My

19    understanding of the repo contract is that you have possession

20    of the securities, but it's a repurchase agreement, and so the

21    borrower can repurchase those securities at the end of the loan

22    period, be it overnight, or repo or whatever it is, the term

23    repo.

24         So you have custody of those securities as collateral, but

25    that doesn't mean from an economic point of view, you could go
```

Page 69

1    out and sell those, and, say, convert it into cash without

2    taking some risk, because you have to return those securities

3    when the loan is paid off by the borrower.

4        So your economic position is quite different from actually

5    having full possession of those securities and being able to do

6    what with them what you want, without incurring any risk or

7    liabilities.

8    Q    Except if you've terminated the repo transaction, then you

9    don't have any obligation to return those securities, do you,

10   sir?

11   A    My understanding would be that if the repo transaction was

12   no longer in effect, then it depends upon how that comes about.

13   I know that there would be legal considerations there, so I

14   don't want to say anything about what the termination of the

15   repo would -- the consequences of that, because that would

16   involve some legal considerations as to exactly what happens in

17   a termination of a repo.

18   Q    Do you know one way or the other, sir, whether Barclays

19   terminated the repo on Friday before this Court heard arguments

20   on the sale order motion?

21   A    My understanding was that due to a technical process, the

22   repo was declared in default, but then the clarification letter

23   basically made that null and void ab initio, so I think from

24   the standpoint of thinking about the transaction, the repo was

25   not terminated.

Page 70

1   Q    Okay.  Well, it was terminated and then unterminated,

2   correct, mechanically speaking?

3   A    That's right, but when you get to the 22nd, my

4   understanding, and again, I'm put in a position where I'm asked

5   to do something that I think is drawing a legal conclusion.

6   But my understanding as a layperson would be at the

7   transaction, given that the repo had been put back into effect,

8   by declaring that the termination was null and void, that at

9   the time of the transaction, it was still in effect.  But

10  that's just my understanding as a layperson.

11  Q    And your understanding is, in fact, that with respect to

12  securities that came over Thursday night, on Friday Barclays

13  was already establishing hedges for many of those securities,

14  correct?

15  A    I believe there was an effort to do that, yes.

16  Q    By the way, having terminated the repo on Friday, if the

17  Court had not approved the transaction Friday night into

18  Saturday morning, I guess a clarification could not have -- a

19  clarification letter then could not have unterminated the

20  termination, and Barclays would just be left with the

21  securities and no LBI business, correct?

22       MR. HUME:  Objection, Your Honor.  I think, if I

23  understand the question Mr. Tambe's, I think not for the first

24  time, asking the witness to give a legal opinion.

25       THE COURT:  Well, the witness is very clear in

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 71 of 194

Page 71

1   answering all questions that he has answered as a lay witness,

2   in respect to at least legal questions.  And I think he's

3   demonstrated his capacity to respond to questions such as this.

4   But it is, however, a wildly convoluted hypothetical, and my

5   suggestion is that it be restated.

6   BY MR. TAMBE:

7   Q    Professor Pfleiderer --

8        THE COURT:  Especially the use of the term

9   unterminated.

10  Q    Professor Pfleiderer, the state of play on Friday

11  afternoon was, a termination letter had been delivered from

12  Barclays, terminating the repo, correct?

13  A    Again, that's just my understanding.  I am basically using

14  my memory here to remember some documents or discussion that I

15  have seen somewhere, and I know that in the clarification

16  letter, there was, I believe, an entry in that, that declared

17  that that was null and void ab initio, I believe was the

18  language.  I may not be remembering it correctly.

19  Q    But you would agree with me that the clarification only

20  has life, if in fact, the Court had approved the larger sale

21  transaction as a whole on Friday night?

22  A    I don't -- that -- here we're on ground where you're

23  asking for, I think, me to speculate on what would've happened

24  in a circumstance, and how the legal environment would have

25  changed, and I don't know.  I really can't comment on that.

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 72 of 194

Page 72

 1   Q    And we discussed incentives and motivations yesterday, but

 2   having taken possession of securities, having delivered a

 3   termination notice, do you have any views as to the incentives

 4   or motivations that Barclays may have had as it stood here on

 5   Friday evening, the 19th of September, 2008, seeking approval

 6   of the sale transaction?

 7   A    I'm not sure I'm understanding.  You're conditioning it on

 8   the termination notice and asking how the incentives changed

 9   because the notice had been sent out.  I'm not sure I

10   understand the question you're asking me.

11   Q    Well, as a financial economist, do you believe it would

12   have had any effect on the motivation or incentives of

13   Barclays, the fact that they had taken possession of, by

14   whatever measure, fifty billion dollars' odd worth of

15   collateral, and were hoping to get a sale transaction approved?

16   A    Well, since you're asking about the specifics here, this

17   actual occurrence, my understanding, which may be incorrect, is

18   that the termination notice was in some sense almost

19   automatically generated, so I don't think there was a conscious

20   decision, I may be wrong, on the part of those that were making

21   decisions at the top levels to terminate the repo.

22       And so since the incentives that you're asking about

23   concerns those people that are making decisions about how to

24   handle the repo and various other things, I'm not sure that,

25   and I'm just to some extent speculating here, I'm not even sure

Page 73

1    that they were aware of this termination notice, given that my

2    understanding is that it was automatically generated.

3         So I am interpreting it -- your question is a

4    hypothetical, if they'd understood and had the intent to

5    terminate the repo, what would their incentives have been, and

6    I'd have to really think that through before giving you a

7    considered answer.

8    Q    Well, with all other things being equal, they'd really

9    want the transaction to be approved, wouldn't they?

10   A    I'd want to think it through carefully.

11   Q    Okay.  In your report, in your original report, you had

12   some discussion about how it is that Barclays and the Fed

13   agreed to this take-out of the Fed.  Do you recall that, and we

14   can turn to that.

15        There's some specific phrasing you used that I want to ask

16   you about.  This is your expert report.  I believe it's been

17   marked as BCI Exhibit 341.  It should be the first item in your

18   binder.  We'll pull it up on the screen, it's paragraph 13 of

19   that report.

20        MR. TAMBE:  It's page eight.  The bottom of page

21   eight, it's going to page -- numbered page nine.

22        Starting with, on the paragraph 13, the last line, so

23   far as I am aware.  Can you just highlight that, please?  And

24   then toward the end of that sentence.

25   Q    You state, so far as I am aware, there is no dispute that

Page 74

```
 1   Barclays entered into the Fed replacement repo only because the
 2   Federal Reserve insisted that it do so as a condition of
 3   supporting the transaction.  Do you see that?
 4   A    Yes, I do.
 5   Q    From whom did you get that understanding, sir?
 6   A    That was -- I'm not sure how I got that understanding.  It
 7   was based upon various testimony that I had read, and basically
 8   it's a factual statement at the time that I made it.  I said,
 9   so far as I'm aware, that was my understanding based upon
10   depositions I'd read, and my understanding of the record.
11        It may have been a mistaken belief at the time, but that
12   certainly was my belief.
13   Q    And certainly while the views expressed in your report and
14   your declaration is that Barclays was somehow an unwilling
15   participant in this repo, it would not have willingly taken on
16   this obligation, it wasn't, in effect, requested or required to
17   by the Fed; isn't that right?
18   A    My understanding is that the Federal Reserve did not want
19   to basically stay in this position, having that risk, and had
20   -- perhaps the word required is too strong a word, I'm not
21   really sure, but, or insisted.
22   Q    How about the word insisted?
23   A    Insisted, yeah, I meant insisted was too strong a word,
24   although that was my understanding, since it is a little bit
25   different than required.  But that there was pressure on
```

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 75 of 194

Page 75

1    Barclays to take this position, to my understanding.

2    Q    How about the timing?  Do you have any sense, do you have

3    any knowledge, does it enter into your opinion, whether

4    Barclays was required to go through with the transaction on

5    Thursday night, before the sale hearing, as opposed to after

6    the sale hearing?

7    A    I don't know how to answer that question without you

8    telling me which opinion.  I have several opinions.

9    Q    Let's just say, do you have an -- do you have a view?

10   Before we get to your opinions, do you have a view as to

11   whether Barclays was required by the Fed, or that the Fed

12   insisted that Barclays take out the Fed on Thursday night,

13   prior to the sale hearing on Friday?

14   A    Well, what I wrote here was that as far as I was aware,

15   there was no dispute that Barclays entered, because the Federal

16   Reserve insisted.  I haven't read anything subsequent to

17   writing that, to have changed that view, but I'm not absolutely

18   sure sitting here today, that that's the correct view.  But I

19   can still say the statement that I made there, so far as I am

20   aware, sitting here today, there's no dispute that that's the

21   case, but I just may not be aware of something.

22   Q    Have you read Ms. Leventhal's testimony from trial?

23   A    I read her declaration, I believe I read some of her

24   testimony, I'm not sure.  I remember certainly reading a

25   declaration that she filed with the Court, I believe.

Page 76

1    Q    Okay.  And you'd certainly defer to Ms. Leventhal from the

2    Fed as to what the Fed may or may not have insisted that

3    Barclays do, correct?

4    A    Oh, indeed I will, yes.

5    Q    Okay.  If you could turn to slide 58 in the demonstratives

6    that Mr. Hume handed you.  It's Exhibit BCI 1103.

7         On slides 58 and 59, you tackle this issue of the bid-ask

8    spreads and the fact that data from December was used by

9    Barclays to derive an appropriate bid-ask spread for the

10   equities on September 22nd, right?

11   A    I discussed the method that they used, yes.

12   Q    Right.  And that's not a methodology that you found in any

13   written procedures and processes manual at Barclays, correct?

14   A    I don't believe and I would be surprised if there was a

15   written procedure that is addressing this particular issue,

16   because it wouldn't have come up in the normal course of

17   business.

18   Q    And so this was devised as a one-off to deal with this

19   situation, correct?

20   A    I believe that in this circumstance, given the special

21   nature of this transaction, they had to address a problem of

22   how to determine how to adjust the equity prices to exit

23   prices, and they had to use the information that they had at

24   the time --

25   Q    Right.  That would be that process that you have devised

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 77 of 194

Page 77

1    or used in the course of your work, have you, sir?

2    A    I never had to do this type of calculation, no.

3    Q    And what you did is you studied what Barclays had done,

4    and you studied PWC's review of what Barclays had done,

5    correct?

6    A    I looked at what Barclays had done, and I --

7    Q    Can you answer my question yes or no, you looked --

8    A    I'm sorry?

9    Q    -- at this and you looked at what PWC had done to review

10    Barclays' work, correct?

11    A    That is correct.

12    Q    Okay.  You did not try to replicate, go into the market

13    and replicate this process to see if it produced skewed

14    results, did you, sir?

15    A    Well, I can't do that because again, the problem here is

16    the question marks.  So the question that you'd like to ask is,

17    was this accurate.  And to answer that question, you need to be

18    able to fill in those question marks, and there's no way to

19    fill in those question marks.  We're trying to come up with a

20    reasonable approach to make an estimate when we can't see, as I

21    explained yesterday --

22    Q    But my question, though, did you try to replicate what

23    Barclays did?  They did a look back process, did you try and

24    replicate a look back process to try and validate their

25    methodology?

Page 78

1    A    Make sure that the calculations that they made were

2    correct?

3    Q    Did you take this approach and run it with your own data

4    set, where you went and collected data, in a live environment,

5    and then tried to extrapolate it back to three months prior to

6    see how it stood up to real observed observations from three

7    months prior?

8    A    So you're asking me did I do it with a live environment --

9    Q    Yeah.

10   A    -- from some time later?

11   Q    Yeah.

12   A    So, in other words, a live environment from today, for

13   example, not today, but let's say in June of this year?

14   Q    Well, there's one way you can do this, can't you, sir?

15   You could go in the live environment today and collect a set of

16   bid-ask spreads in the live environment.  You can do that,

17   correct?

18   A    My understanding is you could do that, yes.

19   Q    And you could wait for a month and go collect some quotes

20   in a live environment a month from now for those same

21   securities, correct?

22   A    That is correct.

23   Q    And then you could run this exercise that you have, you'd

24   have the benefit of having live data both from the future point

25   in time and the past point in time because you're doing a test,

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 79

1    you're doing a validation, correct?  You could do that?

2    A    Well, you could only partially do that.  That's the

3    problem, because there are question marks that come up here,

4    and you're only getting part of the data.  See, what is the

5    problem here, is that you're trying to estimate adjustment for

6    the entire portfolio of equities, which includes --

7    Q    Let me stop you because you may have misunderstood my

8    question.  I'm asking you whether you tested the methodology,

9    whether this was a robust methodology.  You could, for example,

10   go into the market today, not with these securities, find a

11   hundred securities for which there's live data available,

12   collect that data, store it, so you have real live data from

13   the day.  Wait a month.  You've had several months in this

14   litigation, wait a month, collect live data a month from now

15   for those same hundred securities, no unknowns.  Now apply the

16   ratios and averages and see how well the ratios and averages

17   work at predicting or providing a multiplier to look back one

18   month.  And now you have the benefit of having two full,

19   complete sets of live data.  Did you do that?

20   A    No, because that wouldn't have been a test.

21   Q    And did PWC do that?

22   A    No, I don't believe that they did, and I'm afraid that

23   you're failing to understand or failing to communicate is

24   probably a better way to say it, what is the issue here.

25        That exercise that you talk about could indeed be done.

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 80 of 194

Page 80

1   But it wouldn't be, in any way, indicative of the success of

2   the approach that's taken to capture what you don't see, which

3   is that the illiquid securities are not giving you the

4   information, and those are going to have generally speaking,

5   larger spreads, larger adjustments needed to mark down to an

6   exit price.

7        And again, it's really the problem that when I was talking

8   about yesterday, when I talked about Gallup poll not being able

9   to contact people without telephones.  But we're not going to

10  be seeing the live quotes for securities, they're illiquid and

11  not trading, or not trading frequently.  So that's the problem.

12       So the exercise that you are proposing is one that could

13  have been carried out, but it would not have answered the

14  ultimate question, which is, is this a reasonable way to

15  capture an estimate of live data, when you're not going to be

16  able to see it even when you can access it, on all of the

17  portfolio.

18       And that's why if you look at December 18th here, you'll

19  notice that even in the accompanying live data, that the solid

20  green is what we get, but the striped with the question mark is

21  what we don't observe.  And the problem is estimating what we

22  need to do for what we don't observe.

23  Q    But with respect to what's observed, two points, the 459

24  CUSIPs and the historical, you know that's what Barclays

25  collected, but there was more historical data available from

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 81 of 194

Page 81

1   Bloomberg and Reuters, correct?  All you have to do is call

2   them up and you'd get the data.  You don't disagree with that,

3   correct?

4   A    I believe that Professor Zchemiasky was able to get more

5   data than what Barclays was using, that's my understanding,

6   yes.

7   Q    If you ran the test, at least on the observed portions,

8   you could test on the observed portions how good your model or

9   methodology works with respect to the observed portions.  You

10  may still have the issues on the unobserved, but at least you

11  can test the validity of this approach on the observed, and it

12  doesn't work on the observed either, does it, sir?

13  A    I'm sorry.  I'd ask what you mean it doesn't work on the

14  observed.

15  Q    The fact of the matter, sir, is you're drawing a

16  distinction between what's observed and what's not observed,

17  and saying therefore, this is a pretty good methodology.  The

18  fact of the matter is, even on the observed data, this

19  methodology doesn't work.  It skews the results.  You end up

20  with wider bid-ask spreads than you have for the sample for

21  which you actually have data.  There's a mathematical problem

22  with this approach, correct, sir?

23  A    As I explained yesterday, and I had an example showing

24  that Professor Zchemiasky's mathematical result is certainly

25  correct and can happen, so I'm in no way saying that that can't

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 82 of 194

Page 82

1   happen.

2       But what I'm saying and what I said yesterday, is that

3   there are multiple issues here to address an appropriate

4   adjustment to an exit price; and part of the problem is that

5   you just can't observe data on those securities that are not

6   liquid.  And since those are part of the portfolio, you need to

7   come up with a way to account for those.

8   Q     So --

9   A     So Barclays came up with a method, and my question, in my

10  mind was whether that was reasonable to solve the overall

11  problem, as opposed to just a part of the problem.

12      So if everything were observed, they wouldn't have had to

13  do this, the problem was not everything was observed, and they

14  approached this in a way that attempted to account for the

15  various problems that you see here.

16  Q     Other than the slide you produced yesterday, you've

17  produced no calculations showing your testing of Barclays'

18  methodology, to see if it made sense, whether it was a

19  reasonable approach, whether it yielded reasonable results,

20  correct, sir?

21  A     Because I can't do that, and that's the point.  Because

22  you can't test something that you don't observe what you're

23  trying to do here.  You're just making an estimate based upon

24  again, all this data here, which is striped with a question

25  mark is something you can't observe.

Page 83

1    Q    Now, what you do offer in your slide yesterday was an

2    example that if you put in the right numbers, gets you a result

3    that validates Barclays' view, correct?

4    A    That is correct.  That is correct.

5         MR. TAMBE:  Would you turn to slide 16, BCI 1103,

6    please, and enlarge it.  Please enlarge the numbers.

7    Q    And what you did was, you put in what happens if we have

8    an unobserved security C, correct?

9    A    That's correct.

10   Q    And then you inserted some hypothetical spreads for that

11   security on each of the days, correct?

12   A    That's correct.

13   Q    And in each instance, you picked a number that was

14   significantly higher than one as your hypothetical for

15   unobserved security C, correct?  Sixteen, fourteen and four are

16   greater than one, correct?

17   A    One percent?

18   Q    Yes.

19   A    That is correct, yes.

20   Q    Okay.  In picking that example, and showing this to the

21   Court, did you try and fit your example to real-world examples

22   of what distributions of spreads look like for large

23   collections of securities, sir?  Did you make any effort to do

24   that?

25   A    I'm not sure how I would've done that, because if we don't

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 84 of 194

Page 84

```
 1    observe the observe the spreads on the securities here, this is

 2    why it's unobserved.

 3    Q    You have seen Professor Zchemiasky's distribution for the

 4    459 observed securities, correct?

 5    A    That's correct.

 6    Q    And that shows that the vast majority of the observations

 7    that you see are actually smaller than one, correct?

 8    A    And that again is because they are observed, and they,

 9    because they're observed, they're going to have lower spreads

10    in all likelihood, because they're more liquid.

11    Q    And you have very few outliers, correct, in that -- in the

12    observed data?

13    A    I'm not sure what you mean by outliers.

14    Q    Well, numbers that are, you know, as high as four, five,

15    multiples of that number.

16    A    Again, that's to be expected, because this is a more

17    liquid part of the spectrum.

18    Q    And in any of your analysis, you didn't try to collect

19    from market participants or from market studies, any kind of

20    hard data that would give you an indication of what reasonable

21    spreads ought to be for the unobserved positions, correct?

22    A    I did not and --

23    Q    Well, you did not, PWC did not, and as far as you know, no

24    one at Barclays did either, correct?

25    A    Not that I'm aware, no.
```

Page 85

1          MR. TAMBE:  Give us slide 61, please.

2     Q    You do make some comments about what it is that PWC did.

3     You don't have a similar slide that says what steps you and

4     your staff took with respect to these equities, do you, sir?

5     There's no similar bullet list of here's what we did?

6     A    Did in what sense?  I'm sorry.

7     Q    Analytics.

8     A    So analytics, in terms of --

9     Q    Other than just reading the documents, did you test the

10    methodologies, did you test the prices, did you do any of these

11    things that Barclays did or PWC did or didn't do?

12    A    I did not replicate what Barclays did, nor did I replicate

13    what PWC did, no.

14    Q    The third bullet point which talks about audit sampling,

15    that's a reference not to spreads but to prices, correct?

16    A    That's correct.

17    Q    Okay.  So they're going back to prices and you don't think

18    there's any dispute in this case, putting aside the date issue

19    which you're picking the 19th or the 22nd, there's no dispute

20    about what the price data set looks like, correct?

21    A    I don't believe there is, no.

22    Q    All right.  So let's put that away.  The bottom bullet

23    point, you suggest that what PWC did, was did additional audit

24    procedures on the bid-offer adjustment, considered further

25    scenarios to adjust for illiquid positions, and this produces a

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 86

1    range of 373 to 453.

2         Those additional audit procedures, no part of those

3    procedures dealt with adjusting the 4.34 multiplier, correct?

4    It all dealt with how you would further increase that

5    multiplier for the illiquids.

6    A    I'd have to go back and look at it.  Sitting here today, I

7    don't remember precisely what they did.

8    Q    Now, go to the next page, 62.  The first point there, you

9    observe from the PWC papers is September spread should be

10   wider, due to the prevalent extreme market conditions.  Right.

11   And that's a relative statement, should be wider than December,

12   correct?

13   A    I didn't interpret that as what they're saying, that's

14   implied, but I'm not sure, maybe they're saying should be wider

15   than normal, but I think it's referring to December.

16   Q    And you know that not to be true, correct?

17   A    I'm sorry?

18   Q    You know that's not true.

19   A    I know that for the samples that they observed, which was

20   liquids, there was a difference, and it was in the direction of

21   December, I believe.  But I think here what they're doing, is

22   they're referring to the entire equity portfolio and not to

23   that sample.

24   Q    And, in fact, not only did the data set that they used or

25   selected show greater spreads in December than September, that

Page 87

1    was the general sentiment of the market, as you went through

2    the fourth quarter, right, volatility increased dramatically

3    after the closing of this transaction.

4    A    In fact, we looked at it yesterday, how it increased

5    dramatically and then it came back down in December.  Not to

6    quite as low a level as I recall as what was in September.  The

7    highest volatility, as I recall, was in October and November.

8    Q    Okay.  So if we could look at that, 946, BCI 946.

9            MR. TAMBE:  And if we could just increase the numbers.

10   Q    And you agree with me, this is what you call the fear

11   index, right, the VIX index?

12   A    That's what people call it, yes.

13   Q    Well, you called it that, too.

14   A    Yeah, I did say it is called the fear index.

15   Q    Okay.

16   A    I usually, if I'm teaching, though, I call it the VIX.

17   Q    Okay.  On -- September 22nd is shown there, and it's

18   somewhere below the thirty-five line.  Do you see that?

19   A    That's correct.

20   Q    And then when you get to December, you are talking about

21   December 18th, somewhere in the middle of that last column,

22   you're talking about volatilities in the forty-five to fifty-

23   five range.  Do you see that?

24   A    I'm not sure exactly where it would be, but it would be

25   somewhere in there, yes.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 88

1    Q    This goes higher --

2    A    It is higher, but --

3    Q    -- than September.

4    A    -- as I was saying, it is not as high as what it was in

5    October and November.

6    Q    So to the extent there's a statement being made by

7    PriceWaterhouse that the September spread should be wider due

8    to prevalent extreme market conditions, that data, at least,

9    seems to undermine that conclusion in some way, correct?

10   A    Well, the observation I would make is that, yes, indeed

11   volatility had gone up, and as a financial economist, I would

12   say that spreads would tend to go up with volatility, but there

13   are other considerations as well, in terms of what determines

14   spreads.  So it is not a simple relationship between volatility

15   and spreads, and here's where I think we get into the issue of

16   does someone who's there trading in the markets, has a feel for

17   the markets, and gets some information, basically Barclays and

18   PWC were making judgments based upon their quote/unquote feel

19   for the markets at various times.

20   Q    Right.  A feel for the market is an important issue for

21   you, correct?

22   A    It was an important issue in the sense that going back and

23   making estimates of what liquidity adjustments would be or what

24   pricing would be requires someone to have some understanding of

25   what market conditions were there.  What we're looking at here

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 89 of 194

Page 89

1   does measure something about market conditions, but doesn't

2   necessarily capture all of the important characteristics of the

3   market in any particular point in time.

4   Q    And you wouldn't describe yourself as someone who has

5   market feel in all of the complex securities that are at issue

6   in this case, correct?

7   A    Indeed, I wouldn't, and that was one of the reasons that I

8   didn't think it was useful to me.  I think I explained this, to

9   go back and do a valuation of my own, because I would not have

10  today the feel for the markets, and my judgment today or back

11  in December would not have been better than the judgment of the

12  Barclays personnel who were doing this in the price testing,

13  and being audited by PricewaterhouseCoopers.

14  Q    Right.  The Barclays' traders weren't the only traders in

15  the market.  There were all sorts of traders in the market, who

16  had better market feel for what was going on then than you do,

17  correct?

18  A    Oh, indeed.  I, being an academic I'm not trading in the

19  market every day, so I don't have that knowledge that a trader

20  would have.

21  Q    So someone who has traded and valued and risk managed

22  fixed income assets for three decades is likely to have a

23  slightly better feel for the market and those securities than

24  you do?

25  A    That's possible, it would depend on the individual, but as

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 90 of 194

Page 90

1    a general proposition, that could be true.

2    Q    And that market feel would give them a position to make

3    reasoned rational judgments about bid-ask spreads and

4    volatility in prices, correct?

5    A    Correct with the qualification that we could get five

6    people in this room with market feel, experience, put them in

7    five different rooms and they would come up with different

8    judgment, and that's why I said that as we move across this

9    spectrum, from the green to the red, some element of judgment

10   comes into play.  There is no absolute correct answer here.  It

11   involves some judgment.

12   Q    But all the things being equal, someone who has trading

13   experience, in your view as a financial economist, has a better

14   sense of market feel than someone who doesn't?

15   A    Yeah, given that you said all the things being equal, I'd

16   have to agree with that, yes.

17   Q    Right.  In terms of the review and the work you did off

18   the Barclays' materials -- I'm sorry, the PWC materials, at the

19   time of your report, you hadn't spoken with anyone from PWC

20   before rendering your opinion, correct?

21   A    I believe that's correct.  I'd only spoken with Barclays'

22   personnel.

23   Q    And as of your last declaration on September 1, you had

24   spoken to Barclays' personnel who had been in touch with PWC,

25   but you made no statement in that declaration that you had had

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 91 of 194

Page 91

1    discussion with PWC, correct?

2    A    I personally have had no discussions with an individual

3    from the PWC.

4    Q    Okay.  So, Mr. Hume had laid out here, I think ten large

5    banker boxes, you weren't here that day, but there were large

6    banker boxes of documents from PWC.  I take it in your review

7    of those documents, you personally didn't feel the need to

8    speak directly with someone at PWC to understand what was going

9    on there, correct?

10   A    I basically read the documents and took them for what they

11   were and didn't speak to anyone, yes, that's correct.

12   Q    And the people at Barclays --

13   A    Can I qualify?  I did not read all the documents.  I want

14   to emphasize that I read quite a substantial number of

15   documents, but I think that the percentage, it probably wasn't

16   as great as -- I certainly don't want to misrepresent that I

17   read all ten boxes.

18   Q    And in terms of what PWC did, they performed an audit,

19   correct?

20   A    That's my understanding, yes.

21   Q    It's not your understanding that PWC here was asked to do

22   an independent CUSIP-by-CUSIP valuation of the securities that

23   had come over, correct?

24   A    I don't believe that was what they were charged to be, no.

25   Q    And, in fact, what they were doing in this matter, in

Page 92

1    reviewing this transaction, was part of the audit of the

2    financial statements of Barclays, correct?

3    A     That is, I believe, yes.

4    Q     And this wasn't a special assignment in any way, you got

5    your audit responsibilities to come in here and help us do

6    something special with these transactions, as part of the

7    annual audit, correct?

8    A     That is my understanding, yes.

9    Q     Now, you know that the PWC papers are replete with

10   statements by PWC that management said this, and specific

11   people at management said that, et cetera, correct?

12   A     That is correct, yes.

13   Q     And that's consistent with your understanding again, not

14   as an accountant, but as a financial economist, that financial

15   statements are the responsibility of management, not the

16   auditors.  It's management who's providing that information,

17   correct?

18   A     I believe, and I may be characterizing this incorrectly,

19   but I believe that management signs off on the accounting

20   statements, and are basically, by signing off on it, asserting

21   that they are true and correct, at least they've been prepared

22   according to generally accepted accounting principles.

23   Q     And there's a statement that PWC makes when it's concluded

24   an audit about what its audit means, correct, as a little as

25   almost boiler-plate type language that appears in financial

Page 93

1    statements.

2    A    I believe that's correct.

3          MR. TAMBE:  If we turn to M-554, page 178, keeping

4    rolling down, you're on page 159.  There we go.  And that will

5    need to be enlarged, please.

6    Q    And I've just pulled up on the screen the statement made

7    by PWC in connection with the Barclays' 20-F.  All right.  This

8    is a statement they made.  And starting with the fourth line

9    down, towards the right, these financial statements.

10         And it reads, these financial statements are the

11   responsibility of the company's management, our responsibility

12   is to express an opinion on these financial statements based on

13   our audits conducted.  Our audits of these financial

14   statements, in accordance with the standards of the Public

15   Company Accounting Oversight Board of the United States.

16         And you've seen that abbreviated as PCAOB, correct, from

17   time to time?

18   A    I believe so.  I can't assert for sure that I've seen that

19   abbreviation, but I believe so.

20   Q    And then it goes on to describe what those standards are

21   and what the audit really is.  Do you see that?

22   A    Yes, I do.

23   Q    As part of those auditing standards, the PCAOB standards,

24   does the information or a rationale that's offered by

25   management have to be convincing for PWC to accept it, or can

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 94 of 194

Page 94

1   PWC be satisfied with allure of standard of evidence or

2   rationale offered by the client, do you know?

3   A    I don't know the precise threshold and how it would be

4   said, so I wouldn't want to say something that is not in

5   accordance to what actually is said.

6   Q    And you did see from time to time --

7           MR. TAMBE:  You can take that down.

8   Q    You did see from time to time in the various PWC papers,

9   statements about PWC not taking exception with something that

10  management has suggested or proposed?

11  A    That's correct.

12  Q    Okay.  And Mr. Romain testified that accountants were

13  masters of negative assurances.  Do you remember reading that?

14  A    I do remember reading that, and it's certainly in

15  accordance with my reading referenced statements that PWC

16  makes.

17  Q    And you saw no statement in any of the PWC papers that you

18  looked at, that says, we've reviewed all the valuations done by

19  Barclays, and we agree with each of the values ascribed by

20  Barclays to each of these assets?

21  A    I believe that the term is used, and I can't say that it's

22  used everywhere, but the term that's used often, is that we

23  found this reasonable, or we do not find this not reasonable, I

24  think is sometimes the double negative that they put it in, but

25  basically they're looking for processes that have been

1   following, and asking the simple question, are these likely to

2   produce reasonable results.

3       Again, we get back to this notion that there's a fair

4   amount of judgment involved in assessing these values, and I

5   think that PWC, as I understand it, is asking more reasonable

6   procedures follow, especially in those situations where some

7   judgment is involved, that are likely to produce reasonable

8   results.  Now that language may not be used in the precise way

9   that I stated it, but that's my understanding of what they're

10  doing.

11  Q    Right.  And for that process to be a meaningful process,

12  that would be a process by PWC, you'd agree with me for the

13  kinds of assets we're talking about here, PWC needs people who

14  have the same or better market feel than the folks at Barclays

15  for making those judgments, correct?

16  A    I would state it a little bit differently.  First of all,

17  I know that they had people that -- I forget the name of the

18  group, it was a special -- actually I can't remember now, it

19  had an acronym, and I just can't remember sitting here right

20  now -- a group of people that, for example, did the -- review

21  the fixed income valuation that was done in various settings.

22  Q    Well, what do you know about those group of people?  Do

23  you know anything about them?

24  A    I don't know anything -- I don't know who they are by name

25  or what their FON (ph) for days are, but what I do know, and to

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 96

1   respond to your question, it's not even necessary that PWC

2   people are better than Barclays --

3   Q    Or as good as.

4   A    Or even as good as.  What you're getting is an independent

5   opinion which provides some additional information.  So you've

6   got a process where --

7   Q    Can I just stop you there for a second.

8           THE COURT:  I think you should let the witness finish.

9           THE WITNESS:  You have a process where people in

10  Barclays are basically doing their best to come up with values,

11  and other people outside that have a great deal of expertise,

12  they may have different knowledge than the people in Barclays

13  who are reviewing it, and so you're bringing some more

14  knowledge and expertise into the process.  And the outcome of

15  that generally is going to be more reliable numbers, not

16  always, but that process is set up to be one that produces a

17  more reliable outcome.

18  BY MR. TAMBE:

19  Q    And just so I understand then the various steps in the

20  process.  It starts with, I guess at the very beginning, it

21  starts with traders at Barclays taking these assets onto their

22  books, and ascribing some values to them, correct?

23  A    Well, I want to be a little bit careful in answering that.

24  In the normal course of business, you would have traders who

25  are in the markets, who are acquiring and selling assets.  This

Page 97

1    transaction turns out to be quite different.  It wasn't that

2    particular trader sitting at a particular desk said, I want to

3    buy this particular security from Lehman.  Instead, a bundle, a

4    portfolio of securities came in.  They were allocated to desks,

5    there were some internal sales, but it was a slightly different

6    process than in the normal course of business.

7         So with that caveat, I'm not sure whether what we were

8    talking about was the normal course of business or this

9    particular transaction, which was a little bit different just

10   by its very nature than the normal course of business.

11   Q    Well, let's talk about this transaction, though.  So in

12   this transaction, even though the way the assets are acquired

13   is different, in the sense it's not individual desks doing

14   trades, there's a lump of assets that comes over, there was

15   some trader involvement at the outset, correct?

16   A    The traders had input into the process, definitely.

17   Q    And so they exercised, you would expect, some market feel

18   and judgment in those initial assessments of value.

19   A    That was my understanding, and again, that's why I didn't

20   attempt to do it myself because I wasn't there in the markets

21   at the time, and they had traders that were there that had

22   knowledge that I certainly do not have.

23   Q    And among the traders that you may have heard of or spoken

24   to, Mr. King and Mr. Yang, correct?

25   A    Those would be two in the PMTG Group, yes.

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 98 of 194

Page 98

1    Q    The PMTG Group that deals with the mortgage-backed assets,

2    correct?

3    A    Basically they deal with the more difficult to value

4    assets.  Many of them involved mortgages and real estate, but

5    not all of them.

6    Q    And so their market feel and judgment would be especially

7    important in terms of assessing the values of those difficult

8    to value assets, correct?

9    A    They had knowledge that would be useful in adding to the

10   mix of information that's used in this process, yes.

11   Q    That's level one.

12   A    However --

13   Q    And this is called that level one.  It's the first

14   exercise --

15   A    Could we not call that level one.

16   Q    You're actually right, I shouldn't use level one.  That's

17   step one.

18   A    Step one, yes, much better.

19   Q    Good point by you.

20        Step one, you've got the traders; step two, PCG comes in

21   behind the traders and does, what you call this independent

22   price assessment, correct?

23   A    The PCG Group within Barclays that's going to, again, in

24   the normal course of business would be reviewing the trader's

25   marks.

Page 99

1   Q    And they're exercising judgment as part of doing that as

2   well, correct?

3   A    They're exercising some judgment and getting some

4   additional information, that's correct.

5   Q    Okay.  And then when PW -- when PCG is done, the PWC comes

6   in, and PWC exercises judgment in terms of how it reviews the

7   judgment exercised by PCG, and in turn, the judgment exercised

8   by the traders at Barclays; is that right?

9   A    That's correct, but I would like to add one caveat here.

10  The process that you described makes it sound like it's a

11  sequential process.  And my understanding is, at least in this

12  particular case, that PWC was involved not as coming in at a

13  final point, and looking back on what had been done, but rather

14  was actively involved in a more dynamic process, so that when

15  various procedures were proposed or were being used, PWC could

16  push back or make suggestions and Barclays could then make

17  changes.

18       So the only change that I would make to your description

19  is simply to say that it's not necessarily a sequential process

20  when step one is done, and then step two occurs, and then when

21  step two occurs, then step three occurs.

22  Q    Fair point, that it's given that the unique nature of this

23  transaction, you have these various exercises of judgment, so

24  almost happening one on top of the other, correct?

25  A    That's more correct than saying it was sequentially, yes.

Page 100

1   Q    All right.  And it's not just PWC that is involved at an

2   early stage in this process, you also have a situation here

3   where the traders remain involved and in contact with PCG and

4   PWC at least through December, correct?

5   A    I believe that's certainly true.  I believe it certainly

6   -- I believe Jasen Yang was in contact with PCG.  There's an

7   interplay there, definitely.

8   Q    And on the things that there's interplay about is stress,

9   liquidity discounts, prices; correct?

10  A    Those would be some of the things that would be the

11  technical information that one needs to establish reasonable

12  marks for these assets, yes.

13  Q    Okay.  So we've got traders exercising judgment, you've

14  got PCG exercising judgment, you've got PWC exercising

15  judgment, and on top of all of that, we've got you, Professor

16  Pfleiderer, exercising judgment over their exercise of

17  judgment; is that right?

18  A    I would characterize it differently.  I wasn't certainly

19  involved in the process that led to the acquisition balance

20  sheet.  What I did is look at what was done by Barclays, and

21  looked certainly when I got them and all the PW -- well, no,

22  scratch that, not all the PWC papers, but many of the PWC

23  papers, and satisfied myself that this was a process that was

24  going to produce a reasonable valuation that would be an upper

25  bound on the economic value of these assets.

1      So that was the -- while I don't think that I was a

2   sequential part of this process that led to the acquisition

3   balance sheet, certainly I was not that.

4   Q     The phrase you use that I want to come back to, you said

5   an upper bound on the economic value of these assets.  You're

6   not expressing any opinion as to the upper bound of the fair

7   market value as measured in accounting terms of these assets,

8   are you, sir?

9   A     Well, here we get into -- I certainly -- let me give a

10   quick answer to that, no.

11      I'm not opining as an accountant.  When we use the term

12   fair market value or economic value, we again have to go back

13   to my discussion yesterday of whether you're looking at

14   individual CUSIPs, CUSIP-by-CUSIP or whether and for this

15   transaction it's very important when you're considering the

16   totality of the whole portfolio.

17      So I would be careful, or I wouldn't be careful when we

18   use the term fair market value or economic value, we specified

19   which of those we're talking about, but certainly I'm not, in

20   any way, opining on the accounting that was done and whether it

21   was done correct or done according to generally accepted

22   accounting principles.

23   Q     Thank you for answering my question, but the last part of

24   the answer causes me to go back and make sure we're not talking

25   past each other.

Page 102

1        You're not expressing an opinion that the value that's

2    been arrived at that's on the acquisition balance sheet, is an

3    upper bound of the accounting fair market value for those

4    assets, are you, sir?

5    A    Again, if it's construed as my expressing an accounting

6    opinion, no.

7    Q    Thank you.  Can we turn in your expert report, BCI Exhibit

8    341, to paragraph 51, please?  Page 30 in the document.

9        MR. TAMBE:  If you'd go back, if you would -- just

10   highlight 51, please.

11   Q    And in 51 you sort of lay out several parts of your

12   analysis and what you looked at, correct?

13   A    What I said is based on some investigative work, and my

14   understanding of what was done, I believe the following are key

15   aspects of the process by which Barclays developed exit price

16   marks.

17   Q    So this is the process that Barclays follows to get exit

18   price marks?

19   A    And this is my understanding at the time I wrote the

20   report, yes.

21   Q    Let's turn to subparagraph 11, please.  And in

22   subparagraph 11, you recognize that there is a connection

23   between how you value these assets, the Lehman assets for

24   acquisition balance sheet purposes versus a potential impact

25   that the valuation could have on trading profits and losses in

Page 103

1    subsequent periods, correct?

2    A    That's correct.

3    Q    And as a financial economist, to the extent you have

4    traders involved in the valuation process, you would expect the

5    financial incentives to be such that they'd want to minimize

6    their trading losses, and maximize their trading profits,

7    correct?

8    A    Well, I would have to point out, ultimately I would think

9    that their incentives are based upon how their compensation is

10   determined.  And so I would need to know, basically, how the

11   trading profits relate to their compensation.  Generally

12   speaking, their bonuses they're given as I understand that have

13   some relation to their trading profits, not necessarily

14   completely defined by that, is my understanding, but I don't

15   know in the case of Barclays exactly how their compensation

16   works.

17        So I would -- to make a definitive statement, I would need

18   to know a little bit more.

19   Q    Now, you have no reason to believe that Barclays

20   compensates its traders differently than most Wall Street

21   firms, do you, sir?

22   A    I have no knowledge one way or another, no.

23   Q    And in terms of compensation, it's not just some of the

24   trader's compensation that comes out of bonus, it's generally

25   the case, is it not, that most of the compensation comes from

Page 104

1    the bonus pool?

2    A    My understanding is that is correct, yes, at least for

3    most traders, yes.

4    Q    As directly linked to profit and loss for that trading

5    desk on which that trader works, correct?

6    A    Well, no, that was what I was not willing to say with a

7    definitive statement, because when I say directly it could be

8    indirectly.  So, in other words, I think I know what this

9    relates to, the movant's, I believe, are going to assert that

10   the traders had an incentive to mark things low to get high

11   profit.

12       The question is, whether that would ultimately because of

13   the direct relation with their compensation, result in higher

14   compensation, and there's a certain linkage there, and I just

15   don't know how that works within Barclays.  So that's why I'm

16   being careful.

17       If you tell me that or if Barclays were to tell me, or I

18   would see evidence that there's a complete linear relationship,

19   for example, between trading profits as measured by the

20   accounting systems and their bonus, then that would be one

21   situation.  If there's some judgment that's being made, then

22   that linkage is not as direct, and then we have to think more

23   carefully about what the incentives are.

24   Q    Okay.  And in the course of all the work that you have

25   done in this case, you didn't ask Barclays what its incentive

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 105 of 194

Page 105

1    compensation plans are for traders, especially the traders who

2    were involved in this valuation exercise, did you, sir?

3    A    I personally did not, no.

4    Q    Well, not only did you personally not, you're not aware of

5    anyone on your staff having done so, are you, sir?

6    A    I don't know.  Someone may have had and I don't know about

7    it.

8    Q    Just one question on policies and procedures, or a couple

9    of questions on policies and procedures.

10        You have commented from time to time in your expert

11   report, probably yesterday in your direct as well, that there

12   were policies and procedures that were followed by the PCG

13   Group in Barclays in coming up with values, right?

14   A    I believe that Barclays has not denoted, Barclays has

15   various policies and procedures, and my understanding is that

16   they made every effort to follow those in this particular

17   transaction, but because this transaction was a unique

18   transaction, having some characteristics that were not in the

19   normal course of business, they had to, in some cases, have

20   followed policies that may not have been contemplated, or may

21   not have been in the books before, just because of the unique

22   nature of that transaction.

23   Q    And while the example of that was, what we talked about

24   earlier, the adjustment that was made for liquidity in the

25   equities, correct?  That was --

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 106 of 194

Page 106

1    A    I believe that would be a good example where they had to

2    do something just because of the nature of what they were

3    having to do, that wasn't similar to what they did in the

4    normal course of business.

5    Q    And in that type of exercise for liquidity adjustments,

6    was also used for agency RMBS and treasuries.  And when I say

7    that type of exercise, they had to devise a way of calculating

8    spreads, correct?

9    A    In the case of most of these assets, they had to determine

10   how to basically make sure that they were marking down to an

11   exit price, because my understanding, which I don't think it is

12   at all contested in anything that we've been discussing, is

13   that the accounting requires them to mark to an exit price.

14   Q    Right.  And as part of that process, they would start by

15   calculating spreads, and in calculating those spreads, they're

16   not reading something off of a policy manual or a procedure,

17   they're devising a methodology to deal with this situation and

18   these circumstances, correct?

19   A    Well, certainly the case if there's no policy manual that

20   says that you should use a spread of four percentage or three

21   percent, because the spread in the adjustment is going to

22   depend upon market conditions.  So the policies don't give you

23   actual numbers to use.  They tell you how to basically follow

24   policy to get reasonable valuations, given the right

25   circumstances.

1  Q    Well, the policies don't give you mathematical formulas,

2  into which you can plug data in either, right?  They don't tell

3  you one approach, for example, for equities is, you take a date

4  out of December and you roll something back three months.

5  There's no level of detail like that in the policies and

6  procedures manuals that you saw, is there, sir?

7  A    Well, again, we weren't even contemplating seeing

8  something like in the policy and procedure manual, because that

9  was not something that was encountered in the normal course of

10  business.

11       So I would've been very surprised if I picked up the

12  policies and procedures manual, and said -- which was written,

13  let's say, in January of 2008 and there was a section that

14  said, if you acquire in a large transaction, the trading

15  portfolio of Lehman Brothers, here's what you do.  So it didn't

16  surprise me at all that there were some idiosyncratic elements

17  that had to be addressed here, for which there wasn't a simple

18  policy that was written.

19  Q    Another issue that comes up in the valuation, and

20  especially the valuation of this Lehman collateral that's come

21  over to Barclays is to compare and see how you're pricing this

22  new collateral to existing collateral that's already in your

23  books of a similar nature, right?

24  A    I'm sorry, could you read the question back?  I was just

25  thinking of the last answer I gave, and wanted to make sure

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 108 of 194

Page 108

1    that I'd said the right thing, which I'm now sure that I did,

2    but I'm sorry, I missed your question.

3    Q    Okay.

4    A    I apologize.

5    Q    I'll try.  One of the issues you'll agree with me needs to

6    be looked at when you're taking on board a large set of

7    securities and pricing them, is to see if you're pricing them

8    in a manner that's consistent with how you've priced other such

9    securities already on your books, correct?

10   A    That would generally be the case.  And indeed I saw, in

11   various parts of the PWC work papers, specific references to

12   the fact that Barclays was using similar procedures to value

13   the acquisition portfolio to what they call the legacy

14   portfolio.  So if you search the PWC work papers for the word

15   legacy, you'll see that quite often or fairly often, they're

16   comparing the procedures that are being used in this

17   idiosyncratic transaction, huge idiosyncratic transaction, with

18   what was done to value things in the legacy portfolio, which

19   means the Barclays' assets that were already there.  And noting

20   that generally speaking, that similar procedures were being

21   followed.

22   Q    And so they were reviewing all procedures, not the

23   outputs, not the prices of values actually assigned to those

24   securities.  You may have the same CUSIP on Barclays' book, one

25   legacy, one new, valued at two different prices, correct?

Page 109

1    A    That's potentially possible, but I haven't seen specific

2    evidence that that occurred, but it's potentially possible for

3    a CUSIP to have two prices assigned to it.

4    Q    Are you done?  I'm sorry.

5    A    Yes, I am.  I'm sorry.

6    Q    As part of your analysis, as a forensic economist into the

7    reasonableness of the value, did you do any analysis to see how

8    Barclays had valued these securities, the Lehman securities

9    compared to how they had valued legacy securities?

10   A    Let me -- to clear the record, I don't -- maybe I'm

11   considered a forensic economist, but I just consider myself a

12   financial economist that's been brought in to do this.  I just

13   don't call myself a forensic economist.

14   Q    No, that's my mistake.

15   A    No --

16   Q    I misspoke, a financial economist.

17   A    Anyhow, I just wanted to make sure that it was understood

18   that this is not what I do for a living.

19        So the question is, did I do that exercise of looking at

20   it, the answer is no.

21   Q    And not only are you not a forensic economist, you're not

22   a forensic accountant either?

23   A    I am even less a forensic accountant than I am a forensic

24   economist.

25   Q    In the course of the work you were doing, and you've

Page 110

1    described aspects of this work, the review of the PWC papers,

2    conversations with Barclays, did you speak with any of the

3    Lehman traders, who had placed some of these positions, and

4    while presumably now employed at Barclays, to see how they

5    would describe these transactions to get some market feel?

6    A    No, I did not.

7    Q    Did anyone on your staff do that?

8    A    I would have to check.  I know that my staff spoke with

9    many people -- several people at Barclays, and I'm not sure

10   whether they were Lehman, I forget if the term should be legacy

11   Lehman or legacy Barclays, whether they came over with the

12   transaction from Lehman, or whether they were legacy Barclays

13   traders, so I don't quite know how to make that distinction.

14   Q    You described, I think yesterday, that you spent time

15   talking to people at Barclays, but that your staff had spent

16   many, many more hours in those discussions.  Is that fair?

17   A    I think that's fair.  I don't know the precise number of

18   hours.  I know what I spent, which was several hours in

19   December talking to Gary Romain, Sean Teague, Rich Landerman

20   (ph) -- Washdel, I forget his first name, I'm sorry, I

21   apologize, I don't recollect his first name, but I talked to

22   several people, yes -- and Jasen Yang, Stephen King.

23   Q    Well Mr. Washdel may be one that you didn't actually speak

24   to.

25   A    I'm pretty sure I did, but I may not have.  I'd have to go

Page 111

1    back and review.

2    Q    So you spoke to those individuals, and I assume that your

3    staff spoke to many more individuals for much longer periods of

4    time, correct?

5    A    I know that they spoke with those people and perhaps some

6    others, much more.  I can't quantify what the ratio is, but I

7    know it's a fairly large ratio of the time that they spent

8    talking to the time I spent, yes.

9    Q    And given your direct testimony yesterday, along with the

10   work that you've done, these are not chats, these are really

11   detailed conversations on the real nitty gritty about how bid-

12   ask spreads come about, how prices come about, all this stuff,

13   right?

14   A    That is correct, yes.

15   Q    How is it that your staff conveyed to you the results of

16   their conversations?

17   A    Mainly verbally.  We would sit down and go through, go

18   through -- we met in Palo Alto a number of times and talked

19   over the phone.

20   Q    But you understand there's no notes, no writings?

21   A    There may have been some e-mails, but most of it was in

22   meetings that we had in Palo Alto and in conversations with

23   Romain and -- and work that we'd done in, when we were sitting

24   in the same room.

25   Q    I know from your deposition that you did not take any

Page 112

1  notes of any of the conversations that you had with the people

2  that you spoke with, right?

3  A    That's right.  When I was speaking to Gary Romain and

4  others, I was not taking notes.

5  Q    And I know no notes have been produced to us that were

6  given by your staff to you describing their conversations with

7  staff.  How do you do this in a conversation, sir?  How do you

8  get through 12,000 CUSIPs, the most complicated securities, and

9  it's all done orally, and that's how you come to your

10  conclusions?

11  A    Well, first of all, I didn't do CUSIP-by-CUSIP, so there

12  wouldn't be 12,000 different conversations.  There were

13  questions that came up, where I had questions about various

14  things, and I think they were probably at least maybe 30 or 40,

15  I'm just guessing, but at least 25 or 30 questions that I can

16  probably remember asking about various things.

17       And staff would contact oftentimes Sean Teague, or I think

18  Gary Romain, but mainly Sean Teague I believe, and find out

19  answers in terms of how things were done and then report back

20  to me.

21  Q    And again, all orally, not in writing.

22  A    Well, usually it was -- at least some of those questions

23  would relate to how to do the various analysis that was being

24  done, and understanding just how to navigate through the

25  spreadsheet, and basically where calculations were made and

Page 113

1    things of that sort.  So staff would find this out, and then we

2    would sit down, and oftentimes again in Palo Alto we would go

3    through the spreadsheet, and I'd have some more questions, and

4    some more questions would be answered.

5    Q    Okay.  And just so I'm clear, you would not write down the

6    answers, and your staff would not write down the answers?

7    A    Staff may have written down the answers.  Once I saw how

8    it worked in the spreadsheet, then I had an understanding, and

9    we could go forward.

10   Q    And did you rely on any of those writings by staff to form

11   your opinion, sir?

12   A    No, I did not.

13   Q    So whatever they wrote down, you didn't look at it?

14   A    Certainly not when I wrote my report or declarations or

15   any other things I've done.

16   Q    Let's change topics.  Let's talk about the Giant Stadium.

17   A    Okay.

18           MR. TAMBE:  May I just have one moment to grab my --

19           THE COURT:  Sure.

20      (Pause)

21   BY MR. TAMBE:

22   Q    And again, let's start with your testimony yesterday about

23   the Giant Stadium marks.  And, in particular, in the rough

24   transcript, it's on page 8626 at the bottom over on to 8627,

25   and while that's loading up, let me give you some context.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 114

1      You were obviously -- you disagree that the valuation that

2    movants had put on par on the Giant's Stadium bonds, correct?

3    A    Yes, I do.

4    Q    And one of the questions or statements you made yesterday

5    about why you doubt the valuation of par, has to do with, well

6    if they're valued at par, why didn't Lehman sell them before

7    bankruptcy.  Do you remember that?

8    A    I think that's an interesting question to ask, certainly.

9    Q    Yeah, that's a question you asked yesterday, so let's

10   highlight that, and the answer starting on line 17 down over on

11   to page 8627.

12        MR. TAMBE:  And if you could pull up the rest of the

13   answer, please.

14   Q    You say, did I say September, I meant to September, 10th

15   of September.  So before the bankruptcy, some time before the

16   bankruptcy, Lehman Brothers is in fairly desperate need of

17   cash, it's got a liquidity crisis, among other things, so if it

18   could have sold the Giants' bonds at par, and this of course,

19   was before the market turmoil, you would think that it would

20   have even a better prospect of selling them before than as

21   things developed.

22        Then there's an interesting question why didn't, because

23   this would've solved, at least to some extent, its liquidity

24   problems by being able to sell these for their full value.  And

25   the fact that they didn't, I think additionally calls into

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 115

1    question this proposition that they could be sold at par.

2        That was your testimony yesterday, correct?

3    A    That is correct.

4    Q    Okay.  Pre-bankruptcy of Lehman Brothers, sir, who bore

5    the risk of the floating interest rate on the Giants' Stadium

6    bonds?

7    A    So my understanding of the transaction was that the bond,

8    as it was actually held by the Giants was basically a fixed

9    rate bond, because the Giants were paying floating to Lehman

10   Brothers, but then there was a fixed or floating spot in

11   effect.

12   Q    You may have that backwards.  They were paying fixed to

13   Lehman Brothers, receiving floating from Lehman Brothers.

14   A    Well, no.  I believe that they were paying floating, and

15   then Lehman Brothers would pay the floating to the Giants, and

16   then the Giants would then pay fixed.  There were two parts of

17   it.

18       The bond required the Giants to pay floating.  They

19   basically -- when I say floating, what I mean is the auction

20   rate that's been determined, which is intended to be a floating

21   rate.  So the Giants had to pay floating to Lehman Brothers.

22   If that was all the transaction, then they would be paying

23   floating.  But Lehman Brothers entered into a slot in which

24   Lehman would pay floating to Giants, and then Giants would pay

25   fixed.

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 116 of 194

Page 116

1      So when you add that all up, it looks a little bit

2   strange.  It turns out that the Giants are paying fixed rate,

3   of I think it was 6.55 percent, I may have that wrong, to

4   Lehman Brothers.

5   Q    And Lehman Brothers will in turn, is paying the floating

6   rate?

7   A    That's correct.

8   Q    Okay.  And if Lehman had sold the bonds to a third party,

9   that third party would have the right to receive the floating

10  rate, correct?

11  A    The third party would have the right to receive the

12  floating rate, and Lehman Brothers could potentially have sold

13  or traded position in the fixed for floating spot, to get rid

14  of that liability as well.

15  Q    Right.  So given all the turmoil in the auction rate

16  market, in 2008 -- well do you think Lehman would've had an

17  easy time selling that bond?

18  A    Well, that's exactly the point.  That's exactly the point

19  I made.

20  Q    That's your point.  The point is it's difficult to sell

21  the bond.

22  A    Exactly.  That is precisely the point I made.  In other

23  words, with the marking it to the par, assumes that the bond is

24  easy to sell.  And the point that you just raised is exactly

25  the point I'm trying to make.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 117

1      Presumably, Lehman couldn't sell that bond or didn't sell

2    that bond, because it was difficult to sell, and that's why you

3    wouldn't mark it to par.  So that was the point --

4    Q    So that was the point.

5    A    -- that I was trying to make.

6    Q    Here's the point.  If Lehman sells the bond, it also has

7    to sell the slot, correct?

8    A    So the slot is part of that bond, but the notion that the

9    markets are liquid at this time would indicate that it

10   shouldn't have any trouble selling that.  In other words, the

11   notion that there's liquidity here that allows these

12   transactions to occur, and things can be marked at par, is

13   called into question by the fact that Lehman Brothers isn't

14   able to disentangle itself and get full value from this bond.

15   Q    Yeah, but the disentanglement ends with the filing of

16   bankruptcy, because the swap gets terminated or the swap no

17   longer exists, correct, sir?  That's a changed circumstance,

18   post bankruptcy, but pre-Lehman/Barclays' transaction, correct?

19   A    My understanding is again -- this calls for a legal

20   conclusion, so my understanding as a layperson, is that that

21   spot may not be enforced after the bankruptcy is declared.

22   Yes, that is correct.

23   Q    And so before the swap was terminated with Lehman, because

24   it effectively was paying the floating rate --

25   A    Uh-huh.

Page 118

1    Q    -- had an incentive not to have that floating rate go too

2    high, or to hold the bonds itself, correct?

3    A    Well, that assumes that it's going to be used

4    strategically and is expected to go bankrupt.  So I chose the

5    10th of September, so I think what you're implying here is that

6    Lehman Brothers on the 10th of September says, we're going to

7    go bankrupt, so let's be strategic here, we know that the fixed

8    or floating slot was going to disappear, and let's take that

9    into account.

10        Now whether they were contemplating bankruptcy at that

11   time or not, I don't know.  But if they were, let's just go

12   back to August or July.  They still had a liquidity crisis at

13   that time, it was developing, and they certainly weren't, I

14   don't believe, contemplating bankruptcy at that time.  In which

15   case, this scenario that you're, I think, trying to develop, I

16   may be wrong, wouldn't apply, and so I can just make the point

17   in July or August.  It's the same point.

18   Q    But the point is, unlike other auction rate securities

19   holders, Lehman was not just an auction rate security holder,

20   it was also the payer of the floating interest rate on the

21   swaps.  That made it somewhat different than all the other

22   investors who held auction rate securities, correct?

23   A    The slot made Lehman's position a little bit different

24   because it had basically taken on some risk, in terms of paying

25   this and the bond was a hedge.  That is true.  But if markets

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 119

1    are liquid, it could sell that bond, it could lay off that

2    hedge, and solve its liquidity crisis.  And I shouldn't say

3    solve, that would not have solved the liquidity crisis

4    certainly, but it would've moved in that direction.

5    Q    All right.  And because Lehman was somewhat different than

6    the usual holder of offering of securities, it couldn't just

7    sell that bond, without also dealing with the slot transaction,

8    correct, pre-bankruptcy?

9    A    I'm sorry, could you repeat the question again?

10   Q    Sure.  And because Lehman was somewhat different than the

11   usual option rate securities investor, it could not just sell

12   the bond without also dealing with the swap transaction,

13   correct, pre-bankruptcy?

14   A    Well, no, that's not true.  It could certainly sell the

15   bond.  That would've raised cash.  So let's break it down into

16   the two parts.

17        By selling the bond, it would raise cash.  There would be

18   left with the risk of a fixed or floating swap.  Now, it may

19   not want to take that risk, although we certainly saw that

20   Lehman Brothers was willing to take a fair amount of risk in

21   other areas, but it may not have wanted to take that risk, but

22   that doesn't preclude it from selling the bond, and either

23   taking that risk, or laying that risk off in some other

24   transaction.

25   Q    Right.  And if it was not able to lay off the swap, and it

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 120 of 194

Page 120

1   had sold the bond, and the auction had failed, for all the

2   reasons that you talked about yesterday about the turmoil in

3   the market --

4   A    Uh-huh.

5   Q    -- Lehman would be faced with paying a twenty-two percent

6   rate of interest, as a result of the failed auction, correct?

7   A    So again, we're talking about the turmoil in the market

8   and why this is difficult.  And --

9   Q    Answer my question, please?

10  A    I'm sorry?

11  Q    Answer my question.  It was a specific question.

12       And if it was not able to lay off the swap, and it had

13  sold the bond, and the auction had failed for the reasons you

14  talked about yesterday about the turmoil in the market, Lehman

15  would be faced with paying a twenty-two percent rate of

16  interest on the -- as a result of the failed auction, correct?

17  A    So as I understand that hypothetical or the scenario that

18  you're laying out, Lehman has sold the bond, retained the fixed

19  or floating swap position, and auctions had failed, so in that

20  scenario, it would be receiving twenty-two percent --

21  Q    That's right.

22  A    -- it would be paying twenty-two percent or whatever the

23  penalty rate would be, and it would be receiving 6.55, that is

24  correct.

25  Q    On the subject of auction rate securities, you don't have

Page 121

1   any extensive experience in trading or selling and buying

2   auction rate securities, do you, sir?

3   A    No, I do not.

4   Q    Okay.  And you are not a market participant, actually

5   buying or selling auction rate securities during 2008, were

6   you, sir?

7   A    No, I'm not, and that's again, just to say it once again,

8   why I didn't do my own analysis here, but I realize that I

9   didn't have a feel for the market, and my judgment had a later

10  date in the litigation concepts would not be appropriate.

11  Q    And the market feel of someone who is actually in the

12  market trading, buying and selling auction rate securities,

13  you'd defer to that market feel, as opposed to substituting

14  your own market feel for that person's judgment, correct?

15  A    Basically what I've done is said that my judgment could

16  not be based upon market feel, and so I understand what the

17  market situation was, we had failed auctions, there was a lot

18  of evidence in terms of pricing and volume out there that I can

19  observe, but since I wasn't trading in the market, I didn't go

20  to the point of figuring out what an appropriate mark would be

21  for the Giant Stadium bonds.

22  Q    Well, and in terms of the market turmoil, one of the

23  observations you had yesterday is, there were in fact

24  transactions that were taking place at par in the auction rate

25  securities market, correct?

Page 122

```
 1    A    My understanding, based upon everything that I've read and

 2    looked at is that most of those transactions that were

 3    occurring at par were what comes to be called forced buy backs

 4    where the issuer or someone involved is buying it back at par

 5    because of the failed auctions.

 6    Q    Right.  And, in fact, that's a -- that's almost a feature

 7    of auction rate securities, that if you have a failed auction,

 8    the interest rate rises to such a high level, that the issuer

 9    is incentivized to buy back the bonds, because of the failed

10    auction, correct?

11    A    That can happen, yes.

12    Q    And not can it happen, but you know from your reading, it

13    was happening.

14    A    It can happen, it was happening, it doesn't necessarily

15    happen.

16          MR. TAMBE:  Your Honor, now's a good time for a lunch

17    break.

18          THE COURT:  I think it's a fine idea.  My question to

19    you relates to your expected duration of further examination,

20    only as that applies to when we come back for lunch.  I'm

21    wondering if we need a short lunch today or if a return at 2:00

22    o'clock will be sufficient.  If the extra 15 minutes will help,

23    we can come back at --

24          MR. TAMBE:  I think 2:00 o'clock would be fine.  I

25    think -- I feel right now that I'm still on schedule for 3:30.
```

Page 123

1              THE COURT:  All right.

2              MR. TAMBE:  Thank you.

3              THE COURT:  We'll take a lunch break and return at

4    2:00.

5    (Recessed at 12:23 p.m.; reconvened at 2:07 p.m.)

6              THE COURT:  Please be seated and please proceed.

7              MR. TAMBE:  Thank you, Your Honor.

8    BY MR. TAMBE:

9    Q    Good afternoon, Professor Pfleiderer.

10   A    Good afternoon.

11   Q    Let's turn to a different topic than the one we were

12   discussing before lunch and this is the municipals and the

13   valuation of municipals.  And I believe in slide 71 through 73

14   of your demonstrative's binder, you have a few slides prepared

15   about municipals, correct?

16   A    I believe it may be those numbers, yes.

17   Q    Okay.

18             MR. TAMBE:  If you'd pull up BCI Exhibit 1103, slide

19   71.

20   Q    And what you're showing here is the total amount of

21   securities, municipal securities that were acquired by Barclays

22   and you've divided them up into level one, level two, and

23   unavailable, correct?

24   A    That is correct.

25   Q    And the next slide, 72, you kind of split that out between

Page 124

1    auction rate and non-auction rate securities, correct?

2    A    That is correct.

3    Q    And we've discussed the auction rate securities, but with

4    respect to non-auction rate securities, you see that

5    differential in value, the last two columns, Barclays' exit

6    value 922 versus movant's exit value 919.

7         You'd agree with me that the vast majority of that

8    differential is a result of a mistake by Barclays, correct?

9    A    The -- I agree there were seven bonds that were marked by

10   BoNY at, I think it was seven, but I think a hundredth of a

11   cent, and that was carried over.  That was a mistake, yes.

12   Q    Okay.  And if you'd turn to the next slide, slide 73, you

13   have those bonds listed.  You have them as eight municipal

14   bonds Barclays adopted the BoNY marks one-tenth of one penny, a

15   hundred percent at level two.  Do you see that?

16   A    That's correct.

17   Q    You don't have any indication on that slide acknowledging

18   that this was a mistake.

19   A    That was a mistake, yes.

20   Q    Okay.  And it was a mistake for you not to note that on

21   the slide, wasn't it, sir?

22   A    I don't know that that was a mistake, but it certainly was

23   a mistake that was made apparently by BoNY and then carried

24   over through into the acquisition balance sheet, yes.

25   Q    Right.  But along the way and we've been through this

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 125

1  process that you say it's a mistake made by BoNY picked up PCG

2  and audited by PwC, reviewed by Professor Pfleiderer, and no

3  one picked up this mistake, correct?

4  A    That is correct.

5  Q    That's about a hundred million dollar mistake?

6  A    I don't believe it's that large, but I'd have to go back.

7  I believe it's like more seventy-eight, eighty million, but I'd

8  have to check.  My recollection is not perfect here.

9  Q    What was the materiality threshold set by PwC for errors

10  in adjustments on a category-by-category basis, sir?

11  A    I don't actually recall precisely.

12  Q    Could it have been as much as five million, ten million,

13  twenty million dollars per category?

14  A    I'd have to go back and check what they had per category.

15  Q    That's not something you looked at when you were reviewing

16  the PwC's work papers, in terms of where they drew the line on

17  materiality?

18  A    It was such something I certainly was aware of at the

19  time, but I can't recall right now.

20  Q    Now, you have seen Mr. Teague's testimony with respect to

21  these bonds that were priced at one-tenth of one penny,

22  correct?

23  A    I believe I have, although I can't -- I'm not remembering

24  the specifics of it right now.

25        MR. TAMBE:  Can we just pull up that testimony?  It's

Page 126

1    the Teague deposition testimony at page 167.  It'll just come

2    up on the screen in a second.

3        (Pause)

4        MR. TAMBE:  If you'd highlight from lines 5 down to line

5    13, please, and enlarge.

6    Q    And what was Mr. Teague was asked, I'm sorry, what was an

7    oversight, pricing of one-tenth of one penny was an oversight.

8    Answer, yes, I believe there was an oversight on our part.  We

9    had no data to mark those assets.

10       What have you done to correct that oversight?  The

11   oversight itself was brought up after the opening balance sheet

12   was closed.

13       Is it the case, sir, that Barclays had no data to price

14   those securities, where it chose to take BoNY's one-tenth of

15   one penny price?

16   A    I'd have to go back and review exactly what was the case

17   for these seven or eight bonds, but generally speaking, and I

18   don't know if it applies to this case, but I believe taking his

19   testimony as given here it does, that in those cases where

20   Barclays was not able to come up data -- that from other

21   sources it did revert on occasion at least to the BoNY marks,

22   yes.

23   Q    But it didn't do so when there were FTID prices available,

24   correct, the Financial Times Interactive Data process?

25   A    I believe that the intention was that when they were

Page 127

1    outside vendor prices or some prices that were available to use

2    those and not rely on the BoNY marks generally speaking, yes.

3    Q     In fact, you note on your slide 73 --

4          MR. TAMBE:  If you could go there, please.

5    Q     -- the second category the 486 non-ERS municipal bonds, in

6    fact, you have a bullet that says, FTID prices used.  Do you

7    see that?

8    A     That's correct.

9    Q     And do you know one way or the other, sir, these seven

10   bonds where Barclays took the one-tenth of one penny price and

11   Mr. Teague said there was no data available, were FTID prices

12   available and provided for in Barclays' own spreadsheets for

13   those securities?

14   A     I don't recall.  I'd have to go back and check.

15   Q     That's not something you looked into?

16   A     It may be that I did at the time but I don't recall

17   sitting here now.

18   Q     Now, let's talk about the non -- some of the ARS portion

19   of the municipal portfolio.  And going back to your slide 72,

20   and you'll see there's a differential between the Barclays'

21   exit value and the movant's exit value for the valuation of the

22   auction bid securities in the municipal bucket, correct?

23   A     That is correct.

24   Q     And then that's primarily driven, if not exclusively

25   driven by the fact that what Barclays did was take the quoted

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 128 of 194

Page 128

1    prices and reduced them by twenty percent, a twenty percent

2    liquidity discount, correct?

3    A    It applied a twenty liquidity discount, yes, that's

4    correct.

5    Q    And movant's expert, Mr. Schwaba priced those at par.

6    A    That is correct, I believe, yes.

7    Q    Do you have any basis, sir, to opine on whether a twenty

8    percent adjustment for auction rate securities in the municipal

9    space was reasonable or unreasonable?

10   A    Well, again, we get into the philosophical problem that

11   we've got a market that basically is almost completely closed

12   down, and for which there are very few trades.  So when we

13   don't observe many trades, they're trying to construct what an

14   exit price would be, and we know that it's an illiquid market

15   where you don't have liquidity, and so the determination was

16   made here to reflect that illiquidity by taking a twenty

17   percent discount, and if I recall, PwC reviewed that and found

18   that reasonable.

19        Again, it's hardly a manner of judgment here, based upon

20   trying to assess what the situation in the market is at the

21   time, and what's a reasonable adjustment to take, given that

22   there's very little liquidity in the market.

23   Q    Right.  And the question for you, Professor Pfleiderer,

24   was do you have an opinion or basis to judge the reasonableness

25   of that judgment call that was made by others?

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 129 of 194

Page 129

1    A    I mean, in the sense of do I have an opinion based upon

2    having a feel for the market, no, I wasn't there.  I know a

3    fair amount about the market conditions at the time.  Volume

4    had fallen off tremendously since the beginning of February in

5    these bonds, and so the question is, as I said one of judgment

6    of determining what is a reasonable exit mark, given that you

7    have a market that's, for all intents and purposes, virtually

8    closed down.

9        And so I guess I'll use the language of pre-PwC, based

10   upon my knowledge, I certainly don't find this unreasonable.

11   And I think it was a reasonable judgment that given the market

12   that had broken down, one would take a substantial liquidity

13   adjustment.

14       So I think that taking the liquidity adjustment to the

15   significant margin is much more appropriate than pricing it at

16   par.

17   Q    And you believe the twenty percent liquidity adjustment

18   was a significant adjustment, correct?

19   A    It's certainly not trivial, yes.

20   Q    How about a thirty percent liquidity adjustment, would

21   that have been substantial and significant?

22   A    It would've been greater than twenty, yes.

23   Q    And -- I know that.  But in your view, would that have

24   been a reasonable adjustment to take with respect to municipal

25   auction rate securities?

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 130

```
 1   A    Well, at some point, as we go down this path, we start to

 2   approach unreasonableness, and again, it's a matter of having a

 3   feel for the market, and it's again, a philosophical problem

 4   when there's really very little and no ability to trade in a

 5   market because it's broken down.  How do you reflect that in an

 6   exit mark?  And I think that twenty percent discount is

 7   certainly a reasonable reflection of the fact that the market

 8   is broken down and there's very little liquidity.

 9   Q    How about a ninety percent discount?  Would that be

10   reasonable in your estimation?

11   A    I think for my purposes, that would -- depending upon the

12   market, depending upon the circumstances, and depending what

13   you're attempting to do, that would perhaps approach a level of

14   unreasonableness in certain circumstances.  But you need to

15   basically describe exactly what those circumstances are.

16   Q    And in terms of describing those circumstances, did you

17   attempt to do that with respect to any of the auction rate

18   securities?  Did you try and look at the securities, the credit

19   characteristics, the issuer, to determine whether a flat twenty

20   percent or thirty percent discount was appropriate or some

21   other adjustment was more appropriate?

22   A    So --

23   Q    Did you attempt to do that is the question.

24   A    I looked at the market conditions at the time, and I

25   looked at the type of ARS securities that they had, and I
```

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 131 of 194

Page 131

1    didn't do a full scale analysis, because again, I didn't have a

2    feel for the markets at the time, but it struck me as being

3    reasonable to take something on the order of this magnitude.

4    Q    Well, on the Giants' auction rate securities, what

5    Barclays took for three of the four, was a ninety percent

6    adjustment.  They valued them at ten cents on the dollar.

7    That's not reasonable, is it, sir?

8    A    Well, the Giants are obviously different, because that's

9    not a municipal that is issued by a corporation, the Giants,

10   and so there are differences there.  And it's difficult to

11   figure out how those factor in to get a precise number, but I

12   would certainly say that it's reasonable to take a substantial

13   discount from par, given that these were bonds that weren't

14   trading and they failed at auction.

15   Q    So as I understand your answer then, taking a ninety

16   percent discount on three of the four Giant Stadium bonds, it

17   is not your opinion that that's reasonable, is it, sir?

18   A    I would think that that is closer to the unreasonableness

19   threshold, but the valuation at par is very far from

20   reasonableness, so we don't know quite where it is within this

21   range that's reasonable, because there really is a range.  But

22   I can't say we're farther away from what's reasonable when we

23   value them at par, then when we take a substantial discount.

24   Q    Well, there lots of factors that would go into where in

25   that continuum you fall, correct?

Page 132

1    A    That is right, and that's where we -- where you come to a

2    manner of judgment in that case.

3    Q    A manner of judgment and market feel, correct?

4    A    That is correct.

5    Q    And would depend on, for example, the credit rating of the

6    issuer, correct?

7    A    That would be one consideration but it wouldn't be the

8    only one.

9    Q    It would depend on considerations such as what is the

10   maximum rate in the event of failed auction, correct?

11   A    That would be another consideration.

12   Q    Because you and I have discussed before that that max rate

13   can incentivize an issuer to redeem bonds, correct?

14   A    That is correct.

15   Q    And closing the circle on the auction rate securities, it

16   seems to me that you find yourself in a position where you are

17   prepared to second-guess a par valuation, but you are perfectly

18   comfortable with a twenty percent discount off of par; is that

19   right, sir?

20   A    With a twenty percent?

21   Q    Yes.

22   A    I'm much more comfortable with a twenty percent than what

23   I am basically pricing at par.  So my knowledge as a financial

24   economist and the breakdown of this market would say that par

25   is definitely unreasonable.

1    If you ask me is fifteen percent, eighteen percent, or

2    twenty-three percent more reasonable than the other two, that I

3    really am not prepared to opine upon because I didn't have a

4    feel for the market, and this is a range where reasonable

5    people can disagree.  But pricing it at par, I mean, there's

6    very little liquidity in the market when you're instructed to

7    price it at an exit mark, basically you're instructed to price

8    it for what you could sell it at, I think that that is

9    unreasonable.

10   Q    Okay.  And you do know, do you not, sir, that Barclays

11   priced for auction rate securities at par?

12   A    I'm sorry?

13   Q    You do know, do you not, sir, that Barclays priced for

14   auction securities, auction rate securities at par?

15   A    I believe they may have done that, yes.

16   Q    But that would've been unreasonable?

17   A    That would've been, in my view, depending upon the

18   securities, that could very well be unreasonable if there was

19   no market for those securities.

20   Q    And again, you didn't do any such analysis when you were

21   looking at this portfolio of auction rate securities to

22   determine whether in a particular instance when Barclays used

23   par, whether that reasonable or unreasonable, correct?

24   A    I was looking at the overall process and the assumptions

25   that have been made to value this group of securities, and so

Page 134

1    taking a twenty percent discount, based upon the substantial

2    illiquidity in the market, and the fact that these auctions had

3    failed was, from my opinion, within the bounds of

4    reasonableness.

5        Again, I can't quantify it, and I'm not going to sit here

6    and say that it would've been more reasonable if it was twenty-

7    three or more reasonable if it was seventeen, but what I can

8    say with substantial confidence, is that pricing it at par

9    would've basically been not taking into account the market

10   conditions at the time, that can be easily seen by just looking

11   at the fact that this market had basically failed.

12   Q    But again, you'd agree with me that someone who was

13   actually transacting in the market, has familiarity of the

14   market, may have a slightly better street sense of that market,

15   than for example, someone like you?

16   A    I would agree with that, yes.

17   Q    Let's move to Pine, please, and that is -- you had a

18   discussion of Pine on pages 43 to 50 of your demonstrative.

19   There was one place, in particular, that I want to draw your

20   attention and that is slide 45 of your demonstrative, BCI 1103.

21       And before I delve into this analysis, you did not do any

22   independent round-up analysis of the Pine valuation, correct?

23   A    That is correct.

24   Q    For example, you didn't go to LoanX or CES spreads to

25   determine the probability of default of any of the borrowers,

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 135 of 194

Page 135

1    correct?

2    A    No, I did not.

3    Q    And you didn't have your staff do that either, correct?

4    A    No, I did not.  I did not -- I should say, I did not

5    instruct my staff to do that.

6    Q    Okay.  So -- and again, in this instance, you saw a

7    valuation in the first instance that was done by Barclays, the

8    PCG Group and then reviewed by PwC, and then you reviewed what

9    PwC had reviewed, and you reviewed what Barclays had done,

10   correct?

11   A    Among other things.  I was looking, as you can see, at

12   some other valuations, including the valuation that JPMorgan

13   made, and Gifford Fong who I can tell you is far more qualified

14   than I am to make these valuations.  He does that as a

15   business.

16   Q    You know, I noticed that on your slide, you have a date

17   for JPM, when you say, on September 12th, JPM revalues at

18   seventy percent.  Do you see that?

19   A    Yes.

20   Q    Yeah.  But you have no date next to the Gifford Fong

21   valuation.  Do you know when the Gifford Fong valuation was

22   rendered?

23   A    I believe it was before that or at that time.  It's

24   certainly, if I recall correctly, and I'd have to go back and

25   look, I believe it's mentioned as something that had been done

Page 136

1    before, certainly before the bankruptcy.  I know it's been done

2    before the bankruptcy.

3    Q    Well, let's not guess about it.  Let's pull up, if we

4    could please, BCI Exhibit 1005.  I think that's the document

5    you were shown yesterday.

6        (Pause)

7            MR. TAMBE:  We may not have it in our system, it's a

8    relatively new exhibit.  Thank you.  If you could please pull

9    it up.

10            UNIDENTIFIED SPEAKER:  1005?

11       (Pause)

12   Q    That's the e-mail you were asked about yesterday, correct,

13   sir?

14   A    Yes, it is, I believe.

15   Q    That has a date of September 4th, 2008, correct?

16   A    So, yes, it is, at least a couple of weeks before the

17   bankruptcy.

18   Q    Right.  And some fairly tumultuous weeks between September

19   4th and the bankruptcy, correct?

20   A    Those were weeks of some turmoil, yes.

21   Q    So on September 4, 2008, Gifford Fong comes out with a

22   fifty percent valuation.  Now, let's go back to your slide,

23   slide 47.

24   A    Excuse me, I don't want to interrupt, but I'm not sure

25   when Gifford Fong came up with the valuation, this is an e-mail

Page 137

1    reporting it on September 4th.

2    Q    This could be an e-mail --

3    A    We don't know when Gifford Fong actually made that

4    valuation, but it was presumably before September 4.

5    Q    That's a very good point.  So at least September 4th or

6    earlier, you got the Gifford Fong valuation.

7         MR. TAMBE:  Go back to slide 45, BCI 1103.

8    Q    And at least eight days later as the prices is worsening,

9    JPM, you say then revalues Pine at seventy percent.

10   A    That's correct.

11   Q    So they've got a different view from Gifford Fong, and in

12   fact, they ascribe a higher value to Pine.

13   A    Yes.  And this is yet further evidence of how a security

14   like this, which Barclays classified as being a level three

15   security, when it was classified by Lehman as level two, is

16   extremely difficult to value, and it requires some judgment,

17   which was the point I was making yesterday, and I think this

18   illustrates it as well.

19   Q    And you see this as an exercise by JPM as an independent

20   judgment, they got some information from Gifford Fong, but they

21   independently value it at a higher value, correct?

22   A    I'm not sure whether their valuation was made taking into

23   account Gifford Fong's valuation, or whether it was made not

24   taking it into account and made independently.  All I know is

25   Gifford Fong valued it around fifty percent.  I think it was

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 138 of 194

Page 138

1    Mr. Delaney at JPM valued it at seventy.

2    Q    And when you say JPM valued it at seventy, is there a

3    document you have in mind where you actually saw JPM valuing

4    this at seventy percent?

5    A    Well, I certainly saw it in the examiner's report.

6    Q    So you saw a reference to it in the examiner's report.

7    Did you see any underlying documents from JPM that show JPM

8    valuing this at seventy percent?

9    A    If I did, I'm not recalling it as I sit here, but I may

10   have, but I do remember it in the examiner's report.

11   Q    Did you see any documents where JPMorgan valued this at a

12   hundred percent after September 12?

13   A    I don't know what the custodial mark was, but I believe it

14   might have been -- I'd have to go back and check.  I think

15   there may have been a custodial mark at a higher level, I'm

16   just not sure.

17   Q    Well, let's check the custodial mark.  Let's go to M-909.

18         MR. TAMBE:  We'll pull that up on the screen, it's

19   Movant's Trial Exhibit 909.

20   Q    And there's an Excel spreadsheet.  First, let's look at

21   the e-mail.  Do you see there's an e-mail on 9/26, so post

22   closing from Stephanie Heller at the Fed to Mr. Laraca at

23   Barclays Capital.  Do you see that?

24   A    I do, yes.

25   Q    Copying Stephen Cutler and Tom Baxter at the Fed.

Page 139

1    A    Right.

2    Q    Steve Cutler at JPMorgan and Tom Baxter at the Feds, yeah.

3    A    Yes.  I don't know who those two people are, but I'll take

4    it that they're JPMorgan and the Fed, yes.

5    Q    And what's being sent over is here's a list of securities

6    pledged to the Fed Wednesday to Thursday.  Do you see that?

7    A    I do, yes.

8    Q    And you recognize that as a reference to the week of the

9    15th, the securities that were pledged to the Fed, Wednesday

10   into Thursday.

11   A    I believe that must be what it's referring to, yes.

12   Q    And then the file has a name 080917 next to that, do you

13   see that column?

14   A    That would certainly indicate that it's a point at that

15   timetable.

16   Q    Let's take a look at the value of the Pine security in

17   that Excel spreadsheet.

18        MR. TAMBE:  It's a PDCF tab, please.  Ought to be the

19   very first one, and then we just need to expand it.  Expand row

20   -- column F, please.

21   Q    Do you see the CUSIP that appears there in row F -- in

22   column F, row two?

23   A    Yes.  I recognize the AA7 as referring to -- I can't say

24   it refers to Pine, but I know that the Pine CUSIP ended with

25   AA7.

Page 140

1    Q    Right.

2         MR. TAMBE:  And if you'd scroll across, please, Steve,

3    slowly.  Stop.  You see the -- I have trouble seeing it now.

4    Q    You see the price column has an M -- in column M, 2 is

5    100.  Do you see that?

6    A    I do, yes.

7    Q    And you see the market column, column J-2 has a value,

8    lots of numbers in there that's about 919 million.  Do you see

9    that?

10   A    I do.

11   Q    Okay.  And you have no reason to doubt that this is, in

12   fact, JPMorgan's custodial value on the Pine security on

13   September 17, 2008, do you?

14   A    No.  I take it as that was the value, and what that

15   indicates to me is how unreliable or potentially unreliable

16   some of these custodial marks are.  In particular, here we have

17   the JPMorgan as custodian placing the price at a hundred, when

18   I understand from the examiner's report, that internally it was

19   valuing it at seventy, and Gifford Fong had valued it at fifty.

20        So I think that just illustrates the type of thing that

21   we're talking about here, where taking an inventory in at

22   custodial marks is not necessarily going to be reliable.

23   Q    Well, you are not an expert on custodial customs and

24   practices, are you, sir?

25   A    No, I'm not representing myself as such, no.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 141

1  Q    And you are aware, though, as a financial economist, that

2  large institutions like JPMorgan have some processes and

3  procedures in place when they're asked to do important things,

4  like serve as custodial agents, correct?

5  A    I know, but it -- I'm aware of that, but what we have

6  before us is a situation where internally JPMorgan was valuing

7  it at probably in one part of its institution at seventy or

8  seventy-four, I think it was, getting a report from Gifford

9  Fong, who is an expert in this business, valuing it at fifty-

10  four, fifty something, and then they're putting a price of a

11  hundred on it here, a little bit later in a very tumultuous

12  period.

13      So I think as a financial economist, I may not be an

14  expert in custodial practices, but I do believe I have the

15  expertise to realize that this calls into serious question that

16  price of a hundred there, when in other parts of the

17  institution, they're marking it at a much lower price.

18  Q    Well, the reality is, you don't know what JPM may be

19  marking it at in different parts of the institution, you're

20  speculating as to that?

21  A    I'm --

22  Q    Based on the examiner's report.

23  A    By reading the examiner's report.  My information, I

24  believe, is mainly from the examiner's report, that is correct.

25  Q    And earlier today we discussed the definition of market

Page 142

1    value in the e-mail that was shared between Ms. Leventhal and

2    Jonathan Hughes, correct, and that was the definition of market

3    value as it relates to the PDCF.  Do you remember that

4    discussion?

5    A    I do remember, but I want to be careful here.  That was

6    market value as what -- I should have to have my memory

7    refreshed, as to exactly what that context was, and whether it

8    was market value for purposes of posting values for the repo or

9    market value as an economist would understand it.

10   Q    So you may have a completely different view of market

11   value than the definition ascribed to by the Fed and JPM as set

12   out in their contracts; is that what you're saying?

13   A    I'd like to go back and review what that was, just so that

14   I can review it and make sure that if I'm answering your

15   question, I'm answering it as I would as a financial economist.

16   Q    Well, let's look at M-705.  That was the e-mail that we

17   were looking at this morning.  Page two of M-705.

18         MR. TAMBE:  And if you could increase the size of

19   that, please.

20   Q    And what Shari Leventhal is saying to Mr. Hughes at

21   Barclays is, this is the definition of market value used in the

22   PDCF program.  You understand that to be the Fed program,

23   correct?

24   A    That's the Primary Dealers Credit Facility, yes.  So here

25   we have a problem right away.  This is why I wanted it put back

Page 143

1    up on the screen, because I was remembering something like

2    this.  If you read that, it says, market value, the most

3    recently available closing bid price for the particular

4    security.

5         Well, this is a security that never traded.  We're talking

6    about Pine, it never traded.  There's no bid price that's out

7    there.  So here's where someone has to use judgment, and you

8    have Gifford Fong, you have internally and JPMorgan, at least

9    according to the examiner, you have a price, and then you have

10   the custodian putting a price at hundred is not the most

11   recently available closing bid price for the particular

12   security.

13        So I, with all due respect, I don't think that this

14   definition can be applied in this situation where you have a

15   security that was not traded and was never meant to trade.

16   Q    You haven't seen any communications between JPMorgan and

17   the Fed where JPMorgan says, we know you've got a definition of

18   market value, but we're going to disregard that for the

19   following classes of securities.  You haven't seen anything

20   like that, have you, sir?

21   A    Not to my knowledge, but this definition that you've put

22   up in front of me, I don't think can be applied to Pine.

23   Q    Let's move to US Agency securities.  In your

24   demonstrative, you had slide 66 and others where you discuss

25   some of the valuation issues concerning agency securities,

1    correct?

2    A    That is correct, yes.

3    Q    And you see there that there is a differential in value

4    between the movants' exit values and the Barclays' exit values.

5    Do you see that?

6    A    That is correct.

7    Q    And you understand from work you've done in this case,

8    that part of that relates to price differential, but part of

9    that also relates to a liquidity discount differential.

10   A    That is correct.

11   Q    And just so we can put some definition around that, if we

12   could turn to a demonstrative we used earlier with Mr. Slattery

13   just to talk about the differential on Movant's Exhibit 920,

14   page 7.

15        MR. TAMBE:   The next page.

16   Q    All right.   And here what Mr. Slattery has done is just

17   divided up the differential amongst different types of U.S.

18   treasuries and agencies, and you'll see that the bulk of the

19   differential in price and value comes from U.S. agency debt

20   securities, and most of that difference comes from liquidity

21   adjustment.   Do you see that?

22   A    Yes, I do.

23   Q    Okay.   And that's consistent with your review and analysis

24   of his work, correct?   That's where the differential comes

25   from.

Page 145

1   A    Yes, I would agree with that.

2   Q    Okay.  So now let's go back to your slide then.

3        What work did you do to satisfy yourself that a five

4   percent mid-to-bid adjustment, so a ten percent bid-ask spread

5   was appropriate for those particular CUSIPs?

6   A    So again, I'm relying here on the traders and the people

7   that are close to the market and knew what market conditions

8   are.  Again, if you look at this, what you see is that level

9   two securities and we're in that middle part of the spectrum

10  make up a substantial part of this portfolio, and these are the

11  ones that are more difficult to value, and for which price

12  information is harder to come by, and have a lower liquidity.

13       So those that were in the market at Barclays, and this is

14  again reviewed by PwC, are making a judgment as to what the

15  liquidity adjustment should be.  I was not in the market, and

16  so I didn't have the feel for the market to make a judgment

17  against that.

18  Q    Did you look at any publicly available data, any published

19  data about what prevailing spreads are in this market?

20  A    Well, you can see prevailing spreads on some of the more

21  liquid securities, and so-called benchmark securities, and by

22  definition, those are going to be lower.  So that information

23  is not going to tell you how to basically make the liquidity

24  adjustment to this overall inventory.

25  Q    Well, did you make any effort to determine how, if at all,

1    the traders at Barclays had gone from the benchmark securities

2    to liquid securities to this five percent, this ten percent

3    bid-ask spread that they apply here?

4    A    No, I did not make any effort to do that.

5         (Pause)

6    Q    And do you have any greater level of specificity as to

7    your knowledge how that five percent was arrived at?  You said

8    you got it from traders.  How was that five percent arrived at?

9    A    No, I didn't say I got it from traders, but it was, I

10   believe, formed by those that were in the market, again, had

11   this feel for the market at the time, but I don't know

12   precisely how the information for that was gathered.

13   Q    Are there any names of the PCG Group that you associated

14   with that decision to have a ten percent bid-ask spread on US

15   agencies?

16   A    There may be, but I don't recall at this time who was

17   involved.

18   Q    And you don't recall seeing any work papers that --

19   specifically Barclays' work papers, specifically lay out the

20   rationale, the analysis for that five percent adjustment?

21   A    Not that I can recall sitting here.

22   Q    And you'd agree with me that that five percent drives a

23   non-immaterial differential between movants and Barclays, 370

24   million dollars, correct?

25   A    It was a number that I think we saw up there, at least I

1    believe that's an order of magnitude -- as an order of

2    magnitude, it's fair in terms of representing the difference.

3    Q    You have seen some of the materials that Mr. Slattery has

4    put in about publicly available information, Fannie and Freddie

5    publication that actually reported on what the prevailing

6    spreads were in September 2008 for agency securities, correct?

7    A    Yes, I did.

8    Q    And that shows spreads that were, I think, bid-ask spreads

9    and liquidity adjustments of about two basis points; is that

10    right?

11    A    I believe those were for the most actively traded

12    benchmark bonds, yes.

13    Q    So let's just to be sure that we're looking at the right

14    information, we can go back to Movant's 920, slide number nine,

15    which is page ten, I believe.

16        You've seen this before, right?

17    A    Yes, I have.

18    Q    And the Fannie Mae spread of .02 percent, that's

19    consistent with what you saw in the materials cited by Mr.

20    Slattery, correct?

21    A    I think that's -- yes.

22    Q    And what Barclays has applied, the 5.8 and the 4.8 percent

23    is several hundred times the spread experienced on the Fannie

24    Mae securities, correct?

25    A    Those Fannie Mae securities again, I believe, are the

Page 148

1   benchmark securities that tend to be very actively traded, yes.

2   Q    And you did not do any further analysis to determine the

3   appropriateness of using that wide a spread across all of this

4   class of securities?

5   A    No, I did not.

6   Q    Okay.  Let's move to agency RMBS.  And in your

7   demonstrative, that's slides 80 and 81, so let's move to slide

8   80 and BCI 1103.

9        And here again, as you've done on other instances, you're

10  describing the level one, level two, level three status and the

11  differential in values.  Do you see that?

12  A    That is correct.

13  Q    And on the next page, page 81, you lay out some

14  methodology, correct?

15  A    That is correct.

16  Q    And the second bullet or well the first two bullets talk

17  about the use of a model.  Do you see that?

18  A    Yes, I do.

19  Q    And you referred to that model in the second bullet point

20  as the Black Rock prepayment model.  Do you see that?

21  A    Yes.

22  Q    Did you actually examine the model that was used by

23  Barclays to come up with these valuations on this class of

24  securities?

25  A    In this particular case, I did not, no.

Page 149

1   Q    And the model would have a series of assumptions and

2   inputs that would drive an output, correct?

3   A    That's true of any model.

4   Q    And you did not examine the inputs and assumptions that

5   went into the Black Rock prepayment model used by Barclays to

6   arrive at the prices that they arrived at for these securities,

7   correct?

8   A    I did not, no.

9   Q    Okay.  And you did not create your own model to try and

10  replicate -- test what Barclays had arrived at, correct?

11  A    No, I did not.

12  Q    It sounds from your last answer, the Black Rock prepayment

13  model is something you're familiar with, correct?

14  A    I'm familiar in broad-brush strokes, but I haven't used it

15  and I don't know the details.

16  Q    So you've never used it?

17  A    I've never used it, no.

18  Q    Are you familiar with other prepayment models other than

19  the Black Rock model that are used in the industry?

20  A    I'm familiar with how the models are generally used, but

21  I'm not that familiar with all the specifics.

22  Q    And with respect to the models that we used by movant's

23  experts, did you try and analyze those models?

24  A    No, I did not.

25  Q    And did you -- but you did try to analyze a lot of the

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 150 of 194

Page 150

1    inputs and assumptions used by Mr. Slattery in arriving at his

2    numbers, correct?

3    A    Some of those I did, yes.

4    Q    And you took -- you told us about you and your staff

5    having spent countless hours trying to figure out how Mr.

6    Slattery arrived at a particular number, right?

7    A    That was a different exercise.  It wasn't looking at his

8    actual inputs in terms of assumptions of CPRs and weighted

9    average life and things of that sort.  It was rather and a

10   simpler exercise than that, which was simply to try to identify

11   where in his work papers he had calculated midpoint or mid-

12   level prices.

13   Q    And you're not suggesting that we hadn't provided you with

14   the assumptions that were driving this model.  You were looking

15   for a particular piece of information that you couldn't find in

16   the work papers, right?

17   A    What my staff looked for and did not find was a situation

18   for a number of the CUSIPs where a mid price had been

19   calculated, based on whatever inputs he had, that filtered up

20   into the spreadsheet, which I'll characterize as a top level

21   spreadsheet, as a midpoint price range from which a liquidity

22   adjustment was taken.

23        Rather, what we found was the output of models that he was

24   using, filtered up as a bid price, or appeared to.  I'm going

25   to say appears to.  A bid price, which was then, it appears,

Page 151

1    grossed up to mid price.

2    Q    And you don't quarrel with the notion that you could have

3    models that, in fact, because they're driven by market inputs

4    generate a bid price as opposed to a mid price, correct?

5    A    In principle that could be done, but the practice, as far

6    as I understand it, is always to generate mid prices and scale

7    them down.  And my understanding was that Mr. Slattery

8    represented, at least in some of his testimony, that he was

9    generating mids and then adjusting them down to bids.  So it

10   was based upon that that we attempted to look for where the

11   mids were generated in his underlying work papers.

12   Q    Did you spend the same time of effort and ask your staff

13   to turn over every stone looking for assumptions and inputs and

14   drivers of the Barclays' model, sir?

15   A    This exercise obviously required some effort.  We did not

16   do that effort throughout what Barclays was doing, in some

17   sense, that was done by PwC.

18   Q    Well, you don't know to what extent PwC did -- conducted

19   that effort, do you, sir?

20   A    That's why I qualified it by saying in some sense.  I know

21   that PwC, if you look at their work papers, did extensive

22   testing.  As a matter of fact, I pointed out yesterday to a

23   case where they were looking at exactly this type of situation

24   where a matrix pricing was used, and they looked and they saw

25   that the wrong matrix was being used, so they were looking very

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 152

1    carefully at the process, at least in that case they certainly

2    were, because they identified an incorrect matrix being used.

3    Q    And other than that case that you talked about yesterday,

4    you can't comment on how carefully or how appropriately they

5    may have looked at and studied the model used by Barclays to

6    arrive at these values, correct?

7    A    No, that's not correct.  I looked through their work

8    papers, and I saw instances where they were doing lots of

9    analysis to examine whether the pricing that was being done by

10   Barclays was using the same process and the same models as was

11   being used for their legacy portfolio.  I had a number of

12   issues in mind where PwC was basically doing these type of

13   checks.

14       I don't think that PwC checked everything.  It take -- it

15   took representative samples, it looked at the process, but it

16   was a very extensive procedure of basically doing this type of

17   analysis.

18   Q    Do you know whether PwC in all the work that it did,

19   obtained the risk premium inputs that were used by Barclays to

20   run their models?

21   A    Sitting here now, I don't know.  I'd have to go back to

22   their work papers.  I believe that they did send outside

23   checks.  I believe -- actually, I'm pretty sure.  Let me say

24   I'm ninety percent confident that the following occurred, that

25   for various types of securities, they got -- they used this

Page 153

1    group, and I can't remember the acronym as I sit here now, on

2    this internal to PwC to basically use their own models to see

3    if the prices that they came up with were similar.

4         So I think that the exercise was not looking specifically

5    at whether the inputs into the Barclays' model were what PwC

6    thought they should be, although that may have been done as

7    well.  But rather, to look at the Barclays' prices, send those

8    prices to this group within PwC and have that group use its own

9    models to see if they came up with similar prices.

10        So I'm quite confident.  We economists always like to

11   quantify these things in some way.  So I'm ninety percent

12   confident that they did that in at least the one case that I'm

13   thinking of, and I think in other cases as well.

14   Q    Going back to your slide, you say that in addition to

15   whatever models and assumptions were used to drive the pricing

16   methodology, which was run by Barclays, and in your view,

17   tested in some way by PwC, there was also a liquidity discount

18   taken for the prices that were then obtained, correct?

19   A    That is correct.  So they had obtained what we would call

20   mid value prices or midpoint prices, and then mark them to exit

21   values as required by the accounting rules.

22   Q    And for the agency CMOs, you see there that there was a

23   ten percent liquidity adjustment taken by Barclays, correct?

24   A    That is correct.

25   Q    And you understand that to be a twenty percent bid-ask

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 154

1    spread, right?

2    A    Well, that is an adjustment that was marketing their mid

3    values down to a bid value.  I'm not sure in some of these

4    cases whether they're interpreting it as half of a larger

5    spread, or whether part of it is an adjustment to value to

6    reflect market conditions, so.

7    Q    You just don't know?

8    A    I don't know in this case exactly what the interpretation

9    was.

10   Q    And you have no street sense, knowledge, about whether ten

11   percent mid-to-bid adjustment for agency CMOs was appropriate

12   for all of the different types of agency CMOs that were at

13   issue in this case, correct?

14   A    If by street sense you mean did I have a feel for the

15   market --

16   Q    Yeah.

17   A    -- that phrase that we've been using for, no, I was not in

18   the market at the time, and so I don't have that street sense

19   or feel for the market.

20   Q    And you do understand, though, that in this market, the

21   agency CMO market, there are many different flavors or stripes

22   of products that are traded, correct?

23   A    There's a very large, a very extensive range of IOs and

24   POs and varied sequentials and various other things, yes.

25   Q    And you do know that liquidity and bid-ask spreads would

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 155 of 194

Page 155

1    vary from product-to-product within this segment, correct?

2    A    That would generally be the case, yes.  And here again,

3    you're taking an average over a range of products, so there's a

4    certain level of granularity that they decided to do and they

5    basically lumped the CMO products together and took what they

6    thought was an average over that.

7    Q    And again, this is an area where you would defer to

8    someone who actually had that sense of the market, who actually

9    had traded in value these types of securities to determine what

10    an appropriate bid-ask spread should be for particular

11    subcategories of the segment, correct?

12    A    Indeed.  I would say that someone who is there in the

13    market at the time, or has the sense of the market at the time

14    would have more information to do this than what I would.

15        MR. TAMBE:  If we can take about a five-minute break,

16    Your Honor.  I think I'm almost done.  I may have two areas to

17    cover, but I just want to make sure I don't have anything else

18    left.

19        THE COURT:  Fine.  We'll take a five-minute break.

20    (Recessed at 2:55 p.m.; reconvened at 3:14 p.m.)

21        THE COURT:  Be seated, please.

22        MR. TAMBE:  Your Honor, we let counsel know at the

23    break that we have no further questions on cross.  Thank you,

24    Professor Pfleiderer.

25        THE COURT:  Okay.

Page 156

1          MR. HUME:  Short redirect, Your Honor.

2          THE COURT:  Okay.

3          MR. HUME:  For the record, Hamish Hume, Boies

4    Schiller, representing Barclays.

5                    REDIRECT EXAMINATION

6    BY MR. HUME:

7    Q    Good afternoon, Professor Pfleiderer.

8    A    Good afternoon.

9    Q    I have just a few questions in follow-up to Mr. Tambe's

10   questions.

11        On two different occasions I think in his cross-

12   examination, Mr. Tambe showed you Movant's Exhibit 190, an e-

13   mail attaching a spreadsheet.  Do you recall that?

14   A    I believe so, yes.

15   Q    And do you recall that this was in response to the

16   analysis presented in your report in January of this year, as

17   well as supplemental information you provided, showing that the

18   Lehman book value of the long positions, as defined in the APA,

19   were never higher than seven billion dollars during the week of

20   September 15th.

21        In response to that, Mr. Tambe has shown you this

22   spreadsheet.  Do you recall that?

23   A    Yes, I do.

24   Q    And we have the spreadsheet now up on the screen, and you

25   don't recall studying this spreadsheet in close detail, do you?

Page 157

1    A    Not in close detail.  I believe I've seen -- maybe not

2    this one, but something similar, but I certainly didn't study

3    it in very close detail.

4    Q    It has on that an entry for a number of CUSIPs, including

5    one CUSIP here, Bank of Obio (ph), Argentina, it looks like.

6    Do you see that, the description?

7    A    Yes, I do.

8    Q    And you see in column H it has a quantity of 257 million?

9    A    Yes, I do.

10   Q    And you recall Mr. Tambe representing to you that if you

11   totaled up all the market values, it may be in excess of

12   seventy-three billion.

13   A    Yes, I do remember him saying that, yes.

14   Q    Suggesting that that might be inconsistent with all of

15   your findings that you set forth over the past year, that

16   there's no data showing long positions as defined in the APA

17   greater than seventy billion  Do you recall that?

18   A    I do, yes.

19   Q    Do you see the market value column K?

20   A    I do, yes.

21   Q    Do you see for this one single CUSIP, there is a market

22   value of 28.2 billion dollars.

23   A    That does get one's attention, yes.

24   Q    In all of your analysis, the long positions, and the APA,

25   the GFS data, and the CUSIPs transferred to Barclays, have you

Page 158

1    ever heard of a single bond with a value of 28.2 billion

2    dollars?

3    A    No.  I believe that would've been something I would've

4    remembered, yes.

5    Q    Is that inconsistent with your understanding of what was

6    actually in the collateral transferred to Barclays?

7    A    It's not at all consistent with what I believed was

8    transferred.  I certainly think if it would've been transferred

9    we would've been talking about it if it had that market value.

10   Q    Does it strike you as likely that there even was a single

11   bond from Bank of Obio for 28.2 billion dollars?

12   A    No.  My suspicion would be that that is some sort of

13   clerical error or a calculational error.  That would be a huge

14   bond.

15   Q    And if there were a single bond in this list of 28.2

16   billion, what significance would there be to you that the total

17   spreadsheet adds up to somewhere like seventy-three billion as

18   Mr. Tambe suggested?

19   A    That would be certainly sufficient to put it over seventy

20   billion, certainly would get it to seventy-three billion;

21   twenty-eight billion would certainly fill that gap, yes.

22   Q    And if the 28.2 is included in the calculation that leads

23   to the seventy-three, would the seventy-three have any

24   significance or impact or cause you in any way to modify any of

25   your opinions in this case?

1    A    Not at all, unless I understood that that bond really did

2    have that value, and was defined as part of the loan positions,

3    but I certainly haven't seen anything to indicate that that

4    would be the case.

5    Q    We have prepared a demonstrative to, for efficiency sake,

6    so as not to have to go through a series of documents, or if

7    movant's counsel insists, I'm sure we could, showing the

8    valuations that are given for this Bank of Obio bond.

9        If that's the CUSIP number, it's a Obio bond.  First we

10    have Movant's 190N, which we just looked at and summarized.  Do

11    you see the 28.2 billion dollar number there right here?

12    A    Yes, I do.

13    Q    Okay.  Underneath that, we have taken the BoNY midpoint

14    value, given for the same bond.  You see it has the same

15    quantity, 257,500,000?

16    A    Yes.

17    Q    It's exactly the same with BoNY.  Do you see that?

18    A    It's precisely the same, yes.

19    Q    And the price is precisely the same.

20    A    Indeed.

21    Q    You see the market value is quite a bit different.

22    A    It looks like it's reduced by a factor of a hundred here.

23    Q    And this --

24    A    Approximately.

25    Q    -- I represent to you, Professor Pfleiderer, is taken

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 160

1    straight off of Movant's 285N, the rates tab.  Can you think of

2    a reason, Professor Pfleiderer, why the BoNY value would be one

3    hundred times less than the value of Movant's 190N?

4    A    I can speculate that perhaps, this is just speculation,

5    that somehow cents were put in instead of a dollar, given that

6    it looks like a factor of a hundred difference, that might be

7    the reason.  I'm just not sure.

8    Q    Can you see from the numbers that it is exactly, or it

9    appears to be almost exactly a hundred times different?

10   A    Yes.

11   Q    Now, the Barclays' mid value taken from Movant's 285N is

12   271 million.  Do you see that?

13   A    Yes.

14   Q    And the movant's expert has an exit value of 260.2

15   million.  Do you see that?

16   A    I do.

17           MR. HUME:  And I want to be very careful, Judge, not

18   to be representing here that Barclays' actual value on the

19   acquisition balance sheet was higher than movant's expert, Mr.

20   Olvany, just for simplicity, it was easier for us to take the

21   mid value that Barclays calculated, so that we could list every

22   number exactly as it is on the spreadsheet and keep everything

23   apples-to-apples.  I think that Barclays' exit value is lower,

24   I believe, or I would guess, than Mr. Olvany's.

25   Q    And then finally -- so you see Mr. Olvany's value,

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 161 of 194

Page 161

1    Professor Pfleiderer?

2    A    Yes, I do.

3    Q    And is it in -- is it comparable on the same order of

4    magnitude to what is on Movant's 190N?

5    A    It is.  Oh, wait, I'm sorry.  The top line is not at all.

6    It's again, different by a magnitude of ten to two, a factor of

7    a hundred.

8    Q    And finally we have, do you see the GFS data extracted

9    from September 19th with a value of 259 million.  Do you see

10   that?

11   A    I do.

12   Q    How does that compare to what's on Movant's 190N?

13   A    Again, in the same order of magnitude.  Oh, wait, I'm

14   sorry.  To 190N, it's again a factor of a hundred, but it's the

15   same order of magnitude of all the other lines.

16   Q    And how does this information impact your assessment of

17   the relevant, if any, of the information on Movant's 190N that

18   is presented to you today in response to all of your findings

19   over the past year?

20   A    Well, my strong speculation and I'm fairly confident in

21   making this statement, is that Movant's 190N is plagued by a

22   substantial calculational error of some sort that puts that

23   value off by a factor of a hundred and makes it unreliable.

24   Q    You were also asked some questions about the testimony of

25   the people who were involved in negotiations at the time.  You

Page 162

1    were shown testimony from Mr. Lowett.  Do you recall that?

2    A    Yes, I do.

3    Q    And I think you gave some testimony that in terms of what

4    was actually negotiated, you would defer to the people who were

5    actually there at the time.  Do you recall that?

6    A    Yes, I certainly would.

7    Q    Are you aware, Professor Pfleiderer, of the trial

8    testimony from Mr. Lowett and Mr. McDade regarding whether it

9    would be better for the Court in its search for the truth about

10   the Lehman marks, to rely upon their recollection rather than

11   to rely upon the actual data from the Lehman systems?

12   A    I do recall that both of them said that it'd be more

13   reliable, if not in this precise way, but basically saying it

14   would be more reliable to go back and look at the books rather

15   than what they were remembering.  Again, I'm characterizing

16   what they said, but I believe that both of them said that.

17           MR. HUME:  Could we have the trial, the official trial

18   transcript from April 29th, page 145, line 16 to 20?

19   Q    These are question and answer to Mr. Lowett, I believe

20   from me.

21           Mr. Lowett, if you wanted to know the values listed for

22   these assets on the books of Lehman Brothers on September 12th

23   or 15th or 16th, would it be better to ask someone what they

24   remember, to look at the actual data from the Lehman systems?

25           The answer, it would seem to be better to look at the

Page 163

1    actual data.

2        Do you recall seeing that?

3    A    I do.

4    Q    When you said you would defer -- let me just show you one

5    more excerpt on --

6        MR. HUME:  If you could bring up the April 27th trial

7    transcript, which is for Mr. McDade's testimony, page 30, lines

8    22 to page 31, line 3.

9    Q    This is from Mr. Boies.  Question, Mr. McDade, if you, as

10   the President of Lehman Brothers, wanted to know what the

11   difference was between the valuation number estimating the

12   value of Lehman assets, and the Friday night Lehman marks,

13   estimating the value of those same assets, am I correct that

14   you would compare the valuation number with the results from

15   the GFS system.  Answer, yes.

16       Do you recall seeing that?

17   A    I do, yes.

18   Q    And you testified that you would defer to what was

19   actually negotiated in terms of what actually happened.  Is it

20   your testimony that the most reliable way to know what the

21   Lehman marks are, is to look at deposition testimony or trial

22   testimony from people who were there during that all nighter,

23   in that chaotic time, or to look at the actual data in the GFS

24   system?

25   A    It's my testimony that the data in the GFS system is the

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 164 of 194

Page 164

1     most reliable.  When I read the various -- as I was trying to

2     read the record and read the various statements that were being

3     made, it occurred to me that the way to resolve this as a

4     financial economist, is to simply look at what the numbers are,

5     which is always what you like to do in a situation like this.

6     Q    You also were asked some questions earlier today,

7     Professor Pfleiderer, about whether you had ever analyzed

8     whether the short positions on the liability side of that

9     Berkenfeld schedule had been marked up.  Do you recall those

10    questions?

11    A    Yes, I do.

12    Q    And I think you testified you hadn't analyzed that.

13    A    That was not something that I had looked into.

14    Q    Do you recall, Professor Pfleiderer, in your review of the

15    Movant's Rule 60 brief, of all of their other papers, all the

16    trial testimony, whether they have ever previously, as far as

17    you know, raised the assertion that what happened, was that the

18    short positions on the trading liabilities were marked up?

19    A    I believe I've read most of their -- well, I should be

20    careful here.  I've read quite a few of their filings.  I

21    haven't read everything, but I've never seen any allegation or

22    any testimony or anything that relates to marking up the short

23    position, so I certainly have not read anything of that sort.

24    Q    And would it be your understanding that an allegation that

25    the short positions on the right-hand side of the schedule had

1    been marked up, that would be a very different factual

2    allegation, from an allegation that was actually made that the

3    long positions had been marked down?

4    A    Indeed that would be very different and require a whole

5    different sort of analysis, and so it would be very different.

6    Q    You were also asked some questions about the equities, the

7    valuation of the equities.  And first was the issue of the

8    timing of the valuation, and when Barclays actually received

9    the equities.  Do you recall those questions?

10   A    Yes, I do.

11   Q    And you were shown slide, demonstrative slide 89 of yours,

12   which refers to when certain batches of inventory were

13   transferred to Barclays.  Do you recall that?

14   A    Yes.

15   Q    Is your use of the word transfer in that demonstrative,

16   and generally in your testimony, a technical discussion of when

17   Barclays received full legal ownership and the ability to sell

18   the securities?

19   A    Certainly as a financial economist, in terms of forming my

20   opinions, I was wanting to factor in when I, as an economist,

21   interpreted they had full control.  So I know that transfer is

22   used in various ways.  For instance, transferring the custodian

23   for various securities from JPMorgan to BoNY, but those type of

24   transfers was not what I had in mind, in any way, in terms of

25   thinking about what the economics of the transaction are and

Page 166

1    when Barclays would have basically ownership and be able to

2    sell the assets.

3    Q    Do you understand that there may be a difference between

4    when assets are pledged, which may be referred to it as

5    transferred, for purposes of repo, and when they are fully

6    transferred for all legal purposes in a sale?

7    A    That's my understanding.  Again, I'm a layperson, and not

8    an attorney, but I certainly do understand that there is a

9    distinction or should be that distinction.

10   Q    Then you were asked some questions about the bid offer

11   adjustment on the equities.  And you were shown, I think, one

12   of your demonstratives that referred to a PwC document

13   describing where their spreads were wider in September.  Do you

14   recall that?

15   A    Yes.

16   Q    I think Mr. Tambe said you know that not to be true.  Do

17   you recall that?

18   A    Yes, I do.

19   Q    And then there was a reference made to what the comparison

20   is that Mr. -- Professor Zchemiasky did on the simple average

21   of the bid offer adjustments -- bid offer spreads, sorry, that

22   were gathered, that were actually possible to be gathered by

23   Barclays for December versus those in September.  Do you recall

24   that?

25   A    Yes.

Page 167

1    Q    Do you recall that that analysis showed that the simple

2    average of those observable bid-ask spreads show wider spreads

3    in December than in September?

4    A    That is correct.

5    Q    And did you understand that to be what Mr. Tambe was

6    referring to when he said, you know that's not true?

7    A    Yes.  I thought he was referring to the 450 million

8    comparison.

9              MR. HUME:  Can I just ask that the hypothetical

10   example shown to Professor Zchemiasky be pulled up briefly on

11   the screen.

12   Q    Professor Pfleiderer, is it mathematically possible that

13   the simple average of bid-ask spreads could be shown to be

14   greater in December than in September, even though for a

15   majority of the CUSIPs, the ratio is, in fact, greater in

16   September than December?  Is that mathematically possible?

17   A    Oh, indeed, and this would be one of an infinite number of

18   ways to illustrate that, yes.

19   Q    And I'm not representing to you or asking you to say that

20   this is exactly what the inventory was that Barclays acquired,

21   I'm simply asking you to explain to the Court, is this

22   mathematically possible, and can you explain what's happening

23   here?

24   A    Yes.  Basically, what we see here is in September for, I

25   guess it's nine out of ten CUSIPs, the spread is larger, but

Page 168

1    for one CUSIP, you see that it's going the other way in a

2    substantial direction.  So when you take the average across

3    these, the average is going to be heavily affected by number

4    ten, and that's going to create this difference in the average

5    and yet, we have nine out of ten that are larger in September.

6        So mathematically, all kinds of things can occur

7    mathematically.  And so it's very difficult to make a judgment

8    as to how to cover those question marks that I talked about

9    where you don't have the data.

10   Q    You were also asked questions about the December

11   settlement securities.  Do you recall that?

12   A    Yes.

13   Q    And you were first asked a series of questions with the

14   formulation of what exactly the concept of the settlement was,

15   and you were --

16   A    Yes.

17   Q    -- shown an excerpt where the Court gave its understanding

18   of what was happening in the settlement.  Do you recall that?

19   A    I do.

20        MR. HUME:  Could we just pull that back up again?

21   It's the December 22nd transcript initially at page 41.

22   Q    And I don't -- I think beginning line 15 to the bottom is

23   what you were shown by Mr. Tambe.  And he says -- the Court

24   asks, I would like better clarity that I currently have on a

25   valuation question.

Page 169

1       He goes on to say, I believe if I'm understanding the

2    transaction correctly, that the working premise of it, is that

3    the 1.25 billion dollars in cash consideration, which is going

4    to Barclays upon approval, along with the securities that have

5    been identified, is intended to compensate Barclays -- go to

6    the next page -- for the diminution in value over time of those

7    securities.  Such as Barclays is receiving the same seven

8    billion dollars in value, assuming it's proved today and

9    consummated tomorrow, they would've received if the transaction

10   would've been consummated as contemplated in September.

11       Do you see all of that?

12   A    Yes, I do.

13   Q    And do you see that Judge Peck then says, am I right in

14   understanding that.

15   A    Yes.

16   Q    Do you understand that Judge Peck was asking a question?

17   A    Yes, it's clearly a question.

18   Q    Let me show you, if I could, what comes after that

19   question from Mr. Schiller at page 42, lines 9 to 12.

20   Immediately after the question is asked, Mr. Schiller says,

21   it's a bit different than that, Judge.  The cash component is

22   designed to address the liquidation of certain securities from

23   the Fed portfolio that occurred, and it makes up for that

24   portion of the securities.

25       Do you see that?

Page 170

```
 1    A    Yes, I do.

 2    Q    So is it your understanding, Professor Pfleiderer, that

 3    there was no compensation to Barclays for the diminution in

 4    value of the security portion of the December settlement?

 5    A    I'd probably have to read in more context around it, but

 6    that certainly implies that the nuances of this are different

 7    than what was originally posed.  So, yes, I would understand

 8    that it is subject to a different interpretation.

 9    Q    Let me, if I could, just pull up Movant's 640, which --

10    and I'll just tell you in a moment.  This is an e-mail from

11    Harold Novikoff at Wachtell Lipton, who was a lawyer for

12    JPMorgan on October 31, 2008.

13         And in the second paragraph when he describes the

14    securities on the list, are all the securities financed by the

15    Fed.  Do you see that, on the evening of September 17th?

16    A    Yes, I do.

17    Q    And the second sentence says, a number of securities

18    financed by the Fed after September 17th, but were not

19    previously delivered to BarCap were liquidated by JPMorgan

20    before this settlement took shape.

21         Do you see that?

22    A    Yes, I do.

23    Q    And he says -- goes on to say, which is the reason for the

24    need to make a cash payment as part of the settlement.  Do you

25    see that?
```

Page 171

1    A     Yes, I do.

2    Q     What impact, if any, does that e-mail, that information

3    and Mr. Schiller's statement at the December 22nd hearing have

4    on your analysis and opinion in this case?

5    A     So now I understand the nature of this settlement a little

6    better than I did when I woke up this morning, and it indicates

7    to me that this is sort of ex post settling up based upon the

8    fact that some of those securities were liquidated into cash,

9    and the cash is being delivered.

10         And again, I would understand this to mean that it is

11   still inappropriate to do what the movants are asking to be

12   done, which is to value this on the 22nd, when in fact, you

13   didn't have control of those securities, and in fact, JPMorgan

14   had control of those securities and was liquidating them at

15   various points in time.  So again, based on this understanding,

16   I believe this reinforces my view that it's inappropriate to do

17   what the movants are suggesting.

18   Q     Let me direct your attention, Professor Pfleiderer, to the

19   first paragraph, which says, I've attached the spreadsheet with

20   collateral values in quotes, as of September 17th, which was

21   the last evening on which the Fed provided financing.

22         Do you see that?

23   A     Yes, I do.

24   Q     The next sentence says, I understand that these collateral

25   values were furnished principally by third party pricing

Page 172

1   sources, and we caution against using those values as reliable

2   indicators of realizable value.

3        Do you see that?

4   A    Yes, I do.

5   Q    What impact, if any, does that have on your analysis or

6   opinion?

7   A    Well, I can read that in two ways, both in the same

8   import.  One is that the custodial marks are not basically

9   reliable as it said, I'm basically just repeating it, for

10  calculating what their realizable value was, and also pointing

11  out that you're getting these later, and so the September 17th

12  value is not appropriate.

13  Q    You were also asked questions about statements in your

14  report about the Fed -- the Federal Reserve's insistence that

15  Barclays take its place in the repo lending facility.  Do you

16  recall that?

17  A    Yes, I was.

18  Q    And I'd like to just show you one quick excerpt from the

19  trial testimony.  You were asked if you would defer to Shari

20  Leventhal.  Do you recall that?

21  A    Yes.  I was asked if I would, and I said that I certainly

22  would.

23  Q    I'd just like to pull up a brief transcript from the

24  September 7th, 2010 trial testimony at page 8, line 24 to page

25  9, line 5.

Page 173

 1          MR. HUME:  It must be a different page eight.

 2          UNIDENTIFIED SPEAKER:  Sorry.

 3          MR. HUME:  Page 8, line 24, beginning of the question.

 4   There we go, okay.

 5   Q    Question:  All right, and there were some -- this looks

 6   like the incorrect cite.

 7          MR. HUME:  Is this from September 7th, 2010?  This is

 8   trial testimony from Shari Leventhal from the Fed.

 9      (Pause)

10   Q    Question:  And did you require Barclays do an agreement on

11   September 17th to take out the Fed's exposure to LBI.

12      Do you see that?

13   A    Yes, I do.

14   Q    Answer:  Yes, we did.  We required Barclays to agree to

15   assume the obligation to finance LBI.

16      Do you see that?

17   A    I do.

18   Q    And is that consistent with your understanding as stated

19   in your report?

20   A    That was not the basis for my understanding, but it's

21   certainly very consistent with my understanding.

22   Q    You were also asked some questions by Mr. Tambe about the

23   incentives of the Barclays' traders.  Do you recall that?

24   A    Yes, I do.

25   Q    And was this testimony about -- there was questions about

Page 174

1    whether the traders had an incentive because if they marked the

2    assets down, they could make a profit, which would increase

3    their personal compensation.  Do you recall that?

4    A    Yes.  I believe that was what was behind the question, I

5    believe.

6    Q    And you were asked whether you had done any investigation

7    into the precise nature of the compensation structure of the

8    traders, as opposed to just having a general understanding.  Do

9    you recall that?

10   A    Yes, I do.

11   Q    Do you know one way or the other, Professor Pfleiderer,

12   whether movants have taken detailed discovery to find out what

13   the precise nature of the compensation structure of those

14   traders is?  Do you know one way or the other?

15   A    I did not know one way or the other.

16   Q    Since you were asked questions about those incentives, I'd

17   like to ask you another question.

18        Assuming that traders have some direct or indirect

19   relationship between their compensation and profits on their

20   desks, is it your opinion as a financial economist, do you have

21   an opinion about the incentives of the organization to ensure

22   that those profits are legitimate?

23   A    As a financial economist, I would say and certainly if I

24   were a shareholder at Barclays, I would say that a compensation

25   scheme that allows traders to mark assets down, so that they

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 175

1    can increase their P&L is not a compensation system that I

2    would want to see.  And if I were overseeing an institution

3    like Barclays, I certainly would not base compensation on that.

4    And, in fact, my understanding is that that is why you have a

5    product control group or independent price testing, to make

6    sure that that basically is not happening.  At least that is

7    one way to make sure that the marks of a front office is

8    putting on assets are not basically misrepresenting what those

9    assets are worth.

10       And I know this isn't dealing with traders, but I remember

11   very distinctly when I was talking to Gary Romain on the phone

12   in December, there were a series of questions that we were

13   asking and I think I asked one of them, to make sure that his

14   compensation and all those that are involved in this

15   independent price testing was not based on whether the marks

16   were high or low, and he was emphatic in saying that that was

17   not the case.

18       And so overall, those are the people that are charged with

19   putting the ultimate marks that go onto the acquisition balance

20   sheet.

21   Q    In addition to the incentive structure you just

22   identified, did Barclays, as an organization, and did its

23   senior management, have an incentive or at least a desire,

24   based on your understanding as a financial economist, to have

25   as large a negative goodwill number on their acquisition

08-13555-mg    Doc 15116    Filed 03/17/11    Entered 03/17/11 11:45:47    Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 176 of 194

Page 176

1    balance sheet as possible?

2    A    So there certainly was an incentive for a bank, especially

3    at this time to have larger valuation put on this to increase

4    its registered capital, or its reported capital, given

5    especially at this time.  It was difficult potentially to raise

6    capital.  There would have been, if any, incentive for the

7    organization as a whole to have this recorded on the balance

8    sheet and not in the P&L later on to give capital immediately.

9         And I'm not saying that -- and I want to be careful.  I'm

10    saying that that would be an incentive.  I'm not saying that

11    the organization pushed for marks to be higher for that.  I'm

12    not making any accusation of that sort clearly, but there would

13    be an incentive that would go in that direction.

14         MR. HUME:  Could we briefly show an excerpt from the

15    April 30th, 2010 trial transcript, the testimony of Barclay's

16    CFO Patrick Clackson, page 32, line 24 to page 33, line 5?

17    Q    I apologize I don't know who's doing the questioning here,

18    but the question is:  What did you do in response to that

19    statement or observation from Mr. Ricci, need to get to four or

20    no write down capacity.  Well, if you didn't understand what he

21    meant, you probably didn't know what to do, right?

22         I think I now think this was a question from Mr. Gaffney.

23         Answer:  Yeah, no, I mean, as I said, we were looking at

24    everything, and yes, we obviously wanted as large a number as

25    possible.

Page 177

1      Do you see that?

2    A    Yes.

3    Q    And does that have any relevance or impact on your

4    analysis and opinion in this case?

5    A    I would interpret this as again being motivated to make

6    sure that their capital was not impaired when this transaction

7    was completed, and the desire that it be what, I guess, some

8    people call capital accretive, so that the bank could post

9    higher capital.

10   Q    You were asked a number of questions, Professor

11   Pfleiderer, by Mr. Tambe throughout the day, about whether you

12   would defer to those who had a feel for the market.  Do you

13   recall that?

14   A    Yes, I do.

15   Q    And when you were answering those questions, was it your

16   understanding that you were being asked, whether you deferred

17   to people who are actively trading in the market, and who had a

18   feel for the market at that time, in September 2008?

19   A    That was how I interpreted the question, that basically

20   was the question I was answering, yes.

21   Q    If the question instead was, would you defer to people who

22   had traded not at that time, and who were not active in the

23   market at that time, but instead may have traded at other

24   times, and who were giving an opinion in a litigation context,

25   would your answer have been the same?

Page 178

1   A    No, absolutely not.  A feel for the market was not the

2   feel for a market at some time, it was the feel for this

3   particular market in late September of 2008.  So that was how I

4   was answering the question, and I would take someone who had

5   experience at another time not to really have the experience

6   that was needed here.

7   Q    You were asked some questions about how the process of

8   your doing the work in this case, and the role of your staff,

9   in helping to gather information.  Do you recall that?

10  A    Yes, I do.

11  Q    Now, when you said you had a number of oral conversations

12  with your staff, do you recall that?

13  A    Yes, quite a few.

14  Q    In those conversations, were you having conversations

15  about documents and spreadsheets that related to the valuation

16  of the assets and that have been produced in this case?

17  A    Many of those discussions were about that, yes.

18  Q    And was it in an effort to understand those documents and

19  spreadsheets as best as possible that you were engaged in that

20  work?

21  A    Yes.  Many of the discussions were centered on that issue.

22  Q    You were asked a question or a series of questions about

23  auction-rate securities.  Do you recall that?

24  A    Yes, I do.

25  Q    And you were asked about whether it would be reasonable to

Page 179

1    value an auction rate security at par, given the nature of the

2    market.  Do you recall that?

3    A     Yes, I do.

4    Q     I'd like to pull up BCI Exhibit 1055.  This is a document

5    entitled Municipal Auction Rate Securities and Variable Rate

6    Demand Obligations, Interest Rate, and Trading Trends, prepared

7    by the Municipal Securities Rulemaking Board.  Do you see that?

8    A     Yes, I do.

9    Q     Are you generally familiar with that body as a standards

10   board in the municipal market?

11   A     Yes, I am.

12   Q     And did you review this document in the course of your

13   work in this case?

14   A     Yes, I did see this.

15   Q     It's a recent document from September 2010.  Do you see

16   that?

17   A     Yes.

18   Q     I'd like to refer you to page three of this document.

19         MR. HUME:  And the chart, if we could blow up this

20   chart on the top left of the page.

21   Q     This says municipal ARS trading volume, January '08 to May

22   2010.  Do you see that?

23   A     Yes, I do.

24   Q     And so September 2008 is going to be somewhere in here,

25   correct?

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 180

1    A    Yes, somewhere, right about there.

2    Q    Does the information on this chart -- have you reviewed

3    the information on this chart before?

4    A    Yes, I have.

5    Q    Does it have any relevance or impact on your analysis and

6    opinions in this case?

7    A    This actually graphically shows what I was talking about

8    when I mentioned that this market had basically collapsed, or I

9    guess nearly collapsed in February of 2008.  And you can see

10   the -- one aspect of that is the trading volume has fallen off

11   by many orders of magnitude here.

12           MR. HUME:  Your Honor, we move BCI Exhibit 1055 into

13   evidence.

14           MR. TAMBE:  Your Honor, it's a hearsay document that

15   can come in for notice or reliance materials by an expert, but

16   it's hearsay.

17           THE COURT:  I don't think it is.  It's a -- I'd like

18   to see the cover so I can identify it.

19           MR. HUME:  Can we go back to the cover, please?

20           THE COURT:  This is a document that either is hearsay,

21   subject to an exception where it is the kind of document that

22   is typically relied upon by people in the industry, and has a

23   very high degree of reliability as a means to demonstrate what

24   was going on generally in the market.  I have no idea what else

25   in this document.  I'm simply looking at it for demonstrative

Page 181

1   purposes.  I'm not accepting it as the truth that that is, in

2   fact, the way graphing of the market in auction rate securities

3   at the various times shown on the chart, but I do believe that

4   it is a fair representation of the overall trends, and indeed,

5   the title of the document is trading trends.

6          To that extent, I believe that it fairly reflects a

7   collapse of that market, and I'm going to admit it.

8          THE COURT:  It's admitted.

9   (BCI Exhibit 1055, Municipal Securities Rulemaking Board Chart,

10  was hereby received into evidence as of this date.)

11         MR. HUME:  Thank you, Your Honor.

12         Could you also briefly show BCI Exhibit 1056A?

13  BY MR. HUME:

14  Q    This is a news article from a publication called Financial

15  Week from June of 2008.

16         MR. HUME:  Would you highlight that so I can make sure

17  I have the date correct?  Okay.

18  Q    And on the title of the document is again "Companies Split

19  on Taking ARS Cash Debt", and it reports of 242 firms with

20  disclosed auction rate holdings, fewer than half have owned up

21  to their losses.  Do you see that?

22  A    Yes, I do.

23  Q    And do you recall reviewing this article in your

24  preparations and work on this case?

25  A    Yes, I saw it a few weeks ago, if not before.

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 182

1   Q    Could we look at the attachment to this article, which I

2   think should be the third or fourth page?  Or I think it's

3   embedded in the second page -- I hope we can blow it up, so

4   it's possible to see.

5        You see we have a -- probably have seen in another

6   article, Look Who's Being Kicked in the ARS.  Do you see that?

7   A    Yes, I do.

8   Q    And then it lists a series of companies.  Do you see that?

9   A    I do.

10  Q    And it lists a par value for their auction rate

11  securities.  Do you see that?

12  A    Yes.

13  Q    And then it lists the fair value and an impairment, and

14  the discount which must be the percentage that the impairment

15  has either to the fair value or the par value, I'm not sure.  I

16  assume to the par value.

17  A    It would be to the par value, I believe.

18  Q    Yeah.  The fair value is the par value minus the dollar

19  value of the impairment.

20  A    That is correct.  I believe that would be what they would

21  be calculating.

22  Q    And what significance, if any, does this have to your

23  analysis in the opinions in this case?

24  A    Well, you can see that a number of the companies are

25  recognizing these losses on their books, are taking substantial

08-13555-mg   Doc 15116   Filed 03/17/11   Entered 03/17/11 11:45:47   Main Document
LEHMAN BROTHERS HOLDINGS, INC., et al.
Pg 183 of 194

Page 183

1    write-downs of these.  In many cases, much more than the twenty

2    percent that Barclays took on its ARS portfolio.  So you see in

3    the extreme some discounts of seventy-three, sixty-seven

4    percent, some of them are much less, some down below only seven

5    or five percent.  I don't know what you'd get if you would take

6    an average there, but an average, I'm sure, would be on the

7    order of twenty percent if not more, just looking at it and

8    eyeballing it, which I realize is not a terribly reliable way

9    to do it, but you can see there's just some very substantial

10   discounts there.

11          MR. HUME:  Your Honor, we move BCI Exhibit 1056A into

12   evidence for the limited purpose of showing what was reported

13   at the time about the auction rate securities market, and the

14   write-down being taken.

15          MR. TAMBE:  For that limited purpose, we have no

16   objection.

17          THE COURT:  It's admitted then for that limited

18   purpose.

19          THE COURT:  It's admitted.

20   (BCI Exhibit 106A, Financial Week News Article, was hereby

21   received into evidence as of this date.)

22   BY MR. HUME:

23   Q    Now, Professor Pfleiderer, you were asked also some

24   questions about the work you and your staff did to look for

25   some of these missing mid values in Mark Slattery's back-up

Page 184

1    papers.  Do you recall that?

2    A    Yes, I do.

3    Q    And you were asked whether you had reviewed any Barclays'

4    papers as carefully as that.

5    A    Correct.

6    Q    Do you remember generally those questions?

7    A    Yes, I do.

8    Q    Now, did you give testimony yesterday that there were over

9    three hundred mid values in Mr. Slattery's summary work paper,

10   including all of the mid values for the agency RMBS that could

11   not be found in any other work paper?

12   A    No.  I don't believe I said all.  I said there was a

13   substantial number for which looking through the work papers,

14   there was no calculation apparent of the mid values.  All of

15   the models were apparently producing bid marks that were being

16   grossed up.

17   Q    In response to the testimony you gave and the findings

18   that you reported from your staff, did Mr. Tambe show you today

19   any single mid value shown on Mr. Slattery's summary work

20   paper --

21   A    No, I don't believe he did.

22   Q    -- or that they calculated?

23   A    I don't believe he did, no.

24   Q    Did you testify yesterday that if, in fact, Mr. Slattery's

25   model calculated a bid value, what he lists as a bid value, and

Page 185

1    then he grossed up to a mid value, and then changed his

2    spreadsheet to show that he was reducing from that mid value to

3    a bid value, that that would be misleading?

4    A    I believe I said something to that effect.  I was cautious

5    in the way I said it, but I would take that on face value to be

6    misleading, yes.

7    Q    And in response to that, did Mr. Tambe show you that, in

8    fact, there are work papers showing how any of those mid values

9    were calculated?

10   A    He did not to date, no.

11   Q    Did you see anything in your work -- you did testify about

12   seven or eight bonds, where Barclays had adopted the BoNY marks

13   of .001 and acknowledged that as an oversight.  Do you remember

14   that?

15   A    Yes.

16   Q    Did you see -- do you believe Barclays was attempting to

17   be misleading with respect to those bonds?

18   A    No.  I certainly believe that that was an oversight.

19   Q    Did you see any evidence in any of your review of any of

20   the work papers, PwC papers, or any of the other work done in

21   this case by Barclays for what they had done, would be

22   considered misleading?

23   A    No, I did not.

24   Q    You were asked a question about how the 47.4 billion

25   dollar number was formulated, and whether it included a

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 186

1    quote/unquote liquidation value.  Do you recall that?

2    A    Yes, I do.

3    Q    Now, when Mr. Tambe asked you that, did he define for you

4    precisely what he meant by the phrase liquidation value?

5    A    I am trusting my memory here.  I don't believe he did, he

6    may have, but as I recall, I don't believe he did.

7    Q    Do you, as a financial economist, believe the phrase

8    liquidation value can be meant and understood in different

9    ways?

10   A    Indeed, yes.

11   Q    What are those different ways?

12   A    Well, I've seen the term used by traders to simply mean

13   what you sell it for.  And so that would be, just again, the

14   exit price that you would get, and then of course, we have

15   liquidation value used perhaps in the context of a Chapter 7

16   bankruptcy, where you're liquidating something in a situation

17   that's quite different than what you're selling a security in

18   active markets.

19        So you do need to be careful, and I probably should've

20   been careful interpreting what Mr. Tambe was saying, because

21   liquidation can mean various things in various contexts.

22   Q    Based on your analysis of the assets transferred to

23   Barclays in this transaction, do you believe that in a fire

24   sale liquidation that would've occurred, had there been no sale

25   transaction at all, that the assets transferred -- that the

Page 187

1    particular CUSIPs transferred to Barclays in the trading

2    inventory, would have generated as much as 47.4 billion

3    dollars?

4    A    I think it's almost inconceivable that they could've.  I

5    think that there would have been a substantial liquidation

6    discount if you're selling those CUSIPs in a very different

7    environment, where the transaction didn't go through.

8        I can't quantify what that would be, but I can say with

9    great confidence that it would've been significantly less.

10   Q    You were also asked a series of questions at the beginning

11   of the day about whether you knew, whether the lawyers and the

12   Court involved lawyers presenting the sale to the Court and the

13   Court itself was told that there was uncertainty over the asset

14   values, because so many of them were illiquid, and could

15   potentially be valued in different ways.  Do you recall that?

16   A    Yes, I do.

17   Q    I'd like to show you, if I could, BCI Exhibit 11, which is

18   the motion filed by Weil Gotshal, lawyers for the debtor, to

19   ask for approval of the sale, and direct your attention to

20   paragraph 17.

21       Paragraph 17 in the third sentence states, the proposed

22   sale is unique because of the fragile and highly vulnerable

23   nature of the purchased assets.  Do you see that?

24   A    Yes, I do.

25   Q    Is that relevant to your opinion in this case?

Page 188

1   A    That would indicate some of the uncertainties involved in

2   these assets.

3   Q    I ask you now to pull up the September 19th transcript,

4   trial -- sale hearing transcript, September 19th, 2008, at page

5   109, lines 21 to 22.

6        This is an answer and when Mark McDade was cross-examined

7   during the sale hearing --

8            MR. HUME:  I think we probably ought to show the

9   question.  Sorry about that.

10  Q    Does Lehman have any valuations, internal valuations, of

11  any of the assets that are being transferred to Barclays?

12       Answer:  Absolutely.  There are many complex securities

13  involved, many different models that we use to evaluate those

14  securities.

15       Do you see that?

16  A    Yes, I do.

17  Q    I'd now like to refer you to April 28th trial transcript,

18  page 94, lines 23 to page 95, lines 11.  This is the trial

19  testimony of Harvey Miller, who was the lead lawyer for the

20  debtor.

21       Question:  Through that tumultuous week of September 15th

22  through the 22nd, which you've described dramatically this

23  morning again, you never had what you would call an accurate

24  Lehman balance sheet; is that correct?

25       Answer:  That's a fair statement.

Page 189

1        Question:  And because there was no accurate Lehman

2    balance sheet in that chaotic period, there was significant

3    uncertainty over the value of Lehman's assets and liabilities

4    that were being transferred.

5        Answer:  There was volatility in the values.  There was a

6    high level of risk in the transaction, I think particularly

7    from Barclays' perspective, and that was one of the major

8    elements in this volatility, about those transactions during

9    the week, and concern about the decline in the values.

10       Do you see that?

11   A    Yes, I do.

12   Q    And considering those together with what Lori Fife said at

13   the sale hearing, which you commented upon earlier, do those

14   statements have any relevance or impact on your opinions in

15   this case?

16   A    Yes.  Again, I think that they're all supportive of the

17   notion that there was considerable uncertainty during this

18   week, and the nature of these assets, especially given that

19   they're level two and level three assets.  So it makes it very

20   difficult to value them, especially when the circumstances in

21   the market are changing so dramatically.

22       MR. HUME:  One minute, Your Honor.

23       (Pause)

24       MR. HUME:  No further questions, Your Honor.  Thank

25   you, Professor Pfleiderer.

Page 190

1          THE COURT:  Do you have any further cross-examination?

2          MR. TAMBE:  Just one moment, Your Honor.

3          No further questions, Your Honor.  Thank you.

4     Professor Pfleiderer.  Thank you.

5          THE COURT:  Professor Pfleiderer, thank you very much.

6          THE WITNESS:  Thank you very much.

7          THE COURT:  You're excused.

8          Now, I have -- we can get down from the witness stand.

9          I just have a couple of questions for counsel.  During

10    yesterday's examination, there was an attempt to offer BCI

11    Exhibit 1005, which I deferred, in respect to the hearsay

12    objection, concerning particularly the attached spreadsheet.

13    There was an argument as to whether or not it was or wasn't a

14    business record.  I'm just wondering what the status is of the

15    Barclays' effort to offer that into evidence, whether there's

16    been any reconciliation of positions with the movants

17    concerning admissibility?

18         MR. TAMBE:  To my knowledge, we haven't had a chance

19    to discuss it.

20         MR. HUME:  We haven't had a chance, Your Honor, but we

21    will discuss it.

22         THE COURT:  But you will discuss that?

23         MR. HUME:  Yes, Your Honor.

24         THE COURT:  Also, I'm not doing this because Mr. Hume

25    has a pattern of sometimes forgetting to offer exhibits, but I

Page 191

1    just want to be sure that all exhibits have been offered that

2    you intend to offer in connection with Professor Pfleiderer's

3    testimony.  If the answer is no that's fine, if you don't want

4    to proceed with anything.

5         MR. HUME:  The answer is no, I was reminded just as I

6    sat down, that as with the movants, we will want to offer in

7    the demonstratives from Professor Pfleiderer as evidence, and

8    it gives me an opportunity to inform the Court of something we

9    informed movants last night, that one of the demonstratives had

10   a clerical error -- and so we've replaced that, and we'll --

11   it's slide 71.

12        THE COURT:  Was that the September 2010 versus

13   September 2008 mistake or is there another one?

14        MR. HUME:  No, that's true, actually.  There was

15   another -- there was at least one other typo that Professor

16   Pfleiderer recalled during the examination, but this one was

17   this, it was just a pure -- there were two demonstratives for

18   the municipal securities, analyzing them in different way; one,

19   level one, two, three, and one according to auction rate and

20   non-auction rate.  And it was that those -- that one of those

21   needed to be corrected was the problem.

22        THE COURT:  I'm not going to know the difference.  I

23   mean, they've already served their purpose, but if you wish to

24   make the correction and there's no objection from the movants,

25   that's fine.

Page 192

1          MR. TAMBE:  No objection to the correction and no

2     objection for this exhibit to come in as a demonstrative

3     exhibit, Your Honor.

4          THE COURT:  Okay.  So the demonstratives are admitted

5     with the same limitations that apply to the demonstratives that

6     were admitted in connection with the movant's expert case.

7          THE COURT:  It's admitted.

8     (BCI Exhibit, Professor Pfleiderer's Demonstratives, were

9     hereby received into evidence as of this date.)

10         MR. HUME:  Thank you, Your Honor.  And in terms of

11    other exhibits, I think our understanding is tomorrow we're

12    going to be addressing PwC documents.  There were some other

13    documents I tried to move in that were reserved objections on,

14    and there are some other exhibits that we're trying to resolve,

15    we're going to narrow down, but may need to raise with the

16    Court tomorrow.

17         THE COURT:  Okay.  To the extent that the parties are

18    able to reconcile the differences without having to go through

19    an argument on each one, that's fine.  I recognize that the PwC

20    documents are in a separate category and we have the lawyer

21    briefs on that which will help inform the discussion tomorrow,

22    and I'll see you tomorrow at 10:00 a.m.  Thank you.

23    (Whereupon, the proceedings were recessed at 4:08 p.m., October

24    7, 2010.)

25                         *  *  *  *  *

LEHMAN BROTHERS HOLDINGS, INC., et al.

Page 193

```
 1

 2

 3                        I N D E X

 4

 5                    T E S T I M O N Y

 6    WITNESS                EXAM BY              PAGE      LINE

 7    PAUL PFLEIDERER        MR. TAMBE           5          9

 8                           MR. HUME            156        5

 9

10

11

12                        E X H I B I T S

13    PARTY    NO    DESCRIPTION              ID.       EVID.

14    BCI      1055  Municipal Securities     181       181

15                   Rulemaking Board Chart

16    BCI      1056A Financial Week News Article  183   183

17    BCI            Prof. Pfleiderer's        192       192

18                   Demonstratives

19

20

21

22

23

24

25
```

Page 194

```
1

2                    C E R T I F I C A T I O N

3

4     I, Ellen Kolman, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6     Ellen S. Kolman   Digitally signed by Ellen S. Kolman
                          DN: cn=Ellen S. Kolman, c=US
                          Reason: I am the author of this document
7     _____   Date: 2011.02.23 15:30:08 -05'00'

8     ELLEN KOLMAN

9

10    Veritext

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date: October 11, 2010

16

17

18

19

20

21

22

23

24

25
```