UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                        :
In re:                                                  :        Chapter 11 Case No.
                                                        :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                :        08-13555 (JMP)
                                                        :
                              Debtors.                  :        (Jointly Administered)
                                                        :
------------------------------------------------------------------x

### PARTIAL TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr.P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| **CCP CREDIT ACQUISITION HOLDINGS, LLC** | **DEUTSCHE BANK AG, LONDON BRANCH** |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

    CCP Credit Acquisition Holdings, LLC
    Mike Epstein / Dan Boris
    375 Park Avenue 13th Floor
    New York, NY 10152
    Phone number: 1-212-672-4499 / 1-212-672-4493
    Fax number: 1-201-917-2115
    E-mail address: bankdebt@centerbridge.com

Name and Address where transferee payments should be sent (if different from above):

Same as above

Court Claim # (if known): 67080
Amount of Claim: $325,000,000.00
Amount of Claim to be transferred: $38,381,926.33
Date Claim Filed: September 20, 2010

Name and Address of Transferor:

DEUTSCHE BANK AG, LONDON BRANCH
c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, New York 10005
Attn:    Rich Vichaidith
Email: richard.vichaidith@db.com

**\*\*PLEASE SEE ATTACHED DOCUMENTS\*\***

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

CCP Credit Acquisition Holdings, LLC

By: _Richard Grissinger_      Date: March 17, 2011
Name/Title: Richard Grissinger, Authorized Signatory
*Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.*

## EXHIBIT A

Proof of Claim

| | **PROOF OF CLAIM** |
|---|---|
| **United States Bankruptcy Court, Southern District of New York**<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | |

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | Filed: USBC - Southern District of New York<br>Lehman Brothers Holdings Inc. Et Al.<br>08-13555 (JMP)         0000067080 |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>**Lehman Commercial Paper Inc.** | Case No. of Debtor<br>08-13900 | |

NOTE: This form should not be used to make a claim for an administrative expense arising *after* the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

| Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)<br><br>Swedbank AB, New York Branch<br>One Penn Plaza, 15th Floor<br>New York, NY 10019<br>Attn: John Matthews<br><br><br>Telephone number:                Email Address: | ☑ Check this box to indicate that this claim amends a previously filed claim.<br><br>**Court Claim Number:** 22118<br>     (*If known*)<br><br>Filed on: **Sept. 21, 2009** |
|---|---|
| Name and address where payment should be sent (if different from above)<br><br><br><br>Telephone number:                Email Address: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

**1. Amount of Claim as of Date Case Filed:** $ 565,870,087

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attached addendum to amended proof of claim
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
**3a. Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
**Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____**
(See instruction #6 on reverse side.)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (*See definition of "redacted" on reverse side.*) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

**FILED / RECEIVED**

SEP 2 0 2010

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br><br>9/17/2010 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>John Matthews          Donald Weiss |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

September 17, 2010

## ADDENDUM TO AMENDED PROOF OF CLAIM
## OF SWEDBANK AB, NEW YORK BRANCH

Additional Addresses for Notice.  Claimant's address is set forth on the first page of this amended proof of claim.  Any notice relating to this amended proof of claim should be sent to the address set forth on the first page of this amended proof of claim with additional copies to be sent to the following address:

> DLA Piper LLP (US)
> 1251 Avenue of the Americas
> New York, New York 10020
> Attention: William M. Goldman, Esq.

Basis of Claim.  This proof of claim amends and supersedes Claim No. 22118 filed on September 21, 2009 (the "Initial LCPI Proof of Claim").

Lehman Commercial Paper Inc. ("LCPI"), Lehman Brothers Inc. and Claimant are parties to a whole loan commercial mortgage Master Repurchase Agreement, dated as of December 3, 2002 (as amended, the "Repurchase Agreement").  On September 24, 2008, Claimant gave written notice to LCPI and certain other entities that an Event of Default existed under the Repurchase Agreement and exercised its right to accelerate the Repurchase Date under the Repurchase Agreement.  As a result of LCPI's failure to repurchase the Purchased Securities (as defined in the Repurchase Agreement), Claimant has taken possession and control of the Purchased Securities in accordance with the express terms of the Repurchase Agreement.  The unsecured claim covered by this amended proof of claim (as well as the unsecured claim represented by the Initial LCPI Proof of Claim) results from the fact that the value of the Purchased Securities as of September 24, 2008 was less than the amount owed to Claimant under the Repurchase Agreement.

The Initial LCPI Proof of Claim was filed in an unliquidated amount.  The purpose of this amendment is to set forth the amount of the difference between the amount owed to Claimant under the Repurchase Agreement as of the Date Case Filed and the value of the Purchased Securities as of September 24, 2008, which is calculated as follows:

Deal No. 1003845:

| | |
|---|---|
| Value Date/Purchase Date: | 08 Sep 2008 |
| Maturity Date/Repurchase Date: | 22 Sep 2008 |
| Commencement Proceeds/Purchase Price: | $350,000,000.00 |
| Repo Rate/Pricing Rate: | 3.91750% |
| Amount owed as of 22 Sep 2008/Repurchase Price: | $350,533,215.28 |

| | |
|---|---|
| Interest from 22 Sep 2008 to 5 Oct 2008 (13 days @ 5%): | $632,907.19 |
| Total owed on Deal No. 1003845 as of October 5, 2008: | $351,166,122.47 |

**Deal No. 1003846**

| | |
|---|---|
| Value Date/Purchase Date: | 08 Sep 2008 |
| Maturity Date/Repurchase Date: | 08 Oct 2008 |
| Commencement Proceeds/Purchase Price: | $1,000,000,000.00 |
| Repo Rate/Pricing Rate: | 3.98688% |
| Total owed as of 24 Sep 2008: | $1,001,771,946.67 |
| Interest from 24 Sep 2008 to 5 Oct 2008 (11 days @ 5%): | $1,530,484.92 |
| Total owed on Deal No. 1003846 as of 5 Oct 2008: | $1,003,302,431.59 |

**Summary**

| | |
|---|---|
| Amount Owed on Deal No. 1003845 as of 5 Oct 2008: | $351,166,122.47 |
| Amount Owed on Deal No. 1003846 as of 5 Oct 2008: | $1,003,302,431.59 |
| Total Amount Owed as of 5 Oct 2008: | $1,354,468,554.06 |
| Value of Purchased Securities as of September 24, 2008 | $788,598,467 |
| Difference (unsecured claim) | $565,870,087 |

<u>Documentation</u>. Numerous documents support this amended proof of claim including (a) the Master Repurchase Agreement dated as of December 3, 2002, between Lehman Brothers Inc., LCPI and Claimant; (b) the Addendum to Master Repurchase Agreement, dated as of December 3, 2002; (c) the Amendment to Master Repurchase Agreement and Addendum to Master Repurchase Agreement, dated as of December 10, 2003; (d) Confirmations for Deal No. 1003845 and Deal No. 1003846, each dated September 4, 2008; (e) Tri-Party Custody Agreement dated as of December 23, 2002; (f) Amended and Restated Commitment Letter dated August 26, 2008; and (g) default letter dated August 24, 2008. The documents specifically listed in the preceding sentence are attached hereto. Because of the number and size of other documents supporting this amended proof of claim, they are not being filed but will be provided upon proper request therefor.

---

* Repurchase Agreement ¶¶ 11(h), 2(m)(i).

Reservation of Rights

This amended proof of claim is filed solely in connection with Claimant's claim against LCPI pursuant to the Repurchase Agreement. Claimant hereby explicitly reserves the right to assert further, additional and amended claims against LCPI or any of the other Lehman debtors.

By executing and filing this amended proof of claim, Claimant is not (i) waiving or releasing Claimant's rights against any other entity or person or (ii) electing a remedy which waives or otherwise affects any other remedy of Claimant.



# Master Repurchase Agreement

September 1996 Version

| | |
|---|---|
| Dated as of | **December 3, 2002** |
| Between: | **Lehman Brothers Inc.**<br>**Lehman Commercial Paper Inc.** |
| and | **Swedbank (ForeningsSparbanken AB (Publ)), New York Branch** |
| | *[complete legal name of counterparty]* |

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3.  Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

### 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.
\*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

### 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

    (i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

    (ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

    Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

## 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

## 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

## 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

## 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

**Lehman Brothers Inc.**
**Lehman Commercial Paper Inc.**

By: _____

Name: __T. COURTNEY JENKINS__

Title: _____VICE PRESIDENT____

Date: _____

**Swedbank (ForeningsSparbanken AB (Publ)), New York Branch**

_____
*[complete legal name of counterparty]*

By: _____

Name: ____JOHN MATTHEWS_____

Title: _____

Date: ____12/27/02_____


By: _____

Name: ____JILL LINDBO_____

Title: ____SVP / TREASURER_____

Date: ____12/27/02_____

## ANNEX I
## Supplemental Terms and Conditions

This Annex forms a part of the Master Repurchase Agreement dated as of ___December 3, 2002___ (the "Agreement") between LEHMAN BROTHERS INC., LEHMAN COMMERCIAL PAPER INC. and

**Swedbank (ForeningsSparbanken AB (Publ)), New York Branch**

*[complete legal name of counterparty]*

Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. **This Annex I and Annex II shall form part of the Agreement.**

2. **With respect to individual repurchase transactions, this Agreement shall only apply to the Lehman Brothers entity (i.e. Lehman Brothers Inc., Lehman Commercial Paper Inc.) printed in the confirmation (as described in Section 3(b) herein) provided to the counterparty of the Lehman Brothers entity.**

3. Definitions. For purposes of the Agreement, the following terms shall have the following meanings:

   (a) "Margin Notice Deadline", 10:00 am New York City time.

   (b) "Business Day" or "business day", with respect to any Transaction hereunder, a day on which regular trading may occur in the principal market for the Purchased Securities subject to such Transaction. In no event shall a Saturday or Sunday be considered a business day.

4. Purchase Price Maintenance.

   (a) Unless otherwise expressly agreed by the parties hereto, the parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

   (b) Unless otherwise expressly agreed by the parties hereto, notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities").

5. Submission to Jurisdiction and Waiver of Immunity.

   (a) Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

   (b) To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit, or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

## Annex II
## Names and Addresses for Communications Between Parties

**LEHMAN BROTHERS**
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attn.: Robert Guglielmo, Senior Vice President
Transaction Management
(212) 526-7121 phone
(212) 526-7672 fax

**Legal/Documentation Information:**

Name of Firm: _Swedbank (Foreningspparbanken AB (Publ))_

Address: _ONE PENN PLAZA   (15th FLOOR)_
_NY NY_
_~~ZZZZ~~   10119_

Attn: _JIM LUFORD / MARGARITA SALCEDO_

Tel #: _212 486 8400_

Fax #: _212 486 3220_

**Business/Trading Information:**

Name of Firm: _Swedbank (Foreningspparbanken AB (Publ))_

Address: _ONE PENN PLAZA   (15th FLOOR)_
_NY NY_
_~~ZZZZ~~   10119_

Attn: _JIM LUFORD / MIKE FERRARA / LUIS PINO_

Tel #: _212 486 8233_

Fax #: _212 486 3222_

Annex II-1

[PGAWLAdd 11/99—Swedbank_v1]

## ADDENDUM TO MASTER REPURCHASE AGREEMENT

This ADDENDUM AGREEMENT, dated as of _____ December 3, 2002 _____ is made by and between **Lehman Commercial Paper Inc.** acting as seller ("Seller") and **Swedbank (ForeningsSparbanken AB (Publ)), New York Branch** acting as buyer ("Buyer").

Capitalized terms used herein but not otherwise defined shall have the meanings ascribed thereto in the Repurchase Agreement (as defined below).

### RECITALS

WHEREAS, Buyer and Seller have entered into a Master Repurchase Agreement dated as of December 3, 2002 (the "Repurchase Agreement"); and

WHEREAS, Buyer and Seller desire to supplement and amend the Repurchase Agreement to enter into Transactions involving Assets (as defined below).

NOW, THEREFORE, the parties hereto agree as follows:

1.  The definition of "Securities" in Section 1 of the Repurchase Agreement shall be replaced by the term "Assets" and every reference in the Repurchase Agreement to "Securities" shall be replaced by "Assets".

2.  The definition of "Market Value" in Section 2 of the Repurchase Agreement shall be replaced by the following definition: "The price at which the Purchased Assets could readily be sold as determined in good faith by Seller."

3.  The following definitions are hereby added to Section 2 of the Repurchase Agreement:

"Assets" mean residential, multifamily or commercial mortgage loans, home equity loans, any servicing rights in respect of loans, or other assets agreed to from time to time by Buyer and Seller, or a participating or pro rata interest therein.

"Counterparty" means the third party which sold or pledged the Assets to Seller pursuant to the Underlying Agreement.

"Underlying Agreement" shall mean the agreement pursuant to which the Counterparty sold or pledged the Assets to Seller.

4.  Notwithstanding Section 5 of the Repurchase Agreement, all income payments received with respect to the Purchased Assets shall be retained by Seller pending the occurrence of an Event of Default of Seller.

5.  The third sentence of Section 8 of the Repurchase Agreement shall be replaced with the following sentence: "All of Seller's interest in the Purchased Assets shall pass to Buyer on the Purchase Date."

6.  Seller may substitute other eligible Assets for any Purchased Assets provided that after taking into account such substitution a Margin Deficit shall not occur.

7.  Seller hereby assigns to Buyer such representations and warranties with respect to the Assets as are made by the Counterparty to the Seller pursuant to the Underlying Agreement.

IN WITNESS WHEREOF, the parties have duly executed and delivered this Addendum Agreement as of the date first written above.

**LEHMAN COMMERCIAL PAPER INC.**
("Seller")

By: _T. C. Jc / ___

Name: _T. COURTNEY JENKINS_

Title: _VICE PRESIDENT_

**Swedbank (ForeningsSparbanken AB (Publ)),**
**New York Branch**
("Buyer")

By: _____

Name: _JOHN MATTHEWS_   _JIM LINDGREN (?)_

Title: _____   _SVP/Treasurer(?)_

13.JUL.2006    9:13    SWEDBANK MARKETS 46 8 7902996                    NR.651    S.2/5

## AMENDMENT
## TO MASTER REPURCHASE AGREEMENT
### and ADDENDUM TO MASTER REPURCHASE AGREEMENT
#### dated as of December 10, 2003

This AMENDMENT TO MASTER REPURCHASE AGREEMENT AND ADDENDUM TO MASTER REPURCHASE AGREEMENT (the "Amendment") is made by and among **Lehman Brothers Inc. ("LBI"), Lehman Commercial Paper Inc. ("LCPI")** (collectively "Lehman"), **Swedbank (FöreningsSparbanken AB (publ)), New York Branch ("Swedbank-NY") and Swedbank (FöreningsSparbanken AB (publ)), Stockholm, Sweden (Swedbank-Stockholm).**

WHEREAS, Lehman and Swedbank-NY entered into that certain *Master Repurchase Agreement* dated as of December 3, 2002 (the "Repo Agreement");

WHEREAS, LCPI and Swedbank-NY entered into that certain *Addendum to Master Repurchase Agreement* dated as of December 3, 2002 (the "WL-Addendum");

WHEREAS, Lehman and Swedbank-NY wish to add Swedbank-Stockholm as an additional party to the Repo Agreement, subject to all of the rights and responsibilities as set forth in such Repo Agreement;

WHEREAS, LCPI and Swedbank-NY wish to add Swedbank-Stockholm as an additional party to the WL-Addendum, subject to all of the rights and responsibilities as set forth in such WL-Addendum;

WHEREAS, Swedbank-Stockholm wishes to become an additional party to, and accepts all of the rights and responsibilities specified in the Repo Agreement and WL-Addendum.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, as applicable, agree that:

1.  Swedbank-Stockholm is named a party to the Repo Agreement and WL-Addendum.

2.  The term "Swedbank", whenever it appears in the Repo Agreement or WL-Addendum shall, with regard to any Repurchase Transaction, apply to either the New York Branch or the Stockholm Head Office or both of them, depending upon the instructions provided by Lehman with regard to such Repurchase Transaction pursuant to Section 3(a) of the Repo Agreement.

3.  The following address shall be contact information for Swedbank-Stockholm in accordance with Paragraph 13 of the Agreement:

Name of Firm:    **Swedbank (FöreningsSparbanken AB (publ)), Stockholm, Sweden**

SWEDBANK
(FöreningsSparbanken AB (publ))
Brunkebergstorg 8
05 34 STOCKHOLM
Sweden

Repo Administration
Tel:    46 8 5859 00 00
Fax:    46 8 21 19 66

Trading
Tel:    46 8 700 99 09
Fax:    46 8 723 7193

Swedbank Markets Legal & Compliance
Tel:    46 8 5859 13 47
Fax:    46 8 723 70 82

All capitalized terms used and not defined herein shall have the meaning ascribed to them in the Repo Agreement.

This Amendment may be executed in one or more counterparts, and when each party hereto has executed at least one counterpart, this Amendment shall be deemed to be the one and the same document.

        IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective authorized officers on the dates written below with date of effect from the date first written above .

Agreed to with respect to the Repo Agreement

LEHMAN BROTHERS INC.
LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____

Title: _____

Date: _____ ROBERT F. GUGLIELMO _____

Agreed to with respect to the WL-Addendum

LEHMAN COMMERCIAL PAPER INC.

By: _____

Name: _____ ROBERT F. GUGLIELMO _____

Title: _____

Date: _____

Agreed to with respect to the WL-Addendum and Repo Agreement

(FÖRENINGSSPARBANKEN AB (PUBL)), NEW YORK BRANCH

By: _____

Name: _____ JOHN MATTHEWS _____

Title: _____

Date: _____ 3/17/04 _____

By: _____

Name: _____ JIM LINFSRO _____

Title: _____ SVP/TREASURER _____

Date: _____ 3/17/04 _____

Agreed to with respect to the WL-Addendum and Repo Agreement

SWEDBANK (FÖRENINGSSPARBANKEN AB (PUBL)), STOCKHOLM, SWEDEN

By: _____

Name: _____ PER ASPEGREN _____

Title: _____

Date: _____

By: _____

Name: _____

Title: _____

Date: _____

Page 2

13.JUL.2006    9:14    SWEDBANK MARKETS 46 8 7902996                NR.651    S.4/5

## SECRETARY'S CERTIFICATE

The undersigned, an Assistant Secretary of Lehman Brothers Inc. and Lehman Commercial Paper Inc., respectively, a Delaware corporation and a New York corporation (collectively, the "Corporations"), does hereby certify and attest that Robert E. Guglielmo is duly authorized to execute and deliver financing transaction documentation on behalf of the Corporations and that the below listed signature shown opposite his name is his true, correct and complete specimen signature.

Robert E. Guglielmo
Senior Vice President

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Corporation this 4th day of March, 2004.

LEHMAN BROTHERS INC.

SEAL

BY: _Cindy Gregoire_
Cindy Gregoire
Assistant Secretary

LEHMAN COMMERICAL PAPER INC.

SEAL

BY: _Cindy Gregoire_
Cindy Gregoire
Assistant Secretary



One Penn Plaza
15th Floor
New York, NY 10119
(212) 486-8400

04 September, 2008

LEHMAN COMMERCIAL PAPER, INC.

745 SEVENTH AVENUE

4TH FLOOR

ATTN: SALINA10285-1000

NEW YORK

As principal we confirm the following PURCHASE from you.

REVERSE REPURCHASE AGREEMENT

| | |
|---|---|
| Deal No:    1003845 | |
| Deal Date: | 04 Sep 2008 |
| Value Date: | 08 Sep 2008 |
| Maturity Date: | 22 Sep 2008 |
| Commencement Proceeds: | 350,000,000.00 |
| Repo Interest: | 533,215.28 |
| Repo Rate: | 3.91750000 |
| Maturity Proceeds: | 350,533,215.28 USD |

| Security | Coupon | Mat Date | Quantity | Price/Haircut | Interest/ExchRate | Proceeds/CCY |
|---|---|---|---|---|---|---|
| 7LEHMAN COMML PAPER | 0.00000000 | 14 Oct 2008 | 350,000,000 | 100.00000000 | .00 | -350,000,000.00 |
| 7LEHMAN COMML PAPER | | | | 0.00000000 | 1.00000000 | USD |

Confirmations do not require signature authorization.

(212)548-9462


**Swedbank**

One Penn Plaza
15th Floor
New York, NY 10119
(212) 486-8400

04 September, 2008

LEHMAN COMMERCIAL PAPER, INC.
745 SEVENTH AVENUE
4TH FLOOR
ATTN: SALINA10285-1000
NEW YORK

As principal we confirm the following PURCHASE from you.

REVERSE REPURCHASE AGREEMENT

| | | |
|---|---|---|
| Deal No:    1003846 | Deal Date: | 04 Sep 2008 |
| | Value Date: | 08 Sep 2008 |
| | Maturity Date: | 08 Oct 2008 |
| | Commencement Proceeds: | 1,000,000,000.00 |
| | Repo Interest: | 3,322,400.00 |
| | Repo Rate: | 3.98688000 |
| | Maturity Proceeds: | 1,003,322,400.00 USD |

| Security | Coupon | Mat Date | Quantity | Price/Haircut | Interest/ExchRate | Proceeds/CCY |
|---|---|---|---|---|---|---|
| 7LEHMAN COMML PAPER | 0.00000000 | 14 Oct 2008 | 1,000,000,000 | 100.00000000 | .00 | -1,000,000,000.00 |
| 7LEHMAN COMML PAPER | | | | 0.00000000 | 1.00000000 | USD |

Confirmations do not require signature authorization.

*Fixed*

Swedbank AB (publ)          One Penn Plaza, 15th Floor          Tel: +212 486 8400          www.swedbank.us
New York Branch             New York, NY 10119                   Fax: +212 486 3220          www.swedbank.se

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

# TRI-PARTY CUSTODY AGREEMENT

by and among

## SWEDBANK (SPARBANKEN SVERIGE AB (PUBL)), NEW YORK BRANCH ("*Buyer*")

and

## LEHMAN COMMERCIAL PAPER INC. ("*Seller*")

and

## JPMORGAN CHASE BANK
("*Master Custodian*" or "*Chase*")

Dated as of December 23, 2002

Version 1 - 1/28/2000

Table of Contents                                                    Page

Section 1.    **Definitions**                                                    1

Section 2.    **Services of Master Custodian** ..................................................................5
        a.    Appointment of Master Custodian.........................................................5
        b.    Acceptance of Master Custodian ...........................................................5
        c.    Scope of Master Custodian's Duties .....................................................5
        d.    Sub-Custodians; Scope of Liability; Asset Custody................................5

Section 3.    **Representations, Warranties and Agreements**.....................................6
        a.    Representations of Buyer, Seller and Master Custodian. .........................6
        b.    Further Representations and Covenants of Buyer and Seller. ...................7
        c.    Further Representations and Covenants of Master Custodian.................8
        d.    Continuing Agreement of All Parties ......................................................9

Section 4.    **Maintenance of Buyer's Master Custodial Account and
        Seller's Master Custodial Account** ......................................................9
        a.    Buyer's Master Custodial Account and Seller's Master Custodial Account ...........9
        b.    Transfer of Assets to Master Custodial Accounts....................................9
        c.    Segregation of Assets..........................................................................9
        d.    No Lien or Pledge By Master Custodian ...............................................10

Section 5.    **Arrangements Prior to Repurchase Transaction; Receipt of
        Instructions; Payment of Moneys; Delivery of Assets**.........................10
        a.    Seller's Instructions...........................................................................10
        b.    Buyer's Purchase Price.......................................................................10
        c.    Seller's Tender of Assets....................................................................11
        d.    Cash Accounts .................................................................................11
        e.    Review of Sub-Custodian Data Files and Receipt of Trust
        Receipts By Master Custodian..............................................................11
        f.    Single Trust Receipt..........................................................................14
        g.    Failure of Seller to Transmit Seller's Asset Composition Data File ..........15
        h.    Failure of Seller to Transmit Seller's Repurchase Transaction Data File ...........15

Section 6.    **Effecting Transactions; Grant of Security Interest** ..................................15
        a.    Purchase Date...................................................................................15
        b.    Market Value of Assets.......................................................................16
        c.    Determination of Aggregate Market Value ...........................................17
        d.    Payment of Purchase Price..................................................................17
        e.    Repurchase Date ...............................................................................17
        f.    Simultaneous Transactions .................................................................18
        g.    Effect of Notice of Levy, etc...............................................................18
        h.    Ownership of Purchased Assets...........................................................18
        i.    Deliveries by Master Custodian...........................................................18
        j.    Seller's Grant of a Security Interest .....................................................18

ii

Section 7.    **Valuation and Substitution of Assets** ....................................................... 19
    a.    Margin Deficit.......................................................................................... 19
    b.    Margin Excess.......................................................................................... 19
    c.    Substitutions of Purchased Assets ........................................................... 20
    d.    Release of Mortgage Files for Servicing ................................................. 20

Section 8.    **Master Custodian Statements** ................................................................. 21

Section 9.    **Master Custodian Fee** ............................................................................. 21

Section 10.    **No Guaranty by Master Custodian** ....................................................... 21

Section 11.    **Force Majeure** ......................................................................................... 21

Section 12.    **Concerning Master Custodian** ............................................................... 22
    a.    Delay in Receiving Assets ....................................................................... 22
    b.    Forgery; False Data.................................................................................. 22
    c.    No Duty of Inquiry .................................................................................. 23
    d.    Price Data................................................................................................. 23
    e.    Limitation of Liability.............................................................................. 23

Section 13.    **Indemnification** ....................................................................................... 24

Section 14.    **Continuing Disputes**................................................................................. 24

Section 15.    **Form of Instructions** ............................................................................... 25

Section 16.    **Termination** ............................................................................................. 25

Section 17.    **Notice of Default; Control** ..................................................................... 25
    a.    Delivery of Notice of Default .................................................................. 25
    b.    Effect of Buyer's Notice of Default ......................................................... 26
    c.    Control ..................................................................................................... 26
    d.    Effect of Seller's Notice of Default.......................................................... 27
    e.    Further Assurances................................................................................... 27
    f.    Master Custodian's Knowledge ............................................................... 27

Section 18.    **Miscellaneous**........................................................................................... 27
    a.    Authorized Personnel............................................................................... 27
    b.    Funds Transfers........................................................................................ 28
    c.    Notices ..................................................................................................... 28
    d.    Amendments ............................................................................................ 29
    e.    Binding Agreement.................................................................................. 29
    f.    Examination of Master Custodian's Files; Examination of
        Sub-Custodian's Files.............................................................................. 29
    g.    Survival ................................................................................................... 29

h.   Applicable Law; Jurisdiction ...................................................................................29
i.   Headings and References.........................................................................................29
j.   Counterparts.............................................................................................................30
k.   Time Zone................................................................................................................30
l.   Application of UCC Article 8 .................................................................................30

## SCHEDULES

SCHEDULE 1         List of Additional Asset Types (Grade D Assets)
SCHEDULE 2         Form of Master Custodian Data File
SCHEDULE 3         Form of Seller's Repurchase Transaction Data File (Liability File)
SCHEDULE 4         Form of Seller's Asset Composition Data File (Asset File)
SCHEDULE 5         File Format for Spreads File
SCHEDULE 6         Form of Detail Schedule for Buyer
SCHEDULE 7         Assumed Prices for Commercial and Residential Mortgage Loans
SCHEDULE 8         Form of Seller's Instructions to Master Custodian
SCHEDULE 9         Form of Master Custodian's Notice to Buyer (Receipt of Seller's
                   Instructions)
SCHEDULE 10        Form of Seller's Pre-Allocation Schedule

## EXHIBITS

EXHIBIT A          Investment Category Margin Percentage
EXHIBIT B          Form of Information as to Buyer
EXHIBIT C          Form of Seller Account Information
EXHIBIT D          Form of Tri-Party Sub-Custodial Agreement

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

This **TRI-PARTY CUSTODY AGREEMENT** is made and entered into as of the date written on the cover by and among Buyer, Master Custodian and Seller.

**WHEREAS**, Buyer and Seller have entered into the Master Repurchase Agreement and

**WHEREAS**, Buyer and Seller have agreed to enter into this Agreement to facilitate Repurchase Transactions pursuant to the Master Repurchase Agreement; and

**WHEREAS**, Master Custodian is willing, on a daily basis, to act as agent and bailee on behalf of Buyer or Seller, as their interests may appear, and to perform certain other duties more fully described herein.

**NOW, THEREFORE**, the parties hereby agree as follows:

Section 1.    **Definitions**

"**Aggregate Market Value**" means, with respect to each Repurchase Transaction, the aggregate Market Value of all Purchased Assets located in Buyer's Master Custodial Account as of the time of determination which have been allocated to such Repurchase Transaction pursuant to Sections 6(c) and 7(c) hereof.

"**Agreement**" means this Tri-Party Custody Agreement, as amended from time to time.

"**Asset**" or "**Assets**" means any Grade A Asset, Grade B Asset, Grade C Asset or Grade D Asset.

"**Authorized Person**" means a person described as provided in Section 18(a).

"**Business Day**" means any day on which all of Buyer, Seller and Master Custodian are open for business.

"**Buyer's Master Custodial Account**" means, collectively, the accounts maintained by Master Custodian for Assets held for the benefit of Buyer pursuant to Section 4(a) hereof.

"**Cash**" means U.S. Dollars in immediately available funds.

"**Commercial Mortgage Loan**" means any Mortgage Loan with respect to which the indebtedness of the borrower is evidenced by a mortgage note and secured by a lien on income generating real property used exclusively for commercial or mixed-commercial/residential purposes.

"**Event of Default**" means an "Event of Default" as defined in the Master Repurchase Agreement.

"**FRBNY**" means The Federal Reserve Bank of New York, or any successor thereto.

"**Grade**" means, with respect to an Asset, either Grade A, Grade B, Grade C or Grade D.

"**Grade A Asset**" means Cash.

"**Grade B Asset**" means (a) a Trust Receipt evidencing the possession by a Sub-Custodian of one or more Residential Mortgage Loans, or, as the context shall require, one or more Residential Mortgage Loans held by a Sub-Custodian and evidenced by a Trust Receipt, and (b) in the event of a shortfall of the type of Assets enumerated in clause (a) of this definition, any Grade A Asset.

"**Grade C Asset**" means (a) a Trust Receipt, evidencing the possession by a Sub-Custodian of one or more Commercial Mortgage Loans or, as the context shall require, one or more Commercial Mortgage Loans held by a Sub-Custodian and evidenced by a Trust Receipt, and (b) in the event of a shortfall of the type of Assets enumerated in clause (a) of this definition, any Grade A Asset or Grade B Asset.

"**Grade D Asset**" means any Asset designated as such on a schedule in the form of Schedule 1 hereto, which Schedule 1 has been executed by each party hereto.

"**Margin Percentage**" means, for each Repurchase Transaction, the percentage by which the Purchase Price is multiplied to determine the Required Amount. The Margin Percentage for each Repurchase Transaction, by Grade of Asset, is provided on Exhibit A hereto.

"**Market Value**" means, for each Purchased Asset, the price of such Purchased Asset as determined pursuant to the methodology set forth in Section 6(b) hereof.

"**Master Custodian**" means JPMorgan Chase Bank, its successors in interest or permitted assigns, or any successor Master Custodian pursuant to the terms hereof.

"**Master Custodian Data File**" means a data file in an electronic format in the form of Schedule 2 hereto, compiled by Master Custodian from data transmitted by one or more related Sub-Custodians.

"**Master Custodian Held Asset**" means (a) Cash held by Master Custodian from time to time for the account of Buyer or Seller, as the case may be, pursuant to the terms hereof, (b) Trust Receipts, and (c) any other Asset described as a Master Custodian Held Asset on Schedule 1 hereto from time to time.

"**Master Repurchase Agreement**" means the Master Repurchase Agreement, between Buyer and Seller, as supplemented and amended from time to time, a form of which has been provided to Master Custodian.

"**Mortgage Files**" means Mortgage Loans and all documentation related thereto, all of which shall be held from time to time by a Sub-Custodian pursuant to the terms of a Tri-

2

Party Sub-Custodial Agreement.  The term "Mortgage File" when used herein without further specification shall be deemed to refer to both files relating to Commercial Mortgage Loans and files relating to Residential Mortgage Loans.

"**Mortgage Loan**" means any mortgage loan, the interest in which is evidenced by a Trust Receipt.  The term "Mortgage Loan" when used herein without further specification shall be deemed to refer to both Commercial Mortgage Loans and Residential Mortgage Loans.

"**Notice of Default**" means a written notice delivered by Seller to Master Custodian and Buyer or by Buyer to Master Custodian and Seller, as is more fully described in Section 17 hereof, which written notice identifies the defaulting party, the Repurchase Transaction, and the Event of Default.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

"**Purchased Assets**" means Assets purchased by Buyer from Seller in a Repurchase Transaction and any Assets substituted therefor in accordance with the Master Repurchase Agreement.

"**Purchase Date**" means with respect to any Repurchase Transaction, the Business Day upon which Buyer purchases the related Assets from Seller.

"**Purchase Price**" means with respect to any Repurchase Transaction, the "Purchase Price" relating thereto as defined in the Master Repurchase Agreement.

"**Repurchase Date**" means with respect to any Repurchase Transaction, the earlier of (a) the Business Day upon which Seller is scheduled to repurchase the related Assets from Buyer, and (b) the Business Day upon which a Repurchase Date has been otherwise accelerated due to an Event of Default.

"**Repurchase Price**" means with respect to any Repurchase Transaction, the "Repurchase Price" as defined in the Master Repurchase Agreement.

"**Repurchase Transaction**" means any transaction between Buyer and Seller pursuant to the Master Repurchase Agreement.

"**Required Amount**" shall mean, with respect to any Repurchase Transaction, the Margin Percentage applicable to such Repurchase Transaction multiplied by the Purchase Price to be paid in connection with such Repurchase Transaction.

"**Residential Mortgage Loan**" means any Mortgage Loan with respect to which the indebtedness of the borrower is evidenced by a mortgage note and secured by a lien on real property constituting a one-to-four-family residence.

3

"**Seller's Asset Composition Data File**" means a data file in electronic format in the form of Schedule 4 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(e)(i) hereof.

"**Seller's Pre-Allocation Schedule**" means a data file in electronic format in the form of Schedule 10 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(e)(vi) hereof.

"**Seller's Repurchase Transaction Data File**" means a data file in electronic format in the form of Schedule 3 hereto that is transmitted by or on behalf of Seller to Master Custodian pursuant to the terms of Section 5(a) hereof.

"**Seller's Instructions**" means the instructions described in Section 5(a) as "Seller's Instructions", which shall be contained in a Seller's Repurchase Transaction Data File.

"**Seller's Master Custodial Account**" means, collectively, the accounts maintained by Master Custodian for Assets held by Master Custodian for the benefit of Seller.

"**Sub-Custodian**" means any entity reasonably acceptable to the Seller and the Master Custodian that has entered into a Tri-Party Sub-Custodial Agreement with Seller and Master Custodian.

"**Sub-Custodian Data File**" means a data file in electronic format in the form of Schedule 1 to the Tri-Party Sub-Custodial Agreement, transmitted to Master Custodian as provided pursuant to the terms of this Agreement and the relevant Tri-Party Sub-Custodial Agreement.

"**Tri-Party Sub-Custodial Agreement**" means an agreement among a Sub-Custodian, the Master Custodian and the Seller substantially in the form of Exhibit D hereto.

"**Trust Receipt**" means a receipt or certification executed by a duly authorized officer of the applicable Sub-Custodian, substantially in the form of Exhibit 1 to the applicable Tri-Party Sub-Custodial Agreement to which the related Sub-Custodian is a party, or in any other form subsequently agreed to in writing between the Seller and the Master Custodian.

"**Trust Receipt Delivery Date**" means, for each Sub-Custodian, the Purchase Date on which the initial Repurchase Transaction occurs with respect to which such Sub-Custodian is acting as sub-custodian pursuant to the related Tri-Party Sub-Custodial Agreement.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

Any term not defined in this Agreement shall have the meaning set forth in the Master Repurchase Agreement or the Tri-Party Sub-Custodial Agreement, as the case may be.

Section 2.    **Services of Master Custodian**

a.    <u>Appointment of Master Custodian</u>.    Buyer hereby appoints Master Custodian as custodian to safekeep all Purchased Assets which are Master Custodian Held Assets at any time transferred or delivered to and held by Master Custodian for or on behalf of Buyer under this Agreement and as agent and bailee for Buyer for the purposes set forth in this Agreement.    Seller hereby appoints Master Custodian as custodian to safekeep all Master Custodian Held Assets at any time transferred or delivered to or held by Master Custodian for or on behalf of Seller under this Agreement and as agent and bailee for Seller for the purposes set forth in this Agreement.

b.    <u>Acceptance of Master Custodian</u>.    Master Custodian accepts the appointments and, subject to the terms and conditions of this Agreement, agrees to receive Purchased Assets which are Master Custodian Held Assets in the manner specified herein, for or on behalf of Buyer, to be held hereunder, and to hold, release, or otherwise dispose of such Purchased Assets which are Master Custodian Held Assets as hereinafter provided.    Master Custodian further agrees to receive Master Custodian Held Assets for or on behalf of Seller for transfer to Seller's Master Custodial Account to be delivered hereunder, and to hold, release, or otherwise dispose of such Master Custodian Held Assets as hereinafter provided.

c.    <u>Scope of Master Custodian's Duties</u>.    Master Custodian's duties hereunder shall continue until altered in writing by the parties hereto or until the termination of this Agreement.    Master Custodian undertakes to perform only those duties as are expressly set forth in this Agreement and in the Tri-Party Sub-Custodial Agreement and no additional covenant or obligation shall be implied in this Agreement against Master Custodian.    If a Repurchase Transaction shall not be completed for any reason whatsoever, Master Custodian's duties to Buyer and Seller shall be limited to holding Master Custodian Held Assets for the account of the party hereto owning such Assets prior to the contemplated but not completed Repurchase Transaction and following any other instructions received from Buyer and/or Seller as specifically provided for in this Agreement.

d.    <u>Sub-Custodians; Scope of Liability; Asset Custody</u>.    (i) Buyer and Seller acknowledge that the use of Sub-Custodians to hold and review the Mortgage Files is contemplated throughout the term of this Agreement.    Each Sub-Custodian shall be required to enter into a Tri-Party Sub-Custodial Agreement with respect to the transactions contemplated hereby and shall not be deemed to be the representative or agent of Master Custodian, <u>provided, however</u> that, subject to the provisions of Section 2(d)(ii) hereof, Sub-Custodian shall be deemed to be the agent and hailee of Master Custodian as provided pursuant to the terms of any Trust Receipt.    Master Custodian shall not be responsible for the knowledge of the contents of any separate custody agreement between any Sub-Custodian and Seller to which it is not a party, and the parties hereto agree that Master Custodian shall not in any respect be bound by, or responsible in respect of, any such separate custody agreement.

(ii)    Notwithstanding any provision of this Agreement or any Tri-Party Sub-Custodial Agreement to the contrary, in no event shall Master Custodian be obligated to perform the obligations or duties of any Sub-Custodian under any Tri-Party Sub-Custodial Agreement or other custody agreement, if any, in the event that such

5

obligations or duties are not performed by said Sub-Custodian for any reason whatsoever. Further, except as specifically provided to the contrary in any Tri-Party Sub-Custodial Agreement, Master Custodian shall not be liable to any Person in any respect for any acts or omissions of any Sub-Custodian, including, but not limited to, (A) the failure of a Sub-Custodian to properly perform its duties under any Tri-Party Sub-Custodial Agreement or other custody agreement; (B) the failure of a Sub-Custodian to properly review, and/or certify as to the contents of any Mortgage Files in its custody; (C) any misstatement of fact or omission contained in any Trust Receipt delivered to Master Custodian or otherwise prepared in connection with a Repurchase Transaction; (D) the delivery or transmission by a Sub-Custodian of any other information or data to Master Custodian which is inaccurate, incomplete or misleading in any respect; (E) the failure by a Sub-Custodian to follow or comply with, as the case may be, any direction, authorization or instructions provided to it by any Person pursuant to the terms hereof or otherwise, or (F) the failure by a Sub-Custodian to deliver information regarding the Mortgage Files on a timely basis or its failure to perform any other act which would be required as a prerequisite to Master Custodian's being able to perform its obligations hereunder (including, but not limited to, its failure to deliver to the Master Custodian an original Trust Receipt as required pursuant to Section 5(e)(v) hereof).

(iii)    Master Custodian is not a party to any Master Repurchase Agreement. Master Custodian has not examined the Master Repurchase Agreement, has no responsibility for the content thereof and is not, and shall not be deemed to be, on notice as to any provision thereof. Master Custodian's obligations hereunder shall not be affected by, nor does Master Custodian assume any liability under, any Master Repurchase Agreement.

(iv)    Master Custodian shall not be liable for any act or omission of FRBNY in connection with the transactions contemplated hereby or by any Tri-Party Sub-Custodial Agreement.

Section 3.    **Representations, Warranties and Agreements**

Buyer, Seller and Master Custodian each represents and warrants to the others as of the date hereof, as of each Purchase Date and as of each Repurchase Date, the following:

a.    Representations of Buyer, Seller and Master Custodian.

(i)    It is duly organized and existing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver this Agreement and to perform all of the duties and obligations to be performed by it hereunder.

(ii)    This Agreement and the performance of all transactions contemplated hereunder have been duly authorized, executed, and delivered by it in accordance with all requisite corporate action, and this Agreement

6

constitutes its valid, legal and binding obligation enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, or similar laws, or by equitable principles relating to or limiting creditors' rights generally.

(iii)    The execution, delivery, and performance of this Agreement and the transactions contemplated hereunder will not violate any agreement by which it is bound or by which any of its assets are affected, or its charter, or by-laws, or any statute, regulation, rule, order or judgment applicable to it or its property.

b.    Further Representations and Covenants of Buyer and Seller.

(i)    Each has the power and authority to enter into the Repurchase Transactions and to deliver and transfer the Assets delivered or transferred hereunder.

(ii)    All Assets delivered or transferred by Seller to Master Custodian and all Assets delivered or transferred to Master Custodian by Buyer are delivered free, clear, and unencumbered by any lien, security interest charge, claim, or prior right of any third party, provided, however, the parties hereto agree and acknowledge that the Assets sold by Seller under the Master Repurchase Agreement or other financings may themselves be subject to a repurchase arrangement under which Seller purchased said Assets from a third party and are obligated to resell such Assets to such third party pursuant to such repurchase arrangement or other financing.

(iii)    In the event that with respect to any Repurchase Transaction Buyer checks the box on Exhibit B hereto indicating that it is acting on an agency basis and/or in a trust capacity only for the benefit of one or more of its customers, by checking such box Buyer shall be deemed to have represented, warranted and agreed that:

(a)    Buyer is executing this Agreement on behalf of its customers and Buyer will be effecting Repurchase Transactions hereunder on an agency basis and/or in a trust capacity only;

(b)    Master Custodian will not be required to recognize, follow, or observe the instructions of any such customer with respect to any Repurchase Transaction; and

(c)    If Buyer acts beyond the authority granted to it pursuant to an agreement between it and any such customer, or between it and any entity acting on behalf of such customer or otherwise, Buyer shall be liable for all such actions and related transactions as if it were the principal with respect thereto, provided that the same shall not limit in any manner the liability of such customer or any other party for such actions and related transactions.

7

(iv)   Buyer agrees to indemnify and hold Master Custodian and/or Seller harmless in the event that any customer of Buyer should make any claim against Master Custodian and/or Seller based upon or arising from a breach of any of the representations, warranties or agreements set forth in Section 3(b)(iii) above including, without limitation, a claim that any action taken by Master Custodian with respect to any transactions pursuant to an order, notice, instruction, or other communication from Buyer was unauthorized by such customer.

(v)   By checking the appropriate box on <u>Exhibit B</u> hereto indicating that it is acting as principal, or by checking no box, Buyer represents, warrants, and agrees that it is executing this Agreement solely on its own behalf, and it will be entering into Repurchase Transactions as principal.

(vi)   Seller is executing this Agreement solely on its own behalf, and it will be entering into any and all Repurchase Transactions as principal.

c.   <u>Further Representations and Covenants of Master Custodian.</u>

(i)   Master Custodian is a banking institution chartered under the laws of the State of New York with its principal office at 270 Park Avenue, New York, New York 10017.

(ii)   Master Custodian will maintain Buyer's Master Custodial Account as a custody account and, as requested by Seller and Buyer, as a "securities account" as defined in Section 8-501 of Article 8 of the UCC in which a "financial asset" as defined in Section 8-102(a)(9)(iii) of the UCC, is being held, and shall administer Buyer's Master Custodial Account as a securities intermediary in the same manner it administers similar accounts established for the same purpose.   Master Custodian shall create and maintain the books and records created in connection with Buyer's Master Custodial Account in the State of New York.

(iii)   Master Custodian will maintain Seller's Master Custodial Account as a custody account and shall administer Seller's Master Custodial Account in the same manner it administers similar accounts established for the same purpose.   Master Custodian shall create and maintain the books and records created in connection with Seller's Master Custodial Account in the State of New York.

(iv)   Master Custodian shall maintain at all times during the existence of this Agreement and keep in full force and effect fidelity insurance, theft of documents insurance, forgery insurance and errors and omissions insurance. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies reasonably acceptable to Buyer and Seller.

8

d.    <u>Continuing Agreement of All Parties</u>.   Each party shall promptly notify all other parties hereto in writing in the event that any of the representations made by such party hereunder shall be or become untrue or misleading in any material respect.

Section 4.    **Maintenance of Buyer's Master Custodial Account and Seller's Master Custodial Account**

a.    <u>Buyer's Master Custodial Account and Seller's Master Custodial Account</u>. Master Custodian shall maintain such records and establish such accounts as may be required from time to time to receive, hold and account for all Purchased Assets which are Master Custodian Held Assets to be held for and on behalf of Buyer pursuant to this Agreement. Master Custodian shall maintain such records and establish such accounts as may be required from time to time to receive, hold and account for all Assets which are Master Custodian Held Assets to be held for and on behalf of Seller pursuant to this Agreement.

b.    <u>Transfer of Assets to Master Custodial Accounts</u>.   All Purchased Assets which are Master Custodian Held Assets shall be maintained by Master Custodian in Buyer's Master Custodial Account. All Assets of Seller which are Master Custodian Held Assets shall be maintained in Seller's Master Custodial Account.  Master Custodian shall maintain Cash for Buyer's Master Custodial Account and Seller's Master Custodial Account in the State of New York.

c.    <u>Segregation of Assets</u>.    (i)    Master Custodian shall segregate and separately account on its books and records for all Purchased Assets which are Master Custodian Held Assets held for Buyer from assets it holds in its individual capacity, for Seller, or in any other trust or custodial capacity.   Master Custodian shall maintain and safekeep Master Custodian Held Assets held for Buyer until, (A) it shall receive Buyer's instructions to deliver or transfer to Buyer or its designee such Purchased Assets which are Master Custodian Held Assets (or, with respect to Trust Receipts, has received a copy of Buyer's instructions requesting that the related Sub-Custodian be directed by Master Custodian to deliver or transfer to Buyer or Buyer's designee the Mortgage Files held by such Sub-Custodian evidenced by such Trust Receipt as well as original instructions to Master Custodian to return the related Trust Receipts to such Sub-Custodian for cancellation); (B) Seller shall substitute Assets as provided in Section 7(c) hereof; (C) Master Custodian shall deliver Purchased Assets which are Master Custodian Held Assets to Seller or its designee as provided in Section 6(e) or 7(c) (or, with respect to Trust Receipts, authorize the related Sub-Custodian to transfer such Trust Receipts into the name of Seller); or (D) this Agreement is terminated and Master Custodian has received disposition instructions.

(ii)    Master Custodian shall segregate and separately account on its books and records for all Assets which are Master Custodian Held Assets held for Seller from assets it holds in its individual capacity, for Buyer, or in any other trust or custodial capacity.  Master Custodian shall maintain and safekeep Master Custodian Held Assets for Seller until (A) they are transferred into Buyer's Master Custodial Account pursuant to Section 6(a), (B) they are substituted pursuant to Section 7(c), or (C) it has received disposition instructions in connection with the termination of this Agreement in accordance with the provisions of Subsection 4(c)(i)(D).

9

d.    No Lien or Pledge By Master Custodian.    Neither Buyer's Master Custodial Account, including Purchased Assets therein which are Master Custodian Held Assets, nor Seller's Master Custodial Account, including Master Custodian Held Assets therein, shall be subject to any security interest, lien or right of setoff by Master Custodian or any third party claiming through Master Custodian.  Except as required by law or regulation, Master Custodian shall not pledge, encumber, hypothecate, transfer, dispose of, or otherwise grant any third party an interest in, any Assets held in Buyer's Master Custodial Account or Seller's Master Custodial Account pursuant to this Agreement

Section 5.    **Arrangements Prior to Repurchase Transaction; Receipt of Instructions; Payment of Moneys; Delivery of Assets**

a.    Seller's Instructions.    Prior to 3:30 p.m. on any Business Day on which Seller and Buyer are to enter into one or more Repurchase Transactions, Seller shall deliver to Master Custodian by electronic means mutually agreed upon by Seller and Master Custodian and by facsimile pursuant to the terms of Section 18(c) hereof, a Seller's Repurchase Transaction Data File containing, among other things, for each Repurchase Transaction:

(i)    the Purchase Date and the Purchase Price;

(ii)    the Repurchase Date;

(iii)    the identity of Buyer; and

(iv)    instructions to Master Custodian to select Assets in Seller's Master Custodial Account to be transferred to Buyer's Master Custodial Account, such instructions to indicate what Grade(s) of Assets are eligible for transfer into Buyer's Master Custodial Account pursuant to the terms of the related Repurchase Transaction.

In the event that Seller does not deliver to Master Custodian a Seller's Repurchase Transaction Data File containing instructions identifying the Grade of Assets to be sold by Seller to Buyer (or if such instructions are not received by Master Custodian on a timely basis for any reason or lack the specificity necessary to enable Master Custodian to make such a transfer in accordance with such instructions), Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, the Master Custodian may reject the contents of such Seller's Repurchase Transaction Data File as not in compliance with the terms of this Agreement and in such event the Master Custodian shall act in accordance with the provisions of Section 5(g) hereof.  Nothing provided herein shall be deemed to be an amendment or waiver of the provisions of Sections 12(b) or 15 of this Agreement.

b.    Buyer's Purchase Price.    No later than 3:00 p.m. on each Purchase Date, Master Custodian shall have received from the Buyer or its designee, for credit to Buyer's Master Custodial Account, sufficient Cash such that the total Cash balance in Buyer's Master Custodial Account equals or exceeds the aggregate Purchase Price contained in Seller's Repurchase Transaction Data File with respect to such Repurchase Transaction.

10

       c.     Seller's Tender of Assets.  Prior to 3:30 p.m. on the Purchase Date, Master Custodian shall transfer into Seller's Master Custodial Account those Assets described in Seller's Repurchase Transaction Data File as provided in Section 5(a)(iv) or in the next succeeding paragraph of Section 5(a).

       d.     Cash Accounts.  All payments of Cash to be credited to Buyer's Master Custodial Account shall be effected either by transfer from an account maintained by Seller at Master Custodian or by wire transfer through FRBNY to Buyer's Master Custodial Account designated in Exhibit B.

       e.     Review of Sub-Custodian Data Files and Receipt of Trust Receipts By Master Custodian.

       (i)     On each Business Day, Seller shall have, by 11:00 a.m. (A) reviewed those Sub-Custodian Data Files transmitted to Seller from one or more Sub-Custodians (which shall have been so transmitted to Seller no later than 6:00 p.m. on the immediately preceding Business Day pursuant to Section 3(c) of the Tri-Party Sub-Custodial Agreement), (B) transmitted the Seller's Asset Composition Data File to Master Custodian, and (C) informed the respective Sub-Custodian(s) of any discrepancies between data existing in the Sub-Custodian Data File and the Seller's Asset Composition Data File, and (D) transmitted to the Master Custodian, and pursuant to said Section 3(c) of the Tri-Party Sub-Custodial Agreement caused all applicable Sub-Custodian(s) to transmit to Master Custodian by electronic means mutually acceptable to Master Custodian and Seller, a final Sub-Custodian Data File containing data relating to the Mortgage Loans held by such Sub-Custodian(s).  Subject to the provisions of the last sentence of this clause (e)(i), in the event that the data for any Mortgage Loan contained in a Sub-Custodian Data File is substantially complete but is missing some items of requested information, and one or more missing items of requested information may be obtained by Master Custodian through review of Seller's Asset Composition Data File delivered on the same Business Day (or for such Business Day as provided in Section 5(g) hereof), Master Custodian shall reflect in its files the information regarding such Mortgage Loan obtained from Seller's Asset Composition Data File if no information is provided in the related Sub-Custodian Data File with respect to such characteristic.  In the event that such information is obtained from Seller's Asset Composition Data File and inserted into Master Custodian's files with respect to the relevant Mortgage Loan(s), Master Custodian (x) shall not be liable to any Person for any loss, cost or damage resulting from such insertion, and (y) shall be entitled to rely on the information set forth in Master Custodian's files with respect to the related Mortgage Loan(s) for the purposes of fulfilling each of its other obligations hereunder and shall not be liable to any Person in so relying thereon.  Notwithstanding any other provision of this Agreement, in the event that any Sub-Custodian Data File shall be transmitted to Master Custodian at any time which does not contain information which on its

face appears accurate with respect to (A) the mortgage loan number, (B) the original principal balance, (C) the interest rate, and (D) the maturity date, in each case of any Mortgage Loan for which the related Mortgage File has been reviewed by a Sub-Custodian, such Mortgage Loan shall not be eligible for transfer by the Master Custodian into Buyer's Master Custodial Account, provided, however, that in the event for any reason the information required with respect to items (C) or (D) has not been provided by the Sub-Custodian but has been included in Seller's Asset Composition Data File, Master Custodian may use this information provided by Seller for inclusion in its files with respect to the related Mortgage Loans without any further duty of inquiry and without any liability to any Person and if thereafter all of the information required by clauses (A),(B),(C) and (D) of this Section 3(d) is included in the Master Custodian's files with respect to the related Mortgage Loan, such Mortgage Loan will be eligible for transfer by the Master Custodian into Buyer's Master Custodial Account.

(ii)   In the event that notwithstanding the provisions of subsection 5(e)(i) above Master Custodian receives notice from Seller by electronic means mutually acceptable to Seller and Master Custodian that Seller believes that there are discrepancies or inaccuracies in the Sub-Custodian Data File, Seller may attempt to reconcile such possible discrepancies or inaccuracies prior to 3:00 p.m. on the related Purchase Date, and will provide definitive instructions to Master Custodian no later than 3:00 p.m. on such date with respect to the inclusion or exclusion for transfer of any Mortgage Loans which it has previously determined may be subject to discrepancies or inaccuracies. Seller's determination of whether a discrepancy or inaccuracy exists in the Sub-Custodian's Data File shall be final and Master Custodian shall not be liable for any loss, cost, expense or liability resulting directly or indirectly from its making such a determination.

(iii)   In the event that on any proposed Purchase Date on which the relevant Sub-Custodian is open for business (which may be inferred by the Master Custodian if it has not received notice pursuant to Subsection 5(e)(iv) below) Master Custodian shall not have received one or more Sub-Custodian Data Files by 11:00 a.m., Master Custodian shall immediately inform Seller and await instructions from Seller regarding the Assets to be transferred in connection with such Repurchase Transaction. Upon receipt by Master Custodian of instructions substantially in the form of Schedule 8 hereto, Master Custodian shall promptly provide notice to the Buyer in the form of Schedule 9 hereto to the effect that Master Custodian has received instructions from the Seller, and pursuant to this Agreement shall, accept the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian's Data File ordinarily sent by such Sub-Custodian but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means

12

ordinarily employed by Sub-Custodian for such purpose. In such event, upon receipt of such data file from the Seller, Master Custodian may rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby without further inquiry and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

(iv)   In the event that Master Custodian receives written notice from the Seller that one or more Sub-Custodians are not open for business on any Business Day, Master Custodian may rely upon the accuracy of the Sub-Custodian Data File from the previous Business Day on which such Sub-Custodian was open for business in determining Assets to be transferred to Buyer in connection with Repurchase Transactions occurring on such day and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon; provided that if any Sub-Custodian is not open for business for more than two (2) consecutive Business Days, the Master Custodian shall promptly provide notice thereof to Buyer and Seller and request joint instructions executed by both Buyer and Seller with respect to further action regarding Assets appearing in such Sub-Custodian's most recently transmitted Sub-Custodian Data File and in the event Buyer and Seller cannot agree upon such instructions, the provisions of Section 14 hereof shall be applicable.

(v)   Subject to the provisions of Section 5(f), prior to 3:30 p.m. on each Trust Receipt Delivery Date, Seller shall cause the respective Sub-Custodian, pursuant to Section 4 of the Tri-Party Sub-Custodial Agreement, to execute and deliver to the Master Custodian, each by facsimile (with paper copy to follow by overnight air courier, next day delivery, counterpart signature pages acceptable) a Trust Receipt. The information contained in the Sub-Custodian Data File transmitted to the Master Custodian on the Trust Receipt Delivery Date shall be deemed to constitute the schedule of Mortgage Loans referred to in such Trust Receipt. On each Business Day subsequent to the Trust Receipt Delivery Date, each Sub-Custodian Data File transmitted to the Master Custodian by such Sub-Custodian pursuant to Section 5(e)(i) shall be deemed to amend and restate the schedule of mortgage loans referred to in the Trust Receipt delivered to the Master Custodian on the Trust Receipt Delivery Date to take into account any substitutions of Assets which have occurred pursuant to Section 7(c). Upon receipt of a Notice of Default with respect to a Repurchase Transaction pursuant to Section 17 hereof from either the Buyer or Seller, the Master Custodian shall, at the request of the party sending such Notice of Default, convert the most recently received Sub-Custodian Data File to a paper copy and attach the same to the Trust Receipt.

(vi)   Prior to 3:00 p.m. on any proposed Purchase Date, Seller shall have transmitted to Master Custodian in an electronic manner mutually acceptable to Seller and Master Custodian a Seller's Pre-Allocation

Schedule listing any Assets which Seller has requested be specifically allocated by Master Custodian for transfer from Seller's Master Custodial Account to Buyer's Master Custodial Account in connection with a particular Repurchase Transaction. By no later than 5:30 p.m. on any proposed Purchase Date, Master Custodian shall have reviewed the Seller's Pre-Allocation Schedule provided by Seller and compared it to the information provided in Seller's Instructions with respect to the particular Grade of Assets and other Asset criteria relating to the relevant Repurchase Transaction. If the Assets requested to be allocated to a particular Repurchase Transaction are acceptable for such pre-allocation based upon such review by the Master Custodian such Assets will be pre-allocated to the relevant Repurchase Transaction. If, however, for any reason the Assets requested to be allocated to a particular Repurchase Transaction are not acceptable for such pre-allocation based upon such review by the Master Custodian, the Master Custodian shall not pre-allocate such Assets to the relevant Repurchase Transaction and instead, without further notice to the Seller or other action of any kind, will make such Assets available for allocation to any other Repurchase Transaction on such day.

(vii)    Prior to 5:30 p.m. on any proposed Purchase Date, (A) Seller shall have transmitted to Master Custodian in an electronic manner mutually acceptable to Seller and Master Custodian a schedule of the Assets which have previously been transferred into Seller's Master Custodial Account which it recommends should be transferred into Buyer's Master Custodial Account in accordance with Section 6(a) hereof, and (B) Master Custodian shall have determined whether, based upon the information provided to it by Seller in the schedule provided pursuant to clause (A) of this Section 5(e)(vii) and based upon the Sub-Custodian Data Files, there are sufficient Assets contained in Seller's Master Custodial Account to transfer into Buyer's Master Custodial Account such that a Margin Deficit (as described in Section 7(a) hereof) shall not occur, and, in the event that Master Custodian believes there are insufficient assets located in Seller's Master Custodial Account to prevent a Margin Deficit from occurring, Master Custodian shall immediately so inform Seller in writing by facsimile or mutually pre-approved electronic means.

f.    <u>Single Trust Receipt</u>. Any provision of this Agreement to the contrary notwithstanding, the Master Custodian shall hold only one Trust Receipt from each Sub-Custodian relating to all Mortgage Loans held by such Sub-Custodian for the benefit of the Master Custodian hereunder. The Master Custodian will mark its books to reflect that portion of the Assets relating to each Trust Receipt that have been transferred to the Buyer's Master Custodial Account hereunder from time to time. The Master Custodian shall be under no obligation at any time to update, revise or amend any Trust Receipt received by it except to the extent specifically provided in Section 5(e)(v) hereof.

14

g.    Failure of Seller to Transmit Seller's Asset Composition Data File.    In the event that for any reason Master Custodian does not receive a Seller's Asset Composition Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement, Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, the Master Custodian may rely upon the accuracy of the Seller's Asset Composition Data File, as the case may be, from the previous Business Day on which Seller transmitted such electronic file in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement in performing all tasks required of it hereunder in connection with Repurchase Transactions occurring on such day and in such event Master Custodian shall not be liable to any Person whatsoever in so relying thereon; provided that if the Master Custodian does not receive a Seller's Asset Composition Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement for more than two (2) consecutive Business Days, the Master Custodian shall promptly provide notice thereof to Buyer and Seller and request joint instructions executed by both Buyer and Seller with respect to further action regarding Assets appearing in such Seller's Asset Composition Data File and in the event Buyer and Seller cannot agree upon such instructions, the provisions of Section 14 hereof shall be applicable. In the event that the Master Custodian shall be required to utilize the information set forth in a Seller's Asset Composition Data File from a prior Business Day, the Buyer and the Seller hereby irrevocably authorize the Master Custodian to make any manual adjustments to said data transmission as may be necessary (such as changing dates, etc.) to conform such transmissions to the requirements of its data processing systems or to properly identify such data in its books and records so long as such manual adjustments do not materially adversely affect the integrity of the information contained therein relating to the Assets, and the Master Custodian may evidence such manual adjustments by marking its internal books and records to reflect such adjustments upon their occurrence. The Master Custodian shall not be liable to the Buyer, the Seller, any Sub-Custodian or any third-party resulting from its making such manual adjustments in accordance with the provisions of this Section.

h.    Failure of Seller to Transmit Seller's Repurchase Transaction Data File.    In the event that for any reason Master Custodian does not receive a Seller's Repurchase Transaction Data File from the Seller which has been transmitted in the format required and by the time required for such electronic file pursuant to the provisions of this Agreement, Master Custodian shall so notify the Seller and if the Seller is unable to rectify the problem in a reasonable period of time based upon the required daily schedule with respect to Repurchase Transactions set forth in this Agreement, Seller shall promptly (but in no event later than 4:00 p.m. New York time on the same Business Day) send to an Authorized Representative of the Master Custodian by facsimile transmission at the number listed in Section 18(c) hereof a copy of the Seller's Repurchase Transaction Data File for such Business Day and shall confirm the Master Custodian's receipt of such facsimile transmission telephonically.

Section 6.    **Effecting Transactions; Grant of Security Interest**

a.    Purchase Date.    Subject to the terms of this Agreement, and subject to time limitations imposed by the Federal Funds wire transfer system with respect to transfers to

15

parties outside of JPMorgan Chase Bank in New York City (for which the Master Custodian shall not be liable), at or about 5:30 p.m. on the Purchase Date for any Repurchase Transaction, Master Custodian shall transfer to Seller Cash from Buyer's Master Custodial Account in an amount equal to the Purchase Price and shall transfer Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account in accordance with Seller's Instructions contained in Seller's Repurchase Transaction Data File with respect to such Repurchase Transaction as provided in Section 5(a)(iv) hereof. Master Custodian shall examine all Trust Receipts on the related Trust Receipt Delivery Date to insure that (A) they are substantially in the form of Exhibit 1 to the Tri-Party Sub-Custodial Agreement or in another form subsequently agreed to in writing between the Buyer and Seller and consented to by the Master Custodian, such consent not to be unreasonably withheld, and (B) that they otherwise conform to all of Seller's Instructions, if any, contained in the related Seller's Repurchase Transaction Data File. In the event that any Trust Receipt is not in the proper form or does not conform to all of Seller's Instructions, if any, contained in the related Seller's Repurchase Transaction Data File, Master Custodian shall promptly notify Seller.

    b.    <u>Market Value of Assets</u>.

    (i)    <u>Grade A Assets</u>:  The Market Value of Grade A Assets shall be their face amount.

    (ii)    <u>Grade B Assets</u>:  The Market Value of Residential Mortgage Loans (each of which shall be evidenced by Trust Receipts but treated as individual Mortgage Loans respectively for purposes of determination of Market Value) shall be determined by Master Custodian and shall be equal to the lesser of the outstanding balance or the face amount of the note relating to such Mortgage Loan multiplied by the price, as quoted by a recognized pricing service not earlier than the close of business on the immediately preceding Business Day, of a GNMA, FNMA or FHLMC security backed by Residential Mortgage Loans with (1) a coupon which most closely approximates, but does not exceed the coupon on the Asset to be priced, and (2) a maturity date within three months of, the weighted average maturity of such security.   If the pricing service fails to provide information on any day, Master Custodian shall use the "assumed price" of such Residential Mortgage Loan as provided herein in <u>Schedule 7</u> attached hereto and which schedule shall be revised from time to time by means of distribution of a revised <u>Schedule 7</u> which shall become effective when agreed to in writing by the Buyer and the Seller and receipt thereof acknowledged in writing by the Master Custodian.

    (iii)    <u>Grade C Assets</u>: In the event that the Buyer has indicated on Exhibit A hereto that it will accept Seller pricing of Grade C Assets by virtue of its having checked the box entitled "Agrees to Seller Pricing" therein, then upon the consent of the Master Custodian (such consent to be withheld only if the Master Custodian's computer and data processing systems have not yet been customized to perform Seller pricing in connection with this program), then the Market Value of Commercial Mortgage Loans (each of

which shall be evidenced by Trust Receipts but treated as individual Mortgage Loans respectively for purposes of determination of Market Value) shall be determined by Master Custodian and shall be equal to the price provided to Master Custodian by Seller not earlier than the close of business on the immediately preceding Business Day. If the Buyer has not indicated on Exhibit A hereto that it will accept Seller pricing of Grade C Assets by virtue of its having checked the box entitled "Agrees to Seller Pricing" therein, or the Seller fails to provide price information on any day, Master Custodian shall use the "assumed" price of such Commercial Mortgage Loan as provided herein in <u>Schedule 7</u> attached hereto and which schedule shall be revised from time to time by means of distribution of a revised <u>Schedule 7</u> which shall become effective when agreed to in writing by the Buyer and the Seller and receipt thereof acknowledged in writing by the Master Custodian.

    (iv)    <u>Grade D Assets</u>:  The Market Value of each Grade D Asset shall be determined pursuant to a method agreed upon by each of the parties hereto and provided in an addendum to <u>Schedule 1</u> hereto, executed by each of Buyer and Seller.

    c.    <u>Determination of Aggregate Market Value</u>.  By no later than 5:30 p.m. on the Purchase Date for any Repurchase Transaction, Master Custodian shall determine the then Aggregate Market Value of all Assets to be transferred to Buyer's Master Custodial Account with respect to a Repurchase Transaction.  Master Custodian shall exclude from the determination of the Aggregate Market Value and return to Seller's Master Custodial Account any Mortgage Loans evidenced by a Trust Receipt which is not in the proper form or any Asset which does not conform to all of Seller's instructions, if any, contained in the related Seller's Repurchase Transaction Data File as provided in Section 5(a)(iv) hereof.

    d.    <u>Payment of Purchase Price</u>.  Provided the Aggregate Market Value of all Purchased Assets to be transferred to Buyer's Master Custodial Account with respect to a Repurchase Transaction equals or exceeds the Required Amount with respect to such Repurchase Transaction as provided in the related Seller's Repurchase Transaction Date File, Master Custodian shall, upon telephonic instructions from the Seller followed on the same Business Day by written confirmation thereof by facsimile, transfer such Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and shall disburse from Buyer's Master Custodial Account Cash in an amount equal to the Purchase Price.  All payments of Cash representing the Purchase Price to be credited to Seller's Master Custodial Account (or such other account which Seller shall direct in writing) shall be effected either by transfer from an account maintained by the paying party at Master Custodian or by wire transfer through FRBNY to Seller's Master Custodial Account (or such other account which Seller shall direct in writing).

    e.    <u>Repurchase Date</u>.  On the Repurchase Date for any Repurchase Transaction, Buyer hereby instructs Master Custodian to tender to Seller the Purchased Assets held by Master Custodian in Buyer's Master Custodial Account with respect to such Repurchase Transaction and to transfer the Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account.  Seller hereby instructs Master Custodian at the time

Purchased Assets are transferred to Seller's Master Custodial Account to make payment to Buyer of the Purchase Price by debiting Cash from Seller's Master Custodial Account and crediting Cash to Buyer's Master Custodial Account.

  f.  <u>Simultaneous Transactions</u>. Buyer and Seller agree that transfers of Cash and Assets for the purpose of effecting Repurchase Transactions pursuant to the provisions of this Section 6 are intended to be, and shall be deemed to be, simultaneous. During any period that Cash and Assets are held by or for Buyer or Seller and payment has not been made therefor, the receiving party shall be deemed to hold the Cash and Assets in trust for the delivering party and shall be obligated to return the Cash and Assets upon the delivering party's request.

  g.  <u>Effect of Notice of Levy, etc.</u> Notwithstanding anything in this Agreement to the contrary, Master Custodian shall not be required to deliver or transfer Assets in contravention of any notice of levy, seizure or similar notice or order, or judgment, issued or directed by a governmental agency or court, or officer thereof, having jurisdiction over Master Custodian or its agents or affiliates, which on its face affects such Assets. Master Custodian shall give Buyer and Seller prompt notice of any such notice or order.

  h.  <u>Ownership of Purchased Assets</u>. Until the Repurchase Date, or until Master Custodian shall receive from Buyer a Notice of Default, notification, instruction or entitlement order under Section 17, Buyer hereby instructs Master Custodian to hold Purchased Assets in Buyer's Master Custodial Account and to refuse to act upon any instructions of Buyer or Seller to deliver Purchased Assets other than as expressly provided in this Agreement. Buyer hereby covenants, for the exclusive benefit of Seller, that it shall not, prior to the occurrence of an Event of Default (upon which the provisions of said Section 17 shall be controlling) without the prior written consent of Seller, sell, transfer, assign, pledge, or otherwise utilize or transfer Purchased Assets held in Buyer's Master Custodial Account with respect to any Repurchase Transaction. Further, Buyer hereby covenants, for the exclusive benefit of Seller, that Buyer will not instruct Master Custodian to deliver any Purchased Assets in Buyer's Master Custodian Account to any person other than Seller unless and until an Event of Default has occurred as to which Seller is the defaulting party. Notwithstanding the foregoing, the foregoing covenants in the preceding two sentences are for the exclusive benefit of Seller only and they shall in no way be deemed to constitute a limitation on (i) Buyer's right at any time to provide notifications, instructions or entitlement orders to Master Custodian with respect to the transfer of Assets, or (ii) Master Custodian's obligation to act upon such notifications, instructions or entitlement orders of Buyer. To the extent not otherwise inconsistent with the foregoing, Buyer shall be entitled to exercise all of the rights of a secured party under the UCC with respect to Purchased Assets held in Buyer's Master Custodial Account.

  i.  <u>Deliveries by Master Custodian</u>. All deliveries permitted under this Agreement of Purchased Assets by Master Custodian to Buyer from Buyer's Master Custodial Account shall be made to Buyer by delivery in the manner requested by Buyer in writing.

  j.  <u>Seller's Grant of a Security Interest</u>. In the event that the transactions evidenced by the Master Repurchase Agreement are characterized as a financing notwithstanding the stated intention of the parties thereto to effect a sale, Seller hereby grants to Buyer, in consideration of Buyer's performance of its obligations hereunder and under the Master

Repurchase Agreement, a first priority security interest in all of Seller's right, title and interest in and to the Assets relating to each Repurchase Transaction and Buyer's Master Custodial Account.

Section 7.    **Valuation and Substitution of Assets**

No later than 5:30 p.m. on each Business Day, Master Custodian shall determine the then current Aggregate Market Value (in the manner provided in Section 6(c)) of all Purchased Assets held in Buyer's Master Custodial Account with respect to all Repurchase Transactions then outstanding.

a.    Margin Deficit.  In the event that the aggregate Required Amount with respect to all outstanding Repurchase Transactions is greater than the Aggregate Market Value of all Purchased Assets held with respect to such Repurchase Transactions (a "Margin Deficit") Master Custodian shall so notify Seller at 5:30 p.m.. No later than 7:00 p.m. on the date of any such notice, Seller shall transfer to Master Custodian additional Cash such that, after transfer thereof to Buyer's Master Custodial Account, the then Aggregate Market Value of all Purchased Assets (including the recently transferred Assets) held with respect to outstanding Repurchase Transactions equals or exceeds an amount equal to the aggregate Required Amount with respect to all outstanding Repurchase Transactions. If Seller fails to transfer an appropriate amount of additional Assets by 7:00 p.m. on the date of any such notice, Master Custodian shall promptly notify Buyer and Seller and await further instructions. Master Custodian shall incur no liability to any Person with respect to any Margin Deficit in acting in accordance with the provisions of this Section 7(a).

b.    Margin Excess.  In the event the then Aggregate Market Value of Purchased Assets held with respect to outstanding Repurchase Transactions shall exceed an amount equal to the aggregate Required Amount with respect to all outstanding Repurchase Transactions (a "Margin Excess"), Master Custodian shall, notify Seller and (i) upon instructions from Seller to be delivered by Seller to Master Custodian on the date of execution hereof and to be effective until Master Custodian has received a revocation thereof in writing from Seller, Master Custodian shall transfer Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account having an Aggregate Market Value less than or equal to the Margin Excess, and (ii) in accordance with such transfers as provided for in cause (i) hereof, upon instructions from Seller to be delivered by Seller to all relevant Sub-Custodians pursuant to Section 9(b) of the applicable Tri-Party Sub-Custodial Agreement, Sub-Custodian shall transfer Mortgage Files relating to the Mortgage Loans described in such instructions as directed in such instructions as provided in Section 9(b) of the applicable Tri-Party Sub-Custodial Agreement and subsequent to such release from custody such Mortgage Loans shall not be included in any subsequent Sub-Custodian Data Files transmitted by such Sub-Custodian to the Master Custodian hereunder, provided that in any event, subsequent to such transfers any requirements set forth in Seller's Instructions shall continue to be met. Buyer hereby irrevocably authorizes Master Custodian and each Sub-Custodian (as a third-party beneficiary of this Agreement for the limited purposes set forth herein) to accept the written instructions of Seller identifying the specific Purchased Assets to be released in accordance herewith.  Upon transfer from Buyer's Master Custodial Account, released Assets shall cease to be Purchased Assets for all purposes

19

hereunder and without further action the security interest granted by the Seller to the Buyer with respect to such Purchased Assets pursuant to Section 6(j) hereof shall be automatically released.

      c.     <u>Substitutions of Purchased Assets</u>.  Except as otherwise provided in Section 17, Buyer hereby authorizes Master Custodian from time to time to release to Seller Purchased Assets held in Buyer's Master Custodial Account pursuant to a release request from Seller, <u>provided</u>, <u>however</u>, that Seller shall simultaneously deliver to Master Custodian for transfer to Buyer's Master Custodial Account additional Assets that are of the same or higher Class as, and have an Aggregate Market Value equal to or greater than the then Aggregate Market Value of Purchased Assets released hereunder. The transfer of Assets shall be effected in the manner set forth in Section 6(a) with the following exceptions: (i) Master Custodian shall calculate the Aggregate Market Value of the substitute Assets and determine that the Aggregate Market Value of the substitute Assets equals or exceeds the Aggregate Market Value of the Purchased Assets identified in Seller's release request; and (ii) Master Custodian shall transfer the identified Purchased Assets from Buyer's Master Custodial Account to Seller's Master Custodial Account and transfer the substitute Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account, such transfer of released Purchased Assets and substitute Assets to be deemed to occur as provided in Section 6(f) and subject to the terms thereof. All substitute Assets received pursuant to this Section 7(c) shall be deemed to be Purchased Assets held by Master Custodian as of the Purchase Date of, and identified to, outstanding Repurchase Transactions as determined by Master Custodian. In connection with Master Custodian's performance of its duties under this Section 7(c), the parties hereto acknowledge that throughout each day during which Repurchase Transactions are outstanding, Master Custodian shall be entitled to, without specific instructions of any kind (other than Seller's Instructions), re-allocate Assets among Repurchase Transactions as many times as may be necessary in connection with the origination, rolling over and termination of various Repurchase Transactions and make appropriate substitutions from and into Buyer's Master Custodial Account in connection therewith, so long as such substitutions are made in accordance with this Section 7(c) and subject to the provisions of Section 17, and Master Custodian shall not be required to provide a statement or reconciliation of such Buyer's Master Custodial Accounts indicating such substitutions except as of the end of each such Business Day, such statement to be distributed pursuant to the provisions of Section 8 hereof.

      d.     <u>Release of Mortgage Files for Servicing</u>. Pursuant to Section 7 of each Tri-Party Sub-Custodial Agreement, each Sub-Custodian is permitted and authorized, from time to time and as appropriate for the foreclosure or servicing of any of the Mortgage Loans, upon receipt of a Request for Release of Documents and Receipt in the form of <u>Exhibit 2</u> to each Tri-Party Sub-Custodial Agreement, to release or cause to be released to the Seller or the Seller's Authorized Representative the related Mortgage File or the documents of the related Mortgage File set forth in such Request for Release. All Mortgage Files or documents of Mortgage Files released by a Sub-Custodian to the Seller or, at the Seller's written direction, the Seller's Authorized Representative are required to be held by the Seller or the Seller's Authorized Representative, as applicable, in trust for the benefit of the Master Custodian or other related holder of a Trust Receipt. Pursuant to Section 8 of each Tri-Party Sub-Custodial Agreement, the Seller or the Seller's Authorized Representative may not request to have released to the Seller or the Seller's Authorized Representative in total active Mortgage Files or documents (including those requested) pertaining to Mortgage Loans at the time being held by the Sub-Custodian

under the related Tri-Party Sub-Custodial Agreement with outstanding principal balances representing more than five percent (5%) of the total aggregate outstanding principal balance of Mortgage Loans held by the Sub-Custodian pursuant to the terms thereof without the prior written consent of the Buyer.

Section 8.    **Master Custodian Statements**

Master Custodian shall provide Seller with daily information statements reflecting the Cash and Assets in Seller's Master Custodial Account and shall provide Buyer and Seller with daily information statements reflecting the Cash and Purchased Assets in Buyer's Master Custodial Account. Such statements will be provided prior to 10:00 p.m. each evening and shall be in the form of Schedules 5 & 6 hereto entitled "Schedule 5 - File Format For Spreads File" and "Schedule 6 - Detail Schedule For Buyer", respectively. The File Format For Spreads File shall be electronically transmitted by Master Custodian to Seller by a method of transmission mutually acceptable to the sending and receiving parties. The Detail Schedule for Buyer shall be sent by Master Custodian to Buyer by facsimile transmission at the telecopy number provided in Exhibit B hereto. Buyer and Seller shall promptly review such statements and shall promptly advise Master Custodian of any error, omission, or inaccuracy in the information reported. Master Custodian shall undertake to correct any errors, failures or omissions that are reported to Master Custodian by Buyer or Seller. Any such corrections shall be reflected on subsequent information statements.

Section 9.    **Master Custodian Fee**

Seller shall pay Master Custodian's fees and reimburse it for certain expenses in connection with the services provided pursuant to this Agreement as is more fully provided in that certain Engagement Letter between Seller and Master Custodian dated June 4, 1999.

Section 10.    **No Guaranty by Master Custodian**

BUYER AND SELLER SPECIFICALLY ACKNOWLEDGE THAT MASTER CUSTODIAN IS NOT GUARANTEEING PERFORMANCE OF THE OBLIGATIONS OF BUYER OR SELLER HEREUNDER, UNDER THE MASTER REPURCHASE AGREEMENT, UNDER THE TRI-PARTY SUB-CUSTODIAL AGREEMENT OR WITH RESPECT TO ANY TRANSACTION OR ASSUMING ANY LIABILITY WITH RESPECT TO THE PERFORMANCE OF BUYER OR SELLER, NOR IS MASTER CUSTODIAN UNDERTAKING ANY CREDIT RISK ASSOCIATED WITH THE TRANSACTIONS, WHICH LIABILITIES ARE THE SOLE RESPONSIBILITY OF BUYER AND SELLER. FURTHER, EXCEPT AS MAY BE ARRANGED BY A SEPARATE AGREEMENT, MASTER CUSTODIAN IS UNDER NO OBLIGATION TO UNDERTAKE TO MAKE ANY CREDIT AVAILABLE TO EITHER BUYER OR SELLER TO ENABLE EITHER OF THEM TO COMPLETE TRANSACTIONS.

Section 11.    **Force Majeure**

Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) suffered by Buyer, Seller, or any third party arising out of or caused by any delay in, or failure of, performance by Master Custodian, in whole or in part

21

(other than such as may arise from Master Custodian's gross negligence or willful misconduct), arising out of, or caused by, circumstances beyond Master Custodian's control, including without limitation: acts of God; interruption, delay in, or loss (partial or complete) of electrical power or external computer (hardware or software) or communications services; act of civil or military authority; sabotage; natural disaster, epidemic; war or other government action; civil disturbance; flood, earthquake, fire; other catastrophe; strike or other labor disturbance by employees of nonaffiliates; government, judicial, or self-regulatory organization order, rule, or regulation; riot; energy or natural resource difficulty or shortage; and inability to obtain materials, equipment or transportation, provided the Master Custodian has exercised such diligence as the circumstances may reasonably require, and provided that the Master Custodian has used due care and has exercised due diligence in anticipating such event to the extent reasonably foreseeable and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on the Master Custodian's performance of its duties and responsibilities hereunder, but provided further that the proviso herein shall not be applicable to any events or consequences resulting from the problem commonly know as the "Y2K Problem", which relates to effect of the year 2000 upon any computer systems or equipment containing embedded microchips (including systems and equipment supplied by others with which such systems or equipment interface).

Section 12.    **Concerning Master Custodian**

a.    <u>Delay in Receiving Assets</u>. Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) which Buyer, Seller or any third party may suffer by reason of any delay Buyer, Seller or Master Custodian may experience in obtaining Assets from, or by reason of any action or omission to act on the part of, any Sub-Custodian, depository, clearing agent, transfer agent, third party, clearing corporation, or FRBNY securities wire transfer system, or in obtaining Cash from any bank, including FRBNY, clearing agent, or third party (other than such as may arise from Master Custodian's gross negligence or willful misconduct). Master Custodian shall promptly notify Seller and Buyer of any such delay. Master Custodian shall not be liable in any event for any act or omission of any Sub-Custodian or of any act or omission of any agent or representative selected with due care.

b.    <u>Forgery; False Data</u>. Master Custodian is entitled to act upon any data or instructions received from any Sub-Custodian by computer transmission or other electronic means whether or not authorized or correct if received by it in good faith and in accordance with the security procedures set forth in Section 30 of any Tri-Party Sub-Custodial Agreement. Subject to the foregoing, Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees or expenses) which Buyer, Seller or any third party may suffer by reason of any signature by anyone who is not an Authorized Person on, or forgery or wrongful alteration of, instructions or any other written instrument or inaccuracy, incompleteness, or falsity of data transmitted by any Person by computer tape or terminal or other computer facilities or electronic means, if Master Custodian reasonably shall have believed that such instructions, instrument or data was for the account or benefit of Buyer or Seller or that the writing was signed by, or the data was transmitted by, an Authorized Person, or in the case of any Sub-Custodian, any purportedly authorized person.

22

      c.      <u>No Duty of Inquiry</u>.  Notwithstanding anything to the contrary in this Agreement and without limiting the generality of the foregoing, Master Custodian shall be under no obligation to inquire into, and shall not be liable for:

     (i)     the title, validity, or genuineness of any Asset;

    (ii)     the legality or effectiveness of the purchase or delivery or transfer of any Asset or the propriety of the price by which the same is acquired or sold under a Repurchase Transaction;

    (iii)    the due authority of any Authorized Person to act on behalf of Buyer or Seller with respect to Assets held in Buyer's Master Custodial Account or Assets held in Seller's Master Custodial Account, as applicable;

    (iv)    the due authority of Buyer to purchase or hold any Purchased Asset delivered to Master Custodian pursuant to this Agreement;

    (v)     the accuracy or completeness of any data or information with respect to Assets which has been provided to Master Custodian by Seller at any time pursuant to the terms of this Agreement (including, without limitation, for the failure by the Master Custodian to transfer Assets to the Buyer's Master Custodial Account in respect of any Repurchase Transactions which for any reason are excluded from the report sent by Seller to Master Custodian pursuant to Section 5(a) hereof);

    (vi)    the collectibility, insurability, effectiveness, marketability or suitability of any of the collateral underlying an Asset; or

    (vii)   the legal content of the provisions of any Trust Receipt or the legal adequacy thereof or of any purported transfer thereof.

      d.      <u>Price Data</u>.  Master Custodian shall not be liable for any expense, loss, claim or damage (including counsel fees and expenses) (other than such as may arise solely from Master Custodian's gross negligence or willful misconduct) which Buyer, the Seller, or any third party may suffer by reason of any error by, or inaccuracy of, any price received from any recognized pricing source (including the Seller if the Buyer, Seller and Master Custodian have agreed at any time to permit Seller pricing) including any prices resulting from any formula used to obtain such prices except for the proper calculation of prices thereunder.  Master Custodian shall have no duty to inquire into the appropriateness or relative change of any price nor shall Master Custodian be required to determine volatility factors with respect to any price.

      e.      <u>Limitation of Liability</u>.  Master Custodian shall perform its duties with reasonable care.  Master Custodian shall be liable to Buyer and Seller for loss of Assets resulting from Master Custodian's gross negligence or loss of the same by reason of robbery, burglary, or theft by it or its employees, agents or delegates.  Master Custodian shall not be liable to any Person for loss of Assets in the care and custody of a Sub-Custodian.  Notwithstanding any other provisions of this Agreement, Buyer and Seller agree that Master Custodian's liability under this Agreement shall be limited to direct damages resulting from Master Custodian's breach of this

Agreement. In no event shall Master Custodian be liable for special, consequential, or incidental damages incurred or suffered by Buyer, Seller, any Sub-Custodian or any other Person regardless of the form of action and even if such party is advised of the possibility of such damages.

Section 13.    **Indemnification**

Each of Buyer and Seller agrees, jointly and severally, to release, indemnify and hold harmless Master Custodian, its officers, directors, employees, agents and affiliated persons ("Indemnified Parties") for expenses, losses, claims, fines, penalties, or damages (including the reasonable fees of external legal counsel, accountants or auditors) (collectively, "Covered Costs") suffered by any Indemnified Party, if such Covered Costs (i) relate to those areas of liability from which Master Custodian has been expressly exculpated pursuant to the terms of this Agreement or any applicable Tri-Party Sub-Custodial Agreement, or (ii) result from any actual or alleged breach by the Seller, Buyer or Master Custodian of any provision of this Agreement, or any actual or alleged breach by the Seller, Master Custodian or any Sub-Custodian of any provision of any applicable Tri-Party Sub-Custodial Agreement, or failure in whole or in part, or delay in performing any duty or obligation hereunder or under any applicable Tri-Party Sub-Custodial Agreement, other than by reason of gross negligence or willful misconduct of Master Custodian or the Indemnified Party or for loss or theft as provided in Section 12(e) of this Agreement. Each of Buyer and Seller further agrees, jointly and severally, to indemnify and hold harmless the Indemnified Parties and to pay the reasonable costs and external counsel fees in connection with an Indemnified Party's defense of, or participation in, any action, claim, investigation, or administrative proceeding arising out of Master Custodian's performance of services under this Agreement or any applicable Tri-Party Sub-Custodial Agreement, other than by reason of gross negligence or willful misconduct of Master Custodian or of the Indemnified Party or for loss or theft as provided in Section 12(e) of this Agreement. Notwithstanding the foregoing, Buyer and Seller shall not be jointly and severally responsible for the reasonable counsel fees of more than one external counsel to the Indemnified Parties, regardless of the number of Indemnified Parties.

Section 14.    **Continuing Disputes**

With respect to Buyer's Account, the Assets at any time located in or to be transferred into Buyer's Account and any issues regarding the Buyer's right, title and interest into or under such account and Assets (including, without limitation, the transfer, sale or other liquidation of such Assets) or Seller's purported interest therein, notwithstanding anything to the contrary in this Agreement, in the event of any dispute between, conflicting claims by or conflicting instructions from Seller and Buyer with respect to such account or Assets, Master Custodian shall follow the instructions of Buyer and disregard the instructions of Seller. With respect to any other issues arising in connection with this Agreement, in the event of any dispute between or conflicting claims by Buyer and the Seller and any other person, Master Custodian shall promptly notify Seller and Buyer and shall either act on joint instructions or decline to comply with any and all claims, demands, or instructions with respect to such Assets so long as such dispute or conflict shall continue, and Master Custodian shall not be liable for failure to act or comply with such claims, demands, or instructions. With respect to issues covered by the immediately preceding sentence, Master Custodian shall be entitled to refuse to act or comply until either (i) such conflicting or adverse claims or demands shall have been determined in a

court of competent jurisdiction or settled by agreement between the conflicting parties and Master Custodian shall have received evidence satisfactory to it of the same, or (ii) Master Custodian shall have received security or an indemnity satisfactory to it and sufficient to hold it harmless from and against any and all losses or damages, including reasonable external counsel fees and expenses, which it may incur by reason of taking any action, except Master Custodian shall in all events accept Cash in substitution of any Purchased Assets pursuant to Section 7(c).

Section 15.    **Form of Instructions**

Notwithstanding that this Agreement may require written instructions, Master Custodian may in its discretion act on oral instructions of an Authorized Person if promptly confirmed in writing or on instructions received over any system whereby the receiver is able to verify by code or otherwise with reasonable certainty the identity of the sender of such communications. In such event, if subsequent written instructions differ in any respect from oral instructions, written instructions shall control. Failure to confirm in writing shall not affect the authority of any acts taken or omitted by Master Custodian pursuant to oral instructions. Instructions shall be effective from the time they are actually received by an Authorized Person of Master Custodian from an Authorized Person of the instructing party or from a person reasonably believed by Master Custodian to be an Authorized Person of the instructing party by telephone, by facsimile, or other facsimile machine, or any other means designated by Master Custodian.

Section 16.    **Termination**

Any of (x) Master Custodian, (y) Buyer or (z) Seller, may terminate this Agreement, without cause, by giving the other parties no less than ninety (90) days prior written notice specifying the date of such termination. Master Custodian shall deliver any Cash or Purchased Assets remaining in Buyer's Master Custodial Account on termination of this Agreement to a successor Master Custodian designated in written instructions from Buyer and Seller. If Buyer and Seller do not provide written instructions designating a successor Master Custodian prior to the termination date, Master Custodian shall (a) continue to hold Purchased Assets and Cash in Buyer's Master Custodial Account until the Repurchase Date with respect to each Repurchase Transaction then outstanding, or until it has received a Notice of Default, in connection therewith, and instructions in accordance with Section 17, or (b) in its sole discretion Master Custodian may deliver such Cash or Purchased Assets to Buyer or its designee.

Section 17.    **Notice of Default; Control**

a.    <u>Delivery of Notice of Default</u>.  If the Seller shall declare an Event of Default, it shall deliver a Notice of Default to Master Custodian. Master Custodian shall notify the Buyer of the receipt of a Notice of Default and shall send a notice of such Event of Default to each Sub-Custodian holding Mortgage Loans for the benefit of Buyer as determined pursuant to the most recently delivered Sub-Custodian Data File as provided in Section 9(c) of the related Tri-Party Sub-Custodial Agreement, but shall have no further obligation or duty to inquire into the nature or validity of the Event of Default set forth in the Notice of Default.

b.    Effect of Buyer's Notice of Default.  If Buyer shall declare an Event of Default, it shall deliver a Notice of Default to Master Custodian. Master Custodian shall notify the Seller of the receipt of a Notice of Default and shall send a notice of such Event of Default to each Sub-Custodian holding Mortgage Loans for the benefit of Buyer as determined pursuant to the most recently delivered Sub-Custodian Data File as provided in Section 9(c) of the related Tri-Party Sub-Custodial Agreement.  At any time during which Master Custodian has received a Notice of Default from Buyer with respect to any Repurchase Transaction, Master Custodian shall:

(i)    give notice to Seller of such Notice of Default and hold all Purchased Assets in Buyer's Master Custodial Account, or transfer the same in accordance with Buyer's instructions to Master Custodian; and

(ii)   cease (A) transferring (x) Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and (y) Cash from Buyer's Master Custodial Account to Seller, in each case pursuant to the provisions of Section 6(a) hereof in connection with any new Repurchase Transactions; (B) determining the Aggregate Market Value of Purchased Assets pursuant to Section 6(c); (C) tendering the Purchased Assets pursuant to Section 6(e); or (D) releasing to Seller Purchased Assets pursuant to Sections 7(a) and 7(b), except Master Custodian shall in all events accept Cash in substitution of any Purchased Asset pursuant to Section 7(c).

c.    Control.  All property from time to time in Buyer's Master Custodian Account shall be owned and controlled solely by Buyer, and Bank shall follow only Buyer's instructions with respect to Buyer's Account.  If requested in writing by Buyer, Master Custodian shall, notwithstanding anything to the contrary in this Agreement, comply with all notifications it receives originated by Buyer directing it to transfer or redeem any property in Buyer's Master Custodial Account and any other instructions or "entitlement orders" (as defined in Article 8 of the UCC) concerning Buyer's Master Custodial Account, in each case without further consent by Seller.  Master Custodian shall have no duty to investigate or make any determination as to whether a default exists under the Master Repurchase Agreement and shall comply with any entitlement orders or other notifications or instructions from Buyer even if it believes that no such default exists, and Master Custodian shall have no liability to Seller or to any other Person for complying with orders from Buyer even if Seller notifies Master Custodian that Buyer has no right to give such instructions.  Buyer hereby covenants, for the exclusive benefit of Seller, that Buyer will not instruct Master Custodian to deliver any Assets to any person other than Seller unless and until an Event of Default has occurred as to which Seller is the defaulting party. Notwithstanding the foregoing, the foregoing covenant is for the exclusive benefit of Seller only, and it shall in no way be deemed to constitute a limitation on (i) Buyer's right at any time to provide notifications, instructions or entitlement orders to Master Custodian with respect to the transfer of Assets, or (ii) Master Custodian's obligation to act upon such notifications, instructions or entitlement orders of Buyer.  Nothing contained in this Section 17(c) is intended to, nor shall it be deemed to limit, modify or supersede in any respect the rights of the Seller provided in Section 17(d) hereof, it being agreed that Section 17(d) does not and shall not affect Buyer's control of the Buyer's Master Custodial Account

26

        d.      Effect of Seller's Notice of Default. At any time Master Custodian has received a Notice of Default from Seller, with respect to any Repurchase Transaction, Master Custodian shall:

        (i)      give notice to Buyer of such Notice of Default and continue to hold all Purchased Assets then held in Seller's Master Custodial Account or transfer the some in accordance with Seller's Instructions to Master Custodian; and

        (ii)      cease: (A) transferring (x) Assets from Seller's Master Custodial Account to Buyer's Master Custodial Account and (y) Cash from Buyer's Master Custodial Account to Seller, in each case pursuant to Section 6(a) in connection with any new Repurchase Transactions; (B) determining the Aggregate Market Value of Purchased Assets pursuant to Section 6(c); (C) tendering the Purchased Assets pursuant to Section 6(e), or (D) releasing to Seller Purchased Assets pursuant to Sections 7(c) and 7(d), except that Master Custodian shall in all events accept Cash in substitution of any Purchased Asset pursuant to Section 7(c).

        e.      Further Assurances. In the event that Master Custodian receives a Notice of Default from Seller or any notification, instruction or entitlement order from Buyer as provided in clauses (b) and (c) above with respect to any Repurchase Transaction, Master Custodian shall continue to provide safekeeping services with respect to Purchased Assets and Cash held in Buyer's Master Custodial Account for a period not to exceed 90 days but shall not be required to provide additional services unless Seller gives Master Custodian adequate assurances that Seller shall pay Master Custodian's fees or Buyer undertakes in writing to pay Master Custodian's fees for such additional services.

        f.      Master Custodian's Knowledge. Master Custodian shall not be deemed to have independent knowledge or notice of the existence of an Event of Default. Master Custodian shall be entitled to rely on Buyer's or Seller's written Notice of Default and shall have no duty to inquire into the nature or validity of an Event of Default.

Section 18.    **Miscellaneous**

        a.      Authorized Personnel. Exhibit B contains the names, titles, and specimen signatures of those individuals authorized to act on behalf of Buyer for the purposes for which each is authorized. Seller shall deliver to Master Custodian such information for Seller's Authorized Persons. It is understood that certain designated persons may be Authorized Persons for limited purposes set forth in such lists. Buyer and Seller each agree to furnish to Master Custodian a written notice in the event that any such authorized individual ceases to be authorized or in the event that other or additional authorized individuals are appointed and authorized. Upon receipt and acknowledgment of a notice from Buyer or Seller that an individual is no longer an Authorized Person, Master Custodian shall cease accepting instructions from such person as soon as practicable thereafter.

b.    <u>Funds Transfers</u>.

(i)    <u>Account Identification</u>. In receiving funds transfers for Buyer, Master Custodian may rely solely on the account number or identifying number on the funds transfer in identifying the funds transfer as received for Buyer. Master Custodian shall rely solely on the account number specified on <u>Exhibit B</u> in making a funds transfer to Buyer. Similarly, when Buyer sends a payment order identifying an intermediary bank (a bank other than Master Custodian's or Buyer's originating bank) or a recipient bank for Master Custodian with an identifying number, Master Custodian does not have to determine if the identifying number corresponds to the bank name Buyer provides.

(ii)    <u>Transfer Procedure</u>. Master Custodian will transfer all funds in Cash to Buyer and Seller as required herein pursuant to the wiring instructions provided on <u>Exhibits B and C</u> respectively, as such wiring instructions may be revised or superseded from time to time upon written notice to Master Custodian, such notice to be effective upon receipt by Master Custodian. No confirmation of the receipt of funds sent pursuant to standing wire transfer instructions will be made by telephone or other method of communication.

c.    <u>Notices</u>. Any notice authorized or required by this Agreement shall be sufficiently given if addressed to the receiving party and hand delivered or sent by mail, telecopy or other facsimile machine to the individuals at the addresses specified herein or to such other person or persons as the receiving party may from time to time designate to the other parties in writing. Such notice shall be effective upon receipt or such later time as provided in this Agreement.

TO SELLER:    Lehman Commercial Paper Inc.
745 Seventh Avenue, 28th Floor
New York, New York 10019
Attention: Robert E. Guglielmo, Senior Vice President
Transaction Management
Telephone: (212) 526-7121
Fax: (212) 526-7672

TO BUYER:    See <u>Exhibit B</u>.

TO MASTER
CUSTODIAN:    JPMorgan Chase Bank
4 New York Plaza, 13th Fl.
New York, New York 10004
Attention: Glenn Hett, Vice President
New York Collateral Management
Telephone: (212) 623-1855
Fax: (212) 623-2802

d.    <u>Amendments</u>.   Except as otherwise expressly provided hereunder, this Agreement may not be amended or modified in any matter except by a written agreement executed by an Authorized Person of all the parties. No waiver or acceptance of performance other than as provided herein on the part of any party shall constitute a waiver or acceptance of such performance in the future.

e.    <u>Binding Agreement</u>.   This agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; <u>provided</u>, <u>however</u>, that this Agreement shall not be assigned by any party without the written consent of the other parties hereto, and any purported assignment in the absence of such consent shall be void. In the event that any provision of this Agreement shall be inconsistent or conflict with any provision of the Repurchase Agreement, with respect to Transactions to be processed under this Agreement, the provisions of this Agreement shall control.

f.    <u>Examination of Master Custodian's Files; Examination of Sub-Custodian's Files</u>.   Upon reasonable prior notice to Master Custodian, Seller and Buyer, and their agents, accountants, attorneys and auditors, will be permitted during normal business hours to examine the books and records of Master Custodian relating to the Master Custodian Held Assets held from time to time in each of their respective accounts. Upon the written request of Buyer, pursuant to Section 12(a) of the applicable Tri-Party Sub-Custodial Agreement, Buyer and its agents, accountants, attorneys and auditors shall have the right, upon three Business Days' prior notice, during normal business hours to examine the Mortgage Files and any other documents, records and papers in the possession of or under the control of any Sub-Custodian relating to any or all of the Mortgage Loans. The Master Custodian shall not be responsible for any expenses in connection with such examinations.

g.    <u>Survival</u>.   All releases, exculpations and indemnifications provided in this Agreement shall survive the termination of this Agreement.

h.    <u>Applicable Law; Jurisdiction</u>.   This Agreement shall be construed in accordance with the laws of the State of New York applicable to agreements made to be performed in New York. Each of the parties hereto irrevocably submits to the non-exclusive jurisdiction of any New York State court or Federal court located in the State and City of New York in any action or proceeding arising out of or relating to this Agreement, and each party irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The parties hereto irrevocably consent to the service of any and all process in any such action or proceeding by the mailing of copies of such process to such party at its address specified in Section 18(c) hereof. Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

i.    <u>Headings and References</u>.   The headings and captions in this Agreement are for reference only and shall not affect the construction or interpretation of any of its provisions. Except as expressly provided herein, all references to Sections, Subsections and Exhibits refer to Sections, Subsections and Exhibits of this Agreement unless otherwise specified to the contrary.

j.      Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one Agreement.

k.      Time Zone.  All times referred to herein shall be New York City time on the applicable date.

l.      Application of UCC Article 8.  The parties hereto acknowledge and agree that (i) the Mortgage Loans are not "securities" as defined in Section 8-102(a) of the UCC and (ii) all Assets held by Master Custodian in, or credited to, the Buyer's Master Custodial Account will be treated as "financial assets" (as defined in Section 8-102(a) of the UCC) under Article 8 of the UCC.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective corporate officers, thereunto duly authorized as of the 23rd day of December , 2002.

**SWEDBANK (SPARBANKEN SVERIGE AB (PUBL)), NEW YORK BRANCH, as Buyer**

By: _____

    Name:        JOHN MATTHEWS

    Title:         GENERAL MANAGER

By: _____

    Name:        JIM LINFORD

    Title:         SVP /TREASURER

**LEHMAN COMMERCIAL PAPER INC., as Seller**

By: _____

    Name:        T. COURTNEY JENKINS

    Title:         VICE PRESIDENT

**JPMORGAN CHASE BANK, as Master Custodian**

By: _____

    Name:        Glenn H. Heft

    Title:         Vice President

(Regarding Grade D Assets)

**Schedule 1**
**to Tri-Party Custody Agreement**

**Additional Asset Types**

Asset Type:_____

Master Custodian field Asset _____

Documents Comprising "Mortgage File" (specify which are Essential
Documents):_____

_____

_____

_____

Market Value to be determined as follows: _____

_____

_____

_____

_____

_____, Buyer

By:_____
Name:
Title:

JPMorgan Chase Bank, Master Custodian
By:_____
Name:
Title:

### Schedule 2
### to Tri-Party Custody Agreement

**Form of Master Custodian Data File**

File Header

| Data Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "6H" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 29 | Blanks |
| Total Number of Records | 30 – 34 | Not including header and trailer |
| Total Original Balance | 35 – 49 | Blanks |
| Total Current Balance | 50 – 64 | Blanks |
| Filler | 65 – 491 | Blanks |

Detail Records

| Data Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "6D" |
| MTS Pool Number | 3 – 11 | Alphanumeric |
| Loan Number | 12 – 29 | Alphanumeric |
| Coupon Rate | 30 – 36 | |
| Original Balance | 37 – 51 | |
| Current Balance | 52 – 66 | |
| Asset Grade | 67 – 67 | |
| Security Description | 68 – 72 | |
| Seller Price | 73 – 84 | |
| Maturity Date | 85 – 92 | |
| Months to maturity | 93 – 96 | |
| Months from Issue Date | 97 – 100 | |
| Issuer Name | 101 – 130 | |
| Trade Type | 131 – 132 | |
| Asset Type | 133 – 134 | |
| Asset Sub-Type | 135 – 136 | |
| Name | 137 – 186 | |
| Street Address | 187 – 266 | |
| City | 267 – 296 | |
| State Abbreviation | 297 – 298 | |
| Zip | 299 – 309 | |
| Country | 310 – 319 | |
| Coupon Spread | 320 – 324 | |
| Filler | 325 – 395 | Blanks |
| Record Number | 396 – 400 | Not including header record |

33

| Data Field | Columns | Comments |
|---|---|---|
| Market Value | 401 – 415 | ############.## |
| Sub Custodian Short Name | 416 – 418 | |
| Status | 419 – 419 | A, R or M |
| Rejection Reason1 | 420 – 422 | First error code |
| Rejection Reason2 | 423 – 425 | Second error code |
| Rejection Reason3 | 426 – 428 | Third error code |
| Mismatched Coupon | 429 – 429 | Y/N |
| Sub-Custodian Coupon | 430 – 436 | |
| Coupon Used | 437 – 443 | |
| Mismatched  Maturity Date | 444 – 444 | Y/N |
| Sub-Custodian Maturity Date | 445 – 452 | |
| Maturity Date Used | 453 – 460 | |
| Mismatch Original Balance | 461-461 | Y/N |
| Sub-Custodian Original Balance | 462-476 | |
| Original Balance Used | 477 – 491 | |

File Trailer

| Data Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "6T" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 29 | Blanks |
| Total Number of Records | 30 – 34 | Not including header and trailer |
| Total Original Balance | 35 – 49 | ############.## |
| Total Current Balance | 50 – 64 | ############.## |
| Filler | 65 – 491 | Blanks |

**Schedule 3**
**to Tri-Party Custody Agreement**

**Form of Seller's Repurchase Transaction Data File (Liability File)**

File Header

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | '4H' |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 215 | Blanks |
| Total Records | 216 – 220 | Not including header and trailer |

Detail Records

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | '4D' |
| Filler | 3 – 6 | Blanks |
| MTS Trade Id | 7 – 20 | Alphanumeric |
| Filler | 21 – 23 | Blanks |
| Investor Reference Number | 24 – 31 | |
| Filler | 32 – 86 | Blanks |
| Investment Amount | 87 – 101 | Investment Amount |
| Filler | 102 – 112 | Blanks |
| Issue Date | 113 – 120 | YYYYMMDD; optional |
| Maturity Date | 121 – 128 | YYYYMMDD; required |
| Filler | 129 – 208 | Blanks |
| Investment Grade | 209 – 215 | A, B, C |
| Record Number | 216 – 220 | Not including header record |

File Trailer

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | '4T' |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Total Investment Amount | 27 – 41 | ############.## |
| Filler | 42 – 215 | Blanks |
| Total Records | 216 – 220 | Not including header and trailer |

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

### Schedule 4
### to Tri-Party Custody Agreement

## Form of Seller's Asset Composition Data File (Asset File)

Below is the agreed upon file layout for the Lehman asset file. "Y" indicates that the field is required, "N" indicates that the field is not required.

File Header

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3H" |
| Creation Time Stamp | 3 – 16 | Y | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | Y | YYYYMMDD |
| Investment Bank Id | 25 – 26 | Y | 11 OR 12 |
| Custodian Id | 27 – 29 | N | Not required |
| Total Number of Records | 30 – 34 | Y | Not including header and trailer |
| Total Original Balance | 35 – 49 | Y | Optional |
| Total Current Balance | 50 – 64 | Y | Optional |
| Filler | 65 – 400 | Y | Blanks |

Detail Records

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3D" |
| MTS Pool Number | 3 – 11 | Y | Alphanumeric |
| Loan Number | 12 – 29 | Y | Alphanumeric |
| Coupon Rate | 30 – 36 | Y | ##.#### |
| Original Balance | 37 – 51 | Y | ############.## |
| Current Balance | 52 – 66 | Y | ############.## |
| Asset Grade | 67 – 67 | Y | A, B, C |
| Security Description | 68 – 72 | Y | GNMA, FNMA, FHLMC |
| Seller Price | 73 – 84 | Y | ###.########; Optional; for future use |
| Maturity Date | 85 – 92 | Y | YYYYMMDD; Optional |
| Months to maturity | 93 – 96 | Y | Optional; used for reports |
| Months from Issue Date | 97 – 100 | Y | Optional; used for reports |
| Issuer Name | 101 – 130 | N | Optional; used for reports |
| Trade Type | 131 – 132 | Y | Optional; for future use. |
| Asset Type | 133 – 134 | Y | Optional; for future use. |
| Asset Sub-Type | 135 – 136 | Y | Optional; for future use. |
| Name | 137 – 186 | Y | Optional |
| Street Address | 187 – 266 | Y | Optional |
| City | 267 – 296 | Y | Optional |
| State Abbreviation | 297 – 298 | Y | Optional |
| Zip | 299 – 309 | Y | Optional |
| Country | 310 – 319 | Y | Optional |
| Coupon Spread | 320 – 324 | Y | ##.##; Optional; for future use |

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Filler | 325 – 395 | Y | Optional; for future use |
| Record Number | 396 – 400 | Y | Not including header record |

File Trailer

| Data Field | Columns | Lehman File | Comments |
|---|---|---|---|
| Record Id | 1 – 2 | Y | "3T" |
| Creation Time Stamp | 3 – 16 | Y | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | Y | YYYYMMDD |
| Investment Bank Id | 25 – 26 | Y | 11 or 12 |
| Custodian Id | 27 – 29 | N | Not Required |
| Total Number of Records | 30 – 34 | Y | Not including header and trailer |
| Total Original Balance | 35 – 49 | Y | #############.## |
| Total Current Balance | 50 – 64 | Y | #############.## |
| Filler | 65 – 400 | Y | Blanks |

**Schedule 5**
**to Tri-Party Custody Agreement**

### File Format for Spreads File

File Header

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9H" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 93 | Blanks |
| Total Records | 94 – 98 | Not including header and trailer |

Detail Records

| Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9D" |
| Account/Investment Bank Id | 3 – 10 | Investor Id if allocated, Investment Bank Id if unencumbered |
| MTS Pool Number | 11 – 19 | Alphanumeric |
| Loan Number | 20 – 37 | Alphanumeric |
| Liability Maturity Date | 38 – 45 | YYYYMMDD |
| Asset Coupon Rate | 46 – 52 | ##.#### |
| Asset Grade | 53 – 53 | A, B, C |
| Market Price | 54 – 63 | ###.###### |
| Asset Current Balance | 64 – 78 | ############.## |
| MTS Trade Id | 79 – 92 | Alphanumeric; blank if unencumbered |
| Record Number | 93 – 97 | Not including header record |
| Asset Status | 98 – 98 | "A"llocated, "P"re-allocated or "F"ree |

File Trailer

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "9T" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 93 | Blanks |
| Total Records | 94 – 98 | Not including header and trailer |
| | | |

38

doc of 24 Dec 2002, printed 12/24/2002 12:53 PM

**Schedule 6**
**to Tri-Party Custody Agreement**

**Form of Detail Schedule For Buyer**

JPMORGAN CHASE BANK
TRI-PARTY
Investor Allocation Report
Lehman Commercial Paper Inc.

Production Date:

Investor Name:

Type:

Trade Number:

G No:

Investor Amount:          $

Margin Value:          $

Pricing Source:

| Custodian | Pool No | Loan No | Coupon | Price % | Status | Mat. Date | Face Amount | Market Value |
|-----------|---------|---------|--------|---------|--------|-----------|-------------|--------------|
|           |         |         |        |         |        |           |             |              |
|           |         |         |        |         |        |           |             |              |

39

doc of 24 Dec 2002; printed 12/24/2002 12:53 PM

**Schedule 7**
**to Tri-Party Custody Agreement**

ASSUMED PRICES FOR COMMERCIAL AND RESIDENT MORTGAGE LOANS

Assumed Price for Commercial Mortgage Loans:    100%

Assumed Price for Residential Mortgage Loans:    100%

**Schedule 8**
**to Tri-Party Custody Agreement**

[date]

JPMorgan Chase Bank,
 as Master Custodian
4 New York Plaza, 13 Fl.
New York, New York 10004
 Attn: Glenn Hett, Vice President
        New York Collateral Management

Ladies and Gentlemen:

Reference is made to that certain Tri-Party Custody Agreement dated as of _____ ___, 20__ by and among Lehman Commercial Paper Inc., as Seller (the "Seller") JPMorgan Chase Bank, as Master Custodian (the "Master Custodian") and _____, as Buyer (the "Buyer") (as amended or modified by the parties thereto from time to time, the "Tri-Party Custody Agreement"). Initially capitalized terms not defined herein shall have the meanings ascribed to such terms in the Tri-Party Custody Agreement.

Pursuant to Section 5(e)(iii) of the Tri-Party Custody Agreement, you have informed us that as of 11:00 a.m. New York City time today you have not received [a] Sub-Custodian Data File[s]from the following Sub-Custodian[s],[each of] which you have assumed [is][are] open for business today as permitted pursuant to the terms of said Section 5(e)(iii):

You are hereby instructed pursuant to said Section 5(e)(iii) to accept, in lieu of the Sub-Custodian Data File[s] ordinarily received from the above-referenced Sub-Custodian[s], the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian Data File ordinarily sent by the above referenced Sub-Custodian[s] but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means ordinarily employed by Sub-Custodian[s] for such purpose. Upon receipt of such data file from the Seller, Master Custodian may rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby, without further inquiry and Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

Very truly yours,

LEHMAN COMMERCIAL PAPER, INC.

By:_____
    Name:
    Title:

41

**Schedule 9**
**to Tri-Party Custody Agreement**

[date]

[Name and Address
of Buyer]
   Attn: _____

Ladies and Gentlemen:

    Reference is made to that certain Tri-Party Custody Agreement dated as of _____ ___, 20__ by and among Lehman Commercial Paper Inc., as Seller (the "Seller") JPMorgan Chase Bank, as Master Custodian (the "Master Custodian") and _____, as Buyer (the "Buyer") (as amended or modified by the parties thereto from time to time, the "Tri-Party Custody Agreement"). Initially capitalized terms not defined herein shall have the meanings ascribed to such terms in the Tri-Party Custody Agreement.

    Pursuant to Section 5(e)(iii) of the Tri-Party Custody Agreement, the Master Custodian has informed the Seller that as of 11:00 a.m. New York City time today it has not received [a] Sub-Custodian Data File[s]from the following Sub-Custodian[s],[each of] which it has assumed [is][are] open for business today as permitted pursuant to the terms of said Section 5(e)(iii):

    This letter shall constitute notice to you that upon being informed as provided in the preceding paragraph hereof, the Seller has instructed the Master Custodian pursuant to said Section 5(e)(iii) to accept, in lieu of the Sub-Custodian Data File[s] ordinarily received from the above-referenced Sub-Custodian[s], the transmission of a data file by Seller to Master Custodian in the same form as the Sub-Custodian Data File ordinarily sent by the above referenced Sub-Custodian[s] but by electronic means agreed upon between the Seller and the Master Custodian which may be different from the electronic means ordinarily employed by Sub-Custodian[s] for such purpose. As is provided in said Section 5(e)(iii), upon receipt of such data file from the Seller, Master Custodian shall rely upon the contents of such data file, including, but not limited to, the existence and completeness of the Mortgage Files evidenced thereby, without further inquiry and Master Custodian shall not be liable to any Person whatsoever in so relying thereon.

        Very truly yours,

        JPMORGAN CHASE BANK,
        AS MASTER CUSTODIAN

        By:_____
          Name:
          Title:

**Schedule 10**
**to Tri-Party Custody Agreement**

**Form of Seller's Pre-Allocation Schedule**

File Header

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5H" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 111 | Blanks |
| Total Records | 112 – 116 | Not including header and trailer |

Detail Records

| Data Field | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5D" |
| MTS Trade Id | 3 – 16 | Alphanumeric |
| MTS Pool Number | 17 – 25 | Alphanumeric |
| Loan Number | 26 – 43 | Alphanumeric |
| Liability Investment Amount | 44 – 58 | ###########.##, Optional; not used |
| Investor Margin % | 59 – 71 | ##.#########, Optional; not used |
| Liability Required Amount | 72 – 86 | ###########.##, Optional; not used |
| Asset Market Value | 87 – 101 | ###########.##, Optional; not used |
| Record Number | 102 – 106 | Not including header record |
| Filler | 107 – 116 | Blanks |

File Trailer

| Field name | Columns | Comments |
|---|---|---|
| Record Id | 1 – 2 | "5T" |
| Creation Time Stamp | 3 – 16 | YYYYMMDDHHMMSS |
| Production Date | 17 – 24 | YYYYMMDD of processing date |
| Investment Bank Id | 25 – 26 | 11 or 12 |
| Filler | 27 – 111 | Blanks |
| Total Records | 112 – 116 | Not including header and trailer |

(Regarding Haircut Percentages)

**Exhibit A1 (Residential Mortgage Loans)**
**to Tri-party Custody Agreement**

| INVESTMENT CATEGORY | MARGIN PERCENTAGE |
|---|---|
| Grade A: X (Check) Cash | 100% |
| Grade B* X (Check) Residential Mortgage Loans | 100% + 5% |
| Grade C * ___ (Check) Commercial Mortgage Loans | 100% + ___% |
| Grade D** ___ (Check) Other Assets: N/A | 100% +____% |

Note:    For additional asset types complete Schedule 1.
Check A, B or C above.

\*       In the form of whole loans or represented by Trust Receipt taking the form of Exhibit 1 to the Tri-Party
         Sub-Custodial Agreement.
\*\*      To be designated by the parties hereto.

**Swedbank (Sparbanken Sverige AB (Publ)),**
**New York Branch**
Buyer

By: _____

Name: _____ JOHN MATTHEWS _____    JIM LINFOR

Title: _____ GENERAL MANAGER _____    SVP/ TREASURER

**Lehman Commercial Paper Inc.**
Seller

By: _____

Name: ____ T. COURTNEY JENKINS ____

Title: _____ VICE PRESIDENT _____

**JPMorgan Chase Bank**
Master Custodian

By: _____

Name: _____ Glenn H. Hett _____
              Vice President

Title: _____

(Regarding Haircut Percentages)

**Exhibit A2 (1ˢᵗ Lien Commercial Mortgage Loans)**
**to Tri-party Custody Agreement**

| INVESTMENT CATEGORY | MARGIN PERCENTAGE |
|---|---|
| Grade A: X (Check) Cash | 100% |

| | |
|---|---|
| Grade B* __(Check) Residential Mortgage Loans | 100% + __% |

| | |
|---|---|
| Grade C * X (Check) Commercial Mortgage Loans | 100% + 5% |

___X__ Agrees to Seller Pricing (Check)

| | |
|---|---|
| Grade D** ___ (Check) Other Assets: N/A | 100% +_____% |

Note:    For additional asset types complete Schedule 1.
Check A, B or C above.

*     In the form of whole loans or represented by Trust Receipt taking the form of Exhibit 1 to the Tri-Party Sub-Custodial Agreement.
**    To be designated by the parties hereto.

**Swedbank (Sparbanken Sverige AB (Publ)),**
**New York Branch**
Buyer

By: _____

Name: _____ JOHN MATTHEWS ____   JIM LINFORD

Title: _____   SVP/TREASURER

**Lehman Commercial Paper Inc.**
Seller

By: _____

Name: ___ T. COURTNEY JENKINS ___

Title: _____ VICE PRESIDENT _____

**JPMorgan Chase Bank**
Master Custodian

By: _____

Name: _____ Glenn H. Hett _____

Title: _____ Vice President _____

(Relating to Representations and Covenants of Buyer and Seller)

**Exhibit B**
**to Tri-Party Custody Agreement**

a.  Buyer's Delivery Instructions for Cash

ABA#:_____021000018_____

Bank Name:__The Bank of New York__
_____New York_____

Account No.:_890-0256834_____

Account Name:_Swedbank New York___

b.      Buyer's Authorized Persons

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| Jim Linford | SVP | |
| Michael Ferrara | VP | |
| Luis Pino | AVP | |

c.      Authorized Persons for the purpose of confirming funds transfer instructions.

| Name | Title | Telephone Number |
|------|-------|------------------|
| Anna Magistrale | Supervisor | 212 317 3107 |
| Debbie Grant-Wynter | Treas. Operations | 212 317 3109 |
| Don Weiss | VP Operations | 212 317 3106 |

d.      Notices To Buyer

Name: _____Margarita Salcedo_____

Title: _____Vice President_____

Address: _____Swedbank_____
_____One Penn Plaza, 15th Fl., NY, NY 10119

Attn: _____

Phone: _____212 317 3116_____

Facsimile: ____212 486 3220_____

**BUYER WILL BE ACTING AS:**

Principal_X_                              Agent/Trustee____

**Exhibit C**
**to Tri-Party Custody Agreement**

**Seller Account Information**

Wiring Instructions for Lehman Commercial Paper Inc. (LCPI):

Bank:       JPMorgan Chase Bank
ABA #:      021-000-021
Acct:       507893077
Attn:       Lehman Commercial Paper Inc.

**AMENDED AND RESTATED**

August 26. 2008

Lehman Commercial Paper Inc.
745 Seventh Avenue
New York. NY 10019
Attn: Robert Guglielmo

Re:    Commitment to buy commercial mortgage loans and other assets between each of the Lehman Brothers entities listed on the signature page (each, "Lehman Brothers") and Swedbank AB (publ), New York Branch (the "Bank"), pursuant to the Master Repurchase Agreement dated as of December 3rd, 2002 (the "Master Agreement") between each of Lehman Brothers Inc., Lehman Commercial Paper Inc. ("LCPI") and the Bank, the Custodial Undertaking in Connection with the Master Agreement, dated as of December 23, 2002, among each of LCPI, the Bank and JPMorgan Chase Bank, whose custodial rights and obligations under such agreement were as assigned to and assumed by the Bank of New York on October 1, 2006 (the "Custodian" and such agreement, the "Tri-Party Custody Agreement") or other master repurchase and custody agreements that each Lehman Brothers entity and the Bank may agree to enter into (the "Other Master Agreements")

Dear Sir:

The Bank hereby agrees with Lehman Brothers as follows:

1.  Commitment Letter. The Bank shall enter into Transactions requested by Lehman Brothers. subject to the terms and conditions of the Master Agreement, the Tri-Party Custody Agreement, the Other Master Agreements (as applicable) and this Commitment Letter. including the Schedule I attached hereto (together, the "Agreements").

2.  Termination of Commitment Letter. This Commitment Letter shall have an initial maturity of seventeen (17) months from its Effective Date of [July 21, 2008], and shall automatically extend on each Notice Date for an additional three (3) months; provided, however that each of the Bank and Lehman Brothers may terminate this Commitment Letter by providing a notice to the other party on the 21st day of January, April, July or October of any year (each such day, other than July 21, 2008, a "Notice Date"), which shall cause this Commitment Letter to terminate fourteen (14) months after the relevant Notice Date (in the event that a Notice Date falls on a date that is not a Business Day, the

Business Day immediately following such date shall be deemed the Notice Date.). Further, each of the Bank and Lehman Brothers may terminate this Commitment Letter with written notice immediately after declaring an Event of Default under the Agreements. For the avoidance of doubt, the termination of this Commitment Letter as to one Seller shall have no effect as to any other Seller.

3.  <u>Representations and Warranties.</u> Each of the Bank and Lehman Brothers represents and warrants to each other the representations and warranties made under the Agreements.

4.  <u>Separate Agreements.</u> Each of Lehman Brothers and the Bank acknowledge and agree that this Commitment Letter is to be treated as if it were separate Commitment Letters between the Bank and each of the four Lehman Brothers signatories. For the avoidance of doubt, an Event of Default as to one Lehman Brothers entity shall in no way be considered an Event of Default as to any other Lehman Brothers entity.

5.  <u>Prior Agreements.</u> It is agreed that this Commitment Letter supercedes and replaces any and all existing agreements between the parties covering this subject matter including, without limitation, the most recent agreement between the Bank and Lehman Commercial Paper Inc., dated as of October 2, 2007.

6.  <u>Assignments and Participations.</u> Neither the Bank nor Lehman Brothers may assign its respective rights and obligations hereunder without the prior written consent of the other party, such consent not to be unreasonably withheld. The Bank may sell participations in all or a portion of the Bank's rights and obligations hereunder, provided that:

    a.  the Bank's obligations under this Commitment Letter shall remain unchanged,;

    b.  the Bank shall remain the holder of any obligation owing to it under the Agreements;

    c.  Lehman Brothers and the Custodian may continue to deal solely and directly with the Bank in connection with the rights and obligations under the Agreements; and

    d.  the holders of such participation shall have no direct rights under the Agreements.

7.  <u>Governing Law.</u> This Commitment Letter shall be governed by and construed in accordance with the law of the State of New York (including, without limitation, Section 5-1401 of the General Obligations Law) without regard to any other choice of law doctrine or principles.

8.  <u>Definitions and Priority.</u> All capitalized terms used but not defined herein shall have the meanings ascribed to them under the other Agreements. In the event of any conflict between the other Agreements and this Commitment Letter, this Commitment Letter shall prevail.

9.  The parties acknowledge that additional documentation may be needed to implement the intent of this Commitment Letter and agree to take all reasonable and necessary actions to execute the additional documentation. It is agreed and understood that the Bank's

US-359023 2

commitment hereunder is solely for the benefit of parties to a valid and existing Agreement from time to time.

Accepted and agreed to as of the date first written above by:

**SWEDBANK AB (PUBL), NEW YORK BRANCH**

By _____

Name: John Matthews
       General Manager

Title: _____

**SWEDBANK AB (PUBL), NEW YORK BRANCH**

By _____

Name: DON WEISS

Title: V.P.

**LEHMAN BROTHERS BANKHAUS AG (EUROPE)**

By _____

Name: DAVID RUSHTON    Huw Rees
                        SVP

Title: SVP

**LEHMAN BROTHERS HOLDINGS INC.**

By _____

Name: Julie M. Boyle    Robert Azerad
      Senior Vice President    SVP

Title: _____

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By _____

Name: DAVID RUSHTON    Huw Rees
                        SVP

Title: SVP

**LEHMAN COMMERCIAL PAPER INC.**

By _____

Name: Julie M. Boyle    Robert Azerad
      Senior Vice President    SVP

Title: _____

**LEHMAN BROTHERS INC.**

By _____

Name: Julie M. Boyle    Robert Azerad
      Senior Vice President    SVP

Title: _____

05-359023.2

3

Schedule I

| 1. | Commitment Terms | | |
|---|---|---|---|
| 1 | Seller | Any of the Lehman Brothers signatories named in the Commitment Letter to which this Schedule I is attached, as the case may be. | |
| 2. | Buyer | The Bank | |
| 3. | Condition Precedent: | (i) No Event of Default under the Agreements has occurred and is continuing. | |
| | | (ii) Undertaking of the Transaction would not violate any Limits. | |
| 4 | Limits | Maximum Aggregate Purchase Price: | $1,350,000,000; provided, however that the Maximum Aggregate Purchase Price shall automatically be reduced to $1,000,000,000 on September 21, 2008. Buyer's failure to resell $350 million of the Purchased Assets to Seller, or Seller's failure to pay Buyer the Repurchase Price for such Purchased Assets, on September 21, 2008 shall constitute an Event of Default under the Master Agreement |
| | | Maximum Percentage of Aggregate Purchase Price Attributable to Commercial Mortgage Loans: | No single real estate loan can be in excess of $100,000,000 |
| | | , Corporate Bonds, Medium-Term Notes, and Municipal Securities | No single category of Purchased Securities or Purchased Assets (other than Commercial Mortgage Loans) can represent 25% or more of the Aggregate Purchase Price of Purchased Assets outstanding at any given time. |
| 5. | Purchase Date. | Two Business Days after delivery of a written notice describing the intended Transaction (a "Notice of Purchase") | |

| 1. | Commitment Terms | |
|---|---|---|
| | | when such notice is delivered by 12:00 PM. |
| 6. | *Repurchase Date:* | As determined by Seller, but in no event less than thirty (30) days after the Purchase Date. |
| 7. | *Pricing Rate* | One (1) Month LIBOR plus one hundred fifty (150) basis points. |
| 8. | *Commitment Fee* | To the extent that the Maximum Aggregate Purchase Price is greater than the aggregate Purchase Price of all outstanding Transactions under this Commitment Letter on any day prior to termination of the Commitment Letter (such excess on such day, a "Daily Unutilized Commitment"), Lehman Brothers shall owe to the Bank a fee equal to the daily application of sixty (60) basis points calculated on a 360 day per year basis on such Daily Unutilized Commitment, any such fees to be payable on a quarterly basis. |
| 9. | *Purchased Securities or Purchased Assets:* | (i) Commercial Mortgage Loans with first liens and a loan-to-value ratio (or having an adjusted ratio, defined as the product of the collateral value and the margin percentage divided by the property value) of not more than 75%.<br><br>(ii) Corporate Bonds rated at least B-.<br><br>(iii) Medium-Term Notes rated at least B-.<br><br>(iv) Municipal Securities rated at least B-.<br><br>(v) Residential Whole Loans |
| 10. | *Buyer's Margin Percentage in regards to Purchased Securities* | Commercial Mortgage Loans   105%<br>Corporate Bonds   105%<br>Medium Term Notes   105%<br>Municipal Securities   105%<br>Cash   100%<br>Residential Whole Loans   105% |
| 11. | *Voluntary Prepayments by Seller:* | Seller may prepay the Repurchase Price for any Transactions in whole or in part with written notice delivered by 10:00 AM five (5) Business Days in advance (inclusive of the day upon which prepayment is to be made; *provided, however,* that Seller shall pay to Buyer all breakage costs, if any, incurred by Buyer in connection with such prepayment, such breakage costs equal to the product of (i) the prepaid amount, (ii) the positive difference if any between (A) current One (1) Month LIBOR rate (not including spread), and (B) the interpolated LIBOR rate with a designated maturity equal to the number of breakage days as determined through the end of the monthly interest period, and (iii) the number of breakage days divided by 360 |
| 12. | *Buyer's Reduction in Maximum Aggregate Purchase Price* | If the aggregate Purchase Price is less than the Maximum Aggregate Purchase on every Business Day for a period of six (6) months, then Buyer may reduce, with written notice of at least five (5) Business Days, the Maximum Aggregate Purchase Price by an amount equal to the *smallest* daily difference in such amounts.<br>Reduction by Buyer. If the aggregate Purchase Price is less than the Maximum Aggregate Purchase on every Business Day |

05-359023.2

5

| 1. | Commitment Terms | |
|---|---|---|
| | | for a period of nine (9) months, then Buyer may reduce, with written notice of at least five (5) Business Days, the Maximum Aggregate Purchase Price by an amount equal to the *largest* daily difference in such amounts. |
| | *13 Seller's Reduction in Maximum Aggregate Purchase Price* | Seller may reduce the Maximum Aggregate Purchase Price with written notice of at least six (6) months, provided, however, that such reduction shall not affect the Pricing Rate specified in Section 7 of this <u>Schedule I</u> to the Commitment Letter. |
| | *14 Additional Terms* | Lehman Brothers Inc. (an affiliate of LCPI) may act as agent for LCPI. |
| | | Lehman Brothers Holdings Inc. shall provide a Payment Guaranty for all the obligations of each of the other Sellers in form and substance satisfactory to the Bank. |
| | *15. Notices* | Notices shall be writing and sent to the following: |

<u>If to Swedbank:</u>

Swedbank AB (publ), New York Branch
One Penn Plaza, 15th Floor
New York, NY 10119
Attention: Michael Ferrara
Tel: 212-486-3220

<u>If to Lehman Brothers Bankhaus AG (Europe):</u>

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

<u>If to Lehman Brothers Holdings Inc.:</u>

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

<u>If to Lehman Brothers International (Europe):</u>

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

<u>If to Lehman Commercial Paper Inc.:</u>

c/o Lehman Brothers Inc.

I.    Commitment Terms

745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

<u>If to Lehman Brothers Inc.:</u>

c/o Lehman Brothers Inc.
745 Seventh Avenue, Fl. 4
New York City, NY 10019
Attention: Annina Youngblood
Tel: 212-526-9690

05-359023 2



September 24, 2008

Lehman Brothers
745 Seventh Avenue
New York, NY 10019
Attn: Robert Guglielmo, Senior Vice President


Re: Default Notice relating to Master Repurchase Agreement

Ladies and Gentlemen:

Reference is hereby made to the Master Repurchase Agreement dated as of December 3, 2002 (including all annexes, schedules and exhibits thereto, collectively, the "MRA"), between Lehman Brothers Inc., Lehman Commercial Paper Inc. ("Lehman") and Swedbank AB, New York Branch. ("Swedbank"). Capitalized terms used herein without definition shall have the meanings specified in the MRA.

The exhibit attached to this letter shows the Purchased Securities that you have failed to repurchase upon the applicable Repurchase Date. Your failure to repurchase such securities on the applicable Repurchase Date is an Event of Default under the MRA and we hereby notify you that we have exercised our option to declare that an Event of Default has occurred with regard to the MRA. As a result, the Repurchase Date for each Transaction under the MRA is deemed to have occurred today and the aggregate Repurchase Prices for all Transactions under the MRA, and any and all other amounts owing by Lehman to Swedbank under the terms of the MRA, are now all immediately due and payable. Without in any way limiting any of Swedbank's rights under the MRA, we are hereby serving this Default Notice on you and notify you of the foregoing.

Swedbank reserves all of its rights and remedies under the MRA and any and all other related documents and agreements, available at law or otherwise, including without limitation all rights and remedies available under Paragraph 11 of the MRA.


SWEDBANK AB (PUBL), NEW YORK BRANCH

By:
Name: John Matthews   Magnus Francke
Title: Senior Vice Presidents


cc:
Michael Bond, via e-mail
Stephen Fischler, via e-mail and telefax

WSUMPCSRFX01-15       9/19/2008 5:11:09 PM    PAGE    3/003    Fax Server



**The Bank of New York**
**TRI-PARTY**
**Investor Allocation Detail Report**
**Lehman Commercial Paper Inc.**

THE BANK OF NEW YORK MELLON

Production Run : 09/19/2008        LCPI

Print Date : 09/19/2008 05:09 PM

Investor Name : Swedbank, New York Branch
Investor Reference No : WSWE
Trade Reference No : 941D680

Investment Amount : $1,000,000,000.00
Required Amount : $1,070,000,000.00
Trade Margin % : 7.00

| Required Amount : | $1,070,000,000.00 |
|---|---|
| Excess Amount : | $40,492,902.34 |

Investor Name : Swedbank, New York Branch
Investor Reference No : WSWE
Trade Reference No : 941G350

Investment Amount : $350,000,000.00
Required Amount : $374,500,000.00
Trade Margin % : 7.00

Asset Grade : C
Pricing Service : Seller

| Sub-Cust | Pool No | Loan No | Coupon % | Pricing % | Status | Maturity Date | Asset Amount | Market Value |
|---|---|---|---|---|---|---|---|---|
| 102 | WH9156 | WH9156 | 0.0001 | 100.000000 | P | 09/14/2009 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH9187 | WH9167 | 0.0001 | 100.000000 | P | 01/09/2010 | $99,999,999.00 | $99,999,999.00 |
| 102 | WH8855 | WH8855 | 0.0000 | 100.000000 | P | 02/01/2009 | $41,200,000.00 | $41,200,000.00 |
| 102 | WH8538 | WH8538 | 8.0000 | 100.000000 | P | 10/31/2008 | $24,533,881.00 | $24,533,881.00 |
| 102 | WH6614 | WH6614 | 9.0000 | 100.000000 | P | 05/01/2009 | $19,531,702.46 | $19,531,702.46 |
| 102 | WH8501 | 100101819 | 0.0001 | 100.000000 | P | 01/01/2009 | $18,130,000.00 | $18,130,000.00 |
| 102 | WH8727 | 100101982 | 0.0001 | 100.000000 | P | 10/08/2008 | $17,262,780.55 | $17,262,780.55 |
| 102 | WH8812 | 100101856 | 0.0001 | 100.000000 | P | 08/05/2009 | $15,538,779.25 | $15,538,779.25 |
| 102 | WH8555 | 100101910 | 0.0001 | 100.000000 | P | 10/14/2008 | $12,871,476.49 | $12,871,476.49 |
| 102 | WH8598 | WH8598 | 8.0000 | 100.000000 | P | 08/01/2009 | $11,000,000.00 | $11,000,000.00 |
| 102 | WH4819 | 100101277 | 0.0001 | 100.000000 | P | 08/01/2009 | $10,891,229.63 | $10,891,229.63 |
| 102 | WH8944 | 100102036 | 0.0001 | 100.000000 | P | 12/01/2009 | $9,280,030.32 | $9,280,030.32 |
| 102 | WH8054 | 100101907 | 0.0001 | 100.000000 | P | 11/01/2012 | $7,648,169.44 | $7,648,169.44 |
| 102 | WH8540 | WH8540 | 8.0000 | 100.000000 | P | 10/31/2008 | $6,086,488.47 | $6,086,488.47 |
| 102 | WH8273 | 100101707 | 0.0001 | 100.000000 | P | 04/30/2010 | $5,844,482.70 | $5,844,482.70 |
| 102 | WH8539 | WH8539 | 8.0000 | 100.000000 | P | 10/31/2008 | $4,185,814.92 | $4,185,814.92 |
| 102 | WH8948 | 100102040 | 0.0001 | 100.000000 | P | 12/01/2009 | $2,178,905.47 | $2,178,905.47 |

| | | |
|---|---|---|
| Pricing Service Total : | 17 Assets | $406,023,738.70 | $406,023,738.70 |
| Grade C Total : | 17 Assets | $406,023,738.70 | $406,023,738.70 |
| Total: | 17 Assets | $406,023,738.70 | $406,023,738.70 |

| Required Amount : | $374,500,000.00 |
|---|---|
| Excess Amount : | $31,523,738.70 |

Status Key

A - Allocated

P - Preallocated

This document contains information that is confidential and the property of The Bank of New York. It may not be copied, published or used, in whole or in part
for any purpose other than expressly authorized by The Bank of New York Copyright (c) 2006 The Bank of New York  All rights reserved

Report ID  al_alc

**H
A
N
D

D
E
L
I
V
E
R
Y**

RECEIVED BY: _____

FILED / RECEIVED

SEP 2 0 2010

EPIC BANKRUPTCY SOLUTIONS, LLC
DATE

5:12PM
TIME

## **EXHIBIT B**

Evidence of Transfer from Transferor to Transferee

**EXHIBIT B**

EVIDENCE OF PARTIAL TRANSFER OF CLAIM

TO:        United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court")
           Attn: Clerk

AND TO:    Lehman Commercial Paper Inc. ("Debtor")
           Case No. 08-13555 (JMP) (Jointly Administered)

Proof of Claim Number 67080

**DEUTSCHE BANK AG, LONDON BRANCH**, its successors and assigns ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned unto:

**CCP Credit Acquisition Holdings, LLC**
Mike Epstein / Dan Boris
375 Park Avenue 13th Floor
New York, NY 10152
Phone number: 1-212-672-4499 / 1-212-672-4493
Fax number: 1-201-917-2115
E-mail address: bankdebt@centerbridge.com

its successors and assigns ("Buyer"), Seller's right, title and interest in and to Proof of Claim Number 67080, solely to the extent of $38,381,926.33 (the "Assigned Claim") out of the aggregate $325,000,000.00 claim against Lehman Commercial Paper Inc., in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Assigned Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Assigned Claim and recognizing the Buyer as the sole owner and holder of the Assigned Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Assigned Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Evidence of Partial Transfer of Claim by its duly authorized representative dated March ____, 2011.

**DEUTSCHE BANK AG, LONDON BRANCH**

By: _____          By: _____
    Name:                                          Name:
    Title:        Ross Miller                      Title:    Michael Sutton
                  Director                                    Managing Director

**CCP Credit Acquisition Holdings, LLC**

By: _____
    Name:
    Title:

## EXHIBIT B

### EVIDENCE OF PARTIAL TRANSFER OF CLAIM

TO:     United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court")
Attn: Clerk

AND TO:     Lehman Commercial Paper Inc. ("Debtor")
Case No. 08-13555 (JMP) (Jointly Administered)

Proof of Claim Number 67080

**DEUTSCHE BANK AG, LONDON BRANCH**, its successors and assigns ("Seller"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned unto:

**CCP Credit Acquisition Holdings, LLC**
Mike Epstein / Dan Boris
375 Park Avenue 13th Floor
New York, NY 10152
Phone number: 1-212-672-4499 / 1-212-672-4493
Fax number: 1-201-917-2115
E-mail address: bankdebt@centerbridge.com

its successors and assigns ("Buyer"), Seller's right, title and interest in and to Proof of Claim Number 67080, solely to the extent of $38,381,926.33 (the "Assigned Claim") out of the aggregate $325,000,000.00 claim against Lehman Commercial Paper Inc., in the Bankruptcy Court, or any other court with jurisdiction over the bankruptcy proceedings of the Debtor.

Seller hereby waives any objection to the transfer of the Assigned Claim to Buyer on the books and records of the Debtor and the Bankruptcy Court, and hereby waives to the fullest extent permitted by law any notice or right to a hearing as may be imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Code, applicable local bankruptcy rules or applicable law. Seller acknowledges and understands, and hereby stipulates that an order of the Bankruptcy Court may be entered without further notice to Seller transferring to Buyer the Assigned Claim and recognizing the Buyer as the sole owner and holder of the Assigned Claim.

You are hereby directed to make all future payments and distributions, and to give all notices and other communications, in respect of the Assigned Claim to Buyer.

IN WITNESS WHEREOF, the undersigned has duly executed this Evidence of Partial Transfer of Claim by its duly authorized representative dated March _____, 2011.

**DEUTSCHE BANK AG, LONDON BRANCH**

By: _____     By: _____
    Name:                            Name:
    Title:                             Title:

**CCP Credit Acquisition Holdings, LLC**

By: _____
    Name: Richard Grissinger
    Title: Authorized Signatory