WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU-2297)
J. Christopher Shore (JS-6031)

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al., | ) Case No. 08-13555 (JMP) |
| Debtors. | ) (Jointly Administered) |

**THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS'
STATEMENT IN SUPPORT OF THE MOTION OF LBHI PURSUANT TO
SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL
OF TWO NOTE PURCHASE AGREEMENTS WITH THE INSOLVENCY
ADMINISTRATOR OF LEHMAN BROTHERS AG (IN INSOLVENZ)**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

    The Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group"), by and through its undersigned counsel, hereby files this statement in support (the "Statement in Support") of the Motion of LBHI Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of Two Note Purchase Agreements with the Insolvency Administrator of Lehman Brothers Bankhaus AG (in Insolvenz) ("Bankhaus"), dated March 2, 2011 [Docket No. 14743] (the "Motion"), as will be amended by the Debtors. The Ad Hoc Group respectfully states as follows:

## STATEMENT IN SUPPORT[1]

1. Throughout these cases, the Ad Hoc Group has been keenly aware of the looming need to address, in a comprehensive fashion, the multi-faceted problems created by the Lehman enterprise having operated across multiple jurisdictions subject to the oversight of multiple regulatory bodies. That fact has led to the unfortunate reality of multiple courts and fiduciaries having responsibility under divergent reorganization schemes for billions of dollars of interrelated assets and liabilities. The Ad Hoc Group has, accordingly, paid particular attention to the Debtors' efforts over the past year to seek consensus with its foreign affiliates and their foreign representatives in a manner that allows for a critical cross-border exchange of assets and claims.

2. The Ad Hoc Group, after learning of the terms of the initial settlement proposal between Bankhaus and the Debtors in the Summer of 2010, contacted the Debtors, the Official Committee and met with representatives of Bankhaus to raise significant concerns with both the structure and the underlying economics of the transaction. Most notably, that settlement (i) purported to resolve the claims side of the disputes by awarding Bankhaus inflated claims against the Debtors that did not seem supported by rational economics and (ii) failed to resolve critical issues on the asset side, most notably Bankhaus' possession of the notes at issue in the Motion. From the Ad Hoc Group's perspective, the partial settlement, if pursued, was not only an unfavorable deal for the Debtors, but would only have led to further strife between affiliated estates and a delay of the needed comprehensive restructuring.

3. Following these initial contacts, the Debtors and Bankhaus reassessed the structure and economics of the settlement and, on March 2, 2011, filed the Motion. By the

---

[1] The Ad Hoc Group has been working with the Debtors, including through the weekend, to resolve the final open issues. The Debtors have extended the Ad Hoc Group's response deadline pending final resolution.

Motion, the Debtors now seek approval of two note purchase agreements (the "Note Purchase Agreements") involving LBHI's purchase of notes from Bankhaus for an aggregate purchase price of $957 million. Upon review of the Motion, the Ad Hoc Group once again contacted the Debtors to better understand the economics of the proposed transactions as well as the legal ramifications of the complex set of agreements, including the associated Amended and Restated Settlement Agreement, dated as of March 1, 2011 (the "Plan Settlement Agreement"). Since that initial contact, the Ad Hoc Group and the Debtors have taken a dual track approach with the financial advisors engaging on issues relating to the economics underpinning the note sale and the lawyers addressing drafting issues.

4. With respect to the economics of the note purchases, based upon the materials and explanations furnished to the Ad Hoc Group's financial advisors, AlixPartners, by Alvarez & Marsal, the Ad Hoc Group has no objection to the business judgment exercised by the Debtors in seeking to purchase the notes in exchange for cash and claims allowances at particular levels throughout the capital structure.

5. With respect to the legal agreements, the Ad Hoc Group has had two overarching concerns. First, although the Debtors make clear in the Motion and supporting papers that they are not seeking approval of the Plan Support Agreement, certain provisions of the agreement are purported to be operative already without any court approval. Most notably, Section 2.3 commits the Debtors in writing to file and prosecute "the Amended Plan" at a time when exclusivity is already terminated and material negotiations are still underway by and between various estates' constituencies. As a result, it seemed potentially inappropriate for each of the Debtors to commit themselves to prosecuting a particular plan when it is entirely unclear what plan or plans or provisions thereof are in the best interests of each of the particular Debtor

estates.  Second, the Ad Hoc Group was concerned with the provisions in the SASCO Note Purchase Agreement which commit LBHI alone to pay up to an additional $100,000,000 to Bankhaus depending on the type and timing of plan confirmation.[2]  In other words, despite any prior Court approval, the SASCO Note Purchase Agreement as written can commit LBHI to fund a $100 million administrative expense claim depending on the type or timing of plan that any particular Debtor or party in interest choses to pursue.  The Ad Hoc Group was particularly troubled by the possibility that LBHI could be required to pay an additional $100 million to Bankhaus if, for example, one or more Debtors or creditor constituencies pursued and confirmed an alternate plan structure for a Debtor that in fact did not have any adverse economic effects on the amount of Bankhaus' claims.

6.  From the outset of its review then, the Ad Hoc Group made clear that it wanted certainty as to whether the penalty would be due under four foreseeable events:

(1) If, prior to December 31, 2012, a Debtor was to confirm a plan, other than the existing First Amended Plan, which reduced Bankhaus' recoveries relative to the filed Plan without actually reducing the stipulated claim amounts set forth in Section 2.1 of the Plan Settlement Agreement;

(2) if, prior to December 31, 2012, the Court confirmed one or more plans sponsored by non-Debtors that allowed Bankhaus' claims in the amounts specified in Section 2.1 of the Plan Settlement Agreement and also provided for the release specified in the Agreement;

(3) if Bankhaus validly terminated the Plan Settlement Agreement prior to confirmation of any plan; and

---

[2] The provision at issue states in relevant part that "[i]n the event that the Confirmation Order (as defined in the [Plan] Settlement Agreement) is not entered on or before December 31, 2012, [LBHI] shall be required to remit the Purchase Price Adjustment [$100,000,000] to Seller . . ."  (Bankhaus Motion Ex. B ¶ 2(a)(ii); id. at 3)

(4) if one or more Debtors terminated the Plan Settlement Agreement in an exercise of its or their fiduciary duties and then pursued a path, to substantively consolidate the other Debtor affiliates, outside a joint Debtor-led plan of reorganization.

7. Over the past week, counsel have been in frequent contact regarding each of these issues. As a result, the Debtors and Bankhaus have now agreed to amend their agreements to make clear the following:

(a) As long as, prior to December 31, 2012, the Debtors confirm a plan of reorganization that is technically labeled an "amendment" to the First Amended Plan, the penalty payment is not due.

(b) If, prior to December 31, 2012, a non-Debtor confirms a plan that incorporates the economic settlements set forth in the Plan Settlement Agreements (namely the claim allowance and release provisions but not the plan support agreements), it will qualify as an "Other Plan" that does not trigger the penalty payment.

(c) Bankhaus' termination of the Plan Settlement Agreement, whether valid or not, will not in and of itself trigger the penalty payment, and further such payment can only be paid if Bankhaus validly terminates the Plan Settlement Agreement, and

(d) If one or more Debtors elects to pursue a path other than being the proponent of an Amended Plan, Bankhaus' only remedy is to terminate the Plan Settlement Agreement, and it is not entitled to the penalty payment.

8. The Ad Hoc Group believes that the transactions reflected in the Note Purchase Agreements and Plan Settlement Agreement, as revised, will provide a substantial benefit to the

Debtors' estates without chilling the development of the best possible exit paths for the Debtors and their creditors.

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court grant the relief sought by the Motion, as amended.

Dated: March 21, 2011
      New York, New York

    WHITE & CASE LLP
    1155 Avenue of the Americas
    New York, New York 10036-2787
    Telephone:  (212) 819-8200
    Facsimile:  (212) 354-8113
    Gerard Uzzi (GU-2297)
    J. Christopher Shore (JS-6031)

    By:  /s/ Gerard Uzzi

    ATTORNEYS FOR THE AD HOC GROUP OF
    LEHMAN BROTHERS CREDITORS