# EXHIBIT 1

**Amended Commitment Letter (with Amended Term Sheet attached)**

**FIVE MILE CAPITAL II POOLING REIT LLC**
c/o Five Mile Capital Partners LLC
Three Stamford Plaza, 9th Floor
Stamford, Connecticut 06901

**LEHMAN ALI INC.**
1271 Avenue of the Americas, 38th Floor
New York, New York 10020

As of March 9, 2011

Innkeepers USA Trust
340 Royal Poinciana Way, Suite 306
Palm Beach, Florida 33480
Attn: Marc Beilinson
Chief Restructuring Officer

**Amended and Restated
Binding Commitment Agreement
Regarding the Acquisition and Restructuring
of Certain Subsidiaries of Innkeepers USA Trust**

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), and Lehman ALI Inc. ("Lehman," together with Five Mile, the "Plan Sponsors") are pleased to present this amended and restated commitment letter (the "Amended Commitment Letter") to certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company"), that are identified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), which sets forth, among other things, Lehman and Five Mile's binding commitment to provide equity capital and debt conversion capital (the "Commitment") for the restructuring of the debt and equity of the Fixed/Floating Debtors (the "Transaction"), resulting in Five Mile and Lehman directly or indirectly owning a controlling interest in the Fixed/Floating Debtors on the terms and subject to the conditions set forth in the term sheet (the "Term Sheet") attached hereto as Exhibit B. The undersigned hereto are collectively referred to as "Parties," and each a "Party," each in the capacity in which that Party has executed this Amended Commitment Letter. Reference is made to that certain Binding Commitment Agreement Regarding the Acquisition and Restructuring of Innkeepers USA Trust dated January 14, 2011 (the "Original Commitment Letter"). This Amended Commitment Letter amends and restates the Original Commitment Letter, subject to the terms of Section 12 below.

We believe that the Commitment provides substantial value to the Fixed/Floating Debtors and puts the Company on the path towards a consensual emergence from Chapter 11 on an enterprise basis pursuant to a confirmed Chapter 11 plan. The Commitment provides for an auction process on reasonable terms and is supported by the Company's two largest secured creditors, which

1

hold all of the mortgage debt in the Chapter 11 cases of the Fixed/Floating Debtors.  There are
no due diligence or financing contingencies of any kind in connection with the Commitment.

The Plan Sponsors are each uniquely qualified to consummate the Transaction.  Lehman is the
second largest secured creditor of Innkeepers, as lender under the Floating Rate Mortgage Loan
of Innkeepers (the "Floating Rate Mortgage Loan"), in the original principal amount of
$250 million, and has provided a debtor-in-possession financing to the Company for
approximately $17.5 million.  Five Mile has a substantial investment and rights in the
$825.4 million Fixed Rate Mortgage Loan of Innkeepers (the "Fixed Rate Mortgage Loan") and
has funded a debtor-in-possession financing to the Company for $53 million.  The Plan Sponsors
have completed their due diligence of all of the Fixed/Floating Debtors' hotel assets.  We are
familiar with the Fixed/Floating Debtors' assets and operating performance, derived from Five
Mile's long history as a rights holder in Innkeepers' secured debt, Lehman's long history as a
secured lender, and Five Mile's and Lehman's review of public filings and extensive due
diligence.  The Plan Sponsors each have broad investment experience in the hospitality area and
general expertise in the extended stay lodging sector.

The specific elements of our Commitment are set forth in the Term Sheet.  Additional
components of our proposal are set forth herein.  This Amended Commitment Letter is not an
offer or a solicitation with respect to any securities of Innkeepers or a solicitation of acceptances
of a Chapter 11 plan.

        1.      Conditions/Required Approvals.  The Transaction is subject to the
satisfaction of the terms and conditions contained in the Term Sheet, including without limitation
the section titled "Lehman Approvals."

        2.      Confidentiality.  This Amended Commitment Letter is delivered to you on
the understanding that neither this Amended Commitment Letter, the Term Sheet, nor any of the
terms or substance hereof or thereof, shall be disclosed, directly or indirectly, to any other person
except (i) to your officers, directors, employees, attorneys, accountants and financial, legal and
other advisors on a confidential and need-to-know basis; (ii) as required by applicable law,
including the Bankruptcy Code or compulsory legal process (in which case you agree to inform
us promptly thereof); (iii) in connection with any exercise of remedies under or in connection
with a breach of this Amended Commitment Letter; or (iv) as otherwise agreed by the Parties
hereto.  Notwithstanding the foregoing, this Amended Commitment Letter (including the Term
Sheet) may be filed with the United States Bankruptcy Court for the Southern District of New
York presiding over the Innkeepers Chapter 11 cases (the "Innkeepers Bankruptcy Court") in
connection with the Bid Procedures Motion.

        3.      Due Diligence/Financing.  We have completed our diligence review, and
the Commitment is not subject to diligence contingencies or financing contingencies of any kind.

        4.      Commitment.  Each of the undersigned Parties to this Amended
Commitment Letter acknowledge their agreement to and acceptance of the terms provided in the
section of the Term Sheet titled "Commitments."  In furtherance thereof, on January 14, 2011,
the Company filed the Bid Procedures Motion (as defined in the Term Sheet), with the support of
the Plan Sponsors and Midland Loan Services, a division of PNC Bank, National Association, or

2

any successor thereto, as special servicer for the Fixed Rate Mortgage Loan (the "Special Servicer"). On March 5, 2011, the Company filed their reply brief to the objections to the Bid Procedures Motion, which sets forth certain agreed-upon revised terms to the Original Commitment Letter. This Amended Commitment Letter memorializes those terms.

5.    Means of Implementation.    If the Plan Sponsors are the successful/winning bidders, the funding from our Commitment will be used to finance and otherwise implement the restructuring of the Fixed/Floating Debtors by means of a plan of reorganization for the Fixed/Floating Debtors to be filed by the Fixed/Floating Debtors with the support of the Plan Sponsors and the Special Servicer (the "Fixed/Floating Plan"). The Parties agree that the Company may file a global plan of reorganization (a "Global Plan") that includes the Fixed/Floating Plan and Chapter 11 plans of any or all of the other debtors (the "Other Plans") as the Company deems appropriate in its sole discretion. To the extent the Company files a Global Plan or Other Plans, confirmation of the Fixed/Floating Plan shall not be conditioned on confirmation of the Other Plans.

The Fixed/Floating Plan (i) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion; (ii) will provide for the treatment of claims against and interests in the Fixed/Floating Debtors and in all other respects be in accordance with the Term Sheet; and (iii) will otherwise comply with applicable disclosure requirements and rules of procedure and contain terms and treatment of claims and interests consistent with the applicable provisions of the Bankruptcy Code. For the avoidance of doubt, the Other Plans and the Global Plan with respect to the Excluded Debtors (as defined in the Term Sheet), as applicable, are not subject to this Amended Commitment Letter or the Term Sheet.

6.    Exclusivity.    The Company currently has a motion pending before the Innkeepers Bankruptcy Court pursuant to which it requests a 120-day extension of its exclusive periods, which is scheduled to be heard at the March 29, 2011 omnibus hearing. Provided that the Bid Procedures are approved by the Innkeepers Bankruptcy Court prior to the hearing on the pending exclusivity motion, the Company agrees to modify its request for an extension of its exclusive periods to June 30, 2011, and Five Mile, Lehman, and the Special Servicer agree that they will support such modified request. The Debtors' rights to seek additional extensions of the exclusive periods beyond June 30, 2011, and the rights of Five Mile, Lehman and Special Servicer to oppose additional extensions and to move to terminate exclusivity, are preserved.

7.    Deposit.    Promptly after Bankruptcy Court approval of this Amended Commitment Letter and the entry of an order approving the Bid Procedures Motion, including the Break-Up Fee and Expense Reimbursement (as each such terms are defined in the Term Sheet), the Plan Sponsors shall deposit or cause to be deposited at their respective option, (i) cash and/or (ii) to the extent such loans have been funded to the Company, a pledge from Five Mile or Lehman of the first portion of any recovery on account of their claims under the Five Mile DIP (as defined in the Term Sheet) and the Solar DIP (as defined in the Term Sheet), respectively (collectively, the "DIP Loans"), against the respective Borrowers (as defined in the respective DIP Loans), in an aggregate amount equal to, or having a value of, $20.0 million, to be held in escrow by an escrow agent reasonably acceptable to the Plan Sponsors and the Company (if cash, in an interest bearing account), in either case in accordance with the terms and conditions of an escrow agreement consistent with this Amended Commitment Letter and reasonably acceptable

3

to the Plan Sponsors and the Company. The responsibility for making the deposit shall be allocated among the Plan Sponsors as follows: Five Mile - 50% and Lehman - 50%. The escrow agreement shall specify that (i) on the Effective Date (as defined in the Term Sheet), the full amount of the cash deposit (with interest) deposited (a) by Lehman shall be paid to Lehman and (b) by Five Mile shall be credited against Five Mile's equity commitments, and the pledge of any claim under the DIP Loans shall be released and revoked with respect to such pledging Plan Sponsor, and (ii) upon the occurrence of a termination of this Amended Commitment Letter other than due to a Plan Sponsor Breach (as defined below), or in the event that any of the terms and conditions in the Amended Commitment Letter (including the Term Sheet) are not satisfied timely (unless waived or extended in accordance with the terms hereof) or the Break-Up Fee and Expense Reimbursement become payable to the Plan Sponsors, the full amount of the deposit, plus accrued interest, shall be paid or returned, as applicable, to the Plan Sponsors and any pledge of a Plan Sponsor's claims under the DIP Loans shall be released and revoked. The deposit shall not be considered or become property of the Fixed/Floating Debtors' or the Company's estates unless and until there is a Plan Sponsor Breach or with respect to Five Mile's portion of the deposit, such amounts are credited to Five Mile's equity commitments. In the event that a Plan Sponsor breaches this Amended Commitment Letter and fails to close the Transaction as determined by a final ruling of the Innkeepers Bankruptcy Court (a "Plan Sponsor Breach"), it being understood that the deposit shall remain in escrow pending such final determination, the Company's sole remedy at law and in equity against the Plan Sponsors shall be receipt and retention of the deposit, plus accrued interest (if applicable), as liquidated damages. Nothing herein shall release a breaching Plan Sponsor of its obligation to repay the non-breaching Plan Sponsor for any forfeited deposit caused by the breach of the breaching Plan Sponsor. A breach by Special Servicer of this Amended Commitment Letter or the Five Mile/Midland Commitment that is not caused by a Plan Sponsor Breach shall not result in any forfeiture of the deposit. For the avoidance of doubt, the failure to obtain the approval of the Lehman Bankruptcy Court (as defined in the Term Sheet) is not and shall not be deemed to be a breach of any Plan Sponsor's obligations under this Amended Commitment Letter and shall not result in the forfeiture of the deposit.

8.    Termination.    Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate this Amended Commitment Letter by written notice to the Company and the Special Servicer upon the earliest occurrence of a Termination Event (as defined in the Term Sheet).

9.    Governing Law.    This Amended Commitment Letter shall be governed by, and interpreted and enforced in accordance with, the laws in force in the state of New York. The Parties to this Amended Commitment Letter waive any right to a trial by jury, to the extent lawful, and agree that either of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among each Party irrevocably to waive its right to trial by jury in any claims whatsoever between them relating to this Amended Commitment Letter.

10.    Jurisdiction.    Each of the Parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Innkeepers Bankruptcy Court, in any action or proceeding arising out of or relating to this Amended Commitment Letter.

11.    Assignments; No Third Party Beneficiaries. Except as provided by the Transfer Provision in the Term Sheet, this Amended Commitment Letter (i) shall not be assignable by any Party hereto without the prior written consent of each other Party hereto (and any attempted assignment without such consent shall be null and void *ab initio*), (ii) is intended to be solely for the benefit of the Parties hereto, and (iii) is not intended nor shall be construed to confer any benefits upon, or create any rights in favor of any person or entity other than the Parties hereto.

12.    Amendments/Effectiveness/Counterparts. Notwithstanding anything in this Amended Commitment Letter or the Term Sheet to the contrary, neither this Amended Commitment Letter nor the Term Sheet may be amended or any provision hereof or thereof waived or modified except by an instrument in writing signed by each of the Parties hereto. This Amended Commitment Letter and Term Sheet shall be effective upon delivery of original signature pages or "pdf" or facsimile copies thereof executed by each of the Parties and upon the commencement of the hearing on the Bid Procedures Motion on March 10, 2011 and upon counsel to the Official Committee of the Unsecured Creditors in these Chapter 11 cases (the "Creditors' Committee") memorializing on the record at the hearing on the Bid Procedures Motion its support of the Transactions contemplated by this Amended Commitment Letter and Term Sheet. This Amended Commitment Letter and Term Sheet may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.

13.    Other Agreements. The execution of this Amended Commitment Letter shall not modify any of the rights or obligations of each of the respective parties to the Further Amended and Restated Commitment Agreement between Lehman and Five Mile, dated as of March 9, 2011 (the "Lehman/Five Mile Commitment"), and the Further Amended and Restated Binding Commitment for the Acquisition of Innkeepers USA Trust between Five Mile Capital II Pooling REIT LLC and Special Servicer, dated as of March 9, 2011 (the "Five Mile/Midland Commitment") attached hereto as Exhibit C and Exhibit D, respectively.

14.    Special Servicer/Lehman. Provided that there has not been an occurrence of a Termination Event under this Amended Commitment Letter or the Term Sheet or a "Termination Event" (as defined in the Five Mile/Midland Commitment and the Five Mile/Lehman Commitment), the Special Servicer and Lehman undertake to actively support the Term Sheet and the provisions of the Term Sheet (including the Fixed/Floating Plan, Transaction, Auction, and the Bid Procedures Order, each as set forth in the Term Sheet).

15.    Entire Agreement. This Amended Commitment Letter and the Term Sheet (and Appendices A, B, and C thereto) and not the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment, represent the entire understanding and agreement among the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings among the Parties, both written and oral, with respect to the subject matter hereof; provided, however, that this Amended Commitment Letter and the Term Sheet are expressly not in derogation of any of the terms, conditions, or limitations contained in either the Lehman/Five Mile Commitment or the Five Mile/Midland Commitment.

5

16.    <u>Survival</u>.  Notwithstanding the termination of this Amended Commitment Letter in accordance with its terms, the following agreements and obligations of the Parties shall survive such termination and shall continue in full force and effect for the benefit of the Parties hereto in accordance with the terms hereof:    Sections 2 (confidentiality), 7 (deposit), 9 (governing law), 10 (jurisdiction), and 11 (assignments; no third party beneficiaries) of this Amended Commitment Letter.

Accepted and agreed to as of the first date written above:

**INNKEEPERS USA TRUST**
**(solely on behalf of the Fixed/Floating Debtors, its wholly owned**
**direct and indirect subsidiaries)**

By: _Marc Murphy_____
Name:
Title:

**MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION**
**(as Special Servicer for U.S. Bank, National**
**Association as Trustee for the Registered**
**Holders of LB-UBS Commercial Mortgage**
**Trust 2007-C6, Commercial Mortgage Pass-**
**Through Certificates successor trustee to**
**Bank of America National Association)**

By: _____
Name:
Title:

**APOLLO INVESTMENT CORPORATION**

By: _____
Name:
Title:

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

Accepted and agreed to as of the first date written above:

INNKEEPERS USA TRUST
(solely on behalf of the Fixed/Floating Debtors, its wholly owned
direct and indirect subsidiaries)

By: _____
Name:
Title:

MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION
(as Special Servicer for U.S. Bank, National
Association as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage
Trust 2007-C6, Commercial Mortgage Pass-
Through Certificates successor trustee to
Bank of America National Association)

By: _____
Name:
Title:    Kevin G. Donahue
          Senior Vice President
          Servicing Officer

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

Accepted and agreed to as of the first date written above:

INNKEEPERS USA TRUST
(solely on behalf of the Fixed/Floating Debtors, its wholly owned
direct and indirect subsidiaries)

By: _____
Name:
Title:

MIDLAND LOAN SERVICES, A DIVISION OF PNC BANK, NATIONAL ASSOCIATION
(as Special Servicer for U.S. Bank, National
Association as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage
Trust 2007-C6, Commercial Mortgage Pass-
Through Certificates successor trustee to
Bank of America National Association)

By: _____
Name:
Title:

APOLLO INVESTMENT CORPORATION

By: _____
Name: James C. Zalter
Title: Chief Executive officer

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By:

Name:      Alkhond L. Nickerson III

Title:      Managing Director

LEHMAN ALI INC.

By: _____

Name:

Title:

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

By signing below, each Party acknowledges its agreement to the foregoing.

Very truly yours,

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____
Name:
Title:

LEHMAN ALI INC.
By: _____
Name: Jeff Fitts
Title: Only Authorized Signatory

SIGNATURE PAGE TO THE AMENDED COMMITMENT LETTER

**EXHIBIT A**

### FIXED/FLOATING DEBTORS

The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC, and Grand Prix West Palm Beach, LLC.

The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; and Grand Prix Mezz Borrower Fixed, LLC.

**The "Fixed/Floating Debtors" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors.  The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.**

**EXHIBIT B**

**TERM SHEET**

*THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY
SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A
CHAPTER 11 PLAN.*

| | |
|---|---|
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction")[1] of the Fixed/Floating Debtors is to be effectuated through the Fixed/Floating Plan to be filed in the Innkeepers Bankruptcy Court by the Fixed/Floating Debtors with the support of the Plan Sponsors and the Special Servicer. The Company, Plan Sponsors, and the Special Servicer each acknowledge and agree that any and only a plan of reorganization that is consistent with the terms and conditions contained in this Term Sheet shall be deemed a "Fixed/Floating Plan." <br><br> The Global Plan shall be acceptable in all respects to the Company in its reasonable discretion. The Fixed/Floating Plan shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. The Company shall not amend, withdraw, or revoke the Fixed/Floating Plan or waive or amend any provision thereof without the consent of the Plan Sponsors and the Special Servicer, which consent shall not be unreasonably withheld, conditioned, or delayed. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Fixed/Floating Debtors' debt in amounts and with the treatment terms provided herein and in Appendix A attached hereto, or with such other terms that are: (i) acceptable to the Company; and (ii) acceptable to the Plan Sponsors and the Special Servicer (a) in each of their respective sole discretion with respect to the economic and treatment terms set forth herein and in Appendix A attached hereto and (b) otherwise in each of their respective reasonable discretion. |
| **New Equity:** | Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Fixed/Floating Plan on account of such interests. An entity that is newly formed by the Plan Sponsors ("New HoldCo") will acquire the indirect and direct equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC, and such other assets as may be subsequently identified as necessary to |

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Commitment Letter.

| | |
|---|---|
| | the operation of the Fixed/Floating Debtors, provided, however, that no assets of the Excluded Debtors (defined below), including, without limitation, cash or cash equivalents, shall be included in the transaction contemplated by this Amended Commitment Letter. New HoldCo will issue equity (the "New Equity") as set forth below upon the effective date of the Fixed/Floating Plan (the "Effective Date"). |
| | The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined by the Plan Sponsors, in their sole discretion, and will be described in a plan supplement document to be filed no later than 10 days before the scheduled date of confirmation of the Fixed/Floating Plan. |
| **Equity Stalking Horse Bid /Treatment of Floating Rate Mortgage Loan:** | On the terms and subject to the conditions contained in this Term Sheet and the Amended Commitment Letter, the Plan Sponsors commit to purchase the New Equity as follows (the "Plan Sponsors' Bid"): (i) Five Mile, through one or more of its wholly owned affiliates(s), or through a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase 50.0% of the New Equity for cash in the amount of $174.1 million; and (ii) Lehman, in full and final satisfaction of all of its claims against the Fixed/Floating Debtors arising under or in connection with the Floating Rate Mortgage Loan will receive: (a) 50.0% of the New Equity and (b) $26.2 million in cash (the "Commitment"); provided, however, that, subject to applicable law and the Fixed/Floating Plan, the Plan Sponsors may, subject to the consent of the Company, such consent not to be unreasonably withheld, conditioned, or delayed, require the Company to provide due diligence access (subject to an appropriate confidentiality agreement) and distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third-party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly, provided, further, however, that notwithstanding any direction by the Plan Sponsors with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment. |
| | In the event the Plan Sponsors' Bid is not the winning bid at the Auction (as defined below), the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance with the Overbid Allocation (as defined below), assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid, |

| | |
|---|---|
| | plus additional consideration in accordance with the Overbid Allocation. |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of all claims arising under or in connection with the Fixed Rate Mortgage Loan against the Fixed/Floating Debtors, subject to receipt of further consideration as a result of the Auction contemplated herein, the holder of the Fixed Rate Mortgage Loan shall receive the following treatment:<br><br>• New non-recourse mortgage loan of $622.5 million, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer shall reasonably require as reasonably acceptable to New HoldCo and the Plan Sponsors and as is consistent with the Amended Commitment Letter and this Term Sheet.<br><br>• In the event the Plan Sponsors' Bid is not the winning bid at the Auction, the holder of the Fixed Rate Mortgage Loan shall receive consideration in accordance with the Overbid Allocation.<br><br>• Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of $2.5 million to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, the Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other |

3

<table>
<tr><td></td><td>

compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate Mortgage Loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II of the Five Mile/Midland Commitment.

- The lender under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling and a limited guaranty from the New HoldCo as defined in and as more fully set forth in the Five Mile/Midland Commitment.

- Payment of $3 million and the Global Release (as defined below) as set forth in the "Releases" section herein.

</td></tr>
</table>

| **Treatment of Floating Rate Mezzanine Debt and Unsecured Debt:** | Following the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code:<br><br>- SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between each of the Plan Sponsors and the Fixed/Floating Debtors, provided that it votes to accept and otherwise supports the Fixed/Floating Plan; and<br><br>- Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below) in the amount of the lesser of $3.75 million and 65% of the face amount of the general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order (the "Unsecured Claims") shall be available for distribution to the holders of Unsecured Claims (the "Unsecured Claims Fund"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the |

| | |
|---|---|
| | Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code. |
| **Transition Services Agreement:** | The Company will develop a separation plan and transition services agreement for the Fixed/Floating Debtors and the Excluded Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be outlined in the plan supplement and be reasonably satisfactory to the Plan Sponsors, the Fixed/Floating Debtors, and the Excluded Debtors. |
| **DIP Financings:** | The debtor-in-possession financing provided by Solar Finance, Inc. (the "Solar DIP"), which is secured by liens on the assets of the Floating Rate Debtors, and Tranche A of the debtor-in-possession financing provided by Five Mile Capital II Pooling International LLC, which is secured by liens on the assets of the Fixed Rate Debtors (solely with respect to Tranche A, the "Five Mile DIP") shall be repaid in cash on the Effective Date. |
| **Required Cash:** | Upon consummation of the Transaction and on the Effective Date, New HoldCo will have at least $22.8 million to fund future PIP work and FF&E reserves (if necessary, as determined by New HoldCo), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 million) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $46.6 million),[2] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order [Docket No. 402], as previously amended (the "Final Cash Collateral Order"), as to be further amended as set forth below, that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy, and at least $41.6 million of cash on hand. |
| **Bid Procedures:** | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Fixed/Floating Plan through an auction (the "Auction") on the following terms (the "Bid Procedures"): |
| | • Bids will be solicited for up to forty-five (45) calendar days following the date of the entry of the Bid Procedures Order and the Auction shall commence no later than 50 days following the date of the entry |

---

[2]    This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by the Company.

of the Bid Procedures Order;

- Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a deposit of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company.

- Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer and the Creditors' Committee, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer and the Creditors' Committee, disclosure of the bidders, their qualifications, and their bids;

- All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be enterprise bids for all of and only the assets of the Fixed/Floating Debtors and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth in the Five Mile/Midland Commitment and the treatment of claims as set forth in this Term Sheet);

- The initial Overbid of the implied value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[2]

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool is receiving under the Fixed/Floating Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Fixed/Floating Plan in the

---

[2]    Note that the Midland Financing shall be no more than $622.5 million plus 70% of the Overbid amount (minus $15 million); provided, however, that the debt-capitalization ratio of the Fixed/Floating Debtors shall never exceed 70%.

face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools under the Overbid Allocation shall be allocated to each collateral pool pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective collateral pool has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer and the Creditors' Committee relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $46.6 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as to be amended as set forth below) that

are necessary for the Fixed/Floating Debtors to emerge from bankruptcy;[3] (e) at least $41.6 million in cash for New HoldCo; (f) with respect only to qualified bids other than the Amended Commitment Letter and this Term Sheet, at least $200.3 million in cash to pay Lehman's claims against the Fixed/Floating Debtors (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement.

- If there is an Auction and the winning bidder is not the Plan Sponsors, (i) the winning bidder shall be required to execute and agree to the Amended Commitment Letter, the provisions of this Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and other Fixed/Floating Plan-related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation, (ii) such modified documents shall be deemed to be the Amended Commitment Letter, Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents as such terms are used in this Term Sheet and the Amended Commitment Letter, and (iii) Lehman (only to the extent the Floating Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) and the Special Servicer (only to the extent the Fixed Rate Mortgage Loan receives the treatment contemplated in, and required under, this Term Sheet) shall be required to use such efforts, take such actions, and not take such actions to the extent required under this Term Sheet and the Amended Commitment Letter with respect to the Term Sheet, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents of the Company and the Plan Sponsors, each as modified to incorporate the results of the Auction and the Overbid Allocation, including Lehman's agreement to receive at least $200.3 million in cash (plus any applicable Overbid Allocation) and the Special Servicer's obligation to provide the Midland Financing (as defined in the Bid Procedures) to the winning bidder (the "Revised Agreements Provision"); and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company

---

[3]    For the avoidance of doubt, to the extent the Fixed/Floating Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts; further, to the extent the administrative expense claims of the Fixed/Floating Debtors are less than $10 million, any excess cash shall remain with New HoldCo.

|  | within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable non-bankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support this Term Sheet or the New Party/Midland Commitment (as defined in, and attached as <u>Exhibit C</u> to, the Bid Procedures Motion), (iii) Lehman terminates the Amended Commitment Letter, (iv) the Fixed/Floating Plan is not confirmed, or (v) the Effective Date shall not have occurred by the Outside Date (as defined below).<br><br>• Other terms to be agreed upon by the Company, the Plan Sponsors, and Special Servicer.<br><br>Prior to entry of the Bid Procedures Order, nothing in this Term Sheet or the Amended Commitment Letter limits the Company from taking any action the Company believes necessary or appropriate in furtherance of the Company's marketing process. |
|---|---|
| **Stalking Horse Fee:** | The Bid Procedures Order will provide that, to the extent the Amended Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Amended Commitment Letter), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for any of the Fixed/Floating Debtors' assets after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Fixed/Floating Debtors to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile. Other than terminating their obligations in accordance with the Term Sheet and Amended Commitment Letter, the Plan Sponsors' sole remedy at law and in equity against the Company in the event of an Overbid Transaction or Alternative Transaction shall be receipt of the Break-Up Fee and Expense Reimbursement as liquidated damages, provided, however, that (i) nothing in the "Stalking Horse Fee" section of this Term Sheet shall limit any rights and remedies at law or in equity that the Plan Sponsors have or may have as creditors of the Company and (ii) if there is a material breach by the Company of the Amended Commitment Letter or this Term Sheet that results in a termination of the Amended Commitment Letter, and provided the Plan Sponsors are not |

| | |
|---|---|
| | entitled to the Stalking Horse Fee, the Plan Sponsor's damages for such material breach shall be capped at $10 million.<br><br>The Stalking Horse Fee, if any, shall be payable by the Fixed/Floating Debtors upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction. |
| **Means For Implementation:** | The Company (i) has filed a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and requested a hearing for approval thereof and (ii) will file the Fixed/Floating Plan, a disclosure statement for the Fixed/Floating Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Fixed/Floating Plan.<br><br>Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. |
| **The Excluded Debtors:** | The Innkeepers debtors other than the Fixed/Floating Debtors (the "Excluded Debtors") are excluded from the Stalking Horse Bid, and the Plan Sponsors will not be the stalking horse for the Excluded Debtors or their assets. The Company may continue to market the assets of the Excluded Debtors independently from the assets of the Fixed/Floating Debtors. |
| **Pro Forma Equity Ownership:** | Following the Effective Date, the New Equity will be allocated among the new ownership as follows:<br><br>• 40.0%-50.0% to Five Mile;<br><br>• 40.0%-50.0% to Lehman; and<br><br>• 0.0%-20.0% pursuant to the Third-Party Investment. |
| **Governance:** | The board of directors for New HoldCo will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members to be nominated at the discretion of the Plan Sponsors. |
| **Commitments:** | Subject to the conditions set forth in this Term Sheet, the Plan Sponsors, Company, and Special Servicer, as applicable, agree and covenant that:<br><br>The Plan Sponsors, Company, and Special Servicer shall (i) use reasonable efforts to prepare or cause the preparation of the Fixed/Floating Plan, Disclosure Statement, other Fixed/Floating Plan-related documents, and other Fixed/Floating Plan-related pleadings |

|  | (collectively, and together with the Bid Procedures Motion, the "Fixed/Floating Plan Documents"), which shall be consistent in all material respects with the Amended Commitment Letter and this Term Sheet, and cause the filing and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Fixed/Floating Plan and the Transaction contemplated in the Amended Commitment Letter and this Term Sheet, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with the Amended Commitment Letter or this Term Sheet or (b) that would materially delay the confirmation or consummation of the Fixed/Floating Plan or the Transaction contemplated in the Amended Commitment Letter and this Term Sheet.<br><br>The Plan Sponsors, Company, and the Special Servicer each hereby covenant and agree to negotiate in good faith the Fixed/Floating Plan Documents, each of which shall (i) contain the same treatment and economic terms as set forth herein and in Appendix A attached hereto (subject to adjustment as agreed to by the Parties in each of their reasonable sole discretion) and other terms consistent in all respects with the terms set forth in this Term Sheet, and (ii) be acceptable in all other respects to the Plan Sponsors, the Company, and the Special Servicer in each of their respective reasonable discretion.<br><br>The Plan Sponsors hereby commit to provide the entire principal amount of the Commitment upon the Effective Date, upon the terms and subject to the conditions set forth in the Amended Commitment Letter and this Term Sheet. |
| **Lehman Approvals:** | Notwithstanding anything to the contrary contained herein or in the Amended Commitment Letter: (a) Lehman's obligations with respect to the Transaction shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court"). Following the entry of the Bid Procedures Order, Lehman will promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking an order from the Lehman Bankruptcy Court authorizing Lehman to enter into the Transaction, which order shall: (x) be entered prior to the Auction; and (y) be in form and substance reasonably acceptable to the Company and materially consistent in all respects with the Amended Commitment Letter and this Term Sheet; and (b) Lehman's obligations with respect to voting in favor of the Fixed/Floating Plan shall be conditioned in all respects on the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of its votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. |

| | |
|---|---|
| **Fiduciary Out:** | Upon the determination by the Company's directors, trustees, or members, as applicable, and upon advice of counsel, no term or provision of this Term Sheet or the Amended Commitment Letter shall prevent, amend, alter, or reduce the Company's ability to exercise its fiduciary duties under applicable law (the "Fiduciary Out"). |
| **Termination:** | Unless otherwise agreed by the Plan Sponsors in writing, the Plan Sponsors may terminate the Amended Commitment Letter and Term Sheet by written notice to the Company and the Special Servicer upon the earliest occurrence of the following events (each a "Termination Event"):<br><br>• February 11, 2011, which shall be deemed extended for so long as any Fixed/Floating Plan Document that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court, or on the date a written order of the Innkeepers Bankruptcy Court is entered denying any of the Fixed/Floating Plan Documents;<br><br>• Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures (including the Break-Up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of such date in substantially the form attached hereto as Appendix B;<br><br>• Notwithstanding anything contained herein to the contrary, April 8, 2011, if the Fixed/Floating Plan and Disclosure Statement for the Fixed/Floating Debtors have not been filed by such date by the Fixed/Floating Debtors;<br><br>• Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Fixed/Floating Plan has not been confirmed by the Innkeepers Bankruptcy Court, pursuant to an order of the Innkeepers Bankruptcy Court, as of such date; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;<br><br>• The dismissal or conversion to Chapter 7 of any of the Fixed/Floating Debtors' Chapter 11 cases or any of the Chapter 11 cases of Grand Prix Holdings LLC, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership (collectively, the "Parent Companies"); provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;<br><br>• The termination of exclusivity for any of the Fixed/Floating Debtors or the Parent Companies unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not |

apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Approval by the Innkeepers Bankruptcy Court with respect to the assets of the Fixed/Floating Debtors or the Parent Companies of any bidding procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bid Procedures Motion, Disclosure Statement, and the Fixed/Floating Plan;

- The granting of stay relief with respect to any of the Fixed/Floating Debtors' or the Parent Companies' assets, other than immaterial assets; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;

- The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event

| | if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;<br><br>• Failure by the Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;<br><br>• Such earlier date as may be agreed upon in writing by the Company, Lehman and Five Mile;<br><br>• The Company terminates the Auction without selecting a winning bidder for the Fixed/Floating Debtors and without the consent of the Plan Sponsors and the Special Servicer, in each of their respective sole discretion;<br><br>• Subject to Lehman and the Special Servicer's compliance with the Revised Agreements Provision, the Plan Sponsors are not selected as the successful bidders at the Auction; or<br><br>• The Company materially breaches its obligations under the Term Sheet or the Amended Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out.<br><br>Time is of the essence with respect to the Termination Events. |
|---|---|
| **Effective Date/Outside Date Termination:** | • The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of an order confirming the Fixed/Floating Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable, and the Fixed/Floating Plan will also include customary provisions with respect to waiver of conditions to the Effective Date.<br><br>• Notwithstanding anything contained herein to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and the Special Servicer in writing, the Amended Commitment Letter and Term Sheet shall automatically terminate and be of no further force or |

|  | effect and the order confirming the Fixed/Floating Plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011 (the "Outside Date") if the Effective Date has not occurred and all of the transactions contemplated under the Amended Commitment Letter, this Term Sheet, and the Fixed/Floating Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date Termination Event"); provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC.<br><br>Time is of the essence with respect to the Outside Date Termination Event. |
|---|---|
| **Other:** | • On or after the Effective Date, New HoldCo shall reimburse Five Mile for the reasonable and documented fees and expenses of counsel, provided that the Transaction contemplated by the Fixed/Floating Plan is consummated.<br><br>• Lehman's advisors' and counsel's reasonable and documented fees and expenses shall continue to be paid in accordance with the Final Cash Collateral Order.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Lehman and Five Mile agree not to: (i) terminate the Lehman/Five Mile Commitment pursuant to the following termination event in the Lehman/Five Mile Commitment: "Such earlier date as may be agreed upon in writing by the parties hereto"; (ii) make any modification to any termination event under the Lehman/Five Mile Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Lehman/Five Mile Commitment that (a) would create a new termination event under the Lehman/Five Mile Commitment, (b) could affect any termination event under the Lehman/Five Mile Commitment, or (c) would result in any inconsistency with this Term Sheet or the Amended Commitment Letter.<br><br>• Without the Company's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed, Five Mile agrees not to: (i) terminate the Five Mile/Midland Commitment pursuant to the following Termination Event in the Five Mile/Midland Commitment: "mutual agreement of Special Servicer and Five Mile to terminate this Amended Commitment Letter"; (ii) make any modification to any termination event under the Five Mile/Midland Commitment; or (iii) make any other modification to, or addition or deletion of, any other provision in the Five Mile/Midland Commitment that (a) would |

create a new termination event under the Five Mile/Midland
Commitment, (b) could affect any termination event under the Five
Mile/Midland Commitment, or (c) would result in any inconsistency
with this Term Sheet or the Amended Commitment Letter.

- The Company shall seek to amend the Final Cash Collateral Order,
with the support of Lehman and the Special Servicer, to increase the
amount of cash that may be held back as an expense reserve to
$16.5 million in order to account for certain closing and emergence
costs of the Fixed/Floating Debtors, including potential success fees,
$14.9 million of which shall be allocable to and be used for payment
of the obligations of the Fixed/Floating Debtors only, in substantially
the form attached hereto as Appendix C.

- In reasonable cooperation with the Plan Sponsors, and subject to
confidentiality agreements acceptable to the Company in its
reasonable discretion, the Company agrees to share information on a
confidential basis with third parties as reasonably necessary for the
solicitation of a prospective new manager or other Third Party
Investor for the Fixed/Floating Debtors' hotel properties.

- The Midland Financing shall be no more than $622.5 million plus
70% of the Overbid amount (minus $15 million); provided, however,
that the debt-capitalization ratio of the Fixed/Floating Debtors shall
never exceed 70%.

- If the Company seeks an order requesting authority from the
Innkeepers Bankruptcy Court to reimburse the reasonable and
documented expenses of "Bidder D," incurred prior to December 15,
2010, in an amount not greater than $500,000, provided that the
Break-Up Fee and Expense Reimbursement have been approved by
the Innkeepers Bankruptcy Court, the Plan Sponsors, and the Special
Servicer shall not object to such request and to the payment of such
expenses by the Company at the conclusion of the Auction, so long as
Bidder D is not the successful winning bidder at the Auction.

- Unless and until a Termination Event occurs, Lehman shall not sell,
transfer, pledge, assign, or otherwise hypothecate any of its claims
under the Floating Rate Mortgage Loan or grant any option thereon
or any right or interest (voting or otherwise) therein
(collectively, a "Transfer"), unless such transfer is to Five Mile or an
entity in which Lehman Brothers Holding Inc. directly or indirectly
owns at least 51% of the voting interests (a "Lehman Affiliate"),
provided that Five Mile or such Lehman Affiliate, as applicable,
agrees to the treatment of the Floating Rate Mortgage Loan as set
forth in the Amended Commitment Letter and this Term Sheet

| | |
|---|---|
| | (the "Transfer Provision"). |
| **Releases:** | Releasing Parties. |
| | • The "Releasing Parties" shall be the Fixed/Floating Debtors, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees), and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "Apollo"), and other holders of claims against and interests in the Fixed/Floating Debtors, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, trustees, and members of the Parent Companies, in their capacity as such). |
| | Special Servicer Release. |
| | • The Fixed/Floating Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, an order confirming the Fixed/Floating Plan as entered in the Innkeepers Bankruptcy Court that has become final and non-appealable. Contemporaneously with the occurrence of the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Fixed/Floating Plan and shall be in form and substance reasonably satisfactory to Special Servicer and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date. |
| | Apollo Release. |

- Apollo shall agree to (i) waive all rights to receive any recovery or distribution under the Fixed/Floating Plan; and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) the Special Servicer, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of the Special Servicer's claims against Apollo, that are related in any way to the Apollo Guaranty; provided that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided for herein and shall not be effective until the occurrence of the Effective Date.

Global Release.

- The Fixed/Floating Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Fixed/Floating Plan and other Transaction-documents, from the following: (i) any and all claims and causes of action relating to the Company arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, New HoldCo, and the new manager. It is expressly understood and agreed, that notwithstanding anything otherwise contained in the Amended Commitment Letter or Term Sheet, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date.

Reservation of Rights.

- Except as otherwise provided in the Amended Commitment Letter and Term Sheet, the Releasing Parties reserve all of their rights to object to

|   | any releases by the Releasing Parties of other parties if the terms of the Fixed/Floating Plan differ materially from those set forth in the Amended Commitment Letter and Term Sheet. <br><br> • Additionally, the Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors and all assets of the Excluded Debtors. <br><br> • Whatever rights, claims, and interests the Excluded Debtors may have with respect to the Fixed/Floating Debtors and their assets are also preserved. |
|---|---|

# APPENDIX A[1]

| | PRO FORMA CAPITALIZATION | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| **DEBT** | Current Principal Balance[a] | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Principal Balance |
| Five Mile Fixed Pool DIP Loan | $46.6 | $0.0 | $46.6 | ($46.6) | $0.0 |
| Lehman DIP Loan[b] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage[c] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| Floating Pool Loan | | | | | |
|    Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
|    Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
|    Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Total Debt** | **$1,242.1** | **($355.2)** | **$886.9** | **($264.4)** | **$622.5** |
| **Implied Equity** | **$0.0** | | | | **$348.2** |
| **Total Capitalization** | **$1,242.1** | | | | **$970.7** |

Note: All numbers are rounded to a single decimal place.
(a) Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.
(b) Assumes DIP financing facility is fully drawn.
(c) A new, non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

---

[1]   Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Apollo Contribution | 0.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 46.6 |
| | | Unsecured Creditors Payment | 3.8 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 74.9 |
| **Total** | **$174.5** | | **$174.5** |

Note: All numbers are rounded to a single decimal place.

(a)   Subject to adjustment based on participation in the Third-Party Investment. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b)   Balance sheet cash to be used for, among other purposes, the funding of $22.8 million of FF&E, PIP, and working capital reserves, the potential $500,000 payment to Bidder D and closing costs (currently estimated to be approximately $10 million). Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with the New HoldCo.

<u>APPENDIX B</u>

**Bid Procedures Order**

<u>APPENDIX C</u>

**Amended Cash Collateral Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INNKEEPERS USA TRUST, et al.,[1] | ) Case No. 10-13800 (SCC) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER MODIFYING FINAL CASH COLLATERAL ORDER

Upon the motion (the "**Motion**")[2] of the Debtors, as debtors and debtors in possession

(collectively, the "**Debtors**"), for the entry of an order (this "**Order**") (a) authorizing the Debtors

to enter into the Amended Commitment Letter with Five Mile Capital II Pooling REIT LLC,

Lehman ALI Inc., and Midland Loan Services, a division of PNC Bank, National Association,

(b) approving the Amended New Party/Midland Commitment, (c) approving the Fixed/Floating

Bidding Procedures, (d) approving Bid Protections, (e) authorizing an expense reimbursement to

a bidder, all as more fully set forth in the Motion, and (f) modifying the Final Cash Collateral

Order to increase the expense reserve contemplated therein from $4.5 million to $16.5 million;

and upon the Reply;[3] and upon the Derrough Declarations;[4] and upon the Final Cash Collateral

---

[1]  The list of Debtors in these Chapter 11 Cases along with the last four digits of each Debtor's federal tax identification number can be found by visiting the Debtors' restructuring website at www.omnimgt.com/innkeepers or by contacting Omni Management Group, LLC at Innkeepers USA Trust c/o Omni Management Group, LLC, 16161 Ventura Boulevard, Suite C, PMB 606, Encino, California 91436.  The location of the Debtors' corporate headquarters and the service address for their affiliates is:  c/o Innkeepers USA, 340 Royal Poinciana Way, Suite 306, Palm Beach, Florida 33480.

[2]  All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion, the Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (the "**Amended Commitment Letter**"), attached hereto as **Exhibit A**, or the Bidding Procedures for the Fixed/Floating Debtors (the "**Fixed/Floating Bidding Procedures**"), attached hereto as **Exhibit B**, as applicable.

[3]  *Debtors' Omnibus Reply in Support of Stalking Horse Motion* [Docket No. 986] (the "**Reply**").

[4]  *Declaration of William Q. Derrough in Support of the Motion* [Docket No. 821] (the "**Derrough Declaration**"), the *Supplemental Declaration of William Q. Derrough in Support of the Motion* [Docket No. 916] (the

Order;[5] and the Debtors and the Official Committee of Unsecured Creditors in these Chapter 11

cases (the "Committee"), on the record at the hearing on the Motion, having agreed to support

the Motion and in connection therewith having negotiated an amendment of paragraph 13 of the

Final Cash Collateral Order; and it appearing that the relief requested is in the best interests of

the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334;

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and

1409; notice of the Motion having been adequate and appropriate under the circumstances; and

after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      ¶ 6(f)(i)(1), page 30 of the Final Cash Collateral Order is modified to delete

"$4,500,000" and insert "$16,500,000" in its place.

2.      With respect to amounts reserved pursuant to ¶ 6(f)(i)(1) of the Final Cash

Collateral Order, as modified by paragraph 1 above (the **Modified Expense Reserve**"),

$14,900,000 shall be allocable to and be used for obligations of the Fixed/Floating Debtors only.

3.      With respect to amounts reserved in the Modified Expense Reserve for expenses

in the category labeled "Permanent Modification" in the chart, attached as **Exhibit 1** hereto,

summarizing the estimated amounts and categories of expenses the Modified Expense Reserve is

intended to satisfy (the **"Expense Reserve Chart"**), these amounts shall remain in the Modified

---

"**Supplemental Derrough Declaration**"), the *Second Supplemental Declaration of William Q. Derrough in Support of the Motion* [Docket No. 987] (the "**Second Supplemental Derrough Declaration**" and, together with the Derrough Declaration and the Supplemental Derrough Declaration, the "**Derrough Declarations**").

[5]    Final Order Authorizing the Debtors to (i) Use the Adequate Protection Parties' Cash Collateral and (ii) Provide Adequate Protection to the Adequate Protection Parties Pursuant to 11 U.S.C. §§ 361, 362, and 363, entered on September 2, 2010 [Docket No. 402, as amended by Docket No. 539] (the "**Final Cash Collateral Order**").

K&E 18520066

Expense Reserve regardless of whether the Amended Commitment Letter terminates for any reason.

4.        With respect to amounts reserved in the Modified Expense Reserve for expenses in the category labeled "Modification Subject to Termination" in the Expense Reserve Chart, these amounts shall remain in the Modified Expense Reserve so long as the Amended Commitment Letter has not been terminated. If the Amended Commitment Letter terminates for any reason, any cash reserved in the Modified Expense Reserve for expenses in the category labeled "Modification Subject to Termination" in the Expense Reserve Chart shall be distributed in accordance with ¶ 6(f)(i)(2)-(6) of the Final Cash Collateral Order.

5.        Nothing in this Order or the Expense Reserve Chart attached as **Exhibit 1** hereto shall represent an acknowledgement of the Debtors as to the amount or validity of any claim or expense.

6.        Paragraph 13 of the Final Cash Collateral Order, as amended by the Stipulation and Order, dated November 29, 2010 (Docket No. 744); the Second Stipulation and Order, dated December 30, 2010 (Docket No. 788), the Third Stipulation and Order, dated January 28, 2011 (Docket No. 875), and the Fourth Stipulation and Order, dated February 28, 2011 (Docket No. 953) (collectively, the **"Stipulation and Orders"**), shall be further amended to provide that the deadline for the Committee to assert any other claims or causes of action, at law or in equity, against parties relating to the "2007 Transaction" as such term is defined in the Final Cash Collateral Order is hereby extended up to and including the date that is the earlier of (a) a date that is twenty (20) days after counsel to the Committee is given written notice of the termination of the Amended Commitment Letter, if any, and (b) the effective date of the Fixed/Floating Plan (as defined in the Amended Commitment Letter). Notwithstanding the foregoing, with respect to

3

CWCapital and  LNR, the Challenge Period shall remain March 29, 2011 unless  otherwise extended by the parties and the Court and shall otherwise be limited to the Perfection Analysis (as defined in the Stipulation and Orders).

7.    Except as specifically set forth in this Order, the Final Cash Collateral Order shall remain in full force and effect.

New York, New York
Dated: _____, 2011

_____
    United States Bankruptcy Judge

K&E 18520066

**Innkeepers USA Trust**
**Assumed Exit 6/30/2011**

The schedule below sets forth the estimated line items pursuant to the company's amended cash collateral reserve. This does not represent any acknowledgement on the amount or validity of claims.

| | Proposed Modification | | Actual Expense Reserve at 12/31/10, as Reported on 2/15/11 | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Fixed Rate Loan | Floating Rate Loan | Capmark $47.4 Loan (Mission Valley) | Merrill $25.2 Loan (Tysons Corner) | Capmark $37.6 Loan (Garden Grove) | Merrill $25.6 Loan (Washington DC) | Merrill $24.2 Loan (San Antonio) | Anaheim Loan | |
| Permanent Modification | $ 3,775,607 | $ 2,104,860 | | | | | | | $ 5,880,467 |
| Modification Subject to Termination | $ 5,895,988 | $ 3,204,179 | | | | | | | $ 9,100,167 |
| Estimated Closing Costs | $ 9,671,594 | $ 5,309,039 | | | | | | | $ 14,980,634 |
| Actual Excess Cash Reserved at 12/31/10 (as reported on 2/15/11) | | | $ 217,608 | $ 66,130 | $ 454,857 | $ 289,615 | $ 320,832 | $ 234,623 | $ 1,583,665 |
| Total Modified Expense Reserve | $ 9,671,594 | $ 5,309,039 | $ 217,608 | $ 66,130 | $ 454,857 | $ 289,615 | $ 320,832 | $ 234,623 | $ 16,564,299 |

**EXHIBIT C**

**LEHMAN/FIVE MILE COMMITMENT**

**Execution Version**

**REVISED AMENDED AND RESTATED
COMMITMENT AGREEMENT
(Lehman/Five Mile)**

**March 9, 2011**

*THIS AGREEMENT IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF INNKEEPERS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. THIS AGREEMENT AMENDS, RESTATES AND SUPERSEDES IN ITS ENTIRETY, IN ACCORDANCE WITH THE TERMS HEREOF, THE COMMITMENT AGREEMENT DATED AS OF DECEMBER 10, 2010 (AS AMENDED) AND THE AMENDED AND RESTATED COMMITMENT AGREEMENT DATED JANUARY 14, 2011.*

| Fixed/Floating Debtors: | The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC; and Grand Prix West Palm Beach, LLC.<br><br>The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and |

| | |
|---|---|
| | Grand Prix Mt. Laurel LLC.<br><br>The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; and Grand Prix Mezz Borrower Fixed, LLC.<br><br>The "Fixed/Floating Debtors" are the Floating Rate Debtors, the Fixed Rate Debtors, and the Other Plan Debtors. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan (each as defined below). |
| **Plan of Reorganization:** | The recapitalization and debt restructuring (the "Transaction") of the Fixed/Floating Debtors is to be effectuated through a plan of reorganization for the Fixed/Floating Debtors (the "Fixed/Floating Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the bankruptcy cases of Grand Prix Holdings LLC, Innkeepers USA Trust, and their wholly owned direct and indirect subsidiaries (collectively, "Innkeepers" or the "Company") (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Fixed/Floating Debtors with the support of Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), Lehman ALI Inc. ("Lehman," together with Five Mile, the "Plan Sponsors"), and Midland Loan Services, a division of PNC Bank, N.A. or any successor thereto, as special servicer ("Special Servicer") for the $825.4 million fixed rate mortgage loan (the "Fixed Rate Mortgage Loan").<br><br>The Plan Sponsors each acknowledge and agree that any and only a plan of reorganization that is consistent with the terms and conditions contained herein shall be deemed a "Fixed/Floating Plan."<br><br>The Plan Sponsors have agreed that the Company may file a global plan of reorganization (a "Global Plan") that includes the Fixed/Floating Plan and Chapter 11 plans of any or all of the other debtors (the "Other Plans") as the Company deems appropriate in its sole discretion. To the extent the Company files a Global Plan or Other Plans, confirmation of the Fixed/Floating Plan shall not be conditioned on confirmation of the Other Plans. |
| **Amendment/ Other Agreements:** | This Revised Amended and Restated Commitment Agreement (the "Agreement") amends, restates and supersedes in its entirety, in accordance with the terms hereof, that certain Amended and Restated Commitment Agreement, dated as of January 14, 2011, between Lehman and Five Mile, which amended and restated that certain Commitment |

Agreement, dated December 10, 2010, between Lehman and Five Mile (as amended by a separate amendment dated January 14, 2011, the "12/10 Agreement").

Simultaneously with the execution of this Agreement, Special Servicer and Five Mile shall execute a revised amended and restated commitment letter (the "Five Mile/Midland Commitment"), amending and restating that certain amended and restated commitment letter, dated as of January 14, 2011, between Special Servicer and Five Mile, which amended and restated that certain commitment letter, dated December 10, 2010, between Midland and Five Mile (as amended by a separate amendment dated January 14, 2011, the "12/10 Five Mile/Midland Commitment"). The Five Mile/Midland Commitment is attached hereto as Appendix C, but is not incorporated herein. Five Mile agrees not to make any material modifications to or to exercise or waive any Termination Event under (except Termination Event No. 10) the Five Mile/Midland Commitment without Lehman's prior written consent.  To the extent there is any inconsistency between this Agreement and the Five Mile/Midland Commitment, the rights and obligations of Five Mile and Lehman are governed by this Agreement.  Five Mile will provide Lehman with a copy of any communication between Special Servicer and Five Mile, in its capacity as Plan Sponsor (as defined in the Five Mile/Midland Commitment), with respect to the Five Mile/Midland Commitment.

Simultaneously with the execution of this Agreement, Plan Sponsors, Special Servicer, the Company, and Apollo Investment Corporation shall execute that certain Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust (together with the term sheet and other appendices and exhibits attached thereto, the "Innkeepers Commitment Letter"). This Agreement shall become effective only upon the effectiveness of the Innkeepers Commitment Letter.  The Innkeepers Commitment Letter is attached hereto as Appendix D, but is not incorporated herein.  To the extent there is any inconsistency between this Agreement and the Innkeepers Commitment Letter, the rights and obligations of Five Mile and Lehman are governed by this Agreement.

In the event that the Innkeepers Commitment Letter terminates according to its terms, but such termination does not also constitute a termination of the 12/10 Agreement (notwithstanding any termination of the 12/10 Five Mile/Midland Commitment), this Agreement shall become void, the rights and obligations of Lehman and Five Mile shall be governed by the 12/10 Agreement; provided, however, that Lehman and Five Mile shall confer in good faith with each other, including with respect to reducing the number of included hotels from 72 hotels to 64 hotels with corresponding adjustments consistent with this Agreement, prior to taking any action contemplated under the 12/10 Agreement and the

| | |
|---|---|
| | deadlines referenced in the 12/10 Agreement shall be extended by the number of days between January 14, 2011, and the date of the termination of the Innkeepers Commitment Letter. |
| **New Equity:** | Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Fixed/Floating Plan on account of such interests. An entity that is newly formed by the Plan Sponsors ("New HoldCo") will acquire the indirect and direct equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC, and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors, <u>provided</u>, however, that no assets of the Excluded Debtors (defined below), including, without limitation, cash or cash equivalents, shall be included in the transaction contemplated by this Amended Commitment Letter. New HoldCo will issue equity (the "New Equity") as set forth below upon the effective date of the Fixed/Floating Plan (the "Effective Date").<br><br>The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined by and be mutually acceptable to each of the Plan Sponsors, and will be described in a plan supplement document to be filed no later than 10 days before the scheduled date of confirmation of the Fixed/Floating Plan. |
| **Equity Stalking Horse Bid/ Treatment of Floating Rate Mortgage Loan:** | On the terms and subject to the conditions contained in this Agreement, the Plan Sponsors agree to purchase the New Equity as follows (the "Plan Sponsors' Bid"): (i) Five Mile, through one or more of its wholly owned affiliates(s) or through a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase up to 50.0% of the New Equity for cash in an amount of up to $174.1 million (the "Five Mile Commitment"); and (ii) Lehman, in full and final satisfaction of all of its claims against the Fixed/Floating Debtors arising under or in connection with the approximately $220 million floating rate mortgage loan (the "Floating Rate Mortgage Loan") will receive (a) up to 50.0% of the New Equity and (b) at least $26.2 million in cash (the "Lehman Payment"), subject, in each case, to adjustment for the Third-Party Investment (as defined below).[1]<br><br>The Plan Sponsors may seek to direct New HoldCo to distribute up to 20% of the New Equity to a third-party investor and/or new manager (the |

[1] If there is full participation in the Third-Party Investment, Five Mile will receive 40.0% of the New Equity for a cash payment of $139.29 million, and Lehman will receive 40.0% of the New Equity and $61.04 million in cash.

|  | |
|---|---|
|  | "Third-Party Investment"), and, in the event the third party investor and/or new manager pays cash on the Effective Date for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly so that Lehman and Five Mile receive equal percentages of New Equity. The Plan Sponsors agree that an affiliate of Hunt Realty Investments (the "Third-Party Investor") may purchase 10% of the New Equity (as part of the Third-Party Investment) for cash in an amount equal to $34.82 million. <br><br> In the event the Plan Sponsors' Bid is not the winning bid at the Auction (as defined below), the Floating Rate Mortgage Loan shall be repaid in cash and in an amount determined in accordance with the Overbid Allocation (as defined below), assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid, plus additional consideration in accordance with the Overbid Allocation. |
| **Excluded Debtors:** | The Innkeepers debtors other than the Fixed/Floating Debtors (the "Excluded Debtors") are excluded from the Stalking Horse Bid, and the Plan Sponsors will not be the stalking horse for the Excluded Debtors or their assets. |
| **Treatment of Debt:** | Consummation of the Transaction is subject to the restructuring of the Fixed/Floating Debtors' debt in amounts and with the treatment terms provided herein and in Appendix A attached hereto, or with such other terms that are mutually acceptable to Lehman and Five Mile.[2] |
| **Treatment of Fixed Rate Mortgage Loan:** | In full and final satisfaction of all claims arising under or in connection with the Fixed Rate Mortgage Loan against the Fixed/Floating Debtors, subject to receipt of further consideration as a result of the Auction contemplated herein, the holder of the Fixed Rate Mortgage Loan shall receive the following treatment: <br><br> • New non-recourse mortgage loan of $622.5 million, which shall have the following terms: (i) no change to the interest rate of 6.71%; (ii) no change to the maturity date of July 9, 2017; (iii) during the first 48 months after the Effective Date, interest only will be payable monthly |

---

[2]    Lehman and Five Mile recognize that the treatment of other claims set forth herein and in Appendix A are approximate and subject to change during the course of discussions relating to the Fixed/Floating Plan; provided, however, that absent material differences with respect to the treatment of any particular claim, Lehman and Five Mile each shall receive an equal percentage of New Equity, Five Mile shall fund the Five Mile Commitment, and Lehman shall receive the Lehman Payment.

and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iv) prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and (v) property release provision whereby the properties serving as collateral under the Fixed Rate Mortgage Loan may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then-applicable REMIC rules and regulations, such other provision that is acceptable to the Plan Sponsors and Special Servicer that is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement. Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations, and the pooling and servicing agreement. The applicable loan and credit documents evidencing and securing the Fixed Rate Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer shall reasonably require as reasonably acceptable to New HoldCo and the Plan Sponsors and as is consistent with the Innkeepers Commitment Letter.

- In the event the Plan Sponsors' Bid is not the winning bid at the Auction, the holder of the Fixed Rate Mortgage Loan shall receive consideration in accordance with the Overbid Allocation.

- Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of $2.5 million to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, the Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate Mortgage Loan documents, including the appropriate review fee to be set forth

| | |
|---|---|
| | in the definitive documentation as set forth in the second paragraph of Section II of the Five Mile/Midland Commitment.<br><br>• The lender under the Fixed Rate Mortgage Loan will receive a limited guaranty from Five Mile Pooling and a limited guaranty from New HoldCo as defined in and as more fully set forth in the Five Mile/Midland Commitment.<br><br>• Payment of $3 million and the Global Release (as defined below) as set forth in the "Releases" section herein. |
| **Treatment of Floating Rate Mezzanine Debt and Unsecured Debt:** | Following the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code:<br><br>• SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between each of the Plan Sponsors and the Fixed/Floating Debtors, provided that it votes to accept and otherwise supports the Fixed/Floating Plan; and<br><br>• Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below (the "Apollo Commitment")) in the amount of the lesser of $3.75 million and 65% of the face amount of the general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order (the "Unsecured Claims") shall be available for distribution to the holders of Unsecured Claims (the "Unsecured Claims Fund"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code. |
| **Transition Services Agreement:** | The Company will develop a separation plan and transition services agreement for the Fixed/Floating Debtors and the Excluded Debtors, which shall address the uses of certain assets including, without limitation, intellectual property, licenses, IT resources, book and records and permits, and address cash management, cash collateral, and other cash issues, which separation plan and transition services agreement shall be outlined in the plan supplement and be reasonably satisfactory to the Plan Sponsors, the Fixed/Floating Debtors, and the Excluded Debtors. |

| DIP Financings: | The debtor-in-possession financing provided by Solar Finance, Inc. (the "Solar DIP"), which is secured by liens on the assets of the Floating Rate Debtors, and Tranche A of the debtor-in-possession financing provided by Five Mile Capital II Pooling International LLC, which is secured by liens on the assets of the Fixed Rate Debtors (solely with respect to Tranche A, the "Five Mile DIP") shall be repaid in cash on the Effective Date. |
|---|---|
| Required Cash: | Upon consummation of the Transaction and on the Effective Date, New HoldCo will have at least $22.8 million to fund future PIP work and FF&E reserves (if necessary, as determined by New HoldCo), sufficient capital to pay off the Solar DIP (in the principal amount then outstanding, of up to approximately $17.5 million) and the Five Mile DIP (in the principal amount then outstanding, of up to approximately $46.6 million),[2] sufficient capital to pay all administrative and other claims and expenses not paid pursuant to Final Cash Collateral Order [Docket No. 402], as previously amended (the "Final Cash Collateral Order"), as to be further amended as set forth below, that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy, and at least $41.6 million of cash on hand. |
| Bid Procedures: | The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Fixed/Floating Plan through an auction (the "Auction") on the following terms (the "Bid Procedures"):<br><br>• Bids will be solicited for up to forty-five (45) calendar days following the date of the entry of the Bid Procedures Order and the Auction shall commence no later than 50 days following the date of the entry of the Bid Procedures Order;<br><br>• Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a deposit of $20 million in cash to an interest bearing escrow account to be identified, established, and held by and in the name of the Company;<br><br>• Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer and the Official Committee of Unsecured Creditors in these Chapter 11 cases (the |

---

[2]    This number assumes that both the Solar DIP and the Five Mile DIP have been fully funded. If the Solar DIP has not been fully funded, or funded amounts have not been used by the Company, cash in an amount equal to the amount then unfunded or unused under the Solar DIP shall be placed into an account held by the Company. Likewise, if the Five Mile DIP has not been fully funded, or funded amounts have not be used by the Company, cash in an amount equal to the amount then unfunded or unused under the Five Mile DIP shall be placed into an account held by the Company.

"Creditors' Committee"), which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer and the Creditors' Committee, disclosure of the bidders, their qualifications, and their bids;

- All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be enterprise bids for all of and only the assets of the Fixed/Floating Debtors and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth in the Five Mile/Midland Commitment and the treatment of claims as set forth in this Agreement);

- The initial Overbid of the implied value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[3]

- The percentage increase in the implied value of the winning bidder will be allocated to each collateral pool (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool is receiving under the Fixed/Floating Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Fixed/Floating Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool receiving a mortgage in the face amount of $104; the same would apply to cash

---

[3] Note that the Midland Financing shall be no more than $622.5 million plus 70% of the Overbid amount (minus $15 million); provided, however, that the debt-capitalization ratio of the Fixed/Floating Debtors shall never exceed 70%.

[4] For the avoidance of doubt, to the extent the Fixed/Floating Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts; further, to the extent the administrative expense claims of the Fixed/Floating Debtors are less than $10 million, any excess cash shall remain with New HoldCo.

16284088

9

consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools under the Overbid Allocation shall be allocated to each collateral pool pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective collateral pool has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer and the Creditors' Committee relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $46.6 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as to be amended as set forth below) that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy;[4] (e) at least $41.6 million in cash for New HoldCo; (f) with respect only to qualified bids other than the Innkeepers Commitment Letter, at least $200.3 million in cash to pay Lehman's claims against the Fixed/Floating Debtors (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a

competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement.

- If there is an Auction and the winning bidder is not the Plan Sponsors, (i) the winning bidder shall be required to execute and agree to the Innkeepers Commitment Letter, the Fixed/Floating Plan, the Disclosure Statement, and other Fixed/Floating Plan-related documents, each as modified to incorporate the results of the Auction and the Overbid Allocation , (ii) such modified documents shall be deemed to be the Innkeepers Commitment Letter, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents as such terms are used in the Innkeepers Commitment Letter, and (iii) Lehman (only to the extent the Floating Rate Mortgage Loan receives the treatment contemplated in, and required under, the Innkeepers Commitment Letter) and the Special Servicer (only to the extent the Fixed Rate Mortgage Loan receives the treatment contemplated in, and required under, the Innkeepers Commitment Letter) shall be required to use such efforts, take such actions, and not take such actions to the extent required under the Innkeepers Commitment Letter with respect to the Innkeepers Commitment Letter, the Fixed/Floating Plan, the Disclosure Statement, and the other Fixed/Floating Plan-related documents of the Company and the Plan Sponsors, each as modified to incorporate the results of the Auction and the Overbid Allocation, including Lehman's agreement to receive at least $200.3 million in cash (plus any applicable Overbid Allocation) and the Special Servicer's obligation to provide the Midland Financing (as defined in the Bid Procedures attached to the Innkeepers Commitment Letter) to the winning bidder; and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable non-bankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support the Innkeepers Commitment Letter or the New Party/Midland Commitment (as defined in, and attached as Exhibit C to, the Bid Procedures Motion), (iii) Lehman terminates the Innkeepers Commitment Letter, (iv) the Fixed/Floating Plan is not confirmed, or (v) the Effective Date shall not have occurred by the Outside Date (as defined below).

| | |
|---|---|
| | • Other terms to be agreed upon by the Company, the Plan Sponsors, and Special Servicer. |
| **Stalking Horse Fee:** | The Bid Procedures Order will provide that, to the extent the Innkeepers Commitment Letter has not terminated as a result of a Plan Sponsor Breach (as defined in the Innkeepers Commitment Letter), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for any of the Fixed/Floating Debtors' assets after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee").  <br><br>Five Mile and Lehman agree that 25% of the Break-Up Fee shall be allocated to Lehman, and promptly turned over to Lehman upon receipt by the Plan Sponsors of the Stalking Horse Fee, as consideration for Lehman's agreement to fund a portion of the capital necessary for the Fixed/Floating Debtors to emerge from bankruptcy, with the remainder of the Stalking Horse Fee allocated to Five Mile.  <br><br>The Stalking Horse Fee, if any, shall be payable by the Fixed/Floating Debtors upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction. |
| **Means For Implementation:** | The Company (i) has filed a motion to approve the Bid Procedures and the Stalking Horse Fee (the "Bid Procedures Motion") and requested a hearing for approval thereof and (ii) will file the Fixed/Floating Plan, a disclosure statement for the Fixed/Floating Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Fixed/Floating Plan.  <br><br>Each of the foregoing and subsequent pleadings (including the order approving the Bid Procedures Motion (the "Bid Procedures Order")) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion. |
| **New Manager:** | Prior to the Effective Date, the Plan Sponsors agree to sell, on a pro rata basis, an aggregate of 10% of New Equity to a new third-party investor that will serve as the new hotel property manager for the reorganized Fixed/Floating Debtors (the "New Manager").  <br><br>The sale of New Equity to the New Manager will not close until after confirmation of the Fixed/Floating Plan and the occurrence of the Effective Date, and neither the effectiveness of the Fixed/Floating Plan |

| | |
|---|---|
| | nor the occurrence of the Effective Date will be conditioned upon such closing.<br><br>The Fixed/Floating Plan will contain a provision conditioning the grant of the Global Release (defined below) to Island Hospitality Management, Inc. with its cooperation with the Plan Sponsors, New HoldCo, and the New Manager. |
| **Pro Forma Equity Ownership:** | Following full participation in the Third-Party Investment, the New Equity will be allocated among the new ownership as follows:<br><br>• 40% to Five Mile;<br><br>• 40% to Lehman;<br><br>• 10% to New Manager; and<br><br>• 10% to Third-Party Investor.<br><br>For the avoidance of doubt, in the event Lehman and Five Mile agree to any increase or decrease in the percentage of New Equity allocated to the New Manager or Third-Party Investor, any resulting surplus or reduction in New Equity shall be split equally between Lehman and Five Mile. |
| **Governance:** | The board of directors for New HoldCo will initially consist of up to 7 members as follows: 2 members nominated by Five Mile, 2 members nominated by Lehman, and 3 independent members to be nominated at the discretion of the Plan Sponsors; provided, however, that subject to agreement among Lehman and Five Mile, 1 independent member nomination may be allocated to the New Manager, 1 independent member nomination may be allocated to Third-Party Investor, and 1 independent member nomination may be allocated in such manner as Lehman and Five Mile mutually agree.<br><br>A super-majority vote of 66 2/3% of the equity interests in New HoldCo will be required for material decisions as outlined in Appendix B (the "Material Decisions").<br><br>Lehman and Five Mile shall negotiate and agree upon required board actions and a process for resolving deadlocked votes on decisions that are non-Material Decisions. |
| **Shareholders Agreement:** | On or prior to the Effective Date, Lehman and Five Mile shall enter into a shareholders'/operating agreement for New HoldCo that shall be agreed upon by Lehman and Five Mile and shall contain customary protections mutually acceptable to Lehman and Five Mile. |

16284088

13

| | |
|---|---|
| **Commitment:** | From the date of execution of this Agreement until the Termination Date, and subject to the conditions set forth in this Agreement, Five Mile and Lehman, as applicable, agree and covenant that: |
| | Lehman and Five Mile shall (i) use reasonable efforts to prepare or cause the preparation of the Fixed/Floating Plan, Disclosure Statement, other Fixed/Floating Plan-related documents, and other Fixed/Floating Plan-related pleadings (collectively, and together with the Bid Procedures Motion, the "Fixed/Floating Plan Documents"), which shall be consistent in all material respects with this Agreement, and to cause the Company to file and seek the approval of such pleadings, (ii) take all reasonably necessary and appropriate actions to support and achieve confirmation and consummation of the Fixed/Floating Plan and the Transaction contemplated in this Agreement, and (iii) not take any actions (either by affirmative action or omission) (a) inconsistent with this Agreement or (b) that would materially delay the confirmation or consummation of the Fixed/Floating Plan or the Transaction contemplated in this Agreement; |
| | Lehman and Five Mile shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Transaction. Furthermore, each of Lehman and Five Mile shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement; |
| | Lehman and Five Mile each hereby covenant and agree to negotiate in good faith the Fixed/Floating Plan Documents, each of which shall (i) contain the same treatment and economic terms as and other terms consistent in all material respects with, the terms set forth in this Agreement (subject to adjustment as agreed to by Lehman and Five Mile in each of their respective sole discretion) and (ii) otherwise be in form and substance acceptable in all respects to Lehman and Five Mile, in each of their respective reasonable discretion; |
| | Five Mile hereby commits to provide the entire principal amount of the Five Mile Commitment on the Effective Date, upon the terms and subject to the conditions set forth in this Agreement; and |
| | Subject to the terms and conditions contained in this Agreement, including but not limited to the section labeled "Lehman Approvals," Lehman hereby commits to consent to the treatment of its claims and vote its claims to accept the Fixed/Floating Plan, solely on the terms and subject to the conditions contained in this Agreement. |

| | |
|---|---|
| **Lehman Approvals:** | Notwithstanding anything to the contrary contained herein:<br><br>(a) Lehman's obligations with respect to the Transaction shall be subject to the approval of the United States Bankruptcy Court for the Southern District of New York presiding over the Lehman Brothers Holdings Inc. bankruptcy cases (Case No. 08-13555) (the "Lehman Bankruptcy Court"). Following the entry of the Bid Procedures Order, Lehman will promptly file a motion (the "Lehman Bankruptcy Court Motion") seeking an order from the Lehman Bankruptcy Court authorizing Lehman to enter into the Transaction, which order shall be entered prior to the Auction. Lehman agrees to deliver to Five Mile a draft of the Lehman Bankruptcy Court Motion prior to its filing. The provisions in the Lehman Bankruptcy Court Motion referencing Five Mile, the Agreement or the Transaction shall be reasonably acceptable to Five Mile; and<br><br>(b) Lehman's obligations with respect to voting in favor of the Fixed/Floating Plan shall be conditioned in all respects on the approval of the Disclosure Statement by the Innkeepers Bankruptcy Court and the solicitation of its votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code. |
| **Non-Solicitation:** | Lehman agrees until the Termination Date (as defined herein), without the written consent of Five Mile, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, any or all of the Company's assets, the businesses of Innkeepers or the Floating Rate Mortgage Loan (the "Potential Transactions"), (ii) solicit, initiate or encourage any proposals or offers from any person other than Five Mile relating to a Potential Transaction and Lehman's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction related to the Potential Transactions other than the Transaction contemplated hereby; and<br><br>Five Mile agrees until the Termination Date (as defined herein), without the written consent of Lehman, it will not authorize or permit any of its officers, directors, controlled affiliates, subsidiaries, representatives, or advisors to (i) take, directly or indirectly, any action with respect to investing or otherwise participating in any transaction involving, directly or indirectly, the Potential Transactions, (ii) solicit, initiate or encourage any proposals or offers from any person other than Lehman or Special Servicer relating to a Potential Transaction and Five Mile's participation therein, or (iii) reach any agreement or understanding (whether or not such agreement or understanding is absolute, revocable, contingent or conditional) for, or otherwise attempt to consummate, any transaction |

|  | related to the Potential Transactions other than the Transaction contemplated hereby (the "Non-Solicitation Period"). |
|---|---|
| **Specific Performance:** | Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the Non-Solicitation provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each party agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of any of the Non-Solicitation provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter. The only remedy for breach of this Agreement shall be specific performance. |
| **Termination:** | Lehman and Five Mile may terminate this Agreement upon written notice to the other upon the earliest occurrence of the following events (each a "Termination Event" and the date of such notice, the "Termination Date"): |

> - February 11, 2011, which shall be deemed extended for so long as any Fixed/Floating Plan Document that is on file has not been denied by a written order of the Innkeepers Bankruptcy Court, or on the date a written order of the Innkeepers Bankruptcy Court is entered denying any of the Fixed/Floating Plan Documents;
>
> - Notwithstanding anything contained herein to the contrary, March 31, 2011, if the Bid Procedures (including the Break-Up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of such date in substantially the form attached to the Innkeepers Commitment Letter as Appendix B;
>
> - Notwithstanding anything contained herein to the contrary, April 8, 2011, if the Fixed/Floating Plan and Disclosure Statement for the Fixed/Floating Debtors have not been filed by such date by the Fixed/Floating Debtors;
>
> - Notwithstanding anything contained herein to the contrary, June 30, 2011, if the Fixed/Floating Plan has not been confirmed by the Innkeepers Bankruptcy Court, pursuant to an order of the Innkeepers Bankruptcy Court, as of such date; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;
>
> - The dismissal or conversion to Chapter 7 of any of the Fixed/Floating Debtors' Chapter 11 cases or any of the Chapter 11 cases of Grand Prix Holdings LLC, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership (collectively,