the "Parent Companies"); provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- The termination of exclusivity for any of the Fixed/Floating Debtors or the Parent Companies unless supported or sought by the Plan Sponsors; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Approval by the Innkeepers Bankruptcy Court with respect to the assets of the Fixed/Floating Debtors or the Parent Companies of any bidding procedures, sale procedures for sales other than of *de minimis* assets, disclosure statement, or plan other than the Bid Procedures Motion, Disclosure Statement, and the Fixed/Floating Plan;

- The granting of stay relief with respect to any of the Fixed/Floating Debtors' or the Parent Companies' assets, other than immaterial assets; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- Denial of the Lehman Bankruptcy Court Motion or the Lehman Bankruptcy Court's entry of any other order, judgment or decree prohibiting Lehman from consummating the Transaction;

- The occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), or operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

- In the exercise of the Parties' reasonable best efforts, failure to execute, deliver, or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate (i) the Transaction with respect to the Fixed Rate Mortgage Loan or otherwise affecting the treatment, including the economics, thereof, in each case in form and substance satisfactory to Special Servicer and the Plan Sponsors in each of their respective reasonable discretion and (ii) the Transaction, in such case in form and substance satisfactory to the Plan Sponsors in each of their respective reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 case of

|  | Grand Prix West Palm Beach LLC; |
|--|--|
|  | • Termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement reasonably deemed necessary by the Plan Sponsors or the Special Servicer prior to the Effective Date without the Plan Sponsors and the Special Servicer's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC; |
|  | • Failure by the Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, that it shall not be a Termination Event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment of the Fixed Rate Mortgage Loan; provided, further, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC; |
|  | • Such earlier date as may be agreed upon in writing by Lehman and Five Mile; |
|  | • The Company terminates the Auction without selecting a winning bidder for the Fixed/Floating Debtors and without the consent of the Plan Sponsors and the Special Servicer, in each of their respective sole discretion; |
|  | • Subject to Lehman and the Special Servicer's compliance with the Revised Agreements Provision, the Plan Sponsors are not selected as the successful bidders at the Auction; |
|  | • A party thereto materially breaches its obligations under the Innkeepers Commitment Letter, including, without limitation, if the Company materially breaches its obligations, whether or not through its exercise of the Fiduciary Out (as defined in the Innkeepers Commitment Letter); or |
|  | • The occurrence of the Outside Date (as defined below) |
|  | Time is of the essence with respect to the Termination Events. |

| | |
|---|---|
| **Effective Date/Outside Date Termination:** | • The occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including, without limitation, entry of an order confirming the Fixed/Floating Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable, and the Fixed/Floating Plan will also include customary provisions with respect to waiver of conditions to the Effective Date.<br><br>• Notwithstanding anything contained herein or in the Innkeepers Commitment Letter to the contrary, unless otherwise agreed by the Company, the Plan Sponsors, and the Special Servicer in writing, the Innkeepers Commitment Letter shall automatically terminate and be of no further force or effect and the order confirming the Fixed/Floating Plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011 (the "Outside Date") if the Effective Date has not occurred and all of the transactions contemplated under the Innkeepers Commitment Letter, and the Fixed/Floating Plan have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date Termination Event"); provided, however, that this Outside Date Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC.<br><br>Time is of the essence with respect to the Outside Date Termination Event. |
| **Other:** | • On or after the Effective Date, New HoldCo shall reimburse Five Mile for the reasonable and documented fees and expenses of counsel, provided that the Transaction contemplated by the Fixed/Floating Plan is consummated.<br><br>• Lehman's advisors' and counsel's reasonable and documented fees and expenses shall continue to be paid in accordance with the Final Cash Collateral Order.<br><br>• The Company shall seek to amend the Final Cash Collateral Order, with the support of Lehman and the Special Servicer, to increase the amount of cash that may be held back as an expense reserve to $16.5 million in order to account for certain closing and emergence costs of the Fixed/Floating Debtors, including potential success fees, $14.9 million of which shall be allocable to and be used for payment of the obligations of the Fixed/Floating Debtors only, in substantially the form attached hereto as Appendix E.<br><br>• Unless and until a Termination Event occurs, Lehman shall not sell, transfer, pledge, assign, or otherwise hypothecate any of its claims under the Floating Rate Mortgage Loan or grant any option thereon |

16284088

| | |
|---|---|
| | or any right or interest (voting or otherwise) therein (collectively, a "Transfer"), unless such transfer is to Five Mile or an entity in which Lehman Brothers Holding Inc. directly or indirectly owns at least 51% of the voting interests (a "Lehman Affiliate"), provided that Five Mile or such Lehman Affiliate agrees to the treatment of the Floating Rate Mortgage Loan as set forth herein (the "Transfer Provision").<br><br>• Each of Five Mile and Lehman shall indemnify the other and hold the other harmless with respect to any loss of the Deposit (as defined in the Innkeepers Commitment Letter) caused by a breach of the Innkeepers Commitment Letter by such party.<br><br>• This Agreement may only be modified, altered, amended, or supplemented by an agreement in writing signed by Lehman and Five Mile. |
| **Releases:** | <u>Releasing Parties.</u><br><br>The "Releasing Parties" shall be the Fixed/Floating Debtors, the Plan Sponsors, the Special Servicer (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts, and trustees), and Apollo Investment Corporation (and together with its predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, and professionals, "Apollo"), and other holders of claims against and interests in the Fixed/Floating Debtors, and each of the foregoing parties' respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, trustees, and members of the Parent Companies, in their capacity as such).<br><br><u>Special Servicer Release.</u><br><br>The Fixed/Floating Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo, related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice. The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and such settlement, waiver, and release shall be embodied in, and shall not be effective unless and until the Global Release (as defined herein) has been embodied in, an order confirming the |

16284088

Fixed/Floating Plan as entered in the Innkeepers Bankruptcy Court that has become final and non-appealable. Contemporaneously with the occurrence of the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Fixed/Floating Plan and shall be in form and substance reasonably satisfactory to Special Servicer and Apollo, and shall be conditioned on the above-described payment and the occurrence of the Effective Date.

Apollo Release.

Apollo shall agree to (i) waive all rights to receive any recovery or distribution under the Fixed/Floating Plan and (ii) settle and provide a complete general release and waiver of any of its claims against the Releasing Parties. Apollo shall provide such waiver of rights and such general release and waiver of claims against the Releasing Parties in exchange for such entities settling, releasing, and waiving any claims they may have against Apollo to the extent provided herein. Such release by the Releasing Parties shall include (but shall not be limited to) the Special Servicer, on behalf of the C6 and C7 Trusts, settling, releasing, and waiving all of the Special Servicer's claims against Apollo, that are related in any way to the Apollo Guaranty; provided that, the effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided for herein and shall not be effective until the occurrence of the Effective Date.

Global Release.

The Fixed/Floating Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, by and among the Releasing Parties (each against one another), other than a release of the obligations undertaken herein and in the Fixed/Floating Plan and other Transaction-documents, from the following: (i) any and all claims and causes of action relating to the Fixed/Floating Debtors arising at any time prior to the Effective Date, and in connection therewith, the Global Release shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, New HoldCo,

and New Manager.    It is expressly understood and agreed, that notwithstanding anything otherwise contained in the Innkeepers Commitment Letter, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date.

Reservation of Rights.

- Except as otherwise provided in the Innkeepers Commitment Letter, the Releasing Parties reserve all of their rights to object to any releases by the Releasing Parties of other parties if the terms of the Fixed/Floating Plan differ materially from those set forth herein.

- Additionally, the Releasing Parties reserve all of their respective rights, claims, and interests with respect to the Excluded Debtors and all assets of the Excluded Debtors.

- Whatever rights, claims, and interests the Excluded Debtors may have with respect to the Fixed/Floating Debtors and their assets are also preserved.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI INC.

By: _____

Name: Jeff Filts

Title: Duly Authorized Signatory

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____

Name:

Title:

SIGNATURE PAGE TO THE REVISED
AMENDED AND RESTATED COMMITMENT AGREEMENT

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement as of the date first written above.

By signing below, each party acknowledges its agreement to the foregoing.

LEHMAN ALI INC.

By: _____
Name:
Title:

FIVE MILE CAPITAL II POOLING REIT LLC

BY: FIVE MILE CAPITAL PARTNERS LLC

By: _____
Name:    Almond L. Nickerson III
Title:    Managing Director

SIGNATURE PAGE TO THE REVISED
AMENDED AND RESTATED COMMITMENT AGREEMENT

APPENDIX A[5]

| | PRO FORMA CAPITALIZATION | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| **DEBT** | Current Principal Balance[(a)] | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Principal Balance |
| Five Mile Fixed Pool DIP Loan | $46.6 | $0.0 | $46.6 | ($46.6) | $0.0 |
| Lehman DIP Loan[(b)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage[(c)] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| Floating Pool Loan | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Total Debt** | **$1,242.1** | **($355.2)** | **$886.9** | **($264.4)** | **$622.5** |
| **Implied Equity** | **$0.0** | | | | **$348.2** |
| **Total Capitalization** | **$1,242.1** | | | | **$970.7** |

Note: All numbers are rounded to a single decimal place.
(a) Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.
(b) Assumes DIP financing facility is fully drawn.
(c) A new, non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

---

[5]   Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

16284088

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Apollo Contribution | 0.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 46.6 |
| | | Unsecured Creditors Payment | 3.8 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 74.9 |
| **Total** | **$174.5** | | **$174.5** |

Note: All numbers are rounded to a single decimal place.

(a)    Subject to adjustment based on participation in the Third-Party Investment. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b)    Balance sheet cash to be used for, among other purposes, the funding of $22.8 million of FF&E, PIP and working capital reserves, the potential $500,000 payment to Bidder D and closing costs (currently estimated to be approximately $10 million). Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with New HoldCo.

16284088

## APPENDIX B

### Material Decisions

1.      The Sale[6] by the Company[7] or its subsidiaries of assets totaling more than the lesser of (x) $20 million and (y) two hotels, whether in one or more transactions;

2.      Exceeding the amount of operating and capital expenditures in excess of the amount set forth in the Company's approved annual budget, subject to a 3% variance, whether for repositioning, asset improvements, deferred capital expenditure requirements and infrastructure or otherwise, and taking any action that is inconsistent with the approved budget or business plan;

3.      Approval or modification of the Company's annual budget or business plan (provided that until an annual budget is approved, the previously approved annual budget shall govern, with automatic increases (i) for utilities, taxes and insurance (with such increase not to exceed the actual increases in such expense items) and (ii) for all other items, (x) three percent (3%) of the line item for any line item other than capital expenditures, and (y) with respect to capital expenditures, the lesser of (A) three percent (3%) of budgeted line items and (B) $5 million in the aggregate for any year for both budgeted and unbudgeted capital expenditure items); provided, that at all times, whenever the Company's property manager authorizes emergency expenditures (to the extent permitted by the management agreement/shareholders agreement), the annual budget shall be deemed revised and approved to include such expenditures with respect to such period but shall not be included as part of the baseline for determining the annual budget or business plan for future periods;

4.      Commencing, settling or compromising any litigation, arbitration, mediation or other dispute resolution proceeding (x) in excess of $2.5 million, individually or in the aggregate, in any fiscal year, unless such settlement is fully reimbursed by insurance or (y) which may otherwise have a material adverse effect on the Company and its subsidiaries;

5.      (A) The filing of any voluntary petition in bankruptcy on behalf of the Company or any subsidiary, (B) the consenting to the filing of any involuntary petition in bankruptcy against the Company or any subsidiary, (C) the filing by the Company of any petition seeking, or consenting to, the reorganization or relief under any applicable federal or state law relating to bankruptcy or insolvency, (D) the consenting to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or a substantial part of its property, (E) the making of any assignment for the benefit of creditors, (F) the admission in writing of the Company's

---

[6] As used herein, the term "Sale" shall mean the direct or indirect sale (by derivative, swap, repurchase or similar transaction), lease, conveyance, disposition or other transfer.

[7] As used herein, the "Company" shall mean New HoldCo.

inability to pay its debts generally as they become due or (G) the taking of any action by the Company in furtherance of any such action;

6.  Acquisitions of additional properties or material assets except as specifically provided for in the approved annual budget and business plan;

7.  Entering into, amending or modifying agreements with cost or liability to the Company or its subsidiaries in excess of $5 million in any fiscal year or which are otherwise material to the business of the Company, provided that for purposes of this provision, the cost of an agreement shall be calculated based only on the period prior to the time that the Company or its subsidiaries shall have the right to freely terminate such agreement, and shall include any fee payable upon termination by the Company or its subsidiaries;

8.  Raising new equity for the Company or any of its subsidiaries or admitting any new partner or owner to the Company or any subsidiary;

9.  Making distributions to the Members or owners of the Company's subsidiaries;

10.  Prepayment of the Company's debt or debt of the Company's subsidiaries, other than as required by the terms of such debt in connection with a property sale consummated pursuant to the approved business plan or as otherwise specifically permitted by the approved business plan;

11.  With regard to any subsidiary, approving any decision or taking any action which, if it was being made or taken by the Company, would be a Material Decision as set forth herein;

12.  Approving reserves in excess of $2 million, excluding reserves required to be held by lenders of the Company or its subsidiaries, and "FF&E" reserves carried over from the previous approved annual budget;

13.  The recapitalization, reclassification, redemption, repurchase or other acquisition by the Company of equity or other interests in the Company;

14.  Any amendment or modification of the operating/shareholders agreement (if applicable), the management agreement, or organizational documents (including the operating agreement of a limited liability company and partnership agreement of a partnership) of the Company or any subsidiary of the Company;

15.  Entering into, amending or modifying any agreement between the Company or any subsidiary, on the one hand, and a Member or any affiliate of a Member, on the other hand;

16.  Merging, consolidating or dissolving the Company or any of its subsidiaries;

16284088

17.        Making any change to a tax election or accounting principles of the Company or any of its subsidiaries that is materially adverse to any Member or converting the Company or any of its subsidiaries to a corporation;

18.        The Company or its subsidiaries refinancing any indebtedness or materially modifying any indebtedness in an amount greater than $15 million in the aggregate;

19.        The Company or its subsidiaries incurring or guaranteeing any indebtedness in any amount;

20.        The Company holding any assets other than the interests in its subsidiaries existing on the date of hereof, any interest in an entity treated as a corporation for U.S. federal income tax purposes, or any cash reserves intended for distributions to the Members or to pay Company expenses;

21.        Removal and replacement of the New Manager as property manager of any of the assets of the Company or its subsidiaries;

22.        Any Transfer which may reasonably be expected to cause the assets of the Company to be deemed "plan assets" (within the meaning of 29 C.F.R. 2510.3-101, as modified by Section 3(42) of ERISA);

23.        Appointing, dismissing, setting or modifying the terms of compensation and benefits for the material officers and employees of the Company or any of its subsidiaries;

24.        Any investments (including in the form of loans, guaranties, advances or capital contributions) in any person other than a subsidiary of the Company;

25.        Any appointment or removal of the auditors, regular counsel, financial advisors, underwriters, investment bankers or company wide insurance providers of the Company or any of its subsidiaries;

26.        The taking of any significant actions, including the making of any significant filing with respect to any governmental or regulatory body, agency, official or authority including application for new regulatory licenses, requests for transfer or assignment of existing regulatory licenses or participation in material rulemaking or policy proceedings;

27.        The entry into, or the termination, disposition or material amendment of the terms of any joint venture;

28.        Approval of any action or inaction by the Company or any of its subsidiaries that would violate any provision of a loan document or other material agreement or instrument binding on the Company or any of its subsidiaries or any property of the Company or any of its subsidiaries;

29.        Enter into any swap, hedge, collar or other interest rate protection agreement, in each case, for a notional amount in excess of $10 million;

16284088

30.         Entering into any material modification of, or terminating or allowing to expire, any insurance programs covering the Company or its subsidiaries, or their respective assets and personnel (including officers and directors);

31.         Changing the principal banking institutions with which the Company or its subsidiaries maintain deposit, borrowing or other relationships;

32.         Entering into any lease not provided for in the approved annual budget or business plan (other than short term storage leases in connection with a capital program or equipment leases in the ordinary course of business);

33.         Granting any lien, mortgage, pledge or other encumbrance with respect to any material assets of the Company or any of its subsidiaries;

34.         The Company or any subsidiary materially changing its line(s) of business or conducting business in a jurisdiction other than the United States;

35.         Approving any management incentive plan or other equity compensation plan; and

36.         Any rebranding of properties or entry into new franchise agreements.

16284088

## APPENDIX C

**Five Mile/Midland Commitment**

16284088

## APPENDIX D

**Innkeepers Commitment Letter**

16284088

APPENDIX E

**Order Amending the Final Cash Collateral Order**

16284088

**EXHIBIT D**

**FIVE MILE/MIDLAND COMMITMENT**

EXECUTION VERSION
NOT A SOLICITATION OF VOTES ON A PLAN
Subject to FRE 408
Subject to Joint Interest Agreement

FIVE MILE CAPITAL PARTNERS

# FIVE
# MILE

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

March 9, 2011

Midland Loan Services, a division of PNC Bank, National Association
10851 Mastin, 6th Floor, Overland Park, KS 66210
Attention: Kevin S. Semon
            Vice President, Special Servicing Manager

## Second Amended and Restated Binding Commitment Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust

Five Mile Capital II Pooling REIT LLC ("Five Mile Pooling"), through its investment advisor Five Mile Capital Partners LLC (collectively, "Five Mile"), is pleased to submit this second amended and restated letter (this "Second Amended Commitment Letter") to Midland Loan Services, a division of PNC Bank, National Association, as special servicer for the $825.4 million Fixed Rate CMBS Mortgage Loan (together with any successor special servicer, "Special Servicer"), which sets forth, among other things, our binding commitment to provide equity capital (the "Commitment") for the restructuring of the debt and equity of certain wholly owned direct and indirect subsidiaries of Innkeepers USA Trust (together with all of its wholly owned direct and indirect subsidiaries, "Innkeepers" or the "Company") that are indentified on Exhibit A attached hereto (collectively, the "Fixed/Floating Debtors"), resulting in Five Mile and Lehman ALI, Inc. ("Lehman" and together with Five Mile Pooling, the "Plan Sponsors") directly or indirectly owning a controlling interest in the Fixed/Floating Debtors as more fully set forth in that certain Revised Amended and Restated Commitment Agreement between Five Mile Pooling and Lehman dated as of March 9, 2011 (the "Lehman Commitment") and that certain Amended and Restated Binding Commitment Agreement Regarding the Acquisition and Restructuring of Certain Subsidiaries of Innkeepers USA Trust, dated as of March 9, 2011 among the parties thereto (the "Amended Debtor Commitment"). The recapitalization and debt restructuring (the "Transaction") is to be effectuated through a plan of reorganization for the Fixed/Floating Debtors (the "Plan") to be filed in the United States Bankruptcy Court for the Southern District of New York presiding over the Company's bankruptcy cases (jointly administered as Case No. 10-13800) (the "Innkeepers Bankruptcy Court") by the Fixed/Floating Debtors with the support of Lehman, us and you. The Plan Sponsors have agreed that the Company may file a global plan of reorganization (a "Global Plan") that includes the Plan and Chapter 11 plans of any or all of the other debtors (the "Other Plans") as the Company deems appropriate in its sole discretion. To the extent the Company files a Global Plan or Other Plans, confirmation of the Plan shall not be conditioned on confirmation of the Other Plans.

This Second Amended Commitment Letter shall become effective only upon the satisfaction of the conditions to effectiveness contained in Section 12 of the Amended Debtor Commitment.

Upon effectiveness, this Second Amended Commitment Letter hereby amends, restates and supersedes that certain Amended and Restated Binding Commitment for the Acquisition of Innkeepers USA Trust by and between Five Mile Pooling and Special Servicer dated January 14, 2011 (the "January 14 Five Mile Commitment") in its entirety.  Upon effectiveness of this Second Amended Commitment Letter, that certain Binding Commitment for the Acquisition of Innkeepers USA Trust between Five Mile Pooling and Special Servicer dated December 10, 2010 as amended by that certain Amendment to the Binding Commitment for the Acquisition of Innkeepers USA Trust dated as of December 10, 2010 (as so amended, the "December 10 Five Mile Commitment") shall be hereby terminated and of no further force or effect.

If the Plan Sponsors are the successful/winning bidders at the Auction (as defined below), it is intended that the funding from our Commitment will be used to finance and otherwise implement a confirmed Plan acceptable in all respects to you in your reasonable discretion, including the necessity of REMIC compliance and consistency with grantor trust rules and regulations and the pooling and servicing agreement, and acceptable to us in our reasonable discretion, which will provide for the treatment of claims and other terms outlined below and in the Amended Debtor Commitment and will otherwise comply with applicable disclosure requirements, rules of procedure and contain terms and treatment of claims consistent with the applicable provisions of the Bankruptcy Code.

Five Mile is uniquely qualified to consummate the Transaction, given our substantial investment and the rights we have in certain indebtedness in Innkeepers.  As you know, we have funded a debtor-in-possession financing to the Company for $53 million and have performed our due diligence of all the hotel assets of the Fixed/Floating Debtors.  As a result, we are familiar with the hotel assets of the Fixed/Floating Debtors and operating performance thereof, gleaned from our review of public filings and our own extensive due diligence.  We also have broad investment experience in the hospitality area and general expertise in the extended stay lodging sector.

I.    **Value & Proposed Capital Structure**

Our Commitment and the Transaction are based on a valuation of New HoldCo (as defined below) of $970.7 million and result in a final capital structure of $622.5 million in aggregate indebtedness and $348.2 million in new equity, which will include funding for closing and emergence costs.  The details of the reorganized capital structure for New HoldCo are provided in Section IV below.

II.    **Capital Commitments; Guaranties**

Subject to the conditions set forth herein, we hereby submit this binding and irrevocable offer to provide $174.1 million of cash to fund the Transaction (a portion of which may be provided by other investors, including an operating partner, who will manage the hotels) pursuant to which, if the Plan Sponsors are the successful winning bidders, Five Mile, through one or more of its wholly owned affiliates(s) or a Five Mile controlled investment vehicle, comprised of limited partners in Five Mile Capital Partners II LP and Five Mile Capital Investment Opportunities LP, will purchase 50.0% of the New Equity for cash in an amount of $174.1 million; and (ii) Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan

will receive, subject to receipt of further consideration as a result of the Auction (defined below) contemplated herein, (a) 50.0% of the New Equity and (b) $26.2 million in cash; provided, however, that, subject to applicable law and the Plan, the Plan Sponsors may, subject to the consent of the Company not to be unreasonably withheld, conditioned, or delayed, require the Company or the reorganized Company as applicable to provide due diligence access (subject to an appropriate confidentiality agreement) and to distribute up to 20% of the New Equity to a third-party investor and/or new manager (the "Third-Party Investment"), and, in the event the third party investor and/or new manager pays cash on the Effective Date (as defined below) for the New Equity in connection with the Third Party Investment, then the amount of New Equity (and the corresponding payment therefor) purchased by Five Mile, and the amount of New Equity (and the corresponding payment in cash to Lehman) received by Lehman, shall be adjusted accordingly, provided, further, however, that notwithstanding any direction by the Plan Sponsors with respect to the Third Party Investment, Five Mile and Lehman shall remain liable for the full amount of the Commitment. The Transaction will be effectuated consistent with the terms of this Second Amended Commitment Letter, the Lehman Commitment and the Amended Debtor Commitment on the effective date of the Plan (the "Effective Date") (the occurrence of the Effective Date shall be subject to the satisfaction of customary conditions, including without limitation entry of an order confirming the Plan by the Innkeepers Bankruptcy Court that has become final and non-appealable and the Transaction contemplated under the Plan having been closed and consummated as contemplated thereunder on or before the Outside Date), and the Plan will also include customary provisions with respect to waiver of conditions to the Effective Date). Five Mile's intended investment, as reflected herein, will be used to recapitalize the Fixed/Floating Debtors, and more specifically, will be used to retire the existing DIP facilities (as they relate to the Fixed/Floating Rate Debtors) and provide funds for future property improvement work ("PIP"), furniture, fixtures, and equipment investments ("FF&E"), cash reserves and potential growth opportunities. Five Mile will provide its portion of the cash investment required to consummate the Transaction from our existing investment vehicles or Five Mile sponsored and controlled co-investment vehicles.

In addition, in connection with the Fixed Rate CMBS Mortgage Loan, (a) Five Mile Pooling will enter into a new limited "bad boy" guaranty (the "FM Guaranty") which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that Five Mile Pooling will not have any liability under the FM Guaranty unless such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or under common control with Five Mile and (b) the new holding company entity which owns all the equity of the Fixed/Floating Debtors (the "Parent Entity") shall enter into a new "bad boy" guaranty (the "Parent Guaranty"), which shall cover the same "bad acts" as the "bad boy" guaranty given by Grand Prix Holdings LLC in connection with the Fixed Rate CMBS Mortgage Loan, except that the beneficiary of the Parent Guaranty shall have no right to enforce such Parent Guaranty unless the Five Mile member of the joint venture between the Plan Sponsors as contemplated by the Lehman Commitment (the "FM/Lehman JV") ceases to have the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions (as defined below)) of the equity interests in the FM/Lehman JV. Five Mile Pooling's maximum liability under the FM Guaranty shall not exceed 10% of the outstanding principal balance of the restructured Fixed Rate CMBS Mortgage Loan from time to time for which such guaranty is provided. There shall be no such cap on the liability of Parent Entity under the Parent Guaranty. If Five Mile desires to sell or otherwise transfer (i) all of its interests in the FM/Lehman JV or (ii) a portion of its interest in the FM/Lehman JV and with respect to any such partial sale or transfer, Five Mile would cease to have

the right to vote at least 34% (which is a blocking right with regards to Super Majority Decisions) of the equity interests in the FM/Lehman JV following such sale or transfer, then, in addition to any other conditions to such sale or transfer set forth in the Fixed Rate CMBS Mortgage Loan documents, as a condition to any such sale or other transfer, an entity, which has a minimum net worth of $135 million and which is otherwise acceptable to the holder of the Fixed Rate CMBS Mortgage Loan in its sole but reasonable discretion shall deliver a guaranty in form and substance substantially similar to the FM Guaranty which covers "bad acts" actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by the transferee or an affiliate that controls, is controlled by or under common control with such transferee and Five Mile or the transferee shall pay an appropriate review fee to be set forth in the definitive documentation.

During the term of the Fixed Rate CMBS Mortgage Loan, (x) the corporate or other governance documents of the FM/Lehman JV and the borrowers under the Fixed Rate CMBS Mortgage Loan the operating lessees and such other subsidiaries of the FM/Lehman JV (as may be necessary to effectuate the provisions of this paragraph) shall provide that super-majority voting (i.e., the consent of at least 66 2/3 % of the equity interests in the FM/Lehman JV) shall be required for the decisions identified on Appendix B to the Lehman Commitment if such decision would result in or otherwise constitute a "bad act" under the FM Guaranty (irrespective and independent of whether or not such "bad act" is actually, actively and affirmatively a direct and immediate cause of and/or actually and affirmatively consented to by Five Mile or an affiliate that controls, is controlled by or is under common control with Five Mile) and/or the Parent Guaranty, as applicable (collectively, the "Super Majority Decisions") and (y) such Super Majority Decisions may not be amended, waived or modified without the consent of the holder of the Fixed Rate CMBS Mortgage Loan. Nothing contained in this Second Amended Commitment Letter shall require the Special Servicer to take any action in violation, derogation or contravention of the terms or provisions of the Fixed Rate CMBS Mortgage Loan documents.

The Parties acknowledge that the applicable loan and credit documents evidencing and securing the Fixed Rate CMBS Mortgage Loan shall be assumed, amended, restated, and/or supplemented as Special Servicer and its counsel shall reasonably require as reasonably acceptable to the reorganized borrowers and the Plan Sponsors in order to implement the proposed treatment of the Fixed Rate CMBS Mortgage Loan, to incorporate the terms herein and to implement the Plan.

In connection with the foregoing, we hereby confirm that we have available, and will have available at all times prior to consummation of the Transaction or the termination of the Second Amended Commitment Letter, investor commitments that exceed, in the aggregate, $300 million.

III.    **Plan Subject to Higher and Better Offers; Five Mile Free to Pursue Other Transactions**

Subject to Court approval of the Bid Procedures (as hereinafter defined), Five Mile acknowledges that the creditor treatment proposed herein will be subject to higher and better offers through an auction. For avoidance of doubt, our providing this Second Amended Commitment Letter does not preclude us in any way from discussing alternate transactions, including competing plans of reorganization, or engaging in any discussions regarding providing financing or participating in any such alternate transactions (each, an "Alternate Transaction"); provided however, that other than the Lehman Commitment and the Amended Debtor Commitment (and the transactions contemplated

4

respectively thereby) we will not enter into a binding commitment with respect to, or otherwise consummate, any Alternate Transaction prior to the occurrence of a Termination Event (as defined in Section VIII hereof).

Special Servicer and Five Mile agree that until a Termination Event (as defined in Section VIII hereof) occurs, Special Servicer and its affiliates and advisors shall be able to participate in discussions regarding an Alternative Transaction; provided however, Special Servicer shall not enter into a binding commitment with respect to, or otherwise consummate, any Alternative Transaction prior to the occurrence of a Termination Event.

## IV.    Restructuring of Debt and Equity of the Company – New Equity, Debt Forgiveness, & Cash Pay Downs

### A.    *Debt Restructurings*

If the Plan Sponsors are the winning bidders at the auction, our Commitment for the Plan Sponsors' stalking horse bid contemplates a restructuring implemented through the Plan whereby the current Fixed/Floating Debtors' debt holders will realize value totaling $889.9 million (including the $3 million payment in connection with the Special Servicer's release of Apollo as described below) or 71% of their $1,242.1 million current outstanding obligations. The Fixed/Floating Debtors' creditor treatment is being implemented through $622.5 million in new debt, $348.2 million in equity and cash, $5.5 million of cash consideration for existing guarantees and servicing fees paid on behalf of the C6 and C7 Trusts and $3.75 million ($375,000 of which shall come from Apollo) in cash to fund certain creditor payments. The new debt also benefits from a capital structure supported by approximately 35.9% in equity value.

An illustration and an explanation of the Plan Sponsors' stalking horse bid and the resultant Fixed/Floating Debtors' creditor treatment under the Plan if the Plan Sponsors' stalking horse bid is the winning bid are detailed in Appendix A.

### B.  *Cash Sources & Uses*

Our Commitment contemplates that the cash investment of $174.1 million will be used as follows:
- o  Repayment of the Lehman and Five Mile DIP (as they relate to the Fixed/Floating Debtors) in the amount of up to $64.1 million plus any accrued fees or interest due on such facility;
- o  Payment of $3 million to the Special Servicer in connection with the treatment of the Fixed Rate CMBS Mortgage Loan;
- o  Payment of fees to the Special Servicer of the Fixed Rate CMBS Mortgage Loan equal to $2.5 million as consideration for effecting the restructuring transactions on behalf of the LBUBS 2006-C6 and LBUBS 2006-C7 trusts (the "C6 and C7 Trusts");
- o  $74.9 million of cash to cover 2011 FF&E and future PIP work (currently estimated at approximately $22.8 million and to be verified by the parties), funding of additional cash on the post-Effective Date balance sheet, and closing and emergence costs;

5

FIVE MILE CAPITAL PARTNERS LLC

- o  Payment of $3.75 million ($375,000 of which shall come from Apollo) for the various classes of unsecured creditors; and
- o  $26.2 million in cash as the Lehman Payment.[1]

## C. Our Stalking Horse Bid and Resultant Treatment of Claims and Interests

The Amended Debtor Commitment and the Plan Sponsors' stalking horse bid is comprised of the following treatment of claims and interests:

1.  <u>Fixed Rate CMBS Mortgage Loan:</u> Reduction of the outstanding balance to $622.5 million.

    a.  Non-Recourse New Mortgage Loan of $622.5 million shall have the following terms:
        i.   No change to the interest rate of 6.71%;
        ii.  No change to maturity date of July 9, 2017;
        iii. During the first 48 months after the Effective Date, interest only will be payable monthly and amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; and
        iv.  Prepayment shall be permitted at par without penalty and defeasance requirements will be waived; and
    b.  Property release provision whereby the properties may be released at 108% of the new allocated loan amount, so long as the debt service coverage ratio thereunder, after giving effect to such release, is no worse than such ratio prior to such release or if the foregoing is not consistent with the then applicable REMIC rules and regulations such other provision that is acceptable to the Company and you which is consistent with then applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement.  Notwithstanding anything to the contrary, any property release contemplated herein can only be effected in accordance with applicable REMIC rules and regulations, the grantor trust rules and regulations and the pooling and servicing agreement;
    c.  The Plan shall provide that the Special Servicer, on behalf of the C6 and C7 Trusts, shall (i) settle, release, and waive all of the Special Servicer's claims against Apollo Investment Corporation ("Apollo"), related in any way to that certain Required Capital Improvements Guaranty executed by Apollo on June 29, 2007 (the "Apollo Guaranty") and (ii) if an action remains pending in the State Courts of New York or elsewhere, the Special Servicer shall dismiss its claims against Apollo with prejudice.  The effectiveness of such settlement, release, and waiver is conditioned on the receipt by Special Servicer of indefeasible payment as provided in the next sentence and shall be embodied in, and shall not be effective unless and until, the Global Release (as defined herein) has been

---

[1]    Subject to adjustment based on participation in the Third-Party Investment.  For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment), then the cash payment to Lehman would be $61.0 million.  Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

6

FIVE MILE CAPITAL PARTNERS LLC

embodied in an order entered in the Innkeepers Bankruptcy Court that has become final and become non-appealable. Immediately after the Effective Date, the Plan Sponsors will direct New HoldCo to make a cash payment of $3 million to Special Servicer, on behalf of the C6 and C7 Trusts, as settlement of Special Servicer's claims against Apollo with respect to the Apollo Guaranty, which have been the subject of litigation pending in New York Supreme Court. The settlement, release, and waiver shall be embodied in the Global Release in the Plan and shall be in form and substance reasonably satisfactory to Special Servicer and the form of release and waiver shall be in form and substance reasonably satisfactory to Apollo and conditioned on the above-described payment and the occurrence of the Effective Date;

    d. Contemporaneously with the occurrence of the Effective Date, and as a condition thereto, the Plan Sponsors will direct New HoldCo to make a cash payment of a $2.5 million fee to the Special Servicer as consideration for effecting the restructuring of the Fixed Rate Mortgage Loan on behalf of the C6 and C7 Trusts contemplated herein. In addition, Special Servicer shall continue to be entitled to collect any and all monthly or periodic fees and other compensation payable to it under the pooling and servicing agreement, including, without limitation, any monthly or periodic workout fee payable in connection with the restructuring of the Fixed Rate Mortgage Loan contemplated herein and same becoming a "corrected mortgage loan" except for the portion of such workout fee that would be payable in connection with the final principal payment of the Fixed Rate Mortgage Loan at the maturity date or upon the earlier prepayment of same. For purposes of clarification, the preceding sentence does not create any additional obligation or otherwise modify the obligations, if any, of the Fixed/Floating Debtors, the reorganized Fixed/Floating Debtors or New HoldCo to pay any of such fees or other compensation or any other amounts under the Fixed Rate CMBS Mortgage loan documents, including the appropriate review fee to be set forth in the definitive documentation as set forth in the second paragraph of Section II herein; and

    e. The lender under the Fixed Rate CMBS Mortgage Loan will receive the FM Guaranty and the Parent Guaranty.

2.    <u>Floating Rate Mortgage Loan</u>: Lehman, in full and final satisfaction of all of its claims arising under or in connection with the Floating Rate Mortgage Loan will receive: (a) 50.0% of the New Equity and (b) $26.2 million in cash, subject, in each case, to adjustment for the Third-Party Investment.

3.    <u>Additional Treatment for the Following Accepting Classes</u>: Following the approval of the disclosure statement by the Innkeepers Bankruptcy Court and the solicitation of votes in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, they shall receive the following treatment:

    a. <u>Floating Rate Mezzanine Loan (TriMont as special servicer)</u>: SASCO 2008-C2, LLC, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool, serviced by TriMont Real Estate Advisors, Inc. as special servicer, shall receive a structured note or other debt or equity instrument or other consideration on terms to be

7

agreed upon between the Plan Sponsors and the Fixed/Floating Debtors; provided that it votes to accept and otherwise supports the Plan.

b.  Unsecured Debt:  Cash (of which Apollo Investment Corporation will fund $375,000, subject to receipt of each of the releases described below) in the amount of the lesser of $3.75 million and 65% of the face amount of the general unsecured claims against the Fixed/Floating Debtors (excluding any deficiency claims) that are not otherwise paid pursuant to a "first day" order (the "Unsecured Claims") shall be available for distribution to the holders of Unsecured Claims (the "Unsecured Claims Fund"); further, the Fixed/Floating Debtors shall release and waive all preferences under section 547 of the Bankruptcy Code and, to the extent related thereto, section 550 of the Bankruptcy Code.

4.  Existing Equity of the Fixed/Floating Debtors and Issuance of New Equity:  Holders of common, preferred, and any other equity interests in the Fixed/Floating Debtors shall receive no distributions under the Plan on account of such interests.  An entity that is newly formed by the Plan Sponsors ("New HoldCo") will acquire 100% of the indirect and direct equity of reorganized Grand Prix Mezz Borrower Fixed, LLC, reorganized Grand Prix Mezz Borrower Floating, LLC, reorganized Grand Prix Fixed Lessee, LLC, and Grand Prix Floating Lessee, LLC, and such other assets as may be subsequently identified as necessary to the operation of the Fixed/Floating Debtors provided, however, that no assets of the Excluded Debtors[2] (defined below), including, without limitation, cash or cash equivalents, shall be included in the transaction contemplated by the Transaction. New HoldCo will issue equity (the "New Equity") as set forth below upon the Effective Date.  The ultimate corporate structure for the reorganized Fixed/Floating Debtors shall be determined prior to the Effective Date of the Plan, by the Plan Sponsors in their sole discretion (and consistent with this Second Amended Commitment Letter) and will be described in a plan supplement document to be filed no later than ten (10) days before the scheduled date for the confirmation hearing for the Plan.

5.  Application of Existing Cash on the Effective Date:  The Company shall seek to amend the Final Cash Collateral Order, with the support of Lehman and the Special Servicer, to increase the amount of cash that may be held back as an expense reserve to $14.9 million in order to account for certain closing and emergence costs of the Fixed/Floating Debtors, including potential success fees, in substantially the form attached as Appendix C to the Amended Debtor Commitment.  Special Servicer and Five Mile agree that any cash at the Company that is the property of the Fixed/Floating Debtors or as of the Effective Date that is subject to application for disbursement, payment, repayment, or distribution for the Fixed/Floating Debtors under the Final Cash Collateral Order, whether or not applied prior to the Effective Date, shall be applied to satisfy

---

[2] Excluded Debtors shall mean "the Innkeepers debtors other than the Fixed/Floating Debtors." The Excluded Debtors are excluded from the Transaction, and the Plan Sponsors will not be the stalking horse for the Excluded Debtors or their assets.  The Company may continue to market the assets of the Excluded Debtors independently from the assets of the Fixed/Floating Debtors.

FIVE MILE CAPITAL PARTNERS LLC

administrative claims incurred but unpaid as of the Effective Date and to consummate the transaction contemplated herein pursuant to the waterfall set forth in the Final Cash Collateral Order (as shall be amended to increase the amount of cash held back as an expense reserve, in order to account for certain closing and emergence costs, including potential success fees). After the Effective Date, cash will be administered and applied pursuant to the applicable cash management procedures under the applicable loan documents, and the waterfall set forth in the Final Cash Collateral Order will no longer govern.

## V.     Offer Structure and Protections

The Company will solicit higher and better offers for 100% of the New Equity to be issued pursuant to the Plan through an auction (the "Auction") on the terms set forth herein. We require that there be an Auction of the Fixed/Floating Debtors on an enterprise basis where the Plan Sponsors will be the stalking horse bidder at the Auction with initial stalking horse bids to be as described herein and in the Amended Debtor Commitment and bid protections set forth below. To that end, we require the Bankruptcy Court's entry of an order (the "Bid Procedures Order") approving bid procedures (the "Bid Procedures") which include the following terms:

- Bids will be solicited for up to forty-five (45) calendar days following the date of the entry of the Bid Procedures Order and the Auction shall commence no later than 50 days following the date of the entry of the Bid Procedures Order.

- Bids, to be deemed a qualified bid and eligible to participate in the Auction, must be accompanied by a cash deposit in the amount of $20 million to an interest bearing escrow account to be identified, established, and held by and in the name of the Company;

- Bidders must be qualified on terms reasonably acceptable to the Company after consultation with the Special Servicer and the Creditors' Committee, which consultation shall include, subject to confidentiality agreements reasonably acceptable to the Company and the Special Servicer and the Creditors' Committee, disclosure of the bidders, their qualifications, and their bids;

- All bids and overbids, to be deemed a qualified bid and eligible to participate in the Auction, and whether made prior to or at the Auction, must be enterprise bids for all of and only the assets of the Floating Rate Debtors and the Fixed Rate Debtors and either be (i) comprised entirely of cash or (ii) based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A, on terms substantially similar to those provided herein (including but not limited to the guarantees provided to Special Servicer and the other terms, conditions, and treatment as set forth herein);

- The initial Overbid of the implied value must be at least $15 million higher (in cash and inclusive of the Stalking Horse Fee (as defined below)) than the implied value of the Plan Sponsors' Bid and based on the debt and capital structure and sources and uses of funds outlined herein and in Appendix A (the "Initial Minimum Overbid"), and subsequent bids must be in increments of at least $5 million and based on the debt and capital structure and sources and uses of funds

9

outlined herein and in Appendix A (each qualifying initial and subsequent overbid, an "Overbid");[3]

- The percentage increase in the implied enterprise value of the winning bidder will be allocated to each collateral pool (the "Overbid Allocation") by increasing the debt or cash consideration that such collateral pool is receiving under the Plan in proportion to the incremental Overbid amount (e.g., if a collateral pool is receiving a new mortgage under the Plan in the face amount of $100, then a winning Overbid that is 4% greater than the Plan Sponsors' Bid would result in that collateral pool receiving a mortgage in the face amount of $104; the same would apply to cash consideration); provided, however, that the amount of the incremental Overbid consideration not allocated to collateral pools under the Overbid Allocation shall be allocated to each collateral pool pro rata based on the respective percentage of consideration value allocated to each of the respective collateral pools against which such respective collateral pool has a claim or from which it is entitled to payment and such non-allocated amount shall flow through the Company's corporate and debt and equity structure for purposes of payment satisfying prepetition claims and interests and determining the ultimate recipients of such Overbid; provided, further, however, that to the extent any winning Overbid includes debt consideration to the Special Servicer in excess of the amounts provided in Appendix A, such additional debt shall be valued based on a net present value analysis using an 8% discount rate (the mechanics of such valuation to be agreed upon between the Plan Sponsors, Special Servicer, and the Company);

- In the event the winning bidder is not the Plan Sponsors (which includes any wholly-owned subsidiary of Five Mile), the Floating Rate Mortgage Loan shall be repaid in cash in an amount determined in accordance with the Overbid Allocation (assuming an allocation of $200.3 million of value to the Floating Rate Mortgage Loan in the Plan Sponsors' Bid);

- In the event that the application of the Overbid Allocation would cause any prepetition holder's recovery to exceed such holder's allowed claim, then such amount will be capped by the amount of the allowed claim and any excess Overbid Allocation will be allocated through and in accordance with the corporate and debt and equity structure for purposes of determining the ultimate recipients of such Overbid value;

- The determination of the winning bidder at the Auction shall be made by the Company only after consulting with the Special Servicer relating to the Bids made at the Auction;

- To be deemed a qualified bid and eligible to participate in the Auction, the equity consideration of such bid must have a value of at least $363.2 million (comprised of the $348.2 million equity value as set forth herein and $15 million on account of the Initial Minimum Overbid) to be used for, among other things, the following on the Effective Date: (a) $46.6 million in cash to satisfy claims on account of the Five Mile DIP; (b) $17.5 million in cash to satisfy claims on account of the Solar DIP; (c) at least $22.8 million in cash to fund future property improvement plan work and furniture, fixtures, and equipment reserves; (d) at least $10 million in cash to pay all

---

[3]    Note that the Midland Financing shall be no more than $622.5 million plus 70% of the Overbid amount (minus $15 million).

FIVE MILE CAPITAL PARTNERS LLC

administrative and other claims and expenses not paid pursuant to the Final Cash Collateral Order (as to be amended as set forth below) [Docket No. 402] that are necessary for the Fixed/Floating Debtors to emerge from bankruptcy;4 (e) at least $41.6 million in cash for New HoldCo; (f) with respect only to qualified bids other than the Amended Debtor Commitment and this Second Amended Commitment Letter, at least $200.3 million in cash to pay Lehman's claims against the Fixed/Floating Debtors (plus any applicable Overbid Allocation); and (g) to the extent the bid is submitted by a competing bidder, $10 million in cash to satisfy the $7.0 million Break-Up Fee and the up to $3.0 million Expense Reimbursement; and

- A bid submitted by or through a holder of a secured claim against the Company shall not be deemed a qualified bid and eligible to participate in the Auction if the bid contemplates the ability of secured creditors to credit bid their claims against the Company within the meaning of sections 363(k) or 1129(b)(2)(A)(ii) of the Bankruptcy Code; provided that all rights with respect to a creditor's ability to credit bid under both applicable non-bankruptcy and bankruptcy law are expressly reserved to the extent that (i) the auction process contemplated in the Bid Procedures is terminated or abandoned, (ii) the Special Servicer is no longer obligated to support this Term Sheet or the New Party/Midland Commitment (as defined in, and attached as Exhibit C to, the Bid Procedures Motion), (iii) Lehman terminates the Amended Debtor Commitment, (iv) the Plan is not confirmed, or (v) the Effective Date shall not have occurred by September 15, 2011.

The Bid Procedures Order will provide that, to the extent the Amended Debtor Commitment has not terminated as a result of a Plan Sponsor Breach (as defined in the Amended Debtor Commitment), in the event of (i) an Overbid in which Plan Sponsors' Bid is not the winning bid (an "Overbid Transaction") or (ii) the Company's execution of an agreement to pursue an alternative transaction for any of the assets of the Fixed/Floating Debtors after entry of the Bid Procedures Order (the "Alternative Transaction"), the Plan Sponsors will receive a breakup fee in the amount of $7 million (the "Break-Up Fee") plus reimbursement of all of Five Mile's reasonable and documented fees and expenses, not to exceed $3 million (the "Expense Reimbursement" and together with the Break-Up Fee, the "Stalking Horse Fee"). Twenty-five percent (25%) of the Break-Up Fee may be allocated to Lehman as consideration for Lehman's agreement to fund a portion of the capital necessary for the Fixed/Floating Debtors to emerge from bankruptcy, as has been mutually agreed between Lehman and Five Mile, with the remainder allocated to Five Mile. Other than terminating their obligations in accordance with this Second Amended Commitment Letter and the Amended Debtor Commitment, the Plan Sponsors' sole remedy at law and in equity against the Company in the event of an Overbid Transaction or Alternative Transaction shall be receipt of the Break-Up Fee and Expense Reimbursement as liquidated damages, provided, however, that (i) nothing in the Amended Debtor Commitment shall limit any rights and remedies at law or in equity that the Plan Sponsors have or may have as creditors of the Company and (ii) if there is a material breach by the Company of the Amended Debtor Commitment or the Term Sheet that results in a termination of the Amended Debtor Commitment, and provided the Plan Sponsors are not entitled to the Stalking Horse Fee, the Plan Sponsors' damages for such material breach shall be capped at $10 million.

---

4       For the avoidance of doubt, to the extent the Fixed/Floating Debtors incur administrative expense claims in excess of the $10 million estimate, the Successful Bidder (as defined below) shall be required to fund such amounts.

FIVE MILE CAPITAL PARTNERS LLC

The Stalking Horse Fee, if any, shall be payable by the Fixed/Floating Debtors upon the earlier of (i) the Effective Date and (ii) consummation of an Alternative Transaction.

The Company will file the Plan, a disclosure statement for the Plan ("Disclosure Statement"), and request a hearing for approval of the Disclosure Statement and seek confirmation of the Plan.

Each of the foregoing and subsequent pleadings (including the Bid Procedures Order) shall be acceptable in all respects to the Plan Sponsors and the Special Servicer in each of their respective reasonable discretion.

Special Servicer confirms that, other than the sale of equity interests in New HoldCo, the Plan will not contemplate or provide for a sale of the Company or any of its assets pursuant to section 1129(b)(2)(a)(ii) or (iii) or section 363 of the Bankruptcy Code.[5]  As such, no holder of a lien on any asset of the Company shall be permitted to credit bid its claim as part of the Plan.

If the Company seeks an order requesting authority from the Innkeepers Bankruptcy Court to reimburse the reasonable and documented expenses of "Bidder D", incurred prior to December 15, 2010, in an amount not greater than $500,000, provided that the Break-Up Fee and Expense Reimbursement have been approved by the Innkeepers Bankruptcy Court, Five Mile and Special Servicer confirm that they shall not object to such request and to the payment of such expenses by the Company at the conclusion of the Auction, so long as Bidder D is not the successful winning bidder at the Auction.

## VI.    Strength of the Stalking Horse Bid and the Proposed Plan

We believe the Transaction and the Plan (consistent with the terms of this Second Amended Commitment Letter and the Amended Debtor Commitment) is beneficial to all creditors and is in the best interests of the Company and its bankruptcy estates. The Plan values the Fixed/Floating Debtors at $970.7 million and the current debt is reduced through debt forgiveness, pay down and equity conversion post-confirmation to approximately $622.5 million.  Further, there is high certainty and low execution risk with the Plan, financed by our Commitment, as it will provide for the exit financing component critical to the success and emergence of Innkeepers from bankruptcy. There is no due diligence condition.

We believe the Plan also provides additional stability for the Fixed/Floating Debtors by providing adequate cash to pay exit costs, fund $7.8 million of FF&E reserve contribution for the first year of the restructured Fixed Rate CMBS Mortgage Loan (which funds shall be held by the Master Servicer of the Fixed Rate CMBS Mortgage Loan), and provide general cash liquidity to be held at New

---

[5]        The Parties acknowledge that all rights with respect to a creditor's ability to credit bid under both applicable nonbankruptcy and bankruptcy law are expressly reserved to the extent that (a) the auction process contemplated in the Bid Procedures is terminated or abandoned, (b) Special Servicer is no longer obligated to support the Term Sheet attached to the Amended Debtor Commitment or the Amended and Restated Agreement Relating to Midland Commitment to Support Amended Debtor Commitment with New Party under Certain Circumstances dated as of March 9, 2011 by and among Grand Prix Holdings, LLC, Innkeepers USA Trust and Special Servicer, (c) Lehman terminates the Amended Debtor Commitment, (d) the plan of reorganization that encompasses the provisions provided for herein or the winning Bid through the auction process described in (a) is not confirmed, or (e) Effective Date shall not have occurred by September 15, 2011.

HoldCo (includes amounts for future PIPs) to manage seasonality within the business, cover operating or interest shortfalls should they occur, and provide funds to pay administrative and priority expenses upon emergence.

Further, the Plan shall include a mutual full discharge, release and exculpation of liability, and injunction (the "Global Release"), to the maximum extent of applicable law, other than a release of the obligations undertaken herein and in the Plan and other Transaction documents, by and among (each against one another) the Fixed/Floating Debtors, the Plan Sponsors, Special Servicer, (including the master servicer for the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts and trustees), Apollo, and other holders of claims against and interests in the Fixed/Floating Debtors, each of their respective predecessors, successors and assigns, shareholders, affiliates, subsidiaries, principals, employees, agents, officers and directors, trustees, members, master servicers, special servicers, trusts and trustees, and professionals (including the officers, directors, members and trustees of the Parent Companies,[6] in their capacities as such) from the following: (i) any and all claims and causes of action relating to the Fixed/Floating Debtors arising prior to the Effective Date, and in connection therewith, shall confirm and adjudicate the validity, enforceability and perfection, in all respects, of the liens, claims, interests, mortgages and encumbrances of the Fixed Rate Mortgage Loan, the C6 and the C7 Trusts; and (ii) any and all claims arising from the actions taken or not taken in good faith in connection with the Transaction and the Chapter 11 cases; provided, however, Island Hospitality Management, Inc. shall not be entitled to a release unless it reasonably cooperates with Plan Sponsors, New HoldCo, and the new manager. It is expressly understood and agreed, that notwithstanding anything otherwise contained herein or in the Amended Debtor Commitment, the (i) releases of Apollo and the stipulation of discontinuance of the Apollo Guaranty litigation and (ii) the waivers and releases to be given by Apollo that are described herein shall not be effective until the Special Servicer has received the $3 million cash payment provided for herein and the occurrence of the Effective Date, which shall include that the Global Release has been embodied in the order confirming the Plan as entered in the Innkeepers Bankruptcy Court that has become final and become non-appealable.

We are ready to move forward and have all the resources, including available funds, to conclude the transactions outlined in this Second Amended Commitment Letter and the Amended Debtor Commitment.

## VII.   Special Servicer Covenants

The Company, Lehman, Five Mile Pooling and the Special Servicer have entered into the Amended Debtor Commitment whereby the Company has agreed to prosecute the Plan described herein. The Special Servicer by virtue of its execution of the Amended Debtor Commitment intends to proceed and perform its undertakings contained therein. For as long as no Termination Event has occurred under the Amended Debtor Commitment, and no Termination Event has occurred hereunder, the Special Servicer hereby covenants to support the provisions of the Term Sheet (the "Term Sheet") as provided for therein, which is included in the Amended Debtor Commitment (including the Plan, Transaction, Auction, and the Bid Procedures Order, each as set forth in the Term Sheet).

---

[6] Parent Companies shall mean "Grand Prix Holdings LLC, Innkeepers USA Trust, Innkeepers Financial Corporation, and Innkeepers USA Limited Partnership."

## VIII.   Termination of Commitment

This Second Amended Commitment Letter outlines only some of the essential terms regarding the proposed Transaction, is not all-inclusive and does not purport to summarize or contain all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation for the Transaction.

This Second Amended Commitment Letter shall terminate and be of no further force or effect, and we and you shall no longer be obligated with respect to this Commitment and other agreements set forth herein (including, without limitation, our agreement with respect to Alternate Transactions set forth in Section III hereof), upon the earliest to occur of the following (each, a "Termination Event") and notice from the party with the right to terminate as set forth below:

1.   the failure to occur on or before the stated deadline of any of the following with respect to the Plan (the "Target Dates"):

   a.   the Bid Procedures (including the Break-up Fee and the Expense Reimbursement) have not been approved by the Innkeepers Bankruptcy Court as of March 31, 2011;

   b.   the Plan has not been confirmed by the Innkeepers Bankruptcy Court pursuant to an order of the Innkeepers Bankruptcy Court by June 30, 2011; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

   c.   the Plan and Disclosure Statement have not been filed by April 9, 2011; and

   d.   the Effective Date has not occurred and/or all of the transactions contemplated under the Plan and this Second Amended Commitment Letter have not been closed and consummated as contemplated thereunder, all on or before September 14, 2011 (the "Outside Date"); provided further, unless otherwise agreed by each of the Fixed/Floating Debtors, the Plan Sponsors, and the Special Servicer in writing, that upon the occurrence of this Termination Event, the Second Amended Commitment Letter shall automatically terminate and be of no further force or effect and the order confirming the Plan will provide that both confirmation and the confirmation order will be automatically revoked (with a reversion to the *status quo ante*) on September 15, 2011;

2.   the occurrence of any condition, change or development that could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent), operations, condition (financial or otherwise) or prospects of the Fixed/Floating Debtors taken as a whole with such Termination Event exercisable only by Five Mile; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

3.   failure to execute, deliver or obtain all related documents (including customary representations, warranties, covenants, conditions, opinions, including an opinion by Special Servicer's REMIC counsel with respect to the structure of the contemplated transaction, corporate and other governance documents and indemnities) and rating agency confirmations necessary to effectuate i) the Transaction with respect to the Fixed Rate CMBS Mortgage Loan or otherwise affecting the treatment, including the economics thereof, in each case in form and substance satisfactory to Special Servicer and Five Mile in our reasonable discretions and ii) the

FIVE MILE CAPITAL PARTNERS LLC

Transaction in each case in form and substance satisfactory to Five Mile in each of our reasonable discretion; provided, however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

4.  any material breach by Special Servicer or Five Mile of, or material, non-compliance with, the agreements set forth in this Second Amended Commitment Letter;

5.  mutual agreement of Special Servicer and Five Mile to terminate this Second Amended Commitment Letter;

6.  termination (other than by expiration of the term in the normal course) or rejection of any franchise agreement deemed necessary by the Plan Sponsors or Special Servicer prior to the Effective Date without the Plan Sponsors and Special Servicer's written approval with respect to the assets of the Fixed/Floating Debtors; provided, however, this shall not be a termination event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment, including the economics thereof, of the Fixed Rate CMBS Mortgage Loan; provided, further however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

7.  failure by Company to assume and, if necessary, assign all franchise agreements pursuant to an order of the Court satisfactory to the Plan Sponsors or the Special Servicer in all material respects on or before the Effective Date with respect to the assets of the Fixed/Floating Debtors; provided, however, this shall not be a termination event if the Plan Sponsors elect to pursue the transaction contemplated herein with no modifications to the treatment, including the economics thereof, of the Fixed Rate CMBS Mortgage Loan; provided, further however, that this Termination Event shall not apply to the Chapter 11 case of Grand Prix West Palm Beach LLC;

8.  immediately on or prior to the hearing on the Bidding Procedures (as defined in the Amended Debtor Commitment), failure by the Plan Sponsors to identify a list of property managers reasonably acceptable to Special Servicer and Five Mile in all material respects for the management of the hotels;

9.  prior to the Effective Date, the change of any of the Super Majority Decisions and/or voting requirements for Super Majority Decisions as established in the Lehman Commitment;

10.  the occurrence of any termination event under the Lehman Commitment;

11.  the occurrence of any termination event under the Amended Debtor Commitment.

Time is of the essence with respect to the Termination Events.

## IX.    Miscellaneous

All notices, requests, claims, demands and other communications hereunder shall be given (and shall be deemed to have been duly received if given) by hand delivery in writing or by facsimile transmission with confirmation of receipt, as follows:

15

FIVE MILE CAPITAL PARTNERS LLC

if to Five Mile:

Three Stamford Plaza
301 Tresser Boulevard, Ninth Floor
Stamford, CT 06901
Attention: James G. Glasgow, Jr.
Email: jglasgow@fivemilecapital.com
Facsimile: (203) 905-0954

With a copy to:

Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
Attention: Adam L. Shiff
Email: ashiff@kasowitz.com
Facsimile: (212) 506-1000

if to Special Servicer:

Midland Loan Services, a division of PNC Bank, National
  Association
10851 Mastin, 6th Floor
Overland Park, KS 66210
Attention: Kevin S. Semon
Email: kevin.semon@midlandls.com
Facsimile: (913) 253-9723

With a copy to:

Haynes and Boone, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
Attention: Lenard M. Parkins and Lawrence Mittman
Email: lenard.parkins@haynesboone.com
        lawrence.mittman@haynesboone.com
Facsimile: (212) 884-8226
          (212) 884-8219


This Second Amended Commitment Letter, the rights of the parties, and all actions arising in whole or part under or in connection herewith will be governed by and construed in accordance with the laws of the State of New York.

This Second Amended Commitment Letter constitutes the entire agreement between the parties and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, between you (or the Company), on the one hand, and us, on the other hand. No material modification or waiver of any provision hereof shall be enforceable

FIVE MILE CAPITAL PARTNERS LLC

unless approved by you and us in writing. Neither you, on the one hand, nor us, on the other hand, is relying upon any statement or representation made by or on behalf of the other, except as expressly provided in this Second Amended Commitment Letter. This Amended Commitment Letter shall not be assignable by any party hereto without the prior written consent of the other party hereto (and any attempted assignment without such consent shall be null and void ab initio).

We are prepared to enter into a transaction on the terms set forth herein. Upon receipt of a fully executed counterpart to this Second Amended Commitment Letter, both parties agree to negotiate in good faith regarding the implementation of the Transaction contemplated in this Second Amended Commitment Letter, including engaging in the preparation and negotiation of definitive documents, and Special Servicer agrees to move forward with its undertakings described in Section VII herein.

Remainder of Page Intentionally Blank
Signature Pages to Follow

NOT A SOLICITATION OF VOTES ON A PLAN
Subject to FRE 408
Subject to Joint Interest Agreement

FIVE MILE CAPITAL PARTNERS

# FIVE
## MILE

THREE STAMFORD PLAZA, 9TH FLOOR
STAMFORD, CONNECTICUT 06901
TELEPHONE 203-905-0950
FACSIMILE 203-905-0954

Should you have any questions regarding this Amended Commitment Letter, please do not hesitate to contact James Glasgow (jglasgow@fmcp.com) or Al Nickerson (anickerson@fmcp.com) at (203) 905-0950.

Sincerely yours,

**Five Mile Capital II Pooling REIT LLC,**

By:    Five Mile Capital Partners LLC,
       its manager

By: _____
       Almond L. Nickerson III
       **Managing Director**

FIVE MILE CAPITAL PARTNERS LLC

Acknowledged and Agreed:

**Midland Loan Services, a division of PNC Bank, National Association,**
as Special Servicer for U.S. Bank, National Association as Trustee for the Registered
Holders of LB-UBS Commercial Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through
Certificates successor trustee to Bank of America National Association

By: _____

Name:

Title:

Kevin C. Donahue
Senior Vice President
Servicing Officer

<u>**EXHIBIT A**</u>

### FIXED/FLOATING DEBTORS

The "Floating Rate Debtors" are Grand Prix Atlantic City LLC; Grand Prix Montvale LLC; Grand Prix Ft. Wayne LLC; Grand Prix Grand Rapids LLC; Grand Prix Harrisburg LLC; Grand Prix Ontario LLC; Grand Prix Troy (Central) LLC; Grand Prix Troy (SE) LLC; KPA/GP Valencia LLC; Grand Prix Albany LLC; Grand Prix Woburn LLC; KPA/GP Louisville (HI) LLC; KPA/GP Ft. Walton LLC; Grand Prix Rockville LLC; Grand Prix Morristown LLC; Grand Prix Addison (SS) LLC; Grand Prix Bulfinch LLC; Grand Prix East Lansing LLC; Grand Prix Indianapolis LLC, and Grand Prix West Palm Beach, LLC.

The "Fixed Rate Debtors" are Grand Prix Ft. Lauderdale LLC; Grand Prix Addison (RI) LLC; Grand Prix Altamonte LLC; Grand Prix Arlington LLC; Grand Prix Atlanta (Peachtree Corners) LLC; Grand Prix Atlanta LLC; Grand Prix Bellevue LLC; Grand Prix Binghamton LLC; Grand Prix Bothell LLC; Grand Prix Campbell / San Jose LLC; Grand Prix Cherry Hill LLC; Grand Prix Chicago LLC; Grand Prix Denver LLC; Grand Prix Englewood / Denver South LLC; Grand Prix Fremont LLC; Grand Prix Gaithersburg LLC; Grand Prix Lexington LLC; Grand Prix Livonia LLC; Grand Prix Louisville (RI) LLC; Grand Prix Lynnwood LLC; Grand Prix Mountain View LLC; Grand Prix Portland LLC; Grand Prix Richmond LLC; Grand Prix Richmond (Northwest) LLC; Grand Prix Saddle River LLC; Grand Prix San Jose LLC; Grand Prix San Mateo LLC; Grand Prix Shelton LLC; Grand Prix Sili I LLC; Grand Prix Sili II LLC; Grand Prix Tukwila LLC; Grand Prix Windsor LLC; Grand Prix Horsham LLC; Grand Prix Columbia LLC; Grand Prix Germantown LLC; Grand Prix Islandia LLC; Grand Prix Lombard LLC; Grand Prix Naples LLC; Grand Prix Schaumburg LLC; Grand Prix Westchester LLC; Grand Prix Willow Grove LLC; Grand Prix Belmont LLC; Grand Prix El Segundo LLC; Grand Prix Las Colinas LLC; and Grand Prix Mt. Laurel LLC.

The "Other Plan Debtors" are Grand Prix Floating Lessee LLC; Grand Prix Fixed Lessee LLC; Grand Prix Mezz Borrower Floating, LLC; Grand Prix Mezz Borrower Floating 2, LLC; and Grand Prix Mezz Borrower Fixed, LLC.

The **"Fixed/Floating Debtors"** are the **Floating Rate Debtors**, the **Fixed Rate Debtors**, and the **Other Plan Debtors**. The Fixed/Floating Debtors own and/or operate the assets that serve as collateral for the Floating Rate Mortgage Loan and the Fixed Rate Mortgage Loan.

APPENDIX A[7]

| PRO FORMA CAPITALIZATION | | | | | |
|---|---|---|---|---|---|
| ($ in millions) | | | | | |
| **DEBT** | Current Principal Balance[(a)] | Debt Impairment | Adjusted Balance | Pay Down/ Conversion | Pro Forma Principal Balance |
| Five Mile Fixed Pool DIP Loan | $46.6 | $0.0 | $46.6 | ($46.6) | $0.0 |
| Lehman DIP Loan[(b)] | 17.5 | 0.0 | 17.5 | (17.5) | 0.0 |
| Fixed Pool Mortgage[(c)] | 825.4 | (202.9) | 622.5 | 0.0 | 622.5 |
| Floating Pool Loan | | | | | |
| Mortgage | 220.2 | (19.9) | 200.3 | (200.3) | 0.0 |
| Mezzanine (PIK interest) | 132.4 | (132.4) | 0.0 | 0.0 | 0.0 |
| Total | 352.6 | (152.3) | 200.3 | (200.3) | 0.0 |
| **Total Debt** | **$1,242.1** | **($355.2)** | **$886.9** | **($264.4)** | **$622.5** |
| **Implied Equity** | **$0.0** | | | | **$348.2** |
| **Total Capitalization** | **$1,242.1** | | | | **$970.7** |

Note: All numbers are rounded to a single decimal place.

(a)   Current Principal Balance represents principal balance as of the date the Company filed for Chapter 11 and does not include any accrued or unpaid interest, default interest, or other fees and charges.

(b)   Assumes DIP financing facility is fully drawn.

(c)   A new, non-recourse note having the following terms: (i) the same maturity (July 9, 2017) and interest rate (6.71%) as under the existing loan; (ii) interest-only during the first 48 months after the Effective Date, amortization will begin 48 months after the Effective Date and will be based on a 30-year amortization schedule; (iii) prepayment permitted at par without penalty, defeasance requirements will be waived.

---

[7]      Appendix A (and all of the statements contained herein) is proffered in the nature of a settlement proposal in furtherance of settlement discussions, and is intended to be entitled to the protection of Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions, and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

## ILLUSTRATIVE SOURCES AND USES SCHEDULE

($ in millions)

| Sources | | Uses | |
|---|---|---|---|
| New Cash[a] | $174.1 | Lehman Mortgage Payment[a] | $26.2 |
| Apollo Contribution | 0.4 | Repayment of Solar DIP Financing | 17.5 |
| | | Repayment of Five Mile DIP Financing | 46.6 |
| | | Unsecured Creditors Payment | 3.8 |
| | | Apollo Guaranty Settlement | 3.0 |
| | | Special Servicer Cash Payment | 2.5 |
| | | Balance Sheet Cash[b] | 74.9 |
| **Total** | **$174.5** | | **$174.5** |

Note: All numbers are rounded to a single decimal place.

(a)    Subject to adjustment based on participation in the Third-Party Investment. For example, if Lehman were to own 40% of the New Equity (i.e., assuming 20% of the New Equity is sold pursuant to the Third-Party Investment), then the cash payment to Lehman would be $61.0 million. Accordingly, in this example, the "New Cash" would increase by $34.8 million to a total of $208.9 million.

(b)    Balance sheet cash to be used for, among other purposes, the funding of $22.8 million of FF&E, PIP and working capital reserves, the potential $500,000 payment to Bidder D and closing costs (currently estimated to be approximately $10 million). Insofar as any of these costs are not realized in their full amounts, the balance sheet cash shall stay with the New Holdco.