1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP)

5

6    - - - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    LEHMAN BROTHERS HOLDINGS INC., et al.

10

11              Debtors.

12

13   - - - - - - - - - - - - - - - - - - - - - -x

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              March 23, 2011

19              10:08 AM

20

21   B E F O R E:

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    HEARING re Debtors' Motion for an Order Modifying the Automatic

3    Stay to Allow Settlement Payments Under 2007-2008 Directors and

4    Officers Insurance Policy by Zurich American Insurance Co.

5

6    HEARING re Motion of Edgewood Management LLC for an Order

7    Directing Lehman Brothers Holdings Inc. to Release and Return

8    Non-Estate Property

9

10   HEARING re Motion of Debtors for Approval of the Sales of

11   Shares of Quadrant Structured Products Company, Ltd.

12

13   HEARING re Motion of LBHI for Approval of Two Note Purchase

14   Agreements with the Insolvency Administrator of Lehman Brothers

15   Bankhaus AH (In Insolvenz)

16

17   CHAPTER 15 PROCEEDINGS:   IN RE LEHMAN BROTHERS BANKHAUS AG (IN

18   INSOLVENZ):

19   HEARING re Motion by LB Bankhaus AG for an Order Approving

20   Agreements with Lehman Brothers Holdings Inc. and Authorizing

21   the Sale of Certain Notes Free and Clear of All Liens, Claims,

22   Encumbrances and Interests

23

24

25   Transcribed by:  Lisa Bar-Leib

Page 3

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors and Debtors-in-Possession

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   RICHARD P. KRASNOW, ESQ.

9        MAURICE HORWITZ, ESQ.

10        LEE JASON GOLDBERG, ESQ.

11

12   JONES DAY

13        Attorneys for Lehman Brothers Holdings Inc.

14        North Point

15        901 Lakeside Avenue

16        Cleveland, OH 44114

17

18   BY:   CARL E. BLACK, ESQ.

19

20

21

22

23

24

25

Page 4

1

2   HUGHES HUBBARD & REED LLP

3        Attorneys for SIPA Trustee, James W. Giddens

4        One Battery Park Plaza

5        New York, NY 10004

6

7   BY:   JEFFREY S. MARGOLIN, ESQ.

8        KENNETH LEE, ESQ.

9

10   MILBANK, TWEED, HADLEY & MCCLOY LLP

11        Attorneys for the Official Committee of Unsecured

12         Creditors

13        One Chase Manhattan Plaza

14        New York, NY 10005

15

16   BY:   DENNIS C. O'DONNELL, ESQ.

17        EVAN R. FLECK, ESQ.

18

19   U.S. DEPARTMENT OF JUSTICE

20        Office of the United States Trustee

21        33 Whitehall Street

22        21st Floor

23        New York, NY 10004

24

25   BY:   ELISABETTA G. GASPARINI, ESQ.

Page 5

1

2    DAVIS POLK & WARDWELL LLP

3         Attorneys for Quadrant Structured Products

4         450 Lexington Avenue

5         New York, NY 10017

6

7    BY:   TIMOTHY GRAULICH, ESQ.

8

9    SNR DENTON US LLP

10        Attorneys for Dr. Michael C. Frege, in his capacity as

11         Insolvency Administrator of Lehman Brothers Bankhaus AG

12         (in Insolvenz)

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16   BY:   D. FARRINGTON YATES, ESQ.

17

18   WHITE & CASE LLP

19        Attorneys for Ad Hoc Group of Lehman Brothers Creditors

20        1155 Avenue of the Americas

21        New York, NY 10036

22

23   BY:   GERARD UZZI, ESQ.

24

25

Page 6

1

2    CHAPMAN & CUTLER LLP

3         Attorneys for U.S. Bank, N.A.

4         111 West Monroe Street

5         Chicago, IL 60603

6

7    BY:   JAMES HEISER, ESQ.

8         FRANKLIN H. TOP III, ESQ.

9         (TELEPHONICALLY)

10

11   STUTMAN, TREISTER & GLATT

12        1901 Avenue of the Stars

13        12th Floor

14        Los Angeles, CA 90067

15

16   BY:   JEFFREY H. DAVIDSON, ESQ.

17        MARINA FINEMAN, ESQ.

18        MICHAEL NEUMEISTER, ESQ.

19        (TELEPHONICALLY)

20

21

22

23

24

25

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Good morning.  Be seated, please.

3              MR. KRASNOW:  Good morning, Your Honor.  Richard

4    Krasnow, Weil Gotshal & Manges, on behalf of the Chapter 11

5    debtors.  Your Honor, in connection with this Lehman omnibus

6    hearing, the debtors filed an amended agenda last night.  And

7    if it's acceptable to the Court, I will simply address the

8    motions in the order in which they appear in the amended

9    agenda.

10             THE COURT:  That's fine.

11             MR. KRASNOW:  Your Honor, the first matter -- well, I

12   should note at the outset, Your Honor, that all of the matters

13   that are before the Court this morning are uncontested.  So

14   this should be a relatively short hearing.

15             The first motion that is to be considered by the Court

16   today is the debtors' motion for an order modifying the

17   automatic stay to allow settlement payments under 2007-2008

18   Directors and Officers Insurance policy issued by Zurich

19   American Insurance.  That's docket number 14707.

20             Your Honor, this is, I believe, the seventh motion of

21   this type that we have filed with the Court where we're seeking

22   a modification of the stay in order to allow the D&O carrier to

23   make payments in connection with various settlements where the

24   defendants are former Lehman employees who are covered by those

25   policies.

Page 8

1           This particular matter relates to two separate

2      arbitration settlements where the proposed payments with

3      respect to both matters in the aggregate are approximately 2.1

4      million dollars.  Your Honor has previously considered, as I've

5      noted, motions similar to this.  There is no opposition.  And

6      so, for the reasons we've set forth in the motion, we would

7      request that the relief be granted.

8           THE COURT:  The relief is granted.

9           MR. KRASNOW:  Thank you, Your Honor.  The next matter

10     on the agenda is the motion of Edgewood Management LLC.  And

11     this, Your Honor, is being handled by my colleague, Mr.

12     Goldberg.

13          MR. GOLDBERG:  Good morning, Your Honor.  Lee Goldberg

14     for the Chapter 11 debtors.  Your Honor, I have a copy of the

15     stipulation if you would like me to hand that up.

16          THE COURT:  Please hand it up.  Thank you.

17          MR. GOLDBERG:  Your Honor, before the Court is the

18     motion of Edgewood Management LLC, docket number 13063.  The

19     motion seeks the return of $505,936.13 from LBHI to Edgewood

20     and -- Edgewood Management LLC which is acting on behalf of its

21     client, Edgewood Growth Fund.  Upon consideration and review of

22     the facts and the applicable law in this case, the debtors and

23     Edgewood have determined that it is in the best interest of all

24     parties to agree to the settlement that is before the Court.

25     LBHI, having Your Honor's review, will turn over 400,000

Page 9

1   dollars to Edgewood for the -- in satisfaction of the matter

2   set forth in the motion.

3           THE COURT:  That's fine.  There are no objections.

4   The stipulation is approved.

5           MR. GOLDBERG:  Thank you, Your Honor.

6           MR. KRASNOW:  Your Honor, the third matter on today's

7   calendar relates Quadrant Structured Products.  And this matter

8   is being handled by the firm of Jones Day on behalf of the

9   Chapter 11 debtors.

10          MR. BLACK:  Good morning, Your Honor.  Carl Black of

11  Jones Day on behalf of the Chapter 11 debtors.  Item 3 on

12  today's agenda is the uncontested motion of Lehman Brothers

13  Holding Inc. and Lehman Commercial Paper Inc., docket number

14  14708, for an order approving the sale of 80,000 shares of

15  Quadrant Structured Products Company Ltd. representing a twenty

16  percent interest in Quadrant to Quadrant for ninety million in

17  cash consideration.  In connection with the authorization to

18  sell the shares, the debtors also seek a waiver of the

19  fourteen-day stay imposed under Bankruptcy Rule 6004(h) and a

20  finding that the purchaser acted in good faith and is entitled

21  to the protections of 363(m).  The motion was filed on February

22  28th.  Proper notice of the motion was provided and service

23  effectuated on the general and special service parties as well

24  as other parties entitled to receive notice under General Order

25  M-383 and the case management order applicable in these Chapter

1    11 cases.  Proof of such service is set forth in the

2    certificate of service that has been filed with the Court on

3    March 4th.

4         The official committee of unsecured creditors filed a

5    statement in support of the motion on March 18th.  And no

6    objections to the motion have been filed or otherwise raised.

7         Your Honor, also present here today and available for

8    questions is Andrew Grapkowski, a managing director in the

9    private equity and principal investment groups of LAMCO LLC.

10   Attached to the motion is Mr. Grapkowski's written declaration

11   and support.  If Your Honor wishes, the debtors would offer

12   this declaration into evidence as his testimony for the

13   hearing.  Otherwise, we're happy to make a proffer.

14        THE COURT:  You can do that whichever way you prefer.

15   I've reviewed the papers and you can either rely on the

16   declaration as evidentiary support or you can make a proffer of

17   it.

18        MR. BLACK:  We would ask to have the declaration

19   entered into evidence, Your Honor.

20        THE COURT:  It's admitted then.

21        MR. BLACK:  Thank you.

22   (Declaration of Andrew Grapkowski was hereby received into

23   evidence as of this date.)

24        THE COURT:  Given the lack of objection and the

25   evidence in support of the transaction, it's approved.

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 67

Page 11

1            MR. BLACK:  Thank you, Your Honor.  Hand the order up

2     at the conclusion?

3            THE COURT:  Yes.

4            MR. BLACK:  Thank you.

5            MR. KRASNOW:  Your Honor, Richard Krasnow of Weil

6     Gotshal & Manges on behalf of the Chapter 11 debtors.  The next

7     two matters and the last two matters on today's calendar are,

8     if you will, companion motions.  There is the motion filed by

9     the Chapter 11 debtors for approval of LBHI's purchase of three

10    notes referred to as the Spruce-Verano and SASCO notes from the

11    insolvency administrator of Lehman Brothers Bankhaus, the

12    former Lehman Brothers bank in Germany that is the subject of a

13    separate insolvency proceeding in Germany, for an aggregate

14    purchase price of 957 million dollars subject to one possible

15    adjustment which I will address shortly, Your Honor.  The

16    companion motion is a motion filed by the insolvency

17    administrator in his pending Chapter 15 case before the Court

18    for authority to sell the notes to LBHI which notes, as

19    reflected in the pleadings that the administrator has filed,

20    are located in the United States free and clear of all liens,

21    claims and encumbrances.  So we would suggest or request that

22    Your Honor, if you will, consider both motions concurrently

23    since one is very much tied to the other.

24            We have filed with the Court in connection with the

25    relief that we are requesting as attachments to the initial

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 12

1    motion that we filed the SASCO purchase agreement, which is

2    Exhibit A to the motion, the Spruce-Verano purchase agreement,

3    which is Exhibit B to the motion, and an amended and restated

4    settlement agreement which is characterized in the motion as a

5    plan settlement agreement.  That, Your Honor, is a document as

6    to which we are not seeking Court approval but there is an

7    element to that agreement that is tied to the SASCO purchase

8    agreement and the purchase price that the debtors will be

9    paying for the SASCO note.  And I will address that as well.

10          Also attached to the motion is the declaration of

11   Daniel Ehrmann, a managing director of Alvarez & Marsal, in

12   support of the relief that's requested.

13          We also, this past Friday, filed two additional

14   documents, Your Honor.  One was Amendment number 1 to the SASCO

15   purchase agreement and Amendment number 1 to what I refer to as

16   the plan settlement agreement.  Those documents both go to one

17   aspect of a purchase price for the SASCO notes which, as I

18   said, I will address in a moment.

19          And lastly, Your Honor, on Monday we filed a revised

20   proposed order.  And I will also get to why we filed that and

21   what the revisions relate to.

22          Your Honor, we were before the Court approximately a

23   little more than a year ago with respect to another rather

24   large transaction with Bankhaus that was approved by the Court.

25   There, too, there were no objections.  Here, while there were

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 13

1    three filings made in connection with our motion, one by the

2    creditors' committee, one by the ad hoc group and one by the

3    LBI trustee.  None of them are objections to the transaction

4    and two of them are styled as statements in support.  While, if

5    Your Honor pleases, I will give the Court a general overview of

6    what these transactions contemplate, in light of the fact that

7    there are no objections, I would offer in evidence Mr.

8    Ehrmann's declaration in support of the relief we're requesting

9    as well as each of the agreements that I have alluded to

10    before.

11            THE COURT:  That's fine.  And I have no problem

12    admitting into evidence the documents that you have just

13    identified.  In preparing for today's hearing, however, I'll

14    just share this with you, I'm a little concerned about this

15    transaction in that I don't have a good feel for how the price

16    was reached.  And this is a private affiliate transaction.

17    There's no auction to test the market for the fair value.

18    Although that may not be a big issue for me, I'm also being

19    asked to approve the Bankhaus side of the transaction in which

20    the affidavits generally advert to the fact that an auction

21    could have taken place but did not, notes the applicable law in

22    Germany that appears to contemplate monetizing assets of this

23    sort.  So there's a little question that from Bankhaus'

24    perspective based upon what I have reviewed, they're achieving

25    a fundamental objective of German insolvency practice but it's

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 14 of 67

Page 14

1    not clear that that's the right number.  Because I'm being

2    asked to approve both sides of a transaction in which both

3    parties to the transaction are talking about how beneficial it

4    is to them, it becomes difficult for me to understand how both

5    sides can be so right.  Moreover, each of the parties who might

6    have been an objecting party has rallied around the transaction

7    which gives me a lot of comfort especially when those parties

8    include the creditors' committee and the sometimes oppositional

9    ad hoc committee.

10        So, I have no reason to get in the way of progress.

11   But I want, in the evidentiary record, to have a better

12   understanding as to how this can be good for everybody and how

13   the price was negotiated.

14        MR. KRASNOW:  Your Honor, I'll be prepared to address

15   that certainly from the debtors' perspective.  And I'm sure

16   Bankhaus will address that from their perspective.  Just to

17   address one issue, as I'm sure they will describe further,

18   among the approvals that are required in order for this

19   transaction to close, in addition to an order from this Court

20   in our case and an order in the Chapter 15 approving it, there

21   must be approvals obtained in the German insolvency proceeding,

22   two in particular.  One is the Bankhaus creditors' committee

23   and the other is the Bankhaus creditor assembly.  I think I

24   have the correct terms.

25        THE COURT:  I think you do have the correct terms.

1        MR. KRASNOW:  And we have been advised and Bankhaus

2    can confirm that their creditors' committee has approved the

3    transaction.  With respect to the assembly, that assembly

4    meeting will not occur until -- I believe is April 14.  But

5    this transaction has, as we understand it, been vetted at least

6    by the Bankhaus creditors' committee.

7        But, Your Honor, let me, if I may, and this is

8    addressed in the papers, but let me give the overview to the

9    Court, describe to the Court the process which led us to be

10   before Your Honor today.

11       THE COURT:  Okay.

12       MR. KRASNOW:  As Your Honor may recall when we were

13   last here on a Bankhaus matter, that was a matter where the

14   debtors were, in the context of the settlement, addressing two

15   issues, if you will.  One was who had ownership interest with

16   respect to certain loans and resolving disputes in that regard.

17   The transactions contemplated are acquiring those loans for

18   purchase price, if memory serves me, of a net of a little more

19   than a billion dollars.

20       In addition, it fixed certain claims that Bankhaus had

21   under what's called the Security and Collateral Agreement.

22   That's an agreement that was entered into by LBHI and Bankhaus

23   prior to the commencement of the case.  And I would generally

24   characterize it as an agreement pursuant to which LBHI -- I'll

25   use the term loosely -- guarantied asset values on Bankhaus'

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 16

1    records such that LBHI was required to make payments,

2    characterized as cash collateral payments, to LBHI to the -- to

3    Bankhaus, excuse me, Your Honor -- to the extent that there was

4    a write-down in asset values, nonpayments on loans.  Our

5    understanding was that this arrangement was entered into

6    basically to give the German regulators comfort about LBHI's

7    protecting the bank itself in terms of its assets.

8         The various loans which we acquired in that last

9    transaction were carried as assets on Bankhaus' books and

10   records.  We purchased them at an amount that were less than

11   what they were carried at and therefore, in that transaction,

12   certain claims that they had under the SCA were allowed by the

13   Court.

14        Both prior to when that transaction occurred and

15   certainly thereafter, there were ongoing discussions and

16   negotiations with Bankhaus with respect to its claims.  They

17   are a very significant creditor of LBHI.  I believe their

18   asserted claims against LBHI was more than twenty billion

19   dollars.  And thus, the resolution of those claims were

20   important for the purpose of this case moving forward in a

21   plan.

22        And so, in connection with our reviewing their claim,

23   and particularly their claim under the SCA, what naturally

24   followed from that is looking at the assets on their books and

25   records which would give rise to the claim.  And among the

LEHMAN BROTHERS HOLDINGS INC., et al.

1    assets we focused on were the SASCO, Spruce and Verano notes.

2    And that was of particular interest to us because as reflected

3    in the motion, LBHI and Lehman Brothers Commercial Paper, LCPI,

4    have currently various notes that were issued by the SASCO,

5    Spruce and Verano structures.  So there was already familiarity

6    on the part of the debtors as to what these notes were.  These

7    notes were issued by special purpose vehicles and they are

8    secured, if you will, by participations in various loans,

9    mostly commercial loans on the Spruce and Verano side; mostly,

10   if not entirely, real estate related loans on the SASCO side.

11   And as those discussions pursued, there was a recognition

12   ultimately on our part that if we could agree at a reasonable

13   value of those notes, it would make sense to do more than just

14   fix their claim, Bankhaus' claim, against LBHI with respect to

15   any write-downs in values.  But because we already had

16   Holdings, we knew about the underlying assets, we knew about

17   these other notes. to perhaps acquire the notes, assuming we

18   could do so at a reasonable price.  They would, through that

19   acquisition -- LBHI would realize any potential enhancement in

20   value if we bought them at a discount.  And by purchasing the

21   notes, we would ultimately end up in having control amongst the

22   debtors of a hundred percent of the capital structure of each

23   of those vehicles which would afford to us the ability to be

24   more efficient and maximize ultimate recoveries on the notes

25   with the underlying assets.

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 67

Page 18

1         And so, there were negotiations that were pursued by

2    the parties over the last six months or so with respect to

3    exactly that issue.  During the course of the negotiations as

4    is reflected in the statement which was filed by the creditors'

5    committee, we were in constant communications with the

6    committee as to how we were progressing because this was

7    potentially, and indeed is, a very significant transaction.

8         It's our understanding, but again the administrator

9    will address this, that during the course of this process and

10   particularly towards the end, they themselves undertook their

11   own analysis in their own fashion as to what potential values

12   were attributable to these notes.  There were arduous

13   negotiations that took place over an extended period of time.

14   Information which we had with respect to these particular

15   assets were provided to Bankhaus as requested by them so that

16   they could be in a position to evaluate the offers that were

17   being made and wouldn't be in a position where they were

18   evaluating that information in a vacuum.  And, Your Honor,

19   those negotiations ultimately gave rise to the agreements which

20   are currently before the Court.

21        On our side, as I said, Your Honor, we are familiar

22   with the notes.  And we're familiar with the underlying assets

23   because of our current involvement.  And the analysis which the

24   debtors undertook was not just looking at the notes but, in

25   fact, looking at the underlying assets, what we believe would

Page 19

1    ultimately be realized and we believe that, indeed, we will

2    recoup our investment and then some with respect to these

3    particular notes.  And I would say, Your Honor, the fact that

4    that's the case doesn't necessarily mean that Bankhaus isn't

5    getting a reasonable deal from their perspective.  I don't

6    think they would expect us to buy these notes only to get our

7    purchase price back.  There are other motivations that they

8    have for wanting to sell the notes and they themselves will

9    address that in their presentation.

10           Your Honor, with respect to the purchase prices, as

11   indicated in the papers, for Spruce and Verano, we're paying in

12   the aggregate 332 million dollars.  It's broken down between

13   the two of them.  With respect to Spruce, rough numbers, it's

14   around 193 million.  With respect to Verano, it's close to 140

15   million.  And that represents a discount of approximately

16   thirty percent to the current outstanding balances of those

17   notes.

18           With respect to SASCO, the purchase price that we

19   would pay now, if you will, upon closing is 625 million dollars

20   and that would represent a discount of approximately forty-two

21   percent to the outstanding principal amount.

22           The reason that the plan settlement agreement is

23   attached to the motion is with respect to the SASCO purchase

24   price.  What the administrator indicated to us during the

25   course of the negotiations was that they were prepared -- he

1    was prepared to proceed with the transaction based on these

2    purchase prices because he was looking to not only monetize and

3    liquefy these assets so that he could make distributions to his

4    creditors, but he also looked at it in the context of the

5    claims that he would then have against LBHI under the SCA as a

6    result of this transaction.  And in light of that, he told us

7    that if, at the end of the day, he didn't get the benefit of

8    his bargain under the plan settlement agreement, he didn't get

9    the claims allowed and whatever else is contemplated and

10   provided for under that agreement, that it would be appropriate

11   under those circumstances for him to get a higher purchase

12   price because he isn't getting the benefit of his bargain.  And

13   I'm generally describing, Your Honor, what's provided for in

14   the plan settlement agreement.  Obviously, as we say in the

15   motion, the terms of the transactions as set forth in the

16   agreements and the relevant provisions of the plan settlement

17   agreement, not my general description or what's said in the

18   motion, is what controls here.  But what we agreed, in light of

19   that, which we thought was a reasonable proposition was that if

20   he doesn't get the benefit of his bargain that -- in a timely

21   fashion that we would be obligated to pay an additional

22   purchase price of a hundred million dollars with respect to the

23   SASCO note.  And again, very generally speaking, and it's a

24   little more complicated than this, what's contemplated in this

25   regard is that if a plan -- and I say a plan -- is not

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 67

Page 21

1   confirmed by December 31, 2012, and he terminates the plan

2   settlement agreement, because that's one of the conditions, if

3   you will, of the plan settlement agreement, then he's entitled

4   to the hundred million dollars.

5          Now when we looked at that, we felt it would not be

6   appropriate as a fiduciary to tie that confirmation requirement

7   simply to our plan.  While we believe ours is the best plan on

8   file, and it will be amended to reflect the settlement as is

9   required under the plan settlement agreement, for reasons which

10  we may not be able to understand ourselves, there may be

11  another plan that is ultimately confirmed by the Court.  And we

12  did not believe, as fiduciaries, that it would be appropriate

13  to have a provision in the agreement that was, if you will, a

14  poison pill with respect to somebody else's plan.

15         So, so long as, as I said a moment ago, a plan is

16  confirmed that incorporates the settlement and that's confirmed

17  by December 31 of 2012, and again there are other provisions in

18  the agreements, then he is not entitled to the hundred million

19  dollars.  We believe that even were the estates required to pay

20  that hundred million dollars, this is still a deal, a

21  transaction which is very beneficial to the estates.  And while

22  it reduces the discount, if you will, from around forty-two

23  percent to a little more than thirty some odd percent, it's

24  still a not insignificant discount to what we anticipate will

25  be the cash flows that will be generated from these particular

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 22 of 67

Page 22

1    notes.  And we believe that we will recover the full principal

2    amounts that are due and payable under these notes through that

3    which is produced under the underlying assets.

4         So, Your Honor, that is what led to our being here

5    today and the kind of analysis that we undertook.  Now, Your

6    Honor, as I alluded to before, on Friday, we did file an

7    amendment to the SASCO purchase agreement and an amendment too

8    the plan settlement agreement.  Those amendments arose from

9    discussions which occurred last week with the ad hoc group who

10   were, not surprisingly, particularly focused on the

11   circumstances which would give rise to the incremental hundred

12   million dollar payment.  There were discussions over the course

13   of the week, various drafts of amendments that were circulated

14   amongst that group, ourselves and Bankhaus.  And, ultimately,

15   that which was filed on Friday are documents which we were

16   advised the ad hoc group felt comfortable with.  And again,

17   they were simply clarifications, if you will, of, for example,

18   what had to be in a competing plan for it to comport with the

19   requirements of the plan settlement agreement and the SASCO

20   agreement in terms of incorporating the settlement with the

21   trustee and certain other related issues.  So we believe, based

22   upon what we've been advised, that at least the forms of the

23   documents are satisfactory to all concerned.

24        Your Honor, I would simply close by noting that we

25   think, and obviously, a number of our major stakeholders

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 23 of 67

Page 23

1   concur, that from the debtors' perspective, these are very

2   beneficial transactions.  And for the reasons set forth in our

3   motion and the declaration, we would request that the Court

4   approve it.

5           Perhaps, Your Honor -- if the Court has any questions,

6   obviously, I'm ready, willing and able to answer them.

7           THE COURT:  I --

8           MR. KRASNOW:  But, Your Honor, perhaps we should --

9           THE COURT:  I'd like to hear a little bit more from

10  you, Mr. Krasnow, and then I'll hear from others.

11          MR. KRASNOW:  Sure.

12          THE COURT:  But I appreciate what you've said.  Yet,

13  it doesn't entirely answer the question that I raised a little

14  earlier which is how these prices came to be.  I understand

15  that the fundamental transaction that we're talking about here,

16  and it's complicated, calls for the debtors before me to obtain

17  control of the capital structure of SASCO, Spruce and Verano in

18  order to realize the value imbedded in the underlying asset

19  base without interference and that the fundamental concept that

20  underlies the transaction, as I understand it, is that the

21  right to realize incremental value is tied to the acquisition

22  of these notes at a discount.  But that it's more complicated

23  than that because there are also relationship issues with

24  Bankhaus in the Bankhaus claim not entirely revealed to me in

25  the pending motion that I assume represents one of the reason

1    that from both the perspective of Bankhaus and the perspective

2    of the debtors, this transaction is viewed as more desirable

3    than a third party transaction.

4            MR. KRASNOW:  Yes, Your Honor.

5            THE COURT:  So that I am assuming that, for example,

6    from the perspective of Bankhaus, and I'll hear from them, as

7    seller of the notes, they're content with the transaction,

8    otherwise they wouldn't be advocating it to their creditors'

9    committee, their creditors' committee wouldn't be supporting it

10   and they wouldn't have a high degree of confidence that their

11   creditor assembly will ultimately approve it next month.  So I

12   sense that there's more to this than just the amount being paid

13   for the notes.

14           MR. KRASNOW:  Your Honor, let me provide you with a

15   little more information in light of Your Honor's observation.

16   Yes, as reflected in the motion, there is a connection between

17   our acquisition and the purchase price and the SCA claim which

18   is to be allowed under the plan and is referred to in the plan

19   settlement agreement.  Again, we're not seeking approval of

20   that now.  And the SCA claim would be allowed in an approximate

21   amount of six billion dollars.  Now, not all of that relates to

22   this particular transaction.  And to be specific, Your Honor,

23   with respect to this particular transaction or transactions,

24   that portion of the SCA claims that would -- will be allowed

25   under our to-be-amended plan that would reflect the settlement

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 25 of 67

Page 25

1    that relates to these three notes aggregates 273 million

2    dollars.  Now that's with respect to Spruce, Verano and SASCO,

3    and I can break that down if Your Honor desires which, in fact,

4    I will.  With respect to the Spruce element, it's approximately

5    ten million dollars.  With respect to Verano, it's seven

6    million.  And with respect to SASCO, it's 256 million dollars.

7    So there is very much of a connection.  And again, Your Honor,

8    that's the reason why the administrator insisted in the course

9    of the negotiations that if their claims -- his claims are not

10   allowed since he was prepared to take the number that

11   ultimately was agreed upon with respect to the purchase price

12   that he should have the right to get an incremental purchase

13   price in order to protect his creditors.  And it was difficult

14   to argue against that.

15         I hope I've answered Your Honor's question.

16         THE COURT:  You have.  The only thing I don't have an

17   answer to that I still care about is how the pricing was

18   arrived at for these notes.  There's approximately a thirty

19   percent discount as to Spruce-Verano and approximately a forty-

20   two percent discount as to SASCO in your recitation with a

21   SASCO adjustment that might be as much as a hundred million

22   dollars based upon conditions that we can't presently identify

23   fully.  But what I'm simply trying to get a sense of, because

24   this is a transaction with moving parts, some of which are not

25   entirely clear to me, how were the notes priced.

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 67

Page 26

1            MR. KRASNOW:  Your Honor --

2            THE COURT:  It's as simple as that.

3            MR. KRASNOW:  Your Honor, with respect to Spruce and

4    Verano, which is a lot simpler, we believe that the notes we're

5    acquiring will be satisfied through payments made from the

6    underlying assets in a two to three year time frame.  And I

7    should note, as we state in the papers, and I think it's

8    reflected in Mr. Ehrmann's declaration as well, the interest

9    rate on those notes are perhaps lower than what the market

10   might otherwise be.  So with respect to Spruce and Verano, the

11   way we looked at it and the way we priced it took into account

12   a liquidity discount.  So we proposed a number which reflected

13   that from our perspective and, again, the administrator will

14   respond from his perspective, but they do reflect in their

15   papers that there is a significant benefit for them in being

16   able to monetize assets quickly and liquefy them quickly so

17   that they can make distributions to the creditors.  There's a

18   shorter time frame that they have in mind, as one would have

19   here if it were Chapter 7.

20           I think that with respect to SASCO, it's a bit more

21   complicated.  We're dealing with real estate for the most part,

22   not the commercial loans.  There are other issues attendant to

23   it.  But the number that we -- I should say numbers because

24   there was a negotiation here, Your Honor, that ultimately led

25   to the number that was reached here.  But from our perspective,

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 67

Page 27

1    there was, if you will, a similar analysis that took into

2    account anticipated cash flows over a period of time, took into

3    account maybe different difficulties that may be attendant to

4    collecting monies from the real estate loan than from the

5    commercial loan.  But it was a very, as I understand it,

6    quantitative analytical analysis from the bottom up which

7    ultimately resulted in the numbers that were put on the table.

8    It was as complicated and as simple as that and, as I said, a

9    little more complicated perhaps than Spruce and Verano.  And

10   there was just simply a negotiation back and forth with

11   frequent communications with the committee's financial advisors

12   who were privy to information relating to the underlying assets

13   so that they were in a position to advise the committee as to

14   whether or not they believe that, from the debtors'

15   perspective, it was a reasonable transaction.

16            I hope I've illuminated this a bit, Your Honor.

17            THE COURT:  You have in a very lawyer-like way.

18            MR. KRASNOW:  I try, Your Honor.  I've been doing it

19   for a while.

20            THE COURT:  I can tell.  But I guess I'll get some

21   more color when I hear from others.  I gather that the pricing

22   of the notes was the product of a financial analysis, the

23   assumptions underlying such analysis having been fundamentally

24   agreed to by the parties.  No doubt, based upon my experience,

25   different analysts looking at the same set of facts might come

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 67

Page 28

1    up with a different value or a different set of assumptions.

2    And that's the zone for negotiability in my experience.

3         But I don't know what happened here.  And since this

4    is a very complex transaction that's being expedited by virtue

5    of the fact that it's not contested, I want to understand why

6    each group that might otherwise have raised significant

7    questions concerning the fairness of this transaction is on

8    board.  This is an opaque transaction from my perspective.  I

9    can't tell how the numbers were derived.  And I know that

10   you've done an excellent job of explaining at least generally

11   how this occurred.  I don't know who negotiated with whom.  I

12   don't know which positions were taken on one side or the other.

13   I don't know what alternatives existed on the Bankhaus side or

14   on the Lehman side to generate more value in a different way.

15        Because this is a simultaneous transaction, unusual in

16   that respect, that I'm being asked to approve at the same time,

17   I don't think I have enough yet based upon the colloquy of

18   counsel and what I view as a fairly limited declaration to say

19   yes to this transaction.  But I'm prepared to do that.  I'm

20   asking the parties to supplement the record now.

21        MR. KRASNOW:  Your Honor, what we did do, I've

22   described what we did with respect to the creditors' committee.

23   But we did have discussions with the ad hoc group and their

24   advisors and with LBI to advise them as to how the process was

25   conducted.

1          THE COURT:  I'd like to be advised.  This is a

2     bankruptcy court hearing in which I'm being asked to approve a

3     significant transaction and I view the record as deficient.

4          MR. KRASNOW:  Your Honor, I'd be prepared to put Mr.

5     Ehrmann on the stand and --

6          THE COURT:  I think that might be a good idea.

7          MR. KRASNOW:  Okay.

8          THE COURT:  And if you'd like to take a break to talk

9     with him in advance and to confer with other parties so we can

10    make this as efficient as possible, we can do that.

11         MR. KRASNOW:  Your Honor, if we can take a short

12    break, that would be fine.

13         THE COURT:  Let's take a break until 11 a.m.

14         MR. KRASNOW:  Thank you, Your Honor.

15    (SASCO purchase agreement with its Amendment A, Exhibit A to

16    the motion, the Spruce-Verano purchase agreement with its

17    Amendment A, Exhibit B to the motion, and the plan settlement

18    agreement, Exhibit C, as well as an amended proposed order,

19    Exhibit D to the motion, were hereby received into evidence as

20    of this date.)

21    (Declaration of Daniel Ehrmann, Exhibit E to the motion, was

22    hereby received into evidence as of this date.)

23         (Recess from 10:49 a.m. until 11:03 a.m.)

24         THE COURT:  Be seated, please.

25         MR. KRASNOW:  Your Honor, Richard Krasnow for the

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 67

Page 30

```
 1   Chapter 11 debtors.  If I may, I'd like to call Mr. Ehrmann to

 2   the stand.

 3            THE COURT:  Fine.

 4            MR. KRASNOW:  Mr. Ehrmann?

 5            THE COURT:  And I need to swear you.

 6            MR. EHRMANN:  Okay.

 7            THE COURT:  Please stand and raise your right hand.

 8        (Witness sworn)

 9            THE COURT:  Be seated.  And please speak up.

10            THE WITNESS:  Yep.

11   DIRECT EXAMINATION

12   BY MR. KRASNOW:

13   Q.   Mr. Ehrmann, whom are you currently employed by?

14   A.   Alvarez & Marsal.

15   Q.   And what role, if any, do you have with the Lehman

16   Brothers Chapter 11 cases?

17   A.   I'm currently the co-head of the derivatives team effort

18   and the head of the international effort.

19   Q.   How long have you been engaged in those activities?

20   A.   Since September 2008.

21   Q.   Were you involved in the negotiations with Bankhaus that

22   led to the SASCO, Spruce and Verano purchase agreements that

23   are currently being considered by the Court?

24   A.   Yes, I was.

25   Q.   Were you a lead negotiator in that regard?
```

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 67

Page 31

1   A.   Yes, I was.

2   Q.   Could you, Mr. Ehrmann, describe to the Court the

3   analysis, if any, that Lehman undertook when valuing the Spruce

4   and Verano notes in the context of the proposed transaction

5   with Bankhaus?

6   A.   Sure.  For Spruce and Verano, as you pointed out

7   previously, the actual analysis was far more straightforward

8   than it was for the SASCO notes given that the actual

9   underlying loans or participations are actively trading in the

10   marketplace.

11       In addition to that, our loans team constantly updates our

12   loan book and, effectively, ensures that the book is constantly

13   mark-to-market.  And as a result of that, as part of the

14   transaction, no real analysis was really required.

15   Q.   And could you describe the analysis that was undertaken by

16   Lehman in connection with arriving at a proposed purchase price

17   from the debtors' perspective with respect to the SASCO note?

18   A.   Sure.  On the SASCO side, we actually projected cash flows

19   over a period of time for each of the underlying assets and

20   divided a future cash flow stream which we then discounted back

21   to present based on various assumptions on rate of returns.  In

22   addition to that, we actually got some indications from the

23   marketplace on the actual value of the notes; not the

24   underlyings, the actual notes.

25   Q.   Mr. Ehrmann, is it correct that the discount to the

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 67

Page 32

1   outstanding balances with respect to Spruce and Verano when

2   concurred to the proposed purchase price is around thirty

3   percent?

4   A.   Correct.

5   Q.   And the comparable analysis with respect to SASCO is

6   approximately forty-two percent assuming a 625 million dollar

7   purchase price, is that correct?

8   A.   Correct.

9   Q.   How do you account for the difference in the discount

10  rates between those two sets of notes, if you will?

11  A.   Well, it's primarily linked to the timing of the actual

12  realization of the underlying assets.  Spruce-Verano has a time

13  horizon of two to three years whereas SASCO -- the actual

14  underlyings have a longer time horizon.  Also, you should note

15  that on SASCO, the actual maturity of the note is 2038.  And so

16  that was factored into the discount.

17  Q.   And is there an expectation on the debtors' part that with

18  respect to each of the three notes that are purchased -- that

19  are being purchased or proposed to being purchased that the

20  estates will realize the full balance outstanding on each of

21  those notes?

22  A.   Yeah.  For Spruce-Verano, that's correct.  On SASCO, it

23  would be the low or the actual notional value of the notes.

24  But it would be higher than the purchase price.

25  Q.   Mr. Ehrmann, you were involved in the direct negotiations

Page 33

1   with the Bankhaus representatives in connection with this

2   transaction.

3   A.    Yes.

4   Q.    Over what period of time were the negotiations?

5   A.    Specifically, on Spruce-Verano and SASCO, we started in

6   earnest the negotiations August of last year.  Prior to that,

7   we had negotiations around Bankhaus' SCA claim.  And as you

8   pointed out before, a critical part of that SCA claim are the

9   actual -- or is the actual value of the notes.  So the reality

10  is that discussions around the values of these assets have

11  taken long than a year, I think.

12  Q.    Did the -- are the proposed purchase prices with respect

13  to these three notes the initial offers that were made by the

14  debtors to the administrator?

15  A.    No.  There was a considerable amount of back and forth

16  with the first offer having been made in August and the final

17  offer having been accepted less than a month ago.

18  Q.    And during the course of these discussions, did you have

19  any communications with the financial advisors for the

20  creditors' committee with respect to the status of those

21  negotiations?

22  A.    On a very regular basis, yes.

23          MR. KRASNOW:  Your Honor, I have no further questions

24  of this witness.

25          THE COURT:  Is there anyone who wishes to ask any

Page 34

1    questions?  You're excused.  Thank you.

2          THE WITNESS:  Thank you.

3          MR. KRASNOW:  Your Honor, perhaps it would make sense

4    since Your Honor posed questions of me that really related to

5    Bankhaus and I responded based upon what I knew, that perhaps

6    it would make sense for Bankhaus to make its presentation and

7    respond to a number of the questions the Court had.

8          THE COURT:  I mean, that's fine.  And I'm also going

9    to hear from counsel for the committee, counsel for the ad hoc

10   group and any other party in interest who wishes to express a

11   perspective but they're the principal parties, I think, that

12   have weighed in on this issue.  It's an uncontested matter.

13   I'm not trying to drag it out.  I'm just trying to get a

14   sufficient record that I can comfortable approve that which is

15   very familiar to the lawyers but not so familiar to the Court.

16   Based upon my review of the papers, I found this to be less

17   than clear

18         MR. KRASNOW:  I apologize for that, Your Honor.

19         THE COURT:  And that's not to say that the papers

20   weren't well drafted.  It seemed to me that there were issues

21   that were under the surface that I simply wanted to have fully

22   presented in open court.

23         MR. KRASNOW:  And, Your Honor, this is close to a

24   billion dollar transaction so we understand that it's

25   appropriate for there to be a thorough airing of transparency

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 35 of 67

Page 35

1   to this.

2          THE COURT:  That's precisely my point.  And I think

3   you understand it.

4          MR. KRASNOW:  Thank you, Your Honor.

5          MR. YATES:  Your Honor, Farrington Yates with SNR

6   Denton on behalf of Michael Frege, the insolvency administrator

7   for Lehman Brothers Bankhaus AG (In Insolvenz).  As opposed to

8   making a formal presentation, I thought I would just try to

9   answer the questions that you asked earlier --

10         THE COURT:  Fine.

11         MR. YATES:  -- so that we could expedite matters.  And

12  I guess the primary question which we're prepared to bring --

13  to put on our own witness to add some more color to give the

14  Court more comfort around this pricing issue so that you can

15  understand clearly why, in our view and in Dr. Frege's view,

16  this is a good deal for the German estate.

17         By way of backdrop, we had also submitted declarations

18  on behalf of Joachim Kuhne, a member of Dr. Frege's team, and

19  Hulmut Olivier, who was formerly with Bankhaus prior to the

20  insolvency proceedings and is not still employed by Bankhaus

21  and working with Dr. Frege.  As opposed to making a full

22  proffer, we'll rely on those declarations and ask to submit

23  those into evidence.  And we'll supplement with some additional

24  questioning --

25         THE COURT:  That's fine.

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 36 of 67

Page 36

1          MR. YATES:  -- if that's acceptable.

2    (Declarations of Joachim Kuhne and Hulmut Olivier were hereby

3    received into evidence as of this date.)

4          THE COURT:  I reviewed those declarations.  They don't

5    really go to the question that I --

6          MR. YATES:  Sure.  No problem.

7          THE COURT:  -- posed earlier about how the price was a

8    good price for the estate.  But --

9          MR. YATES:  Sure.

10          THE COURT:  -- I assume that your later submissions

11    will supplement the declarations.

12          MR. YATES:  Sure.  With that context laid then, as the

13    Court appreciates, the charge to the German administrator under

14    German law is slightly different.  Although we've sought

15    approval of the transaction in a Chapter 15 and 363 applies, we

16    believe that this transaction not only comports with what Dr.

17    Frege's duties are in Germany but also comports with what's

18    required under 363 as incorporated in a Chapter 15.

19          Dr. Frege, under German law, must liquidate assets in

20    a commercially reasonable way.  And the way that he discharges

21    that duty is he collects information, evaluates the various

22    underlying economics and legal risks with respect to particular

23    assets with a view towards monetizing them in the near future.

24    This is not a reorganization proceeding or even an extended

25    liquidation proceeding, perhaps like Lehman's Chapter 11, but

Page 37

1    Dr. Frege is charged with liquidating this asset, monetizing

2    the assets and delivering money to its creditors.

3         And so, one of the great benefits of this transaction

4    is that it monetizes these assets of approximately 900 and some

5    odd million dollars which will serve as the basis for a

6    distribution to German creditors later in the year.  That's the

7    intent.

8         So one of the driving forces behind the insolvency

9    administrator's desire to have this transaction approved is

10   that it provides the estate cash immediately with a view toward

11   making a distribution -- partial distribution to creditors in

12   the future.

13        Also, with respect to continuing to hold these assets,

14   there are certain risks.  There is cost of administration and

15   monitoring the assets.  I mean, these are sophisticated complex

16   assets and so that's not an insignificant amount.  And there is

17   also risk with respect to the value of these assets

18   deteriorating over time.  We've seen the market move up and

19   down.  And also, there's a foreign exchange rate volatility

20   issue as well.

21        So it fixes those potential risks right now so that we

22   don't have to worry about those particular issues going

23   forward.  And then, as has been described by Mr. Krasnow at

24   length, it fixes the SCA claim which is a large claim in the

25   Lehman estate that has been subject of discussion.  But as

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 38 of 67

Page 38

1    values move up and down with respect to the underlying notes,

2    the claim also could rise or fall.  And so, in the

3    administrator's view, in Dr. Frege's view, it was best to have

4    that fixed now so that there wouldn't be any risk going

5    forward.  And as the Court can appreciate, Germany is a

6    personal liability jurisdiction.  And so, the administrator --

7    you're absolutely correct in your assessment -- would not

8    propose any sort of transaction to his creditors unless he was

9    absolutely confident that he was going to be discharging his

10   duties under German law to monetize the assets in a

11   commercially reasonable way.

12          Now, you made a comment earlier about you didn't

13   conduct an auction.  Our -- and how do we arrive at price.

14   Well, you're right.  Our submission, the declaration, didn't go

15   into great detail.  However, we did conduct an informal

16   process.  And if I call Mr. Olivier to the stand, he will go

17   through the process informally that the insolvency

18   administrator went through to verify in the marketplace that

19   the values for these notes were in a range so that the offer

20   that came from LBHI eventually was within a range that was

21   acceptable.  There were not any wide deviations.  And that

22   process included hiring their own investment advisors going out

23   to the market.   These are sophisticated complex assets.  And

24   so the pool of people that could really understand what they

25   might be buying was unfortunately relatively narrow.  But in

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 67

Page 39

1    those discussions, they did receive some discussion, some

2    indications of value from these potential purchasers.  None of

3    them actually made an offer, the reason being because some of

4    these assets are so complicated they couldn't really figure out

5    how it was all going to work and how they would actually

6    monetize value when they recovered it.  But based on those

7    indications of value, we used that -- the administrator used

8    that as the baseline to go into the negotiations with LBHI.

9    And as you've also heard Mr. Krasnow state, the negotiations

10   were lengthy.  They were contentious and, clearly, at arm's

11   length from our perspective.

12           But ultimately, based on our informal market testing,

13   the proposals that we received for value from LBHI were within

14   range so that Dr. Frege was comfortable, under German law, that

15   he would be discharging his duty to monetize these assets in a

16   cursory reasonable way.

17           And also, because there was this informal process, we

18   felt confident that if there were any questions about the

19   process and fixing the value that once we explained to the

20   Court and gave a little bit more color to what Bankhaus did to

21   confirm the values that you would ultimately become

22   comfortable, too, hopefully.

23           Unfortunately, some of the process is covered by a

24   confidentiality agreement.  So we won't identify names.  But if

25   needed, we'll talk about ranges and offers if the Court so

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 40

1    desires.  But I think that the declaration that was submitted

2    indicated that there was a process and the result of it was

3    that the administrator was confident that the values that were

4    being proposed by LBHI were within a range that would allow him

5    to discharge his fiduciary duties to German creditors.

6           If you'd like, I can bring Hulmut Olivier to the stand

7    and we can go through additional testimony and evidentiary

8    support if the Court so desires.

9           THE COURT:  You can do that or you can do it by means

10   of a proffer.  Up to you.

11          MR. YATES:  Actually, I think I'll bring Mr. Olivier

12   up.

13          THE COURT:  Fine.

14       (Pause)

15          THE COURT:  Good morning.  Would you please --

16          MR. OLIVIER:  Good morning.

17          THE COURT:  -- raise your right hand?

18       (Witness sworn)

19          THE COURT:  Be seated, please.

20   DIRECT EXAMINATION

21   BY MR. YATES:

22   Q.   Good morning.  Can you state your name for the record,

23   please?

24   A.   Good morning.  My name is Hulmut Olivier.

25   Q.   And are you affiliated with Lehman Brothers Bankhaus?

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 67

Page 41

1    A.    I am.  I am serving as a managing director and board

2    member of Lehman Brothers Bankhaus.

3    Q.    And how long have you been affiliated with Bankhaus?

4    A.    Prior to its insolvency in the fall of '08, I was with

5    Lehman Brothers Bankhaus starting in March of 1995 and later

6    appointed to the board in 1998.

7    Q.    Are you currently assisting Dr. Michael Frege with the

8    administration of the Bankhaus estate?

9    A.    I am indeed.

10   Q.    And what are some of your duties with respect to assisting

11   Dr. Frege?

12   A.    My core responsibility and duty is to assist Dr. Frege in

13   managing and liquidating the remaining assets of Lehman

14   Brothers Bankhaus and advising him in all financial aspects

15   relating thereto.

16   Q.    Are you familiar with assets that are subject to the

17   motion which we refer to as the SASCO, Spruce and Verano notes?

18   A.    I am indeed.

19   Q.    All right.  And you heard the Court's inquiry regarding

20   how value and pricing was established for purposes of the sale.

21   Can you explain to the Court how Dr. Frege tested the prices in

22   the marketplace?

23   A.    Sure.  I would structure my remarks in the following way.

24   We basically had to go through four stages.  One is to address

25   the issue of information disparity.  In other words, we had to

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 67

Page 42

1    create a level playing field with regard to the notes in

2    question and, in particular, the underlying assets.  That was

3    stage 1 of the process.  And, as you just referred to, we

4    conducted -- or we concluded a -- and a number of

5    confidentiality agreements with LBHI.  So that some of the

6    information which we lacked could be made available to us.  So

7    that's -- that was point 1.

8        Point 2 was to create our own process around valuation.

9    And we did that in a three-prong way.  Number one, we developed

10   our own in-house analysis models analyzing and forecasting cash

11   flows.  We then also asked external financial advisors to do

12   the same -- using their methodologies and we organized

13   through -- as you mentioned, we retained financial advisors who

14   contacted my participants externally and asked them for their

15   views.

16       The third element was that we had to ascertain the bench

17   whole liquidity/marketability of these securities away from the

18   debtors, away form LBHI, and then conclude by forming a view on

19   what's exclusively referred to as time-valued money.  In other

20   words, if we were to give another way, was it having it

21   analyzed -- the underlying cash flows having analyzed the

22   securities in question what is a -- what would an investor

23   impute as their internal requirements as they determined their

24   purchase price.

25   Q.   When did you start the process of testing the market

Page 43

1    speaking closely with respect to these assets?

2    A.   We started in earnest just after late summer of last year.

3    And prior to doing that, we had a long run-up period, gestation

4    period, internally where we developed our own models and also

5    identified, to my earlier point, our particular information

6    requirements.

7    Q.   Sure.  Mr. Olivier, in your view, are the prices for these

8    assets within a reasonable range of the market as you

9    determined informally?

10   A.   I believe so.  And again, I would like to distinguish

11   between, on the one hand, Spruce and Verano and, the other,

12   SASCO.  As was explained earlier, I think there was a very

13   reasonable amount of transparency and understanding of the

14   Spruce and Verano notes.  And so, the valuation of the

15   underlying assets wasn't really much in dispute.  It really

16   revolved around, again, the time value of money, how much time

17   would need to elapse for these values to be crystallized and

18   what rate of return a would-be purchaser would impute to rack

19   up those values.  And also, who would be eligible investors in

20   these notes.  And again, we were a mezzanine noteholder and

21   with LBHI and the debtors being senior noteholders, it became

22   very clear, all that based on the input from our external

23   financial advisors that essentially external investors were

24   privy to the information that we were privy to or that the

25   debtors were privy to would not bid aggressively at all for

1   these securities.  And essentially, it was a one-horse race.

2   So that was Spruce and Verano.

3       On SASCO, the situation was a lot more complex because, as

4   it was explained earlier, we were dealing with a portfolio of

5   real estate related assets.  And the most important asset in

6   that portfolio actually led to a very large exposure which was

7   itself subject to debt for equity swap late last year.  And so,

8   we were charged with putting the value on this particular large

9   asset and some of the other major assets and then protecting

10  cash flows on -- again, as we explained earlier, looking at not

11  just the value of allied schemes but also can you actually get

12  the -- can you crystallize the value of the underlying asset

13  and how do you do that bucking just a senior noteholder.  And

14  that is the key to the equation.  It was not just about the

15  valuation of the underlying.  We also had to basically find --

16  advise those who has -- it was also faced with the information

17  disparity of the fact that we're -- these parties do not have

18  the information that we have and did not have the ability as

19  the debtors do to unwind the issuing structure and manage the

20  underlying assets.

21  Q.   Mr. Olivier, why is this transaction a benefit to the

22  Bankhaus estate?

23  A.    It's likely that based on the factors I've just outlined

24  that -- and what were determined to be reasonable at -- based

25  on our scenario -- those analyses and probability with those

Page 45

1    scenarios that, again, the crystallization of the sale proceeds

2    and therefore at the time they have money from our perspective

3    leads us to believe that this is a commercially viable

4    transaction.

5    Q.    Have the creditors of the German estate approved the

6    transaction?

7    A.    They have, certainly, as far as the creditors' committee

8    is concerned and given the fact that it represents the major

9    creditors of Bankhaus who hold a very large majority of

10   Bankhaus debt.  We believe that they represent the vast

11   majority of the Bankhaus assembly which you alluded to earlier.

12   Q.    Just to give the Court some color on the difference

13   between the committee versus the assembly, when you say that

14   the committee has some of the largest creditors, could you

15   identify those and then give us -- you gave an estimate of the

16   amount of the debt of the estate that they hold -- a total,

17   just a total.

18   A.    Well, I don't have all the numbers to hand but,

19   essentially, it's used to identify the major creditors, one

20   being at the German Central Bank, the Bundesbank, on behalf of

21   the European Central Bank.  And the other is the so-called

22   German Deposit Protection Fund which compensated nonbank

23   investors in Bankhaus debt and filed insolvency.

24   Q.    Between the two of those, about what percentage of the

25   total outstanding debt or claims of Bankhaus does that

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 67

Page 46

1    represent?

2    A.    Well, in excess of seventy-five percent.

3    Q.    And those -- the members of the creditors' committee will

4    also -- they're also members of the creditors' assembly, is

5    that correct?

6    A.    Yes.

7    Q.    Okay.  And they've indicated to date that they're voting

8    in favor at the assembly meeting of this transaction?

9    A.    Yes, to the best of my knowledge.

10          MR. YATES:  Your Honor, I don't have any further

11   questions.

12          THE COURT:  Thank you.  Does anyone else have

13   questions of the witness?  You're excused.  Thank you very

14   much.

15          MR. YATES:  Your Honor, I don't know if -- I know that

16   Mr. Krasnow went through the bases for the relief requested

17   under his motion.  To complete the record, I didn't know if you

18   just wanted me to make my brief argument, cover the points and

19   then that would be our presentation with respect to the motion.

20          THE COURT:  Fine.  Why don't we complete your

21   presentation and then I'll hear from the official committee and

22   the ad hoc group?

23          MR. YATES:  All right, Your Honor.  We, of course,

24   have sought approval of the sale of these assets and free and

25   clear of liens, claims and encumbrances which we refer to in

1    the motion as interest under 363(f) and 1520 of the Bankruptcy

2    Code.  We believe that we've satisfied the requirements to do

3    so under U.S. and under German law.  The assets are located

4    here in the United States.  The testimony indicates and the

5    proffers -- I'm sorry -- the declarations that there is a sound

6    business justification for the sale.  Based on the declarations

7    and Mr. Olivier's testimony, it is the administrator's view

8    that the transaction and the sale of these assets is for fair

9    value and is a discharge of Dr. Frege's duties as the

10   insolvency administrator in a commercially reasonable way under

11   German law.  Based on the declarations that were submitted,

12   there are no interests or any claims, et cetera, that have been

13   made with respect to the assets.  And there have been no

14   objections to the sale in the Chapter 15 proceedings.  The

15   notice was given pursuant to local rules so we believe that

16   satisfies the requisites for satisfying fair notice to parties

17   in interest and creditors.

18         As you've also heard, Your Honor, from Mr. Ehrmann's

19   testimony, and I'm also including the declaration, these

20   negotiations certainly, I think, can be characterized as being

21   at arm's length.  They went over a long period of time.  There

22   were many exchanges, many participants and, ultimately, we

23   arrived at this transaction.  As a result, we have sought in

24   our order a finding that LBHI is a purchaser in good faith and

25   would be entitled to the protections of 363(m) and, as a

Page 48

1    corollary to that, there would be no application of 363(n).

2         As Mr. Olivier testified to, the German creditors'

3    committee has approved.  That represents about seventy-five

4    percent of the creditors of the Bankhaus estate.  And the deal

5    is still subject to creditors' assembly approval which will

6    come forward on the 14th of April of this year.  But again, as

7    Mr. Olivier testified to, the largest creditors support this

8    transaction so we're confident that that will  ultimately be

9    approved.

10        We've also asked in our motion to have the order

11   become effective and enforceable immediately.  And as a result,

12   based on the evidence, the submissions, argument, et cetera,

13   and the fact that it's unopposed, we'd ask for the Court to

14   approve the motions.

15        THE COURT:  Okay.  Thank you.

16        MR. YATES:  Thank you.

17        THE COURT:  Let's start with the creditors' committee.

18        MR. FLECK:  Good morning, Your Honor.  Evan Fleck with

19   Milbank, Tweed, Hadley & McCloy on behalf of the official

20   committee.  As Your Honor noted, and it was noted by Mr.

21   Krasnow, the official committee is supportive of the Court's

22   approval of the note purchase agreements that are before the

23   Court.  We did file a statement on the docket setting forth the

24   reasons for that support.  And they are principally threefold,

25   and they've been discussed by other parties here.  But it's the

Page 49

1     control of the structures that the entry into these agreements

2     and the approval of these agreements will provide to the

3     estates; the favorable pricing that we're comfortable will

4     result in a profit to the estates; and also the fixing of the

5     claim under the SCA.

6           We've all been very careful to say that the -- we're

7     not here for approval of the settlement agreement -- plan

8     settlement agreement with the Bankhaus estate, and I'm not

9     standing up to say anything different, Your Honor.  Although I

10    would note -- and I would emphasize that the note purchase

11    agreements themselves stand on their own.  We think that --

12    we're very comfortable that they represent a sound exercise of

13    the debtors' business judgment.  They are appropriate, and they

14    will benefit the creditors of the U.S. estates on their own.

15    We are also pleased with the progress and with, in fact, the

16    results of those discussions and how they fit in to the overall

17    plan settlement, which will be laid out more fully for the

18    Court in connection with the plan.

19          In light of the Court's inquiries so far during this

20    hearing, we thought it was appropriate to address specifically

21    the committee's role in the process and how we understood the

22    agreement and why we are supportive of it.  And there -- as the

23    Court is aware, there have been many times that we've come

24    before the Court with varying degrees of involvement with

25    transactions that are being proposed by the debtors.  They

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 67

Page 50

1   range from having received notice early on in the process, an

2   opportunity for us to ask questions, subcommittee review and

3   the like.

4        There has not been a transaction brought before the

5   Court that has received greater attention by the creditors'

6   committee, for the reasons set forth in our statement -- I

7   think they're obvious, including the size of the transaction.

8   I want to add a little bit more granularity to that.

9        The creditor's committee met more than six times

10  specifically to discuss aspects of this transaction.  Three of

11  those sessions were actually meetings to discuss just the note

12  purchase agreement and the terms.  During one of those meetings

13  we were joined by representatives of the debtors for a

14  discussion between the members of the committee and the

15  debtors, with respect to the terms of the note purchase

16  agreements.

17       In addition, as was referenced a few times this

18  morning, Houlihan Lokey, one of the financial advisors to the

19  creditors' committee, participated directly in the

20  negotiations.  Early on in the process, it was the case that

21  Houlihan Lokey received updates and regular updates from the

22  debtors about the status of the discussions.  We, as counsel,

23  also received updates from Weil Gotshal and through our

24  intermittent participation in the foreign administrator

25  protocol discussions.

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 67

Page 51

1          As the concept of the note purchase agreements

2     crystallized, in fact, just before they became crystallized,

3     the representatives from Houlihan Lokey began to participate

4     directly in the negotiations, both in person in Germany, as

5     well as in discussions here and the telephonic negotiations

6     that were discussed here.  It is absolutely a fair

7     characterization to say that based upon our experience and the

8     committee's understanding through Houlihan Lokey that these

9     were certainly arm's-length -- Mr. Krasnow's characterization

10    of them as arduous is also accurate and probably charitable --

11    these were very difficult negotiations, Your Honor.  And I

12    don't think anybody involved with them had a high degree of

13    certainty that we would be here today, in fact, given the fact

14    that there were, at many times, very significant issues that

15    had to get resolved.

16          It brought comfort to the committee that we were so

17    involved in the process, because given the complexities here,

18    sitting on the sidelines, and I think as Your Honor has

19    referenced, perhaps the Court is feeling that today, it is very

20    difficult to understand the give-and-take of these transactions

21    and why we believe these are in the best interests of the

22    estates.

23          From the committee's perspective, we're very

24    comfortable that the parties leveraged upon the different

25    mandates that exist in the different proceedings.  That was

Page 52

1    also the case with respect to the prior transaction from a year

2    ago, where there was -- the parties appreciated an opportunity

3    to purchase assets here again, purchase assets where the

4    Bankhaus estate has a greater focus on liquidation now, and

5    there's an increased flexibility in these proceedings, to see

6    opportunities over a longer time horizon.

7         Your Honor, it's for these reasons that the creditors'

8    committee, again, is supportive of entry into these

9    transactions between the estates and the Bankhaus estate.

10        I have just one final point, and I'm happy to respond

11   to any questions.  And it doesn't go to the approval of the

12   transactions.  The creditors' committee, as it always does,

13   reaches out to its constituency to gauge its reaction to

14   transactions.  We were pleased that in addition to other

15   creditors in the process, that the ad hoc group did file a

16   statement in support.

17        Just for purposes of a clean record -- and again, it

18   doesn't go to the overall approval of the transaction because

19   they obviously are supporting it.  The committee respectfully

20   disagrees with the ad hoc group's characterization of the steps

21   and the role that they played in the process before the filing

22   of the motion.  I only mention that, Your Honor, it's not about

23   who gets credit for a transaction but the committee does

24   believe it's important, for purposes of other parties that are

25   going to be negotiating and are in negotiations with the

Page 53

1   debtors now, for resolution in connection with the plan that

2   parties have confidence that settlements that are proposed by

3   the debtors, and in this case are supported by the creditors'

4   committee, are sound, reasoned and have been the subject of

5   considerable negotiations.  We think that's the case here.

6           And for those reasons and all the others I've stated,

7   as well as those in our written submission, we are supportive

8   of the transaction.

9           THE COURT:  Thank you very much.

10          MR. FLECK:  You're welcome.

11          MR. UZZI:  Your Honor, Gerard Uzzi of White & Case on

12  behalf of the ad hoc group of Lehman Brothers creditors.  Your

13  Honor, perhaps interestingly, before the hearing, I was I guess

14  what could be characterized as chit-chatting with Mr. Yates,

15  saying, gee, just from an intellectual standpoint, this is an

16  interesting hearing for some of the reasons why Your Honor has

17  noted.  And we posited as to what would happen if somebody was

18  actually objecting to this hearing given that we have a Chapter

19  15 case going on and a Chapter 11 case going on.  And I think

20  the conclusion we reached which, for what it's worth, is the

21  reason why this can happen is because there's different

22  perspectives at play here.  And I do think there's probably --

23  and I'm no Chapter 15, certainly no German insolvency law

24  expert -- there's a perspective for the Chapter 15 estate that

25  makes sense for the Chapter 15 estate.  We obviously focused on

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 54

1    whether this made sense for the Chapter 11 estate.  But I do

2    think that those things can coexist, Your Honor.

3            So how did the ad hoc group look at this?  The easy

4    part, Your Honor, I'll deal with first, is our concerns about

5    what Mr. Krasnow referred to as a poison pill.  We appreciate

6    Mr. Krasnow's statements regarding it was never the debtors'

7    intent to put a poison pill in this.  We never thought it was

8    the debtors' intent to put a poison pill in this.  But we did

9    have concerns about some ambiguity in the language.  We raised

10   it to the debtors.  The debtors raised it with the Bankhaus

11   administrator.  And those issues have been clarified and

12   resolved.  And I do want to say we appreciate the efforts of

13   both the debtors and the Bankhaus administrator, and

14   particularly Mr. Krasnow and Mr. Yates, in getting rid of what

15   could have been some noise there.

16           With respect to the economics, Your Honor, you know,

17   we did file a statement in support.  But we look at this under

18   not necessarily what I'd say a legal standard.  It is a legal

19   standard.  But we look at this from a standpoint, if we were an

20   objecting party, what would we have to do to upset this

21   transaction.  That is, are we able to say that this doesn't

22   make sense for the debtor.

23           And so, our statement of support in our analysis of

24   this looks at it from that context.  And so we weren't looking

25   at this as is this a great deal, even is this a good deal; it's

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 55 of 67

Page 55

1    really, is this a rational deal.  And from that standpoint, we

2    think it's a rational deal, and therefore we support the deal.

3              With respect to what we looked at, Your Honor, first

4    and foremost, you've heard some testimony as to the pricing of

5    the individual notes.  While we did consider each part of the

6    transaction, we've always understood this to be one all-in

7    transaction.  That is, the LBHI estate or the debtors -- let me

8    say the Chapter 11 debtors -- didn't have the ability to

9    cherry-pick.  And had we had the ability to cherry-pick, we

10   might like one part of the transaction and not another.  So we

11   looked at this as in the context of the whole.

12             And what we understand with respect to price overall,

13   Your Honor, is while there's an analysis that underlies it, it

14   is principally the product of a negotiation.  And when our

15   question is to the debtors, well, how did you arrive at this

16   price, it's, well, that's the best deal we could get.

17   Obviously, we, from our standpoint, would prefer a bigger

18   discount to the notes.  But it's the best deal they could get.

19   So from our standpoint, we have a deal that's on the table.

20   And it's really a yes or no and whether it's better to accept

21   this transaction today, given the totality of the

22   circumstances, or would it be better to say this doesn't make

23   sense, walk away, and let's see what else we could get done.

24             In the specifics of what we were considering, Your

25   Honor, the Spruce and Verano notes, you've heard some

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 67

Page 56

1    references to market prices and the like.  One of the things we

2    considered carefully was the fact that they are mezzanine

3    notes.  And because of that, there is a risk as to the

4    valuation and what might actually be derived.  And so

5    therefore, you know, we were considering when we look at

6    everything, the potential downside, and we do think that

7    there's downside in the transaction, so are we covered on the

8    downside.

9           With respect to the SASCO notes, Your Honor, I think

10   it's worth noting, and it was -- it's in the testimony, but

11   it's something we considered also, that the SASCO notes are

12   backed by real estate assets.  The consequence of that, Your

13   Honor, is that it takes -- and these are what I understand,

14   Your Honor, not just plain vanilla real estate assets, these

15   are sophisticated transactions that back up sophisticated

16   notes.  The consequence of that is that it takes a certain

17   level of expertise, and probably a considerable level of

18   expertise, to manage those assets.  LB -- the debtors -- the

19   Chapter 11 debtors have that expertise.  I don't believe the

20   Bankhaus trustee or administrator has the expertise.

21          So this, Your Honor -- and I'm not here to make the

22   case on the Bankhaus part of it -- but this is a situation, I

23   think, where you can look at this a little bit as a strategic

24   transaction, whereby the notes themselves, the SASCO notes,

25   make more sense being held by the Chapter 11 debtors than they

1    make sense being held by the Bankhaus debtors.  And you've

2    heard also some references to imperfect information and the

3    ability to manage those assets.

4         We were focused also on what's been referred to -- and

5    I'm not sure this word has been used -- but the hundred million

6    dollar penalty, that is, the LBHI estate would have to pay a

7    hundred million dollars more under certain circumstances --

8         THE COURT:  You're the first person to use the term

9    "penalty".

10        MR. UZZI:  Okay.  Well, there's an incremental charge,

11   let's say, if certain conditions aren't met.  We analyzed it

12   differently, Your Honor.  We said, instead of 625 with maybe

13   having to pay 100 million dollars more, we said let's look at

14   as if this is 725 and maybe we can get a further 100 million

15   dollar discount.  Because I think it's worth noting, Your

16   Honor, that 100 million dollars is a potential admin claim.

17   It's day-one cash that gets paid to the Bankhaus administrator.

18        If you look at the contingencies, it's tied

19   principally to the entitlements under a plan of reorganization.

20   Under the debtors' current plan and their current valuation,

21   LBHI creditors would receive around -- rough numbers -- twenty

22   cents -- just to make the -- I think it's twenty-one and a half

23   cents, but just to make the math easy, twenty cents.  That

24   equates to a 500 million dollar claim.  I mean, that's a

25   material claim, Your Honor.

08-13555-mg   Doc 15351   Filed 03/23/11   Entered 03/25/11 09:20:57   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 67

Page 58

1          And so, whether it's going to make sense to actually

2     trigger the 100 million dollars when we're looking at 500

3     million dollars in claims that that equates to, may be paid out

4     over time, in addition to the 6 and a half billion,

5     approximately, claims that is referenced in the plan support

6     agreement, that 100 million may very well come into play.  So

7     we wanted to analyze it under, let's presume it's triggered,

8     and maybe we can ultimately get a better deal, and there'll be

9     tradeoffs in not triggering it.  And at 725, again, we thought

10    it was still rational.

11         The last point, I think, Your Honor, with respect to

12    the notes themselves, particularly the SASCO notes, is that we

13    do understand -- and I think there was at least some innuendo

14    in the testimony that there is what I would refer to as some

15    hair on these notes with respect to disputes already, not

16    surprisingly, between Bankhaus and the Chapter 11 debtors, with

17    respect to the entitlements of underlying assets under the

18    notes.  That, Your Honor, I raise solely because you asked a

19    question, well, why not do a third-party auction.  Yeah, it's

20    possible.  But I think you have to take into consideration the

21    fact that there are underlying issues that might make it

22    difficult to actually see that through.

23         And so one of the things that is happening here, and

24    one of the things we considered, is the reduction of some of

25    the noise that relates to asset allocation issues just

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 59 of 67

Page 59

1    generally in the case.  So this is going to have a benefit,

2    incrementally, to seeing all of us through to the end here.

3         Of course, what you give with the left hand, you

4    some -- or what you get on the left hand, sometimes you give

5    away on the right hand.  There is a reservation of rights in

6    the order now regarding the Chapter 11 debtors' estates'

7    relative rights with respect to this transaction.  So there are

8    other, let me say, inter-estate issues that are now ripening as

9    a result of this transaction.  That will be dealt with

10   separately, Your Honor.  We welcome the opportunity to

11   participate in those discussions as well.

12        But with respect to the transaction that is before the

13   Court today, we do support the transaction.  We don't believe

14   it's a great transaction.  We believe it's a rational

15   transaction.  And since it's rational for the debtors' estate,

16   we believe it's likely rational for the Bankhaus estate too.

17   We at least believe the two can coexist together.  Your Honor,

18   that's really all I have to say.  If you have questions of me

19   on how our group looked at this, I'm happy to answer them.

20        THE COURT:  No, I don't have any questions.  Thank you

21   very much.

22        MR. UZZI:  Thank you, Your Honor.

23        THE COURT:  Is there anyone else who wishes to be

24   heard?

25        MR. LEE:  Briefly, Your Honor.  Kenneth Lee from

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 60

1    Hughes, Hubbard & Reed for the SIPA trustee.  As Mr. Krasnow

2    noted, the SIPA trustee did file a statement last week stating

3    that it did not object to the transaction.  Since that time, we

4    have had further conversations with advisors to LBHI and

5    received further information from them concerning the

6    transaction.  And the SIPA trustee is increasingly comforted

7    that this is an exercise of the sound business discretion of

8    the debtors.  And so we also support the transaction.

9           I would also point out that -- and I don't think this

10   is necessary to go into in excruciating detail -- but the SIPA

11   trustee does have continuing interests -- LBI does have

12   continuing interests in certain of SASCO notes, and that since

13   we believe and understand that this transaction does not affect

14   any of those rights, we just continue to reserve our rights and

15   otherwise support the transaction, because it doesn't affect

16   us.

17           THE COURT:  Okay.

18           MR. LEE:  Thank you, Your Honor.

19           THE COURT:  Mr. Krasnow, do you have anything more to

20   say, or --

21           MR. KRASNOW:  Your Honor, I was just going to point

22   out -- Mr. Uzzi alluded to it -- in terms of the black-line

23   order that we filed with the Court on Friday, it does contain a

24   rather lengthy paragraph that emanates from discussions that

25   were had with certain LCPI creditors who raised questions as to

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 61

1    whether or not LCPI should have an interest in some of the

2    notes that we are acquiring.

3         We indicated in the pleadings why we thought it was

4    appropriate for LBHI to be the purchaser of the notes.  But in

5    any event, the paragraph that was added basically is a

6    reservation of rights, so it's not an issue that needs to be

7    addressed or considered in the context of today's hearing.

8         I would just say that for the reasons that you've

9    heard from all parties, we would, again, request that the Court

10   approve the transactions in the Chapter 11 cases.  Thank you,

11   Your Honor.

12        THE COURT:  Fine.  I will approve the motion of LBHI

13   relating to the two note purchase agreements, as well as the

14   motion by LB Bankhaus AG for an order approving these

15   agreements.  The hearing in these parallel proceedings were

16   uncontested.  But for all practical purposes, we've had a full

17   record, as if someone had been an objector, thereby giving the

18   Court deeper insight as to the nature of the transaction than

19   at least I was able to discern from a review of the various

20   pleadings in anticipation of today's hearing.

21        I'm satisfied that the transaction is a reasonable

22   one, both from the perspective of the Chapter 11 estate and

23   from the perspective of Lehman Brothers Bankhaus.  I note that

24   there are different objectives and different time horizons

25   applicable to each of these cases, and that as a result of

08-13555-mg    Doc 15351    Filed 03/23/11    Entered 03/25/11 09:20:57    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 67

Page 62

 1    those differences, it became possible for the parties to reach

 2    an agreement that satisfied the needs of both sides.

 3         As to the pricing question, which I raised during Mr.

 4    Krasnow's opening remarks, I suppose I'm satisfied.  Although I

 5    still have some questions as to how the discounted amounts came

 6    to be, I understand the negotiations to have been arm's-length

 7    and protracted.  I'm satisfied with Mr. Ehrmann's testimony and

 8    with Mr. Olivier's testimony on the subject, and recognize that

 9    in a transaction such as this, we're not achieving market value

10    as much as we are achieving a negotiated number which takes

11    into account the particulars of these highly structured assets.

12         One of my takeaways, particularly from the Bankhaus

13    presentation, is that given the so-called information disparity

14    and the underlying complexity of the asset base, which

15    represents the real measure of value of the notes, it would

16    have been difficult to structure a true auction for these notes

17    that would produce robust competitive bidding.  Moreover, given

18    the relationship in the capital structure between Bankhaus and

19    the Lehman debtors, a minority position or mezzanine position

20    might not be all that attractive to a third-party purchaser.

21         Under all the circumstances, I view the transaction as

22    not only a rational transaction, as described by Mr. Uzzi, but

23    as a creative and productive one.  While not described at

24    length in today's hearing, it is apparent to the Court that the

25    transaction also is an important building block in the plan

1    process.  That does not play any role in the Court's decision

2    to approve these purchase agreements, but it is, I believe, a

3    useful context in which to view the current motions.

4            For the reasons stated, I'll enter the order in the

5    form presented.  And if there's nothing further, we're

6    adjourned.

7        (Whereupon these proceedings were concluded at 11:58 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 64

1

2                    **I N D E X**

3

4                 **T E S T I M O N Y**

5

6  WITNESS                EXAM BY                PAGE    LINE

7  Daniel Ehrmann         Mr. Krasnow            30      3

8  Hulmut Olivier         Mr. Yates

9

10                  **E X H I B I T S**

11

12  DEBTOR     DESCRIPTION                        ID.    EVID.

13  ---        Declaration of Andrew Grapkowski          10

14  ---        Exhibit A to debtors' motion seeking      29

15             approval of two note purchase

16             agreements with Lehman Brothers

17             Bankhaus AG (in Insolvenz), SASCO

18             Agreement

19  ---        Exhibit B to debtors' motion seeking      29

20             approval of two note purchase

21             agreements with Lehman Brothers

22             Bankhaus AG (in Insolvenz), Spruce-

23             Verano Agreement

24

25

Page 65

1

2                          I N D E X , cont'd

3

4                            E X H I B I T S

5

6    DEBTOR     DESCRIPTION                              ID.      EVID.

7    ---        Exhibit C to debtors' motion seeking             29

8               approval of two note purchase

9               agreements with Lehman Brothers

10              Bankhaus AG (in Insolvenz), Plan

11              Settlement Agreement

12   ---        Exhibit E to debtors' motion seeking             29

13              approval of two note purchase

14              agreements with Lehman Brothers

15              Bankhaus AG (in Insolvenz),

16              declaration of Daniel J. Ehrmann

17              of Alvarez & Marsal

18

19   BANKHAUS   DESCRIPTION                              ID.      EVID.

20   ---        Declarations of Joachim Kuhne and                36

21              Hulmut Olivier

22

23

24

25

```
                                                            Page 66

  1

  2                          I N D E X, cont'd

  3

  4                          R U L I N G S

  5

  6    DESCRIPTION                                    PAGE    LINE

  7    Debtors' motion for an order modifying          8       8

  8    automatic stay to allow settlement payments

  9    under 2007-2008 Directors and Officers

 10    Insurance policy issued by Zurich American

 11    Insurance granted

 12    Stipulation re motion of Edgewood Management     9       4

 13    LLC seeking return of $505,936.13 from LBHI

 14    to Edgewood Management LLC approved

 15    Motion of Lehman Brothers Holding Inc. and      10      25

 16    Lehman Commercial Paper Inc. for order

 17    approving the sale of 80,000 shares of Quadrant

 18    Structured Products Company Ltd. to Quadrant

 19    for $90,000 in cash consideration approved

 20    Motion of LBHI relating to two note purchase    61      10

 21    agreements, and motion by LB Bankhaus AG for

 22    order approving these agreements approved

 23

 24

 25
```

Page 67

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6         Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                            DN: cn=Lisa Bar-Leib, o, ou,
                            email=digital1@veritext.com,
7    _____  c=US
                            Date: 2011.03.24 16:29:20 -04'00'

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  March 24, 2011

18

19

20

21

22

23

24

25