**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| **LEHMAN BROTHERS HOLDINGS INC., *et al.*,** | : | **08-13555 (JMP)** |
| **Debtors.** | : | **(Jointly Administered)** |

**SUPPLEMENTAL AFFIDAVIT AND DISCLOSURE STATEMENT OF JACQUELINE M. O'NEIL, ON BEHALF OF THE O'NEIL GROUP**

STATE OF VIRGINIA )
) ss:
COUNTY OF LOUDOUN )

Jacqueline M. O'Neil, being duly sworn, upon her oath, deposes and says:

1. I am a Managing Director of The O'Neil Group, located at 4431 P Street, NW Washington, DC 20007 (the "Firm").

2. On January 27, 2010, Lehman Brothers Holdings Inc. and its affiliated debtors in the above-captioned chapter 11 cases (together, the "Debtors") filed an Application Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for an Order Authorizing the Retention and Employment of The O'Neil Group as Tax Services Providers *Nunc Pro Tunc* to the Engagement Date (the "Application")[1] [Docket No. 6798], together with copies of my declaration in support thereof (the "2010 Declaration") and the engagement agreement entered into between the Debtors and the Firm, each dated January 26, 2010 (the "2010 Engagement Agreement"). By order, dated February 9, 2010, the United States Bankruptcy Court for the Southern District of New York granted the Application [Docket No. 7044].

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Application.

3. This affidavit supplements the Application and 2010 Declaration, pursuant to Federal Rule of Bankruptcy Procedure 2014.

4. As set forth in the 2010 Declaration (¶¶ 11-13) and pursuant to the 2010 Engagement Agreement, the Firm provided services to the Debtors at a reduced rate. As indicated in the 2010 Engagement Agreement, in the ordinary course, the Firm charges its non-Debtor clients based on hourly rates of $325-$450 for services provided by a Managing Director, hourly rates of $225-$350 for services provided by a Director, and hourly rates of $165-250 for services provided by a Manager of the Firm. (Decl. ¶ 11).

5. In 2010 the Firm performed and billed the Debtors approximately 7,800 hours of services. Although approximately 5,900 of the 7,800 hours billed to the Debtors, and approximately 75% of the fees accrued were attributable to Managing Directors and Directors, the Firm charged the Debtors a lower fixed blended rate of $180 per hour. Overall the Firm billed 95% of the work performed in 2010 at the fixed blended rate of $180 per hour.

6. As indicated in the Application (Appl. ¶ 26) and the 2010 Declaration (Decl. ¶ 12), the 2010 compensation arrangement was subject to periodic revisions in the Firm's ordinary course of its business, and the Firm agreed to advise the Debtors of such increases.

7. On December 6, 2010, the Debtors and the Firm entered into an amended and restated engagement agreement (the "2011 Engagement Agreement"), effective as of January 10, 2011. A copy of the 2011 Engagement Agreement is attached hereto as Exhibit A.

8. Pursuant to the 2011 Engagement Agreement, based upon the level of effort and related experience required to perform the services, the Firm will increase the fixed hourly rate it will charge the Debtors for international tax compliance (5471s), state and local compliance and real estate joint venture review by $10 (or approximately 5%). This new rate

still provides the Debtors with a considerable discount taking into consideration the average range of rates ordinarily charged by the Firm for similar services, local market rates charged by other firms for similar services, and the percentage of work performed by senior employees.

9. The firm will also increase the hourly rates charged for preparation and review of the foreign tax credit 1118 and other special tax services, as requested, by $25 for Tax Managing Directors, Tax Senior Directors and Tax Managers; as indicated on the chart below. Services that are applicable to this compensation structure account for less than 10% of the work performed for the Debtors.

| Team Member | Hourly Bill Rate 2010 | Hourly Bill Rate 2011 |
|---|---|---|
| Tax Managing Director | 325 | 350 |
| Tax Senior Director | 225 | 250 |
| Tax Managers | 165 | 190 |
| Tax Associates | 125 | 125 |

10. Considering the services that the Firm will provide, and the market prices for the Firm's services, the proposed fee structure, agreed upon by the Debtors, as described in the 2011 Engagement Agreement, is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code and fulfills the requirements of Rule 2014-1 of the Local Rules.

11. As demonstrated by their entry into the 2011 Engagement Agreement, the Debtors were advised and agreed to these rate changes in advance of services being provided.

By: Jacques O'Neil

Subscribed and sworn to before me
this 24th day of March, 2011

Margaret R Wegley
Notary Public
#295862

**EXHIBIT A**

**2011 Engagement Agreement**




December 6, 2010

Jeffry J. Ciongoli
Managing Director
Lehman Brothers Holdings Inc.
101 Hudson Street
Jersey City, NJ 07302

Re: Tax Compliance and Reporting

Dear Mr. Ciongoli:

The O'Neil Group is pleased to present our proposal to Lehman Brothers Holdings Inc ("you" or "your") to provide Tax Compliance and Reporting services for tax years ending 2008 (Amended) and 2010 (the "Services").

*Objectives and Scope*

We understand the engagement objectives and scope to be the completion of 2010 Foreign Tax Returns (Forms 5471, 8865, 8858, 1120F and 1118), review of Lehman joint venture real estate returns and completion of various State and Local income tax returns. We will also assist with the 2008 amended US Corporate Income Tax Return, as needed. Our team will be working with your internal tax department on this project, using the prior year templates – to be updated for 2010, statements and document retention process. We will utilize the Lehman tax software for all preparation. We will also provide training to and manage the time of the Lehman staff and interns, as requested. The accounting information provided will be verified by internal Lehman tax members prior to distribution to The O'Neil Group. It is critical that this information arrive timely and complete. Prior to beginning a new return, we will verify key information with a member of your internal tax department to make sure that the entity is still a reportable CFC and that all information is complete and accurate.

Given the number of returns to be completed for the 2010 filing year, we plan to start working with your team on January 10, 2011. Our initial team will then be able to evaluate




the flow of new information and add team members as appropriate. See anticipated Budget and Timeline attached. This Budget does not include a detail time allocation for the preparation of amended 2008 tax returns but we anticipate the addition of approximately 500 hours for that project.

*Our Services*

We will perform those services or tasks you request which are within our scope or practice, as discussed and outlined herein – see Schedule of Returns, Attachment A. You agree to comply with all of our reasonable requests and to provide us timely access to all information and locations reasonably necessary to our performance of the services.

The successful delivery of our Services, and the fees charged, are dependent on (i) your timely and effective support and direction, (ii) the accuracy and completeness of the documentation provided, and (iii) timely decisions and approvals by your management.

The O'Neil Group estimates that the preparation of the international tax returns listed on Attachment A will require approximately nine thousand five hundred (9,500) hours to complete. We estimate that the preparation of the state and local tax returns listed on Attachment A will require approximately one thousand two hundred (1,200) hours to complete. We understand that this estimate is consistent with the level of effort required to complete these returns in past years after giving consideration for the current circumstances.

The review of the real estate joint venture returns is estimated to take approximately nine hundred forty (940) hours to complete, although this will depend upon the scope of work requested. Our estimate is based upon the review performed for the 2009 returns which was relatively cursory and did not include much of the project management as we were transitioning the work mid-year from Alvarez and Marsal. We anticipate a possible increase in scope of work on this project and will have to adjust our estimated time if that occurs.

In the event that the scope of our work changes due to the loss of internal Lehman support in the existing tax department, Lehman will be responsible for any delays, additional costs, or




other liabilities caused by or associated with any deficiencies in the assumptions or in carrying out your responsibilities. We will have the appropriate resources available to fill those gaps, should they occur, however, those additional hours for that additional expertise will be billed at our regular hourly rates, as outlined herein.

We understand that you intend our work, opinions, conclusions and communications to be covered by the attorney-client and work product privileges to the extent provided by law, and we will comply with any requests you make of us that are designed to preserve these privileges. In addition, we understand that you will provide us with instructions regarding any document retention or document production procedures you expect us to follow.

We are a management consulting firm and not a CPA firm, and do not provide attest services, audits or other engagements in accordance with the AICPA Statements on Auditing Standards. Any accounting related services that we may provide you will be in our role as business advisor to you. We will not be auditing any financial statements or performing attest procedures with respect to information in conjunction with this engagement. Our services are not designed, nor should they be relied upon, to identify weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies.

We will not make any final judgments or decisions regarding accounting treatment. Such final judgments or decisions must be made by others who have the ultimate responsibility for such decisions and who can evaluate the information we provide together with all other relevant information. You understand and agree that our services are not to be considered to be part of your internal control environment.

*Bankruptcy Court Approval*

You agree to file an appropriate motion prepared in consultation with The O'Neil Group as to matters relating to our retention and provision of the Services as contemplated hereunder, as soon as practical and this engagement letter shall be subject to the entry of a final order of the Court approving the retention of The O'Neil Group to perform the Services.




*Fees and Expenses*

The O'Neil Group's professionals generally bill at hourly rates commensurate with the individual professional's experience and area of specialization. The current standard ranges of rates, which are subject to adjustment in the ordinary course, are as follows:

| *Title* | *Hourly Rate* |
|---|---|
| Managing Director | $325 to $450 |
| Director | $225 to $350 |
| Manager | $165 to $250 |
| Associate | $125 to $185 |

Based on our estimation of the level of effort and related experience required to perform the Services, The O'Neil Group agrees to provide the Services as specifically contemplated herein at a Blended Rate of $190 per hour.

Any additional work, including the preparation of the 1118, will be provided at the reduced billing rates – outlined below. See estimated Budget attached hereto.

| The O'Neil Group Partners Team Member | Hourly Bill Rate |
|---|---|
| Tax Managing Director | 350 |
| Tax Senior Director | 250 |
| Tax Managers | 190 |
| Tax Associates | 125 |

In the event additional assistance is required, beyond the tax return preparation contemplated herein and outside of the scope of The O'Neil Group's tax services, we will agree with you in writing on the scope of such service and our standard rates for the related service and personnel will apply.




The O'Neil Group shall be reimbursed by Company for all reasonable expenses incurred by The O'Neil Group in the performance of the Services, including, but not necessarily limited to, travel time, travel and lodging expenses, tax software and supplies, and reasonable legal fees that may be incurred in connection with the engagement. As requested, we will bill our meals and incidentals on a per diem basis – as per the IRS standard rates. We have also agreed to account for the first 2 hours of travel time as "Unbilled Time" with the remaining travel time billed at the standard blended rate.

The O'Neil Group will bill on a monthly basis in accordance with *Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals*, dated November 19, 2008 (Docket No. 1604) and applicable local bankruptcy rules, except as otherwise allowed. Payments will be made by wire transfer to:

TBD

*General Business Terms*

We are an independent contractor and not your employee, agent, joint venturer or partner, and will determine the method, details and means of performing our services. We assume full and sole responsibility for the payment of all compensation and expenses of our consultants.

Our fees and payment terms are set out above. Those fees do not include taxes and other governmental charges (which will be separately identified in our invoices). We reserve the right to suspend services if invoices are not timely paid, in which event we will not be liable for any resulting loss, damage or expense connected with such suspension.

If you are required by the laws of any foreign tax jurisdiction to withhold income or profits taxes from our payment, then the amount payable by you upon which the withholding is based shall be paid to us net of such withholding. You shall pay any such withholding to the




applicable tax authority. However, if after 120 days of the withholding, you do not provide us with official tax certificates documenting remittance of the taxes, then you shall pay to us an amount equal to such withholding. The tax certificates shall be in a form sufficient to document qualification of the taxes for the foreign tax credit allowable against our corporation income tax. You will be responsible for and pay all applicable sales, use, excise, value added and other taxes associated with the provision or receipt of the services and deliverables, excluding taxes on our income generally.

With respect to any information supplied in connection with this engagement and designated by either of us as confidential, or which the other should reasonably believe is confidential based on the subject Services or the circumstances of its disclosure, the other party agrees to protect the confidential information in a reasonable and appropriate manner, and use confidential information only to perform its obligations under this engagement and for no other purpose. This will not apply to information which is: (i) publicly known, (ii) already known to the recipient, (iii) lawfully disclosed by a third party, (iv) independently developed or (v) disclosed pursuant to legal requirement or order.

Confidential Information made available hereunder, including copies thereof, shall be returned or destroyed upon request by the disclosing party; provided that the receiving party may retain other archival copies for recordkeeping and quality assurance purposes and receiver shall make no unauthorized use of such copies.

Upon full and final payment of all amounts due to us in connection with this engagement, all right, title and interest in any deliverables we provide to you will become your sole and exclusive property, except as set forth below. We will retain sole and exclusive ownership of all right, title and interest in our work papers, proprietary information, processes, methodologies, know how and software ("The O'Neil Group Property"), including such information as existed prior to the delivery of our services and, to the extent such information is of general application, anything which we may discover, create or develop during our provision of services. To the extent our reports or other documents delivered to you contain The O'Neil Group Property, we grant you a non-exclusive, non-assignable,




royalty-free license to use it in connection with the subject of the engagement. As discussed more fully elsewhere in this letter, your use of deliverables is limited to the Services and should not be published, used or relied on for any other purpose.

Our engagement with you is not intended to shift risk normally borne by you to us. In the event of a legal proceeding or other claim brought against us by a third party, including a subpoena or court order, you agree to indemnify and hold us and our personnel, agents and contractors harmless against all costs, fees, expenses, damages, and liabilities, including reasonable defense costs and legal fees, associated with such third-party claim arising from or relating to any services or work product that you use or disclose to others, or this engagement generally. The provisions of this section for indemnification will not apply to the extent a claim arises out of our gross negligence or willful misconduct, as finally adjudicated by a finder of fact. We will not be liable for any special, consequential, incidental, indirect or exemplary damages or loss (nor any lost profits, savings or business opportunity). Further, our liability relating to this engagement will in no event exceed an amount equal to the fees we receive from you for the portion of the engagement giving rise to such liability. Neither of us will be liable for any delays or failures in performance due to circumstances beyond our reasonable control.

You may terminate this Agreement for convenience at any time on 30 days' prior written notice to us. We may terminate this Agreement for convenience at any time on 30 days' prior written notice to you. We may terminate this Agreement if, within 15 days' notice, you fail to cure a material breach of this Agreement including in the event of non-payment of amounts due us. Further, we reserve the right to terminate the Agreement at any time, upon providing written notice to you, if conflicts of interest arise or become known to us that, in our sole judgment would impair our ability to perform the services objectively. To the extent you terminate this Agreement for convenience, you will pay us for all services rendered, expenses incurred or commitments made by us to the effective date of termination. To the extent you terminate this Agreement for breach, you will pay us for all conforming services rendered and reasonable expenses incurred by us to the effective date of the termination. The terms of this Agreement which relate to confidentiality, ownership




and use, limitations of liability and indemnification, non-solicitation and payment obligations shall survive its expiration or termination.

This Agreement shall not provide third parties with any remedy, cause, liability, reimbursement, claim of action or other right in law or in equity for any Services governed by or subject to the provisions of this Agreement.

No term of this Agreement will be deemed waived, and no breach of this Agreement excused, unless the waiver or consent is in writing signed by the party granting such waiver or consent.

We each acknowledge that we may correspond or convey documentation via Internet e-mail and that neither party has control over the performance, reliability, availability, or security of Internet e-mail. Therefore, neither party will be liable for any loss, damage, expense, harm or inconvenience resulting from the loss, delay, interception, corruption, or alteration of any Internet e-mail due to any reason beyond our reasonable control.

This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland without giving effect to conflict of law rules. The parties hereto agree that any and all disputes or claims arising hereunder or under any Engagement letter shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any arbitration will be conducted in Washington, DC. Any arbitration award may be entered in and enforced by any court having jurisdiction thereof, and the parties consent and commit themselves to the jurisdiction of the courts of the State of Maryland for purposes of any enforcement of any arbitration award. Except as may be required by law, neither party nor any arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of both parties.

If any portion of this Agreement is found invalid, such finding shall not affect the enforceability of the remainder hereof, and such portion shall be revised to reflect our mutual intention.




This engagement letter constitutes the entire understanding and agreement between us with respect to the services described above, supersedes all prior oral and written communications between us, and may be amended, modified or changed only in writing when signed by both parties.

* * * * * *




Please indicate your agreement to these terms by signing and returning to me the enclosed copy of this letter. We appreciate the opportunity to be of service to you and look forward to working with you on this project.

Sincerely,

THE O'NEIL GROUP

By: ______________________
Jacqueline M. O'Neil, Managing Partner

Acknowledged:

[Complete legal name of Law Firm]

By: ______________________

Title: ______________________

Date: ______________________

Acknowledged and Accepted:

[Complete legal name of Client]

By: ______________________
Jeffry Ciongoli

Title: Managing Director

Date: 1-14-11