# EXHIBIT A

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555-JMP |
| Debtor. | Chapter 11 |
| KA KIN WONG, SIU LUI CHING, TIM CHOY FUNG, LIN TEI TSE, SAU KING TSE, LAI KUEN CHAN, FUK SHING WONG, SIU KWAN WONG, YEE MING SHEN, YUEN FUN TANG, | Adversary Proceeding No. 09-01120-JMP |
| Plaintiffs, | |
| vs. | |
| HSBC BANK USA, NATIONAL ASSOCIATION, LEHMAN BROTHERS SPECIAL FINANCING INC., LEHMAN BROTHERS HOLDINGS INC. and BNY CORPORATE TRUSTEE SERVICES LIMITED, | DEMAND FOR JURY TRIAL |
| Defendants. | |

AMENDED CLASS ACTION AND VERIFIED DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ...........................................................1

II. JURISDICTION AND VENUE ....................................................5

III. PARTIES ........................................................................................6

IV. THE MINIBONDS PROGRAM ..................................................7

    A. Credit Default Swaps: The Basic Building Block of the Minibonds' FTD Basket and Saphir Notes ...........................................................8

    B. The FTD Basket ..................................................................10

    C. The Saphir Notes and the Subordination Provisions ............12

        1. The Condition 44 Provision ....................................15

        2. The Priority Provision..............................................16

        3. The Condition Precedent...........................................16

        4. No Event Vested LBSF with Priority, Ever...............17

        5. Many Events Vested Saphir Notes Noteholder (HSBC Bank) with Priority Before Lehman Declared Bankruptcy ...........17

        6. Noteholder Priority Vested *Automatically*...............18

    D. The Relationship Between the FTD Basket and the Saphir Notes .......19

V. HSBC'S SELF-DEALING ...........................................................22

    A. HSBC Allowed Lehman to Run the Minibonds ...................22

    B. HSBC Obeyed Lehman's "Exceptionally Large Wallet".......24

    C. HSBC Abandoned the Minibonds While It Raced to Save Its Own Assets as Lehman Collapsed ...........................................26

        1. Mid-2008: Lehman Became Insolvent........................28

        2. Mid-2006 to Mid-2008: HSBC Examined Exposure to Lehman .............29

        3. June 2008: HSBC Derided Lehman's Weak Balance Sheet.....................30

**Page**

4.    Early July 2008: HSBC Developed a Covert Lehman Escape ................32

5.    Late July to Mid-August 2008: HSBC Placed Lehman on "Amber Alert"................................................................................................32

6.    Early to Mid-August 2008: HSBC Moved to Code Red ...........................33

7.    Mid-August 2008: HSBC "Put a Gun" to Lehman's Head ......................34

8.    September 2008, Week One: HSBC Stayed on Red Alert for Its Own Exposure but It Was "Business as Usual" Mode for the Minibonds ...............................................................................................37

9.    September 2008, Week Two: "Business as Usual" Continued for the Minibonds ................................................................................38

VI.    LEHMAN'S FRAUD ...............................................................................40

A.    Lehman's Credit Rating Was Necessary to Sustain the Saphir Notes as "Eligible Collateral" for the Minibonds.................................................40

B.    Lehman Misled the Rating Agencies ....................................................42

C.    The Specific Lehman Entities and Agents Involved in Creating the Minibonds Collateral Knew Lehman Manipulated Its Balance Sheet.................43

D.    In September 2008, HSBC Helped Lehman Manipulate Its Balance Sheet .........43

E.    Lehman's Balance-Sheet Fraud Related to the Minibonds...................45

F.    Lehman Owed a Duty to Disclose .......................................................45

VII.    LEHMAN'S BANKRUPTCY...................................................................46

A.    HSBC Awakens to Declare the Minibonds and the Saphir Notes in Default........49

B.    LBSF Makes Another Run at the Minibonds and the Saphir Notes.....................50

C.    Lehman's Bankruptcy Heightens HSBC's Conflicts of Interest ...........................51

D.    Thousands Await the Outcome of This Proceeding .............................52

VIII.    DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS ......................53

IX.    DERIVATIVE COUNTS ........................................................................56

- ii -

**Page**

|  A.  | Derivative Count I: Declaratory Relief Against All Defendants ............................ | 56 |

|  B.  | Derivative Count II: Injunctive Relief Against All Defendants ........................... | 57 |

|  C.  | Derivative Count III: For Constructive or Resulting Trust Against All Defendants .......................................................................................................... | 58 |

| X. | CLASS ACTION ALLEGATIONS ............................................................... | 60 |

| xi. | CLASS ACTION COUNTS ......................................................................... | 61 |

| XII. | PRAYER FOR RELIEF ............................................................................... | 62 |

| XIII. | JURY DEMAND ......................................................................................... | 63 |

By and through their attorneys, named plaintiffs bring this action seeking equitable relief

derivatively on behalf of a trust administered by HSBC Bank USA, National Association ("HSBC

Bank," together with its affiliates "HSBC"), against defendants Lehman Brothers Special Financing

Inc. ("LBSF"), Lehman Brothers Holdings Inc. (with its affiliates, "Lehman") and BNY Corporate

Trustee Services Limited ("BNY") and bring their constructive or resulting trust claims against

defendants as a class on behalf of all and persons who owned bonds between January 1, 2008

through the termination of this action that were issued by the HSBC trust.  Plaintiffs' allegations are

based upon personal knowledge as to their own acts, and upon information and belief as to all other

matters, based upon, *inter alia*: the Report of Anton R. Valukas, Examiner (the "Examiner" and the

"Valukas Report") and the documents attached to the Valukas Report; reports, documents and

testimony made public by the Financial Crisis Inquiry Commission (the "FCIC"), created by the

Fraud Enforcement Recovery Act of 2009; testimony and other materials made public by the Hong

Kong legislature and other regulatory bodies; and other news reports, press releases and other

documents obtained in the course of investigating the claims by plaintiffs' counsel, as follows:

## I.    NATURE OF THE ACTION

1.    Defendant LBSF is attempting to destroy property that belongs to Plaintiffs and is

currently held by defendant HSBC Bank in trust for their benefit.

2.    Plaintiffs own or owned (and maintain beneficial interests in) collateralized notes (the

"Notes" or "Minibonds") issued by Pacific International Finance Limited ("Pacific") pursuant to a

trust deed, prospectuses and supplements thereto.  They and thousands of other similarly situated

Minibonds investors ("Plaintiffs") are trust beneficiaries of a trust that Pacific created to secure its

obligations to Plaintiffs and to issue the Minibonds to Plaintiffs.  HSBC Bank is the trustee of that

trust and holds naked possession and wrongful legal title to the trust property, called the "Saphir Notes."

3.        HSBC Bank should have liquidated or distributed the Saphir Notes to Plaintiffs to satisfy Pacific's obligations to Plaintiffs over two years ago.  But HSBC Bank refuses to distribute or liquidate that property *at par* (or nearly so) to satisfy Pacific's obligations.  LBSF is attempting to destroy the Saphir Notes and has ordered HSBC Bank to "cease and desist" from discharging its obligations to use those bonds to repay Plaintiffs.  HSBC Bank has actively collaborated with LBSF to *prevent* Plaintiffs from recovering the Saphir Notes, while working in a "commercially reasonable" manner with Lehman to keep hundreds of millions of dollars it extracted from Lehman shortly before Lehman filed for bankruptcy on September 15, 2008.

4.        Through the Minibonds, Lehman and LBSF made a $1.5 billion bet against the Minibond investors that billions of dollars worth of bonds that Lehman and LBSF carried on their balance sheet would default.  In essence Lehman "shorted" bonds that it purchased and manipulated the Minibonds program to entice approximately 33,000-34,000 retail investors to take the other side of Lehman's bet.  To induce retail savings bank depositors resident mostly in Hong Kong to take that bet, Lehman set up a front and offered investors grocery store coupons, cameras, bottles of wine, camcorders and other consumer goods as "prizes" for buying Minibonds.

5.        Lehman and LBSF twisted the economics of the Minibonds and generated profits for themselves at the Minibond investors' expense for years.  But the big "win" for Lehman and LBSF would only arrive once the junk bond risk that they deceptively and intentionally foisted upon the Minibond investors arrived.  On that pay day, Lehman and LBSF would win everything and the Minibond investors – many retirees – would lose everything.  That was the nature of the gamble:

578397_2

every dollar Lehman and LBSF won came out of the Minibond investors' pockets. It was a zero sum game.

6.    Lehman and LBSF stacked the odds in their favor by creating a series of fronts to create and peddle the Minibonds. It used HSBC Bank and one of its affiliates to issue the Minibonds. The "issuer" of the Minibonds – Pacific – was in fact a wholly owned subsidiary of another HSBC entity and was directed by HSBC personnel.

7.    But HSBC Bank and its affiliates simply turned control of Pacific over to Lehman. After the Minibonds collapsed in late 2008 following Lehman's bankruptcy, HSBC Bank started to blame Lehman for the entire scheme. In sworn testimony, a representative of HSBC Bank said that it played all of its roles "***at the behest of Lehman Brothers,***" and that it was "approached by Lehman Brothers to take on the role, and of course, ***follow their instructions***."

8.    The Valukas Report reveals that HSBC Bank could not have cared less about the Minibond investors, although it owed them fiduciary duties to protect their interests – duties that were even more critical given the fact that Lehman and LBSF were "shorting" the same assets they were selling to the Minibond investors. HSBC Bank only cared about Lehman's "extremely large wallet" and simply turned complete control of the Minibond investors' $1.5 billion over to Lehman and LBSF, who had diametrically opposing interests to the Minibonds.

9.    HSBC Bank cared even less about the Minibonds in mid-2008 when it commenced a "covert" project initially called "Project Opaque" and later "Project Milan." Top HSBC executives from all over the world – including key executives from HSBC Bank in New York – joined forces in that project to terminate HSBC's business relationship with Lehman. That is, its entire $12 billion business relationship.

10.    Although HSBC and Lehman had been business partners since the 1970s, by
mid-2008, HSBC concluded that Lehman was insolvent. Project Milan served to "[h]olistically
protect *the HSBC organization's interests*, thereby limiting total losses" and operated quietly to
avoid "market signaling" that could "could precipitate the exit of other creditors, counterparties &/or
clients thereby . . . potentially crystallizing *our losses*."

11.    HSBC cut or dumped over $2 billion in exposure to Lehman before Lehman went
under. But it did so quietly. Rather than starting a run on Lehman and getting only some of its
money, HSBC's task force decided to walk to Lehman and take it all. When Lehman resisted
HSBC's demands for $1 billion in cash to keep clearing trades in August 2008, HSBC threatened to
put Lehman out of business. In the words of a senior Lehman executive, "'[b]asically they [HSBC]
were not going to allow us to do business. . . . *They put a gun to our head*.'" "*Not granting
HSBC's demand would have been 'terminal' for Lehman*."

12.    HSBC Bank, Lehman and LBSF joined forces to take retail investors' money. When
Lehman started to fall apart by the summer of 2008, HSBC Bank did not declare the Minibonds
mandatorily redeemable – a duty it owed to the Minibond holders. Instead, HSBC engaged in self-
dealing, protected "the HSBC organization's interests," and hung the Minibond investors out to dry.

13.    Despite every conceivable circumstance and plan working against the Minibond
investors' interests, by some minor miracle, the one-sided, distorted risks that Lehman foisted on
them never materialized. Lehman lost its bet against retail investors in Hong Kong.

14.    Lehman and LBSF are now making one last grab for the Minibond holders' property.
As if all of the odds and profits they reaped at the Minibond investors' expense were not enough,
Lehman and LBSF – the most sophisticated investors in the world – greedily want to *destroy* the sole
piece of property that HSBC Bank holds in trust to repay the Minibonds.

- 4 -

578397_2

15.     Asserting entirely illusory "rights" that never vested or materialized in reality, Lehman and LBSF are attempting to take all of the Minibond holders' money, again.  During that process, HSBC Bank has helped LBSF to prevent the Minibond holders from protecting their interests.  This behavior is unsurprising given the cozy relationship Lehman and HSBC have enjoyed since the 1970s.  And as the estate still owes HSBC at least $345 million in cash, HSBC Bank wants LBSF and Lehman to win this case as the estate will then have more money to pay HSBC.  At the same time, HSBC holds $243 million of the estate's cash.  These two old friends have agreed to sort out *that* dispute in a "commercially reasonable manner."

16.     As for the Minibonds, HSBC Bank will no doubt continue to fight against their interests and in favor of Lehman and LBSF.  Under these extreme circumstances, sufficient "special circumstances" are present to empower the Minibond holders to protect their property rights to the Saphir Notes against LBSF's full scale attack.

17.     Plaintiffs have been injured and continue to be injured by defendants.  The trust that holds the sole property that can be used to repay them is at imminent risk of being destroyed by LBSF.  As will become immediately clear, there is a substantial likelihood that Plaintiffs will succeed on the merits of this case, as LBSF has already *litigated and lost* a critical issue.  The time for evasion is over.  After interfering with Plaintiffs' property rights for years, defendants must answer Plaintiffs' claims.

## II.     JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§157(a) and 1334(b).

19.     Venue is proper pursuant to 28 U.S.C. §1409(a).  Plaintiffs do not consent to the entry of final orders and judgment by the Bankruptcy Court.

- 5 -

578397_2

### III.    PARTIES

20.    The named Plaintiffs own or owned Minibonds and property and equitable interests in
the Saphir Notes.  *See* Ex. A.  Their Minibonds are presently worthless because LBSF is interfering
with the collateral that is held in trust to support their repayment and because the trustee refuses to
discharge its fiduciary obligations to repay them.

21.    Defendant HSBC Bank USA, National Association (formerly known as HSBC Bank
USA) is a professional trustee and serves as trustee ("HSBC Bank," "HBUS" or the "Trustee") for
Plaintiffs.  As the Minibonds' indenture trustee, it holds the property that Pacific placed in trust for
Plaintiffs' benefit and to secure Pacific's obligation to repay Plaintiffs.  HSBC Bank's primary
operations are in New York and its offices are located at 452 Fifth Avenue, New York, New York,
10018.  HSBC Bank's affiliate HSBC Bank (Cayman) Limited (formerly HSBC Financial Services
(Cayman) Limited) owned 100% of Pacific's equity and its employees served as Pacific's directors.
At all relevant times, Pacific and the HSBC Bank were ultimately owned and controlled by HSBC
Holdings plc ("HSBC Holdings").  Pacific and HSBC Bank were affiliates.  HSBC Bank also had
control over and the ability to direct Pacific's actions as trustee on behalf of the holders of the
Minibonds issued by Pacific.

22.    Defendant LBSF is a Delaware corporation with its former principal business address
at 745 Seventh Avenue, New York, NY 10019, and its current principal business address at
1271 Avenue of the Americas, 46th Floor, New York, NY 10020.  LBSF commenced a case under
the Bankruptcy Code on October 3, 2008.  LBSF is attempting to use the Bankruptcy Code to
destroy property that belongs to Plaintiffs.

23.    Defendant Lehman is a Delaware corporation with its former principal business
address at 745 Seventh Avenue, New York, NY 10019, and its current principal business address at

- 6 -

1271 Avenue of the Americas, 46th Floor, New York, NY 10020.  Lehman commenced a case under

the Bankruptcy Code on September 15, 2008.  Reflecting on the circumstances leading to that filing,

counsel to Lehman testified before the FCIC on September 1, 2010: "As the parent corporation,

[Lehman Brothers Holdings, Inc.] managed and directed the affairs of the Lehman enterprise.  The

enterprise maintained a global network of subsidiaries and affiliates with offices in every major

financial center in the world . . . ."  The last Form 10-K that Lehman filed with the U.S. Securities

and Exchange Commission ("SEC") on January 29, 2008, explains the particular relationship

between it and LBSF: "Our fixed income derivative products business is principally conducted

through our subsidiary Lehman Brothers Special Financing Inc." and other entities.

24.    Defendant BNY is a company organized with limited liability under the laws of

England with its principal place of business at One Canada Square, London E14 5AL, England.

HSBC Bank has the power and duty to direct BNY to redeem the Saphir Notes at or near *par value*.

BNY is able redeem the Saphir Notes at par because it is the entity that must pay the holder of the

Saphir Notes – here, HSBC Bank.  On information and belief, BNY will not redeem the Saphir

Notes because (a) in breach of its duties, HSBC Bank refuses to honor the obligations it owes to

Plaintiffs to direct and require BNY to redeem the Saphir Notes at par, and (b) LBSF and Lehman

have launched legal attacks on notes similar to the Saphir Notes at issue in this case that may place

BNY's own capital at risk as practical matter.

## IV.    THE MINIBONDS PROGRAM

25.    Pacific sold credit-linked collateralized notes or "Minibonds" to individual investors,

including Plaintiffs.  Pacific stated in its program prospectus that "[w]e have set up our secured

continuously offered note programme so that we can issue our notes to the public in Hong Kong

frequently and easily." Pacific marketed the Minibonds as credit-linked to financially stable companies and backed by AAA-rated collateral.

26.    Pacific secured its obligations to pay principal and interest to the Minibond holders through two related transactions. First, Pacific took the Minibond investors' money and purchased an equivalent amount of notes from another Lehman note program known as the "Dante Program." The terms of the notes that Pacific bought from the Dante Program issuers were substantially identical and are called the "Saphir Notes" for ease of reference. The Saphir Notes are a form of exotic credit derivative known as single-name synthetic collateralized debt obligations or Synthetic CDOs. Pacific placed the Saphir Notes in trust with HSBC Bank for the benefit of Pacific's investors. Pacific also used HSBC Bank to issue its Minibonds pursuant to a principal trust deed and supplemental trust deeds.

27.    Second, Pacific executed a credit default swap agreement with LBSF. Under this swap (called a "First-To-Default" swap or "FTD Basket"), LBSF agreed to pay Pacific a sum equal to what Pacific owed the Minibond holders in exchange for the interest earned by Pacific on the Saphir Notes. Lehman constructed the FTD Basket and the Saphir Notes by using credit default swaps or CDS. An understanding of CDS is therefore necessary to understand the FTD Basket and the Saphir Notes.

A.    **Credit Default Swaps: The Basic Building Block of the Minibonds' FTD Basket and Saphir Notes**

28.    Credit default swaps or "CDS" arrangements are the "basic building block for most 'exotic' credit derivatives," according to *The Lehman Brothers Guide to Exotic Credit Derivatives* (2003) (the "*Lehman Guide*"). The *Lehman Guide* states that CDS are used "to transfer the credit risk of a reference entity (corporate or sovereign) from one party to another . . . to cover the loss of the face value of an asset following a credit event," and a "***credit event***" is "a legally defined event

- 8 -

that typically includes bankruptcy, failure to pay and restructuring." The *Lehman Guide* states that (a) "[b]uying credit protection is economically equivalent to shorting the credit risk" and (b) "selling credit protection is economically equivalent to going long the credit risk."

29.     Applying these concepts to a real-world example, in the summer of 2008, many investors who owned Lehman obligations grew concerned about Lehman defaulting on its obligations. HSBC was one of those investors. Among many other exposures to Lehman during this time, HSBC had committed approximately $50 million to a Lehman revolving credit facility that would not mature until March 2011. HSBC knew that Lehman could draw on that line of credit, and knew that Lehman would likely not pay it back due to its deteriorating financial condition. Therefore, HSBC bought protection against Lehman's default from some third party by way of a CDS. In this example, (a) the "reference entity" was Lehman; (b) the "protection buyer" was HSBC; and (c) the "protection seller" was some third party.

30.     During the term of the CDS, HSBC was required to make periodic premium payments and if no "credit event" occurred during the term of the CDS (*e.g.*, Lehman did not default) then the protection seller would not be required to make any payments to HSBC. If a credit event did occur during the term of the CDS, however, then the third party would be required to make a payment to HSBC. Because Lehman defaulted, HSBC likely recovered its $50 million from the third-party protection seller.

31.     In the case of the Minibonds, Lehman used the two pieces of property held by HSBC Bank – the FTD Basket and the Saphir Notes (Synthetic CDOs) – to short specific credit risks. LBSF took the "protection buyer" or "short" side of both trades. Lehman and LBSF then twisted the economics of these two exotic credit derivatives to benefit themselves and hurt the Minibond

investors.  Although it was the Minibond trustee, HSBC Bank colluded with Lehman LBSF to harm the Minibond investors.

**B.    The FTD Basket**

32.    Pacific marketed its notes in large measure by claiming they were credit-linked to highly stable companies.  In one representative issuance (Series 10), Pacific stated its notes were credit-linked to seven companies: The Coca-Cola Company; IBM; McDonald's; BMW; Hutchison Whampoa Limited; HSBC Bank plc.; and MTR Corporation.  Every time Pacific issued Minibonds, it stated they were credit-linked to very stable companies like these.

33.    If a "Company Credit Event" occurred – such as a bankruptcy, a failure to pay or a restructuring – with respect to any one of these seven companies, then the loss to investors would roughly equal the difference between the par value of a particular referenced obligation of the identified companies (*i.e.*, particular bonds issued by Coke (5.75% interest), IBM (5.875%), McDonald's (6.00%), BMW (5%), Hutchison Whampoa (7%), HSBC Bank plc (5.375%) or MTR (7.5%)) and the market value of that obligation after taking into consideration the negative credit event.

34.    The Minibond investors would likely lose all or nearly all of their investment under such circumstances.  Thus, Pacific explained that its "Notes [were] designed for investors" who were "confident that none of the seven named Companies [identified above] [would] be affected by a major corporate default, bankruptcy or adverse debt restructuring in the next 5 1/2 years and accept the risk that the principal amount of the Notes may not be redeemed in such event."  Conversely, Pacific explained that if "no Company Credit Event occurs during the life of the Notes . . . then [Pacific] [would] apply the redemption monies receivable in respect of the [Saphir Notes] in direct repayment of the Notes, such redemption of the Notes therefore being at par."

35.    LBSF and Pacific placed bets on exactly opposite contingencies.  Pacific bet (with the Minibond investors' money) that no Company Credit Event would occur.  LBSF made the opposite bet.  Pacific provided insurance to LBSF against the risk of such events; and LBSF made insurance payments in the form of premiums to compensate Pacific for taking those risks.

36.    An FTD basket is supposed to expose an investor to more risk **and** compensate the investor with a higher yield.  The *Lehman Guide* explains that "[t]he advantage of an FTD basket is that it **enables the investor to earn a higher yield than any of the credits in the basket**" because the FTD basket leverages credit risk.  Continuing, "FTD baskets leverage the credit risk by increasing the probability of loss by conditioning the pay-off on the first default among several credits."  In other words, it is a lot riskier to assume the risk associated with **the first of** all seven companies' defaulting than with assuming the credit risk associated with just one of those companies' defaulting.  For that reason, Pacific should have paid investors a higher yield than any of the credits referenced – a rate higher than the highest yielding obligation referenced in the basket.

37.    Pacific did the opposite.  Pacific jammed its own investors.  In Series 10, for example, Pacific **paid investors less** (between 4% and 4.7%) than any of the seven referenced credits (between 5% and 7%) would have paid.  But in Lehman's own words, the point of an FTD Basket is to pay investors **more** than any of the referenced credits.  Pacific and LBSF intentionally underpaid the Minibond investors for the risks they foisted upon them.  On information and belief, the difference went into LBSF and Lehman's wallet, helped pay HSBC Bank and its affiliates their fees, and helped pay the fees of the law firm of Linklaters (a law firm based in England that drafted the documentation governing both the Minibonds and the Saphir Notes).

38.    None of the Company Credit Events occurred.  None of Coke, IBM, McDonald's, BMW, Hutchison Whampoa, HSBC Bank plc or MTR filed for bankruptcy, stopped paying on their

- 11 -

bonds or went through restructuring.  The risks that Lehman, LBSF and "Pacific" greedily shifted to

the Minibond investors at a huge discount did not materialize.

39.    The FTD Basket was apparently not sufficiently profitable to Lehman and LBSF,

however.  Rather than simply hold on to the cash that Pacific raised by issuing the Minibonds,

Pacific took investors' money and purchased another even riskier Lehman product.  Lehman's

avarice knew no bounds.

**C.    The Saphir Notes and the Subordination Provisions**

40.    Pacific promised that the Minibonds were backed by safe collateral.  In every case,

Pacific represented that it would collateralize its obligations to repay the Minibond investors their

principal and interest by purchasing "AAA" securities.  Pacific helped investors appreciate the

significance of "AAA" collateral by stating that the term meant that the obligor's capacity to meet its

financial commitment on the obligation was "extremely strong" (per S&P), and that the credit was

"exceptionally stable" and "principal is secure" (per Moody's).  By way of comparison, U.S.

Treasury Bills are "AAA" securities.

41.    Lehman created the Saphir Notes in the following way.  First, Lehman set up Dante

Program issuers (including Saphir Finance plc., Beryl Finance Ltd. and Zircon Finance Ltd.).  These

issuers were special purpose vehicles controlled by Lehman and the notes they issued were

substantially identical.  These issuers are called the "Saphir Issuers" and their notes are called the

"Saphir Notes" for ease of reference.  The Saphir Issuers entered into a master swap agreement with

LBSF (as supplemented and amended, the "Saphir Swap").

42.    Second, Lehman controlled Pacific and caused Pacific to use the money it had raised

by selling Minibonds to purchase an equivalent face value of Saphir Notes.  Pacific purchased

578397_2

approximately $1.5 billion worth of such notes, or approximately 75% of all notes issued by the Saphir Issuers.

43.    Third, Lehman caused the Saphir Issuers (a) to appoint defendant BNY as the trustee for each issuance of Saphir Notes pursuant to a principal trust deed and supplemental trust deeds; (b) to take the money Lehman used Pacific to raise and place that money in trust with defendant BNY (mostly in the form of money market instruments); and (c) to enter into a swap arrangement with LBSF (the Saphir Swap).    The Saphir Swap was a risky gamble that a pre-determined percentage of high-risk securities within a larger pool of securities would experience certain negative credit events, such as a bankruptcy, restructuring or payment failure.

44.    Lehman's ultimate objective was to shift certain risks of default that it carried on its balance sheet to retail investors in Hong Kong.    When it evaluated the Saphir Notes, the credit rating agency S&P explained that their purpose was to "transfer the credit risk associated with a pool of corporates and financial institutions," valued at billions of dollars, "from Lehman Brothers Special Financing to external parties."    Such "external parties" included Plaintiffs in this case, as *The New York Times* reported: the Minibond "[i]nvestors were effectively paying for Lehman to insure its own portfolio."

45.    Using Pacific as a front, Lehman caused it to buy Saphir Notes in series worth approximately $1.5 billion.    The Saphir Notes, in turn, were a form of funded CDS trade.    The *Lehman Guide* describes this funded format as follows:

> The other format is to trade the risk [in a CDS] in the form of a credit linked note.    This format is known as "funded" because the investor has to fund an initial payment, typically par.    This par is used by the protection buyer to purchase high quality collateral.    In return the protection seller receives a coupon, which may be floating rate, *ie*, Libor plus a spread, or may be fixed at a rate above the same maturity swap rate.    ***At maturity, if no default has occurred the collateral matures and the investor is returned par***.

- 13 -

46.     It is very important to appreciate the fact that Lehman created the Saphir Notes as fully "funded" CDS trades.  The reason why this fact is important is because it means that it was practically impossible for the Saphir Issuers to default on any obligation to LBSF under the Saphir Swap.  Returning to the first principles of a CDS, LBSF could have obtained payments from the Saphir Issuers under the Saphir Swap if and only if the prescribed number of "credit events" occurred under the Saphir Swap.  *If* those credit events occurred *and* the Saphir Issuers could not pay what was due under the Saphir Swap *then* the Saphir Issuers would have been in default.  But Lehman made sure that it took enough money from retail investors in Hong Kong to fully fund all of the money LBSF could possibly take under the Saphir Swap.  For these reasons, it was practically *impossible* for the Saphir Issuers to default.

47.     Given the fact that it was practically impossible for the Saphir Issuers to default on the Saphir Swap, the weak, extremely remote, unvested, theoretical, academic, speculative and contingent nature of LBSF's "rights" in the Saphir Notes becomes apparent.

48.     Although LBSF owns none of the Saphir Notes, it has gone on a suing spree attempting to destroy similar notes by asserting certain "rights" in them.  LBSF had nothing more than a mere contingent, contractual right under the terms of the transaction documents that it played a primary (if not an exclusive) role in creating years ago.  Notwithstanding its bankruptcy filing, LBSF has retained the very same contractual right that was contemplated when the transaction documents were executed and throughout the duration of the transaction.  In other words, there has

- 14 -

been no loss of rights or transfer of property and no party may be characterized as a "transferor" with respect to any provision of the transaction documents.[1]

49.    In reality, LBSF has sought to create rights – a sort of bankruptcy bonus – that did not exist before or after Lehman filed for bankruptcy.  All of the Saphir Notes, which HSBC Bank holds for the benefit of the Minibond investors, include terms substantially identical to those described below.

### 1.    The Condition 44 Provision

50.    The Condition 44 provision provides a method to calculate redemption payments to the Saphir Notes noteholder (HSBC Bank).  It is a binary switch recognizing two possibilities.  An Event of Default can occur where either (a) LBSF is the defaulting party or (b) the Saphir Issuer is the defaulting party.

51.    Condition 44 states that "*if an Event of Default* (as defined in the ISDA Master Agreement) occurs under the Swap Agreement *and* the Swap Counterparty [LBSF] is the Defaulting

---

[1]    Recognizing that it agreed to the provisions of the transaction documents years ago and that the contingency simply did not occur, LBSF now seeks to "change the deal" by enhancing its position on account of its bankruptcy filing and through a variety of curious, opportunistic and divergent positions.  While arguing that the bankruptcy court should "interpret" or re-write certain provisions of the transaction documents so that it can take the unintended fruits of the transaction, LBSF has contended that other provisions describing Events of Default should be disregarded as unenforceable *ipso facto* provisions because they improperly penalize it for seeking bankruptcy protection.  LBSF has also recently filed numerous lawsuits seeking to avoid the effect of provisions in the transaction documents it agreed to years ago by claiming that the property interest underlying such provisions should be avoided and recovered for the benefit of its bankruptcy estate despite the facts that there has been no loss of rights, transfer of property, and no party may be characterized as a transferor.  LBSF's efforts to feast on the sweet provisions of the transaction documents while setting aside the bitter provisions in an effort to readjust the bundle of compromises are contrary to well-settled principles of bankruptcy, commercial, contract, and property law.  LBSF has made these specious arguments in a thinly veiled attempt to fill the void between its assets and liabilities with the Minibond investors' money.

- 15 -

Party (as defined in the ISDA Master Agreement)"  then the Saphir Notes shall be redeemed essentially at par value.  Condition 44 provides that "[i]n the event that Unwind Costs are payable by [the Saphir Issuer] to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral as aforesaid (1) *first in redeeming each Note in an amount equal to its Outstanding Principal Amount* as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty."  LBSF was the Swap Counterparty.  This provision is "Condition 44."

52.    Condition 44 vested the Saphir Notes noteholder (HSBC Bank as trustee for the Minibond investors) with rights *as soon as* an Event of Default occurred that was caused by LBSF.

## 2.    The Priority Provision

53.    The Priority Provision states that upon the occurrence of an Event of Default, BNY is required to make the payments calculated pursuant to Condition 44 in accordance with "Swap Counterparty Priority" unless "(i) an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party . . . in which case Noteholder Priority shall apply."  Conversely, if an Event of Default occurred and LBSF *was not* the Defaulting Party, then Swap Counterparty Priority would apply.  This provision is the "Priority Provision."

54.    The Priority Provision vested the Saphir Notes noteholder (HSBC Bank) with priority rights *as soon as* an Event of Default occurred that was caused by LBSF.

## 3.    The Condition Precedent

55.    To this day LBSF has no rights to any payments because LBSF's payment rights are further contingent upon the "condition precedent that no Event of Default or Potential Event of

578397_2

Default has occurred and is continuing." Such events did occur and are continuing. LBSF gets
nothing. This provision is the "Condition Precedent" provision.

### 4.    No Event Vested LBSF with Priority, Ever

56.    No Event of Default ever occurred vesting LBSF with any right under either
Condition 44 or the Priority Provision. As explained above, it was practically impossible for the
Saphir Issuers to default on their obligations because they were fully "funded" with money Lehman
took from the Minibond investors. The Saphir Issuers defaulted on none of their obligations to
LBSF.

### 5.    Many Events Vested Saphir Notes Noteholder (HSBC Bank) with Priority Before Lehman Declared Bankruptcy

57.    Holding such benefit for the Minibond investors, many independent LBSF Events of
Default occurred, vesting HSBC Bank with priority rights under Condition 44 and the Priority
Provision of the Saphir Notes. In chronological order these events included:

- By June 2008 – September 14: Lehman or LBSF, or both, became "insolvent or
  unable to pay its debts," or "cause[d] or [was] subject to any event which . . . [had]
  an analogous effect." *See infra* ¶¶87-158.

- July – August 2008: Lehman or LBSF or both made a "representation" that "prove[d]
  to have been incorrect or misleading in any material respect when made or repeated
  or deemed to have been made or repeated" in that an "Event of Default or Potential
  Event of Default" occurred by Mid-August 2008 when Lehman and LBSF conducted
  the August Exchange. *See infra* ¶¶146-148. The August Exchange involved $344
  million worth of "[t]ransactions" that vested HSBC Bank with priority rights under
  Condition 44 and the Priority Provision as to *all* $1.5 billion of the Saphir Notes.

- By late August to early September 2008: Lehman or LBSF or both had "a secured
  party take possession of all or substantially all of its assets" or "cause[d] or [was]
  subject to any event which . . . [had] an analogous effect," as evidenced by
  Lehman's complaint against JPMorgan Chase Bank, N.A. dated May 26, 2010.

- September 14, 2008: Lehman "ha[d] a resolution passed for its winding-up . . . or
  liquidation" or "cause[d] or [was] subject to any event which . . . [had] an analogous
  effect," as that was the date Lehman's board of directors authorized Lehman's
  bankruptcy petition.

- 17 -

- September 15, 2008: Lehman commenced its bankruptcy "case."

- September 15, 2008 – October 3, 2008: The major credit rating agencies downgraded Lehman below particular thresholds (to sub-investment grade status) requiring LBSF to post collateral to the Saphir Issuers. On information and belief, this posting never occurred and was an Event of Default.

- October 3, 2008: LBSF commenced its own bankruptcy "case."

58.    Each of the foregoing events automatically and independently vested the sole noteholder of the Saphir Notes backing the Minibonds – HSBC Bank – with priority rights under Condition 44 and the Priority Provision. To the extent that LBSF's "bankruptcy" Event of Default constituted an "illegality" for any reason, such events must "be treated as an illegality and will not constitute" an Event of Default. All other Events of Default still automatically vested the holder of the Saphir Notes with priority rights. LBSF remains in default. LBSF is entitled to no payments.

### 6.    Noteholder Priority Vested *Automatically*

59.    LBSF has already litigated and lost an important issue. On November 6, 2009, the Court of Appeal of England (similar in authority to the Second Circuit) construed provisions similar to the Priority Provision and Condition 44 at issue in this case, and ruled: "the way in which clause 5.5 of the STD operated, and the terms in which Condition 44 of the T&C was expressed, mean that, when, on 15 September 2008, an Event of Default, namely [Lehman's] filing for Chapter 11, occurred, Noteholder Priority *automatically replaced* Swap Counterparty Priority and Condition 44.2 *automatically replaced* Condition 44.1 on that date, which, crucially, was before LBSF filed for Chapter 11." This binding authority is the "*Perpetual Decision*."[2]

60.    In this case, many Events of Default occurred on September 15, 2008, when Lehman filed for bankruptcy *and before* that date and after that date. Such events did not and cannot trigger

---

[2]    *Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd.*, [2009] EWCA (Civ) 1160 (Eng.).

the *ipso facto* and related arguments LBSF made in connection with the *Perpetual Decision*. LBSF

cannot destroy the Saphir Notes as a matter of law and should not be permitted to do so as a matter

of equity.

**D.    The Relationship Between the FTD Basket and the Saphir Notes**

61.    Pacific combined the FTD Basket and the Saphir Notes to create a toxic product.

Pacific explained the relationship between its FTD Basket and the Saphir Notes in the following

terms in its program prospectus:

> **What happens to my money?  How can Pacific International Finance Limited
> pay me back?**
>
> We use the money which you invest in our notes to buy a package of assets.
> These assets [the Saphir Notes] are carefully selected and tailored to match our
> payment obligations under our notes.  We will also enter into swap arrangements [the
> FTD Basket] to enable us to meet our payment and other obligations under any series
> of notes.

62.    Through the FTD Basket, LBSF agreed to pay Pacific a sum equal to what Pacific

owed the Minibond holders in exchange for the interest earned on the Saphir Notes.

63.    As explained above, by twisting the terms of the FTD Basket, LBSF received a

benefit far greater than the premium payments it made to Pacific.  If LBSF did nothing more, the

Minibonds would have been profitable to Lehman because it was underpaying Pacific for the credit

protection LBSF and Lehman sought on the "blue chip" credits referenced by the FTD Basket.  But

LBSF did not stop there.  LBSF kept the additional yield generated by the Saphir Notes, which was

calculated by taking a LIBOR benchmark and adding an additional amount of interest or margin.

Greedily pocketing the benefits from the FTD Basket and the Saphir Notes, LBSF passed along

small payments to Pacific, which Pacific then used to pay interest on the Minibonds.  Again, Pacific

jammed its own investors.

578397_2

64.    By placing the FTD Basket and the Saphir Notes in the HSBC Bank trust, and then using that trust to securitize those products, LBSF achieved the best of two worlds.  It received the benefits associated with a high yield bond, but pushed the default risk associated with that kind of bond onto the Minibond investors.

65.    The Minibonds and the Saphir Notes were therefore inextricably linked from an economic perspective.  Similarly, when the Saphir Notes experienced an Event of Default, it triggered an Event of Default under the Minibonds.

**E.    When the Saphir Notes Defaulted, the Minibonds Were "Mandatorily" Redeemable**

66.    Under the terms of the Minibonds, "mandatory redemption" of the Minibonds must occur when "any of the [Saphir Notes] become or ***becomes capable of being declared repayable*** prior to their stated date of maturity ***for whatever reason.***"

67.    The Saphir Notes became capable of being declared repayable early when they experienced an Event of Default.  Upon such event, the Minibonds became redeemable at an amount equal to the "Liquidation Proceeds" of the Saphir Notes.  The "Liquidation Proceeds" means the "amount realizable upon the sale" of the Saphir Notes based on "the highest clean bid price" that can be obtained from three different unaffiliated brokers.  At such time, Pacific also had the right but not the obligation to terminate its swap agreement with LBSF.  The Saphir Notes experienced Events of Default before October 3, 2008, and Pacific did not terminate the FTD Basket during that period.

68.    In short, upon early redemption of the Minibonds, the redemption amount is nearly "par," provided no negative credit event had occurred to any of the blue chip companies (such as HSBC Bank plc, IBM and so forth) referenced in the swap between Pacific and LBSF.

69.    Both Pacific and HSBC Bank had an affirmative obligation to determine whether the Minibonds became mandatorily redeemable.  Under the Minibonds principal trust deed, Pacific

- 20 -

owed an affirmative obligation to "notify the Trustee [HSBC Bank] in writing immediately on
becoming aware of the occurrence of any Event of Default or Potential Event of Default and without
waiting for the Trustee [HSBC Bank] to take any action." As trustee, HSBC Bank held this
obligation in trust and was "entitled to enforce" this obligation. And per the Minibonds principal
trust deed, where it failed to "show the degree of care and diligence required of it as trustee" in doing
so, nothing relieved HSBC Bank from "any negligence, default, breach of duty or breach of trust of
which it may be liable."

70.    Further, a representative of HSBC Bank admitted that it had an obligation to take
action upon an Event of Default. HSBC Bank's representative testified that "***our role in a default is
to take action to enforce the collateral [the Saphir Notes] for the benefit of the [Minibond]
investors to ensure that they receive whatever value is raised from that collateral***."

71.    Importantly, HSBC Bank knew that the Saphir Notes had experienced one or more
Events of Default during the summer of 2008. Knowing that the Minibonds were mandatorily
redeemable under such circumstances, HSBC breached its duties to redeem the Minibonds. Even so,
the Saphir Notes still must be redeemed at or near par because LBSF's contingent rights under
Condition 44 and the Priority Provision never materialized, and HSBC Banks' rights (as trustee for
the Minibond investors) did materialize for the reasons stated.

72.    Given the fact that the rights HSBC Bank held for the Minibond investors vested
during the summer of 2008 (by the latest), it has been unclear why HSBC Bank refused to discharge
its obligations to enforce those rights, until now.

578397_2

## V.    HSBC'S SELF-DEALING

### A.    HSBC Allowed Lehman to Run the Minibonds

73.    Pacific promised to deal with Lehman at arm's length.  In its program prospectus governing the entire Minibonds program, Pacific stated that "[n]either Lehman Brothers Holdings Inc. nor any of its subsidiaries or affiliates has any equity interest in, or any control over, us" and that its "directors are independent from Lehman Brothers Holdings Inc. and its subsidiaries and affiliates."  Pacific promised that "[w]e are issuing our notes in the ordinary course of business and not for the purposes of fund raising for Lehman Brothers Holdings Inc. or its subsidiaries and affiliates."  Pacific promised to "use the money which you invest in our notes to buy a package of assets" that was "carefully selected and tailored to match our payment obligations under our notes."  Pacific further promised it would buy ultra-safe "AAA" collateral to secure its obligations to repay investors.  Pacific broke all of these promises.

74.    As a matter of fact, Lehman and LBSF did control Pacific.  Pacific did not carefully select ultra-safe assets.  Lehman and LBSF selected those assets.  When "Pacific" sold $45 million in Minibonds, Lehman forced it to buy $45 million in Saphir Notes.  Lehman and LBSF sold $1.5 billion worth of exposure to Saphir Notes to retail investors in this manner.  The Minibonds and Saphir Notes were thus one single derivatives transaction designed for the purpose of shifting extraordinary risks from defendant LBSF to Plaintiffs cheaply.

75.    Pacific was a bizarre corporate entity.  HSBC entities owned and controlled it, but Lehman entities created Pacific to shift billions of dollars in risk from LBSF in New York to investors in Hong Kong.  Pacific accomplished this goal with no employees.

76.    Various HSBC entities owned and controlled Pacific.  Pacific's program prospectus states: "Our directors are professional company directors supplied by HSBC Bank (Cayman)

Limited" and all of Pacific's equity shares "are fully-paid, for cash, and are in the legal ownership of HSBC Financial Services (Cayman) Limited (now HSBC Bank (Cayman) Limited)," or "HSBC Cayman."  HSBC Cayman legally owned and controlled Pacific through its directors.  As the top company in the HSBC group, HSBC Holdings plc ("HSBC Holdings") ultimately owned and controlled HSBC Cayman, Pacific and HSBC Bank.  HSBC Bank executives had the authority to order HSBC Cayman and the directors of Pacific to take action or refrain from taking action.  An HSBC officer testified to HSBC's various roles.

77.    Specifically, on December 30, 2008, HSBC's Susan Sayers ("Sayers") testified before the Hong Kong legislature regarding the Minibonds.  Sayers spoke for all of the HSBC entities involved in the Minibonds, testifying: "*We* [*HSBC*] have a number of roles.  One of which is as *trustee*," referring to the role HSBC Bank served.  Sayers confirmed "we are indeed the *shareholder* of the issuing company and we provided *directorship* services," referring to HSBC Cayman and the directors it supplied to Pacific.

78.    Shocking but candid testimony demonstrates HSBC abdicated all of its responsibilities and turned control of the entire Minibonds program over to Lehman.  Sayers testified that HSBC played all of its roles "at the behest of Lehman Brothers after the program was structured."  Sayers further explained: "At the outset, we were approached by Lehman Brothers to take on the role, and of course, follow their instructions or acted on their request to take on the role," and stated "[w]e [were] appointed by Lehman Brothers as trustee."

79.    Although HSBC legally owned and controlled Pacific, in breach of its duties and obligations to the Minibonds holders, HSBC allowed Lehman and LBSF to control Pacific in practice.  Sayers explained that "[t]he prospectus for each series [of Minibonds] was compiled by those who designed the product, by Lehman Brothers."  Sayers confirmed that "as director of the

- 23 -

issuers, it would indeed be our responsibility to ensure or to be satisfied that the contents of the prospectus that is put together by Lehman was correct." To "make a point if I could just to clarify," however, Sayers stated that ***Pacific existed only to issue the Minibonds and was "a creature of Lehman's design***, and set up simply to perform a role, a function within the larger structured product." She continued, Pacific was "not an active company as such and HSBC's role as director [was] not an active role," but was "an administrative corporate services role."

80.     All of the roles HSBC performed served one master: namely, Lehman's massive "wallet." Lehman designed and in practice operated Pacific to serve its business needs. LBSF needed Plaintiffs' money to provide cheap credit insurance against events that never occurred. LBSF is not contented with the cheap credit insurance and the profits and benefits it derived from the Minibonds for many years. LBSF now wants to destroy the collateral that it created with the Minibond investors' money.

81.     One of many fundamental points that LBSF's attack on the Saphir Notes misses is this: neither LBSF nor any affiliates invested one penny of their own money in the Minibonds or the Saphir Notes. Pacific took Plaintiffs' money and bought the Saphir Notes. That is the source of LBSF's purported "property." It is not and never was the case that LBSF placed its own capital at risk in the Minibonds and now wants to recover its hard-earned money. LBSF is manipulating its own bankruptcy to destroy property that belongs to Plaintiffs and fabricate rights that never existed. Far from avoiding a "penalty" by filing for bankruptcy, LBSF seeks a "bonus" for doing so.

**B.    HSBC Obeyed Lehman's "Exceptionally Large Wallet"**

82.     LBSF and Lehman have thrown the entire Minibonds program in abeyance for more than two years. Just as HSBC Bank colluded with Lehman to create and sustain the Minibonds and Saphir Notes (even after Events of Default occurred), so too it has sided with Lehman and ***against***

- 24 -

the interests of Plaintiffs as its trust beneficiaries in this very litigation. From the very beginning, HSBC Bank considered Lehman its real "client." This business partnership helps explain why HSBC Bank and Lehman worked together to intentionally manipulate retail investors into purchasing bonds they knew were mispriced and then colluded to *prevent* the investors from learning that Lehman had triggered Events of Default before September 15, 2008.

83.    According to an internal HSBC document prepared by HSBC Bank executives, HSBC and Lehman's business relationship dated back to the 1970s. By 2008, HSBC had extended to Lehman approximately $12 billion in credit across various business lines. As of May 2008, HSBC Bank – the Minibonds trustee – owned at least approximately $2.87 billion of that exposure. HSBC derived "[s]olid relationship revenues/returns which support the level of exposure." As of 2008, Lehman was one of HSBC's "most profitable client relationships and the fourth most profitable of the US Broker Dealers." It is therefore unsurprising that HSBC referred to Lehman as its "[c]lient" and gave Lehman "[p]latinum" priority status at HSBC.

84.    When HSBC provided platinum service to Lehman, Lehman paid dividends. HSBC grew its business dealings with Lehman by 40% in 2007, 60% of which was from product areas in "HSS" or HSBC Securities Services. Those services include the services HSBC Bank provided to Lehman in the Minibonds program, such as "trustee and depositary services and a full range of investment administration and performance consultancy services" according to HSBC.

85.    To maintain a steady income stream from Lehman, Lehman made HSBC do its bidding. If HSBC did not provide funding support to Lehman, Lehman would punish HSBC. HSBC explained: "For the [Lehman] client relationship, there is a strong correlation between the provision of funding support and revenue growth." Further, "Lehman manages credit relationships

- 25 -

very effectively and in a globally coordinated fashion (centralized creditor relationship function within Treasury) ensuring credit support is rewarded and lack of support *penalized*."

86.     HSBC internally reported in May 2008 that Lehman's "exceptionally large wallet" generated "[m]assive opportunities" for HSBC.  Referring to Lehman as its "[c]lient," HSBC stated the perceived total value of Lehman's "[w]allet" was $2.173 billion to HSBC.  Combined with the fact that Lehman "penalized" any lack of support by HSBC, this $2.173 billion revenue stream explains why HSBC helped Lehman create Pacific and then handed the keys to Pacific over to Lehman.  But HSBC Bank should have recovered some sense of responsibility when it realized Lehman was falling apart.

## C.     HSBC Abandoned the Minibonds While It Raced to Save Its Own Assets as Lehman Collapsed

87.     HSBC knew that Lehman was insolvent before it filed for bankruptcy protection.  In mid-2008, HSBC formed an elite unit of senior executives to conduct a "covert" operation focused on evacuating from Lehman.  HSBC gave this operation two code names – "Project Opaque" and later "Project Milan" – and created a powerful working group to execute this operation.  The group covered HSBC's entire worldwide organization.

88.     HSBC assigned senior executives in New York to this massive operation.  Executives from HSBC Bank (the Minibonds trustee) were on the team.  Working in New York on Project Milan, Paul Lopez ("Lopez") was a Senior Vice President of HSBC Bank.  Lopez held another title for HSBC – he was the Global Relationship Manager for Financial Institutions for HSBC.  In that capacity, Lopez managed HSBC's relationship with Lehman.  Lehman debtors identified Lopez as their "relationship contact" for a number of HSBC's banks that held money for such debtors as of November 2008.  Also in New York, Joseph Travaglione ("Travaglione") was a Vice President of

- 26 -

HSBC Bank, a Senior Vice President of HSBC Corporate & Institutional Banking, and a member of the Project Milan team.

89.    HSBC put Nicholas J. Taylor ("Taylor") on Project Milan.  Taylor worked in New York.  Internal HSBC Bank documents identify Taylor's title as "Head FIG, Global Banking HBUS," and further identify him as a "Client Relationship Manager" for Lehman, a role he shared with Lopez.  "HBUS" refers to defendant HSBC Bank, as its affiliates referred to HSBC Bank by the "HBUS" acronym in annual reports for the years ending 2007 and 2008.  HSBC assigned several other U.S.-based executives to Project Milan.  It appointed non-U.S. HSBC employees to Project Milan as well, including Sayers.  HSBC later appointed Sayers to provide testimony in Hong Kong as a representative for HSBC, HSBC Bank, Pacific, and the directors of Pacific regarding their roles in the Minibonds program.

90.    Many other HSBC executives were on Project Milan.  Guy Bridge ("Bridge"), for example, carried the title "Director, Global Financial Institutions Group."  According to a document created by the Financial Services Authority ("FSA") of the United Kingdom, Bridge was an employee of HSBC Bank plc, an HSBC entity that provided issuing, paying agent and custodial services for the Minibonds.  According to Pacific's program prospectus, HSBC Bank plc was "our agent."  Bridge was a senior executive of the entire HSBC organization and an employee of a particular HSBC entity that was an "agent" of Pacific.

91.    HSBC executives Lopez, Travaglione, Taylor, Bridge, Sayers and others carried out Project Milan's mission: terminate HSBC's exposure to Lehman.  HSBC carefully planned and executed this operation, demonstrating in detail how HSBC dealt with Lehman when its own money was on the line.  As to the Minibond investors, it was business as usual.  Recent revelations show Lehman was insolvent well before it filed for bankruptcy protection, and HSBC knew it.

- 27 -

1.      **Mid-2008: Lehman Became Insolvent**

92.      On information and belief, Lehman was insolvent by June 2008.  The belief that

Lehman was insolvent by this time is based upon the following facts:

(a)      On or about April 15, 2008, an Assistant Secretary for Economic Policy at the

U.S. Federal Reserve wrote that Lehman was securitizing loans but keeping those loans on its own

books: "'[T]o game the PDCF [Primary Dealer Credit Facility] – they securitized their illiquid

CLO's and got a rating agency to say that some large fraction of it was investment grade. And then

poof, they get access to tens of billions of dollars from the Fed's PDCF.'"  The U.S. Federal Reserve

describes the PDCF as follows: "The Primary Dealer Credit Facility (PDCF) was an overnight loan

facility that provided funding to primary dealers in exchange for a specified range of eligible

collateral and was intended to foster the functioning of financial markets more generally.  The PDCF

began operations on March 17, 2008, and was closed on February 1, 2010."

(b)      On or about June 9, 2008, Lehman pre-announced its first loss since going

public.  The loss was $2.8 billion.

(c)      On or about June 25, 2008, Lehman failed a Federal Reserve Bank of New

York ("FRBNY") liquidity stress test.  The FRBNY concluded that "'[1] Lehman's weak liquidity

position was driven by its relatively large exposure to overnight CP combined with significant

overnight secured funding of less liquid assets, [2] one and two notch downgrades would result in

significant collateral calls, [3] Lehman recognized its vulnerabilities and was trying to reduce illiquid

assets and extend maturities, and [4] Lehman should improve liquidity by $15 billion.'"

(d)      During the first two fiscal quarters of 2008, Lehman used a device known as

"Repo 105" to manipulate its reported liquidity and debt leverage metrics.  Repo 105 involved

Lehman giving securities to a counterparty in exchange for cash, and returning the counterparty's

cash in exchange for the securities at a later time.  In substance it was similar to a secured financing.
But "under the aegis of an opinion letter" of the "Linklaters law firm in London," Lehman accounted
for the transaction as a "true sale."  The bankruptcy Examiner determined that during this period
"Lehman painted a misleading picture of its financial condition."

93.     The foregoing facts in isolation and combined demonstrate that Lehman was
insolvent by mid-2008.  For more than 148 years, Lehman was a leader in the global financial
markets by serving the financial needs of corporations, governmental units, institutional clients, and
individuals worldwide.  It did not live up to such standards for the last two years of its existence.  In
2006 Lehman started to make bad business decisions, and then tried to conceal the effects of those
decisions.  By mid-2008, Lehman tried to game the U.S. Government, was insufficiently capitalized
and misled others about its financial condition.  Lehman knew what HSBC Bank would soon
discover.  Lehman was insolvent.

**2.     Mid-2006 to Mid-2008: HSBC Examined Exposure to Lehman**

94.     HSBC carefully studied Lehman's financial condition and prepared for its collapse.
According to the Valukas Report, "Taylor stated that in mid-2006, HSBC began an in-depth
examination of its exposure to the financial sector. . . .  HSBC decided to conduct the examination
because HSBC was concerned that Lehman and other financial institutions had not adequately
disclosed their exposures to risks from subprime mortgages."

95.     Based on interviews with Taylor, the Examiner explained that HSBC began to reduce
its own exposure to investment banks.  "According to Taylor, other banks did the same."  And
"Taylor noted that, despite this reduction, the stress tests conducted by the investment banks during
this period relied on assumptions that the credit" – that HSBC and other banks had cut – "was still
available."  Then "Taylor said that the cash capital model of calculating liquidity was 'discredited'

- 29 -

by 2008 precisely because it relied on these overly optimistic assumptions about the availability of credit and unsupported assumption about the value of certain asset-back securities."

96.    HSBC's concerns about Lehman spiked after Bear Stearns became insolvent in March 2008.  Based on an interview of Taylor, the Examiner reported that "HSBC viewed Lehman as the weakest remaining broker-dealer."  HSBC then took decisive action.

### 3.    June 2008: HSBC Derided Lehman's Weak Balance Sheet

97.    By June 2008, HSBC realized that Lehman was starting to unravel.  On Sunday, June 15, 2008, HSBC's Taylor e-mailed other HSBC senior executives (including Lopez) to provide an update on Lehman's deterioration.  Taylor stated Lehman had "poor transparency in valuing assets and liabilities" on its balance sheet.  Taylor described a "[l]ong call" he had on a Saturday, June 14, 2008, with a treasurer for Lehman, and Lehman's rationale for firing its CFO Erin Callan on June 12.  Lehman told Taylor that it fired Callan because she was "regularly speaking off message" and (quoting Lehman) "'damaging the brand.'"  Laughing at Lehman's absurd explanation, Taylor exclaimed that Callan would not cause Lehman's brand "quite so much damage as the billions of dollars in write offs methinks!"

98.    HSBC knew Lehman's balance sheet was in trouble but nevertheless "suggested" that Lehman invest in a loan syndication it was arranging for its U.S. subprime lender HSBC Finance.  This self-serving "suggestion" makes little sense in light of the fact that HSBC commenced its "in-depth examination of its exposure to the financial sector" precisely because "HSBC was concerned that Lehman and other financial institutions had not adequately disclosed their exposures to risk from subprime mortgages."

99.    When Lehman was reeling from such investments in the summer of 2008, HSBC's Lopez told Lehman that its participation in HSBC's subprime syndication was "high profile for

- 30 -

HSBC in terms of [the] 'relationship'" between HSBC and Lehman.  HSBC pressured Lehman to

commit even more of its capital to subprime loans while simultaneously deriding Lehman for

carrying undisclosed exposure on its balance sheet.  HSBC took advantage of Lehman's weakened

condition.  The Examiner reported that "HSBC personnel used Lehman's need for continued credit

support as leverage to encourage Lehman's participation" in the subprime facility.  When Lehman

asked HSBC to cancel its commitment, HSBC rejected that request given the "'negative signal and

precedent it would send to our other banks in the deal.'"  HSBC had Lehman cornered and kept

cutting.

100.    Sometime between May and July 2008, HSBC quietly eliminated a $1 billion

liquidity facility that HSBC Bank provided Lehman.  The Examiner reported that "HSBC initially

focused its efforts on lines of credit that Lehman seldom used so that the reductions would not alert

Lehman or other market participants to HSBC's actions."  Cutting a $1 billion liquidity line at first

appeared to satisfy those goals, but Lehman needed the liquidity to fund trading arrangements with

another bank in 2008.  So Lehman asked HSBC to help it repurpose the $1 billion facility to that end

sometime between May and July 2008.  HSBC rejected the request.  HSBC's "Lopez stated that *he*

*decided* not to proceed with repurposing the facility because Lehman's deteriorating financial

condition" made that exposure unjustifiable.  Again, Lopez was a Project Milan operative who

worked for HSBC Bank, the Minibonds' trustee.

101.    HSBC knew that Lehman was in dire straits.  Rather than "repurposing" the $1 billion

trading facility Lehman already had in place with HSBC into a more useful liquidity line, HSBC

decided to cancel the $1 billion facility altogether.  Lehman thus had $1 billion less liquidity thanks

to HSBC.  HSBC did not stop there.

102.    More cuts were on the way.

4.      **Early July 2008: HSBC Developed a Covert Lehman Escape**

103.    An internal July 2008 memo produced by HSBC Bank shows some of its careful planning to withdraw liquidity from Lehman and eliminate any credit exposure to Lehman.  In that "Lehman Exposure Summary," dated July 2008 and "Prepared by: GB FIG NY" – that is, a document prepared in New York by Lopez and Taylor's "FIG" group – HSBC set forth a number actions it would take to implement a "'controlled and managed' exit from Lehman Brothers."

104.    Among many other actions, this New York memo advised that "*if* management [of HSBC] believes [Lehman] is in imminent or immediate threat of collapse," then HSBC should entertain "*immediate* hedging actions" of HSBC's portfolio holdings.  The memo then identifies $27.7 million of such holdings by one of HSBC's German affiliates.  This fact is important because in the middle of August HSBC authorized selling this $30 million position, and starts selling other Lehman securities.  HSBC knew Lehman was in imminent or immediate threat of collapse in mid-August.  Lehman was insolvent before then, and HSBC acted rationally to protect its interests by cutting and selling its exposure to Lehman as fast as possible.  HSBC did not take similar action to protect the Minibonds.

5.      **Late July to Mid-August 2008: HSBC Placed Lehman on "Amber Alert"**

105.    By July 28, 2008, HSBC internally increased the threat level Lehman posed.  Referring to its "[c]overt reduction of exposure" to Lehman, an internal HSBC document dated July 28, 2008 states: "We assume we are firmly on Amber alert and are establishing clear and robust global procedures for exposure management to be invoked on migration to Red."  HSBC created a "Global Default Working Group" to manage the fallout and move away from Lehman.

106.    HSBC outlined four specific steps to implement its exit strategy.  The most serious of these involved a move to "[w]ithdraw from the provision of [credit of] all Limit intensive business

- 32 -

areas.  Assumes effective exit."  This step involved "giving notice on major payments and securities clearing contracts in UK and Asia," but would take "3-9 months to implement."  Before HSBC could implement that action, it planned to demand more collateral while recognizing that on "an ongoing basis, this increases operational, reputational and litigation risks."  Both "[s]elective hedging" and "[d]isposal of [b]ond holdings" offered "further material reductions in exposure" along with "aggressive negotiation" on bi-lateral tear-ups.

107.    This July 28, 2008 HSBC memorandum further outlined an HSBC risk mitigation action plan, noting various "[i]nsolvency issues" associated with a Lehman bankruptcy.  HSBC knew Lehman was insolvent.

**6.    Early to Mid-August 2008: HSBC Moved to Code Red**

108.    In early to mid-August 2008, HSBC's Project Milan team recommended advising "Lehman Treasury management of HSBC exit decision."  HSBC had not determined an exact date yet, suggesting "AUGUST ??" as a date to communicate the decision and work with Lehman to develop a "strategy for orderly implementation."  This Project Milan memo stated that "[b]oth parties should agree on a global project team, which would coordinate and implement the exit plan in each region with minimal leakage."  Minimal leakage was important so that HSBC could recover as much of its own money as possible.

109.    The Project Milan memo further explains that HSBC's exit strategy revolved around three core principles: (1) "Holistically protect the HSBC organization's interests, thereby limiting total losses"; (2) "Avoid crystallizing committed credit and/or precipitate a collapse of the regulated businesses or subsidiaries of Lehman Brothers"; and (3) "Avoid market signaling or externally transparent actions (to extent possible) that could precipitate the exit of other creditors,

counterparties &/or clients thereby undermining the franchise and potentially crystallizing our losses

on hard to exit/mitigate exposure, as well as lender liability and reputational considerations."

110.    Meanwhile, HSBC could not have cared less about its obligations to the Minibond

investors.  The Project Milan memo states in a category entitled "OTHER ISSUES" that "HBUS

CTLA" – referring to HSBC Bank's Corporate Trust & Loan Agency Service – "provides

trustee/paying agent services," referring to the exact services HSBC Bank was supposed to provide

in the Minibonds.  Because ***those*** services did "not require or use any credit limits" provided by

HSBC, HSBC had a simple plan of action: do nothing and keep collecting fees.

111.    HSBC had a different plan of action as to its own financial affairs.  With reference to

"HBUS" – HSBC Bank, the Minibonds trustee – the memorandum reports $446,215,000 in "CAT

A" or "direct exposure" to Lehman.  As to $50 million of this direct exposure, HBUS had already

hedged $20 million, and decided to hedge the remaining $30 million through the CDS discussed

above.  With regard to another $300 million of CAT A direct exposure, HSBC decided to

"[i]mmediately advise Lehman [of] withdrawal of facility" and allow $129 million outstanding

under the facility to "roll off" in the ordinary course.

112.    HSBC had similar plans with respect to other exposures, and  HSBC engaged in a

similar analysis with respect to several billion dollars worth of credit lines in Europe.  HSBC decided

to "[c]heck what amount of Lehman's paper we [were] lending against" in Europe.  HSBC knew that

Lehman's "paper" was just paper.

### 7.    Mid-August 2008: HSBC "Put a Gun" to Lehman's Head

113.    On August 18, 2008, senior executives at HSBC formally terminated their business

relationship with Lehman.  Taylor terminated it in New York.  In a briefing note on Project Milan

dated August 18, 2008, Taylor explained: "Our desire to withdraw was communicated to the client

[Lehman] today in New York (Nicholas Taylor, Head FIG, Global Banking **HBUS** to Paolo Tonucci, Global Treasurer, LB)."

114.    Taylor explained the "decision to withdraw is on the basis of deteriorating risk and business fundamentals" among other things.  Taylor continued, "Lehman is the weakest with less diversification and relatively more exposure to troubled fixed income assets.  Also, arguably, with its business model terminally damaged, it is perhaps the least likely to be saved."  Stating HSBC was "very important" to Lehman, Taylor anticipated a "likely call from [Lehman] Chairman Jeremy Isaacs or CEO Dick Fuld to either SKG [then HSBC Chairman, Stephen Green] or MFG [then HSBC CEO Michael Geoghan]."  Nonetheless, HSBC resolved to "effect immediate cancellation" of several billion dollars worth of exposure to Lehman.

115.    HSBC went about terminating its business relationship with Lehman in secret.  The next step in that process involved colluding with Lehman.  HSBC and Lehman "form[ed] small project teams in both institutions to execute [HSBC's] exit plan."  "Lehman and HSBC personnel met over August 21 and 22 and discussed ways for HSBC to continue reducing its exposure to Lehman," meeting secretly to avoid "alerting the market."

116.    By the end of August, HSBC adopted "a much more aggressive tone, culminating in a $1bn cash deposit demand by Friday," August 29, 2008.  HSBC executives implied to Lehman that they were "worried" about Lehman's surviving over the weekend.  To continue clearing Lehman's trading business in London, HSBC demanded $945 million in cash.  Lehman explained: "'Basically they [HSBC] were not going to allow us to do business. . . .  ***They put a gun to our head.***'"  "***Not granting HSBC's demand would have been 'terminal' for Lehman.***"

117.    HSBC's actions set off panic at Lehman at the highest levels.  Lehman stated they needed ASAP to "Inform [the] FSA," the "FED" and the "SEC" and "[f]ind out if legally we can

- 35 -

stop them from doing this," *i.e.*, ceasing to clear Lehman's trades in London without another $1 billion. HSBC separately noted Lehman is "likley [sic] to discuss" the demand with "the Fed/FSA regardless they can't afford not to not least if our demands squeeze their position more than we expect." HSBC stated the "Fed know[s] our intended course and I think it only natural under the circumstances they will get more tetchy."

118.    This information is stunning. HSBC told the U.S. Federal Reserve that they were going to demand $1 billion, and just did it. No evidence suggests HSBC had any contractual right to demand $1 billion. HSBC used it business power to take cash out of the Lehman enterprise and brought that cash into the HSBC enterprise. As the Examiner explained, "HSBC acted to protect its economic interests by securing ***its own credit risk*** against a potential default by Lehman."

119.    But HSBC needed more time to eliminate its own personal financial exposure to Lehman. That is the reason why secrecy was one of the three key organizing principles of Project Milan. Project Milan sought to "[a]void market signaling or externally transparent actions (to extent possible) that could precipitate the exit of other creditors, counterparties &/or clients thereby undermining the franchise and potentially crystallizing ***our losses*** on hard to exit/mitigate exposure, as well as lender liability and reputational considerations." Rather than running to the bank to take some of its money, HSBC planned to walk to the bank and take all of its money.

120.    To that end, HSBC aided and abetted Lehman's deceitful balance sheet manipulation. Specifically, HSBC took $800 million in cash from Lehman on August 28, 2008. HSBC bounced back that same $800 million to Lehman "over the Labor Day weekend 'to help with [Lehman's] quarter end BS [balance sheet] targets.'" Lehman returned the $800 million in deposits back to HSBC on September 1, 2008, completing the round trip. Lehman wrongfully counted this encumbered cash in its reported liquidity and HSBC knew Lehman cooked its books.

- 36 -

121.    Before the world learned that Lehman was insolvent, HSBC moved quickly to extract every penny (of its own money) it could from Lehman.  Between August 11 and September 2, 2008, HSBC unloaded nearly $13.5 million in Lehman securities on Lehman.  On August 11, 2008, HSBC sold $4.7 million in Lehman medium term notes to Lehman.  On August 28, 2008, HSBC sold Lehman $1.5 million in Lehman common stock.  On September 2, 2008, HSBC pulled another $7.2 million out of Lehman in exchange for Lehman bonds.  These are just the Lehman securities HSBC sold to Lehman from mid-August to mid-September.  And they represent the execution of HSBC's covert strategy established in July 2008: "if management [of HSBC] believes [Lehman] is in imminent or immediate threat of collapse," then HSBC should entertain "***immediate*** hedging actions" of HSBC's portfolio holdings.  HSBC emphasized "immediate."

122.    At least by August 2008 Lehman was insolvent.  The foregoing facts demonstrate HSBC knew this fact.  Lehman knew this fact as well, having admitted it in a pleading filed on May 26, 2010.  Referring to agreements Lehman executed on or about August 29, 2008, Lehman stated: "On information and belief, at the time the parties entered into the August Agreements, LBHI was undercapitalized, and certain of the Lehman subsidiaries whose obligations were guaranteed under those agreements, including LBI, ***were insolvent***."  HSBC hedged and sold its Lehman positions before the oncoming collapse.

**8.    September 2008, Week One: HSBC Stayed on Red Alert for Its Own Exposure but It Was "Business as Usual" Mode for the Minibonds**

123.    In early September 2008, HSBC accelerated its global covert evacuation of Lehman. On September 2, 2008, a senior executive at HSBC wrote to HSBC "ASP insiders on [Project] Milan."  Among those "insiders" were Taylor and Travaglione who, as noted, were senior HSBC executives and worked for HSBC Bank, the Minibonds trustee, in New York.  Sayers – the spokesperson for HSBC Bank, Pacific, and Pacific's directors – participated in the evacuation.

- 37 -

124.    There, HSBC repeated the following mandate: "I reiterate that the guidance received by **senior mgmt globally**" is to take action to reduce HSBC's direct and indirect exposure to Lehman, but "with global markets cat B / TSL operating in 'business as usual' mode."  The Minibonds program fell into "cat B" from HSBC's perspective. HSBC described "Cat B" types of exposure to include "securities driven collateralized financing transactions" in an internal document concerning its business dealings with Lehman.   The Minibonds were a securities-driven collateralized financing transaction.

125.    While it was business as usual for the Minibonds, by September 2, 2008, HSBC reduced its direct exposure to Lehman in HSBC's Asia-Pacific region from $198.4 million to $33.4 million.  HSBC moved quickly to reduce and obtain cash collateral for other credit exposure, including cash collateral to cover a measly "$195K Guarantee line to Milan [Lehman] Services" in India.  Where HSBC's $195,000 was at stake, it moved heaven and earth.  Where the Minibonds' $1.5 billion was at stake, it was business as usual.

**9.     September 2008, Week Two: "Business as Usual" Continued for the Minibonds**

126.    HSBC monitored Lehman closely during its final days and continued its race to protect its own assets.  On Wednesday, September 10, 2008, HSBC sent an internal e-mail to Milan members, including Taylor, Travalgione and Sayers.  HSBC explained that in light of "recent events on Milan [meaning Lehman] (downgrades, share price fall, etc.)" an update on "securing our position" was in order.  After Lehman conducted its accelerated earnings call on that same day, HSBC alerted Milan members that "the cost to protect against a default by Lehman rose to a record." And "[c]redit-default swaps on Lehman jumped 115 points to 590 points . . . [t]hat surpassed a previous peak of 580 points in March after the collapse and emergency sale of Bear Stearns Cos. to JPMorgan Chase & Co."

- 38 -

127.    By September 10, 2008, HSBC ran at a dead sprint for the exits, giving Lehman "48 hours" to execute documents it wanted, ordering that "no more longer term exposure is to be booked" without them, and limiting short-term foreign exchange trading to "our activity as custodian." So long as HSBC's own money was not on the line, such trading was fine with HSBC. Two days later, HSBC reported that Lehman would "place $153.85m in the HK deposit account" secured by a new cash deed and that HSBC would look to replicate the same arrangement with respect to another $20 million in another facility. HSBC extracted another $173 million in protection.

128.    On September 12, 2008, HSBC Bank executive Taylor received an e-mail entitled "Trouble brewing . . . Part 2." There, one of HSBC's executives responded to a statement by another HSBC executive that she "must have sought HBUS guidance on our strategy over the weekend" of September 13 and 14, 2008. Again, HSBC entities refer to HSBC Bank by the acronym "HBUS." Confirming "[t]his has been done and we have guidance," the executive explained "I am in constant communication with London, NY and the Counterparty Default working group."

129.    On September 14, 2008, Taylor e-mailed other Project Milan insiders that it appeared Barclays had "walked" on buying Lehman and that there was a "[p]ossible bankruptcy." At approximately 3:05 p.m. on the same day, Taylor stated "[w]e need to leave ourself the option to close this [particular issue with Lehman regarding an unsecured trade settlement facility] *and everything*." Taylor copied Lopez.

- 39 -

## VI.    LEHMAN'S FRAUD

A.    **Lehman's Credit Rating Was Necessary to Sustain the Saphir Notes as "Eligible Collateral" for the Minibonds**

130.    While Lehman was collapsing, it tried to hide its poor creditworthiness.  A direct relationship existed between Lehman's credit quality and the Minibonds.   HSBC Bank's representative explained this relationship in testimony before Hong Kong's legislature in late 2008:

> [Legislative Counsel Member, Hon. Abraham Shek's] Statement:  But you trust the Government and the minibond people trust you!  You betray them!

*       *       *

> [HSBC's Sayers'] Response:  Perhaps Chairman, if I could answer.  Sir, at the time there was a requirement, at the time that these products were sold, ***Lehman Brothers, of course, had a, I think, double A credit rating given by various credit rating agencies.  It was on that basis that, I believe, the product was all priced and sold*** . . . .

131.    Lehman's credit quality underpinned the credit rating of the Saphir Notes and the existence of the Minibonds.  To assign the Saphir Notes "AAA" credit ratings, the credit rating agencies required LBSF to find a suitable third party to guarantee unconditionally all of LBSF's obligations relating to the Saphir Notes.  The credit rating agencies required such a guarantee to reach the conclusion that the Saphir Notes would perform as planned, thus warranting the "AAA" designation.  The guarantee backstopped LBSF's obligations, allowing the noteholders of the Saphir Notes (only HSBC Bank for the Minibond investors) to recover their investment capital from the guarantor if necessary.  The guarantee would have great value where, as here, LBSF breaks its promises, reneges on its obligations, and then attempts to rewrite the terms of the Saphir Notes that it helped create for its own benefit in the first place.  LBSF selected Lehman as its guarantor, and the credit rating agencies accepted LBSF's selection on the basis of Lehman's credit ratings.

132.    The rating agencies explicitly based their "AAA" ratings of the Saphir Notes on Lehman's credit ratings among other things.  For example, in rating a series of Saphir Notes, S&P

- 40 -

stated its rating "reflect[ed]" the "credit quality of Lehman Brothers Holdings Inc. (A/Positive/A-1) as guarantor" for LBSF. In the event that Lehman were downgraded "to below 'A-2/BBB+'" then LBSF would "be required" to provide "additional credit support" to maintain the "AAA" rating. Providing another series of Saphir Notes "AAA" ratings, Fitch stated Lehman's credit support was necessary: "Specifically, if the rating of Lehman Holdings is downgraded to below 'A/F1', LBSF will transfer collateral to [Saphir] to cover interest payments and associated costs of a sufficient buffer period; and if Lehman Holdings is downgraded to below 'BBB+/F2', LBSF will provided further collateral," among other things.

133.    Lehman's guarantees thus played a critical role in sustaining the Saphir Notes as eligible collateral for the Minibonds. HSBC Bank has in fact admitted that the Saphir Notes would not have been "eligible collateral" for the Minibonds but for such ratings. Pacific highlighted Lehman's importance in its program prospectus, stating that repayment of the Minibonds "will be will be dependent upon the redemption in full" of the Saphir Notes, and that "Lehman Brothers Holdings Inc. (the swap guarantor) has unconditionally guaranteed to us the due and punctual payment of all amounts" payable under the swap agreements. In fact, Lehman guaranteed LBSF's obligations with respect to **both** the FTD Basket **and** the Saphir Notes.

134.    As Lehman's credit quality declined, its guarantees declined in step and became worthless. Lehman's ratings declined rapidly:

- Fitch placed Lehman's short-term "F1" rating on negative watch on September 9, 2008, and then downgraded that rating to "D" on September 15, 2008. Fitch downgraded Lehman's long-term rating from "AA-" to "A+" on June 9, 2008, placed that rating on negative watch on September 9, 2008, and then downgraded that rating to "D" on September 15, 2008.

- S&P downgraded Lehman's short-term "A-1" rating on September 15, 2008 to "SD" and then to "D" on September 16, 2008. S&P downgraded Lehman's "A" rating to "SD" on September 15, 2008, and to "D" on September 16, 2008.

- 41 -

- Moody's placed Lehman's short-term "P-1" rating on negative watch on September 10, 2008, and downgraded Lehman to "NP" on September 15, 2008. Moody's placed Lehman's "A1" rating on negative watch on June 13, 2008, downgraded the rating to A2 on July 17, 2008, and further downgraded the rating to "B3" on September 15, 2008.

135.    When these three agencies downgraded Lehman to low sub-investment grade (commonly called "junk" grade) status on or about September 15, 2008, LBSF was required to post additional collateral to the Saphir Issuers to support its obligations. On information and belief, LBSF failed to do so.  LBSF thus breached its obligations under the Saphir Notes, triggering yet another Event of Default that is independent of Lehman's or LBSF's formal bankruptcy filing.

## B.    Lehman Misled the Rating Agencies

136.    The rating agencies' actual credit ratings downgrades lagged Lehman's true credit quality descent.  The rating agencies did not downgrade Lehman sooner because Lehman misrepresented its financial condition to them.  The Valukas Report explained that Lehman used a deceptive device known as "Repo 105" to mislead the rating agencies and others.  An analyst at one of the rating agencies stated Lehman's use of Repo 105 "'sounded like fraud.'"

137.    The Examiner stated that Repo 105 temporarily removed securities from Lehman's balance sheet.  Lehman would give securities to a counterparty in exchange for cash, and unwind the transaction shortly thereafter.  Repo 105 transactions were short-term secured financings.  But there was a "critical difference" between the way that Lehman accounted for such transactions and the way that other banks did.  Lehman called them "sales" (by providing 5% overcollateralization – hence the term "Repo 105") for accounting purposes, which materially misrepresented Lehman's financial affairs.  Lehman engaged in this practice with an "*eye towards the rating agencies*' view of Lehman," according to the Examiner.

- 42 -

138.    As to Lehman's use of Repo 105 transactions, the Examiner concluded: "There is sufficient evidence to support a determination by a trier of fact that Lehman's failure to disclose that it relied upon Repo 105 transactions to temporarily reduce the firm's net balance sheet and net leverage ratio was materially misleading."

C.    **The Specific Lehman Entities and Agents Involved in Creating the Minibonds Collateral Knew Lehman Manipulated Its Balance Sheet**

139.    Lehman used its London affiliate, Lehman Brothers International (Europe) or "LBIE," to execute these fraudulent transactions.  Lehman did so "under the aegis of an opinion letter the Linklaters law firm in London wrote for LBIE."  Thus, according to the Examiner, if "United States-based Lehman entities such as LBI and *LBSF* wished to engage in a Repo 105 transaction, they transferred their securities inventory to LBIE in order for LBIE to conduct the transaction on their behalf."  Notably, LBIE arranged the Saphir Notes for Lehman and Linklaters created the trust documentation for both the Saphir Notes and the Minibonds.  Lehman called on its special teams to do the enterprise's dirty work, and the affiliates and advisors who put the Saphir Notes and Minibonds together had actual knowledge that Lehman was manipulating its balance sheet.  Coincidentally or not, the Saphir Notes held by HSBC Bank also had "a minimum of 105%" of the collateralization required by the rating agencies.  It is impossible to know whether the Minibonds formed part of a broader Lehman Repo 105 accounting scheme without the benefit of discovery.

D.    **In September 2008, HSBC Helped Lehman Manipulate Its Balance Sheet**

140.    By September 2008, HSBC helped Lehman manipulate its balance sheet.  HSBC demanded hundreds of millions of dollars in cash from Lehman on or about August 28, 2008.  In response, Lehman CFO Ian Lowitt ("Lowitt") asked HSBC "if it were at all possible to have deposits starting on Monday [over the Labor Day weekend] rather than tomorrow to help with our quarter end

- 43 -

BS [balance sheet] targets."  Relating the conversation he had with HSBC to another Lehman executive, Lowitt stated he "spoke with head of risk at HSBC today (will cover Douglas next week when he is back from vacation) and ***they were accommodating of our month end issue re depositing cash*** – spirit is of trying to work things out, they are very worried about our quarter." Lehman returned the deposits back to HSBC on September 1, 2008, completing the round trip.

141.    Lehman's including the restricted cash in its liquidity calculations was "'completely inappropriate'" according to one rating agency analyst, and other rating agencies would have wanted to know that Lehman was shuffling encumbered deposits onto its balance sheet just at the end of the financial quarter.  Even more pointed, one FRBNY official told the Examiner that "'[a]t some point,'" the FRBNY concluded that Lehman's "'liquidity pool isn't "X;" it's "X" minus something,'" and that "'something'" was the cash collateral Lehman deposited with its clearing banks, including the encumbered cash it deposited with HSBC.

142.    Reflecting on the "round trip" transaction that occurred between HSBC and Lehman over the September 2008 Labor Day weekend, HSBC's Taylor (a Project Milan member) told the Examiner he thought there was nothing wrong with returning $800 million in cash to Lehman for three days, but was surprised by the request.

143.    Given HSBC's Project Milan activity, HSBC knew that Lehman was in serious financial distress.  Lehman's internal e-mails show they spoke with HSBC about the purpose of moving $800 million to and from HSBC – to help with Lehman's "month end" issue.  Lehman wanted the $800 million in cash it gave to HSBC so that it could dress up its balance sheet, and HSBC knew it.

578397_2

### E.    Lehman's Balance-Sheet Fraud Related to the Minibonds

144.    Lehman's fraud directly related to the Minibonds.  Lehman knew that if it told the rating agencies that it was manipulating its balance sheet the rating agencies would downgrade Lehman and certainly would not have accepted Lehman's fraudulent "guarantee" of LBSF's obligations with respect to the Saphir Notes.  Moreover, Lehman knew that if the rating agencies knew what Lehman was doing, Lehman would be required to post more collateral on LBSF's other deals, exactly as the agencies required with respect to the Saphir Notes.

145.    In an internal LBSF document entitled "2008 Q2 – Liquidity Position," which was e-mailed at Lehman on June 7, 2008, Lehman explained that it would have to post an "additional $5 billion margin" if "we are downgraded below A2/A."   The requirement that Lehman post additional collateral was present in the Saphir Notes, as stated above.

### F.    Lehman Owed a Duty to Disclose

146.    Lehman owed Pacific a duty to disclose the fact that it was misleading the credit rating agencies for two reasons.  First, Lehman took over Pacific and knew that Pacific had promised in its program prospectus that it would "give notice of any information about us (or, if we are aware of it, about Lehman Brothers Holdings Inc.) which is necessary to avoid the establishment of a false market in our notes *or which may significantly affect our ability to make payments on our notes*."

147.    Second, Lehman engaged in very suspicious transactions in the Saphir Notes in the summer of 2008.  In or about July 2008 through approximately August 15, 2008, Lehman and LBSF caused the issuer of the Saphir Notes to exchange approximately $344 million in existing Saphir Notes that supported the Minibonds for *new* Saphir Notes to support the Minibonds (the "August Exchange").  The last of these exchanges occurred on August 15, 2008, just three days before HSBC "put a gun" to Lehman's head, demanding $1 billion in cash.

- 45 -

148.    To close the last of the Saphir Notes transactions in the August Exchange, on or about August 15, 2008, LBSF had to represent that no "Potential Event of Default" nor any "Event of Default" had occurred with respect to it *or* Lehman.  A "Potential Event of Default" means "any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default."  Engaging in actionable balance sheet manipulation and misrepresenting its financial condition constitutes a Potential if not an actual Event of Default.  Further, because LBSF knew that Lehman's credit rating was necessary to sustain the Saphir Notes' AAA ratings, it had a duty to disclose the fact that it was helping Lehman manipulate its balance sheet.  Pacific would have been able to sell *all* of the Saphir Notes or require LBSF to get a new guarantor if it had revealed the truth before filing for bankruptcy.

## VII.    LEHMAN'S BANKRUPTCY

149.    By the second week of September 2008, Lehman was crashing.  On September 9, 2008, Lehman reported a $3.9 billion loss for the third financial quarter.  Moody's warned Lehman that it would lower Lehman's credit rating by three notches unless Lehman found an acquirer by September 15, 2008.  This meant that Lehman would be unable to pay its debts as they fell due unless Lehman found an acquirer.  Lehman made a business judgment not to file for bankruptcy protection but to search for an acquirer while it was insolvent.

150.    According to Lehman's bankruptcy counsel, the "first communication to Weil as to possible contingency planning was during the middle of the week of September 8, 2008," when "Steven Berkenfeld, the then head of Lehman's Legal, Compliance and Audit Division, called Steven J. Dannhauser, Weil's Chairman, to engage Weil on a confidential basis to assist Lehman in contingency planning if Lehman was unable to resolve its evolving liquidity crisis."  According to Weil's counsel, at a September 12, 2008 meeting between Lehman and regulatory authorities, "there

- 46 -

was no discussion as to the probability of Lehman seeking or being subject to the commencement of a bankruptcy case" and "[n]o urgency was expressed as to the need to prepare any pleadings or other documents necessary to a bankruptcy filing." Instead, there "were very brief comments made that intensive negotiations were in progress as to a potential sale or merger of Lehman with another financial institution."

151.    After a meeting on September 13, 2008, "the Weil team, using publicly available information, attempted to prepare the necessary pleadings to be used if the bankruptcy contingency arose." However, during the course of that day "it appeared that the bankruptcy contingency remained a remote possibility and that a transaction involving a merger or sale with Barclays or Bank of America appeared promising." During the morning of September 14, 2008, Bank of America withdrew "from any sale or merger negotiations." That night, "Lehman representatives were advised that a transaction with Barclays was not going to occur and, further, that there would be no federal assistance to save or support Lehman." "The Lehman bankruptcy was unplanned," according to counsel.

152.    On September 15, 2008, Lehman Brothers Holdings Inc. filed for bankruptcy protection.

153.    Lehman made a business decision to operate under insolvency conditions and focused almost exclusively on finding a merger partner to solve its business problems. Plaintiffs did not make that choice. Lehman did. That Lehman did not actually plan to seek the protections of the Bankruptcy Code does not mean that Lehman should not have had a plan. In its final Form 10-K, Lehman explained that "[o]ur borrowing costs and our access to the debt capital markets depend significantly on our credit ratings." It further stated that "[l]iquidity, that is ready access to funds, is essential to our businesses." But Lehman lied about its liquidity to the rating agencies and others,

- 47 -

and many of its largest business partners, like HSBC, JPMorgan and others, withdrew liquidity from Lehman in massive quantities in 2008. JPMorgan and HSBC threatened not to clear securities trades for Lehman and Lehman was in the securities trading business.

154.    Other market participants planned for Lehman's bankruptcy. For example, according to a July 20, 2008 e-mail from Federal Reserve Chairman Bernanke, JPMorgan and "BNYM [were] sufficiently concerned" about Lehman's ability to satisfy its trading obligations that they "arranged a meeting Monday afternoon with SIPC," which is the government organization that would be responsible for administering Lehman's liquidation. JPMorgan appreciated Lehman's insolvency, and protected itself against Lehman's bankruptcy. HSBC did the same thing.

155.    The problem with HSBC's approach is that it colluded with Lehman to terminate its personal exposure while hanging the Minibond investors out to dry. HSBC has publicly attempted to hide that fact, as is evident from the following exchange between a Hong Kong legislator and the representative of HSBC, HSBC Bank, Pacific **and** the directors of Pacific **and** a member of Project Milan:

> [Legislative Counsel Member, Hon. Abraham Shek's] Statement: But you trust the Government and the minibond people trust you! You betray them!
>
> *            *            *
>
> [HSBC's Sayers'] Response: Perhaps Chairman, if I could answer. Sir, at the time there was a requirement, at the time that these products were sold, Lehman Brothers, of course, had a, I think, double A credit rating given by various credit rating agencies. It was on that basis that, I believe, the product was all priced and sold, and ***none of us unfortunately had the benefit of foresight to know what terrible circumstances would happen*** . . . .

156.    The facts show HSBC Bank did have the "foresight" to plan for Lehman's demise and started that process months before Lehman filed for bankruptcy. Above, Sayers says that the

Minibonds were priced on the basis of Lehman's credit quality.  But its credit quality started to collapse before it filed for bankruptcy.

157.    Well before Lehman filed for bankruptcy, the cost to insure its bonds skyrocketed (as Sayers and other Project Milan members knew).  The credit guarantees that Lehman provided to create the Minibonds were worthless.  The Saphir Notes were therefore not "AAA" and *not even eligible* as collateral to support the Minibonds.  HSBC Bank knew these facts.  But still, it slumbered.

158.    HSBC Bank recognizes that is owes fiduciary duties to the Minibond investors.  Sayers explained: "Of course, in this unfortunate circumstance, where we have seen the demise of Lehman Brothers, our role in a default is to take action to enforce the collateral for the benefit of the investors to ensure that they receive whatever value is raised from that collateral."  Despite the fact that numerous Events of Default occurred *before* Lehman filed for bankruptcy, HSBC Bank decided to wait seven weeks *after* Lehman's September 15, 2008 petition to declare an Event of Default.

## A.    HSBC Awakens to Declare the Minibonds and the Saphir Notes in Default

159.    On November 6, 2008, HSBC Bank made an announcement concerning the Minibonds.  It announced that "Pacific" determined Events of Default arose under the Saphir Notes, and Pacific "directed" the issuer of the Saphir Notes to terminate its swap arrangements with LBSF.  Defaults under the Saphir Notes in essence cross-defaulted to the Minibonds, triggering their mandatory redemption.

160.    Pacific had the right to undertake this action because, as noted, Pacific used the Minibond investors' money to buy custom-made CDOs to support each series of Minibond issuance.  In its program prospectus, in response to the questions "What happens to my money?  How can Pacific International Finance Limited pay me back?"  Pacific explained: "We use the money which

- 49 -

you invest in our notes to buy a package of assets.  These assets are carefully selected and tailored to match our payment obligations under the notes."   With each issuance of Minibonds, Pacific purchased (or should have purchased) an equivalent par value of "tailored" Saphir Notes.  While Pacific sold notes to thousands of investors, it was the ***sole purchaser*** of a number and quantum of Saphir Notes that equaled the number and (aggregate) par value of each series of Minibonds it issued.  As a consequence, Pacific had complete control over the issuer of the Saphir Notes with respect to each Minibond series.

161.    Finally asserting its control over Pacific, HSBC Bank determined Events of Default occurred under the Saphir Notes, and belatedly commenced the process of repaying the Minibonds in November 2008.

## B.    LBSF Makes Another Run at the Minibonds and the Saphir Notes

162.    On November 25, 2008, LBSF sprung into action and ordered (on its own authority) HSBC Bank to "cease and desist" from doing anything more to repay Plaintiffs.  An affiliate of HSBC Bank attached a document to an affidavit that states:

> [On November 25, 2008, a] US law firm representing the liquidator of Lehman sends a "***cease and desist***" letter to the trustee for the Minibonds, to the effect that, according to the US Bankruptcy Code, the trustee's actions since 15 September might be invalid; and that the ***trustee might not lawfully realize the collateral and pay the money to Minibond investors, and should refrain from taking any further action***.

163.    From New York, defendant LBSF sent the letter to HSBC Bank in New York.  That November 25, 2008 "cease and desist" letter orders HSBC Bank not to pay Plaintiffs.  It is addressed to Plaintiffs' trustee, HSBC Bank USA "as trustee."  In the letter, LBSF warned the trustee that the trust fund "may be subject to the automatic stay provisions of . . . the Bankruptcy Code" and further threatened "we hereby demand that you immediately cease and desist from taking any further actions."

- 50 -

164.    LBSF's two-page letter purportedly caused HSBC Bank to cease discharging the obligations it owes to Plaintiffs to repay Pacific's obligations.  Since that time HSBC Bank has favored LBSF and has actively attempted to prevent the Minibond holders from protecting and recovering their collateral.  HSBC Bank needs to stay on its best behavior to stay out of the way of Lehman's "preference" suing spree and has powerful economic incentives for Lehman to win this case.

## C.    Lehman's Bankruptcy Heightens HSBC's Conflicts of Interest

165.    While HSBC was able to escape economic fallout thanks to its aggressive but covert work under Project Milan, according to HSBC representatives as set forth in the Valukas Report, Lehman and certain of its affiliates still owe HSBC approximately $345 million.   HSBC representatives communicated that figure to the Examiner in or about March 2010, but hastened to tell the Examiner that HSBC had not tallied the full amount of remaining claims against Lehman.

166.    The (at least) $345 million Lehman debtors owe HSBC represents an actual conflict of interest.  If LBSF succeeds in this litigation, then the estate will have billions of dollars more to repay the HSBC entities.  And what affects one HSBC entity affects them all, even when just a few hundred thousand dollars are at stake in some HSBC outpost in India.  Project Milan makes that rule abundantly clear.

167.    HSBC Bank's rank self-dealing and conflicts of interest between June and September 2008 places it at substantial risk.  With this reality in mind, HSBC Bank again rose to the occasion of protecting its own personal economic interests.  In September 2009, it filed a $1.6 billion claim against defendant LBSF, seeking an indemnity from the estate for the harm HSBC Bank caused the Minibond holders.

168.    Letting bygones be bygones, HSBC and Lehman recently agreed to let HSBC keep approximately $174 million in cash held in a cash collateral account.  HSBC agreed to transfer approximately $101 million from that account to Lehman.  And the parties have agreed to act in a "commercially reasonable manner" to divy up the remaining amount in the accounts, which is approximately $243 million.

169.    With $345 million in claims against the estate, and $243 million of the estate's cash, it is in HSBC's economic interests to continue cooperating with Lehman, and against the interests of the Minibond holders, in much the same way that HSBC Bank has operated throughout the existence of the Minibonds.

**D.    Thousands Await the Outcome of This Proceeding**

170.    According to reports, Pacific sold Minibonds to approximately 33,000-34,000 retail investors.  Reports indicate that almost approximately 25,000 of those investors were "eligible" to participate in and did participate in a repurchase program orchestrated by the Hong Kong government and the banks that Pacific used to distribute the Minibonds to retail investors (the "Distributing Banks").  Reports further indicate that approximately 500 Minibond holders were "eligible" but did not participate in the repurchase program, but thousands more were not "eligible." Thus, thousands of retail investors (including most of the plaintiffs who are named in this proceeding) still hold Minibonds that are in default because of LBSF.

171.    Although the Distributing Banks did not create the Minibonds or the promotional documents that "Pacific" (*i.e.*, HSBC and Lehman) used to sell the Minibonds, they agreed to help alleviate the social chaos that enveloped Hong Kong as a consequence of LBSF's final grab at the Minibond investors' money.

- 52 -

578397_2

172.    All of the Minibonds at issue in this case, with a par value of approximately $1.5 billion, remain outstanding and in default due to LBSF's wrongful interference with their repayment.  As to the Distributing Banks, they "step into the shoes of the noteholders" as HSBC has explained.  The Distributing Banks have reportedly agreed to pass any additional funds they get from HSBC Bank to the former noteholders.  But all of the ***present*** noteholders are identically situated in that all of the Minibonds are in default and they have received zero distributions from the Minibonds trust that HSBC Bank administers.

173.    A live, actual, substantial case or controversy persists.  Plaintiffs have standing to bring this case.

### VIII.   DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

174.    Plaintiffs bring this action derivatively in the right and for the benefit of the trust administered by HSBC Bank, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure (the "FRCP") and the Bankruptcy Rules, and pursuant to the Special Circumstances doctrine articulated by the Court in *Ka Kin Wong v. HSBC USA, Inc*., No. 10 Civ. 0017(WHP), 2010 U.S. Dist. LEXIS 81058 (S.D.N.Y. Aug. 9, 2010).

175.    Plaintiffs satisfy the prerequisites of FRCP 23.1 because:

(a)    they bring this action to enforce a right that HSBC Bank as trustee may properly assert but has failed to enforce; and,

(b)    Plaintiffs will fairly and adequately represent the interests of all similarly situated Minibond holders in enforcing the rights of the trust.

176.    Plaintiffs satisfy the pleading requirements of FRCP 23.1 because:

(a)    this complaint has been verified;

- 53 -

(b)      Plaintiffs owned or own and have owned Minibonds and have been beneficiaries of the trust at the times of the transactions complained of, including as of the date hereof (*see* Ex. A);

(c)      this action is not a collusive one to confer jurisdiction that the Court would otherwise lack;

(d)      although unnecessary for the reasons set forth below, Plaintiffs have tried to compel HSBC Bank to satisfy its duties and HSBC Bank – through its representatives and affiliates – has sought to prevent Plaintiffs from protecting their rights.

177.     Special circumstances permit Plaintiffs to bring this action and FRCP 23.1's demand requirement (already satisfied as noted above) is further excused because:

(a)      LBSF is actively attempting in litigation to destroy the only property that can be used to repay the Minibond investors – the Saphir Notes.

(b)      But for LBSF's improper attempts to change the terms of the Saphir Notes and its interference with the Minibonds trust, the Minibonds would have been redeemed at or near par over two years ago.

(c)      LBSF ordered HSBC Bank to "cease and desist" from liquidating, realizing, or distributing the Saphir Notes and demanded HSBC Bank do ***nothing*** to defeat LBSF's attack on the Saphir Notes and the Minibonds.  Consistent with past practice, HSBC Bank has agreed to LBSF's demands, favoring LBSF over the Minibond holders.

(d)      HSBC Bank has engaged in substantial impeachable conduct.  HSBC Bank and its affiliates engaged in self-dealing and had many conflicts of interest and breaches of common law and regulatory duties both before and after Lehman's bankruptcy.

578397_2

(e)     HSBC Bank allowed Lehman and LBSF to select and retain the Saphir Notes as collateral for the Minibonds but knew that Lehman and LBSF's economic interests were exactly opposite to the interests of the Minibond investors.

(f)     HSBC Bank knew that the Minibonds were mandatorily redeemable before Lehman filed for bankruptcy but did not discharge its duties to realize the Saphir Notes and redeem the Minibonds.

(g)     HSBC Bank breached its duties to take action after LBSF and Lehman triggered Events of Default under the Saphir Notes and the Minibonds.

(h)     Lehman and its affiliates owe HSBC Bank and its affiliates hundreds of millions of dollars.  HSBC Bank will benefit if LBSF and Lehman succeed in destroying the Saphir Notes.  HSBC Bank's personal interests and legal duties conflict.

(i)     HSBC Bank faces substantial financial liability in this case as evidenced by its $1.6 billion indemnity claim filed against Lehman and LBSF.

(j)     HSBC Bank faces conflicting duties because LBSF claims it is a beneficiary of the Minibonds trust.  LBSF seeks to destroy the trust's sole asset, while Plaintiffs seek to preserve the value of that asset at par value.  These objectives are mutually exclusive and HSBC Bank cannot simultaneously discharge its duties to LBSF (as LBSF claims) and to the Minibond holders.

(k)     Justice requires LBSF and Lehman answer the Counts as LBSF and Lehman intentionally manipulated tens of thousands of retail investors for their own gain; LBSF and Lehman lost the bets they foisted on those investors; such investors will receive substantial recoveries if this suit succeeds.

- 55 -

(l)     LBSF has already litigated and lost critical legal issues in England, and there
is a strong likelihood of success on the merits of this case given the numerous Events of Default that
occurred under the Saphir Notes before LBSF (or Lehman) filed for bankruptcy and after.

(m)     LBSF and Lehman engaged in fraud to sustain the Saphir Notes and the
Minibonds.

(n)     HSBC Bank knew or should have known LBSF and Lehman manipulated
their financials as it helped them do it.

## IX.    DERIVATIVE COUNTS

### A.    Derivative Count I: Declaratory Relief Against All Defendants

178.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding
paragraphs with the same force and effect as if hereinafter fully set forth at length.

179.    An actual and justiciable controversy exists as to defendants' conduct with respect to
the Saphir Notes and the Minibonds.  Defendants have injured Plaintiffs, Plaintiffs remain injured,
and a ruling by the Court will resolve the controversy.

180.    Plaintiffs seek the following declarations:

(a)     One or more Events of Default occurred under the Saphir Notes before
September 15, 2008; in the alternative, one or more Events of Default under the Saphir Notes
occurred on or after September 15, 2008.

(b)     LBSF was the defaulting party under all circumstances.

(c)     Upon LBSF's defaults, the priority rights of the noteholder of the Saphir
Notes (HSBC Bank as trustee for the Minibonds holders) immediately and automatically vested
pursuant to Condition 44 and the Priority Provision and such defaults give rise to the Minibonds'
mandatory redemption.

- 56 -

(d)    Condition 44, the Priority Provision and the Condition Precedent provision are enforceable as written.

(e)    Condition 44, the Priority Provision and the Condition Precedent provision are enforceable subordination provisions, are protected by statutory safe harbors, do not constitute *ipso facto* provisions or give rise to improper "preferences," and are not otherwise unenforceable under the Bankruptcy Code in this case.

(f)    To the extent that LBSF or Lehman have any payment or other rights with respect to either the Saphir Notes or the Minibonds, they are subordinate to the Minibonds holders' superior interests in being repaid first under principles of equitable subordination.

(g)    HSBC Bank is entitled to no indemnity; in the alternative, any such interest is subordinate to the Minibonds holders' interests in being repaid first under principles of equitable subordination.

(h)    BNY must be indemnified by LBSF per LBSF's contractual obligations (which it has not challenged) or by HSBC Bank, if at all.

(i)    The Saphir Notes must be redeemed at or near par.

(j)    The Minibonds must be redeemed at or near par.

**B.    Derivative Count II: Injunctive Relief Against All Defendants**

181.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

182.    An actual and justiciable controversy exists as to defendants' conduct with respect to the Saphir Notes and the Minibonds. Defendants have injured Plaintiffs, Plaintiffs remain injured, and a ruling by the Court will resolve the controversy.

- 57 -

183.    Without Court intervention, Plaintiffs will suffer immediate and irreparable injury in that LBSF may succeed in destroying the sole piece of property that can be used to redeemed the Minibonds – the Saphir Notes.

184.    Plaintiffs have endured substantial suffering already in that they have not received the full amount of principal they are owed nor have they received any interest payments they are owed at least since LBSF ordered HSBC Bank to "cease and desist" from discharging its obligations to repay Plaintiffs.

185.    Plaintiffs seek a temporary and permanent injunction enjoining LBSF or Lehman or their affiliates from interfering with the Saphir Notes, the Minibonds, Plaintiffs' fiduciary and contractual relationships with HSBC Bank or Plaintiffs right to a return of their principal and interest payments.

186.    Plaintiffs seek a temporary and permanent injunction requiring BNY and HSBC Bank to do all things necessary to redeem the Saphir Notes at or near par and distribute those payments to the Minibonds holders; or, in the alternative, requiring BNY and HSBC to do all things necessary to distribute the Saphir Notes to the Minibonds holders directly.

## C.    Derivative Count III: For Constructive or Resulting Trust Against All Defendants

187.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

188.    An actual and justiciable controversy exists as to defendants' conduct with respect to the Saphir Notes and the Minibonds.  Defendants have injured Plaintiffs, Plaintiffs remain injured, and a ruling by the Court will resolve the controversy.

189.    Equity requires the imposition of a constructive trust over the harms LBSF and Lehman have caused the Minibond holders.

- 58 -

190.    Equity must operate on the consciences of all defendants to impose a trust over whatever legal rights or interests they claim with respect to the Saphir Notes or the Minibonds for the benefit of the trust that HSBC Bank administers for Plaintiffs.

191.    LBSF and Lehman dishonestly assisted HSBC Bank in a breach of trust and are required to release whatever interests they claim to the Saphir Notes or Minibonds even if they have yet to receive any identifiable trust property.

192.    HSBC Bank dishonestly assisted LBSF and Lehman in a breach of its trust obligations and a trust must be imposed over the property HSBC Bank received in connection with that breach, including but not limited to all cash payments it extracted from Lehman or LBSF while it served as trustee (including the proceeds of HSBC's sales of securities issued by any Lehman entity before they filed for bankruptcy) when it should have acted to sell the Saphir Notes at or near par value.

193.    Whatever property rights defendants hold with regard to the Saphir Notes or the Minibonds, they cannot in good conscience and equity retain under the circumstances revealed and the Minibond holders plainly are the correct beneficial and legal owners of such rights.

194.    A resulting trust is appropriate as Plaintiffs' and the Minibond investors' money was used (through HSBC Bank as trustee) to acquire the Saphir Notes.  Having provided the purchase money to buy the property that is in the name of HSBC Bank, HSBC Bank holds title to that property on a resulting trust in proportion to the Minibond investors' aggregate contribution of 100% of the purchase money.

195.    A resulting trust is appropriate as HSBC Bank purchased the Saphir Notes (either directly or indirectly through Pacific or by conveying the Minibond holders' capital to LBSF or

Lehman) and the intent of all parties involved in the acquisition of the Saphir Notes was that the

beneficial interest in the Saphir Notes reside in HSBC Bank for delivery to the Minibonds holders.

## X.    CLASS ACTION ALLEGATIONS

196.    Plaintiffs bring the claims set forth below as a class pursuant to FRCP 23 on behalf of

a class consisting of all persons or entities who owned Minibonds at any time between January 1,

2008 through the date this action terminates (the "Class Period"), and who were injured thereby.

Excluded from the Class are defendants, the officers and directors of the defendants, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or

assigns and any entity in which defendants have or had a controlling interest.

197.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown at this time and can only be

ascertained through appropriate discovery, it is likely that there are numerous members in the

proposed Class, possibly more than 33,000, according to media and government reports.  Purchasers

and holders of the Minibonds and other members of the Class may be identified from records

maintained by defendants or their transfer agents and may be notified of the pendency of this action

by mail, using the form of notice similar to that customarily used in complex class actions.

198.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of law that is

complained of herein.

199.    The representative plaintiffs will fairly and adequately protect the interests of the

members of the Class and have retained counsel competent and experienced in class actions

involving complex financial matters.

- 60 -

200. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether the collateral held by defendants is the rightful property of Plaintiffs or must be transferred to Plaintiffs in equity.

201. Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive, declaratory or other relief is appropriate respecting the Class as a whole.

## XI.    CLASS ACTION COUNTS

202. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

203. This is a claim for a constructive or resulting trust.

204. An actual and justifiable controversy exists as to defendants' conduct with respect to the Saphir Notes and the Minibonds. Defendants have injured Plaintiffs, Plaintiffs remain injured, and a ruling by the Court will resolve the controversy.

205. Equity requires the imposition of a constructive trust over the harms LBSF and Lehman have caused the Minibond holders.

206. Equity must operate on the consciences of all defendants to impose a trust over whatever legal rights or interests they claim with respect to the Saphir Notes or the Minibonds for the benefit of the Class.

207. LBSF and Lehman dishonestly assisted HSBC Bank in a breach of trust and are required to release whatever interests they claim to the Saphir Notes or Minibonds even if they have yet to receive any identifiable trust property.

208. HSBC Bank dishonestly assisted LBSF and Lehman in a breach of its trust obligations and a trust must be imposed over the property HSBC Bank received in connection with

- 61 -

that breach, including but not limited to all cash payments it extracted from Lehman or LBSF while it served as trustee (including the proceeds of HSBC's sales of securities issued by any Lehman entity before they filed for bankruptcy) when it should have acted to sell the Saphir Notes at or near par value.

209.    Whatever property rights defendants hold with regard to the Saphir Notes or the Minibonds, they cannot in good conscience and equity retain under the circumstances revealed and the Minibond holders plainly are the correct beneficial and legal owners of such rights.

210.    A resulting trust is appropriate as Plaintiffs' money was used (through HSBC Bank as trustee) to acquire the Saphir Notes.  Having provided the purchase money to buy the property that is in the name of HSBC Bank, HSBC Bank holds title to that property on a resulting trust in proportion to the Minibond investors' aggregate contribution of 100% of the purchase money.

211.    A resulting trust is appropriate as HSBC Bank purchased the Saphir Notes (either directly or indirectly through Pacific or by conveying the Minibond holders' capital to LBSF or Lehman) and the intent of all parties involved in the acquisition of the Saphir Notes was that the beneficial interest in the Saphir Notes reside in HSBC Bank for delivery to the Minibonds holders.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Entry of a declaratory judgment in accordance with Count I;

B.    A temporary restraining order and preliminary and permanent injunctive relief in accordance with Count II;

C.    Imposing or declaring a resulting or constructive trust in accordance with Count III;

D.    Awarding Plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

- 62 -

E.      Awarding rescission or a rescissory measure of damages;

F.      Awarding such additional equitable/injunctive or other relief as deemed appropriate
by the Court, including an order for HSBC Bank to repurchase the Minibonds at par value plus
accumulated or owed interest; and

G.      For such other relief as the Court deems just and proper.

## XIII.   JURY DEMAND

Plaintiffs hereby demand a trial by jury before an Article III Court.

DATED: November 29, 2010          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                  SAMUEL H. RUDMAN
                                  DAVID A. ROSENFELD


                                  _____
                                        SAMUEL H. RUDMAN

                                  58 South Service Road, Suite 200
                                  Melville, NY  11747
                                  Telephone:  631/367-7100
                                  631/367-1173 (fax)
                                  srudman@rgrdlaw.com
                                  drosenfeld@rgrdlaw.com

                                  ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                  LUKE O. BROOKS
                                  JASON C. DAVIS
                                  Post Montgomery Center
                                  One Montgomery Street, Suite 1800
                                  San Francisco, CA  94104
                                  Telephone:  415/288-4545
                                  415/288-4534 (fax)
                                  lukeb@rgrdlaw.com
                                  jdavis@rgrdlaw.com

- 63 -

ROBBINS GELLER RUDMAN
    & DOWD LLP
SPENCER A. BURKHOLZ
PATRICK W. DANIELS
CHRISTINA A. ROYCE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
patrickd@rgrdlaw.com
croyce@rgrdlaw.com

GENOVESE JOBLOVE & BATTISTA, P.A.
JOHN H. GENOVESE
PAUL J. BATTISTA
DAVID C. CIMO
ROBERT F. ELGIDELY
Bank of America Tower, 44th Floor
100 Southeast Second Street
Miami, FL  33131
Telephone:  305/349-2300
305/349-2310 (fax)

Attorneys for Plaintiffs

- 64 -

# EXHIBIT A

# (VERIFICATIONS ATTACHED)

578397_2

確認書

本人 _陳麗娟_ 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

　　本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 _23-11-2010_ 簽立

簽署 _陳麗娟_

正楷姓名 _陳麗娟_

地址

_九龍柯士甸道西壹號尊天圭萬幸立盤23/H_

**VERIFICATION**

I _CHAN LAI KUEN_ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

　　I verify under penalty of perjury that the foregoing is true and correct.

Executed on _23rd NOV. 2010_

Signature _陳麗娟_

Print Name

_CHAN LAI KUEN_

Address

_FLAT H 23/F BLK T5 SORRENTO_
_1 AUSTIN ROAD WEST_
_TSIMSHA TSUI KLN._

確認書

本人 _____馮 添財_____ 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 _23 - 11 - 2010_ 簽立

Baldwin Fung

簽署
馮 添財
正楷姓名
香港將軍澳, 毓雅里 9號,
地址
豐安園, 3座, 38樓D室

**VERIFICATION**

I _FUNG Tim CHOY_ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on _23 - 11 - 2010_

Baldwin Fung

Signature
FUNG Tim CHOY
Print Name
Flat D, 33/F., Block 3,
Address
Well On Garden, 9 Yuk Nga Lane,
Tseung Kwan O, N.T, Hong Kong.

3

確認書

本人 ___汪福成_____ 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

　　本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 _2010 / 11 / 23_ 簽立

_____汪福成_____
簽署

_____汪福成_____
正楷姓名

_____觀塘月華街 71號 好景樓_____
地址

_____8樓 F樓_____

**VERIFICATION**

I ___WONG FUK SHING___ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

　　I verify under penalty of perjury that the foregoing is true and correct.

　　Executed on _23 Nov 2010_

_____汪福成_____
Signature

_____WONG FUK SHING_____
Print Name

_____FLAT F 8/F HO KING HSE_____
Address

_____71 YUET WAH ST KWUN TONG_____

4

確認書

本人 黃笑辟 _____ 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

　　本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 23-11-2010、簽立



簽署 黃笑辟

正楷姓名 黃笑辟

地址 香港新界天水圍），天盛苑，
盛昭閣，B座304室

**VERIFICATION**

I ___WONG  SIU  KWAN___ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

　　I verify under penalty of perjury that the foregoing is true and correct.

Executed on 23-11-2010、

黃笑辟
Signature

WONG  SIU  KWAN
Print Name

Room 304, 3/F., Block B,
Address

Shing Chiu House, Tin Shing Court,
Tin Shui Wai, N.T., Hong Kong.

確認書

本人 _沈一鳴_____ 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 _2010年11月23日_____ 簽立

_Y. n. Shen_____
簽署

_沈一鳴_
正楷姓名

_訖港 新界元朗洪水橋栢雨花園_
地址
_白花路5號B2地下_

**VERIFICATION**

I _SHEN YEE MING_____ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on _23-11-2010_____

_Y. n. Shen_____
Signature

_SHEN YEE MING_
Print Name

_B2/GF, 5 PAK FA ROAD,_
Address

_PARKVIEW GARDEN   YUEN LONG, N.T. H.K._

確認書

本人 *謝秀琼，謝連娣* 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 *2010年 11月 23日* 簽立        *謝秀琼，謝連娣*

簽署

正楷姓名

*謝秀琼，謝連娣*

地址

*FLAT 1409, 14/F YIU HEI HSE*

**VERIFICATION**      *TUNG HEI COURT SAI WAN HO, HK*

I *謝秀琼，謝連娣* hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on *23 Nov 2010 -*

Signature      *謝秀琼，謝連娣*

Print Name      *謝秀琼，謝連娣*

Address

*FLAT 1409, 14/F YIU HEI HSE*
*TUNG HEI COURT SAI WAN HO, HK*

確認書

本人 謝連娣 特此確認，已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟，確認本人目前擁有屬該訴訟主體的迷你債券，且在此處所述事件發生期間擁有此類

迷你債券，並確認就本人所知、所悉和所信，前述內容均屬實。

本人確認，前述內容均真實准確。如作偽証，即受處罰。

於 2010年11月23日 簽立                    謝連娣

                                        簽署

                                        正楷姓名  謝連娣

                                        地址

                                        FLAT 1409, 14/F YIU HEI HSE

                            **VERIFICATION** TUNG HEI COURT SAI WAN HO, HK

I 謝連娣 hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on 23 Nov 2010

Signature  謝連娣

Print Name  謝連娣

Address

FLAT 1409, 14/F YIU HEI HOUSE
TUNG HEI COURT. SAI WAN HO. HK.

確認書

本人 _鄧婉芬_ 特此確認,已與律師查閱前述經修訂集體訴訟和經核

証派生訴訟,確認本人目前擁有屬該訴訟主體的迷你債券,且在此處所述事件發生期間擁有此類

迷你債券,並確認就本人所知、所悉和所信,前述內容均屬實。

本人確認,前述內容均真實准確。如作偽証,即受處罰。

於 _23-11-10_ 簽立

簽署 _Tang yuen_

正楷姓名 _鄧婉芬_

地址 _香港九龍美孚新邨蘭畦道_
_23座 C 室 15樓_

**VERIFICATION**

I _TANG YUEN FEUN_ hereby verify that I have reviewed the foregoing

Amended Class Action and Verified Derivative Complaint with counsel, verify that I currently

own Minibonds that are the subject of this action and owned those Minibonds during the period

of the events described herein and that the foregoing is true to the best of my knowledge,

information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on _23-11-10_

Signature _Tang yuen_

Print Name _TANG YUEN FEUN_

Address _23C, NASSAU ST. 15/Floor_
_MEI FOO KOWLOON_
_HONG KONG_

# EXHIBIT B

**THIS NOTICE IS IMPORTANT AND REQUIRES THE IMMEDIATE ATTENTION OF NOTEHOLDERS. IF NOTEHOLDERS ARE IN ANY DOUBT AS TO THE ACTION THEY SHOULD TAKE, THEY SHOULD SEEK THEIR OWN FINANCIAL AND LEGAL ADVICE, INCLUDING AS TO ANY TAX CONSEQUENCES, IMMEDIATELY FROM THEIR STOCKBROKER, SOLICITOR, ACCOUNTANT OR OTHER INDEPENDENT FINANCIAL OR LEGAL ADVISERS.**

HSBC Bank USA, National Association, as Trustee
(the "**Trustee**")

**Information Notice Relating to Details of the Underlying Securities of the Notes**

**NOTICE IS HEREBY GIVEN** to the holders of all Notes issued by Pacific International Finance Limited (the "**Issuer**") presently outstanding (the "**Noteholders**" and the "**Notes,**" respectively) identified in the attached Annex A:

Annex A of this Notice is a statement prepared by the Trustee (based on information provided to it by the various custodians) which details the assets underlying each Series/Tranche of the Notes (the **"Pacific Underlying Securities"**). Annex A further details the collateral assets underlying the Pacific Underlying Securities.

*Please note that certain Pacific Underlying Securities constitute the underlying security for one or more Tranches of Notes within the same Series.*

We further refer to the attached letter received from The Bank of New York Mellon ("BNYM") in their capacity as custodian of the collateral underlying the Pacific Underlying Securities. This letter therefore confirms the details of custodian assets which BNYM are holding in such capacity.

In the meantime, Noteholders who have any questions for the Trustee are invited to contact the representative of the Trustee by email at lbnyinquiries@us.hsbc.com.

This Notice is given by
HSBC Bank USA, National Association,
as Trustee
Dated: 20 October, 2008

## ANNEX A
### REVISED

| Issuer | ISIN | Series | Pacific Underlying Security (NB: held by HSBC Bank plc as Custodian) | Collateral underlying the Pacific Underlying Security (NB: held by Bank of New York Mellon as Custodian) |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0227396974 | Series 21 A | Series 2008-9 USD 31,500,000 of Synthetic Portfolio Floating Rate Notes due 3/15/11 issued by Beryl Finance Limited (ISIN: XS0372254831) | USD 31,500,000 in principal amount Floating Rate Notes due 2011 issued by Europaische Hypothekenbank S.A. (subject to exchange) (ISIN: XS0229688311) |
| Pacific International Finance Ltd | XS0227397436 | Series 21 B | Series 2008-9 USD 31,500,000 of Synthetic Portfolio Floating Rate Notes due 3/15/11 issued by Beryl Finance Limited (ISIN: XS0372254831) | USD 31,500,000 in principal amount Floating Rate Notes due 2011 issued by Europaische Hypothekenbank S.A. (subject to exchange) (ISIN: XS0229688311) |
| Pacific International Finance Ltd | XS0227397865 | Series 21 C | Series 2008-9 USD 31,500,000 of Synthetic Portfolio Floating Rate Notes due 3/15/11 issued by Beryl Finance Limited (ISIN: XS0372254831) | USD 31,500,000 in principal amount Floating Rate Notes due 2011 issued by Europaische Hypothekenbank S.A. (subject to exchange) (ISIN: XS0229688311) |
| Pacific International Finance Ltd | XS0266951804 | Series 27 A | Series 2006-10 USD 114,465,000 of Synthetic Portfolio Floating Rate Notes due 9/15/09 (subject to extension) issued by Beryl Finance Limited (ISIN: XS0266953172) | USD 115,192,714.78 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0266952281 | Series 27 B | Series 2006-10 USD 114,465,000 of Synthetic Portfolio Floating Rate Notes due 9/15/09 (subject to extension) issued by Beryl Finance Limited (ISIN: XS0266953172) | USD 115,192,714.78 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0266952794 | Series 27 C | Series 2006-11 USD 18,005,000 of Synthetic Portfolio Floating Rate Notes due 3/15/12  issued by Beryl Finance Limited (ISIN: XS0266953685) | USD 18,119,467.39 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0266953255 | Series 27 D | Series 2006-11 USD 18,005,000 of Synthetic Portfolio Floating Rate Notes due 3/15/12  issued by Beryl Finance Limited (ISIN: XS0266953685) | USD 18,119,467.39 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0279846223 | Series 29A | Series 2006-16 USD 37,010,000 of Synthetic Portfolio Floating Rate Notes due 12/21/09 (subject to extension) issued by Beryl Finance Limited (ISIN: XS0279744063) | USD 37,229,952.72 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

10/20/2008

| Issuer | ISIN | Series | Description | Value |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0279848609 | Series 29B | Series 2006-16 USD 37,010,000 of Synthetic Portfolio Floating Rate Notes due 12/21/09 (subject to extension) issued by Beryl Finance Limited (ISIN: XS0279744063) | USD 37,229,952.72 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0279848195 | Series 29C | Series 2006-17 USD 5,250,000 of Synthetic Portfolio Floating Rate Notes due 6/21/12 issued by Beryl Finance Limited (ISIN: XS0279744147) | USD 5,281,201.07 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0279848948 | Series 29D | Series 2006-17 USD 5,250,000 of Synthetic Portfolio Floating Rate Notes due 6/21/12 issued by Beryl Finance Limited (ISIN: XS0279744147) | USD 5,281,201.07 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0175992246 | Series 6 | Aggregate principal amount USD 4,750,000 of 5.0% Principal Protected Notes with Credit-linked Coupon due 3/24/09 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 18,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0175976983) | USD 4,750,000.00 (ISIN: XS0175976983) |
| Pacific International Finance Ltd | XS0189470726 | Series 9 A | Aggregate principal amount USD 22,075,000 of Traunch A Floating Rate Notes due 9/25/09 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 18,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0189451346) | USD 67,330,000.00 (ISIN: XS0189451346) |
| Pacific International Finance Ltd | XS0189471377 | Series 9 B | Aggregate principal amount HKD 353,000,000 (translated to USD) of Traunch B Floating Rate Notes due 9/25/09 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 18,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0189451346) | USD 67,330,000.00 (ISIN: XS0189451346) |
| Pacific International Finance Ltd | XS0258956738 | Series 26 A | Series 2008-13 USD 15,030,000 of Synthetic Portfolio Floating Rate Notes due 12/30/11 issued by Beryl Finance Limited (ISIN: XS0372555218) | USD 15,113,227.04 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0258956902 | Series 26 B | Series 2008-13 USD 15,030,000 of Synthetic Portfolio Floating Rate Notes due 12/30/11 issued by Beryl Finance Limited (ISIN: XS0372555218) | USD 15,113,227.04 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0258957207 | Series 26 C | Series 2008-13 USD 15,030,000 of Synthetic Portfolio Floating Rate Notes due 12/30/11 issued by Beryl Finance Limited (ISIN: XS0372555218) | USD 15,113,227.04 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

10/20/2008

| Entity | ISIN | Series | Collateral Description | Reference |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0213743775 | Series 18 A | Series 2008-12 USD 36,500,000 of Synthetic Portfolio Floating Rate Notes due 10/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554245) | USD 500,000 in principal amount of Global Medium Term Notes due 2010 by MBIA Global Funding LLC (subject to exchange) Note: terms indicate further collateral to be acquired after Issue Date. Remainder of issuance proceeds of Notes held in cash until further collateral acquisition. (ISIN: (Reg S) US55266MCG78) |
| Pacific International Finance Ltd | XS0213744070 | Series 18 B | Series 2008-12 USD 36,500,000 of Synthetic Portfolio Floating Rate Notes due 10/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554245) | USD 36,000,000 in principal amount of Global Medium Term Notes due 2010 by MBIA Global Funding LLC (subject to exchange) Note: terms indicate further collateral to be acquired after Issue Date. Remainder of issuance proceeds of Notes held in cash until further collateral acquisition. (ISIN: (Reg S) US55266MCH51) |
| Pacific International Finance Ltd | XS0338557704 | Series 34 A | Series 2007-19 USD 44,775,000 of Synthetic Portfolio Floating Rate Notes by Beryl Finance Limited due 1/7/11 (ISIN: XS0338528692) | (a) USD 156,300,000 in principal amount of Floating Rate Notes due 1/7/11 issued by General Electric Capital Corporation (ISIN: XS0339340506) |
| Pacific International Finance Ltd | XS0338558181 | Series 34 B | Series 2007-19 USD 44,775,000 of Synthetic Portfolio Floating Rate Notes by Beryl Finance Limited due 1/7/11 (ISIN: XS0338528692) | (a) USD 15,072.32 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0311435787 | Series 32 A | Series 2007-15 USD 11,320,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 7/16/10 (subject to extension) (ISIN: XS0311230204) | USD 11,368,184.53 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0311438377 | Series 32 B | Series 2007-15 USD 11,320,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 7/16/10 (subject to extension) (ISIN: XS0311230204) | USD 11,368,184.53 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0311436082 | Series 32 C | Series 2007-16 USD 5,935,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 1/16/13 (ISIN: XS0311227168) | USD 5,960,620.50 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0311438708 | Series 32 D | Series 2007-16 USD 5,935,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 1/16/13 (ISIN: XS0311227168) | USD 5,960,620.50 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0296675605 | Series 31 A | Series 2007-5 USD 37,580,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 4/19/10 (subject to extension) (ISIN: XS0296886053) | USD 37,734,688.81 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

| | | | |
|---|---|---|---|
| Pacific International Finance Ltd | XS0296677056 | Series 31 B | Series 2007-5 USD 37,580,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 4/19/10 (subject to extension) (ISIN: XS0296886053) | USD 37,734,688.81 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0296675944 | Series 31 C | Series 2007-6 USD 6,460,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 10/19/12 (ISIN: XS0296886301) | USD 6,486,590.99 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0296677486 | Series 31 D | Series 2007-6 USD 6,460,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 10/19/12 (ISIN: XS0296886301) | USD 6,486,590.99 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0225019842 | Series 20 A | Series 2008-3 USD 29,700,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/20/11 (ISIN: XS0372554757) | USD 29,700,000 in principal amount Floating Rate Notes due 2011 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0225160604) |
| Pacific International Finance Ltd | XS0225020261 | Series 20 B | Series 2008-3 USD 29,700,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/20/11 (ISIN: XS0372554757) | USD 29,700,000 in principal amount Floating Rate Notes due 2011 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0225160604) |
| Pacific International Finance Ltd | XS0225020774 | Series 20 C | Series 2008-3 USD 29,700,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/20/11 (ISIN: XS0372554757) | USD 29,700,000 in principal amount Floating Rate Notes due 2011 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0225160604) |
| Pacific International Finance Ltd | XS0225020931 | Series 20 D | Series 2008-3 USD 29,700,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/20/11 (ISIN: XS0372554757) | USD 29,700,000 in principal amount Floating Rate Notes due 2011 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0225160604) |
| Pacific International Finance Ltd | XS0252325005 | Series 25 A | Series 2008-12 USD 37,155,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/26/11 (ISIN: XS0372555135) | USD 37,291,672.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0252325690 | Series 25 B | Series 2008-12 USD 37,155,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/26/11 (ISIN: XS0372555135) | USD 37,291,672.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

10/20/2008

| Issuer | Code | Series | Description | Note |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0252326318 | Series 25 C | Series 2008-12 USD 37,155,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/26/11 (ISIN: XS0372555135) | USD 37,291,672.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0252327399 | Series 25 D | Series 2008-12 USD 37,155,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/26/11 (ISIN: XS0372555135) | USD 37,291,672.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0272928879 | Series 28 A | Series 2006-13 USD 76,630,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/27/09 (subject to extension) (ISIN: XS0272940221) | USD 76,91,878.63 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0272929091 | Series 28 B | Series 2006-13 USD 76,630,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 10/27/09 (subject to extension) (ISIN: XS0272940221) | USD 76,91,878.63 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0272929414 | Series 28 C | Series 2006-14 USD 11,025,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 4/27/12 (ISIN: XS0272938837) | USD 11,065,554.70 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0272929687 | Series 28 D | Series 2006-14 USD 11,025,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 4/27/12 (ISIN: XS0272938837) | USD 11,065,554.70 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0285418215 | Series 30 A | Series 2007-3 USD 6,080,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 7/31/12 (ISIN: XS0285424965) | USD 6,100,463.48 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0285419023 | Series 30 B | Series 2007-3 USD 6,080,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 7/31/12 (ISIN: XS0285424965) | USD 6,100,463.48 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0285419619 | Series 30 C | Series 2007-2 USD 39,020,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/31/10 (subject to extension) (ISIN: XS0285427984) | USD 39,151,329.65 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0285420468 | Series 30 D | Series 2007-2 USD 39,020,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 1/31/10 (subject to extension) (ISIN: XS0285427984) | USD 39,151,329.65 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

| | | | | |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0243200143 | Series 23 A | Series 2008-11 USD 49,675,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 8/3/11 (ISIN: XS0372554914) | USD 49,836,012.02 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0243200812 | Series 23 B | Series 2008-11 USD 49,675,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 8/3/11 (ISIN: XS0372554914) | USD 49,836,012.02 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0243201463 | Series 23 C | Series 2008-11 USD 49,675,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 8/3/11 (ISIN: XS0372554914) | USD 49,836,012.02 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0243201620 | Series 23 D | Series 2008-11 USD 49,675,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 8/3/11 (ISIN: XS0372554914) | USD 49,836,012.02 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0363491829 | Series 36 A | Series 2008-5 USD 86,125,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 5/15/11 (ISIN: XS0363443853) | USD 86,329,061.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0363492124 | Series 36 B | Series 2008-5 USD 86,125,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 5/15/11 (ISIN: XS0363443853) | USD 86,329,061.34 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0348459131 | Series 35 A | Series 2008-2 USD 282,785,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 2/22/11 (ISIN: XS0348325449) | USD 283,331,523.25 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0348459487 | Series 35 B | Series 2008-2 USD 282,785,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 2/22/11 (ISIN: XS0348325449) | USD 283,331,523.25 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0263282585 | Series 22 A | Series 2008-10 USD 13,252,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 5/25/11 (ISIN: XS0372555051) | USD 13,274,286.20 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0236382742 | Series 22 B | Series 2008-10 USD 13,253,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 5/25/11 (ISIN: XS0372555051) | USD 13,274,286.20 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |

10/20/2008

10/20/2008

| Issuer | ISIN | Series | Description | Amount |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0263382825 | Series 22 C | Series 2008-10 USD 13,252,000 of Synthetic Portfolio Floating Rate Notes issued by Beryl Finance Limited due 5/25/11 (ISIN: XS0372555051) | USD 13,274,286.20 in principal amount Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0220695604 | Series 19 A | Series 2008-13 USD 34,700,000 of Floating Rate Notes issued by Saphir Finance Limited due 11/26/10 (ISIN: XS0372554328) | USD 34,758,356.07 in principal amount of Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0220695943 | Series 19 B | Series 2008-13 USD 34,700,000 of Floating Rate Notes issued by Saphir Finance Limited due 11/26/10 (ISIN: XS0372554328) | USD 34,758,356.07 in principal amount of Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0193554622 | Series 10 A | Series 2008-6 USD 44,600,000 of Floating Rate Notes issued by Saphir Finance Limited due 11/28/09 (ISIN: XS0372553510) | USD 45,000,000 in principal amount Floating Rate Notes due 11/28/09 issued by Bayerische Landesbank (subject to exchange) (ISIN: XS0193436002) |
| Pacific International Finance Ltd | XS0193555199 | Series 10 B | Series 2008-6 USD 44,600,000 of Floating Rate Notes issued by Saphir Finance Limited due 11/28/09 (ISIN: XS0372553510) | USD 45,000,000 in principal amount Floating Rate Notes due 11/28/09 issued by Bayerische Landesbank (subject to exchange) (ISIN: XS0193436002) |
| Pacific International Finance Ltd | XS0318915823 | Series 33 A | Series 2007-18 USD 22,405,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 8/31/10 (ISIN: XS0318941233) | USD 22,438,409.57 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0318916631 | Series 33 B | Series 2007-18 USD 22,405,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 8/31/10 (ISIN: XS0318941233) | USD 22,438,409.57 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0318916128 | Series 33 C | Series 2007-19 USD 9,985,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 2/28/13 (ISIN: XS0318942041) | USD 9,999,889.27 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0318916987 | Series 33 D | Series 2007-19 USD 9,985,000 of Synthetic Portfolio Floating Rate Notes issued by Zircon Finance Limited due 2/28/13 (ISIN: XS0318942041) | USD 9,999,889.27 in net asset value of shares of the Lehman US Dollar Liquidity Fund Institutional Reserve Accumulation Class (subject to exchange) (ISIN: IE00B03TKP85) |
| Pacific International Finance Ltd | XS0180628017 | Series 7 A | Aggregate principal amount USD 15,200,000 of 4.2% principal amount Tranche A Notes with Credit-linked Coupon due 12/3/08 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 18,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0180580226) | USD 15,200,000.00 (ISIN: XS0180580226) |

| | | | | |
|---|---|---|---|---|
| Pacific International Finance Ltd | XS0180628108 | Series 7 B | Aggregate principal amount HKD 250,000,000 of 4.2% principal amount Tranche B Notes with Credit-linked Coupon due 12/3/08 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 18,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0180580572) | HKD 249,586,500.00 (ISIN: XS0180580572) |
| Pacific International Finance Ltd | XS0208476035 | Series 15 A | Series 2008-9 USD 53,240,000 of Synthetic Portfolio Floating Rate Notes due 6/28/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553783) | USD19,000,000 in principal amount of Euro Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN:US55526MBZ68) |
| Pacific International Finance Ltd | XS0208476464 | Series 15 B | Series 2008-9 USD 53,240,000 of Synthetic Portfolio Floating Rate Notes due 6/28/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553783) | USD 34,240,000 in principal amount of Euro Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN:US55526MCA09) |
| Pacific International Finance Ltd | XS0170735160 | Series 5 | Aggregate principal amount USD 10,600,000 of 3.8% principal amount Credit Linked Notes due 7/2/10 issued by Lehman Brothers Treasury Co. BV and guaranteed by LBHI under the USD 15,000,000,000 Euro Medium-Term Note Programme (ISIN: XS0170825664) | USD 16,500,000.00 (ISIN: 0170825664) |
| Pacific International Finance Ltd | XS0195869879 | Series 11 A | Series 2008-7 USD 42,000,000 of Floating Rate Notes due 1/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553601) | USD 42,000,000 in principal amount Floating Rate Notes due 2010 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0195831804) |
| Pacific International Finance Ltd | XS0195870299 | Series 11 B | Series 2008-7 USD 42,000,000 of Floating Rate Notes due 1/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553601) | USD 42,000,000 in principal amount Floating Rate Notes due 2010 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0195831804) |
| Pacific International Finance Ltd | XS0195870612 | Series 11 C | Series 2008-7 USD 42,000,000 of Floating Rate Notes due 1/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553601) | USD 42,000,000 in principal amount Floating Rate Notes due 2010 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0195831804) |
| Pacific International Finance Ltd | XS0195870968 | Series 11 D | Series 2008-7 USD 42,000,000 of Floating Rate Notes due 1/6/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553601) | USD 42,000,000 in principal amount Floating Rate Notes due 2010 issued by Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. (Rabobank Nederland) (subject to exchange) (ISIN: XS0195831804) |

10/20/2008

| | | | |
|---|---|---|---|
| Pacific International Finance Ltd | Series 16 A | XS0209692960 | Series 2008-10 USD 50,500,000 of Synthetic Portfolio Floating Rate Notes due 8/7/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553866) | (a) USD 4,000,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC; and (b) USD 46,500,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN: (a) (Reg S) US55266MCA09; and (b) (Reg S) US55266MCD48) |
| Pacific International Finance Ltd | Series 16 B | XS0209693349 | Series 2008-10 USD 50,500,000 of Synthetic Portfolio Floating Rate Notes due 8/7/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372553866) | (a) USD 4,000,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC; and (b) USD 46,500,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN: (a) (Reg S) US55266MCA09; and (b) (Reg S) US55266MCD48) |
| Pacific International Finance Ltd | Series 12 A | XS0200468998 | Series 2008-8 USD 61,000,000 of Synthetic Portfolio Floating Rate Notes due 3/8/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554674) | USD 61,000,000 in principal amount Floating Rate Notes due 2010 issued by Landesbank Baden-Wurttemberg (subject to exchange) (ISIN: XS0200537552) |
| Pacific International Finance Ltd | Series 12 B | XS0200469376 | Series 2008-8 USD 61,000,000 of Synthetic Portfolio Floating Rate Notes due 3/8/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554674) | USD 61,000,000 in principal amount Floating Rate Notes due 2010 issued by Landesbank Baden-Wurttemberg (subject to exchange) (ISIN: XS0200537552) |
| Pacific International Finance Ltd | Series 17 A | XS0214180720 | Series 2008-11 USD 71,500,000 of Synthetic Portfolio Floating Rate Notes due 9/9/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554161) | USD 71,500,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN: (Reg S) US55266MCG78) |
| Pacific International Finance Ltd | Series 17 B | XS0214180993 | Series 2008-11 USD 71,500,000 of Synthetic Portfolio Floating Rate Notes due 9/9/10 issued by Saphir Finance Public Limited Company (ISIN: XS0372554161) | USD 71,500,000 in principal amount of Global Medium Term Notes due 2010 issued by MBIA Global Funding LLC (subject to exchange) (ISIN: (Reg S) US55266MCG78) |



THE BANK OF NEW YORK MELLON

FAO: Chris Knowles
Head of CTLA Transaction Management
HSBC Securities Services
HSBC BANK
PLC UK
8 Canada Square,
London E14 5HQ

16th October 2008

Dear Sirs

As Custodian acting for the Issuer, we confirm that The Bank of New Mellon is holding the below listed collateral for the benefit of the noteholders of the Issuer on the following transactions:-

| ISSUE NAME | SERIES NO | ISIN | NOMINAL | COLLATERAL | AMOUNT |
|---|---|---|---|---|---|
| BERYL FINANCE LTD | 2008-9 | XS0372554831 | 31,500,000 | XS0229588311 | 31,500,000 |
| ▆▆▆▆▆▆▆ | ▆▆▆▆ | ▆▆▆▆▆ | ▆▆▆▆ | ▆ | ▆▆▆▆▆ |
| BERYL FINANCE LTD | 2006-16 | XS0279744063 | 37,010,000 | Liquidity Fund ISIN IE00B03TKP85 | 37,229,952.72 |
| BERYL FINANCE LTD | 2006-17 | XS0279744147 | 5,250,000 | Liquidity Fund ISIN IE00B03TKP85 | 5,281,201.07 |
| BERYL FINANCE LTD | 2007-2 | XS0285427984 | 39,020,000 | Liquidity Fund ISIN IE00B03TKP85 | 39,151,329.65 |
| BERYL FINANCE LTD | 2007-3 | XS0285424965 | 6,080,000 | Liquidity Fund ISIN IE00B03TKP85 | 6,100,463.48 |
| BERYL FINANCE LTD | 2008-2 | XS0348325449 | 282,785,000 | Liquidity Fund ISIN IE00B03TKP85 | 283,331,523.25 |
| BERYL FINANCE LTD | 2008-12 | XS0372555135 | 37,155,000 | Liquidity Fund ISIN IE00B03TKP85 | 37,291,672.34 |
| BERYL FINANCE LTD | 2006-13 | XS0272940221 | 76,630,000 | Liquidity Fund ISIN IE00B03TKP85 | 76,911,878.63 |
| BERYL FINANCE LTD | 2006-14 | XS0272938837 | 11,025,000 | Liquidity Fund ISIN IE00B03TKP85 | 11,065,554.70 |
| BERYL FINANCE LTD | 2008-8 | XS0372554757 | 29,700,000 | XS0225160604 | 29,700,000 |
| BERYL FINANCE LTD | 2008-10 | XS0372555051 | 13,252,000 | Liquidity Fund ISIN IE00B03TKP85 | 13,274,286.20 |
| BERYL FINANCE LTD | 2008-11 | XS0372554914 | 49,675,000 | Liquidity Fund ISIN IE00B03TKP85 | 49,836,012.02 |
| BERYL FINANCE LTD | 2008-13 | XS0372555218 | 15,030,000 | Liquidity Fund ISIN IE00B03TKP85 | 15,113,227.04 |
| BERYL FINANCE LTD | 2006-10 | XS0266953172 | 114,465,000 | Liquidity Fund ISIN IE00B03TKP85 | 115,192,714.78 |
| BERYL FINANCE LTD | 2006-11 | XS0266953685 | 18,005,000 | Liquidity Fund ISIN IE00B03TKP85 | 18,119,467.39 |
| BERYL FINANCE LTD | 2007-19 | XS0338328692 | 156,315,000 | XS0339340506 | 156,300,000 |
| | | | | Liquidity Fund ISIN IE00B03TKP85 | 15,072.32 |
| BERYL FINANCE LTD | 2008-5 | XS0363443853 | 86,125,000 | Liquidity Fund ISIN IE00B03TKP85 | 86,329,061.34 |

| | | | | | |
|---|---|---|---|---|---:|
| SAPHIR FINANCE PLC | 2008-9 | XS0372553783 | 53,240,000 | US55266MBZ68 | 19,000,000 |
| | | | | US55266MCA09 | 34,240,000 |
| SAPHIR FINANCE PLC | 2008-10 | XS0372553866 | 50,500,000 | US55266MCD48 | 46,500,000 |
| | | | | US55266MCA09 | 4,000,000 |
| SAPHIR FINANCE PLC | 2008-6 | XS0372553510 | 45,000,000 | XS0193436002 | 45,000,000 |
| SAPHIR FINANCE PLC | 2008-7 | XS0372553601 | 42,000,000 | XS0195831804 | 42,000,000 |
| SAPHIR FINANCE PLC | 2008-8 | XS0372554674 | 61,000,000 | XS0200537552 | 61,000,000 |
| SAPHIR FINANCE PLC | 2008-11 | XS0372554161 | 71,500,000 | US55266MCG78 | 71,500,000 |
| SAPHIR FINANCE PLC | 2008-12 | XS0372554245 | 36,500,000 | US55266MCG78 | 500,000 |
| | | | | US55266MCH51 | 36,000,000 |
| SAPHIR FINANCE PLC | 2008-13 | XS0372554328 | 34,700,000 | Liquidity Fund ISIN IE00B03TKP85 | 34,758,356.07 |
| ZIRCON FINANCE LIMITED | 2007-5 | XS0296886053 | 37,580,000 | Liquidity Fund ISIN IE00B03TKP85 | 37,734,688.81 |
| ZIRCON FINANCE LIMITED | 2007-6 | XS0296886301 | 6,460,000 | Liquidity Fund ISIN IE00B03TKP85 | 6,486,590.99 |
| ZIRCON FINANCE LIMITED | 2007-15 | XS0311230204 | 11,320,000 | Liquidity Fund ISIN IE00B03TKP85 | 11,368,184.53 |
| ZIRCON FINANCE LIMITED | 2007-16 | XS0311227168 | 5,935,000 | Liquidity Fund ISIN IE00B03TKP85 | 5,960,620.50 |
| ZIRCON FINANCE LIMITED | 2007-18 | XS0318941233 | 22,405,000 | Liquidity Fund ISIN IE00B03TKP85 | 22,438,409.57 |
| ZIRCON FINANCE LIMITED | 2007-19 | XS0318942041 | 9,985,000 | Liquidity Fund ISIN IE00B03TKP85 | 9,999,889.27 |

1,512,830,157

Note that HSBC are not holding full nominal for Beryl 2007-19 and Saphir 2008-6

Yours faithfully

Kevin Rainbird
Asset Repackaging
The Bank of New York Mellon
Global Corporate Trust

40th Floor, One Canada Square
Canary Wharf, London, E14 5AL
United Kingdom
Phone: 00 44 207 964 8800
Fax:    00 44 207 964 2532
Email:  kevin.rainbird@bnymellon.com

# EXHIBIT C

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _8_/_9_/_10_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                    :
KA KIN WONG, et al.,                                :        10 Civ. 0017 (WHP)
                                                    :        Appeal from Bankruptcy
            Plaintiffs/Appellants,                  :        Case No. 08-13555 (JMP)
                                                    :
            -against-                               :        MEMORANDUM & ORDER
                                                    :
HSBC USA, INC., et al.,                             :
                                                    :
            Defendants/Appellees.                   :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                    :
KA KIN WONG, et al.,                                :        10 Civ. 0096 (WHP)
                                                    :        Appeal from Bankruptcy
            Plaintiffs/Appellants,                  :        Case No. 08-13555 (JMP)
                                                    :
            -against-                               :
                                                    :
HSBC USA, INC., et al.,                             :
                                                    :
            Defendants/Appellees.                   :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

            Plaintiffs/Appellants Ka Kin Wong and six other noteholders appeal from two

orders of the United States Bankruptcy Court for the Southern District of New York (Peck,

Bankr. J.) (the "Bankruptcy Court") dated November 23, 2009 and December 3, 2009 dismissing

their Class Action Complaint (the "Complaint") with prejudice.  While the events giving rise to

this adversary proceeding are complicated, two discrete issues are presented on appeal: (1)

whether Plaintiffs have standing to sue, and (2) whether amendment of the Complaint would be

futile.  For the following reasons, this Court affirms in part, reverses in part, and vacates in part

-1-

08-13555-mg   Doc 15598-1   Filed 04/04/11   Entered 04/04/11  13:51:19   Exhibit A
Case 9:10-cv-00698-WHP   Document 22   Filed 08/09/10   Page 2 of 18
through C    Pg 94 of 110

the Bankruptcy Court's orders.

BACKGROUND

I.   <u>Parties on Appeal</u>

   Plaintiffs seek to represent a class of purchasers of structured finance notes—also

known as "Minibonds"—between June 16, 2003 and September 15, 2008.  (Appellants'

Designation of Contents of the Record Designation Number ("DN") 1: Complaint against HSBC,

USA, et al. dated Mar. 12, 2009 ("Compl.") ¶ 1.)  Plaintiffs brought claims against Pacific

International Finance Limited ("Pacific Finance" or the "Issuer"), the issuer of the Minibonds, as

well as several other entities and individuals.  (Compl. ¶¶ 27-38.)  The underlying transactions

and relationships among the various entities are opaque.

   On appeal, Plaintiffs pursue their claims against only two entities: HSBC Bank

USA, N.A. ("HSBC Bank" or the "Trustee"), and Lehman Brothers Special Financing, Inc.

("LBSF").  HSBC Bank is the trustee of collateral securing Pacific Finance's payment

obligations to the Minibonds holders and LBSF.  In the Complaint, Plaintiffs mistakenly named

HSBC Bank's predecessor as trustee, (DN 6 Ex. 2: Affidavit of Song Qun Sworn, Programme

Prospectus dated Mar. 12, 2007 at 7), and now appeal the Bankruptcy Court's denial of leave to

amend the Complaint to name HSBC Bank.  Defendant LSBF is a bankrupt Delaware

corporation and a debtor in the underlying bankruptcy proceedings, which involve several

Lehman entities (the "Lehman Bankruptcy").  (Compl. ¶¶ 38, 67.)

II.   <u>The Minibonds Program</u>

   Plaintiffs seek damages and injunctive relief relating to $1.6 billion in Minibonds

-2-

08-13555-mg    Doc 15598-1    Filed 04/04/11    Entered 04/04/11    13:51:19    Exhibit A
Case 9:10-cv-80698-WHP    Document 22    Filed 08/09/10    Page 9 of 78
through C    Pg 95 of 110

issued by Pacific Finance in separate, but virtually identical, series. (Compl. ¶ 45.) Pacific

Finance sold the Minibonds to retail investors located primarily in Hong Kong, and marketed

them as "credit-linked" to financially stable companies and backed by AAA-rated collateral.

(Compl. ¶¶ 45, 47, 51.) As a consequence of Lehman Brothers Holdings, Inc.'s ("Lehman

Brothers") collapse, the Minibonds are now worthless. (Compl. ¶¶ 67-69, 101-04.)

While the Minibonds were issued by Pacific Finance, Lehman Brothers and other

Lehman entities designed the Minibonds program. (Compl. ¶¶ 46, 48, 50, 82.) The details of

Lehman Brothers' involvement emerged during an inquiry conducted by Hong Kong regulatory

authorities. In that proceeding, officers of HSBC Holdings Plc ("HSBC Holdings"), the

company at the top of the HSBC pyramid, testified that Lehman Brothers appointed HSBC Bank

as trustee of the Minibonds collateral.[1] (Compl. ¶ 82.) Lehman Brothers also compiled the

prospectus for each Minibonds series. (Compl. ¶ 82.) Pacific Finance existed only "to issue the

[Minibonds]. It [was for] all intents and purposes a creature of Lehman's design . . . . [Pacific

Finance was] not an active company . . . and HSBC's role as a Director [was] not an active role .

. . ." (Compl. ¶ 82.) Indeed, the Complaint alleges that Lehman Brothers and LBSF, not the

Issuer, "selected the collateral" for the Minibonds. (Compl. ¶ 50.)

Pacific Finance secured its obligation to pay interest to the Minibonds holders

through two related transactions.[2] First, Pacific Finance purchased notes from Saphir Finance

Public Limited Company (the "Saphir Notes"). (DN 9 Ex.1, Ex. B: Tenth Supplemental Trust

---

[1]  The Hong Kong testimony in the Complaint does not distinguish among the various HSBC and
Lehman entities. At times, it is difficult to discern the specific entity referenced in the testimony.

Deed ("Tenth Deed") at 1.)  The Saphir Notes were placed in trust with HSBC Bank as Trustee.
(Tenth Deed at 1.)  Pacific Finance also executed a credit default swap agreement with LBSF.
(Tenth Deed at 1; Compl. ¶ 54.)  Under the credit default swap, LBSF agreed to pay Pacific
Finance a sum equal to what Pacific Finance owed the Minibonds holders in exchange for the
interest earned by Pacific Finance on the Saphir Notes.  (Tenth Deed at 15-16.)  Because Lehman
Brothers and LBSF exercised control over the Minibonds program, Plaintiffs assert that LBSF
"negotiate[d] with itself over the essential terms of the swap agreements."  (Compl. ¶ 50.)

　　　The Saphir Notes are governed by a principal trust deed and a supplemental trust
deed issued for each series of Minibonds.  (Compl. ¶¶ 84-85.)  These trust deeds and the
prospectuses advertising the Minibonds sale set forth the "duties and obligations" of the Trustee
and the Issuer.  (Compl. ¶¶ 84-87.)  The trust deeds contain, inter alia, provisions governing the
priority of payment in the event the Saphir Notes are liquidated.  (Compl. ¶¶ 84, 90.)  The parties
disagree about the operation of these provisions and who has priority to the Saphir Notes.
Choice of law provisions in the trust deeds provide that they are to be construed under English
law.  (DN 9 Ex. 1: Principal Trust Deed ("Principal Trust Deed"), Sec. 17(a).)  The prospectuses
represented that "neither Lehman Brothers Holdings, Inc. nor any of its subsidiaries or affiliates
has any equity interest in, or any control over, us [Pacific Finance/HSBC]."  (Compl. ¶¶ 84, 87.)

　　　According to the Complaint, Pacific Finance is controlled by HSBC Bank
(Cayman) Limited ("HSBC Cayman").  (Compl. ¶ 29.)  In turn, HSBC Cayman is controlled by
HSBC Holdings.  (Compl. ¶ 31.)  HSBC Holdings also controls the Trustee's predecessor,

---

[2]  Plaintiffs brought claims against other entities and individuals alleging rights to collateral
purchased as part of additional transactions.  (Compl. ¶¶ 8, 32-37, 110, 118.)  Because Plaintiffs
do not appeal the Bankruptcy Court's dismissal of these claims, that collateral is not at issue.

HSBC Bank USA.[3]  (Compl. ¶ 31.)

       Another HSBC entity—HSBC Bank Plc—filed a claim for $234 million in the Lehman Bankruptcy.  (DN 30 Ex. 6: Amended Schedule of Assets and Liabilities for Lehman Brothers at 3.)  In addition, a Lehman Bankruptcy Examiner's report published after the orders on appeal discloses that HSBC Holdings and Lehman Brothers cooperated extensively during Lehman's collapse to ensure that Lehman Brothers satisfied its obligations to HSBC Holdings. (Report of Anton R. Valukas, Examiner, dated Mar. 11, 2010 at 1321-26.)


III.  Procedural History

       On October 3, 2008, LBSF filed for bankruptcy.  (Counter-Designation of Items To Be Included In Record On Appeal ("C-DN") 10: Supplement to Proof of Claim in Chapter 11 Case of LBSF ¶ 10; Compl. ¶ 67.)  Thereafter, LBSF's counsel informed HSBC Bank that any attempt to liquidate the Saphir Notes may be subject to the automatic stay provisions of the United States Bankruptcy Code and demanded the Trustee cease all further action.  (DN 30 Ex. 5: Pls.' Opp'n to Def. [LBSF's] Mot. to Dismiss the Compl., Letter dated Nov. 25, 2008.) HSBC Bank complied.

       On March 12, 2009, Plaintiffs filed an adversary proceeding in the Bankruptcy Court.  Count One of the Complaint seeks a declaratory judgment that the Minibonds collateral is the property of the Minibonds holders, not the bankruptcy estate, based on breaches of contract and fiduciary duty by the Issuer and Trustee.  (Compl. ¶¶ 97-108.)  Count Two seeks to enjoin LBSF and the Trustee from impairing the Minibonds collateral and requests transfer of the

---

[3] This Court presumes that an amended complaint would include the same allegation.

collateral to the Minibonds holders.  (Compl. ¶¶ 109-13.)  Count Three seeks a resulting or constructive trust on the Minibonds collateral for the benefit of the Minibonds purchasers. (Compl. ¶¶ 114-21.)  Finally, the remaining counts of the Complaint—Counts Four through Thirteen—assert damages claims for breach of contract, breach of fiduciary duty, negligence, unjust enrichment, and aiding and abetting against the Trustee, the Issuer, and the Issuer's directors and parent company.  (Compl. ¶¶ 122-89.)

On May 27, 2009, LBSF and HSBC Bank USA each moved to dismiss the Complaint.  (DN 5: Notice of HSBC USA, Inc.'s Mot. to Dismiss the [Complaint], Abstain or Stay the Adversary Proceeding; DN 9: Notice of Mot. of [LBSF] for an Order Dismissing the Adversary Compl.)

In a ruling from the bench, Bankruptcy Judge Peck dismissed the Complaint.  The Bankruptcy Court dismissed Counts One through Three for lack of standing on three principal grounds.  First, relying on the trust deeds and English law, the Bankruptcy Court held that Plaintiffs lack standing to bring a direct claim against Defendants.  The relevant provisions of the trust deeds state that "[a] person who is not a party to [the deed] has no right under the Contracts (Rights of Third Parties) Act 1999 [("Contracts Act of 1999")] to enforce any term of [the deed] except and to the extent (if any) that [the deed] expressly provides for such Act to apply to any of its terms."  (Principal Trust Deed at 3; Tenth Deed at 3).  The Bankruptcy Court held that "[t]hese provisions fit squarely within the tenets of governing English law," which "provides that it is a trustee and not a beneficiary of a trust that is the appropriate party to bring an action on behalf of the trust beneficiaries."  (Tr. of Nov. 18, 2009 Hr'g (the "Bankr. Ct. Ruling") at 25.)

Second, the Bankruptcy Court held that it would be futile to allow Plaintiffs to

-6-

amend the Complaint to bring a derivative claim on behalf of the Trustee. (Bankr. Ct. Ruling at 26.) Construing English law, the Bankruptcy Court concluded that a trust beneficiary may step into the shoes of the Trustee and sue on its behalf only in special circumstances. (Bankr. Ct. Ruling at 26.) Applying this standard, the Bankruptcy Court reasoned that (i) the "mere fact that the trustee has not filed a lawsuit [seeking to enforce Plaintiffs' right to the Minibonds collateral] is not a sufficient 'special circumstance;'" and (ii) the fact that an HSBC affiliate filed a proof of claim in the Lehman Bankruptcy does not establish that the Trustee is conflicted because "there is no allegation of any actual conflict." (Bankr. Ct. Ruling at 26.)

Third, the Bankruptcy Court concluded that it would be futile to allow amendment of the Complaint to name the proper trustee—HSBC Bank—"for the reasons set forth in this ruling." (Bankr. Ct. Ruling at 22.) However, it is not apparent from the transcript of the ruling what those reasons were.

The Bankruptcy Court also dismissed Counts Four through Thirteen because they were "not related to the debtors' proceedings." (Bankr. Ct. Ruling at 29.) The Bankruptcy Court stated that an adversary proceeding is considered related to a bankruptcy case "if the outcome might have a conceivable [e]ffect on the estate." (Bankr. Ct. Ruling at 28.) After noting that Counts Four through Thirteen "involve tort, breach of contract and breach of fiduciary duty claims against various defendants, none of whom are debtors" in the Lehman Bankruptcy, (Bankr. Ct. Ruling at 27), the Bankruptcy Court held that "[i]nasmuch as Counts [Four] through [Thirteen] comprise actions governed by foreign law between two or more non-debtors, such claims, regardless of the outcome, will not affect the debtor's bankruptcy cases. . . . Resolution of these claims will have no [e]ffect on the rights of debtors or creditors in the debtors'

bankruptcy cases, nor will it have any [e]ffect on the debtors' estates." (Bankr. Ct. Ruling at 29.)

## DISCUSSION

I.  Standard of Review

A district court reviews a bankruptcy court's findings of fact for clear error and its

legal conclusions de novo. Fed. R. Bankr. P. 8013; In re Vouzianas, 259 F.3d 103, 107 (2d Cir.

2001); In re Bennett Funding Grp., Inc., 146 F.3d 136, 138 (2d Cir. 1998). The dismissal of a

complaint is a legal conclusion which is subject to de novo review. Selevan v. N.Y. Thruway

Auth., 584 F.3d 82, 88 (2d Cir. 2009) ("We review de novo a district court's dismissal of a

complaint for lack of standing."); see also Raine v. Lorimar Prods., Inc., 71 B.R. 450, 452

(S.D.N.Y. 1987) ("Because this is an appeal from [a Bankruptcy Court's] decision on a motion

to dismiss for failure to state a claim, purely legal considerations are involved, and thus this

court's review must be de novo."). When reviewing such a dismissal, a court "accept[s] all

factual allegations in the complaint and draw[s] all reasonable inferences in the plaintiff's favor."

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Generally, "[a] bankruptcy court's denial of a request to amend [the complaint] is

reviewed for abuse of discretion." In re Calpine Corp., 406 B.R. 463, 472 (S.D.N.Y. 2009)

(citing In re Enron Corp., 419 F.3d 115, 124 (2d Cir. 2005)). However, "[i]f that denial was

based on an interpretation of law," such as the determination that an amendment would be futile,

a court employs de novo review. See Dougherty v. Town of N. Hempstead Bd. of Zoning

Appeals, 282 F.3d 83, 87 (2d Cir. 2002); see also Ricciuti v. N.Y. City Transit Auth., 941 F.2d

119, 122-24 (2d Cir. 1991) (reviewing de novo the lower court's determination that amendment

-8-

08-13555-smg   Doc 15598-1   Filed 04/04/11   Entered 04/04/11   13:51:19   Exhibit A
through C   Pg 101 of 110
Case 1:10-cv-05598-WH   Document 22   Filed 08/09/10   Page 19 of 73

would be futile).

A court "should freely give leave [to amend the Complaint] when justice so

requires." Fed. R. Civ. P. 15(a)(2). Particularly where a court grants a motion to dismiss, "the

usual practice is to grant leave to amend." <u>Hayden v. Cnty. of Nassau</u>, 180 F.3d 42, 53 (2d Cir.

1999). A court may deny leave to amend as futile only "if the proposed claim could not

withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." <u>Lucente v. Int'l Bus. Mach.

Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002). Indeed, futility means that it is "beyond doubt that the

plaintiff can prove no set of facts in support of his amended claims." <u>Pangburn v. Culbertson</u>,

200 F.3d 65, 70 (2d Cir. 1999) (quotations and citations omitted).


## II.  <u>Claims Against LBSF:  Counts One & Two</u>

Plaintiffs appeal the dismissal of their direct claims against LBSF and the denial

of leave to replead those claims derivatively. This Court addresses Count Three of the

Complaint separately for the reasons articulated in Section IV, <u>infra</u>.

### a.  <u>Direct Claim Against LBSF</u>

Plaintiffs appeal the Bankruptcy Court's dismissal of their direct claims against

LBSF on two principal grounds: (1) Plaintiffs have standing under English law to sue LBSF

directly because LBSF is a co-beneficiary under the trust; and (2) the Bankruptcy Court's

reliance on the provisions of the trust deeds prohibiting non-parties from enforcing the deeds'

terms was misplaced. Because Plaintiffs lack standing under English law to bring a direct claim

against LBSF, this Court need not address Plaintiffs' second contention.

Under English law, a trustee generally has "a duty to protect and preserve the trust

-9-

estate for the benefit of the beneficiaries . . . ."  Alsop Wilkinson v. Neary, [1996] 1 W.L.R.

1220, 1224 (Ch.).  As such, "[n]ormally [it is] the trustee who has a right of action [and] is the

proper person to enforce [the trust]."  Hayim v. Citibank NA, [1987] A.C. 730, 733 (P.C.); see

also Alsop, 1 W.L.R. at 1224 ("Trustees have a duty to . . . represent the trust in a third party

dispute.").  Plaintiffs seek to circumvent this general principle by invoking the so-called

"beneficiaries dispute" theory.  Under that theory, "where the dispute is between rival claimants

to a beneficial interest in the subject matter of the trust, . . . the duty of the trustee is to remain

neutral and . . . leav[e] it to the rivals to fight their battles."  Alsop, 1 W.L.R. at 1225.  Plaintiffs

argue this theory applies here because LBSF persuaded the Bankruptcy Court that it is a

beneficiary rather than a third party under the trust.

       As a threshold matter, Plaintiffs mischaracterize the Bankruptcy Court's ruling.

The Bankruptcy Court did not describe LBSF as a trust beneficiary.  Instead, relying on Gregson

v. HAE Trs. Ltd., [2008] EWHC 1006 (Ch.), the Bankruptcy Court found that the Trustee was

the appropriate party to bring an action on behalf of the trust beneficiaries.  In Gregson, a trust

beneficiary brought suit against the director of a corporate trustee for impairment of trust

property.  The beneficiary argued that a corporate trustee's claims against its directors are held

for the trust's beneficiaries, thereby empowering them to sue directly.  Gregson, EWHC 1006 at

¶¶ 9, 22.  The Gregson court rejected this notion and described the general rule that "a director of

a trustee company does not owe a fiduciary duty to the beneficiary of the trust," and absent that

duty, a trust beneficiary has no direct claim against the director.  Gregson, EWHC 1006 at ¶¶ 44,

56, 69.

       As the Gregson analysis illustrates, the core inquiry is whether the potentially

liable third party owed a duty to the trust's beneficiaries. See Gregson, EWHC 1006 at ¶¶ 44, 46, 57-58 (stating that if a direct claim against the directors was valid, it would "circumvent the clear and established principle that no direct duty is owed by the directors to the beneficiaries"); see also Roberts v. Gill & Co, [2010] UKSC 22, ¶¶ 46, 110 (S.C.) (beneficiary sought to amend to bring a derivative claim where it was "accepted that a claim that the [third parties] owed a duty of care to the beneficiaries would be difficult to sustain"). While LBSF is a party to the trust deeds, Plaintiffs do not allege the existence of any fiduciary relationship between themselves and LBSF. Accordingly, the Bankruptcy Court properly held that Plaintiffs lack standing under English law to sue LBSF directly.

   b. Derivative Claims Against LBSF

         The Bankruptcy Court also concluded that re-pleading derivative claims against LBSF would be futile because Plaintiffs cannot allege the existence of special circumstances. In making this determination, the Bankruptcy Court considered Plaintiffs' allegations that the Trustee failed to bring suit against LBSF and that an HSBC entity filed a proof of claim in the Lehman Bankruptcy.

         Under English law, a trust beneficiary may bring a derivative suit against a third party when "special circumstances" are present. The "special circumstances" rule, articulated in Hayim v. Citibank NA, provides:

> [A] beneficiary has no cause of action against a third party save in special circumstances which embrace a failure, excusable or inexcusable, by the trustees to the beneficiary to protect the trust estate or to protect the interests of the beneficiary in the trust estate.

Hayim, A.C. 730 at 748. The Supreme Court of the United Kingdom recently addressed the

-11-

"special circumstances" rule and summarized the relevant authorities as follows:

> The special circumstances which were identified in the earliest
> authorities as justifying a beneficiary's action were fraud on the
> part of the trustee, or collusion between the trustee and the third
> party, or the insolvency of the trustee, but it has always been clear
> that these are merely examples of special circumstances, and that
> the underlying question is whether the circumstances are
> sufficiently special to make it just for the beneficiary to have the
> remedy.

Roberts, UKSC 22 at ¶¶ 46, 110 (emphasis added).  The Supreme Court of the United Kingdom

noted that a court has "wide latitude in evaluating . . . special circumstances," taking into account

"all [of] the relevant circumstances."  Roberts, UKSC 22 at ¶¶ 76, 78, 114.

Through the prism of these English law principles, this Court concludes that the

Bankruptcy Court erred in finding that Plaintiffs cannot allege special circumstances.  Despite

representations in the Minibonds prospectuses that neither Lehman Brothers nor any of its

subsidiaries exercised control over the Issuer, Lehman Brothers designed the Minibonds program

and directed the Issuer's activities.  As a party to the trust deeds, LSBF was substantially

involved in that process.  The Issuer then created a trust that, in certain circumstances, distributes

its only collateral to a Lehman entity, rather than the trust's sole beneficiary.  Juxtaposed against

the promise that the Minibonds would be secured by highly-rated collateral, this is an odd result.

See Royal Brunei Airlines Sdn Bhd v. Tan, [1995] 2 A.C. 378, 386-87 (P.C.) ("If, for his own

purposes, a third party deliberately interferes in that relationship by assisting the trustee in

depriving the beneficiary of the property held for him by the trustee, the beneficiary should be

able to look for recompense to the third party as well as the trustee."); see also Roberts, UKSC

22 at ¶¶ 46, 110 ("[T]he underlying question is whether the circumstances are sufficiently special

to make it just for the beneficiary to have the remedy."); In re Field, [1971] 1 W.L.R. 555, 561

-12-

(Ch.) (holding that special circumstances existed and "justice require[d] that the plaintiff, who is the only other person interested [in the property], should be allowed to have [his claim] properly tried before a court"). Furthermore, the recently released Examiner's report reveals cooperation between HSBC and Lehman Brothers at the highest levels during Lehman Brothers' collapse. Given the totality of these circumstances, this Court cannot find that it is "beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] amended claims." Pangburn v. Culbertson, 200 F.3d 65, 70 (2d Cir. 1999).

On appeal, the parties advance arguments concerning the operation of the trust deeds' payment priority provisions and potential class certification problems caused by a settlement arranged by Hong Kong regulatory authorities. While interesting, these arguments are extraneous to the issue of standing; they concern the merits of Plaintiffs' claims and are not before this Court on appeal. At this stage of the litigation, Plaintiffs should be permitted to replead Counts One and Two as derivative claims against LBSF. The Bankruptcy Court's denial of leave to replead is reversed.

III. Claims Against the Trustee: Counts One & Two

Plaintiffs also contend that the Bankruptcy Court erred in denying leave to amend the Complaint to name HSBC Bank as the Trustee. The Bankruptcy Court held that amending the Complaint would be futile for the reasons set forth in its ruling, but did not articulate those reasons.

As an initial matter, the Bankruptcy Court's analysis of English case law ignored the differences between Plaintiffs' relationship with the Trustee and Plaintiffs' relationship with

-13-

LBSF and the other dismissed entities. Under English law, "the basic right of a beneficiary is to have the trust duly administered in accordance with the provisions of the trust instrument . . . and the general law." <u>Target Holdings Ltd. v. Redferns</u>, [1996] 1 AC 421, 434 (H.L.). When a trustee unlawfully administers the trust, a trust beneficiary may sue the trustee directly. <u>See Hayim</u>, A.C. at 735 ("The beneficiaries have a right to enforce the trust directly against the . . . trustee."); <u>Bartlett v. Barclays Bank Trust Co. Ltd.</u>, [1980] 2 W.L.R. 430, 444, 452 (Ch.) (holding a trustee liable to the trust beneficiaries for willful "breach of trust"); <u>see also Target Holdings</u>, 1 AC at 437 ("A trustee who wrongly pays away trust money . . . commits a breach of trust and comes under an immediate duty to remedy such breach."). The Bankruptcy Court held that the trustee is the proper party to bring suit on behalf of a trust beneficiary. While that may explain Plaintiffs' lack of standing to sue LBSF directly, it does not resolve the issue of whether a beneficiary has standing to sue his trustee. Indeed, Counts One and Two are premised on alleged breaches of contract and fiduciary duty by the Trustee for failing to distribute the Saphir Notes to Plaintiffs.

The standing provisions of the trust deeds provide that a non-party to the trust has no right under the Contracts Act of 1999 to enforce any of the deeds' terms. While the Bankruptcy Court held that these provisions fit squarely within English law, it merely quoted the provisions without analyzing their language or the statute on which they rely. Notably, the Contracts Act of 1999 allows a non-party to a contract to enforce the contract's terms if they "purport[] to confer a benefit on him," Contracts Act of 1999, c. 31, § 1 (U.K.), but expressly states that it does not "affect any right or remedy of a third party that exists or is available apart from th[e] Act." Contracts Act of 1999, c. 31, § 7. Thus, while the trust deeds deprive Plaintiffs

-14-

of rights derived from the Contracts Act of 1999, Plaintiffs may hold rights outside of the Act, an issue the Bankruptcy Court did not consider.

      Finally, the Bankruptcy Court's rationale for dismissing Counts Four through Thirteen fails to render futile an amended complaint naming the correct trustee.  The Bankruptcy Court reasoned that these counts involve questions of foreign law which will have no effect on the rights of debtors or creditors in the underlying bankruptcy.  The applicable rule is that "[a] proceeding is 'related to' a [bankruptcy] case . . . if the outcome might have a 'conceivable effect' on the estate."  In re New 118th LLC, 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (citing In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992)).  A conceivable effect is one which "could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  In re New 118th LLC, 396 B.R. at 890 (citing In re Pacor, Inc., 743 F.2d 984, 994 (3d Cir. 1984), overruled on other grounds by Things Remembered, Inc. v. Petrarca, 516 U.S. 124, 134-35 (1995)).  In this case, Plaintiffs seek to prevent the transfer of the Saphir Notes—worth $1.6 billion—to the bankruptcy estate.  The effect of $1.6 billion on the bankruptcy estate is self-evident.  Moreover, by instructing the Trustee to postpone distribution of the Saphir Notes, LBSF—not Plaintiffs—tethered the Saphir Notes to the Lehman Bankruptcy.  Accordingly, the Bankruptcy Court's denial of leave to replead Counts One and Two against the Trustee is reversed.

## IV.  Constructive & Resulting Trust Claims:  Count Three

      In Count Three of the Complaint, Plaintiffs seek to impose a constructive or

-15-

.

resulting trust on the Minibonds collateral. While the Bankruptcy Court made a passing

reference to these claims, it provided no analysis in its ruling. Understandably, the Bankruptcy

Judge was juggling a host of complex and urgent issues. Nonetheless, this Court cannot discern

why the constructive and resulting trust claims were dismissed. See In re Gucci, 309 B.R. 679,

685 (S.D.N.Y. 2004) ("This Court . . . has no way of knowing whether and to what extent the

defense or elements thereof were rejected as a matter of law, [and] the reasons for any such

rejection . . . ."). A constructive trust relies on equitable, as opposed to contractual and formal

trust, principles. See, e.g., Counihan v. Allstate Ins. Co., 194 F.3d 357, 361 (2d Cir. 1999) ("A

constructive trust is an equitable remedy . . . [whose] purpose is to prevent unjust enrichment.").

Without some analysis of why standing principles derived from the trust deeds' and English law

apply to claims for a constructive or resulting trust, denial of leave to replead Count Three

against both the Trustee and LBSF was inappropriate. See Pangburn, 200 F.3d at 70 (denial of

leave to replead is warranted only when it is "beyond doubt that the plaintiff can prove no set of

facts in support of [the] amended claims"). Moreover, it is not evident whether these claims are

governed by English law, an issue the Bankruptcy Court did not address. Accordingly, the

Bankruptcy Court's dismissal of Count Three is vacated and remanded for further consideration.

08-13555-mg   Doc 15598-1   Filed 04/04/11   Entered 04/04/11 13:51:19   Exhibit A
Case 1:10-cv-00696-WHP   Document 22   Filed 08/09/10   Page 17 of 18
through C   Pg 109 of 110

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's dismissal of Counts One and
Two against LBSF is affirmed, and its denial of leave to replead those claims derivatively against
LBSF is reversed.  The Bankruptcy Court's denial of leave to replead Counts One and Two
against the Trustee is reversed.  The Bankruptcy Court's dismissal of Count Three is vacated.
This action is remanded to the Bankruptcy Court for further proceedings consistent with this
Memorandum and Order.

Dated: August 9, 2010
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Jason C. Davis, Esq.
Robbins Geller Rudman & Dowd LLP
100 Pine Street, Suite 2600
San Francisco, CA 94111
*Counsel for Appellants*

Howard Grant Sloane, Esq.
Cahill Gordon & Reindel LLP
80 Pine Street
New York, NY 10005
*Counsel for the HSBC Appellees*

-17-

08-13555-mg   Doc 15598-1   Filed 04/04/11   Entered 04/04/11 13:51:19   Exhibit A
Case 1:10-cv-00696-WHP   Document 22   Filed 08/09/10   Page 18 of 18
through C    Pg 110 of 110

Richard W. Slack, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for Appellee Lehman Brothers Special Financing, Inc.*

David S. Cohen, Esq.
Milbank, Tweed, Hadley & McCloy LLP
1850 K Street, NW
Washington, DC 20006
*Counsel for Intervenor Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. et al.*