# EXHIBIT D

04n6leha

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------x
     IN RE: LEHMAN BROTHERS
 3   HOLDINGS, INC.,
                                     10 CV 17(WHP)
 4   ----------------------------x
                                     New York, N.Y.
 5                                   April 23, 2010
                                     3:00 p.m.
 6
     Before:
 7
                    HON. WILLIAM H. PAULEY III,
 8
                                       District Judge
 9
                           APPEARANCES
10
     ROBBINS GELLER RUDMAN & DOWD, LLP
11        Attorneys for Plaintiffs
     BY:  JASON C. DAVIS
12        LUKE BROOKS

13
     GENOVESE JOBLOVE & BATTISTA
14        Attorneys for Plaintiffs
     BY:  ROBERT F. ELGIDELY
15
     WEIL, GOTSHAL & MANGES, LLP
16        Attorneys for Defendants
     BY:  RICHARD SLACK
17        ROBERT VELEVIS

18   CAHILL GORDON & REINDELL, LLP
          Attorneys for Defendants
19   BY:  HOWARD G. SLOANE
          PATRICIA FARREN
20

21   MILBANK, TWEED, HADLEY & McCLOY, LLP
          Attorneys for Official Intervenor
22   BY:  ROBERT J. LIUBICIC

23

24

25
```

CORRECTED

04n6leha

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    IN RE: LEHMAN BROTHERS
3   HOLDINGS, INC.,
                                        10 CV 17(WHP)
4   ------------------------------x
                                        New York, N.Y.
5                                       April 23, 2010
                                        3:00 p.m.
6
    Before:
7
                    HON. WILLIAM H. PAULEY III,
8
                                        District Judge
9
                           APPEARANCES
10
    ROBBINS GELLER RUDMAN & DOWD, LLP
11       Attorneys for Plaintiffs
    BY:  JASON C. DAVIS
12       LUKE BROOKS

13

14  GENOVESE JOBLOVE & BATTISTA
         Attorneys for Plaintiffs
    BY:  ROBERT F. ELGIDELY
15
    WEIL, GOTSHAL & MANGES, LLP
16       Attorneys for Defendants
    BY:  RICHARD SLACK
17       ROBERT VELEVIS

18  CAHILL GORDON & REINDELL, LLP
         Attorneys for Defendants
19  BY:  HOWARD G. SLOANE
         PATRICIA FARREN
20

21  MILBANK, TWEED, HADLEY & McCLOY, LLP
         Attorneys for Official Intervenor
22  BY:  ROBERT J. LIUBICIC

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

1              (Case called; in open court)

2              THE DEPUTY CLERK:  Matter on for argument.  Counsel

3    for plaintiff, please give their appearance.

4              MR. DAVIS:  Jason Davis of Robbins Geller Rudman &

5    Dowd, LLP, for plaintiffs, your Honor.

6              MR. BROOKS:  Luke Brooks of Robin Geller Rudman & Dowd

7    for plaintiffs.

8              MR. ELGIDELY:  Robert Elgidely of Genovese Joblove &

9    Battista for plaintiffs, your Honor.  Good afternoon.

10             THE COURT:  Good afternoon, gentlemen.

11             THE DEPUTY CLERK:  Counsel for defendants, please give

12   your appearance.

13             MR. SLACK:  Your Honor, Richard Slack from Weil,

14   Gotshal & Manges for Lehman Brothers, and I am here with Robert

15   Velevis also from Weil Gotshal & Manges.

16             THE COURT:  Good afternoon.

17             MR. SLOANE:  Good afternoon, your Honor.  Howard G.

18   Sloane with Cahill Gordon & Reindel for all the defendants,

19   other than Lehman Brothers, and with me is my partner Patricia

20   Farren.

21             THE COURT:  Good afternoon.

22             Behind the chart?

23             MR. LIUBICIC:  Your Honor, Robert Liubicic with

24   Milbank on behalf of the Intervenor, the Committee of Unsecured

25   Creditors.

04n6leha

1          THE COURT:  Do you have any horse in this race?

2          MR. LIUBICIC:  Your Honor, we filed a joinder with

3     LBSF's opposition.

4          THE COURT:  This is oral argument on two appeals.  Do

5     you want to be heard, Mr. Davis?

6          MR. DAVIS:  Yes, your Honor.  Thank you.

7          THE COURT:  Take the podium.

8          MR. DAVIS:  May I point to some of the demonstratives

9     we prepared?

10         THE COURT:  Sure.  Just keep your voice up so everyone

11    can hear.

12         Before you get started on all your demonstratives, I

13    want to figure out what these appeals are actually about.  In

14    your briefing, you only discuss standing to bring claims

15    against HSBC, that is the trustee, and LBSF.

16         Does that mean that you dropped the claims against

17    other entities and individuals?

18         MR. DAVIS:  Well, your Honor, the Bankruptcy Court

19    essentially made two overarching rules.  The first was that

20    plaintiffs lacked standing sue Lehman Brothers Special

21    Financing, Inc., who is called LBSF in these proceedings; and

22    secondly, that plaintiffs lack standing to sue HSBC Bank USA,

23    who is the trustee.

24         Separate and apart from that ruling, the Court

25    determined that it lacked subject matter jurisdiction under the

04n6leha

1    Bankruptcy Code to hear claims that are not related to the

2    debtor in bankruptcy and that relates to Claims 4 through 13 of

3    the complaint.

4         So just to be clear, Judge, it is plaintiffs' position

5    that those claims could be presented in Article III court, but

6    that specific decision that the Court didn't have sufficient

7    subject matter jurisdiction to your claims against foreign

8    parties is not on appeal today, Judge.

9         THE COURT:  So you are not appealing the dismissal of

10   Counts 4 through 13?

11        MR. DAVIS:  We are not appealing the dismissal of

12   Counts 4 through 13 as to the foreign parties based on the

13   specific finding that the Court lacked subject matter

14   jurisdiction as a Bankruptcy Court.

15        THE COURT:  What about the parties that are before the

16   Court here?

17        MR. DAVIS:  The parties before the Court, your Honor,

18   raised questions about plaintiffs' standing to sue the trustee.

19        Just so it is clear who the parties are, the issuer of

20   the minibonds Pacific Finance, Ltd., the bonds that my clients

21   purchased, is an HSBC affiliate that is owned by one of the

22   other named parties, HSBC Cayman, and is owned and controlled

23   by another HSBC party and that is HSBC Holdings, PLC.

24   Separately from that plaintiffs named individual defendants who

25   were directors of the issuer of the minibonds.

04n6leha

 1             Now, all of those individuals and entities are HSBC

 2     related entities.  Plaintiffs mistakenly named HSBC USA, Inc.,

 3     a New York entity as the trustee in the minibond program.   The

 4     correct trustee, Judge is HSBC Bank USA, National Association.

 5             Now, I will let the HSBC defendants speak for

 6     themselves, but the reason that the Court granted their motion

 7     in part rested on an argument that they made that the trustees

 8     of the collateral trust that was created for their benefit

 9     lacked standing to sue the nonparty HSBC Bank USA, N.A., and

10     the Court determined that it would be futile to allow

11     plaintiffs leave to amend the complaint because plaintiffs

12     lacked standing to sue the trustee directly.

13             That is the issue on appeal today, Judge.  In addition

14     to the question of whether plaintiffs have standing to sue

15     Lehman Brothers Special Financing, Inc.

16             THE COURT:  If you are not appealing the dismissal of

17     the breach of contract and fiduciary duty claims against the

18     trustee in Counts 4 through 12 or 13, what are you suing the

19     trustee for?

20             MR. DAVIS:  Plaintiffs are suing the trustee for

21     failure to deliver the collateral that is held in trust for

22     plaintiffs' benefit following an event of default, which is

23     what we have here.

24             THE COURT:  Isn't that a breach of contract?

25             MR. DAVIS:  It is not a breach of contract, Judge.

04n6leha

1          THE COURT:  What is it?

2          MR. DAVIS:  At a minimum, it is a breach of fiduciary

3   duty, Judge.

4          THE COURT:  But you are not pursuing the breach of

5   fiduciary duty claims in Counts 4 through 13, right?

6          If I look at Counts 1 through 3, you are looking for a

7   declaratory judgment, you are looking for an injunction.  The

8   injunction has to be based on something.

9          What is the underlying claim?

10         MR. DAVIS:  Well, Judge, we brought a claim for

11  declaratory relief and we also brought claims for constructive

12  trust and resulting trust.  Now, whether the Bankruptcy Court

13  has subject matter jurisdiction to hear fiduciary duty claims

14  that are unrelated to the state, that is Lehman Brothers, has

15  nothing to do with whether the Court had subject matter

16  jurisdiction to hear breach of fiduciary duty claims underlying

17  plaintiffs' declaratory relief action, constructive trust, and

18  resulting trust claims.  Those are two completely separate

19  issues.

20         The whole reason, your Honor, that the Court did

21  denied plaintiffs' requests to amend the complaint -- the whole

22  reason -- is that the Court determined that plaintiffs as trust

23  beneficiaries lacked standing to sue the trustee.  So focused

24  on Counts 1 through 3 the Court determined as a matter of law

25  that plaintiffs as trust beneficiaries lacked standing to sue

1   their trustee.  That is what is on appeal today, Judge.

2         What plaintiffs would like is the opportunity to amend

3   the complaint, to name the correct trustee, to seek declaratory

4   relief that is supported by English law and all of the

5   authorities we have in our papers that clearly show plaintiffs

6   have standing to sue their own trustee and clearly show that

7   plaintiffs have standing to sue either a cobeneficiary or an

8   entity that is interfering with the distribution of trust

9   property, namely, Lehman Brothers Special Financing, Inc.

10         THE COURT:  Mr. Davis, why don't you go ahead and

11   proceed with your argument.

12         MR. DAVIS:  So, Judge, just to give a little bit more

13   background on why we're here today, plaintiffs are investors

14   who purchased collateralized bonds that were formerly called

15   minibonds or notes.  The bonds defaulted at the latest by

16   September 15, 2008, when Lehman Brothers filed for bankruptcy.

17   The reason why the minibonds defaulted when Lehman Brothers

18   Holdings, Inc., filed for bankruptcy is that Lehman was an

19   important credit support provider to the entire minibond

20   program.  So when Lehman went bankrupt, he entire minibonds

21   program terminated.

22         Now, several weeks later the trustee of the minibonds

23   program, HSBC Bank USA, was in the process of distributing the

24   collateral to the investors, including the plaintiffs.  What

25   happened is on November 25th, 2008, Lehman Brothers Special

1   Financing, Inc., sent a cease and desist letter to the trustee

2   ordering the trustee to take no further action to distribute

3   the property and to repay plaintiffs.  The bankruptcy entity

4   known as Special Financing, Inc., contended that the entire

5   minibond program was frozen under the automatic stay provisions

6   of the United States Bankruptcy Code.

7         That is where we stand, today, Judge.  Since

8   November 25th, 2008, LBSF in ancillary litigation has been

9   attempting to destroy the value of the sole piece of property

10  that is held in trust for plaintiffs' benefit, namely, what the

11  parties are calling the Saphir Notes.  In order to protect

12  their hard-nose property rights and those bonds, Judge,

13  plaintiffs filed suit on March 12, 2007.

14        Since then the principal issue has been whether

15  plaintiffs as trust beneficiaries have standing to sue the

16  trustee.  The Court determined that plaintiffs lack standing to

17  sue the trustee and lack standing to sue LBSF.

18        If it pleases the Court, I would like to point out a

19  couple of factual determinations that the Bankruptcy Court made

20  that are relevant to the legal questions.

21        THE COURT:  Don't the provisions of the trust

22  agreement state that the Saphir Notes go to LBSF?

23        MR. DAVIS:  That is not at all true, Judge.  What the

24  provisions of the trust documents say and what LBSF's argument

25  has been below is, LBSF has stated LBSF is a senior beneficiary

04n6leha

1    in the minibonds trust and as a consequence they get all of the

2    value of this Saphir Notes.   That is a factual statement that

3    is simply not accurate.

4         What we described in the complaint, Judge, is that

5    LBSF in essence had an insurance right that turned out at least

6    by September 15th, 2008, and certainly before then.   So by the

7    time that the minibonds terminated, they had no value.   They

8    may have had a senior interest, but just like a senior creditor

9    in bankruptcy who has been repaid, they've got no value in the

10   bonds.   So what the plaintiffs state, Judge, is LBSF may be

11   senior but their claim is worth zero and they have had over a

12   year to say exactly what their claim is worth and they have not

13   stated it.   All they have said is they are senior, and there is

14   a factual dispute as to whether they are entitled to a single

15   penny of those Saphir Notes.

16        My clients contend that that value should be

17   distributed 100 percent to them, minus administrative fees.

18   And therein lies the harm that starts the analysis of injury

19   and standing to sue.   Everybody agrees that the minibonds are

20   in default.   Everybody agrees that the collateral should have

21   been distributed.   The question is how and to whom.   It is my

22   client's position that it should have been distributed to them,

23   it should have been distributed long ago, and the only reason

24   it hasn't been distributed is LBSF has used the U.S. Bankruptcy

25   Code to interfere with that distribution.

1          There is plenty of paper before the Court, but what is

2    clear even though HSBC Bank USA the trustee is technically not

3    a party to this suit, many of the those affidavits demonstrate

4    that they would have distributed the property but for LBSF's

5    interference with the process.  Plaintiffs contend that that

6    process, that that interference was wrongful and as a matter of

7    Second Circuit precedents that allegation needs to be accepted

8    as true.  It creates the injury that provide plaintiffs'

9    standing and that is not the only reason why plaintiffs have

10   standing to sue LBSF.

11         THE COURT:  Why is it that LBSF's position with

12   respect to those Saphir Notes is valueless?  What's the basis

13   for that?

14         MR. DAVIS:  The basis for that, Judge, is essentially

15   that entire minibonds program was a credit insurance program.

16   LBSF essentially used plaintiffs' capital to insure credit risk

17   on its own portfolio.  When that insurance termed out, it was

18   entitled to nothing.  That is the basis for plaintiffs'

19   position, Judge.

20         Nobody has contested that.  What LBSF has repeatedly

21   stated is that they have a senior interest in the Saphir Notes.

22   What they have never stated is what the value of that interest

23   is.  Plaintiffs contend that it is worthless and they haven't

24   submitted anything facts demonstrating a contrary conclusion.

25         THE COURT:  What in the provisions of the agreements

04n6leha

1    renders it worthless?

2         MR. DAVIS:  Well, there has been no discovery, Judge.

3    But what the prospectuses say is that in an event of bankruptcy

4    or similar events, LBSF's -- I don't have the language in front

5    of me, Judge -- interest terms out at most it and may be

6    entitled to some termination payment.  But unless that

7    termination payment is worth 100 percent of the collateral, my

8    client's are entitled to a distribution under the notes.  That

9    much is clear and they never said, whatever their position is,

10   that they are entitled to 100 percent of the collateral.

11        THE COURT:  Are those prospectus provisions referenced

12   in your brief?

13        MR. DAVIS:  The relevant provisions are referenced in

14   the complaint, Judge.  They are not referenced in the brief.

15   This hasn't been a factual issue that has been brought up, but

16   plaintiffs would be happy to submit supplemental briefing on

17   the question.

18        THE COURT:  Let's go ahead.

19        MR. DAVIS:  Turning to the factual findings that bear

20   on whether plaintiffs have standing to sue both of the entities

21   if question, Judge, the Bankruptcy Court found that plaintiffs

22   are investors who purchased minibonds from an entity known as

23   Pacific Finance.  Pacific Finance is a named defendant in the

24   case and is represented here today.  Pacific Finance entered

25   into a contract with LBSF, a swap agreement.  The Bankruptcy

04n6leha

1   Court determined that that swap agreement provided income for

2   the issuer to pay the bonds that were sold to plaintiffs.

3       Now, Pacific Finance has defaulted.  LBSF is in

4   bankruptcy.  So the question now, Judge, is who is entitled to

5   a distribution of the collateral and in what quantity.  So the

6   focus at this point, Judge, is on the collateral trust.  Now,

7   the Bankruptcy Court determined that Pacific Finance placed the

8   Saphir Notes in trust for the benefit of the minibond investors

9   and LBSF, but described the minibond investors as junior

10  beneficiaries.

11      It is undisputed that HSBC Bank USA, N.A. is the

12  trustee in the program and it is undisputed that the minibond

13  investors are trust beneficiaries.  LBSF has raised questions

14  as to whether it is a beneficiary under the trust, but

15  plaintiffs respectfully submit that the Bankruptcy Court made

16  an error in applying English law to both questions -- whether

17  plaintiffs have standing to sue LBSF and whether they have

18  standing to sue LBSF.

19      On the question on whether plaintiffs have standing to

20  sue HSBC, the Court applied two English precedents.  The first

21  was Gregson v. HAE and the second was Roberts v. Gill.  Now, in

22  both of those cases, Judge, what they involved was a suit by a

23  beneficiary against a third party to the trust.  The English

24  courts called that third party a dog-leg party.  So in Gregson,

25  Judge, the trust beneficiaries attempted to sue the directors

04n6leha

1      of the trustee who technically were legal strangers to the

2      trust, but they that issue didn't involve suing the trustee

3      directly.  Similarly in Roberts v. Gill, the trust

4      beneficiaries attempted to sue the attorneys who were advising

5      the trustee.  They too were dog-leg defendants because they

6      were strangers to the trust.

7             Now, plaintiffs respectfully submit that the

8      Bankruptcy Court erred in applying that doctrine to the

9      trustee.  It is very clear, and plaintiffs cite many citations

10     going back several hundred years demonstrating that trust

11     beneficiaries have standing to sue their trustee and that is

12     the reason that plaintiffs believe that the Court erred in

13     making that determination.

14            Now, in terms of having standing to sue LBSF, there

15     seems to be a dispute on appeal, Judge.  The way that

16     plaintiffs interpreted the Bankruptcy Court's ruling was that

17     LBSF was a cobeneficiary of the trust and under established

18     English precedent what needs to happen when there is a dispute

19     between the trust beneficiaries over property held in dispute

20     in trust is the cobeneficiaries "Fight their battles and the

21     trustee is supposed to remain neutral."  We cite authorities

22     for that position as well.

23            In opposition, LBSF argues that they are not

24     technically a beneficiary under the trust.  They argue that

25     they just have contract rights.  Assuming that were the case,

1    contrary to Bankruptcy Court's demonstration, still plaintiffs

2    have standing to sue LBSF because it is interfering with the

3    distribution of property that belongs to my client.

4         Now, the English courts take those property rights

5    very seriously.  Plaintiffs cited to opinions written by the

6    House of Hight Lords in England, which is the Supreme Court of

7    the United States, that states trust beneficiaries with

8    equitable rights in property in held there trust have absolute

9    rights and absolute interest.  The English courts elevate those

10   property rights above contract claims.

11        So for those two reasons, Judge, plaintiffs submit

12   that the Bankruptcy Court made an error of law as to whether

13   plaintiffs have standing to sue both the trustee and LBSF

14   directly.  Separate and apart plaintiffs contend that the

15   Bankruptcy Court made an error of law in not permitting

16   plaintiffs to amend the complaint to bring derivative suit.

17        Now, everybody agrees that if the correct test is

18   followed a trust beneficiary does have standing to sue third

19   parties as a matter of English trust law.  Now, the rule is

20   called the Special Circumstances Rule, Judge.  The parties have

21   a dispute as to what the exact rule is.  Everybody agrees it is

22   articulated in Roberts v. Gill, but the parties disagree as to

23   what the holding of that Court was.  Plaintiffs contend that at

24   paragraph 40 of the Roberts v. Gill position the holding is

25   very clear, and it states that where there is a breach by the

1  trustee of its obligation to protect the trust property or to

2  distribute it then plaintiffs have standing to bring a suit

3  derivatively.  There are a number of special circumstances

4  supported by the case law.

5       THE COURT:  Against whom would you be bringing the

6  suit against derivatively?

7       MR. DAVIS:  That is an excellent question, Judge.

8  Plaintiffs' position is we don't have to sue the trustee

9  derivatively.  Plaintiffs' position is we can sue the trustee

10  directly.  So just from a doctrinal perspective, it is

11  plaintiffs' position that the derivative suit doesn't make

12  sense as to a suit against the trustee.

13       THE COURT:  Good because I don't think that makes

14  sense either.

15       MR. DAVIS:  I agree, Judge.

16       THE COURT:  Who would a derivative suit be against?

17       MR. DAVIS:  A derivative suit would be against LBSF

18  presupposing as LBSF argues that it is a stranger to the trust.

19  Because only if LBSF if a stranger to the trust are plaintiffs

20  required to sue them derivatively.  That much is clear based on

21  the very precedent that the Court applied to this case.  The

22  derivative suit, Judge, under English law requires an

23  application of the Special Circumstances Doctrine.

24       Plaintiffs have articulated four different special

25  circumstances that apply here.  Number one, the trust

04n6leha

1   beneficiary has an obligation to distribute this property

2   following an event of default.  Judge Sotomyo in LNC relied on

3   a New York case called Beck, which raised a completely valid

4   question that if a collateral trust serves any purpose, the

5   purpose is to protect the underlying obligation.  Why are we

6   here?  It has been a year and a half later and the property

7   hasn't been distributed.  That is a special circumstance,

8   Judge.

9           The second special circumstance that plaintiffs cited

10  to your Honor is a conflict of economic interest that the

11  trustee has.  The trustee has a $234 million credit owed by the

12  bankruptcy estate on top of that plaintiffs cite to the Valucas

13  Report recently released that adds another $345 million on top

14  of that economic conflict.  Now, the trustee would argue, Well,

15  those debts are owed to other affiliates of HSBC entities, but

16  the Court Bankruptcy Court's findings in Charter Communications

17  makes it clear that one affiliate is affected by the economic

18  impact of any credit decision on the rest of its affiliates.

19  So that is a clear conflict of economic interest.

20          THE COURT:  What is the exact relationship between the

21  trustee and these other HSBC entities?

22          MR. DAVIS:  Your Honor, what is very unique about this

23  transaction that is uncommon in a marketplace is the trustee is

24  the issuer.  Typically when a corporation issues bonds, Judge,

25  they put property in a trust under the purview of the

04n6leha

1    indentured trustee to protect the collateral just in case the

2    issuer goes bankruptcy.  What happened here is the trustee,

3    HSBC bank USA, is a incorporate affiliate of the issuer,

4    Pacific International Finance, Ltd.

5           Now, that is an allegation in the complaint and it is

6    also clear based on Pacific International Finance's corporate

7    ownership statement that that is true.  On top of that, Judge,

8    the entity that owned Pacific International Finance is also an

9    HSBC entity and the directors of Pacific International are HSBC

10   employees.  So this is a bond program, Judge, that was put

11   together by Lehman on the one hand and HSBC on the other hand

12   to transfer enormous credit risks from the portfolio of Lehman

13   to individual bondholders who are retail investors in Hong

14   Kong.

15          Now, that allegation, Judge, is irrelevant to

16   plaintiffs' constructive trust in resulting trust claims

17   because the equities matter under English law.  Plaintiffs

18   don't understand why the Bankruptcy Court determined that

19   plaintiffs lack standing bring either of those claims because

20   nobody has submitted any authority for the proposition that

21   under these circumstances a trust beneficiary doesn't have

22   standing to bring those claims.

23          So, Judge, plaintiffs believe there are at least two

24   special circumstances but there are more than just two.  There

25   are four.  The third special circumstance, your Honor, is the

1    fact that the trustee is now between a rock and a hard place.

2    On the one happened LBSF at least through its expert opinion at

3    paragraph 8 of the supplemental opinion of Professor McCormak

4    claimed they were a beneficiary of the HSBC trust but had a

5    superior interest.   That is a position that they took through

6    their expert, who is an expert on English law.   Given that

7    position and given the undisputed fact that plaintiffs are

8    trust beneficiaries under the same trust, it is clear that the

9    trustee owes obligations to two different groups of trust

10   beneficiaries with conflicting economic interest in the exact

11   same property.   And under the English authorities that we have

12   cited in our brief, including Alsap, they have an obligation to

13   remain neutral.   So under In Re Field, which we also cited in

14   our papers, that constitute a special circumstance.   It is not

15   merely a conflict of economic interest.   It is also a conflict

16   of duty.

17        The fourth factor that we would cite as a special

18   circumstance to the Court is the fact that the entire minibond

19   program rested upon credit support from Lehman Brothers

20   Holdings, Inc.   If Lehman Brothers Holdings, Inc., went

21   insolvent, the entire program was supposed to terminate.   The

22   reason why that is the case, Judge, is that one risk among the

23   many, many, many risks that were transferred to plaintiffs,

24   that one risk stayed behind.   The truth of what happened is the

25   trustee did not exercise its obligation to terminate the

1    minibonds program even though it knew that Lehman was

2    experiencing insolvency at least over the summer of 2008

3    because it was protecting its own economic interest during that

4    period of time.

5         The Valucas Report is after the Bankruptcy Court heard

6    arguments, but it is fully consistent with the allegations,

7    including those set forth at paragraph 70 of the complaint,

8    which say the entire program should have terminated in the

9    summer of 2008.  If that had happened, Judge, all of the

10   arguments that bankruptcy counsel is making today about the

11   enforceability of certain provisions of the property held in

12   trust couldn't be made.  That is the fourth special

13   circumstance that plaintiffs submit supports standing in a

14   derivative capacity against LBSF.

15        The final two points I would mention, Judge, is that

16   plaintiffs have not been permitted any discovery in this case.

17   The final point that I would submit is it is clear that at a

18   minimum plaintiffs should be given an opportunity amend the

19   complaint.  Much has past since it was first filed on

20   March 12th, 2007.

21        THE COURT:  You have something better than discovery

22   in this case, don't you?  You have the examiner's report.

23        MR. DAVIS:  Yes, Judge.  I just point that out because

24   we filed a complaint on March 12th, 2007.

25        THE COURT:  I understand.

04n6leha

1          MR. DAVIS:  So much has occurred since then.  I would

2     rest just addressing one point that I am sure is very important

3     to the defendants in this case.

4          THE COURT:  Let me hear from defense first.

5          MR. DAVIS:  Yes, your Honor.

6          THE COURT:  Thank you very much, Mr. Davis.

7          MR. SLACK:  Good afternoon, your Honor.  Richard Slack

8     from Weil Gotshal on behalf of Lehman Brothers Special Finance,

9     which as you've been told is referred to LBSF.

10          Now, this action was brought by seven of what are 25

11     to 30,000 noteholders of an entity called Pacific Finance.

12     They are creditors of Pacific Finance and Pacific Finance in

13     turn entered into a swap agreement with LBSF.  The money that

14     it received from noteholders went in and purchased collateral,

15     which secured both the notes and the swap for LBSF and those

16     notes were put in trust.  There is a trust agreement and it is

17     the governing document.  That trust agreement was entered into

18     between Pacific Finance, LBSF, and the trustee.

19          THE COURT:  Is LBSF a beneficiary under the trust?

20          MR. SLACK:  It has a contractual right to receive

21     money, but it is not a beneficiary the way we think of it.

22     What I mean by that, your Honor, is we've heard discussion

23     about under UK law, for example, that the noteholders have the

24     right to bring, if there are extraordinary circumstances, a

25     derivative action.  We agree that is the law.  LBSF cannot do

1     that.

2           THE COURT:  Didn't your own experts opine that LBSF

3     was a beneficiary under the trust?

4           MR. SLACK:  What I would tell you, your Honor, is

5     there is two different things.  One, what are experts said is

6     that there they are entitled to get money contractually.  So if

7     you call that a beneficiary in that context, then it is a

8     beneficiary.  The law, however, is talking about where you have

9     cobeneficiary, meaning people who could direct the trustee.

10    The only case that the plaintiffs cite for this dueling

11    beneficiaries is the Alsap case.  That is the only case.

12           That case doesn't stand for what they say it stands

13    for and at best what that case says -- let me talk about the

14    facts of that case.  You had a trustee who had absolutely no

15    money.  That trustee was sued -- not a third party -- by one of

16    the beneficiaries of a trust.  That trustee went into court, in

17    the UK court and said, Court, I have got no money, do I have to

18    defend this?  And the Court said, No.  Now, presumably what may

19    have happened is the beneficiaries made have tried to sue each

20    other.  They may not have.  But the difference is, your Honor,

21    here the governing documents, that is the trustee, says that

22    the noteholders here cannot sue.

23           So where you have a situation where the governing

24    document, that is the trustee, and it is the trustee that

25    governs who gets money in what order -- and, your Honor, I am

1   going to spend a little bit of time on that because it is very

2   important to our case -- in that circumstance, your Honor, this

3   whole idea of dueling beneficiaries simply doesn't work.

4           THE COURT:  Hold on for one second.

5           (Pause)

6           THE COURT:  Go ahead, Mr. Slack.

7           MR. SLACK:  Thank you, your Honor.

8           I think, your Honor, if you are asking about

9   beneficiaries, and I think again you have to look at even if

10  there was such a rule under UK law, which I think is dubious,

11  what they are talking about is two beneficiaries who both have

12  the right to direct the trustee.  So what happens when you have

13  two beneficiaries who both have the right to direct the

14  trustee?

15          If you look at their pleading, and I think that is

16  what is truly critical here, their pleading says, and I think

17  they have to rely on their pleading, that the trust agreement

18  says expressly that the trustee "Shall have regard solely to

19  the interest of the noteholder."

20          It shouldn't be surprising that they cite that in

21  three different spots in their -- I think is more, but three

22  that I have here which is their complaint in paragraph 50,

23  their complaint at paragraph 88, and their complaint at

24  paragraph 126.  That shouldn't surprise anyone because the

25  whole idea of the trust here and the way this is set up is you

04n6leha

1    ever 25,000 to 30,000 noteholders.  Obviously you cannot have

2    every noteholder suing on the same trust document.  You can

3    have then thousands of suits, they can be in all kinds of

4    jurisdictions

5            So what do they do?  The trust document says the

6    trustee is the one who brings the suit.  It says specifically

7    that only the trustee and not any noteholder can bring claims

8    against third parties.

9            THE COURT:  Who is the third party here?

10           MR. SLACK:  Well, the third party is LBSF.

11           With respect to the noteholders, your Honor, and if

12   you look at the way this works, the way this works is minibond

13   holders are noteholders of Pacific Finance.  They are

14   creditors, your Honor.  LBSF is a swat counterparty to Pacific

15   Finance.  There is absolutely no contractual privity between

16   the minibond holders and LBSF.  There is no document where the

17   noteholders and LBSF have any kind of relationship whatsoever.

18           THE COURT:  Let me ask you this:  Didn't you

19   specifically state in your brief in the Bankruptcy Court below

20   that LBSF was a beneficiary?  Isn't that exactly the term that

21   you used?  Because I have a note.  I can go get the brief, but

22   you know what you put in your brief.

23           MR. SLACK:  I don't remember the terminology.

24           THE COURT:  Page 18 of your brief to the Bankruptcy

25   Court, didn't you say that?

04n6leha

1          MR. SLACK:  I know our expert had in fact said that

2    they are a beneficiary.

3          THE COURT:  Your expert said it and your said it,

4    didn't you?

5          MR. SLACK:  Right.  I don't deny that we said it, your

6    Honor.

7          THE COURT:  When I ask you now whether you are a

8    beneficiary, you say no.

9          MR. SLACK:  That's true, your Honor.  We are not a

10   beneficiary in the way the plaintiffs intended.

11         THE COURT:  Or the way you said in your brief to the

12   Court below, right?

13         MR. SLACK:  No.  I think we said exactly right to the

14   Court below, your Honor.

15         Your Honor, what we said below and what we said here

16   is that we have a contractual right under the trust agreement

17   to get certain dollars out of the trust.  That is the only

18   right we have.

19         THE COURT:  That contractual right to get money first

20   out of the trust, how does that not make you a beneficiary?

21         MR. SLACK:  What I am suggesting, your Honor --

22         THE COURT:  Can you just answer that question?  How

23   does that not make you a beneficiary if you are going to

24   characterize it as a contractual right to get money first out

25   of a trust?

04n6leha

1        MR. SLACK:  I think it makes us a beneficiary, but a

2   contractual beneficiary.

3        The key is this:  When you are talking about under the

4   law, the law that the plaintiffs try to bring in here, every

5   case that talks about suing beneficiaries, talks about suing

6   people who under the trust have the right to either direct the

7   trustee or where the trustee has fiduciary duties to that

8   person.  There is not a single case that the plaintiffs cite

9   where somebody who has a contractual right under a trust

10  agreement -- that is all LBSF has here -- is a beneficiary for

11  the purposes of the rule that they are trying to cite in this

12  one case that frankly doesn't say that.

13       So all I am saying, your Honor, is that, Yes, we have

14  a contractual right to the money and under certain

15  circumstances you can say that we're a beneficiary of the

16  trust.

17       THE COURT:  Under certain circumstances then why

18  shouldn't I consider plaintiffs' argument about dueling

19  beneficiaries?

20       MR. SLACK:  Well, I would say there is really three

21  reasons.  Two of them I have talked to, but I will say them

22  again just because I didn't get an opportunity to really go

23  through it.

24       First, your Honor, this is a new argument that was not

25  raised below.  In fact, the plaintiffs' below -- and you can go

04n6leha

1    through and look at their briefs, look at their arguments --

2    did not only not make that argument, they made the exact

3    opposite argument.   The argument that they made below, your

4    Honor, was that LBSF was a stranger to the contract and

5    therefore the trustee, HSBC, had to give all of their duties to

6    the plaintiffs and they plead it in their complaint.   That is

7    what they plead, that is the argument that they made below, and

8    Judge Peck below never had an opportunity to address that

9    argument because it wasn't made.

10        So under I think what is fairly longstanding

11   precedents, an argument that is first raised on appeal where

12   the lower court, in this case the Bankruptcy Court, never got a

13   chance to address it is one that cannot be considered on

14   appeal.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

04NMLEHC2

1          MR. SLACK:  Second, your Honor, and I think this is

2     just equally as critical, they have one case that they cite.

3     It's a lower court case in England that doesn't say what they

4     say it says.  So while they say dueling beneficiaries should be

5     able to sue each other, that case doesn't say it.  There is no

6     authority under UK law for the proposition that they are trying

7     to make.

8          The case is the Alsop case.  The Alsop case did not

9     have a situation where one party sued another beneficiary.  It

10    was a different situation.  In that case you had a trustee that

11    was getting sued.  The trustee had no money.  And in that

12    particular situation, where the trustee would have had to go

13    out-of-pocket, the UK court said, you don't have to defend the

14    suit.

15         Now, what happened next, we have no idea.  But it's

16    not that case and that case doesn't say that where you have a

17    contractual prohibition against noteholders suing that somehow

18    you can abrogate the contract and allow, quote, dueling

19    beneficiaries to sue.  The case doesn't say it and it's not the

20    law.

21         THE COURT:  Why shouldn't the plaintiffs be allowed to

22    amend their complaint to bring a derivative claim in view of

23    the examiner's report about self-dealing?

24         MR. SLACK:  Well, I think there is really two reasons,

25    your Honor.  The first is that under what I think is now fairly

1   standard Second Circuit law, there is a big difference under

2   the law and in terms of a lower court judge in whether the

3   lower court judge has a motion to amend in front of him or

4   whether or not there is just a statement made in a brief.

5           The plaintiffs here have had the opportunity -- and

6   this is critical under the Second Circuit authority -- have had

7   the opportunity to amend their complaint from day one.  They

8   have chosen not to.  They didn't make a motion to amend.  There

9   is no amended pleading that was filed.  And instead what they

10  did is they essentially said to the judge below, we want you,

11  if we lose this, to be able to amend our pleading.  And what

12  the Second Circuit has said is, in those circumstances the

13  lower court, the district court in this case, the bankruptcy

14  court, has the opportunity to use its discretion in whether or

15  not to allow a party to amend.

16          Now, Judge Peck below didn't stop there.  He could

17  have just said, you know what, I'll exercise my discretion and

18  no amendment.  He actually went and analyzed it and below they

19  raised two principal reasons why they say they should be able

20  to bring a derivative suit.  Number one, they alleged that

21  there is a conflict and, number two, let's deal with the

22  conflict question first.

23          With respect to the conflict they say that because

24  HSBC has a claim in the bankruptcy that that is a situation

25  where for all purposes any time you have a claim you can't be

1   an independent trustee.

2        One thing which I can tell you from a practical

3   standpoint, your Honor, is that every single trust in every

4   single transaction has some major bank that has filed a proof

5   of claim in the Lehman bankruptcy.  If the law was that you

6   file a claim in the Lehman bankruptcy and you can no longer be

7   a trustee for any of these trusts, you'd have every single, you

8   know, noteholder and beneficiary throughout.  There is hundreds

9   of thousands, millions of them who can sue directly.  So the

10  law can't be that merely because you file a proof of claim in

11  an estate, unless you show more, and that was what, of course,

12  Judge Peck ruled below.

13        THE COURT:  Anything else?

14        MR. SLACK:  Yes.  I'm sorry, your Honor.  I'm just

15  getting a drink and taking a short break.

16        Your Honor, the second --

17        THE COURT:  Will you agree that it's sort of a very

18  peculiar trust where if I accept your argument, all of the

19  collateral of the trust is given by contract to another party

20  ahead of the beneficiary of the trust?  That's your argument,

21  isn't it?

22        MR. SLACK:  It is the argument, your Honor.

23        THE COURT:  That's kind of a peculiar trust, isn't it?

24        MR. SLACK:  I don't know whether it's a peculiar

25  trust.  What I can tell you, though, is that that's the way

04NMLEHC2

1    that that trust works.

2              THE COURT:  And that doesn't make it peculiar?

3              MR. SLACK:  I think, your Honor, this is not -- this

4    is not a peculiar structure in the world of these kinds of

5    swaps.  And the fact is is that you have a structure and you

6    have people buying into the structure where there are specific

7    rights that they have.  So one of the things that this trust

8    does, and it's very important, is the principal trust deed says

9    specifically, and you have it in 1.4 here, that third parties,

10   nonparties to the trust deed, do not have a right to sue under

11   the trust deed.

12             Now, remember the mini bondholders here are not

13   parties to the trust deed, and so under the plain terms of the

14   trust deed they have no right contractually to sue under it.

15             Now, again, the way these worked, your Honor, and I

16   apologize because we have jumped around in answering questions,

17   and I haven't really had the opportunity to lay this out, but

18   there was -- in the briefs that they filed they say there are

19   28 different series of these mini bonds.  The way that works

20   is, there was one principal trust deed and then there were

21   supplemental trust deeds for each of the other series.  And so

22   the way the contracts worked, the governing documents worked

23   for each of these series was you look at the principal trust

24   deed, you look at the supplemental trust deed, and those two

25   together are the contract that bound the parties here.

1        And the principal trust deed in 1.4 had the language

2    that specifically said and that Judge Peck below relied on,

3    that the mini bondholders as nonparties to not have a right to

4    sue under the principal trust deed or the supplemental trust

5    deed.

6        Section 6.2 of the supplemental trust deed states

7    specifically that, again, very similarly, a person who is not a

8    party to the tenth supplemental trust deed has no right under

9    the contracts, Right of Third Parties Act 1999, to enforce any

10   term of this tenth supplemental trust deed.  Again, what it

11   means is, your Honor, is that mini bondholders, as a matter of

12   contract, do not have a right to bring claims under the trust

13   deed.

14       Now, we have an independent argument, your Honor, that

15   the Court didn't reach below, but it was mentioned by the

16   plaintiffs, and I think it's worth going through.  If I could

17   have the next board.

18       THE COURT:  Why should we be addressing arguments that

19   the Court didn't reach below?  Why should we be addressing that

20   on appeal?

21       MR. SLACK:  The only reason is it's an independent

22   ground for your Honor to affirm.  And the fact is, your Honor,

23   that the court below --

24       THE COURT:  I want to hear from your colleague

25   shortly.  So if you want to spend the last remaining minutes --

04NMLEHC2

 1           MR. SLACK:  I've just got a couple of minutes and if I

 2    can go through this, I would appreciate it because the --

 3           THE COURT:  I'll give you three more minutes.  I have

 4    other matters on.  You are taking a lot of time with these

 5    demonstratives.  You could have handed me up a couple of pieces

 6    of paper.  The first one, believe it or not, I copied it out of

 7    the papers because it's the only way that I could understand,

 8    get an understanding of what the transaction was about, was to

 9    have a visual depiction of it.

10           But go ahead.  I want to hear from Mr. Sloane.

11           MR. SLACK:  I will take two minutes and then I will

12    turn it over, your Honor.

13           The sole basis for the plaintiff's claims are under

14    the principal trust deed.  What they say is they are entitled

15    to the money and for the first time they said something today

16    that they have never said at any other time, your Honor.

17           Below and in their complaint they never argued that

18    the swap was valueless, never argued it.  What they argued

19    below, and it's very important, your Honor, is there was a

20    specific provision in the trust deed that flipped -- if you

21    look in their complaint, which is paragraph 72 to about 78,

22    your Honor, they argued that the reason they were entitled to

23    is even though LBSF under the principal trust deed was entitled

24    to the money first, once they defaulted because of the

25    bankruptcy, there was a flip in the priority of payments.

1         And the trouble with that, your Honor, is, it's just

2    not true.  That's what they argued below.  So for the very

3    first time, not in their complaint, never argued below, they

4    just say it here, they say that the swap is valueless and

5    that's the reason.  You know what, that's not in their

6    complaint.  And, in fact, if you look at the principal trust

7    deed, we have it in our papers, your Honor, what you'll see is

8    that LBSF is entitled to a senior priority.  There is no flip

9    in the priority.

10        And so as a matter of what they have pled, your Honor,

11   the contract specifically says that even if you thought they

12   had standing that LBSF should win on each of the merits of the

13   three arguments.

14        THE COURT:  Does English law have any application to

15   the plaintiff's claim for constructive trust?

16        MR. SLACK:  I would argue, your Honor, that it is a

17   remedy that you still need -- and so English law does govern

18   the contracts and the contracts here say that the money goes to

19   LBSF.  Constructive trust is a remedy that this Court can

20   exercise.  And the one thing which we say in our papers again

21   which is important is where you have an actual trust you are

22   not allowed to get a constructive trust.  And so, again, we

23   think that claim fails on the law.  Whether or not they have

24   standing is an independent ground to affirm the decision below.

25        Thank you, your Honor.

04NMLEHC2

1          THE COURT:  Thank you, Mr. Slack.

2          MR. SLOANE:  Good afternoon, your Honor.  Howard G.

3   Sloane from Cahill Gordon & Reindel for all of the defendants

4   other than LBSF.

5          Your Honor, I don't have any demonstrative exhibits.

6   I do know, however --

7          THE COURT:  You are not arguing that plaintiff lacks

8   standing to sue the correctly named trust deed, are you?

9          MR. SLOANE:  Your Honor, I actually would argue that

10  except it's not part of this appeal.

11         The trust documents do not give them that right,

12  absent 20 percent making a written demand indemnification and

13  the like.  It was paragraph 18 of the trust documents.  But

14  what is on appeal is not that.

15         Let me just deal with your first question, your Honor,

16  that you posed to the plaintiffs.

17         First of all, Counts Four to Thirteen are not on

18  appeal at all as to anyone.  It's page 6, footnote 6 of their

19  brief.  They say they are not appealing the dismissal of Counts

20  Four and Thirteen.

21         THE COURT:  I know that.  In fact, I had to read

22  through about 17 or 18 pages of your brief to get to anything

23  that was relevant to this appeal.  I found it quite amazing

24  that you'd submit a brief in which the first 15 to 18 pages are

25  only telling me about what's not on appeal, what the plaintiffs

04NMLEHC2

1   have withdrawn or haven't pursued, as if it's some sort of

2   victory, without giving me anything about what the appeal was

3   about.

4           MR. SLOANE:  I apologize for that, your Honor, but I

5   think the effort --

6           THE COURT:  The old song is that you are supposed to

7   lead with your best argument first, aren't you?

8           MR. SLOANE:  Yes, your Honor.

9           THE COURT:  You want to keep the reader's attention.

10          MR. SLOANE:  Yes, your Honor.  Let me lead with my

11  best argument.

12          THE COURT:  That would be refreshing.

13          MR. SLOANE:  Standing is jurisdictional, your Honor.

14  The simple fact is, the trustee, which is HSBC Bank USA, N.A.,

15  is not a party to these proceedings and never has been.  So any

16  suggestion that the judge ruled something about their rights to

17  sue a party that was not a party is not part of this appeal.

18  It was not part of the decision below.

19          THE COURT:  But didn't the bankruptcy judge say that

20  it would be futile to amend to name the proper party trustee?

21          MR. SLOANE:  What the opinion below refers to, your

22  Honor, is the futility of amending to sue the issuer, which is

23  Pacific, your Honor.  And if you read the opinion, as I know

24  your Honor has, that's what he's talking about.  He's talking

25  about the right to amend to sue the issuer, Pacific.  And the

1   trust documents -- let me get right to your question.   In a

2   properly-brought proceeding against the proper trustee, there

3   would be other arguments about why they could not proceed or

4   should not be able, but that was not the decision below.   That

5   was not an issue below.   And it's respectfully not an issue on

6   this appeal.

7         Moreover, let me refer your Honor to specifically

8   Section 18 of the principal trust, which does not allow them to

9   stand in the shoes of the trustee, absent indemnification and

10  absent 20 percent of the noteholders making written demand, and

11  there is good and logical reasons for that.

12        The simple fact is that it requires a certain amount

13  of the noteholders to require the trustee to take action, and

14  the trustee must fail to take action.

15        I want to make two procedural points, your Honor,

16  which I think are important and should be important to the

17  Court.   First of all, your Honor referred to the Valucas

18  report.   The Valucas report is not part of the record on

19  appeal.   And the fact is that there are numerous cases in this

20  court and the Second Circuit, I won't bother to cite, that say,

21  you are confined to the record on appeal.

22        THE COURT:   My only reference to the report was in

23  response to Mr. Davis' comment that he had no discovery in this

24  case.

25        Let's go back to this futility question.   The

1    bankruptcy Judge Peck said, at page 22, line 3:  Plaintiffs

2    have requested leave to amend a complaint to name HSBC Bank

3    USA, N.A. as defendant.  That request is denied because for

4    reasons set forth in this ruling such an amendment would be

5    futile.

6              Why would that amendment be futile?

7              MR. SLOANE:  Your Honor, let me speak to that directly

8    first and let me go back to what he said later.

9              It would be futile, your Honor, because paragraph 18

10   of the trust document of the principal trust requires certain

11   things, certain procedural things to happen before such a claim

12   could be made.  And no one has suggested in any way, the

13   plaintiffs have not suggested in any way how they get around

14   that.

15             Moreover, let me say one point that Mr. Slack alluded

16   to but perhaps didn't emphasize as much as I would.  The case

17   law in the Second Circuit makes clear that you don't just say

18   I'd like to amend my complaint.  What you need to do is you

19   need to offer an amended complaint.  You need to make a motion.

20   And the case which I would cite is a case I argued against the

21   same plaintiff's counsel called Malin v. XL Corporation in

22   which the Second Circuit made specific reference to the failure

23   to offer amended complaints both below and as part of the

24   appeal.  It's 312 F. App. 400 at 403.  And there are other

25   cases, your Honor, including the Pakini case, which is 133 F.3d

04NMLEHC2

1    907.

2         The reason for that is not some minor procedural

3    point, your Honor.  The reason is that the courts are allowed

4    to look and should be looking at what it is you actually are

5    going to say your amended pleading will recite so the Court can

6    determine futility.

7         To answer your question directly, your Honor, the

8    futility is precisely because the principal trust document does

9    not give them that right, and the principal trust document is

10   the key document here.  It's not English law, at least as to

11   our claim or our defense.  It's a basic contract claim.

12        I would also note, your Honor, that all this stuff

13   about futility depends upon this concept of conflict or

14   something else.  The fact is, HSBC Bank USA, N.A., acting as

15   trustee, has filed a proof of claim in the bankruptcy.  So the

16   suggestion that we have taken no action, that we are sitting

17   back on our hands, is patently false based upon the actions

18   that have been taken at the time and shortly before the time we

19   made our arguments on the appeal.

20        I would also point out, your Honor, one other thing,

21   which is that we moved on numerous grounds, moved on numerous

22   grounds, including jurisdiction grounds, foreign non grounds,

23   standing grounds, et cetera.  In the bankruptcy court's opinion

24   the judge says, he grants the motion based upon all the

25   arguments and all of the grounds.  Now, he doesn't discuss

04NMLEHC2

1   them.  He doesn't discuss them.  But he does incorporate those

2   arguments into his ruling.

3        THE COURT:  I guess you'll argue anything.  Bankruptcy

4   Judge Peck didn't even mention them.  I was amazed that you

5   would make that point in your brief, Mr. Sloane, that the

6   bankruptcy judge dismissed on personal jurisdiction and forum

7   non conveniens grounds because he made an oblique reference to

8   grounds in your motion papers and that's it, just a single line

9   from the bench?

10        MR. SLOANE:  Your Honor, they were extensively briefed

11   and extensively argued.

12        THE COURT:  The bankruptcy judge didn't even use the

13   words forum non conveniens.

14        MR. SLOANE:  That's correct, your Honor.

15        THE COURT:  But you stated in your brief that he

16   decided on that issue.  I think that kind of advocacy, quite

17   frankly, is ill-advised to a district judge.  I went back and

18   looked again.  I thought I must have missed something.  I found

19   out I didn't miss anything.  I was being misled.

20        MR. SLOANE:  Your Honor, may I go on with one other

21   point?

22        THE COURT:  Yeah.

23        MR. SLOANE:  I started by saying, your Honor, you

24   asked the question about what the judge said in the first part

25   of the opinion.  If you actually go through the opinion, he

04NMLEHC2

1    says at page 24, for example:  None of the holders of notes

2    shall be entitled to proceed directly against the issuer.

3    That's what he's referring to.  And I think throughout the

4    opinion he's referring to claims that could be asserted against

5    Pacific, which is the issuer of the notes, not to a nonparty

6    who is HSBC Bank USA, N.A.

7             Your Honor, I don't have anything further.

8             THE COURT:  But if the complaint had pled and named

9    the proper party as the trustee, could you make that argument?

10            MR. SLOANE:  Your Honor, we would make the same

11   argument about paragraph 18 as was mentioned earlier, which is

12   that absent the indemnity and absent the 20 percent, they don't

13   have any rights.

14            THE COURT:  Mr. Davis, anything further?

15            MR. DAVIS:  One minute.

16            THE COURT:  One minute is fine.

17            MR. DAVIS:  What's happened here, Judge, is two very

18   sophisticated institutions create a trust to borrow a lot of

19   money from a lot of people and now they don't want to pay it

20   back.  What's clear is that under the principles of trust law,

21   English trust law, plaintiffs have standing and plaintiffs

22   respectfully request leave to file the amended complaint.

23            Aside from that, the Court understands the issue.

24            THE COURT:  Counsel.  Thank you for your arguments.

25   Decision reserved.  I'll issue an opinion in this matter.

04n6leha

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | SOUTHERN DISTRICT OF NEW YORK |
| 2 | - - - - - - - - - - - - - - - - - - - - - - - - - -x |
| | IN RE: LEHMAN BROTHERS |
| 3 | HOLDINGS, INC., |

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     IN RE: LEHMAN BROTHERS
 3   HOLDINGS, INC.,
                                         10 CV 17(WHP)
 4   ------------------------------x
                                         New York, N.Y.
 5                                       April 23, 2010
                                         3:00 p.m.
 6
     Before:
 7
                         HON. WILLIAM H. PAULEY III,
 8
                                              District Judge
 9
                             APPEARANCES
10
     ROBBINS GELLER RUDMAN & DOWD, LLP
11        Attorneys for Plaintiffs
     BY:  JASON C. DAVIS
12        LUKE BROOKS
13
     GENOVESE JOBLOVE & BATTISTA
14        Attorneys for Plaintiffs
     BY:  ROBERT F. ELGIDELY
15
     WEIL, GOTSHAL & MANGES, LLP
16        Attorneys for Defendants
     BY:  RICHARD SLACK
17        ROBERT VELEVIS
18   CAHILL GORDON & REINDELL, LLP
          Attorneys for Defendants
19   BY:  HOWARD G. SLOANE
          PATRICIA FARREN
20
21   MILBANK, TWEED, HADLEY & McCLOY, LLP
          Attorneys for Official Intervenor
22   BY:  ROBERT J. LIUBICIC
23
24
25
```

1   them. He doesn't discuss them. But he does incorporate those

2   arguments into his ruling.

3           THE COURT:  I guess you'll argue anything. ~~He~~ didn't            *Bankruptcy Judge Peck*

4   even mention them. I was ~~rather~~ amazed that you would make

5   that point in your brief, Mr. Sloane, that the bankruptcy judge

6   ~~decided~~ DISMISSED on personal jurisdiction and forum non conveniens

7   grounds because he made ~~a~~ AN oblique reference to grounds in ~~the~~ YOUR motion

8   papers and that's it, ✓YET ~~in~~ a single line ~~on~~ FROM the bench?

9           MR. SLOANE:  Your Honor, they were extensively briefed

10  and extensively argued.

11          THE COURT:  The bankruptcy judge didn't even use the

12  words forum non conveniens.

13          MR. SLOANE:  That's correct, your Honor.

14          THE COURT:  But you ~~put on~~ STATED IN your brief that he decided

15  on that issue. I think that ~~that~~ kind of advocacy, quite

16  frankly, is ~~really~~ ill-advised to a district judge. I went

17  back and looked again. I thought I must have missed something.

18  I found out I didn't miss anything. I was being misled.

19          MR. SLOANE:  Your Honor, may I go on with one other

20  point?

21          THE COURT:  Yeah.

22          MR. SLOANE:  I started by saying, your Honor, you

23  asked the question about what the judge said in the first part

24  of the opinion. If you actually go through the opinion, he

25  says at page 24, for example:  None of the holders of notes

# EXHIBIT E

# DOC # 130

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

LEHMAN BROTHERS HOLDINGS INC., et al.,

    Debtors.

————————————————————— x

————————————————————— x

LEHMAN BROTHERS SPECIAL FINANCING
INC.,

    Plaintiff,

  -against-

BNY CORPORATE TRUSTEE SERVICES
LIMITED,

    Defendant.

————————————————————— x

Chapter 11
No. 08-13555 (JMP)

Adversary Proceeding
No. 09-01242 (JMP)

## DECISION AND ORDER GRANTING BNY CORPORATE TRUSTEE
## SERVICES LIMITED'S MOTION FOR LEAVE TO APPEAL

McMahon, J.:

### INTRODUCTION

  BNY Corporate Trustee Services Limited ("BNY") moves for leave to appeal the July 19,

2010 order (the "Order") of the United States Bankruptcy Court for the Southern District of New

York (Hon. James M. Peck) (the "Bankruptcy Court") granting summary judgment for Lehman

Brothers Special Financing Inc. ("LBSF"). Judge Peck's Order memorialized his memorandum

decision of January 25, 2010, which he described as "break[ing] new ground as to unsettled

subject matter" and likely to be "controversial." Lehman Bros. Special Fin. Inc. v. BNY

Corporate Tr. Servs. Ltd., 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010) ("LBSF"). For the reasons

set forth herein, BNY's motion for leave to appeal is granted.

Copies mailed/faxed/handed to counsel on 9/29/10

## BACKGROUND

On September 18, 2008, Lehman Brothers Holdings Inc. ("LBHI"), one of the largest

investment banks in the U.S. at the time, filed for chapter 11 bankruptcy protection in the

Bankruptcy Court. LBSF, 422 B.R. at 411. Eighteen days later, on October 3, 2008, LBSF, an

LBHI subsidiary, filed its chapter 11 petition in the Bankruptcy Court. Id. at 413.

On May 20, 2009, LBSF initiated this adversary proceeding (the "Adversary

Proceeding") against BNY. Id. at 411. The Adversary Proceeding arises out of a complex series

of synthetic collateralized debt obligations ("CDOs") and related credit default swaps, and has

been further complicated by the pendency of parallel and potentially conflicting legal

proceedings in the United Kingdom (the "English Litigation").

The facts relevant to today's decision are not in dispute, and are set forth below. For

additional background information regarding the underlying structured financial transaction, the

English Litigation and the proceedings in the Bankruptcy Court, the reader should refer to the

Bankruptcy Court's January 25, 2010 decision, see id. at 410-14.

## I.    The Underlying Transaction

The Adversary Proceeding involves two series of credit-linked synthetic portfolio notes

(the "Notes") that are now held by non-party Perpetual Trustee Company Limited ("Perpetual"),

an Australian company. LBSF, 407 B.R. at 410, 413. The Notes were secured by various assets

and certain secured obligations (the "Collateral"), including credit default swap transactions

between LBSF and the issuer of the Notes (a special-purpose vehicle created by Lehman

Brothers International (Europe) called Saphir Finance Public Limited Co. ("Saphir")). Id. at

412-13. The Collateral was held by BNY in trust for creditors of Saphir, including LBSF (as

2

swap counterparty) and Perpetual (as the noteholder). Id. at 413. LBHI was the credit support

provider for LBSF's payment obligations under the swap agreements. Id. at 411.

Pursuant to the terms of the Transaction Documents, LBSF's interest in the Collateral

ordinarily takes priority over Perpetual's interest—this is called "Swap Counterparty Priority."

Id. at 413. However, in the event of a default by LBSF under a swap agreement, the Transaction

Documents provide for a "flip" from Swap Counterparty Priority to "Noteholder Priority," such

that Perpetual receives payments *before* LBSF. Id. Among the events of default under each of

the swap agreements are a filing in bankruptcy of any party to the transaction, including LBSF or

LBHI. See id.

On December 1, 2008, after LBHI and LBSF had separately filed for bankruptcy, Saphir

exercised its right to terminate the swap agreements, obligating it to redeem the Notes. Id. at

413-14. The question in this Adversary Proceeding is whether the Swap Counterparty Priority or

Noteholder Priority distribution scheme applies—i.e., whether Perpetual or LBSF has priority in

the payment of proceeds to satisfy Saphir's obligations. BNY holds the Collateral that is subject

to these competing claims.

## II.    The English Litigation

On May 13, 2009, Perpetual filed an action against BNY in the High Court of Justice,

Chancery Division (the "High Court"), seeking an order requiring BNY to pay it in accordance

with Noteholder Priority. LBSF, 422 B.R. at 410. One week later, LBSF intervened in the

English Litigation. Id. at 411. After a trial, the High Court (applying English law) ruled in favor

of Perpetual, holding, *inter alia*, that Noteholder Priority became effective on September 15,

2008, when LBHI filed for bankruptcy. See Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs.

Ltd., [2009] EWHC 1912, 2009 WL 2221998.

LBSF appealed the High Court's judgment. LBSF, 422 B.R. at 412. On November 6, 2009, the English Court of Appeal unanimously affirmed the High Court, finding, *inter alia*, that the event "triggering" the flip from Swap Counterparty Priority to Noteholder Priority "was LBHI filing for Chapter 11 which occurred on 15 September 2008, some 18 days before LBSF filed for Chapter 11." Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd., [2009] EWCA (Civ) 1160, ¶ 69, 2009 WL 3643805.

On March 31, 2010, the Supreme Court of the United Kingdom agreed to hear LBSF's appeal. (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J.) BNY asserts, and LBSF does not dispute, that a hearing is scheduled to take place in March 2011, and that an opinion is expected to issue sometime in late 2011.

## III.    The Adversary Proceeding

### A.    LBSF's Complaint

On the same day it intervened in the English Litigation, LBSF initiated the instant Adversary Proceeding against BNY. LBSF, 422 B.R. at 411.[1] Count I of LBSF's two-count Complaint seeks a declaratory judgment that the contractual provisions modifying LBSF's payment priority upon an event of default "constitute unenforceable *ipso facto* clauses" that violate the Bankruptcy Code, 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that, as a result, "LBSF is entitled to payment under Swap Counterparty Priority." (LBSF, No. 09-01242 (JMP), Docket No. 1 at 10.) Count II seeks a declaratory judgment that any action to enforce such provisions "constitutes a willful violation of the automatic stay under [Bankruptcy Code] section 362(a)(3)." (Id. at 11.)

---

[1] On June 22, 2009, BNY moved to dismiss, arguing that Perpetual is an "indispensable party" under Federal Rule of Civil Procedure 19. LBSF, 422 B.R. at 411. The Bankruptcy Court found that BNY had the capacity to adequately represent Perpetual's interests in the litigation, and denied the motion. Id.

### B.    Inter-Court Communication

From the start, "[t]he interplay between [the Adversary Proceeding] and the English

Litigation has been obvious . . . , and both [the Bankruptcy] Court and the English Courts have

been aware of the potential for conflicting rulings due to differences in the law being applied."

LBSF, 422 B.R. at 411. Judge Peck and the parties agreed that the Bankruptcy Court should

"communicat[e] with the High Court regarding coordination of and cooperation with respect to

the litigation here and in London." See id. at 412; see also 11 U.S.C. § 1501 et seq. (providing

for cooperation and direct communication between U.S. and foreign courts in cases of cross-

border insolvencies).

Numerous such inter-court communications have occurred. For example, after LBSF and

BNY cross-moved for summary judgment, Judge Peck wrote to the High Court, requesting that it

not make any final disposition until "I am able to consider and rule on the United States

bankruptcy law issues raised in the summary judgment briefing" and stating that, "Once I have

considered and ruled on the issues in the Adversary Proceeding, I intend to communicate further

with your Lordship in an attempt to reach a coordinated result in light of each Court's ruling."

(LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. A at 2.)

The High Court responded that it "look[ed] forward to receiving [the Bankruptcy

Court's] rulings in due course and any further requests," and that it welcomed "further co-

operat[ion]." (Id. Ex. B at 2.) After the English Court of Appeal affirmed the High Court on

November 6, 2009, the High Court sent another letter to the Bankruptcy Court, requesting that it

not enter an order that would conflict with the Court of Appeal's judgment—specifically, that the

Bankruptcy Court "not . . . make any order which would either (a) require BNY to act in any

particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or

deal in any particular way with the collateral or its proceeds, until . . . further communication has taken place between the US and English courts." (Id. Ex. D at 2); see LBSF, 422 B.R. at 412.

## C.    The Bankruptcy Court's Memorandum Decision

On January 25, 2010, the Bankruptcy Court issued a "Memorandum Decision Granting Motion for Summary Judgment and Declaring Applicable Payment Priorities." LBSF, 422 B.R. 407, 410. Judge Peck's opinion granted summary judgment to LBSF, holding that "the provisions in the Transaction Documents purporting to modify LBSF's right to a priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses" under 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that "any attempt to enforce such provisions would violate the automatic stay" under § 362(a). Id. at 420-21. Judge Peck indicated that he would enter a declaratory judgment memorializing the decision. Id. at 422.

At the outset of his opinion, Judge Peck confronted BNY's argument that, pursuant to principles of comity and res judicata, the Bankruptcy Court should defer to the English courts' determinations that LBHI's chapter 11 filing on September 15, 2008 was the trigger event for the flip in payment priorities. Id. at 416. Judge Peck declined to afford preclusive effect to the English judgments because he concluded that the English courts had not taken into account the relevant provisions of U.S. bankruptcy law, which afford debtors broader protections than those available under applicable foreign law. Id. at 417-18.

Judge Peck ultimately reached the scope of the *ipso facto* protections provided by §§ 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code. Those sections prohibit the modification of a debtor's right solely because of a provision in an agreement conditioned on "the commencement of *a case* under this title." 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B) (emphasis added).

6

Relying on his interpretation of the legislative history and "plain meaning" of these *ipso facto* provisions, Judge Peck held that they apply to contract terms conditioned on the commencement of "presumably any [bankruptcy] case that is related in some appropriate manner to the contracting parties." LBSF, 422 B.R. at 419. Judge Peck acknowledged that this interpretation was unprecedented, stating that, "No case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself but may be a case filed by a related entity." Id. at 422. He further admitted that his interpretation of the Bankruptcy Code's *ipso facto* provisions as applying "to cases filed by debtors other than the counterparty itself has the potential of opening up a proverbial 'can of worms' that may lead to speculation as to the nature and degree of the relationship between debtors that is needed in order to properly apply the provision." Id. at 419.

Judge Peck then applied his novel statutory interpretation to the circumstances at hand, and concluded that the separate bankruptcy filings of LBHI and its affiliates, including LBSF, constituted "a singular event" for *ipso facto* purposes—but not for purposes of "any other legal determination that may relate to the date of commencement of a case." Id. at 420. Accordingly, Judge Peck held that LBHI's petition "entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code." Id.

### D. Further Communication with the High Court

At the close of his decision, Judge Peck reiterated that "[the] situation . . . calls for the parties, this Court and the English Courts to work in a coordinated and cooperative way to identify means to reconcile the conflicting judgments," and "direct[ed] that the parties attend a

status conference to be held . . . for purposes of exploring means to harmonize the decisions of this Court and the English Courts." LBSF, 422 B.R. at 423.

After the status conference on February 19, 2010, Judge Peck wrote to the High Court, with the parties' consent, explaining that: "I limited my ruling so as to award only a declaratory judgment as to the nature of United States bankruptcy law on th[e] issue [of whether 'a shift in payment priority to favor Perpetual based on the bankruptcy filings of either LBSF or its corporate parent, [LBHI], would violate the *ipso facto* prohibitions of the United States Bankruptcy Code']. I have not entered an order requiring BNY to tender the collateral to LBSF at this time. Prior to entering any such order, I wish first to communicate with your Lordship in an effort to reach a coordinated resolution of these matters." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. G at 1.) Judge Peck "request[ed] that Your Lordship recognize and give effect to my January 25, 2010 declaratory judgment in the cases pending before you in a manner that you deem appropriate." (Id. at 2.)

On March 10, 2010, and again on March 31, the date the English Supreme Court accepted LBSF's appeal, the High Court responded, stating that it was "not proposing to have any further hearings pending the outcome of the appeal," and that "the position under English law is unclear until the appeal is decided." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J at 1.)

### E.    The Bankruptcy Court's July 19, 2010 Order

On July 19, 2010, the Bankruptcy Court entered an Order memorializing its January 25 decision in favor of LBSF. In the months following the decision, LBSF had opposed the entry of any such order, forcing BNY to move for the entry of an order. (See Decl. of Randy M. Mastro in Supp. of Mot. of BNY for Leave to Appeal, Aug. 2, 2010 ("Mastro Decl."), Ex. H;

8

LBSF, No. 09-01242 (JMP), Docket No. 90.) At the June 30, 2010 hearing on BNY's motion,

Judge Peck stated:

> It was never my contemplation, given the existing communication that took place between this Court and the High Court in London, that I was setting up a multiyear double-blind appellate process. It was, in fact, my view that I was simply entering a memorandum decision that was, at that point, regardless of the form of order, interlocutory in nature. . . . I am anxious to maintain the cooperative posture with my colleagues in the UK and to be in a position to try to ameliorate the potentially conflicting aspects of applying the law.

(LBSF, No. 09-01242 (JMP), Docket No. 99 at 55.) Ultimately, at the conclusion of the hearing,

Judge Peck decided to enter an order, "because it will at least get us past this episode in the

litigation." (Id. at 56.)

Accordingly, a few days later, Judge Peck entered an Order granting LBSF's motion for

summary judgment and ordering that:

> the contractual provisions . . . that purport to modify LBSF's payment priority as a result of its chapter 11 filing and the chapter 11 filing of LBSF's corporate parent, [LBHI], are unenforceable *ipso facto* clauses under United States Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B), and any action to enforce such provisions is prohibited by the automatic stay under Bankruptcy Code section 362(a).

(Mastro Decl. Ex. A at 3-4.) The Order further stated that "in view of this Court's expectation

that further coordination and communication between the High Court and this Court shall take

place," it is

> ORDERED that, consistent with the statements made by the Court on the record of the hearing on June 30, 2010, this Order is interlocutory; and it is further
>
> ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

(Id.) BNY's motion for leave to appeal the Order followed.

## DISCUSSION

BNY first asserts that the Bankruptcy Court's Order is final and therefore appealable as of right pursuant to 28 U.S.C. § 158(a)(1). However, most of the space in BNY's papers is spent arguing that, even if the Order is not final, the Court should grant BNY leave to appeal the Order on an interlocutory basis pursuant to § 158(a)(3).

The Court will assume, without expressly deciding, that Judge Peck's self-styled "interlocutory" Order is, in fact, not final. The Court does so because, as explained below, it is readily apparent that the Order satisfies the requirements for granting an interlocutory appeal. Accordingly, the Court grants BNY's motion for leave to appeal.

## I.   The Bankruptcy Court's Order Warrants Interlocutory Appeal

Appeals from non-final bankruptcy court orders may be taken pursuant to 28 U.S.C. § 158(a)(3). In deciding whether to grant leave to appeal, reviewing courts apply the standards of 28 U.S.C. § 1292(b), which governs interlocutory appeals from district court orders. See, e.g., In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).

Interlocutory review is warranted under § 1292(b) if (1) the order being appealed "involves a controlling question of law," (2) there is "substantial ground for difference of opinion" as to that question, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As the Second Circuit has cautioned, "use of this certification procedure should be strictly limited because 'only 'exceptional circumstances' [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" In re Flor, 79 F.3d 281, 284 (2d Cir. 1996) (quoting Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir.1990)). "The

decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion." In re Enron Corp., 2006 WL 2548592, at *3.

Here, LBSF concedes that the Bankruptcy Court's Order involves controlling questions of law. (LBSF's Mem. in Opp'n to BNY's Mot. for Leave to Appeal, Aug. 16, 2010 ("LBSF Mem."), at 32.)  For the reasons discussed below, the second and third prongs of § 1292(b) are also satisfied.

### A.    There Is Substantial Ground for Difference of Opinion

Substantial ground for difference of opinion "must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard." In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006).  The substantial ground requirement may be met when there is conflicting authority on the issue, id., or the issue is "difficult and of first impression" in this Circuit, Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990).  Indeed, "When a controlling question of law presents an issue of first impression, permission to appeal is often granted." In re Enron Creditors Recovery Corp., No. 01-16034, 2009 WL 3349471, at *6 (S.D.N.Y. Oct. 16, 2009).  However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." In re Flor, 79 F.3d 281, 284 (2d Cir. 1996).  The district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." Id. (internal quotations and citation omitted).

Judge Peck's decision resolved a difficult, dispositive legal question of first impression. He forthrightly acknowledged that his unprecedented ruling—which he predicted would be "controversial"—was the "first such interpretation of the *ipso facto* language" in the Bankruptcy

11

Code. LBSF, 422 B.R. at 422. He stated that he was not aware of any case that "has ever

declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy

case by the debtor-counterparty itself." Id. Indeed, prior cases in this and other circuits appear

to assume—albeit in circumstances that are factually distinguishable—that the Bankruptcy

Code's *ipso facto* provisions invalidate clauses that condition an event of default on the

contracting party's *own* bankruptcy filing. See, e.g., In re Chateaugay Corp., No. 92 CIV.

7054(PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (interpreting §§ 365(e)(1) and

§ 541(c) as "render[ing] unenforceable contract provisions that altered the rights or obligations

of a debtor as a result of the *debtor's* commencement of a case under the Bankruptcy Code"

(emphasis added)); accord, e.g., In re EBC I, Inc., 356 B.R. 631, 640 (Bankr. D. Del. 2006)

(describing *ipso facto* clauses as provisions "by which a contract is terminated as a result solely

of the debtor's insolvency or bankruptcy").

 In short, Judge Peck's decision involved a difficult question of first impression in this

(and, apparently, any other) Circuit. That is enough to establish substantial ground for difference

of opinion. See, e.g., Klinghoffer, 921 F.2d at 25; In re Trace Int'l Holdings, Inc., No. 04 Civ.

1295(KMW), 2009 WL 3398515, at *3 (S.D.N.Y. Oct. 21, 2009); Republic of Colom. v. Diageo

N. Am., Inc., 619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007).

 Furthermore, BNY has pointed to numerous legal and other commentaries questioning

the correctness of Judge Peck's ruling. See, e.g., Latham & Watkins LLP, Client Alert, The

"Flip" Flap: Lehman Bankruptcy Judge Invalidates Payment Priority Clause, at 4 (May 13, 2010)

(Decl. of Randy M. Mastro in Further Supp. of Mot. by BNY for Leave to Appeal, Aug. 23,

2010 ("Mastro Reply Decl."), Ex. B) ("[T]his decision is troubling for a number of reasons

. . . ."); Hunton & Williams LLP, Client Alert, Bankruptcy Court Rules for Lehman on Flip

Clause, at 2 (Feb. 2010) (Mastro Reply Decl. Ex. A) ("[W]e believe that there are significant arguments that the decision is wrong in a number of respects."); Cleary Gottlieb Steen & Hamilton LLP, Alert Memo, Lehman Bankruptcy Court Holds That CDO Provision Subordinating Swap Termination Payments to Lehman Is Unenforceable, at 5 (Jan. 26, 2010) (Mastro Reply Decl. Ex. C) ("This case . . . creates significant uncertainty regarding which contractual provisions constitute unenforceable *ipso facto* clauses under the Bankruptcy Code.").

LBSF meekly responds, citing a single article, that the commentary on the Bankruptcy Court's decision has, in fact, been "mixed." (LBSF Mem. at 40 n.11.) But even that lone article, which predicts that Judge Peck's decision will be upheld on appeal, supports BNY's position that an interlocutory appeal is warranted—it highlights the "groundbreaking nature" of Judge Peck's ruling, and warns of the possibility that "savvy guarantors will soon begin to use the 'related entity bankruptcy' ploy as a means of invalidating *ipso facto* cross-corporate default provisions." Dan Schechter, Debtor's Prepetition Loss of Priority Under Springing Subordination Agreement Triggered by Parent Corporation's Bankruptcy Filing Is Unenforceable Ipso Facto Provision, 2010 Com. Fin. Newsl. 16 (2010). Moreover, even if LBSF were correct that mainstream views are "mixed," that is consistent with the conclusion that "substantial ground for difference of opinion" exists.

In sum, the Court concludes that there is substantial ground for difference of opinion over whether Judge Peck applied the correct legal standard in reaching his decision that LBHI's bankruptcy filing entitled LBSF to claim the protections of the *ipso facto* provisions. Thus, the Bankruptcy Order satisfies the second element required by § 1292(b) for interlocutory appeal.

**B.    Review Will Materially Advance the Ultimate Termination of the Litigation**

The third prong of the § 1292(b) analysis is whether immediate review of the Bankruptcy Court's order "may materially advance the ultimate termination of the litigation." This prong, like the other two, is satisfied.

Judge Peck's decision resolved controlling questions of law that may dispose of the ultimate issue in this Adversary Proceeding—that is, whether Swap Counterparty Priority or Noteholder Priority applies. Accordingly, immediate review of his ruling will materially advance the ultimate termination of the litigation. See In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *8 (S.D.N.Y. Sept. 5, 2006) (finding that "[t]he third prong is easily met" where, as here, "granting leave to appeal . . . may result in the disposition of the Adversary Proceedings in their entirety").

Nor do there appear to be any factual disputes that might impede this Court's review of the Bankruptcy Court's decision. As Judge Peck noted at the outset of his opinion, "The parties acknowledge that there are no genuine issues of material fact and that the questions presented purely involve the application of relevant provisions of the Bankruptcy Code to undisputed facts." LBSF, 422 B.R. at 413.

LBSF, in arguing that immediate review of Judge Peck's Order would *not* materially advance this litigation, relies exclusively on the pendency of the proceedings in England. It asserts that an interlocutory appeal would actually *prolong* the ultimate termination of the litigation because "[t]he Bankruptcy Court would be precluded from effectively communicating with the English court until BNY's appeals are exhausted," and that no such appeal should go forward because it might be rendered "moot" by the final result in the English Litigation. (LBSF Mem. at 38.)

14

These contentions are easily discounted. LBSF cannot credibly claim that an immediate

appeal would delay the ultimate termination of the litigation when LBSF is apparently (if not

expressly) taking the position that U.S. courts should essentially do *nothing* while waiting for the

English Litigation to run its course. LBSF's assertion that the English Litigation could somehow

"moot" any appeal is somewhat puzzling, particularly in light of LBSF's view (adopted by the

Bankruptcy Court) that U.S. bankruptcy law governs the dispute.

In the end, it is not difficult to see LBSF's arguments for what they really are: an attempt

to use the English proceedings to insulate Judge Peck's decision from appellate review for as

long as possible. For many months, LBSF opposed the entry of any order memorializing the

Bankruptcy Court's decision; now, it vigorously seeks to forestall any review. LBSF's efforts to

shield Judge Peck's unprecedented and—for LBSF—extremely favorable decision from review

are, of course, not surprising; indeed, LBSF does not deny that, since the decision was handed

down, it has used it as leverage in settlement negotiations concerning billions of dollars worth of

similar transactions. LBSF's desire to insulate Judge Peck's ruling from appellate scrutiny only

further demonstrates the need for immediate review.

For the reasons set forth above, the Court concludes that the Bankruptcy Court's Order

satisfies the third and final requirement for an interlocutory appeal.

### C.    Extraordinary Circumstances Are Present

The Bankruptcy Court's Order not only meets the § 1292(b) test on its face; it also

presents precisely the sort of "extraordinary circumstances" that warrant an interlocutory appeal.

Judge Peck's decision is of obvious and critical importance to the LBHI bankruptcy, as it

could allow LBSF to recover billions of dollars from various other structured finance deals that

would otherwise be distributed to noteholders. Beyond the LBHI bankruptcy—which is itself a

15

massive and extraordinary proceeding—Judge Peck's interpretation of the Bankruptcy Code's *ipso facto* provisions has potentially far-reaching ramifications for the international securities markets, and has triggered significant uncertainty in the financial community. *See, e.g.,* Aline van Duyn & Nicole Bullock, <u>Lehman Ruling Creates New Doubts for CDOs</u>, Fin. Times, Feb. 9, 2010 (Mastro Decl. Ex. C) (stating that "uncertainty looms" as a result of the Bankruptcy Court's Decision, and that the ruling "may turn the conventional wisdom which has driven many of these deals on its head"); Andrew Cavenagh, <u>Dante's Inferno</u>, FTSE Global Markets, June 2010 (Mastro Decl. Ex. J), at 14-18 ("[A]ttempts to revive securitisation in the US and Europe are hamstrung by doubts over whether a fundamental historical tenet of the business—that securitised bonds are protected from the bankruptcy of the deal's participants—will withstand legal scrutiny."). Indeed, at the June 30, 2010 hearing on BNY's motion for entry of an order embodying the Bankruptcy Court's decision, Judge Peck "recognize[d] the importance" of his ruling "to parties who are not in the room, including . . . market participants who are looking at the risks of securitization transactions in light of the consequences of the *ipso facto* clause as I have interpreted those consequences." (<u>LBSF</u>, No. 09-01242 (JMP), Docket No. 99 at 53-54.)

LBSF essentially acknowledges that Judge Peck's decision upset market expectations, but counters that "it is perfectly appropriate for a court to upset those expectations if they are contrary to the law." (LBSF Mem. at 40.) That may be. And to be clear, this Court is not suggesting that the financial community's reaction to Judge Peck's decision necessarily casts doubt on its *legal* correctness.[2] But the decision's potentially game-changing effect on the structured finance business *does* militate in favor of reviewing the decision *now*—not months, or even years, from now.

---

[2] Nor, for that matter, should anything in today's decision be interpreted as indicative of whether this Court will or will not uphold Judge Peck's decision; the Court expresses no opinion on the merits of BNY's appeal.

In sum, having found that the Bankruptcy Court's Order meets the requirements of

§ 1292(b) and presents extraordinary circumstances warranting an interlocutory appeal, the Court

holds that immediate review of Judge Peck's decision is appropriate.

## CONCLUSION

For the reasons set forth above, BNY's motion for leave to appeal the Bankruptcy

Court's July 19, 2010 Order is granted.  The parties must appear on Friday, October 1, 2010, at

12:30 p.m., for a conference to set an expedited briefing schedule for the appeal.

Dated: September 20, 2010

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

17

# EXHIBIT F

**MOVING FORWARD TOGETHER WITH OUR CUSTOMERS**

**A PROPOSAL RELATING TO THE FINAL RESOLUTION OF CERTAIN SERIES OF LEHMAN
BROTHERS MINIBONDS**

We, the sixteen Distributing Banks (the "Banks" or the "Distributing Banks") of Lehman Brothers
Minibonds ("Minibonds") issued by Pacific International Finance Limited (the "Issuer"), have
been working towards a satisfactory outcome for the recovery of the Minibond collateral, and
announce today a final resolution proposal for **Series 10 to 12, 15 to 23 and 25 to 36** of the
Minibonds (the "Relevant Series" or the "Relevant Minibonds").

Following the offer of a repurchase scheme of Minibonds announced on 22 July 2009
("Repurchase Scheme"), we committed to assist in and to expedite the recovery of the collateral
for, among other outstanding Minibonds, the Relevant Minibonds ("Collateral") by HSBC Bank
USA, N.A., the trustee for the Minibonds (the "Trustee").  The Trustee had already appointed
Messrs. Ted Osborn, Anthony Boswell and Jan Blaauw, partners of PricewaterhouseCoopers
Hong Kong as receivers (the "Receivers") for the Collateral.

**COLLATERAL RECOVERY**

The Receivers separately announced today that a conditional agreement among Lehman
Brothers Special Financing Inc. ("Lehman Brothers"), the Receivers (as agents of the Issuer and
without personal liability), the Trustee and others has been reached to settle opposing claims
asserted by Lehman Brothers in respect of the Collateral.  The Receivers advised that the
agreement will, upon it becoming unconditional, enable investors of Relevant Minibonds to
recover between **70% and 93%** of the amounts they invested.  Investors should note that the
level of recovery for each tranche of the Relevant Minibonds is different. The actual distribution
to each investor (the "Recovery Payment") will depend on the specific circumstances of the
investor as illustrated under "Payment Examples" below.  Investors should also refer to the
Receivers' announcement for further details.

After extensive negotiations with Lehman Brothers, the Receivers believe that the proposed
level of recovery represents the best possible outcome for investors of Relevant Minibonds given
the legal uncertainty surrounding the priority of competing claims over the Collateral.  The
agreement allows the Receivers and the Trustee to avoid the risks and uncertainty of prolonged,
complex and costly litigation with Lehman Brothers and other parties.  Accordingly, the
Receivers recommend the proposed arrangements with Lehman Brothers.

The agreement is subject to two conditions.

Firstly, the agreement is conditional on the US Bankruptcy Court confirming that its previous
orders which lay down procedures for Lehman Brothers to enter into settlements in respect of
claims arising under certain derivatives contracts apply to settlements relating to the Collateral.
The Receivers have confirmed that an application will be made by Lehman Brothers to the US
Bankruptcy Court on 29 March 2011 for this purpose.

Secondly, the agreement is conditional on the passing of extraordinary resolutions for each and
every Relevant Series.  The Issuer will convene a meeting for each Relevant Series which can
only be attended by persons who hold a beneficial title in the Relevant Minibonds.  If investors
have transferred the beneficial title in their Minibonds to their Bank pursuant to either the
Repurchase Scheme or some other settlement with their Bank, their Bank will participate and
vote in such noteholder meetings.  Each Distributing Bank has, based on the information
available to it today, individually decided to accept the Receivers' recommendation for the
Relevant Minibonds owned by it and will vote in favour of the extraordinary resolutions at the
noteholder meetings so that this matter can be resolved in a way which maximizes the benefits
to investors within a reasonable timeframe.

**Distributing Banks' Voluntary Initiative – the Ex Gratia Payment Scheme and Expenses Funding Agreement**

*Distributing Banks to make Ex Gratia Payment to Eligible Customers*

In addition to the Collateral recovery amount, as a goodwill gesture, the Distributing Banks have resolved to offer an ex gratia payment scheme to Eligible Customers of Relevant Minibonds. For the purpose of the ex gratia payment scheme, Eligible Customers are either those investors who were eligible to participate in the Repurchase Scheme or those who would have been eligible under the Repurchase Scheme had they not previously reached a settlement with the Distributing Banks on a case-by-case basis. The ex gratia payment to which each Eligible Customer will be notionally entitled is equal to 50% of any shortfall in the recovery of the amount invested ("Ex Gratia Payment"). The actual amount of the Ex Gratia Payment will depend on the Collateral recovery amount as well as the amount (if any) previously received from the investor's Bank as part of a settlement. Consequently, the amount of the Ex Gratia Payment is investor specific. For further details, please see the "Payment Examples" and "Estimated Time for Payment" below and review in detail the notice that will be sent out by each Distributing Bank, on or about 28 March 2011, to its investors who currently hold, or previously held, Relevant Minibonds.

Based on the rates of recovery of between 70% and 93% as advised by the Receivers, the total level of recovery to Eligible Customers, after taking into account the offer of Ex Gratia Payments by the Distributing Banks, will be in the range of **85% to 96.5%** of the principal amount of their investment.

**The proposal to pay the Ex Gratia Payments to Eligible Customers is *not* part of the Repurchase Scheme, but is instead a goodwill gesture by the Distributing Banks under highly unusual and unprecedented circumstances. It should not be viewed as a precedent for other investors or investment products.**

**Payment of the Recovery Payment and the Ex Gratia Payment, as applicable, is subject to the Distributing Banks having received from or on behalf of the Issuer the recovery proceeds from the Collateral for each Relevant Series. The Issuer will not receive the recovery proceeds from the Collateral unless the two conditions in the agreement with Lehman Brothers are satisfied.**

*Distributing Banks to provide further support to the Trustee*

The Distributing Banks have made available to the Trustee approximately HK$291 million (equivalent to the amount of commission income they received as distributors of Minibonds) by way of an Expenses Funding Agreement dated 30 October 2009. As part of this final resolution proposal, the Distributing Banks will increase the funding available to the Trustee to approximately HK$662 million to pay for all fees, expenses and other amounts which may be incurred in connection with the recovery of the collateral of the outstanding Minibonds and the Trustee's role in respect of the Minibonds. Without this funding, the Trustee would have been entitled to retain all or a part of the Collateral to indemnify it (and its agents) for liabilities and expenses arising from the settlement process. Such retention would reduce the amounts available to holders of the Relevant Series.

**LOOKING AHEAD**

To date, approximately 97% of total Minibond investors who purchased Relevant Minibonds from the Distributing Banks have already received offers to repurchase their Minibonds, and 96% in total have accepted these offers (either under the Repurchase Scheme or under other terms). An overwhelming majority of investors of Relevant Minibonds have therefore already settled their claims with the Distributing Banks. We believe that those settlements, together with the Recovery Payment and (if applicable) the Ex Gratia Payment, will provide a high level of recovery to the vast majority of those investors. In addition, most investors of Relevant Minibonds (irrespective of whether they have previously settled with their Bank) can expect to

receive the Recovery Payment as described in this Announcement.  We are therefore confident that the proposed arrangements will find the support of Minibond investors and the public.

We thank our customers, shareholders and the community again for their understanding and support during this challenging period.  We also extend our appreciation to our staff who have exhibited commitment and professionalism throughout this trying time.  We thank the HKSAR Government and local regulators for working with us to procure this result.  We remain fully committed to working with the HKSAR Government, the local regulators and the investor community to ensure that Hong Kong remains one of the world's pre-eminent international financial centres.

Distributing Banks (In alphabetical order):

| | |
|---|---|
| Bank of China (Hong Kong) Limited | Industrial and Commercial Bank of China (Asia) Limited |
| Bank of Communications Co., Ltd. Hong Kong Branch | MEVAS Bank Limited |
| The Bank of East Asia, Limited | Nanyang Commercial Bank, Limited |
| Chiyu Banking Corporation Limited | Public Bank (Hong Kong) Limited |
| Chong Hing Bank Limited | The Royal Bank of Scotland N.V. |
| CITIC Bank International Limited | Shanghai Commercial Bank Limited |
| Dah Sing Bank Limited | Wing Hang Bank, Limited |
| Fubon Bank (Hong Kong) Limited | Wing Lung Bank Limited |

Hong Kong, 28 March, 2011

**PAYMENT EXAMPLES**

The amount that investors will receive following the recovery of the Collateral depends on whether they are Eligible Customers or non-Eligible Customers.

***Eligible Customers***

Eligible Customers may receive both a Recovery Payment and an Ex Gratia Payment.

---

*Example 1*

*Calculation of recovery – If you have received 60% of the amount invested*

If you:

- are an Eligible Customer;

- accepted the offer to have your Minibonds repurchased; and

- have already received 60% of the principal amount of your Minibonds,

the following table sets out examples to illustrate how to calculate your Recovery Payment and Ex Gratia Payment:

| Collateral recovered | 70% | 75% | 80% | 85% | 90% | 95% |
|---|---|---|---|---|---|---|
| Settlement amount received | 60% | 60% | 60% | 60% | 60% | 60% |
| Recovery Payment | 10% | 15% | 20% | 25% | 30% | 35% |
| Ex Gratia Payment | 15% | 12.5% | 10% | 7.5% | 5% | 2.5% |
| Total payment due to Eligible Customer | 25% | 27.5% | 30% | 32.5% | 35% | 37.5% |
| Total amount recovered by Eligible Customer | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% |

*Example 2*

*Calculation of recovery – If you have received 70% of the amount invested*

If you:

- are an Eligible Customer;

- accepted the offer to have your Minibonds repurchased; and

- have already received 70% of the principal amount of your Minibonds,

the following table sets out examples to illustrate how to calculate your Recovery Payment and Ex Gratia Payment:

---

| Collateral recovered | 70% | 75% | 80% | 85% | 90% | 95% |
|---|---|---|---|---|---|---|
| Settlement Amount received | 70% | 70% | 70% | 70% | 70% | 70% |
| Recovery Payment | 0% | 5% | 10% | 15% | 20% | 25% |
| Ex Gratia Payment | 15% | 12.5% | 10% | 7.5% | 5% | 2.5% |
| Total payment due to Eligible Customer | 15% | 17.5% | 20% | 22.5% | 25% | 27.5% |
| Total amount recovered by Eligible Customer | 85% | 87.5% | 90% | 92.5% | 95% | 97.5% |

### Non-Eligible Customers

Non-Eligible Customers will receive a Recovery Payment that equals:

- the Collateral recovery amount for their Minibonds;

- *less* any payment they have previously received pursuant to any settlement with their Bank for their Minibonds,

*provided that* if the amount a non-Eligible Customer has previously received from their Bank for their Minibonds is equal to or higher than the Collateral recovery amount for their Minibonds, they will not receive any Recovery Payment.

## ESTIMATED TIME FOR PAYMENT

Following receipt by the Distributing Banks of the recovery proceeds from the Collateral, which is currently expected to be not later than the end of June 2011:

- the Recovery Payment will be paid; and

- the Ex Gratia Payment will be payable to Eligible Customers upon receipt by the Distributing Banks of a prescribed form of acceptance signed and returned by those Eligible Customers.

Investors will not receive a Recovery Payment and/or Ex Gratia Payment if they have already been placed in an equivalent or better position through the receipt of settlement amounts from their Bank.

---

**IMPORTANT**

**IF YOU ARE IN ANY DOUBT AS TO ANY ASPECT OF THIS ANNOUNCEMENT, YOU SHOULD CONSULT YOUR LEGAL, FINANCIAL OR OTHER PROFESSIONAL ADVISER.**

**THIS ANNOUNCEMENT IS A SUMMARY ONLY.   YOU MUST READ THIS ANNOUNCEMENT TOGETHER WITH:**

- **THE ANNOUNCEMENT MADE TODAY BY THE RECEIVERS OF THE COLLATERAL. SEE** http://www.pwchk.com/minibonds**; AND**
- **A LETTER WHICH YOUR BANK WILL SEND TO YOU BY POST ON OR ABOUT 28 MARCH 2011 WHICH EXPLAINS HOW THIS ANNOUNCEMENT APPLIES TO YOU.**

---

# EXHIBIT G

# Receivers from PwC reach agreement with Lehman Brothers in respect of Minibonds Collateral

## The agreement

Receivers from PricewaterhouseCoopers ("PwC") announce today that they have reached a conditional agreement with Lehman Brothers Special Financing Inc. ("Lehman Brothers") which will result in the Pacific Minibond noteholders ("Noteholders") of series 10 to 12, 15 to 23 and 25 to 36 (the "Relevant Series") receiving significant recoveries from the underlying collateral to be released as a result of the agreement becoming unconditional.

The agreement is expected to result in most of the Minibond investors recovering over 80% of their original investment from the underlying collateral.

The Receivers believe that the agreement reached provides a good result in the circumstances and will avoid the risks and uncertainties of prolonged, costly and complex litigation. The agreement is conditional on Noteholder approval (explained below) and obtaining US Bankruptcy Court confirmation that an order made on 16 December 2008 (known as the Derivatives Procedures Order) applies to the transactions underlying the Relevant Series. Lehman Brothers will make the necessary application on 29 March 2011 for this purpose.

## Background

On 30 June 2009, HSBC Bank USA, National Association, the trustee of the Relevant Series of the Minibonds, appointed PwC partners Ted Osborn, Anthony Boswell and Jan Blaauw as Receivers of the collateral underlying the Relevant Series.

Since their appointment, the Receivers' role has been to consider all available options to unwind the complex Minibond structure and find a solution to the competing claims on the Minibond collateral in order to preserve and recover value for the Minibond investors in the Relevant Series.

## Recovery levels from the realisation of collateral

A summary of the estimated recoveries that Minibond investors in the Relevant Series will be entitled to receive from the collateral recovered by the Receivers after the agreement reached with Lehman Brothers becomes unconditional is set out below:

| Estimated percent recovery (of principal amount invested) | Estimated percent of Minibond investors in each percentile range |
| --- | --- |
| > 90% | 4% |
| 80 – 90% | 65% |
| 70 – 80% | 31% |
| | 100% |

The recovery to Minibond investors from the collateral will vary from series to series and by tranches within the series due to differences in the characteristics of the swap contracts attached to each Minibond series, including the maturity dates, the reference entities against which credit protection was sold and the currency denomination for each tranche. The estimated recoveries in each series/tranche are set out in the information box at the end of this announcement.

The recovery of the collateral as a result of the conditional agreement will mean that all Noteholders of the Relevant Series will be entitled to the returns referred to below.

***This announcement summarises the recovery Minibond investors can expect to receive as a result of the conditional agreement with Lehman Brothers only and should be read in conjunction with the announcement made today by the Distributing Banks. Minibond investors should contact the party from whom they acquired their Minibonds for further information including an estimate of their total anticipated recovery.***

## Meetings required to approve the agreement

Noteholders must pass an extraordinary resolution at a special meeting of Noteholders for each and every Relevant Series in order for the agreement with Lehman Brothers to become effective. Noteholder meetings are expected to be announced in April and held in May for this purpose.

A majority of Noteholders consisting of 75% or more of the votes cast at the meeting must vote in favour of the agreement for each and every Relevant Series in order for the extraordinary resolutions to be passed and the agreement with Lehman Brothers to become effective.    Notices of the meetings for each of the Relevant Series will



be sent to Minibond investors who are in the margin and through the clearing systems in the normal way and directly by the party from whom they acquired their Minibonds. These notices will be despatched after obtaining US Bankruptcy Court confirmation that the Derivatives Procedures Order applies to the relevant transactions.

Eligible investors who continue to own the Relevant Minibonds are encouraged to attend and vote at the meetings.

Information in connection with the Noteholder meetings will be placed on the Receivers' Website: http://www.pwchk.com/minibonds

### Distributions to minibond investors

Subject to the requisite approvals being obtained, Minibond investors should expect to receive distributions in June 2011.

Further information including *Frequently Asked Questions* in connection with the agreement can be found on the Receivers' website: http://www.pwchk.com/minibonds

For the avoidance of doubt, the agreement does not include series 5, 6, 7 and 9.   The agreement is only in relation to the collateral underlying series 10 to 12, 15 to 23 and 25 to 36.

*Indicative recovery to Minibond investors as a percentage of the principal amount invested*

| Series/Tranche | Approximately* | Series/Tranche | Approximately* | Series/Tranche | Approximately* |
|---|---|---|---|---|---|
| 10A | 86% | 22A | 79% | 29D | 72% |
| 10B | 86% | 22B | 79% | 30A | 84% |
| 11A | 93% | 22C | 77% | 30B | 81% |
| 11B | 93% | 23A | 81% | 30C | 76% |
| 11C | 92% | 23B | 80% | 30D | 73% |
| 11D | 92% | 23C | 83% | 31A | 78% |
| 12A | 86% | 23D | 83% | 31B | 78% |
| 12B | 86% | 25A | 81% | 31C | 71% |
| 15A | 83% | 25B | 80% | 31D | 70% |
| 15B | 81% | 25C | 82% | 32A | 78% |
| 16A | 85% | 25D | 81% | 32B | 77% |
| 16B | 83% | 26A | 72% | 32C | 72% |
| 17A | 83% | 26B | 72% | 32D | 71% |
| 17B | 82% | 26C | 70% | 33A | 84% |
| 18A | 82% | 27A | 87% | 33B | 82% |
| 18B | 81% | 27B | 85% | 33C | 76% |
| 19A | 81% | 27C | 80% | 33D | 75% |
| 19B | 80% | 27D | 78% | 34A | 85% |
| 20A | 83% | 28A | 85% | 34B | 84% |
| 20B | 82% | 28B | 82% | 35A | 79% |
| 20C | 78% | 28C | 78% | 35B | 78% |
| 20D | 79% | 28D | 75% | 36A | 79% |
| 21A | 84% | 29A | 84% | 36B | 79% |
| 21B | 83% | 29B | 81% | | |
| 21C | 81% | 29C | 75% | | |

*The recoveries are expressed as "approximately" because exact amounts will not be known until all the collateral has been exchanged into Hong Kong dollars (where relevant) and costs incurred by the collateral custodian have been deducted. The table reflects the Receivers' present estimates of recoveries to Minibond investors from the collateral.

*The Receivers and PwC cannot and do not offer any form of financial or legal advice to Minibond investors and nothing herein should be construed as such. Minibond investors should seek independent professional advice with respect to their own legal and financial positions.*

28 March 2011

© 2011 PricewaterhouseCoopers Limited. All rights reserved. In this document, "PwC" refers to PricewaterhouseCoopers Limited, which is a member firm of PricewaterhouseCoopers International Limited, each member firm of which is a separate legal entity.

# EXHIBIT H

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ———————————————— x | | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : : : | Case No. 08-13555-JMP |
| | : | Chapter 11 |
| Debtor. | : : | |
| ———————————————— | : | |
| KA KIN WONG, *et al.*, | : : | |
| Plaintiffs, | : : | Adversary Proceeding No. 09-01120-JMP |
| vs. | : : | |
| HSBC BANK USA, NATIONAL ASSOCIATION, *et al.*, | : : : | |
| Defendants. | : : | |
| ———————————————— x | | |

PLAINTIFFS' OPPOSITION TO LEHMAN AND HSBC DEFENDANTS' MOTIONS TO
DISMISS THE AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ............................................................................1

II. SUMMARY OF THE AMENDED COMPLAINT.........................................5

III. RELEVANT PROCEDURAL HISTORY .........................................................9

IV. ARGUMENT ...................................................................................................11

    A.    Applicable Standards ...........................................................................11

    B.    Plaintiffs Have Derivative Standing to Bring Their Equitable Claims to the
        Saphir Notes (Counts I-III) ...............................................................12

        1.    As a Threshold Matter, Defendants Ignore Trust Law .............12

        2.    Defendants Ignore Facts Demonstrating the Presence of "Special
            Circumstances" Sufficient to Confer Standing on All Plaintiffs to
            Sue Lehman in the Name of the HSBC Bank Trust ...................14

            a.    Special Circumstance #1: Collusion ..............................15

            b.    Special Circumstance #2: Self-Dealing .........................18

            c.    Special Circumstance #3: Fraud ....................................21

            d.    Special Circumstance #4: Conflicts ...............................23

            e.    Special Circumstance #5: The *Perpetual* Judgments....................24

    C.    The Amended Complaint Properly Alleges Constructive Trust Claims
        Given Defendants' Unconscionable Conduct........................................25

    D.    A Resulting Trust Is Properly Alleged Given the Failure of the HSBC
        Bank Trust............................................................................................29

    E.    Plaintiffs Satisfy Rules 23.1 and 23 ....................................................30

    F.    The District Court Found It "Self-Evident" that This Court Has Subject
        Matter Jurisdiction over Plaintiffs' Claims..........................................33

    G.    Defendants' Miscellaneous Contract Arguments Did Not Prevail on
        Appeal, and Should Not Prevail Here...................................................33

    H.    LBHI Is a Proper Party to This Action ................................................36

613196_2

**Page**

V.      CONCLUSION AND REQUEST FOR LEAVE TO AMEND .........................................37

613196_2

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ackerman v. Nat'l Prop. Analysts, Inc.*,
    887 F. Supp. 494 (S.D.N.Y. 1992) ...................................................................31

*Alsop Wilkinson v. Neary*,
    [1996] 1 W.L.R. 1220 (Ch.)............................................................................24

*Amusement Indus. v. Stern*,
    693 F. Supp. 2d 327 (S.D.N.Y. 2010)..............................................................26

*Bartlett v. Barclays Bank Trust Co. Ltd. (No. 2)*,
    [1980] 2 W.L.R. 430 (Ch.)...............................................................17, 20, 35

*Beck v. Mfrs. Hanover Trust Co.*,
    218 A.D.2d 1 (N.Y. App. Div. 1995) ...............................................................35

*Brooklyn Legal Servs. Corp. B v. Legal Servs. Corp.*,
    462 F.3d 219 (2d Cir. 2006)............................................................................11

*Clark Boyce v. Mouat*,
    [1994] 1 AC 428 .............................................................................................20

*Corporacion Venezolana de Fomento v. Vintero Sales Corp.*,
    629 F.2d 786 (2d Cir. 1980)............................................................................26

*Deshawn E. by Charlotte E. v. Safir*,
    156 F.3d 340 (2d Cir. 1998)............................................................................25

*Foskett v. McKeown*,
    [2001] 1 A.C. 102 ...........................................................................................13

*Golden Budha Corp. v. Canadian Land Co., N.V.*,
    931 F.2d 196 (2d Cir. 1991)............................................................................28

*Goldstein v. Pataki*,
    516 F.3d 50 (2d Cir. 2008)..............................................................................11

*Gregson v. HAE Trustees Ltd.*,
    [2008] EWHC 1006 (Ch.)................................................................................34

*Hayim v. Citibank NA*,
    [1987] 1 A.C. 730 ...........................................................14, 17, 18, 20

613196_2

**Page**

*In re AppOnline.com, Inc.*,
   315 B.R. 259 (Bankr. E.D.N.Y. 2004) ...................................................................29

*In re Charter Comm'ns*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................19, 20, 23, 32

*In re Field*,
   [1971] W.L.R. 555, 559 (Ch.) .........................................................................23

*Kaster v. Modification Sys., Inc.*,
   731 F.2d 1014 (2d Cir. 1984) ..........................................................................31

*Kauffman v. Dreyfus Fund, Inc.*,
   434 F.2d 727 (3d Cir. 1970) .............................................................................31

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   173 F.3d 454 (2d Cir. 1999) .............................................................................35

*Meldrum v. Scorer*
   (1887) 56 LT 471) .............................................................................................18

*Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Servs. Ltd.*
   [2009] EWHC 1912 (Ch.) ...............................................................................3

*Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Servs. Ltd.*
   [2009] EWCA Civ. 1160 (C.A.) .....................................................................3

*Re Lehman Bros. Int'l (Europe) (in administration) (No. 2)*,
   [2009] EWCA Civ. 1161 (C.A.) ..............................................................13, 17

*Roberts v. Gill & Co.*,
   [2010] UKSC 22 (S.C.) ............................................................................. *passim*

*Royal Brunei Airlines Sdn Bhd v. Tan*,
   [1995] 2. A.C. 378 (P.C.) ................................................................................15

*Saulia v. Saulia*,
   31 A.D.2d 640 (N.Y. App. Div. 1968) .....................................................29, 30

*Tang v. Capacious Investments Ltd.*,
   [1996] 1 All ER 193 ........................................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................11

613196_2

**Page**

*Tinsley v. Milligan,*
[1994] 1 A.C. 340 ..................................................................................29

*Torres v. $36,256.80 United States Currency,*
25 F.3d 1154 (2d Cir. 1994)..................................................................29

*Weiner v. Winters,*
50 F.R.D. 306 (S.D.N.Y. 1970) .............................................................31

*Westdeutsche Landesbank Girozentrale v. Islington LBC,*
[1996] A.C. 669 (H.L.) ..............................................................26, 27, 28

*Winn v. Schafer,*
499 F. Supp. 2d 390 (S.D.N.Y. 2007)....................................................31

## STATUTES, RULES AND REGULATIONS

12 U.S.C.
§632.......................................................................................................26

Federal Rules of Civil Procedure
Rule 12(b)(1)....................................................................................1, 11
Rule 12(b)(6)....................................................................................1, 11
Rule 23 .............................................................................................. *passim*
Rule 23.1 ........................................................................................... *passim*

Federal Rules of Bankruptcy Procedure
7012(b)............................................................................................1, 11

## SECONDARY AUTHORITIES

7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and
Procedure* §1831, at 123 (3d ed. 2007) .................................................32

613196_2

Plaintiffs respectfully submit this memorandum of law in opposition to defendants Lehman Brothers Special Financing Inc.'s ("LBSF") and Lehman Brothers Holdings Inc.'s ("LBHI") (together, "Lehman") Motion to Dismiss the Amended Class Action and Verified Derivative Complaint (Dkt. No. 110) ("Leh. Mem."); and defendant HSBC Bank USA, National Association's ("HSBC Bank") Memorandum of Law in Support of Its Motion to Dismiss the Amended Class Action and Derivative Complaint (Dkt. No. 112) ("HSBC Mem.").  Although Lehman and HSBC Bank filed separate motions, they move to dismiss the Amended Class Action and Verified Derivative Complaint (Dkt. No. 104) (the "Amended Complaint") on substantially similar grounds pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as incorporated into these proceedings by Federal Rules of Bankruptcy Procedure 7012(b).[1]

## I.    PRELIMINARY STATEMENT

Plaintiffs are beneficiaries of a trust that holds collateral that became mandatorily redeemable over two years ago.  The terms of the trust documents state that in the event that Lehman became insolvent, the trust property, known as the "Saphir Notes," would be automatically and immediately redeemed at or near par value.  Lehman has been insolvent since at least the middle of 2008.

Yet HSBC Bank, the trustee, refuses to redeem the Saphir Notes, deferring instead to a "cease and desist" letter sent by Lehman.  *See* Exhibit A.[2]  Lehman, in turn, seeks illusory rights in the Saphir Notes and is attempting to rewrite the terms of the Saphir Notes in a manner that will destroy their value.  Plaintiffs have derivative standing to step into the shoes of the trustee, HSBC

---

[1]      The Amended Complaint also states claims against BNY Corporate Trustee Services Limited ("BNY").  On January 31, 2011, BNY answered the Amended Complaint.  Dkt. No. 109.

[2]      All "Ex._" references are to the Declaration of Jason C. Davis in Support of Plaintiffs' Opposition to Lehman and HSBC Defendants' Motions to Dismiss the Amended Class Action and Derivative Complaint, filed herewith, unless otherwise noted.

613196_2

Bank, to protect and redeem the Saphir Notes.  Plaintiffs also have standing, and have pled facts sufficient to state a claim for a constructive and resulting trust over the trust, as well as the claims asserted by Lehman and HSBC Bank to the trust property.  Defendants have already litigated and lost several of the issues that they raise here.  *See* Ex. B.

Defendants' motions to dismiss should be denied in full.  ***First***, Lehman ignores trust law, as it has throughout the course of this case, instead claiming that the Saphir Notes exist on a contractual "level" that is somehow unrelated to the HSBC Bank trust.  Yet the District Court rejected Lehman's efforts to turn the HSBC Bank trust and the Saphir Notes into severable "contracts," and Lehman's own expert on English trust law similarly rejects Lehman's attempt to hide the existence of the trust in this case.  The Minibonds investors are beneficiaries of the HSBC Bank trust, which holds the Saphir Notes as its sole trust property.  As beneficiaries of the HSBC Bank trust, plaintiffs have "hard-nosed property rights" in the Saphir Notes.

***Second***, plaintiffs have derivative standing to bring their equitable claims relating to the Saphir Notes.  Plaintiffs have pled "special circumstances" under English law sufficient to establish derivative standing to sue Lehman in the name of HSBC Bank trust.  Specifically, the Amended Complaint contains detailed allegations that: (a) HSBC Bank and its affiliates ("HSBC") and Lehman colluded to collect plaintiffs' investment capital to benefit a Lehman entity, not the Minibond investors; (b) HSBC entities, including the trustee, HSBC Bank, engaged in extensive self-dealing to protect their own economic interests while avoiding any action to protect the trust estate from that collapse; (c) Lehman, with HSBC's help, fraudulently deceived the credit rating agencies by engaging in balance sheet manipulation that was responsible for making the Saphir Notes eligible as collateral to support the Minibonds; (d) HSBC Bank has a conflict of interest as a creditor of the Lehman bankruptcy estate, which will be reduced if the Saphir Notes are redeemed,

- 2 -

and a conflict of duty due to LBSF's claim that it, too, is a trust beneficiary; and (e) the *Perpetual Judgments*[3] conclusively establish that the noteholder priority provisions in the Saphir Notes were triggered automatically when Lehman became insolvent before September 2008.

**Third**, plaintiffs adequately allege a claim for a constructive trust. English law imposes a constructive trust on a legal owner when that owner has engaged in "unconscionable conduct." Defendants' unconscionable conduct, detailed at length in the Amended Complaint, establishes a constructive trust over the Saphir Notes, Lehman's attempts to alter the terms of the Saphir Notes, and HSBC Bank, which holds naked possession of the Saphir Notes.

**Fourth**, plaintiffs also adequately allege a claim for a resulting trust under English law over the Saphir Notes. Pacific International Finance Limited ("Pacific") took class members' investment capital and used it to buy the Saphir Notes, which were placed in trust for plaintiffs' benefit. Because that trust has failed, the trustee, HSBC Bank, is presumed to hold the Saphir Notes in a resulting trust for plaintiffs.

**Fifth**, plaintiffs have derivative and class standing under Fed. R. Civ. P. 23.1 and 23, respectively, to represent other trust members and absent class members in this action. Under Rule 23.1, plaintiffs may bring their derivative claims on behalf of all members of the HSBC Bank trust. The HSBC Bank trust was established by a single settlor, Pacific; is administered by a single trustee, HSBC Bank; and contains a single trust property, the Saphir Notes. It is the common duty that HSBC Bank owes to all Minibond noteholders that enables any Minibond noteholder to

---

[3]    *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Servs. Ltd.* ("*Perpetual I*"), [2009] EWHC 1912 (Ch.), and again on appeal at *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Servs. Ltd.* ("*Perpetual II*"), [2009] EWCA Civ. 1160 (C.A.) (collectively, the "*Perpetual Judgments*").

establish special circumstances. Plaintiffs are not required under Rule 23.1 to demand that HSBC Bank take action in this case because such a demand would be, and has been, futile.

Plaintiffs also have standing to bring their constructive and resulting trust claims directly on behalf of a class of all Minibond noteholders, pursuant to Rule 23. Defendants' unconscionable acts are identical as to every noteholder. Because a constructive trust claim focuses on the nature of the wrong perpetrated by defendants, it is clear that plaintiffs have standing to bring a putative class action. Similarly, because the HSBC Bank trust has failed in the same way as to all Minibond noteholders, plaintiffs may seek a resulting trust on all noteholders' behalf.

**Sixth**, the District Court has already rejected HSBC Bank's meritless argument that this Court lacks subject matter jurisdiction to hear plaintiffs' claims. This Court should deny HSBC Bank's attempt to relitigate that issue.

**Seventh**, defendants' miscellaneous contract arguments did not prevail on appeal, and should not prevail here. Lehman's contention that plaintiffs' derivative claims are barred by an English statute governing contractual disputes is wrong. Plaintiffs do not bring a single claim under that statue, nor does the statute in question affect this dispute, which sounds in trust law. Nor is HSBC Bank protected by a "no action" clause in the principal trust deed. The clause at issue only purports to limit proceedings against the issuer, not the trustee. In addition, another provision of the principal trust deed specifically allows plaintiffs to sue HSBC Bank. Further, even if the "no action" clause were otherwise enforceable as to HSBC Bank, the clause is unenforceable as a matter of public policy. HSBC Bank's argument that plaintiffs' "rescission" claim should be dismissed due to "unreasonable delay" makes no sense.

***Eighth,*** Lehman's motion to dismiss LBHI from this action fails. LBHI was integral to the creation, purpose, and operation of the Minibonds program from the start, and is therefore a proper defendant to this action.

For the above listed reasons, each of which is addressed in detail below, this Court should deny in full defendants' motions to dismiss.

## II.   SUMMARY OF THE AMENDED COMPLAINT

Plaintiffs own, or owned and maintain beneficial interests in, collateralized notes called "Minibonds." ¶2.[4] Pacific issued those notes pursuant to a trust deed, prospectuses and supplements thereto. *Id.* Plaintiffs and thousands of other similarly situated Minibonds investors are trust beneficiaries of a trust that Pacific created to secure its obligations and issue the Minibonds to plaintiffs. *Id.* HSBC Bank is the trustee of that trust and, as such, undertook obligations to act in the best interests of the Minibonds investors. *Id.* HSBC Bank holds the trust property, the Saphir Notes, for plaintiffs' benefit. *Id.*

HSBC Bank should have liquidated the Saphir Notes at or near par value or distributed the Notes to plaintiffs (over two years ago) to satisfy Pacific's obligations to plaintiffs. ¶3. But HSBC Bank refuses to satisfy Pacific's obligations. *Id.* That is because Lehman has ordered HSBC Bank to "cease and desist" from discharging its obligations to use those bonds to repay Plaintiffs. *Id.* Not only has HSBC Bank chosen to obey LBSF's "cease and desist" request at the expense of the trust beneficiaries, HBSC Bank has also actively collaborated with LBSF to prevent plaintiffs from recovering the Saphir Notes while simultaneously working in a "commercially reasonable" manner with Lehman to keep hundreds of millions of dollars that HSBC extracted from Lehman shortly

---

[4]      Unless otherwise indicated, paragraph references ("¶_" or "¶¶__") are to the Amended Complaint.

- 5 -

before Lehman filed for bankruptcy on September 15, 2008. *Id.* Meanwhile, Lehman is attempting to destroy the Saphir Notes, property that belongs to plaintiffs and is currently held by defendant HSBC Bank in trust for plaintiffs' benefit. ¶1.

Through the Minibonds, Lehman made a $1.5 billion bet against plaintiffs that billions of dollars worth of bonds Lehman carried on their balance sheet would default. ¶4. In other words, Lehman created the Minibonds program as a massive hedge, "shorting" bonds that it owned. *Id.* Lehman enticed thousands of retail investors, mostly in Hong Kong, to take the other side of the bet by offering them grocery store coupons, cameras, bottles of wine, camcorders and other consumer goods in exchange for buying Minibonds. *Id.* From the inception of the Minibonds program, Lehman generated profits for itself at the retail investors' expense. ¶5. Those profits were small, however, compared to the amount that Lehman would "win" once the junk bond risk that it deceptively and intentionally shifted to the Minibonds investors came due. *Id.* On that day, Lehman would win everything, while the Minibonds investors, including many retirees, would lose everything. *Id.* Every dollar Lehman stood to win would come out of the Minibonds investors' pockets. *Id.* It was a zero-sum game. *Id.* Further, in contrast to the retail investors, who put up $1.5 billion to collateralize these bets, Lehman did not put a cent of its own money on the line. ¶81.

Lehman created the bet and stacked the odds in its favor. ¶6. Though it promised that Pacific was independent, Lehman itself created Pacific as a wholly owned subsidiary of another HSBC entity, to be directed by HSBC employees. *Id.* HSBC, however, turned control of Pacific back over to Lehman. ¶7. Pacific, which existed only to issue the Minibonds, was, according to the sworn testimony of a HSBC Bank executive following Lehman's bankruptcy, "a creature of Lehman's design, and set up simply to perform a role, a function within the larger structured product." ¶79. The HSBC Bank executive also testified that HSBC Bank played all of its roles "at

- 6 -

the behest of Lehman Brothers," and that HSBC and HSBC Bank were "approached by Lehman brothers to take on the role, and of course, follow their instructions." ¶78. Pacific was "not an active company as such and HSBC's role as director [was] not an active role," but rather "an administrative corporate services role." ¶79. Lehman designed and drafted the prospectus for the Minibonds. *Id.*

Not only did Lehman design and run the Minibonds program, it appointed the trustee, HSBC Bank, which cared more about its relationship with Lehman than its duty to the trust beneficiaries. The recently released Valukas Report confirms that, from the inception of the Minibonds program, HSBC Bank did not care about the Minibonds investors. ¶8. Instead, HSBC Bank cared about Lehman's "extremely large wallet," in the words of HSBC executives. *Id.* For that reason, as soon as it was appointed trustee, HSBC Bank abdicated control of the Minibond noteholders' $1.5 billion investment to Lehman – whose economic interests were diametrically opposed to those of the Minibond noteholders. *Id.*

The extent to which HSBC Bank abdicated its duties as trustee is demonstrated by its actions in 2008, when it commenced a "covert project" called "Project Opaque," later renamed "Project Milan." ¶¶9, 87-91. According to the Valukas Report and its underlying documents, top HSBC executives from around the world – including key executives from HSBC Bank – joined forces to terminate HSBC's $12 billion relationship with Lehman (*id.*), because HSBC had concluded that Lehman was insolvent. ¶10. Project Milan served to "[h]olistically protect the HSBC organization's interests, thereby limiting total losses." *Id.* It operated in secret, to avoid "market signaling" that "could precipitate the exit of other creditors, counterparties &/or clients thereby . . . potentially crystallizing our losses." *Id.* Rather than starting a run on Lehman and getting only some of its

- 7 -

money, Project Milan decided to walk to Lehman and try to take it all.  ¶11.  Project Milan

successfully cut or dumped over $2 billion in exposure to Lehman before it became insolvent.  *Id.*

All the while, HSBC Bank did nothing to protect the retail investors' interest in the

Minibonds.  Specifically, though the Minibonds became automatically and mandatorily redeemable

due to Lehman's insolvency, and though Project Milan demonstrates that HSBC Bank knew that

Lehman was insolvent and had triggered other events of default, HSBC Bank never redeemed the

Minibonds.  ¶¶12, 66-72.  Rather, HSBC Bank joined with Lehman to take the retail investors'

money.  ¶12.  HSBC engaged in self-dealing, protecting "the HSBC organization's interests," and

hung the Minibond investors out to dry.  *Id.*

Against all odds, Lehman lost its stacked bet to the Minibond noteholders when it went

insolvent.  ¶57.  Thanks to HSBC Bank's stubborn refusal to discharge its duties, however, Lehman

is making one last grab at the Minibond noteholders' property.  ¶14.  Lehman and LBSF seek to

destroy the Saphir Notes, the sole piece of property that HSBC Bank holds in trust to repay the

Minibonds.  *Id.*  Lehman does this by asserting "rights" in the trust property – the Saphir Notes –

that never vested.  ¶15.  Having lost the bet, Lehman fabricates new "rights" in an attempt to take all

of the Minibond noteholders' money, again.  *Id.*  HSBC Bank has helped Lehman to prevent the

Minibond noteholders from protecting their interests.  *Id.*

Plaintiffs, Minibond noteholders, have been and continue to be injured by defendants.  ¶17.

The trust that holds the sole property that can be used to repay plaintiffs is at imminent risk of being

destroyed by Lehman.  *Id.*  The Amended Complaint states four causes of action to prevent this

unjust result: derivative claims for declaratory relief, injunctive relief and a constructive and

resulting trust against all defendants, and an individual and class action claim for a constructive and

resulting trust against all defendants.

613196_2

## III.     RELEVANT PROCEDURAL HISTORY

Plaintiffs filed the original complaint ("Complaint") on March 12, 2009.  Dkt. No. 1.

Defendants moved to dismiss the Complaint by framing the conflict as a contractual dispute, rather

than as a contested trust.  This Court dismissed plaintiffs' Complaint. Dkt. Nos. 90, 92.  The Court

found that plaintiffs lacked standing to bring a direct claim against defendants, and that it would be

futile to allow plaintiffs to amend the Complaint to bring a derivative claim on behalf of HSBC

Bank, the trustee.  *See* Ex. C.  This Court also dismissed plaintiffs' resulting and constructive trust

claims and denied plaintiffs leave to amend the Complaint.

Plaintiffs appealed this Court's rulings dismissing the Complaint and denying plaintiffs leave

to amend the Complaint to the District Court.  *Ka Kin Wong v. HSBC USA, Inc.*, No. 1:10-cv-00017-

WHP (S.D.N.Y. Jan. 4 & Feb. 3, 2010), Dkt. Nos. 1, 6; *see also Ka Kin Wong v. HSBC USA, Inc.*,

No. 1:10-cv-00096 WHP (S.D.N.Y. Jan. 7 & Feb. 3, 2010), Dkt. Nos. 1, 7.  The District Court

conducted a detailed examination of the facts and the parties' argument at oral arguments on April

23, 2010.  *See* Ex. D.  The District Court upheld this Court's ruling that plaintiffs lacked standing to

sue LBSF directly, but reversed this Court's other rulings.[5]  Appellate Order at 16-17.

The District Court applied English law to the determination of whether plaintiffs could bring

a derivative claim against LBSF.  Appellate Order at 11-12.  The District Court held that, "[u]nder

English law, a trust beneficiary may bring a derivative suit against a third party when 'special

---

[5]      The District Court also reversed this Court's denial of leave to amend the Complaint to name HSBC Bank as the Trustee.  *Ka Kin Wong v. HSBC USA, Inc.*, No. 1:10-cv-00017 WHP, Memorandum & Order (S.D.N.Y. August 9, 2010), Dkt. No. 14 at 15-16; *Ka Kin Wong v. HSBC USA, Inc.*, No. 1:10-cv-00096 WHP, Memorandum & Order (S.D.N.Y. August 9, 2010), Dkt. No. 22 (together the "Appellate Order") (Ex. B) at 15-16.

circumstances' are present" (*id.* at 11), and that this Court "erred in finding that Plaintiffs cannot allege special circumstances." *Id.* at 12.

The District Court set forth the special circumstances rule as follows:

> The special circumstances which were identified in the earliest authorities as justifying a beneficiary's action were fraud on the part of the trustee, or collusion between the trustee and the third party, or the insolvency of the trustee, but it has always been clear that these are merely examples of special circumstances, and that the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy.

*Id.* at 12 (quoting *Roberts v. Gill & Co.*, [2010] UKSC 22, ¶¶46, 110 (S.C.)). "The Supreme Court of the United Kingdom noted that a court has 'wide latitude in evaluating . . . special circumstances,' taking into account 'all [of]the relevant circumstances.'" *Id.* (quoting *Roberts*, UKSC 22, ¶¶76, 78, 114).

The District Court all but held that special circumstances exist sufficient to confer derivative standing on plaintiffs. The special circumstances included Lehman's fraudulent misstatements that it was not involved in designing and executing the Minibonds program and that neither Lehman nor any subsidiary exercised control over Pacific. *Id.* at 12-13. The District Court found that Lehman designed the Minibonds program and directed Pacific's activities. *Id.* In addition, the District Court found that the Valukas Report revealed cooperation between HSBC and Lehman at the highest levels during Lehman's collapse.[6] *Id.* at 13. In light of these circumstances, the District Court reversed this Court's decision denying plaintiffs leave to amend the Complaint to state derivative claims under the special circumstances rule. *Id.*

---

[6]    The Valukas Report, which was issued on March 11, 2010, postdates this Court's dismissal of plaintiffs' Complaint.

The District Court also vacated and remanded for further consideration this Court's dismissal of plaintiffs' constructive and resulting trust claim. *Id*. at 16-17. The District Court found that dismissal was inappropriate in light of the absence of analysis as to choice-of-law and why equitable principles under the governing law do not support plaintiffs' claim. *Id*.

Plaintiffs filed an Amended Complaint on November 29, 2010. Dkt. No. 104. The parties are now before this Court on Lehman's and HSBC Bank's motions to dismiss the Amended Complaint, filed on January 31, 2011. Dkt. Nos. 110, 112.[7]

## IV.    ARGUMENT

### A.    Applicable Standards

Defendants move to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012(b). The applicable standards are well established. Courts faced with motions to dismiss pursuant to Rule 12(b)(1) and (b)(6) "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true" and construe the pleading liberally. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (applying standard in Rule 12(b)(6) context); *Brooklyn Legal Servs. Corp. B v. Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006) (applying standard in Rule 12(b)(1) context). Plaintiffs readily satisfy these standards.

---

[7]    The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. moved to join Lehman's motion to dismiss the Amended Complaint. Dkt. No. 111.

613196_2

B.    **Plaintiffs Have Derivative Standing to Bring Their Equitable Claims
to the Saphir Notes (Counts I-III)**

1.    **As a Threshold Matter, Defendants Ignore Trust Law**

Lehman contends that plaintiffs lack standing to prevent Lehman from destroying the Saphir

Notes – the sole property that HSBC Bank holds in trust to repay plaintiffs' Minibonds – because the

Saphir Notes exist on some contractual "level" that is somehow unrelated to the HSBC Bank trust,

the very trust that holds those notes.  Leh. Mem. at 14-28.  This argument is meritless.

Lehman's own expert on English trust law would reject Lehman's novel proposal to hide the

existence of the trust at issue in this case.  Lehman's expert, Professor McCormack, reviewed the

Minibonds principal trust deed appointing HSBC Bank as trustee, and concluded that the retail

"minibond investors" are "designated beneficiaries, in addition to LBSF" of the HSBC Bank trust,

which holds the Saphir Notes.  Dkt. No. 75, Ex. 3, ¶8.  Professor McCormack conceded plaintiffs

have property rights in the Saphir Notes as beneficiaries of the HSBC Bank trust.  *Id.*, ¶¶5, 8.

The District Court likewise rejected Lehman's efforts to turn the HSBC Bank trust and the

Saphir Notes into severable "contracts."  Referring to Minibonds trust documentation, the District

Court stated: "The Saphir Notes were placed in trust with HSBC Bank as Trustee."  Appellate Order

at 4.  The Minibonds issuer, Pacific, "secured its obligation to pay interest to the Minibonds holders"

by purchasing the Saphir Notes.  *Id.* at 3.  These findings agree with this Court's rulings that the

Minibonds program involved "a sale of notes by Pacific Finance to individual noteholders, including

the Plaintiffs" (Ex. C at 21:2-4), in which Pacific "purchased notes from Saphir Finance PLC [the

'Saphir Notes'] to serve as collateral for its obligations to LBSF under the swap agreement and to the

noteholders under the notes" (*id.* at 21:23-25), and for which "HSBC Bank USA, N.A. serves as

trustee with respect to the Saphir notes."  *Id.* at 21:25-22:1.

- 12 -

As beneficiaries of the HSBC Bank trust, plaintiffs have property rights in the Saphir Notes. According to England's highest court, these beneficial interests are not "discretionary," but are "hard-nosed property rights." *Foskett v. McKeown*, [2001] 1 A.C. 102, 109 (H.L.). Lehman's affiliate recently litigated and lost its efforts to erase the property rights of trust beneficiaries under the guise of contract law in *Re Lehman Bros. Int'l (Europe) (in administration) (No. 2)*, [2009] EWCA Civ. 1161 (C.A.), ¶¶67-68, 69. In that case, an English court applying English law rejected Lehman Brothers International (Europe)'s attack on trust law, holding, "I do not therefore accept that the trust element in these arrangements ought in some way to be merged into the general contractual framework and treated merely as ancillary." *Id.*, ¶68.

In 2008, HSBC Bank's representative in Hong Kong testified that "our role in a default is to take action to enforce the collateral [the Saphir Notes] *for the benefit* of the [Minibond] investors to ensure that they receive whatever value is raised from that collateral." ¶70. In what appears to be unprecedented – at least in recorded case law – HSBC Bank has been working in tandem with Lehman *to the detriment* of the Minibond investors, repeatedly deriding and criticizing plaintiffs for attempting to protect the *sole* property that will support the repayment of the Minibonds.

Given plaintiffs' property rights in the Saphir Notes held in trust by HSBC Bank, the question is whether they have standing to protect that property from Lehman's efforts to destroy it. Because, as a matter of trust law, Lehman is a complete stranger to the HSBC Bank trust – and the Saphir Notes it holds – the general rule under English law is that the trustee is obligated to take action against Lehman. Appellate Order at 10-11. But the general rule does not apply in this case.

- 13 -

2.    **Defendants Ignore Facts Demonstrating the Presence of "Special Circumstances" Sufficient to Confer Standing on All Plaintiffs to Sue Lehman in the Name of the HSBC Bank Trust**

Trust beneficiaries have standing to sue third parties to a trust – strangers like Lehman – where, as here, "special circumstances" are present. *Id.* at 11-13. On November 18, 2009, this Court found that plaintiffs could not allege that such circumstances are present in this case, but the District Court reversed that decision. On August 9, 2010, the District Court reviewed the facts set forth in the original Complaint, and held that through "the prism of these English law principles, this Court concludes that the Bankruptcy Court erred in finding that Plaintiffs cannot allege special circumstances." *Id.*

In rejecting defendants' contention that plaintiffs cannot allege special circumstances in this case, the District Court first articulated the relevant legal principles. The District Court relied on two English cases to identify the correct rules. First, the court relied on *Hayim v. Citibank NA*, [1987] 1 A.C. 730 (P.C.). Appellate Order at 11. *Hayim* held that special circumstances "embrace a failure, excusable or inexcusable, by the trustees in the performance of the duty [owed] by the trustees to the beneficiary to protect the trust estate or to protect the interests of the beneficiary in the trust estate." *Hayim*, A.C. 730 at 748. Second, the District Court relied on a recent decision by the Supreme Court of the United Kingdom, *Roberts*. The District Court quoted *Roberts* at length, in which the Supreme Court of the United Kingdom explained:

> The special circumstances which were identified in the earliest authorities as justifying a beneficiary's action were fraud on the part of the trustee, or collusion between the trustee and the third party, or the insolvency of the trustee, but it has always been clear that these are merely examples of special circumstances, and that the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy.

- 14 -

613196_2

Appellate Order at 12. The District Court emphasized and underlined *Roberts's* finding that the "underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy." *Id.* The answer to that question is obvious in this case.

### a.    Special Circumstance #1: Collusion

Special circumstances exist where there is "collusion between the trustee and the third party." *Roberts*, UKSC 22, ¶46. It is black letter law that a trustee cannot allow a third party to "deliberately interfere[]" with trust property for this own benefit. Appellate Order at 12 (quoting *Royal Brunei Airlines Sdn Bhd v. Tan*, [1995] 2. A.C. 378, 386-87 (P.C.)). Yet, that is what occurred in this case.

HSBC Bank's own sworn testimony is proof that HSBC and Lehman colluded to collect plaintiffs' investment capital to benefit a Lehman entity, not the Minibond investors. On December 30, 2008, HSBC's Susan Sayers ("Sayers") testified before the Hong Kong legislature regarding the Minibonds. ¶77. Sayers spoke for **all** HSBC entities involved in the Minibonds, testifying: "We [HSBC] have a number of roles. One of which is as **trustee**." *Id.* She confirmed that "we [HSBC] are indeed the shareholder" of Pacific and HSBC provided "directorship services" to Pacific. *Id.* Sayers then admitted that Lehman actually controlled the Minibonds program, stating that HSBC played all three roles – as trustee, owner and director – of Pacific, "at the behest of Lehman Brothers," and that HSBC was "approached by Lehman Brothers to take on the role, and of course, follow their instructions or acted on their request to take on the role." ¶78. On behalf of all of the HSBC entities involved in the Minibonds program, Sayers testified that Pacific was "a creature of Lehman's design." ¶79.

Pacific's prospectuses made the opposite representations, stating that "[n]either Lehman Brothers Holdings Inc. nor any of its subsidiaries or affiliates has any equity interest in, or **any control** over, us" and that Pacific's "directors are independent from Lehman Brothers Holdings Inc.

- 15 -

and its subsidiaries and affiliates." ¶73. Pacific also stated that it was not "fund raising for Lehman

Brothers Holdings Inc. or its subsidiaries and affiliates." *Id*. In addition, Pacific promised to "use

the money which you invest in our notes to buy a package of assets" that was "***carefully selected*** and

tailored to match our payment obligations under our notes." *Id*. To ensure that the assets were

carefully selected, Pacific promised that it would buy ultra-safe "AAA" collateral to secure its

obligations to repay the Minibond investors. ¶40. Contrary to its promises, Pacific instead

purchased extremely risky derivative securities that benefitted Lehman and dramatically underpaid

the Minibond investors. ¶¶32-39, 40-49. "Pacific" – read HSBC and Lehman – injured its own

investors from the very beginning of the transaction. ¶37.

The Valukas Report, including its supporting documentation, helps to explain why HSBC

colluded with Lehman to harm the Minibond investors. According to HSBC documents, as of 2008,

Lehman was one of HSBC's "most profitable client relationships and the fourth most profitable of

the US Broker Dealers." ¶83. The ***specific HSBC entity*** that served as the Minibonds trustee,

HSBC Bank, extended approximately $2.87 billion in credit to Lehman, out of approximately

$12 billion in credit that HSBC extended to Lehman in the aggregate. *Id*.

The "trustee" services that HSBC provided to Lehman were profitable and growing in 2007,

according to HSBC documents. ¶84. HSBC gave Lehman "[p]latinum" status internally (¶83), and

in return Lehman demanded capital to keep paying HSBC's fees. ¶85. According to HSBC,

"Lehman manages credit relationships very effectively and in a globally coordinated fashion

(centralized creditor relationship function within Treasury) ensuring credit support is rewarded and

lack of support ***penalized***." *Id*. Any such penalty was out of the question for HSBC, whose own

internal documents refer to "the [m]assive opportunities" for HSBC generated by Lehman's

"exceptionally large wallet." ¶86. The opportunity to reach into Lehman's "[w]allet" – in HSBC's

- 16 -

words – was worth $2.173 billion to HSBC.  ¶¶85-86.  HSBC colluded with Lehman to harm the

Minibond investors because HSBC wanted open access to Lehman's "wallet."  ¶86.

Clear allegations of collusion backed by defendants' own internal documents, their party

admissions, and the Valukas Report compel a finding of special circumstances.  *Roberts*, UKSC 22,

¶46.  The District Court emphasized these facts on appeal.  The District Court noted that "Lehman

Brothers designed the Minibonds program and directed the Issuer's activities," and that as "a party to

the trust deeds, LBSF was substantially involved in that process."  Appellate Order at 12.  The Court

also noted that the "Issuer then created a trust [the HSBC Bank trust] that, in certain circumstances,

distributes its only collateral to a *Lehman* entity, rather than the trust *sole* beneficiary."  *Id.*

(emphasis in original).  Examining these facts, the Court held: "Juxtaposed against the promise that

the Minibonds would be secured by highly-rated collateral, this is an odd result."  *Id.*[8]  HSBC Bank

violated its duty "to exercise the special care and skill which it professes to have" as a professional

trustee by colluding with Lehman to benefit Lehman and turning control over the HSBC Bank trust

to Lehman.  *Bartlett v. Barclays Bank Trust Co. Ltd. (No. 2)*, [1980] 2 W.L.R. 430, 444 (Ch.).

Whether "excusable or inexcusable," violating this duty constitutes an independent and legally

sufficient ground to find special circumstances present in this case.  Appellate Order at 11 (quoting

*Hayim*, A.C. 730 at 748); *accord* Ex. E; Ex. F.

The Amended Complaint goes well beyond mere allegations of collusion.  Proof of collusion

is supplied by HSBC's own testimony and the internal HSBC and Lehman documents underlying the

Valukas Report.  Collusion is also independently sufficient to establish special circumstances as a

---

[8]    Citations are omitted and emphasis added throughout unless otherwise noted.

matter of English law.  Appellate Order at 11 (citing *Roberts*, UKSC 22, ¶¶46, 110).  But collusion is not the only special circumstance alleged in the Amended Complaint.

### b.    Special Circumstance #2: Self-Dealing

Special circumstances also exist where, as here, there is a "failure, excusable or inexcusable, by the trustees to the beneficiary to protect the trust estate or to protect the interests of the beneficiary in the trust estate."  Appellate Order at 11 (quoting *Hayim*, A.C. 730 at 748).  Passive failure to protect the Saphir Notes is a special circumstance.  *Id.*  Affirmative self-dealing is another. *See* Ex. E, ¶18(a) (citing *Meldrum v. Scorer*, (1887) 56 LT 471)); *see also* Ex. F.  The District Court has all but held that that the Valukas Report demonstrates the existence of this special circumstance. Specifically, the District Court found that "the recently released Examiner's report reveals cooperation between HSBC and Lehman Brothers at the highest levels during Lehman Brothers' collapse."  Appellate Order at 13.

By cooperating with Lehman at the highest levels, HSBC learned that Lehman was insolvent before Lehman filed for bankruptcy protection.  ¶87.  This fact is important because Lehman's insolvency triggered an obligation on the part of HSBC to terminate the Minibonds program by forcing the redemption of the Saphir Notes at par.  ¶¶66-69.  HSBC Bank's representative, Sayers, confirmed its obligations as trustee in the event of Lehman's insolvency.  ¶70.  Sayers testified to Hong Kong legislators that "our role in a default is to take action ***to enforce the collateral [the Saphir Notes]*** for the benefit of the [Minibond] investors to ensure that they receive whatever value is raised from that collateral."  *Id.*  Despite the occurrence of four separate events of default under the Minibonds before Lehman formally commenced its first bankruptcy case (¶57), HSBC Bank did not take action to enforce the Saphir Notes.

- 18 -

Rather than redeeming the Minibonds at par during the summer of 2008, HSBC executed a covert operation focused on terminating its ***own*** $12 billion business relationship with Lehman. ¶87. Covering HSBC's entire worldwide organization, HSBC called this operation "Project Opaque," and later renamed it "Project Milan." *Id.* Documents underlying the Valukas Report demonstrate that at least three of HSBC Bank's executives – that is, executives of ***the specific entity*** that was the Minibonds trustee in this case – had major roles in executing Project Milan. ¶¶88-89. In addition, another senior executive who worked for an HSBC entity that provided issuing, paying agent and custodial services for the Minibonds was on Project Milan. ¶90. And last, but not least, internal HSBC documents show that Susan Sayers – the ***spokesperson*** for HSBC Bank and the rest of the HSBC entities involved in the Minibonds – was also on Project Milan. ¶89. HSBC Bank's contention that it had nothing to do with Project Milan (HSBC Mem. at 7-10, 16-19), is patently false and legally irrelevant. As "an integrated enterprise," what affects "the financial condition of one affiliate affects the others." *In re Charter Comm'ns*, 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009).

Project Milan carefully monitored, and indeed helped precipitate, Lehman's collapse by pulling Lehman's much-needed liquidity. Project Milan had three core principles, according to HSBC internal documents: (1) "Holistically protect the HSBC organization's interests, thereby limiting total losses"; (2) "Avoid crystallizing committed credit and/or precipitate a collapse of the regulated businesses or subsidiaries of Lehman Brothers"; and (3) "Avoid market signaling or externally transparent actions (to extent possible) that could precipitate the exit of other creditors, counterparties &/or clients thereby undermining the franchise and potentially crystallizing our losses on hard to exit/mitigate exposure, as well as lender liability and reputational considerations." ¶109. Project Milan involved, in HSBC's words, a "[c]overt reduction in exposure" to Lehman. ¶105.

On August 18, 2008, Project Milan executives terminated every HSBC entity's business dealings with Lehman. ¶113. By the end of August 2008, internal Lehman documents show HSBC took "a much more aggressive tone," demanding nearly a **billion** in cash under the threat of refusing to clear trades. ¶116. One Lehman executive told the Examiner that "'[b]asically they [HSBC] were not going to allow us to do business . . . *[t]hey put a gun to our head*'" such that not "granting HSBC's demand would have been '*terminal*' for Lehman." *Id.* Lehman raced to comply with HSBC's demands, setting off alarms at Lehman's highest levels. ¶117.

HSBC's actions in Project Milan, including "put[ting] a gun" to Lehman's head to protect HSBC's **own** economic interest, are legally relevant to the special circumstances doctrine. These actions show that while HSBC Bank was capable of doing whatever was necessary "to protect the trust estate or to protect the interests of the beneficiary in the trust estate," (Appellate Order at 11 (quoting *Hayim*, A.C. 730 at 748)), it chose not to do anything. Because HSBC's own money was not on the line in "securities driven collateralized financing transactions" like the Minibonds, the Minibonds fell into a special "'business as usual'" category of Project Milan. ¶124. By placing the Minibonds into the "'business as usual'" category while "'put[ting] a gun'" to Lehman's head to protect its own interests, HSBC Bank engaged in self-dealing while simultaneously violating *Hayim*'s obligation to take action to protect the trust estate or the Minibonds noteholders' interests in that property. Self-dealing violates the basic principle of trust law that a trustee must avoid a conflict between its personal interests and the interests of the beneficiaries. *Clark Boyce v. Mouat*, [1994] 1 AC 428. HSBC Bank also breached its duties to act in the interests of the Minibonds holders as it would act in its "own affairs." *Bartlett*, W.L.R. 430 at 440.

- 20 -

Special circumstances are present because HSBC Bank engaged in self-dealing, attempting to cut off all of its own business affairs with Lehman while conducting business as usual with Lehman as to the Minibonds. But there are still more special circumstances.

### c.    Special Circumstance #3: Fraud

Another special circumstance that is independently sufficient to justify plaintiff's suit against Lehman is "fraud on the part of the trustee." Appellate Order at 12 (citing *Roberts*, UKSC 22, ¶46). Further, fraud on the part of Lehman is also a special circumstance because "the underlying question is whether the circumstances are sufficiently special for the beneficiary to have the remedy." *Id.*

One fraud that Lehman perpetrated involved tricking the major U.S. credit rating agencies into giving Lehman higher credit ratings than it deserved. ¶¶136-138. Lehman's Examiner concluded: "There is sufficient evidence to support a determination by a trier of fact that Lehman's failure to disclose that it relied upon Repo 105 transactions to temporarily reduce the firm's net balance sheet and net leverage ratio was materially misleading." ¶138. The Examiner determined that Lehman engaged in this practice with an "eye towards the rating agencies' view of Lehman." ¶137. When the Examiner told one rating agency analyst about this practice, the analyst stated that the practice "'sounded like fraud.'" ¶136. HSBC Bank, through Project Milan, assisted Lehman in perpetrating this fraud on the Minibonds investors. Understanding why this is true requires a basic understanding of the relationship between Lehman's credit quality and the credit quality of the so-called "AAA" Saphir Notes that HSBC Bank held in trust for plaintiffs' benefit.

HSBC Bank spokesperson and Project Milan member Sayers clarified this relationship during her testimony to the Hong Kong legislature in late 2008. Sayers testified that "at the time that these products were sold, Lehman Brothers, of course, had a, I think, double A credit rating given by various credit rating agencies," and that "[i]t was on that basis that, I believe, the product was all

priced and sold" to the Minibond investors.  ¶130.  As the credit rating agencies Standard and Poor's and Fitch made clear, the "AAA" ratings that they provided to the Saphir Notes that collateralized the Minibonds were based, in substantial part, on Lehman's "AA" credit rating, which provided credit enhancement to support the Saphir Notes' "AAA" ratings.  ¶¶132-133.  Thus, if Lehman's credit rating were lower, the Saphir Notes' ratings would be lower.  Had the Saphir Notes been rated lower, they would not have even been *eligible* as collateral to support the Minibonds.  ¶133.

To trick the rating agencies and others into perceiving Lehman's credit quality to be stronger than it was in fact, Lehman needed help.  At the end of August and beginning of September 2008, HSBC helped Lehman dress up its balance sheet.  ¶¶140-143.  According to Project Milan materials, HSBC gave Lehman $800 million to place on its balance sheet over Labor Day weekend, requiring that Lehman return this restricted cash a few days later.  ¶¶140, 142.  The Federal Reserve Bank of New York indicated to the Examiner that it was improper for Lehman to count this type of restricted cash in its liquidity ratios.  ¶141.  HSBC assisted Lehman with this "month end" issue by providing restricted cash to Lehman, while it was "very worried about [Lehman's] quarter."  ¶140.  Internal Lehman documents corroborate the fact that Lehman's credit ratings would have been lower if it had accurately represented its liquidity position to the rating agencies.  ¶145.  At the same time that Lehman misrepresented its financial condition to the rating agencies and others, it caused the issuer of the Saphir Notes to exchange $344 million in old Saphir Notes for new Saphir Notes, the last of these deals occurring just three days before HSBC "'put a gun'" to Lehman's head, demanding $1 billion in cash.  ¶147.  As the sole noteholder of the Saphir Notes for plaintiff's benefit, it is eminently reasonable to infer that HSBC Bank knew about these $344 million in transactions and knew that they triggered another event of default, requiring the mandatory redemption of the Minibonds.  ¶¶147-148.

The Valukas Report and its underlying documents provide strong evidence that Lehman was engaged in actionable balance sheet manipulation, meaning that Lehman engaged in financial fraud. That fraud had a direct impact on the Minibonds, as both Lehman knew directly and HSBC Bank knew by way of Project Milan. This fraud is not only another "special circumstance" (Appellate Order at 12 (citing *Roberts*, UKSC 22, ¶46)), but it begins to explain HSBC Bank's bizarre conduct in this case. HSBC Bank and its affiliates have helped Lehman **prevent** the Minibond investors from protecting and recovering the Saphir Notes. An additional reason why HSBC Bank is fighting plaintiffs in **this case** and helping Lehman is because HSBC Bank's own personal economic interests are served if plaintiffs are defeated.

### d.    Special Circumstance #4: Conflicts

The conflict of interest that exists between HSBC Bank's personal economic interests and its duty to act in the best interests of the Minibonds investors is another special circumstance. Special circumstances are present where, "by reason of conflict of interest **or** duty," it is difficult for the trustee to sue. *In re Field*, [1971] W.L.R. 555, 559 (Ch.) (cited in *Roberts*, UKSC 22, ¶¶46, 51). Here, HSBC Bank has conflicts of interest **and** duty.

According to the Valukas Report, the bankruptcy estate owes numerous HSBC entities approximately $345 million. ¶¶165-167. Project Milan makes clear that it is irrelevant to HSBC whether those accounts are with HSBC Bank or any other entity; when any HSBC entity's capital is at risk, every HSBC entity's capital is at risk. ¶109; *accord Charter Commc'ns*, 419 B.R. at 251 ("the financial condition of one affiliate affects the others"). The existence of this direct economic conflict of interest is a special circumstance under *In re Field*.

Another special circumstance arises under *In re Field* due to HSBC Bank's conflict of duties. Lehman's expert, Professor McCormack contends that the "minibond investors" are "designated

beneficiaries, *in addition* to LBSF" of the HSBC Bank trust, which holds the Saphir Notes. Dkt. No. 75, Ex. 3, ¶8. To the extent that LBSF is considered a beneficiary, a "beneficiary dispute" exists between LBSF and the Minibond investors; rivals to trust property have standing "to fight their battles" *inter se*, while the trustee's obligation is "to remain neutral." *Alsop Wilkinson v. Neary*, [1996] 1 W.L.R. 1220, 1224-25 (Ch.). The trustee's obligation is to stay neutral in a dispute between similarly situated beneficiaries was recently confirmed in the *Perpetual* Judgments. The *Perpetual* Judgments demonstrate that it is appropriate for rivals to the Saphir Notes – Lehman and plaintiffs – to fight their battles while HSBC Bank remains neutral. *Perpetual II* explained that while the rival beneficiaries contested the trust property, "[t]he Trustee adopted a neutral position on the appeal." *Perpetual II*, EWCA Civ. 1160, ¶2. The *Perpetual* Judgments themselves constitute yet another special circumstance.

### e.    Special Circumstance #5: The *Perpetual* Judgments

The *Perpetual* Judgments stand for the proposition that *as soon as* Lehman became insolvent in the summer of 2008, or triggered any other events of default under the Saphir Notes, such defaults "automatically" triggered the so-called noteholder priority provisions. ¶59 (citing *Perpetual II*). The English Court of Appeals, similar to the Second Circuit in authority, used the term "automatically" twice to describe how the holder of the Saphir Notes became vested with noteholder priority as a matter of law. *Id.* Therefore, the *Perpetual* Judgments conclusively establish that the noteholder priority provisions in the Saphir Notes were automatically triggered when Lehman became insolvent.

The argument that Lehman has raised concerning the operation of the "noteholder priority" provisions in the Saphir Notes is that this Court should rewrite those provisions under a novel *ipso facto* argument to favor Lehman and to harm retail investors in Hong Kong. That argument has no

- 24 -

613196_2

chance of success in defeating the automatic operation of the noteholder priority provisions in this case, because they were triggered before *any* Lehman entity filed for bankruptcy protection in this case.

Although the District Court did not find that a very high likelihood of success on the merits was a "special circumstance" on its own, it emphasized *Roberts*'s finding that the "underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy." Appellate Order at 12. Plaintiffs' strong likelihood of success on the merits – based on binding authority and Lehman's own admissions that it was insolvent at least by August 2008 – is another independently sufficient special circumstance.[9]

### C.   The Amended Complaint Properly Alleges Constructive Trust Claims Given Defendants' Unconscionable Conduct

Citing cases from numerous jurisdictions, not including England, defendants contend that plaintiffs fail to allege constructive and resulting trust claims. Leh. Mem. at 28-30; HSBC Mem. at 16-21. These arguments are meritless. Plaintiffs bring their constructive and resulting trust claims both derivatively under Fed. R. Civ. P. 23.1 (*see* Derivative Count III, ¶¶187-195), and directly as class claims under Fed. R. Civ. P. 23 (*see* Class Action Counts, ¶¶202-211). Plaintiffs have standing to bring these claims derivatively on behalf of the HSBC Bank trust because, as detailed above,

---

[9]   Both defendants contend that the Amended Complaint fails to allege facts sufficient to support standing for Article III purposes. HSBC Mem. at 12-13; Leh. Mem. at 14. Article III standing is very broad, *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998), and is satisfied here because plaintiffs are holding bonds that are worthless because of Lehman's attack on the trust property supporting those bonds, HSBC Bank's stubborn refusal to protect the Minibonds holders' interests, and Lehman's and HSBC Bank's jointly collusive and unconscionable activities over the course of the life of the Minibonds program, as alleged in painstaking detail in the Amended Complaint and summarized herein. The wrongs that plaintiffs have suffered are plainly "traceable" to defendants' conduct and a court order can "redress" that conduct. *Deshawn E. by Charlotte E.*, 156 F.3d at 344. Article III standing is plainly present in this case.

- 25 -

special circumstances are present. Plaintiffs have standing to bring these claims directly because, as the District Court found, a "constructive trust relies on equitable, as opposed to contractual and formal trust, principles." Appellate Order at 16.

To start, no defendant even addresses the question of what law applies to plaintiffs' constructive and resulting trust claims. This deficiency is difficult to explain in light of the fact that the District Court remanded these claims for a choice of law analysis. *See* Appellate Order at 12. Under this analysis, English law applies. Federal choice of law determines the applicable law because HSBC Bank is an Edge Act company and this case involves international banking transactions pursuant to 12 U.S.C. §632. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980) (federal law applies in Edge Act cases). The federal choice-of-law rule is that law of the situs of the property governs equitable trust claims. *Amusement Indus. v. Stern*, 693 F. Supp. 2d 327, 342 (S.D.N.Y. 2010). Under this rule, English substantive law governs plaintiffs' constructive and resulting trust claims because HSBC Bank holds the Saphir Notes through its agent and Project Milan member HSBC Bank plc in London. *See* Declaration of David G. Januszewski in Support of Defendant HSBC Bank USA, National Association's Motion to Dismiss the Amended Class action and Derivative Complaint ("Januszewski's Decl."), Ex. 2 at 16 (Saphir Notes as Securities held by Custodian) and 68 (Custodian is HSBC Bank plc, an English entity).

English law will impose a constructive trust on a legal owner when that owner has engaged in "unconscionable conduct." *Westdeutsche Landesbank Girozentrale v. Islington LBC*, [1996] A.C. 669, 705 (H.L.). England's highest court set forth the relevant principles "fundamental to the law of trusts and . . . uncontroversial." *Id.* England's highest court summarized these "uncontroversial" principles in the following terms:

613196_2

(i) Equity operates on the conscience of the owner of the legal interest. In the case of a trust, the conscience of the legal owner requires him to carry out the purposes for which the property was vested in him (express or implied trust) or which the law imposes on him by reason of his unconscionable conduct (constructive trust).

(ii) Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, *i.e.* until he is aware that he is intended to hold the property for the benefit of others in the case of an express or implied trust, or, in the case of a constructive trust, of the factors which are alleged to affect his conscience.

(iii) In order to establish a trust there must be identifiable trust property. The only apparent exception to this rule is a constructive trust imposed on a person who dishonestly assists in a breach of trust who may come under fiduciary duties even if he does not receive identifiable trust property.

(iv) Once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property, which proprietary interest will be enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal interest without notice.

*Id.* at 705. These principles apply to establish a constructive trust in this case.

Under these principles, a constructive trust should be imposed on the Saphir Notes, all of Lehman's purported claims to alter the terms of the Saphir Notes, and on HSBC Bank's ill-gotten property, which includes naked possession of the Saphir Notes and ownership of assets it forced Lehman to convey to HSBC during Lehman's insolvency. Lehman and HSBC Bank have engaged in "unconscionable conduct" under *Girozentrale* because they colluded to harm retail investors while enriching Lehman as detailed above. *Accord* Appellate Order at 12 (noting that Pacific, directed by Lehman, secured the Minibonds with derivatives that benefitted Lehman instead of, as promised, "AAA" rated bonds – "an odd result"). Again, according to the sworn testimony of HSBC Bank spokesperson and Project Milan member Sayers, Pacific was "a creature of Lehman's design." ¶79. But, at the same time, Pacific was owned and operated by a cluster of HSBC entities, including HSBC Bank. ¶77. Pacific created complex financial credit derivatives, sold them to retail investors

- 27 -

by offering store coupons, cameras, bottles of wine, camcorders and other consumer goods as "prizes." ¶4. Grocery store coupons, however, were not sufficient to compensate investors for the low interest they received on these derivatives. ¶¶36-37. And while Lehman teetered on collapse, HSBC Bank colluded with Lehman (¶120), and "'put a gun'" to Lehman's head to pull its own liquidity from Lehman (¶116) while keeping the Minibonds in "'business as usual'" mode. ¶¶123-125.

Even if the foregoing facts and the rest of the Project Milan collusive saga are insufficient to render Lehman and HSBC Bank's actions "unconscionable" under *Girozentrale*, Lehman's greedy efforts to ***rewrite*** the Saphir Notes' terms more than suffices. This effort to change what was already a one-sided transaction favoring Lehman and harming the Minibond investors is unconscionable, if that term has any meaning at all. Under these egregious circumstances, Lehman is "dishonestly assist[ing] in a breach of trust," and thereby "come[s] under fiduciary duties [to plaintiffs] even if [it] does not receive identifiable trust property." *Girozentrale*, A.C. 669 at 705. HSBC Bank's actions are no better: it is aggressively attempting to ***prevent*** the Minibond investors from protecting and recovering the Saphir Notes. ¶3. English law would impose a constructive trust over any and all claims that Lehman and HSBC Bank purport to have over the Saphir Notes. The same is true for whatever capital HSBC Bank took from Lehman when Lehman was insolvent in the summer of 2008. ¶167.

Contrary to defendants' arguments, *Girozentrale* does not limit the application of the constructive trust doctrine to situations were no "contracts" touch the property at issue (Leh. Mem. at 28), nor does *Girozentale* limit the reach of a constructive trust where another remedy at law exists. HSBC Mem. at 20. New York law reaches the same result. *Golden Budha Corp. v. Canadian Land*

*Co., N.V.*, 931 F.2d 196, 202 (2d Cir. 1991) (a constructive trust is a "flexible device," to be imposed """under such circumstances that in equity and good conscience"" call for it).

The Amended Complaint clearly and adequately alleges plaintiffs' constructive trust claims.

**D.    A Resulting Trust Is Properly Alleged Given the Failure of the HSBC Bank Trust**

Plaintiffs properly bring their claim for a resulting trust as well.  English substantive law controls this question for the same reasons it governs plaintiffs' constructive trust claims.

Plaintiffs have adequately alleged a claim for resulting trust under English law.  To invoke this claim, all that is required is that plaintiffs contribute a portion of the purchase price of the Saphir Notes.  The House of Lords set forth the applicable rule in *Tinsley v. Milligan*, [1994] 1 A.C. 340 (H.L.):

> The creation of such an equitable interest does not depend upon a contractual obligation but on a common intention acted upon by the parties to their detriment.  It is a development of the old law of resulting trust under which, where two parties have provided the purchase money to buy a property which is conveyed into the name of one of them alone, the latter is presumed to hold the property on a resulting trust for both parties in shares proportionate to their contributions to the purchase price.

*Id.* at 371.  Pacific – a creature of Lehman's design and HSBC Bank's operation – took class members' investment capital and used it to buy the Saphir Notes.  ¶¶26, 39, 81.  A resulting trust over that property is thus appropriate in this case as a matter of English law.

New York courts apply a similar rule.  Under New York law, a resulting trust "arises where there is an agreement by one person to purchase property for another, with the intent that the beneficial interest in that property reside not with the one who holds title to it, but with the purchaser." *Torres v. $36,256.80 United States Currency*, 25 F.3d 1154, 1159 n.5 (2d Cir. 1994); *In re AppOnline.com, Inc.*, 315 B.R. 259, 275-76 (Bankr. E.D.N.Y. 2004) (a resulting trust arises "'where an express trust fails in whole or in part'") (quoting *Saulia v. Saulia*, 31 A.D.2d 640, 640

- 29 -

(N.Y. App. Div. 1968)).  The Minibonds are in default, and have been for over two years.  The HSBC Bank trust was suppose to collateralize those bonds and repay or distribute the Saphir Notes to investors under these circumstances.  That trust has clearly failed, requiring the imposition of a resulting trust.  Plaintiffs' resulting trust claims are more than adequately pled.

### E.    Plaintiffs Satisfy Rules 23.1 and 23

Conceding that the named plaintiffs have standing to bring derivative claims for the so-called "series" of Minibonds they own, defendants allege that plaintiffs cannot satisfy Rule 23.1 as to other Minibonds series that they do not own.  Leh. Mem. at 15-18; HSBC Mem. at 12-14.  In addition, defendants complain that plaintiffs have not alleged demand futility under Rule 23.1.  Leh. Mem. at 19-20.  Both of these arguments fail.

First, under Rule 23.1, plaintiffs are members of the HSBC Bank trust, having purchased Minibonds issued by a single issuer, Pacific, governed in its entirety by a single trust deed, the principal trust deed, which is administered by a single trustee, HSBC Bank.  It is the common duty that HSBC Bank owes to all Minibond noteholders that enables any Minibond noteholder to allege special circumstances.  HSBC Bank itself recognized this common duty in sworn testimony, explaining, "our role in a default is to take action *to enforce the collateral [the Saphir Notes]* for the benefit of the [Minibond] investors to ensure that they receive whatever value is raised from that collateral."  ¶70.  By their derivative complaint, plaintiffs seek to step into the shoes of this single trustee to fulfill that common obligation owed to *all* Minibond noteholders by HSBC Bank.  None of the cases defendants cite involve this type of common duty owed to a group of beneficiaries by a single trustee, who is obligated to satisfy the obligations to a single issuer, Pacific.  To the contrary, defendants' cases which address separate legal entities that were not bound by a single organizational document such as the principal trust deed.  These cases, which involve attempts to

- 30 -

assert derivative claims on behalf of entities (such as mutual funds) that had no relation to each other

or the plaintiffs, are inapposite.[10]   None of the cases even address claims arising out of special

circumstances created by a trustee's conflicts, let alone support dismissal where that trustee owes an

identical fiduciary duty to each trust beneficiary.   Since plaintiffs do not seek to occupy the shoes of

numerous unrelated entities, but instead those of a single trustee which owes common duties to all of

the plaintiffs, defendants' contention that plaintiffs cannot satisfy Rule 23.1 as to all of the

Minibonds is meritless.   In any event, defendants cannot dispute that the named plaintiffs have

standing to represent the series they did purchase and still own.

Second, plaintiffs are not required to demand that HSBC Bank take action in this case under

Rule 23.1 because such a demand would be – indeed, has been – futile.   "[T]he 'demand' conditions

spelled out in Rule 23.1 are waived when they would be futile, useless or unavailing." *Ackerman v.

Nat'l Prop. Analysts, Inc.*, 887 F. Supp. 494, 507 (S.D.N.Y. 1992) (citing *Kaster v. Modification

Sys., Inc.*, 731 F.2d 1014, 1017 (2d Cir. 1984)).   Demand is excused and futile in this case because

"special circumstances" are present under English law, which applies here because the Minibonds

trust is governed by English law.   *Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007)

(internal affairs doctrine required application of English derivative rules to Cayman entity).   Demand

---

[10]     Each case holds that the holder of one mutual fund may not assert derivative claims on behalf of other mutual funds managed by the same investment manager. *See Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 734-37 (3d Cir. 1970); *Weiner v. Winters*, 50 F.R.D. 306, 310-11 (S.D.N.Y. 1970).   In *Kauffman*, the plaintiff held four mutual funds – The Dreyfus Fund, Inc., Fidelity Trend Fund, Inc., Manhattan Fund – and sued derivatively on behalf of 65 mutual funds.   434 F.2d at 731 & n.1; *see also Weiner*, 50 F.R.D. at 308 (plaintiff was a holder of the Fund of America, Inc., and did not contend that he was a shareholder in any of the other funds encompassed by the derivative claim); *Kauffman*, 434 F.2d at 732 (describing the question as whether a shareholder of mutual funds has derivative standing to bring an action on behalf of other funds similarly situated); *Weiner*, 50 F.R.D. at 310-11 (stating that plaintiff may not maintain a derivative action on behalf of mutual funds in which he owns no shares).

613196_2

is also waived "when the basis of plaintiff's complaint is mismanagement or fraud on the part of a majority of the directors themselves," because "[r]igid adherence to Rule 23.1 in this context would oblige plaintiff to demand that the directors bring suit against themselves, a futile gesture." 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §1831, at 123 (3d ed. 2007).

Defendants argue that plaintiffs have not pled a plausible conflict on behalf of HSBC Bank. Leh. Mem. at 22-24. The Amended Complaint, however, spends more than 50 paragraphs detailing HSBC's self-dealing at the expense of the trust. ¶¶73-129. Such self-dealing renders the demand requirement futile, and therefore unnecessary. In addition, the Amended Complaint makes clear that HSBC is a party to the bankruptcy estate, which will be increased by $1.5 billion should plaintiffs' claims fail. ¶¶165-169. In "an integrated enterprise, . . . the financial condition of one affiliate affects the others." *Charter Comm'ns*, 419 B.R. at 251. Therefore, because HSBC is a party to the bankruptcy estate, HSBC Bank has a clear conflict in acting on plaintiffs' behalf. Further, "demand may" also "be excused when plaintiff alleges, with supporting facts, that the individual directors . . . are under the control of the real defendants." Wright, *supra*, §1831, at 123-26. HSBC Bank admitted that it abdicated control of the trust to Lehman, turning control over the entire Minibond program to Lehman. ¶¶78-79.

In addition, plaintiffs have direct standing to represent all Minibond investors through their class action claims for constructive trust and resulting trust under Rule 23. All Minibond investors, regardless of series, are identically situated in respect to plaintiffs' equitable claims. All of the Minibond investors were harmed by the same "unconscionable conduct" that mandates a constructive trust. Further, all Minibond investors are entitled to repayment of their principal or distribution of the Saphir Notes through the resulting trust. Thus, it cannot be disputed that plaintiffs

- 32 -

have standing to represent all Minibond investors in their direct causes of action for equitable and constructive trust – claims grounded in "equitable, as opposed to contractual and formal trust, principles" – regardless of the series of minibonds notes they purchased. Appellate Order at 16.

**F.    The District Court Found It "Self-Evident" that This Court Has Subject Matter Jurisdiction over Plaintiffs' Claims**

HSBC Bank continues its crusade to prevent the Minibond investors from protecting the trust property that HSBC Bank is duty-bound to protect by urging this Court to dismiss plaintiffs' claims on the grounds that it lacks subject matter jurisdiction to hear them. HSBC Mem. at 14.

The District Court has already rejected this meritless argument, stating that in "this case, Plaintiffs seek to prevent the transfer of the Saphir Notes – worth $1.6 billion – to the bankruptcy estate," and that the "effect of $1.6 billion on the bankruptcy estate is self-evident." Appellate Order at 15. The District Court noted that it was LBSF, "not Plaintiffs," that "tethered the Saphir Notes to the Lehman Bankruptcy." *Id.* The District Court held that plaintiffs should be permitted to replead their equitable claims against LBSF "as derivative claims," which, by definition, involves joining HSBC Bank and alleging the special circumstances that the District Court analyzed. *Id.* at 13. The District Court reversed this Court's rulings that plaintiffs could not sue HSBC Bank, and found that this Court has "related to" jurisdiction over that matter. *Id.* at 14-15.

HSBC Bank's subject mater jurisdiction argument ignores the District Court's order.

**G.    Defendants' Miscellaneous Contract Arguments Did Not Prevail on Appeal, and Should Not Prevail Here**

On appeal, defendants argued that plaintiffs lacked standing to sue on the basis of various contract-based arguments. Lehman contended that plaintiffs' derivative claims were supposedly barred by a statute in England governing contractual disputes. HSBC Bank argued that plaintiffs'

- 33 -

derivative claims were barred by a so-called no-action clause. Neither of these arguments prevailed on appeal, and they should not prevail here.

Lehman claims that it is able to destroy the Saphir Notes with impunity due to a Contracts (Rights of Third Parties) Act 1999 provision in the Minibonds principal trust deed. Leh. Mem. at 25. Lehman made this same argument on appeal, and the District Court rejected it. The District Court held that the Contracts Act 1999 "*expressly* states that it does not 'affect any right or remedy of a third party that exists or is available apart from th[e] Act." Appellate Order at 14 (alteration in original) (citing Contracts Act 1999, c. 31, §7). The District Court concluded that "while the trust deeds deprive Plaintiffs of rights derived from the Contracts Act of 1999, Plaintiffs may hold rights outside the Act, an issue the Bankruptcy Court did not consider." *Id.* at 14-15.

The Amended Complaint does not bring a single claim under the Contracts Act 1999. Plaintiffs' claims rest on trust and equitable principles, which the Contracts Act 1999 expressly preserved. Indeed, as plaintiff's English law expert, Professor Oditah, explained, the language of the Contracts Act 1999 itself states that it "does *not* affect any right or remedy of a third party that exists or is available apart from this Act." Oditah Opinion, ¶39; *see also* Contracts Act 1999 §7(1).

Numerous authorities demonstrate that Professor Oditah's reading of the Contracts Act 1999 is correct and that Lehman's repeated attempts to eliminate trust law from the legal landscape must fail. *See, e.g.*, *Gregson v. HAE Trustees Ltd.*, [2008] EWHC 1006 (Ch.) (applying general trust law and Trustee Act 2000 in context of trust dispute, not contract law); *Re Lehman Brothers*, EWCA Civ. 1161, ¶¶67, 68, 69 (contract law does not defeat or displace trust beneficiaries' property rights); the Trustee Act of 2000 (demonstrating beneficiaries have rights apart from the Contracts Act 1999). *Perpetual I* and *Perpetual II* further demonstrate that the Contracts Act 1999 did not "affect" or void any remedy trust beneficiaries have. In those cases, the transaction documents included substantially

- 34 -

similar Contracts Act 1999 provisions as those cited by Lehman in this case, but those provisions did not prevent the contractual "non-party" plaintiffs in that case (*see Perpetual I*, ¶2), from asserting their claims. *Compare* Ex. G at 30 (§19) (relevant provision in *Perpetual I* and *Perpetual II*); *with* Januszewski's Decl. (Dkt. No. 14), Ex. 2 at 3 (§1.4).

HSBC Bank's contract-based arguments fared no better on appeal. Nonetheless, HSBC Bank claims it is free to allow Lehman to attack the Saphir Notes because of a certain "no action" clause in the Minibonds principal trust deed. HSBC Mem. at 10. This argument fails on several grounds. First, nowhere does the clause limit *any* suits against HSBC Bank, the trustee: it only limits "proceedings against the Issuer," a separate (albeit related) entity, not the trustee. *Id.* at 10, 17, 19. Second, another provision specifically allows plaintiffs to sue HSBC Bank:

> If the Trustee [HSBC Bank] fails to show the degree of care and diligence required of it as a trustee, ***nothing*** in this Principal Trust Deed or any Supplemental Trust Deed shall relieve or indemnify it from or against any liability that would otherwise attach to it in respect of any negligence, default, breach of duty or breach of trust of which it may be guilty.

Januszewski Decl., Ex. 2 at 22 (Trust Deed, §10).

Third, following default, "no action" clauses are unenforceable as a matter of public policy in New York, *Beck v. Mfrs. Hanover Trust Co.*, 218 A.D.2d 1, 12 (N.Y. App. Div. 1995), and England. In the *Perpetual Judgments*, for example, the trust beneficiaries did not follow the "no action" clause but refused to provide any "indemnity" to the trustee (*Perpetual I*, EWHC 1912, ¶¶6, 11, 12), and that case reached a trial on the merits. Fourth, Lehman never followed this purported "no action" clause when it froze the entire HSBC Bank trust through its "cease and desist" letter. Fifth, the trustee owes plaintiffs direct duties to return the trust property to plaintiffs under *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 173 F.3d 454, 459 (2d Cir. 1999), and *Bartlett*, 2 W.L.R. at 444, due to the

- 35 -

fact that the Minibonds have defaulted. HSBC Bank cannot continue to shirk its obligations by pointing to a no action clause.

HSBC Bank next seizes on plaintiffs' demand for a rescissory remedy, contending that plaintiffs have delayed in alleging this remedy. HSBC Mem. at 22. HSBC Bank's primary complaint is that plaintiffs should have discovered how HSBC Bank helped Lehman commit fraud during the summer of 2008 ***before*** the Valukas Report and its underlying documents were released in 2010. *Id.* Plaintiffs have the right to seek any remedy at this stage, *Tang v. Capacious Investments Ltd.*, [1996] 1 All ER 193, and have not unreasonably delayed in doing so. On the subject of delay, the better question focuses on why HSBC Bank has been sleepwalking for over two years while Lehman attacks and prevents the distribution of the Saphir Notes. The answer to that question is clearly alleged – based on Project Milan and other documents underlying the Valukas Report – in the Amended Complaint.

### H.    LBHI Is a Proper Party to This Action

Lehman also seeks the dismissal of LBHI as a defendant, claiming that plaintiffs fail to allege that LBHI would stand to recover anything under any interpretation of the contracts. As an initial matter, Lehman again ignores trust law in favor of a "contractual" analysis that is not applicable. This Court, the District Court, and Lehman's own English law expert concluded that the principles of trust law, not contract law, apply to this dispute. §IV.B.1, *supra*.

Substantively, it is apparent that LBHI is a proper defendant to this action. The District Court credited plaintiffs' allegations that LBHI designed the Minibonds program, appointed HSBC Bank as trustee of the Minibonds collateral, and complied the prospectus for each Minibonds series.

613196_2

Appellate Order at 3, 12.[11]  LBHI, along with LBSF, "exercised control over the Minibonds program[.]"  *Id.* at 4.  Further, LBHI, along with LBSF, caused Pacific to use the money it raised by selling Minibonds to purchase an equivalent face value of Saphir Notes.  ¶42.  LBHI helped to create and control the special purpose vehicles that issued the Saphir Notes, too.  ¶41.

In addition, the very purpose of the Minibonds program was to enable LBHI access to cheap insurance on bad debt it carried on its own balance sheet.  ¶44.  LBHI provided the credit guarantees necessary to launch and sustain the Minibonds.  ¶¶131-133.  And LBHI colluded with HSBC to engage in balance sheet fraud, which enabled the Saphir Notes to attain the "AAA" rating that qualified them as collateral for the Minibonds.  ¶¶131-133, 144-145; *see also* Appellate Order at 13 (HSBC and LBHI cooperated "at the highest levels" during LBHI's collapse).

In short, LBHI was integral to the creation, purpose and operation of the Minibonds program from the start, and it is a participant in the efforts to rewrite the Saphir Notes.  LBHI is a proper defendant to this action.

## V.    CONCLUSION AND REQUEST FOR LEAVE TO AMEND

For the reasons set forth above, Lehman's and HSBC Bank's motions to dismiss should be denied in full.  In the alternative, plaintiffs request leave to amend the Amended Complaint to address the Court's rulings if the Court grants the motions to dismiss in any respect.

---

[11]    When the District Court refers to "Lehman Brothers," it is referencing the entity that plaintiffs have labeled LBHI.  Appellate Order at 3.

- 37 -

DATED:  March 17, 2011                 Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       LUKE O. BROOKS
                                       JASON C. DAVIS


                                              s/ Jason C. Davis
                                       _____
                                             JASON C. DAVIS

                                       Post Montgomery Center
                                       One Montgomery Street, Suite 1800
                                       San Francisco, CA  94104
                                       Telephone:  415/288-4545
                                       415/288-4534 (fax)
                                       lukeb@rgrdlaw.com
                                       jdavis@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SPENCER A. BURKHOLZ
                                       DARRYL J. ALVARADO
                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)
                                       spenceb@rgrdlaw.com
                                       dalvarado@rgrdlaw.com

                                       ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)
                                       srudman@rgrdlaw.com
                                       drosenfeld@rgrdlaw.com

- 38 -

GENOVESE JOBLOVE & BATTISTA, P.A.
JOHN H. GENOVESE
PAUL J. BATTISTA
DAVID C. CIMO
ROBERT F. ELGIDELY
Bank of America Tower, 44th Floor
100 Southeast Second Street
Miami, FL  33131
Telephone:  305/349-2300
305/349-2310 (fax)

Attorneys for Plaintiffs

- 39 -