Objection Deadline: April 7, 2011 at 4:00 p.m. (Prevailing Eastern Time)
Hearing Date and Time: April 13, 2011 at 10:00 a.m. (Prevailing Eastern Time)

BINGHAM McCUTCHEN LLP
Edwin E. Smith
Sabin Willett
Stephanie W. Mai
One Federal Street
Boston, MA 02110
Telephone: (617) 951-8000
Facsimile: (617) 951-8736

*Attorneys for State Street Bank and Trust Company*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
:
:
: Chapter 11
In re :
: Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., et al., :
: (Jointly Administered)
Debtors. :
:
::
------------------------------------------------------------------- X

**OPPOSITION OF STATE STREET BANK AND TRUST COMPANY TO DEBTORS'
MOTION PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND
RULE 7026 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR
AUTHORIZATION TO ESTABLISH AND IMPLEMENT PROCEDURES IN
CONNECTION WITH DISCOVERY RELATED TO PLAN CONFIRMATION**

**I.  INTRODUCTION**

State Street Bank and Trust Company ("State Street"), a substantial creditor of Lehman

Commercial Paper, Inc. ("LCPI") and Lehman Brothers Holdings, Inc. ("LBHI") submits this

opposition to the Debtors' motion [No. 14867] to establish discovery procedures for plan

confirmation purposes (the "Motion"). Establishing uniform procedures will be appropriate, and

State Street commends the effort to rationalize the process that will soon commence concerning

A/74017292.5

two competing plans: the Debtors' proposed plan[1] and the competing plan submitted by an *ad hoc* group of creditors of the holding company.[2] The problem with the Motion is that it unfairly burdens -- indeed, appears to target -- the very creditor constituencies who are disadvantaged by the structure of each plan. Those creditors are the "opco" creditors -- who hold contractual claims against the operating subsidiary Debtors. Each plan would strip value from the operating Debtors and deliver it to the holding company (and ultimately its bondholders). The Debtors, advocates of this effort, are well represented by professionals who have, in practical terms, a limitless budget. Similarly well-represented is the official committee of unsecured creditors ("<u>Committee</u>"), but here the Committee serves creditors of the parent holding company as well as the operating companies, and thus is in no position to defend creditors of the latter from creditors of the former.[3] No estate representative uniquely protects any of the creditors of the operating debtors -- even though their chapter 11 cases, standing alone, certainly would constitute "megacases." The current Motion would increase the imbalance of power and access, by imposing significant practical burdens on impaired creditors, and, at a practical level make it difficult to unearth the factual basis for the proponents' substantive consolidation theories.

A better alternative is available. The Motion's awkward delegation mechanics point the way toward a different approach that could indeed rationalize and simplify the pretrial phase without prejudicing victims of the proposed plans. Under this approach, which State Street outlines below, confirmation discovery might be coordinated and shortened by: (a) recognizing

---

[1] First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [No. 14150] ("<u>Debtors' Plan</u>").

[2] Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors . . . . [No. 13504] ("<u>Holdco Plan</u>").

[3] The Holdco Plan provides for compensation of the proponents' professionals. *See* Holdco Plan § 9.6. One can be sure that any compromise between the Debtors and this group will propose reimbursement of its professionals.

*ad hoc* committees, *for plan purposes only,* for the operating subsidiaries that would be harmed by confirmation of each of the proposed plans, (b) compensating the professionals of those committees as administrative expense claimants under section 503(b), and (c) requiring, as a *quid pro quo*, that creditors who opt into the benefits of an *ad hoc* committee opt out of direct participation in the plan discovery process, subject only to exceptional showings of cause.

## II. GROUNDS FOR OPPOSITION

**A.    The Plans**

1.    To understand the process problems presented by the Motion, the Court may begin with the crucial issue framed by the proposed plans, and the nature and custodians of the discovery information that would be necessary to the Court's resolution of that issue.

   *i.    The Holdco Plan*.

2.    The Holdco Plan is a modified "substantive consolidation" plan. Sophisticated creditors of the holding company, LBHI, would raid the assets of the major operating companies by consolidating those entities with the holding company, and treating creditor claims substantially identically.[4] The Holdco Plan folds in a "death trap" mechanism, by which creditors can mitigate their injury by voting to accept the Holdco Plan.[5]

   *ii.    The Debtors' Plan*.

3.    The Debtors have crafted a more nuanced form of a "substantive consolidation" plan. The Debtors' Plan would not give effect to corporate consolidation by substantively consolidating debtor estates. Rather, it would pick and choose between particular *classes* of

---

[4] Proposed Disclosure Statement for the Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors . . . . at 5-6 [No. 13505].

[5] Holdco Plan at ¶ 4.6.

creditors at discrete estates, burdening some to the benefit of others.[6] The Debtors' Plan seeks refuge in Rule 9019, styling itself a "settlement" of intercompany issues and balancing the potential effects of consolidation and non-consolidation approaches.

**B.    Key Legal Questions and Related Discovery Issues Raised by the Plans**

    *i.    The Weak Underpinnings of the Substantive Consolidation Doctrine.*

4.    The first question raised by the proposed plans is whether, as a matter of law, the substantive consolidation of estates may be imposed on parties in interest.[7] The Court of Appeals has grudgingly acknowledged a limited substantive consolidation power in *dictum*, *see In Re Augie-Restivo Baking Company*, 860 F.2d 515 (2d Cir. 1988) (reversing an order upholding a substantive consolidation plan); *Federal Deposit Insurance Corp. v. Colonial Realty, et al.*, 966 F.2d 57 (2d Cir. 1992) (approving substantive consolidation but expressly limiting holding to sole issue appealed, *viz.*, whether substantive consolidation could be denied merely because certain debtors were natural persons). However, later authorities have unearthed the mistaken premise of the doctrine: that an equitable power of substantive consolidation had

---

[6] Debtors' Plan at ¶ 6.5 (Plan Settlements); *see, e.g.* Debtors' Plan at ¶¶ 5.3-5.7 (treatment of LCPI Classes 3-5C, demonstrating the application of ¶ 6.5 to most classes of creditors of operating company debtors).

[7] By "substantive consolidation," this opposition refers to *judicially-enforced* consolidation. Legitimate creditor classes are free to vote for compromise treatment, and to the extent that entity-specific creditor classes accept treatment that is economically equivalent to a consolidation, that treatment can be approved. *See* 11 U.S.C. §§ 1126(c) (class acceptance binds class members), 1129(a)(8)(A) (plan confirmable where all classes accept). This approach is theoretically possible through the Debtors' Plan (which classifies creditors on an entity basis), although not through the Holdco Plan, which does not classify creditors by entity, and thus deprives them of the ability to cast that vote. The practical reality, however, is that burdened classes are likely to reject both plans, thus presenting the question whether substantive consolidation might be judicially enforced.

previously arisen under the Bankruptcy Act, and been imported into the Code through section 105(a).[8]

5.  In fact, no such power ever existed under the Bankruptcy Act. The wellspring usually cited, *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941), was simply a fraudulent conveyance case. Neither *Sampsell* nor the cases upon which it rested[9] recognized a power to consolidate corporate estates outside the context of furnishing remedies for fraudulent conveyances or enforcing equitable subordination of a discrete creditor claim. As one scholar has noted, the term, "substantive consolidation" was never even used in a case decided under the Bankruptcy Act.[10]

6.  More recently (and after the Second Circuit's rulings in *Augie-Restivo* and *Colonial Realty*), the Supreme Court held that federal courts have only two sources of equity jurisdiction: that conferred expressly by Congress, and that which existed in the English Court of Chancery in 1789. *Grupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). Neither source of power will aid the plan proponents here. "Substantive consolidation has no express statutory basis but is a product of judicial gloss." *Augie Restivo*, 860 F.2d at 518. As to a general *equitable* power, there is no plausible argument that "substantive consolidation power" existed in 1789, when reorganization was not yet a part of

---

[8] *See Augie-Restivo*, 860 F.2d at 518 n.1 ("Courts have found the power to consolidate substantively in the court's general equitable powers as set forth in 11 U.S.C. § 105").

[9] *See Taylor v. Standard Gas & Electric*, 306 U.S. 307 (1939); *Pepper v. Litton*, 308 U.S. 295 (1939); and *Bird & Sons Sales Corp. v. Tobin*, 78 F. 2d 371 (8th Cir. 1935), none of which involves the substantive consolidation of corporate entities.

[10] Douglas Baird, Substantive Consolidation Today 11-12 (2005); available at www.iiiglobal.org/country/usa/Substantive_Consolidation_5.pdf.

bankruptcy, and the business corporation itself was still in its cradle.[11]  No doctrine had then evolved whereby courts might consolidate distressed corporations.  Thus, the size and stakes in these cases are likely to drive, at the threshold, a fundamental reappraisal of whether there is a basis for substantive consolidation relief at all.  *See generally, In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).

    ii. *The Defective 9019 Theory in Debtors' Plan.*

    7. A second legal point that will be hotly contested is the Debtors' Plan's misuse of Bankruptcy Rule 9019.  Broadly speaking, the rule is available to permit bankruptcy courts to approve *actual* -- not hypothetical -- compromises between litigants or other disputants.  *Foster Mortgage Corporation v. Connecticut General Life Insurance Company*.  68 F.3d 914, 918 (5th Cir. 1995); *In re Nutritional Corp.*, 398 B.R. 816 (Bankr. D. Del. 2009).  A plan proponent cannot use the rule to "settle" with itself, and then justify a result unsupported in the law on the theory that it is a balanced "compromise" of potential outcomes.  *See Nutritional Corp,* 398 B.R. at 837 (denying confirmation of Rule 9019 settlement plan where parties whose rights were severely impacted were not present in negotiations).  That is what the Debtors seek to do here.  Disputes on that question will involve some factual exploration of what exactly has occurred vis-à-vis the "settlement" to which the Debtors' Plan refers.

    iii. *Litigating Substantive Consolidation in the Lehman Cases.*

    8. The proposed discovery order comes sharply into focus if one assumes, as the plan proponents do, that Second Circuit authorities still confer a right to impose substantive consolidation over the objection of parties in interest in *some* cases.  In *Augie-Restivo,* the

---

[11] Historians identify only six native business corporations that had come into being in Colonial times, and only twenty more that were added during the thirteen years preceding the adoption of the Federal Constitution.  *See* William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 2 (2005).

Second Circuit reversed an order of substantive consolidation, in *dictum* limiting the doctrine to situations that look much like the state law of veil piercing, where (i) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit, and (ii) the economic affairs of the debtors were so entangled that the expense of disentanglement would outweigh -- for *all* creditors -- the harms of consolidation. *Augie Restivo*, 860 F.2d at 518. Assuming, *arguendo*, that these were the tests here, the plan proponents would bear the burden of making these showings. If they could be made at all, these showings would depend in large measure on documents, testimony, and facts within the knowledge of the Debtors and their former employees.

9. The opco creditors who would suffer harm through consolidation have no effective way to unearth this information. They have no estate representative to pursue it, and they are opposed by adversaries that are massively-staffed and estate supported. As to facts relevant to the consolidation issue, they have no obvious place even to begin, because on its face, these cases lie at a far extreme from the two *Augie-Restivo* factors.

    a. *Entanglement of finances*. What creditors can glean from the Debtors' proposed disclosure statement is that auditors were able to audit the financial statements of the Debtors, including those financial statements that reflected intercompany debt, Debtors' Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors . . . . at 81-82 [No. 14151]. The Debtors' Plan further shows that the Debtors *themselves* can easily identify creditors by Debtor and class of creditor. The principal operating subsidiary, a registered broker dealer, was highly regulated and transparent, with its capital inspected on a daily basis. With well-documented intercompany funds flows involving the parent, the other

A/74017292.5      - 7 -

operating subsidiaries and the regulated broker dealer on a daily basis, no one has yet explained how the parent might fairly be consolidated with other operating companies but not with Lehman Brothers Inc. The Holdco Plan points to a centralized cash management system, but such systems are common, if not universal among large corporate groups, and the system here was transparent. The Examiner's Report illustrates *integration*, not consolidation -- with trades being booked "to the legal entity within Lehman that corresponded to the product being traded, or that satisfied tax, financing or regulatory considerations." Examiners' Report Vol. 5 at 1967-68. Intercompany financings, which could not have existed at all were it impossible to disentangle finances, were common.[12] These cash management arrangements demonstrate that the Debtors observed corporate separateness, and instantaneously tracked the assets and liabilities of all of the relevant entities. The post-petition evidence is that, based on the Debtors' cash management system, books and records, the Debtors' financial advisors had been able to prepare accurate schedules, debtor by debtor.

   b. *Creditor Expectations*. Ample evidence (in the form of creditor requests for guaranties) shows that the market understood the entities *not* to be a single entity. The substantive consolidation theory was launched by shrewd group of hedge funds that sought out parent-company bonds and have not suggested that they were confused about their counterparty. ISDA contractual provisions permitting a Lehman counterparty to assign liability to another Lehman entity confirms that, absent the contract, the corporations were *separate* -- not the reverse. That such provisions could exist at all only

---

[12] In the tumultuous period surrounding the filing, the Debtors contend that certain financings and transactions were made without consideration or were otherwise inappropriate. If and to the extent that were so, avoidance law would provide an appropriate remedy for discrete transactions.

demonstrates that the marketplace understood that it was dealing with separate entities. In short, there was no hopeless entanglement here, but simply a group of large and complex businesses. As the Second Circuit put it when it rejected substantive consolidation in *Augie-Restivo*, "substantive consolidation should be used only after it has been determined that *all creditors will benefit* because untangling is either impossible or so costly as to consume the assets," *Augie-Restivo*, 860 F.2d at 519 (emphasis added), and where, as the Second Circuit elsewhere put it, the evidence of commingling of assets and business functions creates "hopeless[ ] obscur[ity]". *Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966).

## C.     The Proposed Discovery Order[13]

10.     So where does the puzzled creditor begin, in seeking to uncover the basis for a consolidation that is about to be forced upon it by parties underwritten by the estates? The Motion would have it delegate to, and coordinate with other, equally puzzled creditors, working through a process so unwieldy and costly as to dissuade many from participating at all. The Proposed Order does not narrow issues, but rather compounds the core problem of the Motion -- limiting creditors to discovery conducted through two levels of ill-defined and unreimbursed agency.[14]

---

[13] State Street addresses the revised form of order, proposed by the Debtors on March 31, 2011 (the "Proposed Order").

[14] The Proposed Order lets creditors opt out of its strictures, but only on motion to the Court, thus burdening creditors and the Court unnecessarily.

11.     Some aspects of the Proposed Order are sensible: setting time deadlines, establishing a document repository, attending to confidentiality concerns.[15] But the Motion's core is inappropriately burdensome. A creditor must give notice of its intent to participate (not problematic for large creditors), but then have its participation subject to the Debtors' or the Committee's "successful" objection. *See* Proposed Order ¶ 2(e), (g). This gives the estate-funded contestants far too much power. The problem of the harassing creditor could better be dealt with, by filing a simple motion for protective order under Bankruptcy Rule 7026.

12.     Document requests, interrogatories, and deposition notices must be formulated collectively. *See* Proposed Order ¶¶ 3(b), 5(b), 12(a), (b), 13(a). Participants from across the globe must, in a compressed time period, behave like committees, without the benefit of a committee structure, advisors, or reimbursement. This requirement would lead to considerable expense of coordination, and one creditor may be prejudiced by the acts or omissions of another.

*(i)     The "Designated Party"*

13.     A key provision of the Proposed Order, applicable to discovery requests directed to the Debtors, creates the novel concept of a "Designated Party" and forces creditors to work through two levels of collective. *See* Proposed Order ¶¶ 3(a), 13(a). Each Participant must identify with a specified "Group" (generally associated with different Debtors[16]). The Participant Groups must then designate a *single* "Designated Party" to act as facilitator and intermediary for a joint document discovery request and a joint deposition notice to be served on

---

[15] The "attorneys' eyes only" provisions of the Proposed Order, Ex. B, appear to be excessive and unwarranted by the record, but, State Street will comply with whatever procedures the parties negotiate and are approved by the Court.

[16] The Debtors are to compile an official service list of Participants and their attorneys. It is unclear how Participants are to determine which other Participants are in the same "Group." *See* Proposed Order ¶¶ 2(f), 3(b).

the Debtors that would encompass *all* Participants' requests.  *See* Proposed Order ¶¶ 3(a), (b), 13(a).  Neither the Proposed Order nor the Federal Rules of Bankruptcy Procedure provide rules regarding formation, governance or centralized representation of Groups, nor regarding appointment, election, or voting for the Designated Party.

14.    Document discovery and depositions of the Debtors would be filtered through both the Designated Party and the Group.  *See* Proposed Order ¶¶ 3(a)-(f), 13(a).  The Designated Party is to provide suggested document requests to all Participants, and may confer with the Debtors regarding the same.  Each Group of Participants is to submit comments, as a Group, to the Designated Party.  The Designated Party consolidates these requests, meets and confers with the individual Participants, formulates a single and consolidated document request, and serves the consolidated document discovery request on the Debtors.  *See* Proposed Order ¶ 3(a)-(f).  In effect, a Participant's document request will be filtered first through the Group, and second through the Designated Party.

15.    A similar filtration mechanism would govern depositions.  Participants must, acting as a Group, provide a list of preliminary deposition topics to the Designated Party.  The Designated Party compiles the deposition topics into a form of joint notice of deposition, which it will serve on the Debtors.  In addition, "representatives" of each Group are to meet and confer and identify a list of employees of the Debtors they seek to depose.  *See* Proposed Order ¶ 13(a).

16.    The Proposed Order is silent as to the duties of the Designated Party or any other "Coordinating Participant" or Group "representative."[17]  In complex cases, the discovery request is only the beginning: much of what follows depends on negotiation and compromise.  Although

---

[17] Terminology in the Proposed Order is confusing.  It appears to include an unwritten requirement that each Group have a "representative."  *See* Proposed Order ¶ 13(a)(vi).  There is also an undefined "Coordinating Participant" role.  *See* Proposed Order ¶ 6(h).

the Proposed Order does not define the scope of duties of the Designated Party, Coordinating Participant or Group "representative," each plainly would function as an agent for a vast group of Participants in a process that will require enormous time and coordination, with no right to reimbursement or indemnification and no limitations on its liability.[18]

17.   In short, the Motion would force creditors to work through two levels of intermediaries, neither of which is provided for by the rules, and neither of which affords the benefits of an actual committee.  They would do this to discover facts, known to the Debtors, that bear on consolidation provisions that penalize them, and that the plan proponents bear the burden to justify.

>   ii.   *Debtors as Coordinator for Discovery Related to Alternative Plan Proponents and Participants.*

18.   The Debtors propose a different two-level process for discovery related to Alternative Plan Proponents (including proponents of the Holdco Plan) and Participants.  Here the Debtors would act as effective "Designated Party" and coordinator of discovery.  *See* Proposed Order ¶¶ 5, 6, 13(b), (c).  The Debtors would provide to all Participants suggested documents requests and search terms.  Participant Groups would submit comments to the Debtors' suggested document requests, which the Debtors would collect and consolidate to create a single document request.  The *Debtors* would then meet and confer with the individual Participants.  *See* Proposed Order ¶¶ 5, 6; *see also* Proposed Order ¶¶ 13(b) and (c) (process for joint deposition notices directed to Alternative Plan Proponents and Participants coordinated through the Debtors).

---

[18] Why any discrete creditor would take on this uncompensated role is unclear.  What is clear is that many large creditors in these cases have substantial disputes with the Debtors as to the quantum of their claims.  In negotiating regarding discovery, a non-fiduciary "Designated Party" might be subject to conflicting incentives, as to Group and personal interests.

19. It is inappropriate for the Debtors to serve *any* coordinating function for creditors in the current context. As proponent of a species of substantive consolidation plan, the Debtors cannot effectively litigate against the Holdco Plan's consolidation provisions, particularly as the Debtors are in a position to settle with the Holdco Plan Proponents at any time. State Street is unaware of any authority holding that a debtor in possession, given its unique fiduciary duties, might be designated by the Court to coordinate, within simultaneous proceedings, discovery efforts of creditors opposed to its objectives. The Debtors should not be involved with creditors' discovery strategies on any level.

   *iii.*  *Other Burdensome Discovery Procedure Provisions.*

20. The Proposed Order would limit to 25 (including all subparts) the number of interrogatories for the Debtors, the Alternative Plan Proponents, and any Participant, reserving to the Debtors and the Committee priority in this limited universe. *See* Proposed Order ¶ 12. State Street is well aware of the general lack of utility of the interrogatory, as a form of information discovery, particularly when the respondent does not act in good faith (with gamesmanship in answers, or blanket references to warehouses of documents). But this is an unusual case, and here the interrogatory could prove an invaluable tool for cost-savings.

21. The plan proponents carry a substantial burden to obtain confirmation of a plan. Nothing in the available record supports a substantive consolidation of the estates or their assets. In this context, interrogatories should be an important tool for narrowing. Contention interrogatories (which the Proposed Order would bar) in particular are necessary here. After more than two years in chapter 11, and the expenditure of hundreds of millions in attorneys' fees, plan proponents advocating substantive consolidation should point out in interrogatory answers, with the factual precision that would be required of them at trial by the Federal Rules of Evidence, what facts show commingling of funds, confusion by creditors, inability to segregate

accounts, creditor reliance on consolidated status, and other factors alleged to support consolidation. They should also be forced to disclose their knowledge of facts adverse to a substantive consolidation finding, including facts showing regulatory conduct (which State Street believes will tend to show corporate separateness), auditor interactions (which will as well), creditor interaction regarding, and appreciation of the need for, guaranties, and a great number of other issues. By the same token, plan proponents are entitled to protection from needless repetition of interrogatories, or the use of the interrogatory as a tool of abuse. The proposal outlined below would well balance the interests of the parties.

22. The Proposed Order would eliminate requests for admission altogether. *See* Proposed Order ¶ 14. This is unwarranted. Requests for admission are an invaluable tool, for authentication of documents, narrowing of factual disputes, limiting issues for trial, and avoiding depositions. Questions of burden or abuse would be mitigated by the *ad hoc* committee approach, and could be addressed by a discovery master, or if necessary the Court.

23. The Proposed Order contains limitations on discovery of the Debtors' professionals. It should be clarified to ensure that there is no limitation on the factual discovery from a key source of information relevant to the consolidation theory: Alverez & Marsal. Alverez & Marsal's work in culling debtor financial and creditor information, preparing schedules, and examining financial records likely contains a great deal of information (for which the estates have already paid) bearing on the relevant questions. There should be no limit on the ability of creditors to obtain this information.

**D.      Proposed Alternative Approach[19]**

24.     *Sub silentio*, the Debtors' awkward effort to create an ill-defined two-level system of uncompensated delegation acknowledges a need for *effective* coordination. But the Motion would make coordination impractical, wildly expensive, and unfair. In concert, the provisions of the Proposed Order burden the very parties injured by the substantive consolidation approach -- the discrete creditors whose classes are singled out by the proposed plans, and who have no committee or other estate representative to advocate on their behalf.

25.     The simple solution is to appoint *ad hoc* committees, and let *them* vigorously discover the facts. For example, the Court might appoint, for plan confirmation purposes, an *ad hoc* committee to represent the creditors of similarly-situated operating company debtor adversely impacted by the proposed plans. The Court might then appropriately limit discovery almost *entirely* to *ad hoc* committees, with respect to entities that opt to participate in such committees.[20] (Creditors executing the appropriate confidentiality and protective orders would have access to discovery materials, but only through those *ad hoc* committees). Compelling creditors within a Group to single out a "Designated Party" or other group representative, with no mutual obligations or duties, is a step towards an *ad hoc* committee concept.

26.     Accordingly, State Street proposes, as a protocol for effectuating the "cooperation" model of the Proposed Order, the following:

    a.      An *ad hoc* committee would be recognized for each of the operating subsidiaries, solely for the purpose of plan negotiation, litigation, and confirmation. The

---

[19] State Street proposed the *ad hoc* committee approach outlined in this opposition by letter to the Debtors dated March 22. The Debtors rejected it.

[20] The Court would entertain motions by discrete creditors for relief from this limitation, on a showing of cause. To illustrate, were LCPI to have a compensated *ad hoc* committee, State Street would be content to let that committee pursue all plan discovery on its behalf, and on behalf of other LCPI creditors.

*ad hoc* committee might retain counsel and litigation experts for the purpose of responding to, contesting, litigating, and negotiating in connection with plans of reorganization.[21]

    b.    All reasonable professional fees of the *ad hoc* committee for such activities would receive section 503(b) administrative charge status in the chapter 11 case of the respective debtor.

    c.    A creditor participating in an *ad hoc* committee would have access to the fruits of that committee's discovery labors, and the benefit of the attorney-client privilege and the fee reimbursement provisions enjoyed by that committee. Such a creditor would, however, be required to opt out of any direct participation in the plan discovery process, absent consent of the plan proponents or an order by the court on a special showing of cause.

    27.    In the near term, the Debtors' Motion should be denied without prejudice. Upon the prompt formation of *ad hoc* committees, those committees should promptly negotiate the Proposed Order and report to the Court if disputes persist.

    28.    The Debtors may object that there is already an official committee. Indeed a responsible committee operates today, and as a general proposition its watchdog function need not and should not be supplanted by *ad hoc* committees. But because each proposed plan takes wealth from the operating companies, and shifts it to the holding company, an official committee that acts for all creditors of all Debtors' estates cannot be an effective advocate for any.

---

[21] Alternatively, the Court might consider a single *ad hoc* committee for a group of operating companies treated similarly by the proposed plans. In the event of plan modifications that treated creditors of those operating companies differently, however, additional committees might later need to be appointed.

29.     The Debtors may protest the administrative expense.  Four points may be made in response.  First, the status quo and proposed discovery order would unfairly impose expense on the discrete creditor entities victimized by these proposed plans.  Second, State Street's alternative approach should reduce the expenses of existing administrative creditors by reducing the number of Participants in discovery.  Third, and perhaps most important, any one of the operating debtors in question -- take LCPI or LBSF for example -- would be a "megacase" on its own.  Each has assets and liabilities well in excess of $10 billion.  It is an extraordinary thing to say that creditors of a $10 billion entity may have their claims impaired in chapter 11, through the doubtful agency of a now-suspect legal doctrine, and yet be denied the protection of a committee, merely because the case is jointly administered with another case.  Certainly nothing in the Code warrants that result.  Fourth, each plan is a liquidating plan.  No operating business will survive.  The interests of creditors are paramount.  As things stand today, the rights of holding company creditors are favored and underwritten by the estates, while all other creditors must fend at their own expense and, under the Motion, effectively be barred even from fending for themselves.

### III. CONCLUSION

The Motion should be denied without prejudice. The Court should authorize the appointment of *ad hoc* committees in conformity with this opposition. Once appointed, those committees should promptly meet and confer regarding a discovery order that would, in the first instance, permit those entities fully to discover the relevant issues, and preclude individual creditors opting into the *ad* hoc structure from direct initiation of discovery, subject to further orders of this Court, on a showing of cause.

Dated: April 5, 2011
       Boston, MA

                                              Respectfully submitted,

                                              By: /s/ Sabin Willett
                                              **BINGHAM MCCUTCHEN LLP**
                                              Edwin E. Smith
                                              Sabin Willett (*pro hac vice* pending)
                                              Stephanie W. Mai
                                              One Federal Street
                                              Boston, MA 02110
                                              Telephone: (617) 951-8000
                                              Facsimile: (617) 951-8736

                                              Attorneys for State Street Bank and Trust Company