**Hearing Date and Time:  April 13, 2011 at 10:00 a.m. (Prevailing Eastern Time)**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JCS – 6031)

Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |
|---|---|
| In re | **:**      **Chapter 11 Case No.** |
|  | **:** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **:**      **08-13555 (JMP)** |
|  | **:** |
| **Debtors.** | **:**      **(Jointly Administered)** |

------------------------------------------------------------------x

## LIMITED OBJECTION OF THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS TO MOTION OF LEHMAN BROTHERS HOLDINGS INC. TO COMPEL THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS TO COMPLY WITH <u>FEDERAL RULE OF BANKRUPTCY PROCEDURE 2019</u>

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Group"), by and through its

undersigned counsel, files this limited objection (the "Objection") to the Motion of Lehman

Brothers Holdings Inc. to Compel the Ad Hoc Group of Lehman Brothers Creditors to Comply

with Federal Rule of Bankruptcy Procedure 2019 (the "Motion") [Docket No. 15461], filed in

the chapter 11 cases of Lehman Brothers Holdings Inc. and its affiliated debtors (the "Debtors").

In support of its Objection to the Motion, the Group respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Group fully supports greater transparency in these cases by all parties in

interest, including on the part of the Debtors.  Indeed, since its inception, the Group has

advocated, albeit sometimes to no avail, for greater transparency on all fronts for the benefit of

all stakeholders.[1]

2.      The Group takes issue, however, with the Debtors' present request to have the

Court enforce selectively Rule 2019 (to the extent it is applicable).  As an initial matter, the relief

sought by the Debtors will be of little benefit to the Debtors themselves, as the Group has already

provided to the Debtors on a confidential basis much of the information that the Debtors are

requesting and has offered to provide additional information upon request.  Specifically, the

Group has provided detailed information that sets forth each Group member's claims against

each Lehman entity, including non-Debtor affiliates, whether such claims were acquired

prepetition or postpetition, and, to the extent the claim is a guarantee claim, the nature of such

claim and the related primary claim.  The Group has also provided the Debtors with a copy of the

Group's formation agreement, an explanation of the Group's governance structure, including the

---

[1]      See, e.g., Letter from Gerard Uzzi to Harvey R. Miller dated August 11, 2009 (attached hereto as Exhibit A); Group's Disclosure Statement Exs. 4A-M (previously provided to the Debtors). The Group has also encouraged the Debtors to implement periodic reporting requirements in connection with a number of requests for relief. (See Statement of Ad Hoc Group of Lehman Brothers Creditors in Support of Debtors Motion, as Revised, Authorizing the Establishment of Procedures to Terminate Unfunded Commitments and Restructure Corporate Loan Agreements [3744]; Statement of Ad Hoc Group of Lehman Brothers Creditors in Support of Motions for Establishment of Procedures for the Debtors to (I) Compromise Claims of the Debtors in Respect of Real Estate Loans and (II) Transfer Their Interests in Respect of Residential and Commercial Loans Subject to Foreclosure to Wholly-Owned Non-Debtor Subsidiaries [Docket No. 5122]; Statement of ad Hoc Group of Lehman Brothers Creditors in Support of Motion of the Debtors for the Establishment of Procedures to (I) Restructure, (II) Make New or Additional Debt or Equity Investments In, and/or (III) Enter Into Settlements and Compromises in Connection with Existing Real Estate Investments [Docket No. 5864].)

identity of the members of its steering committee, and the identity of both "paying" members and "non-paying" members.[2]

3.      Nevertheless, as advocates for greater transparency generally in these cases, the Group is naturally prepared to make further additional disclosures to assist the Court to the extent the Court determines that such additional disclosures will be beneficial and appropriate, whether or not Rule 2019 is technically applicable. The Group's sole objective is to ensure that, if additional disclosure is required, such requirements are imposed fairly and uniformly in these cases, so that from a transparency and efficiency standpoint, a true level playing field is established.

4.      In creating information equality, the Group sees principally two issues that must be addressed. The first issue is who should be required to make disclosure. The second issue is what information should be disclosed. With respect to "who," if the disclosure requirements focus solely on the limits of Rule 2019, then Rule 2019 simply does not apply to the activities of the Group and similarly situated creditors. The Group is willing to dispense with the debate if uniform disclosure requirements are implemented that are fair and tailored specifically for the needs of this very unique case. But the Group is concerned that others will attempt to avoid making disclosures (and therefore conceal potential conflicts of interest) by advocating an overly formulaic definition of "committee." For instance, several creditors may decide to act in concert, but retain individual counsel for the purposes of avoiding 2019 disclosures. If the Court were to conclude that the mere appearance through separate counsel was dispositive of whether disclosures were required, every creditor group in this case, including the Group, could simply

---

[2]      Certain members of the Group, most notably, cities, counties and institutional holders, are allowed to participate as "non-paying" members. Given the obvious limitations on non-paying members, the paying members have agreed to permit the non-paying members to receive the benefits of being part of the Group without having to shoulder the heavy burdens of fees.

disband, rely on one former member to take a lead role with the remaining former members

joining through separate counsel.  Obviously, such a result would be unfortunate.

5.      Accordingly, to the extent the Court believes additional disclosures are warranted,

the Group suggests that the Court dispense with any analysis of Rule 2019 and instead simply

implement uniform procedures.  Not only would such procedures promote fundamental fairness,

but they would also promote greater efficiency through the avoiding of a piecemeal application

of Rule 2019 and debates over its applicability to any particular creditor.  Specifically, the Group

suggests that the following parties be subject to making further disclosures:

- Any parties acting in cooperation or concert with others whether or not represented jointly or by a single law firm or other advisors;

- Any party filing pleadings in connection with any proposed disclosure statement or plan of reorganization and holding more than $500 million in claims in the aggregate against Lehman affiliates, including non-Debtor affiliates;

- Any plan proponent;

- Any Participant in the plan discovery; and

- To the extent any formal plan negotiation process is ever implemented, whether by Court order, such as mediation, or by effort of the Debtors or the Official Committee, any party seeking to participate in any such negotiation.

6.      With respect to the "what," the Group believes that the most important

information is information relating to potential conflicts of interest.  Recognizing that Rule 2019

perhaps goes further, however, the Group suggests the following information be disclosed:

- All holdings including those of affiliates broken down on a creditor legal entity basis and Lehman legal entity basis, including foreign affiliates;

- Whether holdings are held solely of record or beneficially and, to the extent the power to vote such holdings is not under common control, how such voting power is divided;

- Whether a claim was acquired or accrued prepetition or postpetition and, if such claim was acquired postpetition, the date of purchase and the price paid;

- The nature of the claim, <u>e.g.</u>, whether such claim is bond debt, a derivative claim, a guarantee claim, etc., and if such claim is a guarantee claim, the nature of the underlying primary claim and the basis for asserting the guarantee;

- Any governing documentation; and

- Any arrangements or agreements with respect to the sharing of fees and costs among parties.

7.      The Group recognizes that the proposed disclosure procedures are unique and not necessarily warranted in most chapter 11 cases, but these are very unique cases.  For this reason, the Group also recognizes that other parties in interest may have different views as to what type of information should be disclosed, who should be required to disclose such information and what form such disclosures should take.  The Group intends to work with any party in interest in developing a consensual framework for the Court's consideration, but has no desire to control the process through keeping the "pen in our hands."  Thus, to the extent the Court is amenable, the Group suggests that parties who wish to be part of such discussions be given the opportunity to contact the Debtors so that all views may be appropriately considered.

8.      Accordingly, to the extent the Court is prepared to order that uniform disclosure requirements be imposed in these cases, the Group has no objection and urges the Court to do so. To the extent that the Debtors determine to continue with their Motion directed solely at the Group, the Group objects to the Motion and its selective enforcement.

**LIMITED OBJECTION**

**A.      The Court Should Establish Definitive, Uniform**
**        Procedures for Disclosing Economic Interests.**

9.      As more fully discussed below, Rule 2019 was promulgated so that all parties would be aware of the true economic interests, including conflicts of interest, of those parties capable of influencing a reorganization.  The Debtors have estimated that there will be approximately $361 billion of allowed claims against the twenty-three chapter 11 debtors.

Certain of those claims are held by Debtors, certain are held by the Debtors' foreign affiliates, and certain are held by third parties.  As well, certain of those claims are guarantee claims (sometimes held by a Debtor or one of the Debtors' foreign affiliates) for which there is also a related primary claim against a Debtor or a foreign affiliate.  And, in some instances, parties may hold substantial claims against foreign affiliates (not included in the $361 billion of estimated allowed claims) that are unrelated to less substantial claims that such parties hold against the chapter 11 Debtors.

10.     As a consequence of this complexity, the opportunity for undisclosed motives during plan negotiations and, later, plan-related litigation is substantial.  For this reason, although ultimately not included, the Group had requested that the Debtors include in their proposed plan discovery procedures provisions requiring prospective participants therein to make reasonable disclosures regarding their economic interests.

11.     The Group believes it is now the appropriate time for the Court to implement procedures requiring parties that intend to be active participants in plan negotiations and plan-related litigation to disclose their economic interests.  As noted, in establishing these procedures, the Group sees two primary issues that would need to be evaluated: (1) who and (2) what.  A brief discussion of these issues demonstrates why simply relying on Rule 2019 to reveal conflicts is insufficient in these cases.

12.     As to who must disclose, it is insufficient and invites excessive debate to rely only on the term "committee" as used in Rule 2019 for several reasons.  First, it appears that certain parties, who are acting in concert, may be attempting to avoid having the issue of Rule 2019 raised with respect to them by retaining separate counsel[3] but yet filing joint pleadings.  (See,

---

[3]     Upon information and believe, however, certain of these parties, and perhaps others, have hired (and are sharing the burden of fees with respect to) a common financial advisor pursuant to a written agreement.

e.g., Objection of Certain LBSF Derivative Creditors to Debtors' Motion Pursuant to Sections

105(a) and 363 of the Bankruptcy Code and Rule 6004(h) of the Bankruptcy Rules for

Authorization to Enter Into Certain Asset Management and Related Agreements [Docket No.

8029]; Response of the Operating Company Creditors to the Motion of the Ad Hoc Group of

Lehman Brothers Creditors Seeking, Among Other Things, an Order Scheduling a Disclosure

Statement Hearing and Approving the Form and Manner of Notice Thereof [Docket No.

15668].)[4]  This tactic should not be countenanced.

13.      If it were, the result would be absurd.  For instance, if the hiring of separate

counsel becomes dispositive of who must make disclosures under Rule 2019, the Group (as well

as others acting through a single counsel) could formally disband and each Group member could

hire its own separate counsel.  One member and its counsel could take the lead role, and the other

members and their counsel could simply file joinders thereto or separate statements in support

thereof.  The consequence would be multiple law firms appearing and filing multiple pleadings,

multiplied by the many different groups that will ultimately participate in the cases, all requiring

time from this Court.  In addition, to the extent creditor participants are ultimately reimbursed

under section 503 of the Bankruptcy Code, the increase in creditor attorney involvement will

only serve to multiply the already historic fees incurred in these cases.

14.      Moreover, if the Court agrees with the case law the Debtors have cited for the

proposition that the Group constitutes a "committee" under Rule 2019, then for the sake of

consistency the Court should find that entities "acting in concert" also are a "committee" under

---

[4]      As well, it appears that multiple creditor groups now also intend to file joint pleadings, at least with respect to certain issues.  (See Statement of Various LBT Noteholders regarding the Motion of the Ad Hoc Group of Lehman Brothers Creditors for Entry of (i) an Order Scheduling a Disclosure Statement Hearing and Approving the Form and Manner of Notice Thereof and (ii) an Order Approving the Disclosure Statement for the Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and Certain of its Affiliated Debtors Other than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC, Filed by the Ad Hoc Group of Lehman Brothers Creditors [Docket No. 15671].)  Evidently, some unidentified subset of the creditors in these two groups is "seriously considering" filing a third plan.  (Id. ¶ 2.)

Rule 2019 regardless of whether each has its own counsel or that pleadings are signed in

individual fashion rather than as a "group." While the courts in Northwest and WaMu did find it

relevant that the creditors at issue had retained common counsel and appeared as a "committee"

or a "group," such factor was not dispositive. The courts' primary concern appeared to be that

those were indicia of such creditors taking "collective action" and the creditors asking "the court

and other parties to give their positions a degree of creditability appropriate to a unified group

with large holdings." In re Northwest Airlines Corp., et al., 363 B.R. 701, 703 (Bankr. S.D.N.Y.

2007); In re Washington Mutual Inc., et al., 419 B.R. 271, 279 (Bankr. D. Del. 2009). Creditors

filing joint pleadings are taking collective action and asking for that same credibility.

15.    Even singular entities with sufficient size in the capital structure that intend to

participate in plan negotiation and plan-related litigation should be required to disclose their

economic interests. As this Court has just seen, there are parties in these cases that intend to

speak with respect to plan issues but act on their own rather than collectively. For instance,

CarVal Investors UK Limited has just filed a pleading stating that it "holds or has a controlling

economic interest in claims exceeding $5 billion against the Debtors" and "strongly opposes the

Debtors' and the Ad Hoc Group's proposed plans in their current forms." (Joinder of CarVal

Investors UK Limited to Response of Operating Company Creditors to Motion of Ad Hoc Group

of Lehman Brothers Creditors, Seeking, Among Other Things, Order Scheduling Disclosure

Statement Hearing and Approving Form and Manner of Notice Thereof ¶ 2 [Docket No. 15674].)

Similarly, Bank of America, N.A. ("BofA"), filed a pleading failing to set forth any information

regarding BofA's interest in these cases, but stating that BofA believes that both the Group's

plan and the Debtors' plan are "objectionable and not confirmable." (Limited Response of Bank

of America, N.A. to the Motion of the Ad Hoc Group of Lehman Brothers Creditors Seeking,

Among Other Things, an Order Scheduling a Disclosure Statement Hearing and Approving the Form and Manner of Notice Therein ¶ 3.)

16.    The Group is not casting aspersions on any of the foregoing parties, however, one can see how even a single party can hold material but undisclosed interests in the context of these cases and the global Lehman enterprise.  For example, a creditor may have a relatively minor claim against a Debtor, but also hold a substantial claim against a non-Debtor affiliate. That creditor may file pleadings in connection with plan-related litigation claiming to speak on account of its chapter 11 Debtor interest, but may in actuality be trying to advance the position of the non-Debtor affiliate and thereby its own interest, which is derivative thereof.

17.    This is of course a relatively simple example and, upon information and belief, a number of significant third-party creditors in these cases, including foreign affiliates, big banks, and distressed debt investors, hold much more complicated positions across the global Lehman Brothers capital structure.  Indeed, in comparison to these parties, the Group's positions, which are heavily weighted toward senior bonds issued by LBHI, are relatively easy to understand.  For this reason, requiring disclosure based on the arbitrary basis of whether a party is a "committee" (an undefined term) would not be useful in the context of these chapter 11 cases.

18.    Instead, the Group respectfully suggests that the Court consider imposing disclosure requirements consistent with those set forth in paragraphs five and six hereof.  The Group believes that such disclosures would materially enhance the integrity of any negotiations or litigation process.

**B.    Rule 2019 Is Not Applicable to the Group And In**
       **Any Event Should Not Be Enforced Selectively**.

19.    The Group recognizes that, as of today, it stands in the unique position in these cases of being the only non-Debtor proponent for a proposed plan of reorganization.  By filing

this Objection, the Group is not suggesting that robust disclosure in its disclosure statement

concerning the identity and interests of the plan proponents is not appropriate. To the contrary,

the Group believes that it is. The Group, however, submits that the debate over the level of

disclosure appropriate for a disclosure statement is itself appropriately considered in connection

with the approval of such disclosure statement, whereby parties can raise through objection or

otherwise their views as to what is necessary to satisfy section 1125 of the Bankruptcy Code and

plan proponents can respond in thoughtful and considered fashion thereto. The applicability of

Rule 2019 simply does not rest upon whether someone is a plan proponent and, while there may

be some overlap in what may be disclosed under a "strict" reading of Rule 2019 and what may

be appropriate disclosure in a disclosure statement, strict Rule 2019 disclosures would

overwhelm most disclosure statement readers, rendering such disclosure counterproductive.

20.     Rule 2019 applies to an "entity or committee representing more than one creditor

or equity security holder" other than an official committee appointed in a chapter 11 case. FED

R. BANKR. P. 2019. The applicability of Rule 2019 to a modern day ad hoc group has been a

source of significant debate since Judge Gropper issued his opinion in Northwest. The Group

does not dispute the Debtors' analysis of the cases applying Rule 2019 to modern day ad hoc

committees (and will not burden the Court with a regurgitation of such analyses). Instead, the

Group respectfully submits that the bankruptcy courts in Scotia and, recently, Six Flags and

Philly News, which have reached conclusions opposite to Northwest and Wamu, have correctly

interpreted the Rule. See In re Scotia Develop. LLC, Case No. 07-20027, (Bankr. S.D. Tex.

April 18, 2007); In re Premier Int'l Holdings, Inc., et al., 423 B.R. 58 (Bankr. D. Del. 2010); In

re Philadelphia Newpapers, LLC, et al., 422 B.R. 553 (Bank. E.D. Penn. 2010).

21.     Simply, the Group is not an "entity or committee" within the meaning of the Rule

because it does not purport to represent any class of stakeholders nor has it been delegated any

authority to perform any particular duty in these chapter 11 cases.  As aptly put by Judge Sontchi

in Six Flags, the starting point of any analysis or "default entrance" is plain meaning:

> A 'committee' is a 'body of two or more people appointed
> for some special function by, and usu. out of a (usu. larger) body.'
> The use of the word 'appointed' clearly contemplates some action
> be taken by the larger body. Thus, a self-appointed subset of a
> larger group – whether it calls itself an informal committee, an ad
> hoc committee, or by some other name – simply does not
> constitute a committee under the plain meaning of the word. In
> order for a group to constitute a committee under Rule 2019 it
> would need to be formed by a larger group either by consent,
> contract or applicable law – not by 'self-help.' This construct is
> supported by the rule's applicability to indenture trustees, which
> are delegated with certain rights and obligations on behalf of all
> holders of the debt by operation of contract, i.e., the indenture.
> Similarly, official committees under section 1102 of the
> Bankruptcy Code (although exempted from Rule 2019) receive
> their authority from federal law, i.e., the Bankruptcy Code.
>
> The meaning of 'represent' is: 'take the place of (another);
> be a substitute in some capacity for; act or speak for another by a
> deputed right.' A deputed right is one that is assigned to another
> person. Thus, the plain meaning of 'represent' contemplates an
> active appointment of an agent to assert deputed rights. It is black
> letter law that a person cannot establish itself as another's agent
> such that it may bind the purported principal without that
> principal's consent unless the principal ratifies the agent's actions.
> Thus, under the plain meaning of the phrase 'a committee
> representing more than one creditor,' a committee must consist of
> a group representing the interests of a larger group with that larger
> group's consent or by operation of law. As the [informal
> committee of noteholders in Six Flags] does not represent any
> persons other than its members either by consent or operation of
> law, it is not a 'committee' under Rule 2019 and, thus, its members
> need not make the disclosures required under the rule.

Six Flags, 423 B.R. at 58.  Judge Raslavich, in Philly News, agreed with Judge Sontchi, finding

that Rule 2019 did not apply to a self-styled "Steering Group of Prepetition Lenders" as that

group was not a "committee" as that term is used in Rule 2019 and the did not "represent" any persons other than its members.  Philly News, 422 at 566-67 (citing Six Flags).

22.     Like the informal groups in Six Flags and Philly News, the Group does not represent any persons other than its members either by consent or operation of law.  Moreover, the Group's formation agreement (the "Formation Agreement"), the form of which is attached hereto as Exhibit B,[5] includes a number of express provisions protecting an individual Group member's right to take positions or otherwise act independently, including the following:

- Section 5.1(e), which provides that "the Group shall have no power to vote the LBHI Claims of any member to accept or reject a proposed chapter 11 plan";

- Section 5.2, which provides that "[n]othing herein shall be construed to obligate any [Group member] to take or abstain from taking any action on its own behalf in its sole discretion except as specifically provided in this Agreement"; and

- Section 6.1, which provides that "[w]hile the [Group members] acknowledge that they are acting as a Group, nothing contained in this Agreement shall prevent any creditor of the Debtors, including the [Group members], from (a) exercising or seeking to enforce or protect any of its rights as an individual creditor as it may deem appropriate, or (b) otherwise affect the ability of any creditor to act or forbear from taking action in its capacity as an individual creditor as it may deem appropriate."

Moreover, Section 14.2 of the Formation Agreement provides that "[a]ny [Group member] may withdraw from the Group . . . , in which case this Agreement prospectively shall [with certain exceptions] no longer apply to the withdrawing Participant . . . ."  (Formation Agreement ¶ 14.2.) For these reasons, Rule 2019 does not apply to the Group or its members.[6]

---

[5]     Although the form of agreement currently provides that the Group's "Steering Committee" is comprised of King Street Capital Management, L.P., and Paulson & Co. Inc., as previously explained to the Debtors, the Group's Steering Committee is presently comprised of Canyon Capital Advisors LLC, Fir Tree, Inc., Paulson & Co. Inc. and Taconic Capital Advisors L.P.

[6]     In fact, the Rule was promulgated to protect against potential abuses by "protective committees" – i.e., privately formed committees organized by insiders and generally dominated by the debtor, its investment bank or institutional investors. See Sec. & Exch. Comm., Study & Investigation of the Work, Activities, Personnel and Functions of Protective & Reorganization Committees, Conclusions and Recommendations at 897 (1937) at 586 (excerpts attached as Exhibit C); Tabb, Charles J., The History of the Bankruptcy Laws in the U.S., 3 Am. Bankr. Inst. L. Rev. 5, 30 (1995) (attached as Exhibit D).  Those insiders would solicit smaller investors to enter into "deposit agreements" (or similar agreements), which required the smaller investors to deposit their securities with

23.     Similarly, in the chapter 11 cases of <u>Scotia Development LLC</u>, <u>et al.</u>, the

bankruptcy court recognized this limitation on Rule 2019's application when it determined that

an ad hoc noteholder group was "not a 'committee' within the meaning of Rule 2019." <u>In re</u>

<u>Scotia Develop. LLC</u>, Case No. 07-20027, Order (Bankr. S.D. Tex. April 18, 2007) (Scotia

Docket No. 659) (attached as Exhibit E)[7] (finding that the Ad Hoc Group of Timber Noteholders

---

and granted control over those securities to the protective committee.  <u>Id.</u>  This allowed the "committee" to negotiate on behalf of and bind the smaller investors without having to consult with them.  Thus, scandals ensued when these supposed fiduciaries acted in their own self interest rather than in the interests of those they purported to represent. <u>In re Rosenbaum Grain Co.</u>, 13 F. Supp. 600, 600-01 (N.D. Ill. 1935).  As a consequence, courts were often "in the dark as to the method of the organization of the committee[s]" and were "forced to rely on the statements of the interested parties" when determining the "real merits of a plan of reorganization" and could "very easily be misled and confirm a plan which should have been rejected."  <u>Id.</u> at 601.

Abuses by protective committees purporting to act as fiduciaries to other claimholders motivated the promulgation of Rule 2019's predecessor.  <u>See</u> Bankruptcy Act of 1935, § 77(p) 11 U.S.C. § 205(p) (repealed 1978); Section 211 of Chapter X, 52 Stat. 895; Chapter X Rule 10-211; see also Fed. Rule. Bankr. P. 2019, Adv. Comm. Note ("[Rule 2019] is derived from §§ 209-231 of the [Bankruptcy] Act and former Chapter X Rule 10-211").  "The language of Rule 2019 is substantially the same as that of its predecessor."  9 Collier on Bankruptcy ¶ 2019.RH (Alan N. Resnick & Henry J. Sommers eds., 15th ed. rev.).

Modern day ad hoc groups, including the Group, bear little resemblance to protective committees:

> The nub of the question is how the legislative history of Rules 10-211 and 2019 applies to the informal and ad hoc committees of today and, more specifically, the Informal Committee of SFO Noteholders. Certainly there are parallels between the 'protective committees' under equity receivership and the informal committees of today. For example, both are usually composed of Wall Street banks and institutional investors. Both are formed for the purpose of obtaining leverage in the reorganization that would not be available to disparate creditors. Both are involved in the negotiation and formulation of a plan . . . .

> The differences, however, far outweigh the similarities. The 'protective committees' that were the target of the reforms under the Chandler Act were able to control completely the entire reorganization – from inception to formulation to solicitation to implementation. They were granted the authority to negotiate on behalf of and to bind creditors through the use of deposit agreements. They were so intimately involved with management so as to be virtually in control of the business. They could force disparate treatment of similarly situated creditors. Finally, they were able 'to steal' the company for an inadequate 'upset price' at a foreclosure sale by credit bidding their debt.

<u>Six Flags</u>, 423 B.R. at 72-73.

[7]     Additionally, the motion to compel the ad hoc group to comply with Rule 2019(a) [Scotia Docket 492], the ad hoc group's objection to that motion [Scotia Docket 599] from the <u>Scotia</u> case are also attached hereto as Exhibits F and G, respectively. The transcripts for the hearings concerning these issues on April 10, 2007 [Scotia Docket 695], April 17, 2007 [Scotia Docket 696], and May 22, 2007 [Scotia Docket 885] are also attached hereto as Exhibits H, I, and J,  respectively.

(the "Scotia Noteholders Group") was not required to disclose information pursuant to Rule

2019); see also Scotia Hr'g Tr. 4:18-5:4, Apr. 17, 2007 (J. Schmidt) (Exhibit I).

     24.     When presented with arguments that were substantially similar to those presented

by the Debtors here, the Scotia court took a "practical" approach and found that the Scotia

Noteholders Group was "a bunch of creditors" represented by one law firm; therefore the group

was not a "committee." Scotia Hr'g Tr. 4:25-5:2, Apr. 17, 2007 (J. Schmidt) (Exhibit I). During

the hearing, the court stated that Rule 2019 was only applicable to a group of creditors where

"you have some sort of fiduciary responsibility to people that you're not actually representing"

because those other individuals would have a right to know about a group that was "purporting to

represent" them. Scotia Hr'g Tr. 74:22-25, Apr. 10, 2007 (J. Schmidt) (Exhibit H).

     25.     Like the groups in Scotia, Six Flags and Philly News, the Group is not a

"committee" or other entity subject to Rule 2019 as it is not acting on behalf of, nor does it owe

fiduciary duties to, any parties in these chapter 11 cases.  Rule 2019 was enacted to require

disclosure of information from parties purporting to act as representatives for a class, which the

Group explicitly states that it does not.  For these reasons, Rule 2019 does not apply.

**C.**     **The Debtors Have Identified No Cogent Reason as to
Why the Group and Its Counsel Should Not Be Heard.**

     26.     Rule 2019 provides that, "the [C]ourt may determine whether there has been a

failure to comply with the provisions of [Rule 2019] . . . and, if it so determines, the [C]ourt may

refuse to permit that entity, committee, or indenture trustee to be heard further or to intervene in

the case . . . ." FED. R. BANKR. P. 2019 (emphasis added).  In other words, the Court has the

discretion, in the first instance, to investigate any alleged noncompliance with Rule 2019 and, if

there is noncompliance, whether to permit the noncomplying party to participate.

27.      The Group has been an active participant in these chapter 11 cases for close to

two years and has filed close to thirty pleadings, including statements supporting a number of the

Debtors' requests for relief, including the Debtors motion to enter into certain note purchase

agreements with Bankhaus (which was heard only two weeks ago).  Not once when the Group

chose to support the Debtors have the Debtors raised the issues related to Rule 2019.

28.      White & Case has filed a 2019 statement, which has been supplemented twice,

setting forth the names and addresses of the members of the Group as well as the Group's

aggregate holdings generally.  (See Verified Statement of White & Case LLP Pursuant to

Bankruptcy Rule 2019(a) [Docket No. 3953]; Supplemental Statement of White & Case LLP

Pursuant to Bankruptcy Rule 2019 [Docket No. 9718]; Second Supplemental Statement of White

& Case LLP Pursuant to Bankruptcy Rule 2019 [Docket No. 15216].)  The 2019 statement filed

by White & Case is in substantially the same form as those that have been filed by other law

firms in these cases for the past two-and-a-half years.  (See, e.g., Verified Statement of Brown

Rudnick LLP Pursuant to Bankruptcy Rule 2019(a) [Docket No. 10887]; Verified Statement of

Akin Gump Strauss Hauer & Feld LLP Pursuant to Bankruptcy Rule 2019 [Docket No. 519].)

Not once have the Debtors questioned any of these parties' compliance with Rule 2019.

29.      Moreover, the Group has responded to two separate requests from the Debtors for

information regarding the Group's claims and governance structure.  As a result, the Debtors

have been provided on a confidential basis with detailed information that sets forth each Group

member's claims against each Lehman entity, including non-Debtor affiliates, whether such

claims were acquired prepetition or postpetition, and, to the extent the claim is a guarantee claim,

the nature of such claim.  The Group has also provided the Debtors with a copy of the Group's

formation agreement, an explanation of the Group's governance structure, including the identity

of the members of its steering committee, and the identity of both "paying" members and "non-paying" members.  In addition, the Group has offered to provide the Debtors with additional information provided that any request is reasonable and not simply designed to harass its members.  In short, the Debtors know with a fair degree of specificity where the economic interest of each Group member lies and no further disclosure is necessary.

30.     Accordingly, the Court should exercise its discretion to not consider the Debtors' request and, even if the Court finds that the Group is technically noncompliant with the formalities of Rule 2019, the Court should decline to selectively exercise any of the remedies listed therein.  To the extent further disclosure is warranted because the Group has filed a competing plan, such issue is more appropriately considered in connection with consideration of the Group's disclosure statement.

WHEREFORE, the Group respectfully requests that the Court enter an

order implementing disclosure procedures in these cases, as more fully set forth herein, or

otherwise denying the relief sought by the Motion and grant such other and further relief as the

Court deems just.

Dated:  April 8, 2011
        New York, New York                     Respectfully submitted,

                                        WHITE & CASE LLP
                                        1155 Avenue of the Americas
                                        New York, New York 10036-2787
                                        Telephone: (212) 819-8200
                                        Facsimile:  (212) 354-8113
                                        Gerard Uzzi (GU – 2297)
                                        J. Christopher Shore (JS – 6031)

                                 By:  /s/ Gerard Uzzi
                                          Gerard Uzzi

                                        ATTORNEYS FOR THE AD HOC GROUP
                                        OF LEHMAN BROTHERS CREDITORS