# EXHIBIT D

# THE HISTORY OF THE BANKRUPTCY LAWS IN THE UNITED STATES

## CHARLES JORDAN TABB[*]

### INTRODUCTION

"Bankruptcy," one observer noted, "is a gloomy and depressing subject."[1]  It is a subject, however, that commands much attention in modern American life.  No corner of our society seems immune from the ubiquitous reach of bankruptcy.  It touches mass tort victims, mega corporations, mom-and-pop businesses, (supposedly) wealthy California counties, fraudulent schemers, polluters, unfortunate individuals—the list is endless.  Since the enactment of the Bankruptcy Reform Act of 1978,[2] bankruptcy filings have multiplied dramatically.[3]  In 1994, Congress passed the Bankruptcy Reform Act of 1994.[4]  The 1994 law was significant in two ways.  First, it amended the current bankruptcy law in dozens of places.  Second, it provided for the creation of a National Bankruptcy Review Commission, to study the bankruptcy law over the next two years and recommend further changes.[5]

Mindful of Janus, the Roman god who represents beginnings,[6] and is depicted with two faces, one looking forward and one back, this Article seeks to inform the Commission's forward look with a brief look back at the history of the bankruptcy laws.  Many radical proposals have been floated in recent years with regard to bankruptcy reform.  Before those ideas are too readily embraced, the Commission and Congress should bear in mind the experience of almost five hundred years of Anglo-American bankruptcy experience.

Part I of the Article examines the history of the bankruptcy law before 1978, which as noted is the year our current bankruptcy law was enacted.  That first

---

[*] Professor of Law, University of Illinois College of Law.

[1] CHARLES WARREN, BANKRUPTCY IN UNITED STATES HISTORY 1 (1935).

[2] Pub. L. No. 95-598, 92 Stat. 2549.

[3] *See* Jagdeep S. Bhandari & Lawrence A. Weiss, *The Increasing Bankruptcy Filing Rate: An Historical Analysis*, 67 AM. BANKR. L.J. 1, 2 (1993) (reporting a 185% increase in bankruptcy filing rate from 1980, shortly after 1978 Act took effect, to 1991). The data was obtained from the Administrative Office of the United States Courts. *Id.* at 1 n.1. Scholars disagree over whether the increased filing rate was due to the changes rendered by the 1978 Act. *Compare* William J. Boyes & Roger L. Faith, *Some Effects of the Bankruptcy Reform Act of 1978*, 29 J.L. & ECON. 139, 148 (1986) (concluding empirical data demonstrates 1978 Act to be determining, but not sole factor, in increased number of filings subsequent to effective date of Act) *and* Michelle J. White, *Personal Bankruptcy Under the 1978 Bankruptcy Code: An Economic Analysis*, 63 IND. L.J. 1, 45-49 (1987) (arguing that increased exemption levels effected by 1978 Act and increased unemployment rate primary contributors to increased filing rate for personal bankruptcies, with other economic and demographic changes contributing to lesser extent) *with* Bhandari & Weiss, *supra* at 12 (arguing increased number of filings due to decreased debt servicing capacity rather than 1978 Act).

[4] Pub. L. No. 103-394, 108 Stat. 4106.

[5] *Id.* §§ 601-610.

[6] The word January, the first month of the year, is derived from Janus.

5

section is broken down into several parts: the English antecedents of our United States law; the Constitution and United States bankruptcy laws before 1898; and the Bankruptcy Act of 1898[7] and the numerous amendments thereunder, notably the Chandler Act of 1938[8] and other Depression-era legislation. Part II examines the history of the passage of the Bankruptcy Reform Act of 1978. Part III then looks at bankruptcy legislation since the enactment of the 1978 Bankruptcy Code. Finally, in Part IV, the Article shifts from a chronological review to a thematic study, with a brief consideration of major constitutional issues that have arisen with regard to the bankruptcy laws.

## I. BANKRUPTCY LAW PRIOR TO 1978

### A. English Antecedents

#### 1. Origins

The framers of the United States Constitution had the English bankruptcy system in mind when they included the power to enact "uniform laws on the subject of bankruptcies" in the Article I powers of the legislative branch.[9] The first United

---

[7] Ch. 541, 30 Stat. 544, *amended by* Act of June 22, 1938, (Chandler Act), ch. 575, 52 Stat. 840, *repealed by* Bankruptcy Reform Act of 1978, Pub, L. No. 95-598, 92 Stat. 2549.

[8] Act of June 22, 1938, ch. 575, 52 Stat. 840 (1938), *repealed by* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549.

[9] U.S. CONST. art. I, § 8, cl. 4.

For discussions of the history of the United States bankruptcy laws, see PETER J. COLEMAN, DEBTORS AND CREDITORS IN AMERICA: INSOLVENCY, IMPRISONMENT FOR DEBT, AND BANKRUPTCY 1607-1900 (1974); 1 COLLIER ON BANKRUPTCY ¶¶ 0.01-0.10 (James W. Moore et al. eds., 14th ed. 1974); FRANK O. LOVELAND, A TREATISE ON THE LAW AND PROCEEDINGS IN BANKRUPTCY §§ 1-8 (4th ed. 1912); F. REGIS NOEL, HISTORY OF THE BANKRUPTCY LAW (1919); 1 NORTON BANKRUPTCY LAW AND PRACTICE 2D, chs. 1, 2 (1994); 1 HAROLD REMINGTON, A TREATISE ON THE BANKRUPTCY LAWS OF THE UNITED STATES, §§ 1 *et seq.* (J. Henderson ed., 5th ed. 1950); WARREN, *supra* note 1; Vern Countryman, *A History of American Bankruptcy Law*, 81 COM. L.J. 226 (1976); Charles J. Tabb, *The Historical Evolution of the Bankruptcy Discharge*, 65 AM. BANKR. L.J. 325 (1991). A delightful companion piece to the Countryman article just cited, set (sort of) in rhyme, is Lawrence P. King, *An Ode to the Bankruptcy Lawr*, 81 COM. L.J. 234 (1976).

Good discussions of the development of the English system are found in Jay Cohen, *The History of Imprisonment for Debt and its Relation to the Development of Discharge in Bankruptcy*, 3 J. LEG. HIST. 153 (1982); Ian P. Duffy, *English Bankrupts, 1571-1861*, 24 AM. J. LEG. HIST. 283 (1980); Louis E. Levinthal, *The Early History of English Bankruptcy*, 67 U. PA. L. REV. 1 (1919). Blackstone's well-known work covered bankruptcy law. 2 WILLIAM BLACKSTONE, COMMENTARIES *471-88. So too did the work of the second Vinerian Professor of Law at Oxford, Sir Robert Chambers. 2 ROBERT CHAMBERS, A COURSE OF LECTURES ON THE ENGLISH LAW 199-203 (T. Curley ed. 1986). Professor Holdsworth addressed bankruptcy law in numerous places in his monumental work. 1 WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 470-73 (1922); 8 *id.* at 229-45 (1926); 11 *id.* at 444-47 (1938); 12 *id.* at 387-88, 541-42 (1938); vol. 15 *id.* at 97-100 (1965). Other treatise writers have delved into the topic as well. *See, e.g.*, EDWARD JENKS, A SHORT HISTORY OF ENGLISH LAW 373-79 (1912); LOVELAND, *supra* § 3. Even Professor Samuel Williston, later known as one of the giants of American contract law, discussed bankruptcy history, from

States bankruptcy law, passed in 1800,[10] virtually copied the existing English law.[11] United States bankruptcy laws thus have their conceptual origins in English bankruptcy law prior to 1800. On both sides of the Atlantic, however, much has changed since then.

Early English law had a distinctly pro-creditor orientation, and was noteworthy for its harsh treatment of defaulting debtors.[12] Imprisonment for debt was the order of the day, from the time of the Statute of Merchants in 1285,[13] until Dickens' time in the mid-nineteenth century. The common law writs of *capias* authorized "body execution," *i.e.*, seizure of the body of the debtor, to be held until payment of the debt.

English law was not unique in its lack of solicitude for debtors. History's annals are replete with tales of draconian treatment of debtors. Punishments inflicted upon debtors included forfeiture of all property, relinquishment of the consortium of a spouse, imprisonment, and death. In Rome, creditors were apparently authorized to carve up the body of the debtor, although scholars debate the extent to which the letter of that law was actually enforced.

As commerce expanded, the need for a collective procedure to collect debts became evident. Individual collection remedies, such as the common law execution writs of *fieri facias*,[14] *elegit*,[15] and *levari facias*,[16] did not address the distinct problems presented by a debtor's multiple defaults. Creditors needed protection from defaulting debtors and from each other.

2. First Bankruptcy Laws: 1542 and 1570

In 1542, during the reign of Henry VIII, the first bankruptcy law was passed in England, entitled "An act against such persons as do make bankrupts."[17] This law viewed debtors as quasi-criminals (they were called "offenders"), and placed additional remedies in the hands of creditors. A more comprehensive bankruptcy

---

England to the 1898 Act. SAMUEL WILLISTON, SELECTED CASES AND STATUTES ON THE LAW OF BANKRUPTCY 1-6 (1902).

[10] Act of Apr. 4, 1800, ch. 19, 2 Stat. 19 (repealed 1803).

[11] Much of the language of the Act of 1800 was copied verbatim from the statute of Geo. 2, ch. 30, § 10 (1732).

[12] E. BALDWIN, A TREATISE UPON THE LAW OF BANKRUPTCY AND BILLS OF SALE 1 (10th ed. 1910). Professors Baird and Jackson have described the early English laws as "viciously punitive from the perspective of the debtor." DOUGLAS BAIRD & THOMAS JACKSON, CASES, PROBLEMS, AND MATERIALS ON BANKRUPTCY 27-28 (2d ed. 1990).

[13] 13 Edw. 1, stat. 3 (1285). *See also* Statute of Acton Burnell, 11 Edw. 1 (1283); Statute of Westminster II, 13 Edw. 1, stat. 1, chs. 11, 18, and 45 (1285).

[14] A writ of *fieri facias* authorized the judicial seizure and sale of a debtor's chattels. BLACK'S LAW DICTIONARY 627 (6th ed. 1990).

[15] A writ of *elegit* caused a defendant's goods and chattels to be appraised. *Id.* at 520.

[16] A writ of levari facias authorized judicial seizure and sale of the produce of a debtor's land. *Id.* at 906.

[17] 34 & 35 Hen. 8, ch. 4 (1542-43).

law was passed in 1570 during the reign of Queen Elizabeth I.[18]  That law filled out the basic parameters of the English bankruptcy system, lacking only the discharge provisions added in the early eighteenth century, and remained in effect until the time of the American Revolution.

Only creditors could commence a bankruptcy proceeding.[19]  This limitation, which persisted for three centuries,[20] was indicative of the law's overriding purpose, namely, to aid creditors in the collection of debts.[21]  Relief was not *for* debtors, but *from* debtors.  Debtors could be imprisoned for committing fraudulent acts of bankruptcy.  A discharge of debts was unheard of, and indeed would have been at odds with the entire premise of the law.  The ground for commencing a bankruptcy proceeding by the creditor was the commission of an "act of bankruptcy" by the debtor.  An act of bankruptcy was a form of conduct that indicated that the debtor was attempting to prevent creditors from recovering on debts justly owed them.[22]  For example, one act of bankruptcy was "keeping house," whereby the debtor would hole up in their home, immune from the reach of creditors.  Another, added by the 1570 law, was making a fraudulent conveyance.  The premise of debtor misconduct as the basis for involuntary bankruptcy, rather than financial status, remained in place until the Bankruptcy Reform Act of 1978 was enacted.

Upon the occurrence of an act of bankruptcy, creditors could petition the Lord Chancellor to convene a bankruptcy proceeding.  The Chancellor would appoint bankruptcy "commissioners" to supervise the process.  In broad form, the process mirrored a modern straight liquidation case.  The bankrupt's assets were seized, appraised, and sold, and the proceeds distributed pro rata to creditors.  The centrality of the principle of equal distribution in the bankruptcy case was emphasized by Lord Coke in 1584 in *The Case of Bankrupts*.[23]  Since there was no discharge, creditors were free after bankruptcy to continue to pursue individual collection remedies against the debtor.

The commissioners had substantial powers, originally somewhat akin to a combination of today's trustee and bankruptcy judge.  In addition to the normal trustee-like activities of collecting, liquidating, and distributing the debtor's property to creditors, commissioners could seize property, summon persons to appear before them, and commit people to prison.  Although appointed by the Chancellor, commissioners initially were not subject to his jurisdiction.  Recourse was to the common law courts.  By the early eighteenth century, however, the Chancellor had

---

[18] 13 Eliz., ch. 7 (1570).

[19] *Id.* § 1.

[20] The first purely voluntary bankruptcy law was the United States Bankruptcy Act of 1841. Act of Aug. 9, 1841, ch. 9, 5 Stat. 440 (repealed 1843).

[21] NOEL, *supra* note 9 at 25-27; 1 REMINGTON, *supra* note 9, § 2.

[22] For discussions of acts of bankruptcy during this early period, see 2 BLACKSTONE, *supra* note 9 at *477-79; 2 CHAMBERS, *supra* note 9, at 200-01; 8 HOLDSWORTH, *supra* note 9, at 237-38.

[23] 76 Eng. Rep. 441, 473 (K.B. 1584) (stating debtor's preferential payment to single creditor was act opposite to bankruptcy statute's goal of equal distribution among creditors).

largely taken over direct jurisdiction of bankruptcy matters.[24] Later the trustee-like functions were delegated to "assignees," so named because the bankruptcy estate was assigned to them.

The bankruptcy law only applied to "traders," *i.e.*, to *merchant* debtors.[25] This limitation remained until the nineteenth century. Non-merchants were relegated to the separate "insolvency" laws, which sporadically allowed for release from prison in certain circumstances and occasional relief from debt.[26] For us today, it is somewhat difficult to fathom the purpose of the limitation of the bankruptcy laws to traders. But at that time, the bankruptcy laws were viewed as a necessary concomitant to the exigencies of commerce, but no more. Credit generally was viewed as immoral and almost fraudulent; as Blackstone noted:

> [T]he law holds it to be an unjustifiable practice, for any person but a trader to encumber himself with debts of any considerable value. If a gentleman, or one in a liberal profession, at the time of contracting his debts, has a sufficient fund to pay them, the delay of payment is a species of dishonesty, and a temporary injustice to his creditor: and if, at such time, he has no sufficient fund, the dishonesty and injustice is the greater.[27]

In commerce, however, credit became recognized as a necessary evil. And once credit is used, things can go wrong.[28] Defaults happen, and in the instance of multiple defaults, a collective remedy such as bankruptcy is needed. Bankruptcy was limited to traders because it was believed that they had "peculiar facilities for delaying and defrauding creditors."[29] Non-traders, in short, simply lacked the wherewithal to commit a wrong sufficient to need the bankruptcy remedy.

Over the next two centuries, Parliament periodically amended the bankruptcy

---

[24] 1 HOLDSWORTH, *supra* note 9, at 470.

[25] The first English bankruptcy statute, 34 & 35 Hen. 8, ch. 4 (1542-43), was not on its face restricted to traders, although in practice such a limitation may have existed. NOEL, *supra* note 9, at 25-26; Countryman, *supra* note 9 at 227. This limit first appeared expressly in the next English bankruptcy statute, 13 Eliz., ch. 7, § 1 (1570). BALDWIN, *supra* note 12, at 237-38.

[26] NOEL, *supra* note 9, at 140-41; WARREN, *supra* note 1, at 61.

[27] 2 BLACKSTONE, *supra* note 9, at *473-74.

[28] Blackstone continued:
But in mercantile transactions the case is far otherwise. Trade cannot be carried on without mutual credit on both sides: the contracting of debts is therefore here not only justifiable but necessary. And if by accidental calamities, . . . a merchant or trader becomes incapable of discharging his own debts, it is his misfortune and not his fault.
*Id.*

[29] Levinthal, *supra* note 9, at 16 n.59; *see also* NOEL, *supra* note 9 at 25-26 (same).

laws.[30]    In many instances, especially in the seventeenth century, Parliament sought: (1) to enhance the power of the bankruptcy commissioners to reach more of the debtor's assets; and (2) to increase the penalties against noncompliant debtors. For example, the commissioner was empowered to break into the debtor's house or shop to seize the debtor's property, thus eliminating the effectiveness of "keeping house."[31]    A debtor could be pilloried and have his ear cut off.[32] During this long period, bankruptcy remained an involuntary remedy to be used by creditors only against debtors who were merchant traders.

### 3. Discharge Introduced in 1705

The English bankruptcy law of this era became complete with the passage of the Statute of Anne in 1705.[33] That law introduced the discharge of debts for the benefit of a debtor who cooperated in the bankruptcy proceeding.[34] A cooperative debtor also was granted a monetary allowance out of the bankruptcy estate, the amount of which depended on the percentage dividend that was paid to creditors.[35] At the same time, however, the Statute of Anne raised the stakes even higher for uncooperative debtors by providing for the death penalty for fraudulent bankrupts.[36] While the quasi-criminal nature of bankruptcy remained, the Statute of Anne first established the roots of a more humanitarian legislative treatment of honest but unfortunate debtors.

It is unlikely, however, that humanitarian concerns for debtors primarily motivated the legislators of 1705.[37]    Rather, the main focus was on assisting

---

[30] English laws dealing with the topic of bankruptcy after the passage of the 1570 Statute of Elizabeth up to the ratification of the United States Constitution were: 1 Jam., ch. 15 (1604); 21 Jam., ch. 19 (1623); 14 Car. 2, ch. 24 (1662); 4 Anne, ch. 17 (1705); 5 Anne, ch. 22 (1706); 7 Anne, ch. 25, § 3 (1708); 10 Anne, ch. 15 (1711); 3 Geo., ch. 12 (1716); 5 Geo., ch. 24 (1718); 6 Geo., ch. 22 (1719); 7 Geo., stat. 1, ch. 31 (1720); 11 Geo. 1, ch. 29 § 1, (1724); 13 Geo., ch. 27 § 2 (1726); 3 Geo. 2, ch. 29 (1730); 5 Geo. 2, ch. 30 (1732); 9 Geo. 2, ch. 18 § 2 (1736); 16 Geo. 2, ch. 27 (1743); 19 Geo. 2, ch. 32 (1746); 24 Geo. 2, ch. 57 §§ 9-10 (1751); 31 Geo. 2, ch. 35, § 2 (1758); 4 Geo. 3, ch. 33 (1764); 4 Geo. 3, ch. 36 (1764); 12 Geo. 3, ch. 47 (1772); 14 Geo. 3, ch. 77, §§ 58-59 (1774); 16 Geo. 3, ch. 38, §§ 68-69 (1776); 18 Geo. 3, ch. 52, §§ 75-76 (1778); 21 Geo. 3, ch. 29 (1781); 28 Geo. 3, ch. 24 (1788).

[31] 21 Jam. 1, ch. 19, § 8 (1623).

[32] 1 Jam. 1, ch. 15, § 9 (1604).

[33] 4 Anne, ch. 17 (1705).

[34] *Id.* § 7. This provided that "all and every person and persons so becoming bankrupt . . . who shall . . . in all things conform . . . shall be discharged from all debts by him, her, or thems due and owing at the time that he, she, or they did become bankrupt." *Id.*

[35] *Id.* §§ 7-8.

[36] *Id.* §§ 1, 18. The typically English terminology for the death penalty was that the criminal "shall suffer as a felon, without benefit of clergy." *Id.*

[37] *See* Tabb, *supra* note 9, at 333, 337-39.

creditors; the title and preamble to the act reflect as much.[38]  Indeed, the fact that only creditors could file a bankruptcy petition negates any serious argument that the 1705 law was intended as a debtor relief measure.   Furthermore, non-traders remained ineligible for bankruptcy.  Nor was a discharge an automatic entitlement. The commissioners had to certify that the debtor had "conformed" to the requirements of the act, meaning in essence that the debtor cooperated in the bankruptcy proceeding.  Interestingly, the same basic premise persists today in section 727 of the United States Bankruptcy Code,[39] which predicates denial of a debtor's discharge on various acts that hinder the trustee in the collection and distribution of the estate.

More evidence of the predominantly pro-creditor orientation of even the discharge provision is the fact that during the very next year, 1706, creditor consent was added as a prerequisite to the granting of a discharge.[40]  In various forms creditors retained some voice in whether the debtor received a discharge until the late nineteenth century.  In practice the creditor consent provision seriously undercut any beneficial effects of the discharge.  It is reputed that a lack of creditor consent blocked Daniel Defoe from obtaining a discharge.[41]

While obviously quite dramatic, the importance of the death penalty for fraudulent bankrupts should not be overstated (except for the few unfortunate souls who suffered that punishment).  Although some writers have highlighted the travails of some of those who were executed, in fact at most five executions occurred in the 115 years that the death penalty for fraudulent bankruptcy was on the books.[42]  It also should be remembered that bankruptcy was no different from most property crimes of that era, which also provided for the possible imposition of the death penalty.

Although on the books the laws remained strongly pro-creditor, by the middle of the eighteenth century a somewhat more enlightened attitude toward bankruptcy had taken hold.   Attitudes about credit and commerce were changing as the Industrial Revolution took hold.[43]  Blackstone, writing in 1765, observed:

---

[38] The act was entitled: "An act to prevent frauds frequently committed by bankrupts." 4 Anne, ch. 17 (1705). The preamble refers to the need for "the prevention" of losses caused by persons who become bankrupt "not so much by reason of losses and unavoidable misfortunes, as to the intent to defraud and hinder their creditors." *Id.* § 1.

[39] 11 U.S.C. § 727(a) (1988).

[40] 5 Anne, ch. 22, § 2 (1706).

[41] Tabb, *supra* note 9, at 340.

[42] *See* Leon Radzinowicz, A History of English Criminal Law and Its Administration from 1750: The Movement for Reform, 1750-1833, at 520-21 n.94 (1948) (citing J. Stephen, A History of the Criminal Law of England 229, 230 (1883)).

[43] *See* Robert Weisberg, *Commercial Morality, the Merchant Character, and the History of the Voidable Preference*, 39 Stan. L. Rev. 3, 32 (1986). "[T]he idealogy of commerce that took hold in the eighteenth century . . . turned the morally questionable and perceptually elusive phenomena of trade and credit into necessities, and then into virtues." *Id.*

> A bankrupt . . . was formerly considered merely in the light of a criminal.
> . . . But at present the laws of bankruptcy are considered as laws calculated
> for the benefit of trade, and founded on the principles of humanity as well
> as justice: and to that end they confer some privileges, not only on the
> creditors, but also on the debtor or bankrupt himself.[44]

The 1732 Statute of George II[45] was the English bankruptcy law in effect at
the time of the ratification of the United States Constitution and the passage of the
first United States bankruptcy law in 1800. That English law served in many
respects as the model for the American 1800 Act. The carrot and stick approach
of prior laws was continued: a discharge and an allowance for the debtor who
cooperated, and death for the fraudulent debtor.[46] Debtors also were permitted to
retain a modest amount of property as exempt. The 1732 law gave direct juris-
diction to the Chancellor.

Bankruptcy throughout remained an involuntary proceeding available only
against traders. A separate set of "insolvency" laws addressed the concerns of
debtor relief more directly. These laws dealt with relief from debts and, more
commonly, release from imprisonment.[47] In this early English period, such laws
were only infrequently in force, and were often ineffective. Discharge from debts
was rare. The Privy Council had intervened directly on behalf of debtors with
greater effect, but the Council's jurisdiction was abolished in 1641.[48] Debtor
relief laws became more common, and effective, in the nineteenth century.

## B. *The Constitution and American Bankruptcy Law Prior to 1898*

### 1. The Constitution

In the colonial era, many of the states had comprehensive laws regulating
debtor-creditor relations.[49] Some of these were bankruptcy laws, and others were
insolvency laws. Imprisonment for debt was commonplace in the colonies and then
in the states, until the mid-nineteenth century. Some states had more liberal debtor
relief measures than did England. Since no provision was made for federal

---

[44] 2 BLACKSTONE, *supra* note 9, at *471.

[45] 5 Geo. 2, ch. 30 (1732).

[46] BAIRD & JACKSON, *supra* note 12, at 28-29.

[47] For a particularly enlightening discussion of the movements to assist honest debtors through the
insolvency laws, see Cohen, *supra* note 9; Duffy, *supra* note 9. Professor Holdsworth deals with the subject
in some detail. 8 HOLDSWORTH, *supra* note 9, at 233-36. The first relief measure was passed in 1670. 22
& 23 Car. 2, ch. 20 (1670). Subsequent measures included 30 Car. 2, ch. 4 (1678); 2 W. & M., sess. 2,
ch. 15 (1690); 5 & 6 W. & M., ch. 8 (1694); 7 & 8 Will. 3, ch. 12 (1696); 8 & 9 Will. 3, ch. 18 (1697);
1 Anne, stat. 1, ch. 25 (1701); 2 & 3 Anne, ch. 16 (1703).

[48] Countryman, *supra* note 9, at 227.

[49] The standard reference on this subject is COLEMAN, *supra* note 9. *See also* NOEL, *supra* note 9, ch.
3.

bankruptcy legislation in the Articles of Confederation, state regulation continued.

The subject of bankruptcy received only passing attention from the framers at the Constitutional Convention of 1787.[50]    A bankruptcy law was apparently believed to be a necessary subject of federal legislation because of the problems that varying and discriminatory state laws caused for nonresident creditors and interstate commerce in general.[51]    James Madison described the perceived purpose of the Bankruptcy Clause:

> The power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different states that the expediency of it seems not likely to be drawn into question.[52]

The Bankruptcy Clause, empowering Congress to "pass uniform laws on the subject of bankruptcies,"[53] was added late in the proceedings of the Constitutional Convention, after very little debate.    Charles Pinckney of South Carolina is generally credited with first drafting the Bankruptcy Clause.[54]    The only vote against was by Connecticut, with Roger Sherman expressing concern that bankruptcies could be punished by death, as was still the law in England.[55]    An unsuccessful attempt was made to extend the prohibition against impairing the obligation of contracts from the states to the federal government, which if successful would have undermined the utility of any federal bankruptcy legislation.[56]

For over a century after the Constitution, however, the Bankruptcy Clause remained largely unexercised by Congress. During this period, many states stepped into the void and passed their own bankruptcy legislation. A federal bankruptcy law was in existence only from 1800 to 1803,[57] from 1841 to 1843,[58] and from 1867 to 1878.[59]    Permanent federal bankruptcy legislation did not go into effect

---

[50] NOEL, *supra* note 9, ch. 4; WARREN, *supra* note 1, at 4-7; Frank R. Kennedy, *Bankruptcy and the Constitution*, 33 U. MICH. L. QUAD. 40 (Spring 1989); *cf.* James M. Olmstead, *Bankruptcy a Commercial Regulation*, 15 HARV. L. REV. 829, 831 (1902) (explaining entire historical origin of Bankruptcy Clause in one paragraph).

[51] Judith Koffler, *The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. REV. 22, 36 (1983).

[52] THE FEDERALIST NO. 42 (James Madison).

[53] U.S. CONST. art. I, §, 8 cl. 4.

[54] Koffler, *supra* note 51, at 35 (citing THE RECORDS OF THE FEDERAL CONVENTION OF 1787 447 (M. Farrand ed. 1911)).

[55] Symposium, *Contemporary Issues in Bankruptcy and Corporate Law: "A View From the Bench"*, 61 U. CIN. L. REV. 511, 513-14 (noting this was not regarded as serious objection).

[56] Koffler, *supra* note 51 at 37.

[57] Bankruptcy Act of 1800, ch. 19, 2 Stat. 19, *repealed by* Act of Dec. 19, 1803, ch. 6, 2 Stat. 248.

[58] Bankruptcy Act of 1841, ch. 9, 5 Stat. 440, *repealed by* Act of Mar. 3, 1843, ch. 82, 5 Stat. 614.

[59] Bankruptcy Act of 1867, ch. 176, 14 Stat. 517, *repealed by* Act of June 7, 1878, ch. 160, 20 Stat. 99.

until 1898. Thus, states were free to act in bankruptcy matters for all but 16 of the first 109 years after the Constitution was ratified. Each instance of federal legislation followed a major financial disaster: the Act of 1800 followed the Panic of 1797; the Act of 1841 came after the Panic of 1837; the 1867 Act followed the Panic of 1857 and the Civil War; and finally the 1898 Act was passed in the wake of the Panic of 1893.

## 2. Bankruptcy Act of 1800

The first federal bankruptcy law was passed on April 4, 1800, eleven years after the ratification of the Constitution.[60]  Pressure had been brought for a national bankruptcy law by a crash in 1792, but nothing was done until 1797, when another panic caused widespread ruin and the imprisonment of thousands of debtors. Robert Morris, one of the main financiers of the Revolution, spent three years in debtor's prison owing $12 million, and Supreme Court Justice James Wilson fled from Pennsylvania to avoid a like fate.[61]  The 1800 Act finally was passed, carrying by but a single vote in the House. Federalist representatives of commercial interests pushed the bill, while the law was opposed by anti-Federalist southerners and agricultural sympathizers.[62]  The 1800 Act was designed as a temporary measure, to sunset in five years, but actually was repealed after only three.[63]

The 1800 Act was very similar to the 1732 English act, and also had many of the features of the Pennsylvania statute. It was purely a creditors' remedy. Only creditors, upon proof of the debtor's commission of an act of bankruptcy,[64] could initiate a bankruptcy.[65]  Debtors, however, apparently were often able to persuade a friendly creditor to bring a case. Only merchants were eligible debtors.[66]  Fraudulent bankruptcy was a criminal offense, but was not punishable by death.[67]  Commissioners appointed by the district court[68] supervised the process, and had powers very similar to the English commissioners. The commissioners would appoint assignees to effect the liquidation and distribution.[69]

A discharge of the debts[70] and the person[71] of a cooperative debtor was

---

[60] Ch. 19, 2 Stat. 19.

[61] WARREN, *supra* note 1, at 13.

[62] *Id.* at 19.

[63] Ch. 6, 2 Stat. 248 (1803) (repealing 1800 Act).

[64] Ch. 19, § 1, 2 Stat. at 18-21.

[65] *Id.* § 2, 2 Stat. at 21-22. A creditor owed at least $1000 by the debtor could initiate bankruptcy without the cooperation of other creditors of the bankrupt. *Id.*, 2 Stat. at 21.

[66] *Id.* § 1.

[67] *Id.* § 18, 2 Stat. at 26-27 (providing prison term of twelve months to ten years).

[68] *Id.* § 2, 2 Stat. at 21-22.

[69] *Id.* § 7, 2 Stat. at 23. The creditors of the debtor were permitted to elect an assignee to replace the one chosen appointed by the commissioners. *Id.* §§ 6-7, 2 Stat. at 23.

[70] *Id.* § 34, 2 Stat. at 30-31.

allowed. Before a discharge could be granted, the bankruptcy commissioners had to certify to the federal district judge that the debtor had cooperated, and two-thirds of the creditors, by number *and* by value of claims, had to consent to the discharge.[72] The debtor received a graduated allowance out of the estate, depending on the size of the dividend to creditors.[73] Modest exemptions were also permitted.[74] The 1800 Act did provide a discharge for some of the prominent financiers, including Robert Morris, who had been ruined in 1797.

By 1803, the sentiment for repeal of the 1800 Act was overwhelming. Some of the objections ring familiar. Small dividends were paid, and many of the discharged debtors were high-rolling speculators who went through bankruptcy and then started their operations anew. In addition, travel to the distant federal courts was difficult. Finally, agricultural interests were outraged at the perceived favoritism of mercantile groups.[75]

### 3. State Law in Nineteenth Century

The states picked up part of the slack and continued to regulate relations between debtors and creditors, bankruptcy, and insolvency during the lengthy era of federal inaction after the 1803 repeal. In some important respects state relief was limited. In 1819, the Supreme Court, in *Sturges v. Crowninshield*,[76] held that states could not constitutionally discharge preexisting debts.[77] In 1827, the Court, in *Ogden v. Saunders*[78] held that states could not discharge the debts due a citizen of another state.[79] *Ogden* did hold, however, that states could discharge future debts against citizens of the same state.[80] The *Sturges* decision in particular caused considerable consternation, because the period around 1819-1820 was one of extreme economic depression. During this depression there was no federal bankruptcy law by which debtors could be relieved, and because of *Sturges*, state relief was not possible as to preexisting debts.

---

[71] *Id.* § 38, 2 Stat. at 32 (providing district court judge *may* order incarcerated debtor released upon proof, in form of certificate, that all debtor's nonexempt assets were turned over).

[72] *Id.* § 36, 2 Stat. at 31. Only creditors owed at least fifty dollars by the debtor were entitled to vote on whether the debtor should receive a discharge. *Id.*

[73] *Id.* § 34, 2 Stat. at 30-31. For example, if the amount distributed to creditors gave them a 50% return on their claims, the debtor received 5% of the proceeds collected for distribution, up to a maximum of $500. *Id.* If the return to creditors was 75% or more, the debtor received 10% of the proceeds collected for distribution, up to a maximum of $800. *Id.*

[74] *Id.* § 5, 2 Stat. at 23 (exempting necessary wearing apparel and bedding of debtor and family); *id.* § 18, 2 Stat. at 26-27 (same).

[75] WARREN, *supra* note 1, at 19-20.

[76] 17 U.S. (4 Wheat.) 122 (1819).

[77] *Id.* at 208.

[78] 25 U.S. (12 Wheat.) 213 (1827).

[79] *Id.* at 368-69.

[80] *Id.*

In the meantime, the lengthy era of widespread use of imprisonment for debt was coming to an end. The practice was abolished at the federal level in 1833, and many states followed suit in the 1830s and 1840s. In England, general abolition of the practice did not come until 1869. Today only vestiges of "body execution" remain, usually in cases where the debtor is perceived to be morally culpable, such as a debt incurred through fraud, or for failure to make alimony[81] or child support payments.[82]

Even though debtors eventually no longer went to prison, they lacked any means to discharge preexisting debts during the first four decades of the nineteenth century after 1803. At times, especially in the 1830s, states did give partial relief through the enactment of stay laws or moratoria on debt collection. These laws presaged the stay laws to follow a century later.

## 4. Bankruptcy Act of 1841

Throughout the 1820s attempts were made to pass a bill permitting voluntary bankruptcy for the direct relief of debtors, merchant and non-merchant alike.[83] Yet throughout that period all such efforts were rebuffed by an alliance of southerners, who opposed any federal bankruptcy bill, and others who believed that voluntary bankruptcy was unconstitutional.[84] John Calhoun, for example, heatedly fought off federal intervention. Daniel Webster, conversely, was a leading advocate of a national bankruptcy law, and often fronted for Joseph Story, who wrote a number of bankruptcy bills.[85] Even those who favored a bankruptcy bill differed on whether involuntary bankruptcy should be permitted and whether corporations should be eligible debtors. Finally, the devastating Panic of 1837, coupled with the victory by the Whigs over the Democrats in the 1840 election, turned the tide. In a very close vote, the Bankruptcy Act of 1841[86] was passed. Again a major national financial crisis had forced Congress's hand. The legislative background to the passage of the 1841 Act is a fascinating story in itself, demonstrating how strange bedfellows and apt logrolling can sometimes work to accomplish seemingly impossible legislative goals.[87] The final compromise allowed both involuntary and voluntary bankruptcy, did not limit eligibility to merchant debtors, but did exclude

---

[81] *See, e.g.*, Bible v. Bible (*In re* Bible), 110 B.R. 1002, 1005 (S.D. Ga. 1990) (noting that any sanction against debtor, including imprisonment, would be to coerce debtor to make payments, not to punish debtor for failure to make payments).

[82] *See, e.g.*, Nathan v. Ehrhart (*In re* Ehrhart), 155 B.R. 458, 460 (E.D. Mich. 1993) (noting contempt proceedings against noncustodial parent could result in incarceration).

[83] For a detailed treatment of these attempts, see WARREN, *supra* note 1, part III.

[84] CARL B. SWISHER, 5 HISTORY OF THE SUPREME COURT OF THE UNITED STATES: THE TANEY PERIOD, 1836-1864, at 138 (1974).

[85] *Id.* at 133.

[86] Ch. 9, 5 Stat. 440, *repealed by* Act of Mar. 3, 1843, ch. 82, 5 Stat. 614.

[87] WARREN, *supra* note 1, at 56-79. A thorough discussion of the background of the 1841 law is found in SWISHER, *supra* note 84, ch. 6.

corporations from eligibility.

While the 1800 Act was nothing more than a reprise of the old English bankruptcy model, the 1841 Act, because of its establishment of voluntary bankruptcy, was a watershed event in bankruptcy history.[88] For the first time, a financially troubled debtor could file for bankruptcy and receive a discharge. Nor was relief limited to merchant debtors; eligibility was extended to "all persons whatsoever . . . owing debts . . . ."[89] Considerable debate focused on whether such a law even fell within the "subject of bankruptcies" specified by the Constitution as one of Congress's enumerated powers.[90] Ultimately Congress's power was upheld, although never directly by the Supreme Court.[91]

The 1841 Act was a coordinated, simple, and short act of only seventeen sections. It was reputedly written in large part by Story[92] and modeled after the Massachusetts insolvency law of 1838.[93] The act provided that "[a]ll persons whatsoever . . . owing debts" who did petition "for the benefit of this act, and therein declare themselves to be unable to meet their debts . . . shall be deemed bankrupts within the purview of this act."[94] Involuntary bankruptcy was permitted against merchants.[95] Jurisdiction was vested in the district court, "in the nature of summary proceedings in equity."[96] Assignees effected the liquidation and distribution,[97] thus replacing the commissioners featured in previous bankruptcy laws.

The debtor was allowed basic exemptions,[98] but was not permitted to invoke state exemption laws. This restriction became a point of considerable contention during the consideration of later federal bankruptcy acts. The discharge extended to "every bankrupt, who shall bona fide surrender all his property [except that made exempt], and shall fully comply with . . . and conform to . . . this act."[99] Creditors still could block the discharge, but only through a written dissent filed by a majority in number and value of creditors.[100] Even then the debtor could

---

[88] *See* John C. McCoid, II, *The Origins of Voluntary Bankruptcy*, 5 BANKR. DEV. J. 361, 361-62 (1988) (noting that currently, far more voluntary filings occur than involuntary filings and stating "Congress seemingly broke new ground" by departing from English precedent and providing for voluntary bankruptcy).

[89] Ch. 9, § 1, 5 Stat. at 441.

[90] *See infra* part IV.A (discussing scope of Bankruptcy Clause).

[91] *See* SWISHER, *supra* note 84, at 141 (noting that while Supreme Court interpreted 1841 Act in numerous decisions, the Act's constitutionality was discussed only in lower court cases).

[92] *Id.* at 133.

[93] WARREN, *supra* note 1, at 70.

[94] Ch. 9, § 1, 5 Stat. at 441.

[95] *Id.*, 5 Stat. at 441-42. An involuntary petition could be initiated by any creditor owed more than $500 by the debtor, but only if the total amount of the debtor's indebtedness was at least $2000. *Id.*

[96] *Id.* § 6, 5 Stat. at 445.

[97] *Id.* § 3, 5 Stat. at 443. In this respect, the assignee's duties were similar to those of today's trustees.

[98] *Id.* (exempting "necessary household and kitchen furniture" and other items at discretion of assignee, up to a maximum of $300, as well as wearing apparel of debtor and debtor's family).

[99] *Id.* § 4, 5 Stat. at 443.

[100] *Id.*

demand a trial by jury or appeal to the circuit court on the issue of whether the debtor had conformed.[101]  Unlike the 1800 Act, a number of grounds for denying discharge were included.[102]  Like the 1800 Act, very few debts were excepted from the discharge.  Special emphasis in the new law was placed on halting preferences.  The giving of preferences was made a ground for denial of discharge.[103]  A hearing on the discharge was held in the district court.[104]  The old practice of commissioners certifying the discharge to the court was abandoned.  The discharge was enforced as an affirmative defense raised by the debtor in subsequent collection efforts.[105]  This practice did not change until 1970.

Even though in operation the law worked well, from the viewpoint of creditors, the 1841 Act, like its 1800 predecessor, was a dismal failure.  Many thousands of debtors were discharged, minimal dividends were paid to creditors, and administrative fees were high.[106]  Control was in the hands of the courts and the assignees, not creditors.  With the immediate goal of relieving the plight of the mass of insolvent debtors accomplished, and with little continuing political capital to be gained from the law, the 1841 Act was repealed in early 1843 after little more than a year of operation.[107]  Nonetheless, the 1841 Act established the fact of voluntary bankruptcy for all debtors.  Voluntary proceedings have been a feature of all subsequent bankruptcy laws.  Never again was the constitutionality of voluntary bankruptcy seriously questioned.  The 1841 Act, with its marriage of the concepts of "bankruptcy" and "insolvency," could be called the first modern bankruptcy law.

## 5.  Bankruptcy Act of 1867

The years after the 1843 repeal of the 1841 Act were finally times of prosperity for the United States, and consequently, no push was made for a federal bankruptcy law.  To the Whigs, considering the political harm done to them by the 1841 Act, a bankruptcy law was anathema.  Determined to stave off any more disastrous federal laws, states experimented even more with stay and insolvency laws.  England, meanwhile, finally liberalized its bankruptcy law in favor of debtors by abolishing the requirement of creditor consent to the discharge in 1842,[108] allowing voluntary bankruptcy in 1844,[109] and extending eligibility to non-merchants in 1861.[110]

---

[101] *Id.* 5 Stat. at 444.

[102] *Id.* 5 Stat. at 443-44.  Grounds for discharge included fraud, willful concealment of assets, preferential treatment of creditors, and willfully refusing to comply with court orders.  *Id.*

[103] *Id.* § 2, 5 Stat. at 442; *id.* § 4, 5 Stat. at 443-44.

[104] *Id.* § 4, 5 Stat. at 443-44.

[105] *Id.* § 4, 5 Stat. at 444.

[106] WARREN, *supra* note 1, at 81-82.

[107] Act of Mar. 3, 1843, ch. 82, 5 Stat. 614.

[108] Bankruptcy Law Amendment Act, 1842, 5 & 6 Vict., ch. 122, § 39.

[109] Law of Insolvency, Bankruptcy and Execution Amendment Act, 1844, 7 & 8 Vict., ch. 96, § 41.

[110] Bankruptcy and Insolvency Law Amendment Act, 1861, 24 & 25 Vict., ch. 134, §§ 69, 86.

08-13555-mg    Doc 15746-4    Filed 04/08/11    Entered 04/08/11 10:21:48    Exhibit D
Pg 16 of 49

After the Panic of 1857 and the financial cataclysm caused by the American Civil War, overwhelming pressure for another federal bankruptcy law led to the enactment of the Bankruptcy Act of 1867.[111]    The inability of state laws to discharge preexisting debts[112] or debts of nonresident creditors[113] contributed to the need for a federal law.  Northern creditors pushed hard for the bankruptcy bill, viewing such a law as essential to their ability to collect anything from southern debtors.  The compromise bill that eventually passed was described as "unwieldy because of too great attention to details."[114]

The 1867 Act included both voluntary[115] and involuntary[116] bankruptcy. The constitutionality of voluntary bankruptcy was now taken for granted.  Unlike the 1841 Act, corporations were permitted to take advantage of the act.[117]    In keeping with the times, an oath of allegiance to the United States had to be taken by a petitioning bankrupt.[118]  The 1841 Act's restriction of involuntary bankruptcy to merchants was dropped.  Now "any person" was subject to the threat of involuntary bankruptcy.  The list of "acts of bankruptcy" that would support an involuntary petition was greatly extended as well.[119]

The judicial machinery for dealing with bankruptcy cases was much closer to the system in place today.  The district courts were given original jurisdiction as "courts of bankruptcy."[120]  The district courts were directed, however, to appoint one or more "registers in bankruptcy, to assist the judge of the district court in the performance of his duties."[121]  These registers thus were the predecessors of the twentieth century referee and bankruptcy judge.  Assignees superintended the liquidation itself.

In time, this law too proved to be a failure and was eventually repealed in 1878.[122]  As with the prior federal bankruptcy acts, criticisms levied by creditors included small dividends, high fees and expenses, and lengthy delays.[123] Northern creditors who had hoped to use the bankruptcy law to facilitate collection from southern debtors were disappointed.  Indeed, most of the pressure for repeal came from creditors.

---

[111] Ch. 176, 14 Stat. 517, *repealed by* Act of June 7, 1878, ch. 160, 20 Stat. 99 (1878).

[112] *See supra* text accompanying notes 76-77 (discussing Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122 (1819)).

[113] *See supra* text accompanying notes 78-80 (discussing Ogden v. Saunders, 25 U.S. (12 Wheat.) 213 (1827)).

[114] NOEL, *supra* note 9, at 153.

[115] Ch. 176, § 11, 14 Stat. at 521-22.

[116] *Id.* § 39, 14 Stat. at 536-37.

[117] *Id.* §§ 36-37, 14 Stat. at 534-35.

[118] *Id.* § 11, 14 Stat. at 521.

[119] *Id.* § 39, 14 Stat. at 536.

[120] *Id.* § 1, 14 Stat. at 517.

[121] *Id.* § 3, 14 Stat. at 518.

[122] Act of June 7, 1878, ch. 160, 20 Stat. 99.

[123] NOEL, *supra* note 9, at 153-54; WARREN, *supra* note 1, at 127.

Nor did debtors do very well under the 1867 law. Due to the inclusion of numerous grounds for denying discharge,[124] only about one-third of the debtors received a discharge.[125] Procedurally, the discharge was obtained after application by the debtor, upon notice to creditors and a court hearing.[126] The discharge still had to be raised as an affirmative defense to subsequent collection efforts.[127]

The issues of creditor consent to the discharge and the need for a minimum dividend were very hotly debated, and produced an odd history. In the 1867 Act itself, creditors seemingly carried the day; unless a majority of creditors consented, the law required a fifty percent dividend as a prerequisite to the granting of a discharge.[128] However, the effective date of this provision was postponed for a year, which of course allowed debtors to file before that time and discharge their debts. Later amendments denuded the provision of what little vitality it still had.[129] Later laws completely abandoned the creditor consent restriction.

An important benefit of the 1867 Act to debtors, however, was that it allowed debtors to elect the benefit of generous state exemption laws as an alternative to the federal scheme.[130] The constitutionality of this provision was contested, on the ground that it violated the uniformity requirement of the Bankruptcy Clause. In 1902, while construing the 1898 Act, the Supreme Court finally held that the uniformity requirement was satisfied notwithstanding the incorporation of state exemptions.[131] The utilization of state exemption laws in federal bankruptcy cases has continued to the present.[132]

A major innovation, the composition agreement, was introduced into the

---

[124] Ch. 176, § 29, 14 Stat. at 531-32.

[125] Countryman, *supra* note 9, at 230 (citing ANNUAL REPORT OF THE ATTORNEY GENERAL OF THE UNITED STATES 34 (1879)).

[126] Ch. 176, § 29, 14 Stat. at 531-32.

[127] *Id.* § 34, 14 Stat. at 533.

[128] *Id.* § 33, 14 Stat. at 533.

[129] An 1870 amendment provided that the provision did not apply to any debts contracted before January 1, 1869. Act of July 14, 1870, ch. 262, § 1, 16 Stat. 276. In 1874, the law again was amended, so that the consent rule was eliminated entirely for involuntary cases, and reduced voluntary cases to either a 30% dividend or the consent of one-fourth in number and one-third in value of creditors. Act of June 22, 1874, ch. 390, § 9, 18 Stat. 180.

[130] Ch. 176, § 14, 14 Stat. at 523.

[131] Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 188-90 (1902). For a more detailed discussion of the uniformity requirement, see *infra* part IV.B.

[132] An intriguing aspect of the state exemption question under the 1867 Act concerned fixing the date of the effective state exemption law that was to be used in federal bankruptcy cases. The 1867 Act allowed debtors to use state exemption laws as of 1864. Ch. 176, § 14, 14 Stat. at 523. This of course excluded the southern states. After the war the southern and many western states adopted new exemption laws that were very generous to debtors. In 1872 the incorporation date was changed to 1871. Act of June 8, 1872, ch. 339, 17 Stat. 334. This allowed debtors to take advantage of those post-war amendments. A serious question developed over the constitutionality of applying the 1872 amendment against preexisting debts. Congress passed a "clarifying" law in 1873 that stated that the prior year's amendment did apply to preexisting debts. Act of Mar. 3, 1873, ch. 235, 17 Stat. 577. However, some courts held that the clarifying law was unconstitutional.

bankruptcy law in 1874.[133]    England had taken a similar step in 1869.[134] Congressional action had been hastened by the Panic of 1873. The composition agreement, the forerunner of modern reorganization provisions, allowed the debtor to propose payment of a certain percentage of his debts over time in full discharge of those debts, while also keeping his property. If the proposed composition was accepted by a majority in number and three-fourths in value of the creditors,[135] it was binding on all creditors named in the composition.[136]    Dissenters were protected by a "best interests" test,[137] which required that creditors be paid as much as they would receive in a liquidation.[138]

The new composition law also was held to be within the "subject of bankruptcies,"[139] thus complying with the Bankruptcy Clause. Indeed, as a proceeding in bankruptcy, compositions were governed by other provisions of the bankruptcy law. For example, in 1881 the Supreme Court held that a debt based on fraud could not be discharged in a composition without creditor assent.[140]    Of course, the composition law died with the rest of the bankruptcy law upon its repeal in 1878. By all accounts, the sentiment for repeal was overwhelming.

The twenty years following the repeal of the bankruptcy act in 1878 marked the final period during which there was no federal bankruptcy law. One last attempt was made to solve bankruptcy and insolvency problems at the state level, and again these efforts did not succeed. The Panics of 1884 and 1893 highlighted the inability of the states to deal with national financial problems.

## 6. Equity Receiverships

Federal courts entered the reorganization business with the advent of the equity receivership. Use of this device blossomed in the late nineteenth century as a means to keep the railroads running. At a time when railroads were of great economic importance, but in dire financial straits, there was no federal bankruptcy law or composition provision on the books to deal with their problems. Given the interstate nature of virtually all of the railroads, state remedies were entirely

---

[133] Act of June 22, 1874, ch. 390, § 17, 18 Stat. 178, 182-84 (repealed 1878).

[134] The Bankruptcy Act, 1869, 32 & 33 Vict., ch. 71, § 126.

[135] Ch. 390, § 17, 18 Stat. at 183. Fully secured creditors were not entitled to vote on a proposed composition unless their security was relinquished. *Id.*

[136] *Id.*

[137] *Id.* (providing that court will approve composition if, inter alia, it is "satisfied that the . . . [composition] is for the best interest of all concerned . . . .").

[138] *See, e.g., In re* Whipple, 29 F. Cas. 929, 930 (D. Mass. 1875) (No. 17, 513) (rejecting composition that proposed to distribute $11,000 among unsecured creditors where forced sale of debtor's net assets would have yielded $18,000). The court explained that compositions must be rejected "even if opposed by a small minority of creditors when it is made to appear that a settlement in bankruptcy would be more for their advantage." *Id.*

[139] *In re* Reiman, 20 F. Cas. 490, 497 (S.D.N.Y. 1874) (No. 11,673).

[140] Wilmot v. Mudge, 103 U.S. 217, 219 (1880).

inadequate. The creative solution achieved was to invoke the power of the federal courts to supervise the restructuring of troubled railroads.[141]   Court-supervised receiverships remained the predominant means of corporate reorganization for about a half century, until federal reorganization laws were enacted during the Great Depression.

A receivership was commenced by a creditor's petition[142] to the federal court to exercise its equity jurisdiction to appoint a receiver to take control of the corporate debtor's assets.[143]   The receiver would take title to the assets, thereby stopping collection efforts by individual creditors. The receiver, while looking for a buyer for the assets, would continue to run the railroad.  Eventually the creditors would be paid out of the proceeds of a foreclosure sale of the assets.  Since the business could be sold as a going concern, a higher price could be realized and jobs could be preserved.

In practice, the equity receivership came to be dominated by insiders, and was subject to much abuse.  In form, the receivership resulted in the sale of the debtor's assets, with the proceeds distributed to creditors.  In substance, however, the entire elaborate proceeding often resulted in old management retaining control of the enterprise, and dictating the terms of the sale.  While a market sale was supposedly utilized, the only bidder in many cases was a "reorganization committee" or "protective committee" controlled by insiders.[144]   The equity receivership had a number of other defects that limited its usefulness.[145]

A number of judicial doctrines were developed to curb insider abuses.  The most important was the "absolute priority rule," which precluded shareholders from retaining their interests unless all creditors were paid.[146]   Another was the use of an "upset price," to ensure that an adequate price was paid at the foreclosure sale. The "best interests" test used in compositions was not applied to equity receiver-

---

[141] The issue of whether federal courts possessed jurisdiction to take charge of a debtor corporation's assets in the absence of statutory authority is discussed in Garrard Glenn, *The Basis of the Federal Receivership*, 25 COLUM. L. REV. 434, 436-46 (1925).

[142] *But see* Wabash, St. L. & P. Ry. v. Central Trust Co., 22 F. 272, 273-75 (C.C.E.D. Mo. 1884) (describing federal court's appointment of receiver for financially troubled railroad upon request of *debtor* railroad); D.H. Chamberlain, *New-Fashioned Receiverships*, 10 HARV. L. REV. 139, 142-43 (1896) (criticizing appointment of receiver by federal court upon request of debtor in *Wabash* case, and noting that receivers have been appointed upon request of debtors in other cases).

[143] For a brief, informative discussion of the equity receivership, see *supra* BAIRD & JACKSON note 12, at 960-64.

[144] Jacob Trieber, *The Abuses of Receiverships*, 19 YALE L.J. 275, 276-77 (1910).

[145] For a discussion of some of these defects, see THOMAS K. FINLETTER, THE LAW OF BANKRUPTCY REORGANIZATION (1939); JOHN GERDES, CORPORATE REORGANIZATIONS (1936); Trieber, *supra* note 144, at 277-78 (noting tendency of receivers to hire numerous professionals at considerable expense to debtor business).

[146] *See* Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 501-08 (1913) (where shareholders of railroad to be foreclosed pursuant to reorganization plan are reserved stock interest in reorganized company, transferees interests are subject to claims of nonconsenting unsecured creditors of foreclosed railroad not made parties to foreclosure).

ships.

Vestiges of many of the judicial doctrines developed in the receivership cases remain in present-day corporate reorganizations. Furthermore, many of the issues confronted in the receivership cases—notably, how to protect dissenting creditors and ensure that the sale price is fair—are still sources of considerable controversy in the current debate over the merits of Chapter 11.

## C. Bankruptcy Act of 1898 and Amendments

### 1. Bankruptcy Act of 1898

The Bankruptcy Act of 1898[147] marked the beginning of the era of permanent federal bankruptcy legislation. The 1898 Act remained in effect for eighty years, until being replaced by the Bankruptcy Reform Act of 1978.[148] During the course of its existence, the 1898 Act was amended numerous times; most radically in 1938 by the Chandler Act.[149]

The road to the passage of the 1898 Act was anything but smooth.[150] Enormous hostility against a federal bankruptcy law of any sort had been generated by the 1867 law. However, the panics of 1884 and 1893 clearly exposed the need for some form of federal bankruptcy law. State laws were simply incapable of dealing with the financial problems created by these widespread calamities.

As had been true throughout much of the nineteenth century, southern and western congressmen, in particular, opposed a national bankruptcy bill. Their opposition focused on the use of involuntary bankruptcy as a means of collection by northern and eastern creditors. An alternative bill, introduced by Bailey of Texas, provided only for voluntary bankruptcy. In 1894, it actually was passed by the House. Ironically, in half a century the debate had come full circle; bankruptcy was now being urged *only* as a relief measure for debtors.

Another major point of contention was whether bankruptcy law should be instituted as a permanent regulation, or instead as a temporary expedient to resolve the immediate financial crisis only. The earlier laws had been of the latter variety, and substantial sentiment remained for that view, especially in the Senate. In the end, the forces seeking to establish bankruptcy law as a permanent part of the federal code prevailed.

A leading advocate and draftsman of a bankruptcy bill during the 1880s was Judge Lowell of Massachusetts. His bill proposed striking revisions to bankruptcy administration, anticipating some of the changes to come many decades later.

---

[147] Ch. 541, 30 Stat. 544 (repealed 1978).

[148] Pub. L. No. 95-598, 92 Stat. 2549.

[149] Ch. 575, 52 Stat. 840 (1938) (repealed 1978).

[150] For a discussion of the events that ultimately led to the enactment of the 1898 Act, see WARREN, *supra* note 1, at 128-41.

*ABI LAW REVIEW*

Although at one point the Lowell bill did pass the Senate, his efforts did not bear fruit.[151] More successful was the bill drafted by Jay Torrey, a St. Louis lawyer. The "Torrey Bill" originally was inspired by commercial creditor interests. First introduced in 1889, the Torrey Bill eventually became the Bankruptcy Act of 1898. Numerous amendments that were more favorable to debtors were added during the 1890s to secure its passage.

Notwithstanding its origins with the credit industry, the 1898 Act ushered in the modern era of liberal debtor treatment in United States bankruptcy laws.[152] While the earlier laws had allowed a debtor a discharge, many restrictions qualified that privilege. In particular, the 1867 Act, containing numerous grounds for denial of the discharge, had made discharge hard to obtain. All prior bankruptcy laws had conditioned discharge upon the consent (or at least failure to object) of a specified percentage of creditors and a minimum dividend payment to creditors. The 1898 Act abolished those restrictions, and also severely limited the number of grounds for denial of discharge.[153] Furthermore, very few debts were excepted from the discharge.[154] Indeed, some contemporary commentators suggested that Congress went too far in favoring debtors.[155] One commentator suggested that Congress had forgotten that bankruptcy was primarily a "commercial regulation," not a general debtor "jubilee" on the Biblical model.[156] Congress did not elect to follow the English system of conditional and suspended discharges.

The exemption question, so divisive under the 1867 Act, was resolved in favor of allowing the debtor to claim only state exemptions.[157] No separate federal exemptions were permitted. In 1902, the Supreme Court held that this delegation to the states did not run afoul of the Bankruptcy Clause mandate for uniform

---

[151] On this point, Professor King's *Ode* is entertaining:

Venture to the State of Mass./Judge named Lowell, quite upper class.
What a bill he put in draft./Many must have thought him daft. . . .
Many years ahead of time,/Lowell's bill met a hostile clime. . . .
For a more successful story/Let's turn to a Colonel Torrey.
While at Lowell so many laughed,/Torrey handed in his draft.

King, *supra* note 9, at 235 (emphasis omitted).

[152] Tabb, *supra* note 9, at 364.

[153] Ch. 541, § 14, 30 Stat. at 550 (discharge granted unless debtor commits crime or fraudulently conceals financial condition).

[154] *Id.* § 17, 30 Stat. at 550-51.

[155] *See, e.g.,* Walter D. Coles, *The Bankrupt Law of 1898—Its Merits and Defects,* 7 AMER. LAW. 283 (1899); John W. Hinsdale, *The New Bankruptcy Law,* 59 ALBANY L.J. 497, 501 (1898) (criticizing discharge without consent of creditors and lack of means for court to hear creditor objections to discharge). Another commentator observed that "the principal object of the law appears to be to make discharges easy, inexpensive and certain." Henry G. Newton, *The United States Bankruptcy Law of 1898,* 9 YALE L.J. 287, 290 (1900).

[156] Olmstead, *supra* note 50, at 843. The Bible has been acknowledged as a fundamental source of Western law concerning relationships between debtors and creditors. HOWARD L. OLECK, DEBTOR-CREDITOR LAW 3 (1953).

[157] Ch. 541, § 6, 30 Stat. at 548.

laws.[158]

Much of the 1898 Act was directed not at debtor relief, but rather at facilitating the equitable and efficient administration and distribution of the debtor's property to creditors. Considerable attention was devoted to the details of estate administration. Unlike the 1978 Act, which left most procedural questions to the Bankruptcy Rules, the 1898 Act addressed many procedural matters. The Supreme Court was given the power to prescribe rules, forms, and orders for procedure.[159] Creditors exercised significant control over the bankruptcy process through the power to elect the trustee[160] (no longer called an assignee) and creditors' committees.

The federal district courts sat as "courts of bankruptcy,"[161] but the bulk of the judicial and administrative work was done by "referees in bankruptcy" appointed by the district courts.[162] Referees were compensated on a fee basis[163] which did not change until 1946, when a salary based compensation scheme was substituted.[164] Referees became "bankruptcy judges" in 1973. The referees were the successor to the "registers" of the 1867 Act, and the "commissioners" of earlier times. Through references by district judges, referees exercised much of the jurisdiction given to the district court.[165] State courts retained concurrent jurisdiction of many bankruptcy-related issues.[166] Litigation over which court had jurisdiction was frequent. The distinction between "summary" jurisdiction and "plenary" jurisdiction[167] became a point of enormous contention. Indeed, one of the main thrusts of the reforms of the 1970s was to give the federal bankruptcy courts comprehensive, unified jurisdiction. Unfortunately, that effort failed.

Provisions were made in the 1898 Act for both voluntary[168] and involun-

---

[158] Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 188-90 (1902).

[159] Ch. 541, § 30, 30 Stat. at 554.

[160] *Id.* § 44, 30 Stat at 557.

[161] *Id.* § 2, 30 Stat. at 545.

[162] *Id.* § 34, 30 Stat. at 555.

[163] *Id.* § 40, 30 Stat. at 556.

[164] Act of June 28, 1946, ch. 512, § 40, 60 Stat. 323, 326-28.

[165] Ch. 541, § 22, 30 Stat. at 552; *id.* § 38, 30 Stat. at 555.

[166] *Id.* § 23, 30 Stat. at 552-53.

[167] Generally, the term "summary jurisdiction" referred to proceedings over which federal courts of bankruptcy exercised exclusive jurisdiction; proceedings involving administration of the bankruptcy estate under the Bankruptcy Act, and those involving property in the bankruptcy court's possession. 2 COLLIER ON BANKRUPTCY, *supra* note 9, ¶ 23.02 [1]; OLECK, *supra* note 156, at 204-05. The term was derived from the common bankruptcy court practice of acting through summary proceedings—those in which formal pleading were not required. 2 COLLIER ON BANKRUPTCY, *supra* note 9, ¶ 23.02 [1], [2].

"Plenary jurisdiction" referred to authority to adjudicate disputes between the bankruptcy trustee or receiver and third parties concerning property not in the possession of the bankruptcy court. *Id.* [1]. If the adverse party did not consent to bankruptcy court jurisdiction, a case involving a plenary matter could only be brought in a court that would have jurisdiction of the matter in a non-bankruptcy context, *i.e.*, a state court or, if subject matter jurisdiction exists on an alternative basis, a federal district court not sitting in bankruptcy. Ch. 541, § 23b, 30 Stat. 552-53; 2 COLLIER ON BANKRUPTCY, *supra* note 9, ¶ 23.12; OLECK, *supra* note 156, at 204-05.

[168] Ch. 541 § 4, 30 Stat. at 547; *id.* § 18, 30 Stat. at 551.

tary[169] bankruptcy. Acts of bankruptcy were retained as the basis for submitting a debtor to involuntary bankruptcy,[170] but there were fewer acts than had been included under the 1867 law. Furthermore, a new definition of "insolvency" replaced the former equity test of whether the debtor was paying his debts as they came due with a balance sheet test.[171]

Eligibility for voluntary bankruptcy was extended to "any person who owes debts, except a corporation."[172] No requirement was imposed of either insolvency or a minimum amount of debts. Although corporations were excluded from voluntary bankruptcy, certain types of business corporations were subject to involuntary bankruptcy.[173] Provisions were made for partnership bankruptcy.[174]

The 1898 Act gave the trustee important powers to avoid preferential[175] and fraudulent transfers[176] and to recapture their value for the bankruptcy estate. In addition, such transfers constituted an act of bankruptcy that could subject the debtor to involuntary bankruptcy.[177] The need to unwind preferential transfers was viewed as a primary justification for the passage of the national bankruptcy law.

Compositions in lieu of liquidation were authorized much along the lines of the 1874 law.[178] For the composition to be confirmed, a majority of creditors in both number and value had to accept the composition, and the court had to approve it as being in the "best interests" of creditors.[179] A debtor could not confirm a composition if the debtor had committed any acts that would be a bar to the discharge under section 14.[180] Upon confirmation, the consideration was distributed and the bankruptcy case was dismissed.[181]

2. Legislation Between 1898 and the Depression

The enactment of the Bankruptcy Act of 1898 did not end Congressional infatuation with the bankruptcy law. To the contrary, this century has witnessed an unending parade of bankruptcy legislation. During the period between the

---

[169] *Id.* § 3, 30 Stat. at 546-47.

[170] *Id.*

[171] *Id.* § 1, 30 Stat. at 544. The definition of insolvency was important because many of the acts of bankruptcy hinged on whether the debtor completed certain transfers of property while insolvent. *See id.* § 3, 30 Stat. at 546.

[172] *Id.* § 4a, 30 Stat. at 547.

[173] *Id.* § 4b.

[174] *Id.* § 5.

[175] *Id.* § 60, 30 Stat. at 562; *id.* § 67c, 30 Stat. 564.

[176] *Id.* § 67e, 30 Stat. at 564.

[177] *Id.* § 3, 30 Stat. at 546.

[178] *Id.* § 12, 30 Stat. at 549.

[179] *Id.* § 12b, d, 30 Stat. at 549-50.

[180] *Id.* § 12d, 30 Stat. at 550.

[181] *Id.* § 12e, 30 Stat. at 550.

passage of the 1898 Act and the onset of the Depression, Congress made a number of changes.[182] The most comprehensive of these amendatory acts was that of 1926.[183] While many in number, these amendments did not reflect any sea change in fundamental attitude. Periodic attempts were made to ameliorate the perceived extreme pro-debtor orientation of the 1898 Act. Several of the acts added grounds for denial of discharge[184] or added debts excepted from the discharge,[185] and the number of acts of bankruptcy was increased.[186] The penal provisions were strengthened considerably in 1926.[187] Corporations were made eligible for voluntary bankruptcy in 1910.[188] Preferences were another favorite subject of congressional tinkering.[189]

Not all congressmen were enamored of the permanent bankruptcy law. Concerted efforts were made to repeal the law in 1902, 1903, 1909, and 1910.[190] Those efforts failed. The main objections were raised by southern congressmen who believed that bankruptcy should only be used to relieve debtors, not as a collection law.

By the time of the Hoover administration,[191] the credit industry had come to question the wisdom of the still generous discharge provisions. In efforts similar to those launched by the credit industry in the 1960s, 1980s and 1990s, a serious attempt was made in the late 1920s and early 1930s to change the basic premise of the discharge. The credit industry wanted to impose a form of payment requirement upon those debtors with some ability to pay as a condition to receiving a discharge. The idea of a suspended or conditional discharge along the lines of the English system was suggested. However, the creditors' timing was bad. With the Depression deepening daily, their concerns over debtor abuse of the bankruptcy discharge were hard to sell to Congress. The creditors' attempts were rebuffed. With the coming of the New Deal and its militant pro-debtor attitude, the credit industry could do little in Congress but fight a rear-guard action, then take their fight to the Supreme Court.

---

[182] Act of Feb. 5, 1903, ch. 487, 32 Stat. 797; Act of June 15, 1906, ch. 3333, 34 Stat. 267; Act of June 25, ch. 412, 36 Stat. 838; Act of Jan. 28, 1915, ch. 22, § 4, 38 Stat. 803; Act of Sept. 6, 1916, ch. 448, § 3, 39 Stat. 726; Act of Mar. 2, 1917, ch. 153, 39 Stat. 999; Act of Jan. 7, 1922, ch. 22, 42 Stat. 354; Act of Feb. 13, 1925, ch. 229, 43 Stat. 936 ; Act of May 27, 1926, ch. 406, 44 Stat. 662.

[183] Act of May 27, 1926, ch. 406, 44 Stat. 662. For a detailed discussion of those amendments, see James A. McLaughlin, *Amendment of the Bankruptcy Act*, 40 HARV. L. REV. 341 (1927).

[184] Act of Jan. 7, 1922, Ch. 22, 42 Stat. 354; Act of Mar. 2, 1917, ch. 153, 39 Stat. 999; Act of Feb. 5, 1903, ch. 487, § 5, 32 Stat. 797, 798.

[185] Ch. 406, § 6, 44 Stat. at 663-64; Act of June 25, 1910, ch. 412, § 6, 36 Stat. 838, 839-40.

[186] Ch. 406, § 3, 44 Stat. at 663.

[187] *Id.* § 11, 44 Stat. at 665-66.

[188] Ch. 412, § 3, 36 Stat. at 839 (1910). The act extended eligibility for voluntary bankruptcy to "[a]ny person except a municipal, railroad, insurance, or banking corporation. . . ." *Id.*

[189] Ch. 406, § 3, 44 Stat. at 662; ch. 412, § 11, 36 Stat. at 842; ch. 487, §§ 12-13, 32 Stat. at 799-800.

[190] *See* NOEL, *supra* note 9, at 161-62, 166-67; WARREN, *supra* note 1, at 143.

[191] Herbert Hoover served as President from 1929 to 1933.

3.  Depression-Era Legislation: Congress Versus the Court and the Chandler Act

After the Depression came crashing down in 1929, Congress passed several pro-debtor amendments that facilitated rehabilitation through bankruptcy. Severe restraints were laid upon the ability of creditors to collect, even upon their collateral. The Supreme Court that infuriated President Roosevelt so much held some of these acts to be unconstitutional. Ultimately however, Congress was able to enact revised versions that passed constitutional muster. The pro-reorganization sentiment in Congress became cemented during these trying times. With the passage of these amendments, federal equity receiverships fell into disuse.

The legislative onslaught began in 1933 with a law that made compositions more readily and widely available,[192] authorized agricultural compositions,[193] and permitted railroads to reorganize.[194] Corporate reorganizations were sanctioned just a year later.[195] Also in 1934, Congress introduced a reorganization law for municipalities.[196] The Supreme Court overturned this law in 1936.[197] Congress passed yet another version in 1937,[198] which then was upheld by the Court.[199] The Frazier-Lemke Act was passed in 1934, giving farmers greater ability to keep their farms.[200] In 1935, the Supreme Court struck down this act on the ground that it violated the Fifth Amendment property rights of mortgagees.[201] In just a few weeks Congress responded by passing a revised amendment,[202] which then survived judicial review.[203] The railroad reorganization law was amended in 1935,[204] as was the corporate reorganization section.[205] In a crucial decision, the Supreme Court upheld the constitutionality of § 77, the railroad reorganization section.[206] Numerous other amendments were made to the

---

[192] Act of Mar. 3, 1933, ch. 204, 47 Stat. 1467, 1467-70 (creating § 74 of Bankruptcy Act of 1898).

[193] *Id.*, 47 Stat. at 1470-74 (creating § 75 of 1898 Act).

[194] *Id.*, 47 Stat. at 1474-82 (creating § 77 of 1898 Act).

[195] Act of June 7, 1934, ch. 424, 48 Stat. 911, 912-25 (creating § 77B of 1898 Act). Good discussions of the corporate reorganization provisions are found in FINLETTER, *supra* note 145; GERDES, *supra* note 145; GEORGE E.Q. JOHNSON, BANKRUPTCY REORGANIZATION (1936).

[196] Act of May 24, 1934, ch. 345, 48 Stat. 798 (creating Chapter IX of 1898 Act).

[197] Ashton v. Cameron County Water Improvement Dist. No. 1, 298 U.S. 513, 527-532 (1936) (holding law permitting local governmental units to voluntarily attain bankruptcy relief unconstitutionally interferes with states sovereignty).

[198] Act of Aug. 16, 1937, ch. 657, 50 Stat. 653 (creating Chapter X of 1898 Act).

[199] United States v. Bekins, 304 U.S. 27, 51-54 (1938) (upholding provision allowing state taxing authorities to enter into compositions with creditors).

[200] Ch. 869, 48 Stat. 1289 (1934) (amending § 75 of 1898 Act).

[201] Louisville Joint Stock Bank v. Radford, 295 U.S. 555, 589-602 (1935).

[202] Act of Aug. 28, 1935 (Second Frazier-Lemke Act), ch. 792, 49 Stat. 942.

[203] Wright v. Vinton Branch, 300 U.S. 440, 470 (1937).

[204] Act of Aug. 27, 1935, ch. 774, 49 Stat. 911 (amending § 77 of 1898 Act).

[205] Act of Aug. 19, 1935, ch. 809, 49 Stat. 965 (amending § 77B of 1898 Act).

[206] Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock I. & P. Ry., 294 U.S. 648, 667-685 (1935).

Bankruptcy Act in the mid-1930s.[207]

The fury of bankruptcy legislation in the 1930s came to a head in 1938 with the passage of the comprehensive Chandler Act.[208] The Chandler Act followed a lengthy period of careful study of the bankruptcy law, although not by a formal commission.[209] At the instance of President Hoover, Congress published the Donovan Report[210] in 1931, and the Thacher-Garrison Report in 1932.[211] The American Bar Association successfully opposed the enactment of the recommendations of the Thacher Report, which had been introduced as the Hastings-Michener bill.[212] However, some of the ideas in that bill found their way into the Chandler Act. The National Bankruptcy Conference, formed in 1932 to study bankruptcy reform, played an important role in the enactment of the Chandler Act. Other influential organizations included the National Association of Referees in Bankruptcy, the Commercial law League of America, and the National Association of Credit Men.[213]

Extensive hearings were held in 1937 and 1938 on Congressman Walter Chandler's bill,[214] which had been introduced in 1936. The bill finally was enacted in the summer of 1938, forty years after the 1898 Act had become law, and forty years before the 1978 Code was enacted.

The Chandler Act substantially revised virtually all of the provisions of the 1898 Act.[215] The substantive law and procedural workings of liquidation cases were thoroughly updated. A serious attempt was made to improve bankruptcy administration. Perhaps most significant, however, was its reworking of the

---

[207] Act of Feb. 11, 1932, ch. 38, 47 Stat. 47; Act of June 18, 1934, ch. 580, 48 Stat. 991; Act of May 15, 1935, ch. 114, 49 Stat. 246; Act of Aug. 20, 1935, ch. 577, 49 Stat. 664; Act of April 10, 1936, ch. 186, 49 Stat. 1198; Act of April 11, 1936, ch. 210, 49 Stat. 1203; Act of June 5, 1936, ch. 512, 49 Stat. 1475; Act of June 26, 1936, ch. 833, 49 Stat. 1969; Act of Aug. 12, 1937, ch. 589, 50 Stat. 622; Act of Aug. 25, 1937, ch. 777, 50 Stat. 810; Act of Mar. 4, 1938, ch. 41, 52 Stat. 84.

[208] Ch. 575, 52 Stat. 840 (1938) (repealed 1978).

[209] Much of the background to the Chandler Act can be found in Mitchell S. Dvoret, *Bankruptcy Under the Chandler Act: Background,* 27 GEO. L.J. 194 (1938).

[210] HOUSE JUDICIARY COMM., 71ST CONG., 3D SESS., DONOVAN REPORT (Comm. Print 1931). For a summary of the report, see Dvoret, *supra* note 209, at 197-99.

[211] S. DOC. NO. 65, 72d Cong., 1st Sess. (1932). For a summary of the Thacher Report, see Dvoret, *supra* note 209, at 199-200.

[212] S. 3866, 72d Cong., 1st sess. (1932).

[213] Dvoret, *supra* note 209, at 203.

[214] *Hearings Before Comm. on Judiciary of H. Rep. on H.R. 6439 and H.R. 8046,* 75th Cong., 1st Sess. (1937); *Hearings Before Subcomm. of Comm. on Judiciary of Senate on H.R. 8046,* 75th Cong., 2d Sess. (1937 and 1938). The first version of Chandler's bill, H.R. 12889, was followed by H.R. 6439 and H.R. 8046.

[215] Some of the contemporary commentary on the Chandler Act included: Jacob M. Lashly, *The Chandler Bill,* 23 VA. L. REV. 880 (1937); Dvoret, *supra* note 209; Mitchell S. Dvoret, *Bankruptcy Under the Chandler Act: Legislative History and Summary,* 27 GEO. L.J. 345 (1939); Mitchell S. Dvoret, *Bankruptcy Under the Chandler Act: Analysis,* 27 GEO. L.J. 599 (1939); W. Randolph Montgomery & Garrard Glenn, *The Chandler Act Again: Two Criticisms,* 25 VA. L. REV. 881 (1939). For a more complete listing, see 1 COLLIER ON BANKRUPTCY, *supra* note 9, ¶ 0.07 n.1.

recently enacted reorganization provisions into the form that prevailed for the next forty years: Chapter X governed corporate reorganizations; Chapter XI dealt with arrangements; Chapter XII applied to real property arrangements; and Chapter XIII provided for wage earners' plans.

Another important development at the time was the investigation of protective and reorganization committees by the Securities and Exchange Commission under the leadership of William Douglas. The end result was a monumental eight-part study, published between 1937 and 1940.[216] The essential conclusion of the report was that public investors needed protection from insiders in reorganization cases.

## 4. Legislation After 1938

Over the next forty years, Congress amended the bankruptcy laws dozens of times, but only as to specific and discrete issues.[217] A few of these amendments

---

[216] SECURITIES AND EXCHANGE COMMISSION, REPORT ON THE STUDY AND INVESTIGATION OF THE WORK, ACTIVITIES, PERSONNEL AND FUNCTIONS OF PROTECTIVE AND REORGANIZATION COMMITTEES, pts. 1-8, (1937-1940).

[217] Act of July 28, 1939, ch. 393, 53 Stat. 1134; Act of Aug. 11, 1939, ch. 689, 53 Stat. 1406; Act of Mar. 4, 1940, ch. 41, 54 Stat. 44; Act of June 28, 1940, ch. 438, 54 Stat. 667; Act of July 1, 1940, ch. 500, 54 Stat. 709; Act of June 22, 1942, ch. 434, 56 Stat. 377; Act of Oct. 16, 1942, ch. 610, 56 Stat. 787; Act of Mar. 11, 1944, ch. 87, 58 Stat. 113; Act of June 3, 1946, ch. 280, 60 Stat. 230; Act of June 28, 1946, ch. 512, 60 Stat. 323; Act of July 1, 1946, ch. 532, 60 Stat. 409; Act of Apr. 2, 1948, ch. 225, 62 Stat. 198; Act of June 25, 1948, ch. 645, §§ 151-155, 62 Stat. 683, 689-90; Act of Mar. 18, 1950, ch. 70, 64 Stat. 24; Act of Sept. 19, 1950, ch. 954, 64 Stat. 866; Act of Dec. 20, 1950, ch. 1138, 64 Stat. 1113; Act of Dec. 29, 1950, ch. 1193, 64 Stat. 1134; Act of May 16, 1951, ch. 81, 65 Stat. 42; Act of May 16, 1951, ch. 82, 65 Stat. 42; Act of July 3, 1951, ch. 205, 65 Stat. 114 ; Act of Oct. 24, 1951, ch. 543, 65 Stat. 606; Act of July 7, 1952, ch. 579, 66 Stat. 420; Act of July 7, 1952, ch. 580, 66 Stat. 438; Act of Aug. 5, 1953, ch. 327, 67 Stat. 366; Act of May 10, 1956, ch. 257, 70 Stat. 151; Act of July 30, 1956, ch. 784, 70 Stat. 725; Act of Aug. 1, 1956, ch. 819, 70 Stat. 785; Act of Aug. 2, 1956, ch. 893, 70 Stat. 955; Act of Sept. 2, 1957, Pub. L. No. 85-275, 71 Stat. 599; Act of Sept. 4, 1957, Pub. L. No. 85-295, 71 Stat. 617; Act of July 11, 1958, Pub. L. No. 85-515, 72 Stat. 357; Act of Aug. 23, 1958, Pub. L. No. 85-732, 72 Stat. 820; Act of Aug. 28, 1958, Pub. L. No. 85-824, 72 Stat. 984; Act of May 13, 1959, Pub. L. No. 86-24, 73 Stat. 24; Act of June 23, 1959, Pub. L. No. 86-49, 73 Stat. 80; Act of June 23, 1959, Pub. L. No. 86-64, 73 Stat. 109; Act of July 28, 1959, Pub. L. No. 86-110, 73 Stat. 259; Act of Aug. 7, 1959, Pub. L. No. 86-144; 73 Stat. 296; Act of Sept. 21, 1959, Pub. L. No. 86-293, 73 Stat. 571; Act of June 11, 1960, Pub. L. No. 86-504, 74 Stat. 198; Act of June 12, 1960, Pub. L. No. 86-519, 74 Stat. 217; Act of July 12, 1960, Pub. L. No. 86-621, 74 Stat. 408; Act of July 12, 1960, Pub. L. No. 86-631, 74 Stat. 466; Act of July 14, 1960, Pub. L. No. 86-662, 74 Stat. 528; Act of Sept. 2, 1960, Pub. L. No. 86-701, 74 Stat. 753; Act of Sept. 19, 1962, Pub. L. No. 87-677, 76 Stat. 559; Act of Sept. 25, 1962, Pub. L. No. 87-681, 76 Stat. 570; Act of May 8, 1963, Pub. L. No. 88-16, 77 Stat. 14; Act of May 8, 1963, Pub. L. No. 88-17, 77 Stat. 14; Act of Nov. 13, 1963, Pub. L. No. 88-175, 77 Stat. 330; Act of Oct. 3, 1964, Pub. L. No. 88-623, 78 Stat. 1001; Act of Sept. 2, 1965, Pub. L. No. 89-166, 79 Stat. 646; Act of May 10, 1966, Pub. L. No. 89-414, 80 Stat. 135; Act of July 5, 1966, Pub. L. No. 89-495, 80 Stat. 268; Act of July 5, 1966, Pub. L. No. 89-496, 80 Stat. 270; Act of Nov. 28, 1967, Pub. L. No. 90-156, 81 Stat. 510; Act of Nov. 28, 1967, Pub. L. No. 90-157, 81 Stat. 511; Act of Nov. 28, 1967, Pub. L. No. 90-158, 81 Stat. 516; Act of Nov. 1967, Pub. L. No. 90-161, 81 Stat. 518; Act of July 24, 1970, Pub. L. No. 91-354, 84 Stat. 468; Act of Oct. 19, 1970, Pub. L. No. 91-467, 84 Stat. 990; Act of Dec. 27, 1973, Pub. L. No. 93-

were fairly significant. Specifically, a 1946 amendment changed the compensation of referees from a fee to a salary basis.[218] The amendments of 1952,[219] responded to a number of undesirable court decisions (including some from the Supreme Court),[220] made clear that the "fair and equitable" requirement for plan confirmation[221] did not apply in Chapters XI,[222] and otherwise cleared up some ambiguities in the 1938 law.[223] In 1966 Congress limited the priority and non-dischargeability of tax claims in bankruptcy cases.[224]

Bankruptcy procedure was governed in substantial part by many sections of the 1898 Act. Under the authority of section 30 of the 1898 Act, the Supreme Court periodically passed General Orders in Bankruptcy to further govern procedure. In 1960, an Advisory Committee on Bankruptcy Rules was established. In 1964, Congress authorized the promulgation of rules of bankruptcy procedure by the Supreme Court.[225] After years of effort by the Rules Committee, the bankruptcy rules took effect in 1973. Special rules for the various rehabilitation chapters came into being in the years following. The rules superseded inconsistent statutory provisions, which was quite important under the Act, given its detailed procedural provisions. Today the situation is reversed; rules cannot supersede a statute.[226]

---

200, 87 Stat. 838; Act of Feb. 27, 1976, Pub. L. No. 94-217, 90 Stat. 192; Act of Apr. 8, 1976, Pub. L. No. 94-260, 90 Stat. 315; Act of Sept. 22, 1978, Pub. L. No. 95-383, 92 Stat. 729.

[218] Act of June 28, 1946, ch. 512, § 6, 60 Stat. 323.

[219] Act of July 7, 1952, ch. 579, 66 Stat. 420.

[220] In Cline v. Kaplan, 323 U.S. 97 (1944), the Court held that a defendant could object to the bankruptcy court's summary jurisdiction at any time until the court rendered its decision, *i.e.*, that appearing, answering, and participating in the proceeding did not waive the jurisdictional objection. *Id.* at 100. The 1952 amendment to § 2a(7) reversed this result. Ch. 579, § 2(b), 66 Stat. at 420. In SEC v. United States Realty and Improvement Co., 310 U.S. 434 (1940), the Court held that an improperly filed Chapter XI case had to be dismissed. *Id.* at 456-57. An amendment to § 328 allowed the judge to permit a debtor to amend a pleading and seek relief instead under Chapter X without having the case dismissed. Ch. 579, § 30, 66 Stat. at 432. *See generally*, H.R. REP. NO. 2320, 82d Cong., 2d Sess. (1952), *reprinted in* 1952 U.S.C.C.A.N. 1960 (outlining legislative history of 1952 amendments).

[221] The central premise of the fair and equitable rule was that in order for the equity owners of a debtor business to retain any ownership interest pursuant to a reorganization plan, the plan must provide for payment in full of the claims of both secured and unsecured creditors. *See* Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115-19 (1939) (explaining rule). The rule was described as one of "absolute priority." *Id.* at 117. *See supra* note 146 and accompanying text (explaining operation of rule as applied to equity receiverships).

[222] Ch. 579, § 35, 66 Stat. at 433 (omitting fair and equitable rule from list of Chapter XI plan confirmation requirements).

[223] For discussions of the 1952 amendments, see Samuel C. Duberstein, *Highlights of Bankruptcy Amendments (1952)*, 58 COM. L.J. 42 (Feb. 1953); Charles E. Nadler, *The Bankruptcy Act Materially Overhauled*, 15 GA. B.J. 178 (1952).

[224] Act of July 5, 1966, Pub. L. No. 89-496, 80 Stat. 270 (1966).

[225] Act of Oct. 3, 1964, Pub. L. No. 88-623, 78 Stat. 1001, 1001 (1964) (codified at 28 U.S.C. § 2075, amended 1978, 1994). The amendment did check the rule making power of the Supreme Court by providing that bankruptcy rules were not permitted to "abridge, enlarge, or modify any substantive right." *Id.*

[226] 28 U.S.C. § 2075 (1988), *as amended by* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 104(f), 108 Stat. 4106, 4110.

However, since the current Bankruptcy Code has very few procedural provisions, the rules still actually have a fairly unfettered field in which to operate.

In 1970, Congress enacted a new dischargeability law,[227] strongly enhancing the debtor's ability to protect and enforce the discharge. The law made the discharge self-executing rather than just an affirmative defense. It also gave the bankruptcy court exclusive jurisdiction over some common types of dischargeability litigation.[228] The principal features of that reform of the discharge provisions were continued in the 1978 Code.

## 5. The Commission

In 1970, Congress created the Commission on the Bankruptcy Laws of the United States to study and report on the existing law.[229] The Commission filed its two-part report in 1973.[230] Five years later, almost a decade of study and debate about bankruptcy reform culminated when the Bankruptcy Reform Act of 1978 replaced the 1898 Act with the Bankruptcy Code.[231]

## II. THE BANKRUPTCY REFORM ACT OF 1978

The Bankruptcy Reform Act of 1978[232] was the first comprehensive reform of the federal bankruptcy law in the forty years since the passage of the Chandler Act and replaced the law that had been in effect since the end of the nineteenth century. The 1978 Act is unique in the history of the nation's bankruptcy legislation in that it was the first major enactment that was not enacted as a response to a severe economic depression. The Bankruptcy Code governs bankruptcy law in the United States today. As will be discussed in the following section, the Code has been the subject of a number of amendments in the years since 1978, most recently in 1994.

The reform process that led to the passage of the 1978 Act lasted for a decade.[233] The process began in 1968, when Senator Quentin Burdick chaired hearings before a subcommittee of the Senate Judiciary Committee to determine

---

[227] Act of Oct. 19, 1970, Pub. L. No. 91-467, 84 Stat. 990.

[228] *See* Vern C. Countryman, *The New Dischargeability Law*, 45 AM. BANKR. L.J. 1 (1971).

[229] Act of July 24, 1970, Pub. L. No. 91-354, 84 Stat. 468.

[230] *Report of the Commission on the Bankruptcy Laws of the United States*, pts. I and II, H.R. DOC. NO. 137, 93d Cong., 1st Sess. (1973).

[231] Pub. L. No. 95-598, 92 Stat. 2549 (1978).

[232] This law is variously referred to as "BRA," "the 1978 Act," "The Reform Act," or, most often, with reference to the primary law it created, the "Bankruptcy Code" or "Code" (except for aficionados of the Uniform Commercial Code or the Internal Revenue Code, who also jealously refer to their patron saint law as "the" "Code").

[233] For a good review of the legislative history of the Bankruptcy Reform Act, see Kenneth N. Klee, *Legislative History of the New Bankruptcy Law*, 28 DEPAUL L. REV. 941 (1979). Mr. Klee, along with Richard Levin, served on the congressional staff that drafted the Bankruptcy Code.

whether a bankruptcy review commission should be formed.[234] Congress created such a review commission in 1970, charged with the mission to "study, analyze, evaluate, and recommend changes to the [1898] Act . . . in order for such Act to reflect and adequately meet the demands of present technical, financial, and commercial activities."[235]

The Commission, under the able guidance of Professor Frank Kennedy as Executive Director, filed its two-part report in July 1973.[236] Part I contained a series of reports and recommendations. Part II consisted of a draft bankruptcy statute, which then was introduced as a bill in both the House and Senate.[237] The "Commission Bill" recommended many substantial changes from prior law, including expansion of the jurisdiction of bankruptcy judges, creation of a Bankruptcy Administration to handle all administrative matters, consolidation of all of the business reorganization chapters into a single chapter, and greater protection on a uniform basis of the rights of consumer debtors.

A competing bill was drafted by the National Conference of Bankruptcy Judges. The "Judges' Bill" was also introduced in both the House and Senate.[238] In 1975 and 1976, Representative Don Edwards presided over thirty-five days of hearings on the two bills.[239] Senator Burdick presided over twenty-one days of hearings in the Senate on the companion bills in 1975.[240] From 1973 to 1978, the bankruptcy reform bills underwent numerous metamorphoses, and were the subject of extensive commentary and debate.

Committee reports regarding the extant versions of the bill were published in 1977 by the House[241] and in 1978 by the Senate.[242] While these reports are of great assistance as legislative history in construing the Bankruptcy Code, in some

---

[234] *Id.* at 942 (citing *Hearings on S.J. Res. 100 Before the Subcomm. on Bankruptcy of the Senate Comm. on the Judiciary*, 90th Cong., 2d Sess. (1968)).

[235] Act of July 24, 1970, Pub. L. No. 91-354, § 1(b), 84 Stat. 468, 468 (1970).

[236] *Report of the Commission on the Bankruptcy Laws of the United States*, pts. I and II, H.R. DOC. NO. 137, 93d Cong., 1st Sess. (1973).

In 1971, while the Commission was engaged in its work, a useful study of bankruptcy was published by the Brookings Institution. DAVID T. STANLEY & MARJORIE GIRTH, BANKRUPTCY: PROBLEM, PROCESS, REFORM (1971).

[237] H.R. 10,792, 93d Cong., 1st Sess. (1973); S. 4026, 93d Cong., 1st Sess. (1973). The bills were reintroduced in the 94th Congress as H.R. 31 and S. 236.

[238] H.R. 32, 94th Cong., 1st Sess. (1975); S. 235, 94th Cong., 1st Sess. (1975).

[239] *Hearings on H.R. 31 & H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st & 2d Sess. (1975-1976).

[240] *Hearings on S. 235 and 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 94th Cong., 1st Sess. (1975).

[241] H.R. REP. NO. 595, 95th Cong., 1st Sess. (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 (accompanying H.R. 8200, which was reported favorably by House Judiciary Committee in September 1977).

[242] S. REP. NO. 989, 95th Cong., 2d Sess. (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (accompanying S. 2266, which was reported favorably by Senate Judiciary Committee in July 1978). The Senate Finance Committee also published a report on S. 2266. S. REP. NO. 1106, 95th Cong., 2d Sess. (1978).

*ABI LAW REVIEW* [Vol. 3:5

instances the reports refer to bill provisions which underwent further amendment before the final bill became law. No conference report on the 1978 Act was prepared. Instead, the floor leaders of the bill, Congressman Edwards and Senator DeConcini, issued a joint explanatory statement as to the compromise bill that became law.[243]

A decade of study and debate came to a conclusion when President Carter signed the Bankruptcy Reform Act of 1978 into law on November 6, 1978. The law took effect, for the most part, on October 1, 1979.[244] Some of the provisions, in particular those affecting the bankruptcy courts, were to be phased in over a five-year transition period.[245]

A major point of debate in the bankruptcy bill concerned the status of bankruptcy judges. One of the major weaknesses of the 1898 Act was the splintered jurisdictional scheme, in which bankruptcy referees (renamed judges in 1973) could only hear certain core matters. A key aspect of the 1978 Act's substantial enlargement of bankruptcy court jurisdiction was the enabling of bankruptcy judges to hear virtually any matter arising in, or related to the bankruptcy case. Everyone agreed that creating a unified jurisdictional system would be a substantial improvement.[246]

What was not agreed upon was the status of the judges who would exercise that enlarged jurisdiction.[247] The options were to (1) keep the bankruptcy judges as non-Article III adjuncts to the federal district court judges, or (2) make the bankruptcy judges Article III judges in their own right, with the constitutional guarantees of life tenure and protection against diminution in salary. The latter course would eliminate the constitutional concern over non-Article III bankruptcy judges exercising the judicial power of the United States in derogation of Article III, and would enhance the status of the bankruptcy bench. The House favored giving bankruptcy judges Article III status, while the Senate steadfastly opposed such a course.[248] Chief Justice Burger lobbied against the creation of Article III bankruptcy judges. In the end the Senate prevailed: bankruptcy judges were given jurisdiction over all matters arising in, under, or related to bankruptcy cases as adjuncts of the district court, without the protections of Article III. This choice proved improvident, however, for in 1982, the Supreme Court held in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*[249] that the 1978 Act

---

[243] 124 CONG. REC. 32,350-420 (1978); 124 CONG. REC. S17403-34 (daily ed. Oct. 6, 1978).

[244] Pub. L. No. 95-598, tit. IV, § 402(a), 92 Stat. 2549, 2682 (1978).

[245] *Id.* §§ 402(b), 404-407, 92 Stat. at 2682-86.

[246] S. REP. No. 989, *supra* note 242, at 15-16, *reprinted in* 1978 U.S.C.C.A.N. at 5801-02.

[247] H.R. REP. NO. 595, *supra* note 241, app. II at 63-87, *reprinted in* 1978 U.S.C.C.A.N. at 6023-6049 (publishing differing scholarly opinions regarding the constitutionality of bankruptcy judges powers under 1978 Act).

[248] *Compare id.* at 7, *reprinted in* 1978 U.S.C.C.A.N. at 5968 (arguing bankruptcy judges should be granted full powers and protections of Article III) *with* S. REP. NO. 989, *supra* note 242 at 16, *reprinted in* 1978 U.S.C.C.A.N. at 5802 (arguing bankruptcy courts should be adjuncts of district courts).

[249] 458 U.S. 50 (1982).

unconstitutionally gave Article III powers to non-Article III judges.

A strong effort was made in the 1978 Act to improve the administration of bankruptcy cases. The Commission had recommended the use of a Bankruptcy Administrator. This suggestion was not adopted, although a pilot program utilizing "United States trustees" as administrative officers was implemented. In 1986 the United States Trustee system was established nationwide (except in Alabama and North Carolina). An attempt was made to relieve bankruptcy judges of administrative duties, thereby permitting them to focus more exclusively on their judicial role. For example, judges were no longer to preside at the first meeting of creditors.[250]

Another administrative matter concerned professional fees. Under the 1898 Act, the "economy" principle artificially capped the amount of fees that could be paid to lawyers and other professionals. The drafters of the 1978 Act rejected the economy principle, concluding that bankruptcy administration would be better served if the best professionals were willing to serve in bankruptcy cases.[251] Competitive fees were seen as necessary to that end.

Another notable feature of the 1978 law was the merger of the reorganization chapters into a single chapter. This marriage combined features of old Chapter X and Chapter XI. The new Chapter 11 left the debtor in possession, with a trustee to be appointed only for cause;[252] gave the debtor in possession a limited exclusive period to file a reorganization plan;[253] adopted a modified form of the absolute priority rule, to be applied only when a class dissents;[254] limited the involvement of the SEC in reorganization cases,[255] and otherwise attempted to streamline reorganization practice. The success of this reform is a matter of considerable debate.

The 1978 Act also sought to encourage greater use of Chapter 13, the mode of relief allowing for the readjustment of the debts of individuals with regular income (the old "wage-earner" chapter expanded). The hope was that creditors would be paid more in a Chapter 13 and that debtors would emerge with better credit. Congress rejected suggestions for a compulsory Chapter 13, however. Thus only voluntary Chapter 13 cases are allowed. Congress did offer a number of inducements to encourage debtors to select Chapter 13, such as the "super discharge" of some debts that would not be dischargeable in a straight liquidation

---

[250] 11 U.S.C. § 341(c) (1988) (prohibiting court from attending creditors' meetings).

[251] See H.R. REP. NO. 595, *supra* note 241, at 329-30, *reprinted in* 1978 U.S.C.C.A.N. 6286 (explaining that consistently low bankruptcy attorneys' fees will result in dearth of bankruptcy specialists with result that bankruptcy system will operate less smoothly); *see also* 11 U.S.C.A. § 330(a)(1)(e) (West Supp. 1995) (fees to be allowed attorneys in bankruptcy are to be based in part on "customary compensation charged by comparably skilled practitioners . . ." in non-bankruptcy cases).

[252] 11 U.S.C. § 1104(a) (1988).

[253] *Id.* § 1121(b) (providing for 120 day exclusivity period).

[254] *Id.* § 1129(b).

[255] For a discussion of how the Act altered the role of the SEC in the bankruptcy process see Allen F. Corotto & Irving H. Picard, *Business Reorganizations Under the Bankruptcy Reform Act of 1978—A New Approach to Investor Protections and the Role of the SEC*, 28 DEPAUL L. REV. 961 (1979).

case.[256]   In the ensuing years, however, Congress has made Chapter 13 less favorable to debtors by weakening the discharge and requiring compliance with a "disposable income" test as a prerequisite to plan confirmation.[257]  And yet, at the same time Congress has indirectly attempted to force some debtors out of Chapter 7 and into Chapter 13, primarily by authorizing bankruptcy courts to dismiss Chapter 7 cases where it is determined that granting Chapter 7 relief would be a "substantial abuse" of the liquidation process.[258]

The treatment of individual debtors otherwise represented a fairly even balance between the interests of the credit industry and debtors (although creditors might take issue with that assertion!). The basic format of the discharge established in the 1970 amendments was retained. Discharge was made readily available save but for a number of excepted debts.[259]  Discharge was also still subject to grounds for complete denial.[260] In the years since 1978, many additional types of debts have been excepted from the discharge. The discharge was enforced by statutory injunction, with no need for the debtor to assert the discharge as an affirmative defense.[261] In addition, certain forms of discrimination on the basis of bankruptcy were outlawed.[262]

Other aspects of the bill favored creditors. While reaffirmation agreements were regulated more strictly than they had been under the 1898 Act,[263] the enacted law did not go as far to prevent uninformed or ill-advised decisions to reaffirm as reformers had suggested. Also, the discharge provisions were not as favorable to debtors as early drafts of the bill had provided.

The legislative history of the exemption provision under the 1978 law was especially bizarre. The old issue of state versus federal exemptions[264] was played out yet again. Until the last minute, the bill provided for debtors to have a choice of state or federal exemptions. However, a final change gave states the right to "opt out" of the federal exemptions for debtors residing in their state.[265] To date, three-fourths of the states have enacted legislation limiting resident debtors to the

---

[256] 11 U.S.C. § 1328(a) (1988 & Supp. V 1993), *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 1328(a) (West Supp. 1995).

[257] 11 U.S.C. § 1325(b) (1988).

[258] *Id.* § 707(b).

[259] *Id.* § 523(a) (1988 & Supp. V 1993), *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 523(a) (West Supp. 1995).

[260] 11 U.S.C. § 727(a) (1988).

[261] *Id.* § 524(a) *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 524(a) (West Supp. 1995).

[262] *Id.* § 525, *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 525 (West Supp. 1995).

[263] *Id.* § 524(c), (d), *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 524(c), (d) (West Supp. 1995).

[264] *See supra* notes 130-31, 157-58 and accompanying text (discussing exemption provisions of 1867 and 1898 Acts).

[265] 11 U.S.C. § 522(b) *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 522(b) (West Supp. 1995).

bankruptcy exemptions provided under state law.

## III. LEGISLATION SINCE 1978

The passage of the Bankruptcy Reform Act of 1978 did not put an end to congressional tinkering with bankruptcy legislation.[266]    Several factors have spurred Congress into almost non-stop consideration of the federal bankruptcy laws since 1978.  First, Congress has felt compelled to respond to court decisions handed down by both the Supreme Court and lower courts.  Second, the credit industry, unhappy with increased bankruptcy filings and mounting bad debt losses, has steadily lobbied for amendments providing for harsher treatment of debtors.  Third, the farm crisis of the early 1980s prompted a call for relief for family farmers. Fourth, the bankruptcy court has unexpectedly become the forum in which many complex social problems have been aired.  Fifth, special interest groups have tried to persuade Congress to amend the Code in ways favoring their interests.  Finally, the exponential growth in the number of bankruptcy cases since the enactment of

---

[266] Since the Bankruptcy Reform Act of 1978, the following laws relating to bankruptcy have been enacted: Act of Aug. 14, 1979, Pub. L. No. 96-56, 93 Stat. 387; Staggers Rail Act of 1980, Pub. L. No. 96-448, § 227, 94 Stat. 1895, 1931; Bankruptcy Tax Act of 1980, Pub. L. No. 96-589, 94 Stat. 3389; Act of July 27, 1982, Pub. L. No. 97-222, 96 Stat. 235; Technical Corrections Act of 1982, Pub. L. No. 97-448, § 304, 96 Stat. 2365, 2398-99; Rail Safety and Service Improvement Act of 1982, Pub. L. No. 97-468, tit. II, 96 Stat. 2543, 2543-47; Act of Nov. 28, 1983, Pub. L. No. 98-166, 97 Stat. 1071; Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333; Act of Oct. 19, 1984, Pub. L. No. 98-531, 98 Stat. 2704; Act of Sept. 30, 1986, Pub. L. No. 99-429, 100 Stat. 985; Judicial Improvements Act of 1985, Pub. L. No. 99-336, § 7, 100 Stat. 633, 639; Act of Oct. 18, 1986, Pub. L. No. 99-500, tit. II, 100 Stat. 1783, 1783-45 to 1783-46; Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 501, 100 Stat. 1874, 1911-12; Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, 100 Stat. 3088; Act of Oct. 30, 1986, Pub. L. No. 99-591, tit. II, 100 Stat. 3341, 3341-45 to 3341-46; Act of Nov. 14, 1986, Pub. L. No. 99-651, § 375, 100 Stat. 3642, 3647; Act of Nov. 14, 1986, Pub. L. No. 99-656, § 2, 100 Stat. 3668, 3668-69; Act of May 15, 1987, Pub. L. No. 100-41, 101 Stat. 309; Act of Aug. 18, 1987, Pub. L. No. 100-99, 101 Stat. 716; Agricultural Reconciliation Act of 1987, Pub. L. No. 100-203, § 10103, 101 Stat. 1330, 1330-386; Retiree Benefits Bankruptcy Protection Act of 1988, Pub. L. No. 100-334, 102 Stat. 610; Act of Oct. 18, 1988, Pub. L. No. 100-506, 102 Stat. 2538; Act of Nov. 3, 1988, Pub. L. No. 100-587, 102 Stat. 2982; Act of Nov. 3, 1988, Pub. L. No. 100-597, 102 Stat. 3028; Retirement and Survivors' Annuities for Bankruptcy Judges and Magistrates Act of 1988, Pub. L. No. 100-659, 102 Stat. 3910; Judicial Improvements and Access to Justice Act, Pub. L. No. 100-702, § 1003, 102 Stat. 4642, 4665 (1988); Act of Nov. 21, 1989, Pub. L. No. 101-162, tit. IV, 103 Stat. 988, 1011; Act of June 25, 1990, Pub. L. No. 101-311, 104 Stat. 267; Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 3007, 104 Stat. 1388, 1388-28; Act of Nov. 5, 1990, Pub. L. No. 101-509, § 110, 104 Stat. 1389, 1452; Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, 104 Stat. 2865; Criminal Victims Protection Act of 1990, Pub. L. No. 101-647, tit. XXXI, 104 Stat. 4916; Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 317, 104 Stat. 5089, 5115-16; Act of Oct. 28, 1991, Pub. L. No. 102-140, tit. III, 105 Stat. 782, 808; Bankruptcy Judgeship Act of 1992, Pub. L. No. 102-361, 106 Stat. 965; Rail Safety Enforcement and Review Act, Pub. L. No. 102-365, § 19, 106 Stat. 972, 982-85 (1992); Energy Policy Act of 1992, Pub. L. No. 102-486, § 3017, 106 Stat. 2776, 3130-31; Act of Aug. 6, 1993, Pub. L. No. 103-65, 107 Stat. 311; Act of Oct. 27, 1993, Pub. L. No. 103-121, tit. I, 107 Stat. 1153, 1157; Id. § 111, 107 Stat. at 1164-65; Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106.

the 1978 Act has impeded the administration of those cases and clogged the bankruptcy courts.

## A. The 1984 Amendments: BAFJA

The Supreme Court's decision on June 28, 1982 in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*[267] forced Congress to restructure the bankruptcy court system. In *Marathon*, the Court held that the broad grant of jurisdiction to bankruptcy courts in the 1978 Act violated Article III of the Constitution by vesting non-Article III bankruptcy judges with too much of the "judicial power" of the United States.[268] The Court further held that the unconstitutional portion of the jurisdictional grant could not be severed from the constitutional portion, thus condemning the entire bankruptcy court system, and forcing Congress to reorganize the jurisdictional and court scheme.[269] The Court did avoid wholesale disaster by deciding that its holding of unconstitutionality should only apply prospectively, thus validating actions taken by bankruptcy courts under the Code to that date.[270] To give Congress time to fix the broken court system, the *Marathon* Court stayed its judgment until October 4, 1982,[271] and later extended the stay until December 24, 1982.[272]

Surprisingly, Congress did not act to amend the bankruptcy court system before the expiration of the *Marathon* stay on Christmas Eve 1982, instead delaying any response until July 1984. During the eighteen month interregnum in which no federal statute governed the operation of the bankruptcy courts, the Judicial Conference of the United States stepped into the breach by proposing a model "Emergency Rule." Adopted as a local rule by all United States District Courts, the Emergency Rule used a bifurcated jurisdictional scheme, with some core bankruptcy matters heard by bankruptcy judges on reference from the district courts, and the remaining matters heard in the district courts.[273] Although many doubts were raised as to the constitutionality of the Emergency Rule,[274] the circuit courts upheld the Rule and the Supreme Court refused to decide the Rule's validity. The Supreme Court's decision in February 1984 in *NLRB v. Bildisco & Bildisco*[275] finally triggered congressional action. In *Bildisco*, the Court held that a Chapter

---

[267] 458 U.S. 50 (1982).

[268] *Id.* at 61, 76, 87.

[269] *Id.* at 88.

[270] *Id.*

[271] *Id.*

[272] Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 459 U.S. 813, 813 (1982).

[273] The Emergency Rule eventually transmitted by the Administrative Office of the United States Courts to the circuit courts of appeal, district courts, and bankruptcy courts as a model rule is reprinted in 11 U.S.C.A. FED. R. BANKR. P. app. at 377-80 (West 1984).

[274] *See, e.g.*, Vern Countryman, *Emergency Rule Compounds Emergency*, 57 AM. BANKR. L.J. 1, 6 (1983) (describing draft version of proposed rule as "both invalid and unworkable").

[275] 465 U.S. 513 (1984).

11 debtor in possession could reject its collective bargaining agreement in bankruptcy and that the debtor did not commit an unfair labor practice by unilaterally modifying that labor contract.[276] The resulting furor pushed Congress into speedy action, and the jurisdictional problem was corrected along with the labor problem. The consumer credit industry and other special interest groups took advantage of the congressional activity and seized the opportunity to obtain desired changes in the Bankruptcy Code.

The result was the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA).[277] Congressional consideration of the *Marathon* problem revived the long-running debate of the 1970s over whether the bankruptcy judges should have comprehensive jurisdiction, and if so, whether they should be made Article III judges. The *Marathon* decision prevented Congress from granting comprehensive jurisdiction to bankruptcy courts without conferring Article III status on bankruptcy judges. One or the other had to go. The House again favored Article III status and unified jurisdiction, and the Senate favored non-Article III status and bifurcated jurisdiction. The Senate position prevailed. The jurisdictional and court scheme established by Title I of BAFJA created the bankruptcy courts as units of the district court.[278] Bankruptcy courts hear cases and proceedings in bankruptcy only by reference from the district courts.[279] BAFJA made a distinction between "core" bankruptcy matters, in which the bankruptcy court can enter a final order, and "non-core" matters, which are reviewable de novo by the district court.[280]

Title II of BAFJA created additional judgeships.[281] Title III contained a series of amendments to the Bankruptcy Code itself.[282] In Subtitle J,[283] Congress responded to the *Bildisco* decision by enacting a new section to govern the rejection of collective bargaining agreements.[284] The consumer credit industry got many of the items on its wish list in Subtitle A, the "Consumer Credit Amendments."[285] These amendments, Congress's reaction to the hotly debated allegation that many consumer debtors were abusing the bankruptcy laws,[286] tightened the reins on

---

[276] *Id.* at 534.

[277] Pub. L. No. 98-353, 98 Stat. 333 (codified as amended in scattered sections of 11 and 28 U.S.C.).

[278] 28 U.S.C. § 151 (1988).

[279] *Id.* §§ 157(a), 1334(a).

[280] *Id.* § 157(b), (c).

[281] Pub. L. No. 98-353, §§ 201-202, 98 Stat. at 346-51.

[282] *Id.* §§ 301-553, 98 Stat. at 352-92.

[283] *Id.* § 541, 98 Stat. at 390-91.

[284] 11 U.S.C. § 1113 (1988).

[285] Pub. L. No. 98-353, §§ 301-324, 98 Stat. at 352-58.

[286] Much of the fuel for the consumer credit industry's fire was provided by a study financed by the industry itself. CREDIT RESEARCH CENTER, KRANNERT GRADUATE SCHOOL OF MANAGEMENT, PURDUE UNIVERSITY, MONOGRAPHS NO. 23-24, CONSUMER BANKRUPTCY STUDY (1982) [hereinafter PURDUE STUDY]. Monograph no. 23 is reprinted in *Personal Bankruptcy: Oversight Hearings Before the Subcomm. on Monopolies and Commercial Law of the Comm. on the Judiciary*, 97th Cong., 1st and 2d Sess. at 868 (1982), *available in* WESTLAW, BANKR84-LH Library. The Purdue study concluded that at least a third of consumer debtors could repay a significant portion of their debts. The Purdue Study has been severely

consumer debtors.[287] Not fully satisfied with these changes, the consumer credit industry has continued to lobby vigorously for more amendments, but has not yet repeated the coup of 1984. Other special interest groups shared in the bounty of the 1984 amendments. For example, lessors of commercial real estate obtained substantial beneficial changes in Subtitle C, the Leasehold Management Amendments.[288]

### B. *The 1986 Amendments: Family Farmers and United States Trustees*

The farm crisis motivated Congress to pass yet another major bankruptcy bill just over two years after BAFJA became law. In October 1986, the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986 was enacted.[289] The 1986 legislation created Chapter 12, designed specifically for "family farmers." The avowed purpose of Chapter 12 was to make it easier for such farmers to keep their farms and pay their creditors over time. Chapter 12 was not enacted as permanent legislation, but was to sunset after seven years. The sunset period has since been extended until October 1998.[290] Chapter 12 is largely analogous to Chapter 13 as tailored to farm bankruptcies.

The 1986 bill also made the United States Trustee System permanent on a nationwide basis (except in Alabama and North Carolina).[291] The United States Trustee performs many of the administrative and supervisory tasks in a bankruptcy case,[292] enabling the bankruptcy judge to serve more exclusively in a judicial role than was the case under the 1898 Act. In 1993, Congress's commitment to the United States Trustee program was reaffirmed through a ninety-nine million dollar appropriation for it.[293]

### C. *Legislation Between 1986 and 1994*

In July 1986, the LTV Corporation filed Chapter 11 and stopped paying for medical and life insurance benefits for retired employees. That fall Congress

---

criticized. *See* Teresa A. Sullivan et al., *Rejoinder: Limiting Access to Bankruptcy Discharge*, 1984 WIS. L. REV. 1087, 1088-89 (noting that calculations in Purdue Study for debtor's allowed expenses put debtor at federal poverty level); Teresa A. Sullivan et al., *Limiting Access to Bankruptcy Discharge: An Analysis of the Creditors' Data*, 1983 WIS. L. REV. 1091.

[287] For a review of the 1984 consumer credit amendments, see Karen Gross, *Preserving a Fresh Start for the Individual Debtor: The Case for Narrow Construction of the Consumer Credit Amendments*, 135 U. PA. L. REV. 59 (1986).

[288] Pub. L. No. 98-353, §§ 361-363, 98 Stat. at 361-64.

[289] Pub. L. No. 99-554, 100 Stat. 3088.

[290] Pub. L. No. 103-65, 107 Stat. 311 (1993).

[291] In the 1978 Act, Congress had instituted the system as a pilot program in a few judicial districts.

[292] *See* 28 U.S.C. § 586 (1988), *as amended by* Bankruptcy Act of 1994, Pub. L. No. 103-394, § 224, 108 Stat. 4106 (listing duties of United States Trustee).

[293] Act of Oct. 27, 1993, Pub. L. No. 103-121, 107 Stat. 1153, 1157.

responded with a joint resolution that required the continued payment of bene-fits.[294]    In June 1988 permanent legislation to protect retirees' benefits was passed.[295]    The 1988 legislation created a new Code section, governing the payment of insurance benefits to retired employees,[296] and added the requirement that a plan could be confirmed only if it provided for the continued payment of retiree benefits.[297]

Meanwhile, the Fourth Circuit had issued a controversial holding in 1985, allowing a debtor to reject a technology licensing agreement and thereby deprive the licensee of the right to use the licensed technology.[298]    Congress effectively overruled this holding by adding a new section to the Code, which permits licensees to retain the use of intellectual property even after rejection of a licensing agree-ment.[299]

The year 1990 proved bountiful for specific bankruptcy legislation.    Six separate public laws that affected bankruptcy in some manner were enacted.    Part of this legislation[300] overruled the Supreme Court's decision earlier that same year in *Pennsylvania Department of Public Welfare v. Davenport*[301] that a debtor's criminal restitution obligation could be discharged in Chapter 13.[302]    The savings and loan crisis was addressed by amendments designed to protect the rights of federal depository institutions.[303]

Special interest legislation continues.    In 1992, a provision regarding airport leases, was enacted to protect the St. Louis airport in connection with the TWA bankruptcy case.[304]    The oil and gas industry obtained the passage of an amend-ment affecting farmout agreements, excluding property covered by such an agreement from the bankruptcy estate.[305]

---

[294] Act of Oct. 30, 1986, Pub. L. No. 99-591, 100 Stat. 3341; Act of Nov. 14, 1986, Pub. L. No. 99-656, § 2, 100 Stat. 3668, 3668.

[295] Retiree Benefits Bankruptcy Protection Act of 1988, Pub. L. No. 100-334, 102 Stat. 610 (codified as amended in scattered sections of 11 U.S.C.).

[296] *Id.* § 2(a), 102 Stat. at 610-13 (creating 11 U.S.C. § 1114).

[297] *Id.* § 2(b), 102 Stat. at 613 (amending 11 U.S.C. § 1129(a)(13)).

[298] Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

[299] Act of Oct. 18, 1988, Pub. L. No. 100-506, 102 Stat. 2538 (1988) (creating 11 U.S.C. § 365(n)).

[300] Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, § 3, 104 Stat. 2865, 2865 (amending 11 U.S.C. § 1328(a)); Crime Control Act of 1990, Pub. L. No. 101-647, § 3103, 104 Stat. 4789, 4916 (same).

[301] 495 U.S. 552 (1990).

[302] *Id.* at 563-64.

[303] Crime Control Act of 1990, Pub. L. No. 101-647, § 2522, 104 Stat. 4789, 4865-68 (inter alia, excepting from discharge certain debts incurred through fraudulent acts practiced upon federal depository institutions).

[304] Rail Safety Enforcement and Review Act, Pub. L. No. 102-365, § 19, 106 Stat. 972, 982-84 (1992).

[305] Energy Policy Act of 1992, Pub. L. No. 102-486, § 3017, 106 Stat. 2776, 3130-31.

## D. *The Bankruptcy Reform Act of 1994*

In the fall of 1994 Congress passed a major bankruptcy bill; the Bankruptcy Reform Act of 1994.[306] It was significant on two counts. First, Congress created a second National Bankruptcy Review Commission,[307] just less than a quarter century after the first Commission was established in 1970. The 1994 Commission was charged with the duty of studying the Code and submitting a report in two years suggesting proposed reforms.[308] Congress made clear, however, that it "is generally satisfied with the basic framework" of the current Code, and that the Commission should therefore focus on "reviewing, improving, and updating the Code in ways which do not disturb the fundamental tenets and balance of current law."[309] The Senate had pushed for a review commission for several years, and in 1992 had unanimously passed a bill that would have created a commission.[310] The House had been more reticent about a commission, but eventually acquiesced in 1994.

The second significant aspect of the Bankruptcy Reform Act of 1994 was the unprecedented number of substantive amendments by Congress made to the Bankruptcy Code. This feature of the bill was somewhat paradoxical, given the concurrent creation of a review commission charged with the responsibility of studying the Code and suggesting amendments thereto. Nevertheless, the 1994 Act made literally scores of changes in the bankruptcy law. Congress took the opportunity to resolve numerous specific issues that had arisen under the Code, and to overrule many court decisions. One prominent example is the overruling of a Seventh Circuit decision which held non-insiders vulnerable to recovery of preferential payments received after the expiration of standard preference period when payments were received by such non-insiders for the benefit of insiders.[311] Special emphasis was also placed on means of improving bankruptcy administration.

The 1994 Act was also noteworthy for what it did not contain. Earlier reform bills in the 1990s had proposed the creation of a separate reorganization chapter (Chapter 10) for "small business" debtors.[312] Chapter 10 was scuttled in the final version of the bill that was passed,[313] with only a vestige remaining in the form of a handful of special Chapter 11 rules for small business debtors.[314] Likewise,

---

[306] Pub. L. No. 103-394, 108 Stat. 4106.

[307] *Id.* § 602, 108 Stat. at 4147.

[308] *Id.* § 603; *Id.* § 608, 108 Stat. at 4149.

[309] 140 CONG. REC. H10,764 (daily ed. Oct. 4, 1994) (Section-by-Section Description of Bankruptcy Reform Act of 1994).

[310] S. 1985, 102d Cong., 2d Sess., tit. 1 (1992).

[311] Pub. L. No. 103-394, § 202, 108 Stat. at 4121 (amending 11 U.S.C. § 550 to overrule Levit v. Ingersoll-Rand Fin. Corp. (*In re* V.N. DePrizio Constr. Co.), 874 F.2d 1186 (7th Cir. 1989)).

[312] S. 540, 103d Cong., 1st Sess., § 201 (1993); S. 1985, 102d Cong., 2d Sess., § 205 (1992); H.R. 6020, 102d Cong., 2d Sess., § 205 (1992).

[313] H.R. 5116, 103d Cong., 2d Sess. (1994).

[314] Pub. L. No. 103-394, § 217, 108 Stat. at 4127-28.

a controversial provision from the 1992 Senate bill that would have mandated the payment of retiree benefits[315] was dropped from the bill that eventually became law.

On several occasions since the passage of the 1978 Act Congress has authorized the creation of additional bankruptcy judgeships in response to the quantum increase in the number of bankruptcy filings under the Code. In late 1993, however, the number of filings began to decline slightly, and some of the authorized judgeships have been put on hold until it can be determined whether they will be necessary.

## IV. CONSTITUTIONAL ISSUES

The Bankruptcy Clause of The United States Constitution[316] gives Congress the power to establish "uniform laws on the subject of bankruptcies." As noted earlier, the framers gave little attention to the subject of bankruptcy at the Constitutional Convention of 1787.[317] The need for a federal bankruptcy law was believed to stem from potential interstate commerce problems. Without a federal law, the ability of nonresident creditors to collect their debts might be impaired, thereby hindering interstate commerce to the detriment of the nation. Nonresident creditors might be discriminated against by local state laws, and also might have difficulty in reaching property of the debtor located in or removed to another state.[318] The idea of a bankruptcy law as a means of providing a fresh start for distressed debtors was foreign to the framers.

The Bankruptcy Clause has raised four main constitutional issues.[319] The first issue questions what comprises the "subject of bankruptcies." The second is determining whether a bankruptcy law is "uniform." The third major concern is establishing when a state law regulating relationships between debtors and creditors is preempted by Congress's exercise of its powers under the Bankruptcy Clause. Finally, courts have had to sort out the relationship between the Bankruptcy Clause and other constitutional provisions, such as the Fifth Amendment Takings Clause and the Seventh Amendment right to a jury trial.

### A. The "Subject of Bankruptcies"

The constitutional framers probably well understood the scope of the "subject

---

[315] S. 1985, § 212, 102d Cong., 2d Sess. (1992).

[316] U.S. CONST. art. I, § 8, cl. 4.

[317] *See supra* notes 50-56 and accompanying text.

[318] THE FEDERALIST No. 42 (James Madison).

[319] A good short study of the topic of constitutional bankruptcy issues is found in Kennedy, *supra* note 50.

of bankruptcies." The model they had in mind was the one in existence in England,[320] where bankruptcy was a collective collection remedy that creditors could invoke involuntarily against a merchant trader who had committed an "act of bankruptcy." Debtors had no right to institute a voluntary bankruptcy case. By contrast, an "insolvency" law was one that a financially distressed debtor could invoke to obtain relief.[321]

As the forms of available bankruptcy relief evolved over time, questions were raised as to whether the newer types of relief fell within the constitutional grant of power over the subject of bankruptcies. The Supreme Court has regularly rejected these challenges, declining to limit the reach of the bankruptcy power to the conception of bankruptcy existing at the time of the Constitution. It has been suggested that the "emotional suggestiveness" of new bankruptcy legislation, which in most instances is a product of "commercial crisis," makes the expansion of the conception of bankruptcy "as a need of commercial life" almost inevitable.[322]

The first major expansion in the concept of a bankruptcy law came with the adoption of voluntary bankruptcy for nonmerchant debtors in the Bankruptcy Act of 1841.[323] The constitutionality of the law was challenged by John Calhoun and Thomas Benton, among others, and defended by Daniel Webster and Joseph Story. Story, the chief architect of the 1841 Act, had suggested that the "subject" of bankruptcies was quite broad:

> A bankrupt law . . . is a law for the benefit and relief of creditors and their debtors in cases in which the latter are unable or unwilling to pay their debts. And a law on the subject of bankruptcies in the sense of the Constitution is a law making provisions for cases of persons who fail to pay their debts.[324]

The Supreme Court never directly decided the constitutionality of voluntary bankruptcy, although Justice Catron sitting on circuit did uphold the constitutionality of the new law in 1843.[325] Justice Catron's broad definition of the scope of the Bankruptcy Clause has been quoted with approval by the Supreme Court in the twentieth century:

---

[320] *See* Garrard Glenn, *Essentials of Bankruptcy: Prevention of Fraud, and Control of the Debtor*, 23 VA. L. REV. 373, 376 (1937); Olmstead, *supra* note 50, at 833; Max Radin, *The Nature of Bankruptcy*, 89 U. PA. L. REV. 1, 1 (1940).

[321] *See* Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 194 (1819) (discussing historical distinction between bankruptcy and insolvency laws). In *Sturges*, Justice Marshall did note, however, that the historical distinction between bankruptcy laws and insolvency laws did not necessarily define the limits of the constitutional grant. *Id.* at 194-97.

[322] Radin, *supra* note 320, at 2.

[323] Ch. 9, 5 Stat. 441 (1841) (repealed 1843).

[324] JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 543 [also cited as § 1113] (abridged ed. Boston 1833).

[325] *In re* Klein, appended in notes at 42 U.S. (1 How.) 277 (1843).

> I hold, it [the bankruptcy power] extends to all cases where the law
> causes to be distributed, the property of the debtor among his creditors: this
> is its least limit. Its greatest, is a discharge of the debtor from his
> contracts. And all intermediate legislation, affecting substance and form,
> but tending to further the great end of the subject—distribution and dis-
> charge—are in the competency and discretion of Congress.[326]

Thus, after the 1841 Act, the question of the constitutionality of voluntary
bankruptcy for nonmerchants was settled in the affirmative.

The authorization for composition agreements, contained in the 1874
amendments to the 1867 Act,[327] represented the next significant expansion in the
scope of the subject of bankruptcies. The composition agreement, if accepted by
the requisite percentage of creditors, allowed the debtor to retain property and
discharge debts by paying the amounts specified in the composition. The
constitutionality of the new provision was upheld,[328] although never by the
Supreme Court. In an 1881 case, the Supreme Court recognized that the
composition provision was a proceeding "in bankruptcy," and thus had to be applied
consistently with the other provisions of the bankruptcy law.[329]

The Depression of the 1930s produced a spate of bankruptcy legislation.
Although the Supreme Court overturned two acts during this period on other
grounds, the Court continued to reaffirm the expansive scope of the bankruptcy
power.[330] In *Continental Illinois National Bank & Trust Co. v. Chicago, Rock
Island & Pacific Railway Co.*,[331] the Court upheld the provisions of section 77 of
the 1898 Act, permitting railroad reorganizations, as within the scope of the
Bankruptcy Clause.[332] In the 1970s the Court again held that a railroad reorgani-

---

[326] *Id.* at 281, *quoted in* Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 588 n.18 (1935).

[327] Act of June 22, 1874, ch. 390, § 17, 18 Stat. 178, 182-84 (repealed 1878); *see supra* notes 133-40
and accompanying text (discussing composition provisions of 1867 Act).

[328] *In re* Reiman, 20 F. Cas. 490, 496 (S.D.N.Y. 1874) (No. 11,673) (stating subject of bankruptcy
cannot properly be defined as "anything less than the subject of the relations between an insolvent or
non-paying or fraudulent debtor, and his creditors, extending to his and their relief."). The Supreme Court
has often quoted this statement with approval. *See* Wright v. Union Cent. Life Ins. Co., 304 U.S. 502,
513-514 (1938); Continental Illinois Nat'l Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.,
294 U.S. 648, 672-73 (1935).

[329] Wilmot v. Mudge, 103 U.S. 217 (1881) (holding debt based on fraud could not be discharged in
composition when defrauded creditor did not assent).

[330] In the two cases in which the Court struck down bankruptcy legislation, it did not do so on the
ground that the legislation exceeded the scope of the bankruptcy power, but rather that the exercise of the
bankruptcy power had to yield to other constitutional demands. *See* Ashton v. Cameron County Water
Improvement Dist., 298 U.S. 513, 531 (1936) (discussing state sovereignty); Louisville Joint Stock Land
Bank v. Radford, 295 U.S. 555, 589-93 (1935) (discussing Fifth Amendment).

[331] 294 U.S. 648 (1935).

[332] *Id.* at 675.

zation law fell within the subject of bankruptcies.[333]  Today, virtually any law that readjusts the respective rights between creditors and a financially distressed debtor falls within the "subject of bankruptcies."  Indeed, according to the Supreme Court, the bankruptcy power encompasses the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief."[334]

## B.  Uniformity

A second major constitutional bankruptcy issue is whether a given law is a "uniform" law within the meaning of the Bankruptcy Clause.  "Uniformity" is problematic in the bankruptcy context because: (i) most laws governing the substance of relationships between debtor and creditors are *state* laws; (ii) these state laws are incorporated into and applied in the federal Bankruptcy Code; and (iii) these state laws are not necessarily uniform.  Since debtors and creditors in similar factual situations will often receive different treatment in bankruptcy from state to state, one might conclude that constitutional uniformity is not achieved by the bankruptcy law.  This type of uniformity (or lack thereof) has been described by the Supreme Court as "personal" uniformity.[335]  For example, a debtor in California might be liable in bankruptcy on a claim for breach of a cohabitation agreement, while a Vermont debtor might not be liable on such a claim on identical facts.  A debtor in Florida may be able to exempt a palatial homestead, while a Pennsylvania debtor may be entitled to almost no homestead exemption.  Does this destroy bankruptcy uniformity?

Perhaps somewhat surprisingly, the short answer is no.[336]  According to a landmark 1902 Supreme Court decision, *Hanover National Bank v. Moyses*,[337] all the Constitution requires is "geographical" uniformity, rather than personal uniformity.[338]  In *Moyses,* the Court upheld the incorporation of state exemption laws in the 1898 Bankruptcy Act.  Geographical uniformity in this context, the Court observed, was satisfied "when the trustee takes in each state whatever would

---

[333] Blanchette v. Connecticut General Ins. Corp. (Regional Rail Reorganization Act Cases), 419 U.S. 102 (1974).

[334] Wright v. Union Cent. Life Ins. Co., 304 U.S. 502, 513-14 (1938) (citing *In re* Reiman, 20 F. Cas. 490 (No. 11,673) (S.D.N.Y. 1874)).

[335] Hanover Nat'l Bank v. Moyses, 186 U.S. 181, 188 (1902).

[336] *See* Judith S. Koffler, *The Bankruptcy Clause and Exemption Laws: A Reexamination of the Doctrine of Geographic Uniformity*, 58 N.Y.U. L. REV. 22 (1983).  The answer is surprising in part because "uniformity" is given a much narrower meaning when applied to other constitutional powers, such as naturalization and taxation. *Id.* at 38-40.

[337] 186 U.S. 181 (1902).

[338] *Id.* at 188. Although the Court later explained the difference between personal and geographic uniformity, *id.* at 190, it did not explain its choice of labels for the two different aspects of uniformity.

have been available to the creditor if the bankrupt law had not been passed."[339]

Thus, a bankruptcy law is "uniform" when (i) the substantive law applied in a bankruptcy case conforms to that applied outside of bankruptcy under state law; (ii) the same law is applied to all debtors within a state and to their creditors; and (iii) Congress uniformly delegates to the states the power to fix those laws. The fact that debtors and creditors in different states may receive different treatment does not render the law unconstitutional.

In 1918, the Court reaffirmed the *Moyses* principle in a case involving the use of state fraudulent conveyance laws in bankruptcy.[340] More recently, lower courts have followed *Moyses* in upholding the exemption provisions of the 1978 Bankruptcy Code against uniformity challenges.[341] The Supreme Court has not addressed the issue. The Court continues to affirm, however, that "[T]he uniformity requirement is not a straitjacket that forbids Congress to distinguish among classes of debtors, nor does it prohibit Congress from recognizing that state laws do not treat commercial transactions in a uniform manner."[342]

A uniformity issue is also presented when Congress passes a bankruptcy law that is not available to all debtors across the country. Private bankruptcy laws for particular debtors are not permitted. In recent years the Supreme Court has twice confronted this problem with regard to special railroad legislation. In *Blanchette v. Connecticut General Insurance Corp. (The Regional Rail Reorganization Act Cases)*,[343] the Court upheld the Regional Rail Reorganization Act even though the law was restricted in its application to the railroads of a single geographic region. The saving grace in the law stemmed from the reality that all of the railroads then operating under the bankruptcy laws were in that region; even if the statute had been drafted to be of general applicability, its operation and effect would have been unchanged.[344] According to the Court in *Railway Labor Executives' Association v. Gibbons*,[345] however, Congress did overreach its authority in passing a private bankruptcy law that affected only the employees of the Rock Island Railroad.[346]

## C. Preemption

The third major concern raised by the Bankruptcy Clause is preemption. In the bankruptcy context, there are two basic types of preemption issues. The first issue is the more global question of whether a state insolvency law is a "bankruptcy" law

---

[339] *Id.* at 190. The Court went on to note: "The general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.*

[340] Stellwagen v. Clum, 245 U.S. 605, 613 (1918).

[341] *See, e.g., In re* Sullivan, 680 F.2d 1131 (7th Cir.), *cert. denied,* 459 U.S. 992 (1982).

[342] Railway Labor Executives' Ass'n v. Gibbons, 455 U.S. 457, 469 (1982).

[343] 419 U.S. 102 (1974).

[344] *Id.* at 159-60.

[345] 455 U.S. 457 (1982).

[346] *Id.* at 470-71.

and thus generally preempted by Congress's exercise of its power under the Bankruptcy Clause. The second issue concerns whether a particular state statute conflicts with some specific aspect of the federal bankruptcy law.

For much of the nineteenth century, Congress did not exercise the bankruptcy power. Subject to the limitation that states may not impair the obligation of contracts,[347] states were free to fill this vacuum with bankruptcy and insolvency laws of their own. Many states did enact such bankruptcy laws. Since 1898, however, a federal bankruptcy law has occupied the field. In 1929 in *International Shoe Co. v. Pinkus*,[348] the Supreme Court struck down an Arkansas insolvency law that forced creditors to stipulate to the debtor's discharge in order to share in the distribution of the debtor's property. In sweeping language, the Court held that states were precluded from enacting competing bankruptcy legislation.[349] Although state laws governing assignments for the benefit of creditors are permitted, such laws may not provide for a discharge of debts because discharge is a feature of bankruptcy law.[350]

Preemption questions occasionally arise regarding whether specific state legislation might conflict with the federal scheme spelled out in the Bankruptcy Code. The form of analysis here is not peculiar to the bankruptcy field, but follows standard constitutional preemption doctrine. Under the Supremacy Clause, of course, federal law controls in the event of conflict. Nevertheless, resolution of the issue can be tricky in bankruptcy. One problem concerns the widespread use of state laws in bankruptcy cases. For example, Congress has authorized the states to pass exemption laws that will be available to bankruptcy debtors.[351] State exemption laws are therefore not preempted in their entirety. In some particulars, however, a state's exemption law may conflict with the federal scheme, and to that

---

[347] U.S. CONST. art. I, § 10, cl. 1.

[348] 278 U.S. 261 (1929).

[349] *Id.* at 265-66.

> The power of Congress to establish uniform laws on the subject of bankruptcies is paramount. . . . In respect of bankruptcies the intention of Congress is plain. The national purpose to establish uniformity necessarily excludes state regulation. It is apparent ... that intolerable inconsistencies and confusion would result if that [Arkansas] insolvency law be given effect while the national [Bankruptcy] Act is in force. Congress did not intend to give insolvent debtors seeking discharge, or their creditors seeking to collect claims, choice between the relief provided by the Bankruptcy Act and that specified in state insolvency laws. . . . It is clear that the provisions of the Arkansas law governing the distribution of property of insolvents for the payment of their debts and providing for their discharge . . . are within the field entered by Congress when it passed the Bankruptcy Act, and therefore such provisions must be held to have been superseded.

*Id.*

[350] *Id.* at 268.

[351] 11 U.S.C. § 522(b) (1988), *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 522(b) (West Supp 1995).

extent may be preempted.[352]

Another problem arises in defining the scope of the federal interest and the extent of state interference in cases of indirect conflict. Perhaps the best-known example is the Supreme Court's decision in *Perez v. Campbell*,[353] holding that an Arizona driver's responsibility statute was invalid under the Supremacy Clause as conflicting with the federal fresh start policy manifested in the bankruptcy discharge.[354] The offending law required suspension of a debtor's driver's license as long as a judgment arising out of the operation of a motor vehicle remained unsatisfied, even if that debtor obtained a discharge of the debt in bankruptcy. Yet, cases after *Perez* have upheld other state driver's responsibility laws as applied against bankruptcy debtors when those laws interfered less directly with the federal scheme.[355] Drawing the line is not easy.

## D. *Relationship of Bankruptcy Clause to Other Constitutional Provisions*

A final type of constitutional issue is whether Congress's exercise of its Bankruptcy Clause powers in a particular instance conflicts with other provisions of the Constitution. The Supreme Court has held that the reach of the Bankruptcy Clause is limited by other constitutional provisions, such as the Fifth Amendment, the Seventh Amendment, and Article III. In each instance, defining the appropriate constitutional accommodation has proved to be an elusive task.

The Fifth Amendment prohibitions against the taking of private property without just compensation and without due process of law limit the Bankruptcy Clause. In *Louisville Joint Stock Land Bank v. Radford*,[356] the Supreme Court struck down the Frazier-Lemke Act—a Depression era bankruptcy law designed to alleviate the plight of farmers—on the ground that it deprived mortgagees of their collateral without just compensation.[357] Yet, just two years later, the Court upheld a very slightly revised version of the invalidated law in *Wright v. Vinton Branch*.[358] The very next year the Court again read narrowly the Fifth Amendment limitation on the Bankruptcy Clause in *Wright v. Union Central Life Insurance Co.*[359] In 1982,

---

[352] For example, the Code permits the avoidance of certain liens that impair exemptions. States thus may not define exemptions so as to preclude lien avoidance. 11 U.S.C. § 522(f) (1988), *as amended by* Bankruptcy Reform Act of 1994, 11 U.S.C.A. § 522(f) (West Supp. 1995).

[353] 402 U.S. 637 (1971).

[354] *Id.* at 656.

[355] *E.g.*, Duffey v. Dollison, 734 F.2d 265, 273 (6th Cir. 1984) (upholding statute requiring drivers, who failed to satisfy judgements against them from operation of motor vehicle, to purchase insurance or post surety bond as a condition of restoration of driving privileges, even where judgement is stayed or judgement debt discharged in bankruptcy).

[356] 295 U.S. 555 (1935).

[357] *Id.* at 560-61.

[358] 300 U.S. 440, 457 (1937).

[359] 304 U.S. 502 (1938).

however, the Supreme Court in *United States v. Security Industrial Bank*[360] squelched any speculation that it had abandoned *Radford*, citing that decision with approval for the proposition that the Fifth Amendment limits the bankruptcy power.[361]   To avoid a constitutional problem, the Court construed the lien avoidance provisions in section 522(f) of the Code as only applying prospectively.[362]

The Seventh Amendment preserves the right to a trial by jury in suits at common law as that right existed at the time the Constitution was ratified. In 1966, the Supreme Court in *Katchen v. Landy*,[363] cast doubt on whether Seventh Amendment guarantees apply in bankruptcy. In 1989, the Supreme Court removed the doubts when it held in *Granfinanciera, S. A. v. Nordberg*[364] that a trustee's suit to recover a fraudulent conveyance in bankruptcy was subject to the defendant's right to trial by jury.[365]   The next year, the Court in *Langenkamp v. Culp*[366] concluded that both *Katchen* and *Granfinanciera* were still good law, holding that a creditor has a jury trial right when sued for a preference (under *Granfinanciera*), but that the creditor lost that right when it filed a claim against the estate (under *Katchen*).

The Court in *Granfinanciera* expressly left open the question whether a non-Article III bankruptcy judge could preside over a constitutionally mandated jury trial.[367]   The concern is whether doing so constitutes an exercise of "the essential attributes of judicial power," which the Court in *Marathon Pipe Line* and in *Granfinanciera* had suggested could only be done by an Article III court in the federal system.   Prior to 1994 most courts of appeals dodged the difficult constitutional question by ruling that bankruptcy courts did not have the statutory authority to preside over a jury trial.[368]   Although the Court initially granted certiorari on the question in the case of *Ben Cooper, Inc. v. Insurance Co. of Pennsylvania, (In re Ben Cooper, Inc.)* out of the Second Circuit, it remanded on

---

[360] 459 U.S. 70 (1982).

[361] *Id.* at 75.

[362] *Id.* at 78-82. The Court's decision was criticized in James S. Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause*, 96 HARV. L. REV. 973 (1983).

[363] 382 U.S. 323, 336-37 (1966) (creditor sued for recovery of preference did not have jury trial right when creditor filed claim against the estate). The Court explained that because the dispute over the creditor's claim could not be adjudicated without first determining whether a voidable preference existed, the preference issue would be adjudicated within a claims proceeding which is equitable in nature, and thus no right to a jury trial attached. *Id.*

[364] 492 U.S. 33 (1989).

[365] *Id.* at 61.

[366] 498 U.S. 42 (1990).

[367] 492 U.S. at 64.

[368] *E.g., In re* Grabill Corp., 967 F.2d 1152, 1158 (7th Cir. 1992).

an unrelated procedural issue and then refused to grant certiorari again.[369]  In the Bankruptcy Reform Act of 1994, Congress has forced the courts to reach the constitutional question by conferring on bankruptcy judges express statutory authority to conduct jury trials.[370]  However, the party consent provision in that law probably solves any constitutional infirmity.

Although all of the foregoing constitutional decisions have been significant, each pales next to the Supreme Court's 1982 decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*[371] that the bankruptcy jurisdictional and court system instituted in the 1978 Act unconstitutionally violated Article III.  The Court concluded that bankruptcy judges, who did not enjoy the Article III guarantees of life tenure and protection against diminution in salary, could not exercise the judicial power of the United States to the extent authorized by the 1978 Act.[372] The Supreme Court has not passed on the constitutionality, under Article III, of the court system as revised by the 1984 amendments.

## CONCLUSION

The Chinese have a saying, "May you live in interesting times."  For those connected with bankruptcy law and practice, the concluding years of the second millennium promise to be interesting times.  The Bankruptcy Review Commission is due to report its findings in 1997, which will surely prompt a further spate of legislative activity.  Bankruptcy has become a central feature in our society, touching the lives of almost everyone.  This Article has taken a look at the path we have traveled over the past 450 years.  Perhaps some knowledge of where we have been will help us make an informed choice of which road to take in the years ahead.

---

[369] 896 F.2d 1394 (2d Cir.), *cert. granted,* 497 U.S. 1023, *vacated and remanded,* 498 U.S. 964 (1990), *decision on remand,* 924 F.2d 36 (2d Cir.), *cert. denied,* 500 U.S. 928 (1991). The Second Circuit was the only circuit court to hold that bankruptcy judges had the statutory and constitutional authority to conduct a jury trial.

[370] Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 112, 108 Stat. 4106 (1994).

[371] 458 U.S. 50 (1982).

[372] *Id.* at 87.