# **EXHIBIT G**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| IN RE: | § | JOINTLY ADMINISTERED |
| | § | |
| SCOTIA DEVELOPMENT LLC, ET AL., | § | Case No. 07-20027-C-11 |
| | § | |
| Debtors. | § | Chapter 11 |
| | § | |

Related Docket Nos. 265 & 492
Hearing Date: April 10, 2007 @ 11:00 am CST

---

THIS PLEADING APPLIES ONLY TO
SCOTIA PACIFIC COMPANY LLC, CASE NO. 07-20032

---

NOTEHOLDER GROUP'S OBJECTION TO SCOTIA
PACIFIC COMPANY LLC'S MOTION FOR AN ORDER COMPELLING
THE AD HOC COMMITTEE TO FULLY COMPLY WITH BANKRUPTCY
RULE 2019(A) BY FILING A COMPLETE AND PROPER VERIFIED
STATEMENT DISCLOSING ITS MEMBERSHIP AND THEIR INTERESTS

The Ad Hoc Group of Timber Noteholders (the members of which hold or manage, as of

the date hereof, more than 95% in principal aggregate amount outstanding of the Timber Notes,

the "**Noteholder Group**")[1] in the above captioned chapter 11 case, respectfully submits this

objection to Scotia Pacific Company LLC's ("**Scopac**") above referenced motion (dkt. no. 492,

---

[1] The current members of the Noteholder Group include: Angelo, Gordon & Co. L.P., on
behalf of certain managed accounts and funds; Avenue Investments, L.P.; Avenue International,
Ltd.; Avenue Special Situations Fund III, L.P.; Avenue-CDP Global Opportunities Fund, L.P.
US; Avenue Special Situations Fund IV, L.P.; Banc of America Securities, Inc.; Camulos Master
Fund LP; CarVal Investors LLC; Citigroup Global Markets Inc.; CSG Investments, Inc.;
Davidson Kempner Capital Management LLC, on behalf of certain affiliated investment funds;
Deutsche Bank Securities Inc.; D. E. Shaw Laminar Portfolios, L.L.C.; ECO Master Fund Ltd.;
ECR Master Fund Ltd.; Gruss & Co.; funds managed by GSO Capital Partners LP; HBK Capital
Management; Intermarket Corp.; J.P. Morgan Securities Inc.; KeyBanc Capital Markets; KS
Capital Partners, L.P.; KS International; Lehman Brothers Inc.; Murray Capital Management (on
behalf of certain managed accounts and funds); Northeast Investors Trust; Par IV Capital;
Phoenix Investment Partners; Plainfield Special Situations Master Fund Limited; QDRF Master
Ltd; QVT Financial LP; RockView Capital; TCW Credit Mortgage and Watershed Asset
Management, L.L.C. The members of the Noteholder Group each act in their own individual
interests, and neither the individual members nor the Group as a whole purport to act on behalf
of or to represent any other holder of Timber Notes.

the "**2019 Motion**") pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

**OVERVIEW**

1.    Bankruptcy Rule 2019 requires (i) a "committee" (ii) "representing more than one creditor" to make certain disclosures and to provide a copy of (iii) "the instrument" (iv) "whereby the ... committee ... is empowered to act on behalf of creditors." The Noteholder Group (i) is *not* a "committee," (ii) does *not* "represent" any creditors, (iii) does *not* have any "instrument," and (iv) is *not* "empowered to act on behalf of creditors." *In short, Bankruptcy Rule 2019 simply does not apply to the Noteholder Group.*

2.    Scopac knows this. In fact, in numerous Form 8-K filings in 2005, Scopac complained that it was having discussions with an "Ad Hoc Committee" (*i.e.*, the Noteholder Group) that held only a small percentage of the outstanding principal amount of the Timber Notes. Scopac was actually wrong on this point[2], but it demonstrates that Scopac did not believe that the Ad Hoc Committee represented, or ever asserted that it represented, the entire class of Timber Notes. In fact, one of Scopac's Form 8-K filings stated that Scopac was seeking "to facilitate direct negotiations with the Noteholders," because Scopac knew that the Ad Hoc Committee did not have authority to commit to any proposal on behalf of any Noteholder other than the members of the Ad Hoc Committee itself. *See, e.g.*, Scotia Pacific Form 8-K filings dated August 1, 2005, September 26, 2005 & October 5, 2005 (Exhibits A, B & C hereto).

3.    Just three weeks ago, Scopac complained yet again that it was unable to negotiate a restructuring in 2005 "at least partly because counsel for the noteholder group represented

---

[2] The overall group held approximately 80% in outstanding principal amount of the Timber Notes, as Scopac knew. The 15-20% that Scopac always referred to was just the "restricted" holders in the group.

fewer than twenty percent (20%) of the outstanding debt on the Timber Notes." Scotia Pacific
Company LLC's Omnibus Response filed March 15, 2007, at ¶ 4 (dkt. no. 480). In sum, until
Scopac filed the 2019 Motion, Scopac always understood (and complained) that the Noteholder
Group did not represent all of the holders of the Timber Notes.

4.      Furthermore, even if the Noteholder Group did purport to represent other
Noteholders, the purpose of Bankruptcy Rule 2019 is to provide disclosure to the other members
of the class that the "committee" represents. Here, the members of the Noteholder Group hold
more than 95% in outstanding principal amount of the Timber Notes, and the one or two
Noteholders who are not currently members of the Noteholder Group are welcome to join the
group at any time. Thus, no useful purpose would be served by seeking to compel investors to
reveal confidential and highly proprietary commercial information that they do not even share
with each other, only with counsel in strictest confidence. *See In re I. G. Servs. Ltd.*, 244 B.R.
377, 389 (Bankr. W.D. Tex. 2000) (declining to apply Rule 2019 where "[t]he only interest that
the court might have in enforcing the letter of Rule 2019 is to protect these very investors.")
This reveals Scopac's true motives. Scopac is not seeking "to vindicate the rights of innocent
investors who are being shut out of the process by their secretive and conflicted representatives."
Scopac is simply continuing its unrelenting campaign of attempting to demonize the Noteholder
Group in every way possible.

5.      For example, the 2019 Motion attacks the Noteholder Group for "hiding behind a
veil of secrecy" (2019 Motion ¶ 1) in an effort to remain "shrouded in secrecy" (2019 Motion ¶
2). Scopac asserts that this "secrecy" is particularly inappropriate given the Noteholder Group's
"patently absurd pleadings" (2019 Motion ¶ 1). Scopac further asserts that additional disclosure
"is particularly critical in this case given the Ad Hoc Committee's overly aggressive behavior,

repeated baseless filings, and unwillingness to compromise – tactics and strategies that are diverting Scopac's attention away from and, therefore, delaying the successful reorganization of its business." (2019 Motion ¶ 17).

      6.    Scopac's allegations that the Noteholder Group's positions are "absurd," "baseless," etc. etc., will not be dignified with a response. However, Scopac's allegation that the Noteholder Group is "hiding behind a veil of secrecy" can easily be answered by the record in this case. Every single pleading that the Noteholder Group has filed in this case (including this one) has provided up-to-the-minute information as to both the members of the Noteholder Group and their approximate aggregate holdings. Bankruptcy Rule 2019 does not apply to the Noteholder Group, but even if it did, the Noteholder Group's pleadings already disclose everything that is relevant to know about the Noteholder Group.

## BACKGROUND

      7.    In 1998, Scopac borrowed $876 million from investors ("**Noteholders**") through the issuance of timber collateralized notes (the "**Timber Notes**"). Approximately $714 million of the Timber Notes remain outstanding. More than 95% of that principal amount is held by the members of the Noteholder Group.[3]

      8.    In March 2005, Scopac contacted several Noteholders to request that the Noteholders form a group for the purpose of engaging in restructuring discussions. After several organizational calls, the Noteholder Group had its first formal call on March 21, 2005.[4] The

---

[3] To be even more precise, as of March 29, 2007, the Noteholder Group members hold, in the aggregate, $695,502,014 in outstanding principal amount of Timber Notes, equating to 97.41% of the total issue.

[4] The original members of the Noteholder Group AEGON USA Investment Management, LLC; Capital Research and Management Company; Delaware Investment Advisers; Genworth Financial Inc.; and Ohio National Life Insurance Company.

Noteholder Group interviewed a number of law firms on March 23, 2005, and selected Bingham McCutchen LLP ("**Bingham**") as Noteholder Group counsel (the assignment has since been transferred to Bracewell & Giuliani LLP ("**Bracewell**") as a result of the move of the lead Bingham attorney to Bracewell).

9.    Over the Summer of 2005, the Noteholder Group discussed a potential restructuring with Scopac until Scopac abruptly terminated the discussions in September 2005.

10.    The Noteholder Group has remained intact and in communication since then (although the members of the group have changed from time to time), with periods of relative activity or inactivity depending on matters such as Scopac's periodic financial reporting, litigation and regulatory developments affecting Scopac, and the semi-annual payments due on the Timber Notes.

11.    The Noteholder Group has never had, and still does not have, any by-laws, procedural rules, agreements or other "instruments" concerning its existence.  The simple reason for this is that the Noteholder Group has never purported to "represent" anyone or to make decisions on behalf of anyone.

12.    The members of the Noteholder Group are required to keep Bracewell updated as to their individual holdings so that Bracewell can accurately represent the current overall holdings of the group to this Court.  The individual holdings are provided only to Bracewell and on a strictly confidential basis; they are not shared with other members of the Noteholder Group, with the group's Texas counsel, Gardere Wynne Sewell LLP ("**Gardere**"), or with any other professionals for the Noteholder Group.

13.    When the Noteholder Group takes positions, such as the group's decision to file the so-called "SARE Motion," the decisions are typically made via consensus after frequent e-

mail discussions and occasional group calls. The "consensus decision" is not binding on the individual Noteholder Group members and any member is free to drop off or re-join the group at any time. Regardless of whether they remain part of the Noteholder Group, individual group members are free at any time to take individual positions that are inconsistent with the positions taken by the Noteholder Group as a whole.

14.     The Noteholder Group members do not owe fiduciary duties to each other or to any other Noteholder.

15.     On February 13, 2007, Bingham and Gardere made a voluntary disclosure pursuant to Bankruptcy Rule 2019 identifying the Noteholder Group members and their aggregate holdings. The 2019 Motion incorrectly describes the disclosure as having been filed by the Noteholder Group, but in fact it was filed by counsel on their own behalf, as its title makes clear: "Verified Statement of Bingham McCutchen LLP and Gardere Wynne Sewell LLP Pursuant to Bankruptcy Rule 2019" (dkt. no. 265). This was not a required disclosure, given that Bracewell and Gardere have only one client in this case -- the Noteholder Group --but it was made so that this Court would have a verified statement of counsel as to the members and aggregate holdings of the Noteholder Group.[5] This disclosure was consistent with the practice in courts throughout this country, including this Court. *See, e.g.*, Verified Statement of Stroock & Stroock & Lavan LLP Pursuant to Bankruptcy Rule 2019, *In re Asarco*, case no. 05-21207, dkt. no. 2072 (Bankr. S.D. Tex., pleading filed Apr. 28, 2006) (copy attached as Exhibit D).

---

[5] While Bracewell has only one client in Scopac's chapter 11 case, a separate Bracewell team represents two creditors in the separate chapter 11 case for Palco. As a result, Bracewell filed a 2019 statement in the Palco case with respect to those two creditors (dkt. no. 516). As noted in that 2019 statement, there is a strict "fire wall" between the two Bracewell teams.

## OBJECTION

**I.    BANKRUPTCY RULE 2019 DOES NOT APPLY TO THE NOTEHOLDER GROUP**

**A.    The Noteholder Group is not a "Committee" within the meaning of Bankruptcy Rule 2019(a)**

16.    Bankruptcy Rule 2019(a) requires "every entity or committee representing more than one creditor ... and every indenture trustee," to file a Rule 2019(a) Statement.  The 2019 Motion is based upon the assumption that the Noteholder Group is a "committee" within the meaning of Bankruptcy Rule 2019(a).  "Committee" is a common term in both legal and non-legal contexts and, therefore, the analysis must start with the plain meaning of the term "committee."  *See United States v. Ron Pair Enter.*, 489 U.S. 235, 241 (1989) ("where, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms") (internal quotations omitted).[6]

17.    The <u>legal definition</u> of "committee" is, "A group of people appointed or elected to consider, determine, or manage a matter." BLACK'S LAW DICTIONARY (7th ed. 1999).  While the Noteholder Group is certainly "a group," its members have not been "appointed or elected" by anyone "to consider, determine, or manage" anything.  As noted above, the Noteholder Group is self-selecting (any Noteholder can join, any Noteholder can drop off) and does not speak for anyone except itself.  To the contrary, the Noteholder Group expressly disclaims any right or duty to speak on behalf of anyone else or to consider or determine anything on behalf of anyone

---

[6] Scopac does not assert that the Noteholder Group is an "indenture trustee" or an "entity" under Rule 2019(a).  The 2019 Motion demands that the members of the Noteholder Group disclose specific information regarding their holdings of Timber Notes (*e.g.*, individual amounts, times of acquisition and prices paid), none of which would be required if the Noteholder Group were an "entity" because 2019(a) would only apply to "the amounts of claims or interests *owned by the entity.*" *See In re C.F. Holdings Corp.*, 145 B.R. 124, 127 (Bankr. D. Conn. 1992) (Rule 2019(a)(4) "applies to the entity filing the Rule 2019 statement ... not the parties represented by the [entity].").

else.  It is for this reason that the Noteholder Group has stopped referring to itself imprecisely as the "Ad Hoc Committee" – the group is not a "committee" of any nature, regardless of the terminology employed.

18.    Indeed, as discussed in paragraphs 2 & 3 above, even when the Noteholder Group was informally called the "Ad Hoc Committee," Scopac itself never believed or understood that the group was a "committee" that purported to represent any other Noteholders.  This was a continuing sore spot for Scopac because Scopac *wanted* to be able to negotiate with a true "committee" and was repeatedly frustrated that the Noteholder Group refused to represent anyone other than its individual members.

19.    The <u>non-legal definition</u> of "committee" is, "A group of people *officially delegated to perform* a function, such as investigating, considering, reporting, or acting on a matter."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2004) (emphasis added).  This language demonstrates even more succinctly that the Noteholder Group is not a "committee."  There is nothing "official" about the group and no one has "delegated" anything to the group.

**B.    The Noteholder Group Does Not "Represent More Than One Creditor" Within the Meaning of Bankruptcy Rule 2019(a)**

20.    The "representative capacity" which is at the heart of the meaning of the term "committee" is confirmed by Rule 2019's text.  Indeed, it is explicitly stated in the most important part of Rule 2019(a), its first clause, which defines the parties who are subject to the disclosure obligations set forth in clauses (1) through (4) that follow.  That clause states that it

applies to every "committee *representing* more than one creditor" except for "committee[s] appointed pursuant to §§ 1102 or 1114 of the Code."[2]

21.    BLACK'S LAW DICTIONARY (7th ed. 1999) does not define "represent" but it does define a "representative" as, "One who stands for or acts on behalf of another <the owner was the football team's representative at the labor negotiations>. See AGENT." Thus, in order to "represent" other Noteholders, the Noteholder Group would need to have the authority to "stand for" or to "act on behalf of" the other Noteholders as their "agent." The Noteholder Group does not have any such authority and does not stand for or act on behalf of anyone. The Noteholder Group also does not operate as anyone's agent, not even as the "agent" of its own members, who remain free to advocate whatever positions they wish without regard to the views expressed by the Noteholder Group as a whole.

22.    The word "represent" and variations thereof are used in many places in the Bankruptcy Code, and in each place it is clear that the term is used consistent with the definition noted above as denoting someone who represents someone else.  *See* Bankruptcy Code §§ 101(24) ("The term 'foreign representative' means a person or body ... authorized ... to act as a representative of such foreign proceeding"); 323(a) ("The trustee in a case under this title is the representative of the estate"); 327(a) & (e) (referring to professionals eligible to "represent" the trustee); 329(a) ("Any attorney representing a debtor..."); 333(a)(1) (appointment of an ombudsman "to represent the interests of patients"); 503(b)(3)(D) (ability of "a committee

---

[2] Notably, the two other targets of Rule 2019(a) also function in a representative and fiduciary capacity.  Those two are (a) any "entity ... *representing* more than one creditor," which is typically applicable to law firms whose business it is to "represent" the interests of its clients, and (b) indenture trustees, who are contractual trustees acting on behalf of the holders of the securities issued under the relevant indenture.

representing creditors" to seek payment for making a substantial contribution);[8] 1102(a)(2) (authorizing the court to appoint additional committees of creditors "if necessary to assure adequate representation of creditors"); 1102(a)(4) (the court can reconstitute a committee if "necessary to ensure adequate representation of creditors"); 1102(b)(1) (a committee should be "representative of the different kinds of claims to be represented"); 1102(b)(3)(A) (a committee "shall provide access to information for creditors who (i) hold claims of the kind represented by that committee; and (ii) are not appointed to the committee"); 1103(a) & (b) (referring to a committee's ability to employ professionals to "represent" the committee); 1103(c)(3) (permitting a committee to "advise those represented by such committee," meaning other creditors of the same class); 1113 (repeated references to a "representative of employees"); & 1114 (defining "authorized representative" as the "representative ... for persons receiving any retiree benefits" and repeatedly referring to the representative's "representative" capacity).

23.     Consistent with the Bankruptcy Code's concept that a "committee" "represents" others who are not on the committee, Palco has filed a scathing motion in the Palco case demanding that the Official Creditors' Committee must be reconstituted because its members do not adequately "represent" unsecured creditors in general.  *See* Amended Motion of Palco Debtors To Reconstitute the Official Unsecured Creditors' Committee To Allow Unsecured Creditors (With Claims Against the Estates) Adequate Representation (dkt. no. 534).  If Scopac's interpretation of Rule 2019 is correct, it could lead to the remarkable result that Scopac would

---

[8] Bankruptcy Code § 503(b)(3)(D) also contemplates that a "creditor" can make a substantial contribution.  The members of the Noteholder Group will be seeking "substantial contribution" status in their capacity as a group of creditors, not as a "committee representing creditors."  *See* Bankruptcy Code § 102(7) ("the singular includes the plural," meaning that the reference to a "creditor" includes a reference to "creditors"); *In re Mirant Corp.*, 354 B.R. 113, 135 & n.60 (Bankr. N.D. Tex. 2006) (group of "Convenience Creditors" awarded payment of attorneys' fees for making a substantial contribution).

actually have the ability to file a motion to compel the Noteholder Group to be reconstituted. That makes no sense, of course, because the members of the Noteholder Group do not represent anyone other than themselves.

24. Finally, the non-legal definition of "represent" reinforces the fact that the Noteholder Group does not represent other creditors. As relevant here, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2004) defines "represent" as, "To serve as the official and authorized delegate or agent for." The Noteholder Group is neither "official and authorized" nor a "delegate or agent" for anyone.

**C.    The Noteholder Group Does Not Have Any "Instrument" Pursuant To Which It Is "Empowered To Act on Behalf of Creditors" Within the Meaning of Bankruptcy Rule 2019(a)**

25. Bankruptcy Rule 2019(a) requires "committees" to file "a copy of the instrument, if any, whereby the … committee … is empowered to act on behalf of creditors or equity security holders." The importance of this documentary aspect of Rule 2019 "committees" is further evidenced by subsection (b)(2), which contemplates that, when enforcing the rule, the court should "examine any representation provision of a … committee or other authorization." *See In re Kaiser Aluminum Corp.*, 327 B.R. 554, 559 (D. Del. 2005) ("As Rule 2019(b) suggests, the *operative portion* of the agreements deposited under 2019(a) are the *representation provisions*.") (emphasis added).

26. As noted above, there is no instrument or any other agreement with respect to the Noteholder Group's authority to represent any other Noteholders, for the simple reason that the Noteholder Group does not "represent" any other Noteholders.

27. Courts recognize that, "The purpose of Rule 2019 is to ensure that plans of reorganization are negotiated and voted upon by people *who are authorized to act* on behalf of

the real parties in interest." *Kaiser Aluminum Corp.*, 327 B.R. at 559 (emphasis added). Similarly, the limited Rule 2019 jurisprudence focuses upon whether the party at issue has "authority" to act as an "agent" on behalf of others, particularly where the party asserts that it represents a larger class of creditors. *See In re White Motor Corp.*, 886 F.2d 1462, 1471 (6th Cir. 1989) (attorney purporting to represent class action claimants in bankruptcy failed to comply with Rule 2019 because attorney failed to prove his "authority to act as an agent for any purported class"); *In re Craft*, 321 B.R. 189, 197-98 (Bankr. N.D. Tex. 2005) (requiring putative class action representatives to comply with Rule 2019 to establish "authority to represent" the class members); *In re Wang Labs.*, 164 B.R. 401, 403 (Bankr. D. Mass. 1994) (Rule 2019 requires party seeking to represent class of mass tort claimants to "demonstrate authority" to act as "agent" for class members in bankruptcy); *In re Ionosphere Clubs*, 101 B.R. 844, 851-53 (Bankr. S.D.N.Y. 1989) (Consumers Union whose members held only 0.05% of relevant claims needed to show "express authorization" and "fiduciary relationship" to represent the remaining 99.95% of the claimant class under Rule 2019); *In re Great Western Cities*, 88 B.R. 109, 112 (Bankr. N.D. Tex. 1988) (Rule 2019 required attorney claiming to represent class of claimants beyond immediate client must show authority to act as "agent" for class members); *In re Vestra Indus.*, 82 B.R. 21, 22 (Bankr. D.S.C. 1987) (union failed to comply with Rule 2019 where it failed to show "authority" to act as agent on behalf of individual union members); *In re Continental Airlines Corp.*, 64 B.R. 874, 880 (Bankr. S.D. Tex. 1986) (same); *In re Electronic Theatre Rests. Corp.*, 57 B.R. 147, 148 (Bankr. N.D. Ohio 1986) (class action representative failed to comply with Rule 2019 because it did not show "authority" to act as an "agent" for individual class members); *In re Baldwin-United Corp.*, 52 B.R. 146, 148 (Bankr. S.D. Ohio 1985) (class action representative failed to comply with Rule 2019 because it failed to show that

it was an "agent" of the individual class members with "fiduciary duties" to class). *See also* 8 COLLIER ON BANKRUPTCY, ¶ 2019.03, 2019-3 to 2019-5 (15th ed. 1989) ("Rule 2019 covers entities which *act in a fiduciary capacity* but which are not otherwise subject to the control of the court.") (emphasis added).

28.     In sum, the plain meaning of the words used in Bankruptcy Rule 2019 compels the conclusion that the rule does not apply to the Noteholder Group regardless of whether the group colloquially refers to itself as the "Ad Hoc Group," the "Ad Hoc Committee," or the "Noteholder Group."

**D.     The Origins of Bankruptcy Rule 2019 Confirm that the Noteholder Group Is Not a "Committee" Within the Meaning of the Rule**

29.     When a "statute's language is plain," there is no reason to look behind the statute to discern Congressional intent.  United States v. Ron Pair Enterprise, 489 U.S. 235, 241 (1989). This is even more of a truism when interpreting a rule promulgated by the Supreme Court itself. See 28 U.S.C. § 2075 ("The Supreme Court shall have the power to prescribe by general rules ... the practice and procedure in cases under title 11.").  Nevertheless, a review of the origins of Bankruptcy Rule 2019 also confirms that the rule is not intended to apply to non-representative creditor groups.

30.     Bankruptcy Rule 2019 can be traced to the post-Depression era and several initiatives enacted to codify suggestions made in a report of the Securities Exchange Commission (the "SEC Report").9  The self-stated purpose of the SEC Report was to deal with the perceived harms caused by "protective committees" in the context of equity receiverships.

---

⁹ *See* Report on the Study And Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (1937).  A copy of certain excerpts of the SEC Report is attached hereto as Exhibit E.  The SEC Report was part of a larger set of reports delivered to Congress in the wake of the Depression that suggested numerous changes to

31.    "Protective committees" were privately formed committees that were often organized by insider groups dominated by the debtor or its investment bank and institutional investors who would solicit smaller investors to enter into a "deposit agreement" (or other instrument, which was rarely arms-length) whereby the smaller investor would deposit their securities and then the "committee" would negotiate with the debtor with little, if any, participation by the smaller holders who the committee represented. See Charles Jordan Tabb, The History of the Bankruptcy Laws in the United States, 3 Am. Bankr. Inst. L. Rev. 5, 30 (1995) (noting that the SEC Report involved "the investigation of protective and reorganization committees" and that "the essential conclusion of the report was that public investors needed protection from insiders in reorganization cases"); SEC Report at 586 (discussing deposit agreements). The SEC Report described the "deposit agreement" as follows:

> The deposit agreement has in many respects been the foundation of the control which committees dominated by the inside group have been able to obtain over the security holders. It is this agreement that has given the committees their unifying quality.... [T]hese agreements bind the depositor to go along with the Committee through thick and thin.

The "Conclusions and Recommendations" of the SEC Report advised (at 897):

> It is essential that renewed emphasis be given to the fact that representatives of security holders in reorganization occupy a fiduciary position.... The use of deposit agreements as means of preserving or obtaining arbitrary and exclusive control over security holders should not be permitted.

32.    Justice William O. Douglas, who served as the Chairman of the SEC that oversaw the SEC Report, echoed this concern in his testimony before Congress urging adoption of the SEC Report's recommendations:

> There is at present the problem and the necessity of affording to the individual investors of this country protection against a type of abuse and exploitation with which existing

---

the bankruptcy laws, enactment of the Trust Indenture Act and other changes to the federal securities laws.

legislation cannot cope—the abuses on the part of protective committees in reorganization....

[C]ommittees have been sponsored by the management of the debtor company or by the investment bankers, not by security holders or their authorized representatives.... As a consequence the debtors (which, in any realistic sense, means the corporate management) together with the investment bankers for the corporation have been able to control the effective formation and operation of protective committees. The individual investor has had little choice but to throw in his lot with committees sanctioned and sponsored by banker-management groups....

*I cannot emphasize too strongly that committee members are fiduciaries.* As such they owe exclusive loyalty to the class of investors that they represent. They owe that class diligence, efficiency, and single minded devotion.[10]

33.    Congress adopted the SEC Report's recommendation for legislation to combat the evils of "protective committees" by adopting § 210 and § 211 of Chapter X of the Bankruptcy Act, which subsequently were combined in the form of Rule 10-211 (under Chapter X), the text of which is virtually identical to Bankruptcy Rule 2019.[11]

34.    Further evidence of the "representative" concern regarding "protective committees" can also be found in the Trust Indenture Act of 1939, which, like Rule 2019, resulted from action to implement the SEC Report's recommendations to curtail abusive

---

[10] Comments of William O. Douglas to Congress, attached hereto as Exhibit F (emphasis added).

[11] *See* Chapter X, § 210 & Chapter X, Rule 10-211 ("Every person or committee representing more than one creditor or stockholder, and every indenture trustee, shall file a signed statement with the court setting forth (1) the names and addresses of such creditors or stockholder; (2) the nature and amounts of their claims or stock and the time of acquisition thereof unless they are alleged to have been acquired more than one year prior to the filing of the petition; (3) a recital of the pertinent fact and circumstances in connection with the employment of such person or indenture trustee, and, in the case of a committee, the name or names of the person or persons at those instance, directly or indirectly, such employment was arranged or the committee was organized or agreed to act; and (4) with reference to the time of the employment of such person, or the organization or formation of such committee, or the appearance in the case of any indenture trustee, a showing of the amounts of claims or stock owned by such person, the members of such committee or such indenture trustee, the times when acquired, the amounts paid therefor, and any sales or other disposition thereof.").

behavior by protective committees. the Trust Indenture Act prohibits any provision in an indenture from impairing any individual bondholders' right to payment of principal and interest. *See* 15 U.S.C. § 77ppp(b). This provision was specifically enacted to curtail so-called "majority action clauses" in indentures that were used by "protective committees" to negotiate out-of-court restructurings that were binding upon all bondholders. *See In re Multicanal*, 307 B.R. 386, 388-89 (Bankr. S.D.N.Y. 2004) ("One purpose of the [Trust Indenture Act] was to regulate and reform prior practice whereby indentures contained provisions that permitted a group of bondholders, often controlled by insiders, to agree to amendments to the indenture that affected the rights of other holders -- so-called "majority" or "collective" action clauses."

35. Thus, the origins of Bankruptcy Rule 2019 confirm that the term "committee" is focused on true committees that stand in a fiduciary and representative capacity and have the ability to bind other creditors in the same class. Nothing in the history of the rule suggests that it should apply to informal groups that gather for the purpose of sharing expenses and conveniently speaking with one voice in a bankruptcy proceeding and do not purport to represent any party's interest other than the individual interests of the members of such group. The essential concern for the manipulation of small investors by a "committee" that purportedly represents their interests is simply not present in such circumstances, let alone where, as here, the Noteholder Group represents more than 95% of the principal amount of the securities at issue.

E. *Northwest Airlines* **Was Wrongly Decided and Is Distinguishable in Any Event**

36. Perhaps the best proof that Bankruptcy Rule 2019 means exactly what it says is the fact that, prior to the *Northwest Airlines* slip opinions earlier this year, no published decision in the *70 years* that Rule 2019 (or its predecessor) has been on the books has ever ordered a non-fiduciary creditor group such as the Noteholder Group to make public disclosure of the confidential and highly proprietary commercial information that Scopac demands here.

37.    *Northwest Airlines* presented a situation of a group of shareholders holding only 27% of the debtor's outstanding stock that sought to negotiate improved treatment for shareholders generally.  *See In re Northwest Airlines Corp.*, case no. 05-17930, slip op. (Bankr. S.D.N.Y. Feb. 26, 2007), *appeal pending* ("*Northwest I*"), & *In re Northwest Airlines Corp.*, case no. 05-17930, slip op. (Bankr. S.D.N.Y. Mar. 9, 2007), *appeal pending* ("*Northwest II*").  In *Northwest I*, the court concluded that the "Ad-hoc Committee of Equity Holders" was required to file a Rule 2019 Statement because "the members purport to speak for a group and implicitly ask the court and other parties to give their positions a degree of credibility appropriate to a unified group with large holdings."  Slip op. at 5.  In *Northwest II*, the court denied the ad hoc committee's motion to file certain confidential and proprietary information under seal pursuant to Bankruptcy Code § 107(b), because "Rule 2019 protects other members of the group -- here, the shareholders -- and informs them where a committee is coming from by requiring full disclosure."  Slip op. at 7.

38.    The *Northwest* decisions are wrongly decided because the court wrongly interpreted the plain meaning of Bankruptcy Rule 2019.  Moreover, it simply cannot be the case that, as Scopac and the *Northwest* decisions assert, the test for whether any group of creditors is a "committee" under Rule 2019 is whether a creditor group wishes to be "taken seriously" by the bankruptcy court and colloquially calls itself a "committee."  This logic suggests that creditors who are not members of a creditor group do not deserve to be "taken seriously," a remarkable proposition that would turn the bankruptcy world on its head.  Every party-in-interest wants to be considered seriously in bankruptcy.  This logic also suggests that two Noteholders holding $10,000,000 in claims who decide to call themselves a "committee" should be taken more seriously than a group of Noteholders holding almost $700,000,000 in claims that decides to call

itself a "group." It is not the self-labeling that is important here, it is whether the group is a "committee" as that term is used in Bankruptcy Rule 2019. The Noteholder Group / Ad Hoc Committee, regardless of what it calls itself, is simply not a "committee" within the meaning of Rule 2019.

39.     In any event, the *Northwest* decisions are also plainly distinguishable.

40.     *First*, the members of the *Northwest* group actively sought to be appointed as an official committee of equity security holders in the case but were repeatedly turned down by the United States Trustee and the Court. Thus, unlike the Noteholder Group, it can be argued that the *Northwest* group effectively announced its desire to serve in a representative and fiduciary capacity on behalf of other equity holders.

41.     *Second*, the *Northwest* group held only 27% of the securities in question. This led the court to be concerned that a group would appear to be representing an entire class of which the group was only a small part: "other shareholders have a right to information as to Committee member purchases and sales so that they can make an informed decision whether this Committee will represent their interests or whether they should consider forming a *more broadly based* committee of their own." *Northwest II*, slip op. at 7. Here, the Noteholder Group holds more than 95% in outstanding principal amount of the Timber Notes. Even if the one or two Noteholders not in the group had a concern, it would obviously be impossible for them to form a "more broadly based" group of their own. In addition, they remain welcome to join the Noteholder Group at any time should they feel a pressing need to have their particular viewpoints included as part of group discussions.

42.     *Third*, the *Northwest* case involves a much more complicated capital structure. Members of the *Northwest* group admittedly "own a very significant amount of debt" in addition

to their equity interests, "a fact that might raise questions as to divided loyalties." *Id.* at 8. Here, on the other hand, there are no divided loyalties and no secrets: the members of the Noteholder Group own Timber Notes, nothing else.

43. *Fourth*, the *Northwest* group hoped to increase its leverage by seeking to negotiate the recovery for the entire class of shareholders, even though the members of the *Northwest* group did not even hold enough shares to block a plan, let alone the number of shares necessary for class approval of a plan. Here, the members of the Noteholder Group are easily a majority in number of Noteholders and hold more than 95% in aggregate principal amount of the Timber Notes. Their vote alone will be determinative of whether the class of Timber Notes accepts or rejects a plan and they do not need (and do not want) the appearance of representing others in order to give the group any additional voting power.

44. *Fifth*, Northwest Airlines asserts that it is insolvent, thus putting the ad hoc shareholder group in the position of fighting for any recovery at all in the case. This fight would inevitably be bolstered by the appearance that the group represented the entire class of shareholders and, therefore, could deliver plan consents to a negotiated deal. Scopac, on the other hand, has asserted from the beginning that it is solvent and, therefore, the Noteholders are entitled to full recovery. As a result, the Noteholder Group does not need the appearance of representing any larger constituency in order to negotiate an appropriate recovery for its members.

45. *Sixth*, the *Northwest* court believed that disclosure would serve the important public purpose of providing valuable information to the substantial majority of shareholders who were not members of the ad hoc shareholder group. Here, there is no important public purpose to be served. The members of the Noteholder Group already are the substantial majority of the

Noteholders (in both amount and number) and *they do not want to know* the individualized details of each other's holdings.

46.     Thus, neither the plain meaning of Bankruptcy Rule 2019, the history of Rule 2019 nor the *Northwest* decisions present any basis to consider the Noteholder Group a "committee" within the meaning of the rule.

## II.    BANKRUPTCY RULE 2019 CANNOT BE USED AS A SWORD TO ABRIDGE THE NOTEHOLDER GROUP'S SUBSTANTIVE RIGHTS UNDER THE BANKRUPTCY CODE AND THE UNITED STATES CONSTITUTION

47.     Scopac's 2019 Motion requests an order "stating that the Court will refuse to further hear the Ad Hoc Committee unless and until it files an adequate verified Rule 2019 statement." 2019 Motion ¶ 18. Even if the Court were to determine that the term "committee" under Bankruptcy Rule 2019 somehow encompasses the Noteholder Group, Rule 2019 cannot be applied in the manner that Scopac seeks.

48.     To begin with, Bankruptcy Rule 1001 mandates that the Bankruptcy Rules "shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding." As discussed below, Scopac's 2019 Motion has been brought for a highly improper purpose that would abridge several fundamental rights of the members of the Noteholder Group; therefore, construing the rule as Scopac suggests would not be "just." Scopac's misuse of Rule 2019 has also impaired the "speedy and inexpensive" resolution of this case by diverting the parties' attention from the essential business of reorganization. *See In re Shank*, 315 B.R. 799, 812 (Bankr. N.D. Ga. 2004) (citing Bankruptcy Rule 1001 to overrule debtor's objection that claims should be denied because they did not provide information expressly required by Bankruptcy Rule 3001 and stating that "[a] bankruptcy case imposes burdens on creditors.... But that injury need not be compounded by imposing unnecessary costs on creditors who desire to

participate fairly in the process. Rule 1001's directive requires a bankruptcy court to apply the bankruptcy rules to permit creditors to realize their fair share in a bankruptcy case without unnecessary expense.").

49.     Even more fundamentally, Congress has specifically mandated that the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075.[12] The Fifth Circuit has held that this mandate also preserves the equitable jurisprudence of the bankruptcy courts from impairment by the Bankruptcy Rules. *See In re Mobile Steel Co.* 563 F.2d 692, 699 (5th Cir. 1977). Accordingly, courts will not apply the Bankruptcy Rules where such application would violate a substantive Bankruptcy Code provision. *See Caudill v N.C. Mach., Inc. (In re American Eagle Mfg.)*, 231 B.R. 320 (B.A.P. 9th Cir. 1999) (Bankruptcy Rule 2003(d) violates 28 U.S.C. § 2075 because its ten-day period unreasonably frustrates substantive rights established by Bankruptcy Code § 702 and creates unwarranted bias towards invalidating trustee election.); *In re Barnes*, 308 B.R. 77 (Bankr. D. Colo. 2004) (pursuant to 28 U.S.C. § 2075, Bankruptcy Rule 9006(b) could not override substantive provisions of Bankruptcy Code § 1121(e) to extend exclusivity period beyond 160 day deadline).

50.     Scopac's efforts to bar the Noteholder Group from further participation in this case violate at least four fundamental rights of the Noteholder Group's members.

---

[12] The mandate of § 2075 is a crucial historical difference between the application of Rule 2019 today and its predecessors that emerged from the SEC Report under the former Bankruptcy Act.

> Bankruptcy procedure was governed in substantial part by many sections of the 1898 Act.... In 1964, Congress authorized the promulgation of rules of bankruptcy procedure by the Supreme Court.... The rules superseded inconsistent statutory provisions, which was quite important under the Act, given its detailed procedural provisions. Today the situation is reversed, rules cannot supersede a statute.

Tabb, *supra* at 31.

51.  *First*, the most fundamental policy underlying U.S. bankruptcy law is the equality of treatment of creditors.  *See Board of Directors of Multicanal*, 314 B.R. 486, 518-19 (Bankr. S.D.N.Y. 2004) ("The principle of equality between identically situated creditors is fundamental under U.S. insolvency law."); Bankruptcy Code § 1129(b) (prohibiting discrimination in chapter 11 plans).  At an even more fundamental level, the U.S. Constitution guarantees "equal protection" under the laws of the United States.  *See* U.S. CONST. amend. V & XIV.  Scopac's 2019 Motion seeks to deny to the members of the Noteholder Group both the equality of treatment and the equal protection to which they are entitled.

52.  *Second*, the objective of Scopac's discrimination is to use this Court's jurisdiction to terminate the Noteholder Group's opportunity to be heard in this bankruptcy case.  Not only does this impermissibly infringe upon the Noteholder Group members' fundamental rights to participate in bankruptcy under Bankruptcy Code § 1109(b), it also violates the most basic Constitutional due process protections -- the opportunity and right to be heard before a court takes action that could affect a party's rights.  *See* U.S. CONST. amend. V ("No person shall ... be deprived of life, liberty or property without due process of law."); *Multicanal*, 314 B.R. at 503 (holding that the key issue in recognizing foreign insolvency is whether due process, including notice and opportunity to be heard, were provided in bankruptcy proceeding).

53.  *Third*, the property rights at issue here are those of a secured creditor, which are property rights that are protected by the Takings Clause of the Fifth Amendment against governmental action.  *See* U.S. CONST. amend. V ("[N]or shall private property be taken for public use without just compensation."); *In re Treco*, 240 F.3d 148, 158-60 (2d Cir. 2000) ("security interests have been recognized as property rights protected by our Constitution's prohibition against takings without just compensation.").  Plainly stated, Scopac seeks an order

that would violate the Fifth Amendment by precluding the Noteholder Group from protecting the property rights of its members.

54.     *Fourth*, the Noteholder Group's members also have the right to maintain the confidentiality of their proprietary commercial information as recognized by, among other legal sources, Bankruptcy Code § 107(b).  While disclosure of confidential information can sometimes be compelled in litigation where the information is actually relevant to an issue in dispute, such disclosure is invariably done pursuant to a protective order.  Scopac's ultimatum that the Noteholder Group publicly disclose information that has no relevance to any dispute between Scopac and the Noteholder Group improperly abridges the Noteholder Group's members' property rights and liberty interests in their confidential proprietary information, which are protected by the Constitution's due process guarantee and the First Amendment freedom of speech guaranty, which includes the right not to speak. *See Int'l Dairy Foods Assoc. v. Amestoy*, 92 F.3d 67, 71-72 (2d Cir. 1996) (statute compelling disclosure of commercial information infringed upon defendants companies' First Amendment "right not to speak"); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (stating that "the First Amendment's [protection] against state action includes both the right to speak freely and the right to refrain from speaking at all.").

## III.    SCOPAC IS INVOKING BANKRUPTCY RULE 2019 FOR IMPROPER PURPOSES AND THE COURT HAS DISCRETION TO DENY SCOPAC THE RELIEF IT IS SEEKING

55.     Scopac seeks to use Bankruptcy Rule 2019 as a weapon against the Noteholder Group.  Scopac understands full well the confidential and highly proprietary commercial nature of the information it is demanding.  What Scopac is really seeking to do is nothing less than to silence the voices of Noteholders holding $695 million of the approximately $750 million in claims asserted against the Scopac estate.  This is not a good faith objective, to say the least. ***The***

*information that Scopac seeks has absolutely no relevant purpose for Scopac in this chapter 11 case.* It is well settled that a chapter 11 debtor cannot treat its similarly situated creditors differently based upon the price that they paid for their claims. *See* Hon. Robert D. Drain, *Are Bankruptcy Claims Subject to the Federal Securities Laws*, 10 AM. BANKR. INST. L. REV. 569, 578 (2002) ("[A] discounted purchase price is irrelevant to the ability to enforce the claim in full."); *In re Executive Office Ctrs.,* 96 B.R. 642, 649 (Bankr. W.D. La. 1988) (purchasers of bankruptcy claims at a discount succeed to the rights of the sellers).

56.     Moreover, any argument that this information might be relevant to explain the "motivations" of the Noteholder Group's members for the benefit of other parties-in-interest does not hold water.  What "motivates" creditors to enforce their claims is legally irrelevant, nor does Rule 2019 require any disclosure of "motivations."  In any event, such motivations are crystal clear -- the members of the Noteholder Group want to maximize recovery on their claims.[13]

57.     Thus, it is abundantly evident that Scopac has resorted to its pretextual 2019 Motion for the purpose of harassing the Noteholder Group by seeking the disclosure of confidential information that Scopac has no legitimate use for and that has not been requested by any member of the Noteholder class that Scopac asserts that the Noteholder Group supposedly "represents."

58.     Even if the Court were to determine that Rule 2019's text applied to the Noteholder Group and did not violate 28 U.S.C. § 2075, the rule is clearly discretionary and the Court should exercise its discretion to protect the Noteholder Group from the unnecessary disclosure of highly confidential and proprietary information that can serve no useful purpose in

___

[13] Some have argued that disclosure of holdings can be useful in cases like *Northwest* where the debtor's capital structure includes numerous levels for investor participation, which can lead to conflicting motivations.  Even if this were a legitimate concern, it simply is not an issue in this case for the reasons discussed *supra* in paragraph 42.

these proceedings.  Bankruptcy Rule 2019(b) only provides that the court "may" order various remedies for a failure to comply with Rule 2019, not that it "shall" order such remedies.  *See Kaiser Aluminum Corp.*, 327 B.R. at 559 ("It has been recognized that Rule 2019 need not always be strictly applied."); *In re Hudson Shipbuilders*, No. Civ. S.84-0757, 1985 U.S. Dist. LEXIS 17654, at *14 (S.D. Miss. July 22, 1985) (holding that "Bankruptcy Rule 2019(b) affords the court the discretion, and does not mandate" that the court must order a remedy).

59.    The Court also has the power under Bankruptcy Code § 105 to enter an order protecting the Noteholder Group members from the unwarranted application of Rule 2019, particularly where it is being invoked by Scopac in a manner completely inconsistent with the rule's actual purpose.  *See In re I. G. Servs. Ltd.*, 244 B.R. 377, 389 (Bankr. W.D. Tex. 2000), *rev'd on other grounds*, 263 B.R. 505 (W.D. Tex. 2000) (holding that § 105 provided power to protect party against application of Rule 2019 where application of the rule did not serve the purpose of protecting against improper participation in bankruptcy proceedings).  At bottom, Bankruptcy Rule 2019 is designed to protect investors, not debtors.  *See id.* at 389 ("The only interest that the court might have in enforcing the letter of Rule 2019 is to protect these very investors.").  Where, as here, application of Rule 2019 would not serve the purpose of protecting investors (because investors holding 97.41% in outstanding principal amount of the Timber Notes are already part of the Noteholder Group and the remainder are free to join at any time), there is no rational purpose to apply it.  *See id.* at 389-90 (denying motion by press to require strict public disclosure of Rule 2019 information because rule was designed to protect investor participation in bankruptcy, not the press); *Kaiser Aluminum Corp.*, 327 B.R. at 559.  Accordingly, even if the Noteholder Group were a "committee" within the meaning of Rule 2019, the Court should exercise its discretion not to enforce the rule as the 2019 Motion requests.

## CONCLUSION

60.     The Noteholder Group respectfully requests that the Court deny the 2019 Motion and grant the Noteholder Group such other relief as the Court deems just and fair under the circumstances.

Dated:  April 6, 2007                    BRACEWELL & GIULIANI LLP

                                         Evan D. Flaschen (304232)
                                         Gregory W. Nye (300188)
                                         Kurt A. Mayr (425858)
                                         One Goodwin Square
                                         225 Asylum Street, 26th Floor
                                         Hartford, CT 06103
                                         Telephone: (860) 947-9000
                                         Facsimile: (860) 760-6789
                                         E-Mail: evan.flaschen@bgllp.com

                                         and

                                         GARDERE WYNNE SEWELL LLP


                                         By:    /s/ John. P Melko
                                              John P. Melko (13919600)
                                              1000 Louisiana, Suite 3400
                                              Houston, TX 77002-5007
                                              Telephone: (713) 276-5727
                                              Facsimile: (713) 276-6727

                                         *Attorneys for the Ad Hoc Group of
                                         Timber Noteholders*


### CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of April, 2007 a true and correct copy of the foregoing instrument was forwarded to all parties listed on the attached Service list

                                         /s/ John P. Melko
                                         John P. Melko

**Master Service List**
**Scotia Development, LLC, et al**
**Exhibit "1"**

**Debtor**
Gary L. Clark
Scotia Pacific LLC
125 Main Street
Scotia, CA 95565-0000

**Debtor's Attorneys**
John F. Higgins
James Matthew Vaughn
Porter & Hedges, L.L.P.
1000 Main Street, 36th Floor
Houston, TX 77002

Kathryn Coleman
Gibson Dunn & Crutcher LLP
One Montgomery Street, Suite 3100
San Francisco, CA 94104

Eric J. Fromme
Gibson Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, CA 92614

**Debtors**
Scotia Development LLC
921 N. Chaparral, Suite 104
Corpus Christi, TX 78401

Salmon Creek LLC
P.O. Box 37
Scotia, CA 95565

Scotia Inn Inc.
100 Main Street
Scotia, CA 95565

Britt Lumber Co., Inc.
449 15th Street, Suite 401
Oakland, CA 94612

The Pacific Lumber Company
P.O. Box 37
Scotia, CA 95565

**Debtors' Counsel**
Shelby A. Jordan
Harlin C. Womble, Jr.
Nathaniel Peter Holzer
Jordan, Hyden, Womble, Culbreth & Holzer
500 N. Shoreline Blvd., Suite 900
Corpus Christi, TX 78471

Jeffrey Schaffer
Gary M. Kaplan
Howard Rice Nemerovski, et al.
Three Embarcadero Center, 7th Floor
San Francisco, CA 94111

**U.S. Trustee**
United States Trustee
606 N. Carancahua, Suite 1107
Corpus Christi, TX 78476

**Committee of Unsecured Creditors**
Environmental Protection Information Center,
Interim Chairman
c/o Sharon E. Duggan
370 Grand Avenue, Suite 5
Oakland, CA 94610

John Miller, Interim City Manager
City of Rio Dell
675 Wildwood Ave.
Rio Dell, CA 95562

Pacific Coast Trading, Inc.
c/o Miles T. Crail
1690 Green Ash Road
Reno, NV 89511

United Steelworkers
c/o David Jury
Five Gateway Center, Suite 807
Pittsburgh, PA 15222

Steve Cave
2332 Wrigley Road
Eureka, CA 95503

**Counsel for Committee of Unsecured Creditors**
Maxim B. Litvak
John D. Fiero
Pachulski Stang Ziehl Young Jones & Weintraub
150 California Street, 15th Floor
San Francisco, CA 94111-4500

**Governmental Entities**
Susan Combs, Comptroller
LBJ State Office Bldg.
111 E. 17th Street
P.O. Box 13528
Austin, TX 78711

Securities Exchange Commission
Attn: Merri Jo Gillette, Regional Director
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604-2908

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Internal Revenue Service
1919 Smith Street
Stop 5022 HOU
Houston, TX 77002

U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

U.S. Attorney's Office
Southern District
Donald J. Degabrielle, Jr.
Judy A. Robbins
P.O. Box 61129
Houston, TX 77208-1129

Kimberly A. Walsh
Assistant Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX 78711-2548
**Counsel for The Comptroller of Public Accounts
of the State of Texas**

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880-0001
Sacramento, CA 94280-0001

Michael M. Stahl
Lisa Lund
U.S. Environmental Protection Agency
Office of Compliance
1200 Pennsylvania Avenue, NW
Washington, DC 20640-0001

Walker Smith
Randy Hill
U.S. Environmental Protection Agency
Office of Civil Enforcement
1200 Pennsylvania Avenue, NW
Washington, DC 20640-0001

Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
401 M Street, S.W.
Washington, DC 20460

Arizona Department of Revenue
P.O. Box 29079
Phoenix, AZ 85038-9079

State of California
Franchise Tax Board
P.O. Box 2952
Sacramento, CA 95812-2952

Kentucky Revenue Cabinet
Department of Revenue
200 Fair Oaks Lane
Frankfort KY 40620

Louisiana Department of Revenue
P.O. Box 91011
Baton Rouge, LA 70821-9011

Michigan Department of Treasury
430 W. Allegan Street
Lansing, MI 48922

Missouri Director of Revenue
P.O. Box 3020
Jefferson City, MO 65105-3020

Corporation Income Tax
P.O. Box 700
Jefferson City, MO 65105-0700

Ohio Treasurer of State
Ohio Department of Taxation
P.O. Box 804
Columbus, OH 43216-0804

West Virginia State Tax Department
Bankruptcy Unit
P.O. Box 766
Charleston, WV 25323-0766

Stephanie Tom Coupe
State of California
Department of Fish and Game
1416 Ninth Street, 12th Floor
Sacramento, CA 95814
**Department of Fish and Game**

Department of Fish and Wildlife Service
Attn: Anne Badgely, Regional Director
911 N.E. 11th Avenue
Portland, OR 97232
**U.S. Department of the Interior**

Pacific Region, Region 1 Offices
Attn: Ren Lohoefener, Regional Director
911 NE 11th Ave
Portland, OR 97232

California and Nevada Operations:
Steve Thompson, California and Nevada Operations
(CNO) Manager
Kenneth McDermond, Deputy Operations Manager
2800 Cottage Way
Sacramento, CA 95825
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

National Marine Fisheries Services
US Department of Commerce
Attn: Dr. William Hogarth
        Deanna Harwood, Office of Counsel
501 W. Ocean Blvd., Suite 4200
Long Beach, CA 90802
**U.S. Department of Commerce National Oceanic**
**and Atmospheric Administration; National**
**Marine Fisheries Service, Southwest Regional**
**Office**

Lisa Roberts
John Clancey
1655 Heindon Road
Arcata, CA 95521
**U.S. Department of Commerce National Oceanic**
**and Atmospheric Administration; National**
**Marine Fisheries Service**

The Resources Agency
Secretary of Resources
Attn: Mary Nichols
1416 Ninth Street, Suite 1131
Sacramento, CA 95814

Department of Forestry and Fire Protection
Norman Hill, Chief Counsel
Ginevra Chandler, Chief Counsel
P.O. Box 944246
Sacramento, CA 94244-2460

Tom Osipovich, Unit Chief
Joe Fassler, Forest Inspector
118 S. Fortuna Boulevard
Fortuna, CA 95540
**State of California – Department of Forestry and**
**Fire Protection, Humboldt Del Norte Unit**

Wildlife Conservation Board
W. John Schmidt, Executive Director
**RETURNED MAIL**

Wildlife Conservation Board
John P. Donnelly, Executive Director
1807 13th Street, Suite 103
Sacramento, CA 95814
**State of California; Wildlife Conservation Board**

Sacramento Fish & Wildlife Office
Lynn Cox, Deputy Solicitor General
2800 Cottage Way, Room W-2605
Sacramento, CA 95825
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

Arcata Fish & Wildlife Office
Mike Long
Amedee Brickey
James Bond
1655 Heindon Road
Arcata, CA 95521
**U.S. Department of the Interior**
**U.S. Fish and Wildlife Service**

Ted Cobb, Assistant Chief Counsel
1001 "I" Street
P.O. Box 100
Sacramento, CA 95814
**California Environmental Protection Agency**
**State Water Resources Control Board**

Robert Klamt, Chief, Timber Harvest Division
5550 Skylane Boulevard, Suite A
Santa Rosa, CA 95403
**California Environmental Protection Agency**
**State Water Resources Control Board**
**North Coast Regional Water Control Board**

Rick Martin, Director
North Coast Unified Air Quality Mgmt. District
2300 Myrtle Avenue
Eureka, CA 95501
**North Coast Unified Air Quality Management**
**District**

California Forest Products Commission
Attn: Donn Zea, President
853 Lincoln Way, Suite 208
Auburn, CA 95603

Alan Tenenbaum
National Bankruptcy Coordinator
Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC 20044
**Counsel for the United States on behalf of the**
**Department of the Interior and NOAA**

Margarita Padilla
Mary Hackenbracht
Irene Tamura
Deputy Attorney General
Office of the California Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
**Counsel for the California Department of Fish**
**and Game, the California Department of Forestry**
**and Fire Protection, the North Coast Region**
**Water Quality Control Board, the California State**
**Water Resources Control Board and the**
**California Wildlife Conservation Board**

Michael Neville
Tiffany Yee
Deputy Attorney General
Office of the California Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
**Counsel for the California Department of Fish**
**and Game, the California Department of Forestry**
**and Fire Protection, the North Coast Region**
**Water Quality Control Board, the California State**
**Water Resources Control Board and the**
**California Wildlife Conservation Board**

**Secured Creditors**
The Bank of New York Trust Company, N.A.
John Stohlmann
600 North Pearl St., Suite 420
Dallas, TX 75201
**Indenture Trustee**

Bank of America
Clara Yang Strand
333 South Hope Street
Los Angeles, CA 90071

**Counsel to Secured Creditors**
Evan M. Jones
Brian M. Metcalf
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899
**Counsel for Bank of America**

Evan D. Flaschen
Bracewell & Giuliani LLP
One Goodwin Square
225 Asylum Street, 26th Floor
Hartford CT 06103
**Counsel to Ad Hoc Committee of Bondholders**

Rhett G. Campbell
Diana M. Woodman
Matthew R. Reed
Thompson & Knight LLP
333 Clay Street, Suite 3300
Houston, TX 77002
**Counsel for The Bank of New York Trust**
**Company, N.A., Indenture Trustee**

Ira L. Herman
Thompson & Knight LLP
919 Third Avenue, 39th Floor
New York, NY 10022-3915
**Counsel for The Bank of New York Trust**
**Company, N.A., Indenture Trustee**

**Twenty Largest Unsecured Creditors**
Aetna – Middletown
11300 Tomahawk Creek Parkway, Suite 300
Leawood, KS 66211

Blair Forest Consulting
1225 Central Avenue #3
Mckinleyville, CA 95519

California Forest Products Commission
853 Lincoln Way, Suite 208
Auburn, CA 95603

D.R. Systems
2599 McCullough Road
Nanaimo B.C.
Canada

David Gillott
Tall Trees Forestry
P.O. Box 413
Blue Lake, CA 95525

Environmental Protection Information Ctr.
c/o Brian Gaffney
Law Offices of Brian Gaffney
605 Market Street, Suite 505
San Francisco, CA  94105

Hohman & Associates
P.O. Box 733
Hydesville, CA  95547-0733

Humboldt Del Norte IPA
3100 Edgewood Road
Eureka, CA  95502

Humboldt Fish Action Council
c/o Fisheries Biology Department
Humboldt State University
1 Harpst Street
Arcata, CA 95519

IBM Corporation
275 Viger East
Montreal, QC
Canada

Laco Associates
21 West 4th Street
P.O. Box 1023
Eureka, CA  95501

Les Schwab Tire Center
275 N. Fortuna Bl.
Fortuna, CA  95540

Maxey Forestry
P.O. Box 4858
Arcata, CA  95518

Metlife
Dept. CH 10579
Palatine, IL  60055-0579

National Benefit Resources
Attn. Michael Ann Johnson
16004 SW Tualatin-Sherwood Rd., #447
Portland, OR 97140

NCASI
P.O. Box 13318
Research Triangle Park, NC  279909-3318

Steve Cave, et al.
c/o William G. Bertain
Law Offices of William G. Bertain
1310 Sixth Street
Eureka, CA  95501

SWRCB
5550 Skylane Blvd. #A
Santa Rosa, CA  95403

Timberland Res. Consultants
165 S. Fortuna Bl. Suite 4
Fortuna, CA  95540

United Steelworkers of America, et al.
c/o Jonathan Weissglass
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, CA 94108

**Interested Parties and Parties Requesting Notice**
Alan Gover
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036-2787
**Counsel for MAXXAM Group, Inc.**

Craig H. Averch
Roberto J. Kampfner
White & Case LLP
633 West Fifth Street, 19th Floor
Los Angeles, CA 90071
**Counsel for MAXXAM Group, Inc.**

Vincent E. Lazar
Michael S. Terrien
Phillip W. Nelson
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611
**Counsel for LaSalle Bank, N.A. and LaSalle
Business Credit, LLC**

Vicky Namken
IBM Corporation
13800 Diplomat
Dallas, TX 75234
**Counsel for International Business Machines
Credit LLC and International Business Machines
Corporation**

Bruce G. MacIntyre
Perkins Coie LLP
1201 Third Avenue, 40th Floor
Seattle, WA 98101-3099
**Counsel for Green Diamond Resource Company**

Andrew Herenstein
Patrick Bartels
Quandrangle Group LLC
375 Park Avenue, 14th Floor
New York, NY 10152

David Neier
Winston & Strawn LLP
200 Park Avenue
New York, NY 10166
**Counsel for Marathon Structured Finance Fund L.P.**

Eric E. Sagerman
Winston & Strawn
333 South Grand avenue, Suite 3800
Los Angeles, CA 90071
**Counsel for Marathon Structured Finance Fund L.P.**

John D. Penn
Haynes and Boone LLP
201 Main Street, Suite 2200
Fort Worth, TX 76102
**Counsel for Marathon Structured Finance Fund L.P.**

David E. Martinek
Dun & Martinek LLP
2313 I Street
Eureka, CA 95501
**Counsel for City of Rio Dell**

Steven H. Felderstein
Paul J. Pascuzzi
Felderstein Fitzgerald Willoughby & Pascuzzi
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
**Counsel for State of California ex rel. Edmund G. Brown, Jr., A.G., CA Resources Agency, CA Dept. of Fish & Game, CA Dept. of Forestry & Fire Protection, North Coast Region Water Quality Control Board, CA State Water Resources Control Board, and CA Wildlife Conservation Board**

Michael A. Axel
KeyBank National Association
127 Public Square, Second Floor
Cleveland, OH 44114-1306
**Counsel for Key Equipment Finance Inc.**

Phillip W. Nelson
Jenner and Block LLP
330 North Wabash Ave.
Chicago, IL 60611

North Coast Unified Air Quality
Rick Martin, APCO
c/o Nancy Diamond
Law Offices of Nancy Diamond
822 G Street, Suite 3
Arcata, CA 95521

Pacific Forest Trust
101-A O-Riley Avenue
San Francisco, CA 94129

Tiffany Yee
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102

Chanin Capital Partners LLC
c/o Brent C. Williams
330 Madison Ave.
New York, NY 10017

Dallas County
Linebarger Goggan Blair & Sampson
2323 Bryant St., Suite 1600
Dallas, TX 85201

Development Specialists Inc. (DSI)
345 California St., Suite 1150
San Francisco, CA 94104-2664

Mattole Restoration Council
P.O. Box 160
Petrolia, CA 95558

Ray Miller
3147 Dolbeer St., #13
Eureka, CA 95503

John C. Morrison
1890 Loop Road
Fortuna, CA 85540

Ira L. Herman
Thompson & Knight
919 Third Ave., 39th Floor
New York, NY 10022-3915

Humboldt Watershed Council
Post Office Box 1301
Eureka, CA 95502

Lewis Logging
3908 Rohnerville Rd.
Fortuna, CA 85540

James  A. Shepherd
Office of the U. S. Trustee
235 Pine St., Suite 700
San Francisco, CA 94708