## EXHIBIT H



United States District Court
Southern District of Texas
FILED

APR 24 2007

Michael N. Milby, Clerk

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF

## TEXAS

CASE NO.:          07-20027

STYLE:             Scotia Pacific Co., LLC

HEARD ON:          04/10/07

FILED ON:          04/24/07

NO. OF PAGES:      102

JUDGE:             Richard S. Schmidt

COURT REPORTER: Lori Cayce

ORIGINAL

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION

United States Courts
Southern District of Texas
FILED

APR 2 4 2007

Michael N. Milby, Clerk of Court

IN RE: SCOTIA DEVELOPMENT LLC,.      CASE NO. 07-20027
                              .
                              .      CORPUS CHRISTI, TEXAS
          DEBTOR.             .      TUESDAY, APRIL 10, 2007
                              .      11:03 A.M. TO 1:12 P.M.
. . . . . . . . . . . . . . .

MOTION HEARING

**SOME PARTIES APPEARING TELEPHONICALLY**

BEFORE THE HONORABLE RICHARD SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

Trinity Transcription Services
122 Trinity Oaks Circle
The Woodlands, TX 77381
281-296-2290

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF TEXAS

CORPUS CHRISTI DIVISION


IN RE: SCOTIA DEVELOPMENT LLC,.     CASE NO. 07-20027

                             .     CORPUS CHRISTI, TEXAS
         DEBTOR.        .     TUESDAY, APRIL 10, 2007
                             .     11:03 A.M. TO 1:12 P.M.

. . . . . . . . . . . . . . . .


MOTION HEARING

### SOME PARTIES APPEARING TELEPHONEICALLY

BEFORE THE HONORABLE RICHARD SCHMIDT
UNITED STATES BANKRUPTCY JUDGE

Appearances:

For Scotia Pacific Company:     Kathryn A. Coleman, Esq.
                                  Eric J. Fromme, Esq.
                                  Robert Davis, Esq.
                                  Gibson, Dunn & Crutcher LLP
                                  200 Park Avenue
                                  New York, NY 10166-0193

                                  John F. Higgins, Esq.
                                  Robert Dakis, Esq.
                                  Porter & Hedges LLP
                                  Reliant Energy Plaza
                                  1000 Main Street, 36th Floor
                                  Houston, TX 77002

                                  Gary Clark, Esq.
                                  No Address Provided

Bank of New York Trust Co.:     Diana M. Woodman, Esq.
                                  Matt Reed, Esq.
                                  Thompson & Knight LLP
                                  333 Clay Street, Suite 3300
                                  Houston, TX 77002

```
Appearances (continued):

Official Committee of          John D. Fiero, Esq.
  Unsecured Creditors:         Maxim B. Litvak, Esq.
                               Pachulski Stang Ziehl Young
                                 Jones & Weintraub
                               150 California Street, 15th Floor
                               San Francisco, CA 94111-4500

Ad Hoc Committee of            Evan D. Flaschen, Esq.
  Timber Noteholders:          Kurt Mayr, Esq.
                               Bracewell & Giuliani, LLP
                               711 Louisiana Street, Suite 2300
                               Houston, TX 77002-2270

Ad Hoc Noteholders:            John P. Melko, Esq.
                               Gardere Wynne Sewell LLP
                               1000 Louisiana, Suite 3400
                               Houston, TX 77002-5007

For Pacific Lumber Company:    Shelby Jordan, Esq.
                               Peter Holzer, Esq.
                               No Address Provided

                               Frank Bacik, Esq.
                               The Pacific Lumber Company
                               No Address Provided

U.S. Trustee:                  Christine A. March, Esq.
                               Assistant United States Trustee
                               Office of the United States
                                 Trustee
                               606 No. Carancahua, Suite 1107
                               Corpus Christi, TX 78476

CSG Investments:               Roberto Kampfner, Esq.
                               Alan Gover, Esq.
                               White & Case LLP
                               No Address Provided

Bank of America:               Evan Jones, Esq.
                               O'Melveny & Myers
                               No Address Provided

California State Agencies:     Paul Pascuzzi, Esq.
                               Felderstein Fitzgerald & Pascuzzi
                               No Address Provided
```

Appearances (continued):

| | |
|---|---|
| Marathon Structured Finance Fund: | David Neier, Esq. Winston & Strauser No Address Provided |
| | John D. Penn, Esq. Haynes and Boone, LLP 201 Main Street, Suite 2200 Fort Worth, TX 76102-3126 |
| Interested Party: | Brian Lennon, Esq. Kirkland & Ellis, LLP No Address Provided |
| CSG Investments: | Jacob Cherner, Esq. CSG Investments No Address Provided |
| Avenue Capital Group: | Stephen Burnazian, Esq. Avenue Capital No Address Provided |
| Quadrangle Group: | Robert Burns, Esq. Quadrangle Group No Address Provided |
| Houlihan Lokey Howard & Zukin: | Todd Hanson, Esq. Houlihan Lokey Howard & Zukin No Address Provided |
| DE Shaw: | Sarah Johnson, Esq. DE Shaw No Address Provided |
| Maxxam, Inc. | Joli Pecht, Esq. Maxxam, Inc. No Address Provided |
| LaSalle Bank: | Mark W. Wege, Partner Bracewell & Giuliani, LLP 711 Louisiana Street, Suite 2300 Houston, TX 77002-2770 |
| Pension Benefit Guaranty Corporation | Theresa Betro, Esq. Pension Benefit Guaranty Corp. No Address Provided |

TRINITY TRANSCRIPTION SERVICES

Appearances (continued):

SIFFMAA & LLSTA:                    Matthew Barr, Esq.
                                    Peter Newman, Esq.
                                    Milbank Tweed Hadley & McCloy
                                    No Address Provided

Scotia Development, LLC:            Gary M. Kaplan, Esq.
                                    Howard, Rice, Nemerovski, Canady
                                    No Address Provided

Marathon Asset Management:          Richard K. Ronzetti, Esq.
                                    Marathon Asset Management
                                    No Address Provided

U.S. Department of Interior         Alan Tenenbaum, Esq.
   And Department of                U.S. Department of Justice
   Commerce:                        No Address Provided

Aurelius Capital Management:        Wei Wang, Esq.
                                    Aurelius Capital Management
                                    No Address Provided

Mendocino Forest Products:          Daniel Zazove, Esq.
                                    Perkins Cole LLP
                                    No Address Provided

Bond Holder:                        Ceki Aluf Medina Esq.
                                    EOS Partners
                                    No Address Provided

Court Recorder:                     Lori Cayce

Transcriber:                        Cheryl Hendershot
                                    Trinity Transcription Services
                                    122 Trinity Oaks Circle
                                    The Woodlands, TX 77381
                                    281-296-2290

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

**TRINITY TRANSCRIPTION SERVICES**

1

1      **Corpus Christi, Texas; Tuesday, April 10, 2007; 11:03 a.m.**

2         **(Some parties appearing telephonically)**

3            **THE COURT:**  Send in the call.

4      **(Pause)**

5            **THE COURT:**  All right.  I'm going to call everyone's

6   name.

7            Theresa Betro?

8            **MS. BETRO:**  Here, your Honor.

9            **THE COURT:**  Maxim Litvak?

10           **MR. LITVAK:**  Here, your Honor.

11           **THE COURT:**  Matthew Barr?

12           **MR. BARR:**  Here, your Honor.

13           **THE COURT:**  Even Flaschen?

14           **MR. FLASCHEN:**  Here, your Honor.

15           **THE COURT:**  Gary Kaplan?

16           **MR. KAPLAN:**  Here, your Honor.

17           **THE COURT:**  Evan Jones?

18           **MR. JONES:**  Here, your Honor.

19           **THE COURT:**  David Neier?

20           **MR. NEIER:**  Here, your Honor.

21           **THE COURT:**  Richard Ronzetti?

22           **MR. RONZETTI:**  Here, your Honor.

23           **THE COURT:**  Frank Bacik?

24           **MR. BACIK:**  Good morning, your Honor.  Present.

25           **THE COURT:**  Paul Pascuzzi?

**TRINITY TRANSCRIPTION SERVICES**

2

1          **MR. PASCUZZI:**  Here, your Honor.

2          **THE COURT:**  Alan Tenenbaum?

3          **MR. TENENBAUM:**  Good morning, your Honor.

4          **THE COURT:**  Brian Lennon?

5          **MR. LENNON:**  Present, your Honor.

6          **THE COURT:**  Diane [sic] Woodman?

7          **MS. WOODMAN:**  Here, your Honor.

8          **THE COURT:**  Matt Reed?

9          **MR. REED:**  Here, your Honor.

10         **THE COURT:**  Peter Newman?

11         **MR. NEWMAN:**  Here, your Honor.

12         **THE COURT:**  Molly Bogdan?

13         **OPERATOR:**  This is the Court Call Operator,

14   Ms. Bogdon has not dialed in yet.

15         **THE COURT:**  Anyone for Bank of America Securities?

16     **(No audible response)**

17         **THE COURT:**  No.  All right.

18         Wei Wang?

19         **MR. WANG:**  Here, your Honor.

20         **THE COURT:**  Joli Pecht?

21         **MS. PECHT:**  Present, your Honor.

22         **THE COURT:**  Sarah Johnson?

23         **MS. JOHNSON:**  Present, your Honor.

24         **THE COURT:**  Francine Brodowicz?

25     **(No audible response)**

3

1        **THE COURT:**  Daniel Zazove, or Zazove?

2        **MR. ZAZOVE:**  Present, your Honor.

3        **THE COURT:**  Jacob Cherner?

4        **MR. CHERNER:**  Present, your Honor.

5        **THE COURT:**  Stephen Burnazian?

6        **MR. BURNAZIAN:**  Here, your Honor.

7        **THE COURT:**  Alan Gover?

8        **MR. GOVER:**  Present, your Honor.

9        **THE COURT:**  Roberto Kampfner.

10       **MR. KAMPFNER:**  Here, your Honor.

11       **THE COURT:**  Gren Day?

12       **(No audible response)**

13       **THE COURT:**  Ceki Aluf Medina?

14       **MR. MEDINA:**  Present, your Honor.

15       **THE COURT:**  Robert Burns?

16       **MR. BURNS:**  Present, your Honor.

17       **THE COURT:**  And Todd Hanson?

18       **MR. HANSON:**  Present, your Honor.

19       **THE COURT:**  All right.  Anyone from Murray Capital

20    Management?

21       **(No audible response)**

22          **THE COURT:**  Anyone from Bank of America Securities?

23       **(No audible response)**

24          **THE COURT:**  Anyone else on the line?

25          **MR. CLARK:**  Yes, your Honor.  This is Gary Clark for

4

1    the Debtors.

2              **THE COURT:**  All right.  Go ahead, Mr. Holzer.

3              **MR. HOLZER:**  Pete Holzer, your Honor and Shelby

4    Jordan for Pacific Lumber and its subsidiaries, except Scopac.

5              **THE COURT:**  All right.

6              **MS. COLEMAN:**  Good morning, your Honor, Kathryn

7    Coleman, Eric Fromme, Robert Davis, Gibson, Dunn & Crutcher for

8    Debtor, Scotia Pacific.

9              **THE COURT:**  All right.

10             **MR. HIGGINS:**  John Higgins on behalf of Scopac, your

11   Honor.

12             **THE COURT:**  All right.

13             **MR. WEGE:**  Good morning, your Honor.  Mark Wege here

14   on behalf of LaSalle Bank.

15             **MR. FIERO**  John Fiero from Pachulski, Stang for the

16   Official Committee, your Honor.

17             **MR. PENN:**  John Penn on behalf of Marathon Structured

18   Finance.

19             **MS. MARCH:**  Your Honor, Christine March on behalf of

20   the United States Trustee.

21             **MR. MEYER:**  Good morning, your Honor.  Kurt Meyr,

22   Bracewell & Giuliani on behalf of the Noteholder Group.

23             **THE COURT:**  All right.

24             **MR. MELKO:**  Good morning, your Honor, John Melko on

25   behalf of the Ad Hoc Noteholder Group in Scopac.

5

1              **THE COURT:**  Okay.

2              **MR. HOLZER:**  We have a number of matters up this

3   morning, your Honor.  Pete Holzer for Pacific Lumber.

4              I guess with the Court's permission I'll take care of

5   passes and -- and unopposed orders first.

6              **THE COURT:**  All right.

7              **MR. HOLZER:**  And the first one taking in that order

8   is Docket Number 531 and 532.  Those are the two motions

9   related to the retention of Morris and Forester as Debtor's

10  Special Counsel.

11             By agreement we'd like to pass those to the April the

12  17th.

13             **THE COURT:**  April 17th.

14             **MR. HOLZER:**  Eleven o'clock.

15             **THE COURT:**  All right.

16             **MR. HOLZER:**  The next is Docket Number 534.  That's

17  the motion to reconstitute the committee by agreement.  We'd

18  like to pass that matter to April the 24th also at 11 o'clock.

19             **THE COURT:**  All right.

20             **MR. HOLZER:**  Dropping back then to Docket Number 506.

21  It's the Debtor's application to retain Pierce Baymiller as its

22  Human Resources Manager.

23             We've had some discussions with the Committee and,

24  based on my understanding, there are no objections.  I have an

25  order to present on that.

6

1          **THE COURT:**  Is that correct?

2          **MR. FIERO:**  Yes, your Honor.

3          **THE COURT:**  All right.  You may submit the order.

4          **MR. HOLZER:**  Your Honor, Docket Number 5-9-8, 598, is

5   the Pacific Lumber side motion to pay a secured pre-petition

6   and post-petition real estate ad valorem property taxes.

7          The U.S. Trustee asked me to clarify that for Pacific

8   Lumber that these taxes are all being paid to Humboldt County.

9   And with that, I believe there are no objections on Docket

10  Number 598.  I have an order.

11         **THE COURT:**  The Creditors Committee agree?

12         **MR. FIERO:**  Yes, your Honor.

13         **THE COURT:**  U.S. Trustee agree now?

14         **MS. MARCH:**  Yes, your Honor.

15         **THE COURT:**  All right.  Submit the order.

16     **(Pause)**

17         **MR. HOLZER:**  Continuing in the same -- the same way,

18  I believe I'd like to go to a matter that is -- is actually not

19  on the docket.  And this was Docket Number 4-9-4, and this was

20  the joint application to retain Deloitte Touche as the Debtor's

21  auditors.

22         And I understand there's -- there's no objections on

23  the Palco side to that order.  But I understand we have a

24  clarification on the Scopac side.

25         **MR. HIGGINS:**  We do, your Honor.  On the Scopac side,

7

1   and it's Docket Number 4-9-5 is the order that the Debtor

2   filed, your Honor, yesterday.

3          Scopac is retaining Deloitte to assist in the audit

4   for 12/31/06.  The audit -- engagement letter, excuse me, not

5   the audit, the engagement letters refer to who will be

6   responsible for directing the services of Deloitte.  And it

7   specifically provides that the Maxxam independent directors are

8   responsible for that.  That is because Maxxam is the SEC

9   registrant.

10          We've agreed to clarify on the record for the

11   noteholders that for any work related to the 2007 accounting

12   and/or audit services, that Deloitte will be reporting to the

13   board of managers of Scopac.

14          The only portion that relates to the Maxxam

15   independent directors is with respect to the '06 audit.

16          **THE COURT:**  All right.

17          **MR. FIERO:**  And with that, your Honor, there's no

18   other action needed by the Court on that order.

19          **THE COURT:**  All right.  Mr. Melko, is that correct?

20          **MR. MELKO:**  It is correct, your Honor.  It was a

21   little confusing, because as the Court, they have seen Scopac

22   was a public -- the monthly report and they've elected to stop

23   the public reporting, because the number of holders is -- is

24   under the threshold.

25          What's being done here is Deloitte is -- is going to

**TRINITY TRANSCRIPTION SERVICES**

8

1   do a consolidated audit.  And for that -- for those purposes

2   for '06, they will report to the audit committee of the public

3   reporting entity, which is the ultimate parent company, Maxxam.

4           **THE COURT:**  All right.  Thank you.

5           **MR. HOLZER:**  Your Honor, the next matter is the -- is

6   Docket Number 5-9-6.  This is the parallel taxes motion for

7   Scopac.

8           **MR. HIGGINS:**  Your Honor, we received one objection

9   from the Official Committee of Unsecured Creditors.  We've had

10  an opportunity to speak with the Creditors Committee.  And we

11  have suggested, your Honor, is that we will pass the portion of

12  the motion with respect to the timber yield taxes until April

13  24th to allow the parties to further discussion.

14          And there were no objections to the request for

15  authority to pay the pre-petition property taxes and the sales

16  and use taxes.

17          I've modified the proposed form of order to make --

18  to reflect that agreement.

19          **THE COURT:**  All right.

20          **MR. HIGGINS:**  May I?

21          **THE COURT:**  You may.  And the Court will note for the

22  record the nodding of the Creditors Committee lawyer.

23          **MR. FIERO:**  Yes, your Honor.

24          **MR. HOLZER:**  I think, Judge, we have basically three

25  contested issues spread over the docket.  And I'll just go down

**TRINITY TRANSCRIPTION SERVICES**

9

1    the docket in order.

2            Docket Number 7 is Pacific Lumber's continuing cash

3    collateral usage.    And on the docket this morning, that shows

4    up as 5-22, which I believe is a prior order.

5            But any event, that's Pacific Lumber's cash

6    collateral.    There is one disputed issue on that matter.    And

7    it really has to do more with the Docket Number 12, which is

8    Pacific Lumber's application to pay pre-petition compensation

9    and benefits.

10            One of those sub-items in that -- that particular

11    motion, we've had two prior interim orders.    We've been

12    carrying forward one issue, and the issue is payments with

13    respect to the defined benefit pension plan.

14            And we do have an objection on that payment from

15    LaSalle.    So I think that'll be the first matter we'll here

16    this morning.

17            If I go ahead and go through what else is up, Docket

18    492 is Scopac's motion to require that the Ad Hoc

19    Committee/Group file a 2019 Disclosure Statement.

20            That is opposed.    And I believe we'll have extensive

21    arguments on that.    So I think that should come after.

22            And related to that is Docket Number 610, which is a

23    Motion for Leave to File an Amicus Brief in that matter by

24    another group of interested parties.

25            So those, I believe, should be taken together.    So

10

1  that's the second.

2           Then the third issue is --

3           **THE COURT:**  Who's the interested party?

4           **MR. BARR:**  Your Honor, it's Matthew Barr, Milbank

5  Tweed, on behalf of the Securities Industry and Financial

6  Markets Association, and the Loans, Syndications, and Trading

7  Association.

8           We are the two parties that filed the Motion for

9  Leave to File an Amicus Brief in support of the Ad Hoc's

10 Committee's objection to the 2019 motion.

11          **THE COURT:**  Okay.

12          **MR. HOLZER:**  And then lastly, yesterday the

13 noteholder group filed a Motion for Emergency Hearing and what

14 they're asking the Court to do in their motion -- no one

15 objects to hearing it today.  So I don't think there's any

16 opposition on the emergency hearing motion.

17          But the application, they want a certification of

18 your Honor's opinion on the SARE Motion.  They're asking the

19 Court to certify it -- certify that for a direct appeal to the

20 Fifth Circuit.

21          And that also is not on the docket today.  But I

22 don't think anyone's objecting to go forward on that.  It would

23 be Docket Number 612 was the Motion for Hearing.  And 613 was

24 the actual application itself.

25          And the Debtors do oppose that.  And I'm not sure

11

1    what the other parties' position are.

2             So I guess what I would like to do then is proceed on

3    the Docket Number 12, the pre-petition compensation and

4    benefits.  I have some exhibits that have been circulated.  I'd

5    like to offer 1 through 7.

6             **MR. WEGE:**  Your Honor, we would object to, I believe,

7    it's to number 3 for lack of foundation.

8        **(Pause)**

9             **THE COURT:**  Number 3 is what you're objecting to?

10            **MR. WEGE:**  Yes, your Honor.

11            **THE COURT:**  Thank you.  What is your objection?

12            **MR. WEGE:**  Foundation.  There is no information as to

13   what this document is or who sponsors it, or, you know, it

14   would have --

15            **THE COURT:**  A witness.

16            **MR. HOLZER:**  Your Honor, Gary Clark is on the phone.

17   And he would testify as far as foundation for this document

18   that this -- this is the --

19            **MR. WEGE:**  Your Honor, I would object to any

20   testimony offered by phone.

21       **(Pause)**

22            **THE COURT:**  Is the only issue as to this document is

23   foundation?  And you're objecting to the foundation witness

24   appearing by phone?

25            **MR. WEGE:**  Yes, your Honor.

**TRINITY TRANSCRIPTION SERVICES**

12

1            **THE COURT:**  And why is that?

2            **MR. WEGE:**  Your Honor, if their witness is available

3    to be here to testify, they filed the emergency motion.  I

4    would like the opportunity to cross exam him in person.

5            **MR. HOLZER:**  Your Honor, we didn't know there was an

6    objection until last night about nine o'clock.

7            So we would have had him here had we known there was

8    an objection.

9            **MR. WEGE:**  Your Honor, that's actually not correct.

10   We filed our objection to this on February the 14th, 2007,

11   Docket Number 295.

12        **(Pause)**

13           **THE COURT:**  Well do you have any -- any information

14   to suggest that these figures are incorrect?  I mean, they just

15   appear to be calculations.

16           **MR. WEGE:**  Your Honor, I have no information

17   whatsoever for this -- for this chart.

18           **MR. HOLZER:**  Your Honor, there's only one figure on

19   this chart that we're really talking about today.  Because all

20   we're asking the Court to approve is the payment of $588,625

21   that is due three days from now on April the 13th.

22           And so that's really the only relevant figure.  For

23   the Court's information, this is a -- a calculation prepared by

24   Fidelity Investments, who is the administrator of the defined

25   benefit pension plan.

13

1        **MR. WEGE:**  Your Honor, I would object.  Unless there

2   is testimony for this matter, I would object to the counsel

3   providing evidence.

4        **(Pause)**

5        **THE COURT:**  Do we have someone from Fidelity?

6        **MR. HOLZER:**  No, your Honor.  The company would treat

7   this as a business record.

8        **THE COURT:**  So you are hoping to be able to have

9   Mr. Clark assert that this was taken from the business records

10  of the Debtor, and that they get -- they get something like

11  this from time to time from Fidelity.  And they just pay

12  whatever they tell them.

13       **MR. HOLZER:**  Yes, your Honor.

14       **THE COURT:**  And the amount was 588,625 for the April

15  13th payment.

16       **MR. HOLZER:**  Yes, your Honor.  It actually does

17  change over time.  We've had a series of reports over the last

18  few weeks where the number --

19       **MR. WEGE:**  Your Honor, I would object again to

20  counsel testifying.

21       **THE COURT:**  Okay.  All right.  So what is the

22  committee's position with respect to this?

23       **MR. FIERO:**  Your Honor, the committee previously

24  imposed an objection to the payment of pre-petition debt under

25  the cash collateral order.

**TRINITY TRANSCRIPTION SERVICES**

1          The committee has elected with respect to this

2    payment only, this payment which is due in three days, not to

3    assert that objection, but rather to reserve it for later

4    payments if --

5          The committee wants to see how this case is going to

6    turn out.  And if it is, in fact, the reorganization that we

7    expect it to be, we think this issue will recede.

8          But in the -- in the interim, we simply elected not

9    to oppose this particular payment.

10         **THE COURT:**  Okay.

11         **MR. HOLZER:**  Your Honor, the application with respect

12   to the -- the pension plan payment was supported by Mr. Clark's

13   declaration.  And we did file in connection with the first stay

14   hearings.

15         That's in evidence.  And I've attached the excerpts

16   from that declaration as Exhibit Number 7.

17         **THE COURT:**  Okay.  For everything but -- but 3,

18   you're not objecting to.  So those are --

19         **MR. WEGE:**  That's correct, your Honor.

20         **THE COURT:**  So the rest of the documents will be

21   admitted.

22         **(Pacific Lumber's Exhibits Number 1, 2, 4, 5, 6, and**

23   **7 were received into evidence)**

24         **MR. HOLZER:**  Your Honor, the --

25         **THE COURT:**  Number 7 you think provides some

15

1   assistance?

2        **MR. HOLZER:**  Well it's -- it's general background,

3   your Honor, for the Debtor's request to pay what it believes

4   are a pre-petition obligation under the Necessity of Payment

5   Doctrine.

6        What the testimony, the prior testimony, showed you

7   was that at the time we filed the case, we believe that the

8   unfunded portion -- the underfunded portion of the pension plan

9   was approximately $20.5 million.

10       We believe that amount is less now, but I don't think

11  it matters one way or the other for this hearing.  But if

12  you'll turn to what's the third page, and it's actually

13  paragraph 63, 64, and 65 was Mr. Clark's testimony with respect

14  to the request to make the pre-petition payments under the

15  pension plan.

16       **(Pause)**

17       **THE COURT:**  All right.  Mr. Clark, you on the phone?

18       **MR. CLARK:**  Yes, your Honor.

19       **THE COURT:**  All right.  I'm going to overrule the

20  objection concerning testimony by telephone.

21       Raise your right hand and be sworn.

22       **MR. CLARK:**  Okay.

23       **(Witness sworn)**

24       **THE COURT:**  Go ahead, Mr. Holzer.

25  //

```
                          CLARK - DIRECT                    16
```

 1                          **DIRECT EXAMINATION**

 2    **BY MR. HOLZER:**

 3    Q    Mr. Clark, do you have Exhibit 3 in front of you?

 4    A    Yes, I do.

 5    Q    And could you tell the Court what Exhibit 3 is?

 6    A    Exhibit is a regularly prepared report by Fidelity

 7    Investments who acts as our administrator and our actuary,

 8    telling us the amount that is due for the coming four periods

 9    as a contribution to the pension plan.

10    Q    All right.

11              **MR. HOLZER:**  Your Honor, I believe that's all the

12    testimony I need from Mr. -- from Mr. Clark.

13              **THE COURT:**  Do you have any questions you wanted to

14    ask?

15              **MR. WEGE:**  Your Honor, I would continue my objection.

16    If this is a document by Fidelity, then we need a witness by

17    Fidelity if it's offered for the truth of the matter.

18              **THE COURT:**  Do you want to complete the foundation?

19              **MR. HOLZER:**  Well you've already admitted the

20    document and overruled the objection.

21              **THE COURT:**  I haven't -- no.  I overruled the --

22              **MR. HOLZER:**  Oh, okay.

23              **THE COURT:**  -- objection to testimony.

24              **MR. HOLZER:**  I apologize, your Honor.

25              Yes, I will continue, then, Judge.

CLARK - DIRECT                    17

1   **BY MR. HOLZER:**

2   Q   Mr. Clark, could you tell the Court how -- how the

3   company -- what the company does in response to these

4   documents.  So let's talk specifically about line number, the

5   April 13 line, and the $588,625 payment.

6   A   Yes.  When we receive these updates from the actuary, that

7   is the amount that we set in our budget to make the payments,

8   the contribution.

9         We have used the 588,625, which was the most recent

10  document received from Fidelity just yesterday for payment on

11  the 13th, pending Court approval.

12  Q   And does the company rely on Fidelity to calculate and

13  provide the amount that is owed on -- in respect to its pension

14  plan obligations?

15  A   Yes, we do.

16        **THE COURT:**  Well, normally we would have to know that

17  it was kept in the ordinary course of business, that he was a

18  custodian of the record, those kinds of things.

19        I mean, this is unusual for Bankruptcy Court to have

20  actual evidentiary issues come up, but go ahead.

21        **MR. HOLZER:**  Yes, Judge.

22        **THE COURT:**  Finish it off.

23  **BY MR. HOLZER:**

24  Q   Mr. Clark, these reports you get from Fidelity are they

25  kept in Pacific Lumber's regular course of business?

CLARK - DIRECT                    18

1   A    Yes.

2   Q    And does the -- you or the persons that you supervise,

3   rely on these documents and keep them in the company's regular

4   course of business?

5   A    Yes, we do keep them as part of our records, business

6   records.  And we use them to make the payments.

7            **THE COURT:**  Okay.  Well do you still have an

8   objection to Number 3?

9            **MR. WEGE:**  Your Honor, I have no objection as it be

10  admitted as offered as a business record.  If it's offered for

11  more than that.

12           **THE COURT:**  Okay.  It'll be admitted.

13       **(Pacific Lumber's Exhibit Number 3 was received into**

14  **evidence)**

15           **THE COURT:**  Do you have any questions for Mr. Clark?

16           **MR. WEGE:**  Your Honor, with respect to the document,

17  or --

18           **THE COURT:**  Any questions that you want.  He just had

19  him testify, so you can ask questions.

20       **(Pause)**

21           **MR. WEGE:**  Your Honor, the only questions I would

22  have is with respect to the affidavit of Mr. Clark.  I just

23  wanted to ask if there's anything -- if he has any dispute with

24  any of the information in the affidavit that was submitted

25  today, or in the motion that was filed with the Court.  And in

                          CLARK - DIRECT/CROSS                    19

 1  particular, the description of the defined contribution plan

 2  and the defined benefit pension plan, that if, in fact, all

 3  those representations are true and correct.

 4          **MR. HOLZER:**  Objection, your Honor.

 5          **THE WITNESS:**  Yes.

 6          **MR. HOLZER:**  That's a very broad question.

 7          **THE COURT:**  Well he answered it, so -- are you

 8  familiar with all of those documents that he just talked about?

 9          **THE WITNESS:**  Yes, your Honor.

10          **THE COURT:**  And do you agree with the fact statements

11  made therein?

12          **THE WITNESS:**  Yes, sir.

13          **THE COURT:**  Okay.

14          **THE WITNESS:**  Yes, your Honor.

15                          **CROSS EXAMINATION**

16  **BY MR. WEGE:**

17  Q    And, in fact, that the -- the defined benefit plan was, in

18  fact frozen as of December 31st, 2005.

19  A    The benefits were frozen as of 12/31/05, yes.

20  Q    And, in fact, there is a defined contribution plan that is

21  provided to employees that is a transition from the defined

22  benefit plan; is that correct?

23  A    There is a defined contribution plan, yes.  And it was

24  modified at the time that the pension plan was frozen to

25  provide a transition for the -- the employees, yes.

                    **TRINITY TRANSCRIPTION SERVICES**

CLARK - CROSS                          20

1   Q    And that the new employees were not offered any benefits,

2   new employees being the employees following 12/31/05, the new

3   employees are not offered benefits under the terms of the

4   defined benefit pension plan.

5   A    That is correct, yes.

6           **MR. WEGE:**  That's all the questions I have.

7           **THE COURT:**  All right.  Anything further?

8           **MR. HOLZER:**  Not evidentiary, your Honor.

9           **THE COURT:**  Anyone else have any questions for

10  Mr. Clark?

11      **(No audible response)**

12          **THE COURT:**  All right.  Were there any other

13  opposition to the -- to the funding?

14          **MR. HOLZER:**  None other than the committees, which

15  has been withdrawn.

16          **MR. FIERO:**  No, your Honor.  I want to make sure I

17  set for the record that originally the Debtor's motion sought

18  to make all future pension payment.

19          **THE COURT:**  Yeah.  All you're doing in authorizing

20  this one.

21          **MR. FIERO:**  That's correct.  And that was something

22  that --

23          **THE COURT:**  All right.

24          **MR. FIERO:**  -- that was okay with the Debtors.

25          **THE COURT:**  And did the, let's see, Theresa Betro?

**TRINITY TRANSCRIPTION SERVICES**

1           **MS. BETRO:**  Yes, your Honor.

2           **THE COURT:**  Did you have any comment on this issue?

3           **MS. BETRO:**  CFC supports the Debtor's motion to make

4    this payment of minimum funding due on April 13th as within the

5    Debtor's business judgment, I believe that their motion was

6    under 353(b), to make it as an outside of the ordinary course

7    payment.  And HBGC believes that they have satisfied their

8    business judgment, that this is a proper exercise of their

9    business judgment for various reasons.

10          One would be that nothing in bankruptcy law relieves

11   the Debtors of their pension funding obligations under ERISA.

12   And, in fact, the Bankruptcy Code at §1106(a)(1) requires the

13   Debtor to continue to perform its obligations as the plan

14   administrator.

15          And LaSalle's statement, supplemental objection filed

16   last night at midnight, they stated that PBGC is the plan

17   administrator, and that is not correct.  Upon information and

18   belief, Pacific Lumber is the administrator of the pension

19   plan.

20          **THE COURT:**  All right.

21          **MS. BETRO:**  We also believe that it is within the

22   Debtor's proper exercise of business judgment to make this

23   payment because if the pension's minimum funding payment is

24   missed, an excise tax will come due that could be as much as

25   110 percent of any funding deficiency.

1           **THE COURT:**  Okay.

2           **MS. BETRO:**  Also the Debtors have stated in their

3    motion that this is a critical issue to their employees and it

4    could affect the employees support for the reorganization of

5    this company.

6           And missed funding might, in fact, cause the PBGC to

7    feel that the pension is at risk, in which case it may

8    terminate the pension plan.  And that would result -- may

9    result in increased cost to the estate.  And it certainly

10   result in the liquidation of PBGC's now contingent claim for

11   unfunded benefit liabilities, which we currently estimate at

12   $24 million.

13          And in regard to LaSalle's supplemental objection

14   which they filed last night, they have cited cases.  But those

15   cases are only as to the administrative expense issue.  Whether

16   or not PBGC's claims that it -- it will file -- would be

17   entitled to administrative expense or not is not the issue

18   before the Court, but only as to whether or not it was in the

19   proper business judgment to make this payment on April 13th.

20   PBGC, by the way, disagrees with those cases.

21          I think it's most helpful, your Honor, to view this

22   pension plan as similar to an executory contract.  Although

23   that's not what it is.  Although it's not an executory

24   contract, if a reorganizing Debtor decides to continue its

25   pension plan, and assume the obligations of that going forward,

23

1   it would have to cure the arrears upon exit.

2        If the economic costs making these payment can

3   reasonably be said it will far outweigh any cost of making

4   them.

5        **THE COURT:**  All right.  Thank you.

6        **MS. BETRO:**  Thank you, your Honor.

7        **THE COURT:**  Anyone else have any comments?  LaSalle

8   Bank have anything further.

9        **MR. WEGE:**  Sure, your Honor.  I wish to make a brief

10  comment --

11       **THE COURT:**  Go right ahead.

12       **MR. WEGE:**  -- if I may.

13       Your Honor, there's no question that this is a pre-

14  petition obligation.  There's no question that the legal

15  standard to pay a pre-petition unsecured obligation is not the

16  Debtor's business judgment.

17       In fact, there's got to be some basis to pay a pre-

18  petition obligation, whether it's the Necessity of Payment

19  Doctrine, or some priority, or some other basis to pay a pre-

20  petition obligation.

21       So we would respectfully disagree with the PBGC on

22  their theory as to what the standard is to pay pre-petition

23  obligations.

24       Clearly, it's a pre-petition obligation.  It's a pre-

25  petition contract.  We would agree that that's the case.  The

24

1    pension plan, based on the evidence, was frozen on December

2    31st, 2005.  So the employees could not have earned any

3    benefits in the 180 days before the case with respect to that

4    plan.

5              It's clearly not an administrative claim.  Again,

6    because there -- there's no earning or there's no benefit to

7    the estate post-petition for the -- for that plan.

8              So in sum, this is a pre-petition unsecured claim.

9    It's wholly premature to pay this claim.  It's a very sizeable

10   claim on whether it be in full or whether it be over time, it's

11   inappropriate to pay this pre-petition claim until we know

12   where this case is going.

13             And this case could -- could go in a number of

14   different directions.  It could go into liquidation.  It could

15   go -- it could be, you know, it could proceed to

16   reorganization.  We just don't know.

17             And, frankly, to elevate a pre-petition claim above

18   secured claims in this case, based upon some long term pay out,

19   is inappropriate.  I don't think the law supports it.

20             The cases we've cited in our supplemental brief which

21   was filed yesterday, make it clear that any claims for these --

22   these pre-petition claims should not be paid.  There's no basis

23   in the Code to elevate their status.

24             So that's our --

25             **THE COURT:**  All right.

25

1        **MR. HOLZER:**  Your Honor, I find myself agreeing and

2    disagreeing with both sides.

3        I do agree with LaSalle's position that this is a

4    pre-petition claim, not an administrative claim.  And the basis

5    we're asking for approval for payment is the Necessity of

6    Payment Doctrine as we pled in our first day -- day pleadings.

7        And the reason we need to do that was touched on by

8    PBGC.  There is risk of plan termination if the payment's not

9    made.  The penalties and potential excise taxes, if they become

10   due, could be substantial.  And at the bottom line is the

11   severe impact on employee morale that failure to make a payment

12   like this would create.

13       And so on those bases, we think it is appropriate

14   under Section 105 in the Necessity of Payment Doctrine to make

15   this payment.  But we have limited it to just the one payment,

16   as opposed to all future payments.

17       So we're trying to minimize the impact.  And we'll

18   come back and talk about the rest at another day.

19       If this company's going to go forward, then this is

20   important to make this payment.  One thing, by failing to make

21   the payment, while LaSalle may very well be starting down the

22   road into ensuring the collapse of the company, 'cause the

23   effect on morale by failing to make something like this that

24   the employees rely on, could be substantial.

25       So we are requesting approval.

26

1          **THE COURT:**  Okay.

2          **MR. WEGE:**  Your Honor, may I just note.  There's been

3    no testimony as to the effect on morale.  The only testimony

4    was that the -- the plan was frozen and that they're getting

5    401(k) from Scopac.  So I disagree that the evidence

6    incorporates an effect on morale.  There's been no evidence --

7          **THE COURT:**  Well --

8          **MR. WEGE:**  -- of that.

9          **THE COURT:**  I think there -- there is no doubt as to

10   what the test is that this Necessity of Payment Doctrine is the

11   test that would apply in this particular situation.  No

12   question that it's a pre-petition obligation, although it's a

13   special pre-petition obligation.  And I think that there -- the

14   Code and recent amendments to the Code, and certainly lots of

15   the -- whatever background information there is for the Code,

16   suggests that pension plans certainly have a peculiar position

17   in the Bankruptcy Code, and a different position anyway than

18   normal unsecured claims.

19         I think that the -- the showing today is sufficient

20   to -- to justify the payment as necessary.  I think that while

21   there's no testimony from employees, there certainly is a

22   inference that can be drawn with respect to morale.

23         I think the penalty, there's no question about the

24   penalties that might be imposed by virtue of the missed

25   payment.  And, as well as the -- the failure to make it, the

27

1    impact on plan stability, as well as the -- not only the future

2    plan of the organization of this company, but these companies,

3    but the -- the plan itself, the pension plan stability with

4    respect to what -- what may or may not happen with respect to

5    that.

6              So for all of those reasons, and based on the almost

7    unanimous agreement of the parties, I will approve the payment.

8              **MR. HOLZER:**  Thank you very much.

9              We're now to the 2019.

10             **MR. HOLZER:**  Judge, I think before we go there, I

11   think we need to talk about Pacific Lumber's cash collateral,

12   which would be Docket Number, 7.

13             **THE COURT:**  Oh, okay.

14             **MR. HOLZER:**  And Mr. Kaplan is going to proceed with

15   that.

16             **THE COURT:**  All right.

17             **MR. HOLZER:**  I think with respect to cash collateral,

18   we have an agreement on the budget and the form of order,

19   except perhaps with -- LaSalle may still have an objection on

20   use of its cash collateral to make the payment you just

21   approved.

22             Other than that, I don't know if there are any other

23   objections.

24             **MR. WEGE:**  Your Honor, just a couple of things.

25             One, of course, we objected to the use of cash

28

1   collateral for the -- the payment of the 656, which was in the

2   budget for the pension payment.

3         The other note I would make, really not an objection,

4   just a clarification is, there's a $5 million payment to Scopac

5   by Palco listed in the budget.  We just asked that it be

6   clarified in the record that that $5 million relates to all

7   post-petition sales, no pre-petition.

8         I received an email that -- that indicated that that

9   was for March purchases.  And I just wanted to clarify that

10  that's, in fact, the case.

11            **THE COURT:**  Mr. Holzer?

12            **MR. HOLZER:**  Actually, we can have Mr. Clark --

13            **THE COURT:**  Mr. Clark, is that correct?

14            **MR. CLARK:**  Yes, your Honor.  That is correct.

15            **THE COURT:**  All right.

16            **MR. HOLZER:**  And with that I don't think there are

17  any other --

18            **THE COURT:**  Well, so --

19            **MR. HOLZER:**  -- objections to cash collateral.

20            **THE COURT:**  Yes.

21            **MR. FIERO:**  Nothing from the committee, your Honor,

22  except that the sixth interim cash collateral order has been

23  distributed, I've never seen it.  The last thing I got from

24  Mr. Kaplan is the -- is just a .pdf of the fifth.

25            And I assume that if they're the same it's going to

29

1   be fine.  But if there are changes, I'm interested in what they

2   are.

3          **THE COURT:**  So make sure they get a copy and submit

4   the order.  I'll approve the cash collateral.

5          **MR. HOLZER:**  I have it here, Judge.  And it is the

6   same order with the only difference being reset dates.  And I

7   think we need to set a reset date.

8          The order approves use of cash collateral through --

9   Mr. Kaplan, help me out, through April 27th?

10         **MR. KAPLAN:**  April 27th, yes.

11         I believe that order was circulated by Marathon's

12  counsel yesterday.  And it's identical to the prior order, save

13  for changing the dates for use of cash collateral from April

14  13th to April the 27th.

15         **MR. HOLZER:**  So it's like to interlineate the 24th as

16  the reset date with the Court's permission.

17         **THE COURT:**  All right.  Twenty-fourth at ten o'clock.

18         **MR. HOLZER:**  Eleven, your Honor?

19         **THE COURT:**  Eleven o'clock.  That's right.

20         All right.

21         **MR. HOLZER:**  Now the 2019, Judge.

22         **THE COURT:**  Now the 2019.  All right.  Is this --

23  Mr. Melko, or as are -- are we going to --

24         **MR. MELKO:**  It's the Debtor's motion, your Honor.

25         **THE COURT:**  Debtor's motion.

30

1        **MS. COLEMAN:**  It's the Debtor's motion, your Honor.

2        **THE COURT:**  All right.  Go ahead.

3        **MS. COLEMAN:**  Thank you, your Honor.

4        Your Honor, the reason we're here to day is really

5   quite simple.  It's not that there's any doubt about what Rule

6   2019 says, nor is there any real doubt that the Rule applies in

7   this situation to the committee.

8        The reason we're here is -- is reality, your Honor.

9   You can't have it both ways.  We all know that the bankruptcy

10  process requires transparency.  And Rule 2019 is really just

11  one example of many of that public policy.

12       The Ad Hoc Committee has made it very clear that it's

13  going to assert a -- itself in this case a very significant

14  voice in this case, because it represents more than 90 percent.

15  The numbers moved around a little bit, but it represents more

16  than 90 percent of the Debtor, Scopac.  I think it's always

17  said that.

18       You remember at the venue trial, your Honor, even

19  though the Ad Hoc Committee was not one of the initial moving

20  parties, and they didn't come in supporting the transfer of

21  venue, until one business day before the hearing.

22       They argued first.  And why did they argue first,

23  because they represented that the moving parties, the other

24  moving parties, asked the noteholders to speak first, because

25  they're such an important constituency in the case.

31

1        Now contrary to what they say in their papers, we

2   don't want to silence them.  That's not what we're about here.

3   In fact, we tried to settle this motion.  We tried to not -- to

4   not bring this in front of your Honor.  It didn't work out,

5   but -- and we're not trying to silence them.

6        The trouble is really that the Ad Hoc Committee does

7   not like one of the consequences of having this enhanced voice

8   in this case and of acting collectively.  Because they're

9   acting collectively, they have an enhanced voice.

10       You get a lot of benefits out of doing that.  One of

11  the things they're going to get is presumably a better shot of

12  making an argument to your Honor that they've made a

13  substantial contribution at the end of the case and getting

14  their fees paid.

15       But there are consequences for having that -- for

16  having that bigger voice.  And one of them is they have to

17  comply with Rule 2019.

18       At heart, 2019 is a public disclosure rule.  It

19  applies to parties to act together to increase their leverage

20  in the case.

21       And, your Honor, Judge Gropper (phonetic) recently

22  issued two opinions in the *Northwest Airlines Case*.  And we've

23  prepared a small binder with both of those opinions and some

24  other items in it.

25       May I hand it up?

32

1           **THE COURT:**   You may.

2           **(Counsel approaches the Court)**

3           **MS. COLEMAN:**   So in *Northwest*, your Honor, the

4    situation was really very similar to this one.

5           All of the arguments that the Ad Hoc Committee is

6    making to oppose this relief were made there.   And Judge

7    Gropper didn't accept any of them.

8           What he said is, you hold yourself out as a

9    committee, you take an active role in an attempt to affect the

10   outcome of the case, you're acting collectively.   The Ad Hoc

11   Committee has certainly done that here.   You've brought

12   yourself under Rule 2019.

13          Twenty nineteen is self-executing.   It's automatic.

14   It's mandatory.   The only --

15          **THE COURT:**   Is this your motion to require them to do

16   it, or is there a motion to have leave not to do it?

17          **MS. COLEMAN:**   Well technically, your Honor, our

18   motion is to require them to do it.   We sent them a letter

19   requesting that they do it.   And they haven't done it.   So we

20   brought the motion.

21          **THE COURT:**   Okay.

22          **MS. COLEMAN:**   So the motion is to -- is to require

23   them to do it.

24          But there's no -- there's no exceptions in 2019.

25          **THE COURT:**   But is -- is it -- is it the position of

**TRINITY TRANSCRIPTION SERVICES**

33

1    the committee that they -- they are going to -- that they don't

2    have to comply with 2019, or is it that they are requesting

3    permission not to comply.

4             **MR. FROME:**  Your Honor, Evan Flaschen of Bracewell &

5    Giuliani for the Ad Hoc Group of Noteholders.

6             Our position is that the Rule does not apply to our

7    group.  If your Honor finds that it does apply, we would

8    request in the alternative that since the relief to 2019(b) is

9    discretionary, we would request you exercise your discretion

10   and not require us to comply with the Rule.

11            **THE COURT:**  Okay.

12            **MR. FROME:**  In the further alternative, if you deny

13   both of those, we would request we have the ability to file the

14   information under seal.

15            **THE COURT:**  Okay.

16            **MS. COLEMAN:**  Your Honor, just -- just one note

17   there.

18            I don't believe that 2019(b) gives you the ability

19   to -- gives you the discretion to not allow them to comply.

20   There was one case that was cited in the Ad Hoc Committee's

21   brief that was -- that was reversed on appeal that says that.

22            But 2019(b) talks about the discretion of the Court

23   to -- to order relief for failure to do it.  It doesn't talk

24   about giving them relief from actually filing.

25            So, your Honor, again 2019 going exactly to this

34

1    point, it's self-executing.  It's automatic and mandatory.

2    It's been on the books for 70 years.  And it is something that

3    parties who seek to act collectively in a case are required to

4    do, and they haven't done it.

5           So the rule is very clear.  So given that, what's the

6    Ad Hoc Committee going to argue?  Well they're going to argue

7    exactly what Mr. Flaschen just said.  They're going --

8           **THE COURT:**  Well (a) says, unless otherwise directed

9    by the Court, doesn't it?

10          **MS. COLEMAN:**  I'm sorry, your Honor?

11          **THE COURT:**  (a) is unless otherwise directed by the

12   Court.

13          **MS. COLEMAN:**  Only as to indentured trustees, your

14   Honor.  And unless otherwise directed by the Court, as an

15   indentured trustee.

16          So the only possibility for escape is --

17          **THE COURT:**  All right.

18          **MS. COLEMAN:**  -- indentured trustees.

19          **THE COURT:**  Okay.

20          **MS. COLEMAN:**  And, your Honor, the only argument the

21   committee can make is to argue that they're not a committee.

22   So that's what they've done.  Now they're a group.  As of March

23   28th, they're a group.

24          Nothing changed, though, your Honor, on March 28th,

25   except that they changed their name from a committee to a

1    group, because they wanted to get out from under 2019.

2            We filed our motion on March -- on March 16th.  On

3    March 28th they responded and said, okay, we're not a committee

4    anymore.  Now all I know, your Honor, is these noteholders have

5    been acting through the same counsel.  They've had the same

6    financial advisor since 2005.

7            And part of your exhibit book is that we have three

8    engagement letters and confidentiality agreements in there

9    between -- two of them are between Mr. Flaschen's former firm,

10   Bingham, McCutcheon (phonetic).  And the other one is between

11   the financial adviser to the noteholders, Houlihan Lokey.

12           All of those refer to representing an Ad Hoc

13   Committee.  They use the word committee.  So, your Honor,

14   they -- as the Court knows, the committee referred to itself as

15   a committee all the up through late March.

16           We also -- also in your exhibit book we've got a list

17   of 17 or 18 pleadings they filed as a committee with all the

18   docket numbers for the Court's convenience.

19           It's very simple.  If it looks like a committee, acts

20   like a committee, calls itself a committee, I think we know

21   it's a committee.  Now they say, well, we can't be a committee,

22   because we're only 27, or 35, or some number, they put a

23   footnote on all their pleadings saying -- saying the committee

24   includes 27, or 35, or some number of -- of entities.

25           And they say we -- we act independently.  We don't

36

1    represent all the other -- there's over a hundred noteholders.

2    I don't know the exact number, your Honor, today.  But there's

3    over a hundred, that we know, there are less than 300.  But

4    some numbers put it high -- as high as 200.

5           We don't represent those.  We just act for ourselves.

6    And there are lots of examples to refute this, your Honor.  But

7    the most obvious one is back at the cash collateral hearing on

8    March 9th.

9           Without saying that the 20, or 30, or however many

10   entities in the footnote represented all 99 percent of the

11   timbernotes that Mr. Flaschen said he represented, the

12   committee offered to credit its counsel fees against the

13   principal of all 99 percent of the timber notes that they

14   purport to represent.

15          And it wasn't just those held by the committee

16   members.  In fact, the offer even applied to future holders

17   when Mr. Campbell raised the question, well, these are publicly

18   traded, what are you going to do with the people who buy these

19   in the future?  Nobody's restricted.  These things are trading.

20          Mr. Flaschen said that's no problem.  We'll tell

21   them, too.  And, your Honor, if that's not representing other

22   people who are not part of the committee, I don't know what is.

23          Just to conclude, your Honor, again, very simple.

24   This Ad Hoc Committee was a committee in 2005.  They were a

25   committee on the first day of this case.  They were a committee

37

1  on March 16th when he filed the motion.  They're a committee

2  now.

3          THE COURT:  Was there some requirement they represent

4  people other than the actual members of the group?

5          MS. COLEMAN:  Well the Rule says, your Honor -- the

6  Rules says every entity or committee representing more than one

7  creditor or equity security holder.

8          So --

9          THE COURT:  But there's no requirement that they

10 actually represent a class of people --

11          MS. COLEMAN:  No, your Honor, there's not.

12          THE COURT:  -- that is larger than the actual

13 membership of the committee.

14          MS. COLEMAN:  That's correct, your Honor, they still

15 have to disclose, even if they don't represent a class that's

16 larger than them.  There's still disclosure required.

17          THE COURT:  You were trying to suggest to me that

18 they represent people other than their own clients --

19          MS. COLEMAN:  Well I'm trying --

20          THE COURT:  -- by virtue by the -- what they said

21 with respect in the -- to the motion concerning their fees.

22          MS. COLEMAN:  Yes.  What I'm saying, your Honor, is

23 that -- that their argument as to how they're not a committee

24 is, look, we just -- we have this committee.  We have this

25 group.  And we -- you can't call us a committee, because a

committee represents other people.

And I'm saying even if that were the test, which I'm not sure it is, quite frankly. I think that you could have a committee just representing itself and you'd still have to have the same disclosures. But even if --

**THE COURT:** Well, as I recall the conversation with respect to Mr. Campbell and -- and the charge against other, in other words, fees of other people who might buy in, that that was more of an issue of how will this affect the transferability of future notes, since these are traded in the open market.

**MS. COLEMAN:** That's certainly right, your Honor.

**THE COURT:** And the statement was made, well that can be another statement with respect to those notes. It wasn't that they were actually representing those people.

**MS. COLEMAN:** No, your Honor, it wasn't.

But, again, if you're willing to -- if you're willing to say that something I do in this Court from authority from my clients is going to affect people who are -- going to affect people in the future, it seems that you are -- you are at least affecting -- you're at least affecting a larger group than yourself.

And I only offer that because the Ad Hoc Committee said we don't represent anybody other than ourselves. And they may not represent them, but -- but I think they do, because

08-13555-mg   Doc 15746-8   Filed 04/08/11   Entered 04/08/11 10:21:48   Exhibit H
Pg 46 of 107
Case 07-20027   Document 695-2   Filed in TXSB on 04/24/07   Page 4 of 40

39

1   they're purporting to affect them.

2          That's my only point.  You're certainly right that

3   the public -- public trading.

4          **THE COURT:**  All right.

5          **MS. COLEMAN:**  Now, your Honor, the only thing that

6   has changed since we filed this motion is they've now decided

7   to call themselves a group, because they want to take

8   themselves out of the literal words of 2019.

9          But the Rule applies anyway.  It doesn't matter what

10  they call themselves.  There's no reason it doesn't apply here.

11  And, therefore, they should be required to comply.

12         **THE COURT:**  All right.

13         **MS. COLEMAN:**  Thank you, your Honor.

14         **THE COURT:**  The U.S. Trustee have a position in this?

15         **MS. MARCH:**  No, sir.

16         **THE COURT:**  Okay.  Does the committee have a

17  position?

18         **MR. FIERO:**  No, your Honor.  The committee did not

19  take a position.

20         **THE COURT:**  All right.  Anyone else besides the group

21         **MR. BARR:**  Your Honor, again, this is Matthew Barr of

22  Milbank Tweed on behalf of the Securities Industry and

23  Financial Markets Association --

24         **THE COURT:**  Yes, sir.

25         **MR. BARR:**  -- Loans Syndication and Trading

40

1   Association.

2           If, your Honor, would prefer, our statement is in --

3   and our brief is in support of the Ad Hoc group's objection.

4           **THE COURT:**   Well why don't we let them talk first,

5   then.

6           **MR. BARR:**   Thank you, your Honor.

7           **MR. FROME:**   Your Honor, Evan Flaschen --

8           **THE COURT:**   Go right ahead, sir.

9           **MR. FROME:**   -- Bracewell & Giuliani for the

10  noteholder group.

11          A brief response to counsel's comments.   There's some

12  irony about the use of the word transparency.   Your Honor,

13  would not be aware, but to this date, for example, the official

14  committee has not been given any confidential information.

15          The noteholder group has not been given any

16  confidential information.   Now we're all working on

17  confidentiality agreements.

18          My experience I have never been in a case where for

19  this lengthy period the Debtor still is refusing to give

20  confidential information to its own unsecured creditors

21  committee.   So transparency's a relevant, relative topic.

22          Why do we care so much about this?   This is a matter

23  of monumental importance, your Honor, to the point where the

24  securities industries and the LSTA have filed *amicus* briefs.

25  And you will be hearing from them.

41

1          We care very much because this is public debt.

2     Public debt means it is freely tradable.  It means you trade

3     through brokers.  It means the holdings of specific

4     individuals, which includes companies, and the amounts they pay

5     for their debt are not public information.

6          More than that, more than the fact that it's

7     confidential, it is proprietary information.  How funds engage

8     in trade, the methods they employ, the frequency that they

9     trade, the prices which they pay, are highly confidential,

10    proprietary information that should not be disclosed.

11         Because of that, we raised several very important

12    arguments in our brief.  And even more than in other situations

13    in this case, we strongly urge you to review our brief and

14    therefore to take this matter under advisement today, rather

15    than issue a decision on the spot.

16         For example, our brief raises four separate issues of

17    Constitutional law that we think apply to this situation.

18         **THE COURT:**  Okay.

19         **MR. FROME:**  The custom for the past 70 years that

20    we're aware of, I'm told the *Northwest* decision, including the

21    custom in this very Court, for example, Asarco, is that counsel

22    for an ad hoc group, files a statement saying here who -- here

23    are the names of the people in the group.  Here is the

24    aggregate amount of the holdings in the groups.

25         For 70 years, no one has required a so-called ad hoc

08-13555-mg   Doc 15746-8   Filed 04/08/11   Entered 04/08/11 10:21:48   Exhibit H
Pg 49 of 107
Case 07-20027   Document 695-2   Filed in TXSB on 04/24/07   Page 7 of 40

42

1    committee that is not acting in a fiduciary capacity, to

2    disclose anything more than that.  The *Northwest* Courts did,

3    and I'll come back to *Northwest* in a few minutes.

4            It begs the question why does Scopac care?  They know

5    who we are.  We've identified it in footnote one of every

6    single pleading we've filed in this case.  We've updated

7    footnote one every single time the membership of the group has

8    changed, or the amount of the holdings has changed.

9            They know all the information they need to know.  So

10   why do they care?  In 2005, when the Ad Hoc Group negotiated

11   with this Debtor.  The Ad Hoc Group was formed in March, 2005,

12   by the way, your Honor.  It's been in existence and in

13   communication ever since then.  This is not a new group.

14           In 2005, the Debtor made several public filings, and

15   we attached them to our brief, complaining they can't negotiate

16   with this group, 'cause it's only 15 or 20 percent of the

17   noteholders.

18           In fact, that was an inaccurate statement.  But the

19   point is, in 2005, this Debtor complained that this group did

20   not represent the class of noteholders.  Now they're saying

21   differently.

22           In their pleadings in support of *Blackstone*

23   (phonetic) filed in this case filed three weeks ago, they

24   complained that in 2005 counsel for the noteholder group

25   represented only 15 percent of the noteholders.  And therefore,

43

1   you could not get an agreement with the noteholders of the

2   class.

3           Again, their percentages were wrong, and they know

4   it.  The point is, they always recognized this was a group that

5   consisted of holders and of their holdings.  The group never

6   purported to speak on behalf of the timbernotes as a class.

7           Scopac never stated and never recognized the group as

8   speaking on behalf of the noteholders as a class.

9           So why does Scopac care?  Because they know how

10  confidential and proprietary this information is.  They do not

11  appreciate the extent of our involvement in the case and the

12  fact that we do not say yes, sir to everything they wish to do.

13  And they want to break up our group.

14          It is that simple.  For whose benefit is this rule

15  anyway?  It's not for the Debtor's benefit.

16          **THE COURT:**  But can we -- before you go any further,

17  can you tell me, the information -- you don't mind giving the

18  total amount of information -- of debt that you have and the

19  members of your group?  That --

20          **MR. FROME:**  Right.

21          **THE COURT:**  That you say is the tradition.

22.         **MR. FROME:**  That is tradition.  And we've done that

23  throughout this case without needing to file a 2019 statement.

24          **THE COURT:**  And so --

25          **MR. FROME:**  We

44

1        **THE COURT:**  -- what is it that you object to

2    specifically?  What information is it that you specifically

3    object to giving?

4             **MR. FROME:**  Well --

5             **THE COURT:**  The specific amount of each person's

6    claim.

7             **MR. FROME:**  Person's claim.

8             **THE COURT:**  And how much they paid for them?

9             **MR. FROME:**  Depending on how you interpret the Rule.

10   But if you interpreted the Rule the way Scopac

11   believes it should be interpreted, the individual holdings of

12   each member of the group, we would object to that.  Object to

13   saying, for example, A holds $10; B holds $20.  That's clause

14   two of the definition.

15        Clause four, which we happen to think is not relevant

16   in any event, but under Scopac's interpretation, clause four

17   would say every member of our group has to disclose its entire

18   trading history, including the price it paid every time it

19   bought or sold the securities, which for some members of our

20   group, could be a hundred times or more, given the business

21   they're in.

22        And that is the most confidential, proprietary trade

23   information these folks have in this case.

24             **THE COURT:**  Okay.

25             **MR. FROME:**  And it begs the question why does Scopac

45

1    care?  Scopac knows it owes $714 million, whether our group

2    paid a hundred cents on the dollar, or once cent on the dollar,

3    and I assure you it didn't ay one cent, they still owe the same

4    amount of money.

5            There is plenty of case authority that says the

6    amount you paid for your debt is not relevant to the amount

7    that the Debtor owes on the debt.

8            The statute is for the benefit of the other members

9    of the class that the committee purports to represent.  For

10   example, in *Northwest*, there the equity -- ad hoc committee of

11   equity security holders held 27 percent in amount of the

12   shares.

13           They sought to negotiate the recovery for the entire

14   shareholder class.  I'm taking this right out of the *Northwest*

15   decision.  Judge Gropper said that if you are going to say that

16   you represent the entire class, if you are going to seek to

17   negotiate a recovery for the entire class, then the other

18   members of that class, the other shareholders, have a right to

19   know what your particular motivations are.  And in two ways in

20   *Northwest*.

21           First, what did you pay for your shares.  As it

22   happens that the ad hoc equity security holder committee all

23   paid one cent for their shares, and all other shareholders paid

24   $10, that would be relevant to other shareholders.  So they

25   could then form a conclusion should we form our own group.

**TRINITY TRANSCRIPTION SERVICES**

08-13555-mg   Doc 15746-8   Filed 04/08/11   Entered 04/08/11 10:21:48   Exhibit H
Pg 53 of 107
Case 07-20027   Document 695-2   Filed in TXSB on 04/24/07   Page 11 of 40

46

1           And using the *Northwest Airlines* decision term,

2    should be form a larger group to negotiate on behalf of shares,

3    'cause we don't think this 27 percent group has the same

4    interest we are.

5           Second in *Northwest*, the 27 percent group admitted

6    its members held substantial debt claims as well as equity

7    claims.  Judge Gropper found it important to disclose that.

8    Again, so that other shareholders could determine for

9    themselves are they willing to rely on this 27 percent group to

10   negotiate the recovery for 100 percent of the shareholders.

11          Here we do not have a single noteholder saying I need

12   this information, I want this information, I don't feel

13   comfortable with this group.  To the contrary, your Honor, to

14   emphasize how confidential and proprietary this information is,

15   the only one who knows the individual holdings of all the

16   members of the group is me.

17          The members of the group themselves do not know what

18   each other individually holds or what their trading prices are.

19   They don't want to know, because if they want to know someone

20   else's, then the someone else will want to know theirs.

21          It's important for me to know, of course, so that

22   when I sign a pleading and represent what I've been told, I can

23   do so accurately.  So they do update me quite constantly.  And

24   I remind them of that, which is why our footnote one keeps

25   changing.

1        It's also why we as counsel, at the time Bingham, now
2   Bracewell, and Gardere Wynne filed a voluntary 2019 statement.
3   We were not required to do one, because we only have one
4   client, the group.  But we filed a voluntary statement as is
5   the custom so that there was a verified statement on record as
6   to the members of the group and their aggregate holdings.

7        So all the information this Debtor and this Court
8   needs is already of record.  Any information any other
9   noteholder needs, none of them have asked for.  And therefore,
10  there's no point in making this disclosure.  It's not for the
11  Debtor's benefit.  It's for the benefit of other noteholders.

12       Continuing with the *Northwest* comparison.  Northwest
13  is a situation of bad facts.  There the group did say we
14  represent all holders.  And we try to negotiate on behalf of
15  the class.  We do not say that.

16       We are negotiating only for our own position.  We
17  don't need to say we negotiate on behalf of the class, because
18  our votes are more than a majority in numbers and two-third of
19  an amount, or we thought maybe more a majority number.  Now
20  Ms. Coleman says it might be different.

21       But we have enough on our own to vote in favor of a
22  plan.  We do not need the support of other noteholders.  We do
23  not request the support of other noteholders. We do not speak
24  for other noteholders.

25       Turning to the statute itself.

48

1       **THE COURT:**  Was I correct about the statement with

2   respect to the charges, if we -- if there had been an agreement

3   with respect to your fees that I made earlier that you were

4   not, at that time, suggesting that you represented those other

5   parties, but that --

6       **MR. FROME:**  We -- in our engagement letter in 2005

7   and our confidentiality letter of 2005, each identified us as

8   counsel on behalf of an ad hoc committee of noteholders.

9       The engagement letter in particular attached a list

10  naming every member of the group.  And therefore, explicitly

11  not naming other holders who were not part of that group.

12      The engagement letter also -- no, I'm sorry.  I'll

13  return to the confidentiality letter.

14      We do call ourselves an Ad Hoc Committee, and I'll

15  get back to that.  But the confidentiality letter is clear,

16  only Bingham, 'cause at the time we were Bingham, is bound by

17  the confidentiality.  We do not bind the group.  The group does

18  not bind the group.

19      It says on page four, we, Bingham, are not entitled

20  to share with any member of the group, except an individual

21  member who signs its own confidentiality agreement.  Again

22  demonstrating that the group does not represent anyone.  It's a

23  bunch of individual holders who, for purposes of expressing a

24  common view, have retained common advisors.

25      The alternative in Scopac's perspective is that the

 1   40 members of the group should hire 40 different law firms, or

 2   the law firms for the 40 members of the group should have

 3   separate communications with each of the 40 members, which is

 4   an absurd approach to how to deal with this.

 5          In the cash collateral discussions, your Honor,

 6   recalls correctly.  We indicated quite clearly that we were

 7   willing to have fees paid to counsel for the group deducted

 8   from the distribution solely to the group members, not

 9   distributions to all noteholders.

10          Again, we represent no one other than ourselves.

11   Your comments about future holders was, not that this was

12   binding as to a holder, as opposed to it being binding as to a

13   note, so that if you sold a note, the future holder would be

14   advised that with that note comes various things, principal,

15   interest, and so forth, and the potential of having fees

16   deducted from the amount paid on that note.

17          So even in the cash collateral context, we did not

18   propose on a voluntary basis to charge all noteholders, only

19   those holders of notes in the group.

20          Turning to the statute itself.  Counsel's right.

21   We've always called ourself an Ad Hoc Committee.  In every case

22   they called themselves an Ad Hoc Committee.

23          I have to note an irony.  The same with the use of

24   the word transparency.

25          This is a Debtor, who in every SEC statement they

1  ever filed, referred to their principal place of business as

2  being the Northern District of California.  This is a Debtor,

3  who in their bankruptcy petition, where it says where is your

4  principal place of business said Northern District of

5  California.

6         This is a Debtor who has said, what is your venue?

7  It said we're only venued here because of Scotia Development.

8  This is a Debtor who says, oh, we don't care what we said our

9  principal place of business was, our principal place of

10  business is different.

11         So to hang us by the use of the word committee we

12  think is not appropriate.  Instead, we need to examine what the

13  word committee means in Rule 2019.

14         Another reason to read our brief, your Honor, is we

15  trace the use of the word committee back to the late 1930's,

16  when the predecessor to Rule 2019 was created.  It was created

17  as a result of an SEC, Securities and Exchange Commission,

18  report to Congress to deal with abuses in equity

19  reorganizations.  So I'll just give you the short version.  We

20  have a longer version in our brief.

21         At the time, there was a phenomenon known as a

22  protective committee. . It was a group that was formed to

23  represent all members of a class.  In order to be a part of

24  that group, you had to sign a deposit agreement and deposit

25  your securities with the committee.

51

1          The problem with protective committees was they were

2    insider affairs.  They included affiliates of the Debtor.  They

3    included brokers or industry participants who did not hold any

4    debt themselves.

5          Therefore, the SEC was very concerned that these so-

6    called protective committees were only protecting insider

7    interests, not the actual holders of the securities in that

8    class.

9          In that context, the SEC reported that there should

10   be a rule saying for protected committees, for committees who

11   act on behalf of a class, they should be required to disclose

12   their particular interests, so that other members of that class

13   could decide whether they feel appropriately represented by

14   that committee, or should obtain their own representation.

15         That is not the case in our situation.  Again, we

16   focus on the word committee.  Where it came from is important.

17   Also, the definition of committee is important.

18               Under Black's Legal Dictionary,

19               "A committee is a group of people appointed or

20               elected to consider, determine, or manage a matter."

21         Noteholder group was not appointed.  It has not been

22   elected to consider, determine, or manage anything.  It is a

23   group of holders who'd gotten together because they have a

24   common interest.

25         The non-legal definition, this is from American

**TRINITY TRANSCRIPTION SERVICES**

52

1    Heritage Dictionary.

2              "A group of people officially delegated to perform a

3              function, such as investigating, considering,

4              reporting, or acting on a matter."

5              Our group is not official.  We have not been

6    delegated by anyone to do anything.  We are a group that has

7    gotten together to act in our mutual interests.

8              For example, our group has no by-laws.  It has no

9    written agreement forming the group.  There are no rules as to

10   how things are conducted.

11             That is because any noteholder is entitled to join

12   the group, or drop off the group at any time.  Any noteholder

13   is free to take any position it wants, regardless of the

14   consensus of the group.  We are not a committee.  We do not act

15   on behalf of anyone else.

16             Rule 2019, by its own terms, makes it clear what they

17   mean by committee, 'cause after it says every committee, it

18   uses the word "representing."  We do not represent others.  We

19   do not serve as the agent.

20             For our brief provides various definitions of the

21   word represent, which means, you act in the name of, with the

22   authority of, on behalf of, as the agent for, others.  We do

23   not.  We do not represent anyone.

24             Further down in Rule 2019, it talks about you should

25   deposit with the Court the instrument, if any, showing how the

53

1   committee "is empowered to act on behalf of creditors or equity

2   security holders."

3          Now the "if any" means it's possible you don't have

4   an instrument, but my point is, we are not empowered to act on

5   behalf of anyone.  We don't have an instrument anyway, but if

6   we did, it would not empower us to do anything.  We are not a

7   committee within the meaning of this statute.

8          Turning again to *Northwest*, it talks about a couple

9   of other points.  First, *Northwest* is the first decision, 70

10  years, to compel a non-fiduciary committee to make this kind of

11  disclosure.

12         And in doing that, when you read the *Northwest*

13  decision, you'll find that Judge Gropper concluded that, in

14  fact, they were holding themselves out to be quasi fiduciary.

15  Therefore, they should be treated as a fiduciary committee.

16         Let me direct quote from the decision.  When I talked

17  about for whose benefit is this.  Quote --

18         **THE COURT:**  Which page.

19         **MR. FROME:**  "Northwest decides through the" -- the

20  *Northwest* decision.

21         **THE COURT:**  I know, but do you know which page it is?

22         **MR. FROME:**  This is Northwest 2.  There's two slip

23  opinions.  This is the second one, the second one being March

24  9th at page 7.

25         **THE COURT:**  All right.

54

1          **MR. FLASCHEN:** "Rule 2019 protects other members of

2     the group," meaning of the class, here the shareholders, "and

3     it forms them where a committee is coming from by requiring

4     full disclosure, protects other members of the group."  It

5     doesn't protect the Debtor.  It doesn't protect other parties

6     in the case, other members of the group, meaning the class.

7          Here there are no other members of the class

8     interested or asking for this information.  They don't even

9     want it from each other if they're on the group.

10          Similarly, in *Northwest*, again Northwest 2 at page 7,

11          "Other shareholders have a right to information as to

12          committee member purchases and sales so that they can

13          make an informed decision whether this committee will

14          represent their interest, or whether they should

15          consider forming a more broadly based committee of

16          their own."

17          We do not represent their interests.  We expressly

18     disclaim representing the interest of any other noteholder.  In

19     addition, it would not be possible for other noteholders to

20     form a more broadly based committee.  There's only two, three,

21     five percent of notes not on the committee.

22          Again, *Northwest* really focused on the fact this

23     group's holding 27 percent.  And also holding substantial debt

24     claims, purporting to negotiate for the entire class of

25     shareholders.

1          The *Northwest* Court also talks about this group

2     trying to leverage its position by saying it could negotiate on

3     behalf of the entire group of shareholders.  It's a variation

4     of what I just said before.

5          We're only 27 percent.  But if you come to agreement

6     with us, it will deliver the class of shareholders.  We are not

7     saying that.

8          We're saying if you come to agree -- agreement with

9     us, it will deliver the votes of the members of our group who

10    are in support of that agreement, nothing more than that.

11         In *Northwest*, Northwest was an insolvent entity.  The

12    shareholder committee there was fighting to get any recovery at

13    all.  To them it was, therefore, critical that they be

14    appear -- they appear to represent the entire class of

15    shareholders.

16         Again, motivation being if you negotiate a deal with

17    us 27 percent, you will have the consent of the entire class of

18    shareholders.  Therefore, there will be no confirmation fight.

19         Here everyone talks about Scopac being solvent.

20    There is no issue of a recovery for the timber noteholders.

21    We're not seeking to exercise that type of leverage.  We don't

22    need it.

23         Finally, and again, these are all variations of the

24    same theme, but these are phrases taken straight out of the

25    *Northwest* decisions.

56

 1          Judge Gropper felt it would serve an important public

 2    purpose, and would provide valuable information to the

 3    substantial majority of the shareholders who were not members

 4    of the ad hoc shareholders as a group.

 5          Again, it emphasizes for those benefit disclosure

 6    was.  And it emphasizes that in Northwest's financial majority

 7    holders were not on that committee.

 8          We do not believe the use of the word committee in

 9    2019(a) applies to the type of group we are.  Whether we walk

10    like a committee, or talk like a committee, we do not.  Whether

11    we call ourselves a committee, we plead guilty on that.  But we

12    are not a committee within the meaning of 2019(a).

13          Turning to 2019(b).  Counsel's correct.  It does not

14    literally say the Court can permit someone not to comply.

15          It says if the Court finds that 2019(a) applies,

16    which we believe it does not, the Court may enter various types

17    of -- types of orders.  And the word is may.  It's not shall.

18          The Court may determine with that, that the Court may

19    refuse the Court to permit the entity to participate, but it's

20    not required to.  It may do other things.  It is all

21    discretionary.

22          We site a case in our pleading to the proposition

23    that this includes the ability of a Court to enter no relief at

24    all on the basis that no purpose would be served by complying

25    with the Rule.  No one's ox is being gored by failing to comply

1   with the Rule.

2         It was reversed on appeal.  We say that in our

3   pleading.  The reversal was on a different issue entirely.

4   This involved whether the press had access to information.  But

5   was the classic reversed on other grounds.

6         We then get to our statutory arguments.  Rule 1001

7   says that the Bankruptcy Rules, "Shall be applied to ensure a

8   just, speedy, and efficient reorganization."

9         It would not be just to apply Rule 2019 to a group of

10  this nature, because many members of the group would drop off.

11  That would harm the speedy and efficient reorganization,

12  because then there are far fewer timber noteholders involved in

13  the discussion and the process.

14        So requiring our group to comply with this Rule would

15  result in the opposite of a just, speedy, and efficient

16  reorganization.

17        Next, we believe that applying this rule would deny

18  our right to free speech.  It is a fundamental Constitutional

19  provision.  Applying this rule would say we are not permitted

20  to speak as a group, because there is a condition to our doing

21  so.

22        We are also a secured creditors.  And therefore, the

23  United States Constitution, we have a property interest that is

24  protected.  This would deny us our property interest by denying

25  us the ability to appear and be heard on the basis of this

58

1    rule.

2            We also talk in our pleadings, and it's more in depth

3    there.  I'm not going to bore you too much with the U.S.

4    Constitution, but about the equal protection of the laws.  We

5    do not believe this would be equal protection to compel a group

6    to disclose its individual holdings in this fashion.  So

7    there's a whole host of reasons here.  I encourage you to take

8    this under advisement and read our pleadings.

9            I want to bring it right back to where we started.

10   We do not believe this applies to us at all.  Even were your

11   Honor to say maybe it does apply to us, we ask you to what end?

12           No one needs this information.  No one has any use

13   for this information, except possibly a noteholder itself.  And

14   none of the noteholders want this information.

15           It's not just, oh, that's nice.  The members of our

16   group affirmatively instruct me.  I am not permitted to share

17   with other members of the group what the holdings are.  In

18   fact, Gardere Wynne, who's in Court today, our financial

19   advisor, Houlihan Lokey, they do not know the individual

20   holdings, or the amounts of the timing people paid for their

21   debt.  Only Bracewell, and only Evan Flaschen knows that

22   information to show you how important it is.

23           This is simply Scopac taking advantage of a *Northwest*

24   decision and saying ah, ha!  Here's another way maybe we can

25   attack the noteholder group.

1           And I'll say it again.  I said it at the last

2    hearing, all we want in this case, your Honor, whether it's

3    through S-A-R-E, or through this pleading or anything else, it

4    just gets Scopac to file its plan of reorganization, and to do

5    it soon, so that we can all engage in the real battle of this

6    case, which is the valuation and the treatment of the

7    timbernotes.  And please permit that 95 percent of the

8    timbernotes represented in this group, do represent in a just,

9    speedy, and efficient manner, the views of that 95 percent.

10          Rather than compelling us to break up into 40

11   separate, individual noteholders, filing 40 separate,

12   individual pleadings, all advocating pretty similar things,

13   that would hardly be an efficient result in this case.

14          Thank you, your Honor.

15          **THE COURT:**  All right.  Thank you.

16          I'm going to take a three minute break.  And then

17   we'll hear from the other counsel on the phone --

18          **UNITED STATES MARSHAL:**  All rise.

19          **THE COURT:**  -- Milbank Tweed.

20          **MR. BARR:**  Thank you, your Honor.

21          **(Recess taken from 12:18 p.m. to 12:24 p.m.)**

22          **THE COURT:**  Be seated.  All right.  Go ahead.

23          **MR. BARR:**  Thank you, your Honor.

24          Again, this is Matthew Barr of Milbank Tweed, on

25   behalf of the Securities Industry and Financial Markets

60

1    Association, and the Loan Syndications and Trading Association.

2              Your Honor, these institutions are two of the

3    nation's leading industry groups in the debt and equity

4    markets, whose members include many of the largest and best

5    known participants in today's financial markets.

6              While our clients have no view on the underlying

7    merits of any disputes between the Debtors and the noteholder

8    group in these cases, our clients are very concerned, your

9    Honor, that any order approving the Debtor's 2019 motion will

10   have a detrimental impact on the active and vibrant market that

11   trading distressed company's debt and equity security, and an

12   willingness and ability of many sophisticated parties in

13   interest in these cases, and sophisticated institutions, from

14   participating in future bankruptcy cases.

15             So as institutions that focus on the health and

16   vitality of these financial markets, we believe that our

17   concerns are much broader than those that you heard here today

18   so far, your Honor.  And we also believe that we're well

19   situation to bring forth to you negative market implications

20   and public interest concerns.  And that's why we filed our

21   amicus brief in support of the Ad Hoc Group's objection to the

22   motion, your Honor.

23             Forcing disclosure of the information that the

24   Debtors see here will require public dissemination of highly

25   confidential and proprietary information from certain stake

1   holders.

2          We believe that requiring that information, in all

3   likelihood, will erect a substantial obstacle to certain

4   parties participating in future Chapter 11 cases.  And, in

5   fact, may in, as you've heard from other counsel, cause certain

6   parties from dropping out of currently pending Chapter 11

7   cases.

8          We believe that these obstacles will prevent the

9   involvement of sophisticated parties that have frequently made

10  positive contributions, and offered valuable input in

11  restructurings, and will continue to hopefully in the future,

12  and also negatively impact the markets that create liquidity in

13  Debtor's securities, by preventing and hampering the ability of

14  parties to manage their expose.

15         Because these markets allow certain parties to

16  liquidate their exposure and avoid the delay and uncertainty of

17  a bankruptcy case, and also create volatility in -- in certain

18  securities, which also increase values of restructurings, your

19  Honor.

20         As you heard, seeking by motion, or compelling to

21  seek a party to file a disclosure by 2019, for an ad hoc group,

22  is inconsistent with -- with customary practice.  We've also

23  heard that -- that counsel here, if he filed a 2019 motion,

24  which is generally how that rule is complied with when you deal

25  with ad hoc groups of creditors acting collectively by sharing

62

1   costs of counsel, and other professionals, whether they're

2   acting on their own behalf.

3          So we would submit, your Honor, that like in other

4   cases, 2019 had been complied with in this case by counsel.

5   And that is customary practice.

6          We believe that that commonly-held view is the proper

7   interpretation of 2019 under these circumstances, and

8   consistent with the history that led to the promulgation of

9   2019 when ad hoc groups are acting on their own behalf and

10  don't have a fiduciary obligation to other parties that they

11  may be similarly situated to.

12         It should also be noted, your Honor, that customary

13  practice of stakeholders maintaining their proprietary trading

14  information in strict confidence is a corollary to the

15  fundamental principal of trading in these types of securities.

16  Which is, that the value of a claim in a -- or an interest in a

17  bankruptcy case is determined by the nature of the Debtor's

18  obligation under that instrument or equity security, not the

19  price that a stakeholder paid that's asserting that right in

20  that interest or in that claim.

21         It's well established that the consideration paid for

22  a claim or interest is irrelevant to the treatment of that

23  claim or interests.  Courts have also repeatedly held, your

24  Honor, and we site in our brief, that to reduce the value of a

25  claim or interest based upon the price at which someone

1    purchased that claim or interest, is to visit an unearned

2    windfall upon a Debtor.  And to destroy the incentive for

3    investors to purchase distressed claims.

4        And these are some of the concerns that we have if these

5    parties, of course, disclose how much they paid for these

6    securities.

7            And this is exactly, your Honor, what will happen if

8    these parties are forced to disclose their basis in the

9    Debtor's securities.  It is inevitable that this information

10   will be used to the advantage of other parties in negotiations

11   in such things as treatment of securities under a plan, or if

12   these parties that have disclosed the information, decide to

13   liquidate their position, this information will be used against

14   them in the marketplace, because people understand and know the

15   basis upon which they purchased this security.

16           Requiring the information, your Honor, will

17   undoubtedly shift the focus of negotiations in bankruptcy cases

18   from the Debtor's obligation to these parties, under the terms

19   of the relevant instruments, to the consideration that the

20   specific stakeholder should be receiving based upon what he or

21   she purchased the security at.

22           It should come as no surprise, your Honor, and I

23   don't think anybody's been hiding it, that parties trade in

24   securities with an expectation to make a profit.  Disclosure of

25   somebody's basis will impair that prospect.  And ultimately, we

64

1    believe, and we fear, will leave parties not betrayed in these

2    types of securities or to participate in restructuring.

3        Your Honor, as you heard briefly from counsel, and it

4    is set forth in our papers as filed, we do believe that the

5    motion filed by the Debtor, and an order granting it, would be

6    inconsistent with the history of why 2019 is in the Bankruptcy

7    Rules.

8        The disclosure found today in 2019 is a solution to

9    an agency problem that is simply irrelevant to ad hoc groups

10   that are formed in today's bankruptcy cases, who typically

11   expressly disclaim any intent to represent any other parties

12   but themselves, and do not owe a fiduciary duty to any other

13   party.

14       Twenty-nineteen was promulgated to allow smaller

15   investors, or at certain -- in certain cases, larger investors

16   with small positions, your Honor, faced with the prospects

17   of -- of having to negotiate with larger investors, or Debtors,

18   or larger committees, with the ability to understand who was

19   negotiating with them, which you heard before the so-called

20   protective committees.  And again, that's laid out in much more

21   detail in the pleadings as filed.

22       If these parties, these smaller investors, or larger

23   investors with the small positions, were faced with the

24   prospect of having to disclose this highly confidential and

25   proprietary trading information, it is highly likely, and this

65

1    is another fear that our clients have, that they will not

2    coordinate efforts in order to share the costs.  And will,

3    therefore, it will become economically irrational for them to

4    take active roles and participate in bankruptcy cases.

5            This may be parties, and these are very highly

6    sophisticated parties, who hire not only experienced and

7    sophisticated counsel and advisors, but bring their own

8    experience to a restructuring process, would likely be that the

9    business decisions not to purchase securities, to the detriment

10   of those who want to liquidate their position, and to a

11   debtor's case, and not get involved in restructuring matters to

12   the detriment of all involved.

13           Again, because there's -- although we have an ad hoc

14   group that the Debtors believe is detrimental to the process in

15   causing delays and what -- what I guess could be characterized

16   as side shows, there are many, many cases where ad hoc groups

17   add tremendous value to cases, irrespective of official

18   committees being appointed.

19           Giving today's debt structures and capital

20   structures, there are many ad hoc groups that form because they

21   believe, given the complexity of a company's structure, they

22   need an added voice to be heard.  And there are many, many

23   examples of where these sophisticated, experienced parties help

24   a process and bring it towards reorganization.

25           In the same vein, your Honor, and we site the cases,

66

1    there are many Courts that recognize that joint activity by

2    creditors facing a debtor is commonly in the best interests of

3    all parties.

4            Forcing these creditors to act alone, because,

5    unfortunately, that is likely the outcome if these creditors

6    are forced to disclose this confidential, proprietary

7    information, will lead these stakeholders with no practical

8    choice but to either decide to act on their own, which would

9    compel them to resort to the most extreme action available,

10   which is likely litigating many, many issues to protect their

11   individual claims.

12           This obviously is contrary to bankruptcy principals

13   of encouraging collective action, which will foster consensual

14   reorganization.

15           Specifically, your Honor, our clients are concerned

16   that a 2019 ruling forcing these parties to disclose the

17   confidential, proprietary information, the impact of that will

18   be borne by not only by the markets as we discussed, and the

19   parties, but will be borne by lots of parties involved in

20   reorganization cases.

21           Individual creditors and interest holders that want

22   to liquidate their claims to get out of a -- a Chapter 11 or a

23   restructuring, and not endure the time and certainty of that

24   case, will be impacted because potentially there is no longer

25   an efficient liquid market out there.

67

1          Individuals, as opposed to groups, will have to

2    share -- would have to, excuse me, bear the costs of

3    litigation, which would absolutely go right to somebody's

4    bottom line of how much they believe they can get out of a

5    particular claim, or interest, which goes into a business

6    decision of whether or not he or she wants to buy that interest

7    from a holder.

8          Again, collective actions share and spread those

9    costs.  And that's why groups are -- are very prevalent in

10   bankruptcy cases today.  These groups also retain typically

11   highly sophisticated and experienced professionals to negotiate

12   with the debtors.  Which, I'm sure, your Honor, can appreciated

13   a negotiated outcome of a Chapter 11 is by far superior than a

14   litigated time costly, expensive process in a confirmation.

15         By discouraging collective actions, you're going to

16   have fewer sophisticated and knowledgeable investors willing to

17   go through these negotiation processes, because of just the

18   cost and expense, which will hurt all.

19         Again, your Honor, we heard that this particular Ad

20   Hoc Group in the Debtor's view is diverting the Debtor's

21   attention from and delaying a reorganization process.

22         Again, it's indisputable there are many, many cases

23   where, even though there are official committees appointed, the

24   ad hoc committees bring tremendous to restructurings.

25         We fear that if parties are imposed upon to file

68

1    these 2019 statements, the business decision, in and of itself,

2    may prevent them from getting involved in restructurings.  The

3    requirement of this may directly impact public markets will

4    then hurt small creditors.

5         Also, it may just be an unintended consequence, by

6    forcing people to comply with 2019 in these circumstances,

7    where they expressly disclaim any fiduciary duty to other

8    parties or that they're representing anything other than their

9    self interests, your Honor, may unintendedly imply some kind of

10   representative capacity upon these stakeholders, which they

11   didn't assume as a role in the case, because of the history of

12   2019.

13        Therefore, complying with that rule, or forcing them

14   to comply, is another reason why these parties may in and of

15   themselves decide we can't get involved in a restructuring,

16   because we don't want to have the appearance of having a

17   representative fiduciary capacity to parties we are not

18   intending to represent.

19        Again, your Honor, the fear is that at the end of the

20   day, being required to disclose confidential and proprietary

21   information will lead people to the rational business decision

22   of not buying or selling securities of a distressed company,

23   and not participating in Chapter 11 cases.

24        If they decide to, we believe that it won't lead to a

25   consensual negotiation process, which most parties promote in

69

1   Chapter 11.  So it would lead to much more a liquidation, time

2   consuming costs, and be detrimental to all of the parties

3   involved in restructurings.

4          So we respectfully support, your Honor, the Ad Hoc

5   Group's motion -- objection to the motion, and believe that the

6   motion should be denied for the reasons stated here and in our

7   brief, your Honor.

8          **THE COURT:**  All right.  Anyone else have anything

9   further?

10         **MS. COLEMAN:**  Can I just be heard very briefly, your

11   Honor.

12         **THE COURT:**  All right.

13         **MS. COLEMAN:**  I'd just like to respond very quickly.

14         And your Honor, Mr. Flaschen said why does Scopac

15   care?  Well, your Honor, with all due respect, it doesn't

16   really matter.  I'll tell you why we care.  But it doesn't

17   really matter why we care.

18         We care for all the reasons that the Rule is there in

19   the first place.  Let's take another example of disclosure

20   required in a bankruptcy case.

21         Every Debtor has to file a disclosure statement.  And

22   you could take the position that in any given case why does

23   anybody care about this particular piece of the disclosure

24   statement?  It's not relevant here because, set forth your

25   reason.

1          It doesn't matter why we care.  That being said, I'll
2   tell you why we are.  And it's all -- it's actually not even
3   just about us.  We care because we have to do a plan.  We care
4   precisely because the Ad Hoc Committee does have a big voice in
5   this case.  They represent a lot of the debt in our case.  Well
6   one could argue almost all the debt in our case.

7          So we care because we have to negotiate with these
8   people.  And we need to know who we're talking to.  It doesn't
9   help us to say we have $695 million of your $714 million of
10  debt.  It helps us a little bit, but it doesn't help us as much
11  as we need.  Because if you say our committee is these 30
12  people.  Well, okay, they're freely trading.

13         What if one of them has 20 percent of the notes on a
14  given day, and at the time of the filing of a given pleading,
15  and then they're still in footnote one at the time of the next
16  pleading, but they've sold down in the public markets, which
17  they're able to do, and then they only own one percent.

18         We are entitled to know that information.  And that's
19  exactly what 2019 says we are entitled to get.  And we're
20  entitled to get the information as of the date of the committee
21  was formed, and we're entitled to -- to frequent updates.
22  We're entitled to the same information that Mr. Flaschen has.
23         We care because we need to know who we're talking to
24  and who owns what.  Moreover, your Honor, as I said, it's not
25  all about us.  The process requires disclosure.  And process

1    requires transparency.

2         And I'm just going to ignore Mr. Flaschen's comments

3    about that, because -- because information is currency in

4    bankruptcy.  And the process does require -- does require this

5    kind of disclosure.

6         Now Mr. Flaschen says it doesn't apply to a committee

7    like this, and he went through the history.  And I would

8    recommend you to read the first *Northwest* opinion does a

9    wonderful job of doing this as well, better than I can do here.

10   So I will simply refer you to that.

11        But it's very simple, your Honor.  Yes, the initial

12   SEC report focused on protective and reorganization committees.

13   But when the rule, which was the predecessor rule to current

14   rule 2019 was drafted, it wasn't so narrow, your Honor.  They

15   didn't say protective or reorganization committees, like the

16   kind referred to in Justice Douglas' SEC Report of 1937.

17        It says committees.  These people are acting as a

18   committee.  Mr. Flaschen say we don't need to be a committee

19   here.  And you don't need to -- we don't need to make the

20   disclosure, 'cause we don't -- because all you're doing is

21   protecting other people in the class.  And we already represent

22   everybody anyway, so they don't need protection.

23        That's just not right, your Honor.  If you refer to

24   the sentence that he -- that Mr. Flaschen referenced on page

25   seven, it's actually my sentence is seven going on to *Northwest*

1   2, which is at tab six in our binder.

2           Mr. Flaschen read you a sentence talking about --

3   about protecting the others in the class that the Ad Hoc

4   Committee is in.  Very next sentence, your Honor, says, "It

5   also give," "it" being disclosure,

6                "Also gives all parties a better ability to gauge the

7                credibility of an important group that has chosen to

8                appear in a bankruptcy case and play a major role."

9           That's exactly, your Honor, what we have here.

10          I'd like to read another sentence from six to seven

11  to *Northwest 2*, again at tab six in our book.  And this goes to

12  the issue of the percentage.  Mr. Flaschen makes much of the

13  fact that --

14          **THE COURT:**  Now we're on tab six?

15          **MS. COLEMAN:**  We're on tab six, page six, your Honor,

16  at the very bottom.  Staring the sentence, "By acting as a

17  group."  It's three lines up from the bottom.

18                "By acting as a group, the members of this

19                shareholders committee subordinated to the

20                requirements of Rule 2019, their interest in keeping

21                private the prices at which they individually

22                purchased or sold the Debtor's security."

23          They chose to act as a group.  They didn't have to do

24  that.  They chose to act as a group.  And once they do, they

25  bring themselves under Rule 2019.  And I don't care if they

73

1    call themselves, a group, or a committee, or -- or whatever
2    they call themselves.

3              Your Honor, very briefly, with respect to the -- to
4    the industry association concerns.  First I would point out
5    that of the -- of the funds that have been required to
6    disclose -- that were required to disclose in Judge Gropper's
7    opinion in *Northwest,* a number of them have chosen to simply
8    make the disclosures.  And I have not heard of any -- of any
9    market crashes.

10             **THE COURT:**  Okay.  Well, does the -- Mr. Flaschen
11   suggested that the New York Judge did, in fact, place an
12   emphasis on the fact that they were representing people other
13   than the members of the committee.

14             **MS. COLEMAN:**  Well, your Honor --

15             **THE COURT:**  Is that in there or is he wrong?

16             **MS. COLEMAN:**  It is --

17             **THE COURT:**  I mean, that's always been my
18   understanding.  I just went back to look at Colliers, and as we
19   all have to go back to the beginning from time to time.  And
20   they talk about -- about fiduciary.  It only applies to the
21   fiduciary representations.

22             **MS. COLEMAN:**  Well, no.  No, Judge.

23             **THE COURT:**  It doesn't use the word representative
24   fiduciary representations.  And I don't know whether it makes
25   any difference.  I hadn't really thought about it that much.

74

1          But -- but there's no question that if there are two

2     or three people being represented -- two or three claimants

3     being represented by one lawyer, I think the rule requires the

4     lawyer to file the -- the -- because he represents more.

5          But when you -- the committee itself as an entity,

6     has to file, I'd always thought, when they represent more than

7     the committee.  They purport to represent not only their 93

8     percent, but the hundred percent.

9          **MS. COLEMAN:**  Well, your Honor, they are clearly

10    not --

11         **THE COURT:**  Is that distinction in the -- in -- I

12    haven't read the *Northwest* opinion.  So is that --

13         **MS. COLEMAN:**  I bet you're going to.

14         No.   Judge Gropper does not -- does not talk about

15    the fiduciary issue in either, I believe, either of the

16    opinions.  However --

17         **THE COURT:**  Colliers clearly limits the requirement

18    to file to fiduciaries --

19         **MS. COLEMAN:**  But --

20         **THE COURT:**  -- the fiduciary committees.

21         In other words, if there's a -- if you have some sort

22    of fiduciary responsibility to people that you're not actually

23    representing, then it makes sense that the people that

24    you're -- that you're purporting to represent ought to know

25    about you.

75

1            Now in -- and in addition to that, it also lets

2    everybody else know about you.  But the paramount

3    responsibility is to those people that you're purporting to

4    represent.  And the Court has an interest in making certain

5    that that's done appropriately.

6            **MS. COLEMAN:**  Your Honor, Judge Gropper did address

7    this issue, but he addressed it --

8            **THE COURT:**  Okay.  So you got help.

9            **MS. COLEMAN:**  Yeah.  He did address it.  It's on --

10   it's in --

11           **THE COURT:**  Which --

12           **MS. COLEMAN:**  -- tab six.

13       **(Voices speaking off the record)**

14           **THE COURT:**  Tab six.  At page -- this is the opinion

15   on *Sealand* (phonetic)

16           **MS. COLEMAN:**  Yeah.  Exactly.

17           **THE COURT:**  Where?

18           **MS. COLEMAN:**  Yeah.  It's the same pagination, your

19   Honor.  It is on page seven --

20           **THE COURT:**  All right.

21           **MS. COLEMAN:**  -- tab six.  And --

22           **THE COURT:**  And what does it --

23           **MS. COLEMAN:**  I'll read it -- I'll read it as

24   follows.

25           **THE COURT:**  Okay.

76

1              **MS. COLEMAN:**  "This committee contends that it did

2              not take on any fiduciary responsibility to the

3              shareholders as a group when it appeared in these

4              cases.

5              Assuming arguendo for purposes of this motion that

6              the committee does not as a fiduciary, Rule 2019 is

7              based on the premise that the other shareholders have

8              a right to information as to committee member

9              purchases and sales, so that they make an informed

10             decision whether this committee will represent their

11             interests, or whether they should consider forming a

12             more broadly based committee of their own.

13             It also" --

14    Then it goes into the sentence I just read.

15             "It also gives all parties a better ability to gauge

16             the credibility of an important group that has chosen

17             to appear in a bankruptcy and play a major role."

18             So, your Honor, Judge Gropper assumed that -- assumed

19    no fiduciary responsibility and does not -- does not read --

20    read it in the same way as Colliers.  I haven't looked at

21    Colliers, but if Colliers requires a fiduciary, then Judge

22    Gropper does not -- does not agree with that.

23             Your Honor, I'll just close by briefly addressing

24    the -- briefly addressing the trade industry -- the trade

25    industry concerns.

1          First of all, your Honor, it's very clear that --

2    that the industry just doesn't like this Rule.  I think they

3    don't like this Rule, though, your Honor, not because they're

4    worried about the Debtor finding out what they paid for their

5    claims.

6          Because it is clear, and Scopac absolutely concedes,

7    that what is paid for a claim does not affect how much has to

8    be -- how it has to be treated under a plan of reorganization.

9    That's absolutely clear.  And there's no point in spending any

10   time on it.

11         What they really don't like is that each other are

12   going to find out -- they're all competitors, they're all going

13   to find out what they paid.  And that's really what they --

14   that's really what they don't want to do.  And unfortunately,

15   that is -- that is simply not a problem that this Court can

16   address.

17         Rule 2019 says what it says.  I'd like to read a

18   quotation from Dow Jones Newswire today in a -- in an article

19   about this case.  It says,

20             "Hedge funds, lightly regulated private investment

21             funds, have managed to turn the bankruptcy system

22             into a return-driven market, while keeping their

23             trading secrets in tact, in spite of the Bankruptcy

24             Code's disclosure requirements."

25             Your Honor, counsel -- the counsel for the industry

78

1    association makes it sound like you're talking about something

2    radical, and crazy, and new.  And if you force people to

3    disclose all of this stuff, wait a minute, the statute -- this

4    Rule has been on the books for -- for 70 years.  It's not new.

5    There are plenty of situations in which it's been required.

6              As I said, in *Northwest*, some of the -- some of the

7    committee members who've -- who were ordered to disclose have

8    actually done so.  And, again, we don't have any record that

9    the markets are crashing.

10             Your Honor, I want to close with a quotation from the

11   end of the first *Northwest* opinion, which is tab five.

12             "The Rule is longstanding.  There is not basis for

13                  failure to apply it as written.  Although the

14                  committee argues that the Rule has been frequently

15                  ignored or watered down, there is no shortage of

16                  cases applying it."

17             Your Honor, we would submit that it should be applied

18   in this case.  And the Ad Hoc Committee should be required to

19   disclose.

20             Thank you.

21             **THE COURT:**  All right.  Well I'll take this matter

22   under advisement.

23             **MR. JORDAN:**  Your Honor, may I just submit for the

24   record --

25             **THE COURT:**  Okay.

**TRINITY TRANSCRIPTION SERVICES**

79

1        **MR. JORDAN:**  -- on behalf of members, we support the

2   motion of Scopac for reason.  And I want to reference for you

3   page six of the brief and response that was filed by the Ad Hoc

4   Committee, on for this purpose.

5        They indicate that they operated by consensus.  And

6   then, "The consensus decision," which there is no rules, no

7   majority, nothing, it just says they sent emails around.  It

8   says,

9             "The consensus decision is not binding on an

10            individual noteholder group members.  And any member

11            is free to drop off or rejoin a group at any time."

12       Now there's one lawyer who says that he is

13   representing people who may disagree with him, and drop off,

14   and then come back onto the committee.  And the only reference

15   that I want to be certain, only because we seem to get the

16   fallout from the activity of this committee, which, by the way,

17   has been incredibly active in this case, not in support of what

18   we believe is reorganization.

19       So we obviously have somewhat different goals.  And I

20   only point this out, and the Palco Debtors stress that the

21   Court gauge the credibility as -- as the New York Judge says,

22   of the representation.

23       What is it when Mr. -- when Mr. Flaschen shows up at

24   the podium and says, I represent, and then we find that what he

25   actually represents is maybe a group who has reached some

80

1    undefined consensus with a bunch of them dropping off for this
2    particular reason, in case anybody later asked, well who gave
3    you the authority to do that.  Would it be nice for some of
4    them said, well we dropped off.  We didn't want to deal with
5    it.  So we had ten percent left, or five percent left.  He
6    said, well I had a majority, 'cause that's all that were left.

7         So the problem that we have as the Palco Debtors is
8    how do you gauge the credibility of someone who's going to be
9    as active and aggressive as Mr. Flaschen is when he says I have
10   no signed agreement, lawyer agreement, which I thought every
11   lawyer had to have with every filing.  In Texas you do.  It's a
12   matter of ethical requirements that you must have a signed
13   agreement to the extent of your representation.

14        And I have a committee that someone can disagree and
15   drop off, and then later come back on, and I could represent
16   then again, even though I may have represented something which
17   was a conflict to them in an earlier case.

18        So aside from the confusion, I simply want to point
19   out that this committee could not possibly have any credibility
20   attributed to them, unless every time Mr. Flaschen approaches
21   the podium he gives you a complete count of everyone who has
22   said yea, said nay, gotten off the committee, decided not to
23   vote, so that his consensus might be of a different percentage
24   or a different method.

25        And, your Honor, it just -- to me 2019 --

08-13555-mg   Doc 15746-8   Filed 04/08/11   Entered 04/08/11 10:21:48   Exhibit H
Pg 88 of 107
Case 07-20027   Document 695-3   Filed in TXSB on 04/24/07   Page 6 of 25

81

1          **THE COURT:**  I thought he did that in the footnote for

2     each time he filed a pleading.

3          **MR. JORDAN:**  Well my problem is this.  He might -- he

4     may do that from time to time.  He certainly isn't obligated to

5     do that.  This is something I said he -- has suggested he can

6     do or would do.  But he's not obligated to do that.

7          And that isn't, then, the compliance with 2019 in any

8     event.  We don't know when he represents -- I still represent

9     so-and-so, who at one point in time, claimed to have a -- a 20

10    percent stake, only has a 1 percent stake.

11         And so, your Honor, I'm not suggesting that you don't

12    fashion whatever you think is the right type of disclosure, if

13    any.  I'm really pointing to the -- the issue of without that

14    kind of disclosure, gauging the credibility of this committee

15    would be -- is, to me, practically impossibly.

16         **THE COURT:**  Okay.

17         **MR. FROME:**  Your Honor, Evan Flaschen.  I do want to

18    respond briefly.  I'm an officer of this Court.  I will stack

19    my credibility up against Shelby Jordan's or anyone else in the

20    room.  I resent the implications otherwise.

21         When I sign a pleading, I mean what I say.  And up in

22    Court --

23         **THE COURT:**  I don't think --

24         **MR. FROME:**  -- on behalf of those rules --

25         **THE COURT:**  Before you get upset, I think what he was

82

1    saying was not that -- that you're undependable.  But that --

2    that there are times when you have argued or, I mean,

3    apparently you have filed -- in every one of your pleadings

4    that you filed, did you put a footnote one that said how

5    members of your -- that you represented?

6              **MR. FROME:**  That is correct, your Honor.

7              **THE COURT:**  Okay.  So now the only problem would be

8    is when between the time when you file it, and we actually hear

9    it, should you be required to do a, basically a footnote one,

10   when you stand up to argue it?

11             **MR. FROME:**  All right.  Since Rule 2019 does not

12   apply, no, we should not be required.  I am happy to do so

13   voluntarily.

14             **THE COURT:**  Okay.

15             **MR. BARR:**  Your Honor, I'm sorry.  This is Matt Barr

16   from Milbank, just two --

17             **THE COURT:**  Yes, sir.  Go ahead.

18             **MR. BARR:**  Thank you.  Two very quick data points,

19   just so you have them in front of you in response to Debtor's

20   counsel.

21             First it is our understanding that after the

22   *Northwest* ruling that certain members of the ad hoc equity

23   committee did drop off that committee.  And number two, from a

24   market perspective, your Honor, the equity was trading at about

25   $1.50 right before Judge Gropper's ruling.  It is now at 72

**TRINITY TRANSCRIPTION SERVICES**

83

1   cents, or a 50 percent reduction in the equity value, your

2   Honor.

3          So there is some data to prove that it did have some

4   impact.  Don't know the extent of the impact, but that's

5   exactly what we fear, your Honor, is that the impact would be

6   detrimental.

7          **THE COURT:**  All right.  Thank you.

8          **MR. FIERO:**  Your Honor, If I might.

9          **THE COURT:**  Yes, sir.

10         **MR. FIERO:**  Your Honor, as you know, John Fiero, for

11  the Official Committee of Unsecured Creditors.

12         As you know, the Committee did not take a position on

13  this motion.  But I'm just struck that every time any committee

14  or group in this case takes a position, the first thing that

15  the Debtors suggest is that we have to examine the credibility

16  of the Committee.

17         I don't understand why in this case.  And, in

18  particularly in this case, where the briefs are incredibly

19  detailed.  The arguments are well thought out, and presented

20  with all of the time that -- that you've graciously allowed us,

21  that the question of the credibility of the speaker is somehow

22  more important or superseding to the credibility of the

23  arguments.

24         And, you know, this issue is not going away.  There

25  is still pending a potential attack on the Unsecured Creditors

84

1    Committee, with respect to a as yet unruled upon and unargued

2    Motion to Reconstitute the Official Committee of Creditors.

3            And so, at some point in this case, we have to get

4    past these issues and start thinking about reorganization  And

5    the Committee's ready to do that now, your Honor.

6            **THE COURT:**  Okay.

7            **MR. JORDAN:**  Your Honor, If I can make it clear for

8    the record, I wasn't talking about credibility of any person.

9    I was talking about how you gauge the credibility of this group

10   when they are an amoeba.  They're a moving target.  That's all

11   I had a reference to.

12           If Mr. Fiero worries about representation I make

13   every time I go to the podium, that was his comment just then.

14   I don't think I made any representation about any counsel or

15   any party credibility.

16           I only want the Court to keep in mind that there's a

17   committee who is -- who is the 500 pound gorilla in many

18   occasions, even Mr. Fiero's committee when there was a SARE

19   motion pending, deferred to that committee to speak; didn't

20   take a position at all which, to me, was a very loud position.

21   So --

22           **THE COURT:**  Well he took a editorial position earlier

23   on in the case.  But it changed when we got to the -- they

24   didn't take an official position --

25           **MR. JORDAN:**  But I just please --

1          **THE COURT:**  -- when we got to the case.

2          **MR. JORDAN:**  Yes, sir.  If it just please for the

3    record, so that the --

4          **THE COURT:**  The committees in cases do have great, I

5    mean, I have the -- you know, I often defer to the committee --

6          **MR. JORDAN:**  Well that's why --

7          **THE COURT:**  -- because they are the people who have

8    the most at stake.  They're the -- the unsecured creditors.

9    And I think that if --

10         **MR. JORDAN:**  If that was the only reference I meant

11   is what bases do you have --

12         **THE COURT:**  I understand that.  And I didn't, I mean,

13   I -- I can also understand how somebody might have their

14   feelings hurt by what you said, but I think they misunderstood

15   what you said.  'Cause they were not, I mean, I think -- I

16   think it's important to have groups to be able to represent

17   parties so that we don't have 500 noteholders in here with 500

18   lawyers.  We've got enough lawyers involved already.  That's a

19   good thing.

20         I mean, it's important to have creditors committees.

21   That's a good thing.  All of those things are good things.  And

22   it's also important to have a plan.  That's a good thing.

23         So we'd love to have a plan and a disclosure

24   statement, even though it's just required.  I mean, I agree

25   that it's required and we have to have that also.

1           But as for this motion, I will -- I will take it

2    under advisement and -- and rule on it.

3           All right.

4           **MR. FROME:**  And, your Honor --

5           **THE COURT:**  And I do think it would be important for

6    you to -- if there's been any significant change in the people

7    you represent at any time when you make a presentation, you

8    need to -- you need -- I think it would be good, I mean,

9    there's no question I would want you to tell us that.

10          **MR. FROME:**  As I said, I voluntarily am happy to do

11   so.

12          **THE COURT:**  All right.

13          **MR. FROME:**  I would also suggest, your Honor, should

14   you decide that we are required to make disclosure, we would

15   request time, then, to file a motion to file that information

16   under seal, in the same way this Debtor has already sought to

17   file under seal, information about its relationship with the

18   Morris and Forester firm.

19          **THE COURT:**  All right.  Thank you.

20          **MR. FROME:**  Thank you.

21          **THE COURT:**  All right.  Now we're down to the -- oh,

22   certification.  Okay.  So somebody has to remind me what it is

23   that I do when somebody wants an issue certified to the Fifth

24   Circuit.  Is that my call?  Or is it initially my call and then

25   it goes to the District Court to make the call?  Exactly

87

1   what -- do I have to make a recommendation to the District

2   Court under circumstances like that?  What does the Code say?

3            **MR. MAYR:**  Your Honor, this is -- I'd be happy to

4   address that, your Honor, Kurt Mayr, Bracewell & Giuliani on

5   behalf of the noteholder group.

6            Certification is a two step process under Title

7   28, --

8            **THE COURT:**  Okay.

9            **MR. MAYR:**  -- Section 158(d)(2).  New provision

10  cannot --

11           **THE COURT:**  158(d)(2) is the --

12           **MR. MAYR:**  (d)(2).

13           **THE COURT:**  D as in David?

14           **MR. MAYR:**  D as in David.

15           **THE COURT:**  Okay.

16           **MR. MAYR:**  An act that is part of the 2005

17  amendments, has expanded the Court of appeals appellate

18  jurisdiction in bankruptcy matters, skipping the District Court

19  appeal process in certain circumstances.

20           And the process for certifying to do that, is two

21  step, fist before your Honor or before the District Court, or

22  before both, the appellant, if there is no agreement of the

23  parties with respect to certification, makes a request for

24  certification, and the Court can issue a very brief order that

25  certifies the issues in the relevant decision to the Circuit

88

1   Court.

2        We've elected to come to your Honor, obviously,

3   having just received your decision last Friday.  At that point,

4   the issue is sent to the Fifth Circuit Court of Appeals.  And

5   the Fifth Circuit Court of Appeals has the discretion to

6   determine whether or not to accept the certification.

7        One big distinction between the two steps is that at

8   the Bankruptcy Court, District Court level, certification is

9   required if any of the three circumstances in the statute are

10  present.  The Circuit Court of Appeals, however, has discretion

11  to determine whether or not it wants to accept that

12  certification.

13       **THE COURT:**  Okay.  So what impact -- first of all, do

14  you have to make sort of interim order?  Do I have to sort of

15  recommend, first of all, that the matter be -- be appealed --

16       **MR. MAYR:**  No, your Honor.

17       **THE COURT:**  -- and then certified?

18       **MR. MAYR:**  No, your Honor.  All we have to do is file

19  a Notice of Appeal, then it is on appeal.  And then we request

20  your Honor to --

21       **THE COURT:**  This isn't an order -- this is an order

22  that is appeallable as a matter of right?

23       **MR. MAYR:**  I believe so, your Honor.  I even titled

24  it a final order.  It is a Relief From Stay order which --

25  which -- which is final in this Circuit under *In re: Chun*

**TRINITY TRANSCRIPTION SERVICES**

89

1     (phonetic).

2               **THE COURT:**  Okay.

3               **MR. MAYR:**  And in any event --

4               **THE COURT:**  Okay.

5               **MR. MAYR:**  -- that's an issue more for the Appellate

6     Court to determine at the end of the day.

7               **THE COURT:**  Okay.  So go ahead.

8               **MR. MAYR:**  So the -- why don't I just skip ahead to

9     the three grounds, all of which we think are present here.  The

10    first --

11              **THE COURT:**  The statute sets out three grounds?

12              **MR. MAYR:**  It does, 158(d)(2)(A) sets out three

13    separate grounds, any one of which is sufficient to support

14    certification.

15              The first is whether or not the decision being

16    appealed presents the legal question for which there's no

17    controlling Court of Appeals or Supreme Court authority.  We

18    think that as your Honor's decision, and the parties' briefs in

19    this case, indicate, there is no controlling Fifth Circuit or

20    Supreme Court decision on interpreting the scope of

21    §101(51)(b), the single asset real estate definition in the

22    Bankruptcy Code, either when it was enacted in '94 through to

23    the recent enactments in 2005.

24              I understand that the -- the Debtor has fled a

25    response claiming that the *In Re: Humble Place* decision in 1991

**TRINITY TRANSCRIPTION SERVICES**

90

1    is somehow Fifth Circuit controlling the jurisprudence.  That

2    case, obviously, predates enactment of the SARE definition in

3    the Bankruptcy Code and can't be controlling on the meaning of

4    that definition.

5           The second ground is whether or not the legal

6    question requires reconciling conflicting decisions.  And as --

7    as your Honor saw on the parties' briefs, there are conflicting

8    decisions; one by your Honor and by the Eastern District of

9    Texas in the *Golf Partners Case*, which have adopted passive

10   versus active test.  And the *Kara* (phonetic) *Homes Decision*

11   recently in the District of New Jersey, which rejected that

12   test.

13          There's a conflict between the two decisions that

14   urgently needs reconciliation at the Court of Appeals level.

15   It's be very helpful for -- for parties to understand what

16   exactly single asset real estate cases mean in the aftermath --

17          **THE COURT:**  The *Golf Partners Case*, did it get

18   appealed?

19          **MR. MAYR:**  I don't know the answer to that, your

20   Honor.

21          **THE COURT:**  It didn't get certified.

22          **MR. MAYR:**  Not that I know of.

23          **THE COURT:**  That we know of.  Okay.

24          Has anything been certified?

25          **MR. MAYR:**  In the Fifth Circuit?

1        **THE COURT:** In the Fifth Circuit.

2        **MR. MAYR:** It's funny that you ask. Mr. Melko was

3     telling me earlier today that he had a -- had heard that there

4     was a discussion recently among the fifth Circuit Judges that

5     they were so surprised that parties had not been certifying

6     bankruptcy appeals.

7              So far, they had really thought that they would get

8     more than they are getting, and they're looking forward to

9     getting some. Hopefully, we can give them one.

10            The third ground under the statute is whether the

11    appeal would materially advance the Chapter 11 case. The star

12    motion, given the economic realities of this case has always

13    been about getting this Debtor to put a plan of reorganization

14    on the table on an expedited basis.

15            And obviously in a bankruptcy case, which is about

16    reorganizing a Debtor, getting a plan on the table sooner

17    rather than later, which would be the result of a successful

18    appeal, would materially advance Scopac's Chapter 11 case.

19            For those reasons, your Honor, we believe that all

20    three of the grounds for certification are present. The

21    statute is worded in a mandatory shell with respect to

22    certification by Bankruptcy Courts and District Courts.

23            And we would respectfully request your Honor to

24    certify the questions presented in your Honor's final decision,

25    which are legal questions. As you will recall, we -- as your

92

1    Honor I think observed the first time that we had a status

2    conference on the SAFE motion, you thought it was a legal

3    issue.  We agreed.  And we stipulated to the Debtor's facts in

4    their pleadings, and in their opening statements is a

5    relatively focused legal question that was ripe for direct

6    review by the Fifth Circuit.

7                It is the -- the new §158(d)(2) was enacted for

8    situates just like this, situations where Congress recognized

9    the -- the double layered appellate process in bankruptcy often

10   moves too slow for parties who need expedited review.  And

11   that's what the SARE statute is all about, expedition.  And we

12   would like to move this -- move this along as your Honor has

13   moved the termination of the SARE Motion along before this

14   Court, at the appellate level now, though.

15               **THE COURT:**  All right.  Thank you.

16               **MR. MELKO:**  One clarification, your Honor.

17               **THE COURT:**  Yes, sir.

18               **MR. MELKO:**  Mr. Mayr gives me way too much credit.  I

19   wasn't privy to the Fifth Circuit discussion.  What actually

20   happened was Judge Jones spoke at a Court function in Houston

21   last week.  And apparently said that she was -- wanted to be

22   sure the bankruptcy lawyers knew about this provision, and

23   expressed some surprise that they has not seen a number of

24   these come up.

25               Thank you.

**TRINITY TRANSCRIPTION SERVICES**

93

1          **MR. FROME:**  Good afternoon, your Honor.  Eric Fromme,

2     Gibson, Dunn, and Crutcher on behalf of Scotia Pacific Company.

3          Just a clarification to first start off with.  The

4     new section 28 U.S.C. 158(d)(2), needs to be read a little bit

5     more closely.  (d)(2)(A) starts off with,

6               "The appropriate Court of Appeals to have

7               jurisdiction of appeals described in the first

8               sentence of subsection (a)."

9          So we go back to subsection (a) of 158,

10               "The District Courts of the United States shall have

11               jurisdiction to hear appeals from final judgments, or

12               orders, and decrees, from interlocutory orders

13               regarding exclusivity."

14          I shortened that up.  And then,

15               "With leave of the Court from other interlocutory

16               orders of decrees."

17          To the extent that this -- that your order regarding

18     the SARE Motion is an interlocutory order, they first must

19     obtain leave from the Court.  SO you do have discretion to --

20     to grant that appeal.

21          Then you go into the three factors that Mr. Mayr went

22     through that's laid forth in 28 U.S.C. 158(d)(2)(A).  And

23     that's Roman, that's i, ii, and iii.

24          First of all, this matter is -- this matter is -- it

25     says it involves a question of, although there's no controlling

94

1    decision at the Court of Appeals level.  The *Humble Place*

2    decision, your Honor, has been followed in this Circuit on SARE

3    decisions.  And we believe it is controlling -- controlling

4    authority.

5           The second factor is that there's a question of law

6    regarding conflicting decisions.  Okay.  There's no conflicting

7    decisions out there.  *Kara Homes* follows every case that's out

8    there.  The determining factors in *Kara Homes* were factual

9    decisions, factual findings by the Court.

10          This Court made factual decisions in a factual

11   application of the law.  When pressed during oral argument,

12   counsel for the noteholders admitted that's a fact specific

13   inquiry.  At best, it's a mixed question of law and fact.  It's

14   not a question of law.

15          The next factor is this is going to materially

16   advance the progress of the case.  And really the only reason

17   given is that a SARE -- SARE provisions allow for expedited

18   relief.  Therefore, since -- since it's denied, we should get

19   an expedited appellate process.

20        But Congress didn't provide for expedited appeals of SARE

21   decisions.  They simply didn't.  If it wanted to do so, it

22   would have.

23          Here they don't meet any of the -- of the

24   requirements of the section.  It's up to your Honor, and it's

25   your discretion, as well, to determine whether this is an

1    interlocutory appeal -- interlocutory order.

2         The issue before your Honor is -- is why can't we go

3    through the normal appellate process?  There's really no --

4    there's really no reason.  The Debtors are moving forward.

5    Scopac is moving forward, formulating its plans of

6    reorganization, formulating alternatives, based on what

7    Blackstone -- the work that Blackstone's been doing.

8         They're working on their long-term projections.  And

9    they're working on hiring an evaluation consultant.  They're

10   moving forward expeditiously.

11        There's no reason to -- to unnecessarily short

12   circuit that process.

13        **THE COURT:**  All right.

14        **MR. FROME:**  Thank you, your Honor.

15        **THE COURT:**  Thank you.

16   **(Pause)**

17        **MR. MAYR:**  Your Honor, if I may, just a couple of

18   very quick points.

19        On the issue of whether this is an interlocutory

20   appeal, I think I mentioned the *Chun Case*, just want to give

21   your Honor a citation for that if you think that's an issue

22   that you need to decide.  I think that's an issue that the

23   Court of Appeals for the District Court decides.

24        But *In re: Chun* in 106th F.3d. 1239, Fifth Circuit

25   Case, 1997.  In addition, if, in fact --

**TRINITY TRANSCRIPTION SERVICES**

1        **THE COURT:** And it said that a Motion to Lift Stay --

2    proceeding on a lift stay is a final order.

3        **MR. MAYR:** It's a final order, yes.

4        **THE COURT:** Okay.

5        **MR. MAYR:** And that is the majority -- majority rule,

6    your Honor.

7        In additional, you know, I think that at the first

8    scheduling conference where we raised -- where we discussed the

9    SARE motion, it was the Debtor's position that this essentially

10   was a declaratory judgment relief. You could view it also as

11   though this were a complaint with one claim that you have now

12   denied.

13       That is a final order, final judgment on the merits

14   for our request for determination whether or not this is a

15   single asset real estate debtor. And

16       **THE COURT:** Okay. All right.

17       **MR. MAYR:** That's all I have, your Honor.

18       **THE COURT:** Okay. You wanted to say one more thing?

19       **MR. FROME:** Your Honor, I just want to clarify. I've

20   never been quite clear what the motion, the SARE Motion was.

21   It's a motion for declaratory judgment. We made that clear

22   that the status should be -- should have been an adversary

23   proceeding, or it was a relief from stay.

24       They argued that it wasn't for a relief from stay.

25   The issue is is that I still think it's an interlocutory order.

**TRINITY TRANSCRIPTION SERVICES**

1    Regardless, I think the case law is -- is that if the motion to

2    grant a relief from stay, then that's a final order.

3            But if it's a motion to deny relief from stay, I

4    think the law is less clear in that it's a -- it's an

5    interlocutory order.

6            Thank you your Honor.

7            **THE COURT:**  All right.  Does the Creditors Committee

8    have a position on this?

9        **(Pause)**

10           **MR. HOLZER:**  Your Honor, as you know, this -- this

11   motion was filed on an emergency basis.  And the Creditors

12   Committee did not take an explicit position yet.

13       But what I'm struck by is the fact that six parties moved

14   to transfer venue in this case.  And we now see more and more

15   things happening, matters going either upstairs or all the way

16   to New Orleans.

17           And I'm sure that the Creditors Committee and the

18   other Movants, including the State of California, are not

19   interested in seeing the merits of the venue motion prejudiced

20   by anything that happens in this Court, one week, one month,

21   two months after the motion was presented and argued to the

22   Court.

23           **THE COURT:**  Okay.  Anything else?

24       **(No audible response)**

25           **THE COURT:**  Does that conclude everything?

**TRINITY TRANSCRIPTION SERVICES**

98

1        **MR. HOLZER:**  That's all the matters on the docket for

2    today, your Honor.

3        **THE COURT:**  All right.  I did promise to have the

4    venue ruling last week, and I didn't finish it.  So I apologize

5    for that.  We're working as hard as -- hard as we can.

6        Thank you.

7        **MR. FROME:**  Your Honor, before you -- this is Evan

8    Flaschen again.

9        **THE COURT:**  Yes, sir.

10        **MR. FROME:**  The one item which I request you not take

11    under advisement is this certification, because if your Honor

12    should decide it, we will take it to the District Court.

13    Because, again, timing is of the essence.

14        So whether it's now or after a short period, we would

15    just like a top ruling on that.

16        **THE COURT:**  Yeah.  I agree with you.  I mean, it

17    either needs to go to the Circuit Court, because it needs to be

18    decided quickly, and the relief is basically mooted by not

19    granting the appeal or -- and things of that sort.  Or it

20    doesn't, one of the two.

21        But in any event, so I -- I agree with you for

22    various reasons.  But perhaps the most important one is is that

23    whatever I do in that, it's going to be looked at by the

24    District Court.

25        I assure that I got to get it done quickly.

**TRINITY TRANSCRIPTION SERVICES**

99

1          **MR. FROME:**  Yes, your Honor.

2          **THE COURT:**  So thank you.

3          **SOME COUNSEL:**  Thank you, your Honor.

4          **THE COURT:**  You all are excused.

5          **(This proceeding was adjourned at 1:13 p.m.)**

1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript from the

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8    _Ch: Kudeshot_                    _April 20, 2007_

9              Transcriber                         Date

10   07-20027

11   04/10/07 - 04/20/07

**TRINITY TRANSCRIPTION SERVICES**