WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU – 2297)
J. Christopher Shore (JS – 6031)
Andrew W. Hammond (AWH – 0415)

Attorneys for the Ad Hoc Group
of Lehman Brothers Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
In re                                                : Chapter 11 Case No.
                                                     :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**           : 08-13555 (JMP)
                                                     :
                       Debtors.                      : (Jointly Administered)
------------------------------------------------------------------x

**OMNIBUS STATEMENT OF THE AD HOC GROUP OF LEHMAN BROTHERS CREDITORS TO (1) MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE FOR AUTHORITY TO CONSENT TO ITS NON-DEBTOR AFFILIATE LEHMAN ALI INC. (I) ENTERING INTO COMMITMENT LETTER WITH INNKEEPERS USA TRUST; (II) SUPPORTING THE CHAPTER 11 PLAN OF CERTAIN AFFILIATES OF INNKEEPERS USA TRUST; AND (III) PARTICIPATING IN THE AUCTION FOR CERTAIN OF THE ASSETS OR EQUITY OF INNKEEPERS USA TRUST; (2) MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE FOR APPROVAL OF THE PURCHASE OF NOTES ISSUED BY PINE CCS, LTD. FROM BARCLAYS BANK PLC AND THE TERMINATION OF THE PINE SECURITIZATION; AND (3) MOTION OF LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO MAKE ADDITIONAL INVESTMENTS WITH RESPECT TO 25 AND 45 BROAD STREET**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group"), by and through

its undersigned counsel, hereby files this omnibus statement (the "Omnibus Statement") to (1)

the Motion of Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code

for Authority to Consent to Its Non-Debtor Affiliate Lehman ALI Inc. ("ALI") (I) Entering Into Commitment Letter with Innkeepers USA Trust; (II) Supporting the Chapter 11 Plan of Certain Affiliates of Innkeepers USA Trust; and (III) Participating in the Auction for Certain of the Assets or Equity of Innkeepers USA Trust, dated March 22, 2011 [Docket No. 15259] (the "Innkeepers Motion"); (2) the Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of the Purchase of Notes Issued by Pine CCS, Ltd. from Barclays Bank PLC and the Termination of the Pine Securitization, dated March 23, 2011 [Docket No. 15283] (the "Pine Motion"); and (3) the Motion of Lehman Brothers Holdings Inc. Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Make Additional Investments with Respect to 25 and 45 Broad Street, dated March 22, 2011 [Docket No. 15257] (the "Broad Motion," and together with the Innkeepers Motion and the Pine Motion, the "Motions"), filed in the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (the "Debtors").  The Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

1.      As with many prior post-petition transactions involving the LBHI estate, the transactions at issue in the Innkeepers Motion, the Pine Motion, and the Broad Motion all raise concerns regarding inter-Debtor relationships and entanglements, the potential waiver or relinquishment of estate rights, and the manner in which the Debtors have operated and continue to operate as one consolidated enterprise.  As the Ad Hoc Group has done in the past, upon reviewing these Motions, counsel reached out to the Debtors to discuss their concerns.  The Debtors, for their part, amplified the justifications for their actions, but left other questions unanswered either due to the lack of a definitive answer to an issue or a reluctance to provide certain financial data underlying the Motions.  Following these interactions, the Ad Hoc Group

2

has concluded that, with respect to each Motion, it is not able to conclude that the relief sought by the Debtors is adverse to the Debtors' collective best interests. The Ad Hoc Group has also concluded, however, that a different conclusion might apply if the transactions outlined in the Motions were to be viewed on an estate-by-estate, deconsolidated basis. Rather than precipitating a resolution of such issues today, the Debtors have agreed to address the Ad Hoc Group's concerns by including broad inter-Debtor reservations of rights in the proposed forms of order, as has been the practice in these cases to date.

2.  As discussed herein (and on prior occasions with the Court), reservations of rights are not the answer to the enterprise problem—they merely defer consideration of extremely complex inter-Debtor issues to another day. Once again, the Group notes that, if parties in interest are to receive timely distributions in these cases, inter-Debtor issues have to be resolved either by the Court, as litigated by ad hoc groups, or settled by an affirmative vote of all interested parties in the plan process. We further note that, over the past few months, these kinds of conflicts are manifesting themselves more frequently as the Debtors seek to unwind complicated prepetition financial structures in order to unlock value in the plan process. In fact, the amount of the inter-Debtor disputes at issue continues to grow into the billions upon billions, which amounts only include transactions that have been restructured with Court approval.[1]

---

[1] See, e.g., Order Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of Two Note Purchase Agreements with the Insolvency Administrator of Lehman Brothers Bankhaus AG (In Insolvenz) at 3-4 [Docket No. 15278]; Order Pursuant to Section 363 of the Bankruptcy Code and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure Authorizing LBHI and LCPI to Enter Into Settlement Agreement Related to Heritage Fields Property and to Consummate Transactions in Connection Therewith at 3 [Docket No. 13518]; Order (I) Allowing LCPI to Acquire Certain Loans Through a Joint Venture and (II) Authorizing LCPI and LBHI to Provide Gap Funding Through A Term Loan, Revolver, and Preferred Equity Investment at 3 [Docket No. 10954]; Order Pursuant to Section 363 of the Bankruptcy Code Amending the RACERS Transaction Documents and Terminating Certain RACERS Transaction Documents at 6 [Docket No. 10464]; Order Pursuant to Bankruptcy Rule 9019 Authorizing Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc. To Enter Into Release and Termination of Loan Agreement and Other Documents with TS Boston Core Holdings, L.P.; 125 High Junior Mezz, L.P.; One Federal Intermediate Mess, L.P.; One Federal Junior Mess, L.P.; and Other Borrower Affiliates at 3 [10953]; Order Granting LBHI's Motion, Pursuant to Sections 105(a), 363(b)(1) and 363(f) of the Bankruptcy Code

3

Given the procedural status of these cases, the question will soon turn from <u>whether</u> rights will be reserved to <u>when</u> the rights of the respective Debtor estates will be resolved, <u>who</u> will assert and defend them, and <u>how</u> that will be done.  Given the material impact that resolution of inter-Debtor issues will have on creditor recoveries, it is imperative that, while the business of the enterprise is ongoing, parties-in-interest in these cases not lose sight of the tremendous number of issues that may have to be resolved.

   3. In short, in light of the reservations of rights agreed to by the Debtors, the Ad Hoc Group's concern that the relief requested in the Motions would inordinately prejudice LBHI's rights has been addressed for the time being.  We simply submit this statement to assist the Court in understanding the Group's concerns relating to the underlying issues on the Motions and the ultimate importance of, and inherent limitations of, the inter-estate reservations of rights.

## I. STATEMENT WITH RESPECT TO THE INNKEEPERS MOTION

   4. The transaction at issue in the Innkeepers Motion is an exceedingly complex one and presents a stark example of the entangled nature of the Debtors' enterprise, both pre- and post-petition, and the overlapping interests held by their constituent estates.  The chart appended hereto as Exhibit A depicts, as best as the Ad Hoc Group can discern from the facts disclosed, the transaction proposed in the Innkeepers Motion, the relationship of that transaction to various prepetition inter-Debtor transactions, and the relationship of all the foregoing to the transaction approved by the Court in the orders on the Met Life Motion,[2] and the Bankhaus Motion[3] just two weeks ago.

---

and Rule 6004(h) of the Bankruptcy Rules, for Authorization to Transfer Certain Mortgage Servicing Rights to Aurora Bank FSB at 3 [Docket No. 10222].

[2] Motion for Entry of an Order Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 Authorizing Lehman Commercial Paper Inc. to Settle Dispute with the Metropolitan Life Insurance Company [Docket No. 2978] (the "<u>Met Life Motion</u>").

4

5.By way of further background, ALI originated a $367,658,725 financing (the "Financing") with Innkeepers in June 2007. The Financing was bifurcated into a $250 million floating-rate first mortgage loan (the "ALI Mortgage Loan") and a $117.7 million floating rate mezzanine loan (the "SASCO Mezzanine Loan"). (Innkeepers Motion at ¶ 1)

6.With respect to the ALI Mortgage Loan, LCPI sold and assigned the ALI Mortgage Loan to Variable Funding Trust 2007-1 (the "Met Life Trust") which was financed by Notes purchased by Met Life (the "Met Life Transaction"). In March 2010, LCPI entered into a settlement with Met Life, whereby LCPI repaid the outstanding Met Life Notes and transferred the ALI Mortgage Loan to ALI. As is customary, that settlement contained a broad reservation of rights, and in fact the Debtors have subsequent to March 2010 disclosed that LBHI is entitled to recover approximately $221 million contributed to the Met Life Trust although the Notes are currently reflected on the ALI balance sheet. See Monthly Operating Report (June 2010 - Supplemental) [Docket No. 14105] at 9 ("Subsequent to the Met Life Settlement in March 2010, it was determined that LBHI made pre-petition cash contributions of approximately $221 million to VFT 2007 and VFT 2008 to meet collateralization requirements prior to the Chapter 11 cases. As a result, the Company believes LBHI is entitled to recover these amounts.").

7.With respect to the SASCO Mezzanine Loan, LBHI sought approval six weeks ago from this Court to purchase Bankhaus' interests in certain notes issued by SASCO (the "SASCO Notes") for at least $625 million.[4] (Bankhaus Motion at ¶ 22) One of the assets

---

[3] Motion of LBHI Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of Two Note Purchase Agreements with the Insolvency Administrator of Lehman Brothers Bankhaus AG (in Insolvenz), dated March 2, 2011 [Docket No. 14743] (the "Bankhaus Motion").

[4] Pursuant to the Note Purchase Agreements, Bankhaus will sell, and LBHI will purchase on the Closing Date all of Bankhaus' right, title and interest in and to the following Notes: Initial Face Amount U.S. $1,450,000,000.00 Floating Rate Term Notes Due 2038 issued pursuant to that certain Indenture, dated as of May 22, 2008, by and among SASCO 2008-C2, LLC, Wachovia Bank, National Association and Wells Fargo Bank, National Association, CUSIP Number: 78403WAA6 (the "Purchased SASCO Notes"). On the Closing Date, (i) LBHI shall pay Bankhaus an amount equal to the SASCO Purchase Price, and (ii) Bankhaus shall deliver, or cause to be delivered, the

5

underlying the SASCO Notes is the approximately $120 million Mezzanine Loan of Innkeepers held by SASCO 2008-C2 LCC ("SASCO"). On March 23, 2011 the Bankruptcy Court approved LBHI's Motion to purchase, among other things, the SASCO Notes for $625 million. [Docket No. 15278] Upon information and belief, the SASCO Notes transaction has yet to close.

8. In the Innkeepers Motion, filed March 22, 2011, the Debtors now seek authority to consent to Lehman ALI, Inc. ("ALI"), a non-Debtor affiliate of LCPI, entering into transactions that would allow it to pursue a stalking horse bid for substantially all of Innkeepers' assets (the "Stalking Horse Bid") and participate in an auction for those assets if necessary. (Innkeepers Motion at ¶ 7) In the proposed transaction, the Debtors, along with Five Mile Capital II Pooling REIT LLC (together with its affiliates, "Five Mile"), and Midland Loan Services Inc., a division of PNC Bank, National Association ("Midland") have agreed with Innkeepers on the terms of the Stalking Horse Bid for substantially all of the Innkeepers enterprise and seek approval to enter into such agreement pursuant to the Innkeepers Motion.

9. Specifically, if all of the transactions contemplated in the Stalking Horse Bid are consummated:

(a) ALI and Five Mile will post a $20 million deposit, funded equally by ALI and Five Mile, to secure their obligations under the Commitment Letter.

(b) ALI will exchange its interest in the ALI Mortgage Loan for up to 50% of the new equity in reorganized Innkeepers and a cash payment of at least $26.2 million.

(c) The Solar DIP Loan will be repaid in full, in cash.

(d) Five Mile will purchase up to 50% of the new equity of Innkeepers for an amount of up to $174.1 million.

(e) The transactions will be consummated through an Innkeepers' chapter 11 plan which would be supported by both ALI and Five Mile.

(f) It is anticipated that a third-party investor and a new property manager will purchase in the aggregate up to 20% of the new equity for up to $70 million, and the cash

---

Purchased SASCO Notes to LBHI. (Bankhaus Motion at ¶ 25) Note that the purchase price can increase under certain circumstances. (Bankhaus Motion at ¶ 25).

6

received by ALI will increase, and the amount paid by Five Mile will decrease correspondingly. This will proportionately reduce the amount of the new equity held by ALI and Five Mile.

10. The Stalking Horse Bid is subject to higher and better offers, and Innkeepers and their advisors are currently in a marketing process for potential bids. (Innkeepers Motion at ¶ 31) If any potential bidders come forward, Innkeepers will conduct a formal auction (the "Auction") for the Innkeepers' assets. (Innkeepers Motion at ¶ 31) Any winning bid at the Auction must provide a payment in cash for an amount not less than $200.3 million (the "ALI Cash Payout"), and ALI will receive its proportionate share of any overbid amount. (Innkeepers Motion at ¶ 30) The Debtors state that the ALI Cash Payout is required "in order to protect ALI's interest" if the Stalking Horse Bid is not the winning bid at the Auction. Furthermore, any competing bid must be substantially similar to the terms of the Stalking Horse Bid, including the treatment of claims as set forth in the Term Sheet.

11. If no higher bid materializes, under the terms of the Stalking Horse Bid, LCPI would receive a recovery of approximately 91% on the $220 million outstanding under the ALI Mortgage Loan.[5] With respect to the anticipated recovery on the Mezzanine Loan, the Term Sheet attached to the Commitment Letter states, "SASCO 2008-C2, as 100% participant and owner of all economic and beneficial interests in the mezzanine loan relating to the assets in the floating rate pool . . . shall receive a structured note or other debt or equity instrument or other consideration on terms to be agreed upon between [Lehman ALI and Five Mile] and [Innkeepers], provided that it votes to accept and otherwise supports" the Innkeepers plan of

---

[5] Under the terms of the Stalking Horse Bid, in exchange for its interest in the ALI Mortgage Loan, ALI will receive either 50% of the New Equity ($174.1 million) and at least $26.2 million in cash or 40% of the New Equity ($139.3 million) and $61 million in cash, for a total consideration valued at $200.3 million. The current balance of the ALI Mortgage Loan is approximately $220.2 million, so the $200.3 million total consideration represents a recovery of approximately 91% to ALI on the ALI Mortgage Loan. If the Stalking Horse Bid is not the winning bid at an Auction, the winning bid must provide a $200.3 million payment, in cash, to ALI, preserving ALI's 91% recovery. (Innkeepers Motion at ¶ 25)

7

reorganization. (Term Sheet at 4) The Term Sheet and Commitment Letter provide no additional information on SASCO's (and thus LBHI's) anticipated recovery on the Mezzanine Loan. In short, if the contemplated sale structure is completed, SASCO's interest in the Mezzanine Loan, and LBHI's derivative interest in that facility, could be rendered virtually valueless. On the other hand, by virtue of its 70.7% interest in the SASCO Notes, LBHI stands to benefit directly to the extent that SASCO recovers on the Mezzanine Loan in the Innkeepers bankruptcy proceeding.

12.    The Ad Hoc Group has significant concerns about the willingness of the LBHI estate to stand back and allow a process to move forward that could eradicate $117 million in loans that support its recovery on the SASCO Notes, and about the propriety of LCPI participating in the establishment of a "death-trap" for SASCO (and thus LBHI's) consent in the Innkeepers' case. Indeed, if one were only "wearing an LBHI hat," LBHI would not likely be supporting the proposed Innkeepers transaction and instead would seek to preserve the full value of the Mezzanine Loan through some alternate strategy. At the same time, however, the Ad Hoc Group is cognizant of the need to move these chapter 11 cases forward and maximize the total enterprise value of all estates as a means of increasing total recoveries to the creditors. To that end, as a means of accepting the lesser of two evils, the Ad Hoc Group has consulted with the Debtors on a reservation of rights provision in the proposed order granting the Innkeepers Motion. The Debtors have accommodated the Ad Hoc Group's request for the following reservation of rights that is, at best, a makeshift solution to a difficult problem:

> ORDERED that notwithstanding entry of this Order, all other rights, claims and defenses of LBHI and LCPI or any of the Debtors or their non-debtor affiliates with respect to the ownership of the ALI Mortgage Loan and the Mezzanine Loan (including without limitation rights, claims and defenses arising with respect to ownership from the Met Life Transaction) shall be reserved and not affected by this Order;

8

ORDERED that nothing contained in the Motion or this Order shall be deemed to be a waiver or the relinquishment of any other rights, claims, interests, obligations, benefits, or remedies of LCPI, LBHI or any of the Debtors or their non-debtor affiliates, that any of the Debtors or their non-debtor affiliates may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including against each other or third parties and that such reservations will be preserved as between the Debtors or their non-debtor affiliates notwithstanding any relief granted or order entered in the Innkeepers USA Trust chapter 11 bankruptcy case pending under case number 10-13800. It is further ordered that the parties are authorized to execute such further documentation necessary to reflect this reservation of rights.

13. As noted above, however, neither this reservation of rights, nor similar ones entered into in the past, is a complete solution to the problem created by having multiple debtors' estates operated as one enterprise and the complex financial entanglements resulting therefrom. To the extent the Court is ever called upon to determine a wholly "deconsolidated" statement of assets and liabilities of each Debtor, the Innkeepers' issues tabled today will have to be addressed. These include: (a) a judicial determination of the rightful owners of the ALI Mortgage Loan and the Mezzanine Loan, including ownership issues arising from the Met Life Transaction; (b) a valuation of the Innkeepers' Assets as determined by the Debtors; (c) a legal finding as to whether the Mezzanine Loan is "in the money" based on the Debtors' valuation of the Innkeepers' assets; (d) whether competing bids submitted from third parties would value the Innkeepers' assets differently than the Debtors have here; (e) whether the Debtors anticipate that LBHI will ever receive any consideration in respect of the Mezzanine Loan under the proposed transaction; (f) which Debtor entities will benefit from the acquisition of New Equity in the reorganized Innkeepers; and (g) how ALI will finance any overbid it places at an Auction for the Innkeepers' assets.

9

## II. STATEMENT WITH RESPECT TO THE PINE MOTION

14. Prior to the Commencement Date, LCPI sold participations in commercial loans to Pine CCS, Ltd. ("Pine"). (Pine Motion at ¶ 14) Pine then issued securities secured by such assets and the cash generated therefrom. (Pine Motion at ¶ 14) Upon information and belief, the securities held by entities with interests in the Lehman enterprise. The Pine securitization included senior Class A-1 Notes, the Class A-2 Notes, the Class B Notes, and the Subordinated Notes. (Pine Motion at ¶¶ 14, 15)

15. As the result of a number of subsequent transactions primarily related to post-petition repurchase transactions in connection with the sale of Lehman's brokerage dealer business to Barclays, Barclays Bank PLC ("Barclays") currently holds 99.6 % of the senior Class A-1 Notes (the "Barclays Notes,") and LBHI holds the remaining 0.4% of the Class A-1 notes (the "LBHI Notes"). (Pine Motion at ¶¶ 14-16, 19) LCPI currently holds the Class A-2 Notes, Class B Notes, and Subordinated Notes. (Pine Motion at ¶ 15) However, LBHI holds a security interest, in the Class A-2 Notes, Class B Notes, and Subordinated Notes issued by Pine pursuant to the Collateral Disposition Agreement entered into with JP Morgan, and approved by the Court on March 24, 2010. (Pine Motion at ¶¶ 14, 15) LBHI's security interest in the Class A-2 Notes, Class B Notes, and Subordinated Notes relates to a contingent claim LBHI has against LCPI which is based on events that the Debtors deem "unlikely to occur." (Pine Motion at ¶ 17)

16. Like the Innkeepers Motion, the Pine Motion presents yet another example of the entangled nature of the Lehman enterprise and highlights the conflicting interests that exist between two Debtor entities, LCPI and LBHI, which are on opposite sides of a proposed purchase and sale transaction.[6]

---

[6] Moreover, the Note Sale and Termination Agreement governing the purchase of the Barclays Notes and the termination of the Pine securitization is conditioned on the settlement of disputes among (i) entities collectively

10

17. Pursuant to the Pine Motion, LCPI seeks authority under section 363 of the Code to purchase Barclays Notes in the outstanding amount of $927,434,005.19 for a price of $805 million, which included $261 million already in the securitization and $303 million from amounts LCPI has collected on the Underlying Assets. In other words, LCPI will put in $241 million of its unrestricted cash to receive $927 million in Barclays Notes. (Pine Motion at ¶ 1, Declaration of David Walsh in Support of the Pine Motion at ¶ 8, [Docket No. 15284])

18. In addition, LCPI also seeks authority to purchase from LBHI, and LBHI seeks authority to sell, $4.08 million of LBHI Notes at a price of par plus all accrued interest. The stated purpose of the purchase and sale is to allow LCPI to obtain control over 100% of the capital structure of Pine. (Pine Motion at ¶ 2) To that end, LBHI will also release its security interest in the Class A-2 Notes, Class B Notes, and Subordinated Notes issued by Pine. (Pine Motion at ¶ 25) The Debtors claim that, by obtaining control over Pine, LCPI will be enabled to terminate the Pine securitization and own the Underlying Assets free and clear of the interests of any other party, which ultimately will allow LCPI to maximize the value of its interest in the Underlying Assets. (Pine Motion at ¶ 26) In other words, by obtaining the LBHI Notes, LCPI hopes to unlock substantial value that will inure to the enterprise. The Pine Motion is silent, however, as to how the price for LBHI's Notes was reached or as to how the anticipated unlocked value will be allocated throughout the enterprise. It is, however, our understanding that the "Debtors' intent" was initially to allocate all value to LCPI and to make the price paid to LBHI a "final" price.

---

referred to as Ceago, (ii) LBSF, (iii) LBHI and (iv) other parties (Motion Ex. A at ¶ 6). The Motion does not explain why such settlement is a precondition and does not specify the consideration, if any, that was exchanged between and among the parties to the Note Sale and Termination Agreement and the parties to the contemplated Ceago settlement to arrive at the settlement described in the Motion.

11

19. The Ad Hoc Group has consulted with the Debtors, who have accommodated the request of the Ad Hoc Group to include broad reservation of rights language in the Order to make clear that the settlements are not final. Once again, the reservation only defers a number of open issues, including: (a) the fair market value of the LBHI Notes and the price the LBHI Notes would obtain at an auction or under a similar market test; (b) whether LCPI was appropriately afforded the sole corporate opportunity to purchase the Barclays Notes at a discount (or whether LBHI should have been afforded a portion of that opportunity); (c) the fair market value of the security interests released by LBHI; (d) whether releasing LBHI's security interests in the Class A-2 Notes, Class B Notes, and Subordinated Notes was in fact in the best interest of LBHI; and (e) the nature and likelihood of the contingent claims LBHI has against LCPI arising out of the Collateral Disposition Agreement.

20. We note that following discussions regarding the reservation of rights, the Debtors filed the Supplemental Declaration of David Walsh in Support of Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of Notes issued by Pine CCS, LTD from Barclays Bank PLC and the termination of the Pine securitization. We assume this Supplemental Declaration was filed to provide additional information to the Court and was not in any way intended to limit the reservation of rights that was intended to address the Ad Hoc Group's concerns. However, if the Supplemental Declaration was intended to limit the reservation of rights in the proposed form of order, the Ad Hoc Group objects to the Pine Motion on the grounds outlined above.

**III. STATEMENT WITH RESPECT TO THE BROAD MOTION**

21.     Commencing in 2006, LBHI originated senior and mezzanine financing in the amount of approximately $309 million for certain entities controlled by Kent M. Swig to finance (a) the acquisition and condominium conversion of 25 Broad Street and (b) the acquisition of 45 Broad Street (together with 25 Broad Street, the "Properties"). LBHI's collateral for the financing included mortgage liens encumbering the Properties. (Broad Motion at ¶ 1)

22.     In 2007, LBHI, 25 Broad, LLC and Swig entered into a transaction involving, among other things, refinancing the acquisition costs of 25 Broad Street. (Broad Motion at ¶ 11) In connection with the transaction, LBHI provided the 25 Broad Loans, whose current aggregate outstanding balance is approximately $399.6 million. (Broad Motion at ¶ 11) LBHI's collateral for the 25 Broad Loans includes three mortgages encumbering 25 Broad Street. (Broad Motion at ¶ 11)

23.     LBHI, 45 Broad, LLC and Swig also entered into two loan transactions involving the refinancing of certain costs related to 45 Broad Street. (Broad Motion at ¶ 13) In connection with the transactions, LBHI provided the 45 Broad Loans (together with the 25 Broad Loans, the "Loans"), whose current aggregate outstanding balance is approximately $72.7 million including accrued and default interest. (Broad Motion at ¶ 13) LBHI's collateral for the 45 Broad Loans includes two mortgages encumbering 45 Broad Street. (Broad Motion at ¶ 13)

24.     Certain of the Loans were the subject of a repurchase transaction with Fenway Capital, LLC, as more particularly described in a prior motion filed by the Debtors concerning Fenway (the "Fenway Motion" [Docket No. 7831]). (Broad Motion at n.1). Upon information and belief, although the mortgages for the properties were held in LBHI, now, the beneficial interest was held by Fenway. Further, the Fenway Motion indicates that the repurchase

13

transaction involved LCPI's transfer of its interests in certain real property loans and other assets to Fenway Capital. (Fenway Motion at ¶ 11) Accordingly, it appears that LCPI may have had interests in the Loans as well.

25.    The borrowers on the Loans have since defaulted, and construction on the Properties has halted. (Broad Motion at ¶¶ 14, 18) Since then, LBHI has made investments in the Properties in the aggregate amount of approximately $39.9 million "to protect against asset loss and enhance the value of the collateral securing the Loans." (Broad Motion at ¶ 18)

26.    Pursuant to the Broad Motion, the Debtors seek authority for LBHI to make additional investments with respect to the Properties, which LBHI anticipates will not exceed $25.1 million in the aggregate. (Broad Motion at ¶ 2) The Debtors assert that such additional investments will assist LBHI in maximizing the value of its existing investment in the Properties.[7] (Broad Motion at ¶ 2)

27.    Similar to the Innkeepers Motion and the Pine Motion, the relief requested in the Broad Motion makes sense on an enterprise basis, but might not be in the best interests of the respective Debtor estates involved. Accordingly, the Ad Hoc Group's concerns have been addressed through the inclusion of a reservation of rights provision which preserves inter-Debtor claims.

28.    As with the other reservations, the one here will only defer a host of inter-Debtor questions for the Court to decide including: (a) a determination of the legal owners of the 25 Broad Loans and the 45 Broad Loans; (b) whether any other Debtor entities have interests or

---

[7] The Debtors did not seek individual Court authorization for any of these advances, instead taking the position that they had authority pursuant to the Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a) Establishing Procedures to (I) Restructure (II) Make New or Additional Debt or Equity Investments In, and/or (III) Enter into Settlements and Compromises in Connection with Existing Real Estate Investments, dated November 23, 2009 [Docket No. 5912] and/or that the advances were in the ordinary course of business. (Broad Motion at ¶ 18)

investments in the Properties that will benefit from the additional investments provided by LBHI; (c) the value of the Loans and the underlying collateral as determined by the Debtors; (d) whether LCPI or any other Debtor entity stands to recover with respect to the 25 Broad Loans and/or the 45 Broad Loans; and (e) whether it is appropriate for LBHI alone to make additional investments in the Properties.

For the foregoing reasons, the Ad Hoc Group joins in the relief sought by the Debtors and respectfully requests that the Court grant the relief sought by the Motions.

Dated: April 9, 2011
      New York, New York

                                      WHITE & CASE LLP
                                      1155 Avenue of the Americas
                                      New York, New York 10036-2787
                                      Telephone: (212) 819-8200
                                      Facsimile: (212) 354-8113
                                      Gerard Uzzi (GU-2297)
                                      J. Christopher Shore (JS-6031)
                                      Andrew W. Hammond (AWH-0415)

                                      By: /s/ Gerard Uzzi

                                      ATTORNEYS FOR THE AD HOC GROUP OF
                                      LEHMAN BROTHERS CREDITORS

15