# Exhibit 4

| **United States Bankruptcy Court/Southern District of New York** | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Brothers Holdings Inc.** | Case No of Debtor 08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al
08-13555 (JMP)    0000031955

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Program Securities (See definition on reverse side).

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Great Bay Condominium Owners Association, Inc.
6900 Great Bay
St. Thomas, Virgin Islands 008021010
with notices to be sent to: Nancy Elizabeth Shaw
P.O. Box 2
East Dover, Vermont 05341

Telephone number: (617) 947-5615    Email Address: neshaw@earthlink.net

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____ (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number: _____    Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 2,000,000*    * Indicates principal amount; other amounts may be due and sought, including interest, fees, costs and other damages.

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 USC §503(b)(9), complete item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Written guarantee, noncontractual claims (See Addendum)
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:
Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☑ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$ 2,000,000 (plus interest, fees, costs and other damages)

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 09/18/2009

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Nancy Elizabeth Shaw, Treasurer

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

___DEFINITIONS___

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers Securities (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

___INFORMATION___

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), and any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

<u>Addendum to Great Bay Condominium Owners Association, Inc.'s Proof of Claim</u>

Great Bay Condominium Owners Association, Inc. ("GBCOA") is an association comprised of more than 1000 individual homeowners, in the aggregate owning 1260 residence interests located in St. Thomas, Virgin Islands. GBCOA has filed this proof of claim on behalf of itself and its homeowners against Lehman Brothers Holdings Inc. ("LBHI") in the principal amount of $2,000,000, plus interest, costs, fees, and other damages, as applicable, and any other relief that is proper under law and equity, pursuant to LBHI's guarantee (the "Guarantee") of the debts and obligations of Lehman Brothers Treasury Co. B.V. ("LBT") owing under the prospectus (the "Prospectus," attached hereto as Exhibit A) relating to the Issue of Principal Protected SUNS due 2010 (the "GBCOA Security"), issued by LBT, guaranteed by LBHI and brokered by Lehman Brothers, Inc. ("LBI"), final terms dated July 11, 2007. The GBCOA Security's ISIN is XS0311765654, as indicated on GBCOA's August 2008 brokerage statement from LBI, also attached hereto as Exhibit B. The GBCOA Security purchase was made using funds obtained from GBCOA's individual homeowner constituents.

GBCOA is a customer of LBI and, on this basis, filed a claim (the "SIPC Customer Claim") with the trustee of LBI's Securities Investor Protection Act proceeding by the customer bar date of January 30, 2009. GBCOA's SIPC Customer Claim number is 800003349. Out of an abundance of caution, in the event GBCOA is deemed not to be a customer of LBI and its SIPC Customer Claim is disallowed, GBCOA also filed a proof of claim (the "SIPC Creditor Claim") as a general creditor of LBI by the creditor bar date of June 1, 2009.

GBCOA and its constituent homehowners also have a valid claim against LBHI on account of the Guarantee, as evidenced by this proof of claim. Pursuant to the Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form, entered in LBHI's bankruptcy cases on July 2, 2009 (the "LBHI Bar Date Order") [Docket No. 4271], GBCOA also intends to file a proof of claim against LBHI based on its Guarantee of the GBCOA Security as a "Lehman Program Security" (as defined in the LBHI Bar Date Order and identified on http://www.lehman-docket.com under the heading "Lehman Programs Securities" as of July 17, 2009 at 5:00 pm (prevailing Eastern Time)) by the special bar date of November 2, 2009 established for the filing of proofs of claim based on any Lehman Program Security.

As the GBCOA Security was represented to be 100% principal protected if held until the maturity date of July 26, 2010 (the "Maturity Date"), GBCOA's claim against LBHI includes a contingent component for interest accruing as of the Maturity Date through the date of distribution on the claim, if the principal amount is not paid before the Maturity Date.

As the GBCOA Security purchase was made using deposits aggregated by GBCOA's individual homeowner constituents, each of the more than 1000 individuals is entitled to priority on its *pro rata* portion of the claim up to the statutory cap of $2,425 pursuant to 11 U.S.C. § 507(a)(7). Accordingly, the subject claim is entitled to priority status on the $2,000,000 principal amount plus interest, costs, fees, and other damages, as applicable, up to an aggregate of at least $2,425,000.

In addition, GBCOA and its constituent homeowners seek all damages caused to them, including based upon tort, contract, and statutory violations committed by or on behalf of LBHI.

GBCOA is entitled to damages in the form of, _inter alia_: (i) compensatory damages; (ii) fees and costs (including as provided under the Guarantee) incurred in connection with pursuing GBCOA's claim; and/or (iii) punitive damages.  GBCOA reserves its rights to pursue recovery under these and other contract, tort, and damages theories relating to the GBCOA Security.

GBCOA reserves all rights to amend and/or supplement this proof of claim.

2

# Exhibit A

Final Terms dated July 11, 2007

## LEHMAN BROTHERS TREASURY CO. B.V.

**Issue of USD 2,000,000 Principal Protected SUNS®
(Stock Upside Note Securities®) due 2010
on an equally weighted basket of indices
Guaranteed by Lehman Brothers Holdings Inc.
under the U.S.$60,000,000,000
Euro Medium-Term Note Program**

### PART A – CONTRACTUAL TERMS

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Base Prospectus dated August 9, 2006, as supplemented by the Base Prospectus Supplements dated August 29, 2006, September 6, 2006, September 26, 2006, October 16, 2006, December 19, 2006, February 6, 2007, February 14, 2007, March 16, 2007, April 17, 2007 and June 29, 2007 (together, the "Base Prospectus") which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC)(the "Prospectus Directive"). This document constitutes the Final Terms of the Notes described herein and must be read in conjunction with such Base Prospectus. Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.

**Information Concerning Investment Risk**

**Noteholders and prospective purchasers of Notes should ensure that they understand the nature of the Notes and the extent of their exposure to risk and that they consider the suitability of the Notes as an investment in the light of their own circumstances and financial condition. The performance of the Indices (as defined below) may affect the nature and value of the investment return on the Notes. Also, a relatively small movement in the levels of the Indices could result in a disproportionately large movement in the value of the Notes. Noteholders and prospective purchasers of Notes should conduct their own investigations and, in deciding whether or not to purchase Notes, prospective purchasers should form their own views of the merits of an investment related to the Indices based upon such investigations and not in reliance on any information given in these Final Terms.**

**If you are not a highly sophisticated investor you should not consider purchasing these Notes without taking detailed advice from a specialized professional adviser.**

**SEE ANNEX I: "RISK FACTORS"**

The information in Annex III has been extracted from publicly available information for the information of investors, without independent verification. The levels of the Indices are widely disseminated, and investors may acquire such further information as they deem necessary from any publicly available information as they deem appropriate. Neither the Issuer, the Guarantor nor Lehman Brothers Inc. accept responsibility as to the correct extraction of such information, and no further or other responsibility (express or implied) is accepted by the Issuer, the Guarantor or Lehman Brothers Inc. in respect of such information. Investors should make their own investment, hedging and trading decisions (including decisions regarding the suitability of this investment), based upon their own judgment and upon advice from such advisers as such investors deem necessary and not upon any view expressed by the Issuer or the Guarantor.

| 1. | (i) | Issuer: | Lehman Brothers Treasury Co. B.V. |
| | (ii) | Guarantor: | Lehman Brothers Holdings Inc. |
| 2. | Series Number | | 7856 |
| 3. | Specified Currency or Currencies: | | United States Dollars ("USD") |
| 4. | Aggregate Nominal Amount: | | USD 2,000,000 |
| 5. | Issue Price: | | 100 per cent. of the Specified Denomination |
| 6. | Specified Denomination(s) | | USD 1,000 |
| 7. | Issue Date: | | July 25, 2007 |
| 8. | Maturity Date: | | July 26, 2010, subject to adjustment in accordance with the Following Business Day Convention |
| 9. | Interest Basis: | | Not Applicable |
| 10. | Redemption/Payment Basis: | | As described in Annex II |
| 11. | Change of Interest or Redemption/Payment Basis: | | As described in Annex II |
| 12. | Put/Call Options: | | Not Applicable |
| 13. | (i) | Status of the Notes: | Senior Notes |
| | (ii) | Status of the Guarantee: | Senior Guarantee |
| 14. | Method of distribution: | | Non-syndicated |

NYA 787851.3

### PROVISIONS RELATING TO INTEREST·(IF ANY) PAYABLE

| | | |
|---|---|---|
| 15. | Fixed Rate Note Provisions | Not Applicable |
| 16. | Floating Rate Note Provisions | Not Applicable |
| 17. | Zero Coupon Note Provisions | Not Applicable |
| 18. | Index-Linked Interest Note Provisions | Not Applicable |
| 19. | Dual Currency Note Provisions | Not Applicable |

### PROVISIONS RELATING TO REDEMPTION

| | | |
|---|---|---|
| 20. | Call Option | Not Applicable |
| 21. | Put Option | Not Applicable |
| 22. | Final Redemption Amount of each Note: | As described in Annex II |
| 23. | Early Redemption Amount of each Note<br><br>Early Redemption Amount(s) of each Note payable on redemption for taxation reasons or on an event of default and/or the method of calculating the same (if required or if different from that set out in the Conditions): | In respect of each Note, an amount equal to the fair market value of such Note on such day as is determined by the Calculation Agent (as defined in Annex II) in its sole and absolute discretion (provided that such day is not more than 15 days before the date fixed for redemption of the Note), less the reasonable cost to the Issuer or any affiliate of unwinding any related hedging arrangements all as calculated by the Calculation Agent and as agreed with the Issuer.<br><br>The Notes may also be subject to an early redemption for taxation reasons, event of default or any other early redemption in accordance with the provisions of Annex II. |

### GENERAL PROVISIONS APPLICABLE TO THE NOTES

| | | |
|---|---|---|
| 24. | Form of Notes: | Interests in a permanent global Note in registered form are exchangeable for interests in definitive Notes in registered form. |
| 25. | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | Not Applicable |
| 26. | Details relating to Partly Paid Notes: amount of each payment comprising the Issue Price and date on which each payment is to be made and consequences (if any) of failure to pay, including any | Not Applicable |

NYA 787851.3

right of the Issuer to forfeit the Notes and
interest due on late payment:

27. Details relating to Installment Notes:   Not Applicable
    Installment Amounts and Installment
    Dates:

28. Details relating to Extendible Notes:   Not Applicable

29. Details relating to Renewable Notes:   Not Applicable

30. Redenomination, renominalization and   Not Applicable
    reconventioning provisions:

31. Consolidation provisions:   Not Applicable

32. Other terms or special conditions:   As described in Annex II

## DISTRIBUTION

33. (i)   If syndicated, names of Managers:   Not Applicable

    (ii)   Date of Subscription Agreement:   Not Applicable

    (iii)   Stabilizing Manager (if any):   Not Applicable

34. If non-syndicated, name and address of   Lehman Brothers Inc.
    Dealer:   745 Seventh Avenue
    New York, NY 10019

35. Total commission and concession:   1.75% percent of Aggregate Nominal Amount

36. Selling restrictions:   The Notes have not been registered under the U.S.
    Securities Act of 1933, as amended (the
    "Securities Act"), or any state securities laws. The
    Notes may not be offered or sold within the
    United States or to, or for the account or benefit
    of, U.S. persons (as such terms are defined under
    the Securities Act) except pursuant to an
    exemption from, or in a transaction not subject to,
    the registration requirements of the Securities Act.
    Accordingly, the Notes are being offered hereby
    only to U.S. Persons (as defined in Regulation D
    under the Securities Act ("Regulation D")) who
    are "accredited investors" (as defined in Rule
    501(a) under the Securities Act) in the United
    States. Purchasers of the Notes and subsequent
    transferees of Notes will be required to execute
    and deliver a purchase agreement or
    representation letter, as applicable, containing
    certain representations and agreements relating to

- 4 -

the restrictions on transfer of the Notes. For a
description of restrictions on transfers of the
Notes see Annex V: "Notice to Investors."

SEE ANNEX I: "RISK FACTORS"

**SUPPLEMENTAL DISCLOSURE REGARDING UNITED STATES FEDERAL
INCOME TAX CONSEQUENCES**

The Issuer is required to provide the comparable yield to holders of the Notes and,
solely for tax purposes, is also required to provide a projected payment schedule that includes
the actual interest payments on the Notes and estimates the amount and timing of contingent
payments on the Notes. The Issuer has determined that the comparable yield is an annual rate of
5.5420%, compounded semi-annually. Based on the comparable yield, the projected payment
schedule per U.S.$1,000 Note is U.S.$1,178.39 due at maturity. The Issuer agrees and, by
purchasing a Note, each holder agrees, for United States federal income tax purposes, to be
bound by the Issuer's determination of the comparable yield and projected payment schedule.
As a consequence, for United States federal income tax purposes, each holder of Notes must use
the comparable yield determined by the Issuer and the projected payments set forth in the
projected payment schedule prepared by the Issuer in determining such holder's interest
accruals, and the adjustments thereto, in respect of the Notes. See Annex IV: "United States
Federal Income Tax Consequences" for more detail.

NYA 787851.3

**RESPONSIBILITY**

The Issuer and the Guarantor accept responsibility for the information contained in these Final Terms subject as provided in the third paragraph under the heading "Information Concerning Investment Risk" on the second page of these Final Terms.

Signed on behalf of the Issuer:

By: _____
        Duly authorized

**PART B – OTHER INFORMATION**

1.  **LISTING**

    (i)  Listing                              None

    (ii)  Admission to Trading:               Not Applicable

2.  **RATINGS**

    The Notes to be issued have not been rated.

3.  **NOTIFICATION**

    Not Applicable

4.  **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

    Save as discussed in the section headed "Subscription and Sale" in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

5.  **REASONS FOR THE OFFER, ESTIMATED NET PROCEEDS AND TOTAL EXPENSES**

    Not Applicable

6.  **YIELD (Fixed Rate Notes Only)**

    Not Applicable

7.  **HISTORIC INTEREST RATES**

    Not Applicable

8.  **PERFORMANCE OF INDEX/FORMULA/other variable, EXPLANATION OF EFFECT ON VALUE OF INVESTMENT AND ASSOCIATED RISKS and other information concerning the underlying (INDEX-LINKED OR OTHER VARIABLE - LINKED NOTES ONLY)**

NYA 787851.3

See the Annex to the Final Terms

Details on historical prices of the Shares can be found on the New York Stock Exchange's, websites: (http://www.nyse.com).

The Issuer does not intend to provide post issuance information.

9.  **PERFORMANCE OF RATES OF EXCHANGE AND EXPLANATION OF EFFECT ON VALUE OF INVESTMENT (DUAL CURRENCY NOTES ONLY)**

      Not Applicable

10.  **OPERATIONAL INFORMATION**

| | |
|---|---|
| ISIN Code: | XS0311765654 |
| Common Code: | 3264570 |
| Any clearing systems(s) other than Euroclear and Clearstream, Luxembourg and the relevant identification number(s): | Not Applicable |
| Delivery: | Delivery against payment |
| The Aggregate Nominal Amount of Notes issued has been translated into U.S. Dollars at the rate of (€=$[  ] producing a sum of (for Notes not denominated in U.S. Dollars): | Not Applicable |
| Names and addresses of Additional Paying Agents(s) (if any): | Not Applicable |

- 7 -

NYA 787851.3

## ANNEX I

## RISK FACTORS

You should carefully consider the risk factors provided below as well as the other information contained in these Final Terms and the documents incorporated in this document by reference.

You should reach an investment decision only after you have carefully considered, with your advisors, the suitability of an investment in the Notes in light of your particular circumstances.

**Unlike conventional debt securities of the Issuer, the Notes do not pay interest and the payment that you receive may be less than the Issue Price.**

The Notes do not pay interest. Even if the amount payable on the Notes at maturity exceeds the USD1,000 Issue Price per Note, the overall return earned on the Notes may be less than would have been earned by investing in a conventional interest-bearing, non-callable debt security over the same three-year period.

**Your return on the Notes could be less than if you owned the Shares because of the operation of the formulae applied on redemption and will not reflect dividends paid on the Shares.**

Your return on the Notes could be less that the return obtainable if you had owned the Shares. Your return on the Notes is unlikely to be the same as the return you would realize if you actually owned the Shares and received the dividends paid on the Shares. This is because the Calculation Agent will calculate the amount payable to the Noteholder by reference to the formulae applied on redemption. In addition, the formulae do not take into consideration the value of the dividends paid on the Shares.

**The payment you receive at maturity may be less than the yield on a conventional debt security of comparable maturity.**

The amount the Issuer pays you on the Maturity Date may be less than the return you could earn on other investments. Because the amount you receive on the Maturity Date can vary, depending on the levels of the Basket Indices on the Trade Date and the Valuation Date, the effective yield to maturity on the Notes may be less than that which would be payable on a conventional fixed-rate, non-callable debt security. In addition, any return on the Notes may not fully compensate you for any opportunity cost to you of investing in the Notes when you take into account inflation and other factors relating to the time value of money.

**There is no pool of assets to which you have recourse.**

Because the Notes are a notional investment, there are no actual investments in the Shares comprising the Basket Indices underlying the Notes or to which a holder would have recourse. The Issuer may, in order to hedge its obligations under the Notes, purchase shares comprising the Indices but it is under no obligation to do so. Such shares, if any, are the separate property of the Issuer and do not secure or otherwise underlie the Notes. In the event of a default by the Issuer under the Notes, holders of Notes will have no beneficial interest in or claim to any such assets.

**Your return will not be adjusted for changes in currency exchange rates.**

Although some of the Shares are traded in foreign currencies and the Notes are denominated in U.S. dollars, any amounts payable to you will not be adjusted for the currency exchange rates in effect on the

- 8 -

NYA 787851.3

date of such payment. Any amount in addition to the principal amount of each Note payable to you is based solely upon the formulae detailed herein. Changes in exchange rates, however, may reflect changes in various non-U.S. economies, which in turn may affect the levels of the Foreign Indices and the Notes.

**Historical levels of the Indices should not be taken as an indication of the future levels of the Indices during the term of the Notes.**

It is impossible to predict whether the levels of the Indices will fall or rise. The levels of the Indices will be influenced by complex and interrelated political, economic, financial and other factors that can affect the markets in which the Shares are traded and the levels of the Indices.

**No Due Diligence on the Indices.**

The Issuer andf the Guarantor have not performed any investigation or review of the companies whose shares comprise the Indices, including any public filings by such companies. You should not conclude that the sale by the Issuer of the Notes is any form of investment recommendation by the Issuer or the Guarantor to invest in the companies comprising the Indices directly.

**Volatility of currency exchange rates.**

The exchange rate between the U.S. dollar and each of the foreign currencies in which the securities underlying the Foreign Indices are denominated is a foreign exchange spot rate that measures the relative values of two currencies, the particular currency in which the securities underlying a particular Index are denominated and the U.S. dollar. This exchange rate increases when the U.S. dollar appreciates relative to the particular currency in which the securities underlying a particular Foreign Index are denominated and decreases when the U.S. dollar depreciates relative to such currency. This exchange rate is expressed as a rate that reflects the amount of the particular currency in which the securities underlying a particular Foreign Index are denominated that can be purchased for one U.S. dollar. Volatility is the term used to describe the size and frequency of price and/or market fluctuations. If the volatility of the exchange rate between the U.S. dollar and any of the foreign currencies in which the securities underlying the Basket Indices are denominated changes, the trading value of the Notes may be adversely affected.

**Correlation between currency exchange rates and the Foreign Indices**

Correlation is the term used to describe the relationship between the percentage changes in the exchange rate between the U.S. dollar and each of the foreign currencies in which the securities underlying the Foreign Indices are denominated and the percentage changes in the Foreign Indices. If the correlation between the exchange rate between the U.S. dollar and any of the foreign currencies in which the securities underlying a particular Foreign Index are denominated changes, the trading value of the Notes may be adversely affected.

**The formula for determining the Final Redemption Amount does not take into account all developments in the levels of the Basket Indices.**

Changes in the levels of the Basket Indices during the term of the Notes before the Valuation Date will not be reflected in the calculation of the Final Redemption Amount. The Calculation Agent will calculate the Final Redemption Amount by comparing only the levels of the Basket Indices on the Trade Date and the levels of the Basket Indices on the Valuation Date. No other levels of the Basket Indices between the Trade Date and the Valuation Date will be taken into account.

NYA 787851.3

The Calculation Agent will calculate the Final Redemption Amount by comparing only the Initial Level and the level of the Index on the Valuation Date. No other levels of the Index between the Trade Date and the Valuation Date will be taken into account. As a result, you may not be entitled to the Automatic Redemption Amount if the levels of the Index have risen at certain times during the term of the Notes before falling to prices below the Initial Level on the relevant Observation Dates and you may lose some or all of your investment even if the level of the Index has risen at certain times during the term of the Notes before falling to prices below 70% of the Initial Level on the Valuation Date.

**There is no trading market for the Notes and they are subject to substantial restrictions on transferability.**

There is no trading market for the Notes and none is expected to develop. Accordingly, it will be difficult to obtain reliable information about the value of the Notes at any given time. After the initial offering, Lehman Brothers Inc., and/or its affiliates intends to buy and sell the Notes to create a secondary market in the Notes and may stabilize or maintain the market price of the Notes during the initial distribution of the Notes. However, Lehman Brothers Inc., and/or its affiliates will not be obligated to engage in any of these market activities or to continue them once they are begun. Any secondary market prices will likely be lower than the Issue Price since the Issue Price included, and secondary market prices are likely to exclude, commissions paid with respect to the Notes, as well as the projected profit included in the cost of hedging our obligations under the Notes. In addition, any such prices may differ from values determined by pricing models used by Lehman Brothers Inc. and/or its affiliates, as a result of dealer discounts, mark-ups or other transaction costs. The Notes will not be registered under the Securities Act of 1933, as amended, or the securities laws of any state or any other jurisdiction and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found. You must thus be prepared to bear the risk of owning Notes for an extended period of time.

**Principal protection.**

The Notes are designed so that if, and only if, the Notes are held to maturity, and subject to the other risk factors detailed herein, an investor in the Notes will receive at least USD1000 per Note. Prior to maturity, an investor seeking to sell Notes may be quoted an amount less than the Issue Price per Note. If upon maturity the Notes do not pay more than the Issue Price per Note, an investor will have forgone at least the returns that might have been achieved on an investment of like amount in a conventional interest-bearing, non-callable debt security over the same three-year period.

**The value of the Notes will be affected by numerous factors, some of which are related in complex ways.**

The value of the Notes will be affected by supply of and demand for the Notes, the levels of the Basket Indices at that time and a number of other factors, some of which are interrelated in complex ways. As a result, the effect of any one factor may be offset or magnified by the effect of another factor. The price at which you will be able to sell the Notes prior to maturity, if at all, may be at a discount, which could be substantial, from their principal amount. A change in a specific factor could have the following impacts on the value of the Notes, assuming all other conditions remain constant.

- **Index.** The Issuer expects that the value of the Notes will depend substantially on the levels of the Basket Indices at any given point in time. If you decide to sell the Notes prior to maturity you may receive substantially less than the Issue Price and potentially less than the amount that would be payable upon maturity. If you decide to sell the Notes when the level of one or more of the Basket Indices is below the level of such Basket Indices on the Trade Date, you will receive substantially less than the Issue Price and potentially less than the amount that would be payable

- 10 -

NYA 787851.3

upon maturity. Political, economic and other developments affect the levels of the Basket Indices, and thus, the value of the Notes.

- **Interest rates.** In general, if interest rates increase, the value of the Notes may be adversely affected.

- **Volatility of the Basket Indices.** Volatility is the term used to describe the size and frequency of market fluctuations. If the volatility of the Basket Indices increases or decreases, the value of the Notes may be adversely affected. Lehman Brothers Holdings Inc. is unable to predict the effect of these events on the future level or volatility of the Basket Indices.

- **Volatility of the U.S. dollar.** If the volatility of the exchange rate between the U.S. dollar and any of the currencies in which the Shares comprising the Foreign Indices are denominated changes (each a "USD Exchange Rate"), the trading value of the Notes may be adversely affected.

- **Correlation between the U.S. dollar exchange rates and the Basket Indices.** If the correlation between a USD Exchange Rate and the relevant Foreign Index changes, the trading value of the Notes may be adversely affected.

- **Merger and acquisition transactions.** The Basket Indices may be affected by mergers and acquisitions, which can contribute to the volatility of the Basket Indices. Additionally, as a result of a merger or acquisition, one or more of the Shares may be replaced with a surviving or acquiring entity's securities. The surviving or acquiring entity's securities may not have the same characteristics as the original Shares.

- **Time remaining to maturity.** The value of the Notes may be affected by the time remaining to maturity. As the time remaining to the maturity of the Notes decreases, this time value may decrease, adversely affecting the value of the Notes.

- **Dividend yields.** If dividend yields on the Shares increase, the value of the Notes may be adversely affected because the Shares do not incorporate the value of those payments.

- **The Guarantor's credit ratings, financial condition and results.** Actual or anticipated changes in the Guarantor's credit ratings, financial condition or results may affect the value of the Notes.

- **Economic conditions and earnings performance of the Shares.** General economic conditions and earnings results of each of the companies whose securities underlie the Basket Indices, and real or anticipated changes in those conditions or results may affect the value of the Notes.

You should understand that the impact of one of the factors specified above, such as an increase in interest rates, may offset some or all of any change in the value of the Notes attributable to another factor, such as an increase in the levels of the Basket Indices. In general, assuming all relevant factors are held constant, the effect on the value of the Notes of a given change in most of the factors listed above will be less if it occurs later than if it occurs earlier in the term of the Notes.

**The Issuer cannot control actions by the companies whose securities underlie the Basket Indices.**

Actions by a Basket Company may have an adverse effect on the levels of the Basket Indices and the Notes. In addition, the Basket Companies are not involved in the offering of the Notes and have no obligations with respect to the Notes, including any obligation to take the Issuer's or your interests into

- 11 -

NYA 787851.3

consideration for any reason. The Basket Companies will not receive any of the proceeds of this offering of the Notes and are not responsible for, and have not participated in, the determination of the timing of, prices for, or quantities of, the Notes to be issued. The Basket Companies are not involved with the administration, marketing or trading of the Notes and have no obligations with respect to the amount to be paid to you at maturity.

**Potential conflicts of interest exist because the Issuer is an affiliate of Lehman Brothers Inc., which will act as the Calculation Agent.**

Lehman Brothers Inc. will act as the Calculation Agent, which determines the amount holders will receive on the Notes, whether adjustments should be made and whether a Market Disruption Event has occurred and which selects a successor underlying security if necessary. As a result, potential conflicts of interest may exist between Lehman Brothers Inc. and the Noteholders. The Issuer, Guarantor and their affiliates act in various capacities with respect to the Notes. Lehman Brothers Inc. and other affiliates of the Issuer and Guarantor may act as a dealer or placement agent in connection with the Notes. Such affiliates will derive compensation from the distribution of the Notes and they may have an incentive to sell these Notes instead of other similar investments. The Issuer will pay compensation of up to $25 per Note to the Dealers in connection with the distribution of Notes.

**An investment in the Notes is subject to risks associated with foreign securities markets.**

The Foreign Indices are comprised of securities issued by foreign companies and are denominated in foreign currencies. You should be aware that investments in securities linked to the value of foreign equity securities involve particular risks. Foreign securities markets may be more volatile than U.S. securities markets, and market developments may affect a foreign market differently from the U.S. or other securities markets. Direct or indirect government intervention to stabilize the foreign securities markets, as well as cross-shareholdings in foreign companies, may affect trading prices and volume in those markets. Also, there is generally less publicly available information about foreign companies that are not subject to the reporting requirements of the SEC, and foreign companies are subject to accounting, auditing and financial reporting standards and requirements that differ from those applicable to U.S. reporting companies.

Securities prices outside the United States are subject to political, economic, financial and social factors that apply in foreign countries. These factors, which could negatively affect foreign securities markets, include the possibility of changes in a foreign government's economic and fiscal policies, the possible imposition of, or changes in, currency exchange laws or other laws or restrictions applicable to foreign companies or investments in foreign equity securities and the possibility of fluctuations in the rate of exchange between currencies. Moreover, foreign economies may differ favorably or unfavorably from the U.S. economy in different respects, such as growth of gross national product, rate of inflation, capital reinvestment, resources and self-sufficiency. In addition, the economies of many Asian countries have been characterized by uneven, negative or low rates of growth in the past. Many Asian stocks have performed poorly over an extended period.

**Time differences between the cities where the securities underlying the Foreign Indices trade and New York City may create discrepancies in trading levels.**

As a result of the time difference between the cities where the securities underlying the Foreign Indices trade and New York City (where the Notes may trade), there may be discrepancies between the levels of the Foreign Indices and the trading prices of the Notes. In addition, there may be periods when the foreign securities markets are closed for trading (for example during holidays in a foreign country), as a

- 12 -

NYA 787851.3

result of which the levels of the Foreign Indices remain unchanged for multiple trading days in New York City.

**Adjustments to the Basket Indices could adversely affect the value of the Notes.**

The policies of a publisher of a Basket Index concerning additions, deletions and substitutions of the securities underlying such Basket Index and the manner in which such publisher takes account of certain changes affecting such underlying securities may affect the level of the basket. The policies of the publisher of a Basket Index with respect to the calculation of such Basket Index could also affect the level of the basket. You should realize that the changing of companies included in a Basket Index may affect the Basket Index as a newly added company may perform significantly better or worse than the company or companies it replaces. The publisher of a Basket Index may discontinue or suspend calculation or dissemination of such Basket Index or materially alter the methodology by which it calculates such Basket Index. Any such actions could affect the value of the Notes and the Final Redemption Amount.

**Lehman Brothers Holdings and its affiliates have no affiliation with the publishers of the Basket Indices and are not responsible for their public disclosure of information.**

Each publisher of a Basket Index provides and services such Basket Index. Lehman Brothers Holdings and its affiliates are not affiliated with the publishers of the Basket Indices in any way (except for licensing arrangements discussed below) and have no ability to control or predict their actions, including any errors in or discontinuation of disclosure regarding their methods or policies relating to the calculation of the Basket Indices. The publishers of the Basket Indices are not involved in this offering of Notes in any way and have no obligation to consider your interests as an owner of the Notes in taking any actions that might affect the value of your Notes.

Neither Lehman Brothers Holdings nor any of its affiliates assumes any responsibility for the adequacy or accuracy of the information about the Basket Indices or the publishers of such Basket Indices contained herein or any public disclosure of information by such publishers. You, as an investor in the Notes, should make your own investigation into the Basket Indices and the publishers of such Basket Indices.

**We or our affiliates may have adverse economic interests to the holders of the Notes.**

Lehman Brothers Inc. and other affiliates of ours trade the stocks underlying the Basket Indices and other financial instruments related to the Basket Indices and their component stocks on a regular basis, for their accounts and for other accounts under their management. Lehman Brothers Inc. and these affiliates may also issue or underwrite or assist unaffiliated entities in the issuance or underwriting of other securities or financial instruments with returns linked to the Index. To the extent that we or one of our affiliates serves as issuer, agent or underwriter for such securities, our or their interests with respect to such products may be adverse to those of the holders of the Notes. Any of these trading activities could potentially affect the level of the Index and, accordingly, could affect the value of the Notes and the Final Redemption Amount.

We or our affiliates may currently or from time to time engage in business with companies whose stocks are included in the Basket Indices, including extending loans to, or making equity investments in, or providing advisory services to them, including merger and acquisition advisory services. Such business relationships are established and conducted on an arm's length basis, but to the extent such interests or relationships of Lehman Brothers Inc. or affiliates of Lehman Brothers Inc. are in conflict with the interests of holders of the Notes, there is a possibility that such conflicts could be resolved to the detriment of the holders. In the course of this business, we or our affiliates may acquire non-public information about the companies, and we will not disclose any such information to you. In addition, one

- 13 -

NYA 787851.3

or more of our affiliates may publish research reports about companies whose stock is included in a Basket Index. Such reports may impact the trading price for such stock, and the impact may be negative. Any prospective purchaser of the Notes should undertake an independent investigation of each company in the Basket Indices as in its judgment is appropriate to make an informed decision with respect to an investment in the Notes.

Additionally, we or one of our affiliates may issue additional Notes or serve as issuer, agent or underwriter for issuances of other securities with returns linked or related to changes in the level of the Basket Indices or the stocks which comprise the Basket Indices. By introducing competing products into the marketplace in this manner, we or one or more of our affiliates could adversely affect the value of the Notes.

We may have hedged our obligations under the Notes through certain affiliates, who would expect to make a profit on such hedge. Because hedging our obligations entails risk and may be influenced by market forces beyond our or our affiliates' control, such hedging may result in a profit that is more or less than expected, or it may result in a loss.

Lehman Brothers Inc., one of our affiliates, will act as the Calculation Agent. The Calculation Agent will determine the Final Redemption Amount. The Calculation Agent will also be responsible for determining whether a Market Disruption Event has occurred, whether a Basket Index has been discontinued and whether there has been a material change in the method of calculation of a Basket Index. In performing these duties, the Calculation Agent may have interests adverse to the interests of the holders of the Notes, which may affect your return on the Notes, particularly where the Calculation Agent, is entitled to exercise discretion.

**The Calculation Agent has considerable discretion in making determinations that affect the value of and amount payable with respect to the Notes.**

The Calculation Agent has considerable discretion in determining whether a Market Disruption Event has occurred with respect to a Basket Index, in selecting a successor index, in calculating an index that is comparable to the relevant Basket Index and in selecting an alternative means of measuring such Basket Index. The exercise of this discretion by the Calculation Agent could reduce the value of your Notes or the Final Redemption Amount.

**Market disruptions may adversely affect your return.**

The Calculation Agent may, in its sole discretion, decide that the markets have been affected in a manner that prevents it from properly valuing the Final Redemption Amount that we are required to pay you. These events may include disruptions or suspensions of trading in the markets as a whole. If the Calculation Agent, in its sole discretion, determines that these events prevent us or any of our affiliates from properly hedging our obligations under the Notes, it is possible that your return will be adversely affected.

**Hedging activities related to the Shares and the Basket Indices by the Issuer and its affiliates could affect the prices of the Shares and the levels of the Basket Indices.**

The Issuer and its affiliates, including Lehman Brothers Inc., may from time to time buy or sell the common stocks underlying the Basket Indices or derivative instruments related to such stocks or the Basket Indices for their own accounts in connection with their normal business practices or in connection with hedging of the Issuer's obligations under the Notes, including on the Trade Date and Valuation Date. These transactions could affect the prices of those securities and the levels of the Basket Indices.

NYA 787851.3

**You have no shareholder rights.**

Investing in the Notes is not equivalent to investing in the Shares. As an investor in the Notes, you will not have voting rights or rights to receive dividends or other distributions or any other rights with respect to the Shares.

**For tax purposes, holders of the Notes will be required to include original issue discount in income and to recognize ordinary income on any disposition of the Notes.**

For United States federal income tax purposes, the Notes will be classified as contingent payment debt instruments. As a result, they will be considered to be issued with original issue discount. Although the holders of the Notes will receive no cash payments during the term of the Notes, such holders will be required to include this original issue discount in income during their ownership of the Notes, subject to some adjustments, based on the "comparable yield" of the Notes, which will generally be the rate at which the Issuer could issue a fixed rate debt instrument with terms and conditions similar to the Notes. Additionally, holders of the Notes will generally be required to recognize ordinary income on the gain, if any, realized on a sale, upon maturity, or other disposition of the Notes. See Annex IV: "United States Federal Income Tax Consequences."

**Investment Experience**

The Notes are not typical, straightforward debt securities. Prospective investors should determine whether an investment in the Notes is appropriate in their particular circumstances and should consult with their legal, business, and tax advisors to determine the consequences of an investment in the Notes and to arrive at their own evaluation of the investment.

Investment in the Notes is only appropriate for investors who:

(a)    have the requisite knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Notes;

(b)    have access to, and knowledge of, appropriate analytical tools to evaluate such merits and risks in the context of their financial situation;

(c)    are capable of bearing the economic risk of an investment in the Notes for an indefinite period of time; and

(d)    recognize that it may not be possible to dispose of the Notes prior to their maturity.

You should not rely on any communication (written or oral) of the Issuer or Lehman Brothers Inc. as investment advice or as a recommendation to invest in the Notes, it being understood that information and explanations related to the terms and conditions of these Notes shall not be considered to be investment advice or a recommendation to invest in the Notes. No communication (written or oral) received from the Issuer or Lehman Brothers Inc. shall be deemed to be an assurance or guarantee as to the expected results of an investment in the Notes.

NYA 787851.3

ANNEX II

1.    **Interpretation**

1.1    **Definitions:** In these Final Terms:

"**Basket**" means the basket of Indices (each a "**Basket Index**" and collectively the "**Basket Indices**" which shall refer to any one or more of the Indices included in the Basket, as the context requires) of the three Indices described in Annex III;

"**Basket Company**" means a company whose securities underlie a Basket Index;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for business in New York;

"**Calculation Agent**" means Lehman Brothers Inc.;

"**Clearance System**" means, in respect of any Basket Index at any time, the domestic clearance system customarily used for settling trades in the securities comprised in the relevant Basket Index at that time;

"**Clearance System Business Day**" means, in respect of a Clearance System, any day on which such Clearance System is (or but for the occurrence of a Settlement Disruption Event, would have been) open for the acceptance and execution of settlement instructions;

"**Disrupted Day**" or "**Disruption**" means, in respect of each of the Basket Indices, any Scheduled Trading Day on which a relevant Exchange or any relevant Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred;

"**Dow Jones Euro STOXX 50**" means the Dow Jones Euro STOXX 50 Price Index (Bloomberg: SX5E Index), a stock index of 50 selected stocks currently sponsored by the relevant Index Sponsor;

"**Early Closure**" means, in respect of each of the Basket Indices, the closure on any Scheduled Trading Day of any relevant Exchange(s) relating to the securities thereof that comprise 20 per cent. or more of the level of the relevant Basket Index or any Related Exchange(s) prior to its Scheduled Closing Time unless, where the level of the relevant Basket Index is to be determined at the Valuation Time, such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Scheduled Trading Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Scheduled Trading Day;

"**Exchange**" means, with respect to the Dow Jones Euro STOXX 50, in relation to each security comprised in the Dow Jones Euro STOXX 50 (a "**Component Security**"), the principal stock exchange on which such Component Security is principally traded, as determined by the Calculation Agent; with respect to the S&P 500 Index, each of the New York Stock Exchange, the American Stock Exchange and the National Association of Securities Dealers Automated Quotation National Market System; and with respect to the Nikkei-225 Stock Average Index, the Tokyo Stock Exchange, and in each case any successor to such exchange or quotation system and

- 16 -

NYA 787851.3

**"Exchanges"** means, as the context requires, such exchanges or quotation systems in respect of all or any one or more of the Basket Indices;

**"Exchange Disruption"** means in respect of each of the Basket Indices, any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions on any relevant Exchange in securities thereof that comprise 20 per cent. or more of the level of the relevant Index, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the relevant Basket Index on any relevant Related Exchange;

**"Final Redemption Amount"** shall have the meaning assigned to such term herein;

**"Following Business Day Convention"** means, in respect of the relevant date, that an adjustment will be made if such date would otherwise fall on a day that is not a Business Day so that that date will be the first following day that is a Business Day;

**"Foreign Index"** means each of the Dow Jones Euro STOXX 50, and the Nikkei-225 Stock Average Index (Bloomberg: NKY Index) (together, the **"Foreign Indices"**);

**"Index"** means each of the Dow Jones Euro STOXX 50, the S&P 500 Index (Bloomberg: SPX Index) and the Nikkei-225 Stock Average Index (together, the **"Indices"**), each of which is currently sponsored by the relevant Index Sponsor;

**"Index Sponsor"** means, for the Dow Jones Euro STOXX 50, Stoxx Limited; for the S&P 500 Index, S&P; and for the Nikkei-225 Stock Average Index, Nihon Keizai Shimbun, Inc., and/or, as the context requires or permits, any successor sponsor accepted by the Calculation Agent pursuant to the provisions below;

**"Index Units per Basket Index"** means, with respect to the relevant Basket Index, 100 multiplied by the relevant Initial Weighting and divided by the relevant Trade Date Index Level;

**"Market Disruption Event"** means in respect of each of the Basket Indices, the occurrence or existence, in respect of any security thereof of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material, where the level of the relevant Basket Index is to be determined at the Valuation Time, at any time during the one hour period that ends at the relevant Valuation Time, or (iii) an Early Closure;

For the purposes of determining whether a Market Disruption Event exists in respect of each of the Basket Indices at any time, if a Market Disruption Event occurs in respect of a security thereof at that time, then the relevant percentage contribution of that security to the level of the relevant Basket Index shall be based on a comparison of (x) the portion of the level of the relevant Basket Index attributable to that security to (y) the overall level of the relevant Basket Index, in each case immediately before the occurrence of such Market Disruption Event;

**"Maturity Date"** means 10 Business Days after Valuation Date, subject to adjustment in accordance with the Following Business Day Convention;

**"Other Indices"** means (a) the S&P 500 Index and (b) the Nikkei-225 Stock Average Index;

**"Participation Rate"** means 92%;

- 17 -

NYA 787851.3

"**Redemption Amount**" means, any or both of, as the context implies, an Early Redemption Amount or a Final Redemption Amount;

"**Related Exchange**" means, with respect to the Dow Jones Euro STOXX 50, EUREX; with respect to the S&P 500 Index, each of the Chicago Board Options Exchange and the Chicago Mercantile Exchange; and with respect to the Nikkei-225 Stock Average Index, the Osaka Securities Exchange, and in each case any successor to such exchange or quotation system and "**Related Exchanges**" means, as the context requires, such exchanges or quotation systems in respect of all or any one or more of the Basket Indices;

"**S&P**" means Standard and Poor's, a division of McGraw-Hill Inc;

"**Scheduled Closing Time**" means, in respect of each Exchange or a Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours;

"**Scheduled Trading Day**" means (i) in respect of the Dow Jones Euro STOXX 50, any day on which: (a) the Stoxx Limited is scheduled to publish the level of the Dow Jones Euro STOXX 50; and (b) EUREX is scheduled to be open for trading for its regular trading session(s); and (ii) in respect of the Other Indices, any day on which each Exchange and Related Exchange are scheduled to be open for trading for their respective regular trading sessions.

"**Settlement Cycle**" means the period of Clearance System Business Days following a trade in the securities comprised in the relevant Index on the relevant Exchange in which settlement will customarily occur according to the rules of such Exchange (or if there are multiple Exchanges in respect of such Index, the longest such period);

"**Settlement Disruption Event**" means an event beyond the control of the Issuer as a result of which the relevant Clearing System cannot clear the transfer of Shares comprised in the relevant Index.

"**Shares**" means the securities underlying the Basket Indices;

"**Specified Office**" means the office of Lehman Brothers Inc. at 745 Seventh Avenue, New York, New York 10019, USA, or any other office of Lehman Brothers Inc., or any office of any other Calculation Agent, from time to time notified to the Noteholders by the Calculation Agent as its specified office;

"**Trade Date**" means July 11, 2007;

"**Trade Date Index Level**" means, for each Basket Index, the level of the relevant Basket Index, as calculated and published by the relevant Index Sponsor, at the Valuation Time on the Trade Date;

"**Trading Disruption**" means in the case of each of the Basket Indices, any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) on any relevant Exchange relating to securities that comprise 20 per cent. or more of the level of the relevant Basket Index, or (ii) in futures or options contracts relating to the relevant Basket Index on any relevant Related Exchange;

- 18 -

"**Valuation Date**" means, subject to paragraph 3 *(Disrupted Days and Index Adjustment Events)*, July, 12 2010 (or if such is not an Scheduled Trading Day the immediately following Scheduled Trading Day);

"**Valuation Time**" means: (A) in respect of the Dow Jones Euro STOXX 50, (i) for the purposes of determining whether a Market Disruption Event has occurred: (a) in respect of any security that comprises the Dow Jones Euro STOXX 50, the Scheduled Closing Time on the Exchange in respect of such component security, and (b) in respect of any options contracts or future contracts on the Dow Jones Euro STOXX 50, the close of trading on the Related Exchange; and (ii) in all other circumstances, the time at which the official closing level of the Dow Jones Euro STOXX 50 is calculated and published by the relevant Index Sponsor; and (B) in respect of each of the Other Indices, the Scheduled Closing Time on the relevant Exchange; all as calculated or determined, if necessary, by the Calculation Agent.

1.2    **Construction:** In this Annex each reference to a paragraph shall be construed as a reference to a paragraph of this Annex.

1.3    **The Conditions:** In the event of any inconsistency between the Conditions and the provisions of this Annex, the provisions of this Annex shall prevail.

2.    **Final Redemption**

2.1    **Final Redemption:** Unless previously redeemed or purchased and cancelled, the Issuer shall pay the holder of each Note on the Maturity Date an amount in USD determined by the Calculation Agent in accordance with the following:

the greater of:

(i)                USD1,000, and

(ii)    $USD1,000 + USD1,000 \times \text{Participation Rate} \times \left( \dfrac{Basket_f - Basket_0}{Basket_0} \right)$

Where:

"**Closing Basket Level**" means, in respect of a Scheduled Trading Day, a value as determined by the Calculation Agent on such date, equal to the sum of the products of the official closing level of each Basket Index on the relevant Exchange on such Scheduled Trading Day and the Index Units per Basket Index for each such Basket Index on such Scheduled Trading Day;

$Basket_0$ is 100, the Closing Basket Value on the Trade Date; and

$Basket_f$ is the Closing Basket Value on the Valuation Date.

| Basket Index | Trade Date Index Level | Index Units per Basket Index | Initial Weighting |
|---|---|---|---|
| DJ EuroStoxx 50 Index | 4447.52 | 0.0074948 | 33.333% |
| S&P 500 Index | 1518.76 | 0.0219477 | 33.333% |
| Nikkei 225 Index | 18049.51 | 0.0018468 | 33.333% |

- 19 -

3.     **Disrupted Days and Index Adjustment Events**

If the Valuation Date is a Disrupted Day, then the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day relating to the relevant Index, unless there is a Disrupted Day relating to the relevant Index on each of the Scheduled Trading Days immediately following the scheduled Valuation Date until and including the Scheduled Trading Day that is one Settlement Cycle before the Maturity Date (the "**Valuation Cut-Off Date**"). In that case, such Valuation Cut-Off Date shall be deemed to be the Valuation Date for the relevant Index notwithstanding that it is a Disrupted Day and the level of the relevant Index on such date shall be determined according to (b) above except that such Valuation Cut-Off Date shall be deemed the eighth Scheduled Trading Day.

3.2    **Successor Index:**  If any Index is (i) not calculated and announced by the relevant Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of that Index, then in each case that index (the "**Successor Index**") will be deemed to be the relevant Index.

3.3    **Index Adjustment Event:**  If on or prior to the Valuation Date, an Index Sponsor announces that it will make a material change in the formula for or the method of calculating any Index or in any other way materially modifies that Index (other than a modification prescribed in that formula or method to maintain that Index in the event of changes in constituent stock and capitalization and other routine events) (an "**Index Modification**"), permanently cancels the Index and no Successor Index exists (an "**Index Cancellation**") or fails to calculate and announce any Index (an "**Index Disruption**" and together with an Index Modification and an Index Cancellation, each an "**Index Adjustment Event**"), then the Calculation Agent shall determine if such Index Adjustment Event has a material effect on the Notes and, if so, shall make its determination for the purposes of calculating the the Final Redemption Amount, using, in lieu of a published level for the relevant Index, the level for that Index as at the Valuation Date, as the case may be and as determined by the Calculation Agent in accordance with the formula for and method of calculating the relevant Index last in effect prior to the change, failure or cancellation, but using only those securities that comprised that Index immediately prior to that Index Adjustment Event.

3.4    **Correction of Index:**  In the event that any index level published by an Index Sponsor and which is utilized for any calculation or determination made under the provisions of these Final Terms or the Conditions is subsequently corrected and the correction is published by the relevant Index Sponsor within 30 calendar days after the original publication, the Calculation Agent will determine the amount that is payable or deliverable as a result of that correction, and, to the extent necessary, will adjust the provisions of these Final Terms or the Conditions to account for such correction, provided that any correction effected and published after the Valuation Cut-Off Date shall be ignored.

4.     **Notification of Disrupted Days and Index Adjustment Events**

4.1    **Disrupted Days:**  The Calculation Agent shall as soon as reasonably practicable notify the Issuer (and the Issuer shall promptly give notice to the Noteholders in accordance with Condition 15 (*Notices*)) of the existence or occurrence of a Disrupted Day on any day which but for such Disrupted Day would have been the Valuation Date or of the occurrence of any Settlement Disruption Event on any day which but for such Settlement Disruption Event would have been the Valuation Date.

- 20 -

NYA 787851.3

4.2    **Index Adjustment Event:** Upon the occurrence of an Index Adjustment Event, the Calculation Agent shall give notice as soon as practicable to the Issuer stating the occurrence of the Index Adjustment Event, giving details thereof and the action proposed to be taken in relation thereto.

4.3    **Adjustments binding:** Adjustments in accordance with the foregoing sections shall be calculated by the Calculation Agent, shall be notified to the Noteholders in accordance with Condition 15 (*Notices*) and shall be (in the absence of manifest error) binding on all parties concerned. However, Noteholders should be aware that there may be, necessarily, some delay between the time at which any of the above events occur and the time at which it is reported to Noteholders.

5.    **The Calculation Agent**

5.1    **Independence:** In performing its duties pursuant to the terms herein, the Calculation Agent shall act independently and not as an agent of the Issuer or the Noteholders and all estimates, calculations or determinations which it is required or permitted to make shall be made by it in its sole and absolute discretion.

5.2    **Determinations final and conclusive:** All estimates, calculations or determinations made by the Calculation Agent hereunder shall, in the absence of manifest error, willful default or bad faith, be final and conclusive, and the Calculation Agent shall have no liability to the Issuer, the Guarantor, the Noteholders or any third party in relation to such estimates, calculations or determinations except in the case of its willful default or bad faith.

5.3    **Transactions by the Calculation Agent:** Nothing contained herein shall prevent the Calculation Agent from dealing in the Notes or from entering into any related transaction, including without limitation any swap or hedging transactions with the Issuer, the Guarantor (or any of their respective affiliates) or any holder of the Notes (or any of its affiliates).

NYA 787851.3

## ANNEX III

## INFORMATION ON THE BASKET AND THE BASKET INDICES

The information contained in these Final Terms relating to the Basket Indices consists of extracts from or summaries of information which is publicly available. Neither the Issuer nor the Guarantor has independently verified any such information, and neither accepts any responsibility for error or omission, other than accepting responsibility for accurately extracting and/or summarising such information. Investors may acquire such further information as they deem necessary in relation to the Index from such publicly available information as they deem appropriate. Investors should make their own investment, hedging and trading decisions (including decisions regarding the suitability of this investment), based upon their own judgment and upon advice from such advisers as such investors deem necessary and not upon any view expressed by the Issuer, the Guarantor or the Dealer.

### THE DOW JONES EURO STOXX 50 INDEX

**General**

Lehman Brothers Holdings obtained all information contained in this final terms regarding the Dow Jones EURO STOXX 50 Index, including, without limitation, its make-up, method of calculation and changes in its components, from publicly available information. That information reflects the policies of, and is subject to change by, STOXX. STOXX has no obligation to continue to publish, and may discontinue publication of, the Dow Jones EURO STOXX 50 Index. The consequences of STOXX discontinuing publication of the Dow Jones EURO STOXX 50 Index are described in Annex II. Lehman Brothers Holdings makes no representation or warranty as to the accuracy or completeness of any information relating to the Dow Jones EURO STOXX 50 Index.

The Dow Jones EURO STOXX 50 Index was created by STOXX, a joint venture between Deutsche Boerse AG, Dow Jones & Company and SWX Swiss Exchange. Publication of the Dow Jones EURO STOXX 50 Index began on February 28, 1998, based on an initial index value of 1,000 at December 31, 1991. The Dow Jones EURO STOXX 50 Index is published in The Wall Street Journal and disseminated on the STOXX website at www.stoxx.com.

**Index composition and maintenance**

The Dow Jones EURO STOXX 50 Index is composed of 50 component stocks of market sector leaders from within the Dow Jones EURO STOXX Supersector indexes, which includes stocks selected from the Eurozone. The component stocks have a high degree of liquidity and represent the largest companies across all supersectors as defined by the Dow Jones Global Classification Standard. Set forth below are the country weightings and industrial sector weightings of the securities included in the Dow Jones EURO STOXX 50 Index as of March 30, 2007:

### Country Weightings

| | |
|---|---|
| Great Britain | 38.0% |
| Switzerland | 13.9% |
| Germany | 12.9% |
| France | 12.6% |
| The Netherlands | 7.4% |
| Spain | 6.7% |
| Italy | 5.2% |

- 22 -

NYA 787851.3

Finland ............................... 1.9%
Sweded............................... 1.2%

### Industrial Sector Weightings

Banks........................................32.6%
Oil & Gas ............................... 13.0%
Healthcare .............................. 11.4%
Telecommunications ..............  8.7%
Insurance ................................  7.7%
Food & Beverage ....................  5.9%
Basic Resources................  4.4%
Technology                               4.3%
Utilities                                     3.5%
Retail                                        2.5%
Industrial Goods & Services    2.0%
Automobiles & Parts...............  1.4%
Chemicals.....................  1.3%
Personal & Household Goods    1.0%

The composition of the Dow Jones EURO STOXX 50 Index is reviewed annually, based on the closing stock data on the last trading day in August. The component stocks are announced the first trading day in September. Changes to the component stocks are implemented on the third Friday in September and are effective the following trading day. Changes in the composition of the Dow Jones EURO STOXX 50 Index are made to ensure that the Dow Jones EURO STOXX 50 Index includes the 50 market sector leaders from within the Dow Jones EURO STOXX Index.

The free float factors for each component stock used to calculate the Dow Jones EURO STOXX 50 Index are reviewed, calculated and implemented on a quarterly basis and are fixed until the next quarterly review.

The Dow Jones EURO STOXX 50 Index is also reviewed on an ongoing basis. Corporate actions (including initial public offerings, mergers and takeovers, spin-offs, delistings and bankruptcy) that affect the Dow Jones EURO STOXX 50 Index composition are immediately reviewed. Any changes are announced, implemented and effective in line with the type of corporate action and the magnitude of the effect.

### Index calculation

The Dow Jones EURO STOXX 50 Index is calculated with the "Laspeyres formula," which measures the aggregate price changes in the component stocks against a fixed base quantity weight. The formula for calculating the Dow Jones EURO STOXX 50 Index value can be expressed as follows:

$$\text{Index} = \frac{\text{free float market capitalization of the Dow Jones EURO STOXX 50 Index}}{\text{adjusted base date market capitalization of the Dow Jones EURO STOXX 50 Index}} \times 1{,}000$$

The "free float market capitalization of the Dow Jones EURO STOXX 50 Index" is equal to the sum of the products of the closing price, market capitalization and free float factor for each component stock as

- 23 -

NYA 787851.3

of the time the Dow Jones EURO STOXX 50 Index is being calculated.

The Dow Jones EURO STOXX 50 Index is also subject to a divisor, which is adjusted to maintain the continuity of the Dow Jones EURO STOXX 50 Index values across changes due to corporate actions. The following is a summary of the adjustments to any component stock made for corporate actions and the effect of such adjustment on the divisor, where shareholders of the component stock will receive "B" number of shares for every "A" share held (where applicable).

(1) Split and reverse split:

Adjusted price = closing price $* A/B$

New number of shares = old number of shares $* B / A$

Divisor: no change

(2) Rights offering:

Adjusted price = (closing price $* A$ + subscription price $* B$ )$/(A + B)$

New number of shares = old number of shares $* (A + B) / A$

Divisor: increases

(3) Stock dividend:

Adjusted price = closing price $* A / (A + B)$

New number of shares = old number of shares $* (A + B) / A$

Divisor: no change

(4) Stock dividend of another company:

Adjusted price = (closing price $* A$ - price of other company $* B$ ) $/ A$

Divisor: decreases

(5) Return of capital and share consolidation:

Adjusted price = (closing price - dividend announced by company $* (1$-withholding tax)) $* A / B$

New number of shares = old number of shares $* B / A$

Divisor: decreases

(6) Repurchase shares / self tender:

Adjusted price = ((price before tender $*$ old number of shares ) - (tender price $*$ number of tendered shares)) / (old number of shares - number of tendered shares)

New number of shares = old number of shares - number of tendered shares

- 24 -

Divisor: decreases

(7)  Spin-off:

Adjusted price = (closing price * A - price of spun-off  shares * B) / A

Divisor: decreases

(8)  Combination stock distribution (dividend or split) and rights offering:

For this corporate action, the following additional assumptions apply:

o   Shareholders receive B new shares from the distribution and C new shares from the rights offering for every A shares held

o   If A is not equal to one share, all the following "new number of shares" formulae need to be divided by A:

- If rights are applicable after stock distribution (one action applicable to other):

Adjusted price = (closing price * A + subscription price * C * (1 + B / A)) / ((A + B) * ( 1 + C / A))

New number of shares = old number of shares * ((A + B) * (1 + C /A)) / A

Divisor: increases

- If stock distribution is applicable after rights (one action applicable to other):

Adjusted price = (closing price * A + subscription price * C) / ((A + C) * (1 + B / A))

New number of shares = old number of shares * ((A + C) *  (1 + B / A))

Divisor: increases

- Stock distribution and rights (neither action is applicable the other):

Adjusted price = (closing price * A + subscription price * C) / (A + B + C)

New number of shares = old number of shares * (A + B + C) / A

Divisor: increases

## Historical information

The following table sets forth the high and low level, as well as the end-of-quarter closing levels, of the Dow Jones EURO STOXX 50 Index for each quarter in the period from January 1, 2001 through July 11, 2007. The closing level on July 11, 2007 was 4447.52. The results shown should not be considered as a representation of the income, yield or capital gain or loss that may be generated by the Dow Jones EURO STOXX 50 Index in the future. The historical levels of the Dow Jones EURO STOXX 50 Index are not necessarily indicative of future performance.

NYA 787851.3

All information in the table that follows was obtained from Bloomberg L.P., without independent verification.

| | High | Low | Period-end |
|---|---|---|---|
| **2001** | | | |
| First Quarter | 4787.45 | 3891.49 | 4185.00 |
| Second Quarter | 4582.07 | 4039.16 | 4243.91 |
| Third Quarter | 4304.44 | 2877.68 | 3296.66 |
| Fourth Quarter | 3828.76 | 3208.31 | 3806.13 |
| **2002** | | | |
| First Quarter | 3833.09 | 3430.18 | 3784.05 |
| Second Quarter | 3748.44 | 2928.72 | 3133.39 |
| Third Quarter | 3165.47 | 2187.22 | 2204.39 |
| Fourth Quarter | 2669.89 | 2150.27 | 2386.41 |
| **2003** | | | |
| First Quarter | 2529.86 | 1849.64 | 2036.86 |
| Second Quarter | 2527.44 | 2067.23 | 2419.51 |
| Third Quarter | 2641.55 | 2366.86 | 2395.87 |
| Fourth Quarter | 2760.66 | 2434.63 | 2760.66 |
| **2004** | | | |
| First Quarter | 2959.71 | 2702.05 | 2787.49 |
| Second Quarter | 2905.88 | 2659.85 | 2811.08 |
| Third Quarter | 2806.62 | 2580.04 | 2726.30 |
| Fourth Quarter | 2955.11 | 2734.37 | 2951.24 |
| **2005** | | | |
| First Quarter | 3114.54 | 2924.01 | 3055.73 |
| Second Quarter | 3190.80 | 2930.10 | 3181.54 |
| Third Quarter | 3429.42 | 3170.06 | 3428.51 |
| Fourth Quarter | 3616.33 | 3241.14 | 3578.93 |
| **2006** | | | |
| First Quarter | 3881.69 | 3515.07 | 3853.74 |
| Second Quarter | 3890.94 | 3408.02 | 3648.92 |
| Third Quarter | 3899.41 | 3492.11 | 3899.41 |
| Fourth Quarter | 4140.66 | 3880.14 | 4119.94 |
| **2007** | | | |
| First Quarter | 4272.32 | 3906.15 | 4181.03 |
| Second Quarter | 4556.97 | 4189.55 | 4489.77 |
| Third Quarter (through July 11, 2007) | 4528.76 | 4447.52 | 4447.52 |

**License agreement between STOXX and Lehman Brothers Holdings**

Lehman Brothers Holdings has entered into a non-transferable, non-exclusive license agreement with STOXX, which grants Lehman Brothers Holdings a license in exchange for a fee to use the Dow Jones EURO STOXX 50 Index in connection with the issuance of the Notes.

STOXX has trade name and trademark rights to EURO STOXX$^{SM}$ and EURO STOXX 50$^{SM}$. Dow Jones EURO STOXX 50 Index is a service mark of Dow Jones & Company, Inc.

STOXX and Dow Jones & Company, Inc. have no relationship to Lehman Brothers Holdings, other than the licensing of the Dow Jones EURO STOXX 50 Index and the related trademarks for use in connection with the Notes. The Issuer, Lehman Brothers Holdings and the Calculation Agent disclaim all

- 26 -

NYA 787851.3

responsibility for the calculation or other maintenance of or any adjustments to the Dow Jones EURO STOXX 50 Index.

STOXX and Dow Jones Company, Inc. do not:

- sponsor, endorse, sell or promote the Notes;

- recommend that any person invest in the Notes or any other securities;

- have any responsibility or liability for or make any decisions about the timing, amount or pricing of the Notes;

- have any responsibility or liability for the administration, management or marketing of the Notes; nor

- consider the needs of the Notes or the owners of the Notes in determining, composing or calculating the Dow Jones EURO STOXX 50 Index or have any obligation to do so.

STOXX and Dow Jones & Company, Inc. will not have any liability in connection with the Notes. Specifically,

- STOXX and Dow Jones & Company, Inc. do not make any warranty, express or implied and disclaim any and all warranty about:

  - the results to be obtained by the Notes, the owner of the Notes or any other person in connection with the use of the Dow Jones EURO STOXX 50 Index and the data included in the Dow Jones EURO STOXX 50 Index;

  - the accuracy or completeness of the Dow Jones EURO STOXX 50 Index and its data; and

  - the merchantability and the fitness for a particular purpose or use of the Dow Jones EURO STOXX 50 Index and its data.

- STOXX and Dow Jones & Company, Inc. will have no liability for any errors, omissions or interruptions in the Dow Jones EURO STOXX 50 Index or its data.

- Under no circumstances will STOXX or Dow Jones & Company, Inc. be liable for any lost profits or indirect, punitive, special or consequential damages or losses, even if STOXX or Dow Jones & Company, Inc. know that they might occur.

The licensing agreement between Lehman Brothers Holdings and STOXX is solely for their benefit and not for the benefit of the owners of the Notes or any other third parties.

**STOXX does not guarantee the accuracy and/or the completeness of the Dow Jones EURO STOXX 50 Index or any data included therein and STOXX shall have no liability for any errors, omissions or interruptions therein. STOXX makes no warranty, express or implied, as to results to be obtained by Lehman Brothers Holdings, holders of the Notes or any other person or entity from the use of the Dow Jones EURO STOXX 50 Index or any data included therein. STOXX makes no express or implied warranties, and expressly disclaims all warranties of merchantability or fitness for a particular purpose or use with respect to the Dow Jones EURO STOXX 50 Index or any data included therein. Without limiting the foregoing, in no event shall STOXX have any liability for any**

NYA 787851.3

**special, punitive, indirect or consequential damages (including lost profits), even if notified of the possibility of such damages.**

## THE S&P 500 INDEX

### General

Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings") obtained all information contained in these final terms regarding the S&P 500 Index, including, without limitation, its make-up, method of calculation and changes in its components from publicly available information. Such information reflects the policies of, and is subject to change by, S&P. S&P has no obligation to continue to publish, and may discontinue publication of, the S&P 500 Index. The S&P 500 Index is calculated, maintained and published by S&P. The consequences of S&P discontinuing publication of the S&P 500 Index are described in Annex II. Lehman Brothers Holdings makes no representation or warranty as to the accuracy or completeness of any information relating to the S&P 500 Index.

The S&P 500 Index is published by S&P and is intended to provide an indication of the pattern of common stock price movement. The calculation of the value of the S&P 500 Index is based on the relative value of the aggregate market value of the common stocks of 500 companies as of a particular time compared to the aggregate average market value of the common stocks of 500 similar companies during the base period of the years 1941 through 1943 (the "Base Period").

### Index composition

S&P chooses companies for inclusion in the S&P 500 Index with the aim of achieving a distribution by broad industry groupings that approximates the distribution of these groupings in the common stock population of The New York Stock Exchange, which S&P uses as an assumed model for the composition of the total market. Relevant criteria employed by S&P include the viability of the particular company, the extent to which that company represents the industry group to which it is assigned, the extent to which the market price of that company's common stock is generally responsive to changes in the affairs of the respective industry and the market value and trading activity of the common stock of that company. S&P may from time to time, in its sole discretion, add companies to, or delete companies from, the S&P 500 Index to achieve the objectives stated above.

As of July 13, 2007, the 500 companies included in the S&P 500 Index were divided into 10 industry groups (with the number of companies currently included in each industry group indicated in parentheses): Consumer Discretionary (88), Consumer Staples (39), Energy (32), Financials (92), Health Care (53), Industrials (53), Information Technology (74), Materials (28), Telecommunications Services (9) and Utilities (32).

### Index computation

While S&P currently employs the following methodology to calculate the S&P 500 Index, no assurance can be given that S&P will not modify or change such methodology in a manner that may affect the trading price of the Notes.

On March 18, 2005, S&P began to calculate the S&P 500 Index based on a half float-adjusted formula, and, on September 16, 2005, the S&P 500 Index became fully float-adjusted. S&P's criteria for selecting

NYA 787851.3

stocks for the S&P 500 Index will not be changed by the shift to float adjustment. However, the adjustment affects each company's weight in the S&P 500 Index (i.e., its market value).

Under float adjustment, the share counts used in calculating the S&P 500 Index will reflect only those shares that are available to investors, not all of a company's outstanding shares. S&P defines three groups of shareholders whose holdings are presumed to be for control and are subject to float adjustment:

- holdings by other publicly traded corporations, venture capital firms, private equity firms, strategic partners, or leveraged buyout groups;

- holdings by government entities, including all levels of government in the United States or foreign countries; and

- holdings by current or former officers and directors of the company, founders of the company, or family trusts of officers, directors, or founders, as well as holdings of trusts, foundations, pension funds, employee stock ownership plans, or other investment vehicles associated with and controlled by the company.

However, treasury stock, stock options, restricted shares, equity participation units, warrants, preferred stock, convertible stock, and rights are not part of the float. Within each group, the holdings are totaled. In cases where holdings in a group exceed 10% of the outstanding shares of a company, the holdings of that group will be excluded from the float-adjusted count of shares to be used in the S&P 500 Index calculation. Mutual funds, investment advisory firms, pension funds, or foundations not associated with the company and investment funds in insurance companies, shares of a United States company traded in Canada as "exchangeable shares" unless they fall under one of the three groups enumerated above, shares that trust beneficiaries may buy or sell without difficulty or significant additional expense beyond typical brokerage fees, and, if a company has more than one class of stock outstanding, shares in an unlisted or non-traded class if such shares are convertible to the listed class by shareholders without undue delay and cost, are also part of the float.

For each stock, an investable weight factor ("IWF") is calculated by dividing the available float shares, defined as the total shares outstanding less shares held in one or more of the three groups listed above where the group holdings exceed 10% of the outstanding shares, by the total shares outstanding. The float-adjusted S&P 500 Index is calculated by dividing the sum of the IWF multiplied by both the price and the total shares outstanding for each stock by the index divisor. For companies with multiple classes of stock outstanding, S&P will calculate the weighted average IWF for each stock using the proportion of the total company market capitalization of each share class as the weights.

The S&P 500 Index is calculated using a base-weighted aggregate methodology: the level of the S&P 500 Index reflects the total market value of all 500 component stocks relative to the S&P 500 Index's Base Period. The actual total market value of the component stocks during the Base Period has been set equal to an indexed value of 10. This is often indicated by the notation 1941-43=10.

### Index maintenance

Index maintenance includes monitoring and completing the adjustments for company additions and deletions, share changes, stock splits, stock dividends, and stock price adjustments due to company restructurings or spinoffs. Some corporate actions, such as stock splits and stock dividends, require changes in the common shares outstanding and the stock prices of the companies in the S&P 500 Index and do not require index divisor adjustments.

NYA 787851.3

To prevent the level of the S&P 500 Index from changing due to corporate actions, corporate actions which affect the total market value of the S&P 500 Index require an index divisor adjustment. By adjusting the index divisor for the change in market value, the level of the S&P 500 Index remains constant. This helps keep the level of the S&P 500 Index accurate as a barometer of stock market performance and ensures that the movement of the S&P 500 Index does not reflect the corporate actions of companies in the S&P 500 Index. Divisor adjustments are made after the close of trading and after the calculation of the S&P 500 Index closing level.

Changes in a company's shares outstanding of 5% or more due to mergers, acquisitions, public offerings, private placements, tender offers, Dutch auctions or exchange offers are made as soon as reasonably possible. All other changes of 5% or more (due to, for example, company stock repurchases, redemptions, exercise of options, warrants, subscription rights, conversion of preferred stock, notes, debt, equity participation units or other recapitalizations) are made weekly and are announced on Tuesdays for implementation after the close of trading on Wednesday. Changes of less than 5% are accumulated and made quarterly on the third Friday of March, June, September and December, and are usually announced two days prior.

Changes in IWFs of more than ten percentage points caused by corporate actions (such as M&A activity, restructurings or spinoffs) will be made as soon as reasonably possible. Other changes in IWFs will be made annually, in September, when IWFs are reviewed.

### Historical information

The following table sets forth the high and low level, as well as the end-of-quarter closing levels, of the S&P 500 Index for each quarter in the period from January 1, 2001 through July 11, 2007. The closing level on July 11, 2007 was 1518.76. The results shown should not be considered as a representation of the income, yield or capital gain or loss that may be generated by the S&P 500 Index in the future. The historical levels of the S&P 500 Index are not indications of future performance.

All information in the table that follows was obtained from Bloomberg L.P., without independent verification.

|  | High | Low | Period-end |
|---|---|---|---|
| **2001** | | | |
| First Quarter | 1373.73 | 1117.58 | 1160.33 |
| Second Quarter | 1312.83 | 1103.25 | 1224.42 |
| Third Quarter | 1236.72 | 965.80 | 1040.94 |
| Fourth Quarter | 1170.35 | 1038.55 | 1148.08 |
| **2002** | | | |
| First Quarter | 1172.51 | 1080.17 | 1147.39 |
| Second Quarter | 1146.54 | 973.53 | 989.82 |
| Third Quarter | 989.03 | 797.70 | 815.28 |
| Fourth Quarter | 938.87 | 776.76 | 879.82 |
| **2003** | | | |
| First Quarter | 931.66 | 800.73 | 848.18 |
| Second Quarter | 1011.66 | 858.48 | 974.50 |
| Third Quarter | 1039.58 | 965.46 | 995.97 |
| Fourth Quarter | 1111.92 | 1018.22 | 1111.92 |
| **2004** | | | |
| First Quarter | 1157.76 | 1091.33 | 1126.21 |

NYA 787851.3

| | | | |
|---|---|---|---|
| Second Quarter | 1150.57 | 1084.10 | 1140.84 |
| Third Quarter | 1129.30 | 1063.23 | 1114.58 |
| Fourth Quarter | 1213.55 | 1094.81 | 1211.92 |
| **2005** | | | |
| First Quarter | 1225.31 | 1163.75 | 1180.59 |
| Second Quarter | 1216.96 | 1137.50 | 1191.33 |
| Third Quarter | 1245.04 | 1194.44 | 1228.81 |
| Fourth Quarter | 1272.74 | 1176.84 | 1248.29 |
| **2006** | | | |
| First Quarter | 1307.25 | 1254.78 | 1294.83 |
| Second Quarter | 1325.76 | 1223.69 | 1270.2 |
| Third Quarter | 1339.15 | 1234.49 | 1335.85 |
| Fourth Quarter | 1427.09 | 1331.32 | 1418.3 |
| **2007** | | | |
| First Quarter | 1459.68 | 1374.12 | 1420.86 |
| Second Quarter | 1539.18 | 1424.55 | 1503.35 |
| Third Quarter (through July 11, 2007) | 1531.85 | 1510.12 | 1518.76 |

**License agreement between S&P and Lehman Brothers Holdings**

Lehman Brothers Holdings has entered into a non-exclusive license agreement with S&P, which grants Lehman Brothers Holdings and certain of its affiliated or subsidiary companies a license in exchange for a fee to use the S&P 500 Index in connection with certain securities, including the Notes. The license agreement between Lehman Brothers Holdings and S&P provides that the following language must be stated in this Final Terms:

The Notes are not sponsored, endorsed, sold or promoted by S&P. S&P makes no representation or warranty, express or implied, to the holders of the Notes or any member of the public regarding the advisability of investing in securities generally or in the Notes particularly or the ability of the S&P 500 Index to track general stock market performance. S&P's only relationship to Lehman Brothers Holdings is the licensing of certain trademarks and trade names of S&P and of the S&P 500 Index which is determined, composed and calculated by S&P without regard to Lehman Brothers Holdings or the Notes. S&P has no obligation to take the needs of Lehman Brothers Holdings or the holders of the Notes into consideration in determining, composing or calculating the S&P 500 Index. S&P is not responsible for and has not participated in the determination of the timing of the sale of the Notes, prices at which the Notes are to be initially sold, or quantities of the Notes to be issued or in the determination or calculation of the equation by which the Notes are to be converted into cash. S&P has no obligation or liability in connection with the administration, marketing or trading of the Notes.

NYA 787851.3

S&P DOES NOT GUARANTEE THE ACCURACY AND/OR THE COMPLETENESS OF THE S&P 500 INDEX OR ANY DATA INCLUDED THEREIN AND S&P SHALL HAVE NO LIABILITY FOR ANY ERRORSOMISSIONS, OR INTERRUPTIONS THEREIN. S&P MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY LEHMAN BROTHERS HOLDINGS, INVESTORS, OWNERS OF THE NOTES, OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE S&P 500 INDEX OR ANY DATA INCLUDED THEREIN. S&P MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE S&P 500 INDEX OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL S&P HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS), EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

## THE NIKKEI 225 INDEX

### General

Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings") obtained all information contained herein regarding the Nikkei 225 Index, including, without limitation, its make-up, method of calculation and changes in its components, from publicly available information. That information reflects the policies of, and is subject to change by, Nihon Keizai Shimbun, Inc. ("NKS)". NKS has no obligation to continue to publish, and may discontinue publication of, the Nikkei 225 Index. None of the Issuer, the Guarantor, the Calculation Agent or their affiliates make any representation or warranty as to the accuracy or completeness of any information relating to the Nikkei 225 Index.

The Nikkei 225 Index is a stock index calculated, published and disseminated by NKS that measures the composite price performance of selected Japanese stocks. The Nikkei 225 Index is currently based on 225 underlying stocks trading on the TSE and represents a broad cross-section of Japanese industry. All of the stocks underlying the Nikkei 225 Index are stocks listed in the First Section of the TSE. Stocks listed in the First Section are among the most actively traded stocks on the TSE. Nikkei rules require that the 75 most liquid issues (one-third of the component count of the Nikkei 225 Index) be included in the Nikkei 225 Index. Futures and options contracts on the Nikkei 225 Index are traded on the Singapore Monetary Exchange, Ltd., the Osaka Securities Exchange and the Chicago Mercantile Exchange.

### Composition of the Nikkei 225 Index

As of July 11, 2007, the companies included in the Nikkei 225 Index were divided into six sector categories: Technology, Financials, Consumer Goods, Materials, Capital Goods/Others and Transportation/Utilities. This sector-based breakdown and the underlying industry classifications may be modified to reflect changes in the industrial structure.The 36 Nikkei industrial classifications included in the six sector categories are as follows:

- 32 -

NYA 787851.3

Technology -- Pharmaceuticals, Electrical machinery, Automobiles, Precision machinery, Telecommunications

Financials -- Banks, Miscellaneous finance, Securities, Insurance

Consumer Goods -- Marine products, Food, Retail, Services

Materials -- Mining, Textiles, Paper & pulp, Chemicals, Oil, Rubber, Ceramics, Steel, Nonferrous metals, Trading House

Capital Goods/Others -- Construction, Machinery, Shipbuilding, Transportation equipment, Miscellaneous manufacturing, Real estate

Transportation and Utilities -- Railroads & Buses, Trucking, Shipping, Airlines, Warehousing, Electric power, Gas

### Computation of the Nikkei 225 Index

While NKS currently employs the following methodology to calculate the Nikkei 225 Index, the NKS may modify or change such methodology in the future.

The Nikkei 225 Index is a modified, price-weighted index. Each stock's weight in the Nikkei 225 Index is based on its price per share rather than the total market capitalization of the issuer. NKS calculates the Nikkei 225 Index by multiplying the per share price of each underlying stock by the corresponding weighting factor for that underlying stock (a "Weight Factor"), calculating the sum of all these products and dividing that sum by a divisor. The divisor, initially set on May 16, 1949 at 225, was 24.293 as of April 3, 2007, and is subject to periodic adjustments as set forth below. Each Weight Factor is computed by dividing ¥50 by the par value of the relevant underlying stock, so that the share price of each underlying stock when multiplied by its Weight Factor corresponds to a share price based on a uniform par value of ¥50. Each Weight Factor represents the number of shares of the related underlying stock, which are included in one trading unit of the Nikkei 225 Index. The stock prices used in the calculation of the Nikkei 225 Index are those reported by a primary market for the underlying stocks, which is currently the TSE. The level of the Nikkei 225 Index is calculated once per minute during TSE trading hours.

In order to maintain continuity in the level of the Nikkei 225 Index in the event of certain changes due to non-market factors affecting the underlying stocks, such as the addition or deletion of stocks, substitution of stocks, stock dividends, stock splits or distributions of assets to stockholders, the divisor used in calculating the Nikkei 225 Index is adjusted in a manner designed to prevent any instantaneous change or discontinuity in the level of the Nikkei 225 Index. The divisor remains at the new value until a further adjustment is necessary as the result of another change. As a result of each change affecting any underlying stock, the divisor is adjusted in such a way that the sum of all share prices immediately after the change multiplied by the applicable Weight Factor and divided by the new divisor, that is, the level of the Nikkei 225 Index immediately after the change, will equal the level of the Nikkei 225 Index immediately prior to the change

Underlying stocks may be deleted or added by NKS. However, to maintain continuity in the Nikkei 225 Index, the policy of NKS is generally not to alter the composition of the underlying stocks except when

- 33 -

NYA 787851.3

an underlying stock is deleted in accordance with the following criteria. Any stock becoming ineligible for listing in the First Section of the TSE due to any of the following reasons will be deleted from the underlying stocks: bankruptcy of the issuer; merger of the issuer into, or acquisition of the issuer by, another company; delisting of the stock or transfer of the stock to the "Seiri-Post" because of excess debt of the issuer or because of any other reason; or transfer of the stock to the Second Section of the TSE. In addition, a component stock transferred to the "Kanri-Post" (post for stock under supervision) is in principle a candidate for deletion. Underlying stocks with relatively low liquidity, based on trading value and rate of price fluctuation over the past five years, may be deleted by NKS. Upon deletion of a stock from the Nikkei 225 Index, NKS will select, in accordance with certain criteria established by it, a replacement for the deleted underlying stock. In an exceptional case, a newly listed stock in the First Section of the TSE that is recognized by NKS to be representative of a market may be added to the underlying stocks. As a result, an existing underlying stock with low trading volume and not representative of a market will be deleted.

**The Tokyo Stock Exchange**

The TSE is one of the world's largest securities exchanges in terms of market capitalization. Trading hours are currently from 9:00 a.m. to 11:00 a.m. and from 12:30 p.m. to 3:00 p.m., Tokyo time, Monday through Friday.

Due to the time zone difference, on any normal trading day the TSE will close prior to the opening of business in New York City on the same calendar day. Therefore, the closing level of the Nikkei 225 Index on a trading day will generally be available in the United States by the opening of business on the same calendar day.

The TSE has adopted certain measures, including daily price floors and ceilings on individual stocks, intended to prevent any extreme short-term price fluctuations resulting from order imbalances. In general, any stock listed on the TSE cannot be traded at a price lower than the applicable price floor or higher than the applicable price ceiling. These price floors and ceilings are expressed in absolute Japanese yen, rather than percentage limits based on the closing price of the stock on the previous trading day. In addition, when there is a major order imbalance in a listed stock, the TSE posts a "special bid quote" or a "special asked quote" for that stock at a specified higher or lower price level than the stock's last sale price in order to solicit counter-orders and balance supply and demand for the stock. Prospective investors should also be aware that the TSE may suspend the trading of individual stocks in certain limited and extraordinary circumstances, including, for example, unusual trading activity in that stock. As a result, changes in the Nikkei 225 Index may be limited by price limitations or special quotes, or by suspension of trading, on individual stocks which comprise the Nikkei 225 Index, and these limitations may, in turn, adversely affect the value of the Notes.

**Historical information**

The following table sets forth the high and low level, as well as the end-of-quarter closing levels, calculated in Japanese yen, of the Nikkei 225 Index for each quarter in the period from January 1, 2001 through July 11, 2007. The closing level on July 11, 2007 was 18049.51. The results shown should not be considered as a representation of the income, yield or capital gain or loss that may be generated by the Nikkei 225 Index in the future. The historical levels of the Nikkei 225 Index are not indications of future performance.

All information in the table that follows was obtained from Bloomberg L.P., without independent verification.

NYA 787851.3

|  | High | Low | Period-end |
|---|---|---|---|
| **2001** | | | |
| First Quarter | 14032.42 | 11819.70 | 12999.70 |
| Second Quarter | 14529.41 | 12574.26 | 12969.05 |
| Third Quarter | 12817.41 | 9504.41 | 9774.68 |
| Fourth Quarter | 11064.30 | 9924.23 | 10542.62 |
| **2002** | | | |
| First Quarter | 11919.30 | 9420.85 | 11024.94 |
| Second Quarter | 11979.85 | 10074.56 | 10621.84 |
| Third Quarter | 10960.25 | 9075.09 | 9383.29 |
| Fourth Quarter | 9215.56 | 8303.39 | 8578.95 |
| **2003** | | | |
| First Quarter | 8790.92 | 7862.43 | 7972.71 |
| Second Quarter | 9137.14 | 7607.88 | 9083.11 |
| Third Quarter | 11033.32 | 9265.56 | 10219.05 |
| Fourth Quarter | 11161.71 | 9614.60 | 10676.64 |
| **2004** | | | |
| First Quarter | 11770.65 | 10365.40 | 11715.39 |
| Second Quarter | 12163.89 | 10505.05 | 11858.87 |
| Third Quarter | 11896.01 | 10687.81 | 10823.57 |
| Fourth Quarter | 11488.76 | 10659.15 | 11488.76 |
| **2005** | | | |
| First Quarter | 11966.69 | 11238.37 | 11668.95 |
| Second Quarter | 11874.75 | 10825.39 | 11584.01 |
| Third Quarter | 13617.24 | 11565.99 | 13574.30 |
| Fourth Quarter | 16344.20 | 13106.18 | 16111.43 |
| **2006** | | | |
| First Quarter | 17059.66 | 15341.18 | 17059.66 |
| Second Quarter | 17563.37 | 14218.60 | 15505.18 |
| Third Quarter | 16385.96 | 14437.24 | 16127.58 |
| Fourth Quarter | 17225.83 | 15725.94 | 17225.83 |
| **2007** | | | |
| First Quarter | 18215.35 | 16642.25 | 17287.65 |
| Second Quarter | 18240.30 | 17028.41 | 18138.36 |
| Third Quarter (through July 11, 2007) | 18261.98 | 18049.51 | 18049.51 |

**License agreement between NKS and Lehman Brothers Holdings**

Lehman Brothers Holdings will enter into a non-exclusive license agreement with NKS providing for a license to Lehman Brothers Holdings and certain of its affiliates or subsidiary companies, in exchange for a fee, to use the Nikkei 225 Index in connection with the Notes.

The license agreement between NKS and Lehman Brothers Holdings will provide that the following language must be stated in these final terms.

The Notes are not in any way sponsored, endorsed or promoted by NKS. NKS does not make any warranty or representation whatsoever, express or implied, either as to the results to be obtained from the use of the Nikkei 225 Index or the level of the Nikkei 225 Index on any particular day or otherwise. The Nikkei 225 Index is compiled and calculated solely by NKS. However, NKS shall not be liable to any

NYA 787851.3

person for any error in the Nikkei 225 Index, and NKS shall not be under any obligation to advise any person, including any purchaser or vendor of the Notes, of any error therein.

In addition, NKS gives no assurance regarding any modification or change in any methodology used in calculating the Nikkei 225 Index and is under no obligation to continue the calculation, publication and dissemination of the Nikkei 225 Index.

"Nikkei" and "Nikkei 225" are the service marks of NKS.  NKS reserves all the rights, including copyright, to the Nikkei 225 Index.

**Nikkei 225 Index Disclaimer:**

THE INDEX IS THE INTELLECTUAL PROPERTY OF NIHON KEIZAI SHIMBUN, INC., THE SPONSOR. "NIKKEI", "NIKKEI STOCK AVERAGE" AND "NIKKEI 225" ARE THE SERVICE MARKS OF THE SPONSOR. THE SPONSOR RESERVES ALL RIGHTS, INCLUDING COPYRIGHT, TO THE INDEX.

THE NOTES ARE NOT IN ANY WAY SPONSORED, ENDORSED OR PROMOTED BY THE SPONSOR. THE SPONSOR DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EXPRESS OR IMPLIED, EITHER AS TO THE RESULTS TO BE OBTAINED AS TO THE USE OF THE INDEX OR THE FIGURE AT WHICH THE INDEX STANDS AT ANY PARTICULAR DAY OR OTHERWISE. THE INDEX IS CALCULATED AND ANNOUNCED SOLELY BY THE SPONSOR. HOWEVER, THE SPONSOR SHALL NOT BE LIABLE TO ANY PERSON FOR ANY ERROR IN THE INDEX AND THE SPONSOR SHALL NOT BE UNDER ANY OBLIGATION TO ADVISE ANY PERSON, INCLUDING, WITHOUT LIMITATION, A PURCHASER OR VENDOR OF THE NOTES, OF ANY ERROR THEREIN.

IN ADDITION, THE SPONSOR GIVES NO ASSURANCE REGARDING ANY MODIFICATION OR CHANGE IN ANY METHODOLOGY USED IN CALCULATING THE INDEX AND IS UNDER NO OBLIGATION TO CONTINUE THE CALCULATION, PUBLICATION AND DISSEMINATION OF THE NIKKEI STOCK AVERAGE.

NYA 787851.3

## ANNEX IV

## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**THE STATEMENTS ABOUT U.S. FEDERAL TAX ARE MADE TO SUPPORT THE MARKETING OF THE NOTES. NO TAXPAYER CAN RELY ON THEM TO AVOID TAX PENALTIES. EACH PROSPECTIVE PURCHASER SHOULD SEEK ADVICE FROM AN INDEPENDENT TAX ADVISOR ABOUT THE TAX CONSEQUENCES UNDER ITS OWN PARTICULAR CIRCUMSTANCES OF INVESTING IN THE NOTES UNDER THE LAWS OF THE UNITED STATES AND ITS CONSTITUENT JURISDICTIONS AND ANY OTHER JURISDICTIONS WHERE THE PURCHASER MAY BE SUBJECT TO TAXATION.**

The following is a summary of the material United States federal income tax consequences of the purchase, ownership and disposition of Notes as of the date of this Final Terms. If any information in this Annex is inconsistent with the accompanying Debt Issuance Program Prospectus, holders of the Notes should rely on the information in this Annex.

Except where noted, this summary deals only with a Note held as a capital asset by a United States holder who purchases the Note on original issue at its initial offering price, and it does not deal with special situations. For example, this summary does not address:

- tax consequences to holders who may be subject to special tax treatment, such as dealers in securities or currencies, traders in securities that elect to use the mark-to-market method of accounting for their securities, financial institutions, regulated investment companies, real estate investment trusts, investors in pass-through entities, tax-exempt entities or insurance companies;

- tax consequences to non-United States holders of the Notes;

- tax consequences to persons holding Notes as part of a hedging, integrated, constructive sale or conversion transaction or a straddle;

- tax consequences to holders of Notes whose "functional currency" is not the U.S. dollar;

- alternative minimum tax consequences, if any; or

- any state, local or foreign tax consequences.

The discussion below is based upon the provisions of the Internal Revenue Code of 1986, as amended (which we refer to as the Code), and regulations, rulings and judicial decisions as of the date of

- 37 -

NYA 787851.3

this Final Terms. Those authorities may be changed, perhaps retroactively, so as to result in United States federal income tax consequences different from those discussed below.

If a partnership holds Notes, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. A partner of a partnership holding Notes should consult its own tax advisors.

Persons considering the purchase of Notes should consult their own tax advisors concerning the federal income and estate tax consequences in light of their particular situation and any consequences arising under the laws of any other taxing jurisdiction.

### United States Holders

The following discussion is a summary of certain United States federal tax consequences that will apply to United States holders of the Notes.

For purposes of this discussion, a United States holder is a beneficial owner of a Note that is for United States federal income tax purposes:

• a citizen or resident of the United States;

• a corporation or partnership created or organized in or under the laws of the United States or any political subdivision of the United States;

• an estate the income of which is subject to United States federal income taxation regardless of its source; or

• a trust if (1) it is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) it has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

A Non-United States holder is a holder of Notes that is not a United States holder.

### Accrual of interest

The Treasury regulations that apply to contingent payment debt obligations will apply to the Notes. All payments on the Notes will be taken into account under these Treasury regulations. As discussed more fully below, the effect of these Treasury regulations will be to:

• require holders of the Notes, regardless of such holders' usual method of tax accounting, to use the accrual method with respect to the Notes;

• result in the accrual of original issue discount by holders of the Notes based on the "comparable

- 38 -

NYA 787851.3

yield" of the Notes in excess of stated interest payments actually made to such holders; and

• generally result in ordinary rather than capital treatment of any gain, and to some extent loss, on the sale, exchange or other disposition of the Notes.

Under the contingent payment debt rules, holders of the Notes will be required to include original issue discount in income each year, regardless of their usual method of tax accounting, based on the "comparable yield" of the Notes, which will generally be the rate at which the Issuer could issue a fixed rate debt instrument with terms and conditions similar to the Notes.

The Issuer is required to provide the comparable yield to the holders of the Notes and, solely for tax purposes, is also required to provide a projected payment schedule that includes the actual interest payments on the Notes and estimates the amount and timing of contingent payments on the Notes. The comparable yield and projected payment schedule is provided in the term sheet included in this Final Terms. The Issuer agrees and, by purchasing a Note, each holder of the Notes agrees, for United States federal income tax purposes, to be bound by the Issuer's determination of the comparable yield and projected payment schedule. As a consequence, for United States federal income tax purposes, each holder of the Notes must use the comparable yield determined by the Issuer and the projected payments set forth in the projected payment schedule prepared by the Issuer in determining such holder's interest accruals, and the adjustments thereto, in respect of the Notes.

*The comparable yield and the projected payment schedule are not provided for any purpose other than the determination of the interest accruals for the holders of the Notes and adjustments thereto and do not constitute a representation regarding the actual amount of the payment on a Note.*

The amount of original issue discount on a Note for each accrual period is determined by multiplying the comparable yield of the Note, adjusted for the length of the accrual period, by the Note's adjusted issue price at the beginning of the accrual period, determined in accordance with the rules set forth in the contingent payment debt regulations. The amount of original issue discount so determined is then allocated on a ratable basis to each day in the accrual period that a holder held the Note. The Issuer is required to provide information returns stating the amount of original issue discount accrued on Notes held of record by persons other than corporations and other exempt owners.

If an actual contingent payment made on the Notes differs from the projected contingent payment, an adjustment will be made for the difference. A positive adjustment, for the amount by which an actual payment exceeds the projected contingent payment, will be treated as additional original issue

- 39 -

NYA 787851.3

discount in the current year. For these purposes, the payments in a taxable year include the fair market value of property received in that year. A negative adjustment will:

- first, reduce the amount of original issue discount required to be accrued in the current year; and

- second, any negative adjustments that exceed the amount of original issue discount accrued in the current year will be treated as ordinary loss to the extent of a holder's total prior original issue discount inclusions with respect to the Note.

### *Sale, exchange, redemption, repurchase or other disposition of Notes*

Upon the sale, exchange or other disposition of a Note, a holder will recognize gain or loss equal to the difference between such holder's amount realized and such holder's adjusted tax basis in the Note. Such gain on a Note generally will be treated as ordinary income. Loss from the disposition of a Note will be treated as ordinary loss to the extent of such holder's prior net original issue discount inclusions with respect to the Note. Any loss in excess of that amount will be treated as capital loss. Special rules apply in determining the tax basis of a Note. A holder's adjusted tax basis in a Note is generally increased by original issue discount such holder's previously accrued on the Note and reduced by the projected amount of any payments previously scheduled to be made on the Note.

### Information reporting and backup withholding

Information reporting requirements will generally apply to all payments the Issuer makes to a United States holder of a Note and the proceeds from the sale of a Note paid to such holder, unless such holder is an exempt recipient such as a corporation.

NYA 787851.3

## ANNEX V

## NOTICE TO INVESTORS

The Notes have not been registered under the Securities Act or any other applicable securities laws. Thus, until they are registered, the Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in compliance with the registration requirements of the Securities Act and any other applicable securities laws, or pursuant to an exemption from registration under the Securities Act and any other applicable securities laws, or in a transaction not subject to such laws. Accordingly, the Notes are being offered and sold only to "accredited investors" in compliance with Regulation D.

Each initial purchaser of a Note will be required to execute and deliver a purchase agreement to the Placement Agent. A form of purchase agreement is attached to this Final Terms as Annex VI.

Each transferee of the Notes will be required to deliver to the Transfer Agent a representation letter containing representations and warranties substantially similar to those contained in the purchase agreement and may be required to deliver a legal opinion or opinions from counsel to such transferee.

Any sales or transfers of the Notes in violation of the transfer restrictions are prohibited and will be treated by the Issuer and the Transfer Agent as having no legal effect. The Issuer will not honor such sale or transfer and will have the right, at any time, at the expense and risk of the holder of any Notes held by or on behalf of a person who is not an Eligible Investor (as defined below) at the time it purchases such Notes to (1) redeem such Notes at the maturity payment amount, calculated as if the date of redemption was the Maturity Date and the date three business days before that date was the Valuation Date as determined by the Calculation Agent, in whole or in part or (2) require such holder to sell such Notes to an Eligible Investor, as the case may be.

The following is only a summary of certain material provisions of the purchase agreement and the representation letter required for subsequent transfer of Notes. This summary is not complete and is subject to, and qualified in its entirety by reference to, the purchase agreement and the representation letter. Copies of the purchase agreement and representation letter are available from the Placement Agent and the Transfer Agent, respectively.

Each initial purchaser of a Note and each transferee of a Note will represent and agree as follows:

(i) It is an "accredited investor" within the meaning of Rule 501 (a) under the Securities Act.

(ii) In connection with the purchase of such Notes: (1)(A) it has received a copy of the Final Terms and any other information it deems necessary to make an investment decision; (B) it has such

- 41 -

NYA 787851.3

knowledge and experience in financial and business matters so as to be able to evaluate the merits and risks of an investment in the Notes and have sufficient net worth and/or annual income to hold the Notes for an indefinite period of time and to bear the risk of losing its entire investment; and (2)(A) it was not formed for the purpose of acquiring or investing in Notes; (B) it is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (C) that the shareholders, partners or other holders of its equity or beneficial interests are not able to decide individually whether to participate, or to the extent of their participation, in its investment in the Notes; and (D) all Notes purchased and held directly or indirectly by it, as applicable, does not constitute in the aggregate an investment of more than 40% of its total assets (on a consolidated basis with its subsidiaries) (such persons, "Eligible Investors").

(iii) On each date from the date on which it acquires such Note (or any interest therein) through and including the date on which it disposes of all its interests in such Note, either that (a) it is not a, and is not purchasing and will not hold the Note or any interest therein with the assets of a Plan, an entity whose underlying assets are considered to include the assets of any Plan by reason of U.S. Department of Labor Regulation Section 2510.3-101 or otherwise, or a plan that is subject to any federal, state or local law which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (b) that its purchase, holding and disposition of such Note (and any interest therein) will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a Plan that is not subject to ERISA or the Code, any applicable similar federal, state or local law in the U.S. or outside of the U.S.).

(iv) Such beneficial owner understands that such Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities, such Notes have not been and will not be registered under the Securities Act, and, if in the future such beneficial owner decides to offer, resell, pledge or otherwise transfer such Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with the provisions of the Notes including the legends thereon, and that the Transfer Agent is not required to register any purported transfers of Notes which would, in the opinion of the Issuer or Lehman Brothers Inc., cause the Issuer or Lehman Brothers Inc. to be in violation of the Securities Act. Such beneficial owner acknowledges that no representation has been made as to the availability of any exemption under the Securities Act or any state securities laws for resale of such Notes.

(v) It understands that, prior to any proposed transfer of Notes, the proposed transferee will be required to provide to the Transfer Agent an executed representation letter in favor of the Issuer.

NYA 787851.3

(vi) It understands that the Notes have not been approved or disapproved by any governmental authority or agency of any jurisdiction, no has any governmental authority or agency passed upon the accuracy or adequacy of this Final Terms.

(vii) It is not, either alone or together with others, directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer, all within the meaning of the Securities Act.

(viii) In the case of a Purchaser who is not a United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), the investor is not purchasing the Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan.

(ix) Each Note will bear a legend to the following effect:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE

SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE

SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND THE OFFER,

SALE OR TRANSFER OF THIS NOTE IS SUBJECT TO CERTAIN CONDITIONS

AND RESTRICTIONS, INCLUDING THOSE SET FORTH IN THE AMENDED AND

RESTATED FISCAL AGENCY AGREEMENT DATED AUGUST 18, 2004

RELATING TO THIS NOTE. THE HOLDER HEREOF, BY PURCHASING OR

OTHERWISE ACQUIRING THIS NOTE, ACKNOWLEDGES THAT THIS NOTE IS

A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE

SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER THAT

THIS NOTE MAY BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE

TRANSFERRED ONLY TO A PERSON (1) THAT IS ACQUIRING THE NOTES AS

PRINCIPAL SOLELY FOR ITS OWN ACCOUNT FOR INVESTMENT AND NOT

WITH A VIEW TO THE RESALE, DISTRIBUTION OR OTHER DISPOSITION

THEREOF IN VIOLATION OF THE SECURITIES ACT, (2) THAT IS NOT AN

ENTITY IN WHICH THE SHAREHOLDERS, PARTNERS OR OTHER HOLDERS

OF THE ENTITY'S EQUITY OR BENEFICIAL INTERESTS ARE ABLE TO

- 43 -

NYA 787851.3

DECIDE INDIVIDUALLY WHETHER TO PARTICIPATE, OR TO THE EXTENT OF

THEIR PARTICIPATION, IN ITS INVESTMENT IN THE NOTES, (3) THAT IT WAS

NOT FORMED FOR THE PURPOSE OF ACQUIRING OR INVESTING IN THE

NOTES, AND (4) ALL NOTES PURCHASED AND HELD DIRECTLY OR

INDIRECTLY BY SUCH PERSON DO NOT CONSTITUTE IN THE AGGREGATE

AN INVESTMENT OF MORE THAN 40% OF ITS TOTAL ASSETS (ON A

CONSOLIDATED BASIS WITH ITS SUBSIDIARIES (EACH SUCH PERSON, AN

"ELIGIBLE INVESTOR"), AND IN COMPLIANCE WITH THE CERTIFICATION

AND OTHER REQUIREMENTS SPECIFIED HEREIN AND IN COMPLIANCE

WITH ANY APPLICABLE SECURITIES LAW OF ANY APPLICABLE

JURISDICTION.

THE HOLDER HEREOF AGREES THAT THE NOTE EVIDENCED HEREBY MAY

ONLY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED TO AN

ELIGIBLE INVESTOR (A) PURSUANT TO THE EXEMPTION FROM

REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT (IF

AVAILABLE) OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION

UNDER THE SECURITIES ACT TO AN ACCREDITED INVESTOR, IN EACH

CASE IN AN AGGREGATE FACE AMOUNT OF AT LEAST $50,000.

THE HOLDER HEREOF REPRESENTS EITHER THAT (I) IT IS NOT A, AND IS

NOT PURCHASING OR HOLDING THIS NOTE (OR ANY INTEREST THEREIN)

ON BEHALF OF OR WITH THE ASSETS OF ANY, "EMPLOYEE BENEFIT PLAN"

WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT

SECURITY ACT OF 1974, AS AMENDED ("ERISA") (WHETHER OR NOT

SUBJECT TO ERISA), ANY "PLAN" DESCRIBED IN SECTION 4975 OF THE

INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR ANY

ENTITY WHOSE UNDERLYING ASSETS ARE CONSIDERED TO INCLUDE PLAN

NYA 787851.3

ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN BY REASON OF

U.S. DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101 OR

OTHERWISE (EACH, A "PLAN") OR (II) THE ACQUISITION, HOLDING AND

DISPOSITION OF THIS NOTE (AND ANY INTEREST HEREIN) WILL NOT

RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION

406 OF ERISA OR SECTION 4975 OF THE CODE (OR, IN THE CASE OF A PLAN

THAT IS NOT SUBJECT TO ERISA OR THE CODE, ANY APPLICABLE SIMILAR

FEDERAL, STATE OR LOCAL LAW IN THE U.S OR OUTSIDE OF THE U.S.).

THE HOLDER HEREOF REPRESENTS THAT IT IS EITHER (1) A U.S. PERSON

(AS DEFINED UNDER THE SECURITIES ACT) THAT IS AN "ACCREDITED

INVESTOR" AS DEFINED IN RULE 501(A) UNDER THE SECURITIES ACT (AN

"ACCREDITED INVESTOR") OR (2) A NON-US PERSON IN EACH CASE THAT

IS PURCHASING AT LEAST $50,000 IN AGGREGATE FACE AMOUNT OF

CERTIFICATES.

THE HOLDER HEREOF AGREES THAT IT WILL DELIVER TO EACH PERSON

TO WHOM THE NOTE EVIDENCED HEREBY IS TRANSFERRED A NOTICE

SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

IF THIS NOTE IS HELD IN VIOLATION OF THE APPLICABLE TRANSFER

RESTRICTIONS, THE ISSUER SHALL HAVE THE RIGHT AT ANY TIME, AT THE

EXPENSE AND RISK OF THE HOLDER OF ANY NOTES HELD BY OR ON

BEHALF OF A PERSON WHO IS NOT AN ELIGIBLE INVESTOR AT THE TIME IT

PURCHASES SUCH NOTES TO (A) REDEEM SUCH NOTES, IN WHOLE OR IN

PART, AT THE MATURITY PAYMENT AMOUNT, CALCULATED AS IF THE

DATE OF REDEMPTION WAS THE STATED MATURITY AND THE DATE

THREE BUSINESS DAYS BEFORE THAT DATE WAS THE VALUATION DATE

OR (B) REQUIRE SUCH HOLDER TO SELL SUCH NOTES TO AN ELIGIBLE

- 45 -

INVESTOR, AS FURTHER PROVIDED FOR IN THE TERMS AND CONDITIONS

SET FORTH BELOW. ANY TRANSFER OF THE NOTES REPRESENTED BY THIS

NOTE TO A PERSON WHO IS NOT AN ELIGIBLE INVESTOR AT THE TIME OF

SUCH TRANSFER SHALL BE DEEMED VOID AB INITIO AND OF NO LEGAL

EFFECT, ANY SUCH TRANSFEREE SHALL BE DEEMED NOT TO BE THE

HOLDER OF SUCH NOTES FOR ANY PURPOSE, AND SUCH TRANSFEREE

SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN THE

CERTIFICATES.

IF THIS NOTE IS HELD BY OR ON BEHALF OF A PLAN (AS DEFINED ABOVE)

IN VIOLATION OF THIS LEGEND, IT MAY BE REDEEMED AT THE OPTION OF

THE ISSUER AT THE EXPENSE AND RISK OF THE HOLDER, IN WHOLE OR IN

PART, OR THE ISSUER MAY REQUIRE THE HOLDER OF THIS NOTE HELD BY

OR ON BEHALF OF SUCH PLAN, AT THE EXPENSE AND RISK OF THE

HOLDER, TO SELL ITS HOLDING TO AN ELIGIBLE INVESTOR. ANY

TRANSFER OF THE NOTES REPRESENTED BY THIS NOTE TO A PLAN IN

VIOLATION OF THIS LEGEND SHALL BE DEEMED VOID AB INITIO AND OF

NO LEGAL EFFECT, ANY SUCH TRANSFEREE SHALL BE DEEMED NOT TO BE

THE HOLDER OF SUCH NOTES FOR ANY PURPOSE, AND SUCH TRANSFEREE

SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN THE NOTES.

EACH HOLDER OF THIS NOTE ACKNOWLEDGES THAT ITS INVESTMENT IN

SUCH NOTES IS CONSISTENT WITH ITS OVERALL INVESTMENT STRATEGY.

THE ISSUER AGREES, AND BY ACCEPTANCE OF BENEFICIAL OWNERSHIP

INTEREST IN THE NOTES EACH BENEFICIAL HOLDER OF THE NOTES WILL

BE DEEMED TO HAVE AGREED, FOR UNITED STATES FEDERAL INCOME

TAX PURPOSES, (I) TO TREAT THE NOTES AS INDEBTEDNESS THAT IS

SUBJECT TO TREAS. REG. SEC. 1.1275-4 (THE "CONTINGENT PAYMENT

NYA 787851.3

REGULATIONS") AND (II) TO BE BOUND BY THE ISSUER'S DETERMINATION
OF THE "COMPARABLE YIELD" AND "PROJECTED PAYMENT SCHEDULE,"
WITHIN THE MEANING OF THE CONTINGENT PAYMENT REGULATIONS,
WITH RESPECT TO THE NOTES. THE ISSUER HAS DETERMINED THE
"COMPARABLE YIELD" TO BE 5.5420% PER ANNUM, COMPOUNDED
SEMIANNUALLY, AND THE PROJECTED "PAYMENT SCHEDULE" PER U.S.$1,000
NOTE TO BE U.S.$1,178.39 DUE ON THE STATED MATURITY DATE. A
HOLDER MAY ALSO OBTAIN THE COMPARABLE YIELD AND THE
PROJECTED PAYMENT SCHEDULE BY CONTACTING THE ISSUER AT THE
FOLLOWING ADDRESS: 745 SEVENTH AVENUE, NEW YORK, NEW YORK,
10019.

NYA 787851.3

ANNEX VI

SUNS (STOCK UPSIDE NOTE SECURITIES) DUE 2010
ON AN EQUALLY WEIGHTED BASKET OF INDICES

PURCHASE AGREEMENT

FOR

REGULATION D NOTES

July 11, 2007

Lehman Brothers Treasury Co. B.V.

c/o Lehman Brothers Inc.

745 Seventh Avenue

New York, NY 10019

Ladies and Gentlemen:

In connection with the proposed issuance by Lehman Brothers Treasury Co. B.V. (the "Issuer") of U.S.$2,000,000 aggregate principal amount of SUNS (Stock Upside Note Securities) due July 26, 2010, on an equally weighted basket of indices (the "Securities"), the undersigned (the "Purchaser") hereby agrees with the Issuer as follows (defined terms used but not defined herein shall have the meanings given to such terms in the Final Terms (as defined below):

1. On the basis of the representations, warranties and agreements contained herein the Issuer agrees to sell to the Purchaser, and the Purchaser agrees to purchase from the Issuer, on July 11, 2007 or on such other date as shall be mutually agreed upon by the Issuer and the Purchaser (the "Closing Date"),

U.S. $2,000,000

principal amount of the Securities at a purchase price of 100% of the face amount thereof (the "Purchase Price"). The Purchase Price shall be paid by the Purchaser on the Closing Date by (i) wire transfer in immediately available funds to an account or (ii) in the case of Lehman Brothers Holdings Inc. ("Lehman") customers, at such Lehman customer's option, written authorization to the Placement Agent to pay the Purchase Price to the Issuer out of funds available from such Lehman customer's customer account.

- 48 -

NYA 787851.3

2. The Purchaser represents, warrants and covenants as of the date hereof and as of the Closing Date that:

(i) It is an "accredited investor" within the meaning of Rule 501(a) ("Accredited Investor") under the Securities Act of 1933, as amended (the "Securities Act") that it is purchasing at least U.S.$50,000 in aggregate principal amount of Securities, and that it has (A) individual net worth, or joint net worth together with its spouse, in excess of U.S.$1,000,000 or (B) individual income in excess of U.S.$200,000 in each of the two most recent years or joint income with its spouse in excess of U.S.$300,000 in each of those years (and it has a reasonable expectation of reaching the same income level in the current year).

(ii) It is acquiring the Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act, the shareholders, partners or other holders of its equity or beneficial interests are not able to decide individually whether to participate, or to the extent of their participation, in its investment in the Securities, it was not formed for the purpose of acquiring or investing in the Securities, and that all Securities purchased and held directly or indirectly by such person do not constitute in the aggregate an investment of more than 40% of its total assets (on a consolidated basis with its subsidiaries).

(iii) It has such knowledge, sophistication and experience in financial and business matters that it is capable of evaluating the merits and risks of purchasing the Securities and it is able and prepared to bear the financial risk of investing in and holding the Securities. It understands and agrees that, in making a decision to purchase the Securities, it is relying on its own examination of the transaction (in consultation with such of its advisors as it deems necessary), and that neither the Issuer, the Placement Agent nor any of their affiliates has made, and none shall be deemed to have made, any recommendation regarding the merits of an investment in the Securities or the suitability of an investment in the Securities. It understands and agrees that neither the Issuer nor the Placement Agent is acting as a fiduciary or financial or investment adviser for it, that it is not relying (for purposes of making an investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer other than the representations expressly set forth in this agreement and that it is entering into this agreement and any other related documentation with a full understanding of all the terms, conditions and risks hereof and thereof. It has had access to, and has received, such financial and other information concerning the Issuer and the Securities as it deems necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Securities, including an opportunity to ask questions of and request information from the Issuer and the Placement Agent, it has read such documents and it understands the related provisions. It also understands that neither the Issuer nor any affiliate thereof has any obligation to supply it with any information, except such information concerning the Issuer or the terms of the

NYA 787851.3

Securities provided in accordance with the prior sentence. It further understands that neither the Issuer nor any affiliate thereof has performed any independent due diligence investigation with respect to the common stocks or other equity securities comprising the Basket Indices. Finally, it acknowledges and agrees that it has made its own independent review and reached its own conclusions regarding the legal, credit, tax and accounting aspects of this transaction relating to its assets, liabilities, risk management objectives and risk tolerance. It acknowledges that its investment in such Securities is consistent with its overall investment strategy. It represents that it is purchasing the Securities for either investment, financial intermediation, hedging or other commercial purposes.

(iv) It has read and understands the final terms dated July 11, 2007 (such final terms, together with the attached Debt Issuance Program Prospectus, the " Final Terms") with respect to the Securities and has made such investigation as it deems necessary to evaluate the merits and risks involved in an investment in the Securities. The Purchaser understands and has fully considered those matters set forth under the heading "Risk Factors" in the Final Terms.

(v) It understands that, prior to any proposed transfer of Securities, the proposed transferee will be required to provide to the Issuer or the Transfer Agent, as applicable, an executed representation letter in favor of the Issuer substantially in the form attached hereto as Exhibit A.

(vi) Either (A) it is not a, and it is not purchasing and will not hold the Securities or any interest therein on behalf of or with the assets of any, Plan or entity whose underlying assets are considered to include the assets of any Plan by reason of U.S. Department of Labor Regulation Section 2510.3-101 or otherwise or (B) its purchase, holding and disposition of the Securities and any interest therein will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a Plan that is not subject to ERISA or the Code, any applicable similar federal, state or local law in the U.S. or outside of the U.S.).

(vii) It is not acquiring the Securities with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities law of any State of the United States or any other applicable jurisdiction. It shall resell, distribute, dispose of or transfer the Securities only in compliance with all applicable transfer restrictions in the Debt Issuance Program Prospectus.

(viii) It understands that the Securities have not been and will not be registered and are being offered in "transactions by an issuer not involving any public offering" within the meaning of the Securities Act. It understands and agrees that the Securities may only be offered, resold, pledged or otherwise transferred to an Eligible Investor (A) outside the United States in compliance with Regulation S under the Securities Act, (B) pursuant to an exemption from registration under the Securities Act to an

- 50 -

Accredited Investor or (C) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if available), in each case to an Eligible Investor that is purchasing Securities in an aggregate face amount of at least U.S.$50,000 and only upon the buyer's execution and delivery to the Issuer or the Transfer Agent, as applicable, of a representation letter in favor of the Issuer substantially in the form attached hereto as Exhibit A. It acknowledgesthat no representation is made by the Issuer or the Placement Agent as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Securities.

(ix) It is not, either alone or together with others, directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer, all within the meaning of the Securities                                                                                                          Act.

3. The Issuer represents and warrants as of the Closing Date that:

(i) The Securities will have been duly authorized by the Issuer and, when the Securities are delivered and paid for pursuant to this Agreement, the Securities will constitute valid and legally binding obligations of the Issuer entitled to the benefits provided in the definitive Securities, and enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles (whether considered in a proceeding in equity or at law).

(ii) This Agreement has been duly authorized, executed and delivered by the Issuer.

4. The Purchaser acknowledges that the Final Terms is personal to the Purchaser and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities. Distribution of the Final Terms, or disclosure of any of its contents to any person other than ourselves and those persons, if any, retained to advise the Purchaser with respect thereto is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited.

5. The Purchaser understands that there is no market for the Securities and that no assurance can be given as to the liquidity of any trading market for the Securities and that it is unlikely that a trading market for the Securities will develop. The Purchaser further understands that, although Lehman Brothers Inc. may from time to time make a market in the Securities, Lehman Brothers Inc. is under no obligation to do so and, following the commencement of any market-making, may discontinue the same at any time.

NYA 787851.3

Accordingly, The Purchaser is prepared to hold the Securities for an indefinite period of time or until the maturity date.

6. The Securities were not offered or sold by any form of general solicitation or advertising. The Purchaser understands and agrees that Lehman Brothers Inc. or its affiliates may share commissions and fees with a third party in connection with our purchase of the Securities.

7. The Purchaser acknowledges that the Issuer and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that, if any of the acknowledgments, representations or warranties made or deemed to have been made by us in connection with our purchase of the Securities are no longer accurate, the Purchaser will promptly notify the Issuer.

8. The respective representations, warranties and agreements made by the Issuer and the Purchaser herein or in any certificate or other instrument delivered pursuant hereto shall survive the delivery of payment for the Securities, notwithstanding any investigation made by or on behalf of any party hereto.

9. All communications provided for or permitted hereunder shall be in writing and shall be deemed to have been duly given if personally delivered, sent by overnight courier or mailed by registered mail, postage prepaid and return receipt requested, or transmitted by telex, telegraph or telecopier and confirmed by a similar mailed writing, if to the Purchaser, addressed to such Purchaser at the address set forth on the last page of this Agreement, or to such other address as such Purchaser may designate in writing to the Issuer, and if to the Issuer, addressed to Lehman Brothers Treasury Co. B.V. Officia 1, 2nd Floor, De Boelelaan 7, 1083 HJ Amsterdam, with a copy to Lehman Brothers Inc., 745 Seventh Avenue, New York, New York, 10019, Attention: Structured Equity Sales, or to such other address as the Issuer may designate in writing to the Purchaser.

10. This letter shall inure to the benefit of and be binding upon the Issuer, the Purchaser and each of their respective successors and assigns. Nothing expressed herein is intended or shall be construed to give any person other than the persons referred to in the preceding sentence any legal or equitable right, remedy or claim under or in respect of this letter.

11. The Purchaser acknowledges that the Issuer and others will rely upon its representations, confirmations, acknowledgments and agreements set forth herein and as deemed repeated from time to time, and the Purchaser agrees to notify the Issuer promptly in writing if any of its representations or warranties herein ceases to be accurate and complete.

12. This letter constitutes the entire agreement and understanding of the parties hereto with respect to the matters and transactions contemplated hereby and supersedes all prior agreements and

NYA 787851.3

understandings whatsoever relating to such matters and transactions. Neither this letter nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. This letter may be executed in counterparts, each of which shall constitute an original, but all of which shall together constitute one instrument.

13. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Final Terms

14. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Very truly yours,

_____

By:

Name:

Title:

Address of Purchaser:

Dated: July 11, 2007

Accepted and Agreed as of the date first above written

LEHMAN BROTHERS TREASURY CO. B.V.

By:_____

Name:

Title:

- 53 -

EXHIBIT A

[FORM OF REPRESENTATION LETTER]

Lehman Brothers Treasury Co. B.V.

c/o Lehman Brothers Inc.

745 Seventh Avenue

New York, NY 10019


Ladies and Gentlemen:

In connection with the proposed transfer by

_____ (the "Transferor") of

U.S.$_____

principal amount of SUNS (Stock Upside Note Securities) due July 26, 2010, on an equally weighted basket of indices (the "Securities"), the undersigned (the "Transferee") hereby represents, warrants and covenants to Lehman Brothers Treasury Co. B.V. (the "Issuer") as follows (capitalized terms used but not defined herein shall have the meanings given them in the (Final Terms):

1. It is an "accredited investor" within the meaning of Rule 501 (a) ("Accredited Investor") under the Securities Act of 1933, as amended (the "Securities Act"), that it is purchasing at least U.S.$50,000 in aggregate face amount of Securities and that, if it is an individual Accredited Investor, it has (A) individual net worth, or joint net worth together with its spouse, in excess of U.S.$1,000,000 or (B) individual income in excess of U.S.$200,000 in each of the two most recent years or joint income with its spouse in excess of U.S.$300,000 in each of those years (and it has a reasonable expectation of reaching the same income level in the current year).

2. It is acquiring the Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act, that the shareholders, partners or other holders of its equity or beneficial interests are not able to decide individually whether to participate, or to the extent of their participation, in its investment in the Securities, that it was not formed for the purpose of acquiring or investing in the Securities, and that all Securities purchased and held directly or indirectly by such person do not constitute in the aggregate an investment of more than 40% of its total assets (on a consolidated basis with its subsidiaries).

- 54 -

NYA 787851.3

3. It has such knowledge, sophistication and experience in financial and business matters that it is capable of evaluating the merits and risks of purchasing the Securities and it is able and prepared to bear the financial risk of investing in and holding the Securities. It understands and agrees that, in making a decision to purchase the Securities, it is relying on its own examination of the transaction (in consultation with such of its advisors as it deems necessary), and that neither the Issuer, the Placement Agent nor any of their affiliates has made, and none shall be deemed to have made, any recommendation regarding the merits of an investment in the Securities or the suitability of an investment in the Securities. It understands and agrees that it is purchasing the Securities from the Transferor with a full understanding of all the terms, conditions and risks of the Securities. Finally, it acknowledges and agrees that it has made its own independent review and reached its own conclusions regarding the legal, credit, tax and accounting aspects of this transaction relating to its assets, liabilities, risk management objectives and risk tolerance. It acknowledges that its investment in such Securities is consistent with its overall investment strategy.

4. It understands that, prior to any proposed transfer of Securities, the proposed transferee will be required to provide to the Issuer or the Transfer Agent, as applicable, an executed representation letter substantially in the form hereof in favor of the Issuer.

5. Either (A) it is not a, and it is not purchasing and will not hold the Securities or any interest therein on behalf of or with the assets of any, Plan or entity whose underlying assets are considered to include the assets of any Plan by reason of U.S. Department of Labor Regulation Section 2510.3-101 or otherwise or (B) its purchase, holding and disposition of the Securities and any interest therein will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a Plan that is not subject to ERISA or the Code, any applicable similar federal, state or local law in the U.S. or outside the U.S.).

6. It is not acquiring the Securities with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities law of any State of the United States or any other applicable jurisdiction. It shall resell, distribute, dispose of or transfer the Securities only in compliance with all applicable transfer restrictions in the Debt Issuance Program Prospectus.

7. It understands that the Securities have not been and will not be registered and are being offered in "transactions by an issuer not involving any public offering" within the meaning of the Securities Act. It understands and agrees that the Securities may only be offered, resold, pledged or otherwise transferred to an Eligible Investor (A) outside the United States in compliance with Regulation S under the Securities Act, (B) pursuant to an exemption from registration under the Securities Act to an Accredited Investor or (C) pursuant to the exemption from registration provided by Rule 144 under the Securities Act (if

NYA 787851.3

available); in each case, to an Eligible Investor that is purchasing Securities in an aggregate face amount of at least U.S.$50,000 and only upon the buyer's execution and delivery to the Issuer or the [Transfer Agent], as applicable, of a representation letter in favor of the Issuer substantially in the form hereof. It acknowledges that no representation is made by the Issuer or the [Placement Agent] as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Securities.

8. It is not, either alone or together with others, directly or indirectly controlling or controlled by the Issuer or under direct or indirect common control with the Issuer, all within the meaning of the Securities Act.

9. In the case of a Transferee who is not a United States person (as defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended), the investor is not purchasing the Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan.

10. The Transferee acknowledges that the Issuer and others will rely upon its representations, confirmations, acknowledgments and agreements set forth herein and as deemed repeated from time to time, and the Transferee agrees to notify the Issuer promptly in writing if any of its representations or warranties herein ceases to be accurate and complete.

11. THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Very truly yours,

[INSERT NAME OF TRANSFEREE]

By:

Name:

Title:

- 56 -

NYA 787851.3

# Exhibit B

# LEHMAN BROTHERS

**Your investment representative:**

LEHMAN BROTHERS INC.
399 PARK AVENUE
6TH FLOOR
NEW YORK NY 10022
TEL: 800-392-5000

Member SIPC

## Brokerage account
831-34036

**Portfolio summary**

3 Account asset allocation
  Change in account value
4 Tax spotlight
  Bulletin board
5 Fixed income summary
6 Holdings
8 Activity
9 Cash investment summary
10 Tax lots
11 Realized gains and losses

### GO PAPERLESS

Sign up for electronic delivery of account statements and trade confirmations and we will plant a tree on your behalf.

Visit www.lehmanlive.com for details. If you currently do not have online access, please contact your Investment Representative.

**Valuation summary: USD**

Last period account value
5,686,037.11
This period account value
1,682,637.16

*All transaction dates appearing on this statement are settlement dates, unless otherwise labeled.*

## GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

GREAT BAY CONDO OWNERS
RESERVE ACCOUNT #2
ATTN: DON HANCOCK
6900 GREAT BAY
ST. THOMAS VI 00802-1010

## Bulletin board *(continued on pg.4)*

Lehman Brothers is committed to complying with various customer identification and verification obligations. We may ask you to provide documentation or additional information, as necessary, to enable Lehman Brothers to comply with these requirements. We may also screen your name against various databases to verify your identity. This verification applies to both new accounts and when changes are made to existing accounts. Please be assured that this information and documentation will be treated with the highest regard to your personal privacy.

Business Continuity at Lehman Brothers: For a summary of how Lehman Brothers would respond to a significant business disruption, please go to www.lehman.com/bcp.htm.

Additional information about your investment representative or your representative's brokerage firm may be available by accessing FINRA's BrokerCheck program. Please visit www.nasdbrokercheck.com or call 1-800-289-9999 for more information.

The Multi-tone area of this document changes gradually from light to dark. Heat sensitive "SECURITY MARK" on front of the document turns from Gray to Clear when heat is applied.    CS-00000000-N

# LEHMAN BROTHERS

## Brokerage account 831-34036

## GREAT BAY CONDO OWNERS
### August 1 - August 31, 2008

## Understanding your portfolio statement

**Client Services Department** Within the U.S. 800-253-4626
International 212-526-5600
Please contact us immediately to report any errors, omissions or discrepancies you find in your statement. Any oral communications should be re-confirmed in writing. Please send written inquiries to:

Lehman Brothers
Compliance Division
399 Park Avenue, 6th Floor
New York, NY 10022-3769
If you have any questions about your statement or if you have a material change in your investment objectives or financial situation, please call us. A financial statement of Lehman Brothers Inc. is available for your personal inspection at our offices, or a copy of it will be mailed upon your written request.

**Transaction charges** Details of transaction charges and commissions are displayed on transaction confirmations, which have been mailed separately to you. We will also send you this information upon request.

**Client order policy** We route client orders to the market where we believe clients receive the best execution, taking into account price, reliability, market depth, quality of service, speed and efficiency. Ordinarily, we will route orders only to markets where there is an opportunity for them to be executed at better prices than the quoted bid or offer. Lehman Brothers executes an order to such markets based on our receipt of automatic orders for particular volume of our trading activity for directing customer orders to particular broker/dealers or market centers. However, we may receive discounts, rebates, reductions of fees or credits as a result of the overall volume of our trading activity or other client orders. But these benefits will generally not be sufficient to defray the cost of all orders placed by such broker/dealers or market centers. If your statement indicates that a security was delivered to you or your designated representative, and you have not received it within three weeks, you must notify your branch office immediately. If you do not notify your branch office within 5 months of the statement delivery date, Lehman Brothers Inc. will not be responsible for the cost of posting a replacement bond.

**Pricing and foreign exchange rates** We obtain pricing and foreign exchange rates from various outside sources and do not guarantee the accuracy, reliability or completeness of the pricing information. The prices of the securities appearing therein have not been adjusted from the closing market prices to reflect any adjustment (such as an illiquidity discount) that may apply or be appropriate to a particular security or position that is a restricted security, a control security or a similar type of security that is not freely tradable in the hands of the client. You or your service providers should make the necessary adjustments that you believe are appropriate for the security, the client's status and the prevailing market conditions. The prices and rates in this statement indicate values as of the close of business on the last business day of the month only.

**Cost basis** The unit cost for securities have been obtained from various sources including, where applicable, supplied by you. We do not guarantee the accuracy, reliability or completeness of this information. Cost basis and associated realized gain and loss information has been provided to you as a courtesy. Such information may not reflect all adjustments necessary for tax

reporting purposes. You should verify cost basis and corresponding gain/loss information against your own records when calculating reportable gain or loss resulting from a sale. You are solely responsible for the accuracy of cost basis and gain/loss information reported to federal, state and other taxing authorities.

**Funds and securities** Clients funds and securities are held at Lehman Brothers. We will give you a free credit balance in any account, except for regulated commodity accounts, on demand. These funds may be used for our business purposes and are properly accounted for on our record book.

**Guide to Lehman Brothers Equity Research Rating System** Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector ("the sector coverage universe").

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not a directive of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

### Stock Rating

| | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 2 - Equal weight: | The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| RS Rating Suspended: | The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company. |

### Sector View

| | |
|---|---|
| 1 - Pos / Positive: | "sector coverage universe" fundamentals/valuations are improving. |
| 2 - Neu / Neutral: | sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating. |
| 3 - Neg / Negative: | sector coverage universe fundamentals/valuations are deteriorating. |

**Independent Research** We provide ratings from Independent Research Providers ("IRPs") for certain companies. BNY Jaywalk Inc., an intermediary, maps individual IRP ratings to standard ratings (1-Buy, 2-Hold, 3-Sell) which are referenced on your statement.

**Taxes** For tax reporting purposes, you should rely on the official tax forms we send you after the end of the year.

**Late charges** If you purchase securities in your cash account and do not make payment by the settlement day, you may have to pay a late charge.

**Interest charges** Any interest you are charged is generally calculated from the 21st day of each month through the 20th day of the following month. When the 20th day falls on a weekend or holiday, the interest is calculated through that weekend or holiday, and the next business day is the start of the next interest period.

**To calculate interest charges, we do the following:**
Net the long and short debit balances. Multiply the net debit balance x interest rate x number of days the debit was outstanding x 1/360

We charge you interest on the debit balance in your account. Interest charges that are not paid will be added to the opening balance debit balance in your account for the next interest period.

**Credit balances** In accordance with New York Stock Exchange Rule 436, it is our understanding that any free credit balances in your account are being maintained for the purpose of investing those amounts through us.

**General Information** All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretations of the pertinent exchanges, markets, self-regulatory organizations and clearing houses, as well as the terms and conditions set forth on the reverse side of Lehman's trade confirmation. All balances are subject to verification. Post-settlement and other differences may appear on subsequent statements. We and our affiliates trade for our own accounts, including as odd lot dealers, block positioners or otherwise. At the time of your transaction in your account, we or our affiliates may have a short or a long position in the same security and our positions may be completely or partially hedged. This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax return and to verify interest charges that may appear on your next statement.

We are required by law to report to the Internal Revenue Services certain dividends, bond interest and the net proceeds of certain sales. For reporting purposes, you should rely on the 1099 forms that you will receive from us after the end of the year.

**Member of SIPC** Lehman Brothers Inc. is a member of the Securities Investor Protection Corporation (SIPC). Under SIPC regulations, client accounts are protected for securities and cash held in client accounts up to $500,000 for each client (including up to $100,000 for claims for cash). In addition to the coverage provided by SIPC, Lehman Brothers Inc. carries coverage protection from the Customer Asset Protection Company. Thus, the securities and cash held for clients by Lehman Brothers Inc. are protected up to each client's net equity value. Securities lending, borrowing transactions (including repurchase and reverse repurchase agreements), and private equity may not be protected by SIPC. Sweep funds in the Lehman Brothers Bank Cash Deposit Account are also not covered by SIPC. You may obtain information about SIPC, including the SIPC brochure, at www.sipc.org or by calling 202-371-8300.

# LEHMAN BROTHERS

| Brokerage account
831-34036

GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

page    3 of    11

## Account asset allocation

Asset allocation includes derivative instruments classified based upon the corresponding underlying security and does not represent a comprehensive risk assessment of your account.

| | Last period | This period | % change | Asset allocation Aug. 31 |
|---|---|---|---|---|
| Fixed income | $ 5,686,000.00 | $ 1,682,600.00 | - 70.4% | 100.0% |
| Cash, cash equivalents & other | 37.11 | 37.16 | 0.1 | |
| **Total account value** | **$ 5,686,037.11** | **$ 1,682,637.16** | **- 70.6%** | |

## Change in account value

Interest and dividends for this year include all income received in 2008. Please see the Tax Spotlight section for a summary of income that may be reportable in 2008.

| | This period | This year |
|---|---|---|
| **Opening portfolio value** | $ 5,686,037.11 | $ 4,592,290.00 |
| Deposits | 0.00 | 4,000,000.00 |
| Withdrawals | - 4,000,000.00 | - 6,705,184.48 |
| Interest | 0.00 | 33,750.00 |
| Dividends | 0.03 | 2,903.93 |
| Tax withheld | 0.00 | - 432.34 |
| Change in value* | - 3,399.98 | - 240,689.95 |
| **Closing portfolio value** | **$ 1,682,637.16** | |

You sold or redeemed $4,000,000.00 of securities this statement period.

* May include changes in market value, changes in accrued interest or securities transferred in or out of your account.

# LEHMAN BROTHERS

|  | Brokerage account 831-34036 |
|---|---|

**GREAT BAY CONDO OWNERS**
August 1 - August 31, 2008

## Tax spotlight

*This is not a tax document. This information is being provided for your convenience and is for informational purposes only. Information on hedge funds, limited partnerships, private equity, and private offerings are excluded from this section. For tax reporting, you should rely on your official tax documents. Transactions requiring tax consideration should be reviewed with your accountant or tax advisor*

| Reportable Income | This period | This year |
|---|---|---|
| Dividends | $0.03 | $2,903.93 |
| Interest | | 33,750.00 |
| **Total** | **$0.03** | **$36,653.93** |

| Withholding | | |
|---|---|---|
| Non US Citizen (NRA) | $0.00 | -$432.34 |

| Additional Information | | |
|---|---|---|
| Proceeds from sales | $4,000,000.00 | $6,100,000.00 |

*Cash In Lieu ( C-I-L) proceeds from fractional shares are not included in this section. The IRS does not require reporting on C-I-L under $20. Higher amounts will appear on your year end tax form based on your tax reporting status.*

*Gain/Loss information excludes cash, cash equivalents, and other, alternative investments, and commodity & commodities equivalents - private offerings.*

## Bulletin board *(continued from pg. 1)*

Lehman Brothers provides 24 hour online access to your account information. You will have access to your account summary, holdings, activity, statements, trade confirmations and year-end tax reports. Contact your Investment Representative if you do not currently have online access or need assistance in accessing your account information at www.LehmanLive.com.



# LEHMAN BROTHERS

**Brokerage account 831-34036**

## GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

page    5 of    11

## Fixed income

**Maturity** (*exclusive of calls*)

| | % of total portfolio % | Market value | % of bonds Aug. 31 % |
|---|---|---|---|
| 0 - 3 months | | | |
| 3 - 12 months | | | |
| 1 - 2 years | 100.0 | 1,682,600.00 | 100.0 |
| 2 - 5 years | | | |
| 5 - 10 years | | | |
| Over 10 years | | | |
| **Total** | **100.0%** | **$ 1,682,600.00** | **100.0%** |

**Type**

| | % of total portfolio % | Market value | % of fixed income Aug. 31 % |
|---|---|---|---|
| CORPORATE | | | |
| GOVERNMENTS AND AGENCIES | | | |
| MUNICIPAL | 100.0 | 1,682,600.00 | 100.0 |
| INTERNATIONAL | | | |
| MORTGAGE AND ASSET-BACKED | | | |
| MUTUAL FUND | | | |
| OTHER | | | |
| **Total** | **100.0%** | **$ 1,682,600.00** | |

**Coupon rate**

| | % of total portfolio | Market value | % of bonds Aug. 31 |
|---|---|---|---|
| Under 2% | | | |
| 2 - 4% | | | |
| 4 - 6% | | | |
| 6 - 8% | | | |
| 8 - 10% | | | |
| Over 10% | 100.0% | $ 1,682,600.00 | 100.0% |
| **Total** | **100.0%** | **$ 1,682,600.00** | |

**Credit Quality**

| | % of total portfolio % | Market value |
|---|---|---|
| Not rated by Moody's | 100.0% | $ 1,682,600.00 |

## Bond indices

**Lehman U.S. Aggregate Bond Index**

| Aug. 29 | % change |
|---|---|
| 1,309.35 | 0.95 |

1311.00
1306.20
1301.40
1296.60
1291.80
1287.00

07/31          08/29

**Lehman Municipal Bond Index**

| Aug. 29 | % change |
|---|---|
| 666.82 | 1.17 |

668.00
665.60
662.80
660.20
657.60
655.00

07/31          08/29

# LEHMAN BROTHERS

| | **Brokerage account** 831-34036 | | GREAT BAY CONDO OWNERS August 1 – August 31, 2008 |
|---|---|---|---|

## HOLDINGS

In instances where prices of securities are not readily available, securities have no values, securities have not been actively traded or where other factors prevent the pricing of securities, *** appears in the market price column, the market value for the security is not computed and the total equity in your account does not reflect the long or short market value (if any) of those securities.  Please also note that totals may differ from the sum on individual components due to rounding.
Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.

## Fixed Income

Yield information is provided for informational purposes only. Lehman Brothers makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.

| International bonds | Par | Unit cost<br>Adj. unit cost | Total cost<br>Adj. total cost | Market price | Market value<br>Accrued interest | Unrealized<br>gain/loss | Yield-to-<br>maturity(%) | Comment |
|---|---|---|---|---|---|---|---|---|
| ***LEHMAN BROS TREASURY COBV<br>PP SUNS BSKT ON SX5E, SPX, NKY<br>DUE 7/26/2010<br>DUE 26 JUL 2010<br>ISIN: XS0311765654<br>DATED DATE 25 JUL 2007 | 2,000,000 | $ 100.000<br>100.000 | $ 2,000,000.00<br>2,000,000.00 | 84.13 | $ 1,682,600.00 | N/A | | In cash account |

| | Market value (USD) |
|---|---|
| | $ 1,682,600.00 |
| Accrued int. (USD) | $ 0.00 |
| **Total Fixed Income** | $ 1,682,600.00 |

# LEHMAN BROTHERS

| Brokerage account
| 831-34036

GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

page    7 of    11

## Cash, cash equivalents & other

*Money Market Preferred, SAVRs and other Auction Rate Securities are included in the Cash, Cash Equivalents and Other category. The interest rate on these securities generally is reset on a periodic basis in an auction process. Investors should be aware that these securities may have a final legal maturity date that is of a long-term nature and that under certain circumstances the rate paid or the mechanism for setting the rate paid on these securities could change. Please consult your investment representative with any questions.*

*Gain/Loss information also excludes cash, cash equivalents, and other.*

| Cash Investments | Quantity | Market value Accrued Income | Comment |
|---|---|---|---|
| LEHMAN BROS INSTL LIQUIDITY FDS PRIME PORT PREMIER CL | 37.11 | $ 37.11 0.05 | |

| | Market value (USD) Accrued Income (USD) |
|---|---|
| Total Cash, cash equivalents & other | $37.11 $ 0.05 $ 37.16 |

# LEHMAN BROTHERS

| Brokerage account
| 831-34036

GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

page    8 of    11

## ACTIVITY

### Security transactions

| | Type | Trade date | Settlement date | Quantity | Price | Amount | Comment |
|---|---|---|---|---|---|---|---|
| LEHMAN BROS HLDGS INC MEDIUM TERM NTS | Redemption | 06 Aug 2008 | 06 Aug 2008 | -4,000,000 | | $ 4,000,000.00 | ISSUE REDEEMED FOR CASH |

### Withdrawals

| | Date | Tracking code | Reference No. | Amount | Comment |
|---|---|---|---|---|---|
| TFR TO ACCT 831-88101-1 | 06 Aug 2008 | | | -$ 4,000,000.00 | |

### Dividends

| | Date | Taxable amt. | Non-taxable amt. | Amount | Comment |
|---|---|---|---|---|---|
| LEHMAN BROS INSTL LIQUIDITY FDS PRIME PORT PREMIER CL | 01 Aug 2008 | $ 0.03 | | $ 0.03 | MONTHLY DIVIDEND FOR PERIOD 07/01/08 - 07/31/08 31 DAYS 7 DAY YIELD 1.95% |

*The taxable and non-taxable designations provided above refer to the US income tax treatment of distributions from your securities. The designations are accurate to the best of our knowledge. Clients should consult with a tax advisor regarding the tax treatment of their investments.*

LEHMAN BROTHERS

| Brokerage account
| 831-34036

GREAT BAY CONDO OWNERS
August 1 - August 31, 2008

page    9 of    11

## Cash investment summary

| | Type | Date | Amount | Comment |
|---|---|---|---|---|
| Opening balance | | | $ 37.08 | |
| LEHMAN BROS INST'L LIQUIDITY FDS PRIME PORT PREMIER CL | Investment | 01 Aug 2008 | 0.03 | REINVEST |
| Closing balance | | | $ 37.11 | |

# LEHMAN BROTHERS

| | | Brokerage account | | GREAT BAY CONDO OWNERS |
| --- | --- | --- | --- | --- |
| | | 831-34036 | | August 1 - August 31, 2008 |

page    10 of    11

## TAX LOTS

** Days Held: Either # of days if held one year or less or  L if held for more than one year or S/L for Index Options.

## Fixed Income

*Unrealized gain/loss is calculated using adjusted unit cost.  Please consult your tax advisor to determine if your situation requires that you use unit cost for your unrealized gain/loss.*

| International bonds - long | Quantity or Par | Settle date | Unit cost Adj. Unit cost | Total cost Adj. total cost | Market price | Market value | Unrealized gain/loss | Days held ** |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **LEHMAN BROS TREASURY COBV | 2,000,000 | 25 Jul 2007 | $ 100.00 | $ 2,000,000.00 | $ 84.13 | $ 1,682,600.00 | N/A | |
| PF SUNS BSKT ON SX5E, SPX, NKY | | | 100.00 | 2,000,000.00 | | | | |
| DUE 7/26/2010 | | | | | | | | |
| R/MD0000    07/26/2010 | | | | | | | | |

# LEHMAN BROTHERS

| | Brokerage account | GREAT BAY CONDO OWNERS |
| --- | --- | --- |
| | 831-34036 | August 1 - August 31, 2008 |

page    11 of    11

## REALIZED GAINS AND LOSSES

*Cash-in-lieu transactions are not included in this figure.  This may cause the value of your realized gains or losses to differ from the value of your gross proceeds or your total amount sold or redeemed.  Realized gain/loss is calculated using adjusted unit cost on a settlement date basis.  Please consult your tax advisor to determine if your situation requires that you use unit cost for your realized gain/loss.*

*Gain/Loss information excludes cash, cash equivalents, and other, and commodity & commodities equivalents, and CDO holdings.*

### US Dollar (USD)

| | Opening transaction Closing transaction | Quantity | Original Unit cost | Total cost | Price | Gross proceeds | Amortization / Accretion | Days held | Realized gain/loss Short-term | Long-term |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| LEHMAN BROS HLDGS INC | 06 Feb 2008 06 Aug 2008 | 4,000,000 | $ 100.00 | $ 4,000,000.00 | $ 100.00 | $ 4,000,000.00 | | 181 | N/A | N/A |
| **Total realized gains and losses** | | | | | | $ 4,000,000.00 | | | $ 0.00 | $ 0.00 |
| **Total realized gains and losses year-to-date** | | | | | | $ 6,100,000.00 | | | $ 0.00 | $ 0.00 |

