**Hearing Date and Time: April 28, 2011 at 11:00 a.m. (prevailing Eastern Time)**

HOGAN LOVELLS US LLP
Christopher R. Donoho, III
875 Third Avenue
New York, New York 10022
212-918-3000

*Attorneys for Dr. Jürgen Grossmann*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

In re:                                                              :

LEHMAN BROTHERS HOLDING INC., et. al.,                              :     Chapter 11

                                 Debtors.                           :     Case No. 08-13555 (jmp)

                                                                    :

                                                                    :     (Jointly Administered)

-------------------------------------------------------------------- X

### RESPONSE OF DR. JÜRGEN GROSSMAN TO DEBTORS' ONE HUNDRED SECOND OMNIBUS OBJECTION TO CLAIMS (FOREIGN CURRENCY CLAIMS)

Dr. Jürgen Grossmann ("Dr. Grossman"), by and through his undersigned counsel, hereby files his response (the "Response") to the Debtors' One Hundred Second Omnibus Objection to Claims (Foreign Currency Claims) (the "Objection") [Docket No. 14950] and respectfully represents as follows:

### BACKGROUND

1.    On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI" or the "Debtors") filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

1

2.      On January 30, 2009, the Court of First Instance of the Netherlands Antilles, venue Curacao, adjudicated bankrupt the limited liability company Lehman Brothers Securities N.V., ("LBS") seated in Curacao, appointing Mr. Michiel R.B. Gorsira as trustee.

3.      Pursuant to the Offering Circular dated August 30, 2005 (the "Offering Circular"), LBS and other Lehman-related entities issued certain derivative securities linked primarily to equity securities or commodities (collectively, the "Securities"), as part of a note, warrant and certificate program (the "Program").

4.      LBHI irrevocably guaranteed all obligations of LBS to the Holders (as such term is defined in the Offering Circular) of the Securities issued as part of the Program pursuant to a guarantee dated August 30, 2005 (the "LBHI Guarantee").

5.      Further, LBHI, as the ultimate corporate parent and controlling entity for LBS, guaranteed all obligations of LBS pursuant to a Board Guarantee of the Executive Committee of the Board of Directors of LBHI, dated June 9, 2005 (the "Board Guarantee"), through which LBHI "fully guarantee[d] the payment of all liabilities, obligations, and commitments of the subsidiaries set forth on Schedule A," which schedule identified LBS, among other subsidiaries.

6.      As part of the Program, LBS, as more fully described in the "Final Terms dated as of 11 May 2006, LEHMAN BROTHERS SECURITIES N.V. Warrant and Certificate Programme Guaranteed by LEHMAN BROTHERS HOLDINGS INC. Up to 2,184 Certificates on the Lehman Brothers Global Asset Allocator Net Values in EUR," (the "Final Terms"),[1] issued a series of Securities with International Securities Identification Number ("ISIN") ANN521334980 and Common Code 205357108 (the "Notes"). Per the Final Terms, the Notes were issued in denominations of EUR 1,000.00 per Note.

---

[1] An unexecuted copy of the Final Terms is annexed hereto as **Exhibit A**.

\\\NY - 002983/000001 - 2316037 v2

7.      On or around May 11, 2006, Dr. Grossman purchased five-hundred and four (504) units of the Notes, as evidenced by the attached trade confirmation (the "Confirmation", a copy of which is annexed hereto as **Exhibit B**).

8.      On July 2, 2009, the Bankruptcy Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [Docket No. 4271].  The Bar Date Order created a separate claims process for filing claims against LBHI for holders of certain "programs securities" issued by affiliates of LBHI outside of the United States and establishing November 2, 2009 as the bar date for these claims (collectively, the "LPS Claims Process").  As part of the LPS Claims Process, on July 27, 2009, LBHI issued a Notice of Deadlines for Filing Proofs of Claim Based on Lehman Programs Securities (the "LPS Claims Notice").

9.      The LPS Claims Notice directed creditors to LBHI's website, where a list of securities subject to the LPS Claims Process was posted.  The Notes were on that list and, as of the date of this Response, remain on that list.

10.     The LPS Claims Notice instructed that "You MUST file a Securities Programs Proof of Claim [the LPS Claims Process claim form] to share in LBHI's estate if you have a claim based on a Lehman Programs Security."   Further, the LPS Claims Notice listed requirements for the "Securities Programs Proof of Claim Form" ("LPS Claim Form") under "WHAT TO FILE."   These requirements stated that any claim submitted as part of the LPS Claims Process must meet eight (8) criteria:

> *"(i) be written the English language;*
> *(ii) to the extent a claim amount is reflected thereon, be denominated in the lawful currency of the United States using the exchange rate as applicable as of September 15, 2008;*

\\\NY - 002983/000001 - 2316037 v2

*(iii) conform substantially with the . . . [LPS Claim Form"*);

*(iv) state the name and case number of the specific Debtor against which it is filed;*

*(v) identify the . . . [ISIN] for each Lehman Programs Security;*

*(vi) include either a . . . depository blocking reference number, as appropriate;*

*(vii) be signed by the claimant or by an authorized agent of the claimant; and*

*(viii) be submitted in hard copy form with an original signature.*"

11.    Dr. Grossman received a copy of the LPS Claims Notice, as he remained the owner of the Notes, as evidenced by the attached brokerage account statement (the "<u>Statement</u>", a copy of which is annexed hereto as **<u>Exhibit C</u>**).

12.    On October 28, 2009, Dr. Grossman timely completed and filed an LPS Claim Form against LBHI based on his ownership of the Notes, and such claim was assigned claim number 51295 by LBHI's claims agent (the "<u>Claim</u>", a copy of which is annexed hereto as **<u>Exhibit D</u>**).  The Claim complied with all criteria set forth in the LPS Claims Notice, save for one minor clerical error.  In Box 1 of the first page of the Claim, on the line where "Amount of Claim: $_____" had been printed by the Debtors on the LPS Claim Form, Dr. Grossman entered "504,000.00."  However, Dr. Grossman attached the Confirmation and Statement to the Claim, showing that he held EUR 504,000.00 of the Notes, not USD 504,000.00.

13.    On January 14, 2010, the Court entered its Order Pursuant To Section 105(a) Of The Bankruptcy Code And Bankruptcy Rules 3007 And 9019(b) For Approval Of Claim Objection Procedures (the "<u>Claim Objection Procedures Order</u>") [Docket No. 6664], *inter alia*,

4

authorizing the Debtors, "in addition to those grounds set forth in Bankruptcy Rule 3007(d),[2] to

file Omnibus Claims Objections to claims seeking reduction, reclassification and/or disallowance

of claims on one or more of the following grounds (the "Additional Permitted Grounds"):

> (a)    the amount claimed contradicts the Debtors' books and records; *provided*
> that the Debtors will include the amount of such claim, if any, reflected in
> their books and records;
>
> (b)    the Claims were incorrectly classified;
>
> (c)    the Claims seek recovery of amounts for which the Debtors are not liable;
> *provided* that the Debtors will include the legal basis for such objection;
>
> (d)    the Claims do not include sufficient documentation to ascertain the
> validity of the Claim; and
>
> (e)    the Claims are objectionable under section 502(e)(1) of the Bankruptcy
> Code.
>
> Claim Objection Procedures Order.

14.    On March 11, 2011, LBHI filed the Objection, seeking an order, *inter alia*,

disallowing and expunging the Claim on the basis that the Claim was filed "in denominations

---

[2] Bankruptcy Rule 3007(d) allows a debtor to file an Omnibus Claims Objection to object to multiple claims where the claims were all filed by the same entity, or where disallowance of multiple claims is sought on one of the following grounds: "(1) they duplicate other claims; (2) they have been filed in the wrong case; (3) they have been amended by subsequently filed proofs of claim; (4) they were not timely filed; (5) they have been satisfied or released during the case in accordance with the Code, applicable rules, or a court order; (6) they were presented in a form that does not comply with applicable rules, and the objection states that the objector is unable to determine the validity of the claim because of the noncompliance;  (7) they are interests, rather than claims; or (8) they assert priority in an amount that exceeds the maximum amount under § 507 of the Code."

other than lawful currency of the United States" contrary to the requirements set forth in the Bar

Date Order. Objection ¶ 14.

## RESPONSE

15.     The Objection to the Claim should be overruled for the following reasons: (i) Dr.

Grossman's minor, non-fatal and clerical mistake was limited to the first page of the Claim and

corrected on subsequent pages, as the Claim and its attachments clearly set forth the amount of

Dr. Grossman's claim against LBHI; (ii) Dr. Grossman should be allowed to amend the Claim to

correct this clerical mistake; and (iii) the Objection is procedurally improper as it seeks

expungement of claims not among those enumerated in Bankruptcy Rule 3007(d) or the Claim

Objection Procedures Order.

## I.    The Claim's Only Error is Minor and Clerical

16.     As described above, the only conceivable "error" was Dr. Grossman's failure to

convert the value of the Notes from Euros to US Dollars on the first page of the Claim.  In all

other respects, Dr. Grossman fully complied with all requirements of the LPS Claims Process,

including the "blocking number" requirements which were onerous for individual investors like

Dr. Grossman.

17.     By attaching the Confirmation and the Statement to the Claim, Dr. Grossman

provided LBHI with ample documentation and evidence of his claim.  A simple examination of

the Claim by LBHI would have instantly revealed to LBHI that the "504,000.00" amount shown

on the first page of the Claim referred to Euros and not US Dollars.  Given the number of

sophisticated financial advisers LBHI has engaged, it would have been a very simple task for

LBHI to have converted the EUR 504,000.00 to US 714,420.00 using the well-established

\\\NY - 002983/000001 - 2316037 v2

prevailing exchange rates on September 15, 2008.[3] This minor and clerical error should not disallow Dr. Grossman's claim.

## II.      **Dr. Grossman Should be Allowed to Amend the Claim**

18.      Given that the Claim only contains only one minor, non-fatal, and clerical error, Dr. Grossman respectfully asks the Court's leave to amend the Claim to fix the error and that such amended Claim be allowed.  A copy of such proposed amended Claim is annexed hereto as **Exhibit E**.

19.      Should the Debtors object to Dr. Grossman amending the Claim, Dr. Grossman expressly reserves the right to provide additional evidentiary support that he would have provided for the Claim but for the Notes' inclusion in the LPS Claims Process, which, due to its abbreviated nature, precluded such inclusion.

## III.      **The Objection is Procedurally Improper**

20.      The Objection is also *procedurally improper* in that the ground on which it seeks expungement of claims is not among those enumerated in Bankruptcy Rule 3007(d) or the Claim Objection Procedures Order.

21.      The Debtors, having successfully moved the Court for an order granting them permission to file omnibus objections on the Additional Permitted Grounds (i.e., the Claim Objection Procedures Order), inexplicably proceeded to file the Objection without stating which permitted ground allowed agglomeration of the objections contained therein.

22.      In examining the particulars of the Claim, it is evident that none of the permitted grounds in Bankruptcy Rule 3007(d) or the Claim Objection Procedures Order provide a valid

---

[3] Applying the Federal Reserve Bank of New York Noon Buying Rate for Euros for September 15, 2008, EUR 504,000.00 is equal to $714,420.00.

\\\NY - 002983/000001 - 2316037 v2

basis for the Objection.  Thus, the Objection is not a properly filed omnibus objection and is dismissable as procedurally defective.

**IV.**     **Alternatively, the Claim Should be Allowed as an Informal Proof of Claim**

23.     In the event that the Court disagrees with the foregoing arguments, Dr. Grossman respectfully requests that the Claim be allowed as an "informal proof of claim," as the Claim clearly evidences Dr. Grossman's claim against the Debtors save for its alleged failure to fully comply with all technical requirements of the LPS Claims Notice.  See *In re Operation Open City, Inc.,* 148 B.R. 184, 189 n. 5 (Bankr. S.D.N.Y. 1992) (noting that courts in the Second Circuit have long recognized the concept of informal proofs of claims).

24.     The requirements for an informal proof of claim are well-settled in this Circuit. "[I]n order to qualify as an informal proof of claim, a filing must meet four criteria. The filing must: (1) have been timely filed with the bankruptcy court and have become part of the judicial record; (2) state the existence and nature of the debt; (3) state the amount of the claim against the estate, and (4) evidence the creditor's intent to hold the debtor liable for the debt." *In re Dana Corp.*, 2008 Bankr. LEXIS 2241, 7-8 (Bankr. S.D.N.Y. July 23, 2008) (citing *In re Enron Corp.*, 370 B.R. 90, 99 (Bankr. S.D.N.Y. 2007)).

25.     The Claim meets all four of these requirements: (1) the Claim was timely filed as part of the LPS Claims Process and is currently listed on the claims register maintained by the Debtors' agent; (2) the nature of LBHI's obligation to Dr. Grossman under the LBHI Guarantee and the Board Guarantee is clearly evident from the Claim and its attachments, and LBHI has acknowledged that debt by including the Notes on the list of securities covered by the LPS Claims Process published and maintained on its website; (3) the Claim clearly states the amount of the claim, despite the fact that it was incorrectly listed in US Dollars and not Euros on the first

8

page but listed in the correct amount on subsequent pages of the Claim (a simple examination of the Confirmation and Statement attached to the Claim would have revealed this to the Debtors); and (4) by filing the Claim, Dr. Grossman provided evidence of his intent to hold LBHI liable for its obligations to him as the owner of the Notes.

**V.**     **The Objection Fails to Recognize the Validity of the Amount Stated**

26.     The Debtors, on page 10 of "Exhibit A" to the Objection, list the Claim as "undetermined." This is misleading, as it mischaracterizes the plain reading of the first page of the Claim.

27.     As described above, the LPS Claim Form completed by Dr. Grossman that comprises the first page of the Claim has, in Box 1, written "Amount of Claim: $504,000.00." While the subsequent pages attached to the Claim reveal that this amount should have been expressed in Euros, it is not correct to assert that this amount is "undetermined." A plain reading of the first page of the Claim shows that Dr. Grossman is claiming $504,000.00, which represents, at the very least, a minimum of what he is entitled to pursuant to the above-described guarantees of the Notes.

28.     Dr. Grossman reserves all of his rights, claims and defenses, including without limitation the right to discovery in connection with the Debtors' Objection.

\\\NY - 002983/000001 - 2316037 v2

WHEREFORE, Dr. Grossman respectfully requests that the Court (i) overrule the

Objection, (ii) allow Dr. Grossman to amend the Claim in the form annexed hereto**,** (iii) in the

alternative, allow the Claim as an informal proof of claim, and (iii) grant such other and further

relief as this Court deems just and proper under the circumstances.

Dated: April 12, 2011
New York, New York

<div style="margin-left:40%">

**HOGAN LOVELLS US LLP**

/s/ Christopher R. Donoho, III
Christopher R. Donoho, III
875 Third Avenue
New York, NY 10022
(212) 909-0630 Telephone
(212) 918-3100 Facsimile

*Attorneys for Dr. Jürgen Grossmann*

</div>

\\\NY - 002983/000001 - 2316037 v2

## EXHIBIT A

\\\NY - 002983/000001 - 2316037 v2

Final Terms dated as of 11 May 2006

## LEHMAN BROTHERS SECURITIES N.V.

### Warrant and Certificate Programme

### Guaranteed by
### LEHMAN BROTHERS HOLDINGS INC.

### Up to 2,184 Certificates on

### the Lehman Brothers Global Asset Allocator Net Values in EUR

Terms used herein shall be deemed to be defined as such for the purposes of the Conditions set forth in the Offering Circular dated 30 August 2005. This document constitutes the Final Terms of the Certificates and must be read in conjunction with such Offering Circular. Full information on the Issuer and the offer of the Certificates is only available on the basis of the combination of these Final Terms and the Offering Circular.

Save as disclosed herein, neither the Issuer nor the Guarantor is involved in any litigation or arbitration proceedings which the Issuer or the Guarantor (as the case may be) believes would have a material adverse effect on the financial position of the Issuer or the Guarantor (as the case may be) nor is the Issuer or the Guarantor aware of any such proceedings pending or threatened.

The Issuer accepts responsibility for the information contained in these Final Terms and declares that, having taken all reasonable care to ensure that such is the case the information contained in these Final Terms is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

The information contained herein with regard to the underlying asset (or basket of assets), Commodity (or Basket of Commodities), Currency (or Basket of Currencies), Debt Instrument (or Basket of Debt Instruments), Depositary Receipt (or Basket of Depositary Receipts), Index (or Basket of Indices) or Share (or Basket of Shares) (as all such terms are defined in the Terms and Conditions) or other item(s) (the "**Underlying**") to which the Securities relate consists of extracts from or summaries of information that are publicly available. The Issuer accepts responsibility for accurately reproducing and/or summarising the information relating to the Underlying to which the Securities relate, which information is more particularly described in these Final Terms but no further or other responsibility (express or implied) is accepted by the Issuer in respect of such information and, in particular, the Issuer has not independently verified any such information. The Issuer shall not have any responsibility for any errors or omissions in the calculation and publication of the level of or information relating to the Strategy or any Index by the relevant Strategy Advisor, Index Sponsor, Data Provider or by Bloomberg. Investors may acquire such further publicly available information, as the case may, as they deem necessary and appropriate.

**Information Concerning Investment Risk**

*General*

Holders and prospective purchasers of Certificates should ensure that they understand the nature of the Certificates and the extent of their exposure to risk and that they consider the suitability of the Certificates as an investment in the light of their own circumstances and financial condition and in view of the complexity and risks inherent in the Certificates. Prospective investors of Certificates should be experienced with respect to derivatives, particularly options and options transactions.

The performance of the Strategy and of the Indices (both as defined below) may affect the nature and value of the investment return on the Certificates. Holders and prospective purchasers of Certificates should conduct their own investigations and, in deciding whether or not to purchase Certificates, prospective purchasers should form their own views of the merits of an investment related to the Strategy and should invest in the Certificates only after careful consideration of the suitability of the Certificates in light of their particular financial circumstances and after consultation with their own legal, tax, accountancy and other professional advisers but not in reliance on any information given in these Final Terms. No person should deal in the Certificates unless that person understands fully the nature of the relevant transaction and the transaction's legal, tax, accountancy and other potential implications.

**Given the highly specialised nature of these Certificates, the Issuer and the Guarantor consider that they are only suitable for highly sophisticated investors who are able to determine themselves the risk of an investment linked to the Strategy.**

**Consequently, if you are not an investor who falls within the description above you should not consider purchasing these Certificates.**

*Potential conflicts of interest*

The Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries may, from time to time, engage in purchase, sale or other transactions involving the component assets of each Index or related derivatives for their proprietary accounts and/or for accounts under their management and/or for clients. Such transactions may have a positive or negative effect on each Index and consequently on the value of the Certificates. In addition, the Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries may, from time to time, act in other capacities with regard to the Certificates (such as in an agency capacity and/or as the calculation agent) and may issue or participate in the issue of other competing financial instruments in respect of the Strategy and/or the component assets of each Index or similar securities or assets in similar sectors or markets and the introduction of such competing financial instruments may affect the value of the Certificates. Such activities could present certain conflicts of interest with the interest of Holders and may affect the value of the Certificates. The Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their

respective subsidiaries owe no duty or responsibility to any Holder (or any other party) to avoid such conflicts.

In connection with the offering of the Certificates, the Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries may enter into one or more hedging transactions with respect to the Strategy and/or any of the component assets of each Index or related derivatives. In connection with such hedging or with respect to proprietary or other trading activities by the Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries, the Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries may enter into transactions in the Strategy and/or any of the component assets of each Index or related derivatives which may affect the market price, liquidity or value of the Certificates and which could be deemed to be adverse to the interests of the relevant Holder.

Such transactions could present certain conflicts of interest with the interest of Holder and may affect the value of the Certificates. The Issuer, the Guarantor, the Dealer, the Calculation Agent, the Strategy Advisor, the Fixed Income Index Sponsor and/or their respective subsidiaries owe no duty or responsibility to any Holder (or any other party) to avoid such conflicts.

*Potential Termination Events*

Holders should familiarise themselves and understand events which constitute Potential Termination Event as set out in the Annex 2 and particularly note that some of the Potential Termination Events are triggered by changes to the Strategy or failure by the Strategy Advisor in the performance of its duties. Holders should understand clearly that such Potential Termination Event may lead to the Calculation Agent procuring the Issuer to early cancel the Certificates at the Alternative Settlement Amount. The Alternative Settlement Amount payable will be calculated by reference to the fair market value of the Certificates as determined by the Calculation Agent in its sole and absolute discretion and will be reduced by an amount referable to the cost to the Issuer of unwinding any related hedging arrangements as determined by the Calculation Agent. Holders should understand that such Alternative Settlement Amount may be an amount less than the amount the Holder has paid for the Certificates and even may be zero.

*Determinations by the Calculation Agent*

The Calculation Agent has certain discretions to determine whether certain events as further set out in Annexes have occurred. Holders should be aware that any determination made by the Calculation Agent may have an adverse effect on the value of the Certificates. For example, the Calculation Agent may determine that a Market Disruption Event has occurred or exists at a relevant time which may affect the determination of the price of an Index on a relevant Scheduled Trading Day. Any such discretion exercised by, or any calculation made by, the Calculation Agent (in the absence of manifest error) shall be binding.

*Risk relating to the Strategy*

The Certificates are linked to the performance of a basket comprising an Equity Index and and Fixed Income Index in accordance with the Strategy (as detailed in Annexes 1and 2 and defined in Annex 3 hereto).

Any analysis presented herein or in connection with the Certificates or the Strategy that indicates a range of outcomes that may result from changes in market parameters is not comprehensive, is not intended to suggest that any outcome is more likely than another and may have been derived using the Strategy Advisor's proprietary models, historic data and subjective interpretation. **Holders must understand that past performance is not necessarily indicative of future results.**

The Strategy Advisor produces a number of different types of research product including, amongst others, fundamental analysis, quantitative analysis and short term trading ideas and have developed different types of investment strategies. Recommendations contained in one type of research product or resulting from one type of strategy may differ from recommendations contained in other types of research product or resulting from other types of strategies, whether as a result of differing time horizons, methodologies, or otherwise. The Strategy Advisor does not represent or guarantee that the model used for the purpose of determining the Strategy is correct and achieves its aims.

The description of the Strategy contained herein is based on proprietary information of the Strategy Advisor and on current public information that the Strategy Advisor considers reliable. The Strategy Advisor does not represent that this information, including any third party information, is accurate or complete and it should not be relied upon as such. Market price, liquidity or value of the Certificates may be adversely affected by exchange rates, interest rates, or other factors (including without limitation endogenous factors).

**IN WITNESS WHEREOF, LEHMAN BROTHERS SECURITIES N.V.** has caused these Final Terms to be executed by a duly authorised officer or director.

Dated:    11 May 2006

Executed by

**LEHMAN BROTHERS SECURITIES N.V.**

and signed and delivered on its behalf

By: _____

Name:  Jonathan J. Knapp

Title:    Authorised Signatory

**Part A**

**Information about the Securities**

**General**

| | | |
|---|---|---|
| 1. | Issuer: | Lehman Brothers Securities N.V. |
| 2. | Guarantor: | Lehman Brothers Holdings Inc. |
| 3. | Description of the Securities: | |

| | | |
|---|---|---|
| | (a)    Warrants or Certificates: | The Securities are Certificates |
| | (b)    Type of Securities: | The Securities are Index Securities |

| | | |
|---|---|---|
| 4. | Form of the Securities: | Bearer: Global Security |
| 5. | Description of the Underlying: | As described in Item 49 below |
| 6. | If Warrants, American Style Warrants, European Style Warrants or other: | Not Applicable |
| 7. | If Warrants, Call Warrants, Put Warrants or other: | Not Applicable |
| 8. | Number of Securities being issued: | Up to 2,184 Securities |

| | | |
|---|---|---|
| 9. | (a)    Series Number: | L-06/32 |
| | (b)    Tranche Number: | 1 |

| | | |
|---|---|---|
| 10. | Issue Date: | 11 May 2006 |
| 11. | Issue Price(s): | Euro ("EUR") 1,000.00 per Security |
| | | Each Dealer reserves the right, in its sole discretion, at any time and from time to time, to offer and sell the Securities at one or more prices that differ from the Issue Price |
| 12. | Minimum initial purchase of the Securities: | 100 Securities |
| 13. | Minimum transferable number (for the purposes of Condition 1(c)): | 100 Securities |
| 14. | Last Trading Day (for the purposes of Conditions 1(c) and 9(c)): | Three Business Days prior to the Valuation Date |

**Warrants - Provisions relating to exercise**

15. If American Style Warrants, the Exercise Period:                     Not Applicable

16. If European Style Warrants, the Expiration Date:                     Not Applicable

17. Exercise Notice Deposit Time(s) (for the purposes of Condition 5(a)):     Not Applicable

18. Minimum Exercise Number (for the purposes of Condition 5(b)):     Not Applicable

19. Integral multiple of Minimum Exercise Number (for the purposes of Condition 5(b)):     Not Applicable

20. If Physical Delivery Warrants, any modification of minimum Board Lot requirement in relation to exercise (for the purpose of Condition 9(h)):     Not Applicable

21. If American Style Warrants, the Maximum Exercise Number (for the purposes of Condition 5(b)):     Not Applicable

22. Automatic Exercise in respect of Cash Settled Warrants (for the purposes of Condition 4(a)):     Not Applicable

**Certificates - Provisions relating to interest**

23. Interest Payment Dates:                     Not Applicable

24. Notional Amount per Certificate (for the purposes of Condition 6):     Not Applicable

25. Interest Rate (for the purposes of Condition 6):     Not Applicable

26. Interest Rate Day Count Fraction (for the purposes of Condition 6):     Not Applicable

27. Other terms relating to the method of calculating interest (for the purposes of Condition 6):     Not Applicable

**Provisions relating to settlement and redemption**

28. Form of Settlement (for the purposes of Condition 1(a)):

    Cash Settled Securities

29. Issuer's option to vary settlement in respect of the Securities (for the purposes of Conditions 1(a) and 10(c)):

    Not Applicable

30. Valuation Date:

    27 April 2009

31. Averaging Dates:

    Not Applicable

32. Consequence of Averaging Date Disruption (for the purposes of Condition 13(b)):

    Not Applicable

33. Valuation Time:

    As set out in the Annex 3

34. If Warrants, the Settlement Date:

    Not Applicable

35. If Certificates, the Certificate Settlement Notice Period:

    The period of three Business Days ending on and including the Valuation Date

36. If Certificates, the Redemption Date:

    11 May 2009, subject to adjustment in accordance with the Modified Following Business Day Convention

37. Business Day Centre(s):

    London and Luxembourg

38. Exchange Rate, including details of when such rate is to be ascertained:

    Not Applicable

39. If Cash Settled Securities, Settlement Currency for the payment of the Cash Settlement Amount and/or Alternative Cash Settlement Amount:

    EUR

40. If Cash Settled Securities, Cash Settlement Amount or method of calculation of the Cash Settlement Amount (for the purposes of Condition 4(b) or Condition 7, as applicable):

    The Cash Settlement Amount with respect to each Certificate shall be an amount in the Settlement Currency equal to the following:

$$EUR\,1,000 \times Max\left( PF \times \frac{GAA_i^{Max}}{GAA_{Initial}} ; 88\% \right)$$

    Where:

**GAA$_{initial}$** means EUR 1013.00

**GAA$_i^{Max}$** Highest Value of the Underlying (Value (i) as defined in Annex 2) on any Scheduled Trading Day (k) (as defined in Annex 2) which is an Observation Date j, as determined by the Calculation Agent

**PF** 88%

**Observation Date j** Quarterly, starting on and including 27 July 2006 to and including 27 April 2009, or if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day, subject to Condition 13 (as modified)

41. If Physical Delivery Warrants, the Strike Price(s): — Not Applicable

42. If Physical Delivery Securities: — Not Applicable

43. If Physical Delivery Certificates, any modification of minimum Board Lot requirement in relation to settlement (for the purpose of Condition 9(h)): — Not Applicable

44. Other circumstances where Holder will receive the Alternative Settlement Amount (for the purposes of Condition 10(c)): — Not Applicable

45. Other additional conditions to settlement (for the purposes of Condition 10(a)(i), 10(a)(ii), 10(b)(i) and 10(b)(ii)): — Not Applicable

**Other specified terms and modifications to the Conditions**

46. If Currency Securities, details of the Relevant Screen Page, the Base Currency and the relevant Subject Currency or Subject Currencies: — Not Applicable

47. If Commodity Securities, provisions for calculations: — Not Applicable

| | | |
|---|---|---|
| 48. | If Index Securities: | The Securities are linked to the performance of a basket comprising an Equity Index and Fixed Income Index whose composition is determined on a periodic basic in accordance with the Lehman Brothers Global Asset Allocator Net Values in EUR or "GAA" (Bloomberg GAAEURN), a rules-based dynamic asset allocation strategy as detailed in Annexes 1, 2 and 3 hereto (the "Strategy"). |
| | Index or Indices: | |

As of 31 March 2006 the respective weights of the Equity Index Equity Index (Alpha) and the Fixed Income Index (1-Alpha) in the Strategy are:

Alpha = 75%

1-Alpha = 25%

| | | | |
|---|---|---|---|
| 49. | If Share Securities: | | Not Applicable |
| | (a) | Share(s): | Not Applicable |
| | (b) | Exchange: | Not Applicable |
| | (c) | Related Exchange: | Not Applicable |
| | (d) | Method of Adjustment (for the purposes of Condition 14(b)): | Not Applicable |
| | (e) | Consequences of Merger Events (for the purposes of Condition 15(a)): | |
| | | (i)   Share-for-Share: | Not Applicable |
| | | (ii)  Share-for-Combined: | Not Applicable |
| | | (iii) Share-for-Other: | Not Applicable |
| | (f) | Consequences of Tender Offers (for the purposes of Condition 15(b)) | |
| | | (i)   Share-for-Share: | Not Applicable |
| | | (ii)  Share-for Combined: | Not Applicable |
| | | (iii) Share-for-Other: | Not Applicable |
| | (g) | Options Exchange (for the purposes | Not Applicable |

- 9 -

of Condition 14(b)(i), Condition
15(a)(iii) or Condition 15(b)(ii),
where applicable)

50. Additional Disruption Events:

    (a)    Applicable Additional Disruption    None
            Events:

    (b)    Consequences of Additional    Not Applicable
            Disruption Event:

51. Further adjustments:

    (a)    whether provisions for market    Not applicable
            disruption apply other than as
            provided for in Condition 13:

    (b)    in relation to Debt Instrument    Not Applicable
            Securities, provisions dealing with
            the situation where one or more of
            the relevant Debt Instruments is
            redeemed (or otherwise ceases to
            exist before expiration of the
            relevant Securities):

    (c)    any supplemental adjustment    Not Applicable
            provisions:

52. Other special conditions and any    As set out in the Annexes 1, 2 and 3
modification to the Terms and Conditions
of the Securities:

53. Relevant Clearing System(s) (for the    Euroclear
purposes of the definition in Condition 28):    Clearstream, Luxembourg

    The Bank of New York, Brussels shall act
    as common depositary for Euroclear and
    Clearstream, Luxembourg

54. Calculation Agent if not the Issuer:    Lehman Brothers International (Europe)

55. Rule 144A eligibility:    No

56. Eligibility for private placement to other    No
"accredited investors" in the United States:

57. US Selling Restrictions and additional
selling restrictions:

| | | |
|---|---|---|
| (a) | details of the applicable type of US Selling Restrictions including in respect of the relevant US Selling Restrictions certification required for the purposes of exercise or redemption: | Type 2B |
| (b) | details of any additional selling restrictions (for the purposes of Condition 9(e)): | Not Applicable |

**Part B**

**Other Information**

1.  (a)    Listing:                                          Not Applicable

    (b)    Admission to Trading:                              Not Applicable

2.  Notification                                              Not Applicable

3.  Interests of Natural and Legal Persons                    Not Applicable
    Involved in The Issue/Offer

4.  (a)    Method of distribution of the                      Non-syndicated
           Securities:

    (b)    Names of the Dealer(s):                            Lehman Brothers International (Europe)

5.  ISIN:                                                     ANN521334980

6.  Common Code:                                              025357108

7.  CUSIP:                                                    Not Applicable

8.  Telekurs number and, where any additional                CH2547710
    or alternative Clearing System(s) has/have
    been specified in paragraph 39(b) above,
    any other relevant security code:

9.  WKN                                                       Not Applicable

10. Principal Securities Agent:                               Belgian Securities Agent

11. Whether Definitive Security Certificates                  The Securities will be at all times
    may be issued as well as/instead of a                     represented by a Global Security
    Global Security:

12. Reasons for the Offer:                                    Not Applicable

13. Performance of index/formula/ other                       Details on historical prices of the Strategy
    variable, explanation of effect on value of               can be found on Bloomberg Page
    investment and associated risks and other                 GAAEURN.
    information concerning the Underlying:
                                                              Details on historical prices of the Equity
                                                              Index can be found on Bloomberg Page
                                                              SPTR00EN Index. Details of on the daily
                                                              and monthly pricing of the Fixed Income
                                                              Index can be found on the Bloomberg
                                                              Page LG03TREU, under Global --
                                                              Customised (option 9) and then page 7.

The Issuer does not intend to provide post issuance information regarding the Underlying.

**S&P Disclaimer:**

The instrument(s) is not sponsored, endorsed, sold or promoted by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P"). S&P makes no representation or warranty, express or implied, to the holder of the instrument(s) or any member of the public regarding the advisability of investing in securities generally or in the instrument(s) particularly or the ability of the S&P Indices to track general stock market performance. S&P's only relationship to the Licensee is the licensing of certain trademarks and trade names of S&P and of the S&P Indices which is determined, composed and calculated by S&P without regard to the licensee or the instrument(s). S&P has no obligation to take the needs of the Licensee or the holders of the instrument(s) into consideration in determining, composing or calculating the S&P Indices. S&P is not responsible for and has not participated in the determination of the timing of, prices at, or quantities of the instrument(s) to be issued or in the determination or calculation of the equation by which the instrument(s) is to be converted into cash. S&P has no obligation or liability in connection with the administration, marketing or trading of the instrument(s).

S&P DOES NOT GUARANTEE THE ACCURACY AND/OR THE COMPLETENESS OF THE S&P INDICES OR ANY DATA INCLUDED THEREIN AND S&P SHALL HAVE NO LIABILITY FOR ANY ERRORS, OMISSIONS, OR INTERRUPTIONS THEREIN. S&P MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY LICENSEE, HOLDERS OF THE INSTRUMENT(S), OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE S&P INDICES OR ANY DATA INCLUDED THEREIN. S&P MAKES NO EXPRESS OR IMPLIED WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE WITH RESPECT TO THE S&P INDICES OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL S&P HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS), EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

**Lehman Brothers Inc. Disclaimer:**

LEHMAN BROTHERS INC. DOES NOT GUARANTEE THE ACCURACY AND/OR THE COMPLETENESS OF THE LEHMAN BROTHERS GLOBAL SYNTHETIC 5 YEAR BOND INDEX OR ANY DATA INCLUDED THEREIN AND LEHMAN BROTHERS INC. SHALL HAVE NO LIABILITY FOR ANY ERRORS, OMISSIONS, OR INTERRUPTIONS THEREIN. LEHMAN BROTHERS INC. MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO RESULTS TO BE OBTAINED BY THE ISSUER, HOLDERS OF THE INSTRUMENT(S), OR ANY OTHER PERSON OR ENTITY FROM THE USE OF THE LEHMAN BROTHERS GLOBAL SYNTHETIC 5 YEAR BOND INDEX OR ANY DATA INCLUDED THEREIN. WITHOUT LIMITING ANY OF THE FOREGOING, IN NO EVENT SHALL LEHMAN BROTHERS INC. HAVE ANY LIABILITY FOR ANY SPECIAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES (INCLUDING LOST PROFITS), EVEN IF NOTIFIED OF THE POSSIBILITY OF SUCH DAMAGES.

ANNEX 1

ANNEX 1

**Strategy and Methodology**

Lehman Brothers' Global and European Equity Strategy team (the '**Strategy Advisor**") has developed the Lehman Brothers Global Asset Allocator Net Values in EUR ("**the Strategy**") as a transparent, rules-based dynamic asset allocation strategy based on a quantitative model whose objective is to achieve an optimal asset allocation for a portfolio exposed to the global equities market (through the Equity Index) and the global fixed income market (through the Fixed Income Index), as detailed hereafter. The strategy aims to maximise returns by switching between asset classes based on the signals from the quantitative model.

The allocation between each of the Equity Index and the Fixed Income Index is reviewed and adjusted on a monthly basis and is based on a set of quantitative market signals.

The Strategy is based on a methodology which overweighs / underweighs the equity markets in an initially balanced portfolio of global equities and global fixed income based on Forecast Excess Returns of equities versus fixed income (the "**Methodology**").

The Methodology represents a quantitative approach pursuant to which the respective weight of each of the Equity Index and the Fixed Income Index is determined for each period from and including a Re-Balance Date to and excluding the immediately following Re-Balance Date (a "**Calculation Period**") based on the three following signals:

- Valuation Signal: relative valuation of equities and bonds measured by risk adjusted yield gap (earnings yields relative to bond yields adjusted by relative volatility);

- Sentiment Signal: sentiment towards the equity market measured by fund flow sentiment indicator; and

- Investor Positioning Signal: indicator of long and short investor positioning in derivatives market from the CFTC.

Capitalised terms used herein have the meaning ascribed to them in Annex 3.

**Allocation of assets**

The respective weight of each of the Equity Index and the Fixed Income Index in the Strategy will be calculated by the Strategy Advisor for each Calculation Period on the corresponding Weighting Calculation Date according to the Methodology using fundamental data from the Data Providers.

**Alpha** or **a** is the percentage weight of the Equity Index in the Strategy as applicable for each Calculation Period.

The level of Alpha is determined by the percentage band (an '**Observed Band**", as specified in the table below) into which the Forecast Excess Return falls.

In respect of a Re-Balance Date, the allocation into the Equity Index (**a**) for the immediately following Calculation Period is determined by the level of Forecast Excess Return (derived from the allocation model as described below) on the relevant Weighting Calculation Date in accordance with the table below:

| Observed Band | % weight of Equity Index (a) | % weight of Fixed Income Index (1- a) |
|---|---|---|
| Less than or equal to -7% | 0% | 100% |

- 14 -

| | | |
|---|---|---|
| Greater than -7% and less than or equal to -2% | 25% | 75% |
| Greater than -2% and less than or equal to +2% | 50% | 50% |
| Greater than +2% and less than or equal to +7% | 75% | 25% |
| Greater than +7% | 100% | 0% |

**Forecast Excess Return** is the forecast value of Excess Return derived from a regression[1] of observed 6-month Excess Returns against the Allocation Signal on a set of Weighting Calculation Dates, as described below:

Excess Return$_{(t-6, t)}$ = a + b * Allocation Signal$_{(t-6)}$ + ε

With:

a ~ 0;

b is the regression coefficient, i.e. the numerical measure of the degree of the linear relationship between two variables given by the regression;

e$_t$ is the residual of the regression

Excess Return$_{(t-6, t)}$ is defined as the difference (1) − (2) between:

(1)  Equity Index(t)/Equity Index(t-6)

(2)  Fixed Income Index(t)/Fixed Income Index(t-6)

The set of Weighting Calculation Dates (t) over which the regression is performed is a set starting on 30 June 1987 and expanding with every new Weighting Calculation Date.

The results of this regression are then used to determine the Forecast Excess Return knowing the value of the Allocation Signal, using the following formula:

Forecast Excess Return$_{(t)}$ = b * Allocation Signal$_{(t)}$

**Allocation Signal** is calculated as the weighted average of three signals:

Allocation Signal$_{(t)}$ = 0.5 * Valuation$_{(t)}$ + 0.25 * Sentiment$_{(t)}$ + 0.25 * Investor Positioning$_{(t)}$

With:

**Signal 1: Valuation Signal:** Relative Valuation of equities and bonds (earnings yield relative to bond yields adjusted by their relative volatility)

The Valuation Signal measures the relative valuation of equity markets versus fixed income markets with a view to determine whether equity markets are under or overvalued compared to fixed income markets and can be interpreted as a refined valuation signal which quantifies the deviation in valuations taking into account the relative risks of the asset classes.

Valuations are influenced by several factors. One of the factors which influence relative valuations is the relative volatility of asset classes, which in turn drives relative return expectations.

The Valuation Signal used in the Methodology adjusts the Earnings Yield Gap (EYG) (as defined below) by the relative volatility of stocks to bonds and reflects the portion of the yield gap that is not explained by movements in the relative volatility of the asset classes.

---

[1] Regression analysis is a statistical tool for the investigation of relationships between variables. The goal in regression analysis is to create a mathematical model that can be used to predict the values of a dependent variable based upon the values of an independent variable. In other words, such model is used to predict the value of Y when the value of X is known.

Earnings yields could move up relative to bond yields due to higher volatility of equities relative to bonds and therefore a higher yield gap may not necessarily reflect a valuation discrepancy. Hence, the Earnings Yield Gap is adjusted for relative volatility in the model.

The Methodology provides for this adjustment by performing a regression of the Earnings Yield Gap on relative stock / bond volatility (s rel). A relative valuation framework is used, looking at earnings yields relative to bond yields so that the risk of both asset classes is taken into account. The residual e from this regression gives the volatility-adjusted Earnings Yield Gap and is the Valuation Signal.

The regressions are done over an expanding window using monthly data (from relevant Data Providers) from December 1969.

The Earnings Yield Gap is calculated as:

$$EYG_t = a' + b' * s\,rel_t + e_t$$

where

$EYG_t$ = Earnings Yield Gap = $EY_t - BY_t$ on the relevant Weighting Calculation Date(t),

$s\,rel_t = s_{stocks,t} / s_{bond,t}$ where $s_{stocks}$ and $s_{bond}$ are calculated as the 60 month rolling standard deviation of monthly total returns of stocks and bonds respectively. The equity returns are calculated as the equity market capitalisation weighted average of the returns of the relevant DataStream Global Indices[2] in local terms for the G7 Countries and the bond returns are calculated as the equity market capitalisation weighted average of the returns of the relevant DataStream 7-10 year Bond Indices[3] in local terms. The market capitalisation weights are calculated using market capitalisations for the G7 countries in USD terms.

EY = 12 month forward earnings yield from the relevant Weighting Calculation Date(t) calculated as (a)/(b)*100, where (a) is the sum of the 12 month forward earnings (in USD or as converted in USD) (calculated from IBES consensus estimates) representing for a stock the earnings expected 12 months from the relevant Weighting Calculation Date(t) and (b) the sum of the market capitalisation (in USD or as converted in USD), where the summation in (a) and (b) is over all stocks in the FTSE World Index Series[4] (or any successor thereto acceptable to the Strategy Advisor) which have data available for both numerator and denominator.

BY = Nominal yield on 10 year government bonds being the weighted average of the 10 year benchmark bond yields for the G7 Countries from DataStream weighted by the market value of the DataStream Global Indices for the respective G7 Countries in USD.

$e_t$ = Residual of the regression.

a' and b' = Regression factors.

---

[2] DataStream Global Indices consist of national, regional and worldwide indices, updated on a daily basis as soon as the closing data is received in London for each market as calculated and disseminated by DataStream Group (or any successor thereto acceptable to the Strategy Advisor). This set of indices provides a tool for single sector-to-sector and stock-to-market comparisons.

[3] DataStream Bond Indices are calculated and disseminated by DataStream Group (or any successor thereto acceptable to the Strategy Advisor) to the revised formulations recommended by EFFAS (European Federation of Financial Analyst Societies). The indices are comprehensive and detailed: all major bond markets are available, with extensive historic data covering a wide range of calculations.

[4] The FTSE World Index Series is a subset of the FTSE Global Equity Index Series (GEIS) which covers over 7,000 securities in 48 different countries and captures 98% of the world's investable market capitalisation and includes a broad range of traditional and alternative asset class indexes such as multinationals, style, socially responsible investment, real estate and hedge funds. as calculated by the FTSE Group (or any successor thereto acceptable to the Strategy Advisor).

**Signal 2: Sentiment Signal:** Sentiment towards the asset class measured by fund flow sentiment indicator.

The Strategy assumes that (a) in general, stock market highs tend to coincide with extremely positive crowd sentiment and stock market lows are characterised by excessive crowd fear, (b) at extremes in sentiment, the majority is usually on the wrong side and (c) taking a contrary stance at such extremes may prove to be beneficial for market timing. Thus, analysing investor sentiment gives a complementary and important input into the asset allocation process.

The Sentiment Signal is based on four sub-signals:

*Mutual Fund Flows*: the net inflows (purchases minus sales) into equity mutual funds. Aggregating all the purchases of mutual funds serve as a contrarian tactical indicator of market sentiment. The Strategy assumes that when sentiment is extremely positive, stock prices are near a peak and when sentiment is low, stock prices are near a bottom.

*Cross Border Flows*: the aggregate of all portfolio investment activity across international boundaries. The Strategy regards willingness to move capital abroad as a key indicator of investors' risk appetite and as a feature of any recovery. As such, it has also served as a contrarian indicator of future stock market returns.

*Net issuance*: the aggregate of stock issuance minus buybacks (i.e. flows from the corporate sector). Again, there is a contrarian relationship between the net supply of equity to the market and subsequent market performance which is reflected in the Strategy.

*Liquidity*: The Strategy assumes that low liquidity is associated with positive sentiment towards equities and high liquidity with negative sentiment towards equities. Thus, the Strategy regards low liquidity as negative for forward returns and vice versa.

The Sentiment Signal is calculated as the equal weighted average of the zscores[5] of the following four flow-based series (using the negative of the liquidity indicator):

- The three-month moving average of global purchases of equity mutual funds in USD for US, UK, Europe ex UK, Japan and Hong Kong, expressed as a percentage of the market value in USD of the DataStream Global Indices for the same regions *(data sourced on weekly(W or monthly(M) basis from the following Data Providers: AMG Data Services(M), ICI(W), Fininfo Group(M), BVI Bundesverband Investment und Asset Management e.V.(M), Assogestioni(M), Inverco(M), Swedish Investment Fund Association(M), IMA(M), Hong Kong Investment Funds Assocation(M), DataStream(M) and Bloomberg(M))*;

- The three-month moving average of cross-border equity mutual funds in USD for US, UK, Japan, Sweden and the Euro area, expressed as a percentage of the market value of the DataStream World Index in USD *(data sourced on a weekly(W), monthly(M) or quarterly(Q) basis from the following Data Providers: AMG Data Services(W), United States Department of the Treasury(M), Ministry of Finance of Japan(W,M), Tokyo Stock*

---

[5] Z-scores are a special application of the transformation rules. The z-score for an item indicates how far and in what direction, that item deviates from its distribution's mean, expressed in units of its distribution's standard deviation. The mathematics of the z-score transformation are such that if every item in a distribution is converted to is z-score, the transformed scores will necessarily have a mean of zero and a standard deviation of one.

Thus a very positive z-score indicates the item is significantly above its distribution's mean, a very negative z-score indicates it is significantly below its distribution's mean and a z-score close to zero means the item is close to its distribution's mean.

Z-scores are sometimes called "standard scores". The z-score transformation is especially useful when seeking to compare the relative standings of items from distributions with different means and/or different standard deviations.

Z-scores are particularly informative when the distribution to which they refer, is normal. In every normal distribution, the distance between the mean and a given z-score cuts off a fixed proportion of the total area under the curve.

*Exchange(W), Sveriges Riksbank(Q), ECB(M), Office of National Statistics(Q) and DataStream(M,Q)*;

- The sum of the latest 12-month net equity mutual funds issuance in USD adjusted for buybacks for US, UK, Europe ex UK and Japan divided by the market value of the DataStream Global Indices for the same regions in USD *(data sourced on a weekly(W) or monthly(M) basis from the following Data Providers: Equityware(W,M), SDC(W,M), Bloomberg(W), Tokyo Stock Exchange(M) and DataStream(W))*; and

- The level of portfolio liquidity, which is the weighted percentage of cash in institutional portfolios minus the weighted short rate, where the weighted percentage of cash is calculated as the market capitalisation weighted averages of the cash held as a percentage of total assets for US, UK and Germany and the weighted short rate is calculated as the market capitalisation weighted averages of the 3 month rates for US, UK and Germany, all as determined by the Strategy Advisor. The market capitalisation weights are based on the market capitalisations of the DataStream Global Indices for US, UK and Germany respectively. *(data sourced on a monthly(M) or quarterly(Q) basis from the following Data Providers: ICI(M), WM Performance Services(Q),Bundesbank(M) and DataStream(M))*.

Given the delay in the availability of the data referred to above, the Sentiment Signal will be calculated using the latest available data relating to the calendar month which ends 2 months before the relevant Weighting Calculation Date.

Z-scores for the Sentiment Signal are calculated on an expanding window of data, starting in January 1991.

**Signal 3: Investor Positioning Signal:** Investor Positioning Data based upon outstanding positions in derivatives markets

The Strategy takes into account investor positioning analysis as an indicator of the directional opinions of different categories of participants in the market. The Investor Positioning Signal is derived from the investor positioning data on the S&P 500 Index (which for the purpose hereof shall include any successor index using, in the determination of the Strategy Advisor, the same or a substantially similar formula for and method of calculation as used in the calculation of the S&P 500 Index).

The Investor Positioning Signal is calculated based on data on open positions on the S&P 500 Index (or any successor thereto acceptable to the Strategy Advisor) published weekly by the CFTC. Information is derived from 2 categories of trades on the S&P500 Index (or any successor thereto acceptable to the Strategy Advisor):

- Net commercial positions; and

- Net non reportable positions

The "Commitment of Traders Reports" published by the CFTC provide a breakdown of open interest[6] for markets in which traders hold positions equal to or above the reporting levels established by the CFTC. Traders whose futures and option positions are above specific reporting levels set by CFTC regulations are classified as reportable positions.

*Commercial Positions* - When an individual reportable trader is identified to the CFTC, the trader is classified either as "commercial" or "non-commercial". A trader's reported futures positions in a commodity (this term being used in a generic sense to refer to all the contracts

---

[6] Open interest is the total of all futures and/or option contracts entered into and not yet offset by a transaction, by delivery, by exercise, *etc.* The aggregate of all long open interest is equal to the aggregate of all short open interest. Open interest held or controlled by a trader is referred to as that trader's position. (as per CFTC Backgrounder Number: 4-9)

traded on the futures and options markets, including financial contracts like those on the S&P500) are classified as commercial if the trader is commercially "...engaged in business activities hedged by the use of the futures or option markets" in that commodity (as defined in the relevant CFTC's regulations (1.3(z)).

*Non reportable Positions* - The long and short open interest shown as "non reportable positions" are derived by subtracting total long and short "reportable positions" from the total open interest. Accordingly, for "non reportable positions", the number of traders involved and the commercial/non-commercial classification of each trader are unknown.

The net positions (ie, long position minus short position) as a percentage of open interest[7] for both the commercial positions and the non-reportable positions are calculated from the data published by the CFTC. Both series are smoothed using a 4 week moving average, and z-scores calculated over a 1 year moving window. The final signal is calculated as the average of the two z-scores (using the negative of the z-score for the non-reportable trades).

Publication of the data referred to above being made on a weekly basis by the CFTC, the Investor Positioning Signal will be calculated using data relating to the latest available publication from the CFTC as at the relevant Weighting Calculation Date.

---

[7] *Percentage of Open Interest:* Percents are calculated against the total open interest for the futures-only report and against the total futures-equivalent open interest for the options-and-futures-combined report (as per CFTC Backgrounder Number: 4-9). (Since derivatives markets have grown in size and complexity over the years, it is appropriate to refer to the positions as a percentage of open interest rather than the absolute sizes of the positions to get the underlying picture.)

**ANNEX 2**

**Determination of Value (i) of the Lehman Global Asset Allocator Net Values USD**

## 1.    Calculation method

On any Scheduled Trading Day (k) from and including the Issue Date, Value (i) reflects the then prevailing market value of the Strategy as determined by the Calculation Agent in accordance with the following:

$$Value_i = Value_0 \times \prod_{k=1}^{i} \left( \frac{Strategy_k}{Strategy_{k-1}} - FA \times DCF_{(k-1:k)} \right)$$

With

$$Strategy_k = \alpha_t \frac{Equity_k}{Equity_t} + (1 - \alpha_t) \times \frac{FixedIncome_k}{FixedIncome_t}$$

For the purposes hereof:

> **Interval (I) k-1, k** means the period between the Scheduled Trading Day (k-1) and the Scheduled Trading Day (k) (exclusive);

> **Value $_0$** means 1000.00 being Value$_i$ on the Strategy commencement date of 30 December 2005;

> **FA** means 1.75% p.a.;

> **DCF** means the ratio of (a) the actual number of days during the Interval I $_{k-1, k}$ and (b) 360;

> **Equity$_k$** means the Closing Level of the Equity Index on the relevant Scheduled Trading Day (k);

> **Fixed Income$_k$** means the Closing Level of the Fixed Income Index on the relevant Scheduled Trading Day (k);

> **Equity$_t$** means the Closing Level of the Equity Index on the Re-Balance Date immediately preceding the relevant Scheduled Trading Day (k);

> **FixedIncome $_t$** means the Closing Level of the Fixed Income Index on the Re-Balance Date immediately preceding the relevant Scheduled Trading Day (k); and

> $\alpha_t$ means the weighting of the Equity Index as determined by the Strategy Advisor on the relevant Weighting Calculation Date for the Re-Balance Date immediately preceding Scheduled Trading Day (k).

Value (t) in respect of a Re-Balance Date (t) (for the avoidance of doubt, this is Value (i) on a Scheduled Trading Day (k) that is a Re-Balance Date(t)) shall be adjusted by the Calculation Agent to reflect the re-balancing in accordance with the following:

$$Value_t = Value_t - Value_t \times 2 \times \left( |\alpha_{t-1} - \alpha_t| \right) \times tc$$

For the purposes hereof:

- 20 -

$Value_t$ means Value (t) as determined on the relevant Re-Balance Date (t) for the Re-Balance Date (t) after the adjustment for transaction costs;

$\alpha_t$ means the weighting of the Equity Index as determined on the relevant Weighting Calculation Date (t) for the Re-Balance Date (t);

$\alpha_{t-1}$ means the weighting of the Equity Index as determined on the relevant Weighting Calculation Date (t-1) for the last Re-Balance Date (t-1); and

tc means the transaction costs of 0.10%.

## 2.   Disrupted Day

The following shall replace Condition 13 of the Programme:

"If there is a Disrupted Day in relation to an Index on any date which would otherwise have been an Scheduled Trading Day on which the level of the relevant Index would have had to be determined (a 'Determination Date'), then for each Index affected by the occurrence of a Disrupted Day, the Calculation Agent shall determine its good faith estimate of the level for that Index as of the relevant Valuation Time of that Determination Date in accordance with the formula for and method of calculating the Index last in effect prior to the occurrence of the Disrupted Day and using only those securities that comprised the Index immediately prior to that Disrupted Day, notwithstanding the fact that such day is a Disrupted Day

Provided that if the Determination Date which is a Disrupted Day falls on a Weighting Calculation Date, then the Determination Date for both Indices shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day. If the first succeeding Scheduled Trading Day that is not a Disrupted Day in respect of the Indices has not occurred as of the relevant Valuation Times on the fifth Scheduled Trading Day immediately following the original date that, but for the occurrence of another Disrupted Day, would have been the relevant Determination Date, then:

(a)   that fifth Scheduled Trading Day shall be deemed to be the Determination Date in respect of both Indices (the "Deemed Determination Date");

(b)   in respect of the Index where a Closing Level is published on the Deemed Determination Date, as the case may be, the level of such Index shall be such Closing Level, as determined by the Calculation Agent; and

(c)   in respect of the Index or Indices where no Closing Level is published on the Deemed Determination Date, the Calculation Agent shall determine its good faith estimate of the level of the relevant Index that would have prevailed but for that Disrupted Day as of the relevant Valuation Time on that Deemed Determination Date."

## 3.   Extraordinary Events

The following shall replace Conditions 14(a) and (c) of the Programme:

"(a) Adjustments to Index

(x)   Successor Index:   If an Index is (i) not calculated and announced by the relevant Index Sponsor but is calculated and announced by a successor sponsor acceptable to the Calculation Agent, or (ii) replaced by a successor index using, in the determination of the Calculation Agent, the same or a substantially similar formula for and method of calculation as used in the calculation of the Index, then in each case that index (the "Successor Index") will be deemed to be the Index.

- 21 -

*(y)    Index Adjustment Event*:  If in respect of an Index on or prior to the Valuation Date the relevant Index Sponsor announces that it will make a material change in the formula for or the method of calculating the Index or in any other way materially modifies the Index (other than a modification prescribed in that formula or method to maintain the Index in the event of changes in constituent stock and capitalization and other routine events) (an "**Index Modification**") or permanently cancels the Index and no Successor Index exists (an "**Index Cancellation**" and together with an Index Modification, each an "**Index Adjustment Event**"), then the Calculation Agent shall determine if such Index Adjustment Event has a material effect on the Certificates and, if so, shall make its determination for the purposes of calculating Value (i) using, in lieu of a published level for the Index, the level for the Index as at that Determination Date as determined by the Calculation Agent in accordance with the formula for and method of calculating the Index last in effect prior to the Index Adjustment Event, but using only those securities that comprised the Index immediately prior to that Index Adjustment Event.

**(b) Correction of Index**

In respect of an Index, in the event that the Closing Level on any Determination Date is subsequently corrected and the correction is published by the Exchange or the Index Sponsor within three (3) Scheduled Trading Days after the original publication, the Strategy Advisor will adjust corresponding Value (i) to account for such correction, provided that any correction effected and published after the third weekday (meaning a day other than a Saturday or Sunday) prior to the Redemption Date shall be ignored."

**4    Potential Termination Events**

In the event of a Potential Termination Event occurring, then such Potential Termination Event shall be deemed to be an "Index Adjustment Event" as described in Clause 3 above and the consequences thereof shall be "Cancellation and Payment" (as defined in Condition 28 of the Programme) unless a successor Strategy Advisor ("**Successor Strategy Advisor**") is appointed within five (5) Business Days after the date upon which the Potential Termination Event occurred and such Successor Strategy Advisor assumes, to the satisfaction of the Issuer, all respective rights, duties and functions of the Strategy Advisor. The Calculation Agent shall notify the Issuer of the occurrence of such an event and the Issuer shall have the right to cancel its obligations under the Certificates as of such date as the Issuer shall determine in its sole discretion by notice given to the Holders and the Issuer will pay to each Holder the "Alternative Settlement Amount" (as defined in Condition 28 of the Programme) with respect to each Certificate held by such Holder.

In the context of this Clause, "**Potential Termination Event**" shall be deemed to have occurred should the Calculation Agent determine that:

(1)    the Strategy parameters are amended, implemented or developed in a way which, in the determination of the Calculation Agent, has an adverse impact on the Certificates and/or the Issuer's obligations thereunder;

(2)    the method for calculating the Value of Strategy is amended, implemented or used in a way which, in the determination of the Calculation Agent, has an adverse impact on the Certificates and/or the Issuer's obligations thereunder;

(3)    the currency or the frequency in which the Value of the Strategy is calculated and published changes in a way which, in the determination of the Calculation Agent, has an adverse impact on the Certificates and/or the Issuer's obligations thereunder;

(4)    the Strategy Advisor in respect of the Strategy fails for reasons other than of technical or operational nature to calculate or publish the Value of the Strategy for eight (8) consecutive Scheduled Trading Days; and

(5)    the Strategy Advisor breaches any of its obligations in relation to the Strategy (as set out in the description of the Strategy in the Annex), as determined by the

Calculation Agent and notified to the Strategy Advisor thereafter by the Calculation Agent, and such breach is not remedied, to the satisfaction of the Calculation Agent, within five (5) Scheduled Trading Days.

5.    **Strategy Advisor / Calculation Agent**

None of the Strategy Advisor and the Calculation Agent shall have any responsibility to Certificateholders for good faith errors or omissions in its calculations and determinations except such as may result from its own wilful default, gross negligence or bad faith. The calculations and determinations of the Strategy Advisor or the Calculation Agent, as the case may be, shall, in the absence of manifest error, be final, conclusive and binding on the Certificateholders. Certificateholders shall not be entitled to make any claim against the Strategy Advisor or the Calculation Agent, the Issuer or the Guarantor in the case where an Index Sponsor or a Data Provider shall have made any error, omission or other incorrect statement in connection with the calculation and public announcement of the relevant Index or the relevant information, as the case may be.

Nothing contained herein shall prevent the Strategy Advisor and the Calculation Agent from dealing in these Certificates or from entering into any related transactions, including without limitation any swap or hedging transactions, with the Issuer (or any of its affiliates) or any holder of Certificates (or any of its affiliates).

**ANNEX 3**

**Definitions**

**Allocation Signal** has the meaning ascribed to this term in Annex 1.

**Alpha** or **a** has the meaning ascribed to this term in Annex 1. Alpha on the Strike Fixing Date is as specified hereabove in Part A.

**Calculation Agent** means Lehman Brothers International (Europe) of 25 Bank Street London E14 5LE.

**Calculation Period** has the meaning ascribed to this term in Annex 1.

**Closing Level** means in relation to an Index and a Scheduled Trading Day, the official level of such Index, as calculated and announced by the Index Sponsor at the relevant Valuation Time on such Scheduled Trading Day.

**Cross Border Flows** has the meaning ascribed to this term in Annex 1.

**Data Provider** means a leading financial data provider or publicly available source as selected by the Strategy Advisor in its sole discretion and as of the date hereof, in respect of (a) the Valuation Signal, Institutional Brokers' Estimate System (IBES) for the forward earnings, FTSE for share numbers, investability factors and index constituents, Exshare (the International Pricing database from FT Interactive Data) for prices, DataStream for bond yields, equity and bond total returns and market capitalisations and Global Financial Data for historical equity and bond total returns and bond yields; (b) the Investor Sentiment Signal, AMG Data Services, Investment Company Institute (ICI), Fininfo Group, BVI Bundesverband Investment und Asset Management e.V., Associazione del Risparmoio Gestito (Assogestioni), Asociacion de Instituciones de Inversion Colectiva y Fondos de Pensiones (Inverco), the Swedish Investment Fund Association, the Investment Management Association (IMA), the Hong Kong Investment Funds Association, DataStream and Bloomberg for the Mutual Fund Flows, AMG Data Services, United States Department of the Treasury, Ministry of Finance of Japan, Tokyo Stock Exchange, Office of National Statistics (ONS), Sveriges Riksbank, European Central Bank (ECB) and DataStream for the Cross-border Flows, Equityware, Securities Data Co. (SDC), Tokyo Stock Exchange, Bloomberg and DataStream for the Net Issuance and ICI, Deutsche Bundesbank, WM Performance Services and DataStream for the Liquidity; and (c) the Investor positioning Signal, the Commodity Futures Trading Commission (CFTC), or for each of the above, any successor thereto acceptable to the Strategy Advisor.

**Determination Date** has the meaning ascribed to this term in Annex 2.

**Disrupted Day** means (a) any Exchange Business Day on which in relation to the Equity Index, a relevant Exchange or any relevant Related Exchange fails to open for trading during its regular trading session or on which a Market Disruption Event has occurred and (b) any Scheduled Trading Day on which in relation to the Equity Index and/or Fixed Income Index, the relevant Index Sponsor fails to calculate and announce the Closing Level of the Index.

**Early Closure** means the closure on any Exchange Business Day of any relevant Exchange(s) relating to the securities thereof that comprise 20 per cent. or more of the level of the Equity Index or any Related Exchange(s) prior to its Scheduled Closing Time unless, where the level of the Equity Index is to be determined at the Valuation Time, such earlier closing time is announced by such Exchange(s) or Related Exchange(s) at least one hour prior to the earlier of (i) the actual closing time for the regular trading session on such Exchange(s) or Related Exchange(s) on such Exchange Business Day and (ii) the submission deadline for orders to be entered into the Exchange or Related Exchange system for execution at the Valuation Time on such Exchange Business Day.

**Earning Yield Gap** or **EYG** has the meaning ascribed to this term in Annex 1.

**Equity Index** means the Standard and Poor's Global 100 Net Total Return index in euros (Bloomberg: SPTR00EN Index), a stock index that is composed of 100 stocks which is currently compiled and calculated by the Equity Index Sponsor.

**Equity Index Sponsor** means Standard and Poor's Corporation and/or, as the context requires or permits, any successor sponsor accepted by the Calculation Agent pursuant to Annex 2.

**Excess Return** has the meaning ascribed to this term in Annex 1.

**Exchange** means, with respect to (A) the Equity Index, (i) the New York Stock Exchange, (ii) the American Stock Exchange and (iii) the National Association of Securities Dealers Automated Quotation National Market System (or any successor to such exchange or quotation system) and (B) the Fixed Income Index, not applicable.

**Exchange Business Day** means any Scheduled Trading Day on which each Exchange and Related Exchange is open for trading during its respective regular trading sessions, notwithstanding any such Exchange or Related Exchange closing prior to its Schedule Closing Time.

**Exchange Disruption** means any event (other than an Early Closure) that disrupts or impairs (as determined by the Calculation Agent) the ability of market participants in general (i) to effect transactions on any relevant Exchange in securities thereof that comprise 20 per cent. or more of the level of the Equity Index, or (ii) to effect transactions in, or obtain market values for, futures or options contracts relating to the Equity Index on any relevant Related Exchange.

**Fixed Income Index** means Lehman Brothers Global Synthetic 5 Year Bond Index which is currently compiled and calculated by the Fixed Income Index Sponsor daily and published on Bloomberg Page LG03TREU Index. The Fixed Income Index is a proprietary composite index comprising the Fixed Income Sponsor's 5 years Bellwether Swap Indices in USD (40%), EUR (30%), GBP (10%) and JPY (10%) that is designed to be representative of the evolution of the main fixed income markets worldwide. The underlying 5 years swap indices are rebalanced monthly.

**Fixed Income Index Sponsor** means Lehman Brothers Inc. and/or, as the context requires or permits, any successor sponsor accepted by the Calculation Agent pursuant to Annex 2.

**Forecast Excess Return** has the meaning ascribed to this term in Annex 1.

**G7 Countries** means United States of America, United Kingdom, Germany, France, Italy, Canada and Japan.

**Index** means either the Equity Index or the Fixed Income Index and **Indices** means both the Equity Index and the Fixed Income Index.

**Index Sponsor** means either the Equity Index Sponsor or the Fixed Income Index Sponsor.

**Investor Positioning Signal** has the meaning ascribed to this term in Annex 1.

**Liquidity** has the meaning ascribed to this term in Annex 1.

**Market Disruption Event** means in respect of the Equity Index, the occurrence or existence of (i) a Trading Disruption, (ii) an Exchange Disruption, which in either case the Calculation Agent determines is material, at any time during the one hour period that ends at the Scheduled Closing Time, or (iii) an Early Closure. For the purposes of determining whether a Market Disruption Event exists at any time, if a Market Disruption Event in respect of the Equity Index exists at any time, if a Market Disruption Event occurs in respect of a security included in the Index at any time, then the relevant percentage contribution of that security to the level of the Index shall be based on a comparison of (x) the portion of the level of the Index attributable to that security to (y) the overall level of the Index, in each case immediately before the occurrence of such Market Disruption Event.

- 25 -

**Methodology** has the meaning ascribed to this term in Annex 1.

**Mutual Fund Flows** has the meaning ascribed to this term in Annex 1.

**Net Issuance** has the meaning ascribed to this term in Annex 1.

**Observed Band** has the meaning ascribed to this term in Annex 1.

**Re-Balance Date** means the Scheduled Trading Day immediately following a Weighting Calculation Date.

**Related Exchange** means with respect to (A) the Equity Index, both (i) the Chicago Board Options Exchange and (ii) the Chicago Mercantile Exchange and (B) the Fixed Income Index, not applicable.

**Scheduled Closing Time** means, in respect of an Exchange or a Related Exchange and a Scheduled Trading Day, the scheduled weekday closing time of such Exchange or Related Exchange on such Scheduled Trading Day, without regard to after hours or any other trading outside of the regular trading session hours.

**Scheduled Trading Day** means any day on which (a) each Exchange is scheduled to be open for trading for its regular trading sessions, notwithstanding such Exchange closing prior to its scheduled weekday closing time on such day, without regard to after hours or any other trading outside of the regular trading session and (b) the Fixed Income Index is scheduled to be calculated and published by the Fixed Income Index Sponsor in accordance with the provisional calendar of the Fixed Income Index Sponsor.

**Sentiment Signal** has the meaning ascribed to this term in Annex 1.

**Strategy** has the meaning ascribed to this term in Annex 1.

**Strike Fixing Date** means the date specified hereabove in Part A, provided that if such day is not a Scheduled Trading Day, the Strike Fixing Date shall be the immediately following day that is a Scheduled Trading Day.

**Trading Disruption** means, with respect to the Equity Index, any suspension of or limitation imposed on trading by the relevant Exchange or Related Exchange or otherwise and whether by reason of movements in price exceeding limits permitted by the relevant Exchange or Related Exchange or otherwise (i) on any relevant Exchange relating to securities that comprise 20 per cent. or more of the level of the Equity Index, or (ii) in futures or options contracts relating to the Index on any relevant Related Exchange.

**Valuation Date** means the date specified hereabove in Part A.

**Valuation Time** means in respect of a Scheduled Trading Day and (a) the Equity Index, the latest of the Scheduled Closing Times in respect of the Exchanges and (b) the Fixed Income Index, the scheduled publication time at which the Fixed Income Index Sponsor proceeds with the latest publication of level of the Index in accordance with the provisional calendar of the Fixed Income Index Sponsor.

**Valuation Signal** has the meaning ascribed to this term in Annex 1.

**Value$_{Initial}$** means Value (i) on the Strike Fixing Date.

**Value$_{Final}$** means Value (i) on the Valuation Date.

**Value (i)** has the meaning ascribed to this term in Annex 2.

**Value (t)** has the meaning ascribed to this term in Annex 2.

**Weighting Calculation Date** means the day that is five (5) Scheduled Trading Days before the last Scheduled Trading Day in each calendar month during the term of the Certificates. For the purpose hereof, whether a day will be treated as a Scheduled Trading Day will be determined on the Scheduled Trading Day immediately preceding the day scheduled to be the Weighting

Calculation Date, without regard to any change in any Exchange's schedule on or after such day.

## REGISTERED AND PRINCIPAL OFFICE OF THE ISSUER

**Lehman Brothers Securities NV**
E-Commercepark
E-Zone Vredenberg
Hoek Heelsumstraat
Hugenolzweg Z/N
Curacao
The Netherlands Antilles

## PRINCIPAL OFFICE OF THE GUARANTOR

**Lehman Brothers Holdings Inc.**
745 Seventh Avenue
New York, New York 10019
USA

| BELGIAN SECURITIES AGENT | LUXEMBOURG SECURITIES AGENT |
|---|---|
| **The Bank of New York** | **The Bank of New York** |
| Avenue des Arts, 35 | **(Luxembourg) S.A.** |
| Kunstlaan | 1A, Hoehenhof |
| 1040 Brussels | L-1736 Senningerberg |
| Belgium | Grand Duchy of |
| | Luxembourg |

| LEGAL ADVISERS TO THE ISSUER | AUDITORS TO THE ISSUER |
|---|---|
| | **Ernst & Young** |
| **Clifford Chance** | Zeelandia Office Park |
| **Limited Liability** | Kaya W.F.G. (Jombi) |
| **Partnership** | Mensing 16 |
| 10 Upper Bank Street | P.O. Box 3626, Curacao |
| London E14 5JJ | The Netherlands Antilles |
| England | |

## LUXEMBOURG LISTING AGENT
**The Bank of New York Europe Limited**
One Canada Square
London E14 5AL
England

**EXHIBIT B**

# LEHMAN BROTHERS

LEHMAN BROTHERS INTL (EUROPE)
ATTN: BRANCH MANAGER
25 BANK STREET
LONDON E14 5LE, UNITED KINGDOM
DAVISON M/LADANYI C/

| **Confirmation** | Page 1 of 2 |
|---|---|

**Account information**

**Your investment representative
for this activity**
IR#: 075941
DAVISON M/LADANYI C/
44-20-7102-100

**Account number**
739-71018

JUERGEN GROSSMAN
C/O GEORGSMARIENHUETTE
HOLDINGS GMBH
ELBCHAUSSEE 189
22605 HAMBURG
GERMANY

This document confirms the transaction(s) described below. The transaction(s) are USD denominated unless otherwise reflected. Please review the details provided. Notify the branch manager immediately if you disagree with any information provided here. Your confirmation contains research ratings for companies covered by Lehman Brothers Equity Research. The ratings reflect both the Lehman Brothers rating and, where applicable, the ratings of an independent, third party research provider. You may obtain a copy of any independent research report, at no cost to you, where such research is available. Clients may access Lehman Brothers or independent research at www.LehmanLive.com or by calling 1-800-2-LEHMAN. A complete description of Lehman Brothers and independent research providers and ratings may be found at the end of confirmation.

## Transaction summary for May 05, 2006

| | Total number |
|---|---|
| Buys | 1 |
| Sells | 0 |

## You bought

| Description (Symbol) | Trade date | Settlement date | Market | Capacity | Account type |
|---|---|---|---|---|---|
| CUSIP #:  N52133498000 | 26 Apr 06 | 11 May 06 | 8 | 5 | Cash |
| Trade #:  TMS/05/06 - 0001357 | | | | | |
| ***LEHMAN BROTHERS SEC (L006680 ) | Quantity bought | Price | | | Amount |
| LOCKER CERT ON GLOBAL ASSET | 504 | 1000 | Principal | | 504,000.00 |
| ALLOCATOR NET EUR MAT 05/11/09 | | | Net amount | | 504,000.00 |
| UNSOLICITED | | | | | |
| AS OF 04/26/06 | Research Provider | | | | Research Rating |
| TMS-REF:200605050001357 | | | | | |
| 504,000.00 EUR TOTAL | | | | | |
| LBIE EXECUTED; SETTLED BY LBI | | | | | |
| THE TIME OF TRANSACTION,AND IN | | | | | |
| TRANSACTIONS WHERE LEHMAN | | | | | |
| BROTHERS INC. ACTS AS AGENT | | | | | |
| THE NAME OF BUYER OR SELLER | | | | | |
| WILL BE FURNISHED UPON REQUEST | | | | | |
| Reference #:  303258 | | | | | |

# LEHMAN BROTHERS

Account Number: 739-71018
Page 2 of 2

greed between Lehman Brothers Inc. and the client:
at all securities purchased for or sold to the client and not paid for in full
be pledged, hypothecated, lent or used by Lehman Brothers Inc. either
ately or together with other client securities in the ordinary course of its
ess, without further notice to the client, unless the client has indicated
wise on the Client Agreement.

transactions are subject to the laws, rules, customs and usages regulating
xchange or market and the clearing house, if any, where executed.
en applicable, the transaction set forth on the front of this confirmation
utes an offer to the client made pursuant to the information contained in
nclosed prospectus or official statement.

escriptive words in the title of any security are used for identification
ses only, and do not constitute representations.

transactions where Lehman Brothers Inc. acts as agent, the date, time of
ution and the name of buyer or seller will be furnished on written request.
this is a purchase, payment is due on the settlement date indicated. Clients
have purchased securities in cash accounts and have not paid for such
ties by settlement date may be subject to a late charge. Any late charge
e at the maximum interest rate set forth in the Statement of Credit Terms
ed by the client upon opening the account, and as modified from time to
and may be charged from the settlement date to the date of payment.
s confirmation is conclusive proof of this contract unless objected to in
g by the client within 10 days of mailing to you by us.
payment or delivery of securities is not received by Lehman Brothers Inc.
the time specified by the Federal Reserve Board Regulations, we may be
ted to cancel, sell out or buy in the described security, and the client will be
liable for any loss incurred.

Municipal and Other Debt Securities, call features in addition to those may
sclosed on the front of this confirmation may exist. Debt securities subject
ll features or other redemption features such as sinking funds may be
emed in whole or in part before maturity. Such features could affect yield,
n and maturity. Please contact your Investment Representative for further
ation.
lds on CMOs and other mortgage-backed securities (MBS) are quoted as a
rate Bond Equivalent Yield (BEY). Actual yields may fluctuate based on
ges in prepayment speed on the underlying instruments. Total amount due
BS may be subject to change after settlement date due to factor changes.
fic information will be provided upon the client's written request.
r Zero Coupon, Compound Interest and Multiplier securities, no periodic
ents of interest or principal are generally made. These securities may be
le at a price below their maturity value without prior notice by mail to
r unless the holder has requested these securities be held in registered
Unless specifically requested and agreed to by Lehman Brothers Inc.,
s' securities will not be held in registered form. Additional information will
rnished upon request.
r the purpose of evaluating Federal Deposit Insurance, CDs are aggregated
all other deposits held by a client in the same legal capacity at the issuing
tion. The insurance limit is $100,000 combined principal and interest for
st bearing CDs or accredited value for zero-coupon CDs.
this confirmation relates to a debt obligation in bearer form, Lehman
ers Inc. agrees to satisfy the conditions set forth in U.S. Treasury regulation
ns 1.165-12(c)(3), and covenants with you to deliver the obligation in
r form in accordance with the requirements of paragraph (c)(1)(ii) and (iv)
ose regulations. The regulations prohibit deliveries, and restrict resales of
ations in bearer form within the United States, and may affect the resale
st for such obligations. Consult your tax advisor.
r CMOs, clients may contact Customer Account Services for a complimentary
of an Investor's guide to CMOs.
r transactions that specify that this paragraph applies, a short sale is subject
andatory close out if there is no delivery of shares within 10 business days of
al settlement date.
r transactions that specify that this paragraph applies, payment for order
was received for directing your order to a particular broker/dealer or
st center for execution. The source and amount of compensation received
nnection with your transaction will be disclosed to you upon written
st.

ehman Brothers is committed to complying with various customer
fication and verification obligations. We may ask you to provide
nentation or additional information, as necessary, to enable Lehman
ers to comply with these requirements. We may also screen your name
st various databases to verify your identity. This verification applies to both
accounts and when changes are made to existing accounts. Please be
ed that this information and documentation will be treated with the
st regard to your personal privacy.
ss you have directed that trades be executed on a specified exchange or
et and we have agreed to such execution, we will, at our sole discretion and
ut prior notification to you, execute any of your orders to purchase or sell
ties on the over-the-counter market in any location or on any exchange,

including a foreign exchange, where such security is traded, either on a principal
or agency basis.

## EXPLANATION OF CODES

**Markets**    Security Markets

| | |
|---|---|
| 1. New York Stock Exch. | 6. OTC, PCSE Options |
| 2. American Stock Exch. | or Canadian Exchs. |
| 3. Other U.S. Registered Exchs. | 7. Underwriting and |
| (Name on Request) | Governments |
| 4. Mutual Funds/Unit Trusts | 8. Money Markets, Mixed |
| 5. CBOE and Governments | Markets, and Other Markets |

**Capacity**    1 -5 and 8. We acted as your agent. A commission may have been
charged on this transaction.
6. We acted as agent for the buyer and the seller in a cross transaction.
Time of execution and source and amount of commissions received will
be written on request.
Written consent to agency crosses can be revoked at any time by
written notice.
7. We acted as principal. A commission-equivalent / mark-up or
mark-down may have been charged on this transaction. Alternately,
our compensation is realized by selling to you or buying this security
from you at a profit.
9. This transaction was processed in an average price account. We may
have acted as principal on all or part of this transaction. Details will be
furnished on written request.

**Understanding Research Ratings:** Your confirmation may contain ratings for equity
securities that are covered by Lehman Brothers Equity Research. The ratings are as
of the close of Trade date. In addition to Lehman Brothers' research ratings, we
provide ratings from an Independent Research Provider ("IRP"), for U.S. companies
and non-U.S. companies for which the U.S. is the principal equity trading market
and certain other companies with significant U.S. trading volume. BNY Jaywalk Inc.
serves as an intermediary to provide coverage from a variety of IRPs. An
Independent Consultant selects the IRP whose ratings appear on your confirmation
based upon a variety of factors including the IRP's record of recommendations,
consistency of performance and frequency of ratings changes and other factors.
The IRP ratings (1-Buy, 2-Hold, 3-Sell) differ from Lehman Brothers' ratings. A guide
to the Lehman Brothers rating system is listed below.

| Research Ratings | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 2 - Equal Weight: | The stock is expected to perform in line with the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| RS Rating Suspended: | The stock rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers Inc. is acting in an advisory capacity in a merger or strategic transaction involving the company. |

| Industry Ratings | |
|---|---|
| 1 - Pos / Positive: | Sector fundamentals/valuations are improving |
| 2 - Neu / Neutral: | Sector fundamentals/valuations are neither improving nor deteriorating |
| 3 - Neg / Negative: | Sector fundamentals/valuations are deteriorating. |

**NOTE: WE ARE REQUIRED TO REPORT NET PROCEEDS OF CERTAIN
TRANSACTIONS TO THE INTERNAL REVENUE SERVICE. IF YOU ARE
REQUIRED TO DOCUMENT TRANSACTIONS, THIS FORM WILL SATISFY
THE PURPOSES OF IRS FORM 1099B.**

**EXHIBIT C**



# BARCLAYS WEALTH

| | Brokerage account |
| --- | --- |
| | 739-71018 |

JUERGEN GROSSMANN
July 1 - July 31, 2009

## HOLDINGS

*In instances where prices of securities are not readily available, securities may not have been actively traded or where other factors prevent the pricing of securities, no price may be shown in the price column, the market values for the security is not computed and the total equity in your account does not reflect the long or short market value (if any) of those securities. Please also note that totals may differ from the sum on individual components due to rounding.*
*Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.*

## Fixed income

*Yield information is provided for informational purposes only. Barclays makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.*

### EURO (EUR) FX rate in USD: 1.425300

| International bonds | Par | Unit cost / Adj. unit cost | Total cost / Adj. total cost | Market price | Market value (EUR) / Accrued int. (EUR) | Market value (USD) / Accrued int. (USD) | Unrealized g/l (EUR) / Unrealized g/l (USD) | Y-T-M(%) | Comment |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ***LEHMAN BROTHERS SEC LOCKER CERT ON GLOBAL ASSET ALLOCATOR NET EUR MAT 05/11/09 DUE 00 0000 ISIN: ANN521334980 DATED DATE 11 MAY 2006 | 504 | 100,000,000 / 100,000,000 | 504,000.00 / 504,000.00 | | | | N/A / N/A | | In cash account |

| | | | | | Market value (EUR) / Accrued int. (EUR) | Market value (USD) / Accrued int. (USD) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total EUR Fixed income | | | | | 0.00 / 0.00 | $ 0.00 / $ 0.00 | | | |

| | | | | | | Market value (USD) / Accrued int. (USD) | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Total Fixed income | | | | | | $ 0.00 / $ 0.00 | | | |

## EXHIBIT D

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al., Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |

Note: This form may not be used to file claims other than those based on Lehman Programs Securities as listed on http://www.lehman-docket.com as of July 17, 2009

## LEHMAN SECURITIES PROGRAMS PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)       0000051295

||| (barcode)

**THIS SPACE IS FOR COURT USE ONLY**

---

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Dr. Jürgen Grossmann
Elbchaussee 189
22605 Hamburg
Germany

Telephone number:

Lovells LLP    Tel: +49/40/419930
Dr. Daniel Weiss
Alstertor 21
20095 Hamburg
Germany
Email Address: daniel.weiss-at-lovells.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

---

Name and address where payment should be sent (if different from above)

Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

---

1. Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

Amount of Claim: $ 504,000.00 _____ (Required)

☐ Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

2. Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

International Securities Identification Number (ISIN): ANN521334980 _____ (Required)

3. Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:

9544935 _____ (Required)

4. Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:

16367 _____ (Required)

---

5. Consent to Euroclear Bank, Clearstream Bank or Other Depository: By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

FILED / RECEIVED

OCT 2 8 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

---

Date
Oct 26,
2009

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

_Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571_

### INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The questions on the Proof of Claim form include instructions for completing each question. The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

_____DEFINITIONS_____     _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**Lehman Brothers Holdings Claims Processing c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076**

**Lehman Programs Security**
Any security included on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

001852  000000  000383

# BARCLAYS WEALTH

| Brokerage account
739-71018

JUERGEN GROSSMANN
July 1 - July 31, 2009

page    7 of    10

## HOLDINGS

*In instances where prices of securities are not readily available, securities may not have values, securities may not have been actively traded or where other factors prevent the pricing of securities,*
*** appears in the market price column, the market value for the security is not computed and the total equity in your account does not reflect the long or short market value (if any)*
*of those securities. Please also note that totals may differ from the sum on individual components due to rounding.*
*Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.*

## Fixed income

*Yield information is provided for informational purposes only. Barclays makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.*

## EURO (EUR) FX rate in USD: 1.425300

| International bonds | Par | Unit cost<br>Adj. unit cost | Total cost<br>Adj. total cost | Market price | Market value (EUR)<br>Accrued int. (EUR) | Market value (USD)<br>Accrued int. (USD) | Unrealized g/l (EUR)<br>Unrealized g/l (USD) | Y-T-M(%) | Comment |
|---|---|---|---|---|---|---|---|---|---|
| ***LEHMAN BROTHERS SEC | 504 | 100,000.000 | 504,000.00 | | | | N/A | | In cash account |
| LOCKER CERT ON GLOBAL ASSET | | 100,000.000 | 504,000.00 | | | | N/A | | |
| ALLOCATOR NET EUR MAT 05/11/09 | | | | | | | | | |
| DUE 00 0000 | | | | | | | | | |
| ISIN: ANN521334980 | | | | | | | | | |
| DATED DATE 11 MAY 2006 | | | | | | | | | |

| | Market value (EUR)<br>Accrued int. (EUR) | Market value (USD)<br>Accrued int. (USD) |
|---|---|---|
| **Total EUR Fixed income** | 0.00<br>0.00 | $0.00<br>$0.00 |

| | Market value (USD)<br>Accrued int. (USD) |
|---|---|
| **Total Fixed income** | $0.00<br>$0.00 |

# LEHMAN BROTHERS

LEHMAN BROTHERS INTL (EUROPE)                    |**Confirmation**                    Page 1 of 2
ATTN: BRANCH MANAGER
25 BANK STREET
LONDON E14 5LE, UNITED KINGDOM
DAVISON M/LADANYI C/

**Account information**

**Your investment representative
for this activity**
**IR#: 075941**
DAVISON M/LADANYI C/
44-20-7102-100                                   JUERGEN GROSSMAN
                                                 C/O GEORGSMARIENHUETTE
**Account number**                               HOLDINGS GMBH
739-71018                                        ELBCHAUSSEE 189
                                                 22605 HAMBURG
                                                 GERMANY

This document confirms the transaction(s) described below. The transaction(s) are USD denominated unless otherwise reflected.
Please review the details provided. Notify the branch manager immediately if you disagree with any information provided here.
Your confirmation contains research ratings for companies covered by Lehman Brothers Equity Research. The ratings reflect both the
Lehman Brothers rating and, where applicable, the ratings of an independent, third party research provider. You may obtain a copy
of any independent research report, at no cost to you, where such research is available. Clients may access Lehman Brothers or
independent research at www.LehmanLive.com or by calling 1-800-2-LEHMAN. A complete description of Lehman Brothers and
independent research providers and ratings may be found at the end of confirmation.

## Transaction summary for May 05, 2006

|        | Total number |
|--------|--------------|
| Buys   | 1            |
| Sells  | 0            |

## You bought

| Description (Symbol) | Trade date | Settlement date | Market | Capacity | Account type |
|----------------------|------------|-----------------|--------|----------|--------------|
| CUSIP #:  N52133498000 | 26 Apr 06 | 11 May 06 | 8 | 5 | Cash |
| Trade #: TMS05/05/06 - 0001357 | | | | | |

| | Quantity bought | Price | | | Amount |
|---|---|---|---|---|---|
| ***LEHMAN BROTHERS SEC (L006680 ) | | | | | |
| LOCKER CERT ON GLOBAL ASSET | 504 | 1000 | Principal | | 504,000.00 |
| ALLOCATOR NET EUR MAT 05/11/09 | | | Net amount | | **504,000.00** |
| UNSOLICITED | | | | | |

AS OF 04/26/06                                   Research Provider                              Research Rating
TMS-REF:200605050001357
504,000.00 EUR TOTAL
LBIE EXECUTED; SETTLED BY LBI
THE TIME OF TRANSACTION,AND IN
TRANSACTIONS WHERE LEHMAN
BROTHERS INC. ACTS AS AGENT
THE NAME OF BUYER OR SELLER
WILL BE FURNISHED UPON REQUEST
Reference #: 303258

# LEHMAN BROTHERS

Account Number: 739-71018
Page 2 of 2

greed between Lehman Brothers Inc. and the client:
at all securities purchased for or sold to the client and not paid for in full
be pledged, hypothecated, lent or used by Lehman Brothers Inc. either
rately or together with other client securities in the ordinary course of its
ess, without further notice to the client, unless the client has indicated
wise on the Client Agreement.
transactions are subject to the laws, rules, customs and usages regulating
xchange or market and the clearing house, if any, where executed.
hen applicable, the transaction set forth on the front of this confirmation
itutes an offer to the client made pursuant to the information contained in
nclosed prospectus or official statement.
escriptive words in the title of any security are used for identification
ses only, and do not constitute representations.
transactions where Lehman Brothers Inc. acts as agent, the date, time of
tion and the name of buyer or seller will be furnished on written request.
this is a purchase, payment is due on the settlement date indicated. Clients
have purchased securities in cash accounts and have not paid for such
ties by settlement date may be subject to a late charge. Any late charge
e at the maximum interest rate set forth in the Statement of Credit Terms
ved by the client upon opening the account, and as modified from time to
and may be charged from the settlement date to the date of payment.
es confirmation is conclusive proof of this contract unless objected to in
g by the client within 10 days of mailing to you by us.
payment or delivery of securities is not received by Lehman Brothers Inc.
the time specified by the Federal Reserve Board Regulations, we may be
ated to cancel, sell out or buy in the described security, and the client will be
liable for any loss incurred.
Municipal and other Debt Securities, call features in addition to those may
sclosed on the front of this confirmation may exist. Debt securities subject
il features or other redemption features such as sinking funds may be
med in whole or in part before maturity. Such features could affect yield,
and maturity. Please contact your Investment Representative for further
ation.
ds on CMOs and other mortgage-backed securities (MBS) are quoted as a
rate Bond Equivalent Yield (BEY). Actual yields may fluctuate based on
ges in prepayment speed on the underlying instruments. Total amount due
BS may be subject to change after settlement date due to factor changes.
ific information will be provided upon the client's written request.
r Zero Coupon, Compound Interest and Multiplier securities, no periodic
ents of interest or principal are generally made. These securities may be
ble at a price below their maturity value without prior notice by mail to
r unless the holder has requested these securities be held in registered
Unless specifically requested and agreed to by Lehman Brothers Inc.,
s' securities will not be held in registered form. Additional information will
rnished upon request.
r the purpose of evaluating Federal Deposit Insurance, CDs are aggregated
all other deposits held by a client in the same legal capacity at the issuing
ution. The insurance limit is $100,000 combined principal and interest for
st bearing CDs or accredited value for zero-coupon CDs.
this confirmation relates to a debt obligation in bearer form, Lehman
ers Inc. agrees to satisfy the conditions set forth in U.S. Treasury regulation
ons 1.165-12(c)(3), and covenants with you to deliver the obligation in
r form in accordance with the requirements of paragraph (c)(1)(ii) and (iv)
ose regulations. The regulations prohibit deliveries, and restrict resales of
ations in bearer form within the United States, and may affect the resale
t for such obligations. Consult your tax advisor.
r CMOs, clients may contact Customer Account Services for a complimentary
of an Investor's guide to CMOs.
r transactions that specify that this paragraph applies, a short sale is subject
ndatory close out if there is no delivery of shares within 10 business days of
al settlement date.
r transactions that specify that this paragraph applies, payment for order
was received for directing your order to a particular broker/dealer or
et center for execution. The source and amount of compensation received
onnection with your transaction will be disclosed to you upon written
st.
Lehman Brothers is committed to complying with various customer
fication and verification obligations. We may ask you to provide
mentation or additional information, as necessary, to enable Lehman
ers to comply with these requirements. We may also screen your name
st various databases to verify your identity. This verification applies to both
accounts and when changes are made to existing accounts. Please be
ed that this information and documentation will be treated with the
st regard to your personal privacy.
s you have directed that the order be executed on a specified exchange or
et and we have agreed to such execution, we will, at our sole discretion and
ut prior notification to you, execute any of your orders to purchase or sell
ities on the over-the-counter market in any location or on any exchange,

including a foreign exchange, where such security is traded, either on a principal
or agency basis.

## EXPLANATION OF CODES

**Markets/Security Markets**

1. New York Stock Exch.
2. American Stock Exch.
3. Other U.S. Registered Exchs.
   (Name on Request)
4. Mutual Funds/Unit Trusts
5. CBOE and Governments

6. OTC, PCSE Options
   or Canadian Exchs.
7. Underwriting and
   Governments
8. Money Markets, Mixed
   Markets, and Other Markets

**Capacity**

1 -5 and 8. We acted as your agent. A commission may have been
charged on this transaction.
6. We acted as agent for the buyer and the seller in a cross transaction.
Time of execution and source and amount of commissions received will
be written on request.
**Written consent to agency crosses can be revoked at any time by
written notice.**
7. We acted as principal. A commission-equivalent / mark-up or
mark-down may have been charged on this transaction. Alternately,
our compensation is realized by selling to you or buying this security
from you at a profit.
9. This transaction was processed in an average price account. We may
have acted as principal on all or part of this transaction. Details will be
furnished on written request.

**Understanding Research Ratings:** Your confirmation may contain ratings for equity
securities that are covered by Lehman Brothers Equity Research. The ratings are as
of the close of Trade date. In addition to Lehman Brothers' research ratings, we
provide ratings from an Independent Research Provider ("IRP"), for U.S. companies
and non-U.S. companies for which the U.S. is the principal equity trading market
and certain other companies with significant U.S. trading volume. BNY Jaywalk Inc.
serves as an intermediary to provide coverage from a variety of IRPs. An
Independent Consultant selects the IRP whose ratings appear on your confirmation
based upon a variety of factors including the IRP's record of recommendations,
consistency of performance and frequency of ratings changes and other factors.
The IRP ratings (1-Buy, 2-Hold, 3-Sell) differ from Lehman Brothers' ratings. A guide
to the Lehman Brothers rating system is listed below.

| Research Ratings | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 2 - Equal Weight: | The stock is expected to perform in line with the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| RS Rating Suspended: | The stock rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers Inc. is acting in an advisory capacity in a merger or strategic transaction involving the company. |

| Industry Ratings | |
|---|---|
| 1 - Pos / Positive: | Sector fundamentals/valuations are improving |
| 2 - Neu / Neutral: | Sector fundamentals/valuations are neither improving nor deteriorating. |
| 3 - Neg / Negative: | Sector fundamentals/valuations are deteriorating. |

**NOTE: WE ARE REQUIRED TO REPORT NET PROCEEDS OF CERTAIN
TRANSACTIONS TO THE INTERNAL REVENUE SERVICE. IF YOU ARE
REQUIRED TO DOCUMENT TRANSACTIONS, THIS FORM WILL SATISFY
THE PURPOSES OF IRS FORM 1099B.**

From: Origin ID: HGLA 04023886886
Marcos Fernandez
GOI GENERAL OVERNGHT
Borstelmannsweg 109-115

HAMBURG, D 20537
GERMANY



Ship Date: 26OCT09
ActWgt: 0.2 KG
CAD: 1269038/INET9090
Account#: S *********

REF: 2608613472
DESC-1: Office Records
DESC-2:
DESC-3:
DESC-4:

**SHIP TO: (000) 000-0000      BILL SENDER**
c/o Epiq Bankrutcy Solutions, LLC
**Lehmann Brothers Holding Claims, Pr**
PO Box 5076
FDR STA

**NEW YORK, NY 10150**
US

COUNTRY MFG: DE
CARRIAGE VALUE: 0.00 EUR
CUSTOMS VALUE: 1.00 EUR
T/C: S 18174448
SIGN: Marcos Fernandez      D/T: R
EINVAT:
PKG TYPE: ENV

RECEIVED

OCT 28 2009

TRK# 7970 5198 6713     **INTL PRIORITY**
0430                     ISR

A1

**XA JRBA**

10150
NY-US
EWR



The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal
Express for loss or delay of or damage to your shipment. Subject to the conditions of the contract.

CONSIGNEE COPY - PLEASE PLACE IN POUCH

---

**Nach dem Drucken dieses Luftfrachtbriefs:**
1. Mit der Schaltfläche "Drucken" auf dieser Seite können Sie den Luftfrachtbrief auf ihrem Thermo- oder Tintenstrahldrucker ausdrucken.
2. Falten Sie die ausgedruckte Seite entlang der horizontalen Linie.
3. Stecken Sie den Luftfrachtbrief in die Versandtasche und befestigen Sie diese so an Ihrer Sendung, dass der Strichcode des Luftfrachtbriefs gelesen und gescannt werden kann.

**Hinweis:** Verwenden Sie nur den ausgedruckten Original-Luftfrachtbrief für den Versand. Die Verwendung einer Fotokopie dieses Luftfrachtbriefs zu Versandzwecken stellt einen Betrugsversuch dar und kann zu zusätzlichen Versandkosten sowie zur Löschung Ihrer FedEx Kundennummer führen.

GESCHÄFTSBEDINGUNGEN DER FEDEX VERSANDDEFINITIONEN. Auf diesem Luftfrachtbrief stehen "wir", "unser/eles", "uns" und "FedEx" für Federal Express Corporation, die Tochtergesellschaften und Zweigstellen und ihre jeweiligen Mitarbeiter, Vertreter und unabhängigen Vertragspartner. Die Begriffe "Sie" und "Ihre/ihr" beziehen sich auf den Absender, seine Mitarbeiter, Hauptverpflichteten und Vertreter. Sollte Ihre Sendung ihren Ursprung außerhalb der USA haben, so ist Ihr Transportvertrag mit der Tochtergesellschaft von FedEx, der Zweigstelle oder dem unabhängigen Vertragspartner zu schließen, der die Sendung ursprünglich von Ihnen entgegennahm. Der Begriff "Paket" steht für jeden Behälter oder Umschlag, der von uns für eine Zustellung akzeptiert wird, einschließlich der Artikel, die Ihnen von uns mit unseren automatisierten Systemen, Messgeräten, Manifesten oder Luftfrachtbriefen ausgehändigt werden. Der Begriff "Sendung" steht für alle Pakete, die uns übergeben und von uns auf einem einzigen Luftfrachtbrief angenommen werden. LUFTFRACHTVERMERK. Auf alle internationalen Luftfrachtsendungen findet das Warschauer Abkommen in seiner geänderten Fassung Anwendung. Das Warschauer Abkommen in seiner geänderten Fassung regelt und beschränkt in den meisten Fällen die Haftung von FedEx für Verlust, Verzögerung oder Beschädigung Ihrer Sendung. Das Warschauer Abkommen in seiner geänderten Fassung beschränkt die Haftung von FedEx. In den USA beispielsweise ist die Haftung auf USD 9,07 pro Pfund (USD 20 pro Kilogramm) beschränkt, es sei denn, ein höherer Transportwert wird, wie unten beschrieben, angegeben und Sie zahlen die jeweils geltenden höheren Gebühren. Die Auslegung und Handhabung der Haftungsbeschränkungen gemäß den Warschauer Konventionen kann von Land zu Land verschieden sein. Es gibt keine bestimmten vereinbarten Zwischenlandungsorte, und FedEx behält sich das Recht vor, die Routen für die Sendung so festzulegen, wie FedEx es für angemessen hält. HINWEIS FÜR DEN STRASSENGÜTERVERKEHR. Sendungen, die nur bzw. den Straßenwegs innerhalb oder in einem Vertragsstaat des Übereinkommens über den Beförderungsvertrag im internationalen Straßengüterverkehr ("CMR") transportiert werden, unterliegen den Bedingungen des CMR, und zwar unabhängig von gegenteiligen Klauseln aus diesem Luftfrachtbrief. Bei den Sendungen, die allein auf der Straße transportiert werden, gelten im Fall eines Konflikts zwischen den Bestimmungen des CMR und diesem Luftfrachtbriefs die Bestimmungen des CMR. HAFTUNGSBESCHRÄNKUNGEN. Sofern nicht durch die Warschauer Konvention, das CMR oder sonstige internationale Abkommen, nationale Vorschriften, staatliche Regelungen, Verordnungen oder Vorschriften geregelt, ist die Haftung von FedEx bei Beschädigung, Verlust, Überschreitung der Lieferfrist, Eingässe, Falschlieferung, Falschinformationen oder Fehlinformationen in Verbindung mit Ihrer Sendung durch diese Vereinbarung beschränkt und richtet sich nach den Bestimmungen und Bedingungen aus dem Beförderungsvertrag. Siehe zur Bestimmung der vertraglich geregelten Beschränkung des Transportaktionen in den geltenden FedEx Service Guide oder dem entsprechenden Dokument. FedEx bietet keine Frachtversicherung oder Versicherung gegen alle Gefahren an, aber Sie können eine zusätzliche Gebühr für alle weiteren USD 100 (oder die entsprechende Währung des Ursprungslandes) des deklarierten Werts entrichten. Sollten Sie einen höheren Wert für die Sendung angeben und zusätzliche Gebühren zahlen, haftet FedEx höchstens für den niedrigeren der beiden folgenden Werte: der angegebenen Wert der Sendung oder Ihrem tatsächlichen Schaden. NICHT ÜBERNOMMENE HAFTUNG. FEDEX HAFTET IN KEINEM FALL FÜR DIREKTE, INDIREKTE, BEILÄUFIGE, SPEZIELLE ODER MITTELBARE SCHÄDEN, DIE ÜBER DEN DEKLARIERTEN WERT (EINSCHLIESSLICH UNTER ANDEREM EINKOMMENS- ODER GEWINNVERLUSTE) ODER DEN TATSÄCHLICHEN WERT DER SENDUNG, FALLS DIESER GERINGER IST, HINAUSGEHEN, UND ZWAR UNABHÄNGIG DAVON, OB FEDEX DAVON KENNTNIS HATTE, DAS SOLCHE SCHÄDEN AUFTRETEN KÖNNTEN. FedEx haftet nicht für Ihre Handlungen und Unterlassungen, wie u.a. nicht korrekte Angabe der Sendung, nicht ordnungsgemäße und unzureichende Verpackung, Sicherung, Kennzeichnung oder Adressierung der Sendung, sowie für Handlungen und Unterlassungen seitens des Empfängers oder einer anderen an der Sendung beteiligten Person und auch nicht für Vergehen einer Partei dieser Vereinbarung. FedEx übernimmt keine Haftung für Schäden, Verluste, Eingässe, Falschlieferung, Nichtlieferung, Falschauskünfte oder Nichterteilung von Auskünften in Bezug auf Geld- oder Devisensendungen oder Devisensendungen; oder in Fällen, die FedEx nicht zu vertreten hat, wie u.a. höhere Gewalt, Gefahren in der Luft, Wetterbedingungen, mechanische Verzögerungen, Handlungen von Nationen, mit denen ein Staat im Kriegszustand ist, Kriege, Streiks, Bürgerkrieg oder Handlungen und Unterlassungen von Behörden (einschließlich der Zollbehörde und des Gesundheitsamtes), die tatsächlich Vollmacht oder Anscheinvollmacht besitzen. KEINE GEWÄHRLEISTUNG. Wir bieten keine ausdrücklichen oder implizites Garantien. ANSPRÜCHE FÜR VERLUST, BESCHÄDIGUNG ODER VERZÖGERUNG. SÄMTLICHE FORDERUNGEN SIND SCHRIFTLICH INNERHALB EINER BESTIMMTEN FRIST ZU STELLEN. SIEHE ZU EINZELHEITEN UNSERE PREISE, DEN GELTENDEN FEDEX SERVICE GUIDE ODER DIE STANDARDTRANSPORTBEDINGUNGEN. Die Warschauer Konvention sieht spezielle schriftliche Anspruchseinrichtungsverfahren bei Schäden, Verzögerung oder Nichtzustellung Ihrer Sendung vor. Ferner können die Bestimmungen der Warschauer Konvention zu den Forderungen in jedem Land unterschiedlich ausgelegt und gehandhabt werden. Die Forderungsfristen für Ihre Sendung entnehmen Sie bitte der Konvention. Ein Schadenersatzanspruch gegenüber FedEx erlischt gemäß der Konvention, sofern er nicht innerhalb von zwei Jahren geltend gemacht wird. FedEx ist erst nach Zahlung aller Transportkosten zur Behandlung einer Forderung verpflichtet. Der Forderungsbetrag darf nicht von den Transportgebühren abgezogen werden. Sollte der Empfänger die Sendung annehmen, ohne irgendwelche Schäden auf der Empfangsbestätigung zu vermerken, geht FedEx davon aus, dass die Sendung in gutem Zustand ausgeliefert wurde. Damit FedEx eine Schadenersatzforderung prüfen kann, sind FedEx der Inhalt, der Originalkarton sowie die Originalverpackung der Sendung vorzulegen. SALVATORISCHE KLAUSEL. Sollte eine Bestimmung im Luftfrachtbrief oder auf die im Luftfrachtbrief Bezug genommen wird geltenden internationalen Abkommen, rechtlichen Vorschriften, staatlichen Regelungen, Verordnungen oder Vorschriften widersprechen, so bleibt diese Bestimmung als Teil unseres Vertrages insoweit rechtsgültig, als dass sie nicht außer Kraft gesetzt wird. Die Ungültigkeit bzw. Nichtdurchsetzbarkeit irgendeiner Vorschrift berührt nicht die Gültigkeit der übrigen Vorschriften im Luftfrachtbrief. Sofern nichts anderes angegeben, ist FEDERAL EXPRESS CORPORATION, 2005 Corporate Avenue, Memphis, TN 38132, USA, der erste Frachtführer dieser Sendung. E-Mail-Adresse bei www.fedex.com.

**<u>EXHIBIT E</u>**

| **United States Bankruptcy Court/Southern District of New York**<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **LEHMAN SECURITIES PROGRAMS<br>PROOF OF CLAIM** |
|---|---|

| In Re:<br>Lehman Brothers Holdings Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|

Note: This form may not be used to file other claims other than
those based on Lehman Programs as listed on
http://www.lehman-docket.com as of July 17, 2009

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Dr. Jürgen Grossmann
Elbchausse 189
22605 Hamburg
Germany

Telephone:
Email:

with copy to:
Hogan Lovells US LLP
Attn: Christopher R. Donoho III, Esq.
875 Third Avenue
New York, NY 10022
Telephone: 212 918 3000
Email: chris.donoho@hoganlovells.com

☒ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: __51295__
*(If known)*

Filed on: __10/28/09__

Name and address where payment should be sent (if different from above)

Telephone number:                     Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

1.    Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

**Amount of Claim: $ 714,420.00_____ (Required).**

☐    Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

2.    Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

**International Securities Identification Number (ISIN):           ANN521334980           (Required)**

3.    Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

**Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:**

**9544935_____ (Required)**

4.    Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

**Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:**
**16367_____ (Required)**

5.    **Consent to Euroclear Bank, Clearstream Bank or Other Depository:** By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

| Date:<br>April 12,<br>2011 | Signature: |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**RIDER TO AMENDED PROOF OF CLAIM FILED BY DR. JÜRGEN GROSSMAN
AGAINST LEHMAN BROTHERS HOLDINGS INC. REGARDING
GUARANTEE OF CERTAIN OBLIGATIONS OF LEHMAN BROTHERS SECURITIES N.V.**

**A.    INTRODUCTION**

1.      This rider to the attached Amended Proof of Claim of Dr. Jürgen Grossmann   ("**Dr.
Grossman**") is incorporated into the Amended Proof of Claim in its entirety as if fully set forth therein.

2.      On October 28, 2009, Dr. Grossman filed a claim, subsequently assigned claim number
51295, against Lehman Brothers Holdings Inc. ("**LBHI**") relating to LBHI's guarantee of certain
obligations of Lehman Brothers Securities N.V., to Dr. Grossman (the "**Prior Proof of Claim**") (attached
hereto as Annex 1).  Dr. Grossman inadvertently, through a clerical error, misstated the Amount of Claim
on the Prior Proof of Claim and, after careful review of the relevant documentation, files this Amended
Proof of Claim to correct such miscalculation.

3.      On the Prior Proof of Claim, in Box 1, Dr. Grossman listed the "Amount of Claim:
$504,000.00."  However, the attachments to the Prior Proof of Claim and a review of the evidence
contained therein shows that this was the value in Euros, not US Dollars, of Dr. Grossman's claim.
Therefore, the Amount of Claim has been amended to reflect its value in US Dollars, $714,420.00 (using
the September 15, 2008 Federal Reserve Bank of New York Noon Buying Rate for EUR to USD,
1:1.4175).

4.      All riders and exhibits attached to the Prior Proof of Claim are incorporated into the
Amended Proof of Claim as if fully set forth therein.

5.      This rider to the attached Amended Proof of Claim is incorporated into the Amended
Proof of Claim in its entirety as if fully set forth therein. Dr. Grossman hereby reserves all rights to
adjust, amend, supplement, increase, decrease, or withdraw this Amended Proof of Claim (including,
without limitation, as a result of future events) to reflect, including, without limitation, the calculation of
any such amounts, the discovery and analysis of additional information, the correction of any errors, the

-2-

resolution of disputes, the calculation of additional costs incurred by Dr. Grossman in connection with the enforcement or protection of its legal rights and/or the assertion of any rights of setoff or recoupment.

6.    Dr. Grossman expressly reserves any and all defenses, counterclaims or objections, including without limitation, the right of setoff, recoupment or similar right, remedy or defense against any claims or counterclaims asserted by LBHI in relation to this Amended Proof of Claim.  The filing of this Amended Proof of Claim is not an election of remedies and is without prejudice to the claimant's rights to assert claims against LBHI or any other third-parties, whether arising out of or relating to the facts and circumstances underlying this claim, or otherwise.  Dr. Grossman hereby expressly preserves any and all rights, claims, causes of action, defenses, counterclaims or objections, or any similar rights, remedies or defenses against all persons or entities, whether in this court or elsewhere, whether currently existing or arising in the future, against whom it determines it may have claims.

Dated:  April 12, 2011
           Hamburg, Germany

By:  _____

Name: _____

**Annex 1**

| *United States Bankruptcy Court/Southern District of New York*<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **LEHMAN SECURITIES PROGRAMS**<br>**PROOF OF CLAIM** |
|---|---|

| In Re:<br>Lehman Brothers Holdings Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | Filed: USBC - Southern District of New York<br>Lehman Brothers Holdings Inc., Et Al.<br>08-13555 (JMP)    0000051295 |
|---|---|---|

Note: This form may not be used to file claims other than those based on Lehman Programs Securities as listed on http://www.lehman-docket.com as of July 17, 2009

**THIS SPACE IS FOR COURT USE ONLY**

---

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Dr. Jürgen Grossmann
Elbchaussee 189
22605 Hamburg
Germany
Telephone number:

Lovells LLP    Tel: +49/40/419930
Dr. Daniel Weiss
Alstertor 21
20095 Hamburg
Germany
Email Address: daniel.weiss-at-lovells.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
  (*If known*)

Filed on: _____

---

Name and address where payment should be sent (if different from above)




Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

---

1. Provide the total amount of your claim based on Lehman Programs Securities. Your claim amount must be the amount owed under your Lehman Programs Securities as of September 15, 2008, whether you owned the Lehman Programs Securities on September 15, 2008 or acquired them thereafter, and whether such claim matured or became fixed or liquidated before or after September 15, 2008. The claim amount must be stated in United States dollars, using the exchange rate as applicable on September 15, 2008. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the claim amounts for each Lehman Programs Security to which this claim relates.

Amount of Claim: $ 504,000.00_____ **(Required)**

☐  Check this box if the amount of claim includes interest or other charges in addition to the principal amount due on the Lehman Programs Securities.

2.  Provide the International Securities Identification Number (ISIN) for each Lehman Programs Security to which this claim relates. If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the ISINs for the Lehman Programs Securities to which this claim relates.

**International Securities Identification Number (ISIN):** ANN521334980_____ **(Required)**

---

3. Provide the Clearstream Bank Blocking Number, a Euroclear Bank Electronic Reference Number, or other depository blocking reference number, as appropriate (each, a "Blocking Number") for each Lehman Programs Security for which you are filing a claim. You must acquire a Blocking Number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). If you are filing this claim with respect to more than one Lehman Programs Security, you may attach a schedule with the Blocking Numbers for each Lehman Programs Security to which this claim relates.

**Clearstream Bank Blocking Number, Euroclear Bank Electronic Instruction Reference Number and or other depository blocking reference number:**

9544935_____ **(Required)**

---

4. Provide the Clearstream Bank, Euroclear Bank or other depository participant account number related to your Lehman Programs Securities for which you are filing this claim. You must acquire the relevant Clearstream Bank, Euroclear Bank or other depository participant account number from your accountholder (i.e. the bank, broker or other entity that holds such securities on your behalf). Beneficial holders should not provide their personal account numbers.

**Accountholders Euroclear Bank, Clearstream Bank or Other Depository Participant Account Number:**

16367_____ **(Required)**

---

5. Consent to Euroclear Bank, Clearstream Bank or Other Depository: By filing this claim, you consent to, and are deemed to have authorized, Euroclear Bank, Clearstream Bank or other depository to disclose your identity and holdings of Lehman Programs Securities to the Debtors for the purpose of reconciling claims and distributions.

**FOR COURT USE ONLY**

**FILED / RECEIVED**

OCT 2 8 2009

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

---

Date:
Oct 26,
2009

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571*

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The questions on the Proof of Claim form include instructions for completing each question. The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

### _____DEFINITIONS_____

### _____INFORMATION_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured, reduced to judgment or not, liquidated or unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**Lehman Brothers Holdings Claims Processing c/o Epiq Bankruptcy Solutions, LLC**
**FDR Station, PO Box 5076**
**New York, NY 10150- 5076**

**Lehman Programs Security**
Any security included on the list designated "Lehman Programs Securities" available on http://www.lehman-docket.com as of July 17, 2009.

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.



001852 000000 000383

# BARCLAYS WEALTH

| Brokerage account
739-71018

JUERGEN GROSSMANN
July 1 - July 31, 2009

page   7 of   10

## HOLDINGS

*In instances where prices of securities are not readily available, securities may not have values, securities may not have been actively traded or where other factors prevent the pricing of securities, ••• appears in the market price column, the market value for the security is not computed and the total equity in your account does not reflect the long or short market value (if any) of those securities. Please also note that totals may differ from the sum on individual components due to rounding. Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.*

### Fixed income

*Yield information is provided for informational purposes only. Barclays makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.*

EURO (EUR) FX rate in USD: 1.425300

| International bonds | Par | Unit cost / Adj. unit cost | Total cost / Adj. total cost | Market price | Market value (EUR) / Accrued int. (EUR) | Market value (USD) / Accrued int. (USD) | Unrealized g/l (EUR) | Unrealized g/l (USD) | Y-T-M(%) | Comment |
|---|---|---|---|---|---|---|---|---|---|---|
| ***LEHMAN BROTHERS SEC LOCKER CERT ON GLOBAL ASSET ALLOCATOR NET EUR MAT 05/11/09 DUE 00 0000 ISIN: ANN521334980 DATED DATE 11 MAY 2006 | 504 | 100,000.000 / 100,000.000 | 504,000.00 / 504,000.00 | * | | | N/A | N/A | | In cash account |

| | | | | | Market value (EUR) / Accrued int. (EUR) | Market value (USD) / Accrued int. (USD) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total EUR Fixed Income** | | | | | 0.00 / 0.00 | $0.00 / $0.00 | | | | |

| | | | | | Market value (USD) / Accrued int. (USD) | | |
|---|---|---|---|---|---|---|---|
| **Total Fixed Income** | | | | | $0.00 / $0.00 | | |

# LEHMAN BROTHERS

LEHMAN BROTHERS INTL (EUROPE)
ATTN: BRANCH MANAGER
25 BANK STREET
LONDON E14 5LE, UNITED KINGDOM
DAVISON M/LADANYI C/

**Confirmation**                                    Page 1 of 2

**Account information**

**Your investment representative
for this activity**
**IR#: 075941**
DAVISON M/LADANYI C/
44-20-7102-100

**Account number**
739-71018

JUERGEN GROSSMAN
C/O GEORGSMARIENHUETTE
HOLDINGS GMBH
ELBCHAUSSEE 189
22605 HAMBURG
GERMANY

This document confirms the transaction(s) described below. The transaction(s) are USD denominated unless otherwise reflected. Please review the details provided. Notify the branch manager immediately if you disagree with any information provided here. Your confirmation contains research ratings for companies covered by Lehman Brothers Equity Research. The ratings reflect both the Lehman Brothers rating and, where applicable, the ratings of an independent, third party research provider. You may obtain a copy of any independent research report, at no cost to you, where such research is available. Clients may access Lehman Brothers or independent research at www.LehmanLive.com or by calling 1-800-2-LEHMAN. A complete description of Lehman Brothers and independent research providers and ratings may be found at the end of confirmation.

## Transaction summary for May 05, 2006

|  | Total number |
| --- | --- |
| Buys | 1 |
| Sells | 0 |

## You bought

| Description (Symbol) | Trade date | Settlement date | Market | Capacity | Account type |
| --- | --- | --- | --- | --- | --- |
| CUSIP #:  N52133498000 | 26 Apr 06 | 11 May 06 | 8 | 5 | Cash |
| Trade #: TMS05/05/06 - 0001357 | | | | | |

| | Quantity bought | Price | | | Amount |
| --- | --- | --- | --- | --- | --- |
| ***LEHMAN BROTHERS SEC (L006680 ) | 504 | 1000 | Principal | | 504,000.00 |
| LOCKER CERT ON GLOBAL ASSET | | | Net amount | | 504,000.00 |
| ALLOCATOR NET EUR MAT 05/11/09 | | | | | |

UNSOLICITED
AS OF 04/26/06
TMS-REF:200605050001357       Research Provider                        Research Rating
504,000.00 EUR TOTAL
LBIE EXECUTED; SETTLED BY LBI
THE TIME OF TRANSACTION, AND IN
TRANSACTIONS WHERE LEHMAN
BROTHERS INC. ACTS AS AGENT
THE NAME OF BUYER OR SELLER
WILL BE FURNISHED UPON REQUEST
Reference #: 303258

# LEHMAN BROTHERS

**Account Number: 739-71018**
**Page 2 of 2**

greed between Lehman Brothers Inc. and the client:

at all securities purchased for or sold to the client and not paid for in full be pledged, hypothecated, lent or used by Lehman Brothers Inc. either rately or together with other client securities in the ordinary course of its ess, without further notice to the client, unless the client has indicated wise on the Client Agreement.

transactions are subject to the laws, rules, customs and usages regulating xchange or market and the clearing house, if any, where executed.

hen applicable, the transaction set forth on the front of this confirmation utes an offer to the client made pursuant to the information contained in nclosed prospectus or official statement.

escriptive words in the title of any security are used for identification ses only, and do not constitute representations.

transactions where Lehman Brothers Inc. acts as agent, the date, time of tion and the name of buyer or seller will be furnished on written request. this is a purchase, payment is due on the settlement date indicated. Clients have purchased securities in cash accounts and have not paid for such ties by settlement date may be subject to a late charge. Any late charge e at the maximum interest rate set forth in the Statement of Credit Terms ved by the client upon opening the account, and as modified from time to and may be charged from the settlement date to the date of payment.

is confirmation is conclusive proof of this contract unless objected to in g by the client within 10 days of mailing to you by us.

payment or delivery of securities is not received by Lehman Brothers Inc. the time specified by the Federal Reserve Board Regulations, we may be ted to cancel, sell out or buy in the described security, and the client will be liable for any loss incurred.

Municipal and other Debt Securities, call features in addition to those may sclosed on the front of this confirmation may exist. Debt securities subject al features or other redemption features such as sinking funds may be med in whole or in part before maturity. Such features could affect yield, and maturity. Please contact your Investment Representative for further ation.

ds on CMOs and other mortgage-backed securities (MBS) are quoted as a rate Bond Equivalent Yield (BEY). Actual yields may fluctuate based on ges in prepayment speed on the underlying instruments. Total amount due BS may be subject to change after settlement date due to factor changes. fic information will be provided upon the client's written request.

r Zero Coupon, Compound Interest and Multiplier securities, no periodic ents of interest or principal are generally made. These securities may be le at a price below their maturity value without prior notice by mail to r unless the holder has requested these securities be held in registered Unless specifically requested and agreed to by Lehman Brothers Inc., s' securities will not be held in registered form. Additional information will nished upon request.

r the purpose of evaluating Federal Deposit Insurance, CDs are aggregated all other deposits held by a client in the same legal capacity at the issuing tion. The insurance limit is $100,000 combined principal and interest for st bearing CDs or accredited value for zero-coupon CDs.

this confirmation relates to a debt obligation in bearer form, Lehman ers Inc. agrees to satisfy the conditions set forth in U.S. Treasury regulation ons 1.165-12(c)(3), and covenants with you to deliver the obligation in r form in accordance with the requirements of paragraph (c)(1)(ii) and (iv) ose regulations. The regulations prohibit deliveries, and restrict resales of tions in bearer form within the United States, and may affect the resale et for such obligations. Consult your tax advisor.

r CMOs, clients may contact Customer Account Services for a complimentary of an investor's guide to CMOs.

r transactions that specify that this paragraph applies, a short sale is subject ndatory close out if there is no delivery of shares within 10 business days of al settlement date.

r transactions that specify that this paragraph applies, payment for order was received for directing your order to a particular broker/dealer or et center for execution. The source and amount of compensation received onnection with your transaction will be disclosed to you upon written st.

Lehman Brothers is committed to complying with various customer fication and verification obligations. We may ask you to provide mentation or additional information, as necessary, to enable Lehman ers to comply with these requirements. We may also screen your name st various databases to verify your identity. This verification applies to both accounts and when changes are made to existing accounts. Please be ed that this information and documentation will be treated with the st regard to your personal privacy.

s you have directed that the order be executed on a specified exchange or et and we have agreed to such execution, we will, at our sole discretion and ut prior notification to you, execute any of your orders to purchase or sell ties on the over-the-counter market in any location or on any exchange,

including a foreign exchange, where such security is traded, either on a principal or agency basis.

## EXPLANATION OF CODES

**Markets/Security Markets**

1. New York Stock Exch.
2. American Stock Exch.
3. Other U.S. Registered Exchs.
   (Name on Request)
4. Mutual Funds/Unit Trusts
5. CBOE and Governments

6. OTC, PCSE Options or Canadian Exchs.
7. Underwriting and Governments
8. Money Markets, Mixed Markets, and Other Markets

**Capacity**  1 -5 and 8. We acted as your agent. A commission may have been charged on this transaction.
6. We acted as agent for the buyer and the seller in a cross transaction. Time of execution and source and amount of commissions received will be written on request.
**Written consent to agency crosses can be revoked at any time by written notice.**
7. We acted as principal. A commission-equivalent / mark-up or mark-down may have been charged on this transaction. Alternately, our compensation is realized by selling to you or buying this security from you at a profit.
9. This transaction was processed in an average price account. We may have acted as principal on all or part of this transaction. Details will be furnished on written request.

**Understanding Research Ratings:** Your confirmation may contain ratings for equity securities that are covered by Lehman Brothers Equity Research. The ratings are as of the close of Trade date. In addition to Lehman Brothers' research ratings, we provide ratings from an Independent Research Provider ("IRP"), for U.S. companies and non-U.S. companies for which the U.S. is the principal equity trading market and certain other companies with significant U.S. trading volume. BNY Jaywalk Inc. serves as an intermediary to provide coverage from a variety of IRPs. An Independent Consultant selects the IRP whose ratings appear on your confirmation based upon a variety of factors including the IRP's record of recommendations, consistency of performance and frequency of ratings changes and other factors. The IRP ratings (1-Buy, 2-Hold, 3-Sell) differ from Lehman Brothers' ratings. A guide to the Lehman Brothers rating system is listed below.

| Research Ratings | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 2 - Equal Weight: | The stock is expected to perform in line with the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the industry sector over a 12-month investment horizon. |
| RS Rating Suspended: | The stock rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers Inc. is acting in an advisory capacity in a merger or strategic transaction involving the company. |

| Industry Ratings | |
|---|---|
| 1 - Pos / Positive: | Sector fundamentals/valuations are improving |
| 2 - Neu / Neutral: | Sector fundamentals/valuations are neither improving nor deteriorating. |
| 3 - Neg / Negative: | Sector fundamentals/valuations are deteriorating. |

**NOTE: WE ARE REQUIRED TO REPORT NET PROCEEDS OF CERTAIN TRANSACTIONS TO THE INTERNAL REVENUE SERVICE. IF YOU ARE REQUIRED TO DOCUMENT TRANSACTIONS, THIS FORM WILL SATISFY THE PURPOSES OF IRS FORM 1099B.**

From:    Origin ID: HGLA  04023886886
Marcos Fernandez ,
GOI GENERAL OVERNGHT
Borstelmannsweg 109-115

HAMBURG, D 20537
GERMANY



FedEx
Express

Ship Date: 26OCT09
ActWgt: 0.2 KG
CAD: 1269038/INET9090
Account#: S *********

REF: 2608613472
DESC-1: Office Records
DESC-2:
DESC-3:
DESC-4:

SHIP TO: (000) 000-0000    BILL SENDER
c/o Epiq Bankrutcy Solutions, LLC
Lehmann Brothers Holding Claims, Pr
PO Box 5076
FDR STA

NEW YORK, NY 10150
US

COUNTRY MFG: DE
CARRIAGE VALUE: 0.00 EUR
CUSTOMS VALUE: 1.00 EUR
T/C: S 18174448        D/T: R
SIGN: Marcos Fernandez
EINVAT:
PKG TYPE: ENV

RECEIVED

OCT 2 8 2009

TRK#  7970 5198 6713
0430

INTL-PRIORITY
ISR

A1

XA JRBA

10150
NY-US

EWR



The Warsaw Convention may apply and will govern and in most cases limit the liability of Federal
Express for loss or delay of or damage to your shipment. Subject to the conditions of the contract.

CONSIGNEE COPY - PLEASE PLACE IN POUCH

**Nach dem Drucken dieses Luftfrachtbriefs:**
1. Mit der Schaltfläche "Drucken" auf dieser Seite können Sie den Luftfrachtbrief auf Ihrem Thermo- oder Tintenstrahldrucker ausdrucken.
2. Falten Sie die ausgedruckte Seite entlang der horizontalen Linie.
3. Stecken Sie den Luftfrachtbrief in die Versandtasche und befestigen Sie diese so an Ihrer Sendung, dass der Strichcode des Luftfrachtbriefs gelesen und gescannt werden kann.

**Hinweis:** Verwenden Sie nur den ausgedruckten Original-Luftfrachtbrief für den Versand. Die Verwendung einer Fotokopie dieses Luftfrachtbriefs zu Versandzwecken stellt einen Betrugsversuch dar und kann zu zusätzlichen Versandkosten sowie zur Löschung Ihrer FedEx Kundennummer führen.

GESCHÄFTSBEDINGUNGEN DER FEDEX VERSANDDEFINITIONEN. Auf diesem Luftfrachtbrief stehen "wir", "unser/eines", "uns" und "FedEx" für Federal Express Corporation, die Tochtergesellschaften und Zweigstellen und ihre jeweiligen Mitarbeiter, Vertreter und unabhängigen Vertragspartner. Die Begriffe "Sie" und "Ihre/sir" beziehen sich auf den Absender, seine Mitarbeiter, Hauptverpflichteten und Vertreter. Sollte Ihre Sendung ihren Ursprung außerhalb der USA haben, so ist Ihr Transportvertrag mit der Tochtergesellschaft von FedEx, der Zweigstelle oder dem unabhängigen Vertragspartner zu schließen, der die Sendung ursprünglich von Ihnen entgegennahm. Der Begriff "Paket" steht für jeden Behälter oder Umschlag, der von uns für eine Zustellung akzeptiert wird, einschließlich der Artikel, die Ihnen von uns mit unseren automatisierten Systemen, Messgeräten, Manifesten oder Luftfrachtbriefen ausgehändigt werden. Der Begriff "Sendung" steht für alle Pakete, die uns übergeben und von uns auf einem einzigen Luftfrachtbrief angenommen werden. LUFTFRACHTVERMERK. Auf alle internationalen Luftfrachtsendungen findet das Warschauer Abkommen in seiner geänderten Fassung Anwendung. Das Warschauer Abkommen in seiner geänderten Fassung regelt und beschränkt in den meisten Fällen die Haftung von FedEx für Verlust, Verzögerung oder Beschädigung Ihrer Sendung. Das Warschauer Abkommen entsteht in einer geänderten Fassung beschränkt die Haftung von FedEx. In den USA beispielsweise ist die Haftung auf USD 9,07 pro Pfund (USD 20 pro Kilogramm) beschränkt, es sei denn, ein höherer Transportwert wird, wie unten beschrieben, angegeben und Sie zahlen die jeweils geltenden höheren Gebühren. Die Auslegung und Handhabung zur Haftungsbeschränkungen gemäß den Warschauer Konventionen kann von Land zu Land verschieden sein. Es gibt keine bestimmten vereinbarten Zwischenlandungsorte, und FedEx behält sich das Recht vor, die Routen für die Sendung so festzulegen, wie FedEx es für angemessen hält. HINWEIS FÜR DEN STRASSENGÜTERVERKEHR. Sendungen, die nur bei dem Straßenwegs innerhalb oder in einem Vertragsstaat des Übereinkommens über den Beförderungsvertrag im internationalen Straßengüterverkehr ("CMR") transportiert werden, unterliegen den Bedingungen des CMR, und zwar unabhängig von gegenteiligen Klauseln aus diesem Luftfrachtbrief. Bei den Sendungen, die allein auf der Straße transportiert werden, gelten im Fall eines Konflikts zwischen den Bestimmungen des CMR und dieses Luftfrachtbriefs die Bestimmungen des CMR. HAFTUNGSBESCHRÄNKUNGEN. Sofern nicht durch die Warschauer Konvention, das CMR oder sonstige internationale Abkommen, rechtliche Vorschriften, staatliche Regelungen, Verordnungen oder Vorschriften geregelt, ist die Haftung von FedEx bei Beschädigung, Verlust, Überschreitung der Lieferfrist, Eingpässe, Falschlieferung, Falschinformationen oder Fehlinformationen in Verbindung mit Ihrer Sendung durch diese Vereinbarung beschränkt und richtet sich nach den Bestimmungen und Bedingungen aus dem Beförderungsvertrag. Gilt zur Bestimmung der vertraglich gergelten Beschränkung das Transportabkommen in den geltenden FedEx Service Guide oder dem entsprechenden Dokument. FedEx bietet keine Frachtversicherung oder Versicherung gegen alle Gefahren an, aber Sie können eine zusätzliche Gebühr für alle weiteren USD 100 (oder die entsprechende Währung des Ursprungslandes) des deklarierten Werts entrichten. Sollten Sie einen höheren Wert für die Sendung angeben und zusätzliche Gebühren zahlen, haftet FedEx höchstens für den niedrigeren der beiden folgenden Werte: der angegebenen Wert der Sendung oder Ihrem tatsächlichen Schaden. NICHT ÜBERNOMMENE HAFTUNG. FEDEX HAFTET IN KEINEM FALL FÜR DIREKTE, INDIREKTE, BEILÄUFIGE, SPEZIELLE ODER MITTELBARE SCHÄDEN, DIE ÜBER DEN DEKLARIERTEN WERT (EINSCHLIESSLICH UNTER ANDEREM EINKOMMENS- ODER GEWINNVERLUSTE) ODER DER WARSCHAUER KONVENTION steht speziale schriftliche Anspruchseinrichtungsverfahren bei Schaden, Verzögerung oder Nichtzustellung Ihrer Sendung vor. Ferner können die Bestimmungen der Warschauer Konvention zu den Forderungen in jedem Land unterschiedlich ausgelegt und gehandhabt werden. Die Forderungsfristen für Ihre Sendung entnehmen Sie bitte der Konvention. Ein Schadenersatzanspruch gegenüber FedEx erlischt gemäß der Konvention, sofern er nicht innerhalb von zwei Jahren geltend gemacht wird. FedEx ist erst nach Zahlung aller Transportkosten zur Behandlung einer Forderung verpflichtet. Der Forderungsbetrag darf nicht von den Transportgebühren abgezogen werden. Sollte der Empfänger die Sendung annehmen, ohne irgendwelche Schäden auf der Empfangsbestätigung zu vermerken, geht FedEx davon aus, dass die Sendung in gutem Zustand ausgeliefert wurde. Damit FedEx eine Schadensersatzforderung prüfen kann, sind FedEx der Inhalt, der Originalkarton sowie die Originalverpackung der Sendung vorzulegen. SALVATORISCHE KLAUSEL. Sollte eine Bestimmung im Luftfrachtbrief oder auf die im Luftfrachtbrief Bezug genommen wird geltenden internationalen Abkommen, rechtlichen Vorschriften, staatlichen Regelungen, Verordnungen oder Vorschriften widersprechen, so bleibt diese Bestimmung als Teil unseres Vertrages insoweit rechtsgültig, als dass sie nicht außer Kraft gesetzt wird. Die Ungültigkeit bzw. Nichtdurchsetzbarkeit irgendeiner Vorschrift berührt nicht die Gültigkeit der übrigen Vorschriften im Luftfrachtbrief. Sofern nichts anderes angegeben, ist FEDERAL EXPRESS CORPORATION, 2005 Corporate Avenue, Memphis, TN 38132, USA, der erste Frachtführer dieser Sendung. E-Mail-Adresse bei www.fedex.com.