**SILVERMANACAMPORA LLP**
Attorneys for Western Digital Corp.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman, Esq.
Jay S. Hellman, Esq.
Katina Brountzas, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re

        LEHMAN BROTHERS HOLDING INC., *et al.*      Case No. 08-13555 (JMP)

                                                                 (Jointly Administered)
                                      Debtor.
-------------------------------------------------------------------X

**OPPOSITION OF WESTERN DIGITAL CORP. TO THE DEBTORS' ONE
HUNDRED ELEVENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABLITY CLAIMS)**

Western Digital Corp. ("WDC"), by it counsel, SilvermanAcampora LLP, as and for its opposition to The Debtors' One Hundred Eleventh Omnibus Objection To Claims (No Liability Claims) (the "Claim Objection") and, more specifically, with respect to the Claim Objection as it purports to disallow WDC's claim, Claim Number 5357 (the "WDC Claim"),[1] respectfully represents as follows:

**Preliminary Statement**

The Claim Objection is nothing more than perfunctory, *pro-forma* omnibus claim objection by which Lehman Brothers Holdings, Inc. ("LBHI" or the "Debtors") contends, without any legal or factual basis, that it is not liable to pay any of the listed claims in its Exhibit A because "[m]any of the No Liability Claims assert a claim against the Debtors related to pending litigations in which the Debtors are not defendants" and "[i]n particular, some of the No Liability Claims are based on pending litigation or other legal proceedings with LBI," a "separate legal

---

[1] The WDC Claim seeks Ninety-One Million ($91,000,000) Dollars based upon actual losses of over $26 million in illiquid positions resulting from an undisclosed conflict of interest and deceptive sales practices by Lehman Brothers, Inc. ("LBI") with respect to Auction Rate Securities ("ARS"). WDC has also filed a proof of claim in the LBI case.

JSH/892296.1/056621

entity." *See* Claim Objection, at ¶10.[2] WDC acknowledges, as it must, that the genesis of the WDC Claim arises out of the massive losses it incurred as a result of WDC's investment in ARS[3] through LBI. As demonstrated below and based upon a review of the numerous documents filed in this massive and unprecedented bankruptcy case it appears that LBHI has continually treated LBI as its "asset" and, further, that LBHI appears to be in possession of LBI funds that may be used to satisfy WDC's Claim. Accordingly, the Claim Objection should be denied or, alternatively, this matter should be converted to an adversary proceeding pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") so that the parties may engage in discovery pursuant to Bankruptcy Rule 9014 and 7001 *et seq.* to determine LHBI's liability to WDC.

### The Nature Of The WDC Claim

1.   In late 2005 and early 2006, LBI pitched ARS to WDC – and numerous other customers – as money-market instruments or cash alternatives. LBI explained to WDC that the

---

[2] WDC is aware of the January 14, 2010 Order Pursuant To Section 105(a) Of The Bankruptcy Code And Bankruptcy Rules 3007 And 9019(b) For Approval Of Claim Objection Procedures (the "January Order"), but that January Order requires that the Debtor provide some basis for the objection.

[3] "ARS" or auction rate securities typically refers to either municipal or corporate debt securities or preferred stocks that pay interest at rates set at periodic "auctions." ARS generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date. The theory behind ARS was to enable long-term debt to be readily tradable as if it were short-term debt through an auction mechanism, so that issuers could have the benefit of having issued long-term debt but having to pay only a lower interest rate that is more in alignment with short term debt obligations. Generally, auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period. The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers and were required to submit orders to the broker-dealers by a deadline set by a broker-dealer. The deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. That gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.
    Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the United States Securities and Exchange Commission (the "SEC") began to investigate those manipulative practices affecting the auction market. In 2006, the SEC entered into a consent decree with a number of major broker-dealers that required them to disclose certain practices to investors and stop engaging in certain other practices. The SEC consent decree noted that, in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they had claimed. The consent decree did nothing, however, to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place.

interest rates on the ARS were set through a well-established auction market and that the instruments were readily tradable at such auctions.

2.    LBI represented that, as a consequence of the auctions, the ARS would *always* be liquid, short-term investments.  LBI also represented that the ARS were therefore ideal for investors whose investment goals were principal preservation and liquidity.  LBI offered the ARS to corporate investors as a means for such investors to invest their operational cash in highly-liquid instruments that could be accessed upon short notice for continuing operations and upcoming projects.[4]

3.    The reality, well known to LBI but undisclosed to WDC, was that the ARS were *not* supported by a broad, fully-functioning market and therefore could be subject to failed auctions and illiquidity.  LBI concealed from WDC that:

- The auctions were not supported by arms-length transactions consummated in an "open market."  In fact, the auction market was only supported and directed by a handful of investment banks.

- LBI, in fact, submitted a support bid for every auction for which it was a broker-dealer to ensure that the auction did not fail.  LBI also set the interest rate in most of the auctions with the bids it submitted.

- LBI actively managed the interest rates so that they would be just high enough to move the ARS it had underwritten but not so high as to make the issuers that were its underwriting clients unhappy.

---

[4] In 2005, LBI pitched WDC to serve as its financial advisor.  WDC told LBI that it had a significant amount of cash it wanted to place in liquid investments based upon a strategy of principal preservation and parity. WDC specifically indicated that principal preservation and liquidity were priorities. To ensure that WDC's investment risk profile was clear, WDC's board of directors prepared an investment policy that was discussed with LBI. In response to WDC's clear statements regarding its investment objectives, LBI recommended that WDC invest in ARS.  Upon discovery of the various problems with ARS, instead of disclosing those problems to WDC LBI continued to represent that ARS was a liquid investment consistent with WDC's investment objectives. By doing so, LBI was able to sell ARS on its books directly to its customers such as WDC and reduce LBI's exposure to ARS.  This was done solely to help LBI at the direct expense of WDC.

- The products offered to WDC were products that LBI had underwritten and was trying to distribute. In other words, LBI was serving a dual role in underwriting the ARS and, at the same time, selling them to clients.[5]

4. LBI also intentionally concealed the problems with the ARS that began to surface in the middle of 2007. During that period, certain auctions failed because there was an insufficient number of purchasers. As a result, LBI was forced to support the auction market by purchasing increasing amounts of the ARS. The troubled auctions meant that LBI was carrying dangerous levels of the ARS inventory on its books in the latter half of 2007. This created tension within LBI because it was purchasing the ARS at the same time it needed to reduce its ARS inventory.

5. At that point, an incredible conflict of interest existed. LBI desired to have auctions clear thus allowing it to continue its lucrative business of underwriting the ARS through the end of 2007. For auctions to clear, however, LBI had to use more and more of its own capital to purchase the ARS. At the same time, LBI needed to clear the ARS off its books. Instead of acting in the interests of its customers, LBI considered only its own interests and refused to break the cycle created by its inherent conflict of interest. LBI instead embarked on a secret scheme to reduce its ARS inventory by selling to the very customers that LBI should have been protecting. In breach of ethics and fiduciary obligations, LBI began an all-out effort to market the ARS – often its own ARS – to its investors while it concealed the above facts.

6. LBI's efforts could not have been more harmful to its customers. LBI was dumping the ARS on its customers when those customers should have been selling the ARS out of their positions.

---

[5] As one of the largest underwriters of ARS, LBI received significant underwriting fees from the issuers of these securities. As a broker-dealer, LBI also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process. LBI also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account. The multiple income streams from which LBI benefited when ARS were sold were not disclosed to LBI's customers, including WDC.

7. On February 13, 2008, eighty-seven (87%) percent of all the ARS failed when several of the major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by those broker-dealers, the market for the ARS collapsed, leaving the holders of more than *$300 billion* worth of the ARS with no means of liquidating the investments that LBI offered and sold as a suitable alternative to money market funds and other short-term cash management vehicles.

8. LBI soon decided to cease support for ARS thereby leaving WDC with instruments that are now illiquid.  By setting up a situation in which it was actively controlling whether auctions would clear and at what rate they would clear, LBI had (unbeknownst to its customers, including WDC) set up a situation that put LBI in a fundamentally conflicted role between its desire to keep its underwriting clients happy with the promise of low financing costs and its need to keep the auctions it had set up afloat.  LBI was confronted with a conflict between its customers who thought they had purchased safe, liquid, money market instruments which, without LBI's continued support, would no longer be liquid and its risk management arm which did not want to be stuck holding the very paper LBI underwrote and pushed to its clients. None of those conflicts were visible to LBI's retail clients, including WDC.

9. LBI's conduct amounted to an intentional fraud, a breach of basic fiduciary duties and an abdication of its duties to its customers.  WDC has been damaged as result.

10. Indeed, to date, WDC has over $26 million in illiquid ARS positions.

### **The LBHI/LBI Bankruptcy Proceedings**

11. WDC has no doubt that this Court, having presided over the LBHI and LBI matters, is intimately familiar with the multitude of proceedings in this massive bankruptcy case. Accordingly, any discussion of the background of any of the proceedings will be kept to a minimum and is addressed solely to illuminate the basis for WDC's Claim against LBHI.

12. On September 15, 2008, LBHI commenced a voluntary case under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). On September 16, 2008, LB 745 commenced a voluntary case under chapter 11 of the Bankruptcy Code.

13. Aptly, "[t]he Court has coined the term the 'fog' of Lehman to characterize the confusion, ambiguity, and uncertainty that prevailed during Lehman Week, something akin to the classic expression the 'fog of war.'" *See* February 22, 2011 Opinion On Motions Seeking Modification Of The Sale Order Pursuant To Rule 60(B), The Trustee's Motion For Relief Under The SIPA Sale Order, Barclay's Cross-Motion To Enforce The Sale Orders And Adjudication Of Related Adversary Proceedings (the "February 22, 2011 Decision"), at p. 17.[6]

14. The February 22, 2011 Decision was the product of complex and protracted litigation necessitated by the harried and vague sale of assets of LBHI and LBI to Barclay's Capital, Inc. ("Barclays") under §363 of Bankruptcy Code. *Id.* That the parties would engage in a subsequent dispute relating to the sale is not surprising given the "urgent sale to Barclays [which] took place during the terribly stressful days immediately following LBHI's bankruptcy filing and [which] was one of the landmark events of the extraordinary week from September 15 through September 22, 2008 (labeled by the Court as 'Lehman Week'….)". *Id.* at p. 11.

15. As part of the sale process, the parties agreed that, prior to any sale hearing, LBI would "consent to the commencement of a case under the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §78aaa, *et. seq.*" *See* Debtors' Motion To (A) Schedule A Sale Hearing; (B) Establish Sales Procedures; (C) Approve A Break-Up Fee; And (D) Approve The Sale Of The Purchased Assets And The Assumption And Assignment Of Contracts Relating To The Purchased Assets (the "Sale Motion"), at ¶12.[7]

---

[6] This decision can also be found at 2011 WL 597970 but, for purposes of this opposition, the page references herein cite to the actual decision from the Court's docket.

[7] In that regard, the U.S. Securities Investor Protection Corporation commenced a liquidation proceeding against LBI on September 19, 2008.

6                                                                                                                    JSH/892296.1/056621

16. The Sale Motion, which contemplated the sale of assets relating to LBI's business that were owned by LBI, as well as certain assets of LBHI that were related to the business of LBI, described LBI as "a valuable, but highly sensitive, *asset of LBHI*." *See* Sale Motion at ¶¶9 and 11. (Emphasis supplied).

17. The Sale Motion further characterized the sale as "critical to the stabilization of value … [and] in the best interests of the Debtors…." *See* Sale Motion at ¶6.

18. On September 19, 2008, this Court approved the Sale Motion and issued an Order Under 11 U.S.C. §105(a), 363 And 365 And Federal Rules Of Bankruptcy Procedure 2002, 6004, And 6006 Authorizing And Approving (A) The Sale of Purchased Assets Free And Clear Of Liens And Other Interests And (B) Assumption And Assignment Of Executory Contracts And Unexpired Leases (the "Approval Order").

19. Notably, paragraph 30 of the Approval Order provides for an allocation of $1.29 billion to LBHI and only $250 million to LBI. Moreover, upon information and belief, LBHI reaped a substantial benefit from the sale of LBI's assets (the value of which does not seem to have been accounted for) because LBHI was able to avoid its liability under various guarantees it provided to JPMorgan Chase Bank N.A. and/or Citibank N.A. on obligations of LBI under certain "clearance agreements."[8]

20. Unfortunately, the "fog" has not lifted for WDC and the rationale for the allocation is less than clear. Specifically, there is no indication *why* the proceeds of the sale were allocated in the manner that they were between LBHI and LBI and why there is such a great disparity.

21. Indeed, as this Court noted, witnesses involved in the sale process described the negotiations for LBI's assets as taking place in a compressed time frame, "within a 'scene of

---

[8] *See e.g.* Standard & Poor's *Ratings Direct*, at pp. 3 & 4 (October 1, 2008); *see also* LBHI's First Amended Complaint against JPMorgan Chase Bank, N.A., Adv. Pro. No. 10-03266 [ECF Docket No 19].

organized chaos' and with a 'sense of frenzy [and] distress'." *See* February 22, 2011 Decision at p. 40.

22. Moreover, LBHI witnesses testified that, in the "absence of the sale to Barclays, LBI's liquidation could result in 'open-ended negative series of claims' on the estate," and, therefore, the sale would provide further value to LBHI. *Id.* at p. 58.

23. In addition, at the hearing on the Sale Motion, the testimony provided that "'the sale of LBI must be immediately consummated or there will be little or nothing to sell . . . and that [w]ithout Barclays, Lehman would be forced to sell [discrete] assets for a fraction of the value that will be realized from this transaction.'" *Id.* at p. 59.

24. It is clear that the LBI assets were extremely valuable and that LBHI reaped a substantial benefit from the sale either directly (through the allocation of $1.29 billion) or indirectly (through the release from guarantees and/or avoidance of the "open-ended negative series of claims" against it), but WDC has located nothing in the vast docket that illuminates how or why the allocation was made, or if there was any disagreement to the allocation of any "remaining proceeds."

25. Pursuant to paragraph 30 of the Approval Order, any disagreement concerning the allocation of any "remaining proceeds" was required to be decided by motion. From WDC's review of the docket, there also appears to be no evidence of any motion with respect to any such allocation.

26. Based on the foregoing, it is likely that LBHI is in possession of LBI assets sufficient to satisfy WDC's Claim.

### The Claim Objection Is Deficient

27. "A proof of claim in a bankruptcy proceeding 'cannot be defeated by mere formal objection and the sworn proof is to be treated as some evidence even when it is denied'." *In re Minbatiwalla*, 424 B.R. 104, 111 (S.D.N.Y. 2010) *citing In re Sabre Shipping Corp.*, 299 F. Supp 97, 99 (S.D.N.Y. 1969).

28. "A proof of claim filed in accordance with Fed. R. Bankr. P. is *prima facie* evidence of the validity and amount of the claim." See *In re Martinez*, 409 B.R. 35, 38 (S.D.N.Y. 2009), *citing* Fed R, Bankr. P. 3001(f). "To rebut the presumption of the claimant's *prima facie* case, an objecting party is required to produce 'sufficient evidence to negate one or more of the sworn facts in the proof of claim'." *Id.* at 38, *citing In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). See also *In re Minbatiwalla*, 424 B.R. 104, 111 (S.D.N.Y. 2010) *citing Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. BAP 2000) (an "objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim").

29. If the objector does not "introduce[ ] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the validity and the amount of the claim." *Minbatiwalla*, 424 B.R. at 111, *citing* 4 Collier On Bankruptcy, 502.03[3][f] (rev. ed. 2007).

30. "The objecting party carries the burden if the evidence it produces is equal in probative force to the claim." *Martinez*, 409 B.R. at 38, *citing* Bankr. Proc. Manual § 3001:6 (2008) and *Allegheny*, 954 F.2d at 173-174. If the objecting party does introduce evidence then, "[a]t that point, the burden shifts back to the claimant to produce additional evidence proving the validity of the claim by a preponderance of the evidence." *Id.* at 38, *citing* Bankr. Law Manual § 6:7 (5th ed. 2008).

31. In this case, other than setting forth a mechanical, *pro-forma* omnibus claim objection, LBHI does not refute the WDC Claim or dispel the "fog" that has surrounded the sale of all of LBI's assets and/or the $1.29 billion allocation to LBHI sufficient to defeat WDC's Claim to funds in the possession of LBHI that may rightfully belong to LBI and be sufficient to pay the WDC Claim.

32. Under these circumstances, WDC respectfully submits that LBHI's Claim Objection, as it relates to the WDC Claim, should be denied or, alternatively, converted to an

adversary proceeding to determine the basis for the allocations and whether LBHI is in possession of LBI assets in the form of cash or otherwise that may be available to satisfy WDC's Claim.

**WHEREFORE**, WDC respectfully requests that the Court deny the LBHI Claim Objection to the WDC Claim or, alternatively, convert the Claim Objection into an adversary proceeding under Bankruptcy Rule 9014, together with such other and further relief as this Court may deem just and proper.

Dated: Jericho, New York
April 13, 2011

        **S**ILVERMAN**A**CAMPORA **LLP**
Attorneys for Western Digital Corp.

By:   s/ Jay S. Hellman
      Jay S. Hellman, Esq.
      A Member of the Firm
      100 Jericho Quadrangle, Suite 300
      Jericho, New York 11753
      (516) 479-6300