# EXHIBIT A

## (Part 3)

**(Local Currency-Single Jurisdiction)**                                Execution Copy

[FSA-Insured]



**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated as of July 27, 2007

Lehman Brothers Special Financing Inc. and Giants Stadium LLC have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.    Interpretation**

(a)    *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(iii)  Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.*  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.*  If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts.*  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations.*

    (i)    *Status.*  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(ii)   *Powers*.   It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)   *No Violation or Conflict*.   Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*.   All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)   *Obligations Binding*.   Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)   *Absence of Certain Events*.   No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)   *Absence of Litigation*.   There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)   *Accuracy of Specified Information*.   All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)   *Furnish Specified Information*.   It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)   *Maintain Authorizations*.   It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(c)        *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

## 5.    Events of Default and Termination Events

(a)        *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

      (i)        *Failure to Pay or Deliver*.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

      (ii)        *Breach of Agreement*.  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

      (iii)        *Credit Support Default*.

          (1)        Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

          (2)        the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

          (3)        the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

      (iv)        *Misrepresentation*.  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

      (v)        *Default under Specified Transaction*.  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(vi) *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1)     is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1)     the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

- 5 -

(2)    the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    ***Termination Events.*** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)    ***Illegality.*** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)    ***Credit Event Upon Merger.*** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)    ***Additional Termination Event.*** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    ***Event of Default and Illegality.*** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6.    Early Termination

(a)    ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    **Right to Terminate Following Termination Event.**

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate.* If:—

(1) an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    **Effect of Designation.**

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    **Calculations.**

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

(ii)    *Payment Date.*  An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event).  Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method."  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply.  The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.*  If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*  If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*  If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*  If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.*  If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.*  If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.*  If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.* If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(b)    *Amendments.*  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.*  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.*  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 9.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 10.    Notices

(a)    *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery ) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*    Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.    Governing Law and Jurisdiction

(a)    *Governing Law.*    This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*    With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.*    Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.    Definitions

As used in this Agreement:—

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)   in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)   in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)   in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)   in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled* Payment *Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

***"Termination Event"*** means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

***"Termination Rate"*** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

***"Unpaid Amounts"*** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYK 1112854-9.071370.0011

market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate.    Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

NYK 1112854-9.071370.0011

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL
FINANCING INC.

GIANTS STADIUM LLC

By: _____

By: _____

Name:  T. Courtney Jenkins
Title:   Vice President
Date:

Name:
Title:
Date:

- 17 -

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL                    GIANTS STADIUM LLC
FINANCING INC.

By: _____              By: _____

    Name:                                      Name:    John K. Mara
    Title:                                     Title:   Authorized Representative
    Date:                                      Date:

SCHEDULE
to the
MASTER AGREEMENT
(FSA-INSURED)
dated as of July 27, 2007
between

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),
a corporation organized under
the laws of
the State of Delaware
and

GIANTS STADIUM LLC ("Party B"),
a limited liability company of
the State of Delaware

Part 1.  **Termination Provisions.**

In this Agreement:—

(a)   *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not Applicable. |
| Section 5(a)(vi) (Cross Default), | Not Applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not Applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not Applicable. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

(b)  The "*Breach of Agreement*" provisions of Section 5(a)(ii) will apply to Party A and will apply to
Party B; provided, however, with respect to Party B, the provisions of Section 5(a)(ii) will not apply
to Section 4(d) of the Agreement (as added pursuant to Part 4(c)(ii) of this Schedule).

(c)  The "*Misrepresentation*" provisions of Section 5(a)(iv) will apply to Party A and will not apply to
Party B.

(d)  The "*Default Under Specified Transaction*" provisions of Section 5(a)(v) will not apply to Party A
and will not apply to Party B.

(e)  The "*Cross Default*" provisions of Section 5(a)(vi) will apply to Party A and will apply to Party B;
provided, that the phrase "or becoming capable at such time of being declared" shall be deleted
from clause (1) of such Section 5(a)(vi).

The following provisions apply:—

"*Specified Indebtedness*" will have the meaning specified in Section 12 of this Agreement;
provided, however, that Specified Indebtedness, with respect to Party B, will be limited to the
Bonds.

"*Threshold Amount*" means, with respect to Party A, USD 50,000,000 and, with respect to Party
B, zero.

The following proviso will be inserted at the end of Section 5(a)(vi) of this Agreement:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under
either (1) or (2) above if (a) the event or condition referred to in (1) or the failure to pay referred to
in (2) is a failure to pay caused by an error or omission of an administrative or operational nature;
and (b) funds were available to such party to enable it to make the relevant payment when due; and
(c) such relevant payment is made within three Business Days following receipt of written notice
from an interested party of such failure to pay."

(f)  "*Bankruptcy*". Section 5(a)(vii) of this Agreement shall be amended to add, in the last line thereof,
immediately following the phrase "the foregoing acts", the words "other than any consents or
deemed consents contained in the NFL Letter Agreement (as defined below)".

(g)  The "*Credit Event Upon Merger*" provisions of Section 5(b)(ii) will apply to Party A and will not
apply to Party B.

(h)  The "*Automatic Early Termination*" provisions of Section 6(a) will not apply to Party A and will
not apply to Party B.

(i)  "*Credit Support Default*". Section 5(a)(iii) will apply to Party A and not to Party B.

(j)  *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement, Market
Quotation and the Second Method will apply.

(k)  *Additional Termination Event* will apply. The following shall constitute an Additional Termination
Event:—

(A)    There is a repayment, mandatory redemption or other retirement of all of the Bonds
before their scheduled maturity date.

For the purpose of the foregoing Additional Termination Event, the Affected Party shall be Party
B.

- 2 -

(B)    Party A's Credit Support Provider fails to have at least one outstanding issue of rated senior unsecured long-term debt with an unenhanced rating (disregarding any insurance or other support with respect to such debt) of at least (i) A3 as determined by Moody's Investors Service, Inc. ("Moody's"), and (ii) A- as determined by Standard & Poor's Rating Services (a division of the McGraw Hill Companies) ("S&P") .

For the purpose of the foregoing Additional Termination Event, the Affected Party shall be Party A.

(l)    **_Insurer Provisions._**  The following provisions shall apply to any Transaction that is insured by a financial guaranty insurance policy (the "Swap Insurance Policy") issued on or subsequent to the date hereof by Financial Security Assurance Inc. (the "Insurer" or the "Swap Insurer"), for the account of Party B, as principal, and Party A, as beneficiary (each, an "Insured Transaction"):

(i)    **_Designation of Early Termination Date._**  Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(a)    Event of Default in respect of any Insured Transaction under this Agreement occurs; or

(b)    Termination Event (other than the Additional Termination Events set forth in Part 1(l)(ii)(A) and Part 1(l)(ii)(B)) in respect of any Insured Transaction under this Agreement occurs;

then, in either such case, Party A shall not designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Transaction without the prior written consent of the Insurer. Further, Party B shall not designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Transaction if the termination of such Insured Transaction (or any part thereof) would violate Section 609(nn) or any other provision of the Covered Indenture or any provision of the Insurance and Indemnity Agreement.

(ii)    **_Party B Additional Termination Events._**  The following shall constitute Additional Termination Events with respect to Party B, upon the occurrence of which, Party A may designate an Early Termination Date without the consent of the Swap Insurer:

(A)    (i) an Event of Default has occurred under Section 5(a)(i) of the Agreement with respect to Party B as a Defaulting Party and (ii) the Insurer has failed to make a payment to Party A when due under the terms and conditions of the Swap Insurance Policy and such failure is continuing, after giving effect, in the case of (i) and (ii) above, to any applicable notice requirements and grace periods.

(B)    Both (1) an Event of Default pursuant to Section 5(a)(vi)(1) of the Agreement (as modified by Part 1(e) of this Schedule) has occurred with respect to Party B as the Defaulting Party and (ii) the Insurer fails to have both a claims-paying ability rating of at least "A-" in the case of S&P and at least "A3" in the case of Moody's. In the event Party A designates an Early Termination Date pursuant to this Part 1(l)(ii)(B), any Settlement Amount due from Party B (such amount, the "Accelerated Amount") will be insured by the Insurer (subject to any limitations set forth in the Swap Insurance Policy) and payable and secured as set forth in Section 4(e) of the Agreement (as added pursuant to Part 4(c) herein). Any Accelerated Payment will be paid in a manner consistent with payments on the

- 3 -

Bonds. If Bonds are paid from the proceeds of any liquidation (or any portion thereof) of the Collateral (other than amounts on deposit in the Senior Lien Debt Service Reserve Fund or the Senior Lien Strike Reserve Fund) ("Liquidation Proceeds"), the Accelerated Amount will share ratably with the accelerated principal amount of the Bonds (and all interest then due and payable thereon) in the Liquidation Proceeds that are used to pay the Bonds. Any portion of the Accelerated Amount that remains unpaid will (i) bear interest at an interest rate equal to the interest rate on the Bonds that remain outstanding, (ii) be amortized in equal installments (based on the number of principal payment dates remaining on such outstanding Bonds) over the remaining life of such outstanding Bonds and (iii) be payable on the principal payment dates for such outstanding Bonds. If no Bonds are paid from Liquidation Proceeds, the entire amount of the Accelerated Amount shall bear interest at an interest rate equal to the interest rate on the outstanding Bonds and will be amortized in equal installments over the remaining life of the outstanding Bonds pursuant to the foregoing sentence.

For the purposes of the foregoing Additional Termination Events, Party B shall be the sole Affected Party and all Insured Transactions shall be Affected Transactions.

The parties acknowledge (unless the Swap Insurance Policy is otherwise endorsed) that only those termination payments due from Party B resulting from the application of Part 1(l)(ii)(A) or Part 1(l)(ii)(B) (subject, in the case of either Part 1(l)(ii)(A) or Part 1(l)(ii)(B), to any limitation as to amount set forth in the Swap Insurance Policy) or as a result of the Swap Insurer's designation (as opposed to merely consenting to such designation by one of the parties) of an Early Termination Date in accordance with Part 1(l)(iii) hereof shall be insured.

(iii)    ***The Insurer – Right to Designate Early Termination Date – due to Event of Default/Termination Event with respect to Party B.***  Notwithstanding anything in this Agreement, if any Event of Default under this Agreement occurs, with Party B as the Defaulting Party, or if any Termination Event under this Agreement occurs, with Party B as the Affected Party, then the Insurer (so long as no Additional Termination Event described in Part 1(l)(ii) has occurred and is continuing), shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A.  For purposes of the foregoing sentence, an Event of Default or Termination Event where Party B is the Defaulting Party or the Affected Party, as applicable, shall be considered to be continuing, notwithstanding any payment by the Insurer under the Swap Insurance Policy.

(iv)    ***Amendments.***  Section 8(b) of the Agreement is hereby amended by adding the phrase "; provided, however, that Party B has agreed with the Insurer in the Insurance and Indemnity Agreement that certain amendments, modifications and waivers shall require the consent of the Insurer pursuant to the terms of the Insurance and Indemnity Agreement" immediately after the word "parties" in the third line thereof.  Any amendment, modification or waiver made to this Agreement (including, but not limited to, the Credit Support Annex or any Insured Transaction (or the Confirmation thereof) in violation of the Insurance and Indemnity Agreement or of the Covered Indenture shall be void and of no force and effect.  Party A reserves the right to require either of the following as a condition to its consent to any amendment, modification or waiver of this Agreement or any Insured Transaction: (a) the consent of the Insurer or (b) an

- 4 -

acknowledgment by the Insurer that such Insurer's consent is not required with respect to such amendment, modification or waiver; provided, however, that Party A may waive any such right in its sole discretion.

(v)    **Transfers/Assignments/Delegation.**    Notwithstanding Section 7 of the Agreement, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Transaction under the Agreement, unless it receives the prior written consent of the Insurer; provided, however that Party A may make such an assignment, without the Insurer's consent, to (A) any Reference Market-maker having a long-term debt rating from S&P of "AA-" or higher or from Moody's of "Aa3" or higher (a "Substitute Counterparty") or (B) an Affiliate of Party A if Party A's Credit Support Provider provides a guaranty of the Agreement in form and substance acceptable to the Insurer, which acceptance shall not be unreasonably withheld; provided, further, that such Substitute Counterparty or Affiliate assumes the rights and duties of Party A under the Insured Transaction pursuant to an agreement that is in form and substance satisfactory to the Insurer.

(vi)    **No Suspension of Payments.**    Notwithstanding anything contained herein to the contrary, Party A shall not suspend any payments due under an Insured Transaction under Section 2(a)(iii) of the Agreement unless either (a) Party A has designated an Early Termination Date pursuant to the terms hereof or (b) Party A has the right to designate an Early Termination Date pursuant to the terms hereof without the consent of the Insurer.

(vii)    **No Netting.**    Notwithstanding anything contained herein to the contrary, and unless the Insurer consents in writing, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Transactions with the same effect as if the Insured Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transactions shall be determined without regard to any Transactions other than the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Insurer.

(viii)    **No Set-off or Counterclaim.**    Notwithstanding anything contained herein to the contrary, in no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Transactions, or net the payment obligations of the other party that are not with respect to Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the

- 5 -

termination of any Insured Transaction shall be determined without regard to any obligation other than those under the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Insurer.

(ix)   *Representations and Agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Insurer.

(x)   *Third-party Beneficiary.* Party A and Party B hereby each acknowledge and agree that each of the Controlling Bond Insurer, the Insurer, and should Financial Guaranty Insurance Company ("FGIC") choose, in its sole and absolute discretion, to exercise its rights provided for in Part 1(l)(xvi) below, FGIC shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Transaction, and as such, entitled to enforce the Agreement and the terms of any such Insured Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

(xi)   *Policy Coverage.* Party A and Party B hereby acknowledge and agree that the Insurer's obligation with respect to Insured Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(xii)   *Subrogation; Assignment.*

(a) Party A and Party B hereby acknowledge that to the extent of payments made by the Insurer to Party A under the Swap Insurance Policy, the Insurer shall be fully subrogated to the rights of Party A against Party B under the Covered Indenture and under the Insured Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Insurer its (i) right to receive payment from Party B under any Insured Transaction and (ii) its rights under the Covered Indenture as they relate to such payment under any Insured Transaction, in each case, to the extent of any payment by the Insurer to Party A.

(b) Party B hereby acknowledges and consents to the assignment by Party A to the Insurer of any rights and remedies that Party A has under any Insured Transaction, the Covered Indenture or any other document executed in connection herewith.

(c) Unless (i) the Insurer has failed to pay any payment due to Party A under the terms and conditions of the Swap Insurance Policy and such failure is continuing or (ii) the Insurer fails to have both a claims-paying ability rating of at least "A-" in the case of S&P and at least "A3" in the case of Moody's, Party A acknowledges and agrees that the Insurer shall have the right to direct and control Party A's voting rights under the Covered Indenture; provided, however, that except for the Insurer's rights obtained

- 6 -

pursuant to Part 1(l)(xii)(a) above, the Insurer shall not have the right to direct and control Party A's rights under clause (7) of Section 11.02(a) of the Covered Indenture).

(xiii)  *Isolation of Insured Transactions in Designating an Early Termination Date.*

(a) Notwithstanding Section 6 of this Agreement, any designation by Party A or Party B of an Early Termination Date in respect of any Transactions that are not Insured Transactions shall not apply to any Insured Transactions under this Agreement, unless expressly provided in such designation and consented to in writing by the Insurer.

(b) Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of Insured Transactions by the Insurer or by Party A or Party B shall apply only to the Insured Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Insurer.

(xiv)  [RESERVED]

(xv)  *Insurer – Right to Designate Early Termination Date due to Event of Default/Termination Event with respect to Party A.*

(a)  Notwithstanding anything in this Agreement, if any Event of Default under this Agreement occurs with Party A as the Defaulting Party or if any Termination Event under this Agreement occurs, with Party A as the Affected Party, in each case at a time when the Insurer is entitled to control Party B's rights pursuant to paragraph (xvii) below, then the Insurer (so long as no Additional Termination Event described in Part 1(l)(ii) has occurred), shall have the right (but not the obligation) upon notice to Party B to designate an Early Termination Date with respect to Party A with the same effect as if such designation were made by Party B. If the Insurer exercises such right in connection with an Additional Termination Event under Part 1(k)(B) hereof and, in connection with such termination, a termination payment would be owed to Party A, Party A shall have the right, within thirty (30) days after the designation of an Early Termination Date, to, at its own expense, assign this Agreement to a Substitute Counterparty. Notwithstanding anything to the contrary, if Party A is unable to assign this Agreement to a Substitute Counterparty pursuant to the foregoing, or a designation of an Early Termination Date occurs as a result of any other Termination Event where Party A is the Affected Party or any Event of Default where Party A is the Defaulting Party, then any payment owed by Party B to Party A upon such termination (the "Payable Amount") shall be neither insured nor guaranteed by the Insurer, shall be subordinated to other payment obligations of Party B under the Covered Indenture, and shall be payable only if (1)(a) prior to the occurrence of a Trustee Revenue Fund Event, funds are available in the Operating Fund for use for any lawful corporate purpose of Party B pursuant to Section 504(c)(x) of the Covered Indenture ("Surplus Funds") sufficient to pay such Payable Amount or (b) following the occurrence and during the continuance of a Trustee Revenue Fund Event, funds are available in the Second Lien Debt Service Fund pursuant to section 509(c)(vi) and (vii) of the Covered Indenture sufficient to pay such Payable Amount and (2) Party B demonstrates to Party A and the Insurer that the Senior Lien Pro Forma Debt Service Coverage Ratio (as

- 7 -

defined in the Covered Indenture) for the then-current fiscal year will be at least
1.00:1.00 (assuming for purposes of such calculation that the Payable Amount
shall be included as Debt Service (as defined in the Covered Indenture) on Senior
Lien Indebtedness (as defined in the Covered Indenture)); provided, however,
that, prior to the application of any such Surplus Funds to the payment of such
Payable Amount, Party B shall first be obligated to use Surplus Funds to fund or
replenish the Debt Service Reserve Fund and the Senior Lien Strike Reserve
Fund to the extent they are required to be funded or replenished under the
Covered Indenture. The Payable Amount shall accrue interest at the Default Rate
(i) from and including the date such Payable Amount would have been due
pursuant to Section 6(d)(ii) of this Agreement but for such deferral and (ii) to but
excluding the date such Deferred Amount is paid in full. Party B covenants that it
shall not, pursuant to any derivative transaction, secure or make any termination
payments in the nature of an Payable Amount to another swap provider under
similar circumstances on a basis superior to any Payable Amount due from Party
B hereunder without the written consent of Party A. Party B further covenants to
take, as soon as practicable, such measures that are within its reasonable control
to permit payment of any Payable Amount as quickly as possible, but only to the
extent such measures are in compliance with the terms hereof and of the Covered
Indenture. "Trustee Revenue Fund Event" means the occurrence of any event
under Section 509(a) of the Covered Indenture that requires that transfer of all
amounts held in the Operating Fund to the Trustee Revenue Fund.

(b)    If the Insurer exercises its rights pursuant to paragraph (a) above and Party B
enters into a transaction with a replacement swap provider, then, notwithstanding
any provision therein to the contrary, a portion of any upfront payment made to
Party B by the replacement swap provider in an amount up to, but not exceeding,
the Payable Amount (the "Upfront Payment") shall constitute neither Swap
Payments nor Pledged Revenues and shall be paid by Party B to Party A in whole
or partial satisfaction of the Payable Amount. Any portion of the Payable
Amount remaining unpaid after payment of any Upfront Payment to Party A
shall remain payable and accrue interest in accordance with paragraph (a) above.

(xvi)    *Other Insurer's Cure Right.*  Notwithstanding anything to the contrary, Party A shall not
exercise its right to designate an Early Termination Date pursuant to Part 1(l)(ii) hereof,
unless it shall have given (1) FGIC written notice of the Insurer's failure to make a
payment pursuant to the terms of the Swap Insurance Policy and (2) FGIC at least three
(3) Business Days to cure such failure and to deliver to Party A, within fifteen (15) days, a
replacement swap insurance policy in a form reasonably acceptable to Party A (a
"Replacement Policy"). If FGIC exercises its right (in its sole discretion) to cure such
Insurer's failure and delivers the Replacement Policy within fifteen (15) days of such
failure, (i) Party A shall not be able to designate an Early Termination Date with respect to
the cured failure to pay and (ii) FGIC shall be deemed to be the Insurer for all purposes
hereof.

(xvii)    *Insurer's Right to Control Party B's Rights.*  Notwithstanding any other provision of this
Agreement, following a Termination Event where Party B is the Affected Party and/or an
Event of Default where Party B is the Defaulting Party, if the Controlling Bond Insurer
has the right to take actions in accordance with the Covered Indenture and has delivered a
Foreclosure Notice in accordance with the NFL Agreement, the Controlling Bond Insurer

- 8 -

shall have the right (but not the obligation) to control all of Party B's rights under this Agreement with respect to an Insured Transaction. For purposes of the foregoing sentence, an Event of Default or Termination Event where Party B is the Defaulting Party or the Affected Party, as applicable, shall be considered to be continuing, notwithstanding any payment by the Insurer under the Swap Insurance Policy. In furtherance of such provision, Party B irrevocably appoints the Insurer as its attorney-in-fact, and will deliver a power of attorney evidencing such appointment, with full authority in its place and stead and in its name or otherwise, from time to time in the Insurer's discretion, to take any action and to execute any instrument which the Insurer may deem necessary or advisable to accomplish or invoke these exercise rights.

(xviii) *Reference Market-makers*. The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirely to read as follows:

"Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the greater New York City metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A2" or higher as determined by Moody's, or (2) "A" or higher as determined by S&P or (3) if not rated by one of S&P or Moody's, an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties and the Insurer, provided, however, that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Insurer, to use fewer than four (4) leading dealers.

## Part 2. Agreement to Deliver Documents.

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Lehman Brothers Holdings, Inc. ("Holdings") in the form of Exhibit A to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A and Holdings substantially in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | No |
| Party B | An opinion of counsel to Party B in the form of Exhibit C to this Schedule. | Upon execution of this Agreement and, with respect to each Transaction, Upon the execution of such Transaction. | No |

- 9 -

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit D to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party A and Party B | A copy of the annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party B | Party B's unaudited consolidated financial statements, the consolidated balance sheet and related statements of income for the most recent fiscal quarter. | Within 45 days after the end of each fiscal quarter of Party B. | Yes |
| Party A | Party A's unaudited consolidated financial statements, the consolidated balance sheet and related statements of income for the most recent fiscal quarter. | Promptly following demand by Party B. | Yes |
| Party B | An executed copy of the Covered Indenture and the NFL Letter Agreement. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | Power of Attorney in favor of the Insurer as required by Part 1(l)(xvii) | Upon execution of this Agreement. | Yes |
| Party B | Swap Insurance Policy | Upon execution of this Agreement. | No |
| Party B | Opinion of counsel to the Insurer in the form and substance acceptable to Party A | Upon execution of this Agreement. | No |
| Party B | A copy of each document required by the Covered Indenture, including all documents required to qualify this | Prior to execution of this Agreement and each | Yes |

NYK 1112854-9.071370.0011

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | Agreement as a "Qualified Swap" | Confirmation hereunder | |

**Part 3. Miscellaneous.**

(a)   *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

Address for notices or communications to Party A:—

Address:  745 Seventh Avenue, 5th Floor, New York, NY 10019

>    Attention:        Municipal Financial Products - Middle Office
>
>    Facsimile No.:  646-758-2988
>
>    Telephone No.: 212-526-2240

Address for notices or communications to Party B:—

Address: Meadowlands Sports Complex, 50 State Route 120, East Rutherford, NJ 07073

>    Attention:        Christine Procops
>
>    Facsimile No.:  201-939-5447
>
>    Telephone No.: 201-460-2852

A copy of all notices or communications to either Party A or Party B shall be sent to the Insurer and to FGIC at their respective address or facsimile number reflected below:

>    Financial Security Assurance Inc.
>    31 West 52nd Street
>    New York, NY 10019
>    Attention: Transaction Oversight
>
>    Financial Guaranty Insurance Company
>    125 Park Avenue
>    New York, New York 10017
>    Attention: Risk Management

(b)   *Calculation Agent.*  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction; provided, however, that if an Event of Default has occurred and is continuing where Party A is the Defaulting Party, then the Calculation Agent shall be a Reference Market-maker selected by Party B and reasonably acceptable to Party A.

(c)   *Credit Support Document.*  Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A in favor of Party B, as beneficiary thereof and the ISDA Credit Support Annex attached

- 11 -

hereto and incorporated by reference herein shall each constitute a Credit Support Document with respect to the obligations of Party A. Party A agrees that it will not amend any Credit Support Document without the prior written consent of the Insurer.

In the case of Party B, there will be no Credit Support Documents.

(d) **Credit Support Provider.** Credit Support Provider means in relation to Party A: Holdings. Credit Support Provider means in relation to Party B: Not applicable.

(e) **Governing Law.** THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE.

(f) **Jurisdiction.** Section 11(b) is hereby amended by:

    (A)    deleting in the second line of subparagraph (i) thereof the word "non-"; and

    (B)    deleting the final paragraph thereof.

(g) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(h) **Rating Agencies.** All rating requirements herein reference those of Moody's and S&P, respectively. Notwithstanding anything to the contrary contained herein, if Moody's or S&P shall no longer exist or deliver ratings as contemplated hereunder, an equivalent rating, of the grade required by the applicable provision of this Agreement, determined by a nationally-recognized rating service acceptable to Party A and Party B, and with respect to any Insured Transaction, the Insurer, shall be used instead.

(i) **"Affiliate"** will have the meaning specified in Section 12 of this Agreement.

(j) **"Bonds"** means Senior Lien Bonds, as defined in the Covered Indenture.

(k) **"Covered Indenture"** means the Indenture of Trust, dated as August 1, 2007, between Party B and The Bank of New York, as Trustee, as amended and supplemented prior to the date hereof in accordance with the terms thereof and as amended and supplemented following the date hereof in accordance with the terms hereof and thereof.

(l) **"Insurance and Indemnity Agreement"** means the Insurance and Indemnity Agreement dated as of August 16, 2007, by and between Party B and the Insurer.

(m) **"Covered Indenture Incorporation Date"** means the date of this Agreement.

## Part 4. **Other Provisions.**

(a) **Agreements.**

    (i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d) and (e), Party B agrees with Party A) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

    (ii)    Section 4 of this Agreement is hereby amended by adding the following subsections "(d)" and "(e)" thereto:—

- 12 -

"(d) *Compliance with Covered Indenture.* Party B will (i) observe, perform and fulfill each provision in the Covered Indenture applicable to Party B, as any of those provisions may be amended, supplemented or modified from time to time in accordance with the provisions thereof and (ii) not make any amendment, supplement, modification or waiver of any of the provisions of the Covered Indenture without the prior written consent of Party A to the extent the consent of Party A is required by the terms thereof.

(e) *Security and Source of Payment of Party B's Obligations.* This Agreement and each Transaction hereunder each constitutes a Qualified Swap (as defined in the Covered Indenture) related to Senior Lien Bonds. Party B's obligations to make regularly scheduled payments hereunder shall constitute Parity Swap Obligations (as defined in the Covered Indenture) on parity with the Senior Lien Bonds pursuant to the Covered Indenture. Party B's obligations to make termination payments hereunder shall (i) either constitute Parity Swap Obligations, or in the case of Part 1(l)(xv) herein, Swap Termination Payments (as defined in the Covered Indenture) and (ii) be payable from the proceeds of any Upfront Swap Payment (as defined in the Covered Indenture) resulting from any Qualified Swap entered into for the purpose of replacing an existing Transaction hereunder. As such, Party B's obligations shall be secured by a pledge of, and shall be payable from, the Trust Estate, including the Pledged Revenues and other funds (but not including the Senior Lien Debt Service Reserve Fund or the Senior Lien Strike Reserve Fund) as provided by, and subject to the terms and conditions of, the Covered Indenture. Party B hereby covenants and warrants to Party A that it shall take all necessary action to ensure that the Transactions entered into hereunder shall be and constitute Qualified Swaps pursuant to the Covered Indenture and that Party A shall, as a Qualified Swap Provider, be entitled to all of the benefits accorded to Qualified Swap Providers, as applicable, pursuant to the Covered Indenture."

(b) *Definitions.* Capitalized terms not defined herein will have the meaning given to such terms in the Covered Indenture. In addition, Section 12 of this Agreement is hereby amended to add the following definitions in their appropriate alphabetical order:—

" `Covered Indenture' has the meaning specified in the Schedule."

" `Covered Indenture Incorporation Date' has the meaning specified in the Schedule."

Miscellaneous:

(c) This Agreement is hereby amended by adding the following Section "13" hereto:—

"**13.    Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):-

(a) *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

- 13 -

(b)      *Assessment and Understanding.*    It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)      *Status of Parties.*  The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction.

(d)      *Termination Payments.*    Each party acknowledges that, pursuant to the terms of this Agreement (including, without limitation, Section 6(e) hereof), it may owe a payment to the other party upon the designation of an Early Termination Date hereunder, even in the event such Early Termination Date is the result of an Event of Default with respect to such other party."

(d)    **Set-off.**  Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

"(f)  In addition to any rights of set-off a party may have as a matter of law or otherwise, subject to the terms of the Covered Indenture, upon the occurrence of an Event of Default with respect to a party ("X") the other party ("Y") will have the right (but will not be obliged) without prior notice to X or any other person to set-off any obligation of X owing to Y (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y owing to X (whether or not arising under this Agreement, whether or not matured, whether or not contingent and regardless of the currency, place of payment or booking office of the obligation).

For the purpose of cross-currency set-off, Y may convert any obligation to another currency at a market rate determined by Y.

If an obligation is unascertained, Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this provision will be deemed to create a charge or other security interest."

(e)    *Notices.*  For the purposes of subsections (iii) and (v) of Section 10(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)    *Waiver of Right to Trial by Jury.*  Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this section.

(g)    *Accuracy of Specified Information.*  Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or

- 14 -

unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(h)   *Severability.* In the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby; provided, however, that this severability provision will not be applicable if any provision of Section 1(c), 2, 5, or 6 is held to be invalid or unenforceable.  The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(i)   *Additional Representations.* For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (d) thereof:

"(e) *Non-Speculation.* This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments, hedging its underlying assets or liabilities or in connection with its line of business (including financial intermediation services) or the financing of its business and not for purposes of speculation.

(f) **No Agency.** It is entering into this Agreement, any Credit Support Document to which it is a party, each Transaction, and any other documentation relating to this Agreement as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(g) **Due Execution.** The individual(s) executing and delivering this Agreement and any other documentation (including any Credit Support Document and each Confirmation) relating to this Agreement to which it is a party or that it is required to deliver are duly empowered and authorized to do so, and it has duly executed and delivered this Agreement, each Confirmation and any Credit Support Document to which it is a party.

(h) **Eligible Contract Participant.** It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act, as amended."

(j)   *NFL Requirements.* It is acknowledged, understood and agreed that, so long as the letter agreement, dated as of August 16, 2007, by and among Party A, Party B, the Insurer, the NFL and various other parties (the "NFL Letter Agreement"; all capitalized terms used in this Part 4(j) and not defined herein are defined in the NFL Letter Agreement) is in effect, and notwithstanding anything in this Agreement or any other Operative Document to the contrary, (a) the exercise by the Secured Parties of remedies under any Operative Document will be made in accordance with the terms and provisions of the NFL Letter Agreement, the terms, conditions and provisions of which each of the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the event of any conflict or inconsistency between the terms of the NFL Letter Agreement and the terms of any Operative Document (including without limitation this Agreement), the terms of the NFL Letter Agreement will control.

(k)   *Pledge by Party B to Trustee.* The parties acknowledge that Party B has pledged, pursuant to the Covered Indenture, its rights to receive payments from Party A under this Agreement to The Bank of New York, as Trustee, to secure certain of its obligations under the Covered Indenture.

- 15 -

(l)    **Confirmation Procedures.**  For each Transaction that Party A and Party B enter into hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation to Party A or request correction of any error within three Business Days of receipt.  Failure of Party B to respond within such period shall not affect the validity or enforceability of such Transaction and shall be deemed to be an affirmation and acceptance of such terms.

(m)    **Consent to Recording.**  Each party consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties, with or without the use of a warning tone, and their Affiliates in connection with this Agreement or any potential Transaction.

(n)    **Transfer.**  The following amendments are hereby made to Section 7:

    (i)    In the third line, insert the words "which consent will not be arbitrarily withheld or delayed," immediately before the word "except";

    (ii)    in clause (a), insert the words "or reorganization, incorporation, reincorporation, or reconstitution into or as," immediately before the word "another"; and

    (iii)    add at the end of Section 7, a new sentence, "Notwithstanding the foregoing, Party A, without consent of Party B, may transfer this Agreement or its interests or its obligations in or under this Agreement to any Reference Market-maker whose unenhanced senior unsecured long-term debt rating (disregarding any insurance or other support with respect to such debt) (or that of the entity guaranteeing its obligations) assigned by Moody's, Fitch, or S&P is not below the rating assigned by the same rating agency to the unenhanced senior unsecured long-term debt rating (disregarding any insurance or other support with respect to such debt) of Party A's Credit Support Provider at the time of transfer."

(o)    **Performance on Behalf of Party B.**  Payment and performance obligations due from Party B hereunder may be paid or performed by the Insurer, the Trustee under the Covered Indenture, the NFL under the NFL Letter Agreement, or any other person authorized by Party B to make such payment on Party B's behalf, and Party A agrees to accept payment and performance for purposes of this Agreement as if made directly from Party B.

(p)    **Non-Petition.**  Party A agrees that it will not, prior to the date which is at least one year and one day or, if longer, the then applicable preference period following the payment in full of all the Bonds issued pursuant to the Covered Indenture and the expiration of all applicable preference periods under Title 11 of the United States Code or other applicable law relating to any such payment, acquiesce, petition or otherwise invoke or cause Party B to invoke the process of any governmental authority for the purpose of commencing or sustaining a case (whether voluntary or involuntary) against Party B under any bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of Party B or any substantial part of its property or ordering the winding-up or liquidation of the affairs of Party B.  Nothing contained herein shall prohibit Party A from submitting a claim, or proof of claim, in any proceeding or process instituted by or against Party B by any person other than Party A or its Affiliates.

(q)    **Foreclosure Notice.**  Notwithstanding any contrary provision of this Agreement, each of Party A and the Insurer hereby covenants and agrees that (i) it will not commence a Foreclosure (as defined in the NFL Agreement) and (ii) such party does not have the right to commence a Foreclosure, in each case, unless and until a Foreclosure Notice has been delivered.  Notwithstanding the

NYK 1112854-9.071370.0011

foregoing, the parties hereto acknowledge that Party A or the Insurer may deliver a Foreclosure Notice under the NFL Agreement at any time that Party A or the Insurer has designated an Early Termination Date hereunder in accordance with the terms hereof.

NYK 1112854-9.071370.0011

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Title:    Vice President

GIANTS STADIUM LLC

By: _____

Title: _____

- 17 -

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____

Title:_____

GIANTS STADIUM LLC

By:_____

Title:_____

**John K. Mara**
**Authorized Representative**

- 17 -

<u>EXHIBIT A to Schedule</u>

<u>GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.</u>

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and GIANTS STADIUM LLC ("Party B") have entered into a Master Agreement (FSA-Insured) dated as of July 27, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity, by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of any obligation of Party A under the Agreement , the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment with respect to any Event of Default or Potential Event of Default, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until receipt by Party B of a written notice of termination from Guarantor. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in <u>Section 5(a)(vii)</u> of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)    Guarantor shall have no right of subrogation with respect to any payments made under this Guarantee until all obligations of the Guaranteed Party under the Agreement are paid in full.

(h)    Guarantor represents and warrants (which representations and warranties shall be deemed to have been made by Guarantor on the date of each Transaction) that:

      i.    Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

      ii.    Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

      iii.    no consent or authorization of, filing with, or other act by or in respect of, any governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

      iv.    this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

      v.    the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(i)    Any provision of this Guarantee which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(j)    No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege, and no waiver by Party B of any right or remedy hereunder on any one occasion shall be construed as a bar to any right or remedy which Party B would otherwise have on any future occasion. No failure to exercise, nor any delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

(k)    If any term, provision, covenant, or condition of this Guarantee, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Guarantee had been executed with the illegal, invalid or unenforceable portion

NYK 1112854-9.071370.0011

eliminated, so long as this Guarantee as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Guarantee and the deletion of such portion of this Guarantee will not substantially impair the respective benefits or expectations of the parties to this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

**By:** _____

**Name:**

**Title:**

**Date:**

Exhibit A
Page 3

EXHIBIT B to Schedule

[Form of Opinion of Counsel for
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[DATE]

Giants Stadium LLC
[ADDRESS]

[*With respect to each Insured Transaction*:

Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019]

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc,. a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (FSA-Insured), including the Schedule and Credit Support Annex thereto (collectively, the "Master Agreement"), dated as of July 27, 2007 between Party A and Giants Stadium LLC, the related Confirmation, dated July 27, 2007, between Party A and Party B (the "Confirmation" and, together with the Master Agreement, the "Agreement") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Agreement and the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York which, in my experience, are normally applicable to transactions of the type contemplated by the Agreement and the Guarantee. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or

Exhibit B
Page 1

validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2. The execution, delivery and performance of the Agreement in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3. The Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, have been duly executed and delivered and each constitutes a legal, valid and binding obligation, enforceable against it in accordance with its respective terms.

4. No Governmental Approval is required in connection with the execution, delivery and performance of the Agreement in the case of Party A, or the Guarantee, in the case of Guarantor, except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to:    (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.    My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered solely to you solely for your benefit in connection with the Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any

other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman Brothers Holdings Inc., except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Party A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement or the Guarantee.

E.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Party A and Guarantor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Party A, and (vi) that the Agreement is the legal, valid, binding and enforceable obligation of each party other than Party A, enforceable against each such party in accordance with its terms.

F.    My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreement and the Guarantee may not be enforceable, but such unenforceability will not render the Agreement or the Guarantee invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with said opinions.

Very truly yours,

NYK 1112854-9.071370.0011

<u>EXHIBIT C to Schedule</u>

[Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Special Financing Inc.
New York, NY

Lehman Brothers Holdings Inc.
New York, NY

*[With respect to each Insured Transaction*:

Financial Security Assurance Inc.
31 West 52nd Street
New York, NY 10019]

Ladies and Gentlemen:

We have acted as counsel to Giants Stadium LLC, a limited liability company of the State of Delaware ("Party B") in connection with the execution and delivery of the Master Agreement (FSA-Insured), including the Schedule and Credit Support Annex thereto, dated as of July 27, 2007 (the "Master Agreement"), between Lehman Brothers Special Financing Inc. ("Party A") and Party B, and the Confirmations, dated July 27, 2007 (the "Initial Confirmation(s)"), each between Party A and Party B. The Master Agreement is to be supplemented by additional confirmations of Transactions to be entered into by Party A and Party B from time to time (each an "Additional Confirmation") and the Master Agreement together with the Initial Confirmation(s) and all such Additional Confirmations shall constitute one agreement.

In connection with this opinion, we have examined executed copies of the Master Agreement and the Initial Confirmation(s), and such documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

Based upon the foregoing, we are of the opinion that:

1.      Party B is a limited liability company of the State of Delaware duly organized and validly existing under the laws of the State of Delaware.

2.      Party B is authorized to enter into the Master Agreement, the Initial Confirmation(s) and each Additional Confirmation and to perform its obligations thereunder.

3.      Party B has taken all necessary action required to be taken to ensure that the Master Agreement, the Initial Confirmation(s) and each Additional Confirmation comply in all respects with [charter and/or by-laws].

4.      The Master Agreement and the Initial Confirmation(s) have been duly executed and delivered by Party B and constitutes, and each Additional Confirmation, upon due

Exhibit C
Page 1

execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

5.      To the best of our knowledge, no consent, authorization, license or approval of, or registration or declaration with, any governmental authority is required in connection with the execution, delivery and performance of the Master Agreement, the Initial Confirmation(s) and each Additional Confirmation by Party B.

6.      [Opinion re: security and source of payment of Party B's obligations, enforceability of Covered Indenture.]

Very truly yours,

Exhibit C
Page 2

## EXHIBIT D to Schedule

### Form of Resolutions

RESOLVED that (i) _____ ("_____") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Agreement (the "Agreement") dated as of _____, ____, between Lehman Brothers Special Financing Inc. ("Lehman") and _____, in the form previously presented to _____ (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by _____ into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that _____ is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of _____ authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a net basis, i.e., where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of _____ be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of _____ and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of _____ in connection with or related to the matters set forth in or reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of _____.

NYK 1112854-9.071370.0011

## EXHIBIT E to Schedule

### Officer's Certificate

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of _____ (the "_____") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of _____, ____, between Lehman Brothers Special Financing Inc. ("Lehman") and _____ that:

_____ has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [its charter and/or by-laws], including

[set forth any actions required to be taken.]

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN WITNESS WHEREOF, this Certificate has been executed as of this _____ day of _____, ____.

NYK 1112854-9.071370.0011

EXHIBIT F to Schedule

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# CREDIT SUPPORT ANNEX

to the Schedule to the

**ISDA MASTER AGREEMENT**

**(FSA-Insured)**

**dated as of July 27, 2007**

between

| LEHMAN BROTHERS SPECIAL FINANCING INC. | and | GIANTS STADIUM LLC |
|---|---|---|
| **("Party A")** | | **("Party B")** |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1.     Interpretation**

(a)     *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the Pledgor will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.     Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

NYK 1112854-9.071370.0011

**Paragraph 3.**          **Credit Support Obligations**

(a)      *Delivery Amount.* Subject to Paragraphs 4 and 5, upon demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds, the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

> (i)      the Credit Support Amount
>
> exceeds
>
> (ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)      *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

> (i)      the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party
>
> exceeds
>
> (ii)      the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)      *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

> (i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and
>
> (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)      *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

NYK 1112854-9.071370.0011

(c)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time.  The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

(d)    *Substitutions.*

(i)  Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5.        Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i)  In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A)    utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B)    calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction);

(C)    utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

NYK 1112854-9.071370.0011

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6.**      **Holding and Using Posted Collateral**

(a)      *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)      *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii)*Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)      *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

NYK 1112854-9.071370.0011

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)      *Distributions and Interest Amount.*

(i)   *Distributions.*   Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii)  *Interest Amount.*   Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).   The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7.          Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)   that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii)  that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8.          Certain Rights and Remedies

(a)      *Secured Party's Rights and Remedies.*   If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)   all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)  any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

Exhibit F
Page 5

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)    *Pledgor's Rights and Remedies.*  If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i)  the Pledgor may exercise all rights and remedies available to a Pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)  the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

    (A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

    (B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.*  The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.*  When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

NYK 1112854-9.071370.0011

**Paragraph 9.**            **Representations**

Each party represents to the other party (which representation will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i) it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii) it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obliged to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that the Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create,

NYK 1112854-9.071370.0011

preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)    **Further Protection.**  The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)    **Good Faith and Commercially Reasonable Manner.**  Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)    **Demands and Notices.**  All demands and notices given by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)    **Specifications of Certain Matters.**  Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

## Paragraph 12.  Definitions

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means, with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c).  Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-

NYK 1112854-9.071370.0011

market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

> (x)    the amount of Cash on that day; multiplied by

> (y)    the Interest Rate in effect for that day; divided by

> (z)    360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day,"* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

NYK 1112854-9.071370.0011

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered in book-entry, the giving of written instruments to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated, and subject to Paragraph 5 in the case of a dispute, with respect to:

(i) Eligible Collateral or Posted Collateral that is:

(A) Cash, the amount thereof; and

(B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

NYK 1112854-9.071370.0011

(iii)  Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

NYK 1112854-9.071370.0011

**Paragraph 13.  Elections and Variables**

(a)    *Security Interest for "Obligations".*  The term **"Obligations"** as used in this Annex includes the following additional obligations:

> With respect to Party A: Not applicable.

> With respect to Party B: Not applicable.

(b)    *Credit Support Obligations.*

> (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

>> (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

>> (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

>> (C)    *"Credit Support Amount"* means, for any Valuation Date (i) 105% of the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to Pledgor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

> (ii)    *Eligible Collateral.*  The following items will qualify as **"Eligible Collateral"** for the party specified:

|  | Collateral Type | Party A | Valuation Percentage |
|---|---|---|---|
| (A) | Cash, in the form of U.S. Dollars | [X] | 100% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than one year ("Treasury Bills") | [X] | 100% |
| (C) | negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than one year but not more than ten years ("Treasury Notes") | [X] | 98% |
| (D) | negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of more than ten years ("Treasury Bonds") | [X] | 95% |

NYK 1112854-9.071370.0011

(E)     Other: negotiable debt obligations issued by the          [X]          95%
Federal National Mortgage Association, the
Government National Mortgage Corporation the
Federal Home Loan Mortgage Corporation,
provided, however, that such securities may not be
(a) multi-class or multi-branch securities, (b)
paying interest or principal only ("Agency
Securities"), (c) securities representing residual
interests in mortgage pools, or (d) securities that
are not listed on a national securities exchange or
regularly quoted on a national quotation service.

(iii)     *Other Eligible Support.* The following items will qualify as **"Other Eligible Support"**
for the party specified:  Not applicable.

(iv)     *Thresholds.*

(A)     *"Independent Amount"* shall mean an amount, if any, as set forth in a
confirmation with respect to Party A.

*"Independent Amount"* shall mean an amount, if any, as set forth in a
confirmation with respect to Party B.

(B)     *"Threshold"* as of any date shall be the amount set forth in Schedule I hereto
under the caption "Threshold" and shall be, with respect to Party A, the amount
set forth opposite the unenhanced rating classification (i.e. disregarding any
insurance or other support with respect to same) assigned to any long-term
unsecured, unsubordinated, debt securities of Party A's Credit Support Provider
by any Relevant Rating Agency and, with respect to Party B, shall be not
applicable.  If at any time all unenhanced (i.e. disregarding any insurance or other
support with respect to same) outstanding long-term unsecured, unsubordinated
debt securities of Party A's Credit Support Provider shall not be rated by any of
the Relevant Rating Agencies, the Threshold for Party A shall be zero (USD
0.00).   In the event of a split rating classification by the Relevant Rating
Agencies the Threshold shall be the amount opposite the lowest of the ratings on
Schedule I hereto.   "Relevant Rating Agency" for the purposes hereof means
S&P, Moody's and Fitch.

(C)     *"Minimum Transfer Amount"* as of any date shall be the amount set forth in
Schedule I hereto under the caption "Minimum Transfer Amount" and shall be,
with respect to Party A, the amount set forth opposite the unenhanced rating
classification (i.e. disregarding any insurance or other support with respect to
same) assigned to any long-term unsecured, unsubordinated, debt securities of
Party A's Credit Support Provider by any Relevant Rating Agency and, with
respect to Party B, shall be USD 1,000,000.  If at any time all outstanding long-
term unenhanced (i.e. disregarding any insurance or other support with respect to
same) unsecured, unsubordinated debt securities of Party A's Credit Support
Provider shall not be rated by any of the Relevant Rating Agencies, the Minimum
Transfer Amount for Party A shall be zero (USD 0.00).  In the event of a split
rating classification by the Relevant Rating Agencies the Minimum Transfer

NYK 1112854-9.071370.0011

Amount shall be the amount opposite the lowest of the ratings on Schedule I hereto. "Relevant Rating Agency" for the purposes hereof means S&P, Moody's and Fitch.

(D)   *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of $10,000.

(c)   *Valuation and Timing.*

(i)   *"Valuation Agent"* means Party A.

(ii)   *"Valuation Date"* means (i) at any time that the Credit Support Amount with respect to Party A as the Pledgor exceeds $0, each New York Banking Day and (ii) at any time that the Credit Support Amount with respect to Party A as the Pledgor does not exceed $0, each Friday, and if such day does not fall on a Local Business Day, then the next following day that is a Local Business Day.

(iii)   *"Valuation Time"* means the close of business in the location where the relevant product is traded; provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)   *"Notification Time"* means by 3:00 p.m., New York time, on a Local Business Day.

(d)   *Conditions Precedent and Secured Party's Rights and Remedies.* Paragraph 4(a) is hereby amended and restated in its entirety as follows:

"(a)   *Conditions Precedent.* Each Transfer obligation of Party A, as Pledgor, under Paragraphs 3 and 5 is subject to the condition precedent that no Additional Termination Event set forth in Part 1(1)(ii) of the Schedule to this Agreement has occurred and is continuing with respect to Party B.

Each Transfer obligation of Party B, as Secured Party, under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i)   no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii)   no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party."

(e)   *Substitution*

(i)   *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here:  Not later than two (2) Local Business Days following the Secured Party's receipt of Substitute Credit Support.

(ii)   *Consent.* The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)   *Dispute Resolution*

NYK 1112854-9.071370.0011

(i)     *"Resolution Time"* means 1:00 p.m. New York time on the fifth Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 5.

(ii)     *"Value."* For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Treasury Bills, Treasury Notes, Treasury Bonds or Agency Securities (referred to herein as "Government Obligations") the sum of (I)(x) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day, next preceding such date, on which such quotations were available, plus (II) the accrued interest on such Government Obligations (except to the extent Transferred to a party pursuant to this Agreement or included in the applicable price referred to in (I) of this Clause) as of such date.

(iii)    *Alternative.* Not Applicable.

(g)    *Holding and Using Posted Collateral.*

(i)    *Eligibility to Hold Posted Collateral; Custodians.*

Party B will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(1)    Party B is not a Defaulting Party and no Additional Termination Event under Part 1(l)(ii) of the Schedule to this Agreement shall have occurred and be continuing.

Party B's Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), <u>provided</u> that the following conditions applicable to it are satisfied:

(1)    The Custodian, if any, is a bank or trust company located in the State of New York having total assets of at least $100,000,000.

Initially, the Custodian for Party B is: To be provided by Party B in writing prior to the initial Transfer of Eligible Credit Support by Party A.

(ii)    *"Use of Posted Collateral"* The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    *Distributions and Interest Amount.*

(i)    *"Interest Rate."* The Interest Rate will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii)    *"Transfer of Interest Amount."* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii)    *"Alternative to Interest Amount."* Not applicable.

(i)    *Additional Representation(s).* Not applicable.

NYK 1112854-9.071370.0011

(j)    **Other Eligible Support and Other Posted Support.**

    (i)    **"Value"** with respect to Other Eligible Support and Other Posted Support means: Not applicable.

    (ii)    **"Transfer"** with respect to Other Eligible Support and Other Posted means: Not applicable.

(k)    **Demands and Notices.** All demands, specifications and notices made by a party to this Annex will be made pursuant to the Notices Section of this Agreement.

(l)    **Addresses for Transfers.**

Party A:

    (i)    In the case of cash, by wire transfer of immediately available funds for credit to a bank account of Party A to be designated in Party A's demand for the Delivery Amount or Return Amount, as applicable.

    (ii)    In the case of securities or obligations that can be paid or delivered by book-entry on the records of U.S. Federal Reserve Banks, delivery to Chase, for credit to the account of Lehman Brothers Inc., as agent for Party A (in telegraphic abbreviation, CHASE NYC/LEHMAN, ABA #021000021).

Party B:

To be provided by Party B in writing prior to the initial Transfer of Eligible Credit Support by Party A.

(m)    **Agreement as to Single Secured Party and Pledgor.** Party A and Party B agree that, notwithstanding anything to the contrary in the recital to this Annex, Paragraph 1(b) or Paragraph 2 or the definitions in Paragraph 12, (a) the term **"Secured Party"** as used in this Annex means only Party B, (b) the term **"Pledgor"** as used in this Annex means only Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder.

NYK 1112854-9.071370.0011

Schedule I

| Moody's | S&P | Fitch | Threshold | Minimum Transfer Amount |
|---|---|---|---|---|
| Aa3 or higher | AA- or higher | AA- or higher | Infinity | Zero |
| A1 | A+ | A+ | $15,000,000 | $1,000,000 |
| A2 | A | A | $10,000,000 | $1,000,000 |
| A3 or lower | A- or lower | A- or lower | $0 | $100,000 |

NYK 1112854-9.071370.0011