Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP)

5

6    - - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8

9    LEHMAN BROTHERS HOLDINGS INC., et al.

10

11             Debtors.

12

13    - - - - - - - - - - - - - - - - - - - -x

14             United States Bankruptcy Court

15             One Bowling Green

16             New York, New York

17

18             April 13, 2011

19             10:02 AM

20

21    B E F O R E:

22    HON. JAMES M. PECK

23    U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    HEARING re Debtors' Motion for Authorization to Make Additional

3    Investments with Respect to 25 and 45 Broad Street

4

5    HEARING re Motion of Lehman Commercial Paper Inc. for Authority

6    to Consent to its Non-Debtor Affiliate Lehman ALI Inc. (i)

7    Entering into Commitment Letter with Innkeepers USA Trust; (ii)

8    Supporting the Chapter 11 Plan of Certain Affiliates of

9    Innkeepers USA Trust; and (iii) Participating in the Auction

10   for Certain of the Assets or Equity of Innkeepers USA Trust

11

12   HEARING re Debtors' Motion for Approval of the Purchase of

13   Notes Issued by Pine CCS, Ltd. from Barclays Bank PLC and the

14   Termination of the Pine Securitization

15

16   HEARING re Notice of Presentment of Amended Order Authorizing

17   the Debtors to Establish Procedures for the Settlement or

18   Assumption and Assignment of Pre-Petition Derivative Contracts

19

20   HEARING re Debtors' Motion to Compel The Ad Hoc Group of Lehman

21   Brothers Creditors to Comply with Federal Rule of Bankruptcy

22   Procedure 2019

23

24

25

**Page 3**

1

2    HEARING re Motion of the Ad Hoc Group of Lehman Brothers

3    Creditors for Entry of (I) an Order Scheduling a Disclosure

4    Statement Hearing and Approving the Form and Manner of Notice

5    Thereof and (II) an Order Approving the Disclosure Statement

6

7    HEARING re Debtors' Motion for Authorization to Establish and

8    Implement Procedures in Connection with Discovery Related to

9    Plan Confirmation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

Page 4

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors and Debtors-in-Possession

5         767 Fifth Avenue

6         New York, NY 10153

7

8   BY:   HARVEY R. MILLER, ESQ.

9         JACQUELINE MARCUS, ESQ.

10        LORI R. FIFE, ESQ.

11        RICHARD A. SLACK, ESQ.

12        RANDI W. SINGER, ESQ.

13

14   WEIL, GOTSHAL & MANGES LLP

15         Attorneys for Debtors and Debtors-in-Possession

16         700 Louisiana

17         Suite 1600

18         Houston, TX 77002

19

20   BY:   ALFREDO R. PEREZ, ESQ.

21

22

23

24

25

Page 5

1

2   WEIL GOTSHAL & MANGES LLP

3        Attorneys for Debtors and Debtors-in-Possession

4        1300 Eye Street, NW

5        Suite 900

6        Washington, DC 20005

7

8   BY:   JAIME S. KAPLAN, ESQ.

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for SIPA Trustee, James W. Giddens

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   JEFFREY S. MARGOLIN, ESQ.

16        DAVID WILTENBURG, ESQ.

17

18

19

20

21

22

23

24

25

Page 6

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3          Attorneys for the Official Committee of Unsecured

4           Creditors

5          One Chase Manhattan Plaza

6          New York, NY 10005

7

8    BY:   EVAN R. FLECK, ESQ.

9          STACEY J. RAPPAPORT, ESQ.

10         DENNIS O'DONNELL, ESQ. (TELEPHONICALLY)

11

12   MILBANK, TWEED, HADLEY & MCCLOY LLP

13         Attorneys for the Official Committee of Unsecured

14          Creditors

15         International Square Building

16         Washington, DC 20006

17

18   BY:   DAVID S. COHEN, ESQ.

19

20

21

22

23

24

25

Page 7

1

2    QUINN EMANUEL URQUHART & SULLIVAN LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         51 Madison Avenue

6         22nd Floor

7         New York, NY 10010

8

9    BY:   ROBERT K. DAKIS, ESQ.

10

11   U.S. DEPARTMENT OF JUSTICE

12        Office of the United States Trustee

13        33 Whitehall Street

14        21st Floor

15        New York, NY 10004

16

17   BY:   ANDREA B. SCHWARTZ, TRIAL ATTORNEY

18

19   BINGHAM MCCUTCHEN LLP

20        Attorneys for State Street Bank

21        One Federal Street

22        Boston, MA 02110

23

24   BY:   SABIN WILLETT, ESQ.

25

Page 8

1

2   BROWN RUDNICK LLP

3         Attorneys for Newport Global Advisors LP, Newport Global

4          Opportunities Fund (Master) L.P., Newport Global

5          Opportunities Fund L.P., PEP Credit Investor L.P.,

6          Providence Equity Partners VI L.P., Providence Equity

7          Partners VI-A L.P. and Providence TMT Special Situations

8          Fund L.P.

9         Seven Times Square

10        New York, NY 10036

11

12   BY:   HOWARD S. STEEL, ESQ.

13

14   BROWN RUDNICK LLP

15        Attorneys for Ad Hoc Group of Creditors

16        One Financial Center

17        Boston, MA 02111

18

19   BY:   ANGELO THALASSINOS, ESQ.

20

21

22

23

24

25

**Page 9**

1

2  CADWALADER, WICKERSHAM & TAFT LLP

3       Attorneys for Morgan Stanley and Lehman Re Ltd.

4       One World Financial Center

5       New York, NY 10281

6

7  BY:   ELLEN M. HALSTEAD, ESQ.

8        PETER FRIEDMAN, ESQ.

9        INGRID BAGBY, ESQ.

10

11  CLEARY GOTTLIEB STEEN & HAMILTON LLP

12       Attorneys for Barclays Bank PLC and Its Affiliates;

13        Goldman Sachs and DE Shaw

14       One Liberty Plaza

15       New York, NY 10008

16

17  BY:   SEAN A. O'NEAL, ESQ.

18        THOMAS J. MOLONEY, ESQ.

19        LINDSEE P. GRANFIELD, ESQ.

20        BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)

21

22

23

24

25

Page 10

1

2   CLIFFORD CHANCE US LLP

3        Attorneys for Credit Agricole Corporate and Investment

4         Bank

5        31 West 52nd Street

6        New York, NY 10019

7

8   BY:   SARA M. TAPINEKIS, ESQ.

9

10   CRAVATH, SWAINE & MOORE LLP

11        Attorneys for Credit Suisse International

12        Worldwide Plaza

13        825 Eighth Avenue

14        New York, NY 10019

15

16   BY:   RICHARD LEVIN, ESQ.

17

18

19

20

21

22

23

24

25

Page 11

1

2    DAVIS POLK & WARDWELL LLP

3           Attorneys for Lehman Brothers Inc. Europe

4           450 Lexington Avenue

5           New York, NY 10017

6

7    BY:   MARSHALL HUEBNER, ESQ.

8           JAMES WINDELS, ESQ.

9           BRIAN M. RESNICK, ESQ.

10          CHRISTOPHER ROCHE, ESQ.

11

12   DECHERT LLP

13          Attorneys for Lehman ALI

14          1095 Avenue of the Americas

15          New York, NY 10036

16

17   BY:   MICHAEL J. SAGE, ESQ.

18

19   DEWEY & LEBOEUF LLP

20          Attorneys for Royal Bank of Scotland

21          1301 Avenue of the Americas

22          New York, NY 10019

23

24   BY:   IRENA M. GOLDSTEIN, ESQ.

25

```
 1

 2    DEWEY & LEBOEUF LLP

 3         Attorneys for Royal Bank of Scotland

 4         1301 Avenue of the Americas

 5         New York, NY 10019

 6

 7    BY:   MONIKA WIENER, ESQ.

 8         ELIZABETH P. SMITH, ESQ.

 9         (TELEPHONICALLY)

10

11    DLA PIPER LLP

12         Attorneys for Pension Benefit Guaranty Fund of Government

13          of Canada

14         919 North Market Street

15         Suite 1500

16         Wilmington, Delaware 19801

17

18    BY:   SELINDA A. MELNIK, ESQ.

19

20

21

22

23

24

25
```

Page 13

1

2    FRESHFIELDS BRUCKHAUS DERINGER US LLP

3         Attorneys for Deutsche Bundesbank

4         520 Madison Avenue

5         34th floor

6         New York, NY 10022

7

8    BY:    WALTER STUART, ESQ.

9

10   GODFREY & KAHN, S.C.

11        Attorneys for Fee Committee

12        One East Main Street,

13        Suite 500

14        Madison, WI 53701

15

16   BY:    BRADY C. WILLIAMSON, ESQ.

17         KATHERINE STADLER, ESQ.

18         (TELEPHONICALLY)

19

20   KIRKLAND & ELLIS LLP

21        Attorneys for

22        601 Lexington Avenue

23        New York, NY 10022

24

25   BY:    BRIAN S. LENNON, ESQ.

Page 14

1

2    KIRKLAND & ELLIS LLP

3          Attorneys for Farallon Capital Partners, L.P.

4          300 North LaSalle

5          Chicago, IL 60654

6

7    BY:   JEFFREY W. GETTLEMAN, ESQ.

8          JAMES A. STEMPEL, ESQ.

9          (TELEPHONICALLY)

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12          Attorneys for Bank of New York Mellon as Indenture

13           Trustee; KPMG as Trustee for Lehman Brothers Singapore

14          1177 Avenue of the Americas

15          New York, NY 10036

16

17   BY:   GREGORY A. HOROWITZ, ESQ.

18          THOMAS MOERS MAYER, ESQ.

19          CRAIG SIEGEL, ESQ.

20

21

22

23

24

25

Page 15

1

2   LATHAM & WATKINS LLP

3        Attorneys for Bundesverband deutscher Banken e.V.

4        53rd at Third

5        885 Third Avenue

6        New York, NY 10022

7

8   BY:   MARK A. BROUDE, ESQ.

9

10   LINKLATERS LLP

11        Attorneys for Joint Administrators of the UK

12         Administration Companies

13        One Silk Street

14        London

15        EC2Y 8HQ

16

17   BY:   TITIA HOLTZ, ESQ.

18        (TELEPHONICALLY)

19

20

21

22

23

24

25

Page 16

1

2      MCCARTER & ENGLISH LLP

3            Attorneys for Occidental Energy Marketing

4            Renaissance Centre

5            405 North King Street

6            8th Floor

7            Wilmington, DE 19801

8

9      BY:   DANIEL M. SILVER, ESQ.

10           (TELEPHONICALLY)

11

12     PAUL, HASTINGS, JANOFSKY & WALKER LLP

13           Attorneys for CarVal Investors U.K.

14           75 East 55th Street

15           New York, NY 10022

16

17     BY:   LUC A. DESPINS, ESQ.

18

19     REED SMITH LLP

20           Attorneys for Bank of New York Corporate Trustee Services

21           599 Lexington Avenue

22           22nd Floor

23           New York, NY 10022

24

25     BY:   DAVID M. SCHLECKER, ESQ.

Page 17

1

2    REED SMITH LLP

3          Attorneys for Bank of New York Corporate Trustee Services

4          225 Fifth Avenue

5          Pittsburgh, PA 15222

6

7    BY:   ERIC A. SCHAFFER, ESQ.

8          (TELEPHONICALLY)

9

10   ROBBINS GELLER RUDMAN & DOWD LLP

11         Attorneys for the Minibond Noteholder Plaintiffs

12         Post Montgomery Center

13         One Montgomery Street

14         Suite 1800

15         San Francisco, CA 94104

16

17   BY:   JASON C. DAVIS, ESQ.

18

19   WHITE & CASE LLP

20         Attorneys for Ad Hoc Group of Lehman Brothers Creditors

21         1155 Avenue of the Americas

22         New York, NY 10036

23

24   BY:   GERARD UZZI, ESQ.

25         J. CHRISTOPHER SHORE, ESQ.

1

2    STUTMAN, TREISTER & GLATT

3         Attorneys for Stutman, Treister & Glatt; Perry Capital

4         1901 Avenue of the Stars

5         12th Floor

6         Los Angeles, CA 90067

7

8    BY:   MARINA FINEMAN, ESQ.

9         MICHAEL NEUMEISTER, ESQ.

10        (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 19 of 142

Page 19

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  Be seated, please.  We have

3    a lot of people standing in the aisle.  And we do have an

4    overflow room.  I'm just going to make the statement that some

5    of you will be a lot more comfortable if you don't have a

6    speaking role or anticipate one going down the hall to Room

7    608.  I'm not going to compel it but I'm going to suggest it

8    because it would be not only more comfortable for you but for

9    everybody else.

10           MR. MILLER:  Good morning, Your Honor.  Harvey Miller,

11   Weil, Gotshal & Manges, for the debtors.  This is the April

12   omnibus hearing, Your Honor.  Looking at the size of the

13   overflow, I tend to say you may not believe it but it's a

14   relatively short agenda.  There are seven matters on the agenda

15   for this morning including, Your Honor, three uncontested

16   matters.  Mr. Perez will be handling the first two uncontested

17   matters, Your Honor.

18           THE COURT:  Okay.  Thank you.

19           MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

20   on behalf of the debtors.  Your Honor, the first matter is a

21   matter involving 20-45 Broad.  That's a building not too far

22   from here that was the subject of a conversion.  Lehman is in

23   the process of foreclosing on the building and they need to add

24   some additional investment in it, approximately twenty-five

25   million dollars.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 142

Page 20

1          Your Honor, we've consulted with everyone.  There

2     doesn't seem to be any objections with respect to that.  We did

3     file an affidavit.  Mr. Fitts filed an affidavit in support of

4     that.  So we would request that that be entered.

5          THE COURT:  I've reviewed the papers and I'm prepared

6     to approve this.  There was a statement made by the ad hoc

7     group in reference to each of these uncontested matters

8     including 25 and 45 Broad Street.  But I recognize from reading

9     that that it's really more of a statement of their general

10    position in the case than it is a problem with this particular

11    motion.  But I'm just going to ask if anybody wishes to be

12    heard in reference to 25-45 Broad Street.  Apparently not, so

13    it's approved.

14         MR. PEREZ:  Thank you, Your Honor.  Your Honor, the

15    next matter that we have on the agenda is the Innkeepers'

16    motion.  Your Honor, that was also the subject of extensive

17    discussion with the ad hocs as well as various other groups.

18    We have filed, I think, three additional amended forms of

19    motion just to address all of the issues that were raised by

20    the various groups.

21         But just to recap, Your Honor, when we were here

22    before, we were doing a motion that basically took all the

23    hotels and converted Lehman's approximately 220 million dollar

24    mortgage into fifty percent of the equity.  This deal, Your

25    Honor, involves sixty-four of the hotels, the ones on which

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 142

Page 21

1    Lehman and Midland have liens.  It converts that to equity.

2    Lehman would get fifty percent of the interest plus twenty-six

3    million dollars in cash.  There is going to be a new manager,

4    likely, and there will be a sell-down of twenty percent of the

5    equity, ten percent each by Lehman and Five Mile, which is the

6    other participant.  And that would return approximately thirty-

7    five million dollars to the estate.  So if all of the

8    transactions are done, Lehman would end up with forty percent

9    of the equity in the reorganized debtor as well as

10   approximately sixty-one million dollars in cash.  The existing

11   DIP loan which the Court previously approved would be repaid.

12   It's less than ten million dollars right now.  And if the Court

13   recalls, that was really intended for capital improvements and

14   operating expenses on the hotels that were subject to our lien.

15          Your Honor, this -- unlike the last time, Your Honor,

16   this commitment letter has been approved by the Innkeepers

17   Court.  They have a disclosure statement hearing set for May.

18   Bids are due in late April.  The auction is the beginning of

19   May.  I think May 10th is the disclosure statement hearing in

20   that case.  And the confirmation hearing is scheduled for June,

21   Your Honor.  So again, we filed an affidavit on behalf of Mr.

22   Lascher who was the person directly involved.  And again, we

23   would request that the Court enter the order.

24          THE COURT:  I'm generally familiar with the Innkeepers

25   case and read Judge Chapman's decision in Innkeepers dated

Page 22

1   April 1 which recites some of the facts of the circumstances of

2   the auction process in that case.  I've also reviewed the

3   submissions in connection with what you're now requesting from

4   me.  And in the absence of objection, and there are none, this

5   is approved.

6          MR. PEREZ:  Thank you, Your Honor.  May the people who

7   are here for Innkeepers and 25 Broad be excused?

8          THE COURT:  I think that would be a good idea

9          MR. PEREZ:  Mr. Fitts and Mr. Lascher, specifically.

10         MS. MARCUS:  Good morning, Your Honor.  Jacqueline

11  Marcus of Weil Gotshal & Manges on behalf of Lehman Brothers

12  Holdings Inc. and its affiliated debtors.  Item number 3 on the

13  agenda, Your Honor, is the debtors' motion for approval of the

14  purchase of notes issued by Pine CCS, Ltd. from Barclays Bank

15  PLC and the termination of the Pine securitization.

16         As noted on the agenda, Your Honor, this is an

17  uncontested motion.  Nevertheless, in light of the magnitude of

18  the dollars involved and the Court's observations at other

19  hearings, I'd like to summarize the relief sought in the motion

20  and address any questions that the Court may have.

21         The debtors have filed a declaration and a

22  supplemental declaration of David Walsh of Alvarez & Marsal in

23  support of the motion.  Mr. Walsh, who is present in court, had

24  the primary responsibility for negotiating the proposed

25  transaction.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 23

1          Pursuant to the motion, the debtors seek approval for

2     Lehman Commercial Paper Inc. to purchase the Class A-1 notes

3     issued by Pine.  Specifically, Class A-1 notes held by Barclays

4     Bank PLC in the face amount of approximately 927 million for a

5     purchase price of 805 million dollars; and Class A-1 notes held

6     by LBHI in the amount of approximately 4.1 million dollars for

7     a price equal to par plus accrued interest.

8          Despite the purchase price of 805 million, as

9     described in the motion, LCPI only has to pay approximately 241

10    million of its unrestricted cash for the Barclays notes.  The

11    balance would come from cash being held by U.S. Bank on behalf

12    of Pine and cash held by LCPI in respect of collections on the

13    underlying assets.

14         Additional relief sought in the motion is

15    authorization for LBHI to release its contingent security

16    interest and certain securities issued by Pine that are held by

17    LCPI, namely, the Class A-2 notes and the Class B notes, which

18    have no amounts outstanding, and the subordinated note in the

19    amount of thirty-two million dollars.  As set forth in the

20    motion, the debtors have concluded that it's very unlikely that

21    the circumstances that could give rise to such a security

22    interest would ever materialize.

23         Finally, Your Honor, out of an abundance of caution,

24    the motion seeks authority for LCPI once it has acquired all of

25    the notes to terminate the Pine securitization, the effect of

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 24 of 142

Page 24

1    which would be to restore the underlying assets, the loans that

2    were participated to Pine to LCPI which is the lender of record

3    on most of the loans.  Termination of the Pine securitization

4    will enable LCPI to more actively manage the portfolio and

5    thereby maximize its value.  A summary of the terms of the note

6    sale and termination agreement is included in the motion.

7          The debtors engaged in extensive negotiations with

8    representatives of the creditors' committee prior to reaching

9    the agreement with Barclays.  In addition, subsequent to the

10   filing of the motion, the debtors have engaged in discussions

11   with representatives of the ad hoc committee, the SIPA trustee

12   and other creditors.  As a result of such continuing

13   discussions, we made a clarifying change to the note sale and

14   termination agreement and a change to the proposed order each

15   of which was filed, together with blacklined copies, yesterday

16   afternoon.

17          If I may approach, Your Honor, to hand you the

18   blacklined copies?

19          THE COURT:  Yes.  Thank you.

20          MS. MARCUS:  The change to the note sale and

21   termination agreement clarifies in Section 13 on page 7 of the

22   blacklined copy that nothing contained in the release provision

23   is intended to affect the parties' rights with respect to the

24   Rule 60(b) litigation other than with respect to the Barclays

25   notes.

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 25 of 142

Page 25

1          The change to the proposed order addresses the issues

2     raised by the ad hoc committee with respect to certain alleged

3     intercompany issues between the LBHI estates and the LCPI

4     estate and that change in the second decretal paragraph on page

5     3 of the blacklined order.

6          The creditors' committee has filed a statement in

7     support of the motion; the SIPA trustee has filed a statement

8     that indicates that it does not object to the motion.  And as

9     the Court noted, the ad hoc committee has filed a statement.

10    It appears that the ad hoc committee is seeking clarification

11    from the debtors regarding the effect of the supplemental

12    declaration filed on Friday.  To be perfectly clear, Your

13    Honor, the supplemental declaration was intended to supplement

14    the record for the Court and not intended to limit the

15    reservation of rights contained in the proposed order.

16         The debtors believe that the relief requested in the

17    motion is in their best interest and the best interest of their

18    creditors.  Accordingly, for all the reasons set forth in the

19    motion and based on the evidentiary support provided by the

20    Walsh declarations, unless the Court has further questions, the

21    debtors request that the Court enter the proposed order.

22         THE COURT:  I'm prepared to do that.  I've read the

23    Walsh declarations and I'm familiar with the Pine

24    securitization in part because it was the subject of discussion

25    and evidentiary support in connection with the 60(b)

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 142

Page 26

1    litigation.  But if any party wishes to comment, particularly

2    the creditors' committee, this is an opportunity to do that.

3    But this is an unopposed motion.

4           MR. DAKIS:  Your Honor, Robert Dakis from Quinn

5    Emanuel Urquhart & Sullivan for the official committee of

6    unsecured creditors.  As Your Honor is aware, the committee has

7    filed a statement in support of this motion.  I won't repeat

8    what's in our pleading, but I did want to focus on two areas

9    with which the committee took particular interest.

10          First, the committee's financial advisors had

11   considerable time to assess the economics of the transaction

12   including looking at the value of the underlying securities.

13   Based on the work done by the committee's financial advisors,

14   the committee is comfortable that the economics of the deal are

15   fair and reasonable and represent a sound exercise of the

16   debtors' business judgment.

17          Also, Your Honor, the committee focused particularly

18   on certain inter-estate issues.  And with the reservations of

19   rights that both the committee negotiated into the initial form

20   of the order and into the sale agreement and the reservations

21   of rights that the ad hoc group negotiated for, the committee

22   is comfortable that these issues are preserved until the

23   appropriate time.

24          THE COURT:  All right.  Thank you.  It's approved.

25          MR. MILLER:  Thank you, Your Honor.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 142

Page 27

 1          MS. MARCUS:  Your Honor, Richard Slack will handle the

 2     next matter on the agenda.  May I be excused?

 3          THE COURT:  You may be excused.

 4          MS. MARCUS:  Thank you.

 5        (Pause)

 6          THE COURT:  Good morning.

 7          MR. SLACK:  Good morning, Your Honor.  Richard Slack

 8     from Weil Gotshal & Manges for the debtors.  Your Honor, the

 9     matter I'm up here to handle is the approval of the sixth

10     supplemental order to establish procedures for the settlement

11     or assumption and assignment of derivative contracts.  We seek

12     a technical amendment after a request of the Bank of New York,

13     Your Honor, that authorizes the debtors to enter into

14     settlements with respect to certain transactions that are

15     listed in that motion in Exhibit 1.  And that would provide

16     that the debtor can resolve these matters without the need for

17     BNY to consent to the actual settlements.  All of these

18     transactions are transactions where BNY acts as trustee for the

19     noteholders of that particular series.  What makes this motion

20     a bit different, Your Honor, is that BNY has, in fact, agreed

21     to a settlement with respect to these transactions and has not

22     objected to the efforts to carve these transactions back into

23     the derivative procedures order.  To the contrary, Your Honor,

24     BNY has actually requested that this motion be made as a

25     condition to the settlement that's been reached.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 28

1          As we've informed the Court in the past, the

2   derivative procedures order has been a huge success.  It's

3   allowed the debtors to resolve disputes with nearly 3,000

4   counterparties without the expense and delay of 9019 hearings

5   and has allowed the debtors to collect over eleven billion

6   dollars as a result of these settlements.  This technical

7   amendment would allow us to continue with that success.

8          THE COURT:  Do I understand that the technical

9   amendment only applies to BNY as trustee?

10          MR. SLACK:  Yes, Your Honor.  And the reason for that

11   is that the history of the amendments here when we adopted the

12   original derivatives procedures order, there were a number of

13   objectors.  One of those was BNY.  And so, BNY, at the

14   beginning -- we had carved out all of the transactions that BNY

15   acted as a trustee.  Later on, Your Honor, we agreed in a

16   subsequent supplement to that order to allow them to

17   essentially be carved back in as long as BNY consented.  This

18   technical amendment requested by BNY literally just lists those

19   particular transactions that we're going to carve back in that

20   now can be settled even without BNY's consent.  And again, BNY

21   has, in fact, consented to this technical amendment.  So absent

22   BNY's objection, Your Honor, these would all be carved back in.

23          One bit of background, Your Honor, just because the

24   one objector we have raises it, is that the technical amendment

25   will allow the consummation of a settlement which is a

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 29

1    comprehensive settlement, Your Honor, with respect to the mini

2    bond transactions that I know Your Honor's aware of from the

3    adversary proceeding.  And as Your Honor will recall, there are

4    two levels to that:  there's the mini bond level and then

5    there's the Saphir level.  And I won't go through that.  But I

6    think the important thing for Your Honor is that this

7    settlement, which was enormously complicated, affects both the

8    mini bond level and the Saphir level.  And it had as parties

9    the trustees at both levels, the SPVs at both levels, PwC as

10   the receiver for the mini bonds.  So, Your Honor, it was quite

11   an effort to get this settlement negotiated.

12            At the end of the day, Your Honor, the settlement goes

13   through.  The mini bondholders will receive approximately

14   seventy to ninety-five percent of their original investment

15   depending on what series they hold.  And --

16            THE COURT:  This is the settlement that was structured

17   in Hong Kong.

18            MR. SLACK:  Well, this settlement actually is

19   obviously cross-border because it's a settlement -- it's a new

20   settlement that really goes on top of the one that had been

21   done in Hong Kong, Your Honor.  So this settlement was

22   negotiated by the parties to the swaps, LBSF, the trustees, the

23   SPVs, PwC as the receiver, and it goes on top of the one that

24   we talked about before, the Hong Kong settlement.

25            THE COURT:  And what's the status of the Hong Kong

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 142

Page 30

1    settlement?

2          MR. SLACK:  I think the Hong Kong settlement was

3    consummated completely, Your Honor.  So that settlement which

4    we talked about before had certain distributing banks buy some

5    of the mini bonds.  And so some of the mini bondholders got out

6    then.  And so, this is, again, on top of that, both for the

7    distributing banks who are also parties to the settlement, by

8    the way, as well as the rest of the mini bondholders that were

9    not necessarily in the original settlement.  So this

10    comprehensively will resolve everything, Your Honor.

11          THE COURT:  And what will the realization be for the

12    mini bondholders?

13          MR. SLACK:  For the mini bondholders?

14          THE COURT:  Yes.

15          MR. SLACK:  The mini bondholders, in this settlement,

16    will get somewhere between seventy percent and ninety-five

17    percent of their investment back depending on the series that

18    they hold.  One of the exhibits that was put in by the

19    objectors actually sets out the various charts for each series

20    what the recovery is going to be.

21          THE COURT:  And BNY's role in this is what?

22          MR. SLACK:  BNY is the trustee at the Saphir level.

23    So to the extent that there was a settlement at the Saphir

24    level, BNY was a party to the settlements with respect to those

25    transactions.  And those are the ones being carved back in in

1     the six supplemental procedures order.

2           THE COURT:  All right.  And is approval of this

3     supplement to the procedures order a condition to the

4     effectiveness of the settlement that you just described?

5           MR. SLACK:  It is, Your Honor.

6           THE COURT:  Okay.

7           MR. SLACK:  At BNY's request, they -- even though they

8     were signing the agreement and support this, they wanted there

9     to be a procedure by which the Court approved the derivatives

10    procedure supplement.

11          THE COURT:  Is BNY represented today and does BNY have

12    a position to express in connection with this contested matter?

13          MR. SCHLECKER:  Your Honor, David Schlecker from the

14    Reed Smith law firm for BNY Corporate Trustee Services.  Mr.

15    Slack has accurately and aptly stated the nature of the

16    settlement.  And BNY has requested that the sixth supplement,

17    the order, be signed by Your Honor and that it is a condition

18    precedent to the ultimate settlement going forward.  The

19    objectors in this case don't have any privity with BNY and, as

20    Mr. Slack has indicated, BNY is the trustee at the Dante level

21    and not at the mini bond level.

22          THE COURT:  All right.  Thank you.

23          MR. SLACK:  So, Your Honor, one more point about the

24    settlement which, frankly, is not at issue really in front of

25    Your Honor.  But one more point, I think, as a matter of

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 142

Page 32

1    background is that the settlement will only become final if

2    seventy-five percent of the noteholders at each series approve

3    it.  So in order for the settlement to go through, there has to

4    be widespread, not just a majority but a supermajority of the

5    mini bondholders have to approve this.

6         So, Your Honor, the only objection that we received

7    was from the Wong plaintiffs in connection with this.  As Your

8    Honor knows, the Wong plaintiffs have a separate adversary

9    proceeding relating to the mini bonds.  And the Wong plaintiffs

10   have essentially argued that the derivatives procedures order

11   should not be entered or the sixth supplement shouldn't be

12   entered because the settlement that it's conditioned on is

13   somehow too rich for the estate.  In other words, they're not

14   arguing that this isn't a good thing for the estate.  They're

15   arguing somehow that this isn't good for noteholders.

16        We think the objection should be overruled on a number

17   of grounds.  First, Your Honor, the mini bondholders have

18   already expressly consented to the settlement procedures in the

19   derivative procedures order.  As Your Honor might recall, the

20   Wong plaintiffs had filed an objection sort of in between the

21   supplement and the time we had the third supplement they filed

22   an objection.  We resolved that.  And there was a stipulation

23   that was put in place.  And the terms of that stipulation were,

24   number one, that the terms of the assumption and assignment

25   procedures of the derivatives order would not be applicable to

Page 33

1    derivatives contract related to the Wong plaintiffs series.  So

2    that's just the assignment and assumption procedures.  And it

3    says specifically that nothing else was modified including the

4    settlement procedures and that the Wong plaintiffs would

5    withdraw their objection.

6           What that means, Your Honor, is the Wong plaintiffs

7    have already agreed to be bound by the settlement procedures of

8    the derivative procedures order.  And as I just explained

9    earlier, the only reason these are getting carved back in is

10   because BNY had objected.  And if BNY is dropping their

11   objection then I would say that the Wong plaintiffs who've

12   already agreed to be bound by the settlement procedures don't

13   have the ability to go back with respect to the stipulation

14   that was signed in the order that Your Honor signed.

15          The second thing, Your Honor, is that the objection is

16   really misdirected.  As I said, the objection by the Wong

17   plaintiffs is not that the estate is somehow unfairly treated

18   in this settlement but that noteholders are unfairly treated.

19   But the derivatives procedures order, Your Honor is not

20   directed at fairness to noteholders.  Essentially, what the

21   derivatives procedures order does is it says if you go by the

22   procedures, you don't have to have the 9019 hearing.  And the

23   9019 hearing is directed at whether it's fair to the estate not

24   whether it's fair to other constituents such as noteholders.

25   So even if the derivatives procedures order wasn't entered as

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 34 of 142

Page 34

1    the Wong plaintiffs suggested it shouldn't be, all that would

2    happen, Your Honor, is likely we'd be back in a 9019 and none

3    of the objections that the Wong plaintiffs are making would be

4    relevant or available to them in a 9019 hearing.

5          The Second Circuit has stated in a Refco decision from

6    2007 -- and that's at 505 F.3d 109 -- exactly this proposition.

7    And in that case, which I think is analogous here, there was an

8    investment vehicle called Sphinx which was a Cayman Island

9    company and Refco was hired to manage the investments there.

10   When Refco filed for bankruptcy, or I should say just before,

11   it delivered 300 million to Sphinx on behalf of the investors.

12   And the estate then sought to return that money in a

13   preference.  Sphinx ended up negotiating a settlement with

14   respect to that preference action.  And investors came in and

15   said that that was too good for the estate.  In other words,

16   the investors were not being treated fairly.  And the Second

17   Circuit held that those investors of an investment company or,

18   essentially, a creditor, did not have standing.  They weren't a

19   party in interest for purposes of the Bankruptcy Code.  But the

20   Second Circuit also held that the kind of objection that was

21   made, i.e., that the investors were treated unfairly was not

22   appropriate for the 9019.  And the Second Circuit held "A

23   bankruptcy court's obligation is to determine whether a

24   settlement is in the best interest of the estate, not to ensure

25   that the creditors' representatives are honoring their

Page 35

1    fiduciary duties."  They then went on to say "We agree that the

2    bankruptcy court's astute observation that to permit investors

3    to lodge objections to the settlement on the basis of their

4    fiduciaries' appropriate approval would entirely skew the task

5    of bankruptcy court and that it would be extremely unfair to

6    debtors to force them to negotiate not only with the legal

7    representatives of creditors but also with any interest holders

8    of a creditor."

9          So again, in short, Your Honor, the arguments that the

10   Wong plaintiffs are making wouldn't be appropriate for a 9019

11   and, consequently, they're not appropriate in terms of the

12   derivatives procedures order.

13         Last, Your Honor, the Second Circuit decision in Refco

14   leads really to the next point which is that the Wong

15   plaintiffs are not a party in interest for purpose of the

16   bankruptcy, for purpose of the motion.  As the counsel for BNY

17   stated, the Wong plaintiffs are not even noteholders that have

18   privity with BNY because they're not holders of notes where BNY

19   is the trustee.  They're holders of notes where HSBC is the

20   trustee.  And here, like in Refco, the Wong plaintiffs are

21   merely investors in an entity that's a creditor.  And again, as

22   the Second Circuit in Refco held, only Sphinx, not individual

23   investors, where even investors as a group could assert a claim

24   against the Refco estate.  And only Sphinx was permitted to

25   negotiate a settlement with the committee.  Investors maintain

Page 36

1    a financial interest in Sphinx but they are not a party in

2    interest within the meaning of the Bankruptcy Code.  The party

3    in interest in the bankruptcy sense representing the investors'

4    financial interest is Sphinx.

5            Lastly, Your Honor, I want to make one point because

6    it's a point that I think the Wong plaintiffs spent a lot of

7    time on in their papers.  And it's just flat out wrong.

8    Throughout their objection, the Wong plaintiffs repeatedly

9    assert that the approval of the derivatives procedures order

10   will somehow conflict with district court orders.  And these

11   assertions are really a gross mischaracterization of the

12   district court order that were rendered by Judge Pauley and

13   Judge McMahon in this case.  As Your Honor will recall, the

14   Wong plaintiffs had filed an original complaint that asserted

15   only direct claims against LBSF.  This Court dismissed those

16   claims and declined to allow the plaintiffs to amend.  That was

17   appealed and Judge Pauley actually affirmed the dismissal of

18   Your Honor's -- of the complaint and affirmed Your Honor's

19   decision but did allow them an attempt to replead a derivative

20   claim which they hadn't brought originally.  Nothing in that

21   decision allows the Wong plaintiffs to essentially assert the

22   rights to negotiate settlements.  And there's nothing in the

23   decision by Judge Pauley that prevents this settlement in any

24   way, shape or form.

25           Lastly, Your Honor, there's a lot of discussion about

1    Judge McMahon's opinion which allowed an interlocutory appeal

2    on an issue.  And although you wouldn't know it from the Wong

3    plaintiffs' brief, Judge McMahon was very careful to make it

4    clear she was not commenting on the merits of that particular

5    issue.  Judge McMahon wrote, "Nor, for that matter, should

6    anything in today's decision be interpreted as indicative of

7    whether this Court will or will not uphold Judge Peck's

8    decision.  The Court expresses no opinion on the merits of

9    BNY's appeal."  So again, Judge McMahon's opinion has nothing

10   whatsoever to do with this motion.

11           With that, Your Honor, we urge the Court to adopt the

12   sixth supplement to the derivatives procedures order.

13           THE COURT:  All right.  Thank you.

14           MR. DAVIS:  Good afternoon, Your Honor.  Jason Davis

15   on behalf of the mini bond noteholders in the adversary

16   proceeding 09-1120.  We have objected to the proposed order for

17   some of the reasons that Mr. Slack talked about.  Critically,

18   what he did mention was that this order is necessary to settle

19   claims concerning the Saphir notes.  The Saphir notes are

20   listed on Exhibit 1 to the proposed order.  All of those Saphir

21   notes and only those Saphir notes are the notes that

22   collateralize the mini bonds that are subject to adversary

23   proceeding, 09-1120.  As debtors acknowledged, that adversary

24   proceeding has gone up to the district court.  And the district

25   court reversed this Court's decision that the mini bond

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

 1    noteholders lack standing to sue to protect their interest in

 2    the Saphir notes.  So --

 3           THE COURT:  That's really not true.  I've read Judge

 4    Pauley's decision, as I'm sure you have, and I agree with Mr.

 5    Slack that your papers mischaracterize the decision and your

 6    argument now is mischaracterizing the decision.  So you might

 7    as well move on to another subject.  That decision speaks for

 8    itself.  And you have a standing issue that relates to BNY.  So

 9    let's talk about that.

10           MR. DAVIS:  Okay.  Yes, Your Honor.  The standing

11    issue as to BNY is directly related to Judge Pauley's decision

12    because Judge Pauley said it would not be futile to allow my

13    clients to amend the pleading to step into the shoes of HSBC

14    Bank USA.  Stepping into the shoes of HSBC Bank USA places the

15    adversary proceeding structurally in an identical position to

16    the Perpetual proceeding with which this Court is intimately

17    familiar.  The Perpetual proceeding in New York is the one that

18    went up to Judge McMahon said that LBSF does not deny that

19    since the decision concerning the ipso facto provisions was

20    handed down has used it as leverage in settlement negotiations

21    concerning billions of dollars worth of similar transactions.

22           THE COURT:  Okay.  Let's just say that's true.  That's

23    good for the estate.  Why is that a problem?

24           MR. DAVIS:  Because the hundreds of millions of

25    dollars that go to the estate did not go to the mini bond

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 142

Page 39

1    noteholders.

2         THE COURT:  Well, the mini bond noteholders --

3         MR. DAVIS:  It's a zero sum situation.

4         THE COURT:  -- are getting the huge recovery that the

5    Wong class is not responsible for.  And I understand that

6    you're here as a class action lawyer but the mini bondholders

7    are receiving significant recoveries, it seems, ahead of every

8    other creditor constituency that touch Lehman as a result of

9    activities in Hong Kong and a settlement which may or may not

10   be approved.  It depends upon what the mini bondholders

11   individually decide when I presume they're going to be

12   solicited to accept or not accept this proposed settlement.  So

13   why are you opposed to that?  This is good for your class.

14        MR. DAVIS:  It's -- what would be better for the class

15   is if they got what they're supposed to get which is a hundred

16   percent.  And every dollar that goes to the estate is really

17   increased by their ability to use the ipso facto decision to

18   negotiate a better settlement for themselves.  And --

19        THE COURT:  Well, we're not --

20        MR. DAVIS:  -- there's no reason --

21        THE COURT:  -- talking about the ipso facto decision

22   from Perpetual, a case which was settled.  We're talking about

23   whether or not a certain procedures order that apparently, your

24   class once consented to should be modified to permit

25   settlements without the need for BNY consent.  That's what's

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 142

Page 40

1    before the Court.  How do you have a position with respect to

2    that narrow issue?  Don't talk to me about ipso facto clauses

3    'cause that's not what this is about.

4            MR. DAVIS:  Well, what this -- the argument that

5    plaintiffs have somehow agreed to the derivatives procedure

6    order is just bizarre.  It's a bizarre argument.  The

7    settlement that we entered into with debtors deals with

8    assignment and assumption procedures.  There's assignment and

9    assumption procedures and then there's settlement procedures.

10   Settlement procedures was explicitly carved out of that

11   stipulation.  We didn't agree to anything concerning settlement

12   procedures.  And the settlement procedures at issue here

13   concern the Saphir notes that Judge Pauley discussed twelve

14   times in his opinion.

15           THE COURT:  Is that it?  Do you have anything more?

16           MR. DAVIS:  No, Your Honor.

17           THE COURT:  Okay.  The objection is overruled.  And

18   the sixth amendment to the procedures order is approved.  There

19   are multiple reasons for the decision but perhaps the most

20   basic one is that the Wong plaintiffs do not really have

21   privity with BNY, have no real standing here, are not adversely

22   affected by the modification of the order as requested by BNY.

23   And whatever rights the Wong plaintiffs have in the adversary

24   proceeding will be decided in that adversary proceeding.

25           I'll accept an order.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 41 of 142

Page 41

1           MR. SLACK:  Thank you, Your Honor.

2           MR. MILLER:  Harvey Miller for the debtors once again.

3    Your Honor, item number 5 on the agenda is the debtors' motion

4    to compel compliance with Bankruptcy Rule 2019 by the ad hoc

5    group.  The ad hoc group, Your Honor, from the debtors'

6    perspective, functions as a committee within the parameters of

7    Bankruptcy Rule 2019.  You cannot avoid the application of

8    Bankruptcy Rule 2019 by calling yourself a group when you

9    function essentially as a committee.  The group has appeared in

10   these proceedings to give its position on various and many,

11   many matters as a unified group with allegedly large holdings

12   with the obvious intent of persuading the Court and influencing

13   the Court as to those matters.  The ad hoc group is represented

14   by one set of attorneys, one financial advisor.  And the

15   attorneys do not represent the individual members of the group.

16   There are twelve members of the group as far we are able to

17   ascertain.  And the activities of the group are essentially

18   within the parameters of Bankruptcy Rule 2019.

19           The ad hoc has interposed, Your Honor, a limited

20   objection to the motion.  And basically, what that limited

21   objection relates to as set forth in paragraph 2 that the

22   relief requested would be a little benefit to the debtors

23   themselves.  That argument or defense, Your Honor, misperceives

24   the purpose of Rule 2019.  It is for all parties in interest to

25   have access to the information that's required by Rule 2019 and

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 142

Page 42

1     not just the debtors.  And the rule, in fact, requires that the

2     statement be filed with the Court.  The information that was

3     furnished to the debtors was furnished on the basis that it

4     would be held confidential.  And the group's attorneys

5     specifically said they would require a court order to release

6     the information so that other parties would have access to it.

7          In paragraph 3, Your Honor, the ad hoc group advocates

8     greater transparency generally in these cases.  The debtors

9     wholeheartedly agree.  The discovery protocol motion which will

10    be heard later this morning is a step forward in that

11    direction.  However, it doesn't obviate the application of Rule

12    2019.  The debtors agree that the requirements of Rule 2019

13    should be enforced.  If the ad hoc group believes that there

14    are other entities that are subject to 2019, it is free to make

15    appropriate motions.

16         The limited objection goes on, essentially, Your

17    Honor, to argue that the group should not be required to make a

18    disclosure unless other parties are likewise required to make

19    disclosure and again advocates uniform disclosure requirements

20    that are fair and tailored specifically to the needs of the

21    case.  Again, Your Honor, the debtors favor full disclosure,

22    full transparency but that does not constrain the application

23    of Rule 2019.

24         The ad hoc group clearly functions as a committee.  It

25    has all of the same attributes that were discussed and

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 43 of 142

Page 43

1    addressed by Judge Gropper in the Northwest Airlines case which

2    is cited in the pleadings, Your Honor, in which he directed

3    full compliance with Rule 2019.

4        The issue of uniform disclosure proceedings as

5    received by the ad hoc group is a separate and distinct matter

6    and not part of this bilateral motion.  So paragraphs 5, 6 and

7    7, Your Honor, are really not pertinent to this particular

8    motion.  The debtors have no objection to parties working to

9    develop a consensual framework for disclosure.  Nevertheless,

10   in the absence of such a framework, Rule 2019 should be

11   enforced.

12       The ad hoc group, consisting of twelve members acts in

13   concert.  Its attorneys represent the group which acts

14   collectively according to its own formation documents.  The

15   group never hesitates in each presentation to note that it is a

16   group and that it represents twenty plus billion dollars of

17   claims against LBHI.

18       The ad hoc group has never filed a statement under

19   Rule 2019.  Rather, White & Case, as its attorneys, has filed

20   statements under Rule 2019.  The rule requires that the group

21   which acts as a committee to file the requisite disclosure

22   documents under Rule 2019.

23       Moreover, Your Honor, as a plan proponent, it is

24   necessary and appropriate and logical that the group meet all

25   of the requirements of the Bankruptcy Code and the rules of

Page 44

1    bankruptcy practice and all other applicable local rules.

2    Otherwise, the group, as a plan proponent, Your Honor, cannot

3    comply with Section 1129(a) of the Bankruptcy Code.

4          In this district, strict compliance with Rule 2019 is

5    the rule.  Indeed, it is hard to understand the reluctance and

6    rigid opposition to compliance by the ad hoc group and others

7    who oppose the application of Rule 2019.  In substance, the ad

8    hoc group asserts that Judge Gropper was wrong in Northwest,

9    that statements made by Judge Gerber in the General Motors case

10   are in error and this Court should look to bankruptcy courts in

11   other districts for its interpretation and construction of Rule

12   2019.  Great emphasis was put on the decision of Judge Sontchi

13   in the Delaware bankruptcy court in the Six Flags case.

14   However, there's a split even in the Delaware bankruptcy court

15   as to the applicability of Rule 2019 as evidence by Chief Judge

16   Walrath's decision in the WaMu case.

17         Notwithstanding the contentions of the ad hoc group in

18   its limited objection, it has, in its arguments before this

19   Court, taken the position that it represents the interests of

20   the bondholders against LBHI.  It is not a question of the

21   practical approach; it is a question of enforcing the rule.  As

22   a group that's actively involved in these cases and a plan

23   proponent, it must be held to strict compliance with the rule

24   and full and complete disclosure of all information required by

25   the rule so that positions taken by the ad hoc group may be

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 45 of 142

Page 45

1    evaluated in the perspective of the economic interest of that

2    group.

3            Now, we submit, Your Honor, that pari delicto is not a

4    defense.  The fact that others who may be subject to Bankruptcy

5    Rule 2019 are not complying doesn't obviate the requirement on

6    the part of the ad hoc group, Your Honor.

7            THE COURT:  Mr. Miller, I have a question about

8    timing.

9            MR. MILLER:  Yes, sir?

10            THE COURT:  One of the things that I have observed

11    about Rule 2019 -- and I actually did a little research on this

12    last August.  I was speaking on a panel and the subject was the

13    revision of 2019 as adopted by the bankruptcy rules committee

14    which is not yet in effect, so we're dealing with the old

15    version of the rule.  And I took a look at the docket as it

16    then existed and counted up the number of 2019 statements that

17    had been filed.  And then I took a look at the 2019 statements

18    randomly and discovered that they were mostly not at all

19    useful.

20            One of the things that I have observed -- and I think

21    this is true in virtually every decision involved in 2019 is

22    that the rule has weaponized in the sense that parties use

23    compliance with 2019 as a form of strategic leverage in

24    bankruptcy cases large and small in order to, in effect, put

25    groups or committees in a position of having to disclose

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 46 of 142

Page 46

1    information that might be proprietary or that might be

2    embarrassing or that they might prefer to keep private.

3        Is the timing of today's motion driven by the fact

4    that there is also another contested matter relating to

5    disclosure statements in the case involved in competing plans?

6    And one of my concerns -- and I just want a fair dialogue on

7    this point -- is that the timing of the 2019 motion is

8    suspiciously tied to the other contested matter, which I

9    understand has been largely resolved, involving competing

10    disclosure statements to be heard on the same day.

11        MR. MILLER:  The answer to your question, Your Honor,

12    is absolutely not.  The debtors have been in extensive

13    discussions with the ad hoc group about compliance with 2019.

14    And to some extent, the attorneys for the ad hoc group did

15    provide certain information on a confidential basis.  In all of

16    those discussions, Your Honor, which go back months, we always

17    said to Mr. Uzzi representing the ad hoc group, you're not

18    fully complying.  And if you don't comply, you're forcing us to

19    make a motion under 2019.  Why don't you just comply with the

20    rule and that will simplify it?

21        This has no connection, Your Honor, with the other

22    contested matters that are on the calendar.  It is exacerbated,

23    I would say, Your Honor, by the fact that the ad hoc committee

24    has filed an alternative plan.  And as a plan proponent, it is

25    even more important that the ad hoc group comply with 2019.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 47 of 142

Page 47

1           So this is not being used, Your Honor, for tactical

2     purposes.  This is being used to enforce the rule so that there

3     is full disclosure and full transparency.  As a plan proponent,

4     Your Honor, people are entitled to know what are the economic

5     interests of the ad hoc group just like any other -- any

6     creditors' committee, Your Honor.  And of all the 2019s that

7     have been filed, Your Honor, they're mostly by attorneys.  In

8     fact, I think they're all by attorneys.  And what I'm pointing

9     out, Your Honor, is the rule requires the group to file and the

10    group has not filed, Your Honor.  And as I understand it,

11    reading the limited objection, they really don't -- essentially

12    are saying we'll file but we don't want to file unless

13    everybody else has to file.  Well, that's not a defense of the

14    application of the rule.  It's like saying.  I passed the red

15    light and you caught me but you can't give me a ticket unless

16    you give a ticket to everybody else.  That simply is not a

17    defense, Your Honor.  Thank you.

18           THE COURT:  Okay.

19           MR. UZZI:  Good morning, Your Honor.  Gerard Uzzi of

20    White & Case on behalf of the ad hoc group.  Your Honor, just

21    very briefly on the issue of the application of 2019 to ad hoc

22    groups or committees or loose alliance of creditors, how ever

23    people want to style it, we believe simply that the reasoning

24    set forth by Judge Sontchi in the Six Flag decision is the

25    better reasoning.  I don't intend to argue with Your Honor -- I

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 48 of 142

                                                        Page 48

1    can't say it better than Judge Sontchi has.  And in any event,

2    I suspect that Your Honor has already formed his own opinion.

3    So I don't need to belabor the record unless, of course, Your

4    Honor has questions with respect to that.

5           I would like to spend a little bit of time, though,

6    Your Honor, on the issue of selective enforcement and timing

7    and, putting aside what the true motivations may be, the impact

8    of the appearance of a potential litigation sword and what it

9    might have in the case.  And, Your Honor, what we've said in

10   our papers is that we believe transparency is important.  We've

11   also said that we recognize the uniqueness of these cases and

12   the overwhelming complexity of the capital structure here.  And

13   that capital structure and that complexity plays out in front

14   of Your Honor with respect to the Chapter 11 debtors.  And

15   that's complex enough.  But there's also, I don't even know how

16   many, Your Honor, number of foreign affiliates out there that

17   are in foreign proceedings in front of foreign tribunals with

18   creditors' committees in those proceedings that have varying

19   degrees of authority.  And I'd you to keep that last part in

20   mind with respect to creditor influence maybe in foreign

21   proceedings for something I'm going to say in a little while.

22   But the complexity of the capital structure leads to potential

23   conflicts of interest.  And in this case, perhaps it's

24   inevitable that we are going to have conflicts of interest.

25           Now there is nothing inherently wrong in somebody

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
Pg 49 of 142
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 49

1    having a conflict of interest.  There's nothing wrong with

2    people holding multiple positions across the capital structure.

3    But what we're talking about here, Your Honor, is a settlement

4    -- well, at least the debtors' plan and our plan right now are

5    variations of settlement plans.  We're going to talk about a

6    litigation over a settlement.  We're going to have plan

7    negotiations that, really, I don't think are started in any

8    sort of robust fashion.

9         And when you're considering the issues with respect to

10   a settlement, subjective intent is at least an element there

11   with respect to somebody's view of fairness of the settlement.

12   So I think it's appropriate for us to stop right now and

13   consider, based upon this case, where we are today.  Is it

14   appropriate for us to require, among material parties -- and we

15   can discuss who material parties are later -- but among

16   material parties who want to play a role in the outcome of this

17   case, to make some sort of disclosure that is specifically

18   designed to fetter out conflicts of interest.  So we know in

19   plan negotiations what people are trying to achieve.  And Your

20   Honor knows with respect to somebody says -- when they're

21   saying a settlement is not fair or a piece of the relief is not

22   fair, what their true economic interests are.

23        If you look at 2019, I'm not sure 2019 solves the

24   problem.  I mean, for one thing, a strict compliance of 2019

25   doesn't require disclosure of interest or claims against

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 50

1    foreign affiliates.  It certainly doesn't require disclosure of

2    anybody to say that they sit on a committee of a foreign

3    affiliate.

4          So that's why we made the proposal, Your Honor, that,

5    if the Court were amenable, we'll just dispense with 2019.  We

6    don't have a problem making the disclosures.  We have a problem

7    with the way this was brought and the implications of it.  But

8    we don't have a problem with making the disclosures.  And I'm

9    not sure 2019 is the right framework for the disclosures but

10   we'll do it.  But we should really consider the bigger process

11   at large here.

12         THE COURT:  Let me just break in and make sure --

13         MR. UZZI:  Sure.

14         THE COURT:  -- and make sure I understand what you've

15   just said in reference to the current motion.  Are you saying

16   that the members of the ad hoc group represented by White &

17   Case will comply with 2019 and will do so promptly?  I'm not

18   yet talking about how promptly but it needs to be very promptly

19   consistent with Judge Gropper's Northwest decision.  But that

20   you are really questioning whether 2019, as a tool, is well

21   suited to the circumstances of this case.  And you are

22   proposing that there be a special disclosure protocol for use

23   in these cases.  Do I understand you correctly on both points?

24         MR. UZZI:  On all those points, yes.  Absolutely, Your

25   Honor.  And we --

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 51 of 142

Page 51

1          THE COURT:  Okay.  So this is, in effect, an

2    uncontested motion, in respect of 2019.

3          MR. UZZI:  Well, ex -- well, let me put a nuance on it

4    then, Your Honor.  This -- we say unequivocally and without

5    constraint, we will make whatever disclosures the Court wants

6    us to make whether by 2019 or otherwise.  What we have a

7    significant problem with is the selective enforcement of 2019.

8          We think we can -- it makes sense to dispense with

9    that today and that's why we've made the proposal to the

10   debtors.  But with respect to timing, Your Honor, 2019 -- our

11   discussions on 2019 with the debtors started after we filed our

12   competing plan.  It didn't start two years ago when we first

13   appeared in this case.  So I think the timing is at least --

14   there's an appearance at least of timing influencing the

15   debtors.  I'm not prepared to go far as saying that it is.  But

16   what I -- let me back up, Your Honor.  I'm not prepared to

17   accuse the debtors of wrongdoing here.  I'm not saying that.

18   I'm saying just the mere fact that we can question it, that

19   there might be the appearance, is a problem in itself.  And let

20   me just explain a little bit more of what I mean because we've

21   been in this case for two years.  We've appeared before your

22   court.  We've worked with the debtors on many motions where

23   we've tested their propositions.  We've made suggestions to

24   them to make changes that I think are beneficial.  We've

25   informed the Court of our positions when we thought that it

Page 52

1    would be helpful for the Court to know there is somebody out

2    there actually looking at this.  And we even, from time to

3    time, have filed motions in support of the debtors' relief.

4         But let me give you an example of -- right now --

5    so -- I'm just trying to streamline this a little bit, Your

6    Honor.  The debtors filed -- didn't file their 2019 motion

7    until after we filed our motion to schedule the disclosure

8    statement hearing.  So there is at least an appearance of that

9    being a litigation tactic.  We've done other things in this

10   case, Your Honor -- and I don't disagree with Mr. Miller with

11   respect of the fact that, as a plan proponent, parties are

12   entitled to know more about you.  But that's a disclosure

13   statement issue.  That's a disclosure statement objection and

14   we can deal with that with respect to the disclosure statement.

15   With respect to the 2019 and issues that's been before this

16   Court, we were before the Court just a couple of weeks ago with

17   respect to the motion of the debtors to sell notes -- or

18   rather, to buy -- purchase notes from Bankhaus.  And if you

19   recall, Your Honor, you were concerned since you are the

20   presiding judge over both estates, how could this possibly be a

21   good transaction for both estates.  And we had a dialogue and

22   we supported the debtors' motion in our capacity as the ad hoc

23   group where we said we are substantially weighted towards LBHI.

24   Just to correct the record for a second, we hold twenty billion

25   dollars of claims across the Lehman capital structure, sixteen

Page 53

1   billion of senior claims at LBHI.  And we said to you, Your

2   Honor, that we supported -- we thought it was a rational

3   decision by LBHI.  Nowhere was it discussed what our positions

4   in Bankhaus might be.

5           Now let me assure you that we don't have conflicts of

6   interest with respect to Bankhaus.  But why wasn't that issue

7   relevant with respect to me standing up supporting the debtors.

8   It should have been.  And in hindsight, Your Honor, I wish I

9   would have told you that, that, you know, let me clarify what

10  our positions are.  It can't be -- it cannot be that whether

11  somebody has to make a 2019 disclosure or some other sort of

12  collateral or ancillary type of thing in this case rises and

13  falls upon whether you're opposing the debtors or supporting

14  the debtors because not only is it perhaps a litigation tactic,

15  it goes beyond that and it infects the integrity of the

16  process.  That's why, Your Honor, we filed our objection.

17  That's why we didn't just simply say okay.  We felt it was

18  appropriate to raise these issues for the Court.

19          We're prepared to make whatever disclosures the Court

20  wants us to make, again, whether within the parameters of 2019

21  or not.  The disclosure -- rather, the discovery procedures,

22  you've heard about.  They require disclosures.  They are not

23  designed to fetter out conflicts of interest.  And the only

24  thing we ask of Your Honor in ruling on this bilateral motion

25  that you just take into consideration our concern with respect

Page 54

1    to the impact on the total process.

2          And unless you have questions for me, Your Honor, I'm

3    done.

4          THE COURT:  Okay.  I don't have questions.  Does

5    anyone else wish to be heard?  Okay.

6          I've reviewed the pleadings with some care but it's

7    also true that the 2019 disclosure issue is an issue that I

8    have been following for some time in a manner unrelated to this

9    particular contested matter.  I believe that it is generally

10   known by the bankruptcy specialists in the room that Rule 2019

11   has been reformulated as a result of a rulesmaking process and

12   that there is a new Rule 2019 which is not yet in effect.

13   During the course the deliberations relating to new Rule 2019,

14   a number of parties in interest provided input and testimony

15   including one of Mr. Uzzi's partners.

16         In effect, this is a subject that has a great deal of

17   history unrelated to this case.  And the issue of appropriate

18   disclosure in bankruptcy cases large and small is a manner that

19   has been not only recently discussed and provisionally codified

20   but no doubt is a subject of ongoing discussion and evolution.

21         Notwithstanding that, the only matter which is before

22   me is the current motion brought by the debtors relating to

23   compliance with the current formulation of 2019.  And the

24   motion has been addressed to the one collection of creditors

25   that has filed a competing plan of reorganization.  So this is

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 55

1    not really a situation of selective enforcement as much as it

2    is a case of obvious enforcement.  Based upon the colloquy with

3    Mr. Uzzi, this appears not even to be a strenuously contested

4    motion as it relates to the enforcement of 2019 as much as it

5    is an argument brought on behalf of the ad hoc committee,

6    perhaps as a friend of the process, to obtain what amounts to

7    Lehman-specific disclosure.  That is not at the moment a motion

8    that I need to address.  And whether or not such a motion will

9    ever be filed either by the ad hoc committee or any other party

10   in interest remains to be seen.  I note that there are some

11   disclosures that will be required as part of the discovery

12   protocol that will later be a subject of today's hearing.  But

13   that, too, has nothing to do with my decision on this

14   particular motion.

15        The motion is granted.  And I believe that compliance

16   should be as prompt as practicable.  I think it would be

17   reasonable for this to occur within the next week to ten days.

18   And I'm not imposing a deadline but believe that that would be

19   a reasonable period of time for compliance.  If for cause shown

20   there's more time needed, we can always address that.

21        In effect, 2019, in its present formulation, is a

22   blunt instrument which necessarily is selectively enforced

23   because, for reasons that I noted in colloquy with Mr. Miller,

24   more often than not, a motion seeking compliance with 2019

25   arises in the context of some contested matter where one party

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 56

1    is seeking some procedural advantage.  That having been said, I

2    subscribe to the Northwest view and agree with my colleague,

3    Judge Gropper.  I have reviewed Judge Sontchi's decision and I

4    have considered it.  I believe that even if Judge Sontchi's

5    decision were to be reviewed in the context of the pending

6    motion that this is a distinguishable circumstance principally

7    because, regardless of nomenclature, the ad hoc group of Lehman

8    Brothers creditors for the past two years has purported to act

9    not only for itself but as a voice of similarly situated

10   creditors in the case.  I further believe that all of the

11   pleadings that have been filed, many of which have been useful

12   to the Court, have been filed purposefully with a view toward

13   influencing the outcome of the bankruptcy case.  It's obvious

14   that this group continues to do just that.

15          And so, whether or not, strictly speaking, there are

16   fiduciary duties here, there are duties to act responsibly.

17   And one of those responsible acts will be full compliance of

18   2019.

19          MR. MILLER:  We will submit an order, Your Honor.

20          Your Honor, number 6 on the agenda is a procedural

21   motion.  And if I might, even though it's Mr. Uzzi's motion, I

22   think we can resolve it very quickly on the basis of what's

23   happened over the past few days.  The motion essentially was to

24   put the ad hoc committee -- excuse me -- group's -- Freudian --

25          THE COURT:  It doesn't matter what we call them now.

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 57 of 142

Page 57

1              MR. MILLER:  -- on the same timeline as scheduled for

2      disclosure and plan prosecution as the debtors' disclosure

3      statement and plan.  The debtors' disclosure statement hearing

4      under Section 1125 is scheduled for June 28th.  And the intent

5      of the motion was to get on that schedule.  Over the weekend

6      and during Monday -- the early part of this week, there were

7      various discussions.  And Your Honor will note that there are

8      many, many pleadings that have been filed in connection with

9      this motion, primarily as a result of the response which the

10     debtors put in which talked about sequencing the consideration

11     of plans.  Everybody's rights are reserved in that respect,

12     Your Honor.  And the resolution is anybody who wants to file a

13     proposed disclosure statement and a plan can calendar it for

14     that day or whatever day it turns out to be all without

15     prejudice to the rights of all parties as to opposition

16     objections, defenses, et cetera.  And an order to that effect,

17     Your Honor, will be submitted.

18              THE COURT:  That's fine.

19              MR. MILLER:  Silence reigns, Your Honor.

20              THE COURT:  That's great.  Okay.

21              MR. MILLER:  That takes us, Your Honor, to item 7

22     which is consideration of the discovery protocol.  As the cases

23     start in, Your Honor, I'd like to set the scene for this

24     protocol.

25              On March 15, the debtors filed a proposed Chapter 11

Page 58

1    plan and it was amended on April 15.  The objective was to set

2    an environment for negotiations which, because of the

3    complexity of the cases and the time constraints, could not

4    have been accomplished within the eighteen-month period

5    preceding March 15, 2010.  From the very beginning of the plan

6    process, there has been one significant issue that has

7    permeated all plan discussions and debates and that is whether

8    it would be proper to apply the equitable remedy of substantive

9    consolidation to the twenty-three debtors and the nondebtor

10   affiliates and subsidiaries.

11          In the first half of 2009, in addition to the UCC, as

12   we've just discussed, an ad hoc group of LBHI creditors was

13   formed and became quite active.  In the latter part of 2010,

14   the ad hoc group began to press for discovery with respect to

15   the debtors' plan and the implementation of its objectives.  In

16   December of 2010, the ad hoc group filed an alternative plan

17   predicated, as we read it, Your Honor, on substantive

18   consolidation of essentially all the debtors.  On January 25,

19   2011, the debtors filed their first amended Chapter 11 plan and

20   proposed disclosure statement.

21          After that event, the discovery discussions among the

22   debtors, the unsecured creditors' committee and the ad hoc

23   group accelerated.  The Court suggested that efforts be made to

24   develop a protocol to facilitate and discipline discovery as to

25   plan issues.  As a result, the debtors, the creditors'

Page 59

```
 1    committee and the representatives of the ad hoc group met and
 2    conferred over an extended period of time to develop a
 3    discovery protocol.  The proposed protocol that is attached to
 4    the debtors' motion dated March 8, 2011 is the product of those
 5    activities.  The return date of the motion was deliberately
 6    selected to give sufficient time for other parties in interest
 7    to comment on the discovery protocol.  Since the filing of the
 8    motion, there have been extensive broad ranging discussions
 9    with multiple parties and groups who had indicated opposition,
10    objections and various comments concerning the protocol.  There
11    have been two large broadly based meetings within the past
12    thirty days and numerous revisions have been made to the
13    original proposal to incorporate many of the comments made by
14    participating parties in interest.
15         As a consequence of such conferences and exchange of
16    comments, which necessitated extending the objection date to
17    the debtors' motion, a very extensively revised proposed
18    protocol is being proposed.  Indeed, the last revisions were
19    made almost thirty minutes ago.
20         By reason of these conferences and meetings, the
21    debtors believe that they have substantially reduced the number
22    of objections that might have been filed to the motion and have
23    achieved, with the cooperation and the good faith efforts of
24    all participants, what we propose is a fair, reasonable and
25    evenly balanced discovery protocol that will expedite discovery
```

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 60 of 142

Page 60

1    and effectively limit the cost of such discovery.

2         However, there may remain some objections.  These

3    objections are described, in part, in the chart which was

4    attached to the debtors' omnibus reply.  And even that chart,

5    Your Honor, is no longer accurate as my partner, Ms. Singer,

6    will describe to the Court.  In dealing with the specific

7    objections, Your Honor, my partner, Randi Singer, will address

8    the motion.

9         MS. SINGER:  Your Honor, Randi Singer of Weil Gotshal

10   for the debtors.  As Mr. Miller expressed, this has really been

11   quite the process.  The Court made it very clear that the

12   parties were expected to work together and I'm very pleased to

13   report that the parties -- all of the interested parties have

14   in fact worked together and it's been a really incredible

15   process.  I want to thank and express my appreciation to many

16   of the people in the courtroom today who have helped ensure

17   that our discussions were truly productive.  People took time

18   to understand each other's positions and everybody was really

19   willing to keep at it through midnight last night up until just

20   before we started proceedings this morning.

21        And there's been lots of different drafts; lots of

22   comments have gone back and forth.  I have confirmation that --

23   a formal confirmation that several of the objections have been

24   withdrawn.  I think that there may be other objections that

25   have been withdrawn in whole or in part.  So I would propose to

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 61 of 142

Page 61

1    go through at a very high level what we think the objections

2    are and then we can see what's left and -- what the debtors'

3    position is and what we think is no longer an issue.

4         THE COURT:  That's fine.  It might be helpful not only

5    to me but to the parties who are in the courtroom who may be

6    interested in this subject but who are not directly involved in

7    the most recent changes to know what the current arrangement is

8    by focusing on what has changed and by also identifying what

9    categories of objections may have been resolved or satisfied by

10   virtue of those changes.

11        MS. SINGER:  Certainly.  I think Your Honor

12   anticipated my next question which was do you want me to go

13   through the structure a little bit at a high level of the

14   current version of the --

15        THE COURT:  Well, I'm familiar with what --

16        MS. SINGER:  Okay.

17        THE COURT:  -- in the past was a changing landscape

18   but one that was changing in the direction of a accommodating

19   objectors.  And I have reviewed your chart and I have reviewed

20   your omnibus reply to objections and I have reviewed all of the

21   objections.  I just want to know what's pertinent for today.

22        MS. SINGER:  Okay.  Well, then I think, at the outset,

23   there's several objections that I would characterize as

24   outliers.  And I think that those objections actually typify

25   why it is we need a collective process.  One is the limited

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 62 of 142

Page 62

1    objection of Giant Stadium LLC and their renewed limited

2    objection.  They're simply contending that plan discovery at

3    all is totally premature and shouldn't start yet.  In our

4    opinion, this doesn't really doesn't even rise to the level of

5    the tail wagging the dog.  I think the point here is that there

6    really needs to be common procedures, common deadlines, because

7    otherwise people can come in and have the ability to step in at

8    any point and completely demand special treatment and bring the

9    entire process to a complete stop.  I believe that objection is

10   still outstanding.

11        And there's a number of folks that have joined in the

12   objection that it's too early to start plan discovery.  Plan

13   discovery is going to be very complex.  A lot of these

14   deadlines are very aggressive.  But they've been worked out

15   with a lot of creditors.  We think they're realistic.  We think

16   we should get started sooner rather than later so that we

17   can -- the sooner we start, the sooner we can finish.  And

18   there's mechanisms built in to the protocol that if things need

19   to slip, there's a setup that that can happen.  There's

20   pretrial conferences.  There's various status conferences.

21   There's lots of meet and confers.  And it's arranged so that if

22   these deadlines do turn out to be problematic, we can address

23   that as we go forward.

24        I think the second objection that I would characterize

25   as an outlier is the objection of State Street Bank and Trust

Page 63

1    Company, docket number 15613.  They're essentially contending

2    that it's too expensive and too impossible for everybody to

3    work together.  I think all of the negotiations leading up to

4    this proceeding have proven that wrong.  There's been a very

5    cooperative process doing that.  And the fact that I'm standing

6    here today with the objections as limited as they are I think

7    is proof.

8         Their proposal is essentially that we form a whole

9    bunch more -- I don't know whether to call them ad hoc groups

10   or ad hoc committees or additional groups, whatever they are.

11   And these committees would be the proxy and they would all

12   engage in discovery and the estate would pay for everything.

13   This seems to me to be problematic on a number of levels.  It's

14   not efficient.  It's very burdensome.  It's very expensive.

15   And, frankly, if the estate is paying for it, nobody would have

16   any incentive to do anything except engage in years and years

17   of discovery at the expense of the estate.

18        In addition to sort of that different approach, State

19   Street also joined a number of the common objections that were

20   set forth in our omnibus reply.  And we can go through those

21   very quickly and I'll give you my best guess as to what the

22   status of them is today.

23        The first was Objection A1 which was the proposed

24   order provides the debtors with an unfair advantage.  And to

25   this objection, we just think that this was a misinterpretation

Page 64

1   of the order.  We think that this is a very even-handed -- it

2   might have been in -- the early stages of the early drafts of

3   the order might have been legitimate.  But at this point, all

4   of the changes in the process have made this a very even-handed

5   order.  In fact, the debtors think in some places it goes too

6   far because I don't think there can really be any dispute that

7   the debtors aren't -- that the vast burden of this isn't going

8   to fall on the debtors.

9        To the best of my knowledge, that's still an active

10  objection but I don't -- short of starting over again, I'm not

11  sure what changes could be made to address that.  We think it's

12  very even-handed.

13       The objection A2, that the debtor should not have a

14  coordinating role, I think, misunderstands what the role of the

15  designated parties is.  The designated party is really designed

16  to be a ministerial role.  It's designed to be somebody who

17  puts forth the initial set of -- draft the initial set of

18  document requests or 30(b)(6) topics or whatever it is.  They

19  get circulated to the group.  Nobody is bound by them.

20  Everybody can add whatever it is they want.  The list --

21  there's specific provisions in here that say the designated

22  party cannot refuse to accept anybody's additions.  There's

23  language that says nobody's prejudiced by other people's

24  additions.  And the final document request or 30(b)(6) notice

25  that goes to the party will say next to it whose request it is

Page 65

1    or who put that topic on the list so that the receiving party

2    will know who they should go negotiate with.  The designated

3    party is not the agent that you go negotiate your objections to

4    request with.  You go directly to the parties who made it.  All

5    the designated party is trying to do is ensure that everybody

6    faces and it's the debtors, it's the alternative plan

7    proponents, it's participants, it's whosever working, gets one

8    document request or one 30(b)(6) notice.  It may be a very long

9    one.  It may have hundreds of requests, whatever it has on it.

10   But it'll ensure that it's not -- they're not getting ten or a

11   hundred different requests that all have exactly the same

12   request but phrased a little differently.  It's really just a

13   streamlining.

14          For discovery on the debtors, it will be -- that role

15   will be served by some participants.  We'll get to this in a

16   second.  For various participants, if the debtor plans to take

17   discovery, it makes sense that that debtor would take that

18   role.  But again, that would not prejudice anybody's rights or

19   abilities to make requests throughout the process.

20          State Street and Libertyview, to the best of my

21   knowledge, have interposed that objection.  I don't know where

22   that stands today.

23          There have been several objections that the

24   requirement that people file a notice of intent to begin to

25   participate as unfair because the debtors or the creditors'

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 66 of 142

Page 66

1    committee have the opportunity to object to that.  It's meant

2    to be very ministerial.  In the last version -- and actually,

3    Your Honor, if I may, hand up the copies that were as of an

4    hour before we started -- may I approach?

5         THE COURT:  Oh yes.  Thank you.

6         MS. SINGER:  And my colleague, Jamie Kaplan, has a few

7    extra copies if people would like.

8         This was a change -- it's not -- it wouldn't be

9    redlined in that draft 'cause it was a change that was made in

10   the version that was filed on Monday.  But what we've done is

11   add a line to the notice of intent so that people can tell us

12   what group they want to be in.  So we figured that will make it

13   very easy.  To the extent people are objecting that we have the

14   ability to object, obviously, the objections would go to Your

15   Honor so nobody is prejudiced.  It wouldn't be solely within

16   the control of the debtor who gets to participate.  It's really

17   meant to just make sure that we know who's in there and we know

18   what their interests are.

19        The objection B1 is that there's no procedures for

20   selecting the designated party.  It's ironic that some people

21   are complaining the debtors have too much ability to control

22   and other people are upset or sometimes some of the same people

23   are upset with them because we didn't put procedures in place

24   for us to choose who the designated party is.  We respectfully

25   suggest that it's not really the place of the debtors to

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 67 of 142

Page 67

1    appoint the party that's going to be coordinating discovery on

2    the debtors.  We think -- we feel certain that all of the

3    highly sophisticated and experienced attorneys who represent

4    the participants will be able to get together a designated

5    party.

6         I believe those objections are still outstanding.  We

7    have not taken any of the proposed language changes that put in

8    place balloting procedures or any of that for how to pick the

9    designated party.

10        B2 is similar.  There's no procedures explaining how

11   people should mobilize.  This is the additional language we've

12   added.  The notice of intent -- you tell us what group you're

13   in.  We're going to circulate a service list once we get all

14   the notices of intent.  Everybody'll know who's in your group.

15   You'll have their e-mail address, you'll have their contact

16   information.  And we're pretty sure that everybody will be able

17   to reach out and coordinate amongst themselves.  Again, we

18   don't think it's appropriate to impose procedures on people for

19   how they get together and coordinate.

20        C1 and C2 relate to paragraph 3(j).  Paragraph 3(j) --

21   there's no language changes from what was filed on Monday.  But

22   what was filed on Monday did contain some language changes.

23   3(j) involves -- takes the several categories of documents that

24   are virtually certain to contain -- at least the majority be

25   privileged documents.  There's more than a hundred in-house

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 68 of 142

Page 68

1    lawyers at Lehman.  There were lots and lots of outside

2    counsel.  The idea was it's virtually certain that these are

3    going to be mostly privileged documents.  To the extent that

4    these lawyers are communicating with business folks, those e-

5    mails, those communications, are going to come up when we

6    search the files of the business folks.  All we were trying to

7    do is sort of ex-ante save some of the burden.  I mean, with

8    the examiner's request, the numbers I've heard involve forty or

9    fifty attorneys working full time for more than a year to do

10    the privileged log.  And that was without even searching the

11    files of lawyers.  We're really just trying to save burden and

12    expense here.

13         It was originally this was only the debtors didn't

14    have to search these categories.  After extensive negotiations,

15    the version on Monday made it mutual so that all participants

16    can enjoy this exemption and this burden saving.  I believe

17    that most of the objections have now been withdrawn because we

18    have made this mutual.

19         The one outstanding objection that I am aware of,

20    which may or may not still be the case, there's several

21    creditors who have objected to the fact that they think there

22    are certain communications involving counsel that will not be

23    privileged or that they are entitled to get a privileged log

24    on.  The way we've addressed that is there's language in there

25    that says if it's a reasonably targeted request or if you go to

LEHMAN BROTHERS HOLDINGS INC., et al.

1    the court and Your Honor so orders, we'll make exceptions.

2    We'll look at things.  If you tell us specifically what it is

3    you want, we will go look for those specific documents.  But we

4    can do that without necessarily searching all of it.  The other

5    concession that we have made is if somebody is going to be a

6    witness, if we know somebody falls into one of these categories

7    but we're pretty sure they're going to be a witness at the

8    confirmation hearing, obviously, we will make an exception

9    there as well.  So to the extent people are trying to build

10   additional -- pre-negotiate other exceptions in, we think

11   that's inappropriate at this point.  There's plenty of

12   mechanisms.  There's a lot of flexibility built in here to take

13   it on a case by case basis.  And we think -- you know,

14   privileges, as the Court knows, is a very, very nuanced

15   analysis and we think it's inappropriate to ask the Court for

16   an advisory opinion at this stage on what may or may not be

17   privileged.  We think there's enough built in here that it

18   should be taken as it comes.

19           Similarly, objection C3, that it should be clarified

20   to ensure there's no limitation on fact discovery from Alvarez

21   & Marsal, our advisors, we believe has been taken care of with

22   the language that says if somebody is going to be a witness,

23   their documents will be produced or if there are specific

24   things that you want, we'll produce those documents as well.

25           Objection C4 I believe is moot.  It has not been

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 70 of 142

Page 70

1    formally withdrawn by certain objectors but I believe it is or

2    it should be because it was asking that debtors provide a

3    privilege log.  Original versions of this tried to recognize

4    that the extreme burden that was going to be inherent in the

5    debtors producing a privileged log -- we fought the good fight

6    but I think the debtors, in the last version that was filed on

7    Monday, the debtors have agreed that they will do a limited

8    privileged log using the categories that can be automatically

9    populated by the software -- was the exception and that would

10   apply to everybody.  And with that change, I believe those

11   objections should be either mooted or withdrawn.

12          Objection D1 is the objections to the former paragraph

13   12 of the protective order.  This came out in the Monday

14   version.  Originally -- I think there's no dispute that there's

15   certain asset level evaluation information, how the debtors are

16   valuing certain assets in the estate that is highly

17   competitively -- very, very sensitive information.  Giving out

18   information about how the estate is valuing things is obviously

19   going to have an adverse impact on how the estate is able to

20   maximize its assets.  So originally, there was an outright ban.

21   It was built into the protective order that the debtors refused

22   to provide any such information.  There's been a lot of

23   negotiations around this and the current version of this is

24   found in paragraph 19 of the protective order.  And what that

25   holds is that calls this specific information restricted

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 71 of 142

Page 71

1     information.  It makes it clear that there may be situations

2     where it is appropriate to provide such information.  If in

3     fact, it is appropriate, there should -- recognizes that there

4     should be some additional restrictions put on it.  It shouldn't

5     be loaded up to the database available to anybody.  But it

6     leaves a lot of flexibility in terms of exactly what those

7     restrictions are going to be.

8          So what we think we've done here is built in the

9     necessary flexibility but we've compromised and there's no

10    longer an outright ban.  Several creditors have withdrawn their

11    objection based on this new paragraph 19.  And we think that

12    that should take care of all of those objections.

13         Objection E1, that goes to the blackline.  That is the

14    first language that's actually different today.  And this goes

15    to paragraph 1(b).  The issue here is there's a recognition

16    that we should do plan discovery once, that doing the

17    electronic searches, doing depositions, doing document

18    production, this is going to be a tremendous burden on

19    everybody involved.  So the plan is to try to do this in an

20    efficient manner so that we don't take all of the assets of the

21    estate and spend it on e-discovery.  We've balanced that by

22    recognizing that there are certain creditors who may have

23    certain individual claims that they don't necessarily want to

24    get involved in plan discovery but they need to reserve their

25    rights.

1          We've gone back and forth on language on this because,

2     at the same time, this needs to not be the exception that

3     swallows the rule.  The proposed language that is in the

4     blackline today is the latest compromise that we've proposed.

5     I believe that that has been accepted by most of the objectors

6     but I'm sure they will tell if I am wrong.

7          F1 is the discovery deadlines are too short.  Again,

8     we think that this -- we haven't changed anything in response

9     to that.  They're admittedly aggressive but a lot of people

10    have gotten together to help establish them and we think they

11    should be adhered to.

12          A lot of folks, F2, were upset that there weren't

13    enough interrogatories.  We had originally said twenty-five

14    interrogatories.  No contention interrogatories.  Twenty-five

15    on each participant.  That was loudly and soundly booed by

16    pretty much everybody.  The latest version gives ten to each

17    group plus to the creditors' committee and the U.S. trustee.

18    Hopefully, that will address people's concerns.  But it's worth

19    noting that we have eliminated contention interrogatories here.

20          Similarly, F3, we've eliminated requests for

21    admissions.  My partner, Irwin Warren, refers to those as

22    generating a whole lot of heat but no light whatsoever.  We

23    think in a proceeding like this, it's really unduly burdensome

24    to start getting into requests for admissions.  We're not going

25    to admit that sub-con is appropriate.  They're not going to be

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 73

1     useful.

2            As of last night, there was still a handful of

3     individual objections.  Oh.  The other large issue is 11(c)

4     which is reflected in the language that I've handed up.  11(c)

5     is meant to be a carve-out.  It's reflective of 3(j).  It

6     essentially says that anybody who's in bankruptcy,  you don't

7     have to search these categories of likely to be privileged

8     documents post-filing.  There was some concern that 3(j) and

9     11(c) as it was before the version I just handed you were

10    inconsistent.  It wasn't clear what trumped what.  The language

11    has been changed to just make them entirely consistent.  What

12    11(c) adds that 3(j) doesn't have is nonparticipants who are in

13    bankruptcy or in some sort of liquidation proceedings can also

14    take advantage of that.

15           I believe that you will also hear from the United

16    States trustee, we have taken -- in this blackline, there are

17    several places where the U.S. trustee has also asked us to

18    clarify that the U.S. trustee was its own group, it could

19    submit its own document request.  It could submit its own

20    deposition requests.  We have tried to take that language

21    wherever possible -- last night, it was pointed out to me that

22    we've missed a couple of places.  So in this blackline, we've

23    added it to the couple of places that we've missed.

24           The open issue with the U.S. trustee is that the U.S.

25    trustee has made a request that five days before anything that

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 74

1     we propose to file under seal, we give it to the U.S. trustee

2     so that the U.S. trustee's office can evaluate and object to

3     anything that we propose to file under seal.  We would just

4     submit that that's impractical and unworkable here.  If we had

5     -- there's nothing under seal here but if we had to give this

6     five days ago, it wouldn't have borne any resemblance to what

7     we're dealing with today.  There's mechanisms that the U.S.

8     trustee will have access to all documents that are marked

9     "Confidential" or "Attorneys Eyes Only".  There's mechanisms to

10    object to them at the time they're so marked or at some point

11    later in the process.  But having to know what you're going to

12    do five days before you do it is, really, in a proceeding like

13    this, I think just unworkable.  We have not seen any precedent

14    that we could model anything off of for such a provision.  And

15    so we have not accepted that language.

16          There are several folks who wanted to be their own

17    group.  We have not taken that language either.  The groups we

18    put together with the help of a lot of different creditors.  We

19    think they're fair.  At some point, if everybody becomes their

20    own group, you start to lose the efficiency.  So we've not

21    taken that language.

22          There is some -- there's language in here at the

23    request of Barclays and at the request of the SIPA trustee that

24    say to the extent either Barclays or the SIPA trustee has

25    additional -- has the same documents or there's some overlap,

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 75 of 142

Page 75

1    let's be efficient.  Go to the debtors.  Ask the debtors for

2    all the documents.  The debtors will provide all the document

3    production here.  We have had -- there's objections that think

4    that people should be able to also go to the SIPA trustee

5    separately.  We've not accepted that language.  We think it's

6    most efficient for everyone just to come to the debtors.  And

7    if we don't have something, the debtors will figure out

8    efficiently how to get it.  You may hear those objections.  The

9    SIPA trustee filed a statement against those objections.  It's

10   not really my fight to have here.  We think it should be --

11   everybody should come once to the debtors.

12          There's also some objections to subsequent discovery.

13   The idea here is that if you don't file your notice of intent

14   or if you file it later or something else is filed or you file

15   an objection or -- basically, the point is if you join

16   discovery at some point, you are joining the regularly

17   scheduled program already in progress.  You can't restart

18   deadlines.  Just because you file an objection to a plan, if

19   you could have filed it today, the fact that you choose to file

20   it six months from now does not give you the ability to restart

21   everything.  So there's language in paragraph 8 and paragraph

22   15 that clarify if something subsequent happens, you can --

23   paragraph 8 is on page 30 and paragraph 15 is on page 49.  If

24   somebody files a new plan or if there's additional issues or if

25   you're in a deposition and somebody mentions a document that

1    you think you should have gotten, there's provisions to get

2    those specific things.  The ad hoc group and several others

3    have objected that -- some have objected it's too broad; some

4    have objected it's too narrow.  We haven't touched the language

5    because we think it accomplishes what it needs to do.

6         And there were several other objections that I think

7    were based on earlier versions of the -- that were objecting

8    not to the most recent version that make reference to things in

9    old drafts.  So we think all of those are mooted.

10        And that's my best guess of where we are as we sit

11    here today.

12        THE COURT:  Well, we'll soon find out if you guessed

13    right.  I'm a little concerned about the comfort of the crowd.

14    And there a number of people who are still standing and have

15    been since before 10:00.  And at some point, I think, we're

16    going to want to take a break and figure out how we're going to

17    stage hearing the various objectors as we approach the lunch

18    hour.

19        One of the things I'd like to do before taking the

20    break is to find out from those who are here how many people

21    wish to speak.  And ordinarily, I would say, well, just please

22    stand up.  But that doesn't work.  So if those who have

23    continuing objections or a need to address some reservation of

24    rights with respect to the current form of the discovery order

25    would simply identify themselves so I have some sense of the

1    number of people we're talking about in light of where we are

2    right now -- and then I also have a question which is whether

3    or not people are even equipped to do that because I don't know

4    how many people have had a chance to review what you just

5    handed up to me.  So I'm just going to start by asking who

6    thinks they want to object?  One, two -- okay.  Hands.  One,

7    two, three, four, five, six, seven, eight, nine.  Okay.  Of the

8    nine -- ten.

9           UNIDENTIFIED SPEAKER:  Your Honor, if I may, I would

10   like to speak briefly to the Court, though, to the proposed

11   order.

12          THE COURT:  Okay.  And I'm sure we'll hear from the

13   committee.  So that's eleven.  If we assume that everybody is

14   only five minutes and we round up, that's an hour.  I'm

15   assuming some people may be longer than that.  So we maybe have

16   an hour and a half.  I'm not limiting; I'm just trying to

17   estimate.  Of the eleven other than those who are supporters,

18   how many view themselves as a distinct group as opposed to

19   being -- okay.  One, two, three, four -- all right.  By that, I

20   meant, some of you may be saying the same things.  And I'm

21   assuming that you've spoken to each other and have some sense

22   as to what's going on within your assembled multitude.

23          Okay.  I have a 2:00 calendar of adversary

24   proceedings.  There is one motion to dismiss and there's one

25   simple pretrial conference although it may not be simple.  I'm

Page 78

1    also conscious of the fact that in order to give this a fair

2    hearing, it may be that we're not going to finish by 2.  I just

3    recognize that possibility.  So let's do the following.  Those

4    who are not interested in this subject may just feel stuck in

5    the middle of a row and feel awkward about getting up and

6    leaving.  So let's take a ten minute break.  You can take a

7    drink of water and refresh yourselves, come back at about ten

8    to 12.  Those who want to leave, that's fine.  Those who have

9    an ongoing interest in the subject matter will resume at ten of

10   and we'll go till 1:00 and then take a lunch break and then

11   consider what happens next.

12            MS. SINGER:  Thank you, Your Honor.

13            THE COURT:  We're adjourned for ten minutes.

14            THE CLERK:  All rise.

15        (Recess from 11:43 a.m. until 11:57 a.m.)

16            THE COURT:  Be seated, please.  I think we'll just

17   take the objections in turn.

18            MR. WILLETT:  Good morning, Your Honor.  Sabin Willett

19   of Bingham McCutchen appearing for State Street Bank and Trust

20   Company.  I'd like to begin with a statement of our objective,

21   and then proceed to a concession.  The objective is consistent

22   with what Mr. Miller said.  We need -- this is all about

23   substantive consolidation.  And the discovery we care about is

24   that which is going to educate us about that subject.  There's

25   other things, but they're details.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 79 of 142

Page 79

1          THE COURT:  Do you have a point of view with respect

2    to that subject right now?

3          MR. WILLETT:  I do indeed, Your Honor.  I don't think

4    that it's permissible in this case.  Or --

5          THE COURT:  So you'll be looking for discovery that

6    supports that position?

7          MR. WILLETT:  Right.  But if it turns out there was

8    contrary discovery, we'd like to know about it early enough to

9    make an intelligent change of view.  We don't think we'll find

10   that.

11          We started out by looking at this process, which is

12   unlike most litigation processes.  We don't stand at the

13   starting gate together.  The debtors are way ahead of us.  They

14   have one of the finest financial advisors in the world which

15   has spent 400 million dollars looking under every rock and

16   understanding every financial detail of these debtors, and

17   doing a superb job at it.  But that's -- that work has been

18   done, and it's not currently available to us, except in limited

19   public ways.

20          And we thought, the only way that we'll have a chance

21   against these well-financed, estate-financed, adversaries is to

22   come up with our own committee.  But I have to concede that I

23   feel a little bit like Colonel Lawrence on Little Round Top

24   waiting for the reinforcements that have not come.  You can't

25   have a committee of one.  And the many creditors who are

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 80 of 142

Page 80

1    situated as we are, which is to say a claim against an opco or

2    a guaranty claim parent, they're not also advocating that

3    result.  So I think that I have to say that it's just not going

4    to work to set up even one ad hoc committee.

5         I regret that.  I think it would have actually been

6    cheaper and more efficient.  In fact, the complicated process

7    that Ms. Singer described might have been simpler if there were

8    one voice for many of us.  But it's not going to happen.

9         So coming back to our primary objective, which is how

10   do we discover efficiently and quickly the facts pro and con

11   consolidation, it seems to me -- and this is going to drive

12   really just a couple of points on the order.  The answer is, we

13   need to know what Alvarez & Marsal knows.  That's the quickest

14   and most efficient way to get it.  We don't care about their

15   advice.  We don't care about the lawyers' advice.  But we do

16   need to know the facts.  And they know the facts.  In fact,

17   we're quite confident of that, because their plan says we know

18   the facts, we've looked at the facts, we have assessed them and

19   we've come up with a compromise.

20        And this informs what may have seemed to Your Honor as

21   a trivial objection, which is the one to the interrogatories.

22   I'm a litigator by trade.  I regard interrogatories as the

23   least useful tool in the bag, usually.  But this case is

24   different.  I'd like to send them an interrogatory that says, I

25   want an answer that shows me every fact, pro and con,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 81

1    entanglement of these finances known to Alvarez and an

2    identification of the documents that support it.

3         I suspect they would call those contention

4    interrogatories, but I think that would be the swiftest way to

5    put facts on the table that we can then argue about later.

6    Right now the order doesn't permit that.  But with a change to

7    paragraph 12(a)(1), deleting the limitation of "no contention

8    interrogatories" and also deleting the language that tracks

9    Local Rule 7033-1(a), we could get there.

10        Your Honor can do that under Local Rule subsection

11   (b).  You could permit us to take this kind of discovery by

12   interrogatory.  So that's the first technical objection to the

13   order:  can we strike that language from paragraph 12(a)(1).

14        THE COURT:  I'm sorry, what language in particular do

15   you want to have stricken?

16        MR. WILLETT:  I'm on -- in my draft it's page 33, Your

17   Honor.  It's paragraph 12, headed "Interrogatories".

18        THE COURT:  I'm looking at it.

19        MR. WILLETT:  Okay.  And in there it says, about five

20   lines down, "Interrogatories to the debtors shall be limited to

21   identification of witnesses and authentication of documents."

22   We would strike that.  And it goes on to say, "and shall not

23   include contention interrogatories."  So we would simply

24   propose to strike that sentence.

25        THE COURT:  And you want to strike that sentence so

Page 82

1    that you can ask an interrogatory that will give you all the

2    information known to Alvarez & Marsal with respect to

3    substantive consolidation issues.  That's impossible.

4         MR. WILLETT:  Well, Your Honor, we have to be more

5    precise in framing an interrogatory. But, for example, one of

6    the things that it is their burden to show, is a hopeless

7    entanglement of the finances.  They have said in the plan that

8    they have analyzed facts on that, pro and con, and that that

9    drives the compromise in their plan.  We want to know what

10   those facts are; what they precisely are, not simply as they're

11   broadly described in the disclosure statement; what evidence

12   you would hear at a trial of that matter.

13        And I can imagine half a dozen interrogatories framed

14   in that way to give us the information that is known to

15   Alvarez, precisely on that point.

16        The alternative, which is what we now have in the

17   form, is we're going to have to look through ten million

18   documents, we who don't have an estate-funded representative,

19   and recreate what they've observed.  So that's what informs

20   that request.

21        Related -- if I can move on to the next one, Your

22   Honor, it's related in object, although it's a different

23   subject.  And this one is subsection 11(c)(vi).  It's also

24   3(j).  And it goes to the extent of discovery from Alvarez.

25   Right now -- I'm on 11(c)(vi) which is page 33 -- right now we

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 83 of 142

Page 83

1    can't get any internal documents of the advisor.  That's where

2    this information is going to be.  They're going to have memos

3    or e-mails or other communications that describe what they have

4    found that's either suggestive of entanglement or suggestive of

5    transparency.  And that's -- they can redact out the advice.

6    We don't care about that.  We just want to get to the facts

7    that they have unearthed in their work.

8            So we have suggested that the order delete 11(c)(vi)

9    and similarly, the parallel language that Ms. Singer described,

10   which I think is in 3(j), relating to the scope of discovery.

11           THE COURT:  I don't understand what you just told me.

12           MR. WILLETT:  Okay.

13           THE COURT:  Why is it you don't find 11(c)(vi) to be

14   workable right now?

15           MR. WILLETT:  Because the internal documents within

16   the advisor, in this case, Alvarez, that's where this

17   responsive information will be.

18           THE COURT:  Well, this is of a witness.  "provided,

19   however, in the event that a representative of any advisor is

20   disclosed to be an anticipated witness at the plan confirmation

21   hearing, such individual's documents shall be subject to

22   discovery," blah, blah.  What's wrong with that?

23           MR. WILLETT:  I don't know whether they'll call any

24   Alvarez witnesses or which ones they would call.

25           THE COURT:  Well, they do have a burden as plan

Page 84

1    proponent to put on a case that supports their plan.  And

2    presumably they'll do that with someone who is speaking

3    English.

4              MR. WILLETT:  I'm sure they would, Your Honor.  But --

5              THE COURT:  I don't know who the witnesses are going

6    to be, but they'll be somebody, presumably that -- whether an

7    Alvarez & Marsal employee or an employee of some other estate

8    representative or advisor would say, I've studied the following

9    and a truck comes in with documents that have been analyzed.

10   And presumably there's some testimony and an opportunity to

11   cross-examine.

12             MR. WILLETT:  But we're going to start with document

13   production.  They don't designate their witnesses until later.

14   So we don't know who the witnesses are.  We can't get at this

15   material.  The simple point I'm trying to make is that we

16   believe this material exists, that they know, because they've

17   said in their disclosure statement --

18             THE COURT:  But this paragraph deals with privilege.

19             MR. WILLETT:  Well, I'm not sure that it is, at (vi)

20   "internal documents and communications of the advisor."  I'm

21   not sure why that's privileged.  And we're just trying to get

22   at the source where the relevant facts would be.  We think

23   that's where it will be.  Otherwise, we're just going to go on

24   a hunt through ten million documents, trying to recreate what

25   they've already done.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 85 of 142

Page 85

1          3(j) follows the same -- it's the same issue.  It

2     relates to the post-petition -- it would cut off, as I

3     understand it, inquiry into post-petition matters.  But again,

4     it's all going to be post-petition.  That's when they did their

5     work -- or, I imagine substantially all of it.

6          I have a couple more points on the order, Your Honor.

7     The next one's at paragraph 16, which has to do with experts.

8     And this may simply be a point of clarification.  I just want

9     to be sure that experts -- and that's 16(b) on page 50.

10    Experts who are resisting consolidation, I want to clarify, are

11    indeed rebuttal experts, since it's the debtors' -- the plan

12    proponents' burden to make a claim for consolidation.  We'd

13    like to know what it is they're saying before we have to

14    respond to it.

15         If -- it's not clear from this order, but if that is

16    indeed the intention, there's no problem.

17         THE COURT:  I didn't get what you just said.

18         MR. WILLETT:  Okay.

19         THE COURT:  We're in paragraph 16(b), rebuttal

20    experts.  It says, "Participants shall identify and serve all

21    disclosures regarding rebuttal experts, including rebuttal

22    expert reports, no later than thirty days after the service of

23    initial expert disclosures."

24         MR. WILLETT:  Yes.  What I'm --

25         THE COURT:  What's the problem with that?

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 86

1           MR. WILLETT:  There's no problem with that, if it's

2      clear that experts who speak in opposition to consolidation are

3      rebuttal experts and within that paragraph, as opposed to (a),

4      which is a simultaneous disclosure of expert disclosures.

5           Typically, the way it works is the party with the

6      burden discloses its expert view first so that the party

7      without the burden can respond.  That's what we're trying to

8      accomplish there.

9           THE COURT:  I'm not getting what change you're looking

10     for.

11          MR. WILLETT:  I'm looking for a clarification that

12     experts who speak in opposition to consolidation will be deemed

13     to be rebuttal experts for the purposes of this order.

14          THE COURT:  I think that they're just rebuttal

15     experts.  That's what -- I'm just reading the words.  I hear

16     your point, but I'm not truly understanding it.

17          MR. WILLETT:  Okay, it may be simple -- maybe the

18     debtors' can clarify that that's their intent.  If it's not

19     their intent, then we have a problem.  If they would say no,

20     your experts, whatever they might opine to, they're not

21     rebuttal experts, they have to go when ours go.

22          THE COURT:  I'm assuming that whatever is in this

23     document, and it's a long document, that parties have spent a

24     lot of time drafting, revising, evaluating, and objecting to,

25     is a document that's a best effort attempt to deal with a very

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 87 of 142

Page 87

1    difficult problem, and may not be perfect, despite those best

2    efforts.  To the extent that there is a disagreement concerning

3    language of the order, ultimately, I'll be the person to

4    interpret it, or somebody like me.

5         And this is all going to be construed consistent with

6    the fundamental premise of the Federal Rules of Civil Procedure

7    to achieve fairness and efficiency and to avoid prejudice.  So

8    I don't see how this can be a problem for you.

9         MR. WILLETT:  Your Honor, it sounds like we're reading

10   the order the same way, in which case it won't be any problem.

11   There's just some ambiguity in the way it's drafted.  There are

12   a couple of other small points in the order, one of which I

13   think I heard Ms. Singer to clarify in a way that avoids a

14   problem, and that's the treatment of Barclays, which appears in

15   Section 3(L) of my draft.

16        My understanding is that this is not designed to cut

17   off discovery from Barclays, but that the discovery has to be,

18   in effect, routed through the debtors.  And we have no interest

19   in Barclays unless it turns out that they're a repository for

20   information that's relevant to consolidation.  That would be

21   the only relevance.

22        If there's no limitation on the ability to ultimately

23   get that material, if we can't get it through the debtors, then

24   that shouldn't be a problem.  But I wanted to flag for Your

25   Honor, there shouldn't be some sort of shield around Barclays

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 88 of 142

Page 88

1   if it turns out that they are a repository of information

2   relevant to consolidation.

3        There's also on the privilege logs, which is 11(a).

4   It's not quite there, because they don't disclose to/from and

5   cc, so you can't tell whether you have the basis for privilege

6   in the fields that that they would disclose.  It's on page 32.

7   But if they were to add "to/from" and "cc", that would be fine.

8   And that's all I have, Your Honor.

9        THE COURT:  Okay.  I'm going to make a comment before

10  hearing from the U.S. Trustee.  But it's just going to be a

11  brief comment.

12       I have a sense, based upon not only what I have

13  reviewed but the comments of counsel, both counsel for the

14  debtor seeking to characterize the objections, and now having

15  heard from Mr. Willett -- and I don't mean to say that all of

16  the other objections will be like that -- that it may not be

17  possible, in one document today, to satisfy everybody.  And I'm

18  conscious of the fact that this order is, in effect, making

19  modifications to discovery rules that have stood the test of

20  time in civil litigation for decades.

21       But they're designed to deal with a very real problem.

22  And I believe that everybody, including the objectors,

23  recognizes that this is a problem of case management that may

24  be uniquely complicated, given the number of parties who are

25  involved, the complexity of the assets and businesses that

Page 89

1    we're talking about, and the enormous stakes in terms of

2    outcome.  And as I hear these objections, I want you to know

3    that I'm going to be balancing the particularized needs of

4    individual objectors, as against the common good, which is

5    managing a difficult case on a timeframe that ultimately works

6    to everybody's advantage by getting us to the finish line in a

7    fair and efficient way.  So I just wanted to say that, so that

8    as you're making your objections you recognize that I'm

9    listening, but you may not all get what you want.  In fact,

10   there's a good chance you won't.

11         Go ahead.

12         MS. SCHWARTZ:  Good afternoon, Your Honor.  Andrea

13   Schwartz for the United States Trustee.  We're certainly

14   mindful of Your Honor's comments just now and earlier, and also

15   as we stated in our papers, the United States Trustee is in

16   favor of the establishment and implementation of discovery

17   procedures in connection with plan discovery, with the positive

18   goal toward effectuating an efficient and expeditious and

19   streamlined process for all the parties within the court's

20   jurisdiction and within the parameters of the Bankruptcy Code.

21         On April 6th, the United States Trustee filed a

22   response to the then second iteration of the discovery

23   procedures, which, as Your Honor commented and debtors' counsel

24   has commented, was an extensively revised version.  We had had

25   two prior discussions with debtors' counsel, where they

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 90 of 142

Page 90

1    listened to our comments, incorporated many of them, some of

2    which were incorporated, some of which were not.  But it was

3    clear that their effort was to try to incorporate as many

4    comments from us and, it appears, from the other interested

5    parties as well.

6            In our response we set forth three areas of concern.

7    One was that the United States Trustee should be able to fully

8    participate in all aspects of discovery.  It wasn't clear to

9    us, but it did appear to us, that given that this is such a

10   complicated procedures mechanism, that it was probably more

11   likely than not that the debtors had omitted the United States

12   Trustee or it was a scrivener's error where we hadn't been

13   included.

14           Subsequent to that time, we have had conversations and

15   e-mail communications with debtors' counsel.  The revised

16   document that Your Honor got today contains many of those.  In

17   fact, when Ms. Singer was referring to the twelve o'clock call

18   last night, it might have been me.  But we had one more change

19   to that which they've already agreed to put in.  So we're

20   comfortable that the U.S. Trustee can participate fully, and we

21   very much appreciate debtors working with us in that regard.

22           The second issue that we raised, Your Honor, was with

23   regard to the United States Trustee's obligations for

24   disclosure under 586 of Title 28, the Freedom of Information

25   Act, the Privacy Act and any other applicable law, as well as

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 91 of 142

Page 91

1    disclosing information that's discovered for purposes of civil

2    and criminal law enforcement purposes.

3            We spoke with debtors' counsel about that.  At

4    paragraph 23 of the protective order, there is a provision that

5    includes some language relating to the United States Trustee's

6    ability to make those disclosures, consistent with her

7    statutory duties as well as federal law.  If Your Honor reads,

8    in the middle of that paragraph, it does read, "Nothing herein

9    shall prevent the UST from disclosing information designated as

10   confidential or attorneys'-eyes-only for civil and criminal law

11   enforcement purposes or in compliance with a subpoena or court

12   order."  Then it reads, "To the extent confidential

13   information," and we suggest that there might be just a

14   typographical error there -- they should include the words "or

15   attorneys'-eyes-only information" -- "is sought pursuant to any

16   request made under the Freedom of Information Act or applicable

17   law, prior to that disclosure, the U.S. Trustee will notify the

18   party," and they'll have an opportunity to take whatever

19   measures that they may need to take.

20           That's okay.  That works for us.  We think that

21   language should also be in the discovery procedures order.

22   What the discovery procedures order contains is just a

23   reference to paragraph 23 of the protective order.  The problem

24   is this, Judge.  Oftentimes these discovery orders get

25   separated from the protective orders, and the issue here is

Page 92

1    notice.  All parties should be on notice that information that

2    comes to the United States Trustee is subject to these

3    disclosures.  We don't think that simply a reference to the

4    paragraph in the protective order is sufficient, and we would

5    propose that this language also be included in the discovery

6    order.

7         The bigger issue here, though, Your Honor, is that the

8    protective order and the discovery procedures order, seek to

9    limit the use of that information.  If Your Honor looks at

10   paragraph 1 of the procedures order, subparagraph (a), it

11   reads, "All plan discovery sought must be sought in connection

12   with the plan issues only, and no discovery nor any information

13   contained therein may be used in connection with any other

14   matter or proceeding."

15        It is our view that if the United States Trustee,

16   under her statutory duties or other applicable law, discloses

17   information for purposes of criminal or civil law enforcement,

18   that those law enforcement authorities should be able to use

19   that information, and that they shouldn't have to then go and

20   take their own discovery to get the same information.  And we

21   would just like the order to provide as such.

22        We've spoken with debtors' counsel about it.  They

23   stated in response that they didn't believe there was anything

24   in the orders that prohibited that type of use.  We see it

25   differently, and we would appreciate if those modifications

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 93 of 142

Page 93

1    were made.  And I won't take up the time with Your Honor, with

2    all the sections where it talks about use of the material, but

3    that's the overall concept.

4         The last issue, Your Honor, deals with paragraph 9 of

5    the protective order.  And Ms. Singer alluded to the United

6    States Trustee's position with regard to what is provided for

7    in the protective order as an automatic sealing provision.  Our

8    position, which is slightly different than Ms. Singer stated,

9    is that the Court should not permit any automatic sealing at

10   all, under these procedures.  We believe, and as the case law

11   in our circuit states, that under 105(a), we're certainly

12   mindful that Your Honor has broad equitable powers.  One of our

13   leading treatises, Colliers, notes that the Court should not

14   use its broad equitable powers to override another section of

15   the Bankruptcy Code.  That would bring us into 107, and also

16   Rule 9018.

17        There's a long presumption, Your Honor, and I imagine

18   Your Honor is very well versed on this, that records that are

19   filed with the court should be public and they should be

20   transparent.  The Second Circuit, in Orion Pictures stated and

21   noted that, "there is a longstanding presumption in the

22   jurisprudence in this area that evidences the United States

23   Congress' intent to preserve the public's right of access to

24   judicial records in bankruptcy proceedings." That's at 21 F.3d

25   24 (2d Cir. 1994).

1          That public policy is codified in Section 107(a) of

2     the Bankruptcy Code which states, "All papers filed in a

3     bankruptcy case are public records and open to examination."

4     I'm certainly mindful of 107(b), and that's where the rub comes

5     in here with respect to the procedures.

6          The law of this circuit makes it clear that the burden

7     for showing that information which falls within 107(b), that's

8     trade secrets, confidential research, et cetera, falls on the

9     party seeking to have that information sealed.  That was

10    somewhat recently stated by Judge Glenn in In re Food

11    Management Group, 359 B.R. 543 (Bankr. S.D.N.Y. 2007).

12         To meet this burden, the Second Circuit in Orion held

13    that, "The movant must demonstrate extraordinary circumstances

14    and compelling need to obtain protection."  Now, that's the law

15    that governs here with respect to these procedures orders, in

16    practice.  Your Honor, prior to joining the United States

17    Trustee's Office, I had sixteen years as a litigator.  I was

18    involved in a lot of litigation.  I was involved in a lot of

19    discovery orders and, as well, with respect to how parties go

20    about designating documents as either confidential or

21    attorneys'-eyes-only.

22         Under the procedures orders that are before Your

23    Honor, the requirement to designate material as confidential or

24    attorneys'-eyes-only, is a good-faith belief.  Nobody doubts

25    that anybody would have a good-faith belief, but I think it's

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 95 of 142

Page 95

1    also fair to say that in practice, there is a tendency to

2    overdesignate things as confidential out of an abundance of

3    caution.  That being said, that is not the same standard that

4    has to be met when documents are sought to be sealed when

5    they're being filed under the public record.  That is not a

6    good-faith belief.  And the law is absolutely clear that only

7    certain types of information can be -- that can qualify for

8    sealing.

9           If Your Honor looks at the documents that are subject

10   to being designated as attorneys'-eyes-only under the discovery

11   order, or under confidential information -- and we cited this

12   in our papers, and I know Your Honor's read that -- there's a

13   whole host of information that would not necessarily meet the

14   standard under 107.  So our position is that there should not

15   be an automatic sealing provision that just receives this

16   Court's imprimatur.  The burden should be on any party that's

17   seeking to file documents where they want to seek to file

18   information that's been designated as confidential or

19   attorneys'-eyes-only.

20          As an alternative, Your Honor, and solely as an

21   alternative, we said okay, we're trying to come up with a way.

22   This -- as Your Honor noted -- this is a very complex case,

23   lots of parties.  You know, look, it's not just the United

24   States Trustee.  It's all parties.  It's the public that has a

25   right to see documents that don't satisfy the protections that

Page 96

1    have been put in place by Congress.  But we suggested a

2    mechanism by which parties could provide us with those

3    documents.

4         I want to say two things about that.  One, counsel

5    asked us, do you have any precedent for any other orders where

6    discovery procedures were entered.  I've only been with our

7    office for a fairly short time.  But I was able to locate, in

8    the case of Quigley, which is a Judge Bernstein matter, where

9    Judge Bernstein approved a stipulation and order; and very

10   sophisticated lawyers were in that case.  And that

11   sophisticated order provides that they have to make a motion in

12   order to get documents filed under seal.

13        I'm not saying that that case is on par with the

14   Lehman Brothers case.  What I'm saying is that although Your

15   Honor has broad powers under 105, I would suggest that the

16   Court should not use that power to override 107, and that an

17   appropriate mechanism could be installed in these procedures so

18   that parties seeking to file documents that have confidential

19   information, respect the public's right to see documents that

20   are not otherwise provided for protection under the Code.

21   Thank you.

22        MR. HUEBNER:  Good afternoon, Your Honor.  I am

23   Marshall Huebner of Davis Polk & Wardwell on behalf of the LBIE

24   entities.  First let me thank the debtors for their shout-out

25   about the nature of the collaborative process.  In fact, it was

1    a -- it is an extraordinarily good and robust process, with the

2    creditors, in a remarkably large group; first getting all their

3    comments into a single voice, and interacting with the debtors

4    and receiving mature and thoughtful responses back.  And so I

5    do want to sort of give kudos, frankly, all around, in return,

6    including frankly, to the debtors themselves.

7         Number two, Your Honor, I know that her slip of tongue

8    was surely inadvertent, but Ms. Singer in her remarks, when she

9    was talking about the groups that are contemplated under the

10   order, said, "And if people need to they can set up additional

11   ad hoc committees or groups."  In light of the connection to

12   the prior motion and Mr. Harvey Miller's slip of the tongue

13   about the actual ad hoc, just to be very clear, there is no

14   argument -- I assume she was not attempting to say -- that the

15   unbelievably broad umbrella groups in the discovery order,

16   which are all creditors against -- directors against LBHI, in

17   any way constitute ad hoc groups under 2019, and that this

18   order now gifts us eight new monster blocks of 2019 targets.

19        I know it was completely inadvertent, but I want the

20   record to be clear, because obviously, we had just finished a

21   rather sensitive colloquy with Your Honor about ad hocs, and I

22   don't think that's anyone's view.  And I'm looking at body

23   language that completely agrees with my position.

24        Third point, Your Honor.  I think that your opening

25   question to Ms. Singer actually was, I've read everything,

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 98 of 142

Page 98

1    could you please tell me what the further changes are,

2    including the ones that you referenced from this morning.  I

3    don't actually think that question was answered.  And because

4    this is such a delicately done document, in which, frankly,

5    paragraphs and words were looked at by many people, with

6    extraordinary care, rather, I think, than burdening the Court

7    with let me tell you or show you what happened this morning,

8    although that may be the Court's pleasure, the core parties who

9    sat and wrestled with this thing night after night, clearly

10   need to see those.

11           And I think you deserve an answer, we all need to have

12   an answer.  Because as it turns out, and this is my fourth

13   point, one of the changes that we saw for the first time --

14   which is fine -- obviously they were working around the clock

15   and we have no -- we brook no disagreement with that -- one of

16   the changes we saw for the very first time in court this

17   morning when they handed it out at the beginning of Ms.

18   Singer's presentation, in fact, doesn't work.  And we had a

19   little conversation about it while Your Honor was back in

20   chambers.  And I actually think we have language that will fix

21   it to everyone's satisfaction.

22           It was another creditor's point.  We understand it.

23   In fact, we had talked about closely related issues.  But I

24   think that rather than trying to draft at ninety-five miles an

25   hour on the fly with a full courtroom of people who care

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 99

1    passionately about that particular point and others, I think

2    that probably some mechanism where whatever the further changes

3    are that we haven't seen at all, because they're not even in

4    this blackline -- she referenced further changes agreed to only

5    this morning -- we clearly need to see those.  And based on the

6    little conclave that happened here while Your Honor was in

7    chambers, certainly as to the potentially substantial and not-

8    so-okay change to paragraph 1(b), I think we've already seen

9    our way through.

10           I'm confident that we will be able to address any of

11   the new, new comments, and just make sure that they don't gore

12   someone else's ox by accident, as this one did.  And in fact,

13   we have a pathway through procedurally.

14           One other kind of very small point and then the final

15   point.  I'm actually going to be incredibly brief.  One of the

16   things Ms. Singer said about the categories of documents for

17   which, as an initial matter -- and Your Honor, I think, has

18   correctly noted, this is unthinkably complex, and this has to

19   be a living, breathing document.  And if there are issues,

20   there may need to be issues to be resolved.

21           Ms. Singer did say that it's the debtors' view that

22   one of the reasons for a categorical exemption initially of

23   certain types of documents is because they will likely

24   virtually all be privileged.  Just to be clear, we don't know

25   that.  We don't know enough to know that.  And we're not sure

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 100 of 142

Page 100

1    we agree, which is why the document is actually pretty

2    sophisticated, and in fact, as heavily negotiated, specifically

3    said "presumptively" this category is not open hunting.  But if

4    there are things you need to know, you're absolutely entitled

5    to ask them.  And we will go look.

6         So I just didn't want to share the last piece of what

7    she said, which is, and we think they're all going to be

8    privileged.  That's -- she may be right, but that's not a

9    shared assumption.  That's just their preliminary view.

10         And then finally, I do want to note that I also

11    appreciate, because it matters -- and, you know, the Court

12    doesn't always know when it sees a final product, what was very

13    heavily negotiated, what was of great concern to the parties --

14    the thought that Ms. Singer articulated in the name of Weil and

15    the debtors, which is that it's not really the debtors'

16    business to be deciding who is the clearinghouse for discovery

17    against the debtors, and that that's best left to the parties.

18    We really appreciate that and we really agree it.  And the

19    document reflects that and it's correct.

20         In fact, a huge umbrella of parties, that we had an

21    awful lot of involvement with, including the LBSF folks at

22    large, a whole bunch of foreign affiliates at large, and

23    frankly some other parties Your Honor has heard from a lot in

24    these cases, that we spoke to, think we know who it has to be,

25    because there's probably only one law firm that you know will

Page 101

1    be in the same role, and anyone else could settle, and then

2    disappear.  And you can't have one firm be the clearinghouse in

3    discovery against the debtors to be told two months before

4    confirmation, sorry, we've just settled and now we're

5    completely supporting the debtors.

6           So, we'll figure that out and we'll figure out how to,

7    once again, get an even bigger group of people in the room, to

8    pick the people and designate them.  Because as others have

9    remarked from the podium, there's a whole universe of creditors

10   that belongs to all these groups collectively, but we'll figure

11   that out as it comes.

12          And with that, since I don't -- other than needing to

13   have 1(b) fixed, because it's not okay as currently drafted,

14   and needing to just see what further changes are made, we

15   actually think that this is a pretty amazing piece of

16   groupthink and very hard and assiduous work.

17          MR. MILLER:  Your Honor, just a point of

18   clarification.  I'm not sure I understand what Mr. Huebner was

19   asking for in connection with the drafting.  Are you asking for

20   an adjournment or what?  I'm not sure.

21          MR. HUEBNER:  No, I'm sorry.  I don't imagine there

22   was confusion, but I guess I'll say it again.  Paragraph 1(b),

23   which was changed very late last night at the request of one

24   party, which none of us saw until they handed them out, not

25   first thing when we got here, but right when Ms. Singer began,

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 102 of 142

Page 102

1    needs to be tweaked, and we had a conceptual conversation.  I

2    think we'll figure it out together right after the hearing.

3    Assuming we can agree on 1(b) and assuming that whatever other

4    changes that we just haven't seen yet -- and there may be

5    none -- there are no more?  This is it, the blackline?

6            MS. SINGER:  If I may, Your Honor, just to be clear --

7            UNIDENTIFIED SPEAKER:  There are people on the phone.

8            MS. SINGER:  Your Honor, just to be clear, what we

9    handed up to you this morning, the 1(b) changes were -- that

10   was from the debtors' point of view, there were no further

11   changes.  That represented the last -- debtors' understanding

12   of what the last negotiated point was.  My understanding is

13   that that may have subsequently changed, and to the extent it

14   has -- but there were no other changes to it from the debtors'

15   point of view, to the order at all.

16           The three -- the three things that changed were the

17   proposed language to 1(b), the, I believe, accepted language to

18   11(c), and a few handful of changes, adding the U.S. Trustee,

19   making it clear that the U.S. Trustee had the ability to

20   participate fully in discovery.  Those were the only changes

21   since what was filed on the record on Monday.

22           MS. SCHWARTZ:  Except there was one change today, this

23   morning in court, that you guys agreed to put into the order.

24           MS. SINGER:  It falls into the same category.

25           MS. SCHWARTZ:  But it's not in the document the judge

Page 103

1    has.

2             MS. SINGER:  There's one additional place where the

3    U.S. Trustee has asked us to clarify that the U.S. Trustee has

4    the ability to fully participate in discovery.  We've agreed.

5    It was a language oversight, and we will make that scrivener's

6    change.

7             MR. HUEBNER:  Then, Your Honor, it's even easier.

8    Maybe I was the only person confused.  It sounds like the

9    blackline that we were handed, has just one issue which we know

10   about and we've already discussed.  We certainly are not

11   requesting an adjournment.  We think that that change can be

12   negotiated very quickly, post-hearing, other than, obviously,

13   Your Honor ruling on other people's substantive objections, and

14   then the people for whom we speak will be satisfied.

15            THE COURT:  Okay.  Mr. Mayer is standing, and I'm not

16   sure if it's because he wants to jump the line or he has

17   something else to say.

18            MR. MAYER:  What I have to say relates to what Mr.

19   Huebner said.  I therefore thought it would be appropriate for

20   me to speak at this time.  But I'm happy to sit down and let

21   Mr. -- if Your Honor wishes other people go first.

22            THE COURT:  Well, why don't we do this in the order in

23   which people are aggressive enough to get to the podium.

24            UNIDENTIFIED SPEAKER:  Mr. Miller?

25            MR. DESPINS:  Good afternoon, Your Honor.  Mindful of

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 104 of 142

Page 104

1    Your Honor's comments -- for the record, Luc Despins with Paul

2    Hastings, on behalf of CarVal Investors UK.  Mindful of Your

3    Honor's comment, I'll be very brief.

4             The first issue is really, I think, an unintended

5    consequence of what the U.S. Trustee just said, which is that

6    she wants the ability to access even things that are marked

7    confidential.  I don't have an issue with that, except that the

8    debtors, in their order, as a cost of entry to this process

9    said, you must disclose what you hold.  And my first reaction

10   is, I'm not a group; I'm CarVal, I have no obligation to do

11   that under Federal Rules, but I'll do it, as long as I can mark

12   that confidential.  They've agreed to that.

13            Now, there's a yin and a yang, which is, if the U.S.

14   Trustee is going to say, oh, no, this -- the public has access

15   to all of that, then unfortunately, I can't agree to that,

16   because there's no basis under the rules for me to be subjected

17   to disclosure of what I hold, to get discovery.  I mean, it

18   doesn't exist.  2019 doesn't apply to us.

19            So I don't know what to do.  Meaning, if Your Honor is

20   inclined to not -- not to heed their comments, that's fine.

21   But otherwise, unfortunately, our agreement to disclose what we

22   hold, if it's not going to be confidential, is a problem.  So I

23   don't know how to deal with that issue.  It just came up now,

24   meaning that -- so --

25            THE COURT:  Well, it may be that the parties will need

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 105

1    to talk with counsel for the U.S. Trustee on this point.  I'll

2    tell you what I understood, and it doesn't necessarily create

3    the problem you're describing, unless a document that includes

4    disclosure of your client's holdings is referenced in a

5    pleading that is to be filed in connection with confirmation;

6    in which case, under the existing format, it would be

7    automatically sealed, and under the format proposed by the U.S.

8    Trustee, presumably, there would need to be a sealing motion

9    filed beforehand, it or might be public.

10           MR. DESPINS:  If it's limited to that --

11           THE COURT:  Do I understand that, correctly?

12           MS. SCHWARTZ:  Yes, Your Honor.

13           MR. DESPINS:  Okay.  Because I want to make sure, just

14   so she understands, that we are going to disclose to the

15   participants of the discovery, our holdings.  We're going to

16   mark it as confidential, and apparently that's okay.

17           MS. SCHWARTZ:  We -- just for clarification, as I read

18   the discovery procedures order, there's a whole process by

19   which parties can designate information confidential,

20   attorneys'-eyes-only.  There's a process for people to dispute

21   that.  If there's a dispute, it could be brought to the court.

22   We have no problem with that process.  Our comments were

23   strictly limited to documents that were going to be filed with

24   the court that had been previously marked as confidential or

25   attorneys'-eyes-only --

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 106 of 142

Page 106

1           MR. DESPINS:  Okay.

2           MS. SCHWARTZ:  -- and the judge accurately stated what

3    our position is.

4           MR. DESPINS:  Okay, thank you.  And I'm glad we

5    resolved this.  On to the main point.

6           Our issue is limited, Your Honor, to 3(j).  And this

7    going to really be -- again, given Your Honor's comment, this

8    is going to be in the nature, mostly of a placeholder.  3(j),

9    Your Honor, is a provision that says the debtor does not have

10   to search categories of documents, because, as Ms. Singer said,

11   they believe that they're very likely to contain privileged

12   information.

13          I'm not asking the Court to make a ruling on whether

14   what I'm about to describe is privileged or not.  What I want,

15   though, to be clear, is that our issue in this case is also

16   sub-con, in a different context.  We hold a lot of claims

17   against LBIE, the U.K. entity, and we have guarantees from the

18   parent.  We don't believe -- but we're not asking the Court to

19   opine on that today -- that communications between LBIE folks

20   and LBHI folks, counsel or not, are privileged.  I'm not asking

21   the Court to rule on that.  We want to make sure they

22   understand.  We're going to make a discovery request for those

23   documents.

24          And there's a safety valve, as pointed out by Ms.

25   Singer, in the order, that says the Court -- if there are

Page 107

1    targeted discovery requests, the Court can order them.  I don't

2    want to be faced with an argument three, four months down the

3    road, that oh well, we didn't know that; that's too broad; we

4    didn't have time, et cetera, et cetera.

5            The issue is placed on the table now.  These

6    documents, we want them to search them.  I'm not asking the

7    Court to order that today.  I want to make sure, though, that

8    we're not going to be prejudiced three or four months down the

9    road when we ask for that and they say well, there's not enough

10   time, it's too burdensome, et cetera.  So as long as we have

11   that placeholder, I'm happy to sit down.

12           THE COURT:  Does that mean, when you say you're happy

13   to sit down, that you don't have an objection to the form of

14   order that's before me?

15           MR. DESPINS:  As long as it's clear that we will come

16   back on that issue, meaning that the Court will reserve that

17   issue for a later date, correct.

18           THE COURT:  Fine.

19           MR. DESPINS:  Thank you.

20           MR. MILLER:  And it's reciprocal on our side, Your

21   Honor.  We reserve all rights also.

22           MR. BROUDE:  Good morning, Your Honor.  Mark Broude,

23   Latham & Watkins, on behalf of Bundesverband deutscher Banken,

24   which I'll refer to as BdB.  It's a lot easier.  A few items.

25   And I think with each of these I have a relatively simple way

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 108 of 142

Page 108

1    to deal with them.

2         The first one is a question of timing.  And not so

3    much when discovery starts, but the concept of when discovery

4    has to end.  And the debtors have discovery ending or discovery

5    requests effectively ending in mid-May, by the way the calendar

6    works, which is over a month before any disclosure statement is

7    even up for approval.  Their safety valve, they say is that,

8    well, if there are changes to the plans then you can make new

9    discovery requests that relate to those changes, which is fine.

10        But, for example, it doesn't deal with the fact there

11   might be material changes to the disclosure statement required

12   to obtain Your Honor's approval that, in fact, the disclosure

13   statements satisfy 1125.  Those aren't changes to the plan.

14   There may be brand new information there coming up after the

15   discovery deadline has passed.  It also may be that a change in

16   a provision of one plan has impacts throughout the document.  I

17   think it's -- sort of to cut it short -- I think what makes

18   sense is, in Section 15(a), where they talk about re-upping and

19   re-allowing discovery, two changes are made:  one, it includes

20   a reference to changes to the disclosure statement as well as

21   changes to the plan.  And then rather than having their

22   fourteen-day time clock for new discovery to run from when

23   those things are filed, since I assume that as we get close to

24   the disclosure statement hearing, there will be multiple

25   filings, that that fourteen-day period start to run from the

Page 109

1    date of the disclosure statement hearing, so that we know, at

2    that point in time, we have the final document that Your Honor

3    is being asked to approve, and then we know what changes have

4    been made between today or middle of May and that disclosure

5    statement hearing.

6              THE COURT:  Mr. Broude, I'm not sure I understood that

7    last point.  The disclosure statement hearing is currently

8    scheduled for June 28th.  It may or may not go forward on that

9    day.

10             MR. BROUDE:  Right.

11             THE COURT:  Let's assume that that's the date.  And

12   there is an amended disclosure statement filed at 2 a.m. --

13             MR. BROUDE:  Correct --

14             THE COURT:  -- that day.  That's my hypothetical.

15   What discovery right do you have at that point?

16             MR. BROUDE:  Discovery requests as to the changes to

17   the plan and the changes to the disclosure statements, between

18   effectively today and 2 a.m. on June 28th, and the period of

19   time for those incremental, nonduplicative discovery requests

20   is fourteen days from June 28th, rather than fourteen days from

21   the date they are filed, which in your hypothetical is the

22   same.

23             I'm concerned about there being one document filed on

24   June 15th, another document filed on June 20th, another

25   document filed on June 27th, and the last document filed on

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 110 of 142

Page 110

1    filed on June 28th.  So you would, in effect, have four

2    different fourteen-day periods running simultaneously, and

3    trying to make sure your discovery requests are in on time,

4    could be somewhat challenging.

5            THE COURT:  So what is it you want?

6            MR. BROUDE:  Just two changes which are simple

7    drafting in 15(a).  One is where it talks about discovery upon

8    a change to the plan, it says "or disclosure statement"; and

9    that the fourteen-day period referenced there, runs not from

10   the date of the filing of any particular document, but the date

11   of the disclosure statement hearing or really the entry of the

12   disclosure statement order, since that's when we know the

13   document has stopped moving.

14           THE COURT:  So does that mean that if a disclosure

15   statement hearing commences on June 28th, that there be a two

16   week discovery period thereafter?

17           MR. BROUDE:  Let's assume that the order approving the

18   disclosure statement is entered on June 28th, and there have

19   been certain changes made between now and then, there would be

20   the right -- and this is already in the debtors' plan --

21   debtors' document as to changes to the plan in any event -- to

22   seek document requests solely related to the changes, starting

23   on June 28th, for the two week period, so through July 12th.

24           THE COURT:  Let's say I approve the disclosure

25   statement on June 28th.  That's discovery that would be used in

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 111 of 142

Page 111

1    connection with confirmation or --

2          MR. BROUDE:  Correct.  This is --

3          THE COURT:  -- okay.

4          MR. BROUDE:  -- all solely in connection with

5    confirmation.

6          We objected to the fact that there's no mechanism for

7    picking a designated participant.  In accordance with Mr.

8    Huebner's comments, I think we're comfortable that there will

9    be one picked.  Our concern was really that there would be --

10   that nobody would want the job, and then what happens.  But as

11   long -- I mean, I gather that there will be someone to do it,

12   and they'll be picked relatively quickly, so that's fine.

13         In terms of mechanisms for forming groups.  Again, the

14   debtors wish to create constructs and then abdicate

15   implementation.  I think here it's very simple.  You'll have

16   groups that will be fairly large.  You could have all kinds of

17   e-mails among the groups running back and forth, different

18   people proposing different times and things like that.  When

19   the debtor sends out the list of the people that are in each

20   group, they can simply schedule a meeting which they don't have

21   to take part in -- you can say everybody in Group A show up at

22   Weil Gotshal's offices, two to five business days thereafter,

23   during business hours, here's the time, here's the date; show

24   up.  At which point the group can take care of itself.

25         I'm more concerned about it taking forever for the

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 112 of 142

Page 112

1   group to simply find a time and place to meet.  And so if the

2   debtors simply say everyone shows up here at this point in

3   time, then the debtors can wash their hands of the group.

4   They've done what they can to get the group working.

5           THE COURT:  So you want the debtor to have a kind of

6   camp counselor role in connection with this?

7           MR. BROUDE:  To a certain extent, yes, Your Honor,

8   because these are going to be large groups.  I agree with the

9   debtors.  You can't have fifty different groups for each

10  particular set of interests, but more -- you can have a group

11  with fifty people, and they'll send e-mails running around

12  saying let's meet here, let's meet there.  Nothing happens.

13          The debtors are creating a construct and sort of

14  hoping that the groups, regardless of how large they are, will

15  coalesce extremely quickly.  It's a very -- as Ms. Singer said,

16  it's a very aggressive time frame.  I just think there needs to

17  be a mechanic sort of forced on the group so that they actually

18  have their initial meeting.

19          With respect to the privilege categories -- again,

20  this goes back to Section 3(j) -- there are two categories in

21  particular that cause us some consternation.  One is the hard

22  copy files of in-house counsel, which as Ms. Singer says, are

23  virtually certain to be mostly privileged.  There's, you know,

24  high likelihood there's stuff there that isn't privileged.  And

25  the question is, are they entitled not to search it simply

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 113

1    because it'll be too hard for them to.

2         They say well, we'll search it if you give us specific

3    directed questions.  It may be difficult to even ask the

4    questions if we don't know what's there.

5         And with respect to the internal files of advisors,

6    they'll say we'll search those only if that advisor is going to

7    be a witness.  Two issues there.  One is how am I to know if I

8    want that advisor to be a witness, even if the debtors don't

9    want if I can't get that advisor's files.  And second of all,

10   how am I to know whether those advisor's files may, in fact, be

11   relevant to a witness outside of that advisor, particularly

12   where there will be disagreements among advisors as to what the

13   right result, for example, for substantive consolidation is;

14   the files of one of the debtors' advisors who may not be a

15   witness, may be incredibly relevant to cross-examining another

16   of the debtors' advisors, or an advisor that some other party

17   is putting up on the stand.

18        And then I think there are two points I want to make

19   with respect to deposition scheduling, a point, I think, we may

20   be the only people raising this.  The debtors' order provides

21   that all depositions are scheduled based upon the debtors'

22   unilateral declaration that document production is

23   substantially complete and that fact discovery is complete.

24   That declaration, the debtors can make without court input or

25   review.  It simply says that once they send that notice out,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 114

1   that's it.  All the deposition scheduling runs from there.

2          It's very easy for the debtors to say that they think

3   document production is complete.  The participants may not

4   agree with that.  And we just think there needs to be a

5   mechanic in there for that dispute over the debtors'

6   declaration to be addressed, and that the deposition schedule

7   does not actually start until that mechanic has gone through,

8   so that people have an opportunity to say no, I'm engaged in

9   material fights with the debtor over a particular document

10  production.  And having that deposition go forward while that

11  fight is ongoing, would in fact be materially prejudicial.

12         Lastly, the debtors have rebuttal expert deposition --

13  rebuttal reports, rather, due within a certain period of time

14  after the expert reports are due, without regard to when the

15  expert deposition occurs.  And since the results of that

16  deposition may have a material impact on the rebuttal reports,

17  we think the debtor -- that rebuttal reports should be keyed

18  off of the experts' deposition, not off the actual delivery of

19  the report.  Thank you, Your Honor.

20         THE COURT:  Okay.  It's about time you made it.

21         MR. MAYER:  Thank you, Your Honor.  Tom Mayer of

22  Kramer, Levin, Naftalis & Frankel, as counsel for -- and this

23  is actually -- the identification of client is important

24  here -- Lehman Singapore Liquidators.  I don't represent the

25  following parties, but I think I'm sort of speaking for them.

Page 115

1    They are represented separately in this courtroom.  And they

2    are the other foreign Lehman estate:  Lehman Australia, Lehman

3    Hong Kong, Lehman Japan, Lehman Re, which is Bermuda, and

4    Lehman Finance, which is Switzerland.  Did I miss anybody?

5    Okay.

6              THE COURT:  Is this now a group?

7              MR. MAYER:  No, Your Honor.  I don't think this is a

8    2019 group; this is merely for purposes of economy at this

9    hearing.

10             These are basically nonparticipants.  That's why we

11   sort of grouped together to speak together.  And it deals with

12   an issue that Mr. Huebner raised in terms of Section 1(b).

13   Several of us filed objections to this protocol on behalf of

14   parties, Singapore in particular, and also, I believe Lehman Re

15   filed and Lehman Finance filed, because many of us don't intend

16   to be participants in this protocol.  We will have little

17   discrete one-off issues with the debtors over our claims.

18             I'm not here for Lehman Brothers Treasury, which has a

19   plus-minus thirty-four billion dollar claim.  They're probably

20   going to be a participant.  That's going to be a plan issue.

21   We got that.  I'm here for Lehman Brothers Singapore.  We have

22   maybe 200 million dollars of claims.  Probably not even.  We

23   don't intend to be a participant.  We don't intend to take

24   earth-shattering positions on sub-con or not.  We are

25   negotiating with the debtors over how much our claim is.  We

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 116 of 142

Page 116

1    hope to get to a deal.

2         The way the plan reads, unfortunately, if you don't

3    get to a deal, the plan says your claim is estimated at a buck.

4    That -- whether or not that's enforceable, is an issue for

5    another time, but it raised the whole question of does this

6    proceeding on plan discovery foreclose people two, three, six

7    months from now, from finding out they don't have a deal with

8    the debtors, they need to take some discovery just on their

9    claim.

10         But we wanted to make sure there was language in

11    Section 1(b) that said that people who don't plan on

12    participating -- because all we have is little bilateral

13    issues -- don't wake up six months from now and are told, wait

14    a minute, too late, you should have been a participant.  You

15    should have spend the millions of dollars necessary to be a

16    participant, because now you need discovery on just your claim.

17         Now, we were working on language with the debtors to

18    solve that problem.  Mr. Huebner brought up another issue.  I

19    assume Mr. Huebner was a participant.  It never occurred to me

20    this was going to gore his ox.  And apparently we did, and I

21    apologize for that.  Although as perhaps corrected, it was not

22    one party who asked for this change, it was six.

23         In any event, we hope to work out language with the

24    debtors to solve this problem.  And all I ask the Court,

25    because we do expect, when have language to solve this problem,

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 117

1    we'll withdraw our objection, and from our perspective this

2    will then not be a contested order, is that there has to be

3    flexibility for nonparticipants to come back and just get

4    discovery on their little issues.  This can't be an exception

5    that swallows the rule.  We understand that.

6             And I think this may be an issue that's best dealt

7    with when there's something concrete for Your Honor to look at,

8    two, three, six months down the road, if there is, in fact, a

9    bilateral issue.  But we were concerned that we not be

10   foreclosed from dealing with our relatively small bilateral

11   issues by this gigantic order.  And that's the only point I

12   wanted to make.  I'm happy to take questions if the Court

13   wishes.

14            THE COURT:  I realize that Mr. Huebner had an issue

15   with 1(b).  Are you satisfied with the language of 1(b) as it

16   presently exists?

17            MR. MAYER:  We had indicated to the debtor, with the

18   reservation that I just put on the record, the answer was yes.

19   With respect to what Mr. Huebner wants, we may probably also

20   get to yes.  What he wants is not, as I understand it, too much

21   different from what we want.  So I think with a half an hour or

22   so of drafting we can probably get to agreement amongst all of

23   us.  I'm not trying to foreclose Mr. Huebner's objection.  I'm

24   just saying that's -- he comes to this from a perspective of

25   somebody who's a participant, and we're coming at this from a

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 118 of 142

Page 118

1     perspective of people who are not participants.  But we'll -- I

2     think we can get to yes on language.

3              THE COURT:  Fine.

4              MR. MAYER:  Thank you.  I should probably ask if I

5     stated correctly.  Am I okay, folks?  Thank you, Your Honor.

6              MR. WILTENBURG:  Your Honor, David Wiltenburg; Hughes,

7     Hubbard & Reed on behalf of the SIPA trustee.  I'd like to

8     speak briefly in support of paragraph 6(m) of the protocol,

9     which is designed to avoid duplication where documents are in

10    the possession both of the LBHI debtors and at least

11    theoretically in the possession, custody and control of the LBI

12    trustee.

13             This is an important provision.  And, Your Honor, it's

14    found at page 27 of the --

15             THE COURT:  I have it.

16             MR. WILTENBURG: -- blackline.  This is an important

17    provision, because as Your Honor is aware, the LBHI debtors and

18    LBI shared information systems.  And it's just going to be

19    quite a common occurrence that the same documents and

20    information are in those systems -- are potentially accessed by

21    both parties.  And of course, as this is a protocol in support

22    of discovery relating to the LBHI plan, as Ms. Singer said,

23    it's appropriate that LBHI be the party to respond to requests

24    of those kinds.

25             Now, we're informed that one objector proposed this

Page 119

1    morning that the operation of paragraph 6(m) be qualified not

2    by the fact of access by both parties but by a requestor's

3    belief as to whether both parties have access.  And of course

4    many parties can have many different beliefs.  And it's a fact

5    whether there is joint possession, custody or control.  And so

6    it shouldn't be a consequence of an erroneous belief on the

7    part of a requestor on that subject, that duplicative discovery

8    occurs.

9           Finally, Your Honor, no party needs to be concerned

10   that what happens with respect to this protocol will limit or

11   waive discovery rights that exist in the SIPA proceeding.  I

12   would invite the Court's attention to Section 1(d) of the

13   proposed protocol, which states quite directly, "Nothing in

14   this order shall be construed to apply to the separate SIPA

15   proceeding."

16          And so, Your Honor, to sum up.  We believe that those

17   two principles should remain in place in the final order.

18   First, the separateness of the SIPA proceedings; and secondly,

19   the promotion of efficiency, avoidance of duplication and a

20   burden that is embodied both in paragraph 6(m) and in many of

21   the other provisions of this proposed order.  Thank you, Your

22   Honor.

23          THE COURT:  I understand that's your position on

24   behalf of your client.  But is there any controversy with

25   respect to the language that you've highlighted?

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 120 of 142

Page 120

1           MR. WILTENBURG:  I believe there is an objector that

2      is -- would like to address -- it may be that an objector will

3      address the Court on that subject.

4           THE COURT:  So you're basically staking out your

5      position that the language of the order is appropriate, and

6      that I should disregard whatever that objector is about to tell

7      me.

8           MR. WILTENBURG:  Well, if it's inconsistent with that

9      principle of separateness, then we would oppose it, certainly.

10          THE COURT:  Okay.  Understood.

11          MR. STEEL:  Your Honor, I'm not an objector.  Howard

12     Steel of Brown Rudnick on behalf of the Newport and Providence

13     Funds.  We're trying to be a friend of the process here and

14     brief.

15          As Mr. Wiltenburg identified, we have a different

16     issue from all the other objectors.  We have a fight with the

17     SIPA trustee.  I don't think the debtors have a real dog in

18     this fight over this provision.  It is provision 6(m) of the

19     proposed order, and we have two problems.  I think Mr.

20     Wiltenburg did a good job identifying the problems.  But first

21     we think, as drafted, this language forecloses third-party due

22     process discovery rights against the SIPA trustee.  Mr.

23     Wiltenburg pointed to the provision in 1(d) that says, "Nothing

24     in this order shall impact the SIPA proceeding," and I

25     appreciate his concerns.  But this clause 6(m), the language

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 121 of 142

Page 121

1    starts, "Notwithstanding anything in this order to the

2    contrary, to the extent participants seek discovery of

3    documents that are in the possession, custody or control of the

4    debtors and the SIPA trustee, the participants shall direct

5    such document requests to the debtors.

6           So I think this directly impacts third-party discovery

7    rights against the SIPA trustee, whether it be for SIPA claims,

8    which Newport and Providence have.  They have disputed SIPA

9    claims, as the Court is well aware, that we have ongoing

10   discovery requests there and we also have ongoing contested

11   litigation that's not even been scheduled for hearing yet.  And

12   we have Chapter 11 claims arising out of that prime brokerage

13   arrangement, and also guaranty claims.  So we're very active on

14   plan issues and we're also very active in the SIPA proceeding.

15          So we looked to this language and we thought it's

16   foreclosing third-party discovery rights against the SIPA

17   trustee.  And we also said, well, we don't know what documents

18   the SIPA trustee has as compared to the debtors.  So those were

19   our two infirmities with this language.  So we sharpened our

20   pencils and suggested some clarifying, some modifying language.

21   In our objection we asked to strike it.  That would be good.

22   But we thought we could refine the language and propose

23   modifying language to the debtors.  This morning the debtors

24   said all right, let's talk to the trustee.  The trustee said no

25   go.

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 122 of 142

Page 122

1           But I wanted to propose to the Court our modifying

2      language.  And if the Court would accept this language, that

3      would palliate our objection.  We asked two things to focus on.

4      One, clarity that this clause 6(m) is directly related to plan

5      issues.  If we're serving discovery requests related to plan

6      issues, we're fine with it going only to the debtors.  And

7      second, I want a reservation of rights, something --

8           THE COURT:  But isn't true that in the scope of the

9      order, paragraph 1(a), it's very clear that this is all about

10     plan issues?  We're not -- I mean, I don't blame you for being

11     a careful lawyer.  But in the same way that Mr. Mayer on behalf

12     of his client and others that allowed him to speak on their

13     behalf was attempting to protect against the contingency that

14     there would be some preclusive effect on the ability of a party

15     to deal with a bilateral claim issue, I don't view this order

16     as either affecting anything that goes on in the LBI separate

17     proceeding, or affecting any discovery that isn't plan

18     discovery.

19          Now, if I'm missing something very basic, somebody

20     should tell me.  But if that's true, I don't know what your

21     concern is.

22          MR. STEEL:  Well, my concern is the language used in

23     this provision.  I think it undercuts that intent.  I think Mr.

24     Mayer and the folks did a good job clarifying the claims issue.

25     I think it's very clear that this is only pertaining to plan

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 123

1    issues.  But this language says notwithstanding anything else

2    in this order, if a participant seeks discovery of any

3    documents that are in the possession, custody or control of the

4    debtors or SIPA trustee -- we don't know what those document

5    might be -- the participants will only direct those to the

6    debtors.

7         So I'm only asking to slide in for plan issues that

8    the participant reasonably believes those parties might both

9    have, because we don't know what they have.  We've been seeking

10   discovery of the SIPA trustee since the commencement date, and

11   we still don't really have any bona fide discovery.  We don't

12   know where we are.  So we've asked to put that request in.

13        And then just a real general reservation of rights to

14   give our client's the comfort that nothing in this order shall

15   prejudice any discovery rights in the SIPA proceeding or in any

16   way limit a participant's right to discovery of the SIPA

17   trustee.  I think this is a pretty benign reservation.  I think

18   that was the intent of this order.  But the SIPA trustee has

19   disagreed.

20        MR. MILLER:  We would agree to that language, Your

21   Honor.

22        MS. SINGER:  Your Honor, if I may?  This is another of

23   these -- I think we were e-mailing at seven or eight o'clock

24   this morning.  And I think within -- I'm sure we could come to

25   some sort of agreement on this issue.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 124

1          THE COURT:  Whether you do or you don't, I know that

2     the intent is.  And if it's be construed, and I'm the one

3     construing it, no one's going to be hurt.

4          MR. STEEL:  Thank you, Your Honor.

5          MR. CLARK:  Good afternoon, Your Honor.  Bruce Clark,

6     Sullivan & Cromwell, for Giants Stadium.  We do not have a

7     drafting issue.  I'm not going to ask you to look at a

8     particular paragraph.

9          Giants Stadium was in an interest rate swap with LBSF,

10    the obligations of which were guaranteed by LBHI.  And what we

11    have been told in the disclosure statement about derivative

12    claims like ourselves, is that the debtors had outstanding at

13    the time of the filing, 1.2 million derivative contracts.  Now,

14    they have obviously resolved some of those.  There was a letter

15    delivered to you yesterday that said they resolved seventy

16    through ADR process.  And I think Mr. Slack mentioned that he

17    resolved another several thousand in the course of the recent

18    months.  So some of those have been resolved.  No doubt about

19    that.

20         But what they've said about the allowed amount of

21    derivative claims in the disclosure statement on page 85 is the

22    debtors have spent significant time valuing each of the

23    derivative contracts and determining the appropriate amount for

24    derivative claims.  And they go on to say they have

25    developed -- the debtors have developed a uniform and

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 125 of 142

Page 125

1   standardized methodology to calculate derivative claims which

2   is reflected in a derivative claims framework which is going to

3   be applied, under the disclosure statement's language, to

4   claims like ours, including claims against LBHI as guarantor.

5   Presumably that framework was used.  It's been in place for

6   some time, according to the disclosure statement, in resolving

7   the derivative claims that have already been successfully

8   ended.

9           Now, our problem is we don't have the derivative

10  claims framework.  We don't know what they intend for

11  derivative claimants like us.  We've asked for a copy; we have

12  been denied that.  And in order to participate in the discovery

13  process that is contemplated, it seems to me derivative

14  claimants like us, who have a very substantial claim, need to

15  know that.  And that's the problem we have.  The fix is easy.

16  If we could get the derivative claims framework then we could

17  decide whether or not to participate and how to formulate

18  discovery requests and things of that sort.  It's going to be

19  much harder without that document, without that framework.

20          The debtors stood here this morning and said they'd

21  favor full disclosure and full transparency.  It should be

22  applied here.  And they have also indicated that they are going

23  to move for approval of this framework in this court before

24  their disclosure statement hearing.  It's going to become a

25  public document then.  Why not put us on a level playing field

Page 126

1     now in connection with this discovery issue so that we can

2     participate like some of the others.  That's our pitch.

3           THE COURT:  But let me just understand what you've

4     just told me.  You're not objecting to the language of the

5     order or the concept of the order.  You're seeking

6     particularized discovery for yourself now.

7           MR. STEEL:  We're seeking to -- you're correct on the

8     first two points.  We are not criticizing the language of the

9     order or the concept of it.  We understand it.  We think it's a

10    good thing overall.  But for my client to participate as a very

11    substantial derivative claimant, they ought to understand what

12    is not in the plan and what is not in the disclosure statement,

13    namely, how that claim is going to be treated, so that we can

14    participate too.  If that is particular, perhaps it is, but

15    it's fair so that we can be on the same playing field.

16          THE COURT:  Okay.

17          MR. CLARK:  Thank you.

18          THE COURT:  Do you want to comment in respect of that?

19          MS. FIFE:  Yes.  Good afternoon, Your Honor.  Lori

20    Fife on behalf of the debtors.

21          Let me respond to that comment.  The derivatives

22    settlement framework doesn't exist so we can't really provide

23    it to the attorney for Giant Stadium.  It is a work in

24    progress.  We are in the midst of negotiating it with several

25    creditors.  But it is also going to be the subject of a

Page 127

1    separate motion which we hope to bring to the Court prior to

2    the disclosure statement hearing, and in connection with that

3    motion parties will have an opportunity to seek discovery.  So

4    I think that clears up that objection.

5          THE COURT:  I think it does too.  You can't turn over

6    what doesn't yet exist.

7          MS. FIFE:  Thank you.

8          MR. SHORE:  Your Honor, Chris Shore from White & Case

9    for the ad hoc group.

10          THE COURT:  Before --

11          MR. SHORE:  I rise --

12          THE COURT:  Just before you start I just want to get a

13    sense as to where we are.  It's ten after 1 and I'm trying to

14    get a sense, because I haven't been keeping score as to the

15    number of people who've spoken, I just want to make sure I

16    know -- I see Ms. Granfield there; that's for Barclays,

17    presumably.  You're there for the ad hoc committee.  I'm just

18    trying to get a sense of timing.  Committee?

19          MR. SHORE:  Brief.

20          THE COURT:  Brief?  Let's just proceed.

21          MR. SHORE:  Okay.  So I rise in support of the motion

22    here.  I want to comment first on the need for procedures and

23    give Your Honor a context of kind of what discovery we're

24    talking about because there hasn't been much said about that.

25    I'm not going to go over the history starting with how these

08-13555-mg   Doc 16085   Filed 04/15/11   Entered 04/18/11 10:44:18   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 128 of 142

Page 128

1    procedures started but I do want to comment on one of Mr.

2    Miller's comments on the bookends of sub-con and de-con.  Both

3    plans out there right now are settlement plans that are

4    intended to land somewhere between those bookends.  We may see

5    other plans that stake out 100 percent on one side and 100

6    percent on the other.

7            Anybody who's been in the case and following along

8    pretty much knows what a sub-con recovery looks like.  You

9    value the assets, you determine the total third-party claims,

10   you divide the assets by the claims.  The discovery's going to

11   help refine that on valuation points, on what the third-party

12   playing points are.  But the other bookend has been the huge

13   mystery in this case and why we've been asking for documents.

14   It's really what a deconsolidated plan is.  That is one which

15   recognizes separate existence and determines a fair statement

16   of the assets and liabilities of each of the debtors.

17           The debtors have taken no position on that.  There's

18   nothing in the disclosure statement on that.  That's a

19   gargantuan process here and one that has to be done.  Go

20   through the inter-company claims.  What are legitimate claims,

21   what are illegitimate claims?  What are the value of the

22   Chapter 5 actions?  We all know about all the repos that took

23   place in the summer of 2008.  What of those were fraudulent

24   conveyances?  What of them were preferences?  I gave you the

25   chart on Innkeepers, that one little securitization structure,

Page 129

1    assets moved everywhere in the months leading up to the

2    bankruptcy.  We have to get a sense.  We don't necessarily have

3    to resolve that issue but we have to get a sense of what those

4    are.  We have to find out where assets belong.  We have to find

5    out where liabilities get done.  It is a gargantuan job that

6    the parties are committing to do here.  But in approving these

7    procedures, it bears noting, one, we have to have procedures

8    otherwise this is all going to get bogged down.

9          I rise to make two other understandings clear here.

10   And let me also not only thank Weil for doing it, thank Ms.

11   Singer for doing it.  We've spent hundreds of hours on this, I

12   know she's spent many more multiples of that, and I believe she

13   deserves a special commendation for putting up with all of us

14   on the phone.  On the specifics of the order, though, we have

15   two understandings that generally cover the order.  And I think

16   Your Honor's touched on them but they're very hard to draft.

17         One are issues related to finality.  Of course every

18   litigant wants the opportunity to have maximum flexibility in

19   approaching the case in how they want to do it.  People want to

20   join late, people want to sit on the sidelines, people want

21   good cause relief, people want new searches, new targeted

22   searches.  Our understanding is that these procedures that are

23   being adopted are a discovery order.  These are not guidelines.

24   People are supposed to subscribe to this order, follow the

25   procedures, and live by them.  We're not going to have people

Page 130

1    coming in late in the game saying oh, I just spotted an issue,

2    I want to get involved.

3          Now let me say two things about that.  First, I think

4    it does make sense in the context of what we just now agreed to

5    on the disclosure statement hearing that if other people are

6    filing plans maybe we want to hold off the initial discovery

7    request until all the plans are on file, which is probably

8    about a month by now.  We could talk about that.  But given the

9    size of the matter and the complexity of what I've described,

10   people are going to have to be flexible in doing this.

11         As someone said, it's a living, breathing document.  I

12   guess that's right because issues are going to arise like

13   they've arising throughout this case.  The default is to come

14   back to Your Honor and show good cause why we need to modify

15   something, why a timeline has to be drawn out.  These are very,

16   very aggressive time lines that the debtors have set for

17   themselves -- for themselves on doing electronic searches and

18   producing what -- I think someone's probably right -- ten

19   million documents in this case into a repository.  They may not

20   be able to do it.  Rather than burdening the Court, though, I

21   think our other understanding is everybody's going to have to

22   act in good faith here.  Comments -- I hope the debtors aren't

23   going to over-designate confidential documents.  I hope the

24   SIPA Trustee is not going to hold back documents.  I hope that

25   other participants aren't going to take the position that their

Page 131

1   entire case is going to go in on rebuttal.  But unless the

2   parties are charged with acting in good faith here and trying

3   to minimize the burden on the Court, just the sheer size of

4   discovery and the number of procedures set forth in this order

5   that have to be followed, it's going to be a terrible process.

6   So I stand and ask the parties, as somebody who's lived through

7   this kind of confirmation discovery before, to work in good

8   faith, to try to be reasonable where possible but still live

9   within the tenant that the order that's being set today is a

10   set of procedures that if we all start moving away from without

11   really considering it, we're never going to get anything done.

12          THE COURT:  Before you sit down, Mr. Shore, that was a

13   very statesman-like presentation, by the way, and I just want

14   to ask you a question which I think is obvious.  You've

15   participated in the process and others in your firm have

16   participated in the process of developing these procedures and

17   I take it that on behalf of the ad hoc group you're satisfied

18   that this is about as good as we can get at this point?

19          MR. SHORE:  Absolutely.

20          THE COURT:  Okay, thank you.

21          MR. SHORE:  You're welcome.

22          MS. GRANFIELD:  Very briefly and quickly, Your Honor.

23   Lindsay Granfield on behalf of Barclays Capital, Inc. and its

24   affiliates.  I apologize, there were no written objections

25   relating to any of the Barclays related provisions in the

Page 132

1    order.  And I wouldn't have stood up except that I heard Mr.

2    Willett mention Marquis and unfortunately I couldn't hear

3    everything he was saying at the time that he was speaking.  I

4    don't think he was asking for any changes in the order, and

5    that's fine.  I heard something about, "Oh, with that

6    clarification from the debtor".  I think it might have just

7    been about the fact that the debtors certainly intend -- you

8    know, the Barclays provisions are really just about the fact

9    that pre-closing information about Lehman, for the most part

10   Lehman really does have access to it or really actually

11   possesses it already.  We can't know everything that everyone's

12   going to ask for.  And so to the extent there may be some

13   things that the debtor needs to seek access from Barclays,

14   there are provisions in place, contractual provisions in place,

15   other ways that the debtor can do that.  And so that's -- all

16   those provisions about Barclays are just not doing things twice

17   and not putting Barclays in the position of kind of rushing

18   rough shod over the procedures by having people end-run them by

19   coming to Barclays rather than going to the debtors.

20          If there are no changes to the order, I don't have any

21   further comments.  But it wasn't quite clear to me what had

22   been said about Barclays, so I just didn't want it to go past

23   without knowing whether there was an issue or not.

24          THE COURT:  I think the answer is there's no issue.

25          MR. COHEN:  Good afternoon, Your Honor.  David Cohen,

Page 133

1   Milbank, Tweed, Hadley & McCloy here on behalf of the official

2   committee of unsecured creditors.

3           We agree with a lot of the comments that you've heard

4   today that this is as good as it gets.  The committee started

5   working with the debtors on the discovery protocol in November.

6   For five months we've been engaged, if not daily almost every

7   other day at least, in working on these proposals.  It's a

8   fifty-four page order.  The first draft was three pages long.

9   This reflects a lot of compromise.  From the beginning the

10  debtors took input from the committee, were accepting of it, it

11  is reflected in the draft.  You've heard from a number of

12  creditors that the debtors took their input as well.  This is a

13  compromise order that reflects the best thinking of a lot of

14  people who have a lot at stake in this case.

15          The order also contemplates that the committee, the

16  debtors and the individual creditors will continue to work

17  together productively to get through the procedures

18  contemplated by this order.  As we stand here today there's no

19  reason to believe that's not going to happen.  Everybody shares

20  the goal of getting to a confirmation hearing in a reasonable

21  and appropriate amount of time, giving all parties-in-interest

22  access to relevant information without the discovery free for

23  all and reducing the burdens attendant to discovery,

24  particularly in the context of this case.  For these reasons

25  and those set forth in the committee's filed statement in

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 134

1    support of the motion, we ask that the Court enter the order as

2    submitted by the debtors.  Thank you.

3           THE COURT:  Thank you.  Is that the last word?

4           I'm reminded of the hearing that took place a number

5    of years ago in reference to the bar date order in this case.

6    And there were any number of objections to the unique form of

7    order that was entered.  And the stakes couldn't be higher than

8    whether or not a particular claim is timely filed and properly

9    asserted against the debtors.  Similarly, the document that has

10   been evolving over time and that is now before the Court quite

11   obviously is a collaborative effort, an effort that has

12   included the input of multiple parties-in-interest, and as I

13   said earlier, no doubt while best efforts of the parties, has

14   some flaws.

15          Earlier today I approved, over an objection, a sixth

16   supplemental order having to do with certain procedures in the

17   case.  I think that's useful background for what I'm being

18   asked to do now.  The New York Times indicated in connection

19   with the Masters Tournament that just took place that the

20   individual who won happened to be ahead at the time that the

21   match ended.  And in effect, the order which is before me today

22   is the form of order that happens to have been agreed to in

23   time for 10 a.m., April 13, 2011.  I have no doubt that if the

24   parties had until May to work on this order that there would be

25   plenty of work to do and plenty of people to speak with about

Page 135

1    adjustments to the order that will not necessarily make it

2    better.

3          One thing is clear.  An order establishing procedures

4    in connection with plan related discovery is absolutely

5    critical.  Ad it's also clear that I have not only the

6    authority but the duty to enter such an order in order to make

7    the process that you are about to embark upon as rational,

8    orderly and efficient as possible.

9          There are any number of objections that remained

10   outstanding and that I've listened to this morning and I'm

11   going to overrule most of them.

12         As to the language of 1(b), which apparently is a

13   subject of ongoing discussion, I have reason to believe, based

14   upon the comments made by Mr. Huebner and Mr. Mayer, that to

15   the extent there are disagreements as to the form of that

16   paragraph that that's simply a question of lawyers talking to

17   one another and maybe tweaking the language.

18         As to the arguments made by counsel for State Street,

19   with respect, I don't believe those arguments are particularly

20   persuasive and we're going to be micro-managing this process

21   through discovery conferences, meet and confer sessions,

22   hopefully not much motion practice but certainly there's the

23   potential for motion practice.  And frankly, from my

24   perspective, every monthly status conference will include, from

25   my perspective, an opportunity for parties who believe they are

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 136

1   aggrieved by the order to express themselves.  But that right

2   to be heard pretty much on a monthly basis is one that I assume

3   that parties will choose to exercise with discretion and with

4   only good cause for appearing to be heard on a discovery issue.

5          I'm satisfied that this evolving order represents the

6   best of what litigators and what bankruptcy lawyers in this

7   district are capable of generating.  As I reviewed it in its

8   early form and in its now present form, it occurred to me that

9   what was really happening here was that lawyers for parties who

10  were directly affected by a confirmation process that will no

11  doubt be extraordinary in its intensity and detail, have

12  effectively cobbled together a discovery protocol that is

13  unique to the case and which deals with the limitations of the

14  Federal Rules of Civil Procedure as those rules apply to a case

15  of this magnitude.

16         In the ordinary course of developing rules, people get

17  together and spend time on a line-by-line basis examining not

18  only the language used but the unintended consequence of the

19  language used.  And there's a comment process that allows

20  individuals who are not in the room to review the words,

21  consider the implications, and the language can then be later

22  adjusted.

23         I think to some extent, even as I approve this order,

24  we're entering a comment phase in that while this is an order

25  that has the force of a court order, to the extent that there

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 137

1    are parties, notably the objectors who remain outstanding, and

2    those who expressed objections in the past and participated in

3    the process who believe in practice that this is, for whatever

4    reason, not leading to substantial justice in the management of

5    the case during this key period of time, my door is open.  And

6    if parties seek, for good cause, appropriate adjustments, I

7    have every reason to believe that I will be responsive to those

8    requests.

9         Perhaps the most difficult issue has been raised by

10   the U.S. trustee because it goes to issues of public access to

11   confidential documents.  And I'm going to overrule the

12   objection of the U.S. trustee with the understanding that

13   what's really happening doesn't change the public's right to

14   have access to confidential information, rather, it goes to the

15   burden of who has to go forward with the request for sealing as

16   opposed to who has the burden of seeking to unseal an otherwise

17   sealed document.

18        While it's a somewhat different circumstance, I am

19   reminded of what occurred when the examiner, Mr. Valukas, filed

20   his initial examiner's report under seal and it was thereafter,

21   following motion practice, unsealed.  For a period of about

22   four or five weeks I believe I was the only person who had

23   access to that report and I read it with great interest,

24   largely because I knew it was for my eyes only.  But the public

25   ultimately, and it wasn't a long delay, obtained full access to

08-13555-mg    Doc 16085    Filed 04/15/11    Entered 04/18/11 10:44:18    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 138 of 142

Page 138

1    that report.

2         In effect, this order balances the need of parties

3    with a right to participate in an open process to gain access

4    to all relevant information, some of which is extraordinarily

5    sensitive.  And so I am satisfied that in this case it almost

6    goes without saying that a substantial portion of the

7    information to be reviewed and assessed will be critical,

8    sensitive, commercial information of the sort that goes to

9    valuation and a recovery analysis on an entity-by-entity basis

10   as well as on a fully consolidated basis.

11        The uncontested matters that were on the docket today

12   are an example of the complexity, but those uncontested matters

13   truly were just the tip of the iceberg.  Whether we're talking

14   about an investment in Innkeepers or an investment in 25-45

15   Broad Street or the value of the Pine securitization, we are

16   simply identifying aspects of that which is extraordinarily

17   complicated and ultimately sensitive information.

18        As counsel for the ad hoc committee observed earlier,

19   a transaction with Bankhaus approved last month was itself an

20   extraordinarily complicated analysis.  These transactions

21   become public when they're filed in court for bankruptcy court

22   approval, but before they become public they are no doubt

23   extraordinarily sensitive.

24        I am also aware, based upon my periodic review of the

25   electronic docket in this case, that a great many of the docket

Page 139

1    entries relate to claims transfers.  I know nothing of the

2    specifics, I only know that they have occurred.  It is

3    obviously of critical importance that sensitive information

4    that could go to the market be kept confidential.

5           For that reason, I believe, based upon my knowledge of

6    the case as I have been observing it over the last number of

7    years, that there is no question that a great deal of the

8    information to be shared in discovery will fit the definition

9    of confidential and sensitive information.  And to the extent

10   that such information is used in a pleading, I consider it

11   appropriate that there be what amounts to an automatic sealing

12   order as to such information, provided of course that the

13   parties who have designated it as confidential have done so in

14   good faith.  This is all without prejudice to the rights of any

15   party in interest, including the U.S. trustee, to seek to

16   obtain an unredacted copy of such materials on a lawyers-only

17   basis.

18          With the understanding that the parties are probably

19   going to do some final revisions to the form of order to

20   accommodate some of the events of today's hearing, I will bench

21   order approval of the procedures in their present form as

22   modified with the consent of the parties.  And if there's

23   nothing more we're adjourned until 2:00.

24       (Whereupon these proceedings were concluded at 1:37 p.m.)

25

Page 140

### I N D E X

### R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for authorization to make additional investments with respect to 25 and 45 Broad Street approved | 20 | 13 |
| LCPI's motion for consent for Lehman ALI Inc. to enter into commitment letter with Innkeepers USA Trust approved | 22 | 5 |
| Debtors' motion for approval of the purchase of notes issued by Pine CCS, Ltd. from Barclays Bank PLC and the termination of the Pine securitization | 26 | 24 |
| Debtors' application for approval of the sixth supplemental order to establish procedures for the settlement or assumption and assignment of derivative contracts granted | 40 | 18 |
| Debtors' motion to compel compliance with Bankruptcy Rule 2019 by the ad hoc group | 55 | 15 |

Page 141

1

2                            I N D E X, cont'd

3

4                            R U L I N G S

5

6    DESCRIPTION                                    PAGE      LINE

7    Debtors' motion for authorization to establish    139        20

8    a discovery protocol related to plan confirmation

9    bench order approved as modified on the record

10   with the consent of the parties

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 142

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date:  April 15, 2011

18

19

20

21

22

23

24

25