UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x

In re                                        :
LEHMAN BROTHERS HOLDING INC.                 :      Chapter 11 Case No. 08-13555
                                             :      Jointly Administered

-----------------------------------------------------x

## CREDITOR CLAUDIA GROHS' OPPOSITION TO DEBTORs' OMNIBUS OBJECTION No. 87

Upon Debtors' Omnibus Objection No. 87, challenging Creditor Grohs' claim number #, Creditor Claudia GROHS hereby respectfully submits her Opposition to Debtors' Omnibus Objection No. 87 for the reasons stated as follows:

**1.** In 2007, Creditor Claudia grohs purchased a security ISIN XS0229269856, through a commercial bank (the "Sales Agent"), for €62,000.00 x 1.4181 = $103,408.99. This security is established as a Program Securities list, and Creditor provided all pertinent data to claim thereunder.

**2.** Such Security was issued by Lehman Brothers International Europe ("LBIE"), London/Great Britain (the "Issuer").

**3.** The Issuer was incorporated in the United Kingdom and acted, inter alia, as the Lehman Group's broker-dealer and market-maker. See LBIE Joint Administrator's Process Report dated Apr 14, 2009 attached hereto as *Exhibit 01*. It has been a wholly-owned subsidiary of Lehman Brothers Holding Inc. (the "Debtor Guarantor"). It was at all pertinent times owned and controlled by the Debtor Guarantor, and its financial statements were prepared internally monthly. Lehman Brothers Holding Inc. is the holding company of the worldwide operating Lehman Brothers group. (See *id*)

RECEIVED
APR 2 1 2011
U.S. BANKRUPTCY COURT, SDNY

**4.** The Issuer's purpose within the Lehman Brothers group was to finance the business activities of the group by issuing structured notes and other securities, and to facilitate trading activities within the Lehman Group. One key feature is that most of the notes issued by LBIE are linked to various derivate market elements such as the

development of specific share prices, stock indices, and commodity prices. The Issuer hedged the risks related to these derivative market elements by entering into swap agreements with other Lehman and related enterprises. The Issuer did not assume the market risk of variations in value with respect to the notes issued, but other entities within the group assumed such risks by entering into hedging agreements with external parties. The Issuer merely lent the proceeds of the notes to the Debtor Guarantor. See id. One of its single largest assets were account receivables against other affiliates in the Lehman Group of $ 7.9b. and it was indebted towards LBHI to the extent of US$ 6.7b. See id.

5. The Issuer is itself in bankruptcy proceedings in the High Court – Chancery Division – in London, England, Cause No. 7942/2008. According to interim accountings by the trustee for the Issuer, claims of the Issuer against LBHI valued at US$1.4b are still disputed. See LBIE Joint Administrator's Process Report dated Apr 14, 2011 attached hereto as Exhibit 02. This infers that all funds received by the Issuer, through the issuance of notes, including but not limited to the Security funded by the Creditor, were absorbed by the Debtor Guarantor.

6. Upon information and belief, the Product Feature Flyer marketing the Security, outlining the terms of the loan made by the Creditor, was distributed through Sales Agents and internal market makers, both under the control and supervision of the Debtor Guarantor, and states something to the effect, inter alia,

> "Lehman Brothers, and/or related entities may act as market maker, engage in trades amongst each other and conduct hedging transaction with respect to the note. This may affect the market value, liquidity, or the value of the note and may not be in the interest of the investor."..

7. Upon information and belief, the Product Feature Flyer, authored by the "Lehman Brothers", is silent about the possibility and mechanics of such intra-corporate transfers, and Creditor was not informed about the possibility and mechanics of intra-corporate transfers of loan principals, this possibility was not disclosed, caused or ensured to be disclosed, by the Sales Agent, the Issuer, or the Debtor Guarantor, to the Creditor.

**8.** The Security is recognized by a the Debtor Guarantor as a Program Security, as defined in this Court's order dated July 2, 2009, and listed in the Lehman Programs Securities list per July 17, 2009.

**9.** Neither the Debtor Guarantor, the Issuer, nor the Sales Agent provided, caused or ensured to be provided, the Creditor with a prospectus prior to, concurrently with, or subsequent to Creditor making a purchasing decision.

**10.** Upon information and belief, the Product Flyer does not identify a particular Lehman entity as its author, but merely states "Lehman Brothers" as the originator of such publication. See id.

**11.** Upon information and belief, the Product Flyer further states, *inter alia*, that

"In connection with the offer to sell, and the sale of the Security, the Sales Agent acquires the Security for a price discounted to under face value or for face value. Inasfar as the Sales Agent acquires the Security for face value, it is possible that the Dealer will pay the Sales Agent a sales incentive. Such incentive payment may then be added in addition to sales commissions and expenses, which are regularly charged by the Sales Agent in the sale of, or offer to sell, securities. Additional information from the Sales Agent are available upon request."

**12.** Creditor was not informed by the Sales Agent, the Issuer, or the Debtor Guarantor, about particular charges, fees, and commissions included in or added to the final price for the Security, with the exception to the stated premium, if any. The Purchase Order Confirmation does not itemize the face value of the Security, any incentive components, or built-in commissions.

## LEGAL ARGUMENTS SUPPORTING CREDITOR's CLAIM
### I. GUARANTY CLAIM

Pursuant to the Court's Order detailing the submission of proof of claims, in case a claim is based on the guaranty given by the Debtor Guarantor for Program Securities issued by the Issuer, no further substantiation is necessary if a particular Proof of Claim form containing ISIN, Blocking Number, and Depository Participant Account Number is submitted by the deadline set by the Court for this particular claim.

Creditor has submitted all such information with her Proof of Claim #36008 on or about October 2, 2009. Creditor relied upon the Program Securities list, as amended as of the time of submission. The entry of XS0229269856 has not been removed to-date.

This Court's Order establishing the procedure set forth for submitting proofs of claim suggests that the Program Securities list shall be conclusive after the time period for amendments lapses. If creditors are thus precluded from seeking amendments to the Program Securities list after such date, so should be the Debtors. Considering that there are still contested claims pending between the Guarantor Debtor and LBIE, such contested claims can easily be adjusted to reflect Creditor's claim against LBHI, and no prejudice will occur against the Debtor Guarantor or LBIE.

Creditor reserves the right to amend her claim #36008 further, if and when the the Court has designated the ultimate debtor responsible for servicing Creditor's claim.

## II. SECURITIES-RELATED CLAIMS

Creditor asserts a claim arising out of a violation of 15 U.S.C. §77l(a)(2) based on the facts stated above because the Debtor Guarantor did not disclose, cause to disclose, or ensured to be disclosed, any information concerning any commissions, sales incentives, or other costs and charges embedded in the price of Creditor's Security.

Creditor further asserts a claim arising out of a violation of 15 U.S.C. §77l(a)(2) based on the facts stated above because the Debtor Guarantor did not disclose, cause to disclose, or ensured to be disclosed, that the Issuer had no other assets than an approximately $6.5 billion account receivable against the Debtor Guarantor's knowledge and approval, and was therefore unable to repay a single loan without first successfully collecting the proportionate part of that such account receivable.

Creditor lastly asserts a claim arising out of a violation of 15 U.S.C. §77l(a)(2) based on the fact stated above because the Debtor Guarantor did not disclose, cause to disclose, or ensure to be disclosed, any information concerning the final destination of the loan proceeds within the Lehman conglomerate.

"An offeror is duty-bound to disclose all material information required to be disclosed by statute. Second, an offeror has a duty to disclose any additional information required to make another statement, whether required or voluntarily made, not misleading". See J&R Marketing v. General Motors Corp., 549 F.3d 384 (6th Cir. 2008). "A misrepresented or omitted fact is material if there is a substantial likelihood

that a reasonable investor would consider it important in deciding whether to invest". See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, (1976); Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1532 (2d Cir. 1991). In other words, a fact is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." TSC, 426 U.S. at 449.

1. The Sales Agent, the Debtor Guarantor, and the Issuer, respectively, did not disclose, caused to be disclosed, or ensured to be disclosed, to the Creditor that the purchase price of the Security included, or may have included, components of hidden sales incentives, commissions, and other fees and charges in addition to the definite surcharges stated in the Product Flyer. Such disclosure is required pursuant to 15 U.S.C.§77j(c), 15 U.S.C. §77l(a)(2) to avoid the price of a security being obscured with other components composing its face value or price, and to allow an investor to ascertain whether such components are excessive in comparison to the value of the security. Cf. Spielman v. Merril Lynch Pierce Fenner & Smith Inc., 2001 U.S.Dist. LEXIS 15943 (2nd Cir.), Azrielli v. Cohen Law Offices, 21 F.3d 512 (2nd Cir. 1994). The Issuer was under a direct duty to disclose, or ensure to be disclosed, such fees and charges to the Creditor. The Debtor Guarantor was under such an indirect duty because it ultimately acquire control and benefit of the net loan proceeds, less the amount subtracted from the Creditor's capital investment for such hidden fees and charges, if any, exercised control over the Issuer, despite the representations made by, and *in concerto* with, the Issuer. See infra.

2. In addition to its stated corporate purpose, it is obvious from the amount owed by the Debtor Guarantor to the Issuer, that the Issuer was merely a sham entity, controlled by and operated through the Debtor Guarantor, to collect an clear loan proceeds from investors and various of the Debtors' affiliates. and ultimately for the benefit of the Debtor Guarantor's operations. See LBIE Joint Administrator's Process Report dated Apr 14, 2011 attached hereto as *Exhibit 02*. The Issuer had no independent ability, to carry out its obligations under the terms of the securities it issued, nor was it intended to have. Its sole purpose was to generate leveraged funds for the operation and disposal of the Debtor Guarantor. See id. The inability to operate and latent illiquidity of the Issuer was not disclosed to the Creditor.

Such disclosure is required under U.S. securities laws pursuant to 15 U.S.C.§77j(c), 15 U.S.C. §77l(a)(2). The Issuer represented, with knowledge, approval, and intent of the Debtor Guarantor, that its own financial condition allows it to carry out the investment under the terms of the Security, that it was able to meet all obligations arising therefrom, and that the Debtor Guarantor's promise was an additional feature to boost investor confidence and reputableness. It fact, the Issuer was merely an internal clearing house, had no consumer-to-business operations, and no other significant assets other than accounts receivable against the Debtor Guarantor. See LBIE Joint Administrator's Process Report dated Apr 14, 2009 attached hereto as *Exhibit 01*. In other words, the Issuer could not repay without first being able to collect upon such account receivable. This risk was not disclosed to the Creditor upon or prior to soliciting the investment decision and acceptance of funds through the Issuer.

**3.** The Debtor Guarantor expressly stated that intra-corporate trading and hedging activities may impact the value of Creditor's note to the Creditor's detriment, but it did not inform the Creditor of the transfer of actual funds from one Lehman-entity to another.

Such disclosure is required under U.S. securities laws pursuant to 15 U.S.C.§77j(c), 15 U.S.C. §77l(a)(2). "Lehman Brothers", through the Issuer, represented that the loan proceeds it received from Creditor were to be invested in securities betting on the future development of other securities, stock bundles, indices, or commodities. It also represented that any obligation under such loan were secured by a guaranty of the Debtor Guarantor, indicating that the Issuer was financially able to repay all monies due on the Security when called upon, and simply backed up by the Debtor Guarantor to boost the sales argument of reputableness. The misleading omission lays in the circumstance that the Issuer in fact did not invest the proceeds, but loaned them to the Debtor Guarantor for whatever purpose, and that the Issuer relied upon the Debtor Guarantor to provide sufficient liquidity upon maturity, irrespective of its source. Without sustaining the suspicion, it may be noted that such a practice resembles the format of a classic Ponzi-scheme, paying old creditors with new money.

Whether the Debtor Guarantor used the loan proceeds in accordance with the loan agreement governing the fiduciary relationship between the Issuer and the

Creditor, could not and cannot be reconciled. Through use its diffuse structure, accumulation of debt in one entity, and assets in another, it is impossible to trace Creditor's loan throughout the Lehman conglomerate. A finding, position or negative, whether or not the loan was indeed used to acquire futures, options, or other instruments reflecting varying positions on the development of a particular stock index, stock basket, commodity, or any other marketable securities, was obscured for the Creditor to make at the time of purchase, and remains impossible today. However, this information is material to the Creditor because the risks of loaning funds to a European entity for purposes of investment, with the safeguards of European securities, corporate, and bankruptcy protections, differs greatly from loaning the same funds to a U.S. entity for what appears to be any purpose. Yet, this information was omitted, despite the statement that intra-corporate dealings may occur detrimental to the interests of the Creditor.

## LEGAL BASIS FOR DEBTOR GUARANTOR's LIABILITY

**1.** "In determining whether to apply the securities and antitrust laws extraterritorially, courts have employed two alternative tests, the 'conduct test' and the 'effects test.' [...] Under the effects test, jurisdiction exists when there are substantial effects within the United States. Transactions with only remote and indirect effects in the United States do not qualify as substantial. See <u>Giro v. Banca Espanol de Credito S.A.</u>, 1999 U.S. Dist. LEXIS 9673 (S.D.N.Y.); see also <u>North South Finance Corp. v. Al-Turki</u>, 100 F.3d 1046, 1051 (2nd Cir. 1996) and <u>Consolidated Gold Fields PLC v. Minorco</u>, 871 F.2d 252, 261 (2d Cir. 1988). Here, the actions of the Issuer, even though a corporate entity organized and operating under the laws of the Netherlands, are subject to U.S. securities laws because its actions had an immediate effect upon the assets, liabilities, the values of such assets and liabilities, as well as the market value and share price of Lehman Brothers Holding Inc., the Debtor Guarantor, in the U.S., as its activities were consolidated into the Debtor Guarantor's balance sheet, as well as incorporated into requisite filings with the Securities & Exchange Commission. Further, the value and credit rating of the Debtor Guarantor was directly influenced by the amount of loan proceeds received by the Issuer and channeled through to the ultimate

control of the Debtor Guarantor. Therefore, the actions of the Issuer had direct effects in the U.S., and upon U.S. capital markets. Thus, U.S. securities laws are applicable.

**2.** "The veil of a corporation may be pierced upon a showing that the owner exercised complete domination of the corporation with respect to the transaction at issue; and the owner used this domination to commit a fraud or wrong against the plaintiff which resulted in injury to the plaintiff." In re Vytautas Vebeliunas, 32 F.3d 85 (2nd Cir. 2003). Here, the Issuer was indirectly controlled by the Debtor Guarantor because the Debtor Guarantor alone determined whether or not the Issuer remained able to meet its obligations towards investors, including the Creditor – the Issuer has liabilities of approximately $7.9 billion, and is owed $6.4 billion by the Debtor Guarantor. See LBIE Joint Administrator's Process Report dated Apr 14, 2009 attached hereto as Exhibit 01. The Issuer's ability to meet its obligations entirely depends upon the Debtor Guarantor to honor its obligations to it, and the Issuer is, and was at the time of Creditor's investment, illiquid. Complete domination is thus established.

The Issuer, under the Debtor Guarantor's domination and through its Sales Agent, sold its notes, including the Security acquired by the Creditor, in violation of applicable U.S. securities laws. See supra. The Creditor did not, and could not, know that the fait of his investment dependent upon the Debtor Guarantor's destiny because the Issuer was already unable to meet its obligations at the time. Therefore, Creditor was proximately harmed by such material omissions, of which the Debtor Guarantor knew by virtue of its overwhelming control over the Issuer's financial constitution.

**3.** Lastly, Debtor Guarantor is liable to the Creditor on the theory of a constructive trust. "Generally, there are four requirements for the imposition of a constructive trust: (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment (see Sharp v Kosmalski, 40 NY2d 119, 121, 351 N.E.2d 721, 386 N.Y.S.2d 72). However, these requirements are not rigidly applied (see Simonds v Simonds, 45 NY2d 233, 241, 380 N.E.2d 189, 408 N.Y.S.2d 359; Kaufman v Cohen, 307 AD2d 113, 127, 760 N.Y.S.2d 157; see also Nastasi v Nastasi, 26 AD3d 32, 38, 805 N.Y.S.2d 585). The purpose of a constructive trust is to prevent unjust enrichment (see Simonds v Simonds, 45 NY2d at 241; Cruz v McAneney, 31 AD3d 54,

58-59, 816 N.Y.S.2d 486)." AG Homes LLC v. Gerstein, 52 A.D.3d 546, 547 (NY App. Div. 2008).

Here, the Creditor made the loan for the particular purpose of investing in certain instruments under certain terms, and the Issuer promised in return to do so, and repay the loan upon expiration of its term with interest as agreed. The Creditor relied upon the Issuer to do so because he would not have otherwise made a loan to the Issuer. The Issuer and Debtor Guarantor knew about those specific terms because it guaranteed the Issuer's compliance therewith and performance thereunder. The Debtor Guarantor, however, gained ultimate control not only over the loan proceeds themselves, but also over the Issuer's ability to repay. The Debtor Guarantor would be unjustly enriched if it could avoid liability, and simply keep the loan proceeds without honoring the duty to invest them in the fashion agreed-upon, and without honoring the promise it made to the Creditor in case the Issuer fails to meet its obligations. Therefore, a constructive trust is established for the benefit of the Creditor has been established.

## PRAYER FOR RELIEF

WHEREFORE, the Creditor

1. hereby accelerates and calls due all monies owed under the terms of the instrument further described above by reason of Issuer's insolvency;
2. requests acknowledgment of the obligation of the Debtor Guarantor to repay the principal amount received through intra-corporate transfers by the Issuer from Creditor, through the Issuer, of $103,408.99 in full; and
3. seeks any other relief that the Court deems just.

DATED this 19th day of April, 2011.

Helge Naber
Montana Bar. Id. #7059
NABER PC
300 Central Avenue Suite 320
Great Falls Montana 59401
T 406 452 3100
F 406 452 6599
e naber@naberpc.com
ATTORNEY FOR CREDITOR

| | CERTIFICATE OF SERVICE |
|---|---|
| • Chambers of the Honorable James M Peck<br><br>U.S. Bankruptcy Judge<br><br>U.S. BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK<br><br>One Bowling Green<br><br>New York New York 10004<br><br><br>• Shai Waisman Esq.<br><br>WEIL GOTSCHAL & MANGES LLP<br><br>767 Fifth Avenue<br><br>New York New York 10153<br><br>*Attorney for Debtor*<br><br><br>• Andy Velez-Rivera Esq., Paul Schwartzberg Esq., Brian Masumoto Esq., Linda Riffkin Esq., and Tracy Hope Davis Esq.<br><br>U.S. TRUSTEE's OFFICE FOR THE SOUTHERN DISTRICT OF NEW YORK<br><br>33 Whiteall Street 21st floor<br><br>New York New York 10004<br><br>*US Trustee*<br><br><br>• Dennis F. Dunne Esq., Dennis O'Donnell Esq., and Evan Fleck Esq.<br><br>MILBANK TWEED HADLEY & McCLOY LLP<br><br>1 Chase Manhattan Plaza<br><br>New York New York 10005<br><br>*Attorneys for Official Committee of Unsecured Creditors* | This is to certify that the foregoing CREDITOR'S OPPOSITION TO TO DEBTOR'S PROPOSED EXPUNGEMENT OR DISALLOWANCE was duly served by U.S. Express mail, appropriate postage prepaid, upon the other parties or their attorney of record at their address or addresses, as shown herein on APR 1 9 2011<br><br>NABER PC<br><br>By _____<br>300 Central Avenue Ste. 320 • Great Falls, MT 59401 |

# Lehman Brothers International (Europe)

# In Administration

Joint Administrators' progress report for the period
15 September 2008 to 14 March 2009

14 April 2009

## Contents

| | | |
|---|---|---|
| Section 1 | Purpose of the Joint Administrators' progress report | 2 |
| Section 2 | Executive summary | 4 |
| Section 3 | Background information | 8 |
| Section 4 | The LBIE Operating Model | 12 |
| 4.1 | Operating Model | 14 |
| 4.2 | Operations ("COO") | 17 |
| Section 5 | Activities | 20 |
| 5.1 | House Positions | 22 |
| 5.2 | Counterparties | 25 |
| 5.3 | Trust Property | 30 |
| 5.3.1 | Proposed Client Asset Scheme of Arrangement | 34 |
| 5.4 | Treasury | 36 |
| 5.5 | Reporting | 38 |
| Section 6 | Cross Functional Workstreams | 40 |
| 6.1 | Custodians | 42 |
| 6.2 | Failed Trades | 44 |
| 6.3 | Corporate Events | 46 |
| 6.4 | Terminations and Valuations | 48 |
| 6.5 | Derivative Exchanges | 50 |
| 6.6 | Financing | 51 |
| 6.7 | Overseas Branches | 53 |
| 6.8 | Affiliate company relationships | 55 |
| Section 7 | Functions | 58 |
| 7.1 | Information Technology | 60 |
| 7.2 | Regulatory and Compliance | 64 |
| 7.3 | Infrastructure and Property | 66 |
| 7.4 | Human Resources | 68 |
| 7.5 | Tax | 69 |
| Section 8 | Statutory and other information | 72 |
| 8.1 | Statement of Affairs | 75 |
| 8.2 | Administrators' Remuneration | 76 |
| Section 9 | Receipts and payments to 14 March 2009 | 80 |
| Appendix 1 | LBIE contact details | 88 |
| Appendix 2 | News releases and information | 90 |

# Section 1

# Purpose of the Joint Administrators' progress report

## Introduction

This report has been prepared by the Joint Administrators (the "Administrators") of Lehman Brothers International (Europe) ("LBIE" or the "Company") under Rule 2.47(3)(a) of the Insolvency Rules 1986 (the "Rules").

Creditors were notified of the Administrators' Proposals for Achieving the Purpose of the Administration on 28 October 2008. These were approved with modification at a meeting of creditors held on 14 November 2008. Creditors have been provided with access to the presentation that was given at that meeting. Copies of this report and other announcements by the Administrators are available at www.pwc.co.uk.

This report provides details of the work undertaken and the progress made during the first six months to 14 March 2009. Particular emphasis has been placed on developments since the meeting of creditors on 14 November 2008.

## Objective of the Administration

The Administrators are pursuing the objective of achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets, including all cash, securities and in-the-money derivative positions on a managed basis;

- Mitigate as far as is possible and agree in principle the claims of all stakeholders and counterparties; and

- Manage Client Assets and Client Monies, assess the claims to such assets and return all Trust Property to their rightful owners on a systematic basis.

## Creditors' Committee

Your Creditors' Committee (the "Committee") was elected at the meeting of creditors and its members are:

- Lehman Brothers Holdings Inc;

- Ramius Credit Opportunities Master Fund Limited;

- GLG European Long/Short Fund;

- Legal and General Pensions Limited; and

- Oceanwood Global Opportunities Master Fund.

The Administrators meet with the Committee regularly, either in person or by conference call. To date three formal full day meetings of the Committee have taken place. Summary minutes of these meetings have been placed on the LBIE Client Information and Claims website at https://lbn.pwc.com/LBIEClient. In addition, seven telephone meetings have taken place and three further full day meetings have been held to develop the outline of a Scheme of Arrangement in order to deal with Client Assets.

The meetings with your Committee provide the Administrators with the opportunity to review progress and activities in detail and to consult on critical issues. The Committee has been active in its dealings with the Administrators and has provided constructive support. We wish to express our thanks for the significant time they have committed to date.

## Future Reports

The Administrators' next formal progress report to creditors will be in six months time.

Signed:

*[signature]*

SA Pearson
Joint Administrator
Lehman Brothers International (Europe)

# Section 2

# Executive summary

## Objective

The objective of the Administration is to achieve a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration).

## Progress to date

Considerable progress has been made in meeting this objective. In particular:

- LBIE's equities business was sold to Nomura Holdings Inc ('Nomura'). Over 2,400 jobs were preserved and related employee claims against the estate were mitigated;

- Control has been asserted over the assets of the Company and its clients, including over $35.5bn in cash on deposit or investments;

- $8.7bn has been recovered to date and is held as cash on deposit or investments;

- An interim mechanism for the return of assets has been implemented. $12.2bn (46%) of Client Assets (as defined in Section 5.3) have been returned or released to 14 March 2009;

- Policies have been formed for handling the estimated 839,000 pending and failed trades, including deleting many from exchanges;

- We have identified and valued the majority of LBIE's estimated 130,000 over-the-counter ("OTC") derivative contracts;

- A new operating model has been designed and implemented. This has already been effective in ensuring the systematic realisation of value for creditors;

- Revised employee reward and retention processes have been implemented for the retained 360 employees. These focus activities and reward on the objectives of the Administration;

- Extensive communication has been provided to the estimated 22,000 current and historic counterparties with LBIE and to the market generally. Over 25 news releases have been posted on our website. (See Appendix 2);

- We have negotiated agreements with certain Lehman affiliates to govern the provision of services between LBIE and those companies, post-Administration, and other agreements to reconcile claims between companies. We continue to negotiate agreements with other affiliates, tailored to the specific circumstances of LBIE's relationship with them;

- A mechanism for the systematic return of Client Assets has been identified, shared with the High Court, the Committee, key industry groups and the market. Its practical feasibility is being tested;

- The IT environment, critical to the protection and recovery of value from the estate, has been stabilised. Annual IT costs have been reduced by over $200m per annum; and

- The exit from overseas branches has been largely concluded, realising over $150m to date.

Specific progress in these and other areas is discussed in more detail in the balance of this report.

## Financial position at 15 September 2008

The directors have provided a draft Statement of Affairs at 15 September 2008. This financial information is unaudited and is stated before provisions for losses post 15 September 2008. Based upon this draft Statement of Affairs:

- The book value of LBIE's gross assets (i.e. grossed up for collateral and Client Assets) was $628.6bn;

- The book value of gross liabilities was $611.8bn;

- After counterparty and cross product netting and eliminating amounts relating to Trust Property this reduces to assets of $49.5bn and liabilities of $32.6bn ("Adjusted Assets and Liabilities");

4

- The resulting net equity at 15 September 2008, was estimated as $16.8bn; and

- Some $6.7bn was reported as payable to Lehman Brothers Holdings Inc. ("LBHI"), the ultimate holding company; $7.3bn was reported as receivable from Lehman Brothers Inc ("LBI"), LBIE's sister broker-dealer.

Included in the gross balances are:

- Segregated assets (cash and securities) and related liabilities of $24.9bn to third parties;

- Financing receivables (including intercompany) of $493.1bn and related liabilities of $486.4bn; and

- Inventory (depot securities) of $37.1bn, of which $23.0bn is identified as segregated for clients. A further $3.1bn of inventory was held in safe custody for clients and $5.0bn relating to affiliates.

As illustrated above, the nature of LBIE's business is such that considerable collateral was posted by and received from counterparties. This collateral has been reflected based upon book values at 15 September 2008.

## Issues impacting recovery

LBIE's draft Statement of Affairs indicates net equity at 15 September 2008, of $16.8bn. Whilst this appears to be a significant equity cushion when compared to Adjusted Assets and Liabilities, it represents just 1.3% of the gross book value of market positions at 15 September 2008 and an even smaller proportion of nominal outstanding positions.

LBIE's business was historically managed to control Value at Risk ("VaR"), however a number of events could result in LBIE suffering material losses, including:

- Significant movements in global securities and derivatives markets since 15 September 2008;

- Unilateral termination of positions by market counterparties, leaving LBIE unhedged in various products and markets;

- An inability for LBIE to terminate certain of its open market positions and close-out for value;

- Default valuation rules which favour the non-defaulting party resulting in an adverse effect on carrying values of both assets and liabilities;

- Asserted set-off by market counterparties above levels reflected in the books of LBIE;

- An inability to quantify and hedge residual market exposures;

- Hedges provided to LBIE by its affiliates, now themselves in insolvency; and

- Significant other unsecured intercompany receivables now in insolvency.

As such, we believe that there is a high probability that these factors will have eliminated the reported $16.8bn equity cushion and as such there is likely to be a shortfall to unsecured creditors.

## Dividend Prospects

Due to the early stage of the Administration and, in particular, the limited visibility we currently have on the value of claims against the estate and the recoverable value of the assets of LBIE we are unable to provide any form of dividend estimate to creditors or give any illustration of the timing of any such dividend at present. We will of course, provide further clarity on this as the case progresses.

## Other sources of recovery

LBIE is an unlimited liability company and in due course creditors are likely to have access to LBIE's shareholders for any shortfall. However, LBIE's shareholders are themselves insolvent and we are unable to determine whether any material recoveries will arise from this source.

Many of LBIE's market counterparties have the benefit of guarantees from the ultimate holding company, LBHI. Creditors are encouraged to lodge any guarantee claims they may have directly with LBHI. Further information is available at www.lehmanbrothersestate.com.

In addition, certain of LBIE's market counterparties may have a claim against Customer Asset Protection Company ("CAPCO"), a provider of insurance cover to certain clients, for any shortfall they may suffer after these creditors are encouraged to communicate directly with CAPCO. Further information is available at www.capcoaccess.com.

## Cash position at 14 March 2009

To 14 March 2009, the Administrators have recovered cash and bonds totalling $8.7bn, comprising $5.7bn in house positions and $3.0bn in potential client positions. Net cash balances (including investments of $0.7bn) at 14 March 2009, totalled $7.4bn.

Payments for costs, taxes and expenses to date total $0.5bn. In addition, $0.8bn has been returned in cash to clients. More details are set out in Section 5.

Assets potentially subject to trust claims are held in separate accounts and not co-mingled with House accounts.

All funds on hand are prudently invested, either held with the Bank of England, invested in institutions which are AA-rated or above, subject to defined market capitalisation parameters and credit default swap spreads, or invested in short-dated AAA rated government securities.

## Trust Property Asset Claimants

Creditors with Client Asset claims are covered in detail in Section 5.3 of this report. We are sensitive to the consequences of returning Trust Property Assets and have committed extensive resources to this activity.

During October 2008, a formal process to commence the return of assets to clients was announced. A structured process for dealing with client claims has been implemented and there have been extensive dealings with many of the c.2,000 account holders.

An initial prioritisation of clients has been agreed and over 100 hardship cases have been considered and responded to.

To date Trust Property Asset returns total $12.2bn (assets and cash $11.5bn, release of claims to collateral held by third parties $0.7bn). We have to date returned material assets to client claimants by value, but a limited amount by number.

During March 2009, we outlined a potential mechanism for the orderly return of assets using a Scheme of Arrangement under the Companies Act 2006. The practical viability and application of the Scheme of Arrangement is under assessment and we are working with the Committee to progress it. This is discussed further in Section 5.3.1.

## Creditors' claims

Creditors should continue to submit their claims to the Administrators electronically via the LBIE Client Information and Claims website. At this early stage limited resources are being deployed to formally agreeing creditors' unsecured claims, but a comprehensive framework is being implemented to receive, value and monitor such claims for subsequent admission for dividend.

No bar date has been established yet for claims.

The LBIE Information and Claims website is only accessible by a unique user ID and password. All creditors and counterparties were provided with access details in our letter accompanying the Administrators' Proposals for Achieving the Purpose of the Administration dated 28 October 2008. If you are unsure of your access details, please follow the email link at www.pwc.co.uk.

Updates from the Administrators and certain information regarding the LBIE Administration are regularly posted. (See Appendix 2).

## Future strategy and actions

The Administration of LBIE is exceptionally complex. Actions to date have established a comprehensive framework for the systematic run-off of positions and processing of claims.

Over the coming months, the Administrators intend to explore the alternative mechanisms for distributing realisations to unsecured creditors. We caution, however, that it is likely to be some time before a dividend is paid to unsecured creditors.

The Administrators would like to formally acknowledge the invaluable ongoing contribution being made by the LBIE management and staff in working as an integral part of the LBIE Administration team. The circumstances of the insolvency of LBIE and its impact on them, their friends and families have been very significant. Despite this they have demonstrated a high degree of professionalism and commitment to ensure the impact on LBIE's creditors is minimised.

# Section 3

# Background information

## Background information

Investment banking was at the core of the business of the global Lehman Brothers Group of companies (the "Lehman Group"). Until its collapse, the Lehman Group was one of the four biggest investment banks in the United States. It provided financial services to corporations, governments and municipalities, institutional clients and high net worth individuals. The business activities of the Lehman Group were organised in three segments, namely, capital markets, investment banking and investment management. Those segments included businesses in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

The Lehman Group's headquarters were in New York, with regional headquarters in London and Tokyo and many offices in North America, Europe, the Middle East, Latin America and the Asia-Pacific region.

The ultimate parent company of the Lehman Group is LBHI, which is incorporated in the United States.

## Events immediately preceding the Administrators' appointment

The Lehman Group operated in a market that depends heavily on investor and market confidence. In the period immediately prior to its insolvency, there was an escalating loss of confidence in the Lehman Group, as evidenced by a significant deterioration in LBHI's share price on the New York Stock Exchange of almost 80 per cent during the week from Friday 5 September 2008 to Friday 12 September 2008.

On Tuesday 9 September 2008, the share price fell 45 per cent following reports that negotiations with the Korean Development Bank, regarding a potential major investment in the Lehman Group, had been put on hold.

The following day, the Lehman Group announced a third quarter loss of $3.9bn.

At the same time, the Lehman Group announced plans to sell a majority stake in its investment management business and to spin-off the majority of its commercial real estate assets into a new, separate public company. These measures failed to restore investor confidence and the share price fell a further 7 per cent on Wednesday 10 September 2008.

Following the close of business that day, Moody's Investors Service, one of the main credit rating agencies, announced that, in the absence of a purchaser for the Lehman Group or its business by Monday 15 September 2008, it intended to downgrade the Lehman Group's credit rating.

Various steps were taken in an attempt to resolve the Lehman Group's situation. We understand that weekend discussions were held in New York with potential investors and purchasers of the Lehman Group's business (or part thereof).

During the afternoon of 14 September 2008, we met with the directors of LBIE in order to consider what steps should be taken in the event that the New York discussions to save the Lehman Group were to fail.

LBIE managed substantially all of the material cash resources of the Lehman Group centrally. A continuing failure of LBHI to settle obligations on behalf of LBIE at any point in time would result in the insolvency of LBIE, as it would be unable to meet its liabilities as they fell due. On 14 September 2008, the directors of LBIE sought assurances from LBHI that payments due to be made on 15 September 2008 on its behalf would in fact be made by LBHI. The directors also planned how to react in the event that these assurances could no longer be given by LBHI.

At approximately 12.30 am on 15 September 2008, LBIE was informed by LBHI that it would no longer be in a position to make payments to or for LBIE and other Lehman Group companies and that it was preparing to file for Chapter 11 bankruptcy protection in the US.

Overnight, preparations were made by the directors, employees and advisers for a number of the Lehman Group companies in the UK to seek the protection

of an administration order and the directors of those companies, including LBIE, met and resolved to place those companies into Administration (collectively "the Lehman Administration Companies").

At 7.56 am, on 15 September 2008, Administration orders were made in respect of each of the Lehman Administration Companies. Having been appointed as administrators, the Administrators and their teams immediately assumed responsibility for LBIE's affairs and began to pursue the purpose of the appointment.

Later on 15 September 2008, LBHI announced that it had filed for Chapter 11 bankruptcy protection in the US. At the same time, LBIE's fellow affiliate, Lehman Brothers Inc ("LBI") was supported by the USA financial authorities, for a further five days. LBI finally entered Securities Investor Protection Act ("SIPA") trusteeship on 19 September 2008, whereupon a significant part of its prime brokerage activities, including a material quantity of Client Assets and obligations, was transferred to Barclays Capital Inc ("BarCap") and others. LBIE has major claims against LBI, but for Client Assets and cash, and for apparently unsecured amounts.

## Business Activities

LBIE was LBHI's main European broker-dealer. It provided investment banking services to clients (including corporate customers, institutions, governments, hedge funds and private clients) on a global basis.

LBIE was a global market maker in certain major equity and fixed income products. As part of its market-making activities it was a member of all principal securities and commodities exchanges across Europe and many others across the world.

LBIE had trading, research, structuring and distribution capabilities in equity and fixed income products and used a client-flow business model, which was based on the principal focus of facilitating client transactions in all major global capital markets products and services. LBIE generated client-flow revenues from a full range of clients by:

• Advising on and structuring transactions specifically suited to meet client needs;

• Serving as a market-maker and / or intermediary in the global marketplace, including trading securities and other financial instrument products available to allow clients to adjust their portfolios and risks across different market cycles;

• Originating loans for distribution to clients in the securitisation or principals market; and

• Acting as an underwriter to clients.

LBIE maintained inventory positions of varying amounts across a broad range of financial instruments and took proprietary trading and principal investment positions.

LBIE's Capital Markets division carried out primarily institutional client-flow activities, including secondary trading, financing, origination and securitisation, prime brokerage and research activities in fixed income and equity products. These products included a wide range of cash, derivative, secured financing and structured instruments and investments. LBIE was a leading global market-maker in numerous equity and fixed income products, European equities, government and agency securities, money market products, corporate high-grade, high-yield and emerging market securities, mortgage and asset-backed securities, preferred stock, municipal securities, commodities and energy products, bank loans, foreign exchange, financing and derivative products.

LBIE was one of the largest market participants in terms of pan-European listed equities trading volume and maintained a major presence in over-the-counter stocks, large capitalisation stocks, warrants, convertible debentures and preferred issues.

The secured financing business managed equity and fixed income matched book activities, supplied secured financing to institutional clients and provided secured funding for their own book inventory of equity and fixed income products. LBIE also served as an agent, market-maker and / or intermediary in the global marketplace, including making available securities and other financial instruments and products to clients to adjust their portfolios and risks across different market cycles, enabling clients to buy or sell large positions of securities through block trades and originating loans for distribution to clients through securitisations and / or syndications.

## Corporate Functions

LBIE and all other companies in the Lehman Group were supported by a number of corporate support functions, including: Operations, Information Technology, Treasury, Finance, Risk, Compliance, Legal, Regulatory and Human Resources.

These were organised and managed on a global basis with regional or local management providing the appropriate local input. The main role of each function is outlined below.

The corporate functions provided support to LBIE's businesses through the processing of securities transactions arising from multiple business units across a multitude of systems, across multiple geographies. It also included receipt, identification and delivery of funds and securities, safeguarding of clients' securities, risk management, and compliance with regulatory and legal requirements.

Included in corporate functions are technology infrastructure and systems maintenance, information security, business continuity planning, treasury operations, financial reporting and business unit financial support, tax planning and compliance, internal audit, expense management, and other support functions. Records relating to the status of transactions (including unsettled, terminated and failed trades) and the physical location of assets by sub-custodian were managed, reconciled and reported by the corporate functions.

LBIE's businesses and operations relied on the secure processing, storage and transmission of confidential and other information. Substantial investment has historically been made in systems, processing capability and technology to manage and record execution and clearing and risk management. The businesses were highly dependent on the ability to process, on a daily basis, a large number of often complex transactions across numerous and diverse markets in many currencies. Consequently, LBIE relied (and continues to rely) heavily on IT systems for financial, accounting, business and settlement systems as well as interfaces to third parties such as banks, custodians and settlement entities / clearing houses.

Extensive protective measures are required for LBIE's computer systems, internet sites, software and networks to protect against vulnerabilities to unauthorised access, computer viruses, denial of service attacks or other events that could have a security or business impact.

These systems and business infrastructure are inextricably linked to the same facilities utilised by other companies in the Lehman Group, and important geographic locations for the maintenance and support of these are both London and New York.

The Administrators only have control over certain parts of the Lehman located facilities. Various other Lehman Group companies, actively through their respective representatives, claim title to certain intellectual property rights in competition with LBIE. This has required the development and implementation of operating protocols and service agreements to ensure LBIE's continued access to data, applications and systems and to govern the basis on which the infrastructure use will be shared and funded going forward.

---

Section 4

The LBIE Operating Model

# Section 4.1 Operating Model

Background

In our report to creditors of 28 October 2008, we identified that the control and management of the Administration was to be managed in three phases:

**Phase I – Control and Assimilation**

- We asserted control over the Company, its business processes and personnel. We identified key roles and individuals and set the primary objectives to meet the purpose of the Administration;

**Phase II – Systemisation**

- The LBIE Operating Model was assessed and restructured to reorganise LBIE's activities to meet the objectives of realising assets, controlling and managing the return of trust property and to agreeing creditors' claims. The current LBIE Operating Model has established a flexible and efficient operating structure through which to support these objectives; and

**Phase III – Run Off**

- The process of running off the balance sheet of LBIE is now well underway, being implemented through the LBIE Operating Model. This phase of the project will ensure the systematic realisation of assets, return of Trust Property and agreement of creditors' claims.

At this early stage we have not determined the mechanism for distributing assets to unsecured creditors; this will be assessed over coming months and will form Phase IV of the process - Distribution.

## The LBIE Operating Model

Set out below is an illustration of the LBIE Operating Model. Each element is discussed in detail in the identified section.

**ACTIVITIES**

| House Positions | Counterparties | Trust Property | Treasury | Reporting | Human Resources | Tax & In-house legal | Infrastructure & Property |
|---|---|---|---|---|---|---|---|
| Section 5.1 | Section 5.2 | Section 5.3 | Section 5.4 | Section 5.5 | | | |

**CROSS FUNCTIONAL WORKSTREAMS**

| Custodians | | Section 6.1 |
|---|---|---|
| Failed Trades | | Section 6.2 |
| Corporate Events | | Section 6.3 |
| Terminations and Valuations | | Section 6.4 |
| Derivative Exchanges | | Section 6.5 |
| Financing | | Section 6.6 |

| Information Technology | Regulatory & Compliance | Infrastructure & Property |
|---|---|---|

COO
Section 4.2

As noted above, the LBIE Operating Model has been restructured to meet the objectives of the Administration. To enable creditors to better understand this, we set out below a description of the Operating Model. This report then provides an update on the various activities of the teams managing each aspect of the Operating Model.

Operations ("Chief Operating Officers" or "COO")

COO are responsible for managing the operations of the organisation, allocating resources and supporting the Activities, Cross Functional Workstreams and Functions.

Activities

The Operating Model has five Activities:

• House Positions – the primary objective is the realisation of House positions (securities and open derivatives). See section 5.1:

• Counterparties – the primary objective is to settle outstanding positions (collect receivables and agree claims) with market counterparties, including street counterparties, Lehman affiliates and to deal with prime brokerage clients which are debtors of LBIE. See section 5.2;

• Trust Property – the primary objective is the identification of clients asserting claims to Client Assets (and Client Monies) in LBIE's custody prior to Administration and to manage the return of those assets. See section 5.3;

• Treasury – the primary objective is to ensure all accounts held by LBIE with cash balances at the date of Administration are collected and to manage the funds realised in the Administration. See section 5.4; and

• Reporting – this Activity coordinates the production and distribution of management information and information for reporting to the Committee and the creditors generally. See section 5.5.

**Cross Functional Workstreams**

Six Cross Functional Workstreams provide support to the Activities in meeting their objectives:

• Custodians – responsible for gaining control of and reconciling all assets in LBIE's extensive custodian network;

• Failed Trades – responsible for establishing the manner in which failed and pending trades are to be dealt with in the 80 markets in which LBIE operated;

• Corporate Events – responsible for ensuring that all corporate actions, coupons and dividends relating to securities held by LBIE (both House and client) are collected and ultimately accounted for;

• Terminations & Valuations – responsible for coordinating the collation of all termination notices and statements received and undertaking valuations to support the settlement and close out of counterparty positions;

• Derivative Exchanges – responsible for all dealings with the various derivative exchanges, including recovering posted collateral and reviewing the close out of House and client positions; and

• Financing – responsible for managing the process of collecting sums relating to excess collateral posted with the Street on LBIE's very extensive financing activities.

Each of the Activities and Cross Functional Workstreams has specific objectives, which have in turn been cascaded through to remaining LBIE employees and Administrators' staff.

**Functions**

Supporting the work of the Activities and Cross Functional Workstreams are several Functions. Some of the LBIE Functions are provided by Lehman Brothers Limited ("LBL") in its capacity as the service company for the UK Lehman Group entities and recharged to LBIE:

• Information Technology – managing the transitional and ongoing IT needs;

• Regulatory & Compliance – ensuring ongoing compliance with FSA and other regulatory requirements and handling investigations;

• Infrastructure & Property – managing LBIE's physical premises in London and elsewhere;

• Human Resources – handling all matters relating to the retention, reward and restructuring of the employee base; and

• Tax and In-house Legal – dealing with all ongoing tax matters, including corporation tax and withholding tax and in-house legal matters.

Four other traditional back-office functions: Finance, Operations, In-house Legal and Risk, have been incorporated directly into the Activities and Cross Functional Workstreams.

**Coordination**

Each of the Activities, Cross Functional Workstreams and Functions has its own specific objectives; at all times they work together as a unit to achieve the aims of the Administration. These are coordinated by the Joint Chief Operating Officers, who report into the Administrators. Mr Tom Bolland, a senior Lehman Executive, leads this team.

Each of the Activities, Cross Functional Workstreams and Functions comprise of integrated teams of LBIE and the Administrators' staff ensuring the knowledge and experience of the LBIE management and staff are an integral part of the process. All staff act under the supervision of the Administrators. This balances the cost effectiveness of the run off with the management of risk.

We have now completed a relocation of the remaining 360 LBIE staff and have consolidated the bulk of the operations in place. The Activities, Cross Functional Workstreams and Functions teams into contiguous working areas.

**Resourcing**

The Operating Model has been designed to allow staff to move fluidly between Activities and Cross Functional Workstreams as required by work demands. Resourcing is reviewed weekly by the COOs to ensure efficient staffing and optimal utilisation of resources. We have an active recruitment programme to replace employees who have resigned at various times and to increase capacity in specific areas, as needed.

As part of our ongoing management of people, retained LBIE employees have individual goals and objectives which are aligned with the goals of the Activities, Cross Functional Workstreams and Functions they support. Performance against these objectives is regularly monitored (and reported to your Committee) and reward for the LBIE staff is linked to progress. In summary, the objectives of the Administration are met in a coordinated, focused and cost effective manner. The Operating Model is now well established and the benefits of this reorganisation are increasingly apparent.

# Section 4.2 Operations ("COO")

## Background

Immediately following Administration the priority was to stabilise the operations of LBIE. The existing operating and management model was preserved, subject to the supervision of the Administrators. This provided an immediate risk management infrastructure and enabled the Administrators to gain knowledge and to assert control over LBIE's activities.

As discussed in Section 4.1 the Operating Model was subject to review and during late 2008, a revised Operating Model was designed to meet the objectives of the Administration. The model was formally implemented in January 2009.

LBIE is overseen on a daily basis by the COOs, who are responsible for managing the operations of the organisation to effect the aims of the Administration. The COOs report directly to the Administrators.

At the time of the Administration LBIE occupied approximately 571,000 sq ft at 25 Bank Street, London, its European head office, with some 5,000 staff employed in its operations.

The IT architecture involved over 2,000 applications to support LBIE's global operations.

## Objectives

The objectives of the COO function are:

- Effect control across the organisation and prioritise activities against key objectives;

- Allocate resources across the organisation and manage headcount via selective recruitment;

- Manage Functions that support the Cross Functional Workstreams and Activities; and

- Monitor and manage costs.

## Progress to date

Identifying the key resource, applications and processes needed to support the Administration was the key objective prior to 2009, and has resulted in a consolidation of activities to London.

Approximately 360 LBIE employees have been retained, led by partners and staff from the Administrators' team. The revised team now occupies approximately 137,000sq. ft.

**Effecting control and prioritising work – implementing the Operating Model**

The LBIE Operating Model is focused on driving the Administration objectives to:

- Realise all assets;

- Mitigate and agree claims; and

- Manage and return Trust Property (as defined in Section 5.3).

The COOs ensure that the processes are stable but dynamic such that workflow volumes shift between areas and that change can be implemented smoothly, with minimal disruption.

The COOs act as a key point of contact for the Administrators to ensure the interface between the Activities and Cross Functional Workstreams is effective. This includes prioritisation of tasks enabling the Activities to deliver on their agreed targets and that targets are appropriately aligned at the Cross Functional Workstream level. They manage this through Cross Functional Workstream target setting and monitoring, directing Cross Functional Workstreams to priority activities and redistributing resource to meet priority needs.

In terms of prioritisation, on a quarterly basis each Activity and Cross Functional Workstream submits detailed objectives and tasks, which are reviewed by the COOs to agree priority activities. In addition, the objectives and associated tasks are mapped between Activity and Cross Functional Workstreams to enable capacity issues to be identified and addressed.

Key Performance Indicators have been defined and are monitored by the COOs to measure progress and identify where resource reallocations are needed.

**Allocating resources – creating the resource model**

The COOs are focused on maintaining a skilled, highly utilised and cost efficient team. They use a resource headcount model to formally manage identification of staffing requirements, resource allocation, prioritisation and conflict resolution. This model provides a systematic way to optimise staff utilisation and support the preparation of forecasts.

Resource reports are distributed weekly with budget versus actual assessments performed on a monthly basis.

## Key Processes

**Controlling Management Information ("MI"), managing costs and reporting**

MI is prepared regularly – the Activities report bi-weekly and the Cross Functional Workstreams and Functions report weekly. The MI is used to monitor progress, manage costs and as a basis for all reporting internally as well as externally. It is the primary measure against which the COOs manage the activities of

the Administration, hold Activity, Cross Functional Workstream and Functions leaders accountable and ensure the Activities, Cross Functional Workstreams and Functions are properly integrated.

## Transitional Service Arrangements ("TSA")

The global nature of the legacy Lehman Group and the centralised nature of transaction processing arrangements have resulted in LBIE losing access to key systems and data. In effect, control of the data and systems sits outside the immediate control of LBIE.

Agreements have been implemented with other Lehman entities and third parties, on a bilateral basis to minimise the impact on the run off of the LBIE balance sheet. In addition, LBIE and LBL are continuing to work with Lehman affiliates and their insolvency officeholders to provide support and assistance to them in gaining access to data and systems where this is not prejudicial to the interests of LBIE's creditors.

The COOs manage the coordination of such service provision and in particular manage the resourcing conflict which arises from these actions.

## Managing Functions

The COOs manage the corporate Functions which support the entire Operating Model. These include: Human Resources, Information Technology, Infrastructure & Property, Regulatory & Compliance and Tax. In this capacity the COOs ensure:

- The consistent provision of support to the Activities and Cross Functional Workstreams;

- The adequacy of the resource to ensure ongoing compliance with relevant regulations and laws;

- Accountability against team targets; and

- Existence of an effective infrastructure (both physical infrastructure and IT).

## Capacity Issues

The COOs also proactively identify potential operating issues around resources, technology and business continuity as well as react to specific issues. In those instances, they serve as a liaison managing through these issues with the Function providing the service, the Activity and Cross Functional Workstream leads and the Administrators.

## Issues and challenges

Given the complexity of the business of LBIE prior to Administration the nature of the activities undertaken by the Activities themselves are inherently complex. This requires appropriately skilled individuals to undertake such activities and the support from Cross Functional Workstreams and Functions is critical.

The inter-dependencies across each Activity, Cross Functional Workstream and Function are considerable. The appropriate prioritisation of Activities and the need for a dynamic process results in a highly complex matrix of tasks that need to be controlled.

Section 5

Activities

# Section 5.1 House Positions

## Introduction

The primary objective is the realisation of House positions (securities and open derivatives) for optimal value.

The activity of the House Positions team is divided across three streams: Securities, live OTC and exchange traded derivatives ("ETD"). The overall objective across these three streams has been to maximise the value to the creditors through an orderly resolution of open house positions.

We have made significant progress in meeting this objective, despite initially being constrained by frozen custody accounts, the need for extensive diligence to identify House Positions (as distinct from client positions) and the complexity of live derivative contracts. This progress has been achieved under very difficult market conditions. Key progress to date includes:

- $1.6bn realised from the sale of House cash securities (bonds and shares across 80 markets);

- $1.0bn realised from the negotiated novation or termination of various OTC contracts;

- $738m of excess collateral released to counterparties following the settlement of their outstanding obligations to LBIE; and

- Risk positions on derivative exchanges closed out enabling the return of $2.3bn of LBIE's cash and collateral.

## SECURITIES

### Objective

Our objective is to liquidate House securities positions in an expedient and orderly manner once the release of House Assets are not sold.

### Strategy

Our strategy is to limit the market risk remaining within LBIE while realising the best value for these assets in markets which continue to be challenging. High quality fixed income assets (primarily highly rated, short term, government debt) are being retained within LBIE's investment portfolio, pending realisation and distribution to the unsecured creditors in due course. Certain positions, typically structured fixed income securities may be held to maturity or until greater liquidity returns to the markets to optimise their realised value.

Once our diligence procedures are complete, a liquidation strategy is determined for material security holdings and execution initiated following a formal trade approval process.

## Progress to date

As at 14 March 2009, some $1.6bn has been realised from securities, being $593m from the sale of equities (798 trades over 311 positions) and the realisation or transfer to the Treasury portfolio of $1.2bn fixed income securities (101 positions).

The other key accomplishments to date include:

- Sustaining an ability to execute transactions in the markets by retaining a core front office team and implementing a support framework with a third party;

- Engaging third party brokers, securing terms for best execution;

- Establishing stand-alone global settlements capabilities that were lost on the insolvency of LBHI and on the Administration of LBIE;

- The sale of House positions requires the prior reconciliation of the asset ownership records by the in-house finance team, securing the release of assets from custodians and separating House from Client Assets. To enable the early realisation of assets we have implemented processes which should eliminate the risk of disposing of Client Assets; and

- As of 14 March 2009, we had liquidated 78% in value terms of those positions that have been confirmed as House positions. Certain positions lent to clients have been recalled and disposed of. We have prioritised higher value positions to reduce the market risk of the house book.

## Key processes

In conjunction with the Custodians Cross Functional Workstream (see Section 6.1), the majority of House positions in both open and closed LBIE custodians have been identified. Regular management information is prepared and presented to the COO, Administrators, the LBIE management team and the Creditors' Committee to enable close monitoring of the effectiveness of the activities. These reports detail progress across all activities, relating to the movement of House assets to our new global custodian, the status of the assets (House vs. Client) and the liquidation and settlement.

## Issues and challenges

To date, the main challenges have been:

- The majority of positions held by LBIE are illiquid – being in thinly traded securities. LBIE had an active financing business prior to Administration such that the majority of high value liquid securities were lent into the market for cash, thus residual positions are less liquid and more complex to realise.

- The Administrators place a high level of importance on the protection of Client Assets. We have therefore implemented a robust due diligence process to ensure that we only sell House positions. To complete these procedures we have had to implement a revised management infrastructure, including obtaining information from various custodians and affiliates which was not previously required. This has been time consuming but is now operating in a systematic and automated manner enabling us to segregate higher volumes of assets in a shorter timeframe; and

- Realising illiquid positions in the current, difficult market conditions. Working with the LBIE front office teams we continue to develop individual strategies to realise illiquid assets on a case-by-case basis. Given that the Administration is likely to continue for some time these illiquid positions will only be realised if a suitably acceptable bid is procured.

## LIVE OTC DERIVATIVE CONTRACTS

### Objective

To identify the live OTC derivative contracts with counterparties which are debtors to the estate and to negotiate the novation or termination of these derivatives.

### Strategy

Our strategy is to reduce the level of uncertainty for LBIE and the client over the value of these contracts and we have worked bilaterally with many counterparties to settle outstanding positions. This process involves understanding multiple valuations of vanilla and structured derivatives and / or offering them into the market for novation.

A comprehensive valuation capability has been developed as part of this process and we are now leveraging this expertise into other areas of the estate, including supporting the activities of both the Counterparties team and the Trust Property team to value live and terminated derivatives.

### Progress to date

As at 15 September 2008, there were approximately 134,000 OTC derivative contracts between LBIE and its counterparties, of which approximately 1,100 were still live at 14 March 2009; the remainder having been terminated.

The key accomplishments across the OTC population include:

- Successful negotiation of a significant number of novations and terminations of live contracts. Our approach of expediently identifying, valuing and

building a proposition to take to counterparties has resulted in the recovery of over $1.0bn on live contracts to date;

- In a number of instances, these negotiations have resulted in the return of excess collateral held on behalf of LBIE by third parties. We estimate that collateral with a value of $798m has been released, allowing counterparties to use that collateral in their other dealings;

- Over 99% of the OTC derivative contracts have been terminated, allowing their valuation to be undertaken and a final position to be determined with the counterparty;

- The development of our own valuation capability or sourcing valuations from third parties to enable us to value all the live trades on a regular basis. To do this we have negotiated contracts with market data providers to provide the relevant valuation inputs;

- Retention of a core Lehman front office team to assist in the valuation process and to negotiate novations and terminations with counterparties. This was achieved despite the personnel concerned being highly marketable. The success to date is in no small part attributable to the effectiveness of that team; and

- Development and implementation of a software application to identify all existing derivative, track live contracts, validate incoming valuations on terminated contracts and record progress of all negotiations at a counterparty level.

### Key processes

The key steps to the resolution of live OTC positions are:

- Valuation;

- Identification of counterparties that are net debtors;

- Strategy development and options analysis;

- Negotiation; and

- Legal documentation and settlement.

Live derivatives are valued on a regular basis and these valuations are combined with data on collateral and other positions held by or for LBIE to develop a comprehensive view of the overall financial position between LBIE and the counterparty. Using this information, activities are prioritised.

To date this approach has allowed us to either novate open positions to a replacement financial institution or to reach an agreed termination of the derivative contracts at an agreed termination value. These novations and terminations are documented and funds due to the estate are collected.

### Issues and challenges

The main challenges have been:

- A number of counterparties with live OTC contracts have to date refused to terminate those contracts and have indicated a lack of willingness to agree a close-out or novation of the contract. We will be pursuing all legal remedies available to LBIE against such counterparties;

- Many of the counterparties with whom there remain live contracts have multi-product, multi-Lehman entity relationships with other dependencies and complexities that need to be analysed and understood. Many clients have asserted set-off and we are evaluating the validity of these claims; and

- Determining the complete population of live contracts has been challenging as many counterparties have yet to submit valid termination notices or related valuations.

## EXCHANGE TRADED DERIVATIVES ("ETD")

Working with the Derivative Exchanges Cross Functional Workstream, the House Positions team has successfully closed out all risk positions on global exchanges resulting in the return of $2.3bn of bonds and cash posted as collateral.

Actions in this area are discussed in further detail at Section 6.5 - Derivative Exchanges.

# Section 5.2 Counterparties

## Background

The Counterparties team was formally established in January 2009, to reflect the optimal manner for dealing with the multiplicity of market counterparties. There are estimated to be up to 22,000 counterparties of which some 6,000 had live positions with LBIE at 15 September 2008.

The Counterparties team is structured into four sub-teams, each with distinct responsibilities for specific types of counterparty relationship:

• The "Street" team which manages dealings with Asset Managers, Central Counterparties, Pension Funds, Corporates, Banks and other Non-Banking Financial Institutions;

• The "Intercompany" team which deals with LBIE relationships with many other Lehman Group entities;

• The "Prime Brokerage" team which deals with LBIE Prime Services counterparties who are debtors to the LBIE estate. Prime Brokerage clients who are creditors to the estate are handled by the Trust Property team (as detailed at Section 5.3); and

• The "Agency" team which handles LBIE's multiple roles in various structures and loan facilities arranged by LBIE and other Lehman entities.

Prior to the formalisation of these teams there was no equivalent of the Street team.

Equivalent relationships were managed across the global Lehman organisation or along global product lines by the Equities and Fixed Income business lines.

## Objectives

The Counterparties team's purpose is to manage counterparty relationships in such a way as to provide the greatest opportunity to maximise returns to creditors in the most cost effective timescale. The Activity's key objectives to fulfil this purpose are outlined below. The common objectives of the teams are to:

• Maximise realisations from counterparty receivables; and

• Validate counterparty creditor claims.

## Summary progress to date

Considerable progress has been achieved to date in reaching agreed settlements with counterparties but we note that given the number and complexity of counterparty relationships, the most complex relationships and claims may take some time to conclude.

Key progress to date includes:

• Establishing a comprehensive team to systematically settle positions with market counterparties;

• $1.3bn realised from settling outstanding positions with Street counterparties (including the $1.0bn recovered from OTC derivatives referred to in Section 5.1);

• Filed claims totalling $85.0bn (gross) with 11 Lehman entities. Established an effective dialogue with many insolvency office holders of affiliates;

• Re-established credit risk management systems to monitor credit risk with Street and PB debtors and taken recovery proceedings against a number of clients in breach of terms / limits. Developed an effective interface with the Trust Property process;

• Integrated the Lehman / Administrators' staff in a single team, using the global network of PwC to be represented in all material territories; and

• Implemented a systematic approach for dealing with the multiple agency arrangements to which LBIE was a party.

The remainder of this section summarises the progress made by each of the four teams.

## STREET

### Overview

Dealings with all types of counterparties with all types of relationships were conducted under the original Lehman structure immediately post-Administration. These discussions were typically conducted with those counterparties with single product relationships with LBIE and hence were conducted primarily by the legacy Equities and Fixed Income teams. A dedicated Street team was formed in January 2009. This has provided central coordination for dealings with these parties – a fundamental shift in the manner in which the legacy Lehman business operated.

The Street team's counterparty base comprises approximately 3,500 counterparties. Of this number, up to c.2,000 may have a Trust Asset relationship with LBIE and a further 1,500 have a Financing (i.e. stock loan / borrow / repo / reverse repo) relationship. The management of these Trust and Financing client relationships is being conducted in conjunction with those two respective teams.

In terms of value, per the Company's records, as at 15 September 2008, the total net value to the estate of the Street relationships includes some $8.8bn of in-the-money derivatives and $5.5bn of in-the-money financing positions.

### Progress to date

Since the formation of the Street team, the primary focus has been on ensuring the organisation is engaging with and settling as many counterparties with net receivables balances to LBIE as possible, regardless of whether the counterparty has a multiple or single product relationship.

This approach has been productive to date generating material asset realisations. At 14 March 2009, cumulative cash collections from the team amounted to $1.3bn.

In addition to the amounts collected, a further $3.5bn is subject to active and ongoing negotiations with c.200 counterparties.

The balance of the counterparties we have yet to have an active negotiation with regarding settlement (c.1,400 counterparties). These counterparties have either not provided valuation statements or have provided valuation statements which require further clarification.

Over 500 counterparties have been contacted to request valuation statements and a further 400 counterparties have been contacted requesting further and better information on statements provided.

### Key processes

To address the challenges faced to date whilst enabling us to meet our key objectives and maintain momentum, the team has adopted a range of strategies.

• The initial focus has been on engaging with those counterparties which the Company's records indicate owe sums to LBIE as of the 15 September 2008; and

• Given the high volume of counterparties, we have sought to agree criteria by which counterparties are dealt with on agreed criteria. Clearly these processes are sensitive and are not disclosed in this report.

### Issues and challenges

The challenges facing the Street team in meeting their objectives are numerous and significant. They include:

• Complexity of counterparty balances: Multi-product, multi-fund and multi entity relationships;

• Nature of the counterparty's relationships with LBIE and the Lehman Group, including:

  – Multiple agreements;

  – Complex cross entity netting arrangements and cross default provisions;

  – Uncertainties as to the treatment of a counterparty as agent vs. principal; and

  – Diversity of the underlying derivative contracts.

• Sheer volume of counterparties;

• Valuation challenges;

• Timely availability of information and variable quality of information, especially valuation statements;

• Credit risk; and

• Legal interpretation and consequential litigation risk.

### Major residual challenges

Over the coming weeks and months, there are three key challenges which the Street team are addressing:

• Generating a significant increase in the volume and quality of valuation statements from terminated agreements with counterparties;

• Reviewing the assertions from counterparties claiming cross master or cross entity netting; and

• Timely valuation of a high volume of exotic trade and product trades.

The systematic approach should deliver material ongoing recoveries to the estate. Clearly the effectiveness of this team is dependent upon information provided by Street and we will continue to request counterparties provide such information.

## INTERCOMPANY

### Overview

The global nature of the Lehman business with highly integrated, trading and non-trading relationships across the group led to a complex series of intercompany positions being outstanding at the date of Administration. There are over 300 debtor and creditor balances between LBIE and its affiliates representing $10.6bn of receivables and $11.0bn of payables as at 15 September 2008.

In addition, there are very substantial Trust Property claims against other Lehman Group companies, which we are actively pursuing on behalf of LBIE and its clients. Other Lehman Group companies have similar claims against LBIE on behalf of themselves and their clients (See Section 5.3).

### Progress to date

The primary focus at the outset of the Administration was to ensure that LBIE's interests were preserved with other group companies – in particular meeting the early claims filing bar dates, with Lehman Brothers Japan ("LBJ") and LBI. These were filed by their due dates.

The Intercompany team has continued to make significant progress, including:

- Total claims amounting to $650m (gross) have been filed against 11 group companies and all bar dates have been met. Claims against other group companies continue to be prepared for submission;

- A working protocol has been established with LBI regarding the process for agreeing the Security Investors Protection Corporation ("SIPC") claim (Trust Property claim);

- Local individuals have been appointed in key locations – Japan, Hong Kong, Australia and Korea to represent LBIE's interests in these countries;

- Active dialogue is ongoing with the office holders in Europe, including Switzerland, France, Holland, Luxembourg, Germany and Italy;

- A formal basis of funding the costs associated with a number of affiliates has been established;

- Negotiations have commenced with material Lehman Group companies regarding their role in the Client Asset Scheme of Arrangement (see Section 5.3.1); and

- A secure central repository has been established for storing supporting documentation and evidence for claims.

Key processes

Significant progress has been made as a result of the intercompany team adopting the following approach:

- A dedicated team is preparing evidence for all intercompany claims;

- A central team is interacting with all relevant overseas insolvency practitioners and office-holders to progress claims, post filing;

- The organisation is being leveraged to assist in the trading elements of the intercompany validation and claims filing;

- Two specialist teams are focusing on non-trading and exceptional items, supported by an experienced advisory group; and

- Documentation has been standardised.

Issues and challenges

The intercompany relationships are complex, and subject to a multiplicity of legal agreements. They deal with many differing types of activities including financing, swaps, common cash and securities accounts, staff and cost recharges etc. Accordingly, the challenges inherent in

filing claims across the world for such are many and include:

- A significant volume of securities and non-securities trading transactions;

- Intercompany positions remain subject to market risk where agreements are still live;

- Uncertainties over asset ownership with affiliates and the risk that these entities seek to assert trust claims; and

- Uncertainty over the precise scope and impact of various intercompany guarantees and assignment agreements, and local set-off rules.

Work is ongoing with Linklaters and our other advisors to address these issues.

PRIME BROKERAGE ("PB")

Overview

The primary focus of the PB team is to manage credit risk with debtor PB clients to maximise the realisation of assets to the estate.

Progress to date

The key achievements of the PB team are:

- Identification of the debtor population and prioritising engagement;

- Implementation of credit risk management disciplines and the active pursuit of accounts at risk;

- Identification and implementation of a robust reconciliation and valuation process; and

- Initiating a programme to fully understand the range of issues associated with rapidly settling a high quantity of two types of counterparty relationship.

Key processes

The rate of progress has been high as a result of the PB team implementing the following key processes:

- Prioritising engagement based on a range of criteria including: value of receivable, credit worthiness, existing relationships, complexity and termination status relating to all agreements held;

- Leveraging existing processes across the organisation to provide all necessary information to enable robust reconciliation and valuation; and

- Monitoring PB counterparties where credit risk may exist.

Issues and challenges

The key challenges facing the PB team and the approach adopted to overcome these challenges are set out below:

- Right of set-off: due to the vast range of the legal agreements and underlying products for each PB Debtor relationship, complexity is high. Assessing counterparty's right of set-off across the range of agreements remains a particular challenge with detailed bespoke legal analysis required for each client relationship. A process has been devised to manage this effectively and enable scalability;

- Terminating live PB agreements - many PB agreements remain live extending the time required to reach settlement and recover cash. A series of actions are being implemented which should markedly increase the number of matters terminated;

- Principal vs Agency - many of the PB counterparties entered into Prime related transactions with LBIE via an Agent. As such, agreements in place were held between the Agent and LBIE and not with the underlying funds. Accordingly, the Administration faces challenges in this area; and

- Reliance on administrations in New York and Asia- certain positions are held and controlled within the US and Asia depot structure and are therefore outside the control of LBIE. To date, the relevant data and information required to reconcile this trade population at a counterparty level remains outstanding. Negotiations for data access are ongoing.

AGENCY TEAM

Introduction

Prior to the Administration LBIE had been appointed in various agency roles in the vast majority of structured transactions and deals that it had arranged. LBIE performed a number of different roles under these contractual agency agreements, both with external counterparties and other Lehman Group entities. These agency roles include:

- Security agent;

- Facility agent;

- Calculation agent; and

- Balancing agent.

Continuing to perform this role as an agent under these agreements would require a significant diversion of the Administration's resources and would also result in the LBIE estate being exposed to unacceptable performance and litigation risk.

It has been assessed that the other parties involved in the deals where LBIE was the calculation or balancing agents (over 500 structures identified to date), can replace LBIE, without the process requiring any action from LBIE. However, upon request, we have confirmed LBIE's willingness to formally resign from these agency roles, subject to certain conditions.

The principal area of concern arises where LBIE is appointed to the role of security agent where, LBIE continues to hold the rights to pledges of security granted by the borrower, on trust for the lenders and other secured creditors. Managing obligations on these roles is both time consuming and potentially risky.

The level of fees LBIE was entitled to for fulfilling these roles was deminimus and does not cover the costs of discharging the roles.

Objectives

The key objectives for the Agency Team in the run-off phase are to:

- Establish and communicate a practical policy that enables LBIE to resign from the security agent roles, whilst managing risk and the costs to the Administration;

- Work with the counterparties involved to identify the structures where LBIE was the security agent and agree a prioritisation for resignation; and

- Resign as security agent in a systematic and controlled manner.

Progress to date

The accomplishments to date include:

- A formal policy addressing all of the agency roles (including security agent) has been developed and implemented;

- A set of procedures and principles for the resignation of LBIE as a security agent (including a cost contribution policy) has been formulated and communicated to counterparties on request;

- Full pro-forma legal documentation has been drafted with input from the major counterparties to streamline the resignation process going forward;

- To date we have resigned from five agency roles and have commenced the process for a further seventeen security agent roles;

- Formal contact with significant counterparties has been held to initiate the identification of the remaining population of agency roles and to prioritise resignations;

- Responses to counterparties via the Query Management System ("QMS") have been provided on LBIE's position with regards to the different agency roles.

### Issues and challenges

It has been estimated that LBIE was a security agent in over 100 structures which involves a large number of individual pledges over different types of securities including real estate (for example in one particular structure, there are some 5,200 individual real estate properties in eleven different legal jurisdictions, where LBIE holds the pledges of security).

LBIE continues to receive a large volume of requests from various parties involved in these structures who are unable to progress a wide range of basic actions such as: refinancing, making repayments, restructuring the vehicles or selling/leasing secured properties, without the involvement of the security agent.

It has also been assessed that there is a risk of liability (which would rank unsecured) that could arise for the LBIE estate, if LBIE fails to perform its role as security agent or is in error in its performance of that role (e.g. for loss to the lender for non performance or erroneous performance).

### Ongoing actions

We have agreed that LBIE should cease to perform the role of security agent (due to the inherent risk and the significant resources required) and that it should facilitate its resignation and the transfer of the pledges to the new incoming agents.

The resignation process includes the borrower making a cost contribution to compensate the LBIE estate for the redemption of resources and to cover the legal and administration costs incurred in the resignation process. To date borrowers have been willing to make these payments to ease the manner in which their positions are addressed.

Due to the number and complexity of the agency roles, a separate Agency team has been established to ensure the appropriate priority and resources are applied to the resignation process.

### Summary

The resignation process has been formalised and we are working with a large number of counterparties and legal counsel to deal with the many outstanding agency relationships.

# Section 5.3 Trust Property

### Objectives

From the commencement of the Administration there has been very considerable focus on the return of property to which third parties may assert a trust claim. This includes securities in the Company's possession at 15 September 2008, ("Client Assets"), and cash balances managed by LBIE pursuant to the UK Financial Services Authority's Client Money Rules at 15 September 2008, ("Client Money"). – (jointly referred to as "Trust Property").

The Administrators recognise the market issues being placed by Trust Property claimants and are treating the identification and return of Trust Property as an urgent matter. It is a complex and highly technical area.

A large team (comprising in excess of 100 staff of the Administrators, Linklaters and LBIE as well as numerous staff from Nomura) are deployed specifically to deal with the return of Trust Property.

The Activity's key overarching objectives are:

- Identification, protection and return of Client Assets;

- Verification that House assets assets for disposal are not Client Assets;

- Pooling and return of pre-Administration Client Money; and

- Management and ultimate resolution of post-Administration cash receipts.

### Progress to date

The Trust Property team has a number of key achievements to date, specifically:

- Defined a clear process for the return of assets under a risk mitigating indemnity framework;

- Returned c.$11.5bn out of the estimated $26.1bn of Client Assets;

- Implemented a process to reconcile the Client Asset claims (over 1,100 such claims received to date) against records and return unencumbered assets that are not subject to legal or reconciling complexities;

- Submitted claims against LBI, LBJ, Lehman Brothers Bankhaus AG ("Bankhaus") and others for the return of Trust Property to LBIE;

- Automated and streamlined a process for review and approval for the disposal of LBIE's House assets in order to diminish the risk of potentially disposing of co-mingled Client Assets;

- Recovered $0.9bn of the pre-Administration Client Money held in agent banks constituting the pre-Administration Client Money Pool ("the Pool"), and

substantially established the client entitlement to the Pool (subject to pending legal issues); and

- Gained control of approximately $2.1bn of money received post-Administration that is potentially Client Money and commenced a process to allocate these post-Administration receipts to assets and eventually clients.

The Trust Property Activity has met the objectives established in Phases I and II and commenced those in Phase III, specifically:

### Phase I – Control and Assimilation

In Phase I:

- Various reviews were completed of the business lines and products, the IT systems, processes and agreements involved around the creation and management of Trust Property that had existed in LBIE prior to Administration;

- An estimated $26.1bn of Client Assets and $2.1bn of Client Money was identified to be segregated as control over these assets was asserted from various custodians, affiliates, and agent banks in over 80 markets;

- New policies and arrangements for the safeguarding of Client Money and Client Assets were defined and implemented;

- The population of pre-Administration Client Money claimants, and the counterparties that purport to have claims, rights or other interests in Client Assets were circulated. In excess of 1,700 notification letters were circulated, In excess of 1,100 notification letters being sent and followed up on. To date, in excess of 1,100 Trust Property claims have been received, which are in the process of being reconciled to underlying records;

- A bespoke reconciliation system was built allowing the automated reconciliation between client claims, LBIE records and custodian records for Client Assets;

- A dedicated Client Money reconciliations team was formed; and

- A bespoke IT system was built to determine entitlement to Client Money.

### Phase II – Systemisation

In Phase II:

- Procedures to reconcile all data and information were embodied; specifically a process was implemented to undertake three-way reconciliation exercises between counterparty claims, LBIE records and custodian records;

- A process for the allocation of post-Administration receipts to specific asset holdings was launched;

- A process was established for the legal review of agreements to establish counterparty entitlements to Trust Property. To date this review has completed on c.2,100 legal agreements relating to in excess of 1,000 LBIE counterparties;

- A significant number of legal issues that impact upon the validity of the Trust Property claims are being raised with counsel, which may be resolved via the directions of the High Court;

- The Administrators have notified affected clients and the High Court of the intention to explore the feasibility of a Scheme of Arrangement for dealing with Client Assets claims (see below);

- A dedicated client relationship team was formed to interact with counterparties regarding Trust Property. In excess of 3,000 individual queries have been responded to, to date;

- Regular updates and answers to 'Frequently Asked Questions' continue to be provided on-line to inform the market of the issues and progress made; and

- Stakeholders such as regulators and industry bodies (including the Financial Services Authority, Alternative Investment Management Association, and Managed Fund Association) have been presented to and their queries addressed. Wherever possible, the support of stakeholders has been sought to assist in achieving the workstream objectives.

## Phase III – Run-off

Phase III is currently underway, with the objective of agreeing and implementing a procedure for making distributions of Trust Property to counterparties with valid trust claims.

- A working committee was established in January 2009, to explore a mechanism for the return of assets to Client Assets claimants. A Scheme of Arrangement is currently being assessed;

- The interim processes for the return of unencumbered Client Assets that meet certain conditions has progressed and some 260 account claims received are within the final stages of this process;

- Work has commenced on establishing systems and controls to make an interim distribution of the pre-Administration Client Money Pool, pending the resolution of two material issues which could impact the distribution (see below); and

- An automated process has been developed to review and approve the disposal of LBIE's House assets

in order to diminish the risk of potentially disposing of co-mingled Client Assets. Approximately 40% of equity stock lines and 30% of fixed income have been reviewed, leading to approximately 500 security lines available for House disposal.

### Hardship and Priority process

The Hardship and Priority process is chaired by one of the Administrators and coordinated by a dedicated committee, which was established in accordance with the Court directions application of 7 October 2008, to address special claims that meet specific criteria allowing accelerated return while ensuring that the overriding objective of treating all counterparties fairly is not prejudiced to the interests of a minority.

The Committee periodically meets to review special claims, and makes recommendations to the Administrators who then decide the terms on which resolutions will be reached with individual counterparties or classes of counterparties. Approximately 120 such claims have been received to date.

### Issues and challenges

The identification, securing, reconciliation and return of Trust Property are complex and highly technical areas. The Trust Property Activity has required the support of many of the other Activities and Cross Functional Workstreams within the Administration, which have their own challenges and dependencies (as described in other parts of this report). Set out below are some of the key challenges that the Trust Property Activity is directly overseeing.

## CLIENT MONEY

### Bankhaus

Prior to Administration, $1.0bn of Client Money was deposited by LBIE with Bankhaus a member of the Lehman Brothers Group and a licensed bank, registered in Germany. This deposit represents approximately 50% of the total Pre-Administration Client Money held by LBIE.

Client Monies had been invested with Bankhaus over the preceding year. On 12 November 2008, the German regulator, BaFIN, announced that insolvency proceedings had been commenced in relation to Bankhaus.

A claim on behalf of LBIE clients was filed with the Bankhaus administration on 3 February 2009, to recover the $1.0bn of Client Money deposited. The initial Bankhaus creditors' meeting was held under German insolvency proceedings on 17 March 2009. There continues to be considerable uncertainty surrounding the treatment of the Client Monies claim and to date the German administrator has been unwilling to confirm

his interpretation of the basis of LBIE's dealings with Bankhaus and hence the status of these monies. The timing and extent of the recovery of the deposit of Client Money with Bankhaus is fundamentally uncertain at this juncture.

### Pre-Administration Client Money: Pool Legal Boundary Issues

The precise application of the FSA rules to the circumstances of the LBIE Administration is complex. Investigations are ongoing to confirm total claims to the Pool and whether there may be further competing claims. Details of the claims are not yet set out in this report to minimise the risk of prejudicing LBIE's client's recoveries from the Pool, but include:

- Futures margins;
- Affiliates entitlements; and
- Impact of depot breaks.

We are in ongoing dialogue with the FSA and intend seeking directions from the High Court in certain areas.

For these reasons it is unlikely that any form of Client Money distribution will be made within the next few months. The aim is to resolve these matters as quickly as possible, ensuring that any distribution of monies is in accordance with the FSA Client Money Rules and applicable legal rulings. In order to facilitate this, the Administrators will ask clients to agree their Client Money position and obtain other administrative information prior to any distribution.

### Assets held by Lehman Brothers affiliates

Prior to Administration, different entities within the Lehman Group routinely acted as depositories or sub-custodians of one another, where commercially convenient. At 15 September 2008, LBIE's House and Client securities were held by a number of affiliates, including LBI, LBJ and Lehman Brothers entities in Hong Kong ('LBHK'). In total over $7.0bn of securities are controlled by these three parties.

LBIE has submitted claims in each of these affiliate estates for the return of Client Assets. The most material claim is against LBI, and this claim was filed on behalf of LBIE itself and its clients by the LBI deadline of 30 January 2009.

LBI is in a US bankruptcy process, under the supervision of a trustee appointed by the US District Court for the Southern District of New York granting the application of the SIPC. The trustee, Mr James Giddens of US law firm Hughes Hubbard & Reed LLP, was appointed on 19 September 2008.

LBJ is subject to a liquidation proceeding in Japan.

Japanese law firm Oh-Ebashi has been appointed to deal with LBJ's dealings in Japan.

The LBHK entities are in provisional liquidation in Hong Kong. KPMG LLP is dealing with the liquidation, which is subject to the supervision of the Hong Kong authorities.

### LBI

In the case of US securities the majority of securities traded, received or held by LBIE for its clients and for its own account in the Depository Trust Company ('DTC') were held in a DTC account managed by LBI. According to LBIE's records some $5.6bn of House and Client securities were held by LBI at 15 September 2008.

The Administrators have made progress in their dealings with the LBI Trustee and have obtained access to certain information from LBI's books and records concerning the securities held in the LBI DTC account. In addition, agreement has been reached between the LBI Trustee, SIPC and LBIE the "Claims Agreement") regarding the filing of such claims and their reconciliation.

The Administrators and the LBI Trustee are now actively working to reconcile clients' holdings subject to the control of the LBI Trustee. This process involves reconciling the securities held by over 1,000 LBIE clients via LBI and access to these securities will be restricted until the LBI Trustee is satisfied with the claims of LBIE and its clients.

A material barrier to obtaining information about LBIE Client Assets in the US resulted from the transfer of LBI's IT systems and databases to BarCap following the sale of certain assets belonging to LBHI and LBI to BarCap. We understand that the LBI Trustee is continuing negotiations to reach a general agreement with BarCap in relation to IT access. In addition, the Administrators are negotiating directly with BarCap, with a view to entering into a TSA on behalf of LBIE, pursuant to which LBIE will secure access to those software systems which it used prior to entering into Administration and which are now under the control of BarCap.

Whilst obtaining information from LBI has been particularly complex, through the Claims Agreement, we have established a protocol for progressing the task.

### Other entities

Negotiations are also ongoing with LBJ and LBHK, which together hold some $1.1bn of House and Client Assets.

The Administrators are in the process of submitting claims to LBHK and have a regular dialogue with the liquidator regarding the mutual return of assets.

Recent meetings with Oh-Ebashi representatives have resulted in obtaining their confirmation that some $1.0bn of LBIE securities are held by LBJ.

Discussions with affiliate company office holders have extended to the subject of those companies' potential claims to securities held by LBIE on their (or their clients') behalf. LBIE, will manage these claims in a similar manner to claims from third parties.

# Section 5.3.1 Proposed Client Asset Scheme of Arrangement

## Background

The return of Trust Property is a core objective of priority to the Administration and we are anxious to return Trust Property to clients as expeditiously as possible.

The mechanism in place for the return of Client Assets by individual bilateral negotiation is sub-optimal as it a lengthy process and onerous on clients, failing to bring finality or dealings between them and LBIE.

## Key Issues

Before a systematic distribution of Client Assets can be implemented it is necessary to identify and determine the pool of claimants. This objective has been hampered by the following issues:

* We presently face uncertainty over whether the assets we are currently holding may be the subject of competing claims;

* We are aware that the significant number of fails has resulted in shortfalls of certain assets which should have been held for return to clients. In some instances these were unaccounted for by additional segregation of Client Monies, but in some circumstances this is not the case (some 400 securities);

* The reconciliation exercise currently underway involves all clients providing adequate information and documentation to substantiate their claim – to date less than 60% of client account holders have provided sufficient data to meet our requests;

* There is uncertainty as to whether particular holdings of Client Assets are subject to set-off rights in respect to liabilities of clients to LBIE and / or any of its affiliates (over which we have no control);

* Valuing Client Assets is a complex task, both operationally and legally. There is significant variation in valuation dates which affect clients' rights to Client Assets;

* A significant number of clients have not terminated their agreements. As such the value of their open positions with LBIE fluctuates daily. The aggregate client entitlement to Client Assets varies daily, which in turn impacts the possible shortfall on certain stock lines; and

* The effects of termination are not legally clear in all cases. Again, this issue is likely to impact whether there are stock shortfalls for clients.

The current bilateral approach to distributing Client Assets will take some years. We have identified that the return of Client Assets to clients would be best facilitated through a Scheme of Arrangement ("Scheme") pursuant to section 895 of the Companies Act 2006.

## Proposed Scheme of Arrangement

Broadly speaking a Scheme is a contractual compromise between LBIE and its affected creditors. The objective of the Scheme is to materially speed up the return of Client Assets to clients through, inter alia, the imposition of a bar data for submitting final claims.

A Scheme should be capable of providing the following benefits:

* Achieves finality of the population of Client Assets claims allowing Client Assets to be distributed without the need for indemnity;

* Ensures no future claims arise against LBIE for assets distributed under the Scheme;

* Addresses the issue of any competing claims to stock lines. Defines rules for dealing with asset shortfalls;

* Provides finality of dealings with Client Assets claimants – defines the trust and unsecured claim;

* Allows the controlled termination of open positions; and

* Applies a consistent set of rules for a number of issues, including valuation methodology, allocation of costs and dispute resolution.

If the Scheme is approved by the pre-requisite majorities (see below) all affected creditors will become bound by the terms of the Scheme whether they vote or not.

## Development process

The feasibility and parameters of the proposed Scheme are currently being explored and developed with the assistance of a representative group of clients, a formal working group consisting of members of the Creditors' Committee who are assisting with developing the elements of the scheme and their application.

We have published information on the website and held open meetings with industry bodies in both the US and UK in early March 2009, to solicit the views of the affected funds industry.

We are taking the views of the working group and industry bodies into consideration and are actively working with our legal advisers to define a feasible Scheme.

The nature and scope of the Scheme being explored is both novel and ambitious. It will likely require compromise by clients and LBIE if it is to be effective. We will continue to take counsel on the various issues from affected clients.

# Section 5.4 Treasury

## Timescale

If we and the working group conclude that a well formulated Scheme can be promoted, then we shall revert to the Court in due course to seek sanction to convene the appropriate scheme meeting(s) for all affected creditors.

We hope to hold the Scheme creditors' meeting(s) by the end of September 2009. Prior to any meeting being held, we will provide full disclosure of the proposed terms of the Scheme to all affected creditors.

If this timescale is met, we aim to set a bar date during 2009, with a view to commencing asset distributions in 2010. The High Court, our counsel and external observers have commented that this timescale is ambitious, given the complexity of the issues to be addressed in the Scheme. We will revert to affected creditors with a more specific timeline once the substantive issues in the Scheme are advanced.

## Pre-requisite majorities

All affected creditors with Trust claims against segregated Client Assets will be able to vote and the Scheme will need to be approved by 75% of the value and 50% by number of each class of creditors voting at the meeting. It is presently uncertain as to the number of classes in the Scheme.

Further information on the current status of the Scheme proposal can be found at www.pwc.co.uk.

## Objectives

The Treasury Activity is responsible for the recovery and management of LBIE's cash, as such the core objectives are:

- The identification and repatriation of cash within the pre-Administration network, followed by the reconciliation and closure of pre-Administration accounts;

- The implementation of efficient processes for the collection, reconciliation and management of post-Administration receipts; and

- The investment of the estate's cash and assets in order to realise greatest return while safeguarding capital.

## Progress

### Cash Operations – structure and efficiency

Treasury has implemented a full set of operational processes and controls to support the function. This includes cross-activity processes for:

- The management and forecasting of receipts;

- The identification, follow-up and collection of anticipated non-receipts; and

- Account reconciliation and closure.

Key achievements include:

- $7.4bn (net) cash now under the Administrators' control;

- The outstanding cash in the agent network has been classified and projects established to actively pursue recovery in a number of territories;

- Of the 1,517 pre-Administration accounts, 31 have been closed and a further 173 have been instructed for closure;

- Following Administration, the global treasury management systems ceased and reconciliations failed. A project was initiated to address this extensive task and material progress has been made;

- Detailed management information for both external and internal accounts has been established and production is automated;

- Under the requirements of Administrations, all receipts and payments need to be captured on a gross basis. Since 15 September 2008, over 60,000 cash movements have occurred on the pre-Administration accounts, these movements are in the process of being reconciled and captured within the Administration receipts and payments system; and

- An investment strategy and policy framework was required to support the investment of estate cash. The policy has been implemented and our 'investment policy' detailed below.

A summary of the cash position of the estate is provided in Section 9.

## Investment policy

At 14 March 2009, LBIE held $7.4bn of cash and investments in accounts under our control, comprising $2.0bn of Client Monies and $5.3bn (cash $4.3bn, bonds $0.7bn) of House funds.

An investment policy for the management and investment of these funds has been established.

The primary objectives of this policy are:

- Meet legal requirements and comply with FSA regulations including suitable Client Money segregation and no set-off arrangements between pre and post-Administration liabilities and between post-Administration liabilities of the various Lehman entities in insolvency proceedings;

- Security of funds and protection of principal. To meet this objective a comprehensive investment risk policy has been established with clear limits on counterparties, instruments, amounts and duration with associated monitoring and management;

- Ensure sufficient liquidity to meet the day-to-day working capital requirements of the Administration and the requirements to meet payments to creditors. The duration of cash assets will be chosen to match the expected duration of liabilities wherever this is possible; and

- To achieve an appropriate yield on surplus cash in line with the investment risk policy, operational constraints, FSA regulations and legal requirements. The yield is benchmarked against relevant indices dependent upon the type of instrument used.

Positions are monitored and managed on a real time basis by the team and reports are provided weekly basis as part of the Treasury MI.

Current market conditions are resulting in frequent intra-day balancing of the portfolio within the investment policy. The primary aspects of the investment policy are:

**Short term investment policy (cash at bank plus money market deposits):**

- Long term credit rating – minimum rating AA- (if on negative watch, the effective rating is reduced one notch to give an effective credit rating);

# Section 5.5 Reporting

## Objectives

The Reporting Activity is responsible for the provision of regular internal management information to the Administrators and the management team in the production of information for external use, including reporting to the Committee and creditors in general.

The Reporting Activity also ensure compliance with the Administrators' statutory reporting obligations set out in the Insolvency Act 1986.

In summary, the Reporting Activity aims to:

- Provide the Administrators with information necessary to monitor progress against the defined strategy and to support the management team in leading and controlling the process of the Administration;

- Coordinate the production of MI to support and assist the Activities;

- Assimilate information, prepare published statutory reports and presentations and to convene and conduct periodic meetings with creditors and the Committee;

- Construct and maintain a database for the recording of creditors' claims and for the publication of confidential materials to LBIE creditors;

- Reconcile and track post-Administration activity against LBIE's balance sheet and books and records; and

- Control the updating and maintenance of all LBIE financial books and records to the date of the Administration and thereafter.

## Progress to date

Given the size and complexity of the Administration, a specific Reporting Activity was established to assist the Administrators to monitor and report progress and to aid decision making. This team:

- Designed and implemented an efficient and streamlined MI framework which is aligned to the LBIE Operating Model. This reports on Activity, Cross Functional Workstream and Function performance against measurable objectives and forecasts;

- Established cost management procedures to monitor and report to the LBIE management team and the Administrators a rolling three month budget and workplan for each Activity, Cross Functional Workstream and Function;

- Monitor costs fortnightly; and

- Ensure that the Administrators' statutory reporting obligations set out in the Insolvency Act 1986 have been met including:

  - Convening the creditors' meeting held on 14 November 2008, to consider the Administrators' proposals, which was attended by approximately 700 creditors;

  - Established and monitored the LBIE Client Information and Claims website: (https://lbn.pwc.com/LBIEClient) to capture unsecured claims, to ensure equitable voting rights for the creditors' meeting. This website, which is accessible only by a unique user ID and password, has subsequently been utilised to post confidential information being made available only to LBIE creditors (see Appendix 2). All creditors and counterparties were provided with access details to the website in the letter accompanying the Administrators' Proposals for Achieving the Purpose of Administration dated 28 October 2008;

  - Preparing this report and the related receipts and payments accounts in the prescribed form for filing with Companies House; and

  - Providing extensive reports and presentations for the meetings and conference calls with the Committee which detail and discuss progress of the Administration.

## Management of LBIE financial records

### Global close

As a consequence of the insolvency of LBIE, it was necessary for the accounting systems to be updated and reconciled at a date other than the normal period end. Any close of the accounting records needed to be coordinated globally to ensure a degree of consistency between Lehman Group entities in establishing intercompany positions.

In the days immediately following our appointment as Administrators of LBIE, we initiated discussions with Lehman accounting staff in New York and elsewhere in the world with a view to arranging a global close for the nominal ledgers of the principal operating companies in the Lehman Group, at the end month point. Such a close was dependent upon access to, and processing by, systems outside the control of the Administrators. LBIE worked closely with those responsible for the other principal group entities in various jurisdictions to agree a cut-off date and define processes to be adopted.

To illustrate the scale of this exercise, LBIE had to process over 200,000 manual journal line ledger transactions, relating to over 1 million underlying trades in order to reflect unposted / unprocessed transactions.

---

- 5 year Credit Default Swap ("CDS") spreads must be below defined level;

- An absolute limit on funds that can be placed with any one institution is derived from by assigning a maximum proportion of market capitalisation and credit rating;

- Tier 1 capital and P/E ratio for banks are also monitored; and

- A short maximum duration for money market deposits is currently set to allow maximum response to a change in limit.

### Medium term investment policy (bonds):

- AAA-stable rated sovereign backed issuances with CDS within acceptable limits and where the markets are sufficiently large and liquid to allow for easy purchase and sale at large volume;

- Currency - USD, GBP and EUR in line with determination of the Committee;

- Duration – investment periods which mean bonds will be held to maturity. In cases where bonds are already held within the Lehman estate they may be transferred to the investment policy with longer maturity dates; and

- Maximum holding limits in any one issue to ensure diversification.

### Issues and challenges

- Negotiation and return of cash assets – a number of cash assets identified within the Statement of Affairs will require extensive negotiation and in some cases are progressing through in difficult jurisdictions. Teams are mobilised and actively pursuing these claims;

- Systems access – the formation of new operational teams with dependencies on applications not under direct control of the Administration has resulted in a back log of systems access and permissions. This has been progressed with the wider IT systems issues; and

- Reconciliation of pre-Administration accounts – around 30% of the pre-Administration LBIE accounts were operationally managed in non-LBIE entities. New service agreements or teams are being established to resolve these issues.

# Section 6

# Cross Functional Workstreams

The accounting for a large number of LBIE positions was controlled outside London and the support of and collaboration with those managing the affairs of the other affiliates was essential to update the records.

These records now provide the basis for discussion with affiliates, where we are seeking to reconcile balances between LBIE and each affiliate including accounting for post global close revisions and agreement of the relevant claims proving date(s), valuation mechanisms, proprietary interests and set off.

## Reconciliation

A team within the Reporting Activity has undertaken the process of reconciling transactions, balances, stock lines and bank accounts within LBIE's books of account on Lehman systems as at 15 September 2008. The reconciliation exercise is now largely complete, with reconciled data having been made available to all Activities and Cross Functional Workstreams to assist them in carrying out their day-to-day processes.

The updated LBIE records form the basis of a control account to ensure the integrity and completeness of all data utilised and processed since the Administration.

The Reporting team is also developing a database of counterparty data to support the various asset recovery and claims management processes.

# Section 6.1 Custodians

## Objectives

The key objectives of the Custodians Cross Functional Workstream are to:

- Gain control of the House and client securities inventory held within the global network of master and sub-custodians, including affiliates; and

- Facilitate asset realisations and trust property returns.

To achieve this, the Cross Functional Workstream has:

- Progressed the reconciliation of LBIE internal accounted inventory on its record keeping system to the external records of the real-world custodian statements;

- Set up a new global master custodian which is used to hold all migrated LBIE securities;

- Claimed securities held on LBIE's behalf through the other Lehman Brothers Group entities custodian relationships; and

- Developed controlled operational processes to effect the above.

## Key Achievements

The securities held by LBIE's custodians are now largely under our control. The value of this was $45.2bn at 15 September 2008, of which $37.1bn was included in the balance sheet and $8.1bn held off balance sheet (for clients and affiliates). A further breakdown is as follows:

- $11.5bn have been returned to clients;

- $21.8bn of assets are under our control held within our new global master custodian depots;

- $7.6bn (US $6.6bn, Japan $1.0bn) held by affiliates;

- $2.1bn remain in depots frozen by the custodians;

- Assets with a book value at 15 September 2008, of $1.4bn have been sold realising $1.3bn;

- $0.8bn of securities have been redeemed, with proceeds paid to the cash accounts;

- $4.7bn was seized and realised by custodians to settle liabilities to the custodian. Alternative securities replaced those held at 15 September 2008;

- 71% of assets held through the legacy LBIE custodian network have been transferred to the new global master custodian. The remainder are in the process of being migrated where depot access has been obtained;

- Reconciliations - significant progress has been made in the identification and resolution of breaks on the custodian depot reconciliation. The process is now 95% complete;

- Liquidations - through performing the reconciliations and by communication with the legacy LBIE custodians, the Cross Functional Workstream has received significant information to support the booking of the involuntary liquidations to the underlying accounting systems. These liquidations reflect the involuntary (i.e. done without LBIE's express request) sale of collateral from the House accounts by the custodians to extinguish outstanding settlement liability. These relate to 1,501 lines of stock; and

- A full operating model has been developed, processes designed and levels of automation designed and implemented to facilitate a controlled, efficient and accelerated process.

## Key Processes

A process has been developed to migrate the assets from the c.100 legacy custodians to the single new global custodian. To aid the process the Cross Functional Workstream has developed a processing 'tool kit' to include:

- The new global master custodian workflow;

- Automation on inbound receipt instructions;

- Automation of internal record keeping to reflect the migration; and

- Development of key control and authorisation points.

In addition, the Custodian Cross Functional Workstream supports the activities of the House Positions and Trust Property Activities by:

- Facilitation of House asset realisation through the development of a robust support model to include:

  – Production of MI to identify assets as available for sell authorisations and controls;

  – Trade capture;

  – Broker matching;

  – Settlement;

  – Fails management; and

  – Reconciliation.

- Facilitation of the return of Trust Property assets through the development of a robust returns process.

# Section 6.2 Failed Trades

## Issues and challenges

### Frozen assets

The release of assets held at seven of the legacy LBIE custodians will take some time to resolve. This equates to c. 3,800 lines of stock valued at $2.1bn. The majority of this exposure resides with North American custodians.

This population can be further split into sub-categories:

- Securities held at LBIE custodians which are closed due to either litigation or local regulatory actions; and

- Securities held at LBIE custodians where the custodian is additionally a counterparty of LBIE and has a multi-product, entity relationship with them. These relationships and negotiations are being managed through the Counterparty Activity.

### Systems

The core control and record keeping processes continue to utilise the legacy Lehman mainframe application. This application is now controlled by BarCap following the sale of the Lehman Brothers North American operations. The Information Technology team has been progressive in ensuring limited disruption to the Cross Functional Workstream and has commenced work on the longer term solutions around mitigating this risk (see Section 7.1).

## Objectives

The key objectives of the Failed Trades Cross Functional Workstream are to:

- Recover cash from failed trades with counterparties where a net debtor position exists;

- Agree creditor claims for net creditor failed trade positions; and

- Manage the operational activity with respect to updating LBIE's books and records to reflect the result of net cash settlement of OTC failed trades and the actions taken by exchanges and settlement agents, including affiliates.

To achieve the above objectives the Failed Trades Cross Functional Workstream is working to:

- Establish a complete population of failed trades taking into consideration post-Administration events;

- Understand the legal framework for resolution of failed trades in the various jurisdictions;

- Understand the trading relationship with other Lehman Group entities and the impact of LBIE Administration on failed trades executed with / through these affiliates;

- Define and implement a detailed approach for handling specific categories of failed trades; and

- Implement a controlled and efficient operating model with appropriate levels of automation and authorisation.

In addition, the Cross Functional Workstream supports the activities of Trust Property Activity by validating the failed trades position of LBIE's clients.

## Key Achievements

These include the following:

- Determined the population of failed trades. The population of pending and failed trades is up to 839,000 trades, as opposed to the 140,000 initially estimated from the Company's systems. These contaminate the records of the vast majority of the company's estimated 6,000 live counterparties;

- Responded to over 2,000 queries from counterparties;

- Developed and implemented a mechanism for handling failed trades and facilitated the bilateral cancellation of significant fails;

- Segregated failed trades with or on behalf of Prime Brokerage clients, Trust clients, Street counterparties and other Lehman Group entities;

- Stratified failed trades by type of street counterparty (i.e. counterparties with failed trade-only exposures and those with other product relationships) to enable effective prioritisation of resolving failed trades; and

- Working with exchanges, central counterparties and LBIE's settlement agents who have applied their default rules to close-out LBIE's positions and reflected those actions in LBIE's books and records.

For example:

   - Prepared a standard used across all jurisdictions for the deletion of trades from exchanges between LBIE and its counterparties to establish a net settlement position of failed trades;

   - Where net settlement is a claim for the estate, working to obtain cash. Agreeing creditor claims where there is a net payable;

   - As a result of our continued work with Euroclear on 29 December 2008, Euroclear Bank cancelled all pending LBIE settlement instructions in the system; and

   - We have provided supporting documentation required to meet the filing deadlines imposed by the administrators / trustees / provisional liquidators of certain Lehman Group entities. For example, in January 2009, we filed a claim against LBI in relation to approximately 200,000 failed trades.

## Key Processes

A process has been implemented for:

- Prioritisation of counterparties for the settlement of failed trades where the counterparty has other exposures with LBIE;

- Prioritisation of counterparties where the only exposure arises from failed OTC trades;

- Improved communication with the counterparties; and

- Recording the net settlement of failed trades in LBIE's books and records in conjunction with the Custodians Cross Functional Workstream.

## Systems and MI

Information repositories underpinning the Administration have been developed to provide Activities and Cross Functional Workstreams with a consistent view of failed cash trades by counterparty and entity. In addition, this will support the production of MI and the tracking of realisation of cash or agreed creditors' claims from failed trades.

# Section 6.3 Corporate Events

## Introduction

The Corporate Events team deals with the income processing of coupons, dividends and handling mandatory and voluntary corporate actions, such as the processing of redemption monies or the sale of unpaid rights.

## Objectives

The objectives of the Corporate Events team are to:

* Efficiently update the books and records in relation to corporate actions, dividends and coupons that have occurred since Administration;

* Support the distribution of Client Trust Property Assets; and

* To provide a service to clients in respect of corporate actions until such time as the assets can be returned.

## Progress to date

* On the morning of 15 September 2008, revised Standing Settlement Instructions ("SSIs") were sent to paying agents advising them to no longer remit payments to the pre-Administration LBHI managed accounts;

* To date there have been over 20,000 corporate events for processing, including c.200 redemptions, c.160 other corporate actions and over 19,000 income events (notification or receipt of dividends and interest). Receipts into accounts under our control from corporate events total over $2.2bn;

* Of this $2.1bn has been received into accounts controlled by the Administrators and in relation to Client Assets (of which c$0.8bn has been on transferred to clients);

* c.$21.7m was received immediately pre-Administration in relation to Client Assets and retained by LBHI. We are pursuing the recovery of these amounts, which may have been pooled with other LBHI accounts pre-Administration;

* A further c.$200m has been received into accounts not in the control of the Administrators – primarily accounts with custodians who have yet to release Client Assets to LBIE;

* Early in the Administration, clear processes were defined for the processing of voluntary corporate actions and details provided to clients via the PwC website;

* Segregating all funds received relating to assets which are potentially Client Assets; and

* Established a proactive corporate actions environment, using Announcement Manager.

## Issues impacting control of Corporate Events

Shortly after the Administration date, the LBIE team responsible for managing corporate events (i.e. those responsible for the processing of corporate events) transferred to Nomura under the business sale arrangements. Provisions were included in the sale terms for ongoing support from Nomura. In practice, LBIE had no IT infrastructure and no direct staff to manage corporate events. Inevitably, following the Administration and the sale, the entire corporate events operations ceased to function.

Considerable resources have been committed to re-establish a team and systems to process the many dividends and coupons and to provide a limited corporate actions service to clients. This team includes resource provided by Nomura.

Processing backlogs as a result of the interruption in processes are significant. This issue is exacerbated by the separation of LBIE systems from those of BarCap and a continuing lack of visibility and control over securities held by LBI and LBIJ.

An estimated 10,000 corporate events relating to securities held by affiliates remain unposted at 14 March 2009, as we have yet to receive the data and, more importantly, the related funds.

The UK based corporate events team has also now taken in-house the function that provides detail on upcoming corporate events, which was previously outsourced to Lehman Brothers in Mumbai, as the latter were unwilling to provide ongoing support.

A corporate actions committee was established pursuant to paragraph 3.4 of the Schedule to the order of Mr Justice Blackburne dated 7 October 2008. The committee's role is to "agree a protocol in relation to the *implementation of corporate actions that may need to be undertaken in relation to Trust Property, for example the exercise of voting rights, receipt of dividends, rights issues and other pre-emptive offers, that will have an impact on the ultimate value of the Trust Property".*

The team has clear plans and actions underway to address the issues resulting from the break in systems and is working with affiliates to agree a programme for dealing with corporate events relating to assets outside our control.

In addition to the events processing functions, there is a significant element of reconciliation work, and provision of information to other business functions, particularly in relation to the ongoing process of returning Client Assets.

Counterparties should be aware that LBIE will be working to quantify and agree financial claims between LBIE and the relevant party to the failed trades to ensure that obligations to LBIE are settled and / or claims against LBIE are recognised.

# Section 6.4 Terminations and Valuations

## Issues and challenges

- Gain full functional access to the suite of software controlled by BarCap which supports the income processing needs. This should enable the arrears of UK processing to be addressed. At present there are many thousands of unposted entries to address;

- Eliminate dependency on the staff provided by Nomura. This is currently work in progress;

- To maintain some level of client service for corporate actions until the Client Assets can either be returned or be determined to be House assets;

- In respect of corporate events, put a robust system in place to ensure all income properly due to LBIE and its clients is pursued. This has yet to be fully implemented, but the use of Announcement Manager provides the cornerstone of this system; and

- To process the LBIE related transactions held in affiliate companies and secure the release of the underlying cash. This is intrinsically linked to the Trust Property Activity and Custodians Cross Functional Workstream.

## Objectives

The Terminations and Valuations Cross Functional Workstream's core to the LBIE Administration, coordinating the processing of terminations and related valuations. The objectives of the Cross Functional Workstream are to:

- Support the settlement of derivatives and financing positions with counterparties where the counterparty is a net debtor. This includes analysis of terminated positions and the review of valuations;

- Agree claims: through the establishment of a LBIE portfolio view, provision of in-house valuations to reference claims, and reconciliation with counterparties' close-out valuations to ensure they are compliant with the underlying agreements; and

- Support the return of Trust Property: through the identification of Client Assets, counterparties' complete dealings with LBIE and valuation of these positions.

The ability of the organisation to value positions was fundamentally affected by the insolvency of the various Lehman Brothers entities, the sale to BarCap and Nomura and the exceptional nature of the valuation exercise required, both in terms of scale and technicality.

The dismantling of the Lehman Group has resulted in access to systems, personnel and expertise being materially impaired. The underlying infrastructure and technical skills required to assess and value many of the more exotic derivative structures no longer existed in LBIE.

## Progress to date

Against this backdrop the Terminations and Valuations Cross Functional Workstream has been working to:

- Establish the population of Master Agreements. The majority of these Master Agreements covered OTC derivatives, stock loans and repos (currently estimated to be c.11,200 Master Agreements);

- Establish the precise population of derivative positions covered by these Master Agreements (currently estimated to be c.134,000 trades);

- Obtain termination notices from the counterparties for all terminated derivative trades, to establish when the agreement was terminated;

- Obtain and reconcile a valuation statement which shows the settlement amount for all the trades under the Master Agreement. (These documents are prepared and submitted by the non-defaulting counterparty to LBIE);

- Manage the data and reconciliation process by logging and validating any outstanding amounts owed to LBIE and supporting their collection via the Counterparties team;

- Complete the logging and valuation of intercompany reconciliations as required;

- Maintain a list of forecast cash flows and historical resets / events for all OTC derivatives;

- Support the Trust Property Activity team by providing 'fast track' valuations and delivering security prices for determining client net equity positions;

- Support the Counterparties Activity by providing 'fast track' valuations and investigating and resolving House vs. counterparty valuation disputes;

- Support the Failed Trades Cross Functional Workstream by valuing several portfolios of failed securities. The population of failed trades is approximately 839,000; and

- Support the Financing Cross Functional Workstream by providing security price information for large portfolios of trades, facilitating settlement of positions with counterparties – the recovery of net debtors and the determination of net creditors.

### Key processes

Counterparties are prioritised by means of weekly meetings and a 'fast track' process is followed to ensure that the team's effort are focused on achieving maximum return for the Administration.

In parallel with the 'fast track' and priority Counterparties processes, the team is procuring termination notices for all Master Agreements that had live trades as at the 15 September 2008:

- All termination notices are reviewed for legal validity. Where a termination notice has not been received, the House Positions team will follow up;

- A trade level valuation statement is obtained from each counterparty and reconciled to the counterparty valuation statements;

- The Corporate Events team provides an analysis of cash events to assist the valuation team;

- Reconciling differences are addressed;

- The valuations team ensures that all terminations have a house valuation and undertake some price verification; and

- Once reconciled the Counterparty team progress to settlement.

A bespoke Asset Realisation Tool ('ART') has been developed as a single application to support the Administration. This acts as a central point of reference for legal documentation, trade population, House valuations and for the reporting of MI. ART facilitates the production of comprehensive counterparty statements.

Key Achievements to Date

The Terminations and Valuations process which is core to all activities has been designed and established. To support the process:

• Clear prioritisation mechanisms working with all Cross Functional Workstreams and Activities, and focusing on asset realisation and Client Assets, have been established;

• ART has been developed and implemented, to act as central repository of all derivative trade agreements and house valuations, provide an efficient workflow across the Administration;

• At 14 March 2009, the legal team had received, identified, scanned, logged and verified approximately 7,000 termination, valuation, and ancillary legal notices from counterparties;

• A London based trade reconciliation team has been established to supplement / cover the reconciliation process previously performed by Lehman India. Through the transition, continuity of India service has been ensured via an agreement with Nomura;

• The trade reconciliation team have valued and successfully reconciled over 500 trade populations where a counterparty valuation statement with sufficient information has been received. In addition, the reconciliation of a further 500 trade populations is in progress;

• An escalation workflow for counterparties which have not provided sufficient information has been implemented;

• A shared service framework has been established to address reconciliation and valuation needs for Financing products, on the same basis of activities initially performed for OTC derivatives;

• For fixed income derivatives, the inventory of LBIE clients, derivative agreements and the related trade inventory has been finalised. The trade population has been segmented;

• Pricing policies have been developed to value illiquid securities where no market quote is available; and

• Critical risk and valuation engines are now operational across all fixed income product groups. A process has been established for rebuilding the historical volatility surfaces and gathering other input required for valuation.

Significant progress has been made in building a scalable process for the valuation of Equity derivatives. This functional capability proved to exist in-house, but implementing a replacement capability is underway.

Issues and challenges

Overall, challenges are primarily of scale and complexity in terms of trade volumes and agreeing close-out valuations. Terminations and Valuations is a labour intensive exercise with extensive systems and data reliance. Other key challenges include:

• Establishing the LBIE view of the counterparty positions to reconcile against the close-out valuations relies on an incomplete LBIE infrastructure;

• Comprehensive legal reviews are required to confirm validity of claims and of submitted documents (e.g. termination notices, valuation statements);

• Complex legal issues such as counterparty set-off are currently being addressed;

• In the majority of cases, counterparties have not provided adequate valuation statements;

• The availability of market data has also been an issue. The valuation of many positions requires a large volume of retrospective market data over an extensive time period which was unavailable in many cases;

• Key issues concern obtaining volume of market data over time period in question;

• There are a number of legacy problems with the quality of the underlying trade data; and

• Establishing the portfolios on trades with intercompany entities is complex given the number of systems involved and the existence of auto booking mechanisms.

Processes are in place to address these issues, but they are time-consuming. On balance, the progress made with managing terminations and valuations is satisfactory to date. It will continue to be a major focus in the implementation of counterparty settlement.

# Section 6.5 Derivative Exchanges

Objectives

The Derivative Exchanges Cross Functional Workstream is responsible for establishing and recovering House and client net equity from clearing houses and brokers. House and client gains and losses on these positions mean that it is now necessary to:

• Validate the House and Client positions as at the point of Administration;

• Reconcile the net cash received or paid to terminated trades;

• Establish the amount of cash owed to or by each client and affiliate; and

• Coordinate with the Client Monies team to ensure Client funds relating to derivatives exchanges are addressed.

Progress to date

Highlights to date are as follows:

• Cash and collateral recovered relating to House positions is $2.2bn;

• A further $208m remains outstanding, primarily from Korea and Taiwan. Local regulatory authorities have prohibited the return of these funds to date;

• Client money repatriated is $74m. An additional $59m remains still to collect;

• Work on the task of determining client and House entitlement (including affiliates) following liquidation and transfer of positions has commenced. Emphasis has been on the client accounts;

• Data sources have been identified and quality of the information available has been assessed;

• A methodology for determining realised gains and losses has been defined; and

• As at 14 March 2009, we had successfully reconciled 21 of the 39 positions at exchanges and brokers.

Key Processes

• Accounts, House and Client have been identified and a process is in place for monitoring repatriation of cash resulting from the transfer and liquidation of positions;

• All exchange relationships have been identified. All Client and House positions have been identified and global trade flows between former Lehman entities are understood;

• A reconciliation process for Lehman data to that provided by clearing houses and brokers has been established and reconciliation activity is underway for the 39 exchanges in where there were open positions;

• The process is in place, which can be summarised as:

- Reconcile LBIE records at the point of Administration to information provided by the exchange for positions and cash;

- Confirm prices on booked trades correcting as necessary; and

- Calculate realised gains and losses.

• To the extent possible this process has been automated and IT solutions have been implemented to enable us to convert data into a format that can be readily manipulated.

Issues and challenges

In determining the reconciliation of position we have encountered the following challenges:

• Information provided by clearing houses and brokers is variable in format, content and completeness;

• Delays are suffered in receiving data;

• Legacy Lehman systems are now operated by BarCap, so access is restricted; and

• The treatment of pre and post-Administration gains and losses on Client positions is subject to ongoing legal review as to how the rules should be interpreted. There remain outstanding questions as to how the pool of segregated money should be apportioned and the extent to which costs should be properly allocated.

# Section 6.6 Financing

## Introduction

In the report to Creditors dated 28 October 2008, Financing transactions were included within Prime Services, as that was where the financing business resided. Due to the size and complexity of the financing business, a separate Financing Cross Functional Workstream was established in order to ensure that appropriate priority, resource and process would be applied to the run off of all financing transactions.

Financing transactions include:

- Repos and Reverse Repos;
- Stock Loans and Borrows; and
- Buy / Sell Backs and Sell / Buy Backs.

Typical market contracts were OSLA, GMSLA, GMRA, GESLA and MEFISLA in addition to French law and German law equivalent agreements.

At 15 September 2008, outstanding collateral posted with third parties on financing transactions was valued at $283.4bn, against collateral received of $278.3bn. Outstanding collateral posted with other Lehman entities on financing transactions was valued at $210.7bn, against collateral received of $208.2bn.

An estimated 211,000 financing transactions require valuation and settlement / admission as unsecured creditors.

The net book receivable with third parties at 15 September 2008, was $8.5bn and net payable $3.3bn. The net receivable from affiliates was $7.9bn and net payable $5.4bn.

Many of the counterparties with whom collateral was posted have other relationships with LBIE and Lehman Group entities, which serves to complicate the process of recovering posted collateral.

## Key Objectives

The three key objectives for the Financing Cross Functional Workstream in the run off phase are:

- Identify all excess collateral;
- Implement appropriate resourcing, processes and systems for realising excess financing assets and agreeing creditor claims; and
- Work with the Trust Property and Counterparties Activities to deliver a composite settlement by counterparty.

## Progress to date

Priority and focus to date has been on realising excess collateral from third party debtors.

Key accomplishments to date include:

- Established a formalised counterparty contact and communication programme to manage the close-out process;
- Formal contact with over 200 financing counterparties to 14 March 2009, equating to 73% of third party debtors;
- Established source data for revaluing 90% of the underlying securities in the Financing population;
- Processes underway for sourcing data for the remaining 10% population, represented by the more illiquid securities; and
- Robust trade reconciliation and revaluation processes are in place.

## Key Financing Processes

Key processes have been designed and implemented to support the Financing Cross Functional Workstream objectives and are set out further below.

- Terminations – following receipt of a counterparty termination the default notice is centrally logged, recorded and reviewed for compliance. The counterparty is obligated to provide a close out statement;
- Internal Systems Reconciliation – a daily reconciliation is undertaken between LBIE financing systems. The reconciliations take into account actions taken by market intermediaries;
- External Reconciliation – a reconciliation of trade populations and close-out statements provided by counterparties to LBIE's books and sourced valuations is performed. Exceptions are logged, actively addressed and followed up.
- Valuation – the Financing Cross Functional Workstream works closely with the Terminations and Valuations Cross Functional Workstream to leverage the valuation resources. Valuations are also being sourced for open (i.e. unterminated) transactions to enable engagement with the market counterparty; and
- Cash Realisation – if a counterparty provides a statement indicating a payable to LBIE an immediate request for payment is submitted. Where LBIE's valuations differ from the counterparty further investigations are undertaken to address the balance.

## Issues and challenges

### Agency vs. Principal relationships

Many organisations who entered into financing transactions with LBIE did so as agent for underlying principals. The precise basis of the agents relationship with LBIE differs by counterparty, with both LBIE's and the agent's rights varying. Following LBIE's Administration the various contractual dealings between both the agent and the underlying principal impact the basis of settlement of the outstanding trade. It is estimated that over 1,200 principals sit behind 53 agents. This creates a need for a multiple number of cross party reconciliations ahead of a final settlement being implemented.

The diversity of arrangements in place require each position to be examined. Given the value at stake for LBIE and the relevant counterparty this is a necessarily time-consuming exercise.

We have designed information requests which request transactional details of all underlying principals and have a record of underlying principals' data.

### Termination of trades

The process of settling with counterparties depends upon termination of the governing legal agreements for each counterparty. The vast majority of counterparties have terminated their agreements, but a notable proportion remain live. Clearly until there is a close-out date both, LBIE and the market counterparty have continuing market risk.

We have implemented various methods to encourage counterparty terminations. Ultimately those which remain unterminated will need to be closed-out.

### Provision of close-out statements

Once financing contracts are terminated the counterparty must determine the net amounts owed by or to LBIE. Close-out statements providing details of such calculations enable LBIE to reconcile amounts.

In many cases, either no close-out statement has been received or the form or content of the close-out statement received has been inadequately detailed.

A comprehensive programme has been implemented, including providing guidance, templates and offers of support in valuation to counterparties. LBIE intends to formally pursue settlement with recalcitrant counterparties.

### Set-off

Many LBIE counterparties transacted multiple products with both LBIE and other Lehman entities. In some instances counterparties have asserted a right of set-off.

In many instances this is not a valid set-off.

The process of examining and pursuing LBIE's rights is time-consuming, but will be systematically addressed.

### Price transparency and liquidity of financing collateral

Pricing information is an essential prerequisite for the production and reconciliation of close-out statements. The financing business involved many thousands of securities. Whilst the majority of these securities were liquid, a significant proportion have been challenging to price.

To address these pricing issues we have built independent valuation capabilities, including maintaining use of external market data providers and retention of key staff with extensive pricing experience.

## Summary

The Financing business is very extensive and requires considerable time and resources to optimise recoveries and agree unsecured creditors claims. The process has been highly systemised and we are working with market counterparties to work through the many thousands of outstanding positions.

# Section 6.7 Overseas Branches

## Background

At the date of Administration LBIE had branches in Holland, Germany, Switzerland (Geneva & Zurich), France, Italy, Dubai, Qatar, Spain, Korea, Sweden & Israel.

There are many complexities with the branch network. Each branch has been subject to a controlled local closure process which has had to address many issues, including; local employment law regulatory issues, assets managed locally, local creditors, property and facilities, and tax.

Whilst the total recoveries from the branches are not material to the overall outcome of the estate, effecting a transition to Nomura (where appropriate) and designing and implementing a controlled formal programme for the exit from the local office has been important to preserve value, limit market impact and minimise claims against LBIE.

## Objectives

The objectives for LBIE's overseas branches team are as follows:

- Identify, preserve and realise all available assets from the overseas branches. Identify any locally managed trust property;

- Assist with the completion of the sale of the Investment Banking division and Equity business by concluding conditions subsequent to the sale insofar as they relate to branches;

- Retain or make redundant remaining staff as appropriate; and

- Formally close and wind-up LBIE's overseas branches.

## Progress to date

### Key accomplishments

- Some $150m has been recovered from our controlled programme with branches;

- Over 300 of the 450 branch personnel have been transferred to Nomura. We continue to employ 11 branch staff;

- Operations in all branches have ceased, with each branch moving through a formal closure process, which in most cases is being supervised by local regulators and will be subject to local laws and processes. Certain residual activities are underway;

- We are continuing to manage the exit from Korea, Spain, France, Italy and Holland. Further value is likely be recovered from these sources in due course; and

- Where assistance is provided to other Lehman entities we have a mechanism for the recovery of these costs.

## Issues and challenges

In the Administrators' Proposals dated 28 October 2008, we identified that according to the books of LBIE there are assets held in Korea, France and Switzerland. We set out below an update of our progress in realising these assets and formally closing the branches.

The major outstanding issues are the recovery of funds from Korea and the formal closure of the other branches.

## Korea

In order to comply with local Korean regulations we are advised that assets held in the local branch must first be used to repay the creditors of the Korean branch in full, prior to any funds being remitted outside Korea. Since 15 September 2008, the Administrators' staff from the local offices in Seoul have been working with the local regulator and the branch management in Seoul to:

- Identify and realise all locally held assets;

- Agree the claims of creditors and work with local management to settle those claims with locally held funds. To date settlements of $104m have been made from restricted funds held in Korea to local creditors;

- Applied to the Korean authorities for the closure of the branch;

- Transferred the majority of staff to Nomura;

- Clear objectives for remaining staff have been set which are aligned with the interests of the Administration;

- Plan the formal liquidation of the Korean branch, in accordance with local regulations; and

- Oversee an inspection by the local tax authorities.

Current estimates indicate that there will be a remittance back to LBIE's UK estate on the conclusion of the liquidation.

The settlement with one of the local counterparty's claims facilitated the payment of some $50m from a Korean institution to the UK estate which could have otherwise been set-off against the payable in Korea.

Current tasks to move towards branch closure in Korea include:

- Devising a strategy for dealing with amounts identified as Client funds;

- Monitoring tax audit, which covers the five years through to March 31 2009;

- Negotiating and settling with remaining market counterparties; and

- Disposing of remaining securities, once House title has been confirmed.

We expect the Korean liquidation process to progress during 2009, but at this time cannot provide any further visibility into the quantum and timing of recoveries.

## France

Approximately €62m has been recovered from France to date. There is a further €10m that could flow back to the UK Administration; however this is subject to the solvency of another Lehman entity.

## Switzerland

$45m of LBIE's funds continue to be frozen in Switzerland by the local regulator. This is likely to be retained pending resolution of various local issues, including employee claims.

## Saudi Arabia

LBIE was in the process of opening a branch in Saudi Arabia. A capital advance of $13m had been sent to Saudi Arabia in order to initiate the process of establishing a local branch. We have successfully recovered this sum from the receiving bank.

## Branch closure

In order to formally close the branches and determine tax creditors or receivables there are certain steps to conclude in all of the branches which include:

- Identifying and realising assets held in the branches that were not sold to Nomura;

- Completing the transfer of leases from LBIE to either Nomura or a third party and recovering the return of deposits from landlords;

- Capturing the data held with the branches and cleansing data from IT systems. This work is largely complete with only one branch remaining;

- Completing tax returns. There could be repayments due to LBIE in terms of corporate tax refunds and VAT refunds. This will be quantified once the exercise is complete.

- Recovering various costs from Nomura. Salary recharges have been completed for the majority of costs incurred to date and will be finalised by our Human Resources team; and

- Formally closing the overseas branches and coordinating with the FSA and local regulators in each jurisdiction.

# Section 6.8 Affiliate company relationships

## Background

As already noted elsewhere in this report, Lehman Brothers corporate entities and operating systems across the world had a significant degree of interdependency. The various insolvencies across the world, including the appointment of the UK Administrators and the Chapter 11 Bankruptcy proceedings in the US, have inevitably resulted in many entities, including LBIE, being unable to access data and resources regarding their financial position, business and operations.

LBIE has open positions with some 200 affiliate entities. In addition, prior to its insolvency it acted in various roles for certain other affiliates, ranging from custodian and loan servicer to supporting LBL and other UK entities in accounting and processing transactions. In many instances records for the affiliates were not retained locally.

In Europe the material entities with which LBIE had a relationship included Lehman Brothers Treasury Co BV (Holland), Lehman Brothers (Luxembourg) SA, Lehman Brothers (Luxembourg) Equity Finance SA, Lehman Brothers France SA (Switzerland) and Lehman Brothers Bankhaus AG (Germany).

These and other European affiliates were, to a greater or lesser extent, reliant upon accounting and IT systems maintained primarily by Lehman entities in London. Certain affiliates had their own staff located in London but in most instances LBL staff in London ran both instances, also carried out duties for LBIE. The fact that these various companies have become subject to separate local insolvency processes has proven challenging for both the office-holders managing the separate processes of these and the Administrators of the various UK registered companies.

LBL, the UK based European service company employed the majority of Lehman staff based in the UK (and elsewhere in the LBIE branches) and was the contracting party for key infrastructure arrangements (such as IT and property). LBL seconded most of its staff to carry out duties for other group companies. The majority of these were for the benefit of LBIE but certain of these individuals provided day-to-day transactional and technical support to a number of the European entities. In many instances LBIE acted as calculation agent or arranger for the multiplicity of transactions of its European affiliates.

In addition, certain LBIE staff arranged and managed transactions which were booked by other non-European Lehman entities, including Lehman Brothers Special Financing, Inc. (USA) and Lehman Commercial Paper Inc (USA).

## Progress to date

At the outset of the LBIE Administration we took steps to ensure the position of LBIE and its creditors was best protected and risks to LBIE and the Administrators were minimised. Inevitably, the immediate and pressing creditor issues faced by LBIE staff took priority over the issues faced by the affiliates.

Early in the case it was apparent that LBIE's support would be required by various affiliates and bi-lateral discussions were commenced in late September 2008 with a view to collaborating in areas which would mutually benefit the various estates.

### US affiliates

The initial concern of the UK Administrators (including those of LBIE) was the relationship with LBHI, the ultimate US holding company, LBIE and the other UK affiliates were themselves at least partly dependent upon the US for systems support. This dependency ran both ways, and a Transitional Services Agreement ("TSA") was negotiated by LBL and agreed with LBHI and certain of its affiliates during November 2008, to which LBIE is a signatory.

Since that date considerable support has been provided to LBHI under the TSA on a cost indemnified basis. This has allowed LBHI to further its objectives with the support of both LBIE and LBL and to manage in various complex risk and conflict issues being managed. Extensive dealings continue with the team managing LBHI, including daily interactions on issues where LBL or LBIE provides support.

To date over $300m has been transferred to LBIE from LBHI in relation to sums paid by LBIE counterparties to legacy bank accounts as well as continuing for the transfer of a further $100m of similar funds to LBIE.

In April 2009, LBIE entered into a further arrangement with LBHI under which certain London-based staff employed by LBHI's affiliates were seconded to LBIE. Under these arrangements, they will benefit from the use of certain LBIE systems and the continuing co-operation recovery of value to LBHI's creditors. The FSA is aware of these arrangements and we have put controls in place to enable LBIE to perform those activities in line with prevailing laws, rules and regulations.

In addition, following LBIE's sale of certain information systems and data previously managed by LBHI to BarCap, the Administrators have worked with the trustee of LBI, the US broker dealer, and BarCap to gain access to key information systems. These discussions are ongoing. We are grateful for the support and assistance provided by both LBI's Trustee and BarCap to date.

## European Affiliates

The UK Administrators, including those managing LBIE, have offered support to various European affiliates in a number of ways. These efforts have included:

- The formation of a dedicated team to manage dealings with affiliates;

- Active dialogue from the inception of the case;

- Meetings in the UK and elsewhere;

- Regular, focused communication to address specific requests of affiliates;

- Specific proposals for the provision of services and support;

- Advice and observations on the manner in which affiliates can address issues common to those faced by LBIE; and

- Discussion on the manner in which claims will be admitted and proved in the various estates, respecting local requirements of the affiliate.

As the LBIE Administrators are primarily responsible to the creditors of the LBIE estate, any provision of services to affiliates is provided on a cost indemnity basis. Furthermore, because LBIE's resources have extreme demands being put upon them by the Company's own creditor community, their availability to provide services to affiliates is very limited. In so far as affiliates are also creditors, of course their requests are being dealt with *pari passu* with the requests of other LBIE creditors.

As the business model of the individual affiliate companies vary widely the service needs are different, tailored agreements are being negotiated with affected affiliates.

## Asian Affiliates

In Asia, the material entities with which LBIE has a relationship include LB Commercial Corporation Asia Limited, LB Asia Holdings Limited ("LBAHL"), LB Securities Asia Limited, LB Asia Capital Company and LBJ ("Asian Affiliates").

LBIE is a member of the Committee of Inspection ("COI") in respect of LBAHL, the holding company for the Hong Kong Lehman entities and the UK Administrators have instructed a local PwC principal to represent LBIE at the periodic COI meetings, and the UK Lehman entities generally in respect of interactions with the Hong Kong office holder.

A number of the Asian Affiliates have similar dependencies to those of European affiliates on fellow Lehman entities, including LBIE and particularly in respect of access to shared IT services.

Together with the Administrators of the other Lehman entities, we have sought to establish constructive bilateral working relationships with the office-holders in Asia to further LBIE's objectives with the Asian Affiliates and vice versa.

Activities in respect of the bilateral working relationships with the office-holders of the Asian Affiliates have included, the following:

- The formation of a dedicated team to manage dealings with those affiliates, in the same way as has been instigated with European Affiliates;

- Engagement with local PwC principals in both Hong Kong and Japan in order to assist the dealings with Asian Affiliates;

- Meetings with the Japanese office holder;

- Meetings with the Hong Kong office holder;

- Introduction of an 'trissues log' with both the Hong Kong and Japanese office holders to manage in an orderly way the specific requests of those office holders of LBIE and vice versa;

- Discussions with the Japanese office holder in respect of the proposed LBIE Client Assets Scheme of Arrangement;

- Implementation of a protocol for the management of Corporate Events, and an agreement in respect of the intercompany claim between the UK entities, including LBIE and LBJ; and

- Preliminary discussions with the Hong Kong office holder on the above areas.

## Guarantees

According to the draft Statement of Affairs, LBIE was indebted to LBHI for some $8.7bn. The obligations of various Lehman affiliates have been guaranteed by LBHI. The Administrators intend to assert a claim against LBHI for the value of these affiliates to LBIE where LBIE benefits from a guarantee. It is too early to establish the effect of these guarantees and the precise quantum of these claims and related recoveries, if any, at this stage.

The precise quantum of any such claims will not become clear until final claims have been agreed with the other Lehman affiliates whose liabilities have been guaranteed by LBHI. This may take some time to conclude as it will be influenced by local insolvency proceedings, but will ultimately reduce LBIE's liabilities to LBHI and benefit the other unsecured creditors of LBIE. We are developing a claims agreement methodology to expedite the agreement of intercompany claims.

Also, we are aware of an agreement which appears to allow LBIE the right to offset LBIE indebtedness owed

# Section 7

# Functions

to LBIE against amounts owing by LBIE to LBHI. We are investigating the legal effectiveness, if any, of this agreement.

**Other matters**

Creditors may be aware that LBHI is currently promoting a far-reaching multi-lateral agreement between Lehman legal entities requiring entities, inter alia, to provide rights of access and information to each other. At this time the Administrators do not consider it to be in the best interests of LBIE and its creditors to be party to or bound by such a broad arrangement, which could potentially place a very significant burden on LBIE, to the cost of its general body of creditors. We will continue to manage LBIE's affairs efficiently and effectively, in the interests of its creditors and will continue to provide appropriate levels of professional cooperation with affiliate company office holders dealing with the specific matters which affect LBIE's interface with each of them, in a tailored manner.

In light of the progress made in our bilateral dealings with affiliates over the six months to date, as reflected in TSAs, bilateral arrangements and current dealings with affiliates, we plan to continue following this approach.

# Section 7.1 Information Technology

## Objectives

The objective of the Information Technology ("IT") function is to provide LBIE with a secure, stable, cost effective and appropriate technology platform to facilitate the activities and financial objectives of the Administration.

The key tasks involved with this objective are to:

* Refine the technology solution to meet changing requirements over time;

* Minimise and manage the risks represented by dependencies on third parties;

* Manage the service delivery from Nomura and BarCap;

* Manage key contracts with external parties;

* Decommission the legacy technology in an optimal fashion; and

* Capture and store data from the core applications for future use.

## Background on the legacy architecture

Similar to most other large investment banking groups, Lehman Brothers operated a global IT architecture that was independent of legal entity. Application developers and support staff were located in London, New York, Sweden, India and the Far East. Applications tended to be hosted where the developers that had led the development were based. Development of applications was also shared globally with multiple legal entities contributing to development and funding.

The diagram below illustrates the scale of the IT infrastructure in terms of numbers of staff, applications and the servers that hosted the applications.



The complexity of the architecture led to a number of immediate issues for LBIE:

- The IT service needed to ensure the wind down of trading positions in the UK to be provided from different locations and legal entities, including BarCap and Nomura;

- Ownership of the IT infrastructure including the core business applications was not clear and in dispute; and

- Key data that was needed to unwind the trades was co-mingled with other entities data and was located in different global locations

## Progress to date

After the initial actions required in Phase I (set out in our previous report to creditors), our Control and Assimilation Phase focused on securing control of and access to key data, applications and infrastructure. We are now in the Systemisation Phase and are implementing a model to allow us to run IT to support the wind down of the balance sheet.

To achieve this we performed the following:

- Gained a detailed understanding of key systems required – at 15 September 2008, LBIE was dependent upon over 2,000 applications. We analysed the reduced business requirements and settled on 120 critical applications. This allowed us to start retiring redundant applications and to identify specific dependencies on Nomura, BarCap and LBHI;

- Analysed the IT staff for ongoing support – we identified a core number of staff needed to support the IT on an ongoing basis, 60 core staff out of the original 720. Appropriate cost reductions were implemented;

- Implemented an operating model and governance processes for on-going IT support;

- Agreed a TSA with Nomura – this covered IT applications and support that they would provide to us, the infrastructure that we would provide, the related costs (the LBIE recharged to Nomura) and defined service levels;

- Agreed TSA with LBHI to allow mutual provision of services;

- Negotiated a draft TSA with BarCap. The TSA is due to be finalised shortly;

- Reviewed contracts for software applications, IT service provision and market data provision, ensuring coverage for necessary services.

- Developed and agreed data governance principles with other entities in Administration, BarCap and Nomura, to control trading data transfer from co-mingled sources to those entities for whom it is relevant; and

- Identified key data that needed to be archived for forensic and legal purposes and implemented a plan.

These focused actions have contributed to a reduction in the cost base for IT for LBIE from some $320m per annum to approximately $70m to $80m per annum.

We now have a secure, stable, cost effective and appropriate technology platform to support Phase III wind down activities.

## Issues and challenges

### Migration to the target IT architecture

Two of the key tasks to achieve the objective of the IT function are to:

- Refine the technology solution to meet changing wind down requirements over time; and

- Decommission the legacy technology achieving best possible outcome for creditors.

We have performed a considerable amount of analysis to assess the options for the target architecture. We considered three key options:

- Legacy option – use existing architecture (fairly complex architecture based in US and Europe) – a number of the applications currently being used are being supported by third parties. The TSAs that allow us access to these applications have a defined end date. In addition, the current infrastructure is reasonably complex and costly with potential for simplification. It was therefore decided that this was not a long term solution;

- Simplification – use a rationalised UK-based architecture and eliminate dependencies by recreating applications in the UK. We would also need to take a similar approach for Nomura hosted applications as we neared the end of the TSA; and

- Outsourcing – outsource the required application functionality, support and, potentially, some business processes to third party service providers leaving decision making with LBIE. After investigation it was apparent that the complexity of the infrastructure makes wholesale outsourcing not practical or cost-effective.

The strategy for the target IT architecture is a combination of Simplification and Outsourcing. For areas where we can find a suitable third party service provider

we will outsource. This can primarily be achieved for front office valuation applications.

For back office applications where we have not yet identified appropriate third party service providers we intend to migrate a number of the core applications, including the mainframe cash settlement system onto a single application that provides the required functionality.

We are currently running a proof of concept for an application. The application is already licensed to LBIE and the Administrators staff have sufficient IT and operations skills. We will need a small number of other core middle office and back office applications where the core replacement system does not include that functionality.

For forensic and legal data archiving, we will need to retain historical data. We have a solution identified, which will be implemented shortly.

The target date for completion of the implementation of this architecture is the end of March 2010.

### Customisation of tools to support the administration

Since the business processes that are required to perform the run off differ from the legacy business processes, we have customised legacy applications to provide tools to support our activities. Specifically key tools that have been customised and are being provided for wind down are:

- Asset Realisation Tool ("ART") - this provides a single counterparty view that identifies all the exposures to a single counterparty and stores all related counterparty valuations, positions and allows a statement to be prepared, once all data is available;

- The Trust Property Tool - this tool facilitates the process to capture data from clients with Trust Property managed by LBIE and segregated Client Money. It interfaces with ART in relation to valuation data;

- Daily Asset Reporting Tool ("DART") - this tool provides a front end reporting layer for information that is stored in the mainframe settlement system to provide an easier user interface to view a stock's position from books and records and from the external world depots;

- Query Management System ("QMS") – this system tracks all external queries received and tracks response and resolution; and

- LBIE Client Information and Claims website – this database allows creditors to enter the exposures to LBIE and their valuations and gain access to confidential communications.

These applications allow the combined LBIE employees and Administrators' staff to systematise their daily activities and have been central to enhancing processing rates.

### Separation of the network

As described above, the legacy IT architecture was global. After the business sales, competing organisations (BarCap and Nomura) were using the same IT architecture and there was a risk of disclosure of each other's data.

In January 2009, BarCap advised of its intention to separate the networks between the UK and US. LBIE needs to continue to access to the US applications until the migration to the Target Architecture (see above) has been achieved. To avoid potentially damaging consequences to LBIE a joint working group was formed to manage the separation.

A major project was initiated in January 2009 to perform the following:

- Manage the interaction with BarCap and with Nomura who needed to help support LBIE during the separation;

- Understand the impact of the separation on the wind down processes;

- Identify potential issues in terms of continued access and identify solutions to maintain access;

- Test solutions prior to network separation; and

- Manage the impact over the separation weekend and the following weeks.

Over 110 people from the IT function, other Administration Activities, Cross Functional Workstreams, Functions and Nomura were involved in the project including 4 weekends of testing.

Network separation was achieved successfully on the weekend of 21 February 2009.

### Future priorities for the IT function

Over the next few months, the IT function will be focused on:

- On-going day-to-day support of the IT architecture;

- Continued customisation of tools to support including a tool to track contact with counterparties;

- Management of service from third parties;

- Migration to the Target Architecture:

  – proof of concept with front office valuation providers;

# Section 7.2 Regulatory and Compliance

- Completion of proof of concept with mainframe replacement; and

- Rationalisation of applications.

The accomplishments of the IT team have been critical to managing the ongoing position and extracting and analysing data. It is likely to require considerable resources over the coming months to preserve functionality and effectiveness.

## Objectives

The objectives of the Regulatory & Compliance ("R&C") function are to:

- Oversee an orderly and compliant wind-down in line with relevant FSA regulations;

- Maintain adequate compliance infrastructure to mitigate regulatory and reputational risks;

- Proactively manage relationships with regulators, in the UK and other jurisdictions; and

- Address ad-hoc regulatory issues as they arise.

The R&C team combines specialists from the Administrators' staff with existing LBIE regulatory and compliance expertise.

## Progress to date

### Key achievements

The R&C Function has been designed to be aligned with the Activities and Cross Functional Workstreams. Key accomplishments include:

- Designed and implemented a revised compliance infrastructure;

- Integration throughout the LBIE Administration through designated points of contact for relevant Activities and Cross Functional Workstreams;

- A presence on the trading floor and provide real-time support in the House Positions and Counterparties Activities;

- Compliance policies have been updated and communicated to all LBIE and Administrators' staff;

- Bespoke training has been delivered for staff with a focus on those who are at greatest risk of encountering regulatory matters;

- To support the ongoing obligation to meet Anti-Money Laundering requirements, a process has been developed and implemented to manage the risks in this area. The plan includes:

  - Reviewing historical documentation on all clients who claim money or assets;

  - A process to screen all clients and counterparties prior to the return of any money or assets; and

  - Implementing procedures for engaging with counterparties.

- R&C has maintained a regular liaison with the FSA to ensure that LBIE is responsive to the Regulator's needs in respect of specific regulatory investigations

/ requests for information, enquiries, employee / individuals and the run-off of regulated firms.

### Other achievements

The focus during the early period of the Administration was on reviewing existing compliance processes and determining how to reduce costs by eliminating redundant processes. The R&C team developed a process for meeting reporting and disclosure requirements and developed standard responses where feasible.

Given the need to access information held in legacy Lehman systems to meet regulatory obligations, R&C has supported the negotiations with other market counterparties, including BarCap, Nomura, LBHI and other affiliates.

These dealings have had to finely balance the need to provide support and assistance to the affected parties with the need to ensure the strict compliance with regulatory guidelines.

The function is now established in Phase III (Run-off) with the focus on managing compliance as a "business-as-usual" activity within the revised context of LBIE in Administration. To ensure regulatory obligations are met in addition to accomplishments highlighted above, the function has been:

- Responding to disclosure requests where there is a mandatory obligation to do so;

- Providing oversight of trading out of large positions to ensure relevant disclosures are made;

- Providing factual regulatory references for former LBIE staff;

- Supporting the Administration in establishing contractual arrangements with Nomura, (e.g. Terms of business with regulated market counterparties); and

- Providing regulatory advice and support on a number of matters including record keeping, client money and asset rules, market abuse, anti-money laundering and implications of specific FSA obligations (e.g. Approved Persons rules).

The R&C team has been working alongside the team responsible for closing the international branches of LBIE to agree a compliant plan of action for the surrendering of branch licenses as appropriate.

### Issues and challenges

R&C will continue to provide services to the Counterparties team and deal with regulatory matters as they emerge.

# Section 7.3 Infrastructure and Property

## Background

LBL holds the service (IT and property) and employee contracts that are integral to support the UK based Lehman Brothers companies. Through cost capture and recharge mechanisms, LBL recovers these costs from the various Lehman Brothers companies and subtenants.

LBL holds leases and other contracts for properties, including 25 Bank Street (the current location of the bank in the UK), Broadgate (the previous UK headquarters), data centres, business continuity centres, overflow offices, residential properties, European branches and storage facilities. Over 90% of LBL's costs are recharged to LBIE, consistent with the pre-Administration regime.

From an IT and general operations perspective, there are a large number of suppliers with whom LBL transacts as part of its daily operations.

## Objectives

The objectives of the LBL Infrastructure and Property ("I&P") team are to:

- Process the various suppliers to the UK based Lehman entities, including LBIE;

- Minimise the costs of LBL in dealing with I&P;

- Coordinate the recovery of incurred costs on an appropriate basis from the participating entities; and

- Manage the real estate and occupation of various Lehman Group companies.

## Progress to date

### Cost Recharge Mechanism

Our priority has been to:

- Identify essential services for the ongoing operation of LBL;

- Review LBL's cost base and minimise the costs levied on LBIE;

- Provide funding to LBL (from the initial loan and subsequently from asset realisations) to enable LBL to continue to provide services to LBIE. Agree appropriate terms for the provision of such funding;

- Negotiate and participate in the cost sharing agreement with LBL; and

- The Administrators team working within LBL negotiated with many vendors to agree a basis of continued supply. To date no critical services have been interrupted.

## Properties

### London

Negotiations with the Bank Street landlord, Canary Wharf resulted in the sub-letting of approximately one third of the building to a third party. Significant effort has been committed to supporting the tenants of the building as it has materially reduced the occupancy and operating costs of LBL, hence LBIE.

Bank Street has been reorganised to optimise occupancy efficiency. LBL is looking to market the empty space using its agents. If successful this will further reduce LBIE's costs.

Bank Street has now charged from a single tenanted building to a multi-tenanted building. A major focus has been around preparing the 2009 service charge budget for the tenants and considering options around the operation of the amenity areas. Furthermore, given the risks around being the head lessee for a property such as Bank Street, a major focus has been to consider the best management structure to support the running of the building. This process is on going.

There have been numerous savings achieved by reducing the remainder of the contracts with other LBL landlords and service providers, such as the surrender of the lease at Broadgate, and the transition or termination of LBL's contracts with business continuity centres and storage facilities.

### Branches

We are continuing to dispose of and transfer the leasehold interests and fixed assets across the EMEA branches. Property transfers or disposals have now completed in Amsterdam, Frankfurt, Geneva, Kuwait City, Madrid, Munich, Paris, and Stockholm. We are working to transfer the Rome property. Negotiations are continuing with landlords and third parties in Milan, Dubai, Istanbul and Doha.

### Other vendor management

Immediately upon our appointment, a number of vendors took legal proceedings against LBL for purported breaches of contracts that were in place pre-Administration. These have been managed without disruption to date.

Established processes are now in place for the timely discharge of infrastructure costs incurred.

A major focus has been to ensure the Bank Street property continues to function as required. We have negotiated ongoing arrangements with vendors ranging from the mail room services through to building maintenance, which both reduce costs and preserve our ability to operate.

Some of the activities of R&C have been hampered due to the challenges of accessing LBIE data held in systems controlled by other parties. This is having particular impact on the ability to review client information needed to meet Anti-Money Laundering compliance and the ability to respond in a timely manner to the FSA on specific information requests.

R&C is working with the IT Function to resolve these issues with the relevant parties.

# Section 7.4 Human Resources

## Future Strategy

The main priority is to assess the benefits and practicalities of relocating LBIE to a lower cost location, whilst minimising the impact on the effectiveness of the operations. This is a very challenging project, particularly given the IT infrastructure.

These decisions will be explored in detail with the Committee over coming months as options and timescales become clearer.

## Objectives

Some 5,500 personnel were deployed in the LBIE operations worldwide at 15 September 2008. The focus of this team was to:

- Rapidly implement retention processes for critical staff;

- Ensure comprehensive and rigorous processes are implemented for the management of the remaining employees;

- Support the downsizing efforts required to match the skills and resources to the ongoing business needs of the Administration; and

- Manage the operation of the residual HR function.

## Progress to date

The position of the remaining employees has been stable for some time, following the effectiveness of the early actions in the Administration. Notable areas of progress are:

- Identified employees who are core to the wind-down and agreed contracts for 2009 for c.360 employees;

- The 2008 retention payment process has been concluded. A robust exercise was implemented to ensure employees were retained and rewarded in an objective performance based process;

- A new Operating Model was developed to restructure existing teams into workstreams that would support asset realisation, return trust property and agreement of claims. A thorough communication strategy was implemented and re-enforced by the 2009 performance management process;

- A rigorous performance management process for 2009 has been implemented which aligns individual performance and reward to the achievement of specific Activity, Cross Functional Workstream and Functional objectives. Written objectives have been agreed with all retained employees;

- Day-to-day HR support for employees has continued;

- All HR related issues are being actively progressed including: pension issues, benefit issues and employee grievances;

- Payment in January 2009 of all bonuses in respect of 2008 performance. Dealing with related tax issues in an optimal manner for the estate;

- Implemented a comprehensive recruitment process to replace any employees who resign during 2009 and / or additional staff needed to optimise the efficiency of the Administration. Some 30 personnel have been

recruited to date. Further recruitment is underway;

- Resolution of residual issues relating to the transfer of staff to Nomura;

- All employee claims received in respect of redundancy, holiday pay, arrears of notice and notice payments have been submitted to the Redundancy Payments Office for payment; and

- The process of accumulating all employee residual claims has also commenced.

All the objectives set out in the Joint Administrators' Proposals for Achieving the Purpose of Administration under Phase I (Control and Stabilisation) and Phase II (Systemisation) have been met.

## Key Processes

Two key processes have been introduced that maximise efficiency, control costs and support the achievement of the overall objectives of the Administration:

- Performance Management - all retained employees and all new fixed term contract employees must have documented performance objectives set for 2009; and

- Hiring - where it is identified that additional or replacement resources are required, a rigorous process is undertaken to assess the business justification of the hire and to ensure that the most appropriate and cost effective resource is utilised.

## Issues and challenges

Whilst the position of the employees is currently stable there are a number of ongoing challenges in preserving an effective environment for the remaining employees:

- The Operating Model is fundamentally different to the legacy business and operating framework. This requires continuing support by employees during the transition;

- It is imperative to ensure that employees receive regular communication and details of how their roles form part of the overall Operating Model;

- Challenges will be faced as the changing resourcing needs become apparent as the run off progresses. Taking necessary steps to ensure that appropriate resources are in place at all times to ensure that the business deliverables are not compromised; and

- Retaining, assessing, rewarding and motivating key employees will be crucial to the overall success of the wind down.

We are confident that the framework implemented will allow these issues to be addressed.

# Section 7.5 Tax

## Objectives

The five key objectives of the tax function are as follows:

- Tax strategy - to develop an optimal tax strategy for the Administration;

- Corporation tax repayments - to capture, maximise and preserve losses and obtain a refund of corporation tax;

- Management of transactional matters - management of tax liabilities arising from transactions;

- Tax infrastructure - to develop procedures to ensure that tax risks are managed; and

- Overseas Branches - to develop and implement a tax strategy for each branch.

## Progress to date

- We have set processes in place to prepare and control the preparation of corporation tax returns to ensure that compliance obligations are met as necessary;

- Tax reclaims have been made in relation to overseas withholding taxes suffered by LBIE;

- Agreement has been reached with HM Revenue and Customs ("HMRC") that LBIE holds recognised intermediary status for UK Stamp Duty Reserve Tax purposes, preventing charges to UK Stamp Duty Reserve Tax arising to LBIE in relation to future transfers of UK equities; and

- We have established essential relationships with HMRC and the Enforcement Office and have conducted meetings to discuss key issues such as:

  - Group tax losses and the format and time limits for group relief claims;

  - Clarifying the structure of the Group Payment Arrangement ("GPA") and implications on the GPA and tax recoveries as a consequence of Administration; and

  - Negotiating with HMRC on on-going enquiries to limit the areas of focus to key issues so that costs for the Administration can be minimised.

We continue to maintain close liaison with the tax authorities on these key issues.

- We are in dialogue with HMRC to arrive at a pragmatic solution to tax accounting for specific consequences of the way in which the Financing business operates. With the Corporate Events Cross Functional Workstream, Tax is working to produce the necessary information for HMRC;

- Managing the tax status of new custody accounts for house and client positions at the global custodian and in the migration of securities from former agent network;

- Action is being pursued in Italy to establish LBIE's entitlement to certain reclaims. Overall we are seeking to protect cash reclaims that have already been made and to put LBIE in a position to pursue further recoveries;

- Established relationships and developed a network of advisors in each of the branch territories to ensure tax objectives are met; and

- Submitted tax computations and returns in all branch jurisdictions for periods to 2006 and for material jurisdictions to 2007.

## Key processes

### Tax compliance

A robust and efficient process has been developed for the preparation of corporation tax returns. In addition to ensuring that LBIE satisfies its tax compliance requirements, it is necessary for a large number of corporation tax returns to be filed to realise the value of LBIE tax losses and obtain a refund of corporation tax.

### US tax reporting

Work is well underway to identify LBIE's obligations and to manage its historical and ongoing obligations to the US Internal Revenue Service under the "Qualified Intermediary" regime to which LBIE is subject.

### Manufactured Dividend rules

Manufactured dividends relate to financing transactions to which LBIE was party. There may be a manufactured dividend event which has to be accounted for.

## Issues and challenges

### HMRC relationship

Various tax related aspects will potentially be affected or influenced by HMRC (including, in particular, successfully obtaining a refund of corporation tax using LBIE tax losses).

The tax function has been researched and identified the optimal position for LBIE in relation to the manner in which processes real and manufactured dividends. Work is underway with regard to how to tax optimise the required reporting and accounting procedures.

The tax function has met and spoken regularly with senior inspectors within HMRC to provide with the existing good working relationship and to reach quick agreement on matters that could potentially deplete the value of the estate or delay the tax reclaim process.

### Availability of accounting information

In order to file corporation tax returns, accounting records of sufficient quality are required to be maintained. The tax team has worked with other Cross Functional Workstreams to ensure the necessary information can be made available for the corporation tax compliance process.

Given the extensive demands on the accounting resources within LBIE and the limited personnel and access to systems, this is a challenging objective.

In addition, there have been many income events (dividend and coupon receipts on LBIE custodian securities) post-Administration. To 14 March 2009, an estimated 10,000 such events have occurred outside the UK, in entities not under our control. Ensuring that is correctly accounted for on these income events is essential.

### Operational processes

LBIE previously relied on various processes to ensure that it was able to effect various tax filings and record keeping. There are a number of these processes that are strategically important to the Administration going forward and therefore need to continue post-Administration. Following the sale to Nomura and BarCap, certain operations staff and systems formerly deployed, that were integral to the delivery of these various processes, are, in some instances, no longer available.

In the initial days post-Administration, the Tax function identified the key individuals responsible for key processes and as far as possible ensured that their knowledge was available to enable these processes to continue.

A key challenge will be to ensure that the processes operate in a systematic manner to be able to support the tax position of LBIE going forward.

The major residual challenges include:

- Successfully agreeing and securing the refund of corporation tax;

- Ensuring that unnecessary tax liabilities are not crystallised as a result of transactions undertaken to realise LBIE's assets; and

- Retaining access to data in respect of overseas income pre-Administration and obtaining data in respect of overseas income arising since Administration, which is sufficient to enable tax refund claims to be filed and pursued.

### Branches

We are in the process of negotiating and agreeing final tax positions with the local tax authorities such that expected tax recoveries are possible for LBIE. This will be a particular challenge due to diverse legal requirements in each territory and also the local political and fiscal environments.

We are in regular contact with local tax advisors in each territory to ensure that the elements required to meet this end are identified and that processes are in place for the winding up of the branches from a tax perspective.

### Group Payment Arrangement ("GPA")

GPA aim to reduce the administrative burden of paying tax liabilities in a large group of companies and operate on an accounting period-by-accounting period basis. The Lehman GPA is a corporation tax payment arrangement between many Lehman UK entities and HMRC. GPAs are not drafted with insolvency in mind. Once party to an agreement, a company must abide by the contract for the whole of the accounting period until the GPA is terminated. LBL is the "Principal Entity" facilitating the Lehman GPA - prior to our appointment GPAs have been established for all Lehman accounting periods up to and including 30 November 2008 year end.

As a general rule, corporation tax liabilities (or other UK tax liabilities) of a GPA participating entity may be assessable on any other member of the GPA. To assess whether a corporation tax under or over-payment has arisen at GPA companies must first submit their tax returns for a period. Only then can an application be made to HMRC recover any tax overpayment.

In summary, the tax issues to address are numerous – we have implemented a framework to ensure these are systematically addressed.

Section 8

Statutory and other information

| | |
|---|---|
| Court details for the Administration: | High Court of Justice, Chancery Division, Companies Court - case 7942 of 2008 |
| Full name: | Lehman Brothers International (Europe) |
| Trading name: | Lehman Brothers International (Europe) |
| Registered number: | 02538254 |
| Registered address: | 25 Bank Street, London E14 5LE |
| Company directors: | Mr WT John, Mr PR Sherratt, Mr JM Isaacs, Mr R Magnoni, Mr M Jameson, Mr AJ Rush, Mr JP Phizackerley, Mr A Wright, Mr D Gibb |
| Company secretary: | Ms M Smith |
| Shareholdings held by the directors and secretary: | None of the directors own shares in LBIE |
| Date of the Administration appointment: | 15 September 2008 |
| Administrators' names and addresses: | AV Lomas, SA Pearson, DY Schwarzmann & MJA Jervis, of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT |
| Appointer's name and address: | High Court of Justice, Chancery Division, Companies Court |
| Objective being pursued by the Administrators: | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration) |
| Division of the Administrators' responsibilities: | In relation to paragraph 100(2) Sch B1 IA86, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Joint Administrators may be done by any one or more of the persons for the time being holding that office. |
| Proposed end of the Administration: | The Administrators are not yet in a position to determine the most likely exit route from the Administration. At this stage, the Administrators intend to apply for an extension of the Administration order beyond the initial 12 month statutory period. |
| Estimated dividend for unsecured creditors: | We are unable to provide an estimate at this time due to material uncertainties regarding the quantum of asset recoveries and the level of unsecured creditors' claims. |
| Estimated values of the prescribed part and LBIE's net property: | It is estimated that the value of the prescribed part will be £500,000, which will be met in full. The estimated value of LBIE's net property is uncertain. |
| Whether and why the Administrators intend to apply to court under Section 176A(5) IA86: | Such an application is considered unlikely. |
| The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000): | The European Regulation on Insolvency Proceedings does not apply to this Administration, as LBIE is an investment undertaking. |

# Section 8.1 Statement of Affairs

The Administrators have granted the directors an extension of time in which to prepare a Statement of Affairs, due to the complexity of the task. Interim submissions have been received from the directors, which have allowed the Administrators to prioritise and focus their activities on asset recovery and claims management.

The Administrators do not believe it is in the interests of creditors to provide an alternative financial analysis at this time as it could potentially provide a misleading view of the recovery prospects for creditors. This report has included various material extracts from the information provided in the draft Statement of Affairs to illustrate the value of the assets for which the Administrators have responsibility and to provide a proxy for the complexity and volumes of the issues to be addressed. As such, extracts are not comprehensive and no reliance should be placed upon them in forming any view of the dividend prospects for unsecured creditors.

At this stage it is not possible to assess the level of claims against LBIE, as claims will ultimately result from the quantification of the impact of events subsequent to the date of insolvency. At this early stage we have not formed a view on the level of claims, but note that gross contractual claims are £611.8bn, before accounting for counterparty and cross product netting and Trust Property claims, with a book value of $275.1bn. Whilst in the draft Statement of Affairs the directors have provided details on the value and identity of creditors at 15 September 2008, according to the books and records at that date, actual claims by creditors will differ materially.

A list of known counterparties is provided on the PwC website (see Appendix 2).

# Section 8.2 Administrators' Remuneration

## Background

This section sets out the process for setting and monitoring the Administrators' remuneration. The Administrators recognise that the costs of the insolvency proceedings will be significant and that it is appropriate in this case to exceed the disclosure standards defined in statute and regulatory guidance.

### Insolvency Rules 1986 ("the Rules")

By way of context, the manner in which Administrators' remuneration is determined and approved is set out in the Rules (2.106 to 2.109).

Pursuant to these rules, on 14 November 2008, the Company's creditors resolved to appoint a Creditors' Committee whose duties include approving the basis and quantum of the Administrators' remuneration.

There are two alternative bases of determining the remuneration under the Rules, either:

- A percentage of the value of the property with which the Administrator has to deal; or

- By reference to the time properly given by the Insolvency Practitioner and his staff in attending to matters arising in the Administration.

The Rules also provide that in arriving at its decision on remuneration the Committee is required to consider the following matters:

- The complexity (or otherwise) of the case;

- Any responsibility of an exceptional kind or degree which falls on the Administrators;

- The effectiveness with which the Administrators appear to be carrying out, or have carried out, their duties; and

- The value and nature of the property which the Administrators have to deal with.

### Statement of Insolvency Practice No.9 ("SIP 9")

In addition to the Rules, SIP 9, issued by the Joint Insolvency Committee provides guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, inter alia, Administrators. The purpose of SIP 9 is to:

- Ensure that Administrators are familiar with the statutory provisions relating to office holders' remuneration;

- Set out best practice with regard to the observance of the statutory provisions;

- Set out best practice with regard to the provision of

information to those responsible for the approval of remuneration to enable them to exercise their rights under the insolvency legislation; and

- Set out best practice with regard to the disclosure and drawing of disbursements.

Committee members have each been provided with a copy of SIP 9.

When seeking agreement for remuneration, the Administrators are required to provide sufficient supporting information to enable those responsible for approving their remuneration ("the approving body") to form a judgement as to whether the proposed remuneration is reasonable having regard to all the circumstances of the case. The nature and extent of the supporting information which should be provided will depend upon:

- The nature of the activity being sought;

- The stage during the Administration of the case at which it is being sought; and

- The size and complexity of the case.

### Remuneration review and approval process

In accordance with SIP 9 the Committee has been provided with details of the charge-out rates for all grades of staff which are involved on the case.

As the Administrators' remuneration is based on time costs, the Committee has been provided with an account of the time spent and the charge-out value, together with additional information setting out the approach to the project, the milestones and progress against such milestones. Given the size and complexity of the case these disclosures have been extensive. This additional information which has been provided comprises an extensive explanation of the Administrators' activities, methods and achievements in order to enable the value of the exercise to be understood.

The time analysis provided to the Committee gives details of the work performed and grade of staff, by Activity, Cross Functional Workstream and Function for all two weekly periods post 15 January 2009 (the commencement of the LBIE Operating Model). Prior to January 2009, a similar level of detail was provided using classifications relevant to the pre-existing LBIE structure. In addition, the Committee has been provided with a rolling budget and summary work-plans which forecast costs and identify work to be undertaken for the following 3 month period.

SIP 9 guidance suggests the following areas of activity as a basis for the analysis of time spent:

- Administration and planning

## Other matters

In accordance with the current operating regime, a certain cash retention is made in respect of Client Assets that we have returned. These retention amounts are in lieu of Administrator and legal advisor costs and may, in due course, be transferred from the relevant Client accounts to the House. If this is the ultimate treatment of these retentions then the costs to be borne by the unsecured creditors will be reduced accordingly. Until that time these amounts will continue to be held on deposit under the Trust account structure.

### Additional analysis of the Administrators' time costs

Due to the complexity and scale of the Administration, there is a high proportion of Partner and senior staff time. The table below provides an analysis of the total hours and cost by grade of staff.

| Global Grade | Hours | £'000s |
| --- | --- | --- |
| Partner | 18,781 | 11,847 |
| Director | 21,405 | 11,574 |
| Senior Manager | 48,458 | 18,932 |
| Manager | 32,539 | 10,491 |
| Senior Associate | 73,155 | 18,806 |
| Associate | 40,240 | 5,783 |
| **Total** | **234,578** | **77,233** |

The following table provides an analysis of the total hours and costs incurred by the Activity, Cross Functional Workstream and Function.

| LBIE Operating Model | | Hours | £'000s |
| --- | --- | --- | --- |
| COO | Operations | 15,319 | 6,051 |
| Activities | House Positions | 21,974 | 8,843 |
| | Counterparties | 18,525 | 6,027 |
| | Trust Property | 41,937 | 11,456 |
| | Treasury | 23,208 | 7,912 |
| | Reporting | 27,984 | 8,691 |
| Cross Functional Workstreams | Custodians | 3,852 | 1,354 |
| | Failed Trades | 1,254 | 414 |
| | Corporate Events | 828 | 239 |
| | Terminations and Valuations | 4,551 | 1,325 |
| | Derivative Exchanges | 348 | 151 |
| | Financing | 965 | 441 |
| | Branches & Subsidiaries | 19,222 | 6,328 |
| Functions | Tax | 4,559 | 2,292 |
| | Regulatory & Compliance | 5,999 | 1,956 |
| | Other | 3,628 | 1,032 |
| | LBL Recharges | 40,465 | 12,921 |
| **Total** | | **234,578** | **77,233** |

---

- Investigations
- Realisation of assets
- Trading
- Creditors
- Any other case-specific matters

The analysis that has been provided to the Committee contains 23 subdivisions (including LBL recharges) of time spent.

The following categories are suggested by SIP 9 as a basis for analysis by grade of staff:

- Partner
- Manager
- Other senior professionals
- Assistants and support staff

The Committee has been provided with an analysis of staff allocated between six grades.

SIP 9 also suggests that an explanation of what has been done should include an outline of the nature of the assignment and the Administrator's own initial assessment, including the anticipated return to creditors. To the extent applicable it should also explain:

- Any significant aspects of the case, particularly those that affect the amount of time spent;
- The reasons for subsequent changes in strategy:
- Any comments on any figures in the summary of time being spent accompanying the request the Administrator wishes to make;
- The steps taken to establish the views of creditors, particularly in relation to agreeing the strategy for the assignment, budgeting, time recording, fee drawing or remuneration agreement; and
- Details of how other professionals, including subcontractors, were chosen, how they were contracted to be paid, and what steps have been taken to review their fees.

Each of these matters has been covered in some detail in the discussions we have had with the Committee. The administrative matters referred to in summary in the body of this report have been covered in extensive detail with the Committee and each area of our activities discussed in depth.

The Administrators recognise that the Committee has an unusually difficult task in reviewing and assessing the Administrators' remuneration and have sought to address this by providing significantly more information

---

and explanation than is required by SIP 9. Further consideration is being given to providing independent support to the Committee in this task.

### Resolutions of the Creditors' Committee

**To pay costs on a "time properly given" basis**

Given the fundamental uncertainties about the value of the property with which the Administrators have to deal, the Committee resolved to use the "time properly given" basis i.e. an hourly billing basis.

**Charge-out rates**

Details of the hourly charge-out rates have been provided to the Committee, together with available market benchmarks. The hourly rates used are the standard rates charged by the Administrators' firm for complex insolvency cases.

**Remuneration approvals to date**

The Committee has authorised the Administrators to draw 75% of their time costs on account in the period between Committee resolutions. At approximately six to eight week intervals, the Committee is requested to consider and approve remuneration.

To date the Committee has approved remuneration of £77,233,373 which comprises 234,578 hours at an average hourly rate of £329. Further details of these costs are set out in the tables on the following page.

The remuneration drawn in the period shown by the Receipts and Payments account in Section 5 is £72.3m. The difference between this and the £77.2m now authorised has subsequently been drawn.

**Relevant references**

In the body of the report to creditors, we have set out in some detail the achievements of the Administrators to date. Aside from the very many complex matters which we have had to address it is important to note that:

- During the period to 14 March 2009, the Administrators have recovered or realised gross cash funds totalling approximately $8.7bn. In addition, the Administrators have succeeded in taking control of securities with a book value of $35.5bn (House and Client combined); and
- Operating costs of the Company have been substantially reduced to a forecast annual run rate of approximately $50m to $90m, a fraction of the previous level. Whilst the historical total payroll costs are not immediately a relevant comparator, over $1.0bn in annual cost savings has been made to date. In addition, property costs have been materially reduced, as have other expenditures.

It is likely that current levels of activity will be sustained for some time and we therefore expect that these costs will continue to accrue at a similar rate over the coming months.

| LBL Recharges | Hours | £,000's |
| --- | --- | --- |
| Employee Issues | 5,480 | 2,126 |
| Interdependencies | 4,467 | 1,691 |
| IT | 19,967 | 5,635 |
| Litigation | 15 | 10 |
| Media and Communications | 2,757 | 1,121 |
| Property Issues | 7,779 | 2,338 |
| Total | 40,465 | 12,921 |

# Section 9

# Receipts and payments to 14 March 2009

## House receipts and payments to 14 March 2009

| | Note | GBP £mil | EUR €mil | USD $mil | Other $mil | Total (USD $ Equivalent) at 14 Mar 2009 |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| House | | | | | | |
| Fixed Income | | 9.5 | 844.7 | 63.0 | 5.6 | 1,170.8 |
| Derivative Exchanges | | 273.7 | 893.6 | 12.5 | 21.9 | 1,568.8 |
| Equities | | 68.0 | 317.8 | 53.1 | 35.5 | 593.3 |
| Corporate Events | | 5.8 | 46.9 | 5.7 | 44.4 | 118.7 |
| Counterparties | | 233.9 | 314.0 | 545.7 | 10.8 | 1,288.0 |
| Other | 1 | 3.8 | 92.2 | 60.8 | 14.1 | 199.2 |
| Receipts on behalf of affiliates | 2 | 23.8 | - | 34.1 | - | 67.3 |
| Loan | 3 | - | - | 100.0 | - | 100.0 |
| Interest | | 1.5 | 11.1 | 0.2 | - | 16.6 |
| **Total Receipts for period** | | 620.0 | 2,520.3 | 875.1 | 132.3 | 5,122.7 |
| **Payments** | | | | | | |
| Payroll and employee costs | 4 | (114.8) | (0.6) | (1.4) | - | (162.6) |
| Administrators' remuneration | 5 | (72.3) | - | - | - | (101.0) |
| Loan repayment | 3 | - | - | (100.0) | - | (100.0) |
| Building and occupancy costs | 6 | (34.6) | - | - | - | (48.3) |
| Legal costs | 7 | (33.5) | - | (0.1) | - | (46.9) |
| Loan to LBL | 8 | (17.8) | (2.6) | (14.2) | - | (42.4) |
| Loans to/payments for group companies | 8 | (7.4) | (1.4) | (0.1) | - | (12.2) |
| Other costs | | (0.2) | (0.7) | (5.1) | (0.6) | (6.9) |
| VAT paid | | (18.5) | - | - | - | (25.6) |
| **Total payments for period** | | (299.1) | (5.3) | (120.9) | (0.6) | (546.1) |
| Inter-currency transfers | | 17.6 | (22.3) | 69.0 | (71.3) | (6.5) |
| **Net position** | | 338.5 | 2,492.7 | 823.2 | 60.4 | 4,570.1 |
| **Bank balances** | | | | | | |
| Bank of England | | 11.1 | 103.0 | 612.7 | 27.3 | 798.3 |
| Other institutions | | 327.4 | 2,389.7 | 210.5 | 33.1 | 3,761.8 |
| **Total Balance** | | 338.5 | 2,492.7 | 823.2 | 60.4 | 4,570.1 |

In addition to the above balances, Long Term Securities of $664.7m have been secured.

Joint Administrators' progress report for the period 15 September 2008 to 14 March 2009

## Client receipts and payments to 14 March 2009

| | GBP £ml | EUR €ml | USD $ml | Other $ml | Total (USD $ Equivalent) at 14 Mar 2009 |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Pre-Administration client monies | - | - | 876.0 | - | 876.0 |
| Redemption proceeds, coupons & dividends & investment income | 102.3 | 397.1 | 1,216.7 | 223.8 | 2,101.4 |
| **Total Receipts for period** | 102.3 | 397.1 | 2,092.7 | 223.8 | 2,977.4 |
| **Payments** | | | | | |
| Transfers to clients | - | (1.7) | (799.5) | - | (801.7) |
| **Net position** | 102.3 | 395.4 | 1,293.2 | 223.8 | 2,175.7 |
| **Bank balances** | | | | | |
| Bank of England | 24.4 | 0.3 | 1,249.4 | 128.7 | 1,413.6 |
| Other institutions | 77.9 | 395.1 | 43.8 | 100.1 | 762.1 |
| **Total Balance** | 102.3 | 395.4 | 1,293.2 | 228.8 | 2,175.7 |

## Notes to Receipts and Payments accounts

### General

In accordance with the Insolvency Act 1986 and Insolvency Rules 1986, the transactions within the LBIE estate are reported to creditors on the basis of cash receipts and payments. These statements in this section reflect transactions in cleared funds in accounts established and controlled by the Administrators.

Separate accounts have been established for handling realisations from House assets and assets which may, in due course, be deemed to be Client Assets.

In addition to these accounts there continue to be movements on accounts operated by or on behalf of LBIE prior to Administration. We continue our efforts to assert control over those accounts and progress is set out in Section 5.5.

Accrued income and costs, including taxes, are not reported in the receipts and payments accounts.

For convenience we have aggregated the receipts and payments into a single reporting currency, US Dollars. As detailed in the receipts and payments account realisations are held in a number of currencies and the aggregation is for reporting purposes only.

### 1. Other receipts

Includes recoveries of cash balances from Saudi Arabia and receipts from recharges to Nomura and LBHI.

### 2. Receipts on behalf of Affiliates

Relates to funds LBIE holds on behalf of certain other UK affiliate companies.

### 3. Loan and Loan Repayment

Shortly after our appointment, a loan of USD $100 million was negotiated and drawn to fund the immediate expenses of the Administration, primarily payroll and rent. The loan has been fully repaid.

### 4. Payroll and employee costs

Our activities in the Human Resources area are detailed at Section 7.5. Payments to date relate to the payroll of LBIE staff and include:

- The relevant proportion of payroll and costs of c 5,500 Lehman staff for the month of September 2008;

- Payroll, taxes and national insurance costs including retention bonus for 2008; and

- Ongoing salary and expense payments for retained staff.

### 5. Administrators' remuneration

This reflects payments to the Administrators for remuneration and expenses, in accordance with the framework detailed in the previous section.

### 6. Building and occupancy costs

In accordance with the existing pre-Administration cost recharge regime between LBL and LBIE, this expense represents LBIE's share of occupancy and infrastructure costs for the Bank Street premises.

As set out in Section 7.3, numerous savings have been implemented. We are mitigating costs through tenancy arrangements and generating revenue from the amenity areas at 25 Bank Street, London.

### 7. Legal costs

This includes the costs of retained legal advisers in providing advice in respect of the various complex issues which are being addressed as part of this process.

The Administrators implemented a rigorous review process for all legal costs, which requires each Activity, Cross Functional Workstream and Function leaders to define objectives for any legal advice sought and to manage the provision of advice and review the level of costs. Further disclosures are provided to the Committee.

An in-house legal team has been retained and is increasingly managing the legal issues that we are able to distil for them to handle.

A significant amount of legal costs have necessarily been incurred in dealing with Trust Property, including assets and client monies, as more fully detailed in Section 5.3.

The management and return of Trust Property is a complex and highly technical area, accordingly, we expect legal costs to continue to be extensive.

### 8. Loan to LBL and payments on behalf of other Affiliates

The largest entity in the UK group of Lehman companies was LBIE, which accounted for some 90% of group costs incurred in London. In order to effectively manage these costs LBL, LBIE's affiliate, is the contracting party for administrative and operating costs. LBL has no source of cash other than its recharges to affiliates.

# Appendices

To ensure LBL is able to fund costs and provide essential support services to LBIE, LBIE has entered into a formal funding arrangement whereby it advances funding to LBL on specific terms. These advances bear interest.

Certain other loans have been made to other UK Lehman entities or payments made on their behalf where this has been in the interest of LBIE's creditors.

# Appendix 1 - LBIE contact details

General enquiries

enquiries.lehmanbrothers@uk.pwc.com

**Activities**

| | |
|---|---|
| **House Positions** | housepositions@lbia-eu.com |
| **Counterparties** | counterparties@lbia-eu.com |
| **Trust Property** | clientpositionsresponses@lbia-eu.com |
| **Treasury** | treasury@lbia-eu.com |
| **Reporting** | lbiecreditors.lehmanbrothers@uk.pwc.com |

Cross Functional Workstreams

| | |
|---|---|
| **Custodians** | custodians@lbia-eu.com |
| **Failed Trades** | unsettledtrades@lbia-eu.com |
| **Corporate Events** | corporateevents@lbia-eu.com |
| **Terminations & Valuations** | uk.terminationnoticesqueries@lbia-eu.com |
| **Derivative Exchanges** | derivativesandexchanges@lbia-eu.com |
| **Financing** | financingreplies@lbia-eu.com |

# Appendix 2 - News releases and information

## LBIE Client Information and Claims website

The following is a summary of the information the Administrators have made available to LBIE counterparties to keep them apprised of developments in the Administration. These have been made available on the LBIE Client Information and Claims website, https://lbm.pwc.com/LBIEClient, which is accessible only by a unique user ID and password. All creditors and counterparties were provided with access details to the website in the letter accompanying the Administrators' Proposals for Achieving the Purpose of Administration dated 28 October 2008. Registration details to access the LBIE Client Information and Claims website can be found on www.pwc.co.uk:

- Presentation to the Creditors' meeting on 14 November 2008
- First meeting of the Creditors' Committee 3 December 2008
- Creditors Update 14 January 2009
- Second meeting of the Creditors' Committee 22 January 2009
- Presentation to members of MFA and AIMA on 3 March 2009 and 5 March 2009

## PwC website

The following is a summary of updates which have been posted on www.pwc.co.uk:

### Trust Property

- Client money and assets update 10 October 2008
- Client money and assets update 15 October 2008
- Client money and assets update 13 November 2008
- Client money and assets update - SIPA customer claims  20 January 2009
- Client money and assets update 26 February 2009
- Client money and assets update 23 March 2009
- Trust Property FAQ's  25 March 2009
- Impact of Global Trader Europe Limited High Court Judgment  27 March 2009

### Failed Trades

- Update on OTC cash trades unsettled in CREST 24 September 2008
- Unsettled OTC trades 8 October 2008
- Exchange and clearing house communications 22 October 2008
- Failed trades - Market update 7 November 2008

### General

- Update video 18 September 2008
- Update 30 September 2008
- Webcast to Lehman Brothers employees 7 October 2008
- Webcast to Lehman Brothers employees 15 October 2008
- Frequently asked questions 24 October 2008
- All known LBIE counterparty addresses- 28 October 2008
- All known LBIE trade creditor addresses- 28 October 2008
- FAQ on Audit Confirmation Letters 3 December 2008

PRICEWATERHOUSE(COOPERS ⬚

© 2009 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited liability partnership in the United Kingdom) or, as the context requires, other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity.

www.pwc.co.uk/lehman

# Lehman Brothers International (Europe) – In Administration

Joint Administrators' progress report
for the period 15 September 2010
to 14 March 2011

14 April 2011



## Important Notice

Creditors will note that this report provides data relating to costs of the Administration process, certain estimated future recoveries and creditor claim amounts. Please note that material facts, which may severely impact any or all of these figures and, in turn, the dividend prospects for Lehman Brothers International (Europe) creditors, are, in some instances, known to the Administrators but have not been disclosed to creditors in this report for reasons of commercial sensitivity and legal confidentiality.

Accordingly, very material uncertainties continue to exist regarding the ultimate value realisable from assets, the timing of asset recoveries, future costs of the process and the eventual level of Admissible creditors' claims. These will have a significant effect on the timing and quantum of any interim or final dividend payable.

The Administrators therefore wish to caution creditors from using any data in this report to estimate comprehensively the value of their claims or any likely dividend ranges as any such assessments are potentially materially misleading. LBIE, the Administrators, their firm, its members, partners and staff and its advisers accept no liability to any party for any reliance placed upon this report.

While amounts included in this report are stated in Sterling, a proportion of the assets and liabilities are currently denominated in currencies other than Sterling.

This report encloses various defined terms as set out in the glossary of terms in Appendix A.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

1

2

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

# Contents

| Section 1: | Purpose of the Administrators' progress report | 4 |
| Section 2: | Executive summary | 5 |
| Section 3: | Financial update | 8 |
| Section 4: | House Estate | 12 |
| Section 5: | Affiliates | 16 |
| Section 6: | Client Assets | 21 |
| Section 7: | Client Money | 24 |
| Section 8: | Unsecured creditors | 27 |
| Section 9: | Statutory and other information | 31 |

**Appendices**

| Appendix A: | Glossary of terms | 38 |
| Appendix B: | Receipts and payments: six months to 14 March 2011 | 43 |
| Appendix C: | LBIE contact details | 47 |
| Appendix D: | Court update | 48 |

# Section 1:

## Purpose of the Administrators' progress report

This report has been prepared by the Joint Administrators of Lehman Brothers International (Europe) under Rule 2.47(O) of the Insolvency Rules 1986 (the "Insolvency Rules"). This is the fifth formal update to unsecured creditors.

This report provides details of progress for the six month period 15 September 2010 to 14 March 2011. The statutory receipts and payments accounts are attached at Appendix B.

Wherever possible, the Administrators have sought not to duplicate information disclosed to creditors in previous updates and reports. Creditors are advised to refer to the Administrators' previous progress reports for background information. A copy of previous progress reports can be found at www.pwc.co.uk/lehman.

### Objective of the Administration

The Administrators continue to pursue the objective of achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration).

The specific aims of the Administration are to:

*   recover and/or realise all House (i.e. LBIE) assets, including cash, securities and in the money financial contracts on a managed basis;

*   admit unsecured creditors' claims and make distributions to creditors; and

*   manage Client Assets and Client Monies, assess the claims to such assets and return all such Trust Property to its rightful owners on a systematic basis.

### Creditors' Committee

The Administrators continue to meet with the Creditors' Committee (the "Committee") regularly to review progress and consult on major issues by way of physical meetings, and telepresence or audio conference calls.

The Administrators remain grateful to the members of the Committee for their continuing engagement and commitment to the Administration.

### Future report

The Administrators' next formal progress report to creditors will be in six months time.

In the meantime, relevant contact details are set out at Appendix C.

Signed:

_AV Lomas_
Joint Administrator
Lehman Brothers International (Europe)

# Section 2:
## Executive summary

### Significant developments

Some of the most significant developments in the six month period ending 24 March 2011 have been:

- a further c.£2.1bn of Client Assets has been returned to claimants (c.£12.8bn returns and collateral released to date);

- a further c.£1.6bn of House assets has been realised (c.£10.7bn to date);

- a Consensual Approach for the agreement of unsecured claims has been launched and we are close to being issued the first 100 Claims Determination Deeds to creditors (c.£1.1bn aggregate claims value), in respect of which some c.£0.4bn claims have now been formally agreed;

- out legal action to confirm the ownership of various assets held by LBIE but claimed by Affiliates (the RASCALS litigation) was found in favour of LBIE at first instance. Appeals have been lodged by certain respondents and will be heard in October 2011;

- LBI has further extended to 30 June 2011 LBIE's deadline for objection to its House and Omnibus claims determinations. Since September 2010, LBIE has been able to materially increase the frequency at which we could issue determinations, this will have little visibility on how LBI will eventually decide to treat the many different aspects of LBIE claims. No further or amended determinations have been received to date;

- LBIE and certain of its US debtor affiliates filed an amended Plan of Reorganization, LBIE continue to seek a consensual holding agreement with LBHI and its US debtor affiliates;

- permission was granted for an appeal to the UK Supreme Court of the Appeal Court Judgment in relation to pre-Administration Client Money. The appeal hearing is scheduled for October 2011;

- a UK High Court directions application will be filed imminently, seeking court directions in respect of various aspects of the Client Money Tracing exercise that is being undertaken pursuant to the UK Appeal Court ruling;

- we have concluded a major change programme to achieve full independence of the Information Technology and Infrastructure service provisions from BarCap and Nomura in the period. The related TSAs have been concluded ahead of schedule, resulting in annual cost savings of c.£15m; and

- the Notice of Proposed Distribution, specifying LBIE's intention to pay a dividend to unsecured creditors by 28 February 2011 was extended for two years. Assuming that planned progress is in fact achieved in the critical Administration work streams during 2011, and that no new and material unforeseen issues arise, we expect to be able to make a first interim distribution during 2012.

### $1 billion+ issues

The Administrators are working to resolve ten major business issues summarised below. All of these issues have an individual impact of greater than £1 billion. The resolution of these issues is critical to winding down LBIE and therefore to the final outcome of the House Estate. In summary, these issues are:

**Issue 1** – recovery of securities, House cash and Client Money from a major international financial institution.

**Issue 2** – agreement of a very significant number of unresolved financial trading positions with a second major international financial institution.

**Issue 3** – resolution of Over Claims and other third party and Affiliate claims to ring-fenced assets and cash recoveries.

**Issue 4** – recovery of securities and House cash from certain third party custodians in Asia.

**Issue 5** – recovery of Client Money from and agreement of claims against Barclays.

**Issue 6** – resolution of Affiliate disputes relating to RFB, Extended Liens, and RASCALS, all of which have, or are likely to become the subject of court proceedings.

**Issue 7** – recovery of Trust Property, House cash and securities currently held by Affiliates (LBHK, LBI, and LBJ).

**Issue 8** – resolution of claims between LBIE and its Affiliates (Bankhaus, LBF, LBHI, LBHK, LBJ, LB Lux, and LBSF).

**Issue 9** – quantification of any Client Money taint on House recoveries and the extent of Client Money entitlements to a share in the Client Money pool.

**Issue 10** – resolution of contingent claims against the House Estate.

### Financial update

Subject to suitable caveats, we have previously presented the financial position of the House and Trust Estates by reference both to the Revised SoA, and to the value of cash recovered to date. In the current report, with the benefit of additional information and insight gained in the period, we have adopted an amended approach to providing an indication of the likely financial outcome for creditors. Subject to certain material assumptions and uncertainties, we have provided indicative low and high case estimates for certain asset recoveries and unsecured claims in the House Estate. In presenting this information, we have been mindful of the various litigation and negotiations that continue with third parties, and have sought not to prejudice these. For the purpose of presenting financial information in this report only, the following are some of the material simplifying assumptions that have been made:

**Affiliates** – the net claim balance with each of LBIE's Affiliates will be zero. The actual current position regarding our dealings with Affiliates is discussed in Section 5.

**Trust Property** – future amounts receivable from and shortfalls suffered by Client Asset and Client Money claimants will be zero. These issues are referred to in Sections 6 and 7. We have included amounts owed to Trust Property claimants in respect of other financial trading contracts, as detailed in Section 8.

**Client Money** – the taint on House recoveries will be zero. The work being undertaken to address this is further described in Section 7.

**Contingent liabilities** – no major liabilities will crystallise.

For the avoidance of doubt, it is highly unlikely that these assumptions will hold true in due course. They are made simply for the purpose of this report, because the aggregate effect of certain combinations of favourable or adverse outcomes for these matters could be so material to the House Estate, as to make the range between the two extremes very large, which would produce dividend estimates that were so wide as to be of little use to readers.

Whilst this report contains further information relating to the subject matter of these simplifying assumptions, the Administrators caution readers with regard to using this information to further evaluate the eventual likely outcome for creditors. The Administrators accept no responsibility to any party in this regard.

In summary, subject to the above and other simplifying assumptions and before future and accrued costs (but after priority claims), the potential range of House recoveries is between c.£7.5bn and c.£10bn and the potential range of unsecured claims is between c.£13.3bn and c.£15.7bn. For the avoidance of doubt, these ranges remain upside and downside sensitivity to these ranges. Additionally, the eventual impact on these ranges arising from Affiliate and Trust claims resolution is likely to be material in due course.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

5

6    Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

# Section 3

## Financial update

### Financial summary

As progress has been made in the Administration, multiple, extremely complex, and often interrelated issues have arisen, some of which individually and others collectively, will have a material impact on the outcome for LBIE's unsecured creditors.

These issues generally relate to:

• the quantification of claims into and out of the House Estate;

• asset valuations;

• proprietary rights; and

• contractual obligations.

A significant proportion of the largest of these issues relate to Affiliates and Trust Property claimants. Because the impact of their eventual resolution could swing between materially beneficial and materially adverse, a very wide range of potential outcomes for creditors is possible. For this reason, and in order not to prejudice the Administrators' negotiation or litigation efforts, we do not provide a comprehensive estimated final outcome statement for LBIE in this report.

For the purpose of presenting an update of LBIE's financial position in this report, we have provided indicative outcome ranges only in respect of categories of assets and liabilities that do not primarily relate to Affiliates or Trust Property claimants, as we have more visibility of the potential range of outcome in these areas, albeit there remains material upside and downside sensitivity taking this narrower insight. Please see the table on page 9 for a summary of this potential range of outcomes.

### Affiliates

This report (page 11) highlights those Affiliates with which LBIE had the most significant financial interrelationships, and the recorded positions between the parties according to the Revised SoA (which continues to be updated as an Administration accounting routine). Material matters, such as guarantees and other contractual entitlements, give rise to additional, substantial financial obligations between the parties.

This report highlights the nature of some of the more material unresolved issues that exist between LBIE and various key Affiliates, along with the Administrators' view regarding whether each Affiliate entity is likely to ultimately be a debtor or creditor in the House Estate. There is presently no agreement between LBIE and those Affiliates over the validity and quantum of claims. As a result, the Administrators are unable to provide creditors with any reasonable estimate of the quantum or timing of the eventual outcome at this stage.

### Trust Property claimants

With regard to Trust Property claimants, their potential impact on the House Estate derives from the unsecured claims that might eventually arise from a shortfall in claimants' recovery of both Client Assets and Client Money, and from the House Estate's recovery of debtor balances separately owed by certain individual Trust Property claimants. In many cases, such debtor balances are likely to be offset against Client Assets or, potentially, Client Money, within the Administrators' control or currently in the hands of a third party depot or bank.

In addition, in many cases, LBIE has unsecured liabilities owing to Trust Property claimants in respect of amounts due under financial trading contracts.

Pending the UK Supreme Court Client Money appeal outcome, the release of cash and securities by LBIE and the negotiation of trading balances with certain Trust Property claimants, very significant uncertainty exists concerning their combined potential impact on the House Estate. Save for a provision for unsecured claims in respect of amounts due under financial trading contracts, the Administrators are therefore unable to provide creditors with an estimate of the impact on the House Estate at this stage.

### Summary

Owing to the significant number of material outstanding matters which make the eventual outcome for unsecured creditors very uncertain, the Administrators caution creditors against reliance on the financial and other information contained in this report. Wherever possible though, we have endeavoured to give creditors further insight into LBIE's financial position, based on recent developments.

### Critical Administration work streams

As agreed with the Creditors' Committee, the focus for 2011 Administration activities will be in the three most critical work streams, where the most significant potential impediments to a first interim distribution lie. The Administrators' objectives for each of these work streams are as follows:

Creditors' claims agreement – procuring Proofs of Debt from, and "agreeing" a material proportion of, all third-party claims against LBIE and "admitting" the eventual unsecured element of these in preparation for a first interim distribution.

Client Money – considering alternative commercial solutions to overcome Client Money as an impediment to a first interim distribution to unsecured creditors, at the same time as establishing "floating rights and claims entitlement" together with participation in the UK Supreme Court appeal, in order to quantify (i) any "Client Money loss" on House Estate recoveries and (ii) any "Client Money entitlement" in addition to that already identified by LBIE's accounting systems.

Affiliates – materially progressing agreement of secured and unsecured claims, set-offs and liens, between LBIE and its Affiliates, where the nominal value of the unresolved differences are currently so large and the potential for delay is so great, that the consequential effect on creditor returns in each estate could be very material.

### Court update

A number of the more material, disputed matters in the Administration will be the subject of court proceedings, in the UK and overseas, during the course of 2011, with their outcomes known towards the end of the year or early in 2012. Subject to further appeal where relevant, the Administrators hope that these legal proceedings will bring substantially more clarity to the financial position of the House Estate, and help remove the major impediment to making a first interim distribution to unsecured creditors. An outline timetable of current and imminent legal proceedings is contained at Appendix D to this report.

### Currencies

The Administrators have continued to defer the further conversion of House recoveries into Sterling, following the UK Appeal Court ruling on pre-Administration interest. Payments out of the House Estate may, therefore, continue to be made in US Dollars and Euros as well as Sterling. Identified Client Money has continued to be held in the currencies in which it has been recovered, which is primarily US Dollars.

### Human resources

The Administrators and contractor headcount levels have increased slightly in the period, with the current combined headcount of 495 compared with 650 at the date of our last report. Employee related costs in the period totalled £49.6m (c.£28.6m total to date).

A High Court hearing relating to the status of a pension fund deficit liability, which is likely to become the subject of a Financial Support Direction, took place in November 2010. The judgment on 10 December 2010 held that a liability eventually derived from a Financial Support Direction would constitute an expense of the Administration. The Administrators have submitted an appeal which will be heard by the UK Appeal Court in July 2011.

### Administrators' remuneration and expenses

c.£66m was paid during the period in respect of Administrators' fees and expenses relating to the current and prior periods (c.£352m paid to date).

## Indicative financial outcome

Note that this summary relies on account of amounts that might be recovered from, or owed to, Affiliates and owed to Trust Property claimants in respect of shortfalls. It also takes no account of any potential third party proprietary rights that might arise from the Client Money Trading exercise or of future and accrued costs in the Administration.

| | Low £bn | High £bn |
|---|---|---|
| House Estate (note 1) | 8.0 | 8.0 |
| Cash deposits and short dated government bonds (note 2) | | |
| Future recoveries | | |
| Third party debtors (see Section 4) | 0.1 | 0.5 |
| Affiliates (see Section 5) | N/A | N/A |
| House debt securities (see Section 4) | 0.6 | 1.6 |
| Trust Property claimants (see Sections 6 and 7) | N/A | N/A |
| Other (note 5) | - | 0.1 |
| Total expected recoveries | 8.7 | 10.2 |
| Priority claimants (note 4) | (1.2) | (0.2) |
| Funds available for unsecured creditors | 7.5 | 10.0 |
| Creditors | | |
| Unsecured creditors (see Section 8) | (14.5) | (12.1) |
| Trust Property claimant shortfalls (see Sections 6 and 7) | N/A | N/A |
| Affiliates (see Section 5) | N/A | N/A |
| Total unsecured claims | (14.5) | (12.1) |
| Subordinated debt | (1.2) | (1.2) |
| Total creditors | (15.7) | (15.3) |

Notes:

1. This is an indicative financial outcome, subject to change, and should be read in conjunction with the narrative and assumptions set out elsewhere in this report.

2. Cash deposits and short dated government bonds are stated net of c.£1.6bn of funds arising from the sale of securities together with their related income, against which certain Affiliates and Trust Property claimants may have proprietary claims. Please refer to Appendix R.

3. Other future recoveries represent, on a high outcome, an amount of £0.1bn in respect of potential further tax refunds.

4. Priority claimants include the potential pension fund deficit liability, indemnities and other claims.

## Trust Property summary

Further significant progress has been made with Client Asset returns and the reconciliation of client positions, although the remaining population of outstanding claims is materially impacted by matters outside the Administrators' control such as assets still held by LBI and LBHI, Over-Claims, Affiliate liens and potential shortfalls.

| | £bn |
|---|---|
| Client Assets (see Section 6) | |
| Client Assets at 15 September 2008 (note 1) | 19.6 |
| Prior period adjustments | (3.1) |
| Estimated shortfall on LBIE controlled assets (note 2) | (0.2) |
| | 16.3 |
| Prior period returns under CRA and other arrangements (note 1) | (10.1) |
| Returns under CRA and other arrangements in the period | (2.1) |
| Ring-fenced for Affiliates claims | (0.1) |
| Client Assets at 14 March 2011 (note 3) | 4.0 |
| Pre-Administration Client Money (see Section 7) | |
| Value at 15 September 2008 | 1.2 |
| Potential shortfall in cash on hand (note 2) | (0.6) |
| Remaining balance (note 3) | 0.6 |
| Post-Administration Client Money (see Section 7) | |
| Prior period recoveries by LBIE | 2.2 |
| Recovered in period | 0.2 |
| Recoveries to 14 March 2011 | 2.4 |
| Prior period distributions to Trust Property claimants | (1.4) |
| Distributed in period | (0.1) |
| Remaining balance (note 3) | 0.9 |

Notes:

1. Excludes c.£0.6bn collateral pledged to LBIE by clients but held by third parties which was released with LBIE's agreement in prior periods.

2. This amount is included for illustrative purposes only and may change in due course. Any actual shortfalls are expected to become unsecured claims against LBIE in due course.

3. In certain circumstances, Client Assets or Client Money may be retained for the benefit of the House Estate to cover amounts owed to LBIE by Trust Property claimants.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

9

## Affiliates summary

| Affiliate | Revised SoA as at 15 September 2008 (note 1) Debtor £bn | Revised SoA as at 15 September 2008 (note 1) Creditor £bn | Material additional unresolved issues (note 2) | Target eventual status |
|---|---|---|---|---|
| LBB | 0.3 | - | Antecedent transactions / Client Money | Debtor |
| LBF | - | (0.6) | BTB / Client Money / Extended Liens / RASCALS / Valuations | Debtor |
| LBHI (note 3) | - | (3.7) | BTB / Extended Liens / Guarantees / RASCALS / Valuations | Debtor |
| LBHK (note 4) | - | (0.5) | Client Assets / Extended Liens / RASCALS | Debtor/Creditor |
| LBI (note 5) | 2.9 | - | Client Assets / Client Money / Extended Liens / House Customer Property claim status | Debtor/Creditor |
| LBJ | - | (0.1) | Client liens | Creditor |
| LB Lux | - | - | Termination date | Debtor |
| Other | 1.0 | (1.0) | Various Issues | Debtor/Creditor |
| Total | 4.2 | (5.9) | | |

Notes:

1. The positions above represent LBIE's view of the unresolved balances between LBIE and the relevant Affiliates from the Revised SoA. None of these balances has yet been reconciled and agreed in full with the respective Affiliate.

2. Various alleged rights and obligations arise from the post Administration termination of certain contracts between LBIE and its Affiliates and from the impact of local insolvency legislation, resulting in a number of additional, material claims being made between Affiliates.

3. LBHI includes 121 US debtor affiliates, which are the subject of Plan discussions.

4. LBHK expresses more than one legal entity as defined in Appendix A.

5. The Administrators are presently pursuing House Estate claims with a value of c.$146m against LBI, none of which currently is agreed by LBI to have Customer Property status.

6. Please refer to Section 5 of this report for further information regarding Affiliates.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

11

# Section 4
## House Estate

### Highlights

- Recovery of a further c.£0.5bn from Street debtors.
- Realisation of c.£0.53bn from the sale of House securities.
- Consensual disposal and redemption of c.£0.4bn of securities ring-fenced for Affiliates.
- Significant progress made with the top 150 debtor groups. Agreement reached with a further 20.
- Agreement of settlement terms with one of LBIE's largest non-Affiliate debtors, resulting in the recovery of c.£0.4bn of cash and securities.
- Realisation of c.£0.1bn on account cash from a German financing agent.
- Finalisation of ring-fenced agreement with a European state-sponsored pension fund.
- Progress towards a negotiated settlement with a major international financial institution.
- Settlement of six counterparties previously expected to require litigation to resolve.
- Completion of a further 24 smaller debtor groups. Positions with over 450 individual counterparties have now been finalised.
- Continued preparation for litigation in respect of a number of large and unresponsive counterparties.

Third party debtors (excluding Affiliates) within the House Estate comprise:

| | No. of valuation cases | LBIE £bn |
|---|---|---|
| Street debtors | 1,550 | 9.0 |
| Exchanges | 33 | 1.6 |
| Cash receivables from Trust Property claimants | 90 | 0.2 |
| Other debtors | - | 0.6 |
| Total | 1,663 | 11.4 |

The LBIE valuations shown above reflect the gross amounts recorded in LBIE's books prior to any realisations. As at 14 March 2011, £6.6bn of cash and other collateral had been recovered against the aggregate balance of £11.4bn. Of the remaining £4.8bn, the net book value after provisions and other adjustments representing the high case indicative financial outcome is £0.5bn.

Debtors arising from Street counterparties and exchanges are addressed further below. Cash receivables from Trust Property claimants represent amounts potentially due to LBIE from counterparties who have claims in the Trust Estate. Other debtors represent coupons and dividends and taxation receivables and other sundry amounts (which are all fully provided for).

### Street debtors

#### Focus

The primary focus in relation to Street debtors has been to pursue realisations, settlements and/or litigation in respect of the top 150 groups (which together represent over 95% of the gross Street debtor value), with a secondary focus on smaller groups. Negotiations are typically conducted with groups of related debtor entities - e.g. entities under common legal ownership or represented by the same agent or asset manager, as this is generally more efficient for both LBIE and its counterparties.

The population of debtors being progressed by the Street debtors work stream is:

| Mid-market valuation | No. of options | £bn |
|---|---|---|
| Top 150 groups | 523 | 8.6 |
| Other Street debtors | 1,007 | 0.4 |
|  | 1,530 | 9.0 |
| Less: | | |
| Adjustments | | (3.6) |
| Cash received | | (5.1) |
| Indicative financial outcome (High) | | 0.3 |
| Further potential adjustments | | (0.2) |
| Indicative financial outcome (Low) | | 0.1 |

The mid-market valuation represents LBIE's current view of the cash market as at the termination date (where terminated), or an estimate of the value as at 14 March 2011 in respect of any remaining live positions.

Adjustments represent deductions such as SGA/ offer spreads, credit charges, pricing variances, bad debt provisions and any other commercial differences arising during negotiations.

**Progress**

As at 14 March 2011, c.£5.1bn of cash and other collateral has been recovered from Street debtors, including c.£0.5bn in the period. Of this amount:

- c.£3.5bn has been realised in respect of positions that have been fully settled; and

- c.£1.6bn has been received on-account where negotiations to agree a final amount are ongoing.

Significant developments during the past six months include:

- agreement of settlement terms with one of LBIE's largest third party debtors, resulting in the realisation of c.£0.2bn cash (and the return of a further c.£0.2bn securities and cash accounts included in House assets below);

- realisation of c.£0.1bn on-account cash from a German financing agent. Work continues to move the counterparty to full and final settlement;

- material progress towards a negotiated settlement with a major international financial institution including the release of c.£0.2bn from its existing market location;

- continued reconciliation activity with a second major international financial institution in relation to a significant number of financial trading contracts;

- finalisation of a settlement agreement with a European stock-exchanged position fund and recovery of a residual cash balance;

- agreement of final settlement terms with a German commercial bank and recovery of a residual cash balance;

- conclusion of a settlement with a large US based financing agent;

- settlement of positions with a Scandinavian national bank;

- finalisation of settlement terms with a targeted UK based insurance group, including agreement of a related creditor claim in order to reach commercial agreement;

- recovery of a first interim cash dividend in respect of pre-Administration claim from the liquidators of a UK based fund;

- continued settlement of underlying principals linked to a UK derivative asset manager (c.80 counterparties). Approximately two thirds of the principals have been settled to date;

- settlement of positions in the period which were expected to require litigation to resolve;

- continued work to prepare for litigation in respect of a number of legal unresponsive counterparties; and

- preparation for submission of an application to the UK High Court for directions in respect of assertion of post-Administration non-mutual contractual set-off.

In addition, a further 24 counterparties (below the top 150 group) have been completed during the period, and specialist teams continue to focus on recovery and settlement of smaller positions (typically under c.£1m).

LBIE estimates that future recoveries in respect of the top 150 groups will be up to c.£0.2bn (excluding any amounts from litigation, where there are material uncertain disputes and any securities due to be recovered). This amount principally relates to reparation of amounts from counterparties in Asia where work is ongoing to resolve local, regulatory and other commercial issues. Work on the remaining groups is carried out with the objective of identifying and realising any residual cash balances and agreeing final settlement terms, or preparing for litigation in certain cases.

**Challenges**

Since the Appeal Court Judgment, the treatment of Client Money in debtor settlement deeds has been a cause of delays in finalising terms. LBIE continues to review actual or potential Client Money entitlements in order to ensure that these are reflected appropriately in settlement agreements, which should safeguard LBIE's interests at the same time as continuing to make progress with fund debtor settlements.

Progress on several large debtor cases has been deferred pending the outcome of the set-off leaving in the High Court referred to above, which is not expected until later in 2011, or early 2012. In these cases, internal analysis is continuing in order to allow for swift action following the relevant legal determination.

On 21 December 2010, the UK High Court handed down its judgment in respect of LBIE's application for directions, upholding the entitlement asserted by three groups (four individual entities) not to pay amounts to LBIE in respect of certain derivative positions that were in-the-money at the date of insolvency and not subsequently terminated. LBIE has lodged an appeal which is expected to be heard later in the year.

**Exchanges**

To date, £1.5bn of cash and collateral originally held at clearing houses and brokers has been recovered, and remaining funds trapped in Asia (c.£0.1bn) continue to be actively pursued. LBIE continues to defend relevant assets against legal challenges by local banks, with some success to date.

Activity in respect of exchanges during the period has principally been associated with LBIE's relationship with certain of its Affiliates. This is covered in Section 5 of this report.

**House assets**

**Focus**

The House assets work stream is responsible for:

- realisation of available-for-sale securities held in LBIE's House depot;

- analysis of assets held by LBIE subject to ownership disputes in order to facilitate the disposals above; and

- organisation of securities held by third party and Affiliate custodians.

**Progress**

Assets in the LBIE depot can be categorised as follows:

| | £bn |
|---|---|
| Available-for-sale | 0.6 |
| Frozen accounts at third party custodians | 1.1 |
| Held subject to client disputes | 0.7 |
| Held subject to Affiliate disputes | 1.6 |
| Held by Affiliates | 4.2 |
| House depot at 14 March 2011 | 8.2 |

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

13

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

14

Realizations of House securities in the period were:

- c.£0.5bn (c. £2.4bn to date) principally relating to the release and subsequent sale of securities, previously held as a major international financial institution and LBI; and

- ring-fenced cash realizations, including under IMAs, of c.£0.4bn (c.£0.8bn to date) which are potentially subject to Affiliate proprietary claims.

Assets held subject to client and Affiliate disputes are excluded from the indicative financial outcome range in Section 5. Insofar as these assets are eventually returned to those parties, their respective claims against LBIE will reduce.

Assets held by Affiliates are also excluded from the indicative financial outcome range, as discussed in the Affiliate section of this report (Section 5).

## Challenges

Progress with asset sales continues to be inhibited by:

- potential Affiliate and client title to certain assets in LBIE's House depot;

- continuing negotiation with third party custodians to recover assets currently not under direct LBIE control, notably one major international financial institution; and

- limitations in LBIE's ability to recover assets held by Affiliates, notably LBI.

# Section 5
## Affiliates

### Highlights

- UK High Court substantially agreed with the Administrators' position in respect of the RASCALS dispute. Appeal by certain Affiliates to be heard in the UK Appeal Court in Q4 2011.

- LBI Lux rejection of LBIE claim challenged in Luxembourg court.

- LBIE BTB UK High Court application for directions prepared.

- Extensive dialogue with LBHI and its US debtor affiliates in relation to LBIE's claims into their estates under the Plan.

- Increased dialogue with LBI and extension of LBI Determination objection deadline to 30 June 2011.

  - c.£0.1bn LBI assets recovered as part of settlement agreement reached previously with Affiliates.

- Launch of Affiliate Claims Portal in January 2011 and continued pursuit of significant outbound claims against Affiliates.

### Focus

The resolution of Affiliate claims will have a very material impact on the overall outcome for unsecured creditors. For the purposes of this report, we have assumed the outcome on a net zero basis, although there are circumstances where the net outcome could result in a very material enhancement or dilution to unsecured creditor returns.

LBIE has a small number of major Affiliate relationships. These relationships are complex and multi-faceted in nature, giving rise to significant issues that need to be addressed. Court proceedings may be necessary in order to determine the actual legal and commercial nature of the relationship and, as a result, the timescale for resolution of these matters is protracted.

The current areas of focus are:

- endeavouring to reach satisfactory settlements with LBHI and its US debtor affiliates;

- seeking agreement with LBI of revised House and Omnibus Customer claims prior to 30 June 2011; or

- if appropriate, preparing and prosecuting an objection to the LBI Determination (in the event that it is not amended consensually or LBIE and LBI do not mutually agree to extend the deadline to the LBIE's objection beyond 30 June 2011);

- resolving outstanding litigation: the RASCALS appeal, BTB directions hearing, LBI Lux claims and Extended Liens;

- recovering assets from LBI and LBHK; and

- agreeing creditor claims received via the Affiliate Claims Portal.

### Progress

**LBHI and its US debtor affiliates**

LBIE has continued to engage with LBHI with a view to:

- understanding the impact of the Plan on LBIE;

- reconciling and valuing trades and positions between LBIE and the US debtors (principally LBHI and LBSF); and

- exploring the possibility of reaching a binding, composite settlement of claims between LBIE and the US debtors.

LBIE continues to invest significant resource in developing its dialogue with the US debtors, with other third party creditor groups and fellow Affiliates, in order to ensure that appropriate recognition is given to LBIE's principal and guarantee claims, in any eventually confirmed Plan.

**LBIE House claim against LBI**

As previously reported, LBIE filed its original SIPA House Customer claim (the "House claim") in January 2009 and has subsequently filed two amended House claims with LBI (later on 10 September 2010).

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

15

The LBI Determination of LBIE's House claim was issued on 19 September 2010. LBI:

- rejected LBIE's claim to have Customer Property status and deemed its status to be a General Estate unsecured claim; and

- rejected c.£1.40n. of the House claim as both a Customer Property and General Estate unsecured claim.

Pursuant to SIPA, LBIE was given 30 days to object to the LBI Determination. However, given the lack of information provided by LBI, the continued absence of the LBI cash element of the determination and the complexity of the relationship between LBI and LBIE, LBI has agreed to several extensions to this deadline. The latest extension to the time by which LBIE must object, if it is to do so, is to 30 June 2011.

Claims accepted by LBI as being Customer Property are likely to receive a substantially higher recovery than the General Estate unsecured claims.

LBI has not given any justification for the rejection of LBIE's claim to Customer Property. The Administrators and their legal team continue to assert Customer Property status to the majority, if not all, of their House chain of approximately $140m.

In light of the above, LBIE has expended significant effort in this period addressing two main areas, being:

- the reconciliation of balances and pending trades between LBI and LBIE; and

- providing information and analysis to LBIE's legal advisors to enable them to advise on the merits of its claim, should it be necessary to object formally to the LBI Determination in due course.

In addition, regular meetings are held with the advisors of LBI to enable them to progress these issues and facilitate efficient information flows. Comprehensive joint action plans have been agreed, which the Administrators are closely monitoring.

## Other major Affiliates

### LBHK

LBHK submitted claims to LBHK in the period for the return of House Estate assets and Client Assets in advance of the LBHK bar date of 10 December 2010.

The reconciliation of these claims is now substantially complete. LBIE is working with LBHK to resolve a small number of outstanding material differences.

LBHK maintains that it is unable to return House Estate assets and Client Assets to LBIE until issues regarding any potential Extended Liens claims are removed. LBIE is working with LBHK and other Affiliates to attempt to resolve this.

In addition, two LBHK entities have appealed against the RASCALS judgment. The outcome of this appeal could have a material impact on the financial claims between LBIE and LBHK.

Separately, the reconciliation of the various trading balances continues, with the current focus on securities financing trades and OTC derivatives.

### LBF

LBIE continues to work with LBF to complete the trade reconciliation process for all positions and thereafter their valuation. In this regard, assistance has been offered to LBF by LBIE because LBF currently has limited specialist resource and access to former Lehman systems.

LBF has also appealed against the RASCALS judgment and is a party to the LIC Supreme Court pre-Administration Client Money appeal. The outcome of these appeals, and the RTB and Extended Liens directions hearings, could have a material impact on the financial claims between the two entities.

## LBJ

LBIE has continued to focus on securing the return of the stock lending assets held by LBJ on LBIE's behalf. Following approval of an agreement by the Japanese court supervisor, a further c.£0.1bn of assets were returned in January 2011. Associated derived income is expected to be returned in Q2 2011.

LBIE continues to seek certain third party confirmations requested by LBJ for the remaining assets held. When received, LBIE will resume negotiations for the return of these remaining assets (less than c.£0.1bn).

### LBI Lux

LBIE has taken further legal advice on the interpretation of the relevant provisions in the agreements that govern LBIE's relationship with LB Lux, to confirm the approach taken to LBIE's valuation of its claim.

LBIE continued to discuss its claim with the LB Lux liquidators during the period.

In December 2010, LBIE received formal rejection from the LB Lux liquidators of LBIE's submitted claim.

Accordingly, LBIE commenced formal legal proceedings in the Luxembourg court. At the initial hearing in early February 2011, LBIE challenged the rejection and the Luxembourg court's jurisdiction to hear the claim.

The next Luxembourg court hearing is scheduled for May 2011 and LBIE will continue to pursue this matter vigorously.

### Bankhaus

The reconciliation of all financing and OTC derivative trade populations has been completed.

The financing trades are now being valued by both parties and Bankhaus is expected to provide a valuation statement shortly.

An OTC derivatives valuation statement has been received from Bankhaus and is being reviewed by LBIE.

The current status of the legal proceedings in relation to pre-Administration Client Money is discussed in Section 7.

An inbound claim of £9bn has been received which includes c.£7bn of antecedent transactions relating to payments made to LBIE in the three months prior to Administration. This claim will be rejected by LBIE.

### UK Affiliates

LBIE has commenced work to agree claims by:

- identifying and agreeing the trade populations; and

- valuing the general intercompany and financing balances.

Most of the UK companies no longer have the Lehman product and finance expertise to undertake the above, so LBIE is assisting where possible.

### Exchanges

The vast majority of the Administration work done in the period in respect of exchanges has been in relation to Affiliate activity. LBF and LBI used LBIE for clearing trades in Europe and the Far East, with LBI clearing LBIE's trading in North America. These activities resulted in inbound and outbound claims with House and client elements.

Work in the period has focused on:

- completing reconciliations and determining claims;

- engaging with Affiliates to establish the fact pattern surrounding transfers and liquidations of positions;

- assessing the legal position; and

- analysing and establishing the status of cash balances held by LBI on behalf of House or client.

Lehman Brothers International (Europe) – in Administration
Your attention is drawn to the important notice on page 4

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

## Korean branch

In February 2011, the Seoul court in South Korea delivered its judgment in the matter of the credit-linked note of £0.2bn issued to Korea Investment and Securities Co. Limited (KIS) by a Lehman entity and guaranteed by LBHI. An assignee from KIS sued LBIE for the principal and interest of the credit-linked note.

The judgment was found in favour of LBIE on the basis that the assignee did not have the right to claim against LBHI under the credit-linked note as LBIE was not a party to any contract. The judgment is subject to appeal.

### Affiliate Claims Portal

In January 2011, LBIE launched its Affiliate Claims Portal, which is a sub portal of the Client Information Portal ("CIP"), which was developed to accelerate the claims submission process for Affiliate creditors.

The Affiliate Claims Portal enables electronic submission and efficient management of claims and is customised to meet the specific requirements of Affiliate relationships.

Affiliates have been notified of the Affiliate Claims Portal and LBIE encourages Affiliates to post their claims as soon as possible so that LBIE can review these and work with Affiliates to eliminate discrepancies and agree claims as appropriate.

As at 14 March 2011, we have received claims in excess of c.£20bn from 34 Affiliates and we are currently investigating the claims.

## Challenges

### LBHI and its US debtor affiliates

The principal challenges LBIE faces to achieve settlement with LBHI and its US debtor affiliates include:

• agreeing final valuations on the most material claims and complete products;

• LBHI achieving "confirmation" of any settlements which might be agreed by LBHI;

• achieving an acceptable position for LBIE within the complex multi-creditor environment in the US;

• dealing with the potentially extensive discovery requirements as part of the Plan process;

• preparing for potentially protracted litigation in a number of areas (particularly in regard to Guarantees) in the event that settlement is not achieved; and

• dealing with other issues arising from prosecuting claims in the Chapter 11 estates in the US Bankruptcy court.

### LBIE House claim against LBI

There are a number of obstacles to overcome for LBIE relating to its House claim against LBI. These challenges include:

• prosecuting LBIE's claim in the US which give rise to a number of complex jurisdictional issues, not least of which is the 30 June 2011 deadline for filing an objection to the LBI Determination;

• demonstrating that LBIE's House claim should be considered as a Customer Property claim rather than a General Estate unsecured claim; and

• concluding the information gathering and sharing exercise which will enable LBI and LBIE to have an adequate understanding of the differences in the books and records.

In addition to the specific challenges referred to above, there are a number of very important areas which cut across all of the Affiliate relationships to a greater or lesser extent. Certain of these are issues are explained in more detail below.

### Ownership of assets held by LBIE

LBIE continues to work to resolve ownership and Extended Liens claims from Affiliates in relation to certain securities held by LBIE.

### RASCALS securities

A hearing in the UK High Court in October 2010 resulted in a judgment handed down on 19 November 2010 (details available at *www.pwc.co.uk/lehman*).

The court found that while the Affiliates had acquired a beneficial interest in the securities upon their purchase from Street counterparties, the RASCALS process had the effect in the case of certain standard fact patterns of transferring that beneficial ownership in the securities to LBIE.

Three of the five respondents, LBF and two LBHK entities, have launched appeals to the judgment.

LBSF and LBI have chosen not to appeal the judgment. LBIE has cross-appealed on other issues.

Both LBIE and the appellants have filed defection arguments, and further defection arguments are expected in April 2011 from the appellants in response to LBIE's skeleton for the cross-appeal.

The appeal hearing is expected to take place in October 2011.

The outcome of this appeal could have a material impact on the asset returns and other balances between LBIE and its Affiliates.

### Extended Liens

Discussions are underway with a number of Affiliates in an attempt to avoid the need for an application to the UK High Court and instead agree on a comprehensive mutual waiver of Extended Liens.

Discussions with some of the Affiliates have been protracted and the prospects of agreeing a consensual approach appear limited. As a result, LBIE has been focusing on:

• reviewing the relevant legal agreements between LBIE and Affiliates; entities;

• preparing a UK High Court application and liaising with Affiliates; and

• obtaining consent from potential claimants to disclose information relating to the Extended Liens issue to the wider Lehman affiliate population.

The impact of Extended Liens on the assets held by LBIE in its or other Affiliates' depots could be material to the House Estate.

### BTB

LBIE entered into book-to-book transactions and associated side-letters with Affiliates to provide LBIE with certain protections.

The most significant side letters in both value and population impact are with LBSF, LBOC and LBF.

LBIE plans to deal with the LBSF and LBOC BTB issue as part of ongoing settlement negotiations with the US debtors.

LBF disputes the applicability of the side letter to the intercompany derivatives portfolio with LBIE. As a result, LBIE and LBF have agreed to go to the UK High Court for directions to resolve such issues.

The court application has now been finalised and it is intended it will be filed at court shortly, with a view to having a substantive hearing by Autumn 2011.

The resolution of the BTB issues will have a material impact on LBIE.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1    19

Lehman Brothers International (Europe) – in Administration
Your attention is drawn to the important notice on page 1    20

# Section 6
# Client Assets

## Highlights

- Client Asset returns of c.£2.1bn were completed in the period. Total Client Asset returns and collateral releases since the beginning of the Administration are c.£12.5bn.

- Over-Claims with a value of c.£2.2bn were identified and rejected in the period, facilitating the release of a range of Client Assets previously reserved because of competing claims.

- The remaining population of Client Assets within LBIE's control relate mainly to counterparties where there are a number of complex unresolved issues. Resolution of these issues requires significant assistance from Affiliates and clients themselves.

- Data exchange and reconciliation efforts with LBI in respect of the Omnibus Customer claim have progressed during the period. The LBI determination for cash has not yet been received.

- LBI is not prepared to engage in discussions regarding the key legal principles affecting the Omnibus claim and hence the timeframes for ultimate resolution and recovery remain uncertain.

## Focus

The focus of the Client Assets team is:

- return of Client Assets through either the CRA mechanism or bilateral negotiation;

- resolution of the various restrictions that impact the addressable population of assets now available for return, including Over-Claims and Affiliate liens;

- regular and intensive engagement with overseas Affiliates to recover Client Assets still held by them on behalf of LBIE; and

- recovery of any debts owed to the estate by Trust Property claimants.

In 2011, the Client Assets team has initiated a new stream of activity to accelerate progress in agreeing unsecured claims into the estate.

## Client Assets analysis

Movements in the Client depot during the period are as follows:

| | £bn |
|---|---|
| Reported at 15 September 2010 | 8.2 |
| Returned to clients in the period | (2.1) |
| Ring-fenced for Affiliates in the period | (0.1) |
| Client Assets at 14 March 2011 | 4.0 |

Client Assets comprise:

| | £bn |
|---|---|
| In LBIE controlled depots | 1.4 |
| LBI controlled (estimated) | 2.2 |
| LBHK and others (estimated) | 0.4 |
| Client Assets at 14 March 2011 | 4.0 |

Assets controlled by LBI and LBHK have been estimated after assuming perfect settlement of any open unsettled trades as at the date of LBIE's Administration. These estimates will be revised following the completion of reconciliation efforts with the office holders in those estates. In the case of LBI, no estimate has been included for the sub-component arising from settlements in the week commencing 15 September 2008, pending receipt and reconciliation of the cash determination from LBI.

## Progress

### CRA

During the period, LBIE issued CANs for a further 1,849 security holdings with a value of c.£0.4bn. The programme of CAN issuance has now progressed substantially, with 89% by value and 81% by count of holdings having been issued since the implementation of the CRA.

Asset returns under the CRA in the period totalled c.£0.3bn and were distributed to 69 counterparties across 1,785 holdings.

Total CRA returns since its inception are c.£2bn to 116 counterparties and for 2,013 separate holdings.

In addition to the CRA returns, LBIE investigated c.£0.1bn of segregated assets previously attributed to CRA signatories which were confirmed as no longer eligible for return to those clients. Instead, these have now been separately ring-fenced for Affiliates pending resolution of their claims.

To accelerate the progress of future Client Asset returns, the Administrators have implemented a fast-track process, designed to operate within the parameters of the CRA, for those Client Asset holdings that meet the criteria for low risk returns.

### Non-CRA

The Administrators continue to make progress on Client Asset returns to non-CRA signatories in parallel with addressing the CRA population.

Client Asset returns under bilateral arrangements in the period have totalled c.£1.8bn. Total bilateral returns since the start of the Administration total c.£10.2bn.

The majority of the remaining value of Client Assets currently under LBIE's control for non-CRA counterparties is heavily linked to LBI-related assets and thus cannot yet be returned. In a number of cases, LBI continues to make a competing claim for the underlying assets held for these Trust claimants, asserting that the underlying clients are clients of LBI rather than LBIE. We are seeking to work with LBI and the claimants affected to resolve these matters in the near term.

### Over-Claims

An analysis of Over-Claims is shown in the table below:

| | £bn |
|---|---|
| Over-Claims as at 15 September 2010 | 6.9 |
| New Over-Claims identified | 0.1 |
| Over-Claims resolved in the period | (2.2) |
| Total Over-Claims at 14 March 2011 | 4.8 |
| This comprises: | |
| Over-Claims asserted for assets within LBIE's control | 1.5 |
| Over-Claims asserted for assets outside LBIE's control | 3.3 |

In a significant number of cases, LBIE has received multiple claims for the same Client Asset holdings leading to multiple restrictions on the release of these assets to valid claimants. Moreover, the vast majority of the Over-Claims appear to be for liabilities already recognised by LBIE, albeit with unsecured status, including claims for re-hypothecated assets.

During the period, our efforts to expedite the overall asset return programme have largely focused on the investigation and resolution of Over-Claims pertaining to Client Assets already within the Administrators' control. Of the c.£2.2bn of resolved Over-Claims in the period, c.£1.9bn relates to securities nominally under LBIE's control.

Formal claim rejection notices have been issued for those Over-Claims and the impacted assets have been recategorised as eligible for return to other clients, subject to certain other conditions also being met.

The Administrators continue to take a prudent approach to the remaining population of Over-Claims. To the extent that LBIE holds equivalent assets which are subject to unresolved Over-Claims, as a precaution these have been fully ring-fenced and have been excluded from the House Estate.

### Affiliate liens

As previously reported, the Administrators have received claims from Affiliates asserting liens over certain Client Assets. The total value of asserted Affiliate liens as at the date of this report is c.£0.5bn.

The Administrators have notified certain counterparties that their Client Asset claims may be affected by Affiliate liens. The Administrators encourage any such claimants who are affected in this way to contact the Affiliates concerned directly, in order to resolve the asserted indebtedness, release any liens and ultimately expedite the process of LBIE asset returns to them.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

## LBI – Omnibus Customer claim

The Administrators received the initial LBI Determination of the Omnibus Customer claim (the "Omnibus claim") on 16 September 2010. During the period since then the Client Assets team has continued to work with LBI to:

- reconcile the securities balances and pending trades in the LBI Determination to LBIE's records;

- respond to further information requests from LBI, particularly with reference to the LBIE Omnibus cash claim for which no determination has yet been received; and

- develop a joint action plan with LBI to improve the co-ordination between the LBI and LBIE estates and accelerate our joint progress in the first half of 2011.

Reflecting a commitment to continue to co-operate in the reconciliation of LBIE's Omnibus claim, LBIE has extended the deadline for objection to the LBI Determination until the end of June 2011.

Whilst progress has been made on securities reconciliations and the exchange of data between LBI and LBIE, LBI is not yet ready to engage with the Administrators on the core legal principles affecting the different components of the Omnibus claim. Separately, LBI has raised certain information requests relating to the level of financing that may have been provided by LBIE to the Omnibus clients pre-Administration. These requests have been made in the context of the cash determination which is still outstanding from LBI. LBIE has expressed to LBI the Administrators' concern that such requests will unnecessarily delay the overall claim determination and the claim reconciliation process and the response of LBI is awaited.

The Administrators continue to press LBI to open a substantive dialogue on legal principles as soon as possible, with a view to accelerating the overall timeframe for resolution of the Omnibus claim.

## LBIH

The Administrators submitted an updated claim to the Hong Kong liquidators to meet the LBIH bar date of 30 December 2010. Since then, LBIE has continued to work co-operatively with the liquidators to reconcile and generally progress the Client Asset claim, although the timing and quantum of the release of Client Assets remains uncertain.

### Challenges

Since the LBIE asset return programme commenced, significant progress has been made in returning assets to a large number of claimants. However, a number of important challenges remain. In order of significance these are:

- recovery of further assets is heavily dependent on the progress of Insolvent Affiliate estates outside LBIE's control – specifically LBI and LBHI;

- in many cases, LBIE is unable to return controlled assets because the net financial exposure to the underlying Client Asset claimants is dependent on the outcome of the Omnibus claim against LBI and is therefore uncertain;

- the Administrators need to decide by 30 June 2011 as to whether to object to the LBI Determination of the Omnibus claim;

- claims from Affiliates asserting liens over Client Assets remain outstanding and are only capable of being resolved directly between the impacted clients and Affiliates;

- levels of engagement from outstanding claimants are variable and in some cases this is expected to delay returns; and

- the profile of the remaining LBIE controlled Client Asset population is skewed towards much larger numbers of lower value holdings.

The above challenges mean that the timing of future material releases of Client Assets will fall increasingly outside the direct control of the Administrators, and quantification of any such remaining claims is uncertain.

# Section 7
# Client Money

### Highlights

- Permission to appeal the Appeal Court Judgment in relation to part of the Administration Client Money has been granted to GLG Investments Plc ("GLG"), refined to LBIE, and held over for the Administrators. The resulting UK Supreme Court hearing is scheduled for 31 October 2011.

- The urgent assessment to quantify potential Client Money protection entitlements and identify Client Money in non-segregated accounts has been significantly progressed. The Administrators are preparing to make an application for directions to the UK High Court regarding the Tracing principles to be applied;

- The Administrators have filed an appeal in the Frankfurt court in respect of the claim for the return of $1bn of Client Money from Bankhaus. On 10 December 2010, the Frankfurt court rejected Bankhaus' counterclaim made against LBIE (although this has been appealed).

- c.£2.4bn has been recovered into the post-Administration Client Money account to date, of which c.£1.5bn has already been returned to counterparties as part of settlement activities.

### Focus

As previously reported, the Appeal Court Judgment handed down in August 2010 created significant uncertainty around both the size of the Client Money pool and the number and identity of clients with entitlements to a share of the pool.

One consequence of the Appeal Court Judgment is that the Administrators are required to retrospectively evaluate possible Client Money entitlements that were not evident at the point of Administration and were not recognised as such in LBIE's books and records. In addition, all unsegregated Client Money (or its proceeds) held by LBIE must be identified by the Administrators and added to the pool. These are highly complex exercises.

The uncertainty that the Appeal Court Judgment creates has delayed distributions from the Client Money pool.

The focus of the Client Money team in the period has been on:

- a detailed impact assessment to analyse the potential quantum of identifiable Client Money held in non-segregated accounts;

- a high level risk-based contract review to determine whether previously unidentified clients have an entitlement to claim against the pool;

- preparation of an application to the High Court for directions on the nature and extent of the Tracing work that is required to trace Client Money (or its proceeds); and

- preparation of an application to the UK High Court for directions on the treatment of the costs associated with the Client Money pool.

The Administrators believe that the consequences of the Appeal Court Judgment were not intended by CASS and MiFID. As such, the Administrators sought permission to appeal the Appeal Court Judgment to the UK Supreme Court. GLG and LBI also sought leave to appeal.

The UK Supreme Court has granted leave to appeal to GLG, but refused LBI's appeal. The Administrators' appeal has been held over, for as long as this situation persists, LBIE remains a participant in the proceedings but is not an appellant. The UK Supreme Court hearing is scheduled for 31 October 2011. Judgment is not likely until 2012.

In parallel with making preparations for the UK Supreme Court hearing, LBIE continues to work on identifying unsegregated Client Money (or its proceeds) and counterparties who might have an entitlement to share in the Client Money pool. The Administrators' objective is to have conducted sufficient investigation and analysis, such that there will be as little further delay as reasonably possible to the distribution of Client Money, following receipt of the UK Supreme Court ruling.

The Administrators also continue to focus on the legal actions necessary (where appropriate) to recover pre-Administration Client Money deposits with third party institutions and Affiliates.

## Progress

The Administrators have made significant progress in the last six months in addressing the various complex issues raised by the Appeal Court Judgment.

## UK Supreme Court

The appeal to the UK Supreme Court has been set in motion. A four day UK Supreme Court hearing is scheduled to take place starting on 31 October 2011.

## Tracing

The Administrators expect to make an application for UK High Court directions regarding the Tracing principles imminently, and it is anticipated that the hearing will be in early 2012.

### Bank and transaction accounts

The Appeal Court Judgment held that identifiable Client Money in LBIE's non-segregated accounts should be added to the Client Money pool. As a result, the Administrators are working through an impact analysis of LBIE's entire bank and exchange transaction accounts to assess if any of them contained Client Money.

The analysis involves a review of c.800 bank accounts to assess vulnerability to Tracing. Transactions in these bank accounts are undergoing review, to establish whether client-related payments passed through the accounts.

Work is also underway to establish if Client Money (or proceeds) was held in various Exchange and Clearing House transaction accounts, which related to LBIE's futures and options business.

The results of these reviews will be used to develop an assessment of the potential identifiable Client Money in non-segregated accounts. Analysis is ongoing and has been developed using a methodology and Tracing principle that will be tested in the UK High Court.

### Liquidity management process

We have completed a high level review of the liquidity management process in operation pre-Administration. This process managed the movement of money around the Lehman organisation and understanding this process and these movements is a fundamental component of the Tracing exercise.

The results of these reviews have been discussed with counsel and form the basis of our application to the UK High Court for directions on the Tracing principles to be applied.

### Debtors

The Administrators have commenced a review of cash recovered from debtors post-Administration to determine the extent to which this may be subject to Tracing claims.

A process and methodology to review the recoveries has been developed and agreed with our legal advisers. If the recoveries are determined to be free from a Tracing claim, this will allow the funds to remain available to the House Estate.

### Entitlements

The Appeal Court Judgment held that any client with a contractual entitlement to Client Money protection should share in the Client Money pool. The Administrators and their legal advisers have completed a legal review of each standard trading contract type to determine which contract types may confer Client Money entitlement. This has involved a review of more than c.50 contract types in relation to c.3,700 clients. Work has also been undertaken on how these contract types relate to CASS.

### Cost application

Potential representative respondents to the Administrators' intended application to the UK High Court for directions on the treatment of costs incurred in managing the Client Money pool have been identified and have agreed to participate.

The Administrators are currently in discussions with the representative respondents regarding the most appropriate approach to the application. If a pragmatic approach can be agreed between the parties, the Administrators intend to launch the application imminently. A preliminary hearing is anticipated to take place in Q3 2011.

### Bankhaus

The Administrators have filed an appeal against the Frankfurt court's decision to dismiss LBIE's claim against Bankhaus. The appeal process is expected to take a number of months and will require additional submissions to court by LBIE and Bankhaus.

On 16 December 2010, the Frankfurt court dismissed the separate $1bn Bankhaus counterclaim against LBIE. The administrator of Bankhaus has appealed this judgment.

### LBJ/BarCap recovery

The previous progress report explained the uncertainty around whether c.$340m of LBIE Client Money was transferred to BarCap as part of the sale of LBI's business in September 2008. The Administrators have continued their dialogue with both LBI and BarCap in order to resolve the allocation of customer accounts and the associated Client Money.

Both BarCap and LBI agree that BarCap acquired the LBIE Client Money accounts.

The Administrators continue their efforts to recover the Client Money from BarCap and believe the recent US court ruling relating to the dispute between BarCap, LBI, LBHI and others, does not impact LBIE's position in respect of seeking the return of funds from BarCap.

### Korean recovery

At the time LBIE entered administration, the Korean regulator imposed a moratorium on LBIE's entry in Korea to prevent the Administrators repatriating c.$20m of Client Money to the UK. During the period, the Administrators have continued their dialogue with the Korean regulator, with the support of the FSA, with the aim of gaining recognition of the customer status of the money, to enable repatriation to the UK.

### Post-Administration Client Money

c.£2.4bn has been recovered in to the Administrators' post-Administration Client Money account as at 14 March 2011, with c.£13bn of post-Administration cash being returned to clients to date.

## Challenges

The Administrators continue to be unable to agree entitlements or make a distribution of pre-Administration Client Money for a significant period of time due to the impact of the Appeal Court Judgment. As a result, the quantification of any eventual shortfall giving rise to unsecured claims against the LBIE estate is uncertain.

The Administrators have faced significant challenges in responding to the Appeal Court Judgment, due to the lack of clarity around the potential application of the legal principles set out by it and the volume and complexity of data that needs to be investigated.

Over the next reporting period, the Administrators intend to:

- apply to the UK High Court for directions on Tracing Client Money;

- engage with a cross section of clients and Affiliates to better understand their view of their claim to having Client Money entitlements against the pool;

- conclude a client-by-client contract review to establish which clients may have a Client Money entitlement against the pool; and

- marry up any Client Money identified as a result of the Tracing work performed so far, to the entitlements identified through the contract review.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

23

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

26

25

## Section 8
## Unsecured creditors

### Highlights

- LBIE has started to issue claims determinations to financial trading creditors using the Consensual Approach, initially focusing on the largest, most complex creditors.
- As at 14 March 2011, aggregate LBIE Determinations of c.£1.1bn had been provided to some 100 Street Creditors, of which claims totalling c.£0.4bn (21 counterparties) had been formally agreed.
- Two additional large unsecured claims have been agreed with Trust Property claimants, totalling c.£0.3bn.
- Significant progress has been made on the reconciliation and valuation of creditors' positions, such that LBIE Determinations have been finalised (but not yet offered) for a further c.£1.6bn of claims (166 counterparties).
- Submissions of Proofs of Debt remain relatively slow. As at 14 March 2011, 1,600 unsecured creditors (excluding Affiliates) had submitted Proofs of Debt, out of an estimated population of c.5,800 counterparties.
- The bar date for lodging claims and the subsequent date for payment of a dividend (not more than two months thereafter) have been extended by two years, although the Administrators are seeking to shorten the timetable to continue to submit Proofs of Debt as soon as possible.

### Focus

A key priority for 2011 is to progress the reconciliation, valuation and determination of unsecured claims.

As at 14 March 2011, the current low case estimated value of LBIE's unsecured liabilities (excluding Affiliates' claims and Client Asset shortfalls) is c.£19.5bn, where provisions which take account of certain differences between LBIE's assessment of the liabilities and the amounts claimed by counterparties, as follows:

| Unsecured claimants | No. of claims | Indicative financial outcome (Low) £bn |
|---|---|---|
| Street Creditors | 3,712 | 8.6 |
| Client Asset claimants* | 771 | 5.5 |
| Financial trading counterparties | 4,483 | 14.1 |
| Non-financial trading counterparties | 1,313 | 0.4 |
| Total | 8,796 | 14.5 |

*This relates solely to estimated unsecured claims from counterparties with Client Assets and includes additional unsecured claims arising from Client Asset shortfalls.

The LBIE valuation used for the low case (indicative financial outcome above incorporates LBIE's current view of the valuation as at the termination date (before termination), or an estimate of the value as at 14 March 2011 in respect of any remaining open positions, together with provision to take account of certain claims which exceed LBIE valuations.

The high case valuation of financial creditors is currently estimated to be c.£12.1bn (a reduction of c.20%).

The overall number of creditors is estimated to be c.5,800, although this number will continue to change as LBIE engages further with the creditor population and undertakes additional analysis of its underlying books and records. The above analysis does not reflect any impact of the Appeal Court Judgment on the classification of LBIE's liabilities as either unsecured or entitled to Client Money protection (see Section 7 for further information).

During the past six months, the main focus of the unsecured creditors work stream has been the valuation and agreement of financial trading creditors' claims under the Consensual Approach described in the Administrators' previous progress report. The Consensual Approach is the preferred method for valuing and agreeing the Consensual Approach as a compelling legal or commercial reason to the contrary, it is the Administrators' current intention to deal with all Street Creditors under the Consensual Approach, before deploying resources to agree financial trading claims in any other way (such as via bilateral negotiation).

The Administrators are also considering how the Consensual Approach may be adapted to deal with the unsecured claims arising from other creditors, as well as Trust Property claimants.

Unsecured claims arising from Affiliates are dealt with separately; further information in this regard is provided in Section 5.

A more conventional claims agreement process may be adopted in respect of other third party creditors in due course, although this is not an area of focus at the present time in view of the fact that a first interim distribution is unlikely before 2012.

#### Progress

Since the last report, the Administrators have made significant progress in improving claims processing, enhancing LBIE's valuation methodologies and commencing the agreement of creditors' claims under the Consensual Approach. In addition, the Administrators obtained court approval to extend the claims bar date. Further detail on these areas is set out below.

#### Claims processing

During the period, key achievements in respect of claim reconciliation and valuation under the Consensual Approach include:

- extensive engagement with counterparties, notably in respect of the c.250 largest and most complex claims;
- completion of the initial reviews of contracts and termination notices for c.1,200 counterparties;
- completion of the review of prime brokerage contracts and assessment of the impact on c.700 Street Creditors;
- processing of c.1,300 amendments to LBIE's records to take account of changes in the trade population, claims assignments, agent/principal mapping issues and counterparty name changes;
- completion of substantially all of the trade population reconciliation in respect of LBIE's OTC derivative and financing counterparties that have submitted valuation statements; and

- further development of LBIE's valuation methodologies in order to derive LBIE's House view for c.£2.7bn of Street Creditors such that LBIE Determinations can be issued in due course (in the absence of specific legal, commercial or other reasons to the contrary).

#### Valuation methodologies

Over the last six months, LBIE's valuation methodologies have been improved in order to generate creditor valuations which are in line with market practice and are universally applied to LBIE's Street Creditor population.

Specific focus has been in respect of generating valuations across multiple asset classes, including OTC derivatives (credit, rates, foreign exchange and equity traded), securities financing, prime brokerage positions, exchange traded derivatives and failed trades.

LBIE's valuation methodologies and processes have undergone significant review and challenge to ensure that they are robust and reflect market practice. Additionally, data inputs have been reviewed to ensure where appropriate they are derived from market sources and/or are based on standard industry-recognised pricing models.

#### Claims agreement

#### LBIE Determination

In December 2010, LBIE formally commenced the unsecured creditor claims agreement process, with each determination being a single amount for each creditor which takes into account positions under all master agreements and other financial trading arrangements between that creditor and LBIE.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

27

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

28

In order to be eligible for receipt of a LBIE Determination, the Administrators require that the relevant creditor has submitted a Proof of Debt that is compliant with UK Insolvency Regulations. Certain creditors, however, are currently excluded from consideration under the Consensual Approach for payments of unliquidated amounts, such as assertion of non-mutual set-off against LBIE receivables that LBIE intends to challenge.

The communication of LBIE Determinations was initially on a trial basis, but has since broadened to the 250 largest or most complex eligible Street Creditor claims ("Tier 1"), and more recently, to smaller, less complex claims ("Tier 2").

**Claims Determination Deed**

Since the date of the Administrators' last progress report, LBIE has also developed a standardised legal or contractual mechanism (the "Deed"), which is designed to preserve a creditor's potential entitlements to Client Money, notwithstanding the agreement of a single claim figure in respect of its LBIE estate, potentially incorporating both unsecured and Client Money elements.

In recognition of creditors' desire for flexibility, the Administrators are free to accept such agreed claims without the need for LBIE's consent.

**Offers to creditors**

Any offer to a creditor under the Consensual Approach completes the issue of a Deed alongside the LBIE Determination. The offer is non-negotiable, but creditors are free to accept or reject it. Any creditors who choose not to accept the LBIE offer will have their claims reviewed in detail on a bilateral basis at a later date. Only four creditors (totalling £34m) to whom offers have been made have formally notified LBIE of their rejection.

The table below summarises the progress made in the past six months with respect to agreement of claims:

| Unsecured claimants[1] | Total population[3] | | Offers made[2] | | Claims agreed[2] | |
|---|---|---|---|---|---|---|
| | No. | £bn | No. | £bn | No. | £bn |
| Tier 1 | 242 | 5.8 | 78 | 1.1 | 21 | 0.4 |
| Tier 2 | 3,470 | 2.8 | 8 | - | 8 | - |
| Total | 3,712 | 8.6 | 86 | 1.1 | 21 | 0.4 |
| Client Asset claimants | 771 | 5.5 | 2 | 0.3 | 2 | 0.3 |
| Total | 4,483 | 14.1 | 88 | 1.4 | 23 | 0.7 |

* The value of the total population is after including provisions for claims in excess of LBIE's valuations. In the majority of cases, offers made represent LBIE valuations without additional provisions.

As shown, in addition to the c.£0.4bn of claims agreed with Street Creditors, a further c.£0.3bn has been agreed in respect of the unsecured components of the Trust Property claimants, agreed as part of asset returns in late 2010.

Claims agreed above predominantly relate to claims agreed in quantum but not yet submitted to the Court, and due in due course, owing to the uncertainty as to Client Money entitlements caused by the Appeal Court Judgment.

**Extension of claims bar date**

In December 2010, the Administrators applied to the UK High Court to extend the date by which claims must be lodged, and the subsequent date for making a distribution, by two years, due to the impact of the Appeal Court Judgment with respect to Client Money, as set out in the progress report dated 14 October 2010. The Administrators' request was granted by the court, such that the current date by which claims must be lodged is 31 December 2012 (with the latest date for payment of a distribution being 28 February 2013).

**Challenges**

**Limited number of Proof of Debt submissions**

UK insolvency legislation requires any creditor waiting to claim against an insolvent estate to submit its claim in the form of a compliant Proof of Debt in order that their position can be considered for agreement and admission for dividend purposes.

During the past six months, a further 813 Proofs of Debt have been received by the Administrators via the online LBIE Creditors' Portal launched in July 2010.

As at 14 March 2011, the number and value of known claims submitted (excluding Affiliates) were as follows:

| Unsecured claimants | No. of claims | Claims £bn |
|---|---|---|
| Street Creditors | 1,301 | 7.4 |
| Client Asset claimants | 70 | 1.2 |
| Other third party | 249 | 0.1 |
| Total | 1,620 | 8.7 |

The above summary is after an initial review of claims and the removal of duplicate records (including, non-LBIE counterparties, Client Money-only claimants and other non-compliant claims.)

Given that the overall number of unsecured creditors is estimated to be up to c.5,800, it appears that a significant number of potential creditors are yet to submit Proofs of Debt. This is likely to impair progress of the unsecured creditors work stream and LBIE's ability to complete the reconciliation and valuation of claims depends on the receipt of these.

The Administrators continue to encourage creditors to submit their Proofs of Debt (accompanied by supporting valuation statements as appropriate) as soon as possible in order that they can be considered by the unsecured creditors work stream.

**Assignments**

Assignment of creditor claims (in full or in part) continues to progress, as resources are then focused on determining what specifically has been assigned and ensuring that LBIE's records accurately reflect this. Given that there have been c.600 assignments to date, LBIE has focused on improving the rigour and automation of the assignment process.

**Client Money**

As highlighted in the previous progress report, a major consequence of the Appeal Court Judgment is that the Administrators are currently unable to determine definitively which liabilities constitute unsecured claims and which are entitled to Client Money protection. Given that this distinction does not impact a creditor's overall claim, the Administrators have largely progressed with the agreement of total claim amounts, preserving potential Client Money entitlements by way of language included in the Deed, as outlined above.

However, as work continues in assessing the risks and implications of the Appeal Court Judgment, the Administrators will increasingly seek to admit more unsecured claims, as opposed to merely agreeing the quantum of a creditor's claim. This approach will extinguish any potential Client Money rights, and ahead of the UK Supreme Court judgment will therefore only be adopted where the Administrators consider it appropriate to do so, and where the counterparty provides its consent.

**Complexities of creditor positions**

Whilst the Consensual Approach was developed in order to accelerate the agreement of unsecured claims, the Administrators are aware that, given the complexities of LBIE's counterparty positions, certain creditors may choose to reject the offer and have their claims reviewed in detail on a bilateral basis at a later date.

In such cases, it is likely that substantial further documentation will be required to support the claims of such creditors and agree the amounts to be admitted (for dividend purposes). Depending on the complexities of individual creditor claims and the number of claims that may opt for this route, any claims dealt with via a bilateral approach may take a significant amount of time to conclude and, in exceptional cases, may require court adjudication. In any event, it is likely that this process would continue well beyond the first unsecured distribution date and so the Administrators intend to prudently reserve for such claims at the relevant point in time.

Joint Administrators' progress report for the period 16 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

# Section 9
Statutory and other information

## Statutory information

| | |
|---|---|
| Court details for the Administration: | High Court of Justice, Chancery Division, Companies Court. Court case number 7942 of 2008. |
| Full name: | Lehman Brothers International (Europe) |
| Trading name: | Lehman Brothers International (Europe) |
| Registered number: | 02538254 |
| Registered address: | Level 23, 25 Canada Square, London E14 5LQ |
| Date of the Administration appointment: | 15 September 2008 |
| Administrators' names and addresses: | AV Lomas, SA Pearson, DY Schwarzmann, MJA Jervis (all appointed 15 September 2008) and DA Howell (appointed 30 November 2009) of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT. |
| Appointor's name and address: | High Court of Justice, Chancery Division, Companies Court on the application of LBIE's directors. |
| Objective being pursued by the Administrators: | Achieving a better result for LBIE's creditors as a whole than would be likely if LBIE were wound up (without first being in Administration). |
| Division of the Administrators' responsibilities: | In relation to paragraph 100(2) of Schedule B1 to the Insolvency Act, during the period for which the Administration is in force, any act required or authorised under any enactment to be done by either or all of the Joint Administrators may be done by any or one or more of the persons for the time being holding that office. |
| Details of any extensions for the initial period of appointment: | The court has granted an extension of the Administration to 30 November 2011. |
| Proposed end of the Administration: | The Administrators have yet to determine the most appropriate exit route due to material uncertainties highlighted in the report. A further extension to the Administration is expected to be required. |
| Estimated dividend for unsecured creditors: | The Administrators are unable to provide an estimate at this time due to material uncertainties regarding the quantum of asset recoveries and the level of unsecured creditors' claims. |
| Estimated values of the prescribed part and LBIE's net property: | The estimated value of LBIE's net property is uncertain, but is expected to exceed the maximum threshold for the prescribed part. Accordingly, the value of the prescribed part is estimated at £600,000. |
| Whether and why the Administrators intend to apply to court under Section 176A(5) of the Insolvency Act: | Such an application is considered unlikely. |
| The European Regulation on Insolvency Proceedings (Council Regulation (EC) No. 1346/2000 of 29 May 2000): | The European Regulation on Insolvency Proceedings does not apply to this Administration as LBIE is an investment undertaking. |

# Other statutory matters

## Change to the constitution of the Committee

The members of the Committee at 15 September 2010 consisted of:

1. Lehman Commercial Paper Inc.

2. Ramius Credit Opportunities Master Fund Limited

3. GLG European Long Short Fund

4. Oceanwood Global Opportunities Master Fund

5. Société Générale

During the period, Oceanwood Global Opportunities Master Fund resigned from the Committee.

---

# Administrators' remuneration

## Background

Creditors are referred to previous progress reports for detailed information regarding the statutory framework for the approval of the Administrators' remuneration and the review process undertaken by the Committee.

The Administrators continue to provide the Committee and its adviser (the "Adviser") with detailed information relating to their requested remuneration in accordance with Statement of Insolvency Practice No.9 ("SIP 9").

Up until 31 December 2010, approval of remuneration by the Committee has been sought on a quarterly basis, in order to reduce the complexity and cost of collation of data. Time costs for the period to 31 December 2010 have been provided to and approved by the Committee.

## Resolutions of the Creditors' Committee

In the period since our last report, the Committee has approved a further £65,331,556 of time costs, totalling 213,264 hours at an average hourly rate of £306 (previously reported £302) relating to work done in the period 1 July 2010 to 31 December 2010.

The Committee has also approved remuneration arrangements for 2011 which require that in consideration of a significant proportion of the Administrators' requested time costs in the year will be deferred until early 2012, in order that the Committee can judge the Administrators' performance against medium-term as well as short-term objectives.

## Analysis of time costs

The flexible resourcing model, utilising combined teams of PwC, Lehman and contract staff, enables the Administrators to deal with the changing demands of the Administration, effectively and efficiently, ensuring that maximum possible progress is made in all work streams. The cost-effective balance of resources between these three pools is a matter which is monitored by the Creditors' Committee when considering the appropriateness of the Administrators' remuneration requests.

It is anticipated that the Administrators' time costs for Q1 2011 will increase compared with Q4 2010 as additional PwC staffing has been required to support:

- the claims agreement process;

- the Client Money Tracing and entitlements investigations; and

- the Affiliate team in supplementing the claims and reconciliation efforts.

## Additional analysis of Administrators' remuneration

The table below provides an analysis of the total hours and cost by grade for the remuneration resolutions approved by the Committee in respect of the period 1 July 2010 to 31 December 2010.

| Grade | Period 1 July 2010 to 31 December 2010 Hours | £'000s | Total from 15 December 2008 to 31 December 2010 £'000s |
|---|---|---|---|
| Partner | 9,595 | 6,538 | 35,889 |
| Director | 10,193 | 6,050 | 35,552 |
| Senior Manager | 33,995 | 14,295 | 74,606 |
| Manager | 51,032 | 17,090 | 72,129 |
| Senior Associate | 76,644 | 16,575 | 79,314 |
| Associate | 31,935 | 4,773 | 24,932 |
| Total | 213,394 | 65,321 | 322,422 |

The following table provides a further analysis of the total hours and costs incurred by activity.

| | | Period 1 July 2010 to 31 December 2010 Hours | £'000s | Total from 15 December 2008 to 31 December 2010 £'000s |
|---|---|---|---|---|
| Counterparties | Street | 21,144 | 8,100 | 59,358 |
| | Trust | 49,676 | 18,263 | 58,660* |
| | Affiliates | 11,244 | 3,723 | 8,042 |
| | Valuation Governance | 10,342 | 3,053 | 5,192* |
| | Branches | 5,819 | 1,597 | 16,476 |
| Middle Office | Middle Office | 12,099 | 3,181 | 14,531 |
| | Transaction Processing and Control | 26,809 | 7,775 | 35,713 |
| COO | Operations | 16,067 | 5,762 | 33,843 |
| | Functions | 1,483 | 727 | 5,317 |
| | Regulatory & Compliance | 1,206 | 449 | 3,825 |
| | LBL Recharges (see overleaf) | 44,800 | 13,592 | 74,252 |
| Insolvency specific | Insolvency specific | 7,292 | 2,330 | 4,182 |
| | Forensic Investigations | 5,293 | 1,379 | 3,031 |
| Total | | 213,394 | 65,321 | 322,422 |

* Reclassification of £14.3m from Valuation Governance to Trust relating to prior periods.

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

35

| LBL Recharges | Period 1 July 2010 to 31 December 2010 Hours | £'000s |
|---|---|---|
| Employees | 2,457 | 1,155 |
| Estate accounting | 1,875 | 586 |
| Group services management | 7,599 | 2,223 |
| Information Technology ("IT")* | 28,420 | 6,013 |
| Intercompany | 79 | 20 |
| Interdependencies | 1,661 | 681 |
| Property issues | 2,709 | 914 |
| Total | 44,800 | 13,592 |

* Time spent relating to IT matters included activities in the following subsidiary work streams:

- governance – strategic roadmap for systems development, programmes of work to validate and protect the long-term data needs of LBIE, and negotiation of the IT infrastructure outsourcing contract;

- application development – delivery of important new core applications and changes to existing applications to enable the progress of the Administration (e.g. pre-Administration Client Money, stock record system, old forward balance sheet);

- systems separation and independence – a significant change programme providing full independence of service provision from BarCap and Nomura was completed in the period, with separation of data from Nomura following cessation of the shared infrastructure;

- security – managing and maintaining a stable and secure IT environment, including cataloguing of the most critical data sources to enable the data to be procured in a single location; and

- TSA management – TSAs related to BarCap and Nomura were concluded ahead of schedule, resulting in annual cost savings of c.£15m.

The current Lehman headcount of 495 includes a 164 dedicated to IT, working together with the PwC specialists across each of these subsidiary work streams.

# Appendices

## Appendix A:
### Glossary of terms

| Abbreviation | Term | Definition |
|---|---|---|
| AAA | AAA | The highest credit rating given by the two main US rating agencies, Standard & Poor's and Moody's |
| Administration | Administration | UK corporate insolvency process governed by the Insolvency Act 1986 |
| Administrators | Joint Administrators | AV Lomas, SA Pearson, DY Schwarzmann, and MJA Jervis were appointed as Joint Administrators of LBIE on 15 September 2008. DA Howell was appointed on 30 November 2009. All are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales and are partners of PricewaterhouseCoopers LLP |
| Adviser | Adviser | An adviser retained to assist the Committee in considering the Administrators' remuneration requests |
| Affiliate Claims Portal | Affiliate Claims Portal | A secure, structured framework for Affiliates to electronically submit details of their claims against LBIE accessible through the CIP |
| Affiliates | Affiliate entities | Various subsidiaries and affiliates of Lehman Brothers Holdings, Inc |
| Appeal Court Judgment | Pre-Administration Client Money Appeal Judgment | Judgment handed down by the Court of Appeal on 2 August 2010 which overturned a previous judgment regarding the composition of the Client Money pool and Client Money claimants |
| Bankhaus (also referred to as LBB) | Lehman Brothers Bankhaus A.G. | Affiliate entity subject to insolvency proceedings in Germany |
| BarCap | Barclays Capital, Inc. | Investment banking business of Barclays Bank PLC |
| BTB | Back-to-Back derivative side-letters | Intercompany derivative side-letters which provide hedges to LBIE |
| CAN | Claim Agreement Notice | Notices issued by the Administrators to CPA signatories confirming an asset entitlement at a security level |
| CASS | Client Asset Sourcebook | Requirements issued by the Financial Services Authority relating to holding of Client Assets and Client Money |
| CIP | Client Information Portal | A secure, structured framework that provides access for counterparties to relevant LBIE sub portals (Affiliate Claims Portal and LBIE Creditors Portal). Access is provided by a unique user name and password only |
| Client Assets | Client Assets | Client securities which LBIE should have held as at 15 September 2008 |
| Client Money | Client Money | Client cash balances managed by LBIE pursuant to the UK FSA's Client Money Rules as at 15 September 2008 |

36
Lehman Brothers International (Europe) – In Administration
Your attention is drawn to the important notice on page 1

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1
37

| Abbreviation | Term | Definition |
|---|---|---|
| Committee | Creditors' Committee | Creditors voted to represent the general body of creditors of LBIE to assist the Administrators in discharging their functions set out in the Insolvency Act 1986 |
| Consensual Approach | Consensual Approach | A framework developed for the expedient resolution of the claims of financial trading counterparties without Client Assets |
| COO | Chief Operating Officers | Responsible for managing the operations of the organisation, allocating resources and supporting the other teams within the operating model |
| CRA | Claim Resolution Agreement | An innovative and practical claim resolution framework which governs the return of Client Assets. The CRA was proposed by the Administrators to clients in November 2009 and was accepted by over 90% of eligible Client Asset claimants |
| Customer Property as defined in SIPA | Customer Property as defined in SIPA | A combination of claims to securities and certain cash amounts relating to securities, as defined in SIPA |
| Deed | Claims Determination Deed | A standardised legal document for agreeing claims under the Consensual Approach |
| Extended Liens | Extended Liens | Assertion by certain Affiliate claimants to benefit from the rights conferred on LBIE to assert lien and other security entitlements over securities held by LBIE on behalf of other Affiliates, in order for the Affiliate claimants to reduce debts owed to them by other Affiliates |
| Financial Support Direction | Financial Support Direction | Direction determined by the Pensions Regulator requiring financial support to be put in place for the purpose of maintaining the solvency of a defined benefit schema in accordance with the Pensions Act 2004 |
| FSA | Financial Services Authority | Regulator of all providers of financial services in the UK |
| General Estate | General Estate as defined in SIPA | Claims to a certain pool of assets available to satisfy general non-Customer Property creditors' claims, including any potential deficiencies in Customer Property claims |
| Guarantees | LBHI Guarantees | Various forms of guarantees provided by LBHI relating to, inter alia, contracts and financing transactions, derivative contracts and other payment performance guarantees |
| HMRC | Her Majesty's Revenue & Customs | Organisation of the British Government primarily responsible for the collection of taxes |
| House Customer claim (also referred to as the House claim) | House Customer claim | Element of LBI SIPA Customer claim relating to LBIE House positions |

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

39

| Abbreviation | Term | Definition |
|---|---|---|
| House or House Estate | House or House Estate | Dealings that relate to LBIE's general unsecured estate |
| IMA | Interim Management Agreement | Agreement between LBIE and certain Affiliates regarding the management of securities over which uncertainty of ownership exists |
| Insolvency Act | Insolvency Act 1986 | Statutory legislation that provides the legal platform for matters relating to personal and corporate insolvency in the UK |
| Insolvency Rules | Insolvency Rules 1986 | Statutory rules that provide the legal platform for matters relating to personal and corporate insolvency in the UK |
| LB Lux | Lehman Brothers (Luxembourg) S.A. | Affiliate entity subject to insolvency proceedings in Luxembourg |
| LBCC | Lehman Brothers Commercial Corporation | Affiliate entity subject to insolvency proceedings in the US |
| LBF | Lehman Brothers Finance S.A. (Switzerland) | Affiliate entity subject to insolvency proceedings in Switzerland |
| LBHI | Lehman Brothers Holdings, Inc | Ultimate parent of the Lehman group, incorporated in the US and subject to Chapter 11 bankruptcy protection on 15 September 2008 |
| LBHK | Lehman Brothers Hong Kong | Collective group of affiliate entities subject to insolvency proceedings in Hong Kong |
| LBI | Lehman Brothers, Inc | LBI broker-dealer affiliate entity, incorporated in the US which entered SIPA trusteeship on 19 September 2008 |
| LBI Determination | Letters of Determination | Letters of Determination issued on 16 September 2010 in respect of LBIE's House and Omnibus Customer claims against LBI |
| LBIE (also referred to as the Company) | Lehman Brothers International (Europe) – In Administration | Private unlimited UK subsidiary of LBHI, acting as its main European broker-dealer, subject to an administration order dated 15 September 2008 |
| LBIE Creditors Portal | LBIE Creditors Portal, previously referred to in earlier progress reports as Claims Portal | A secure, structured framework for counterparties to submit details of their unsecured claims against LBIE accessible through the CIP |
| LBIE Determination | LBIE Determination | Agreement of eligible claims using a value determined by LBIE, derived from LBIE's own valuation methodology |
| LBJ | Lehman Brothers Japan KK | Affiliate entity subject to insolvency proceedings in Japan |
| LBL | Lehman Brothers Limited | UK service entity for the Lehman Administration Companies. LBL was placed into Administration on 15 September 2008 |

| Abbreviation | Term | Definition |
|---|---|---|
| LBSF | Lehman Brothers Special Financing, Inc | Affiliate entity subject to insolvency proceedings in the US |
| MiFID | Markets in Financial Instruments Directive | EU Directive setting out basic high-level provisions governing the internal organisational and conduct of business requirements for investment service firms |
| MTM | Mark-to-market | Recording the price or value of a security, portfolio or account at current market value |
| Nomura | Nomura Holdings, Inc | An investment and financial services business. LBIE's equities business was acquired by Nomura shortly after the Administrators' appointment |
| Notice of Proposed Distribution | Notice of Proposed Distribution | A formal notice by the Administrators issued to creditors pursuant to Rule 2.95 of the Insolvency Rules 1986, specifying the last date creditors may prove claims |
| Omnibus Customer claim (also referred to as the Omnibus claim) | Omnibus Customer claim | Element of LBI SIPA Customer claim relating to LBIE Client positions |
| OTC | Over-the-counter | A market in which securities, or other financial products, are traded by direct dealer-to-dealer communications |
| Over-Claims | Over-Claims | Proprietary claims made for or in respect of securities in an amount which exceeds the amount which appears as the client entitlement to securities of that type as documented in LBIE's books and records |
| Plan of Reorganization | Plan of Reorganization | Document filed by LBHI and its US debtor affiliates with the US bankruptcy court, proposing an economic solution for creditors designed to achieve resolution of the Chapter 11 proceedings |
| Proof of Debt or Statement of Claim | Proof of Debt | A formal document prescribed by the Insolvency Rules 1986 submitted to the Administrators by a creditor wishing to prove their claim. The form is made in writing or electronically under the responsibility of a creditor and signed by an authorised person |
| RASCALS | Regulation and Administration of Sale and Custody and Local Settlement | A series of securities finance transactions between LBIE and certain Affiliates as recorded in Lehman books and records |
| Revised SoA | Revised SoA | Position reflecting certain revisions to the SoA figures filed in July 2009 driven by information and facts arising since the filing of the SoA, as amended from time to time |
| SIP 9 | Statement of Insolvency Practice 9 | Rules issued by the Joint Insolvency Committee which provide guidance to insolvency practitioners and creditors' committees in relation to the remuneration of, inter alia, administrators |

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011
Your attention is drawn to the important notice on page 1

41

| Abbreviation | Term | Definition |
|---|---|---|
| SIPA | Securities Investor Protection Act 1970 | A US legal proceeding for handling the liquidation of a broker-dealer |
| SoA | Statement of Affairs | Statutory document which company directors are bound to submit to the insolvency office holders, in accordance with the Insolvency Act 1986 which sets out the financial position of a company as at the date of insolvency |
| Street | Street counterparties | Third party counterparties consisting of financial institutions, including asset managers, custodians and banks, and non-banking financial institutions, including pension funds and corporate entities |
| Street Creditors | Street Creditors | Creditors with financial trading claims without Client Assets |
| Tracing | Tracing | Identification of unsegregated Client Money |
| Trust Estate | Trust Estate | Refers to both Client Assets and Client Money |
| Trust Property | Trust Property | Refers to both Client Assets and Client Money |
| TSA | Transitional Services Agreement | Service agreements between LBIE and various entities for the provision of certain services |
| UK Affiliates | Lehman Administration Companies | UK Lehman entities in Administration |
| UK Appeal Court | Appeal Court of England and Wales | The second most senior court in the English legal system (for civil cases. Permission to appeal is required, either from the lower court or the Court of Appeal itself |
| UK High Court | High Court of England and Wales | Court of England and Wales which deals with all High value and high importance cases, and also has a supervisory jurisdiction over all subordinate courts |
| UK Supreme Court | Supreme Court of the United Kingdom | This is the court of last resort and highest appellate court in the United Kingdom for civil cases |
| VAT | Value Added Tax | A consumption tax levied on the sale of goods and services in the UK |

# Appendix B:
## Receipts and payments: six months to 14 March 2011

### House receipts and payments: six months to 14 March 2011

| | Notes | GBP £m | EUR €m | USD $m | Various currencies £m | Total (GBP equivalent) at 14 March 2011 £m |
|---|---|---|---|---|---|---|
| **Receipts** | | | | | | |
| Counterparties | 1 | 83 | 182 | 489 | | 530 |
| Depot securities | 2 | 160 | 130 | 336 | 455 | 906* |
| Client Monies for onward distribution | 3 | 3 | 18 | 29 | 8 | 48 |
| Other income | 4 | 98 | 34 | 6 | 12 | 95 |
| **Total Receipts for the period** | | 284 | 364 | 870 | 475 | 1,607 |
| **Payments** | | | | | | |
| Payroll and employee costs | 5 | (41) | (9) | (3) | | (51) |
| Administrators' remuneration and expenses | 6 | (64) | | | | (66) |
| Building and occupancy costs | 7 | (28) | (1) | (7) | | (33) |
| Legal costs | 8 | (29) | | (9) | | (38) |
| Other payments | 9 | (35) | (4) | (2) | (12) | (51) |
| Distribution of Client Monies | 10 | (3) | (16) | (29) | (8) | (46) |
| **Total Payments for the period** | | (202) | (32) | (50) | (20) | (282) |
| Net movement in the period | | 82 | 322 | 820 | 455 | 1,325 |
| Balance at bank as at 14 September 2010 as previously reported | | 4,814 | 2,544 | | 52* | 8,122* |
| Net inter-currency transfers for six month period to 14 March 2011 | | 71 | (6) | 286 | (245) | (1) |
| **Total balances as at 14 March 2011** | 11 | 4,967 | 2,861 | 2,797* | 262 | 9,446 |
| Add: Treasury investments (at par) | | | | | | 77 |
| Less: Funds arising from securities with potential third party claims | | | | | | (1,559) |
| **Total cash and bonds (see Section 3)** | | | | | | 7,964 |

* balances for 'Various currencies' and 'GBP equivalent' above are translated as at 14 March 2011. Balances under £53m and £8,045m respectively had they been translated using 14 September 2010 exchange rates.

** Includes £53m of funds arising from sale of securities to which Affiliates and third parties have asserted claims in the six months to 14 March 2011.

### Notes to the House receipts and payments accounts

**General**

The transactions in the period are reported to creditors on a cash receipts and payments basis in accordance with the Insolvency Act and Insolvency Rules. With the exceptions of accruals for interest earned (note 4) and LBIE branch payroll costs for prior period (note 5), the statements in this section reflect transactions completed in the period, in cleared funds, in accounts established and controlled by the Administrators.

Separate accounts are held for handling realisations from House assets and Client Assets.

**1. Counterparty receipts**

Recoveries of c.£0.5bn achieved in the period relate to financing, prime brokerage and OTC derivatives.

**2. Depot security sales and related income**

Realisations of c.£0.9bn relate to the disposal or redemptions of securities and derived income on depot holdings.

**3. Client Monies for onward distribution**

Under some client agreements, certain Trust Property is transferred from the client account to a special purpose vehicle ("SPV"). Under a separate agreement, funds are transferred from the SPV to the House account. The House makes a separate payment to the client to give value for its Trust Property under the client agreements (see note 10).

**4. Other income**

Other income includes:

• c.£32m of corporation tax repayments received in the period. LBIE continues to actively pursue the remainder of the c.£150m of refunds from HMRC relating to group loss surrenders for 2004 to 2007. This follows agreement of the Group Payment Arrangement between UK Lehman entities. HMRC has also agreed in principle to the repayment of c.£33m of income tax due in respect of tax suffered on certain structured transactions. Dialogue continues with HMRC, but the timing and quantum of further repayments is uncertain;

• c.£25m ring-fenced in House account, which have been repatriated or redirected after investigation;

• c.£17m of bank and bond interest;

• c.£9m recovered from a pre-Administration bank account;

• c.£5m of other receipts and items under investigation as at 14 March 2011;

• c.£3m retained from Client Asset returns as a contribution towards costs; and

• c.£4m of other realisations.

**5. Payroll and employee costs**

During the period, previously unreported payroll costs of c.£5m for prior periods relating to overseas branches were recognised.

**6. Administrators' remuneration and expenses**

Payments include remuneration and expenses paid in accordance with the Insolvency Rules and SIP 9 detailed in Section 9.

**7. Building and occupancy costs**

This reflects occupancy and infrastructure costs, primarily related to the offices currently occupied by LBIE at Canary Wharf.

## 8. Legal costs

International legal advisers' costs relate to advice given and litigation conducted, in connection with various complex issues across the Administration, including Client Monies, Affiliates and Trust Asset matters.

Over 30 law firms are retained in various capacities and in various geographies.

## 9. Other payments

Include the following:

- c.£24m of repatriated or redirected funds to which were mistakenly paid into House accounts (see other income);
- c.£19m of VAT paid on invoices; and
- c.£6m of other sundry payments.

## 10. Distribution of Client Monies

Relates to returns to clients under the Trust Property return scheme (see note 3 above).

## 11. Investment profile

| | Notes | GBP equivalent £m |
|---|---|---|
| House Estate | | |
| Short-term deposits | 1, 2 | 4,264 |
| Interest bearing accounts | | 94 |
| AAA government bonds – short dated | 3 | 5,088 |
| Total | | 9,446 |

1. Average rate of return for six months ending 14 March 2011 of EUR 0.39%, GBP 0.39% and USD 0.17%.
2. LBIE currently has investment mandates with 15 banks.
3. Managed by four independent fund managers.

## Client Monies receipts and payments: six months to 14 March 2011

| | GBP £m | EUR £m | USD $m | Various currencies £m | Total (GBP equivalent) at 14 March 2011: £m |
|---|---|---|---|---|---|
| Receipts | | | | | |
| Pre-Administration Client Monies | - | - | 1 | - | 1 |
| Redemptions, coupons, dividends and Investment Income | 8 | 18 | 177 | 65 | 199 |
| Total Receipts for the period | 8 | 18 | 178 | 65 | 200 |
| Payments | | | | | |
| Return of collateral | (12) | (43) | (3) | - | (51) |
| Transfers to clients | (3) | (18) | (31) | (8) | (47) |
| Total Payments for the period | (15) | (61) | (34) | (8) | (98) |
| Net movement in the period | (7) | (43) | 144 | 57 | 102 |
| Balance at bank as at 14 September 2010 as previously reported | 106 | 347 | 1,136 | 237* | 1,349* |
| Total balances as at 14 March 2011 | 99 | 304 | 1,280 | 294 | 1,451 |

* balances for "Various currencies" and "GBP equivalent" above are restated as at 14 March 2011. Balances would have been £233m and £1,360m respectively had they been translated using 14 September 2010 exchange rates.

Investment profile

| | Notes | GBP equivalent £m |
|---|---|---|
| Trust Estate | | |
| Short-term deposits | 1, 2 | 1,258 |
| Interest bearing accounts | 2 | 193 |
| Total | | 1,451 |

1. LBIE currently has investment mandates with 12 banks.
2. Client monies are held in original currencies, the majority being USD.

# Appendix C:
## LBIE contact details

| | |
|---|---|
| General queries | generalqueries@lbia-eu.com |
| Employee claims queries | LBIEHRqueries@lbia-eu.com |
| Counterparty contact information | |
| Counterparty contact* | counterpartycontacts@lbia-eu.com |
| Termination notices and valuation statements | unsecuredcreditors@lbia-eu.com |
| Unsecured creditors queries | unsecuredcreditors@lbia-eu.com |
| LBIE Creditors Portal access requests | logons@lbia-eu.com |
| Trust Property claimants | |
| Client Assets (CRA signatories and Non-CRA clients) | claimresolutionagreement@lbia-eu.com |
| Client Money | clientpositionresponses@lbia-eu.com |

* Email is still the preferred method of communication and remains the most efficient manner to contact counterparties in terms of both time and accuracy. If you have not provided your email address, it is essential that you do so as soon as possible.

# Appendix D:
## Court update

Below is a summary of the major court proceedings that LBIE expects to be involved in through 2011.

| Period | Court | Event |
|---|---|---|
| Q2 2011 | UK High Court | BTB application launch |
| | | Client Money Trading application launch |
| | | Extended Liens application launch |
| | Luxembourg Court | Affiliate claims interim hearing |
| | German Court | Client Money interim hearing |
| | US Bankruptcy Court | LBI Determination objection deadline |
| Q3 2011 | UK High Court | Extended Liens application directions hearing |
| | UK Appeal Court | Pension fund deficit substantive hearing |
| Q4 2011 | UK High Court | BTB derivative side-letters substantive hearing |
| | UK Appeal Court | RASCALS appeal substantive hearing |
| | | ISDA s2(a)(iii) derivatives appeal substantive hearing |
| | UK Supreme Court | Client Money substantive hearing |
| | US Bankruptcy Court | LBIE current proposal for confirmation hearing of Debtor Plan of Reorganization |
| Q1 2012 | UK High Court | Extended Liens application substantive hearing |