## Exhibit A

**(Swap Agreement)**

(Multicurrency-Cross Border)

# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of July 23, 2007

**LEHMAN BROTHERS**                  and                  **BH FINANCE LLC**
**SPECIAL FINANCING INC.**

have entered and/or anticipate entering into one or more transactions (each a Transaction) that are or will be governed by this Master Agreement, which includes the schedule (the Schedule), and the documents and other confirming evidence (each a Confirmation) exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purposes of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this Agreement), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)   *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)   *Netting*. If on any date amounts would otherwise be payable:—

    (i)   in the same currency; and

    (ii)   in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)   *Deduction or Withholding for Tax.*

    (i)   *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

**ISDA® 1992**

(ii) *Liability*. If: —

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e) *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

### 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a) *Basic Representations*.

(i) *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii) *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

**ISDA® 1992**

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

    (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

    (ii)    any other documents specified in the Schedule or any Confirmation; and

    (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.      Events of Default and Termination Events**

(a)      *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

>    (i)    *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

>    (ii)    *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

>    (iii)    *Credit Support Default*.

>>    (1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

>>    (2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

>>    (3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

>    (iv)    *Misrepresentation*. A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

>    (v)    *Default under Specified Transaction*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

>    (vi)    *Cross Default*. If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

**ISDA® 1992**

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

                               **ISDA® 1992**

**6.   Early Termination**

(a)   *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event*.

(i)   *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)   *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)   *Right to Terminate*. If: —

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

**ISDA® 1992**

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)  *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

**ISDA® 1992**

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*.  If the Early Termination Date results from a Termination Event: —

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties: —

(A)  if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

10

ISDA® 1992

**7.      Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.      Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

**9.     Miscellaneous**

(a)     *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes  all oral communication and prior writings with respect thereto.

(b)     *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)     *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)     *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)     *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)     *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)     *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.     Offices; Multibranch Parties**

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)     Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)     If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.     Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

**ISDA® 1992**

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)    if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)    if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

**ISDA® 1992**

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

**ISDA® 1992**

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **BH FINANCE LLC** |
|---|---|
| *(Name of Party)* | *(Name of Party)* |

By: _____

Name:

Title:        Allyson M. Carine

Date:        Authorized Signatory

By: _____

Name: MARC D CHAMPURL

Title: President

Date:

(Multicurrency-Cross Border)

**SCHEDULE**
to the
**Master Agreement**
dated as of July 23, 2007
between
**LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**BH FINANCE LLC** ("Party B"),
a limited liability company organized under the laws of
the State of Nebraska

**Part 1: Termination Provisions**

In this Agreement:

(a)     **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)     **"Specified Transaction"** will have the meaning specified in Section 14 of this Agreement.

(c)     The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in Section 14 of this Agreement.

**"Threshold Amount"** means (i) USD 75 million in the case of Party A and any Credit Support Provider of Party A (or its equivalent in any other currency) and (ii) USD 75 million in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency).

(d)     The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv) will not apply to Party A or Party B.

(e)     The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)     **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement, Loss and the Second Method will apply.

(g)     **"Termination Currency"** means United States Dollars ("USD").

(h)     **Additional Termination Events** will not apply.

(i)    **Tax Clauses.** Sections 2(d)(i)(4) and 5(b)(ii) and 5(b)(iii) shall not apply; provided, however, that if Party B or any entity which directly or indirectly has a controlling interest in Party B re-organizes to a jurisdiction which is not in the United States of America, then Sections 2(d)(i)(4), 5(b)(ii) and 5(b)(iii) shall apply with respect to Party B.

### Part 2: Tax Representations

(a)    **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)    **Payee Tax Representations.**

(i)    For the purpose of Section 3(f) of this Agreement, Party A makes the following representation:

(A)    It is a United States person (within the meaning of Section 7701(a)(30) of the Code) and is an "exempt recipient" as described in Treasury Regulation Section 1.6049-4(c)(1)(ii); or

(B)    Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States; or

(C)    It is not (i) a bank that has entered into this Agreement in the ordinary course of its trade or business of making loans, as described in section 881(c)(3)(A) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) a 10% shareholder of the other party within the meaning of Code section 871(h)(3)(B), or (iii) a controlled foreign corporation with respect to the other party within the meaning of Code section 881(c)(3)(C); or

(D)    It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision (as the case may be), the "Interest" provision, or the "Other Income" provision (if any) (and is not restricted from the aforementioned benefits under any provision of the "Limitation of Benefits" provision) of the Specified Treaty with respect to any payment described in such provisions and received or to be received by such party in connection with this Agreement, and no such payment is attributable to a trade or business carried on by such party through a permanent establishment in the other party's Specified Jurisdiction.

(ii)    For the purpose of Section 3(f) of this Agreement, Party B makes the following representation:

(A)    It is a United States person and it is a limited liability company that is the beneficial owner of all payments to be made to it under this Agreement organized under the laws of Nebraska, and its taxpayer identification number is 47-0355979.

(B)    Backup Withhold.  Under penalties of perjury, Party B certifies that:

(i)  the correct taxpayer identification number of Party B is 47-0355979; and

(ii)  Party B is not subject to the backup tax withholding under the Internal Revenue Code of 1986, as amended, because it is exempt fro such backup withholding.

(c)    **Tax Representations in Confirmations.**  For purposes of <u>Sections 2(d)(i)(4)</u> and <u>3(f)</u>, any payee tax representation specified in a Confirmation under this Agreement shall be deemed to be specified in this Schedule.

**Part 3: Agreement to Deliver Documents**

For the purpose of <u>Sections 4(a)(i)</u> and <u>(ii)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in <u>Section 4(a)(iii)</u> of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | A copy of the annual report of each party's Credit Support Provider containing audited consolidated financial statements for each such fiscal year, certified by independent public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized. | As soon as practicable after the execution of this Agreement and also within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years while there are any obligations outstanding under this Agreement. Availability on the Credit Support Provider's website shall constitute delivery. | Yes |
| Party A and Party B | For its most recent fiscal quarter, a copy of the unaudited financial statements of (i) in the case of Party A, its Credit Support Provider and (ii) in the case of Party B, Party B and its Credit Support Provider, prepared in accordance with generally accepted accounting principles consistently applied. | Availability on the Credit Support Provider's website shall constitute delivery. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

21

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | An opinion of counsel to Party B substantially in the form of Exhibit C to this Schedule | Upon execution of this Agreement. | No |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit D to this Schedule | Upon execution of this Agreement. | No |
| Party A and Party B | Such other documents as the other party may reasonably request. | Upon request. | No |

**Part 4: Miscellaneous**

(a)      **Addresses for Notices.** For the purpose of <u>Section 12(a)</u> of this Agreement:

Address for notices or communications to **Party A**:

Address:          Lehman Brothers Special Financing Inc.
                  c/o Lehman Brothers Inc.
                  Transaction Management Group
                  Corporate Advisory Division
                  745 Seventh Avenue
                  New York, NY 10019

Attention:        Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672

                  For all purposes.

Address for notices or communications to **Party B**:

Address:          BH Finance LLC
                  1440 Kiewit Plaza
                  Omaha, NE 68131

Attention:        Dan Jaksich, Vice President
Telephone No.:    (402) 978-5425
Facsimile No.:    (402) 346-3375

                  For all purposes.

**With a copy to:**

Address:          Berkshire Hathaway Reinsurance Group
                  100 First Stamford Place
                  Stamford, CT  06902

Telephone No.:    (203) 363-5200
Facsimile No.:    (203) 363-5221

**With a copy to:**

Address:          BH Finance LLC
                  99 Mill Lane
                  Norwell, MA  02061

Attention:        Robert E. Bennett
Telephone No.:    (781) 659-2432
Facsimile No.:    (781) 659-2491

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

      Party A appoints as its Process Agent:     Not applicable.

      Party B appoints as its Process Agent:     Not applicable.

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

      Party A is not a Multibranch Party.

      Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)    **Credit Support Document.** Details of any Credit Support Document, each of which is incorporated by reference in, constitutes part of, and is in connection with, this Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in this Agreement or such Confirmation:

      In the case of **Party A**:

      Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

      In the case of **Party B**:

      Guarantee of Party B's obligations hereunder in the form annexed hereto as Exhibit B to this Schedule.

(g)    **Credit Support Provider.**

      Credit Support Provider means in relation to Party A:     Lehman Brothers Holdings Inc., a Delaware company.

      Credit Support Provider means in relation to Party B:     Berkshire Hathaway Inc., a Delaware company.

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)    **Netting of Payments.** <u>Subparagraph (ii)</u> of <u>Section 2(c)</u> of this Agreement will <u>not</u> apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in <u>Section 14</u> of this Agreement.

(k)    **Jurisdiction.** <u>Section 13(b)</u> is hereby amended by: (i) deleting in the second line of subparagraph (i) thereof the word "non-"; and (ii) deleting the final paragraph thereof.


**Part 5: Other Provisions**

(a)    **Representations.** <u>Section 3</u> of this Agreement is hereby amended by adding the following additional subsections:

      (g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and

explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)   *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)   *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)   *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a(12) of the Commodity Exchange Act.

(b)   **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

(f)   *Set-off.*

(i)   In addition to any rights of set-off a party may has as a matter of law or otherwise, upon the occurrence of an Event of Default, and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

(ii)   For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

(iii)   If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

(iv)   This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(v)   For purposes of this Part 5(b), Party B shall be deemed to have no Affiliates.

(c)   **Transfer.** Section 7 is hereby amended by adding in the third line thereof after the word "party" the words ", which consent shall not be unreasonably withheld or delayed; provided that it shall be considered reasonable to withhold consent if there are any costs and expenses relating to a change in the mark-to-market value of the underlying Transactions directly from any such transfer,".

(d)   **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(e)   **Waiver of Trial By Jury.** Insofar as is permitted by law, each party irrevocably waives any and all rights to trial by jury in any legal proceeding in connection with this Agreement or any Transaction, and acknowledges that this waiver is a material inducement to the other party's entering into this Agreement and each Transaction hereunder.

(f) **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(g) **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(h) **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(i) **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction.

(j) **Party B Representations.** Party B represents and warrants to Party A (which representations will be deemed to be repeated by Party B on each date on which a Transaction is entered into) that:

   (i) all Transactions effected under this Agreement, and the performance by it of its obligations under all such Transactions, are within its internal guidelines and restrictions;

   (ii) it is not entering into any Transaction for the benefit of an "affiliate" (as such term is defined in any applicable state insurance holding company systems act) or, if a Transaction is for the benefit of an affiliate, Party B has fully complied with any applicable state insurance holding company systems act; and

   (iii) the transactions contemplated in this Agreement and any Credit Support Document (including the Transactions) are not voidable under any applicable state insurance holding company systems act, asset protection act or investment law.

(k) **Confirmations.** Party A will deliver to Party B a Confirmation relating to each Transaction.

(l) **ERISA Representation.** Party B represents and warrants to Party A that no class of the equity interests issued by Party B is directly or indirectly owned to the extent of 25% or more by one or more "Benefit Plan Investors", as determined under the U.S. Department of Labor regulation defining "plan assets" for purpose of ERISA.

(m) **Policies etc.** Section 3(a)(iii) is hereby amended by inserting the words "or investment policies, or guidelines, procedures, or restrictions" immediately following the word "documents".

(n)      **Scope of Agreement.** Notwithstanding anything contained in this Agreement to the contrary, Transactions governed by this Agreement shall be limited to credit protection transactions, credit swaps, credit default swaps, credit default options, total return swaps, credit spread transactions, and such similar transactions.

## Part 6: Additional Terms for FX Transactions and Currency Options

(a)      **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

(i)      Incorporation of 1998 FX and Currency Option Definitions. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

(ii)     Amendment of 1998 FX and Currency Option Definitions. The following amendments are made to the 1998 Definitions:

Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

**Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

|  |  |
|---|---|
| **LEHMAN BROTHERS SPECIAL FINANCING INC.** | **BH FINANCE LLC** |
| *(Name of Party)* | *(Name of Party)* |
| By: | By: |
| Name: | Name: Marc D'Hampuet |
| Title: Allyson M. Carine  Authorized Signatory | Title: President |
| Date: | Date: |

27

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and BH FINANCE LLC ("Party B") have entered into a Master Agreement dated as of July 23, 2007, as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

1

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

2

<u>EXHIBIT B to Schedule</u>

## GUARANTY

This **GUARANTY** (the "Guaranty"), dated as of July 23, 2007, made by **BERKSHIRE HATHAWAY INC.**, a corporation organized under the laws of Delaware with principal offices at 1440 Kiewit Plaza, Omaha, Nebraska, 68131 (the "Guarantor") is made in favor of **LEHMAN BROTHERS SPECIAL FINANCING INC.** (the "Beneficiary").

<u>RECITALS</u>

1. Guarantor is the indirect parent company of the sole member of BH Finance LLC, a limited liability company organized under the laws of Nebraska ("Counterparty").

2. Counterparty and Beneficiary have entered into a Master Agreement, dated as of July 23, 2007 (as amended, supplemented or modified from time to time, the "Agreement"). Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to them in the Agreement.

3. Pursuant to the Agreement, the Counterparty is required to provide the Beneficiary with a guaranty duly executed by the Guarantor and this Guaranty is being delivered in satisfaction of such requirement.

Pursuant to the Agreement and as an inducement to the Beneficiary to enter into the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1. <u>Guaranty</u>. The Guarantor hereby unconditionally guarantees to the Beneficiary: (i) the due and punctual payment of all amounts (now or hereafter payable) by the Counterparty arising out of or in connection with the Agreement, whether due on a scheduled payment date or earlier by reason of early termination thereof or otherwise and (ii) the due and punctual performance of all delivery obligations (now or hereafter due) of the Counterparty under any and all Transactions and Confirmations, whether due on a scheduled payment date or earlier by reason of early termination thereof or otherwise (all of the foregoing payment and delivery obligations (whether actual or contingent) of the Counterparty (being the "Guaranteed Obligations").

2. <u>Guaranty Absolute and Unconditional</u>. The Guarantor hereby agrees that its obligations hereunder shall be absolute, irrevocable and unconditional and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

    (i)    any failure to enforce the provisions of the Agreement;

    (ii)    any waiver, modification or consent to departure from, or amendment of the Agreement or any Transaction;

    (iii)    the invalidity, illegality or unenforceability of the Agreement;

    (iv)    any change in the corporate existence, structure or ownership of the Counterparty or the Guarantor; or

    (v)    any other circumstances which may otherwise constitute a legal or equitable discharge of a surety or guarantor.

Nothing here shall be construed to affect either the rights of the Counterparty against the Beneficiary or the obligations of the Beneficiary to the Counterparty and Beneficiary shall have no greater rights hereunder against the Guarantor than it shall have against the Counterparty.

3.    Waiver by Guarantor.  The Guarantor hereby waives notice of acceptance of this Guaranty, diligence, acceleration, presentment, demand of payment, filing of claims with a court in the event of merger or bankruptcy of the Counterparty, any protest or notice with respect to any Transaction or the Agreement or the obligations created or evidenced thereby and all demands whatsoever, any exchange, sale or surrender of, or realization on, any other guaranty or any collateral, and any and all other notices and demands whatsoever. Subject to the immediately following paragraph, this Guaranty shall remain in full force and effect until such time as when (i) there are no Transactions and no Agreement outstanding and all Guaranteed Obligations shall have been satisfied in full.

4.    Reinstatement in Certain Instances.  The Guarantor further agrees that if any payment or delivery of any of the Guaranteed Obligations is subsequently rescinded or is subsequently recovered from or repaid by the recipient thereof, in whole or in part, in any bankruptcy, reorganization, insolvency or similar proceedings instituted by or against the Counterparty, or otherwise, the Guarantor's obligations hereunder with respect to such Guaranteed Obligation shall be reinstated at such time to the same extent as though the payment or delivery so recovered or repaid had not been originally made.

5.    Representations and Warranties.  The Guarantor hereby represents and warrants to the Beneficiary (which representations and warranties shall survive the delivery of this guaranty) that:

(a)    Guarantor (i) is a corporation duly organized, validly existing and in good standing under the laws of Delaware, (ii) has full power and authority to own its properties and assets and to carry on its business as now being conducted and as presently contemplated, and (iii) has full power and authority to execute, deliver and perform its obligations under this Guaranty to which it is a party or signatory;

(b)    The execution, delivery and performance by the Guarantor of its obligations under this Guaranty will not (i) violate or conflict with (x) any provision of law, order, judgment or decree of any court or other agency or government, (y) any provision of its constitutional documents, or (z) any indenture, agreement or other instrument to which the Guarantor is a party or is bound; (ii) result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual provision to which it is bound; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Guarantor pursuant to any indenture, agreement or instrument.

(c)    The Guarantor is not required to obtain any consent, approval or authorization from or to file any declaration or statement with, any governmental instrumentality or other agency, or any other person or entity, in connection with or as a condition to the execution, delivery or performance of this Guaranty other than such as have already been obtained and are in full force and effect.

(d)    There are no actions, suits or proceedings at law or in equity or by or before any governmental instrumentality or other agency, including any arbitration board or tribunal, now pending, or to the knowledge of the Guarantor, threatened (i) which is likely to affect the validity or enforceability of this Guaranty or the Guarantor's ability to perform its obligations hereunder, or (ii) against or affecting the Guarantor which, if adversely determined, individually or in the aggregate, would have a materially adverse effect on the condition (financial or otherwise), business, results of operations, prospects or properties of the Guarantor or the Counterparty.

(e)    The Guarantor is currently solvent and the Guarantor's obligations hereunder will not render the Guarantor insolvent; the Guarantor is not contemplating either a

filing of a petition under any state or federal bankruptcy law, or, the liquidating of all or a major portion of its property; and the Guarantor has no knowledge of any person contemplating the filing of such petition against it.

6. Successor and Assigns. This Guaranty shall continue in full force and effect and be binding upon the Guarantor and the successors and permitted assigns of the Guarantor; provided, however, that the Guarantor may not assign or otherwise transfer this Guaranty or any obligations hereunder without the prior written consent of the Beneficiary and any such assignment or transfer without such consent shall be void. The Beneficiary may assign this Guaranty or any rights or powers hereunder, with any or all of the underlying liabilities or obligations, the payment of which is guaranteed hereunder.

7. Entire Agreement; Amendments and Waivers. This Guaranty supercedes any prior negotiations, discussions, or communications between the Beneficiary and the Guarantor and constitutes the entire agreement between the Beneficiary and the Guarantor with respect to the Transactions and this Guaranty. No provision of this Guaranty may be amended, modified or waived without the prior written consent of the Beneficiary.

8. Subrogation. The Guarantor shall be subrogated to all rights of the Beneficiary against the Counterparty in respect of any amounts paid or deliveries made by the Guarantor pursuant to the provisions of this Guaranty.

9. Expenses of Enforcement. The Guarantor further agrees to pay all costs and expenses, including reasonable attorneys' fees, which may be incurred by the Beneficiary in any successful effort to collect or enforce any provision of this Guaranty

10. No Set-Off or Counterclaim. All payments and deliveries hereunder shall be made by the Guarantor without set-off or counterclaim. Without prejudice to the survival of any other agreement contained herein, the Guarantor's agreements and obligations contained in this paragraph shall survive the payment in full of the obligations and any termination of this Guaranty.

11. Governing Law; Submission to Jurisdiction. THIS GUARANTY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK(WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE). The Guarantor hereby submits to the jurisdiction of the State and Federal Courts sitting in New York, New York and hereby waives any objection it may have as to venue in any of such courts.

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed by one of its duly authorized representatives or officers as of this _____ day of _____, 2007.

**BERKSHIRE HATHAWAY INC.**

_____

*By:*   _____

Name:
Title:
Date:

EXHIBIT C to Schedule

[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers Special Financing Inc.
c/o Lehman Brothers Inc.
Corporate Advisory Division
Transaction Management Group
745 Seventh Avenue
New York, NY 10019 USA

Dear Sir or Madam:

This opinion is furnished to you pursuant to the ISDA Master Agreement (the "Agreement") dated July 23, 2007 between BH Finance LLC ("Party B") and Lehman Brothers Special Financing Inc. ("Lehman") and is provided with respect to the Agreement and the related Guaranty (the "Guaranty") dated as of July 23, 2007 issued by Berkshire Hathaway Inc. (the "Guarantor") in favor of Lehman. Terms defined in the Agreement and the Guaranty are used herein as defined in the Agreement and the Guaranty.

I am counsel to Party B and the Guarantor, and in that capacity have examined such documents and have conducted such investigations of fact and law as I have deemed necessary or advisable for the opinions expressed herein. The opinions expressed herein are limited to questions arising under the laws of Nebraska.

Upon the basis of the foregoing, I am of the opinion that:

1.  Party B is a limited liability company validly organized and existing and in good standing under the laws of Nebraska. The Guarantor is a corporation validly organized and existing in good standing under the laws of Delaware.

2.  The execution, delivery and performance of the Agreement, dated on or prior to the date hereof, by Party B and the execution, delivery and performance of the Guaranty, dated on or prior to the date hereof, by the Guarantor, are within Party B's and the Guarantor's powers, respectively, have been duly authorized by all necessary resolutions and do not conflict with, or constitute a default under any provisions of the articles of organization of Party B and the Guarantor, respectively, or any applicable law or regulation or any agreement, decree, order, judgment, injunction or other instrument known to me and binding on or affecting the property or assets of Party B and the Guarantor, respectively.

3.  The Agreement and the Guaranty, have been duly executed and delivered by Party B and the Guarantor, respectively, and constitute the valid and binding obligations of Party B and the Guarantor, respectively, in accordance with their terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting the enforcement of creditor's rights generally or by general equity principles.

4.  To the best of my knowledge no consent, authorization, license or approval of or registration filing or declaration with, any governmental authority of Party B or the Guarantor is required in connection with the execution, delivery and performance of the Agreement and the Guaranty by Party B and the Guarantor, respectively.

5.  The choice of the laws of the State of New York to govern the interpretation and enforcement of the Agreement and the Guaranty is valid under the laws of Nebraska and, in

a suit in a court of or in Nebraska to enforce the rights of Lehman under the Agreement or the Guaranty, such choice of law should be honored by such court.

6.    There are no provisions in the Agreement or the Guaranty which are repugnant to the public policy of Nebraska.

This opinion is solely for your benefit in connection with the Agreement and Guaranty referenced above, and may not be relied on by, nor copies hereof delivered to, any other person or entity without my prior consent.

Very truly yours,

EXHIBIT D to Schedule

[Form of Opinion of Counsel for Party A]

[Date]

BH Finance LLC
1440 Kiewit Plaza
Omaha, NE 68131

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a corporation organized under the laws of the State of Delaware ("Party A"), and am familiar with matters pertaining to the execution and delivery of the Agreement (the "Agreement") dated as of July 23, 2007 between Party A and BH Finance LLC. ("Party B").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of the Agreement, certificates and statements of public officials and officers of Party A and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.  Party A is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

2.  The execution, delivery and performance of the Agreement, by or on behalf of Party A, are within its corporate power, have been duly authorized by all corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3.  To the best of my knowledge no consent, authorization, license or approval of or registration or declaration with, any U.S. federal or state governmental authority is required in connection with the execution, delivery and performance of the Master Agreement by Party A.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.  I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the federal laws of the United States of America and the General Corporation Law of the State of Delaware.

B.  My opinions are limited to the laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph A above be changed by legislative action, judicial decision or otherwise.

C.  This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having

jurisdiction over you or over Party B, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement.

D.    I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Party A.

Very truly yours,

# ISDA®

International Swaps and Derivatives Association, Inc.

## NOVATION AGREEMENT

dated as of June 25, 2009 among:

BH Finance LLC (the "**Remaining Party**" or "**BH Finance**"), Lehman Brothers Special Financing Inc. (the "**Transferor**" or "**LBSF**")

AND

1271 LLC (the "**Transferee**" or "**1271**").

The Transferor and the Remaining Party have entered into one or more Transactions listed on Annex 1 hereto (each an "**Old Transaction**"), each of which is evidenced by a Confirmation (each an "**Old Confirmation**") subject to an ISDA Master Agreement (1992 Multicurrency-Cross Border), dated as of July 23, 2007 (the "**Old ISDA Master Agreement**"), and Schedule thereto, dated as of July 23, 2007 (the "**Old Schedule**") (the Old Confirmations, the Old ISDA Master Agreement and the Old Schedule, collectively, the "**Old Agreement**").

With effect from and including June 25, 2009 (the "**Novation Date**") the Transferor wishes to transfer by novation to the Transferee, and the Transferee wishes to accept the transfer by novation of, all the rights, liabilities, duties and obligations of the Transferor under and in respect of each Old Transaction, with the effect that the Remaining Party and the Transferee enter into (i) new transactions (each a "**New Transaction**") between them and (ii) a new ISDA Master Agreement (1992 Multicurrency – Cross Border) and Schedule thereto (the "**New Agreement**") between them, in each case having terms identical to those of each Old Transaction, Old ISDA Master Agreement or Old Schedule, as applicable, except as modified herein and as more particularly described below.

The Remaining Party wishes to accept the Transferee as its sole counterparty with respect to the New Transactions.

The Transferor and the Remaining Party wish to have released and discharged, as a result and to the extent of the transfer described above, their respective obligations, and those of the Transferor's Credit Support Provider and (to the extent provided in Section 2(e) hereof) the Remaining Party's Credit Support Provider, under and in respect of the Old Agreement.

Accordingly, the parties agree as follows: ---

## 1. Definitions.

Terms defined in the Old Agreement are used herein as so defined in the applicable document, unless otherwise provided herein.

Copyright © 2002 by International Swaps and Derivatives Association, Inc.

## 2.  Transfer, Release, Discharge and Undertakings.

With effect from and including the Novation Date and in consideration of the mutual representations, warranties and covenants contained in this Novation Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties):

(a)     the Remaining Party and the Transferor are each released and discharged from all obligations to each other (including any payment and delivery obligations pursuant to Section 2(a)(i) of the Old Agreement) with respect to the Old Agreement and their respective rights against each other thereunder are cancelled and deemed waived; provided, however, that the Remaining Party shall not be released and discharged from its obligations in respect of the Net Payment until the Net Payment is received by the Transferee;

(b)     subject to the modifications to the Old Agreement as set forth herein, including as described below in Section 3(c)(iv) and in Schedule 1 hereto, in respect of each New Transaction, the Remaining Party and the Transferee each undertake liabilities and obligations towards the other and acquire rights against each other identical in their terms to each corresponding Old Transaction (for the avoidance of doubt, as if the Transferee were the Transferor and with the Remaining Party remaining the Remaining Party) except:

(1) that on the third Business Day following each Event Determination Date occurring after the date of this Agreement with respect to any Transaction, the Remaining Party shall refund to the Transferee an amount equal to the nominal amount of all Fixed Amounts that would have been payable (and were pre-paid by way of withholding as described below in clause (2)) under such Transaction (or, if less, with respect to the applicable Exercise Amount) with respect to all Fixed Rate Payer Payment Periods from such Event Determination Date to the Scheduled Termination Date of such Transaction assuming for this purpose that no Event Determination Date had ever or would ever occur under such Transaction, provided that the refund with respect to the first such Fixed Rate Payer Payment Period with respect to a Transaction (or, if applicable, an Exercise Amount) shall be pro rated on a calendar day basis to the extent the Event Determination Date occurs after the first day of such Fixed Rate Payer Payment Period (each such amount, a "Refund Amount"), and

(2) the Remaining Party shall be released and discharged from its obligations with respect to any Transaction the Reference Entity of which is referenced in the ISDA 2009 Lyondell Entities CDS Protocol, the ISDA 2009 Nortel Entities CDS Protocol, the ISDA 2009 Smurfit Entities CDS Protocol or the ISDA 2009 Ideare CDS Protocol upon receipt by the Transferee from the Remaining Party of $ 101,351,003 (being the sum of $26,400,000 related to Nortel Networks Corporation Credit Event, $25,350,000 related to Lyondell Chemical Company Credit Event, $27,337,500 related to Smurfit-Stone Container Enterprises, Inc. Credit Event and $29,475,000 related to the Ideare Inc. Credit Event, as offset by the $3,486,878 March 15, 2009 Fixed Amount Payable and the $3,724,619 June 22 , 2009 Fixed Amount Payable) as the outstanding portion of the aggregate Cash Settlement Amounts with respect to the applicable Reference Entities (from which amount the Remaining Party shall withhold $ 54,339,133 as a pre-payment of all Fixed Amounts to become payable with respect to the New Transactions commencing on and after June 25, 2009, such amount, after giving effect to such withholding, being equal to $47,011,869 (the "Net Payment")); and

(c)     each New Transaction shall be governed by and form a part of the New Agreement and the relevant Old Confirmation (which, in conjunction and as deemed modified to be consistent with this Novation Agreement) shall be deemed to be a Confirmation between the Remaining Party and the Transferee;

(d)   the Remaining Party and Transferor intend and agree that, with effect from and including the Novation Date:

(1) the Transferor and the Transferor's Credit Support Provider are released and discharged from all obligations arising under or in connection with each Old Transaction,

(2) the Remaining Party's rights against the Transferor and such Credit Support Provider are cancelled,

(3) all existing Events of Default and Termination Events, breaches and any similar events (whether or not declared) relating to the Transferor, its Credit Support Provider and its Credit Support Document are hereby waived and deemed cured,

(4) each Credit Support Document provided by the Transferor is hereby cancelled and shall not have any effect on or give rise to any Events of Default, Termination Events or similar events under any New Transaction, and

(5) the Transferor's Credit Support Provider is a third party beneficiary of this paragraph 2(d).

(e)   the Remaining Party and Transferor intend and agree that, with effect from and including the Novation Date:

(1) the Remaining Party and the Remaining Party's Credit Support Provider are released and discharged from all obligations arising under or in connection with each Old Transaction,

(2) the Transferor's rights against the Remaining Party and its Credit Support Provider are cancelled,

(3) all existing Events of Default and Termination Events, breaches and any similar events (whether or not declared) relating to the Remaining Party, its Credit Support Provider and its Credit Support Document are hereby waived and deemed cured,

(4) the Transferor hereby releases and discharges the Remaining Party's Credit Support Provider from all obligations arising under or in connection with each Credit Support Document provided by the Remaining Party, provided that such Credit Support Document shall remain applicable to the New Agreement and each New Transaction, and

(5) the Remaining Party's Credit Support Provider is a third party beneficiary of this paragraph 2(d).

## 3.   Representations and Warranties.

(a)   On the date of this Novation Agreement and on the Novation Date:

(i)   Each of the parties hereto makes to each of the other parties those representations and warranties set forth in Section 3(a) of the 1992 ISDA Master Agreement with references in such Section to "this Agreement" or "any Credit Support Document" being deemed references to this Novation Agreement alone.

(ii)   The Remaining Party and the Transferee each makes to the other the representation set forth in Section 3(b) of the 1992 ISDA Master Agreement with respect to the New

Transaction and taking into account the parties entering into and performing their obligations under this Novation Agreement.

    (iii)    Each of the Transferor and the Remaining Party represents and warrants to each other and to the Transferee that it has made no prior transfer (whether by way of security or otherwise) of the Old Agreement or any interest or obligation in or under the Old Agreement or in respect of any Old Transaction.

    (iv)    As of the Novation Date, the Remaining Party represents and warrants to each other party hereto that after giving effect to the Net Payment, all of its respective obligations under each Old Transaction required to be performed on or before the Novation Date have been fulfilled.

(b)    The Transferor makes no representation or warranty and does not assume any responsibility with respect to the legality, validity, effectiveness, adequacy or enforceability of any New Transaction or any documents relating thereto and assumes no responsibility for the condition, financial or otherwise, of the Remaining Party, the Transferee or any other person or for the performance and observance by the Remaining Party, the Transferee or any other person of any of its obligations under any New Transaction or any document relating thereto and any and all such conditions and warranties, whether express or implied by law or otherwise, are hereby excluded.

(c)    The Remaining Party acknowledges that:

    (i)    it has not designated an Early Termination Date and, for the avoidance of doubt, shall have no right to designate an Early Termination Date with respect to (or otherwise terminate a Transaction in connection with) any Event of Default or Termination Event or similar event existing immediately prior to the execution of this Novation Agreement;

    (ii)    any amounts due and payable by the Transferor to the Remaining Party under each Old Transaction have been paid in full;

    (iii)    the Remaining Party shall be obligated to pay to the Transferee any Refund Amounts calculated pursuant to Section 2(b)(1) hereof; and

    (iv)    the Transferee shall have no obligation to pay any Fixed Payments (or similar amounts) to the Remaining Party pursuant to any New Transaction, all such amounts having been paid by the Transferor through the withholding as set forth in Section 2(b)(2).

(d)    The Transferor and Transferee direct the Remaining Party to make the Net Payment provided for in Section 2(b)(2) to the following account of the Transferee:

    Branch: Citi, New York
    SWIFT: CITIUS33
    ABA: 021000089
    Account Number: 3080-3752
    Account Title: 1271 LLC Promissory Note
    Address: 111 Wall Street
    New York, N.Y. 10043
    USA

(e)    Unless the Transferee amends the wiring instructions set forth in section 3(d) on fifteen days' advance notice to the Remaining Party, payments due the Transferee shall be paid to the account set forth in section 3(d).

4. **Court Order**

The parties acknowledge that this Novation Agreement is entered into under the Order Approving Consensual Assumption and Assignment of Prepetition Derivative Contracts In re LEHMAN BROTHERS HOLDINGS INC., *et al.* (Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) entered by the United States Bankruptcy Court, Southern District of New York (the "Order"). The Transferor hereby represents to the Remaining Party that this Novation Agreement conforms to the terms of the Order and that the Transferor's execution, delivery, and the entry into effect of this Novation Agreement is within the scope of the authority granted to the Transferor under the Order.

5. **Counterparts.**

This Novation Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

6. **Amendments.**

No amendment, modification or waiver in respect of this Novation Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

7. (a) **Governing Law.**

This Novation Agreement will be governed by and construed in accordance with the laws of the State of New York, including Section 5-1401 and Section 5-1402 of the General Obligations Law but otherwise without reference to the conflict of laws provisions thereof.

(b) **Jurisdiction.**

The terms of Section 13(b) of the 1992 ISDA Master Agreement shall apply to this Novation Agreement with references in such Section to "this Agreement" being deemed references to this Novation Agreement alone.

5

IN WITNESS WHEREOF the parties have executed this Novation Agreement on the respective dates specified below with effect from and including the Novation Date.

BH FINANCE LLC

By: .........................................
    Name:
    Title:
    Date:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: .........................................
Name: William Fox
Title: Senior Vice President
Date:

1271 LLC

By: .........................................
    Name: William Fox
    Title: Senior Vice President
    Date:

Agreed, acknowledged and consented:

BERKSHIRE HATHAWAY INC. solely in its capacity as Credit Support Provider to BH Finance LLC

By: .........................................
    Name:
    Title:
    Date:

**ANNEX 1**

| Count | Corporate CDS | Coupon | Ticker | Contract Notional | Upfront Amount |
|---|---|---|---|---|---|
| 1 | 20165283 | quarterly | C | 25,000,000 | 0 |
| 2 | 20165617 | quarterly | C | 25,000,000 | 0 |
| 3 | 20166020 | quarterly | EIX_SCE | 25,000,000 | 0 |
| 4 | 20166032 | quarterly | KFT | 25,000,000 | 0 |
| 5 | 20166877 | quarterly | KFT | 35,000,000 | 0 |
| 6 | 20167466 | quarterly | KFT | 15,000,000 | 0 |
| 7 | 20167786 | quarterly | KFT | 25,000,000 | 0 |
| 8 | 20168196 | quarterly | PG | 10,000,000 | 0 |
| 9 | 20177388 | quarterly | MER | 25,000,000 | 0 |
| 10 | 20180041 | quarterly | ED | 20,000,000 | 0 |
| 11 | 20181273 | quarterly | TXU_E | 20,000,000 | 0 |
| 12 | 20188439 | quarterly | PPL | 10,000,000 | 0 |
| 13 | 20205402 | quarterly | JCP | 10,000,000 | 0 |
| 14 | 20219817 | quarterly | TOCCN | 10,000,000 | 0 |
| 15 | 20287606 | quarterly | CIT | 10,000,000 | 0 |
| 16 | 20291939 | quarterly | TXU_E | 25,000,000 | 0 |
| 17 | 20315545 | quarterly | MER | 20,000,000 | 0 |
| 18 | 20318561 | quarterly | AIG | 20,000,000 | 0 |
| 19 | 20323152 | quarterly | AIG | 20,000,000 | 0 |
| 20 | 20326915 | quarterly | AIG | 25,000,000 | 0 |
| 21 | 20329931 | quarterly | AIG | 25,000,000 | 0 |
| 22 | 20330426 | quarterly | GE | 25,000,000 | 0 |
| 23 | 20330618 | quarterly | AIG | 20,000,000 | 0 |
| 24 | 20331317 | quarterly | AXP | 25,000,000 | 0 |
| 25 | 20340478 | quarterly | CEG | 15,000,000 | 0 |
| 26 | 25080288 | quarterly | Tesco | 15,000,000 | 0 |
| 27 | 20346939 | quarterly | POHANG | 20,000,000 | 0 |
| 28 | 25080441 | quarterly | TSCO | 15,000,000 | 0 |
| 29 | 20348136 | quarterly | POHANG | 20,000,000 | 0 |
| | Corp Total | | | 580,000,000 | 0 |

| Count | Tranches | Coupon | | Contract Notional | Upfront Amount |
|---|---|---|---|---|---|
| 1 | 3231438 | All Upfront | CDX_HY8_25_35_5Y | 50,000,000 | (8,500,000) |
| 2 | 3210728 | All Upfront | CDX_HY8_00_25_5Y | 150,000,000 | (76,375,500) |
| 3 | 3211987 | All Upfront | CDX_HY8_00_25_5Y | 100,000,000 | (52,000,000) |
| 4 | 3212808 | All Upfront | CDX_HY8_00_25_5Y | 50,000,000 | (26,125,000) |
| 5 | 3215345 | All Upfront | CDX_HY8_00_25_5Y | 350,000,000 | (179,750,000) |
| 6 | 3230263 | All Upfront | CDX_HY8_00_25_5Y | 100,000,000 | (54,000,000) |
| 7 | 20137589 | All Upfront | CDX_HY9_35_100_5Y_UPF | 260,000,000 | (18,525,000) |
| 8 | 20152177 | All Upfront | CDX_HY9_35_100_5Y_UPF | 520,000,000 | (37,050,000) |
| 9 | 20158570 | All Upfront | CDX_HY9_25_100_5Y_UPF | 500,000,000 | (48,500,000) |
| | | Tranche Total | | 2,080,000,000 | (500,825,500) |

| Count | Muni CDS | Coupon | | Contract Notional | Upfront Amount |
|---|---|---|---|---|---|
| 1 | 3723046 | All Upfront | The State of Delaware | 650,000,000 | (4,328,900) |
| 2 | 3723050 | All Upfront | The State of Florida | 1,100,000,000 | (41,042,925) |
| 3 | 3723058 | All Upfront | The State of Illinois | 650,000,000 | (14,724,816) |
| 4 | 3723131 | All Upfront | The State of North Carolina | 650,000,000 | (4,330,828) |
| 5 | 3723201 | All Upfront | The State of Utah | 250,000,000 | (1,665,703) |
| 6 | 3723230 | All Upfront | The Commonwealth of Virginia | 550,000,000 | (3,664,547) |
| 7 | 3905500 | All Upfront | CAS SENIOR | 200,000,000 | (10,100,000) |
| 8 | 3723063 | All Upfront | The State of Maryland | 850,000,000 | (5,663,391) |
| 9 | 3723072 | All Upfront | The Commonwealth of Massachusetts | 500,000,000 | (9,994,219) |
| 10 | 3723078 | All Upfront | The State of New Jersey | 250,000,000 | (6,662,813) |
| 11 | 3723119 | All Upfront | The State of New York | 250,000,000 | (6,662,813) |
| 12 | 3723163 | All Upfront | The State of Ohio | 700,000,000 | (20,278,125) |
| 13 | 3723170 | All Upfront | The Commonwealth of Pennsylvania | 500,000,000 | (9,994,219) |
| 14 | 3723181 | All Upfront | The State of Texas | 1,150,000,000 | (22,986,703) |
| | Muni Total | | | 8,250,000,000 | (162,100,002) |
| Grand Total | | | | 10,910,000,000 | (662,925,502) |

**SCHEDULE 1**

**Modified Terms of the New Agreement**

Notwithstanding anything to the contrary in the Old Agreement, immediately upon execution of the Novation Agreement the following amendments shall apply to the New Agreement:

1.      All References to Party A, Lehman Brothers Special Financing Inc. or Lehman Brothers Holdings Inc. shall be references to 1271 LLC.

2.      The phrase "USD 75 million in the case of Party A and any Credit Support Provider of Party A" (or its equivalent in any other currency) and (ii) USD 75 million in the case of Party B and any Credit Support Provider of Party B (or its equivalent in any other currency) shall be deemed deleted in its entirety and replaced with "not applicable for Party A and not applicable for Party B".

3.      A new subpart (j) shall be added at the end of Part 1 and read as follows:

Notwithstanding the terms of Section 5(a) of this Agreement, the only Events of Default that shall be applicable are "Failure to Pay or Deliver" (Section 5(a)(i)); "Credit Support Default" (Section 5(a)(iii)); "Misrepresentation" (Section 5(a)(iv)); and, in the case of Party B as the Defaulting Party only, "Bankruptcy" (Section 5(a)(vii) and "Merger Without Assumption" (Section 5(a)(viii).

Notwithstanding the terms of Section 6(b) of this Agreement, "Credit Event Upon Merger" (Section 5(b)(iv)) shall not be applicable.

The parties acknowledge that as of June 25, 2009, Party A has satisfied in full all its payment and delivery obligations under Section 2(a)(i) of this Agreement and has no future payment or delivery obligations, whether absolute or contingent, under such Section."

"(b) **Payee Tax Representations.** For the purpose of Part 3(f) of this Agreement, Party A makes the following representation(s): Party A is a limited liability company organized under the laws of the State of Delaware."

4.      Party A shall be deemed to have no delivery obligations pursuant to Part 3(b). Party B shall be deemed to have met its delivery obligations  pursuant to Part 3(b) if while there are any obligations outstanding under this Agreement:

    i.   the annual report of Party B's Credit Support Provider containing audited consolidated financial statements for each such fiscal year, certified by independent public accountants and prepared in accordance with generally accepted accounting principles in the country in which such party is organized is available within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years; and

    ii.  the quarterly report of Party B's Credit Support Provider containing unaudited condensed consolidated financial statements for each such fiscal quarter, prepared in accordance with generally accepted accounting principles in the country in which such party is organized is available within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal quarters.

Availability on the Credit Support Provider's website shall constitute delivery.

5.   The address relating to Party A in Part 4(a) shall be deleted in its entirety and replaced with:

Address:         1271 Sixth Avenue, 40th Floor
                 New York, New York 10020
Attention:       Derivatives Legal

6.   (a) The phrase "Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule." shall be deleted from Part 4(f) in its entirety and replaced with the phrase "None."

     (b) Exhibit A shall be deleted in its entirety and shall be replaced with the phrase "[Reserved]".

7.   The phrase "Lehman Brothers Holdings Inc., a Delaware company." shall be deleted from Part 4(g) in its entirety and replaced with the phrase "None."

8.   Part 4(j) shall be deleted in its entirety and replaced with:

     "(j) **Affiliate** shall have the meaning specified in <u>Section 14</u>; provided, however, that Party A shall be deemed to have no Affiliates for purposes of this Agreement."