WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
: 
In re : Chapter 11 Case No.
: 
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, : 08-13555 (JMP)
: 
Debtors. : (Jointly Administered)
: 
: 
------------------------------------------------------------------x

### DECLARATION OF DANIEL EHRMANN IN SUPPORT OF LEHMAN BROTHERS SPECIAL FINANCING INC.'S MOTION PURSUANT TO SECTIONS 105(A) AND 363 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION TO (I) CAUSE 1271 LLC TO ISSUE CLASSES OF INTERESTS, (II) SELL INTERESTS IN 1271 LLC AND (III) MAKE A CAPITAL CONTRIBUTION TO 1271 LLC

Pursuant to 28 U.S.C. § 1746, I, Daniel Ehrmann, declare:

1.  I am over the age of 18 years and make these statements of my own personal knowledge, following my review of the business records of Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Brothers Holdings Inc. ("LBHI") and their affiliated debtors in the above-referenced chapter 11 cases (collectively, the "Debtors") and/or my consultation with employees of the Debtors. If called to testify, I could testify to the truth of the matters set forth herein.

2.  I submit this Declaration in support of *Lehman Brothers Special Financing Inc.'s Motion Pursuant to Sections 105(a) and 363 of the Bankruptcy Code for*

*Authorization to (I) Cause 1271 LLC to Issue Classes of Interests, (II) Sell Interests in 1271 LLC and (III) Make a Capital Contribution to 1271 LLC* (the "Motion").[1] The Motion accurately reflects the terms of the Transactions.

3.   I am a Managing Director with Alvarez & Marsal North America, LLC. I was assigned to the Lehman matter in September 2008. I am a co-head of the derivatives group for the Debtors. In that capacity, I am responsible for and manage all derivatives-related matters of the Debtors.

### 1271 LLC

4.   1271 LLC ("1271") is a wholly-owned non-debtor subsidiary of LBSF. It was created in June 2009 for the sole purpose of taking an assignment of LBSF's interest in a credit default swap agreement (the "Swap Agreement") with BH Finance LLC ("BH"), a subsidiary of Berkshire Hathaway Inc.[2] LBSF prepaid all payments that could become due from 1271 to BH under the Swap Agreement.

5.   The Swap Agreement is 1271's sole asset. Under the Swap Agreement, BH provides credit protection (similar, in concept, to insurance) to 1271. BH's obligations under the Swap Agreement are guaranteed by its ultimate parent, Berkshire Hathaway, Inc. The credit protection covers a portfolio of reference entities and obligations with an aggregate notional value of approximately $10.9 billion. The municipal portfolio constitutes approximately $8 billion of the aggregate notional value of the portfolio. Under the Swap Agreement, the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] The transactions governed by the Swap Agreement are each evidenced by a confirmation subject to an ISDA Master Agreement (1992 Multicurrency Cross-Border) and Schedule thereto, each dated as of July 23, 2007, as amended by that certain Novation Agreement, dated June 25, 2009, among LBSF, 1271 and BH. A copy of the Swap Agreement is attached to the Motion as Exhibit A.

occurrence of certain credit events related to the portfolio triggers payment obligations of BH to 1271.

## The Transactions

6. Around February 2009, LBSF commenced efforts to monetize the Swap Agreement for the benefit of LBSF and its creditors. After attempts to sell the entire or a large portion of the Municipal Portfolio in one transaction to a single purchaser were unsuccessful, taking into consideration the large size of the Municipal Portfolio, LBSF determined that the most efficient and best method to maximize the value of the Municipal Portfolio was to create Classes of interests that will correspond to portions of the reference entities or obligations underlying the Swap Agreement and sell Classes corresponding to municipal reference entities to various investors. Specifically, as described in the Motion, 1271 will reorganize its capital structure and issue Classes corresponding to a municipal reference entity to investors through auctions to the highest and best bidders.[3] In exchange for a purchase price to be paid to LBSF, investors that purchase a Class (or portion thereof) will be entitled to receive the ratable cash flows received by 1271 that are attributable to the respective reference entity. From October 2009 through March 2011, LBSF has marked the value of the Municipal Portfolio on its internal books and records between $375 million and $675 million.

7. In order to protect the estate from a fluctuation in the market value of the Swap Agreement, LBSF currently contemplates that Classes representing a portion of the Municipal Portfolio will be immediately auctioned and sold off with the balance of the Municipal Portfolio to be monetized through the end of the year. Minimum reserve prices will

---

[3] One or more classes corresponding to the non-municipal reference obligations under the Swap Agreement, *i.e.*, the corporate and index obligations, will also be created but will not be auctioned at this time.

be set for the sales. LBSF will set those prices based upon its internal data and assessment of the market value of the Municipal Portfolio and in consultation with the Creditors' Committee.

8.  After deliberation and arms-length negotiation, 1271 recently engaged Morgan Stanley & Co. Inc. and certain of its affiliates (collectively, "MS") pursuant to the Engagement Letter to assist in the creation and auctioning of Classes.[4] MS will apply its institutional resources, experience and expertise to reorganize 1271, structure Classes of securities, identify prospective purchases, market such securities and auction them to the highest and best bidders. As compensation for MS's services, 1271 has agreed to pay Percentage Fees based upon the sales prices secured by MS. As set forth more fully in the Motion and Engagement Letter, MS will be entitled to a Minimum Service Fee of $2.5 million from 1271 if there are no sales of Classes and, if sales of Classes do occur, minimum payments on the structuring fee in the amount of $1.8 million and/or the marketing fee in the amount of $700,000 so as to equal the Minimum Service Fee. The Minimum Service Fee and Percentage Fees are necessary to ensure that MS will assist 1271 with structuring and monetizing the Municipal Portfolio, which has proven difficult.

9.  Based upon its analysis of a variety of options, LBSF believes that MS's involvement in the process is necessary to maximize the value of the Municipal Portfolio for the benefit of LBSF and its creditors. LBSF believes that MS's prominent role and active participation in the municipal credit derivatives market position MS as the best agent to effect the Transactions. In addition, based upon LBSF's understanding of the fees charged by peer-broker dealers in connection with the structuring, marketing and placement of comparable asset

---

[4] A copy of the Engagement Letter is attached to the Motion as Exhibit B. To the extent there is any inconsistency between the terms of the Engagement Letter and the description thereof in this Declaration, the Engagement Letter shall control.

classes in the market place, as well as the fees charged by MS for other similar engagements, LBSF believes that the Percentage Fees and Minimum Service Fee represent the most competitive pricing achievable for the services to be provided.

### Sound Business Reasons Support the Transactions

10.     Through the Transactions, LBSF will realize the value of 1271's "in the money" position on the Municipal Portfolio for the benefit of its creditors, which LBSF has marked on its internal books and records from October 2009 through March 2011 between $375 million and $675 million.  Based upon my consultation with the Debtors' employees and assessment of the value of the Municipal Portfolio, the current and projected market conditions and the Debtors' prior efforts to monetize the Municipal Portfolio, LBSF believes the proposed Transactions represent the best and most efficient method to maximize the value of the Municipal Portfolio.  The sale of the Classes to various investors also relieves LBSF's estate of the risk that a change in market conditions could shift the value of the Municipal Portfolio into the swap counterparty's favor and reduce the value of 1271's "in the money" position, which would decrease LBSF's ultimate recovery on the Municipal Portfolio.

11.     Through the restructuring of 1271 and the sale of the Classes, LBSF's estate obtains the benefit of an immediate cash payment (as opposed to periodic payments over time) while, at the same time, relieving its estate of the risks that LBSF's recovery from the Municipal Portfolio could be reduced.  Accordingly, the Transactions represent a reasonable exercise of LBSF's business judgment, are in the best interests of its estate and creditors and should be approved.

**Advance Authority to Complete the Sales Is Necessary to Maximize Value**

12. LBSF believes it is imperative to the success of the Transactions that it receive advance approval from the Court to sell or to cause 1271 to sell the Classes. Originally, LBSF attempted to sell a large portion of the Swap Agreement as a whole, which, due to the size of the portfolio, limited the pool of potential purchasers. After those efforts were unsuccessful, LBSF determined it would be in the best interests of the estate to monetize portions of the Municipal Portfolio. LBSF believes that that buyers will not be willing to wait for Court approval of a sale because they are likely to enter into an immediate hedge with respect to an underlying reference entity, which would result in an economic loss if the sales were not completed. Without advance approval of the sales, at a minimum, the purchase prices will be depressed to reflect the risk that LBSF might not be able to consummate a sale.

13. There are ample measures to ensure that LBSF will maximize its return on the Municipal Portfolio. Only a small pool of investors exists that have the financial capacity to invest in a product as large as the Municipal Portfolio. LBSF understands that MS has ongoing relationships with and can aggressively pursue this limited universe of potential investors. The potential investors will have to bid on the Classes representing the various portions of the Municipal Portfolio, thereby allowing 1271 to receive the best offer. 1271 also retains the ultimate discretion to refuse an offer that it believes to be insufficient. Minimum reserve prices for the auctions will be set. Finally, the Creditors' Committee has been and will continue to be consulted in the monetization of the Municipal Portfolio, and all sales are subject to the consent of the Creditors' Committee.

**The Capital Contribution Should Be Approved**

14. As set forth more fully above and in the Motion, to ensure that MS will be

compensated for its work in the event the Minimum Service Fee becomes payable or the minimum Percentage Fees are not paid from the aggregate proceeds of the sales, 1271 requires a capital contribution of $2.5 million. This cost is relatively minor in comparison to the potential benefit to the estate from the monetization of the Municipal Portfolio. Because 1271's engagement of MS will best position the estate to maximize the value of the Municipal Portfolio, and based upon LBSF's assessment of the market price for such services and MS's experience and expertise, LBSF believes that the amount of the Minimum Service Fee and the Percentage Fees are reasonable.

### **The Sale Should be Free and Clear of All Liens and Claims**

15. I am not aware of any parties that have any liens, claims, encumbrances, or interests in LBSF's interests in 1271. If LBSF's interests in 1271 are not sold free and clear, bidders may be deterred from offering the highest and best offers for the purchase of such interests. Accordingly, the Court should authorize all sales of LBSF's interests in 1271 to be free and clear of any liens, claims, encumbrances or interests.

16. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of April 2011.

/s/ Daniel Ehrmann
Daniel Ehrmann