## Exhibit 3

**The Plan Proponents Liquidation Analysis for the Consolidated Debtors**

Pursuant to section 1129(a)(7) of the Bankruptcy Code (the "Best Interest Test"), each holder of an impaired Claim or Equity Interest must either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such non-accepting holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. In determining whether the Best Interest Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets in chapter 7. The gross amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their chapter 7 cases. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interest Test has been met for general unsecured creditors, further reductions would be required to eliminate Cash and asset liquidation proceeds that would be applied to Secured Claims and amounts necessary to satisfy chapter 7 and chapter 11 Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims, including any incremental Administrative Expense Claims that may result from the termination of the Debtors' businesses and the liquidation of assets. Any remaining Cash would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

The Liquidation Analysis (the "Liquidation Analysis") below reflects the estimated Cash proceeds, net of liquidation-related costs that would be available to the Consolidated Debtors creditors if the Consolidated Debtors were to be liquidated in a separate chapter 7 case. This Liquidation Analysis is based upon the Debtors' Liquidation Analysis filed with the Debtors' Amended Plan and Disclosure Statement and has been adjusted as necessary to conform with the terms of the Plan Proponents' Plan.  Specifically, this Liquidation Analysis assumes the substantive consolidation of the Chapter 11 Debtors as such outcome is not dependent upon whether the Debtors liquidate under Chapter 7 or Chapter 11.

The Debtors report that underlying the Liquidation Analyses are a number of estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

For certain assets classes, estimates of the liquidation proceeds were made for each asset individually. For other assets, liquidation values were assessed for general classes of assets by estimating the percentage recoveries that a chapter 7 trustee might achieve through their disposition. A Liquidation Analysis was performed for the assets in each asset class held by the Debtors, and assumes that the Debtors' liquidation proceeds would be distributed in accordance

with Bankruptcy Code sections 726 and 1129(b) of the Bankruptcy Code. The Liquidation Analysis should be read in conjunction with the following notes.

**Assumptions**

For purposes of the Debtors' Liquidation Analysis, the Debtors disclosed that they considered many factors and made certain assumptions. Those assumptions that the Debtors consider significant are described below.

1. **General**

    a. **Conversion:** The Chapter 11 Cases are consolidated and converted to chapter 7 in 2012.

    b. **Appointment of Chapter 7 Trustee:** One chapter 7 trustee is appointed to liquidate and wind down the Consolidated Debtors' estate.

    c. **Chapter 7 Trustee:** The chapter 7 trustee would retain professionals (investment bankers, law firms, accounting firms, consultants, forensic experts, etc.) to assist in the liquidation and wind down of the Debtors' estates. Although the chapter 7 trustee may retain certain of the Debtors' professionals for discrete projects, it is assumed that the trustee's primary investment banking, legal, accounting, consulting and forensic support would be provided by new professionals, because most (if not all) of these professionals will hold Claims in the chapter 7 cases. Nevertheless, given that the Debtors have been managing the orderly wind down of their estates with over 500 employees and financial advisor professionals, and have stayed current on tax filings, regulatory and judicial inquiries, and financials records for hundreds of entities and bank accounts, it is reasonable to expect that the chapter 7 trustee will require the assistance of some portion of the Debtors' professionals and/or their employees to assist in maintaining regulatory compliance and in the short-term liquidations due to their institutional knowledge.

    d. **Start-Up Time:** Given the complexity of the Chapter 11 Cases and the underlying assets and Claims, it is anticipated that the chapter 7 trustee and any newly retained professionals will require at least three to six months to familiarize themselves with the Debtors' estates, the assets, the Claims and related matters before they begin marketing assets or litigating Claims.

    e. **Duration of Liquidation** The Liquidation Analyses assume that after the start-up period the actual liquidation of assets of the Debtors would continue for 9 to 12 months, during which time all of the Debtors' major assets would either be sold or conveyed to the applicable lien holders and the Cash proceeds, net of liquidation-related costs, would be available for Distribution to creditors. Approximately 67,000 Claims were filed against the Debtors prior to the Bar Date, in amounts totaling approximately $1.2 trillion (including the Debtors' estimates of amounts for unliquidated Claims). As of December 16, 2010, approximately 53,500 Filed Claims remain on the Claims register. It is unlikely that the chapter 7 trustee could adequately reconcile all Claims during 12 to 18 month period of assessment and asset recovery. Therefore, a large number of the Claims in these cases will be reconciled, valued, negotiated and settled, and/or

litigated to conclusion only after the asset recovery work is mostly complete. The Debtors estimate that a chapter 7 trustee will require at least an additional 12 to 18 months to reconcile Claims and initiate litigation including, but not limited to, claim objections and avoidance actions (to the extent the applicable statute of limitations has been extended pursuant to tolling agreements). It is possible that some Distributions could be made prior to such period, but Claims would be subject to reserves.  It is not uncommon in large cases for liquidations to last many years while chapter 7 trustees prosecute difficult Claims-related and other litigation.

2. **Assets**

   a. **Cash:** Beginning Cash is based on restricted and unrestricted Cash balances.

   b. **Assets:** This analysis assumes that the assets of each Debtor are sold, transferred, abandoned or otherwise liquidated on or before 18 months from the date that the Chapter 11 Cases are converted. With respect to the different asset classes of the Debtors, the following assumptions were made when calculating the liquidation amount:

   i. <u>Derivative Contracts</u>

   The settlement or disposition of Derivative Contracts requires experienced derivatives and financial services experts. In a chapter 7 liquidation, it is assumed that the chapter 7 trustee will reduce the number of the Debtors' current employees, and that other employees will leave for other market opportunities. It is estimated that headcount is reduced significantly, which will result in the loss of legacy knowledge relating to the derivatives portfolio and will disrupt ongoing settlement discussions with counterparties.  This will make a chapter 7 liquidation significantly more difficult and will result in lower recoveries as compared to current projections.

   ii. <u>Real Estate Assets</u>

   A forced liquidation of Real Estate Assets over a 12-month period (after the 3-6 month transition period) would have an adverse impact on the value of the Debtors' recoveries from their Real Estate Assets. Additional discounts on current valuations would be required due to the following assumptions:

   - <u>Lack of liquidity in the market</u> – Potential purchasers may not be able to obtain the requisite financing to purchase the Debtors' Real Estate Assets.

   - <u>Supply and demand imbalances</u> – Given the size of the Debtors' portfolio of Real Estate Assets, if offered for sale in its entirety, the market equilibrium in certain markets or geographies may be disturbed. Assets available for sale may outweigh existing demand, inviting further discounts in order to attract non-traditional buyers.

   - <u>Bulk sales</u> – Liquidation of the Debtors' entire portfolio of Real Estate Assets within a 12-month period would require bundling multiple positions together for purchasers (most likely

by geography, property type or lien type); valuations would likely reflect discounts for what would amount to bulk purchases.

- <u>Inability to offer seller representations or warranties</u> – Liquidation would preclude the Trustee/Debtors' willingness or ability to offer representations and warranties on positions for sale. Additional discounts would be necessary to compensate buyers for the risk of not securing certain guarantees or indemnities.

Taking these assumptions into account, liquidation discounts have been applied based on lien type and property type. Discounts relative to lien type are a reflection of the priority of Claims on underlying collateral (so senior positions generally have lower discounts than equity discounts). Discounts relative to property type (office, condo/multifamily, hospitality, land, etc.) are a reflection of unique features in the markets for those assets.

In addition, there are certain Real Estate Assets within the commercial real estate portfolio that possess unique characteristics and as a result, individual liquidation discounts have been applied. This situation generally applies to larger projects that may involve multiple positions across lien and property types (*e.g.*, a condo development with some undeveloped land), and/or debt positions whereby a liquid market for a security establishes a market price.

Other considerations

A quick liquidation of the Debtors' portfolio of Real Estate Assets would likely entail significant involvement on the part of third party investment bankers, real estate brokers, and legal resources (including representation by local counsel). For the purposes of this analysis, the Debtors included fees for brokers and bankers and additional amounts to cover legal and other contingencies.

It is possible that some of the Debtors' Real Estate Assets cannot be sold in the liquidation time frame. Outstanding litigation and structural impediments (transfer consents, regulatory or environmental restrictions, rights of first refusal, *etc.*) may require that certain positions be held beyond the self-imposed deadline.

### iii. Private Equity/Principal Investments:

The assumptions used are based on estimates and are by definition subject to variability in ultimate outcome.

Liquidation Impediments

*Contractual and Structural Impediments*

- <u>Tag-Along Rights</u>: Investors in certain Private Equity/Principal Investments have a right to dispose of a portion of their interest in any transaction in which the Debtors' transfer an interest. Such right may limit the amount of any Private Equity/Principal Investment that the Debtors are able to sell in any one transaction.

- Regulatory Restrictions: Certain Private Equity/Principal Investments impose regulatory restrictions on the type of buyer or quantity of ownership of such investment. Potential purchasers might demand a discount for any such Private Equity/Principal Investment due to the uncertainty of obtaining such approvals and the time necessary to obtain regulatory approvals.
- Structural Impediments: With respect to certain Private Equity/Principal Investments, purchasers are likely to apply discounts in a forced sale process (see "Market Psychology" below).

*Procedural Impediments*

- Market Psychology: In a chapter 7 liquidation, potential purchasers will be aware of the Debtors' desire to liquidate its Private Equity/Principal Investments in a limited time frame, and resultant pressure to accept highest price available, regardless of the inherent value of the asset.
- Higher Expenses: The complexity of selling a large number of Private Equity/Principal Investments in a limited timeframe is likely to increase costs (e.g. financial and legal advisors) as compared to a medium-term orderly liquidation of such assets.

Liquidation Process/Assumptions

For a variety of reasons, it is possible that some Private Equity/Principal Investments cannot be sold in the liquidation time frame. Outstanding litigation and structural impediments (transfer consents, regulatory or environmental restrictions, rights of first refusal, etc.) may require that certain positions be held beyond the 9 to 12-month period assumed in this liquidation analysis.

Many of these assets are in non-Debtor entities so the normal bankruptcy sale protections are not available to the buyer. Taking the owning entity into bankruptcy raises the costs to the estates and may not attract better offers.

Direct Portfolio

Given the concentration inherent in the portfolio of direct Private Equity/Principal Investments, with the largest 40 positions accounting for approximately 90% of the carrying value, it is assumed that each of the largest 40 positions are sold individually as opposed to as part of a block transaction. The remaining approximately 40 smaller Private Equity/Principal Investments in the portfolio can be divided into better known positions (sponsor co-invests) and non-sponsor positions. It is assumed that sponsor co-invests can be sold individually, while the non-sponsor positions can be sold as a block.

To sell the direct portfolio positions over a 9 to 12-month period would require the retention of multiple investment banks. The investment banks would likely run a controlled competitive auction process (bound, to a certain extent, by the transfer and other restrictions inherent in the governing documents).

GP/LP Investments

The Private Equity/Principal Investment structured as limited partnership interests would be sold through an auction process conducted by a third party. Given that it is unlikely that one buyer would acquire the entire portfolio, multiple sales would be necessary. Furthermore, because each position in this portfolio requires general partner consent, the 9 – 12 month liquidation time frame would be challenging and would likely result in substantial discounts.

The hedge fund limited partnership interests would also be sold through an auction process conducted by a third party. The buyer universe for such interests is much more limited. Also, given the significant concentration in this portfolio, as well as the length of many lock-ups, discounts would be very significant. Finally, general partner consent is required in every case.

The general partnership interests would be sold individually. Although two are public equity positions, the size of the positions and lack of trading volume make the positions highly illiquid. Third parties would be used in each case.

The aggregate cost of third parties to liquidate the GP/LP investments would be substantial.

    iv. (iv) Loans

Below outlines the liquidation impediments and the process that would be employed to effectuate the liquidation. To the extent that loans are fully funded, liquidation of these assets will not be difficult. Given the volume of Loans available for sale, however, and market participants' knowledge of the Debtors' mandate to liquidate their portfolio of Loans in a limited time frame, it is likely that a significant discount will be necessary to liquidate the portfolio. A description of the disposition of the different types of Loans held by the Debtors is set forth below:

Loan Positions

- Special Purpose Vehicles: Loans to special purpose vehicles are illiquid and are not traded in any commercial market. As a result, a financial player is the only possible buyer and would likely require a steep discount for purchase.

- Commercial Loans: Commercial Loans are generally liquid and trade in commercial markets. However, many of the Debtors' Loans include future commitments to make additional funding, so the disposition of these Loans would require an additional discount to offset the buyer's obligations and additional risk. Larger positions would require a substantial discount as a result of the expedited sale.

- Distressed Debt or Claims Against Chapter 11 Debtors: Claims against entities in a chapter 11 proceeding are generally illiquid. The Debtors would realize significant discounts to current market value.

- Loans Participated to CLOs: Loans participated to collateralized loan obligations are generally liquid and trade in the commercial markets. To the extent that the revolvers are unfunded, these positions would be priced at an additional discount.

    c. **Avoidance Actions:** Due to uncertainty and litigation risk, there are no significant amounts reflected in the liquidation analysis for avoidance actions.

    d. **Other Litigation:** Consistent with the calculation of the estimated recoveries under the Plan, no values are included for recoveries from other litigation.

3. **Costs**

    a. **Employees:** The chapter 7 trustee will require a significant number of employees to liquidate the assets. To the extent that the chapter 7 trustee terminates the post-petition employment contracts of any of the Debtors' current employees, the Debtors' estates would be subject to additional Administrative Expense Claims.

    b. **Trustee Fees:** The chapter 7 trustee would be compensated in accordance with the guidelines of section 326 of the Bankruptcy Code. The liquidation analysis assumes that the chapter 7 trustee's fees would not be greater than 1% of total Distributions by the Debtors. However, the arrangements with a Trustee may result in a different percentage.

    c. **Professional Fees:** Given that the chapter 7 trustee and, to the extent applicable, the trustee's professionals must familiarize themselves with the Debtors, their estates, their assets and the Claims asserted against them, it is anticipated that the Debtors' estates would incur significant professionals' fees in the context of a chapter 7 liquidation.

    d. **Litigation Regarding Plan Issues:** While the Plan provides for compromises of the numerous Plan Issues, in a chapter 7 liquidation, a chapter 7 trustee would only be required to liquidate the Debtors' assets and distribute the proceeds of such liquidation to creditors in accordance with the priorities set forth in section 726 of the Bankruptcy Code. Creditors would therefore be more likely to litigate the Plan Issues. Litigation over the Plan Issues, including substantive consolidation and the enforceability of Guarantee Claims, would be extraordinarily expensive and time consuming.

4. **Estimated Recoveries**

    a. **Determination of Claims:** All Claims are either Allowed or estimated for purposes of establishing a reserve in 2011, such that first Distributions would not be made until 2012. Final determination of all disputed Claims cannot be determined at this time.

    b. **Classes of Claims:** The estimated recoveries use the Classes established by the Plan to facilitate creditors' ability to compare the recoveries under the Plan versus recoveries in a chapter 7 liquidation.

    c. **Timing of Distributions:** While cash may be realized sooner, it is currently contemplated that the first Distributions under the Plan would commence in late 2011. In contrast, the Debtors anticipate that the first Distribution to Creditors in a chapter 7 would not be made until late 2012. This assumption is based, in part, upon the belief that the chapter 7 trustee

would be reluctant to make significant interim Distributions prior to the determination of at least 50% of the disputed Claims, which would take longer with fewer employees with institutional knowledge.

        d.  **Additional Claims:** The liquidation of the Debtors will result in additional Claims being satisfied under chapter 7, including, but not limited to, Claims arising from the rejection of any remaining executory contracts, unexpired leases, and post-petition contracts. However, due to the uncertainty as to which contracts or leases would ultimately be rejected and the determination of the amount of any rejection damages (if any), no Claims related to the rejection of executory contracts are included in the estimated recoveries. Any such Claims, if filed, would further dilute any recoveries in a chapter 7 liquidation.

In connection with the settlements, LBHI entered into capital maintenance agreements and agreed to sell the Banks within 18 months or, if the Banks could not be sold, to purchase the remaining assets of the Banks at a value that would be sufficient to satisfy the Banks' liabilities. If the case were converted to a chapter 7 liquidation and the Banks were liquidated in a substantially shorter period than the 18-month period provided for in the capital maintenance agreements, LBHI is likely to recover a depressed value for the assets of the Banks. In that event, pursuant to its obligations under the capital maintenance agreement, LBHI would have to make up for the shortfall of the Banks' capital (approximated at $1 billion) and satisfy the Banks' liabilities as an administrative expense of its estate.

        e.  **Amount of Allowed Claims:** The determination of the Allowed Claims is an uncertain process given the number of disputed, contingent and/or unliquidated Claims in the Chapter 11 Cases. Furthermore, the accelerated wind down timeline and the substantial loss of experienced workforce that could result from conversion to a chapter 7 would result in a significant impairment to the Claims process.  No order or findings have been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Allowed Claims used in the liquidation analysis. To the extent that Claims have been reduced due to elimination of duplicate and superseded Claims, this is the basis for the Claims used in the liquidation analysis. Claims subject to caps in the recovery analysis for purposes of the Plan will be included at their estimated amounts for purposes of the liquidation analysis. The actual amount of Allowed Claims could vary materially.

Notes to Liquidation Analysis

1. **Secured Claims**

To the extent that the value of the collateral securing a Secured Claim is less than the Secured Claim, the remaining amount would be a deficiency Claim and a General Unsecured Claim against the applicable Debtor.

2. **Estimated Aggregate Unpaid Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims**

The amount of Cash that would be available for Distributions to general unsecured creditors in a chapter 7 case would be reduced by any Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims that are senior to General Unsecured Claims in the Chapter 11 Cases. Any remaining Cash after satisfaction of these Claims would be available for Distribution to general unsecured creditors and Equity Interest holders in accordance with the Distribution hierarchy established by section 726 of the Bankruptcy Code.

### 3. Liquidation Analysis

The Liquidation Analysis is presented as the recoveries from the assets and the estimated Claims in a liquidation as compared to such amounts under the Plan.

**LEHMAN BROTHERS HOLDINGS INC.**

**Liquidation Analysis**

> The analysis contained herein is based on data, estimates, projections and assumptions made by the Debtors and their current management in the Debtors' Liquidation Analysis attached as Exhibit 5 to the Debtors' Amended Disclosure Statement, dated January 25, 2011. The data, estimates, projections and assumptions underlying this analysis have not been independently verified and actual results may differ materially from those reflected herein.

**Exhibit 3 – Liquidation Analysis**
Lehman Brothers Holdings Inc.
*($ in millions)*

| Assets | Plan Value | Liquidation Value | % | | Estimated Claims/Recoveries | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Liquidation | | Plan | |
| | | | | | Liquidation Estimated Claims[1] | Recovery Amount | Recovery %[2] | Recovery Amount | Adjusted Recovery %[2] |
| Cash & Cash Equivalents | 14,322 | 14,322 | 100.0% | Class 1 - Priority Non-Tax Claims | 3 | 3 | 100.0% | 3 | 100.0% |
| | | | | Class 2 - Secured Claims | 3,301 | 3,301 | 100.0% | 3,301 | 100.0% |
| Restricted Cash | 3,602 | 3,602 | 100.0% | Class 3 - Senior Unsecured Claims | 83,582 | 14,178 | 17.0% | 20,436 | 24.4% |
| | | | | Class 4 - General Unsecured Claims | 43,418 | 6,525 | 15.0% | 9,404 | 21.7% |
| *Financial Instruments & Other Inventory* | | | | Class 5A - Subordinated Class 5A Unsecured Claims[3] | 3,393 | - | 0.0% | - | 0.0% |
| Real Estate | 8,604 | 3,344 | 38.9% | Class 5B - Subordinated Class 5B Unsecured Claims[4] | 10,368 | - | 0.0% | - | 0.0% |
| Loans | 4,832 | 3,497 | 72.4% | Class 5C - Subordinated Class 5C Unsecured Claims[5] | 1,503 | - | 0.0% | - | 0.0% |
| Principal Investments | 2,806 | 1,765 | 62.9% | Class 6 - Subsidiary Unsecured Claims | 31,093 | 4,672 | 15.0% | 6,735 | 21.7% |
| Derivatives & Other Contracts | 5,385 | 4,270 | 79.3% | Class 7 - Consolidated Third-Party Guarantee Claims | - | - | - | - | - |
| Other Assets | 2,837 | 2,537 | 89.4% | Class 8 - Senior Non-Consolidated Third-Party Guarantee Claims | 16,698 | 2,751 | 16.5% | 3,966 | 23.7% |
| **Operating Asset Recoveries** | **42,388** | **33,336** | **78.6%** | Class 9 - General Non-Consolidated Third-Party Guarantee Claims | 1,017 | 153 | 15.0% | 220 | 21.7% |
| | | | | Class 10 - Senior Non-Consolidated Intercompany Claims[6] | 22,430 | 3,805 | 17.0% | 5,484 | 24.4% |
| | | | | Class 11 - General Non-Consolidated Intercompany Claims[6] | 10,871 | 1,634 | 15.0% | 2,355 | 21.7% |
| | | | | Class 12 - Senior Non-Consolidated Affiliate Guarantee | - | - | - | - | - |
| | | | | Class 13 - General Non-Consolidated Affiliate Guarantee | - | - | - | - | - |
| Intercompany Receivables | 13,749 | 10,193 | | Class 14A - LBT Intercompany Claims | - | - | - | - | - |
| Equity Interests in Affiliates | 3,269 | 1,822 | | Class 14B - LBSN Intercompany Claims | - | - | - | - | - |
| | | | | Class 15A - LBT Third-Party Gurantee Claims | - | - | - | - | - |
| **TOTAL ASSETS** | **59,406** | **45,351** | | Class 15B - LBSN Third-Party Gurantee Claims | - | - | - | - | - |
| | | | | Class 16 - Designated Non-Debtor Affiliate Intercompany Claims | - | - | - | - | - |
| | | | | Class 17 - Senior Designated Non-Debtor Affiliate Third-Party Guarantee Claims | - | - | - | - | - |
| | | | | Class 18 - General Designated Non-Debtor Affiliate Third-Party Guarantee Claims | - | - | - | - | - |
| | | | | Class 19 - Section 510(b) Claims | - | - | - | - | - |
| Estate Expenses | | | | **TOTAL CLAIMS/RECOVERIES** | **227,677** | **37,021** | | **51,903** | |
| Operating Expenses | (2,267) | (2,261) | | | | | | | |
| Post-Petition Payables | (2,422) | (2,427) | | Class 20 - Equity Interests | - | - | - | - | - |
| Admin Claims & Other[7] | (2,814) | (3,641) | | | | | | | |
| **NET DISTRIBUTABLE ASSETS** | **51,903** | **37,021** | | **TOTAL RECOVERIES** | | **37,021** | | **51,903** | |

Note: All values that are exactly zero are shown as "-". Values between zero and $500,000 appear as "0".

1. "Liquidation Estimated Claims" means, for all Classes except Classes 4, 7, 8, 9, 15A, 15B, 17, and 18 the Debtors' estimate of Allowed Claims, and for Classes 7, 8, 9, 15A, 15B, 17, and 18, the Permitted Third-Party Guarantee Claims. Class 4 includes the Plan Proponents estimate of General Unsecured Claims as the result of the substantive consolidation of LBT and LBSN. Claim amounts assume all Classes reject the Plan, and are therefore included with no enhancements.
2. Recovery shown as a percentage of Liquidation Estimated Claims.
3. Any amounts allocated to LBHI Class 5A are reallocated to LBHI Classes 3 and 10.
4. Any amounts allocated to LBHI Class 5B are reallocated to LBHI Classes 3, 8, 10, and 12.
5. Any amounts allocated to LBHI Class 5C are reallocated to LBHI Classes 3, 5A, 5B, 8, 10, and 12.
6. Includes Pre-petition Intercompany Claims only. Post-petition Intercompany Claims are Administrative Expense Claims.
7. Comprised of Administrative Expense Claims, professional compensation and Priority Tax Claims. Liquidation scenario includes $1 billion of incremental liquidation administrative expenses.