**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                             Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>                             Debtor. | Case No. 08-01420 (JMP)<br>(SIPA) |

**MEMORANDUM SUPPORTING THE POSITIONS OF BARCLAYS**
**CAPITAL INC. RELATING TO THE ORDERS IMPLEMENTING THE**
**COURT'S FEBRUARY 22, 2011 DECISION**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

April 28, 2011

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ........................................................................................................1

I.     Barclays Is Entitled To Actual Delivery Of The Undelivered Clearance Box
       Assets It Demanded In Its Motion, Plus Any Others That The Trustee Can
       Identify. ...................................................................................................1

       A.     Barclays Is Entitled To The Actual Delivery Of All Undelivered Clearance
              Box Assets, Together With Any Distributions Or Similar Payments Made On
              Those Assets Since The Closing. ....................................................2

       B.     Barclays Is Entitled To The Undelivered Assets On Schedule B, The Other
              Clearance Box Assets Barclays Demanded In Its Motion, And Any Other
              Assets That Were In The LBI Clearance Boxes As Of The Closing. ...........9

       C.     The Court Should Either Order The Trustee To Deliver The Assets Barclays
              Has Identified, Or Should Order A Clear Process To Finalize The List Of All
              Undelivered Clearance Box Assets. ...............................................21

II.    The Court's Order Should Clarify Barclays' Entitlement To Certain Specific
       Categories Of Margin Assets..........................................................................22

       A.     The Court's Order Should Provide That Barclays Is Entitled To
              Approximately $2.3 Billion In Margin Assets Needed To Satisfy Liabilities
              Barclays Assumed On Behalf Of The Futures Customers Transferred From
              LBI.......................................................................................23

       B.     The Court's Order Should Ensure That Barclays Is Credited For The
              Liabilities It Incurred Under The Transfer and Assumption Agreement, And
              For Any Other Liabilities That Qualify For A Lien Under Section 550(e) Of
              The Bankruptcy Code................................................................27

       C.     The Court's Final Order Should Provide That Barclays Is Entitled To
              Approximately $1.5 Billion In Margin Assets That Were Neither Cash Nor
              Cash Equivalents. ....................................................................36

       D.     The Court's Order Should Provide That Barclays Is Entitled To Clearing
              Funds And Guaranty Funds Needed To Operate LBI's ETD Business. ......39

       E.     The Trustee Should Not Be Awarded Prejudgment Interest On Any Margin
              Assets Barclays Is Ordered To Deliver To The Trustee.........................41

       F.     The Trustee's Request To "Amend" The Court's Opinion Should Not Be
              Permitted...............................................................................44

III.    The Court's Order Should Provide That Barclays Is Entitled To The $769 Million
In 15c3-3 Assets When And If It Is Determined That The Trustee Has Sufficient
Assets To Satisfy All Legitimate Customer Claims........................................................45

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*4200 Ave. K Realty Co. v. 4200 Realty Co.*,
    506 N.Y.S.2d 723 (N.Y. App. Div. 2d Dep't 1986)...............................................8

*ASARCO LLC v. Americas Mining Corp.*,
    404 B.R. 150 (S.D.Tex. 2009)..............................................................................27

*Butler v. Wright*,
    78 N.E. 1002 (N.Y. 1906) .....................................................................................6

*CBS Inc. v. Ziff-Davis Pub. Co.*,
    75 N.Y.2d 496 (1990)......................................................................................12, 13

*Center v. Hampton Affiliates*,
    66 N.Y.2d 782 (1985).......................................................................................6, 17

*Citadel Equity Fund Ltd. v. Aquila, Inc.*,
    168 F. App'x 474 (2d Cir. 2006) .........................................................................38

*Creative Waste Mgmt., Inc. v. Capitol Envtl. Serv., Inc.*,
    429 F. Supp. 2d 582 (S.D.N.Y. 2006) .................................................................11

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
    662 F.Supp. 798 (S.D.N.Y. 1987) ..................................................................27, 35

*Garber v. Legg Mason, Inc.*,
    347 F. App'x. 665 (2d Cir. 2009).........................................................................38

*Goldstein v. Held*,
    881 N.Y.S.2d 471 (N.Y. App. Div. 2d Dep't 2009).............................................8

*Haymarket LLC v. D.G. Jewelry of Canada Ltd.*,
    736 N.Y.S.2d 356 (N.Y. App. Div. 1st Dep't 2002) ............................................6

*In re 1031 Tax Group, LLC*,
    439 B.R. 84 (Bankr. S.D.N.Y. 2010) ..................................................................42

*In re Ames Dep't Stores, Inc.*,
    2010 WL 6052849 (Bankr. S.D.N.Y. Sept. 10, 2010).........................................42

*In re Bruno Mach. Corp.*,
    435 B.R. 819 (Bankr. N.D.N.Y. 2010) ...........................................................43, 44

*In re Colonial Realty Co.*,
    226 B.R. 513 (Bankr. D. Conn.1998)..............................................................27, 44

*In re Davis*,
    148 B.R. 165, 177-78 (Bankr. E.D.N.Y. 1992) ................................................................27

*In re Frankel*,
    191 B.R. 564 (Bankr. S.D.N.Y. 1995) ............................................................................5

*In re Globe Mfg. Corp.*,
    567 F. 3d 1291 (11th Cir. 2009) ...................................................................................42

*In re Gucci*,
    126 F.3d 380 (2d Cir. 1997) .........................................................................................12

*In re Integra Realty Resources*,
    354 F.3d 1246 (10th Cir. 2004) ...............................................................................27, 35

*John St. Auto Wrecking v. Motors Ins. Corp.*,
    288 N.Y.S.2d 281 (N.Y. 2d Dist. 1968) .......................................................................12

*Jones v. UNUM Life Ins. Co.*,
    223 F.3d 130, 139 (2d Cir. 2000) .................................................................................44

*Kramer v. Time Warner*,
    937 F.2d 767 (2d Cir. 1991) .........................................................................................38

*Menzel v. List*,
    49 Misc.2d 300 (Sup. Ct. N.Y. Co. 1966) ...................................................................12

*Metro. Coal Co. v. Howard*,
    155 F.2d 780 (2d Cir.1946) ..........................................................................................12

*Morales v. Freund*,
    163 F.3d 763 (2d Cir. 1999) .........................................................................................42

*New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*,
    442 F.3d 101 (2d Cir. 2006) .........................................................................................16

*Waddle v. Cabana*,
    220 N.Y. 18 (1917)..........................................................................................................6

## Statutes

11 U.S.C. § 550 ...........................................................................................................passim

28 U.S.C. § 1961 ...............................................................................................................44

N.Y. UCC § 2-312(1) ........................................................................................................12

## Other Authorities

18 WILLISTON ON CONTRACTS § 52:65 ........................................................................12

FASB Statement 95 ....................................................................................................39

IASB Board document ...............................................................................................39

RESTATEMENT (SECOND) OF CONTRACTS § 202(4) ..................................................16

SEC Release 34-39738 (Mar. 10, 1998)....................................................................18

## Rules

12 C.F.R. § 220.9(b) ..................................................................................................39

17 C.F.R. § 240.15c2-1 .............................................................................................18

17 C.F.R. § 240.15c3-3(a)(3) ....................................................................................18

17 C.F.R. § 240.15c3-3(a)(4) ....................................................................................18

17 C.F.R. § 240.15c3-3(a)(5) ....................................................................................18

17 C.F.R. § 240.8c-1 .................................................................................................18

Fed. R. Evid. 201 ......................................................................................................38

## PRELIMINARY STATEMENT

1.      In accordance with the agreement of the parties and the direction of the Court at the April 11, 2011 status conference, Barclays Capital Inc. ("Barclays") submits this brief to address the outstanding issues between Barclays and James W. Giddens as Trustee (the "Trustee") for the SIPA liquidation of Lehman Brothers Inc. ("LBI").

2.      While Barclays and the Trustee have continued to hold a series of informal discussions to seek to reconcile their competing Proposed Orders implementing this Court's February 22, 2011 decision, the parties have not been able to reach agreement on numerous issues.  Accordingly, the parties have agreed that they would submit these briefs to address the remaining unresolved issues that pose an obstacle to agreeing upon Proposed Orders.

3.      During the meet-and-confer process, the positions of both Barclays and the Trustee have evolved since the Proposed Orders were submitted on March 4, 2011.  In addition, between the filing of these briefs and the May 9 hearing on these issues, Barclays and the Trustee will continue to discuss their positions in the hopes of narrowing or eliminating certain issues. Accordingly, Barclays will be prepared to provide a revised set of Proposed Orders at the May 9 hearing (or thereafter, as appropriate).

## ARGUMENT

**I.      <u>Barclays Is Entitled To Actual Delivery Of The Undelivered Clearance Box Assets It Demanded In Its Motion, Plus Any Others That The Trustee Can Identify.</u>**

4.      Barclays and the Trustee disagree over (a) whether Barclays is entitled to an actual delivery of all Clearance Box Assets that have not yet been delivered (the "Undelivered Clearance Box Assets"), or instead is entitled solely to money damages plus prejudgment interest; (b) what the precise population is of the Undelivered Clearance Box Assets; and (c)

1

what if any process should exist to resolve that disagreement. We address each issue in turn

below.

### A. Barclays Is Entitled To The Actual Delivery Of All Undelivered Clearance Box Assets, Together With Any Distributions Or Similar Payments Made On Those Assets Since The Closing.

5.       Based on discussions with the Trustee, Barclays understands the Trustee to be

asserting that: the Barclays claim with respect to the Undelivered Clearance Box Assets was a

breach of contract claim; Barclays succeeded on that claim and has an "adequate remedy at law"

in the form of the damages Barclays proved through the "evidence adduced at trial"; therefore,

Barclays is not entitled to the actual delivery of the Undelivered Clearance Box Assets, but

instead should receive the damages it proved at trial, plus prejudgment interest. The Trustee's

position is wrong at each step, and should be rejected.[1]

### 1. The Barclays Motion Sought Enforcement Of The Sale Order And "Delivery" Of The Undelivered Clearance Box Assets, Not Damages For Breach Of Contract.

6.       Barclays filed a motion to enforce the Sale Order to secure the *actual delivery* of

all undelivered Purchased Assets; Barclays did not file an adversary complaint to recover money

damages for a breach of contract. Specifically, on January 29, 2010, Barclays filed a motion that

was titled "Motion of Barclays Capital Inc. To Enforce The Sale Order And *Secure Delivery* Of

All Undelivered Assets" ("Barclays' Motion") (emphasis added).[2] The Barclays Motion stated

that it sought an order "direct[ing] James W. Giddens (the 'Trustee'), as Trustee for the SIPA

---

[1]  While Barclays is willing to consider any fair remedy for the Trustee's established failure to deliver the remaining Clearance Box Assets, the Trustee's attempt to impose a "damages plus interest" remedy upon Barclays is unjustified, and undesirable. The value of the assets that should have been delivered to Barclays has increased considerably since the middle of the financial crisis in September 2008 (when most were illiquid, and many were of dubious value). The Estate should not be permitted to reap the windfall of the increase in value of assets that should have been delivered to Barclays at the time of the Closing.

[2]  *See* Case No. 08-13555 (JMP) Docket No. 6815; SIPA Proceeding Case No. 08-1420 (JMP) Docket No. 2582. For the Court's convenience, Barclays will provide the Court with a disc containing courtesy copies of all record evidence and Court submissions cited in this memorandum (along with a courtesy copy of this memorandum itself), and will also provide a copy of that disc to Trustee's counsel.

liquidation of Lehman Brothers Inc., and Lehman Brothers Holdings, Inc. (the 'Debtor'), *to deliver to Barclays* the following assets (collectively, the 'Undelivered Assets'), and/or take such actions as may be necessary *to cause their delivery*, as soon as is practicable, but in no event more than sixty days from entry of the requested order." *Id.* at 2. The Undelivered Assets that the Motion sought to compel the Trustee (and LBHI) to deliver included all Undelivered Clearance Box Assets. *Id.*[3]

7.     The Barclays Motion attached a Proposed Order which likewise made clear that Barclays was moving to compel the *actual delivery* of all of the Undelivered Assets. Paragraph 2 of the Barclays Proposed Order provided that the Trustee "*shall deliver* to Barclays the following assets (collectively, the 'Undelivered Assets'), and/or take such actions as may be necessary to *cause their delivery*, as soon as is practicable, but in no event more than sixty days after entry of this Order."[4]

8.     Thus, the Trustee has no basis for trying to re-characterize the relief Barclays claimed as one of "damages" for "breach of contract." The claim was unequivocally brought as a motion to enforce the Sale Order by compelling delivery of the Undelivered Clearance Box Assets.[5]

---

[3] The Motion described the Undelivered Assets which the Trustee should be compelled to deliver as including "all unencumbered securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, including but not limited to clearance boxes held by LBI at the Depository Trust Clearing Corporation ('DTCC') ('Clearance Box Assets')."

[4] *See* Barclays Proposed Order filed January 29, 2010, Notice of Hearing on Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets (Case No. 08-13555 (JMP) Docket No. 6814, attachment 2; SIPA Proceeding Case No. 08-1420 (JMP) Docket No. 2581, attachment 2).

[5] Similarly, the Trustee's claims in its Motion and its Adversary Complaint were all cast as requesting "the return" of the Clearance Box Assets (and other Disputed Assets) that had already been delivered to Barclays. *See* Trustee Adversary Complaint filed November 16, 2009, Count I (seeking "the return" of the Clearance Box Assets that were delivered to Barclays); Trustee's Motion for Relief Pursuant To The Sale Orders, Or Alternatively, For Certain Limited Relief Under Rule 60(b) ("Trustee Motion"), dated September 15, 2008, at ¶ 88 ("the Trustee is entitled to avoid such transfers under Section 549 and to recover the Disputed Assets under Section 550 of the Bankruptcy Code.").

2.    The Sale Order Requires Specific Performance Of The Purchase
Agreement — *i.e.*, That Sellers Deliver All Purchased Assets.

9.    Barclays sought to compel delivery of the undelivered Purchased Assets by asking the Court to enforce the Sale Order for a very simple reason:  the Sale Order expressly directed the Sellers to deliver all the Purchased Assets to Barclays, and expressly provided that the Purchase Agreement was "specifically performable and enforceable" against the Lehman Sellers.  BCI Ex. 16 at ¶¶ 4, 5.

10.    Paragraph 4 of the Sale Order provides that "the Debtors are authorized *and directed to transfer the Purchased Assets* (except to the extent that certain intellectual property rights may be owned by entities other than Seller) *to the Purchaser* and, as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) free and clear of all Interests of any kind or nature whatsoever…." *Id.* at ¶ 4 (emphasis added).

11.    The Sale Order also provides that "*the Purchase Agreement* and the transactions and instruments contemplated hereby *shall be specifically performable and enforceable* against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with respect thereto." *Id.* at ¶ 5 (emphasis added).[6] Similarly, paragraph 20 of the Sale Order confirms that the Court "retains jurisdiction" to, among other things, "*compel delivery of the Purchased Assets to Purchaser.*" *Id.* at ¶ 20.

12.    These provisions establish that the Court *has already ruled* that Barclays would be entitled to specific performance in the event of non-delivery — *i.e.*, to the *actual delivery* of any undelivered Purchased Assets.  The Court should reject the Trustee's assertion that Barclays

---

[6]  The Sale Order entered in the LBI SIPA liquidation case expressly includes the LBI Trustee within the definition of "Debtors" as used in the Sale Order in the LBHI case.  BCI Ex. 17.

is entitled solely to damages, and not to delivery of the Undelivered Clearance Box Assets, as one that directly contradicts the express provisions of the Sale Order.

13. This Court has previously held that where a party is seeking to enforce a sale order that in itself compels a course of action, the non-performing party must specifically perform regardless of whether specific performance would otherwise be available as a matter of contract law. *See In re Frankel*, 191 B.R. 564 (Bankr. S.D.N.Y. 1995). Just as was the case in *Frankel*, in this case "we are not dealing merely with the breach of a contract between private parties" because "[t]he contract here was confirmed and approved by an order of this Court." *Id.* at 574. By failing to comply with such a court-approved contract, the defendant in *Frankel* was "in breach and violation of a final and non-appealable order of this Court," and therefore the Trustee in that case was entitled to specific performance from the defendant "*regardless of the Trustee's entitlement to the common law contractual remedy of specific performance.*" *Id.* (emphasis added). The same is true in this case. The Sale Order required the Purchased Assets to be delivered to Barclays, and even went the extra step (which was not true in *Frankel*) of ordering that the Purchase Agreement was "specifically performable and enforceable." To comply with this Sale Order, the Trustee must now deliver the undelivered Clearance Box Assets to Barclays.

3. The Court's Ruling Requires Delivery Of The Undelivered Clearance Boxes Assets.

14. The Court's February 22, 2011 decision likewise confirms that Barclays is entitled to an actual delivery of the Undelivered Clearance Box Assets. For example, in the title to the section of the Opinion addressing the three categories of Disputed Assets, the Court held "Barclays Does Not Have An Unconditional Right to the 15c3-3 Assets and Is Not Entitled to Margin Assets But Is Entitled to **Transfer** of the Clearance Box Assets." *See* Op. at 76

5

(emphasis added).  Similarly, in evaluating the Trustee's alternative Rule 60(b) request for relief, the Court stated that it "will focus on the impact of *the ruling that the Clearance Box Assets* ***should be transferred** to Barclays.*"  *Id.* at 97 (emphasis added).  Finally, in the last sentence of its Opinion, the Court held that the Barclays Motion "is granted in relation to ***delivery** of the Clearance Box Assets.*"  *Id.* at 102 (emphasis added).

15.    Thus, the Opinion leaves no doubt that the Court was granting the Barclays' Motion to compel *delivery* of the Undelivered Clearance Box Assets.[7]

    4.    <u>Even If The Barclays Claim Is Analyzed Solely As A Breach Of Contract Claim, Barclays Is Entitled To Specific Performance.</u>

16.    Even if the issue of specific performance had not already been resolved through the provisions of the Sale Order and this Court's Opinion (as it was), it is clear that specific performance is appropriate under these circumstances.

17.    Under New York law, specific performance is the appropriate remedy where the contract called for the delivery of securities or other assets that were thinly traded and difficult to value.  *See generally, Haymarket LLC v. D.G. Jewelry of Canada Ltd.*, 736 N.Y.S.2d 356, 357 (N.Y. App. Div. 1st Dep't 2002) (awarding specific performance because trading in the stock was so thin); *Butler v. Wright*, 78 N.E. 1002, 1003 (N.Y. 1906); *Waddle v. Cabana*, 220 N.Y. 18, 26 (1917); *Center v. Hampton Affiliates*, 66 N.Y.2d 782, 786 (1985) (awarding specific performance because the value of securities was not easily ascertainable).

18.    The undisputed trial testimony established that the Clearance Box Assets — sometimes referred to as a "bag of hammers" — were not publicly traded and were difficult to

---

[7]  In analyzing the Disputed Asset issues, the Court's decision is not framed as an adjudication of a breach of contract claim (indeed, it does not even use the word "breach" in that section of the Opinion), but instead is framed entirely as an analysis of whether Barclays is entitled to the *delivery* of the Disputed Assets under the terms of the Sale Order and the Purchase Agreement.  *See* Op. at 76-97.  This is consistent with both the Sale Order and the Barclays' Motion, as explained above.

value.  *See e.g.,* Kirk Dep. Tr. 105:4-106:17; 8/27/2010 Tr. at 53:24 -54:18 (Klein); 10/6/2010

Tr. at 56:6-57:3 (Pfleiderer).

19.    While Barclays was required under the accounting rules to place a value on the

assets it acquired, that does not mean those assets were liquid and easy to value.  Indeed, the trial

proved, and the Court found in its Opinion, that the securities that Lehman was transferring to

Barclays were extremely difficult to value at the time of the Sale.  For example, Professor

Pfleiderer's testimony established that over 50% of all the securities being transferred to

Barclays were either "Level 2" or "Level 3," which means they could not be valued by reference

to the daily transaction price in a sufficiently liquid market, because there was no such market

for those assets.  10/6/10 Tr. at 93:16-95:7 (Pfleiderer); BCI Ex. 1103 (Pfleiderer Demonstrative

29).  The Clearance Box Assets were disproportionately of this nature:  Professor Pfleiderer's

analysis shows that of the total population of assets valued by Barclays, the Clearance Box

Assets were even more illiquid and difficult to value than the securities obtained by Barclays

through the Repo transaction.  *See* BCI Ex. 341 (Expert Report of Professor Paul Pfleiderer), at

29 n.48.[8]

20.    Consistent with this evidence, the Court found that employees of both Barclays

and Lehman were making efforts throughout the week "to estimate market values for assets that

were *difficult to value at a time of extreme uncertainty in the financial markets*."  Op. at 22-23

(emphasis added).  The Court likewise found that "many of the assets were complex structured

financial products that were *difficult to value with any degree of confidence*."  *Id.* at 23-24

(emphasis added).  The Court concluded that "mark-to-market valuation judgments during

---

[8]  To the extent the Court believes further inquiry into the liquidity of the assets in question is necessary, Barclays
requests the opportunity to present a short expert analysis that would show that the overwhelming majority of these
Undelivered Clearance Box Assets were Level 2 or 3 (or unknown), and could not be valued easily by reference to a
daily transaction price in a liquid market.

Lehman Week were uncertain at best due to extreme market volatility." *Id.* at 21. Similarly, the Court recognized that "the only thing that was certain was uncertainty." *Id.* at 69.[9]

21.    Given the foregoing evidence and findings, it is clear that even if it were necessary to address the issue of specific performance versus damages under state contract law (which it is not, given the provisions of the Sale Order and this Court's Opinion), the Court should properly conclude that specific performance is the appropriate remedy for the Undelivered Clearance Box Assets. Accordingly, Barclays is entitled to specific performance — *i.e.*, to specific delivery of the undelivered Clearance Box Assets.

5.    Barclays Is Entitled To Delivery Of All Post-Closing Distributions And Similar Payments On The Clearance Box Assets.

22.    When specific performance is the appropriate remedy, the law requires delivery of any cash earnings received by the defendant on the asset that is subject to the specific performance during the period defendant improperly held the asset. *See 4200 Ave. K Realty Co. v. 4200 Realty Co.*, 506 N.Y.S.2d 723, 724-25 (N.Y. App. Div. 2d Dep't 1986) (ordering the non-performing party to remit any profits derived from the asset to be turned over because "[a] court granting the remedy of specific performance will, so far as possible, place the parties in the same situation they would have been had the contract been performed according to its terms"); *Goldstein v. Held*, 881 N.Y.S.2d 471, 472 (N.Y. App. Div. 2d Dep't 2009). The Undelivered

---

[9]    *See also* Op. at 15 ("Seasoned observers too young to recall the Great Depression had never seen anything to match these disastrous events. By the end of the week, Goldman Sachs and Morgan Stanley had sought refuge under the Bank Holding Company Act to achieve greater operational stability and security. By virtue of astonishingly fast-moving market forces, venerable Wall Street institutions were toppling, being rescued or restructured on a daily basis. Financial counterparties had reason to distrust the soundness of blue chip firms with once seemingly unimpeachable credentials. This loss of confidence was fueled by widespread skepticism concerning the underlying financial strength and reliability of balance sheets that included illiquid and hard-to-value securities backed by subprime assets. These securities and other structured financial products had been widely disseminated to financial institutions throughout the world. Just about every major bank had to make tough judgment calls as to the valuation of these highly-complex and now-suspect structures and faced questions as to the fair value of these assets. This difficult week ushered in an uncertain and volatile period when trust was in very short supply and incremental risk was something to be avoided.").

Clearance Box Assets include assets that generated interest and dividend income, as well as assets that have matured, been redeemed, or otherwise been converted to cash or other assets that Barclays would have received if the Trustee had timely delivered those assets.  Thus, as a matter of law, Barclays is entitled to any distributions, redemptions, maturity payments, or any other proceeds relating to the Undelivered Clearance Box Assets since the Closing.[10]

**B.    <u>Barclays Is Entitled To The Undelivered Assets On Schedule B, The Other Clearance Box Assets Barclays Demanded In Its Motion, And Any Other Assets That Were In The LBI Clearance Boxes As Of The Closing.</u>**

23.    Despite a series of discussions on the subject since the Court issued its February 22, 2011 decision, Barclays and the Trustee have not been able to agree upon a precise list of the Undelivered Clearance Box Assets.

24.    The Court held that Barclays is entitled to the assets covered by section 1(a)(ii)(B) of the Clarification Letter, which provides that the Purchased Assets shall include "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser (provided, however, that Purchaser in its discretion may elect within 60 days after the Closing to return any such securities to LBI); provided, that no securities owned by LBHI or any Subsidiary of LBHI (other than LBI and other than as specified in the Agreement or clause (iii) below)."  BCI Ex. 5 at § 1(a)(ii)(B).

25.    The foregoing contractual language entitles Barclays to the following Undelivered Clearance Box Assets:

- The assets listed on Schedule B to the Clarification Letter that have not yet been delivered;

---

[10]  The Trustee has indicated informally that he likely will not disagree with this proposition, since it is clear as a matter of established law.

- To the extent not listed on Schedule B, the assets former LBI personnel at Barclays identified through an additional analysis performed beginning in the fall of 2008, and that were demanded from the Trustee in early 2009 (with a supplement in early 2010), and then again in the Barclays Motion to Enforce The Sale Order dated January 29, 2010; and

- Any additional assets that were "held in LBI's 'clearance boxes' as of the time of Closing," which the Trustee should be ordered to identify (or which the parties could jointly identify through a clearly established process).

26.    The Trustee, by contrast, has yet to identify what he believes the Undelivered Clearance Box Assets are.  Instead, he has enlisted his advisers at Deloitte in an effort to chisel down the population of assets identified by Barclays, without ever identifying what they believe the actual population of Undelivered Clearance Box Assets to be.

1.    <u>The Assets On Schedule B Were Expressly Represented To Be Clearance Box Assets That Would Be Transferred To Barclays.</u>

27.    There are 856 assets listed on Schedule B to the Clarification Letter that have still not been delivered to Barclays.[11]  The language of paragraph 1(a)(ii)(B) provides that these assets were in the LBI clearance boxes as of the close of business on September 21, 2008.  BCI Ex. 5 at § 1(a)(ii)(B).  The Sale closed before the open of business on September 22, 2008.  *See* BCI Ex. 284 (Harvey Miller email at 8:18 a.m. on September 22, 2008, stating that the deal closed "ten minutes ago").  It was not possible for any assets to be transferred out of LBI's clearance boxes between the close of business on September 21 and the actual Closing of the Sale.  Thus, the assets listed on Schedule B were *expressly represented* to be Clearance Box Assets that were included within the definition of Purchased Assets to be delivered to Barclays.

28.    Indeed, a week *after* the Closing, Lehman's lawyers at Weil Gotshal, together with Barclays, filed a motion to submit the final Schedule B to the Court under seal.  BCI Ex. 19.

---

[11]  This number can be determined by comparing the list of assets on Schedule B (BCI Ex. 20) with each list of Clearance Box Assets that have been transferred to Barclays (found on BCI Exs. 755, 375, 745).

On that final Schedule B that was filed with the Court, Weil Gotshal included another express representation that the assets on Schedule B were Purchased Assets:

> Schedule B lists securities believed to be held in LBI's 'clearance boxes' *as of the time of the Closing* (as defined in the Clarifying Letter) and is without prejudice to the right of Barclays to receive other securities held in such clearance boxes but not listed on Schedule B or to return securities, in each case pursuant to the terms of the Clarifying Letter.

BCI Ex. 20 (emphasis added).

29.     Schedule B was a schedule to the Clarification Letter, which was itself part of the Purchase Agreement as defined in the Sale Order.  Thus, Schedule B is itself a contractual document.  *See Creative Waste Mgmt., Inc. v. Capitol Envtl. Serv., Inc.*, 429 F. Supp. 2d 582, 602 (S.D.N.Y. 2006).  Accordingly, the representation made on this schedule (like that made in the Clarification Letter) is a contractual representation:  the assets on Schedule B were Clearance Box Assets, and therefore were Purchased Assets to be delivered to Barclays.

30.     There should therefore be no dispute that Barclays is entitled to the assets listed on Schedule B that have not yet been delivered.  Nevertheless, the Trustee has not agreed that Barclays is in fact entitled to these assets.

31.     The Trustee may argue that, contrary to the representation in the Clarification Letter and on Schedule B itself, some of the assets listed on Schedule B were in fact not in LBI's clearance boxes as of the Closing.[12]  Even if that were true, however, that would simply mean that the Lehman Sellers (as defined in the APA) are in breach of their express warranties and

---

[12]  Barclays acknowledges that many of the undelivered assets on Schedule B were not identified in the analysis performed months after the Closing by former LBI operations executives in an effort to identify the Undelivered Clearance Box Assets.  8/14/09 Hraska Dep. Tr. at 141:3-142:12, 242:12-243:18.  Nevertheless, these assets were listed on Schedule B and hence were represented to be Clearance Box Assets.

representations in the Purchase Agreement, which would not relieve the Trustee from his

obligation to deliver those securities.[13]

32.     First, § 5.4 of the APA contains a representation and warranty that:  "Seller owns

(directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and

exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted

Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code."  BCI

Ex. 1 (APA), at § 5.4.  Both the Clarification Letter and Schedule B itself expressly provide that

the Purchased Assets included the assets on Schedule B.  BCI Ex. 5 (Clarification Letter) at §

1(a)(ii)(B); BCI Ex. 20 (Schedule B).  Second, even if § 5.4 of the APA is ignored, if the assets

on Schedule B were not actually in the LBI clearance boxes, that would mean that the Seller is in

breach of the express representations in the Clarification Letter and Schedule B that such assets

*were* in the clearance boxes.[14]

33.     It is well-established that a seller who breaches a warranty of title is strictly liable

for the damages caused by that breach.  *See generally CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d

496, 503 (1990) (quoting *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (L.

Hand, J.)).  The seller is liable even if he believed in good faith that he had good title.  *Menzel v.

List*, 49 Misc.2d 300, 314 (Sup. Ct. N.Y. Co. 1966); 18 WILLISTON ON CONTRACTS § 52:65.

Moreover, it is not necessary for the purchaser to demonstrate that he relied on the

---

[13]  Further, to the extent the Trustee argues there was a mistake in the identification of Clearance Box Assets and that some assets listed on Schedule B should not have been included in the sale, that claim is moot because there was no stay of the sale pending appeal and the Court has already determined that Barclays did not act in bad faith. *See In re Gucci*, 126 F.3d 380, 389 (2d Cir. 1997) (holding that a challenge to the improper inclusion of assets in a § 363 sale is moot where the sale was not stayed and the purchaser acted in good faith).

[14]  In addition, even if there had not been an express warranty of title, there would be an implied warranty under the UCC and common law.  *See* N.Y. UCC § 2-312(1); *John St. Auto Wrecking v. Motors Ins. Corp.*, 288 N.Y.S.2d 281, 283 (N.Y. 2d Dist. 1968).

representation; in fact, the seller remains liable even if the purchaser openly questioned and

doubted the accuracy of the representation.  *See CBS*, 75 N.Y.2d at 503-04.

34.    Thus, Barclays is entitled to the 856 assets on Schedule B that were never

delivered, or is entitled to an appropriate remedy for the Seller's breach of an express warranty

that such assets were Clearance Box Assets owned by LBI that would be delivered to Barclays.[15]

2.    Barclays Is Entitled To The Other Clearance Box Assets It Demanded From The Trustee In its Motion, Plus Any Other Undelivered Clearance Box Assets, Even If They Were Not Listed On Schedule B.

35.    As quoted above, the cover page to Schedule B expressly provides that Schedule

B "is without prejudice to the right of Barclays to receive other securities held in such clearance

boxes but not listed on Schedule B."  BCI Ex. 20.  Lehman's lawyers at Weil Gotshal recited

precisely the same language in the September 30, 2008 joint motion asking this Court to allow

Schedule B to be filed under seal.  BCI Ex. 19 at p. 4, n.3.  Thus, the "without prejudice"

language was expressly agreed to and adopted by Lehman's lawyers at Weil Gotshal, whom the

Trustee admitted at trial represented him in the Sale negotiations.  5/5/10 Tr. at 59:19-25

(Kobak); Kobak Dep. Tr. at 134:22-25.

36.    As the "without prejudice" clause provides, Barclays is entitled to any additional

assets "held in such clearance boxes but not listed on Schedule B."[16]  Thus, consistent with the

language on Schedule B, beginning in the fall of 2008, Barclays commenced a process of

---

[15]  To be sure, if the Trustee is able to demonstrate that these undelivered assets on Schedule B were not actually in the LBI clearance boxes as of the Closing, and if the Trustee is ordered to deliver to Barclays all of the other Undelivered Clearance Box Assets demanded by Barclays in its January 2010 Motion (*see* Barclays' Memorandum at ¶ 378 (citing BCI Ex. 359, Exs. 3-5)), then Barclays might not press its breach of warranty claim outlined above.

[16]  The reason for the "without prejudice" clause cited above was that the LBI personnel responsible for assembling Schedule B faced limitations on the information they had access to, and adopted a conservative approach of leaving assets off the list if they were unsure whether the assets were available.  *See generally* 1/15/2010 Hraska Dep. at 139:7-141:15; 161:9-163:12.  Thus, because it was understood that there might be other assets in the clearance boxes that were difficult to identify at the time of the Sale, Weil Gotshal agreed to the "without prejudice" language that was added to Schedule B.  *See* 1/15/2010 Hraska Dep. at 58:18-59:7; BCI Ex. 145.

analyzing LBI's stock records and related information that was not possible to review at the time

of the Sale.[17]  That process identified a population of Clearance Box Assets that were

undelivered.  Those assets were set forth on a series of different lists; both those lists, and the

methodology that produced those lists, were described in testimony that was admitted into

evidence at trial.[18]  Most of the assets were identified on two lists that were provided to the

Trustee in March 2009, together with a demand that such assets be delivered to Barclays.  *See*

BCI Ex. 735.  The remainder were identified on two subsequent lists (which were later

combined), provided to the Trustee in January of 2010.  BCI Ex. 886.  All of the assets on these

lists were demanded from the Trustee in the Barclays Motion to Enforce The Sale Order, dated

January 29, 2010.  *See* Barclays' Motion at ¶ 378 (citing BCI Ex. 359, Exs. 3-5).

      37.    The Trustee had these Barclays lists of additional Undelivered Clearance Box

Assets long before trial, deposed the Lehman operations and finance executives responsible for

creating those lists, and had an opportunity to take complete discovery concerning the analysis.

*See generally* BCI Ex. 735; 1/15/10 Hraska Dep. Tr. at 35:21-36:17, 42:14-24, 85:20-86:25,

100:10-103:20, 127:20-128:7, 129:6-131:22.  Thus, contrary to the Trustee's repeated claim that

he has been asking for some time for information relating to how Barclays compiled these lists,

he has had that information since long before trial.

      38.    Despite all of this discovery, prior to the Court's February 22, 2011 decision, the

Trustee never provided to Barclays any of *his own* analysis of the Barclays lists, or any

alternative statement of what the Trustee's financial advisers believed to be an accurate

---

[17]  *See* 8/14/09 Hraska Dep. Tr. at 142:13-143:24, 145:13-21, 295:21-296:21, 311:20-312:20; BCI Exs. 734, 735, 164.

[18]  *See generally* 8/14/09 Hraska Dep. Tr. at 311:20-316:24; 1/15/10 Hraska Dep. Tr. at 35:21-36:17, 88:7-20, 104:21-106:16, 127:20-128:7, 129:6-131:5; 9/2/10 Tr. at 32:18-33:1, 55:15-23 (Romain); *see also* BCI Exs. 735, 886.

statement of the Undelivered Clearance Box Assets.  The Trustee likewise submitted no evidence at trial taking issue with any of the analyses Barclays performed in identifying these Undelivered Clearance Box Assets.

39.    In any event, even if the Court concludes that the precise identification of the Undelivered Clearance Box Assets is an issue that requires further proceedings, the Court should reject the Trustee's efforts to reduce the population of Undelivered Clearance Box Assets contained on the Barclays lists.  Based on discussions with the Trustee, it appears the Trustee is making three main assertions in this regard.  Each is addressed in turn below.

> a.    Contrary To The Trustee's Assertion, The Clearance Box Assets Include "Physical Securities."

40.    While LBI's principal clearance boxes have for many years been in electronic form, the *traditional clearance boxes* were physical vaults at clearing corporations that contained securities in physical form — *i.e.*, the physical certificates for those securities.  At the time of Closing, LBI continued to hold physical securities in clearance boxes at the DTC and elsewhere.

41.    The Trustee asserts that these "physical securities" should be excluded from the definition of Clearance Box Assets.  The Trustee's argument should be rejected:  these assets are clearly covered by the contractual language, were contained on Schedule B, and were understood by LBI and Barclays at the time of the Sale to be included in the definition of Clearance Box Assets.

42.    The Clarification Letter provides that the definition of Purchased Assets included "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing."  BCI Ex. 5 at § 1(a)(ii)(B).  This language does not exclude securities that were held in physical form, rather than in electronic form.  There is therefore no basis for reading the contract to exclude such "physical securities" from the definition of Clearance Box Assets.

43.     The evidence in the record confirms that the parties always understood that the

Clearance Box Assets included physical securities.  First, the course of conduct of the parties in

creating Schedule B demonstrates that the parties intended for physical securities to be included

in the definition of Clearance Box Assets.  The initial list of Clearance Box Assets that LBI

prepared on September 19, 2008, which was provided to Barclays by Weil, indicates on its face

that it *contained physical securities*.  *See* BCI Ex. 819 (listing clearance box assets that included

"physical positions"); BCI Ex. 750 (same).  Similarly, unrebutted testimony admitted at trial

indicates that the final version of Schedule B that was prepared by LBI personnel, and that Weil

Gotshal reviewed, circulated, and filed in Court after the Closing, *also contained physical*

*securities*.  *See* 1/15/10 Hraska Dep. Tr. at 139:7-141:15 ("physical securities were added to the

list that was finally submitted" to the Court).  This proves that both parties understood and

intended for the definition of Clearance Box Assets to include physical securities.[19]

44.     Second, the unrebutted evidence at trial confirms that it was LBI's understanding

that the Clearance Box Assets included physical securities.  The LBI operations employee who

was principally involved in developing the list of Clearance Box Assets for LBI, Jim Hraska,

testified as follows:

> Q.     Can you tell me how you define the term clearance box, Mr. Hraska?
>
> A.     Sure.  To me a clearance box is an account at either a depository or a
> custodial bank into which securities can be moved into or out of.
>
> Q.     Does your definition include a vault or depository that holds physical
> securities?
>
> A.     Yes.  That would be an account at a custodial bank.

1/15/10 Hraska Dep. Tr. at 7:10-7:20 (designated and admitted in evidence).

---

[19]  *See generally New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) ("any
course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the
agreement") (quoting Restatement (Second) of Contracts § 202(4)).

45.     There is no testimony from any other witness that contradicts this understanding. Since Hraska worked for LBI in developing Schedule B before the Closing (*see* 8/14/09 Hraska Dep. Tr. at 47:18-48:12), his understanding represents the understanding of LBI at the time of the Closing, which was shared by Barclays.[20]

46.     Indeed, Mr. Hraska testified that in preparing Schedule B during the weekend before the Closing, one of the difficulties he and his colleagues faced related specifically to the *physical securities*:  he testified that it was especially difficult at that time to determine which of physical securities were owned by LBI, and which were not.  *See* 1/15/10 Hraska Dep. Tr. at 139:7-140:20.  This operational difficulty would obviously have been irrelevant if LBI had not believed that LBI's physical securities were included in the definition of the Clearance Box Assets being transferred to Barclays as Purchased Assets.  Thus, while some of the physical securities were left off Schedule B due solely to poor information at that time about whether LBI had those assets to transfer, the testimony confirms that LBI understood and intended for the Clearance Box Assets to include any physical securities that were in LBI's clearance boxes as of the Closing.  *See* 1/15/2010 Hraska Dep. at 7:10-7:20, 139:7-141:15.

47.     The Trustee admitted at trial that he did not negotiate the Sale, but instead was represented by Lehman personnel and Weil Gotshal. 5/5/10 Tr. at 59:10-25 (Kobak); *see also* Kobak Dep. Tr. at 22:19-23:18.  He therefore is in no position to contradict the overwhelming evidence showing that LBI understood and intended that the Clearance Box Assets would include physical securities, and that physical securities were included on the final version of Schedule B that was reviewed and filed in Court by Weil Gotshal.

---

[20]  *See generally Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985).

b.    <u>Contrary To The Trustee's Assertion, The Clearance Box Assets Include A Portion Of The Assets LBI Purchased On Margin For Customers, And Which LBI Had The Power To Transfer Or Sell.</u>

48.     In addition to the physical securities, the Trustee has asserted that another subset of the assets that were "held in LBI's 'clearance boxes' as of the time of Closing" should not be considered Clearance Box Assets:  namely, those that had been acquired by LBI for customers, but which the customers had not paid for.  This dispute relates to a portion of the "margin securities," that had been purchased for customers "on margin, " *i.e.*, with financing provided by LBI.  *See generally,* 17 C.F.R. § 240.15c3-3(a)(3) & (4).

49.     The Trustee's argument should be rejected because LBI was clearly entitled to transfer the margin securities it held in its clearance boxes (which had not been paid for fully by customers), and the contractual language clearly obligated it do so.  As a general matter, a broker-dealer is entitled to transfer, pledge, or sell margin securities if those securities have a market value less than 140% of the total "debit balances" in the customer's account — which essentially means, 140% of the amount the customer has borrowed from the broker dealer for purposes of trading on margin.  *See* 17 C.F.R. § 240.15c3-3(a)(5) (defining "excess margin securities" as those in excess of 140% of the customer's debit balances); 17 C.F.R. § 240.8c-1 (allowing hypothecation of non-excess margin securities); 17 C.F.R. § 240.15c2-1 (same); *see also*, SEC Release 34-39738 (Mar. 10, 1998)(agreeing that brokers' loans of customer securities are exempt from the hypothecation rules).  In other words, if a customer directs a broker to buy 1000 XYZ Shares for $20,000, and the broker provides $10,000 of financing for that acquisition, the broker can sell a portion of the customer's XYZ Shares having a market value of up to $14,000 (140% of $10,000).

50.     In identifying the Clearance Box Assets that should be delivered pursuant to the APA and Clarification Letter, Barclays adopted the conservative approach of seeking delivery

18

only of customer margin shares having a value equal to the amount LBI financed.  Using the

example of the XYZ Shares referred to in the preceding paragraph, Barclays claims XYZ Shares

only if worth $10,000 or less, not the full $14,000 amount that LBI was authorized to sell under

the SEC regulations.[21]  This means, in effect, that Barclays seeks delivery of only a subset of

customer margin shares:  only those which customers *had not paid for*, which LBI was therefore

entitled to sell, and which LBI was maintaining in its clearance boxes along with other securities

available for delivery pursuant to its routine clearing and settlement procedures.

51.     In short, LBI had the legal right to pledge, transfer, or sell the securities that LBI

purchased for customers but which the customer had not paid for.  To the extent some of these

assets were "assets held in LBI's 'clearance boxes' as of the time of Closing," they were

promised to Barclays under paragraph 1(a)(ii)(B) of the Clarification Letter (*i.e.*, they constituted

"Clearance Box Assets" and hence Purchased Assets).  Accordingly, the Trustee should not be

permitted to remove assets from any of the lists of Undelivered Clearance Box Assets by

asserting that such assets "belonged to customers" because they were "margin securities."

      c.     <u>If The Trustee Is Permitted To Assert That The Barclays Methodology
Uses The Wrong Data, Then The Trustee Should Be Ordered To Provide
Barclays With Full Discovery Of Any Data That May Be Relevant.</u>

52.     The Trustee has also asserted that the data Barclays used in late 2008 to create its

lists of Undelivered Clearance Box Assets was not an accurate reflection of the assets held in

LBI's clearance boxes as of the Closing.  The Barclays financial and operations professionals are

continuing to work with the Trustee and his financial advisers at Deloitte to understand and

address these data and methodology issues.  While it may be necessary to ask the Court to

---

[21]  The work performed by former Lehman operations personnel at Barclays has taken the conservative approach of
excluding any margin securities that exceeded 100% of the customer's debit balance, and therefore it is clear that
Barclays is not claiming any "excess margin securities" that LBI would not have had the legal right to transfer.
8/14/09 Hraska Dep. Tr. at 314:20-316:5.

19

resolve some of the potential disputes relating to the appropriate data and methodology to be used to identify all of the Undelivered Clearance Box Assets, it is premature to address those issues in this briefing.

53.    However, to the extent the disputes over data and methodology are to continue, Barclays does make the following request:  the Trustee should not be permitted to challenge the factual basis for the Barclays' methodology without also being ordered to provide full discovery to Barclays of any information Barclays needs to analyze the data being relied upon by the Trustee.  In addition, the Trustee should be obligated to provide *his own statement* of all of the Undelivered Clearance Assets (a statement that should be required to include physical securities and margin securities).  During the discovery period in this proceeding, the Trustee resisted all of the Barclays' discovery demands (interrogatories, document requests, and 30(b)(6) topics) that sought to elicit from the Trustee his own statement of all Undelivered Clearance Box Assets, and the data sufficient to show those assets.[22]  The Trustee is the party that holds and controls these assets; he should not be permitted to keep hidden from Barclays all the information about those assets (which may well show the existence of assets Barclays has been unable to identify), even while he uses selective information in an effort to attack the lists of assets Barclays demanded over two years ago.

---

[22]  If the Court believed it appropriate to see evidence of these requests and the Trustee's refusals, Barclays could of course provide them.  *See generally* Barclays' 30(b)(6) Notice to the Trustee, Nov. 12, 2009, Topic 3 (BCI Ex. 546); Barclays' Third Request for the Production of Documents to the Trustee, Nov. 12, 2009, Request 8; Barclays' First Set of Interrogatories to the Trustee, Nov. 12, 2009, Interrogatories Nos. 5-6; Barclays' Second 30(b)(6) Notice to the Trustee, Jan. 22, 2010, Topic 3; Trustee's Responses and Objections to Barclays' Third Request for the Production of Documents to the Trustee, Dec. 2, 2009; Response to Request 7 (erroneously identified as Request 8); Trustee's Responses to Barclays' First Set of Interrogatories to the Trustee, Dec. 14, 2009, response to Interrogatories Nos. 5-6; Trustee's Objections to Barclays' Second 30(b)(6) Notice to the Trustee, Jan. 29, 2010, Topic 3.

C. **The Court Should Either Order The Trustee To Deliver The Assets Barclays Has Identified, Or Should Order A Clear Process To Finalize The List Of All Undelivered Clearance Box Assets.**

54.    Based upon this briefing (and the reply briefs to be filed May 4), the Court should enter an Order requiring the Trustee to deliver to Barclays (a) all assets on Schedule B that have not yet been delivered, (b) all assets on the Barclays' lists of Undelivered Clearance Box Assets, and (c) any other assets the Trustee is aware of that were in LBI's "clearance boxes" as of the time of Closing.

55.    To the extent the Court concludes it is not possible to enter such an Order based on the existing record, the Court should enter an Order that establishes a clear process for resolving all of the issues raised by the Trustee that are not resolved as a result of this briefing. That Order should obligate *the Trustee* to provide a complete statement of *all* "securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing," *including* all physical securities or margin securities held in those clearance boxes (as explained above).  Absent such a precise obligation, the Trustee will continue to take the approach of attacking the lists Barclays developed years ago, and refusing to provide information that might identify other assets Barclays has never been in a position to identify.  The Trustee should not be permitted to engage in such evasive conduct.

56.    Finally, the Court should reject the Trustee's Proposed Orders, which provided merely that "the Trustee and Barclays shall work cooperatively in good faith to effectuate this Order."[23]  Given the nature of the disputes that have now arisen as a result of positions the Trustee has taken, the Trustee's approach is unworkable and impractical:  it would leave unresolved substantial disputes regarding the precise assets Barclays is entitled to receive under

---

[23] *See* Trustee's Proposed Orders submitted March 4, 2011.

21

the Court's decision.  While the Court should be able to resolve those disputes as a result of this briefing, to the extent it cannot, a clear process is needed — not the vague admonition the Trustee prefers.

## II.    The Court's Order Should Clarify Barclays' Entitlement To Certain Specific Categories Of Margin Assets.

57.    The Trustee and Barclays have the following disputes with respect to how to interpret and implement the Court's decision on the Margin Assets:  (A) whether the Court's holding regarding Margin Assets held "for the benefit of customers" (Op. at 89) entitles Barclays to keep assets that were needed to satisfy the liabilities Barclays assumed to brokers and exchanges on behalf of the LBI futures customers (who were transferred to Barclays); (B) whether Barclays is entitled to Margin Assets needed to offset the consideration it provided to acquire those Margin Assets (in the form of assumed liabilities), based upon section 550(e) of the Bankruptcy Code and the fact that the Court's Opinion effectively voided the Transfer and Assumption Agreement ("TAA"); (C) whether Barclays is entitled to Margin Assets that were neither cash nor cash equivalents at the time of Closing; (D) whether Barclays is entitled to those non-cash assets that LBI held as "clearing funds" and "guaranty funds" at the OCC and other exchanges since those funds were required under "various regulations and rules . . . to support trading of futures and options contracts" on behalf of customers (Op. at 89); (E) whether the Trustee should be awarded prejudgment interest, at a rate of 9% from the date of the Closing, on any Margin Assets Barclays is ordered to transfer back to the Trustee; and (F) whether the Court should accept the Trustee's request that it amend its Opinion to remove a statement that the "asset scramble" led to the identification of the Margin Assets.[24]

---

[24]  Barclays notes that issues (B), (D), and (E), above, arose during communications with the Trustee after the March 4 Proposed Orders were submitted, and therefore the positions of the parties on these issues are not reflected in the Proposed Orders submitted by either party on March 4, 2011.

58.    As a threshold matter, it is worth noting that a precise breakdown of all the

Margin Assets at issue is a relatively complex undertaking, which is why Barclays suggested that

the Order establish a process which would call for a schedule to be prepared based on record

evidence, identifying each different, potentially relevant category of Margin Assets.  In general,

as the Court noted in its Opinion, there was a total of approximately $6 billion in Margin Assets:

the Trustee did not dispute Barclays' entitlement to approximately $2 billion of these assets

(because he agreed they were held for customers), but did dispute Barclays' entitlement to

approximately $4 billion of these assets.  Of the total of approximately $6 billion in Margin

Assets, the record demonstrates that (a) Barclays previously received approximately $4 billion

($1.3 billion in cash margin in LBI's OCC accounts, plus approximately $2.7 billion pledged to

the accounts of LBI's futures customers of which, again, the Trustee agrees Barclays is entitled

to keep at least $2 billion), (*see* BCI Ex.133 at cell F16, BCI Ex. 353 at Exs. 1-3; M.494, M.495),

and (b) Barclays has not received approximately $2 billion (more than half of which the Trustee

currently controls, but some of which is held by foreign brokers or Lehman affiliates overseas).

*See* BCI Ex. 353 at Exs. 1, 3, M.494 at p.1, M.495 at p.1; BCI Exs. 335, 156.[25]

A.    **The Court's Order Should Provide That Barclays Is Entitled To
      Approximately $2.3 Billion In Margin Assets Needed To Satisfy Liabilities
      Barclays Assumed On Behalf Of The Futures Customers Transferred From
      LBI.**

59.    The Court's decision holds that Barclays is entitled to the Margin Assets that were

"customer property 'held' by LBI for the benefit of customers."  Op. at 89.  The Court

recognized that "LBI held approximately $2 billion in customer property as margin for futures

positions of customers, along with additional customer property held as margin for the options

positions of customers," and that "[t]he language within the parenthetical would authorize a

---

[25]  All of the foregoing valuation estimates are approximate, and reflect valuations as of the Closing.

transfer of these customer funds to Barclays (for the benefit of those customers) in connection with the transfer of those customer accounts." *Id.* at 89-90.

60.    Barclays interprets this holding as entitling Barclays to Margin Assets that were needed to cover liabilities assumed by Barclays with respect to exchange-traded derivative ("ETD") customers who were transferred to Barclays under the Sale.  As a general matter, LBI's options customers were not transferred to Barclays except to the extent they were PIM customers.  The amount of customer property Barclays was entitled to receive for the PIM customers was settled in a December 2009, Court-approved settlement.[26]  Thus, the extent of Barclays' entitlement under the holding above is determined by reference to the liabilities Barclays assumed with respect to the LBI futures customers transferred to Barclays under the Sale.

61.    The record evidence contains a statement of the liabilities Barclays assumed with respect to the LBI futures customers transferred to Barclays.  In order to prepare its overall "acquisition balance sheet" (BCI Ex. 133), Barclays had to prepare a "futures balance sheet" which itemized the assets and liabilities acquired as part of LBI's business as a futures commission merchant.  That futures balance sheet was entered into evidence as part of BCI Ex. 729, which is an email chain attaching the futures balance statement ("Futures Balance Sheet").

62.    The Barclays Futures Balance Sheet contains the following liabilities, all of which related solely to futures customer accounts (*i.e.*, not to accounts in which LBI or its affiliates conducted their trading)[27]:

---

[26] *See* SIPA Proceeding Case No. 08-1420 (JMP) Docket Nos. 2097, 2338.

[27] *See* M. 494 at p. 1, see "Domestic Exchanges" and "Lehman Affiliates" rows, as labeled in left-most column (chart prepared by Barclays in response to Trustee's 30(b)(6) Notice itemizing each line entry from Futures Balance Sheet, and showing that balances for "domestic exchanges" and "Lehman Affiliates" related solely to customer accounts).

- a $2.335 billion liability to futures customers for Margin Assets those customers had deposited with LBI prior to the Closing;

- a $6.7 million liability for fee rebates and interest amounts owed to customers (described as "Accrued Fees" on Barclays' futures acquisition balance sheet);

- a $134.8 million liability to unaffiliated exchanges for losses incurred during the previous day on the positions of LBI's futures customers that traded through those exchanges; and

- a $127.7 million liability to LBIE for the benefit of its customers, based upon Margin Assets LBIE had deposited on behalf of those customers in an LBI omnibus customer account prior to the Closing.

BCI Ex. 729 at p. 3 (in "Liabilities" column).

63.     Barclays was obligated to satisfy all of these liabilities, and all of them reflected liabilities Barclays assumed solely because of LBI futures customers who were transferred to Barclays.  Thus, as of the Closing, Barclays incurred total liabilities of $2.604 billion with respect to futures customers transferred from LBI.  BCI Ex. 729.

64.     The Futures Balance Sheet also demonstrates that Barclays acquired a receivable from these same futures customers of $315 million.  *Id*.  If Barclays is correct that the Court's decision entitles it to receive Margin Assets sufficient to cover the full amount of the liabilities listed above, Barclays would agree that these liabilities should be reduced by the amount of the $315 million receivable from customers, since most of that receivable was likely used to cover the liabilities owed to brokers and exchanges.  Thus, Barclays seeks an Order confirming that it is entitled to retain $2,289,565,522 in Margin Assets that were received as part of the futures business, and that were needed to cover net liabilities owed on behalf of futures customers.[28]

65.     The Trustee agrees that Barclays is entitled to Margin Assets of approximately $2.02 billion to cover what the Trustee would characterize as the liabilities owed directly to the

---

[28]  This amount of $2,289,565,522 reflects the total liability on behalf of futures customers of $2,604,664,985 *minus* the receivable from futures customers of $315,099,463.  BCI Ex. 729.

LBI futures customers:  that number reflects the $2.335 billion liability to customers on the Futures Balance Sheet, minus the $315 million receivable from customers, also on the Futures Balance Sheet.  But the Trustee's position is neither a complete nor an accurate way of determining the liabilities Barclays assumed with respect to the futures customers who were transferred from LBI.

66.     The Trustee's position is that Barclays is not entitled to Margin Assets needed to cover the liabilities Barclays incurred on behalf of LBI futures customers to brokers and exchanges — *i.e.*, the liabilities of $134.8 million and $127.7 million listed above and on the Futures Balance Sheet.  That position should be rejected.  First, the liability of $134.8 million was a *direct reduction of the amount of Margin Assets available to Barclays* at the domestic exchanges and brokers to whom that liability was owed.  It would more properly be viewed as a reduction in Margin Assets than a liability, since Barclays never even had access to the Margin Assets used to cover that liability.  With respect to the liability of $127.7 million owed to LBIE for the benefit of its customers, that liability is directly analogous to the $2.020 billion net liability LBI owed to its non-affiliate customers, which the Trustee has always admitted Barclays is entitled to satisfy with the Margin Assets it received.

67.     In any event, even if the Court were to accept the Trustee's argument, the result should be an Order confirming that Barclays is entitled to Margin Assets to offset its direct liability to futures customers of $2,342,055,976, with no reduction for the $315 million receivable from customers.[29]  The $2.335 billion number is the amount *directly owed* to the LBI futures customers transferred to Barclays.  If Barclays is not to receive Margin sufficient to cover the liabilities to exchanges and LBIE described above, then the total liability of $2.335 billion to

---

[29]  This reflects the $2.335 billion liability to futures customers for Margin Assets those customers had deposited with LBI prior to the Closing *plus* the $6.7 million liability for fee rebates and interest amounts (described as "Accrued Fees" on Barclays' futures acquisition balance sheet).

LBI futures customers should *not* be reduced by the $315 million receivable from those futures customers, for the following reason:  that receivable reflected a demand by LBI for more assets from its futures customers *specifically in order to cover the liabilities to exchanges and brokers* that had been incurred, and that Barclays assumed, on behalf of those customers.

**B.     The Court's Order Should Ensure That Barclays Is Credited For The Liabilities It Incurred Under The Transfer and Assumption Agreement, And For Any Other Liabilities That Qualify For A Lien Under Section 550(e) Of The Bankruptcy Code.**

68.    Numerous courts have held that when a bankruptcy court orders the return of assets to the estate that are held to have been improperly conveyed by the estate to a third party, that third party is entitled to any consideration it provided to acquire that property.  *See In re Davis*, 148 B.R. 165, 177-78 (Bankr. E.D.N.Y. 1992) (ordering the return of consideration where contract was avoided as a fraudulent conveyance); *ASARCO LLC v. Americas Mining Corp.*, 404 B.R. 150, 176 (S.D.Tex. 2009) ("the restoration of the property to the trustee indirectly contemplates the return of the consideration to the transferee"); *In re Colonial Realty Co.*, 226 B.R. 513, 525 (Bankr. D. Conn.1998) (finding that courts award the "market value of the property at the time of transfer, less the consideration received. . .").

69.    As the Court explained in *ASARCO*, it is an "almost universal" principle that the "intention behind Section 550(a) is to restore the estate to the financial condition it would have enjoyed absent the (fraudulent) transfer."  *ASARCO*, 404 B.R. at 176; *see also In re Integra Realty Resources*, 354 F.3d 1246, 1266 (10th Cir. 2004) ("Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred") (quotations omitted); *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 662 F.Supp. 798, 813 (S.D.N.Y. 1987) (court would not award remedy that would put plaintiff "in a better position than he would have been in had the defendant not breached the contract").

27

70.     Consistent with these authorities, Section 550(e) of the Bankruptcy Code provides that when a Trustee is entitled to the recovery of property under Section 550, a good faith transferee has a "lien" on the property in an amount sufficient to cover (among other things) the "payment of any debt secured by a lien on such property that is superior or equal to the rights of the trustee." 11 U.S.C. § 550(e).

71.     The foregoing authorities are necessarily implicated by the Court's Opinion, which holds that "Barclays should not now be entitled to Margin Assets that constitute Lehman proprietary cash and should return any such cash that it may have received." Op. at 30. To the extent the Court is going to order Barclays to return Margin Assets to the Trustee, it must also address the extent to which Barclays is entitled to an offset (or lien or similar right) to compensate it for liabilities it assumed and paid as consideration for acquiring those Margin Assets.

       1.     <u>Barclays is entitled to recover the consideration it provided under the TAA.</u>

72.     Most importantly, the Court's Order should hold that Barclays is entitled to recover (or retain as an offset) the consideration it provided under the Transfer & Assumption Agreement ("TAA"). On the night of the Sale Hearing, the Trustee signed the TAA, which was also executed by both the Options Clearing Corporation ("OCC") and (later in the weekend) by Barclays. BCI Exs. 3, 229. The TAA provided that Barclays would acquire all of LBI's accounts at the OCC, including all rights and obligations in respect of those accounts, which were expressly defined to include "all margin deposits" in those accounts. BCI Ex. 3. In exchange, however, Barclays was also agreeing to take on "all settlement obligations" with respect to LBI's OCC accounts, and all "obligations in respect of exercises of option contracts," as follows:

"WHEREAS, Lehman desires to terminate its OCC membership and transfer its rights, obligations and liabilities under and in respect of the Account pursuant to OCC's membership agreements and the Rules to Barclays, and Barclays desires to accept the transfer of all of Lehman's rights, obligations and liabilities under and in respect of the Account, including with respect to the Clearing Fund deposit and all margin deposits held by OCC with respect to the Account as of the effective date (the "Effective Date") of the consummation of the acquisition and assumption of certain assets and liabilities of Lehman by Barclays. . . .

NOW, THEREFORE, it is hereby agreed as follows:

1.      Transfer.

(a)      For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lehman hereby sells, assigns, transfers, and sets over to Barclays, without recourse or without representation or warranty (other than as expressly provided herein), all of Lehman's rights, title, interests, powers, privileges, remedies, obligations and duties in, to, and under, and in respect of the Account, as of the Effective Date including with respect to: (i) the Clearing Fund deposit; (ii) all margin deposits held by OCC with respect to the Account; (iii) all settlement obligations with regard to transactions in cleared contracts; and (iv) all rights and obligations in respect of exercises of option contracts and assignments of such exercises."

BCI Ex. 3 at p. 1 (emphasis added).

73.      Pursuant to this TAA, Barclays assumed all obligations with respect to LBI's accounts at the OCC as of the Closing.  Had there been no TAA, Barclays would not have assumed these OCC accounts and related liabilities, and the record evidence establishes that in that scenario (a) the OCC would have seized and liquidated everything in those accounts, (b) that liquidation would have generated substantial losses, and (c) those losses would likely have consumed all (or certainly most) of the Margin Assets at the OCC.[30]

74.      In Count II of his Adversary Complaint, the Trustee disputed the "enforceability" of the TAA, and asked this Court to hold that, to the extent the TAA transferred any Margin

---

[30] *See* BCI Exs. 262; 265; 267; *see also*  5/5/10 Tr. at 118:24-119:8 (Kobak); 4/27/10 Tr. at 46:6-11 (McDade); 10/5/10 Tr. at 36:12-24, 42:4-44:24, 46:10-47:12, 48:11-49:10, 49:22-50:18, 52:14-53:15 (Leitner); 8/30/2010 Tr. at 58:1-59:16 (James); *see also id.* at 17:8-18 (James); 9/8/10 Tr. at 104:14-105:1 (Raisler); 8/24/2010 Tr. at 115:7-116:3 (Rosen); 8/25/10 Tr. at 82:23-83:15 (King).

Assets to Barclays, "those transfers were not authorized by the Court or by the Sale Order." *See*

Trustee Adversary Complaint at ¶¶ 105-109.

75.    In its Opinion, the Court agreed with the Trustee (at least as to cash margin), and

held that since the TAA was not presented to the Court for approval, it is not binding on the

parties, at least insofar as it would transfer to Barclays any LBI proprietary cash:

> Independent of the Clarification Letter, Barclays also claims that the Transfer and
> Assumption Agreement entered into between the Trustee and the OCC transferred
> the Margin Assets to Barclays. However, this ancillary agreement never was
> presented to the Court, and so *cannot be dispositive as to the parameters of the
> deal* that the Court approved. In any event, the evidence indicates that the Trustee
> understood this ancillary agreement merely to facilitate the transfer of customer
> assets to Barclays.

Op. at 87, n.38 (emphasis added).

76.    Thus, the Court's Opinion has the effect of voiding the TAA, at least insofar as

the TAA, on its face, transferred "all margin deposits" to Barclays.  Indeed, under the Trustee's

interpretation of the Court's Opinion, Barclays is entitled to "*no* margin deposits" at the OCC;

that cannot be characterized as anything other than a nullification or voiding of the TAA

provision that Barclays was to receive "all margin deposits" at the OCC.[31]  Accordingly, under

the established case law cited above, Barclays is entitled to receive back the consideration it

provided under the TAA.

77.    The evidence admitted at trial demonstrates that the consideration Barclays

provided under the TAA was substantial.  As explained above, the TAA obligated Barclays to

assume all of LBI's obligations with respect to the options positions in the LBI accounts at the

---

[31]  While the Trustee claimed at trial that he understood the TAA to refer solely to customer margin, the trial showed
that the margin deposits at the OCC were all proprietary assets (including even those held in LBI's OCC customer
account).  Trustee Reply Br. at ¶ 70; BCI Ex. 340 at ¶ 43; 9/8/10 Tr. at 96:24-97:24 (Raisler); 8/30/10 Tr. at 24:15-
26:7, 62:16-19 (James); BCI Exs. 680-92.  Thus, unless the Court agrees that Barclays is entitled to receive non-cash
Margin Assets, its decision will result in Barclays receiving *none* of the "margin deposits" it was promised under the
TAA.

OCC.  BCI Ex. 3 at p. 1.  Those options positions consisted of both "long options," which are

necessarily assets, and "short options," which are necessarily liabilities.[32]  Thus, the TAA

required Barclays to provide consideration in the form of an assumption of all liabilities relating

to LBI's short option positions.

78.    Barclays was not obligated to assume these liabilities under the Purchase

Agreement, and hence would not have assumed them but for the TAA.  Originally under the

APA, the "long" options were Purchased Assets because they were included in the definition of

the "Long Positions," and the "short" options were Assumed Liabilities because they were

included in the definition of "Short Positions."  *See* BCI Ex. 1 at p. 6 (subsection (d) of the

definition of "Purchased Assets"); *id.* at p. 12 (subsection (i) of the definition of "Assumed

Liabilities").  The Clarification Letter, however, removed the "short" options (and all other

"Short Positions") from the definition of Assumed Liabilities.  BCI Ex. 5 at § 3.  It did this

because many of the "Short Positions" had disappeared (been closed out), and because Barclays

had already advanced *$45 billion in cash* to LBI.  *See e.g.,* 5/3/10 Tr. at 32:9-33:21, 67:20-68:9

(Hughes).

79.    Thus, the Purchase Agreement did not require Barclays to assume the short

options, and Barclays assumed those short positions only by executing the TAA, which it did in

reliance upon the provision in the TAA that Barclays would receive "all margin deposits" held in

LBI's OCC accounts.  BCI Ex. 3.  Indeed, the unrebutted record evidence establishes that

Barclays never would have agreed to assume LBI's liabilities to the OCC had LBI not agreed in

---

[32]  If you own a long option, you own the right to buy or sell at an agreed price and will only exercise that right if it
is profitable to do so.  Thus, a long option position can only carry positive or zero value.  If you are short an option,
then another person has the right to exercise an option to buy from or sell to you at an agreed price, which they will
do only if it is profitable for them to do so, which by definition means it is unprofitable for you.  Thus, a short option
position can carry only negative value.  BCI Ex. 340 at ¶¶ 31-36; 10/5/10 Tr. at 146:6-147:9 (Leitner).

the TAA to transfer to Barclays "all margin deposits" in LBI's accounts at the OCC.  *See generally* 6/22/10 Tr. at 23:16-24:8 (Diamond); 5/3/10 Tr. at 22:10-15 (Hughes); 5/7/10 Tr. at 245:19-246:8 (Ricci); 8/30/10 Tr. at 13:18-14:14 (James); *see also id.* at 19:18-24.

80.    Based upon the foregoing, Barclays is entitled to recover the value of the consideration it provided under the TAA.  The short options in the LBI proprietary options accounts at the OCC, which Barclays assumed as the consideration it was providing under the TAA, had a gross negative value of *more than $6 billion* as of the Closing.  *See* BCI Ex. 710.[33] Barclays also assumed liabilities in other LBI accounts at the OCC which are more difficult to measure.[34]  In any event, based solely upon the gross liability values of the short options in the proprietary options accounts, one measure of the consideration Barclays provided under the TAA would be over $6 billion.  At a minimum, Barclays is entitled to treat this consideration as an offset that would allow it to keep the $1.3 billion in Margin Assets it received in the OCC accounts.[35]

81.    The Trustee may argue for a different measure of the consideration Barclays provided under the TAA.  But even if the Court takes the more conservative approach of measuring the consideration by the *net* liabilities Barclays assumed, by that measure Barclays

---

[33]  BCI Ex. 710 was admitted into evidence during the trial. It contains a list of all short options acquired at the OCC proprietary accounts and their values, which total over $6 billion, and all long options acquired at the OCC proprietary accounts and their values, which total over $5 billion (though those numbers are not expressly summarized on the document).

[34]  In addition to the liabilities Barclays assumed on short options positions in LBI's proprietary options accounts, Barclays also assumed liabilities for (1) futures positions in LBI's proprietary accounts that were held on behalf of LBI affiliates, and (2) options positions in LBI's customer accounts that were held on behalf of LBI affiliates.  *See generally* BCI Ex. 3.  Although it would be difficult for Barclays to calculate the amount of these liabilities as of the Closing with precision at this point (some of the underlying data is unavailable or difficult to extract), the record evidence demonstrates that Barclays ultimately incurred $116 million in losses on these positions when they were liquidated shortly after the Closing.  *See* BCI Ex. 147, at pp. 2-3.  That $116 million liability serves as a good approximation of the *net* liabilities incurred by Barclays for these accounts.

[35]  In addition, Barclays should be permitted to recover the remainder of the $6 billion in consideration it provided under the TAA (a) as an offset against any other Margin Assets Barclays received and would otherwise be ordered to return to the Trustee, (b) as a basis for claiming and receiving any other undelivered Margin Assets, and/or (c) as the basis for a claim of unjust enrichment against the Estate.

still provided over $1 billion in consideration:  under the TAA, Barclays assumed more than $6

billion in short option liabilities it was not obligated to assume under the Purchase Agreement; if

that amount is netted against approximately $5 billion in long option assets Barclays was entitled

to under the Purchase Agreement (independent of the TAA), the result is $1.02 billion.  BCI Ex.

710; *see also* 9/2/10 Tr. at 22:4-23:6, 28:13-19.[36]  Thus, even under this more conservative

approach, Barclays would be entitled to an offset that would allow it to keep approximately $1

billion of the $1.3 billion in OCC Margin Assets that it actually received.

82.    That Barclays is entitled to at least a $1 billion offset to reflect the consideration it

provided under the TAA is confirmed by examining what the evidence shows the Trustee would

have recovered had there been no TAA.  In that scenario, the OCC would have seized the LBI

accounts, including especially all the Margin Assets, and would have liquidated everything at a

massive loss.  BCI Exs. 262, 265, 267; 5/5/10 Tr. at 118:24-119:8 (Kobak).  The evidence shows

that this loss would have been likely to consume most if not all of the $2.2 billion in Margin

Assets at the OCC — leaving the Trustee with *none* of those assets.  *See supra,* note 30.  At a

minimum, the losses suffered on the OCC liquidation would have been *greater* than the $1

billion net difference between the shorts and the longs in the proprietary options accounts as of

the Closing:  that $1 billion net liability reflects a fair market value of the long options at $5

billion; if liquidated by the OCC in a fire sale, those assets would have been worth far less, and

the total losses on the liquidation, and hence the total loss of Margin Assets, would therefore

---

[36]  Again, the above amounts do not include the additional liabilities incurred on the firm futures account and the affiliate positions in the customer account (summarized in note 34, *supra*).  Moreover, while it is not possible to determine precisely the amount of total out-of-pocket losses incurred by Barclays on these positions because they were merged into the Barclays accounts shortly after the Closing, the record evidence demonstrates that the liabilities continued *to increase* after the Closing:  for example, Barclays suffered an additional $700 million in losses in closing out the positions in LBI's proprietary accounts at the OCC.  8/30/10 Tr. at 51:20-24 (James); 9/2/10 Tr. at 228:7-15 (Romain).

have been far greater than $1 billion.[37]  Thus, awarding Barclays an offset of $1 billion is a very conservative measure of its entitlement.

83.    Finally, allowing Barclays to offset the liabilities against the Margin Assets at the OCC is entirely consistent with the Trustee's understanding of the deal, *as articulated in this litigation*.  In deposition, the Trustee's 30(b)(6) representative admitted that he believed Barclays was entitled to Margin Assets at the OCC sufficient to offset the liabilities Barclays assumed:

> Q.    It [the Collateral Account Agreement signed by the Trustee and Barclays] says, "LBI has assigned Barclays all rights in securities, cash and other property, defined as collateral, pledged by LBI to the Options Clearing Corporation and held for OCC's benefit at JPMorgan Chase." Did you see that?
>
> A.    Yes.
>
> * * *
>
> Q.    Did you tell anyone, this — when you say you signed this consistent with the idea that there would be no cash, this says cash; this says cash will be transferred to Barclays?
>
> A.    Yeah, but *cash would be transferred against the liabilities*....
>
> * * *
>
> Q.    So, *to the extent the cash was simply needed to cover the liabilities, you thought it was possible to be included in the deal; is that correct*?
>
> A.    *Yes*.

Kobak Dep. Tr. at 282:14-283:21 (emphasis added).

---

[37]  The above assumes that, even though Barclays was promised the long options under the Purchase Agreement, the OCC would nonetheless have been able to seize those long options and to liquidate them to offset the losses in the LBI accounts.  If that were not the case, the OCC's losses on the liquidation of the LBI accounts would obviously have been even larger.

2.      In Addition To Its Right To Recover The Consideration It Provided Under
The TAA, Section 550(e) Entitles Barclays To An Offset For Any Other
Liabilities That Were Secured By The Margin Assets Transferred To
Barclays.

84.      In addition to the liabilities Barclays assumed with respect to futures customers

(discussed in section A, above) and under the now voided TAA (discussed in B(1), above),

Barclays also incurred an additional $13.2 million in liabilities with respect to LBI's futures

house accounts.  BCI Ex. 147 at p. 8.  These liabilities were imposed by exchanges or brokers to

reflect losses that had already been incurred on LBI's futures positions as of the Closing; the LBI

Margin Assets posted with these exchanges and brokers were used to secure the exchanges and

brokers against these losses.  *See generally* BCI Ex. 340 at ¶¶ 40-41.  Thus, the Margin Assets

were subject to a "lien" by these exchanges and brokers that was paid off when Margin Assets

were used to cover the $13.2 million in losses.  This means that section 550(e) provides Barclays

with a lien in the amount of this $13.2 million liability in the firm futures accounts.

3.      The Trustee Is Not Entitled To Be Placed In A Position Better Than He
Would Have Been In Had Barclays Refused To Assume The ETD
Liabilities.

85.      As cited above, the case law holds that a Trustee is not entitled to recover

property to the extent doing so would put him in a better position than if the allegedly wrongful

transfer had not occurred.[38]  Here, the unrebutted record evidence establishes that (a) Barclays

would never have assumed LBI's ETD liabilities without the clear understanding (and promise)

that it would also receive all of LBI's margin deposits, (b) if Barclays had not assumed LBI's

ETD liabilities, the exchanges and brokers holding LBI's ETD accounts, including in particular

the OCC, would have liquidated positions in those accounts, (c) those liquidations would have

generated massive losses that would have consumed LBI's Margin Assets, and (d) the Estate

---

[38] *See generally In re Integra Realty Resources*, 354 F.3d 1246, 1266 (10th Cir. 2004); *Filmline (Cross-Country)
Productions, Inc. v. United Artists Corp.*, 662 F.Supp. 798, 813 (S.D.N.Y. 1987).

would therefore have been left with *no Margin Assets*, and potentially with an additional *liability* for losses not covered by the margin deposits. *See supra,* note 30.

86.     Under these circumstances, the Trustee should not be permitted to receive the benefit of all of the "margin deposits" that were preserved solely as a result of Barclays having assumed all of LBI's ETD liabilities in reliance on the TAA (now voided) and Barclays' understanding of the APA and Clarification Letter (now rejected). For this reason, in addition to those cited above, the Court's final Order should permit Barclays to retain sufficient Margin Assets to offset all of the ETD liabilities Barclays assumed.

**C.     The Court's Final Order Should Provide That Barclays Is Entitled To Approximately $1.5 Billion In Margin Assets That Were Neither Cash Nor Cash Equivalents.**

87.     The Court's Opinion held that Barclays was not entitled under the Purchase Agreement to any "Lehman proprietary cash" and that it should "return any such cash that it received." Op. at 30. The Court's holding in this regard was heavily influenced by the statements made during the September 19, 2008 Sale Hearing that "no cash" was being transferred to Barclays. *See id.* at 30, 84-90.

88.     The Court repeatedly referenced the Sale Hearing "no cash" statements when explaining the bases for its conclusion with respect to Margin Assets. For example, when the Court explained its understanding of the parties' agreement at the time it entered the Sale Order, the Court emphasized that the exclusion of cash from the deal was represented to it "with great clarity at the Sale Hearing" when Ms. Fife explained that "[t]here's no cash that's being transferred to Barclays" and when Mr. Miller informed the Court that Lehman was "not transferring any cash to Barclays." *Id.* at 85. The Court explained that these representations were "a key inducement to entry of the Sale Order in the face of unresolved conflicting claims to cash held by or for the benefit of Lehman." *Id.* at 86. In summarizing its ultimate holding on the

Margin Assets, the Court again recalled the "declarative statement made and repeated several times during the Sale Hearing that still resonates":

> That memorable statement, in plain language, confirmed that no Lehman cash would be going to Barclays. The Court relied on that clear representation that was given to assure the Court and parties who had objected to the sale that the assets being acquired by Barclays would not include cash.
>
> The words used are absolute, unconditional and easily understood without regard to the language of the APA. "No cash" quite simply means "no cash."

*Id.* at 30.[39]

89.    Barclays recognizes that in certain places the Court's Opinion appears to go beyond this "no cash" limitation, and appears to holds that *all* ETD Margin Assets were excluded from the Sale. In each such case, however, the Court appears to have assumed that all of the ETD Margin Assets in dispute consisted of either cash or cash equivalents. For example, the section of the Court's Opinion dealing with Margin Assets begins by stating that "The Margin Assets that are in dispute consist of a total of approximately $4 billion in cash and cash equivalents . . . ." Op. at 84. Similarly, after reviewing the evidence of what was represented to the Court at the Sale Hearing, the Court explained that the "'no cash to Barclays' statements are unambiguous and have only one meaning — **no cash**, **and that also means no Margin Assets** to Barclays." Op. at 86; *see also id.* at 73 ("[T]he Court had the exact opposite understanding and believed, for example, that **all cash, including the Margin Assets**, was excluded from the transaction.").

90.    The Court's assumption stems, no doubt, from Movants' loose and inaccurate characterizations of the Margin Assets throughout the trial as consisting entirely of "cash" and

---

[39] As previously asserted at trial and relevant briefing, Barclays asserts that the statements relating to "cash" referred to what Harvey Miller and other witnesses described as "free cash," and did not apply to assets (cash or otherwise) that were pledged to secure exchange-traded derivatives. Barclays is not re-arguing that point, but merely making clear its continued position.

"cash equivalents."[40] That is not, in fact, the case. Indeed, the record evidence establishes that there cannot be any real dispute that a significant portion of the Margin Assets were *not* held as "cash" or "cash equivalents."

91.    The Purchase Agreement refers to "cash, cash equivalents, bank deposits, or similar cash items of LBI and its Subsidiaries," but does not define the term "cash equivalents." BCI Ex. 1 at p. 2 (subsection (b) of the definition of "Excluded Assets"); BCI Ex. 5 at § 1(c). At the time of the Sale, however, both Barclays and Lehman defined "cash equivalents" in the same way: in their annual reports of 2007 and 2008, *both Barclays and Lehman defined "cash equivalents" as securities with a maturity of three months or less*. *See* Barclays Proposed COL ¶¶ 43.1-43.5; Barclays Proposed FOF ¶¶ 32.22.1-32.22.5.[41] The Trustee has suggested that instead of looking to how the parties actually used the term "cash equivalents," the Court should define the term based upon the SEC's "Regulation T." Trustee Post-Hearing Br. at p. 148, n.53. The Court should reject that argument: on its face, Regulation T expressly provides that "its definition of cash equivalents" does "*not apply* to the deposit of securities with an option or

---

[40] Indeed, throughout the trial, Movants' counsel freely referred to "all" of the $4 billion of disputed ETD Margin Deposits as consisting of either cash or cash equivalents without offering a single piece of evidence demonstrating as much. *See, e.g.*, 4/9/10 Tr. at 102:8-9 (Maguire) ("Lehman margin assets . . . are all cash and cash equivalents"); 4/9/10 Tr. at 109:8-11 (Maguire) ("Barclays and the trustee are also disputing some four billion dollars of Lehman margin assets. Those assets are all cash or cash equivalents . . ."); 4/9/10 Tr. at 109:16-22 (Maguire) ("What remains is four billion dollars of cash or cash equivalents that Lehman owned."); 10/21/10 Tr. at 123:20-22 (Maguire) ("Lehman had billions of dollars in cash and cash equivalents at the OCC").

[41] Barclays' 2008 Annual Report is admitted in evidence as BCI Ex. 731a. It defines the term "cash equivalents" as "highly liquid investments that are convertible into cash with an insignificant risk of changes in value with original maturities of less than three months." BCI Ex. 731a at p. 201. The definitions of the term "cash equivalents" used in the Barclays and Lehman 2007 Annual Reports are materially identical to that quoted above. Although the Barclays and Lehman 2007 Annual Reports were not admitted into evidence, Barclays respectfully requested that this Court take judicial notice of the Barclays and Lehman 2007 Annual Reports in its Proposed Conclusions of Law and Statements of Fact. *See* Barclays Proposed COL ¶¶ 43.5, n.14; Barclays Proposed FOF ¶¶ 32.22.4, n.1. The Court can take judicial notice "at any stage of the proceeding," and must do so where the requested fact is "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201. Courts routinely take judicial notice of information contained within reports publicly filed with the SEC. *See Kramer v. Time Warner*, 937 F.2d 767, 774 (2d Cir. 1991); *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474 (2d Cir. 2006); *Garber v. Legg Mason, Inc.*, 347 F. App'x. 665, 669 (2d Cir. 2009). Since the Court did not rule on Barclays' earlier request that the Court take judicial notice of the Lehman and Barclays 2008 Annual Reports, Barclays renews that request here (or will renew it through whatever process the Court directs).

futures clearing agency for the purpose of meeting the deposit requirements" of that agency if the "deposit consists of any margin security." 12 C.F.R. § 220.9(b).[42]  Nor is there any evidence whatsoever suggesting that the parties intended to adopt the Regulation T definition — rather than the definition that each of them *actually used* — of the term "cash equivalents."

92.    Barclays has calculated that, under the common understanding Barclays and Lehman had of "cash equivalents," approximately $1.5 billion of the Margin Assets did not constitute cash equivalents at the time of Closing.  *See generally* BCI Exs. 680-692, 973; M. 678. Of this amount, Barclays has received assets worth only approximately $174 million.  The remaining $1.32 billion has yet to be delivered.  Because not all of the ETD Margin Assets were in the form of cash or cash equivalents, Barclays believes that the correct interpretation of the Court's Opinion is that Barclays is entitled to retain or receive from the Trustee any ETD Margin that was neither cash nor a cash equivalent at the time of Closing.  The Barclays' Proposed Order submitted on March 4 provided for the specification of these amounts with as much precision as possible, as well as the record evidence supporting them.  Barclays' Proposed Order ¶¶ 3(a)(i)(3), 3(a)(ii)(3).

**D.    The Court's Order Should Provide That Barclays Is Entitled To Clearing Funds And Guaranty Funds Needed To Operate LBI's ETD Business.**

93.    "Clearing funds" and "Guaranty Funds" are deposits that clearing corporations require their clearing members to deposit into a single pool so as to secure all obligations of all of the clearing members.  The amount of these requirements does not fluctuate on a daily basis in

---

42  Moreover, even if the Court were to look beyond the definition of "cash equivalents" used by both Lehman and Barclays in their annual reports, it should not look to the inapplicable Regulation T but instead should look to the definition used by the Financial and International Accounting Standards Boards, which was both applicable and used by the parties: both define "cash equivalents" as investments with original maturities of "three months or less" — the very definition the parties themselves adopted in their public filings.  FASB Statement 95; IASB Board document at pp. 2-3, available at http://www.iasb.org/NR/rdonlyres/E195AEC3-8D35-4639-B308-DCF0E7A19664/0/FSP0703b09cobs.pdf.

the way that margin requirements do. Rather, they are long-term deposits (not cash) used to secure obligations related both to customer and proprietary trading, and the clearing corporations have the ability to draw from this pool of funds when any clearing member defaults.

94.     Although the Court's decision does not address "clearing funds" explicitly, it did hold that Barclays is entitled to margin assets that customers were required to deposit and that were "held for the benefit of customers" on the reasoning that "[v]arious regulations and rules require customers to deposit collateral with their broker-dealer or, in the case of futures, their futures commission merchant, to support trading of futures and options contracts," and "[t]his collateral, which is deposited by customers with the broker-dealer or futures commission merchant and held for the benefit of customers, constitutes the 'property that may be held to secure obligations' under exchange-traded derivatives." (Op. at 89).

95.     The exchange rules invoked by the Court likewise require deposits of clearing funds by broker-dealers "to secure the clearing member's obligation to make good losses suffered . . . in the event of the failure of the clearing member or any other clearing member to discharge its obligations," including as a result of any default by its customers.  BCI Ex. 340 at ¶ 49.  Because these funds are, like customer deposits, funds that "various regulations and rules require . . . to support trading of futures and options contracts" on behalf of customers, the Court's Order should transfer all such funds to Barclays.

96.     As of the Closing, the amount of LBI's clearing fund deposit at the OCC was approximately $171 million, and LBI had allocated government securities to meet that requirement.  BCI Ex. 646.  Barclays is still reviewing the data to determine the amount of such funds held at the CME (while the proprietary positions at CME were liquidated at a substantial loss before the Closing, which resulted in the loss of the Margin at the CME, the customer

40

positions were not liquidated, and it is believed that there were residual clearing and guaranty fund deposits that were not consumed by the liquidation losses). The Court's Order should provide for the identification and transfer to Barclays of such "clearing funds."

**E.**    **The Trustee Should Not Be Awarded Prejudgment Interest On Any Margin Assets Barclays Is Ordered To Deliver To The Trustee.**

97.    The Trustee's Proposed Orders submitted on March 4, 2011 did not seek prejudgment interest on any Margin Assets that Barclays is obligated to transfer to the Trustee, and the Trustee's lawyers did not raise any claim to prejudgment interest in their discussions with Barclays until April 26, 2011 — two days before these briefs were due to be filed. Indeed, it was not until April 27, the day before this brief was to be filed, that the Trustee's lawyers advised Barclays that the rate of prejudgment interest they were seeking was 9%, apparently based upon the New York state statute relating to damages awarded on common law breach of contract claims. Accordingly, Barclays reserves the right to provide a more complete argument on this issue in its reply.

98.    Barclays opposes the award of any prejudgment interest to the Trustee. The award of any such interest is not mandated by any statute, regulation, or contractual provision, and is not appropriate in this case.

99.    The Trustee's claims to recover property from Barclays were based upon the Bankruptcy Code. In the motion he filed at the start of this Rule 60(b) proceeding (on September 15, 2009), the Trustee sought "to recover the Disputed Assets under Section 550 of the Bankruptcy Code." *See* The Trustee's Motion for Relief Pursuant To The Sale Orders, Or Alternatively, For Certain Limited Relief Under Rule 60(b) ("Trustee Motion"), at ¶ 88. The Trustee claimed that the Purchase Agreement did not entitle Barclays to the Margin Assets, and therefore the Trustee was entitled to recover those assets as having been transferred to Barclays

41

without proper authorization.  *See id.* at ¶¶ 80-88.  The Trustee did not cast that claim as one for "breach of contract" and "damages" (and it would have been inaccurate for him to have done so), but rather for the recovery of assets under Section 550 of the Bankruptcy Code.

100.    There is no statutory provision requiring the award of prejudgment interest on assets recovered by a trustee under Section 550 (or any other relevant provision) of the Bankruptcy Code.  Rather, the case law holds that bankruptcy courts should exercise their discretion in determining whether or not to award prejudgment interest, and what rate of interest to award.  *See In re 1031 Tax Group, LLC*, 439 B.R. 84, 87 (Bankr. S.D.N.Y. 2010).

101.    The case law also holds that prejudgment interest is not appropriate when there was a genuine dispute over whether the defendant was entitled to the assets, and when the defendant acted in good faith.  *See In re Globe Mfg. Corp.*, 567 F. 3d 1291, 1300-01 (11th Cir. 2009); *Morales v. Freund*, 163 F.3d 763, 767 (2d Cir. 1999); *In re Ames Dep't Stores, Inc.*, 2010 WL 6052849, at *1 (Bankr. S.D.N.Y. Sept. 10, 2010).

102.    Based on the foregoing, this is not an appropriate case for prejudgment interest. The record evidence shows that, as of the Closing and for many months thereafter, Barclays had every reason to believe that the Trustee shared its understanding that Barclays was entitled to the Margin Assets.  *See* BCI Ex. 3 (TAA, signed by Trustee, providing that Barclays was acquiring "all margin deposits" in LBI's accounts at the OCC); BCI Ex. 230 (Collateral Assignment Agreement, signed by Trustee, providing that Barclays was acquiring all collateral, including "cash," held by LBI at the OCC); BCI Ex. 470 (Trustee counsel's post-Closing e mail stating they are "OK" with Barclays having acquired all of LBI's margin deposits at the OCC); BCI Ex. 156 (Trustee's November 14, 2008 letter to Barclays confirming that he intends to fully comply with terms of TAA).  While the Court has rejected the argument that this evidence entitles

42

Barclays to the Margin Assets, it should recognize that it at least gave Barclays a good faith basis for believing it had such an entitlement.

103.    The good faith nature of this dispute is also evidenced by the fact that the Trustee knew Barclays had received over $1 billion in cash as Margin Assets at the OCC (*see* BCI Exs. 220, 233, 262; 5/5/10 Tr. at 127:19-25, 154:16-22 (Kobak); 8/24/10 Tr. at 104:8-11(Rosen); 9/8/10 Tr. at 88:13-18, 148:15-149:9 (Raisler); 8/30/10 Tr. at 20:4-10 (James)), yet *never made any demand* that Barclays return those Margin Assets until the filing of his September 15, 2009 Motion — almost one full year after the Closing.  This is not a case where the Trustee had to investigate pre-petition fraudulent conveyances that he knew nothing about.  Here, the Trustee's representatives themselves *signed agreements* providing for the transfer of "all margin deposits" to Barclays, *see* BCI Exs. 3, 230 at CGSH33745, then received updates on the amount of such assets Barclays had received, BCI Exs. 470, 156, 335, 233, 262, and communicated with Barclays for months about the identification and transfer of *additional* Margin Assets to Barclays.  *See* BCI Ex. 920.  Thus, the Trustee's conduct for close to a full year was entirely consistent with, and is further confirmation of, Barclays' good faith basis for asserting its entitlement to these assets.

104.    If the Court exercises its discretion to award any prejudgment interest, such interest should be at the federal rate, rather than the 9% rate applicable under the New York statute.  There is no economic justification for awarding the Trustee a 9% prejudgment interest rate, since the Trustee certainly would not have earned 9% on any appropriately low-risk investments it might have made had it had possession of the assets in question over the past two and a half years.  The Court should therefore resist the Trustee's effort to reap such a windfall. *See generally In re Bruno Mach. Corp.*, 435 B.R. 819, 851 (Bankr. N.D.N.Y. 2010) (noting that

the federal interest rate codified in 28 U.S.C. § 1961 should apply to prejudgment interest on a

successful preference action "absent 'substantial evidence' showing 'that the equities of the

particular case require a different rate'") (quoting *Jones v. UNUM Life Ins. Co.*, 223 F.3d 130,

139 (2d Cir. 2000)); *see also In re Colonial Realty Co.*, 226 B.R. at 513, 526 (Bankr. D. Conn.

1998) (awarding Trustee pre-judgment interest at a rate equal to the average annual Treasury bill

rate as set forth in 28 U.S.C. § 1961).

105.    Finally, if the Court were to award any prejudgment interest to the Trustee, it is

established that such interest should not begin to run until "the time demand is made or an

adversary proceeding is initiated."  *In re Colonial Realty Co.*, 226 B.R. at 526 (Bankr. D. Conn.

1998); *In re Bruno Mach. Corp.*, 435 B.R. at 850.  In this case, no demand was made until

September 15, 2009, and therefore the Trustee should not be permitted to seek any interest for

the time period prior to that date.

## F.    The Trustee's Request To "Amend" The Court's Opinion Should Not Be Permitted.

106.    The Trustee has asked the Court to amend its February 22 Opinion so as to

remove the following statement on page 9 of the Opinion:  "The asset scramble yielded the three

disputed asset classes that are now the subject of the motion by Barclays to compel delivery of

the Disputed Assets."  Trustee's Proposed Order on Trustee's Motion at p. 3.  In seeking to

change this portion of the Opinion, the Trustee relies upon Stipulation of Fact ¶ 140.  That

stipulation states that:

> "On Friday September 19, Lehman executives reported to Barclays that they had
> identified additional value in:  (1) unencumbered collateral located in LBI's
> 'clearance boxes' that was marked by Lehman at approximately $1.9 billion and
> (2) an excess amount of value held in LBI's customer reserve account, which was
> estimated by Lehman to be over $1 billion."

Stipulations and Proposed Order Concerning Stipulations at p. 16, ¶ 140. [43]

107.    The stipulation does not address Margin Assets one way or another, and therefore does not support what the Trustee asserts.  Moreover, if the Court is inclined to "amend" its Opinion at this stage, Barclays would also respectfully request an opportunity to seek amendment of certain findings.

### III.    The Court's Order Should Provide That Barclays Is Entitled To The $769 Million In 15c3-3 Assets When And If It Is Determined That The Trustee Has Sufficient Assets To Satisfy All Legitimate Customer Claims.

108.    The Opinion finds that Barclays did not have an unconditional right to the $769 million in securities referred to in paragraph 8(ii) of the Clarification Letter, and was not entitled to such assets "until such time as it may be determined whether any deficit exists in LBI's customer reserve accounts and whether the transfer of all or any portion [of] these assets is permitted by applicable law."  Op. at 84.  Barclays understands this to mean that Barclays will be entitled to the $769 million if and when it is determined that there are sufficient assets in the LBI estate to satisfy all legitimate customer claims.  The Trustee's lawyers have told Barclays that *the Trustee agrees* with Barclays:  *i.e.*, the Trustee agrees that, consistent with the Court's Opinion, when and if it is determined that there are sufficient assets in the LBI estate to satisfy all legitimate customer claims, Barclays will be entitled to the $769 million in securities (or to a lesser amount if the estate's surplus is less than $769 million).  The Trustee, however, does not believe it is appropriate for this entitlement to be included in the Order.

109.    Barclays disagrees.  If there is an agreement that the Court's decision entitles Barclays to the $769 million when and if it is determined that all customer claims will be

---

[43] *See* Case No. 08-13555 (JMP) Docket No. 13825; SIPA Proceeding Case No. 08-1420 (JMP) Docket No. 4021.

satisfied, that should be included in the Order, so it is clear precisely how the dispute was resolved.

110.    Moreover, the Trustee's Proposed Order does not establish a clear protocol for resolving Barclays' right to those assets in a timely manner.  It provides merely that Barclays has a "right to commence further proceedings."  Trustee's Proposed Orders at p. 3.  But there would be no need for "further proceedings" if the Court would simply order now what the Trustee has already agreed:  when and if the Trustee determines there are sufficient assets to satisfy customer claims, Barclays shall receive the $769 million in securities (or the balance of the surplus if a lesser amount).

111.    In addition, to help ensure that Barclays has information potentially relevant to its entitlement, the Barclays' Proposed Order provides that the Trustee shall present its current reserve account calculation within 30 days of entry of the Order, and shall provide weekly updates thereafter.  Since the Trustee asserts, and the Court agreed, that the Trustee is subject to the Rule 15c3-3 requirement of calculating weekly reserve requirements, this should not be a significant burden.  The necessary information is maintained in the LBI systems under the control of the Trustee.

112.    In any event, whether or not the Court agrees that the Order should include an

information reporting requirement, Barclays requests that the Order at least provide what has

been agreed and should be uncontroversial:  if and when the LBI Estate has sufficient funds to

satisfy all valid customer claims, LBI must transfer to Barclays assets comprising that surplus, up

to $769 million (with the value measured as of the date of the transfer).


Dated:  New York, New York
        April 28, 2011

                                           Respectfully submitted,

                                           BOIES, SCHILLER & FLEXNER LLP


                                         By:  ___/s/ Jonathan D. Schiller_____
                                         Jonathan D. Schiller
                                         Jack G. Stern
                                         575 Lexington Avenue
                                         New York, New York 10022
                                         Tel: (212) 446-2300
                                         Fax: (212) 446-2350
                                         Email: JSchiller@bsfllp.com
                                               JStern@bsfllp.com

                                         Hamish P. M. Hume
                                         5301 Wisconsin Avenue, N.W.
                                         Washington, D.C. 20015
                                         Tel: (202) 237-2727
                                         Fax: (202) 237-6131
                                         Email: HHume@bsfllp.com

                                         *Attorneys for Barclays Capital Inc*.