**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. |
| Debtors. | 08-13555 (JMP) |
| | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | (SIPA) |

## REPLY MEMORANDUM SUPPORTING THE POSITIONS OF BARCLAYS CAPITAL INC. RELATING TO THE ORDERS IMPLEMENTING THE COURT'S FEBRUARY 22, 2011 DECISION

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350

*Attorneys for Barclays Capital Inc.*

May 4, 2011

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.    The Trustee's Brief Ignores The Sale Order And This Court's Decision, And
      Misrepresents The Nature Of Barclays' Claim For The Undelivered Clearance
      Box Assets. ............................................................................................................. 3

      A.    The Trustee Ignores The Court's Decision And The Provisions Of The
            Sale Order Requiring Actual Delivery Of The Undelivered Clearance Box
            Assets. ........................................................................................................ 3

      B.    The Trustee Misrepresents The Nature Of Barclays' Claim For The
            Undelivered Clearance Box Assets, And Disingenuously Suggests That
            He Always Understood That Claim To Be One For "Damages" Based On
            Values As Of September 22, 2008.......................................................... 4

      C.    The Trustee Misrepresents The Significance Of The Valuations Barclays
            Proved At Trial. ......................................................................................... 8

      D.    The Fact That The Undelivered Clearance Box Assets Have Appreciated
            In Value Is Not A Basis For Denying Specific Performance. .............................. 10

      E.    Barclays Believes The Undelivered Clearance Box Assets It Claims Are
            Worth Substantially Less Than Indicated By The New Evidence The
            Trustee Seeks To Introduce Now.......................................................... 12

      F.    The Court Should Not Accept The Trustee's Untimely Defense That It Is
            "Not Feasible" To Deliver The Undelivered Clearance Box Assets. .................. 13

      G.    Barclays Is Not "Estopped" From Seeking The Remedy It Has
            Consistently Demanded Throughout This Proceeding, And That Is
            Provided For In The Sale Order And This Court's Opinion.............................. 16

II.   The Court's Order Should Clarify Barclays' Entitlement To Certain Specific
      Categories Of Margin Assets. ........................................................................... 16

      A.    The Court's Opinion And The Trustee's Proposed Findings Of Fact
            Already Confirm That The Disputed Margin Assets Do Not Include The
            Assets Used By Domestic Exchanges To Cover A $134.8 Million Liability
            Owed On Behalf of Futures Customers As Of The Closing................................ 16

      B.    The Court's Order Should Confirm That Barclays Is Not Obligated To
            Return Margin Assets That It Never Received, Because They Were Used
            To Cover Liabilities Incurred On Behalf Of The Futures Customers. ................. 18

C.    The Law Entitles Barclays To An Offset For The Liabilities That Were
Secured By The Margin Assets, Including Those Assumed Under The
TAA. ................................................................................................................ 22

1.    Barclays Never Asserted Or Agreed That The Purchase Agreement
Could Be Read To Transfer The ETD Liabilities To Barclays
Without The Margin. ............................................................................... 25

2.    Barclays' Right To An Offset Under Section 550(e) Is Not
Dependent Upon Whether Barclays Was Required To Assume The
ETD Liabilities Under The Purchase Agreement. ..................................... 28

3.    Barclays Was Not Obligated To Raise Arguments That Were Not
Implicated Prior To The Court's Decision................................................ 29

D.    Based On The Court's Reasoning, Barclays Should Be Entitled To The
Margin Assets The Trustee Now Admits Were Not In The Form Of Cash
Or Cash Equivalents. ......................................................................................... 29

E.    The Court Should Reject The Trustee's Claim For Prejudgment Interest............ 33

F.    The Court Should Reject The Trustee's Request That The Opinion Be
Amended. ........................................................................................................... 36

III.    The Court's Order Should Provide That Barclays Is Entitled To The $769 Million
In 15c3-3 Assets When And If It Is Determined That The Trustee Has Sufficient
Assets To Satisfy All Legitimate Customer Claims. ....................................................... 37

# TABLE OF AUTHORITIES

## <u>Cases</u>

*ACLU v. Wilkinson*,
    895 F.2d 1098 (6th Cir. 1990) ............................................................................ 38

*Aerojet-General Corp. v. Askew*,
    453 F.2d 819 (5th Cir. 1971) ........................................................................ 10, 11

*Bergstrom, Inc. v. Siemens Elec., LTD*,
    208 F.R.D. 234 (N.D. Ill. 2002) ........................................................................ 14

*Cipriano v. Glen Cove Lodge*,
    769 N.Y.S.2d 168 (N.Y. 2003) ........................................................................ 11

*EMF General Contracting Corp. v. Bisbee*,
    774 N.Y.S.2d 39 (N.Y. 2004) ........................................................................ 10

*Gordon v. Vincent Youmans, Inc.*,
    358 F.2d 261 (2d Cir. 1965) ............................................................................ 26

*In re 1031 Tax Group, LLC*,
    439 B.R. 84 (Bankr. S.D.N.Y. 2010) ................................................................ 35

*In re Armstrong*,
    260 B.R. 454 (E.D. Ark. 2001) ........................................................................ 34

*In re Bruno Mach. Corp.*,
    435 B.R. 819 (Bankr. N.D.N.Y. 2010) ........................................................ 35, 36

*In re CNB Intern., Inc.*,
    393 B.R. 306 (Bankr. W.D.N.Y. 2008) ........................................................ 34, 35

*In re Colonial Realty Co.*,
    226 B.R. 513 (Bankr. D. Conn. 1998) ........................................................ 35, 36

*In re Express Liquors, Inc.*,
    65 B.R. 952 (Bankr. D. Md. 1986) .............................................................. 35, 36

*In re FBN Food Service, Inc.*,
    175 B.R. 671 (Bankr. N.D. Ill.,1994) ................................................................ 35

*In re Federated Marketing, Inc.*,
    123 B.R. 265 (Bankr. S.D. Ohio 1991) ........................................................ 35, 36

*In re First Software Corp.*,
    107 B.R. 417 (D. Mass. 1989) ............................................................. 34

*In re Frankel*,
    191 B.R. 564 (Bankr. S.D.N.Y. 1995) ................................................... 4

*In re Globe Mfg. Corp.*,
    567 F.3d 1291 (11th Cir. 2009) ............................................................. 34

*In re Kreger*,
    296 B.R. 202 (Bankr. D. Minn. 2003) .................................................. 11

*In re L & T Steel Fabricators, Inc.*,
    102 B.R. 511 (Bankr. M.D. La. 1989) ........................................... 35, 36

*In re Living Hope Southwest Medical SVCS, LLC*,
    No. 4:09–ap–7026, 2011 WL 887968 (Bankr. W.D. Ark. March 14, 2011) ......................... 34

*In re Miller & Rhoads, Inc.*,
    153 B.R. 725 (Bankr.E.D.Va. 1992) ..................................................... 35

*In re Pameco Corp.*,
    356 B.R. 327 (Bankr. S.D.N.Y. 2006) ................................................. 35

*In re R.J. Patton Co., Inc.*,
    348 B.R. 618 (Bankr. D.Conn. 2006) ............................................ 35, 36

*In re Roco Corp.*,
    37 B.R. 770 (Bankr. R.I. 1984) ............................................................. 36

*Leyda v. AlliedSignal, Inc.*,
    322 F.3d 199 (2d Cir. 2003) .................................................................. 29

*Liberta v. Davis*,
    438 N.Y.S.2d 405 (N.Y. App. Div. 4th Dep't 1981) ............................ 10

*Marinoff v. Natty Realty Corp.*,
    792 N.Y.S.2d 491 (N.Y. App. Div. 2d Dep't 2005) ............................. 10

*Maryland Casualty Co. v. Pacific Co.*,
    312 U.S. 270 (1941) ............................................................................... 38

*Menzel v. List*,
    24 N.Y.2d 91 (1969) .............................................................................. 16

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ............................................................................... 38

iv

*Sinclair Refining Co. v. Miller*,
    106 F. Supp. 881 (D. Neb. 1952) ......................................................................... 11

*Tender Loving Care Health Servs.*,
    No. 02-88020-ast, 2009 WL 5218598 (Bankr. E.D.N.Y. Dec. 31, 2009) ............................. 33

*This Is Me, Inc. v. Taylor*,
    157 F.3d 139 (2d Cir. 1998) ................................................................................ 26

*Thomas v. Arn*,
    474 U.S. 140 (1985) .......................................................................................... 29

*U.S. v. Male Juvenile*,
    121 F.3d 34 (2d Cir. 1997) ............................................................................ 29, 38

*United States v. Alexander*,
    736 F. Supp. 1236 (N.D.N.Y. 1989) .................................................................... 11

*Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers,*
    *AFL-CIO*,
    955 F.2d 831 (2d Cir. 1992) ............................................................................ 34, 35

*Will of Rothko*,
    392 N.Y.S.2d 870 (N.Y. App. Div. 1977) ............................................................. 15

## **Statutes**

28 U.S.C. § 1961 ..................................................................................................... 35

## **Rules**

17 C.F.R. § 15c3-3(a)(10) ......................................................................................... 14

## PRELIMINARY STATEMENT

1.      The Trustee's April 28 Memorandum demonstrates why the Trustee's Proposed Orders were inappropriately vague as to the precise relief being granted, and why the Barclays' Proposed Orders were correct in seeking to establish a clear process that would arrive at precisely identified assets and values that could be the subject of the Court's final orders on the Disputed Assets.

2.      First, the Trustee has swung from an open-ended order on the Clearance Box Assets (where the parties would "work cooperatively" to determine the precise remedy), to one that seeks an open and shut remedy of $869 million in "damages," plus interest.  Unlike his Proposed Order, the Trustee is now at least offering precision in what he proposes.  However, his proposal is an effort to evade his obligation to deliver what the Sale Order and the Court's Opinion entitle Barclays to receive, which is precisely what Barclays demanded in its now-granted motion:  "Whatever Clearance Box Assets Have Not Yet Been Delivered."  *See* Barclays' Jan. 29, 2010 Br. at § I(B)(1)(f), p. 168.

3.      Second, the Trustee asks the Court to ignore the important details that have to be resolved in implementing its decision on the Margin Assets.  Those Margin Assets were the security for over $1 billion of ETD liabilities.  Barclays believed it acquired those liabilities solely because they were a lien on, and hence inextricably linked to, the Margin Assets.  Now that the Court has rejected the Barclays claim to the Margin Assets (or at least to the cash Margin Assets), Barclays is entitled to an offset in the amount of those assumed ETD liabilities.

4.      Similarly, Barclays is likewise entitled to an Order that makes clear that the Trustee is not seeking the return of Margin Assets that Barclays never actually received, because they were used to satisfy liabilities at exchanges that were owed on behalf of LBI's futures customers.

1

5.       In addition, while Barclays acknowledges that portions of the Court's Opinion appear to apply more broadly than just a denial of "cash Margin Assets," Barclays is entitled to ensure that the Order is clear on this issue.  The "cash" issue was clearly central to the Court's analysis, and there should be no dispute that $1.5 billion of the Margin Assets were not cash or "cash equivalents."

6.       Finally, the Court should reject the Trustee's efforts to improve upon the Court's decision on the Margin Assets, first through his unwarranted claim for prejudgment interest of 9%, and second through his strategic effort to amend the Opinion's discussion of the "asset scramble."  Given that the Trustee executed a written agreement in which he promised Barclays "all margin deposits," Barclays clearly acted in good faith in believing that it had, in fact, been promised those deposits.  While the Trustee may have succeeded in disavowing that promise, the case law does not support his desire to go the extra step of adding prejudgment interest, especially not at a rate vastly higher than he could have earned on those margin deposits had they not been delivered to Barclays.  Likewise, there is no justification for the Trustee's request that the Court remove from the Opinion an assertion made repeatedly by LBHI, the Trustee's co-Movant and the principal Seller under the APA, that the Margin Assets were promised to Barclays as part of the so-called "asset scramble."  While Barclays has always asserted that the Margin Assets were understood to be part of the Sale from the beginning of the week, LBHI asserted that they were added in the "asset scramble."  The Court made its finding, and the Trustee should not be permitted to amend that finding, absent an equal opportunity for Barclays to seek amendments to the Opinion.

7.      In sum, Barclays seeks Orders that will provide precision on the relief both the Trustee and the Barclays are entitled to receive, so as to avoid the future disputes that will obviously arise if the Trustee's Proposed Orders are adopted.

## ARGUMENT

**I.**      **The Trustee's Brief Ignores The Sale Order And This Court's Decision, And Misrepresents The Nature Of Barclays' Claim For The Undelivered Clearance Box Assets.**

8.      While claiming that Barclays wants a "do-over" and that he "accepts that he lost on the Clearance Box Assets," the Trustee takes a series of positions that are impossible to reconcile with the Sale Order, the Court's Opinion, the Barclays' Motion, or the course of conduct of the Trustee's counsel from the trial to the present.

**A.**      **The Trustee Ignores The Court's Decision And The Provisions Of The Sale Order Requiring Actual Delivery Of The Undelivered Clearance Box Assets.**

9.      This Court held that Barclays "Is Entitled To *Transfer* Of The Clearance Box Assets," Op. at 76 (emphasis added); it described its own "*ruling* that the Clearance Box Assets *should be transferred* to Barclays," Op. at 97 (emphasis added); and it held that the Barclays' motion was "granted in relation to *delivery* of the Clearance Box Assets." Op. at 102 (emphasis added).[1]  The Trustee ignores all of these clear holdings in arguing that Barclays is not entitled to the transfer or delivery of the undelivered Clearance Box Assets, but solely to damages.  Thus, the Trustee's argument is inconsistent with this Court's Opinion.

10.      The Trustee also ignores the provisions of the Sale Order providing that the Debtors (defined to include the Trustee) were "directed to transfer the Purchased Assets" (which this Court has held include the Clearance Box Assets), and that "*the Purchase Agreement* and the transactions and instruments contemplated hereby *shall be specifically performable and*

---

[1]  These holdings were based on the Court's finding that "the plain text of the letter [the Trustee] signed supports *transferring* the CBAs to Barclays."  Op. at 99 (emphasis added).

*enforceable* against and binding upon, and not subject to rejection or avoidance by, the Debtors

or any successor chapter 11 or chapter 7 trustee appointed with respect thereto." BCI Ex. 16 at

¶¶ 4, 5 (emphases added).[2] Thus, the Trustee's argument is inconsistent with this Court's Sale

Order. *See In re Frankel*, 191 B.R. 564, 574 (Bankr. S.D.N.Y. 1995) (holding that where a

court-approved purchase agreement requires a party to transfer assets, specific performance

should be ordered "regardless of the [party's] entitlement to the common law contractual remedy

of specific performance").

### B.    The Trustee Misrepresents The Nature Of Barclays' Claim For The Undelivered Clearance Box Assets, And Disingenuously Suggests That He Always Understood That Claim To Be One For "Damages" Based On Values As Of September 22, 2008.

11.    In addition to ignoring the terms of this Court's Opinion and the provisions of its

Sale Order, the Trustee also ignores the fact that Barclays consistently articulated its claim in this

case as one seeking the actual *delivery* of the Undelivered Clearance Box Assets. *See* Barclays'

April 28, 2011 Br. at ¶¶ 6-8.

12.    The Trustee does not merely ignore the fact that Barclays has always sought the

actual delivery of the Undelivered Clearance Box Assets; he goes the extra step of affirmatively

mischaracterizing Barclays' claim. The Trustee's Memorandum falsely characterizes Barclays'

claim at trial as one for "damages" of $869 million, and falsely states that "Barclays now

attempts to enlarge its claim by seeking specific performance." Trustee April 28, 2011 Br. at ¶

46. As Barclays demonstrated in its April 28 Memorandum, the Barclays Motion of January 29,

2010 sought an order enforcing the Sale Motion and requiring the *actual delivery* of the

---

[2] The Sale Order entered in the LBI SIPA liquidation case expressly includes the LBI Trustee within the definition of "Debtors" as used in the Sale Order in the LBHI case. BCI Ex. 17. Similarly, paragraph 20 of the Sale Order confirms that the Court "retains jurisdiction" to, among other things, "*compel delivery of the Purchased Assets to Purchaser.*" *Id.* at ¶ 20 (emphasis added).

Undelivered Clearance Box Assets.[3]  That is, Barclays has always sought specific performance.

Barclays has also repeatedly confirmed that while former LBI operations personnel had

attempted to identify the Undelivered Clearance Box Assets after Schedule B was completed,

that effort was not necessarily complete, and required further information from the Trustee.[4]  As

stated in the Memorandum in support of Barclays' Motion to compel delivery of all Undelivered

Clearance Box Assets, the Barclays claim was for "*Whatever Clearance Box Assets Have Not*

*Yet Been Delivered.*"  *See* Barclays' Jan. 29, 2010 Br. at § I(B)(1)(f), p. 168 (emphasis added).

13.    The Trustee knew and understood this at the time of trial.  In late August and

early September of 2010, before the trial had ended, the Trustee proposed a possible stipulation

to Barclays that expressly addressed the issue of how all of the Undelivered Clearance Box

Assets would be identified.  *See* Exhibit 1 (September 4, 2010 email from Trustee counsel N.

Oxford to Barclays' counsel H. Hume (attaching draft of a potential stipulation)).  That draft

stipulation included the following two paragraphs:

> 4.    After the Closing, Barclays conducted an analysis to attempt to
> identify additional unencumbered assets held in LBI's clearance

---

[3]  *See* Barclays' April 28, 2011 Br. at ¶¶ 6-8 (citing Motion of Barclays Capital Inc. To Enforce The Sale Order And Secure Delivery Of All Undelivered Assets, Case No. 08-13555 (JMP) Docket No. 6815; SIPA Proceeding Case No. 08-1420 (JMP) Docket No. 2582; Barclays Proposed Order filed January 29, 2010, Notice of Hearing on Motion of Barclays Capital Inc. to Enforce the Sale Order and Secure Delivery of All Undelivered Assets (Case No. 08-13555 (JMP) Docket No. 6814, attachment 2; SIPA Proceeding Case No. 08-1420 (JMP) Docket No. 2581, attachment 2)).

[4]  *See* Barclays' Jan 29, 2010 Br. at ¶¶ 377-379; Barclays' April 5, 2010 Br. at ¶ 20, n.19; Barclays' Proposed FOF ¶ 44.1.7.1; Barclays' Post-Trial Memo. of Law and Fact at ¶ 229, n.112; BCI Ex. 735 (March 6, 2009 Letter from Granfield to Kobak) (identifying certain undelivered clearance box assets but stating that "Barclays is continuing to review information regarding customer long positions and securities in the clearance boxes at the time of closing and will revert to you in due course with information regarding additional clearance box securities sold to Barclays."); *see also* 1/15/10 Hraska Dep. Tr. at 91:16-93:19 (discussing the use of the stock record data from November 17, 2008 to determine undelivered clearance box assets because of problems with data from September 22, 2008); *id.* at 94:19-95:7 (stating that the analysis relied on the stock record and that they did not use specific data for that analysis from the custodian's directly); *id.* at 58:18-59:7 (discussing his 30(b)(6) deposition notes, BCI Ex. 145, that indicate an agreement between the parties, made prior to the Closing, that Barclays retained its right to amend or supplement Schedule B).

boxes as of November 17, 2008. The securities identified through that analysis are listed on BCI Exs. 885, 886 and 967, which Barclays and the Trustee stipulate shall be admitted into evidence.

5.    The determination of the universe of Clearance Box Assets is a complex matter that does not need to be determined in the course of the current trial proceedings, but can be deferred until the determination of the parties' respective claims to the Clearance Box Assets. In the event that the Court decides that Clearance Box Assets belong to Barclays rather than to the Trustee for the benefit of the LBI estate, the parties shall work cooperatively to determine the accuracy of the analysis referred to in paragraph 4 above. To the extent that the parties are unable to agree upon the amount and value of the securities that are subject of that analysis, the parties will submit any unresolved factual issues to the Court for determination at an additional evidentiary hearing.

*Id.* at Attachment, ¶¶ 4-5 (emphasis added).

14.    While this draft stipulation was never finalized and executed, and was sent to Barclays with a general caveat of being "subject to our clients' comments," *see* Exhibit 1, it clearly reflects the fact that, during the trial, the Trustee's lawyers *never believed* that Barclays was claiming "damages," but instead believed (correctly) that Barclays was claiming the *actual delivery of all undelivered Clearance Box Assets*. Moreover, this proposal also shows that the Trustee's lawyers recognized that more "complex" work would have to be performed to determine a final and accurate list of all such assets, and therefore recognized that there may well be other Undelivered Clearance Box Assets not yet identified by Barclays. Indeed, in a subsequent letter, Trustee's counsel explained that their proposed stipulation "preserves each parties' positions with respect to the identification of those CUSIPs and confirms that the parties would work cooperatively to determine the accuracy of the analysis conducted by Barclays." *See* Exhibit 2 (September 15, 2010 letter from Trustee counsel N. Oxford to Barclays' counsel H. Hume).

6

15.    Even after this Court issued its February 22, 2011 Opinion, the Trustee's actions

continued to confirm his understanding that Barclays was seeking the actual delivery of all

Undelivered Clearance Box Assets.  In a cover letter to the Court that submitted the Trustee's

Proposed Orders of March 4, 2011, the Trustee's lawyers included an extensive discussion

regarding the need to resolve the precise population of the Undelivered Clearance Box Assets —

a resolution that would have been unnecessary if the Barclays' claim had always been one solely

for "damages" that were already "proved" at trial, as the Trustee now asserts.  *See* Exhibit 3

(March 4, 2011 letter to Judge Peck from Trustee counsel William Maguire).  For example, the

March 4 letter from Trustee counsel to the Court stated that "the parties will need to confer

among themselves concerning precisely what assets or value are subject to the transfer under the

Court's Opinion," that "[t]his is particularly important with respect to the Clearance Box Assets

that Barclays is claiming are undelivered," that "Barclays has produced various documents and

lists of securities that purport to refine Schedule B to the Clarification Letter so as to accurately

represent Lehman's undelivered Clearance Box Assets," and that (despite extensive discovery on

the subject) "[t]he Trustee has asked Barclays to give the Trustee's professionals a walk-through

of the methodology that Barclays used in preparing these lists of CUSIPs."  *See id.* at p. 2.  None

of this discussion would have made any sense at all if, as the Trustee now claims, it was

understood that Barclays was merely claiming damages in an amount already proved at trial.[5]

---

[5]  Similarly, Barclays and the Trustee have had a back and forth letter exchange since March 4, 2011 over
the information each side has requested from the other in the ongoing effort to ensure an accurate
identification of all Undelivered Clearance Box Assets.  *See* Exhibits 4-8 (letters of March 9, March 17,
March 30, April 6, and April 11 relating to discussion of proper identification of Undelivered Clearance
Box Assets).

C.    **The Trustee Misrepresents The Significance Of The Valuations Barclays Proved At Trial.**

16.    In his effort to limit Barclays' rights under the Purchase Agreement and this Court's Opinion, the Trustee has also misrepresented the significance of the valuations Barclays proved at trial.

17.    In asserting that there should be no dispute over the *current* value of all of the Undelivered Clearance Box Assets, the Trustee states that "Barclays claimed throughout these proceedings that they *are* worth $869 million." Trustee April 28, 2011 Br. at ¶ 45 (emphasis added). That is a misleading assertion, in two important respects. First, the Barclays' valuation was of the assets *it* had been able to identify as Undelivered Clearance Box Assets; Barclays made clear that this was not necessarily the complete population (and Barclays repeatedly sought information from the Trustee on what the complete population would be, and the Trustee repeatedly claimed work product privilege).[6] Second, and more importantly, the evidence shows that the majority of the assets in the $869 million valuation were valued *as of the end of 2008, not as of the present. See generally* 9/2/10 Tr. at 71:11-23 (Romain); BCI Ex. 592a. Thus, it is misleading for the Trustee to say that Barclays has always said that these assets "*are* worth $869 million."

---

[6]  *See* Barclays' Jan 29, 2010 Br. at ¶¶ 377-379; Barclays' April 5, 2010 Br. at ¶ 20, n.19; Barclays' Proposed FOF ¶ 44.1.7.1; Barclays' Post-Trial Memo. of Law and Fact at ¶ 229, n.112; BCI Ex. 735 (identifying certain undelivered clearance box assets but stating that "Barclays is continuing to review information regarding customer long positions and securities in the clearance boxes at the time of closing and will revert to you in due course with information regarding additional clearance box securities sold to Barclays."); *see also* 1/15/10 Hraska Dep. Tr. at 91:16-93:19 (discussing the use of the stock record data from November 17, 2008 to determine undelivered clearance box assets because of problems with data from September 22, 2008); *id.* at 94:19-95:7 (stating that the analysis relied on the stock record and that they did not use specific data for that analysis from the custodian's directly); *id.* at 58:18-59:7 (discussing his 30(b)(6) deposition notes, BCI Ex. 145, that indicate an agreement between the parties, made prior to the Closing, that Barclays retained its right to amend or supplement Schedule B); Barclays' April 28, 2011 Br. at ¶ 53 & n.22.

18.    The difference between what the assets *were* worth in 2008 and what they *are*

worth today is significant.  As the trial proved, in order to assemble its Acquisition Balance

Sheet, Barclays made reasonable efforts to value the assets it received or believed it was entitled

to receive.[7]  The trial also proved that in the middle of the 2008 financial crisis many of the

assets that were delivered to Barclays were worth less than they might have been worth in a more

promising market environment.[8]  At the time, of course, it was far from certain that the markets

would recover, yet Barclays was willing to assume this substantial risk.

19.    Thus, the fact that the assets have appreciated in value since the financial crisis is

perfectly consistent with (and, indeed, reinforces the correctness of) the Barclays proof at trial

regarding the values of the securities it acquired from Lehman.  By contrast, it is disingenuous

for the Trustee to claim that if he had understood Barclays' position, he "would have adopted a

different litigation strategy" and "would also have raised challenges to the valuation date and

methodology that Barclays used."  Trustee April 28, 2011 Br. at ¶ 77.  The Trustee appears to

have forgotten that the Movants (led by LBHI and the Committee) did indeed challenge "the

valuation date and methodology that Barclays used," and those challenges were rejected.  *See*

Op. at 22, 61, 65-69.[9]

---

[7]  *See* Op. at 24 ("Barclays' audited Acquisition Balance Sheet prepared under the direction of Gary
Romain is also consistent with a finding that Barclays received and accounted for assets that were fairly
valued (or at least not unfairly valued)…."), 54-55, 61-65; *see also* Barclays' Proposed FOF ¶ 53.

[8]  *See* Op. at 21-24, 69; 10/6/10 Tr. at 23:20-37:2, 71:21-74:20, 75:17-77:3 (Pfleiderer);  BCI Ex. 341 at
¶¶ 97-103; BCI Ex. 1103 at 5-6, 23-24.

[9]  On the other hand, if the Trustee means that he would have argued that the value of the Undelivered
Clearance Box Assets claimed by Barclays was *even lower* than the Barclays' valuations, that obviously
contradicts the claims by his co-Movants, and in any event, is both an unfounded and belated suggestion.

9

### D. The Fact That The Undelivered Clearance Box Assets Have Appreciated In Value Is Not A Basis For Denying Specific Performance.

20.    The Trustee erroneously contends that where the assets in question have appreciated in value, that fact weighs against the remedy of specific performance. Trustee April 28, 2011 Br. at ¶¶ 62-63.

21.    First, this argument is inapposite because, as shown above and in Barclays' Memorandum of April 28, 2011, the Sale Order has already ruled that the Purchase Agreement is "specifically performable and enforceable" against the Debtors (which includes the Trustee). BCI Ex. 16 at ¶ 5. There is no basis for the Court to reconsider that provision now, and it is therefore unnecessary (and inappropriate) to address when state contract law calls for specific performance versus damages.

22.    Second, in any event, the Trustee is wrong to suggest that it is improper to award specific performance when the assets in question have appreciated. Specific performance may sometimes be denied when a purchaser unjustly attempts to "speculate" by delaying his suit until he is sure that the assets at issue are increasing in value. *See e.g. Aerojet-General Corp. v. Askew*, 453 F.2d 819, 833 (5th Cir. 1971). But that is not the case here, where Barclays has been demanding the undelivered assets since the Closing.

23.    In the absence of such speculation, specific performance is entirely appropriate. *Id*. "While specific performance will not be granted where it would result in injustice or inequity, *the increase in market value of the property does not in itself create injustice or inequity*." *EMF General Contracting Corp. v. Bisbee*, 774 N.Y.S.2d 39, 55 (N.Y. 2004) (emphasis added); *see also Liberta v. Davis*, 438 N.Y.S.2d 405, 406 (N.Y. App. Div. 4th Dep't 1981); *Marinoff v. Natty Realty Corp*., 792 N.Y.S.2d 491, 496 (N.Y. App. Div. 2d Dep't 2005).

24.     Indeed, the whole point of specific performance is to provide the plaintiff with the specific assets he was to receive under the contract, *irrespective* of whether those assets have gone up or down in value.  As one court explained:

> Specific performance of a contract fair when made will not necessarily be denied because it has become a hard bargain through subsequent events and changed conditions; and it may be said to be the general rule that the mere fact that the value of property which is the subject of a contract has increased or diminished since the contract was executed will not ordinarily warrant a court in refusing to grant a decree of specific performance, in the absence of circumstances indicating fraud or bad faith. Equity will not refuse specific performance merely because of the fact that property contracted to be sold for a price that was fair when the contract was executed has become considerably more valuable at the time performance is due, or, on the other hand, is much less desirable at the time of performance than when the contract was entered into.

*Sinclair Refining Co. v. Miller*, 106 F. Supp. 881, 885-86 (D. Neb. 1952) (quoting 49 Am.Jur. Specific Performance, § 64, p. 78).[10]  *Accord, e.g.*, *Aerojet-General Corp.,* 453 F.2d at 833 (in the absence of proof that the purchaser was "by delay speculat[ing] on the outcome," the "general rule is that specific performance will not ordinarily be denied because of events occurring after the contract is made which tend to show that the contract is unjust, such as change in value"); *In re Kreger*, 296 B.R. 202, 209-10 (Bankr. D. Minn. 2003) ("increase in value is not an equitable defense against specific performance").

25.     Moreover, the factors of "injustice" and "inequity" in this case both cut *against* the Trustee.  It is the *Trustee*, not Barclays, who is seeking a "windfall" by keeping the appreciated value of the Clearance Box Assets that he was obligated to deliver to Barclays years

---

[10]  The cases cited by the Trustee on this issue do not support his argument.  In *Cipriano v. Glen Cove Lodge*, 769 N.Y.S.2d 168, 173 (N.Y. 2003), the court denied specific performance not because the assets had appreciated, but principally because *the plaintiff* (*i.e.*, the party demanding specific performance) was not "ready, willing and able" to buy the property in question (*i.e.*, to perform his side of the bargain).  In *United States v. Alexander*, 736 F. Supp. 1236, 1242 (N.D.N.Y. 1989), the court addresses only whether the change in value of the property would make specific performance "unconscionable," a standard the Trustee does not even try to meet here.

11

ago, as the Purchase Agreement and Sale Order provide, and as this Court has now confirmed.

The Trustee should not be rewarded for breaching the Sale Order and the Purchase Agreement.

### E. Barclays Believes The Undelivered Clearance Box Assets It Claims Are Worth Substantially Less Than Indicated By The New Evidence The Trustee Seeks To Introduce Now.

26.    The Trustee attaches new evidence to his Memorandum — an affidavit from a

KPMG consultant — in an effort to show that the value of the Undelivered Clearance Box Assets

claimed by Barclays is well over $1.4 billion.  Trustee April 28, 2011 Br. at ¶ 58 and Declaration

of D. Eric Stovall.  This new, post-trial evidence is improperly introduced to show that the value

of the assets Barclays claims has appreciated significantly from the values proven at trial.  *Id.*

27.    The Court should not permit the Trustee to use this new evidence to limit

Barclays' entitlement.  First, this new evidence is nothing more than the Trustee's attempt to

value the very same lists of assets that Barclays identified for the Trustee before trial, and that

the Trustee's lawyers sought to address in their proposed stipulation with Barclays during trial —

*i.e.*, those contained on BCI Exs. 885, 886, and 967.  *Compare* Trustee April 28, 2011 Br. at n.

15 (explaining that KPMG analysis is of assets on BCI Exs. 885, 886 and 967) *with* Exhibit 1

(Trustee proposed stipulation addressing assets on BCI Exs. 885, 886, and 967 as containing the

Undelivered Clearance Box assets identified by Barclays).  The Movants already made their

effort to show that these assets were worth more than the amounts estimated by Barclays, and the

Court rejected those efforts.  *See* Op. at 22, 61, 65-69.

28.    Second, the Trustee's use of the KPMG analysis is misleading.  The record

evidence shows that the assets that Barclays valued at $869 million were those Undelivered

Clearance Box Assets which Barclays was able to identify through an analysis of LBI's stock

records after the Closing and after the filing of Schedule B, and which were set forth on BCI Exs.

885 and 886.[11]  Those assets consisted of approximately 1,316 CUSIPS (not the 1,972 CUSIPs

that KPMG attempted to value).[12]  Barclays currently estimates these 1,316 CUSIPS to have

appreciated to approximately $1.1 billion at present.[13]

29.    Thus, the current value of the assets Barclays claims is in no way inconsistent

with the evidence presented at trial.  As the Court noted, the Clearance Box Assets were

estimated to have a value of approximately $1.9 billion *at the time of the Closing*.  Op. at 90.

Barclays valued the Clearance Box Assets that were already delivered to Barclays at $786

million.  BCI Ex. 133 at p. 2, line 11; 9/2/10 Tr. at 34:10-35:1 (Romain).[14]  Accordingly, while

there was never a valuation cap on the Clearance Box Assets, for Barclays to receive assets that

are today worth approximately $1.1 billion, and that were worth approximately $869 million as

of the end of 2008, is completely consistent with the proof presented at trial.

F.    **The Court Should Not Accept The Trustee's Untimely Defense That It Is "Not Feasible" To Deliver The Undelivered Clearance Box Assets.**

30.    Even though Barclays' January 29, 2010 Memorandum made clear that Barclays

was seeking the *actual* delivery of the Undelivered Clearance Box Assets, and even though the

Sale Order expressly provides for specific performance of the Purchase Agreement, the Trustee

---

[11]  1/15/10 Hraska Dep. Tr. at 91:16-93:19; BCI Ex. 146 (Romain's 30(b)(6) deposition notes show that lists A and B1 (BCI Ex. 885) were recognized on the Acquisition Balance Sheet and that lists B2 and C (BCI Ex. 886) were valued at $162 million and that this amount was not recognized on the Acquisition Balance Sheet);  9/2/10 Tr. at 32:18-33:1, 55:15-23 (Romain) (the value of the undelivered clearance box assets that were recognized on the Acquisition Balance Sheet was $707 million).

[12]  BCI Exs. 885, 886.

[13]   If the Court believes it is appropriate or necessary to accept new evidence on this issue, Barclays could produce a declaration or short expert analysis to demonstrate this valuation.

[14]  The Trustee misleadingly uses the "Lehman marks" on these assets of $1.4 billion, which reflected Lehman marks that were "not adjusted for Lehman paper" — *i.e.*, that failed to write down even the worthless Lehman-related debt included in this population of assets.  The record evidence shows that the marks that were "not adjusted for Lehman paper" showed total values for the Clearance Box Assets on Schedule B of $2.3 billion, not $1.9 billion. BCI Ex. 755.  Thus, if the Trustee wants to call the delivered assets "$1.4 billion," then he must also call the total population "$2.3 billion."

never saw fit to argue that specific performance was "not feasible." That argument was made for the very first time in the Trustee's April 28, 2011 Memorandum on the proposed orders. Trustee April 28, 2011 Br. at ¶¶ 66-70.

31.    The Court should reject this untimely defense. If the Trustee truly believed that the remedy sought in Barclays' January 29, 2010 Motion was impossible to provide, then the Trustee would (and should) have said so in response to that motion, or during trial — not fourteen months later in a brief addressing the proposed orders.[15]

32.    Moreover, the Trustee's "feasibility" arguments appear to be largely based, not on the practicality of delivering specific securities, but on his erroneous assertion that Barclays is not entitled to either physical securities or margin securities. Trustee April 28, 2011 Br. at ¶¶ 47, 68. As amply explained in Barclays April 28, 2011 Memorandum, both types of assets were included in the definition of Clearance Box Assets. *See* Barclays' April 28, 2011 Br. at ¶¶ 40-51.[16]

---

[15] *See generally Bergstrom, Inc. v. Siemens Elec., LTD*, 208 F.R.D. 234, 235 (N.D. Ill. 2002) (describing the prejudice that results when a party fails to raise a new theory of defense in a timely manner). The reason the Barclays' Proposed Order from March 4 called for the Trustee to present a list of all Undelivered Clearance Box Assets was not to invite the Trustee to present a list that reduced the population of such assets from those contained in the Barclays' demands, but rather was to ensure that the Trustee was obligated to identify *any other* Undelivered Clearance Box Assets that Barclays was unable to identify.

[16] In footnote 18 of his Memorandum, the Trustee makes a series of inaccurate statements in support of his assertion that the "non-excess margin securities" in LBI's clearance boxes do not constitute "Clearance Box Assets." April 28, 2011 Trustee Br. at n. 18. First, contrary to the Trustee's assertion, Rule 15c3-3(a)(10) does not define "customer securities" as customer credit; it does not deal with securities at all, but instead deals solely with *cash* credit balances. 17 C.F.R. § 15c3-3(a)(10). Second, the LBI customer agreement cited by the Trustee actually proves Barclays' point: it allowed LBI "to lend either to itself or others" any of the securities in question, which means it allowed LBI to lend itself the securities in order for LBI to transfer those securities in a sale to a third party; indeed, the agreement describes the lending of securities as including the ability "*to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others.*" *See* Decl. of Neil Oxford attached to Trustee April 28, 2011 Brief at Ex. B, ¶ 19 (emphasis added).

33.     The Trustee's claim that it is "not feasible" to make an actual delivery of all

Undelivered Clearance Box Assets is also belied by the long chain of communications from the

Trustee to Barclays regarding the Trustee's desire to review Barclays' lists of Undelivered

Clearance Box Assets in order to determine an "accurate" list that could be delivered.  *See* Exs.

4-8.  The Trustee and his advisers would not have embarked on such a process if they believed

(as they now suggest to the Court) that it would be infeasible to complete.[17]

34.     Barclays understands the need for a process to identify all Undelivered Clearance

Box Assets.  That is why the Barclays Proposed Order proposed some specific deadlines for

undertaking that process.  Barclays' Proposed Order at ¶ 2(a)-(c).  It may be that the process is

difficult and complex, but that is not a reason for failing to attempt to identify properly all of the

Clearance Box Assets Barclays is entitled to receive.

35.     Finally, to the extent the "infeasibility" of making an actual delivery of the

Undelivered Clearance Box Assets is truly established, the Trustee should be obligated to pay the

monetary equivalent of what specific performance would be worth to Barclays — *i.e.*, the value

of the undelivered assets today, not as of the Closing.  *See generally Will of Rothko*, 392

N.Y.S.2d 870, 873-74 (N.Y. App. Div. 1977) ("[I]n an action where restitution or specific

performance is allowed, the measure of damages is the value at the time of the trial, on the theory

that the true owner had a continuing right to possession of the painting and can be made whole

only by return of the item or by payment of its value at the time of trial"); *Menzel v. List*, 24

---

[17] The Trustee claims that determining an accurate list of Undelivered Clearance Box Assets requires the
review of "dozens, and perhaps even hundreds, of accounts on Lehman's books and records," and the
process is "further complicated by imperfect information and the extraordinary number of stock record
breaks that occurred on September 19, 2008."  Trustee April 28, 2011 Br. at ¶ 68.  According to his
reports to this Court, the Trustee is supposed to have been attending to the work of reconciling the LBI
stock record breaks, and ensuring the integrity of the LBI stock record, since the Closing.   Trustee's
Second Interim Report for the Period May 30, 2009 through November 11, 2009 at pp. 71, 74.

N.Y.2d 91, 97 (1969) (awarding damages in a breach of title action based on the value of the property as of the time of trial).

###### G. Barclays Is Not "Estopped" From Seeking The Remedy It Has Consistently Demanded Throughout This Proceeding, And That Is Provided For In The Sale Order And This Court's Opinion.

36.      The Court should reject the Trustee's estoppel arguments.  As explained above, Barclays always stated its claim as one for the "delivery" of the Undelivered Clearance Box Assets.  Barclays' April 28, 2011 Br. at ¶¶ 6-8.  Barclays also provided the very same lists to the Trustee that the Trustee now claims have a value that, if delivered to Barclays, would be a "windfall."[18]  Barclays is not in any way disavowing the valuations it presented at trial, or seeking anything inconsistent with those valuations.  Thus, there is nothing at all "new" in what Barclays is claiming, and there is therefore no basis for claiming that Barclays is estopped.

## II.      The Court's Order Should Clarify Barclays' Entitlement To Certain Specific Categories Of Margin Assets.

37.      The Trustee accuses Barclays of seeking an Order that reflects "new arguments" and positions that he alleges are inconsistent with the Court's decision.  These assertions are unfounded.

###### A. The Court's Opinion And The Trustee's Proposed Findings Of Fact Already Confirm That The Disputed Margin Assets Do Not Include The Assets Used By Domestic Exchanges To Cover A $134.8 Million Liability Owed On Behalf of Futures Customers As of The Closing.

38.      As explained in Barclays' opening Memorandum of April 28, the Barclays "Futures Balance Sheet" lists the assets and liabilities associated with the LBI futures business acquired by Barclays, measured as of the Closing.  Barclays' April 28, 2011 Br. at ¶¶ 61-62.  The

---

[18] *Compare* Trustee April 28, 2011 Br. at ¶ 58 & n.15 ("These 1,972 CUSIPs represent the Trustee's compilation of CUSIPs and their claimed quantities from BCI Exs. 885, 886, and 967, which the Trustee understands reflect the undelivered Clearance Box Assets that Barclays is claiming") *with* BCI Ex. 359 at att. 2-5 (containing the same CUSIPs as BCI Exs. 885, 886, and 967).

Futures Balance Sheet includes entries for "Domestic Exchanges" that include (a) a gross asset number of $538.6 million, (b) a liability number of $134.8 million, and (c) a net asset number of $403.7 million (the difference between the first two numbers).  BCI Ex. 729 (attached spreadsheet).  The $134.8 million liability reflected amounts owed to the Domestic Exchanges on behalf of LBI's futures customers as of the Closing; the Domestic Exchanges automatically reduced the amount of Margin Assets available at those exchanges by that liability.  Thus, the appropriate measure of the amount of Margin Assets available at Domestic Exchanges in connection with LBI's futures was $403.7 million (the net number).  *See* Barclays' April 28, 2011 Br. at ¶ 68.

39.    The Court's Opinion adopted a proposed finding of fact from the Trustee that expressly agrees with this position.  The Court found that the $4 billion in disputed Margin Assets consist of the following:  "This total includes nearly $2.3 billion in assets posted by LBI at the OCC, primarily in connection with LBI's options trading business, an additional $1.2 billion at foreign brokers or affiliates and approximately $400 million at domestic exchanges in connection with LBI's futures trading."  Op. at 84.  This finding precisely adopted a proposed finding of fact from the Trustee.  *See* Trustee Post-Trial Br. at ¶ 173 (Trustee Proposed Finding of Fact that "the disputed Margin Assets" include "$400 million at domestic exchanges in connection with LBI's futures trading.").

40.    Thus, based on the Trustee's proposed Finding of Fact, the Court found that the amount of disputed Margin Assets that were held "at domestic exchanges in connection with LBI's futures trading" was "approximately $400 million."  Op. at 84.  Barclays agrees with that finding, and it is supported by the Futures Balance Sheet and all other record evidence.  Thus, the finding is undisputed.  That means this Court has already found, and the parties have already

17

agreed, that the amount of Margin Assets in dispute is an amount that has already been reduced

by the $134.8 million liability that the Trustee purports to be disputing in his April 28

Memorandum.

41.    The Trustee's refusal to acknowledge the $134.8 million liability likely reflects

confusion over the different numbers, and a failure to recognize that this issue is in fact a non-

issue, and is simply an attempt by Barclays to define with precision what Margin Assets were

actually received, what liabilities were assumed, and what the precise import is of the Court's

decision.

> **B.    The Court's Order Should Confirm That Barclays Is Not Obligated To Return Margin Assets That It Never Received, Because They Were Used To Cover Liabilities Incurred On Behalf Of The Futures Customers.**

42.    Even if the Court had not already resolved the issue of the $134.8 million liability

(as shown above), a fair reading of the Court's Opinion would not obligate Barclays to transfer

Margin Assets to the Trustee that Barclays *never received.*  As shown by the example of the

$134.8 million liability, the liabilities on the Futures Balance Sheet directly reduced the Margin

Assets available to Barclays, and hence had the effect of reducing the amount of Margin Assets

*actually received* by Barclays.  If the Trustee understood this, he presumably would not be

disputing the point.  Indeed, the Trustee states he is "still investigating" the issue.  Trustee April

28, 2011 Br. at ¶ 38.  It is precisely in order to clarify all the numbers, and to eliminate such

disputes, that the Barclays Proposed Order called for a process in which a precise schedule of all

categories of Margin Assets could be prepared that both parties could agree upon, and that would

ensure that the Court's Opinion was implemented properly.

43.    In any event, the Trustee agrees that Barclays is entitled to Margin Assets needed

to cover the liabilities *owed directly* to the futures customers transferred to Barclays.  *See* Trustee

April 28, 2011 Br. at ¶ 37.  The Trustee argues, however, that Barclays was required to cover all

*indirect* liabilities owed *on behalf of* these customers — even if those liabilities were fully incurred and owed as of the moment of Closing, and even if the liabilities simply operated to reduce the amount of Margin Assets available to Barclays, as was in fact the case. *Id.* at ¶ 38. That is an unjustifiable distinction that the Court should reject.

44.     As stated above, the Trustee's argument is equivalent to requiring Barclays to return Margin Assets that it never received. This is most obviously the case with respect to the liabilities owed to domestic exchanges — already discussed above, but summarized again here. The Barclays Futures Balance Sheet refers to a *gross* amount of Margin at "Domestic Exchanges" of $538,615,978. However, Barclays *never actually received that amount*. Instead, Barclays received only the *net* amount of $403,733,010, which reflects the fact that the exchanges and brokers to whom the Margin Assets had been pledged had *reduced* the available Margin by $134,882,968 — *i.e.*, the amount owed to those exchanges and brokers on behalf of the futures customers as of the Closing. *See* BCI Ex. 729. It would be manifestly unjust for Barclays to be deemed to have received Margin Assets that it never actually received, and there is no basis for such a conclusion: those assets were immediately seized by exchanges or brokers and used to offset liabilities owed *as of the Closing* on behalf of the futures customers who were transferred to Barclays.[19]

45.     The result should be no different with respect to the $127.7 million liability owed to LBI affiliates, or the $6.7 million owed directly to futures customers. Both liabilities were fully accrued as of the Closing, and both reduced the amount of Margin Assets Barclays had

---

[19]   Again, as explained in Barclays' Memorandum of April 28, 2011, it would be more accurate (and more appropriate) simply to calculate what Barclays received by using the net number of $403 million in Margin Assets at domestic exchanges, rather than to engage in a debate over "liabilities" that need to be "offset." Barclays' April 28, 2011 Br. at ¶ 66. It is not clear the Trustee would even dispute the point if framed in this way.

19

available to it with respect to these futures customers.  Moreover, both liabilities represent part of the total *balance owed to customers* — thus, the assets used to pay these liabilities represent customer property held for the benefit of customers.

46.    The $127.7 million liability is owed to futures customers of a "Lehman Affiliate" (LBIE); that liability is no different than a liability directly to futures customers.  LBIE stood between Barclays and certain futures customers as an intermediary broker, and the $127.7 million represents a liability that was fully accrued as of the Closing, that was assumed by Barclays as of the Closing (as reflected on the Futures Balance Sheet), and that was owed to Lehman's futures customers who traded through LBIE.  *See* M. 494 at "Lehman Affiliates" Tab (showing a $127 million "payable" due and owing to LBIE in connection with LBIE's customer omnibus account); BCI Ex. 649 at p. 1 of attachment (confirming that Barclays "took over LBIE's omnibus customer account with LBI").  Thus, this liability is, in substance, no different from the $2 billion liability owed directly to LBI customers for which the Trustee agrees Barclays is entitled to retain Margin Assets.

47.    Finally, the $6.7 million liability for interest payments and rebated fees was owed *directly* to futures customers, and therefore should not be controversial.  This amount was simply categorized differently from the $2 billion liability to customers because it resulted not from the customers' deposits, but from subsequent fee rebates and interest accrued prior to the Closing. *See* BCI Ex. 729 (attached spreadsheet) (showing "Liabilities" of $6,779,534 for "Accrued fees etc."); M. 494 (column entitled "Accrued fees etc," row entitled "What these assets are?") ("These balances are related to interest and fee rebates that were due to customer as at close of business 19th September 2008.").

48.     In short, each component of the $270 million in customer-related liabilities that the Trustee disputes were fully accrued as of the Closing, either reduced the amount of Margin Assets Barclays had available to it with respect to LBI futures business, or increased the amounts owed by Barclays to futures customers.

49.     The Trustee argues that "Barclays should already have been compensated" for these liabilities because they "should already have been incorporated into the segregated and secured calculations."  Trustee April 28, 2011 Br. at ¶38.  In theory, this would typically be true for the $127.7 million amount owed to LBIE customers and (presumably also for) the $6.7 million owed to LBI customers for fee rebates and interest, since those reflect amounts owed to customers, which is what the segregated and secured calculation is designed to show.[20]  Thus, by making this argument, the Trustee is admitting that these are in fact liabilities to customers, and therefore that the assets used to cover those liabilities were "customer property" that was "held for the benefit of customers."  But the Trustee is ignoring the fact that, while they might typically be included in segregated and secured calculations, on the Barclays Futures Balance Sheet these liabilities happen to be broken out and shown separately.  That does not change the fact that they are customer liabilities that were assumed by Barclays.  It just means that the different categories of customer liabilities, which could be components of the segregated and secured calculation, are broken out separately on the Barclays Futures Balance Sheet:  it shows (a) more than $2.3 billion owed to futures customers for "Customer Balances," (b) $127.7 million owed to futures

---

[20] The $134.8 million liability to "Domestic Exchanges" is slightly different, in that it reflects liabilities owed on behalf of customers to those exchanges; as shown above, this liability directly reduced the amount Margin Assets available to Barclays at those exchanges, and hence is really more of a reduction in total assets than a liability (*i.e.*, it reflects Margin Assets that literally were not and could not have been received by Barclays).

customers at LBIE ("Lehman Affiliates"), and $6.7 million owed to futures customers in the form of interest and fee rebates.  See BCI Ex. 729 (attached spreadsheet); M. 494 at p. 1.

50.    The Trustee also asserts, without any factual support, that the $267 million in additional liabilities on the Futures Balance Sheet might have arisen after the Closing, in which case they are Barclays' sole responsibility.  Trustee April 28, 2011 Br. at ¶38.  Again, the Trustee is simply wrong.  These liabilities were accrued on the Futures Balance Sheet, which flowed up into the Acquisition Balance Sheet — the purpose of which was to record the assets and liabilities that Barclays assumed *as of the Closing*, which by definition does not include any amounts incurred after the Closing.  9/2/10 Tr. at 13:12-17, 63:9-12 (Romain); M. 494 at p. 1 (row entitled "Domestic Exchanges," column entitled "What these assets are").  The time for the Trustee to challenge and revise Barclays' accounting judgments has passed.  The liabilities in question were properly accrued as of the Closing, and do not reflect post-closing liabilities.

51.    Finally, there is an independent legal basis for Barclays to receive an offset for the futures customer liabilities set forth on the Futures Balance Sheet.  As discussed in the Barclays April 28, 2011 Memorandum (and below), section 550(e) entitles Barclays to a lien on the Margin Assets in the amount of any "claim" that was made against those Margin Assets by a third party, and that was paid by Barclays.  In addition to the liabilities discussed below, this statute entitles Barclays to a lien in the amount of the $269 million to reflect the liabilities discussed above, which Barclays assumed and which would otherwise have been claims against the Margin Assets the Trustee demands to be returned.

C.    **The Law Entitles Barclays To An Offset For The Liabilities That Were Secured By The Margin Assets, Including Those Assumed Under The TAA.**

52.    As described in the Barclays Memorandum of April 28, 2011, the law provides that when property is ordered to be returned to the Estate because it was wrongfully transferred

to a third party, the third party is entitled to an offset in the amount of (a) any consideration provided to acquire that property, and (b) any liabilities that were secured by that property, which the third party satisfied.  *See* Barclays' April 28, 2011 Br. at ¶¶ 68-86.

53.    The Trustee does not address this law in his brief.  That is not, as he suggests, because the argument is "new" and his lawyers needed first to see the basis for Barclays' arguments.[21]  Rather, it is because the Trustee has no answer to what the straightforward application of this law to the Court's Opinion requires.

54.    Under this established law, Barclays is entitled to an offset to cover consideration provided under the TAA and any liabilities that it satisfied that were secured by the Margin Assets.  The facts proved at trial establish that the Margin Assets were used to secure ETD liabilities, and that those liabilities, even after netting out the value of the long positions, were well in excess of $1 billion.  *See* Barclays' April 28, 2011 Br. at ¶¶ 81-82.

55.    The Trustee's sole response, thus far, is that this "offset" argument is "too late," and is inconsistent with the arguments Barclays made at trial.  Trustee April 28, 2011 Br. at ¶¶ 27-35.  That is not correct.

56.    During pre-trial briefing and at trial in this case, Barclays consistently argued that:

- The ETD liabilities and the associated Margin Assets were *inextricably linked*;[22]

- The Margin Assets exist precisely in order "to secure" the obligation of the broker-dealer to cover those ETD liabilities — in other words, the

---

[21]    To the contrary, Barclays provided the Trustee all of the legal support for its position — both the case law and the citation to section 550(e) — well in advance of the April 28 briefing.

[22]    Barclays' Jan. 29, 2010 Br. at ¶¶ 152, 154, 155, 228; Barclays' April 5, 2010 Br. at ¶46; Barclays' Post-Trial Memo. of Law and Fact at ¶ 240; 8/24/2010 Tr. at 99:24-102:4 (Rosen); 5/4/10 Tr. at 164:23-165:7 (Seery) ("Barclays was going to buy business and those included the exchange-traded derivatives business which would necessarily include the actual positions and their margin"); 4/30/10 Tr. at 216:22-217:12 (Hughes); 9/8/10 Tr. at  85:11-14, 86:4-88:11 (Raisler); 6/22/10 Tr. at 23:16-24:8 (Diamond); 10/5/10 Tr. at 88:8-89:22 (Leitner).

Margin Assets Barclays believed it was acquiring could not be transferred without the liens attributable to the short option liabilities, as was expressly contemplated in paragraph N of the Sale Order;[23]

- Thus, because Barclays believed that it was acquiring the Margin Assets, it also acknowledged that it was assuming the short option liabilities;[24]

- Indeed, neither Barclays nor any other rational purchaser would ever have taken the ETD liabilities (the shorts) without the Margin Assets;[25]

- The TAA was consistent with and confirmed Barclays' understanding, by providing that Barclays was receiving "all margin deposits" while also requiring Barclays to take on all of the short option liabilities associated with LBI's OCC accounts;[26]

- Barclays in fact assumed well over $1 billion in net ETD liabilities at the OCC (as a result of the "short option" liabilities), secured by approximately $2.2 billion in margin deposits at the OCC;[27] and

- Section 1(a)(ii)(C) of the Clarification Letter could not be read to transfer the ETD liabilities without the Margin Assets because that would improperly transform this "Purchased Asset" provision of the Purchase Agreement into an "Assumed Liability" provision — a result that is

---

[23] BCI Ex. 220; 10/5/10 Tr. at 22:6-14, 122:12-124:11 (Leitner) (testifying that clearing houses had a lien on the margin in the accounts and that lien traveled with the margin and that Barclays needed the margin because it was the "only mitigant" to the risks attendant to the ETD positions at the time"); Barclays' Post-Trial Memo. of Law and Fact at ¶ 244.

[24] *Id.*; Barclays' Jan. 29, 2010 Br. at ¶ 220 ("when Barclays assumed these [ETD-related] risks, it did so based upon its understanding that it was also acquiring the associated margin — as some measure of protection against them"); 6/21/10 Tr. at 259:19-260:16 (Diamond); 6/22/10 at 21:9-14, 24:9-15 (Diamond); 8/25/10 Tr. at 79:12-81:7 (King); 8/24/2010 Tr. at 113:17-114:13 (Rosen).

[25] 10/5/10 Tr. at 118:24-119:12 (Leitner); BCI Ex. 340 at ¶¶ 84-127; 8/30/2010 Tr. at 13:18-14:18 (James); Barclays' Post-Trial Memo. of Law and Fact at ¶¶ 245-246, 258.

[26] BCI Ex. 3; BCI Ex. 233 (confirming the OCC's understanding "that the LBI accounts and all positions, cash and securities collateral that are held by OCC in respect of those accounts are intended to be transferred to Barclays"); *accord* BCI Ex. 231 at HHR 00006078 (attaching the Collateral Account Agreement with the Trustee's signature to release "all collateral" to Barclays); Kobak Dep. Tr. at 282:14-283:21 (acknowledging that margin connected to liabilities would have been included in the agreement to be transferred to Barclays).

[27] Barclays' Jan. 29, 2010 Br. at ¶ 220; BCI Ex. 710; *see also* 9/2/10 Tr. (Romain) at 22:4-23:6, 28:13-19 (explaining the $1 billion liability carried by ETDs); BCI Ex. 147 at pp.1-2 (Romain Jan. 13, 2010 deposition preparation notes, explaining the loss of over $1.026 billion on ETD positions); BCI Ex. 146; BCI Ex. 133 at p. 3; BCI Ex. 353 at ¶ 8.

inconsistent with all of the record evidence reflecting the intent of *all* parties at the time.[28]

57.     These are the same assertions Barclays relies upon now in asserting that, if Barclays was not entitled to any Margin Assets, then it must as a matter of law be entitled to an offset to recover the ETD liabilities that were secured by those Margin Assets, and that Barclays assumed and satisfied.  *See* Barclays' April 28, 2011 Br. at ¶¶ 73-84.

58.     The Trustee points to the fact that Barclays previously made assertions suggesting that, under the Clarification Letter, Barclays was obligated to acquire both the long ETD positions and the short ETD positions.  The Trustee argues this is inconsistent with the positions advocated by Barclays in its April 28 brief — namely, that Barclays was *not* obligated to take the short positions under the plain text of the Clarification Letter, but assumed those obligations solely under the now-voided TAA.  The Court should not accept the Trustee's argument, for the following three reasons.

### 1.     Barclays Never Asserted Or Agreed That The Purchase Agreement Could Be Read To Transfer The ETD Liabilities To Barclays Without The Margin.

59.     The Trustee's April 28 brief quotes two paragraphs from prior Barclays' submissions that are consistent with Barclays' position throughout this proceeding:  namely, that it acquired *all* of LBI's ETD business, which included *all* of the positions — both assets and liabilities — as well as *all* of its Margin Assets.  *See* Trustee April 28, 2011 Br. at ¶¶ 29-30.  In its briefs, and in the evidence presented at trial, Barclays consistently made the point that these

---

[28] Barclays' Apr. 5, 2010 Reply Br. at ¶¶ 45-46 (raising the same points prior to evidentiary hearing before the Court); Kobak Dep. Tr. at 282:14-283:21 (testifying that his understanding at the time was that Barclays was entitled to all margin, including cash margin, needed to offset losses); BCI Ex. 146 at p.3, points 3-4; Barclays' Apr. 28, 2011 Br. at ¶ 73, n.30 (demonstrating that the absence of margin would create a loss for Barclays).

different components of the ETD business could *not* be segregated and split up: no one would ever acquire ETD liabilities without the Margin because the two are inextricably linked.[29]

60.    Similarly, Barclays believed it acquired the ETD liabilities *only because* it also believed that it acquired the Margin Assets, which it was not possible to acquire without the ETD liabilities: the Margin Assets were the *security* for the ETD liabilities, and therefore *could not be transferred without those liabilities*. It is for that reason, reinforced by the express provisions of the TAA, that Barclays recognized in prior briefing before this Court that it had assumed the short option liabilities that attached to (and were secured by) the Margin Assets. By the same token, however, once the Court rejected Barclays' understanding that it had acquired the Margin Assets, there was no logical or contractual basis for asserting that it had assumed the short option liabilities – other than the TAA, which the Opinion effectively voids.

61.    In other words, Barclays understood the Purchase Agreement to be *consistent with the TAA*, which unambiguously (a) required Barclays to assume all ETD liabilities at the OCC, and (b) transferred to Barclays "all margin deposits" in LBI's accounts at the OCC. BCI Ex. 3. Barclays interpreted the TAA and the Purchase Agreement as part of a single, integrated transaction that required the two agreements to be read and understood together.[30]

62.    The Barclays interpretation has been rejected by the Court. Under the Court's decision, (a) the Clarification Letter does not transfer to Barclays the Margin Assets (at least not the cash Margin Assets), and (b) the TAA is voided. Based on those apparent holdings, it is

---

[29] Barclays' Jan. 29, 2010 Br. at ¶¶ 152, 154, 155, 228; Barclays' April 5, 2010 Br. at ¶46; 8/24/2010 Tr. at 99:25-102:8 (Rosen); 5/4/10 Tr. at 164:19-165:7 (Seery); 4/30/10 Tr. at 216:17-217:6 (Hughes); 9/8/10 Tr. at 87:10-88:11, 85:10-13, 86:3-87:8 (Raisler); 10/5/10 Tr. at 88:8-89:22 (Leitner).

[30] *See Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir. 1965) ("New York law . . . requires that all writings that form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties"); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998).

obviously no longer appropriate to interpret the TAA and Clarification Letter as part of a single, integrated transaction in which the provisions of the TAA confirm and inform the meaning of the Clarification Letter. Instead, the Clarification Letter stands alone, subject to the Court's holding that it does not transfer to Barclays any of LBI's Margin Assets (at least not those held as cash), which logically means that it also does not transfer the liabilities that attached to those assets.[31] Barclays assumed those liabilities solely as a result of its now-rejected understanding that, as set forth in the TAA and the Sale Order, it was acquiring both the Margin Assets and the ETD liabilities those assets secured.

63.    Consistent with its prior positions, Barclays asserts that under the Court's holding, it is entitled to an offset for the liabilities it assumed under the TAA in the form of the assumed short option liabilities. While those short option liabilities had a gross value of over $6 billion, the most conservative measure of the offset would be the $1.026 billion that represents the net liability in LBI's proprietary options accounts as of the Closing. That is the most conservative possible offset number because (a) it allows for a netting of the roughly $5 billion in long options against the roughly $6 billion in short options (based on the assumption that the OCC would not have allowed Barclays to receive the long options without the short options, despite Barclays' entitlement under the plain text of the Purchase Agreement), (b) it ignores the fact that if the OCC had *liquidated* the assets in LBI's accounts, the long options would have been worth substantially less than their values on the Barclays balance sheet, yielding a net liability much

---

[31] The Court's decision makes no finding regarding the contractual basis for Barclays having assumed the short options positions in LBI's OCC accounts. As it argued before and during trial, Barclays continues to argue that the Court should reject any interpretation of section 1(a)(ii)(C) of the Clarification Letter that would convert that "Purchased Asset" into an "Assumed Liability," as would occur if it were interpreted to transfer the ETD liabilities without the Margin Assets. There is, after all, no basis in the plain text of the provision for finding that it includes *any* liabilities. Rather, the only contractual basis for the assumption of ETD liabilities is the TAA, which unambiguously provides that Barclays must assume such liabilities (while also providing, of course, that Barclays was acquiring "all margin deposits"). BCI Ex. 3.

larger than $1.026 billion, (c) as it gradually sold off the LBI options after the Closing, Barclays

incurred additional liabilities over and above the $1.026 billion amount, which are not possible to

capture fully due to intermingling of LBI and Barclays positions, and (d) Barclays incurred

additional net liabilities in the firm futures account at the OCC, and with respect to affiliate

positions in the LBI customer account at the OCC, which have also proved difficult to measure.

If the Court agrees that an offset is appropriate, then consistent with the type of approach

outlined in Barclays' March 4 Proposed Order, Barclays requests a process that would gather and

present the relevant information to allow the Court to determine the precise value of that offset.

## 2.    **Barclays' Right To An Offset Under Section 550(e) Is Not Dependent Upon Whether Barclays Was Required To Assume The ETD Liabilities Under The Purchase Agreement.**

64.    Even if the Court were to conclude that Barclays was contractually obligated to

assume the short option liabilities under the Purchase Agreement, Barclays would still be entitled

to an offset for those liabilities based upon the plain text of section 550(e) of the Bankruptcy

Code.

65.    Section 550(e) provides an offset for any payment of a liability that was secured

by a lien on the assets that are being ordered returned to the estate.  The Margin Assets were, *by*

*definition*, subject to liens in the amount of any liabilities owed to a clearing corporation,

exchange, or broker through which the ETDs were traded — such as, for example, the OCC.[32]

There is nothing in section 550(e) that is dependent in any way upon whether the transferee was

obligated to assume the liability secured by the property in question.

---

[32]  10/5/10 Tr. at 122:12-123:7 (Leitner).

66.     Thus, section 550(e) entitles Barclays to a lien on the Margin Assets in the amount of the ETD liabilities Barclays assumed and satisfied irrespective of whether those liabilities were assumed under the TAA or the Purchase Agreement (or otherwise).

### 3.     Barclays Was Not Obligated To Raise Arguments That Were Not Implicated Prior To The Court's Decision.

67.     Finally, Barclays was not obligated to raise a point that would arise solely as an implementation matter in the event that it *lost* the issue being litigated.  With respect to the Clearance Box Assets, even though Barclays was far more clear than the Trustee has been as to what assets constituted undelivered Clearance Box securities, the Trustee never raised its argument that specific performance was "not feasible," and that many of the assets demanded by Barclays were (according to the Trustee) not actually Clearance Box Assets.  The Barclays arguments regarding an "offset" are much more closely tied to the actual arguments it made at trial than those now raised by the Trustee with respect to the Clearance Box Assets.  In fairness, therefore, the Court should permit these arguments and should reflect them in the Orders issued to implement the February 22 decision.[33]

### D.     Based On The Court's Reasoning, Barclays Should Be Entitled To The Margin Assets The Trustee Now Admits Were Not In The Form Of Cash Or Cash Equivalents.

68.     The Trustee argues that the Barclays Proposed Order is contrary to the Court's Opinion in seeking to "carve out" Margin Assets that were not held as cash or cash equivalents. Trustee April 28, 2011 Br. at ¶ 15.

---

[33] If for any reason the Court accepts the Trustee's contention that Barclays somehow "waived" the offset issues by not raising them earlier, the waiver would not be jurisdictional in nature, and therefore the Court should consider these issues under the "interest of justice" exception.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 207 (2d Cir. 2003); *U.S. v. Male Juvenile*, 121 F.3d 34, 38-39 (2d Cir. 1997).  In a case as complex as this, it would be manifestly unjust to deprive Barclays of over $1 billion because of an alleged procedural error.

69.     Barclays acknowledged in its April 28 Memorandum that the Court's Opinion, in certain places, appeared to hold that Barclays was entitled to *no* Margin Assets (beyond the customer property discussed above), irrespective of whether held in the form of cash or not. Barclays' April 28, 2011 Br. at ¶ 89.  However, as Barclays also pointed out, the Court's Opinion was (a) overwhelmingly based upon the rationale that "all cash, including the Margin Assets, were excluded from the transaction," *id.* (quoting Op. at 73), and (b) assumed that all Margin Assets were held as cash or cash equivalents, *id.* (quoting Op. at 84), an assumption that appeared to be based upon the misleading representations of Trustee's counsel.

70.     Indeed, while the Trustee's counsel now asserts that the Margin Assets "include government securities, which account for $1.5 billion of the total $4 billion in Margin Assets," Trustee April 28, 2011 Br. at ¶ 16, they previously chose not to call attention to the fact that the Margin Assets included such a large amount of assets that *neither Barclays nor Lehman would have categorized as a "cash equivalent*."  For example, during the Opening Argument on April 9, 2010, the Trustee's counsel asserted that the Sale "does not give Barclays any right to Lehman margin assets, *which are* all *cash and cash equivalents* that were expressly excluded from this transaction," 4/9/10 Tr. at 101:24-102:10; and that "Barclays cannot possibly have any right under the bankruptcy law to *four billion dollars of cash*, when that was never disclosed to the Court and was inserted in a parenthetical right before the closing," *id.* at 116:22-25.

71.     To support his view that government securities which were *not* cash equivalents were also excluded from the Sale, the Trustee points to a sentence of the Court's Opinion in which the Court cites section 1(b) of the Clarification Letter.  However, the Trustee quotes selectively from that provision, and omits critical language.  The Trustee quotes the provision as follows, with no indication that the quotation is incomplete:  "For the avoidance of doubt, the

'Business' includes LBI's commodities business, government securities trading operations and

mortgage-backed securities trading operations of LBI (*but not any securities of such nature held*

*by Seller*)."  Trustee April 28, 2011 Br. at ¶ 17 (emphasis in original).  However, the provision

does not end where the Trustee's quote ends; instead it continues with the language "*except as*

*otherwise specified herein or in the Agreement*."  BCI Ex. 5 at § 1(b).

72.     Both the Clarification Letter and "the Agreement" (which is the APA) provide

that "government securities" were included in the definition of Purchased Assets.  *See*  BCI Ex. 1

at p. 6, subsection (d) (definition of Purchased Assets" included "Long Positions" which

included "government securities"); BCI Ex. 5 at § 1(a) (clarifying definition of Purchased Assets

to include numerous Purchased Assets that included government securities).  Indeed, at trial, in

the course of his extensive testimony on the Barclays' valuations of the various classes of

securities acquired in the Sale, Barclays' expert Professor Pfleiderer provided an analysis of the

valuations of both federal government securities (Treasuries), federal government agency

securities, and municipal bond securities.  10/6/10 Tr. at 162:9-165:18, 167:20-172:22

(Pfleiderer).  This trial testimony would have made no sense, and would undoubtedly have drawn

an objection from Movants, if "government securities" were *excluded from the Sale altogether.*

73.     Thus, there was no blanket exclusion of "government securities."  To the extent

government securities otherwise fell within the definition of Purchased Assets, they were

included.  Since the reasoning in the Court's Opinion was that Margin Assets were excluded

31

because they were held in the form of "cash" or "cash equivalents," that exclusion should not

apply to government securities.[34]

74.    The Trustee also points to footnote 35 of the Court's Opinion, in which the Court

appears to have adopted the Trustee's argument that subsection (n) of the definition of Excluded

Assets included any assets "primarily related to" exchange-traded derivatives.  Trustee April 28,

2011 Br. at ¶ 18.  Barclays respectfully reiterates its assertion that this provision related solely to

over-the-counter-derivatives, not to exchange-traded derivatives (which is confirmed by

contemporaneous evidence of Weil Gotshal's understanding of this provision at the time of

Closing, *see* BCI Ex. 1104 at pp. 4-5, as well as by fact witness testimony[35]).  In addition, the

Trustee's reading of footnote 35 of the Opinion proves too much as there would not be a basis

for distinguishing between certain kinds of Margin Assets related to exchange-traded derivatives

(customer margin held for the benefit of customers, which the Trustee and the Court agree

Barclays acquired) and other kinds of Margin related to exchange-traded derivatives.

75.    The Trustee also presents evidence to the Court of Bart McDade's subjective,

unexpressed intent with respect to the Margin Assets.  As Barclays has previously shown, Mr.

McDade admitted he did not have any involvement with the Margin Assets, and did not know

whether those assets were even available, since they would have been seized had Barclays not

acquired the ETD accounts.  4/27/10 Tr. at 45:25-46:2, 46:6-47:25 (McDade).

---

[34] The decision also should not deny Barclays the clearing fund deposits (which are a subset of the
government securities discussed above).  The Trustee asserts that the Court's Opinion "made clear that
the Margin Assets to which the Trustee is entitled include LBI's clearing fund deposits," and argues that
the bases for the Court's Opinion on Margin Assets all apply with equal force to the clearing fund
deposits.  Trustee April 28, 2011 Br. at ¶ 21, n.3.  That is not correct.  The clearing funds were neither
cash nor cash equivalents.  *See* Barclays' Proposed FOF ¶ 32.22.6.  They therefore were not addressed by
the Court's central rational for denying Barclays' Motion on the Margin Assets.  Moreover, the clearing
fund deposits constituted property that was required under "various regulations and rules . . . to support
trading of futures and options contracts" on behalf of customers, which the Court held Barclays was
entitled to retain.  Op. at 89; *see* Barclays' April 28, 2011 Br. at ¶¶ 94-95.

[35]  *See* Barclays Post-Trial Memo. of Law and Fact at ¶¶ 248-250;  Barclays' Proposed FOF ¶¶ 31.10.

76.    Finally, the Trustee cites the testimony of Barclays' lawyer and witness Ken Raisler, who explained that there would be no basis for distinguishing between Margin held as cash, and Margin held as non-cash.  The Trustee seeks to use that testimony, but ignores the fact that Mr. Raisler's testimony was in the context of explaining that it would be unthinkable for ETD liabilities to be transferred without *all* of the Margin Assets:

> Q.    If margin were not to be transferred as part of the transfer of an exchange traded derivatives account, would there need to be some kind of special provision mechanically to make that happen?

> A.    Yes. I mean, it sort of -- it's strange even to contemplate, because that's sort of not the way business would be done . . . .
>
> In order to move positions, a position, an individual futures position has to have, not just a contract that entitles you to upside and downside movement in a price in an individual commodity, but it also has to include the initial margin that -- and margin pool associated with that account. So if you were not to transfer margin, the exchange would not accept the transfer because the account was not complete. It was missing margin. And so the only way to do it, and I haven't seen it done before, would be, you would basically have to fund the margin before the exchange would permit the transfer.

9/8/10 Tr. at 87:10-88:11 (Raisler).

### E.    The Court Should Reject The Trustee's Claim For Prejudgment Interest.

77.    The Trustee's Memorandum provides little discussion of why he should be entitled to prejudgment interest of 9%.  It cites to the New York state statute, and to one bankruptcy court case that involved a completely different situation having nothing to do with a claim to recover property under section 550 of the Bankruptcy Code.[36]

---

[36]    In the case cited by the Trustee, *Tender Loving Care Health Servs.*, No. 02-88020-ast, 2009 WL 5218598, at *9-10 (Bankr. E.D.N.Y. Dec. 31, 2009), the plaintiff brought a breach of contract action to enforce a contract under state law.  By contrast, in this case, the Trustee sought to recover property "under Section 550 of the Bankruptcy Code."  *See* Trustee Sept. 15, 2009 Br. at ¶ 88.  There was no contractual basis for the Trustee to reclaim assets from Barclays, and his claims were not, and could not have been, framed as "breach of contract" claims for "damages."

78.    The Trustee fails to recognize that the New York statute does not apply to claims by a trustee to recover property under section 550 of the Bankruptcy Code.  *In re CNB Intern., Inc.,* 393 B.R. 306, 336 (Bankr. W.D.N.Y. 2008) (New York 9% rate inapplicable in an action under § 550, so if "they are to receive any pre-judgment interest at all, plaintiffs must instead ground that additional remedy on the provisions of the Bankruptcy Code").  The awarding of prejudgment interest in avoidance actions is purely discretionary, and courts frequently exercise their discretion to award no prejudgment interest at all.  *See In re Globe Mfg. Corp.*, 567 F.3d 1291, 1300 (11th Cir. 2009) (affirming the denial of prejudgment interest because the bankruptcy court properly found that the defendant's "position was reasonable, that the parties' dispute was genuine and that there was no evidence that either party was responsible for delaying the dispute's resolution").

79.    Indeed, as the Second Circuit has held, "[t]he relative equities may make prejudgment interest inappropriate . . . when there is a good faith dispute between the parties as to the existence of any liability."  *See Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO,*  955 F.2d 831, 834-35 (2d Cir. 1992).  In this case, Barclays acted in good faith:  its defense to the Trustee's claim was "reasonable" such that Barclays was "not wholly lacking in a worthy or credible defense," and therefore prejudgment interest would be inappropriate.  *In re Armstrong*, 260 B.R. 454, 460 (E.D. Ark. 2001) (affirming denial of prejudgment interest); *see also In re First Software Corp*., 107 B.R. 417, 426 (D. Mass. 1989) (affirming denial of prejudgment interest where there was a "good faith dispute"); *In re Living Hope Southwest Medical SVCS, LLC*, No. 4:09–ap–7026, 2011 WL 887968, at *17 (Bankr. W.D. Ark. March 14, 2011) (denying prejudgment interest where amount was not ascertainable prior to trial and "the Defendants mounted a credible if unsuccessful defense");

34

Barclays' April 28, 2011 Br. at ¶¶ 102-103 (explaining basis for Barclays' good-faith belief that it was entitled to all of the Margin Assets).

80.    Even if the Court were to decide that prejudgment interest should be ordered, it should, as most bankruptcy courts around the nation have done when awarding prejudgment interest in avoidance cases, award such interest at a rate that is commensurate with the federal post-judgment interest rate set forth in 28 U.S.C. § 1961, which is based on the one-year Treasury bill rate. *See In re CNB Intern., Inc.* 393 B.R. 306, 336 (Bankr. W.D.N.Y. 2008) (looking to 28 U.S.C. § 1961 "for guidance on the applicable rate" of prejudgment interest); *In re Pameco Corp.*, 356 B.R. 327, 342 (Bankr. S.D.N.Y. 2006) (awarding prejudgment interest at the § 1961 rate); *In re R.J. Patton Co., Inc.*, 348 B.R. 618, 627 (Bankr. D. Conn. 2006) (same).[37] There is no basis for imposing a significantly higher rate in this case:  doing so would over-compensate the Trustee far beyond what he would have earned on the assets.  *See In re 1031 Tax Group, LLC*, 439 B.R. 84, 86 (Bankr. S.D.N.Y. 2010) (noting that purpose of prejudgment interest is to compensate the Trustee for the loss of the funds and awarding interest at the prime rate); *In re Bruno Mach. Corp.*, 435 B.R. 819, 851 (Bankr. N.D.N.Y. 2010) (rejecting request to award interest at 9% as too high in light of market conditions and awarding interest at the average Treasury bill rate during pendency of the suit); *see also Wickham Contracting*, 955 F.2d at 834 (prejudgment interest should not "result in over-compensation of the plaintiff" or be "punitive in nature").

---

[37] *Accord, e.g, In re Colonial Realty Co.*, 226 B.R. 513, 526 (Bankr. D. Conn. 1998) (same); *In re FBN Food Service, Inc.*, 175 B.R. 671, 691 (Bankr. N.D.Ill.1994) (same); *In re Miller & Rhoads, Inc.*, 153 B.R. 725, 729 (Bankr.E.D.Va. 1992) (same); *In re Federated Marketing, Inc.*, 123 B.R. 265, 271 (Bankr. S.D. Ohio 1991) (same); *In re Express Liquors, Inc.*, 65 B.R. 952, 962 (Bankr. D. Md 1986) (same); *In re L & T Steel Fabricators, Inc.*, 102 B.R. 511, 524 (Bankr. M.D. La. 1989) (same).

81.     Finally, the Trustee's Memorandum fails to defend his request (found at the end of his Memorandum) that prejudgment interest begin to run against Barclays "from September 22, 2008 or such other date as the Court may deem proper."  Trustee April 28, 2011 Br. at Conclusion, ¶ iii.  If the Court concludes that prejudgment interest is appropriate, it should not begin to run until September 15, 2009, the day the Trustee first demanded return of the Margin Assets.  *See, e.g., Bruno Mach. Corp.*, 435 B.R. at 850 (awarding interest from date complaint was filed); *R.J. Patton Co.,* 348 B.R. at 627 (same); *In re Roco Corp*., 37 B.R. 770, 774 (Bankr. R.I. 1984) (prejudgment interest, if awarded, runs from date of demand or filing of action, in the absence of "blatant fraud or bad faith in connection with the transfer"); *L & T Steel Fabricators, Inc.*, 102 B.R. at 521-24 (same).[38]

### F.     The Court Should Reject The Trustee's Request That The Opinion Be Amended.

82.     The Trustee asserts that the statements in the Court's Opinion about the Margin Assets being part of the September 19 "asset scramble" reflect an "inadvertent" error.  Trustee April 28, 2011 Br. at ¶¶ 40, 44.  The Trustee makes clear that he seeks this correction "to avoid what might be seen as an inconsistency in the Opinion and to avoid the possibility that a reviewing court might erroneously conclude that the parties agreed to include Margin Assets in the sale."  *Id*. at *¶ 12.*

83.     The Trustee thus seeks to gloss over the fact that there was indeed an "inconsistency" in the positions the Movants advocated before this Court.  The Court's reference to the Margin Assets being part of the "asset scramble" was not, Barclays respectfully submits, a mere "inadvertent" error:  it reflected directly the assertions made by LBHI, the principal

---

[38] *Accord, e.g.*, *Colonial Realty Co.*, 226 B.R. at 526 (interest awarded from date of complaint if no prior demand); *FBN Food Service,* 175 B.R. at 691 (awarding interest from date complaint filed); *Federated Marketing,* 123 B.R. at 271 (same); *Express Liquors,* 65 B.R. at 962 (same).

"Seller" under the Purchase Agreement, throughout the Rule 60(b) proceeding.  For example,

LBHI's post-trial brief asserted that "the weekend *asset grab*" was "comprised of *three items*",

the first of which was "*margin associated with certain exchange-traded derivatives*."  LBHI

Post-Trial Brief at ¶ 674 (emphases added).[39]

84.     Thus, the "Seller" under the Purchase Agreement *agreed* that Margin Assets were

promised to Barclays, but sought Rule 60(b) relief because those assets (they claimed) were not

properly disclosed.  The Trustee might not like the fact that there is this inconsistency between

his position and that of his co-Movants, but it exists, and he should not be permitted to ask the

Court to revise the Opinion now that his theory has prevailed over that of LBHI.

## III.    The Court's Order Should Provide That Barclays Is Entitled To The $769 Million In 15c3-3 Assets When And If It Is Determined That The Trustee Has Sufficient Assets To Satisfy All Legitimate Customer Claims.

85.     The Trustee states there is "no difference of substance between the parties with

respect to the Rule 15c3-3 Assets," and that Barclays has a right to these assets "once the Trustee

has fully satisfied all allowed customer claims."  Trustee April 28, 2011 Br. at ¶¶ 11, 83.  This is

the result of the dispute between the parties over these assets, as resolved by the Court's

decision.  That result should be embodied in the Court's Order, so the Court's precise resolution

of the dispute it is clear.

---

[39]   *See also* LBHI Sept. 15, 2009 Br. at ¶ 114 ("In addition to the 15c3-3 assets and unencumbered assets, over the weekend, Lehman executives also looked into certain margin accounts maintained by Lehman at the Options Clearing Corporation ('OCC') as yet another possible source of assets."); 4/9/10 Tr. at 47:6-11 ("Now, Barclays' claim in this case is also taken into account, that is, where it lays claim to the so-called OCC margin, which is valued at 2.3 billion. We dispute that. But if their claim were also valued -- what that means is, on top of the five billion dollar discount, five billion more was added on the pile on Friday.") (Gaffey).

86.    Barclays is not asking for an "advisory opinion."  Barclays continues to assert all of its claims with respect to the Rule 15c3-3 assets, and the Trustee continues to resist those claims:  Barclays simply requests an Order reflecting how this Court resolved that dispute.[40]

---

[40] The Trustee's assertion that there is an Article III problem with specifying the result of this dispute is simply false. This Court has the power to declare the rights of the parties where, as here, "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Co.*, 312 U.S. 270, 273 (1941). There plainly is a real and concrete controversy between the parties concerning their rights to the Rule 15c3-3 assets. Barclays is not asking the Court to give advice or to "decide questions that cannot affect the rights of litigants in the case;" rather, it is appropriately requesting this Court to resolve the dispute by issuing a judgment "admitting of specific relief through a decree of a conclusive character." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). *See also ACLU v. Wilkinson*, 895 F.2d 1098, 1106 (6th Cir. 1990) (there was "no merit" to the contention that the district court rendered an improper advisory opinion because a court of equity has broad power "to do equity and to mould each decree to the necessities of the particular case.").

Dated: New York, New York
      May 4, 2011

      Respectfully submitted,

      BOIES, SCHILLER & FLEXNER LLP


      By: _____/s/ Jonathan D. Schiller_____
      Jonathan D. Schiller
      Jack G. Stern
      575 Lexington Avenue
      New York, New York 10022
      Tel: (212) 446-2300
      Fax: (212) 446-2350
      Email: JSchiller@bsfllp.com
              JStern@bsfllp.com

      Hamish P. M. Hume
      5301 Wisconsin Avenue, N.W.
      Washington, D.C. 20015
      Tel: (202) 237-2727
      Fax: (202) 237-6131
      Email: HHume@bsfllp.com

      *Attorneys for Barclays Capital Inc.*