WEIL, GOTSHAL & MANGES LLP

767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David R. Fertig

700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Scarlett E. Collings

*Attorneys for Lehman Brothers*
*Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————————————x | | Chapter 11 |
| In re: | : | |
| | | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | |
| Debtors. | : | |
| ————————————————————x | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC., | : | |
| Plaintiff, | : | |
| -against- | : | Adversary Proceeding |
| | | No. _____ (JMP) |
| FORD CREDIT AUTO OWNER TRUST 2007-B, | : | |
| Defendant. | : | |
| ————————————————————x | | |

1

## ADVERSARY COMPLAINT

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

Plaintiff Lehman Brothers Special Financing Inc. ("LBSF"), as debtor in possession, as

and for its Adversary Complaint against Ford Credit Auto Owner Trust 2007-B ("Ford Trust"),

hereby alleges as follows:

## INTRODUCTION

1.      This action for declaratory relief arises out of Ford Trust's failure to pay nearly

$27 million (exclusive of contractual default rate interest) that it owes LBSF as a result of Ford

Trust's early termination of three interest rate swap transactions between LBSF and Ford Trust

(the "Ford Trust Swaps"), each of which was entered into pursuant to, and is governed by, the

terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement dated as of

October 16, 2007 (the "Master Agreement"), as supplemented and/or modified by: (i) that certain

Schedule to the Master Agreement, also dated as of October 16, 2007 (the "Schedule"); (ii) that

certain Credit Support Annex to the Schedule, also dated as of October 16, 2007 (the "Credit

Support Annex"); and (iii) those certain Confirmations evidencing the Ford Trust Swaps (the

"Confirmations" and, together with the Master Agreement, the Schedule, and the Credit Support

Annex, the "Ford Trust Agreement").[1]

2.      It is undisputed that Ford Trust elected to terminate the Ford Trust Swaps as of

October 7, 2008 due to the voluntary bankruptcy proceedings of Lehman Brothers Holdings Inc.

("LBHI"), the commencement of which constituted an Event of Default under the Ford Trust

---

[1]      A true and correct copy of the Ford Trust Agreement, including the Master Agreement, the Schedule, the Credit Support Annex, and the Confirmations, is annexed hereto as Exhibit A.

Agreement.[2] Moreover, it undisputed that, under the express terms of the Ford Trust Agreement, Ford Trust became obligated to make a close-out payment to LBSF as a consequence of, and in respect of, the early termination of the Ford Trust Swaps (such close-out payment, hereinafter referred to as the "Early Termination Payment"). In derogation of its contractual obligations, however, Ford Trust failed to calculate the Early Termination Payment in the manner required by the Ford Trust Agreement, and substantially undervalued – and dramatically underpaid – the Early Termination Payment to which LBSF was contractually entitled.

3.      Indeed, under the plain terms of the Ford Trust Agreement, the parties expressly agreed that the Early Termination Payment was to include a "Settlement Amount" equal to: (i) the value of any "Market Quotation" obtained and accepted by Ford Trust in respect of the Ford Trust Swaps; or (ii) if no "Market Quotation" were obtained and accepted within ten days after termination of the Ford Trust Swaps, the value of Ford Trust's "Loss" – a term that is expressly defined to mean the total losses (or gains) realized by Ford Trust in connection with the early termination of the Ford Trust Swaps. Despite having failed to accept any "Market Quotation," however, Ford Trust has failed and refused to pay to LBSF a Settlement Amount equal to Ford Trust's "Loss," which totaled *negative* $24,745,062.00, representing the gains that Ford Trust realized on account of the early termination of the heavily "out-of-the-money" Ford Trust Swaps.

4.      In an attempt to justify its ongoing refusal to pay these sums, Ford Trust has argued, and continues to contend, that it did accept a "Market Quotation" in respect of the Ford Trust Swaps, and that the Settlement Amount therefore was not required to reflect Ford Trust's "Loss" but instead was properly fixed at $2,104,399.00, because Ford Trust received, and

---

[2]    Capitalized terms not otherwise defined in this pleading shall have the meaning ascribed to them in the Ford Trust Agreement.

actually consummated a transaction on the basis of, a $2,104,399.00 quotation from HSBC Bank, N.A. ("HSBC") in respect of a transaction that Ford Trust used to "replace" the terminated Ford Trust Swaps (such other transaction hereinafter referred to as the "HSBC Transaction").

5.       But the quote that Ford Trust received and ultimately accepted from HSBC (hereinafter the "HSBC Quote") was not a "Market Quotation" within the meaning of the Ford Trust Agreement because it was not, as required by the Ford Trust Agreement, *made in respect of a Replacement Transaction with commercial terms substantially the same*" as those of the Ford Trust Swaps.

6.       Indeed, the HSBC Quote did not even purport to represent an amount that would be paid by or to Ford Trust "in consideration of an agreement between [Ford Trust] and [HSBC] to enter into a transaction … that would have the effect of preserving *for [Ford Trust]* the economic equivalent of any payment[s] or deliver[ies] … *in respect of [the Ford Trust Swaps]*." Instead, the HSBC Quote represented an amount that HSBC allegedly demanded from Ford Trust in consideration of a transaction designed to preserve *for Ford Trust's affiliate, Ford Motor Credit Company LLC* ("FMCC"), the economic equivalent of payments or deliveries that would have been required to be made by LBSF *in respect of certain other terminated transactions* – namely, certain interest rate swaps between LBSF and FMCC that were "in-the-money" *to FMCC* at the time of LBHI's chapter 11 filing (the "FMCC Swaps").[3]

7.       The effect – and, upon information and belief, the very purpose – of Ford Trust's decision to use the HSBC Quote as the basis for its calculation of the Early Termination Payment was to do indirectly that which Ford Trust was prohibited from doing under the express terms of

---

[3]     The FMCC Swaps consist of interest rate swap transactions identified by Global Deal ID Nos. 3413456, 3413466, and 3413469, and were entered into pursuant (and subject) to the terms of a *separate* 1992 Multicurrency-Cross Border ISDA Master Agreement, dated as of May 14, 2007, by and between LBSF and *FMCC* (together with all schedules, annexes and exhibits thereto, the "FMCC Agreement").

the Ford Trust Agreement, the Bankruptcy Code, and New York law: namely, effect a non-mutual, and therefore impermissible, triangular setoff. Indeed, in violation of the provisions of the Ford Trust Agreement and well-settled bankruptcy and non-bankruptcy law, Ford Trust's use of the HSBC Quote had the unmistakable effect (and, on information and belief, the very purpose) of unlawfully setting off amounts allegedly owed by LBSF *to FMCC* (*i.e.*, in respect of the early termination of the FMCC Swaps) against amounts admittedly owed to LBSF *by Ford Trust* (*i.e.*, in respect of the early termination of the Ford Trust Swaps). Ford Trust's calculation of the Early Termination Payment on the basis of the HSBC Quote thus was contrary to the express terms of the Ford Trust Agreement – in which the parties expressly modified the standard form of the 1992 ISDA Master Agreement to provide that the amount payable in respect of the Early Termination Payment would *not* be subject to any right of setoff – and unequivocally prohibited by both the Bankruptcy Code and applicable New York law.

8.      In order to resolve the dispute between LBSF and Ford Trust as to the parties' respective legal rights, duties, and obligations under the Ford Trust Agreement, the Bankruptcy Code, and applicable non-bankruptcy law, LBSF therefore brings this action seeking a declaratory judgment that: (a) the HSBC Quote does not qualify as a "Market Quotation" within the meaning of the Ford Trust Agreement and that, as a result, and in accordance with the express terms of the Ford Trust Agreement, the Settlement Amount was required to be determined on the basis of, and is required to be equal to, Ford Trust's "Loss" (as defined in the Ford Trust Agreement) in connection with the early termination of the Ford Trust Swaps; and (b) Ford Trust's calculation of the Early Termination Payment using the HSBC Quote effected a setoff that is not permitted under the terms of the Ford Trust Agreement, the Bankruptcy Code, and New York law.

## PARTIES

9.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this court voluntary cases under Title 11 of the United States Code (the "Bankruptcy Code"). LBSF commenced its chapter 11 case on October 3, 2008. LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). LBSF is a corporation organized and existing under the laws of the State of Delaware, has its principal place of business located at 1271 Sixth Avenue, New York, New York 10020, and is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.      Upon information and belief, Defendant Ford Trust is a Delaware statutory trust. Ford Trust consented to the personal jurisdiction of this Court in Section 13(b)(i) of the Master Agreement.

## JURISDICTION AND VENUE

11.      This is a civil proceeding arising in a case under the Bankruptcy Code, § 11 U.S.C. § 101, *et seq.*, within the meaning of 28 U.S.C. § 1334. It is properly brought as an adversary proceeding pursuant to Bankruptcy Rule 7001.

12.      This Court has jurisdiction to entertain the claims asserted herein pursuant to 28 U.S.C. § 1334(b) (civil cases arising under title 11), 28 U.S.C. § 1331(e)(1) (district court's exclusive jurisdiction over property of the estate), and 28 U.S.C. § 157(b) (core proceedings arising under title 11).

13.      This is a core proceeding under 28 U.S.C. § 157(b).

14.     Venue is proper in this district under 28 U.S.C. § 1409 and pursuant to the terms of Section 13(b)(ii) of the Master Agreement.

15.     This Court has jurisdiction over Ford Trust pursuant to, *inter alia*, Section 13(b)(i) of the Master Agreement.

## FACTUAL ALLEGATIONS

**A.     The Ford Trust Agreement and the Ford Trust Swaps**

16.     On or about October 16, 2007, LBSF and Ford Trust entered into the Ford Trust Agreement.

17.     Between October 16, 2007 and November 29, 2007, LBSF and Ford Trust entered into the Ford Trust Swaps, each of which was subject to, and governed by, the terms of the Ford Trust Agreement.

18.     Under the terms of the Ford Trust Agreement, the commencement of a voluntary bankruptcy proceeding by either party or their respective Credit Support Providers constitutes an Event of Default.  Section 5(a)(vii) of the Master Agreement expressly provides that an Event of Default shall occur with respect to a party whenever, *inter alia*:

> [t]he party [or] any Credit Support Provider of such party … institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or any other similar law affecting creditors' rights ….

Exhibit A, Master Agreement, at § 5(a)(vii).

19.     Pursuant to Section 6(a) of the Master Agreement, "[i]f at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party (the 'Non-defaulting Party') may, by … notice to the Defaulting Party …, designate … an Early Termination Date [an "Early Termination Date"] in respect of all outstanding Transactions." *Id.* at § 6(a).

**B.      The Contractual Provisions Regarding Payment Upon Early Termination**

20.      Pursuant to the terms of the Ford Trust Agreement, upon the occurrence of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) of the Master Agreement are required to be made in respect of the Ford Trust Swaps. *See id.* at § 6(c)(ii). However, an "amount … payable in respect of an Early Termination Date [*i.e.*, the Early Termination Payment] shall be determined pursuant to Section 6(e) [of the Master Agreement]." *Id.*

21.      In Part 1(j) of the Schedule, LBSF and Ford Trust mutually agreed that any Early Termination Payment payable under the Ford Trust Agreement was to be calculated using the "Second Method" and the "Market Quotation" payment measure. *See* <u>Exhibit</u> <u>A</u>, Schedule, at Part 1(j)(i), (ii). Thus, pursuant to Section 6(e) of the Master Agreement, the Early Termination Payment payable upon early termination of the Ford Trust Swaps is required to include both a "Settlement Amount" and "Unpaid Amounts" as those terms are defined in the Ford Trust Agreement. *See* <u>Exhibit</u> <u>A</u>, Master Agreement, at § 6(e)(i)(3); Schedule, at Part 1(k)(ix).

22.      The term "Settlement Amount" was defined in Section 14 of the Master Agreement. *See* <u>Exhibit</u> <u>A</u>, Master Agreement, at § 14. In the Schedule, however, the parties mutually agreed that, if LBSF were a Defaulting Party in respect of any Event of Default, an alternative, manuscripted definition of "Settlement Amount" would apply. Specifically, in Part 1(k)(iii) of the Schedule, the parties provided that, in the event LBSF were a Defaulting Party in respect of an Event of Default, "[t]he definition of 'Settlement Amount' [contained in Section 14 of the Master Agreement] shall be deleted in its entirety and replaced with the following":

> **"*Settlement Amount*"** means, with respect to any Early Termination Date,
> an amount (as determined by [Ford Trust]) equal to:

(A)    If a Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by [Ford Trust] so as to become legally binding on or before the day falling ten Local Business Days after the day on which the Early Termination Date is designated (or such later day as [Ford Trust] may specify in writing to [LBSF], which in any event will not be later than the Early Termination Date) (such day, the *"Latest Settlement Amount Determination Day"*), the Termination Currency Equivalent of the amount (whether positive of negative) of such Market Quotation; or

(B)    If no Market Quotation for the relevant Terminated Transaction or group of Terminated Transactions is accepted by [Ford Trust] so as to become legally binding on or before the Latest Settlement Amount Determination Day, [Ford Trust]'s Loss (whether positive or negative and without reference to any Unpaid amounts) for the relevant Terminated Transaction or group of Terminated Transactions.

*See* Exhibit A, Schedule, at Part 1(k)(iii) (emphasis in original).

23.    Thus, pursuant to the express terms of the Ford Trust Agreement, whenever an Early Termination Date is designated in respect of an Event of Default as to which LBSF is the Defaulting Party, the "Settlement Amount" that is contractually required to be included in the resulting Early Termination Payment must be equal to: (i) any "Market Quotation" that is obtained and accepted by Ford Trust within ten (10) Local Business Days after the day on which the Early Termination Date is designated; or (ii) if no "Market Quotation" is obtained and accepted by Ford Trust within such time period, the amount of Ford Trust's "Loss," which is defined as an amount equal to Ford Trust's "total losses and costs (*or gain, in which case expressed as a negative number*) in connection with th[e] ... [Ford Trust Swaps] ... including any ... loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them)." *See* Exhibit A, Master Agreement, at § 14 (Definition of "Loss").

24.     Like the term "Settlement Amount," the term "Market Quotation" is also defined in Section 14 of the Master Agreement. *See id.* at § 14 (Definition of "Market Quotation"). As with the former term, however, the parties expressly agreed to abide by a different, manuscripted definition of "Market Quotation" in the event that an Early Termination Date were designated as a consequence of an Event of Default as to which LBSF was the Defaulting Party. *See* Exhibit A, Schedule, at Part 1(k)(ii). Specifically, in Part 1(k)(ii) of the Schedule, the parties provided that, in the event LBSF were a Defaulting Party in respect of an Event of Default, "the definition of 'Market Quotation' [set forth in Section 14 of the Master Agreement] shall be deleted and replaced with the following":

> ***"Market Quotation"*** means, with respect to one or more Terminated Transactions, a Firm Offer which is (1) made by a Reference Market-maker that is an Eligible Replacement, (2) for an amount that would be paid to [Ford Trust] (expressed as a negative number) or by [Ford Trust] (expressed as a positive number) in consideration of an agreement between [Ford Trust] and such Reference Market-maker to enter into a transaction (the ***'Replacement Transaction'***) that would have the effect of preserving for [Ford Trust] the economic equivalent of any payment or delivery … by the parties … in respect of such Terminated Transactions or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that Date, (3) made on the basis that Unpaid Amounts in respect of the Terminated Transaction or group of Transactions are to be excluded … and (4) made in respect of a Replacement Transaction with commercial terms substantially the same as those of this Agreement (save for the exclusion of provisions relating to Transactions that are not Terminated Transactions).

Exhibit A, Schedule, at Part 1(k)(ii) (emphasis in original).

25.     Thus, to qualify as a "Market Quotation" that may be used to calculate the Settlement Amount owing in respect of an Early Termination Date arising from an Event of Default as to which LBSF is the Defaulting Party, a quotation must satisfy three criteria: (i) *first*, it must constitute a "Firm Offer," or an offer "which, when made, [i]s capable of becoming legally binding upon acceptance" by Ford Trust, *see id.* at Part 5(l) (Definition of "Firm Offer");

(ii) *second*, it must represent the amount a Reference Market-maker would demand or be willing to pay as consideration for its agreement to enter into a "Replacement Transaction," or a transaction that would have the effect of preserving *for Ford Trust* the economic equivalent of payments or deliveries that, but for the occurrence of the Early Termination Date, would have been required to be made *by LBSF and Ford Trust in respect of the Ford Trust Swaps*; and (iii) *third*, it must relate to a Replacement Transaction having commercial terms "*substantially the same*" as those of the Ford Trust Swaps.

## C.   The Commencement of LBHI's Chapter 11 Case and Ford Trust's Early Termination of the Ford Trust Swaps

26.     On September 15, 2008, LBHI commenced its voluntary bankruptcy proceeding by filing in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") a petition for relief under chapter 11 of the Bankruptcy Code.

27.     Pursuant to the terms of the Ford Trust Agreement, LBHI was designated as LBSF's "Credit Support Provider." *See id.* at Part 5(l) (Definition of "Credit Support Provider"). Accordingly, the commencement of LBHI's bankruptcy proceeding constituted an Event of Default under Section 5(a)(vii)(4) of the Master Agreement.

28.     By letter dated October 3, 2008 and delivered to LBSF on October 6, 2008 (a true and correct copy of which is annexed hereto as Exhibit B and hereinafter referred to as the "Early Termination Notice"), Ford Trust notified LBSF that, as a consequence of the Event of Default arising from the bankruptcy filing by LBHI, Ford Trust had elected to designate October 7, 2008 as an Early Termination Date in respect of the Ford Trust Swaps.

## D.   Ford Trust's Contractually Improper and Legally Impermissible Calculation of the Early Termination Payment It Owes to LBSF

29.     By letter dated October 6, 2008 and delivered to LBSF on October 7, 2008, a true and correct copy of which is annexed hereto as Exhibit C (the "Calculation Statement"), Ford

Trust provided LBSF with a statement that purported to show Ford Trust's calculation of the Early Termination Payment in ostensible compliance with Section 6(d)(ii) of the Master Agreement.

30.    Thereafter, by letter dated October 10, 2008 and delivered to LBSF on October 14, 2008, a true and correct copy of which is annexed hereto as <u>Exhibit D</u> (the "<u>Amended Calculation Statement</u>"), Ford Trust provided LBSF with an amended statement purporting to show Ford Trust's calculation of the Early Termination Payment in ostensible compliance with Section 6(d)(ii) of the Master Agreement.

31.    As of October 7, 2008, the Early Termination Date, the Ford Trust Swaps were heavily "out-of-the-money" to Ford Trust. Indeed, on the basis of mid-market, mark-to-market prices prevailing as of October 7, 2008, the Ford Trust Swaps had a *negative* market value to Ford Trust of $24,745,062.00. Thus, any commercially reasonable Market Quotation should have approximated *negative* $24,745,062.00 resulting in a Settlement Amount of that same amount pursuant to Part 1(k)(iii) of the Schedule. Accordingly, after accounting for $2,158,389.75 in Unpaid Amounts that were owed to LBSF as of the October 7, 2008 Early Termination Date, any contractually proper and commercially reasonable calculation of the Early Termination Payment should have resulted in an Early Termination Payment, payable to LBSF, of approximately $26,903,451.75. *See* <u>Exhibit A</u>, Schedule, at Part 1(k)(ix).

32.    In its Amended Calculation Statement, however, Ford Trust asserted that the Early Termination Payment to which LBSF was entitled amounted only to $626.26. *See* <u>Exhibit D</u>.

33.    As confirmed by the Amended Calculation Statement, Ford Trust acknowledged that LBSF was entitled to $2,158,389.75 in Unpaid Amounts as of the Early Termination Date.

*See id.* Ford Trust, however, contended that LBSF was not entitled to payment of *any* Settlement Amount at all. Instead, contending that it had received and accepted a purported "Market Quotation" that required it to *pay* $2,104,399.00 in respect of a putative "Replacement Transaction," Ford Trust asserted that it was entitled to receive payment of a Settlement Amount *from* LBSF in the amount of $2,104,399.00, thereby resulting in Ford Trust's drastically understated calculation of the Early Termination Payment. *Id.*

**E.    Ford Trust's Position That The HSBC Quote Constituted A "Market Quotation" On Which The Settlement Amount May Properly Be Determined**

34.    Given that the Ford Trust Swaps were heavily "out-of-the-money" to Ford Trust as of the Early Termination Date, it was incongruous that any Reference Market-maker would demand payment *from* Ford Trust in order to face Ford Trust in a transaction that would preserve for Ford Trust the economic equivalent of the payments that would have been required under the Ford Trust Swaps but for the occurrence of an Early Termination Date. To the contrary, one reasonably would have expected that a rational Reference Market-maker would have offered to make a substantial payment *to* Ford Trust because the Reference Market-maker would, in effect, have been offering to step into the position of LBSF, from whose perspective the Ford Trust Swaps were "in-the-money" to the tune of nearly $27 million. Thus, after receiving Ford Trust's Amended Calculation Statement, LBSF wrote to Ford Trust and requested, among other things, "a narrative description of the methodology used to determine the [Early Termination Payment], including how quotations, if any, were utilized." *See* Letter dated April 24, 2009 from LBSF, a true and correct copy of which is annexed hereto as Exhibit E.

35.    By letter dated June 2, 2009, a true and correct copy of which is annexed hereto as Exhibit F, Ford Trust responded, confirming that the purported "Market Quotation" on which it based its calculation of the Settlement Amount was the HSBC Quote. *See* Exhibit F. Moreover,

Ford Trust acknowledged that the HSBC Quote was not a quote that was made in respect of a transaction that would replace, and preserve for Ford Trust the payments that would have been required to have been made under the terms of, the Ford Trust Swaps – transactions which Ford Trust had no meaningful economic incentive to replace given how heavily "out-of-the-money" they were at the time of their termination. Rather, as explained by Ford Trust, the HSBC Quote was a quote that was instead (or also) made in respect of a transaction that would replace, and preserve the payments that would have been required to have been made under the terms of, the FMCC Swaps – separate swaps that were also terminated as of the Early Termination Date but which were heavily "in-the-money" to Ford Trust's affiliate, FMCC. Indeed, Ford Trust expressly admitted that the HSBC Quote was a quote that HSBC made in respect of an agreement "to enter into a Replacement Transaction for [the Ford Trust Swaps], *subject to the entry by [FMCC] into a back end swap with respect to [the FMCC Swaps]*." *See id.* (emphasis added). By seeking and entering into the transaction in respect of which HSBC offered the HSBC Quote – a "package deal" that included and accounted for the FMCC Swaps – and by then using the HSBC Quote to calculate the Early Termination Payment owed to LBSF, Ford Trust sought to avoid its substantial financial obligations to LBSF under the Ford Trust Agreement.

**F.     Ford Trust's Use of the HSBC Quote to Calculate the Early Termination Payment Effected A Contractually And Legally Impermissible Triangular Setoff**

36.     By using the HSBC Quote to calculate the Early Termination Payment under the Ford Trust Agreement, Ford Trust effectively set off the amounts it owes LBSF under the Ford Trust Agreement against amounts that LBSF allegedly owes FMCC in connection with the FMCC Swaps.

37.     Such a setoff is contractually prohibited by the Ford Trust Agreement. Indeed, Part 5(j) of the Schedule unequivocally provides that "[a]*ll payments under th[e Ford Trust*

*Agreement] will be made **without set-off*** or counterclaim, except as expressly provided for in Section 2(c), Section 6 or Part 1(k)(ix) [of the Ford Trust Agreement]." *See* <u>Exhibit A</u>, Schedule, Part 5(j) (emphasis added). Neither Section 2(c), Section 6, nor Part 1(k)(ix), in turn, authorizes Ford Trust to setoff the Early Termination Payment against amounts allegedly owed to FMCC, under the FMCC Agreement, in respect of the FMCC Swaps.

38.    First, Section 2(c) of the Ford Trust Agreement, as qualified by the parties' election in Part 4(h) of the Schedule, permits netting *only* of amounts that are: (i) ***payable "by each party to the other"***; and (ii) payable "on the same date", "in the same currency" and *"**in respect of the same Transaction**."* *See* <u>Exhibit A</u>, Master Agreement, at § 2(c); Schedule, Part 4(h). The amounts allegedly owed by LBSF to FMCC do not represent amounts payable by one of the parties to the Ford Trust Agreement "to the other." Instead, they represent amounts allegedly payable by one of the parties to the Ford Trust Agreement (*i.e.*, LBSF) to a third party, FMCC, that is not a party to the Ford Trust Agreement. Furthermore, the Early Termination Payment owed by Ford Trust to LBSF, on the one hand, and the amounts allegedly owed by LBSF to FMCC, on the other hand, do not represent amounts that are payable "in respect of the same Transaction." Instead, they represent amounts that are payable (or alleged to be payable) in respect of two separate transactions governed by two separate agreements: the former representing amounts payable under the Ford Trust Agreement and in respect of the early termination of the Ford Trust Swaps; and the latter representing amounts allegedly payable under the FMCC Agreement and in respect of the early termination of the FMCC Swaps. Consequently, Section 2(c) of the Master Agreement neither authorizes nor sanctions the setoff effected by Ford Trust's use of the HSBC Quote to calculate the Early Termination Payment.

15

39.     Second, the parties expressly amended Section 6 of the Master Agreement to provide that the Early Termination Payment shall *not* be subject to setoff.  Indeed, the pre-printed form of Section 6 of the Master Agreement provided, in subsection 6(e), that "[t]he amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off."  *See* Exhibit A, Master Agreement, at § 6(e).  In Part 5(j) of the Schedule, however, LBSF and Ford Trust expressly *deleted* that provision from the Master Agreement.  *See id.*, Schedule, at Part 5(j)(ii) ("*Section 6(e) will be amended by deletion of the following sentence*: 'The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.") (emphasis added).  Thus, Section 6 of the Master Agreement neither authorizes nor sanctions the setoff effected by Ford Trust's use of the HSBC Quote to calculate the Early Termination Payment.

40.     Finally, Part 1(k)(ix) of the Schedule, which modifies the definition of "Second Method and Market Quotation," permits the netting only of Unpaid Amounts owed by and between Ford Trust and LBSF in accordance with the provisions of Section 2(c) of the Master Agreement, *i.e.*, in respect of the same Transaction.  *See* Exhibit A, Schedule, Part 1(k)(ix).  Part 1(k)(ix), in fact, actually provides that the Settlement Amount payable by Ford Trust to LBSF shall *not* be subject to setoff, as it expressly provides that Ford Trust shall pay to LBSF "an amount equal to the absolute value of the Settlement Amount in respect of the Terminated Transactions," and that even Unpaid Amounts payable by LBSF to Ford Trust "shall not be netted-off against" such payment of the Settlement Amount.  *Id.*  Thus, it is clear that Part 1(k)(ix) of the Schedule neither authorizes nor sanctions the setoff effected by Ford Trust's use of the HSBC Quote to calculate the Early Termination Payment.

41.    In addition to possessing no contractual right of setoff under the Ford Trust Agreement, Ford Trust possesses no right of setoff under applicable law. Setoff is appropriate and permissible under section 553 of the Bankruptcy Code *only* when a creditor enjoys both an independent right of setoff under applicable non-bankruptcy law and satisfies the further Bankruptcy Code-imposed requirements and limitations set forth in section 553. 11 U.S.C. § 553(a). Section 553 of the Bankruptcy Code specifically imposes the requirement that any debt sought to be set off against a debt owed to a debtor must be "mutual." *Id.* Indeed, section 553 expressly preserves only the "right of a creditor to offset a ***mutual debt owing by such creditor*** to the debtor ... against a claim ***of such creditor*** against the debtor." *Id.* (emphasis added). Mutuality of obligations is also a prerequisite under New York law.

42.    There exists a lack of mutuality between: (a) Ford Trust's debt to LBSF in respect of the Early Termination Payment (and all accrued interest thereon) owed under the Ford Trust Agreement; and (b) LBSF's alleged debt to FMCC under the FMCC Agreement in connection with the early termination of the FMCC Swaps. Accordingly, New York law, which governs the parties' rights and obligations under the Ford Trust Agreement, *see* Exhibit A, Master Agreement, at § 13(a); Schedule, Part 4(f), does not provide Ford Trust with ***any right under applicable non-bankruptcy law*** to set off amounts allegedly owed by LBSF to FMCC against Ford Trust's admitted obligations to LBSF in respect of the Early Termination Payment.

## COUNT I
### *Declaratory Judgment – The Firm Offer from HSBC Does Not Qualify as a "Market Quotation" and the Settlement Amount Was Required To Be Determined on the Basis of Ford Trust's "Loss"*

43.    LBSF repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1 through 42 above as if fully set forth in this cause of action.

17

44.     As alleged hereinabove, Ford Trust has failed and refused, despite demand by LBSF, to pay to LBSF more than $626.26 in respect of the Early Termination Payment.

45.     As alleged hereinabove, Ford Trust's failure and refusal to pay more than $626.26 in respect of the Early Termination Payment is based on Ford Trust's assertion that the Settlement Amount is equal to $2,104,399.00, the amount of the HSBC Quote, rather than *negative* $24,745,062.00, the amount of Ford Trust's "Loss" (*i.e.*, its gains) in connection with the early termination of the Ford Trust Swaps.

46.     As alleged hereinabove, Ford Trust's assertion that the Settlement Amount is equal to $2,104,399.00 is based upon Ford Trust's contention that the HSBC Quote constituted a "Market Quotation" within the meaning of Part 1(k)(ii) of the Schedule, such that, pursuant to Part 1(k)(iii) of the Schedule, Ford Trust was entitled to treat the Settlement Amount as equal to the amount of the HSBC Quote.

47.     LBSF has denied, and continues to deny, that the HSBC Quote constituted or qualified as a "Market Quotation" within the meaning of Part 1(k)(ii) of the Schedule because it was not made in respect of a "Replacement Transaction," let alone a "Replacement Transaction" having "substantially the same" commercial terms as the Ford Trust Swaps.

48.     Ford Trust did not obtain and/or accept any alleged "Firm Offers" other than the HSBC Quote.

49.     LBSF therefore contends that, pursuant to Part 1(k)(iii) of the Schedule, the Settlement Amount was required to be determined on the basis of, and was required to be equal to, Ford Trust's "Loss" in connection with the early termination of the Ford Trust Swaps, or the sum of *negative* $24,745,062.00, representing gains that Ford Trust realized (*i.e.*, the present value of the net future payments that Ford Trust would have been required to make, but avoided

having to make, to LBSF under the Ford Trust Swaps) as a result of its election to designate October 7, 2008 as an Early Termination Date in respect of the Ford Trust Swaps.

50.    Part 1(k)(ii) of the Schedule expressly provides that a "Market Quotation" shall mean a quote that, among other things, is "*made in respect of a Replacement Transaction with commercial terms substantially the same*" as those of the Ford Trust Swaps.

51.    The HSBC Quote did not represent a quote made in respect of a "Replacement Transaction," let alone a quote made in respect of a Replacement Transaction with commercial terms substantially the same" as those of the Ford Trust Swaps because, among other things, the HSBC Quote did not represent an amount that would be paid by or to Ford Trust "in consideration of an agreement between [Ford Trust] and [HSBC] to enter into a transaction … that would have the effect of preserving *for [Ford Trust]* the economic equivalent of any payment[s] or deliver[ies] … *in respect of [the Ford Trust Swaps]*." Instead, as acknowledged by Ford Trust, the HSBC Quote represented an amount that HSBC allegedly demanded from Ford Trust in consideration of a transaction that would preserve *for Ford Trust's affiliate, FMCC*, the economic equivalent of payments or deliveries that would have been required to be made by LBSF in respect of *certain other terminated transactions* that were governed by an agreement *other* than the Ford Trust Agreement – namely, the FMCC Swaps, which were "in-the-money" to FMCC when they, too, terminated on October 7, 2008.

52.    By virtue of the foregoing, there exists an actual, justiciable controversy between LBSF and Ford Trust relating to their respective legal rights, duties, and obligations under the Ford Trust Agreement, which controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

53.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests a judgment declaring that the HSBC Quote does not qualify as a "Market Quotation" within the meaning of Part 1(k)(ii) of the Schedule and that, in accordance with the express terms of Part 1(k)(iii) of the Schedule, the Settlement Amount was required to be determined on the basis of, and is required to be equal to, Ford Trust's "Loss" in connection with the early termination of the Ford Trust Swaps.

## COUNT II
### *Declaratory Judgment – Ford Trust's Calculation of the Early Termination Payment Using the HSBC Quote Effected a Setoff that Is Prohibited By the Ford Trust Agreement, the Bankruptcy Code, and New York Law*

54.    LBSF repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1 through 53 above as if fully set forth in this cause of action.

55.    As alleged hereinabove, Ford Trust contends that the HSBC Quote constituted a "Market Quotation" within the meaning of Part 1(k)(ii) of the Schedule such that, pursuant to Part 1(k)(iii) of the Schedule, Ford Trust was entitled to treat the Settlement Amount as equal to the amount of the HSBC Quote and thus use it to calculate the Early Termination Payment.

56.    As alleged hereinabove, the HSBC Quote represented an amount that HSBC allegedly demanded from Ford Trust, and that Ford Trust paid to HSBC, in consideration of a transaction that would preserve for Ford Trust's affiliate, FMCC, the economic equivalent of payments or deliveries that would have been required to be made by LBSF in respect of *certain other terminated transactions* that were governed by an agreement *other* than the Ford Trust Agreement – namely, the FMCC Swaps between FMCC and LBSF, which allegedly were "in-the-money" to FMCC when they terminated on October 7, 2008.

57.    As alleged hereinabove, unlike the FMCC Swaps, the Ford Trust Swaps were heavily "in-the-money" to LBSF when they terminated on October 7, 2008, and therefore,

determining the Early Termination Payment on the basis of the amount demanded by and paid to HSBC in connection with the HSBC Transaction – a "package deal" that included and accounted for both the FMCC Swaps and the Ford Trust Swaps – had the effect of ***unlawfully setting off*** the amounts allegedly owed by LBSF ***to FMCC*** under the FMCC Agreement against the Early Termination Payment owed to LBSF ***by Ford Trust*** under the Ford Trust Agreement.

58.    As alleged hereinabove, the Schedule provides that all payments under the Ford Trust Agreement "will be made ***without*** set-off or counterclaim, except as expressly provided in Section 2(c), Section 6, or Part 1(k)(iv)." *See* <u>Exhibit</u> <u>A</u>, Schedule, Part 5(j) (emphasis added). Neither Section 2(c), Section 6, nor Part 1(k)(ix) allows Ford Trust to set off amounts allegedly owed to FMCC under the FMCC Agreement in respect of the early termination of the FMCC Swaps against the Early Termination Payment owed by Ford Trust under the Ford Trust Agreement in respect of the early termination of the Ford Trust Swaps. As such, Ford Trust's use of the HSBC Quote as the Settlement Amount to calculate the Early Termination Payment effected a setoff that is not permitted under the terms of the Ford Trust Agreement.

59.    Ford Trust's calculation of the Early Termination Amount is also contrary to section 553(a) of the Bankruptcy Code which provides, in relevant part,

> [e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. §553.

60.    By its terms, section 553 of the Bankruptcy Code does not create a right of setoff; it merely preserves any right of setoff that a creditor of a debtor may have under applicable non-bankruptcy law.

21

61.     Setoff is appropriate and permissible under section 553 of the Bankruptcy Code only when a creditor enjoys both an independent right of setoff under applicable non-bankruptcy law and satisfies the further Bankruptcy Code-imposed requirements and limitations set forth in section 553.

62.     By its terms, section 553 of the Bankruptcy Code expressly imposes the requirement that any debt sought to be set off against a debt owed to a debtor be a "mutual debt" – that is, a debt owing by the debtor *to the creditor seeking to avail itself of the setoff*. Indeed, section 553 expressly preserves only the "right of a creditor to offset a *mutual debt* owing by *such creditor* to the debtor ... against a claim of *such creditor* against the debtor." 11 U.S.C. § 553(a) (emphasis added).

63.     Moreover, mutuality of obligations is a prerequisite to the right of setoff under New York law, which is the applicable non-bankruptcy law governing the parties' rights and obligations under the Ford Trust Agreement. *See* Exhibit A, Master Agreement, at § 13(a); Schedule, Part 4(f).

64.     As alleged hereinabove, Ford Trust's use of the HSBC Quote as the Settlement Amount to calculate the Early Termination Payment does not involve "mutual debts;" rather, it involves an attempt by Ford Trust to set off a debt allegedly owed by LBSF *to FMCC* against a debt admittedly owed *by Ford Trust* to LBSF. Accordingly, the result – and, upon information and belief, the very purpose – of Ford Trust's decision to use the HSBC Quote to calculate the Early Termination Payment was to effectuate a setoff that is not permitted by, and constitutes a violation of, the Ford Trust Agreement, the Bankruptcy Code, and New York law.

65.     By virtue of the foregoing, there now exists an actual, justiciable controversy between LBSF and Ford Trust relating to their respective legal rights, duties, and obligations

22

under the Ford Trust Agreement, the Bankruptcy Code, and New York law, which controversy is now ripe for adjudication pursuant to 28 U.S.C. § 2201.

66.    LBSF thus requests a judgment declaring the rights and obligations of the parties under the Ford Trust Agreement, the Bankruptcy Code, and New York law, including a declaration that Ford Trust's calculation of the Early Termination Payment using the HSBC Quote unlawfully effected a triangular, non-mutual setoff that is not permitted under the terms of the Ford Trust Agreement, the Bankruptcy Code, and New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

A.    a judgment declaring that the HSBC Quote did not constitute, and does not qualify, as a "Market Quotation" for purposes of Part 1(k) of the Schedule and that, in accordance with Part 1(k) of the Schedule, the Settlement Amount was required to be determined on the basis of, and is required to be equal to, Ford Trust's "Loss" in connection with the early termination of the Ford Trust Swaps;

B.    a judgment declaring that Ford Trust's use of the HSBC Quote as the Settlement Amount for purposes of calculating the Early Termination Payment due to LBSF effected a triangular, non-mutual setoff that is unlawful and not permitted under, and that constitutes a violation of, the Ford Trust Agreement, the Bankruptcy Code, and New York law; and

C.    such other and further relief as the Court deems just and proper, including costs and attorneys' fees.

Respectfully submitted,

By:    /s/ David R. Fertig
        David R. Fertig
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:   (212) 310-8007

        Scarlett E. Collings
        WEIL, GOTSHAL & MANGES LLP
        700 Louisiana, Suite 1600
        Houston, Texas 77002-2755
        Telephone:  (713) 546-5000
        Facsimile:   (713) 224-9511

        *Attorney for Lehman Brothers Special Financing Inc.*

Dated:    New York, New York
        May 6, 2011

24