Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 08-13555-jmp

5  - - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  LEHMAN BROTHERS HOLDINGS INC.,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              May 9, 2011

19              2:05 PM

20

21  B E F O R E:

22  HON. JAMES M. PECK

23  U.S. BANKRUPTCY JUDGE

24

25

```
 1

 2     Hearing Re: Motions Seeking Modification of the Sale Order

 3     Pursuant to Rule 60(b), the Trustee's Motion for Relief Under

 4     the SIPA Sale Order, Barclays' Cross-Motion to Enforce the Sale

 5     Orders and Adjudication of Related Adversary Proceedings

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:  Dena Page
```

Page 3

1

2   A P P E A R A N C E S :

3   HUGHES HUBBARD & REED LLP

4         Attorneys for James W. Giddens, the SIPA Trustee

5         One Battery Park Plaza

6         New York, NY 10004

7

8   BY:   WILLIAM R. MAGUIRE, ESQ.

9         SARAH LOOMIS CAVE, ESQ.

10        DANIEL S. LUBELL, ESQ.

11        JEFFREY S. MARGOLIN, ESQ.

12        NEIL J. OXFORD, ESQ.

13        CHRISTOPHER K. KIPLOK, ESQ.

14

15

16   BOIES, SCHILLER & FLEXNER LLP

17         Attorneys for Barclays

18         333 Main Street

19         Armonk, NY 10504

20

21   BY:   DAVID BOIES, ESQ.

22

23

24

25

Page 4

1

2   JONES DAY

3        Attorneys for Lehman Brothers Holdings Inc.

4        222 East 41st Street

5        New York, NY 10017

6

7   BY:   ROBERT W. GAFFEY, ESQ.

8        ARTHUR J. MARGULIES, ESQ.

9        BENJAMIN ROSENBLUM, ESQ.

10       WILLIAM J. HINE, ESQ.

11

12

13   WEIL, GOTSHAL & MANGES, LLP

14       Attorneys for Lehman Brothers Holdings Inc.

15       767 Fifth Avenue

16       New York, NY 10153

17

18   BY:   SHAI Y. WAISMAN, ESQ.

19       HARVEY R. MILLER, ESQ.

20       JACQUELINE MARCUS, ESQ.

21       ROBERT J. LEMONS, ESQ.

22       DIANE HARVEY, ESQ.

23

24

25

Page 5

```
 1

 2   WEIL, GOTSHAL & MANGES LLP

 3         Attorneys for Lehman Brothers Holdings Inc.

 4         1300 Eye Street, NW

 5         Suite 900

 6         Washington, DC 20005

 7

 8   BY:   RALPH I. MILLER, ESQ.

 9

10

11   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

12         Attorneys for Lehman Brothers Holdings Inc.

13         101 Park Avenue

14         New York, NY 10178

15

16   BY:   STEVEN J. REISMAN, ESQ.

17         JERROLD LYLE BREGMAN, ESQ.

18         LYNN P. HARRISON, III, ESQ.

19

20

21

22

23

24

25
```

Page 6

1

2    BINGHAM MCCUTCHEN LLP

3          Attorneys for Lehman Brothers Holdings Inc.

4          399 Park Avenue

5          New York, NY 10022

6

7    BY:   JOSHUA DORCHAK, ESQ.

8

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for Lehman Brothers Holdings Inc.

12         1177 Avenue of the Americas

13         New York, NY 10036

14

15   BY:   PAUL B. O'NEILL, ESQ.

16         THOMAS T. JANOVER, ESQ.

17

18

19   KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

20         Attorneys for Lehman Brothers Holdings Inc.

21         1633 Broadway

22         New York, NY 10019

23

24   BY:   ROBERT M. NOVICK, ESQ.

25

Page 7

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         21st Floor

6         New York, NY 10004

7

8    BY:   ANDREA B. SCHWARTZ, ESQ.

9          ANDREW D. VELEZ-RIVERA, ESQ.

10

11

12   DUANE MORRIS LLP

13        Attorneys for Aron Oliner as Chapter 11 Trustee of

14          The Kontrabecki Group

15        1540 Broadway

16        New York, NY 10036

17

18   BY:   WILLIAM C. HEUER

19

20

21

22

23

24

25

Page 8

```
 1

 2    SILLS CUMMIS & GROSS P.C.

 3          Attorneys for Alfred H. Siegel, Trustee

 4          1 Riverfront Plaza

 5          Newark, NJ 07102

 6

 7    BY:   ANDREW HOWARD SHERMAN, ESQ.

 8

 9

10    KIRKLAND & ELLIS LLP

11          Attorneys for Liquidators of Lehman Brothers

12            Australia Limited

13          300 North LaSalle

14          Chicago, IL 60654

15

16    BY:   DAVID R. SELIGMAN, ESQ.

17          JAMES H.M. SPRAYREGEN, ESQ.

18

19

20    MILBANK TWEED HADLEY & MCCLOY LLP

21          Attorneys for Official Committee of Unsecured Creditors

22          1 Chase Manhattan Plaza

23          New York, NY 10005

24

25    BY:   DENNIS F. DUNNE, ESQ.
```

Page 9

```
 1

 2    QUINN EMANUEL

 3          Attorneys for Official Committee of Unsecured Creditors

 4          865 S. Figueroa Street

 5          10th Floor

 6          Los Angeles, CA 90017

 7

 8    BY:   ERIC D. WINSTON, ESQ.

 9

10

11    QUINN EMANUEL

12          Attorneys for Official Committee of Unsecured Creditors

13          51 Madison Avenue

14          22nd Floor

15          New York, NY 10010

16

17    BY:   ROBERT K. DAKIS, ESQ.

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Before we start the presentation, I'd be

3    interested in knowing whether or not, notwithstanding the fact

4    that I received reply papers as recently as May 4, any progress

5    may have been made since then in narrowing areas of

6    disagreement.

7              MR. MAGUIRE:  Yes, Your Honor.  Bill Maguire for the

8    SIPA trustee.  We have been able to resolve a couple of issues,

9    Your Honor.  One is with respect to what the right number is on

10   the clearance box and the dispute about specific performance

11   versus a damages remedy.  There, you may recall, that with

12   respect to the box, Barclays was taking the position it was

13   entitle to specific performance remedy for the undelivered

14   clearance box assets and that that included or would give

15   Barclays the appreciation value of the securities.  We disputed

16   that, and we took the position that Barclays was entitled only

17   to the 869 million dollars in damages that it proved at trial.

18   But we also acknowledged that Barclays was entitled to interest

19   at the New York statutory rate of nine percent per annum.  And

20   frankly, when one does the math, one gets to a number through

21   very different paths which, frankly, is pretty much the same

22   number.  So what the parties have done is we have agreed that

23   the amount of the undelivered clearance box assets can be set

24   in an order that will specify the payment by the trustee to

25   Barclays of 1.1 billion dollars and that there will be no other

LEHMAN BROTHERS HOLDINGS INC.

Page 11

1    payment of any kind.  That sets the amount.  It obviously

2    reserves the trustee's right to appeal and the ultimate

3    disposition of the box assets, but it sets the amount and makes

4    clear that there's no additional amount by way of distributions

5    or dividends or pre-judgment interest on top of that number.

6    It is a fixed number that both parties have agreed on as being

7    the right number to adjust the ultimate disposition of the

8    undelivered clearance box assets.

9            THE COURT:  So this means that specific performance is

10   now a moot issue?

11           MR. MAGUIRE:  That is correct.

12           THE COURT:  Let me ask you a question about the nine

13   percent pre-judgment interest.  There was a dispute as to

14   whether or not the trustee could assert nine percent pre-

15   judgment interest with respect to the trustee's claims.  Has

16   that issue been resolved in the context of resolving the issue

17   concerning the clearance box assets?

18           MR. MAGUIRE:  It has not, Your Honor.  That is still a

19   matter of dispute between the parties.

20           THE COURT:  Seems that symmetry would dictate that

21   nine percent should apply both ways or that there shouldn't be

22   nine percent, but rather the federal judgment rate interest

23   applicable to both.

24           MR. MAGUIRE:  The parties have not reached agreement

25   on symmetry or anything else other than simply the number with

Page 12

```
 1    respect to the clearance box.

 2            THE COURT:  I'm not going to get in the way of that

 3    agreement, but I see Mr. Boies standing, I presume in reference

 4    to my comment on the pre-judgment rate.

 5            MR. BOIES:  Exactly, Your Honor, and although I was

 6    not a direct participant in these negotiations --

 7            THE COURT:  Thanks for fixing that.

 8            MR. BOIES:  Yeah, see how long it lasts.

 9            My understanding was to avoid exactly the question

10    that you're -- the Court raised, that we agreed that the 1.1

11    million (sic) dollars was in satisfaction of our specific

12    performance claim.  Now, if that is not your understanding,

13    then maybe we ought to have a sidebar.  But my understanding

14    from the negotiation was that in order to avoid any issue of

15    symmetry or lack of symmetry or any inference of precedent,

16    that we agree that the 1.1 million (sic) dollars --

17            THE COURT:  Billion.

18            MR. BOIES:  -- 1.1 billion dollars, yes, thank you --

19            THE COURT:  I didn't want you to be in trouble with

20    your client, Mr. Boies.

21            MR. BOIES:  I appreciate that because it would have

22    been a lot of trouble.  The 1.1 billion dollar amount was in

23    satisfaction of our specific performance claim, which is what

24    we claimed, and that didn't force either of us to reach the

25    issue of damages or interest.
```

1          Now, if that is not counsel's understanding, perhaps

2     we ought to have a sidebar.

3          THE COURT:  Well, I think that all that I heard from

4     counsel for the trustee was how the number was derived.  I'm

5     not sure that I heard anything that indicated that any rights

6     were being conceded on either side.

7          However, you did well in this agreement compared to

8     how you would have done with me, so you should feel some level

9     of comfort that you've reached a good number.  I would be even

10    happier if there were some symmetry in the agreement because

11    obviously, the number was derived by using some mathematical

12    calculations that included a presumed interest rate.

13          MR. BOIES:  No, Your Honor, that's not so.  That's the

14    point I wanted to make.  It did not include some kind of

15    mathematical calculation that involved interest rate.  It was a

16    settlement of our specific performance claim.  We believe the

17    appreciation is significantly above 1.1 billion dollars.  We

18    thought we were entitled to specific performance.  And we were

19    settling our specific performance claim for 1.1 billion

20    dollars.  It had no implication of any interest rate at all

21    from our standpoint, and indeed, I think that that was

22    something that the parties actively talked about in the

23    negotiations.

24    So --

25          THE COURT:  Well, maybe this is one reason why judges

1    rarely want to know what happens in negotiations, because the

2    more you know, the more likely it is that the deal will

3    unravel.

4         I accept the settlement at 1.1 billion dollars that ha

5    been described, and I'm disregarding the circumstances that

6    give rise to it, including the assertion that you've made that

7    this is a settlement of your specific performance claim.  Of

8    course it is; it resolves issues concerning the clearance box

9    assets regardless of the claims being made or the defenses

10   being made on either side.  It's just an agreed number.

11        MR. BOIES:  It is an agreed number, Your Honor, but it

12   is an agreed number with respect to a very specific claim.

13        THE COURT:  Yes.  It's an agreed number with respect

14   to the clearance box aspect of the decision.

15        MR. BOIES:  Even more specific.  We didn't -- we

16   only -- our claim with respect to that was a claim for specific

17   performance.  We did not make a claim for damages; we made a

18   claim only for specific performance.

19        THE COURT:  Well, whether or not that was a claim for

20   specific performance or for the value of the securities as they

21   may have accreted through the application of an interest rate

22   or through other market factors is really irrelevant because

23   you've made a deal which makes it unnecessary for me to address

24   those specifics at an agreed number.  If we were to get into

25   the specifics, which I think we're trying to avoid, you might

LEHMAN BROTHERS HOLDINGS INC.

Page 15

 1    well have lost on the issue of specific performance.  So

 2    there's really no point in emphasizing that that's what you

 3    just settled.  You settled a claim for clearance box assets.

 4    It's true that in the history of the case, you were regularly

 5    seeking delivery of those assets, but whether or not you had

 6    entitlement to delivery of those assets as valued as of the

 7    closing or as valued as of the time that you ultimately

 8    received delivery is a matter that was never litigated during

 9    the trial.  This is a matter that came up post-trial.  I am

10    happy that you resolved it.

11            MR. MAGUIRE:  Your Honor, Bill Maguire again for the

12    SIPA trustee.  There's one other agreement that we've managed

13    to reach, and that's with respect to two of what I'll call are

14    the smaller items of margin, one involving -- you'll see it in

15    the briefs.  It's a reference to 267 million of margin assets

16    which turn out to be partly LBIE customer funds and another

17    number that was simply some confusion between the parties.  So

18    those fairly minor aspects of the margin dispute have been

19    resolved.

20            THE COURT:  Is this the 137 million dollar issue?

21            MR. MAGUIRE:  Exactly.

22            THE COURT:  Okay.

23            MR. MAGUIRE:  So those two small numbers have been

24    resolved, and we have, I think, an agreement, almost complete

25    agreement on what the right number is that Barclays should pay

1    the trustee, assuming that the arguments that are raised today

2    were to be unsuccessful, the arguments by Barclays.  The total

3    amount, in other words, of margin that Barclays received, we

4    understand now, is a total -- we calculate it as 2.101 billion

5    dollars.  Barclays came up with a number that was eight million

6    dollars less than that, and we've been informed by Barclays

7    that the reason for the difference is eighty million dollars

8    that was not, in fact, received by Barclays but is in a

9    suspense account at the OCC.  We had been going by Barclays'

10   witness, Gary Romain; his notes indicated that Barclays had

11   received 1.375 billion dollars in cash at the OCC.  But we

12   understand that it's been clarified that eighty million of that

13   is, in fact, in a suspense account.  So we're checking that

14   today, but assuming we confirm that, I think we understand that

15   the total amount of Lehman margin that Barclays has received in

16   connection with this transaction.

17        THE COURT:  And is there a breakdown as to cash and

18   cash equivalence versus government securities within that total

19   number?

20        MR. MAGUIRE:  We understand -- it's actually not

21   within that number because most of the government securities

22   are actually in the possession of the trustee; they were never

23   transferred to Barclays.  But we do understand, I think both

24   parties have used the same number to cover that universe of

25   government securities, of margin in the form of government

Page 17

1   securities of being approximately one and a half billion

2   dollars.

3          THE COURT:  And of the one and a half billion dollars,

4   are we talking about government securities regardless of

5   maturity?

6          MR. MAGUIRE:  My understanding is that one and a half

7   billion is entirely -- certainly almost entirely made up of

8   government securities with maturities of greater than ninety

9   days.

10         THE COURT:  Okay.

11         MR. MAGUIRE:  There are some T-bills or whatever that

12  are a little bit less that I think are additional to that.  So

13  that's my understanding, is that the dispute over government

14  securities is in the ballpark of one and a half billion

15  dollars.

16         THE COURT:  Okay.  If I gave you more time, could you

17  reach more agreements?

18         MR. MAGUIRE:  My own sense is we've reached the end of

19  the road --

20         THE COURT:  All right.

21         MR. MAGUIRE:  -- on agreements, Your Honor.

22         THE COURT:  In thinking about how best to deal with

23  this, it seems to me that rather than having one side argue

24  every issue in dispute then having the other side argue every

25  issue in dispute, that we should consider doing this on a

1   dispute-by-dispute basis, thereby focusing in on issues such as

2   margin and having what amounts to a complete argument in

3   connection with that.  Does that make sense to the parties?

4          MR. BOIES:  It does from our respect.

5          THE COURT:  Now, why don't we start with margin, then?

6   It's a big-ticket item and we were just talking about it.  And

7   I'm familiar with the issue.

8          MR. MAGUIRE:  If I might approach, Your Honor?

9          THE COURT:  Yes, you may.

10         MR. MAGUIRE:  Again, Bill Maguire for the SIPA

11  trustee.

12         THE COURT:  It's obvious that my suggestion had been

13  anticipated by the parties because this binder is specifically

14  addressed to the margin assets.

15         MR. MAGUIRE:  It takes us time to learn, but we do

16  eventually start to catch on, Your Honor.

17         Your Honor, we had -- this obviously is, by far, the

18  most significant of the disputed assets.  The total amount in

19  dispute is some four billion dollars, and we under -- I mean,

20  that was, frankly, the most significant disputed asset that was

21  tried in the course of the thirty-four day trial.  We

22  understood that the Court's opinion in February squarely

23  addressed and resolved that dispute.  And we understood from

24  the Court's opinion that the trustee had won on this issue of

25  Lehman's cash and Lehman's cash equivalents and similar cash

1    assets.

2         Having won, then, we find ourselves now, at this

3    stage, in connection with the entry of the form of order facing

4    this fairly fundamental issue that Barclays is raising in which

5    Barclays is now saying that it's entitled to an offset, which

6    in its papers, it puts in the amount of six billion dollars and

7    then says that Barclays will take only about one billion or a

8    little bit more than one billion dollars by way of offset,

9    still an absolutely staggering number.

10        There are a lot of problems that we have with this

11   argument.  We've characterized it as a new argument, and I want

12   to just be clear what we mean by that.  We don't mean that this

13   is just an argument that's arriving too late, that for some

14   procedural misstep, this is something that should really and

15   could have been tried in the course of the case.  And when we

16   say it's new, we are objecting to it because this argument is

17   the exact opposite of what Barclays was arguing throughout the

18   trial.  Barclays could not have raised this argument during the

19   trial because during the trial, Barclays was making affirmative

20   representations to the Court that totally contradict this

21   argument.

22        And what we've done in the binder that's before you,

23   Your Honor, in the tab 1, is to put side by side on one sheet

24   of paper the position that Barclays is asserting now with the

25   position that Barclays has asserted up to now.  And Barclays'

Page 20

1    position, in brief, is that under the so-called transfer and

2    assumption agreement, Barclays took on and assumed this

3    enormous liability, some six billion dollars for the shorts,

4    and that was new consideration.  And Barclays is arguing that

5    somehow, implicit in the Court's opinion, is the voiding of

6    that agreement.  And they say that since they gave some six

7    billion dollars of consideration in undertaking that agreement,

8    Barclays is entitled to be compensated for that consideration.

9    And that whole argument is premised on the notion that in

10   entering into the transfer and assumption agreement, Barclays

11   was providing new consideration, and the new consideration was

12   assuming the shorts, the short exchange-traded derivatives.

13   Those liabilities were in the amount of six billion dollars;

14   Barclays says it took those liabilities on under that agreement

15   and that Barclays was not otherwise obliged to take on any of

16   those liabilities.

17          That is precisely the opposite of what Barclays said

18   up to now.  On the left side of the page, we put forward from

19   Barclays' reply brief filed just a couple of weeks ago where --

20   last week, actually, where Barclays says in paragraph 79, "Thus

21   the purchase agreement did not require Barclays to assume the

22   short options."  Well, that is simply not true, and Barclays

23   itself affirmatively represented to the Court that the purchase

24   agreement did require Barclays to assume the short positions.

25   And on the right side of the page before you, we put forward

1    Barclays' positions both before trial and, indeed, after trial,

2    all of which uniformly represented to the Court that under the

3    purchase agreement, under the clarification letter, Barclays

4    assumed responsibility for the short positions, the short

5    exchange-traded derivatives.  The first is before trial, and

6    that's Barclays' January 2010 opposition brief at paragraph 380

7    where Barclays says, and I quote, "These purchased assets were

8    specifically defined to include LBI's exchange-traded

9    derivatives."  And the sentence goes on and is accompanied by a

10   citation to the clarification letter.

11         And Barclays goes on to say, "Thus, Barclays acquired

12   not only the ETD, the exchange-traded derivative positions

13   themselves," and it includes, then, a phrase that specifically

14   defines what those exchange-traded derivative positions were,

15   composed of both assets, the long positions, and liabilities,

16   the short positions.

17         That is completely consistent with Barclays' position

18   after trial.  After trial, and we put forward here an excerpt

19   from Barclays' November 2010 post-trial brief at paragraph 88,

20   and there, it's a lengthy quotation, but it starts describing

21   the clarification letter and how it actually narrows and

22   provides more precision to the definition of purchased assets.

23   And it goes on to say that no other short positions are being

24   assumed with respect to the trading inventory Barclays is

25   acquiring "except for the ETDs, where Barclays is acquiring

Page 22

1    both long and short positions".  And then we have a

2    parenthetical that further confirms that this is both assets

3    and liabilities.

4         So the new argument that Barclays did not acquire, was

5    not already obliged under the purchase agreement to take

6    responsibility for the shorts is a 180 degree reversal of the

7    representations that Barclays made before trial and after

8    trial.  That, of course, is entirely consistent with the

9    testimony that the Court heard here.  You may remember witness

10   after witness was shown the financial schedule in which there

11   were -- this is under the asset purchase agreement in which

12   there were assets on one side and liabilities on the other, and

13   as those assets changed during the week, ultimately, many of

14   the shorts went away.  But the shorts that remained included

15   the exchange-traded derivative shorts, and that's where

16   Barclays confirmed before trial and after trial that it

17   retained -- it assumed liability for those shorts, the

18   exchange-traded derivative shorts.

19        So now, what we have is Barclays asking for an offset

20   for assuming short liabilities to the OCC which Barclays was

21   already required to assume under the purchase agreement.

22   Barclays is saying it should get a credit for giving

23   consideration in taking those shorts on when it entered into

24   the transfer and assumption agreement.  The problem with that

25   is that Barclays was already obligated to assume those shorts,

1    whether it entered into the transfer and assumption agreement

2    or not.

3             Barclays has a similar argument under Section 550 of

4    the Code.  That's exact replay of the same argument, except

5    this time defining this consideration as a cost.  Now again, I

6    think it's a fairly clear principle of law.  When someone is

7    already obliged to do something, when you're already legally

8    required to assume those liabilities, you can't claim that

9    there's some additional cost in assuming those liabilities.

10   You can't claim that there's some additional consideration that

11   you're providing in undertaking to do what you're already

12   required to do.  And Barclays, by its own admissions, was

13   already required to assume these short positions.

14            I think there are many other subsidiary points that

15   one could make with respect to this new argument, but I think

16   that really is the heart of the issue, Your Honor.

17            THE COURT:  And so your fundamental argument is that

18   having agreed to the number with Barclays, which is

19   approximately 2.1 billion dollars, that that is the amount that

20   the trustee should be receiving back --

21            MR. MAGUIRE:  Exactly.

22            THE COURT:  -- without offset.

23            MR. MAGUIRE:  Without any offset.

24            THE COURT:  Right.  That's the position.

25            MR. MAGUIRE:  And exclusive of any prejudgment

Page 24

```
 1   interest.

 2           THE COURT:  And exclusive of any prejudgment interest

 3   which you would assert should run at the same nine percent

 4   rate -- and I don't mean to restart the dispute -- but at the

 5   same nine percent rate which, at least for your internal

 6   purposes, you used to derive the 1.1 billion dollar number that

 7   we talked about earlier in reference to the clearance box asset

 8   agreement.

 9           MR. MAGUIRE:  Exactly, Your Honor.

10           THE COURT:  Okay.  I understand.

11           Mr. Boies?

12           MR. BOIES:  Yes, and may I approach with a book of our

13   own, Your Honor?

14           THE COURT:  Yes, of course.

15           Thank you.

16           MR. BOIES:  Just in terms of our presentation, I was

17   going to start by addressing the government securities issue

18   that the Court raised, and then get to the argument that he

19   just made, but I'm happy to go in reverse order, if that would

20   be easier for the Court.

21           THE COURT:  Well, since Mr. Maguire has not yet made

22   his argument with respect to the government securities, I don't

23   really care who goes first on the argument.

24           Do you care, Mr. Maguire?

25           MR. MAGUIRE:  I don't, Your Honor.
```

Page 25

1          THE COURT:  Fine.  So you'll get cleanup on that

2    issue.

3          MR. BOIES:  Okay.  So let me begin with the government

4    securities issue, and in that connection, I would like to begin

5    with tab 6.  And the reason I do is because what we are trying

6    to do today is not argue to the Court what we think is right.

7    We're trying to argue to the Court what we think is a natural

8    extension or application of the Court's order.  And as we read

9    the Court's order on margin, it was -- the Court said over and

10   over again that there was no Lehman cash going to Barclays.

11   And if that is correct, then the issue becomes what is cash and

12   cash equivalents?  And we recognize that cash equivalents

13   should be treated as cash under the Court's opinion.

14          What we are arguing about is what constitutes cash

15   equivalents.  Our view is that cash equivalents are government

16   securities of ninety days in duration or less, not government

17   securities of unlimited duration.  The order that the trustee

18   has given the Court would provide that government securities of

19   fifteen, eighteen, nineteen years maturities would be

20   considered cash or cash equivalents.  We think there is simply

21   no support in the record and no support outside the record, as

22   far as that's concerned, for an interpretation of cash and cash

23   equivalents of that nature.

24          If you would turn to tab 10, you'll see a reference to

25   the fact that it is first undisputed that in their annual

1    reports at the time of the sale, both Barclays and Lehman

2    defined cash equivalents as securities with a maturity of three

3    months or less.  By contrast, as is indicated here, many of the

4    margin assets at issue consisted of government securities with

5    maturities greater than three months.  Indeed, many of the

6    securities consisted of government securities with maturities

7    of over fifteen years.  Maturities longer than fifteen years,

8    for example, BCI Exhibit 686, is a Treasury bond of about 120

9    million dollars with a sixteen-year maturity.  BCI Exhibit 689

10   is a Treasury bond of over eighty-six million dollars with a

11   sixteen-year maturity.  BCI Exhibit 691 is a Treasury bond of

12   175 million dollars with a sixteen-year maturity.  BCI 687 is a

13   security bond of approximately sixty million dollars with a

14   nineteen-year maturity.  All of these government securities and

15   all the ones like them would, under the government's proposed

16   order, be treated as cash and cash equivalents.  And we don't

17   think that that is consistent with Your Honor's opinion, and we

18   don't think that such a position could be possibly justified

19   based on the trial record.  So what we would argue first --

20           THE COURT:  Well, wait a minute.  Wait a minute, Mr.

21   Boies.

22           MR. BOIES:  Yes.

23           THE COURT:  And I realize that you're focused on the

24   definition of cash equivalents as that term is tied into the

25   duration of a government security.  But I think you're

Page 27

1    misreading the opinion as a whole as it relates to the

2    disposition of the disputed margin because while it is true --

3    and you emphasize these points -- that the opinion references

4    Lehman cash as an important factor in the decision, it's also

5    true that this entire issue relating to government securities

6    did not come up during the trial, at least I can't remember

7    that it came up during the trial in reference to Barclays'

8    defense to the request by the trustee for a turnover of

9    disputed margin.

10        Additionally, the opinion itself isn't limited to cash

11   but rather finds, based upon an interpretation of the record

12   relating to the negotiation, drafting, and execution of the

13   clarification letter itself, that there was no meeting of the

14   minds in reference to including margin within the clarification

15   letter.

16        So it would be fully consistent with the opinion I

17   wrote for an order to be entered that delivers all 2.1 billion

18   dollars from Barclays to the trustee quite apart from any

19   arguments relating to what cash and cash equivalents may mean

20   as tied to the duration of government securities.

21        MR. BOIES:  The only thing I would say, Your Honor, is

22   that obviously, it's your opinion and your order and you will

23   write it as you see fit.  But I would suggest that if you go

24   beyond the "no cash" rationale, there simply is no support in

25   the record for -- even if you ignore the meeting of the minds,

Page 28

1    even if you ignore the clear language of the agreement, which,

2    as the Court knows was filed with the Court, incorporated in

3    the Court's -- referenced in the Court's sale order, even if

4    you ignore all that, there is still nothing in the record that

5    would justify giving them all of this margin.  I mean, you get

6    there -- they get there -- not the Court, but the trustee gets

7    there, for example, by simply excising words from the sections

8    of the agreement that they quote, like Section 1(b).  They

9    leave out the language that says, "except to the extent

10   otherwise specified herein or in the agreement."  If you

11   look --

12          THE COURT:  Well, we're not going to relitigate --

13          MR. BOIES:  No.

14          THE COURT:  -- what we spent so much time litigating

15   last year.

16          MR. BOIES:  Not at all.

17          THE COURT:  And I remember vividly Mr. Rosen's

18   testimony on examination and cross-examination and the

19   circumstances that surrounded his parenthetical.  I am mindful

20   of at least my recollection of the record.  And I'm also

21   mindful of what I wrote.  And what surprised me -- and I'll say

22   this, actually, to both sides -- what surprised me when I saw

23   the briefs that were submitted on April 28 and again on May 4

24   as a follow-up to our informal chambers conference in which we

25   talked about the dispute surrounding the orders to be entered

1    in reference to the February 22 opinion, I really did not have

2    sufficient foreshadowing of the kinds of disputes that were

3    going to be raised in connection with the form of order to be

4    entered.  And it appears to me -- and I don't mean to be

5    suggesting that this amounts to a motion for reconsideration by

6    either party -- but it appears to me that much of what is being

7    argued in the context of the form of order is a motion for

8    reconsideration, and that the issues surrounding margin do not

9    really tie to the duration of government securities.  It seems

10   to be a completely new argument by Barclays, one that was not

11   supported at all during the lengthy trial that we had.  At no

12   time can I recall any argument made during trial that suggested

13   that the margin issue was in any way tied to the duration of

14   government securities.  This is the first that I'm hearing it.

15          MR. BOIES:  Your Honor, the record at trial is, of

16   course, the record at trial, and I don't mean to argue with the

17   Court about the Court's recollection of it.  But my

18   recollection of it, right or wrong, is that the fight over

19   these assets was, as I think someone could read the Court's

20   opinion as saying, was a fight over cash, Lehman's cash.

21          THE COURT:  No, that was only one part of it Mr.

22   Boies.  That was the part that made it very crystal clear to

23   me, because the trustee was always talking, as I heard it,

24   about cash and cash equivalents, and that was something that I

25   heard repeatedly.

LEHMAN BROTHERS HOLDINGS INC.

Page 30

```
 1              MR. BOIES:  Yes.

 2              THE COURT:  But Barclays was never talking about

 3     noncash margin; it never came up.

 4              MR. BOIES:  But Your Honor, that's because we were

 5     saying that we got them both.  We were saying that we got them

 6     both.

 7              THE COURT:  Yes, but you're not entitled to government

 8     securities, Mr. Boies.  They're excluded.  You may have gotten

 9     the business that included the trading of government

10     securities, but you didn't get the securities themselves.

11              MR. BOIES:  But Your Honor -- that's from Section

12     1(b), right?  That's what you're talking about?  Section 1(b)?

13              THE COURT:  I'm talking about the clarification

14     letter --

15              MR. BOIES:  Yes.

16              THE COURT:  -- and the purchase agreement.

17              MR. BOIES:  Right.

18              THE COURT:  But I don't want to argue with you about

19     this.

20              MR. BOIES:  But all --

21              THE COURT:  Your issue is whether or not the form of

22     order proposed by the trustee is or is not consistent with my

23     opinion.

24              MR. BOIES:  Right.

25              THE COURT:  And I'm letting you know, I believe it is.
```

1          MR. BOIES:  Okay, and if you don't want me to talk

2     anymore about it, I'll stop talking about it.

3          THE COURT:  No, I'm anxious to hear everything you

4     have to say.

5          MR. BOIES:  Okay, one of the things I want to say is I

6     don't think it is consistent with Your Honor's opinion, all

7     right, because I do not think that Your Honor lays out in your

8     opinion a basis for giving them the margin other than cash and

9     cash equivalents.  As the Court says, that's what they argued

10    at trial.  All right?  And that was the -- and that's what was

11    in the Court's opinion.  And I don't think the Court's opinion

12    lays out a basis for giving them the margin other than cash and

13    cash equivalents.  And we've asked them to point to the

14    sections; they point, for example -- the reason I mention 1(b)

15    is they point to Section 1(b) and Section 1(b) does talk about

16    the business and whether they include government securities and

17    the extent to which they do, and then goes on to say, though,

18    it says, "except to the extent otherwise specified herein or in

19    the agreement."  And Your Honor referenced that exact section

20    in the Court's opinion.  And as you -- and I would have

21    interpreted the Court's opinion as being something that gave

22    them the argument they were making at trial, which is cash and

23    cash equivalents were excluded.

24          If the Court intends to make a decision beyond that,

25    that's the Court's decision.  And I'm really not -- I'm really

Page 32

1    not trying to argue the underlying merits.

2            THE COURT:  Well, even your papers, Mr. Boies,

3    acknowledge that the decision can be read to go beyond cash and

4    cash equivalents.  You at least gave me that in your papers.

5            MR. BOIES:  Absolutely, Your Honor.

6            THE COURT:  But you're not giving it to me now.

7            MR. BOIES:  Well, Your Honor, what I'm -- I believe

8    that there are references in the Court's opinion.  I don't

9    think it's the Court's reasoning, but if the Court says it is

10   the reasoning, obviously, I yield.

11           THE COURT:  Multiple grounds for finding against you

12   on this point.

13           MR. BOIES:  Okay, but the only thing I would say to

14   the Court, okay, is that I would just ask the Court -- I won't

15   argue it anymore -- I would just ask the Court to look at those

16   multiple bases because when you had a -- and maybe we can --

17   maybe we can't agree, but maybe we could agree that the primary

18   thing that the Court talks about is the cash and cash

19   equivalents.  And sometimes when you have multiple bases, the

20   Court has not looked with the same exacting scrutiny at the

21   support or lack of support for some of the alternative bases,

22   and the only thing that I would ask the Court to do is that if

23   you are going to hold that they are entitled to all of the

24   government securities that were margin, that the Court look

25   at -- take a hard look and see whether there is a basis for

1      that alternative finding.  And with that, I'll move on, unless

2      the Court has a question.

3              THE COURT:  That's fine.  But is there no -- let me

4      just be clear on this.  There's no dispute with respect to the

5      calculation of the margin.  Is that correct?

6              MR. BOIES:  There is, I think, only the -- I think

7      they will ultimately agree with us on the eighty million

8      dollars, and as I understand it, the difference between 2.021

9      billion and 2.101 billion, the difference being 80 million

10     dollars.  And if the Court rejected the argument I just made

11     and all the other arguments that I have on this issue, then the

12     only dispute on this aspect would be that eighty million

13     dollars.

14             THE COURT:  Okay, and then as to the 1.5 billion which

15     is in government securities, of that 1.5 billion, what

16     percentage constitute long-term government securities of the

17     sort that you identified in your argument, and what percent

18     represent relatively short-term obligations that might fit the

19     definition of cash equivalents?

20             MR. BOIES:  Can I have just one moment, Your Honor?

21             THE COURT:  Sure.

22             MR. BOIES:  Your Honor, our common understanding is

23     that the government securities longer than ninety days are

24     approximately 1.5 billion (ph.) dollars.

25             THE COURT:  That's a fairly wide swath of securities,

1   though.  There could be securities that are six-month

2   securities or securities that are, as you point out, sixteen or

3   nineteen year securities.  It depends on the maturities.  I

4   don't suggest that you selected the long-term maturities to be

5   in any way misleading, but I don't know to what extent they're

6   representative.

7          MR. BOIES:  Your Honor, could I have just one more

8   moment?

9          THE COURT:  Absolutely.

10          MR. BOIES:  Your Honor, our best estimate is that 640

11   million have maturities of more than fifteen years.  Now, I

12   understand that it is still a large amount of real estate

13   between fifteen years and ninety days, but as I -- and we can

14   furnish a the breakdown of that, and we'd be prepared to

15   furnish a breakdown of that to the Court.  But as I stand here

16   now, I can tell you what is longer than ninety days, and I can

17   tell you what's longer than fifteen years.  But exactly where

18   the amount is between the ninety days and the fifteen years, we

19   would need to do some calculations.  But we can do that and we

20   can furnish it to the Court.

21          THE COURT:  Okay, and I'm not being at all critical

22   here when I make this next point, but why is it that these

23   essentially defensive issues concerning the duration of the

24   government securities that constituted part of the margin never

25   came up during the trial?  I never heard this before.

1        MR. BOIES:  Your Honor, during the trial, we read them

2    as saying, as the Court indicated a few moments ago you read

3    them as saying that they were objecting to cash and cash

4    equivalents.  Now, cash and cash equivalents has a very

5    standard definition.  It's not only the definition that's in

6    our annual report, Barclays' annual reports, their annual

7    reports.  It is the Financial Accounting Standards Board, the

8    International Accounting Standards Board defined cash

9    equivalents as investments of original maturities of three

10   months or less.  And we set this out with some of the citations

11   in chart 12 of what we've given the Court.  So when they talked

12   about cash and cash equivalents, from our perspective, that had

13   a very defined meeting, including in the materials that were in

14   the record.

15        THE COURT:  So did you believe during the trial that

16   the only margin that was in dispute was margin that fit the

17   definition of cash and cash equivalents as that term might be

18   understood from standard reference points?

19        MR. BOIES:  We believed that their basic argument was

20   cash and cash equivalents, Your Honor.  There was no doubt,

21   okay, that there were discussions of proprietary margin, but I

22   think if the Court goes back and looks at the record, the Court

23   will find references to any issue that the trustee was arguing

24   about other than cash in terms of these margins few and far

25   between.  I'm not saying they aren't there, but I'm saying that

Page 36

1   the primary argument was, as I think everybody's recognized,

2   that there was to be no transfer of cash and cash equivalents,

3   and there were clearly transfers of cash and cash equivalents.

4            THE COURT:  I recognize that, but from my perspective,

5   and I've been -- I've been presiding in this 60(b) dispute for

6   some time -- I cannot recall a single instance in which

7   Barclays raised during the trial in defense of the claims made

8   by the trustee to recover margin, that that margin should not

9   be turned over on account of the fact that a significant

10  percentage of the amount in dispute was invested in long-term

11  government securities.  It just never was presented to me.

12           MR. BOIES:  I think what was presented was the

13  question of cash or cash equivalents.  We argued in our post-

14  trial brief that cash equivalents were limited to securities of

15  more than -- or, less than ninety days, less than three months.

16  In our trial presentation, we argued that we were entitled to

17  all of the margin.  We thought we were fighting over whether we

18  were entitled to all of the margin, our position, or whether we

19  were only entitled to that margin that was not cash and cash

20  equivalents.  And we thought that the term cash and cash

21  equivalents had a standard definition that we reference in our

22  post-trial brief.  So I think we tried to be clear on that

23  issue.

24           THE COURT:  I understand.  I'm just telling you that I

25  never heard until this briefing round in connection with the

1    form of order to enter that we had an issue concerning longer

2    term maturities of government securities and that the amount at

3    issue was as much as 1.5 billion dollars.  And trust me; if you

4    had brought that up during the trial, I would have remembered

5    it.  It didn't come up.

6        MR. BOIES:  I think the Court is correct that there

7    was nothing in the trial that calculated what percentage of

8    the -- or, what amount in dollars of the government securities

9    were longer than ninety days, although that number was

10    obviously in the materials that went into evidence.  I don't

11    think we argued that -- I don't think we argued that issue

12    until the post-trial briefs.

13        THE COURT:  Okay, so we're in agreement on that at

14    least.  And Mr. Maguire, I think, should have an opportunity to

15    address the government securities component of margin which

16    we've been addressing.  You had another issue you wanted to

17    address as well, Mr. Boies.

18        MR. BOIES:  I did, and I can do that -- I'll do this

19    in any order that is most helpful to the Court.  Would the

20    Court like me to jump to responding to his point, which was --

21    which didn't have to do with the definition of cash and cash

22    equivalents; it had to do with what we referred to as the

23    offset point.

24        THE COURT:  Sure.  Let's do the offset point, and then

25    we'll give Mr. Maguire a chance --

1          MR. BOIES:  Okay.

2          THE COURT:  -- to talk about government securities,

3     and he'll be able to also counter your offset point.

4          MR. BOIES:  Okay.  Now, as I understand the trustee's

5     argument in response to -- you can call it offset, Section

6     550(e), it's all basically the same point, which is that we

7     took certain liability and we took the margin that secured

8     those liabilities, and if you turn to tab 18, you'll see that

9     this issue only arises in the present context, the context

10    we're talking about right now, in connection with the 1.3

11    billion in margin assets transferred to Barclays as part of

12    LBI's OCC accounts.  And these were security for the

13    liabilities, the proprietary and affiliate positions

14    liabilities in those accounts.

15         Now, the -- going on to the next chart, the amount of

16    any liabilities, of any of these liabilities that Barclays was

17    taking on were secured by the transferred assets which included

18    the margin.  And if you say that Barclays is required to take

19    those liabilities without taking the margin that comes with it,

20    what you're obviously doing is you are taking away part of the

21    quo for the quid that was being negotiated.  Now, this is an

22    argument that the trustee, in his briefing, doesn't really

23    answer the 550(e) argument, except to say we already had that

24    obligation, that is, you already had the OCC obligation.  But

25    the Court will remember, among other things, that at the time

1    the TAA was executed, the reason it was executed when it was is

2    the OCC was about ready to close those accounts out.  But the

3    evidence was undisputed that if this wasn't executed when it

4    was, those accounts were going to be closed out.  The reason it

5    was executed before the deal was closed was because the OCC

6    said in no uncertain terms that unless it was executed, they

7    were going to close those accounts out and Lehman wasn't going

8    to have anything.  It was at that point that Barclays stepped

9    up and said that they would sign the TAA which, by its terms,

10    gave them the margin that secured the liabilities as well as

11    the liabilities.

12          We are not here trying to get margin that was

13    transferred that was in excess of what was needed to secure the

14    assets.  And there's a chart in here that has the numbers on

15    it.  If you go to chart 32, Your Honor, I think maybe you can

16    see what I'm talking about.  At the time of the closing, at the

17    time of the closing, there was a net liability of 1.1 billion

18    dollars that Barclays assumed if you ignore the margin.  That

19    is, if you just look at the net of the long and short

20    positions, there's 1.1 billion dollars at the time of closing.

21    In addition to that, as this indicates and BCI Exhibit 147 at

22    page 2 supports this, after the closing, there was an

23    additional 730 million dollars of losses on the option

24    positions in the LBI proprietary accounts -- the LBI

25    proprietary accounts at OCC that Barclays was assuming.

1          Now, we're not saying -- I'm now passing all of our

2     other arguments, all right?  In this part of our argument, we

3     are not saying that we get the margin that was in excess of

4     that net liability.  That is, to the extent that there was

5     margin -- and there was margin -- that was in excess of that

6     1.8 billion dollars, we're not saying we get that under this

7     offset.  But what we are saying is that you can't say that we

8     take the OCC accounts, which we didn't have to take -- they

9     were going to be closed out; we didn't have to sign that TAA.

10    We signed the TAA because we were getting not only the

11    liabilities but the margin that secured those liabilities.  And

12    when you try to break up the TAA and you say, well, you're

13    going to take the liabilities that exist at the closing, but

14    we're not going to give you the margin that was already

15    pledged, secured by those liabilities, we don't think there is

16    any basis in law or in fact or in equity to do that.

17          Let me put it this way.  If we have not executed a

18    TAA, if we've not taken over the OCC, we would have been

19    neutral as far as the OCC assets and liabilities are concerned;

20    they would have been neutral.  All right?  The fact that we

21    took them over before they were closed out means that under the

22    Court's order, they are getting at a minimum the difference

23    between the margin that was required to secure net liabilities

24    that existed and the total margin.  What they're arguing for is

25    that this TAA assumption should, on day one, have been

 1    something that gave them a 1.1 to 1.8 billion dollar windfall

 2    plus amount and gave us on day one a 1.1 to 1.8 billion dollar

 3    shortfall.  And their argument is that we said at the trial

 4    that we were entitled to all of the long and short positions

 5    and including the margin.  When he quoted that to Your Honor,

 6    he left out the last clause of our statement which talked about

 7    including the margin.  That was our position.

 8         Our position at trial was that we were entitled to all

 9    the assets all the liabilities, all the margin.  If the Court

10    concludes that we're not entitled to all of the margin, we

11    think we must at least be entitled to that amount of the margin

12    that is necessary to keep us from having, on day one, a net

13    liability.

14         Now, I want -- just one more point, I would ask you to

15    look at tab 9 because this sets out Mr. Kobak's -- 29, tab 29

16    which sets out Mr. Kobak's testimony.  Now, Mr. Kobak was the

17    trustee's 30(b)(6) representative.  That is, he spoke for the

18    trustee, the trustee is bound by what he testified to.  And

19    we're talking about the OCC margin.  And I asked him,

20    referencing this part of the agreement that said LBI has

21    assigned Barclays "all rights and securities, cash and other

22    property defined as collateral pledged by LBI, the Options

23    Clearing Corporation held for OCC's benefit of JPMorgan Chase.

24    Did you see that?"

25    "A.  Yes.

LEHMAN BROTHERS HOLDINGS INC.

Page 42

1    "Q.  When you say you signed this consistent with the idea

2    there would be no cash, this says cash.  This says cash will be

3    transferred to Barclays.

4    "A.  Yeah, but cash would be transferred against liabilities.

5    "Q.  So to the extent that cash was simply needed to cover the

6    liabilities, you thought it was possible to be included in the

7    deal, is that correct?

8    "A.  Yes."

9            This is the trustee's 30(b)(6) representative whose

10   testimony they are bound by, and even he is recognizing that to

11   the extent that the margin, even cash, was necessary in order

12   to satisfy, secure liabilities that existed at that time, that

13   we're entitled to it.

14           THE COURT:  Okay.

15           MR. BOIES:  Thank you.

16           THE COURT:  Thank you.

17           Mr. Maguire?

18           MR. MAGUIRE:  We have two issues to address, Your

19   Honor.  In terms of which one you'd like me to address first,

20   is there any preference?

21           THE COURT:  Take your pick.

22           MR. MAGUIRE:  Okay.  Well, starting with the last one,

23   the issue of the offset, Mr. Boies started out by saying that

24   the liabilities that that -- Barclays' not getting the margin

25   meant they weren't getting the pro for the quid.  And that,

LEHMAN BROTHERS HOLDINGS INC.

Page 43

1    frankly, is what we tried for thirty-four days, which was was

2    the margin consideration for taking on the exchange-traded

3    derivatives business.  Was the margin in the deal or was it not

4    in the deal.  Here, Barclays was acquiring the North American

5    business of Lehman Brothers.  It was acquiring an extremely

6    valuable franchise.  It wasn't just acquiring derivatives; it

7    was acquiring the entire franchise.  It could have done that

8    with the margin if that was the deal.  It could have done that

9    without the margin if that was the deal.  And the whole issue

10   that we tried for thirty-four days, was -- which is was the

11   margin in the deal or wasn't it in the deal.  And that issue

12   was squarely resolved by the Court's opinion in February, which

13   was the margin was excluded from the deal.  And the Court

14   squarely rejected the arguments that Barclays made that no

15   rational purchaser would undertake a deal of this kind without

16   having the margin in hand for the reason that the issue was not

17   what a rational purchaser would or would not do but what, in

18   fact, the parties had agreed to do in this specific

19   circumstance.

20         Mr. Boies did not respond to the points that I raised

21   earlier, which is that his new offset argument is a 180-degree

22   reversal of the affirmative representations that Barclays made

23   to the Court before and after the trial in which on occasion

24   and reoccasion, Barclays reaffirmed that it took, under the

25   clarification letter, under the asset purchase agreement, not

Page 44

1    under the transfer and assumption agreement, under the

2    clarification letter, it took responsibility for the short

3    exchange-traded derivatives positions.

4            Mr. Boies refers, instead, to the testimony of the

5    trustee's counsel Mr. Kobak, but as you will recall, Your

6    Honor, Mr. Kobak was present here at the sale hearing.  What he

7    heard was that there was no Lehman cash going to Barclays.  All

8    of his testimony is based on his understanding at the time

9    which was that there was no proprietary, no Lehman-owned cash

10   that was going to Barclays.  Obviously, there was customer

11   property that was going to Barclays, not the firm's property.

12           That's really all I have to say, I think, on the

13   offset issue, Your Honor.  Unless you have a question, I'm

14   happy to turn to the other issue concerning government

15   securities.

16           THE COURT:  So your position on the offset issue is

17   that you're entitled to approximately 2.1 billion dollars in

18   cash, cash equivalents, and government securities without

19   offset.

20           MR. MAGUIRE:  With no offset of any kind.

21           THE COURT:  Yes.

22           MR. MAGUIRE:  That's correct, Your Honor.

23           THE COURT:  Okay, I understand it.

24           MR. MAGUIRE:  And now on the subject of government

25   securities, Barclays is raising this accounting convention that

Page 45

1    the parties used in their annual reports whereby for purposes

2    of financial statement presentation, government bonds were

3    classified in different categories, depending on their

4    maturities, obviously, something that we did not at all explore

5    in the course of this trial.  This trial was not a fight over

6    the duration of government securities or long bonds.  This

7    trial was a fight about margin, and it was very clearly about

8    all of the margin.  We were not disputing some of the margin;

9    we were disputing all of the margin.  And we put on the board

10   and we fought through the thirty-four day hearing the number of

11   four billion dollars.

12          THE COURT:  You make it sound as if the whole trial

13   was about margin; of course, it was about a lot of other

14   things, as well.

15          MR. MAGUIRE:  There were a few mundane matters that

16   managed to sneak in, but from my narrow perspective, Your

17   Honor, you'll understand that --

18          THE COURT:  I understand what you were fighting about.

19          MR. MAGUIRE:  And that four billion dollar number that

20   I believe is reflected in the Court's opinion, of course,

21   includes the one and a half billion of government securities.

22   We did not come into this Court asking for two and a half

23   billion dollars in margin, and Barclays did not defend against

24   two and a half billion dollars of margin.  We fought the fight

25   over the four billion, and the four billion includes every

Page 46

1    dollar of those long-term government bonds, whether the

2    maturity is ninety days or ninety years.  They're all in the

3    four billion that we fought about before you.

4            Mr. Boies suggested that Your Honor's opinion does not

5    lay out a basis to award the margin or to find that those long-

6    term government bonds belong to the estate and to the trustee,

7    and I respectfully disagree with Mr. Boies on that score.

8    There are multiple bases in the Court's opinion.  Very

9    specifically, the Court pointed to exclusion N in the Court's

10   opinion -- in the agreement, the parties' agreement, the asset

11   purchase agreement.  And Barclays entirely ignored that when

12   they filed their main brief, here, and they obviously saw our

13   brief, and they did respond on reply.  And our slide 4 sets

14   forth where Barclays acknowledged on reply in their brief at

15   paragraph 74 the fact that this had been raised and had been

16   addressed.  In the first sentence of that paragraph, Barclays

17   states, "The trustee also points to footnote 35 of the Court's

18   opinion in which the Court appears to have adopted the

19   trustee's argument that subsection N of the definition of

20   excluded assets included any assets primarily related to

21   exchange-traded derivatives."  It goes on, then, where Barclays

22   respectfully reiterates its assertion.

23           Now, that, frankly, sounds to us an awful lot like

24   reconsideration and reargument.  And in the course of the

25   proceeding that we're here today in terms of the form of the

1    order that should be entered giving effect, it seems that that

2    is not properly posed.  And even if this were properly a motion

3    for reconsideration or for reargument, we respectfully submit

4    that there is absolutely no basis for any such motion because

5    there is no controlling factor, controlling law that Barclays

6    points to that was overlooked by the Court.  On the contrary,

7    exclusion N which excludes all assets primarily related to

8    derivative positions, no matter what their maturity is, that

9    was squarely addressed at the trial and that is squarely

10   addressed in the Court's opinion, as, of course, is exclusion B

11   for cash, cash equivalents, and our quibble over what is a cash

12   equivalent I don't believe matters here when you consider all

13   the other items and exclusions that we have.  But I would point

14   out that in addition to excluding cash and cash equivalents,

15   the sentence goes on to cover similar cash items.

16         So we have exclusion N clearly covers all assets, all

17   the margin assets.  We have exclusion B that covers cash, cash

18   equivalents, and similar cash items.  And then of course,

19   that's without even getting to the specific exclusion for

20   government securities which is not only before the Court, in

21   the parties' agreement, and specifically addressed in the

22   Court's opinion.

23         So respectfully, we disagree with Mr. Boies and

24   believe the Court's opinion does, indeed, lay out a basis for

25   the trustee to be entitled and to recover the one and a half

Page 48

1    billion dollars of long-dated government bonds.

2            Mr. Boies suggested that there's an exception to the

3    exclusion for government securities in 1(b) because it says

4    "except to the extent otherwise provided".  But he stopped

5    there and he didn't say where it might otherwise be provided.

6    But I have a suspicion that he might be thinking about Mr.

7    Rosen's famous parenthetical, which, of course, has been

8    litigated, was the subject of the trial, is clearly the subject

9    of the Court's opinion, which the Court interpreted that to

10   mean customer property and could not possibly be a basis for

11   Barclays to carve out any Lehman proprietary government

12   securities.

13           That's all I have, Your Honor, unless you have any

14   questions.

15           THE COURT:  Anything more, Mr. Boies, on this point?

16           MR. BOIES:  No, Your Honor, not on those points.  I

17   have one more point that's -- it's a much smaller point.  I

18   have one more point.

19           THE COURT:  Does it relate to the subject of margin?

20           MR. BOIES:  Yes.

21           THE COURT:  Okay, I'd like to hear it then.

22           MR. BOIES:  And this has to do with what are called

23   clearing funds, and this is an issue that does relate to

24   millions and not billions, but it relates to a substantial

25   number of millions, 171 million dollars, at least.

1          First -- and these are tabs 13 through 18 -- clearing

2     funds are deposits that clearing corporations require their

3     clearing members to deposit to secure the obligations of the

4     clearing members.  Now, these are -- this is not margin in the

5     sense that we've been talking about up until now.  And if you

6     look at tab 14, the clearing funds are a long-term requirement.

7     They do not fluctuate on a daily basis in the way that margin

8     requirements do.

9          Second, they are used to secure obligations relating

10    to both customer and proprietary trading without distinguishing

11    between the two so that when they put clearing funds, it's not

12    limited to proprietary, it's not limited to customer.  It

13    permits both to go forward.

14         Third, the clearing funds from LBI were pooled with

15    those from other clearing brokers, and the clearing corporation

16    had the ability to draw from that pool when any clearing member

17    defaulted.  That is, this is money that is put up by LBI, it's

18    given to a clearing corporation like OCC -- let me take OCC as

19    the example because LBI had 171 million dollars of deposited

20    clearing funds at OCC.  Those clearing funds were available for

21    OCC to use for customer accounts, proprietary accounts, or for

22    defaults from companies other than LBI.

23         Now, the Court did not mention clearing funds in its

24    opinion, but in the margin numbers that we're talking about,

25    these clearing funds are included.  That is, the margin that

1    they are seeking to recover includes these clearing funds.  And

2    if you go to chart 17, what the Court held at page 89 of the

3    Court's opinion was that "various regulations and rules require

4    customers to deposit collateral with a broker-dealer, or in the

5    case of futures, their futures commission merchant to support

6    trading of futures and options contracts.  This collateral

7    which is deposited by customers with a broker-dealer or future

8    commission merchant and held for the benefit of customers

9    constitutes the property that may be held to secure obligations

10   under exchange-traded derivatives."

11          Now, these funds that are deposited are deposited to

12   help secure the obligations under the exchange derivative

13   contracts of both proprietary and customer.  And because of

14   that nature, we think that those do not fall within the margin

15   the way the Court was defining it in the Court's opinion.

16          The only thing, it occurs to me that I should be clear

17   about -- with the Court, I think I said this before, but I want

18   to be sure I did.  The idea that -- the argument that we're

19   making with respect to margin, either with respect to cash and

20   cash equivalents or with respect to the -- what constitutes

21   margin or what our obligations were in the absence of the TAA

22   is not a new argument.  This was in our post-findings of fact,

23   conclusions of law that we submitted to Court before -- long

24   before these briefings issues.  I think I made that clear, but

25   I want to -- I didn't want the Court to be under any

1    misapprehension because counsel sort of implied that again in

2    what he just said.  Where we have said that we have been

3    entitled to all of the margin and all of the liabilities and

4    all of the short positions related to where we were saying that

5    was our position.  And that has been our position from the

6    beginning.

7            Our position now is no different.  We think we are

8    entitled to that, but the Court held otherwise.  So what we're

9    saying is that with respect to that Court holding, if you're

10   going to hold otherwise and you're going to hold that we're not

11   entitled to the margin, then we ought to at least be able to

12   keep the margin that offsets the liabilities that existed at

13   the OCC which we didn't have to take.  We didn't have to sign

14   that TAA.  We could have just let the OCC close out their

15   accounts, which is what the OCC was going to do.

16           THE COURT:  Mr. Boies, this last point you're making

17   hearkens back to an earlier point you made.  I take it it's

18   different from the clearing funds argument --

19           MR. BOIES:  Yes.

20           THE COURT:  -- that you had just made?

21           MR. BOIES:  Yes, Your Honor, you're right, Your Honor.

22   And I just -- it was different.  And it just occurred to me

23   that I wanted to be really sure that I'd been clear with the

24   Court about that point.  I think I mentioned that point before,

25   but I wanted to be really clear that the distinction between

1    saying we're entitled to all of the margin, all of the long and

2    all of the shorts, which was our original position continues to

3    be our position.  And what we're doing now, is accepting that

4    the Court's ruled against us on that, and saying, if we're not

5    entitled to all of this, we should be at least entitled to the

6    margin that is required to offset at least the OCC

7    liabilities -- forget everything else -- at least the OCC

8    liabilities that we signed an agreement that was designed, as

9    everybody knew and said at the time and told Your Honor at

10   trial, was designed to prevent and was necessary to prevent the

11   OCC from simply closing out all those accounts.

12            THE COURT:  Okay.

13            MR. BOIES:  Thank you, Your Honor.

14            THE COURT:  I think I should give Mr. Maguire an

15   opportunity to comment about this clearing funds argument,

16   which frankly is a new argument to me.

17            MR. MAGUIRE:  Yes, it is new, Your Honor.  We would

18   agree with that; it's new to us as well.  We do agree with Mr.

19   Boies that it is -- this entire amount in the clearing funds is

20   included in the two billion of margin that we've been talking

21   about, and we do agree that these clearing funds were funds

22   that were kept to secure exchange-traded derivatives positions,

23   both firm-proprietary and customer.  But all of this clearing

24   funds is Lehman proprietary government securities.  It's all

25   Lehman property and it was all as the exchanges for the purpose

1    of securing as margin for the Lehman and the customer

2    securities.  None of it is customer property.

3            THE COURT:  So is it the trustee's position that there

4    is no appropriate distinction to be made with respect to the

5    term "clearing funds" and that clearing funds are properly

6    included in the general category of margin and that all of

7    these funds should be turned over to the trustee?

8            MR. MAGUIRE:  That is exactly our position, Your

9    Honor.  It falls squarely within the margin assets that are the

10   subject of exclusion and squarely within the cash, cash

11   equivalents, similar cash items of exclusion B and squarely

12   within the clarifications letter, exclusion of government

13   securities.

14           THE COURT:  Okay.  I think I've probably heard a

15   sufficient amount of argument on the substantive margin and I'm

16   inclined to take a ten-minute break before going into the next

17   phase of our arguments so that we can all stretch our legs and

18   refresh ourselves a little bit.  So let's take a ten-minute

19   break, and I'll see you at twenty-five of the hour.

20       (Recess from 3:27 p.m. until 3:43 p.m.)

21           THE COURT:  Let's move on to the next matter in

22   dispute.

23           MR. MAGUIRE:  If it pleases the Court, Bill Maguire

24   for the trustee.

25           Your Honor, our next issue is the question of the

1    trustee's claim for pre-judgment interest on the amounts due to

2    the trustee under the Court's ruling.  Now, we believe,

3    respectfully, that that's well within the Court's power to

4    award the trustee interest and to award the trustee interest at

5    the New York statutory rate of nine percent on the margin

6    assets.  We believe that is well within the discretion of the

7    Court under Count II and Count III of our claims because they

8    are claims for declaratory relief that arise under state law.

9         We also have a claim for conversion.  And the reason I

10   raise this is because we submit that for a claim of conversion

11   under New York State law, the awarding of interest at the

12   statutory rate is mandatory.  Now, the conversion claim was one

13   of those claims in our adversary proceeding that was deferred

14   and was not one of the claims that was live in the course of

15   the thirty-four day trial.  However, the Court's ruling in

16   February, we submit, deals with the issue of the rights to the

17   margin and, we believe, substantively disposes of the merits of

18   that claim.  And we don't think it's necessary for us to do a

19   redo just for the purpose of establishing our right to

20   interest.

21        Barclays makes an argument that in conversion, the

22   right to pre-judgment interest at the New York rate only arises

23   when -- from the time that a demand has been made, so they seek

24   to cut off the interest, about a year's worth of the interest.

25   In fact, we disagree with Barclays' statement of the law

Page 55

```
1    because the entire demand requirement is excused in certain

2    circumstances where the person in possession of the property

3    already knows that their possession is unlawful.  The whole

4    purpose of the demand requirement is to put the innocent

5    possessor on notice that there's a problem with their

6    possession and then to give them a chance to cure it by giving

7    up possession.

8              Now, here, we respectfully submit Barclays was on

9    notice from the very beginning that it was not supposed to be

10   getting any of Lehman's cash.  It heard that at the sale

11   hearing, it was part of the asset purchase agreement, that's

12   the whole issue that we've heard throughout these proceedings

13   is that affirmative representations were made to this Court at

14   the sale hearing in which Barclays participated, that there was

15   no Lehman cash going to Barclays.  And on this specific issue,

16   there's no nuance, there's no room, really, for any question of

17   definition about the word "cash".  Here, we're talking now, the

18   sums that Barclays is supposed to be paying us on our pre-

19   judgment interest is large part cash.  At tab 5 of our binder,

20   we show you there, Your Honor, that the parties stipulated that

21   the cash we're talking about, the 1.3 billion dollars in cash

22   assets that Barclays got immediately on the closing of this

23   deal was all cash.  It was not government securities.  The

24   trustee has the government securities; what Barclays got was

25   the very cash that the Court was told Barclays was not supposed
```

1    to be getting.  And you may recall, in the course of the trial,

2    there were a number of e-mail exchanges back and forth in which

3    Barclays' counsel corresponded directly with the Option

4    Clearing Corporation to determine and confirm that indeed, this

5    was cash.

6           THE COURT:  Mr. Maguire, is your request for pre-

7    judgment interest at the nine percent rate limited to the 1.3

8    billion dollars in cash assets or is it a request that extends

9    to the approximately 2.1 billion dollars in margin?

10          MR. MAGUIRE:  It's everything, Your Honor.  1.3 is

11   part of it because that's pure cash, and if you turn to the

12   next tab, Your Honor, you'll see that the second piece of our

13   claim that gets us to the balance of the 2-whatever billion

14   dollars is money market funds.  This was money that --

15   proprietary Lehman money that it maintained in an account.  It

16   was referred to sometimes as the buffer or the excess in the

17   account that was supporting customer derivatives trading.  And

18   that was in the form of money market funds.  And I don't

19   believe there's ever been any question from Barclays -- before,

20   during, after, even in the course of our mutual briefing these

21   issues before the Court, there's never been any suggestion that

22   money market funds are anything other than cash or cash

23   equivalents.  So the some-several hundred million dollars in

24   money market funds which, when aggregated with the 1.3 billion,

25   comes to the totality of the 2-whatever billion dollars that is

1    the entirety of the margin assets that Barclays has that is due

2    to the trustee.  And I think the only piece, maybe, that is not

3    pure cash in all of that would be the clearing funds.  So to

4    the extent that Barclays has any of those in the form of

5    security, then I guess they would be government securities.

6         THE COURT:  Is it -- just to say what I guess is

7    obvious from what you've said, as to the 2.1 -- more or less --

8    billion dollars that the parties stipulate represents the

9    calculation of margin to be turned over by Barclays to the

10   trustee, that entire amount, except, perhaps, for the clearing

11   funds that you just referenced, constitutes cash or cash

12   equivalents in an amount that the trustee would assert Barclays

13   knew it didn't have a right to hold from at least the date of

14   the sale hearing, as a result of which you assert that you

15   should be entitled to nine percent pre-judgment interest

16   running from September 22, 2008, is that correct?

17        MR. MAGUIRE:  That is exactly correct, and the only

18   thing that I'm slightly uncertain about, Your Honor, is exactly

19   where the clearing funds fit into the picture.  I just,

20   offhand, don't remember exactly if that's in the possession of

21   Barclays and part of the two billion are not.  I believe it is,

22   but I need to confirm that for you.

23        THE COURT:  Okay.  Now, I understand the amount, I

24   understand the reason for the reference date for calculation.

25   What's the reason for the rate to be calculated at nine

1      percent, as opposed to the federal judgment rate?

2              MR. MAGUIRE:  The reason, Your Honor, is simply that

3      New York law requires that, that this is something that arises

4      out of a state claim and under New York law applying our

5      conversion claim.

6              THE COURT:  Even though the 90(b) (sic) trial did not

7      definitionally directly relate to that claim --

8              MR. MAGUIRE:  That's --

9              THE COURT:  -- it indirectly related to that claim.

10             MR. MAGUIRE:  That's absolutely right.  We deferred --

11     we agreed to defer for later cleanup the conversion claim on

12     the understanding -- educated understanding at the time that it

13     likely would be resolved, in substance, by the Court's ruling.

14     And in fact, we submit that it has been resolved, that there's

15     really nothing left to fight about on a conversion claim, given

16     the Court's ruling on the margin assets, so the only thing

17     that's left is the question of pre-judgment interest.  But

18     where a party comes into court on a state claim of conversion

19     and prevails, then the party is entitled, as a mandatory

20     matter, to the nine percent.

21             THE COURT:  Okay.  Mr. Boies?

22             MR. BOIES:  Thank you, Your Honor.  Our tabs 34

23     through 39 address this issue.  I mean, essentially, the

24     background is that two days before the April 28th briefs were

25     filed, the trustee informed Barclays for the very first time

Page 59

1    that the trustee was claiming pre-judgment interest at a rate

2    of nine percent on any margin assets Barclays was ordered to

3    return.

4            The trustee agrees that this relates to a state law

5    issue.  We think that even under New York State law they would

6    not be entitled to pre-judgment interest, but we think

7    certainly under federal law in the bankruptcy court they're not

8    entitled to this interest and they're not entitled to interest

9    at nine percent if they're entitled to any interest at all.

10   They say that they have a conversion claim and they agree that

11   the conversion claim was not litigated, but they assert that

12   that was just a formality because the underlying issues for the

13   conversion claim were litigated.

14           That simply is not so, Your Honor.  I remind the Court

15   that this amount of money was transferred by them to Barclays.

16   Barclays didn't go take it.  Barclays didn't embezzle it.

17   Barclays didn't steal it.  Barclays did not get it in any

18   improper way.  None of the requirements for a conversion under

19   state law are made out.  The Lehman personnel responsible for

20   this paid it over.  And the reason that they paid it over, Your

21   Honor, was because they had signed documents that said they

22   owed us the cash.  They had sent e-mails saying they owed us

23   the cash.  The OCC had sent them e-mails saying if you don't

24   say anything we're going to assume that this cash belongs to

25   Barclays and we're going to send it to them.  And they sent

1    back e-mails that said okay.

2         This was a situation in which everybody worked on the

3    assumption -- and I'm not rearguing the merits because I know

4    what the Court has held, I'm simply saying that if you're

5    talking about state of mind and whether Barclays took this

6    improperly you've got to keep in mind that at the time it was

7    done everybody thought that Barclays was entitled to this.

8    That's what Weil Gotshal thought.  That's what Lehman thought.

9    That's what LBHI thought.  All of these people knew what was

10   going on.  All of these people authorized it.  So for them to

11   come in and say that somehow Barclays converted illegally these

12   funds because the Court has held that there was not a meeting

13   of the minds on the clarification letter and all of the

14   alternative grounds that the Court has, the fact is that

15   whether or not we are as a matter of contract entitled to it or

16   not, I don't think you can argue that there is any basis for

17   finding that Barclays somehow converted these funds.

18        Mr. Kobak, the 30(b)(6) witness, testifies that it was

19   his understanding at the time that we got the funds for the OCC

20   that were necessary to balance the liabilities -- the net

21   liabilities that we were taking on and it was not just the

22   thought that it was just cash.  He didn't limit it to cash.  He

23   didn't limit it to noncash.  He didn't limit it to customer

24   accounts.  He didn't limit it to proprietary accounts.  The

25   Court's seen that testimony.  That was the trustee's testimony

Page 61

1   at the time.

2        Now, it may be that they were all wrong, and that

3   issue goes to the issues that we argued about before at the

4   trial and that to some extent we argued about in the earlier

5   phase of this hearing.  But when you come to pre-judgment

6   interest I don't think there can be any argument that this was

7   all something that people voluntarily transferred at the time

8   because that was their interpretation at the time, right or

9   wrong, but that was their interpretation at the time as to what

10  was required.

11       Thank you, Your Honor.

12       THE COURT:  Okay.

13       MR. MAGUIRE:  Your Honor, first as to the point that

14  we did not fully and clearly set forth that we were seeking

15  interest, I would just point out that our adversary complaint

16  count XII is a claim for conversion and it states -- provides

17  in paragraph 147, "The trustee is entitled to judgment in an

18  amount not less than 2.9 billion dollars together with

19  interest, cost and such other and different relief as the Court

20  may find just and proper."  So I do believe the claim for

21  interest was set forth.  I don't believe it's necessary that a

22  claim for interest be set forth, but that's neither here nor

23  there; it was set forth.

24       And also, the parties, in deferring that claim,

25  entered into a stipulation and order before the Court that was

1    dated January 13 of 2010.  And in paragraph 4 of that

2    stipulation and order it is provided that "the stay of claims

3    referenced in paragraph 3 above" -- that includes the

4    conversion claim -- "is without prejudice to any party's

5    ability to seek resolution of those claims through motions

6    informed by or based on the Court's prior resolution of the

7    Rule 60(b) motions."  So I believe the claim for interest was

8    made, it was preserved and is entirely proper.

9           I think I am in a position to clear up a little bit of

10   the question of the clearing funds composition here.  My

11   understanding is that with the exception of nineteen million

12   dollars we actually have all of the clearing funds.  So there's

13   no pre-judgment interest claim with respect to the clearing

14   funds.

15          THE COURT:  Okay.  You haven't responded yet to Mr.

16   Boies' contention that you really never put on a case for, nor

17   could you have put on a case for conversion under New York law

18   because the funds were simply turned over to Barclays at the

19   closing.

20          MR. MAGUIRE:  Yeah, Barclays took over the accounts in

21   which the cash existed; there's no question about that.  This

22   was not a case of somebody coming in and stealing the cash off

23   a suitcase and running out the door.  This was done through a

24   commercial transaction in which the OCC accounts were

25   transferred.

1          At the time, of course, the trustee and the trustee's

2     counsel, as you've heard, had been informed at the sale hearing

3     that there was no Lehman proprietary cash.  There was no cash.

4     And there was no cash specifically going to Barclays.  Barclays

5     knew better.  Barclays' counsel was the person who was directly

6     communicating with the OCC over the Friday and the weekend and

7     who specifically clarified that indeed there was cash.

8     Everybody was wrong; there actually was cash, and specifically

9     that it was proprietary cash.

10          And of course, Barclays got that cash.  And Barclays

11     got that cash having fully participated in the sale hearing in

12     which the representations were made to the Court that Barclays

13     was not getting any cash.  So in those circumstances to say

14     that the innocent party should have to find out exactly what is

15     happening and is not entitled to rely on the representations

16     that were made at the sale hearing but must undertake an

17     investigation and go ask the OCC for statements that are now

18     going to Barclays, as the account holder, to figure out that my

19     goodness, there actually is cash here and then send a demand to

20     Barclays saying we want the cash back, we think that's exactly

21     the kind of circumstance where demand is excused because the

22     party who is exercising unlawful possession is the party with

23     superior knowledge.  It's the one party who has a derivative

24     expert, a lawyer on the scene at the time who is directly

25     communicating with the transferring party, the OCC, and who

 1   knows right from the beginning, long before any demand has been

 2   made, long before the trustee is in a position to even consider

 3   making a demand, that there's billions of dollars of cash being

 4   moved despite the representations that were made to the Court.

 5           THE COURT:  Okay.  Okay, meaning I've heard the

 6   argument.

 7           Do you have anything more on this, Mr. Boies?

 8           MR. BOIES:  No, Your Honor, I don't think so.  I think

 9   the Court has in mind the record evidence on this.  I think

10   that what counsel says just doesn't reflect the many, many

11   things that are in the record, testimony and documents in which

12   people knew what was happening, knew cash was being

13   transferred.  Mr. Kobak's testimony, after the closing the

14   trustee transferred additional cash.  So I just don't think it

15   reflects what's in the record.

16           THE COURT:  Okay.  I've heard enough on this and I'm

17   going to give it some thought.  My immediate reaction, though,

18   is that I don't feel as if I presided over a trial for

19   conversion.  I feel as if I presided over a trial that related

20   to the asset purchase agreement, the clarification agreement

21   and other ancillary agreements.  And that's, in part, because

22   the very count that we're talking about, the conversion count,

23   was reserved for the future.  But let me give it some thought.

24   I'm going to reserve on this one.

25           What's the next point that we need to discuss?

1          MR. MAGUIRE:  If it please the Court, Bill Maguire for

2     the SIPA Trustee.

3          One additional point that we raised, Your Honor, is

4     that we believe on page 9 of the Court's opinion there is a

5     statement, we respectfully submit, and a statement that is

6     inadvertently inconsistent with the thrust of the Court's

7     opinion, and that is a statement, unimportant in and of itself,

8     that ascribes to the Friday asset scramble all three of the

9     disputed assets, including specifically the margin.

10          THE COURT:  Let me stop you on this because I have

11     paid some special attention to this point that is in dispute

12     between the parties and I've actually reviewed some of the

13     underlying materials as well as my own thinking as I was

14     drafting the opinion.  And it wasn't inadvertent.

15          We believed -- and that's my clerks and myself -- as

16     we were addressing the issues that were before the Court, that

17     regardless of whatever was in a stipulated fact, that the

18     evidence is consistent with there being attention paid on

19     Friday, September 19 to the three classes of disputed assets,

20     including margin.  It doesn't matter whether there was or was

21     not any understanding reached on Friday morning to include

22     margin.  Without question, I think, Paolo Tonucci's testimony

23     is consistent with some attention having been paid to that

24     category of asset.

25          For that reason I viewed it as part of the asset

Page 66

1   scramble.  It may not have resulted in an agreement to include

2   it, but it was clearly an asset that the parties paid attention

3   to after the APA had been drafted, and it became part of the

4   subject matter of the clarification letter.  I think there's no

5   dispute as to that.  So I don't consider the reference

6   inadvertent.

7            MR. MAGUIRE:  Well, I would accept all of that, Your

8   Honor.  The only reason we had any concern about this is

9   because we raised it with Barclays and we were concerned that

10  there not be an issue for any reviewing court where a reviewing

11  court was being told that there was a factual finding not as to

12  this being a matter that was looked at in the asset scramble or

13  as to which attention was being paid but that there was

14  actually an agreement, that there was actually an understanding

15  and that margin was indeed added on the Friday.  And in that

16  case, if that kind of argument were to be made before a

17  reviewing court, if that characterization got lost or put on

18  the Court's statement then we had the concern -- certainly I

19  had the concern that a reviewing court might be put in a

20  position of saying here's a factual finding that is at odds

21  with the Court's ruling that the margin assets were excluded.

22  But as Your Honor has described it we have no issue with the

23  Court's statement --

24            THE COURT:  --

25            MR. MAGUIRE:  -- on page 9 of its opinion.

1          One remaining issue, I believe, Your Honor, concerns

2     the form of order on Rule 15c3-3.  And I don't believe, despite

3     what you may have heard the last time, there really is any

4     substantive dispute between the parties on this.

5          We did litigate and fought hard about the issue of

6     whether Barclays had an unconditional right to the 769 million.

7     That is resolved by the Court's ruling.

8          We did not litigate whether Barclays has a conditional

9     right to the 769 million once the trustee is in a position to

10    pay all customers their property.  We have never disputed that.

11    We have always agreed that we will pay Barclays the 769 million

12    when and to the extent we are able to, after taking account

13    what we need for customer property.  So there's no dispute

14    there.

15          The reason why this is still a live issue is two

16    things in Barclays' form of order.  One, Barclays wants us to

17    regularly do a 15c3-3 computation every week.  That of course

18    is a completely pointless exercise and Barclays has no

19    contractual or other right to make us do that kind of thing.

20    We do report regularly to the Court, and if we're in a position

21    to be able to restore customers their property then it is very

22    likely we will be before Your Honor in connection with that.

23    So Barclays has whatever information it needs to apprise itself

24    of the ongoing status of the estate without any need for such

25    reporting which it has no right to and which is entirely

Page 68

1      wasteful and unnecessary.

2              And secondly, we don't believe it's appropriate for

3      the trustee to be ordered to do something which the trustee has

4      agreed to do.  We're perfectly happy to confirm again in

5      writing to Barclays that we're willing to do that.  We already

6      have.  It's clear from Your Honor's order that we have to do

7      it.  So there's no dispute.

8              We're happy to put it in the order in a whereas clause

9      so that it's absolutely clear for all to see that that's what's

10     going to happen.  The only objection is to putting it in a

11     decretal paragraph in which there is something that we have to

12     do in the future.

13             And the concern -- the reason I raise that concern is

14     simply I do not want to have to address any issue by any

15     reviewing court as to whether there is subject matter

16     jurisdiction, depending on whether this is a ministerial act or

17     is not a ministerial act and whether putting this in the

18     decretal section of the Court's final order destroys finality.

19     It seems to me Barclays is fully protected.  There is no -- we

20     have not said -- we are not in breach and we have not said we

21     will breach.  There is no anticipatory breach.  On the

22     contrary, we have said we will fully honor that commitment.

23     And as I say, we're happy to reaffirm it in a written

24     agreement.  We're happy to stipulate.  We're happy to have it

25     go in a whereas clause.  We just don't think this should be

Page 69

1    anything that's in a decretal section of the Court's order and

2    not something that the parties should have to deal with in

3    terms of raising a finality issue that's entirely unnecessary.

4              THE COURT:  Mr. Boies, do you have any reaction to

5    that?

6              MR. BOIES:  Your Honor, I mean, we argued we're

7    entitled to the 769.  They argued we weren't entitled to the

8    769.  What the Court held is that we were conditionally

9    entitled to the 769, that we were entitled as much of the 769

10   as could be paid when and if the trustee determined that there

11   were sufficient assets to repay all LBI customers.  All that

12   we're asking is that that be put into the order.  That doesn't

13   destroy any subject matter jurisdiction.  That simply reflects

14   what the Court has found.

15             THE COURT:  Well, you were looking, if I remember

16   correctly, for active reporting.

17             MR. BOIES:  Yes, Your Honor, and --

18             THE COURT:  Is that still part of your proposed order?

19             MR. BOIES:  Your Honor, I'll withdraw the active

20   reporting.  As long as the trustee will say, as he did to the

21   Court, that he's going to report on this periodically to the

22   Court, it doesn't have to be weekly.  And if he gives us a copy

23   of it when he reports to the Court that's fine.  We're not

24   interested in making him do additional work.

25             THE COURT:  Does that work for you, Mr. Maguire?

1          MR. MAGUIRE:  What I was referring to, Your Honor, are

2     our regular reports that we make on the state of the estate to

3     the Court as well as applications that we make from time to

4     time whenever we're in a position to bring something before you

5     concerning customer property.  So that I would understand would

6     be entirely satisfactory.

7          MR. BOIES:  Yes, I --

8          MR. MAGUIRE:  Certainly we will continue to do that,

9     and within a nanosecond of us filing any such report I have no

10    doubt my colleagues will have it but we will make sure that

11    they have it.

12         MR. BOIES:  Okay.  And I accept that.  I am confident

13    he will -- as he says, when they reach that point they'll tell

14    the Court and if they tell us that'll be fine.

15         THE COURT:  All right.  That seems like an agreement.

16         And to the extent that it's useful to note this, I

17    don't believe that including within the order -- anywhere

18    within the order the notion that the rights under 15c3-3 are

19    conditional and will be dependent upon future events not yet

20    foreseeable has any impact upon the finality of the

21    determination.  I believe it is a final determination fully

22    consistent with that section of the opinion that dealt with

23    that subject matter.

24         MR. BOIES:  And we agree with that, Your Honor.

25         THE COURT:  In that case, the finality question should

1   be resolved for any review in court.

2          Now, is there more?

3          MR. BOIES:  I don't think so, Your Honor, but can I

4   have just a moment to consult?

5          THE COURT:  Sure.

6          MR. BOIES:  Your Honor, we are in agreement.

7          THE COURT:  Good.  I think what I'm going to propose

8   is that I want to give some further thought to the two

9   principal subjects that have been argued this afternoon and

10  spend a little bit more time reviewing the demonstrative

11  materials that have been proposed.  It seems to me that it

12  shouldn't take very long for me to resolve this and I have

13  fairly clear and I think transparent observations that I've

14  made as to how I see these things and some of the concerns I

15  have.

16         I particularly want to focus some attention on the

17  pre-judgment interest question, which I'll be candid to

18  observe, is one that before the hearing I was prepared to rule

19  on in connection with the settlement at 1.1 billion dollars of

20  the clearance box asset question.  And it's one of the reasons

21  that I raised with counsel in the context of that presentation

22  early in the hearing the question of whether the use of nine

23  percent for purposes of deriving the 1.1 billion dollar number

24  might be construed as a balanced agreement in which nine

25  percent would be applicable on both sides.  I quickly learned

1    that that was not true.  But I think it's also true that if I

2    had been asked to rule on the question of the entitlement of

3    Barclays to obtain nine percent interest with respect to the

4    calculation of what was due and owing in connection with the

5    clearance box that I doubt that I would have found that nine

6    percent was a fair and appropriate interest rate.  But that's

7    simply my now expressed subjective intent.  I'm simply letting

8    you know that you made an appropriate agreement and I'm pleased

9    not to have to deal with it further.

10           But I want to give some further thought to what to do

11    with the rate as to the trustee's claim.  My suggestion is that

12    we not set a date yet for a follow-up conference or hearing

13    until I have concluded my deliberations, which shouldn't take

14    terribly long, and we will advise counsel and attempt to

15    schedule an appropriate date for a follow-up.  Does that work

16    for everybody?

17           MR. BOIES:  Yes, Your Honor.

18           THE COURT:  Okay.  I'll see you next time then.

19           Oh, I forgot your letter.

20           MR. GAFFEY:  My letter, Your Honor.

21           THE COURT:  Your letter.

22           MR. GAFFEY:  Hence I rise.

23           THE COURT:  And you're standing up and your red tie

24    helped to remind me of the letter that you sent me a week or

25    two ago.

1          MR. GAFFEY:  I knew the red tie was a good idea, Your

2     Honor.

3          THE COURT:  It was a good idea.

4          MR. GAFFEY:  Robert Gaffey for the debtor, Your Honor.

5     We wrote to the Court on the 29th of April asking that in

6     accordance with this Court's rules that this conference also be

7     treated as a pre-motion conference with respect to a summary

8     judgment motion that the debtor would like to make.

9          Your Honor will recall we had four claims extant as a

10    result of the stipulation that Mr. Maguire talked about a few

11    moments ago, and under paragraph 4 of that stipulation those

12    claims could be resolved as informed by the 60(b) proceedings.

13         With respect to three of them I have a stipulation

14    proposed to Barclays.  That's with respect to the debtors'

15    claims for unjust enrichment conversion and aiding and abetting

16    breach of fiduciary duty where we would agree to have those

17    claims dismissed.  We're not quite done; there's one language

18    issue which I think I just took care of before, but we ought to

19    shortly have a stipulation on that.

20         That leaves our claim for breach of contract, as it

21    relates solely to Barclays' obligation under the asset purchase

22    agreement with regard to the bonus aspect of the consideration

23    it was required to pay.  Put quite briefly, and as we said in

24    our letter, I think there's a basis for us to move based on

25    factual findings that the Court made and discussed in the

LEHMAN BROTHERS HOLDINGS INC.

Page 74

1    February opinion.  We think that they can be put forward as

2    undisputed or undisputable facts based on the doctrine of

3    collateral estoppel, and I think the motion would be soundly

4    based.  We'd like to proceed with it on a schedule to be set or

5    agreed.

6            THE COURT:  Okay.  This is a pre-motion conference.

7    Is there any objection to giving LBHI the opportunity to file

8    its motion for a summary judgment?

9            MR. BOIES:  Your Honor, I don't think so.  I think

10   they've got a right to file it.  We think that is not well

11   taken but the fact that we think it's not well taken I don't

12   think can deprive them of the right to file it.

13           THE COURT:  Well, this is just the gate keeping

14   function that we occasionally get a chance to exercise as to

15   whether or not a motion is ripe for filing and briefing, and it

16   seems to me there's no dispute that it is ripe.  It's clearly

17   going to be disputed, based upon Mr. Boies' general

18   observations, and we'll see what happens next.

19           MR. GAFFEY:  And we can work out a briefing schedule

20   once we've gone ahead.

21           THE COURT:  I think that's a good idea.

22           MR. GAFFEY:  Thank you, Your Honor.

23           THE COURT:  And my only suggestion is that before

24   everybody leave I'm going to adjourn the hearing and I'm going

25   to go off and talk to my courtroom deputy and see if I can

LEHMAN BROTHERS HOLDINGS INC.

Page 75

1   identify some possible dates for a follow-up just so you can

2   know what those dates are in advance.  I'm not saying that

3   we're going to have a hearing but I'd like to maybe clear

4   everybody's calendar.  I know that everybody's quite busy.  So

5   one of my law clerks will come out and at least surface those

6   dates with you on an informal basis.

7           MR. BOIES:  Thank you, Your Honor.

8           THE COURT:  Okay.  We're adjourned.

9       (Whereupon these proceedings were concluded at 4:20 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 76

1

2                        C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    Dena Page
                        Digitally signed by Dena Page
                        DN: cn=Dena Page, o, ou,
8                       email=digital1@veritext.com,
                        c=US
                        Date: 2011.05.11 12:09:17 -04'00'

9    DENA PAGE

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  May 11, 2011

17

18

19

20

21

22

23

24

25