# EXHIBIT A

*United States Bankruptcy Court/Southern District of New York*
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

In Re:
Lehman Brothers Holdings Inc., et al.
Debtors.

Chapter 11
Case No. 08-13555 (JMP)
(Jointly Administered)

Name of Debtor Against Which Claim is Held: Lehman Brothers Holdings, Inc.
Case No. of Debtor: Case No. 08-13555 (JMP)

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP) 0000030596

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: [illegible]

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
Essex Equity Holdings USA, LLC
SEND NOTICES TO:
Michael S. Kim
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022

Telephone number: 212-488-1200 Email Address: Michael.Kim@kobrekim.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** ____________
(*If known*)

Filed on: ____________

Name and address where payment should be sent (if different from above)

Telephone number: Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $1,198,776,791.90 (estimated based on par value of illiquid securities, plus C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages)
(by filing this proof of claim, Essex Equity Holdings USA is not acknowledging that any insurance proceeds available to satisfy the claim are property of the estate that must be litigated or adjudicated through the estate)

☐

☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attached.
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** 4743
**3a. Debtor may have scheduled account as:** ____________
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe: ____________
Value of Property: $____________ Annual Interest Rate ____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$____________ Basis for perfection: ____________

**Amount of Secured Claim: $**____________ **Amount Unsecured: $**____________

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$____________

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**____________
(See instruction #6 on reverse side.)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.

**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**

If the documents are not available, please explain:

FOR COURT USE ONLY

FILED / RECEIVED
SEP 22 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 9/18/09

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Scott H. Schley, Managing Director

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## Itemized Statement of Interest for Essex Equity Holdings USA, LLC

The total amount of claim is calculated based on the par value of the illiquid securities, plus the C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages.

| | | |
|---|---|---|
| **Principal Amount of Claim** | = | 285,650,000.00 |
| **Interest (at 9%)** | = | 56,176,791.90 |
| **Treble Damages** | = | 856,950,000.00 |
| **TOTAL** | = | **1,198,776,791.90** |

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re                                              :
                                                   :
**LEHMAN BROTHERS HOLDINGS INC., ET AL.** :   Case No.  08-13555 (JMP)
                                                   :
Debtors.                    :
------------------------------------------------------x

### SUPPLEMENTAL DOCUMENTATION TO PROOF OF CLAIM

1.     Essex Equity Holdings USA, LLC, M. Brian Maher and Basil Maher (collectively known as "Essex") by and through their attorneys, Kobre & Kim LLP, submit the attached timely proof of claim.

2.     Essex filed the attached Second Amended Statement of Claim with the Financial Industry Regulatory Authority ("FINRA") on May 2, 2008 (the "Statement of Claim"), initiating an arbitration proceeding. (A redacted copy of the Statement of Claim is attached hereto as Exhibit A.)

3.     Essex's claims arise out of the "Client Agreement" (the "Agreement") entered into between Essex and Lehman Brothers, Inc. (A redacted copy of the Agreement is attached as Exhibit C to the attached Statement of Claim.)

4.     The Agreement provides, *inter alia*, for "final and binding" arbitration in connection with "[a]ny controversy ... arising out of or relating to any of [Essex's] accounts...[or] with respect to transactions of any kind" executed for Essex's account. *(Id.)*

5.     On September 15, 2008, a proceeding was commenced under Chapter 11 of the United States Bankruptcy Code with respect to Lehman Brothers Holding, Inc. ("LBHI"). Accordingly, all actions against LBHI were stayed.

### RELIEF REQUESTED

6.     Accordingly, Essex hereby reserves its rights to move the Court to lift the automatic stay to continue the FINRA arbitration in connection with the claims set forth in the attached Second Amended Statement of Claim so as to resolve any disputes regarding Debtor's liability, the amount of damages, the priority of this claim, or any and all other matter that the parties agreed were to be decided by arbitration.

Dated: September 22, 2009
      New York, New York

Respectfully submitted,

KOBRE & KIM LLP

Michael S. Kim
Michael.Kim@kobrekim.com
Robert W. Henoch
Robert.Henoch@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

*Attorneys for Essex Equity Holdings USA, LLC*

08-13555-mg   Doc 16728-1   Filed 05/11/11   Entered 05/11/11 15:50:23   Exhibit A.

Pg 6 of 58

# Exhibit A

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

———————————————————————x

ESSEX EQUITY HOLDINGS USA, LLC (f/k/a
MAHER TERMINALS HOLDINGS CORP.), M.
BRIAN MAHER and BASIL MAHER,

               Claimants,

               v.

LEHMAN BROTHERS INC., JEFFREY L.
CHERNICK, PETER M. GAMBEE, WILLIAM C.
GOURD, NEIL J. GREENSPAN, SANFORD A.
HABER, and MARK J. STEVENSON

               Respondents.

———————————————————————x

Case No. 08-00156

**SECOND AMENDED
STATEMENT OF CLAIM**

       Claimants Essex Equity Holdings USA, LLC ("Essex"), M. Brian Maher

and Basil Maher (the "Mahers"), by and through their attorneys, Kobre & Kim LLP, for

their statement of claim against Lehman Brothers Inc. ("Lehman"), Jeffrey L. Chernick

("Chernick"), Peter M. Gambee ("Gambee"), William C. Gourd ("Gourd"), Neil J.

Greenspan ("Greenspan"), Sanford A. Haber ("Haber"), and Mark J. Stevenson

("Stevenson"), submit as follows:

### Introduction

       1.     Lehman's fraud, negligence and mismanagement of the Maher family's

cash management account caused Claimants to lose the ability to access or invest

approximately US $286 million of the family's money.

       2.     In the Spring of 2007, Claimants sold their family business of 60 years and

began searching for cash managers to manage the proceeds of the sale on a short-term

basis. One of the prospective cash managers Claimants considered was Respondent Lehman.

3.      When Respondents proposed to Claimants their cash management brokerage services in June and early July 2007, Respondents told Claimants they would invest Claimants' money in safe, liquid, tax-exempt municipal or substantially similar securities. Indeed, before Claimants entered into a cash management agreement with Respondents, Respondents sent Claimants' representative a proposed sample investment portfolio filled entirely with such safe, straightforward, municipal securities. Claimants reasonably relied upon Respondents' statements that Respondents would purchase securities substantially similar to the securities listed in the sample portfolio that Respondents provided.

4.      Based on this proposed sample portfolio (as well as other statements and representations by Respondents described below), Claimants set up an account (the "Account" numbered ████) and entered into a cash management agreement (the "Cash Management Agreement") with Lehman. The Cash Management Agreement gave Lehman specific discretion to invest the funds in the Account consistent with a written investment policy (the "Investment Policy") that Claimants provided to Respondents. The Investment Policy outlines the investment objectives for the Account and offers a list of "eligible instruments" in which Respondents were authorized to invest.

5.      However, once Claimants actually funded the Account in mid-July 2007, Respondents—without any authorization—immediately began using the funds to purchase securities that were radically different from what they told Claimants they would purchase. In fact, Respondents purchased securities that were entirely unsuitable

and inappropriate given Claimants' Investment Policy and risk tolerance. The securities that Respondents purchased were risky, complex, highly-structured securities, virtually all of which fit into just three categories: securities issued by sellers of "credit default swap" agreements, securities issued by "contingent capital facilities" established for bond insurers, or securities issued by trusts established to fund "redundant reserves" for insurance companies

6.     The risky and complex nature of these securities is described in detail below. Further examination of them reveals that they were entirely unsuitable and inappropriate given Claimants' stated investment objectives, which were: first, to preserve the capital; second, to provide liquidity (i.e., to make sure Claimants would be able to *quickly and easily sell* the investments and *get their money back* whenever they wanted); and third, to capture a market rate of return consistent with the other parameters of Claimants' Investment Policy and with market conditions.

7.     Many, and potentially all, of these securities are private placement securities, which have not been registered with the Securities and Exchange Commission, and can be purchased and sold only through narrow exemptions to the Securities Act of 1933. The purchase of these securities was never contemplated or authorized by Claimants, since private placement securities are not included among the "eligible instruments" listed on the Investment Policy.

8.     Furthermore, Claimants were not even qualified to purchase many of these securities, since they do not meet the requirements for exemption provided by the Securities Act of 1933 and rules promulgated thereunder.

9.     In addition, upon information and belief, Lehman did not provide the private placement memoranda for any of the private placement securities purchased on Claimant's behalf until well after the securities were purchased and only after Claimants specifically requested the memoranda.  As a result, Claimants had no basis to object to the securities purchased on its behalf.

10.     Further, Lehman violated the issue concentration limits articulated in Claimants' Investment Policy, thereby undermining Claimants' need for diversification and liquidity.

11.     As explained in greater detail below, upon information and belief, Lehman used the Claimants' money entrusted to Lehman to purchase the securities in question to further its own financial interests, including to support the market for securities that were affiliated with Lehman in various ways.

12.     Within a matter of weeks, US $286 million of the securities that Respondents purchased—which were also in the form of "auction rate securities" (a type of security described below)—became illiquid, because the auctions associated with them began to fail.  Claimants became unable to sell these securities or otherwise get their money back and so lost the ability to access or invest US $286 million of their money.

13.     In leading Claimants to believe that they would invest their money in safe, liquid tax-exempt municipal or substantially similar securities but then instead using Claimants' money to purchase the risky, complex, highly-structured, securities described herein, Respondents are liable for having: (i) breached their contract with Claimants; (ii) breached their fiduciary duties owed to Claimants; (iii) invested Claimants' funds in numerous unsuitable securities; (iv) made unauthorized purchases on behalf of

Claimants; (v) made negligent misrepresentations and omissions to Claimants upon which Claimants relied; (vi) violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder; (vii) converted Claimants' possessory interest in the funds; (viii) negligently caused injury to Claimants; (ix) committed gross negligence; (x) failed to supervise their employees; (xi) violated Section 5 of the Securities Act of 1933; (xii) sold securities to Claimants without obtaining a required purchasers letter, thereby rendering the sales null and void and subject to rescission; (xiii) fraudulently induced Claimants to sign the Cash Management Agreement; and (xiv) made fraudulent misrepresentations and omissions to Claimants upon which Claimants relied.

### Parties

14.     Claimant Essex is a limited liability company co-owned by M. Brian Maher and Basil Maher.  Essex was formerly known as Maher Terminals Holdings Corporation.  Its assets – including the US $600 million which it placed in Respondents' short-term care – consist primarily of proceeds from the sale of the Maher family's business, which was completed in July 2007.

15.     Claimant M. Brian Maher, 61, has been employed in the marine terminal industry for more than thirty-five years.  He was the Chairman and Chief Executive Officer of Maher Terminals Holdings Corp. (and its operating subsidiaries) and is currently a Managing Director of Essex.

16.     Claimant Basil Maher, 56, is brother to M. Brian Maher and, likewise, is a veteran of the marine terminal industry.  He was the President and Chief Operating Officer of Maher Terminals Holdings Corp. (and its operating subsidiaries) and is currently a Managing Director of Essex.

17.    Respondent Lehman Brothers Inc. is a FINRA registered broker-dealer headquartered at 745 Seventh Avenue, New York, New York 10019.

18.    Respondent Jeffrey L. Chernick is a Portfolio Manager for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Chernick supervised and managed the allocation of the Account and served as a point of contact for Claimants at Lehman.

19.    Respondent Peter C. Gambee is a Managing Director for Private Investment Management at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Gambee supervised the management of the Account and served as a point of contact for Claimants at Lehman.

20.    Respondent William C. Gourd is a Managing Director for Private Investment Management at Lehman. He is a FINRA registered broker. Mr. Gourd served as Claimants' point of contact at Lehman. Upon information and belief, he collected the Claimants' investment objectives, prepared Lehman's proposal for the investment of Claimants' assets, and supervised the management of the Account.

21.    Respondent Neil J. Greenspan is an Associate for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Greenspan selected securities for purchase, executed trades for the Account, and served as a point of contact for Claimants at Lehman.

22.    Respondent Sanford A. Haber is a Senior Portfolio Manager for the Cash Management Group at Lehman. He is a FINRA registered broker. Upon information and belief, Mr. Haber supervised and managed the allocation of the Account and served as a point of contact for Claimants at Lehman.

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 13 of 58

23. Upon information and belief, Respondent Mark J. Stevenson heads Private Investment Management at Lehman in New York City. He is a FINRA registered broker. Upon information and belief, Mr. Stevenson supervised the Private Investment Management group in New York City responsible for the Account.

## Jurisdiction and Hearing Location

24. This matter is eligible for submission pursuant to Rule 12200 of the NASD Code of Arbitration for Customer Disputes. The Cash Management Brokerage Agreement signed by Respondents and Claimants requires that any and all claims relating to the discretionary Account maintained by Lehman be resolved through arbitration. It further provides that the NASD is an eligible forum for arbitration.

25. At all times material herein, Lehman Brothers Inc. was and is a broker-dealer registered with FINRA and all individual respondents were and are members of FINRA.

26. A proper hearing location for arbitration is New York, New York pursuant to Rule 12213 of the NASD Code. The place of business for Respondents is New York, New York.

### In the Course of Establishing the Account, Claimants Fully Communicated and Respondents Fully Understood That Claimants' Primary Investment Objectives Were To Preserve Capital and To Provide Liquidity

27. In March 2007, Claimants M. Brian Maher and Basil Maher negotiated the sale of their family business, which had been in existence for over 60 years. This family business specialized in the operation of certain marine terminals.

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 14 of 58

28.     Upon the closing of the sale in July 2007, the proceeds of the sale were owned by Maher Terminals Holdings Corporation, the predecessor of Claimant Essex, a limited liability corporation that is co-owned by M. Brian and Basil Maher.

29.     As Claimants were anticipating the influx of cash as a consequence of the sale, they began evaluating options for investing and holding the proceeds of the sale on a short-term basis. Claimants communicated to Respondents that they wanted safe, short-term, highly-liquid investments in which Claimants could temporarily place their cash while they evaluated long-term investment strategies.

30.     Between approximately late May and early June 2007, representatives for Claimants received a cash management proposal from Lehman.

31.     By email sent on or about June 19, 2007, William Gourd, Managing Director at Lehman Private Investment Management, forwarded a letter dated June 1, 2007 from Mr. Gourd and a "Proposed Tax-Exempt Investment Portfolio" for Claimants, reflecting Lehman's "proposal" for an account structured in accordance with Claimants' expressed investment objectives. (See Exhibit A.)

32.     In the letter, Mr. Gourd describes "Lehman Brothers cash management services," which Mr. Gourd represented to include "portfolio monitoring" services.

33.     In his letter, Mr. Gourd also described the proposal as Lehman's "recommendations" for the investment in "short-term cash/fixed-income securities." In this and other communications Mr. Gourd made clear Lehman understood that Claimants wanted safe, liquid, short-term investments.

34.    Mr. Gourd stated in this same letter that Lehman understood Claimants' investment objectives "to be safety of principal, liquidity and yield." Mr. Gourd thus made clear that Lehman understood Claimants' investment objectives.

35.    Mr. Gourd also stated in this letter, "[W]e understand that our proposal should be for a New Jersey domiciled family that is subject to the highest Federal tax bracket (and not subject to the Alternative Minimum Tax)" and "We also understand that the nature of the investments that we should be considering for these funds is to be of extremely high quality with a relatively short duration (initially 1–60 days)." Thus, Mr. Gourd made clear that Lehman understood the portfolio should consist primarily of short-term, safe, tax-exempt municipal or substantially similar securities.

36.    In this same letter, Mr. Gourd stated that the proposed portfolio contained "approximately 35% Tax-Exempt Variable Rate Demand Notes and 65% Tax-Exempt Auction Rate Securities." Thus, it is clear from this proposal that the mutual understanding between Claimants and Respondents was for the majority of the portfolio to be invested in short-term, tax-exempt municipal or substantially similar securities. Respondents represented to Claimants in this proposal and in other communications with Claimants that the portfolio would be so invested.

37.    On or about July 10, 2007, Claimants' written Investment Policy was forwarded to Lehman. (*See* Exhibit B.) Haber acknowledged receipt of the Investment Policy.

38.    The Investment Policy lists "A.  Preserve capital" as the highest objective for the investment account, followed by "B.  Provide sufficient liquidity to satisfy operating requirements, working capital purposes and strategic initiatives." Finally, it

lists "C. Capture a market rate of return *based on the company's investment policy parameters* and market conditions" (emphasis added). Thus, Claimants' objectives were again clearly articulated to Lehman.

39.    The Investment Policy also states, "No security in the account may have a final maturity of more than 3 months." This requirement clearly indicates that the investment account was to be short-term and highly-liquid.

40.    The Investment Policy further outlines requirements regarding "Issuer Concentration," including the requirement that Essex's funds be allocated to no more than 15% of the total issue size outstanding, at the time of purchase. (*See* Exhibit B.) This requirement promoted the highest investment objectives of safety and liquidity, by ensuring that the account was properly diversified and that Essex could exit and given position easily.

41.    The Investment Policy also offered a list of "Eligible Instruments" that were authorized to be purchased for the Essex Account. Private placements do *not* appear on this list.

42.    In approximately early July of 2007, the sale of the Mahers' family business closed. The proceeds from the sale were initially wired to JP Morgan Chase.

43.    In approximately mid-July of 2007, Claimants finalized their choice of cash managers to invest the proceeds of the sale into safe, highly-liquid, short-term investments for a brief period until Claimants developed a longer-term investment strategy. These institutions were Lehman and another FINRA registered broker-dealer, namely, UBS.

44.    On or about July 10, 2007, Claimants signed the Cash Management Agreement with Lehman. (*See* Exhibit C.) By approximately July 26, 2007, Claimants had wired a total of US $600 million to Lehman.

45.    Around this same time, Claimants also transferred other portions of the proceeds of the sale of the family business into discretionary cash management accounts at UBS.

**Respondents Invested the US $600 Million in Ways That Were Highly Inappropriate and Completely Contrary to the Parties' Understanding, Causing Claimants to Lose the Ability to Access or Invest Approximately US $286 Million**

46.    When Respondents invested Claimants' US $600 million in mid through late July 2007, they invested it in ways that differed radically from (i) the sample investment portfolio that Lehman provided in June of 2007; and (ii) the investment objectives and priorities Claimants gave to Respondents. Indeed, the actual portfolio contradicted Respondents' representations and the mutual understanding between Claimants and Respondents that the portfolio would be invested primarily in safe, tax-exempt, short-term municipal or substantially similar securities. The actual portfolio also failed to meet the Mahers' highest priorities of preserving capital and liquidity. Further, it contained numerous securities that were *not* included among the "eligible assets" that were authorized to be purchased under the Investment Policy. Finally, it violated the issue concentration limits articulated in the investment policy.

47.    Based on the sample portfolio prepared for Claimants by Lehman (which is entirely tax-exempt), communications between the parties, and the Investment Policy, the mutual understanding of the parties was that the investment products purchased would be primarily, if not entirely, short term, tax-exempt, municipal or substantially

similar securities. Respondents represented that they would so invest Claimants' funds. Moreover, such an investment would be consistent with the Claimants' highest priorities of safety of principal and liquidity.

48.     Instead, however, as described further below, Respondents invested approximately *two-thirds* of the Account in risky, complex, highly-structured securities virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established for bond insurers, or trusts established to fund "redundant reserves" for insurance companies. Furthermore, such securities were purportedly issued as private placement securities under exemptions to the registration requirements of the Securities Act of 1933 and are meant to be certain specific legal categories of investors defined by the Securities Act of 1933 and the rules promulgated thereunder. Respondents made no effort to determine that Claimants were qualified to purchase such securities, and in many if not all instances, upon information and belief, Claimants were *not* qualified to purchase such securities.

49.     By comparison, Claimants gave UBS the same investment objectives and instructions as those received by Respondents. In stark contrast to Respondents' actions, UBS invested Claimants' funds almost exclusively in short-term tax-exempt municipal or substantially similar securities.

50.     Furthermore, JP Morgan Chase, which managed the accounts to which the proceeds of the sale were initially wired, and from which the funds to be managed by Lehman and UBS were sent, also followed Claimants' investment objectives. Accordingly, JP Morgan Chase placed Claimants' funds in a municipal money market fund and not in any private placement securities. UBS and JP Morgan Chase followed

Claimants' guidance. Respondents did not. As a result, Claimants lost the ability to access or invest approximately US $286 million.

### The Complex and Highly-Structured Products that Lehman Purchased: (1) Violate the Investment Policy and Objectives; (2) Are Grossly Different Than What Lehman Promised It Would Purchase; (3) Are Unsuitable; and (4) Violate Claimants' Core Objectives of Low Risk and High Liquidity

51.     Upon information and belief, virtually all of the complex, highly-structured products purchased by Respondents on Claimants' behalf fall into one of three categories:  they are issued either by sellers of "credit default swap" agreements, "contingent capital facilities" established for the benefit of bond insurers, or trusts established to fund "redundant reserves." These categories will be described in greater detail below.

52.     Claimants only came to learn of the structure of these securities described herein through review of the private placement memoranda associated with the securities, which memoranda describe significant and material details about the securities. However, Respondents never provided Claimants with the private placement memoranda at the time the securities were purchased or even inform Claimants that private placements had been purchased.  Respondents' disregard for their customer continued even after the securities failed and this dispute arose, as Respondents still did not provide any private placement memoranda to Claimants and only did so after Claimants specifically requested them. Even then, Respondents failed to provide all of the private placement memoranda for the securities purchased on Claimants' behalf. Consequently, Claimants did not have a basis for understanding the securities purchased by Respondents on its behalf.

53. The complexity of these structures made it virtually impossible to evaluate the safety and creditworthiness of the assets backing the securities and the entities that issued them. The fact that the securities in question are unregistered, private placement securities (as described further below), about which little to no information is filed publicly, further complicated the evaluation of the creditworthiness of each issue. In their complexity and lack of public information, the securities purchased by Respondents differed radically from the municipal and substantially similar securities that Respondents told Claimants that they would purchase for the Account.

*Lehman Violated Claimants' Investment Objectives of Safety and Liquidity by Purchasing Securities Issued by Sellers of Credit Default Swap Agreements Tied to the Collapsing CDO Market*

54. The first type of unsuitable securities purchased for the Account is issued by a seller of Credit Default Swap Agreements ("CDS").

55. A CDS Agreement is a financial product in which one party (the CDS seller) receives a premium from another party (the CDS buyer) in exchange for agreeing to provide payment upon a credit event for a given bond, such as a default or a failure to pay interest.

56. CDS agreements are purchased both by bondholders, who want to hedge against the risk of the bonds, and by speculators, who do not actually hold the bonds named in the CDS agreements, but who want to effectively take a short position on the bond (i.e., the speculators are betting that the bond will default or fail to pay interest).

57. Since CDS agreements are essentially private contracts between two parties, and since the market for CDS agreements is almost entirely over-the-counter, the market for CDS agreements is largely unregulated. As a result, the market for CDS

agreements is often referred to as a "shadow banking system," since it is has grown to be an extremely massive market, yet remains highly opaque.

58.     The structure of CDS agreements contributed to the massive growth of the CDS market. Since CDS agreements can be purchased by speculators who do not actually hold the bond named in the agreement, the total amount that a CDS seller must pay out upon a given credit event often far exceeds the total value of the bond itself. As a result, the market for CDS agreements has multiplied rapidly. The *New York Times* reported on February 17, 2008 that the total market for credit default swaps had grown from US $900 billion in 2000 to US $45.5 trillion in notional value, which is roughly twice the size of the entire United States stock market.

59.     Given Claimants' expressed investment objectives of safety and liquidity, investments directly linked to such a vast and largely unregulated market were manifestly unsuitable.

60.     Furthermore, since a CDS seller's capacity to write CDS agreements on a given bond is not limited in any way by the total par value of the bond, CDS sellers can concentrate a massive amount of risk on a small group of bonds.

61.     One CDS seller whose securities Lehman purchased for the Account— "Athilon"—focused its business on writing CDS agreements on Collateralized Debt Obligations ("CDOs"), many of which were tied to subprime mortgages.

62.     The focus of Athilon's business on writing CDS agreements for CDOs is outlined in the private placement memorandum for the securities purchased by Lehman on behalf of Claimants. Upon information and belief, this memorandum is normally provided to the purchaser of a security, to ensure that the purchaser understands the

security and its suitability as an investment.

63.    In the winter of 2006-2007, a number of events occurred that made it clear that there were significant problems with CDOs tied to subprime mortgages. In the fourth quarter of 2006, the housing market in the United States slowed for the first time in two years. On February 8, 2007, California's New Century Financial Corporation— the third largest subprime lender in the United States—announced that it expected a loss in the fourth quarter of 2006.

64.    Despite clear problems in the market for CDOs, however, Lehman, in July of 2007, purchased approximately US $22 million of securities issued by Athilon, thereby exposing Claimants to the significant risks of the CDO market.

65.    Furthermore, the CDS seller's obligation to pay holders of CDS agreements takes priority over its obligation to pay investors in the securities that it issues. Consequently, in the event of significant market problems that result in a large number bondholders exercising their CDS agreements, the safety and liquidity of investors in the CDS issued securities will be seriously threatened.

66.    Therefore, such securities were manifestly unsuitable to meet Claimants' investment objectives of preservation of capital and liquidity.

*Lehman Violated Claimants' Investment Objectives of Safety and Liquidity by Allocating
a Massive Portion of the Account to Securities that are
Heavily Exposed to the Troubled Bond Insurance Market*

67.    The second category of unsuitable securities purchased for the Account were issued by trusts set up as "contingent capital facilities."

68.    Contingent capital facilities are established by organizations, often insurance companies, to protect against catastrophic losses by means of a capital injection

that is agreed upon before any loss occurs.

69.    All of the securities purchased by Respondents on behalf of Claimants that fit into this category were issued by contingent capital facilities established for the benefit of bond insurers.   In purchasing these securities, therefore, Lehman concentrated a massive amount of risk in the bond insurance industry.

70.    The securities are structured as follows:   A bond insurer establishes a series of sub-trusts. Each of these sub-trusts enters into a put agreement with the bond insurer, in which they are paid a premium for agreeing to a put option, which allows the bond insurer to require that the sub-trust purchase preferred stock in the bond insurer. The put option, in effect, sets up a line of credit for the bond insurer, allowing it to draw cash from the sub-trust when it so desires.

71.    Each of the sub-trusts then issues securities to raise funds with which it will purchase preferred stock in the bond insurer in the event that the put option is exercised. Each of the sub-trusts also invests in "Eligible Assets." It uses the proceeds from its investment in "Eligible Assets" and the put option premiums to make its interest payments to the investors in the securities that it issues.

72.    The sub-trusts are established by the bond insurer. Furthermore, in the event that the put option is exercised, the investors in the sub-trusts will become owners of the preferred stock of the bond insurer.   Consequently, the credit rating of the securities issued by the sub-trust will reflect the credit rating of the bond insurer, and the safety and liquidity of the security is directly affected by problems with the bond insurer.

73.    Lehman allocated more than US $72 million of Claimants' funds to securities of this type. Thus, more than US $72 million of Claimants' funds were directly

exposed to the risks of a single industry.

74.     The bond insurance industry, moreover, is highly-complex and opaque. Since a bond insurer's risk exposure derives from the risk exposure of every single bond that it insures, it is difficult to determine the safety and creditworthiness of a bond insurer. For this reason, tying such a massive portion of the Account to bond insurers was manifestly inappropriate and failed to meet Claimants' expressed investment objectives of safety and liquidity.

*Respondents Exacerbated Claimant's Extreme Exposure to the Risks of the Bond Insurance Industry by Purchasing a Significant Number of "Wrapped" Securities, Whose Credit Ratings Are Based Entirely on the Rating of the Bond Insurer that Insures Them, Rather than on the Strength of the Underlying Issuer*

75.     The **third category** of unsuitable securities purchased for the Account was issued by trusts established to fund "redundant reserves" for a life insurance company.

76.     This structure is the most complex of the three, and is set up so that in the event of default, investors in these securities have no recourse to the insurance company that actually benefits from the funds raised by the issuance of the securities. Instead, investors only have recourse to the bond insurers that guarantee payment on the securities (thereby "wrapping" the securities). Many of these bond insurers are the same bond insurers for which the second type of securities functions as a source of credit.

77.     This category of unsuitable securities in the Account is structured in the following way:

78.     An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company.

79.     This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts." These notes are not insured.

80.     The capital trusts, in turn, raise funds by issuing securities to investors. These securities are insured by a bond insurer.

81.     The captive reinsurance company entrusts the funds that it received from selling surplus notes to the capital trusts, and that they, in turn, received from selling securities to investors, to a reinsurance credit trust, with which it enters into an asset management agreement.

82.     Such extraordinarily complex and highly-structured securities were never contemplated for Claimants' Account, and were manifestly unsuitable given Claimants' objectives of safety and liquidity.

83.     Furthermore, in the event that the securities default, investors do not have recourse beyond the capital trusts that issued their securities. Investors do not have recourse to the captive reinsurance company that established the capital trusts, or to the insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities are, again, dependent upon the creditworthiness of the bond insurer that insures the securities issued by the capital trusts, since the capital trusts themselves are purely financial entities that have no real, tangible underlying assets.

84.     Indeed, upon information and belief, many of the securities that fall within this third type do not have underlying ratings at all; instead, their credit-rating is reflective only of the bond insurance on the security.

85.     Furthermore, since Lehman purchased for Claimants' Account both securities issued by trusts established to provide credit to bond insurers (i.e., the second type of security described above), and securities insured by some of the same bond

insurers (i.e., the third type of security described herein), Claimants were exposed to bond insurers on both the credit and debit side of the bond insurance industry. In other words, Lehman set up the Account in such a way that Claimants were, by investing in certain securities, in effect lending funds to many of the very same bond insurers that guaranteed payment on certain other securities in Claimants' account.

86.    Indeed, as a result of this manifestly unsuitable and egregiously inappropriate allocation of Claimants' Account, of the approximately US $286 million in currently illiquid securities, approximately US $238 million became exposed to the risks of bond insurers. As such, these investments were grossly unsuitable to meet Claimants' investment objectives

*Respondents Purchased Unregistered Private Placement Securities on Behalf of Claimants, in Violation of the Investment Policy and Section 5 of the Securities Act of 1933*

87.    In addition to being risky, complex, highly-structured products, many securities that Respondents purchased for Claimants' Account were issued as "private placements" that were not registered with the Securities and Exchange Commission.

88.    The purchase of private placement securities was not authorized, since "private placements" were *not* included among the "eligible instruments" listed on the Investment Policy.

89.    Furthermore, Respondents' purchase of private placement securities was manifestly unsuitable given Claimants' express investment objective of liquidity. Since the securities in question have not been registered with the Securities and Exchange Commission, they can be resold only through narrow exemptions to the Securities Act of

1933. The restrictions placed on resale of these securities severely hinder the liquidity of the securities, making them clearly inappropriate for investors that require liquidity.

90.    Upon information and belief, the private placement securities purchased by Respondents for Claimants, without authorization and in violation of the Investment Policy, can be sold only to specific classes of purchasers, such as, among others, "Qualified Institutional Buyers," as required by Rule 144A, 17 C.F.R. § 230.144A. (*See* Exhibit B.)

91.    Upon information and belief, at no point during the period in which Claimants opened the Account or during the period in which Respondents purchased private placement securities for the Account did Respondents *ask* Claimants whether they met the relevant requirements. Nor did Respondents at any time acquire documentation from Claimants certifying their eligibility to purchase private placement securities.

92.    Additionally, upon information and belief, Respondents failed adequately to inform Claimants that the securities purchased on its behalf were private placement securities and could be purchased and resold only under narrow exemptions to the Securities Act of 1933.

93.    Indeed, upon information and belief, Respondents did not meet the requirements to be considered a Qualified Institutional Buyer. Consequently, at least all securities purportedly sold to Claimants pursuant to Rule 144A constituted violations of the Securities Act of 1933.

94.    Under Rule 144A, unregistered securities may be sold to Qualified Institutional Buyers ("QIBs") or to a purchaser whom the seller reasonably believes is a QIB.

95.    To be a QIB, the purchaser must be an entity of a certain type and must own and invest on a discretionary basis at least US $100 million in securities of issuers that are not affiliated with the purchaser. Upon information and belief, sellers of Rule 144A private placements typically establish the buyers' QIB status by acquiring a QIB letter.

96.    Upon information and belief, Claimant Essex did not meet the statutory requirements of a QIB in part because Claimant Essex did not own and invest on a discretionary basis at least US $100 million in securities.

97.    Further, upon information and belief, Respondents had no reasonable basis for believing that Claimant Essex was a QIB. For example, Respondents never sought to obtain a QIB letter or other statement from Claimant Essex demonstrating Claimant Essex's eligibility to purchase restricted, unregistered securities, as Respondents were required to do.

98.    In any event, Lehman's improperly failing to ask Claimants whether they were eligible to purchase private placements was inexcusable. For example, by contrast, in opening the cash management account at UBS, UBS affirmatively determined and recorded the fact that Claimants were not QIBs.

99.    Consequently, at least all sales of securities by Respondents to Claimants purportedly effected under Rule 144A constitute violations of Section 5 of the Securities Act, 15 U.S.C. § 77e.

100.    Under Section 12 of the Securities Act, 15 U.S.C. § 77l, Lehman is liable to Claimants for such sales to the extent they violated Section 5 of the Securities Act

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 29 of 58

101.    Furthermore, upon information and belief, the structure of the private placement securities purchased by Respondents on Claimants' behalf and the exemptions to the Securities Act of 1933 under which these securities must be purchased and sold are outlined in private placement memoranda.  Upon information and belief, broker-dealers typically provide these private placement memoranda to their clients, so that their clients can understand the structure of the securities and the exemptions to the Securities Act of 1933 under which they must be resold.

102.    Upon information and belief, "purchasers letters," to be executed by the prospective purchaser, are typically affixed to the private placement memoranda.  These purchasers letters acknowledge that the purchaser is aware that the securities have not and will not be registered under the Securities Act of 1933, that the purchaser is qualified to purchase the securities, and that purchaser will only resell the securities pursuant to an exemption to the Securities Act.

103.    Upon information and belief, some, and potentially all, of the private placement memoranda for the securities purchased by Respondents on Claimants' behalf state that the securities may be sold only to purchasers that have executed a purchasers letter.    Additionally, many of the private placement memoranda for the securities purchased by Respondents on Claimants' behalf state that the purchaser must review the private placement memoranda before executing the purchasers letter.

104.    Furthermore, many of the private placement memoranda and/or purchasers letters state that the signing of the purchasers letter is a necessary condition precedent to the sale and/or that if the purchasers letter is not signed by the purchaser, the sale will be null and void.

105.    Upon information and belief, Lehman did not provide private placement memoranda to Claimants at or shortly after purchasing private placement securities on their behalf, and never required that Claimants sign and return a purchasers' letter. More than a month after Lehman purchased private placement securities on Claimants' behalf, and only after Claimants specifically requested the memoranda after the auctions relating to the securities failed, did Lehman provide some, though not all, of the private placement memoranda for the securities.

106.    Furthermore, Lehman's sale of unregistered private placement securities to an entity that it did not determine and could not have reasonably believed was eligible to purchase such securities further demonstrates that such securities were never contemplated, authorized, or suitable for the Account, and that Lehman was not handling this account with due care.

107.    Lehman's inappropriate, unauthorized and unlawful sale of private placements caused Claimants to lose the ability to access or invest their approximately US $286 million.

*Claimants Lost the Ability to Access or Invest Their Approximately US $286 Million Because Lehman's Purchases Violated The Issue Concentration Limits Mandated by the Investment Policy*

108.    The Investment Policy expressly prohibited Lehman from purchasing more than 15% of any given issue size outstanding. (*See* Exhibit B.) This prohibition was designed to prevent over-concentration in any one issue and help ensure liquidity, a primary objective of the Claimants.

109.    Nevertheless, Respondents violated the issue concentration limits set by the Investment Policy for at least fourteen of Claimants' presently illiquid securities[1]. In some cases, Respondents purchased as much as 25% of the total size outstanding of certain issues.

110.    Lehman grossly violated Claimants' issue concentration limits thereby contributing to the illiquidity of Claimants' portfolio. Thus, it further caused Claimants to lose the ability to access or invest their approximately US $286 million.

### Respondents Continued to Grossly Mismanage the Account Even After Their Initial Purchase of Inappropriate Investments, Causing Claimants to Lose the Ability to Access or Invest Their Approximately US $286 Million

111.    In late July and early August 2007, several public announcements fueled widespread concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and the safety and liquidity of complex, highly-structured securities, such as those purchased by Respondents.

112.    On or about July 31, 2007, Fitch Ratings announced that it was placing 934 securities insured by the bond insurer Radian on Rating Watch Negative, indicating that they were likely to be downgraded in the near future. The securities that were downgraded were "wrapped securities," like a number of the securities in the Account.

113.    Since a bond insurer's business depends upon having a high rating, with which it can wrap the bonds it insures, the announcement that Radian was likely to be downgraded signaled significant problems with its business. Despite the clear material impact of this announcement on Claimants' portfolio, given their significant exposure to

---

[1] Upon information and belief, Respondents violated the issuer concentration limits in purchasing the following securities for Claimants' Account: Anchorage II, Anchorage IV, Athilon 05 A, Athilon 05 C, Ballantyne C, Grand Central 5, INC 2004-2, Northcastle IV, Northcastle V, Northcastle VII, Potomac 2004-IV, Primus Notes A, State St MMN CR and Sutton Capital II.

the bond insurance industry, Lehman failed to inform Claimants of their significant risk exposure.

114.    On or about August 6, 2007, Ram Holdings, Ltd., announced that it had suffered a 44.5% drop in market value, following a 25% drop in its second-quarter earnings. Ram Holdings is the parent company of Ram Re, a reinsurance company providing reinsurance exclusively to bond insurers.

115.    In the same announcement in which Ram Holdings announced its precipitous drop in earnings, Ram Holdings revealed that Blue Water Trust I, an auction rate security issued by a contingent capital facility established for the benefit of Ram Holdings and identical in structure to a significant portion of the securities purchased by Respondents in the Account, had suffered a "failed auction." Upon information and belief, Lehman served as advisor to Ram Holdings for the purpose of setting up Blue Water Trust I.

116.    As fiduciaries of Claimants, Respondents had a duty to act in Claimants' interests in the matters entrusted to them and to keep Claimants informed of changes in market conditions that affected the Account with respect to the matters that had been entrusted to them. Furthermore, Respondents had a continuing duty to ensure that they had invested Claimants' funds in authorized and suitable securities. In addition, Respondents continued to be responsible for investing Claimants' cash in a manner consistent with Claimants' investment principles.

117.    Despite the announcements described above and the widespread concerns that they prompted, Respondents failed to re-evaluate their own allocation of the Account, to limit Claimants' exposure to the troubled bond insurance market, or to

inform Claimants' of their significant risk exposure resulting from specific transactions that had been entrusted to the Claimants' discretion. Instead, in the first weeks of August, Respondents *reinvested* nearly US $168 million in the similar complex, highly-structured auction rate securities, which in any event were unauthorized and unsuitable upon their purchase in the first place.

118. Despite the announcement of a failed auction relating to Blue Water Trust I (a security identical in structure to a large portion of Claimants' portfolio), Respondents nevertheless made no attempt to alter the allocation of the portfolio.

119. On or about August 14, 2007, the first auction for a security held by Claimants failed, rendering Claimants unable to sell or move out of the security.

120. Despite this failure, Respondents did not inform Claimants of their significant risk exposure. Instead, over the next four days, Respondents reinvested more than US $57 million in these same complex, highly-structured, taxable auction rate securities, even as they experienced three more failed auctions. Throughout this period, Respondents failed to inform Claimants of the failure of auctions for securities held in Claimants' Account, in clear violation of their duties to Claimants.

121. On or about August 21, 2007, an individual assisting the Claimants became aware of the gross mismanagement of Claimants' Account. He wrote an e-mail to Gourd stating that the allocation of the majority of the portfolio in complex, highly-structured, taxable auction rate securities violated Claimants' investment objectives. He expressed concern about the creditworthiness and liquidity of the purchases, and noted that their complex structure rendered it impossible to evaluate the underlying collateral.

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 34 of 58

122.   The individual reiterated his complaints regarding the purchase of these securities in an e-mail sent on or about August 22, 2007. He also noted that Lehman never acquired a QIB letter from Claimants.

123.   Upon information and belief, during these communications, representatives of Lehman made misrepresentations and omissions, inaccurately characterizing the securities purchased by Respondents on behalf of Claimants as corporate securities. In fact, the securities were not issued by straightforward brick-and-mortar entities like corporations, but were instead complex, highly-structured securities, virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established for bond insurers, or trusts established to fund "redundant reserves" for insurance companies

124.   Following the communications between the individual referenced above and Respondents on August 22, 2007, Lehman claimed that it had attempted to liquidate every auction rate security in the Account at the next auction. Although Respondents liquidated a small portion of securities from Claimants' portfolio, they either did not or could not liquidate a majority of them despite the instruction to liquidate all auction rate securities positions, and the auctions associated with them failed and continue to fail.

**Lehman Purchased the Unsuitable Securities for the Account Because of Lehman's Relationship with the Issuers of the Securities and Lehman's Desire to Manipulate Auction Results to Prevent Failed Auctions**

125.   The unsuitable securities that Lehman purchased were not just any security—they were securities to which Lehman was closely associated and stood to gain upon investing Claimants in them.

126.   Lehman served in three different capacities with respect to a significant number of the securities purchased for the Account. In many cases, Lehman served in more than one or all three of these capacities with respect to a security.

127.   Upon information and belief, Lehman served as the **structuring adviser** for many of the unsuitable securities in the Account, meaning that Lehman advised the issuers in the process of creating the securities.

128.   Upon information and belief, Lehman served as the **initial purchaser** for many of the unsuitable securities in the Account, meaning that Lehman purchased all of the newly-issued securities from the issuer in order to sell to other buyers.

129.   Upon information and belief, Lehman served as the **designated broker-dealer**, and in many cases the sole **designated broker-dealer**, for many of the unsuitable securities in the Account, meaning that Lehman was authorized by the issuer to solicit and accept bids for the auction.

130.   Upon information and belief, Lehman receives fees from issuers for serving as structuring advisor and/or initial purchaser and/or designated broker-dealer for their auction rate securities. Upon information and belief, Lehman's relationships with issuers provide it with an incentive to prevent auction failures.

131.   To understand the meaning of a "failed auction," and why Lehman would seek to prevent such an outcome, it is necessary to understand how "auction rate securities" work.

132.   In general, an auction rate security is a long-term bond whose interest rate is reset periodically (typically every 7, 28, or 35 days) by means of a Dutch auction process.

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 36 of 58

133.    In a Dutch auction, the auction agent for an auction rate security collects bids from investors and ranks the various bids according to the interest rate each individual investor is willing to accept. The auction agent, based on these bid rates, determines the "clearing rate" for the auction, which is the lowest rate at which all of the securities of a given issue can be sold at par.

134.    If, however, an auction agent does not receive enough bids to buy securities at or below the maximum interest rate that the issuer of the securities is willing to pay, the auction agent cannot establish a clearing rate, and the auction "fails." A failed auction prevents investors who own positions in a given issue from exiting their positions. Even if such investors have submitted sell orders in the failed auction, they cannot sell, but must hold the securities. In a failed auction the interest rate on the auction rate securities reverts to a pre-determined fail rate.

135.    A failed auction renders the securities illiquid for an indeterminate period of time, potentially for as long as the maturity period of the security, which can be as long as 30 years in the case of debt securities, and perpetual in the case of preferred stock. A failed auction also typically raises serious concerns about the creditworthiness of the issuer. Thus, failed auctions are typically self-perpetuating. That is, once an auction fails, it is unlikely that it will subsequently succeed at a later auction in the absence of intervention (of which none is foreseeable here).

136.    Additionally, when an auction fails, the issuer must pay the pre-determined fail rate until the auction succeeds. Consequently, issuers generally do not want the auctions for the securities that they issue to fail.

137.   Auction failures result from insufficient demand for the securities in question. Upon information and belief, Lehman places bids on behalf of customers over whose accounts it exercises limited discretionary authority, in order to ensure sufficient demand to prevent auction failures.

138.   During the course of a meeting that the associate of Claimants had with Mr. Gourd sometime in late August 2007, the associate asked Mr. Gourd why, given the existing problems and concerns in the market, Lehman had re-invested Claimants' money in complex, highly-structured taxable securities.

139.   Mr. Gourd admitted that Lehman had done so in an attempt to provide enough demand for these securities to prevent the auctions from failing.    Upon information and belief, as explained above, Lehman served as the designated broker dealer or sole designated broker-dealer for many of these auctions.

140.   In other words, instead of acting in Claimants' interests by removing Claimants' funds from the complex, highly-structured, taxable securities (in which Respondents never should have invested in the first place), Respondents acted in their own interests, trying to use Claimants' funds to maintain a market for the securities, for many of which Lehman had served as structuring advisor, initial purchaser and/or designated broker-dealer.  Upon information and belief, these roles provided Lehman with an incentive to purchase these securities on their client's behalf to prevent failed auctions and maintain a liquid market for the securities, especially as soon as problems and concerns in the relevant markets emerged.

141.   Upon information and belief, the fact that Lehman purportedly could not or did not liquidate Claimants' positions in these securities without disrupting the market

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 38 of 58

and causing failed auctions indicates Respondents' over-concentration in these securities, in clear violation of the concentration limits outlined in the Investment Policy.

142.    Although Lehman's account opening documents purported to disclose that Lehman may engage in transactions from which Lehman may derive compensation, and although a document relating to Lehman's auction rate securities practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, neither disclosure gives Lehman license to disregard the Claimants' interests and instructions, to purchase unauthorized securities on behalf of Claimants, or to enrich itself at the expense of the Claimants.

143.    Upon information and belief, a number of the securities purchased by Lehman on Claimants' behalf were sold directly from Lehman's own inventory through trades on the secondary market.

144.    Upon information and belief, Respondents purchased securities for Lehman's own inventory when Lehman knew the auctions would fail without broker-dealer intervention. Upon information and belief, Respondents then transferred the securities to Claimants through trades on the secondary market in between this auction and the following auction. Upon information and belief, Respondents sold Claimants securities it knew, based on the results of the previous auction, to be liquid only because of Lehman's intervention as broker-dealer. Upon information and belief, once the securities were in Claimants' Account and safely removed from Lehman's own balance sheet, Lehman would then at the following auction not submit a covering bid and allow the auction to fail and the security to become illiquid.

145.   Thus, upon information and belief, Respondents had used Claimants' money in an unsuccessful attempt to prop up auctions notwithstanding its knowledge that these complex, highly-structured, taxable securities posed a grave danger to the safety and liquidity of Claimants' Account.

146.   At present, approximately US $286 million of the US $600 million Claimants invested with Lehman is trapped in failed auctions, with no indication that liquidity will return to these securities.

147.   By contrast, Claimants' accounts at UBS, invested per Claimants' investment objectives and guidelines, maintained complete liquidity.

148.   As a result of the illiquidity of the complex, highly-structured, taxable securities purchased by Respondents, Claimants lost the ability to access or invest their approximately US $286 million.

### The Foreseeability of Market Conditions Is Not Relevant

149.   Importantly, Claimants' claims are not based on the fact that Respondents failed to predict market conditions or whether these particular auction rate securities would fail.   Rather, the whole point of Claimants' instructions had been to avoid potentially risky or over-concentrated situations which would be vulnerable to market events, whether predictable or not.   Respondents should never have invested so much of Claimants' funds in complex, highly-structured, private placement securities in the first place; these types of securities are unsuitable and constitute violations of the Investment Policy and the parties' mutual understanding.

### Punitive Damages Are Appropriate

150.    In telling Claimants that they would invest their money in safe, liquid, tax-exempt municipal or substantially similar securities, and instead investing it for Lehman's own interests in risky, complex, highly-structured, taxable securities, which investments were unauthorized and unsuitable, Respondents' conduct was reprehensible and in blatant violation of law and policy. Their conduct, including their acts and failures to act, evidences recklessness and a callous disregard and indifference to Claimants' rights. Punitive damages are therefore warranted.

### First Count
### Breach Of Contract

151.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

152.    In opening the securities Account at issue, Claimants and Respondents executed a Cash Management Agreement. The Cash Management Agreement charged Respondents with the duty of ensuring that all investments, reinvestments and transactions were conducted in accordance with the investment guidelines issued by Claimants, including the Investment Policy.

153.    The Investment Policy expressly listed safety of principal and liquidity as objectives by which Respondents were to abide.

154.    The Investment Policy further listed "eligible instruments" in which Respondents were authorized to invest.

155.    Claimants performed per the terms of the Cash Management Agreement.

156.    Respondents breached the Cash Management Agreement contract by allocating the Account in a manner that clearly contradicted the mutual understanding

between Respondents and Claimants at the opening of the Account and by investing the Account in securities that were not included among the "eligible instruments" listed on the Investment Policy.

157.   As a direct and proximate result of said breach of contract, Claimants have suffered and continue to suffer damages as alleged herein.

158.   Claimants reserve the right to expand upon or amend their account of damages suffered.

## Second Count
## Breach Of Fiduciary Duty

159.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

160.   By reason of the fact that Respondents managed and still manage the Account on a discretionary basis, Respondents owed a fiduciary duty to Claimants, including but not limited to: (1) the duty of loyalty; (2) the duty to act fairly and honestly; and (3) the duty to act in good faith and in the best interests of the Claimants. Respondents also owed a fiduciary duty to Claimants with respect to specific transactions and other acts, including discretionary acts, that Respondents engaged in with or on behalf of the Claimants.

161.   Respondents breached their fiduciary duty and failed to act in the best interests of Claimants by allocating the portfolio to securities which were contrary to the Claimants' stated objectives and by purchasing securities not included among the "eligible instruments" listed in the Investment Policy. Respondents either knew, or should have known, that managing the portfolio in a manner contrary to the Investment policy, stated objectives, and the parties' mutual understanding required Respondents

formally to consult with Claimants on the risks of this investment strategy, something Respondents did not do.

162. Respondents also breached their fiduciary duty and failed to act fairly and honestly with Claimants by failing to disclose material facts regarding the securities purchased.

163. Finally, Respondents breached their fiduciary duty by failing to manage the Account properly, and by failing to respond to or disclose to Claimants changes in market conditions which materially affected Claimants' investments.

164. As a direct and proximate result of said breach of fiduciary duty, Claimants have suffered and continue to suffer damages as alleged herein.

165. Claimants reserve the right to expand upon or amend their account of damages suffered.

### Third Count
### Unsuitability

166. Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

167. A broker-dealer must have reasonable grounds for believing that a recommendation is suitable. The broker-dealer is required to practice due diligence in learning the essential facts relevant to every customer. Respondents had a duty to know and understand the financial position and investment objectives of Claimants. Included within this duty to know and understand, Respondents were also charged with the duty to clarify any instructions or objectives that seem ambiguous to the broker-dealer.

168.    Claimants expressly informed Respondents of their need for a diversified portfolio composed primarily of tax-exempt municipal securities. Claimants further communicated their investment objectives of safety of principal and liquidity.

169.    Respondents knew or should have known that the securities purchased by Respondents did not meet the objectives set forth by Claimants.

170.    Respondents failed to disclose material information relating to the suitability of the securities.

171.    Claimants justifiably relied to their detriment on the Respondents' fraudulent conduct.

172.    As a direct and proximate result of said unsuitable purchases, Claimants have suffered and continue to suffer damages as alleged herein.

173.    Claimants reserve the right to expand upon or amend their account of damages suffered.

<div align="center">

**Fourth Count**
**Unauthorized Purchases**

</div>

174.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

175.    Respondents had a responsibility to Claimants to purchase only those securities listed as "eligible instruments" on the Investment Policy and to manage the Account in accordance with investment objectives and risk tolerance of Claimants, as outlined in the Investment Policy. Prior to effecting any trades contrary to stated "eligible instruments," investment objectives, and risk tolerance, Respondents were required to obtain from Claimants formal written authorization of a switch in investment strategy.

176. Nevertheless, Respondents conducted transactions on behalf of Claimants for securities that were not included among the "eligible instruments" listed on the Investment Policy, and which were contrary to stated investment objectives, without seeking authorization.

177. Having represented to Claimants that they would abide by the provisions of the Investment Policy and invest the Account primarily in short-term tax-exempt or substantially similar municipal securities, Respondents instead invested the majority of the Account in complex, highly-structured, taxable private placement securities. Respondents never sought or received authorization to purchase such securities.

178. As a direct and proximate result of said unauthorized purchases, Claimants have suffered and continue to suffer damages as alleged herein.

179. Claimants reserve the right to expand upon or amend their account of damages suffered.

### Fifth Count
### Negligent Misrepresentation

180. Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

181. Respondents and Claimants had a special relationship such that the Respondents owed a duty to Claimants not to negligently misrepresent material facts or to disclose material facts. Among other things, Respondents and Claimants had privity of contract.

182. Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities. Respondents were aware that Claimants would rely upon Lehman's letter and

sample portfolio and letter (*See* Exhibit A) and Claimants did in fact reasonably rely on Respondents' statements in deciding to invest US $600 million in cash with Respondents. The correspondence between the parties makes clear that Respondents understood that Claimants would rely on the sample portfolio in making their decision.

183.   Respondents' representation was false, as Respondents instead would invest Claimants funds in complex, highly structured, taxable securities, which Respondents omitted to inform Claimants.

184.   It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants' funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations. In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants. They never did.

185.   Due to their relationship and otherwise, Respondents had a duty to disclose this information to Claimants. Respondents were aware the Claimants would use that representation and omission in investing their funds in the Account. Claimants relied upon that representation and omission. By their conduct, Respondents clearly understood that Claimants were relying upon that representation and omission.

186.   Respondents knew, or were at least negligent, grossly negligent, or reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe,

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 46 of 58

liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

187.    As a direct and proximate result of said negligent misrepresentations and omissions, Claimants have suffered and continue to suffer damages as alleged herein.

188.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Sixth Count
### Violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act

189.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

190.    Respondents unlawfully employed devices, schemes, and/or artifices of fraud, omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and/or courses of business which operate and/or would operate as a fraud and deceit upon any person, in connection with the purchase or sale of the securities described herein.

191.    Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities.

192.    Claimants reasonably relied upon that representation.

193.    Respondents' representation was false, as Respondents instead invested Claimants funds in complex, highly structured, taxable securities, which Respondents failed to inform Claimants. It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants'

funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations. In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants. They never did.

194.   Respondents knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

195.   Respondents had a duty to disclose to Claimants that the representation was false. They never did so.

196.   Respondents undertook to monitor the portfolio and the market on behalf of the Claimants and represented thus,, while failing to disclose certain material facts that they had a duty to disclose. Respondents had a duty to disclose to Claimants certain material facts, including the fact that Respondents were investing Claimants' cash in complex, highly-structured securities, virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established by bond insurers, and trusts established to fund "redundant reserves," and which violated Claimants' clearly articulated investment objectives of safety of principal and liquidity. Respondents also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimants' behalf. Respondents also had the duty to disclose the material fact that, upon information and belief, Respondents were using customer funds to support

auctions of Lehman products for its own benefit. Respondents failed to disclose and inform Claimants of such material facts. From these failures, it is manifest that Respondents intended to defraud Claimants and allow them to believe that securities were being purchased and had been purchased in accordance with their investment objectives.

197. Claimants reasonably relied upon the fraudulent misrepresentations and omissions committed by Respondents.

198. In addition to the above, Respondents intentionally or recklessly engaged in acts, practices and courses of business that operated as a fraud and deceit on Claimants in connection with the purchase or sale of securities as described herein.

199. As a direct and proximate result of said fraudulent misrepresentations and omissions, as well as Respondents' acts, practices, and courses of business, Claimants have suffered and continue to suffer damages as alleged herein.

200. Claimants reserve the right to expand upon or amend their account of damages suffered.

### Seventh Count
### Conversion

201. Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

202. Respondents have wrongfully converted approximately US $286 million of the US $600 million that Claimants invested in the Lehman account.

203. Claimants own and have a right to possess the approximately US $286 million, as the funds belong to them.

204. Respondents have deprived Claimants of their right to possess the approximately US $286 million by, having intentionally exercised dominion over those

funds, intentionally and without authorization investing them in unsuitable, complex, highly-structured, taxable securities, the associated auctions of which have now failed. Claimants cannot sell these securities and therefore cannot re-obtain possession of the approximately US $286 million in funds.

205.    Upon information and belief, Respondents have also deprived Claimants of their right to possess the funds by using them to prop-up auctions in danger of failing. Specifically, Respondents used Claimants' money in an attempt to ensure that certain auctions would clear.

206.    Respondents' actions constitute an unauthorized deprivation of Claimants' possessory rights in the approximately US $286 million and thus constitute a conversion of these funds.

207.    Claimants reserve the right to expand upon or amend their account of damages suffered.

<div align="center">

**Eighth Count**
**Negligence**

</div>

208.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

209.    As Claimants' brokers and account managers, Respondents owed Claimants a duty of care.

210.    Respondents breached that duty of care by negligently purchasing securities on claimants' behalf that were unauthorized, unsuitable, unlawful, inappropriate and in violation of Claimants' Investment Policy and mutual understanding of the parties.

<div align="center">

Page 43 of 52

</div>

211.   Claimants have been injured and have sustained damages thereby as alleged herein.

212.   Respondents' negligence was the direct and proximate cause of Claimants' injuries and damages.

213.   Claimants reserve the right to expand upon or amend their account of damages suffered.

### Ninth Count
### Gross Negligence

214.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

215.   In injuring Claimants as described herein, Respondents not only acted carelessly, but they were so careless that it was equivalent to recklessness.

216.   Respondents' conduct evidences a reckless disregard for the rights of Claimants.

217.   As such, Respondents committed gross negligence.

218.   Claimants have been injured and have sustained damages thereby as alleged herein.

219.   Respondents' gross negligence was the direct and proximate cause of Claimants' injuries and damages.

220.   Claimants reserve the right to expand upon or amend their account of damages suffered.

### Tenth Count
### Failure To Supervise

221.   Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

222.   Respondents were responsible for supervising their employees who committed the various violations described herein.   Respondents failed to supervise reasonably to prevent said violations.  Respondents failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in Claimants' Account.  Had Respondents implemented and enforced protocols for the review of purchases made by its employees, Respondents would have been forced to further document the fact that unsuitable securities were purchased, that material facts were not disclosed, that fiduciary duties were breached, that securities regulations were violated, and that purchases were made in violation of Claimants' investment objectives.

223.   It is manifest that Respondents failed to maintain and enforce a proper system of internal supervision over team members.  Respondents failed to provide adequate instruction with regard to supervision of transactions in securities executed by its registered representatives.

224.   As a direct and proximate result of said failure to supervise, Claimants have suffered and continue to suffer damages as alleged herein.

225.   Claimants reserve the right to expand upon or amend their account of damages suffered.

**Eleventh Count**
**Violation of Section 5 of the Securities Act of 1933**

226.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

227.    Under Section 12(1) of the Securities Act of 1933, Respondents are liable to Claimants for the sale of unregistered securities in violation of Section 5.

228.    Respondents sold to Claimants securities that were not registered under Section 5 of the Securities Act of 1933. Claimants were not qualified to purchase such unregistered securities. Furthermore, Respondents had no reasonable basis for believing that Claimants were qualified to purchase such unregistered securities. Thus, Respondents cannot rely on any available exemption provided for by the rules of the Securities and Exchange Commission by which unregistered securities may be sold or re-sold. Accordingly, such sales of unregistered securities to Claimants, in the absence of any available exemption, constituted a violation of Section 5 and damaged Claimants as described above.

229.    Claimants reserve the right to expand upon or amend their account of damages suffered.

**Twelfth Count**
**Rescission**

230.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

231.    The private placement memoranda for many of the currently illiquid private placements in Claimants' Account state that the sale of the security to an investor who has not signed the purchasers' letter will be deemed null and void. Other private

placement for the currently illiquid private placements in Claimants' Account state that the securities are to be sold only to purchasers that have executed a purchasers letter.

232.    Lehman's failure to acquire signed purchasers letters for the private placement securities purchased on Claimants' behalf represents a substantial and material breach of the conditions laid out in the private placement memoranda for the securities. Accordingly, the breach authorizes the rescission of the private placement security purchases which Respondents made for Claimants' Account.

233.    Furthermore, Lehman's purchase of unsuitable and unauthorized securities for Claimants' account, and the fraudulent misrepresentations and omissions made by Lehman to Claimants, represent substantial and material breaches of the conditions laid out in the Cash Management Agreement and Investment Policy. Accordingly, these breaches authorize the rescission of the purchases of all currently illiquid securities which Respondents made for Claimants' Account.

234.    Respondents' breaches of the conditions laid out in the purchasers letters, the Cash Management Agreement, and the Investment Policy have damaged Claimants as described above.

235.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Thirteenth Count
### Fraudulent Inducement

236.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

237.    In telling Claimants, in the letter dated June 1, 2007 and accompanying sample portfolio, sent to Claimants on June 19, 2007, that Respondents would invest the

08-13555-mg    Doc 16728-1    Filed 05/11/11    Entered 05/11/11 15:50:23    Exhibit A.

Pg 54 of 58

Account entirely in municipal or substantially similar securities, Claimants made a representation of material fact. This representation was made for the purpose of inducing Claimants' reliance and causing Claimants to believe that Respondents would invest in accordance with their stated investment objectives.

238.    Claimants reasonably relied upon this representation.

239.    Shortly afterwards, Respondents invested the Account in a manner that is fundamentally different from the allocation represented in the letter and accompanying sample portfolio.    Since this misallocation of the Account occurred shortly after Respondents represented that they would allocate the Account in a completely different way, and since there is no evidence of any change in the mutually agreed upon plan for allocating the account or of any change in circumstances that prevented Respondents from following through with the mutually agreed upon plan, it is clear that Respondents had no intent to follow through with the plan at the time Respondents presented the plan to Claimants.    The representation that they would invest the Account entirely in municipal or substantially similar securities, therefore, was false at the time it was made.

240.    In representing that they would invest the Account in municipal or substantially similar securities without having any intent to perform on the promise at the time the promise was made, Respondents deceived Claimants into entrusting their funds to Respondents.

241.    As a direct and proximate result of said deception, Claimants have suffered and continue to suffer damages as alleged herein.

242.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Fourteenth Count
### Fraud

243.    Claimants incorporate by reference the foregoing paragraphs as if fully set forth herein.

244.    Respondents represented to Claimants that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities.

245.    Claimants reasonably relied upon that representation.

246.    Respondents' representation was false, as Respondents instead invested Claimants funds in complex, highly structured, taxable securities, which Respondents failed to inform Claimants. It is clear that the representation was false when made, as it was within a very short time thereafter, and immediately upon receipt of Claimants' funds, that Respondents invested in the complex, highly structured, taxable private placement securities, contrary to their representations. In any case, the representation became false sometime prior to Respondents' investment in such securities, and Respondents had a duty to disclose this fact to Claimants. They never did..

247.    Respondents knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Claimants' funds, by which time Respondents had a duty to disclose that the representation that they would be investing Claimants' funds in safe, liquid, short term, tax-exempt municipal or substantially similar securities was no longer true.

248.    Respondents had a duty to disclose to Claimants that the representation was false. They never did so.

249.    Respondents undertook to monitor the portfolio and the market on behalf of the Claimants, while failing to disclose certain material facts that they had a duty to disclose.    Respondents had a duty to disclose to Claimants certain material facts, including the fact that Respondents were investing Claimants' cash in complex, highly-structured securities, virtually all of which were issued by sellers of "credit default swap" agreements, "contingent capital facilities" established by bond insurers, and trusts established to fund "redundant reserves," and which violated Claimants' clearly articulated investment objectives of safety of principal and liquidity.  Respondents also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimants' behalf.  Respondents also had the duty to disclose the material fact that, upon information and belief, Respondents were using customer funds to support auctions of Lehman products for its own benefit.  Respondents failed to disclose and inform Claimants of such material facts.  From these failures, it is manifest that Respondents intended to defraud Claimants and allow them to believe that securities were being purchased and had been purchased in accordance with their investment objectives.

250.    Claimants    reasonably    relied    on    Respondents'    fraudulent misrepresentations and omissions to continue to allow Respondents to exercise limited discretionary authority over Claimant's investment.

251.    As a direct and proximate result of said fraudulent misrepresentations and material omissions and Claimants' justifiable reliance on said misrepresentations and omissions, Claimants suffered and continue to suffer damages as alleged herein.

252.    Claimants reserve the right to expand upon or amend their account of damages suffered.

### Prayer for Relief

253.    WHEREFORE, Claimants request the following relief:

a.  An order declaring that Respondents mismanaged Claimants' Account and violated the investment objectives and compelling Respondents to purchase from Claimants all US $285.65 million in illiquid securities at par plus accrued interest; and

b.  An award against Respondent for:

    i.  Damages in an amount to be determined at arbitration;

    ii.  Punitive damages of triple the damages suffered;

    iii.  Interest;

    iv.  Reasonable attorneys' fees and costs of suit; and

    v.  Such other relief as is just, fair, and equitable.

Dated: May 2, 2008
    New York, New York

Respectfully submitted,

KOBRE & KIM LLP

Michael S. Kim
Robert W. Henoch
Leif T. Simonson

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Attorneys for Essex Equity Holdings USA, LLC, M. Brian Maher and Basil Maher*