Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6                                          Case No.

7  LEHMAN BROTHERS INC.,              08-01420-jmp SIPA

8       Debtor.

9

10 - - - - - - - - - - - - - - - - - - - -x

11 In the Matter of:

12                                         Case No.

13 LEHMAN BROTHERS HOLDINGS INC.,     08-13555-jmp

14       Debtor.

15

16 - - - - - - - - - - - - - - - - - - - -x

17               U.S. Bankruptcy Court

18               One Bowling Green

19               New York, New York

20               May 9, 2011

21               2:05 PM

22

23 B E F O R E:

24 HON. JAMES M. PECK

25 U.S. BANKRUPTCY JUDGE

Page 2

1

2      Hearing Re:   The Trustee's Memorandum Regarding the Proposed

3      Orders Submitted by the Trustee and Barclays Capital, Inc., The

4      Trustee's Reply Memorandum Regarding the Proposed Orders

5      Submitted by The Trustee and Barclays Capital, Inc., Reply

6      Memorandum Supporting the Positions of Barclays Capital Inc.

7      Relating to the Orders Implementing the Court's February 22,

8      2011 Decision

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Dena Page

Page 3

1

2    A P P E A R A N C E S :

3    HUGHES HUBBARD & REED LLP

4          Attorneys for James W. Giddens, the SIPA Trustee

5          One Battery Park Plaza

6          New York, NY 10004

7

8    BY:   WILLIAM R. MAGUIRE, ESQ.

9          NEIL J. OXFORD, ESQ.

10

11

12   BOIES, SCHILLER & FLEXNER LLP

13         Attorneys for Barclays

14         333 Main Street

15         Armonk, NY 10504

16

17   BY:   DAVID BOIES, ESQ.

18

19

20   BOIES, SCHILLER & FLEXNER LLP

21         Attorneys for Barclays

22         5301 Wisconsin Avenue, N.W.

23         Washington, DC 20015

24

25   BY:   HAMISH P.M. HUME, ESQ.

Page 4

1

2   BOIES, SCHILLER & FLEXNER LLP

3        Attorneys for Barclays

4        575 Lexington Avenue

5        7th Floor

6        New York, NY 10022

7

8   BY:   JONATHAN D. SCHILLER, ESQ.

9

10

11   BOIES, SCHILLER & FLEXNER LLP

12        Attorneys for Barclays

13        10 North Pearl Street

14        4th Floor

15        Albany, NY 12207

16

17   BY:   TRICIA J. BLOOMER, ESQ.

18

19

20   JONES DAY

21        Attorneys for Lehman Brothers Holdings Inc.

22        222 East 41st Street

23        New York, NY 10017

24

25   BY:   ROBERT W. GAFFEY, ESQ.

Page 5

1

2    QUINN EMANUEL

3        Attorneys for Official Committee of Unsecured Creditors

4        51 Madison Avenue

5        22nd Floor

6        New York, NY 10010

7

8    BY:   ROBERT K. DAKIS, ESQ.

9

10

11   STUTMAN, TREISTER & GLATT

12        Attorneys for Baupost Group

13        1901 Avenue of the Stars

14        12th Floor

15        Los Angeles, CA 90067

16

17   BY:   GABRIEL GLAZER, ESQ.

18

19

20   ALSO PRESENT TELEPHONICALLY:

21        KENNETH CAPUTO, Securities Investors Protection Corp.

22

23

24

25

LEHMAN BROTHERS HOLDINGS INC.

Page 6

1                    P R O C E E D I N G S

2          THE COURT:  Before we start the presentation, I'd be

3    interested in knowing whether or not, notwithstanding the fact

4    that I received reply papers as recently as May 4, any progress

5    may have been made since then in narrowing areas of

6    disagreement.

7          MR. MAGUIRE:  Yes, Your Honor.  Bill Maguire for the

8    SIPA trustee.  We have been able to resolve a couple of issues,

9    Your Honor.  One is with respect to what the right number is on

10   the clearance box and the dispute about specific performance

11   versus a damages remedy.  There, you may recall, that with

12   respect to the box, Barclays was taking the position it was

13   entitled to specific performance remedy for the undelivered

14   clearance box assets and that that included or would give

15   Barclays the appreciation value of the securities.  We disputed

16   that, and we took the position that Barclays was entitled only

17   to the 869 million dollars in damages that it proved at trial.

18   But we also acknowledged that Barclays was entitled to interest

19   at the New York statutory rate of nine percent per annum.  And

20   frankly, when one does the math, one gets to a number through

21   very different paths that is, frankly, pretty much the same

22   number.  So what the parties have done is we have agreed that

23   the amount of the undelivered clearance box assets can be set

24   in an order that will specify the payment by the trustee to

25   Barclays of 1.1 billion dollars and that there will be no other

Page 7

1    payment of any kind.  That sets the amount.  It obviously

2    reserves the trustee's right to appeal and the ultimate

3    disposition of the box assets, but it sets the amount and makes

4    clear that there's no additional amount by way of distributions

5    or dividends or pre-judgment interest on top of that number.

6    It is a fixed number that both parties have agreed on as being

7    the right number to adjust the ultimate disposition of the

8    undelivered clearance box assets.

9         THE COURT:  So this means that specific performance is

10   now a moot issue?

11        MR. MAGUIRE:  That is correct.

12        THE COURT:  Let me ask you a question about the nine

13   percent pre-judgment interest.  There was a dispute as to

14   whether or not the trustee could assert nine percent pre-

15   judgment interest with respect to the trustee's claims.  Has

16   that issue been resolved in the context of resolving the issue

17   concerning the clearance box assets?

18        MR. MAGUIRE:  It has not, Your Honor.  That's still a

19   matter of dispute between the parties.

20        THE COURT:  It seems that symmetry would dictate that

21   nine percent should apply both ways or that there shouldn't be

22   nine percent, but rather the federal judgment rate interest

23   applicable to both.

24        MR. MAGUIRE:  The parties have not reached agreement

25   on symmetry or anything else other than simply the number with

1    respect to the clearance box.

2         THE COURT:  I'm not going to get in the way of that

3    agreement, but I see Mr. Boies standing, I presume in reference

4    to my comment on the pre-judgment rate.

5         MR. BOIES:  Exactly, Your Honor, and although I was

6    not a direct participant in these negotiations --

7         THE COURT:  Thanks for fixing that.

8         MR. BOIES:  See how long it lasts.

9         My understanding was to avoid exactly the question

10   that you're -- the Court raised, that we agreed that the 1.1

11   million (sic) dollars was in satisfaction of our specific

12   performance claim.  Now, if that is not your understanding,

13   then maybe we ought to have a sidebar.  But my understanding

14   from the negotiation was that in order to avoid any issue of

15   symmetry or lack of symmetry or any inference of precedent,

16   that we agree that the 1.1 million (sic) dollars --

17        THE COURT:  Billion.

18        MR. BOIES:  -- 1.1 billion dollars, yes, thank you --

19        THE COURT:  I didn't want you to be in trouble with

20   your client, Mr. Boies.

21        MR. BOIES:  I appreciate that because it would have

22   been a lot of trouble.  The 1.1 billion dollar amount was in

23   satisfaction of our specific performance claim, which is what

24   we claimed, and that didn't force either of us to reach the

25   issue of damages or interest.

Page 9

1           Now, if that is not counsel's understanding, perhaps

2    we ought to have a sidebar.

3           THE COURT:  Well, I think that all that I heard from

4    counsel for the trustee was how the number was derived.  I'm

5    not sure that I heard anything that indicated that any rights

6    were being conceded on either side.

7           However, you did well in this agreement compared to

8    how you would have done with me, so you should feel some level

9    of comfort that you've reached a good number.  I would be even

10   happier if there were some symmetry in the agreement because

11   obviously, the number was derived by using some mathematical

12   calculations that included a presumed interest rate.

13          MR. BOIES:  No, Your Honor, that's not so.  That's the

14   point I wanted to make.  It did not include some kind of

15   mathematical calculation that involved interest rate.  It was a

16   settlement of our specific performance claim.  We believe the

17   appreciation is significantly above 1.1 billion dollars.  We

18   thought we were entitled to specific performance.  And we were

19   settling our specific performance claim for 1.1 billion

20   dollars.  It had no implication of any interest rate at all

21   from our standpoint, and indeed, I think that that was

22   something that the parties actively talked about in the

23   negotiations.  So --

24          THE COURT:  Well, maybe this is one reason why judges

25   rarely want to know what happens in negotiations, because the

1    more you know, the more likely it is that the deal will

2    unravel.

3           I accept the settlement at 1.1 billion dollars that

4    has been described, and I'm disregarding the circumstances that

5    give rise to it, including the assertion that you've made that

6    this is a settlement of your specific performance claim.  Of

7    course it is; it resolves issues concerning the clearance box

8    assets regardless of the claims being made or the defenses

9    being made on either side.  It's just an agreed number.

10          MR. BOIES:  It is an agreed number, Your Honor, but

11   it's an agreed number with respect to a very specific claim.

12          THE COURT:  Yes.  It's an agreed number with respect

13   to the clearance box aspect of the decision.

14          MR. BOIES:  Even more specific.  We di -- we

15   only -- our claim with respect to that was a claim for specific

16   performance.  We did not make a claim for damages; we made a

17   claim only for specific performance.

18          THE COURT:  Well, whether or not that was a claim for

19   specific performance or for the value of the securities as they

20   may have accreted through the application of an interest rate

21   or through other market factors is really irrelevant because

22   you've made a deal which makes it unnecessary for me to address

23   those specifics at an agreed number.  If we were to get into

24   the specifics, which I think we're trying to avoid, you might

25   well have lost on the issue of specific performance.  So

Page 11

1   there's really no point in emphasizing that that's what you

2   just settled.  You settled a claim for clearance box assets.

3   It is true that in the history of the case, you were regularly

4   seeking delivery of those assets, but whether or not you had

5   entitlement to delivery of those assets as valued as of the

6   closing or as valued as of the time that you ultimately

7   received delivery is a matter that was never litigated during

8   the trial.  This is a matter that came up post-trial.  I am

9   happy that you resolved it.

10          MR. MAGUIRE:  Your Honor, Bill Maguire again for the

11   SIPA trustee.  There's one other agreement that we've managed

12   to reach, and that's with respect to two of what I'll call are

13   the smaller items of margin, one involving -- and you'll see it

14   in the briefs.  It's a reference to 267 million of margin

15   assets which turn out to be partly LBIE customer funds and

16   another number that was simply some confusion between the

17   parties.  So those fairly minor aspects of the margin dispute

18   have been resolved.

19          THE COURT:  Is this the 137 million dollar issue?

20          MR. MAGUIRE:  Exactly.

21          THE COURT:  Okay.

22          MR. MAGUIRE:  So those two small numbers have been

23   resolved, and we have, I think, an agreement, almost complete

24   agreement on what the right number is that Barclays should pay

25   the trustee, assuming that the arguments that are raised today

Page 12

 1   were to be unsuccessful, the arguments by Barclays.  The total

 2   amount, in other words, of margin that Barclays received, we

 3   understand now, is a total -- we calculate it as 2.101 billion

 4   dollars.  Barclays came up with a number that was eighty

 5   million dollars less than that, and we've been informed by

 6   Barclays that the reason for the difference is eighty million

 7   dollars that was not, in fact, received by Barclays but is in a

 8   suspense account at the OCC.  We had been going by Barclays'

 9   witness, Gary Romain; his notes indicated that Barclays had

10   received 1.375 billion dollars in cash at the OCC.  But we

11   understand that it's been clarified that eighty million of that

12   is, in fact, in a suspense account.  So we're checking that

13   today, but assuming we confirm that, I think we understand that

14   the total amount of Lehman margin that Barclays has received in

15   connection with this transaction.

16        THE COURT:  And is there a breakdown as to cash and

17   cash equivalents versus government securities within that total

18   number?

19        MR. MAGUIRE:  We understand -- it's actually not

20   within that number because most of the government securities

21   are actually in the possession of the trustee; they were never

22   transferred to Barclays.  But we do understand, I think both

23   parties have used the same number to cover that universe of

24   government securities, of margin in the form of government

25   securities as being approximately one and a half billion

Page 13

1    dollars.

2         THE COURT:  And of the one and a half billion dollars,

3    are we talking about government securities regardless of

4    maturity?

5         MR. MAGUIRE:  My understanding is that one and a half

6    billion is entirely -- certainly almost entirely made up of

7    government securities with maturities of greater than ninety

8    days.

9         THE COURT:  Okay.

10         MR. MAGUIRE:  There are some T-bills or whatever that

11    are a little bit less that I think are additional to that.  So

12    that's my understanding, is that the dispute over government

13    securities is in the ballpark of one and a half billion

14    dollars.

15         THE COURT:  Okay.  If I gave you more time, could you

16    reach more agreements?

17         MR. MAGUIRE:  My own sense is we've reached the end of

18    the road --

19         THE COURT:  All right.

20         MR. MAGUIRE:  -- on agreements, Your Honor.

21         THE COURT:  In thinking about how best to deal with

22    this, it seems to me that rather than having one side argue

23    every issue in dispute and having the other side argue every

24    issue in dispute, that we should consider doing this on a

25    dispute-by-dispute basis, thereby focusing in on issues such as

LEHMAN BROTHERS HOLDINGS INC.

Page 14

1    margin and having what amounts to a complete argument in

2    connection with that.  Does that make sense to the parties?

3           MR. BOIES:  It does from our respect.

4           THE COURT:  Now, why don't we start with margin, then?

5    It's a big-ticket item and we were just talking about it.  And

6    I'm familiar with the issue.

7           MR. MAGUIRE:  If I might approach, Your Honor?

8           THE COURT:  Yes, you may.

9           MR. MAGUIRE:  Again, Bill Maguire for the SIPA

10   trustee.

11          THE COURT:  It's obvious that my suggestion had been

12   anticipated by the parties because this binder is specifically

13   addressed to the margin assets.

14          MR. MAGUIRE:  It takes us time to learn, but we do

15   eventually start to catch on, Your Honor.

16          Your Honor, we had -- this obviously is, by far, the

17   most significant of the disputed assets.  The total amount in

18   dispute was some four billion dollars, and we under -- I mean,

19   that was, frankly, the most significant disputed asset that was

20   tried in the course of the thirty-four day trial.  We

21   understood that the Court's opinion in February squarely

22   addressed and resolved that dispute.  And we understood from

23   the Court's opinion that the trustee had won on this issue of

24   Lehman's cash and Lehman's cash equivalents and similar cash

25   assets.

Page 15

1        Having won, then, we find ourselves now, at this

2    stage, in connection with the entry of the form of order facing

3    this fairly fundamental issue that Barclays is raising in which

4    Barclays is now saying that it's entitled to an offset, which

5    in its papers, it puts in the amount of six billion dollars and

6    then says that Barclays will take only about one billion or a

7    little bit more than one billion dollars by way of offset,

8    still an absolutely staggering number.

9        There are a lot of problems that we have with this

10   argument.  We've characterized it as a new argument, and I want

11   to just be clear what we mean by that.  We don't mean that this

12   is just an argument that's arriving too late, that for some

13   procedural misstep, this is something that should really and

14   could have been tried in the course of the case.  And when we

15   say it's new, we are objecting to it because this argument is

16   the exact opposite of what Barclays was arguing throughout the

17   trial.  Barclays could not have raised this argument during the

18   trial because during the trial, Barclays was making affirmative

19   representations to the Court that totally contradict this

20   argument.

21       And what we've done in the binder that's before you,

22   Your Honor, in the tab 1, is to put side by side on one sheet

23   of paper the position that Barclays is asserting now with the

24   position that Barclays has asserted up to now.  And Barclays'

25   position, in brief, is that under the so-called transfer and

08-13555-mg   Doc 16880   Filed 05/16/11   Entered 05/17/11 11:22:48   Main Document
Pg 16 of 72
LEHMAN BROTHERS HOLDINGS INC.

Page 16

1    assumption agreement, Barclays took on and assumed this

2    enormous liability, some six billion dollars for the shorts,

3    and that was new consideration.  And Barclays is arguing that

4    somehow, that implicit in the Court's opinion, is the voiding

5    of that agreement.  And they say that since they gave some six

6    billion dollars of consideration in undertaking that agreement,

7    Barclays is entitled to be compensated for that consideration.

8    And that whole argument is premised on the notion that in

9    entering into the transfer and assumption agreement, Barclays

10   was providing new consideration, and the new consideration was

11   assuming the shorts, the short exchange-traded derivatives.

12   Those liabilities were in the amount of six billion dollars;

13   Barclays says it took those liabilities on under that agreement

14   and that Barclays was not otherwise obliged to take on any of

15   those liabilities.

16        That is precisely the opposite of what Barclays said

17   up to now.  On the left side of the page, we put forward from

18   Barclays' reply brief filed just a couple of weeks ago where --

19   or last week, actually, where Barclays says in paragraph 79,

20   "Thus the purchase agreement did not require Barclays to assume

21   the short options."  Well, that is simply not true, and

22   Barclays itself affirmatively represented to the Court that the

23   purchase agreement did require Barclays to assume the short

24   positions.  And on the right side of the page before you, we

25   put forward Barclays' positions both before trial and, indeed,

Page 17

1    after trial, all of which uniformly represented to the Court

2    that under the purchase agreement, under the clarification

3    letter, Barclays assumed responsibility for the short

4    positions, the short exchange-traded derivatives.  The first is

5    before trial, and that's Barclays' January 2010 opposition

6    brief at paragraph 380 where Barclays says, and I quote, "These

7    purchased assets were specifically defined to include LBI's

8    exchange-traded derivatives."  And the sentence goes on and is

9    accompanied by a citation to the clarification letter.

10        And Barclays goes on to say, "Thus, Barclays acquired

11   not only the ETD, the exchange-traded derivative positions

12   themselves," and it includes, then, a phrase that specifically

13   defines what those exchange-traded derivative positions were,

14   composed of both assets, the long positions, and liabilities,

15   the short positions.

16        That is completely consistent with Barclays' position

17   after trial.  After trial, and we put forward here an excerpt

18   from Barclays' November 2010 post-trial brief at paragraph 88,

19   and there, it's a lengthy quotation, but it starts describing

20   the clarification letter and how it actually narrows and

21   provides more precision to the definition of purchased assets.

22   And it goes on to say that no other short positions are being

23   assumed with respect to the trading inventory Barclays is

24   acquiring "except for the ETDs, where Barclays is acquiring

25   both long and short positions".  And then we have a

LEHMAN BROTHERS HOLDINGS INC.

Page 18

1    parenthetical that further confirms that this is both assets

2    and liabilities.

3         So the new argument that Barclays did not acquire, was

4    not already obliged under the purchase agreement to take

5    responsibility for the shorts is a 180 degree reversal of the

6    representations that Barclays made before trial and after

7    trial.  And that, of course, is entirely consistent with the

8    testimony that the Court heard here.  You may remember witness

9    after witness was shown the financial schedule in which there

10   were -- this is under the asset purchase agreement in which

11   there were assets on one side and liabilities on the other, and

12   as those assets changed during the week, ultimately, many of

13   the shorts went away.  But the shorts that remained included

14   the exchange-traded derivative shorts, and that's where

15   Barclays confirmed before trial and after trial that it

16   retained -- it assumed liability for those shorts, the

17   exchange-traded derivative shorts.

18        So now, what we have is Barclays asking for an offset

19   for assuming short liabilities to the OCC which Barclays was

20   already required to assume under the purchase agreement.

21   Barclays is saying it should get a credit for giving

22   consideration in taking those shorts on when it entered into

23   the transfer and assumption agreement.  The problem with that

24   is that Barclays was already obligated to assume those shorts,

25   whether it entered into the transfer and assumption agreement

Page 19

1    or not.

2         Barclays has a similar argument under Section 550 of

3    the Code.  That's exact replay of the same argument, except

4    this time defining this consideration as a cost.  Now again, I

5    think it's a fairly clear principle of law.  When someone is

6    already obliged to do something, when you're already legally

7    required to assume those liabilities, you can't claim that

8    there's some additional cost in assuming those liabilities.

9    You can't claim that there's some additional consideration that

10   you're providing in undertaking to do what you're already

11   required to do.  And Barclays, by its own admissions, was

12   clearly already required to assume these short positions.

13        I think there are many other subsidiary points that

14   one could make with respect to this new argument, but I think

15   that really is the heart of the issue, Your Honor.

16        THE COURT:  And so your fundamental argument is that

17   having agreed to the number with Barclays, which is

18   approximately 2.1 billion dollars, that that is the amount that

19   the trustee should be receiving back --

20        MR. MAGUIRE:  Exactly.

21        THE COURT:  -- without offset.

22        MR. MAGUIRE:  Without any offset.

23        THE COURT:  Right.  That's the position.

24        MR. MAGUIRE:  And exclusive of any prejudgment

25   interest.

Page 20

1         THE COURT:  And exclusive of any prejudgment interest

2    which you would assert should run at the same nine percent

3    rate -- and I don't mean to restart the dispute -- but at the

4    same nine percent rate which, at least for your internal

5    purposes, you used to derive the 1.1 billion dollar number that

6    we talked about earlier in reference to the clearance box asset

7    agreement.

8         MR. MAGUIRE:  Exactly, Your Honor.

9         THE COURT:  Okay.  I understand.

10        Mr. Boies?

11        MR. BOIES:  Yes, and may I approach with a book of our

12   own, Your Honor?

13        THE COURT:  Yes, of course.

14        Thank you.

15        MR. BOIES:  Just in terms of a presentation, I was

16   going to start by addressing the government securities issue

17   that the Court raised, and then get to the argument that he

18   just made, but I'm happy to go in reverse order, if that would

19   be easier for the Court.

20        THE COURT:  Well, since Mr. Maguire has not yet made

21   his argument with respect to the government securities, I don't

22   really care who goes first on the argument.

23        Do you care, Mr. Maguire?

24        MR. MAGUIRE:  I don't, Your Honor.

25        THE COURT:  Fine.  So you'll get cleanup on that

Page 21

1    issue.

2         MR. BOIES:  Okay.  So let me begin with the government

3    securities issue, and in that connection, I would like to begin

4    with tab 6.  And the reason I do is because what we are trying

5    to do today is not argue to the Court what we think is right.

6    We're trying to argue to the Court what we think is a natural

7    extension or application of the Court's order.  And as we read

8    the Court's order on margin, it was -- the Court said over and

9    over again that there was no Lehman cash going to Barclays.

10   And if that is correct, then the issue becomes what is cash and

11   cash equivalents?  And we recognize that cash equivalents

12   should be treated as cash under the Court's opinion.

13        What we are arguing about is what constitutes cash

14   equivalents.  Our view is that cash equivalents are government

15   securities of ninety days in duration or less, not government

16   securities of unlimited duration.  The order that the trustee

17   has given the Court would provide that government securities of

18   fifteen, eighteen, nineteen years' maturities would be

19   considered cash or cash equivalents.  We think there is simply

20   no support in the record and no support outside the record, as

21   far as that's concerned, for an interpretation of cash and cash

22   equivalents of that nature.

23        If you would turn to tab 10, you'll see a reference to

24   the fact that it is first undisputed that in their annual

25   reports at the time of the sale, both Barclays and Lehman

Page 22

1   defined cash equivalents as securities with a maturity of three

2   months or less.  By contrast, as is indicated here, many of the

3   margin assets at issue consisted of government securities with

4   maturities greater than three months.  Indeed, many of the

5   securities consisted of government securities with maturities

6   of over fifteen years.  Maturities longer than fifteen years,

7   for example, BCI Exhibit 686, is a Treasury bond of about 120

8   million dollars with a sixteen-year maturity.  BCI Exhibit 689

9   is a Treasury bond of over eighty-six million dollars with a

10  sixteen-year maturity.  BCI Exhibit 691 is a Treasury bond of

11  175 million dollars with a sixteen-year maturity.  BCI 687 is a

12  security bond of approximately sixty million dollars with a

13  nineteen-year maturity.  All of these government securities and

14  all the ones like them would, under the government's proposed

15  order, be treated as cash and cash equivalents.  And we don't

16  think that that is consistent with Your Honor's opinion, and we

17  don't think that such a position could be possibly justified

18  based on the trial record.  So what we would argue first --

19          THE COURT:  Well, wait a minute.  Wait a minute, Mr.

20  Boies.

21          MR. BOIES:  Yes.

22          THE COURT:  And I realize that you're focused on the

23  definition of cash equivalents as that term is tied into the

24  duration of a government security.  But I think you're

25  misreading the opinion as a whole as it relates to the

Page 23

1    disposition of the disputed margin because while it is true --

2    and you emphasized these points -- that the opinion references

3    Lehman cash as an important factor in the decision, it's also

4    true that this entire issue relating to government securities

5    did not come up during the trial, at least I can't remember

6    that it came up during the trial in reference to Barclays'

7    defense to the request by the trustee for a turnover of

8    disputed margin.

9         Additionally, the opinion itself isn't limited to cash

10   but rather finds, based upon an interpretation of the record

11   relating to the negotiation, drafting and execution of the

12   clarification letter itself, that there was no meeting of the

13   minds in reference to including margin within the clarification

14   letter.

15        So it would be fully consistent with the opinion I

16   wrote for an order to be entered that delivers all 2.1 billion

17   dollars from Barclays to the trustee quite apart from any

18   arguments relating to what cash and cash equivalents may mean

19   as tied to the duration of government securities.

20        MR. BOIES:  The only thing I would say, Your Honor, is

21   that obviously, it's your opinion and your order and you will

22   write it as you see fit.  But I would suggest that if you go

23   beyond the no cash rationale, there simply is no support in the

24   record for -- even if you ignore the meeting of the minds, even

25   if you ignore the clear language of the agreement, which, as

Page 24

1    the Court knows was filed with the Court, incorporated -- it's

2    in the Court's -- by -- referenced in the Court's sale order,

3    even if you ignore all that, there is still nothing in the

4    record that would justify giving them all of this margin.  I

5    mean, you get there -- they get there -- not the Court, but the

6    trustee gets there, for example, by simply excising words from

7    the sections of the agreement that they quote, like Section

8    1(b).  They leave out the language that says, "except to the

9    extent otherwise specified herein or in the agreement".  If you

10   look --

11           THE COURT:  Well, we're not going to relitigate --

12           MR. BOIES:  No.

13           THE COURT:  -- what we spent so much time litigating

14   last year.

15           MR. BOIES:  Not at all.

16           THE COURT:  And I remember vividly Mr. Rosen's

17   testimony on examination and cross-examination and the

18   circumstances that surrounded his parenthetical.  I am mindful

19   of at least my recollection of the record.  And I'm also

20   mindful of what I wrote.  And what surprised me -- and I'll say

21   this, actually, to both sides -- what surprised me when I saw

22   the briefs that were submitted on April 28 and again on May 4

23   as a follow-up to our informal chambers conference in which we

24   talked about the dispute surrounding the orders to be entered

25   in reference to the February 22 opinion, I really did not have

Page 25

1    sufficient foreshadowing of the kinds of disputes that were

2    going to be raised in connection with the form of order to be

3    entered.  And it appears to me -- and I don't mean to be

4    suggesting that this amounts to a motion for reconsideration by

5    either party -- but it appears to me that much of what is being

6    argued in the context of the form of order is a motion for

7    reconsideration, and that the issues surrounding margin do not

8    really tie to the duration of government securities.  It seems

9    to be a completely new argument by Barclays, one that was not

10   supported at all during the lengthy trial that we had.  At no

11   time can I recall any argument made during trial that suggested

12   that the margin issue was in any way tied to the duration of

13   government securities.  This is the first that I'm hearing it.

14         MR. BOIES:  Your Honor, the record at trial is, of

15   course, the record at trial, and I don't mean to argue with the

16   Court about the Court's recollection of it.  But my

17   recollection of it, right or wrong, is that the fight over

18   these assets was, as I think someone could read the Court's

19   opinion as saying, was a fight over cash, Lehman's cash.

20         THE COURT:  Well, that was only one part of it, Mr.

21   Boies.  That was the part that made it very crystal clear to

22   me, because the trustee was always talking, as I heard it,

23   about cash and cash equivalents, and that was something that I

24   heard repeatedly.

25         MR. BOIES:  Yes.

1          THE COURT:  But Barclays was never talking about

2    noncash margin; it never came up.

3          MR. BOIES:  But Your Honor, that's because we were

4    saying that we got them both.  We were saying we got them both.

5          THE COURT:  Yes, but you're not entitled to government

6    securities, Mr. Boies.  They're excluded.  You may have gotten

7    the business that included the trading of government

8    securities, but you didn't get the securities themselves.

9          MR. BOIES:  But Your Honor -- that's from Section

10   1(b), right?  That's what you're talking about?  Section 1(b)?

11         THE COURT:  I'm talking about the clarification

12   letter --

13         MR. BOIES:  Yes.

14         THE COURT:  -- and the purchase agreement.

15         MR. BOIES:  Right.

16         THE COURT:  But I don't want to argue with you about

17   this.

18         MR. BOIES:  But all --

19         THE COURT:  Your issue is whether or not the form of

20   order proposed by the trustee is or is not consistent with my

21   opinion.

22         MR. BOIES:  Right.

23         THE COURT:  And I'm letting you know, I believe it is.

24         MR. BOIES:  Okay, and if you don't want me to talk

25   anymore about it, I'll stop talking about it.

Page 27

1          THE COURT:  No, I'm anxious to hear everything you

2     have to say.

3          MR. BOIES:  Okay, one of the things I want to say is I

4     don't think it is consistent with Your Honor's opinion, all

5     right, because I do not think that Your Honor lays out in your

6     opinion a basis for giving them the margin other than cash and

7     cash equivalents.  As the Court says, that's what they argued

8     at trial.  All right?  And that was the -- and that's what is

9     in the Court's opinion.  And I don't think the Court's opinion

10    lays out a basis for giving them the margin other than cash and

11    cash equivalents.  And we've asked them to point to the

12    sections; they point, for example -- the reason I mention 1(b)

13    is they point to Section 1(b) and Section 1(b) does talk about

14    the business and whether they include government securities and

15    the extent to which they do, and then goes on to say, though,

16    it says, "except to the extent otherwise specified herein or in

17    the agreement".  And Your Honor referenced that exact section

18    in the Court's opinion.  And as you -- and I would have

19    interpreted the Court's opinion as being something that gave

20    them the argument they were making at trial, which is that cash

21    and cash equivalents were excluded.

22          If the Court intends to make a decision beyond that,

23    that's the Court's decision.  And I'm really not -- I'm really

24    not trying to argue the underlying merits.

25          THE COURT:  Well, even your papers, Mr. Boies,

Page 28

```
 1    acknowledge that the decision can be read to go beyond cash and

 2    cash equivalents.  You at least gave me that in your papers.

 3            MR. BOIES:  Absolutely, Your Honor.

 4            THE COURT:  But you're not giving it to me now.

 5            MR. BOIES:  Well, Your Honor, what I'm -- I believe

 6    that there are references in the Court's opinion.  I don't

 7    think it's the Court's reasoning, but if the Court says it is

 8    the reasoning, obviously, I yield.

 9            THE COURT:  Multiple grounds for finding against you

10    on this point.

11            MR. BOIES:  Okay, but the only thing I would say to

12    the Court, okay, is that I would just ask the Court -- I won't

13    argue it anymore -- I would just ask the Court to look at those

14    multiple bases because when you had a -- and maybe we can --

15    maybe we can't agree, but maybe we could agree that the primary

16    thing that the Court talks about is the cash and cash

17    equivalents.  And sometimes when you have multiple bases, the

18    Court has not looked with the same exacting scrutiny at the

19    support or lack of support for some of the alternative bases,

20    and the only thing I would ask the Court to do is that if you

21    are going to hold that they are entitled to all of the

22    government securities that were margin, that the Court look

23    at -- take a hard look and see whether there is a basis for

24    that alternative finding.  And with that, I'll move on, unless

25    the Court has a question.
```

1          THE COURT:  That's fine.  But is there no -- let me

2     just be clear on this.  There's no dispute with respect to the

3     calculation of the margin.  Is that correct?

4          MR. BOIES:  There is, I think, only the -- I think

5     they will ultimately agree with us on the 80 million dollars,

6     and as I understand it, it was the difference between 2.021

7     billion and 2.101 billion, the difference being 80 million

8     dollars.  And if the Court rejected the argument I just made

9     and all the other arguments that I have on this issue, then the

10    only, I think, dispute on this aspect would be that eighty

11    million dollars.

12         THE COURT:  Okay, and then as to the 1.5 billion which

13    is in government securities, of that 1.5 billion, what

14    percentage constitute long-term government securities of the

15    sort that you identified in your argument, and what percent

16    represent relatively short-term obligations that might fit the

17    definition of cash equivalents?

18         MR. BOIES:  Can I have just one moment, Your Honor?

19         THE COURT:  Sure.

20         MR. BOIES:  Your Honor, our common understanding is

21    that the government securities longer than ninety days are

22    approximately 1.5 billion (ph.) dollars.

23         THE COURT:  That's a fairly wide swath of securities,

24    though.  There could be securities that are six-month

25    securities or securities that are, as you point out, sixteen or

1   nineteen-year securities.  It depends on the maturities.  I

2   don't suggest that you selected the long-term maturities to be

3   in any way misleading, but I don't know to what extent they're

4   representative.

5           MR. BOIES:  Your Honor, could I have just one more

6   moment?

7           THE COURT:  Absolutely.

8           MR. BOIES:  Your Honor, our best estimate is that 640

9   million dollars have maturities of more than fifteen years.

10  Now, I understand that it is still a large amount of real

11  estate between fifteen years and ninety days, but as I -- and

12  we can furnish a breakdown of that, and we'd be prepared to

13  furnish a breakdown of that to the Court.  But as I stand here

14  now, I can tell you what is longer than ninety days, and I can

15  tell you what's longer than fifteen years.  But exactly where

16  the amount is between the ninety days and the fifteen years, we

17  would need to do some calculations.  But we can do that and we

18  can furnish it to the Court.

19          THE COURT:  Okay, and I'm not being at all critical

20  here when I make this next point, but why is it that these

21  essentially defensive issues concerning the duration of the

22  government securities that constituted part of the margin never

23  came up during the trial?  I never heard this before.

24          MR. BOIES:  Your Honor, during the trial, we read them

25  as saying, as the Court indicated a few moments ago you read

Page 31

1    them as saying, that they were objecting to cash and cash

2    equivalents.  Now, cash and cash equivalents has a very

3    standard definition.  It's not only the definition that's in

4    our annual report, Barclays' annual reports, their annual

5    reports.  It is the Financial Accounting Standards Board, the

6    International Accounting Standards Board defined cash

7    equivalents as investments of original maturities of three

8    months or less.  And we set this out in some of the citations

9    in chart 12 of what we've given the Court.  So when they talked

10   about cash and cash equivalents, from our perspective, that had

11   a very defined meaning, including in the materials that were in

12   the record.

13         THE COURT:  So did you believe during the trial that

14   the only margin that was in dispute was margin that fit the

15   definition of cash and cash equivalents as that term might be

16   understood from standard reference points?

17         MR. BOIES:  We believed that their basic argument was

18   cash and cash equivalents, Your Honor.  There was no doubt,

19   okay, that there were discussions of proprietary margin, but I

20   think if the Court goes back and looks at the record, the Court

21   would find references to any issue that the trustee was arguing

22   about other than cash in terms of these marginal -- few and far

23   between.  I'm not saying they aren't there, but I'm saying that

24   the primary argument was, as I think everybody's recognized,

25   that there was to be no transfer of cash and cash equivalents,

Page 32

1    and there were clearly transfers of cash and cash equivalents.

2          THE COURT:  I recognize that, but from my perspective,

3    and I've been -- I've been presiding in this 60(b) dispute for

4    some time -- I cannot recall a single instance in which

5    Barclays raised during the trial in defense of the claims made

6    by the trustee to recover margin, that that margin should not

7    be turned over on account of the fact that a significant

8    percentage of the amount in dispute was invested in long-term

9    government securities.  It just never was presented to me.

10          MR. BOIES:  I think what was presented was the

11    question of cash or cash equivalents.  We argued in our post-

12    trial brief that cash equivalents were limited to securities of

13    more than -- or, less than ninety days, less than three months.

14    In our trial presentation, we argued that we were entitled to

15    all of the margin.  We thought we were fighting over whether we

16    were entitled to all of the margin, our position, or whether we

17    were only entitled to that margin that was not cash and cash

18    equivalents.  And we thought that the term cash and cash

19    equivalents had a standard definition that we reference in our

20    post-trial brief.  So I think we tried to be clear on that

21    issue.

22          THE COURT:  I understand.  I'm just telling you that I

23    never heard until this briefing round in connection with the

24    form of order to enter that we had an issue concerning longer

25    term maturities of government securities and that the amount at

1   issue was as much as 1.5 billion dollars.  And trust me; if you

2   had brought that up during the trial, I would have remembered

3   it.  It didn't come up.

4           MR. BOIES:  I think the Court is correct that there

5   was nothing in the trial that calculated what percentage of

6   the -- or, what amount in dollars of the government securities

7   were longer than ninety days, although that number was

8   obviously in the materials that went into evidence.  I don't

9   think we argued that -- I don't think we argued that issue

10  until the post-trial briefs.

11          THE COURT:  Okay, so we're in agreement on that at

12  least.  And Mr. Maguire, I think, should have an opportunity to

13  address the government securities component of margin which

14  we've been addressing.  You had another issue you wanted to

15  address as well, Mr. Boies.

16          MR. BOIES:  I did, and I can do that and I'll do this

17  in any order that is most helpful to the Court.  Would the

18  Court like me to jump to responding to his point, which was --

19  which didn't have to do with the definition of cash and cash

20  equivalents; it had to do with what we referred to as the

21  offset point.

22          THE COURT:  Sure.  Let's do the offset point; then

23  we'll give Mr. Maguire a chance --

24          MR. BOIES:  Okay.

25          THE COURT:  -- to talk about government securities,

LEHMAN BROTHERS HOLDINGS INC.

Page 34

 1    and he'll be able to also counter your offset point.

 2         MR. BOIES:  Okay.  Now, as I understand the trustee's

 3    argument in response to -- you can call it offset, Section

 4    550(e), it's all basically the same point, which is that we

 5    took certain liability and we took the margin that secured

 6    those liabilities, and if you turn to tab 18, you'll see that

 7    this issue only arises in the present context, the context

 8    we're talking about right now, in connection with the 1.3

 9    billion in margin assets transferred to Barclays as part of

10    LBI's OCC accounts.  And these were security for the

11    liabilities, the proprietary and affiliate positions

12    liabilities in those accounts.

13         Now, the -- going on to the next chart, the amount of

14    any liabilities, of any of these liabilities that Barclays was

15    taking on were secured by the transferred assets which included

16    the margin.  And if you say that Barclays is required to take

17    those liabilities without taking the margin that comes with it,

18    what you're obviously doing is you are taking away part of the

19    quo for the quid that was being negotiated.  Now, this is an

20    argument that the trustee, in his briefing, doesn't really

21    answer the 550(e) argument, except to say we already had that

22    obligation, that is, you already had the OCC obligation.  But

23    the Court will remember, among other things, that at the time

24    that the TAA was executed, the reason it was executed when it

25    was is the OCC was about ready to close those accounts out.

Page 35

1  For this -- the evidence was undisputed that if this wasn't

2  executed when it was, those accounts were going to be closed

3  out.  The reason it was executed before the deal was closed was

4  because the OCC said in no uncertain terms that unless it was

5  executed, they were going to close those accounts out and

6  Lehman wasn't going to have anything.  It was at that point

7  that Barclays stepped up and said that they would sign the TAA

8  which, by its terms, gave them the margin that secured the

9  liabilities as well as the liabilities.

10       We are not here trying to get margin that was

11  transferred that was in excess of what was needed to secure the

12  assets.  And there is a chart in here that has the numbers on

13  it.  If you go to chart 32, Your Honor, I think maybe you can

14  see what I'm talking about.  At the time of the closing -- at

15  the time of the closing, there was a net liability of 1.1

16  billion dollars that Barclays assumed if you ignore the margin.

17  That is, if you just look at the net of the long and short

18  positions, there's 1.1 billion dollars at the time of closing.

19  In addition to that, as this indicates and BCI Exhibit 147 at

20  page 2 supports this, after the closing, there was an

21  additional 730 million dollars of losses on the option

22  positions in the LBI proprietary accounts -- the LBI

23  proprietary accounts at OCC that Barclays was assuming.

24       Now, we're not saying -- I'm now passing all of our

25  other arguments, all right?  In this part of our argument, we

Page 36

1    are not saying that we get the margin that was in excess of

2    that net liability.  That is, to the extent that there was

3    margin -- and there was some margin -- that was in excess of

4    that 1.8 billion dollars, we're not saying we get that under

5    this offset.  But what we are saying is that you can't say that

6    we take the OCC accounts, which we didn't have to take -- they

7    were going to be closed out; we didn't have to sign that TAA.

8    We signed the TAA because we were getting not only the

9    liabilities but the margin secured those liabilities.  And when

10   you try to break up the TAA and you say, well, you're going to

11   take the liabilities that exist at the closing, but we're not

12   going to give you the margin that was already pledged, secured

13   by those liabilities, we don't think there is any basis in law

14   or in fact or equity to do that.

15        Let me put it this way.  If we have not executed a

16   TAA, if we've not taken over the OCC, we would have been

17   neutral as far as the OCC assets and liabilities are concerned;

18   they would have been neutral.  All right?  The fact that we

19   took them over before they were closed out means that under the

20   Court's order, they are getting at a minimum the difference

21   between the margin that was required to secure net liabilities

22   that existed and the total margin.  What they're arguing for is

23   that this TAA assumption should, on day one, have been

24   something that gave them a 1.1 to 1.8 billion dollar windfall

25   plus amount and gave us on day one a 1.1 to 1.8 billion dollar

LEHMAN BROTHERS HOLDINGS INC.

Page 37

1    shortfall.  And their argument is that we said at the trial

2    that we were entitled to all of the long and short positions

3    and including the margin.  When he quoted that to Your Honor,

4    he left out the last clause of our statement which talked about

5    including the margin.  That was our position.

6         Our position at trial was that we were entitled to all

7    the assets, all the liabilities, all the margin.  If the Court

8    concludes that we're not entitled to all of the margin, we

9    think we must at least be entitled to that amount of the margin

10   that is necessary to keep us from having, on day one, a net

11   liability.

12        Now, I want -- just one more point, I would ask you to

13   look at tab 9 because this sets out Mr. Kobak's -- 29, tab 29

14   which sets out Mr. Kobak's testimony.  Mr. Kobak was the

15   trustee's 30(b)(6) representative.  That is, he spoke for the

16   trustee, the trustee is bound by what he testified to.  And

17   we're talking about the OCC margin.  And I asked him,

18   referencing this part of the agreement that said LBI has

19   assigned Barclays "all rights and securities, cash and other

20   property defined as collateral pledged by LBI, the Options

21   Clearing Corporation held for OCC's benefit at JPMorgan Chase.

22   Did you see that?"

23   "A. Yes.

24   "Q. When you say you signed this consistent with the idea

25   there would be no cash, this says cash.  This says cash will be

Page 38

1    transferred to Barclays.

2    "A. Yeah, but cash would be transferred against liabilities.

3    "Q. So to the extent that cash was simply needed to cover the

4    liabilities, you thought it was possible to be included in the

5    deal, is that correct?

6    "A. Yes."

7           This is the trustee's 30(b)(6) representative whose

8    testimony they are bound by, and even he is recognizing that to

9    the extent that the margin, even cash, was necessary in order

10   to satisfy secure liabilities that existed at that time, that

11   we're entitled to it.

12          THE COURT:  Okay.

13          MR. BOIES:  Thank you.

14          THE COURT:  Thank you.

15          Mr. Maguire?

16          MR. MAGUIRE:  We have two issues to address, Your

17   Honor.  In terms of which one you'd like me to address first,

18   is there any preference?

19          THE COURT:  Take your pick.

20          MR. MAGUIRE:  Okay.  Well, starting with the last one,

21   the issue of the offset, Mr. Boies started out by saying that

22   the liabilities that that -- Barclays not getting the margin

23   meant they weren't getting the pro for the quid.  And that,

24   frankly, is what we tried for thirty-four days, which was was

25   the margin consideration for taking on the exchange-traded

Page 39

1    derivatives business.  Was the margin in the deal or was it not

2    in the deal.  Here, Barclays was acquiring the North American

3    business of Lehman Brothers.  It was acquiring an extremely

4    valuable franchise.  It wasn't just acquiring derivatives; it

5    was acquiring the entire franchise.  It could have done that

6    with the margin if that was the deal.  It could have done that

7    without the margin if that was the deal.  And the whole issue

8    that we tried for thirty-four days was -- which is was the

9    margin in the deal or wasn't it in the deal.  And that issue

10   was squarely resolved by the Court's opinion in February which

11   is that margin was excluded from the deal.  And the Court

12   squarely rejected the arguments that Barclays made that no

13   rational purchaser would undertake a deal of this kind without

14   having the margin in hand for the reason that the issue was not

15   what a rational purchaser would or would not do but what, in

16   fact, the parties had agreed to do in this specific

17   circumstance.

18          Mr. Boies did not respond to the points that I raised

19   earlier, which is that his new offset argument is a 180-degree

20   reversal of the affirmative representations that Barclays made

21   to the Court before and after the trial in which on occasion

22   and reoccasion, Barclays reaffirmed that it took, under the

23   clarification letter, under the asset purchase agreement, not

24   under the transfer and assumption agreement, under the

25   clarification letter, it took responsibility for the short

1    exchange-traded derivatives positions.

2         Mr. Boies refers, instead, to the testimony of the

3    trustee's counsel, Mr. Kobak, but as you will recall, Your

4    Honor, Mr. Kobak was present here at the sale hearing.  What he

5    heard was that there was no Lehman cash going to Barclays.  All

6    of his testimony is based on his understanding at the time

7    which was that there was no proprietary, no Lehman-owned cash,

8    that was going to Barclays.  Obviously, there was customer

9    property that was going to Barclays, not the firm's property.

10        That's really all I have to say, I think, on the

11   offset issue, Your Honor.  Unless you have a question, I'm

12   happy to turn to the other issue concerning government

13   securities.

14        THE COURT:  So your position on the offset issue is

15   that you're entitled to approximately 2.1 billion dollars in

16   cash, cash equivalents and government securities without

17   offset.

18        MR. MAGUIRE:  With no offset of any kind.

19        THE COURT:  Yes.

20        MR. MAGUIRE:  That's correct, Your Honor.

21        THE COURT:  Okay, I understand it.

22        MR. MAGUIRE:  And now on the subject of government

23   securities, Barclays is raising this accounting convention that

24   the parties used in their annual reports whereby for purposes

25   of financial statement presentation, government bonds were

1   classified in different categories, depending on their

2   maturities, obviously, something that we did not at all go to

3   explore in the course of this trial.  This trial was not a

4   fight over the duration of government securities or long bonds.

5   This trial was a fight about margin, and it was very clearly

6   about all of the margin.  We were not disputing some of the

7   margin; we were disputing all of the margin.  And we put on the

8   board and we fought through the thirty-four day hearing the

9   number of four billion dollars.

10        THE COURT:  You make it sound as if the whole trial

11   was about margin; of course, it was about a lot of other

12   things, as well.

13        MR. MAGUIRE:  There were a few mundane matters that

14   managed to sneak in, but from my narrow perspective, Your

15   Honor, you'll understand that --

16        THE COURT:  I understand what you were fighting about.

17        MR. MAGUIRE:  And that four billion dollar number that

18   I believe is reflected in the Court's opinion, of course,

19   includes the one and a half billion of government securities.

20   We did not come into this court asking for two and a half

21   billion dollars in margin, and Barclays did not defend against

22   two and a half billion dollars of margin.  We fought the fight

23   over the four billion, and the four billion includes every

24   dollar of those long-term government bonds, whether their

25   maturity is ninety days or ninety years.  They're all in the

LEHMAN BROTHERS HOLDINGS INC.

Page 42

1    four billion that we fought about before you.

2         Mr. Boies suggested that Your Honor's opinion does not

3    lay out as basis to award the margin or to find that those

4    long-term government bonds belong to the estate and to the

5    trustee, and I respectfully disagree with Mr. Boies on that

6    score.  There are multiple bases in the Court's opinion.  Very

7    specifically, the Court pointed to exclusion N in the Court's

8    opinion -- in the agreement, the parties' agreement, the asset

9    purchase agreement.  And Barclays entirely ignored that when

10   they filed their main brief, here, and they obviously saw our

11   brief, and they did respond on reply.  And our slide 4 sets

12   forth where Barclays acknowledged on reply in their brief at

13   paragraph 74 the fact that this had been raised and had been

14   addressed.  In the first sentence of that paragraph, Barclays

15   states, "The trustee also points to footnote 35 of the Court's

16   opinion in which the Court appears to have adopted the

17   trustee's argument that subsection N of the definition of

18   excluded assets included any assets primarily related to

19   exchange-traded derivatives."  It goes on, then, where Barclays

20   respectfully reiterates its assertion.

21        Now, that, frankly, sounds to us an awful lot like

22   reconsideration and reargument.  And in the course of the

23   proceeding that we're here today in terms of the form of the

24   order that should be entered giving effect, it seems that that

25   is not properly posed.  And even if this were properly a motion

Page 43

1    for reconsideration or for reargument, we respectfully submit

2    that there is absolutely no basis for any such motion because

3    there is no controlling factor, controlling law that Barclays

4    points to that was overlooked by the Court.  On the contrary,

5    exclusion N which excludes all assets primarily related to

6    derivative positions, no matter what their maturity is, that

7    was squarely addressed at the trial and that is squarely

8    addressed in the Court's opinion, as, of course, is exclusion B

9    for cash, cash equivalents, and our quibble over what is a cash

10   equivalent I don't believe matters here when you consider all

11   of the other items and exclusions that we have.  But I would

12   point out that in addition to excluding cash and cash

13   equivalents, the sentence goes on to cover similar cash items.

14        So we have exclusion N clearly covers all assets, all

15   the margin assets.  We have exclusion B that covers cash, cash

16   equivalents and similar cash items.  And then of course, that's

17   without even getting to the specific exclusion for government

18   securities which is not only before the Court, in the parties'

19   agreement and specifically addressed in the Court's opinion.

20        So respectfully, we disagree with Mr. Boies and

21   believe that the Court's opinion does, indeed, lay out a basis

22   for the trustee to be entitled and to recover the one and a

23   half billion dollars of long-dated government bonds.

24        Mr. Boies has suggested that there is an exception to

25   the exclusion for government securities in 1(b) because it says

1      "except to the extent otherwise provided".  But he stopped

2      there and he didn't say where it might otherwise be provided.

3      But I have a suspicion that he might be thinking about Mr.

4      Rosen's famous parenthetical, which, of course, has been

5      litigated, was the subject of the trial, is clearly the subject

6      of the Court's opinion, which the Court interpreted that to

7      mean customer property and could not possibly be a basis for

8      Barclays to carve out any Lehman proprietary government

9      securities.

10           That's all I have, Your Honor, unless you have any

11     questions.

12           THE COURT:  Anything more, Mr. Boies, on this point?

13           MR. BOIES:  No, Your Honor, not on those points.  I

14     have one more point that's -- it's a much smaller point.  I

15     have one more point.

16           THE COURT:  Does it relate to the subject of margin?

17           MR. BOIES:  Yes.

18           THE COURT:  Okay, I'd like to hear it then.

19           MR. BOIES:  And this has to do with what are called

20     clearing funds, and this is an issue that does relate to

21     millions and not billions, but it relates to a substantial

22     number of millions, about 171 million dollars, at least.

23           First -- and these are tabs 13 through 18 -- clearing

24     funds are deposits that clearing corporations require their

25     clearing members to deposit to secure the obligations of the

1   clearing members.  Now, these are -- this is not margin in the

2   sense that we've been talking about up until now.  And if you

3   look at tab 14, the clearing funds are a long-term requirement.

4   They do not fluctuate on a daily basis in the way that margin

5   requirements do.

6        Second, they are used to secure obligations relating

7   to both customer and proprietary trading without distinguishing

8   between the two so that when they put up clearing funds, it's

9   not limited to proprietary, it's not limited to customer.  It

10  permits both to go forward.

11       Third, the clearing funds from LBI were pooled with

12  those from other clearing brokers, and the clearing corporation

13  had the ability to draw from that pool when any clearing member

14  defaulted.  That is, this is money that is put up by LBI, it's

15  given to a clearing corporation like OCC -- let me take OCC as

16  the example because LBI had 171 million dollars of deposited

17  clearing funds at OCC.  Those clearing funds were available for

18  OCC to use for customer accounts, proprietary accounts, or for

19  defaults from companies other than LBI.

20       Now, the Court did not mention clearing funds in its

21  opinion, but in the margin numbers that we're talking about,

22  these clearing funds are included.  That is, the margin that

23  they are seeking to recover includes these clearing funds.  And

24  if you go to chart 17, what the Court held at page 89 of the

25  Court's opinion was that "various regulations and rules require

Page 46

1    customers to deposit collateral with a broker-dealer, or in the

2    case of futures, their futures commission merchant to support

3    trading of futures and options contracts.  This collateral

4    which is deposited by customers with a broker-dealer or future

5    commission merchant and held for the benefit of customers

6    constitutes the property that may be held to secure obligations

7    under exchange-traded derivatives."

8          Now, these funds that are deposited are deposited to

9    help secure the obligations under the exchange derivative

10   contracts of both proprietary and customer.  And because of

11   that nature, we think that those do not fall within the margin

12   the way the Court was defining it in the Court's opinion.

13         The only thing, it occurs to me that I should be clear

14   about -- with the Court, I think I said this before, but I want

15   to be sure I did.  The idea that -- the argument that we're

16   making with respect to margin, either with respect to cash and

17   cash equivalents or with respect to the -- what constitutes

18   margin or what our obligations were in the absence of a TAA is

19   not a new argument.  This was in our post-findings of fact,

20   conclusions of law that we submitted to court before -- long

21   before these briefings issues.  I think I made that clear, but

22   I want to -- I didn't want the Court to be under any

23   misapprehension because counsel sort of implied that again in

24   what he just said.  Where we have said that we have been

25   entitled to all of the margin and all of the liabilities and

Page 47

1    all of the short positions related to where we were saying that

2    was our position.  And that has been our position from the

3    beginning.

4         Our position now is no different.  We think we are

5    entitled to that, but the Court held otherwise.  So what we're

6    saying is that with respect to that Court holding, if you're

7    going to hold otherwise and you're going to hold that we're not

8    entitled to the margin, then we ought to at least be able to

9    keep the margin that offsets the liabilities that existed at

10   the OCC which we didn't have to take.  We didn't have to sign

11   that TAA.  We could have just let the OCC close out their

12   accounts, which is what the OCC was going to do.

13        THE COURT:  Mr. Boies, this last point you're making

14   hearkens back to an earlier point you made.  I take it it's

15   different from the clearing funds argument --

16        MR. BOIES:  Yes.

17        THE COURT:  -- that you had just made?

18        MR. BOIES:  Yes, Your Honor, you're right, Your Honor.

19   And I just -- it was different.  And it just occurred to me

20   that I wanted to be really sure that I'd been clear with the

21   Court about that point.  I think I mentioned that point before,

22   but I wanted to be really clear that the distinction between

23   saying we're entitled to all of the margin, all of the longs,

24   all of the shorts, which was our original position continues to

25   be our position.  And what we're doing now, which is accepting

 1   that the Court's ruled against us on that, and saying if we're

 2   not entitled to all of this, we should be at least entitled to

 3   the margin that is required to offset at least the OCC

 4   liabilities -- if you forget everything else -- at least the

 5   OCC liabilities that we signed an agreement that was designed,

 6   as everybody knew and said at the time and told Your Honor at

 7   trial, was designed to prevent and was necessary to prevent the

 8   OCC from simply closing out all those accounts.

 9          THE COURT:  Okay.

10          MR. BOIES:  Thank you, Your Honor.

11          THE COURT:  I think I should give Mr. Maguire an

12   opportunity to comment about this clearing funds argument,

13   which frankly is a new argument to me.

14          MR. MAGUIRE:  Yes, it is new, Your Honor.  We would

15   agree with that; it's new to us as well.  We do agree with Mr.

16   Boies that it is -- this entire amount in the clearing funds --

17   is included in the two billion of margin that we've been

18   talking about, and we do agree that these clearing funds were

19   funds that were kept to secure exchange-traded derivatives

20   positions, both firm-proprietary and to customer.  But all of

21   this clearing funds is Lehman proprietary government

22   securities.  It's all Lehman property and it was all at (ph.)

23   the exchanges for the purpose of securing as margin for the

24   Lehman and the customer securities.  None of it is customer

25   property.

Page 49

1          THE COURT:  So is it the trustee's position that there

2     is no appropriate distinction to be made with respect to the

3     term "clearing funds" and that clearing funds are properly

4     included in the general category of margin and that all of

5     these funds should be turned over to the trustee?

6          MR. MAGUIRE:  That is exactly our position, Your

7     Honor.  It falls squarely within the margin assets that are the

8     subject of exclusion N, squarely within the cash, cash

9     equivalents, similar cash items of exclusion B and squarely

10    within the clarifications letter, exclusion of government

11    securities.

12         THE COURT:  Okay.  I think I've probably heard a

13    sufficient amount of argument on the subject of margin and I'm

14    inclined to take a ten-minute break before going into the next

15    phase of our arguments so that we can all stretch our legs and

16    refresh ourselves a little bit.  So let's take a ten-minute

17    break, and I'll see you at twenty-five of the hour.

18         (Recess from 3:27 p.m. until 3:43 p.m.)

19         THE COURT:  Let's move on to the next matter in

20    dispute.

21         MR. MAGUIRE:  If it please the Court, Bill Maguire for

22    the trustee.

23         Your Honor, our next issue is the question of the

24    trustee's claim for pre-judgment interest on the amounts due to

25    the trustee under the Court's ruling.  Now, we believe,

1    respectfully, that that's well within the Court's power to

2    award the trustee interest and to award the trustee interest at

3    the New York statutory rate of nine percent on the margin

4    assets.  We believe that is well within the discretion of the

5    Court under Count II and Count III of our claims because they

6    are claims for declaratory relief that arise under state law.

7           We also have a claim for conversion.  And the reason I

8    raise this is because we submit that for a claim of conversion

9    under New York State law, the awarding of interest at the

10   statutory rate is mandatory.  Now, the conversion claim was one

11   of those claims in our adversary proceeding that was deferred

12   and was not one of the claims that was live in the course of

13   the thirty-four day trial.  However, the Court's ruling in

14   February, we submit, deals with the issue of the rights to the

15   margin and, we believe, substantively disposes of the merits of

16   that claim.  And we don't think it's necessary for us to do a

17   redo just for the purpose of establishing our right to

18   interest.

19          Barclays makes an argument that in conversion, the

20   right to pre-judgment interest at the New York rate only arises

21   when -- from the time that a demand has been made, so they seek

22   to cut off the interest, about a year's worth of the interest.

23   In fact, we disagree with Barclays' statement of the law

24   because the entire demand requirement is excused in certain

25   circumstances where the person in possession of the property

Page 51

1    already knows that their possession is unlawful.  The whole

2    purpose of the demand requirement is to put the innocent

3    possessor on notice that there's a problem with their

4    possession and then to give them a chance to cure it by giving

5    up possession.

6         Now, here, we respectfully submit Barclays was on

7    notice from the very beginning that it was not supposed to be

8    getting any of Lehman's cash.  It heard that at the sale

9    hearing, it was part of the asset purchase agreement, that's

10   the whole issue that we've heard throughout these proceedings

11   is that affirmative representations were made to this Court at

12   the sale hearing in which Barclays participated, that there was

13   no Lehman cash going to Barclays.  And on this specific issue,

14   there's no nuance, there's no room, really, for any question of

15   definition about the word "cash".  Here, we're talking now, the

16   sums that Barclays is supposed to be paying us on our pre-

17   judgment interest is in large part cash.  At tab 5 of our

18   binder, we show you there, Your Honor, that the parties

19   stipulated that the cash we're talking about, the 1.3 billion

20   dollars in cash assets that Barclays got immediately on the

21   closing of this deal, was all cash.  It was not government

22   securities.  The trustee has the government securities; what

23   Barclays got was the very cash that the Court was told Barclays

24   was not supposed to be getting.  And you may recall, in the

25   course of the trial, there were a number of e-mail exchanges

Page 52

1    back and forth in which Barclays' counsel corresponded directly

2    with the Options Clearing Corporation to determine and confirm

3    that indeed, this was cash.

4            THE COURT:  Mr. Maguire, is your request for pre-

5    judgment interest at the nine percent rate limited to the 1.3

6    billion dollars in cash assets or is it a request that extends

7    to the approximately 2.1 billion dollars in margin?

8            MR. MAGUIRE:  It's everything, Your Honor; 1.3 is part

9    of it because that's pure cash, and if you turn to the next

10   tab, Your Honor, you'll see that the second piece of our claim

11   that gets us to the balance of the 2-whatever billion dollars

12   is money market funds.  This was money that -- proprietary

13   Lehman money that it maintained in an account.  It was referred

14   to sometimes as the buffer or the excess in the account that

15   was supporting customer derivatives trading.  And that was in

16   the form of money market funds.  And I don't believe there's

17   ever been any question from Barclays -- before, during, after,

18   even in the course of our mutual briefing these issues before

19   the Court, there's never been any suggestion that money market

20   funds are anything other than cash or cash equivalents.  So the

21   some-several hundred million dollars in money market funds

22   which, when aggregated with the 1.3 billion, comes to the

23   totality of the 2-whatever billion dollars that is the entirety

24   of the margin assets that Barclays has that is due to the

25   trustee.  And I think the only piece, maybe, that is not pure

1    cash of all of that would be the clearing funds.  So to the

2    extent that Barclays has any of those in the form of security,

3    then I guess they would be government securities.

4          THE COURT:  Is it -- just to say what I guess is

5    obvious from what you've said, as to the 2.1 -- more or less --

6    billion dollars that the parties stipulate represents the

7    calculation of margin to be turned over by Barclays to the

8    trustee, that entire amount, except, perhaps, for the clearing

9    funds that you just referenced, constitutes cash or cash

10   equivalents in an amount that the trustee would assert Barclays

11   knew it didn't have a right to hold from at least the date of

12   the sale hearing, as a result of which you assert that you

13   should be entitled to nine percent pre-judgment interest

14   running from September 22, 2008, is that correct?

15         MR. MAGUIRE:  That is exactly correct, and the only

16   thing that I'm slightly uncertain about, Your Honor, is exactly

17   where the clearing funds fit into the picture.  I just,

18   offhand, don't remember exactly if that's in the possession of

19   Barclays and part of the two billion are not.  I believe it is,

20   but I need to confirm that for you.

21         THE COURT:  Okay.  Now, I understand the amount, I

22   understand the reason for the reference date for calculation.

23   What's the reason for the rate to be calculated at nine

24   percent, as opposed to the federal judgment rate?

25         MR. MAGUIRE:  The reason, Your Honor, is simply that

Page 54

1  New York law requires that, that this is something that arises

2  out of a state claim and under New York law applying our

3  conversion claim.

4       THE COURT:  Even though the 90(b) (sic) trial did not

5  definitionally directly relate to that claim --

6       MR. MAGUIRE:  That's --

7       THE COURT:  -- it indirectly related to that claim.

8       MR. MAGUIRE:  That's absolutely right.  We deferred --

9  we agreed to defer for later cleanup the conversion claim on

10 the understanding -- educated understanding at the time -- that

11 it likely would be resolved, in substance, by the Court's

12 ruling.  And in fact, we submit that it has been resolved, that

13 there's really nothing left to fight about on a conversion

14 claim, given the Court's ruling on the margin assets, so the

15 only thing that's left is the question of pre-judgment

16 interest.  But where a party comes into court on a state claim

17 of conversion and prevails, then the party is entitled, as a

18 mandatory matter, to the nine percent.

19       THE COURT:  Okay.  Mr. Boies?

20       MR. BOIES:  Thank you, Your Honor.  Our tabs 34

21 through 39 address this issue.  I mean, essentially, the

22 background is that two days before the April 28th briefs were

23 filed, the trustee informed Barclays for the very first time

24 that the trustee was claiming pre-judgment interest at a rate

25 of nine percent on any margin assets Barclays was ordered to

Page 55

1    return.

2         The trustee agrees that this relates to a state law

3    issue.  We think that even under New York State law they would

4    not be entitled to pre-judgment interest, but we think

5    certainly under federal law in the bankruptcy court they're not

6    entitled to this interest and they're not entitled to interest

7    at nine percent if they're entitled to any interest at all.

8    They say that they have a conversion claim and they agree that

9    the conversion claim was not litigated, but they assert that

10   that was just a formality because the underlying issues for the

11   conversion claim were litigated.

12        That simply is not so, Your Honor.  I remind the Court

13   that this amount of money was transferred by them to Barclays.

14   Barclays didn't go take it.  Barclays didn't embezzle it.

15   Barclays didn't steal it.  Barclays did not get it in any

16   improper way.  None of the requirements for a conversion under

17   state law are made out.  The Lehman personnel responsible for

18   this paid it over.  And the reason that they paid it over, Your

19   Honor, was because they'd signed documents that said they owed

20   us the cash.  They had sent e-mails saying they owed us the

21   cash.  The OCC had sent them e-mails saying if you don't say

22   anything we're going to assume that this cash belongs to

23   Barclays and we're going to send it to them.  And they sent

24   back e-mails that said okay.

25        This was a situation in which everybody worked on the

Page 56

1    assumption -- and I'm not rearguing the merits because I know

2    what the Court has held, I'm simply saying that if you're

3    talking about state of mind and whether Barclays took this

4    improperly you've got to keep in mind that at the time it was

5    done everybody thought that Barclays was entitled to this.

6    That's what Weil Gotshal thought.  That's what Lehman thought.

7    That's what LBHI thought.  All of these people knew what was

8    going on.  All of these people authorized it.  So for them to

9    come in and say that somehow Barclays converted illegally these

10   funds because the Court has held that there was not a meeting

11   of the minds on the clarification letter and all of the

12   alternative grounds that the Court has, the fact is that

13   whether or not we are as a matter of contract entitled to it or

14   not, I don't think you can argue that there is any basis for

15   finding that Barclays somehow converted these funds.

16          Mr. Kobak, the 30(b)(6) witness, testifies that it was

17   his understanding at the time that we got the funds for the OCC

18   that were necessary to balance the liabilities -- the net

19   liabilities that we were taking on and it was not just the

20   thought that it was just cash.  He didn't limit it to cash.  He

21   didn't limit it to noncash.  He didn't limit it to customer

22   accounts.  He didn't limit it to proprietary accounts.  The

23   Court's seen that testimony.  That was the trustee's testimony

24   at the time.

25          Now, it may be that they were all wrong, and that

1    issue goes to the issues that we argued about before at the

2    trial and that to some extent we argued about in the earlier

3    phase of this hearing.  But when you come to pre-judgment

4    interest I don't think there can be any argument that this was

5    all something that people voluntarily transferred at the time

6    because that was their interpretation at the time, right or

7    wrong, but that was their interpretation at the time as to what

8    was required.

9           Thank you, Your Honor.

10           THE COURT:  Okay.

11           MR. MAGUIRE:  Your Honor, first as to the point that

12   we did not fully and clearly set forth that we were seeking

13   interest, I would just point out that our adversary complaint

14   Count XII is a claim for conversion and it states -- provides

15   in paragraph 147, "The trustee is entitled to judgment in an

16   amount not less than 2.9 billion dollars together with

17   interests, cost and such other and different relief as the

18   Court may find just and proper."  So I do believe the claim for

19   interest was set forth.  I don't believe it's necessary that a

20   claim for interest be set forth, but that's neither here nor

21   there; it was set forth.

22           And also, the parties, in deferring that claim,

23   entered into a stipulation and order before the Court that was

24   dated January 13 of 2010.  And in paragraph 4 of that

25   stipulation and order it is provided that "the stay of claims

08-13555-mg   Doc 16880   Filed 05/16/11   Entered 05/17/11 11:22:48   Main Document
Pg 58 of 72
LEHMAN BROTHERS HOLDINGS INC.

Page 58

1    referenced in paragraph 3 above" -- and that's -- includes the

2    conversion claim -- "is without prejudice to any party's

3    ability to seek resolution of those claims through motions

4    informed by or based on the Court's prior resolution of the

5    Rule 60(b) motions."  So I believe the claim for interest was

6    made, it was preserved and is entirely proper.

7         I think I am in a position to clear up a little bit of

8    the question of the clearing funds composition here.  My

9    understanding is that with the exception of nineteen million

10   dollars we actually have all of the clearing funds.  So there's

11   no pre-judgment interest claim with respect to the clearing

12   funds.

13        THE COURT:  Okay.  You haven't responded yet to Mr.

14   Boies' contention that you really never put on a case for, nor

15   could you have put on a case for conversion under New York law

16   because the funds were simply turned over to Barclays at the

17   closing.

18        MR. MAGUIRE:  Yeah, Barclays took over the accounts in

19   which the cash existed; there's no question about that.  This

20   was not a case of somebody coming in and stealing the cash off

21   a suitcase and running out the door.  This was done through a

22   commercial transaction in which the OCC accounts were

23   transferred.

24        At the time, of course, the trustee and the trustee's

25   counsel, as you've heard, had been informed at the sale hearing

1   that there was no Lehman proprietary cash.  There was no cash.

2   And there was no cash specifically going to Barclays.  Barclays

3   knew better.  Barclays' counsel was the person who was directly

4   communicating with the OCC over the Friday and the weekend and

5   who specifically clarified that indeed there was cash.

6   Everybody was wrong; there actually was cash, and specifically

7   that it was proprietary cash.

8           And of course, Barclays got that cash.  And Barclays

9   got that cash having fully participated in the sale hearing in

10  which the representations were made to the Court that Barclays

11  was not getting any cash.  So in those circumstances to say

12  that the innocent party should have to find out exactly what is

13  happening and is not entitled to rely on the representations

14  that were made at the sale hearing but must undertake an

15  investigation and go ask the OCC for statements that are now

16  going to Barclays, as the account holder, to figure out that my

17  goodness, there actually is cash here and then send a demand to

18  Barclays saying we want the cash back, we think that's exactly

19  the kind of circumstance where demand is excused because the

20  party who is exercising unlawful possession is the party with

21  superior knowledge.  It's the one party who has a derivatives

22  expert, a lawyer on the scene at the time who is directly

23  communicating with the transferring party, the OCC, and who

24  knows right from the beginning, long before any demand has been

25  made, long before the trustee is in a position to even consider

Page 60

1    making a demand, that there's billions of dollars of cash being

2    moved despite the representations that were made to the Court.

3         THE COURT:  Okay.  Okay, meaning I've heard the

4    argument.

5         Do you have anything more on this, Mr. Boies?

6         MR. BOIES:  No, Your Honor, I don't think so.  I think

7    the Court has in mind the record evidence on this.  I think

8    that what counsel says just doesn't reflect the many, many

9    things that are in the record, testimony and documents in which

10   people knew what was happening, knew cash was being

11   transferred.  Mr. Kobak's testimony, after the closing the

12   trustee transferred additional cash.  So I just don't think it

13   reflects what's in the record.

14        THE COURT:  Okay.  I've heard enough on this and I'm

15   going to give it some thought.  My immediate reaction, though,

16   is that I don't feel as if I presided over a trial for

17   conversion.  I feel as if I presided over a trial that related

18   to the asset purchase agreement, the clarification agreement

19   and other ancillary agreements.  And that's, in part, because

20   the very count that we're talking about, the conversion count,

21   was reserved for the future.  But let me give it some thought.

22   I'm going to reserve on this one.

23        What's the next point that we need to discuss?

24        MR. MAGUIRE:  If it please the Court, Bill Maguire for

25   the SIPA Trustee.

Page 61

1          One additional point that we raised, Your Honor, is

2     that we believe on page 9 of the Court's opinion there is a

3     statement, we respectfully submit, and a statement that is

4     inadvertently inconsistent with the thrust of the Court's

5     opinion, and that is a statement, unimportant in and of itself,

6     that ascribes to the Friday asset scramble all three of the

7     disputed assets, including specifically the margin.

8          THE COURT:  Let me stop you on this because I have

9     paid some special attention to this point that is in dispute

10    between the parties and I've actually reviewed some of the

11    underlying materials as well as my own thinking as I was

12    drafting the opinion.  And it wasn't inadvertent.

13         We believe -- and that's my clerks and myself -- as we

14    were addressing the issues that were before the Court, that

15    regardless of whatever was in a stipulated fact, that the

16    evidence is consistent with there being attention paid on

17    Friday, September 19, to the three classes of disputed assets,

18    including margin.  It doesn't matter whether there was or was

19    not any understanding reached on Friday morning to include

20    margin.  Without question, I think, Paolo Tonucci's testimony

21    is consistent with some attention having been paid to that

22    category of asset.

23         For that reason I viewed it as part of the asset

24    scramble.  It may not have resulted in an agreement to include

25    it, but it was clearly an asset that the parties paid attention

LEHMAN BROTHERS HOLDINGS INC.

Page 62

1    to after the APA had been drafted, and it became part of the

2    subject matter of the clarification letter.  I think there's no

3    dispute as to that.  So I don't consider the reference

4    inadvertent.

5          MR. MAGUIRE:  Well, I would accept all of that, Your

6    Honor.  The only reason we had any concern about this is

7    because we raised it with Barclays and we were concerned that

8    there not be an issue for any reviewing court where a reviewing

9    court was being told that there was a factual finding not as to

10   this being a matter that was looked at in the asset scramble or

11   as to which attention was being paid but that there was

12   actually an agreement, that there was actually an understanding

13   and that margin was indeed added on the Friday.  And in that

14   case, if that kind of argument were to be made before a

15   reviewing court, if that characterization got lost or put on

16   the Court's statement then we had the concern -- certainly I

17   had the concern that a reviewing court might be put in the

18   position of saying here's a factual finding that is at odds

19   with the Court's ruling that the margin assets were excluded.

20   But as Your Honor has described it we have no issue with the

21   Court's statement --

22          THE COURT:  --

23          MR. MAGUIRE:  -- on page 9 of its opinion.

24          One remaining issue, I believe, Your Honor, concerns

25   the form of order on Rule 15c3-3.  And I don't believe, despite

1      what you may have heard the last time, there really is any

2      substantive dispute between the parties on this.

3              We did litigate and we fought hard about the issue of

4      whether Barclays had an unconditional right to the 769 million.

5      That is resolved by the Court's ruling.

6              We did not litigate whether Barclays has a conditional

7      right to the 769 million once the trustee is in a position to

8      pay all customers their property.  We have never disputed that.

9      We have always agreed that we will pay Barclays the 769 million

10     when and to the extent we are able to, after taking account

11     what we need for customer property.  So there's no dispute

12     there.

13             The reason why this is still a live issue is two

14     things in Barclays' form of order.  One, Barclays wants us to

15     regularly do a 15c3-3 computation every week.  That of course

16     is a completely pointless exercise and Barclays has no

17     contractual or other right to make us do that kind of thing.

18     We do report regularly to the Court, and if we're in a position

19     to be able to restore customers their property then it is very

20     likely we will be before Your Honor in connection with that.

21     So Barclays has whatever information it needs to apprise itself

22     of the ongoing status of the estate without any need for such

23     reporting which it has no right to and which is entirely

24     wasteful and unnecessary.

25             And secondly, we don't believe it's appropriate for

Page 64

1   the trustee to be ordered to do something which the trustee has

2   agreed to do.  We're perfectly happy to confirm again in

3   writing to Barclays that we're willing to do that.  We already

4   have.  It's clear from Your Honor's order that we have to do

5   it.  So there's no dispute.

6          We're happy to put it in the order in a whereas clause

7   so that it's absolutely clear for all to see that that's what's

8   going to happen.  The only objection is to putting it in a

9   decretal paragraph in which there is something that we have to

10   do in the future.

11          And the concern -- the reason I raise that concern is

12   simply I do not want to have to address any issue by any

13   reviewing court as to whether there is subject matter

14   jurisdiction, depending on whether this is a ministerial act or

15   is not a ministerial act and whether putting this in the

16   decretal section of the Court's final order destroys finality.

17   It seems to me Barclays is fully protected (ph.).  There is

18   no -- we have not said -- we are not in breach and we have not

19   said we will breach.  There is no anticipatory breach.  On the

20   contrary, we have said we will fully honor that commitment.

21   And as I say, we're happy to reaffirm it in a written

22   agreement.  We're happy to stipulate.  We're happy to have it

23   go in a whereas clause.  We just don't think this should be

24   anything that's in a decretal section of the Court's order and

25   not something that the parties should have to deal with in

Page 65

1    terms of raising a finality issue that's entirely unnecessary.

2         THE COURT:  Mr. Boies, do you have any reaction to

3    that?

4         MR. BOIES:  Your Honor, I mean, we argued we're

5    entitled to the 769.  They argued we weren't entitled to the

6    769.  What the Court held is that we were conditionally

7    entitled to the 769, that we were entitled to as much of the

8    769 as could be paid when and if the trustee determined that

9    there were sufficient assets to repay all LBI customers.  All

10   that we're asking is that that be put into the order.  That

11   doesn't destroy any subject matter jurisdiction.  That simply

12   reflects what the Court has found.

13        THE COURT:  Well, you were looking, if I remember

14   correctly, for active reporting.

15        MR. BOIES:  Yes, Your Honor, and --

16        THE COURT:  Is that still part of your proposed order?

17        MR. BOIES:  Your Honor, I'll withdraw the active

18   reporting.  As long as the trustee will say, as he did to the

19   Court, that he's going to report on this periodically to the

20   Court, it doesn't have to be weekly.  And if he gives us a copy

21   of it when he reports to the Court, that's fine.  We're not

22   interested in making him do additional work.

23        THE COURT:  Does that work for you, Mr. Maguire?

24        MR. MAGUIRE:  What I was referring to, Your Honor, are

25   our regular reports that we make on the state of the estate to

1    the Court as well as applications that we make from time to

2    time whenever we're in a position to bring something before you

3    concerning customer property.  So that I would understand would

4    be entirely satisfactory --

5              MR. BOIES:  Yes, I --

6              MR. MAGUIRE:  -- and certainly we will continue to do

7    that, and within a nanosecond of us filing any such report I

8    have no doubt my colleagues will have it but we will make sure

9    that they have it.

10             MR. BOIES:  Okay.  And I accept that.  I am confident

11   he will -- as he says, when they reach that point they'll tell

12   the Court and if they tell us, that'll be fine.

13             THE COURT:  All right.  That seems like an agreement.

14             And to the extent that it's useful to note this, I

15   don't believe that including within the order, anywhere within

16   the order, the notion that the rights under 15c3-3 are

17   conditional and will be dependent upon future events, not yet

18   foreseeable, has any impact upon the finality of the

19   determination.  I believe it is a final determination fully

20   consistent with that section of the opinion that dealt with

21   that subject matter.

22             MR. BOIES:  And we agree with that, Your Honor.

23             THE COURT:  In that case, the finality question should

24   be resolved for any reviewing court.

25             Now, is there more?

1          MR. BOIES:  I don't think so, Your Honor, but can I

2     have just a moment to consult with counsel?

3          THE COURT:  Sure.

4          MR. BOIES:  Your Honor, we are in agreement.

5          THE COURT:  Good.  I think what I'm going to propose

6     is that I want to give some further thought to the two

7     principal subjects that have been argued this afternoon and

8     spend a little bit more time reviewing the demonstrative

9     materials that have been proposed.  It seems to me that it

10    shouldn't take very long for me to resolve this and I have

11    fairly clear and I think transparent observations that I've

12    made as to how I see these things and some of the concerns I

13    have.

14          I particularly want to focus some attention on the

15    pre-judgment interest question, which I'll be candid to

16    observe, is one that before the hearing I was prepared to rule

17    on in connection with the settlement at 1.1 billion dollars of

18    the clearance box asset question.  And it's one of the reasons

19    that I raised with counsel in the context of that presentation

20    early in the hearing the question of whether the use of nine

21    percent for purposes of deriving the 1.1 billion dollar number

22    might be construed as a balanced agreement in which nine

23    percent would be applicable on both sides.  I quickly learned

24    that that was not true.  But I think it's also true that if I

25    had been asked to rule on the question of the entitlement of

1    Barclays to obtain nine percent interest with respect to the

2    calculation of what was due and owing in connection with the

3    clearance box that I doubt that I would have found that nine

4    percent was a fair and appropriate interest rate.  But that's

5    simply my now expressed subjective intent.  I'm simply letting

6    you know that you made an appropriate agreement and I'm pleased

7    not to have to deal with it further.

8          But I want to give some further thought to what to do

9    with the rate as to the trustee's claim.  My suggestion is that

10   we not set a date yet for a follow-up conference or hearing

11   until I have concluded my deliberations, which shouldn't take

12   terribly long, and we will advise counsel and attempt to

13   schedule an appropriate date for a follow-up.  Does that work

14   for everybody?

15         MR. BOIES:  Yes, Your Honor.

16         THE COURT:  Okay.  I'll see you next time then.

17         Oh, I forgot your letter.

18         MR. GAFFEY:  My letter, Your Honor.

19         THE COURT:  Your letter.

20         MR. GAFFEY:  Hence I rise.

21         THE COURT:  And you're standing up and your red tie

22   helped to remind me of the letter that you sent me a week or

23   two ago.

24         MR. GAFFEY:  I knew the red tie was a good idea, Your

25   Honor.

Page 69

1          THE COURT:  It was a good idea.

2          MR. GAFFEY:  Robert Gaffey for the debtor, Your Honor.

3     We wrote to the Court on the 29th of April asking that in

4     accordance with this Court's rules that this conference also be

5     treated as a pre-motion conference with respect to a summary

6     judgment motion that the debtor would like to make.

7          Your Honor will recall we had four claims extant as a

8     result of the stipulation that Mr. Maguire talked about a few

9     moments ago, and under paragraph 4 of that stipulation those

10    claims could be resolved as informed by the 60(b) proceedings.

11         With respect to three of them I have a stipulation

12    proposed to Barclays.  That's with respect to the debtors'

13    claims for unjust enrichment, conversion and aiding and

14    abetting breach of fiduciary duty where we would agree to have

15    those claims dismissed.  We're not quite done; there's one

16    language issue which I think I just took care of before, but we

17    ought to shortly have a stipulation on that.

18         That leaves our claim for breach of contract, as it

19    relates solely to Barclays' obligation under the asset purchase

20    agreement with regard to the bonus aspect of the consideration

21    it was required to pay.  Put quite briefly, and as we said in

22    our letter, I think there's a basis for us to move based on

23    factual findings that the Court made and discussed in the

24    February opinion.  We think that they can be put forward as

25    undisputed or undisputable facts based on the doctrine of

1    collateral estoppel, and I think the motion would be soundly

2    based.  We'd like to proceed with it on a schedule to be set or

3    agreed.

4              THE COURT:  Okay.  If this is a pre-motion conference,

5    is there any objection to giving LBHI the opportunity to file

6    its motion for a summary judgment?

7              MR. BOIES:  Your Honor, I don't think so.  I think

8    they've got a right to file it.  We think that it is not well

9    taken but the fact that we think it's not well taken I don't

10   think can deprive them of the right to file it.

11             THE COURT:  Well, this is just the gatekeeping

12   function that we occasionally get a chance to exercise as to

13   whether or not a motion is ripe for filing and briefing, and it

14   seems to me there's no dispute that it is ripe.  It's clearly

15   going to be disputed, based upon Mr. Boies' general

16   observations, and we'll see what happens next.

17             MR. GAFFEY:  And we could work out a briefing schedule

18   once we've gone ahead.

19             THE COURT:  I think that's a good idea.

20             MR. GAFFEY:  Thank you, Your Honor.

21             THE COURT:  And my only suggestion is that before

22   everybody leave, I'm going to -- we're going to adjourn the

23   hearing and I'm going to go off and talk to my courtroom deputy

24   and see if I can identify some possible dates for a follow-up

25   just so you can know what those dates are in advance.  I'm not

LEHMAN BROTHERS HOLDINGS INC.

Page 71

1    saying that we're going to have a hearing but I'd like to maybe

2    clear everybody's calendar.  I know that everybody's quite

3    busy.  So one of my law clerks will come out and at least

4    surface those dates with you on an informal basis.

5            MR. BOIES:  Thank you, Your Honor.

6            THE COURT:  Okay.  We're adjourned.

7        (Whereupon these proceedings were concluded at 4:20 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 72

1

2                        C E R T I F I C A T I O N

3

4    I, Dena Page, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    Dena Page          Digitally signed by Dena Page
                         DN: cn=Dena Page, o, ou,
                         email=digital1@veritext.com,
8    _____ c=US
                         Date: 2011.05.16 12:15:22 -04'00'

9    DENA PAGE

10

11   Veritext

12   200 Old Country Road

13   Suite 580

14   Mineola, NY 11501

15

16   Date:  May 11, 2011

17

18

19

20

21

22

23

24

25