HEARING DATE AND TIME:  June 2, 2011 at 10:00 AM (Eastern Time)
RESPONSE DEADLINE:  May 18, 2011 at 4:00 PM (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                                   :
In re:                                                             :  Chapter 11
                                                                   :
LEHMAN BROTHERS HOLDINGS, INC., et. al.                            :  Case No. 08-13555 (JMP)
                                                                   :  (Jointly Administered)
                                Debtors.                           :
                                                                   :
-------------------------------------------------------------------x

## RESPONSE TO ONE HUNDRED EIGHTEENTH OMNIBUS OBJECTION TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)

(Related to Docket No. 15666)

Dated: May 18, 2011

PADUANO & WEINTRAUB LLP
Anthony Paduano
Willard Knox
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100
ap@pwlawyers.com
wk@pwlawyers.com

**Attorneys for William Phillip Walsh**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

William Phillip Walsh ("Walsh"), by and through his undersigned counsel, files this Response (the "Response") to the One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim to Equity Interests) [Docket No. 15666] (the "Omnibus Obj.") filed by Lehman Brothers Holdings, Inc., et. al. (the "Debtors"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.    Walsh was employed by Lehman Brothers, Inc. ("LBI") from August 1990 until his employment was terminated, three days after LBI filed for bankruptcy protection, on September 22, 2008.

2.    On January 14, 2009, Walsh filed a proof of claim against LBI (the "Proof of Claim"). (A copy of Walsh's Proof of Claim – Claim No. 1707 – is attached hereto as Exhibit A.)  Walsh, who was not represented by bankruptcy counsel at the time, filed the Proof of Claim in the amount of $837,859.29.

3.    Along with his Proof of Claim, Walsh filed a letter indicating the breakdown of the Proof of Claim amount:  $561,406.00 relating to restricted stock and stock options that Walsh had previously purchased, and $276,453.29 relating to "monies that were set aside during the fiscal year 2008, but were never used to buy Lehman stock."

4.    Amounts relating to restricted stock and stock options that had already been purchased by Walsh are equity interests as the Debtors have correctly asserted.

5.      However, amounts that were withheld from Walsh's compensation but not used to purchase any equity interests are property to which Walsh retains equitable title and should not be considered part of the Debtors' bankruptcy estate.

6.      Even if the Court were to determine that such money is property of the estate, Walsh never purchased equity – even under a broad reading of Section 510(b) of the Bankruptcy Code (the "Code") – and therefore Walsh should have a general unsecured claim for such amounts, not an equity interest.

7.      In either event, at this point the discussion of Walsh's claims is abstract.   The Debtors did not attach to the Omnibus Obj. a copy of any agreements to which Walsh is a party that may help clarify the issues here. Neither did the Debtors attach a generic form of the agreement(s) to which Walsh is allegedly a party.  Rather, the Debtors provided Walsh and the Court with one out-of-context quote from "Agreements governing certain of the Equity Awards," [Omnibus Obj. ¶ 15] without specifically alleging that Walsh is a party to one of those agreements or that Walsh's claim relates to an "Equity Award."  The out-of-context quote is cited to "*e.g.*, 2003 and 2004 Equity Award Program Agreement, ¶ 10," but again the Debtors fail to provide Walsh or the Court with a copy of any such agreement or even to indicate which of the 461 claimants included in the Omnibus Obj. are signatories to such agreements.

8.      Walsh has been unable to locate copies of any agreements governing the $276,453.29 that was withheld from his compensation; he is nonetheless entitled to review a copy of any such agreements before this Court takes any

action that could negatively impact his claims.  In fact, it is hard to see how the Debtors can seek to recharacterize Walsh's claims – or the claims of any of the claimants included in the Omnibus Obj. – without first providing a copy of the agreement(s) pursuant to which the Debtors seek to recharacterize the claims.

9.    For those reasons, Walsh respectfully requests that the Court order Lehman Brothers Holdings, Inc. and its affiliated debtors (collectively, including LBI, "Lehman" or the "Debtors") to return to Walsh the $276,453.29 that was withheld from his compensation but never used for its intended purpose.

10.    In the alternative, if the Court does not order Lehman to return Walsh's money, Walsh respectfully requests that the Court order the Debtors to provide Walsh with a copy of any agreement pursuant to which the Debtors seek to recharacterize Walsh's property and/or claims as equity interests, and further that the Court permit Walsh to take expedited discovery to determine if there are any other facts relevant to the determination the Court is asked to make.  Anything less would be extremely prejudicial to Walsh.

<u>STATEMENT OF FACTS</u>

11.    In August 1990, Walsh joined Shearson Lehman Brothers—the predecessor to Lehman—in its New York, New York offices.  Shearson Lehman Brothers offered Walsh no upfront monies to join the firm.  Walsh nonetheless relied upon the firm's reputation in deciding to become affiliated with the firm.

12.    After obtaining his securities licenses, Walsh worked tirelessly to build his book of business from the ground up, acquiring as clients numerous high net

worth individuals, institutions and prime brokerage accounts, thereby generating substantial revenues for Lehman.

13.    Walsh worked for Lehman for 18 years, until Lehman summarily terminated his employment without notice or cause after it declared bankruptcy.

14.    During those 18 years of employment with Lehman, on information and belief Walsh entered into a number of agreements relating to compensation. Walsh has been unable to locate copies of any such agreements.

15.    Beginning in July 2008, rumors of Lehman's instability began to circulate.  At no time did anyone at Lehman disclose to Walsh (or his clients) that Lehman faced any difficulties.  In fact, Lehman's senior management (up to and including Richard Fuld, Lehman's Chairman and Chief Executive Officer) repeatedly represented to Walsh and its other advisors that Lehman was in fine shape.

16.    As Lehman's financial stability was the subject of abounding rumor and dire prediction, many of Walsh's colleagues (including his partner) exited Lehman for competitor firms.  Walsh reasonably believed he did not need to seek other employment.  Indeed, as a devoted and loyal employee of 18 years, Walsh did not wish to work elsewhere.

17.    On information and belief, Lehman withheld $276,453.29 from Walsh's 2008 compensation for the purchase of Lehman equity pursuant to one of the agreements Walsh signed, but Walsh has been unable to locate a copy of such agreement.  However, on information and belief, the equity was never purchased.

18.    LBI filed for bankruptcy protection on September 19, 2008.   On September 22, 2008, LBI terminated Walsh's employment without prior notice or cause.

19.    On January 14, 2009, Walsh filed his Proof of Claim as Claim No. 1707. (Exhibit A hereto.)

## ARGUMENT

### I.

### Walsh's Claim Is For Money That Is Not An Asset Of The Estate

20.    The money that Lehman withheld from Walsh's compensation was never Lehman's property.  It was Walsh's property that Lehman held, in trust, until such time as the transaction to purchase Lehman shares for Walsh was completed. Therefore, because Lehman has – at most – legal but not equitable title to Walsh's property, such property is not an asset of the Debtors' estate and should be returned to Walsh.

21.    Section 541(d) of the Code states that:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C.A. § 541(d) (West).

22.    "[U]nder Section 541(d), property held in trust for another is 'not property of the bankruptcy estate because the debtor does not have an equitable interest in it.'" In re Taub, 427 B.R. 208, 220 (Bankr. E.D.N.Y. 2010) aff'd, 10 CV

5717 RJD, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011)(citing In re Braniff Int'l Airlines, Inc., 164 B.R. 820, 825 (Bankr. E.D.N.Y. 1994) subsequently aff'd, 101 F.3d 686 (2d Cir. 1996). See also Begier v. I.R.S., 496 U.S. 53, 59, 110 S. Ct. 2258, 110 L. Ed. 2d 46 (1990)("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'")

23.    The Second Circuit has taken this idea even further, holding that

> Where the debtor's "conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions." ... Indeed, the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition...."

In re Howard's Appliance Corp., 874 F.2d 88, 93 (2d Cir. 1989)(quoting United States v. Whiting Pools, Inc., 462 U.S. 198, 205, 103 S. Ct. 2309, 76 L. Ed. 2d 515 (1983)).

24.    This Court has similarly held that "any right to proceeds or profits from this property [in which the debtor held only legal title] would be excluded from his estate by 11 U.S.C. § 541(d) because he does not hold the equitable interest in the property." In re Altchek, 124 B.R. 944, 958 (Bankr. S.D.N.Y. 1991).

25.    "The question of whether the imposition of a constructive trust is appropriate in a particular set of circumstances is governed, in the first instance, by state law." In re Flanagan, 503 F.3d 171, 181 (2d Cir. 2007); Butner v. United States, 440 U.S. 48, 54-55 (1979).

26.   Under New York law, four elements are generally required for the establishment of a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment." In re First Central Financial Corp., 377 F.3d 209, 212 (2nd Cir. 2004) (quoting United States v. Coluccio, 51 F.3d 337, 340 (2d Cir.1995)).   See also In re Ames Dept. Stores, Inc., 274 B.R. 600, 625 (Bankr. S.D.N.Y. 2002) aff'd sub nom. LFD Operating, Inc. v. Ames Dept. Stores, Inc., 02 CIV. 6271 (SHS), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004) aff'd sub nom. In re Ames Dept. Stores, Inc., 144 F. App'x. 900 (2d Cir. 2005)("the facts need not satisfy every element in all cases"); In re Koreag, Controle et Revision S.A., 961 F.2d 341, 352 (2d Cir. 1992) aff'd in part sub nom. Refco F/X Associates, Inc. v. Mebco Bank, S.A., 89 CIV. 3071 (WK), 1992 WL 200748 (S.D.N.Y. July 31, 1992)(New York courts have consistently stressed the need to apply the doctrine with sufficient flexibility to prevent unjust enrichment; and can impose such trust in the absence of a fiduciary relationship); Counihan v. All State Insurance Co., 194 F.3d 357, 361 (2d Cir. 1999) (constructive trust's main "purpose is to prevent unjust enrichment" including where it "does not implicate the performance of a wrongful act.")   The fourth element is the most important since "the purpose of the constructive trust is prevention of unjust enrichment." In re First Central Financial Corp., 377 F.3d at 212 (quoting Simonds v. Simonds, 45 N.Y.2d 233, 242 (1978)).

7

27.    In this case, Walsh and Lehman were clearly in a confidential, if not a fiduciary, relationship.  Lehman presumably made a promise to Walsh to purchase stock on his behalf – although we do not know the nature and extent of any promises made by Lehman, because the Debtors have not provided Walsh or the Court with a copy of the agreements at issue.  Walsh transferred a portion of his cash compensation – the *res* – to Lehman in reliance on Lehman's promise, but Walsh never received anything from Lehman in return.  This is a textbook case showing Lehman's unjust enrichment from money it withheld from Walsh.

28.    It is true that under New York law, the party seeking to impose a constructive trust generally must "trace one's equitable interest to identifiable property in the hands of the purported constructive trustee." Wilde v. Wilde, 576 F. Supp. 2d 595, 605 (S.D.N.Y. 2008) (quoting Rogers v. Rogers, 63 N.Y.2d 582, 586 (1984)).  But "in view of equity's goal of softening where appropriate the harsh consequences of legal formalisms, in limited situations the tracing requirement may be relaxed." Wilde, 576 F. Supp. 2d at 605 (quoting Rogers, 63 N.Y.2d at 586.  For example, tracing requirements are often relaxed where a fiduciary has breached his duty. Wilde, 576 F. Supp. 2d at 605. See also, Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc., 224 F. Supp. 2d 567, 609-12 (2002), *aff'd in relevant part,* 380 F.3d 624, 646 (2d Cir. 2004); Simonds v. Simonds, 45 N.Y.2d 233, 240 (1978).

29.    Although claims for constructive trust require tracing of the *res*, they "do not require an allegation that specific funds are presently held in a separate

account." Feinberg v. Katz, 99 CIV. 45 (CSH), 2002 WL 1751135 (S.D.N.Y. July 26, 2002). The only requirement is that the money be "specifically identifiable." Id. Money can be specifically identifiable if it is in a segregated account (i.e., if one can identify where the money is today), but it can also be specifically identifiable if Walsh can specifically identify the money that was taken from him (i.e., the exact money that was taken from him). For example, see Nissho Iwai American Corporation v. Siedler, No. 94 Civ. 513, 1995 WL 555699, *3 (S.D.N.Y. Sept. 18, 1995). The plaintiff brought claims alleging that the defendants engaged in a false billing scheme to embezzle nearly $1,000,000 from the plaintiff. The plaintiff submitted evidence of the specific amounts of the 31 checks defendants caused Nissho to issue in their false billing scheme. Id. at *17. The Court found that the embezzled money was specifically identifiable – even though the money was not held in a segregated, identifiable account – because the plaintiff was able to identify the specific checks it issued to defendant.

30. It is premature, however, to require Walsh to trace his *res*. Among other reasons, Walsh does not have sufficient information to make such a determination. That is why Walsh has respectfully requested the opportunity to review the agreements cited by the Debtors and to take expedited discovery, so that he can not only prove the true nature of his interest in the money that was taken from him by Lehman, but also so he can determine if it is possible to trace the *res*, the money that was withheld from his compensation but never used for any purpose by Lehman.

9

II.

## Walsh's Claim Is Not A Claim For Damages
## "Arising From The Purchase Or Sale Of A Security"

31.     Even if the Court determines that the money withheld from Walsh's compensation is not held by Lehman in a constructive trust, Walsh's claim should not be subordinated to the same priority as Lehman's common equity, and certainly not before Walsh and the Court have an opportunity to review the agreements that allegedly require subordination, as asserted by the Debtors.   Even with the broad reading given to Section 510(b) of the Code, Walsh cannot be said to have purchased any stock, option, or other "security" as defined by the Code and is not seeking damages in connection with any purchase of a security.

32.     Pursuant to § 510(b) of the Code:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C.A. § 510(b).

33.     "In enacting Section 510(b), Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy."   In re Telegroup, Inc., 281 F.3d 133, (3rd Cir. 2002).

A.    <u>Walsh's Claim Does Not Relate to Equity Securities</u>

34.    Walsh was not an equity investor, at least in connection with the

$276,453.29 that was taken from his compensation.

35.    As the Debtors correctly note,

> The Bankruptcy Code definition of an "equity security,"
> alternatively, includes a share in a corporation or similar
> "security," including "stock," "treasury stock," "other claim or
> interest commonly known as 'security'," "certificate of interest
> or participation in," and "warrant or right to subscribe to or
> purchase or sell, a security."

Omnibus Obj. ¶ 12; 11 U.S.C.A. § 101(16)(49) (West).

36.    But upon information and belief, Lehman never purchased the stock

with the money that was withheld from Walsh's compensation.    Further, on

information and belief, the agreements on which the Debtors are relying in their

attempt to recharacterize Walsh's claim are not "equity securities" as defined by

the Code.   The Debtors assert that "[t]he Equity Awards provided grantees with a

right to acquire common stock in LBHI upon satisfaction of certain conditions

precedent, similar to stock options or the right to exercise stock options."

Omnibus Obj. ¶ 14.   It is impossible to evaluate the Debtors' assertion because the

Debtors did not provide the Court or Walsh with a copy of the agreements on

which the Debtors are relying.   In fact, the Debtors do not even bother to provide

the Court with a quote from the agreements to back up its claim that the

$276,453.29 taken from Walsh related to "a right to acquire common stock in

LBHI . . . similar to stock options or the right to exercise stock options."

11

**B.** **Walsh's Claim Does Not Arise From The "Purchase Or Sale" Of A Security**

37.     The general trend of bankruptcy courts in recent years has been to read § 510(b) broadly, thereby expanding the definition of "purchase or sale" beyond what would typically be thought of as a "purchase or sale" of securities. As this Court stated in the Enron bankruptcy, "the broad applicability of section 510(b) is now quite settled." In re Enron Corp., 341 B.R. 141, 163 (Bankr. S.D.N.Y. 2006).

38.     Nevertheless, an expansive reading of § 510(b) is not appropriate in this case. According to this Court's opinion in Enron,

> [t]hough the statutory language [of § 510(b)] refers only to 'damages,' the courts reasonably read this to mean 'damages flowing from changes in the debtor's share price.' Where the damages are connected to the declining value of the debtor's stock, the courts are inclined to read section 510(b) broadly for the reason stated in the previous paragraph. Conversely, as the court in Montgomery Ward suggested, where the claim is for a fixed amount and does not arise in parallel with the fortunes of the share price, the courts are inclined to read section 510(b) narrowly.

In re Enron Corp., 341 B.R. at 157 (emphasis added).

39.     In this case, Walsh is seeking a fixed amount, not any damages connected to the declining price of Lehman's stock, because with regard to the $276,453.29 claim at issue here, Walsh did not own any Lehman stock.  Walsh had cash that was withheld from his compensation, and seeks only the return of the amount that was taken from him.  The performance (or non-performance) of Lehman's stock is inconsequential to Walsh's claim for the return of his property. A narrow reading of § 510(b) is therefore justified.

40.    Walsh also did not take any of the risks associated with being an equity holder, and therefore should not suffer the losses of an equity holder.  "The absolute priority rule, upon which section 510(b) rests, is a mechanism for allocating risk between creditors and securityholders."  In re Enron Corp., 341 B.R. at 166.  The question that must be asked in situations like this is: "What principles and facts justify reallocating the risk of securities fraud from the securityholder alone to both equity interests and creditors?"    Id.    Or, put another way, "bankruptcy policy becomes a composite of factors that bear on a better answer to the question, 'How shall the losses be distributed?'" Elizabeth Warren, Elizabeth Warren, Bankruptcy Policy, 54 U. Chi. L. Rev. 775, 777 (1987).

41.    In this case, the questions posed by the Enron court and Professor Warren are not particularly helpful.  Walsh was never a securityholder (at least with regard to the claim for money that was withheld but never used to purchase equity) and so there is no reallocation of risk necessary.  Walsh did not bargain for the risk that the purchase would never be consummated.  Furthermore, because Walsh's money was never used to purchase equity or an equity-like instrument, no other creditor of the Debtors could have relied on Walsh's money to provide the "equity cushion" that typically results from the absolute priority rule, as articulated by Profs. Slain and Kripke in the famous article that led to the adoption of § 510(b), *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors,* by Profs. John J. Slain and Homer Kripke, 48 N.Y.U. L.Rev. 261 (1973).

13

42.     By contrast, most cases where these questions arise involve situations where one party has made a conscious choice to take equity risks, yet upon bankruptcy decides to try and trade up to a general unsecured claim.   This is exactly what § 510(b) is meant to protect against, and why the question of allocation of risk is so pertinent.   As the Second Circuit has noted, "those who conclude the bargain to become investors or shareholders should be treated as such." In re Med Diversified, Inc., 461 F.3d 251, 257 (2d Cir. 2006).

43.     For example, in Enron, employees elected to receive options to purchase the debtor's stock as part of their compensation packages, rather than receiving higher wages.   The Court held that those options were clearly securities, and that it was of no consequence that in "common parlance" the options were granted, rather than purchased.   In re Enron Corp., 341 B.R. at 149.   To hold otherwise would be to endorse "an unduly formalistic reading of the provision' because "this linguistic inconsistency is not legally relevant." Id.   Another Enron claimant filed a proof of claim in connection with "phantom stock" he purchased. The phantom stock "differs from the typical general class of stock in that delivery of the shares is deferred for tax purposes." Id. at 162.   Prior to the time the claimant took delivery of the stock, Enron filed for bankruptcy.   The Court held that "physical possession of the security is not required for a claim based upon that security to be subordinated." Id. at 163.   Physical possession may not be required, but presumably ownership of the security is required.

14

44.    In this case, Walsh's $276,453.29 claim does not relate to options or any other instrument that can be called a "security."  Furthermore, there was no purchase or grant or of anything, and no "bargain" was "concluded" in connection with Walsh's money or Lehman stock.  Instead, Walsh had money withheld from his compensation check by Lehman and the money was not used for any purpose, or at least no purpose authorized by Walsh.  As opposed to the "phantom stock" claimant, the issue for Walsh is not that he never took delivery of the stock – even without physical possession of stock, a stockholder has clearly taken on the risks of an equity holder – but rather that he never purchased any stock, or took on any of the risks of an equity holder.

45.    In In re Med Diversified, Inc., the claimant "took on the risk and return expectations of a shareholder when he agreed to exchange securities in PrimeRx and employment claims for the shares of the debtor." In re Med Diversified, Inc., 461 F.3d 251, 256 (2d Cir. 2006).  Even though the exchange never took place, the claimant had already taken on the expectations of the risks – and potential returns – of a shareholder, and "his resulting claim for damages therefore must be subordinated."    Id.    The claimant in In re Med Diversified, Inc. also claimed damages based on the change in the debtor's share price, thus triggering the broad reading of § 510(b) per this Court's opinion in Enron.

46.    In In re Wireless Corporation, Inc., the claimant had received a grant from the debtor of shares of stock and warrants. In re Wireless Corporation, Inc., 384 B.R. 713 (Bankr. D. Del. 2008).  There was no question that the claimant

owned the shares and warrants, only whether those shares and warrants were "purchased". That is clearly a different scenario than the one presently before the Court, where Walsh has not purchased the equity at issue, nor has it been granted to him. In fact, there is no equity at issue, just property belonging to Walsh that is currently sitting – presumably – in one of Lehman's bank accounts.

47. In <u>In re Calpine</u>, noteholders had

> offered a lower interest rate and less restrictive covenants on the Notes in exchange for the right to convert the notes into cash plus stock ownership in the company . . . In doing so, the Noteholders received a lower return on their debt in exchange for the opportunity to capture the benefits of increased share price in the future.

<u>In re Calpine Corp.</u>, 05-60200 (BRL), 2007 WL 4326738, *13 (S.D.N.Y. Nov. 21, 2007). Therefore, the Court concluded, the noteholders took on the risk that the conversion would not take place "in order to obtain the upside potential of shareholder status." <u>Id</u>. Walsh took on no such risk.

48. In <u>WorldCom</u>, the claimant filed a claim relating to a number of securities, including stock and stock options, some of which were held in retirement accounts. This Court held that the claimant took on the risks of equity when he decided "to trade the relative safety of cash compensation for the upside potential of shareholder status." In <u>In re WorldCom, Inc.</u>, 02-13533 (AJG), 2006 WL 3782712, *6 (Bankr. S.D.N.Y. Dec. 21, 2006).

49. It is possible to describe a dozen more cases along the same lines and each of them would have one thing in common. In each case – whether the claimant owned stock, or options, or any other security – the claimant took on the

16

risks of equity for the chance to receive the potential upside available to equity holders if the company in which the equity was held was successful. As this Court stated in WorldCom, "[s]o long as the claimant's interest enabled him to participate in the success of the enterprise and the distribution of profits, the claim will be subordinated pursuant to section 510(b)." In re WorldCom, Inc., 2006 WL 3782712 at *6. In each of the cases discussed herein, the claimant had an interest that enabled him to participate in the success of the enterprise. In Walsh's case, however, no such interest existed. Walsh instead owned cash that was held by Lehman and never took on the risks associated with the holder of an equity security – or was entitled to the benefits associated with an equity holder – because he never owned an equity security.

50.    Therefore, even if the Court finds that Walsh's money is property of the estate, the Court should not characterize that money as subordinate to everything other than common equity. Rather, Walsh should be permitted to retain his status as a general unsecured creditor.

## Conclusion

For the reasons set forth above, Walsh respectfully requests the Court enter an order classifying and fixing Walsh's claim for $276,453.29 as property excluded from the Debtors' estate. In the alternative, Walsh respectfully requests the opportunity to review the agreements on which the Debtors are relying in their attempt reclassify Walsh's claims as equity and to conduct expedited discovery in preparation for a future hearing at which the Court will fix and classify Walsh's claim.

Dated:  New York, New York
        May 18, 2011

PADUANO & WEINTRAUB LLP

BY: _____
        Anthony Paduano
        Willard Knox
        Jason Snyder
1251 Avenue of the Americas
Ninth Floor
New York, New York 10020
(212) 785-9100 (Phone)
(212) 785-9099 (Fax)

Attorneys for William Phillip Walsh

18

# EXHIBIT A



P 646 282 2500  F 646 282 2501
757 THIRD AVENUE, NEW YORK, NY 10017
WWW.EPIQSYSTEMS.COM

**** LBH CLMLTR (MERGE2,TXNUM2) 4000001706 ****
WALSH, W. PHILLIP
20 PINE STREET, APARTMENT #1906
NEW YORK, NY 10005

June 30, 2009

## ACKNOWLEDGEMENT OF RECEIPT OF PROOF OF CLAIM

This letter serves as acknowledgement that the claim identified below has been recorded by Epiq Bankruptcy Solutions, LLC, the court-approved claims agent, on the claims register in the LEHMAN BROTHERS HOLDINGS INC. case.   To ensure that your claim has been recorded correctly, please review the following information:

Debtor:              LEHMAN BROTHERS HOLDINGS, INC.
Case Number:    08-13555
Creditor:           WALSH, W. PHILLIP
Date Received:   01/14/2009
Claim Number:          1707

*Please note that nothing in this Acknowledgement should be construed to mean or imply that your claim is being allowed.  The Debtor may elect to object to the identified claim on various grounds.*

We also strongly encourage you to review your proof of claim on our website at http://chapter11.epiqsystems.com/LBH.  To find your imaged claim, click on the "Filed Claims & Schedules" icon at the top of the page, type in your claim number in the "Claim #" field, and click "Search".  Additionally, you may search for your claim by typing in your name in the appropriate search field.

If you have any questions, please contact us at 646-282-2500 or via our contact form on our website at http://www.epiqbankruptcysolutions.com/contact.htm.  Please be sure to specify the client name about which you are inquiring.

EPIQ BANKRUPTCY SOLUTIONS, LLC

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____ ☑ Agent
                    ☐ Addressee

B. Received by ( Printed Name) | C. Date of Delivery
S. Spreiter | 1/14/09

1. Article Addressed to:

Epiq Bankruptcy
Attn: Lehman Brother Holdings
757 Third Avenue 3rd Fl-
New York, NY 10017

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered      ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)      ☐ Yes

2. Article Number
(Transfer from service label)

7008 3230 0001 6959 6926

PS Form 3811, February 2004      Domestic Return Receipt      102595-02-M-1540

```
          ROCKEFELLER CENTER APC 1
                610 5th AVENUE
             NEW YORK, NY 10020-2403


01/13/2009                  02:50:42 PM
=========================================

               Sales Receipt
Product         Sale   Unit       Final
Description     Qty    Price      Price

NEW YORK, NY  10017             $1.00
Zone-1 First-Class Mail®
Large Envelope
  0 lb. 1.30 oz.
  Certified Mail™             $2.70
  Return Receipt (U.S. Mail)  $2.20
  Return Receipt (email)      $1.00
                              ========
Issue Postage:                  $6.90

Total:                        ==========
                                $6.90

Paid by:
MasterCard                      $6.90
   Account #:      XXXXXXXXXXXX1866
   Approval #:     84752B
   Transaction #:  887
   23-902280510-99

Transaction Number:     130
USPS® #                  359656-9550

******************************
* IMPORTANT:  For Return Receipt (by *
* email), wait at least one day, but *
* no more than 60 days, to make your *
* request; visit www.usps.com;       *
* select "Track & Confirm"; enter    *
* label number(s); select "Request   *
* Return Receipt (Electronic)";      *
* enter your name and email address. *
******************************

To check on the delivery status of
your Certified Mail™ article, visit
our Track & Confirm website at
www.usps.com or use this Automated
Postal Center™ (or any Automated
Postal Center™ at other Postal
locations).


Please retain all receipts from
affixed forms.  For inquiries, both
the sales receipt and the customer
copy from the affixed form shall be
required.

              Thanks.
      It's a pleasure to serve you.

ALL SALES FINAL ON STAMPS AND POSTAGE.
REFUNDS FOR GUARANTEED SERVICES ONLY.
```

**CERTIFIED MAIL.. RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To  *Epiq Bankruptcy Solutions*
Street, Apt. No.; or PO Box No. *757 Third Ave 3rd Fl.*
City, State, ZIP+4 *NY NY 10017*

PS Form 3800, August 2006                See Reverse for Instructions

7008 0330 0001 6959 9556

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT   Southern District of New York | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Lehman Brothers Holdings | Case Number:<br>08-13555 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>W. Phillip Walsh | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>W. Phillip Walsh<br>20 Pine Street, Apartment # 1906, New York, NY 10005<br><br>Telephone number:<br>(917) 225-1893 | **Court Claim Number:**_____<br>*(If known)*<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**  $ *837,859,29*<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:** ___Services Performed___<br>(See instruction #2 on reverse side.)<br><br>**3.** Last four digits of any number by which creditor identifies debtor: _____<br><br>   **3a. Debtor may have scheduled account as:** *William Walsh*<br>      (See instruction #3a on reverse side.)<br><br>**4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>**Describe:**<br><br>**Value of Property:**$_____ **Annual Interest Rate**___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>**if any:** $_____  **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | **X** Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).<br><br>☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___). |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (*See definition of "redacted" on reverse side.*)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$ *10,950.00*<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

| | | |
|---|---|---|
| Date: *1/12/09* | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Proof of claim for creditor W. Phillip Walsh (William P. Walsh)
Debtor: Lehman Brothers Holdings
Case number: 08-13555

Attached are two documents which detail the amount of my claim totaling $837,859.29.
The first is a summary of the grant value of the restricted stock units and stock options
that were purchased with funds withheld from my monthly paychecks back to 2003. The
total grant value for the restricted stock portion was $548,902 and the total grant value for
the stock options was $12,504.

The second page details the amount of funds that had been withheld from my monthly
checks during fiscal 2008 that was earmarked to buy restricted stock units later in the
year. These were monies that were set aside during the fiscal year 2008, but were never
used to buy Lehman stock, that was scheduled to take place later in the year. This number
is reflected on the Equity Accrual Calculated line and totals $276,453.29

The total of these three line items comes to $837,859.29

W. Phillip Walsh
20 Pine Street Apartment 1906
New York, NY 10005

(917) 225-1893

# LEHMAN BROTHERS | LehmanLive

Data as of August 31, 2008                                     10048252 W Phillip Walsh

## AWARD UNITS[1] OUTSTANDING

| Grant Date | Description | Grant Price | Grant Value[2] | Restriction Ends | Units Granted | Dividend Equivalents | Units Delivered | Units Vested[3] | Units Outstanding | Market Value at $0.00[*] |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2008 | July 2008 IR RSU | $20.9600 | $63,110 | 11/30/2011 | 3,010.95 | 38.07 | 0.00 | 0.00 | 3,049.02 | $0 |
| 12/07/2007 | 2007 IR SVP Principal | $47.6000 | $143,024 | 11/30/2012 | 3,004.70 | 61.89 | 0.00 | 0.00 | 3,066.59 | $0 |
| 12/07/2007 | 2007 IR SVP Discount | $47.6000 | $47,675 | 11/30/2012 | 1,001.57 | 20.65 | 0.00 | 0.00 | 1,022.22 | $0 |
| 12/08/2006 | 2006 IR SVP Principal | $57.7700 | $100,909 | 11/30/2011 | 1,746.73 | 51.69 | 0.00 | 0.00 | 1,798.42 | $0 |
| 12/08/2006 | 2006 IR SVP Discount | $57.7700 | $33,636 | 11/30/2011 | 582.24 | 17.25 | 0.00 | 0.00 | 599.49 | $0 |
| 11/30/2005 | 2005 IR SVP Principal | $47.2500 | $52,944 | 11/30/2010 | 1,120.50 | 41.13 | 0.00 | 1,161.63 | 1,161.63 | $0 |
| 11/30/2005 | 2005 IR SVP Discount | $47.2500 | $17,648 | 11/30/2010 | 373.50 | 13.80 | 0.00 | 0.00 | 387.30 | $0 |
| 12/09/2004 | 2004 IR SVP Principal | $32.1750 | $39,319 | 11/30/2009 | 1,222.04 | 54.90 | 0.00 | 1,276.94 | 1,276.94 | $0 |
| 12/09/2004 | 2004 IR SVP Discount | $32.1750 | $13,106 | 11/30/2009 | 373.50 | 18.30 | 0.00 | 0.00 | 425.64 | $0 |
| 12/10/2003 | 2003 IR SVP Principal | $26.7700 | $28,148 | 11/30/2008 | 1,051.48 | 56.09 | 0.00 | 1,107.57 | 1,107.57 | $0 |
| 12/10/2003 | 2003 IR SVP Discount | $26.7700 | $9,383 | 11/30/2008 | 350.50 | 18.80 | 0.00 | 0.00 | 369.30 | $0 |
| | Total | | $548,902 | | 13,871.55 | 392.57 | 0.00 | 3,546.14 | 14,264.12 | $0 |

## STOCK OPTIONS OUTSTANDING

| Grant Date | Description | Exercise Price | Black-Scholes Grant Price | Expiration Date | Black-Scholes Grant Value | Options Granted | Options Exercised | Options Exercisable | Options Outstanding | Intrinsic Value at $0.00[*] |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/10/2003 | 2003 IR SVP Options | $35.6950 | $10.4200 | 11/29/2013 | $12,504 | 1,200 | 900 | 0 | 300 | $0 |
| | Total | | | | $12,504 | 1,200 | 900 | 0 | 300 | $0 |
| | Total Equity | | | | | | | | | $0 |

[*] Market value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated stock price. The intrinsic value of stock options is calculated by multiplying the number of options outstanding by the difference between the indicated stock price and the option exercise price. Please note that the current market price is based on a delayed 20 minutes feed from Reuters. (null on null)

[1] Award Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Stock Awards, as applicable.
[2] Grant Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated grant price.
[3] Units Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicable plan documents.

Name: 10048252 - WILLIAM WALSH
From: 12/1/2007 To: 11/30/08
Future payout trades

| Year Total | | 9/2008 | 8/2008 | 7/2008 | 6/2008 | 5/2008 | 4/2008 | 3/2008 | |
|---|---|---|---|---|---|---|---|---|---|
| 4,763,621.17 | Gross Production | 265,665.39 | 693,562.12 | 832,710.87 | 591,868.46 | 575,650.57 | 404,012.31 | 266,370.96 | 3 |
| 1,246,556.89 | Net Production | 55,987.95 | 168,118.57 | 208,850.63 | 159,087.45 | 181,772.60 | 119,110.70 | 60,178.27 | 8 |
| 81.06 | Retro Net Production | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.93 | 0.00 | |
| 26.17 | Average Rate (%) | 21.07 | 24.24 | 25.08 | 26.88 | 31.58 | 29.49 | 22.59 | |
| | Prior Months -Deficit/Overage | -55,582.50 | -0.00 | 0.00 | 0.01 | 0.00 | 0.00 | -0.01 | |
| -210,999.30 | Adj to Net Production | 0.00 | -47,875.97 | -58,707.63 | -39,759.62 | -21,332.78 | -10,497.73 | -7,504.03 | |
| | Monthly Payout Balance | 405.46 | 120,242.60 | 150,143.00 | 119,327.84 | 160,439.82 | 108,663.90 | 52,674.23 | |
| 0.00 | Draw Amount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 1,566.21 | Minimum Compensation | 1,566.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 981,622.37 | Total Sales Compensation | 1,971.67 | 120,242.60 | 150,143.00 | 119,327.84 | 160,439.82 | 108,663.90 | 52,674.23 | |
| 703,197.40 | Cash Commissions | 0.00 | 84,740.71 | 102,082.94 | 84,210.15 | 108,055.09 | 74,910.47 | 48,665.64 | |
| 276,453.29 | Equity Accrual Calculated | 0.00 | 35,501.89 | 48,060.06 | 35,117.69 | 52,384.72 | 33,753.43 | 4,008.59 | |
| 1,035,233.19 | Recorded Total Sales Compensation | 0.00 | 175,825.10 | 150,143.00 | 119,327.84 | 160,439.81 | 108,663.90 | 52,674.23 | |
| | -Deficit/Overage | -1,566.21 | -55,582.50 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | |

Mailed by express certified mail on 01/17/09

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Bros Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

W. Phillip Walsh
20 Pine Street Apt. 1906
New York, NY 10005

Claim Search

Page 1 of 2

* Epiq Directory
* Contact Us
* Forms

# Epiq Systems, Inc.

Client Home    Filed Claims & Schedules    Key Documents    Docket    Change Client

## Lehman Brothers Holdings Inc. (Chapter 11)

Filed Claims and Schedules

Claim #

Schedule #

Name Starts With    walsh

Total Claim Value    Equals

Claim Date Range

Order By    Creditor Name

Results Per Page    10

Debtor

Scope    Claims and Schedules

Search    Clear

Page

◄◄ ◄ Page 1 of 1 ► ►►

| Claim # | Schedule # | Creditor Name | Date | Total Claim Value | Image |
|---|---|---|---|---|---|
| 1707 | | WALSH, W. PHILLIP | 1/14/2009 | $837,859.29 | |
| | 555352340 | WALSH,J GARVIN | | $0.00 | |
| | 555352350 | WALSH,JANET | | $0.00 | |
| | 555352360 | WALSH,KEVIN M. | | $0.00 | |
| | 555352370 | WALSH,KIRSTEN | | Schedule G | |

Claim Search

| | | | |
|---|---|---|---|
| 555352380 | WALSH,KIRSTEN | | $0.00 |
| 555352390 | WALSH,W PHILLIP | | $0.00 |

Claims 1-7 of 7

Epiq Bankruptcy Solutions, LLC ("Epiq") maintains this website for the public's convenience. While Epiq makes every attempt to assure the accuracy of the information contained herein, this website is not the website of the United States Bankruptcy Court and does not contain the complete, official record of the Bankruptcy Court. All documents filed with the Bankruptcy Court are available for inspection at the office of the Clerk of the Bankruptcy Court during its normal business hours or online on the Bankruptcy Court's website. Use of this website is also subject to our terms of use and end user license agreement. Please review our privacy statement for additional information regarding the data maintained on this website.

© 2009 Epiq Systems, Inc. All Rights Reserved.

- Home
- Contact
- Subscribe
- Site Map
- Disclaimer
- Terms of Use
- Privacy Statement
- Safe Harbor

- Epiq Directory
- Contact Us
- Forms

# Epiq Systems, Inc.

**Client Home**                     **Filed Claims & Schedules**    **Key Documents**        Do

# Lehman Brothers Holdings Inc. (Chapter 11)



Filed Claims and Schedules

| Claim # | | Name Starts With | walsh |
| Schedule # | | Total Claim Value | Equals |
| | | Claim Date Range | | to | |
| Order By | Creditor Name | | Results Per Page | 10 |

◄ Page 1 of 1 ►

| ⊞ | Claim # | Schedule # | Creditor Name | Date | Total Claim |
|---|---------|------------|---------------|------|-------------|
| ⊞ | 1707 | | WALSH, W. PHILLIP | 1/14/2009 | |
| ⊞ | | 555352340 | WALSH,J GARVIN | | |
| ⊞ | | 555352350 | WALSH,JANET | | |
| ⊞ | | 555352360 | WALSH,KEVIN M. | | |
| ⊞ | | 555352370 | WALSH,KIRSTEN | | |
| ⊞ | | 555352380 | WALSH,KIRSTEN | | |
| ⊞ | | 555352390 | WALSH,W PHILLIP | | |

Claims 1-7 of 7

Epiq Bankruptcy Solutions, LLC ("Epiq") maintains this website for the public's convenience. While Epiq makes every attempt to assure the accuracy of the informati
United States Bankruptcy Court and does not contain the complete, official record of the Bankruptcy Court. All documents filed with the Bankruptcy Court are availab
Court during its normal business hours or online on the Bankruptcy Court's website. Use of this website is also subject to our terms of use and end user license agre
information regarding the data maintained on this website.
© 2009 Epiq Systems, Inc. All Rights Reserved.

- Home
- Contact
- Subscribe
- Site Map
- Disclaimer
- Terms of Use
- Privacy Statement
- Safe Harbor