SHAFFERMAN & FELDMAN LLP
286 Madison Avenue, Suite 502
New York, New York 10017
Telephone: (212) 509-1802
Facsimile: (212) 509-1831
Joel Shafferman, Esq.

Attorneys for KSC Affordable Housing Investment Fund, LLC


BRET H. REED, JR., A LAW CORPORATION
2737 E. Coast Highway
Corona Del Mar, California 92625
Telephone: (949) 955-9150
Facsimile: (949) 566-0090
Bret H. Reed, Jr., Esq.

Attorneys for KSC Affordable Housing Investment Fund, LLC
Pro Hac Vice Pending

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

------------------------------------------------------------


**KSC AFFORDABLE HOUSING FUND, LLC RESPONSE TO**

**OMNIBUS OBJECTION TO CLAIMS FILED BY LEHMAN BROTHERS HOLDINGS**

<u>**INC. AND ITS AFFILIATED Debtors**</u>


TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

On or about October 10, 2006, Creditor and Debtors entered into a Confirmation of LIBOR Interest Rate Cap Agreement Global ID: 2689265 and the ISDA Master Agreement under which the Interest Rate Cap Agreement was issued (together, the "Agreement"). On September 15, 2008 Lehman Brothers Holdings, Inc and its subsidiary Lehman Brothers Special Financing Inc. (the "Debtors") filed for bankruptcy. Creditor was required to obtain the Agreement under the terms of its project financing ("Financing") with Capmark Bank ("Capmark"). Creditor engaged Kensington Capital Advisors ("Kensington Capital") to obtain a replacement interest rate cap after Debtors breached the Agreement by filing for bankruptcy. Creditor complied with all of the requirements for obtaining replacement interest rate cap under the Agreement as detailed in Part III.B. *infra*. Kensington Capital solicited replacement cap bids from five Capmark-approved Reference Market-makers. On or about August 25, 2009, Kensington Capital received the Market Quotations from three Capmark-approved Reference Market-makers responding to the Market Quotation Term Sheet, and one 'pass' response. The arithmetic mean of the three quoted bids was $40,500 (the "Market Quotation"). Creditor also suffered other damages and incurred recoverable fees and costs as a result of the Debtors' breach of the Agreement.

Creditor complied with all of the procedural requirements set forth by Debtors in the Agreement in order to file its claim. After Creditor submitted the Proof of Claim, Debtors requested that Creditor complete an extensive online derivative questionnaire (the "Derivative Questionnaire"), which required Creditor to upload various documents and answer a number of

2

questions. Creditor timely complied with all of the requirements and has confirmations substantiating the same. Nevertheless, on or about April 18, 2011 Debtors filed the One Hundred Thirty-Second Omnibus Objection to Claims (Valued Derivative Claims) (the "Objection") reducing and discounting Creditor's claim to less than twenty-three (23) percent of its value. Debtors fail to set forth any specific facts or legal authority as to why Creditor's derivative claim was reduced. Debtors' Objection has no merit and Creditor requests that the Court either deny the Objection as lacking any evidentiary support or legal merit, or set this matter for hearing as a contested matter under Bankruptcy Rule 9014 and set a briefing schedule, discovery and hearing date and allow for the testimony of witnesses (including expert witnesses).

Debtors also failed to engage in any meaningful meet and confer process on this issue despite the fact that its Objection states that Debtors engaged in "lengthy negotiations." The "lengthy negotiations" that Debtors refer to are a few emails and two telephone conversations in which Creditors' claim was summarily rejected by Debtors on the purported basis that Creditor's claim was barred under a theory of waiver because waited for the time of intensely chaotic volatility in the interest rate hedge market to subside before engaging in the Market Quotation process. Based on the foregoing, this Court should deny Debtors' Objection to Creditor's claim or set this as a contested matter under Bankruptcy Rule 9014.

## II. STATEMENT OF FACTS

On or about October 10, 2006, Creditor and Debtors entered into a Confirmation of LIBOR Interest Rate Cap Agreement Global ID: 2689265 dated October 10, 2006 and the ISDA Master Agreement under which the rate cap agreement was issued (together, the "Agreement"),

3

true and correct copies of which are attached to the Declaration of Bret H. Reed, Jr., (the "Reed Dec.") as Exhibit "A"

Creditor was required to obtain the Agreement under the terms of its project financing with Capmark Bank ("Capmark"). Creditor was under an express, mandatory obligation by virtue of its financing agreements with Capmark to maintain at all times a qualifying "hedge" to protect both Capmark and Creditor against the variable interest rate risk inherent in the Financing. Capmark required that the Agreement have certain terms including, but not limited to, early termination and default provisions, Market Quotation damage quantification provisions and procedures upon the default or termination of the Agreement, and for the qualification of replacement hedge agreements and the eligible providers thereof.

Creditor has fully performed all duties and obligations under the Agreement, other than those duties which have been excused or waived as a result of the Debtors' breach of the Agreement. On or about October 8, 2008, Debtors became unable to perform under the Agreement due to the bankruptcy filing and terminated and breached the Agreement as a result of the same (the "Termination").

The Agreement was a forward-starting interest rate cap with an Effective Date of August 15, 2009. There was no provision in the Agreement for declaring an Early Termination prior to its Effective Date. Within three days of the Agreement going into effect, on or about August 18, 2009 Creditor gave written notice to Debtors that Creditor declared an Early Termination of the Agreement under Sections 5 and 6 of the Agreement because of Debtors' inability to perform its duties thereunder as a consequence of the Bankruptcy Filing, and that Debtors was liable for

4

damages under the Agreement on account of the same pursuant to the Market Quotation methodology set forth in the Agreement.

In connection with fixing and liquidating the damages caused by Debtors' breach of the Agreement by virtue of the termination of the same, Creditor engaged Kensington Capital to price the cost for purchasing replacement interest rate cap protection equivalent to the rate cap protection provided by Debtors under the terminated Agreement, by obtaining Market Quotations therefor from Reference Market-makers as required under the Agreement.

On August 27, 2009 Creditor received from the Cap Consultant the summary recap of the Market Quotation solicitation process and bidding results indicating that the Market Quotation process produced a settlement amount of $40,500.00.

On September 17, 2009 Creditor transmitted written notice to Debtors as required by the Agreement, notifying Debtors that Creditor had, in accordance with the Agreement, obtained Market Quotations for replacement rate cap protection, and that Creditor had suffered other incidental and consequential damages and incurred recoverable fees and costs as a result of Debtors' breach of the Agreement and the early termination of the same.

A summary of Creditor's damages is as follows:

| | |
|---|---|
| Market Quotation from the Cap Consultant: | $ 40,500.00 |
| Creditor's Accrued Attorneys Fees and Costs: | $10,000.00 |
| Cap Consultant Fees: | $  1,750.00 |
| **TOTAL CLAIM:** | $52,250.00 |

On September 18, 2009, Creditor filed a Proof of Claim against Lehman Brothers Special Financing Inc., a subsidiary of Lehman Brothers Holdings, Inc. under case no. 08-13888 (the

5

"Proof of Claim"). A true and correct copy of the Proof of Claim is attached to the Reed Dec. as Exhibit "B". Creditor submitted and attached the Summary of Claim, the Kensington Capital, LLC Market Quotations and the October 17, 2008 letter drafted by Creditor's counsel outlining the Statement of Damages along with its Proof of Claim. After the Proof of Claim was submitted, Debtors requested that Creditor complete an extensive Derivative Questionnaire online. Creditor went through all of the required procedures set forth by Debtors and completed the Derivative Questionnaire, which required that the claimant provide various information in support of its claims, among others, a valuation statement, individual trade-level detail, trade value methodology and quotations and calculation of damages. Creditor uploaded all of the required documents that supported its Proof of Claim and received confirmations that they had, in fact, been completely and correctly uploaded. A true and correct copy of the Derivative Questionnaire and the confirmations timely filed on October 19, 2009 are attached to the Reed Dec. as Exhibit "C".

On December 2, 2010, Debtors' counsel contacted Creditor's counsel stating that Creditor's claim will be reduced from $52,250 to $12,000. On December 28, 2010, Creditor's counsel responded by requesting Debtors to explain the basis for Creditor's claim to be reduced approximately 77%. On January 6, 2011, Debtors' counsel terminated settlement negotiations on Creditor's claim on the basis that Creditor did not terminate the Agreement (which did not go into effect until August 2009) until August 18, 2009, and thus waived its claim. On April 18, 2011, Debtors filed the instant Objection. On May 18, 2011, Creditor's counsel filed a Motion for admission to practice *pro hac vice* in the Southern District of New York.

III. ARGUMENT

    A. **Debtors Objection Has No Merit and the Court Should Be Denied Or This Matter Should Be Set as a Contested Matter Under Rule 9014.**

Debtors fail to set forth any specific facts or legal authority for the reduction of Creditor's derivative claim. Debtors asserted that this Court's opinion in the Metavante Corporation claim establishes that unless a rate cap agreement counterparty terminated the cap agreement no later than the end of 2008 the claimant is deemed to have waived the claim. We have reviewed Judge Peck's opinion in Metavante and that matter is almost entirely inapplicable to the instant claim. Metavante concerned a swap transaction (as opposed to an interest rate cap agreement), with ongoing mutual payment obligations of both Debtors and Metavante, with an apparent suspension by Metavante of its required payments based on a claimed default by Debtors under the swap; Claimant's agreement was a rate cap agreement, not a swap; Claimant paid the price of the rate cap up front in 2006, and the only ongoing payment obligations were from Debtors to Claimant if the Bond rates exceeded the Strike Rate in the Agreement; Claimant never suspended any payments to Debtors.

A key difference between the subject Claim and Metavante is that Metavante's swap contract was in effect at the time of the Debtors bankruptcy filing; Creditor's cap agreement had a future effective date of August 2009. Most significantly, Metavante failed to terminate it swap arrangement with Debtors during the 12-month period following the Debtors bankruptcy filing on October 10, 2008; Claimant followed the Early Termination provisions prior to the Effective Date of the Agreement in August 2009 several months prior to the first anniversary of the Debtors bankruptcy filing date.

7

As Judge Peck says on Pg. 109 of the transcript provided by Debtors, Metavante 'has attempted neither to liquidate, terminate nor accelerate the Agreement'. In contrast, Claimant did terminate within business days of the Agreement's Effective Date. Further, Judge Peck addresses the issue that is before him in that case, being ". . . whether Metavante's withholding performance is permitted." He emphasizes the dispositive issue that what was before the court was " . . . a garden variety <u>executory contract</u>, one for which there remains something still to be done on both sides . . ." in terms of payment obligations.

Whatever the court may have said in <u>Metavante</u> about swaps does not to the Claimant's Agreement that had yet to go into effect, in connection with which only one party had any remaining payment obligations: Debtors. That Metavante had never terminated its swap was the material factor in the Court's concluding that, more than a year after the Debtors bankruptcy was filed, there was a waiver. Claimant, as the non-defaulting party, timely terminated the Agreement that was executory only on the part of Debtors, at the time the Agreement became effective.

We maintain that the termination of this forward starting cap in August of 2009 was well within the time period referenced by Judge Peck. The Early Termination provisions of the Agreement were implemented at a time when the earlier replacement cap market turmoil had calmed down, replacement cap bidders had re-entered the marketplace and cap pricing had fallen from the highs of the final quarter of 2008. The process was valid, effective and in accordance with the relevant Early Termination provisions of the Claimant – Debtors Agreement.

Accordingly, Debtors' Objection is meritless and there are no facts or legal authority to support its decision to reduce Creditors claim by any amount, and certainly not by more than seventy-seven (77) percent. Creditor requests that the Court deny the Objection outright or set this as a contested matter under Bankruptcy Rule 9014. Bankruptcy Rule 9014(d)-(e) provides that:

> "Testimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding . . . The court shall provide procedures that enable parties to ascertain at a reasonable time before any scheduled hearing whether the hearing will be an evidentiary hearing at which witnesses may testify."

The Notes of Advisory Committee to Bankruptcy Rule 9014 clearly state that "Whenever **there is an actual dispute**, other than an adversary proceeding, before the bankruptcy court, the litigation to resolve that **dispute is a contested matter**." (Emphasis added). Here, there is a factual and legal dispute between Debtors and Creditor as to what the claim amount should be. Based on the foregoing, Creditor respectfully requests that this Court set this as a contested matter under Bankruptcy Rule 9014 and set a briefing schedule, discovery and hearing schedule and allow for the testimony of witnesses (including expert witnesses).

### B. Debtors Obtained Market Quotations for Replacement Cap Agreement Pursuant to the Terms Set Forth in the Agreement.

Creditor engaged Kensington Capital to price the cost for purchasing interest rate cap protection equivalent to the rate cap protection provided by the Debtors under the Agreement. Creditor obtained the summary of Market Quotations attached hereto as Exhibit "D" of the Reed

Dec., which states the manner in which the bids were calculated and confirms that Creditor complied with all of the requirements for obtaining replacement interest rate hedge required by its lender Capmark under the Agreement. Kensington Capital went to the market and solicited replacement cap bids from five (5) Reference Market-makers. The arithmetic mean of the quoted bids that were received is $40,500, which is the Market Quotation. On or about August 27, 2009, Kensington Capital transmitted this Market Quotation summary to Creditor confirming that the cost to acquire the replacement cap rate protection was approximately $40,500. Creditor also suffered other incidental and consequential damages and incurred recoverable fees and costs as a result of the Debtors breach of the Agreement and the termination of the same. Debtors fail to provide any facts or legal authority as to why Creditor's claim should be reclassified and reduced to about thirty percent (30%) of the actual damages incurred by Creditor. Therefore, Debtors' Objection has no merit and should be denied outright without further hearing.

### C.   Debtors Fail to Engage in Any Meaningful Meet and Confer Process

Debtors allege that they " [e]ngaged in . . . lengthy negotiations with the holder of the Derivate Claim that are often very detailed and may extend over a period of months." Objection, paragraph 16 at p. 7. Debtors go on to state that "Despite the Debtors' efforts at negotiating this Proposed Settlement Amount and Classification, the Debtors and the holders of the Valued Derivative Claims have reached an impasse." Objection at p. 7-8. However, the fact of the matter is that the lengthy negotiations and the "efforts" that Debtors are referring to consisted of a few of emails from early December 2010 to January 6, 2011. On December 2, 2010, Debtors for the first time informed Creditor that its claim will be reduced from $52,500 to $12,000

without any factual or legal support for the same. This arbitrary figure ($12,000) was never explained or justified with any rational discussion by Debtors. When Creditor sought to discuss this matter further and explore the basis for Debtors' arriving at the $12,000 figure, Debtors' counsel simply stated that no further discussion would take place because Claimant's claim was barred due to untimely termination of the Agreement. Debtors therefore did not engage in any good faith negotiations. Debtors' counsel failed to respond to this and in fact ceased all communications until the filing of the instant Objection. In the Objection Debtors have mysteriously changed the proposed 'allowed' claim amount to $14,863 – without any justification or rationale. Debtors' never bothered to respond to Creditor's good faith efforts to discuss this matter and never engaged in any meaningful meet and confer process. Therefore, Debtors Objection should be denied.

///

///

///

///

///

///

///

///

///

///

///

## IV. CONCLUSION

Based on the foregoing, Creditor respectfully requests that this Court deny Debtors' Objection to Creditor's claim or set this as a contested matter under Bankruptcy Rule 9014.

Dated: May 18, 2011

New York, New York

/s/ Joel Shafferman, Esq.
Joel Shafferman, Esq.
SHAFFERMAN & FELDMAN LLP
286 Madison Avenue, Suite 502
New York, New York 10017
Telephone: (212) 509-1802
Facsimile: (212) 509-1831


Attorney for Easton Investments, II

Corona Del Mar, California

/s/ Bret H. Reed, Jr.
Bret H. Reed, Jr., Esq.
BRET H. REED, JR., A LAW CORPORATION
2737 East Coast Highway
Corona Del Mar, California 92625
Telephone: (949) 955-9150
Facsimile: (949) 566-0090

Attorneys for KSC Affordable Housing Investment Fund, LLC
Pro Hac Vice Pending

## DECLARATION OF BRET H. REED, JR.

I, Bret H. Reed,, Jr. hereby declare as follows:

1.  I am the President of the law firm of Bret H. Reed, Jr., A Law Corporation, attorneys of record for KSC Affordable Housing Investment Fund, LLC ("Creditor"). I know the following facts of my own personal knowledge and if called as a witness I could and would competently testify to the matters stated herein.

2.  On or about October 10, 2006, Creditor and Debtors entered into a Confirmation of LIBOR Interest Rate Cap Agreement Global ID: 2689265 and the ISDA Master Agreement under which the Interest Rate Cap Agreement was issued (together, the "Agreement"), a true and correct copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by this reference. On or about October 8, 2008, Debtors became unable to perform under the Agreement due to their bankruptcy filing and terminated and breached the Agreement as a result of the same (the "Termination").

3.  On September 18, 2009, Creditor filed a Proof of Claim against Lehman Brothers Special Financing Inc., a subsidiary of Lehman Brothers Holdings, Inc. under case no. 08-13888 (the "Proof of Claim"). A true and correct copy of the Proof of Claim is attached hereto as Exhibit "B" and incorporated herein by this reference.

4.  After the Proof of Claim was submitted, Debtors requested that Creditor complete an extensive online derivative questionnaire (the "Derivative Questionnaire"). Creditor completed the Derivative Questionnaire, which required that the claimant provide various information in support of its claims, among others, a valuation statement, individual trade-level

detail, trade value methodology and quotations and calculation of damages. I personally uploaded all of the required documents that supported Creditor's Proof of Claim. A true and correct copy of the Derivative Questionnaire and its confirmations are attached hereto together as Exhibit "C" and incorporated herein by this reference.

5. On December 2, 2010, I received an email from Debtors in-house counsel Satoko Koyama, Esq. seeking to discuss the Claimant's claim. During that telephone discussion Debtors' counsel informed me that Debtors are reducing Creditor's claim to from $52,500 to $12,000. On December 8, 2010 Debtors' counsel transmitted another e-mail stating simply that "With respect to KSC Affordable, UCC's view is that their termination in late August 2009 is not acceptable. As such our allowable claim is based on the current MTM + expenses." Finally, in response to our sending Debtors' Counsel the Market Quotation backup documentation, Debtors' Counsel responded via e-mail on January 6, 2011 as follows: "There is no need to submit KSC Affordable market quotation process. As I said before, our view is that KSC played the market until they were forced to replace the hedge. Whether or not the effective date of the trade was forward starting is not relevant in our view." Attached collectively hereto as Exhibit "E" and incorporated herein by this reference are true and correct copies of the aforementioned emails.

6. From and following the aforementioned January 6, 2011 e-mail from Ms. Koyama, Debtors ceased all communication with me regarding the subject Claim until the filing of Debtors One Hundred Thirty-Second Omnibus Objection to Claims (Valued Derivative Claims) (the "Objection") on April 18, 2011.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on May 17, 2011, at Corona Del Mar, California.

_____

Bret H. Reed, Jr.