**Hearing Date and Time: June 15, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: June 8, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,        :          **Case No. 08-13555 (JMP)**
                                                    :
                               Debtors.             :          **(Jointly Administered)**
                                                    :
-------------------------------------------------------------------x

**NOTICE OF MOTION OF THE DEBTORS PURSUANT TO SECTION 362(a) OF**
**THE BANKRUPTCY CODE FOR ENFORCEMENT OF THE AUTOMATIC STAY**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtor, Lehman Commercial Paper

Inc. ("LCPI"), as debtors and debtors in possession (together, the "Debtors" and together with

non-debtor affiliates, "Lehman"), pursuant to section 362(a) of the Bankruptcy Code seeking

entry of an order enforcing the automatic stay with respect to the SunCal Movants (defined in the

Motion), will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at

the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **June 15, 2011 at**

**10:00 a.m. (prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil, Gotshal & Manges LLP, 700 Louisiana Street, Suite 1600, Houston, Texas 77002, Attn:  Alfredo R. Pérez, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York, 10004, Attn:  Tracy Hope Davis, Esq., Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Evan Fleck, Esq. and Dennis O'Donnell, Esq., attorneys to the official committee of unsecured creditors appointed in these cases, and (v) all parties who have requested notice in these chapter 11 cases, so as to be so filed and received by **no later than June 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.


Dated: May 24, 2011
       Houston, Texas

/s/ Alfredo R. Perez
Alfredo R. Pérez
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511


Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Alfredo R. Pérez
Attorneys for Debtors
and Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                          :
In re                                                     :      **Chapter 11 Case No.**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,              :      **08-13555 (JMP)**
                                                          :
                              **DEBTOR.**                 :      **(Jointly Administered)**
                                                          :
-----------------------------------------------------------------x

**MOTION OF THE DEBTORS PURSUANT TO SECTION 362(a) OF THE**
**BANKRUPTCY CODE FOR ENFORCEMENT OF THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtor, Lehman

Commercial Paper Inc. ("LCPI"), as debtors and debtors in possession (together, the "Debtors"

and together with non-debtor affiliates, "Lehman"), file this Motion (the "Motion") pursuant to

section 362(a) of the Bankruptcy Code seeking entry of an order enforcing the automatic stay

with respect to the SunCal Movants (defined below), and in support thereof, the Debtors

respectfully represent:

# I. PRELIMINARY STATEMENT[1]

1.      Continuing to ignore this Court's repeated warnings and admonitions,

certain of the SunCal Debtors,[2] once again, have launched additional offensives in their

bankruptcy cases aimed at bypassing LCPI's automatic stay and depriving it of its property

interests.  Premised on legal theories that they argue do not require stay relief from this Court,

certain of the SunCal Debtors, along with affiliate non-debtor, SunCal Management LLC

(collectively with the SunCal Debtors party to the SunCal Motions, the "SunCal Movants"),

through two separate motions (the "SunCal Motions"),[3] ask the California Bankruptcy Court to

disallow 14 claims, totaling billions of dollars, held by LCPI against the SunCal Debtors.  The

SunCal Movants allege that (a) LCPI's failure to turn over avoidable transfers, the prosecution of

which avoidance claims are stayed, justifies disallowance of LCPI's claims pursuant to section

---

[1] Capitalized terms used in this Preliminary Statement, but not otherwise defined below, shall have the meanings ascribed to them elsewhere in this Motion.

[2] The SunCal Debtors are comprised of the Voluntary Debtors and the Trustee Debtors (defined below). The Voluntary Debtors are:  (i) Palmdale Hills Property, LLC; (ii) Acton Estates LLC; (iii) Kirby Estates, LLC; (iv) North Orange Del Rio Land, LLC; (v) SCC Communities, LLC; (vi) SCC/Palmdale, LLC; (vii) Seven Brothers, LLC; (viii) SJD Development Corp; (ix) SJD Partners, Ltd.; (x) SunCal Beaumont Heights, LLC; (xi) SunCal Bickford Ranch, LLC; (xiii) SunCal Communities I, LLC; (xiv) SunCal Communities III, LLC; (xv) SunCal Emerald Meadows LLC; (xvi) SunCal Johannson Ranch, LLC; (xvii) SunCal Summit Valley LLC and (xviii) Tesoro SF, LLC.  The Voluntary Debtors who are party to the SunCal Motions are comprised of: (i) Acton Estates LLC; (ii) SunCal Bickford Ranch, LLC; (iii) SunCal Emerald Meadows, LLC; (iv) Palmdale Hills Property, LLC ("Palmdale Hills"); (v) SJD Partners, Ltd. ("SJD"); (vi) SunCal Summit Valley, LLC; (vii) SCC Communities LLC; (viii) Tesoro SF, LLC; (ix) SunCal Communities I, LLC ("SunCal I"); (x) SCC/Palmdale, LLC ("SCC/Palmdale"); and (xi) North Orange Del Rio Land, LLC ("North Orange").  Palmdale Hills and SJD are not parties to the Claim Objection, and SunCal I, SCC/Palmdale, and North Orange are not parties to the 502(d) Motion.

[3] The SunCal Motions are the: (i) *Moving Voluntary Debtors' and SunCal Management LLC's Notice of Motion and Motion for Order Disallowing Claims of Lehman ALI, Inc. and Lehman Commercial Paper Inc. Pursuant to 11 U.S.C. § 502(d)*, dated April 26, 2011 [Case No: 8:08-bk-17206-ES, Docket No. 1976] (the "502(d) Motion") filed in the California Bankruptcy Court (annexed hereto as Exhibit A) and (ii) *Amended Motion for Order Disallowing Certain Claims Held by Lehman ALI Inc and Lehman Commercial Paper, Inc.,* dated May 10, 2011 [Case No: 8:08-bk-17206, Docket No. 2082] (the "Claim Objection"), filed in the California Bankruptcy Court (annexed hereto as Exhibit B).  The Claim Objection amends a previously filed motion, dated April 8, 2011, requesting substantially similar relief.

502(d) of the Bankruptcy Code and (b) the SunCal Movants may "recoup" certain alleged damage claims from the claims filed by LCPI in the SunCal Debtors' chapter 11 cases, merely by taking first dollars from a sale of LCPI's collateral.

2.      Though each of the SunCal Motions seeks affirmative relief against LCPI that requires the SunCal Movants to obtain stay relief from this Court prior to proceeding in the California Bankruptcy Court, the SunCal Movants argue that the relief sought in the SunCal Motions is defensive in nature and that LCPI's automatic stay does not apply.  Putting aside whether the relief sought by the SunCal Movants is truly defensive and outside the purview of the automatic stay, this Court is the final arbiter of whether LCPI's stay applies.  The SunCal Movants cannot, as they have done, unilaterally declare that they need not seek stay relief and charge ahead with impunity.  In fact, nearly two years ago, when LCPI first made this Court aware of the SunCal Debtors' attempts to end-run LCPI's automatic stay, this Court warned the SunCal Debtors that they must take pains not to run afoul of LCPI's stay and counseled them that if there were any doubt as to whether LCPI's stay applied to any action the SunCal Debtors sought to take, the required action was to seek relief from this Court.

3.      Since that time, the Voluntary Debtors have continued to play "Russian-Roulette" with LCPI's automatic stay, choosing at random when to seek stay relief and when to argue the stay does not apply.  Attempting to navigate around LCPI's automatic stay, the SunCal Movants attempt to disguise their violations of LCPI's automatic stay as defensive actions not subject to the stay.

4.      For example, the main premise of the 502(d) Motion is that the SunCal Movants have stated *prima facie* claims to avoid the liens transferred and loan obligations incurred by various SunCal Debtors, on which certain proofs of claim filed by LCPI or Lehman

ALI Inc. ("Lehman ALI") are based.  The SunCal Movants further contend that, because neither

LCPI nor Lehman ALI has paid the amount or turned over property for which such entity is

allegedly liable, disallowance is required under section 502(d) of the Bankruptcy Code.  They

conclude, without support, that their section 502(d) disallowance claims are defensive in nature.

Yet, the California Bankruptcy Court already has held that the SunCal Debtors could not sustain

an action against LCPI under section 502(d) of the Bankruptcy Code without seeking relief from

this Court first.  *See Order re Lehman Entities' Amended Motion to Dismiss the Third Amended*

*Complaint,* dated April 12, 2010 (the "Dismissal Order") (annexed as Exhibit C) (expressly

dismissing count 8 (among others) of the Third Amended Complaint, which sought to disallow,

pursuant to section 502(d), claims filed by LCPI).  Regardless of how the SunCal Movants

characterize the relief they seek or the form in which they seek it, substantively, the SunCal

Movants are attempting to take affirmative actions against LCPI that require relief from stay.

Whether the relief is sought by adversary proceeding or by motion makes no substantive

difference.

   5.  Similarly, in the Claim Objection, the SunCal Movants argue that their

actions do not run afoul of the stay because they are only objecting to LCPI's claims and seeking

"recoupment," which does not require stay relief.  The "recoupment" they seek, however, is not

"recoupment" in the traditional sense of the word.  Instead, it is a disguised attempt at

subordinating LCPI's claims (which relief is subject to the automatic stay) and does not meet the

criteria for an allowable recoupment claim.  Although the SunCal Movants define "recoupment"

in the Claim Objection as "the setting up of a demand arising from the same transaction as the

plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such

claim," (Claim Objection, p. 31), they do not *actually* seek to "abate or reduce" their claims.

6.     The Voluntary Debtors' filed Disclosure Statement Reply[4] reveals that

"recoupment," in the Voluntary Debtors' estimation, means taking "first dollars" from the sale of

LCPI's collateral – in other words, equitably subordinating LCPI's claims.   Specifically, the

Voluntary Debtors state in the Disclosure Statement Reply, "When these sixteen Projects are

sold, which sales shall occur on the Effective Date, the SunCal Proponents will immediately

'recoup' from these sales proceeds the damages owed and immediately pay any allowed

administrative claims.   The hearing on the Recoupment Claim Objection is scheduled for June 9,

2011."   Disclosure Statement Reply, p. 7 (emphasis and citations omitted).   Taking "first dollars"

from the sale of collateral is not synonymous with recoupment.   Instead, it is akin to

subordination – an affirmative act that is subject to relief from stay.

7.     Further, putting aside whether a creditor can "recoup" its claims by taking

first dollars from a collateral sale (as opposed to by reducing the amount of the affected claims),

none of the facts alleged by the SunCal Movants reflect a single, integrated transaction between

LCPI and the SunCal Debtors that would justify a recoupment claim under applicable case law.

Instead, the SunCal Movants try to string together a hodge-podge of transactions, occurring (to

the extent they occurred) at different points in time, between different parties and claim they bear

a "logical relationship" such that recoupment is warranted.   The common law principle of

recoupment is applied sparingly and is not applied in the "mix and match" circumstances

described by the SunCal Movants.   Although the alleged "recoupment" claim is more in the

nature of an alleged setoff, the SunCal Movants do not suggest that the transactions described in

---

[4] *See Omnibus Reply to Objections to Disclosure Statement,* dated May 13, 2011, [Case No: 8:08-bk-
17206, Docket No. 2046] (the "Disclosure Statement Reply"), filed in the California Bankruptcy Court
(annexed hereto as Exhibit D).

the Claim Objection support a claim for setoff, undoubtedly aware that stay relief would be required under section 362(a)(7) to effectuate a valid setoff.

8.      Recharacterizing their affirmative actions against LCPI as defensive ones does not change their substance. The SunCal Movants' actions and express statements demonstrate that the mission of the SunCal Motions is to achieve indirectly what the SunCal Movants cannot achieve directly without first obtaining relief from stay. This Court has previously counseled the SunCal Movants to seek stay relief as necessary. The SunCal Movants should not be allowed to continue to end-run this Court's express warnings. Accordingly, LCPI respectfully requests that this Court enter an order enforcing the automatic stay against the SunCal Movants with respect to the SunCal Motions pending further relief from stay.

## II. <u>BACKGROUND</u>

### A.      General

9.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), the Debtors commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On September 17, 2008, the United States Trustee for Region 2 (the "<u>U.S. Trustee</u>") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "<u>Creditors' Committee</u>").

11.     On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

12.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the

Examiner.  The Examiner filed its report with the Court on March 11, 2010 [Docket No. 7531].

13.     On January 25, 2011, the Debtors filed their First Amended Joint Chapter

11 Plan (as amended or supplemented from time to time, the "Plan") [Docket No. 14150] and the

Disclosure Statement to the Debtors' First Amended Joint Chapter 11 Plan (as amended or

supplemented from time to time, the "Proposed Disclosure Statement") [Docket No. 14151].

Additional information regarding the Debtors' businesses, capital structures, and the

circumstances leading to the commencement of these chapter 11 cases is contained in the

Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

Southern District of New York in Support of First-Day Motions and Applications, filed on

September 15, 2008 [Docket No. 2].

**B.      The SunCal Loans**

14.     Prior to the Commencement Date, between 2005 and 2007, LCPI, Lehman

ALI, and two of their non-debtor affiliates, as successors to Lehman ALI (collectively, the

"Lehman Lenders") provided loans to certain of the SunCal Debtors in an aggregate amount in

excess of $1.7 billion (such loans, the "SunCal Loans") pursuant to loan agreements, guaranties,

and other loan documents with certain of the SunCal Debtors and other non-debtor affiliates of

the SunCal Debtors.  As of the commencement of the SunCal Debtors' chapter 11 cases

(described further below), the applicable SunCal Debtor's repayment obligations with respect to the applicable SunCal Loan were secured by first priority, voluntary liens and security interests in certain real estate projects and/or other property owned by the SunCal Debtors. In certain instances, more than one SunCal Debtor was jointly and severally liable under a particular SunCal Loan. The Lehman Lenders timely filed proofs of claim in the California Bankruptcy Court against each of the SunCal Debtors obligated to repay the applicable Lehman Loan.

15.      On or about May 30, 2008, Lehman ALI, LBHI, certain of the SunCal Debtors, and other non-debtor affiliates of the SunCal Debtors and LBHI entered into a restructuring agreement dated as of May 23, 2008 (the "Restructuring Agreement"), which, among other things, provided for a restructuring of certain of the SunCal Loans and contemplated entering into certain settlement transactions as described therein on the terms, and subject to the conditions, set forth therein. LCPI was not a party to the Restructuring Agreement. As noted above, on September 15, 2008, LBHI commenced chapter 11 proceedings.

C.      **The SunCal Debtors' Chapter 11 Cases and Their Initial Attempts to Avoid the LCPI Automatic Stay**

16.      In November 2008, the SunCal Debtors and certain non-debtor affiliates filed a motion with this Court seeking relief from the automatic stay (the "November 2008 Stay Relief Motion") [Docket No. 1439]. They sought to "generally administer" their chapter 11 cases without regard for the automatic stay or the jurisdiction of this Court, even when their actions undoubtedly would implicate LCPI's property or interests. Rejecting the SunCal Debtors' first request for relief from the stay, the Court instructed "[e]ither the [SunCal Debtors] move again with a targeted motion focused on the particular relief for cause shown or the parties, following discussions, agree by stipulation to limited relief from the automatic stay." November

20, 2008 Hearing Transcript, p. 79 (selected portions attached as <u>Exhibit E</u>) and entered an order

formally denying the November 2008 Stay Relief Motion (the "<u>November 2008 Stay Order</u>")

[Docket No. 1647] (attached as <u>Exhibit F</u>).  No appeal or request for reconsideration was filed.

> 17.    Less than two months after the Court cautioned the SunCal Debtors to

seek (and obtain) relief from stay prior to taking any actions that could implicate LCPI's

property interests, in January 2009, the Voluntary Debtors filed a motion in their bankruptcy

cases seeking to use LCPI's cash collateral without first having sought stay relief from this

Court.  LCPI brought the Voluntary Debtors' motion to this Court's attention, and at the hearing

conducted by this Court on January 30, 2009 to determine whether the filing of their motion in

the California Bankruptcy Court had violated LCPI's automatic stay, the Court admonished

counsel to the Voluntary Debtors,

> The only thing that is before me now, and I think I've already made clear what
> my position is, is that you have no stay relief.  You know you have no stay relief.
> And that denial of the motion brought by you and your local counsel, Morgan
> Lewis & Bockius, in November speaks for itself and there is a final order which
> denies that motion.  The legal consequences of that denial are what they are.  I
> have no knowledge, and I don't expect to get that knowledge now as to what
> happened in California.  To the extent relevant, I'll learn it in due course.  The
> only thing which is before me is an emergency motion to enforce the automatic
> stay.  It is enforced to the extent applicable.  I'm not expanding it nor am I taking
> away from counsel the ability to reach agreements to modify it.  **But if you don't
> come here and seek consensual relief from stay or relief from stay with
> appropriate motion practice, you are at full risk as is your client.  Act
> accordingly….** As you well know as an experienced bankruptcy lawyer, careful
> lawyers almost always, when there's a close question, seek relief from stay to
> avoid the very severe sanctions that flow from – especially flow from willful
> violations of the stay.  You're in the zone of a willful violation.

January 30, 2009 Hearing Transcript, pp. 16-17, p. 19 (emphasis added) (relevant portions

attached as <u>Exhibit G</u>).  Once again, no appeal or request for reconsideration was filed.

D.       **The SunCal Adversary Proceeding against LCPI**

18.     In January of 2009, the Voluntary Debtors, the Trustee Debtors[5] and others affiliated with the SunCal Debtors (collectively, the "SunCal Plaintiffs") filed an adversary proceeding in the California Bankruptcy Court (the "Equitable Subordination Action") seeking, among other things, to equitably subordinate the claims of Lehman ALI, Northlake Holdings, Inc. and OVC Holdings, Inc. (the "Lehman Lender Defendants") to the claims of the SunCal Debtors' unsecured creditors and to transfer the liens of the Lehman Lender Defendants to the SunCal Debtors' estates.  Ostensibly styled as seeking relief only as against non-debtor Lehman Lenders, the causes of action asserted in the Equitable Subordination Action were predicated on actions allegedly committed by, among others, LBHI.

19.     Specifically, the allegations in the Equitable Subordination Action center on the alleged non-performance by Lehman ALI and LBHI of obligations under the Restructuring Agreement, including (a) the alleged failure to make promised payments to contracts and vendors and (b) the failure to close certain settlement transactions anticipated under the Restructuring Agreement.

20.     Also in January 2009, LCPI and certain of its affiliates sought relief from stay in the California Bankruptcy Court to foreclose on their collateral.  In their response to LCPI's motion for relief from stay, the Voluntary Debtors contended that they had equity in the properties on which LCPI sought to foreclose because, in their view, the SunCal Debtors had

---

[5] The Trustee Debtors are: (i) SunCal Heartland, LLC; (ii) LB-L SunCal Northlake, LLC; (iii) SunCal Marblehead, LLC; (iv) SunCal Century City, LLC; (v) SunCal PSV; (vi) Delta Coves Venture LLC; (vii) SunCal Torrance, LLC; (viii) LB-L SunCal Oak Valley, LLC; and (ix) SunCal Oak Knoll, LLC.  Steven M. Speier was appointed by the California Bankruptcy Court to act as trustee in the involuntary chapter 11 cases of the Trustee Debtors.

causes of action for equitable subordination of LCPI's claims and sought to assert those claims against LCPI.  The California Bankruptcy Court initially held that the SunCal Debtors could pursue equitable subordination claims against LCPI, enabling the SunCal Debtors to add LCPI as a defendant in the Equitable Subordination Action pursuant to their Second Amended Complaint, filed March 26, 2009.  LCPI appealed the California Bankruptcy Court's decision to the Bankruptcy Appellate Panel for the Ninth Circuit (the "<u>Bankruptcy Appellate Panel</u>").

21.    The California Bankruptcy Court dismissed the Second Amended Complaint, and the SunCal Debtors later filed their Third Amended Complaint.  The Third Amended Complaint sought numerous forms of relief against LCPI and included  "Claim 8 – To Disallow Claims and Liens, 11 U.S.C. §502(d)" (the "<u>502(d) Cause of Action</u>").  In October 2009, LCPI, along with other non-debtor defendants, sought to dismiss the Third Amended Complaint.  While LCPI's motion to dismiss was pending in the California Bankruptcy Court, in December 2009, the Bankruptcy Appellate Panel issued a decision reversing the California Bankruptcy Court's ruling and holding that actions for equitable subordination were affirmative (not defensive) in nature.[6]  Specifically, the Bankruptcy Appellate Panel held,

> Simply because Lehman Commercial filed a proof of claim (whether formally or informally) does not mean that Debtors may take *any* action against Lehman Commercial without violating Lehman Commercial's automatic stay.  Debtors may not initiate an action or proceeding against Lehman Commercial that seeks affirmative relief such as a counterclaim without violating the automatic stay….In this case, Debtors' subordination action seeks affirmative control over property of Lehman Commercial's bankruptcy estate proposing to alter the priority of Lehman Commercial's claim and the transfer of Lehman Commercial's lien rights to the Debtors' estate.  Thus, equitable subordination seeks affirmative relief: the modification of a

---

[6] The Bankruptcy Appellate Panel's decision was appealed to the Ninth Circuit Court of Appeals.  Oral argument on the Ninth Circuit appeal is scheduled for June 8, 2011.

> claimant's valid claim and property interest.... ***Accordingly, we find the adjudication of Debtors' equitable subordination claim violates Lehman Commercial's automatic stay.***

*In re Palmdale Hills Property, LLC,* 423 B.R. 655, 667 (B.A.P. 9th Cir. 2009) (emphasis added).

22.     The Bankruptcy Appellate Panel further explained, "[W]hile the California bankruptcy court may have concurrent jurisdiction to determine the scope or applicability of the automatic stay, ***the New York bankruptcy court must have final say as to whether the automatic stay applies to the bankruptcy case before it.***" *Id.* at 668 (emphasis added). It also noted that its decision did not deprive the SunCal Debtors of a remedy: they could either seek relief from stay from this Court or initiate their action against LCPI in this Court. *See id.*

23.     Nearly four months after the Bankruptcy Appellate Panel rendered its decision, on April 9, 2010, the California Bankruptcy Court dismissed the 502(d) Cause of Action in the Third Amended Complaint stating,

> The decision in *Lehman Commercial Paper, Inc. v. Palmdale Hills Property, LLC (In re Palmdale Hills Property, LLC),* --- B.R. --, 2009 WL 5812119 (B.A.P. 9th Cir. 2009) is binding on this Court....Under *In re Palmdale Hills Property, LLC,* the claims for relief brought against Defendant [LCPI] – namely claims 1, 5,7, ***8***, and 9 – are affirmative relief and, therefore violate LCPI's automatic stay. Consequently, the first, fifth, seventh, ***eighth*** and ninth claims for relief are dismissed without prejudice to the extent that they are brought against LCPI. Plaintiffs must seek relief from LCPI's automatic stay in the United States Bankruptcy Court for the Southern District of New York in order to bring any claims against LCPI in this adversary proceeding.

*See* Dismissal Order, p. 2 (emphasis added).

24.     With the weight of the rulings of the Bankruptcy Appellate Panel and the California Bankruptcy Court on their proverbial "shoulders," the Voluntary Debtors returned

again to this Court, on April 21, 2010, seeking relief from stay and proposing an order that would

enable them to "prosecute causes of action … seeking to (i) equitably subordinate and/or

otherwise impair claims filed against the SunCal Debtors' estates, and/or (ii) transfer, avoid, or

disallow associated liens associated with the loans on which such claims are premised …" *See*

*Motion of the SunCal Debtors for an Order Determining that the Automatic Stay Does Not*

*Apply; Or, in the Alternative, Granting Relief From Stay*, dated April 21, 2010 [Docket No.

8539] (the "May Stay Relief Motion").

> 25.     At the hearing on the May Stay Relief Motion (the "May 12 Hearing"),

counsel to the Voluntary Debtors conceded to this Court *three* times that this Court determines

the scope and application of the stay with respect to LCPI.  Specifically, counsel stated:

> MR. O'KEEFE:  [T]here is no question in my mind that the home bankruptcy
> court determines the scope and application of the stay, as the BAP said, in the
> final resolution….
> …
> MR. O'KEEFE: The second issue as to who gets the final say on whether the stay
> applies, we absolutely agree that the home bankruptcy court makes that decision.
> …
> MR. O'KEEFE: But we agree – we agree, Your Honor, that if the determination
> of whether the stay applies in the final determination – and that's what the BAP
> said.  And the final determination is Your Honor.  So we absolutely agree.  So, for
> example, Lehman had the right to come back here and say there's this
> determination and we think it's in error.  And had Your Honor said so, too, then
> that's it.  We're stumped.

Hearing Transcript, May 12, 2010, 49:2-50:20.

> 26.     On May 17, 2010, the Court entered its *Order Denying Motion of the*

*SunCal Debtors for an Order Determining that the Automatic Stay Does Not Apply; Or, in the*

*Alternative, Granting Relief from Stay,* Docket No. 9059 (the "May Stay Relief Order").  The

May Stay Relief Order was subsequently appealed to, and affirmed by, the United States District

Court for the Southern District of New York and the United States Court of Appeals for the

Second Circuit.  *See In re Lehman Brothers Holdings, Inc.,* 435 B.R. 122 (S.D.N.Y. 2010), *aff'd,*

402 Fed. Appx. 634 (2nd Cir. Dec. 7, 2010).  On June 10, 2010, the California Bankruptcy Court

stayed the Equitable Subordination Action.

**E.    The Fenway 9019 Motion**

27.    On March 25, 2010, LCPI and LBHI filed a motion in this Court seeking

to enter into a comprise with Fenway Capital, LLC; Fenway Funding, LLC; Hudson Castle

Group Inc.; and Deutsche Bank Trust Company America, Docket No. 7831 (the "Fenway 9019

Motion") pursuant to which LCPI and LBHI sought an order enabling a compromise that would,

among other things, facilitate the retransfer of certain "Repo Assets" (defined in the Fenway

9019 Motion) from Fenway Capital to LCPI.  On May 13, 2010, over the objection of the

Voluntary Debtors, this Court entered an order approving the relief sought in the Fenway 9019

Motion (the "Fenway Order").

28.    The Fenway Order provided, in relevant part, that "upon the closing of the

Transaction, LCPI will have repurchased the Repo Assets pursuant to the MRA and [LCPI] will

be the sole owner of the Repo Assets subject the rights of the Debtors and non-Debtors with

respect to the Repo Assets."  Fenway Order, p. 2.  In addition, the Fenway Order provided that,

subject to certain documentation and applicable law, "LBHI is fully subrogated to the claims of

Fenway against LCPI to the full extent of any payment by LBHI in respect of such claims, and

LBHI shall succeed to any and all liens and security interests with respect to the Repo Assets and

any interests therein asserted by Fenway under the Fenway Repo and/or the Fenway Documents

… in the same priorities as held by Fenway Capital or Fenway Funding, to secure LBHI's

subrogated claims, which liens and security interests shall be … deemed assigned and transferred

by Fenway Capital and Fenway Funding to LBHI."  Fenway Order, p. 3.

29.     Entry of the Fenway Order was subsequently affirmed by the Southern

District and the Second Circuit.  *See In re Lehman Brothers Holdings, Inc.,* 435 B.R. 122

(S.D.N.Y. 2010), *aff'd,* 402 Fed. Appx. 634 (2nd Cir. Dec. 7, 2010).  The transactions described

in the Fenway 9019 Motion and approved by the Fenway Order closed in or about June 2010.

**F.      The Competing SunCal Plans**

30.     In or about March 2011, the Lehman Lenders filed in the California

Bankruptcy Court their proposed chapter 11 plans for the SunCal Debtors.  In or about April

2011, the Voluntary Debtors and SCC Acquisitions, Inc. (the "SunCal Plan Proponents") filed

plans for the SunCal Debtors (collectively, the "SunCal Plans").  On April 8, 2011, the SunCal

Plan Proponents mailed LCPI a letter requesting that LCPI confirm its view on the effect of the

SunCal Plans on the automatic stay in these chapter 11 cases.  A copy of the April 8, 2011 letter

is annexed hereto as Exhibit H.  On April 25, 2011, in response to the letter dated April 8, 2011,

LCPI advised the SunCal Plan Proponents that it would accept the representation made in the

SunCal Plans that "no action provided for in [the SunCal Plans] shall be taken against [LCPI] or

[LBHI] that would have the effect of violating any applicable automatic stay."  A copy of the

April 25, 2011 letter is annexed hereto as Exhibit I.

**G.      The Claim Objection and the 502(d) Motion**

31.     On April 26, 2011, the SunCal Movants filed the 502(d) Motion, and on

May 10, 2011, the SunCal Movants filed the Claim Objection (amending the previously filed

objection seeking substantially similar relief).  Each of the SunCal Motions seeks affirmative

relief against LCPI that is subject to the automatic stay.

32.     The 502(d) Motion.  The 502(d) Motion asserts against LCPI the 502(d)

Cause of Action that was previously asserted in the Third Amended Complaint and dismissed by

the California Bankruptcy Court as violating LCPI's automatic stay.  The 502(d) Cause of

Action is premised on the SunCal Movants' allegations that LCPI received avoidable transfers

that it has not returned to the SunCal Debtors.  Accordingly, the SunCal Movants argue that

fourteen claims filed by LCPI must be disallowed under section 502(d) of the Bankruptcy Code.

Although the SunCal Movants refer to the Dismissal Order as "law of the case" (*see* 502(d)

Motion, p. 11), they continue to attempt to prosecute the 502(d) Cause of Action through the

502(d) Motion ***even though*** the California Bankruptcy Court expressly held it was subject to

LCPI's automatic stay and the SunCal Movants would be required to obtain stay relief from this

Court prior to proceeding with those claims.

   33. <u>Claim Objection.</u>  In the Claim Objection, the SunCal Movants seek,

among other things, an order disallowing ten claims held by LCPI and "recouping from the

secured portion of Lehman Claims, all damages suffered by the Relevant SunCal Debtors on

account of the breach of the Restructuring Agreement by Lehman ALI, Inc…, LCPI's

predecessor-in-interest."  Claim Objection, p. viii.  The SunCal Movants essentially argue that

Lehman ALI breached the terms of a "Restructuring Agreement" by refusing to pay "Urgent

Payables" and by repudiating a "Settlement Agreement" (which Lehman ALI and others contend

never existed because it was never finalized or executed and delivered by the would-be parties

thereto).  Based on Lehman ALI's alleged breach, the SunCal Movants argue they have suffered

damages and that they may "recoup" those damages "against the secured portion of the Lehman

Claims" including LCPI's claims.  *See* Claims Objection, p. 24.

   34. Although the SunCal Movants call the relief they seek "recoupment," in

essence, they seek to subordinate LCPI's claims to those of other creditors, something they know

they cannot do without prior stay relief from this Court.  The SunCal Movants explain what they

seek most clearly in the Disclosure Statement Reply where the Voluntary Debtors state, "When these sixteen Projects are sold, which sales shall occur on the Effective Date, the SunCal Proponents will immediately 'recoup' from these sales proceeds the damages owed and immediately pay any allowed administrative claims. The hearing on the Recoupment Claim Objection is scheduled for June 9, 2011." Disclosure Statement Reply, p. 7 (emphasis and citations omitted). The remedy sought is not to reduce LCPI's claims, but instead to reorder such claims' priorities and to recover damages from LCPI.

35.     As explained in further detail below, courts have recognized that "recoupment" does not entail money changing hands, but instead a "netting out" of claims. Alternatively, even if the SunCal Movants were to agree that "recoupment" does not entail taking "first monies" from sale proceeds but, instead, a reduction of claims (because there is no single, unitary transaction), based on the facts alleged by the SunCal Movants, such "recoupment" is actually a setoff. Setoffs are subject to the automatic stay.

36.     Notwithstanding the numerous proceedings in the Second and Ninth Circuits in which courts in those jurisdictions unequivocally held that this Court is the final arbiter with respect to LCPI's stay, the SunCal Movants continue to take clearly affirmative actions against LCPI without seeking stay relief, unilaterally determining that LCPI's stay does not apply. Characterizing the relief requested as "recoupment" (rather than equitable subordination or setoff, which is the actual nature of the relief sought), does not change its fundamental nature. Similarly, bringing their 502(d) Cause of Action against LCPI by motion (as opposed to the adversary proceeding in which it was originally brought) does not exclude those claims from the purview of the Dismissal Order.

37.     In their April 25, 2011 letter, LCPI advised the SunCal Plan Proponents

16

that the Claim Objection violated the automatic stay in these chapter 11 cases and urged them to

obtain stay relief prior to continuing to prosecute the Claim Objection.  As of the date of this

Motion, however, the Suncal Movants had neither sought nor obtained relief from stay to

prosecute claims made in the 502(d) Motion or the Claim Objection against LCPI.

## H.    The SunCal Movants' Attempts to Obtain Discovery Relating to the Claim Objection and 502(d) Motion

38.    Instead of heeding LCPI's suggestion that they first obtain relief from stay

prior to continuing to prosecute affirmative claims against LCPI, on May 3, 2011, the Voluntary

Debtors, SCC Acquisitions, Inc., and SunCal Management filed their *Motion For Order*

*Regarding Entitlement To Discovery In Connection With Claim Objection, and/or Imposing*

*Discretionary Stay* [California Bankruptcy Court, Docket No. 2039] (the "Discovery Motion")

and requested a hearing on shortened time.  The California Bankruptcy Court conducted a

hearing, on shortened time, on the Discovery Motion, and on May 20, 2011, issued a ruling on

the Discovery Motion, stating:

> Grant limited relief as follows: ***to the extent*** movants have filed an
> objection to claim asserting recoupment, such objection is not violative
> of LCPI's automatic stay and is a contested matter within the meaning
> of FRBP 9014, entitling movants to the discovery process provided
> therfor. ***This ruling is without prejudice to any defenses available to
> LCPI.***  All other relief requested in motion is denied.

*See* California Bankruptcy Court [Docket No. n/a] (emphasis added).

## I.    Motion for Stay of Non-Confirmation Litigation Pending Confirmation

39.    On or about May 20, 2011, the Lehman Lenders filed their *Motion of the*

*Lehman Entities for Stay of SunCal Non-Confirmation Litigation Pending Confirmation*

[California Bankruptcy Court, Docket No. 2108] (the "Discretionary Stay Motion") pursuant to

which the Lehman Lenders requested an order from the California Bankruptcy Court imposing a

discretionary stay of the Equitable Subordination Action, the Claim Objection, the State Court

Action (which was removed to the California Bankruptcy Court), and the 502(d) Motion.  The

Lehman Lenders sought a hearing on the Discretionary Stay Motion on shortened notice for June

9, 2011, when the Claim Objection and 502(d) Motion are currently scheduled to be heard by the

Court.  On or about May 23, 2011, the California Bankruptcy Court denied the Lehman Lenders'

request to shorten the time on the Discretionary Stay Motion.  On information and belief, as of

the date of the filing of this Motion, the earliest date the Discretionary Stay Motion will be heard

by the California Bankruptcy Court is August 9, 2011.

        40.    Although the California Bankruptcy Court ostensibly allowed the SunCal

Movants to proceed with the Claim Objection against LCPI to the extent a claim for recoupment

was asserted, it did not rule on whether a claim for recoupment *actually* was asserted in the

Claim Objection or whether, as is noted below, the claim for recoupment was a disguised

equitable subordination or setoff claim for which stay relief *is* necessary.  Indeed, at the May 13

hearing, Judge Smith advised the SunCal Movants that such issues were not before her and that

she was not immunizing the SunCal Movants from any claims LCPI might assert against them in

its chapter 11 cases relating to the prosecution of the Claim Objection.[7]  In other words,

proceeding with the Claims Objection was at the SunCal Movants' own risk.  For the reasons

stated below, the SunCal Movants have taken too many risks with respect to the automatic stay

in these cases.  They cannot continue their unfettered violations of the automatic stay.

### III.  JURISDICTION AND VENUE

---

[7] As of the date of the filing of this Motion, LCPI had ordered, but had not yet obtained, a copy of the
transcript of the May 13, 2011 hearing.  To the extent LCPI obtains the transcript prior to the hearing on
this Motion, LCPI will supplement the record accordingly.

41.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.  RELIEF REQUESTED

42.     By this Motion, the Debtors respectfully request the entry of an order, pursuant to section 362(a) of the Bankruptcy Code, enforcing the automatic stay and compelling the SunCal Movants to comply with this Court's prior rulings, including by requiring the SunCal Movants to seek relief from this Court prior to attempting any continued prosecution of the 502(d) Motion and the Claim Objection with respect to LCPI and LBHI, to the extent applicable.  A proposed order is annexed hereto as Exhibit J.

### A.     Actions by the SunCal Movants Against LCPI Violate the Automatic Stay

43.     Section 362(a) of the Bankruptcy Code provides, in pertinent part, that the filing of a bankruptcy petition operates as an automatic stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  In enacting section 362, Congress made clear that:

> [T]he automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws.  It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment and all foreclosure actions.  It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R. Rep. No. 95-595 at 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 6296-97; S. Rep. No. 95-989 at 54-55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5840-41; *see also Midatlantic Nat'l Bank v. New Jersey Dep't of Envt'l Protection,* 474 U.S. 494, 503 (1986) (noting that the automatic stay is one of the fundamental protections afforded Debtors under the Bankruptcy Code).

The automatic stay applies to proceedings in other bankruptcy courts as well.  *See In re Miller*,

397 F.3d 726, 730-31 (9th Cir. 2005) ("11 U.S.C. § 362(b) provides 17 exceptions to the

automatic stay provision.  It does not exclude bankruptcy courts, however, from the application

of an automatic stay .... Accordingly we hold that an automatic stay issued by a home bankruptcy

court applies to all other bankruptcy courts.").

44.     Further, the term "property of the estate" is construed broadly.  *See* 11

U.S.C. § 541(a) ("Such estate is comprised of all of the following property, wherever located and

by whomever held…all legal or equitable interests of the debtor in property as of the

commencement of the case."); *see also United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204-

205 (1983) (noting that the "House and Senate Reports on the Bankruptcy Code indicate that §

541(a)(1)'s scope is broad"); *Mid-Island Hosp., Inc. v. Empire Blue Cross and Blue Shield (In re

Mid-Island Hosp., Inc.),* 276 F.3d 123, 128 (2d Cir.), *cert. denied,* 537 U.S. 882 (2002) (defining

"property of the estate" to include contingent interests); *Official Comm. of Unsecured Creditors

v. PSS S.S. Co. (In re Prudential Lines, Inc.),* 928 F.2d 565, 572 (2d Cir. 1991) (noting that

Congress desired to "bring anything of value that the debtors have into the estate."), *cert denied,*

502 U.S. 821 (1991).  Consequently, it is indisputable that the claims of LCPI against the SunCal

Debtors constitute property of LCPI's estate.

### (1) The Claims Asserted in the 502(d) Motion Are Subject to the Automatic Stay

45.     Nearly one year after this Court's denial of the May Stay Relief Motion

without prejudice, and apparently not convinced by the order entered by the California

Bankruptcy Court, the SunCal Movants filed the 502(d) Motion, unilaterally concluding that the

automatic stay in the chapter 11 cases of LCPI and LBHI does not apply.  Ignoring even their

own California Bankruptcy Court's express statements concerning their section 502(d) causes of

action, the SunCal Movants state, "[T]he within Motion does not seek any affirmative recovery against LCPI or LBHI.  Rather, the SunCal Parties are merely acting defensively to disallow the Lehman Claims pursuant to Section 502(d) of the Bankruptcy Code.  Accordingly, LCPI and LBHI cannot possibly argue that their automatic stays apply to the relief requested in this Motion."  502(d) Motion, p. 11.

46.    The Voluntary Debtors, as their counsel conceded nearly one year ago, are not the arbiters of the Debtors' automatic stay.  It is this Court that is ultimately charged with determining the applicability and scope of the automatic stay.  Indeed, as this Court warned the SunCal Debtors as early as January 2009, "[W]hen there's a close question, seek relief from stay to avoid the very severe sanctions that flow from – especially flow from willful violations of the stay.  You're in the zone of a willful violation."  Hearing Transcript, January 30, 2009, p. 19.

47.    Here, however, the applicability of the automatic stay to the Section 502(d) Cause of Action was not a close question.  The California Bankruptcy Court had expressly held that the SunCal Debtors were required to obtain relief from stay in LCPI's chapter 11 case if they intended to proceed with their Section 502(d) Cause of Action against LCPI. Their only effort to obtain this type of relief was denied in May 2010, and the SunCal Movants never sought additional relief from this Court.

48.    The SunCal Movants make no attempt at substantively differentiating between the section 502(d) claims that the California Bankruptcy Court expressly said were subject to LCPI's automatic stay with those asserted in the 502(d) Motion.  The only discernible difference between the two sets of claims is that the former were asserted through an adversary proceeding and the latter were asserted through motion practice.  Repackaging the dismissed section 502(d) cause of action as a contested matter, as opposed to a claim in an adversary

proceeding, as the SunCal Movants have done, does not change the fact that the automatic stay

continues to apply.  Nothing in section 362 of the Bankruptcy Code distinguishes violations of

the stay asserted in adversary proceedings from those asserted in motions.  Section 362(a) of the

Bankruptcy Code proscribes, "any act" to obtain control of property of or from the estate or to

exercise control over the estate.

49.    Even if it were acceptable to ignore the California Bankruptcy Court's law

of the case and litigate the applicability of the Debtors' automatic stay in the California

Bankruptcy Court, the SunCal Movants could not successfully prosecute to conclusion their

section 502(d) claims against LCPI without first obtaining relief from stay.  Although claim

objections do not generally violate the automatic stay,  an objection based on section 502(d) is

not an ordinary claim objection.  Unlike other subsections of section 502, section 502(d) does not

address the merits of a claim, but is intended to ensure compliance with judicial orders and

permit the debtor to setoff avoidance judgments.  *In re Davis*, 889 F.2d 658, 661 (5th Cir. 1989)

("The legislative history and policy behind [§] 502(d) illustrates that the section is intended to

have the coercive effect of insuring compliance with judicial orders."), *cert. denied,* 495 U.S.

933 (1990).  Section 502(d) of the Bankruptcy Code requires a judicial determination of a

claimant's liability before permitting claim disallowance.  Section 502(d) states in full:

> Notwithstanding subsections (a) and (b) of this section, the court
> shall disallow any claim of any entity from which property is
> recoverable under section 542, 543, 550, or 553 of this title or that
> is a transferee of a transfer avoidable under section 522(f), 522(h),
> 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or
> transferee has paid the amount, or turned over any such property,
> for which such entity or transferee is liable under section 522(i),
> 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added).  The language of this section clearly contemplates actual

liability before disallowance is permitted. Bare assertions do not suffice.  The case law on this

subject strongly supports the view that where, as here, the limitations period on the underlying

avoidance period has not run, a judicial determination must be made before a claim can be

disallowed. *See, e.g., Seta Corp. of Boca, Inc. v. Atlantic Computer Sys. (In re Atlantic Computer

Sys.)*, 173 B.R. 858, 862 (S.D.N.Y. 1994) ("That description clearly envisions some sort of

determination of the claimant's liability before its claims are disallowed ...."); *Holloway v.

Internal Revenue Service (In re Odom Antennas, Inc.),* 340 F.3d 705,705 (8th Cir. 2003) (trustee

must first obtain avoidance judgment to use section 502(d)); *In re Midwest Agri Development

Corp.,* 387 B.R. 580 (8th Cir. BAP 2008) (same); *Goldin Assocs., L.L.C. v. Shared Techs.

Cellular, Inc. (In re Shared Techs. Cellular, Inc.)*, 281 B.R. 804, 807 (Bankr. D. Conn. 2002)

("All parties agree that § 502(d) becomes applicable only after a judicial determination of

liability on the preference complaint.") (emphasis in original); *In re Lids Corp*., 260 B.R. 680,

684 (Bankr. D. Del. 2001) ("[A] debtor wishing to avail itself of the benefits of section 502(d)

must first obtain a judicial determination on the preference complaint."); *cf. Katchen v. Landy*,

382 U.S. 323, 330 (1966) (stating that objections under the predecessor to section 502(d) are,

"like other objections, part and parcel of the allowance process" and that "the claim can neither

be allowed nor disallowed until the preference matter is adjudicated").

   50. Obtaining a determination of liability requires obtaining relief from the

automatic stay.  Thus the court in *Shared Technologies* noted:  "Without a stay modification, no

further action on the pending litigation is possible."  281 B.R. at 808.  There, the trustee of one

debtor moved for relief from stay in the other's home bankruptcy court to prosecute a 502(d)

objection in the trustee's home court.  The court conditioned relief from stay to permit the trustee

to prosecute the preference claim but not to permit the use of any judgment as the basis for

disallowing the claim, until it was determined what the claim would actually be worth in the

defendant debtor's bankruptcy case.  Affirming the bankruptcy court, the district court stated:

"Had the STC BC not modified the stay, Appellant would not have been able to determine the

amount of its preference claim in the Delaware BC in the first place. By their very natures,

automatic stays impact proceedings in other, including bankruptcy, courts."  *In re Shared*

*Technologies Cellular, Inc*., 293 B.R. 89, 94 (D. Conn. 2003).

       51.    In their defense, the SunCal Movants cite *In re Metiom*, 301 B.R. 634

(Bankr. S.D.N.Y. 2003) for the proposition that a claim objection under section 502(d) does not

violate the stay.  *Metiom,* however, was not addressing the determination of liability on an

avoidance claim; to the contrary, the court acknowledged that successful prosecution of a section

502(d) objection requires an initial determination that the defendant received "an avoidable

preference or avoidable postpetition transfer."  *In re Metiom*, 301 B.R. 641-42.  Moreover,

*Metiom* involved an unsecured claim, whereas the avoidance claims on which the SunCal

Movants seek a determination in the 502(d) Motion are for avoidance of LCPI's liens.  The

Bankruptcy Appellate Panel specifically distinguished *Metiom* on that basis noting, "*Metiom*

involved an unsecured claim. The facts of this case differ from *Metiom* because, here, Lehman

Commercial's claims are secured and Debtors are seeking to transfer the liens to the estate."  423

B.R. at 667; *see also In re PRS Insurance Group, Inc.,* 331 B.R. 580, 587 (Bankr. D. Del. 2005)

(noting that trustee was not seeking affirmative relief against the other debtor or attempting to

control its assets).

       52.    In light of the foregoing, the SunCal Movants' actions amount to nothing

more than games the SunCal Movants are playing in an attempt to sidestep federal court orders.

The SunCal Movants cannot provide a satisfactory explanation for their blatant disregard of the

automatic stay because there is none.  Their filing of the 502(d) Motion can only be regarded as a

deliberate, willful violation of the automatic stay.  The SunCal Movants' violation of a federal

injunction cannot be countenanced and must be enjoined.

### (2)    The "Recoupment" Claims in the Claim Objection Are Subject to the Automatic Stay

53.    The SunCal Movants argue that the relief sought in the Claim Objection does not violate LCPI's automatic stay because the SunCal Movants allegedly only seek an order allowing the SunCal Debtors to "recoup" their alleged damage claims from LCPI's claims.  As the SunCal Movants acknowledge, recoupment, "is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim."  *Newbery Corp. v. Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1399 (9th Cir. 1996); *see also In re Palmdale Hills Property,* 423 B.R. at 667 n. 9 (same).  Under New York law, "[r]ecoupment is an equitable remedy that, of itself, gives no right to actual payment." *In re Kings Terrace Nursing Home and Health Related Facility,* 184 B.R. 200, 202 (S.D.N.Y. 1995);  *In re Drexel Burnham Lambert Group, Inc.,* 13 B.R. 830, 854 (Bankr. S.D.N.Y. 1990).[8] Yet, the Voluntary Debtors have stated in their Disclosure Statement Reply that their planned method of "recoupment" is to take first dollars from the proceeds of the sale of LCPI's collateral to satisfy their alleged damages – not to reduce the amount of their claims.  The SunCal Movants

---

[8] "Recoupment and setoff rights are determined by nonbankruptcy law, which ordinarily is state law." *New York State Elec. & Gas Corp. v. McMahon (In re McMahon),* 129 F.3d 93, 96 (2d Cir. 1997); *see also Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 146 n.3 (2d Cir. 2002) (holding that the application of New York applies to a defense of recoupment when the agreement at issue selects such law).  The Ninth Circuit also recognizes that recoupment is a state law right.  *See Newbury Corp.,*  95 F.3d 1392 at 1398 n.9 (acknowledging that the disputed contracts were governed by Arizona law and that such law determines the scope of the defense of recoupment); *see also In re Madigan,* 270 B.R. 749, 758 (B.A.P. 9th Cir. 2001) (holding that recoupment is governed by state law).  Here, there is no dispute that agreements at issue are governed by New York law.  The standard for and the analysis and determination of whether the SunCal Movants may assert a defense of recoupment must be determined by New York law.  Consequently, all of the authority cited by the SunCal Movants in the Claim Objection has no application to the facts in this case because such decisions do not apply New York law.  *Newbury,* 95 F.3d at 1398 n.9 (applying Arizona law); *In re TLC Hospitals, Inc.,* 224 F.3d 1008, 1012 (9th Cir. 2000) (applying federal law that governs Medicare claims); *In re Thompson,* 350 B.R. 842 (Bankr. E.D. Wis. 2006) (applying Wisconsin law).

do not cite to any case law establishing that recoupment is effectuated by payment of cash.  In

fact, the *Newbery* case cited by the SunCal Movants speak of recoupment in terms of "abatement

or reduction of such claim."  Although the Claim Objection does not cite a total amount of

alleged damages claimed by the SunCal Debtors, based on other pleadings filed by the SunCal

Debtors in other fora,[9] the SunCal Debtors may claim damages in excess of $100 million.  Even

assuming the damages were awarded at $100 million and the SunCal Debtors were able to satisfy

the criteria necessary to effectuate a "recoupment," there is no reason why such amounts would

not simply reduce the amount of LCPI's claims, as would be consistent with case law on

recoupment.

54.    In fact, the SunCal Movants' notion of "recoupment" (taking first dollars

from the proceeds of a collateral sale) in practice, is nothing more than a subordination of LCPI's

claims to the claims of other creditors.  There is no dispute (and, indeed, the Bankruptcy

Appellate Panel has expressly held) that subordination seeks affirmative relief against LCPI and

its assets and is subject to the stay.  Without obtaining relief from stay, the SunCal Debtors

cannot subordinate LCPI's claims.  Recasting their subordination efforts as a claim for

recoupment does not change the substance of what the SunCal Debtors are trying to achieve.

55.    Even if it were permissible to "recoup" by taking first dollars from the

proceeds of a secured lender's collateral, the transactions described by the SunCal Movants do

not give rise to a recoupment claim.  In fact, at most, the SunCal Movants seek to effectuate a

setoff, which is subject to the automatic stay under sections 553 and 362(a)(7) of the Bankruptcy

---

[9] In the civil action captioned *Acton Estates, LLC, et al. v. Lehman ALI, Inc., et al.,* Case No. 30-2011-
00460847-CU-BC-CJC filed in the Superior Court of California (the "State Court Action"), the plaintiffs
(some of whom are the SunCal Movants) allege damages potentially exceeding $100 million.  The State
Court Action was removed to the California Bankruptcy Court on May 9, 2011.

Code.  Section 362(a)(7) stays, "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor."

56.     Although sometimes used interchangeably, there are distinct differences between recoupment and setoff.  "Recoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered.  Of course, such a process does not allow one transaction to be offset against another, but only permits a transaction which is made the subject of a suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole."  *N.Y. State Elec. & Gas Corp. v. McMahon (In re McMahon),* 129 F.3d 93, 96 (2d Cir. 1997) (quoting *Nat'l Cash Register Co. v Joseph,* 299 N.Y. 200 (N.Y. 1949); *see also Malinowski v. N.Y. State Dep't of Labor (In re Malinowski),* 156 F.3d 131, 133 (2d Cir. 1998) (noting that "[r]ecoupment is in the nature of a defense, the purpose of which is to do justice viewing one transaction as a whole" and noting that in setoffs, mutual claims may arise out of different transactions) (citations omitted).

57.     The term "transaction" is viewed restrictively.  *See In re Malinowski,* 156 F.3d at 133.  A "mere logical relationship" is not enough.  *Id.* (citations omitted).  Further, "[w]hen the circumstances that give rise to the credit and those giving rise to the creditor's obligation to the debtor do not result from a set of reciprocal contractual obligations or from the same set of facts, they are not part of the same transaction." *Id.* at 134.  The "facts" the SunCal Movants allege that give rise to their recoupment claim do not reflect the existence of a single transaction or a set of reciprocal contractual obligations.  The SunCal Movants expressly state, "Lehman ALI breached the terms of the Restructuring Agreement by failing and then refusing to pay the Urgent Payables and by repudiating the Settlement Agreement."  Claim Objection, p. 24.

They then state, "The Debtor [*sic]* is Entitled to Recoup its Damages Against the Secured

Portion of the Lehman Claims." *Id.* Further elaboration by the SunCal Movants similarly

reflects the lack of a single transaction between LCPI and each SunCal Debtor justifying a

recoupment claim. The SunCal Movants state,

> The Lehman Claims are all purported secured claims based on Loan Agreements
> and related guaranty agreements and/or security agreements involving the
> Projects as collateral. The Restructuring Agreement and the Settlement
> Agreement, on which the current objections are based, contemplated "friendly"
> foreclosures whereby Lehman ALI or its designee (the Venture Grantees) would
> take title to the Projects and pay the claims of the applicable creditors, would
> agree not to sue on the very obligations that form the basis of their Claims. The
> respective Loan Agreements, Restructuring Agreement and the Settlement
> Agreement all arise out of a ***common series of transactions*** that clearly bear a
> "logical relationship" for the purposes of recoupment.

Claim Objection, p. 26 (emphasis added). As the SunCal Movants show, even taking all of their

allegations as true, there is no single, unitary transaction from which to effectuate a recoupment.

At best, the SunCal Movants could attempt to assert a setoff (to the extent it could establish a

mutuality of obligation), but, as noted, stay relief is necessary to achieve that result.

58.     Regardless of whether the SunCal Movants' recoupment claim is a veiled

subordination attempt or a disguised setoff claim, it is clear that the SunCal Movants cannot

proceed to prosecute their claims against LCPI without first obtaining stay relief from this Court.

This Court amply and repeatedly warned the SunCal Debtors to seek stay relief if there was even

a shred of doubt as to whether the automatic stay applied. The SunCal Movants cannot be

allowed to continue to ignore this Court's admonitions.

### (3) Property Acquired by a Debtor Postpetition
### Is Property of Its Estate, Subject to the Automatic Stay

59.     The SunCal Movants appear to allege that their "recoupment" from first

dollars of LCPI's collateral is warranted based on an abuse of process that they contend occurred

in this Court.  The SunCal Movants state in the Claim Objection that the transaction between

LCPI and Fenway approved by this Court in May of 2010 authorizing Fenway to retransfer

certain assets to LCPI was designed to enable it to "invoke its automatic stay" and, therefore,

was "an abuse of process."  The SunCal Movants reason that "[u]nder these facts, the Lehman

Claims are subject to any and all defenses held by the Relevant SunCal Debtors, including the

affirmative defenses raised herein."  Claim Objection, p. 31.

        60.     As noted above, this Court already considered the arguments made by the

Voluntary Debtors when it entered the Fenway Order.  The transactions that enabled Fenway to

retransfer to LCPI certain assets previously held by Fenway were approved by this Court.  As a

result of those transactions, a debtor (LCPI) acquired certain property, and, under section

541(a)(7) of the Bankruptcy Code, such property becomes part of its estate.  11 U.S.C. §

541(a)(7).  Moreover, as noted above, LBHI held commercial paper notes that, prior to the entry

of the Fenway Order, were ultimately secured by, among other assets, a pledge of Fenway's

interests in certain of the loans implicated by the 502(d) Motion and the Claim Objection.

Following the entry of the Fenway Order, LBHI became fully subrogated to the claims of

Fenway Capital and/or Fenway Funding against LCPI to the full extent of any payment by LBHI

in respect of such claims, and LBHI succeeded to any and all liens and security interests with

respect to the "Repo Assets" (as defined in the Fenway 9019 Motion) and any interest held

therein by Fenway Capital or Fenway Funding in the same priorities in which they had

previously been held.  Consequently, to the extent the Claim Objection and the 502(d) Motion

attack assets held by LCPI in which LBHI has a security interest, LBHI's automatic stay also is

implicated, and the SunCal Movants should be required to obtain stay relief to equitably

subordinate, offset from or otherwise take affirmative action against such assets, as they

currently attempt to do.

61.    The SunCal Movants may not like the consequences of the Fenway Order
(as is evidenced by the fact that they appealed it).  The fact remains, however, the Fenway Order
was entered by this Court and subsequently affirmed.  Indeed, the Voluntary Debtors previously
raised before this Court some of the same arguments raised in the Claim Objection, namely that
the Fenway Order was sought in bad faith.  After hearing the uncontroverted testimony proffered
by the Debtors,[10] as well as following a statement of support made by the Creditors' Committee,
this Court found a sufficient business justification for entering the Fenway Order.  *See* Hearing
Transcript, May 12, 2010 Hearing, 46:16-47:6.  The SunCal Movants cannot extricate
themselves from the effect of the Fenway Order by collaterally attacking it and arguing the
transactions approved therein were "an abuse of process."  The automatic stay applies; if the
SunCal Movants believe LCPI acquired certain loans subject to the SunCal Movants' defenses
and the defenses are affirmative in nature, then the SunCal Movants' must seek relief from stay
to employ them.

## VI.    NOTICE

62.    The Debtors have served notice of this Motion to (i) the U.S. Trustee; (ii)
the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv)
the Internal Revenue Service; (v) the United States Attorney for the Southern District of New
York; (vi) the SunCal Movants, and (vii) all other parties entitled to notice in accordance with
the procedures set forth in the second amended order entered on June 17, 2010 governing case

---

[10] At the May 12 Hearing, the Debtors proffered the testimony of Jeffrey Fitts, a managing director at
Alvarez and Marsal, concerning the business justification for the transaction ultimately approved in the
Fenway Order.  The SunCal Debtors, who had argued that the transaction was proposed in bad faith, were
provided with an opportunity to cross-examine Mr. Fitts.  They elected not to do so.  *See* Hearing
Transcript,  May 12, 2010, 28:18-22; 29:9-15.

management and administrative procedures for these cases [Docket No. 9635].  The Debtors

submit that no other or further notice need be provided.

       WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: May 24, 2011
Houston, Texas

                    /s/  Alfredo R. Perez
                    Alfredo R. Pérez
                    Weil, Gotshal & Manges LLP
                    700 Louisiana, Suite 1600
                    Houston, TX 77002
                    Telephone: (713) 546-5040
                    Facsimile: (713) 224-9511

                    **Attorneys for Debtors**
                    **and Debtors in Possession**

# Exhibit "A"

1  PAUL J. COUCHOT -- State Bar No. 131934
   pcouchot@winthropcouchot.com
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5
   General Insolvency Counsel for Administratively
6  Consolidated Debtors-in-Possession (the "Voluntary
   Debtors")
7
   RONALD RUS - State Bar No. 67369
8    rrus@rusmiliband.com
   JOEL S. MILIBAND - State Bar No. 77438
9    jmiliband@rusmiliband.com
   **RUS MILIBAND & SMITH**
10 **A PROFESSIONAL CORPORATION**
   2211 Michelson Drive, Seventh Floor
11 Irvine, California 92612
   Telephone: (949) 752-7100
12 Facsimile:  (949) 252-1514

   Attorneys for SunCal Management LLC
13
                **UNITED STATES BANKRUPTCY COURT**
14               **CENTRAL DISTRICT OF CALIFORNIA**
                     **SANTA ANA DIVISION**
15
   In re                              | Case No. 8:08-bk-17206-ES
16                                     | Jointly Administered With Case Nos. 8:08-bk-17209-ES;
   Palmdale Hills Property, LLC, and its| 8:08-bk-17240-ES; 8:08-bk-17224-ES; 8:08-bk-17242-ES;
17 Related Debtors.                    | 8:08-bk-17225-ES; 8:08-bk-17245-ES; 8:08-bk-17227-ES;
                                       | 8:08-bk-17246-ES; 8:08-bk-17230-ES; 8:08-bk-17231-ES;
18        Jointly Administered Debtors | 8:08-bk-17236-ES; 8:08-bk-17248-ES; 8:08-bk-17249-ES;
          and Debtors-in-Possession    | 8:08-bk-17573-ES; 8:08-bk-17574-ES; 8:08-bk-17575-ES;
19                                     | 8:08-bk-17404-ES; 8:08-bk-17407-ES; 8:08-bk-17408-ES;
   Affects:                            | 8:08-bk-17409-ES; 8:08-bk-17458-ES; 8:08-bk-17465-ES;
20 ☐ All Debtors                       | 8:08-bk-17470-ES; 8:08-bk-17472-ES; and 8:08-17588-
   ☐ Palmdale Hills Property, LLC,     | ES
21 ☐ SunCal Beaumont Heights, LLC      |
   ☒ SCC/Palmdale, LLC                 | Chapter 11 Cases
22 ☐ SunCal Johannson Ranch, LLC       |
   ☒ SunCal Summit Valley, LLC         | **THE MOVING VOLUNTARY DEBTORS' AND**
23 ☒ SunCal Emerald Meadows LLC        | **SUNCAL MANAGEMENT LLC'S NOTICE OF**
   ☒ SunCal Bickford Ranch, LLC        | **MOTION AND MOTION FOR ORDER**
24 ☒ Acton Estates, LLC                | **DISALLOWING CLAIMS OF LEHMAN ALI,**
   ☐ Seven Brothers LLC                | **INC. AND LEHMAN COMMERCIAL PAPER,**
25 ☐ SJD Partners, Ltd.                | **INC. PURSUANT TO 11 U.S.C. § 502(d);**
   ☐ SJD Development Corp.             | **MEMORANDUM OF POINTS AND**
26 ☐ Kirby Estates, LLC                | **AUTHORITIES**
   ☒ SunCal Communities I, LLC         |
27 ☒ SunCal Communities III, LLC       | Date:      June 9, 2011
                                       | Time:      10:30 a.m.
28 *Caption Continued on Next Page*    | Place:     Courtroom 5A

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

***Caption Continued from Previous Page***

☒ SCC Communities LLC

☒ North Orange Del Rio Land, LLC

☒ Tesoro SF, LLC

☐ LBL-SunCal Oak Valley, LLC

☒ SunCal Heartland, LLC

☐ LBL-SunCal Northlake, LLC

☒ SunCal Marblehead, LLC

☐ SunCal Century City, LLC

☐ SunCal PSV, LLC

☒ Delta Coves Venture, LLC

☒ SunCal Torrance, LLC

☒ SunCal Oak Knoll, LLC

-ii-

**TO THE HONORABLE ERITHE SMITH, UNITED STATES BANKRUTPCY JUDGE, AND PARTIES IN INTEREST:**

SunCal Communities I LLC ("SunCal I"), Acton Estates LLC ("Acton"), SCC/Palmdale LLC ("SCC/Palmdale"), SunCal Emerald Meadows LLC ("Emerald Meadows"), SunCal Bickford Ranch LLC ("Bickford Ranch"), SunCal Summit Valley LLC ("Summit Valley"), SCC Communities LLC ("SCC Communities"), North Orange Del Rio Land, LLC ("Del Rio"), and Tesoro SF LLC ("Tesoro") (the "Moving Voluntary Debtors"), and SunCal Management, LLC ("SunCal Management" and collectively with the Moving Voluntary Debtors, the "SunCal Parties") hereby move (the "Motion") the Court, in both the Moving Voluntary Debtors' cases and certain of the Trustee Debtors' cases[1], for an order granting the following relief:[2]

(A)    Disallowing, pursuant to 11 U.S.C. § 502(d), the following Proofs of Claim filed by Lehman ALI, Inc. ("Lehman ALI") and Lehman Commercial Paper, Inc. ("LCPI", and together with Lehman ALI, the "Lehman Entities"):

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount | RJN Exhibit No. |
|---|---|---|---|---|
| 1 | SunCal I | LCPI | $343,221,391 | 1 |
| 2 | SunCal III | LCPI | $343,221,391 | 2 |
| 6 | Acton Estates | LCPI | $343,221,391 | 3 |
| 6 | Emerald Meadows | LCPI | $343,221,391 | 4 |
| 16 | Bickford Ranch | LCPI | $343,221,391 | 5 |
| 12 | Summit Valley | LCPI | $343,221,391 | 6 |
| 1 | SCC/Palmdale | LCPI | $119,664,305 | 7 |
| 12 | Oak Knoll | Lehman ALI | $158,141,365 | 8 |
| 4 | Torrance | Lehman ALI | $158,141,365 | 9 |
| 9 | Heartland | LCPI | $354,325,126 | 10 |
| 21 | Marblehead | LCPI | $354,325,126 | 11 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 | 12 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 13 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 | 14 |
| 21 | Delta Coves | Lehman ALI | $ 206,023,142 | 15 |

---

[1] The Trustee Debtors are defined as LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll") (collectively "Trustee Debtors").

[2] The Voluntary Debtors are the moving parties with respect to the objections to claims in the Voluntary Debtors' cases, and SunCal Management is the moving party with respect to the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor in all of the Trustee Debtors' cases.

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1  (B)  Disallowing, pursuant to 11 U.S.C. § 502(d), all administrative claims inclusive of

2 future administrative claims asserted by the Lehman Entities against the below named Debtors,

3 including but not limited to the following:

| Lehman Administrative Claims[3] | *Debtor* | *Claim Holder* | *Claim Amount* |
|---|---|---|---|
| | Delta Coves | Lehman ALI | $2,767,725 |
| | Heartland | Lehman ALI | $1,935,250 |
| | Marblehead | Lehman ALI | $5,634,270 |
| | Oak Knoll | Lehman ALI | $13,002,451 |
| | Torrance | Lehman ALI | $1,346,711 |

(the above referenced proofs of claim and administrative claims are collectively referred to as the

"Lehman Claims"); and

(C)  Such further relief as the Court deems just and proper.

This Motion is based upon the Memorandum of Points and Authorities set forth hereinbelow,

the Declaration of Bruce V. Cook (the "Cook Declaration"), the Declaration of Tom Rollins ("Rollins

Declaration"), the Declaration of Dale Strickland ("Strickland Declaration"), and the SunCal Parties'

Request for Judicial Notice (the "RJN") filed concurrently herewith, all pleadings, papers and records

on file with the Court, and such other evidence, oral or documentary, as may be presented to the Court

prior to or at the time of any hearing on the Motion.

**IF YOU DO NOT OPPOSE THE MOTION, YOU NEED TAKE NO FURTHER ACTION.  HOWEVER, IF YOU OPPOSE THE MOTION, OPPOSITIONS MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION.  YOU MUST FILE YOUR OPPOSITION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030, SANTA ANA, CALIFORNIA 92701.  YOU MUST ALSO SERVE A COPY OF YOUR OPPOSITION TO THE MOTION UPON COUNSELS FOR THE MOVING VOLUNTARY DEBTORS AND SUNCAL MANAGEMENT AT THE MAILING ADDRESSES INDICATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF THIS MOTION. THE VOLUNTARY DEBTORS' COUNSEL WILL ACCEPT E-MAIL SERVE AT THE FOLLOWING ADDRESSES:  PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A COPY**

[3] Figures are from Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket No. 1876].

-iv-

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

TO PJ@WINTHROPCOUCHOT.COM.  ANY FAILURE TO TIMELY FILE AND SERVE AN
OPPOSITION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE
COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER
NOTICE.

DATED:  April 26, 2011

WINTHROP COUCHOT
PROFESSIONAL CORPORATION

By:  /s/ *Paul J. Couchot*
      Paul J. Couchot, Esq.
      Peter W. Lianides, Esq.
      Payam Khodadadi, Esq.
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession ("Voluntary
Debtors")

RUS MILIBAND & SMITH
A PROFESSIONAL CORPORATION

By:  /s/ *Ronald Rus*
      Ronald Rus, Esq.
      Joel S. Miliband, Esq.
      Catherine Castaldi, Esq.
Attorneys for SunCal Management, LLC

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

# TABLE OF CONTENTS

**PAGE**

I.   SUMMARY OF MOTION ............................................................................ 1

II.  FACTUAL BACKGROUND ....................................................................... 2
     A.   The SunCal/Lehman Joint Venture to Develop the Projects ............. 2
     B.   The Lehman Adversary Action ........................................................ 3

III. ACTON AND SUNCAL III NEVER EXECUTED ASSUMPTIONS OF
     THE SUNCAL COMMUNITIES LOAN, AND THEREFORE THE
     LEHMAN CLAIMS ARE UNENFORCEABLE .......................................... 4

IV.  THE LEHMAN CLAIMS MUST BE DISALLOWED AS THE LEHMAN
     ENTITIES HAVE NOT DISGORGED THE AVOIDABLE TRANSFERS ..... 5
     A.   Bankruptcy Code Section 502(d) Provides for the Disallowance of
          Claims Held by a Creditor who Fails to Disgorge an Avoidable
          Transfer ......................................................................................... 5
          (1)  The SunCal Parties Need Only Establish a "Prima Facie
               Case" of an Avoidable Transfer to Sustain an Objection
               Under Section 502(d) ............................................................ 6
          (2)  The Court's Order Denying the Dismissal Motions
               Establishes Prima Facie Avoidance Claims Against the
               Lehman Entities for Purposes of Sustaining an Objection to
               Claim Pursuant to Section 502(d) ......................................... 7
     B.   Section 502(d) Does Not Require That the Creditor Refuse to
          Disgorge the Avoidable Transfer in Order to Sustain the Objection ... 9
     C.   Section 502(d) Also Provides for the Disallowance of
          Administrative Claims .................................................................... 9
     D.   LCPI and LBHI Cannot Argue that the Relief Requested Pursuant
          to 11 U.S.C. § 502(d) Violates Their Automatic Stay ..................... 9

V.   THE SUBSTANTIVE LAW OF FRAUDULENT CONVEYANCES AS
     APPLIED TO THE FACTUAL EVIDENCE SUBMITTED HEREIN
     PRESENTS FURTHER GROUNDS  FOR DISALLOWANCE OF THE
     LEHMAN CLAIMS PURSUANT TO SECTION 502(d) ........................... 11
     A.   Fraudulent Transfer Statutes ......................................................... 11
     B.   The Evidence Supporting the Specific Fraudulent Transfers Compels
          the Disallowance of the Lehman Claims Under Section 502(d) ....... 13
          (1)  The SunCal Communities I Fraudulent Transfers ................. 13
               (a)  Date Obligation Was Incurred .................................. 13
               (b)  Reasonably Equivalent Value .................................. 15
               (c)  The Debtors Were Rendered Insolvent ..................... 17
          (2)  SCC Palmdale Fraudulent Transfers .................................... 20
               (a)  Date Obligation Was Incurred .................................. 13
               (b)  Reasonably Equivalent Value .................................. 15
               (c)  The Debtor Was Rendered Insolvent ........................ 17
          (3)  Oak Knoll/Torrance Fraudulent Transfers ............................ 21

|   |   |   | (a) | Standing to Object to Claims in Trustee Debtor Cases | 21 |
|   |   |   | (b) | Date Obligation Was Incurred | 22 |
|   |   |   | (c) | Reasonably Equivalent Value | 23 |
|   |   |   | (d) | The Debtors Were Rendered Insolvent | 23 |
|   |   | (4) | | The Marblehead/Heartland Fraudulent Transfers | 24 |
|   |   |   | (a) | Date Obligation Was Incurred | 25 |
|   |   |   | (b) | The Debtors Received Less than Reasonably Equivalent Value | 25 |
|   |   |   | (c) | The Debtors Were Rendered Insolvent | 25 |
|   |   | (5) | | Interim Loan Fraudulent Transfers | 26 |
|   |   |   | (a) | Date Obligation Was Incurred | 27 |
|   |   |   | (b) | The Debtors Did Not Receive Reasonably Equivalent Value | 27 |
|   |   |   | (c) | The Debtors Were Rendered Insolvent | 28 |
|   | C. | | | Unsecured Creditors Exist for the Purposes of Section 544(b) | 29 |
| VI. | | | | THE AVOIDABLE PREFERENCE PROVIDE GROUNDS FOR DISALLOWANCE OF LEHMAN ALI'S CLAIM AGAINST DELTA COVES PURSUANT TO SECTION 502(d) | 31 |
| VII. | | | | CONCLUSION | 36 |

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

Barberan v. Nationpoint
    706 F.Supp.2d 408 (S.D.N.Y. 2010)................................................................14

Comm. of Unsecured Cred. v. Commodity Credit Corp.,
    143 B.R. 734 (9th Cir. BAP 1992)..................................................................6

Coronet Capital Co. v. Spodek,
    265 A.D.2d 292, 696 N.Y.S.2d 191 (N.Y.A.D. 2 Dept. 1999)....................14

Dye v. Brown (In re AFI Holding, Inc.),
    530 F.3d 832 (9th Cir.2008) ..........................................................................7

FDIC v. Union Entities (In re Be-Mac Transp.),
    83 F.3d 1020 (8th Cir.1996) ..........................................................................22

In re 3dfx Interactive, Inc.,
    389 B.R. 842 (Bankr.N.D.Cal. 2008) ...........................................................15

In re AFI Holding, Inc.,
    530 F.3d 832 F.3d 832 (9th Cir. 2008) .......................................................6, 9

In re America West Airlines, Inc.,
    217 F.3d 1161 (9th Cir. 2000) ....................................................................6, 9

In re AmeriServe Food Distribution, Inc.,
    315 B.R. 24 (Bankr.D.Del. 2004) ...............................................................8, 9

In re Ames Dept. Stores, Inc.,
    582 F.3d 422 (2d Cir. 2009) ..........................................................................8

In re Anderson,
    382 B.R. 496 (Bankr.D.Or. 2008)................................................................22

In re Art Unlimited,
    356 B.R. 700 (Bankr.E.D.Wis. 2006)..........................................................16

In re AVN Corp.,
    248 B.R. 540 (Bankr.W.D.Tenn. 2000)........................................................7

In re Bob Grissett Golf Shoppes, Inc.,
    50 B.R. 598 (Bankr. E.D.Va. 1985)............................................................6, 8

In re Bousa, Inc.,
    2005 WL 1176108, *4 (S.D.N.Y. 2005).......................................................10

In re Bushey,
    210 B.R. 95 (6th Cir.BAP 1997)..............................................................29, 30

1

# TABLE OF AUTHORITIES

2

### (Continued)

3

<u>PAGE</u>

4

<u>In re Discount Family Boats of Texas, Inc.,</u>
233 B.R. 365 (Bankr.E.D.Tex. 1999) ......................................................................7

5

<u>In re Eerie World Entertainment, L.L.C.,</u>
2006 WL 1288578, *4 (Bankr.S.D.N.Y. 2006) ......................................................7

6

7

<u>In re Enron Corp.,</u>
340 B.R. 180 (Bankr.S.D.N.Y. 2006) ....................................................................6

8

<u>In re Fair Oaks, Ltd.,</u>
168 B.R. 397 (9th Cir. BAP 1994) ...........................................................15, 17, 19

9

10

<u>In re Financial News Network,</u>
158 B.R. 570 (S.D.N.Y. 1993) ..............................................................................10

11

<u>In re Furley's Transport, Inc.,</u>
272 B.R. 161 (Bankr.D.Md. 2001) ........................................................................32

12

13

<u>In re Healthco Intern., Inc.,</u>
195 B.R. 971 (Bankr.D.Mass. 1996) .....................................................................30

14

<u>In re Image Worldwide,</u>
139 F.3d at 581 .......................................................................................................28

15

16

<u>In re Integra Realty Resources, Inc.,</u>
198 B.R. 352 (Bankr.D.Colo.1996) .......................................................................30

17

<u>In re Interlink Home Health Care, Inc.,</u>
283 B.R. 429 (Bankr.N.D.Tex. 2002) ...................................................................35

18

19

<u>In re KF Dairies, Inc.,</u>
143 B.R. 734 (9th Cir.BAP 1992) ...........................................................................6

20

<u>In re Larsen,</u>
80 B.R. 784 (Bankr. E.D.Va. 1987) ........................................................................7

21

22

<u>In re Maddalena,</u>
176 B.R. 551 (Bankr.C.D.Cal. 1995) ....................................................................15

23

<u>In re Marquis Products, Inc.,</u>
150 B.R. 487 (Bankr.D.Me.1993) ..........................................................................16

24

25

<u>In re Martushev,</u>
Slip Copy, 2010 WL 5256802 at *8 (Bankr. D. Mont. 2010) ................................17

26

<u>In re Meade,</u>
1999 WL 33496001, *1 (E.D.Pa. 1999) ................................................................10

27

28

1

## TABLE OF AUTHORITIES

2

### (Continued)

3

**PAGE**

4

In re Merrick,
    175 B.R. 333 (9th Cir. BAP 1994) ................................................................................10

5

In re MicroAge, Inc.
    291 B.R. 503 (9th Cir. BAP 2002) .......................................................................6, 8, 9

6

7

In re Mid Atlantic Fund, Inc.,
    60 B.R. 604 (Bankr. S.D.N.Y. 1986) ............................................................................7

8

In re Morse Tool, Inc.,
    148 B.R. 97 (Bankr.D.Mass. 1992) ............................................................................30

9

10

In re Musicland Holding Corp.,
    398 B.R. 761 (Bankr.S.D.N.Y. 2008) .........................................................................30

11

In re Newtowne,
    157 B.R. 374 (Bankr. S.D.Ohio 1993) ........................................................................16

12

13

In re Oxford Royal Mushroom Products, Inc.,
    59 B.R. 926 (Bankr.E.D.Pa. 1986) ..............................................................................6

14

In re Pajaro Dunes Rental Agency, Inc.,
    174 B.R. 557 (Bankr. N.D.Cal. 1994) ...................................................................15, 28

15

16

In re Prejean,
    994 F.2d 706 (9th Cir. 1993) .......................................................................................15

17

In re PRS Ins. Group,
    331 B.R. 580 (Bankr.D.Del. 2005) .......................................................................10, 11

18

19

In re Qmect, Inc.,
    2007 WL 219942, *6 (Bankr.N.D.Cal. 2007) ...............................................................8

20

In re QMect, Inc.,
    349 B.R. 620 (Bankr.N.D.Cal. 2006) .........................................................................22

21

22

In re Rand Energy Co.,
    259 B.R. 274 (Bankr.N.D.Tex. 2001) .........................................................................32

23

In re RCM Global Long Term Capital Appreciation Fund, Ltd.,
    200 B.R. 514, n. 2 (Bankr.S.D.N.Y. 1996) .................................................................30

24

25

In Re Reichmann Petroleum Corp.,
    364 B.R. 916 (Bankr. E.D. Tex. 2007) .......................................................................35

26

27

In re Sierra Steel, Inc.,
    96 B.R. 275 (9th Cir. BAP 1989) ................................................................................17

28

**<u>TABLE OF AUTHORITIES</u>**

**(Continued)**

<u>PAGE</u>

<u>In re Smith</u>,
  2002 Bankr.LEXIS 1893, at *18 (Bankr.S.D. Ind. April 24, 2002) ........................................7, 15

<u>In re TriGem America Corp.</u>,
  431 B.R. 855 (Bankr.C.D.Cal. 2010) ........................................16

<u>In re Triple Star Welding, Inc</u>.
  324 B.R. 778 (9th Cir.BAP 2005)........................................6, 9

<u>In re Way</u>,
  229 B.R. 11 (9th Cir. BAP 1998) ........................................10

<u>In re Wheatfield Business Park</u>,
  308 B.R. 463 (9th Cir. BAP 2004)........................................10

<u>In re Wiersma</u>,
  483 F.3d 933 (9th Cir. 2007) ........................................8

<u>IRS v. Taylor (In re Taylor)</u>,
  132 F.3d 256 (5th Cir.1998) ........................................22

<u>Lawrence v. Steinford Holding B.V. ( In re Dominelli)</u>,
  820 F.2d 313 (9th Cir.1987) ........................................22

<u>Leibowitz v. Parkway Bank & Trust Co.</u>,
  210 B.R. 298 (N.D.Ill.1997), aff'd, 139 F.3d 574 (7th Cir.1998)........................................15

<u>Matter of Eye Contact, Inc.</u>,
  97 B.R. 990 (Bankr.W.D.Wis. 1989) ........................................7

<u>Matter of Hansen</u>,
  1993 WL 176430, *2 (W.D.Tex. 1993) ........................................9

<u>National Council on Compensation Ins., Inc. v. Caro & Graifman, P.C.</u>,
  2008 WL 450413, 27 (D.Conn. 2008) ........................................14

<u>Old Person v. Brown</u>,
  312 F.3d 1036 (9th Cir. 2002)........................................8, 11

<u>Olick v. Parker & Parsley Petroleum Co.</u>,
  145 F.3d 513 (2d Cir. 1998) ........................................10

<u>Oriska Ins. Co. v. Brown & Brown of Texas, Inc.</u>,
  2005 WL 894912, *2 (N.D.N.Y. 2005) ........................................7

<u>Siegel v. Federal Home Loan Mortg. Corp.</u>,
  143 F.3d 525 (9th Cir. 1998) ........................................22

<u>Vasile v. Dean Witter Reynolds Inc.</u>,
  20 F.Supp.2d 465 (E.D.N.Y. 1998) ........................................10

# TABLE OF AUTHORITIES

### (Continued)

**PAGE**

## STATUTES

11 U.S.C. § 101(2)(A)..................................................................................................35
11 U.S.C. § 101(31)......................................................................................................35
11 U.S.C. § 101(31)(E)...........................................................................................34, 35
11 U.S.C. § 101(32)......................................................................................................17
11 U.S.C. § 362............................................................................................................10
11 U.S.C. § 502(a)........................................................................................................22
11 U.S.C. § 502(b)(1).....................................................................................................4
11 U.S.C. § 502(d)...............................1, 2, 5, 6, 7, 8, 9, 11, 13, 19, 21, 22, 24, 26, 31, 35
11 U.S.C. § 510(d)..........................................................................................................9
11 U.S.C. § 544...............................................................................................................1
11 U.S.C. § 544(b)..................................................................................5, 11, 12, 15, 29, 30
11 U.S.C. § 546...............................................................................................................6
11 U.S.C. § 547....................................................................................................1, 5, 35
11 U.S.C. § 547(b)..................................................................................................31, 32
11 U.S.C. § 548..............................................................................................1, 5, 12, 14, 25
11 U.S.C. § 548(a)..................................................................................................12, 27
11 U.S.C. § 548(a)(1).........................................................................................11, 12, 20, 23
11 U.S.C. § 550........................................................................................................1, 31
11 U.S.C. § 551........................................................................................................1, 21
11 U.S.C.A. § 558...........................................................................................................4
UFCA § 5......................................................................................................................30
UFCA § 7......................................................................................................................30
Cal.Civ.Code § 3439............................................................................................12, 15, 29
Cal.Civ.Code § 3439.02(a)...........................................................................................17
Cal.Civ.Code § 3439.04......................................................................................12, 29, 30
Cal.Civ.Code § 3439.04(a)...........................................................................................12
Cal.Civ.Code § 3439.05...............................................................................................12
Com.Code § 9104(a).....................................................................................................33
Com.Code § 9312(b)(1).................................................................................................33
Com.Code § 9314..........................................................................................................33

## OTHER AUTHORITIES

Advisory Committee Notes to Bankruptcy Rule 3007 .....................................................22

## TREATISES

Collier on Bankruptcy 15th Ed. Revised ¶ 502.05 (2010)..............................................6
5 Collier on Bankruptcy, 15th Ed. Revised ¶ 548.05 (2011)........................................16

## I.

## SUMMARY OF MOTION

By this Motion, the SunCal Parties seek an order disallowing Lehman Claims filed in the specified Debtors' cases pursuant to Section 502(d) of the Bankruptcy Code.  In particular, Lehman ALI and LCPI are recipients of certain fraudulent transfers and preferential transfers from the Debtors, which are avoidable pursuant to Sections 544, 547, 548, 550 and 551 of the Bankruptcy Code.  The avoidable transfers have not been returned by Lehman ALI and/or LCPI to the applicable Debtor's estate, despite the fact that the underlying avoidance causes of action have survived the Lehman Entities' and Fenway Capital's ("Fenway") motions to dismiss the Debtors' Third Amended Complaint against the Lehman Entities and Fenway (the "Dismissal Motions") and the same causes of action are currently set forth in the Debtors' Fourth Amended Complaint ("FAC") against the Lehman Entities (except LCPI) and against Fenway in Adv. No. 8:09-ap-01005-ES ("Lehman Adversary Action").

The Moving Voluntary Debtors move for the disallowance of the "Lehman Claims," set forth below, filed against their respective estates:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount | RJN Exhibit No. |
|---|---|---|---|---|
| 1 | SunCal I | LCPI | $343,221,391 | 1 |
| 2 | SunCal III | LCPI | $343,221,391 | 2 |
| 6 | Acton Estates | LCPI | $343,221,391 | 3 |
| 6 | Emerald Meadows | LCPI | $343,221,391 | 4 |
| 16 | Bickford Ranch | LCPI | $343,221,391 | 5 |
| 12 | Summit Valley | LCPI | $343,221,391 | 6 |
| 1 | SCC/Palmdale | LCPI | $119,664,305 | 7 |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 | 12 |
| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 13 |
| 14 | Del Rio | Lehman ALI | $ 23,795,013 | 14 |

SunCal Management, as a creditor and party in interest in all of the Trustee Debtors' cases, moves for the disallowance of the Lehman Claims filed or asserted against the respective Trustee Debtors' estates as follows:

| Disputed Proof of Claim No. | Debtor | Claim Holder | Claim Amount | RJN Exhibit No. |
|---|---|---|---|---|
| 12 | Oak Knoll | Lehman ALI | $158,141,365 | 8 |
| 4 | Torrance | Lehman ALI | $158,141,365 | 9 |
| 9 | Heartland | Lehman ALI | $354,325,126 | 10 |
| 21 | Marblehead | Lehman ALI | $354,325,126 | 11 |
| 21 | Delta Coves | Lehman ALI | $ 2,060,231 | 15 |

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

| Lehman Administrative Claims[4] | | | | |
|---|---|---|---|---|
| | Delta Coves | Lehman ALI | $2,767,725 | |
| | Heartland | Lehman ALI | $1,935,250 | |
| | Marblehead | Lehman ALI | $5,634,270 | |
| | Oak Knoll | Lehman ALI | $13,002,451 | |
| | Torrance | Lehman ALI | $1,346,711 | |

As demonstrated herein below, as a result of the Order denying the Dismissal Motions, as well as the evidence filed in support of this Motion, the SunCal Parties have made a *prima facie* showing of an avoidable transfer required for the purposes of Section 502(d). As a result, applicable law mandates the disallowance of the Lehman Claims.

Although the Lehman Entities contend that the FAC setting forth these causes of action are currently enjoined by the automatic stay of LCPI and Lehman Brothers Holding Inc. ("LBHI") by virtue of LCPI's purchase of several of the claims subject to this Motion from Fenway pursuant to the New York Bankruptcy Court's order approving the "compromise" with Fenway entered on May 13, 2010 ("Compromise Order"), as set forth below, the law in both the Second and Ninth Circuit are clear: LCPI's and LBHI's automatic stay do not apply to objections to claims involving these same causes of action pursuant to Bankruptcy Code Section 502(d).

## II.

## FACTUAL BACKGROUND

### A.     The SunCal/Lehman Joint Venture to Develop the Projects.

The Debtors are twenty-six (26) affiliated entities (the "Debtors") formed to develop residential real estate development projects ("Projects") throughout California as part of a joint venture between SunCal and the Lehman Entities.  All of the Debtors are affiliates of SCC Acquisitions, Inc.

All of the Debtors were financed by a Lehman Entity.  Some of the Debtors directly own the Projects and others serve as holding companies, owning membership interests in the Debtors that own the Projects.  SunCal Management has contracts to manage all of the Debtors and their Projects.

---

[4] Figures are from Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket No. 1876].

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

## B.    <u>The Lehman Adversary Action.</u>

On July 10, 2009, the Voluntary Debtors and the Trustee filed their Third Amended Complaint (the "TAC") in the Lehman Adversary Action (see RJN, Ex. 23) which *inter alia* added Fenway as a defendant, based upon the discovery of the facts relating to the pre-petition sale of certain loans to Fenway ("Sold Loans") pursuant to the Master Repurchase Agreement ("Repo") and the Court's Sale Order determining that the Repo was a true sale.

On September 30, 2009, the Lehman Entities and Fenway filed the Dismissal Motions contending that the relief requested by the Debtors was not available as a matter of law. On April 12, 2010, the Court entered the *Order re Lehman Entities' Amended Motion to Dismiss the Third Amended Complaint* (the "Order Denying The Dismissal Motions") which *denied* the Lehman ALI's Motion to dismiss the fifth claim for relief (Avoid and Recover Fraudulent Transfers) as to claims brought by all of the relevant Debtors set forth herein, and the sixth claim for relief (Avoid and Recover Preferential Transfers) as to the claims brought by Delta Coves. See RJN, Ex. 25. As set forth in detail below in Section III(A)(1), a claim for relief which survives a motion to dismiss constitutes a *prima facie* showing of an avoidable transfer for the purposes of Section 502(d).

On March 26, 2010, the Debtors filed their Fourth Amended Complaint ("FAC"), which retained the causes of action upheld by the Court in the TAC. See RJN, Ex. 24. Specifically, the FAC asserted the fraudulent transfer claims (renumbered as the third claim for relief) and the preferential transfer claims (renumbered as the fourth claim for relief). The FAC also deleted certain causes of action dismissed by the Court, none of which are relevant to this Motion.[5]

As previously stated, pursuant to the Compromise Order, Fenway transferred all of Sold Loans to LCPI, even those Sold Loans previously held by non-debtor Lehman Entities, and granted liens to

---

[5] LCPI was dismissed from the TAC without prejudice as a result of its automatic stay and the ruling of the Bankruptcy Appellate Panel, In re Palmdale Hills Property, LLC, 423 B.R. 655 (9th Cir. BAP 2009). However, the dismissal of LCPI and its omission as a defendant in the FAC did not then-impact the prosecution of the Lehman Adversary Action, because the Sold Loans were then-owned by Fenway pursuant to this Court's *Order On Objections to and Motion for Order Striking Claims Filed by the Lehman Entities* and the *Findings of Fact and Conclusions of Law In Support of Order On Objections to Claims* entered on October 2, 2009 (the "Ownership Order"), and Fenway had been named as a separate defendant in the TAC, and not subject to or protected by LCPI's automatic stay.

LBHI.  Specifically, LCPI was the original holder of only two of the seven Sold Loans; the majority of

the loans were held by non-debtor Lehman Entities, as follows:

| Sold Loans | Original Claimant | Alleged Balance |
|---|---|---|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| PSV Loan | Lehman ALI | $88,257,340 |
| Delta Coves Loan | Lehman ALI | $206,023,142 |
| Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

LCPI and LBHI have now actively invoked their automatic stays as to several of the causes of

action in the Lehman Adversary Proceeding including those involving the Sold Loans.  As set forth

below, it is undisputed that an objection to claim, such as is set forth in the instant motion, is not

subject to the automatic stay.

### III.

### ACTON AND SUNCAL III NEVER EXECUTED ASSUMPTIONS

### OF THE SUNCAL COMMUNITIES LOAN, AND THEREFORE

### THE LEHMAN CLAIMS ARE UNENFORCEABLE

Section 502(b)(1) authorizes the bankruptcy court to determine whether a claim is valid and

enforceable under applicable state law:

> (b) … if such objection to a claim is made, the court, after notice and a
> hearing, shall determine the amount of such claim … and shall allow such claim in
> such amount, except to the extent that--
> (1) such claim is unenforceable against the debtor … under any … applicable
> law for a reason other than because such claim is contingent or unmatured;

11 U.S.C. § 502(b)(1). See also 11 U.S.C.A. § 558 ("The estate shall have the benefit of any defense

available to the debtor as against any entity other than the estate, including statutes of limitation,

statutes of frauds, usury, and other personal defenses.")

Here, LCPI has failed to attach or establish the existence of any documentary evidence whereby

Acton incurred the liability set forth in Claim 6, and SunCal III incurred the liability set forth in

Claim 2.  Specifically, LCPI entered into a loan agreement dated November 17, 2005 ("SunCal

Communities I Loan") with SunCal I, as borrower.  Bickford Ranch, Summit Valley and Emerald

Meadows were not original borrower under the SunCal Communities I Loan, but rather subsequently

1   executed "Assumption Agreements" – which are attached to LCPI's proofs of claim - whereby they

2   each purported to become additional grantors as to the Guarantee and Collateral Agreement relating to

3   the SunCal Communities I Loan.  See RJN, Exs. 4, 5 and 6.  However, LCPI's Claim 6 and Claim 2 fail

4   to attach or establish the existence of an Assumption Agreement as to Acton or SunCal III.  See RJN,

5   Exs. 2 and 3.

6         As to SunCal III, LCPI's Claim 2-2 contains voluminous attachments totaling 803 pages,

7   however, conspicuously absent is any document executed by SunCal III incurring the liability set forth

8   in such claim.  Similarly, as to Acton, LCPI's Claim 6-3 (against Acton) fails to attach an Assumption

9   Agreement as to Acton.  Rather, Claim 6-3 attaches *Summit Valley's* Assumption Agreement which is

10  also executed by Acton.  However, this Assumption Agreement does not in any way purport to

11  establish liability on the part of Acton.  Simply put, there is no Assumption Agreement purporting to

12  establish Acton's liability.  The signature pages in Claim 6-3 are consecutively numbered, such that

13  LCPI cannot contend that there are simply missing pages.  The Debtors' business records do not reflect

14  any Assumption Agreement executed as to either Acton or SunCal III.  See Cook Declaration ¶ 7.

15        In the absence of a valid executed agreement, LCPI's Claim 2 against SunCal III and Claim 6

16  against Acton must be disallowed.

17  <center>**IV.**</center>

18  <center>**THE LEHMAN CLAIMS MUST BE DISALLOWED AS THE LEHMAN**</center>

19  <center>**ENTITIES HAVE NOT DISGORGED THE AVOIDABLE TRANSFERS**</center>

20  A.     **Bankruptcy Code Section 502(d) Provides for the Disallowance of Claims Held by a**

21         **Creditor who Fails to Disgorge an Avoidable Transfer**

22        The Lehman Entities are transferees of transfers avoidable under Section 544(b), 547 and/or

23  548 of the Bankruptcy Code.  Section 502(d) compels the disallowance of *all of the entity's claims* if it

24  has received and failed to return an avoidable transfer:

25        (d) Notwithstanding subsections (a) and (b) of this section, **the court shall disallow
          any claim of any entity** from which property is recoverable under section 542, 543,

26        550, or 553 of this title or **that is a transferee of a transfer avoidable under
          section** 522(f), 522(h), **544**, 545, **547, 548**, 549, or 724(a) of this title, unless such

27        entity or transferee has paid the amount, or turned over any such property, for which
          such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this

28        title.

<center>-5-</center>

11 U.S.C. § 502(d) (emphasis added).

Section 502(d) compels the disallowance of the claims of creditors who have received and have not disgorged the avoidable transfers.  In re KF Dairies, Inc., 143 B.R. 734, 735 (9th Cir.BAP 1992). The language of section 502(d) is mandatory. The Court must condition allowance of any claim upon the creditor's disgorging of the avoidable transfer.  In re MicroAge, Inc.  291 B.R. 503, 510 (9th Cir. BAP 2002) *citing* In re Bob Grissett Golf Shoppes, Inc., 50 B.R. 598, 607 (Bankr. E.D.Va. 1985).

"This provision is based on the policy that a creditor who fails to turn over to estate any money or property it owes to the estate, will not be entitled to share in the proceeds of the estate."  In re Oxford Royal Mushroom Products, Inc., 59 B.R. 926, 927 (Bankr.E.D.Pa. 1986).  Accordingly, Section 502(d) is not limited to the disallowance of the entity's claims which are directly related to the avoidable transfer.  In re Enron Corp., 340 B.R. 180, 194 (Bankr.S.D.N.Y. 2006)[6] ("There is no requirement that a claim subject to a section 502(d) disallowance be related to an avoidable transfer.") Rather, "*any claim of any entity from which property is recoverable*" is subject to disallowance under Section 502(d).  11 U.S.C. §502(d).

**(1)    The SunCal Parties Need Only Establish a "Prima Facie Case" of an Avoidable Transfer to Sustain an Objection Under Section 502(d).**

It is black letter law that a *judgment* on an avoidance action is not necessary to invoke Section 502(d).  Collier on Bankruptcy 15th Ed. Revised ¶ 502.05 (2010) ("The wording of section 502(d) refers to transfers 'avoidable' under various sections and not to claims that have been avoided.").  In fact, the Ninth Circuit has repeatedly held that even if the avoidance action itself is barred under Section 546, and therefore an avoidance judgment itself is impossible, Section 502(d) may still be invoked to disallow the claim.  See In re America West Airlines, Inc., 217 F.3d 1161, 1168 (9th Cir. 2000) (Section 502(d) could be used to disallow claim even though action to avoid lien would be time-barred); Comm. of Unsecured Cred. v. Commodity Credit Corp. (In re KF Dairies, Inc.), 143 B.R. 734, 736-37 (9th Cir. BAP 1992); In re Triple Star Welding, Inc.  324 B.R. 778, 794 (9th Cir.BAP 2005) *abrogated on other grounds by Dye v. Brown (In re AFI Holding, Inc.), 530 F.3d 832, 851 (9th*

---

[6] *Vacated and remanded on other grounds*, 379 B.R. 425 (S.D.N.Y. 2007).

1  *Cir.2008).*  Accordingly, it is clearly established in this Circuit that an objecting party need not obtain

2  an avoidance judgment as a precondition to invoking Section 502(d).

3         Rather, the objecting party must merely make a *prima facie* showing of an avoidable transfer in

4  order to object to a claim under Section 502(d).  See <u>Matter of Eye Contact, Inc.</u>, 97 B.R. 990, 992

5  (Bankr.W.D.Wis. 1989) ("The trustee need not commence an avoidance action to bring section 502(d)

6  into play. By making a *prima facie* showing that the transfer is voidable, he can assert the alleged

7  preference defensively under section 502(d) to defeat a proof of claim."); <u>In re Discount Family Boats</u>

8  <u>of Texas, Inc.</u>, 233 B.R. 365, 368 (Bankr.E.D.Tex. 1999) (avoidance action is unnecessary - § 502(d)

9  can be invoke by claim objection and a prima facie showing of an avoidable transfer); <u>In re Larsen</u>, 80

10  B.R. 784, 791 (Bankr. E.D.Va. 1987); <u>In re Mid Atlantic Fund, Inc.</u>, 60 B.R. 604, 610 (Bankr.

11  S.D.N.Y. 1986) ("The Trustee has made a *prima facie* showing that the assignment of the Fredebaugh

12  Mortgage was a preferential transfer.").  Accordingly, the SunCal Parties need only make a prima facie

13  showing that the transfer is avoidable in order to sustain an objection to a claim under Section 502(d).

14        **(2)**   <u>**The Court's Order Denying the Dismissal Motions Establishes Prima Facie**</u>

15              <u>**Avoidance Claims Against the Lehman Entities for Purposes of Sustaining**</u>

16              <u>**an Objection to Claim Pursuant to Section 502(d).**</u>

17         Without the necessity of submitting evidence, a "prima facie case" is a mere pleading standard

18  that is established by sufficient pleadings to survive a motion to dismiss for failure to state a claim.  See

19  <u>In re AVN Corp.</u>, 248 B.R. 540, 547 (Bankr.W.D.Tenn. 2000) ("the Court must determine that

20  [claimant] has pled facts sufficient to establish a prima facie case"); <u>In re Eerie World Entertainment,</u>

21  <u>L.L.C.</u>, 2006 WL 1288578, *4 (Bankr.S.D.N.Y. 2006) ("[D]oes Bergrin's proposed Complaint state a

22  *prima facie* case against the Defendants, or would it be subject to dismissal for failure to state a

23  claim?") (emphasis added) citing <u>In re Smith</u>, 2002 Bankr.LEXIS *1893, at* *18 (Bankr.S.D. Ind. April

24  24, 2002) (to establish a *prima facie* case, plaintiff is "required to plead facts with a reasonable degree

25  of particularity which support, either directly or inferentially, *the elem*ents of the claims asserted")

26  (emphasis added); <u>Oriska Ins. Co. v. Brown & Brown of Texas, Inc.</u>, 2005 WL 894912, *2 (N.D.N.Y.

27  2005) ("plaintiff may make a prima facie showing solely on the allegations").

28

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1        In <u>In re Qmect, Inc.</u>, 2007 WL 219942, *6 (Bankr.N.D.Cal. 2007), the Court held that a mere

2   admission in proof of claim that the creditor "received $20,000 in payments on the Debtor's account,

3   presumably from the Debtor, during the preference period" was "sufficient to establish a prima facie

4   case for a preference claim"). See also <u>In re Ames Dept. Stores, Inc.</u>, 582 F.3d 422, 425 (2d Cir. 2009)

5   (bankruptcy court disallowed claim under section 502(d) during pendency of underlying preference

6   action).

7        As set forth above, the Order Denying The Dismissal Motions *denied* the Dismissal Motions as

8   to the TAC's fifth claim for relief (Avoid and Recover Fraudulent Transfers) in its entirety, and the

9   sixth claim for relief (to avoid and recover preferential transfers) as to claims brought by Delta Coves

10  and Century City. Accordingly, the Order Denying The Dismissal Motions establishes that the fifth

11  claim for relief (avoidance and recovery of fraudulent transfers) and sixth claim for relief (avoidance

12  and recovery of preferential transfers) survived the Lehman Entities' motion to dismiss (retained as the

13  third and fourth claims for relief in the FAC) and therefore properly pled their respective causes of

14  action. As a matter of law, the SunCal Parties have established a "prima facie" case for the purposes of

15  Section 502(d).

16       Therefore, the disallowance of the Lehman Claims is mandatory. See <u>In re MicroAge, Inc.</u>, 291

17  B.R. 503, 510 (9th Cir.BAP 2002) quoting <u>In re Bob Grissett Golf Shoppes, Inc.</u>, 50 B.R. 598, 607

18  (Bankr.E.D.Va.1985) ("The language of section 502(d) is mandatory .... [T]he Court must condition

19  allowance of any claim for administrative rent upon the Landlord's disgorging of the unauthorized and

20  avoidable post-petition transfers."); <u>In re AmeriServe Food Distribution, Inc.</u>, 315 B.R. 24,

21  35 (Bankr.D.Del. 2004) ("§ 502(d) is a mandatory provision").

22       The Court's Order Denying The Dismissal Motions was not appealed, and constitutes "law of

23  the case" which cannot be challenged here by the Lehman Entities. See <u>Old Person v. Brown</u>, 312 F.3d

24  1036, 1039 (9th Cir. 2002) (under the law of the case doctrine, a court is precluded from reexamining

25  an issue previously decided by the same court in the same case); <u>In re Wiersma,</u> 483 F.3d 933, 941 (9th

26  Cir. 2007) ("Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an

27  issue previously decided by the same court, or a higher court, in the same case.").

28

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

**B.** **Section 502(d) Does Not Require That the Creditor Refuse to Disgorge the Avoidable Transfer in Order to Sustain the Objection**

Section 502(d) does not require the Court to determine that the creditor/transferee is unwilling or would otherwise refuse to return the avoidable transfer. The mere fact that the creditor has not returned such transfer mandates the disallowance of the transferee's claim(s). See In re America West Airlines, Inc. 217 F.3d 1161, 1165-1167 (9th Cir. 2000) (Section 510(d) does not require the court to find that transferee was liable to, but did not, turn over property of debtor). Rather, the statute requires disallowance of the claim unless the transferee has in fact returned the transfer. Id. See also In re AmeriServe Food Distribution, Inc., 315 B.R. 24, 35 n. 2 (Bankr.D.Del. 2004). In the instant case, the Lehman Entities have not disgorged the fraudulent and preferential transfers referenced herein, despite the fact that such transfers have been the subject of the pending Lehman Adversary Action for over two years. Accordingly, the Lehman Claims must be disallowed.

**C.** **Section 502(d) Also Provides for the Disallowance of Administrative Claims.**

In the Ninth Circuit, Section 502(d) applies equally to disallow both pre-petition claims and administrative claims. See MicroAge, Inc. v. Viewsonic Corp. (In re MicroAge, Inc.), 291 B.R. 503, 514 (9th Cir. BAP 2002) ("§ 502(d) should be interpreted in a manner that is consistent with case law decided under the Bankruptcy Act and should be applied to administrative claims."); In re Triple Star Welding, Inc., 324 B.R. 778, 794 (9th Cir.BAP 2005) ("the bankruptcy court has no discretion to disregard the Bankruptcy Code's requirements … that Baker turn over any avoidable preference before he can be paid any administrative claim for fees. 11 U.S.C. § 502(d).")[7]. See also Matter of Hansen, 1993 WL 176430, *2 (W.D.Tex. 1993) (Bankruptcy Court disallowed the IRS' post-petition administrative tax claim pursuant to Section 502(d)). Accordingly, Lehman ALI's administrative claims against the above referenced Debtors must also be disallowed pursuant to Section 502(d).

**D.** **LCPI and LBHI Cannot Argue that the Relief Requested Pursuant to 11 U.S.C. § 502(d) Violates Their Automatic Stay**

While the parties have previously litigated the issue of whether LCPI's automatic stay is applicable to the equitable subordination cause of action in the Lehman Adversary Action, it is

---

[7] abrogated on other grounds In re AFI Holding, Inc., 530 F.3d 832, 530 F.3d 832 (9th Cir. 2008).

1    well established in both the Ninth Circuit and Second Circuit that a creditor's stay is not

2    applicable to a claim objection proceeding. Where there are two independent bankruptcy estates

3    in which one estate asserts a claim against the other, an objection to claim does not violate the

4    claimant's automatic stay.  See In re Wheatfield Business Park, 308 B.R. 463, 466 (9th Cir. BAP

5    2004); In re Merrick, 175 B.R. 333 (9th Cir. BAP 1994); In re Way, 229 B.R. 11 (9th Cir. BAP

6    1998); In re Financial News Network, 158 B.R. 570 (S.D.N.Y. 1993); In re Metiom, 301 B.R.

7    634, 638-639 (Bankr.S.D.N.Y. 2003); In re PRS Ins. Group, 331 B.R. 580, 587 (Bankr.D.Del.

8    2005); In re Meade, 1999 WL 33496001, *1 (E.D.Pa. 1999).

9        In Wheatfield Business Park, 308 B.R. 463 (9th Cir. BAP 2004), the Bankruptcy Appellate

10  Panel held that the creditor's automatic stay did not apply to an objection to its claim, as the creditor

11  was effectively acting in the capacity of a plaintiff, to whom the stay does not apply.  The subsequent

12  BAP decision in In re Palmdale Hills Property, LLC, 423 B.R. 655 (9th Cir.BAP 2009), cited the

13  Wheatfield Business Park and Financial News Network decisions with approval for the proposition that

14  claim objections do not violate the stay of a debtor-claimant.

15       The law in the Second Circuit is substantially identical.  In In re Financial News Network, 158

16  B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the Southern

17  District of California, filed a claim in Financial News Network's Chapter 11 case in the Southern

18  District of New York.  When Kaypro's claim was disallowed by the bankruptcy court in New York,

19  Kaypro appealed contending that this relief was barred by its automatic stay in California. The District

20  Court rejected this position, stating "both the language and purpose of **section 362** indicate that the

21  automatic stay in effect in the Bankruptcy Court for the Southern District of California did not preclude

22  the New York Bankruptcy Court from sustaining [NY debtor's] objection to [California debtor's] proof

23  of claim filed in New York Bankruptcy Court."  Financial News, 158 B.R. at 573.  See also Olick v.

24  Parker & Parsley Petroleum Co., 145 F.3d 513, 516 (2d Cir. 1998); Vasile v. Dean Witter Reynolds

25  Inc., 20 F.Supp.2d 465, 499 (E.D.N.Y. 1998) ("the primary claims raised by [debtor] are claims

26  asserted by, and not against, the debtor, and are therefore not subject to the stay and can be

27  immediately adjudicated."); In re Bousa, Inc., 2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent

28

1   that the debtor has itself brought the claim, the automatic stay provision does not preclude

2   adjudication.").

3          In fact, in the Southern District of New York, there is specific case law holding that a claim

4   objection based upon Section 502(d) is defensive, and does not violate the claimant's automatic stay.

5   In re Metiom, Inc., 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003) (§ 502(d) claim objection was

6   defensive and did not violate creditor's automatic stay); s*ee also* In re PRS Ins. Group, 331 B.R. 580,

7   584 (Bankr.D.Del. 2005) (applying *Metiom,* § 502(d) claim objection was defensive and did not violate

8   the creditor's stay).

9          Here, the within Motion does not seek any affirmative recovery against LCPI or LBHI.  Rather,

10  the SunCal Parties are merely acting defensively to disallow the Lehman Claims pursuant to Section

11  502(d) of the Bankruptcy Code.  Accordingly, LCPI and LBHI cannot possibly argue that their

12  automatic stays  apply to the relief requested in this Motion.

13                                          **V.**

14  **THE SUBSTANTIVE LAW OF FRAUDULENT CONVEYANCES AS APPLIED TO THE**

15  **FACTUAL EVIDENCE SUBMITTED HEREIN PRESENTS FURTHER GROUNDS  FOR**

16  **DISALLOWANCE OF THE LEHMAN CLAIMS PURSUANT TO SECTION 502(d)**

17         The Court's non-appealable Order Denying the Dismissal Motions constitutes "law of the case"

18  which cannot be challenged here by the Lehman Entities.  See Old Person v. Brown, 312 F.3d 1036,

19  1039 (9th Cir. 2002).  However, the overwhelming evidence submitted by the SunCal Parties in support

20  of this Motion, as applied to the applicable law under Sections 548(a) and 544(b), establishes that the

21  Lehman Entities have no viable defenses to the avoidable transfers alleged in the Lehman Adversary

22  Action.

23         **A.**     **Fraudulent Transfer Statutes.**

24         Section 548(a)(1) of the Bankruptcy Code provides in pertinent part:

25         (a)(1) The trustee may avoid any transfer … of an interest of the debtor in property, or
           any obligation … incurred by the debtor, that was made or incurred on or within 2
26         years before the date of the filing of the petition, if the debtor voluntarily or
           involuntarily -  …
27         (B)(i) received less than a reasonably equivalent value in exchange for such transfer or
           obligation; and
28              (ii)(I) was insolvent on the date that such transfer was made or such obligation was
                incurred, or became insolvent as a result of such transfer or obligation;

-11-

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured;

11 U.S.C. § 548(a)(1).

Similarly, by operation of 11 U.S.C. § 544(b), the California Civil Code Section 3439.04(a) is also applicable, which provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: …

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Cal.Civ.Code § 3439.04.

Further, California Civil Code Section 3439.05 provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Cal.Civ.Code § 3439.05.

Accordingly, in summary, the fraudulent transfer statutes require the following material elements:

(a)     The transfer was made, or the obligation incurred, within 2 years prior to the petition date pursuant to 11 U.S.C. §548(a), or within 4 years prior to the petition date pursuant to 11 U.S.C. §544(b) and Cal.Civ.Code § 3439.

(b)     The Debtor did not receive reasonably equivalent value in exchange for the transfer or obligation.

(c)     The Debtor was rendered insolvent as a result of the transfer or obligation.

1      As set forth below, and in the Lehman Adversary Action, the Lehman Entities are transferees of

2 transfers avoidable under Section 544(b) and/or 548 of the Bankruptcy Code. These avoidable

3 transfers

4 have not been returned to their respective estates, and therefore Bankruptcy Code Section 502(d)

5 compels the disallowance of Lehman Claims. The avoidable transfers are set forth in the Lehman

6 Adversary Action, and described below.

7     **B.**     **The Evidence Supporting the Specific Fraudulent Transfers Compels the**

8         **Disallowance of the Lehman Claims Under Section 502(d).**

9     **(1)**     **The SunCal Communities I Fraudulent Transfers.**

10      On or about November 17, 2005, LCPI entered into that certain Credit Agreement with SunCal

11 I, as borrower ("SunCal Communities I Loan"). On March 30, 2009, LCPI filed identical proofs of

12 claim in the amount of $354,325,126 based upon the SunCal Communities I Loan against SunCal I

13 (Proof of Claim No. 1), SunCal III (Proof of Claim 2), Acton Estates (Proof of Claim 6), Emerald

14 Meadows (Proof of Claim 7), Bickford (Proof of Claim 16), and Summit Valley (Proof of Claim 12).

15 See RJN, Exs. 1 – 6.

16      Bickford Ranch, Summit Valley and Emerald Meadows were not original borrowers under the

17 SunCal Communities I Loan, but rather subsequently executed "Assumption Agreements" whereby

18 they each purported to become additional grantors under the Guarantee and Collateral Agreement

19 relating to the SunCal Communities I Loan. See RJN, Ex. 4, 5, and 6. Acton or SunCal III were also

20 not original borrowers under the SunCal Communities I Loan. Neither LCPI's proofs of claim, nor the

21 Debtors' business records reflect any Assumption Agreement executed as to either Acton or SunCal III.

22 See RJN, Ex. 2 and 3, and the Cook Declaration, ¶ 7.

23         (a)    Date Obligation Was Incurred. The first element of Section 548(a) requires that

24 the "transfer" or "obligation" "was made or incurred on or within 2 years before the date of the filing of

25 the petition…" All of the Chapter 11 petitions of these respective Debtors were filed on November 7,

26 2008.

| Case Name | Case Number | Petition Date |
|-----------|-------------|---------------|
| Summit Valley | 8:08-17227 ES | November 7, 2008 |
| Emerald Meadows | 8:08-17230 ES | November 7, 2008 |
| Bickford Ranch | 8:08-17231 ES | November 7, 2008 |

-13-

| Acton Estates | 8:08-17236 ES | November 7, 2008 |
| SunCal I | 8:08-17248 ES | November 7, 2008 |
| SunCal III | 8:08-17249 ES | November 7, 2008 |

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1    Here, the following obligation/transfers were made within two years prior to the respective

2    petition dates.

3    • Summit Valley executed an "Assumption Agreement" dated November 17, 2006.[8] A UCC

4    financing statement against Summit Valley was filed on December 12, 2006. See RJN, Ex. 6.

5    • Emerald Meadows executed an "Assumption Agreement" dated July 17, 2007. The deed of

6    trust against Emerald Meadows was recorded on July 19, 2007. See RJN, Ex. 4.

7    • As set forth above Claim 6 filed against Acton fails to establish or attached an Assumption

8    Agreement as to Acton. However, Claim 6-3 attaches a deed of trust against Acton recorded on

9    January 16, 2007.[9] See RJN, Ex. 3.

10   (The obligations and related transfers with respect to the SunCal Communities I Loan are collectively

11   referred to as the "SunCal Communities I Transfers"[10]).

12   These transfers as to Summit Valley, Emerald and Acton were clearly made within the two

13   years prior to the respective petition dates (November 7, 2008), thus the fraudulent transfer action is

14   properly brought under 11 U.S.C § 548.

15   SunCal Communities I and Bickford Ranch incurred the SunCal Communities I Loan

16   obligations within the 4 year of their respective petition dates. Specifically, the SunCal Communities I

17   Loan was entered into by SunCal Communities I on November 17, 2005. See RJN, Ex. 1. Further,

18   Bickford executed an "Assumption Agreement" dated as of August 25, 2006, whereby Bickford Ranch

19   became an additional Grantor as to the Guarantee and Collateral Agreement. See RJN, Ex. 5.

20   Accordingly, SunCal Communities I and Bickford Ranch incurred these obligations within the 4 year

21

22

---

23   [8] Summit Valley filed its voluntary Chapter 11 petition on November 7, 2008. See Cook Declaration.

24   [9] Since there is no valid Assumption Agreement as to Acton, there is no valid obligation and thus the
     deed of trust secured nothing. See Barberan v. Nationport 706 F.Supp.2d 408, 424 (S.D.N.Y. 2010)

25   ("A mortgage is merely security for a debt or other obligation and cannot exist independently of the
     debt or obligation."); Coronet Capital Co. v. Spodek, 265 A.D.2d 292, 292, 696 N.Y.S.2d 191, 192

26   (N.Y.A.D. 2 Dept. 1999) ("It has long been held that a mortgage is not valid and enforceable unless
     there is an underlying valid debt or obligation for which the mortgage is intended as security.");

27   National Council on Compensation Ins., Inc. v. Caro & Graifman, P.C., 2008 WL 450413, 27 (D.Conn.
     2008) ("A mortgage secured by a defective underlying obligation is itself invalid.").

28   [10] To the extent that an "obligation" was incurred as to either Acton or SunCal III, such obligations are
     also included within the definition of the "SunCal Communities I Transfers".

1 reach back under California law for causes of action under Cal.Civ.Code § 3439. As set forth in

2 subsection (C) below, there are qualifying creditors for the purposes of Section 544(b).

3     (b) <u>Reasonably Equivalent Value</u>. The second element for a fraudulent transaction

4 is that the Debtor received less than reasonably equivalent value. Under the Bankruptcy Code, the

5 Ninth Circuit case law and the California statutes, "reasonably equivalent value" is to be determined

6 from the standpoint of the consideration received by the debtor and its creditors, as opposed to the

7 consideration provided by the defendant. <u>In re Prejean</u>, 994 F.2d 706, 708 (9th Cir. 1993) (California

8 statute); <u>In re Maddalena</u>, 176 B.R. 551, 555 (Bankr.C.D.Cal. 1995) ("what constitutes reasonably

9 equivalent value must be determined from the standpoint of the benefit to the Debtors' creditors, not

10 from Defendant's perspective."); <u>In re 3dfx Interactive, Inc.</u>, 389 B.R. 842, 863 (Bankr.N.D.Cal. 2008)

11 ("Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably

12 equivalent value is determined from the standpoint of the estate's creditors, it is not determined from

13 the defendant's perspective.").

14     In fact, a debtor does not receive reasonably equivalent value where the debtor encumbers its

15 assets with respect to a loan in which the loan proceeds are provided to an affiliated entity, including

16 parent and sister corporations. *See also* <u>In re Pajaro Dunes Rental Agency, Inc.</u>, 174 B.R. 557 (Bankr.

17 N.D.Cal. 1994) (debtor did not receive "reasonably equivalent value" for its obligation to the lender on

18 a $1 million promissory note, through delivery of $1 million in funds to debtor's corporate parent); <u>In re</u>

19 <u>Fair Oaks, Ltd.</u>, 168 B.R. 397, 402 (9th Cir. BAP 1994) (debtor received less than reasonably

20 equivalent value in exchange for deed of trust encumbering its sole asset, where no consideration was

21 provided to debtor, but, rather, transfer was made for benefit of general partner's president and separate

22 entity in which president held interest); <u>Smith v. American Founders Financial, Corp.</u>, 365 B.R. 647,

23 666-667(S.D.Tex. 2007) ("Generally, a transferor receives less than reasonably equivalent value when

24 it transfers property in exchange for consideration that passes to a third party. … When the

25 consideration for a transfer passes to the parent corporation of a debtor-subsidiary that is making the

26 transfer, as in this case, the benefit to the debtor may be presumed to be nominal, absent proof of

27 specific benefit to the debtor itself."); <u>Leibowitz v. Parkway Bank & Trust Co.</u>, 210 B.R. 298

28 (N.D.Ill.1997), *aff'd,* 139 F.3d 574 (7th Cir.1998) ("This shift of risk from the creditors of the debtor to

the creditors of the guarantor is exactly the situation that fraudulent transfer law seeks to avoid when applied to guarantees. Thus, while [the debtor] received an indirect benefit from the transaction, it did not receive reasonably equivalent value."); In re Marquis Products, Inc., 150 B.R. 487, 492 (Bankr.D.Me.1993) (debtor did not receive reasonably equivalent value for conveying the mortgage to serve as collateral for the loan to the parent); In re Art Unlimited, 356 B.R. 700 (Bankr.E.D.Wis. 2006) (debtor did not receive reasonably equivalent value in exchange for the sale of its assets, the proceeds of which went to pay the debts of its principal, not to pay its own trade creditors); In re Newtowne, 157 B.R. 374, 379 (Bankr. S.D.Ohio 1993) (debtor's payment of affiliated company's debt, significantly diminishing debtor's net worth, could be avoided as a fraudulent transfer). See also In re TriGem America Corp., 431 B.R. 855, 868 (Bankr.C.D.Cal. 2010) (debtor-subsidiary did not receive "reasonably equivalent value" for transfer to parent company's lender); 5 *Collier on Bankruptcy*, 15th Ed. Revised ¶ 548.05 (2011).

Here, the proceeds from the SunCal Communities I Loan Agreement were used in part to fund the projects of Acton Estates, Beaumont, Johannson, Emerald Meadows, Bickford Ranch and Summit Valley as well as other projects. The funds advanced under the SunCal Communities I Loan Agreement were such that the alleged Borrowers and Additional Grantors each received only a small portion of the loan funds, or no funds at all:

| Alleged Borrower or Additional Grantors | SunCal Communities I Loan proceeds received |
|---|---|
| Acton | $ 380,069 |
| Bickford Ranch | 174,570,287 |
| Emerald Meadows | 44,763,858 |
| Summit Valley | 9,925,373 |
| SunCal I | 0 |
| SunCal III | 0 |

The funds advanced under the SunCal Communities I Loan Agreement were also directed to certain other entities who were neither alleged Borrowers nor Additional Grantors under the SunCal Communities I Loan Agreement, as follows:

| Loan Proceed Recipient | SunCal Communities I Loan proceeds received |
|---|---|
| Beaumont | $ 42,030,925 |
| Johannson | 14,636,674 |

Based on the SunCal Communities I Loan, LCPI has filed identical proofs of claim for $343,221,391 against the estates of SunCal I, SunCal III, Acton, Bickford Ranch, Emerald Meadows, and Summit Valley. See RJN, Exs. 1 - 6. Consequently, as a result of the SunCal Communities I Transfers, each of the respective Debtors incurred net liabilities far in excess of their respective value received, thus, satisfying the second element of lack of reasonably equivalent value.

| Debtor | Original Obligation Amount | Loan Proceeds received | Excess Net Liability Incurred[11] | Lehman Claim Amounts |
|---|---|---|---|---|
| Acton | $ 395,313,713.37 | $ 380,069 | $ 394,933,644.37 | $ 343,221,391 |
| Bickford Ranch | 395,313,713.37 | 174,570,287 | 220,743,426.37 | 343,221,391 |
| Emerald Meadows | 395,313,713.37 | 44,763,858 | 350,549,855.37 | 343,221,391 |
| Summit Valley | 395,313,713.37 | 9,925,373 | 385,388,340.37 | 343,221,391 |
| SunCal I | 395,313,713.37 | $0 | 395,313,713.37 | 343,221,391 |

(c)     The Debtors Were Rendered Insolvent. The third and final element is that the respective Debtors were rendered insolvent as a result of the transfers. Under Bankruptcy Code § 101(32) and California Civil Code § 3439.02(a), the term insolvent means that the individual Debtor's debts are greater than the fair market value of such Debtor's property. See also In re Sierra Steel, Inc., 96 B.R. 275, 277 (9th Cir. BAP 1989) ("[U]nder this "balance sheet" test a debtor is insolvent when its liabilities exceed its assets."); In re Fair Oaks, Ltd., 168 B.R. 397, 402 (9th Cir. BAP 1994) ("The question of insolvency is essentially whether the debtor's liabilities exceeded the debtor's assets for the period of time in question.").

A determination of insolvency can be made based on an appraisal of the debtors' properties, particularly where the debtor owns a single asset. In re Fair Oaks, Ltd., 168 B.R. 397 at 402 (reversing summary judgment for defendant and remanding with instructions to enter summary judgment for trustee on fraudulent transfer claim); see also In re Martushev, Slip Copy, 2010 WL 5256802 at *8 (Bankr. D. Mont. 2010) (plaintiff satisfied initial burden of showing insolvency based on debtor's schedules and requests for admission, and was entitled to summary judgment on fraudulent transfer claim.).

---

[11] Original loan amount less loan proceeds received by each respective Debtor.

As stated, LCPI made the "SunCal Communities I Loan" to SunCal I, SunCal III, SunCal Acton, Bickford Ranch, Emerald Meadows, and Summit Valley, in the maximum aggregate principal amount of approximately $395,313,713.37. See RJN, Exs. 1 - 6. However, at this time, the respective properties were appraised or valued at amounts substantially less than the joint and several $395 million debt created by the transaction and therefore rendered each of the Debtors' insolvent. The Lehman Entities obtained appraisals of the various projects owned by the Debtors (the "Lehman Appraisals"), several of which appraisals are contemporaneous with the dates in which the loan obligations where incurred by the respective Debtors. As to the Acton and Bickford Ranch projects, the Lehman Appraisals are as follows:

| Debtor | Lehman Appraisal Date | Lehman Appraised Value | Date Obligation Incurred | Original Obligation Amount |
|--------|----------------------|------------------------|--------------------------|----------------------------|
| Acton | 12/12/06 | $ 13,500,000 | 1/16/07[12] | $ 395,313,713.37 |
| Bickford Ranch | 9/29/06 | 237,500,000 | 8/25/06 | 395,313,713.37 |

The Lehman Appraisals of the Acton and Bickford projects are attached to the Strickland Declaration as exhibits 5 and 6.

As to the Emerald Meadows and Summit Valley projects, there are no contemporaneous appraisals, however, there are Lehman Appraisals both before and after the respective obligations were incurred as follows:

| Debtor | Pre-loan Lehman Appraisal Date | Pre-loan Lehman Appraised Value[13] | Post-loan Lehman Appraisal Date | Post-loan Lehman Appraised Value[14] | Date Obligation Incurred | Original Obligation Amount |
|--------|-------------------------------|-------------------------------------|--------------------------------|--------------------------------------|--------------------------|----------------------------|
| Emerald Meadows | 9/16/06 | 64,500,000 | 12/7/08 | 12,000,000 | 7/17/07 | 395,313,713.37 |
| Summit Valley | 9/16/06 | 59,400,000 | 12/1/08 | 5,200,000 | 11/17/06 | 395,313,713.37 |

[12] As set forth above Claim 6 filed against Acton fails to establish or attached an Assumption Agreement as to Acton. However, Claim 6-3 attaches a deed of trust against Acton recorded on January 16, 2007.

[13] The Pre-Loan Lehman Appraisals for the Emerald Meadows and Summit Valley projects are attached to the Strickland Declaration as exhibits 9 and 10.

[14] The Post-Loan appraisals for the Emerald Meadows and Summit Valley projects were filed by the Lehman Entities in the above entitled case, as docket nos. 64-10 and 66-1, and are attached to the request for judicial notice as Exhibits 20 and 21.

The Lehman Appraisals, both before and after the respective obligations were incurred, establish the loan obligation substantially exceeded the market value of each of the respective Debtor's assets. Further, the Moving Voluntary Debtors' discounted cash flow analysis establishes the project values set forth above at the date the SunCal Communities I Loan obligations were incurred, as follows.

| Debtor | Valuation Date | Project Value | Date Obligation Incurred | Original Obligation |
|--------|---------------|---------------|-------------------------|---------------------|
| Emerald Meadows | 7/17/07 | 57,605,858 | 7/17/07 | 395,313,713.37 |
| Summit Valley | 11/17/06 | 52,992,651 | 11/17/06 | 395,313,713.37 |

See Strickland Declaration, ¶¶ 27 and 28.

Accordingly, as to each of the above referenced Debtors, the SunCal Communities I Loan obligations substantially exceeded the fair market value of the Debtor's assets, rendering each such Debtors insolvent as a result thereof.[15] See Fair Oaks, 168 B.R. at 402-03 (where debtor's liabilities were $1,400,000 million as of May 1991, when transfer occurred, and debtor's sole asset was appraised at $1,220,000 as of June 1992, debtor was insolvent as a matter of law). Consequently, these Debtors were rendered insolvent as a result of the incurrence of the SunCal Communities I Loan obligations, thus, satisfying the third element.

In summary, during the applicable time period, each of these Debtors became allegedly liable for the full amount of the SunCal Communities I Loan Agreement in the maximum principal amount of $395,313,713.37. Each of the above Debtors' net liabilities (after receipt of loan proceeds, if any) increased by between $220 million and $395 million as a result of the SunCal Communities I Transfers. Each of the Debtors incurred liability on the loan which alone vastly exceeded the fair market value of its project, rendering each respective debtor insolvent. Thus, these Debtors have made a prima facie showing that the SunCal Communities I Transfers were fraudulent transfers for the purposes of 11 U.S.C. § 502(d).

---

[15] SunCal I does not, and did not own any real property at the time of the SunCal Communities I Transfers. Pursuant to the Stipulation [docket no 1297], LCPI stipulated that the value of SunCal I's equity membership interest in Acton, Summit, Bickford, Emerald, Beaumont and Johannson, shall be "valued at $0.00." See RJN, Ex. 16. Accordingly, by incurring a $395,313,713.37 liability, SunCal I's assets were unreasonably small in relation to the business or transaction, and was incurring debts beyond its ability to pay as they became due.

**(2)**     **SCC Palmdale Fraudulent Transfers.**

On March 30, 2007, LCPI entered into that certain Mezzanine Credit Agreement dated March 30, 2007, with SCC Palmdale ("SCC Palmdale Loan"). On March 30, 2009, LCPI filed Proof of Claim No. 1-1 against SCC/Palmdale in the amount of $119,664,305.25, based upon the SCC Palmdale Loan. See RJN, Ex. 7. Although the SCC Palmdale Loan was made to SCC Palmdale, and although it was secured by SCC Palmdale's allowed interest in Palmdale Hills, the entire loan proceeds were used by LCPI to make a paydown on the SunCal Communities I Loan Agreement that did not involve SCC Palmdale or Palmdale Hills. *See* Cook Declaration, ¶ 11; Rollins Declaration, ¶ 6.

          (a)     <u>Date Obligation Was Incurred</u>. The first element of Section 548(a) requires that the "transfer" or "obligation" "was made or incurred on or within 2 years before the date of the filing of the petition…" SCC/Palmdale filed its voluntary chapter 11 petition on November 7, 2008. The SCC Palmdale Loan was entered into on or about March 30, 2007. See RJN, Ex. 7. Thus, the obligation was incurred within two years of the petition date for the purposes of avoidance under Section 548(a)(1). The preceding obligations and related transfers are referred to herein as the "SCC Palmdale Transfers."

          (b)     <u>Reasonably Equivalent Value</u>. The second element for a fraudulent transaction is that the Debtor received less than reasonably equivalent value. SCC Palmdale received no consideration in exchange for the SCC Palmdale Transfers. The entire loan proceeds were used by LCPI to make a paydown on the SunCal Communities I Loan Agreement that did not involve SCC Palmdale or Palmdale Hills. *See* Cook Declaration, ¶ 11; Rollins Declaration, ¶ 6. Thus, SCC Palmdale clearly did not receive "reasonably equivalent value".

          (c)     <u>The Debtor Was Rendered Insolvent</u>. The third and final element is that the respective debtor was rendered insolvent as a result of the transfers. SCC Palmdale does not own any project but rather holds the equity interests in Palmdale Hills. LCPI has repeatedly taken the position that SCC/Palmdale's equity interest in Palmdale Hills had no value. For example, on January 23, 2009, LCPI filed a motion for relief from stay as to SCC/Palmdale contending that the equity interest in Palmdale Hills had a value of "$0". See RJN, Ex. 22 (page 10, lines 9-10). Furthermore, the LCPI

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1    previously stipulated [Docket No. 1297] that SCC Palmdale's equity interest in Palmdale Hills was

2    valueless. See RJN, Ex. 16.  Specifically, on June 30, 2009, certain Voluntary Debtors filed the *Motion*

3    *for Order: (1) Valuing Collateral of Certain Disputed Creditors; (2) Avoiding Certain Disputed Liens*

4    *Pursuant to 11 U.S.C. §506(d); and (3) Preserving Avoided Lien(s) for the Respective Estates Pursuant*

5    *to 11 U.S.C.§551* (the "Motion") (Docket No. 368) seeking an order *inter alia* valuing certain collateral,

6    including the equity interest in Palmdale Hills, at zero dollars.  This "zero" valuation was based *inter*

7    *alia* upon the Lehman Appraisal of the Ritter Ranch Project ($42,900,000) and Palmdale Hills' cash

8    (approximately $24 million), which aggregate less than the amount of the alleged first priority deed of

9    trust asserted by Lehman Commercial in the amount of $287,252,096 against the Ritter Ranch Project

10   (LCPI's Claim No. 65 asserted against Palmdale Hills).  See RJN, Ex. 19.  On or about August 17,

11   2010, the Lehman Entities and certain Voluntary Debtors, including SCC Palmdale, filed a stipulation

12   [Docket No. 1297] whereby LCPI stipulated that the pledge of SCC Palmdale's interests in Palmdale

13   Hills (defined therein as the "SCC Palmdale Lien") "shall be valued at $0.00."  See RJN, Ex. 16.

14   Accordingly, SCC Palmdale was rendered insolvent as a result of its incurrence a liability of $120

15   million as a result of the SCC Palmdale Transfer which clearly exceeded the value of its equity interest

16   in Palmdale Hills.

17        SCC Palmdale has made a *prima facie* showing that the SCC/Palmdale Transfer was fraudulent

18   transfers for the purposes of 11 U.S.C. § 502(d).  Therefore, Proof of Claim No. 1 filed against SCC

19   Palmdale in the amount of $120 million should be disallowed pursuant to Bankruptcy Code

20   Sections 502(d).

21        **(3)    Oak Knoll/Torrance Fraudulent Transfers.**

22        On November 30, 2006, Lehman ALI entered into that certain Loan Agreement, dated as of

23   November 30, 2006, by and among Torrance and Oak Knoll, as borrowers, and Lehman ALI, as agent

24   and sole lender (the "Oak Knoll/Torrance Loan Agreement").  On March 30, 2009, Lehman ALI filed

25   substantially identical claims, Proof of Claim No. 12 against Oak Knoll in the amount of

26   $158,141,364.64, and Proof of Claim No. 4 against Torrance in the amount of $ 157,870,186.15, arising

27   from the Oak Knoll/Torrance Loan Agreement.  See RJN, Exs. 8 and 9.

28

(a)    <u>Standing to Object to Claims in Trustee Debtor Cases</u>.  SunCal Management is the moving party on the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor in all of the Trustee Debtors' cases.  A party in interest has standing to objection to claims.  11 U.S.C. §502(a) ("a claim…is deemed allowed, unless a party in interest…objects").  *See also* Advisory Committee Notes to Bankruptcy Rule 3007 ("any party in interest may object to a claim").  The Ninth Circuit has similarly held that "any party in interest" can object to a claim pursuant to Section 502(a):

> Again, any party in interest can object. *See* 11 U.S.C. § 502(a). Although the trustee in Siegel's bankruptcy could have objected to Freddie Mac's proofs of claim, Siegel could have objected as well. *See Lawrence v. Steinford Holding B.V. ( In re Dominelli),* 820 F.2d 313, 316 (9th Cir.1987) (stating that under 11 U.S.C. § 502(a) a party in interest, including the trustee, can object to a proof of claim); *see also IRS v. Taylor (In re Taylor),* 132 F.3d 256, 261 (5th Cir.1998) ("Once a proof of claim is filed, the debt is considered allowed unless the debtor or another party in interest files an objection to the proof of claim."); *FDIC v. Union Entities (In re Be-Mac Transp.),* 83 F.3d 1020, 1025 (8th Cir.1996) ("In order to disallow the claim, the debtor or another party in interest must object and request a determination of the lien's validity.")

<u>Siegel v. Federal Home Loan Mortg. Corp</u>., 143 F.3d 525, 531 (9th Cir. 1998).  See also <u>In re Anderson</u>, 382 B.R. 496, 506 (Bankr.D.Or. 2008) ("To the extent [the plan] limits the parties who may file claims objections to the Debtors and the trustee, it is inappropriate as any party in interest has standing to object to claims. § 502(a)."); <u>In re QMect, Inc</u>., 349 B.R. 620, 625 (Bankr.N.D.Cal. 2006) ("A creditor or creditors' committee has standing independent of the trustee or debtor-in-possession to object to another creditor's claim as long as it has something to gain if it prevails.").

As set forth below, SunCal Management is a creditor and party in interest with respect to the Trustee Debtors' cases which are the subject of this Motion, and thus has standing under Section 502(d).

| Trustee Debtor | SunCal Management Unsecured Claim | SunCal Management Admin Claims |
|---|---|---|
| Delta Coves | 1,084,858.63 | 1,189,572.40 |
| Oak Valley | 1,163,688.91 | 502,979.78 |
| Heartland | 397,455.41 | 588,957.60 |
| Marblehead | 1,799,805.75 | 1,583,624.96 |
| Oak Knoll | 462,392.86 | 2,308,422.05 |
| Torrance | 148,578.54 | 97,749.00 |
| **Total** | **7,348,766.65** | **10,435,862.92** |

(b) <u>Date Obligation Was Incurred</u>.  The first element of Section 548(a) requires that the "transfer" or "obligation" "was made or incurred on or within 2 years before the date of the filing of the petition…"  An involuntary petition was filed against Torrance on November 14, 2008, and an involuntary petition against Oak Knoll was filed on November 19, 2008.  The Oak Knoll/Torrance Loan Agreement was entered into on November 30, 2006.  See RJN, Exs. 8 and 9.  (The preceding obligations and related transfers are referred to herein as the "Oak Knoll/ Torrance Transfers").  Thus the Oak Knoll/Torrance Transfers were made within two years of the petition date for the purposes of avoidance under Section 548(a)(1).

(c) <u>Reasonably Equivalent Value.</u>  The second element for a fraudulent transaction is that the Debtor received less than reasonably equivalent value.  Both Oak Knoll and Torrance were liable for the full amount of the Oak Knoll/Torrance Loan Agreement, in the original amount of $167 million.  The Oak Knoll/Torrance Loan Agreement was cross-collateralized by the Oak Knoll Project and the Del Amo Project.  See RJN, Exs. 8 and 9.  However, the loan proceeds received by Oak Knoll were only $103,575,426 and the loan proceeds received by Torrance were only $45,185,350.  See Rollins Declaration, ¶ 7.  In connection with the Oak Knoll/Torrance Loan, each of these Debtor's net liabilities (after receipt of loan proceeds, if any) increased by $63 million and $121 million, respectively, as a result of the Oak Knoll/Torrance Loan Transfers.

As the chart below illustrates, the transaction contemplated by the Oak Knoll/Torrance Loan Agreement also presents classic fraudulent conveyances.

| Debtor | Original Obligation amount | Loan Proceeds Received | Excess Net Liability Incurred[16] | Lehman Claim Amount |
|--------|---------------------------|------------------------|----------------------------------|---------------------|
| Oak Knoll | 167,000,000.00 | 103,575,426 | 63,424,574.00 | 158,141,365 |
| Torrance | 167,000,000.00 | 45,185,350 | 121,814,650.00 | 158,141,365 |

(d) <u>The Debtors Were Rendered Insolvent.</u>  The third and final element is that the respective Debtors were rendered insolvent as a result of the transfers.  Each of the Debtors incurred liability on the Oak Knoll/Torrance Loan Agreement which alone exceeded the fair market value of its respective project, rendering each Debtor insolvent.  As shown in the above chart, at this time, the

---

[16] Original loan amount less loan proceeds received by each respective Debtor.

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

respective properties were appraised at amounts substantially less than the joint and several $167 million debt created by the transaction and therefore rendered each of these Debtors' insolvent. Specifically, the Oak Knoll project was appraised at a value of $127,800,000 as of January 14, 2006, and was later appraised at a value of $48,000,000 as of December 2008. See Strickland Declaration, ex. 9. The Torrance (Del Amo) project was appraised at $89,300,000 as of January 15, 2006, and later appraised at $25,000,000 as of November 2008. See Strickland Declaration, ex. 10.

| Debtor | Pre-loan Lehman Appraisal Date | Pre-loan Lehman Appraised Value[17] | Post-loan Lehman Appraisal Date | Post-loan Lehman Appraised Value[18] | Date Obligation Incurred | Original Obligation Amount |
|---|---|---|---|---|---|---|
| Oak Knoll | 1/14/06 | 127,800,00 | 12/5/08 | 48,000,000 | 11/30/06 | 316,061,300 |
| Torrance | 1/15/06 | 89,300,000 | 11/28/08 | 25,000,000 | 11/30/06 | 316,061,300 |

Accordingly, the Lehman Appraisals, both before and after the respective obligations were incurred, establish the loan obligation substantially exceeded the market value of each of the respective Debtor's assets. Further, the Moving Voluntary Debtors' discounted cash flow analysis establishes the project values set forth above at the date the SunCal Communities I Loan obligations were incurred, as follows.

| Debtor | Valuation Date | Project Value | Date Obligation Incurred | Original Obligation |
|---|---|---|---|---|
| Oak Knoll | 11/30/06 | $145,934,757 | 11/30/06 | $316,061,300 |
| Torrance | 11/30/06 | $82,988,446 | 11/30/06 | $316,061,300 |

See Strickland Declaration, ¶¶ 29 and 30.

Utilizing any of these valuations, these Debtors were rendered insolvent as a result of the incurrence of the loan obligation, thus, satisfying the third element.

---

[17] The Pre-Loan Lehman Appraisals for the Oak Knoll and Torrance (Del Amo) projects are attached to the Strickland Declaration as exhibits 12 and 13.

[18] The Post-Loan appraisals for the Oak Knoll and Torrance (Del Amo) Projects were filed by the Lehman Entities in the above entitled case, as docket no. 133, and are attached to the request for judicial notice as Exhibit 17.

The SunCal Parties have made a *prima facie* showing that the Oak Knoll/Torrance Transfers were fraudulent transfers. Therefore, Proof of Claim No. 12 against Oak Knoll and Proof of Claim No. 4 against Torrance should be disallowed pursuant to 11 U.S.C § 502(d).

**(4)     The Marblehead/Heartland Fraudulent Transfers.**

On October 3, 2007, Lehman ALI entered into that certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, Marblehead, and Heartland, as borrowers, and Lehman ALI, as agent and sole lender (the "Marblehead/Heartland Loan Agreement"). On March 30, 2009, Lehman ALI filed identical Proof of Claim No. 9 against Heartland and Proof of Claim No. 21 against Marblehead in the amount of $354,325,126 based on the Marblehead/Heartland Loan Agreement. See RJN, Exs. 10 and 11.

(a)     Date Obligation Was Incurred. The first element of Section 548(a) requires that the "transfer" or "obligation" "was made or incurred on or within 2 years before the date of the filing of the petition…" Involuntary petitions were filed against both Marblehead and Heartland on November 12, 2008. The Marblehead/Heartland Loan Agreement was entered into on or about October 3, 2007. See RJN, Exs. 10 and 11. Thus the "transfer" or "obligation" was made within two years of the petition date for purposes of Section 548. The preceding obligations and related transfers are referred to herein as the "Marblehead/Heartland Transfers."

(b)     The Debtors Received Less than Reasonably Equivalent Value. The second element for a fraudulent transaction is that the Debtors received less than reasonably equivalent value. Heartland and Marblehead were liable for the full amount of the Marblehead/Heartland Loan. The loan proceeds received by Marblehead were only $258,843,352 and the loan proceeds received by Heartland were only $49,594,848. See Rollins Declaration, ¶ 8. In connection with the Marblehead/Heartland Loan, each of the debtor's net liabilities (after receipt of loan proceeds, if any) increased by $57 million and $266 million, respectively, as a result of the Marblehead/Heartland Loan Transfers.

As the chart below illustrates, the transaction contemplated by the Marblehead/Heartland Loan Agreement also presents fraudulent conveyances.

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

| Debtor | Original Obligation amount | Loan Proceeds Received | Excess Net Liability Incurred[19] | Lehman Claim Amount |
|---|---|---|---|---|
| Marblehead | 316,061,300 | 258,843,352 | 57,217,948.00 | 354,325,126 |
| Heartland | 316,061,300 | 49,594,848 | 266,466,452.00 | 354,325,126 |

(c)     The Debtors Were Rendered Insolvent.  The third element is that the respective

Debtors were rendered insolvent as a result of the transfers.  Each of the Debtors incurred liability on

Marblehead/Heartland Loan Agreement which alone exceeded the fair market value of its respective

project, rendering each Debtor insolvent.  As shown in the above chart, at this time, the respective

properties were appraised at amounts substantially less than the joint and several $354,325,126 debt

created by the transaction and therefore rendered each of these Debtors' insolvent.  Specifically, the

Marblehead project was appraised at a value of $284,500,000 as of June 2007, and the Heartland project

was appraised at $61,500,000.  See Strickland Declaration, exs. 11 and 12.

| Debtor | Pre-loan Lehman Appraisal Date | Pre-loan Lehman Appraisal[20] | Post-loan Lehman Appraisal Date | Post-loan Lehman Appraisal[21] | Date Obligation Incurred | Original Obligation Amount |
|---|---|---|---|---|---|---|
| Marblehead | 6/1/07 | 284,500,00 | 12/20/08 | 187,500,000 | 10/3/07 | 316,061,300 |
| Heartland | 6/1/07 | 37,400,000 | 12/7/08 | 7,900,000 | 10/3/07 | 316,061,300 |

Consequently, based upon the appraised value of the Marblehead and Heartland Projects, both

before and after the incurrence of the loan, these Debtors were rendered insolvent by the incurrence of

the loan obligation, satisfying the third element.

The SunCal Parties have made a *prima facie* showing that the Marblehead/Heartland Transfers

were fraudulent transfers for the purposes of 11 U.S.C. § 502(d).  Therefore, Proof of Claim No. 21

asserted by Lehman ALI against Marblehead, and Proof of Secured Claim No. 9 asserted by Lehman

ALI against Heartland, should be disallowed pursuant to Bankruptcy Code Section 502(d).

---

[19] Original loan amount less loan proceeds received by each respective Debtor.

[20] The Pre-Loan Lehman Appraisals for the Marblehead and Heartland projects are attached to the Strickland Declaration as exhibits 14 and 15.

[21] The Post-Loan appraisals for the Marblehead and Heartland Projects were filed by the Lehman Entities in the above entitled case, as docket no. 133, and are attached to the request for judicial notice as Exhibit 17.

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1          **(5)**    **Interim Loan Fraudulent Transfers.**

2         On October 31, 2007, Lehman ALI entered into that certain Loan Agreement, dated as of

3 October 31, 2007, by and between SCC Acquisitions LLC, as borrower and Lehman ALI, as lender (the

4 "Interim Loan Agreement"). Lehman ALI has filed identical Proof of Claim No. 9 against SCC

5 Communities, Proof of Claim No. 7 against Tesoro, and Proof of Claim No. 14 against Del Rio in the

6 amount of $23,795,013 based upon the Interim Loan Agreement. See RJN, Exs. 12, 13 and 14.

7         None of the Debtors was a "borrower" under the Interim Loan Agreement. Rather, as set forth

8 in Lehman ALI's respective proofs of claim, the liability against SCC Communities, Tesoro and Del

9 Rio arise because each of these Debtors "is a guarantor under that certain Subsidiary Guaranty dated as

10 of October 31, 2007, as amended and/or supplemented." Id.

11          **(a)**     <u>Date Obligation Was Incurred</u>. The first element of Section 548(a) requires that

12 the "transfer" or "obligation" "was made or incurred on or within 2 years before the date of the filing

13 of the petition…" Here, the three Debtors – SCC Communities, Tesoro and Del Rio – each filed

14 voluntary Chapter 11 petition on November 19, 2008. The Interim Loan Agreement and Subsidiary

15 Guaranties are dated as of October 31, 2007. See RJN, Exs. 12, 13 and 14. (The preceding

16 obligations and related transfers are referred to herein as the "Interim Loan Transfers") Thus the

17 Interim Loan Transfers were within two years of the petition date for the purposes of 11 U.S.C.

18 § 548(a).

19          **(b)**     <u>The Debtors Did Not Receive Reasonably Equivalent Value</u>. The second

20 element for a fraudulent transaction is that the Debtor received less than reasonably equivalent value.

21 The Interim Loan Agreement was entered into with the Voluntary Debtors' parent, SCC Acquisitions

22 LLC, *not* with SCC Communities, Tesoro or Del Rio. Rather SCC Communities, Tesoro or Del Rio

23 each executed a Subsidiary Guaranty with Lehman ALI guaranteeing the same. See RJN, Exs. 12, 13

24 and 14.[22] Of the $20 million in proceeds from the Interim Loan Agreement paid to the parent entity,

25 SCC Acquisitions LLC, only $78,000—less than one half of one percent of the total—was used to

26 fund SCC Communities, SunCal Tesoro or SunCal Del Rio or their properties, as follows:

27 _____

28 [22] The attachment to each proof of claim states: "The liability against the Debtor arises because the
Debtor is a guarantor under that certain Subsidiary Guaranty, dated as of October 31, 2007, as amended
and/or supplemented."

| Debtor | Amount of Loan Proceeds Received | Percentage of Loan Proceeds |
|---|---|---|
| Del Rio | 50,000.00 | 0.25 |
| SCC Communities | 12,441.85 | 0.06 |
| Tesoro | 15,468.38 | 0.08 |
| **TOTAL** | **77,910.23** | **0.39** |

Rollins Declaration, ¶ 9, Exh. 1. At Lehman ALI's direction and insistence, the remainder of the proceeds were used to pay down debts of parties other than these three Debtors, primarily with regard to projects on which Lehman ALI or its affiliates were lenders. Cook Declaration, ¶ 20; Rollins Declaration, ¶ 9, Exh. 1. "This shift of risk from the creditors of the debtor to the creditors of the guarantor is exactly the situation that fraudulent transfer law seeks to avoid when applied to guarantees." In re Image Worldwide, 139 F.3d at 581-82.

In In re Pajaro Dunes Rental Agency, Inc., 174 B.R. 557 (Bankr.N.D.Cal. 1994), the debtor brought an adversary proceeding to avoid alleged fraudulent transfers. The court held that the debtor did not receive "reasonably equivalent value" for its obligation to the lender on a $1 million promissory note, through delivery of $1 million in funds to debtor's corporate parent. 174 B.R. at 562, 579. The court found that the money was taken by the corporate parent for the debtor subsidiary, and the creditor had no reason to believe that the parent would not transfer the funds for the benefit of the debtor subsidiary's real property assets, for which the loan was provided. Id. at 580-81. Here, the case for avoidance is even more compelling: Lehman ALI specifically directed that the monies were *not* to be used by the subject Debtors or for their assets. Rather, Lehman ALI made the Interim Loan contingent on paying off other Lehman ALI debt not related to these Debtors' assets, while using these Debtors' assets for security for such debts and diminishing their value.

(c)    The Debtors Were Rendered Insolvent. The third element is that the respective Debtors were rendered insolvent as a result of the transfers. Each of these Debtors incurred a $20 million obligation when they guaranteed the Interim Loan, and put up their respective properties as security for that loan, in or about November 2007. (That obligation has since allegedly grown to at least $23,795,013 based on the proofs of claim filed by Lehman ALI) This $20 million-plus liability far exceeds the value of these Debtors' assets at the time the Interim Loan Transfers occurred.

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

The value of the Tesoro Project was estimated to be between $8.6 million and $10.8 million at or about the time of the Interim Loan Transfers. Strickland Declaration, ¶ 6, Ex. 2. The value of the Joshua Ridge Project (the sole asset of SCC Communities) was estimated to be $2.3 million at or about the time of the Interim Loan Transfers. Strickland Declaration, ¶ 7, Ex. 3. The value of the assets of Del Rio—the future right to receive anticipated net CFD bond proceeds—was estimated to be $14.2 million in December 2007, at or about the time of the Interim Loan Transfers. Strickland Declaration, ¶ 8, Ex. 4.

| Debtor | Asset Value | Original Obligation amount | Loan Proceeds Received | Excess Net Liability Incurred | Lehman Claim Amount |
|---|---|---|---|---|---|
| SCC Communities | 2,300,000 | 20,000,000 | 12,441.85 | 19,987,558.15 | 23,795,013 |
| Tesoro | 8,600,000 to 10,800,000 | 20,000,000 | 15,468.38 | 19,984,531.62 | 23,795,013 |
| Del Rio | 14,200,000 | 20,000,000 | 50,000.00 | 19,950,000.00 | 23,795,013 |

Thus, SCC Communities, Tesoro and Del Rio were each rendered insolvent by the Transfers as a matter of law. Accordingly, these Debtors have made a *prima facie* showing that the Interim Loan Transfers were fraudulent transfers. Therefore, Proof of Claim No. 9 against SCC Communities, Proof of Claim No. 7 against Tesoro, and Proof of Claim No. 14 against Del Rio should be disallowed pursuant to Bankruptcy Code Sections 502(d).

**C.**    **Unsecured Creditors Exist for the Purposes of Section 544(b)**.

As to the fraudulent transaction claims brought under California Civil Code Section 3439, via 11 U.S.C. § 544(b), the transfer must be avoidable "by a creditor holding an unsecured claim." As set forth below, only two of the subject loan obligations were made more than two years prior to the petition date, and thus only these two obligations require the invocation of the 4 year reach back under California law for causes of action under Cal.Civ.Code § 3439. These two obligations are as follows:

- SunCal Communities I executed the SunCal Communities I Loan dated November 17, 2005.
- Bickford executed an "Assumption Agreement" dated as of August 25, 2006, whereby Bickford became an additional Grantor as to the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan.

Here, qualifying creditors exist as to both SunCal I and Bickford. California Civil Code Section 3439.04 provides that a transfer is fraudulent "as to a creditor, whether the creditor's claim

-30-

arose before or ***after*** the transfer was made or the obligation was incurred…"  Accordingly, any future

creditor that is a claim arising after transfer, who holds an allowed claim as of the petition date, is also

a qualifying creditor for the purposes of Section 544(b).  As recognized by the Bankruptcy Appellate

Panel in In re Bushey, 210 B.R. 95, 104 (6th Cir.BAP 1997), any allowed unsecured claim in the case

will satisfy the requirement for a "future creditor."

> "Future" creditor is not separately defined by [state] law. A common sense definition
> is an entity with a claim arising after the challenged transfer, whether matured or
> unmatured, liquidated or unliquidated, absolute, fixed, or contingent.  Under [state
> law], a bankruptcy trustee can step into the shoes of any creditor that holds an
> allowable unsecured claim that arose after the challenged transfer. Rare indeed will
> be the bankruptcy case in which a trustee cannot identify such a creditor.

In re Bushey, 210 B.R. 95, 104 (6th Cir.BAP 1997).  See also In re Integra Realty Resources, Inc., 198

B.R. 352, 363 (Bankr.D.Colo.1996) ("the plain language of the statute which allows the post-transfer

creditors to be protected from the conveyance."); In re Musicland Holding Corp., 398 B.R. 761, 778

(Bankr.S.D.N.Y. 2008) ("future creditors may invoke [state avoidance statute], and Best Buy probably

assumed that creditors holding allowable claims against the Musicland estate also qualified as future

creditors under [state avoidance statute]."); In re RCM Global Long Term Capital Appreciation Fund,

Ltd., 200 B.R. 514, 523 n. 2 (Bankr.S.D.N.Y. 1996) ("even under section 544(b) that there is no

requirement that a present creditor have been in existence at the time of the transfer"); In re Healthco

Intern., Inc.,  195 B.R. 971, 980 (Bankr.D.Mass. 1996) ("future creditors have avoidance rights if a

transaction without adequate consideration leaves the debtor with unreasonably small capital"); In re

Morse Tool, Inc., 148 B.R. 97, 131 (Bankr.D.Mass. 1992) ("UFCA §§ 5 and 7, which extend standing

to 'future creditors'")

Accordingly, to support an action under Civil Code 3439.04, via 11 U.S.C. §544(b), the

qualifying creditor does not need to have been a "creditor" at the time of the transfer.  Any unsecured

creditor in SunCal I's and Bickford's case is a "creditor's claim [that] arose … ***after*** the transfer was

made or the obligation was incurred", and thus satisfies the requirements of a "qualifying creditor" for

purposes of Section 544(b).  Accordingly, while the SunCal Parties have specifically identified

qualifying creditors in existence at the time of the transfer was made as to Bickford, below, even this

task is unnecessary.  Any of the numerous unsecured claims set forth in the Debtors' schedules are

*qualifying creditors* for the purposes of Section 544(b).

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

1    Accordingly, it is not necessary to have a qualifying creditor who was in existence at the time

2  the transfer was made, or the obligation was incurred.  However, even assuming arguendo that a pre-

3  existing creditor is required, there are such qualifying creditors holding unsecured claims as against

4  Bickford at the time the transfer was made and the obligation was incurred.  Specifically, qualifying

5  creditors include, but are not limited to the following:

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Qualifying Creditors: |
| --- |
| Cook's Portable Toilets & Septic, |
| Ecorp Consulting Inc., |
| Fehr & Peers Associates Inc., |
| Heller Ehrman White & McAuliffe |
| Independent Construction Co. |
| Kiewit Pacific Co. |
| Land Architecture Inc. |
| Valley Utility Services |
| Restoration Resources |
| White Cap Construction Supply Inc. |
| Far West Construction Inc. |
| CH2M Hill Inc. |
| ARB Inc. |
| SunCal Management LLC |

*See* Rollins Declaration, ¶ 12. Accordingly, there are qualifying creditors for the purposes of §544(b).

## VI.

## THE AVOIDABLE PREFERENCE PROVIDE GROUNDS FOR DISALLOWANCE OF LEHMAN ALI'S CLAIM AGAINST DELTA COVES PURSUANT TO SECTION 502(d)

As set forth above, Section 502(d) provides for the disallowance of any claim of an entity from which property is recoverable under section 550 or that is a transferee of a transfer avoidable under section 547, unless such entity or transferee has paid the amount, or turned over any such property.

Again, the Order Denying the Dismissal Motion establishes that the sixth claim for relief in the TAC (now the fourth claim for relief in the FAC) properly pled a claim for relief for the avoidance and recovery of preferential transfers. Thus, as a matter of law, the Debtors have established a "prima facie" case for the purposes of Section 502(d).

Furthermore, in support of this Motion, the SunCal Parties have submitted evidence in the form of supporting declarations that Lehman ALI has received transfers from Delta Coves, which are avoidable pursuant to Section 547(b). Section 547(b) of the Bankruptcy Code provides for the avoidance of preferential transfers as follows:

> (b) ...the trustee may avoid any transfer of an interest of the debtor in property--
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;

(4) made-- … (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Here, within a year prior to the petition date (between November 2007 and May 2008), Delta Coves made pre-petition payments in the amount of $6,195,440.46 to Lehman ALI (the "Delta Coves Preferential Transfers"). These Delta Coves Preferential Transfers constitute avoidable transfers for the reasons set forth below:

(1)    The transfers of $6,195,440.46 were property of the Debtor, Delta Coves, and thus constituted an interest of the Debtor in property. See Rollins Declaration, ¶ 10.

(2)    The $6,195,440.46 transfer was to and for the benefit of the creditor, Lehman ALI. The Delta Coves Preferential Transfers were made at times at which Lehman ALI made demands for payment and were not paid according to any contract schedule. See Rollins Declaration, ¶ 11.

(3)    Pursuant to Lehman ALI's Proof of Claim No. 21, the Delta Coves Loan Agreement is dated as of April 20, 2007, and thus constitutes an antecedent debt. See Proof of Claim No. 21 attached to RJN as Exhibit 15.

(4)    The Delta Coves Loan was vastly undersecured and thus the transfer enabled Lehman ALI to receive more than if the case were under chapter 7 and the transfer had not been made. See In re Furley's Transport, Inc., 272 B.R. 161, 173 (Bankr.D.Md. 2001) ("As a matter of general principle, unless unsecured creditors will receive a one hundred percent distribution, an undersecured creditor who receives a payment during the preference period will receive more than it would have received under a Chapter 7 liquidation if the payment does not release a proportional amount of secured collateral."); In re Rand Energy Co., 259 B.R. 274, 278 (Bankr.N.D.Tex. 2001) ("an undersecured creditor who receives payments is obtaining more than it would receive in a Chapter 7 liquidation to the extent that the payments reduced the unsecured deficiency").

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

Here, Lehman ALI asserts that the Delta Coves Project had a fair market value of $25,200,000 as of January 9, 2009.[23]   Delta Coves was insolvent at and around the time of the Delta Coves Transfers.  Lehman ALI filed a Proof of a Secured Claim in the amount of $206,023,142 (Proof of Secured Claim No. 21).  Accordingly, by Lehman ALI's own admission, the claim is vastly undersecured.  Moreover, Lehman ALI did not purport to release a proportional amount of secured collateral in exchange for the Delta Coves Preferential Transfers.

Further, Lehman ALI's Proof of Claim 21-2 neither alleges nor attaches a "control agreement" over the account from which the Delta Coves Preferential Transfers were made, and thus Lehman ALI lacks a perfected security interest as to such funds.  See Com.Code §§ 9104(a), 9312(b)(1), and 9314.

Accordingly, Lehman ALI received more than if the case was under chapter 7 and the transfers had not been made.

(5)     Further, Lehman ALI's appraisal and Proof of a Secured Claim effectively concede that Delta Coves was insolvent.  Pursuant to Lehman ALI's Proof of Secured Claim No. 21, the remaining principal balance as of the petition date was $186,437, 641.26 (inclusive of interest, services fees, late charge and exit fees, Lehman ALI asserts a total claim of $206,023.142).  Accordingly, even the principal balance of the Delta Coves Loan Agreement alone vastly exceeds Lehman ALI's appraised value of the Delta Coves' project at $25,200,000.

(6)     Lehman ALI is an insider of Delta Coves, and thus preferential transfers include transfers made within a year prior to the petition date.  Here, Delta Coves made pre-petition payments in the amount of $6,229,328.88 to Lehman ALI, an affiliate of a Lehman entity holding a fifty percent interest in Delta Coves within the year preceding Delta Cove's involuntary proceeding (between November 2007 and May 2008).

On March 8, 2010, at the hearing resulting in the Order Denying The Dismissal Motions, this Court found and stated on the record that Lehman ALI was a "statutory insider" as to the respective Trustee Debtors.  The Court stated:

---

[23] On February 25, 2009, Lehman ALI submitted various appraisals, including an appraisal of the Delta Coves Project as of January 9, 2009, attached as exhibit "I" to Docket No. 133.  See RJN, ex. "18". The Delta Coves Preferential Transfers were made between November 2007 and May 2008.

As to, in particular, the "statutory insider" status of Lehman ALI, OVC and Northlake Holdings, I did find persuasive the argument of the plaintiffs that these are "statutory insiders" within the meaning of Section 101(31)(E) as affiliates.

Specifically, the Court agreed with the Debtors' analysis as follows: Delta Coves' parent company has a SunCal affiliated manager member ("SunCal Manager") and a Lehman affiliated member ("Lehman Member").

| Debtor | Parent Company | SunCal Manager | Lehman Member | Lender |
|--------|----------------|----------------|---------------|--------|
| Delta Coves | Delta Coves Master JV LLC | SunCal Delta Coves LLC | LB/L–DUC III Master LLC | Lehman ALI |

LBHI indirectly owns the Lehman Member (LB/L–DUC III Master LLC) and also wholly owns Lehman ALI. The ownership can be represented visually as follows:



The statutory definition of an "insider" includes both an "affiliate" and an "insider of an affiliate as if such affiliate were the debtor." 11 U.S.C. §101(31)(E). The term "affiliate" includes an "entity that directly or *indirectly* owns, controls, or holds with power to vote, 20 percent or more of the

1    outstanding voting securities of the debtor" 11 U.S.C. § 101(2)(A).  Since the definition includes

2    "indirect" ownership, the term "affiliate" includes *a parent of a parent* of the debtor.  See In re

3    Interlink Home Health Care, Inc., 283 B.R. 429, 439 (Bankr.N.D.Tex. 2002) ("it is certain that the term

4    'affiliate' was intended to be broad enough to include a parent of a parent").

5         It is a matter of simple logic, LBHI is an affiliate of Delta Coves because it indirectly owns or

6    controls 20% or more of Delta Coves via its ownership of the LB Member, LB/L–DUC III Master

7    LLC.  As stated above, LBHI indirectly owns the LB Member (LB/L–DUC III Master LLC), which in

8    turn has an approximately 50% ownership interest in Delta Coves Master JV LLC  and therefore Delta

9    Coves as well.[24]  Therefore, LBHI is an "affiliate" of the Trustee Debtors, including Delta Coves, within

10   the meaning of Section 101(2)(A).

11        Now, analyzing LBHI "as if such affiliate were the debtor," Lehman ALI is an insider of LBHI

12   because Lehman ALI is admittedly 100% owned by LHBI and is thus an affiliate of LBHI.  Since

13   Lehman ALI is an affiliate of LBHI, it is also an "insider" of LBHI.  Specifically, an "affiliate" is

14   included in the definition of an "insider."

15        Sibling affiliates that are "horizontally" related to a debtor through a common direct or indirect

16   parent to meet the statutory definition of an "insider" under 11 U.S.C. §101(31).  In re Reichmann

17   Petroleum Corp., 364 B.R. 916 (Bankr. E.D. Tex. 2007).  Accordingly, LBHI is an affiliate of Delta

18   Coves, and Lehman ALI is an insider of LBHI.  Therefore, Lehman ALI is an "insider of an affiliate as

19   if such affiliate were the debtor" pursuant to 11 U.S.C. §101(31)(E).

20        Consequently, the above constitutes a *prima facie* showing that Lehman ALI is a transferee of

21   transfers avoidable under Section 547 of the Bankruptcy Code, which Lehman ALI has failed to return

22   to Delta Coves' estate.  Proof of Claim No. 21 asserted by Lehman ALI against Delta Coves should

23   therefore be disallowed pursuant to 11 U.S.C. § 502(d).

24

25   [24] *See* Declaration of Marsha Jennings ("Jennings Declaration"), docket no. 1276, which is attached to
26   the RJN, exhibit 18, which attached the Delta Coves' Organizational Structure Chart identifying
     various Lehman Brothers' "members" and "managers" in the ownership chain of Delta Coves.  The
27   Jennings Declaration identifies one of Delta Coves' parent companies as "LB/L – Lakeside Capital
     Partners, LLC".  The Amended Corporate Ownership Statement filed in LBHI's Chapter 11 case,
28   attached to the RJN, exhibit 26, discloses LBHI's ownership of various entities including "LB/L –
     Lakeside Capital Partners".

VII.

**CONCLUSION**

For the reasons set forth herein, the SunCal Parties request that the Court enter an order granting the relief requested herein.

DATED:  April 26, 2011

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By:   /s/ *Paul J. Couchot*
        Paul J. Couchot, Esq.
        Peter W. Lianides, Esq.
        Payam Khodadadi, Esq.
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession ("Voluntary
Debtors")

**RUS MILIBAND & SMITH**
**A PROFESSIONAL CORPORATION**

By:   /s/ *Ronald Rus*
        Ronald Rus, Esq.
        Joel S. Miliband, Esq.
        Catherine Castaldi, Esq.
Attorneys for SunCal Management, LLC

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **THE MOVING VOLUNTARY DEBTORS' AND SUNCAL MANAGEMENT LLC'S MOTION FOR ORDER DISALLOWING CLAIMS OF LEHMAN ALI, INC. AND LEHMAN COMMERCIAL PAPER, INC. PURSUANT TO 11 U.S.C. § 502(d); MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 26, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On April 26, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 26, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Via Attorney Service
Honorable Erithe Smith
Ronald Reagan Federal Bldg.
411 W. Fourth St., Suite 5041
Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| Date | Type Name | Signature |
|------|-----------|-----------|
| April 26, 2011 | Viann Corbin | /s/ Viann Corbin |

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com,
  mpritikin@millerbarondess.com;bprocel@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com

- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

| 1 | • James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
|---|---|
| 2 | • United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov |
|   | • Carol G Unruh     cgunruh@sbcglobal.net |
| 3 | • Annie Verdries     verdries@lbbslaw.com |
|   | • Jason Wallach     jwallach@gladstonemichel.com |
| 4 | • Joshua D Wayser     , kim.johnson@kattenlaw.com |
|   | • Christopher T Williams     ctwilliams@venable.com, jcontreras@venable.com |
| 5 | • Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com |
|   | • David M Wiseblood     dwiseblood@seyfarth.com |
| 6 | • Brett K Wiseman     bwiseman@aalaws.com |
|   | • Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com |
| 7 | • Marc A. Zimmerman     joshuasdaddy@att.net |

**SERVICE VIA MAIL**

| Bickford 16, SJDPartners23<br>Comm9, Tesoro7<br><br>Lehman Commercial Paper Inc.<br>Lehman ALI, Inc.<br>Attn:  Gerald Pietroforte<br>1271 Sixth Ave., 46th Fl.<br>New York, NY 10020 | Heartland9, Marblehead21, PSV12<br>Acton6Emerald 7, SunValley17, PalmdaleHills65<br>SummitValley12, Northlake6, OakValley<br><br>Lehman ALI, Inc.<br>OVC Holdings, LLC<br>Northlake Holdings LLC<br>Lehman Commercial Paper Inc.<br>Attn:  Jeff Fitts<br>1271 Sixth Ave., 46th Fl.<br>New York, NY 10020 |
|---|---|
| All<br><br>Weil, Gotshal & Manges LLP<br>Attn:  Shai Y. Waisman<br>767 Fifth Ave.<br>New York, NY 10153 | |

MAINDOCS-#159292-v10-SCC_Motion_502(d).DOC

**Exhibit "B"**

<table>
<tr><td>1</td><td>PAUL J. COUCHOT -- State Bar No. 131934<br>SEAN A. O'KEEFE -- State Bar No. 122417</td></tr>
<tr><td>2</td><td><strong>WINTHROP COUCHOT</strong><br><strong>PROFESSIONAL CORPORATION</strong></td></tr>
<tr><td>3</td><td>660 Newport Center Drive, Fourth Floor<br>Newport Beach, CA 92660</td></tr>
<tr><td>4</td><td>Telephone: (949) 720-4100<br>Facsimile: (949) 720-4111</td></tr>
<tr><td>5</td><td>General Insolvency Counsel for Administratively</td></tr>
<tr><td>6</td><td>Consolidated Debtors-in-Possession</td></tr>
</table>

1  PAUL J. COUCHOT -- State Bar No. 131934
   SEAN A. O'KEEFE -- State Bar No. 122417
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for Administratively
6  Consolidated Debtors-in-Possession

7  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
8  **RUS MILIBAND & SMITH P.C.**
   2211 Michelson Drive, Seventh Floor
9  Irvine, California 92612
   Telephone: (949) 752-7100
10 Facsimile: (949) 252-1514

11 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

12              **UNITED STATES BANKRUPTCY COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
13                    **SANTA ANA DIVISION**

14 In re                              | Case No. 8:08-bk-17206-ES

15 Palmdale Hills Property, LLC, and its   | Jointly Administered With Case Nos.
16 Related Debtors.

| | |
|---|---|
| 14 | In re |
| 15 | Palmdale Hills Property, LLC, and its Related Debtors. |
| 16 | |
| 17 | Jointly Administered Debtors and Debtors-in-Possession |
| 18 | |

Case No. 8:08-bk-17206-ES

Jointly Administered With Case Nos.

8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17224ES; 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES; 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES; 8:08-bk-17231ES; 8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES; 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES; 8:08-bk-17408ES; 8:08-bk-17409ES; 8:08-bk-17458ES; 8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES; and 8:08-17588ES.

Chapter 11 Cases

**NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.**

DATE:   June 9, 2011
TIME:   10:30 a.m.
PLACE:  Courtroom 5A

19  Affects:
    ☐ All Debtors
20  ☒ Palmdale Hills Property, LLC,
    ☐ SunCal Beaumont Heights, LLC
21  ☐ SCC/Palmdale, LLC
    ☐ SunCal Johannson Ranch, LLC
22  ☒ SunCal Summit Valley, LLC
23  ☒ SunCal Emerald Meadows LLC
    ☒ SunCal Bickford Ranch, LLC
24  ☒ Acton Estates, LLC
    ☐ Seven Brothers LLC
25  ☒ SJD Partners, Ltd.
26  ☐ SJD Development Corp.
    ☐ Kirby Estates, LLC
27  ☐ SunCal Communities I, LLC
    ☐ SunCal Communities III, LLC
28      ***Continued on Next Page***

1  | *Continued from Previous Page*
2  | ☒ SCC Communities LLC
   | ☐ North Orange Del Rio Land, LLC
3  | ☒ Tesoro SF, LLC
   | ☒ LBL-SunCal Oak Valley, LLC
4  | ☒ SunCal Heartland, LLC
   | ☒ LBL-SunCal Northlake, LLC
5  | ☒ SunCal Marblehead, LLC
   | ☐ SunCal Century City, LLC
6  | ☒ SunCal PSV, LLC
   | ☐ Delta Coves Venture, LLC
7  | ☐ SunCal Torrance, LLC
   | ☐ SunCal Oak Knoll, LLC
8

# **TABLE OF CONTENTS**

**PAGE**

| | | | | |
|---|---|---|---|---|
| I. | | INTRODUCTION | | 1 |
| II. | | MATERIAL BACKGROUND FACTS | | 2 |
| | A. | The SunCal Debtors | | 2 |
| | B. | Acton Estates | | 2 |
| | C. | Bickford Ranch | | 2 |
| | D. | Emerald Meadows | | 3 |
| | E. | Palmdale Hills | | 3 |
| | F. | SCC Communities | | 3 |
| | G. | SJD Partners | | 4 |
| | H. | Summit Valley | | 4 |
| | I. | Tesoro | | 4 |
| | J. | Heartland | | 4 |
| | K. | Marblehead | | 5 |
| | L. | Oak Valley | | 5 |
| | M. | Northlake | | 5 |
| | N. | PSV | | 5 |
| | O. | The Economic Downturn In 2007 and Promises of Funding | | 6 |
| | P. | The Restructuring Agreement | | 6 |
| | | 1. | The Parties To The Restructuring Agreement | 7 |
| | | 2. | Lehman ALI's Obligation to Fund "Urgent Payables." | 8 |
| | | 3. | Lehman ALI's Obligation to Close | 9 |
| | Q. | The Breach of The Restructuring Agreement | | 10 |
| | | 1. | Failure to Pay Urgent Payables | 10 |
| | | 2. | Failure To Proceed With A Closing Under The Settlement Agreement | 11 |
| | | 3. | The Sale of Seven Sold Loans to Fenway Breached The Terms of The Restructuring Agreement. | 12 |
| | R. | The Settlement Agreement | | 12 |
| | | 1. | The Obligations to Pay Assumed and Authorized Amounts. | 13 |
| | | | a. Scheduled Assumed Obligations | 14 |
| | | | b. Lender Authorized Work | 16 |
| | | 2. | The Obligations to Assume Bond Obligations and to Replace or Release Bonds | 16 |
| | | 3. | Pacific Point Obligations | 19 |
| | S. | The Breaches of The Settlement Agreement | | 20 |
| | | 1. | Lehman ALI Attempted To Repudiate The Settlement Agreement | 20 |
| | | 2. | The Sale of The Sold Loans Repudiated The Settlement Agreement | 21 |
| | | 3. | Covenant Not To Sue | 22 |
| | | 4. | Lehman Parties Acquire the Pacific Point Project Without Payment | 22 |
| | T. | Damages From the Breach of the Settlement Agreement | | 23 |

1

<div align="center">

**TABLE OF CONTENTS**

**(Continued)**

</div>

**PAGE**

III.    ARGUMENT ................................................................. 24

    A.    Lehman ALI Breached The Terms of the Restructuring Agreement ............ 24

    B.    The Debtor is Entitled to Recoup its Damages Against the Secured
          Portion of the Lehman Claims. ........................................ 24

    C.    LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses........ 27

    D.    The SunCal Debtors Are Entitled To Offset Their Damages - Against
          Lehman Ali's Claims Only .............................................. 29

    E.    Allowing The Lehman Claims Would Unjustly Enrich The Lehman
          Entities .............................................................. 30

    F.    The Lehman Entities Cannot Profit From Their own Wrongs (Unclean\
          Hands)................................................................. 31

    G.    The Imposition Of A Constructive Trust Is Justified - Against Lehman
          Ali Only .............................................................. 32

    H.    The Imposition Of An Equitable Lien Is Justified - Against Lehman
          Ali Only .............................................................. 33

    I.    LCPI's Automatic Stay Does Not Apply to an Objection to Claim. ........ 33

    J.    Any Party in Interest Has Standing to Object to Claims. .............. 35

IV.     CONCLUSION................................................................. 36

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2                                                                                    **PAGE**

3       **CASES**

4
        *Albright v. Gates,*
5           362 F.2d 928 (9ᵗʰ Cir.1966) ................................................................... 26

6       *Campbell v. Superior Court,*
            132 Cal. App. 4th 904 (2005) ............................................................... 32
7
        *Coffman v. Cobra Mfg. Co.,*
8           242 F.2d 754 (9th Cir. 1954) ................................................................ 30

9       *Communist Party v. Valencia, Inc.*
            35 Cal.App.4th 980 (1995) ................................................................... 32
10
        *Del Charro Properties, L.P. v. Heron,*
11          H025571, 2004 WL 1616016 (2004) ..................................................... 29

12      *Destro v. Stuhley,*
            675 F.2d 1037 (9th Cir.1981) ............................................................... 33
13
        *Estate of Pitts,*
14          218 Cal. 184 (1933) .............................................................................. 33

15      *FDIC v. Union Entities (In re Be-Mac Transp.),*
            83 F.3d 1020 (8th Cir.1996) ................................................................. 35
16
        *Feature Realty, Inc. v. City of Spokane,*
17          331 F.3d 1082 (9th Cir. 2003) .............................................................. 31

18      *Fiberchem, Inc. v. General Plastics Corp.,*
            495 F.2d 737 (9th Cir.1974) ................................................................. 28
19
        *Gaudiosi v. Mellon,*
20          269 F.2d 873 (3d Cir.1959) .................................................................. 31

21      *Gold Mining & Water Co. v. Swinerton,*
            23 Cal. 2d 19, 142 P.2d 22 (1943) ....................................................... 24
22
        *Granberry v. Islay Investments*
23          9 Cal.4th 738 (1995) ............................................................................ 29

24      *Hammelburger v. Foursome Inn Corp.,*
            54 N.Y.2d 580, 431 N.E.2d 278 (1981) ............................................... 28
25
        *Harrison v. Adams,*
26          20 Cal. 2d 646, 128 P.2d 9 (1942) ....................................................... 30

27      *Highland Tank & Mfg. Co. v. PS Intern. Inc.,*
            393 F.Supp.2d 348 (W.D.Pa.2005) ...................................................... 31

28

<u>**TABLE OF AUTHORITIES**</u>

**(Continued)**

<u>**PAGE**</u>

*In re Anderson,*
    382 B.R. 496 (Bankr.D.Or. 2008) ...................................................................35

*In re Bousa, Inc.,*
    2005 WL 1176108, *4 (S.D.N.Y. 2005) .........................................................34

*In re Brannan,*
    40 B.R. 20 (Bankr. N.D. Ga. 1984), ...............................................................28

*In re Financial News Network,*
    158 B.R. 570 (S.D.N.Y. 1993) ........................................................................34

*In re McMahon,*
    129 F.3d 93 (2d Cir. 1997) ..............................................................................35

*In re Meade,*
    1999 WL 33496001, *1 (E.D.Pa. 1999) ..........................................................34

*In re Metiom,*
    301 B.R. 634 (Bankr.S.D.N.Y. 2003); ........................................................27, 34

*In re Palmdale Hills Property, LLC,*
    423 B.R. 655, n.9 (9th Cir. BAP 2009) ......................................................34, 35

*In re Parker,*
    80 B.R. 729 (Bankr. E.D. Pa. 1987) ............................................................30, 34

*In re Petersen,*
    2010 WL 3842157, *13 (D.Ariz. 2010) ..........................................................35

*In re QMect, Inc.,*
    349 B.R. 620 (Bankr. N.D.Cal. 2006) .............................................................36

*In re Snyder,*
    436 B.R. 81 (Bankr.C.D.Ill. 2010) ..................................................................28

*In re Thompson,*
    350 B.R. 842 (Bankr.E.D.Wis. 2006) .............................................................26

*In re TLC Hospitals, Inc.,*
    224 F.3d 1008 (9th Cir. 2000) .....................................................................26, 34

*In re Wheatfield Business Park,*
    308 B.R. 463 (9th Cir. BAP 2004) ..................................................................34

*IRS v. Taylor (In re Taylor),*
    132 F.3d 256 (5th Cir.1998) ............................................................................35

*Jones v. Sacramento Sav. & Loan Ass'n,*
    248 Cal. App. 2d 522 (1967) ...........................................................................33

**TABLE OF AUTHORITIES**

**(Continued)**

<div align="right"><u>PAGE</u></div>

*Lawrence v. Steinford Holding B.V. ( In re Dominelli),*
    820 F.2d 313 (9th Cir.1987) ................................................................................35

*Lewis Pub. Co. v. Henderson*
    103 Cal. App. 425 (1930) ....................................................................................31

*Margott v. Gem Properties, Inc.,*
    34 Cal. App. 3d 849 (1973) .................................................................................30

*McColgan v. Bank of California Assn.,*
    208 Cal. 329 (1929) ............................................................................................33

*Minidoka Irrigation Dist. v. Dep't of the Interior,*
    154 F.3d 924 (9th Cir.1998) ................................................................................24

*Moore v. New York Cotton Exchange,*
    270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). .............................................26

*Newbery Corp. v. Fireman's Fund Ins. Co.,*
    95 F.3d 1392 (9th Cir. 1996),......................................................24, 25, 26, 34

*Olick v. Parker & Parsley Petroleum Co.,*
    145 F.3d 513 (2d Cir. 1998); ..............................................................................34

*Peterson v. Cellco P'ship,*
    164 Cal.App.4th 1583, 80 Cal.Rptr.3d 316 (2008) ............................................30

*Q Mgmt. v. Snake River Equip. Co.,*
    CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008).....................24

*Rathbun v. Sec. Mfg. Co.,*
    82 Cal. App. 793 (1927) ......................................................................................31

*Robinson, on behalf of C. & R. Transfer, v. Boulevard Express,*
    17 Cal. App. 2d 492 (1936) .................................................................................31

*Shum v. Intel Corp.,*
    630 F. Supp. 2d 1063 (N.D. Cal. 2009) *aff'd,* 633 F.3d 1067 (Fed. Cir. 2010) .......30

*Siegel v. Federal Home Loan Mortg. Corp.,*
    143 F.3d 525 (9th Cir. 1998). ..............................................................................35

*Smith v. Anglo-California Trust Co.,*
    205 Cal. 496 (1928) ............................................................................................33

*Vasile v. Dean Witter Reynolds Inc.,*
    20 F.Supp.2d 465 (E.D.N.Y. 1998) ....................................................................34

1

<u>**TABLE OF AUTHORITIES**</u>

2

**(Continued)**

3

<u>**PAGE**</u>

4

**STATUTES**

5

11 U.S.C. § 362 ......................................................................................................................35

6

11 U.S.C. § 502(a). ...............................................................................................................35
Cal. Code Civ. Proc. § 431.70. ...........................................................................................29

7

Cal Civ. Code § 2224 ..........................................................................................................32

8

**OTHER AUTHORITIES**

9

3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67 ...................................................33

10

4 Pomeroy's Equity Jurisprudence (5th ed.) s 1235, pp. 696—699 ....................................33
3A Corbin, Contracts § 767, at 540 (1960) ........................................................................31
Advisory Committee Notes to Bankruptcy Rule 3007 ........................................................35

11

*Restatement of Restitution* § 3 (1937) .................................................................................31

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2   Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3   Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4   Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro"), and SunCal Management,

5   LLC ("SunCal Management") (collectively, the "SunCal Moving Parties"), hereby move (the

6   "Motion") the Court, in both the Voluntary Debtors' cases[1] and the Trustee Debtors' cases[2], for an

7   order granting the following relief:[3]

8       (A)     Disallowing the following Proofs of Claim filed by Lehman ALI, Inc. ("Lehman

9   ALI") and Lehman Commercial Paper, Inc. ("LCPI", and together with Lehman ALI, the

10  "Lehman Entities") on the grounds that the debt obligation therein was eliminated by the

11  Settlement Agreement, as that term is defined herein:

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|-----------|-------------------------|-------------------------|--------------|-----------------|
| 6         | Acton Estates           | LCPI                    | $343,221,391 | 1.              |
| 16        | Bickford Ranch          | LCPI                    | $343,221,391 | 2.              |
| 7         | Emerald Meadows         | LCPI                    | $343,221,391 | 3.              |
| 65        | Palmdale Hills          | LCPI                    | $287,252,096 | 4.              |
| 23        | SJD Partners            | Lehman ALI              | $120,110,237 | 5.              |
| 12        | Summit Valley           | LCPI                    | $343,221,391 | 6.              |
| 9         | SCC Communities         | Lehman ALI              | $ 23,795,013 | 7.              |

[1] The Voluntary Debtors are defined as Acton, SunCal Beaumont Heights, LLC ("Beaumont"), Bickford, Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), SCC Palmdale, Palmdale Hills, SJD Partners, SJD Development Corp. ("SJD Development"), Summit Valley, SCC Communities, Seven Brothers LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("Del Rio"), and Tesoro.
[2] The Trustee Debtors are defined as LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll") (collectively "Trustee Debtors"). The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."
[3] The respective Voluntary Debtors are the moving parties with respect to the objections to claims in their respective Voluntary Debtors' cases, and SunCal Management is the moving party in the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such Trustee Debtors' cases.
[4] As set forth in more detail below, several of the underlying loans have been subject to multiple transfers before and after the petition date. Accordingly, the "current claim holder" is not necessarily the original claim holder or the entity which initially filed the proof of claim. To the extent that other Lehman affiliated entities are the holders of any of these claims, for the purposes of this Motion, such entities are included in the definition of the "Lehman Entities" and such to this Motion.

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|-----------|------------------------|------------------------|--------------|-----------------|
| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 8. |
| 16 | Oak Valley | LCPI | $141,630,092 | 9. |
| 6 | Northlake | LCPI | $123,654,777 | 10. |
| 12 | PSV | LCPI | $88,257,340 | 11. |
| 9 | Heartland | LCPI | $354,325,126 | 12. |
| 21 | Marblehead | LCPI | $354,325,126 | 13. |

(the above referenced proofs of claim are collectively referred to as the "Lehman Claims");

    (B)    Recouping from the secured portion of the Lehman Claims, all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI, Inc. ("Lehman ALI"), LCPI's predecessor-in-interest;

    (C)    Offsetting from the secured portion of the Lehman ALI's claims all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI;

    (D)    Denying the Lehman Entities any relief or recovery on the Lehman Claims on the grounds that they have failed to establish their burden under applicable law;

    (E)    Imposing a constructive trust on any recovery obtained by Lehman ALI from property of the relevant SunCal Debtors in that amount necessary to enable the such Debtors to recover the damages owed to them by Lehman ALI, or imposing an equitable lien on any such recovery to accomplish this purpose;

    (F)    Barring the Lehman Claims on the grounds of unclean hands and unjust enrichment; and

    (G)    Such further relief as the Court deems just and proper.

    This Motion is made on the basis of the concurrently filed Declaration of Bruce Cook (the "Cook Declaration"), and Request for Judicial Notice, the within points and authorities, and upon such other evidence as the Court elects to consider prior to or at the hearing on this matter.

    IF YOU DO NOT OPPOSE THE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OPPOSE THE MOTION, OPPOSITIONS MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION. YOU MUST FILE YOUR OPPOSITION WITH THE CLERK OF THE UNITED

1  STATES BANKRUPTCY COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030,

2  SANTA ANA, CALIFORNIA 92701. YOU MUST ALSO SERVE A COPY OF YOUR

3  OPPOSITION TO THE MOTION UPON COUNSELS FOR THE VOLUNTARY DEBTORS

4  AND SUNCAL MANAGEMENT AT THE MAILING ADDRESSES INDICATED IN THE

5  UPPER LEFT CORNER OF THE FIRST PAGE OF THIS MOTION. THE VOLUNTARY

6  DEBTORS' COUNSEL WILL ACCEPT E-MAIL SERVE AT THE FOLLOWING

7  ADDRESSES: PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A COPY TO

8  PJ@WINTHROPCOUCHOT.COM. ANY FAILURE TO TIMELY FILE AND SERVE AN

9  OPPOSITION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE

10  COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER

11  NOTICE.

12  DATED: May 10, 2011

    **WINTHROP COUCHOT**
13  **PROFESSIONAL CORPORATION**

14
    By:___/s/ Paul J. Couchot_____
15        Paul J. Couchot, Esq.
          Sean Okeefe, Esq.
16        Peter Lianides, Esq.
    General Insolvency Counsel for Administratively
17  Consolidated Debtors-in-Possession

18
    **RUS MILIBAND & SMITH P.C.**
19

20
    By:__/s/ Ronald Rus_____
21        Ronald Rus, Esq.
          Joel S. Miliband, Esq.
22        Catherine Castaldi, Esq.
    Attorneys for SunCal Management, LLC, and
23  SCC Acquisitions Inc.

24

25

26

27

28

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.**

3    **INTRODUCTION**

4        In May of 2008, the SunCal Parties (as defined herein), on the one hand, and Lehman ALI,

5    Inc. ("Lehman ALI") and its related affiliates, on the other (together, the "Lehman Parties"),

6    entered into that certain "Restructuring Agreement." See Cook Declaration, Exhibit 1. Pursuant

7    to the terms of the Restructuring Agreement, Lehman ALI agreed (1) to pay the certain "urgent

8    payables" (defined below), and management fees, according to a contractual schedule, (2) to the

9    transfer the Relevant SunCal Debtors' projects to newly created Lehman entities (referred to as the

10   Venture Grantees), who would assume the unpaid vendor claims incurred at the respective

11   projects, including but not limited to the "lender authorized work" and assume the bond liabilities

12   associated with that project, and (3) to make a number of material modification to the loans that

13   were secured by liens against these projects. In August of 2008, the SunCal Parties and the

14   Lehman Parties executed a second agreement, the Settlement Agreement (Cook Declaration,

15   Exhibit 2), and further included additional Projects and their respective Debtors as parties to the

16   Restructuring Agreement. The applicable Debtors who were the parties to the Restructuring

17   Agreement, and set forth in the chart above, are referred to herein as the "Relevant SunCal

18   Debtors".

19       As more fully detailed herein, Lehman ALI and the other Lehman Parties breached the

20   terms of the Restructuring Agreement and the Settlement Agreement by failing to pay the vendor

21   claims and bond obligations as promised and they later repudiated the entirety of these

22   agreements. The Lehman Parties' actions have caused the Relevant SunCal Debtors to suffer tens

23   of millions, if not in excess of one hundred million dollars in damages, which will need to be

24   quantified through discovery. The secured portion of the Lehman Claims should be reduced by

25   this sum and the resulting equity should be available for unsecured creditors of the respective

26   estates.

27

28

## II.

## MATERIAL BACKGROUND FACTS

**A)** **The SunCal Debtors.** Beginning in the late 1990s, a group of affiliated companies owned directly or indirectly by or affiliated with SCC Acquisitions, Inc. (collectively "SunCal"), entered into a joint venture (the "Venture") with certain affiliates of LBHI, including most importantly LCPI and Lehman ALI. The objective of the Venture was to acquire, develop and sell a series of residential development projects in California (the "Projects").

Under the parties' Venture, SunCal, which is one of the largest private land developers in the United States, served as the developer/manager of the Projects, and the Lehman Parties served as the capital source. The SunCal Debtors (the debtors listed on the face page of this pleading) were either formed to own the Projects being developed by the Venture, or they were formed to serve as the parent entities of the entities that owned the Projects. The Relevant SunCal Debtors and their Projects are set forth below:

**B)** **Acton Estates.** Acton Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. LCPI entered into a loan agreement dated November 17, 2005 ("SunCal Communities I Loan") with SunCal I, as borrower. The Acton Estates Project is encumbered by a first priority deed of trust securing the SunCal Communities I Loan. Acton was not an original borrower under the SunCal Communities I Loan, but rather LCPI purports that Acton subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan. However, LCPI's relevant proof of claim (Claim 2-2) fails to attach or establish the existence of an Assumption Agreement as to Acton. On or about September 21, 2009, LCPI filed Claim 2-2 in the amount of $343,221,391 against Acton.[5]

**C)** **Bickford Ranch.** SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch

---

[5] Claim 2 against Acton is based upon the SunCal Communities I Loan which was one of the "Sold Loans" (defined below) which was transferred to Fenway prior to the petition date (see RJN Exhibits 13 and 14). On or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI. See Docket Nos. 1179 through 1191.

1   Project is encumbered by a first priority deed of trust recorded on August 25, 2006 securing the

2   SunCal Communities I Loan.  Bickford Ranch was also not an original borrower under the SunCal

3   Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it

4   purported to become an additional grantor under the Guarantee and Collateral Agreement relating

5   to the SunCal Communities I Loan.  On September 21, 2009, LCPI filed Claim 16-3, in the amount

6   of $343,221,391 against Bickford Ranch.

7       **D)**     **Emerald Meadows**.  Emerald Meadows owns the Emerald Meadows Project,

8   consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California.  The

9   Emerald Meadows Project is encumbered by a first priority deed of trust recorded on July 19, 2007

10  securing the SunCal Communities I Loan.  Emerald Meadows was also not a borrower under the

11  SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement".  On

12  September 21, 2009, LCPI filed Claim 7-2 in the amount of $343,221,391 against Emerald

13  Meadows.

14      **E)**     **Palmdale Hills**. Palmdale Hills's primary asset is the Ritter Ranch Project, a 10,000

15  acre residential development located in Antelope Valley, California. The Ritter Ranch Project is

16  encumbered by a first priority deed of trust that was originally granted to LCPI in February of

17  2007. LCPI contend that this deed of trust secures, _inter alia_, all obligations arising under that

18  certain _Credit Agreement_ dated as of February 8, 2007 (the "Ritter Ranch Loan" ), entered into by

19  and between LCPI and the Debtor.  On or about September 23, 2009, LCPI filed Claim 65-4 in the

20  amount of $287,252,096.31 against Palmdale Hills.

21      **F)**     **SCC Communities**. SCC Communities owns the Joshua Ridge Project, consisting

22  of an 80-acre site situated in the City of Victorville in San Bernardino County, California.  The

23  Joshua Ridge Project is encumbered by a first priority deed of trust recorded on November 2, 2007

24  securing that certain Loan Agreement, dated as of October 31, 2007, by and between SCC

25  Acquisitions LLC ("Acquisitions"), as borrower and Lehman ALI, as lender (the "Interim Loan

26  Agreement").  SCC Communities was not a borrower under the Interim Loan Agreement, but did

27  sign a "subsidiary guaranty."  On March 30, 2009, Lehman ALI filed Claim 9 against SCC

28  Communities in the amount of $23,795,013 arising from Interim Loan.

**G)** **SJD Partners.** SJD Partners currently owns no real property. SJD Partners formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project". The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, on the second priority deed of trust, which caused a Lehman Affiliate, LV Pacific Point LLC ("LV PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. The Pacific Point Project is encumbered by a first priority deed of trust securing that certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). On March 30, 2009, Lehman ALI filed Claim 23 in the amount of $120,110,237 against SJD Partners.

**H)** **Summit Valley.** Summit Valley owns most of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. Summit Valley was also not a borrower under the SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan. Claim 12-2 was filed by LCPI on September 21, 2009 in the amount of $343,221,391.

**I)** **Tesoro**. Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The Tesoro Project is encumbered by a first priority deed of trust recorded on November 2, 2007 securing the Interim Loan Agreement. Tesoro was not a borrower under the Interim Loan Agreement, but did sign a "subsidiary guaranty." On March 30, 2009, Lehman ALI filed Claim 7 against Tesoro in the amount of $23,795,013

**J)** **Heartland**. Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California. The Heartland Project is encumbered by a first priority deed of trust recorded on October 3, 2007 securing that certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and

among SunCal Marblehead Heartland Master LLC, Marblehead, and Heartland, as borrowers, and Lehman ALI, as agent and sole lender (the "Marblehead/Heartland Loan Agreement"). On September 21, 2009, Lehman ALI filed Claim 9-2 against Heartland in the amount of $354,325,126.

K) **Marblehead.** Marblehead owns the Marblehead Project, consisting of a 247-acre site and is expected to consist of 308 units in San Clemente, California. The Marblehead Project is encumbered by a first priority deed of trust recorded on October 3, 2007 securing the Marblehead/Heartland Loan Agreement. On September 21, 2009, Lehman ALI filed Claim 21-2 in the amount of $354,325,126.

L) **Oak Valley**. Oak Valley owns the Oak Valley Project consisting of a 985-acre site which is located in Riverside County, California. The Oak Valley Project is encumbered by a first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $120,000,000 ("Oak Valley Loan Agreement"). On or about September 21, 2009, OVC Holdings filed Claim 16-3 against Oak Valley in the amount of $141,630,092.

M) **Northlake.** Northlake owns the Northlake Project, consisting of a 1,564-acre site which is located in Castaic, California, north of Valencia, approximately 45 miles north of downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is encumbered by a first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower, and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately $100,000,000 (the "Northlake Loan Agreement"). On September 21, 2009, Northlake Holdings filed Claim 6-2 against Northlake in the amount of $158,141,365.

N) **PSV**. PSV owns the Palm Springs Village Project, consisting of a 309-acre site which is located in the City of Palm Springs, California. The PSV Project is encumbered by a

1  first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

2  Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI,

3  as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate

4  principal amount of approximately $90 million (the "PSV Loan Agreement"). On or about

5  September 21, 2009, Lehman ALI filed Claim 12-2 against PSV in the amount of $88,257,340.

6      **O)**    **The Economic Downturn In 2007 and Promises of Funding.** Prior to 2007, the

7  Venture thrived, generating favorable returns for both parties. However, beginning in 2007, the

8  real estate market experienced a downturn. This downturn substantially reduced the value of the

9  Projects and negatively impacted potential sales. In an effort to mitigate the cash drain at the

10  Projects caused by the slowdown, SunCal proposed closing certain Projects and slowing the pace

11  of development at others. The Lehman Entities rejected these proposals and insisted that

12  development proceed. In 2007 and 2008, Lehman ALI and LCPI repeatedly assured SunCal that

13  Lehman ALI and LCPI were committed to funding the debts and obligations of the Projects and

14  the work they directed to be performed; that funding would be forthcoming; and that SunCal and

15  the Relevant SunCal Debtors should continue to have contractors undertake work to develop and

16  preserve the value in the Projects. In reliance on these representations, SunCal and the Relevant

17  SunCal Debtors continued to move forward with the Projects and incurred substantial expenses in

18  hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

19      Substantially all of the unsecured creditor claims and mechanic's lien claims that have been

20  filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI authorized the

21  Debtors to incur and promised to provide funding for and/or promised to assume. A list of the

22  unsecured creditors that have filed proofs of claims against each of the Debtors, and the amounts

23  of their claims, is included in Exhibit 19 to the Cook Declaration. A list of mechanic lien claims

24  filed against each of the Debtors, and the amounts of their claims, is included in Exhibit 20

25  attached to the Cook Declaration.

26      **P)**    **The Restructuring Agreement**. It was contemplated as of the October 2007

27  Interim Loan that a restructuring agreement would be entered into shortly, by no later than January

28  or February of 2008. However, implementation was dragged out due in large part to Lehman's

1  extensive documentation. In the meantime, until a restructuring agreement was entered into,

2  Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees

3  of SunCal Management LLC, which was managing and continued to manage each of the Relevant

4  SunCal Debtors' Projects. As the restructuring was pushed further and further out and Lehman

5  ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal

6  was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more

7  desperate and more dependent on Lehman ALI and LCPI financing. Lehman ALI and LCPI used

8  the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring

9  agreement that was tipped heavily in Lehman's favor.

10            1)    The Parties To The Restructuring Agreement. On May 23, 2008, SCC

11  Acquisitions, Inc. ("Acquisitions Inc."), and certain affiliated SunCal entities, [6] on the one hand,

12  and the Lehman Parties on the other, entered into the Restructuring Agreement ("Restructuring

13  Agreement"). See Cook Dec., Exhibit 1. As originally executed in May 2008, the Restructuring

14  Agreement applied to twelve Projects relevant herein (as well as several other projects not at issue

15  in these bankruptcies): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

16  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

17  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

18  held equity interests in the owners of these Projects were signatories to the May 2008 agreement.

19  The Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and

20  "Pledgors," as defined in Annex 1 thereto.[7]

21

22  _____

[6] The original signatories to the Restructuring Agreement include SunCal Marblehead Heartland

23  Master LLC, Marblehead, Heartland, Oak Valley, SJD Partners, Palmdale Hills, SunCal
Communities I, LLC ("SunCal I"), SunCal Communities III, LLC ("SunCal III"), Bickford Ranch,

24  Acton, Summit Valley, Kirby Estates LLC ("Kirby"), SunCal Beaumont Heights, LLC
("Beaumont"), Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), Acquisitions

25  Inc., Acquisitions, SunCal Master JV, LLC, SJD Development Corp ("SJD Development"),
SCC/Indio Land LLC, SCC Master IV Communities LLC, SCC/West Creek LLC, SunCal

26  Communities II LLC, SunCal Management LLC, and Northlake.
[7]   The "Borrowers" included Marblehead, Heartland, Northlake, Oak Valley, SJD Partners,

27  Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and Bickford. The "Grantors" included
Marblehead, Heartland, Northlake, Oak Valley, SJD Partners, Palmdale Hills, Bickford, Acton,

28  Summit Valley, Emerald Meadows, Beaumont and Johannson. The "Pledgors" included SCC
Palmdale, SunCal I, Summit Valley and SJD Development.

1    Between May and August 2008, four additional projects were added to the

2 Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm

3 Springs Village; and (4) Tesoro. Accordingly, the Debtors associated with these Projects—Del

4 Rio, SCC Communities, PSV, and Tesoro—became parties to the Restructuring Agreement as

5 amended. These Debtors were signatories to the August 25, 2008 Settlement Agreement, along

6 with the Debtors associated with the original twelve Projects, as "Borrowers" and/or "Grantors."

7 (The SunCal parties to the agreements are collectively referred to herein as the "SunCal Parties").[8]

8    2)    Lehman ALI's Obligation to Fund "Urgent Payables." Pursuant to

9 Section 1(h) of the Restructuring Agreement, Lehman ALI agreed to pay certain urgent expenses

10 that were either owed, or being incurred at the Relevant SunCal Debtors' Projects that were

11 subject to the Restructuring Agreement. Specifically, Section 1(h) provided, in pertinent part:

> During the term of this Agreement, Lehman ALI, as the Lender with respect to
> each Loan, . . . hereby agrees to make protective advances under the applicable
> Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for
> the payment of any such Urgent Payables which are approved by Lehman ALI....

15 Cook Declaration, Exhibit 1, Section 1(h). "Urgent Payables" were defined in Section 1(h) as:

> work or other services (including, without limitation, litigation defense costs) that
> need to be performed or provided with respect to each Property and any accounts
> payable arising from work previously authorized by Lehman ALI which need to be
> paid with respect to each Property.

19 Cook Declaration, Exhibit 1, Section 1(h).

20    Pursuant to Section 1(i) of the Restructuring Agreement, Lehman ALI also agreed to

21 pay monthly management fees for the management of each of the Projects, from May 15, 2008

---

[8] Thus, four Projects were not formally added to the Restructuring Agreement—Century City, Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects— Century City, Delta Coves, Oak Knoll and Torrance—were not signatories to the Settlement Agreement. Lehman ALI was the lender on each of these Projects, three of which were part of the Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund"). However, even as to these four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other Projects regarding representations of funding. Lehman ALI encouraged SunCal and these four Debtors to continue developing these Projects, and made assurances of payment. Later, Lehman ALI approved all expenses, told these Debtors what work to move forward with, and promised it would pay for such work. These Debtors performed substantial work and incurred millions in third-party debt in reliance on Lehman ALI's promises of payment.

forward, unless and until either (a) it provided thirty (30) 5 days' written notice, or (b) the

Restructuring Agreement was terminated ("Management Fees").

   3)   **Lehman ALI's Obligation to Close**.  The Restructuring Agreement was designed to culminate in a closing ("Closing") with the execution of a Settlement Agreement (and related settlement transaction documents), discussed in more detail below, whereby, among other things:

> (1)   the Grantors would convey title to, and the Borrowers, Pledgors, and Guarantors would transfer all interests in, the Projects to new Lehman entities ("Venture Grantees"), which entities would then be responsible for repayment of the loans previously made to the Borrowers (and which were guaranteed by the Guarantors and/or secured by pledges of interests by the Pledgors), as well as payment of management fees to SunCal Management;

> (2)   the Venture Grantees and/or other Lehman entities would pay for all payables arising from "Lender Authorized Work"—work that Lehman ALI had previously approved;

> (3)   the Venture Grantees and/or other Lehman entities would pay for tens of millions of dollars in outstanding payables which the Grantors, Borrowers, Pledgors and/or Guarantors owed to third-party vendors that had provided goods or services on the Projects (at Lehman ALI's instruction);

> (4)   the Venture Grantees and/or other Lehman entities would indemnify Plaintiffs for up to at least $15 million in existing bond obligations, and also agreed to indemnify the SunCal Parties for certain bond liability going forward if the Lehman parties failed to release and/or replace the existing performance bonds; and

> (5)   PAMI, LLC ("PAMI") an ostensibly creditworthy indemnitor, was the entity designated to be the "Lehman Indemnitor" under the parties' Settlement Agreement would be jointly and severally liable for the above payment and indemnification obligations.

Section 1(a) of the Restructuring Agreement delineated the parties' obligation, upon

satisfaction of the Closing Conditions, to execute, and to cause their respective affiliated parties to

execute, the Settlement Agreement and related settlement documents.  Section 1(c) of the

Restructuring Agreement further provided, in pertinent part, that "[u]pon satisfaction of the

Closing Conditions, the Parties shall proceed to Closing…."The Closing Conditions also included

certain consents and approvals of governmental authorities and other parties which are referred to

in Section 2(a) of the Restructuring Agreement as "Required Consents."  Section 2(a) further

provided a mechanism for partial Closing if Required Consents had been obtained for fewer than all of the Projects by the Closing date. Although the formula was complex, essentially, so long as Required Consents had been obtained for eight of the subject Projects plus the Pacific Point Project, an "Initial Closing" would occur as to those Projects for which consents had been obtained, and a "Subsequent Closing" could occur for Projects for which all consents were subsequently obtained, and the parties were to use commercially reasonable effort to obtain the Required Consents for a Subsequent Closing.

Under Section 1(d)(i), the Restructuring Agreement could be terminated (a "Termination Event") if neither the Closing Conditions for an Initial Closing nor complete Closing were satisfied on or prior to the Closing Date. However, Section 1(d)(i) further provided that neither party could terminate the Restructuring Agreement "if the failure of any Closing Conditions shall have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or failure to pursue the satisfaction [of] the Closing Conditions in good faith." Under Section 1(e) of the Restructuring Agreement, unless the agreement otherwise specified, the obligations of the Parties under the Agreement would terminate "upon termination of this Agreement." Thus, Lehman ALI's obligation under Section 1(h) to make protective advances to cover Urgent Payables on the Projects, its obligation under Section 1(i) to pay Management Fees, and its obligation under Section 1(c) to consummate the Closing did not terminate unless there was a valid Termination Event.

    **Q)**    **The Breach of The Restructuring Agreement**. Lehman ALI breached the terms of the Restructuring Agreement through the following actions or inactions:

    1.    <u>Failure to Pay Urgent Payables</u>. After the Restructuring Agreement was executed, the Lehman Parties insisted that the Relevant SunCal Debtors continue work at the Projects. In reliance upon the Lehman ALI's promise to pay urgent payables, and to have the projects transferred to the Lehman created "Venture Grantees" who would be liable for the "assumed obligations," the Relevant SunCal Debtors continued authorize work on their respective Projects. However, when it came time to pay these expenses, as required under the terms of the Restructuring Agreement, Lehman ALI refused to so, despite written demands by SunCal. An

1  expanded list of total account payables as of the Closing Date for the relevant Projects is set forth

2  in section (G)(1)(a) below.

3  Moreover, Lehman ALI never provided thirty days' written notice of intent to cease

4  payment of the monthly Management Fees. Lehman ALI did purport to terminate the Restructuring

5  Agreement on November 13, 2008. However, as discussed below, the Restructuring Agreement

6  imposed certain requirements for a termination to be valid. Because Lehman ALI's purported

7  termination was invalid, its obligation to pay the monthly Management Fees continued past

8  November 13, 2008, and continues through the present date. SunCal Management and the other

9  SunCal Parties have continued to manage the Projects. All conditions precedent to Lehman ALT

10  paying SunCal Management the monthly Management Fee from May 15, 2008 through at least

11  November 12, 2008, and beyond, were satisfied.

12  "Exhibit D" to the Restructuring Agreement, referenced in Section 1(h) above, listed a

13  total of $580,352 in Monthly Management Fees for ten of the twelve Projects." Subsequent

14  documentation listed a total of $683,383 in Monthly Management Fees for the fifteen Properties at

15  issue that were ultimately subject to the agreement. By Project, the monthly management fees listed in

16  Exhibit D to the Restructuring Agreement were: (1) Acton Estates ($31,396); (2) Beaumont Heights

17  ($53,862); (3) Bickford Ranch ($81,982); (4) Emerald Meadows ($43,593); (5) Heartland ($38,151);

18  (6) Johannson Ranch ($35,868); (7) Marblehead ($111,137); (8) Oak Valley ($42,574); (9) Ritter

19  Ranch ($110,772); and (10) Summit Valley ($31,017). See Exh. 1, at Exh. D.

20  2.  Failure To Proceed With A Closing Under The Settlement Agreement. The

21  Restructuring Agreement was designed to serve as a financial bridge to the implementation –

22  closing – of the transactions described in the Settlement Agreement. One of Lehman ALI's

23  obligations under the Restructuring Agreement was to proceed with the closing of the Settlement

24  Agreement. As more fully explained in the following sections, by failing and refusing to proceed

25  with a closing under the terms of the Settlement Agreement, Lehman ALI-- breached the terms of

26  the Restructuring Agreement. As a result of Lehman ALI's breach, the Projects were never

27  transferred to the Lehman "Venture Grantees" who would be liable for the "assumed obligations"

28  and the "Lender Authorized Work."

|    | |
|----|---|
| 1  | 3.     The Sale of Seven Sold Loans to Fenway Breached The Terms of The |
| 2  | Restructuring Agreement.  In order to perform its obligations under the terms of the Restructuring |
| 3  | Agreement, and to implement the transactions described in the Settlement Agreement, Lehman |
| 4  | ALI had to remain the "Lender with respect to each Loan" as represented in the Restructuring |
| 5  | Agreement.  *See* Restructuring Agreement, Section 1(h).  However, as more fully explained below, |
| 6  | on August 22, 2008, Fenway Capital, as "Buyer," and LCPI, as "Seller," entered into that certain |
| 7  | *Master Repurchase Agreement* (the "Repo"), whereby Fenway Capital purchased all of LCPI's |
| 8  | right, title and interest in the following loans: |

| Loan | Claimant | Alleged Balance |
|------|----------|-----------------|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

(together the "Sold Loans").

When Lehman ALI and LCPI concocted the sale of the Sold Loans under the Repo, which were also governed by the terms of the Restructuring Agreement, they were intentionally breaching their performance obligations under the terms of the Restructuring Agreement.[9] Lehman ALI violated the covenant of good faith and fair dealing by failing to pursue its express obligations in good faith, and by taking action or inaction so as to deprive the Relevant SunCal Debtors of the expected benefits of the agreement.

**R)     The Settlement Agreement**.  One of the exhibits to the Restructuring Agreement is the form of "Settlement Agreement."  The Restructuring Agreement was intended to serve as a bridge to the Settlement Agreement, by providing the SunCal Parties the funds necessary to support themselves until the closing of the Settlement Agreement, on which date the Projects would be transferred to the new Lehman-controlled "Venture Grantees."[10]  The language in the Settlement Agreement makes it clear that this transfer is the final step in the contractual process:

[9] On or about June 22, 2010, Fenway Capital transferred the Sold Loans, and therefore the corresponding claims, to LCPI.  See Docket Nos. 1179 through 1191.
[10] "Venture Grantees" are defined in Recital G of the Settlement Agreement, which itself cross-references Annex 1 of the Settlement Agreement.  The version of Annex 1 appended to the May

> [E]ach Grantor hereby agrees to convey, assign, and transfer to the applicable
> Venture Grantee (and each other Borrower Party agrees to convey, assign and
> transfer to the applicable Venture Grantee all of its respective right, title and
> interest, if any, in and to any of the property described below), and the applicable
> Venture Grantee agrees to accept a conveyance of, on the Closing Date, all of such
> Grantor's (and/or such other Borrower Party's) respective right, title and interest in
> and to [the Conveyance Properties].

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 3, ¶2.

Section 9 of the Settlement Agreement provides, in relevant part: "The closing of the transactions contemplated by this Agreement (the 'Closing') shall take place on the date on which this Agreement is executed (the 'Closing Date')." *The Settlement Agreement and related settlement documents were each executed by all applicable parties on August 25, 2008.* See Cook Declaration, ¶ 41. Although the SunCal parties acquiesced in the Lehman Parties' extension of the closing date to September 30, 2008, this extension did not modify the Lehman Parties' obligation to consummate the Closing upon satisfaction of the Closing Conditions, including the obtaining of the Required Consents. This extension also did not affect Lehman ALI's obligation to pursue in good faith any remaining Required Consents.

In exchange for the Grantors and Borrowers conveying the Projects, the respective Venture Grantees—and LV Pac Point, the Lehman entity designated to by Lehman ALI to be the transferee with respect to the Pacific Point Project—were to assume tens of millions of dollars in certain payment and bond obligations, as described below.

    1.   The Obligations to Pay Assumed and Authorized Amounts. Under Section 14.a of the Settlement Agreement, each of the Venture Grantees were to assume responsibility for (1) Scheduled Assumed Obligations and (2) Lender Authorized Work. Section 14.a. provides, in pertinent part:

---

2008 Restructuring Agreement had placeholders for the name of each Venture Grantee in boldface brackets, e.g., "Acton Estates Venture Grantee," "Beaumont Heights Venture Grantee," etc. In the signature blocks for the Settlement Agreement that were ultimately signed on August 25, 2008, under the heading for "Venture Grantees," for each property (except for Pacific Point, which was treated slightly differently, as discussed below), there was listed a limited liability company with the acronym "SCLV" (for "SunCal-Lehman Venture") followed by the name of the property. Thus, the Venture Grantee for the Acton property was "SCLV Acton Ranch LLC"; for Beaumont Heights, "SCLV Beaumont Heights LLC," etc. Each of these signature blocks was signed by an authorized Lehman representative on behalf of each SCLV entity.

1      At Closing…, each of the Venture Grantees shall assume and be responsible for

2      the payment of (i) those payables and other obligations of the Grantors as

3      described on <u>Schedule 5</u> that relate to such Venture Grantee's Conveyance
     Property… (collectively, the "Scheduled Assumed Obligations"), and (ii) all

4      payables arising from any Lender Authorized Work ("Authorized Assumed
     Obligations" and together with the Scheduled Assumed Obligations, the

5      "Venture Grantee Assumed Obligations").

6 Cook Declaration, Exhibit 2, Settlement Agreement, pg. 12.

7         a.    <u>Scheduled Assumed Obligations</u>. Pursuant to Section 14.a, the

8 "Scheduled Assumed Obligations" are described in Schedule 5 to the Settlement Agreement. The

9 version of Schedule 5 attached to the May 2008 Restructuring Agreement (Cook Declaration,

10 Exhibit 3) listed the following amounts of total accounts payables ("Total AP") for each of the

11 relevant Voluntary Debtors' Projects (along with a description of the amounts owed to each

12 vendor on each Project), totaling over $18 million:

| Project | Total AP |
|---|---|
| Acton | $141,521 |
| Beaumont Heights | $189,052 |
| Bickford | $3,319,114 |
| Emerald Meadows | $2,910,825 |
| Johannson | $69,062 |
| Ritter Ranch | $11,464,998 |
| Summit Valley | $430,669 |
| **TOTAL** | **$18,525,241.00** |

18 When the Scheduled Assumed Obligations for the other Projects are taken into account, the total

19 amount of Scheduled Assumed Obligations was $46,907,019. The additional $28.4 million was

20 comprised as follows:

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $16,835,573 |
| Marblehead—Lender Authorized Work | $1,985,289 |
| Heartland | $3,247,620 |
| Oak Valley | $5,582,297 |
| Northlake | $730,999 |
| **TOTAL** | **$28,381,778.00** |

26 *See* Scheduled 5 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 3). Because

27 the Schedules, Annexes, and Exhibits to the Settlement Agreement are voluminous, totaling many

28 hundreds of pages, only the most pertinent Schedules are attached hereto.

-14-

The August 2008 version of Schedule 5[11] (which reflects adjustments for the settlements that were made after May 2008, as well as the addition of several projects (among other adjustments)) was the most current version as of the time of the execution of the Settlement Agreement. It lists the following amounts of total account payables as of the Closing Date for the relevant Projects (other than Pacific Point) that were to be Assumed Obligations. This figure totals over $9 million after adjustments:

| Project | Total AP |
|---|---|
| Acton | $94,062 |
| Beaumont Heights | $163,709 |
| Bickford | $3,011,191 |
| Del Rio | $1,797,401 |
| Emerald Meadows | $1,451,711 |
| Johannson | $30,526 |
| Joshua Ridge II | $6,156 |
| Ritter Ranch | $2,179,082 |
| Summit Valley | $308,777 |
| Tesoro Burnham | $51,918 |
| **TOTAL** | **$9,094,533.00** |

When the Scheduled Assumed Obligations for the other Projects are taken into account, the Scheduled Assumed Obligations on the updated schedule totals $36,918,153. The additional $27.8 million was comprised as follows:

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $12,334,033 |
| Marblehead—Lender Authorized Work | $224,031 |
| Heartland | $2,910,825 |
| Oak Valley | $4,667,191 |
| Northlake | $346,749 |
| Palm Springs Village | $7,340,791 |
| **TOTAL** | **$27,823,620.00** |

*See* Scheduled 5 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 4).

However, this sum understates the actual figure. The Scheduled Assumed Obligations reflected on the updated Schedule 5 take into consideration reductions resulting from certain settlements that were not paid in some instances. See Cook Declaration.

---

[11] Cook Declaration, Exhibit 4.

1             b.     <u>Lender Authorized Work</u>. As noted above, under Section 14.a of the

2 Settlement Agreement, the "Venture Grantee Assumed Obligations" to be assumed at Closing

3 included not only the Scheduled Assumed Obligations, but also "all payables arising from any

4 Lender Authorized Work ("Authorized Assumed Obligations"). According to the definition in

5 Exhibit A to the Settlement Agreement (at p.5), "Lender Authorized Work" means "work which,

6 as of the Closing Date, has been performed with respect to or for the benefit of any of the

7 Conveyance Properties at the specific direction of or with the authorization of the Lenders and

8 which work is more specifically described on Schedule 17." (Cook Declaration, Exhibit 2,

9 pg. A-5.

10             Schedule 17 did not list particular creditors or dollar amounts owed, as did

11 Schedule 5. Cook Declaration, Exhibit 5 (Schedule 17 to the Settlement Agreement, May 2008),

12 and Exhibit 6 (Schedule 17 to the Settlement Agreement, August2008). Rather, Schedule 17

13 described categories of work that Lehman ALI authorized at the Projects and for which it was

14 bound to pay. For example, in the case of Bickford Ranch, the two categories of Lender

15 Authorized Work listed were: "Construction of the off-site waterline and pump station" and

16 "Mitigation Management and Monitoring of the project, including Oak Tree Mitigation,

17 SWPPP/RWQCB compliance, VELB Habitat, Bat Habitat, and Raptor Nesting."[12] The applicable

18 Lehman parties thus obligated themselves to pay for goods or services that fell within these

19 categories.

20             Schedule 17 was modified between the time of the execution of the Restructuring

21 Agreement in May 2008 and the execution of the Settlement Agreement in August 2008, to

22 account for the Projects that were added to the agreement in the interim, as well as additional

23 categories of work that were authorized.[13] The total value of the Lender Authorized Work which

24 was performed and which the Lehman Parties were obligated to pay for pursuant to Schedule 17 is

25 well into the millions of dollars.

26             2.     <u>The Obligations to Assume Bond Obligations and to Replace or Release</u>

27 <u>Bonds</u>. In addition to assuming the Venture Grantee Assumed Obligations, the Venture Grantees

28

---

[12] *See* Scheduled 17 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 5).
[13] *See* Scheduled 17 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 6).

1    were also to assume certain bond obligations in connection with certain of the Projects.

2    Schedule 12-C to the Settlement Agreement describes the "Payment and Performance Bonds"[14]

3    associated with the Projects subject to the Agreement. For each such Bond, Schedule 12-C

4    delineates: the Project, Bond Number, Carrier, Obligee, Bond Amount, Date of Issue, Tract

5    Number, Description of work covered, and Bond Obligors.[15] Schedule 13 to the Settlement

6    Agreement described the Payment Performance Bonds for which a "Bond Payment Demand" had

7    been made (the "Pre-Closing Designated Payment and Performance Bonds"). For each such Bond

8    for which a Bond Payment Demand had been made, Schedule 13 delineated the Project; Vendor;

9    Date Filed (if applicable); Claim Amount; Case Number (if applicable); Bond Number; and

10   comments regarding case status.

11            The version of Schedule 13 attached to the May 2008 Restructuring Agreement

12   listed $12,622,374.36 in such Bond Payment Demands.[16] These can be grouped by Project, as

13   follows:

| Project | Aggregate Value of Bond Payment Demands on May 2008 Schedule 13 |
|---------|---------------------------------------------------------------|
| Acton | $    11,312.37 |
| Marblehead | $5,686,937.59 |
| Pacific Point | $4,246,595.48 |
| Ritter Ranch | $2,677,528.92 |
| **TOTAL** | **$12,622,374,36** |

18            A subsequent version of Schedule 13 listed Bond Payment Demands as of at least

19   August 2008, which reflected not only new claims, but also claims against Projects that were

20   added to the Restructuring and Settlement Agreement after May 2008.[17] The subsequent

21   documentation shows aggregate Bond Payment Demands totaling at least $22,183,424.22, as

22   follows:

| Project | Aggregate Value of Bond Payment Demands on Updated Schedule 13 |
|---------|---------------------------------------------------------------|
| Bickford | $330,118.00 |
| Del Rio | $627,227.39 |
| Marblehead | $9,547,608.61 |

[14] This term is defined in Section 15.a.(22) to the Settlement Agreement.
[15] *See* Scheduled 12-C to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 7).
[16] *See* Scheduled 13 to the Settlement Agreement, May 2008 (Exhibit 9).
[17] *See* Scheduled 13 to the Settlement Agreement, August 2008 (Exhibit 10).

| Project | Aggregate Value of Bond Payment Demands on Updated **Schedule 13** |
|---|---|
| Oak Valley | $196,922.91 |
| Pacific Point | $4,742,040.39 |
| Palm Springs Village | $3,524,406.54 |
| Ritter Ranch | $3,215,100.38 |
| **TOTAL** | **$22,183,424.22** |

The amounts of bond payment demands on the Marblehead, Ritter Ranch and Pacific Point Projects have increased further beyond these figures because of additional work performed on these Projects by reason of called bonds. The Settlement Agreement contemplated that additional Bond Payment Demands could be made on Payment Performance Bonds post-closing, and referred to Bonds where such demands were made as "Post-Closing Designated Payment and Performance Bonds." (See Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). The Venture Grantees (and the Pac Point Transferee, discussed below) would attempt to litigate and/or resolve the Bond Payment Demands. *See id.*

Section 16.c of the Settlement Agreement provided that the Venture Grantees and Pac Point Transferee (i.e., LV Pacific Point), collectively, would be obligated to pay up to $12,622,374.36 with respect to the payment of claims arising under Pre-Closing Designated Payment and Performance Bonds, and up to $2,377,625.64 with respect to the payment of claims arising under Post-Closing Designated Payment and Performance Bonds (collectively, the "Assumed Bond Obligations"). (Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). Thus, the Venture Grantees and Pac Point Transferee agreed to pay up to a total of at least $15 million in connection with payments under Bond Payment Demands.

Further, Section 14.g. provided that if a Venture Grantee (or LV Pac Point, the transferee of the Pacific Point Project) decides to proceed with development of a Project post-closing, it shall use commercially reasonable efforts to replace and cause to be released existing bonds issued in connection with such Project for such development work, and shall indemnify and hold harmless the applicable Bond Obligor for claims or losses prior to such release. (PAMI also had an indemnification obligation if claims arose when such release was not obtained). Pending such work, the Venture Grantees and LV Pac Point were obligated to pay the premiums on all Payment and Performance Bonds.

Specifically, Section 14.g. of the Settlement Agreement provided, in pertinent part:

> If, and to the extent that, any Venture Grantee or the Pac Point Transferee desires, at its sole option and in its sole and absolute discretion, to proceed with the development of its Property in a material manner after the date of this Agreement ("Material Development Work"), such Venture Grantee or Pac Point Transferee, as applicable, shall use commercially reasonable efforts to replace and cause to be released each existing Payment and Performance Bond issued with respect to such Property that relates to or secures the Material Development Work to be undertaken and shall indemnify and hold the applicable Bond Obligor thereunder harmless from and against any claims or losses incurred by such Bond Obligor in respect of such Payment and Performance Bond until such time as such Payment and Performance Bond has been replaced and released. To the extent that a Venture Grantee or the Pac Point Transferee, undertakes or causes work to be performed on its Property after the date of this Agreement and as a result of such work, liability is created or arises under any existing Payment and Performance Bond, such Venture Grantee or Pac Point Transferee, as applicable, and PAMI LLC shall, jointly and severally, indemnify and hold harmless any applicable Bond Obligor from any liability with respect to, and to the extent of, the work so undertaken. Unless and until Material Development Work is undertaken with respect to a Property, … the applicable Venture Grantee or Pac Point Transferee, as applicable, shall pay the premiums for the maintenance of such Payment and Performance Bonds… .

Cook Declaration, Exhibit 2, pg. 16, Section 14.g.

3.    Pacific Point Obligations.   The transactions contemplated by the Restructuring and Settlement Agreement were configured differently for the Pacific Point project than they were for the remaining Projects. For Pacific Point, however, title would be transferred to Lehman ALI (or its designated transferee, LV Pac Point) pursuant to a nonjudicial foreclosure process. However, the Lehman parties' obligation to cover the payables and bond obligations was similarly structured.

Under Section 14.b of the Settlement Agreement, the "Pac Point Transferee," i.e., LV Pac Point, was to assume (1) approximately $4 million in "Bonded Pac Point Payable Obligations" and (2) approximately $3.7 million in "Other Pac Point Payable Obligations."

Schedules 4-A and 4-B provided detailed information about the bonded and other obligations to be assumed in connection with Pacific Point. Schedule 4-A to the Settlement Agreement delineates, by individual vendor and claim amount, the Bonded Pac Point Payable Obligations totaling $3,956,693.30.25 Schedule 4-B to the Settlement Agreement delineates, by

1 individual vendor and claim amount, the Other Pac Point Payable Obligations totaling $3,688,011.

2 See Cook Declaration, Exhibits 11 through 14.

3          Moreover, as discussed above, pursuant to Section 14.a. of the Settlement

4 Agreement, the entities taking title to the properties at closing were also to pay for "all payables

5 arising from any Lender Authorized Work" on the respective properties. Schedule 17 to the

6 agreement lists various categories of "Lender Authorized Work" relating to, among other Projects,

7 the Pacific Point Project for which the Pac Point Transferee would be liable.

8          In negotiating the Settlement Agreement, the parties agreed that the Lehman Parties

9 would provide a creditworthy indemnitor that would back the Lehman Parties' payment

10 obligations thereunder. Under Section 17.h. of the Settlement Agreement, the Venture Grantees

11 and the "Lehman Indemnitor"—i.e., PAMI - to be jointly and severally liable to indemnify the

12 applicable Debtor for, among other things, the failure of any Venture Grantee or other Lehman

13 Party to pay or otherwise satisfy or settle any of the Assumed Obligations, which include each of

14 the payment obligations under the Settlement Agreement discussed above.

15          Thus, to the extent that the Venture Grantees failed to pay any of the bonded or

16 non-bonded assumed obligations, and to the extent that LV Pac Point, as the Pacific Point

17 Transferee, failed to cover the bonded or non-bonded Pac Point Payables, PAMI is liable to pay

18 those amounts.  Section 14.g. provided that if a Venture Grantee or LV Pac Point, the transferee of

19 the Pacific Point Project, decides to proceed with development of a Project post-closing, they shall

20 replace and cause to be released existing payment and performance bonds, and shall indemnify

21 and hold harmless the Bond Obligors for claims or losses prior to such release.

22      **S.    The Breaches of The Settlement Agreement.**  In addition to the breaches of the

23 Restructuring Agreement discussed above, Lehman ALI breached the Settlement Agreement

24 through the following actions and failure to perform.

25          1)      Lehman ALI Attempted  To Repudiate The Settlement Agreement. As the

26 Declaration of Bruce Cook confirms, Lehman ALI not only failed to perform under the terms of

27 the Settlement Agreement, it affirmatively repudiated the same on November 13, 2008, after

28 written demands for performance.  Lehman ALI's affirmative repudiation occurred after the

1   Relevant SunCal Debtors began filing for bankruptcy, which were precipitated by the Lehman

2   Parties' failure to fulfill their funding obligations (Cook Decl., ¶¶ 59 ).  As to the Relevant SunCal

3   Debtors who had already filed for bankruptcy, the attempted repudiation was ineffective as a

4   violation of the automatic stay.  As to the Relevant SunCal Debtors who had not yet filed their

5   bankruptcies, the purported repudiation was also ineffective, as Lehman ALI had already

6   defaulted, and such Debtors were ready to perform and thus were not in default.

7           2)      The Sale of The Sold Loans Repudiated The Settlement Agreement. At

8   some point on or before August 22, 2008, Lehman ALI transferred all of its right, title and interest

9   in the Sold Loans (i.e., the PSV Loan, the Delta Coves Loan and the Marblehead/Heartland Loan)

10  to LCPI.  Similarly other Lehman affiliates (OVC Holdings and Northlake Holdings) transferred

11  their right, title and interest in the other Sold Loan to LCPI.  LCPI originally held title to the

12  SunCal Communities I Loan and the Ritter Ranch Loan.  Thus, as a result of the transfers from

13  Lehman ALI, OVC Holdings and Northlake Holdings, LCPI held title to all seven Sold Loans.

14  Pursuant to the Repo, LCPI transferred all of its right, title and interest in all of the Sold Loans to

15  Fenway Capital on August 22, 2008.  See RJN, Exhibits 13 and 14.

16          After the Sold Loans were transferred, LCPI and Lehman ALI lacked the power to

17  make the agreed upon changes to this loan that were specifically provided for and mandated by the

18  terms of the Settlement Agreement.  Although LCPI was not a signatory to the May Restructuring

19  Agreement, LCPI was a signatory (along with Lehman ALI, OVC Holdings, and Northlake

20  Holdings) to the Settlement Agreement.  Accordingly, when the Lehman Parties executed the

21  Settlement Agreement on August 25, 2008, three days after the foregoing sale of the Sold Loans

22  they knew that they could not perform its obligations thereunder.

23          In Recital B to the Settlement Agreement, which the Lehman Parties executed on

24  August 25, 2008, the Lehman Parties states:

25      Each of the respective entities identified as "Lenders" on Annex 2 attached hereto
        (each, a "Lender" and collectively, the "Lenders") is the owner and holder, or
26      arranger, of the respective loan or loans more particularly described on Annex 2
        (each, a "Loan" and collectively, the "Loans").
27

28

1  Cook Declaration, Exhibit 2, Settlement Agreement, pg. 1, Recital B. The Lehman Parties

2  represented that they were the owners and holders of the Sold Loans, which in fact was a false

3  statement, since these loans were transferred to LCPI and then re-sold to Fenway Capital, no later

4  than August 22, 2008, three days earlier.

5           In sum, when Lehman ALI executed the Settlement Agreement on August 25, 2008,

6  Lehman ALI did not own any of the Sold Loans referenced therein and it knew that this sale

7  deprived it of the ability to perform the obligations thereunder. Performance was an objective

8  impossibility.[18]

9           3)      Covenant Not To Sue. The exhibits to the Settlement Agreement included a

10 Covenant Not to Sue, which provided that the lenders would not seek to enforce the rights against

11 the SunCal Borrowers, Guarantors and Pledgors, with respect to: "amounts owing pursuant to the

12 Note, the Loan Agreement or the Loan or obligations or liabilities arising under the Deed of Trust,

13 Pledge Agreement, Completion Guaranty, Limited Guaranty or the other Loan" if the Relevant

14 SunCal Parties performed their obligations under the Settlement Agreement. See Cook

15 Declaration, Exhibit 15. If the Lehman Parties had not prevented the closing and consummation of

16 the Settlement Agreement, the Relevant SunCal Debtors would have been wholly exonerated from

17 their obligations under the applicable Lehman Claims.

18          4)      Lehman Parties Acquire the Pacific Point Project Without Payment. LV Pac

19 Point foreclosed on Pacific Point on August 28, 2008—three days after the Settlement Agreement

20 was signed—and acquired the property pursuant to a non-judicial foreclosure sale. Title was thus

21 transferred from SJD Partners to LV Pac Point, and so the Lehman parties obtained the property as

22 contemplated.

23          Lehman ALI, SJD Partners and the City of San Juan Capistrano even entered into

24 an estoppel certificate—at Lehman ALI's request—on August 26, 2008, two days before the

---

25 [18] To the extent that any of the Lehman Parties contends that they had the ability to comply with

26 their obligations under the terms of the Settlement Agreement on August 25, 2008, this
   representation is demonstrably false. A party cannot modify the terms of loan that it does not own

27 and unwinding the sale prior to the extended closing date was not a viable prospect. To the
   contrary, the Lehman Parties affirmatively represented to the New York Bankruptcy that it took

28 them over a year to persuade JP Morgan to release its lien on the commercial paper issuance,
   which was necessary to secure the release of the collateral securing this issuance – the Sold Loans.

1   foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pac Point]

2   shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]"

3   under SJD Partners' agreements with the City. That certificate further provided that there existed

4   no breaches, defaults or claims under SJD Partners' agreements with the City. Yet demands have

5   been made by the City and/or other creditors—even after the estoppel was signed—against SJD

6   Partners, and its bond companies, because of LV Pac Point's failure to fulfill its assumption and

7   payment obligations.

8          Nevertheless, LV Pac Point has not performed any of its Pacific Point obligations.

9   Nor has PAMI performed any of its Pacific Point indemnity obligations. The SunCal Parties

10  related to the project, SJD Partners and its parent, SJD Development, filed for bankruptcy in

11  November 2008 as a result of the Lehman parties' failure to perform. These Debtors remain

12  exposed to millions of dollars in bond and non-bonded liability to third parties due to LV Pac

13  Point's failure to fulfill its payment obligations and PAMI's failure to fulfill its indemnity

14  obligations.

15          **T.      Damages From the Breach of the Settlement Agreement**. As of September 30,

16  2008, Lehman ALI was bound to pay the "urgent payables" and monthly Management Fees, as

17  well as to cause the closing transferring the Projects to new Lehman entities (Venture Grantees),

18  who would assume the unpaid vendor claims incurred at respective Projects, assume the bond

19  liabilities associated with each respective Projects. Had the Lehman Parties performed these

20  contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the

21  instant Chapter 11 cases would have been unnecessary.

22          As a result of the Lehman Parties' failure to pay urgent payables, failure to proceed and

23  cause its affiliates to proceed to closing, and repudiation of the agreements, the Relevant SunCal

24  Debtors had no choice but to file their respective petitions for protection under Chapter 11 of the

25  Bankruptcy Code. This was the very result sought to be avoided by the Restructuring Agreement

26  and Settlement Agreement. Thus, the breaches of the Lehman Parties not only resulted in non-

27  payment of all obligations to be assumed, but they caused the bankruptcies themselves. Thus, the

28  damages incurred by the Relevant SunCal Debtors from the breaches of the Settlement Agreement

1  are all claims and costs incurred relating to their Projects since September 30, 2008. This would

2  include all costs associated with the maintenance and preservation of the Projects since this date,

3  and all costs incurred in this Chapter 11 effort, which was compelled by the Lehman Parties'

4  breach of both the Restructuring Agreement and the Settlement Agreement.

**III.**

**ARGUMENT**

**A.    Lehman ALI Breached The Terms of the Restructuring Agreement.**

Lehman ALI breached the terms of the Restructuring Agreement by failing and then
refusing to pay the Urgent Payables and by repudiating the Settlement Agreement. *See Q Mgmt. v.
Snake River Equip. Co.*, CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008) ("A
breach of contract is non-performance of any contractual duty of immediate performance.");
*Minidoka Irrigation Dist. v. Dep't of the Interior*, 154 F.3d 924, 927 (9th Cir.1998) (anticipatory
repudiation occurs when "the act make[s] the promisor's performance impossible") (internal
quotations and citation omitted); *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29, 142
P.2d 22, 27 (1943) ("It follows that where there has been a partial breach by the promisor
accompanied or followed by a repudiation of the contract by the promisor, the breach is total.").

The Voluntary Debtors, Acquisition Inc., Acquisitions, SunCal Management and Bruce
Elieff filed a complaint with the Orange County Superior Court on March 24, 2011, against
Lehman ALI, LV Pacific Point, PAMI, and other Lehman Parties (none of whom are parties in the
instant proceedings) for breach of contract and breach of the covenant of good faith and fair
dealing. See RJN, Exhibit 16.

**B.    The Debtor is Entitled to Recoup its Damages Against the Secured Portion of
the Lehman Claims.**

In *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996), the Ninth
Circuit explained the right of recoupment, which is an affirmative defense under California law, as
follows:

> [R]recoupment "is the setting up of a demand arising from the *same transaction* as
> the plaintiff's claim or cause of action, strictly for the purpose of abatement or
> reduction of such claim." *Collier* ¶ 553.03, at 553-15 (emphasis in original). Under

recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.' " *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986) (citations omitted). For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses. *See, e.g., In re California Canners and Growers*, 62 B.R. 18, 22 (9th Cir. BAP 1986) (Elliott, Bankruptcy J., concurring) (citation omitted).

*Newbury*, 95 F. 3d at 1399. Here, the Debtor is setting up a demand or counter-demand in response to Claim 65 "strictly for the purpose of abatement or reduction of such claim." *Id.* This is also a case where the demand being set up arises from the "same transaction or occurrence." *Id.*

The *Newbery* case provided dispositive guidance on the "same transaction and occurrence" issue. In *Newbery*, Newbery, an electrical contractor, failed to complete a series of projects that were the subject of completion bonds issued by Firemans Fund Insurance ("Firemans"). Pursuant to this bonding arrangement, Newbery had executed an indemnity agreement indemnifying Firemans from any damages resulting from a failure to complete the projects.

After Newbery's default and Chapter 11 filing, Newbery, Firemans and Citibank, a secured creditor holding a lien on the unfinished projects, entered into a settlement agreement. This agreement allowed Firemans to takeover and complete the projects, using a new contractor, and it allowed the new contractor to use the Newbery equipment at the project sites. As part of this agreement, Firemans was required to pay rent for its use of Newbery's equipment to Citibank. Pursuant to the foregoing settlement, Firemans and the new contractor completed the projects. However, Firemans failed to pay the agreed upon rent for the use of Newbery equipment to Citibank.

Later, Citibank and Newbery engaged in litigation over Citibank's claim in Newbery's Chapter 11 case. This litigation resulted in a settlement pursuant to which Citibank assigned to Newbery the claim that it held against Firemans for the unpaid rent. Newbery (as the debtor) then asserted this rent claim against Firemans in the Chapter 11 proceeding. In response to the Newbury's claim, Firemans asserted the damages that it had incurred under the bond indemnity agreement against Newbery debtor, relying upon recoupment and offset theories. The District Court granted summary judgment in favor of Firemans on both defenses.

Newbery and Citibank then appealed this ruling, arguing that the claim for unpaid rent assigned by Citibank to Newbery did not arise from the same transaction or occurrence as the

damages recoverable by Firemans under the indemnity agreement with Newbery. The Ninth

Circuit rejected this argument:

> In deciding whether the relevant claims arose from the same transaction, the district court applied the "logical relationship" test outlined by the Supreme Court in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). In *Moore,* the Court stated that "'[t]ransaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Id.,* 270 U.S. at 610, 46 S.Ct. at 371; *see also Albright v. Gates,* 362 F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that the term gets an increasingly liberal construction."). Applying this test, the district court accepted Fireman's Fund's argument that, because of the incorporation of the General Indemnity Agreement into the June 4, 1987 Agreement, both claims arose from the latter agreement.

95 F. 3d at 1402; *see also, In re TLC Hospitals, Inc.,* 224 F.3d 1008, 1012 (9th Cir. 2000) ("We

have held that the crucial factor in determining whether two events are part of the same

transaction is the "logical relationship" between the two. *Newbery Corp. v. Fireman's Fund Ins.*

*Co.,* 95 F.3d 1392, 1403 (9th Cir.1996) (resolving a dispute between a contractor and its surety).

Thus, a "transaction" may include "a series of many occurrences, depending not so much upon

the immediateness of their connection as upon their logical relationship." *Moore v. New York*

*Cotton Exch.,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926).").

Here, the claims and the bases for the objections thereto clearly arise out of the "same

transaction." The Lehman Claims are all purported secured claims based on Loan Agreements

and related guaranty agreements and/or security agreements involving the Projects as collateral.

The Restructuring Agreement and the Settlement Agreement, on which the current objections are

based, contemplated "friendly" foreclosures whereby Lehman ALI or its designee (the Venture

Grantees) would take title to the Projects and pay the claims of the applicable creditors, and

would agree not to sue on the very obligations that form the basis of their Claims. The respective

Loan Agreements, Restructuring Agreement and the Settlement Agreement all arise out of a

common series of transactions that clearly bear a "logical relationship" for the purposes of

recoupment. See e.g., *In re Thompson,* 350 B.R. 842 (Bankr.E.D.Wis. 2006) (debtor's claims

originated out of mortgage loan satisfied "same transaction" requirement of recoupment doctrine

against lender).

1    **C.     LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses**.

2         LCPI acquired title to the Sold Loans with full knowledge of the defenses held by the

3    Relevant SunCal Debtors. In fact, LCPI's desire to stay the pursuit of these and other defenses in

4    the form of the equitable subordination adversary action was one of the reasons why it

5    repurchased this loan.[19]

6         As this Court is aware, on October 2, 2009, the Court entered formal findings that the

7    transfer of Sold Loans by LCPI to Fenway Capital to pursuant to the Repo was a true sale, rather

8    than a security device. *See* Docket Nos. 652 and 653 attached to the RJN, Exhibits 14 and 15.

9    Thereafter, under the guise of a "compromise," LCPI and Fenway agreed that Fenway would sell

10   the loans to LCPI--even those loans previously held by Lehman ALI.   LCPI filed a motion with

11   the New York Bankruptcy Court seeking approval of this transaction, characterized as a

12   "Compromise Motion". LBHI Docket No. 7831. The Debtors filed a limited opposition to the

13   extent the transaction would impose LCPI's stay against the pending adversary action, Adversary

14   No. 8:09-ap-01005-ES ("Lehman Adversary Proceeding"). LBHI Docket No. 8105. In its Reply,

15   LCPI was clear that the transaction would result in the Sold Loans being subject to its automatic

16   stay. *See* LBHI Docket No. 8260 at p.13 ¶ 25 ("LCPI's automatic stay will attach to the property it

17   receives as part of the Transaction as a matter of law, regardless of LCPI's intent."). The Debtors

18   also filed a motion for relief from the automatic stay as to both LCPI and LBHI. LBHI Docket No.

19   8539. Immediately after the New York Bankruptcy Court's approved the "compromise", LCPI's

20   counsel filed a Supplement to Unilateral Status Report ("Lehman Status Report") representing that

21   the Lehman Adversary Proceeding has been affirmatively stayed by the approval of the

22   compromise. Adv. Docket No. 290. As set forth above, on or about June 22, 2010, Fenway

23   transferred the Sold Loans, and therefore the corresponding claims, to LCPI,[20] even though most of

24

25

26   [19] The affirmative defenses raised herein are being raised through a claim objection. This does not
     violate LCPI's stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004);

27   *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-
     639 (Bankr.S.D.N.Y. 2003).

28   [20] See *Notices and Evidence of Transfer by Fenway Capital, LLC of Claim* filed on June 22, 2010
     as Docket Nos. 1179 through 1191.

1    the Sold Loans were not originally held by LCPI, but rather by non-bankrupt Lehman Parties, such

2    as Lehman ALI, OVC Holdings and Northlake Holdings.

3         Accordingly, at the time of its acquisition, LCPI was not only aware of the Relevant

4    SunCal Debtors' defenses to the Sold Loans, LCPI's affirmatively acquired the loans in order to

5    invoke its stay over the Sold Loans and the Lehman Adversary Proceeding. A debtor's post-

6    petition acquisition of a distressed asset, for the purpose of invoking its automatic stay, is an abuse

7    of process, and therefore is not in good faith. In *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga.

8    1984), 14 months prior to the petition date, the debtor transferred certain real property to a third

9    party. Subsequently, the property was subject to a foreclosure proceeding. The debtor filed for

10   bankruptcy, and less than two months later, the third party transferred the real property to the

11   debtor. The debtor contended that the pending foreclosure was stayed, since the real property had

12   become property of the estate. The court disagreed, and observed that an attempt to "shield a

13   property interest under the automatic stay by conveying the property interest to" the debtor's estate

14   during the pendency of the bankruptcy "*would be an abuse of the bankruptcy process.*" *Brannan*,

15   40 B.R. at 24-25 (emphasis added). Accordingly, LCPI's post-petition acquisition of the Sold

16   Loans for the purposes of invoking its automatic stay over the Sold Loans and the Lehman

17   Adversary Proceeding, was an abuse of process.

18        Under these facts, Lehman Claims are subject to any and all defenses held by the Relevant

19   SunCal Debtors, including the affirmative defenses raised herein. *See Fiberchem, Inc. v. General*

20   *Plastics Corp.*, 495 F.2d 737 (9th Cir.1974) (an assignee with knowledge of the equities of a third

21   party against the assigned right takes his claim subject to those equities); *Hammelburger v.*

22   *Foursome Inn Corp.*, 54 N.Y.2d 580, 588, 431 N.E.2d 278, 283 (1981) ("An assignee who takes

23   with knowledge can no more enforce the mortgage, whether as to principal or interest, than could

24   the usurer. Knowledge by the assignee of the usurious nature of the transaction will, therefore,

25   defeat an estoppel claim. See also *In re Snyder*, 436 B.R. 81, 90 (Bankr.C.D.Ill. 2010) ("As a

26   general rule, the purchaser of a claim against a debtor in bankruptcy steps into the shoes of the

27   claim seller, enjoying the same benefits, but suffering the same limitations of the claim, as a

28   successor in interest to the seller's position. An assignee of a claim may not receive more than the

1   assignor would have been entitled to without the assignment since an assignment operates to

2   transfer no greater right or interest than was possessed by the assignor.")

3       **D.   The SunCal Debtors Are Entitled To Offset Their Damages - Against Lehman**

4   **ALI's Claims Only.**

5       The relevant SunCal Debtors have the right offset their claims against Lehman ALI,

6   against any claims asserted by Lehman ALI against their assets. Section 431.70 of the California

7   Code of Civil Procedure provides in relevant part:

8       Where cross-demands for money have existed between persons at any point in
9       time when neither demand was barred by the statute of limitations, and an action
        is thereafter commenced by one such person, the other person may assert in the
10      answer the defense of payment in that the two demands are compensated so far
        as they equal each other, notwithstanding that an independent action asserting the
11      person's claim would at the time of filing the answer be barred by the statute of
        limitations. If the cross-demand would otherwise be barred by the statute of
12      limitations, the relief accorded under this section shall not exceed the value of
13      the relief granted to the other party. The defense provided by this section is not
        available if the cross-demand is barred for failure to assert it in a prior action
14      under Section 426.30. Neither person can be deprived of the benefits of this
        section by the assignment or death of the other. For the purposes of this section, a
15      money judgment is a "demand for money" and, as applied to a money judgment,
        the demand is barred by the statute of limitations when enforcement of the
16      judgment is barred under Chapter 3 (commencing with Section 683.010) of
17      Division 1 of Title 9.

18  Cal. Code of Civ. Proc. 431.70.

19      Although Section 431.70 sets forth California's current statutory setoff provision, this

20  source of authority is not exclusive. The defense of setoff under California law "emanates from

21  'the established principle *in equity* that either party to a transaction involving mutual debts and

22  credits can strike a balance, holding himself owing or entitled only to the net difference... ." *Del*

23  *Charro Properties, L.P. v. Heron*, H025571, 2004 WL 1616016 (Cal.App. July 20, 2004). Code

24  of Civil Procedure section 431.70 "does not create a substantive right to raise setoff as a defense to

25  a claim for monetary relief, but merely describes the procedures to be followed in raising this

26  defense. [Citations.]" *Granberry v. Islay Investments* 9 Cal.4th 738, 744 (1995). Setoff is allowed

27  under California law where the parties have mutual debts and they are due to each party in the

28

1  same capacity. *See Coffman v. Cobra Mfg. Co.*, 242 F.2d 754 (9th Cir. 1954). On the facts these

2  elements are clearly satisfied.

3       California law also allows the debtor the right to decide what claims to offset against a

4  where the debtor faces a range of claims asserted by the creditor party. *Margott v. Gem Properties,*

5  *Inc.,* 34 Cal. App. 3d 849, 855 (1973) ("Precedential expression of general rules, however,

6  strongly indicates that it is the judgment debtor and not the judgment creditor who has the right to

7  choose which of several claims possessed by the judgment debtor against the judgment creditor

8  should be offset. Offset is expressed as a right of the judgment debtor."); *see also Harrison v.*

9  *Adams*, 20 Cal. 2d 646, 648-49 (1942) ("Concerning the rights of the appellant to the money on

10  deposit as against the assignee of the judgment for a valuable consideration, it is well settled that a

11  court of equity will compel a set-off when mutual demands are held under such circumstances that

12  one of them should be applied against the other and only the balance recovered. The insolvency of

13  the party against whom the relief is sought affords sufficient ground for invoking this equitable

14  principle."); *In re Parker*, 80 B.R. 729, 732 (Bankr. E.D. Pa. 1987) ("Thus, we will reduce the

15  Mortgagee's "claim" for arrearages to $6,888.53 and the secured portion of its total debt to

16  $19,350.00.).

17      **E.**     **Allowing The Lehman Claims Would Unjustly Enrich The Lehman Entities**.

18       Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and

19  (2) the unjust retention of the benefit at the expense of another. *Shum v. Intel Corp.,* 630 F. Supp.

20  2d 1063, 1073 (N.D. Cal. 2009) *aff'd,* 633 F.3d 1067 (Fed. Cir. 2010); *Peterson v. Cellco P'ship,*

21  164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008). In this case, the Lehman Entities

22  induced the SunCal Debtors to incur debt solely for the benefit of the Lehman Entities, via

23  promises of paying for certain obligations, and then the Lehman Entities refused to pay these

24  obligations. However, the Lehman Entities now come to this Court seeking 1) to have their claims

25  validated in the full amount, and 2) the right to use these claims as basis for foreclosing on the

26  very projects that were improved by the debts that they failed to pay in the first instance.

27  Validating the Lehman Claims would clearly convey an unjust windfall on these claimants.

28  Accordingly, these claims should not be allowed.

**F.      The Lehman Entities Cannot Profit From Their Own Wrongs (Unclean Hands).**

"It is elementary that one party cannot compel another to perform while he himself is in default under the contract." *Rathbun v. Sec. Mfg. Co.*, 82 Cal. App. 793, 796 (1927); see also, *Robinson, on behalf of C. & R. Transfer, v. Boulevard Express*, 17 Cal. App. 2d 492, 495 (1936) ("A party cannot recover damages for the breach of an entire contract if he himself has failed, without lawful cause, to perform the covenants, upon compliance with which the obligations of the defendant were dependent."); *Lewis Pub. Co. v. Henderson* 103 Cal. App. 425, 429 (1930) ("Therefore, in the present case, plaintiff having failed to prove, as alleged in its complaint, that it had performed its part of the contract, was not entitled to enforce its terms against the other party thereto"). It is also well established that "[o]ne who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." 3A Corbin, Contracts § 767, at 540 (1960). Stated more succinctly, a claimant will not be allowed to profit from his or her own wrongdoing. *See Restatement of Restitution* § 3 (1937) ("A person is not permitted to profit by his own wrong at the expense of another."); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1092 (9th Cir. 2003) ("A court of equity will not permit a person to profit by his own breach of contract and to benefit by his own wrong.").

Here, the Lehman Entities, *inter alia*, breached the terms of the Restructuring Agreement and Settlement Agreement, which are an integral part of the loan contracts that they are now seeking to enforce. These breaches left the SunCal Debtors owing millions in unpaid liabilities, which ultimately drove them into Chapter 11. Now, the Lehman Entities – the parties that participated in this breach as primary wrongdoers - come to this court seeking to profit from Lehman ALI's wrongs. This position is untenable. *Id. see also Highland Tank & Mfg. Co. v. PS Intern. Inc.*, 393 F.Supp.2d 348, 361 (W.D.Pa.2005) ("No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."); *see also Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959) ("The doctrine (of unclean hands) is confessedly derived from the

1  unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief

2  to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities

3  of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant

4  who invokes it need not be damaged, and the court may even raise it sua sponte."). The Lehman

5  Entities should be barred from seeking any relief against the Voluntary Debtors with respect to the

6  Lehman Claims until they have cured the taint of unclean hands by remedying their wrongs.

7        **G.    The Imposition Of A Constructive Trust Is Justified – Against Lehman ALI**

8  **Only.**

9        Section 2224 of the California Civil Code states that '[o]ne who gains a thing by fraud,

10  accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or

11  she has some other and better right thereto, an involuntary trustee of the thing gained, for the

12  benefit of the person who would otherwise have had it." A constructive trust may be imposed

13  pursuant to this section if the following three conditions are satisfied: (1) the existence of a *res*

14  (property or some interest in property); (2) the *right* of a complaining party to that res; and (3)

15  some *wrongful* acquisition or detention of the res by another party who is not entitled to it.

16  [Citations.]" *Communist Party v. Valencia, Inc.* 35 Cal.App.4th 980, 990 (1995); *Campbell v.*

17  *Superior Court*, 132 Cal. App. 4th 904, 920 (2005).

18        In this case, Lehman ALI directed the Voluntary Debtors to continue to employ vendors to

19  improve the Projects prior to their transfer to the Lehman controlled entities. The Voluntary

20  Debtors incurred these debts, and Projects were improved by the services and materials provided

21  by the various vendors, in reliance on this promise. Now, Lehman ALI seeks to foreclose upon the

22  Projects and to retain the benefits of the work and services provided to the Projects, without

23  paying for the same. A constructive trust should be imposed upon the proceeds generated from the

24  sale of the Projects to the extent of the damages incurred by the relevant SunCal Debtors through

25  Lehman ALI's breach of its obligations under the terms of the Restructuring Agreement and the

26  Settlement Agreement.

27

28

**H.**     **The Imposition Of An Equitable Lien Is Justified – Against Lehman ALI Only.**

Equity permits imposition of an equitable lien where the claimant's expenditure has benefited another's property under circumstances entitling the claimant to restitution. *Jones v. Sacramento Sav. & Loan Ass'n*, 248 Cal. App. 2d 522, 530 (1967); *McColgan v. Bank of California Assn.*, 208 Cal. 329, 338 (1929); 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1235, pp. 696—699; 3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67. Such relief has been granted where a lender advances money which benefits the land of another in mistaken reliance upon an imperfect mortgage or lien upon that land. *Estate of Pitts*, 218 Cal. 184, 189 (1933); *Smith v. Anglo-California Trust Co.*, 205 Cal. 496, 502-504 (1928). It is particularly likely that an equitable lien will be recognized when "money has been borrowed or other obligation incurred on the faith of it." *Destro v. Stuhley,* 675 F.2d 1037, 1039 (9th Cir.1981).

In this case, Lehman ALI induced the SunCal Debtors to continue to incur debts in the form of vendor obligations for improvements to the Projects. The SunCal Debtors incurred these debts, and the Projects were improved thereby, in express reliance upon Lehman ALI's promises of payment. Thereafter, Lehman ALI's failed to honor these promises, which left the SunCal Debtors owing tens of millions to the unpaid vendors. Notwithstanding this conduct, Lehman ALI seeks to enforce the very contracts that it breached, by foreclosing on the improved Projects. This injustice should not be allowed to occur. The Court should impose an equitable lien on all of the Projects subject to Lehman ALI's liens that is senior to Lehman ALI's liens. This equitable lien will then secure the damages incurred through Lehman ALI's breach of the Restructuring Agreement and the Settlement Agreement.

**I.**     **LCPI's Automatic Stay Does Not Apply to an Objection to Claim.**

While the parties have previously litigated as to whether LCPI's automatic stay is applicable to the equitable subordination cause of action in the Lehman Adversary Action, it is well established in both the Ninth Circuit and Second Circuit that a creditor's stay is not applicable to a claim objection proceeding. Where there are two independent bankruptcy estates in which one estate asserts a claim against the other, an objection to claim does not violate the claimant's

1   automatic stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re*

2   *Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639

3   (Bankr.S.D.N.Y. 2003); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

4            In *Wheatfield Business Park*, 308 B.R. 463 (9th Cir. BAP 2004), the Bankruptcy

5   Appellate Panel held that the creditor's automatic stay did not apply to an objection to its claim,

6   as the creditor was effectively acting in the capacity of a plaintiff, to whom the stay does not

7   apply.  The subsequent BAP decision in *In re Palmdale Hills Property, LLC*, 423 B.R. 655, 665

8   (9th Cir.BAP 2009), cited the *Wheatfield Business Park* and *Financial News Network* decisions

9   with approval for the proposition that claim objections do not violate the stay of a debtor-

10  claimant.

11           The law in the Second Circuit is substantially identical.  In *In re Financial News Network*,

12  158 B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the

13  Southern District of California, filed a claim in Financial News Network's Chapter 11 case in the

14  Southern District of New York.  When Kaypro's claim was disallowed by the bankruptcy court in

15  New York, Kaypro appealed contending that this relief was barred by its automatic stay in

16  California. The District Court rejected this position, stating "both the language and purpose of

17  section 362 indicate that the automatic stay in effect in the Bankruptcy Court for the Southern

18  District of California did not preclude the New York Bankruptcy Court from sustaining [NY

19  debtor's] objection to [California debtor's] proof of claim filed in New York Bankruptcy Court."

20  *Financial News*, 158 B.R. at 573.  See also *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d

21  513, 516 (2d Cir. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 499 (E.D.N.Y.

22  1998) ("the primary claims raised by [debtor] are claims asserted by, and not against, the debtor,

23  and are therefore not subject to the stay and can be immediately adjudicated."); *In re Bousa, Inc.*,

24  2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the

25  claim, the automatic stay provision does not preclude adjudication.").

26           Further, it is well established in this Circuit that the automatic stay does not apply to the

27  assertion of recoupment. See *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1400 (9th

28  Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1014 (9th Cir. 2000); *In re Palmdale Hills*

Case 08-13555-mkv   Doc 17206-1   Filed 05/24/11   Entered 05/24/11 21:57:26   Main Document

Case 8:08-bk-17206-ES   Doc 2082   Filed 05/16/11   Entered 05/16/11 16:30:27   Desc
Main Document   Page 138 of 211   Page 46 of 52

1  *Property, LLC*, 423 B.R. 655, 667 n.9 (9th Cir. BAP 2009) ("[Recoupment] is an equitable

2  common law doctrine to net out debts and allow the defendant to recoup payments made against

3  the claim and is not limited to pre-petition claims. It is not subject to the automatic stay."); *In re*

4  *Petersen*, 2010 WL 3842157, *13 (D.Ariz. 2010) ("because 'recoupment is neither a claim nor a

5  debt, it is unaffected by either the automatic stay or the debtor's discharge.'"); *In re McMahon*,

6  129 F.3d 93, 98 (2d Cir. 1997) ("a  recoupment not subject to the automatic stay of 11 U.S.C.

7  § 362").

8        Here, the within Motion does not seek any affirmative recovery against LCPI.  Rather,

9  SunCal Moving Parties are merely acting defensively to disallow the Lehman Claims.

10  Accordingly, LCPI's automatic stay is not applicable.

11        **J.      Any Party in Interest Has Standing to Object to Claims.**

12        As set forth above, SunCal Management is the moving party in this objection to claims in

13  the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such

14  Trustee Debtors' cases.  Any party in interest has standing to objection to claims.  11 U.S.C.

15  §502(a) ("a claim…is deemed allowed, unless a party in interest…objects").  *See also* Advisory

16  Committee Notes to Bankruptcy Rule 3007 ("any party in interest may object to a claim").

17        The Ninth Circuit has similarly held that "any party in interest" can object to a claim

18  pursuant to Section 502(a):

19        Again, any party in interest can object. *See* 11 U.S.C. § 502(a). Although the
         trustee in Siegel's bankruptcy could have objected to Freddie Mac's proofs of
20        claim, Siegel could have objected as well. *See Lawrence v. Steinford Holding*
         *B.V. ( In re Dominelli),* 820 F.2d 313, 316 (9th Cir.1987) (stating that under 11
21        U.S.C. § 502(a) a party in interest, including the trustee, can object to a proof of
         claim); *see also IRS v. Taylor (In re Taylor),* 132 F.3d 256, 261 (5th Cir.1998)
22        ("Once a proof of claim is filed, the debt is considered allowed unless the debtor
         or another party in interest files an objection to the proof of claim."); *FDIC v.*
23        *Union Entities (In re Be-Mac Transp.),* 83 F.3d 1020, 1025 (8th Cir.1996) ("In
         order to disallow the claim, the debtor or another party in interest must object
24        and request a determination of the lien's validity.")
25
26  *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 531 (9th Cir. 1998).  See also In re

27  *Anderson*, 382 B.R. 496, 506 (Bankr.D.Or. 2008) ("To the extent [the plan] limits the parties who

28  may file claims objections to the Debtors and the trustee, it is inappropriate as any party in interest

has standing to object to claims. § 502(a)."); *In re QMect, Inc.,* 349 B.R. 620, 625 (Bankr.

1  N.D.Cal. 2006) ("A creditor or creditors' committee has standing independent of the trustee or

2  debtor-in-possession to object to another creditor's claim as long as it has something to gain if it

3  prevails.").

4  ### IV.

5  ### CONCLUSION

6  Pursuant to the terms of the Restructuring Agreement and the Settlement Agreement,

7  Lehman ALI, which is the parent entity of LCPI, Lehman ALI was bound to pay the "urgent

8  payables" and Management Fees, as well as to cause to closing transferring the Projects to new

9  Lehman entities (Venture Grantees), who would assume the unpaid vendor claims incurred at

10  Projects, assume the bond liabilities associated with that Project. Had Lehman ALI performed

11  these contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and

12  the instant Chapter 11 cases would have been unnecessary. Lehman ALI did not comply with the

13  terms of this agreement. It did not pay the Urgent Payables or the bond obligations. Moreover,

14  three days before signing the Settlement Agreement, Lehman ALI, and its subsidiary, LCPI, sold

15  all of their right, title and interest in the Sold Loans to Fenway Capital. Yet, when the Lehman

16  Parties signed the Settlement Agreement, they represented that they still owned these loans. These

17  representations were false and this transfer rendered performance under the terms of the

18  Restructuring Agreement and the Settlement Agreement impossible.

19  The foregoing breaches caused the Relevant SunCal Debtors to suffer millions of dollars in

20  damages, which will need to be quantified through discovery. These damages can and should be

21  recouped from the secured portion of the Lehman Claims, and the Lehman Entities should be

22  denied the right to seek any relief on the basis of Lehman Claims until the Relevant SunCal

23  Debtors are made whole.

24  DATED: May 10, 2011                    **WINTHROP COUCHOT**
                                          **PROFESSIONAL CORPORATION**
25
                                          By:___/s/ Paul J. Couchot_____
26                                             Paul J. Couchot, Esq.
                                               Sean Okeefe, Esq.
27                                             Peter Lianides, Esq.
                                          General Insolvency Counsel for Administratively
28                                        Consolidated Debtors-in-Possession
   *[SIGNATURES CONTINUED ON NEXT PAGE]*

1

2 **RUS MILIBAND & SMITH P.C.**

3

4 By: _/s/ Ronald Rus_____
        Ronald Rus, Esq.
5        Joel S. Miliband, Esq.
        Cathrine Castaldi, Esq.
6 Attorneys for SunCal Management, LLC, and SCC
Acquisitions Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 10, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On May 10, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 10, 2011 | Susan Connor | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

-38-

## NEF SERVICE LIST

- Selia M Acevedo   sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams   jadams@sycr.com
- Raymond H Aver   ray@averlaw.com
- James C Bastian   jbastian@shbllp.com
- Thomas Scott Belden   sbelden@kleinlaw.com, ccf@kleinlaw.com
- John A Boyd   fednotice@tclaw.net
- Mark Bradshaw   mbradshaw@shbllp.com
- Gustavo E Bravo   gbravo@smaha.com
- Jeffrey W Broker   jbroker@brokerlaw.biz
- Brendt C Butler   bbutler@mandersonllp.com
- Andrew W Caine   acaine@pszyjw.com
- Carollynn Callari   ccallari@venable.com
- Cathrine M Castaldi   ccastaldi@rusmiliband.com
- Tara Castro Narayanan   tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers   dchambers@jmbm.com
- Shirley Cho   scho@pszjlaw.com
- Vonn Christenson   vrc@paynefears.com
- Brendan P Collins   bpcollins@bhfs.com
- Vincent M Coscino   vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot   pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri   dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte   ana.damonte@pillsburylaw.com
- Vanessa S Davila   vsd@amclaw.com
- Melissa Davis   mdavis@shbllp.com
- Daniel Denny   ddenny@gibsondunn.com
- Caroline Djang   crd@jmbm.com
- Donald T Dunning   ddunning@dunningLaw.com
- Joseph A Eisenberg   jae@jmbm.com
- Lei Lei Wang Ekvall   lekvall@wgllp.com
- Richard W Esterkin   resterkin@morganlewis.com
- Marc C Forsythe   kmurphy@goeforlaw.com
- Alan J Friedman   afriedman@irell.com
- Steven M Garber   steve@smgarberlaw.com
- Christian J Gascou   cgascou@gascouhopkins.com
- Barry S Glaser   bglaser@swjlaw.com
- Robert P Goe   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg   egoldberg@stutman.com
- Richard H Golubow   rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez   mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith   bkemail@harrisbeach.com
- Matthew Grimshaw   mgrimshaw@rutan.com
- Kavita Gupta   kgupta@winthropcouchot.com
- Asa S Hami   ahami@morganlewis.com
- Michael J Hauser   michael.hauser@usdoj.gov
- D Edward Hays   ehays@marshackhays.com
- Michael C Heinrichs   mheinrichs@omm.com
- Harry D. Hochman   hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff   jonathan.m.hoff@cwt.com
- Nancy Hotchkiss   nhotchkiss@trainorfairbrook.com
- Michelle Hribar   mhribar@rutan.com
- John J Immordino   john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson   laj@cohenandjacobson.com

- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh    cgunruh@sbcglobal.net

| 1 | • Annie Verdries    verdries@lbbslaw.com |
| 2 | • Jason Wallach    jwallach@gladstonemichel.com |
|   | • Joshua D Wayser    , kim.johnson@kattenlaw.com |
|   | • Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com |
| 3 | • Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com |
|   | • David M Wiseblood    dwiseblood@seyfarth.com |
| 4 | • Brett K Wiseman    bwiseman@aalaws.com |
|   | • Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com |
| 5 | • Marc A. Zimmerman    joshuasdaddy@att.net |
|   | • |

**SERVICE VIA FIRST CLASS MAIL**

| Bickford 16, SJDPartners23 Comm9, Tesoro7 | Heartland9, Marblehead21, PSV12 Acton6Emerald 7, SunValley17, PalmdaleHills65 SummitValley12, Northlake6, OakValley |
|---|---|
| Lehman Commercial Paper Inc. Lehman ALI, Inc. Attn:  Gerald Pietroforte 1271 Sixth Ave., 46th Fl. New York, NY 10020 | Lehman ALI, Inc. OVC Holdings, LLC Northlake Holdings LLC Lehman Commercial Paper Inc. Attn:  Jeff Fitts 1271 Sixth Ave., 46th Fl. New York, NY 10020 |
| All | |
| Weil, Gotshal & Manges LLP Attn:  Shai Y. Waisman 767 Fifth Ave. New York, NY 10153 | |

**Exhibit "C"**

| | |
|---|---|
| 1 | LOUIS R. MILLER, State Bar No. 54141 |
| | smiller@millerbarondess.com |
| 2 | MARTIN PRITIKIN, State Bar. No. 210845 |
| | mpritikin@millerbarondess.com |
| 3 | BRIAN PROCEL, State Bar No. 218657 |
| | bprocel@millerbarondess.com |
| 4 | **MILLER BARONDESS, LLP** |
| | 1999 Avenue of the Stars, Suite 1000 |
| 5 | Los Angeles, California 90067 |
| | Telephone:    (310) 552-4400 |
| 6 | Facsimile:    (310) 552-8400 |

FILED & ENTERED

APR 12 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY mccall     DEPUTY CLERK

Special Litigation Counsel for
Jointly Administered Debtors in Possession
and Chapter 11 Trustee

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA -- SANTA ANA DIVISION

In re

PALMDALE HILLS PROPERTY, LLC,
AND ITS RELATED DEBTORS,
          Jointly Administered Debtors
          and Debtors-in-Possession

---

**ADVERSARY PROCEEDING**

PALMDALE HILLS PROPERTY, LLC, et
al.,

          Plaintiffs,

v.

LEHMAN ALI, INC., et al.,

          Defendants.

**CASE NO. 8:08-bk-17206-ES**
Jointly Administered With Case Nos.
  8:08-bk-17209-ES; 8:08-bk-17240-ES;
  8:08-bk-17224-ES; 8:08-bk-17242-ES;
  8:08-bk-17225-ES; 8:08-bk-17245-ES;
  8:08-bk-17227-ES; 8:08-bk-17246-ES;
  8:08-bk-17230-ES; 8:08-bk-17231-ES;
  8:08-bk-17236-ES; 8:08-bk-17248-ES;
  8:08-bk-17249-ES; 8:08-bk-17573 ES;
  8:08-bk-17574-ES; 8:08-bk-17575 ES;
  8:08-bk-17404-ES; 8:08-bk-17407-ES;
  8:08-bk-17408-ES; 8:08-bk-17409-ES;
  8:08-bk-17458-ES; 8:08-bk-17465-ES;
  8:08-bk-17470-ES; 8:08-bk-17472-ES;
  8:08-bk-17588-ES
**Adversary No. 8:09-ap-01005-ES**

**ORDER RE LEHMAN ENTITIES' AMENDED
MOTION TO DISMISS THE THIRD
AMENDED COMPLAINT**

Hearing: February 11, 2010
Time: 2:00 p.m.
Ctrm.: 5A

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

61997.1

ORDER RE LEHMAN ENTITIES' MOTION TO DISMISS 3RD AM. CMPLT.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400 FAX: (310) 552-8400

## ORDER

**IT IS HEREBY ORDERED** that the Lehman Lenders Amended Motion to Dismiss Plaintiffs' Third Amended Complaint ("Motion to Dismiss") is **GRANTED IN PART AND DENIED IN PART**.

1) The decision in *Lehman Commercial Paper, Inc. v. Palmdale Hills Property, LLC* (*In re Palmdale Hills Property, LLC*), -- B.R. --, 2009 WL 5812119 (B.A.P. 9th Cir. 2009) is binding on this Court.

2) Under *In re Palmdale Hills Property, LLC*, the claims for relief brought against Defendant Lehman Commercial Paper Inc. ("LCPI") – namely, claims 1, 5, 7, 8, and 9 – are affirmative relief and, therefore violate LCPI's automatic stay. Consequently, the first, fifth, seventh, eighth, and ninth claims for relief are dismissed without prejudice to the extent that they are brought against LCPI. Plaintiffs must seek relief from LCPI's automatic stay in the United States Bankruptcy Court for the Southern District of New York in order to bring any claims against LCPI in this adversary proceeding.

3) As to the remaining Defendants,[1] the Motion to Dismiss:

    a. the first claim for relief is DENIED;

    b. the second claim for relief is DENIED;

    c. the third claim for relief is GRANTED WITHOUT PREJUDICE;

    d. the fourth claim for relief is GRANTED WITHOUT PREJUDICE;

    e. the fifth claim for relief is DENIED;

    f. the sixth claim for relief is GRANTED WITHOUT PREJUDICE to the extent that Plaintiffs seek to avoid and recover certain prepetition transfers from SunCal Marblehead Heartland Master LLC to Defendant Lehman ALI in the amount of $3,390,280.37 and is DENIED in all other respects;

    g. the seventh claim for relief is DENIED;

---

[1] Defendants Lehman ALI, Inc. ("Lehman ALI"), OVC Holdings LLC, Northlake Holdings LLC, and LV Pacific Point, LLC.

ORDER RE LEHMAN ENTITIES' MOTION TO DISMISS 3RD AM. CMPLT.

08-13555-mg    Doc 17961    Filed 05/24/11    Entered 05/24/11 21:57:36    Main Document
Pg 148 of 211

h.  the eighth claim for relief is DENIED;

i.  the ninth claim for relief is GRANTED WITHOUT PREJUDICE.

4)  In sum, as to the remaining Defendants, the third, fourth, and ninth claims for relief are dismissed in their entirety without prejudice, and the sixth claim for relief is dismissed in part consistent with this Order.

5)  Plaintiffs may file an amended complaint by April 9, 2010.


**IT IS SO ORDERED.**


### ###


DATED: April 12, 2010

*Erithe A. Smith*
United States Bankruptcy Judge

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

A true and correct copy of the foregoing document described **ORDER RE LEHMAN ENTITIES' AMENDED MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 18, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 18, 2010 | Carole Conklin | /s/ Carole Conklin |
|---|---|---|
| Date | Type Name | Signature |

61997.1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

# SERVICE LIST

**I.**     **Served by NEF**

n/a

**II.**     **Served By U.S. Mail**

n/a

**II.**     **Served by Personal Delivery, Facsimile Transmission or Email**

BY ATTORNEY SERVICE

Judge's Copy
The Honorable Erithe A. Smith
United States Bankruptcy Court - Central District of California
Ronald Reagan Federal Bldg and United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

BY EMAIL

Lehman Ali, Inc., Lehman Commercial Paper,
Inc., OVC Holdings, Northlake Holdings, LV
Pacific Point
Weil Gostshal & Manges LLP
   edward.soto@weil.com
   elisa.lemmer@weil.com
   shai.waisman@weil.com
   allen.blaustein@weil.com
   lauren.zerbinopoulos@weil.com

Pachulski Stang Ziehl & Jones LLP
   rpachulski@pszjlaw.com
   dziehl@pszjlaw.com

Fenway Capital LLC
Dewey & LeBoeuf LLP
   rreinthaler@DeweyLeBoeuf.com
   clevy@DeweyLeBoeuf.com
   jschreiber@dl.com

Lehman Re Ltd
Cadwalader, Wickersham & Taft LLP
   jonathan.hoff@cwt.com
   liz.butler@cwt.com

DLA Piper

betty.shumener@dlapiper.com

LB/L-Duc III Master LLP
Joseph A. Eisenberg
   jae@jmbm.com

Counsel for Chapter 11 Trustee Steven M.
Speier
The Lobel Firm, LLP
   wlobel@thelobelfirm.com

General Insolvency Counsel for
Jointly Administered Debtors in Possession
Winthrop Couchot, P.C.
   pcouchot@winthropcouchot.com
   plianides@winthropcouchot.com
   sokeefe@winthropcouchot.com

61997.1

1

61997.1

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **ORDER RE LEHMAN ENTITIES' AMENDED MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.   SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF"):** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of **March 18, 2010** the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

☒  Service information continued on attached page

**II.   SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐  Service information continued on attached page

**III.   TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s), and/or email address(es) indicated below:

☒  Service information continued on attached page

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

61997.1

1

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# SERVICE LIST

**I.**      **Served by NEF**

- Selia M Acevedo      sacevedo@millerbarondess.com, mpritikin@millerbarondess.com;bprocel@millerbarondess.com

- Joseph A Eisenberg      jae@jmbm.com

- Lei Lei Wang Ekvall      lekvall@wgllp.com

- Alan J Friedman      afriedman@irell.com

- Christian J Gascou      cgascou@gascouhopkins.com

- Kelly C Griffith      bkemail@harrisbeach.com

- Jonathan M Hoff      jonathan.hoff@cwt.com

- Christopher W Keegan      ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com;tshafroth@kirkland.com

- Kerri A Lyman      klyman@irell.com

- Hutchison B Meltzer      hmeltzer@wgllp.com

- James M Miller      jmiller@millerbarondess.com

- Henry H Oh      henry.oh@dlapiper.com, bambi.clark@dlapiper.com

- Sean A Okeefe      sokeefe@okeefelc.com

- John E Schreiber      jschreiber@dl.com

- Steven M Speier      Sspeier@Squarmilner.com, ca85@ecfcbis.com

- United States Trustee (SA)      ustpregion16.sa.ecf@usdoj.gov

- Christopher T Williams      ctwilliams@venable.com, jcontreras@venable.com

- Dean A Ziehl      dziehl@pszjlaw.com, dziehl@pszjlaw.com

**II.**           **Served By U.S. Mail**

n/a

61997.1      ORDER RE LEHMAN ENTITIES' MOTION TO DISMISS 3RD AM. CMPLT.

III.       **Served by Personal Delivery, Facsimile Transmission or Email**

BY EMAIL

<u>Lehman Ali, Inc., Lehman Commercial Paper, Inc., OVC Holdings, Northlake Holdings, LV Pacific Point</u>

Weil Gostshal & Manges LLP
    edward.soto@weil.com
    elisa.lemmer@weil.com
    shai.waisman@weil.com
    allen.blaustein@weil.com
    lauren.zerbinopoulos@weil.com

Pachulski Stang Ziehl & Jones LLP
    rpachulski@pszjlaw.com
    dziehl@pszjlaw.com

<u>Fenway Capital LLC</u>

Dewey & LeBoeuf LLP
    rreinthaler@DeweyLeBoeuf.com
    clevy@DeweyLeBoeuf.com
    jschreiber@dl.com

<u>Lehman Re Ltd</u>

Cadwalader, Wickersham & Taft LLP
    jonathan.hoff@cwt.com
    liz.butler@cwt.com

DLA Piper
    betty.shumener@dlapiper.com

<u>LB/L-Duc III Master LLP</u>

Joseph A. Eisenberg
    jae@jmbm.com

<u>Counsel for Chapter 11 Trustee Steven M. Speier</u>

The Lobel Firm, LLP
    wlobel@thelobelfirm.com

<u>General Insolvency Counsel for</u>
<u>Jointly Administered Debtors in Possession</u>

Winthrop Couchot, P.C.
    pcouchot@winthropcouchot.com
    plianides@winthropcouchot.com
    sokeefe@winthropcouchot.com

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

61997.1

ORDER RE LEHMAN ENTITIES' MOTION TO DISMISS 3RD AM. CMPLT.

**Exhibit "D"**

1  PAUL J. COUCHOT - State Bar No. 131934
   pcouchot@winthropcouchot.com
2  SEAN A. O'KEEFE -- State Bar No. 122417
   sokeefe@winthropcouchot.com
3  Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for Palmdale Hills
6  Property, LLC et. al. (the "Voluntary Debtors")

7  RONALD RUS - State Bar No. 67369
   rrus@rusmiliband.com
8  JOEL S. MILIBAND - State Bar No. 77438
   jmiliband@rusmiliband.com
9  RUS MILIBAND & SMITH P.C.
   2211 Michelson Drive, Seventh Floor
10 Irvine, California 92612
   Telephone: (949) 752-7100
11 Facsimile:  (949) 252-1514

12 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

13         UNITED STATES BANKRUPTCY COURT
           CENTRAL DISTRICT OF CALIFORNIA
14              SANTA ANA DIVISION

15 | In re | Case No. 8:08-bk-17206-ES
16 | PALMDALE HILLS PROPERTY, AND ITS | Jointly Administered With Case Nos.
   | RELATED DEBTORS, | 8:08-bk-17209-ES; 8:08-bk-17240-ES;
17 |               Jointly Administered Debtors | 8:08-bk-17224-ES; 8:08-bk-17242-ES;
   |               and Debtors-in-Possession | 8:08-bk-17225-ES; 8:08-bk-17245-ES;
18 | | 8:08-bk-17227-ES; 8:08-bk-17246-ES;
   | | 8:08-bk-17230-ES; 8:08-bk-17231-ES;

Affects:                                    8:08-bk-17236-ES; 8:08-bk-17248-ES;
19 ☒ All Debtors                            8:08-bk-17249-ES; 8:08-bk-17573-ES;
   ☐ Palmdale Hills Property,               8:08-bk-17574 ES; 8:08-bk-17575-ES;
20 ☐ SunCal Beaumont Heights, LLC           8:08-bk-17404-ES; 8:08-bk-17407-ES;
   ☐ SCC/Palmdale,                          8:08-bk-17408-ES; 8:08-bk-17409-ES;
21 ☐ SunCal Johannson Ranch, LLC            8:08-bk-17458-ES; 8:08-bk-17465-ES;
22 ☐ SunCal Summit Valley, LLC              8:08-bk-17470-ES; 8:08-bk-17472-ES;
   ☐ SunCal Emerald Meadows LLC             and 8:08-bk-17588-ES
23 ☐ SunCal Bickford Ranch, LLC
   ☐ Acton Estates, LLC                     Chapter 11 Proceedings
24 ☐ Seven Brothers LLC
   ☐ SJD Partners, Ltd.                     **OMNIBUS REPLY TO OBJECTIONS TO**
25 ☐ SJD Development Corp.                  **DISCLOSURE STATEMENT**
   ☐ Kirby Estates, LLC
26 ☐ SunCal Communities I, LLC              DATE: May 13, 2011
   ☐ SunCal Communities III, LLC            TIME:   9:30 a.m.
27 ☐ SCC Communities LLC                    PLACE: Ctrm. 5A
   ☐ North Orange Del Rio Land, LLC
28 ☐ Tesoro SF LLC

   *Continued from Previous Page*

161269.3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# **TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 2 |
| II. | THE RELEVANT LEGAL STANDARD | 3 |
| III. | REPLY TO LEHMAN ENTITIES' OBJECTIONS | 5 |
| | A. The Allegations of Insider Bias | 5 |
| | B. The "Winnability" of The Plans | 5 |
| | C. Payment of Administrative Claims & Feasibility Challenges | 5 |
| | D. The Sale Procedure Objections | 8 |
| | E. Retention of Sales Proceeds | 8 |
| | F. The LitCo Purchase Offer Feasibility Objection | 9 |
| | G. The Unequal Treatment Argument | 9 |
| | H. The Section 1129(a)(7) Objections | 10 |
| | I. The Effective Date Definition | 10 |
| | J. The Plans Do Not Raise Any Adequate Protection Issues | 11 |
| | K. The Fair and Equitable Allegation | 11 |
| | L. The Plans Do Not "Continue" The Stay | 12 |
| | M. The Amortization Allegation | 12 |
| | N. The Lehman Entities' Recourse To The Plan Trust | 12 |
| | O. The Section 1111(b) Allegation | 13 |
| | P. The Alleged Lack of Reserve Provision | 13 |
| | Q. The Absolute Priority Rule Allegation | 13 |
| | R. The Cases Cited By The Lehman Entities Are Inapposite | 14 |
| | S. The Section 1129(a)(5) Allegation | 17 |
| | T. The Description of The ES Action | 18 |
| | U. The Imposition of a Lien and The Recoupment Objections | 19 |
| IV. | REPLY TO ANAVERDE'S LIMITED OBJECTION | 20 |
| V. | REPLY TO CITY OF PALMDALE'S OBJECTION AND JOINDER | 21 |
| | A. City of Palmdale's Joinder | 21 |
| | B. Description of Entitlements | 21 |
| | C. Payment of Administrative Tax Claims | 22 |
| | D. Transferability of Project Documents and Development Agreement | 23 |
| VI. | REPLY TO THE BOND COMPANIES OBJECTIONS | 23 |
| VII. | REPLY TO THE LEHMAN RE OBJECTIONS | 24 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

161269.3

Palmdale Hills Property, LLC, SunCal Communities I, LLC, SunCal Communities III, LLC, SCC Palmdale, LLC, Acton Estates, LLC, SunCal Beaumont, LLC, SunCal Emerald, LLC, SunCal Johansson, LLC, SunCal Bickford, LLC, SunCal Summit, LLC, Seven Brothers, LLC, Kirby Estates, LLC, SJD Partners, LLC, SJD Development, LLC, SCC Communities, LLC, North Orange Del Rio, LLC and Tesoro SF, LLC (the "Voluntary Debtors") and SunCal Management LLC, and SCC Acquisitions, LLC ("SCC') (collectively the "SunCal Proponents") hereby submit the following *Reply* to the *Objections* ("Objections") to the Disclosure Statements filed by the SunCal Proponents (the "Disclosure Statement") in support of their Chapter 11 Plans (the "Plans").

# I

## PRELIMINARY STATEMENT

The Plans proposed by the SunCal Plan proponents are based on an incontestable premise: The highest price for the Projects can only be obtained through a market sale, conducted without the restraints imposed by the disputed liens and claims asserted by Lehman ALI, Inc., a *non*-debtor Lehman lender ("Lehman ALI"), and Lehman Commercial Paper, Inc. ("LCPI") (together the "Lehman Entities") against these properties. Once the assets are sold, the merits of the claims being asserted by the Lehman Entities will be resolved in due course, and all claims will then be paid in accordance with their priority. In addition, under the Plans, as modified, the holders of allowed unsecured claims will receive a one percent (1%) guaranteed distribution, even if the Net Proceeds and the Net Litigation Recoveries are insufficient to otherwise yield such a distribution to these creditors.

The foregoing plan template is neither unfair nor controversial, despite the Lehman Entities' vociferous, but meritless objections. The Lehman Entities simply do not like the idea that they will be outbid, *a second time*[1], if they are forced to participate in a fair sale contest.

The core objection raised in the pleading filed by the Official Committee of Unsecured Creditors (the "Committee") is one of timing. The Committee seeks a fair confirmation contest that is not contingent upon possible future settlements, and that is unfettered by LCPI's opportunistic, but erroneous "automatic stay" threats. In short, the Committee wants the

---

[1] See Exhibit A attached hereto.

1　confirmation contest to be delayed until the parties are in a position to play a *fair* ball game,

2　subject to rules that are both understandable and *equally* applicable.  The SunCal Plan Proponents

3　are in complete agreement with this position.

4　　　　In contrast to the level playing field sought by the Committee, the Lehman Entities are still

5　doing everything within their power to prevent a fair contest.  The Lehman Entities' latest gambit

6　is premised upon the preposterous assertion that the filing of an objection to their claims, based

7　upon recoupment, is a violation of LCPI's automatic stay.  In reliance upon this untenable position,

8　the Lehman Entities are refusing to respond to discovery!  In essence, the Lehman Entities are

9　contending that their claims are shielded from any attack in a confirmation contest, yet everyone

10　else's claims and rights remain subject to the Lehman Entities' sword.  The Court has already

11　recognized that the law will not promote such an unfair result..

12　　　　As the Committee's objection makes clear, Lehman's attempt to impose such conditions

13　renders a *fair* contest impossible.  The SunCal Proponents respectfully submit that the

14　confirmation contest should indeed be delayed  until the Lehman Entities stipulate that their

15　automatic stay has no application to any proceeding initiated in this case, and until all predicate

16　"settlements" are in place.

17　　　　In the case of objections filed by the City of Palmdale and New Anaverde, LLC, the SunCal

18　Plan Proponents are willing to agree, in substantial measure, to address the relevant disclosure

19　objections raised by these claimants.  The same is true of the relevant disclosure objections raised

20　by the bond companies.

21　　　　　　　　　　　　　　**II**

22　　　　　　　　**THE RELEVANT LEGAL STANDARD**

23　　　　A disclosure statement is sufficient if it provides a hypothetical investor/creditor "adequate

24　information" regarding a proponent's reorganization plan.  11 U.S.C. § 1125.  A disclosure

25　statement hearing should focus on disclosure issues: It should not be used as a forum for resolving

26　plan confirmation issues, except in those circumstances where the proposed plan is patently un-

27　confirmable *on its face*.  I*n re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) ("In

28　ruling on a disclosure statement a bankruptcy court must distinguish between 1) whether the

1  disclosure statement contains adequate information to allow the typical creditor to make an

2  informed decision on how to vote, and 2) whether the plan can be confirmed. Only where the

3  disclosure statement on its *face* relates to a plan that cannot be confirmed does the court have an

4  obligation not to subject the estate to the expense of soliciting votes and seeking confirmation of

5  the plan; otherwise confirmation issues are left for later consideration."). In this case, the latter

6  circumstance is not presented.

7  The Disclosure Statements filed by the SunCal Proponents clearly describe simple Plans

8  that address the complex issues presented by these estates. All estate assets will be sold for the

9  highest price obtainable, or abandoned, within 90 days of the Confirmation Date. The sales, which

10  will be made without allowing credit bids pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), will trigger

11  the Effective Date of the plan. All *allowed* administrative claims and all allowed secured claims

12  will then be paid from the proceeds, in their order of priority. Any payout to the disputed claims

13  asserted by the Lehman Entities, and any payout to junior creditors, will have to await the

14  resolution of the disputes relating to the Lehman Entities' claims. Once this is resolved, all allowed

15  claims will then be paid in accordance with their lien or priority rights.

16  Although the Lehman Entities vehemently oppose the Plans, their opposition does not

17  render the Plans "patently unconfirmable" on their face. 104 B.R. 138. To the contrary, within the

18  last three years, two courts of appeal have specifically held that plans providing for sales without

19  credit bid rights are expressly authorized under 11 U.S.C. § 1129(a)(2)(A)(iii). *In re Philadelphia*

20  *Newspapers, LLC*, 599 F.3d 298 (3rd Cir. 2010); *In re Pacific Lumber*, 584 F.3d 229 (5th Cir.

21  2009). The Lehman Entities' transparent attempt to deny creditors an opportunity to vote on this

22  plan option should be rejected. The Lehman Entities' self serving suggestion that the SunCal Plan

23  Proponents lack the desire or the means to perform under the terms of the Plan was decisively laid

24  to rest by the results of the recent bidding contest that occurred in the SunCal cases being

25  administered by Chapter 11 trustee Alfred Siegel. A*s the article attached hereto as Exhibit A*

26  *confirms, SunCal outbid the Lehman Entities in the auction held in those cases by tens of millions,*

27  *which is exactly why the Lehman Entities are so determined to avoid an auction in this case.*

28

<div align="center">

**III**

**REPLY TO LEHMAN ENTITIES' OBJECTIONS**

</div>

    **A.**    **The Allegations of Insider Bias**.  The Lehman Entities argue that the Plans were designed to enable Bruce Elieff, the principal of SCC, to avoid liability for the claims arising under certain prepetition performance and completion bonds (the "Bonds").  The Lehman Entities forget that the Voluntary Debtors and the Trustee Debtors are the *primary obligors* on these Bonds: Mr. Elieff is only a guarantor.  Moreover, the benefits of pushing the SunCal Debtors' primary liability onto Mr. Elieff are fleeting.  The relevant operating agreements include provisions that convert this transferred liability into indemnity claims against the SunCal Debtors - which claims have already been timely filed.

    The Lehman Entities assertion that the Plans are premised on "speculative litigation" ignores that this same litigation is at issue, having survived numerous motions to dismiss filed by the Lehman Entities.[2]  Moreover, the Lehman Entities' efforts over the past year to prevent a trial on the merits evidence their fear concerning the merits of the litigation.  Finally, the SunCal Proponents have confidence that the hundreds of creditors who were defrauded by the Lehman Entities—and will be voting on the Plan—fully appreciate the merits of the Debtors' claims against the Lehman Entities.

    **B.**    **The "Winnability" of The Plans**.  Apparently mistrusting the judgment of the creditors and the Court to discern the better plan for the respective estates, the Lehman Entities submitted thirty-three pages of argument attempting to avert a plan contest, which could disprove their characterization of the Plans as un-winnable.  The Lehman Entities' speculation as to whether creditors will vote in favor of the SunCal Plans is unavailing to the Court's determination concerning the adequacy of the Disclosure Statements and should be disregarded.

    **C.**    **Payment of Administrative Claims & Feasibility Challenges**.  The Lehman Entities contention that the Plans do not provide for the payment of administrative claims on the

---

[2] In addition, in 2009, substantial evidence was submitted with respect to the bona fide disputes over the Lehman Entities' claims and liens, in connection with the Sales Procedures Motion, which was more than sufficient to survive a summary judgment motion.   However the Sale Procedures Motion was withdrawn before it was heard.

1   Effective Date is in error.  The Plans clearly state all *Allowed* administrative claims will be paid on

2   the Effective Date.  To the extent that the Lehman Entities are contesting the SunCal Proponents

3   *ability* to pay the administrative claims, this raises a feasibility issue, which should be deferred

4   until confirmation.  *See In re Columbia Gas Sys., Inc.*, 91-803, 1995 WL 404892 (Bankr. D. Del.

5   June 16, 1995) ("Feasibility of the plan is a confirmation issue."); *In re Mass*, 2008 WL 8013413

6   (Bankr. S.D. Cal. Apr. 23, 2008) ("Plan feasibility is really a plan confirmation issue.").

7          The Lehman Entities' feasibility objection ignores the structure of the Plans, and the

8   recoupment and Section 502(d) rights held by the individual estates.  The Plans are premised upon

9   the sale of the Projects.  These sales will close on the Effective Date.  As this Court is aware, the

10  last time the Projects were put up for sale, a qualified buyer promptly offered to acquire the same

11  for hundreds of millions in cash.  There is every reason to believe that this buyer, and other

12  qualified buyers, will come forward and submit cash offers during the Sales Period.  Since the

13  feasibility test only requires a showing that the Plans are "not likely to fail," *In re Eastland*

14  *Partners Ltd. P'ship*, 149 B.R. 105, 108 (Bankr. E.D. Mich. 1992) ("The debtor bears the burden

15  of proving by a preponderance of the evidence that the plan is not likely to fail."), the SunCal

16  Proponents have satisfied their burden.  Sufficient funds will be available on the Effective Dates to

17  pay all Allowed Administrative Claims.

18         The Lehman Entities presume that the sales proceeds will be unavailable to pay allowed

19  administrative claims, but the terms of the Plans provide for an assumption of both the

20  Restructuring Agreement entered into on May 23, 2008, and the related Settlement Agreement (the

21  "Restructuring Agreements").  Under these agreements, which the Lehman Entities breached

22  prepetition, Lehman ALI was obligated to cause a series of newly formed entities to a) take title to

23  sixteen of the Projects (five of the Trustee Debtors' Projects and eleven of the Voluntary Debtors'

24  projects); b) assume the Lehman loans secured by liens against these Projects; c) pay the payables

25  owing to vendors on account of work performed on these Projects; and d) assume or pay the bond

26  claims associated with these Projects.

27         Lehman ALI's breach of the Restructuring Agreements conveys upon the sixteen affected

28  Debtors recoupment claims in the amount of all damages incurred through such breach.  These

-6-

claims include both the payments that were due under these agreements, *and the costs of maintaining and preserving these Projects after the breach through the present date, which otherwise would not have been the responsibility of these Debtors* (consequential damages). When these sixteen Projects are sold, which sales shall occur on the Effective Date, the SunCal Proponents will immediately "recoup" from these sales proceeds the damages owed and immediately pay any **allowed** administrative claims.  The hearing on the Recoupment Claim Objection is scheduled for June 9, 2011.

The bulk of the "administrative" claims that the Lehman Entities are referring to are the advances that Lehman ALI has made post-petition - loans that were only necessary due to Lehman ALI's prepetition breach.  The SunCal Proponents have filed objections to these claims based upon 11 U.S.C. § 502(d), which is set for hearing on June 9, 2011, since Lehman ALI was the recipient of over twenty million in unpaid preference claims.  The SunCal Proponents believe these objections will result in the disallowance of the Lehman ALI's administrative claims, until its returns the twenty million in preferences that it owes and until the subordination action is resolved. S*ee, In re Racing Services, Inc.*, 571 F.3d 729, 731 (8th Cir. 2009) ("Administrative claims for post-petition services to a bankruptcy estate have first priority when the assets of the estate are distributed to creditors...However, § 510(c)(1) of the Bankruptcy Code authorizes the bankruptcy court to subordinate an allowed administrative claim to other claims "under principles of equitable subordination."); *Matter of Best Refrigerated Exp., Inc.*, 192 B.R. 503, 512-13 (Bankr. D.Neb. 1996) ("There is no question that subordinating an administrative claim to general unsecured claims disturbs the order of payment set forth under the Bankruptcy Code. However, Section 510(c)(1) gives bankruptcy courts the authority to so reorder priorities."). Once Lehman ALI returns the preferences that it has received, these funds, along with the funds recouped from the sales proceeds, will provide more than sufficient funds to repay any outstanding allowed administrative claims.[3]

---

[3] In contrast to the SunCal Proponents' Plan, the Lehman Entities' Plan facially fails even under the "not likely to fail standard." For example, although the Lehman Entities represent that their plan provides for a dividend of 40% to 50%, in fact this promise is illusory, unfunded and legally unenforceable.  The promise is illusory because the Lehman Entities have the right to walk-away from their plan effort if it is determined that Reliance Claims exceed $30 million - a threshold that

-7-

     **D.**    <u>**The Sale Procedure Objections**</u>.  In the Objection, the Lehman Entities contend that the sale procedures provided for in the Plans are confusing and designed to favor the insiders of the Voluntary Debtors. Neither contention is well taken.  In the revised version of the Plans and Disclosure Statements, the bid procedures shall be described in more detail.  Moreover, to insure that the marketing and bidding process yields the highest reasonably obtainable sale price, the SunCal Plan Proponents will select an independent professional to oversee this process.

     **E.**    <u>**Retention of Sales Proceeds**</u>.  In the Objection, the Lehman Entities contend that the Disclosure Statements and Plans are unclear on where the Net Sales Proceeds from the sales of the Projects will be deposited.  This contention is in error.  The Plan defines the term "Net Sales Proceeds Accounts" as follows:

> <u>Net Sales Proceeds Account(s)</u>.  **Separate account(s) that will be established by the Plan Trustee at an FDIC insured bank <u>into which all Net Sale Proceeds shall be deposited</u> from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s) and/or a Disputed Lien(s).**  There shall be a separate Net Sales Proceeds Account for the Net Sale Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except where there are two Disputed Liens on a single Project, in which case, there shall be a single account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject thereto shall become Available Cash and shall be transferred to the applicable Distribution Account(s).  To the extent that a particular Disputed Secured Claim and a Disputed Lien are allowed and deemed valid but subject to the equitable subordination causes of action in the Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

---

has already been exceeded.  The Lehman Entities' plan is clearly unfunded since they refuse to state exactly how much they are willing to invest in their plan. Finally, this promise is unenforceable, because the court presiding over the Lehman Entities' Chapter 11 case has not authorized the Lehman Entities to fund their plan.  That court only authorized them to enter into the amorphous "we will fund an undisclosed amount" agreement with the Trustee of the Trustee Debtors cases.  Accordingly, when the Lehman Entities' default, the Trustee can look forward to zero recourse.

1   (See, § 2.1.95). However, to address the Lehman Entities' concerns, a specific reference to this

2   requirement will be made in the treatment sections of the Plans.

3          The Lehman Entities also contend that it is inappropriate for SCC, in its capacity as the

4   Plan Trustee, to hold the Net Sales Proceeds.  In fact, as indicated above, the Net Sales Proceeds

5   will be held in the Net Sales Proceeds Account, not in SCC's accounts.  To the extent that the

6   Lehman Entities do not believe this is "secure" enough for their needs, and the Court considers

7   this a material issue, the SunCal Proponents are willing to enter into a Deposit Control Agreement

8   or similar escrow arrangement that would limit access until either the Committee consented in

9   writing or the Court approved the release through an order.

10         **F.**     **The LitCo Purchase Offer Feasibility Objection**.  In the Objection, the Lehman

11  Entities dispute the SunCal Plan proponents' ability to perform their financial obligations under

12  the Plans and demand more disclosure regarding their financial capacity.  This contention lacks

13  merit for the following reasons.

14         First, feasibility is a confirmation issue as explained above.  Second, the Lehman Entities'

15  contention regarding financial performance of the SunCal Plan Proponents rings hollow given the

16  complete lack of disclosure regarding this subject in their own Disclosure Statements.  They fail to

17  disclose what will be funded, when and by whom.  In contrast, the SunCal Proponents specifically

18  state that LitCo will fund the purchase offer.  Third, the SunCal Proponents' financial ability to

19  perform is now a matter of record.  *As the news article attached hereto as Exhibit "A" confirms,*

20  *SunCal outbid Lehman in the recent land auction held in the related "Pool One" SunCal*

21  *bankruptcy, paying $71 million*.  This is exactly the reason why the Lehman Entities are so bitterly

22  opposed to holding an auction of the Projects.  In a cash bid environment, they will lose.  Fourth,

23  the Lehman Entities request for more information regarding the SunCal Plan Proponents funding is

24  driven by an improper motive.  If the Lehman Entities can obtain this information, they will

25  attempt, through threats and/or persuasion, to induce this party to withdraw its support. Given the

26  SunCal Plan Proponents past performance, this request should be rejected.

27         **G.**     **The Unequal Treatment Argument**.  The Lehman Entities contend that a third

28  party making an offer to buy claims – LitCo under the Plan – cannot present an offer to creditors

that pays more to creditors who both sell their claims against Lehman and vote in favor of the

Plan, This position is in error.  Because the third party purchase offer is not funded estate assets,

this does not unfairly discriminate against the other unsecured creditors.  *In re Idearc Inc.,* 423

B.R. 138, 172 (Bankr. N.D.  Tex. 2009) ("Finally, because the $3.0 million fund from which

distributions will be made for Sub–Class 2 is being gifted from the Lenders' collateral—and will

not be made from the Debtors' assets—any slight discrimination that could exist against claimants

in Sub–Class 1 in favor of claimants in Sub–Class 2 does not violate the Bankruptcy Code."); *In re*

*Journal Register Co.,* 407 B.R. 520 (Bankr.S.D.N.Y.2009) (finding that gift plan did not unfairly

discriminate under section 1123(a)(4) of the Bankruptcy Code because removing the gift from the

plan would not change the recovery of the objecting creditors, and so the creditors that received

the gift did not do so at the expense of other creditors in the same class); *In re WorldCom Inc.,* No.

02–13533, 2003 WL 23861928 (Bankr.S.D.N.Y. Oct. 31, 2003) (approving gift from class of

creditors, instead of individual, where class voted in favor of gift).  The Reliance Creditors are

selling an individual asset, namely their individual claims against the Lehman Entities.  They have

a right to be paid more for this additional asset.

     **H.**     **The Section 1129(a)(7) Objections**.  The Lehman Entities object to the "best

interests" analysis in the Disclosure Statements on various grounds.  The exhibit reflecting this

analysis will be corrected. Nothing more is necessary from a disclosure perspective.  Moreover, it

is worth noting that the "best interests" analysis in the Lehman Entities' Disclosure Statement

concludes that all creditors other than the Lehman Entities would receive nothing in Chapter 7.

Accordingly, the Lehman Entities  need no additional disclosure regarding this issue.

     **I.**     **The Effective Date Definition**.  The Lehman Entities raise a series of challenges to

the Plans based upon the definition of the Effective Date.  The Effective Date for the Group I and

II will be redefined as the 90th day after the Confirmation Date.  This eliminates all "Effective

Date" objections relative to these Plans. However, it will further provide that if any automatic stay

impairs the implementation of the Plans (the SunCal Proponents do not believe that LCPI's stay

has any impact upon relief granted *in a Plan*), then the SunCal Proponents will have an additional

90 days to eliminate this impairment.

1    Although the Lehman Entities will argue that the definition applicable to the Group I and II

2    Plans renders the Plans infeasible, this is a confirmation issue.  Moreover, it ignores the following

3    facts. First, the automatic stay does not apply to a plan of reorganization.  Second, the stay does not

4    bar claims objections, which means that any relief granted by this Court in the context of a claim

5    objection, including the equivalent of a senior attachment lien, will not be violative of the

6    automatic stay.  This relief should be granted or denied prior to confirmation of the Plans.  Third,

7    the automatic stay in LCPI's case will terminate if a plan is confirmed in that case (which is in

8    process).  Although LCPI believes it is being clever by including an injunction barring the

9    Voluntary Debtors' rights in its Plan, this relief is void, since it violates the Voluntary Debtors'

10   automatic stay. Fourth, as the Lehman Entities themselves note, if the stay still applies post

11   confirmation, the SunCal Proponents can seek relief from the stay.  Since the grounds for

12   maintaining the stay in LCPI's case no longer exist (we are just in the process of preparing our

13   plans), it is difficult to see what opposition the Lehman Entities could raise to a motion for relief

14   from this stay. Fifth and finally, the Ninth Circuit will be deciding the scope of the stay in the near

15   term (oral argument in that appeal is set for June 8, 2011) and the Lehman Entities have agreed to

16   be bound by this ruling.

17   **J.**      **The Plans Do Not Raise Any Adequate Protection Issues**.  The Lehman Entities

18   contend that the Plans fail to afford them adequate protection during the Sale Period - the 90 day

19   period (as amended) between the Confirmation Date and the Effective Date. First, as this Court

20   noted at the hearing on Lehman Entities' motions for relief from stay, disputed claims are not

21   entitled to demand adequate protection.  Second, there is no evidence before the Court that the

22   Lehman Entities would be entitled to adequate protection during the Sales Period, since there is no

23   evidence of a decline in value.  Third, if such an entitlement arises, the Lehman Entities can raise it

24   at that juncture and seek relief. Fourth, this is clearly a confirmation issue, not a disclosure issue.

25   **K.**      **The Fair and Equitable Allegation**.  In the Objection, the Lehman Entities

26   contend that the Plans provisions addressing the estates' recoupment rights fail to satisfy the "fair

27   and equitable" test in 11 U.S.C. § 1129(b). First, this is clearly a confirmation issue, not a

28   disclosure issue.  Second, this issue will be tested when the recoupment objection is either well

1  along or resolved by the Court.  In either case, the Court will be in a better position at that juncture

2  to resolve the merits of what again is clearly a confirmation issue.

3       **L.**     **The Plans Do Not "Continue" The Stay**.  The Lehman Entities contend that the

4  Plans improperly continue the automatic stay.  They do not.  The stay continues until the Effective

5  Date. Prior to that point in time, it would remain in place per the express terms of 11 U.S.C. §

6  362(c).

7       **M.**     **The Amortization Allegation**.  In the Objection, the Lehman Entities contend that

8  the Plans improperly fail to amortize the Lehman Entities' debt.  The Lehman Entities ignore the

9  fact that their debts/claims are disputed. Until these claims are allowed, they are not entitled to a

10  penny.  If and when these claims are allowed they will be satisfied from the sales proceeds per the

11  terms of the Plan-either by payment from their collateral in accordance with the allowance order,

12  or through the exercise of their foreclosure rights in accordance with California law.  In sum, no

13  amortization issue exists.

14       **N.**     **The Lehman Entities' Recourse To The Plan Trust**.  The Lehman Entities

15  contend that the Plans improperly deny them recourse to the Plan Trust as the holder of a

16  deficiency claim.  The Lehman Entities either misunderstand the Plan, or California law.  If a

17  property subject to one of the Lehman Entities' loans is sold, they will receive a replacement lien

18  on the account into which the sales proceeds are deposited.  This lien will survive until the

19  associated claim is eliminated, subordinated or validated by a court order.  Once a ruling is made,

20  the Lehman Entities' secured claims will be paid in accordance therewith from the funds in the

21  applicable distribution account(s).  Once these funds are paid out, no more "secured claims" will

22  exist, so recourse to the Plan Trust would be impermissible for these "secured claims." If the

23  Lehman Entities refer, instead, to a prospective unsecured claim, then any part of their claim that is

24  allowed as an unsecured claim will be paid in accordance with the treatment accorded to unsecured

25  claimants under the respective Plans and the provisions of the Court's allowance of such claim..

26       If, instead of being sold, a property subject to Lehman Entities' lien is abandoned, the

27  Lehman Entities will have no claim against the Plan Trust under Section 580d of the California

28  Code of Civil Procedure, unless they obtain a judgment through a judicial foreclosure.  The SunCal

1  Proponents will incorporate a footnote in the Disclosure Statement to address the latter

2  circumstance - a judgment obtained through a judicial foreclosure.

3       **O.**    **The Section 1111(b) Allegation**.  The Lehman Entities' contend that their rights

4  under 11 U.S.C. § 1111(b) are being denied under the Plan.  This is a confirmation issue, not a

5  disclosure issue. The contention is  also in error.  The recourse rights in Section 1111(b) are denied

6  where, as in this case, the property is being sold under the plan.  See 11 U.S.C. § 1111(b)(1)(A)(ii).

7       **P.**    **The Alleged Lack of Reserve Provision**.  The Lehman Entities contend that the

8  Plans do not include a provision reserving funds to pay their disputed claims.  Such a provision is

9  unnecessary.  All funds from Project sales are reserved until the claims and liens against the same

10  are resolved by the Court.  These funds are then paid out in accordance with the rulings of the

11  Court.

12       **Q.**    **The Absolute Priority Rule Allegation**.  The Lehman Entities contend that the

13  Plans violate the absolute priority rule by granting SCC Acquisitions certain purported rights as the

14  Trustee of the Plan Trust.  These rights include a release of claims, and the alleged power to

15  control the sale of the Projects.  This contention is both erroneous and prematurely  raises a

16  confirmation issue, not a disclosure issue.

17        The absolute priority rule only applies to "property" that is retained "on account of" an

18  equity interest. S*ee Bank of America Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. P'ship,*

19  526 U.S. 434 (1999).  *The Plans explicitly state that the SCC's equity interests are being*

20  *cancelled*.  To the extent that the "rights" referenced above have any value or constitute

21  "property," they are being conveyed upon SCC in consideration for the *post-petition services* that

22  it will be providing as the Plan Trustee.  Such rights are not being provided on "account of" SCC's

23  interest in the Voluntary Debtors. S*ee In re PWS Holding Corp.,* 228 F.3d 224, 242 (3d Cir.2000)

24  (equity holder's recovery cannot be deemed to be "on account of" the equity interest "without

25  some evidence of a causal relationship"); *In re Charter Communications*, 419 B.R. 221, 269

26  (Bankr. S.D.N.Y. 2009) ("Courts have not prohibited parties such as Mr. Allen who happen to

27  hold equity from recovering other consideration. ... Accordingly, the objection of the CCI

28

1   Noteholders based on the absolute priority rule mischaracterizes the settlement with Mr. Allen and

2   is without merit.").

3       **R.**     **The Cases Cited By The Lehman Entities Are Inapposite**.  In the Objection, the

4   Lehman Entities argue that the cases of *In re California Hancock, Inc.*, 88 B.R. 226 (9th Cir. BAP

5   1988), and *In re Monarch Beach Venture*, 166 B.R. 428 (C.D.Cal. 1993), render the Plans

6   unconfirmable. Neither case stands for the proposition cited and the *Monarch* ruling is not good

7   law in any event.

8       In the *Hancock* case, a debtor filed a plan of reorganization in a single asset real estate case

9   shortly before a motion for relief from stay was filed.  *Hancock*, 88 B.R. at 226.  The plan

10   provided for the sale of the apartment project, which was over-encumbered by secured debt, to a

11   purported third party buyer.  I*d*. Under the terms of the sale, the buyer would pay a cash sum equal

12   to the allegedly "secured" part of the lender's claim.  The unsecured part of the lender's claim,

13   being attributable to a loan that was expressly non-recourse, would cease to exist.  *Id*.  The sale

14   agreement described in the plan further provided that the buyer and the debtor-seller would share

15   the future growth in the value of the project through a participatory note.

16       The bankruptcy court in *Hancock* rejected the plan, holding that the proposed sale was not

17   a true sale, but rather a "joint venture" that violated the absolute priority rule, the recourse

18   provisions in 11 U.S.C. § 1111(b) (converting a nonrecourse debt to recourse except where a sale

19   occurs) and the credit bid provisions in 11 U.S.C. § 363(k).  *Id*.  The debtor appealed this ruling.

20       At the outset of the appeal, the BAP acknowledged that the property had already been

21   foreclosed upon.  Accordingly, under clear Ninth Circuit authority (which the court cited), the case

22   was "moot", depriving the Court of Article III jurisdiction.  88 B.R. at 227.  Notwithstanding this

23   fact, the BAP gratuitously elected to opine on the substantive issues.  In essence, the entire opinion

24   is dicta.

25       In the dicta part of the opinion (essentially the entire opinion), the Court agreed with the

26   lower court that the purported sale in the plan was not a true sale, and consequently this exception

27   to the recourse rights afforded to a non-recourse lender should have applied.  The BAP also agreed

28   that the sale violated the absolute priority rule, since it was a joint venture.  Finally, the BAP held

1    that the credit bid rights referenced in Section 363(k) should apply *on the facts* stating: "By

2    holding that it would allow the appellee the right to credit bid as set forth in § 363(k), the

3    bankruptcy court ruled that the appellee should be protected from the consequences of the loss of

4    recourse treatment as set forth in § 1111(b)(1)(A). The legislative history to § 363(k) clearly

5    contemplates such protection." *Hancock* at 88 B.R. at 230-31. This ruling has no application to

6    the facts of this case and does not directly address 11 U.S.C. § 1129(b)(2)(A)(iii).

7          In *Hancock*, the debtor was attempting to sell the property free and clear of the lender's lien

8    based upon the lender's relief from stay value, and then force the lender to accept only this value in

9    full satisfaction of its nonrecourse debt. This treatment obviously deprived the lender of its credit

10   bid right, the benefits of a true sale, and its right to deficiency under Section 1111(b). Here, the

11   facts are very different.

12          Under the SunCal Proponents' Plans, the Lehman Entities retain their deficiency rights

13   against 100% of the proceeds derived from a true sale. To the extent that they have a deficiency

14   claim over and above whatever part of the sales proceeds they receive, this claim will fall into the

15   general unsecured class, unless it is subordinated to the claims in this class, which is entirely

16   possible. In sum, *Hancock* is not binding authority, but dicta, and it does not apply to the fact in

17   this case.

18          The *Monarch* case cited by the Lehman Entities is factually inapposite and arguably not

19   good law. The *Monarch* court did not state that the denial of credit bid rights was not allowed

20   under 11 U.S.C. § 1129(b)(2)(A)(iii). Instead, the court ruled that 1) the absolute priority rule was

21   an "implicit" part of the "fair and equitable" requirement in 11 U.S.C. § 1129(b)(2)(A)**,** and 2) the

22   particular treatment granted the secured creditor in that case did not comply with the "implicit"

23   absolute priority rule. According to the *Monarch* court, any plan that allowed unsecured creditors

24   to receive a penny before all secured claims were paid in full necessarily violates the absolute

25   priority rule - a position that has been rejected by the Ninth Circuit.

26          The so-called absolute priority rule is set forth in 11 U.S.C. § 1129(b)(2)(B):

27             (B) With respect to **a class of unsecured claims**—

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; **or**

        (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129(b)(2)(B) (emphasis added).  The "absolute priority rule" appears in subparagraph (ii) of the above section.  This section, by its express language, only applies to the treatment accorded *unsecured* claims.  See *Corestates Bank, N.A. v. United Chem. Techs., Inc.*, 202 B.R. 33, 55 (E.D.Pa.1996) ("This Court feels that if Congress wanted the payout of secured claims to satisfy the absolute priority rule for purposes of determining whether a plan is fair and equitable, it would have specifically included that requirement in § 1129(b)(2)(A) as it did in § 1129(b)(2)(B)."); *Matter of Sandy Ridge,* 881 F.2d 1346, 1350 (5th Cir. 1989) (stating "section 1129(b)(2)(A) deals with secured claims, while section 1129(b)(2)(B) deals with unsecured claims"); *In re New Midland Plaza Associates*, 247 B.R. 877, 894 (Bankr. S.D.Fla. 2000) ("As a fully secured creditor, Coolidge does not have standing to assert the absolute priority rule of § 1129(b)(2)(B)(ii)."); *In re Linda Vista Cinemas, L.L.C.*, 442 B.R. 724, 753 (Bankr.D.Ariz. 2010) ("this court disagrees with the *Monarch* decision, if it is intended to apply the absolute priority rule to a *secured* class of creditors.  This is because the statute expressly contains the solitary expression of this rule in the section that *only* deals with *unsecured* creditors."); *In re Bashas' Inc.*, 437 B.R. 874, 928 (Bankr.D.Ariz. 2010) (same).  Although the Ninth Circuit has not expressly addressed this point, the Ninth Circuit has indicated that it considers the statutory language in this section to be crystal clear on this issue – the rule is applicable to unsecured creditors.  S*ee In re Bonner Mall Partnership*, 2 F.3d 899, 907 (9th Cir. 1993); *Steelcase v. Johnston*, 21 F.3d 323, 329 (9th Cir. 1994).  In *Bonner Mall*, the Ninth Circuit stated "In determining whether section 1129(b)(2)(B)(ii) abolishes the new value exception we apply the traditional tools of statutory construction.  The interpretation of a statutory provision must begin with the plain meaning of its language. (citation omitted). "If the statutory language is unambiguous, then [court's] judicial inquiry is complete."  *In re Price,* 353 F.3d 1135, 1141 (9th Cir. 2004).  The Ninth Circuit went on

1    to state: "Here, **each of the unsecured claims** against Bonner will not be paid in full on the

2    effective date of the Plan.  As a result, section 1129(b)(2)(B)(i) cannot be satisfied.  Therefore,

3    Bonner's Plan cannot be held to be "fair and equitable" unless it complies with the provisions of

4    section 1129(b)(2)(B)(ii)."  In *Steelcase,* the Court stated "The absolute priority rule comes into

5    play in the 'cramdown' situation evident here; that is, where the court confirms a reorganization

6    plan over the objections of a class or classes of ***unsecured creditors*** … ." *Steelcase,* at 329

7    (emphasis added).  See also *In re Sagewood Manor Associates Ltd. Partnership*, 223 B.R. 756,

8    773 (Bankr.D.Nev. 1998) ("The United States Supreme Court and the Ninth Circuit, in explaining

9    the absolute priority rule, have indicated that the absolute priority rule applies only to unsecured

10   creditors.")   Accordingly, the absolute priority rule does not apply to the Lehman Entities' secured

11   claim, depriving the Lehman Entities of standing to raise this issue.

12         The SunCal Proponents would also note that after the *Monarch* case was remanded by the

13   District Court on the basis of the above opinion, the same exact plan was then re-confirmed by

14   Judge Barr.  Aetna then appealed this second order, which was supported by sixteen pages of

15   findings that tracked the requirements in the *Steelcase* decision. When the merits of the confirmed

16   plan were presented to the District Court judge a second time in the form of a motion for stay

17   pending appeal, he declined to issue the stay requested, as did the Ninth Circuit.  In sum, the plan

18   in the *Monarch* case was confirmed - exactly as written.  M*onarch,* is not good law.

19         **S.     The Section 1129(a)(5) Allegation**.  In the Objection the Lehman Entities contend

20   that the Plans include structural conflicts of interest that bar confirmation under the "consistent

21   with public policy" provision in Section 1129(a)(5).  These conflicts allegedly include the

22   possibility that Mr. Elieff will negotiate Project sales that generate lower sales price in return for

23   the assumption of larger bond liabilities, and the possibility that SCC Acquisitions will use its

24   position as Plan Trustee to acquire the ES Claims on more favorable conditions than otherwise

25   might be available.

26         These allegations raise a confirmation issue, not a disclosure issue, and they are also

27   spurious.  The Plans provide that the Projects will be sold through a public auction.  Any qualified

28

1   bidder will be allowed to bid and will be encouraged to bid the highest price possible. Mr. Elieff

2   will have no ability to manipulate the pricing.

3        Moreover the idea that the assumption of bond liabilities will be "traded" for lower pricing

4   ignores reality. Any buyer will be required to replace or assume the bonds for two reasons. First,

5   the Projects cannot be developed without the replacement or assumption of the bonds – these

6   liabilities constitute a charge against the land that runs with the land. Accordingly, it is highly

7   unlikely that any buyer will attempt to acquire the Projects without addressing this circumstance in

8   its bid. Second, the objective of the sales is to obtain the highest *net yield* for creditors.

9   Ascertaining the highest and best price as between an offer that provides for the assumption of the

10  bonds and one that does not will be both a simple and transparent exercise. Third and finally, since

11  the Committees will remain in place during the Sales Period, they will be able to object to any sale

12  that will not yield the highest price. In sum, no conflict exists under structure designed into the

13  Plans and even if a conflict arose in the future, checks and balance remain in place that will

14  prevent such a conflict from negatively impacting the Plan.

15       **T.**    **The Description of The ES Action**. In the Objection, the Lehman Entities contend

16  that the description of the ES Action in the Disclosure Statement is insufficient. According to the

17  Lehman Entities the following modifications/additions are required: 1) The Lehman Entities'

18  perspective on the lawsuit must be included; 2) the description should provide more detail

19  regarding the risks; 3) the description should explain that any recovery would be creditor specific,

20  with some creditors receiving a benefit and others receiving nothing; and 4) the liquidation

21  analysis should reflect a return of zero if the action fails.

22       The first contention raised above should be rejected by the Court. The Disclosure

23  Statement is intended to describe the material facts relating to the SunCal Proponents' Plan. Here

24  the material facts are disclosed. The SunCal Proponents' are entitled to present their opinion of

25  what these facts mean or will yield in the future, which view is presented. The creditors will

26  receive a contrary view in the Lehman Entities' Disclosure Statement or through the Lehman

27  Entities' objection to plan confirmation. Amalgamating the two documents as the Lehman Entities

28  suggest would simply create a monstrous and totally incomprehensible tome that few creditors

would read.  In sum, the present description in the Disclosure Statement provides all creditors "adequate" information regarding the ES Action.

The second contention is an alternate version of the first and should be rejected for the same reason.  The Court should reject the Lehman Entities' desire to clutter up the Disclosure Statement with a self-serving dissertation concerning the risks associated with the ES Action.  Certainly the creditors are more than capable of discerning the obvious: Not every lawsuit succeeds.  A risk that is already set forth in the Disclosure Statements.

The Lehman Entities' third contention ignores the fact that the Disclosure Statement details the distinction between those creditors who are entitled to recover from the relief sought in the ES Action and those who are not.  No more is required.  The Lehman Entities' contention that some creditors will receive zero benefit from a successful prosecution of the ES Action is in error.  To the extent that a Reliance Claimant's unsecured claim is reduced by  payment carved-out from collateral  otherwise  only available to the Lehman Entities, such payment increases the dividend payable to the other general unsecured claims.

The fourth contention is factually in error.  If the ES Action fails, the creditors will receive a distribution from the estate in the amount of their pro rata share of any unencumbered assets.  These assets include, but are not limited to preference and fraudulent transfer recoveries and unencumbered cash.  Although this dividend would be smaller than the dividend that would otherwise be payable if the ES Action succeeds, it would not be zero.  The SunCal Proponents are willing to include an alternative liquidation schedule in their Disclosure Statement that addresses this possibility.

**U.**       **The Imposition of a Lien and The Recoupment Objections**.  In the Objection, the Lehman Entities contend that the provision in the Plans that provides a lien will be imposed to secure any recoupment rights, as to any abandoned Project, would violate LCPI's automatic stay and the Lehman Entities the "indubitable equivalent" of their claims.  LCPI is not a creditor in the cases addressed in the Group III and IV Plans.  Accordingly, the automatic stay is not an issue in these cases.  In those cases where LCPI's automatic stay *may* be an issue, no action will be taken, per the Plans, that violates the automatic stay.

-19-

1    Again, the Lehman Entities' indubitable equivalent argument presents a confirmation issue

2   not a disclosure issue.  Moreover, if all of the Projects are sold through the auction as

3   contemplated, no lien will be necessary.  Finally, since the Lehman Entities are refusing to provide

4   discovery in connection with the Recoupment Objection, a complete evidentiary preclusion order

5   should be entered against them under Fed.R.Civ.P. 37.  This relief will all but guarantee the entry

6   of an order granting the Recoupment Objection.  Once the Recoupment Objection is granted, no

7   indubitable equivalent argument will be viable, since the Voluntary Debtors' rights to equity

8   created through the reduction of the Lehman Entities' claims will be fixed.

9                                              **IV**

10                       **REPLY TO ANAVERDE'S LIMITED OBJECTION**

11    As set forth below, the Debtor has resolved Anaverde's Limited Objection by amending the

12   definition of "Available Cash" as set forth below.  Prior to the Petition Date, the Debtor and

13   Anaverde LLC entered into an agreement entitled, *Work and Cost Payment Agreement and*

14   *Amendment to Reciprocal Easement Agreement and Cooperation Agreement* dated July 29, 2007

15   ("Work and Cost Agreement").  Pursuant to the Work and Cost Agreement, each party opened and

16   deposited funds in separate bank accounts for the purposes of paying certain shared costs described

17   in the Agreement.  Pursuant to the Agreement, Palmdale Hills established Account no.

18   1000914414, with Central Pacific Bank ("Funds Control Account").

19    On or about October 15, 2009, Palmdale filed a *Motion For Order Rejecting Cost Sharing*

20   *Agreement With Anaverde LLC, And Turnover Of Funds Held By Central Pacific Bank,* [docket no.

21   720] ("Motion")[4] which sought rejection of the Work and Cost Agreement and turnover of the

22   Funds Control Account.  On or about October 22, 2009, Anaverde LLC filed an Opposition to the

23   Motion, docket no. 728.  On or about October 29, 2009, Palmdale filed a Reply [docket no. 749],

24   which *inter alia* withdrew the proposed rejection of the Agreement.

25    New Anaverde represents that on or about June 15, 2010, Anaverde LLC sold considerably

26   all of its assets, including its real property, to New Anaverde.  As a result, New Anaverde is now

27   

28   _____

[4] The entire motion is entitled "*Motion For Order (1) Approving Acquisition's Proposal,
(2) Authorizing Disposition Of Certain Depository Accounts, (3) Rejecting Cost Sharing
Agreement With Anaverde LLC, And (4) Turnover Of Funds Held By Central Pacific Bank*".

the party in interest herein.  Palmdale Hills and New Anaverde dispute among other things, whether the Work and Cost Agreement has been breached and whether the Funds Control Account is property of the bankruptcy estate.

Without waiving any of the parties' rights or respective arguments, the Debtor and Anaverde have resolved the Limited Objection.  The Debtor has agreed to amend the definition of "Available Cash" to include the following language:

> "Available Cash" . . . For avoidance of doubt, and notwithstanding anything to the contrary contained herein or any Confirmation Order, (i) Available Cash shall not include any Cash held in the "Funds Control Account" pursuant to that certain *Work and Cost Payment Agreement and First Amendment to Reciprocal Easement Agreement and Cooperation Agreement between Anaverde LLC and Palmdale Hills,* dated as of June 29, 2001 (the "Work and Cost Agreement"), (ii) the claims, defenses and all other rights of all applicable parties, including New Anaverde LLC and Palmdale Hills Property, LLC, with respect to the Funds Control Account and the Work and Cost Agreement are expressly preserved, and (iii) the Funds Control Account shall only be distributed upon (a) agreement of all of  the applicable parties, including New Anaverde LLC, and Palmdale Hills Property, LLC, (b) as provided pursuant to the terms of the Work and Cost Agreement, or (c) further order of a court of competent jurisdiction.

As a result of the above revisions, Anaverde's Limited Objection is moot.

## V

## REPLY TO CITY OF PALMDALE'S OBJECTION AND JOINDER

**A.    City of Palmdale's Joinder.**  The City of Palmdale ("City") joined the Limited Objection filed by Anaverde.  The above referenced revisions to the definition of "Available Cash" have resolved the issues raised in the Limited Objection, and therefore resolve the City's joinder thereto.

**B.    Description of Entitlements**.  The City's Objection concedes that the Disclosure Statement contains a description of the Debtor's project (the "Ritter Ranch Project") and the Project Documents.  However, the City contends that the "disclosure statement should be amended to include the status of the entitlements, permits, and defaults under the Development Agreement…"

As the Court is aware, there are twenty six (26) jointly administered Chapter 11 debtors, and nineteen (19) project owing Debtors.  Technical disclosures regarding the status of

1   entitlement, permits and development agreements are likely to make the disclosure statement

2   unnecessarily lengthy, and less understandable to a typical creditor.  It is well established that a

3   disclosure statement should not be unnecessarily long or technical.  "[O]verly technical and

4   extremely numerous additions to a disclosure statement suggested by an objecting party may

5   themselves be self-defeating in terms of the resulting clarity and understandability of the document

6   to the average investor." In re Waterville Timeshare Group, 67 B.R. 412, 413 (Bankr.D.N.H.

7   1986).

8
>   [W]hat lawyers regard as useful information based upon their experience might be
9   meaningless verbiage in the hands of a "typical" investor.  Accordingly, by
>   overburdening a proponent's disclosure statement with information significant and
10  meaningful to lawyers alone may result ultimately in reducing the disclosure statement
>   to an overlong, incomprehensible, ineffective collection of words to those whose
11  interests are to be served by disclosure.  Thus, compounding a disclosure statement for
>   the sake of a lawyer's notion of completeness, or because some additional information
12  might enhance one's understanding, may not always be necessary or desirable, and the
>   length of a document should not be the test of its effectiveness.
13

14  Waterville Timeshare Group, 67 B.R. at 413-414; In re Stanley Hotel Inc., 13 B.R. 926, 933

15  (Bankr.D.Colo.1981).

16         For the same reasons here, technical disclosures regarding the status of entitlement, permits

17  and development agreements will be of little relevance to typical creditors, and will thus be

18  counter-productive.

19         **C.      Payment of Administrative Tax Claims**.  The City contends that "the Plan and

20  Disclosure Statement must be amended to provide for the payment of the Special Taxes on the

21  Effective Date".  However, Sections 3.2, 3.4 and 3.5 of the Plan, and Sections 6.2, 6.4 and 6.5 of

22  the Disclosure Statement, govern the treatment and payment of administrative claims, including

23  administrative tax objections.

24         Accordingly, to the extent that the "Special Taxes" are allowed administrative expenses,

25  then the Plan and Disclosure Statement provide for their payment.  The City fails to explain why

26  specialized disclosure of their post-petition taxes is necessary or desirable.  Again, detailed

27  disclosure of each and every administrative claim will make the disclosure statement unnecessary

28  lengthy and cumbersome.

<table>
<tr><td>1</td><td>To the extent that the City is contesting the Debtor's *ability* to pay the administrative</td></tr>
</table>

1    To the extent that the City is contesting the Debtor's *ability* to pay the administrative

2    claims, this raises a feasibility issue, which must be deferred until confirmation.  S*ee In re*

3    *Columbia Gas Sys., Inc.*, 91-803, 1995 WL 404892 (Bankr. D. Del. June 16, 1995) ("Feasibility of

4    the plan is a confirmation issue."); *In re Mass*, 2008 WL 8013413 (Bankr. S.D. Cal. Apr. 23, 2008)

5    ("Plan feasibility is really a plan confirmation issue.").

6    **D.    Transferability of Project Documents and Development Agreement**.  The City

7    contends, without evidence or analysis, that the "Development Agreement" (defined in the

8    Objection), is an executory contract for financial accommodation, and therefore cannot be assigned

9    without the City's consent.  The Plan provides that the executory contracts and unexpired leases to

10    be assumed or rejected will be set forth in Exhibit "2" of the Plan, and that a contract may be added

11    or deleted from the list up to and including the Confirmation Date.  See Plan, Section 10.1.  The

12    issues raised by the City are simply premature at this time, and are more appropriately raised and

13    addressed at confirmation.

14    Accordingly, the Debtor requests that the Objections raised by the City be overruled in

15    their entirety, without prejudice to appropriate confirmation issues being raised at a later time.

16    **VI**

17    **REPLY TO THE BOND COMPANIES OBJECTIONS**

18    Bond Safeguard and Arch Insurance (the "Bond Companies") issued bonds prepetition to

19    various third party municipalities to secure the performance of certain infrastructure work at the

20    Projects.  The Bond Companies have requested additional disclosure regarding 1) what happens to

21    the bond liabilities associated with a Project when the Project is sold under the Plan; 2) what

22    happens to these liabilities if a Project does not sell; and 3) how will the unsecured creditors fare if

23    a Project does not sell.

24    The SunCal Proponents will provide the following additional disclosure in the Disclosure

25    Statements in response to these requests:

26    A)    The Disclosure Statements will explain that the bonds associated with a Project will

27    not be transferred to any purchaser of a Project, and that if the purchaser is to develop such

28

1     Project, then it will at that time provide replacement bonds or assume the existing bonds

2     via agreement with or the consent of the bond company;

3     B)     The Disclosure Statements will explain that unsaleable Projects will be abandoned

4     prior to the Effective Date; and

5     C)     The Disclosure Statements will explain that if a Project is abandoned, the holders of

6     allowed unsecured claims in that particular case, including allowed unsecured claims

7     arising from bond claims *properly chargeable* against a particular debtor, will receive a

8     guaranteed payment of one percent (1%), plus a pro rata share of any other Net Sales

9     Proceeds or Net Litigation Recoveries available, after the payment of all allowed claims

10     secured by liens against such assets and all allowed senior priority claims.

11     The Bond Companies have also raised a number of other arguments in its objection that are

12     not disclosure related.  These include a feasibility objection, a classification objection and an

13     argument based upon the contention that all bond claims are somehow entitled to joint and several

14     recourse against all of the Debtors' estates.  The feasibility and classification objections raise

15     confirmation issues, not disclosure issues.  In the case of the joint and several liability argument,

16     the Bond Companies are welcome to make the argument.  The SunCal Proponents respectfully

17     disagree.  However, they will amend the Disclosure Statements to reflect the Bond Companies

18     asserted position.

19     **VII**

20     **REPLY TO THE LEHMAN RE OBJECTIONS**

21     In the objection filed by Joint Provisional Liquidators of Lehman Re Ltd.[5] ("Lehman Re"),

22     this creditor contends that insufficient disclosure has been provided regarding the status of the

23     Project subject to its lien and, in particular, the steps that will have to be taken before this Project

24     can be sold by the SunCal Proponents.  As more fully explained herein, the SunCal Proponents

25     will address the disclosure related issues identified by Lehman Re. However, they will not convey

26     to creditors Lehman Re's biased view of the merits of the pending litigation.  This is neither

27     relevant nor necessary.

28

---

[5] Lehman Re is a Bermudian affiliate of Lehman Brothers Holdings that is operating in its own insolvency in Bermuda.

-24-

1    Prior to the petition date, the Voluntary Debtors SJD Partners owned a property in San Juan

2    Capistrano commonly known as the Pacific Point Project ("Pacific Point"). As part of the

3    Restructuring Agreement entered into with Lehman ALI, which held the senior lien and loan

4    against this Pacific Point project, it was agreed that Lehman ALI (or its designee) would foreclose

5    on this project and then assume all vendor and bond obligations associated with the project post-

6    foreclosure.

7    The foregoing promise and agreement by Lehman ALI turned out to be fraudulent. In

8    essence, Lehman ALI made these promises in order to induce SJD Partners to allow Lehman ALI's

9    designee to foreclose on the Pacific Point project. Once Lehman ALI obtained what it wanted –

10   title to Pacific Point – Lehman ALI promptly refused to assume and pay the vendor and bond

11   claims associated with Pacific Point as agreed. Instead, Lehman ALI parked the project in a shell

12   entity called LV Pacific Point, LLC ("LV Pacific Point"), and then sold 86% of the senior lien

13   position against the Pacific Point project, which was not affected by the foreclosure, to Lehman

14   Re.

15   In response to Lehman ALI's fraud, SJD Partners, as one of the plaintiffs in the ES Action,

16   is seeking a judgment either setting aside the foreclosure, and allowing SJD Partners to regain title

17   to Pacific Point. For obvious reasons Lehman Re is unhappy with the first prospect – the recovery

18   of Pacific Point – since this would then allow the SunCal Proponents to sell the property free and

19   clear of the lien position that is now owned 86% by Lehman Re pursuant to 11 U.S.C.

20   § 1129(b)(2)(A)(iii).

21   Each of the individual objections raised by Lehman Re to the Group IV Disclosure

22   Statement is cited and then responded to below:

23   1. <u>Objection 1</u>: More disclosure is required regarding the predicates that must be satisfied

24   before a sale of Pacific Point can occur, specifically, the recovery of the project through the

25   pending litigation.

26   <u>Response</u>: The SunCal Proponents will include an additional section in the Group IV

27   Disclosure Statement explaining in greater detail the sequence of events that must occur for a sale

28

of the Pacific Point Project to occur. This disclosure will provide more detail regarding the nature of SJD Partners' claim and the relief that it is seeking.

2. <u>Objection 2</u>: The description of the litigation should include Lehman Re's view of the merits.

<u>Response</u>: The SunCal Proponents do not believe that they are required to include Lehman Re's perspective on the merits of SJD Partners' claims against Lehman ALI or LV Pacific Point, or its prospects for regaining title to the Pacific Point project. However, they will explain in the Disclosure Statement that Lehman Re disputes the merits of the claims and opposes any relief that would allow the SunCal Proponents to regain title to the project.

3. <u>Objection 3</u>. The SunCal Proponents should be required to disclose what will happen if their efforts to uncover Pacific Point are unsuccessful.

<u>Response</u>: The SunCal Proponents will explain that if they fail to regain title to the Pacific Point project a sale will obviously not occur under the Plan. However, they will also explain that if this relief is not granted, they may well obtain a judgment in the amount of the damages suffered through Lehman ALI's fraud, which would then flow to creditors as part of Net Litigation Recoveries.

4. <u>Objection 4</u>: The provision in the Plan imposing a lien on the property to secure the claim held by SJD Partners, in the event a sale of the project is a legal impossibility.

<u>Response</u>: California law does allow claimant to obtain a lien against a property that has been fraudulently transferred. This is provided for in California Civil Code Section 3439.07; it is provided for in the attachment statutes (California Code of Civil Procedure 481.010 et. seq.); and such relief could potentially be obtained through an injunction, including an injunction under 11 U.S.C. § 105. The court's willingness to grant this injunction will depend, in part, on the status and the Court's view of the merits of SJD Partner's claim. It may well be that this claim will already be established by the time confirmation occurs. However, if it is not, the Court can hear evidence on the merits of the claim (as routinely occurs in a prejudgment remedy context in California Superior Court), and grant whatever relief the Court deems necessary.

5. <u>Objection 5</u>: Additional disclosure is required regarding the release being granted to SCC Acquisitions under the Group IV Plan.

<u>Response</u>: Additional disclosure will be provided regarding the potential claims against SCC Acquisitions that are being released and the consideration that is being exchanged for this release.

6. <u>Objection 6</u>: The Group IV Plan does not address the status of SJD Development Corporation.

<u>Response</u>: As set forth in the Disclosure Statement, SJD Development Corp., a California corporation ("SJD Development"), is a Voluntary Debtor, that does not own any real property. SJD Development is the holder of the allowed interest in SJD Partners, which interest is "out of the money". Any claims filed against SJD Development were likely erroneously filed, and should have been asserted against SJD Partners' estate. As a result, the Plan treats such claims as being filed against SJD Partners.

7. <u>Objection 7</u>: The Group IV Plan is infeasible due to LCPI's stay contentions.

<u>Response</u>: This is a confirmation issue, not a disclosure issue. Moreover, it is addressed in more detail in the Omnibus Reply above.

DATED: May 6, 2011

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By: _/s/ Paul J. Couchot_
        Paul J. Couchot, Esq.
        Sean A. Okeefe, Esq.
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession ("Voluntary
Debtors")

**RUS MILIBAND & SMITH**
**A PROFESSIONAL CORPORATION**

By: _/s/ Ronald Rus_
        Ronald Rus, Esq.
        Joel S. Miliband, Esq.
        Cathrine Castaldi, Esq.
Attorneys for SunCal Management, LLC

-27-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **OMNIBUS REPLY TO OBJECTIONS TO DISCLOSURE STATEMENT**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 6, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 6, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

Edward Soto:  edward.soto@weil.com

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 6, 2011 | Susan Connor | /s/ Susan Connor |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com

08-13555-smg-17206-ES Doc 17061 Filed 05/24/11 Entered 05/24/11 21:57:26 Main Document
Pg 186 of 211

| | |
|---|---|
| 1 | • Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com |
| | • Michelle Hribar    mhribar@rutan.com |
| 2 | • John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com |
| | • Lawrence A Jacobson    laj@cohenandjacobson.com |
| 3 | • Michael J Joyce    mjoyce@crosslaw.com |
| | • Stephen M Judson    sjudson@fablaw.com |
| 4 | • Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com |
| | • Steven J Kahn    skahn@pszyjw.com |
| 5 | • Sheri Kanesaka    sheri.kanesaka@bryancave.com |
| | • David I Katzen    katzen@ksfirm.com |
| 6 | • Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com |
| | • Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com |
| 7 | • Irene L Kiet    ikiet@hkclaw.com |
| 8 | • Claude F Kolm    claude.kolm@acgov.org |
| | • Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com |
| 9 | • David B Lally    davidlallylaw@gmail.com |
| | • Leib M Lerner    leib.lerner@alston.com |
| 10 | • Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com |
| | • Charles Liu    cliu@winthropcouchot.com |
| 11 | • Kerri A Lyman    klyman@irell.com |
| 12 | • Mariam S Marshall    mmarshall@marshallramoslaw.com |
| | • Robert C Martinez    rmartinez@mclex.com |
| 13 | • Michael D May    mdmayesq@verizon.net |
| | • Hutchison B Meltzer    hmeltzer@wgllp.com |
| 14 | • Krikor J Meshefejian    kjm@lnbrb.com |
| | • Joel S. Miliband    jmiliband@rusmiliband.com |
| 15 | • James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com |
| | • Louis R Miller    smiller@millerbarondess.com |
| 16 | • Randall P Mroczynski    randym@cookseylaw.com |
| | • Mike D Neue    mneue@thelobelfirm.com, |
| 17 | jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
| | • Robert Nida    Rnida@castlelawoffice.com |
| 18 | • Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com |
| | • Sean A Okeefe    sokeefe@okeefelc.com |
| 19 | • Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com |
| | • Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com |
| 20 | • Penelope Parmes    pparmes@rutan.com |
| | • Ronald B Pierce    ronald.pierce@sdma.com |
| 21 | • Katherine C Piper    kpiper@steptoe.com |
| | • Cassandra J Richey    cmartin@pprlaw.net |
| 22 | • Debra Riley    driley@allenmatkins.com |
| | • James S Riley    tgarza@sierrafunds.com |
| 23 | • Todd C. Ringstad    becky@ringstad.com |
| | • R Grace Rodriguez    ecf@lorgr.com |
| 24 | • Martha E Romero    Romero@mromerolawfirm.com |
| | • Ronald Rus    rrus@rusmiliband.com |
| 25 | • John P Schafer    jschafer@mandersonllp.com |
| | • John E Schreiber    jschreiber@dl.com |
| 26 | • William D Schuster    bills@allieschuster.org |
| | • Christopher P Simon    csimon@crosslaw.com |
| 27 | • Wendy W Smith    wendy@bindermalter.com |
| | • Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com |
| 28 | • Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com |

- Michael St James     ecf@stjames-law.com
- Michael K Sugar     msugar@irell.com
- Cathy Ta     cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem     davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com
- James E Till     jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Carol G Unruh     cgunruh@sbcglobal.net
- Annie Verdries     verdries@lbbslaw.com
- Jason Wallach     jwallach@gladstonemichel.com
- Joshua D Wayser     , kim.johnson@kattenlaw.com
- Christopher T Williams     ctwilliams@venable.com, jcontreras@venable.com
- Marc J Winthrop     mwinthrop@winthropcouchot.com, pj@winthropcouchot.com
- David M Wiseblood     dwiseblood@seyfarth.com
- Brett K Wiseman     bwiseman@aalaws.com
- Dean A Ziehl     dziehl@pszjlaw.com, dziehl@pszjlaw.com
- Marc A. Zimmerman     joshuasdaddy@att.net

-31-

**Exhibit "E"**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP) (Jointly Administered)

Adv. Case. No. 08-01420 (JMP) (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., et al.,

        Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

        Debtor.

- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                Room 601

                New York, New York


                November 20, 2008

                2:00 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

79

1   until such time as one of the following things occurs.  Either

2   the SunCal parties move again with a targeted motion focused on

3   particular relief for cause shown or the parties, following

4   discussions, agree by stipulation to limited relief from the

5   automatic stay.  Or the parties, through discussions, reach

6   agreement concerning the terms and conditions of financing that

7   may be afforded by Lehman related entities.

8        Mr. Gottfried is wrong when he suggests, in his final

9   argument, that if Lehman were the lender that the same problem

10  would exist.  Of course it wouldn't exist.  If Lehman were the

11  lender it would be a consensual arrangement.  It would include

12  consensual stay relief and the terms and conditions would no

13  doubt be perfectly acceptable to Lehman because Lehman was

14  offering the deal.

15       To the extent that the only lending which is

16  available in California is lending which comes on a priming

17  basis, a priming fight in the current environment is something

18  to be avoided.  I encourage the parties, however, to talk to

19  each other and to talk constructively with each other about

20  ways to solve the financing aspect of this problem.  That

21  doesn't mean that they're going to reach agreement nor does it

22  mean that that's the end of the problems that the SunCal

23  entities are exposed to in their bankruptcy cases.  But let's

24  recognize reality, if Lehman entities hold secured claims of

25  2.3 billion dollars somebody in charge at the SunCal companies

**Exhibit "F"**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                    :
In re                                               :          **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,        :          **08-13555 (JMP)**
                                                    :
                            **Debtors.**            :          **(Jointly Administered)**
                                                    :
                                                    :
-------------------------------------------------------------------x

## ORDER DENYING MOTION OF
## THE SCC ENTITIES FOR RELIEF FROM THE AUTOMATIC STAY

Upon the motion, dated November 10, 2008 (the "Motion"), of the SCC Entities

(as defined in the Motion), for an order, pursuant to section 362(d)(1) of title 11 of the United

States Code (the "Bankruptcy Code"), granting relief from the automatic stay in the above-

captioned chapter 11 cases, all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and upon the objection, dated November 18, 2008 (the

"Objection"), of the Lehman Brothers Holdings Inc. and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors-in-possession, and the joinder to the

Objection, dated November 18, 2008, filed by the Official Creditors' Committee; and a hearing

having been held on November 20, 2008 to consider the relief requested in the Motion (the

"Hearing"); and upon the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and

Applications, and all of the proceedings had before the Court; and after due deliberation and

sufficient cause appearing therefor and for the reasons stated by the Court at the Hearing, it is

ORDERED that the Motion is denied without prejudice.


Dated:  New York, New York
        November 21, 2008

                        _s/ James M. Peck_____
                        UNITED STATES BANKRUPTCY JUDGE

**Exhibit "G"**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555 (JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                January 30, 2009

                4:38 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

16

1    therefore, clearly, in my mind you said there was a violation

2    of the automatic stay.  But we proceeded with this motion in

3    good faith that Lehman Commercial was not taking the position

4    that cash collateral violated the stay.  In that related case

5    that's in front of Judge Smith.

6         THE COURT:  Okay.  Well, I know nothing about that

7    related case.  And this is not a hearing on possible sanctions

8    for willful violation of the automatic stay although that may

9    happen at some time in the future at which point the comments

10   you're making might be helpful.  They're not helpful to me now.

11        MR. COUCHOT:  I have the reply papers, Your Honor,

12   that has all that information in there that I could e-mail to

13   you as well.

14        THE COURT:  I don't need to see them tonight.

15        MR. COUCHOT:  Okay.

16        THE COURT:  The only thing that is before me now, and

17   I think I've already made clear what my position is, is that

18   you have no stay relief.  You know you have no stay relief.

19   And that denial of the motion brought by you and your local

20   counsel, Morgan Lewis & Bockius, in November speaks for itself

21   and there is a final order which denies that motion.  The legal

22   consequences of that denial are what they are.  I have no

23   knowledge, and I don't expect to get that knowledge now, as to

24   what happened in California.  To the extent relevant, I'll

25   learn it in due course.

17

1           The only thing which is before me is an emergency

2    motion to enforce the automatic stay.  It is enforced to the

3    extent applicable.  I'm not expanding it nor am I taking away

4    from counsel the ability to reach agreements to modify it.  But

5    if you don't come here and seek consensual relief from stay or

6    relief from stay with appropriate motion practice, you are at

7    full risk as is your client.  Act accordingly.

8           MR. COUCHOT:  Well, thank you for making that --

9    allowing me to make a record, Your Honor.

10          THE COURT:  Excuse me?

11          MR. COUCHOT:  I appreciate the fact that you allowed

12   me to make the record on that.  Thank you.

13          THE COURT:  I didn't think that's what just happened

14   but okay.  I just heard you make some statements about what you

15   believe may have given you cause to believe that what you were

16   doing was permissible.  I have not for a moment suggested that

17   I agree with you.  Nor is there a record here on the basis of

18   which I could make such a finding.  We're just having a

19   conversation.

20          MR. COUCHOT:  I understand, Your  Honor.

21          THE COURT:  Now what happens next, Mr. Waisman?

22          MR. WAISMAN:  Your Honor, I believe Your Honor's

23   ruling is clear.  I believe the stay is in force and --

24          THE COURT:  There could never be a doubt on that

25   question.

19

1          MR. COUCHOT:  Right.

2          THE COURT:  -- relates to a general motion made by

3     your client for relief from the automatic stay.  That motion

4     was denied by final order without prejudice --

5          MR. COUCHOT:  Yes.

6          THE COURT:  -- with statements made on the record

7     that we don't need to recharacterize.  You and other counsel

8     involved no doubt have considered the legal consequences of the

9     actions that you have undertaken with eyes wide open.  I don't

10    want to hear now argument as to why you believe that the action

11    you have taken is not covered by the order that I entered after

12    denying your motion for relief from stay.  It was not a

13    specified targeted motion for relief from stay.  Quite the

14    contrary.  It was a completely general give us full and

15    complete relief from stay.  Motion denied.  That means that the

16    stay applies to the extent it applies.  As you well know as an

17    experienced bankruptcy lawyer, careful lawyers almost always,

18    when there's a close question, seek relief from stay to avoid

19    the very severe sanctions that flow from -- especially flow

20    from willful violations of the stay.  You're in the zone of a

21    willful violation.  And this is not the time for you to defend

22    yourself.  That time may come.

23         MR. COUCHOT:  Yes, Your Honor.

24         MR. WAISMAN:  Your Honor, Shai Waisman.  I actually

25    thought that the issue was resolved.  But based on the

# Exhibit "H"

# WinthropCouchot
### Professional Corporation

660 NEWPORT CENTER DRIVE, FOURTH FLOOR
NEWPORT BEACH, CALIFORNIA 92660
TEL: (949) 720-4100
FAX: (949) 720-4111
WWW.WINTHROPCOUCHOT.COM

PAUL J. COUCHOT
RICHARD H. GOLUBOW
KAVITA GUPTA

GARRICK A. HOLLANDER
PAYAM KHODADADI
PETER W. LIANIDES

*SEAN A. O'KEEFE
ROBERT E. OPERA
MARC J. WINTHROP

*OF COUNSEL

DATED: April 8, 2011

**Via Email**
Mr. Richard Pachulski
Pachulski, Stang, Ziehl & Jones
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067-4100

Dear Mr. Pachulski:

Yesterday, the SunCal Plan Proponents (as defined in the Plans) filed four separate Plans of Reorganization (the "Plans") in the Chapter 11 cases of Voluntary Debtors and the Trustee Debtors. Each Plan refers to a specific "group" of debtors, and each Plan was only filed in the cases of these particular debtors. The four separate groups of debtors (Groups I, II, III and IV) are referenced on the caption page of each Plan. The Plans were prepared and filed in the foregoing manner to insure that no provision therein could not be interpreted, under any perspective or scenario, as being violative of the automatic stay of Lehman Commercial Paper, Inc. ("LCPI").

The debtors who fall within the Group I and II Plans are those entities whose properties are subject to the liens alleged by LCPI. The following express limitation appears in bold capital letters on the first page of both the Group I and II Plans and Disclosure Statements:

> **AS EXPLAINED IN THE DEFINTION OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THIS PLAN BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THIS PLAN SHALL BE TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

# WinthropCouchot
### Professional Corporation

April 8, 2011
Page 2

As the foregoing express limitation states, the definition of the term "Effective Date" set forth in the Group I and Group II Plans is defined with reference to the existence of any possible automatic stay:

> Effective Date. A date selected by the SunCal Plan Proponents that is not later than 1) the one hundred and twentieth (120th) calendar day after the Confirmation Date. However, in any case where the actions provided for in the Plan would be delayed by the automatic stay applicable in the case of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, then the Effective Date shall the one hundred and twentieth (120th) calendar day after the later of (i) the Confirmation Date, or (ii) the date any stay barring the implementation of the Plan arising from the Lehman Entities' cases is no longer applicable, has been deemed inapplicable, or has been lifted by a Court of competent jurisdiction.

As this definition makes clear, if anything in the Group I or II Plans could be construed as being in violation of LCPI's stay, the effectiveness of the Plans is automatically delayed until this stay is eliminated. In short, everything in the Plans is held in abeyance pending relief from stay, if an issue exists.

We do not believe that the automatic stay in one Chapter 11 case can bar the filing of a reorganization plan in a second case, under any interpretation of applicable law. However, the above provisions in the Group I and II Plans, which are explicit, address the only subsection of 11 U.S.C. § 362 that could even form the basis of a conceptual argument - 362(a)(3). The latter section bars direct action seeking control over estate property. As explained, the foregoing provisions eliminate any risk of a possible unintended stay violation under this section. *See, In re Chateaugay Corp.,* 87 B.R. 779, 801 (S.D.N.Y. 1988) *aff'd sub nom. Pension Ben. Guar. Corp. v. LTV Corp.*, 875 F.2d 1008 (2d Cir. 1989) *rev'd on other grounds,* 496 U.S. 633 (1990) ("The purpose of section 362(a)(3) "is to protect the estate from *direct* action taken by creditors against a debtor's personal or real property, and to prevent an uncontrolled scramble to liquidate the estate."); *In re Chugach Forest Products, Inc.,* 23 F.3d 241, 245 (9th Cir. 1994). In sum, nothing in the Group I or II Plans, can have any effect on LCPI that would be violative of this entity's stay.

In the case of the Group III Plan, this Plan was filed in those cases where only Lehman Ali, Inc., *a non-debtor*, holds liens. The Group IV Plan was filed in those cases where the properties at issue are not subject to the liens of any Lehman Entity. Accordingly, LCPI's automatic stay is not a factor in these cases.

# WinthropCouchot
### Professional Corporation

April 8, 2011
Page 3

If for any reason, LCPI contends that the Group I and Group II Plans violate its automatic stay, please advise this office immediately, and we will promptly seek relief before Judge Peck and Judge Smith, concurrently. Specifically, we will file a motion before Judge Peck seeking clarification regarding these stays allegations, and seek relief from any alleged stay. We will also seek a discretionary stay in front of Judge Smith, barring further confirmation efforts pending a resolution of these issues, thereby insuring a full and fair confirmation contest between the parties.

Respectfully,

Sean A O'Keefe
WINTHROP COUCHOT, P.C.

Cc:

Edward Soto
Dean Ziehl
Alan Friedman
William Lobel
Lei Lei Wang Ekvall

**Exhibit "I"**



### PACHULSKI
### STANG
### ZIEHL
### JONES

**LAW OFFICES**
LIMITED LIABILITY PARTNERSHIP

LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE
NEW YORK, NY

10100 SANTA MONICA BLVD.
11th FLOOR
LOS ANGELES
CALIFORNIA 90067-4100

**TELEPHONE: 310/277 6910**
FACSIMILE: 310/201 0760

Dean A. Ziehl

April 25, 2011

dziehl@pszjlaw.com
310.772.2362

**VIA E-MAIL AND FEDERAL EXPRESS**

*pcouchot@winthropcouchot.com*
Paul J. Couchot
Winthrop Couchot P.C.
660 Newport Center Drive, Fourth Floor
Newport Beach, California 92660

*rrus@rusmiliband.com*
Ronald Rus
Rus, Miliband & Smith P.C.
2211 Michelson Drive, Seventh Floor
Irvine, California 92612

SAN FRANCISCO
150 CALIFORNIA STREET
15th FLOOR
SAN FRANCISCO
CALIFORNIA 94111-4500

TELEPHONE: **415/263 7000**
FACSIMILE: 415/263 7010

DELAWARE
919 NORTH MARKET STREET
17th FLOOR
P.O. BOX 8705
WILMINGTON
DELAWARE 19899-8705

TELEPHONE: **302/652 4100**
FACSIMILE: 302/652 4400

NEW YORK
780 THIRD AVENUE
36th FLOOR
NEW YORK
NEW YORK 10017-2024

TELEPHONE: **212/561 7700**
FACSIMILE: 212/561 7777

WEB: www.pszjlaw.com

**Re:**    **In re Palmdale Hills Property, LLC, and its
Related Debtors**
**USBC Case No. 08-17206 (ES)**

Dear Paul and Ron:

Reference is made to Sean O'Keefe's letter dated April 8, 2011 regarding the impact of certain of the SunCal Plan Proponents' Plans on the automatic stay applicable to Lehman Holdings, Inc. and Lehman Commercial Paper, Inc. ("LCPI") (collectively "Lehman Debtors") in particular.

While certain provisions and ambiguities in the SunCal Plans could have the effect of violating the Lehman Debtors' automatic stay, we will accept the representation that

**"…NO ACTION PROVIDED FOR IN THIS
PLAN SHALL BE TAKEN AGAINST
EITHER LEHMAN COMMERCIAL PAPER,
INC. ("LCPI") OR LEHMAN BROTHERS
HOLDINGS, INC. ("LBHI") THAT WOULD**

52063-001\DOCS_LA:236759.2



LAW OFFICES

Paul J. Couchot
Ronald Rus
April 25, 2011
Page 2

## HAVE THE EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY…"

Coupled with the assurance that, if for any reason, the Lehman Debtors contend there is a stay violation, the SunCal Plan Proponents will "promptly seek relief before Judge Peck…" and "…will file a motion before Judge Peck seeking clarification regarding these stays [sic] allegations, and seek relief from any alleged stay."

While the Lehman Debtors currently accept these representations, assurances and procedures for use in connection with the plan confirmation process (and contemplate identifying individual items for clarification or that require stay relief as early as when the Lehman Creditors object to such plans and/or disclosure statements), no such representations, assurances or procedures have been proposed in connection with the *Motion For Order Disallowing Certain Claims Held By Lehman ALI Inc. and Lehman Commercial Paper Inc.* [Docket No. 1901] (the "<u>Claim Objection</u>"), filed by the Voluntary Debtors and SunCal Management, LLC.

Any contention that the Claim Objection does not violate the automatic stay in the chapter 11 case of the Lehman Debtors, including, specifically LCPI, is not correct. *See* Claim Objection 32-33. The mere fact that a pleading is styled as an "objection to claims" or "motion to disallow claims" does not insulate it from the automatic stay when the issues raised therein implicate and depend upon affirmative action and relief against the Lehman Debtors.

As you know, courts "must disaggregate litigation so that particular claims, counterclaims, cross claims and third-party claims are treated independently when determining which of their respective proceedings are subject to the automatic stay." *Lehman Commercial Paper, Inc. v. Palmdale Hills Property, LLC, et al.*, (*In re Palmdale Hills Property, LLC*), 423 B.R. 655, 665 (B.A.P. 9th Cir. 2009) (internal quotations omitted). Regardless of how it is styled, the Claim Objection is no different. As the Ninth Circuit B.A.P. recognized, the filing of a proof of claim by LCPI "does not mean that Debtors may take any action against [LCPI] without



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Ronald Rus
April 25, 2011
Page 3

violating the automatic stay." *Id.* at 667.  The Claim Objection is nothing more than a breach of contract claim of the Restructuring Agreement (executed and delivered in May 2008) and the purported September 2008 Settlement Agreement (that was never executed, delivered or became effective), both of which came years after and are independent of the loan agreements on which the loans are based.  As such, it is an attempt at setoff that is subject to the automatic stay.

Your characterization of this contract claim as recoupment is invalid.  Courts in both the Ninth and Second Circuits recognize that whether a claim for recoupment is stated is governed by state law. *Newbury*, 95 F.3d at 1398 n.9 (9th Cir. 1996); *In re Madigan*, 270 B.R. 749, 758 (B.A.P. 9th Cir. 2001); *New York State Elec. And Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir. 1997).  Where, as here, the underlying documents (the various loan agreements pursuant to which the loans were made, the Restructuring Agreement and the purported Settlement Agreement) have New York choice of law provisions, it is New York law that governs the analysis.  *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 146 n.3 (2d Cir. 2002).  New York law takes a very restricted view of the right of recoupment that does not apply to the breach of contract claims asserted against the Lehman Debtors in the Claims Objection.  *See McMahon*.  Further, your reliance on *Newbury* (which does not even purport to apply New York law) is misplaced because in that case the court was relying on the express integration of the contracts at issue.  Here, the integration and merger language in the Restructuring Agreement (and even the language of the proposed draft Settlement Agreement) expressly excludes the Loan documents.

The bankruptcy court in the Lehman Debtors' chapter 11 cases has the final say regarding the scope of the automatic stay.  *In re Palmdale Hills Property, LLC.* at 668.  Accordingly, it is incumbent upon the Voluntary Debtors and SunCal Management, LLC to seek relief from the automatic stay in Lehman Debtors' chapter 11 cases before proceeding with the Claim Objection.



Paul J. Couchot
Ronald Rus
April 25, 2011
Page 4

On a related matter, on April 15, 2011, Martin Pritikin sent a letter asking that the Lehman Parties accept expedited discovery in connection with the Claim Objection and that it be coordinated with the breach of contract action recently filed in the Orange County Superior Court, entitled *Acton Estates vs. Lehman ALI*, Case No. 30-2011-00460847-CU-BC-CJC.  A few days later he sent a follow-up e-mail requesting production of documents from the stayed Equitable Subordination adversary explaining:

> Because the documents [sic] production undertaken in connection with the equitable subordination/substantive consolidation matters should be inclusive of any document production that would be sought in connection with either the pending motion to disallow claims or the state court breach of contract action, I would think in the interests of efficiency all parties would want to stipulate that the document production in eq sub would be used as the document production in the other matters, and that no new document requests would need to be propounded.

Further, Mr. Pritikin's e-mail requested the completion of document discovery from Barclays that was initiated in the Equitable Subordination adversary and is encompassed within Judge Smith's discovery stay.

It is clear that the SunCal Plan Proponents are attempting to use the Claim Objection to circumvent the Lehman Debtors' automatic stay; the application of which has now been recognized and confirmed by Judges Smith and Peck and appellate courts in the Ninth and Second Circuits.  Consequently, the Lehman Parties will not participate in discovery unless and until your clients obtain relief from the automatic stay.  Further, we will not be coordinating discovery with the newly filed state court action that is not even at issue and, in any event, is in the process of being removed to the Bankruptcy Court.



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

Paul J. Couchot
Ronald Rus
April 25, 2011
Page 5

The Claim Objection should be taken off calendar until the stay violation issue has been resolved by Judge Peck in the Lehman Debtors' chapter 11 cases. As a result, the date and time of our response to the Claim Objection will depend upon the outcome of your request for stay relief.

We see no reason why any of the above should necessarily affect the plan confirmation process. We intend to seek approval of our disclosure statements and plans on the current timeframe and suspect that you will move forward with yours, subject to appropriate modifications needed on a variety of grounds that will be set forth in our objections and based on the representations, procedures and processes in Mr. O'Keefe's letter discussed above.

Sincerely,

Dean A. Ziehl

DAZ

cc:   <u>Via Email</u>:
      Martin Pritikin
      Alan Friedman
      William Lobel
      Lei Lei Wang Ekval
      Edward Soto

# Exhibit "J"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                         :

In re                                       :        **Chapter 11**
                                                          :

**LEHMAN BROTHERS HOLDINGS INC., et al.,**  :        **Case No. 08-13555 (JMP)**
                                                          :

                          **Debtors.**           :        **(Jointly Administered)**
                                                          :

------------------------------------------------------------------x

**ORDER GRANTING MOTION OF THE**
**DEBTORS PURSUANT TO SECTION 362(a) OF THE**
**BANKRUPTCY CODE FOR ENFORCEMENT OF THE AUTOMATIC STAY**

Upon the motion, dated May 24, 2011 (the "Motion")[1] of Lehman Brothers

Holdings Inc. ('LBHI") and its affiliated debtor, Lehman Commercial Paper Inc. ("LCPI"), as

debtors and debtors in possession (together, the "Debtors") in the above-captioned chapter 11

cases, seeking entry of an order enforcing the automatic stay with respect to the SunCal

Movants, all as more fully described in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

the Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New York

Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the second amended order entered on June 17, 2010 governing case

management and administrative procedures for these cases [Docket No. 9635] to (i) the U.S.

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in
the Motion.

Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) the SunCal Movants, and (vii) all other parties entitled to notice in

these chapter 11 cases; and it appearing that no other or further notice need be provided;; and a

hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the

Court having found and determined that the relief sought in the Motion is in the best interests of

LBHI, LCPI and the other Debtors; and after due deliberation and sufficient cause appearing

therefor, it is

        ORDERED that the Motion is granted; and it is further

        ORDERED that the automatic stay is in effect to the portions of the SunCal

Motions that seek to (a) disallow, pursuant to section 502(d) of the Bankruptcy Code, any claim

of a Debtor against a SunCal Debtor; (b) assert against a Debtor any claims or remedies based

upon the alleged breaches of contract pled in the Claim Objection; or (c) assert a right to

"recoupment" from the proceeds of a Debtor's collateral; and it is further

        ORDERED that this Order is without prejudice to the SunCal Movants to seek

additional relief from stay; and it is further

        ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from, or related to, the implementation and/or interpretation of this Order.

Dated: _____, 2011
      New York, New York


_____
     UNITED STATES BANKRUPTCY JUDGE