RESPONSE TO THE DEBTOR'S ONE HUNDRED EIGHTEENTH OMNIBUS OBJECTION TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS AN EQUITY INTERESTS) (APRIL 6, 2011) FOR CLAIM NUMBER 14023

Bankruptcy Court: United States Bankruptcy Court of Southern District of New York

Debtors: Lehman Brothers Holdings Inc., et al.

Chapter 11 Case No. 08-13555 (JMP)

Response to the Debtor's One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as an Equity Interests)

Creditor Name and Address:
HUTTON, RANDALL J.
22 HILLSIDE LANE
NEW HOPE, PA 18938

Claim Number: 14023

Date Filed: 9/16/09

Amount of Claim: $7,566,140.00 (the "Claim"). This amount is reduced from originally filed claim of $8,851,649.15. The revised amount only refers to a portion of the initial claim relating to deferred compensation under the employment contract (see Exhibit B).

<u>Reasons why the claim should not be reclassified for the reasons set forth in the Objection:</u>

I had a signed employment contract ("the Contract") dated December 10, 2004 with Neuberger Berman, LLC ("the Debtor") (Exhibit A). The Contract specifies the consideration/compensation for my services throughout its term which was calculated annually through a defined formula. Per the Contract, Lehman had the discretion to pay a portion of compensation in the form of conditional equity awards ("Conditional Equity") which is the amount of the Claim.

The Debtor had filed for bankruptcy before any of these Conditional Equity amounts were paid to me.

Given the Conditional Equity amount is a contractual obligation for a stated amount and only a stated amount, the Conditional Equity was in form of compensation only—not ultimate value. Had the Debtor not filed for bankruptcy, Lehman could have satisfied the Conditional Equity by delivering the contracted amount of the Claim in stock when it was due in satisfaction with the Contract terms.

To illustrate this point, assume that Lehman did not file for bankruptcy, but instead its stock increased in value substantially. When the Conditional Equity was due to be delivered to pursuant to the terms of the Contract, Lehman could limit the amount of equity delivered to me to the contracted amount of the Claim, even though the market value of the Conditional Equity was much greater. Lehman could argue that under the Contract and under general contract principles, it is only responsible for the contracted amount and not the higher equity market value amount. Thus, I did not have the upside of an equity investor.

Given that the Conditional Equity that I received under the Contract was capped under the Contract amount under general contract law principles, it does not meet the Bankruptcy Code definition of "security" as defined in section 510(b) as the Debtor alleges.

In Enron Corp Opinion Regarding Employee Claims Related to Ownership of Stock Options, and Granting 13th, 19th, and 22nd Omnibus Objections to Proof of Claim, (dated May 2, 2006) Judge Arthur J. Gonzalez describes the absolute priority rule, "In return for the right to share in the profits of a corporation, securityholders must also accept the risk of insolvency and therefore precluded from sharing in the distribution of the estate until all general creditors have been satisfied. Securityholders thus accept greater risk in return for the opportunity of a greater reward, whereas general creditors bear less risk commensurate with the fixed nature of their reward."

Given that the Conditional Equity was contractually capped at a calculated amount, it compromised any right to share in the profits of Lehman.

Per these reasons, the Conditional Equity amount should be not be considered a security per section 510(b) as the Debtor alleges, but should be a general unsecured claim against the Debtor. Thus, I respectfully petition the court to deny the Debtors request to reclassify the Claim as an equity interest.

Dated: May 16, 2011

*[signature]*

Randall Hutton

22 Hillside Lane
New Hope, PA 18938
215-693-1068


Claim Number: 14023


<u>All documentation or evidence to the claim, to the extent not included in the proof of claim previously filed with the Bankruptcy Court</u>

Exhibit A: Employment Contract ("the Contract") with Neuberger Berman, LLC dated December 10, 2004

Exhibit B: Conditional Equity amounts under Contract

Distribution / Delivery:

The Chambers of the Honorable James M. Peck
One Bowling Green
Courtroom 601
New York, NY 10004

Weil, Gotshal & Manges LLP
767 Fifth avenue
New York, NY 10153
(Attn: Robert J. Lemons, Esq. and Mark Bernstein, Esq.)

Office of the United States Trustee for Region 2
33 Whitehall Street, 21st Floor
New York, NY 10004
(Attn: Tracy Hope Davis, Esq., Elisabetta Gasparini, Esq. and Andrea B. Schwartz, Esq.)

Milbank, Tweed, Hadley & McCloy LLP,
1 Chase Manhattan Plaza
New York, NY 10005
Attn: Dennis F. Dunne, Dennis O'Donnell, Esq and Evan Fleck, Esq.)

EXHIBIT A

EXECUTION COPY

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT (the "Agreement") between Neuberger Berman, LLC, a Delaware limited liability company (the "Company"), and Randall Hutton (the "Executive"), dated as of December 10, 2004.

## R E C I T A L S:

WHEREAS, the Executive is currently employed by the Company as a Vice President and Portfolio Manager;

WHEREAS, the Company desires to continue to employ the Executive and the Executive has indicated his willingness to continue to provide his services, on the terms and conditions set forth herein.

NOW, THEREFORE, on the basis of the foregoing premises and in consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

Section 1. <u>Employment</u>. The Company hereby agrees to employ the Executive and the Executive hereby accepts employment with the Company, on the terms and subject to the conditions hereinafter set forth. Subject to the terms and conditions contained herein, the Executive shall serve as a Senior Portfolio Manager of the LibertyView Division of the Company. In such capacity, Executive shall report directly to Richard Meckler or such other officer of the LibertyView Division of the Company as may be reasonably determined by the President of the LibertyView Division of the Company from time to time (the "Designated Reporting Person"), and shall have such duties as are typically performed by a Senior Portfolio Manager, including, but not limited to, taking all actions necessary to implement credit strategies for the various funds and accounts advised by the LibertyView Division. In addition, the Executive shall be responsible for such additional duties, commensurate with the Executive's position as a Senior Portfolio Manager, as may be reasonably assigned to the Executive from time to time by the Designated Reporting Person and/or the President of the LibertyView Division of the Company.

Section 2. <u>Term</u>. This Agreement shall be effective as of January 1, 2005 (the "Effective Date"). Unless terminated pursuant to Section 6 hereof, the Executive's employment hereunder shall commence on the Effective Date and shall continue during the period ending on the third anniversary of the Effective Date (the "Initial Term"). Thereafter, the Executive's term of employment may be extended at the Company's election (on terms that are no less favorable to the Executive than the terms provided herein, except as provided in Section 3(c) hereof) for one year if the Company provides written notice of extension to the Executive not less than ninety (90) days prior to the end of the Initial Term, and the Executive agrees to accept such additional one year term of employment. The Initial Term, together with the extension pursuant to this Section 2 (the "Extended Term") as applicable, is referred to herein as the "Employment Term." The Employment Term shall terminate upon any termination of the Executive's employment pursuant to Section 6.

Section 3. <u>Compensation</u>. During the Employment Term, the Executive shall be entitled to the following compensation and benefits:

EXECUTION COPY

a) <u>Salary</u>. As compensation for the performance of the Executive's services hereunder, the Company shall pay to the Executive a salary (the "Salary") of $160,000 per annum. The Company may, in its discretion, and in accordance with the Company's policies, increase the Salary during the Employment Term. The Salary shall be payable in accordance with the payroll practices of the Company as the same shall exist from time to time.

b) <u>Bonus Plan</u>. The Company shall pay the Executive an annual bonus, if any, which shall be provided pursuant to a bonus pool established for the employees of the Company (the "Annual Bonus"). The amount of the Executive's Annual Bonus shall be calculated by the senior management of the Company pursuant to the formula provided on Schedule 1, attached hereto, for each calendar year during the Employment Term. The Annual Bonus shall be paid to the Executive on an annual basis following completion of the calendar year on which the Annual Bonus is based consistent with the timing of bonus distributions to similarly situated employees of the LibertyView Division of the Company for such calendar year (the "Annual Bonus Payment Date"). Except as set forth in Section 6(f) herein, for terminations of employment (i) by the Company without Cause, (ii) by the Executive for Good Reason, (iii) on account of a nonextension of the Initial Term by either the Executive or the Company, or (iv) upon expiration of the Extended Term, the Annual Bonus shall not be earned or paid to the Executive unless the Executive is employed by the Company on the Annual Bonus Payment Date.

c) <u>Signing Bonus</u>. In addition to the bonus earned, if any, calculated pursuant to Schedule 1, the Company shall pay $750,000 to Executive ("Signing Bonus"), in three equal cash installments of $250,000 on or about each of January 31, 2005, January 31, 2006 and January 31, 2007 (each a "Signing Bonus Payment Date"). Except as set forth in Section 6(f) herein, for terminations of employment (i) by the Company without Cause, (ii) by the Executive for Good Reason, or (iii) on account of a nonextension of the Initial Term by either the Executive or the Company, each installment of the Signing Bonus shall not be earned or paid to the Executive unless the Executive is employed by the Company on the respective Signing Bonus Payment Date. At the Company's option, any or all of the Signing Bonus installment payments may be paid to Executive in fully vested Lehman Brothers Holdings Inc. stock subject to an effective registration statement filed with the Securities Exchange Commission, valued as of the respective Signing Bonus Payment Date. Upon mutual written agreement of the Executive and Company, an alternate Signing Bonus payment methodology may be determined in advance of a Signing Bonus Payment Date. For purposes of the Company's right to extend Executive's contract for one year pursuant to Section 2 hereof, the Signing Bonus shall not be considered with respect to the Company's obligation to offer a contract extension on terms that are no less favorable to the Executive than the terms otherwise provided herein.

d) <u>Benefits, Indemnification.</u> The Executive shall be entitled to participate in health, insurance, pension, and all other welfare and benefit plans, programs, practices and policies provided to similarly situated employees of the Company, on terms no less favorable than those available to such other employees of the Company. The Executive shall also be entitled to the same number of vacation days, holidays, sick days and other benefits, as applicable, as are generally allowed to similarly situated employees of the Company in accordance with the Company's policies in effect from time to time. The Company will grant the Executive service credit for Executive's employment with CPR (USA) Inc. for purposes of eligibility and vesting in the benefit plans and programs of the Company, including without limitation, the Company's vacation policy and severance policy, provided that in no event will service credit be granted (i) for purposes of the tax-qualified profit sharing plan maintained and sponsored by the Company, or (ii) if such service credit grant would result in duplication of benefits. In connection with Executive's employment with the Company, Executive will be eligible for indemnification by Lehman Brothers Holdings Inc. ("LBHI") to the extent provided, and subject to the limitations contained in, LBHI's applicable Charter and Bylaw provisions and in the Delaware General Corporation Law. LBHI shall provide Executive with a letter requesting Executive to serve at the Company under this Agreement.

(e) <u>Equity Award Program.</u> At the Company's discretion a portion of the total compensation (combined base salary, bonus and other compensation) payable to the Executive with respect to the 2006 performance year and thereafter, including amounts other than the Signing Bonus payable under this Agreement, will be payable in the form of conditional equity awards (restricted stock units, stock options, and/or other equity-based awards). Subject to Section 6(f) of this Agreement, the terms and conditions of such awards, including conditions on vesting, exercisability and forfeiture, will be established by the Company in its discretion pursuant to broad-based equity-award programs in effect from time to time.

Section 4. <u>Exclusivity.</u> During the Employment Term, the Executive shall devote his full time to the business of the Company, shall faithfully serve the Company, shall in all respects conform to and comply with the lawful and reasonable directions and instructions given to him by the Designated Reporting Person in accordance with the terms of this Agreement, shall promote and serve the interests of the Company and shall not engage in any other business activity, whether or not such activity shall be engaged in for pecuniary profit, except that the Executive may (i) participate in the activities of professional trade organizations related to the business of the Company, and (ii) engage in personal and family investing activities consistent with the Company's policies therewith; <u>provided</u> that activities set forth in these clauses (i) and (ii), either singly or in the aggregate, do not interfere in any material respect with the services to be provided by the Executive hereunder.

Section 5. <u>Reimbursement for Expenses.</u> The Executive is authorized to incur reasonable expenses in the discharge of the services to be performed hereunder, including expenses for travel, entertainment, lodging, maintaining professional licenses, and similar items,

05/16/2011 16:12 FAX 2015332211 ☒0004/0014
08-13555-mg Doc 17078 Filed 05/17/11 Entered 05/25/11 11:30:21 Main Document
Pg 7 of 19

EXECUTION COPY

in accordance with the Company's expense reimbursement policy, as the same may be modified by the Company from time to time. The Company shall reimburse the Executive for all such proper expenses upon presentation by the Executive of itemized accounts of such expenditures in accordance with the financial policy of the Company, as in effect from time to time.

Section 6. Termination of Employment.

a) Cause. The Company may terminate the Executive's employment during the Employment Term with "Cause" as that term is defined below. In the event of termination pursuant to this Section 6(a) with Cause, the Company shall deliver to the Executive written notice setting forth the basis for such termination, which notice shall specifically set forth the nature of the Cause which is the reason for such termination. Termination of the Executive's employment under this clause (a) shall be effective upon delivery of such notice of termination. For purposes of this Agreement, "Cause" shall mean: (i) the Executive's failure (except where due to disability, in which event the provisions of the Company's policies with respect thereto shall control), neglect or refusal to perform the essential duties of his position hereunder which failure, neglect or refusal shall not have been corrected by the Executive within 30 days of receipt by the Executive of written notice from the Company of such failure, neglect or refusal, which notice shall specifically and in detail set forth the nature of said failure, neglect or refusal; (ii) any willful misconduct by the Executive that has the effect of materially injuring the reputation or business of the Company or its affiliates; (iii) any continued or repeated absence from the Company, unless such absence is approved or excused by the Designated Reporting Person or is the result of the Executive's illness or disability (in which event the provisions of the Company's policies with respect thereto shall control); (iv) a felony for which the Executive is convicted or pleads guilty or nolo contendre; or (v) the commission by the Executive of an act of fraud or embezzlement.

b) Resignation. Unless otherwise provided in Section 6(d) below in the case of a termination of employment for Good Reason, the Executive shall have the right to terminate his employment at any time by giving to the Company 60 days written notice of his resignation other than for Good Reason.

c) Without Cause. The Company may terminate the Executive's employment during the Employment Term "Without Cause", as that term is defined below, at any time by giving written notice to the Executive. A termination of the Executive's employment "Without Cause" shall mean a termination initiated by the Company for any reason other than Cause or on account of death or disability (in which event, except as otherwise provided herein, the provisions of the Company's policies with respect thereto shall control). A termination Without Cause shall be effective immediately upon notice given by the Company to the Executive.

4

EXECUTION COPY

d) <u>Good Reason</u>. The Executive shall have the right to terminate his employment for "Good Reason" under the following circumstances: (i) the failure by the Company to promptly pay to the Executive the Salary, Annual Bonus, Signing Bonus, or promptly provide the benefits in accordance with Section 3(d) hereof and applicable law; (ii) a material diminution in the Executive's responsibilities or authority; (iii) the failure of any successor to all or substantially all of the business and/or assets of the Company to assume the Agreement; <u>provided, however</u>, that Good Reason shall not exist upon a termination of employment described in Section 6(a), (b) or (c); <u>provided, further</u>, that the Executive must provide the Company with written notice identifying in reasonable detail the act or acts constituting Good Reason within 30 days following the Executive's knowledge of such event constituting Good Reason or such event shall not constitute Good Reason hereunder. Notwithstanding the foregoing, Good Reason shall not be deemed to exist unless the Company fails to cure the event giving rise to Good Reason within 30 days after receipt of written notice thereof given by the Executive, and the Executive thereafter has given notice to the Company of termination for Good Reason.

e) <u>Survival of Operative Sections</u>. Upon any termination of the Executive's employment, the provisions of Sections 6(f) through 19 of this Agreement shall survive to the extent necessary to give effect to the provisions thereof.

f) <u>Payments in the event of Termination</u>. (i) In the event that the Executive's employment with the Company terminates for any reason, the Company shall pay to the Executive all amounts earned and accrued but unpaid hereunder through the date of termination (the "Termination Date") in respect of Salary, unreimbursed expenses, and other benefits due pursuant to the terms of the Company's relevant plans, policies or programs. Except as otherwise provided below in this Section 6(f), for purposes of the immediately preceding sentence, an Annual Bonus shall not be earned or accrued until the Annual Bonus Payment Date (provided the Executive is employed with the Company on such date). (ii) In the event that the Executive's employment with the Company terminates on account of the expiration of the Initial Term because the Initial Term is not extended by either the Company or by the Executive, in addition to any payments pursuant to clause (i) above, the Company shall pay to the Executive his Annual Bonus in full for the third calendar year of the Initial Term (to the extent earned and calculated pursuant to Schedule 1) whether or not Executive is employed on the Annual Bonus Payment Date for such year, such payment to be no later than such Annual Bonus Payment Date. (iii) In the event that the Executive's employment with the Company terminates on account of the expiration of the Extended Term, in addition to any payments pursuant to clause (i) above, the Company shall pay to the Executive his Annual Bonus in full for the fourth calendar year of the Employment Term (to the extent earned and calculated pursuant to Schedule 1) whether or not Executive is employed on the Annual Bonus Payment Date for such year, such payment to be no later than such Annual Bonus Payment

5

Date. (iv) In the event the Executive is terminated by the Company without Cause or the Executive terminates his employment for Good Reason, the Company shall pay to the Executive (x) the full Salary payable to the Executive through the end of the Initial Term or Extended Term, as applicable, which, at the Company's sole option may be paid in lump sum within 30 days of Executive's termination date, plus (y) any unpaid installments of the Signing Bonus, plus (z) a pro-rata portion of his Annual Bonus for the calendar year during which the Executive's employment terminated, calculated pursuant to the formula provided on Schedule 1 as of the respective Annual Bonus Payment Date and payable in a lump sum on such date. In addition to the payments in clauses (i), (ii), (iii) and (iv) in this Section 6(f), as applicable, the Executive may be eligible for severance benefits pursuant to the severance policy of the Company (or an affiliate of the Company), as then in effect. Amounts owed by the Company in respect of the Salary or reimbursement for expenses under clause (i) above shall be paid as soon as practicable upon any termination, but in no event more than 30 days after the Termination Date. The timing of any other such payments shall be in the normal course, as determined by the Company's relevant plans, policies and programs. The payment of any full or pro-rata portion of an Annual Bonus or other severance amounts described in this Section 6(f) shall be subject to the execution and delivery by the Executive of a standard release of claims in the form used by the Company under its severance plan then in effect. Notwithstanding anything to the contrary in the Agreement, the disposition upon termination of employment of any conditional equity awards to Executive will be governed by the terms of the applicable plan documents and award agreements, provided that, notwithstanding such terms, upon any termination of employment by the Company without Cause, by the Executive for Good Reason, on account of the expiration of the Initial Term because the Initial Term is not extended by either the Company or by the Executive, or upon the expiration of the Extended Term, such conditional equity awards shall be treated as they would be treated under the "Involuntary Termination without Cause" provisions as described in Lehman Brothers Equity Award Program dated February 2004.

Section 7.    Restrictive Covenants.

a) Nondisclosure of Confidential Information. The Executive, except in connection with his employment hereunder, shall not disclose to any person or entity or use, during the Employment Term or at any time thereafter, any information not in the public domain or generally known in the industry, in any form, acquired by the Executive while employed by the Company or any of its affiliates or any predecessor to the Company's or any of its affiliates' business or, if acquired following the Employment Term, such information which, to the Executive's knowledge, has been acquired, directly or indirectly, from any person or entity owing a duty of confidentiality to the Company or any of its affiliates, relating to the Company or any of its affiliates, including but not limited to information regarding customers, vendors, suppliers, trade

6

secrets, training programs, manuals or materials, technical information, contracts, systems, procedures, mailing lists, know-how, trade names, improvements, price lists, financial or other data (including the revenues, costs or profits associated with any of the products or services of the Company or any of its affiliates), business plans, code books, invoices and other financial statements, computer programs, software systems, databases, discs and printouts, plans (business, technical or otherwise), customer and industry lists, correspondence, internal reports, personnel files, sales and advertising material, telephone numbers, names, addresses or any other compilation of information, written or unwritten, which is or was used in the business of the Company or any of its affiliates. The Executive agrees and acknowledges that all of such information, in any form, and copies and extracts thereof, are and shall remain the sole and exclusive property of the Company and any of its affiliates, and upon termination of his employment with the Company or any of its affiliates, the Executive shall return to the Company the originals and all copies of any such information provided to or acquired by the Executive in connection with the performance of his duties for the Company and any of its affiliates, and shall return to the Company all files, correspondence and/or other communications received, maintained and/or originated by the Executive during the course of his employment.

b) <u>No Interference</u>. During the period beginning on the Effective Date and ending on the first anniversary of the date on which the Executive's employment with the Company is terminated for any reason (except as provided below), the Executive shall not, whether for his own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company or any of its subsidiaries or affiliates), directly solicit, endeavor to entice away from the Company or any of its subsidiaries or affiliates, or otherwise directly interfere with the relationship of the Company or any of its affiliates, with any person or entity (i) who is employed by or otherwise engaged to perform services for the Company or any of its affiliates or (ii) who is a client of the Company or any of its affiliates, its predecessors or any of its subsidiaries or affiliates (it being agreed that the Executive shall not be in violation of this Section 7(b) if, following the Executive's termination of employment from the Company, the Executive becomes affiliated with an entity that has clients that are also clients of the Company or any of its affiliates (subject to Section 7(a) herein)); provided the Executive is not engaging in the activities that are prohibited under this Section 7(b)). Notwithstanding the forgoing, the restriction with respect to the solicitation or enticement of, or interference with, clients in clause (ii) shall not apply to the Executive if the Company does not elect to renew the Employment Term for the one year period immediately following the expiration of the Initial Term pursuant to Section 2 herein, upon expiration of the Extended Term, if the Company terminates the Executive's employment without Cause, or if the Executive terminates his employment for Good Reason. For purposes of clarity, in the event the Company offers to renew the Employment Term for the one year period immediately following

7

05/16/2011 16:15 FAX 2015332211                                                        ☒0008/0014
08-13555-mg    Doc 17078    Filed 05/17/11    Entered 05/25/11 11:30:21    Main Document
                                       Pg 11 of 19

EXECUTION COPY

the expiration of the Initial Term pursuant to Section 2 herein and the Executive rejects such offer of renewed employment, the restrictions provided in this Section 7(c) shall apply to the Executive. For purposes of this Section 7(c), "directly" means to supervise, organize or guide the performance of such solicitation, enticement or interference, including, without limitation, contacting such clients, participating in sales presentations for such clients or providing or otherwise disclosing to any party other than the Company or its affiliates any confidential information regarding such clients).

c) Inventions, etc. The Executive hereby sells, transfers and assigns to the Company or to any person or entity designated by the Company all of the entire right, title and interest of the Executive in and to all inventions, ideas, disclosures and improvements, whether patented or unpatented, and copyrightable material, made or conceived by the Executive, solely or jointly, during his employment by the Company or any of its affiliates, which directly relate to methods, apparatus, designs, products, processes or devices, sold, leased, used or under development by the Company or its affiliates, or which otherwise directly relate or pertain to the business, functions or operations of the Company or its affiliates or which arise from the efforts of the Executive during the course of his employment with the Company or any of its affiliates (the "Inventions"). The Executive shall communicate promptly and disclose to the Company, in such form as the Company requests, all information, details and data pertaining to the Inventions. The Executive shall execute and deliver to the Company such formal transfers and assignments and such other papers and documents as may be necessary or required of the Executive to permit the Company or any person or entity designated by the Company to file and prosecute the patent applications and, as to copyrightable material, to obtain copyright thereof. Any invention relating to the business of the Company and disclosed by the Executive within one year following the termination of his employment with the Company or any of its affiliates shall be deemed to fall within the provisions of this paragraph unless proved to have been first conceived and made following such termination.

d) Non-Disparagement. The parties hereto agree that neither shall, either during the Employment Term or at any time thereafter, disparage the other (including, with respect to the Company, any of its respective subsidiaries or affiliates, or any of its officers, directors, employees, or shareholders). The obligations of parties under this Section 7(e) shall not apply to disclosures required by applicable law, regulation or order of a court or governmental agency.

e) Licensing. As soon as reasonably practicable after the date hereof, and for the remainder of the Employment Term, the Executive shall (if he has not already done so) obtain, as the case may be, and continue to maintain, the Series 7 and 63 licenses, and any other licenses as may be reasonably required so that the Executive may perform the services that he is to perform hereunder and receive the compensation payable to him hereunder.

EXECUTION COPY

Section 8.     Injunctive Relief. Without intending to limit the remedies available to the Company, the Executive acknowledges that a breach of any of the covenants contained in Section 7 hereof may result in material irreparable injury to the Company or its subsidiaries or affiliates for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of such a breach or threat thereof, the Company shall be entitled to obtain a temporary restraining order and/or a preliminary or permanent injunction, without the necessity of proving irreparable harm or injury as a result of such breach or threatened breach of Section 7 hereof, restraining the Executive from engaging in activities prohibited by Section 7 hereof or such other relief as may be required specifically to enforce any of the covenants in Section 7 hereof.

Section 9.     Extension of Restricted Period. In addition to the remedies the Company may seek and obtain pursuant to Section 8 of this Agreement, the period of the covenants described in Section 7 shall be extended by any and all periods during which the Executive shall be found by a court to have been in violation of such covenants.

Section 10.    Representations and Warranties of the Company and the Executive. The Company and the Executive represent and warrant to each other as to themselves as follows:

   a) This Agreement, upon execution and delivery by such party (assuming due execution and delivery hereof by the other party), will be the valid and binding obligation of such party enforceable against such party in accordance with its terms. This Agreement has been duly authorized by all necessary action on behalf of the Company and has been duly and validly executed and delivered on behalf of the Company.

   b) Neither the execution and delivery of this Agreement nor the performance of this Agreement in accordance with its terms and conditions by the Company or the Executive (i) requires the approval or consent of any governmental body or of any other person or (ii) conflicts with or results in any breach or violation of, or constitutes (or with notice or lapse of time or both would constitute) a default under, any agreement, instrument, judgment, decree, order, statute, rule, permit or governmental regulation applicable to the Company or the Executive. Without limiting the generality of the foregoing, the Executive is not a party to any non-competition, non-solicitation, no hire or similar agreement that restricts in any way the Executive's ability to engage in any business or to solicit or hire the employees of any person.

   c) The representations and warranties of the Company and the Executive contained in this Section 10 shall survive the execution and delivery of this Agreement.

Section 11.    Successors and Assigns; No Third-Party Beneficiaries. This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of the Company. This Agreement, and the Executive's rights and obligations hereunder, may not be assigned by the Executive. Any purported assignment by the Executive in violation hereof shall be null and void. Notwithstanding the foregoing, the Company shall have the unrestricted right to assign this

Agreement and to delegate all or any part of its obligations hereunder to any of its affiliates (or other persons or entities in connection with any sale, transfer or other disposition of all or substantially all of the assets or business of the Company (or an affiliate or subsidiary of the Company), whether by merger, consolidation or otherwise), but in such event such assignee shall expressly assume all obligations of the Company hereunder.

Section 12.    Waiver and Amendments. Any waiver, alteration, amendment or modification of any of the terms of this Agreement shall be valid only if made in writing and signed by the parties hereto

Section 13.    Severability; Governing Law; Jurisdiction.

The Executive acknowledges and agrees that the covenants set forth in Section 7 hereof are reasonable and valid in geographical and temporal scope and in all other respects. If any of such covenants or such other provisions of this Agreement are found to be invalid or unenforceable by a final determination of a court of competent jurisdiction (a) the remaining terms and provisions hereof shall be unimpaired and (b) the invalid or unenforceable term or provision shall be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. **EXCEPT AS OTHERWISE PROVIDED IN SECTION 3(d) HEREOF, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE.**

For purposes of Section 8 of this Agreement, the parties hereby (i) submit to the exclusive jurisdiction of the courts of the State of New York and the U.S. federal courts (sitting in New York County, New York, and the U.S. federal courts in the Southern District of New York, respectively)) for any action or proceeding relating to this Agreement, (ii) consent that any such action or proceeding shall be brought in any such venue, (iii) waive any objection that any such action or proceeding, if brought in any such venue, was brought in any inconvenient forum and agree not to claim the same, (iv) agree that any judgment in any such action or proceeding may be enforced in other jurisdictions, and (v) consent to service of process at the address set forth in Section 14 herein.

Section 14.    Notices.

All communications under this Agreement shall be in writing and shall be delivered by hand, by facsimile, mailed by overnight courier or by registered or certified mail, postage prepaid:

    (i)    if to the Executive, to 210 Hudson Street, Hoboken, NJ 07030, with a copy (which shall not constitute notice hereunder) to Leonard B. Pack, Esq., 116 John Street—33rd Floor, New York, NY 10038, or to such other address as the Executive may have furnished the Company in writing;

    (ii)    if to the Company to Neuberger Berman, LLC, 605 Third Avenue, New York, NY 10158, Attention: Ivonne Samaniego and Neuberger Berman,

LLC, 111 River Street – Suite 1000, Hoboken, NJ 07030, Attention: Steven Rogers or such other addresses as it may have furnished in writing to the Executive, or

Any notice so addressed shall be deemed to be given: if delivered by hand or sent via facsimile, on the date of such delivery; if mailed by courier, on the first business day following the date of such mailing; and if mailed by registered or certified mail, on the third business day after the date of such mailing.

Section 15.    <u>Section Headings</u>. The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof, affect the meaning or interpretation of this Agreement or of any term or provision hereof.

Section 16.    <u>Entire Agreement</u>. This Agreement and the Exhibits hereto, as applicable, constitute the entire understanding and agreement of the parties hereto regarding the employment of the Executive. This Agreement and the Exhibits hereto supersede all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties relating to the subject matter of this Agreement.

Section 17.    <u>Severability</u>. In the event that any part or parts of this Agreement shall be held illegal or unenforceable by any court or administrative body of competent jurisdiction, such determination shall not effect the remaining provisions of this Agreement which shall remain in full force and effect.

Section 18.    <u>Legal Fees</u>. Each Party hereto shall be responsible for the payment of their own legal fees in connection with the negotiation and preparation of this Agreement.

Section 19.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same agreement.

[Signature Page Follows]

EXECUTION COPY

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

Neuberger Berman, LLC

By: _____
Name: KEVIN HANDWERKER
Title: CAO AND GENERAL COUNSEL


Randall Hutton

_____

EXECUTION COPY

## SCHEDULE 1

### Credit Group Bonus Pool

**General:** The Executive shall receive an annual cash bonus (the "Annual Bonus") pursuant to a bonus pool established for the employees of the LibertyView Division of the Company responsible for managing the credit strategies for the LibertyView funds and accounts. The amount of the Annual Bonus to be allocated to the Executive and all other Eligible Employees (as defined below) of the LibertyView Division of the Company shall be determined in accordance with the formula set forth in this Schedule 1. The Annual Bonus shall be paid to the Executive and all other Eligible Employees on an annual basis. Except as otherwise provided in the Executive's employment agreement with the Company, in the event the Executive is terminated without Cause or terminates for Good Reason, in each case, as defined in the Executive's employment agreement, said Executive will be entitled to receive an Annual Bonus as calculated from January 1st of the relevant bonus year through the date of the termination without Cause or Good Reason.

**Eligible Employees:** Set forth on Schedule 1A, attached hereto (and as may be amended from time to time) is a list of the employees (together with the title and position of such employees) and eligible consultants who are eligible to receive an Annual Bonus from the Credit Group Bonus Pool (the "Eligible Employees"). The Eligible Employees listed on Schedule 1A shall be determined by the Executive and Richard Meckler, as approved in writing by the Company on an annual basis, but no later than December 1 of each bonus year. Distribution of the Credit Group Bonus Pool shall be as determined by the Executive and Richard Meckler, as approved in writing by the Company, subject to the provision that, as qualified by the Equity Award Program, 100% of the Credit Group Bonus Pool will be paid to Eligible Employees.

**Calculation Period:** January 1 through December 31, subject to the Company's right to adjust the Calculation Period to coincide with the Company's or LBHI's fiscal year.

**Pay Date:** On or about the January 31st following the conclusion of the Calculation Period for the immediately preceding bonus year.

**Calculation:** With the exception of January 2005, The Credit Group Bonus Pool in each Calculation Period will be equal to the sum of:

1. For trading in the LibertyView Credit Opportunities Fund, LP (the "COF Fund"):

    a) 50% of the first $2 million in incentive fees earned by the COF Fund; plus

    b) 40% of incentive fees earned by the COF Fund from $2,000,001 to $4 million; plus

    c) 45% of the incentive fees earned by the COF Fund in excess of $4 million.

2. For trading in existing funds and accounts other than the LibertyView Credit Opportunities Fund, LP:

**EXECUTION COPY**

    a)    45% of the first $1 million in incentive fees earned by the fund or account attributable to Credit Group trading (as determined by the P&L by strategy system), net of the management fee hurdle; plus

    b)    40% of the incentive fees earned by the fund or account in excess of $1 million attributable to Credit Group trading (as determined by the P&L by strategy system, net of the management fee hurdle.

3. 100% of the fees received by the LibertyView Division from SKM-LibertyView CBO I, Ltd.

EXHIBIT B

Randall J. Hutton
Employee Number: 20004734

I. Deferred Compensation under employment contract:

|  | Grant Date | Grant Price | Grant Value | Claim Amount |
|---|---|---|---|---|
| 2006 SVP Principal and Discount | 1/30/2007 | 60.71 | $ 5,223,049.00 | $ 5,223,049.00 |
| 2007 SVP Principal and Discount | 1/28/2008 | 45.47 | $ 2,343,091.00 | $ 2,343,091.00 |
| Total: |  |  |  | $ **7,566,140.00** |

# LEHMAN BROTHERS | LehmanLive

ta as of August 31, 2008                                                    20004734 Randall J. Hutto

## AWARD UNITS¹ OUTSTANDING

| Grant Date | Description | Grant Price | Grant Value² | Restriction Ends | Units Granted | Dividend Equivalents | Units Delivered | Units Vested | Units Outstanding | Market Value at $0.033 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/28/2008 | 2007 SVP Principal | $45.4700 | $1,757,318 | 11/30/2012 | 38,647.86 | 796.02 | 0.00 | 0.00 | 39,443.88 | $1,30: |
| 1/28/2008 | 2007 SVP Discount | $45.4700 | $585,773 | 11/30/2012 | 12,882.62 | 265.35 | 0.00 | 0.00 | 13,147.97 | $43( |
| 1/30/2007 | Liberty View Award | $80.9400 | $1,500,000 | 01/30/2012 | 18,532.25 | 471.39 | 3,739.12 | 0.00 | 15,264.52 | $50( |
| 1/30/2007 | 2006 SVP Principal | $60.7100 | $3,917,287 | 11/30/2011 | 64,524.58 | 1,909.59 | 0.00 | 0.00 | 66,434.17 | $2,19: |
| 1/30/2007 | 2006 SVP Discount | $60.7100 | $1,305,762 | 11/30/2011 | 21,508.19 | 636.55 | 0.00 | 0.00 | 22,144.74 | $73  |
| 1/31/2004 | LTIP Year End Bonus | $41.0500 | $249,994 | 01/31/2009 | 6,090.00 | 0.00 | 4,872.00 | 0.00 | 1,218.00 | $4( |
| **Total** | | | **$9,316,134** | | **162,185.50** | **4,078.90** | **8,611.12** | **0.00** | **157,653.28** | **$5,20:** |
| **Total Equity** | | | | | | | | | | **$5,20:** |

¹arket value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated stock price. The intrinsic value of stock tions is calculated by multiplying the number of options outstanding by the difference between the indicated stock price and the option exercise ce. Please note that the current market price is based on a delayed 20 minutes feed from Reuters. (03:58 PM EST on January 2 2009)

ward Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Stock ards, as applicable.
rant Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated grant price.
nits Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicable n documents.

---

① Deferred Comp under employment contract:

Grant Value 2007 SVP Principal + Discount = 2,343,091
Grant Value 2006 SVP Principal + Discount = 5,223,049
                                              $7,566,140