Hearing Date and Time: June 15, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: June 8, 2011 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                            :
**In re**                                   :    Chapter 11 Case No.
                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, :   08-13555 (JMP)
                                            :
                          Debtors.          :    (Jointly Administered)
                                            :
---------------------------------------------------------------------x

# NOTICE OF LEHMAN BROTHERS
# HOLDINGS INC.'S MOTION PURSUANT TO SECTIONS 105
# AND 363 OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL
# RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF SETTLEMENT
# AGREEMENT RELATING TO REAL PROPERTY LOCATED AT 1107 BROADWAY

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman Brothers Holdings Inc. ("LBHI," together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors"), pursuant to rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of a settlement agreement among LBHI, 1107 Broadway Mezz Holdings LLC, 1107 Broadway LLC, 1107 Broadway Mezz I LLC, 1107 Broadway Mezz II LLC, and Yitzchak Tessler, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **June 15, 2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Elisabetta G. Gasparini, Esq., and Andrea B. Schwartz, Esq.,; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (vi) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **June 8, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

       PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

       PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: May 25, 2011
      New York, New York

                                   /s/ Jacqueline Marcus
                                   Jacqueline Marcus

                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007

                                   Attorneys for Debtors
                                   and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
: 
In re                                                            :   **Chapter 11 Case No.**
: 
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :   **08-13555 (JMP)**
: 
Debtors.                                                   :   (Jointly Administered)
: 
---------------------------------------------------------------------x

**LEHMAN BROTHERS HOLDINGS
INC.'S MOTION PURSUANT TO SECTIONS 105
AND 363 OF THE BANKRUPTCY CODE AND RULE 9019 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL OF SETTLEMENT
AGREEMENT RELATING TO REAL PROPERTY LOCATED AT 1107 BROADWAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI," together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors," and collectively with their non-debtor affiliates, "Lehman") files this motion pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and respectfully represents:

**Preliminary Statement**

1.  In October of 2007, a non-Lehman entity called 1107 Broadway, LLC (the "Mortgage Borrower") acquired a 16-story, former office building located at 1107 Broadway in

Manhattan (the "Property"). Mortgage Borrower planned to convert the Property into 165 luxury condominium units (the "Project"). In order to acquire the Property and complete the Project, Mortgage Borrower and certain of its affiliates entered into a number of loan facilities pursuant to which Lehman agreed to extend up to $343,400,000 to Mortgage Borrower and certain of its affiliates.

2. Mortgage Borrower and its affiliates eventually drew an aggregate amount of approximately $228,344,000 from these loan facilities but, largely due to the disruptions in the real estate market that occurred in 2007 and 2008, Mortgage Borrower was unable to implement its development plan for the Project and, shortly after the Commencement Date (as defined below), defaulted on its obligations to Lehman. As of the date hereof, these obligations, including accrued and unpaid interest and certain protective advances made by Lehman to protect its interest in the Property, remain outstanding.

3. As a result of these alleged defaults, Lehman has taken various actions with respect to its security interests in the Property and the Loans (as defined below). These include (i) a foreclosure proceeding with respect to LBHI's interest in the Property that is currently pending in the New York State Supreme Court, (ii) a Uniform Commercial Code foreclosure sale of LBHI's interest in the equity of 1107 Broadway Mezz I LLC (the "Senior Mezzanine Borrower"), an entity that owns the equity of the Mortgage Borrower, and (iii) a Uniform Commercial Code foreclosure sale of the interest of 1107 Broadway Mezz Holdings LLC (the "Junior Mezzanine Lender")[1] in the equity of 1107 Broadway Mezz II LLC (the "Junior Mezzanine Borrower," together with the Senior Mezzanine Borrower and the Mortgage Borrower, the "Borrowers," and collectively with LBHI, the Junior Mezzanine Lender, and

---

[1] The Junior Mezzanine Lender is an indirect, non-Debtor subsidiary of LBHI.

Guarantor (as defined below) the "Parties"), an entity that owns the equity of the Senior Mezzanine Borrower.

4. While LBHI believes that it (i) would ultimately recover the Property through these actions, and (ii) is likely entitled to additional recoveries pursuant to certain guaranties that it holds in connection with these loan facilities, such recoveries will require extensive litigation and result in significant expense and delay. Accordingly, LBHI has maintained a dialogue with the Borrowers regarding potential transactions that would facilitate LBHI's prompt recovery on its interests in the Property.

5. The Mortgage Borrower has located a potential purchaser of the Property and, following extensive negotiations, the Parties have agreed, subject to Court approval, to enter into that certain settlement agreement, dated May 25, 2011, a copy of which (without exhibits) is attached hereto as Exhibit A. The Settlement Agreement provides for an auction process that allows LBHI to seek to maximize its recovery from the Property and, in the event that the auction is not successful, contains a mechanism for LBHI to take title to the Property without the necessity of contested litigation. The Settlement Agreement also provides for the withdrawal of the proofs of claim filed by the Borrowers and the Guarantor (as defined below) in LBHI's chapter 11 case and for the Parties to provide each other with mutual releases of claims involving the Property.

6. Given the expense and delay attendant to pursuing the foreclosures, and the challenges and uncertainties that would accompany LBHI's development of the Project and future sale of the Property, LBHI believes that the sale process provided for in the Settlement Agreement represents its best opportunity to maximize recoveries from its interests in the Property. In light of the benefits that will accrue to LBHI's estate and creditors through the

disposition of the Property, the withdrawal of the Proofs of Claim (as defined below) and the releases that LBHI will receive from the Borrowers, LBHI's entry into the Settlement Agreement should be approved.

## Background

7. Commencing on September 15, 2008 (the "Commencement Date") and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

9. On September 19, 2008, a proceeding was commenced under the Security Investor Protection Act of 1970, as amended (the "SIPA") with respect to LBI. A trustee appointed under the SIPA is administering LBI's estate.

10. On January 25, 2011, the Debtors filed their First Amended Joint Chapter 11 Plan [Docket No. 14150] and the Disclosure Statement to the Debtors' First Amended Joint Chapter 11 Plan [Docket No. 14151].

11. Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

12. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

13. LBHI seeks an order pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019 approving the Settlement Agreement and authorizing LBHI to effectuate the transactions contemplated therein. LBHI has determined, in the exercise of its sound business judgment, that the Settlement Agreement and the related transactions are in the best interests of its estate and its creditors and should be approved.

## The Debt on the Property

14. On October 16, 2007, LBHI extended a loan to the Mortgage Borrower in the original principal amount of up to $246,000,000 (the "Mortgage Loan").[2] The Mortgage Loan was secured by certain mortgages, assignments of leases and rents, security agreements and fixture filing statements (collectively, the "Mortgage") executed by Mortgage Borrower in favor of LBHI, creating a first priority security interest in the Property. In connection therewith, Yitzchak Tessler (the "Guarantor") provided LBHI with certain guaranties (the "Mortgage Loan Guaranties").

15. Contemporaneously therewith, LBHI extended an additional loan in the original principal amount of up to $59,200,000 (the "Senior Mezzanine Loan") to the Senior

---

[2] The Mortgage Loan was divided into an acquisition loan, a project loan and a building loan. Portions of these loans were then participated to other financial institutions, including certain of LBHI's non-Debtor subsidiaries. LBHI has reacquired control of the entire Mortgage Loan, though certain of LBHI's non-Debtor affiliates retain participation interests in certain portions of the Mortgage Loan.

Mezzanine Borrower secured by, among other things, a pledge of the Senior Mezzanine Borrower's equity interests in the Mortgage Borrower (the "Senior Mezzanine Pledged Collateral"). In connection with the Senior Mezzanine Loan, Guarantor provided LBHI with certain guarantees (the "Senior Mezzanine Guaranties") and the Senior Mezzanine Borrower and Guarantor agreed to indemnify LBHI with respect to certain liabilities related to environmental or hazardous substances claims (the "Indemnity," together with the Senior Mezzanine Guaranties, the "Senior Mezzanine Loan Guaranties").

16. The final component of the financing for the Project was provided by the Junior Mezzanine Lender, which extended a loan in the original principal amount of up to $38,200,000 (the "Junior Mezzanine Loan"; together with the Mortgage Loan and the Senior Mezzanine Loan, the "Loans") to the Junior Mezzanine Borrower secured by, among other things, a pledge of the Junior Mezzanine Borrower's equity interest in the Senior Mezzanine Borrower (the "Junior Mezzanine Pledged Collateral"). In connection with the Junior Mezzanine Loan, Guarantor provided the Junior Mezzanine Lender with certain guarantees (the "Junior Mezzanine Guaranties") and the Junior Mezzanine Borrower and Guarantor agreed to indemnify the Junior Mezzanine Lender with respect to certain liabilities related to environmental or hazardous substances claims (the "Junior Indemnity," together with the Junior Mezzanine Guaranties, the "Junior Mezzanine Loan Guaranties," and collectively with the Mortgage Loan Guaranties and the Senior Mezzanine Loan Guaranties, the "Guaranties").

**LBHI's Interest in the Property**

17. The Loans matured on October 15, 2008, and, as of the date hereof, each remains unpaid. Accordingly, LBHI has commenced a foreclosure proceeding (the "Mortgage Loan Foreclosure") with respect to the Mortgage Loan in the New York State Supreme Court,

New York County, against the Property, due to the alleged payment and other defaults of the Mortgage Borrower and the Guarantor. Similarly, LBHI and the Junior Mezzanine Lender have commenced mezzanine loan foreclosure proceedings under the Uniform Commercial Code (the "Mezzanine Loan Foreclosures," together with the Mortgage Loan Foreclosure, the "Foreclosures") for public sales of the Senior Mezzanine Pledged Collateral and the Junior Mezzanine Pledged Collateral, respectively.

18. On September 22, 2009, Borrower and Guarantor filed four proofs of claim (the "Proofs of Claim") against LBHI alleging indebtedness to Borrower or Guarantor, as applicable, in the following amounts:

| Claimant | Claim Number | Amount |
| --- | --- | --- |
| Yitzchak Tessler | 30017 | Not less than $6,000,000 |
| 1107 Broadway LLC | 30018 | Not less than $40,000,000 |
| 1107 Broadway Mezz I LLC | 30019 | Not less than $40,000,000 |
| 1107 Broadway Mezz II LLC | 30020 | Not less than $40,000,000 |

19. In order to maximize Lehman's recovery under the Loans, and to avoid the expense and delay of prosecuting the Foreclosures, LBHI has determined, in the exercise of its sound business judgment, that disposing of its interests in the Property pursuant to the transactions set forth in the Settlement Agreement is in the best interests of its estate and its creditors and should be approved. The Settlement Agreement, including the sale process set forth therein, will allow LBHI to maximize the return on its investment in the Property, eliminate the expense and delay attendant to litigating the Foreclosures, and avoid litigation involving other disputes with the Borrowers and the Guarantor. Accordingly, LBHI's entry into the Settlement Agreement should be approved.

**The Settlement Agreement**

20.     The Settlement Agreement provides for the Mortgage Borrower to enter into one or more purchase and sale agreements (collectively, the "L&L PSA") with a third party called 1107 Broadway Owner LLC and certain of its affiliates (collectively, "L&L") pursuant to which L&L has agreed to purchase the Property subject to an auction process (the "Auction") with respect to which L&L will act as stalking horse bidder. The Settlement Agreement includes, *inter alia*, the following significant terms:[3]

| | |
|---|---|
| *Entry into the L&L PSA* | The Mortgage Borrower and L&L have entered into the L&L PSA pursuant to which (a) the sale price for the Property will be $161,500,000, plus transfer taxes and any carry costs LBHI has incurred with respect to the Property (the "Carry Costs"); (b) L&L will fund a deposit of $10,000,000 (the "Deposit") to be held in escrow pending the closing of the L&L PSA; (c) the conveyance of the Property to L&L will be made on an "AS-IS, WHERE IS" basis, subject to any and all mechanics' liens; and (d) the closing of the sale must occur within 90 days. The L&L PSA is conditioned upon the occurrence of the Auction in which L&L shall be the initial bidder for the Property in the amount set forth above. |
| *L&L Default or Withdrawal* | In the event that L&L withdraws its offer set forth in the the L&L PSA, the Mortgage Borrower or an entity affiliated with the Mortgage Borrower or a member of the Mortgage Borrower (such entity, the "Substitute Purchaser") is obligated to assume L&L's obligations under the L&L PSA, including the obligation to participate in the Auction. |
| *The Auction* | The Auction will be scheduled after the Court has approved the Settlement Agreement and, if such approval occurs before June 17, 2011, the Auction will be scheduled for June 29, 2011. |
| | On or before June 27, 2011, any parties wishing to participate in the Auction will be required to deposit with Eastdil a $5,000,000 deposit and a form of purchase and sale agreement in substantially the same form as the L&L PSA. |
| | At the Auction, L&L will make the opening bid. Third party bids must |

---

[3] The terms listed below are provided as a summary of the terms of the Settlement Agreement. In the case of an inconsistency between the terms set forth in the summary and the terms of the Settlement Agreement, the terms of the Settlement Agreement shall control.

be in an amount at least equal to $164,500,000 plus the payment of transfer taxes and Carry Costs. Any additional bid must exceed the prior bid by at least $250,000.

If (a) L&L participates in, but is not the successful bidder at, the Auction, (b) the Mortgage Borrower closes with a third party pursuant to an Auction PSA, and (c) L&L has not otherwise defaulted or terminated the L&L PSA, L&L shall be entitled to a break-up fee of $2,500,000 (the "Break-Up Fee") which amount shall be paid from the proceeds of such sale.

Proceeds from the Auction sale or a sale to L&L pursuant to the L&L PSA if the Auction does not result in a higher bid meeting the requirements set forth above, after payment of transfer taxes and reimbursement of LBHI for Carry Costs, shall be allocated and disbursed as follows:
1. $142,500,000 to Lehman,
2. $19,000,000 to the Mortgage Borrower,
3. $2,500,000 to L&L (if L&L is entitled to the Break-Up Fee), and
4. any additional proceeds allocated 50% to Lehman and 50% to the Mortgage Borrower.

| | |
|---|---|
| *Purchaser Default; Back Up Bidder* | In the event that the successful purchaser (including L&L) fails to close in breach of the applicable purchase and sale agreement, said purchaser will forfeit its deposit, which deposit will be distributed equally between Lehman and the Mortgage Borrower |
| | In the event that the Auction resulted in the designation of a back up bidder (the "Back Up Bidder"), which may be L&L, then the Mortgage Borrower shall proceed with a sale of the Property to the Back Up Bidder and the proceeds of such sale will be applied as set forth above. |
| *Failure to Close* | In the event that the successful purchaser at the Auction fails to close and a Back Up Bidder was not designated in the Auction, or in the event that the Back Up Bidder fails to close, then the Mortgage Borrower shall, within three business days, give written notice to LBHI of its election to either: (a) make a payment to Lehman in an amount equal to (x) the Carry Costs, plus (y) $142,500,000,[4] or (b) to deliver documents (which documents are currently being held in escrow) to LBHI affording LBHI the right to record a deed in lieu of foreclosure and/or file a consensual judgment in the Mortgage Foreclosure, and/or pursue consensual Mezzanine Loan Foreclosures. |

---

[4] In this scenario, LBHI would be responsible for the payment of transfer taxes.

| | |
|---|---|
| *Withdrawal of Proofs of Claims and Releases* | Under any of the scenarios described above, the Proofs of Claim will be withdrawn and the Parties will provide each other with mutual releases of, from and against any and all manner of actions, debts, claims and demands, which they now have, ever had or may ever have on account of, arising out of, or relating to the Property or the related transaction documents. |
| *Retention of Eastdil* | While the Mortgage Borrower has engaged Eastdil to market the Property and to conduct the auction, LBHI has agreed that, if the Mortgage Borrower closes a transaction with L&L or pursuant to the Auction with a sale price of up to $164,000,000 (excluding transfer taxes and Carry Costs), Eastdil will be entitled to a fee of $200,000, which amount will be deducted from the proceeds of such transaction that would otherwise be allocated to Lehman. In the event that, pursuant to the Auction, the Mortgage Borrower closes a transaction with a sale price in excess of $164,000,000, Eastdil will be entitled to an additional fee in the amount of 6% of any gross proceeds in excess of $164,000,000 (excluding transfer taxes and Carry Costs). Such additional fee shall be born equally by Lehman and the Mortgage Borrower and will also be deducted from the proceeds of such transaction. |

**The Settlement Agreement Meets The Legal Standard
Established Under Rule 9019 and is in the Best Interests of LBHI's Estate**

21. Bankruptcy Rule 9019(a) provides that, "[o]n motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed R. Bankr. P. 9019(a). This rule empowers bankruptcy courts to approve compromises "if they are in the best interest of the estate." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira* (*In re 47-49 Charles St., Inc.*), 209 B.R. 618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994). Indeed, courts have long considered compromises to be "a normal part of the process of

reorganization." *TMT Trailer Ferry*, 390 U.S. at 424 (quoting *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 130 (1939)).

22.     The decision to approve a particular compromise lies within the sound discretion of the bankruptcy court. *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994). The settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness. *Drexel Burnham Lambert Group*, 134 B.R. at 505; *see also Cosoff v. Rodman* (*In re W.T. Grant Co.*), 699 F.2d 599, 608 (2d Cir. 1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Additionally, a court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998). However, the analysis must focus on the question of whether a particular compromise is "fair and equitable, and in the best interest of the estate." *In re Best Products*, 165 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) (internal citations omitted).

23.     While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact. . . . The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." *Nellis*, 165 B.R. at 123 (internal citations omitted).

24.     The court may give weight to the "informed judgments of the . . . debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." *Drexel Burnham Lambert*

*Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness. . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.").

25. Significantly, there is no requirement that "the value of the compromise . . . be dollar-for-dollar the equivalent of the claim." *Ionosphere Clubs, Inc.*, 156 B.R. at 427. Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id*. at 427-28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974)).

26. As set forth in the declaration of Jeffrey Fitts, attached hereto as <u>Exhibit B</u>, the primary virtue of the Settlement Agreement is that it resolves the disputes between the Parties and allows the Parties to move forward with a consensual sale process that will allow LBHI to either monetize its interests in the Property at a market rate or take possession of the Property without the necessity of engaging in costly and time consuming litigation. While the anticipated proceeds that would accrue to LBHI from a sale pursuant to the L&L PSA or an Auction PSA may be less than the face amount of the Loans, such amounts will be determined by the market, and LBHI's consent to a sale pursuant to the L&L PSA or an Auction PSA, as applicable, will not require any additional investment from LBHI[5] and will relieve LBHI's estate from the risks and uncertainty attendant to the litigation, development and future sale of the

---

[5] While LBHI's will be responsible for all or a portion of the fee that is payable to Eastdil upon the closing of a sale pursuant to the L&L PSA or an Auction PSA, such amounts will be deducted from the proceeds of such a sale and will not be an out-of-pocket expense of LBHI.

US_ACTIVE:\43708004\11\58399.0003               12

Property that would be required absent the Settlement Agreement. Moreover, the terms of the Settlement Agreement create an incentive for the Borrowers to conduct an auction process that maximizes the value of the Property

27. Additionally, the Settlement Agreement provides for the withdrawal of the Proofs of Claim and a release, by the Borrowers and the Guarantor, of any other claims or causes of action relating to the Property, relieving LBHI's estate of claims with a face amount of over $126,000,000.

28. The Debtors have kept the Creditors' Committee's professionals appraised of LBHI's negotiations with the Borrowers and of the terms of the Settlement Agreement.

29. For the reasons stated above, and in the informed judgment of LBHI, the Settlement Agreement is a "fair and equitable" resolution of the issues described herein, is well within the "range of reasonableness," and is in the best interests of LBHI's estate and its creditors. Accordingly, LBHI requests that its entry into the Settlement Agreement be approved pursuant to Bankruptcy Rule 9019.

### The Transactions Set Forth in the Settlement Agreement Are An Appropriate Exercise of the Debtors' Business Judgment

30. As described in greater detail above, the Settlement Agreement allows LBHI to either monetize its interests in the Property or take possession of the Property without the need for further delay or contested litigation and also provides for the withdrawal of the Proofs of Claim, which have a face amount of over $126,000,000. LBHI, in its business judgment, believes that such a settlement is in the best interests of its estate and creditors. Accordingly, LBHI also seeks authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to comply with its obligations under the Settlement Agreement. In particular,

LBHI seeks authority to pay, from the proceeds of a sale pursuant to the L&L PSA or an Auction PSA, amounts due to Eastdil under the terms described above.

31. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). While section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in applying this section, have required that it be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same). Section 105 of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a).

32. It is generally understood that "[when] the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

33. In light of the direct and indirect benefits inuring to LBHI's estate and its creditors described above, entry into the Settlement Agreement, and compliance with its obligations thereunder, is a proper exercise of LBHI's business judgment and should be approved.

## Notice

34. No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the Borrowers and the Guarantor; and (vii) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

35. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: May 25, 2011
New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession