**Hearing Date: TBD**
**Objection Deadline: TBD**

Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                                                              :
In re:                                                        :        Chapter 11 Case No.
                                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,       :        08-13555 (JMP)
                                                              :
                          Debtors.                            :        (Jointly Administered)
                                                              :
------------------------------------------------------------- x

**SEVENTH APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,
COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR
INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES
RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
OCTOBER 1, 2010 THROUGH AND INCLUDING JANUARY 31, 2011**

| | |
|---|---|
| Name of Applicant: | Milbank, Tweed, Hadley & MᶜCloy LLP |
| Authorized to Provide Professional Services to: | Official Committee of Unsecured Creditors |
| Date of Retention: | November 18, 2008 (effective as of September 17, 2008) |
| Period for which compensation and reimbursement is sought: | October 1, 2010 – January 31, 2011 |

1

Amount of Compensation
requested:                              <u>$14,180,784.75</u>

Amount of Expense
Reimbursement requested:                <u>$633,261.80</u>

This is an:  <u>  X  </u> interim  <u>_____</u> final application.

This is the seventh interim fee application filed by Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP in these cases.

**SEVENTH INTERIM FEE APPLICATION OF MILBANK, TWEED, HADLEY & MCCLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL. (OCTOBER 1, 2010 – JANUARY 31, 2011)**

| Name | Position; Experience | Hourly Rate[1] | Total Hours | Total Compensation |
|---|---|---:|---:|---:|
| Paul Aronzon | Financial Restructuring Partner for 21 years; admitted in 1979. | $1,095<br>$1,050 | 14.30<br>32.80 | $15,658.50<br>$34,440.00 |
| Dennis Dunne | Financial Restructuring Partner for 13 years; admitted in 1991. | $1,095<br>$1,050 | 90.30<br>197.70 | $98,878.50<br>$207,585.00 |
| Trayton Davis | Alternative Investments Partner for 22 years, admitted in 1981. | $1,075<br>$1,025 | 2.20<br>23.50 | $2,365.00<br>$24,087.50 |
| Jay Grushkin | Alternative Investments Partner for 22 years, admitted in 1982. | $1,075<br>$1,025 | 5.30<br>4.00 | $5,697.50<br>$4,100.00 |
| Michael Hirschfeld | Litigation Partner for 29 years; admitted in 1974. | $1,025<br>$1,025 | 6.40<br>2.30 | $6,560.00<br>$2,357.50 |
| Rainer Magold | Leveraged Finance Partner for 6 years; admitted in 1986. | $1,075<br>$1,025 | 1.80<br>.70 | $1,935.00<br>$717.50 |
| Richard Sharp | Litigation Partner for 8 years; admitted in 1975. | $1,025 | 8.00 | $8,200.00 |
| Andrew Tomback | Litigation Partner for 14 years; admitted in 1987. | $1,075<br>$1,025 | 2.70<br>27.10 | $2,902.50<br>$27,777.50 |
| Gary S. Wigmore | Global Project Finance Partner for 24 years; admitted in 1983. | $1,025 | .40 | $410.00 |
| Richard Gray | Global Leveraged Finance Partner for 30 years; admitted in 1982. | $975 | 1.50 | $1,462.50 |
| Elizabeth Besio Hardin | Global Finance Partner for 14 years; admitted in 1996. | $1,025<br>$975 | 4.10<br>.50 | $4,202.50<br>$487.50 |
| Nicholas James Angel | Financial Restructuring Partner for 3 years; admitted in 1986. | $975<br>$950 | 11.90<br>49.20 | $11,602.50<br>$46,740.00 |
| Peter Benudiz | Global Corporate Partner for 18 years; admitted in 1987. | $1,025<br>$950<br>$512.5 | 20.90<br>34.20<br>16.90 | $21,422.50<br>$32,490.00<br>$8,661.25 |

---

[1]    The rates listed include (i) the billing rates for all Partners, Of Counsel, Associates and Paraprofessionals applicable up to and including December 31, 2010; (ii) the billing rates for all Partners, Of Counsel, Associates and Paraprofessionals applicable on and after January 1, 2011, as of which date Milbank implemented an annual increase in billing rates; and (iii) as applicable, the rates applied to non-working travel time, which, in accordance with the Fee Committee Guidelines, Milbank has billed at 50% of normal rates.

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| David Cohen | Litigation Partner for 9 years; admitted in 1994. | $1,025 | 170.50 | $174,762.50 |
| | | $950 | 448.20 | $425,790.00 |
| | | $475 | 34.90 | $16,577.50 |
| Thomas C. Janson | Global Corporate Partner for 8 years; admitted in 1982. | $995 | 2.80 | $2,786.00 |
| | | $950 | 1.40 | $1,330.00 |
| Dale Ponikvar | Tax Partner for 21 years; admitted in 1981. | $995 | 90.00 | $89,550.00 |
| | | $950 | 274.40 | $260,680.00 |
| Helfried J. Schwarz | Global Transportation and Space Finance Partner for 21 years; admitted in 1989. | $950 | .90 | $855.00 |
| Michael Bellucci | Global Leveraged Finance Partner for 10 years; admitted in 1994. | $925 | 8.20 | $7,585.00 |
| Robert M. Finkel | Global Corporate Partner for 15 years; admitted in 1988. | $925 | 3.70 | $3,422.50 |
| Wilbur Foster Jr | Financial Restructuring Partner for 20 years; admitted in 1982. | $995 | 167.10 | $166,264.50 |
| | | $925 | 393.80 | $364,265.00 |
| David Lamb | Global Corporate Partner for 21 years; admitted in 1992. | $975 | 30.30 | $29,542.50 |
| | | $925 | 51.70 | $47,822.50 |
| Catherine Marsh | Global Project Finance Partner for 6 years; admitted in 1995. | $975 | 2.70 | $2,632.50 |
| Eric Moser | Global Finance Partner for 12 years; admitted in 1991. | $975 | 43.40 | $42,315.00 |
| | | $487.5 | .50 | $243.75 |
| | | $925 | 100.40 | $92,870.00 |
| Andrew Walker | Tax Partner for 8 years; admitted in 1995. | $925 | 1.90 | $1,757.50 |
| Paul Wessel | Tax Partner for 15 years; admitted in 1988. | $995 | 1.30 | $1,293.50 |
| | | $925 | 16.30 | $15,077.50 |
| Winthrop Brown | Global Finance Partner for 28 years; admitted in 1975. | $900 | 1.10 | $990.00 |
| Wayne M. Aaron | Litigation Partner for 8 years; admitted in 1996. | $875 | 11.60 | $10,150.00 |
| Patrick J. Flanagan | Global Leveraged Finance Partner for 5 years; admitted in 1999. | $875 | 16.50 | $14,437.50 |
| Brett D. Goldblatt | Global Corporate Partner for 6 years; admitted in 1998. | $950 | 2.60 | $2,470.00 |
| | | $875 | 5.40 | $4,725.00 |
| Stacey J. Rappaport | Litigation Partner for 7 years; admitted in 1997. | $925 | 39.40 | $36,445.00 |
| | | $875 | 157.30 | $137,637.50 |
| | | $437.5 | 1.00 | $437.50 |
| Abbilash Raval | Financial Restructuring Partner for 9 years; admitted in 1997. | $925 | 1.10 | $1,017.50 |

4

| Name | Description | Rate | Hours | Amount |
|---|---|---|---|---|
| James Warbey | Global Finance Partner for 6 years; admitted in 1996. | $925<br>$875<br>$437.5 | 70.40<br>230.10<br>4.40 | $65,120.00<br>$201,337.50<br>$1,925.00 |
| David Wolfson | Global Corporate Partner for 7 years; admitted in 1994. | $875 | 12.90 | $11,287.50 |
| Debra Alligood White | Global Corporate Partner for 5 years; admitted in 1993. | $850 | 4.60 | $3,910.00 |
| Thomas Ingenhoven | Global Leveraged finance Partner for 4 years; admitted in 2001. | $825 | 1.50 | $1,237.50 |
| Russell Kestenbaum | Tax Partner for 4 years; admitted in 1999. | $900<br>$825 | 15.50<br>31.50 | $13,950.00<br>$25,987.50 |
| Paul Denaro | Global Securities Partner for 3 years; admitted in 2000. | $875<br>$800 | 87.60<br>168.00 | $76,650.00<br>$134,400.00 |
| Thomas James Canning | Litigation Partner for 1 year; admitted in 1999. | $795<br>$750 | .70<br>40.40 | $556.50<br>$30,300.00 |
| Evan R. Fleck | Financial Restructuring Partner for 1 year; admitted in 2002. | $850<br>$750 | 250.90<br>611.60 | $213,265.00<br>$458,700.00 |
| Robert Liubicic | Litigation Partner for 1 year; admitted in 1999. | $850<br>$750 | 1.20<br>3.70 | $1,020.00<br>$2,775.00 |
| Risa Rosenberg | Financial Restructuring Of Counsel for 9 years; admitted in 1984. | $900<br>$850 | 3.10<br>52.10 | $2,790.00<br>$44,285.00 |
| Dennis O'Donnell | Financial Restructuring Of Counsel for 4 years; admitted in 1992. | $860<br>$810<br>$405 | 278.50<br>767.50<br>19.80 | $239,510.00<br>$621,675.00<br>$8,019.00 |
| Matthew Mortimer | Tax Associate for 15 years; admitted in 1996. | $745 | 23.90 | $17,805.50 |
| Lena Mandel | Senior Attorney for 9 years; admitted in 1991. | $705<br>$685<br>$342.5 | 50.60<br>219.70<br>.50 | $35,673.00<br>$150,494.50<br>$171.25 |
| David Sieradzki | Litigation Associate for 15 years; admitted in 1996. | $720 | 24.60 | $17,712.00 |
| Drew Batkin | Tax Associate for 9 years; admitted in 2003. | $715<br>$695 | 101.10<br>181.90 | $72,286.50<br>$126,420.50 |
| Lisa Brabant | Real Estate Associate for 13 years; admitted in 1999. | $695 | 5.10 | $3,544.50 |
| Paul M. Murphy | Global Project Finance Associate for 15 years; admitted in 1996. | $695 | 3.70 | $2,571.50 |

| | | | | |
|---|---|---|---|---|
| Aaron Renenger | Litigation Associate for 9 years; admitted in 2002. | $715 | 112.50 | $80,437.50 |
| | | $695 | 230.40 | $160,128.00 |
| | | $347.5 | 2.40 | $834.00 |
| Steven Szanzer | Financial Restructuring Associate for 11 years; admitted in 2001. | $715 | 2.7 | $1,930.50 |
| | | $695 | 218.90 | $152,135.50 |
| Stephen Tudway | Litigation Associate for 13 years; admitted in 1998. | $715 | 19.50 | $13,942.50 |
| | | $695 | 49.00 | $34,055.00 |
| Felix Weinacht | Litigation Associate for 9 years; admitted in 2002. | $695 | 37.80 | $26,271.00 |
| Adrian Azer | Litigation Associate for 8 years; admitted in 2003. | $715 | 177.20 | $126,698.00 |
| | | $357.5 | 22.00 | $7,865.00 |
| | | $675 | 519.10 | $350,392.50 |
| | | $337.5 | 46.90 | $15,828.75 |
| Irene Bogdashevsky | Financial Restructuring Associate for 8 years; admitted in 2004. | $675 | 2.30 | $1,552.50 |
| Alistair F. Hill | Global Leveraged Finance Associate for 8 years; admitted in 2003. | $675 | 2.50 | $1,687.50 |
| Erika Kuver-Del Duca | Real Estate Associate for 8 years; admitted in 2004. | $675 | .20 | $135.00 |
| Neda Matar | Global Finance Associate for 8 years; admitted in 2004. | $675 | 1.00 | $675.00 |
| Brian Stern | Global Corporate Associate for 8 years; admitted in 2003. | $715 | 2.30 | $1,644.50 |
| | | $675 | 8.20 | $5,535.00 |
| Grace Gilligan | Litigation Associate for 7 years; admitted in 2005. | $695 | 42.00 | $29,190.00 |
| | | $650 | 289.90 | $188,435.00 |
| Peter Newman | Financial Restructuring Associate for 7 years; admitted in 2005. | $695 | 34.20 | $23,769.00 |
| | | $650 | 19.80 | $12,870.00 |
| Maximilian Schneider | Global Leveraged Finance Associate for 7 years; admitted in 2005. | $650 | 17.00 | $11,050.00 |
| Melanie Westover | Litigation Associate for 7 years; admitted in 2005 | $695 | 15.30 | $10,633.50 |
| Victoria Zhu | Global Corporate Associate for 7 years; admitted in 2008. | $650 | 13.60 | $8,840.00 |
| Michael L. Fleischer | Global Corporate Associate for 6 years; admitted in 2006. | $675 | 16.10 | $10,867.50 |

| | | | | |
|---|---|---|---|---|
| Karen Gartenberg | Financial Restructuring Associate for 6 years; admitted in 2006. | $675<br>$625 | 12.70<br>146.40 | $8,572.50<br>$91,500.00 |
| Rachel Penski Fissell | Litigation Associate for 6 years; admitted in 2006. | $675<br>$625 | 2.10<br>62.30 | $1,417.50<br>$38,937.50 |
| John K. White Jr. | Litigation Associate for 6 years; admitted in 2006. | $675 | 104.60 | $70,605.00 |
| Simon Williams | Global Finance Associate for 6 years; admitted in 2008. | $625 | 45.10 | $28,187.50 |
| Nicholas Bassett | Litigation Associate for 5 years; admitted in 2007. | $650<br>$600<br>$300 | 13.50<br>276.90<br>11.70 | $8,775.00<br>$166,140.00<br>$3,510.00 |
| Jonathan Brown | Global Finance Associate for 5 years; admitted in 2007. | $600 | 6.90 | $4,140.00 |
| Melissa Ann Clark | Global Corporate Associate for 5 years; admitted in 2006. | $650<br>$600 | 4.90<br>12.70 | $3,185.00<br>$7,620.00 |
| James Harris | Financial Restructuring Associate for 5 years; admitted in 2008. | $650<br>$600 | 32.00<br>146.10 | $20,800.00<br>$87,660.00 |
| Emma Hogwood | Litigation Associate for 5 years; admitted in 2006. | $650<br>$600 | 21.40<br>64.40 | $13,910.00<br>$38,640.00 |
| Jeremy C. Hollembeak | Financial Restructuring Associate for 5 years; admitted in 2007. | $600 | .20 | $120.00 |
| Aluyah Imoisili | Litigation Associate for 5 years; admitted in 2006. | $650<br>$600<br>$300 | 1.10<br>59.50<br>10.40 | $715.00<br>$35,700.00<br>$3,120.00 |
| Jeffrey W. Lesovitz | Litigation Associate for 5 years; admitted in 2007. | $650<br>$600 | 5.50<br>53.60 | $3,575.00<br>$32,160.00 |
| Gabriel Mpubani | Global Project Finance Associate for 5 tears; admitted in 2007. | $650 | 28.10 | $18,265.00 |
| Mary Santanello | Alternative Investments Associate for 5 years; admitted in 2007. | $600 | .40 | $240.00 |
| Jed Schwartz | Litigation Associate for 5 years; admitted in 2007. | $650<br>$600 | 13.00<br>44.80 | $8,450.00<br>$26,880.00 |
| Jeremy Sussman | Financial Restructuring Associate for 5 years; admitted in 2007. | $650<br>$600 | 13.40<br>119.70 | $8,710.00<br>$71,820.00 |

| | | | | |
|---|---|---|---|---|
| Constance Beverley | Litigation Associate for 5 years; admitted in 2008. | $625 | 84.30 | $52,687.50 |
| | | $575 | 459.40 | $264,155.00 |
| | | $287.5 | 10.50 | $3,018.75 |
| Brianne Copp | Litigation Associate for 5 years; admitted in 2008. | $625 | 16.40 | $10,250.00 |
| | | $575 | 4.60 | $2,645.00 |
| Dawn Harding | Global Transportation and Space Finance Associate for 4 years. | $575 | 2.00 | $1,150.00 |
| Curtis Johnson | Litigation Associate for 4 years; admitted in 2008. | $625 | 25.00 | $15,625.00 |
| | | $575 | 51.80 | $29,785.00 |
| Nicole Leyton | Tax Associate for 4 years; admitted in 2008. | $575 | 18.00 | $10,350.00 |
| Michael Lynch | Global Corporate Associate for 4 years; admitted in 2007. | $575 | 200.20 | $115,115.00 |
| Melanie Ann McLaughlin | Financial Restructuring Associate for 4 years; admitted in 2008. | $575 | 7.40 | $4,255.00 |
| William J. McNamara | Litigation Associate for 4 years; admitted in 2008. | $625 | 16.70 | $10,437.50 |
| | | $575 | 3.60 | $2,070.00 |
| Gregory Papeika | Financial Restructuring Associate for 4 years; admitted in 2008. | $625 | 5.70 | $3,562.50 |
| | | $575 | 53.20 | $30,590.00 |
| Sangyoon Nathan Park | Litigation Associate for 4 years; admitted in 2008. | $625 | 116.60 | $72,875.00 |
| | | $312.5 | 5.00 | $1,562.50 |
| | | $575 | 306.60 | $176,295.00 |
| Alka Pradhan | Litigation Associate for 4 years; admitted in 2008. | $625 | 30.00 | $18,750.00 |
| Charles Rubio | Financial Restructuring Associate for 4 years; admitted in 2008. | $625 | 48.40 | $30,250.00 |
| | | $575 | 115.90 | $66,642.50 |
| Mikhel Schecter | Alternative Investments Associate for 4 years; admitted in 2008. | $575 | 8.70 | $5,002.50 |
| Andrew Sullivan | Global Securities Associate for 4 years; admitted in 2008. | $625 | 6.00 | $3,750.00 |
| | | $575 | 23.90 | $13,742.50 |
| Andrew Young | Financial Restructuring Associate for 4 years; admitted in 2006. | $625 | 50.60 | $31,625.00 |
| | | $575 | 245.30 | $141,047.50 |
| Jeeseon Ahn | Global Alternative Investments Associate for 3 years; admitted in 2009. | $525 | 1.10 | $577.50 |

| | | | | |
|---|---|---|---|---|
| Michael Applebaum | Tax Associate for 3 years; admitted in 2009. | $525 | .30 | $157.50 |
| Adam Bagley | Tax Associate for 3 years; admitted in 2009. | $525 | 2.60 | $1,365.00 |
| La Tonya D. Brooks | Litigation Associate for 3 years; admitted in 2009. | $525 | 79.10 | $41,527.50 |
| Gabriel Carnwath | Global Corporate Associate for 3 years; admitted in 2008. | $600 | 30.30 | $18,180.00 |
| Ateesh Chanda | Litigation Associate for 3 years; admitted in 2009. | $600 $525 | 2.20 47.50 | $1,320.00 $24,937.50 |
| Michael Clarke | Global Finance Associate for 3 years; admitted in 2009. | $600 $525 | 39.70 28.80 | $23,820.00 $15,120.00 |
| Julie Constantinides | Global Corporate Associate for 3 years; admitted in 2009. | $600 $525 | 3.80 15.60 | $2,280.00 $8,190.00 |
| Erin Culbertson | Litigation Associate for 3 years; admitted in 2009. | $600 $525 $262.5 | 25.60 240.50 3.00 | $15,360.00 $126,262.50 $787.50 |
| Nicole Fidler | Litigation Associate for 3 years; admitted in 2009. | $525 | 95.10 | $49,927.50 |
| Joanna L. Grossman | Tax Associate for 3 years; admitted in 2009. | $600 | 27.70 | $16,620.00 |
| Jared Joyce-Schleimer | Financial Restructuring Associate for 3 years; admitted in 2009. | $600 $525 | 85.70 332.00 | $51,420.00 $174,300.00 |
| Alexander Klein | Global Leveraged Finance Associate for 3 years; admitted in 2009. | $525 | 24.50 | $12,862.50 |
| Brian Lee | Global Finance Associate for 3 years; admitted in 2009. | $600 $525 | 4.20 14.90 | $2,520.00 $7,822.50 |
| Roger Lee | Financial Restructuring Associate for 3 years; admitted in 2009. | $525 | 112.70 | $59,167.50 |
| Andrea McNamara | Financial Restructuring Associate for Associate for 3 years; admitted in 2009. | $600 $525 $262.5 | 221.40 455.50 3.30 | $132,840.00 $239,137.50 $866.25 |
| Tanja L. Olano | Global Corporate Associate for 3 years; admitted in 2009. | $600 $525 | 1.80 5.30 | $1,080.00 $2,782.50 |
| Raisa E. Patron | Global Corporate Associate for 3 years; admitted in 2009. | $525 | 4.10 | $2,152.50 |
| Rachel Pojunas | Litigation Associate for 3 years; admitted in 2009. | $600 $525 | 1.60 206.40 | $960.00 $108,360.00 |

| Brendan Riley | Litigation Associate for 3 years; admitted in 2009. | $600 | 35.90 | $21,540.00 |
| | | $525 | 245.40 | $128,835.00 |
| Joanne Robertson | Global Finance Associate for 3 years; admitted in 2009. | $600 | 94.90 | $56,940.00 |
| | | $525 | 141.90 | $74,497.50 |
| | | $262.5 | 2.20 | $577.50 |
| Jeremy Steckel | Global Securities Associate for 3 years; admitted in 2009. | $600 | 29.40 | $17,640.00 |
| | | $525 | 22.60 | $11,865.00 |
| Stephanie Swanson | Global Securities Associate for 3 years; admitted in 2009. | $600 | 30.20 | $18,120.00 |
| | | $525 | 40.90 | $21,472.50 |
| Diane R. Young | Financial Restructuring Associate for 3 years; admitted in 2009. | $525 | 38.80 | $20,370.00 |
| Armando Acosta III | Litigation Associate for 1 year months; admitted in 2010. | $550 | 51.10 | $28,105.00 |
| | | $450 | 538.00 | $242,100.00 |
| Brittany Akins | Litigation Associate for 1 year; admitted in 2010. | $550 | 168.00 | $92,400.00 |
| | | $450 | 367.70 | $165,465.00 |
| John Babtie | Global corporate Associate for 1 year; admitted in 2010. | $550 | 3.30 | $1,815.00 |
| | | $450 | 30.10 | $13,545.00 |
| Thallen Brassel | Tax Associate for 1 year; admitted in 2010. | $550 | 75.50 | $41,525.00 |
| | | $450 | 248.20 | $111,690.00 |
| John Calabrese | Litigation Associate for 1 year; admitted in 2010. | $550 | 156.40 | $86,020.00 |
| | | $450 | 380.30 | $171,135.00 |
| Ginni Chen | Litigation Associate for 1 year; admitted in 2010. | $550 | 118.90 | $65,395.00 |
| | | $450 | 372.80 | $167,760.00 |
| Randy Clark | Tax Associate for 1 year; admitted in 2010. | $550 | 19.30 | $10,615.00 |
| Victoria Farren | Alternative Investments Associate for 1 year; admitted in 2010. | $450 | .80 | $360.00 |
| Bradley Friedman | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 | 190.90 | $104,995.00 |
| | | $450 | 528.90 | $238,005.00 |
| Vina Ha | Litigation Associate for 1 year; admitted in 2010. | $450 | 191.90 | $86,355.00 |
| Elena Hassan | Global Corporate Associate for 1 year; admitted in 2010. | $450 | 94.70 | $42,615.00 |
| Jacob Jou | Litigation Associate for 1 year; admitted in 2010. | $550 | 37.20 | $20,460.00 |
| | | $450 | 92.90 | $41,805.00 |
| Matthew Kanter | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 | 104.50 | $57,475.00 |
| | | $275 | .50 | $137.50 |
| | | $450 | 415.00 | $186,750.00 |

| | | | | |
|---|---|---|---|---|
| Ethan Lee | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 22.30 101.50 | $12,265.00 $45,675.00 |
| Kathryn Lenahan | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 $450 | 147.70 216.20 | $81,235.00 $97,290.00 |
| Denise Linton | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 99.10 353.00 | $54,505.00 $158,850.00 |
| Andrew Morton | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 $450 | 4.40 122.90 | $2,420.00 $55,305.00 |
| Jonathan Ostrzega | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 $450 | 47.90 120.80 | $26,345.00 $54,360.00 |
| James Reilly | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 25.30 238.40 | $13,915.00 $107,280.00 |
| Katherine Rhodes | Litigation Associate for 1 year; admitted in 2010. | $450 | 18.20 | $8,190.00 |
| Joanne Ricciardiello | Global Transportation and Space Finance Associate for 1 year; admitted in 2010. | $550 $450 | 25.80 92.50 | $14,190.00 $41,625.00 |
| Iiya Ross | Global Securities Associate for 1 year; admitted in 2010. | $550 $450 | 21.70 3.40 | $11,935.00 $1,530.00 |
| Neema Saran | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 24.00 371.90 | $13,200.00 $167,355.00 |
| Megha Shah | Global Securities Associate for 1 year; admitted in 2010. | $550 $450 | 27.80 83.60 | $15,290.00 $37,620.00 |
| Nehal M. Siddiqui | Global corporate Associate for 1 year; admitted in 2010. | $550 | 7.75 | $4,262.50 |
| Sunila Sreepada | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 14.60 24.00 | $8,030.00 $10,800.00 |
| Brian Sturm | Financial Restructuring Associate for 1 year; admitted in 2010. | $550 $450 | 19.70 113.70 | $10,835.00 $51,165.00 |
| Jonathan Walder | Litigation Associate for 1 year; admitted in 2010. | $550 $450 | 2.20 334.90 | $1,210.00 $150,705.00 |
| Eric Weiss | Litigation Associate for 1 year; admitted in 2010. | $450 | 135.20 | $60,840.00 |
| Jeremy Wells | Global Securities Associate for 1 year; admitted in 2010. | $550 $450 | 171.40 218.50 | $94,270.00 $98,325.00 |
| Katie J. Hamilton | Litigation Associate for 9 months; admitted in 2011. | $460 $295 | 11.70 71.60 | $5,382.00 $21,122.00 |

| Name | Title | Rate | Hours | Amount |
|---|---|---|---|---|
| Timothy Wood | Litigation Associate for 9 months; admitted in 2011. | $460 | 41.40 | $19,044.00 |
| | | $295 | 120.90 | $35,665.50 |
| Monica Alston | Case Manager | $255 | 100.00 | $25,500.00 |
| | | $250 | 320.10 | $80,025.00 |
| Abayomi A. Ayandipo | Case Manager | $255 | 38.30 | $9,766.50 |
| | | $250 | 119.00 | $29,750.00 |
| Oscar Castrillon | Case Manager | $250 | 8.40 | $2,100.00 |
| Angel Anderson | Case Manager | $255 | 6.50 | $1,657.50 |
| | | $215 | 21.50 | $4,622.50 |
| Rena Ceron | Case Manager | $225 | 25.30 | $5,692.50 |
| | | $215 | 113.40 | $24,381.00 |
| Richard Cosentino | Legal Assistant | $280 | 85.00 | $23,800.00 |
| | | $275 | 245.50 | $67,512.50 |
| Randy Hooks | Legal Assistant | $280 | 58.80 | $16,464.00 |
| | | $275 | 214.00 | $58,850.00 |
| Kim Strosser | Legal Assistant | $280 | 5.60 | $1,568.00 |
| | | $275 | 71.50 | $19,662.50 |
| Charles Sheehan | Legal Assistant | $280 | 15.90 | $4,452.00 |
| | | $265 | 75.20 | $19,928.00 |
| Marika Tanaka | Legal Assistant | $240 | 1.50 | $360.00 |
| Chris Georgakis | Legal Assistant | $190 | 20.80 | $3,952.00 |
| Paul Butters | Legal Assistant | $225 | 21.00 | $4,725.00 |
| | | $185 | 43.10 | $7,973.50 |
| Peter Delfausse | Legal Assistant | $185 | 1.10 | $203.50 |
| Benjamin Harris | Legal Assistant | $185 | 4.80 | $888.00 |
| Charmaine Thomas | Legal Assistant | $195 | 54.90 | $10,705.50 |
| | | $185 | 163.70 | $30,284.50 |
| Andrew Trainor | Legal Assistant | $185 | 2.00 | $370.00 |
| Kyle Martin | Legal Assistant | $185 | 145.70 | $26,954.50 |
| | | $175 | 446.20 | $78,085.00 |
| Jason Hsu | Legal Assistant | $175 | 48.10 | $8,417.50 |
| | | $165 | 201.90 | $33,313.50 |
| Liga R Michailovs | Legal Assistant | $165 | 2.00 | $330.00 |
| Icsom W. Jones | Managing Attorney Clerk | $215 | 3.30 | $709.50 |
| Jacqueline Brewster | Managing Attorney Clerk | $185 | 23.40 | $4,329.00 |
| | | $175 | 76.70 | $13,422.50 |
| Matthew Ottenstein | Librarian | $205 | 2.90 | $594.50 |
| Robin Traylor | Librarian | $215 | 3.60 | $774.00 |
| | | $205 | 15.15 | $3,105.75 |

| Bryan Loper | Litigation Support Specialist | $295 | .70 | $206.50 |
|---|---|---|---|---|
| Janelle Blanchard | Litigation Support Specialist | $285 | 2.50 | $712.50 |
| Marcin Grabysz | Litigation Support Specialist | $285 | 37.90 | $10,801.50 |
| James McGuire | Litigation Support Specialist | $285 | 6.00 | $1,710.00 |
| Rhodely Vallon | Litigation Support Specialist | $285 | 99.30 | $28,300.50 |
| Joseph S. Klock | Litigation Support Specialist | $275 | 7.00 | $1,925.00 |
| Alexander Sacklowski | Litigation Support Specialist | $275 | 60.20 | $16,555.00 |
| Rhodely Vallon | Litigation Support Specialist | $290 | 70.30 | $20,387.00 |
| | | $275 | 155.60 | $42,790.00 |
| Theartis Everett | Litigation Support Specialist | $290 | 22.50 | $6,525.00 |
| | | $255 | 99.30 | $25,321.50 |
| Juan Rojas | Litigation Support Specialist | $240 | .10 | $24.00 |
| Louisa Crespi | Administrator | $230 | .50 | $115.00 |
| Mitchell Gaines | Programmer | $230 | 5.90 | $1,357.00 |
| | | $230 | 2.90 | $667.00 |
| Gabrielle Zsebi | Librarian | $210 | 7.10 | $1,491.00 |
| Paul Greengross | Librarian | $200 | 4.30 | $860.00 |
| Maria Smilen | File Clerk | $125 | 4.90 | $612.50 |
| | | $115 | 19.30 | $2,219.50 |
| | | | | |
| **Total** | | **$569.70 (blended rate)[2]** | **24,891.70 Hours** | **$14,180,784.75** |

---

[2]    The blended rate excluding paraprofessionals is $623.52 per hour.

SEVENTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2010 – JANUARY 31, 2011)

| ACTIVITY | HOURS | FEES |
|---|---|---|
| General Case Administration | 148.70 | $105,119.00 |
| General Case Strategy Meetings | 16.50 | $15,055.00 |
| Project Monitoring/Court Calendar & Docket Maintenance | 368.10 | $106,879.00 |
| Hearings and Court Communications | 240.80 | $136,176.00 |
| Non-Working Travel | 195.90 | $74,143.00 |
| Interested Party Communications/Website/Lehman Team Hotline | 319.10 | $188,681.50 |
| Communications with Debtors | 39.40 | $29,366.50 |
| Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee | 817.50 | $601,077.50 |
| Secured Creditors Issues/Meetings/Communications | 24.80 | $18,607.00 |
| Equity Holders/Motions/Hearings | 5.30 | $1,086.50 |
| LBI/SIPC Coordination and Issues | 115.40 | $72,432.00 |
| Cash Management | .30 | $157.50 |
| Insurance Issues | 6.80 | $4,387.50 |
| Employee/ERISA/Benefits/Pension Issues | 67.40 | $44,768.00 |
| Customer/Vendor Issues | .80 | $143.00 |
| Tax Issues | 1,220.00 | $857,927.50 |
| Corporate Governance | 18.50 | $11,581.00 |
| Other General Business Operation Issues | 20.70 | $16,343.00 |
| Intercompany Issues | 550.30 | $342,840.50 |
| Real Estate Matters | 798.70 | $551,950.50 |
| Private Equity | 36.60 | $27,112.00 |
| Derivatives/SWAP Agreement Issues (Including Derivatives- Related Adversary Proceedings, Alternative Dispute Resolution, and Claims Reconciliation and Litigation) | 6,085.25 | $3,835,805.25 |

| | | |
|---|---:|---:|
| Loans/Investments | 799.40 | $435,615.50 |
| Domestic Bank and Related Regulatory Issues | 5.20 | $4,458.00 |
| International Insolvency Issues | 656.20 | $416,137.00 |
| Non-Derivative Automatic Stay/Safe Harbor Issues | 35.20 | $15,738.00 |
| Miscellaneous Asset Sales/363 Issues | 37.70 | $22,011.00 |
| Non-Derivative Executory Contracts/365 Issues | 2.10 | $1,340.00 |
| DIP Financing | 3.50 | $1,127.50 |
| Exit Financing | .30 | $277.50 |
| Plan of Reorganization/Plan Confirmation/Plan Implementation | 1,783.30 | $1,159,300.50 |
| Disclosure Statement/Solicitation/Voting | 13.50 | $11,691.00 |
| Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues | 2,399.00 | $1,358,488.50 |
| Other Bankruptcy Motions and Matters | 114.30 | $66,566.00 |
| Non-Derivative Adversary Proceedings Preparation and Litigation | 6,022.25 | $2,839,344.00 |
| Non-Bankruptcy Litigation | 24.00 | $9,830.00 |
| 2004 Issues | 25.50 | $17,715.00 |
| Appeals | 77.90 | $46,157.50 |
| SEC/DOJ Issues | 1.00 | $860.00 |
| Examiner Issues | 2.80 | $1,148.00 |
| Proprietary Retention/Billing/Fee Applications | 1,375.90 | $500,015.00 |
| Retention Issue/Fees Applications: Ordinary Course Professionals | 220.10 | $121,425.00 |
| Retention Issue/Fees Applications: Other Professionals | 195.70 | $109,901.00 |
| | | |
| **Total** | **24,891.70** | **$14,180,784.75** |

**SEVENTH INTERIM FEE APPLICATION OF MILBANK, TWEED,
HADLEY & M<sup>C</sup>CLOY LLP: AS COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF LEHMAN BROTHERS HOLDINGS INC., ET AL.
(OCTOBER 1, 2010 – JANUARY 31, 2011)**

| DISBURSEMENTS | AMOUNT |
|---|---|
| Airfreight | $1,954.70 |
| Cab Fares/Local Travel | 34,748.74 |
| Computer Database Research | 414,727.56 |
| Fees | 22,480.34 |
| Global Filings | 720.00 |
| Mail | 20.02 |
| Meals | 21,002.76[1] |
| Messenger | 3,419.03 |
| Misc | 8.48 |
| Outside Reproduction | 1,249.20 |
| Photocopies | 61,922.15 |
| Telephone/Telecopy | 27,974.12 |
| Travel | 43,034.70 |
| **TOTAL DISBURSEMENTS** | **$633,261.80** |

---

[1]    Overtime Meals have been reduced to $20.00 per meal, per Fee Committee guidelines, resulting in a $4,625.12 reduction.

Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                                                               :
In re:                                                         :          Chapter 11 Case No.
                                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :          08-13555 (JMP)
                                                               :
                              Debtors.                         :          (Jointly Administered)
                                                               :
------------------------------------------------------------- x

**SEVENTH APPLICATION OF MILBANK, TWEED, HADLEY & MᶜCLOY LLP,**
**COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR**
**INTERIM APPROVAL AND ALLOWANCE OF COMPENSATION FOR SERVICES**
**RENDERED AND FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM**
**OCTOBER 1, 2010 THROUGH AND INCLUDING JANUARY 31, 2011**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Milbank, Tweed, Hadley & MᶜCloy LLP ("Milbank"), counsel to the Official

Committee of Unsecured Creditors (the "Committee") of Lehman Brothers Holdings Inc.

("LBHI"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman Commercial Paper Inc.

("LCPI") and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors" and, together with their non-Debtor affiliates, "Lehman"), hereby

submits its application (the "Application"), pursuant to sections 330 and 331 of chapter 11 of

title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy

Code"), Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the

Guidelines for Fees and Disbursements for Professionals in Southern District of New York

Bankruptcy Cases adopted by the Court on June 24, 1991 and amended April 21, 1995 and

November 25, 2009 (together, the "Local Guidelines"), the United States Trustee Guidelines for

Reviewing Applications for Compensation and Reimbursement of Expenses Filed

Under 11 U.S.C. § 330, effective January 30, 1996 (the "U.S. Trustee Guidelines"), the Fourth

Amended Order Pursuant to Sections 105(a) and 331 of the Bankruptcy Code and Bankruptcy

Rule 2016(a) Establishing Procedures for Interim Monthly Compensation and Reimbursement of

Expenses of Professionals, dated April 14, 2011 (the "Interim Compensation Order") [Docket

No. 15997], and the guidelines contained in the Fee Committee's Confidential Letter Report on

the Sixth Interim Application of Milbank, dated April 12, 2011 (the "Fee Committee

Guidelines"), for the allowance of interim compensation for professional services rendered from

October 1, 2010 through and including January 31, 2011 (the "Seventh Interim Compensation

Period"), and for reimbursement of expenses incurred in connection with such services.  In

support thereof, Milbank respectfully represents as follows:

## **INTRODUCTION**

A.    **Background**

        1.    **Bankruptcy Filing**.  On September 15, 2008, and periodically thereafter

(the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (the

"Chapter 11 Cases").  The Debtors' Chapter 11 Cases have been consolidated for procedural

purposes and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    <u>Creditors' Committee</u>.  On September 17, 2008, the Office of the United

States Trustee for the Southern District of New York (the "<u>U.S. Trustee</u>") appointed the

Committee in the Chapter 11 Cases.

3.    <u>SIPA Trustee</u>.  On September 19, 2008, a proceeding (the "<u>SIPA</u>

<u>Proceeding</u>") was commenced under the Securities Investor Protection Act of 1970 ("<u>SIPA</u>")

with respect to Lehman Brothers Inc. ("<u>LBI</u>"), a wholly owned subsidiary of LBHI and a

registered broker-dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the

"<u>SIPA Trustee</u>") and is administering LBI's estate.

4.    <u>Examiner</u>.  The United States Bankruptcy Court for the Southern District

of New York (the "<u>Court</u>") approved the appointment of Anton R. Valukas as examiner (the

"<u>Examiner</u>") in the Chapter 11 Cases in the Order Approving the Appointment of Examiner,

dated January 20, 2009.  In accordance with his appointment, the Examiner issued his report

(the "<u>Examiner's Report</u>") on February 8, 2010, which was originally filed under seal and

subsequently unsealed on March 11, 2010.

5.    <u>Fee Committee</u>.  On May 26, 2009, the Court appointed a fee committee

(the "<u>Fee Committee</u>") and approved a fee protocol (the "<u>Fee Protocol</u>") in the Chapter 11

Cases.  On January 24, 2011, the Court approved the Fee Committee's recommendation to

appoint Richard A. Gitlin as the successor Independent Member on the Fee Committee.  By

motion dated March 11, 2011, the Fee Committee sought authorization to amend the Fee

Protocol, which the Court granted on April 14, 2011 (the "<u>Amended Fee Protocol</u>") [Docket

No. 15998].

6.    <u>Debtors' Plan and Disclosure Statement</u>.  On March 15, 2010, the

Debtors filed their Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors [Docket No. 7572].  Subsequently, on April 14, 2010, the Debtors filed their Disclosure

Statement for Joint Chapter 11 Plan of Lehman Brothers Holding Inc. and its Affiliated Debtors

Pursuant to Section 1125 of the Bankruptcy Code (the "Debtors' Disclosure Statement")

[Docket No. 8332], along with their revised Chapter 11 Plan (the "Debtors' Plan") [Docket No.

8330].

       7.     LBHI Ad Hoc Group's Plan and Disclosure Statement.  On December 15,

2010, the Ad Hoc Group of Lehman Brothers Creditors (the "LBHI Ad Hoc Group") filed their

Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and

Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred

Somerset LLC (the "Ad Hoc Plan") [Docket No. 13504] and their Disclosure Statement for the

Joint Substantively Consolidating Chapter 11 Plan for Lehman Brothers Holdings Inc. and

Certain of Its Affiliated Debtors Other Than Merit, LLC, LB Somerset LLC and LB Preferred

Somerset LLC (the "Ad Hoc Disclosure Statement") [Docket No. 13505].

       8.     Debtors' Amended Plan and Disclosure Statement.  On January 25, 2011,

the Debtors filed their First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc.

and its Affiliated Debtors (the "Debtors' Amended Plan") [Docket No. 14150] and the Debtors'

Disclosure Statement for First Amended Joint Chapter 11 Plan of Lehman Brothers Holdings

Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code  (the "Debtors'

Amended Disclosure Statement") [Docket No. 14151].

       9.     Non-Consolidation Plan and Disclosure Statement.  On April 25, 2011,

the Non-Consolidation Plan Proponents (as defined therein) filed their Joint Chapter 11 Plan for

Lehman Brothers Holdings Inc. and its Affiliated Debtors Other than Merit, LLC, LB Somerset

LLC and LB Preferred Somerset LLC [Docket No. 16229] and their Disclosure Statement for

the Joint Chapter 11 Plan for Lehman Brothers Holdings Inc. and its Affiliated Debtors Other

than Merit, LLC, LB Somerset LLC and LB Preferred Somerset LLC [Docket No. 16230].

        10.    <u>Ad Hoc Amended Plan and Disclosure Statement</u>.  On April 27, 2011, the

LBHI Ad Hoc Group filed their Amended Joint Substantively Consolidating Chapter 11 Plan

for Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit,

LLC, LB Somerset LLC and LB Preferred Somerset LLC [Docket No. 16315] and their

Disclosure Statement for the Amended Joint Substantively Consolidating Chapter 11 Plan for

Lehman Brothers Holdings Inc. and Certain of Its Affiliated Debtors Other Than Merit, LLC,

LB Somerset LLC and LB Preferred Somerset LLC [Docket No. 16316].

        11.    <u>Jurisdiction</u>.  This Court has jurisdiction over this matter pursuant to 28

U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§

1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  The statutory

predicates for the relief sought herein are sections 330 and 331 of the Bankruptcy Code.

Pursuant to the Local Guidelines, a certification regarding compliance with the Local

Guidelines is attached hereto as Exhibit "<u>A</u>."

**B.**    **<u>Retention of Milbank and Billing History</u>**

        12.    <u>Authorization for Milbank's Retention</u>.  On November 5, 2008, pursuant

to the Interim Order Under 11 U.S.C. § 1103 And Fed. R. Bankr. P. 2014 And 5002

Authorizing The Retention And Employment Of Milbank, Tweed, Hadley & McCloy LLP, As

Counsel For The Official Committee Of Unsecured Creditors Effective As Of September 17,

2008 (the "<u>Retention Order</u>"), the Court authorized Milbank's retention as counsel for the

Committee in these Chapter 11 Cases.  The Retention Order, which became a final order on

November 21, 2008, authorized Milbank to receive compensation pursuant to the procedures set

forth in the Bankruptcy Code, the Bankruptcy Rules, the Local Guidelines, the U.S. Trustee

Guidelines, and the local rules and orders of this Court.  Among other things, the Retention

Order provides that Milbank's hourly rates are subject to periodic firm-wide adjustments in the

ordinary course of Milbank's business.

          13.     <u>First Interim Fee Application</u>.  On April 10, 2009, Milbank filed its First

Application Of Milbank, Tweed, Hadley & McCloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From September 17, 2008

Through And Including January 31, 2009 (the "<u>First Interim Fee Application</u>").  In the First

Interim Fee Application, Milbank requested (i) allowance of compensation for professional

services rendered during the period from September 17, 2008 through and including January 31,

2009 (the "<u>First Interim Compensation Period</u>") in the total amount of $12,123,376.00,[1] and (ii)

reimbursement of its actual and necessary expenses incurred during the First Interim

Compensation Period in the amount of $668,388.72.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $10,397,943.56 during the First Interim

Compensation Period.  On August 5, 2009, the Court approved the First Interim Fee

Application, subject to a ten percent holdback pursuant to the recommendation of the Fee

Committee.  On September 10, 2009, the Court approved the release of the remaining holdback,

subject to a $69,990.04 deduction, at the recommendation of the Fee Committee.[2]

---

[1]      Milbank voluntarily reduced the fees it sought to have allowed for the First Interim Compensation Period
by $129,111.00.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of
all or a portion of such fees at a later date.

[2]      Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion
of such fees.

14.     <u>Second Interim Fee Application</u>.  On August 14, 2009, Milbank filed its Second Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From February 1, 2009 Through And Including May 31, 2009 (the "<u>Second Interim Fee Application</u>").  In the Second Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from February 1, 2009 through and including May 31, 2009 (the "<u>Second Interim Compensation Period</u>") in the total amount of $16,829,521.00,[3] and (ii) reimbursement of its actual and necessary expenses incurred during the Second Interim Compensation Period in the amount of $1,019,754.61.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $14,582,737.21 during the Second Interim Compensation Period.  On September 25, 2009, the Court approved the Second Interim Fee Application, subject to a ten percent holdback pursuant to the recommendation of the Fee Committee.  On December 23, 2009, the Court released the ten percent holdback, subject to a $311,734.82 deduction, at the recommendation of the Fee Committee.[4]

15.     <u>Third Interim Fee Application</u>.  On December 14, 2009, Milbank filed its Third Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From June 1, 2009 Through And Including September 30, 2009 (the "<u>Third Interim Fee Application</u>").  In the Third Interim

---

[3]     Milbank voluntarily reduced the fees it sought to have allowed for the Second Interim Compensation Period by $154,700.25, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[4]     Milbank reserved and continues to reserve the right to seek, at a later date, the allowance of all or a portion of such fees.

Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from June 1, 2009 through and including September 30, 2009 (the "Third Interim Compensation Period") in the total amount of $10,881,540.00,[5] and (ii) reimbursement of its actual and necessary expenses incurred during the Third Interim Compensation Period in the amount of $583,803.10.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $7,480,652.96 during the Third Interim Compensation Period.  On April 9, 2010, the Court approved the Third Interim Fee Application, subject to a $292,555.40 deduction, at the recommendation of the Fee Committee.[6]

16.    Fourth Interim Fee Application.  On April 16, 2010, Milbank filed its Fourth Application Of Milbank, Tweed, Hadley & M$^c$Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From October 1, 2009 Through And Including January 31, 2010 (the "Fourth Interim Fee Application").  In the Fourth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from October 1, 2009 through and including January 31, 2010 (the "Fourth Interim Compensation Period") in the total amount of $13,595,778.50,[7] and (ii) reimbursement of its actual and necessary expenses incurred during the Fourth Interim Compensation Period in the amount of $451,410.54.  Pursuant to the Interim Compensation

---

[5]    Milbank voluntarily reduced the fees it sought to have allowed for the Third Interim Compensation Period by $419,548.50, on account of, among other things, certain matters identified by the Fee Committee.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[6]    Milbank reserved, and continues to reserve, the right to seek, at a later time, the allowance of all or a portion of such fees.

[7]    Milbank voluntarily reduced the fees it sought to have allowed for the Fourth Interim Compensation Period by $111,446.50, on account of, among other things, certain matters identified by the Fee Committee.  However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

Order, Milbank received payment in the amount of $11,341,325.19 during the Fourth Interim

Compensation Period.  On September 7, 2010, the Court approved the Fourth Interim Fee

Application, subject to an additional holdback in the amount of $733,570.87, relating to certain

unresolved objections asserted by the Fee Committee.[8]

       17.     <u>Fifth Interim Fee Application</u>.  On August 16, 2010, Milbank filed its

Fifth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of

Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services

Rendered And For Reimbursement Of Expenses During Period From February 1, 2010 Through

And Including May 31, 2010 (the "<u>Fifth Interim Fee Application</u>").  In the Fifth Interim Fee

Application, Milbank requested (i) allowance of compensation for professional services

rendered during the period from February 1, 2010 through and including May 31, 2010 (the

"<u>Fifth Interim Compensation Period</u>") in the total amount of $19,450,342.75,[9] and (ii)

reimbursement of its actual and necessary expenses incurred during the Fifth Interim

Compensation Period in the amount of $851,804.27.  Pursuant to the Interim Compensation

Order, Milbank received payment in the amount of $16,427,844.72 during the Fifth Interim

Compensation Period.[10]  On May 12, 2011, the Court approved the Fifth Interim Fee

---

[8]     Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[9]     Milbank voluntarily reduced the fees it sought to have allowed for the Fifth Interim Compensation Period by $199,247.00, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[10]    Milbank reserves the right to seek the allowance of all or a portion of such fees at a later date.

Application, subject to an additional holdback in the amount of $413,818.13, relating to certain unresolved objections asserted by the Fee Committee.[11]

18.    <u>Sixth Interim Fee Application</u>.  On December 15, 2010, Milbank filed its Sixth Application Of Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, Counsel to Official Committee of Unsecured Creditors, For Interim Approval And Allowance Of Compensation For Services Rendered And For Reimbursement Of Expenses During Period From June 1, 2010 Through And Including September 30, 2010 (the "<u>Sixth Interim Fee Application</u>").  In the Sixth Interim Fee Application, Milbank requested (i) allowance of compensation for professional services rendered during the period from June 1, 2010 through and including September 30, 2010 (the "<u>Sixth Interim Compensation Period</u>") in the total amount of $18,359,367.75,[12] and (ii) reimbursement of its actual and necessary expenses incurred during the Sixth Interim Compensation Period in the amount of $792,924.64.  Pursuant to the Interim Compensation Order, Milbank received payment in the amount of $15,491,759.01 during the Sixth Interim Compensation Period.  Due to recent developments relating to and ongoing discussions with the Fee Committee, no hearing has yet been scheduled with respect to the Sixth Interim Fee Application.

19.    <u>Application</u>.  Milbank makes this seventh interim application for approval and allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.

---

[11]    Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

[12]    Milbank voluntarily reduced the fees it sought to have allowed for the Sixth Interim Compensation Period by $229,420.50, on account of, among other things, certain matters identified by the Fee Committee. However, Milbank reserved, and continues to reserve, the right to seek the allowance of all or a portion of such fees at a later date.

20.    In accordance with the Interim Compensation Order, Milbank submitted

monthly fee statements to the Debtors seeking interim compensation and reimbursement of

expenses.  During the Seventh Interim Compensation Period, Milbank submitted the following

fee statements:

a.  On December 6, 2010, pursuant to the Interim Compensation Order, Milbank
served its twenty-fifth fee statement for the period from October 1, 2010 through
and including October 31, 2010 (the "Twenty-Fifth Fee Statement").  The
Twenty-Fifth Fee Statement sought (i) an allowance of $3,827,282.75 as
compensation for services rendered and (ii) the reimbursement of $148,518.89 in
expenses.  As of the date hereof, Milbank has received a total of $3,210,345.09,
which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the
expenses incurred pursuant to the Twenty-Fifth Fee Statement.

b.  On February 18, 2011, pursuant to the Interim Compensation Order, Milbank
served its twenty-sixth fee statement for the period from November 1, 2010
through and including November 30, 2010 (the "Twenty-Sixth Fee Statement").
The Twenty-Sixth Fee Statement sought (i) an allowance of $3,890,350.75 as
compensation for services rendered and (ii) the reimbursement of $236,292.40 in
expenses.  As of the date hereof, Milbank has received a total of $3,348,573.00,
which represents payment for (i) 80% of Milbank's fees and (ii) 100% of the
expenses incurred pursuant to the Twenty-Sixth Fee Statement.

c.  On March 11, 2011, pursuant to the Interim Compensation Order, Milbank filed
and served its twenty-seventh fee statement for the period from December 1, 2010
through and including December 31, 2010 (the "Twenty-Seventh Fee
Statement").  The Twenty-Seventh Fee Statement sought (i) an allowance of
$2,836,185.25 as compensation for services rendered and (ii) the reimbursement
of $125,037.11 in expenses.  As of the date hereof, Milbank has received a total
of $2,393,985.31, which represents payment for (i) 80% of Milbank's fees and (ii)
100% of the expenses incurred pursuant to the Twenty-Seventh Fee Statement.

d.  On April 7, 2011, pursuant to the Interim Compensation Order, Milbank filed and
served its twenty-eighth fee statement for the period from January 1, 2011
through and including January 31, 2011 (the "Twenty-Eighth Fee Statement")
and, together with the Twenty-Fifth Fee Statement, Twenty-Sixth Fee Statement
and Twenty-Seventh Fee Statement, the "Fee Statements").  The Twenty-Eighth
Fee Statement sought (i) an allowance of $3,626,966.00 as compensation for
services rendered and (ii) the reimbursement of $140,044.81 in expenses. As of
the date hereof, Milbank has received a total of $3,041,617.61, which represents
payment for (i) 80% of Milbank's fees and (ii) 100% of the expenses incurred
pursuant to the Twenty-Eighth Fee Statement.

11

21.     Milbank has not entered into any agreement, express or implied, with any other party for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.  No promises have been received by Milbank or any member thereof as to compensation in connection with these cases other than in accordance with the provisions of the Bankruptcy Code.

22.     <u>Increases in Hourly Rates</u>.  Consistent with past practice, as disclosed in Milbank's retention application and prior fee statements and applications, Milbank increased the hourly rates of all its professionals effective January 1, 2011.  From and after January 1, 2011, hourly rates of partners, of counsel, associates, and paralegals are as follows:

| | |
|---|---|
| Partners: | $795-1,095 |
| Of Counsel: | $745-980 |
| Associates: | $295-715 |
| Legal Assistants: | $175-290 |

In many instances, moreover, the hourly rates charged herein for time billed after January 1, 2011 separately reflect, on a timekeeper-by-timekeeper basis, increases attributable to professionals' increases in seniority (*e.g.,* first year associates becoming second year associates).

23.     Such rate increases are consistent with rate increases implemented, on both a firm-wide and timekeeper-by-timekeeper basis, by Milbank's peer firms in the national and international markets for the services of restructuring and insolvency professionals.

## II.

## <u>APPLICATION</u>

23.     By this Application, Milbank is seeking allowance of (a) compensation for professional services rendered by Milbank, as counsel for the Committee, during the

Seventh Interim Compensation Period and (b) reimbursement of expenses incurred by Milbank in connection with such services during the Seventh Interim Compensation Period.

24.    In this Application, Milbank seeks approval of $14,180,784.75[13] for legal services rendered on behalf of the Committee during the Seventh Interim Compensation Period and 633,261.80[14] for reimbursement of expenses incurred in connection with the rendering of such services, for a total award of $14,814,046.55.

25.    Pursuant to the Interim Compensation Order, Milbank has already received payment of $11,995,760.01 during the Seventh Interim Compensation Period. Milbank will seek a total payment of $2,818,286.54 pursuant to this Application, which amount represents the portion of Milbank's fees for legal services rendered and expenses incurred during the Seventh Interim Compensation Period not previously paid to Milbank pursuant to the Interim Compensation Order.[15]

26.    The fees sought by this Application reflect an aggregate of 24,891.70 hours of attorney and paraprofessional time spent and recorded in performing services for the Committee during the Seventh Interim Compensation Period, at a blended average hourly rate of $569.70 for both professionals and paraprofessionals. The blended hourly rate for professionals only is $623.52.

---

[13]    The compensation sought by this Application reflects a voluntary reduction of approximately $133,519.75 including, but not limited to, certain fee issues identified by the Fee Committee. However, Milbank reserves the right to seek allowance of all or a portion of such fees at a future date.

[14]    This amount reflects a reduction of certain expenses as per the Fee Committee Guidelines, including overtime meal expenses for which Milbank seeks reimbursement of no more than $20 per meal. Milbank reserves the right to seek, at a later date, reimbursement for the total amount of expenses incurred in connection with its representation of the Committee.

[15]    As is customary, in connection with the preparation of this Application, Milbank has reviewed the fees and expenses set forth in its Fee Statements. Based on this review, the amount requested herein on account of fees and expenses incurred by Milbank during the Seventh Interim Compensation Period is $17,631.41 less than the sum of fees and expenses set forth in the Fee Statements. Accordingly, upon approval of the relief requested herein, Milbank will reduce its request for payment from the Debtors by such amount.

27.      Milbank rendered to the Committee all services for which compensation is sought solely in connection with these cases, in furtherance of the duties and functions of the Committee.

28.      Milbank maintains computerized records of the time expended in the rendering of the professional services required by the Committee.  These records are maintained in the ordinary course of Milbank's practice.  For the convenience of the Court and parties in interest, a billing summary for the Seventh Interim Compensation Period is attached as part of the cover sheet, setting forth the name of each attorney and paraprofessional for whose work on these cases compensation is sought, each attorney's year of bar admission, the aggregate of the time expended by each such attorney or paraprofessional, the hourly billing rate for each such attorney or paraprofessional at Milbank's current billing rates, and an indication of the individual amounts requested as part of the total amount of compensation requested.  In addition, set forth in the billing summary is additional information indicating whether each attorney is a partner, counsel or associate, the number of years each attorney has held such position, and each attorney's area of concentration.  The compensation requested by Milbank is based on the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

29.      Attached hereto as Exhibit "B" are time entry records broken down in tenths of an hour by project category, based on the U.S. Trustee Guidelines, setting forth a detailed description of services performed by each attorney and paraprofessional on behalf of the Committee.[16]

---

[16]      Due to the volume of the time and expense records, and consistent with the Interim Compensation Order, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the U.S. Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

30.     Milbank also maintains computerized records of all expenses incurred in connection with the performance of professional services.  A summary of the amounts and categories of expenses for which reimbursement is sought, as well as a breakdown of expenses by project category and detailed descriptions of these expenses, are attached hereto as Exhibit "C."

### III.

### SUMMARY OF PROFESSIONAL SERVICES RENDERED

31.     To provide an orderly summary of the services rendered on behalf of the Committee by Milbank, and in accordance with the U.S. Trustee Guidelines, the Fee Committee adopted the following billing categories in connection with these cases:

| | |
|---|---|
| 00100 | General Case Administration |
| 00200 | General Case Strategy Meetings |
| 00300 | Project Monitoring/Court Calendar & Docket Maintenance |
| 00400 | Hearings and Court Communications |
| 00500 | Non-Working Travel |
| 00600 | Interested Parties Communications |
| 00700 | Communications with Debtors |
| 00800 | Unsecured Creditors Issues/Meetings/Communications/Creditors' Committee |
| 00900 | Secured Creditors Issues/Meetings/Communications |
| 01000 | Equity Holders/Motions/Hearings/Communications |
| 01100 | LBI/SIPC Coordination and Issues |
| 01200 | Cash Management |
| 01300 | Insurance Issues |
| 01400 | Employee/ERISA/Benefits/Pension Issues |
| 01800 | Tax Issues |
| 01900 | Corporate Governance |
| 02000 | Other General Business Operation Issues |
| 02100 | Intercompany Issues |
| 02200 | Data Preservation/Migration |
| 02300 | Real Estate Matters |
| 02400 | Private Equity |
| 02500 | Derivatives/Swap Agreement Issues |
| 02600 | Loans/Investments |
| 02700 | Domestic Bank and Related Regulatory Issues |
| 02800 | International Insolvency Issues |
| 02900 | Schedules/Statement of Financial Affairs |

| 03000 | Non-Derivative Automatic Stay/Safe Harbor Issues |
| 03100 | Miscellaneous Asset Sales/363 Issues |
| 03200 | Non-Derivative Executory Contracts/365 Issues |
| 03300 | DIP Financing |
| 03400 | Exit Financing |
| 03500 | Plan of Reorganization/Plan Confirmation/Plan Implementation |
| 03600 | Disclosure Statement/Solicitation/Voting |
| 03700 | Non-Derivative Claims Reconciliation, Estimation, Litigation, and Alternative Dispute Resolution and Bar Date Issues |
| 03800 | Other Bankruptcy Motions and Matters |
| 03900 | Non-Derivative Adversary Proceedings Preparation and Litigation |
| 04000 | Non-Bankruptcy Litigation |
| 04100 | Rule 2004 Issues |
| 04200 | Appeals |
| 04300 | US Trustee Related Issues |
| 04400 | SEC/DOJ Issues |
| 04500 | Examiner Issues |
| 04600 | Firm's Own Billing/Fee Applications |
| 04700 | Firm's Own Retention Issues |
| 04800 | Third Party Retention/Fee Application/Other Issues |

32.    The following summary is intended only to highlight key services rendered by Milbank in certain project billing categories where Milbank has expended a considerable number of hours on behalf of the Committee, and is not meant to be a detailed description of all of the work performed.  Detailed descriptions of the day-to-day services provided by Milbank and the time expended performing such services in each project billing category are fully set forth in Exhibit "B" hereto.  Such detailed descriptions demonstrate that Milbank was heavily involved in the performance of services for the Committee on a daily basis, including night and weekend work, often under extreme time constraints, to meet the needs of the Committee in these cases.  The sheer magnitude of matters in these Chapter 11 Cases has required and continues to require substantial and continuing efforts on the part of the Committee and its professional advisors, including Milbank, to address the many complicated issues and problems that are presented by these extraordinary and complex cases.

16

A.    **General Case Administration**

33.    During the Seventh Interim Compensation Period, Milbank continued to maintain, and undertake action in accordance with, an elaborate protocol developed earlier in these Chapter 11 Cases for the organization and delegation of the substantial number of tasks engendered by Lehman's chapter 11 process.  The protocol is designed to ensure that the Committee is kept apprised of all aspects of the Chapter 11 Cases.  The protocol also guarantees that all matters are addressed, without duplication of effort.  Due to the highly complex nature of the Debtors' cases, these tasks require knowledge, expertise, and input from a range of Milbank timekeepers, from paralegals to senior partners, all of whom have become intimately familiar with the issues and the parties in the Chapter 11 Cases.

34.    Additionally, Milbank has established a system whereby all substantive court filings are reviewed to provide the Committee with a comprehensive summary and analysis of each material pleading filed in the Chapter 11 Cases.  Milbank's efforts in setting up efficient and comprehensive methods of administering the Committee's needs ensure that the Committee has the information necessary to effectively carry out its fiduciary responsibilities to the unsecured creditors of each of the Debtors.

B.    **Unsecured Creditors' Issues/Meetings/Communications/Creditors' Committee**

35.    During the Seventh Interim Compensation Period, the Committee held weekly telephonic meetings and monthly in-person meetings in advance of in-person meetings with the Debtors.  In addition, the Committee also held a separate weekly telephonic meeting devoted to plan of reorganization issues.  Prior to each Committee meeting, Milbank prepared and distributed memoranda, presentations, and other materials for the Committee members' review and consideration.  During the Committee meetings, Milbank discussed with Committee

17

members and their counsel all significant matters arising during the Seventh Interim

Compensation Period, in particular, the Debtors' Plan and the development of the Debtors'

Amended Plan, and assisted the Committee in formulating positions with respect to such issues.

   36. Through Committee meetings, conference calls and numerous other

communications with members of the Committee, Milbank has assisted the Committee in

(i) fulfilling its obligations to unsecured creditors of each of the Debtors' estates, and

(ii) making informed decisions regarding the multitude of issues that have arisen in these cases.

Indeed, without such meetings and the advice furnished to it by attorneys with expertise in a

variety of different practice areas, the Committee could neither function as a committee nor

make the many decisions that its statutory role and fiduciary duties require it to make in

connection with the Chapter 11 Cases.

**C. Project Monitoring/Court Calendar & Docket Maintenance**

   37. During the Seventh Interim Compensation Period, Milbank continued to

maintain internal filing, record-keeping, docket-monitoring, and calendaring systems to

organize and track (i) pleadings filed in the Chapter 11 Cases, the SIPA Proceeding, and related

adversary proceedings; (ii) ongoing projects; and (iii) upcoming deadlines.  On a real-time

basis, Milbank downloaded, consolidated, and organized pleadings to ensure efficient access.

Milbank also monitored the dockets and summarized and circulated substantive pleadings to the

Milbank team.  These summaries enabled Milbank to stay abreast of ongoing developments in

these cases, facilitated the assignment of projects and helped ensure that deadlines were not

missed.

   38. Additionally, Milbank maintained a comprehensive calendar of active

matters in these cases.  This calendar ensured that Milbank could effectively monitor and update

the status of all pending matters, a resource that proved beneficial in responding to inquiries and

discussing these matters with the Committee and other parties in interest.  Milbank also

maintained and circulated to the Committee, on a weekly basis, a calendar of upcoming

motions, hearing dates, and other important deadlines.

**D.    Hearings and Court Communications**

39.    During the Seventh Interim Compensation Period, Milbank prepared for

and appeared at each of the hearings conducted before this Court, including, among others,

(i) numerous regularly scheduled omnibus hearings; (ii) hearing on claims-related matters;

(iii) special hearings and case conferences; (iv) hearings in the SIPA Proceeding; (v) hearings in

a wide variety of adversary proceedings arising out of the Chapter 11 Cases and the SIPA

Proceeding; and (vi) hearings in related cases and litigations, including the chapter 11 cases of

Innkeepers and SunCal and a number of matters before the UK High Court.

40.    In advance of each hearing, Milbank conferred internally to address the

issues presented by each motion or other substantive pleading and coordinate a response thereto.

To that end, among other things, Milbank reviewed and analyzed documents, including

correspondence and pleadings, conducted factual and legal research, and met with numerous

parties to work toward the consensual resolution of any objections raised by the Committee or

other parties in interest.  Following each hearing, Milbank promptly advised the Committee of

pertinent Court rulings and developments.

**E.    Interested Party Communications/Website/Lehman Team Hotline**

41.    In accordance with the Stipulation and Agreed Order Between the

Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to

Information Pursuant to 11 U.S.C. §§ 105(a), 1102(b)(3) and 1103(c) [Docket No. 498], which

the Court approved on October 1, 2008 (the "Creditor Information Protocol"), Milbank, on behalf of the Committee, continued to populate and maintain a public website (the "Committee Website").  The Committee Website contains a significant amount of content produced by Milbank, which is updated frequently and designed to provide information to creditors worldwide, including, among other things, (i) general information concerning the Debtors' Chapter 11 Cases, including adversary proceedings, chapter 15 cases, and the SIPA Proceeding; (ii) highlights of significant events; (iii) a database of the Court's memorandum decisions and opinions issued in connection with the Chapter 11 Cases, adversary proceedings and the SIPA Proceeding; (iv) a listing of the orders granting the Debtors' omnibus objections to claims, detailing the affected claims by claim number; (v) a case calendar; and (vi) answers to frequently asked questions, which are available in several foreign languages.

42.     The Committee Website also acts as a critical pathway for the dissemination of information between Milbank and the Debtors' creditors.  For example, the Committee Website permits creditors to register to receive monthly reports and to submit inquiries directly to Milbank, as to which Milbank works in collaboration with the Debtors' counsel (as required by the Creditor Information Protocol) to provide responses.

43.     During the Seventh Interim Compensation Period, Milbank continued to expend substantial time maintaining and improving the Committee Website.  In addition, hundreds of creditors contacted Milbank via the Committee Website and telephonically with questions concerning the Chapter 11 Cases and, more specifically, inquiries concerning the proposed treatment of certain claims under the Debtors' Plan and the Debtors' omnibus claim objection process.  In accordance with the Creditor Information Protocol, Milbank reviewed and responded to all such creditor inquiries.

44.     Milbank also spent considerable time working with each of the *ad hoc* groups that formed during the Chapter 11 Cases, as well as with numerous individual creditors, to advance the objectives of various creditor constituencies, assist such creditors' understanding of the issues in the Chapter 11 Cases, and negotiate resolutions of disputed issues.  At the Court's direction, Milbank also frequently acted as an information "liaison" between the Debtors, these *ad hoc* groups and other creditors.

**F.      Communications with Debtors**

45.     During the Seventh Interim Compensation Period, Milbank continued its frequent communication and exchange of correspondence with the Debtors' counsel regarding, among numerous other issues, case administration, responses to pleadings, issues related to the Debtors' Plan, the development of the Debtors' Amended Plan, negotiations with the administrators and trustees (the "Foreign Administrators") managing the affairs of the numerous proceedings (the "Foreign Proceedings") initiated by or against Lehman's affiliates in countries outside of the U.S. (the "Foreign Affiliates"), substantive consolidation, claims based on purported guarantees issued by LBHI of its affiliates' obligations, intercompany claims and negotiations with the aforementioned *ad hoc* groups.  Further, Milbank prepared for and attended in-person meetings with the Committee members, the Debtors, and their respective professionals to, among other things, discuss the ongoing administration of and long term strategy for the Chapter 11 Cases and, specifically, the Debtors' Amended Plan and LAMCO.

**G.      LBI/SIPC Coordination and Issues**

46.     During the Seventh Interim Compensation Period, Milbank devoted significant time to monitoring, evaluating, and analyzing various aspects of LBI's claims reconciliation process including, in pertinent part, (i) monitoring and, where contested,

21

analyzing, the SIPA Trustee's objections to claims; (ii) reviewing and making recommendations

to the Committee with respect to stipulations to close out prepetition transactions among LBI

and various counterparties; and (iii) analyzing and making recommendations to the Committee

regarding various motions and applications filed in the SIPA Proceeding.  In connection with

the foregoing, Milbank regularly participated in Court hearings related to the administration of

the LBI estate.

47.    Additionally, Milbank cooperated with the Debtors to address numerous

inter-estate open issues between the Debtors and LBI.  In particular, Milbank and the Debtors'

counsel worked closely in preparing for a summit meeting with the SIPA Trustee and

representatives of the LBI estate to discuss various issues related to administration of LBI and

to reconcile the claims filed between the parties.  To that end, Milbank analyzed various legal

issues related to the treatment of claims under SIPA and the standards for determining the status

of claims filed against a broker-dealer.  Milbank continues to monitor and, where appropriate,

take part in the ongoing claim reconciliation process.

**H.    Employee/ERISA/Benefits/Pension Issues**

48.    During the Seventh Interim Compensation Period, Milbank devoted

substantial time to researching, analyzing and communicating with the Debtors' counsel with

respect to certain administrative and judicial proceedings (the "UK Pension Proceedings") in the

United Kingdom related to the Debtors' obligations to fund the Lehman Brothers Pension

Scheme (the "Pension Scheme"), sponsored by Lehman Brothers Limited ("LBL").  The UK

Pensions Regulator commenced the UK Pension Proceedings against LBHI and certain of its

non-Debtor affiliates based on a purported funding shortfall in the Pension Scheme, and

ultimately issued a "financial support directive" imposing liability on LBHI, among others, with

respect to this shortfall.  The Debtors thereafter (i) appealed the administrative ruling to issue

the financial support directive against LBHI and its non-Debtor affiliate Lehman Brothers Asset

Management, LLC in respect of the Pension Scheme (the "Upper Tribunal Proceeding"), and

(ii) joined the UK Pensions Regulator as a respondent in a separate case involving the treatment

of pension-related liabilities under UK insolvency laws (the "Insolvency Proceeding").  The

Debtors obtained a stay in the Upper Tribunal Proceeding pending resolution in the Insolvency

Proceeding.  The High Court of Justice for England and Wales (the "UK High Court") decided,

consistent with the Debtors' position, that pension-related liabilities should be treated as an

expense of the administration (i.e., entitled to "super-priority" status).  The Foreign Affiliates in

UK administration have appealed the UK High Court's decision to which the Debtors and the

UK Pensions Regulator have submitted responses.

49.     In connection therewith, Milbank reviewed the relevant documentation,

researched applicable laws, and regularly discussed the proceedings with Debtors.  In addition,

Milbank periodically updated the Committee as to the status of the UK Pension Proceedings,

including preparing a memorandum describing the implications of the UK High Court decision

in the Insolvency Proceeding on creditors of the U.S. estates and the ongoing appeal process.

## I.      Tax Issues

50.     During the Seventh Interim Compensation Period, Milbank analyzed and

evaluated federal, state, local, and international tax issues relating to the Debtors' estates.  A

subcommittee (the "Tax Subcommittee") convened, as necessary, to address the myriad tax

issues arising in the Chapter 11 Cases.  In addition to attending meetings of the Tax

Subcommittee, Milbank participated in the Committee's weekly telephonic meetings to (i)

inform the Committee of significant tax matters (e.g., the structure of the Debtors' Plan, the

proposed terms of the Debtors' Amended Plan, the status and substance of the Debtors' planned

private letter ruling request from the Internal Revenue Service ("IRS") and related filings); (ii)

obtain Committee input as to certain tax matters (e.g., the sale of Real Estate Mortgage

Investment Conduits ("REMICs") held by Lehman Pass Through Securities Inc. and LBI, and

the approval of the Debtors' settlements with New York State); and (iii) ascertain information

that may be relevant to the tax analysis (e.g., recovery projections, ongoing activities that may

give rise to tax and substantive consolidation discussions, and business and derivative

settlements).

51.    Milbank also participated in weekly conferences with the Debtors' in-

house tax department, the Debtors' tax litigation counsel, Bingham McCutcheon LLP and the

Debtors' bankruptcy tax counsel, Weil Gotshal & Manges LLP ("Weil"), to discuss (i) the

Debtors' ongoing business activities; (ii) the Debtors' tax compliance activities and

preparedness; (iii) the progress of negotiations with the IRS, the Department of Justice, and

state and local taxing authorities concerning tax audits by, and contests and settlement

discussions with, those authorities; (iv) certain tax issues with LBI's tax counsel, Hughes

Hubbard & Reed LLP; (v) strategies for obtaining a ruling from the IRS regarding the tax

consequences of the Debtors' Amended Plan; and (vi) any miscellaneous matters materially

related to the Debtors' tax positions.

52.    Milbank also reviewed and analyzed (i) tax issues related to the

disposition of certain of the Debtors' assets; (ii) the Debtors' federal, state, local, and

international tax exposures and potential refund claims; (iii) transactions subject to the ongoing

IRS audit of the Debtors' estates, including foreign tax credit claims (e.g., "Goodspeed" and

"Stock Loan" transactions) and LBI promoter audits; (iv) tax allocation issues among the

Debtors, non-Debtor affiliates, and LBI; (v) tax allocation and issues under United Kingdom law; (vi) structural issues related to the Debtors' Plan; and (vii) Debtor's request for a ruling from the IRS regarding the tax consequences of the Debtors' Plan.

53.    In addition, Milbank, on behalf of the Committee, intervened in the Debtors' suit for a tax refund relating to the "Stock Loan" transaction (the "Tax Litigation") and undertook activities associated with representing the Committee's interests in that litigation.  In particular, Milbank monitored and participated in the discovery process and analyzed the various legal issues in connection with the removal of the Tax Litigation to the United States District Court for the Southern District of New York (the "District Court").

54.    Finally, Milbank researched, prepared legal memoranda, and corresponded with the Debtors regarding (i) the offset of tax overpayments against tax penalties; (ii) tax refund allocation rules related to the Debtors' right to contribution by subsidiaries; (iii) refund allocation rules under UK Law; (iv) allocation of interest expense under New York State and New York City law; (v) subsidiary reporting in the context of combined and consolidated tax returns; (vi) net operating loss elections under New York State and New York City law; (vii) tax liability allocation among debtor entities; (viii) treatment of late-filed claims by the IRS, state and local taxing authorities; (ix) combined reporting rules under New York State and New York City law; and (ix) the continuity of interest requirements for preservation of tax attributes.

## J.    Other General Business Operation Issues

55.    During the Seventh Interim Compensation Period, Milbank continued to review and analyze myriad issues in connection with potential business plans for the Debtors. During the Fifth Interim Compensation Period, the Court approved the formation and

documentation of an asset management company for the Debtors, LAMCO.  Since that time,

Milbank has continued to work with the Committee's financial advisors to oversee LAMCO's

management of the Debtors' assets.  In addition, Milbank and the Committee's financial

advisors, Houlihan Lokey Howard & Zukin Capital, Inc. ("<u>Houlihan</u>") and FTI Consulting, Inc.

("<u>FTI</u>"), reviewed and commented on the Debtors' proposed business plan for LAMCO and

held meetings with the Debtors to discuss the same.

**K.      Intercompany Issues**

56.      During the Seventh Interim Compensation Period, Milbank expended

considerable time investigating matters related to intercompany claims among LBHI and its

affiliates.   Specifically, Milbank devoted substantial resources to analyzing the treatment of the

intercompany claims between LBHI and (i) Lehman Brothers Treasury Co. B.V. ("<u>LBT</u>"); (ii)

Lehman Brothers Securities N.V. ("<u>LBSNV</u>"); (iii) Lehman Brothers Finance AG ("<u>LBF</u>"); and

(iv) Lehman Brothers Commercial Corporation Asia Limited.  In connection therewith, Milbank

had numerous discussions with the Debtors, the Debtors' counsel and Milbank's financial

advisors regarding the treatment of the LBT and LBSNV intercompany claims in the Debtors'

Amended Plan, as well as the potential impact of different treatment on creditor recoveries.

57.      Further, Milbank, along with the FTI, conducted an analysis of the

Debtors' intercompany transactions to assess the likelihood that the Court would recharacterize

the intercompany claims as equity contributions, rather than debt.  There are over 100

agreements documenting intercompany note accounts between all Lehman entities, a sample of

which Milbank reviewed and applied the relevant factors, as outlined in the case law, to

determine the recharacterization risk.  In connection with this analysis, Milbank reviewed every

bankruptcy case addressing the relevant recharacterization factors – focusing on cases with

intercompany transfers that were similar to those between LBHI and its affiliates – and drafted a comprehensive memorandum to the Committee applying these factors to the intercompany transactions at issue between LBHI and its affiliates.  Milbank and FTI spent numerous hours and had several communications with each other and the Debtors evaluating the recharacterization factors against these intercompany transactions, from both a legal and financial perspective.

58.     Milbank also met with the Committee's financial advisors, Weil and the Debtors regarding legal and financial issues surrounding certain intercompany claims and the potential treatment of intercompany claims under the Debtors' Amended Plan.  After gathering all available facts, weighing the relevant recharacterization factors, assessing litigation risk, analyzing overall trends in intercompany balances and testing individual intercompany transactions, Milbank and FTI estimated the likelihood that intercompany claims between LBHI and its affiliates would be recharacterized as equity.  That recharacterization risk was then shared with the Debtors and incorporated into the Debtors' Amended Plan.  In addition, Milbank and FTI gave several presentations to the Committee on the recharacterization analysis, including a factor-by-factor analysis of the potential recharacterization of the intercompany notes and transactions, a discussion of the validity of the recharacterization risk assessment and an analysis of the issues and concerns with respect to the treatment of intercompany claims in the Debtors' Amended Plan.

59.     Finally, Milbank's tax department worked diligently to examine and analyze the tax treatment of intercompany transfers and notes, and determine the effect of such treatment on creditors' ultimate recoveries.

L.    **Real Estate Matters**

60.    As reflected in the First Interim Fee Application, due to the size, complexity and potential for exposure of the Debtors' real estate portfolio, the Committee established a subcommittee (the "Real Estate Subcommittee") to evaluate issues relating to the Debtors' extensive real estate portfolio.  During the Seventh Interim Compensation Period, the Real Estate Subcommittee continued to hold regular meetings to address and make recommendations to the full Committee with respect to issues related to the Debtors' real estate holdings in discrete assets (e.g., Archstone, Avondale, Canary Wharf, Canyon Ranch, Heritage Fields, Innkeepers, Meridien Montparnasse, Moonlight Basin, Ritz Carlton Kapalua, Stamford, 25 Broad, 45 Broad, 100 East Ocean Boulevard, 425 Park and 1107 Broadway) and work with the Debtors under previously approved protocols to maximize the value of the Debtors' real estate assets.

61.    The Debtors' real estate portfolio includes commercial, residential and corporate interests in which the Debtors hold both debt and equity positions, often in the form of joint ventures to develop large commercial projects.  Milbank continued to work closely with the Committee's financial advisors to assess whether the Debtors should continue to meet various real estate related funding obligations.  In addition, Milbank evaluated the terms of the Debtors' proposed restructurings of their debt facilities.  In connection therewith, Milbank reviewed the Debtors' rights, obligations and exposures relative to joint venture partners, borrowers, senior secured lenders, unsecured creditors and other third parties, in order to further analyze the potential consequences of the proposed restructurings or failures to fund capital calls on the Debtors' creditors.  Milbank also participated in the consensual resolution of several outstanding real estate related motions.

62.     During the Seventh Interim Compensation Period, Milbank researched

and drafted memoranda in connection with certain real estate matters, and prepared and filed

several pleadings in connection with real estate transactions requiring Court approval.

Furthermore, Milbank monitored legal proceedings throughout the United States and abroad

related to the Debtors' real estate assets.

63.     **SunCal**.  SunCal is a collection of large-scale residential and commercial

real estate projects in California.  Prior to the Petition Date, Lehman ALI, Inc. ("Lehman ALI"),

LCPI and certain other non-Debtor affiliates of LBHI provided debt financing for the SunCal

projects totaling over $2 billion.  As a result of its financial difficulties, SunCal became a

debtor-in-possession (collectively, the "SunCal Debtors") in voluntary and involuntary chapter

11 cases in California (the "SunCal Cases").  During the Seventh Interim Compensation Period,

Milbank participated in an appeal to the Second Circuit Court of Appeals (the "Second Circuit")

from this Court's order denying the Motion of the Chapter 11 Trustee of the SunCal Master

Debtors for an Order Granting Relief from the Automatic Stay (the "SunCal Trustee's Motion")

[Docket No. 9642].  In particular, Milbank prepared a substantive joinder to the Debtors'

appellee brief and addressed the Second Circuit panel during oral argument.  On December 7,

2010, the Second Circuit issued a summary order agreeing with the Committee and the Debtors

and affirming the decision of the District Court, which had affirmed this Court's rejection of the

SunCal Trustee's Motion.

64.     **Innkeepers.**  Innkeepers USA Trust and certain of its affiliates

(collectively, "Innkeepers") own 71 hotel properties throughout the U.S.  Prior to the Petition

Date, Lehman ALI originated a $367,658,725 financing with Innkeepers that was bifurcated

into a $250,000,000 floating-rate first mortgage loan (the "ALI Mortgage Loan") and a

$117,658,725 floating-rate mezzanine loan (the "Mezzanine Loan").  The ALI Mortgage Loan

was secured by 19 of Innkeepers' hotel properties and the Mezzanine Loan was secured by

pledges of the equity of the entities holding those same 19 properties.  Due to its financial

difficulties, Innkeepers filed for chapter 11 bankruptcy protection in July 2010 (the "Innkeepers

Chapter 11 Cases").  Milbank, along with the Committee's financial advisors, evaluated the

strategic options available to the Debtors to maximize Lehman ALI's recovery on the ALI

Mortgage Loan through the Innkeepers Chapter 11 Cases.  In connection therewith, Milbank

reviewed and analyzed a proposed sale of 64 of Innkeepers' 71 hotel properties, attended the

proceedings in the Innkeepers' Chapter 11 Cases, and monitored negotiations among

Innkeepers' advisors and the major constituencies in the Innkeepers' Chapter 11 Cases

regarding the terms of a potential restructuring that would be beneficial to the Innkeepers'

estates and creditors and would also enable the Debtors to maximize the value of the ALI

Mortgage Loan.  Milbank reviewed and commented on several iterations of a term sheet for a

stalking horse bid (the "Innkeepers Stalking Horse Bid") for substantially all of the Innkeepers

enterprise by the Debtors, Five Mile Capital II Pooling REIT LLC and Midland Loan Services

Inc.  Milbank discussed the details and ramifications of the Innkeepers Stalking Horse Bid with

the Committee and kept the Committee apprised of all relevant developments in the Innkeepers

Chapter 11 Cases.

      65.    **Canary Wharf.**  In July 2003, LBL entered into a lease (the "Canary

Wharf Lease") with Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited

(collectively, the "Landlords"), Canary Wharf Management Limited (the "Management

Company"), Canary Wharf Holdings Limited (the "Landlords' Guarantor" and, together with

the Landlord, the Management Company and Canary Wharf Contractors Limited, the "CW

Claimants") and LBHI as guarantor.  LBL defaulted on its lease payments beginning on April 1,

2010 and vacated the space, which it had continued to occupy, on or about September 30, 2010.

During the Seventh Interim Compensation Period, through negotiations with the Debtors, the

CW Claimants reduced the amount of their claims and reached a proposed settlement (the "CW

Settlement") with LBHI and LBL, which included capping certain amounts owed under section

502(b)(6) of the bankruptcy Code.  Milbank reviewed and analyzed the CW Settlement under

both UK and US law.  Milbank also prepared a detailed memorandum to the Committee making

a recommendation with respect to the ultimate disposition of the CW Settlement, and continued

to monitor negotiations between the Debtors and the CW Claimants in the UK.

**M.      Private Equity**

66.      As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Private Equity Subcommittee") to monitor and evaluate

developments with respect to the Debtors' private equity assets.  During the Seventh Interim

Compensation Period, the Private Equity Subcommittee continued to review specific issues

surrounding the Debtors' portfolio of private equity assets with a view to helping the Debtors

maximize the value of such portfolio.  Milbank worked closely with the Debtors,  the Debtors'

professionals and the Committee's financial advisors regarding these assets.

67.      Among the investments as to which analysis or action was required

during the Seventh Interim Compensation Period were (i) Kingfisher; (ii) Silver Lake; (iii) New

Silk Road; (iv) Frontier Drilling; (v) Mont Fort Re; (vi) Brickman Group; (vii) Spirent

Communications; (viii) Forex Captial Markets; and (ix) GLG.

68.      Most significantly, the Committee's advisors worked with the Debtors to

reach a settlement of disputes among LCPI, Greenbrier Minerals Holdings, LLC and Greenbrier

Minerals, LLC, among others, regarding certain issues that had arisen with respect to LCPI's

membership interest in Greenbrier Minerals Holdings, LLC and a prepetition credit agreement

between LCPI and Greenbrier Minerals, LLC.  The Private Equity Subcommittee reviewed the

terms of the proposed settlement and ultimately approved the Debtors' entry into it.  Milbank

prepared a statement in support of the LCPI's motion seeking approval of the settlement, which

motion the Court granted on February 22, 2011 [Docket No. 14609].

**N.**    **Derivatives Issues**

69.    As reflected in the First Interim Fee Application, the Committee

established a subcommittee (the "Derivatives Subcommittee") to evaluate issues and develop

value-maximizing strategies relating to the Debtors' valuable derivatives portfolio.  During the

Seventh Interim Compensation Period, Milbank continued to conduct regular (at least weekly)

meetings with the Derivatives Subcommittee to address and, where appropriate, make

recommendations to the Committee with respect to specific issues concerning the Debtors'

portfolio of derivatives positions.

70.    **Derivatives ADR**.  On September 17, 2009, this Court entered an order

approving the Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and General

Order M-143 for Authorization to Implement Alternative Dispute Resolution Procedures for

Affirmative Claims of Debtors Under Derivative Contracts (the "Derivatives ADR Order")

[Docket No. 5207], pursuant to which the Committee, the Debtors and derivatives

counterparties mediate disputes arising from the closing out of the Debtors' "in-the-money"

derivatives portfolio.  During the Seventh Interim Compensation Period, Milbank continued to

work closely with the Debtors to review and respond to counterparty notices filed under the

Derivatives ADR Order, and to evaluate settlement proposals arising under the alternative

dispute resolution process. In addition, Milbank participated in and continues to actively

participate in such mediations on behalf of the Committee. In preparation for each such

mediation, Milbank conducted extensive legal and factual research on the issues in dispute and,

where appropriate, drafted memoranda to the Derivatives Subcommittee describing such issues

and seeking approval of minimum settlement amounts. Such efforts have been instrumental in

helping the Debtors achieve settlements in a total of 78 matters involving 89 counterparties, as

of May 12, 2011, resulting in the recovery of almost $730 million into the Debtors' estates.

71.     **Derivatives Litigation**. Milbank also continued to address issues related

to, and provided recommendations regarding, derivatives matters, including the highly complex

derivatives-related adversary proceedings commenced by the Debtors to recover the Debtors'

"in-the-money" positions in various derivatives transactions. To that end, Milbank devoted

substantial resources to analyzing derivatives contracts and other related transaction documents,

monitoring and participating actively in the derivatives-related adversary proceedings,

communicating with the Debtors' counsel and the Committee's financial advisors, and

developing and evaluating strategies to monetize complicated derivatives transactions for the

benefit of unsecured creditors of each of the Debtors' estates. Milbank expended considerable

time summarizing such analyses and recommendations in numerous memoranda to the

Committee.

72.     In particular, Milbank devoted substantial resources to researching and

analyzing the issues presented in certain contested matters and adversary proceedings, and to

acting on behalf of the unsecured creditors in hearings or negotiations, including, among others,

(i) participating in the appeal before the District Court of Swedbank AB (publ) ("Swedbank")

regarding its purported right to set off certain of the Debtors' funds on deposit at Swedbank

against amounts receivable to the Debtors under the parties' prepetition derivative contracts; and (ii) negotiating settlements (a) with bond insurer Ambac Assurance Inc., (b) of the litigation with BNY Corporate Trustee Services Ltd. and Perpetual Trustee Co. Ltd. regarding a "flip clause" designed to subordinate swap payments, and (c) with respect to certain notes underlying the Hong Kong "minibonds."

73.    Milbank also actively monitored, and intervened where appropriate, in certain derivatives-related contested matters, including (i) the Debtors' adversary proceeding against Nomura International plc and Nomura Securities Co., Ltd.; (ii) LBSF's adversary proceeding against, and eventual settlement with, Millennium USA, L.P. and Millennium Management, L.L.C.; and (iii) the Debtors' motion to implement the Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties.

74.    In preparation for the representation of the Committee in certain of the derivatives-related adversary proceedings in which the Committee intervened, Milbank researched complex legal issues related to, among other things, the treatment of derivative contracts in bankruptcy.  Such research and analysis played an essential role in the development of strategies to recover amounts due to the Debtors in disputed derivatives transactions for the benefit of unsecured creditors of each of the affected Debtors' estates.

75.    **Derivatives Settlements**.  On December 16, 2008, this Court entered an order pursuant to sections 105 and 365 of the Bankruptcy Code to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts (the "December Order") [Docket No. 2257], pursuant to which the Committee, the Debtors and derivatives counterparties negotiate outstanding derivative and Guarantee Claims of the counterparties or

amounts due to the Debtors as they may arise from the closing out of the Debtors' derivatives portfolio.  On March 11, 2009 and April 22, 2010, respectively, this Court entered further orders authorizing the Debtors to grant first priority liens in cash collateral posted in connection with the hedging transactions entered into through certain futures and prime brokerage accounts (the "Hedge Order") [Docket No. 3047] and to purchase and sell notes issued by certain special purpose vehicles that are party to transactions with certain Debtors (the "SPV Notes Purchase Order") [Docket No. 8596].

76.    Pursuant to the December Order, the Hedge Order, and the SPV Notes Purchase Order, during the Seventh Interim Compensation Period, Milbank continued to work closely with the Debtors to review such claims or amounts due, hedge proposals, and proposed note purchases, and to arrive at negotiated settlements or transactions with respect thereto.  To that end, Milbank devoted substantial resources to analyzing derivatives contracts and other related transaction documents, communicating with the Debtors' counsel and the Committee's financial advisors, and developing and evaluating strategies to monetize complicated derivatives transactions for the benefit of unsecured creditors of each of the affected Debtors' estates. Milbank expended considerable time summarizing such analyses and recommendations in numerous presentations to the Committee.  Milbank also analyzed the 2011 derivatives employees incentive plan.

**O.    Loans/Investments**

77.    As reflected in the First Interim Fee Application, the Committee established a subcommittee (the "Loan Book Subcommittee") to review and analyze matters related to the Debtors' portfolio of commercial loans.  During the Seventh Interim Compensation Period, the Loan Book Subcommittee reviewed and considered the monetization

of several structured finance vehicles established by the Debtors, including (i) a collateralized

loan obligation with Spruce CCS Ltd. ("Spruce") as issuer; and (ii) a collateralized loan

obligation with Verano CCS Ltd. ("Verano") as issuer.  Additionally, the Loan Book

Subcommittee reviewed the "tracing analysis" regarding the pre-petition movement between

Lehman entities of certain loan structures.

78.    Milbank also performed extensive analyses of issues related the chapter

11 cases of the Tribune Company ("Tribune") and its related subsidiaries, in which LCPI has an

approximately $200 million participation in certain senior loan indebtedness with Tribune.  As

such, Milbank evaluated, among other things, (i) the potential avoidance of obligations owing to

lenders such as the Debtors, and (ii) whether, assuming such obligations were avoided, such

lenders could enforce contractual payment sharing provisions against their co-lenders whose

claims are not avoided.  Additionally, Milbank monitored the Tribune chapter 11 cases and

provided analyses to the Committee of the competing plans of reorganization in those cases and

the effect of such plans on the Debtors' participations.

79.    Finally, Milbank continued to work with the Committee's financial

advisors to analyze and present the legal and financial implications of the Debtors' loan book

transactions to the Loan Book Subcommittee in order to facilitate its recommendations and

responsive courses of action to the full Committee.  To that end, the Loan Book Subcommittee

convened meetings to discuss and formulate recommendations regarding all outstanding loan

book matters.

**P.**    **Domestic Bank and Related Regulatory Issues**

80.    During the Seventh Interim Compensation Period, Milbank continued to

expend considerable time in connection with Woodlands Commercial Bank and Aurora Bank

FSB (together, the "Banks"), which are overseen by the Office of Thrift Supervision (the

"OTS") and the Federal Deposit Insurance Company (the "FDIC," together with the OTS, the

"Regulators").  Throughout the Chapter 11 Cases, the Debtors and the Committee's

professionals have sought to improve the capital levels at each of the Banks to satisfy regulatory

requirements, avoid potential seizures and liquidations by the Regulators, and facilitate the

resumption of depository functions at the Banks to preserve and maximize value.  Accordingly,

Milbank worked closely with the Debtors and their advisors on finalizing the terms of

settlements with the Debtors and the Banks to achieve the Regulators' approval to resume

normal profit-generating banking and lending operations.  On September 23, 2010, the Court

approved the Debtors' entry into such settlements, which were executed on November 30, 2010.

81.     During the Sixth Interim Compensation Period, the Committee's advisors

had worked closely with the Debtors and their advisors on finalizing the terms of settlements

with the Debtors and the Banks to achieve the approval of the Regulators to resume normal

profit-generating banking and lending operations.  On September 1, 2010, the Debtors filed the

Debtors' Motion, Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and

Section 363 of the Bankruptcy Code, for Approval of (I) A Settlement Agreement between the

Debtors and Woodlands Commercial Bank and (II) Certain Related Relief, Including

Authorization of (A) Certain Debtors to Make Capital Transfers and (B) LBHI to Enter Into a

Capital Maintenance Agreement [Docket No. 11142], and the Debtors' Motion, Pursuant to

Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy

Code, for Approval of (I) a Settlement Agreement between the Debtors and Aurora Bank FSB

Regarding the Master Forward Agreement and Other Matters and (II) Certain Other Related

Relief, Including Authorization of (A) Certain Debtors to Make Capital Transfers, (B) LBHI to

37

Enter Into a Capital Maintenance Agreement, and (C) LBHI to Extend the Duration of the

Amended Repurchase Agreement and Financing Facility [Docket No. 11142] (together, the

"Bank Settlement Motions"), which were approved by the Court on September 23, 2010.  The

settlements contemplated by the Bank Settlement Motions were approved by the Regulators on

November 30, 2010.

        82.     In connection therewith, Milbank spent considerable time analyzing and

discussing with the Committee the terms of the settlements and the effect they would have on

the potential recovery for creditors in the Chapter 11 Cases.  In addition, Milbank, on behalf of

the Committee, drafted and filed with the Court a statement in support of the Bank Settlement

Motions and the settlements contemplated thereby [Docket No. 11470].  Finally, subsequent to

the granting of the Bank Settlement Motion, Milbank expended additional time and effort

liaising with the Debtors and their bankruptcy and regulatory counsel concerning

implementation of the settlements, including, without limitation, through commencement of a

sale process for Aurora Bank FSB and its subsidiaries.

**Q.**    **International Insolvency Matters**

        83.     During the Seventh Interim Compensation Period, Milbank continued to

monitor and analyze issues regarding the Foreign Proceedings, including, without limitation, the

proceedings pending in:  (i) the UK; (ii) Hong Kong; (iii) Japan; (iv) the Netherlands; (v)

Germany; (vi) Australia; and (vii) Bermuda.

        84.     **Analysis of Foreign Proceedings, Claims and Discussions**.  During the

Seventh Interim Compensation Period, Milbank attorneys and paraprofessionals across various

jurisdictions continued to collaborate with each other, the Debtors' counsel and the Foreign

Administrators regarding the status of major issues among the Debtors and certain of the

Foreign Administrators.  Milbank also reviewed and analyzed status reports published by the Foreign Administrators – including reports published by the administrators of Lehman Brothers International (Europe) ("LBIE"), Lehman Brothers Australia ("Lehman Australia") and LBT – and other publicly available information.  Milbank focused specifically on reviewing information related to asset recoveries and claims reconciliation.  Based on such analyses, Milbank provided regular updates to the Committee regarding the status of the Foreign Proceedings, their impact on the Debtors and the Debtors' creditors, and the status of negotiations with Foreign Administrators regarding potential settlements of their claims against the U.S. entities.  In addition, Milbank participated in negotiations regarding plan settlement term sheets with certain Foreign Administrators, reviewed, analyzed and commented on proposed term sheets, and made recommendations to the Committee regarding whether potential settlements with individual Foreign Administrators would be beneficial to the Debtor's estates.

85.    Milbank continued to monitor developments regarding that certain Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol"), approved by the Court on June 17, 2009.  In connection therewith, Milbank reported to the Committee on the meeting of the Protocol signatories held in New York City in January 2011, in which Milbank participated.  At the Protocol meeting, Milbank engaged with certain Foreign Administrators to discuss potential plan settlement proposals, understand the Foreign Administrators' concerns regarding the Debtors' Plan and evaluate the potential resolution of contested issues among the Debtors and the Foreign Administrators.

86.    Moreover, during the Seventh Interim Compensation Period, Milbank, among other things, (i) researched and, with the help of the Committee's financial advisors,

presented to the Committee, a valuation analysis regarding LBT issued notes; (ii) continued to identify and analyze various leverage points with respect to certain Foreign Affiliates and their claims in order to assist in the Debtors' negotiations with the respective Foreign Affiliates; and (iii) performed substantial research and analysis with Milbank's colleagues in the UK and drafted memoranda regarding issues related the claims among the Debtors and their affiliates under administration in the UK, including LBIE.

87.     **UK Issues.**  LBIE, the Debtors' principal trading company in the UK, along with several other British subsidiaries and affiliates of the Debtors, were placed into insolvency administration in the UK (the "UK Administration"), and the English High Court appointed PwC as joint administrators (the "Joint Administrators").  During the Seventh Interim Compensation Period, Milbank reviewed and analyzed the Joint Administrators' Fourth Progress Report, and monitored various pending litigation matters in the UK for the Committee.

88.     Most significant is this regard was the UK High Court trial with respect to a process known as the Regulation and Administration of Safe Custody and Global Settlements ("RASCALS").  The Joint Administrators applied to the UK High Court for directions with respect to the effect of the RASCALS process on the ownership of certain securities held by LBIE.  After a trial lasting several days, the UK High Court rendered a decision on November 19, 2010, holding that LBIE, and not any of its affiliates, was the legal owner of not less than £700 million in securities subject to the RASCALS process.  Milbank attended the hearings on behalf of the Committee, reviewed the transcripts, summarized the proceedings and presented an in-depth analysis of the UK High Court's decision at an in-person meeting with the Committee.  The presentation explained the RASCALS process, discussed the judgment and described its effect on Lehman's unsecured creditors.

89.     Moreover, in connection with its ongoing review of issues that have

arisen in the UK Administration, Milbank (i) monitored the LBIE client money appeal in the

UK Court of Appeal; (ii) continued to analyze various issues arising with respect to the claims

of LBIE against the Debtors' estates; (iii) provided UK law advice in relation to (a) landlords'

claims under UK administration law and (b) the right to setoff as applied to LBHI's

intercompany claims against LBL; and (iv) reviewed English insolvency rules and case law

regarding the ability to set off prepetition obligations against postpetition claims, which

Milbank used in oral arguments in Swedbank's appeal from the Bankruptcy Court's order

enforcing the automatic stay against and compelling Swedbank to pay certain postpetition funds

to the Debtors.

90.     **Bankhaus Issues.** Lehman Brothers Bankhaus AG ("Bankhaus") is a

wholly-owned subsidiary of LBHI that was placed into an insolvency proceeding by the

Frankfurt Local Court (*Amtsgericht*) on November 13, 2008.  During the Seventh Interim

Compensation Period, Milbank analyzed numerous issues relating to Bankhaus' German

insolvency proceeding and the claims among Bankhaus, LBHI, LBSF and LCPI.  Specifically,

as part of Milbank's ongoing participation in the negotiations between Bankhaus and certain of

the Debtors, Milbank (i) met with Bankhaus' advisors to discuss the terms of the proposed

settlement among Bankhaus and the Debtors to ensure that any settlement would be beneficial

to the U.S. estates' creditors; (ii) analyzed the amount and validity of Bankhaus' claim against

LBHI based on the Security & Collateral Agreement between LBHI and Bankhaus, dated

August 15, 2002; and (iii) researched issues surrounding the application of regulatory capital

requirements in German insolvency proceedings.  The Debtors' settlement with Bankhaus was

finalized and executed in March 2011.

R.    **Non-Derivative Automatic Stay/Safe Harbor Issues**

91.    During the Seventh Interim Compensation Period, Milbank reviewed

motions filed by parties in interest seeking to lift the automatic stay in order to enforce various

contractual agreements or otherwise exercise rights against the Debtors' estates, as well as a

motion filed by the Debtors seeking to enforce the automatic stay against a party that had

flagrantly violated the stay.

92.    **Fogarazzo**.  Milbank reviewed and analyzed the Motion of Lawrence

Fogarazzo, *et al.* Pursuant to Section 362 of the Bankruptcy Code for Relief from the Automatic

Stay to Allow Advancement Under Insurance Policy by Lloyd's of London (the "Fogarazzo

Motion") [Docket No. 10279].  In response thereto, Milbank filed with the Court a joinder in

the Debtors' objection to the Fogarazzo Motion (the "Joinder") [Docket No. 12732].  The

Joinder concurred with the Debtors' view that the movants' insurance policy, which had been

issued by Lloyd's of London, was cancelled in 2004, such that granting stay relief would be

futile.  In addition, the movants failed to demonstrate that requisite cause existed to lift the

automatic stay pursuant to the factors enunciated by the Second Circuit in In re Sonnax Indus.

Inc., 907 F.2d 1280 (2d Cir. 1990).  Adopting the reasoning set forth by the Debtors and the

Committee, the Court ultimately denied the Fogarazzo Motion without prejudice [Docket No.

13136].

93.    **Prudence M. Waltz**.  During the Seventh Interim Compensation Period,

Prudence M. Waltz filed a motion for relief from the automatic stay [Docket No. 12780] (the

"Waltz Stay Relief Motion").  Milbank analyzed the Waltz Stay Relief motion, LBHI's

response [Docket No. 13384], and Ms. Waltz's reply [Docket No. 13397].  After conducting

research regarding Ms. Waltz's case for lifting the automatic stay, Milbank recommended that

the Committee join in the Debtors' objection to the Waltz Stay Relief Motion.  Milbank drafted

a joinder to LBHI's response to Ms. Waltz's motion [Docket No. 13413], in which Milbank

argued that (i) Ms. Waltz's reliance on section 362(d)(2)(A) of the Bankruptcy Code was

misplaced as she was not a creditor seeking foreclosure on the Debtors' property but rather

sought to pursue litigation against the Debtors in California State Court and, thus, she was not

entitled to relief under section 362(d); and (ii) resolution of the matter in the California State

Court would be the most efficient mechanism for resolving the dispute between Ms. Waltz and

LBHI, because the California State Court was familiar with the matter because Ms. Waltz's

action had already been partially briefed there.

94.   **Motion to Enforce the Automatic Stay**.  Finally, Milbank analyzed the

Motion of Lehman Brothers Special Financing Inc. Pursuant to Section 362 of the Bankruptcy

Code for Enforcement of the Automatic Stay and for Sanctions for Violation of the ADR

Procedures Order [Docket No. 11756] (the "Stay Enforcement Motion") and the Declaration of

Holly E. Loiseau in support of the Stay Enforcement Motion [Docket No. 11758].  Pursuant to

the Stay Enforcement Motion, LBSF sought to enforce the automatic stay and impose sanctions

against PT Mobile-8 Telecom Tbk ("Mobile-8") for violating the automatic stay by

commencing an action against LBSF in Jakarta, Indonesia (the "Jakarta Action").  In connection

therewith, Milbank researched legal issues surrounding violations of the automatic stay and the

appropriate sanctions for doing so.  On behalf of the Committee, Milbank drafted a statement in

connection with the Stay Enforcement Motion [Docket No. 12056] (the "Statement in

Connection") indicating the Committee's agreement with the Debtors that Mobile-8's

commencement of the Jakarta Action constituted an egregious and willful violation of both the

automatic stay and the relevant alternative dispute resolution procedures.  In addition, the

Statement in Connection asserted vigorous enforcement of the automatic stay would send a

clear message to both Mobile-8 and other parties in interest that flaunting the automatic stay and

the authority of the Court should not be tolerated.  The Court ultimately agreed with LBSF and

the Committee, granted the motion to enforce the automatic stay [Docket No. 12201] and

sanctioned Mobile-8 for violating the stay.  The Court directed Mobile-8 to pay all attorneys'

fees and other costs incurred by the LBSF estate in connection with, among other things, the

Jakarta Action and bringing the Stay Enforcement Motion.

**S.**     **Non-Derivative Executory Contracts/365 Issues**

95.     During the Seventh Interim Compensation Period, Milbank reviewed and

analyzed pleadings filed with respect to the Debtors' executory contracts, including motions by

certain of the Debtors' counterparties to compel the respective Debtor to assume or reject a

particular executory contract.  Such review and analysis included legal research regarding the

relief sought by such pleadings, determination of the Debtors' rights and obligations under the

applicable executory contracts, consultation with the Committee's financial advisors regarding

the financial implications of the proposed treatment of the subject contracts, correspondence

with the Debtors' legal and financial advisors regarding the financial context and implications

of the proposed courses of action, and assessment of the potential impact on the Debtors'

estates.

**T.**     **Plan of Reorganization/Plan Confirmation/Plan Implementation**

96.     During the Seventh Interim Compensation Period, Milbank, together with

the Committee's financial advisors, continued its extensive review of the myriad issues involved

in developing a confirmable plan of reorganization.  Such analyses included a thorough review

of relevant bankruptcy, corporate governance, tax and structural issues, and the review of

recovery scenarios.  Further, Milbank and the Committee's financial advisors met with various

creditor groups to discuss each group's position on the Debtors' Plan, and alternative proposals

to settle certain issues that arose in connection therewith, including substantive consolidation,

the reconciliation of intercompany claims and guarantee claims, and the treatment of the claims

arising from the structured notes issued by LBHI, LBT and LBSNV.  Milbank also reviewed

and analyzed the Ad Hoc Plan and regularly spoke with the LBHI Ad Hoc Group to discuss the

terms of such plan.

       97.   **The Amended Plan**.  Taking into account the often disparate opinions of

the various creditor groups in these cases, Milbank assisted the Committee in developing an

alternative framework to the Debtors' Plan.  In that connection, Milbank researched and

analyzed the various inter-Debtor, Debtor-creditor, and inter-creditor issues affecting the

Chapter 11 Cases, and the feasibility of a compromise and settlement of such issues.  This

analyses led to the formulation of a proposal (the "Committee Proposal"), premised on a global

compromise, that addressed the legal risk of substantive consolidation, the legal risk of the

recharacterization of intercompany claims as equity, challenges to the enforceability of

guarantee claims, the unique legal risks facing holders of claims on account of securities issued

by certain of the Foreign Affiliates, and the inter-Debtor issues concerning the ownership of

certain assets.

       98.   Milbank, together with Houlihan, worked with the Committee to modify

the terms of the Committee Proposal prior to presenting it to the Debtors.  Milbank and

Houlihan then met with the Debtors and Weil to discuss the terms of the Committee Proposal

and work with the Debtors on developing a revised plan of reorganization.  Milbank and

Houlihan negotiated extensively with the Debtors on the non-economic, as well as economic,

terms of the revised plan.  Milbank also worked to ensure that the Debtors' Amended Plan

provided the unsecured creditors with a voice in the Debtors' post-Effective Date corporate

governance and the Committee with continued involvement in significant derivative and

litigation matters.

99.     Such efforts led to the formulation of the Debtors' Amended Plan, filed

on January 25, 2011, with the support of the Committee.  Milbank and the Committee's

financial advisors continue to work with the Debtors and meet with various creditor groups to

process the Debtors' Amended Plan and garner the necessary support to facilitate confirmation

of the Debtors' Amended Plan.

100.    **Substantive Consolidation Analysis**.  Milbank continued its work on a

comprehensive analysis of substantive consolidation and the factors generally considered by

courts when analyzing whether substantive consolidation is appropriate in a particular case.

Specifically, Milbank focused on the substantive consolidation of LBHI with its major domestic

subsidiaries and the legal challenges to the separateness of LBSNV.  In preparing such analyses,

Milbank conducted in-depth research on the doctrine of substantive consolidation and other

legal theories by which the assets and liabilities of a subsidiary may be pooled with its parent,

and undertook extensive factual investigation on the issues, including document review and

employee and creditor interviews.  In connection therewith, Milbank, together with the

Committee's financial advisors, analyzed the potential applicability of the principles articulated

in such cases to the facts and circumstances of LBHI's major domestic subsidiaries and of

LBSNV.  Milbank researched and drafted comprehensive memoranda on the foregoing issues

and their implications for the Debtors' estates, LBSNV's estate, and creditor recoveries, and

made presentations to the Committee with respect thereto.

101.    **Plan Discovery Protocol**.  Finally, in response to the document request served by the LBHI Ad Hoc Group on the Debtors seeking discovery on plan issues, Milbank, the Debtors and certain other creditor groups sought to develop a comprehensive protocol by which creditors could take discovery on plan-related matters.  Such comprehensive protocol was intended to ensure that the Debtors' unsecured creditors had access to adequate information so that, with proper confidentiality restrictions in place, they could review the pertinent information to make informed decisions on plan issues.  Milbank assisted the Debtors in formulating procedures for discovery on plan-related matters, which ultimately led to the plan discovery protocol that was approved by the Court on April 14, 2011 [Docket No. 16003].

**U.**    **Claims Analysis**

102.    **Claims Database**.  Milbank continued, during the Seventh Interim Compensation Period, to refine the database of the Debtors' and certain of the Foreign Affiliates' debt offering documents (the "Database") that was created during the First Interim Compensation Period.  Milbank also expanded the Database to cover debt offerings by LBSNV.  Milbank continued to use the Database to develop and present summary forensic capital structure information to the Committee and its advisors, as well as to answer individual queries from the Committee and the public about specific Lehman debt instruments.  The Database is used by Milbank and the Committee's financial advisors on a regular basis to determine and analyze the Debtors' and certain Foreign Affiliates' capital structures, review proofs of claim, establish a basis upon which to determine and validate claim amounts, and analyze substantive consolidation, intercompany, preference and other potential issues.  Access to the Database has proven invaluable to the Committee and its advisors, particularly with respect to the matters related to the claims reconciliation process and the Debtors' Amended Plan.

103.    **Capital Structure Analysis and Classification**.  Milbank also analyzed numerous potential claims and proposed settlements thereof.  Milbank reviewed and analyzed guarantees, make-whole arrangements, warrants, certificates, notes, derivatives and intercompany claims, and settlements thereof, among others, to analyze the classes of claims contained in the terms of the Debtors' Amended Plan.

104.    **Omnibus Claims Objections**.  Milbank reviewed and analyzed the Debtors' numerous omnibus objections to claims, and spoke regularly with the Debtors and their counsel regarding such objections.  In that connection, Milbank researched and analyzed legal issues and responded to various creditor inquiries regarding objections to their claims.

## V.    **Other Bankruptcy Motions and Matters**

105.    After the passing of the deadline for bringing avoidance actions on September 15, 2010, and the execution of tolling agreements with various counterparties, Milbank continued to work working with the Debtors, the Debtors' counsel and advisors, the Committee's financial advisors, the Committee's conflicts counsel, the SIPA Trustee and the SIPA Trustee's advisors, among other things, to (i) identify and analyze categories of pre- and postpetition transfers potentially subject to avoidance and recovery; (ii) analyze the prepetition financial condition of the Debtors to determine whether the Debtors were insolvent and/or undercapitalized during any period for purposes of pursuing preference and constructive fraudulent transfer claims; (iii) investigate and analyze in greater depth particular transfers identified as potential avoidance targets; (iv) analyze potential legal issues that might arise in connection with the pursuit of any avoidance actions; and (v) develop potential litigation strategies.

W.     **Non-Derivative Adversary Proceedings Preparation and Litigation**

106.    During the Seventh Interim Compensation Period, Milbank researched and prepared memoranda regarding the claims and issues raised by a wide range of pending and potential lawsuits and potential settlements impacting the Debtors' estates.  Milbank also held teleconferences and meetings, both internally and with the Debtors, and provided regular updates to the Committee.

107.    More specifically, excluding cases in which the Committee's interests are represented by the Committee's conflicts counsel, Milbank monitored developments in and provided updates in the form of reports and presentations to the Committee with respect to (i) all pending and potential adversary proceedings commenced, or to be commenced, in this Court; (ii) prepetition lawsuits commenced against the Debtors and pre- and post-petition lawsuits against non-Debtor affiliates, officers, directors, and related parties; (iii) litigation issues similar to those raised, or to be raised, in the Chapter 11 Cases; and (iv) contested matters in the Chapter 11 Cases (collectively, the "Monitored Matters").  When appropriate and directed by the Committee, Milbank intervened in such Monitored Matters, prepared pleadings and participated in various proceedings with respect to the Monitored Matters on the Committee's behalf.

108.    In connection with the Monitored Matters, Milbank reviewed and analyzed proposed settlement agreements and advised the Committee regarding the same.  Milbank also participated in numerous settlement negotiations and mediations with respect to the Monitored Matters on behalf of the Committee.

109.    In addition, Milbank sought discovery from a third party, and conducted research to assess the viability of potential claims against such party.  In this connection,

Milbank continued to review documents from two sources:  (i) the Debtors' "Stratify" database, which contains documents that Lehman submitted in connection with the Examiner's investigation of various prepetition issues (the "<u>Stratify Documents</u>"); and (ii) documents received from various third parties in response to the Committee's motions seeking the production of documents pursuant to rule 2004 and/or informal discovery requests (the "<u>2004 Documents</u>").

110.    As with any complex litigation handled by Milbank, there have generally been two levels of review of the Stratify and 2004 Documents.  The first level entailed review of the relevant documents for responsiveness and issue coding, which review was generally assigned to the most junior associates.  The second level entailed review of selected documents by more senior attorneys involved in assembling and assessing the evidence required to establish the proposed claims.  The Committee's financial advisors have also participated in such document review where the documents at issue were primarily financial in nature. However, every effort has been made to avoid duplication of effort by carefully allocating the review tasks among attorneys and directing the financial advisors to only those portions of the relevant databases requiring their review.

## X.    <u>2004 Issues</u>

111.    During the Seventh Interim Compensation Period, Milbank reviewed and analyzed several discovery requests and stipulations filed by various parties in interest, such as Intel Corporation and Rosslyn Investors I, LLC.  Milbank also researched potential targets of Rule 2004 discovery by the Committee and drafted pleadings and correspondence in connection with the same.

## Y.    <u>Firm's Own Billing/Fee Applications</u>

112.    During the Seventh Interim Compensation Period, Milbank reviewed the
Fee Statements for, among other purposes, compliance with the Interim Compensation Order,
the Local Guidelines and the Fee Committee Guidelines.  Milbank also prepared and served its
Fee Statements and its Sixth Interim Fee Application on all parties as required by the Interim
Compensation Order.

113.    In connection with the appointment of the new Independent Member of
the Fee Committee during the Seventh Interim Compensation Period, Milbank reviewed and
analyzed matters related to the Amended Fee Protocol, and regularly corresponded with the
members of the Fee Committee and the other professionals retained in the Chapter 11 Cases
regarding such matters.  Additionally, Milbank continued to work cooperatively with the Fee
Committee to settle certain outstanding issues identified in the Fee Committee reports
pertaining to the retained professionals' Fourth and Fifth Interim Fee Applications.

## Z.    Third Party Retention/Fee Application/Other Issues

114.    During the Seventh Interim Compensation Period, Milbank reviewed the
retention applications of Wollmuth Maher & Deutsch LLP, Clyde Click, P.C., and others, as
certain of these professionals originally retained as ordinary course professionals pursuant to the
Court's Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code
Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business,
dated November 5, 2008 (the "OCP Order") [Docket No. 1394], exceeded the $1 million cap on
fees during the pendency of the Chapter 11 Cases established in the OCP Order.

115.    Milbank also reviewed the monthly fee statements received from other
professionals pursuant to the Interim Compensation Order.  Finally, Milbank assisted in the
filing and service of the sixth interim fee applications of other Committee professionals.

# IV.

## ALLOWANCE OF COMPENSATION

116.    The professional services rendered by Milbank have required a high

degree of professional competence and expertise to address, with skill and dispatch, the

numerous issues requiring evaluation and action by the Committee.  The services rendered to

the Committee were performed efficiently, effectively and economically, and the results

obtained to date have benefited not only the members of the Committee, but also the unsecured

creditors of each of the Debtors' estates.

117.    The allowance of interim compensation for services rendered and

reimbursement of expenses in bankruptcy cases is expressly provided for in section 331 of the

Bankruptcy Code:

> Any professional person . . . may apply to the court not more than once
> every 120 days after an order for relief in a case under this title, or more
> often if the court permits, for such compensation for services rendered . . .
> as is provided under section 330 of this title.

11 U.S.C. § 331.

118.    With respect to the level of compensation, section 330(a)(1)(A) of the

Bankruptcy Code provides, in pertinent part, that the Court may award to a professional person,

"reasonable compensation for actual, necessary services rendered."  Section 330(a)(3), in turn,

provides that:

> In determining the amount of reasonable compensation to be awarded to
> . . . [a] professional person, the court shall consider the nature, the extent,
> and the value of such services, taking into account all relevant factors,
> including –
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;

(C)     whether the services were necessary to the administration of, or
beneficial at the time which the service was rendered toward the
completion of, a case under this title;

(D)     whether the services were performed within a reasonable amount
of time commensurate with the complexity, importance, and nature
of the problem, issue, or task addressed;

(E)     with respect to a professional person, whether the person is board
certified or otherwise has demonstrated skill and expertise in the
bankruptcy field; and

(F)     whether the compensation is reasonable based on the customary
compensation charged by comparably skilled practitioners in cases
other than cases under this title.

11 U.S.C. § 330(a)(3).

119.    The congressional policy expressed above provides for adequate
compensation in order to continue to attract qualified and competent professionals to
bankruptcy cases.  In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 850 (3d Cir. 1994)
("Congress rather clearly intended to provide sufficient economic incentive to lure competent
bankruptcy specialists to practice in the bankruptcy courts.") (citation and internal quotation
marks omitted); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 18 (Bankr. S.D.N.Y.
1991) ("Congress' objective on requiring that the market, not the Court, establish attorneys'
rates was to ensure that bankruptcy cases were staffed by appropriate legal specialists.").

120.    In assessing the "reasonableness" of the fees requested, courts have
looked to a number of factors, including those first enumerated by the Fifth Circuit in In re First
Colonial Corp. of America, 544 F.2d 1291, 1298-99 (5th Cir. 1977), and thereafter adopted by

most courts.[17]  See In re Nine Assocs., Inc., 76 B.R. 943, 945 (S.D.N.Y. 1987) (adopting First

Colonial/Johnson analysis); In re Cuisine Magazine, Inc., 61 B.R. 210, 212-13 (Bankr. S.D.N.Y

1986) (same); see generally 3 Collier on Bankruptcy ¶ 330.04[3] (Lawrence P. King et al., eds.,

15th rev. ed. 2009) (enumerating First Colonial and Johnson as the "leading cases to be

considered in determining a reasonable allowance of compensation").  Milbank respectfully

submits that the consideration of these so-called Johnson factors should result in this Court's

allowance of the full compensation requested.

(A)    The Time and Labor Required.  The Debtors' cases are among the largest, most
complex and active bankruptcy cases ever filed.  Accordingly, the professional
services rendered by Milbank on behalf of the Committee have required the
continuous expenditure of substantial time and effort, under time pressures which
sometimes required the performance of services late into the evening and, on a
number of occasions, over weekends and holidays.  The services rendered
required a high degree of professional competence and expertise in order to be
administered with skill and dispatch.

(B)    The Novelty and Difficulty of Questions.  Novel and complex issues have arisen
in the course of these Chapter 11 Cases, and it is anticipated that other such issues
will be encountered.  In these cases, as in many others in which the firm is
involved, Milbank's effective advocacy and creative approach to problem solving
have helped clarify and resolve difficult issues and will continue to prove
beneficial.

(C)    The Skill Requisite to Perform the Legal Services Properly.  Milbank believes
that its recognized expertise in the area of financial restructuring, its ability to
draw from highly experienced professionals in other areas of its practice such as
securities, structured products, asset divestiture, litigation, and regulatory law and
its practical approach to the resolution of issues help maximize the distributions to
the unsecured creditors of each of the Debtors.

(D)    The Preclusion of Other Employment by Applicant Due to Acceptance of the
Case.  Due to the size of Milbank's financial restructuring department and the
firm as a whole, Milbank's representation of the Committee has not precluded the

---

[17]    The factors embraced by the Fifth Circuit in First Colonial were first adopted by the Fifth Circuit's decision
in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), except that First Colonial also
included the "spirit of economy" as a factor expressly rejected by Congress in enacting section 330 of the
Bankruptcy Code.  Stroock & Stroock & Lavan v. Hillsborough Holdings Corp. (In re Hillsborough
Holdings Corp.), 127 F.3d 1398, 1403 (11th Cir. 1997).  A majority of the First Colonial factors are now
codified in section 330(a)(3). 3 Collier on Bankruptcy ¶ 330.04[3].

acceptance of new clients.  However, the number of matters needing attention on a continuous basis has required numerous Milbank attorneys, across multiple practice groups, to commit significant portions of their time to these cases.

(E)     The Customary Fee.  The compensation sought herein is based upon Milbank's normal hourly rates for services of this kind.  Milbank respectfully submits that the compensation sought herein is not unusual given the magnitude and complexity of these cases and the time dedicated to the representation of the Committee.  Such compensation is commensurate with fees Milbank has been awarded in other cases, as well as with fees charged by other attorneys of comparable experience.

(F)     Whether the Fee is Fixed or Contingent.  Milbank charges customary hourly rates, adjusted annually, for the time expended by its attorneys and paraprofessionals in representing the Committee, and Milbank's fee is not outcome dependent.

(G)     Time Limitations Imposed by Client or Other Circumstances.  As stated above, Milbank has been required to attend to various issues as they have arisen in these cases.  Often, Milbank has had to perform these services under significant time constraints requiring attorneys and paraprofessionals assigned to these cases to work evenings and on weekends.

(H)     The Amount Involved and Results Obtained.  The Committee represents the interests of unsecured creditors of each of the Debtors that, in the aggregate, hold unsecured claims estimated to be valued in the hundreds of billions of dollars in what has been widely described as the largest chapter 11 case ever filed.  The Committee's participation, with Milbank's counsel and guidance, has greatly contributed to the efficient administration and prospects for reorganization of these cases.

(I)     The Experience, Reputation and Ability of the Attorneys.  Milbank has a sophisticated and nationally recognized corporate reorganization and financial restructuring practice, and Milbank attorneys involved in this representation have played a major role in numerous complex restructurings including, for example, the chapter 11 cases of Lyondell Chemical Company, Nortel Networks Inc., Capmark Financial Group Inc., Hayes Lemmerz International, Inc., DBSD North America, Inc., Refco, Inc., Enron Corp., TOUSA, Inc., Vicorp, Interstate Bakeries Corp., Winn-Dixie Stores, Inc., Fruit of the Loom Inc., Adelphia Communications Corp., Maxxim Medical Group, Inc., RCN Corp., US Airways Group, Inc., Global Crossing Ltd., Fleming Companies, Inc., Dairy Mart Convenience Stores, Inc., Lernout & Hauspie Speech Products N.V., Teligent, Inc., World Access, Inc., ORBCOMM Global, L.P., ICO Global Communications Inc., Safety-Kleen Corp., HomePlace Stores, Inc., Hvide Marine, Inc., Sun TV and Appliances, Inc., Seven-Up/RC Bottling Company of Southern California, Inc. and Ames Department Stores, Inc.  Milbank's experience enables it to perform the services described herein competently and expeditiously.

(J)    The "Undesirability" of the Case.  These cases are not undesirable but, as already indicated, have required a significant commitment of time from many of Milbank's attorneys.

(K)    Nature and Length of Professional Relationship.  Milbank was selected as the Committee's counsel shortly after the Committee's formation, on September 17, 2008, and was retained nunc pro tunc to that date pursuant to an order of the Court dated November 21, 2008.  Milbank has been rendering services continuously to the Committee since the Committee was formed, and Milbank has rendered such services in a necessary and appropriate manner.

121.    The total time spent by Milbank attorneys and paraprofessionals during the Seventh Interim Compensation Period was 24,891.70 hours and has a fair market value of $14,180,784.75.  As shown by this Application and supporting exhibits, Milbank's services were rendered economically and without unnecessary duplication of efforts.  In addition, the work involved, and thus the time expended, was carefully assigned in consideration of the experience and expertise required for each particular task.

## V.

## EXPENSES

122.    Milbank has incurred a total of $633,261.80 in expenses in connection with representing the Committee during the Seventh Interim Compensation Period.  Milbank records all expenses incurred in connection with the performance of professional services.  A schedule of expenses by project billing category, as well as a summary of these expenses and detailed descriptions of these expenses, is annexed hereto as Exhibit "C."

123.    In connection with the reimbursement of expenses, Milbank's policy is to charge its clients in all areas of practice for expenses, other than fixed and routine overhead expenses, incurred in connection with representing its clients.  The expenses charged to Milbank's clients include, among other things, telephone and telecopy toll and other charges, mail and express mail charges, special or hand delivery charges, photocopying charges, out-of-

town travel expenses, local transportation expenses, expenses for working meals, computerized research and transcription costs.

124.    Milbank charges the Committee for these expenses at rates consistent with those charged to Milbank's other bankruptcy clients, which rates are equal to or less than the rates charged by Milbank to its non-bankruptcy clients.  Milbank seeks reimbursement from the Debtors at the following rates for the following expenses:  (i) ten cents ($0.10) per page for photocopying and printing; (ii) fifty cents ($0.50) for color copies; (iii) no charge for incoming facsimiles; (iv) toll charges only for outgoing facsimiles; and (v) an average of nineteen cents ($0.19) per minute for long distance.  Specifically, with respect to phone charges over $100.00, such charges were generally accrued in connection with (i) conference calls in which the Committee, the Debtors and/or other parties in interest participated; and (ii) mobile phone charges for selected attorneys who were required to participate in Committee conference call while traveling on Committee business.

125.    In accordance with section 330 of the Bankruptcy Code, the Local Guidelines and the U.S. Trustee Guidelines, Milbank seeks reimbursement only for the actual cost of such expenses to Milbank.[18]  Additionally, Milbank has further limited and defined its expenses in accordance with the Fee Committee Guidelines.

126.    In providing or obtaining from third parties services which are reimbursable by clients, Milbank does not include in such reimbursable amount any costs of investment, equipment or capital outlay.

---

[18]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted cost of such expenses.

57

127.    Milbank regularly charges its non-bankruptcy clients for ordinary business hourly fees and expenses for secretarial, word processing and other staff services because such items are not included in the firm's overhead for the purpose of setting the billing rates.  However, in light of discussions with Fee Committee, no reimbursement for the charges incurred in connection with such services is requested in the Application.

128.    Attorneys at Milbank have not incurred expenses for luxury accommodations or deluxe meals.  The Application does not seek reimbursement of air travel or train fare expenses in excess of coach fares.[19]  Further, all overtime transportation costs were incurred after 8:00 p.m. for transporting timekeepers to their respective homes.  Moreover, although overtime meal expenses are listed in their actual amounts, per the Fee Committee guidelines, Milbank does not seek reimbursement for overtime meal expenses beyond the $20.00 maximum per meal.  Throughout the Seventh Interim Compensation Period, Milbank has been keenly aware of cost considerations and has tried to minimize the expenses charged to the Debtors' estates.

## VI.

## NOTICE

129.    Notice of this Application has been given to (a) the Debtors, (b) counsel for the Debtors, (c) the United States Trustee, and (d) the members of the Fee Committee.

## VII.

## CONCLUSION

WHEREFORE, Milbank respectfully requests the Court to enter an order conforming to the amounts set forth in Fee Schedule A(1) attached hereto as Exhibit "D" (i) allowing Milbank (a) interim compensation for professional services rendered as counsel for

---

[19]    Except in the instance of Amtrak's Acela Express train, where the lowest class is "business class."

the Committee during the Seventh Interim Compensation Period in the amount of

$14,180,784.75 and (b) reimbursement of expenses incurred in connection with rendering such

services in the aggregate amount of $633,261.80, for a total award of $14,814,046.55;

(ii) authorizing and directing the Debtors to pay to Milbank $2,818,286.54 which is an amount

equal to the difference between (a) this $14,814,046.55 award and (b) $11,995,760.01, the total

of all amounts that the Debtors have previously paid to Milbank pursuant to the Interim

Compensation Order for services rendered and expenses incurred during the Seventh Interim

Compensation Period; and (iii) granting such further relief as is just.

Dated: New York, New York
        June 2, 2011

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By: _/s/ Dennis F. Dunne_____
Dennis F. Dunne
Evan R. Fleck
Dennis C. O'Donnell
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

# **EXHIBIT A**

**Certification**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
                                                               :
In re:                                                         :        Chapter 11 Case No.
                                                               :
LEHMAN BROTHERS HOLDINGS INC., <u>et al.</u>,                  :        08-13555 (JMP)
                                                               :
                                Debtors.                       :        (Jointly Administered)
                                                               :
-------------------------------------------------------------- x

**CERTIFICATION UNDER GUIDELINES FOR FEES AND DISBURSEMENTS
FOR PROFESSIONALS IN RESPECT OF SEVENTH APPLICATION OF MILBANK,
TWEED, HADLEY & McCLOY LLP, COUNSEL TO
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, FOR INTERIM
ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND
FOR REIMBURSEMENT OF EXPENSES DURING PERIOD FROM
<u>OCTOBER 1, 2010 THROUGH AND INCLUDING JANUARY 31, 2011</u>**

Pursuant to the Guidelines for Fees and Disbursements for Professionals in

Southern District of New York Bankruptcy Cases adopted by the Court on June 24, 1991 and

amended April 21, 1995 and November 25, 2009 (together, the "<u>Local Guidelines</u>"), the United

States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of

Expenses Filed Under 11 U.S.C. § 330, effective January 30, 1996 (the "<u>U.S. Trustee</u>

<u>Guidelines</u>"), and the guidelines contained in the Fee Committee's Confidential Letter Report on

the Sixth Interim Application of Milbank, Tweed, Hadley & McCloy LLP, dated April 12, 2011

(the "<u>Fee Committee Guidelines</u>" and, together with the Local Guidelines and the U.S. Trustee

Guidelines, the "<u>Guidelines</u>"), the undersigned, a member of the firm Milbank, Tweed, Hadley &

McCloy LLP ("<u>Milbank</u>"), counsel to the Official Committee of Unsecured Creditors of Lehman

Brothers Holdings Inc., Lehman Brothers Special Financing Inc., Lehman Commercial Paper

Inc. and their affiliated debtors and debtors in possession in the above-captioned cases

(collectively, the "Debtors"), hereby certifies with respect to Milbank's seventh application for

allowance of compensation for services rendered and for reimbursement of expenses, dated June

2, 2011 (the "Application"), for the period of October 1, 2010 through and including January 31,

2011 (the "Seventh Interim Compensation Period") as follows:

1.    I am the professional designated by Milbank in respect of compliance with

the Guidelines.

2.    I make this certification in support of the Application, for interim

compensation and reimbursement of expenses for the Seventh Interim Compensation Period, in

accordance with the Local Guidelines.

3.    In respect of section A.1 of the Local Guidelines, I certify that:

a.    I have read the Application.

b.    To the best of my knowledge, information and belief formed after
reasonable inquiry, the fees and disbursements sought fall within
the Guidelines.

c.    Except to the extent that fees or disbursements are prohibited by
the Guidelines, the fees and disbursements sought are billed at
rates in accordance with practices customarily employed by
Milbank and generally accepted by Milbank's clients.

d.    In providing a reimbursable service, Milbank does not make a
profit on that service, whether the service is performed by Milbank
in-house or through a third party.[1]

4.    In respect of section A.2 of the Local Guidelines, I certify that Milbank has

provided statements of Milbank's fees and disbursements previously accrued, by filing and

serving monthly statements in accordance with the Interim Compensation Order (as defined in

the Application), except that completing reasonable and necessary internal accounting and

---

[1]    The cost of expenses Milbank is seeking reflects any discounted rates based on volume or other discounts
which Milbank anticipates receiving from certain outside vendors; however, Milbank does not perform a
retrospective reconciliation of any "year-end" adjustments (positive or negative) to the actual discounted
cost of such expenses.

review procedures have at times precluded filing fee statements within the time periods

established in the Interim Compensation Order.

      5.  In respect of section A.3 of the Local Guidelines, I certify that copies of the

Application are being provided to (a) the Court, (b) the Debtors, (c) counsel for the Debtors, (d)

the Office of the United States Trustee, and (e) the members of the Fee Committee.

      6.  I certify that the Application for interim compensation and reimbursement of

expenses for the Seventh Interim Compensation Period has been prepared in accordance with the

Fee Committee Guidelines.

      7.  Pursuant to the Fee Committee Guidelines, I certify that all transportation

charges fall within the reimbursement rule for transportation expenses.

Dated:      New York, New York
             June 2, 2011

                     By:  /s/ Dennis F. Dunne
                         Dennis F. Dunne

# EXHIBIT B

**Time Entry Records[1]**

---

[1] Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; and (v) the members of the Fee Committee.

# EXHIBIT C

**Expenses**[1]

---

[1]   Due to the volume of the time and expense records, these materials are not being filed with the Court, but copies thereof have been delivered to (i) the Court; (ii) the United States Trustee; (iii) the Debtors; (iv) counsel for the Debtors; (v) the members of the Fee Committee.

# EXHIBIT D

**Fee Schedule A(1)**

CASE NO.:  08-13555 (JMP) (Jointly Administered)

CASE NAME:  IN RE LEHMAN BROTHERS HOLDINGS INC., et al.

| FIRST INTERIM FEE PERIOD SEPTEMBER 17, 2008 – JANUARY 31, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
|---|---|---|---|---|---|---|---|
| Milbank, Tweed, Hadley & McCloy LLP | 4/10/09 Docket No. 3337 | $12,132,376.00 | $12,062,428.50 | $1,213,237.60 | $1,143,247.54 | $668,388.72 | $668,346.18 |

| SECOND INTERIM FEE PERIOD FEBRUARY 1, 2009 – MAY 31, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
|---|---|---|---|---|---|---|---|
| Milbank, Tweed, Hadley & McCloy LLP | 8/14/09 Docket No. 4821 | $16,829,521.00 | $16,233,210.42 | $1,682,952.10 | $1,371,217.28 | $1,019,754.61 | $1,006,175.08 |

| THIRD INTERIM FEE PERIOD JUNE 1, 2009 – SEPTEMBER 30, 2009 | | | | | | | |
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
|---|---|---|---|---|---|---|---|
| Milbank, Tweed, Hadley & | 12/14/09 | $10,881,540.00 | $10,689,053.40 | $1,088,154.00 | $795,598.60 | $583,803.10 | $483,734.30 |

FEE SCHEDULE A(1)

| McCloy LLP | Docket No. 6203 | | | | | | |
|---|---|---|---|---|---|---|---|

| FOURTH INTERIM FEE PERIOD<br>OCTOBER 1, 2009 – JANUARY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 4/16/10<br>Docket No. 8432 | $13,595,778.50 | $12,908,822.79 | $1,359,577.85 | $6,211,791.04 | $451,410.54 | $404,795.38 |

| FIFTH INTERIM FEE PERIOD<br>FEBRUARY 1, 2010 – MAY 31, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 8/16/10<br>Docket No. 10804 | $19,450,342.75 | $19,041,118.43 | $1,945,034.28 | $11,674,570.75 | $851,804.27 | $847,210.46 |

| SIXTH INTERIM FEE PERIOD<br>JUNE 1, 2010 – SEPTEMBER 30, 2010 | | | | | | | |
|---|---|---|---|---|---|---|---|
| **APPLICANT** | **DATE/DOCKET NO. OF APPLICATION** | **FEES REQUESTED** | **FEES ALLOWED (INCLUDING FEES HELD BACK)** | **FEES HELD BACK** | **FEES PAYABLE BY DEBTOR** | **EXPENSES REQUESTED** | **EXPENSES ALLOWED** |
| Milbank, Tweed, Hadley & McCloy LLP | 12/14/10<br>Docket No. 13493 | $18,359,367.75 | [ ] | $1,835,936.78 | $3,681,873.55 | $792,924.64 | [ ] |

**FEE SCHEDULE A(1)**

| SEVENTH INTERIM FEE PERIOD OCTOBER 1, 2010 – JANUARY 31, 2011 | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLICANT | DATE/DOCKET NO. OF APPLICATION | FEES REQUESTED | FEES ALLOWED (INCLUDING FEES HELD BACK) | FEES HELD BACK | FEES PAYABLE BY DEBTOR | EXPENSES REQUESTED | EXPENSES ALLOWED |
| Milbank, Tweed, Hadley & McCloy LLP | 6/2/11 Docket No. [    ] | $14,180,784.75[1] | [ ] | $2,818,286.54 | $[ ] | $633,261.80 | [ ] |

---

[1]    The amount requested on account of fees and expenses incurred by Milbank during the Seventh Interim Compensation Period was $151,151.16 less than the sum of fees and expenses set forth in the Fee Statements served during the Seventh Interim Compensation Period.

**FEE SCHEDULE A(1)**