**Exhibit 1**

000006

# WinthropCouchot
### Professional Corporation

660 NEWPORT CENTER DRIVE, FOURTH FLOOR
NEWPORT BEACH, CALIFORNIA 92660
TEL: (949) 720-4100
FAX: (949) 720-4111
WWW.WINTHROPCOUCHOT.COM

PAUL J. COUCHOT
RICHARD H. GOLUBOW
KAVITA GUPTA

GARRICK A. HOLLANDER
PAYAM KHODADADI
PETER W. LIANIDES

*SEAN A. O'KEEFE
ROBERT E. OPERA
MARC J. WINTHROP

*OF COUNSEL

DATED: April 8, 2011

**Via Email**
Mr. Richard Pachulski
Pachulski, Stang, Ziehl & Jones
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067-4100

Dear Mr. Pachulski:

Yesterday, the SunCal Plan Proponents (as defined in the Plans) filed four separate Plans of Reorganization (the "Plans") in the Chapter 11 cases of Voluntary Debtors and the Trustee Debtors. Each Plan refers to a specific "group" of debtors, and each Plan was only filed in the cases of these particular debtors. The four separate groups of debtors (Groups I, II, III and IV) are referenced on the caption page of each Plan. The Plans were prepared and filed in the foregoing manner to insure that no provision therein could not be interpreted, under any perspective or scenario, as being violative of the automatic stay of Lehman Commercial Paper, Inc. ("LCPI").

The debtors who fall within the Group I and II Plans are those entities whose properties are subject to the liens alleged by LCPI. The following express limitation appears in bold capital letters on the first page of both the Group I and II Plans and Disclosure Statements:

> **AS EXPLAINED IN THE DEFINTION OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THIS PLAN BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THIS PLAN SHALL BE TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

# WinthropCouchot
#### Professional Corporation

April 8, 2011
Page 2

As the foregoing express limitation states, the definition of the term "Effective Date" set forth in the Group I and Group II Plans is defined with reference to the existence of any possible automatic stay:

> Effective Date. A date selected by the SunCal Plan Proponents that is not later than 1) the one hundred and twentieth (120th) calendar day after the Confirmation Date. However, in any case where the actions provided for in the Plan would be delayed by the automatic stay applicable in the case of any Lehman Entity operating under the protection of Chapter 11 or Chapter 7, then the Effective Date shall the one hundred and twentieth (120th) calendar day after the later of (i) the Confirmation Date, or (ii) the date any stay barring the implementation of the Plan arising from the Lehman Entities' cases is no longer applicable, has been deemed inapplicable, or has been lifted by a Court of competent jurisdiction.

As this definition makes clear, if anything in the Group I or II Plans could be construed as being in violation of LCPI's stay, the effectiveness of the Plans is automatically delayed until this stay is eliminated. In short, everything in the Plansis held in abeyance pending relief from stay, if an issue exists.

We do not believe that the automatic stay in one Chapter 11 case can bar the filing of a reorganization plan in a second case, under any interpretation of applicable law. However, the above provisions in the Group I and II Plans, which are explicit, address the only subsection of 11 U.S.C. § 362 that could even form the basis of a conceptual argument - 362(a)(3). The latter section bars direct action seeking control over estate property. As explained, the foregoing provisions eliminate any risk of a possible unintended stay violation under this section. *See, In re Chateaugay Corp.,* 87 B.R. 779, 801 (S.D.N.Y. 1988) *aff'd sub nom. Pension Ben. Guar. Corp. v. LTV Corp.*, 875 F.2d 1008 (2d Cir. 1989) *rev'd on other grounds,* 496 U.S. 633 (1990) ("The purpose of section 362(a)(3) "is to protect the estate from *direct* action taken by creditors against a debtor's personal or real property, and to prevent an uncontrolled scramble to liquidate the estate."); *In re Chugach Forest Products, Inc.,* 23 F.3d 241, 245 (9th Cir. 1994). In sum, nothing in the Group I or II Plans, can have any effect on LCPI that would be violative of this entity's stay.

In the case of the Group III Plan, this Plan was filed in those cases where only Lehman Ali, Inc., *a non-debtor*, holds liens. The Group IV Plan was filed in those cases where the properties at issue are not subject to the liens of any Lehman Entity. Accordingly, LCPI's automatic stay is not a factor in these cases.

# WinthropCouchot
**Professional Corporation**

April 8, 2011
Page 3

If for any reason, LCPI contends that the Group I and Group II Plans violate its automatic stay, please advise this office immediately, and we will promptly seek relief before Judge Peck and Judge Smith, concurrently. Specifically, we will file a motion before Judge Peck seeking clarification regarding these stays allegations, and seek relief from any alleged stay. We will also seek a discretionary stay in front of Judge Smith, barring further confirmation efforts pending a resolution of these issues, thereby insuring a full and fair confirmation contest between the parties.

Respectfully,

Sean A O'Keefe
WINTHROP COUCHOT, P.C.

Cc:

Edward Soto
Dean Ziehl
Alan Friedman
William Lobel
Lei Lei Wang Ekvall

**Exhibit 2**

000010

1   PAUL J. COUCHOT -- State Bar No. 131934
    WINTHROP COUCHOT, P.C.
2   660 Newport Center Drive, Fourth Floor
    Newport Beach, CA 92660
3   Telephone: (949) 720-4100
    Facsimile: (949) 720-4111
4
    General Insolvency Counsel for Palmdale Hills
5   Property, LLC et. al. (the "Voluntary Debtors")

6   RONALD RUS - State Bar No. 67369
    JOEL S. MILIBAND - State Bar No. 77438
7   RUS MILIBAND & SMITH P.C.
    2211 Michelson Drive, Seventh Floor
8   Irvine, California 92612
    Telephone: (949) 752-7100
9   Facsimile:  (949) 252-1514

10  Counsel for SunCal Management LLC and
    SCC Acquisitions Inc.

11              UNITED STATES BANKRUPTCY COURT
                CENTRAL DISTRICT OF CALIFORNIA
12                   SANTA ANA DIVISION

13  In re                                          Case No. 8:08-bk-17206-ES
14  PALMDALE HILLS PROPERTY, AND ITS               Jointly Administered With Case Nos.
    RELATED DEBTORS,                               8:08-bk-17209-ES; 8:08-bk-17240-ES;
15           Jointly Administered Debtors          8:08-bk-17224-ES; 8:08-bk-17242-ES;
             and Debtors-in-Possession             8:08-bk-17225-ES; 8:08-bk-17245-ES;
16                                                 8:08-bk-17227-ES; 8:08-bk-17246-ES;
    Affects:                                       8:08-bk-17230-ES; 8:08-bk-17231-ES;
17                                                 8:08-bk-17236-ES; 8:08-bk-17248-ES;
    ☐ All Debtors                                  8:08-bk-17249-ES; 8:08-bk-17573-ES;
18  ☒ Palmdale Hills Property,                     8:08-bk-17574 ES; 8:08-bk-17575-ES;
    ☐ SunCal Beaumont Heights, LLC                 8:08-bk-17404-ES; 8:08-bk-17407-ES;
19  ☐ SCC/Palmdale,                                8:08-bk-17408-ES; 8:08-bk-17409-ES;
    ☐ SunCal Johannson Ranch, LLC                  8:08-bk-17458-ES; 8:08-bk-17465-ES;
20  ☐ SunCal Summit Valley, LLC                    8:08-bk-17470-ES; 8:08-bk-17472-ES;
    ☐ SunCal Emerald Meadows LLC                   and 8:08-bk-17588-ES
21  ☒ SunCal Bickford Ranch, LLC
    ☐ Acton Estates, LLC                           Chapter 11 Proceedings
22  ☐ Seven Brothers LLC
    ☐ SJD Partners, Ltd.                           CHAPTER 11 PLAN FILED BY SUNCAL
23  ☐ SJD Development Corp.                        PLAN PROPONENTS IN THE CHAPTER
    ☐ Kirby Estates, LLC                           11 CASES OF PALMDALE HILLS
24  ☐ SunCal Communities I, LLC                    PROPERTY, LLC, SUNCAL BICKFORD
    ☐ SunCal Communities III, LLC                  RANCH, LLC, SUNCAL MARBLEHEAD,
25  ☐ SCC Communities LLC                          LLC AND SUNCAL PSV, LLC [GROUP I
    ☐ North Orange Del Rio Land, LLC               DEBTORS]
26  ☐ Tesoro SF LLC
                                                   Date:    May 13, 2011
27                                                 Time:    9:30 a.m.
                                                   Place:   Courtroom 5A
28

MAINDOCS-#160302-v1-Plan_Group_I.DOC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Continued from Previous Page*

☐ LBL-SunCal Oak Valley, LLC
☐ SunCal Heartland, LLC
☐ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | 3 |
| | 2.1 Definitions | 3 |
| | 2.2 Rules of Construction | 24 |
| | 2.3 Exhibits | 24 |
| III. | TREATMENT OF UNCLASSIFIED CLAIMS | 25 |
| | 3.1 Introduction | 25 |
| | 3.2 Treatment of Allowed Administrative Claims | 25 |
| | 3.3 Treatment and Repayment of Lehman's Administrative Loan(s) | 25 |
| | 3.4 Repayment of Allowed Administrative Claims Other than the Lehman Administrative Loans | 26 |
| | 3.5 Administrative Claims Bar Date | 26 |
| | 3.6 Treatment of Priority Unsecured Tax Claims | 27 |
| IV. | CLASSIFICATION OF CLAIMS AND INTERESTS | 27 |
| V. | THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ON AND AFTER THE EFFECTIVE DATE | 34 |
| | 5.1 The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1. 4). | 34 |
| | 5.2 The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.4). | 35 |
| | 5.3 The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 3.1 Through 3.29). | 37 |
| | 5.4 The Plan's Treatment of Holders of Priority Claims (Classes 4.1 and 4.2). | 38 |
| | 5.5 The Plan's Treatment of Holders of General Unsecured Claims that are Reliance Claims (Classes 5.1 Through 5.4). | 39 |
| | 5.6 The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4). | 39 |
| | 5.7 The Plan's Treatment of Holders of Allowed Interests. | 40 |

000013
MAINDOCS-#160302-v1-Plan_Group_I.DOC

# TABLE OF CONTENTS

## (Continued)

| | | | PAGE |
|---|---|---|---|
| VI. | | ACCEPTANCE OR REJECTION OF THIS PLAN | 40 |
| | 6.1 | Introduction | 40 |
| | 6.2 | Who May Object to Confirmation of the Plan | 40 |
| | 6.3 | Who May Vote to Accept/Reject the Plan | 40 |
| | 6.4 | What Is an Allowed Claim/Interest | 41 |
| | 6.5 | What Is an Impaired Class | 41 |
| | 6.6 | Who Is Not Entitled to Vote | 41 |
| | 6.7 | Who Can Vote in More than One Class | 41 |
| | 6.8 | Votes Necessary for a Class to Accept the Plan | 42 |
| | 6.9 | Treatment of Nonaccepting Classes | 42 |
| | 6.10 | Request for Confirmation Despite Nonacceptance by Impaired Class(es) | 42 |
| VII. | | MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN | 42 |
| | 7.1 | Introduction | 43 |
| | 7.2 | Removal of Trustee | 43 |
| | 7.3 | Transfer of Property To The Plan Trust | 43 |
| | 7.4 | Purposes of The Plan Trust | 43 |
| | 7.5 | Trust Agreement | 44 |
| | 7.6 | Operations of the Plan Trust | 44 |
| | 7.7 | The Plan Trustee | 44 |
| | 7.8 | Payment of Trust Expenses | 44 |
| | 7.9 | Plan Distribution System | 45 |
| | 7.10 | Claims Estimation Rights | 45 |
| | 7.11 | No Payment of Transfer-Related Fees to the United States Trustee. | 45 |
| | 7.12 | No Payment of Transfer-Related Fees to the Trustee. | 45 |
| | 7.13 | Books and Records of Trust | 46 |
| | 7.14 | Limitations on Liability. | 46 |
| | 7.15 | Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests. | 47 |
| | 7.16 | Termination of the Trust | 47 |
| | 7.17 | Exemption from Certain Transfer Taxes. | 48 |
| | 7.18 | Tax Consequence of The Plan. | 48 |
| | 7.19 | The Plan Sponsor | 48 |
| | 7.20 | Acquisitions' Funding Obligations Pursuant to the Acquisitions Administrative Loan | 49 |
| | 7.21 | The Committee(s). | 49 |
| | | 7.21.1  Duties and Powers. | 49 |
| | | 7.21.2  Dissolution of Committees. | 50 |
| | 7.22 | Litigation Claims. | 50 |
| | 7.23 | Collection of Litigation Recoveries. | 50 |

000014
MAINDOCS-#160302-v1-Plan_Group_I.DOC

TABLE OF CONTENTS

(Continued)

PAGE

VIII. DISTRIBUTIONS ............................................................................................ 51
    8.1 Distribution Agent ................................................................................ 51
    8.2 Distributions........................................................................................ 51
        8.2.1 Dates of Distributions .............................................................. 51
        82.2 Limitation on Liability ............................................................ 51
    8.3 Old Instruments and Securities ............................................................ 51
        8.3.1 Surrender and Cancellation of Instruments and Securities......... 51
        8.3.2 Cancellation of Liens ............................................................... 52
    8.4 De Minimis Distributions and Fractional Shares.................................. 52
    8.5 Delivery of Distributions ..................................................................... 52
    8.6 Undeliverable Distributions ................................................................. 53
    8.7 Disposition of Unclaimed Property ...................................................... 53

IX. OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS ................................ 53
    9.1 Standing for Objections to Claims........................................................ 53
    9.2 Treatment of Disputed Claims and Disputed Liens............................... 54
        9.2.1 No Distribution Pending Allowance .......................................... 54
        9.2.2 Distribution After Allowance .................................................... 54

X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES.............................. 54
    10.1 Executory Contracts Potentially Being Assumed .................................. 54
    10.2 Executory Contracts Being Rejected ..................................................... 55
    10.3 Bar Date for Rejection Damages .......................................................... 55
    10.4 Changes in Rates Subject to Regulatory Commission Approval .................. 55

XI. LIMITATION OF LIABILITY .......................................................................... 55
    11.1 No Liability for Solicitation or Participation. ............................................. 55

XII. CONDITIONS TO CONFIRMATION AND EFFECTIVENESS OF PLAN .......... 55
    12.1 Conditions Precedent to Plan Confirmation ......................................... 55
    12.2 Conditions Precedent to Plan Effectiveness .......................................... 56

XIII. RETENTION OF JURISDICTION ................................................................... 56

XIV. MODIFICATION OR WITHDRAWAL OF PLAN ........................................... 56
    14.1 Modification of Plan ............................................................................ 56
    14.2 Nonconsensual Confirmation................................................................ 56

1

### **TABLE OF CONTENTS**

2

### **(Continued)**

3

| | | PAGE |
|---|---|---|
| XV. | MISCELLANEOUS | 57 |
| | 15.1 Payment of Statutory Fees | 57 |
| | 15.2 Payment Dates | 57 |
| | 15.3 Headings | 57 |
| | 15.4 Other Documents and Actions | 57 |
| | 15.5 Notices | 57 |
| | 15.6 Governing Law | 58 |
| | 15.7 Binding Effect | 58 |
| | 15.8 Successors and Assigns | 58 |
| | 15.9 Severability of Plan Provisions | 59 |
| | 15.10 No Waiver | 59 |
| | 15.11 Inconsistencies | 59 |
| | 15.12 Exemption from Certain Transfer Taxes and Recording Fees | 59 |
| | 15.13 Post-Confirmation Status Report | 60 |
| | 15.14 Post-Confirmation Conversion/Dismissal | 60 |
| | 15.15 Final Decree | 61 |

000016
MAINDOCS-#160302-v1-Plan_Group_I.DOC

# I.

## **INTRODUCTION**

This Chapter 11 Plan of Reorganization (the "Plan")[1] is filed by the Voluntary Debtors and Acquisitions[2], as the SunCal Plan Proponents.  Acquisitions is also the Plan Sponsor, and Acquisitions will serve as the Plan Trustee and the Distribution Agent for all of the Debtors, if this Plan is confirmed. The Plan is being filed in the Chapter 11 Cases of the following Debtors:

> Palmdale Hills Property, LLC
> SunCal PSV, LLC
> SunCal Marblehead, LLC
> SunCal Bickford, LLC

(the "Group I Debtors").

In summary, the Plan provides for sale of the following four real estate Projects that are owned by the Group I Debtors: Ritter Ranch, the Palms Springs Village Project, Bickford Ranch and the Marblehead Project (the "Group I Projects"), and for the liquidation of all other assets of the Group I Debtors. The Net Proceeds from these sales will then be distributed to Creditors holding Allowed Claims in accordance with their rights and priorities under the bankruptcy code and under other applicable law.

**The Plan also offers the holders of a certain category of general unsecured claims, which are defined herein as Reliance Claims, the right to sell these claims, and any Litigation Rights held by the holders of such claims against the Lehman Entities, to LitCo, for the sum of fifty-five cents ($0.55) per dollar of claim.  The purchase offer is conditioned upon confirmation of the applicable Plan and the lack of any stay pending an appeal of the Confirmation Order.  However, this purchase offer is not contingent upon the sale of the Group I Projects or a determination regarding any alleged automatic stay claim by LCPI arising from LCPI's pending Chapter 11 proceeding.**

---

[1] All defined terms used herein have the same meanings as set forth in Article II herein and Exhibit "1" attached hereto.

[2] In addition to being one of the proponents of the Plan, Acquisitions is the Plan Sponsor, it will also serve as the Plan Trustee of the Plan Trust and as the Distribution Agent, if the Plan is confirmed.

000017
MAINDOCS-#160302-v1-Plan_Group_I.DOC

**EXCEPT AS PROVIDED IN THE PURCHASE OFFER TO HOLDERS OF RELIANCE CLAIMS REFERENCED ABOVE, AS EXPLAINED IN THE DEFINITION OF THE TERM "EFFECTIVE DATE," WHICH IS THE DATE ON WHICH THIS PLAN BECOMES EFFECTIVE, NO ACTION PROVIDED FOR IN THIS PLAN SHALL BE TAKEN AGAINST EITHER LEHMAN COMMERCIAL PAPER, INC. ("LCPI") OR LEHMAN BROTHERS HOLDINGS, INC. ("LBHI") THAT WOULD HAVE THE EFFECT OF VIOLATING ANY APPLICABLE AUTOMATIC STAY THAT MAY EXIST IN THEIR CHAPTER 11 CASES. ANY SUCH ACTION WILL ONLY PROCEED AFTER ANY APPLICABLE STAY IS EITHER LIFTED OR DEEMED INAPPLICABLE.**

Although the same Plan is being filed in the Cases of all four Group I Debtors, each Plan is independent of the others. The Creditors in each Case will determine, subject to Court approval, whether the Plan will be approved in their Case. Accordingly, the Plan may be confirmed in the Cases of all of the Group I Debtors, but not in others.

The Plan is accompanied by the "' Disclosure Statement Describing Chapter 11 Plan Filed By Suncal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, Suncal Bickford Ranch, LLC, Suncal Marblehead, LLC And Suncal PSV, LLC [Group I Debtor] (the "Disclosure Statement").  The Disclosure Statement has been approved by the Court.  It is being provided along with this Plan in order to provide you with critical information about the Debtors and to help you understand this Plan.  The Disclosure Statement discusses the Debtors' history, businesses, properties, and results of operations and contains a summary and discussion of this Plan.  Holders of Claims and Interests and parties to executory contracts and unexpired leases are encouraged to read the Disclosure Statement.  No solicitation materials, other than the Disclosure Statement and related materials transmitted therewith and approved for solicitation purposes by the Court, have been authorized for use in soliciting acceptances or rejections of this Plan.

**II.**

**DEFINITIONS AND RULES OF INTERPRETATION**

**2.1**     **Definitions.**

The following defined terms are used in this Disclosure Statement.  Any capitalized term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or Bankruptcy Rules.

2.1.1   <u>Acquisitions</u>.  SCC Acquisitions, Inc., a California corporation, an indirect parent company of all of the Debtors, a purported obligor on the Bond Claims, a Creditor of all of the Debtors, a SunCal Plan Proponent, the Plan Sponsor and the proposed Plan Trustee.

2.1.2   <u>Acquisitions Administrative Loan</u>.  The Allowed Administrative Claim of Acquisitions, or of such Affiliate that provides such funding, which will comprised of all amounts caused to be funded by Acquisitions, or such Affiliate, in connection with the Group I Debtors' Cases and the consummation of the Plan, including, but not limited to, the reimbursement of all payments made to Professionals that provided services to the Group I Debtors in connection with the Cases.

2.1.3   <u>Administrative Claim(s)</u>.  Any Claim incurred after the Petition Date but before the Confirmation Dates for any cost or expense of administration of the Cases allowable under Section 330, 331, 503(b), or 507(a)(1) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition expenses of preserving the Estates of the Group I Debtors, any actual and necessary post-petition expenses of operating the business of the Group I Debtors in Possession, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under Section 330, 331, or 503 of the Bankruptcy Code and any fees or charges assessed against the Estates of the Group I Debtors under Section 1930 of title 28 of the United States Code.

2.1.4   <u>Administrative Claims Bar Date</u>.  The last date fixed by the Plan for the filing of Proof of Claims or requests for payment of Administrative Claims.  Under the Plan, the Administrative Claims Bar Date shall be the first business day after the sixtieth (60th) day after the Confirmation Date.

2.1.5   <u>Affiliate</u>.  The term shall have the meaning set forth under Section 101(2), including, but not limited to, as to any Person, any other Person that directly or indirectly owns or controls, is owned or controlled by, or is under common ownership or control with, such Person.

MAINDOCS-#160302-v1-Plan_Group_I.DOC

The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other equity ownership interest, by contract or otherwise.

      2.1.6   <u>Allowed</u>.  When used to describe Claim(s) or Interest(s), such Claim(s) or Interest(s), to the extent that it or they are "Allowed Claim(s)" or "Allowed Interest(s)."

      2.1.7   <u>Allowed Amount</u> shall mean:

      i.   With respect to any Administrative Claim (i) if the Claim is based upon a Fee Application, the amount of such Fee Application that has been approved by a Final Order of the Bankruptcy Court; (ii) if the Claim is based upon any indebtedness or obligation incurred in the ordinary course of business of the Group I Debtors and is not otherwise subject to an Administrative Claim Bar Date, the amount of such Claim that has been agreed to by the Group I Debtors and such creditor, failing which, the amount thereof as fixed by a Final Order of the Bankruptcy Court; or (iii) if the Holder of such Claim was required to file and has filed proof thereof with the Bankruptcy Court prior to an Administrative Claim Bar Date, (1) the amount stated in such proof if no objection to such Proof of Claim is interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (2) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court.  The Allowed Amount of any Administrative Claim which is subject to an Administrative Claims Bar Date and not filed by the applicable Administrative Claims Bar Date shall be zero, and no distribution shall be made on account of any such Administrative Claim;

      ii.   with respect to any Claim which is not an Administrative Claim (the "Other Claim"):  (i) if the Holder of such Other Claim did not file proof thereof with the Bankruptcy Court on or before the Claims Bar Date, the amount of such Claim as listed in the Group I Debtors' '  Schedules as neither disputed, contingent nor unliquidated; or (ii) if the Holder

MAINDOCS-#160302-v1-Plan_Group_I.DOC

of such Claim has filed proof thereof with the Bankruptcy Court on or before the Claims Bar Date, (a) the amount stated in such proof if no objection to such Proof of Claim was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court, or (b) the amount thereof as fixed by Final Order of the Bankruptcy Court if an objection to such proof was interposed within the applicable period of time fixed by the Bankruptcy Code, the Bankruptcy Rules, the Plan or the Bankruptcy Court.  The Allowed Amount of any Other Claim which is not Filed by the applicable Claims Bar Date, is not listed on the Group I Debtors' Schedules or is listed as disputed, unliquidated, contingent or unknown, and is not allowed under the terms of this Plan shall be zero, and no distribution shall be made on account of any such Claim; and

     iii. with respect to any Interest, (i) the amount provided by or established in the records of the Group I Debtors at the Confirmation Date, provided, however, that a timely filed proof of Interest shall supersede any listing of such Interest on the records of the Group I Debtors; or (ii) the amount stated in a proof of Interest Filed prior to the Confirmation Date if no objection to such Interest was filed prior to the Confirmation Date or such later date as the Bankruptcy Court allows; or (iii) the amount of such Interest as fixed by a Final Order of the Bankruptcy Court.

  2.1.8 <u>Allowed Claim</u>.  Except as otherwise provided in the Plan (including with respect to those Classes for which the amount of the Allowed Claims is specified by the Plan), a Claim to the extent (and only to the extent) of the Allowed Amount of such Claim.

  2.1.9 <u>Allowed Interest</u>.  Any Interest to the extent, and only to the extent, of the Allowed Amount of such Interest.

  2.1.10 <u>Allowed Secured Claims</u>.  An asserted Secured Claim that is not either a Disputed Claim or a Disputed Lien.

  2.1.11 <u>Assets</u>.  All assets that are property of the Debtor(s) pursuant to Bankruptcy Code Section 541.

  2.1.12 <u>Arch</u>.  Arch Insurance Company, a Bond Issuer.

2.1.13   <u>Available Cash</u>.  Each Group I Debtors' Cash deposited into the applicable Distribution Account(s) on or after the Effective Date that is available for making Distributions under the Plan to Holders of Allowed Administrative, Priority, and General Unsecured Claims.  The Available Cash shall consist of the respective Group I Debtors' cash on hand as of the Effective Date that is not subject to a Disputed Lien, proceeds of Net Litigation Recoveries that are not subject to a Disputed Lien, Net Sales Proceeds that become Available Cash upon the disallowance of a Disputed Claim or avoidance of a Disputed Lien purportedly encumbering such Cash, or proceeds from the Acquisitions Administrative Loan.  All Available Cash shall be deposited into the applicable Distribution Account(s).  Available Cash shall not include Net Sale Proceeds in the Net Sales Proceeds Account where the Disputed Secured Claims are Allowed but subject to an equitable subordination judgment.

2.1.14   <u>Avoidance Actions</u>.  All Claims and defenses to Claims accruing to the Group I Debtors and their Estates under Bankruptcy Code Sections 506(d), 510(c), 541, 544, 545, 547, 548, 549, 550, or 551.

2.1.15   <u>Bankruptcy Code</u>.  The United States Bankruptcy Code.

2.1.16   <u>Bankruptcy Court</u>.  The United States Bankruptcy Court for the Central District of California, having jurisdiction over the Cases and, to the extent of any withdrawal of the reference made pursuant to Section 157 of title 28 of the United States Code, the United States District Court for the Central District of California; or, in the event such courts cease to exercise jurisdiction over the Cases, such court or unit thereof that exercises jurisdiction over the Cases in lieu thereof.

2.1.17   <u>Bankruptcy Rules</u>.  Collectively, as now in effect or hereafter amended and as applicable to the Cases, (i) the Federal Rules of Bankruptcy Procedure, and (ii) the Local Bankruptcy Rules and General Orders applicable to cases pending before the Bankruptcy Court.

2.1.18   <u>Beneficial Interests</u>. means, collectively, the interests of the holders of Allowed Unsecured Claims in the Plan Trust and in all distributions to be made by the Plan Trust on account of Allowed Unsecured Claims. The Beneficial Interests (a) shall be noted in the books

and records of the Plan Trust, (b) shall not be evidenced by a writing, and (c) may not be transferred, sold, assigned or transferred by will, intestate succession or operation of law.

2.1.19 <u>Bickford Ranch Project</u>. The Project owned by SunCal Bickford, located in the City of Penryn, California, as more particularly described herein.

2.1.20 <u>Bickford Second Loan Agreement</u>. That certain promissory note secured by a deed of trust, dated as of May 25, 2005, in the maximum aggregate principal amount of approximately $30,000,000 executed by SunCal Bickford, as borrower, and payable to the order of Lehman ALI. The Bickford Second Lien Loan Agreement is allegedly secured by a second priority deed of trust on the Bickford Ranch Project. The Bickford Second Loan Agreement has an asserted balance due of $56,494,059.38 as of March 30, 2009.

2.1.21 <u>Bond Claim(s)</u>. Any Claim against the Debtor(s) and a Bond Issuer under various payment or performance bonds, and/or any claims of Bond Issuer(s) against the Debtor(s) under various payment or performance bonds.

2.1.22 <u>Bond Claimant</u>. Holder(s) of a Bond Claim.

2.1.23 <u>Bond Indemnification Claim</u>. All Claims by Bond Safeguard, Lexon, and Arch for indemnification for payment by Bond Safeguard, Lexon and Arch of Bond Claims with respect to the Group I Debtors' Projects.

2.1.24 <u>Bond Indemnitors</u>. The individuals and entities that are allegedly liable on the Bond Indemnification Claims, including, allegedly, all of the Debtors, Acquisitions, all Affiliates of Acquisitions, and Elieff.

2.1.25 <u>Bond Issuer(s)</u>. Bond Safeguard, Lexon and Arch in their capacities as issuers and sureties for payment and performance bonds for the benefit of certain of the Debtors.

2.1.26 <u>Bond Safeguard</u>. Bond Safeguard Insurance Company, a Bond Issuer.

2.1.27 <u>Break-Up Fee</u>. Break-Up Fee means a fee granted to a Stalking Horse Bidder of up to three percent (3%) of the Opening Bid for a Project and of up to five percent (5%) of the Opening Bid for other Plan Trust Assets.

2.1.28 <u>Business Day</u>. Any day, other than a Saturday, a Sunday or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.29    <u>Cases</u>.  The Chapter 11 cases of the Group I Debtors pending before the Bankruptcy Court.

2.1.30    <u>Cash</u>.  Currency of the United States of America and cash equivalents, including, but not limited to, bank deposits, immediately available or cleared checks, drafts, wire transfers and other similar forms of payment.

2.1.31    <u>CFD Bonds</u>.  Community facilities district bonds issued by a governmental entity.

2.1.32    <u>Chapter 11 Trustee</u>.  Steven M. Speier, the duly appointed trustee of the Trustee Debtors in their pending Chapter 11 Cases.

2.1.33    <u>Claim</u>.  This term shall have the broadest possible meaning under Section 101(5) of the Bankruptcy Code, and shall include (a) any right to payment from any of the Group I Debtors, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from any of the Group I Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.1.34    <u>Claims Bar Date</u>.  For any Claim other than an Administrative Claim, March 31, 2009, which was established by the Bankruptcy Court as the last date for creditors to file Proof of Claims with the Bankruptcy Court in all of the Group I Debtors' cases.

2.1.35    <u>Claims Objection Deadline</u>.  The later of (i) the first business day following the one hundred and eightieth (180th) day after the Effective Date, or (ii) such greater period of limitation as may be fixed or extended by the Bankruptcy Court or by agreement between the Plan Trustee and the Holder of the Claim.

2.1.36    <u>Claim Objection Reduction Amount</u>. The amount of Net Sales Proceeds that is made available to the holders of Allowed Unsecured Claims due to the entry of a judgment or order on a Lehman Claim Objection that disallows, reduces, or otherwise adversely modifies the secured claims filed by the Lehman Lenders.

000024
MAINDOCS-#160302-v1-Plan_Group_I.DOC

1   2.1.37   <u>Class</u>.  Each group of Claims or Interests classified in Article V of the

2   Plan pursuant to Sections 1122 and 1123 of the Bankruptcy Code.

3   2.1.38   <u>Committees</u>.  Collectively, the Voluntary Debtors' Committee and the

4   Trustee Debtors' Committee, both before and after the Confirmation Date.

5   2.1.39   <u>Confirmation Date</u>.  The date on which the Confirmation Order is

6   entered in the Bankruptcy Court's docket.

7   2.1.40   <u>Confirmation Order</u>.  The order entered by the Bankruptcy Court

8   confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

9   2.1.41   <u>Contingent Bond Claims</u>.  Unmatured Bond Claims.

10   2.1.42   <u>Creditor</u>.  Any Person who is the Holder of a Claim against any Debtor

11   that arose or accrued or is deemed to have arisen or accrued or to have matured, or otherwise

12   become due, owing, and payable on or before the Petition Date, including, without limitation,

13   Claims of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

14   2.1.43   <u>Debtor(s)</u>.  Individually or collectively, the Voluntary Debtors and the

15   Trustee Debtors, as specifically defined in Exhibit "1" attached to the Disclosure Statement.

16   2.1.44   <u>Debtor(s)-in-Possession</u>.  The Voluntary Debtor(s) when acting in their

17   capacity as representatives of their respective Estates in their respective Chapter 11 Cases.

18   2.1.45   <u>Disclosure Statement</u>.  The document accompanying the Plan that is

19   entitled "Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan Proponents In

20   The Chapter 11 Cases Of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal

21   Marblehead, LLC, SunCal PSV, LLC," as amended and with all accompanying exhibits.

22   2.1.46   <u>Disputed Claim(s)</u>.  All or any part of a Claim other than any Allowed

23   Amount thereof as to which any one of the following applies: (i) no Proof of Claim has been filed

24   with respect to such Claim, and either (a) the Claim is not listed in the Schedules; or (b) the Claim

25   is listed in the Schedules as unliquidated, disputed, contingent, unknown or in a zero amount,

26   (ii) the Claim is the subject of (a) a Litigation Claim; (b) the Claim is subject to offset by a

27   Litigation Claim; (c) a timely objection that has not been resolved by a Final Order; or (d) a

28   request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any

000025
MAINDOCS-#160302-v1-Plan_Group_I.DOC

applicable order of the Bankruptcy Court, or the Plan which is Filed on or before the Claims

Objection Deadline, which Adversary Proceeding, objection, or request for estimation has not

been dismissed, withdrawn or determined by a Final Order; or (iii) the Claim is otherwise treated

as a "Disputed Claim" pursuant to the Plan.

2.1.47    Disputed Lien(s).  An asserted lien(s) against Assets of the Debtor(s) that

is either subject to a Disputed Secured Claim, not duly perfected, subject to an Avoidance Action,

or subject to an action pursuant to Bankruptcy Code Sections 510(c)(2) and/or 506(d).

2.1.48    Distribution(s).  Payments to Holders of Allowed Claims provided for

under the Plan.

2.1.49    Distribution Agent.  The entity that is responsible for making

Distributions under the Plan, which shall be Acquisitions.

2.1.50    Distribution Account(s).  Separate account(s) to be established by the

Plan Trustee at an FDIC insured bank into which each Group I Debtors' Available Cash shall be

deposited and all Available Cash received by the Plan Trust after the Confirmation Date that

would have belonged to such Group I Debtor shall be deposited, other than Net Sales Proceeds

that are subject to Disputed Claims and Disputed Liens.

2.1.51    Distribution Date.  With respect to any Allowed Claim or Allowed

Interest, the date on which a Distribution is required to be made under the Plan.

2.1.52    Effective Date. A date selected by the SunCal Plan Proponents that is not

later than 1) the one hundred and twentieth (120th) calendar day after the Confirmation Date.

However, in any case where the actions provided for in the Plan would be delayed by the

automatic stay applicable in the case of any Lehman Entity operating under the protection of

Chapter 11 or Chapter 7, then the Effective Date shall the one hundred and twentieth (120th)

calendar day after the later of (i) the Confirmation Date, or (ii) the date any stay barring the

implementation of the Plan arising from the Lehman Entities' cases is no longer applicable, has

been deemed inapplicable, or has been lifted by a Court of competent jurisdiction.

2.1.53    Elieff.  Bruce Elieff, the president of Acquisitions, a purported obligor on

the Bond Claims with corresponding indemnity Claims against the Debtors.

2.1.54   Estates.  The bankruptcy estates of the Group I Debtors created pursuant to Section 541 of the Bankruptcy Code.

2.1.55   Fee Applications.  Applications of Professional Persons under Sections 330, 331 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.56   Fee Claim.  A Claim under Sections 330 or 503 of the Bankruptcy Code for allowance of compensation and reimbursement of expenses in the Cases.

2.1.57   Fenway Capital.  Fenway Capital Funding LLC, a Lehman Successor to Lehman's Disputed Claims and Lehman's Disputed Liens arising from (i) SunCal Communities I Loan Agreement, (ii) Ritter Ranch Loan Agreement, (iii) Bickford Second Loan Agreement, (iv) SunCal PSV Loan Agreement, (v) SunCal Marblehead/SunCal Heartland Loan Agreement, (vi) Delta Coves Loan Agreement (vii) SunCal Northlake Loan Agreement, and (viii) SunCal Oak Valley Loan Agreement.  Such Disputed Claims and Disputed Liens were transferred back to LCPI pursuant to a compromise approved by the New York Bankruptcy Court on May 12, 2010.

2.1.58   Filed.  Delivered to, received by and entered upon the legal docket by the Clerk of the Bankruptcy Court.  "File" shall have a correlative meaning.

2.1.59   Final Order.  A judgment, order, ruling or other decree issued and entered by the Bankruptcy Court.

2.1.60   General Unsecured Claim.  A Claim against a Group I Debtor that is not (a) a Secured Claim, (b) an Administrative Claim, (c) a Tax Claim or (d) a Priority Claim.

2.1.61   Group I Debtors. Palmdale Hills Property, LLC, SunCal PSV, LLC, SunCal Marblehead, LLC and SunCal Bickford Ranch, LLC.

2.1.62   Group I Projects. Ritter Ranch, the Palm Springs Village Project, the Marblehead Project and the Bickford Ranch Project.

2.1.63   Holder.  The beneficial owner of any Claim or Interest.

2.1.64   Insider.  The term shall have the broadest meaning possible under Section 101(31), including, but not limited to, a person in control of the Debtor, Affiliates and Insiders of such Affiliates.

MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.65 <u>Interest</u>. Any equity security interest in any Group I Debtor within the meaning, of Section 101(16) of the Bankruptcy Code, including, without limitation, any equity ownership interest in any of the Group I Debtors, whether in the form of common or preferred stock, stock options, warrants, partnership interests, or membership interests.

2.1.66 <u>LBHI</u>. Lehman Brothers Holdings, Inc., a Lehman Entity, the parent company of Lehman ALI and LCPI, and a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.67 <u>LCPI</u>. Lehman Commercial Paper, Inc., a Chapter 11 debtor in a bankruptcy proceeding pending in the Bankruptcy Court for the Southern District of New York.

2.1.68 <u>Legal Rate</u>. The rate of interest payable on judgments obtained in the United States District Courts as set forth in 28 U.S.C. § 1961. The rate applicable under the Plan is 1.44% per annum, representing the applicable rate on November 6, 2008.

2.1.69 <u>Lehman Adversary Proceeding</u>. The Debtors' pending adversary proceeding against the Lehman Lenders and/or the Lehman Successors asserting various causes of action including equitable subordination, fraudulent conveyances and preferential transfers.

2.1.70 <u>Lehman ALI</u>. Lehman ALI, Inc.

2.1.71 <u>Lehman Disputed Administrative Loans</u>. The post-petition financing provided by Lehman ALI to Palmdale Hills, SunCal Emerald, SunCal Bickford, Acton Estates, SunCal Oak Valley, SunCal Heartland, SunCal Northlake, SunCal Marblehead, SunCal Century City, SunCal PSV, Delta Coves, and SunCal Oak Knoll, which grants priming liens on all borrower Debtors' assets, and for super-priority administrative status to Lehman ALI. The Voluntary Debtors have repaid to Lehman ALI the full amount of $270,731 loaned to the Voluntary Debtors. The aggregate amount of the Lehman Administrative Loans to all of the Trustee Debtors is approximately $40 million as of March 1, 2011 and continuing to increase. The Lehman Administrative Loans are the subject of claim objections. Until these objections are resolved, these Lehman Administrative Loans shall not be Allowed Claims.

2.1.72 <u>Lehman Claim Objections</u>. The objections filed by the Debtors to the claims filed by the Lehman Lenders that are based upon the Lehman Disputed Loans and the

Lehman Disputed Administrative Loans, including, but not limited to, the Lehman Recoupment

Objection and the Lehman 502(d) Objection.

       2.1.73     <u>Lehman Entities</u>.  The Lehman Lenders, the Lehman Equity Members

and LBHI.

       2.1.74     <u>Lehman Equity Members</u>.  Lehman Entities that own direct or indirect

membership Interests in all of the Trustee Debtors, except for SunCal Heartland and SunCal

Marblehead.

       2.1.75     <u>Lehman Lenders</u>.  Lehman ALI, LCPI, Northlake Holdings, and OVC

Holdings.

       2.1.76     <u>Lehman Disputed Loans</u>.  Collectively the following loans that are the

purported basis for the Lehman's Disputed Claims:  (a) SunCal Communities I Loan Agreement;

(b) Bickford Second Loan Agreement; (c) Ritter Ranch Loan Agreement; (d) SCC Palmdale Loan;

(e) Interim Loan Agreement; (f) SunCal Oak Knoll/SunCal Torrance Loan Agreement; (g) SunCal

Century City Loan Agreement; (h) SunCal PSV Loan Agreement; (i) SunCal Delta Coves Loan

Agreement; (j) SunCal Marblehead/SunCal Heartland Loan Agreement; (k) Sun Cal Oak Valley

Loan Agreement; (l) SunCal Northlake Loan Agreement; (m) Pacific Point First Loan Agreement;

and (n) Pacific Point Second Loan Agreement.

       2.1.77     <u>Lehman Representatives</u>.  The individuals that controlled the Lehman

Entities.

       2.1.78     <u>Lehman Successor(s)</u>.  Entities other than the Lehman Lenders that either

assert to be or are determined by the Bankruptcy Court to be the beneficial owner(s) of the

Lehman Disputed Loan(s), including, but not limited to Fenway Capital, Lehman Re and Danske

Bank.

       2.1.79     <u>Lehman's Disputed Claim(s)</u>.  All of the Proofs of Secured Claims filed

by a Lehman Lender or a Lehman Successor in the Debtors' Chapter 11 Cases arising from the

Lehman Disputed Loans and the Lehman Disputed Administrative Loans.

000029

MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.80    <u>Lehman's Disputed Lien(s)</u>.  All of the alleged liens relating to Proofs of Secured Claims filed by a Lehman Lender or a Lehman Successor in the Debtor's Chapter 11 Cases arising from the Lehman Disputed Loans.

2.1.81    <u>Lexon</u>.  Lexon Insurance Co.

2.1.82    <u>LitCo</u>.  A newly formed Delaware limited liability company that will be purchasing the claims and litigation rights held by the Reliance Claimants that choose Option A.

2.1.83    <u>Litigation Claims</u>.   Any and all interests of the Group I Debtors in any and all Claims, rights, causes of action, and objections or defenses to Claims, liens, rights, or causes of action which have been or may be commenced by the Group I Debtor(s), the Chapter 11 Trustee, or the Committee(s), as the case may be, including, but not limited to, any (i) Avoidance Actions; (ii) for turnover of property to the Group I Debtors' Estates and/or the Plan Trust; (iii) for the recovery of property or payment of money that belongs to the Debtors' Estates or the Plan Trust; (iv) the right to compensation in the form of damages, recoupment or setoff of the Debtors' Estates and/or the Plan Trust; (v) the Lehman Adversary Proceeding; (vi) the State Court Action, and (vii) any and all other Claims against Lehman's Disputed Claims and/or Disputed Liens referenced in the Plan or the Disclosure Statement.

2.1.84    <u>Litigation Recoveries</u>.  Any Cash or other property received by the Chapter 11 Trustee, the Group I Debtors, the Committees and/or the Plan Trust, as the case may be, from all or any portion of a Litigation Claim(s), including, but not limited to, awards of damages, attorneys' fees and expenses, interest and punitive damages, whether recovered by way of settlement, execution on judgment or otherwise.

2.1.85    <u>Litigation Rights</u>. Any Claims held by a party other than the Group I Debtors that have not been fixed in a final judgment prior to the Effective Date.

2.1.86    <u>Marblehead Project</u>.  The Project owned by SunCal Marblehead, located in the City of San Clemente, California, as more particularly described herein.

2.1.87    <u>Maximum Distributions</u>.  A Distribution to a Holder of an Allowed General Unsecured Claim against a Group I Debtor equal to one hundred percent (100%) of the

1  amount of the Holder's Allowed General Unsecured Claim plus interest at the Legal Rate from

2  and as of the Group I Debtor's Petition Date.

3          2.1.88  <u>MB Firm</u>.  Miller Barondess, LLP.

4          2.1.89  <u>Mechanic Lien Claims</u>.  Mechanic Lien Claims arising pursuant to

5  California Civil Code §3110, et seq. that were either allegedly perfected prepetition or otherwise

6  allegedly satisfy the requirements of Bankruptcy Code 546(b).

7          2.1.90  <u>Minimum Increment</u>.  Minimum Increment means the following: a) <u>For

8  Sales of Projects</u>: One hundred percent of the preceding Qualifying Bid, plus any applicable

9  Break-Up Fee, plus two hundred and fifty-thousand dollars ($250,000); and b) For Sales of Other

10  Plan Trust Assets: One hundred percent (100%) of the preceding Qualifying Bid, plus any

11  applicable Break-Up Fee, plus five percent (5%) of the preceding Qualifying Bid.

12          2.1.91  <u>Net Litigation Recoveries</u>.  Litigation Recoveries less associated

13  Administrative Claims and Post-Confirmation Expenses incurred in connection with such

14  Litigation Recoveries.

15          2.1.92  <u>Net Sales Proceeds</u>.  The Cash generated from the sale(s) or liquidation

16  of the Group I Debtor(s)' Assets or the Plan Trust's Assets, less payment of selling expenses,

17  taxes, Chapter 11 Trustee fees, and any associated Post-Confirmation Expenses and

18  Administrative Claims incurred in furtherance of such sales or liquidation of such Assets.

19          2.1.93  <u>Net Sales Proceeds Account(s)</u>.  Separate account(s) that will be

20  established by the Plan Trustee at an FDIC insured bank into which all Net Sale Proceeds shall be

21  deposited from the sale of Assets that were allegedly encumbered by a Disputed Secured Claim(s)

22  and/or a Disputed Lien(s).  There shall be a separate Net Sales Proceeds Account for the Net Sale

23  Proceeds allegedly subject to each Disputed Secured Claim(s) and/or Disputed Lien(s), except

24  where there are two Disputed Liens on a single Project, in which case, there shall be a single

25  account for the proceeds generated from that Project.  The Disputed Secured Claim(s) and/or

26  Disputed Lien(s) shall attach to the corresponding Net Sales Proceeds Account(s) pending any

27  Final Order(s) of the Bankruptcy Court resolving the applicable Disputed Secured Claim(s) and/or

28  applicable Disputed Lien(s).  To the extent that a particular Disputed Claim is disallowed or a

-16-

particular Disputed Lien is avoided (other than transferred to the Estates pursuant to Bankruptcy

Code Section 510(c)(2)) or otherwise invalidated, such Net Sales Proceeds allegedly subject

thereto shall become Available Cash and shall be transferred to the applicable Distribution

Account(s). To the extent that a particular Disputed Secured Claim and a Disputed Lien are

allowed and deemed valid but subject to the equitable subordination causes of action in the

Lehman Adversary Proceeding, the funds shall remain in the Net Sales Accounts pending a Final

Order on the equitable subordination causes of action in the Lehman Adversary Proceeding.

       2.1.94    Opening Bid. Opening Bid means the first Qualifying Bid accepted by

the Debtor for any of the Plan Trust's Assets.

       2.1.95    Orders for Relief Date. The following are dates that orders for relief

were entered for each of the Trustee Debtors:

| SunCal Oak Valley | January 6, 2009 |
|---|---|
| SunCal Heartland | January 6, 2009 |
| SunCal Northlake | January 6, 2009 |
| SunCal Marblehead | January 6, 2009 |
| SunCal Century City | January 6, 2009 |
| SunCal PSV | January 6, 2009 |
| Delta Coves | January 6, 2009 |
| SunCal Torrance | January 6, 2009 |
| SunCal Oak Knoll | January 6, 2009 |

       2.1.96    Palmdale Hills. Palmdale Hills Property, a Delaware limited liability

company, a Voluntary Debtor herein, and the owner of the Ritter Ranch Project

       2.1.97    Palmdale Hills CFD Bonds. Certain CFD bonds issued by the City of

Palmdale, in the amount of approximately $33 million that are owned by Palmdale Hills.

       2.1.98    Palm Springs Village Project. The Project owned by SunCal PSV,

located in the City of Palm Springs, California, as more particularly described herein.

       2.1.99    Person. An individual, partnership, corporation, limited liability

company, business trust, joint stock company, trust, unincorporated association, joint venture,

governmental authority, governmental unit, committee or other entity of whatever nature.

000032
MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.100   <u>Petition Dates</u>.  The following are dates that each of the Voluntary Debtors filed their Voluntary Chapter 11 petitions or Creditors filed involuntary Chapter 11 petitions against the Trustee Debtors:

| Palmdale Hills | November 6, 2008 |
|---|---|
| SunCal Beaumont | November 6, 2008 |
| SCC Palmdale | November 7, 2008 |
| SunCal Johannson | November 7, 2008 |
| SunCal Summit Valley | November 7, 2008 |
| SunCal Emerald | November 7, 2008 |
| SunCal Bickford | November 7, 2008 |
| Acton Estates | November 7, 2008 |
| Seven Brothers | November 7, 2008 |
| SJD Partners. | November 7, 2008 |
| SJD Development | November 7, 2008 |
| Kirby Estates | November 7, 2008 |
| SunCal I | November 7, 2008 |
| SunCal III | November 7, 2008 |
| SCC Communities | November 19, 2008 |
| Del Rio | November 19, 2008 |
| Tesoro | November 19, 2008 |
| Delta Coves Ventures, LLC | November 14, 2008 |
| SunCal Heartland, LLC | November 12, 2008 |
| SunCal Marblehead, LLC | November 12, 2008 |
| LB-L-SunCal Northlake, LLC | November 12, 2008 |
| LB-L-SunCal Oak Valley, LLC | November 12, 2008 |
| SunCal Century City, LLC | November 14, 2008 |
| SunCal PSV, LLC | November 14, 2008 |
| SunCal Torrance Properties, LLC | November 14, 2008 |
| SunCal Oak Knoll, LLC | November 19, 2008 |

2.1.101   <u>Plan</u>.  This Chapter 11 Plan together with the Exhibits thereto, as the same may be amended or modified from time to time in accordance with the Plan.

2.1.102   <u>Plan Documents</u>.  The Plan, the Plan Trust Agreement and all other documents attached to the Plan Supplement.

2.1.103   <u>Plan Period</u>. The period from the Effective Date to the Plan Termination Date.

2.1.104   <u>Plan Supplement</u>. The compilation of the Plan Documents to be filed with the Bankruptcy Court.

000033
MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.105    Plan Termination Date. The fifth (5th) anniversary date of the Effective Date, unless the Plan elects and earlier date.

2.1.106    Plan Sponsor.  The entity that has committed to cause the funding of certain specified obligations under the Plan on or after the Effective Date.  The Plan Sponsor is Acquisitions.

2.1.107    Plan Trust.  A liquidating trust to be established prior to or on the Effective Date, with Acquisitions as the Plan Trustee and the Holders of Allowed Claims against the Debtors as the beneficiaries.  The purpose of the Plan Trust will be to liquidate the Debtors' Assets and to otherwise consummate the Plan.

2.1.108    Plan Trustee. The Plan Trustee under the Plan Trust Agreement is Acquisitions.

2.1.109    Plan Trust Agreement. The liquidating trust agreement governing the affairs of the Plan Trust, which will be in substantially the form contained in the Plan Supplement.

2.1.110    Plan Trust Beneficiaries. The Plan Trust Beneficiaries are (i) the holders of Beneficial Interests, as of any point in time, and (ii) holders of Allowed Claims that shall be satisfied from Plan Trust Property in accordance with the terms of the Plan.

2.1.111    Plan Trust Property. Plan Trust Property means all property within the Chapter 11 estates of the Group I Debtors, other than property that is affirmatively excluded by the Plan Trustee.

2.1.112    Post-Confirmation Expenses.  The fees and expenses incurred by the Plan Sponsor, the Plan Trustee and the Committee(s) and their professionals following the Confirmation Date (including the fees and costs of Professionals) for the purpose of (i) prosecuting and liquidating the Litigation Claims; (ii) objecting to and resolving Disputed Claims and Disputed Liens; (iii) selling or otherwise liquidating the Plan Trust's Assets; (iv) effectuating Distributions under the Plan; and (v) otherwise consummating the Plan and closing the Group I Debtors' Chapter 11 Cases.

2.1.113    Priority Claim.  Any Claim, other than an Administrative Claim or a Tax Claim, to the extent entitled to priority under Section 507(a) of the Bankruptcy Code.

000034
MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.114  <u>Pro Rata</u>.  Proportionately, so that with respect to any distribution in respect of any Allowed Claim, the ratio of (a)(i) the amount of property distributed on account of such Allowed Claim to (ii) the amount of such Allowed Claim, is the same as the ratio of (b)(i) the amount of property distributed on account of all Allowed Claims of the Class or Classes sharing in such distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

2.1.115  <u>Professional</u>.  A Person or Entity (a) employed by the Group I Debtors, the Committees pursuant to a Final Order in accordance with Sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to Sections 327, 328, 3291 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code.

2.1.116  <u>Professional Fees</u>.  All Allowed Claims for compensation and for reimbursement of expenses under Sections 328, 330 and/or 503(b) of the Bankruptcy Code

2.1.117  <u>Projects</u>.  The Debtors' residential real estate development projects and other assets as separately defined herein and described in Exhibit "1" to the Disclosure Statement.

2.1.118  <u>Reliance Claim</u>. An Allowed Unsecured Claim against a Group I Debtor that would entitle the holder thereof to be the beneficiary of any equitable subordination judgment obtained against a Lehman Entity by such Group I Debtor, or that would entitled the holder thereof to receive a share of any Claim Objection Reduction Amount obtained by the Debtor through a Lehman Claim Objection, before other holders of Allowed Unsecured Claims could participate in this recovery amount.

2.1.119  <u>Reliance Claimant</u>. The holder of a Reliance Claim. A list of the Reliance Claims and Reliance Claimants is attached hereto as Exhibit "1".

2.1.120  <u>Qualifying Bid</u>.  Qualifying Bid means, with respect to a bid on a Project, a bid made by Qualifying Bidder that exceeds the immediately preceding Qualifying Bid by the Minimum Increment.

2.1.121  <u>Qualifying Bidder</u>.  Qualifying Bidder means a bidder who has provided the Plan Trustee, in the case of a bid for a Project, a deposit equal to two hundred and fifty

000035
MAINDOCS-#160302-v1-Plan_Group_I.DOC

1    thousand dollars ($250,000) and who has provided the Plan Trustee evidence confirming that the

2    bidder has the financial means to acquire the Plan Trust Asset being offered for sale. In the case of

3    a bid for an Asset owned by the Plan Trust, other than a Group I Project,  a Qualifying Bidder

4    means a bidder who provides cash deposit equal to ten percent of the value of the Assets being

5    offered for sale and evidence confirming the bidder' s ability to timely pay the remainder of the

6    purchase price.

7            2.1.122   <u>Ritter Ranch Loan Agreement</u>.  That certain Credit Agreement, dated as

8    of February 8, 2007, by and among Palmdale Hills, as borrower, LCPI, as administrative agent

9    and lender, pursuant to which LCPI made a loan in the maximum aggregate principal amount of

10   approximately $264,000,000.  The Ritter Ranch Loan Agreement is allegedly secured by a first-

11   priority deed of trust on all real and personal property owned by Palmdale Hills.  The Ritter Ranch

12   Loan Agreement has an asserted balance due of $287,252,096.31 as of March 30, 2009.

13           2.1.123   <u>Ritter Ranch Project</u>.  The Project owned by Palmdale Hills, located in

14   the City of Palmdale, California, as more particularly described herein.

15           2.1.124   <u>Sale Period</u>.  The Sale Period is the time period that the Plan Trustee is

16   provided under the Plan to consummate a sale or liquidation of the Plan Trust' s Assets subject to

17   the Lehman Disputed Claims(s) and/or the Lehman Disputed Lien(s).  The Sales Period shall

18   commence on the Confirmation Date and shall expire sixty days after the Effective Date.

19           2.1.125   <u>SCC LLC</u>.  SCC Acquisitions LLC, a limited liability company, a

20   subsidiary of Acquisitions and an indirect and/or a direct parent company of all of the Debtors.

21           2.1.126   <u>Schedules</u>.  The schedules of assets and liabilities and list of equity

22   security holders Filed by the Group Debtors, as required by Section 521(1) of the Bankruptcy

23   Code, Bankruptcy Rules 1007(a)(3) and (b)(1), and Official Bankruptcy Form No. 6, as amended

24   from time to time.

25           2.1.127   <u>Secured Claim</u>.  Any Claim, including interest, fees, costs, and charges to

26   the extent allowable pursuant to Bankruptcy Code Section 506, that is secured by a valid and

27   unavoidable Lien on the Group I Debtor(s)' Assets.

28

000036
MAINDOCS-#160302-v1-Plan_Group_I.DOC

2.1.128    <u>Stalking Horse Bidder</u>.  Stalking Horse Bidder means the Qualifying Bidder who submits the Opening Bid for any of the Plan Trust's Assets.

2.1.129    <u>State Court Action</u>. The action filed by certain Voluntary Debtors against Lehman Ali, Inc., and certain other defendants, in California Superior Court for the County of Orange (Case No. 30-2011-0040847-CU-BC-CJC).

2.1.130    <u>SunCal</u>.  The SunCal Companies, a trade name for Acquisitions and its Affiliates.

2.1.131    <u>SunCal Bickford</u>.  SunCal Bickford Ranch, LLC, a Delaware limited liability company, a Voluntary Debtor herein, and the owner of the Bickford Ranch Project.

2.1.132    <u>SunCal Management</u>.  SunCal Management, LLC, a Delaware limited liability company, and the property manager for the Projects.

2.1.133    <u>SunCal Marblehead</u>. SunCal Marblehead, LLC, a Delaware limited liability company, a Trustee Debtor (a Group I Debtor), and the owner of the Marblehead Project.

2.1.134    <u>SunCal Marblehead/SunCal Heartland Loan Agreement</u>.  That certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and among SunCal Marblehead Heartland Master LLC, SunCal Marblehead, and SunCal Heartland, as borrowers, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $316,061,300.  The SunCal Marblehead/SunCal Heartland Loan Agreement is allegedly secured by first-priority deeds of trust on the Marblehead and the Heartland Projects. The SunCal Marblehead/SunCal Heartland Loan Agreement has an alleged balance due of $354,325,126.15 as of March 30, 2009. The proofs of claim filed with respect to this loan agreement are the subject of the Lehman Adversary Proceeding and the Lehman Claim Objections.

2.1.135    <u>SunCal Plan Proponent(s)</u>.  The Voluntary Debtors and Acquisitions as the parties-in-interest that are proposing the Plan.

2.1.136    <u>SunCal PSV</u>. SunCal PSV, LLC, a Delaware limited liability company, a Trustee Debtor (a Group I Debtor), and the owner of the Palm Springs Village Project.

2.1.137   <u>SunCal PSV Loan Agreement</u>.  That certain Term Loan and Revolving Line of Credit Loan Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI, as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $90 million.  The SunCal PSV Loan Agreement is allegedly secured by a first-priority deed of trust on the Palm Springs Village Project.  The SunCal PSV Loan Agreement has an alleged balance due of $88,257,340.20 as of March 30, 2009.

2.1.138   <u>Tax</u>.  Any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax.  "Tax" shall include any interest or additions attributable to, or imposed on or with respect to such assessments.

2.1.139   <u>Tax Claim</u>.  Any Claim for any Tax to the extent that it is entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

2.1.140   <u>Trustee Debtor(s)</u>. The following Debtors, individually or collectively, that are represented by the Chapter 11 Trustee: Delta Coves, SunCal Heartland, SunCal Marblehead, SunCal Northlake, SunCal Oak Valley , SunCal Century City, SunCal PSV, SunCal Torrance, and SunCal Oak Knoll.

2.1.141   <u>Trustee Debtors' Committee</u>.  The Official Committee of Unsecured Creditors of the Trustee Debtors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

2.1.142   <u>Unpaid Secured Real Property Tax Claims</u>.  Secured Claims held by various government entities secured by liens on the underlying real properties owned by the Debtors but that are non-recourse to the Debtors.

2.1.143   <u>Voluntary Debtor(s)</u>.  The following  Chapter 11 debtors and debtors-in-possession, individually or collectively, Palmdale Hills, SunCal I, SunCal III, SCC Palmdale, Acton Estates, SunCal Beaumont, SunCal Emerald, SunCal Johansson, SunCal Bickford, SunCal

000038
MAINDOCS-#160302-v1-Plan_Group_I.DOC

Summit, Seven Brothers, Kirby Estates, SJD Partners, SJD Development, SCC Communities, Del
Rio and Tesoro.

   2.1.144 <u>Voluntary Debtors' Committee</u>.  The Official Committee of Unsecured
Creditors of the Voluntary Debtors appointed in the Cases pursuant to Section 1102 of the
Bankruptcy Code.

   2.1.145

## 2.2 **Rules of Construction.**

   For purposes of the Plan and this Disclosure Statement, unless otherwise provided herein
or in the Plan, (a) whenever from the context it is appropriate, each term, whether stated in the
singular or the plural, will include both the singular and the plural; (b) each pronoun stated in the
masculine, feminine or neuter includes the masculine, feminine and neuter; (c) any reference in
the Plan or this Disclosure Statement to an existing document or schedule filed or to be filed
means such document or schedule, as it may have been or may be amended, modified or
supplemented pursuant to the Plan; (d) any reference to an entity as a Holder of a Claim or Interest
includes that entity's successors and assigns; (e) except as otherwise indicated herein all
references in the Plan or this Disclosure Statement to Sections, Articles and Exhibits are
references to Sections, Articles and Exhibits of or to the Plan; (f) the words "therein,"
"thereunder" and "thereto" refer to the Plan in its entirety rather than to a particular portion of the
Plan; and (g) unless otherwise provided in the Plan or this Disclosure Statement, any reference in
the Plan or this Disclosure Statement to a contract, instrument, release, indenture, agreement, or
other document being in a particular form or on particular terms and conditions means that such
document shall be substantially and materially in such form or substantially and materially on
such terms and conditions; (h) any reference in the Plan or this Disclosure Statement to a
document, schedule, or exhibit to the Plan or Disclosure Statement Filed or to be Filed means such
document, schedule, or exhibit, as it may have been or may be amended, modified, or
supplemented; and (i) the rules of construction set forth in Section 102 of the Bankruptcy Code
shall apply to the extent such rules are not inconsistent with the express terms of the Plan or this
Disclosure Statement or any other provision in this Section 3.2.

000039
MAINDOCS-#160302-v1-Plan_Group_I.DOC

09-18555-mg  Doc 17497-1  Filed 06/08/11  Entered 06/08/11 17:43:49  Exhibits
Pg 35 of 216

2.3    **Exhibits.**

All Exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full therein.

MAINDOCS-#160302-v1-Plan_Group_I.DOC

## III

## **TREATMENT OF UNCLASSIFIED CLAIMS**

**3.1**     **Introduction**.

As required by the Bankruptcy Code, the Plan places Claims and Interests into various Classes according to their right to priority.  However, certain types of Claims are not classified in any Classes under the Plan.  These Claims are deemed "unclassified" under the provisions of the Code.  They are not considered impaired and they do not vote on the Plan, because they are automatically entitled to specific treatment provided for them in the Code.  As such, the SunCal Plan Proponents have not placed the following Claims in a Class.  The treatment of these unclassified Claims is as provided below.

**3.2**     **Treatment of Allowed Administrative Claims**.

The Code requires that all Allowed Administrative Claims be paid on the later of Effective Date of the Plan or the date of their allowance, unless a particular Holder agrees to a different treatment.  The treatment of Allowed Administrative Claims is as described below.  However, such Administrative Claims are continuing to be incurred.  The Allowed Administrative Claims shall be paid from the applicable Distribution Account(s) pursuant to the Acquisitions Administrative Loan.

**3.3**     **Treatment and Repayment of the Lehman's Administrative Loan(s)**.

Subject to any potential rulings on the Lehman Claim Objections and the Lehman Adversary Proceeding, the Lehman's Administrative Loans, which are disputed, shall continue to have a first priority lien against the respective Assets securing such loans and the applicable Net Sale Proceeds Account. The Lehman Disputed Administrative Loans shall be payable from the applicable Net Sales Proceeds Accounts and from the Distribution Accounts of the Debtors that were the borrowers under the terms of the Lehman Disputed Administrative Loan(s) to the extent and amount that such borrower received loan proceeds, on the later of the Effective Date, or the date that they are Allowed.  In the event that the Plan Trust has not repaid such loan(s) on the later of the Effective date, or the date they are Allowed,, the Holders of the Lehman Disputed

1   Administrative Loan(s) shall be free to pursue their rights and remedies against the Assets

2   securing the Lehman Administrative Loans under applicable law.

3       **3.4    Repayment of Allowed Administrative Claims Other than the Lehman**

4           **Administrative Loans.**

5       Except to the extent that the Holder of an Allowed Administrative Claim agrees to a

6   different treatment and subject to the Administrative Claims Bar Date set forth herein, the

7   Distribution Agent shall pay each Allowed Administrative Claim in full, in Cash, on the later of

8   (i) the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Claim

9   becomes an Allowed Administrative Claim, or (iii) the date such Allowed Administrative Claim

10  becomes due according to its terms. Notwithstanding the foregoing, any Allowed Administrative

11  Claim representing obligations incurred in the ordinary course of post-petition business by the

12  Debtors in Possession (including without limitation post-petition trade obligations and routine

13  post-petition payroll obligations) shall be paid in full or performed by the Plan Trustee in the

14  ordinary course of business, in accordance with the terms of the particular obligation.

15      **3.5    Administrative Claims Bar Date.**

16      All applications for final compensation of Professionals for services rendered and for

17  reimbursement of expenses incurred on or before the Effective Date and all other requests for

18  payment of Administrative Claims incurred before the Effective Date under Sections 507(a)(2)

19  or 507(b) of the Bankruptcy Code (except only for (i) post-petition, ordinary course trade

20  obligations and routine post-petition payroll obligations incurred in the ordinary course of the

21  Debtors' post-petition business, for which no bar date shall apply, and (ii) post-petition tax

22  obligations, for which no bar date shall apply) shall be Filed with the Bankruptcy Court and

23  served upon the Plan Trustee no later than the General Administrative Claims Bar Date, unless

24  such date is extended by the Bankruptcy Court after notice to the Plan Trustee.  Any such request

25  for payment of an Administrative Claim that is subject to the General Administrative Claims Bar

26  Date and that is not Filed and served on or before the Administrative Claims Bar Date shall be

27  forever barred; any party that seeks payment of Administrative Claims that (i) is required to file a

28  request for payment of such Administrative Claims and (ii) does not file such a request by the

1  deadline established herein shall be forever barred from asserting such Administrative Claims

2  against the Debtors, the Plan Trust, their estates, or any of their property.

3       **3.6      Treatment of Priority Unsecured Tax Claims.**

4       Priority Tax Claims are certain unsecured income, employment and other taxes described

5  by Code Section 507(a)(8).  The Code requires that each holder of such a Section 507(a)(8)

6  priority tax claim receive the present value of such Claim in deferred cash payments, over a period

7  not exceeding five (5) years from the petition date and that such treatment not be less favorable

8  than the treatment accorded to non-priority unsecured creditors.

9       At the election of the Plan Trustee, the Holder of each Allowed Priority Tax Claim shall be

10  entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of

11  each three-month period following the Effective Date, during a period not to exceed five years

12  after November 6, 2008, totaling the principal amount of such Claim plus simple interest on any

13  unpaid balance from the Effective Date, calculated at the interest rate available on ninety (90) day

14  United States Treasuries on the Effective Date, (ii) such other treatment agreed to by the Holder of

15  the Allowed Priority Tax Claim and the Plan Trustee, provided such treatment is on more

16  favorable terms to the Debtors (or the Plan Trust after the Effective Date) than the treatment set

17  forth in clause (i) hereof, or (iii) payment of the full Allowed Priority Tax Claim in Cash.

18                                    **IV**.

19                **CLASSIFICATION OF CLAIMS AND INTERESTS**

20       The table below lists the Classes of Claims established under the Plan and states whether

21  each particular Class is impaired or left unimpaired by the Plan.  A Class is "unimpaired" if the

22  Plan leaves unaltered the legal, equitable and contractual rights to which the Holders of Claims or

23  Interests in the Class are entitled, with certain exceptions specified in the Bankruptcy Code.

24

25

26

27

28

000043
MAINDOCS-#160302-v1-Plan_Group_I.DOC

| CLASSIFICATION OF HOLDERS OF SECURED REAL PROPERTY TAX CLAIMS | | |
|---|---|---|
| **Class 1** | **Claimant** | **Claim Nos.**[3] |
| **Class 1.1** | Los Angeles County as the Holder of an Unpaid Secured Real Property Tax Claim against the Ritter Ranch Project in the amount of $4,755,857. | Palmdale Hills 12 |
| **Class 1.2** | Placer County as the Holder of an Unpaid Secured Real Property Tax Claim against the Bickford Ranch Project in the amount of $9,467,165. | Scheduled Amount |
| **Class 1.3** | Orange County as the Holder of an Unpaid Secured Real Property Tax Claim against the Marblehead Project in the amount of $2,500,646. | SunCal Marblehead 49 and 57 |
| **Class 1.4** | San Bernardino County as the Holder of an Unpaid Secured Real Property Tax Claim against the Palm Springs Village Project in the amount of $1,725,166. | SunCal PSV 22 |

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.1** | The Holders of Lehman's Disputed Claims filed by LCPI against SunCal Bickford arising from the SunCal Communities I Loan Agreement in the asserted amount of $343,221,391. | SunCal Bickford: 16 |
| **Class 2.2** | The Holder of Lehman's Disputed Claims filed by LCPI against Palmdale Hills arising from the Ritter Ranch Loan Agreement in the asserted amount of $287,252,096. | Palmdale Hills 65 |
| **Class 2.3** | The Holder of Lehman's Disputed Claims filed by Lehman ALI against SunCal Marblehead and SunCal Heartland arising from the SunCal Marblehead/SunCal Heartland Loan Agreement in the asserted amount of $354,325,126. | SunCal Heartland: 9 SunCal Marblehead: 21 |

---

[3] These Real Property Tax Claims have been updated to include amounts for which proofs of claim have not yet been filed.

| CLASSIFICATION OF LEHMAN'S DISPUTED CLAIMS | | |
|---|---|---|
| **Class 2** | **Claims** | **Claim Nos.** |
| **Class 2.4** | The Holder of Lehman's Disputed Claim filed by Lehman ALI against SunCal PSV arising from the SunCal PSV Loan Agreement in the asserted amount of $88,257,340. | SunCal PSV 12 |

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.1** | The Holder of the asserted Mechanic Lien Claim held by Asphalt Professionals against the Ritter Ranch Project owned by Palmdale Hills in the amount of $38,249. | Palmdale Hills 1 and 46 |
| **Class 3.2** | The Holder of the asserted Mechanic Lien Claim held by Sierra Cascade Construction against the Ritter Ranch Project owned by Palmdale Hills in the amount of $550,677. | Palmdale Hills 33 |
| **Class 3.3** | The Holder of the asserted Mechanic Lien Claim held by Staats Construction. Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $166,105. | Palmdale Hills 51 |
| **Class 3.4** | The Holder of the asserted Mechanic Lien Claim held by Southland Farmers, Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $177,801. | Palmdale Hills 55, 67 and 68 |
| **Class 3.5** | The Holder of the asserted Mechanic Lien Claim held by Chamelon Design Inc. against the Ritter Ranch Project owned by Palmdale Hills in the amount of $60,920. | Palmdale Hills 93, 99 |
| **Class 3.6** | The Holder of the asserted Mechanic Lien Claim held by MHM Engineers against the Bickford Ranch Project in the amount of $8,916. | SunCal Bickford 5 |

-30-

MAINDOCS-#160302-v1-Plan_Group_I.DOC

**CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT**

| Class 3 | Claimant | Claim Nos. |
|---------|----------|------------|
| Class 3.7 | The Holder of the asserted Mechanic Lien Claim held by Land Architecture against the Bickford Ranch Project in the amount of $100,245. | SunCal Bickford 6 |
| Class 3.8 | The Holder of the asserted Mechanic Lien Claim held by Kiewit Pacific Co. against the Bickford Ranch Project in the amount of $1,868,357. | SunCal Bickford 10 |
| Class 3.9 | The Holder of the asserted Mechanic Lien Claim held by ARB, Inc. against the Bickford Ranch Project in the amount of $1,052,272. | SunCal Bickford 15 |
| Class 3.10 | The Holder of the asserted Mechanic Lien Claim held by Independent Construction against the Bickford Ranch Project in the amount of $117,209. | SunCal Bickford 28 |
| Class 3.11 | The Holder of the asserted Mechanic Lien Claim held by Marques Pipeline, Inc. against the Bickford Ranch Project in the amount of $330,118. | SunCal Bickford 29 and 30 |
| Class 3.12 | The Holder of the asserted Mechanic Lien Claim held by The Jasper Companies against the Marblehead Project in the amount of $146,657. | SunCal Marblehead 29 |
| Class 3.13 | The Holder of the asserted Mechanic Lien Claim held by Kirk Negrete, Inc. dba United Steel Placers against the Marblehead Project in the amount of $270,056. | SunCal Marblehead 38 |
| Class 3.14 | The Holder of the asserted Mechanic Lien Claim held by RBF Consulting against the Marblehead Project in the amount of $125,093. | SunCal Marblehead 39 |
| Class 3.15 | The Holder of the asserted Mechanic Lien Claim held by RJ Noble Co. against the Marblehead Project in the amount of $175,030. | SunCal Marblehead 42, 50 and 58 |
| Class 3.16 | The Holder of the asserted Mechanic Lien Claim held by Orange County Stripping Services against the Marblehead Project in the amount of $11,752. | SunCal Marblehead 46 and 54 |

000046
MAINDOCS-#160302-v1-Plan_Group_I.DOC

| CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.17** | The Holder of the asserted Mechanic Lien Claim held by Savala Equipment Co. Inc. against the Marblehead Project in the amount of $34,440. | SunCal Marblehead 48 and 56 |
| **Class 3.18** | The Holder of the asserted Mechanic Lien Claim held by All American Asphalt against the Marblehead Project in the amount of $1,344,445. | SunCal Marblehead 63 |
| **Class 3.19** | The Holder of the asserted Mechanic Lien Claim held by Rockey Murata Landscaping against the Marblehead Project in the amount of $285,643. | SunCal Marblehead 60 |
| **Class 3.20** | The Holder of the asserted Mechanic Lien Claim held by BNB Engineering, Inc. against the Marblehead Project in the amount of $1,608,723. | SunCal Marblehead 37 |
| **Class 3.21** | The Holder of the asserted Mechanic Lien Claim held by Brudvik Inc. against the Palm Springs Village Project in the amount of $43,365. | SunCal PSV 4 |
| **Class 3.22** | The Holder of the asserted Mechanic Lien Claim held by Larry Jacinto Construction Inc. against the Palm Springs Village Project in the amount of $212,663. | SunCal PSV 5 and 24 |
| **Class 3.23** | The Holder of the asserted Mechanic Lien Claim held by William + Paddon Architects + Planners Inc. against the Palm Springs Village Project in the amount of $73,798. | SunCal PSV 9 and 10 |
| **Class 3.24** | The Holder of the asserted Mechanic Lien Claim held by Southern California Edison against the Palm Springs Village Project in the amount of $23,861. | SunCal PSV 26 |
| **Class 3.25** | The Holder of the asserted Mechanic Lien Claim held by Pacific Masonry Walls, Inc. against the Palm Springs Village Project in the amount of $314,061. | SunCal PSV 33 and 39 |

000047
MAINDOCS-#160302-v1-Plan_Group_I.DOC

| **CLASSIFICATION OF ASSERTED MECHANIC LIEN CLAIMS ON THE RITTER RANCH PROJECT, THE BICKFORD RANCH PROJECT, THE MARBLEHEAD PROJECT AND THE PALM SPRINGS VILLAGE PROJECT** | | |
|---|---|---|
| **Class 3** | **Claimant** | **Claim Nos.** |
| **Class 3.26** | The Holder of the asserted Mechanic Lien Claim held by J.R. Simplot Company against the Palm Springs Village Project in the amount of $3,467. | SunCal PSV 34 and 40 |
| **Class 3.27** | The Holder of the asserted Mechanic Lien Claim held by Desert Pipeline Inc. against the Palm Springs Village Project in the amount of $469,784. | SunCal PSV 36, 42 and 47 |
| **Class 3.28** | The Holder of the asserted Mechanic Lien Claim held by MSA Consulting against the Palm Springs Village Project in the amount of $666,897. | SunCal PSV 43 |
| **Class 3.29** | The Holder of the asserted Mechanic Lien Claim held by Jackson DeMarco against the Palm Springs Village Project in the amount of $52,234. | SunCal PSV 45 |

| **CLASSIFICATION OF PRIORITY UNSECURED CLAIMS** | | |
|---|---|---|
| **Class 4** | **Claimant** | **Claim Nos.** |
| **Class 4.1** | The Holder of Priority Claims that fall within Code Sections 507(a)(2), (4), (5), (6), and (7) in the asserted amount of $10,950 against SunCal Marblehead. | Scheduled Amount and SunCal Marblehead 45 |
| **Class 4.2** | The Holder of Priority Claims that fall within Code Sections 507(a)(4), (5), (6), and (7) in the asserted amount of $10,950 against Palmdale Hills. | Palmdale Hills 70 |

| **CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS** | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.1** | The holders of Reliance Claims against SunCal Palmdale Hills. | Various Filed and Scheduled |

000048

MAINDOCS-#160302-v1-Plan_Group_I.DOC

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class 5** | **Claimant** | **Claim Nos.** |
| **Class 5.2** | The holders of Reliance Claims against SunCal Marblehead. | Various Filed and Scheduled |
| **Class 5. 3** | The holders of Reliance Claims against SunCal PSV. | Various Filed and Scheduled |
| **Class 5.4** | The holders of Reliance Claims against SunCal Bickford. | Various Filed and Scheduled |

| CLASSIFICATION OF GENERAL UNSECURED CLAIMS THAT DO NOT QUALIFY AS RELIANCE CLAIMS | | |
|---|---|---|
| **Class 6** | **Claimant** | **Claim Nos.** |
| **Class 6.1** | Claimants holding Allowed Unsecured Claims against SunCal Palmdale Hills that are not Reliance Claims | Various Filed and Scheduled |
| **Class 6.2** | Claimants holding Allowed Unsecured Claims against SunCal Marblehead that are not Reliance | Various Filed and Scheduled |
| **Class 6.3** | Claimants holding Allowed Unsecured Claims against SunCal PSV that are not Reliance Claims | Various Filed and Scheduled |
| **Class 6.4** | Claimants holding Allowed Unsecured Claims against SunCal Bickford that are not Reliance Claims | Various Filed and Scheduled |

| CLASSIFICATION OF INTEREST HOLDERS | | |
|---|---|---|
| **Class 7** | **Claimant** | **Scheduled** |
| **Class 7.1** | Allowed Interests in Palmdale Hills held by SCC Palmdale. | Scheduled Amount |
| **Class 7.2** | Allowed Interests in SunCal Marblehead held by SunCal Marblehead Heartland Master LLC. | Scheduled Amount |
| **Class 7.3** | Allowed Interests in SunCal Bickford held by SunCal I. | Scheduled Amount |

-34-

## V.

## THE PLAN'S TREATMENT OF CLASSIFIED CLAIMS AND

## INTERESTS ON AND AFTER THE EFFECTIVE DATE

**5.1.** **The Plan's Treatment of Holders of Allowed Secured Real Property Tax Claims on Real Properties Subject to Deeds of Trust Arising from Lehman's Disputed Secured Claims and Disputed Liens (Classes 1.1 Through 1. 4).**

The rights of the Holders of Allowed Secured Claims in Classes 1.1 through 1. 4 are impaired under  the Plan. Their treatment is as follows:

A.  The Holder(s) shall retain their underlying first priority liens on the applicable real property collateral, but they are barred from pursuing their rights and remedies against this collateral until the expiration of the applicable Sales Period;

B.  If the Plan Trustee is able to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, such Holder(s) shall receive a distribution to the extent of available Net Sale Proceeds from its underlying real property collateral in accordance with the priorities set forth in the Bankruptcy Code and under applicable California law; such distribution shall include accrued interest on such Allowed Claims pursuant to Sections 506 and 511 of the Bankruptcy Code and California Revenue and Tax Code Sections 4102 and 4103(b); and

C.  If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the applicable Sales Period, the Holder(s) shall be free to pursue their respective rights and remedies against the underlying real property collateral under applicable California law, but shall have no recourse against the Plan Trust or Plan Trustee.

**5.2.** **The Plan's Treatment of Lehman's Disputed Claim(s) and Disputed Lien(s) (Classes 2.1 Through 2.4).**

The rights of the Holders of Allowed Secured Claims in Classes 2.1 through 2.4 are impaired under  the Plan. They shall receive the indubitable equivalent of their Allowed Claims, pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii), through the following treatment:

A.  <u>Treatment of Claims Secured By Assets That Are Sold On Effective Date</u>. The Plan Trustee shall proceed with sale of the Group I Projects and the other Assets under the following terms and conditions after the Confirmation Date. If this sale effort is successful and Qualified Bids are received that will result in a closing on the Effective Date, then the following treatment shall apply to Classes 2.1 through 2.4:

1.  The Holder(s) shall retain their interest in their Disputed Lien(s) on the applicable Plan Trust's Assets pending a Final Order(s) resolving the Allowance of the applicable Disputed Claim(s) and determining the validity, priority and extent of the applicable Disputed Lien(s) against the applicable Plan Trust's Assets, except as provided for below;

2.  The Holder(s) shall be barred from pursuing their rights and remedies against the Plan Trust's Assets until the expiration of the Sales Period;

3.  The Plan Trustee shall sell the Group I Projects that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

(a)  The Group I Projects will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least sixty (60) days duration;

(b)  The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder a Break-Up Fee;

(c)  Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum Increment;

(d)  The Qualified Bidder that submits the highest Qualifying Bid shall obtain title to the Group I Project being sold, free and clear of all applicable Disputed Liens and Disputed Claims; and

(e)  No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

-36-

4. The Plan Trustee shall sell all Plan Trust Assets ( other than the Group I Debtors Projects) that are subject to the Holder(s)' Disputed Secured Claims and Disputed Liens, free and clear of such claims and liens, through a sale that satisfies the following conditions:

(a) All other Plan Trust Assets will be sold through a public auction after a commercially reasonable marketing and advertising effort of at least thirty (30) days duration;

(b) The SunCal Plan Proponents shall have the right to provisionally accept an Opening Bid from a Stalking Horse Bidder prior to the public auction and to grant this bidder a Break-Up Fee;

(c) Other Qualified Bidders shall have the right to overbid the Opening Bid by submitting a Qualifying Bid that is equal to or in excess of the Minimum Increment;

(d) The Qualified Bidder that submits the highest Qualifying Bid shall obtain title to the Project being sold, free and clear of all applicable Disputed Liens and Disputed Claims; and

(e) No bidder may submit or demand the acceptance of a "credit bid" based upon an existing claim or lien.

(f) All Net Sale Proceeds generated from such sales shall be deposited into the applicable Net Sales Proceeds Account with all Disputed Claims and Disputed Liens attached thereto;

5. If the Plan Trustee consummates a sale or otherwise liquidates the particular Asset(s) subject to a Disputed Claim(s) and/or Disputed Lien(s) during the Sales Period, as provided for above, the Holder(s) of such Disputed Claim shall receive a distribution to the extent of available funds from the applicable Net Sale Proceeds Account(s) to the extent required by a Final Order determining the allowance and priority of the Disputed Claims and the validity, priority and extent of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections; and

000052
MAINDOCS-#160302-v1-Plan_Group_I.DOC

B. <u>Treatment of Claims Secured By Assets That Are Not Sold Prior To Effective Date</u>. If the Plan Trustee is unable to consummate a sale or otherwise liquidate the particular Asset(s) subject to a Lehman Disputed Claim during the Sales Period, then the following treatment shall apply in the case of unsold Projects:

1. The Plan Trust shall be granted a lien against any Project that is senior to any Disputed Lien held by any of the Lehman Entities. This lien shall secure any recoupment or offset amount allowed by the Court in favor of the Debtor that owned such Project, pursuant to a claim objection filed by such Debtor;

2. The foregoing lien shall only be imposed after the Effective Date, which by definition only occurs after any applicable stay protecting the Lehman Entities is lifted or deemed applicable;

3. The foregoing lien may be enforced after the Effective Date like any other judgment under the laws of the State of California.

All other unsold Asset(s) shall be deemed abandoned by the Plan Trust, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights and remedies against the underlying collateral under applicable law subject to a Final Order determining the allowance and priority of the Disputed Claims and the validity of the Disputed Liens in, including but not limited to, the Lehman Adversary Proceeding and the Lehman Claims Objections.

**5.3.** **The Plan's Treatment of Holders of Asserted Mechanic Lien Claims Against the Debtors' Projects Subject to Lehman's Disputed Claims (Classes 3.1 Through 3.29).**

The rights of the Holders of Allowed Secured Claims in Classes 3.1 through 3.29 are impaired under  the Plan. Their treatment shall be as follows:

A. The Holder(s)' rights are impaired under the Plan;

B. The Holder(s) shall retain their respective underlying liens on the applicable Projects, but shall forebear from pursuing their rights and remedies until the expiration of the Sales Period;

C.    If the Plan Trustee is able to consummate a sale of the Projects subject to the liens asserted by the Holders of Class 3.1 through 3.29 claims  during the Sales Period, such Holders shall receive a distribution, to the extent of available, Net Sale Proceeds in accordance with the priorities set forth under the Bankruptcy Code, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and the validity of the applicable Lehman Disputed Lien(s) in, including but not limited to, the Lehman Adversary Proceeding; and

D.    If the Plan Trustee is unable to consummate a sale of the applicable underlying real property collateral during the Sales Period, such real property collateral shall be deemed abandoned by the Plan Trustee, no payment shall be made to such Holder(s), and such Holder(s) shall be allowed to pursue their respective rights against the real property collateral under applicable California law, subject to a Final Order(s) resolving the allowance and priority of the applicable Lehman's Disputed Claim(s) and applicable Lehman Disputed Lien(s), without recourse to the Debtor (s).

**5.4.    The Plan's Treatment of Holders of Priority Claims (Classes 4.1 and 4.2)**.

The rights of the Holders of Allowed Claims in Classes 4.1 and 4.2 are impaired under  the Plan. Their treatment shall be as follows:

A.    The Holder(s) are unimpaired under the Plan; and

B.    The Holder(s) shall be paid either the applicable Distribution Account(s) (i) the full amount of such Allowed Priority Claim in Cash on the later of (x) the Effective Date, (y) the date such Claim becomes an Allowed Priority Claim or (z) the date such Allowed Priority Claim becomes payable in accordance with the terms governing such Allowed Priority Claim, or (ii) upon such other less favorable terms as may be agreed to by such Holder and the Plan Trustee.

**5.5.    The Plan's Treatment of Holders of General Unsecured Claims that are Reliance Claims (Classes 5.1 Through 5.4).**

The rights of the Holders of Allowed Claims in Classes 5.1 through 5.4 are impaired under the Plan. They shall be entitled to choose between the following treatment options:

000054
MAINDOCS-#160302-v1-Plan_Group_I.DOC

1.   Option A: Any Class 5 claimant *who votes in favor of the Plan*, and who chooses Option A, will have the right to sell to LitCo all of the claimant's right, title and interest in all Allowed Reliance Claims and all of the claimant's Litigation Rights against the applicable Debtor, SunCal Affiliates, and the Lehman Entities, for the sum of fifty-five cents ($0.55) per dollar of allowed claim, payable in cash on or before the sixtieth (60th) date after the Confirmation Date provided there is no stay pending an appeal of the Confirmation Order, in full satisfaction of such claimant's Allowed Reliance Claims; or

A.   Option B: Any Class 5 claimant who votes against the Plan, or who votes in favor of the Plan, but does not choose Option A, or who does not vote on the Plan, will retain such claimant's Reliance Claim(s) and rights against the Lehman Entities and to receive such claimant's share, as determined by the Court, in the benefits and recoveries resulting from a judgment or order entered in the Lehman Adversary Proceeding, the State Court Action, or the Lehman Claims Objections, and to receive a pro-rata share of any funds payable from the applicable Distribution Account(s), after payment in full of all Post Confirmation Expenses, Allowed Administrative Claims, and Allowed Priority Claims.

## 5.6.   The Plan's Treatment of Holders of Allowed General Unsecured Claims that Are Not Reliance Claims (Classes 6.1 Through 6.4).

The rights of the Holders of Allowed Claims in Classes 6.1 through 6.4 are impaired under the Plan. Their treatment shall be as follows:

A.   The Holders' rights are impaired under the Plan; and

B.   After payment in full of Post Confirmation Expenses, Allowed Administrative Claims, Allowed Priority Claims, and any sums that the Bankruptcy Court determines are payable to the Holders of Allowed Classes 5.1 through 5.4 Claims from either the Claim Reduction Amounts or on account of a judgment in the Lehman Adversary, the Holders of Allowed Classes 6.1 through 6.4 Claims shall receive their pro-rata share of funds remaining in the applicable Distribution Account(s).

## 5.7.   The Plan's Treatment of Holders of Allowed Interests.

000055
MAINDOCS-#160302-v1-Plan_Group_I.DOC

The rights of the Holders of Allowed Interests in Classes 7.1 through 7.3 are impaired under the Plan. On the Effective Date, all such Allowed Interest shall be cancelled and will not receive any distribution on account of such Interest(s).

## VI.

## ACCEPTANCE OR REJECTION OF THE PLAN

### 6.1.    Introduction.

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX.  The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing Claims.  The Debtors cannot represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm the Plan.  Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible.  The requirements described herein are not the only requirements for confirmation.

### 6.2.    Who May Object to Confirmation of the Plan.

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### 6.3.    Who May Vote to Accept/Reject the Plan.

A Holder of a Claim or Interest has a right to vote for or against the Plan if that Holder of the Claim or Interest has a Claim which is both (1) Allowed or Allowed for voting purposes and (2) Classified in an impaired Class.  The votes will be tabulated on a Debtor by Debtor basis.

### 6.4.    What Is an Allowed Claim/Interest.

-41-

As noted above, a Holder of Claim or Interest must first have an Allowed Claim or Allowed Interest to vote.

### 6.5. **What Is an Impaired Class**.

A Class is impaired if the Plan alters the legal, equitable, or contractual rights of the Claims or Interests in that Class, other than the right to accelerate the Claim upon certain kinds of defaults. In this case, the Debtors believe that all Classes, except for Classes 4.1 through 4.2, are impaired.

### 6.6. **Who Is Not Entitled to Vote**.

The following four types of Claims are <u>not</u> entitled to vote: (1) Claims that have been disallowed; (2) Claims in unimpaired Classes; (3) Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) or (a)(3) and Claims in Classes that do not receive or retain any value under the Plan. Claims in unimpaired Classes are not entitled to vote because such Classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(8) are not entitled to vote because such Claims are not placed in Classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in Classes that do not receive or retain any property under the Plan do not vote because such Classes are deemed to have rejected the Plan. The Debtors believe that all Classes are entitled to vote except Classes 4.1 and 4.2. These classes are not impaired under the Plan and consequently are not entitled to vote. They are conclusively deemed to have accepted the Plan. Classes 7.1 to 7.3 Interests are being cancelled under the Plan; accordingly these Interest Holders are deemed to have voted to reject the Plan.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 6.7. **Who Can Vote in More than One Class**.

A creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the Claim and another ballot for the Unsecured Claim. Also, a Creditor may

000057
MAINDOCS-#160302-v1-Plan_Group_I.DOC

1  otherwise hold Claims in more than one Class (such as a Holder of Senior Secured Claims and

2  Subordinated Note Claims), and may vote the Claims held in each Class.

3        **6.8.**   <u>**Votes Necessary for a Class to Accept the Plan.**</u>

4       A Class of Claims is deemed to have accepted the Plan when more than one-half (1/2) in

5  number and at least two-thirds (2/3) in dollar amount of the Claims *that actually voted*, vote to

6  accept the Plan.  A Class of interests is deemed to have accepted the Plan when Holders of at least

7  two-thirds (2/3) in amount of the interest-Holders of such Class which actually vote, vote to

8  accept the Plan.

9        **6.9.**   <u>**Treatment of Nonaccepting Classes.**</u>

10       As noted above, even if there are impaired Classes that do not accept the proposed Plan,

11  the Court may nonetheless confirm the Plan if the nonaccepting Classes are treated in the manner

12  required by the Code and at least one impaired Class of Claims accepts the Plan.  The process by

13  which a plan may be confirmed and become binding on non-accepting Classes is commonly

14  referred to as "cramdown."  The Bankruptcy Code allows the Plan to be "crammed down" on

15  nonaccepting Classes of Claims or interests if it meets all statutory requirements except the voting

16  requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and

17  equitable" with respect to each impaired Class that has not voted to accept the Plan, as set forth in

18  11 U.S.C. § 1129(b) and applicable case law.

19

20

21        **6.10.**   <u>**Request for Confirmation Despite Nonacceptance by Impaired Class(es).**</u>

22       The SunCal Plan Proponent will ask the Court to confirm the Plan by cramdown on any

23  impaired Class if such Class does not vote to accept the Plan.

24                                 **VII.**

25      <u>**MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN**</u>

26        **7.1.**   <u>**Introduction.**</u>

27       This section is intended to address how the SunCal Plan Proponents intend to implement

28  the provisions of the Plan.  It addresses the transfer of the Plan Trust Property to the Plan Trust,

000058
MAINDOCS-#160302-v1-Plan_Group_I.DOC

the nature of the Plan Trust, the powers of the Plan Trust, the governance of the Plan Trust, the resolution of disputed claims, the sources of funds that will be used to pay claims and the mechanics of how claims will be paid.

### 7.2. **Removal of Trustee**.

As of the Effective Date, the appointment of the Trustee in the SunCal Marblehead, LLC and SunCal PSV, LLC shall terminate, and possession and control over all property within these estates shall pass to the Plan Trust.

### 7.3. **Transfer of Property To The Plan Trust**.

On the Effective Date, title to and possession of all property of the Group I Debtors, excepting those items of property that the Plan Trustee affirmatively elects not to transfer to the Plan Trust, shall be deemed transferred and delivered to the Plan Trust, without further act or action under any applicable agreement, law, regulation, order or rule of law.

### 7.4. **Purposes of The Plan Trust**.

The Plan Trust's purposes, powers and objectives include, but are not limited to the following: (i) to take control over, manage and over time sell or otherwise dispose of all Plan Trust Property for the highest return reasonably obtainable; (ii) to pursue all Litigation Claims through collection efforts, including through litigation in any court of competent jurisdiction, and to obtain the most favorable recovery on the same, with due consideration of all relevant factors, including cost; (iii) to cause all Available Cash to be deposited into the applicable Distribution Accounts; (iii) to initiate actions to resolve any remaining issues regarding the allowance and payment of Claims including, as necessary, initiation and/or participation in proceedings before the Bankruptcy Court; (iv) to take such other actions as are necessary or useful to maximize the value of all property received by the Plan Trust; (v) to make the payments and distributions to creditors and holders of Beneficial Interests as required by the Plan; and (vi) to enforce all rights with respect to the Plan Trust Property; and (vii) to take all actions reasonable and necessary to implement the terms of the Plan, including but not limited to selling the Group I Projects and the Assets. A more complete statement of the Plan Trust's powers and limitations is set forth in the Plan Trust Agreement, which is a part of the Plan Supplement.

-44-

It is intended that the Plan Trust will be classified for U.S. federal income tax purposes as a "liquidating trust," with the primary objective of liquidating the Plan Trust Property and distributing the net proceeds thereof, with no objective to continue or engage in the conduct or a trade or business in accordance with Treasury Regulation 301.7701-4(d), and, notwithstanding anything to the contrary in the Plan, all actions taken by the Plan Trust or any person acting on behalf of the Plan Trust shall be consistent with such primary objective.

**7.5     Trust Agreement**.

Copies of the Plan Trust Agreement shall be contained in the Plan Supplement. The Plan Trust Agreement shall, among other matters, create the Plan Trust, identify Acquisitions as the initial trustee of the Plan Trust, identify the compensation of the Plan Trust, and specify the authorities and powers of the Plan Trustee, consistent with this Plan.

**7.6     Operations of the Plan Trust**.

From and after the Effective Date, the Plan Trust may use, acquire and dispose of the Plan Trust Property held in the Plan Trust, and take any of the actions set forth in this Article or in the Plan Trust Agreement, without the approval of the Bankruptcy Court and free of the restrictions of the Bankruptcy Code, the Bankruptcy Rules or the prior orders of the Bankruptcy Court, other than restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement, provided that the Plan Trust is administered so that it qualifies as a liquidating trust under Treasury Regulation § 301.7701-4(d).

**7.7     The Plan Trustee**.

Acquisitions shall be Trustee of the Plan Trust. Acquisitions is the direct or indirect parent of all of Debtors.

**7.8     Payment of Trust Expenses.**

The expenses incurred by the Plan Trust during the Plan Period, which shall include the compensation payable to the Acquisitions, shall be paid, or adequate reserves shall be created for the payment of such expenses, prior to any distribution to the Plan Trust Beneficiaries.

**7.9     Plan Distribution System**.

-45-

The Plan Trustee shall establish a separate "Distribution Account" for each Group IV Debtor at an FDIC insured bank. Each Group I Debtor's Available Cash, whether on hand as of the Effective Date or received thereafter, shall be deposited into that Group IV Debtor's Distribution Account. The only exception to this provision shall be in the case of Net Sales Proceeds that are subject to disputed liens. Such proceeds shall remain in the applicable Net Proceeds Accounts established to receive the proceeds from the sale of a particular property. Once all disputes regarding entitlement to the funds in the Net Proceeds Accounts have been resolved, the proceeds remaining (after the payment of the Allowed Claims secured by liens on these proceeds) shall be transferred to the Distribution Account. These funds will then be used to pay the claims of Creditors holding Allowed Claims in their order of priority as provided for in the Plan.

### 7.10 Claims Estimation Rights.

On the Confirmation Date, the SunCal Plan Proponents shall be vested with standing to file a motion under 11 U.S.C. § 502(c), and they shall be authorized and empowered to seek in such motion the estimation, for distribution purposes, of any Disputed Claim seeking recourse to, or claiming an interest in, any asset of the Group I Debtors. After the Bankruptcy Court estimates a Disputed Claimant's rights in, or against an asset of the Estates through this procedure, the Committees shall have the right to use any funds or assets not deemed subject to the rights of the Disputed Claimant, to pay the Allowed Claims under the terms of the Plan, including Allowed Administrative Claims, after the Effective Date.

### 7.11 No Payment of Transfer-Related Fees to the United States Trustee.

The Plan Trust shall not be required to pay any fees to the United States Trustee based on any transfers of the Plan Trust Property to the Plan Trust or from the Plan Trust.

### 7.12 No Payment of Transfer-Related Fees to the Trustee.

The Plan Trust shall not be required to pay any fees to the Trustee based on any transfers of Plan Trust Property from the Trustee Debtors to the Plan Trust, or from the Plan Trust.

### 7.13 Books and Records of Trust.

000061
MAINDOCS-#160302-v1-Plan_Group_I.DOC

The Plan Trustee, and to the extent of payments and distributions by any Disbursing Agent, the Disbursing Agent, shall maintain an accounting of receipts and disbursements of the Plan Trust. The Plan Trustee shall maintain the books and records of the Plan Trust, or provide storage for such book and records, for the longer of six (6) years, or while Plan is in existence, provided that the Court may, upon application by the Plan Trustee, authorize the Plan Trust to destroy all of the Plan Trusts books and records at such time as Plan Trust has no further need for such books and records. The Plan Trust's books and records shall be open to inspection at all reasonable times, upon written request by the Committee.

**7.14** **Limitations on Liability**.

The Plan Trustee shall not be liable for any act it may do or fail to do as the liquidating trustees hereunder while acting in good faith and in the exercise of its best judgment. The Plan Trust shall not be liable in any event for any claims, liabilities or damages based upon or arising out of any conduct of the Plan Trustee in the course of its activities as liquidating trustee, unless such claims, liabilities or damages arise from Plan's gross negligence or willful misconduct.

The Plan Trustee, and its officers, directors, agents and employees shall not be liable for any indebtedness, liability or obligation incurred or entered into on behalf of the Plan Trust, including, without limitation, indebtedness, liabilities or obligations under agreements, undertakings or commitments entered into or executed on behalf of Plan Trust by the Plan Trustee or by any person employed by the Plan Trustee or the Plan, it being expressly understood that all such indebtedness, liabilities and obligations of, and claims against the Plan, shall be the sole responsibility of the Plan and shall be satisfied only from the Plan, or such portion thereof as shall, under the terms of any agreement, be stated to be liable therefore. No claim or cause of action may be asserted against the Plan Trustee, or any member of the New Board on account of any indebtedness, liability or obligation entered into on behalf of the Plan, whether by legal or equitable proceedings, or by virtue of any bankruptcy or non-bankruptcy statute, rule or regulation.

000062
MAINDOCS-#160302-v1-Plan_Group_I.DOC

Any undertaking, contract or agreement entered into in writing by the Plan may, except as otherwise provided by the Plan or the Plan Trust Agreement, expressly disclaim the personal liability of Plan Trustee.

**7.15** **Federal Income Tax Treatment of the Holders of Plan Trust Beneficial Interests**.

For all United States federal income tax purposes, the transfers by the Group II Debtors shall be treated by the Group I Debtors, their estates, the Plan Trust and the Plan Trust Beneficiaries as a transfer of the Plan Trust Property by the Group I Debtors to the Plan Trust Beneficiaries followed by a transfer of the Plan Trust Property by such the Plan Trust Beneficiaries to the Trust. The Plan Trust Beneficiaries shall be treated as the grantors and deemed owners of the Plan Trust for United States federal income tax purposes. The Plan Trust Trustee and the Plan Trust Beneficiaries are required to value their interests in the Plan Trust Property consistently with the values placed upon the Plan Trust Property by the Plan Trust, and to use such valuations for all purposes. The Plan Trust Agreement shall provide for consistent valuations of the Plan Trust Property by the Plan Trust Trustee and the Plan Trust Beneficiaries, and shall provide that the Plan Trust will determine the fair market value of the Plan Trust Property within thirty (30) days after the Effective Date, and send such determination to each the Plan Trust Beneficiary. By its acceptance of a the Beneficial Interest, each recipient of such an interest will be conclusively deemed to agree to use such valuations for all purposes, including, without limitation, in computing any gain recognized upon the exchange of such holder's claim for purposes of determining any United States Federal income tax, and shall be required to include those items of income, deductions and tax credits that are attributable to its the Beneficial Interest in computing its taxable income.

**7.16** **Termination of the Trust.** the Plan Trust shall continue in effect until the earlier of: (a) the date that all the Plan Trust Property has been liquidated, all proceeds have been converted to cash or distributed in kind, all the Plan Trust Expenses have been paid, all claims to be paid under the Plan for which the Plan Trust Trustee is obligated to make distributions on have

000063
MAINDOCS-#160302-v1-Plan_Group_I.DOC

been paid, all distributions to be made with respect to the Beneficial Interests have been made, all litigation to which the Plan Trust is a party have been concluded by dismissal or an order issued by the court in which such litigation is pending and such order has become "final" (consistent with the definition of Final Order in this Plan for orders issued by the Bankruptcy Court), and the Chapter 11 Case has been closed; and (b) the expiration of five (5) years from the Effective Date; provided, however, that the Plan Trust may request the Bankruptcy Court to extend the permitted life of the Plan Trust for such additional period as is reasonably necessary to conclude the liquidation and distributions, not to exceed a total of ten (10) years from the Effective Date, which request shall be filed so the Bankruptcy Court may consider and rule on the request within six (6) months prior to the expiration of the initial five-year term.

**7.17**     **Exemption from Certain Transfer Taxes**.

In accordance with Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under this Plan may not be taxed under any law imposing a stamp tax or similar tax. All governmental officials and agents shall forego the assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

**7.18**     **Tax Consequence of The Plan**.

The implementation of the Plan may have federal, state and local tax consequences to the Group II Debtors, Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**7.19**     **The Plan Sponsor.**

000064
MAINDOCS-#160302-v1-Plan_Group_I.DOC

The Plan Sponsor shall be Acquisitions.

## 7.20    **Acquisitions' Funding Obligations Pursuant to the Acquisitions Administrative Loan**.

As part of its obligations as the Plan Sponsor, Acquisitions has agreed to cause the funding of the payment of the following amounts required under the Plan to the extent necessary after all Available Cash has been exhausted:

      A.  All Allowed Administrative Claims;

      B.  Allowed Priority Claims; and

      **C.**  Continuing Professional fees for the prosecution of the Litigation Claims and other post-confirmation expenses

In exchange for the above referenced funding commitments, Acquisitions, and all of its Affiliates shall receive (i) a complete release from all of the Debtors, the Estates, and the Plan Trust of any potential Litigation Claims, and (ii) Allowance of the Acquisitions Administrative Loan in an amount equal to all Chapter 11 and post-confirmation funding caused by Acquisitions to the extent that the same has not already been approved by the Court.

## 7.21    **The Committee(s).**

On the Effective Date, the Committee(s) shall continue to serve their applicable Debtors as Committees to the applicable reorganized Debtors, subject to the following:

### 7.21.1    **Duties and Powers.**

The duties of the Committees after the Effective Date shall be limited to investigating and prosecuting potential claims objections against Acquisitions and its Affiliates, and monitoring the Plan's implementation, joint decision-making authority on a settlement of the Lehman Adversary Proceeding, and standing to object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures on sale of the Debtors' Projects.

The Committees shall be entitled to retain, employ and compensate Professionals, in order to assist with the obligations and rights of the Committees under the terms of the Plan. Such compensation shall be from the applicable Distribution Account(s).

The Committee(s) shall receive notice of and the right to review all payments and Distributions. In addition, each Committee shall have 25% decision-making authority with respect to settlement of the Lehman Adversary Proceeding along with Acquisitions, which shall have 50% decision making authority. The Bankruptcy Court shall resolve any impasse with respect to a proposed settlement.

### 7.21.2    Dissolution of Committees.

The Committees shall be dissolved upon the entry of an order converting, closing or dismissing the Chapter 11 Cases or entry of a final decree in the Chapter 11 Cases. On dissolution, the Confirmation Committees shall have no other or further obligations or responsibilities on behalf of the Plan Trust.

### 7.22    Litigation Claims.

Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Plan Trust shall retain all Litigation Claims whether or not pending on the Effective Date that are not purchased by LitCo. Unless a Litigation Claim is expressly waived, relinquished, released, compromised or settled in the Plan or in a Final Order, all rights with respect to such Litigation Claims are reserved and the Plan Trustee and the Committees (in the case of Avoidance Actions) may pursue such Litigation Claims. Notwithstanding the foregoing, the Plan Trustee and the Committees shall not settle or abandon a Litigation Claim valued at greater than $100,000 except upon ten (10) days' prior written notice and opportunity to object to one or another. Any disputes concerning the settlement or abandonment of a Litigation Claim shall be submitted to the Bankruptcy Court for resolution on no less than ten (10) days' notice to the objecting party.

### 7.23    Collection of Litigation Recoveries.

All Litigation Recoveries realized or obtained by the Plan Trustee and/or the Committee(s) shall be promptly deposited into the applicable Distribution Account(s). Except as otherwise provided in the Plan and the Confirmation Order, the Litigation Recoveries shall be free and clear of all Claims and Liens and shall only be expended in accordance with the provisions of the Plan.

000066
MAINDOCS-#160302-v1-Plan_Group_I.DOC

# VIII.

## DISTRIBUTIONS

### 8.1. Distribution Agent.

Acquisitions shall serve as the Distribution Agent for distributions due under the Plan. The Distribution Agent may employ one or more sub agents on such terms and conditions as it may agree in its discretion and pay such sub agent as a Post Confirmation Expense from the Distribution Accounts.  The Distribution Agent shall not be required to provide any bond in connection with the making of any Distributions pursuant to the Plan.

### 8.2. Distributions.

#### 8.2.1    Dates of Distributions.

Any distribution required to be made on the Effective Date shall be deemed timely if made as soon as practicable after such date and, in any event, within thirty (30) days after such date. Any distribution required to be made upon a Disputed Claim becoming an Allowed Claim and no longer being a Disputed Claim shall be deemed timely if made as soon as practicable thereafter.

#### 8.2.2    Limitation on Liability.

Neither the Plan Sponsor, the Plan Trustee, the Distribution Agent, their Affiliates, nor any of their employees, members, officers, directors, agents, or professionals or Affiliates shall be liable for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with implementing the Distribution provisions of the Plan and the making or withholding of Distributions pursuant to the Plan, or (ii) any change in the value of distributions made pursuant to the Plan resulting from any delays in making such distributions in accordance with the Plan's terms (including but not limited to any delays caused by the resolution of Disputed Claims).

### 8.3. Old Instruments and Securities.

#### 8.3.1    Surrender and Cancellation of Instruments and Securities.

As a condition to receiving any distribution pursuant to the Plan, each Person holding any note or other instrument or security (collectively "Instruments or Securities" and individually an

000067
MAINDOCS-#160302-v1-Plan_Group_I.DOC

"Instrument or Security") evidencing, an existing Claim(s) against the Debtor(s) must surrender
such Instrument or Security to the Distribution Agent.

### 8.3.2    Cancellation of Liens.

Except as otherwise provided in the Plan, any Lien securing any Secured Claim shall be
deemed released and discharged, and the Person holding such Secured Claim shall be authorized
and directed to release any collateral or other property of the Debtors (including, without
limitation, any cash collateral) held by such Person and to take such actions as may be requested
by the Plan Trustee to evidence the release of such Lien, including, without limitation, the
execution, delivery and Filing or recording of such releases as may be requested by the Plan
Trustee.

### 8.4.   De Minimis Distributions and Fractional Shares.

No Cash payment of less than ten dollars ($10) shall be made by the Plan Trust to any
Holder of Claims unless a request therefore is made in writing to the Plan Trust.  Whenever
payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a
rounding down of such fraction to the nearest whole cent.  Any Cash or other property that is not
distributed as a consequence of this section shall, after the last distribution on account of Allowed
Claims in the applicable Class, be treated as "Unclaimed Property" under the Plan.

### 8.5.   Delivery of Distributions.

Except as provided in the Plan with respect to Unclaimed Property, distributions to Holders
of Allowed Claims and Allowed Administrative Claims shall be distributed by mail as follows:
(1) with respect to each Holder of an Allowed Claim that has filed a Proof of Claim, at the address
for such Holder as maintained by the official claims agent for the Debtors; (2) with respect to each
Holder of an Allowed Claim that has not filed a Proof of Claim, at the address reflected on the
Schedules filed by the Debtors, provided, however, that if the Debtors or the Plan Trust has
received a written notice of a change of address for such Holder, the address set forth in such
notice shall be used; or (3) with respect to each Holder of an Allowed Administrative Claim, at
such address as the Holder may specify in writing.

000068
MAINDOCS-#160302-v1-Plan_Group_I.DOC

**8.6. <u>Undeliverable Distributions</u>.**

If the Distribution of Cash to the Holder of any Allowed Claim is returned to the Plan Trustee as undeliverable or the Distribution check is not negotiated within 90 days of mailing (any such distribution being hereinafter referred to as "Unclaimed Property"), no further distribution shall be made to such Holder unless and until the Plan Trustee is notified in writing of such Holder's then current address. Subject to the remainder of this Section and the following section, Unclaimed Property shall remain in the possession of the Plan Trustee pursuant to this Section, and shall be set aside and (in the case of Cash) held in a segregated interest bearing account (as to Cash Unclaimed Property) to be maintained by the Distribution Agent until such time as the subject Distribution becomes deliverable. Nothing contained in the Plan shall require the Plan Trustee or any other Person to attempt to locate such Person.

**8.7. <u>Disposition of Unclaimed Property</u>.**

If the Person entitled thereto notifies the Plan Trustee of such Person's Claim to a Distribution of Unclaimed Property within ninety (90) days following such Person's initial Distribution Date, Effective Date, the Unclaimed Property distributable to such Person, together with any interest or dividends earned thereon, shall be paid or distributed to such Person as soon as practicable. Any Holder of an Allowed Claim that does not assert a Claim in writing for Unclaimed Property held by the Plan Trustee within ninety (90) days after the Holder's initial Distribution Date shall no longer have any Claim to or Interest in such Unclaimed Property, and shall be forever barred from receiving any distributions under the Plan or otherwise from the Plan Trustee. In such cases, any property held for Distribution on account of such Claims shall become Available Cash and deposited into the Distribution Account.

**IX.**

**OBJECTIONS TO CLAIMS AND DISPUTED CLAIMS**

**9.1. <u>Standing for Objections to Claims</u>.**

The Plan Trustee shall have the sole and exclusive right to file, prosecute and resolve objections to Claims other than to the right to object to the claims of SunCal Affiliates, which shall be vested with the applicable Committee. The applicable Committee shall have standing to

000069
MAINDOCS-#160302-v1-Plan_Group_I.DOC

object to any settlement of any Litigation Claim in excess of $100,000 and standing to object to any proposed sales procedures and sale of the Debtors' Projects.

Any objection to a Claim shall be Filed with the Bankruptcy Court and served on the Person holding such Claim on or before the applicable Claims Objection Deadline. The Plan Trustee shall have the right to petition the Bankruptcy Court, without notice or a hearing, for an extension of the Claims Objection Deadline if a complete review of all Claims cannot be completed by such date.

### 9.2. Treatment of Disputed Claims and Disputed Liens.

#### 9.2.1 No Distribution Pending Allowance.

If any portion of a Claim or Lien is a Disputed Claim or Disputed Lien, no payment or distribution provided for under the Plan shall be made on account of such Claim or Lien unless and until such Claim or Lien becomes an Allowed Claim and/or Allowed Lien.

#### 9.2.2 Distribution After Allowance.

On the next Distribution Date following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Distribution Agent shall distribute to the Person holding such Claim any Cash that would have been distributable to such Person if on the initial Distribution Date such Claim had been an Allowed Claim and not a Disputed Claim.

### X.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1. Executory Contracts Potentially Being Assumed.

The Plan Trustee shall have until the expiration of the Sales Period to assume or reject any of the executory contracts and unexpired leases attached to the Plan as Exhibit "2" to the Plan. The SunCal Plan Proponents may add any executory contract or unexpired leases to these exhibits, or delete any contract or lease therefrom up to and including the Confirmation Date. All contracts or leases not assumed by the expiration of the Sales Period shall be deemed rejected.

000070
MAINDOCS-#160302-v1-Plan_Group_I.DOC

**10.2.** **Executory Contracts Being Rejected**.

The Debtors hereby reject all of the executory contracts and unexpired leases set forth in the Debtors' Schedules attached to the Plan as Exhibit "3." The SunCal Plan Proponents reserve the right to amend Exhibit "3" to the Plan to include additional leases and contracts on this exhibit, or to delete leases and contracts from this exhibit, up to and including the Confirmation Date.

**10.3.** **Bar Date for Rejection Damages**.

Any Claim arising out of the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtors, the Plan Trust, their Affiliates, their successors, or their properties, and shall not be entitled to any distribution under the Plan, unless a Proof of Claim for such Claim is filed and served on the Debtors, or the Plan Trust within thirty (30) days after the receipt of a notice of the rejection of any contract or lease.

**10.4.** **Changes in Rates Subject to Regulatory Commission Approval**.

The Debtors are not subject to governmental regulatory commission approval of their rates**.**

<h1 style="text-align:center">XI.</h1>

<h1 style="text-align:center">LIMITATION OF LIABILITY</h1>

**11.1** **No Liability for Solicitation or Participation**.

As specified in Section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

<h1 style="text-align:center">XII.</h1>

<h1 style="text-align:center">CONDITIONS TO CONFIRMATION AND</h1>

<h1 style="text-align:center">EFFECTIVENESS OF THE PLAN</h1>

**12.1** **Conditions Precedent to Plan Confirmation**.

MAINDOCS-#160302-v1-Plan_Group_I.DOC

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall

have entered a Confirmation Order in form and substance reasonably acceptable to the SunCal

Plan Proponents.

### 12.2    Conditions Precedent to Plan Effectiveness.

The conditions precedent to the effectiveness of the Plan and the occurrence of the

Effective Date is that the Confirmation Order shall be a Final Order in form and substance

reasonably satisfactory to the SunCal Plan Proponents, and the resolutions of any material

impairment of the Plan terms caused by the automatic stays applicable in the Lehman Entities

cases. The automatic stay in the Debtors cases shall continue to be applicable until the Effective

Date.

### XIII.

### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective

Date, the Bankruptcy Court shall not be limited under the Plan and the Bankruptcy Court's

jurisdiction shall apply to the fullest extent possible under applicable law.

### XIV.

### MODIFICATION OR WITHDRAWAL OF THE PLAN

### 14.1    Modification of Plan.

At any time prior to confirmation of the Plan, the former Debtor(s) may supplement,

amend or modify the Plan.  After confirmation of the Plan,  the Debtors or Plan Trustee may (x)

apply to the Bankruptcy Court, pursuant to Section 1127 of the Bankruptcy Code, to modify the

Plan; and (y) apply to the Bankruptcy Court to remedy defects or omissions in the Plan or to

reconcile inconsistencies in the Plan.

### 14.2    Nonconsensual Confirmation.

In the event that any impaired Class of Claims or Interests shall fail to accept the Plan in

accordance with Section 1129(a)(8) of the Bankruptcy Code, SunCal Plan Proponents (i) may

request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the

Bankruptcy Code, and (ii) in accordance with Section 16.1 of the Plan, and may modify the Plan in accordance with Section 1127(a) of the Bankruptcy Code.

**XV.**

**MISCELLANEOUS**

**15.1    Payment of Statutory Fees.**

All quarterly fees due and payable to the Office of the United States Trustee pursuant to Section 1930(a)(6) of title 28 of the United States Code shall be paid in full on or before the Effective Date, or, to the extent such quarterly fees are disputed, an adequate reserve shall have been established and set aside for payment in full thereof, as required by Section 1129(a)(12) of the Bankruptcy Code.  The Plan Trustee shall remain responsible for timely payment of quarterly fees due and payable after the Effective Date and until the Debtors' Cases are closed, to the extent required by Section 1930(a)(6) of title 28 of the United States Code.

**15.2    Payment Dates.**

Whenever any payment or distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or distribution shall instead be made, without interest, on the immediately following Business Day.

**15.3    Headings.**

The headings used in this Disclosure Statement and in the Plan are inserted for convenience only and neither constitutes a portion of this Disclosure Statement or the Plan nor in any manner affect the construction of the provisions of this Disclosure Statement or the Plan.

**15.4    Other Documents and Actions.**

The Plan Trustee may execute such other documents and take such other actions as may be necessary or appropriate to effectuate the transactions contemplated under the Plan.

**15.5    Notices.**

All notices and requests in connection with this Disclosure Statement and the Plan shall be in writing and shall be hand delivered or sent by mail addressed to:

> **To the SunCal Plan Proponents**:
> Bruce V. Cook
> General Counsel

000073
MAINDOCS-#160302-v1-Plan_Group_I.DOC

Authorized Agent of the SunCal Plan Proponents
2392 Morse Ave
Irvine, CA 92614-6234

**With copies to:**
Paul J. Couchot
Winthrop & Couchot, Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

Ronald Rus
Rus Miliband & Smith P.C.
2211 Michelson Drive, Seventh Floor
Irvine, California 92612

All notices and requests to any Person holding of record any Claim or Interest shall be sent to them at their last known address or to the last known address of their attorney of record. Any such Person may designate in writing any other address for purposes of this Section 21.5, which designation will be effective on receipt.

### 15.6    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

### 15.7    Binding Effect.

The Plan and all rights, duties and obligations thereunder shall be binding upon and inure to the benefit of the Plan Sponsor Debtors, the Plan Trustee, Holders of Claims, Holders of Interests, and their respective successors and assigns.

### 15.8    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and assigns of such entity.

000074
MAINDOCS-#160302-v1-Plan_Group_I.DOC

15.9 **Severability of Plan Provisions.**

If, prior to the Confirmation Date, any term or provision of the Plan is held by the Bankruptcy Court to be illegal, impermissible, invalid, void or unenforceable, or otherwise to constitute grounds for denying confirmation of the Plan, the Bankruptcy Court shall, with the consent of the Debtors, have the power to interpret, modify or delete such term or provision (or portions thereof) to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be operative as interpreted, modified or deleted. Notwithstanding any such interpretation, modification or deletion, the remainder of the terms and provisions of the Plan shall in no way be affected, impaired or invalidated by such interpretation, modification or deletion.

15.10 **No Waiver.**

The failure of the Debtors or any other Person to object to any Claim for purposes of voting shall not be deemed a waiver of the Committee(s)', the Debtors' or the Plan Trustee's right to object to or examine such Claim, in whole or in part.

15.11 **Inconsistencies.**

In the event the terms or provisions of this Disclosure Statement are inconsistent with the terms and provisions of the Plan or documents executed in connection with the Plan, the terms of the Plan shall control.

15.12 **Exemption from Certain Transfer Taxes and Recording Fees.**

Pursuant to Section 1146(c) of the Bankruptcy Code, any transfers from a Debtor to the Plan Trust or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property or of any other interest in such property (including, without limitation, a security interest) will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any

-60-

such tax or governmental assessment and to accept for filing and recordation any of the foregoing
instruments or other documents without the payment of any such tax or governmental assessment.

### 15.13 Post-Confirmation Status Report.

Within 180 days following the entry of the Confirmation Order, the Plan Trustee shall file
a status report with the Court explaining what progress has been made toward consummation of
the confirmed Plan. The status report shall be served on the United States Trustee, the twenty
largest unsecured creditors, and those parties who have requested special notice. Unless otherwise
ordered, further status reports shall be filed every 180 days and served on the same entities.

### 15.14 Post-Confirmation Conversion/Dismissal.

A creditor or party in interest may bring a motion to convert or dismiss the case under
§ 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. The Plan
Trustee reserves the right to object to any motion for conversion or dismissal. If the Court orders
any of the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been
property of the Chapter 11 Estate, and that has not been disbursed pursuant to the Plan, will revest
in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only
to the extent that relief from stay was not previously authorized by the Court during this case.

000076
MAINDOCS-#160302-v1-Plan_Group_I.DOC

**15.15  Final Decree.**

Once an Estate has been fully administered, as referred to in Bankruptcy Rule 3022, the Plan Trustee, or other party as the Court shall designate in the Confirmation Order, shall file a motion with the Court to obtain a final decree to close the Case of such Debtor.

Date: April __, 2011

By: _____

Frank Faye
Authorized Agent for the Voluntary Debtors
and Acquisitions

**Submitted By:**

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By: */s/ Paul J. Couchot* _____
    Paul J. Couchot,
    General Insolvency Counsel for
    the Voluntary Debtors

RUS MILIBAND & SMITH P.C.

By: _____
    Ronald Rus,
    Counsel for SunCal Management
    LLC and SCC Acquisitions Inc.

-62-

MAINDOCS-#160302-v1-Plan_Group_1.DOC

000077

**Exhibit 3**

| Filing Date | # | Docket Text |
|---|---|---|
| 03/28/2011 | 1872 | Order on stipulation to continue hearing on first joint omnibus motion for Order disallowing late-filed claims for claimant/claim number: For Debtor SunCal Marblehead, LLC: Mesa Pacific Construction (68) (Related Doc # 1847 ) Signed on 3/28/2011 (I,deputy clerk who is making this entry, certify that service on all parties under Section II was completed, Reid, Rick) (Entered: 03/28/2011) |
| 03/28/2011 | 1873 | Amended Chapter 11 Plan *First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc. (RE: related document(s) 567 Chapter 11 Plan of Reorganization *Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC., 710 Amended Chapter 11 Plan *First Amended Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC, 1423 Chapter 11 Plan of Reorganization *Joint Chapter 11 Plan for Twelve Voluntary Debtors Proposed by the Lehman VD Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc..). (Orgel, Robert) (Entered: 03/28/2011) |
| 03/28/2011 | 1874 | Disclosure Statement *with Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc.. (Orgel, Robert) (Entered: 03/28/2011) |
| | | Amended Chapter 11 Plan *First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Subject Lehman Creditors* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC, Trustee Steven M Speier (TR) (RE: related document(s) 567 Chapter 11 Plan of Reorganization *Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC., 710 Amended Chapter 11 Plan *First Amended Joint Chapter 11 Plan Proposed by Lehman Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC, 1420 Chapter 11 Plan of Reorganization *Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Subject Lehman Creditors* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC, Trustee Steven M Speier). (Orgel, Robert) (Entered: |

000079

| | | |
|---|---|---|
| 03/28/2011 | 1875 | 03/28/2011) |
| 03/28/2011 | 1876 | Disclosure Statement *with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC, Trustee Steven M Speier (TR). (Orgel, Robert) (Entered: 03/28/2011) |
| 03/28/2011 | 1877 | Request for judicial notice *in Support of (1) Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors and (2) Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., OVC Holdings LLC (RE: related document(s) 1873 Amended Chapter 11 Plan, 1874 Disclosure Statement, 1875 Amended Chapter 11 Plan, 1876 Disclosure Statement). (Attachments: # 1 Exhibit 2# 2 Exhibit 3, 4 and POS) (Ziehl, Dean) (Entered: 03/28/2011) |
| 03/28/2011 | 1878 | Notice of Hearing *on Approval of Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders (Related to Docket Nos. 1873 and 1874 )* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc., Northlake Holding LLC, OVC Holdings LLC. (Ziehl, Dean) (Entered: 03/28/2011) |
| 03/28/2011 | 1879 | Notice of Hearing *on Approval of Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors (Related to Docket Nos. 1875 and 1876 )* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc.. (Ziehl, Dean) (Entered: 03/28/2011) |
| 03/28/2011 | | Hearing Set RE: Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders (related document # 1874 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: 04/26/2011) |
| | | Hearing Set RE: Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by The Trustee and Lehman Creditors (related document # 1876 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: |

000080

| | | |
|---|---|---|
| 03/28/2011 | | 04/26/2011) |
| 03/29/2011 | 1880 | Certificate of Service *re Entered Order On Stipulation To Continue Hearing On First Joint Omnibus Motion For Order Disallowing Late-Filed Claims For Claimant/Claim Number: For Debtor SunCal Marblehead, LLC: Mesa Pacific Construction (68)* Filed by Creditors Lehman ALI, Inc., Northlake Holding LLC, OVC Holdings LLC, Trustee Steven M Speier (TR) (RE: related document(s) 1872 Order (Generic)). (Ziehl, Dean) (Entered: 03/29/2011) |
| 03/29/2011 | 1881 | Proof of service *of Notice of Hearing on Approval of Disclosure Statement with Respect to First amended Joint Chapter 11 Plan for Eight Trustee and Lehman Creditors* Filed by Creditors Lehman ALI, Inc., Lehman Commercial Paper Inc. (RE: related document(s) 1879 Notice of Hearing). (Orgel, Robert) (Entered: 03/29/2011) |
| 03/29/2011 | 1882 | Declaration re: non opposition Filed by Debtor Palmdale Hills Property, LLC (RE: related document(s) 1816 Motion to Approve Compromise Under Rule 9019 *Debtors' Notice of Omnibus Motion and Omnibus Motion for Order Approving Compromises of Controversies*). (Gupta, Kavita) (Entered: 03/29/2011) |
| 03/29/2011 | | Hearing Continued (RE: related document(s) 1225 Motion to Disallow Claims) - Continued Status hearing to be held on 5/17/2011 at 10:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701 - Continued to 5/17/11 At 10:30 A.M. Per Order Entered 3/28/11. (cr: Reid) The case judge is Erithe A. Smith (Lyons, Maeve) (Entered: 04/11/2011) |
| 03/30/2011 | 1883 | BNC Certificate of Notice - PDF Document. (RE: related document(s) 1872 Order (Generic)) No. of Notices: 69. Service Date 03/30/2011. (Admin.) (Entered: 03/30/2011) |
| | | Reply to (related document(s): 1712 Motion for Relief from Stay *California Bank & Trust's Notice of Motion and Motion for Relief from the Automatic Stay Pursuant to Stipulation and FRBP 4001 (d) - Personal Property*. Fee Amount $150, filed by Creditor California Bank & Trust, 1819 Amended Motion (related document(s): 1712 Motion for Relief from Stay *California Bank & Trust's Notice of Motion and Motion for Relief from the Automatic Stay Pursuant to Stipulation and FRBP 4001(d) - Personal Property*. Fee Amount $ filed by Creditor California Bank & Trust, 1820 Supplemental filed by Creditor California Bank & Trust) *Notice of Non-Opposition to Motion* Filed by Creditor California Bank & Trust (Kanesaka, Sheri) (Entered: |

000081

| | | |
|---|---|---|
| 03/31/2011 | 1884 | 03/31/2011) |
| 03/31/2011 | 1885 | Order On Stipulation To Continue Hearing on Motion By WEC Corporation For Reconsideration of First Joint Omnibus Objection Motion For Order Disallowing Late Filed Claims (Related Doc # 1868 ) Signed on 3/31/2011. IT IS HEREBY ORDERED that the hearing on the Motion by WEC Corporation for Reconsideration of First Joint Omnibus Objection Motion for Order Disallowing Late Filed Claims is continued from April 12, 2011 at 10:30 a.m. to May 10, 2011 at 10:30 a.m. ( I, deputy clerk who is making this entry, certify that service on all parties under Section II was completed, Deramus, Glenda) (Entered: 03/31/2011) |
| 04/01/2011 | 1886 | Certificate of Service *of Michael Matteo re Certificate of Service Re (1) First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders [Docket 1873]; (2) Disclosure Statement With Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders [Docket 1874]; (3) Notice of Hearing on Approval of Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders [Docket 1878]; (4) First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Subject Lehman Creditors [Docket 1875]; (5) Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket 1876]; and (6) Notice of Hearing on Approval of Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket 1879]* Filed by Creditor Lehman ALI, Inc., Lehman Commercial Paper Inc., OVC Holdings, LLC and Northlake Holdings, LLC (RE: related document(s) 1873 Amended Chapter 11 Plan, 1874 Disclosure Statement, 1875 Amended Chapter 11 Plan, 1876 Disclosure Statement, 1878 Notice of Hearing, 1879 Notice of Hearing). (Orgel, Robert) (Entered: 04/01/2011) |
| 04/02/2011 | 1887 | BNC Certificate of Notice - PDF Document. (RE: related document(s) 1885 Order (Generic)) No. of Notices: 69. Service Date 04/02/2011. (Admin.) (Entered: 04/02/2011) |
| 04/05/2011 | | Hearing Held (RE: related document(s) 1819 Amended Motion filed by Creditor California Bank & Trust) - Grant with 4001(a) (3) waiver. (cr: Reid) (Lyons, Maeve) (Entered: 04/15/2011) |
| | | Statement *of Professional Fees No. 8 for March 2011* Filed by Attorney Miller Barondess LLP. (Miller, James) (Entered: |

000082

| 04/06/2011 | 1888 | 04/06/2011) |
| 04/06/2011 | 1889 | Statement *of Professional Fees No. 14 for March 2011* Filed by Attorney Miller Barondess LLP. (Miller, James) (Entered: 04/06/2011) |
| 04/07/2011 | 1890 | Certificate of Service *of Michael Matteo re Certificate of Service Re (1) First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders [Docket 1873]; (2) Disclosure Statement With Respect to First Amended Joint Chapter 11 Plan for Eleven Voluntary Debtors Proposed by the Lehman VD Lenders [Docket 1874]; (3) First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Subject Lehman Creditors [Docket 1875]; and (4) Disclosure Statement with Respect to First Amended Joint Chapter 11 Plan for Eight Trustee Debtors Proposed by the Trustee and Lehman Creditors [Docket 1876]* Filed by Creditor Lehman ALI, Inc., Lehman Commercial Paper Inc., OVC Holdings, LLC and Northlake Holdings, LLC (RE: related document(s) 1873 Amended Chapter 11 Plan, 1874 Disclosure Statement, 1875 Amended Chapter 11 Plan, 1876 Disclosure Statement). (Orgel, Robert) (Entered: 04/07/2011) |
| 04/07/2011 | 1891 | Chapter 11 Plan of Reorganization *CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL MARBLEHEAD, LLC AND SUNCAL PSV, LLC [GROUP I DEBTORS]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1892 | Disclosure Statement *Disclosure Statement Describing Chapter 11 Plan Filed By Suncal Plan Proponents In The Chapter 11 Cases Of Palmdale Hills Property, LLC, Suncal Bickford Ranch, LLC, Suncal Marblehead, LLC And Suncal PSV, LLC [Group I Debtors]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1893 | Chapter 11 Plan of Reorganization *Chapter 11 Plan Filed By SunCal Plan Proponents In The Chapter 11 Cases Of Acton Estates, LLC, SunCal Emerald Meadows LLC; Delta Coves Venture, LLC, SunCal Heartland, LLC, LBL-SunCal Northlake, LLC And LBL-SunCal Oak Valley, LLC [Group II Debtors]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| | | Disclosure Statement *Disclosure Statement Describing Chapter 11 Plan Filed By SunCal Plan Proponents In The Chapter 11* |

000083

| | | |
|---|---|---|
| 04/07/2011 | 1894 | *Cases Of Acton Estates, LLC, SunCal Emerald, Meadows LLC, Delta Coves Venture, LLC, SunCal Heartland, LLC, LBL-SunCal Northlake, LLC And LBL-SunCal Oak Valley, LLC [Group II Debtors]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1895 | Chapter 11 Plan of Reorganization *CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL BEAUMONT HEIGHTS, LLC, SUNCAL JOHANNSON RANCH, LLC, SUNCAL SUMMIT VALLEY, SEVEN BROTHERS, LLC, KIRBY ESTATES, LLC, AND SUNCAL CENTURY CITY, LLC [GROUP III DEBTORS]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1896 | Disclosure Statement *DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SUNCAL BEAUMONT HEIGHTS, LLC, SUNCAL JOHANNSON RANCH, LLC, SUNCAL SUMMIT VALLEY, SEVEN BROTHERS, LLC, KIRBY ESTATES, LLC, AND SUNCAL CENTURY CITY, LLC [GROUP III DEBTORS]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1897 | Chapter 11 Plan of Reorganization *CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SJD PARTNERS, LTD., SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND, LLC, TESORO SF LLC, SUNCAL TORRANCE, LLC, AND SUNCAL OAK KNOLL [GROUP IV DEBTORS]* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | 1898 | Disclosure Statement *DISCLOSURE STATEMENT DESCRIBING CHAPTER 11 PLAN FILED BY SUNCAL PLAN PROPONENTS IN THE CHAPTER 11 CASES OF SJD PARTNERS, LTD., SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND, LLC, TESORO SF LLC, SUNCAL TORRANCE, LLC, AND SUNCAL OAK KNOLL [GROUP IV DEBTORS]* Filed by Debtor Palmdale Hills Property, LLC. (Attachments: # 1 Part 2 of 4# 2 Part 3 of 4# 3 Part 4 of 4) (Couchot, Paul) (Entered: 04/07/2011) |
| | | Notice of Hearing *NOTICE TO CREDITORS AND PARTIES IN INTEREST OF HEARING ON FOUR DISCLOSURE STATEMENTS FILED BY SUNCAL PLAN PROPONENTS AS FOLLOWS: GROUP I DEBTORS DISCLOSURE STATEMENTS FOR PALMDALE HILLS PROPERTY, LLC, SUNCAL BICKFORD RANCH, LLC, SUNCAL MARBLEHEAD, LLC AND* |

000084

CM/ECF - U.S. Bankruptcy Court (v3.3.3 - LIVE)    Page 7 of 8
08-13555-mg   Doc 17497-1   Filed 06/08/11   Entered 06/08/11 12:43:49   Exhibits
1-7   Pg 80 of 216

| | | |
|---|---|---|
| 04/07/2011 | 1899 | *SUNCAL PSV, LLC] (Docket #1892); GROUP II DEBTORS DISCLOSURE STATEMENTS FOR ACTON ESTATES, LLC, SUNCAL EMERALD, MEADOWS LLC, DELTA COVES VENTURE, LLC, SUNCAL HEARTLAND, LLC, LBL-SUNCAL NORTHLAKE, LLC AND LBL-SUNCAL OAK VALLEY, LLC (Docket #1894); GROUP III DEBTORS DISCLOSURE STATEMENTS FOR SUNCAL BEAUMONT HEIGHTS, LLC, SUNCAL JOHANNSON RANCH, LLC; SUNCAL SUMMIT VALLEY, SEVEN BROTHERS, LLC KIRBY ESTATES, LLC, AND SUNCAL CENTURY CITY, LLC (Docket #1896); and GROUP IV DEBTORS DISCLOSURE STATEMENTS FOR SJD PARTNERS, LTD., SCC COMMUNITIES, LLC, NORTH ORANGE DEL RIO LAND, LLC, TESORO SF LLC, SUNCAL TORRANCE, LLC, AND SUNCAL OAK KNOLL (Docket #1898)* Filed by Debtor Palmdale Hills Property, LLC. (Couchot, Paul) (Entered: 04/07/2011) |
| 04/07/2011 | | Hearing Set RE: Disclosure Statement Describing Chapter 11 Planl filed by SunCal Plan Proponents in the Chapter 11 Cases of SunCal Beaumont Heights, LLC, SunCal Johannson Ranch, LLC, SunCal Summit Valley, Seven Brothers, LLC, Kirby Estates, LLC, and SunCal Century City, LLC [GROUP III DEBTORS] (related document # 1896 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: 04/26/2011) |
| 04/07/2011 | | Hearing Set RE: Disclosure Statement Describing Chapter 11 Plan Filed by SunCal Plan Proponents in the Chapter 11 Cases of SJD Partners, Ltd., SCC Communities, LLC, North Orange Del Rio Land, LLC, Tesoro SF LLC, SunCal Torrance, LLC, and SunCal Oak Knoll [GROUP IV DEBTORS] (related document # 1898 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: 04/26/2011) |
| 04/07/2011 | | Hearing Set RE: Disclosure Statement Describing Chapter 11 Plan filed by SunCal Plan Proponents in the Chapter 11 Cases of Palmdale Hills Property, LLC, SunCal Bickford Ranch, LLC, SunCal Marblehead, LLC and SunCal PSV, LLC [GROUP I DEBTORS] (related document # 1892 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: 05/10/2011) |
| | | Hearing Set RE: Disclosure Statement Describing Chapter 11 Plan filed by SunCal Plan Proponents in the Chapter 11 Cases of Action Estates, LLC, SunCal Emerald, Meadows LLC, Delta Coves Venture, LLC, SunCal Heartland, LLC, LBL-SunCal |

000085

| | | |
|---|---|---|
| 04/07/2011 | | Northlake, LLC, and LBL-SunCal Oak Valley, LLC [GROUP II DEBTORS] (related document # 1894 ). The Hearing date is set for 5/13/2011 at 09:30 AM at Crtrm 5A, 411 W Fourth St., Santa Ana, CA 92701. The case judge is Erithe A. Smith (Duarte, Tina) (Entered: 05/10/2011) |

000086

**Exhibit 4**

000087

1 | IRELL & MANELLA LLP
Alan J. Friedman (State Bar No. 132580)
2 | afriedman@irell.com
Kerri A. Lyman (State Bar No. 241615)
3 | klyman@irell.com
840 Newport Center Drive, Suite 400
4 | Newport Beach, California 92660-6324
Telephone: (949) 760-0991
5 | Facsimile: (949) 760-5200

6 | Counsel for the Official Joint Committee of
Unsecured Creditors in the Voluntary
7 | Debtors' Chapter 11 Cases

**FILED & ENTERED**

**MAY 23 2011**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY reid          DEPUTY CLERK

8

9 | **UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**
10
**SANTA ANA DIVISION**
11

12 | In re

13 | Palmdale Hills Property, LLC, and its Related
Debtors.
14
          Jointly Administered Debtors and
15 |           Debtors-in-Possession.

16 | Affects:

☒    All Debtors
17 | ☐    Palmdale Hills Property, LLC
☐    SunCal Beaumont Heights, LLC
18 | ☐    SCC/Palmdale, LLC
☐    SunCal Johannson Ranch, LLC
19 | ☐    SunCal Summit Valley, LLC
☐    SunCal Emerald Meadows LLC
20 | ☐    SunCal Bickford Ranch, LLC
☐    Acton Estates, LLC
21 | ☐    Seven Brothers LLC
☐    SJD Partners, Ltd.
22 | ☐    SJD Development Corp.
☐    Kirby Estates, LLC
23 | ☐    SunCal Communities I, LLC
☐    SunCal Communities III, LLC
24 | ☐    SCC Communities LLC
☐    North Orange Del Rio Land, LLC
25 | ☐    Tesoro SF LLC
☐    LBL-SunCal Oak Valley, LLC
26 | ☐    SunCal Heartland, LLC
☐    LBL-SunCal Northlake, LLC
27

Case No. 8:08-bk-17206- ES

Jointly Administered With Case Nos.
8:08-bk-17209-ES; 8:08-bk-17240-ES;
8:08-bk-17224-ES; 8:08-bk-17242-ES;
8:08-bk-17225-ES; 8:08-bk-17245-ES;
8:08-bk-17227-ES; 8:08-bk-17246-ES;
8:08-bk-17230-ES; 8:08-bk-17231-ES;
8:08-bk-17236-ES; 8:08-bk-17248-ES;
8:08-bk-17249-ES; 8:08-bk-17573-ES;
8:08-bk-17574-ES; 8:08-bk-17575-ES;
8:08-bk-17404-ES; 8:08-bk-17407-ES;
8:08-bk-17408-ES; 8:08-bk-17409-ES;
8:08-bk-17458-ES; 8:08-bk-17465-ES;
8:08-bk-17470-ES; 8:08-bk-17472-ES
8:08-bk-17588-ES

Chapter 11 Cases

**ORDER RE CONFIRMATION HEARING
AND RELATED DEADLINES**

Hearing
Date: May 13, 2011
Time: 9:30 a.m.
Place: Courtroom 5A

28

*Caption Continued on Next Page*

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

☐ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☐ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

**TO ALL PARTIES-IN-INTEREST:**

Attached hereto as Exhibit "A" and incorporated herein by this reference is that certain proposed SunCal Plan Confirmation/Discovery Time Line (the "Confirmation Time Line"). The Confirmation Time Line and all dates contained therein are hereby approved pursuant to this Order.

# # #

_Erithe A. Smith_
United States Bankruptcy Judge

DATED: May 23, 2011

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 2 -

000089

1
2
3
4
5
6
7
8
9

# EXHIBIT A

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 3 -

000090



# Proposed SunCal Plan Confirmation/Discovery Time Line

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 840 Newport Center Drive, Suite 400, Newport Beach, CA 92660-6324

The foregoing document described as **ORDER RE CONFIRMATION HEARING AND RELATED DEADLINES**  will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** –
Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐   Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☐   Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on May 19, 2011,  I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Caused to be served via Personal Delivery:

Honorable Erithe A. Smith
United States Courthouse
411 West Fourth Street, Suite 5041
Santa Ana, CA 92701-4593

Michael Hauser, Esq.
U.S. Trustee's Office
411 West Fourth Street, 9041
Santa Ana, CA 92701

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 5/18/11 | LESLIE WOLCHUCK | /s/ Leslie Wolchuck |
|---------|------------------|---------------------|
| *Date*  | *Type Name*      | *Signature*         |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 5 -

000092

| | |
|---|---|
| In re:<br>**Palmdale Hills Property, LLC, and its Related Debtors.**<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 8:08-17206-ES |

## NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **ORDER RE CONFIRMATION HEARING AND RELATED DEADLINES**  was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**  Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of  May ___, 2011, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

☒  Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail, first class, postage prepaid, to the following person(s) and/or entity(ies) at the address(es) indicated below:

☐  Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☒  Service information continued on attached page

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 6 -

000093

**SERVED VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com

- Joseph M Adams    jadams@sycr.com

- Raymond H Aver    ray@averlaw.com

- James C Bastian    jbastian@shbllp.com

- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com

- John A Boyd    fednotice@tclaw.net

- Mark Bradshaw    mbradshaw@shbllp.com

- Gustavo E Bravo    gbravo@smaha.com

- Jeffrey W Broker    jbroker@brokerlaw.biz

- Brendt C Butler    bbutler@mandersonllp.com

- Andrew W Caine    acaine@pszyjw.com

- Carollynn Callari    ccallari@venable.com

- Cathrine M Castaldi    ccastaldi@rusmiliband.com

- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com

- Dan E Chambers    dchambers@jmbm.com

- Shirley Cho    scho@pszjlaw.com

- Vonn Christenson    vrc@paynefears.com

- Brendan P Collins    bpcollins@bhfs.com

- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com

- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com

- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com

- Ana Damonte    ana.damonte@pillsburylaw.com

- Vanessa S Davila    vsd@amclaw.com

- Melissa Davis    mdavis@shbllp.com

- Daniel Denny    ddenny@gibsondunn.com

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 7 -

000094

- Caroline Djang    crd@jmbm.com

- Donald T Dunning    ddunning@dunningLaw.com

- Joseph A Eisenberg    jae@jmbm.com

- Lei Lei Wang Ekvall    lekvall@wgllp.com

- Richard W Esterkin    resterkin@morganlewis.com

- Marc C Forsythe    kmurphy@goeforlaw.com

- Alan J Friedman    afriedman@irell.com

- Steven M Garber    steve@smgarberlaw.com

- Christian J Gascou    cgascou@gascouhopkins.com

- Barry S Glaser    bglaser@swjlaw.com

- Robert P Goe    kmurphy@goeforlaw.com,
  rgoe@goeforlaw.com;mforsythe@goeforlaw.com

- Eric D Goldberg    egoldberg@stutman.com

- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com

- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

- Kelly C Griffith    bkemail@harrisbeach.com

- Matthew Grimshaw    mgrimshaw@rutan.com

- Kavita Gupta    kgupta@winthropcouchot.com

- Asa S Hami    ahami@morganlewis.com

- Michael J Hauser    michael.hauser@usdoj.gov

- D Edward Hays    ehays@marshackhays.com

- Michael C Heinrichs    mheinrichs@omm.com

- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com

- Jonathan M Hoff    jonathan.hoff@cwt.com

- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com

- Michelle Hribar    mhribar@rutan.com

- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com

- Lawrence A Jacobson    laj@cohenandjacobson.com

- Michael J Joyce    mjoyce@crosslaw.com

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 8 -

000095

- Stephen M Judson    sjudson@fablaw.com

- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com

- Steven J Kahn    skahn@pszyjw.com

- Sheri Kanesaka    sheri.kanesaka@bryancave.com

- David I Katzen    katzen@ksfirm.com

- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com

- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com

- Irene L Kiet    ikiet@hkclaw.com

- Claude F Kolm    claude.kolm@acgov.org

- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com

- David B Lally    davidlallylaw@gmail.com

- Leib M Lerner    leib.lerner@alston.com

- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com

- Charles Liu    cliu@winthropcouchot.com

- Kerri A Lyman    klyman@irell.com

- Mariam S Marshall    mmarshall@marshallramoslaw.com

- Robert C Martinez    rmartinez@mclex.com

- Michael D May    mdmayesq@verizon.net

- Hutchison B Meltzer    hmeltzer@wgllp.com

- Krikor J Meshefejian    kjm@lnbrb.com

- Joel S. Miliband    jmiliband@rusmiliband.com

- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com

- Louis R Miller    smiller@millerbarondess.com

- Randall P Mroczynski    randym@cookseylaw.com

- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

- Robert Nida    Rnida@castlelawoffice.com

- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 9 -

000096

- Sean A Okeefe    sokeefe@okeefelc.com

- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com

- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com

- Penelope Parmes    pparmes@rutan.com

- Ronald B Pierce    ronald.pierce@sdma.com

- Katherine C Piper    kpiper@steptoe.com

- Cassandra J Richey    cmartin@pprlaw.net

- Debra Riley    driley@allenmatkins.com

- James S Riley    tgarza@sierrafunds.com

- Todd C. Ringstad    becky@ringstadlaw.com

- R Grace Rodriguez    ecf@lorgr.com

- Martha E Romero    Romero@mromerolawfirm.com

- Ronald Rus    rrus@rusmiliband.com

- John P Schafer    jschafer@mandersonllp.com

- John E Schreiber    jschreiber@dl.com

- William D Schuster    bills@allieschuster.org

- Christopher P Simon    csimon@crosslaw.com

- Wendy W Smith    wendy@bindermalter.com

- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com

- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com

- Michael St James    ecf@stjames-law.com

- Michael K Sugar    msugar@irell.com

- Cathy Ta    cathy.ta@bbklaw.com,
  Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com

- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

- James E Till    jtill@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 10 -

000097

1    • Carol G Unruh    cgunruh@sbcglobal.net

2    • Annie Verdries    verdries@lbbslaw.com

3    • Jason Wallach    jwallach@gladstonemichel.com

4    • Joshua D Wayser    , kim.johnson@kattenlaw.com

5    • Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com

6    • Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

7    • David M Wiseblood    dwiseblood@seyfarth.com

8    • Brett K Wiseman    bwiseman@aalaws.com

9    • Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com

10   • Marc A. Zimmerman    joshuasdaddy@att.net

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**ORDER RE CONFIRMATION HEARING AND
RELATED DEADLINES**
Order#40653#8e813109-bbdc-4026-8c55-39ed46a7da08

- 11 -

000098

**Exhibit 5**

000099

PAUL J. COUCHOT -- State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Administratively Consolidated
Debtors-in-Possession

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
**RUS MILIBAND & SMITH P.C.**
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile:  (949) 252-1514

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| Palmdale Hills Property, LLC, and its Related Debtors.<br><br>Jointly Administered Debtors and Debtors-in-Possession | Jointly Administered With Case Nos. 8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES; 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES; 8:08-bk-17231ES; 8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES; 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES; 8:08-bk-17408ES; 8:08-bk-17409ES; 8:08-bk-17458ES; 8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES; and 8:08-17588ES. |

Affects:
- ☐ All Debtors
- ☒ Palmdale Hills Property, LLC,
- ☒ SunCal Beaumont Heights, LLC
- ☐ SCC/Palmdale, LLC
- ☐ SunCal Johannson Ranch, LLC
- ☒ SunCal Summit Valley, LLC
- ☒ SunCal Emerald Meadows LLC
- ☒ SunCal Bickford Ranch, LLC
- ☒ Acton Estates, LLC
- ☐ Seven Brothers LLC
- ☒ SJD Partners, Ltd.
- ☐ SJD Development Corp.
- ☐ Kirby Estates, LLC
- ☐ SunCal Communities I, LLC
- ☐ SunCal Communities III, LLC
- ☒ SCC Communities LLC
- ☐ North Orange Del Rio Land, LLC
- ☒ Tesoro SF, LLC

*Continued on Next Page*

Chapter 11 Cases

**SUNCAL PARTIES' REPLY TO OPPOSITION TO MOTION REGARDING ENTITLEMENT TO DISCOVERY IN CONNECTION WITH CLAIM OBJECTION AND/OR IMPOSING DISCRETIONARY STAY**

DATE:       May 13, 2011
TIME:       9:30 a.m.
PLACE:     Courtroom 5A

*Continued from Previous Page*

☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF CONTENTS

2

| | | PAGE |
|---|---|---|
| I. | PRELIMINARY STATEMENT ................................................................ | 1 |
| II. | THE LEHMAN ENTITIES' STAY ARGUMENT IS PATENTLY MERITLESS................................................................................................ | 4 |
| III. | THE CONTENTION THAT THE RECOUPMENT OBJECTION IS SETOFF IN DISGUISE IS ERRONEOUS ........................................... | 7 |
| IV. | THE LEHMAN ENTITIES' CONTENTION THAT CLAIM ALLOWANCE DISPUTES ARE UNNECESSARY IN THE CONFIRMATION IS PROCESS IS BELIED BY THEIR OWN PLEADINGS ....................................................................................... | 9 |
| V. | DISCOVERY AND A HEARING ON THE AMOUNT OF THE LEHMAN ENTITIES' CLAIMS AFTER DUE CONSIDERATION OF DEFENSES IS NECESSARY ................................................................ | 10 |
| VI. | THE LEHMAN ENTITIES' REQUEST FOR A STAY OF THE CLAIM OBJECTION SHOULD BE DENIED............................................ | 13 |
| VII. | CONCLUSION................................................................................................ | 13 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MAINDOCS-#161523-v2-SCC_ReplyDiscoveryMotion05122011.DOC

000102

| | |
|---|---|
| 1 | **TABLE OF AUTHORITIES** |
| 2 | **PAGE** |

**CASES**

*Addison v. Langston (In re Brints Cotton Mktg., Inc.),*
   737 F.2d 1338 (5th Cir.1984) ............................................................................ 11

*Cahill v. Liberty Mutual Ins. Co.,*
   80 F.3d 336 (9th Cir.1996) ................................................................................ 8

*In re Aspen Limousine Serv., Inc.,*
   193 B.R. 325 (D.Colo.1996) .............................................................................. 11

*In re Bousa, Inc.,*
   2005 WL 1176108, *4 (S.D.N.Y. 2005) .......................................................... 4

*In re Dennis Ponte, Inc.,*
   61 B.R. 296 (Bankr. 9th Cir.1986) ................................................................... 10

*In re Dimas, LLC,*
   2007 WL 2127312, *20 (Bankr.N.D.Cal. 2007) ............................................. 2

*In re Discount Family Boats of Texas, Inc.,*
   233 B.R. 365 (Bankr.E.D.Tex. 1999) ............................................................... 2

*In re Eagle Bus Mfg., Inc.,*
   158 B.R. 421 (S.D.Tex.1993) ........................................................................... 11

*In re Evans Prods. Co.,*
   60 B.R. 863 (S.D.Fla.1986) .............................................................................. 11

*In re Financial News Network,*
   158 B.R. 570 (S.D.N.Y. 1993) ................................................................. 4, 5, 6

*In re Harrison,*
   987 F.2d 677 (10th Cir. 1993) .......................................................................... 1

*In re Larsen,*
   80 B.R. 784 (Bankr. E.D.Va. 1987) ................................................................. 2

*In re M. Long Arabians,*
   103 B.R. 211 (9th Cir.BAP 1989) .................................................................... 1

*In re MacDonald,*
   128 B.R. 161 (Bankr. W.D. Tex. 1991) ..................................................... 10, 11

*In re Madigan,*
   270 B.R. 749 (B.A.P. 9th Cir. 2001) ............................................................... 8

*In re Meade,*
   1999 WL 33496001, 1 (E.D.Pa. 1999) ............................................................ 4

MAINDOCS-#161523-v2-SCC_ReplyDiscoveryMotion05122011.DOC

000103

## TABLE OF AUTHORITIES

### (Continued)

**PAGE**

*In re Merrick,*
    175 B.R. 333, 338 (9th Cir. BAP 1994) ............................................5, 6

*In re Mid Atlantic Fund, Inc.,*
    60 B.R. 604 (Bankr. S.D.N.Y. 1986) ..............................................2

*In re Palmdale Hills Property, LLC,*
    423 B.R. 655 (9th Cir.BAP 2009) ............................................1, 4, 5

*In re Pizza of Hawaii, Inc.,*
    761 F.2d 1374 (9th Cir.1985) ..................................................10

*In re Tidewater Memorial Hosp., Inc.,*
    106 B.R. 885 (Bankr.E.D.Va. 1989) ..............................................1

*In re Wallace's Bookstores, Inc.,*
    317 B.R. 720 (Bankr. E.D. Ky. 2004) ............................................11

*In re Way,*
    229 B.R. 11 (9th Cir. BAP 1998) ................................................5

*In re Wheatfield Business Park,*
    308 B.R. 463 (9th Cir. BAP 2004) ............................................4, 5, 6

*In re Windsor Plumbing Supply Co.,*
    170 B.R. 503 (Bankr.E.D.N.Y.1994) ............................................11

*Justus v. Fin. News Network, Inc., (In re Fin. News Network, Inc.),*
    158 B.R. 570 (S.D.N.Y.1993) ..................................................5

*LeCompte v. Sparks,*
    1997 WL 156488, 5 (N.D.Ill. 1997) ............................................3

*Matter of Eye Contact, Inc.,*
    97 B.R. 990 (Bankr.W.D.Wis. 1989) ............................................2

*Newbery Corp. v. Fireman's Fund Ins. Co.,*
    95 F.3d 1392 (9th Cir.1996) ..................................................7

*Olick v. Parker & Parsley Petroleum Co.,*
    145 F.3d 513 (2d Cir. 1998) ..................................................6

*Oregon v. Harmon (In re Harmon),*
    188 B.R. 421 (9th Cir. BAP 1995) ..............................................7

*Pinkstaff v. United States (In re Pinkstaff),*
    974 F.2d 113 (9th Cir.1992) ..................................................8

# TABLE OF AUTHORITIES

## (Continued)

**PAGE**

*Shwarz v. United States,*
    234 F.3d 428 (9th Cir. 2000) ......................................................................8

*Sims v. U.S. Dept. of Health and Human Servs. (In re TLC Hosps., Inc.),*
    224 F.3d 1008 (9th Cir.2000) .....................................................................7

*Soto v. City of Concord,*
    162 F.R.D. 603 (N.D. Cal. 1995) ...............................................................12

*Vasile v. Dean Witter Reynolds Inc.,*
    20 F.Supp.2d 465 (E.D.N.Y. 1998) .............................................................6

## STATUTES

11 U.S.C. § 362(a)(3) ....................................................................................6
11 U.S.C. § 501 ..............................................................................................1
11 U.S.C. § 502 ..............................................................................................1
11 U.S.C. § 502(a). ........................................................................................1
11 U.S.C. § 502(c) ........................................................................................10
11 U.S.C. § 502(d) ..........................................................................................6
11 U.S.C. § 544 ..............................................................................................2
11 U.S.C. § 550 ..............................................................................................2
11 U.S.C. § 1125 .............................................................................2, 10, 12
11 U.S.C. § 1126(a) ........................................................................................1
11 U.S.C. § 1129 .............................................................................2, 3, 10
11 U.S.C. § 1129(a)(2) ..................................................................................12
11 U.S.C. § 1129(a)(7) ...........................................................................3, 12
11 U.S.C. § 1129(b)(2)(B)(i) ........................................................................12
11 U.S.C. § 1129(b)(2)(B)(ii) .......................................................................12
11 U.S.C. § 1141 ............................................................................................3

## RULES

Fed.R.Civ.P. 26(b)(1) ....................................................................................12
Fed.R.Civ.P. 3007 ..........................................................................................4
Fed.R.Civ.P. 9019 ......................................................................................3, 9

## TREATISES

4 *Collier on Bankruptcy,* ¶ 553.03, at 553–15 (15th ed.1995) .....................7
5 *Collier, supra,* ¶ 553.10[1] .........................................................................8
*Collier on Bankruptcy,* 15th Ed. Revised ¶ 502.05 (2010) .........................2

1    Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2    Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3    Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4    Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro"), and SunCal Management,

5    LLC ("SunCal Management") (collectively, the "SunCal Parties"), hereby submit the following

6    *Reply* to the *Lehman Entities' Opposition To Motion for An Order Regarding Entitlement To*

7    *Discovery In Connection With Claim Objection And/Or Imposing Discretionary Stay* (the

8    "Opposition") filed by Lehman Ali, Inc. and Lehman Commercial Paper, Inc. ("LCPI") (together

9    the "Lehman Entities").

**I**

**PRELIMINARY STATEMENT**

12    The Lehman Entities' opposition to the Motion is premised upon the untenable contention

13    that their claims should not only be deemed to be valid in the coming confirmation contest, but

14    should be immune from challenge in this context. This position is directly contrary to both the

15    letter and the spirit of the sections of the Bankruptcy Code (the "Code") that govern claims, and

16    contrary to basic notions of due process.

17    The Code affords filed claims a limited prima facie validity. 11 U.S.C. § 502(a). Once an

18    objection to a claim is filed this validity evaporates. *From and after that point in time, the creditor*

19    *bears the burden of proving the validity of every dollar asserted in its claims, through the*

20    *admission of competent evidence.*[1] Consistent with this "you prove it" orientation, the Code denies

21    a creditor holding a claim subject to a pending objection the right to vote on a plan, and the right

22    to receive any distribution, until its claim is "allowed".[2] Section 502(d) of the Code goes even

23    further and perpetually suspends a creditor's right to payment on a claim, valid or otherwise, until

---

[1] *In re Harrison*, 987 F.2d 677, 680 (10th Cir. 1993) ("In short, a proper claim timely filed stands, absent objection. If objection is made to the proof of claim, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim."); *In re Tidewater Memorial Hosp., Inc.*, 106 B.R. 885, 888-889 (Bankr.E.D.Va. 1989) ("While the filing of a proof of claim under § 501 of the Bankruptcy Code may be prima facie evidence of the claim, upon objection the creditor has the ultimate burden of proof to establish the validity of the claim by a preponderance of the evidence.")

[2] *In re M. Long Arabians*, 103 B.R. 211, 215 (9th Cir.BAP 1989) ("Section 1126(a) provides that only a 'holder of a claim or interest allowed under section 502 of this title may accept or reject a plan.' Section 502(a) provides that a claim is 'deemed allowed, unless a party in interest ... objects.' Accordingly, until a party is deemed to have an 'allowed' claim, or actually has an allowed claim, it has no right to accept or reject a plan.")

-1-

1   that creditor pays the estate any sums that it might owe to the estate under Sections 544

2   through 550. A final judicial determination on the merits of such a repayment obligation is not

3   required for this suspension to come into play.[3] In summary, the Code's statutory system imposes

4   upon *the creditor* the obligation to affirmatively prove its claim, before the creditor is entitled to

5   any material rights under the Code.

6          The "assumed validity" and "immunity" the Lehman Entities demand for their claims is

7   not only the antithesis of what Congress provided for in the Code, this demand is hypocritical in

8   the extreme. In a pleading filed two days prior to the Opposition (Dkt. No. 2049), Lehman boasts

9   that it is actively objecting to a host claims, including SunCal Management's claims, in order to

10  insure the feasibility of its own plans. Yet, at the very same time, the Lehmann Entities are

11  insisting that their claims should be shielded from attack, deemed valid, and that the amount of

12  these "special" claims is somehow irrelevant under Section 1129. Although this "hunt with the

13  hounds run with the hares" orientation is consistent with the Lehman Entities' past conduct in this

14  case, it should not find favor with the Court.

15         The Lehman Entities' contention that the purported "settlement" they reached with the

16  Chapter 11 trustee in the Trustee Cases somehow obviates any need to resolve the validity of their

17  claims, mischaracterizes the facts and ignores the applicable provisions in 11 U.S.C. § 1125

18  and 1129. The fact of the matter is the Lehman Entities and the Trustee do not have a "settlement."

19  The Trustee lacks the power to unilaterally settle a matter of this magnitude without court

20  approval, and such approval has not been sought or granted.[4] The so-called "settlement" is nothing

21

---

22  [3] It is black letter law that a *judgment* on an avoidance action is not necessary to invoke Section 502(d). Collier on
    Bankruptcy 15th Ed. Revised ¶ 502.05 (2010) ("The wording of section 502(d) refers to transfers 'avoidable' under

23  various sections and not to claims that have been avoided."). Rather, the objecting party must merely make a *prima
    facie* showing of an avoidable transfer in order to object to a claim under Section 502(d). See Matter of Eye Contact,

24  Inc., 97 B.R. 990, 992 (Bankr.W.D.Wis. 1989) ("The trustee need not commence an avoidance action to bring section
    502(d) into play. By making a *prima facie* showing that the transfer is voidable, he can assert the alleged preference

25  defensively under section 502(d) to defeat a proof of claim."); In re Discount Family Boats of Texas, Inc., 233 B.R.
    365, 368 (Bankr.E.D.Tex. 1999) (avoidance action is unnecessary - § 502(d) can be invoke by claim objection and a

26  prima facie showing of an avoidable transfer); In re Larsen, 80 B.R. 784, 791 (Bankr. E.D.Va. 1987); In re Mid
    Atlantic Fund, Inc., 60 B.R. 604, 610 (Bankr. S.D.N.Y. 1986) ("The Trustee has made a *prima facie* showing that the

27  assignment of the Fredebaugh Mortgage was a preferential transfer.").
    [4] *In re Dimas, LLC*, 2007 WL 2127312, *20 (Bankr.N.D.Cal. 2007) ("a settlement or compromise agreement between

28  the debtor in possession and another party must be approved by the court, after notice and opportunity for a hearing, to
    be enforceable. Because the parties … did not obtain court approval of the compromise, it is not enforceable against
    the estate.").

-2-

1   more than an "offer" that the Trustee and the Lehman Entities have agreed to present to the

2   creditors via their joint plans. The merits of this "offer" are not reviewable under the Rule 9019

3   standard, as the Lehman Entities suggest. Instead, this putative deal must satisfy all of the

4   requirements in Section 1129 of the Code.[5]  The amount and validity of claims being settled may

5   not always be critical under Rule 9019, but the amount and validity of secured claims is a critical

6   issue under Section 1129.

7       The simple fact is the unsecured creditors in the Trustee Debtor cases cannot obtain

8   "adequate information" regarding what they would receive in a liquidation, as required under

9   11 U.S.C. § 1129(a)(7), *unless they have some degree of certainty regarding what is owed on the*

10  *Lehman Claims, which comprise 90% of the claims total.* To provide the court an example, if this

11  Court concludes that the defenses asserted by the SunCal Parties are sufficient to justify the

12  disallowance of even ten percent the amount alleged in the Lehman Entities' secured claims, the

13  unsecured creditors will receive a dividend that is more than twenty times higher than the 1%

14  pittance the Lehman Entities and the Trustee are offering.

15      Given this math, and the strength of the evidence submitted by the SunCal Parties in

16  support of their claim objections, any analysis under Section 1129(a)(7) is futile without some

17  level of discovery and a hearing on the merits. Even under the rubric of the most summary

18  estimation proceeding, discovery is allowed and evidence is taken. In a case involving over a

19  billion dollars in disputed claims, the Lehman Entities "because we say so" evidence in support of

20  validity is not sufficient.

21      In weighing the merits of this particular issue, which boils down to what level of discovery

22  is appropriate, not whether it should be allowed at all, the SunCal Parties would ask the Court to

23  consider the history in this case. From day one, the Lehman Entities have frantically opposed any

24  discovery that would allow the SunCal Parties to put any of the Lehman Entities' witnesses under

25  oath, through the deposition process (never mind at a hearing on the merits). In fact, the Court

26  _____

27  [5]*LeCompte v. Sparks,* 1997 WL 156488, 5 (N.D.Ill. 1997) (" The bankruptcy court concluded that to the extent the
    Settlement Agreement was part of the plan of reorganization, the LeComptes should have know it was unenforceable

28  until court approval, as required under §§ 1129 and 1141. ... Certainly the LeComptes must have known that
    confirmation of a plan is not a ministerial act (especially in this case) and that to the extent their agreement was part of
    a plan, under § 1141 it was not enforceable until confirmed.")

-3-

MAINDOCS-#161523-v2-SCC_ReplyDiscoveryMotion05122011.DOC

000108

1    may recall Mr. Ziehl vehemently insisting at an earlier hearing (before the equitable subordination

2    action was stayed) that not one of the Lehman Entities' witnesses could be deposed before every

3    last scrap of documentary evidence was produced. This reluctance, if not near hysteria, speaks

4    volumes. The Lehman Entities "doth protest too much"[6] for a reason. They cannot respond to the

5    wealth of testimony submitted by the SunCal Parties in opposition to the Lehman Claims. The

6    simple fact is that if the claim objection is allowed to proceed, the SunCal Parties will prevail, and

7    the creditors will get their due.

8         In responding to the Lehman Entities' contention that the claims objection violates LCPI's

9    stay, the SunCal Parties would ask the Court to make the following inquiry of the Lehman Entities

10   counsel: "Please cite just one case holding that a claim objection violates the automatic stay?" The

11   answer to this inquiry, as the Court is aware, is "none." Every case that has considered this issue,

12   including every case in the Second Circuit, has held that a claim objection does not violate the

13   stay. The Lehman Entities' contention that the SunCal Parties' claim objection is something other

14   than a claim objection, although absurd, is easily addressed. The SunCal Parties hereby state that

15   the claim objection is that and nothing more and no relief is sought, or should be granted, outside

16   the parameters of Federal Rule of Bankruptcy Procedure 3007. Respectfully, they cannot be

17   clearer than that.

18                                      **II**

19   **THE LEHMAN ENTITIES' STAY ARGUMENT IS PATENTLY MERITLESS**

20         Where there are two independent bankruptcy estates, and one estate asserts a claim against

21   the other, an objection to claim does not violate the claimant's automatic stay. *See In re Wheatfield*

22   *Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re Financial News Network*, 158 B.R.

23   570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003); *In re PRS Ins.*

24   *Group*, 331 B.R. 580, 587 (Bankr.D.Del. 2005); In re Meade, 1999 WL 33496001, 1 (E.D.Pa.

25   1999).[7]  In fact, the BAP decision in *In re Palmdale Hills Property, LLC*, 423 B.R. 655 (9th

26   Cir.BAP 2009), which the Lehman Entities' falsely contend supports their position, cited the

27

28   [6] *Hamlet Act 3, scene 2, 222–230.*
     [7] *See also In re Bousa, Inc.*, 2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the claim, the automatic stay provision does not preclude adjudication.").

-4-

1   *Wheatfield Business Park* and *Financial News Network* decisions (with approval) for the

2   proposition that claim objections *do not* violate the stay of a debtor-claimant:

3             The distinction between defensive and offensive actions affecting a debtor's estate
            is appropriate in determining the applicability of the automatic stay because

4             courts have held that a debtor may defend against suits brought against it without
            violating an automatic bankruptcy stay. Justus v. Fin. News Network, Inc., (In re Fin. News

5             Network, Inc.), 158 B.R. 570, 573 (S.D.N.Y.1993) (distinguishing cases where a
            party "makes an active attempt to recover property" of a debtor through judicial

6             or adversary proceedings); In re Merrick, 175 B.R. at 336. In particular, courts
            allow debtors to object to creditors' claims on the basis that it is a defense against

7             the assertion of the claim, and therefore, does not violate the creditor's automatic

8             stay. In re Wheatfield Bus. Park, LLC, 308 B.R. at 466.

9   *Palmdale Hills Property*, 423 B.R. at 665.

10        The case of *Wheatfield Business Park*, 308 B.R. 463 (9th Cir. BAP 2004), involved a

11   Chapter 11 debtor pending in the Central District of California. A creditor (the Appellant) was

12   also a chapter 11 debtor in a proceeding pending in the Southern District of New York. Id. at 465.

13   The California Debtor filed a motion to disallow Creditor/Appellant's proof of claim as untimely.

14   Id. at 465. The California Bankruptcy Court granted the motion disallowing the claim, and the

15   Creditor/Appellant appealed. One of the issues on appeal was:

16             that Appellant was in its own Chapter 11 bankruptcy case in New York and there
            had been no order granting relief from stay. In response, the Court stated "that's of

17             no consequence here, sir. Hi-Tech is a claimant here. That's the role of a plaintiff.
            The automatic stay doesn't apply to plaintiffs, or it doesn't apply when plaintiffs

18             get automatic stays. It only applies when defendants get automatic stays."

19   *Wheatfield Business Park*, 308 B.R. at 465.

20        The Bankruptcy Appellate Panel agreed that the creditor's automatic stay did not apply as

21   the creditor was effectively acting in the capacity of a plaintiff, to whom the stay does not apply:

22             Appellant contends that the Debtor was required to obtain relief from the
            automatic stay in Appellant's bankruptcy case before objecting to the claim. We

23             disagree. The bankruptcy court correctly decided that Debtor did not violate the
            automatic stay in Appellant's Chapter 11 by objecting to the claim filed in

24             Debtor's case. Appellant was the claimant, and the automatic stay does not apply
            under such circumstances. *In re Way*, 229 B.R. 11, 13 (9th Cir. BAP 1998); *In re*

25             *Merrick,* 175 B.R. 333, 338 (9th Cir. BAP 1994).

26   *Wheatfield Business Park*, 308 B.R. at 466.

       The BAP's citation in *Wheatfield Business* to *In re Merrick,* 175 B.R. 333 (9th Cir. BAP

27   1994) and *In re Way,* 229 B.R. 11 (9th Cir. BAP 1998) are instructive. In both *Merrick* and *Way*,

28

-5-

1    the debtor was a plaintiff in litigation pending in state court. The defendants sought to dismiss the

2    action, and the plaintiff-debtor contended that such act constituted a violation of the automatic

3    stay. The BAP in both the *Merrick* and *Way* decisions held that defending against an action or

4    claim brought by a debtor does not violate the automatic stay.

5         Thus, where one bankruptcy estate asserts a claim against another bankruptcy estate, the

6    BAP decision in *Wheatfield Business* equates the bankruptcy estate asserting the claim as a

7    plaintiff, and concludes that the stay does not apply to such debtor acting in the capacity of a

8    plaintiff or claimant. Accordingly, a bankruptcy estate which is merely defending against the

9    claim asserted by another debtor does not violate the other's stay.

10        The law in the Second Circuit is substantially identical. In *In re Financial News Network*,

11   158 B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the

12   Southern District of California, filed a claim in Financial News Network's Chapter 11 case in the

13   Southern District of New York. When Kaypro's claim was disallowed by the bankruptcy court in

14   New York, Kaypro appealed contending that this relief was barred by its automatic stay in

15   California. The District Court rejected this position, stating:

16        In sum, both the language and purpose of section 362 indicate that the automatic
         stay in effect in the Bankruptcy Court for the Southern District of California did
17        not preclude the New York Bankruptcy Court from sustaining FNN's objection to
         Kaypro's proof of claim filed in New York Bankruptcy Court. Accordingly, the
18        Court finds that the order of the Bankruptcy Court for the Southern District of
         New York sustaining the objection to Kaypro's proof of claim was not a violation
19        of the automatic stay in place in the Bankruptcy Court for the Southern District of
         California, and the Bankruptcy Court in New York exercised its appropriate
20        jurisdiction to disallow Kaypro's proof of claim.

21   *Financial News*, 158 B.R. at 573. *See also Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d

22   513, 516 (2d Cir. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 499 (E.D.N.Y.

23   1998) ("the primary claims raised by [debtor] are claims asserted by, and not against, the debtor,

24   and are therefore not subject to the stay and can be immediately adjudicated."); *In re Metiom, Inc.*,

25   301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003) (§502(d) claim objection was defensive and did not

26   violate creditor's automatic stay) and *In re PRS Ins. Group*, 331 B.R. 580, 584 (Bankr.D.Del.

27   2005) (applying *Metiom* to Ohio stay analogous to § 362(a)(3), § 502(d) claim objection was

28   defensive and did not violate the creditor's stay). Here, the within Motion does not seek any

-6-

1    affirmative recovery against LCPI. Rather, the SunCal Parties are merely acting defensively to

2    disallow the Lehman Claims.

3         The Lehman Entities' contention that this Court dismissed the Section 502(d) objections

4    from the adversary proceeding due to applicability of LCPI's automatic stay, is irrelevant and

5    erroneous. The Court's order solely requires relief from stay to bring causes of action *in the*

6    *adversary proceeding*. The April 12th Order states: "Plaintiffs must seek relief from LCPI's

7    automatic stay in the United States Bankruptcy Court for the Southern District of New York in

8    order to bring any claims against LCPI *in this adversary proceeding*." Here, the SunCal Parties

9    are not bringing a 502(d) cause of action *in the adversary proceeding*, but rather bringing an

10   objection to claim in the main case, which is clearly not subject to LCPI's automatic stay.  A

11   claim objection based upon Section 502(d) is still a claim objection and it is clearly defensive,

12   since no affirmative relief is sought. *See Metiom,* 301 B.R. at 638-639 (Bankr. S.D.N.Y. 2003)

13   (§ 502(d) claim objection was defensive and did not violate creditor's automatic stay); *PRS Ins*,

14   331 B.R. at 584 (Bankr.D.Del. 2005) (applying *Metiom*, § 502(d) claim objection was defensive

15   and did not violate the creditor's stay). In fact, under Federal Rule of Bankruptcy Procedure,

16   affirmative relief cannot be sought in a claim objection.

17        In summary, in the *claim objection* before the Court, the SunCal Parties seek to reduce,

18   dollar for dollar, *the amount* of the Lehman Entities' claim by the sums that they are owed on

19   various grounds. This does not implicate LCPI's stay.

## III

## THE CONTENTION THAT THE RECOUPMENT

## OBJECTION IS SETOFF IN DISGUISE IS ERRONEOUS

23        The Lehman Entities contention that the "recoupment" alleged in the Claim Objection is

24   really a "setoff" and hence subject to LCPI's automatic stay  is erroneous. The Claim Objection

25   makes it crystal clear that recoupment is the applicable relief sought against LCPI. Recoupment "

26   'is the setting up of a demand arising from the *same transaction* as the plaintiff's claim or cause of

27   action, strictly for the purpose of abatement or reduction of such claim.' " *Newbery Corp. v.*

28   *Fireman's Fund Ins. Co.,* 95 F.3d 1392, 1399 (9th Cir.1996) (quoting 4 *Collier on Bankruptcy,* ¶

-7-

1   553.03, at 553–15 (15th ed.1995)) (emphasis in original). It involves "netting out debt," *Oregon v.*

2   *Harmon (In re Harmon),* 188 B.R. 421, 425 (9th Cir. BAP 1995). This is exactly what the SunCal

3   Parties seek to do through the Claim Objection.

4   　　　In defining the parameters of the "transaction", the Ninth Circuit applies the "logical

5   relationship" test. *Sims v. U.S. Dept. of Health and Human Servs. (In re TLC Hosps., Inc.),* 224

6   F.3d 1008, 1012 (9th Cir.2000). This test has been described as follows:

7   　　　　A logical relationship exists when the counterclaim arises from the same
　　　　aggregate set of operative facts as the initial claim, in that the same operative facts
8   　　　　serve as the basis of both claims or the aggregate core of facts upon which the
　　　　claim rests activates additional legal rights otherwise dormant in the defendant.
9

10   *Pinkstaff v. U.S. (In re Pinkstaff),* 974 F.2d 113, 115 (9th Cir.1992). "In applying this standard,

11   "courts have permitted a variety of obligations to be recouped against each other, **requiring only**

12   **that the obligations be sufficiently interconnected so that it would be unjust to insist that one**

13   **party fulfill its obligation without requiring the same of the other party.**" *In re Madigan,* 270

14   B.R. 749, 755 (B.A.P. 9th Cir. 2001) citing, 5 *Collier,* at ¶ 553.10[1] (emphasis added).

15   　　　The "logical relationship" between the underlying loan obligations and obligations

16   undertaken in the Restructuring Agreement and Settlement Agreement is undeniable. The latter

17   transactions were entered into to "restructure" the existing lending relationships, by, *inter alia,*

18   transferring ownership of *the collateral* securing these loans to new entities, and by providing a

19   source of funding – a Lehman source of funding – to pay the vendor claims and bond obligations

20   that were inextricably tied to this collateral. In sum, the relationship between the loans, and the

21   Restructuring Agreement and Settlement Agreement, was substantially more than merely

22   "logical." By agreement, it was inextricable.

23   　　　Although the Lehman Entities are welcome to contest the obvious *at the hearing on the*

24   *Claim Objection,* their efforts to summarily dismiss the merits of this objection, and to thereby

25   deny the SunCal Parties any discovery, cannot succeed. In reviewing the Claim Objection, at this

26   juncture (along with all the supporting declarations), its contents should be construed in the light

27   most favorable to the SunCal Parties, and all well-pleaded factual allegations should be accepted as

28   true. *See Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000); *Cahill v. Liberty Mutual Ins.*

1     *Co.,* 80 F.3d 336, 337-38 (9th Cir.1996). A contest over the facts, should, at a minimum, await the

2     conclusion of a reasonable amount of discovery, and a hearing on the merits.

3     **IV**

4     **THE LEHMAN ENTITIES' CONTENTION THAT CLAIM**

5     **ALLOWANCE DISPUTES ARE UNNECESSARY IN THE**

6     **CONFIRMATION IS PROCESS IS BELIED BY THEIR OWN PLEADINGS**

7         In the Reply Lehman argues that there is no need to resolve the amount of their claims. To

8     the contrary, they demand a stay of the "barrage of discovery" that will result if the claims

9     allowance process moves forward as to their claims. **However, in the same objection they insist**

10     **that their plan confirmation is conditioned upon the resolution of host of other pending**

11     **claims objections that they are actively pursuing (Dkt. No. 2049):**

| P. 7, ll. 10-17 | **Although the Lehman Creditors are not presently prepared to agree to take more financial risk on claims** or distribution levels than set forth in the Plans, as of the filing of the Disclosure Statements, the Lehman Creditors estimate that creditors would receive under the Plans the maximum estimated distributions therein based on known claims (and will amend their Disclosure Statements to more expressly reflect this). **Still, the Lehman Creditors are attempting, by confirmation, to themselves better understand the claims. Moreover, to the extent that the claims allowance and executory contract processes go forward as to claims subject to the caps or thresholds under the Plans, more and more of these claims estimates can become certainties.** |
|---|---|
| P. 7, ll. 18-26 | By confirmation, the Lehman Creditors are hoping to have additional facts and certainties as to claims so that they have more information with which to make their determinations as to whether the Plans' claims conditions are met. **For the cases of the TD Plan Debtors, the claims allowance process is underway. The Lehman Creditors and Trustee have completed proceedings as to numerous duplicate and late-filed claims and recently filed objections to the large SunCal claims. The Lehman Creditors also are analyzing other claims and intend to work with the Trustee to move forward together to obtain the actual disallowance of appropriate disputed claims and in ferreting out possible unknown claims.** |

25         The cases cited by Lehman in support of its contention that a "mini trial" on the amount of

26     their claims is unnecessary address settlements presented for approval under Federal Rule of

27     Bankruptcy Procedure 9019. No settlement is presented to this Court for approval in this context.

28     Instead, the Trustee and the Lehman Entities are making an "offer" to the creditors through the

-9-

1  plan confirmation process. To obtain approval of that offer, it must be accompanied by "adequate

2  information under 11 U.S.C. § 1125, and it must comply with all of the requirements in 11 U.S.C.

3  § 1129. In sum, these cases are inapposite.

4        As explained in the Preliminary Statement, no creditor in this case can intelligently vote on

5  the Lehman Plans without obtaining an understanding of what they would receive in a Chapter 7

6  case. Central to this liquidation analysis is what is owed on the Lehman Claims, or not owed on

7  these claims. Although the parties can debate what level of certainty is necessary regarding the

8  amount of these claims, it absurd for the Lehman Entities' to argue that "assumed validity" should

9  be the rule, and that such validity should be immune from contest. The Code provisions are

10  exactly to the contrary. When a claim objection is filed, as here, invalidity is the rule, and the

11  claimant must prove validity through competent evidence.

12                                        **V**

13  **DISCOVERY AND A HEARING ON THE AMOUNT OF THE LEHMAN ENTITIES'**

14  **CLAIMS AFTER DUE CONSIDERATION OF DEFENSES IS NECESSARY**

15        Lehman comes to this Court as a party whose claims are presently not "allowed." These

16  claims cannot be voted, they cannot serve as a basis for feasibility attacks and they are not entitled

17  to a penny of payment. The Code imposes upon the Lehman Entities the burden of changing this

18  state affairs. They must affirmatively obtain a hearing on the merits of their claims, whether

19  through the resolution of the objection itself, or through an estimation hearing. If the status quo

20  remains in place, their plan fails per se, since they have no claims.

21        Given these circumstances, the core issue before the court is what is the level of certainty

22  that is needed, at a minimum, to "estimate" the Lehman Claims under Section 502(c). See, *In re*

23  *MacDonald*, 128 B.R. 161, 164 (Bankr. W.D. Tex. 1991) ("The estimation of an unliquidated or

24  contingent administrative claim such as the post-petition tort claim is *essential* prior to the hearing

25  on confirmation of a plan, in order for the court to evaluate the feasibility of the plan without

26  unduly delaying the confirmation process. *In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th

27  Cir.1985); *In re Dennis Ponte, Inc.,* 61 B.R. 296, 299 (Bankr. 9th Cir.1986)) (emphasis added).

28

-10-

1    Although the Court has broad discretion in the estimation process, most of the cases make

2    it clear that *an evidentiary hearing* is required and discovery is allowed. See *In re Wallace's*

3    *Bookstores, Inc.*, 317 B.R. 720, 725 (Bankr. E.D. Ky. 2004) ("[T]he bankruptcy court has broad

4    discretion to fashion estimation procedures," using " 'whatever method is best suited to the

5    circumstances.' " *In re Eagle Bus Mfg., Inc.*, 158 B.R. 421, 437 (S.D.Tex.1993) (quoting *Addison*

6    *v. Langston (In re Brints Cotton Mktg., Inc.)*, 737 F.2d 1338, 1341 (5th Cir.1984)); *accord, e.g., In*

7    *re Aspen Limousine Serv., Inc.*, 193 B.R. 325, 337 (D.Colo.1996); *In re Evans Prods. Co.*, 60 B.R.

8    863, 868 (S.D.Fla.1986). "The methods used by courts have run the gamut from summary trials to

9    full-blown evidentiary hearings to a mere review of pleadings, briefs, and a one-day hearing

10   involving oral argument of counsel." *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520

11   (Bankr.E.D.N.Y.1994) (citations omitted). The court concludes that, under the circumstances of

12   this case—where estimation will effectively limit the allowed amount of the claims, where the

13   need for dispatch is not particularly great, and where the sums at stake are large—a procedure

14   closer to the "full-blown evidentiary hearing" is appropriate. The court will fashion a procedure

15   similar to the one approved by the district court in the *Eagle Bus* case, *Eagle Bus Mfg., Inc.*, 158

16   B.R. at 437 (parties were afforded seven hours to present evidence and testimony by affidavit with

17   live cross-examination), and by the bankruptcy court in the *MacDonald* case, *In re MacDonald*,

18   128 B.R. 161, 166–67 (Bankr.W.D.Tex.1991) (court approved a "summary trial" procedure

19   involving proffers of evidence, affidavits, deposition testimony, exhibits, answers to discovery

20   requests, and limited live testimony)).

21   Within the present **confirmation context**, the following core issues must be explored

22   through discovery: A) The amount owed on the Lehman Claims; B) The validity of the defenses to

23   the Lehman Claims; C) Whether the Lehman Entities breached the Settlement Agreement and

24   Restructuring Agreement; D) What is the amount of prepetition damages that can be recouped or

25   offset against the Lehman Entities' claims; E) What post-petition damages have the SunCal Parties

26   suffered through the actions of the Lehman Entities that can be recouped or offset against any

27   administrative claims asserted by the Lehman Entities; F) What Lehman Entity will be funding the

28   distributions under the plan; G) Issues relating to what amount of funds in the estate constitute

-11-

1   "cash collateral" and what amount of funds are not within this legal definition; H) Whether

2   Lehman engaged in actions pre and post-petition that would justify the disallowance or reduction

3   of their claims based upon unclean hand, and unjust enrichment defenses; and  I) Evidence relating

4   to the character (for impeachment purposes) of the witnesses that the Lehman Entities intend to

5   present in support of their claims.

6       *The discovery "barrage" allegations made by the Lehman Entities are nonsensical.*

7   *Substantially all of this evidence can be obtained through depositions, which can be completed in*

8   *less than 60 days.* This discovery is necessary to (1) enable the SunCal Parties to fairly present

9   their defenses to the Lehman Claims; (2) to enable the creditors to obtain a fair understanding

10   regarding what they are voting for  and what they could obtain in a Chapter 7; and (3) to enable

11   the Court to render a decision on compliance with Section 1129(a)(2) (disclosure of relevant data

12   under Sections 1125), 1129(a)(7), 1129(b)(2)(B)(i)  and even 1129(b)(2)(B)(ii) (in those cases

13   where no Lehman secured claims exist and equity could receive a distribution). Moreover there is

14   simply no sound basis for allowing the Lehman Entities to assert their claims in this case, while

15   concurrently allowing them to bar any discovery with respect to the same. Every single witness

16   with knowledge regarding the critical facts that bear upon their claims must submit to discovery.

17   See *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995) ("Under the Federal Rules of

18   Civil Procedure, the parties may obtain discovery regarding any matter that is (1) "not privileged"

19   and (2) "relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1).

20   Furthermore, "[t]he information sought need not be admissible at the trial if the information

21   sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* The

22   scope of discovery under the Federal Rules is extremely broad. A relevant matter is "any matter

23   that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or

24   may be in the case."). There nothing in this case that would justify denying this access to the truth.

25   / / /

26

27

28

-12-

## VI

### THE LEHMAN ENTITIES' REQUEST FOR A STAY OF

### THE CLAIM OBJECTION SHOULD BE DENIED

In the Opposition, the Lehman Entities request a stay of the pursuit of the claims objection. This procedurally improper request should be denied for the reasons stated above. The Lehman Entities cannot, on the one hand, insist that their claims should be accorded all of the attributes of validity, while concurrently insisting that any attempt to contest this unwarranted categorization must be stayed. Moreover, the Lehman Entities cannot object to those claims that they find inconvenient, since they render their plan infeasible, while concurrently barring the SunCal Parties from the objecting to the Lehman Claims, which impair the rights of the SunCal Parties. In sum there is simply no substantive or procedural basis for granting this relief.

## VII

### CONCLUSION

The Lehman Entities seek treatment for their claims that is both preferential and unfair. They seek the benefits afforded to creditors under the Code and the Federal Rules, but none of the burdens. In contrast, the SunCal Parties seek only that relief which the Code and rules provide – access to the facts regarding filed claims. The Motion should be granted.

DATED: May 12, 2011

          **WINTHROP COUCHOT**
          **PROFESSIONAL CORPORATION**

          By:    /s/ *Paul J. Couchot*
                Paul J. Couchot, Esq.
                Sean Okeefe, Esq.
                Peter Lianides, Esq.
          General Insolvency Counsel for Administratively
          Consolidated Debtors-in-Possession

          **RUS MILIBAND & SMITH P.C.**

          By:  /s/ *Ronald Rus*
                Ronald Rus, Esq.
                Joel S. Miliband, Esq.
                Catherine Castaldi, Esq.
          Attorneys for SunCal Management, LLC, and SCC
          Acquisitions Inc.

-13-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **SUNCAL PARTIES' REPLY TO OPPOSITION TO MOTION REGARDING ENTITLEMENT TO DISCOVERY IN CONNECTION WITH CLAIM OBJECTION AND/OR IMPOSING DISCRETIONARY STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 12, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On _____, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| May 12, 2011 | Susan Connor | |
| _Date_ | _Type Name_ | _Signature_ |

-14-

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@klcinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com

-15-

- Michelle Hribar   mhribar@rutan.com
- John J Immordino   john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson   laj@cohenandjacobson.com
- Michael J Joyce   mjoyce@crosslaw.com
- Stephen M Judson   sjudson@fablaw.com
- Kaleb L Judy   ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn   skahn@pszyjw.com
- Sheri Kanesaka   sheri.kanesaka@bryancave.com
- David I Katzen   katzen@ksfirm.com
- Christopher W Keegan   ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi   pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet   ikiet@hkclaw.com
- Claude F Kolm   claude.kolm@acgov.org
- Mark J Krone   mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally   davidlallylaw@gmail.com
- Leib M Lerner   leib.lerner@alston.com
- Peter W Lianides   plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu   cliu@winthropcouchot.com
- Kerri A Lyman   klyman@irell.com
- Mariam S Marshall   mmarshall@marshallramoslaw.com
- Robert C Martinez   rmartinez@mclex.com
- Michael D May   mdmayesq@verizon.net
- Hutchison B Meltzer   hmeltzer@wgllp.com
- Krikor J Meshefejian   kjm@lnbrb.com
- Joel S. Miliband   jmiliband@rusmiliband.com
- James M Miller   jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller   smiller@millerbarondess.com
- Randall P Mroczynski   randym@cookseylaw.com
- Mike D Neue   mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida   Rnida@castlelawoffice.com
- Henry H Oh   henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe   sokeefe@okeefelc.com
- Robert B Orgel   rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay   mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes   pparmes@rutan.com
- Ronald B Pierce   ronald.pierce@sdma.com
- Katherine C Piper   kpiper@steptoe.com
- Cassandra J Richey   cmartin@pprlaw.net
- Debra Riley   driley@allenmatkins.com
- James S Riley   tgarza@sierrafunds.com
- Todd C. Ringstad   becky@ringstadlaw.com
- R Grace Rodriguez   ecf@lorgr.com
- Martha E Romero   Romero@mromerolawfirm.com
- Ronald Rus   rrus@rusmiliband.com
- John P Schafer   jschafer@mandersonllp.com
- John E Schreiber   jschreiber@dl.com
- William D Schuster   bills@allieschuster.org
- Christopher P Simon   csimon@crosslaw.com
- Wendy W Smith   wendy@bindermalter.com
- Steven M Speier   Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)   Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James   ecf@stjames-law.com
- Michael K Sugar   msugar@irell.com

-16-

| | |
|---|---|
| 1 | • Cathy Ta   cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com |
| | • David A Tilem   davidtilem@tilemlaw.com, |
| 2 |   malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com |
| | • James E Till   jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com |
| 3 | • United States Trustee (SA)   ustpregion16.sa.ecf@usdoj.gov |
| | • Carol G Unruh   cgunruh@sbcglobal.net |
| 4 | • Annie Verdries   verdries@lbbslaw.com |
| | • Jason Wallach   jwallach@gladstonemichel.com |
| 5 | • Joshua D Wayser   , kim.johnson@kattenlaw.com |
| | • Christopher T Williams   ctwilliams@venable.com, jcontreras@venable.com |
| 6 | • Marc J Winthrop   mwinthrop@winthropcouchot.com, pj@winthropcouchot.com |
| | • David M Wiseblood   dwiseblood@seyfarth.com |
| 7 | • Brett K Wiseman   bwiseman@aalaws.com |
| | • Dean A Ziehl   dziehl@pszjlaw.com, dziehl@pszjlaw.com |
| 8 | • Marc A. Zimmerman   joshuasdaddy@att.net |

-17-

**Exhibit 6**

000123

PAUL J. COUCHOT -- State Bar No. 131934
SEAN A. O'KEEFE -- State Bar No. 122417
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone: (949) 720-4100
Facsimile: (949) 720-4111
General Insolvency Counsel for Administratively Consolidated
Debtors-in-Possession

RONALD RUS - State Bar No. 67369
JOEL S. MILIBAND - State Bar No. 77438
**RUS MILIBAND & SMITH P.C.**
2211 Michelson Drive, Seventh Floor
Irvine, California 92612
Telephone: (949) 752-7100
Facsimile: (949) 252-1514

Counsel for SunCal Management LLC and
SCC Acquisitions Inc.

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:08-bk-17206-ES |
| Palmdale Hills Property, LLC, and its Related Debtors. | Jointly Administered With Case Nos. |
| | 8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17224ES; 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES; 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES; 8:08-bk-17231FS; 8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES; 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES; 8:08-bk-17408FS; 8:08-bk-17409FS; 8:08-bk-17458ES; 8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES; and 8:08-17588ES. |

Jointly Administered
Debtors and Debtors-in-
Possession

Affects:

☐ All Debtors
☒ Palmdale Hills Property, LLC,
☐ SunCal Beaumont Heights, LLC
☐ SCC/Palmdale, LLC
☐ SunCal Johannson Ranch, LLC
☒ SunCal Summit Valley, LLC
☒ SunCal Emerald Meadows LLC
☒ SunCal Bickford Ranch, LLC
☒ Acton Estates, LLC
☐ Seven Brothers LLC
☒ SJD Partners, Ltd.
☐ SJD Development Corp.
☐ Kirby Estates, LLC
☐ SunCal Communities I, LLC
☐ SunCal Communities III, LLC
***Continued on Next Page***

Chapter 11 Cases

**NOTICE OF MOTION AND MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.**

DATE:    June 9, 2011
TIME:    10:30 a.m.
PLACE:   Courtroom 5A

MAINDOCS-#160014-v7-SCC_Motion_Disallow_Recoupment.DOC

000124

*Continued from Previous Page*

☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

## **TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| MEMORANDUM OF POINTS AND AUTHORITIES | | 4 |
| I | INTRODUCTION | 4 |
| II | MATERIAL BACKGROUND FACTS | 5 |
| | A. The SunCal Debtors | 5 |
| | B. Acton Estates | 5 |
| | C. Bickford Ranch | 5 |
| | D. Emerald Meadows | 6 |
| | E. Palmdale Hills | 6 |
| | F. SCC Communities | 6 |
| | G. SJD Partners | 7 |
| | H. Summit Valley | 7 |
| | I. Tesoro | 7 |
| | J. Heartland | 7 |
| | K. Marblehead | 8 |
| | L. Oak Valley | 8 |
| | M. Northlake | 8 |
| | N. PSV | 8 |
| | O. The Economic Downturn In 2007 and Promises of Funding | 9 |
| | P. The Restructuring Agreement | 9 |
| | 1. The Parties To The Restructuring Agreement | 10 |
| | 2. Lehman ALI's Obligation to Fund "Urgent Payables." | 11 |
| | 3. Lehman ALI's Obligation to Close | 12 |
| | Q. The Breach of The Restructuring Agreement | 13 |
| | 1. Failure to Pay Urgent Payables | 13 |
| | 2. Failure To Proceed With A Closing Under The Settlement Agreement | 14 |
| | 3. The Sale of Seven Sold Loans to Fenway Breached The Terms of The Restructuring Agreement. | 15 |
| | R. The Settlement Agreement | 15 |
| | 1. The Obligations to Pay Assumed and Authorized Amounts. | 16 |
| | 2. The Obligations to Assume Bond Obligations and to Replace or Release Bonds | 19 |
| | 3. Pacific Point Obligations | 22 |
| | S. The Breaches of The Settlement Agreement | 23 |

-i-

000126

|   |   | 1. | Lehman ALI Attempted To Repudiate The Settlement Agreement............................................................................. | 23 |
|   |   | 2. | The Sale of The Sold Loans Repudiated The Settlement Agreement............................................................................. | 24 |
|   |   | 3. | Covenant Not To Sue.......................................................... | 25 |
|   |   | 4. | Lehman Parties Acquire the Pacific Point Project Without Payment................................................................................ | 25 |
|   | T. | | Damages From the Breach of the Settlement Agreement.............................. | 26 |
| III. | ARGUMENT .................................................................................. | | | 27 |
|   | A. | | Lehman ALI Breached The Terms of the Restructuring Agreement ........... | 27 |
|   | B. | | The Debtor is Entitled to Recoup its Damages Against the Secured Portion of the Lehman Claims. ....................................................... | 27 |
|   | C. | | LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses........ | 30 |
|   | D. | | LCPI's Automatic Stay Does Not Apply to an Objection to Claim. ............ | 32 |
|   | E. | | Any Party in Interest Has Standing to Object to Claims.  ........................... | 33 |
| IV | CONCLUSION.............................................................................. | | | 34 |

-ii-

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

Albright v. Gates
   362 F.2d 928, 929 (9th Cir.1966) ...............................................................29

In re Anderson
   382 B.R. 496, 506 (Bankr.D.Or. 2008).....................................................34

In re Bousa, Inc.
   2005 WL 1176108, *4 (S.D.N.Y. 2005) ....................................................33

In re Brannan
   40 B.R. 20 (Bankr. N.D. Ga. 1984) .........................................................31

FDIC v. Union Entities (In re Be-Mac Transp.)
   83 F.3d 1020, 1025 (8th Cir.1996)...........................................................34

Fiberchem, Inc. v. General Plastics Corp.
   495 F.2d 737 (9th Cir.1974) ....................................................................31

In re Financial News Network
   158 B.R. 570 (S.D.N.Y. 1993)..................................................................32

Gold Mining & Water Co. v. Swinerton
   23 Cal. 2d 19, 29, 142 P.2d 22, 27 (1943) ..............................................27

Hammelburger v. Foursome Inn Corp.
   54 N.Y.2d 580, 588, 431 N.E.2d 278, 283 (1981)...................................31

Lawrence v. Steinford Holding B.V. ( In re Dominelli)
   820 F.2d 313, 316 (9th Cir.1987) ............................................................33

In re McMahon
   129 F.3d 93, 98 (2d Cir. 1997)................................................................33

In re Meade,
   1999 WL 33496001, *1 (E.D.Pa. 1999). ................................................32

In re Metiom
   301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003).................................30, 32

Minidoka Irrigation Dist. v. Dep't of the Interior
   154 F.3d 924, 927 (9th Cir.1998) ............................................................27

Moore v. New York Cotton Exchange
   270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). .................................29

Newbery Corp. v. Fireman's Fund Ins. Co.
   95 F.3d 1392, 1403 (9th Cir.1996) .........................................27, 28, 29, 33

Olick v. Parker & Parsley Petroleum Co.
   145 F.3d 513, 516 (2d Cir. 1998).............................................................33

In re Palmdale Hills Property, LLC
   423 B.R. 655, 667 n.9 (9th Cir. BAP 2009) .......................................32, 33

In re Petersen
   2010 WL 3842157, *13 (D.Ariz. 2010)...................................................33

In re QMect, Inc.
   349 B.R. 620, 625 (Bankr. N.D.Cal. 2006) .............................................34

Q Mgmt. v. Snake River Equip. Co.
   CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008) ..........27

Siegel v. Federal Home Loan Mortg. Corp.
   143 F.3d 525, 531 (9th Cir. 1998). ..........................................................34

In re Snyder
   436 B.R. 81, 90 (Bankr.C.D.Ill. 2010).....................................................31

In re Thompson
   350 B.R. 842 (Bankr.E.D.Wis. 2006) ......................................................29

In re TLC Hospitals, Inc.
   224 F.3d 1008, 1014 (9th Cir. 2000) ..................................................29, 33

000128

Vasile v. Dean Witter Reynolds Inc.
   20 F.Supp.2d 465, 499 (E.D.N.Y. 1998) ...................................................................33
In re Wheatfield Business Park
   308 B.R. 463, 466 (9th Cir. BAP 2004)..................................................................32
IRS v. Taylor
   132 F.3d 256, 261 (5th Cir.1998) ...........................................................................34

**Statutes**
11 U.S.C. § 362.............................................................................................................33
11 U.S.C. §502(a)......................................................................................................33, 34

**Other Authorities**
Advisory Committee Notes to Bankruptcy Rule 3007 .................................................33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

000129

1      Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2 Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3 Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4 Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro"), and SunCal Management,

5 LLC ("SunCal Management") (collectively, the "SunCal Moving Parties"), hereby move (the

6 "Motion") the Court, in both the Voluntary Debtors' cases[1] and the Trustee Debtors' cases[2], for an

7 order granting the following relief:[3]:

8      (A)     Disallowing the following Proofs of Claim filed by Lehman ALI, Inc. ("Lehman

9 ALI") and Lehman Commercial Paper, Inc. ("LCPI", and together with Lehman ALI, the

10 "Lehman Entities") on the grounds that the debt obligation therein was eliminated by the

11 Settlement Agreement, as that term is defined herein:

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|---|---|---|---|---|
| 6 | Acton Estates | LCPI | $343,221,391 | 1. |
| 16 | Bickford Ranch | LCPI | $343,221,391 | 2. |
| 7 | Emerald Meadows | LCPI | $343,221,391 | 3. |
| 65 | Palmdale Hills | LCPI | $287,252,096 | 4. |
| 23 | SJD Partners | Lehman ALI | $120,110,237 | 5. |
| 12 | Summit Valley | LCPI | $343,221,391 | 6. |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 | 7. |

[1] The Voluntary Debtors are defined as Acton, SunCal Beaumont Heights, LLC ("Beaumont"), Bickford, Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), SCC Palmdale, Palmdale Hills, SJD Partners, SJD Development Corp. ("SJD Development"), Summit Valley, SCC Communities, Seven Brothers LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("Del Rio"), and Tesoro.

[2] The Trustee Debtors are defined as LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll") (collectively "Trustee Debtors"). The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."

[3] The respective Voluntary Debtors are the moving parties with respect to the objections to claims in their respective Voluntary Debtors' cases, and SunCal Management is the moving party in the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such Trustee Debtors' cases.

[4] As set forth in more detail below, several of the underlying loans have been subject to multiple transfers before and after the petition date. Accordingly, the "current claim holder" is not necessarily the original claim holder or the entity which initially filed the proof of claim. To the extent that other Lehman affiliated entities are the holders of any of these claims, for the purposes of this Motion, such entities are included in the definition of the "Lehman Entities" and such to this Motion.

000130

| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 8. |
| 16 | Oak Valley | LCPI | $141,630,092 | 9. |
| 6 | Northlake | LCPI | $123,654,777 | 10. |
| 12 | PSV | LCPI | $88,257,340 | 11. |
| 9 | Heartland | LCPI | $354,325,126 | 12. |
| 21 | Marblehead | LCPI | $354,325,126 | 13. |

(the above referenced proofs of claim are collectively referred to as the "Lehman Claims");

(B)    Recouping from the secured portion of the Lehman Claims, all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI, Inc. ("Lehman ALI"), LCPI's predecessor-in-interest; and

(C)    Such further relief as the Court deems just and proper.

This Motion is made on the basis of the concurrently filed Declaration of Bruce Cook (the "Cook Declaration"), and Request for Judicial Notice, the within points and authorities, and upon such other evidence as the Court elects to consider prior to or at the hearing on this matter.

IF YOU DO NOT OPPOSE THE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OPPOSE THE MOTION, OPPOSITIONS MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION. YOU MUST FILE YOUR OPPOSITION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030, SANTA ANA, CALIFORNIA 92701. YOU MUST ALSO SERVE A COPY OF YOUR OPPOSITION TO THE MOTION UPON COUNSELS FOR THE VOLUNTARY DEBTORS AND SUNCAL MANAGEMENT AT THE MAILING ADDRESSES INDICATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF THIS MOTION. THE VOLUNTARY DEBTORS' COUNSEL WILL ACCEPT E-MAIL SERVE AT THE FOLLOWING ADDRESSES: PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A COPY TO PJ@WINTHROPCOUCHOT.COM. ANY FAILURE TO TIMELY FILE AND SERVE AN

/ / /

/ / /

/ / /

/ / /

000131

1  OPPOSITION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE

2  COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER

3  NOTICE.

4  DATED: April 8, 2011

**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**

By:  /s/ *Paul J. Couchot*
       Paul J. Couchot, Esq.
       Sean Okeefe, Esq.
       Peter Lianides, Esq.
General Insolvency Counsel for Administratively
Consolidated Debtors-in-Possession

**RUS MILIBAND & SMITH P.C.**

By:  /s/ *Ronald Rus*
       Ronald Rus, Esq.
       Joel S. Miliband, Esq.
       Catherine Castaldi, Esq.
Attorneys for SunCal Management, LLC, and
SCC Acquisitions Inc.

-3-

000132

1 | <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2 | **I**

3 | <u>**INTRODUCTION**</u>

4 |     In May of 2008, the SunCal Parties (as defined herein), on the one hand, and Lehman ALI,

5 | Inc. ("Lehman ALI") and its related affiliates, on the other (together, the "Lehman Parties"),

6 | entered into that certain "Restructuring Agreement." See Cook Declaration, Exhibit 1. Pursuant

7 | to the terms of the Restructuring Agreement, Lehman ALI agreed (1) to pay the certain "urgent

8 | payables" (defined below), and management fees, according to a contractual schedule, (2) to the

9 | transfer the Relevant SunCal Debtors' projects to newly created Lehman entities (referred to as the

10 | Venture Grantees), who would assume the unpaid vendor claims incurred at the respective

11 | projects, including but not limited to the "lender authorized work" and assume the bond liabilities

12 | associated with that project, and (3) to make a number of material modification to the loans that

13 | were secured by liens against these projects. In August of 2008, the SunCal Parties and the

14 | Lehman Parties executed a second agreement, the Settlement Agreement (Cook Declaration,

15 | Exhibit 2), and further included additional Projects and their respective Debtors as parties to the

16 | Restructuring Agreement. The applicable Debtors who were the parties to the Restructuring

17 | Agreement, and set forth in the chart above, are referred to herein as the "Relevant SunCal

18 | Debtors".

19 |     As more fully detailed herein, Lehman ALI and the other Lehman Parties breached the

20 | terms of the Restructuring Agreement and the Settlement Agreement by failing to pay the vendor

21 | claims and bond obligations as promised and they later repudiated the entirety of these

22 | agreements. The Lehman Parties' actions have caused the Relevant SunCal Debtors to suffer tens

23 | of millions, if not in excess of one hundred million dollars in damages, which will need to be

24 | quantified through discovery. The secured portion of the Lehman Claims should be reduced by

25 | this sum and the resulting equity should be available for unsecured creditors of the respective

26 | estates.

27 |

28 |

000133

II

**MATERIAL BACKGROUND FACTS**

**A)**     **The SunCal Debtors**. Beginning in the late 1990s, a group of affiliated companies owned directly or indirectly by or affiliated with SCC Acquisitions, Inc. (collectively "SunCal"), entered into a joint venture (the "Venture") with certain affiliates of LBHI, including most importantly LCPI and Lehman ALI. The objective of the Venture was to acquire, develop and sell a series of residential development projects in California (the "Projects").

Under the parties' Venture, SunCal, which is one of the largest private land developers in the United States, served as the developer/manager of the Projects, and the Lehman Parties served as the capital source. The SunCal Debtors (the debtors listed on the face page of this pleading) were either formed to own the Projects being developed by the Venture, or they were formed to serve as the parent entities of the entities that owned the Projects. The Relevant SunCal Debtors and their Projects are set forth below:

**B)**     **Acton Estates**. Acton Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. LCPI entered into a loan agreement dated November 17, 2005 ("SunCal Communities I Loan") with SunCal I, as borrower. The Acton Estates Project is encumbered by a first priority deed of trust securing the SunCal Communities I Loan. Acton was not an original borrower under the SunCal Communities I Loan, but rather LCPI purports that Acton subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan. However, LCPI's relevant proof of claim (Claim 2-2) fails to attach or establish the existence of an Assumption Agreement as to Acton. On or about September 21, 2009, LCPI filed Claim 2-2 in the amount of $343,221,391 against Acton.[5]

**C)**     **Bickford Ranch**. SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch

---

[5] Claim 2 against Acton is based upon the SunCal Communities I Loan which was one of the "Sold Loans" (defined below) which was transferred to Fenway prior to the petition date (see RJN Exhibits 13 and 14). On or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI. See Docket Nos. 1179 through 1191.

-5-

1  Project is encumbered by a first priority deed of trust recorded on August 25, 2006 securing the

2  SunCal Communities I Loan. Bickford Ranch was also not an original borrower under the SunCal

3  Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it

4  purported to become an additional grantor under the Guarantee and Collateral Agreement relating

5  to the SunCal Communities I Loan. On September 21, 2009, LCPI filed Claim 16-3, in the amount

6  of $343,221,391 against Bickford Ranch.

7  **D)  Emerald Meadows**. Emerald Meadows owns the Emerald Meadows Project,

8  consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California. The

9  Emerald Meadows Project is encumbered by a first priority deed of trust recorded on July 19, 2007

10  securing the SunCal Communities I Loan. Emerald Meadows was also not a borrower under the

11  SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement". On

12  September 21, 2009, LCPI filed Claim 7-2 in the amount of $343,221,391 against Emerald

13  Meadows.

14  **E)  Palmdale Hills**. Palmdale Hills's primary asset is the Ritter Ranch Project, a 10,000

15  acre residential development located in Antelope Valley, California. The Ritter Ranch Project is

16  encumbered by a first priority deed of trust that was originally granted to LCPI in February of

17  2007. LCPI contend that this deed of trust secures, inter alia, all obligations arising under that

18  certain *Credit Agreement* dated as of February 8, 2007 (the "Ritter Ranch Loan" ), entered into by

19  and between LCPI and the Debtor. On or about September 23, 2009, LCPI filed Claim 65-4 in the

20  amount of $287,252,096.31 against Palmdale Hills.

21  **F)  SCC Communities**. SCC Communities owns the Joshua Ridge Project, consisting

22  of an 80-acre site situated in the City of Victorville in San Bernardino County, California. The

23  Joshua Ridge Project is encumbered by a first priority deed of trust recorded on November 2, 2007

24  securing that certain Loan Agreement, dated as of October 31, 2007, by and between SCC

25  Acquisitions LLC ("Acquisitions"), as borrower and Lehman ALI, as lender (the "Interim Loan

26  Agreement"). SCC Communities was not a borrower under the Interim Loan Agreement, but did

27  sign a "subsidiary guaranty." On March 30, 2009, Lehman ALI filed Claim 9 against SCC

28  Communities in the amount of $23,795,013 arising from Interim Loan.

-6-

1     **G)**    **SJD Partners**. SJD Partners currently owns no real property. SJD Partners

2  formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project".

3  The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, on the

4  second priority deed of trust, which caused a Lehman Affiliate, LV Pacific Point LLC ("LV

5  PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a

6  foreclosure sale conducted on August 28, 2008. The Pacific Point Project is encumbered by a first

7  priority deed of trust securing that certain loan agreement, dated February 16, 2006, by and among

8  Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in

9  the maximum aggregate principal amount of approximately $125,000,000. (the "Pacific Point First

10  Loan Agreement"). On March 30, 2009, Lehman ALI filed Claim 23 in the amount of

11  $120,110,237 against SJD Partners.

12     **H)**    **Summit Valley.** Summit Valley owns most of the Summit Valley Project that

13  originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County,

14  California. Summit Valley was also not a borrower under the SunCal Communities I Loan, but

15  rather subsequently executed an "Assumption Agreement" whereby it purported to become an

16  additional grantor under the Guarantee and Collateral Agreement relating to the SunCal

17  Communities I Loan. Claim 12-2 was filed by LCPI on September 21, 2009 in the amount of

18  $343,221,391.

19     **I)**    **Tesoro.** Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the

20  City of Santa Clarita in Los Angeles County, California. The Tesoro Project is encumbered by a

21  first priority deed of trust recorded on November 2, 2007 securing the Interim Loan Agreement.

22  Tesoro was not a borrower under the Interim Loan Agreement, but did sign a "subsidiary

23  guaranty." On March 30, 2009, Lehman ALI filed Claim 7 against Tesoro in the amount of

24  $23,795,013

25     **J)**    **Heartland**. Heartland owns the Heartland Project consisting of a 417 acre site

26  located in Riverside County, California. The Heartland Project is encumbered by a first priority

27  deed of trust recorded on October 3, 2007 securing that certain Second Amended and Restated

28  Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and

1 among SunCal Marblehead Heartland Master LLC, Marblehead, and Heartland, as borrowers, and

2 Lehman ALI, as agent and sole lender (the "Marblehead/Heartland Loan Agreement"). On

3 September 21, 2009, Lehman ALI filed Claim 9-2 against Heartland in the amount of

4 $354,325,126.

5     **K)**    **Marblehead.** Marblehead owns the Marblehead Project, consisting of a 247-acre

6 site and is expected to consist of 308 units in San Clemente, California. The Marblehead Project is

7 encumbered by a first priority deed of trust recorded on October 3, 2007 securing the

8 Marblehead/Heartland Loan Agreement. On September 21, 2009, Lehman ALI filed Claim 21-2

9 in the amount of $354,325,126.

10     **L)**    **Oak Valley**. Oak Valley owns the Oak Valley Project consisting of a 985-acre site

11 which is located in Riverside County, California. The Oak Valley Project is encumbered by a first

12 priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

13 Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC

14 Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor

15 (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately

16 $120,000,000 ("Oak Valley Loan Agreement"). On or about September 21, 2009, OVC Holdings

17 filed Claim 16-3 against Oak Valley in the amount of $141,630,092.

18     **M)**    **Northlake.** Northlake owns the Northlake Project, consisting of a 1,564-acre site

19 which is located in Castaic, California, north of Valencia, approximately 45 miles north of

20 downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is

21 encumbered by a first priority deed of trust securing that certain Term Loan and Revolving Line of

22 Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower,

23 and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake

24 Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of

25 approximately $100,000,000 (the "Northlake Loan Agreement"). On September 21, 2009,

26 Northlake Holdings filed Claim 6-2 against Northlake in the amount of $158,141,365.

27     **N)**    **PSV**. PSV owns the Palm Springs Village Project, consisting of a 309-acre site

28 which is located in the City of Palm Springs, California. The PSV Project is encumbered by a

000137

1   first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

2   Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI,

3   as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate

4   principal amount of approximately $90 million (the "PSV Loan Agreement"). On or about

5   September 21, 2009, Lehman ALI filed Claim 12-2 against PSV in the amount of $88,257,340.

6       **O)**     **The Economic Downturn In 2007 and Promises of Funding.**  Prior to 2007, the

7   Venture thrived, generating favorable returns for both parties. However, beginning in 2007, the

8   real estate market experienced a downturn. This downturn substantially reduced the value of the

9   Projects and negatively impacted potential sales. In an effort to mitigate the cash drain at the

10  Projects caused by the slowdown, SunCal proposed closing certain Projects and slowing the pace

11  of development at others. The Lehman Entities rejected these proposals and insisted that

12  development proceed. In 2007 and 2008, Lehman ALI and LCPI repeatedly assured SunCal that

13  Lehman ALI and LCPI were committed to funding the debts and obligations of the Projects and

14  the work they directed to be performed; that funding would be forthcoming; and that SunCal and

15  the Relevant SunCal Debtors should continue to have contractors undertake work to develop and

16  preserve the value in the Projects. In reliance on these representations, SunCal and the Relevant

17  SunCal Debtors continued to move forward with the Projects and incurred substantial expenses in

18  hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

19      Substantially all of the unsecured creditor claims and mechanic's lien claims that have been

20  filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI authorized the

21  Debtors to incur and promised to provide funding for and/or promised to assume. A list of the

22  unsecured creditors that have filed proofs of claims against each of the Debtors, and the amounts

23  of their claims, is included in Exhibit 19 to the Cook Declaration. A list of mechanic lien claims

24  filed against each of the Debtors, and the amounts of their claims, is included in Exhibit 20

25  attached to the Cook Declaration.

26      **P)**     **The Restructuring Agreement.** It was contemplated as of the October 2007

27  Interim Loan that a restructuring agreement would be entered into shortly, by no later than January

28  or February of 2008. However, implementation was dragged out due in large part to Lehman's

-9-

1   extensive documentation. In the meantime, until a restructuring agreement was entered into,

2   Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees

3   of SunCal Management LLC, which was managing and continued to manage each of the Relevant

4   SunCal Debtors' Projects. As the restructuring was pushed further and further out and Lehman

5   ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal

6   was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more

7   desperate and more dependent on Lehman ALI and LCPI financing. Lehman ALI and LCPI used

8   the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring

9   agreement that was tipped heavily in Lehman's favor.

10              1)      The Parties To The Restructuring Agreement. On May 23, 2008, SCC

11  Acquisitions, Inc. ("Acquisitions Inc."), and certain affiliated SunCal entities, [6] on the one hand,

12  and the Lehman Parties on the other, entered into the Restructuring Agreement ("Restructuring

13  Agreement"). See Cook Dec., Exhibit 1. As originally executed in May 2008, the Restructuring

14  Agreement applied to twelve Projects relevant herein (as well as several other projects not at issue

15  in these bankruptcies): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

16  Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

17  (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

18  held equity interests in the owners of these Projects were signatories to the May 2008 agreement.

19  The Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and

20  "Pledgors," as defined in Annex 1 thereto. [7]

21

22  _____

    [6] The original signatories to the Restructuring Agreement include SunCal Marblehead Heartland
23  Master LLC, Marblehead, Heartland, Oak Valley, SJD Partners, Palmdale Hills, SunCal
    Communities I, LLC ("SunCal I"), SunCal Communities III, LLC ("SunCal III"), Bickford Ranch,
24  Acton, Summit Valley, Kirby Estates LLC ("Kirby"), SunCal Beaumont Heights, LLC
    ("Beaumont"), Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), Acquisitions
25  Inc., Acquisitions, SunCal Master JV, LLC, SJD Development Corp ("SJD Development"),
    SCC/Indio Land LLC, SCC Master IV Communities LLC, SCC/West Creek LLC, SunCal
26  Communities II LLC, SunCal Management LLC, and Northlake.
    [7]  The "Borrowers" included Marblehead, Heartland, Northlake, Oak Valley, SJD Partners,
27  Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and Bickford. The "Grantors" included
    Marblehead, Heartland, Northlake, Oak Valley, SJD Partners, Palmdale Hills, Bickford, Acton,
28  Summit Valley, Emerald Meadows, Beaumont and Johannson. The "Pledgors" included SCC
    Palmdale, SunCal I, Summit Valley and SJD Development.

1      Between May and August 2008, four additional projects were added to the

2   Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm

3   Springs Village; and (4) Tesoro. Accordingly, the Debtors associated with these Projects—Del

4   Rio, SCC Communities, PSV, and Tesoro—became parties to the Restructuring Agreement as

5   amended. These Debtors were signatories to the August 25, 2008 Settlement Agreement, along

6   with the Debtors associated with the original twelve Projects, as "Borrowers" and/or "Grantors."

7   (The SunCal parties to the agreements are collectively referred to herein as the "SunCal Parties").[8]

8          2)     Lehman ALI's Obligation to Fund "Urgent Payables." Pursuant to Section

9   1(h) of the Restructuring Agreement, Lehman ALI agreed to pay certain urgent expenses that were

10  either owed, or being incurred at the Relevant SunCal Debtors' Projects that were subject to the

11  Restructuring Agreement. Specifically, Section 1(h) provided, in pertinent part:

12      During the term of this Agreement, Lehman ALI, as the Lender with respect to
        each Loan, . . . hereby agrees to make protective advances under the applicable
13      Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for
        the payment of any such Urgent Payables which are approved by Lehman ALI....
14

15  Cook Declaration, Exhibit 1, Section 1(h). "Urgent Payables" were defined in Section 1(h) as:

16      work or other services (including, without limitation, litigation defense costs) that
        need to be performed or provided with respect to each Property and any accounts
17      payable arising from work previously authorized by Lehman ALI which need to be
        paid with respect to each Property.
18

19  Cook Declaration, Exhibit 1, Section 1(h).

20      Pursuant to Section 1(i) of the Restructuring Agreement, Lehman ALI also agreed to

21  pay monthly management fees for the management of each of the Projects, from May 15, 2008

22  forward, unless and until either (a) it provided thirty (30) 5 days' written notice, or (b) the

23  ─────────────────
    [8] Thus, four Projects were not formally added to the Restructuring Agreement—Century City,
    Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects—
24  Century City, Delta Coves, Oak Knoll and Torrance—were not signatories to the Settlement
    Agreement. Lehman ALI was the lender on each of these Projects, three of which were part of the
25  Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund"). However, even as to these
    four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other
26  Projects regarding representations of funding. Lehman ALI encouraged SunCal and these four
    Debtors to continue developing these Projects, and made assurances of payment. Later, Lehman
27  ALI approved all expenses, told these Debtors what work to move forward with, and promised it
    would pay for such work. These Debtors performed substantial work and incurred millions in
28  third-party debt in reliance on Lehman ALI's promises of payment.

000140

1 | Restructuring Agreement was terminated ("Management Fees").

2 |     3)    Lehman ALI's Obligation to Close. The Restructuring Agreement was

3 | designed to culminate in a closing ("Closing") with the execution of a Settlement Agreement (and

4 | related settlement transaction documents), discussed in more detail below, whereby, among other

5 | things:

6 |     (1)    the Grantors would convey title to, and the Borrowers, Pledgors, and
Guarantors would transfer all interests in, the Projects to new Lehman entities

7 | ("Venture Grantees"), which entities would then be responsible for repayment of
the loans previously made to the Borrowers (and which were guaranteed by the

8 | Guarantors and/or secured by pledges of interests by the Pledgors), as well as
payment of management fees to SunCal Management;

9 |

10 |     (2)    the Venture Grantees and/or other Lehman entities would pay for all
payables arising from "Lender Authorized Work"—work that Lehman ALI had

11 | previously approved;

12 |     (3)    the Venture Grantees and/or other Lehman entities would pay for tens of
millions of dollars in outstanding payables which the Grantors, Borrowers,

13 | Pledgors and/or Guarantors owed to third-party vendors that had provided goods or
services on the Projects (at Lehman ALI's instruction);

14 |

15 |     (4)    the Venture Grantees and/or other Lehman entities would indemnify
Plaintiffs for up to at least $15 million in existing bond obligations, and also agreed

16 | to indemnify the SunCal Parties for certain bond liability going forward if the
Lehman parties failed to release and/or replace the existing performance bonds; and

17 |

18 |     (5)    PAMI, LLC ("PAMI") an ostensibly creditworthy indemnitor, was the
entity designated to be the "Lehman Indemnitor" under the parties' Settlement

19 | Agreement would be jointly and severally liable for the above payment and
indemnification obligations.

20 |

21 |     Section 1(a) of the Restructuring Agreement delineated the parties' obligation, upon

22 | satisfaction of the Closing Conditions, to execute, and to cause their respective affiliated parties to

23 | execute, the Settlement Agreement and related settlement documents. Section 1(c) of the

24 | Restructuring Agreement further provided, in pertinent part, that "[u]pon satisfaction of the

25 | Closing Conditions, the Parties shall proceed to Closing…."The Closing Conditions also included

26 | certain consents and approvals of governmental authorities and other parties which are referred to

27 | in Section 2(a) of the Restructuring Agreement as "Required Consents." Section 2(a) further

28 | provided a mechanism for partial Closing if Required Consents had been obtained for fewer than

1    all of the Projects by the Closing date. Although the formula was complex, essentially, so long as

2    Required Consents had been obtained for eight of the subject Projects plus the Pacific Point

3    Project, an "Initial Closing" would occur as to those Projects for which consents had been

4    obtained, and a "Subsequent Closing" could occur for Projects for which all consents were

5    subsequently obtained, and the parties were to use commercially reasonable effort to obtain the

6    Required Consents for a Subsequent Closing.

7         Under Section 1(d)(i), the Restructuring Agreement could be terminated (a "Termination

8    Event") if neither the Closing Conditions for an Initial Closing nor complete Closing were

9    satisfied on or prior to the Closing Date. However, Section 1(d)(i) further provided that neither

10    party could terminate the Restructuring Agreement "if the failure of any Closing Conditions shall

11    have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or

12    failure to pursue the satisfaction [of] the Closing Conditions in good faith." Under Section 1(e) of

13    the Restructuring Agreement, unless the agreement otherwise specified, the obligations of the

14    Parties under the Agreement would terminate "upon termination of this Agreement." Thus,

15    Lehman ALI's obligation under Section 1(h) to make protective advances to cover Urgent

16    Payables on the Projects, its obligation under Section 1(i) to pay Management Fees, and its

17    obligation under Section 1(c) to consummate the Closing did not terminate unless there was a

18    valid Termination Event.

19         **Q)**   **The Breach of The Restructuring Agreement**. Lehman ALI breached the terms

20    of the Restructuring Agreement through the following actions or inactions:

21         1.    <u>Failure to Pay Urgent Payables</u>. After the Restructuring Agreement was

22    executed, the Lehman Parties insisted that the Relevant SunCal Debtors continue work at the

23    Projects. In reliance upon the Lehman ALI's promise to pay urgent payables, and to have the

24    projects transferred to the Lehman created "Venture Grantees" who would be liable for the

25    "assumed obligations," the Relevant SunCal Debtors continued authorize work on their respective

26    Projects. However, when it came time to pay these expenses, as required under the terms of the

27    Restructuring Agreement, Lehman ALI refused to so, despite written demands by SunCal. An

28    expanded list of total account payables as of the Closing Date for the relevant Projects is set forth

000142

1    in section (G)(1)(a) below.

2    Moreover, Lehman ALI never provided thirty days' written notice of intent to cease

3    payment of the monthly Management Fees. Lehman ALI did purport to terminate the Restructuring

4    Agreement on November 13, 2008. However, as discussed below, the Restructuring Agreement

5    imposed certain requirements for a termination to be valid. Because Lehman ALI's purported

6    termination was invalid, its obligation to pay the monthly Management Fees continued past November

7    13, 2008, and continues through the present date. SunCal Management and the other SunCal Parties

8    have continued to manage the Projects. All conditions precedent to Lehman ALT paying SunCal

9    Management the monthly Management Fee from May 15, 2008 through at least November 12, 2008,

10   and beyond, were satisfied.

11   "Exhibit D" to the Restructuring Agreement, referenced in Section 1(h) above, listed a

12   total of $580,352 in Monthly Management Fees for ten of the twelve Projects." Subsequent

13   documentation listed a total of $683,383 in Monthly Management Fees for the fifteen Properties at

14   issue that were ultimately subject to the agreement. By Project, the monthly management fees listed in

15   Exhibit D to the Restructuring Agreement were: (1) Acton Estates ($31,396); (2) Beaumont Heights

16   ($53,862); (3) Bickford Ranch ($81,982); (4) Emerald Meadows ($43,593); (5) Heartland ($38,151);

17   (6) Johannson Ranch ($35,868); (7) Marblehead ($111,137); (8) Oak Valley ($42,574); (9) Ritter

18   Ranch ($110,772); and (10) Summit Valley ($31,017). See Exh. 1, at Exh. D.

19   2.    Failure To Proceed With A Closing Under The Settlement Agreement. The

20   Restructuring Agreement was designed to serve as a financial bridge to the implementation

21   closing – of the transactions described in the Settlement Agreement. One of Lehman ALI's

22   obligations under the Restructuring Agreement was to proceed with the closing of the Settlement

23   Agreement. As more fully explained in the following sections, by failing and refusing to proceed

24   with a closing under the terms of the Settlement Agreement, Lehman ALI-- breached the terms of

25   the Restructuring Agreement. As a result of Lehman ALI's breach, the Projects were never

26   transferred to the Lehman "Venture Grantees" who would be liable for the "assumed obligations"

27   and the "Lender Authorized Work."

28

-14-

3. The Sale of Seven Sold Loans to Fenway Breached The Terms of The Restructuring Agreement. In order to perform its obligations under the terms of the Restructuring Agreement, and to implement the transactions described in the Settlement Agreement, Lehman ALI had to remain the "Lender with respect to each Loan" as represented in the Restructuring Agreement. *See* Restructuring Agreement, Section 1(h). However, as more fully explained below, on August 22, 2008, Fenway Capital, as "Buyer," and LCPI, as "Seller," entered into that certain *Master Repurchase Agreement* (the "Repo"), whereby Fenway Capital purchased all of LCPI's right, title and interest in the following loans:

| Loan | Claimant | Alleged Balance |
|---|---|---|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

(together the "Sold Loans").

When Lehman ALI and LCPI concocted the sale of the Sold Loans under the Repo, which were also governed by the terms of the Restructuring Agreement, they were intentionally breaching their performance obligations under the terms of the Restructuring Agreement.[9] Lehman ALI violated the covenant of good faith and fair dealing by failing to pursue its express obligations in good faith, and by taking action or inaction so as to deprive the Relevant SunCal Debtors of the expected benefits of the agreement.

**R)** **The Settlement Agreement**. One of the exhibits to the Restructuring Agreement is the form of "Settlement Agreement." The Restructuring Agreement was intended to serve as a bridge to the Settlement Agreement, by providing the SunCal Parties the funds necessary to support themselves until the closing of the Settlement Agreement, on which date the Projects would be transferred to the new Lehman-controlled "Venture Grantees."[10] The language in the

---

[9] On or about June 22, 2010, Fenway Capital transferred the Sold Loans, and therefore the corresponding claims, to LCPI. See Docket Nos. 1179 through 1191.

[10] "Venture Grantees" are defined in Recital G of the Settlement Agreement, which itself cross-references Annex 1 of the Settlement Agreement. The version of Annex 1 appended to the May 2008 Restructuring Agreement had placeholders for the name of each Venture Grantee in boldface brackets, e.g., "Acton Estates Venture Grantee," "Beaumont Heights Venture Grantee," etc. In the signature blocks for the

-15-

Settlement Agreement makes it clear that this transfer is the final step in the contractual process:

> [E]ach Grantor hereby agrees to convey, assign, and transfer to the applicable Venture Grantee (and each other Borrower Party agrees to convey, assign and transfer to the applicable Venture Grantee all of its respective right, title and interest, if any, in and to any of the property described below), and the applicable Venture Grantee agrees to accept a conveyance of, on the Closing Date, all of such Grantor's (and/or such other Borrower Party's) respective right, title and interest in and to [the Conveyance Properties].

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 3, ¶2.

Section 9 of the Settlement Agreement provides, in relevant part: "The closing of the transactions contemplated by this Agreement (the 'Closing') shall take place on the date on which this Agreement is executed (the 'Closing Date')." ***The Settlement Agreement and related settlement documents were each executed by all applicable parties on August 25, 2008.*** *See* Cook Declaration, ¶ 41. Although the SunCal parties acquiesced in the Lehman Parties' extension of the closing date to September 30, 2008, this extension did not modify the Lehman Parties' obligation to consummate the Closing upon satisfaction of the Closing Conditions, including the obtaining of the Required Consents. This extension also did not affect Lehman ALI's obligation to pursue in good faith any remaining Required Consents.

In exchange for the Grantors and Borrowers conveying the Projects, the respective Venture Grantees—and LV Pac Point, the Lehman entity designated to by Lehman ALI to be the transferee with respect to the Pacific Point Project—were to assume tens of millions of dollars in certain payment and bond obligations, as described below.

      1.    The Obligations to Pay Assumed and Authorized Amounts. Under Section 14.a of the Settlement Agreement, each of the Venture Grantees were to assume responsibility for (1) Scheduled Assumed Obligations and (2) Lender Authorized Work. Section 14.a. provides, in pertinent part:

---

Settlement Agreement that were ultimately signed on August 25, 2008, under the heading for "Venture Grantees," for each property (except for Pacific Point, which was treated slightly differently, as discussed below), there was listed a limited liability company with the acronym "SCLV" (for "SunCal-Lehman Venture") followed by the name of the property. Thus, the Venture Grantee for the Acton property was "SCLV Acton Ranch LLC"; for Beaumont Heights, "SCLV Beaumont Heights LLC," etc. Each of these signature blocks was signed by an authorized Lehman representative on behalf of each SCLV entity.

1   At Closing…, each of the Venture Grantees shall assume and be responsible for
    the payment of (i) those payables and other obligations of the Grantors as
2   described on Schedule 5 that relate to such Venture Grantee's Conveyance
    Property… (collectively, the "Scheduled Assumed Obligations"), and (ii) all
3   payables arising from any Lender Authorized Work ("Authorized Assumed
    Obligations" and together with the Scheduled Assumed Obligations, the
4   "Venture Grantee Assumed Obligations").

5   Cook Declaration, Exhibit 2, Settlement Agreement, pg. 12.

6           a.      Scheduled Assumed Obligations. Pursuant to Section 14.a, the

7   "Scheduled Assumed Obligations" are described in Schedule 5 to the Settlement Agreement. The

8   version of Schedule 5 attached to the May 2008 Restructuring Agreement (Cook Declaration,

9   Exhibit 3) listed the following amounts of total accounts payables ("Total AP") for each of the

10  relevant Voluntary Debtors' Projects (along with a description of the amounts owed to each

11  vendor on each Project), totaling over $18 million:

| Project | Total AP |
|---|---|
| Acton | $141,521 |
| Beaumont Heights | $189,052 |
| Bickford | $3,319,114 |
| Emerald Meadows | $2,910,825 |
| Johannson | $69,062 |
| Ritter Ranch | $11,464,998 |
| Summit Valley | $430,669 |
| **TOTAL** | **$18,525,241.00** |

When the Scheduled Assumed Obligations for the other Projects are taken into account, the total

amount of Scheduled Assumed Obligations was $46,907,019. The additional $28.4 million was

comprised as follows:

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $16,835,573 |
| Marblehead—Lender Authorized Work | $1,985,289 |
| Heartland | $3,247,620 |
| Oak Valley | $5,582,297 |
| Northlake | $730,999 |
| **TOTAL** | **$28,381,778.00** |

See Scheduled 5 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 3). Because

the Schedules, Annexes, and Exhibits to the Settlement Agreement are voluminous, totaling many

hundreds of pages, only the most pertinent Schedules are attached hereto.

-17-

000146

1       The August 2008 version of Schedule 5[11] (which reflects adjustments for the

2 settlements that were made after May 2008, as well as the addition of several projects (among

3 other adjustments)) was the most current version as of the time of the execution of the Settlement

4 Agreement. It lists the following amounts of total account payables as of the Closing Date for the

5 relevant Projects (other than Pacific Point) that were to be Assumed Obligations. This figure totals

6 over $9 million after adjustments:

| Project | Total AP |
|---|---|
| Acton | $94,062 |
| Beaumont Heights | $163,709 |
| Bickford | $3,011,191 |
| Del Rio | $1,797,401 |
| Emerald Meadows | $1,451,711 |
| Johannson | $30,526 |
| Joshua Ridge II | $6,156 |
| Ritter Ranch | $2,179,082 |
| Summit Valley | $308,777 |
| Tesoro Burnham | $51,918 |
| **TOTAL** | **$9,094,533.00** |

15       When the Scheduled Assumed Obligations for the other Projects are taken into account,

16 the Scheduled Assumed Obligations on the updated schedule totals $36,918,153. The additional

17 $27.8 million was comprised as follows:

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $12,334,033 |
| Marblehead—Lender Authorized Work | $224,031 |
| Heartland | $2,910,825 |
| Oak Valley | $4,667,191 |
| Northlake | $346,749 |
| Palm Springs Village | $7,340,791 |
| **TOTAL** | **$27,823,620.00** |

*See* Scheduled 5 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 4).

24       However, this sum understates the actual figure. The Scheduled Assumed Obligations

25 reflected on the updated Schedule 5 take into consideration reductions resulting from certain

26 settlements that were not paid in some instances. See Cook Declaration.

[11] Cook Declaration, Exhibit 4.

-18-

1             b.     Lender Authorized Work. As noted above, under Section 14.a of the

2 Settlement Agreement, the "Venture Grantee Assumed Obligations" to be assumed at Closing

3 included not only the Scheduled Assumed Obligations, but also "all payables arising from any

4 Lender Authorized Work ("Authorized Assumed Obligations"). According to the definition in

5 Exhibit A to the Settlement Agreement (at p.5), "Lender Authorized Work" means "work which,

6 as of the Closing Date, has been performed with respect to or for the benefit of any of the

7 Conveyance Properties at the specific direction of or with the authorization of the Lenders and

8 which work is more specifically described on Schedule 17." (Cook Declaration, Exhibit 2, pg. A-

9 5.

10            Schedule 17 did not list particular creditors or dollar amounts owed, as did

11 Schedule 5. Cook Declaration, Exhibit 5 (Schedule 17 to the Settlement Agreement, May 2008),

12 and Exhibit 6 (Schedule 17 to the Settlement Agreement, August2008). Rather, Schedule 17

13 described categories of work that Lehman ALI authorized at the Projects and for which it was

14 bound to pay. For example, in the case of Bickford Ranch, the two categories of Lender

15 Authorized Work listed were: "Construction of the off-site waterline and pump station" and

16 "Mitigation Management and Monitoring of the project, including Oak Tree Mitigation,

17 SWPPP/RWQCB compliance, VELB Habitat, Bat Habitat, and Raptor Nesting." [12] The

18 applicable Lehman parties thus obligated themselves to pay for goods or services that fell within

19 these categories.

20            Schedule 17 was modified between the time of the execution of the Restructuring

21 Agreement in May 2008 and the execution of the Settlement Agreement in August 2008, to

22 account for the Projects that were added to the agreement in the interim, as well as additional

23 categories of work that were authorized.[13] The total value of the Lender Authorized Work which

24 was performed and which the Lehman Parties were obligated to pay for pursuant to Schedule 17 is

25 well into the millions of dollars.

26           2.     The Obligations to Assume Bond Obligations and to Replace or Release

27 Bonds. In addition to assuming the Venture Grantee Assumed Obligations, the Venture Grantees

28

---

[12] See Scheduled 17 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 5).
[13] See Scheduled 17 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 6).

000148

1   were also to assume certain bond obligations in connection with certain of the Projects. Schedule

2   12-C to the Settlement Agreement describes the "Payment and Performance Bonds"[14] associated

3   with the Projects subject to the Agreement. For each such Bond, Schedule 12-C delineates: the

4   Project, Bond Number, Carrier, Obligee, Bond Amount, Date of Issue, Tract Number, Description

5   of work covered, and Bond Obligors.[15] Schedule 13 to the Settlement Agreement described the

6   Payment Performance Bonds for which a "Bond Payment Demand" had been made (the "Pre-

7   Closing Designated Payment and Performance Bonds"). For each such Bond for which a Bond

8   Payment Demand had been made, Schedule 13 delineated the Project; Vendor; Date Filed (if

9   applicable); Claim Amount; Case Number (if applicable); Bond Number; and comments regarding

10  case status.

11          The version of Schedule 13 attached to the May 2008 Restructuring Agreement

12  listed $12,622,374.36 in such Bond Payment Demands.[16] These can be grouped by Project, as

13  follows:

| Project | Aggregate Value of Bond Payment Demands on May 2008 Schedule 13 |
|---|---|
| Acton | $ 11,312.37 |
| Marblehead | $5,686,937.59 |
| Pacific Point | $4,246,595.48 |
| Ritter Ranch | $2,677,528.92 |
| **TOTAL** | **$12,622,374,36** |

18          A subsequent version of Schedule 13 listed Bond Payment Demands as of at least

19  August 2008, which reflected not only new claims, but also claims against Projects that were

20  added to the Restructuring and Settlement Agreement after May 2008.[17] The subsequent

21  documentation shows aggregate Bond Payment Demands totaling at least $22,183,424.22, as

22  follows:

| Project | Aggregate Value of Bond Payment Demands on Updated Schedule 13 |
|---|---|
| Bickford | $330,118.00 |
| Del Rio | $627,227.39 |
| Marblehead | $9,547,608.61 |
| Oak Valley | $196,922.91 |

[14] This term is defined in Section 15.a.(22) to the Settlement Agreement.
[15] *See* Scheduled 12-C to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 7).
[16] *See* Scheduled 13 to the Settlement Agreement, May 2008 (Exhibit 9).
[17] *See* Scheduled 13 to the Settlement Agreement, August 2008 (Exhibit 10).

-20-

| | |
|---|---:|
| Pacific Point | $4,742,040.39 |
| Palm Springs Village | $3,524,406.54 |
| Ritter Ranch | $3,215,100.38 |
| **TOTAL** | **$22,183,424.22** |

The amounts of bond payment demands on the Marblehead, Ritter Ranch and Pacific Point Projects have increased further beyond these figures because of additional work performed on these Projects by reason of called bonds. The Settlement Agreement contemplated that additional Bond Payment Demands could be made on Payment Performance Bonds post-closing, and referred to Bonds where such demands were made as "Post-Closing Designated Payment and Performance Bonds." (See Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). The Venture Grantees (and the Pac Point Transferee, discussed below) would attempt to litigate and/or resolve the Bond Payment Demands. *See id.*

Section 16.c of the Settlement Agreement provided that the Venture Grantees and Pac Point Transferee (i.e., LV Pacific Point), collectively, would be obligated to pay up to $12,622,374.36 with respect to the payment of claims arising under Pre-Closing Designated Payment and Performance Bonds, and up to $2,377,625.64 with respect to the payment of claims arising under Post-Closing Designated Payment and Performance Bonds (collectively, the "Assumed Bond Obligations"). (Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). Thus, the Venture Grantees and Pac Point Transferee agreed to pay up to a total of at least $15 million in connection with payments under Bond Payment Demands.

Further, Section 14.g. provided that if a Venture Grantee (or LV Pac Point, the transferee of the Pacific Point Project) decides to proceed with development of a Project post-closing, it shall use commercially reasonable efforts to replace and cause to be released existing bonds issued in connection with such Project for such development work, and shall indemnify and hold harmless the applicable Bond Obligor for claims or losses prior to such release. (PAMI also had an indemnification obligation if claims arose when such release was not obtained). Pending such work, the Venture Grantees and LV Pac Point were obligated to pay the premiums on all Payment and Performance Bonds.

Specifically, Section 14.g. of the Settlement Agreement provided, in pertinent part:

-21-

000150

If, and to the extent that, any Venture Grantee or the Pac Point Transferee desires, at its sole option and in its sole and absolute discretion, to proceed with the development of its Property in a material manner after the date of this Agreement ("Material Development Work"), such Venture Grantee or Pac Point Transferee, as applicable, shall use commercially reasonable efforts to replace and cause to be released each existing Payment and Performance Bond issued with respect to such Property that relates to or secures the Material Development Work to be undertaken and shall indemnify and hold the applicable Bond Obligor thereunder harmless from and against any claims or losses incurred by such Bond Obligor in respect of such Payment and Performance Bond until such time as such Payment and Performance Bond has been replaced and released. To the extent that a Venture Grantee or the Pac Point Transferee, undertakes or causes work to be performed on its Property after the date of this Agreement and as a result of such work, liability is created or arises under any existing Payment and Performance Bond, such Venture Grantee or Pac Point Transferee, as applicable, and PAMI LLC shall, jointly and severally, indemnify and hold harmless any applicable Bond Obligor from any liability with respect to, and to the extent of, the work so undertaken. Unless and until Material Development Work is undertaken with respect to a Property, ... the applicable Venture Grantee or Pac Point Transferee, as applicable, shall pay the premiums for the maintenance of such Payment and Performance Bonds... .

Cook Declaration, Exhibit 2, pg. 16, Section 14.g.

3. **Pacific Point Obligations.** The transactions contemplated by the Restructuring and Settlement Agreement were configured differently for the Pacific Point project than they were for the remaining Projects. For Pacific Point, however, title would be transferred to Lehman ALI (or its designated transferee, LV Pac Point) pursuant to a nonjudicial foreclosure process. However, the Lehman parties' obligation to cover the payables and bond obligations was similarly structured.

Under Section 14.b of the Settlement Agreement, the "Pac Point Transferee," i.e., LV Pac Point, was to assume (1) approximately $4 million in "Bonded Pac Point Payable Obligations" and (2) approximately $3.7 million in "Other Pac Point Payable Obligations."

Schedules 4-A and 4-B provided detailed information about the bonded and other obligations to be assumed in connection with Pacific Point. Schedule 4-A to the Settlement Agreement delineates, by individual vendor and claim amount, the Bonded Pac Point Payable Obligations totaling $3,956,693.30.25 Schedule 4-B to the Settlement Agreement delineates, by

-22-

1  individual vendor and claim amount, the Other Pac Point Payable Obligations totaling $3,688,011.

2  See Cook Declaration, Exhibits 11 through 14.

3        Moreover, as discussed above, pursuant to Section 14.a. of the Settlement

4  Agreement, the entities taking title to the properties at closing were also to pay for "all payables

5  arising from any Lender Authorized Work" on the respective properties. Schedule 17 to the

6  agreement lists various categories of "Lender Authorized Work" relating to, among other Projects,

7  the Pacific Point Project for which the Pac Point Transferee would be liable.

8        In negotiating the Settlement Agreement, the parties agreed that the Lehman Parties

9  would provide a creditworthy indemnitor that would back the Lehman Parties' payment

10  obligations thereunder. Under Section 17.h. of the Settlement Agreement, the Venture Grantees

11  and the "Lehman Indemnitor"—i.e., PAMI - to be jointly and severally liable to indemnify the

12  applicable Debtor for, among other things, the failure of any Venture Grantee or other Lehman

13  Party to pay or otherwise satisfy or settle any of the Assumed Obligations, which include each of

14  the payment obligations under the Settlement Agreement discussed above.

15        Thus, to the extent that the Venture Grantees failed to pay any of the bonded or

16  non-bonded assumed obligations, and to the extent that LV Pac Point, as the Pacific Point

17  Transferee, failed to cover the bonded or non-bonded Pac Point Payables, PAMI is liable to pay

18  those amounts. Section 14.g. provided that if a Venture Grantee or LV Pac Point, the transferee of

19  the Pacific Point Project, decides to proceed with development of a Project post-closing, they shall

20  replace and cause to be released existing payment and performance bonds, and shall indemnify

21  and hold harmless the Bond Obligors for claims or losses prior to such release.

22      **S.**   **The Breaches of The Settlement Agreement.** In addition to the breaches of the

23  Restructuring Agreement discussed above, Lehman ALI breached the Settlement Agreement

24  through the following actions and failure to perform.

25      1)   Lehman ALI Attempted To Repudiate The Settlement Agreement. As the

26  Declaration of Bruce Cook confirms, Lehman ALI not only failed to perform under the terms of

27  the Settlement Agreement, it affirmatively repudiated the same on November 13, 2008, after

28  written demands for performance. Lehman ALI's affirmative repudiation occurred after the

-23-

1 | Relevant SunCal Debtors began filing for bankruptcy, which were precipitated by the Lehman

2 | Parties' failure to fulfill their funding obligations (Cook Decl., ¶¶ 59 ). As to the Relevant SunCal

3 | Debtors who had already filed for bankruptcy, the attempted repudiation was ineffective as a

4 | violation of the automatic stay. As to the Relevant SunCal Debtors who had not yet filed their

5 | bankruptcies, the purported repudiation was also ineffective, as Lehman ALI had already

6 | defaulted, and such Debtors were ready to perform and thus were not in default.

7 |         2)    The Sale of The Sold Loans Repudiated The Settlement Agreement. At

8 | some point on or before August 22, 2008, Lehman ALI transferred all of its right, title and interest

9 | in the Sold Loans (i.e., the PSV Loan, the Delta Coves Loan and the Marblehead/Heartland Loan)

10 | to LCPI. Similarly other Lehman affiliates (OVC Holdings and Northlake Holdings) transferred

11 | their right, title and interest in the other Sold Loan to LCPI. LCPI originally held title to the

12 | SunCal Communities I Loan and the Ritter Ranch Loan. Thus, as a result of the transfers from

13 | Lehman ALI, OVC Holdings and Northlake Holdings, LCPI held title to all seven Sold Loans.

14 | Pursuant to the Repo, LCPI transferred all of its right, title and interest in all of the Sold Loans to

15 | Fenway Capital on August 22, 2008. See RJN, Exhibits 13 and 14.

16 |       After the Sold Loans were transferred, LCPI and Lehman ALI lacked the power to

17 | make the agreed upon changes to this loan that were specifically provided for and mandated by the

18 | terms of the Settlement Agreement. Although LCPI was not a signatory to the May Restructuring

19 | Agreement, LCPI was a signatory (along with Lehman ALI, OVC Holdings, and Northlake

20 | Holdings) to the Settlement Agreement. Accordingly, when the Lehman Parties executed the

21 | Settlement Agreement on August 25, 2008, three days after the foregoing sale of the Sold Loans

22 | they knew that they could not perform its obligations thereunder.

23 |       In Recital B to the Settlement Agreement, which the Lehman Parties executed on

24 | August 25, 2008, the Lehman Parties states:

25 |      Each of the respective entities identified as "Lenders" on Annex 2 attached hereto

26 |      (each, a "Lender" and collectively, the "Lenders") is the owner and holder, or arranger, of the respective loan or loans more particularly described on Annex 2

27 |      (each, a "Loan" and collectively, the "Loans").

28 |

-24-

1  Cook Declaration, Exhibit 2, Settlement Agreement, pg. 1, Recital B. The Lehman Parties

2  represented that they were the owners and holders of the Sold Loans, which in fact was a false

3  statement, since these loans were transferred to LCPI and then re-sold to Fenway Capital, no later

4  than August 22, 2008, three days earlier.

5          In sum, when Lehman ALI executed the Settlement Agreement on August 25, 2008,

6  Lehman ALI did not own any of the Sold Loans referenced therein and it knew that this sale

7  deprived it of the ability to perform the obligations thereunder. Performance was an objective

8  impossibility.[18]

9          3)    Covenant Not To Sue. The exhibits to the Settlement Agreement included a

10  Covenant Not to Sue, which provided that the lenders would not seek to enforce the rights against

11  the SunCal Borrowers, Guarantors and Pledgors, with respect to: "amounts owing pursuant to the

12  Note, the Loan Agreement or the Loan or obligations or liabilities arising under the Deed of Trust,

13  Pledge Agreement, Completion Guaranty, Limited Guaranty or the other Loan" if the Relevant

14  SunCal Parties performed their obligations under the Settlement Agreement. See Cook

15  Declaration, Exhibit 15. If the Lehman Parties had not prevented the closing and consummation of

16  the Settlement Agreement, the Relevant SunCal Debtors would have been wholly exonerated from

17  their obligations under the applicable Lehman Claims.

18          4)   Lehman Parties Acquire the Pacific Point Project Without Payment. LV Pac

19  Point foreclosed on Pacific Point on August 28, 2008—three days after the Settlement Agreement

20  was signed—and acquired the property pursuant to a non-judicial foreclosure sale. Title was thus

21  transferred from SJD Partners to LV Pac Point, and so the Lehman parties obtained the property as

22  contemplated.

23          Lehman ALI, SJD Partners and the City of San Juan Capistrano even entered into

24  an estoppel certificate—at Lehman ALI's request—on August 26, 2008, two days before the

25  [18] To the extent that any of the Lehman Parties contends that they had the ability to comply with

26  their obligations under the terms of the Settlement Agreement on August 25, 2008, this
representation is demonstrably false. A party cannot modify the terms of loan that it does not own

27  and unwinding the sale prior to the extended closing date was not a viable prospect. To the
contrary, the Lehman Parties affirmatively represented to the New York Bankruptcy that it took

28  them over a year to persuade JP Morgan to release its lien on the commercial paper issuance,
which was necessary to secure the release of the collateral securing this issuance – the Sold Loans.

-25-

1    foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pac Point]

2    shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]"

3    under SJD Partners' agreements with the City. That certificate further provided that there existed

4    no breaches, defaults or claims under SJD Partners' agreements with the City. Yet demands have

5    been made by the City and/or other creditors—even after the estoppel was signed—against SJD

6    Partners, and its bond companies, because of LV Pac Point's failure to fulfill its assumption and

7    payment obligations.

8            Nevertheless, LV Pac Point has not performed any of its Pacific Point obligations.

9    Nor has PAMI performed any of its Pacific Point indemnity obligations. The SunCal Parties

10   related to the project, SJD Partners and its parent, SJD Development, filed for bankruptcy in

11   November 2008 as a result of the Lehman parties' failure to perform. These Debtors remain

12   exposed to millions of dollars in bond and non-bonded liability to third parties due to LV Pac

13   Point's failure to fulfill its payment obligations and PAMI's failure to fulfill its indemnity

14   obligations.

15   **T.    Damages From the Breach of the Settlement Agreement**. As of September 30,

16   2008, Lehman ALI was bound to pay the "urgent payables" and monthly Management Fees, as

17   well as to cause the closing transferring the Projects to new Lehman entities (Venture Grantees),

18   who would assume the unpaid vendor claims incurred at respective Projects, assume the bond

19   liabilities associated with each respective Projects. Had the Lehman Parties performed these

20   contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the

21   instant Chapter 11 cases would have been unnecessary.

22           As a result of the Lehman Parties' failure to pay urgent payables, failure to proceed and

23   cause its affiliates to proceed to closing, and repudiation of the agreements, the Relevant SunCal

24   Debtors had no choice but to file their respective petitions for protection under Chapter 11 of the

25   Bankruptcy Code. This was the very result sought to be avoided by the Restructuring Agreement

26   and Settlement Agreement. Thus, the breaches of the Lehman Parties not only resulted in non-

27   payment of all obligations to be assumed, but they caused the bankruptcies themselves. Thus, the

28   damages incurred by the Relevant SunCal Debtors from the breaches of the Settlement Agreement

000155

1    are all claims and costs incurred relating to their Projects since September 30, 2008. This would

2    include all costs associated with the maintenance and preservation of the Projects since this date,

3    and all costs incurred in this Chapter 11 effort, which was compelled by the Lehman Parties'

4    breach of both the Restructuring Agreement and the Settlement Agreement.

5                       **III.**

6                    **ARGUMENT**

7      **A.**     **Lehman ALI Breached The Terms of the Restructuring Agreement.**

8        Lehman ALI breached the terms of the Restructuring Agreement by failing and then

9    refusing to pay the Urgent Payables and by repudiating the Settlement Agreement. *See Q Mgmt. v.*

10    *Snake River Equip. Co.*, CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008) ("A

11    breach of contract is non-performance of any contractual duty of immediate performance.");

12    *Minidoka Irrigation Dist. v. Dep't of the Interior*, 154 F.3d 924, 927 (9th Cir.1998) (anticipatory

13    repudiation occurs when "the act make[s] the promisor's performance impossible") (internal

14    quotations and citation omitted); *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29, 142

15    P.2d 22, 27 (1943) ("It follows that where there has been a partial breach by the promisor

16    accompanied or followed by a repudiation of the contract by the promisor, the breach is total.").

17        The Voluntary Debtors, Acquisition Inc., Acquisitions, SunCal Management and Bruce

18    Elieff filed a complaint with the Orange County Superior Court on March 24, 2011, against

19    Lehman ALI, LV Pacific Point, PAMI, and other Lehman Parties (none of whom are parties in the

20    instant proceedings) for breach of contract and breach of the covenant of good faith and fair

21    dealing. See RJN, Exhibit 16.

22      **B.**     **The Debtor is Entitled to Recoup its Damages Against the Secured Portion of**

23    **the Lehman Claims.**

24        In *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996), the Ninth

25    Circuit explained the right of recoupment, which is an affirmative defense under California law, as

26    follows:

27          [R]recoupment "is the setting up of a demand arising from the *same transaction* as

28          the plaintiff's claim or cause of action, strictly for the purpose of abatement or
            reduction of such claim." *Collier* ¶ 553.03, at 553-15 (emphasis in original). Under

000156

1

recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.' " *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986) (citations omitted). For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses. *See, e.g., In re California Canners and Growers*, 62 B.R. 18, 22 (9th Cir. BAP 1986) (Elliott, Bankruptcy J., concurring) (citation omitted).

2

3

4

*Newbury*, 95 F. 3d at 1399. Here, the Debtor is setting up a demand or counter-demand in

5

response to Claim 65 "strictly for the purpose of abatement or reduction of such claim." *Id*. This is

6

also a case where the demand being set up arises from the "same transaction or occurrence." *Id*.

7

The *Newbery* case provided dispositive guidance on the "same transaction and occurrence"

8

issue. In *Newbery*, Newbery, an electrical contractor, failed to complete a series of projects that

9

were the subject of completion bonds issued by Firemans Fund Insurance ("Firemans"). Pursuant

10

to this bonding arrangement, Newbery had executed an indemnity agreement indemnifying

11

Firemans from any damages resulting from a failure to complete the projects.

12

After Newbery's default and Chapter 11 filing, Newbery, Firemans and Citibank, a secured

13

creditor holding a lien on the unfinished projects, entered into a settlement agreement. This

14

agreement allowed Firemans to takeover and complete the projects, using a new contractor, and it

15

allowed the new contractor to use the Newbery equipment at the project sites. As part of this

16

agreement, Firemans was required to pay rent for its use of Newbery's equipment to Citibank.

17

Pursuant to the foregoing settlement, Firemans and the new contractor completed the projects.

18

However, Firemans failed to pay the agreed upon rent for the use of Newbery equipment to

19

Citibank.

20

Later, Citibank and Newbery engaged in litigation over Citibank's claim in Newbery's

21

Chapter 11 case. This litigation resulted in a settlement pursuant to which Citibank assigned to

22

Newbery the claim that it held against Firemans for the unpaid rent. Newbery (as the debtor) then

23

asserted this rent claim against Firemans in the Chapter 11 proceeding. In response to the

24

Newbury's claim, Firemans asserted the damages that it had incurred under the bond indemnity

25

agreement against Newbery debtor, relying upon recoupment and offset theories. The District

26

Court granted summary judgment in favor of Firemans on both defenses.

27

Newbery and Citibank then appealed this ruling, arguing that the claim for unpaid rent

28

assigned by Citibank to Newbery did not arise from the same transaction or occurrence as the

-28-

1   damages recoverable by Firemans under the indemnity agreement with Newbery. The Ninth

2   Circuit rejected this argument:

> In deciding whether the relevant claims arose from the same transaction, the
> district court applied the "logical relationship" test outlined by the Supreme Court
> in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750
> (1926). In *Moore*, the Court stated that "'[t]ransaction' is a word of flexible
> meaning. It may comprehend a series of many occurrences, depending not so
> much upon the immediateness of their connection as upon their logical
> relationship." *Id.*, 270 U.S. at 610, 46 S.Ct. at 371; *see also Albright v. Gates*, 362
> F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that
> the term gets an increasingly liberal construction."). Applying this test, the district
> court accepted Fireman's Fund's argument that, because of the incorporation of
> the General Indemnity Agreement into the June 4, 1987 Agreement, both claims
> arose from the latter agreement.

11  95 F. 3d at 1402; *see also*, *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1012 (9th Cir. 2000) ("We

12  have held that the crucial factor in determining whether two events are part of the same

13  transaction is the "logical relationship" between the two. *Newbery Corp. v. Fireman's Fund Ins.*

14  *Co.*, 95 F.3d 1392, 1403 (9th Cir.1996) (resolving a dispute between a contractor and its surety).

15  Thus, a "transaction" may include "a series of many occurrences, depending not so much upon

16  the immediateness of their connection as upon their logical relationship." *Moore v. New York*

17  *Cotton Exch.*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926).").

18      Here, the claims and the bases for the objections thereto clearly arise out of the "same

19  transaction." The Lehman Claims are all purported secured claims based on Loan Agreements

20  and related guaranty agreements and/or security agreements involving the Projects as collateral.

21  The Restructuring Agreement and the Settlement Agreement, on which the current objections are

22  based, contemplated "friendly" foreclosures whereby Lehman ALI or its designee (the Venture

23  Grantees) would take title to the Projects and pay the claims of the applicable creditors, and

24  would agree not to sue on the very obligations that form the basis of their Claims. The respective

25  Loan Agreements, Restructuring Agreement and the Settlement Agreement all arise out of a

26  common series of transactions that clearly bear a "logical relationship" for the purposes of

27  recoupment. See e.g., *In re Thompson*, 350 B.R. 842 (Bankr.E.D.Wis. 2006) (debtor's claims

28  originated out of mortgage loan satisfied "same transaction" requirement of recoupment doctrine

against lender).

-29-

1      **C.    LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses**.

2          LCPI acquired title to the Sold Loans with full knowledge of the defenses held by the

3   Relevant SunCal Debtors. In fact, LCPI's desire to stay the pursuit of these and other defenses in

4   the form of the equitable subordination adversary action was one of the reasons why it

5   repurchased this loan.[19]

6          As this Court is aware, on October 2, 2009, the Court entered formal findings that the

7   transfer of Sold Loans by LCPI to Fenway Capital to pursuant to the Repo was a true sale, rather

8   than a security device. *See* Docket Nos. 652 and 653 attached to the RJN, Exhibits 14 and 15.

9   Thereafter, under the guise of a "compromise," LCPI and Fenway agreed that Fenway would sell

10  the loans to LCPI--even those loans previously held by Lehman ALI. LCPI filed a motion with

11  the New York Bankruptcy Court seeking approval of this transaction, characterized as a

12  "Compromise Motion". LBHI Docket No. 7831. The Debtors filed a limited opposition to the

13  extent the transaction would impose LCPI's stay against the pending adversary action, Adversary

14  No. 8:09-ap-01005-ES ("Lehman Adversary Proceeding"). LBHI Docket No. 8105. In its Reply,

15  LCPI was clear that the transaction would result in the Sold Loans being subject to its automatic

16  stay. *See* LBHI Docket No. 8260 at p.13 ¶ 25 ("LCPI's automatic stay will attach to the property it

17  receives as part of the Transaction as a matter of law, regardless of LCPI's intent."). The Debtors

18  also filed a motion for relief from the automatic stay as to both LCPI and LBHI. LBHI Docket No.

19  8539. Immediately after the New York Bankruptcy Court's approved the "compromise", LCPI's

20  counsel filed a Supplement to Unilateral Status Report ("Lehman Status Report") representing that

21  the Lehman Adversary Proceeding has been affirmatively stayed by the approval of the

22  compromise. Adv. Docket No. 290. As set forth above, on or about June 22, 2010, Fenway

23  transferred the Sold Loans, and therefore the corresponding claims, to LCPI,[20] even though most of

24

25

---

26  [19] The affirmative defenses raised herein are being raised through a claim objection. This does not
    violate LCPI's stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004);
27  *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-
    639 (Bankr.S.D.N.Y. 2003).
28  [20] See *Notices and Evidence of Transfer by Fenway Capital, LLC of Claim* filed on June 22, 2010
    as Docket Nos. 1179 through 1191.

-30-

1  the Sold Loans were not originally held by LCPI, but rather by non-bankrupt Lehman Parties, such

2  as Lehman ALI, OVC Holdings and Northlake Holdings.

3      Accordingly, at the time of its acquisition, LCPI was not only aware of the Relevant

4  SunCal Debtors' defenses to the Sold Loans, LCPI's affirmatively acquired the loans in order to

5  invoke its stay over the Sold Loans and the Lehman Adversary Proceeding. A debtor's post-

6  petition acquisition of a distressed asset, for the purpose of invoking its automatic stay, is an abuse

7  of process, and therefore is not in good faith. In *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga.

8  1984), 14 months prior to the petition date, the debtor transferred certain real property to a third

9  party. Subsequently, the property was subject to a foreclosure proceeding. The debtor filed for

10 bankruptcy, and less than two months later, the third party transferred the real property to the

11 debtor. The debtor contended that the pending foreclosure was stayed, since the real property had

12 become property of the estate. The court disagreed, and observed that an attempt to "shield a

13 property interest under the automatic stay by conveying the property interest to" the debtor's estate

14 during the pendency of the bankruptcy *"would be an abuse of the bankruptcy process." Brannan*,

15 40 B.R. at 24-25 (emphasis added). Accordingly, LCPI's post-petition acquisition of the Sold

16 Loans for the purposes of invoking its automatic stay over the Sold Loans and the Lehman

17 Adversary Proceeding, was an abuse of process.

18     Under these facts, Lehman Claims are subject to any and all defenses held by the Relevant

19 SunCal Debtors, including the affirmative defenses raised herein. *See Fiberchem, Inc. v. General

20 Plastics Corp.*, 495 F.2d 737 (9th Cir.1974) (an assignee with knowledge of the equities of a third

21 party against the assigned right takes his claim subject to those equities); *Hammelburger v.

22 Foursome Inn Corp.*, 54 N.Y.2d 580, 588, 431 N.E.2d 278, 283 (1981) ("An assignee who takes

23 with knowledge can no more enforce the mortgage, whether as to principal or interest, than could

24 the usurer. Knowledge by the assignee of the usurious nature of the transaction will, therefore,

25 defeat an estoppel claim. See also *In re Snyder*, 436 B.R. 81, 90 (Bankr.C.D.Ill. 2010) ("As a

26 general rule, the purchaser of a claim against a debtor in bankruptcy steps into the shoes of the

27 claim seller, enjoying the same benefits, but suffering the same limitations of the claim, as a

28 successor in interest to the seller's position. An assignee of a claim may not receive more than the

-31-

1    assignor would have been entitled to without the assignment since an assignment operates to

2    transfer no greater right or interest than was possessed by the assignor.")

3             **D.**    **LCPI's Automatic Stay Does Not Apply to an Objection to Claim.**

4         While the parties have previously litigated as to whether LCPI's automatic stay is

5    applicable to the equitable subordination cause of action in the Lehman Adversary Action, it is

6    well established in both the Ninth Circuit and Second Circuit that a creditor's stay is not applicable

7    to a claim objection proceeding. Where there are two independent bankruptcy estates in which one

8    estate asserts a claim against the other, an objection to claim does not violate the claimant's

9    automatic stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re*

10   *Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639

11   (Bankr.S.D.N.Y. 2003); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

12         In *Wheatfield Business Park*, 308 B.R. 463 (9th Cir. BAP 2004), the Bankruptcy

13   Appellate Panel held that the creditor's automatic stay did not apply to an objection to its claim,

14   as the creditor was effectively acting in the capacity of a plaintiff, to whom the stay does not

15   apply. The subsequent BAP decision in *In re Palmdale Hills Property, LLC*, 423 B.R. 655, 665

16   (9th Cir.BAP 2009), cited the *Wheatfield Business Park* and *Financial News Network* decisions

17   with approval for the proposition that claim objections do not violate the stay of a debtor-

18   claimant.

19         The law in the Second Circuit is substantially identical. In *In re Financial News Network*,

20   158 B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the

21   Southern District of California, filed a claim in Financial News Network's Chapter 11 case in the

22   Southern District of New York. When Kaypro's claim was disallowed by the bankruptcy court in

23   New York, Kaypro appealed contending that this relief was barred by its automatic stay in

24   California. The District Court rejected this position, stating "both the language and purpose of

25   section 362 indicate that the automatic stay in effect in the Bankruptcy Court for the Southern

26   District of California did not preclude the New York Bankruptcy Court from sustaining [NY

27   debtor's] objection to [California debtor's] proof of claim filed in New York Bankruptcy Court."

28   *Financial News*, 158 B.R. at 573. See also *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d

1   513, 516 (2d Cir. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 499 (E.D.N.Y.

2   1998) ("the primary claims raised by [debtor] are claims asserted by, and not against, the debtor,

3   and are therefore not subject to the stay and can be immediately adjudicated."); *In re Bousa, Inc.*,

4   2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the

5   claim, the automatic stay provision does not preclude adjudication.").

6        Further, it is well established in this Circuit that the automatic stay does not apply to the

7   assertion of recoupment. See *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1400 (9th

8   Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1014 (9th Cir. 2000); *In re Palmdale Hills

9   Property, LLC*, 423 B.R. 655, 667 n.9 (9th Cir. BAP 2009) ("[Recoupment] is an equitable

10   common law doctrine to net out debts and allow the defendant to recoup payments made against

11   the claim and is not limited to pre-petition claims. It is not subject to the automatic stay."); *In re

12   Petersen*, 2010 WL 3842157, *13 (D.Ariz. 2010) ("because 'recoupment is neither a claim nor a

13   debt, it is unaffected by either the automatic stay or the debtor's discharge.'"); *In re McMahon*,

14   129 F.3d 93, 98 (2d Cir. 1997) ("a recoupment not subject to the automatic stay of 11 U.S.C.

15   § 362").

16        Here, the within Motion does not seek any affirmative recovery against LCPI. Rather,

17   SunCal Moving Parties are merely acting defensively to disallow the Lehman Claims.

18   Accordingly, LCPI's automatic stay is not applicable.

19        **E.**    **Any Party in Interest Has Standing to Object to Claims.**

20        As set forth above, SunCal Management is the moving party in this objection to claims in

21   the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such

22   Trustee Debtors' cases. Any party in interest has standing to objection to claims. 11 U.S.C.

23   §502(a) ("a claim…is deemed allowed, unless a party in interest…objects"). *See also* Advisory

24   Committee Notes to Bankruptcy Rule 3007 ("any party in interest may object to a claim").

25        The Ninth Circuit has similarly held that "any party in interest" can object to a claim

26   pursuant to Section 502(a):

27       Again, any party in interest can object. *See* 11 U.S.C. § 502(a). Although the
        trustee in Siegel's bankruptcy could have objected to Freddie Mac's proofs of

28       claim, Siegel could have objected as well. *See Lawrence v. Steinford Holding
        B.V. ( In re Dominelli)*, 820 F.2d 313, 316 (9th Cir.1987) (stating that under 11

000162

1   U.S.C. § 502(a) a party in interest, including the trustee, can object to a proof of
    claim); *see also IRS v. Taylor (In re Taylor),* 132 F.3d 256, 261 (5th Cir.1998)
2   ("Once a proof of claim is filed, the debt is considered allowed unless the debtor
    or another party in interest files an objection to the proof of claim."); *FDIC v.*
3   *Union Entities (In re Be-Mac Transp.),* 83 F.3d 1020, 1025 (8th Cir.1996) ("In
    order to disallow the claim, the debtor or another party in interest must object
4   and request a determination of the lien's validity.")

5   Siegel v. Federal Home Loan Mortg. Corp., 143 F.3d 525, 531 (9th Cir. 1998).  See also In re

6   Anderson, 382 B.R. 496, 506 (Bankr.D.Or. 2008) ("To the extent [the plan] limits the parties who

7   may file claims objections to the Debtors and the trustee, it is inappropriate as any party in interest

8   has standing to object to claims. § 502(a)."); In re QMect, Inc., 349 B.R. 620, 625 (Bankr.

9   N.D.Cal. 2006) ("A creditor or creditors' committee has standing independent of the trustee or

10  debtor-in-possession to object to another creditor's claim as long as it has something to gain if it

11  prevails.").

12                                           **IV**

13                                    **CONCLUSION**

14          Pursuant to the terms of the Restructuring Agreement and the Settlement Agreement,

15  Lehman ALI, which is the parent entity of LCPI, Lehman ALI was bound to pay the "urgent

16  payables" and Management Fees, as well as to cause to closing transferring the Projects to new

17  Lehman entities (Venture Grantees), who would assume the unpaid vendor claims incurred at

18  Projects, assume the bond liabilities associated with that Project.  Had Lehman ALI performed

19  these contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and

20  the instant Chapter 11 cases would have been unnecessary. Lehman ALI did not comply with the

21  terms of this agreement.  It did not pay the Urgent Payables or the bond obligations.  Moreover,

22  three days before signing the Settlement Agreement, Lehman ALI, and its subsidiary, LCPI, sold

23  all of their right, title and interest in the Sold Loans to Fenway Capital.  Yet, when the Lehman

24  Parties signed the Settlement Agreement, they represented that they still owned these loans.  These

25  representations were false and this transfer rendered performance under the terms of the

26  Restructuring Agreement and the Settlement Agreement impossible.

27          The foregoing breaches caused the Relevant SunCal Debtors to suffer millions of dollars in

28  damages, which will need to be quantified through discovery.  These damages can and should be

                                         -34-

1  recouped from the secured portion of the Lehman Claims.  Moreover, LCPI should be denied the

2  right to seek any relief on the basis of Lehman Claims until the Relevant SunCal Debtors are made

3  whole.

4  DATED: April 8, 2011                          **WINTHROP COUCHOT**

5                                                **PROFESSIONAL CORPORATION**

6

                                                 By:___/s/ *Paul J. Couchot*_____
7                                                       Paul J. Couchot, Esq.
                                                        Sean Okeefe, Esq.
8                                                       Peter Lianides, Esq.
                                                 General Insolvency Counsel for Administratively
9                                                Consolidated Debtors-in-Possession

10

11                                               **RUS MILIBAND & SMITH P.C.**

12

                                                 By: _/s/ *Ronald Rus*_____
13                                                    Ronald Rus, Esq.
                                                      Joel S. Miliband, Esq.
14                                                    Catherine Castaldi, Esq.
15                                               Attorneys for SunCal Management, LLC, and SCC
                                                 Acquisitions Inc.
16

17

18

19

20

21

22

23

24

25

26

27

28

-35-

000164

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **NOTICE OF MOTION AND MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On April 8, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served): On April 8, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on April 8, 2011, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Via Attorney Service
Honorable Erithe Smith
Ronald Reagan Federal Bldg.
411 W. Fourth St., Suite 5041
Santa Ana, CA 92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 8, 2011 | Viann Corbin | /s/ Viann Corbin |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

-36-

000165

**NEF SERVICE LIST**

- Selia M Acevedo    sacevedo@millerbarondess.com,
  mpritikin@millerbarondess.com;bprocel@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ecf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszyjw.com
- Carollynn Callari    ccallari@venable.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com,
  pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com,
  hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly G Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com

-37-

000166

- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Irene L Kiet    ikiet@hkclaw.com
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com
- James M Miller    jmiller@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com,
  jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

-38-

000167

1
 - James E Till  jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
 - United States Trustee (SA)  ustpregion16.sa.ecf@usdoj.gov

2
 - Carol G Unruh  cgunruh@sbcglobal.net
 - Annie Verdries  verdries@lbbslaw.com

3
 - Jason Wallach  jwallach@gladstonemichel.com
 - Joshua D Wayser  , kim.johnson@kattenlaw.com

4
 - Christopher T Williams  ctwilliams@venable.com, jcontreras@venable.com
 - Marc J Winthrop  mwinthrop@winthropcouchot.com, pj@winthropcouchot.com

5
 - David M Wiseblood  dwiseblood@seyfarth.com
 - Brett K Wiseman  bwiseman@aalaws.com

6
 - Dean A Ziehl  dziehl@pszjlaw.com, dziehl@pszjlaw.com
 - Marc A. Zimmerman  joshuasdaddy@att.net

7

8

SERVICE VIA FIRST CLASS MAIL

| Bickford 16, SJDPartners23 Comm9, Tesoro7 | Heartland9, Marblehead21, PSV12 Acton6Emerald 7, SunValley17, PalmdaleHills65 SummitValley12, Northlake6, OakValley |
|---|---|
| Lehman Commercial Paper Inc. Lehman ALI, Inc. Attn: Gerald Pietroforte 1271 Sixth Ave., 46th Fl. New York, NY 10020 | Lehman ALI, Inc. OVC Holdings, LLC Northlake Holdings LLC Lehman Commercial Paper Inc. Attn: Jeff Fitts 1271 Sixth Ave., 46th Fl. New York, NY 10020 |
| All | |
| Weil, Gotshal & Manges LLP Attn: Shai Y. Waisman 767 Fifth Ave. New York, NY 10153 | |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-39-

000168

**Exhibit 7**

000169

1  PAUL J. COUCHOT -- State Bar No. 131934
   SEAN A. O'KEEFE -- State Bar No. 122417
2  **WINTHROP COUCHOT**
   **PROFESSIONAL CORPORATION**
3  660 Newport Center Drive, Fourth Floor
   Newport Beach, CA 92660
4  Telephone: (949) 720-4100
   Facsimile: (949) 720-4111
5  General Insolvency Counsel for Administratively
   Consolidated Debtors-in-Possession
6
7  RONALD RUS - State Bar No. 67369
   JOEL S. MILIBAND - State Bar No. 77438
8  **RUS MILIBAND & SMITH P.C.**
   2211 Michelson Drive, Seventh Floor
9  Irvine, California 92612
   Telephone: (949) 752-7100
10 Facsimile:  (949) 252-1514

11 Counsel for SunCal Management LLC and
   SCC Acquisitions Inc.

12         **UNITED STATES BANKRUPTCY COURT**
           **CENTRAL DISTRICT OF CALIFORNIA**
13              **SANTA ANA DIVISION**

14 | In re | Case No. 8:08-bk-17206-ES |

15 | | Jointly Administered With Case Nos. |

16 | Palmdale Hills Property, LLC, and its Related Debtors. | 8:08-bk-17209ES; 8:08-bk-17240ES; 8:08-bk-17224ES; 8:08-bk-17242ES; 8:08-bk-17225ES; 8:08-bk-17245ES; |

17 | Jointly Administered Debtors and Debtors-in-Possession | 8:08-bk-17227ES; 8:08-bk-17246ES; 8:08-bk-17230ES; 8:08-bk-17231ES; 8:08-bk-17236ES; 8:08-bk-17248ES; 8:08-bk-17249ES; 8:08-bk-17573ES; 8:08-bk-17574ES; |

18 | | 8:08-bk-17575ES; 8:08-bk-17404ES; 8:08-bk-17407ES; 8:08-bk-17408ES; 8:08-bk-17409ES; 8:08-bk-17458ES; |

19 Affects:
   ☐ All Debtors

   8:08-bk-17465ES; 8:08-bk-17470ES; 8:08-bk-17472ES; and 8:08-17588ES.

20 ☒ Palmdale Hills Property, LLC,
   ☐ SunCal Beaumont Heights, LLC

   Chapter 11 Cases

21 ☐ SCC/Palmdale, LLC
   ☐ SunCal Johannson Ranch, LLC

   **NOTICE OF AMENDED MOTION AND**

22 ☒ SunCal Summit Valley, LLC
   ☒ SunCal Emerald Meadows LLC

   **AMENDED MOTION FOR ORDER**
   **DISALLOWING CERTAIN CLAIMS HELD**
   **BY LEHMAN ALI INC. AND LEHMAN**

23 ☒ SunCal Bickford Ranch, LLC
   ☒ Acton Estates, LLC

   **COMMERCIAL PAPER INC.**

24 ☐ Seven Brothers LLC
   ☒ SJD Partners, Ltd.

   DATE:    June 9, 2011

25 ☐ SJD Development Corp.
   ☐ Kirby Estates, LLC

   TIME:    10:30 a.m.
   PLACE:   Courtroom 5A

26 ☐ SunCal Communities I, LLC
   ☐ SunCal Communities III, LLC

27

28 *Continued on Next Page*

*Continued from Previous Page*

☒ SCC Communities LLC
☐ North Orange Del Rio Land, LLC
☒ Tesoro SF, LLC
☒ LBL-SunCal Oak Valley, LLC
☒ SunCal Heartland, LLC
☒ LBL-SunCal Northlake, LLC
☒ SunCal Marblehead, LLC
☐ SunCal Century City, LLC
☒ SunCal PSV, LLC
☐ Delta Coves Venture, LLC
☐ SunCal Torrance, LLC
☐ SunCal Oak Knoll, LLC

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | MATERIAL BACKGROUND FACTS | 2 |
| | A. The SunCal Debtors | 2 |
| | B. Acton Estates | 2 |
| | C. Bickford Ranch | 2 |
| | D. Emerald Meadows | 3 |
| | E. Palmdale Hills | 3 |
| | F. SCC Communities | 3 |
| | G. SJD Partners | 4 |
| | H. Summit Valley | 4 |
| | I. Tesoro | 4 |
| | J. Heartland | 4 |
| | K. Marblehead | 5 |
| | L. Oak Valley | 5 |
| | M. Northlake | 5 |
| | N. PSV | 5 |
| | O. The Economic Downturn In 2007 and Promises of Funding | 6 |
| | P. The Restructuring Agreement | 6 |
| |     1. The Parties To The Restructuring Agreement | 7 |
| |     2. Lehman ALI's Obligation to Fund "Urgent Payables." | 8 |
| |     3. Lehman ALI's Obligation to Close | 9 |
| | Q. The Breach of The Restructuring Agreement | 10 |
| |     1. Failure to Pay Urgent Payables | 10 |
| |     2. Failure To Proceed With A Closing Under The Settlement Agreement | 11 |
| |     3. The Sale of Seven Sold Loans to Fenway Breached The Terms of The Restructuring Agreement. | 12 |
| | R. The Settlement Agreement | 12 |
| |     1. The Obligations to Pay Assumed and Authorized Amounts. | 13 |
| |         a. Scheduled Assumed Obligations | 14 |
| |         b. Lender Authorized Work | 16 |
| |     2. The Obligations to Assume Bond Obligations and to Replace or Release Bonds | 16 |
| |     3. Pacific Point Obligations | 19 |
| | S. The Breaches of The Settlement Agreement | 20 |
| |     1. Lehman ALI Attempted To Repudiate The Settlement Agreement | 20 |
| |     2. The Sale of The Sold Loans Repudiated The Settlement Agreement | 21 |
| |     3. Covenant Not To Sue | 22 |
| |     4. Lehman Parties Acquire the Pacific Point Project Without Payment | 22 |
| | T. Damages From the Breach of the Settlement Agreement | 23 |

000172

1

<u>**TABLE OF CONTENTS**</u>

2

**(Continued)**

3

**PAGE**

4
III.    ARGUMENT ................................................................................................  24

5
        A.    Lehman ALI Breached The Terms of the Restructuring Agreement ............  24
        B.    The Debtor is Entitled to Recoup its Damages Against the Secured

6
              Portion of the Lehman Claims. ........................................................................  24
        C.    LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses........  27

7
        D.    The SunCal Debtors Are Entitled To Offset Their Damages - Against
              Lehman Ali's Claims Only ..............................................................................  29

8
        E.    Allowing The Lehman Claims Would Unjustly Enrich The Lehman

9
              Entities ...........................................................................................................  30
        F.    The Lehman Entities Cannot Profit From Their own Wrongs (Unclean\

10
              Hands) ..............................................................................................................  31
        G.    The Imposition Of A Constructive Trust Is Justified - Against Lehman

11
              Ali Only ...........................................................................................................  32
        H.    The Imposition Of An Equitable Lien Is Justified - Against Lehman

12
              Ali Only ...........................................................................................................  33

13
        I.    LCPI's Automatic Stay Does Not Apply to an Objection to Claim. .............  33
        J.    Any Party in Interest Has Standing to Object to Claims.  ...........................  35

14

15
IV.     CONCLUSION..............................................................................................  36

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

PAGE

CASES

*Albright v. Gates,*
362 F.2d 928 (9th Cir.1966) ............................................................................26

*Campbell v. Superior Court,*
132 Cal. App. 4th 904 (2005) ..........................................................................32

*Coffman v. Cobra Mfg. Co.,*
242 F.2d 754 (9th Cir. 1954) ...........................................................................30

*Communist Party v. Valencia, Inc.*
35 Cal.App.4th 980 (1995) ..............................................................................32

*Del Charro Properties, L.P. v. Heron,*
H025571, 2004 WL 1616016 (2004) ...............................................................29

*Destro v. Stuhley,*
675 F.2d 1037 (9th Cir.1981) ..........................................................................33

*Estate of Pitts,*
218 Cal. 184 (1933) .........................................................................................33

*FDIC v. Union Entities (In re Be-Mac Transp.),*
83 F.3d 1020 (8th Cir.1996) ............................................................................35

*Feature Realty, Inc. v. City of Spokane,*
331 F.3d 1082 (9th Cir. 2003) .........................................................................31

*Fiberchem, Inc. v. General Plastics Corp.,*
495 F.2d 737 (9th Cir.1974) ............................................................................28

*Gaudiosi v. Mellon,*
269 F.2d 873 (3d Cir.1959) .............................................................................31

*Gold Mining & Water Co. v. Swinerton,*
23 Cal. 2d 19, 142 P.2d 22 (1943) ..................................................................24

*Granberry v. Islay Investments*
9 Cal.4th 738 (1995) ........................................................................................29

*Hammelburger v. Foursome Inn Corp.,*
54 N.Y.2d 580, 431 N.E.2d 278 (1981) ...........................................................28

*Harrison v. Adams,*
20 Cal. 2d 646, 128 P.2d 9 (1942) ..................................................................30

*Highland Tank & Mfg. Co. v. PS Intern. Inc.,*
393 F.Supp.2d 348 (W.D.Pa.2005) .................................................................31

## TABLE OF AUTHORITIES

### (Continued)

PAGE

*In re Anderson,*
382 B.R. 496 (Bankr.D.Or. 2008) .......................................................35

*In re Bousa, Inc.,*
2005 WL 1176108, *4 (S.D.N.Y. 2005) ...............................................34

*In re Brannan,*
40 B.R. 20 (Bankr. N.D. Ga. 1984), ....................................................28

*In re Financial News Network,*
158 B.R. 570 (S.D.N.Y. 1993) ............................................................34

*In re McMahon,*
129 F.3d 93 (2d Cir. 1997) ..................................................................35

*In re Meade,*
1999 WL 33496001, *1 (E.D.Pa. 1999) ..............................................34

*In re Metiom,*
301 B.R. 634 (Bankr.S.D.N.Y. 2003); ...........................................27, 34

*In re Palmdale Hills Property, LLC,*
423 B.R. 655, n.9 (9th Cir. BAP 2009) ...........................................34, 35

*In re Parker,*
80 B.R. 729 (Bankr. E.D. Pa. 1987) ................................................30, 34

*In re Petersen,*
2010 WL 3842157, *13 (D.Ariz. 2010) ...............................................35

*In re QMect, Inc.,*
349 B.R. 620 (Bankr. N.D.Cal. 2006) .................................................36

*In re Snyder,*
436 B.R. 81 (Bankr.C.D.Ill. 2010) ......................................................28

*In re Thompson,*
350 B.R. 842 (Bankr.E.D.Wis. 2006) ..................................................26

*In re TLC Hospitals, Inc.,*
224 F.3d 1008 (9th Cir. 2000) .........................................................26, 34

*In re Wheatfield Business Park,*
308 B.R. 463 (9th Cir. BAP 2004) .......................................................34

*IRS v. Taylor (In re Taylor),*
132 F.3d 256 (5th Cir.1998) ................................................................35

*Jones v. Sacramento Sav. & Loan Ass'n,*
248 Cal. App. 2d 522 (1967) ...............................................................33

000175

<u>**TABLE OF AUTHORITIES**</u>

**(Continued)**

**PAGE**

*Lawrence v. Steinford Holding B.V. ( In re Dominelli),*
  820 F.2d 313 (9th Cir.1987) ........................................................................................35

*Lewis Pub. Co. v. Henderson*
  103 Cal. App. 425 (1930) ...........................................................................................31

*Margott v. Gem Properties, Inc.,*
  34 Cal. App. 3d 849 (1973) ........................................................................................30

*McColgan v. Bank of California Assn.,*
  208 Cal. 329 (1929) ...................................................................................................33

*Minidoka Irrigation Dist. v. Dep't of the Interior,*
  154 F.3d 924 (9th Cir.1998) .......................................................................................24

*Moore v. New York Cotton Exchange,*
  270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). ........................................................26

*Newbery Corp. v. Fireman's Fund Ins. Co.,*
  95 F.3d 1392 (9th Cir. 1996), ........................................................................24, 25, 26, 34

*Olick v. Parker & Parsley Petroleum Co.,*
  145 F.3d 513 (2d Cir. 1998); .......................................................................................34

*Peterson v. Cellco P'ship,*
  164 Cal.App.4th 1583, 80 Cal.Rptr.3d 316 (2008) .........................................................30

*Q Mgmt. v. Snake River Equip. Co.,*
  CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008).......................................24

*Rathbun v. Sec. Mfg. Co.,*
  82 Cal. App. 793 (1927) .............................................................................................31

*Robinson, on behalf of C. & R. Transfer, v. Boulevard Express,*
  17 Cal. App. 2d 492 (1936) ........................................................................................31

*Shum v. Intel Corp.,*
  630 F. Supp. 2d 1063 (N.D. Cal. 2009) *aff'd,* 633 F.3d 1067 (Fed. Cir. 2010) ..................30

*Siegel v. Federal Home Loan Mortg. Corp.,*
  143 F.3d 525 (9th Cir. 1998). ......................................................................................35

*Smith v. Anglo-California Trust Co.,*
  205 Cal. 496 (1928) ...................................................................................................33

*Vasile v. Dean Witter Reynolds Inc.,*
  20 F.Supp.2d 465 (E.D.N.Y. 1998)...............................................................................34

-v-

# TABLE OF AUTHORITIES

## (Continued)

PAGE

**STATUTES**

11 U.S.C. § 362 .................................................................................................. 35
11 U.S.C. § 502(a). ........................................................................................... 35
Cal. Code Civ. Proc. § 431.70. ....................................................................... 29
Cal Civ. Code § 2224 ....................................................................................... 32

**OTHER AUTHORITIES**

3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67 .......................... 33
4 Pomeroy's Equity Jurisprudence (5th ed.) s 1235, pp. 696—699 .......... 33
3A Corbin, Contracts § 767, at 540 (1960) .................................................. 31
Advisory Committee Notes to Bankruptcy Rule 3007 ................................ 35
*Restatement of Restitution* § 3 (1937) ........................................................ 31

000177

1   Acton Estates LLC ("Acton"), SunCal Bickford Ranch LLC ("Bickford"), SunCal Emerald

2   Meadows LLC ("Emerald Meadows"), Palmdale Hills Property, LLC ("Palmdale Hills"), SJD

3   Partners, Ltd. ("SJD Partners"), SunCal Summit Valley LLC ("Summit Valley"), SCC

4   Communities LLC ("SCC Communities"), Tesoro SF LLC ("Tesoro"), and SunCal Management,

5   LLC ("SunCal Management") (collectively, the "SunCal Moving Parties"), hereby move (the

6   "Motion") the Court, in both the Voluntary Debtors' cases[1] and the Trustee Debtors' cases[2], for an

7   order granting the following relief:[3]

8       (A)    Disallowing the following Proofs of Claim filed by Lehman ALI, Inc. ("Lehman

9   ALI") and Lehman Commercial Paper, Inc. ("LCPI", and together with Lehman ALI, the

10  "Lehman Entities") on the grounds that the debt obligation therein was eliminated by the

11  Settlement Agreement, as that term is defined herein:

12

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|---|---|---|---|---|
| 6 | Acton Estates | LCPI | $343,221,391 | 1. |
| 16 | Bickford Ranch | LCPI | $343,221,391 | 2. |
| 7 | Emerald Meadows | LCPI | $343,221,391 | 3. |
| 65 | Palmdale Hills | LCPI | $287,252,096 | 4. |
| 23 | SJD Partners | Lehman ALI | $120,110,237 | 5. |
| 12 | Summit Valley | LCPI | $343,221,391 | 6. |
| 9 | SCC Communities | Lehman ALI | $ 23,795,013 | 7. |

---

[1] The Voluntary Debtors are defined as Acton, SunCal Beaumont Heights, LLC ("Beaumont"), Bickford, Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), SCC Palmdale, Palmdale Hills, SJD Partners, SJD Development Corp. ("SJD Development"), Summit Valley, SCC Communities, Seven Brothers LLC ("Seven Brothers"), Kirby Estates, LLC ("Kirby"), SunCal Communities I LLC ("SunCal I"), SunCal Communities III LLC ("SunCal III"), North Orange Del Rio Land LLC ("Del Rio"), and Tesoro.
[2] The Trustee Debtors are defined as LB/L-SunCal Oak Valley LLC ("Oak Valley"), LB/L-SunCal Northlake LLC ("Northlake"), SunCal Heartland LLC ("Heartland"), SunCal Marblehead LLC ("Marblehead"), SunCal Century City LLC ("Century City"), SunCal PSV LLC ("PSV"), Delta Coves Venture LLC ("Delta Coves"), SunCal Torrance LLC ("Torrance"), and SunCal Oak Knoll LLC ("Oak Knoll") (collectively "Trustee Debtors"). The Trustee Debtors and Voluntary Debtors are referred to collectively herein as the "Debtors."
[3] The respective Voluntary Debtors are the moving parties with respect to the objections to claims in their respective Voluntary Debtors' cases, and SunCal Management is the moving party in the objections to claims in the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such Trustee Debtors' cases.
[4] As set forth in more detail below, several of the underlying loans have been subject to multiple transfers before and after the petition date. Accordingly, the "current claim holder" is not necessarily the original claim holder or the entity which initially filed the proof of claim. To the extent that other Lehman affiliated entities are the holders of any of these claims, for the purposes of this Motion, such entities are included in the definition of the "Lehman Entities" and such to this Motion.

000178

| Claim No. | Relevant SunCal Debtors | Current Claim Holder[4] | Claim Amount | RJN Exhibit No. |
|-----------|-------------------------|-------------------------|--------------|-----------------|
| 7 | Tesoro | Lehman ALI | $ 23,795,013 | 8. |
| 16 | Oak Valley | LCPI | $141,630,092 | 9. |
| 6 | Northlake | LCPI | $123,654,777 | 10. |
| 12 | PSV | LCPI | $88,257,340 | 11. |
| 9 | Heartland | LCPI | $354,325,126 | 12. |
| 21 | Marblehead | LCPI | $354,325,126 | 13. |

(the above referenced proofs of claim are collectively referred to as the "Lehman Claims");

    (B)    Recouping from the secured portion of the Lehman Claims, all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI, Inc. ("Lehman ALI"), LCPI's predecessor-in-interest;

    (C)    Offsetting from the secured portion of the Lehman ALI's claims all damages suffered by the Relevant SunCal Debtors on account of the breach of Restructuring Agreement by Lehman ALI;

    (D)    Denying the Lehman Entities any relief or recovery on the Lehman Claims on the grounds that they have failed to establish their burden under applicable law;

    (E)    Imposing a constructive trust on any recovery obtained by Lehman ALI from property of the relevant SunCal Debtors in that amount necessary to enable the such Debtors to recover the damages owed to them by Lehman ALI, or imposing an equitable lien on any such recovery to accomplish this purpose;

    (F)    Barring the Lehman Claims on the grounds of unclean hands and unjust enrichment; and

    (G)    Such further relief as the Court deems just and proper.

    This Motion is made on the basis of the concurrently filed Declaration of Bruce Cook (the "Cook Declaration"), and Request for Judicial Notice, the within points and authorities, and upon such other evidence as the Court elects to consider prior to or at the hearing on this matter.

    IF YOU DO NOT OPPOSE THE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OPPOSE THE MOTION, OPPOSITIONS MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION. YOU MUST FILE YOUR OPPOSITION WITH THE CLERK OF THE UNITED

1 STATES BANKRUPTCY COURT LOCATED AT 411 WEST FOURTH STREET, SUITE 2030,

2 SANTA ANA, CALIFORNIA 92701. YOU MUST ALSO SERVE A COPY OF YOUR

3 OPPOSITION TO THE MOTION UPON COUNSELS FOR THE VOLUNTARY DEBTORS

4 AND SUNCAL MANAGEMENT AT THE MAILING ADDRESSES INDICATED IN THE

5 UPPER LEFT CORNER OF THE FIRST PAGE OF THIS MOTION. THE VOLUNTARY

6 DEBTORS' COUNSEL WILL ACCEPT E-MAIL SERVE AT THE FOLLOWING

7 ADDRESSES: PCOUCHOT@WINTHROPCOUCHOT.COM, WITH A COPY TO

8 PJ@WINTHROPCOUCHOT.COM. ANY FAILURE TO TIMELY FILE AND SERVE AN

9 OPPOSITION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED, AND THE

10 COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER

11 NOTICE.

12 DATED: May 10, 2011                    **WINTHROP COUCHOT**
                                         **PROFESSIONAL CORPORATION**
13

14
                                         By:___*/s/ Paul J. Couchot*_____
15                                             Paul J. Couchot, Esq.
                                               Sean Okeefe, Esq.
16                                             Peter Lianides, Esq.
                                         General Insolvency Counsel for Administratively
17                                       Consolidated Debtors-in-Possession

18

19                                       **RUS MILIBAND & SMITH P.C.**

20
                                         By:__*/s/ Ronald Rus*_____
21                                             Ronald Rus, Esq.
                                               Joel S. Miliband, Esq.
22                                             Catherine Castaldi, Esq.
                                         Attorneys for SunCal Management, LLC, and
23                                       SCC Acquisitions Inc.

24

25

26

27

28

-ix-

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

In May of 2008, the SunCal Parties (as defined herein), on the one hand, and Lehman ALI, Inc. ("Lehman ALI") and its related affiliates, on the other (together, the "Lehman Parties"), entered into that certain "Restructuring Agreement." See Cook Declaration, Exhibit 1. Pursuant to the terms of the Restructuring Agreement, Lehman ALI agreed (1) to pay the certain "urgent payables" (defined below), and management fees, according to a contractual schedule, (2) to the transfer the Relevant SunCal Debtors' projects to newly created Lehman entities (referred to as the Venture Grantees), who would assume the unpaid vendor claims incurred at the respective projects, including but not limited to the "lender authorized work" and assume the bond liabilities associated with that project, and (3) to make a number of material modification to the loans that were secured by liens against these projects. In August of 2008, the SunCal Parties and the Lehman Parties executed a second agreement, the Settlement Agreement (Cook Declaration, Exhibit 2), and further included additional Projects and their respective Debtors as parties to the Restructuring Agreement. The applicable Debtors who were the parties to the Restructuring Agreement, and set forth in the chart above, are referred to herein as the "Relevant SunCal Debtors".

As more fully detailed herein, Lehman ALI and the other Lehman Parties breached the terms of the Restructuring Agreement and the Settlement Agreement by failing to pay the vendor claims and bond obligations as promised and they later repudiated the entirety of these agreements. The Lehman Parties' actions have caused the Relevant SunCal Debtors to suffer tens of millions, if not in excess of one hundred million dollars in damages, which will need to be quantified through discovery. The secured portion of the Lehman Claims should be reduced by this sum and the resulting equity should be available for unsecured creditors of the respective estates.

000181

## II.

## MATERIAL BACKGROUND FACTS

**A)**     **The SunCal Debtors**. Beginning in the late 1990s, a group of affiliated companies owned directly or indirectly by or affiliated with SCC Acquisitions, Inc. (collectively "SunCal"), entered into a joint venture (the "Venture") with certain affiliates of LBHI, including most importantly LCPI and Lehman ALI. The objective of the Venture was to acquire, develop and sell a series of residential development projects in California (the "Projects").

Under the parties' Venture, SunCal, which is one of the largest private land developers in the United States, served as the developer/manager of the Projects, and the Lehman Parties served as the capital source. The SunCal Debtors (the debtors listed on the face page of this pleading) were either formed to own the Projects being developed by the Venture, or they were formed to serve as the parent entities of the entities that owned the Projects. The Relevant SunCal Debtors and their Projects are set forth below:

**B)**     **Acton Estates**. Acton Estates owns the Acton Project consisting of a 175-acre site situated in Los Angeles County, California. LCPI entered into a loan agreement dated November 17, 2005 ("SunCal Communities I Loan") with SunCal I, as borrower. The Acton Estates Project is encumbered by a first priority deed of trust securing the SunCal Communities I Loan. Acton was not an original borrower under the SunCal Communities I Loan, but rather LCPI purports that Acton subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan. However, LCPI's relevant proof of claim (Claim 2-2) fails to attach or establish the existence of an Assumption Agreement as to Acton. On or about September 21, 2009, LCPI filed Claim 2-2 in the amount of $343,221,391 against Acton.[5]

**C)**     **Bickford Ranch**. SunCal Bickford owns the Bickford Ranch Project, consisting of a 1,940-acre site situated in the City of Penryn, in Placer County, California. The Bickford Ranch

---

[5] Claim 2 against Acton is based upon the SunCal Communities I Loan which was one of the "Sold Loans" (defined below) which was transferred to Fenway prior to the petition date (see RJN Exhibits 13 and 14). On or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI. See Docket Nos. 1179 through 1191.

000182

1   Project is encumbered by a first priority deed of trust recorded on August 25, 2006 securing the

2   SunCal Communities I Loan.  Bickford Ranch was also not an original borrower under the SunCal

3   Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it

4   purported to become an additional grantor under the Guarantee and Collateral Agreement relating

5   to the SunCal Communities I Loan.  On September 21, 2009, LCPI filed Claim 16-3, in the amount

6   of $343,221,391 against Bickford Ranch.

7       **D)**      **Emerald Meadows**.  Emerald Meadows owns the Emerald Meadows Project,

8   consisting of a 178-acre site situated in the City of Rubidoux, in Riverside County, California.  The

9   Emerald Meadows Project is encumbered by a first priority deed of trust recorded on July 19, 2007

10   securing the SunCal Communities I Loan.  Emerald Meadows was also not a borrower under the

11   SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement".  On

12   September 21, 2009, LCPI filed Claim 7-2 in the amount of $343,221,391 against Emerald

13   Meadows.

14       **E)**      **Palmdale Hills**. Palmdale Hills's primary asset is the Ritter Ranch Project, a 10,000

15   acre residential development located in Antelope Valley, California. The Ritter Ranch Project is

16   encumbered by a first priority deed of trust that was originally granted to LCPI in February of

17   2007. LCPI contend that this deed of trust secures, _inter alia_, all obligations arising under that

18   certain _Credit Agreement_ dated as of February 8, 2007 (the "Ritter Ranch Loan" ), entered into by

19   and between LCPI and the Debtor.  On or about September 23, 2009, LCPI filed Claim 65-4 in the

20   amount of $287,252,096.31 against Palmdale Hills.

21       **F)**      **SCC Communities**. SCC Communities owns the Joshua Ridge Project, consisting

22   of an 80-acre site situated in the City of Victorville in San Bernardino County, California.  The

23   Joshua Ridge Project is encumbered by a first priority deed of trust recorded on November 2, 2007

24   securing that certain Loan Agreement, dated as of October 31, 2007, by and between SCC

25   Acquisitions LLC ("Acquisitions"), as borrower and Lehman ALI, as lender (the "Interim Loan

26   Agreement").  SCC Communities was not a borrower under the Interim Loan Agreement, but did

27   sign a "subsidiary guaranty."  On March 30, 2009, Lehman ALI filed Claim 9 against SCC

28   Communities in the amount of $23,795,013 arising from Interim Loan.

000183

**G)** **SJD Partners.** SJD Partners currently owns no real property. SJD Partners formerly owned a project located in San Juan Capistrano known as the "Pacific Point Project". The Pacific Point Project was lost through a non-judicial foreclosure sale by Lehman ALI, on the second priority deed of trust, which caused a Lehman Affiliate, LV Pacific Point LLC ("LV PacPoint"), a Delaware Limited Liability Company, to purchase the Pacific Point Project at a foreclosure sale conducted on August 28, 2008. The Pacific Point Project is encumbered by a first priority deed of trust securing that certain loan agreement, dated February 16, 2006, by and among Lehman ALI, SJD Development and SJD Partners, pursuant to which Lehman ALI made a loan in the maximum aggregate principal amount of approximately $125,000,000 (the "Pacific Point First Loan Agreement"). On March 30, 2009, Lehman ALI filed Claim 23 in the amount of $120,110,237 against SJD Partners.

**H)** **Summit Valley.** Summit Valley owns most of the Summit Valley Project that originally consisted of a 2,500-acre site situated in the City of Hesperia, in San Bernardino County, California. Summit Valley was also not a borrower under the SunCal Communities I Loan, but rather subsequently executed an "Assumption Agreement" whereby it purported to become an additional grantor under the Guarantee and Collateral Agreement relating to the SunCal Communities I Loan. Claim 12-2 was filed by LCPI on September 21, 2009 in the amount of $343,221,391.

**I)** **Tesoro**. Tesoro owns the Tesoro Project consisting of a 185-acre site situated in the City of Santa Clarita in Los Angeles County, California. The Tesoro Project is encumbered by a first priority deed of trust recorded on November 2, 2007 securing the Interim Loan Agreement. Tesoro was not a borrower under the Interim Loan Agreement, but did sign a "subsidiary guaranty." On March 30, 2009, Lehman ALI filed Claim 7 against Tesoro in the amount of $23,795,013

**J)** **Heartland**. Heartland owns the Heartland Project consisting of a 417 acre site located in Riverside County, California. The Heartland Project is encumbered by a first priority deed of trust recorded on October 3, 2007 securing that certain Second Amended and Restated Term Loan and Revolving Line of Credit Loan Agreement, dated as of October 3, 2007, by and

000184

1  among SunCal Marblehead Heartland Master LLC, Marblehead, and Heartland, as borrowers, and

2  Lehman ALI, as agent and sole lender (the "Marblehead/Heartland Loan Agreement"). On

3  September 21, 2009, Lehman ALI filed Claim 9-2 against Heartland in the amount of

4  $354,325,126.

5      **K)**    **Marblehead.** Marblehead owns the Marblehead Project, consisting of a 247-acre

6  site and is expected to consist of 308 units in San Clemente, California. The Marblehead Project is

7  encumbered by a first priority deed of trust recorded on October 3, 2007 securing the

8  Marblehead/Heartland Loan Agreement. On September 21, 2009, Lehman ALI filed Claim 21-2

9  in the amount of $354,325,126.

10      **L)**    **Oak Valley**. Oak Valley owns the Oak Valley Project consisting of a 985-acre site

11  which is located in Riverside County, California. The Oak Valley Project is encumbered by a first

12  priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

13  Agreement, dated as of May 23, 2006, by and between SunCal Oak Valley, as borrower, and OVC

14  Holdings, as successor agent and sole lender, pursuant to which OVC Holdings' predecessor

15  (Lehman ALI) made a loan in the maximum aggregate principal amount of approximately

16  $120,000,000 ("Oak Valley Loan Agreement"). On or about September 21, 2009, OVC Holdings

17  filed Claim 16-3 against Oak Valley in the amount of $141,630,092.

18      **M)**    **Northlake.** Northlake owns the Northlake Project, consisting of a 1,564-acre site

19  which is located in Castaic, California, north of Valencia, approximately 45 miles north of

20  downtown Los Angeles and 10 miles north of the San Fernando Valley. The Northlake Project is

21  encumbered by a first priority deed of trust securing that certain Term Loan and Revolving Line of

22  Credit Loan Agreement, dated as of September 5, 2009, between SunCal Northlake, as borrower,

23  and Northlake Holdings, as successor agent and sole lender, pursuant to which Northlake

24  Holdings' predecessor (Lehman ALI) made a loan in the maximum aggregate principal amount of

25  approximately $100,000,000 (the "Northlake Loan Agreement"). On September 21, 2009,

26  Northlake Holdings filed Claim 6-2 against Northlake in the amount of $158,141,365.

27      **N)**    **PSV**. PSV owns the Palm Springs Village Project, consisting of a 309-acre site

28  which is located in the City of Palm Springs, California. The PSV Project is encumbered by a

000185

1    first priority deed of trust securing that certain Term Loan and Revolving Line of Credit Loan

2    Agreement, dated as of February 12, 2007, between SunCal PSV, as borrower, and Lehman ALI,

3    as agent and sole lender, pursuant to which Lehman ALI made a loan in the maximum aggregate

4    principal amount of approximately $90 million (the "PSV Loan Agreement"). On or about

5    September 21, 2009, Lehman ALI filed Claim 12-2 against PSV in the amount of $88,257,340.

6    **O)    The Economic Downturn In 2007 and Promises of Funding.** Prior to 2007, the

7    Venture thrived, generating favorable returns for both parties. However, beginning in 2007, the

8    real estate market experienced a downturn. This downturn substantially reduced the value of the

9    Projects and negatively impacted potential sales. In an effort to mitigate the cash drain at the

10   Projects caused by the slowdown, SunCal proposed closing certain Projects and slowing the pace

11   of development at others. The Lehman Entities rejected these proposals and insisted that

12   development proceed. In 2007 and 2008, Lehman ALI and LCPI repeatedly assured SunCal that

13   Lehman ALI and LCPI were committed to funding the debts and obligations of the Projects and

14   the work they directed to be performed; that funding would be forthcoming; and that SunCal and

15   the Relevant SunCal Debtors should continue to have contractors undertake work to develop and

16   preserve the value in the Projects. In reliance on these representations, SunCal and the Relevant

17   SunCal Debtors continued to move forward with the Projects and incurred substantial expenses in

18   hiring contractors to maintain and/or develop them and to deal with public health and safety issues.

19       Substantially all of the unsecured creditor claims and mechanic's lien claims that have been

20   filed against each of the Debtors' estates are obligations that Lehman ALI or LCPI authorized the

21   Debtors to incur and promised to provide funding for and/or promised to assume. A list of the

22   unsecured creditors that have filed proofs of claims against each of the Debtors, and the amounts

23   of their claims, is included in Exhibit 19 to the Cook Declaration. A list of mechanic lien claims

24   filed against each of the Debtors, and the amounts of their claims, is included in Exhibit 20

25   attached to the Cook Declaration.

26   **P)    The Restructuring Agreement**. It was contemplated as of the October 2007

27   Interim Loan that a restructuring agreement would be entered into shortly, by no later than January

28   or February of 2008. However, implementation was dragged out due in large part to Lehman's

000186

1    extensive documentation. In the meantime, until a restructuring agreement was entered into,

2    Lehman ALI and LCPI stopped paying vendor payables, nor would they pay any management fees

3    of SunCal Management LLC, which was managing and continued to manage each of the Relevant

4    SunCal Debtors' Projects. As the restructuring was pushed further and further out and Lehman

5    ALI and LCPI continued to refuse to provide funding—despite their prior assurances—SunCal

6    was effectively drained of liquidity, and so the Relevant SunCal Debtors became even more

7    desperate and more dependent on Lehman ALI and LCPI financing. Lehman ALI and LCPI used

8    the Relevant SunCal Debtors' vulnerability to their advantage in negotiating a restructuring

9    agreement that was tipped heavily in Lehman's favor.

10            1)      The Parties To The Restructuring Agreement. On May 23, 2008, SCC

11   Acquisitions, Inc. ("Acquisitions Inc."), and certain affiliated SunCal entities, [6] on the one hand,

12   and the Lehman Parties on the other, entered into the Restructuring Agreement ("Restructuring

13   Agreement"). See Cook Dec., Exhibit 1. As originally executed in May 2008, the Restructuring

14   Agreement applied to twelve Projects relevant herein (as well as several other projects not at issue

15   in these bankruptcies): (1) Acton Estates; (2) Beaumont Heights; (3) Bickford Ranch; (4) Emerald

16   Meadows; (5) Heartland; (6) Johannson Ranch; (7) Marblehead; (8) Northlake; (9) Oak Valley;

17   (10) Pacific Point; (11) Ritter Ranch; and (12) Summit Valley. The Debtors that owned and/or

18   held equity interests in the owners of these Projects were signatories to the May 2008 agreement.

19   The Restructuring Agreement was entered into by, among others, the "Borrowers," "Grantors" and

20   "Pledgors," as defined in Annex 1 thereto.[7]

21

22   _____
     [6] The original signatories to the Restructuring Agreement include SunCal Marblehead Heartland

23   Master LLC, Marblehead, Heartland, Oak Valley, SJD Partners, Palmdale Hills, SunCal
     Communities I, LLC ("SunCal I"), SunCal Communities III, LLC ("SunCal III"), Bickford Ranch,

24   Acton, Summit Valley, Kirby Estates LLC ("Kirby"), SunCal Beaumont Heights, LLC
     ("Beaumont"), Emerald Meadows, SunCal Johannson Ranch, LLC ("Johannson"), Acquisitions

25   Inc., Acquisitions, SunCal Master JV, LLC, SJD Development Corp ("SJD Development"),
     SCC/Indio Land LLC, SCC Master IV Communities LLC, SCC/West Creek LLC, SunCal

26   Communities II LLC, SunCal Management LLC, and Northlake.
     [7]   The "Borrowers" included Marblehead, Heartland, Northlake, Oak Valley, SJD Partners,

27   Palmdale Hills, SCC Palmdale, SunCal I, SunCal III, and Bickford. The "Grantors" included
     Marblehead, Heartland, Northlake, Oak Valley, SJD Partners, Palmdale Hills, Bickford, Acton,

28   Summit Valley, Emerald Meadows, Beaumont and Johannson. The "Pledgors" included SCC
     Palmdale, SunCal I, Summit Valley and SJD Development.

1        Between May and August 2008, four additional projects were added to the

2   Restructuring Agreement by agreement of the parties: (1) Del Rio; (2) Joshua Ridge; (3) Palm

3   Springs Village; and (4) Tesoro. Accordingly, the Debtors associated with these Projects—Del

4   Rio, SCC Communities, PSV, and Tesoro—became parties to the Restructuring Agreement as

5   amended. These Debtors were signatories to the August 25, 2008 Settlement Agreement, along

6   with the Debtors associated with the original twelve Projects, as "Borrowers" and/or "Grantors."

7   (The SunCal parties to the agreements are collectively referred to herein as the "SunCal Parties").[8]

8        2)   Lehman ALI's Obligation to Fund "Urgent Payables." Pursuant to

9   Section 1(h) of the Restructuring Agreement, Lehman ALI agreed to pay certain urgent expenses

10   that were either owed, or being incurred at the Relevant SunCal Debtors' Projects that were

11   subject to the Restructuring Agreement. Specifically, Section 1(h) provided, in pertinent part:

12        During the term of this Agreement, Lehman ALI, as the Lender with respect to
           each Loan, . . . hereby agrees to make protective advances under the applicable
13       Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for
           the payment of any such Urgent Payables which are approved by Lehman ALI....
14

15   Cook Declaration, Exhibit 1, Section 1(h). "Urgent Payables" were defined in Section 1(h) as:

16        work or other services (including, without limitation, litigation defense costs) that
           need to be performed or provided with respect to each Property and any accounts
17       payable arising from work previously authorized by Lehman ALI which need to be
           paid with respect to each Property.
18

19   Cook Declaration, Exhibit 1, Section 1(h).

20        Pursuant to Section 1(i) of the Restructuring Agreement, Lehman ALI also agreed to

21   pay monthly management fees for the management of each of the Projects, from May 15, 2008

22

23   [8] Thus, four Projects were not formally added to the Restructuring Agreement—Century City,
     Delta Coves, Oak Knoll and Del Amo; and the four Debtors associated with these Projects—
24   Century City, Delta Coves, Oak Knoll and Torrance—were not signatories to the Settlement
     Agreement. Lehman ALI was the lender on each of these Projects, three of which were part of the
25   Lehman SunCal Real Estate Fund LLC (the "Lehman SunCal Fund"). However, even as to these
     four Projects, Lehman ALI engaged in the same course of conduct that it had regarding the other
26   Projects regarding representations of funding. Lehman ALI encouraged SunCal and these four
     Debtors to continue developing these Projects, and made assurances of payment. Later, Lehman
27   ALI approved all expenses, told these Debtors what work to move forward with, and promised it
     would pay for such work. These Debtors performed substantial work and incurred millions in
28   third-party debt in reliance on Lehman ALI's promises of payment.

000188

1 forward, unless and until either (a) it provided thirty (30) 5 days' written notice, or (b) the

2 Restructuring Agreement was terminated ("Management Fees").

3    3)  Lehman ALI's Obligation to Close.  The Restructuring Agreement was

4 designed to culminate in a closing ("Closing") with the execution of a Settlement Agreement (and

5 related settlement transaction documents), discussed in more detail below, whereby, among other

6 things:

7    (1)  the Grantors would convey title to, and the Borrowers, Pledgors, and
    Guarantors would transfer all interests in, the Projects to new Lehman entities

8    ("Venture Grantees"), which entities would then be responsible for repayment of
    the loans previously made to the Borrowers (and which were guaranteed by the

9    Guarantors and/or secured by pledges of interests by the Pledgors), as well as
    payment of management fees to SunCal Management;

10

11    (2)  the Venture Grantees and/or other Lehman entities would pay for all
    payables arising from "Lender Authorized Work"—work that Lehman ALI had

12    previously approved;

13    (3)  the Venture Grantees and/or other Lehman entities would pay for tens of
    millions of dollars in outstanding payables which the Grantors, Borrowers,

14    Pledgors and/or Guarantors owed to third-party vendors that had provided goods or
    services on the Projects (at Lehman ALI's instruction);

15

16    (4)  the Venture Grantees and/or other Lehman entities would indemnify
    Plaintiffs for up to at least $15 million in existing bond obligations, and also agreed

17    to indemnify the SunCal Parties for certain bond liability going forward if the
    Lehman parties failed to release and/or replace the existing performance bonds; and

18

19    (5)  PAMI, LLC ("PAMI") an ostensibly creditworthy indemnitor, was the
    entity designated to be the "Lehman Indemnitor" under the parties' Settlement

20    Agreement would be jointly and severally liable for the above payment and
    indemnification obligations.

21

22    Section 1(a) of the Restructuring Agreement delineated the parties' obligation, upon

23 satisfaction of the Closing Conditions, to execute, and to cause their respective affiliated parties to

24 execute, the Settlement Agreement and related settlement documents.  Section 1(c) of the

25 Restructuring Agreement further provided, in pertinent part, that "[u]pon satisfaction of the

26 Closing Conditions, the Parties shall proceed to Closing…."The Closing Conditions also included

27 certain consents and approvals of governmental authorities and other parties which are referred to

28 in Section 2(a) of the Restructuring Agreement as "Required Consents."  Section 2(a) further

000189

1  provided a mechanism for partial Closing if Required Consents had been obtained for fewer than

2  all of the Projects by the Closing date.  Although the formula was complex, essentially, so long as

3  Required Consents had been obtained for eight of the subject Projects plus the Pacific Point

4  Project, an "Initial Closing" would occur as to those Projects for which consents had been

5  obtained, and a "Subsequent Closing" could occur for Projects for which all consents were

6  subsequently obtained, and the parties were to use commercially reasonable effort to obtain the

7  Required Consents for a Subsequent Closing.

8      Under Section 1(d)(i), the Restructuring Agreement could be terminated (a "Termination

9  Event") if neither the Closing Conditions for an Initial Closing nor complete Closing were

10  satisfied on or prior to the Closing Date.  However, Section 1(d)(i) further provided that neither

11  party could terminate the Restructuring Agreement "if the failure of any Closing Conditions shall

12  have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or

13  failure to pursue the satisfaction [of] the Closing Conditions in good faith."  Under Section 1(e) of

14  the Restructuring Agreement, unless the agreement otherwise specified, the obligations of the

15  Parties under the Agreement would terminate "upon termination of this Agreement."  Thus,

16  Lehman ALI's obligation under Section 1(h) to make protective advances to cover Urgent

17  Payables on the Projects, its obligation under Section 1(i) to pay Management Fees, and its

18  obligation under Section 1(c) to consummate the Closing did not terminate unless there was a

19  valid Termination Event.

20      **Q)**   **The Breach of The Restructuring Agreement**. Lehman ALI breached the terms

21  of the Restructuring Agreement through the following actions or inactions:

22      1.   Failure to Pay Urgent Payables. After the Restructuring Agreement was

23  executed, the Lehman Parties insisted that the Relevant SunCal Debtors continue work at the

24  Projects.  In reliance upon the Lehman ALI's promise to pay urgent payables, and to have the

25  projects transferred to the Lehman created "Venture Grantees" who would be liable for the

26  "assumed obligations," the Relevant SunCal Debtors continued authorize work on their respective

27  Projects.  However, when it came time to pay these expenses, as required under the terms of the

28  Restructuring Agreement, Lehman ALI refused to so, despite written demands by SunCal. An

000190

1 | expanded list of total account payables as of the Closing Date for the relevant Projects is set forth
2 | in section (G)(1)(a) below.

3 | Moreover, Lehman ALI never provided thirty days' written notice of intent to cease
4 | payment of the monthly Management Fees. Lehman ALI did purport to terminate the Restructuring
5 | Agreement on November 13, 2008. However, as discussed below, the Restructuring Agreement
6 | imposed certain requirements for a termination to be valid. Because Lehman ALI's purported
7 | termination was invalid, its obligation to pay the monthly Management Fees continued past
8 | November 13, 2008, and continues through the present date. SunCal Management and the other
9 | SunCal Parties have continued to manage the Projects. All conditions precedent to Lehman ALT
10 | paying SunCal Management the monthly Management Fee from May 15, 2008 through at least
11 | November 12, 2008, and beyond, were satisfied.

12 | "Exhibit D" to the Restructuring Agreement, referenced in Section 1(h) above, listed a
13 | total of $580,352 in Monthly Management Fees for ten of the twelve Projects." Subsequent
14 | documentation listed a total of $683,383 in Monthly Management Fees for the fifteen Properties at
15 | issue that were ultimately subject to the agreement. By Project, the monthly management fees listed in
16 | Exhibit D to the Restructuring Agreement were: (1) Acton Estates ($31,396); (2) Beaumont Heights
17 | ($53,862); (3) Bickford Ranch ($81,982); (4) Emerald Meadows ($43,593); (5) Heartland ($38,151);
18 | (6) Johannson Ranch ($35,868); (7) Marblehead ($111,137); (8) Oak Valley ($42,574); (9) Ritter
19 | Ranch ($110,772); and (10) Summit Valley ($31,017). See Exh. 1, at Exh. D.

20 | 2. Failure To Proceed With A Closing Under The Settlement Agreement. The
21 | Restructuring Agreement was designed to serve as a financial bridge to the implementation –
22 | closing – of the transactions described in the Settlement Agreement. One of Lehman ALI's
23 | obligations under the Restructuring Agreement was to proceed with the closing of the Settlement
24 | Agreement. As more fully explained in the following sections, by failing and refusing to proceed
25 | with a closing under the terms of the Settlement Agreement, Lehman ALI-- breached the terms of
26 | the Restructuring Agreement. As a result of Lehman ALI's breach, the Projects were never
27 | transferred to the Lehman "Venture Grantees" who would be liable for the "assumed obligations"
28 | and the "Lender Authorized Work."

000191

3.  <u>The Sale of Seven Sold Loans to Fenway Breached The Terms of The</u> <u>Restructuring Agreement</u>. In order to perform its obligations under the terms of the Restructuring Agreement, and to implement the transactions described in the Settlement Agreement, Lehman ALI had to remain the "Lender with respect to each Loan" as represented in the Restructuring Agreement. *See* Restructuring Agreement, Section 1(h). However, as more fully explained below, on August 22, 2008, Fenway Capital, as "Buyer," and LCPI, as "Seller," entered into that certain *Master Repurchase Agreement* (the "Repo"), whereby Fenway Capital purchased all of LCPI's right, title and interest in the following loans:

| Loan | Claimant | Alleged Balance |
|---|---|---|
| SunCal Communities I Loan | LCPI | $343,221,391 |
| Ritter Ranch Loan | LCPI | $287,252,096 |
| SunCal PSV Loan | Lehman ALI | $88,257,340 |
| SunCal Delta Coves Loan | Lehman ALI | $206,023,142 |
| SunCal Marblehead/ Heartland Loan | Lehman ALI | $354,325,126 |
| Sun Cal Oak Valley Loan | OVC Holdings, LLC | $141,630,092 |
| SunCal Northlake Loan | Northlake Holdings, LLC | $123,654,777 |

(together the "Sold Loans").

When Lehman ALI and LCPI concocted the sale of the Sold Loans under the Repo, which were also governed by the terms of the Restructuring Agreement, they were intentionally breaching their performance obligations under the terms of the Restructuring Agreement.[9] Lehman ALI violated the covenant of good faith and fair dealing by failing to pursue its express obligations in good faith, and by taking action or inaction so as to deprive the Relevant SunCal Debtors of the expected benefits of the agreement.

**R)**  **The Settlement Agreement**. One of the exhibits to the Restructuring Agreement is the form of "Settlement Agreement." The Restructuring Agreement was intended to serve as a bridge to the Settlement Agreement, by providing the SunCal Parties the funds necessary to support themselves until the closing of the Settlement Agreement, on which date the Projects would be transferred to the new Lehman-controlled "Venture Grantees."[10] The language in the Settlement Agreement makes it clear that this transfer is the final step in the contractual process:

---

[9] On or about June 22, 2010, Fenway Capital transferred the Sold Loans, and therefore the corresponding claims, to LCPI. See Docket Nos. 1179 through 1191.

[10] "Venture Grantees" are defined in Recital G of the Settlement Agreement, which itself cross-references Annex 1 of the Settlement Agreement. The version of Annex 1 appended to the May

000192

[E]ach Grantor hereby agrees to convey, assign, and transfer to the applicable Venture Grantee (and each other Borrower Party agrees to convey, assign and transfer to the applicable Venture Grantee all of its respective right, title and interest, if any, in and to any of the property described below), and the applicable Venture Grantee agrees to accept a conveyance of, on the Closing Date, all of such Grantor's (and/or such other Borrower Party's) respective right, title and interest in and to [the Conveyance Properties].

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 3, ¶2.

Section 9 of the Settlement Agreement provides, in relevant part: "The closing of the transactions contemplated by this Agreement (the 'Closing') shall take place on the date on which this Agreement is executed (the 'Closing Date')." ***The Settlement Agreement and related settlement documents were each executed by all applicable parties on August 25, 2008.*** *See* Cook Declaration, ¶ 41. Although the SunCal parties acquiesced in the Lehman Parties' extension of the closing date to September 30, 2008, this extension did not modify the Lehman Parties' obligation to consummate the Closing upon satisfaction of the Closing Conditions, including the obtaining of the Required Consents. This extension also did not affect Lehman ALI's obligation to pursue in good faith any remaining Required Consents.

In exchange for the Grantors and Borrowers conveying the Projects, the respective Venture Grantees—and LV Pac Point, the Lehman entity designated to by Lehman ALI to be the transferee with respect to the Pacific Point Project—were to assume tens of millions of dollars in certain payment and bond obligations, as described below.

       1.    The Obligations to Pay Assumed and Authorized Amounts. Under Section 14.a of the Settlement Agreement, each of the Venture Grantees were to assume responsibility for (1) Scheduled Assumed Obligations and (2) Lender Authorized Work. Section 14.a. provides, in pertinent part:

---

2008 Restructuring Agreement had placeholders for the name of each Venture Grantee in boldface brackets, e.g., "Acton Estates Venture Grantee," "Beaumont Heights Venture Grantee," etc. In the signature blocks for the Settlement Agreement that were ultimately signed on August 25, 2008, under the heading for "Venture Grantees," for each property (except for Pacific Point, which was treated slightly differently, as discussed below), there was listed a limited liability company with the acronym "SCLV" (for "SunCal-Lehman Venture") followed by the name of the property. Thus, the Venture Grantee for the Acton property was "SCLV Acton Ranch LLC"; for Beaumont Heights, "SCLV Beaumont Heights LLC," etc. Each of these signature blocks was signed by an authorized Lehman representative on behalf of each SCLV entity.

000193

At Closing…, each of the Venture Grantees shall assume and be responsible for the payment of (i) those payables and other obligations of the Grantors as described on <u>Schedule 5</u> that relate to such Venture Grantee's Conveyance Property… (collectively, the "Scheduled Assumed Obligations"), and (ii) all payables arising from any Lender Authorized Work ("Authorized Assumed Obligations" and together with the Scheduled Assumed Obligations, the "Venture Grantee Assumed Obligations").

Cook Declaration, Exhibit 2, Settlement Agreement, pg. 12.

        a.    <u>Scheduled Assumed Obligations</u>. Pursuant to Section 14.a, the "Scheduled Assumed Obligations" are described in Schedule 5 to the Settlement Agreement. The version of Schedule 5 attached to the May 2008 Restructuring Agreement (Cook Declaration, Exhibit 3) listed the following amounts of total accounts payables ("Total AP") for each of the relevant Voluntary Debtors' Projects (along with a description of the amounts owed to each vendor on each Project), totaling over $18 million:

| Project | Total AP |
|---|---|
| Acton | $141,521 |
| Beaumont Heights | $189,052 |
| Bickford | $3,319,114 |
| Emerald Meadows | $2,910,825 |
| Johannson | $69,062 |
| Ritter Ranch | $11,464,998 |
| Summit Valley | $430,669 |
| **TOTAL** | **$18,525,241.00** |

When the Scheduled Assumed Obligations for the other Projects are taken into account, the total amount of Scheduled Assumed Obligations was $46,907,019. The additional $28.4 million was comprised as follows:

| Project | Total AP |
|---|---|
| Marblehead—Scheduled Assumed Obligations | $16,835,573 |
| Marblehead—Lender Authorized Work | $1,985,289 |
| Heartland | $3,247,620 |
| Oak Valley | $5,582,297 |
| Northlake | $730,999 |
| **TOTAL** | **$28,381,778.00** |

*See* Scheduled 5 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 3). Because the Schedules, Annexes, and Exhibits to the Settlement Agreement are voluminous, totaling many hundreds of pages, only the most pertinent Schedules are attached hereto.

000194

The August 2008 version of Schedule 5[11] (which reflects adjustments for the settlements that were made after May 2008, as well as the addition of several projects (among other adjustments)) was the most current version as of the time of the execution of the Settlement Agreement. It lists the following amounts of total account payables as of the Closing Date for the relevant Projects (other than Pacific Point) that were to be Assumed Obligations. This figure totals over $9 million after adjustments:

| Project | Total AP |
| --- | --- |
| Acton | $94,062 |
| Beaumont Heights | $163,709 |
| Bickford | $3,011,191 |
| Del Rio | $1,797,401 |
| Emerald Meadows | $1,451,711 |
| Johannson | $30,526 |
| Joshua Ridge II | $6,156 |
| Ritter Ranch | $2,179,082 |
| Summit Valley | $308,777 |
| Tesoro Burnham | $51,918 |
| **TOTAL** | **$9,094,533.00** |

When the Scheduled Assumed Obligations for the other Projects are taken into account, the Scheduled Assumed Obligations on the updated schedule totals $36,918,153. The additional $27.8 million was comprised as follows:

| Project | Total AP |
| --- | --- |
| Marblehead—Scheduled Assumed Obligations | $12,334,033 |
| Marblehead—Lender Authorized Work | $224,031 |
| Heartland | $2,910,825 |
| Oak Valley | $4,667,191 |
| Northlake | $346,749 |
| Palm Springs Village | $7,340,791 |
| **TOTAL** | **$27,823,620.00** |

*See* Scheduled 5 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 4).

However, this sum understates the actual figure. The Scheduled Assumed Obligations reflected on the updated Schedule 5 take into consideration reductions resulting from certain settlements that were not paid in some instances. See Cook Declaration.

---

[11] Cook Declaration, Exhibit 4.

1     b. <u>Lender Authorized Work</u>. As noted above, under Section 14.a of the

2 Settlement Agreement, the "Venture Grantee Assumed Obligations" to be assumed at Closing

3 included not only the Scheduled Assumed Obligations, but also "all payables arising from any

4 Lender Authorized Work ("Authorized Assumed Obligations"). According to the definition in

5 Exhibit A to the Settlement Agreement (at p.5), "Lender Authorized Work" means "work which,

6 as of the Closing Date, has been performed with respect to or for the benefit of any of the

7 Conveyance Properties at the specific direction of or with the authorization of the Lenders and

8 which work is more specifically described on Schedule 17." (Cook Declaration, Exhibit 2,

9 pg. A-5.

10    Schedule 17 did not list particular creditors or dollar amounts owed, as did

11 Schedule 5.  Cook Declaration, Exhibit 5 (Schedule 17 to the Settlement Agreement, May 2008),

12 and Exhibit 6 (Schedule 17 to the Settlement Agreement, August2008).  Rather, Schedule 17

13 described categories of work that Lehman ALI authorized at the Projects and for which it was

14 bound to pay.  For example, in the case of Bickford Ranch, the two categories of Lender

15 Authorized Work listed were: "Construction of the off-site waterline and pump station" and

16 "Mitigation Management and Monitoring of the project, including Oak Tree Mitigation,

17 SWPPP/RWQCB compliance, VELB Habitat, Bat Habitat, and Raptor Nesting."[12] The applicable

18 Lehman parties thus obligated themselves to pay for goods or services that fell within these

19 categories.

20    Schedule 17 was modified between the time of the execution of the Restructuring

21 Agreement in May 2008 and the execution of the Settlement Agreement in August 2008, to

22 account for the Projects that were added to the agreement in the interim, as well as additional

23 categories of work that were authorized.[13] The total value of the Lender Authorized Work which

24 was performed and which the Lehman Parties were obligated to pay for pursuant to Schedule 17 is

25 well into the millions of dollars.

26    2. <u>The Obligations to Assume Bond Obligations and to Replace or Release</u>

27 <u>Bonds</u>. In addition to assuming the Venture Grantee Assumed Obligations, the Venture Grantees

28

---

[12] *See* Scheduled 17 to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 5).
[13] *See* Scheduled 17 to the Settlement Agreement, August 2008 (Cook Declaration, Exhibit 6).

000196

1 | were also to assume certain bond obligations in connection with certain of the Projects.

2 | Schedule 12-C to the Settlement Agreement describes the "Payment and Performance Bonds"[14]

3 | associated with the Projects subject to the Agreement.  For each such Bond, Schedule 12-C

4 | delineates:  the Project, Bond Number, Carrier, Obligee, Bond Amount, Date of Issue, Tract

5 | Number, Description of work covered, and Bond Obligors.[15] Schedule 13 to the Settlement

6 | Agreement described the Payment Performance Bonds for which a "Bond Payment Demand" had

7 | been made (the "Pre-Closing Designated Payment and Performance Bonds").  For each such Bond

8 | for which a Bond Payment Demand had been made, Schedule 13 delineated the Project; Vendor;

9 | Date Filed (if applicable); Claim Amount; Case Number (if applicable); Bond Number; and

10 | comments regarding case status.

11 |   The version of Schedule 13 attached to the May 2008 Restructuring Agreement

12 | listed $12,622,374.36 in such Bond Payment Demands.[16]  These can be grouped by Project, as

13 | follows:

| Project | Aggregate Value of Bond Payment Demands on May 2008 Schedule 13 |
|---|---|
| Acton | $   11,312.37 |
| Marblehead | $5,686,937.59 |
| Pacific Point | $4,246,595.48 |
| Ritter Ranch | $2,677,528.92 |
| **TOTAL** | **$12,622,374,36** |

18 |   A subsequent version of Schedule 13 listed Bond Payment Demands as of at least

19 | August 2008, which reflected not only new claims, but also claims against Projects that were

20 | added to the Restructuring and Settlement Agreement after May 2008.[17]  The subsequent

21 | documentation shows aggregate Bond Payment Demands totaling at least $22,183,424.22, as

22 | follows:

| Project | Aggregate Value of Bond Payment Demands on Updated **Schedule 13** |
|---|---|
| Bickford | $330,118.00 |
| Del Rio | $627,227.39 |
| Marblehead | $9,547,608.61 |

[14] This term is defined in Section 15.a.(22) to the Settlement Agreement.
[15] *See* Scheduled 12-C to the Settlement Agreement, May 2008 (Cook Declaration, Exhibit 7).
[16] *See* Scheduled 13 to the Settlement Agreement, May 2008 (Exhibit 9).
[17] *See* Scheduled 13 to the Settlement Agreement, August 2008 (Exhibit 10).

-17-

| Project | Aggregate Value of Bond Payment Demands on Updated **Schedule 13** |
|---|---|
| Oak Valley | $196,922.91 |
| Pacific Point | $4,742,040.39 |
| Palm Springs Village | $3,524,406.54 |
| Ritter Ranch | $3,215,100.38 |
| **TOTAL** | **$22,183,424.22** |

The amounts of bond payment demands on the Marblehead, Ritter Ranch and Pacific Point Projects have increased further beyond these figures because of additional work performed on these Projects by reason of called bonds. The Settlement Agreement contemplated that additional Bond Payment Demands could be made on Payment Performance Bonds post-closing, and referred to Bonds where such demands were made as "Post-Closing Designated Payment and Performance Bonds." (See Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). The Venture Grantees (and the Pac Point Transferee, discussed below) would attempt to litigate and/or resolve the Bond Payment Demands. *See id.*

Section 16.c of the Settlement Agreement provided that the Venture Grantees and Pac Point Transferee (i.e., LV Pacific Point), collectively, would be obligated to pay up to $12,622,374.36 with respect to the payment of claims arising under Pre-Closing Designated Payment and Performance Bonds, and up to $2,377,625.64 with respect to the payment of claims arising under Post-Closing Designated Payment and Performance Bonds (collectively, the "Assumed Bond Obligations"). (Cook Declaration, Exhibit 2, Settlement Agreement § 16.b). Thus, the Venture Grantees and Pac Point Transferee agreed to pay up to a total of at least $15 million in connection with payments under Bond Payment Demands.

Further, Section 14.g. provided that if a Venture Grantee (or LV Pac Point, the transferee of the Pacific Point Project) decides to proceed with development of a Project post-closing, it shall use commercially reasonable efforts to replace and cause to be released existing bonds issued in connection with such Project for such development work, and shall indemnify and hold harmless the applicable Bond Obligor for claims or losses prior to such release. (PAMI also had an indemnification obligation if claims arose when such release was not obtained). Pending such work, the Venture Grantees and LV Pac Point were obligated to pay the premiums on all Payment and Performance Bonds.

000198

1            Specifically, Section 14.g. of the Settlement Agreement provided, in pertinent part:

> If, and to the extent that, any Venture Grantee or the Pac Point Transferee
> desires, at its sole option and in its sole and absolute discretion, to proceed with
> the development of its Property in a material manner after the date of this
> Agreement ("Material Development Work"), such Venture Grantee or Pac
> Point Transferee, as applicable, shall use commercially reasonable efforts to
> replace and cause to be released each existing Payment and Performance Bond
> issued with respect to such Property that relates to or secures the Material
> Development Work to be undertaken and shall indemnify and hold the
> applicable Bond Obligor thereunder harmless from and against any claims or
> losses incurred by such Bond Obligor in respect of such Payment and
> Performance Bond until such time as such Payment and Performance Bond has
> been replaced and released. To the extent that a Venture Grantee or the Pac
> Point Transferee, undertakes or causes work to be performed on its Property
> after the date of this Agreement and as a result of such work, liability is created
> or arises under any existing Payment and Performance Bond, such Venture
> Grantee or Pac Point Transferee, as applicable, and PAMI LLC shall, jointly
> and severally, indemnify and hold harmless any applicable Bond Obligor from
> any liability with respect to, and to the extent of, the work so undertaken.
> Unless and until Material Development Work is undertaken with respect to a
> Property, … the applicable Venture Grantee or Pac Point Transferee, as
> applicable, shall pay the premiums for the maintenance of such Payment and
> Performance Bonds… .

Cook Declaration, Exhibit 2, pg. 16, Section 14.g.

           3.     <u>Pacific Point Obligations</u>. The transactions contemplated by the Restructuring and Settlement Agreement were configured differently for the Pacific Point project than they were for the remaining Projects. For Pacific Point, however, title would be transferred to Lehman ALI (or its designated transferee, LV Pac Point) pursuant to a nonjudicial foreclosure process. However, the Lehman parties' obligation to cover the payables and bond obligations was similarly structured.

           Under Section 14.b of the Settlement Agreement, the "Pac Point Transferee," <u>i.e.</u>, LV Pac Point, was to assume (1) approximately $4 million in "Bonded Pac Point Payable Obligations" and (2) approximately $3.7 million in "Other Pac Point Payable Obligations."

           Schedules 4-A and 4-B provided detailed information about the bonded and other obligations to be assumed in connection with Pacific Point. Schedule 4-A to the Settlement Agreement delineates, by individual vendor and claim amount, the Bonded Pac Point Payable Obligations totaling $3,956,693.30.25 Schedule 4-B to the Settlement Agreement delineates, by

000199

1   individual vendor and claim amount, the Other Pac Point Payable Obligations totaling $3,688,011.

2   See Cook Declaration, Exhibits 11 through 14.

3           Moreover, as discussed above, pursuant to Section 14.a. of the Settlement

4   Agreement, the entities taking title to the properties at closing were also to pay for "all payables

5   arising from any Lender Authorized Work" on the respective properties. Schedule 17 to the

6   agreement lists various categories of "Lender Authorized Work" relating to, among other Projects,

7   the Pacific Point Project for which the Pac Point Transferee would be liable.

8           In negotiating the Settlement Agreement, the parties agreed that the Lehman Parties

9   would provide a creditworthy indemnitor that would back the Lehman Parties' payment

10  obligations thereunder. Under Section 17.h. of the Settlement Agreement, the Venture Grantees

11  and the "Lehman Indemnitor"—i.e., PAMI - to be jointly and severally liable to indemnify the

12  applicable Debtor for, among other things, the failure of any Venture Grantee or other Lehman

13  Party to pay or otherwise satisfy or settle any of the Assumed Obligations, which include each of

14  the payment obligations under the Settlement Agreement discussed above.

15          Thus, to the extent that the Venture Grantees failed to pay any of the bonded or

16  non-bonded assumed obligations, and to the extent that LV Pac Point, as the Pacific Point

17  Transferee, failed to cover the bonded or non-bonded Pac Point Payables, PAMI is liable to pay

18  those amounts.  Section 14.g. provided that if a Venture Grantee or LV Pac Point, the transferee of

19  the Pacific Point Project, decides to proceed with development of a Project post-closing, they shall

20  replace and cause to be released existing payment and performance bonds, and shall indemnify

21  and hold harmless the Bond Obligors for claims or losses prior to such release.

22      **S.**   **The Breaches of The Settlement Agreement.**  In addition to the breaches of the

23  Restructuring Agreement discussed above, Lehman ALI breached the Settlement Agreement

24  through the following actions and failure to perform.

25         1)     <u>Lehman ALI Attempted  To Repudiate The Settlement Agreement</u>. As the

26  Declaration of Bruce Cook confirms, Lehman ALI not only failed to perform under the terms of

27  the Settlement Agreement, it affirmatively repudiated the same on November 13, 2008, after

28  written demands for performance.  Lehman ALI's affirmative repudiation occurred after the

000200

1   Relevant SunCal Debtors began filing for bankruptcy, which were precipitated by the Lehman

2   Parties' failure to fulfill their funding obligations (Cook Decl., ¶¶ 59 ).  As to the Relevant SunCal

3   Debtors who had already filed for bankruptcy, the attempted repudiation was ineffective as a

4   violation of the automatic stay.  As to the Relevant SunCal Debtors who had not yet filed their

5   bankruptcies, the purported repudiation was also ineffective, as Lehman ALI had already

6   defaulted, and such Debtors were ready to perform and thus were not in default.

7            2)      The Sale of The Sold Loans Repudiated The Settlement Agreement. At

8   some point on or before August 22, 2008, Lehman ALI transferred all of its right, title and interest

9   in the Sold Loans (i.e., the PSV Loan, the Delta Coves Loan and the Marblehead/Heartland Loan)

10  to LCPI.  Similarly other Lehman affiliates (OVC Holdings and Northlake Holdings) transferred

11  their right, title and interest in the other Sold Loan to LCPI.  LCPI originally held title to the

12  SunCal Communities I Loan and the Ritter Ranch Loan.  Thus, as a result of the transfers from

13  Lehman ALI, OVC Holdings and Northlake Holdings, LCPI held title to all seven Sold Loans.

14  Pursuant to the Repo, LCPI transferred all of its right, title and interest in all of the Sold Loans to

15  Fenway Capital on August 22, 2008.  See RJN, Exhibits 13 and 14.

16            After the Sold Loans were transferred, LCPI and Lehman ALI lacked the power to

17  make the agreed upon changes to this loan that were specifically provided for and mandated by the

18  terms of the Settlement Agreement.  Although LCPI was not a signatory to the May Restructuring

19  Agreement, LCPI was a signatory (along with Lehman ALI, OVC Holdings, and Northlake

20  Holdings) to the Settlement Agreement.  Accordingly, when the Lehman Parties executed the

21  Settlement Agreement on August 25, 2008, three days after the foregoing sale of the Sold Loans

22  they knew that they could not perform its obligations thereunder.

23            In Recital B to the Settlement Agreement, which the Lehman Parties executed on

24  August 25, 2008, the Lehman Parties states:

25        Each of the respective entities identified as "Lenders" on Annex 2 attached hereto
          (each, a "Lender" and collectively, the "Lenders") is the owner and holder, or
26        arranger, of the respective loan or loans more particularly described on Annex 2
          (each, a "Loan" and collectively, the "Loans").
27

28

000201

1    Cook Declaration, Exhibit 2, Settlement Agreement, pg. 1, Recital B. The Lehman Parties

2    represented that they were the owners and holders of the Sold Loans, which in fact was a false

3    statement, since these loans were transferred to LCPI and then re-sold to Fenway Capital, no later

4    than August 22, 2008, three days earlier.

5           In sum, when Lehman ALI executed the Settlement Agreement on August 25, 2008,

6    Lehman ALI did not own any of the Sold Loans referenced therein and it knew that this sale

7    deprived it of the ability to perform the obligations thereunder. Performance was an objective

8    impossibility.[18]

9           3)    Covenant Not To Sue. The exhibits to the Settlement Agreement included a

10   Covenant Not to Sue, which provided that the lenders would not seek to enforce the rights against

11   the SunCal Borrowers, Guarantors and Pledgors, with respect to: "amounts owing pursuant to the

12   Note, the Loan Agreement or the Loan or obligations or liabilities arising under the Deed of Trust,

13   Pledge Agreement, Completion Guaranty, Limited Guaranty or the other Loan" if the Relevant

14   SunCal Parties performed their obligations under the Settlement Agreement. See Cook

15   Declaration, Exhibit 15. If the Lehman Parties had not prevented the closing and consummation of

16   the Settlement Agreement, the Relevant SunCal Debtors would have been wholly exonerated from

17   their obligations under the applicable Lehman Claims.

18          4)    Lehman Parties Acquire the Pacific Point Project Without Payment. LV Pac

19   Point foreclosed on Pacific Point on August 28, 2008—three days after the Settlement Agreement

20   was signed—and acquired the property pursuant to a non-judicial foreclosure sale. Title was thus

21   transferred from SJD Partners to LV Pac Point, and so the Lehman parties obtained the property as

22   contemplated.

23          Lehman ALI, SJD Partners and the City of San Juan Capistrano even entered into

24   an estoppel certificate—at Lehman ALI's request—on August 26, 2008, two days before the

---

25   [18] To the extent that any of the Lehman Parties contends that they had the ability to comply with
     their obligations under the terms of the Settlement Agreement on August 25, 2008, this
26   representation is demonstrably false. A party cannot modify the terms of loan that it does not own
     and unwinding the sale prior to the extended closing date was not a viable prospect. To the
27   contrary, the Lehman Parties affirmatively represented to the New York Bankruptcy that it took
     them over a year to persuade JP Morgan to release its lien on the commercial paper issuance,
28   which was necessary to secure the release of the collateral securing this issuance – the Sold Loans.

000202

1  foreclosure. That certificate stated, among other things, that the "Acquiring Entity [LV Pac Point]

2  shall by operation of law become the legal successor-in-interest to Developer [SJD Partners]"

3  under SJD Partners' agreements with the City. That certificate further provided that there existed

4  no breaches, defaults or claims under SJD Partners' agreements with the City. Yet demands have

5  been made by the City and/or other creditors—even after the estoppel was signed—against SJD

6  Partners, and its bond companies, because of LV Pac Point's failure to fulfill its assumption and

7  payment obligations.

8       Nevertheless, LV Pac Point has not performed any of its Pacific Point obligations.

9  Nor has PAMI performed any of its Pacific Point indemnity obligations. The SunCal Parties

10  related to the project, SJD Partners and its parent, SJD Development, filed for bankruptcy in

11  November 2008 as a result of the Lehman parties' failure to perform. These Debtors remain

12  exposed to millions of dollars in bond and non-bonded liability to third parties due to LV Pac

13  Point's failure to fulfill its payment obligations and PAMI's failure to fulfill its indemnity

14  obligations.

15       **T.    Damages From the Breach of the Settlement Agreement**. As of September 30,

16  2008, Lehman ALI was bound to pay the "urgent payables" and monthly Management Fees, as

17  well as to cause the closing transferring the Projects to new Lehman entities (Venture Grantees),

18  who would assume the unpaid vendor claims incurred at respective Projects, assume the bond

19  liabilities associated with each respective Projects. Had the Lehman Parties performed these

20  contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the

21  instant Chapter 11 cases would have been unnecessary.

22       As a result of the Lehman Parties' failure to pay urgent payables, failure to proceed and

23  cause its affiliates to proceed to closing, and repudiation of the agreements, the Relevant SunCal

24  Debtors had no choice but to file their respective petitions for protection under Chapter 11 of the

25  Bankruptcy Code. This was the very result sought to be avoided by the Restructuring Agreement

26  and Settlement Agreement. Thus, the breaches of the Lehman Parties not only resulted in non-

27  payment of all obligations to be assumed, but they caused the bankruptcies themselves. Thus, the

28  damages incurred by the Relevant SunCal Debtors from the breaches of the Settlement Agreement

1  are all claims and costs incurred relating to their Projects since September 30, 2008. This would

2  include all costs associated with the maintenance and preservation of the Projects since this date,

3  and all costs incurred in this Chapter 11 effort, which was compelled by the Lehman Parties'

4  breach of both the Restructuring Agreement and the Settlement Agreement.

5  **III.**

6  **ARGUMENT**

7  **A.    Lehman ALI Breached The Terms of the Restructuring Agreement.**

8  Lehman ALI breached the terms of the Restructuring Agreement by failing and then

9  refusing to pay the Urgent Payables and by repudiating the Settlement Agreement. *See Q Mgmt. v.*

10  *Snake River Equip. Co.*, CV 05-322-E-MHW, 2008 WL 219173 (D. Idaho Jan. 24, 2008) ("A

11  breach of contract is non-performance of any contractual duty of immediate performance.");

12  *Minidoka Irrigation Dist. v. Dep't of the Interior,* 154 F.3d 924, 927 (9th Cir.1998) (anticipatory

13  repudiation occurs when "the act make[s] the promisor's performance impossible") (internal

14  quotations and citation omitted); *Gold Mining & Water Co. v. Swinerton*, 23 Cal. 2d 19, 29, 142

15  P.2d 22, 27 (1943) ("It follows that where there has been a partial breach by the promisor

16  accompanied or followed by a repudiation of the contract by the promisor, the breach is total.").

17  The Voluntary Debtors, Acquisition Inc., Acquisitions, SunCal Management and Bruce

18  Elieff filed a complaint with the Orange County Superior Court on March 24, 2011, against

19  Lehman ALI, LV Pacific Point, PAMI, and other Lehman Parties (none of whom are parties in the

20  instant proceedings) for breach of contract and breach of the covenant of good faith and fair

21  dealing. See RJN, Exhibit 16.

22  **B.    The Debtor is Entitled to Recoup its Damages Against the Secured Portion of**

23  **the Lehman Claims.**

24  In *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392 (9th Cir. 1996), the Ninth

25  Circuit explained the right of recoupment, which is an affirmative defense under California law, as

26  follows:

27  [R]recoupment "is the setting up of a demand arising from the *same transaction* as
   the plaintiff's claim or cause of action, strictly for the purpose of abatement or

28  reduction of such claim." *Collier* ¶ 553.03, at 553-15 (emphasis in original). Under

-24-

recoupment, a defendant is able to meet a plaintiff's claim "with a countervailing claim that arose 'out of the same transaction.' " *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 157 (10th Cir.1986) (citations omitted). For this reason, recoupment has been analogized to both compulsory counterclaims and affirmative defenses. *See, e.g., In re California Canners and Growers*, 62 B.R. 18, 22 (9th Cir. BAP 1986) (Elliott, Bankruptcy J., concurring) (citation omitted).

*Newbury*, 95 F. 3d at 1399. Here, the Debtor is setting up a demand or counter-demand in response to Claim 65 "strictly for the purpose of abatement or reduction of such claim." *Id.* This is also a case where the demand being set up arises from the "same transaction or occurrence." *Id.*

The *Newbery* case provided dispositive guidance on the "same transaction and occurrence" issue. In *Newbery*, Newbery, an electrical contractor, failed to complete a series of projects that were the subject of completion bonds issued by Firemans Fund Insurance ("Firemans"). Pursuant to this bonding arrangement, Newbery had executed an indemnity agreement indemnifying Firemans from any damages resulting from a failure to complete the projects.

After Newbery's default and Chapter 11 filing, Newbery, Firemans and Citibank, a secured creditor holding a lien on the unfinished projects, entered into a settlement agreement. This agreement allowed Firemans to takeover and complete the projects, using a new contractor, and it allowed the new contractor to use the Newbery equipment at the project sites. As part of this agreement, Firemans was required to pay rent for its use of Newbery's equipment to Citibank. Pursuant to the foregoing settlement, Firemans and the new contractor completed the projects. However, Firemans failed to pay the agreed upon rent for the use of Newbery equipment to Citibank.

Later, Citibank and Newbery engaged in litigation over Citibank's claim in Newbery's Chapter 11 case. This litigation resulted in a settlement pursuant to which Citibank assigned to Newbery the claim that it held against Firemans for the unpaid rent. Newbery (as the debtor) then asserted this rent claim against Firemans in the Chapter 11 proceeding. In response to the Newbury's claim, Firemans asserted the damages that it had incurred under the bond indemnity agreement against Newbery debtor, relying upon recoupment and offset theories. The District Court granted summary judgment in favor of Firemans on both defenses.

Newbery and Citibank then appealed this ruling, arguing that the claim for unpaid rent assigned by Citibank to Newbery did not arise from the same transaction or occurrence as the

000205

1  damages recoverable by Firemans under the indemnity agreement with Newbery. The Ninth

2  Circuit rejected this argument:

3
        In deciding whether the relevant claims arose from the same transaction, the
4       district court applied the "logical relationship" test outlined by the Supreme Court
        in *Moore v. New York Cotton Exchange,* 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750
5       (1926). In *Moore,* the Court stated that "'[t]ransaction' is a word of flexible
        meaning. It may comprehend a series of many occurrences, depending not so
6       much upon the immediateness of their connection as upon their logical
        relationship." *Id.,* 270 U.S. at 610, 46 S.Ct. at 371; *see also Albright v. Gates,* 362
7       F.2d 928, 929 (9th Cir.1966) ("In deciding what is a transaction, we take note that
        the term gets an increasingly liberal construction."). Applying this test, the district
8       court accepted Fireman's Fund's argument that, because of the incorporation of
        the General Indemnity Agreement into the June 4, 1987 Agreement, both claims
9       arose from the latter agreement.

10 95 F. 3d at 1402; *see also, In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1012 (9th Cir. 2000) ("We

11 have held that the crucial factor in determining whether two events are part of the same

12 transaction is the "logical relationship" between the two. *Newbery Corp. v. Fireman's Fund Ins.*

13 *Co.,* 95 F.3d 1392, 1403 (9th Cir.1996) (resolving a dispute between a contractor and its surety).

14 Thus, a "transaction" may include "a series of many occurrences, depending not so much upon

15 the immediateness of their connection as upon their logical relationship." *Moore v. New York*

16 *Cotton Exch.,* 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926).").

17         Here, the claims and the bases for the objections thereto clearly arise out of the "same

18 transaction." The Lehman Claims are all purported secured claims based on Loan Agreements

19 and related guaranty agreements and/or security agreements involving the Projects as collateral.

20 The Restructuring Agreement and the Settlement Agreement, on which the current objections are

21 based, contemplated "friendly" foreclosures whereby Lehman ALI or its designee (the Venture

22 Grantees) would take title to the Projects and pay the claims of the applicable creditors, and

23 would agree not to sue on the very obligations that form the basis of their Claims. The respective

24 Loan Agreements, Restructuring Agreement and the Settlement Agreement all arise out of a

25 common series of transactions that clearly bear a "logical relationship" for the purposes of

26 recoupment. See e.g., *In re Thompson*, 350 B.R. 842 (Bankr.E.D.Wis. 2006) (debtor's claims

27 originated out of mortgage loan satisfied "same transaction" requirement of recoupment doctrine

28 against lender).

**C.**   **LCPI, as Assignee, Has No Immunity from Palmdale Hill's Defenses**.

LCPI acquired title to the Sold Loans with full knowledge of the defenses held by the Relevant SunCal Debtors.  In fact, LCPI's desire to stay the pursuit of these and other defenses in the form of the equitable subordination adversary action was one of the reasons why it repurchased this loan.[19]

As this Court is aware, on October 2, 2009, the Court entered formal findings that the transfer of Sold Loans by LCPI to Fenway Capital to pursuant to the Repo was a true sale, rather than a security device.  *See* Docket Nos. 652 and 653 attached to the RJN, Exhibits 14 and 15.  Thereafter, under the guise of a "compromise," LCPI and Fenway agreed that Fenway would sell the loans to LCPI--even those loans previously held by Lehman ALI.   LCPI filed a motion with the New York Bankruptcy Court seeking approval of this transaction, characterized as a "Compromise Motion".  LBHI Docket No. 7831.  The Debtors filed a limited opposition to the extent the transaction would impose LCPI's stay against the pending adversary action, Adversary No. 8:09-ap-01005-ES ("Lehman Adversary Proceeding").  LBHI Docket No. 8105.  In its Reply, LCPI was clear that the transaction would result in the Sold Loans being subject to its automatic stay.  *See* LBHI Docket No. 8260 at p.13 ¶ 25 ("LCPI's automatic stay will attach to the property it receives as part of the Transaction as a matter of law, regardless of LCPI's intent.").  The Debtors also filed a motion for relief from the automatic stay as to both LCPI and LBHI.  LBHI Docket No. 8539.  Immediately after the New York Bankruptcy Court's approved the "compromise", LCPI's counsel filed a Supplement to Unilateral Status Report ("Lehman Status Report") representing that the Lehman Adversary Proceeding has been affirmatively stayed by the approval of the compromise.  Adv. Docket No. 290.  As set forth above, on or about June 22, 2010, Fenway transferred the Sold Loans, and therefore the corresponding claims, to LCPI,[20] even though most of

---

[19] The affirmative defenses raised herein are being raised through a claim objection. This does not violate LCPI's stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003).

[20] See *Notices and Evidence of Transfer by Fenway Capital, LLC of Claim* filed on June 22, 2010 as Docket Nos. 1179 through 1191.

000207

1    the Sold Loans were not originally held by LCPI, but rather by non-bankrupt Lehman Parties, such

2    as Lehman ALI, OVC Holdings and Northlake Holdings.

3        Accordingly, at the time of its acquisition, LCPI was not only aware of the Relevant

4    SunCal Debtors' defenses to the Sold Loans, LCPI's affirmatively acquired the loans in order to

5    invoke its stay over the Sold Loans and the Lehman Adversary Proceeding. A debtor's post-

6    petition acquisition of a distressed asset, for the purpose of invoking its automatic stay, is an abuse

7    of process, and therefore is not in good faith. In *In re Brannan*, 40 B.R. 20 (Bankr. N.D. Ga.

8    1984), 14 months prior to the petition date, the debtor transferred certain real property to a third

9    party. Subsequently, the property was subject to a foreclosure proceeding. The debtor filed for

10    bankruptcy, and less than two months later, the third party transferred the real property to the

11    debtor. The debtor contended that the pending foreclosure was stayed, since the real property had

12    become property of the estate. The court disagreed, and observed that an attempt to "shield a

13    property interest under the automatic stay by conveying the property interest to" the debtor's estate

14    during the pendency of the bankruptcy "*would be an abuse of the bankruptcy process.*" *Brannan*,

15    40 B.R. at 24-25 (emphasis added). Accordingly, LCPI's post-petition acquisition of the Sold

16    Loans for the purposes of invoking its automatic stay over the Sold Loans and the Lehman

17    Adversary Proceeding, was an abuse of process.

18        Under these facts, Lehman Claims are subject to any and all defenses held by the Relevant

19    SunCal Debtors, including the affirmative defenses raised herein. *See Fiberchem, Inc. v. General*

20    *Plastics Corp.,* 495 F.2d 737 (9th Cir.1974) (an assignee with knowledge of the equities of a third

21    party against the assigned right takes his claim subject to those equities); *Hammelburger v.*

22    *Foursome Inn Corp.,* 54 N.Y.2d 580, 588, 431 N.E.2d 278, 283 (1981) ("An assignee who takes

23    with knowledge can no more enforce the mortgage, whether as to principal or interest, than could

24    the usurer. Knowledge by the assignee of the usurious nature of the transaction will, therefore,

25    defeat an estoppel claim. See also *In re Snyder*, 436 B.R. 81, 90 (Bankr.C.D.Ill. 2010) ("As a

26    general rule, the purchaser of a claim against a debtor in bankruptcy steps into the shoes of the

27    claim seller, enjoying the same benefits, but suffering the same limitations of the claim, as a

28    successor in interest to the seller's position. An assignee of a claim may not receive more than the

1  assignor would have been entitled to without the assignment since an assignment operates to

2  transfer no greater right or interest than was possessed by the assignor.")

3  **D.  The SunCal Debtors Are Entitled To Offset Their Damages - Against Lehman**

4  **ALI's Claims Only.**

5  The relevant SunCal Debtors have the right offset their claims against Lehman ALI,

6  against any claims asserted by Lehman ALI against their assets. Section 431.70 of the California

7  Code of Civil Procedure provides in relevant part:

8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
> Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this section shall not exceed the value of the relief granted to the other party. The defense provided by this section is not available if the cross-demand is barred for failure to assert it in a prior action under Section 426.30. Neither person can be deprived of the benefits of this section by the assignment or death of the other. For the purposes of this section, a money judgment is a "demand for money" and, as applied to a money judgment, the demand is barred by the statute of limitations when enforcement of the judgment is barred under Chapter 3 (commencing with Section 683.010) of Division 1 of Title 9.

18  Cal. Code of Civ. Proc. 431.70.

19  Although Section 431.70 sets forth California's current statutory setoff provision, this

20  source of authority is not exclusive. The defense of setoff under California law "emanates from

21  'the established principle *in equity* that either party to a transaction involving mutual debts and

22  credits can strike a balance, holding himself owing or entitled only to the net difference... .'" *Del*

23  *Charro Properties, L.P. v. Heron*, H025571, 2004 WL 1616016 (Cal.App. July 20, 2004). Code

24  of Civil Procedure section 431.70 "does not create a substantive right to raise setoff as a defense to

25  a claim for monetary relief, but merely describes the procedures to be followed in raising this

26  defense. [Citations.]" *Granberry v. Islay Investments* 9 Cal.4th 738, 744 (1995). Setoff is allowed

27  under California law where the parties have mutual debts and they are due to each party in the

28  

-29-

000209

1 | same capacity. *See Coffman v. Cobra Mfg. Co.*, 242 F.2d 754 (9th Cir. 1954). On the facts these

2 | elements are clearly satisfied.

3 | California law also allows the debtor the right to decide what claims to offset against a

4 | where the debtor faces a range of claims asserted by the creditor party. *Margott v. Gem Properties,*

5 | *Inc.*, 34 Cal. App. 3d 849, 855 (1973) ("Precedential expression of general rules, however,

6 | strongly indicates that it is the judgment debtor and not the judgment creditor who has the right to

7 | choose which of several claims possessed by the judgment debtor against the judgment creditor

8 | should be offset. Offset is expressed as a right of the judgment debtor."); *see also Harrison v.*

9 | *Adams*, 20 Cal. 2d 646, 648-49 (1942) ("Concerning the rights of the appellant to the money on

10 | deposit as against the assignee of the judgment for a valuable consideration, it is well settled that a

11 | court of equity will compel a set-off when mutual demands are held under such circumstances that

12 | one of them should be applied against the other and only the balance recovered. The insolvency of

13 | the party against whom the relief is sought affords sufficient ground for invoking this equitable

14 | principle."); *In re Parker*, 80 B.R. 729, 732 (Bankr. E.D. Pa. 1987) ("Thus, we will reduce the

15 | Mortgagee's "claim" for arrearages to $6,888.53 and the secured portion of its total debt to

16 | $19,350.00.).

17 | **E.** **Allowing The Lehman Claims Would Unjustly Enrich The Lehman Entities**.

18 | Under California law, the elements of unjust enrichment are: (1) receipt of a benefit; and

19 | (2) the unjust retention of the benefit at the expense of another. *Shum v. Intel Corp.*, 630 F. Supp.

20 | 2d 1063, 1073 (N.D. Cal. 2009) *aff'd*, 633 F.3d 1067 (Fed. Cir. 2010); *Peterson v. Cellco P'ship,*

21 | 164 Cal.App.4th 1583, 1593, 80 Cal.Rptr.3d 316 (2008). In this case, the Lehman Entities

22 | induced the SunCal Debtors to incur debt solely for the benefit of the Lehman Entities, via

23 | promises of paying for certain obligations, and then the Lehman Entities refused to pay these

24 | obligations. However, the Lehman Entities now come to this Court seeking 1) to have their claims

25 | validated in the full amount, and 2) the right to use these claims as basis for foreclosing on the

26 | very projects that were improved by the debts that they failed to pay in the first instance.

27 | Validating the Lehman Claims would clearly convey an unjust windfall on these claimants.

28 | Accordingly, these claims should not be allowed.

000210

**F.    The Lehman Entities Cannot Profit From Their Own Wrongs (Unclean Hands).**

"It is elementary that one party cannot compel another to perform while he himself is in default under the contract." *Rathbun v. Sec. Mfg. Co.*, 82 Cal. App. 793, 796 (1927); see also, *Robinson, on behalf of C. & R. Transfer, v. Boulevard Express*, 17 Cal. App. 2d 492, 495 (1936) ("A party cannot recover damages for the breach of an entire contract if he himself has failed, without lawful cause, to perform the covenants, upon compliance with which the obligations of the defendant were dependent."); *Lewis Pub. Co. v. Henderson* 103 Cal. App. 425, 429 (1930) ("Therefore, in the present case, plaintiff having failed to prove, as alleged in its complaint, that it had performed its part of the contract, was not entitled to enforce its terms against the other party thereto"). It is also well established that "[o]ne who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." 3A Corbin, Contracts § 767, at 540 (1960). Stated more succinctly, a claimant will not be allowed to profit from his or her own wrongdoing. *See Restatement of Restitution* § 3 (1937) ("A person is not permitted to profit by his own wrong at the expense of another."); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1092 (9th Cir. 2003) ("A court of equity will not permit a person to profit by his own breach of contract and to benefit by his own wrong.").

Here, the Lehman Entities, *inter alia*, breached the terms of the Restructuring Agreement and Settlement Agreement, which are an integral part of the loan contracts that they are now seeking to enforce. These breaches left the SunCal Debtors owing millions in unpaid liabilities, which ultimately drove them into Chapter 11. Now, the Lehman Entities – the parties that participated in this breach as primary wrongdoers - come to this court seeking to profit from Lehman ALI's wrongs. This position is untenable. *Id. see also Highland Tank & Mfg. Co. v. PS Intern. Inc.*, 393 F.Supp.2d 348, 361 (W.D.Pa.2005) ("No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act."); *see also Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir.1959) ("The doctrine (of unclean hands) is confessedly derived from the

000211

1  unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief

2  to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities

3  of the judge. It has nothing to do with the rights or liabilities of the parties; indeed the defendant

4  who invokes it need not be damaged, and the court may even raise it sua sponte."). The Lehman

5  Entities should be barred from seeking any relief against the Voluntary Debtors with respect to the

6  Lehman Claims until they have cured the taint of unclean hands by remedying their wrongs.

7  **G.  The Imposition Of A Constructive Trust Is Justified – Against Lehman ALI**

8  **Only.**

9  Section 2224 of the California Civil Code states that '[o]ne who gains a thing by fraud,

10  accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or

11  she has some other and better right thereto, an involuntary trustee of the thing gained, for the

12  benefit of the person who would otherwise have had it." A constructive trust may be imposed

13  pursuant to this section if the following three conditions are satisfied: (1) the existence of a *res*

14  (property or some interest in property); (2) the *right* of a complaining party to that res; and (3)

15  some *wrongful* acquisition or detention of the res by another party who is not entitled to it.

16  [Citations.]" *Communist Party v. Valencia, Inc.* 35 Cal.App.4th 980, 990 (1995); *Campbell v.*

17  *Superior Court*, 132 Cal. App. 4th 904, 920 (2005).

18  In this case, Lehman ALI directed the Voluntary Debtors to continue to employ vendors to

19  improve the Projects prior to their transfer to the Lehman controlled entities. The Voluntary

20  Debtors incurred these debts, and Projects were improved by the services and materials provided

21  by the various vendors, in reliance on this promise. Now, Lehman ALI seeks to foreclose upon the

22  Projects and to retain the benefits of the work and services provided to the Projects, without

23  paying for the same. A constructive trust should be imposed upon the proceeds generated from the

24  sale of the Projects to the extent of the damages incurred by the relevant SunCal Debtors through

25  Lehman ALI's breach of its obligations under the terms of the Restructuring Agreement and the

26  Settlement Agreement.

27

28

000212

1    **H.    The Imposition Of An Equitable Lien Is Justified – Against Lehman ALI**

2    **Only.**

3          Equity permits imposition of an equitable lien where the claimant's expenditure has

4    benefited another's property under circumstances entitling the claimant to restitution. *Jones v.*

5    *Sacramento Sav. & Loan Ass'n*, 248 Cal. App. 2d 522, 530 (1967); *McColgan v. Bank of*

6    *California Assn.*, 208 Cal. 329, 338 (1929); 4 Pomeroy's Equity Jurisprudence (5th ed.) § 1235,

7    pp. 696—699; 3 Pomeroy's Equity Jurisprudence (5th ed.) s 390, p. 67. Such relief has been

8    granted where a lender advances money which benefits the land of another in mistaken reliance

9    upon an imperfect mortgage or lien upon that land. *Estate of Pitts*, 218 Cal. 184, 189 (1933); *Smith*

10   *v. Anglo-California Trust Co.*, 205 Cal. 496, 502-504 (1928). It is particularly likely that an

11   equitable lien will be recognized when "money has been borrowed or other obligation incurred on

12   the faith of it." *Destro v. Stuhley,* 675 F.2d 1037, 1039 (9th Cir.1981).

13         In this case, Lehman ALI induced the SunCal Debtors to continue to incur debts in the

14   form of vendor obligations for improvements to the Projects. The SunCal Debtors incurred these

15   debts, and the Projects were improved thereby, in express reliance upon Lehman ALI's promises

16   of payment. Thereafter, Lehman ALI's failed to honor these promises, which left the SunCal

17   Debtors owing tens of millions to the unpaid vendors. Notwithstanding this conduct, Lehman ALI

18   seeks to enforce the very contracts that it breached, by foreclosing on the improved Projects. This

19   injustice should not be allowed to occur. The Court should impose an equitable lien on all of the

20   Projects subject to Lehman ALI's liens that is senior to Lehman ALI's liens. This equitable lien

21   will then secure the damages incurred through Lehman ALI's breach of the Restructuring

22   Agreement and the Settlement Agreement.

23         **I.    LCPI's Automatic Stay Does Not Apply to an Objection to Claim.**

24         While the parties have previously litigated as to whether LCPI's automatic stay is

25   applicable to the equitable subordination cause of action in the Lehman Adversary Action, it is

26   well established in both the Ninth Circuit and Second Circuit that a creditor's stay is not applicable

27   to a claim objection proceeding. Where there are two independent bankruptcy estates in which one

28   estate asserts a claim against the other, an objection to claim does not violate the claimant's

000213

automatic stay. See *In re Wheatfield Business Park*, 308 B.R. 463, 466 (9th Cir. BAP 2004); *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993); *In re Metiom*, 301 B.R. 634, 638-639 (Bankr.S.D.N.Y. 2003); *In re Meade*, 1999 WL 33496001, *1 (E.D.Pa. 1999).

In *Wheatfield Business Park*, 308 B.R. 463 (9th Cir. BAP 2004), the Bankruptcy Appellate Panel held that the creditor's automatic stay did not apply to an objection to its claim, as the creditor was effectively acting in the capacity of a plaintiff, to whom the stay does not apply. The subsequent BAP decision in *In re Palmdale Hills Property, LLC*, 423 B.R. 655, 665 (9th Cir.BAP 2009), cited the *Wheatfield Business Park* and *Financial News Network* decisions with approval for the proposition that claim objections do not violate the stay of a debtor-claimant.

The law in the Second Circuit is substantially identical. In *In re Financial News Network*, 158 B.R. 570 (S.D.N.Y. 1993), a debtor (Kaypro) whose Chapter 11 case was pending in the Southern District of California, filed a claim in Financial News Network's Chapter 11 case in the Southern District of New York. When Kaypro's claim was disallowed by the bankruptcy court in New York, Kaypro appealed contending that this relief was barred by its automatic stay in California. The District Court rejected this position, stating "both the language and purpose of section 362 indicate that the automatic stay in effect in the Bankruptcy Court for the Southern District of California did not preclude the New York Bankruptcy Court from sustaining [NY debtor's] objection to [California debtor's] proof of claim filed in New York Bankruptcy Court." *Financial News*, 158 B.R. at 573. See also *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2d Cir. 1998); *Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 499 (E.D.N.Y. 1998) ("the primary claims raised by [debtor] are claims asserted by, and not against, the debtor, and are therefore not subject to the stay and can be immediately adjudicated."); *In re Bousa, Inc.*, 2005 WL 1176108, *4 (S.D.N.Y. 2005) ("To the extent that the debtor has itself brought the claim, the automatic stay provision does not preclude adjudication.").

Further, it is well established in this Circuit that the automatic stay does not apply to the assertion of recoupment. See *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1400 (9th Cir. 1996); *In re TLC Hospitals, Inc.*, 224 F.3d 1008, 1014 (9th Cir. 2000); *In re Palmdale Hills*

1 │ *Property, LLC*, 423 B.R. 655, 667 n.9 (9th Cir. BAP 2009) ("[Recoupment] is an equitable

2 │ common law doctrine to net out debts and allow the defendant to recoup payments made against

3 │ the claim and is not limited to pre-petition claims. It is not subject to the automatic stay."); *In re*

4 │ *Petersen*, 2010 WL 3842157, *13 (D.Ariz. 2010) ("because 'recoupment is neither a claim nor a

5 │ debt, it is unaffected by either the automatic stay or the debtor's discharge.'"); *In re McMahon*,

6 │ 129 F.3d 93, 98 (2d Cir. 1997) ("a  recoupment not subject to the automatic stay of 11 U.S.C.

7 │ § 362").

8 │       Here, the within Motion does not seek any affirmative recovery against LCPI.  Rather,

9 │ SunCal Moving Parties are merely acting defensively to disallow the Lehman Claims.

10 │ Accordingly, LCPI's automatic stay is not applicable.

11 │       **J.**    **Any Party in Interest Has Standing to Object to Claims.**

12 │       As set forth above, SunCal Management is the moving party in this objection to claims in

13 │ the specified Trustee Debtors' cases in its capacity as a creditor and party in interest in such

14 │ Trustee Debtors' cases.  Any party in interest has standing to objection to claims.  11 U.S.C.

15 │ §502(a) ("a claim…is deemed allowed, unless a party in interest…objects").  *See also* Advisory

16 │ Committee Notes to Bankruptcy Rule 3007 ("any party in interest may object to a claim").

17 │       The Ninth Circuit has similarly held that "any party in interest" can object to a claim

18 │ pursuant to Section 502(a):

19 │         Again, any party in interest can object. *See* 11 U.S.C. § 502(a). Although the
20 │         trustee in Siegel's bankruptcy could have objected to Freddie Mac's proofs of
        claim, Siegel could have objected as well. *See Lawrence v. Steinford Holding
21 │         B.V. ( In re Dominelli)*, 820 F.2d 313, 316 (9th Cir.1987) (stating that under 11
        U.S.C. § 502(a) a party in interest, including the trustee, can object to a proof of
22 │         claim); *see also IRS v. Taylor (In re Taylor)*, 132 F.3d 256, 261 (5th Cir.1998)
        ("Once a proof of claim is filed, the debt is considered allowed unless the debtor
23 │         or another party in interest files an objection to the proof of claim."); *FDIC v.
        Union Entities (In re Be-Mac Transp.)*, 83 F.3d 1020, 1025 (8th Cir.1996) ("In
24 │         order to disallow the claim, the debtor or another party in interest must object
        and request a determination of the lien's validity.")
25 │

26 │ *Siegel v. Federal Home Loan Mortg. Corp.*, 143 F.3d 525, 531 (9th Cir. 1998).  See also <u>In re</u>

27 │ <u>Anderson</u>, 382 B.R. 496, 506 (Bankr.D.Or. 2008) ("To the extent [the plan] limits the parties who

28 │ may file claims objections to the Debtors and the trustee, it is inappropriate as any party in interest

    has standing to object to claims. § 502(a)."); *In re QMect, Inc.,* 349 B.R. 620, 625 (Bankr.

000215

N.D.Cal. 2006) ("A creditor or creditors' committee has standing independent of the trustee or debtor-in-possession to object to another creditor's claim as long as it has something to gain if it prevails.").

IV.

**CONCLUSION**

Pursuant to the terms of the Restructuring Agreement and the Settlement Agreement, Lehman ALI, which is the parent entity of LCPI, Lehman ALI was bound to pay the "urgent payables" and Management Fees, as well as to cause to closing transferring the Projects to new Lehman entities (Venture Grantees), who would assume the unpaid vendor claims incurred at Projects, assume the bond liabilities associated with that Project. Had Lehman ALI performed these contractual obligations, the Relevant SunCal Debtors would have had little or no debt, and the instant Chapter 11 cases would have been unnecessary. Lehman ALI did not comply with the terms of this agreement. It did not pay the Urgent Payables or the bond obligations. Moreover, three days before signing the Settlement Agreement, Lehman ALI, and its subsidiary, LCPI, sold all of their right, title and interest in the Sold Loans to Fenway Capital. Yet, when the Lehman Parties signed the Settlement Agreement, they represented that they still owned these loans. These representations were false and this transfer rendered performance under the terms of the Restructuring Agreement and the Settlement Agreement impossible.

The foregoing breaches caused the Relevant SunCal Debtors to suffer millions of dollars in damages, which will need to be quantified through discovery. These damages can and should be recouped from the secured portion of the Lehman Claims, and the Lehman Entities should be denied the right to seek any relief on the basis of Lehman Claims until the Relevant SunCal Debtors are made whole.

DATED: May 10, 2011

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

By: ___/s/ Paul J. Couchot_____
       Paul J. Couchot, Esq.
       Sean Okeefe, Esq.
       Peter Lianides, Esq.
       General Insolvency Counsel for Administratively
       Consolidated Debtors-in-Possession

*[SIGNATURES CONTINUED ON NEXT PAGE]*

1

2 **RUS MILIBAND & SMITH P.C.**

3

4 By: _/s/ Ronald Rus_
        Ronald Rus, Esq.
5       Joel S. Miliband, Esq.
        Cathrine Castaldi, Esq.
6 Attorneys for SunCal Management, LLC, and SCC
   Acquisitions Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000217

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **NOTICE OF AMENDED MOTION AND AMENDED MOTION FOR ORDER DISALLOWING CERTAIN CLAIMS HELD BY LEHMAN ALI INC. AND LEHMAN COMMERCIAL PAPER INC.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On May 10, 2011, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On May 10, 2011, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2011 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 10, 2011 | Susan Connor | |
|---|---|---|
| Date | Type Name | Signature |

-38-

000218

## NEF SERVICE LIST

- Selia M Acevedo    sacevedo@millerbarondess.com, mpritikin@millerbarondess.com
- Joseph M Adams    jadams@sycr.com
- Raymond H Aver    ray@averlaw.com
- James C Bastian    jbastian@shbllp.com
- Thomas Scott Belden    sbelden@kleinlaw.com, ccf@kleinlaw.com
- John A Boyd    fednotice@tclaw.net
- Mark Bradshaw    mbradshaw@shbllp.com
- Gustavo E Bravo    gbravo@smaha.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- Brendt C Butler    bbutler@mandersonllp.com
- Andrew W Caine    acaine@pszjw.com
- Carollynn Callari    ccallari@venable.com
- Cathrine M Castaldi    ccastaldi@rusmiliband.com
- Tara Castro Narayanan    tara.narayanan@msrlegal.com, lisa.king@msrlegal.com
- Dan E Chambers    dchambers@jmbm.com
- Shirley Cho    scho@pszjlaw.com
- Vonn Christenson    vrc@paynefears.com
- Brendan P Collins    bpcollins@bhfs.com
- Vincent M Coscino    vcoscino@allenmatkins.com, emurdoch@allenmatkins.com
- Paul J Couchot    pcouchot@winthropcouchot.com, pj@winthropcouchot.com;sconnor@winthropcouchot.com
- Jonathan S Dabbieri    dabbieri@sullivan.com, hill@sullivanhill.com;mcallister@sullivanhill.com;stein@sullivanhill.com;vidovich@sullivanhill.com
- Ana Damonte    ana.damonte@pillsburylaw.com
- Vanessa S Davila    vsd@amclaw.com
- Melissa Davis    mdavis@shbllp.com
- Daniel Denny    ddenny@gibsondunn.com
- Caroline Djang    crd@jmbm.com
- Donald T Dunning    ddunning@dunningLaw.com
- Joseph A Eisenberg    jae@jmbm.com
- Lei Lei Wang Ekvall    lekvall@wgllp.com
- Richard W Esterkin    resterkin@morganlewis.com
- Marc C Forsythe    kmurphy@goeforlaw.com
- Alan J Friedman    afriedman@irell.com
- Steven M Garber    steve@smgarberlaw.com
- Christian J Gascou    cgascou@gascouhopkins.com
- Barry S Glaser    bglaser@swjlaw.com
- Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
- Eric D Goldberg    egoldberg@stutman.com
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Michael J Gomez    mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com
- Kelly C Griffith    bkemail@harrisbeach.com
- Matthew Grimshaw    mgrimshaw@rutan.com
- Kavita Gupta    kgupta@winthropcouchot.com
- Asa S Hami    ahami@morganlewis.com
- Michael J Hauser    michael.hauser@usdoj.gov
- D Edward Hays    ehays@marshackhays.com
- Michael C Heinrichs    mheinrichs@omm.com
- Harry D. Hochman    hhochman@pszjlaw.com, hhochman@pszjlaw.com
- Jonathan M Hoff    jonathan.hoff@cwt.com
- Nancy Hotchkiss    nhotchkiss@trainorfairbrook.com
- Michelle Hribar    mhribar@rutan.com
- John J Immordino    john.immordino@wilsonelser.com, raquel.burgess@wilsonelser.com
- Lawrence A Jacobson    laj@cohenandjacobson.com

000219

1
- Michael J Joyce    mjoyce@crosslaw.com
- Stephen M Judson    sjudson@fablaw.com

2
- Kaleb L Judy    ecf@kleinlaw.com, kjudy@kleinlaw.com
- Steven J Kahn    skahn@pszyjw.com

3
- Sheri Kanesaka    sheri.kanesaka@bryancave.com
- David I Katzen    katzen@ksfirm.com

4
- Christopher W Keegan    ckeegan@kirkland.com, gdupre@kirkland.com;alevin@kirkland.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com

5
- Irene L Kiet    ikiet@hkclaw.com
- Claude F Kolm    claude.kolm@acgov.org

6
- Mark J Krone    mk@amclaw.com, crs@amclaw.com;amc@amclaw.com
- David B Lally    davidlallylaw@gmail.com

7
- Leib M Lerner    leib.lerner@alston.com
- Peter W Lianides    plianides@winthropcouchot.com, pj@winthropcouchot.com

8
- Charles Liu    cliu@winthropcouchot.com
- Kerri A Lyman    klyman@irell.com

9
- Mariam S Marshall    mmarshall@marshallramoslaw.com
- Robert C Martinez    rmartinez@mclex.com

10
- Michael D May    mdmayesq@verizon.net
- Hutchison B Meltzer    hmeltzer@wgllp.com

11
- Krikor J Meshefejian    kjm@lnbrb.com
- Joel S. Miliband    jmiliband@rusmiliband.com

12
- James M Miller    jmiller@millerbarondess.com, vgunderson@millerbarondess.com
- Louis R Miller    smiller@millerbarondess.com

13
- Randall P Mroczynski    randym@cookseylaw.com
- Mike D Neue    mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com

14
- Robert Nida    Rnida@castlelawoffice.com
- Henry H Oh    henry.oh@dlapiper.com, janet.curley@dlapiper.com

15
- Sean A Okeefe    sokeefe@okeefelc.com
- Robert B Orgel    rorgel@pszjlaw.com, rorgel@pszjlaw.com

16
- Malhar S Pagay    mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Penelope Parmes    pparmes@rutan.com

17
- Ronald B Pierce    ronald.pierce@sdma.com
- Katherine C Piper    kpiper@steptoe.com

18
- Cassandra J Richey    cmartin@pprlaw.net
- Debra Riley    driley@allenmatkins.com

19
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com

20
- R Grace Rodriguez    ecf@lorgr.com
- Martha E Romero    Romero@mromerolawfirm.com

21
- Ronald Rus    rrus@rusmiliband.com
- John P Schafer    jschafer@mandersonllp.com

22
- John E Schreiber    jschreiber@dl.com
- William D Schuster    bills@allieschuster.org

23
- Christopher P Simon    csimon@crosslaw.com
- Wendy W Smith    wendy@bindermalter.com

24
- Steven M Speier    Sspeier@Squarmilner.com, ca85@ecfcbis.com
- Steven M Speier (TR)    Sspeier@asrmanagement.com, ca85@ecfcbis.com

25
- Michael St James    ecf@stjames-law.com
- Michael K Sugar    msugar@irell.com

26
- Cathy Ta    cathy.ta@bbklaw.com, Arthur.Johnston@bbklaw.com;Kenneth.Burgess@bbklaw.com
- David A Tilem    davidtilem@tilemlaw.com,
  malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;kmishigian@tilemlaw.com

27
- James E Till    jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;pnelson@thelobelfirm.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

28
- Carol G Unruh    cgunruh@sbcglobal.net

000220

| 1 | • Annie Verdries    verdries@lbbslaw.com |
|   | • Jason Wallach    jwallach@gladstonemichel.com |
| 2 | • Joshua D Wayser    , kim.johnson@kattenlaw.com |
|   | • Christopher T Williams    ctwilliams@venable.com, jcontreras@venable.com |
| 3 | • Marc J Winthrop    mwinthrop@winthropcouchot.com, pj@winthropcouchot.com |
|   | • David M Wiseblood    dwiseblood@seyfarth.com |
| 4 | • Brett K Wiseman    bwiseman@aalaws.com |
|   | • Dean A Ziehl    dziehl@pszjlaw.com, dziehl@pszjlaw.com |
| 5 | • Marc A. Zimmerman    joshuasdaddy@att.net |
|   | • |

**SERVICE VIA FIRST CLASS MAIL**

| Bickford 16, SJDPartners23 Comm9, Tesoro7 | Heartland9, Marblehead21, PSV12 Acton6Emerald 7, SunValley17, PalmdaleHills65 SummitValley12, Northlake6, OakValley |
|---|---|
| Lehman Commercial Paper Inc.<br>Lehman ALI, Inc.<br>Attn:  Gerald Pietroforte<br>1271 Sixth Ave., 46th Fl.<br>New York, NY 10020 | Lehman ALI, Inc.<br>OVC Holdings, LLC<br>Northlake Holdings LLC<br>Lehman Commercial Paper Inc.<br>Attn:  Jeff Fitts<br>1271 Sixth Ave., 46th Fl.<br>New York, NY 10020 |
| All |  |
| Weil, Gotshal & Manges LLP<br>Attn:  Shai Y. Waisman<br>767 Fifth Ave.<br>New York, NY 10153 |  |

000221