# EXHIBIT A

**WHITE & CASE**

White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, Florida 33131-2352

Tel  + 1 305 371 2700
Fax  + 1 305 358 5744/5766
www.whitecase.com

January 22, 2010

BY ELECTRONIC MAIL

John K. Rabiej, Chief
Rules Committee Support Office
Administrative Office of the United States Courts
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Washington, D.C. 20544

Re:   Proposed Amendment to Rule 2019 of the Federal Rules of Bankruptcy Procedure

Dear Mr. Rabiej:

This letter responds to your letter dated January 12, 2010, and supplements my request to testify at the hearing of the Advisory Committee on Bankruptcy Rules on February 5, 2010.[1]  In my request to testify, I stated that even in its current form, Rule 2019 of the Federal Rules of Bankruptcy Procedure is being applied in a discriminatory fashion that has resulted in a chilling of creditor participation in chapter 11 cases, seemingly in direct contravention of the fundamental tenet that creditor participation in chapter 11 cases is to be fostered and maximized.  I further suggested that because Rule 2019 served no real purpose and the information required could be obtained in discovery if relevant (which is generally not the case because someone who buys a claim is entitled to 100% of the rights of the seller regardless of price paid; if it were otherwise, people who do not want, or cannot afford, to participate in a bankruptcy case would be forced to because they would be unable to sell their claim) the Rule should be eliminated as a requirement for investor groups and their members to participate in the reorganization process.

I wish to bring to the Advisory Committee's attention a recent decision by Judge Sontchi of the United States Bankruptcy Court for the District of Delaware in the case of *In re Premier International Holdings, Inc., et al.*[2]  In a thorough review of the history of Rule 2019, Judge Sontchi concluded that the Rule is superfluous and should not be applied to the informal and *ad hoc* groups that participate in today's reorganization cases.

---

[1] Comment Docket Number 09-BK-010 (Dec. 23, 2009).  My earlier request is incorporated in and made a part of this letter.

[2] Case No. 09-12019 (CSS) (Bankr. D. Del. Jan. 20, 2010) (enclosed).

ABU DHABI  ALMATY  ANKARA  BEIJING  BERLIN  BRATISLAVA  BRUSSELS  BUCHAREST  BUDAPEST  DOHA  DÜSSELDORF  FRANKFURT
GENEVA  HAMBURG  HELSINKI  HONG KONG  ISTANBUL  JOHANNESBURG  LONDON  LOS ANGELES  MEXICO CITY  MIAMI  MOSCOW  MUNICH
NEW YORK  PALO ALTO  PARIS  PRAGUE  RIYADH  SÃO PAULO  SHANGHAI  SINGAPORE  STOCKHOLM  TOKYO  WARSAW  WASHINGTON, DC

**WHITE & CASE**

In his decision, Judge Sontchi observed that Rule 2019 is the successor to Rule 10-211 under former Chapter X of the Bankruptcy Act, whose purpose was to curb the abuse of deposit agreements by unofficial "protective committees" in railroad and corporate receiverships. Those protective committees "were generally dominated by Wall Street investment firms working in concert with existing management."[3]

Judge Sontchi went on to explain that prior to the passage of the Chandler Act in 1938, investment firms would form protective committees, which in turn would solicit smaller bondholders and stockholders to deposit their bonds or stock with the committee in a fashion that gave the committee the power to bind the depositor. Frequently, this allowed the members of the committee to transfer control over the debtor to themselves, while giving dissenting and non-depositing bondholders and stockholders comparatively inferior distributions.[4]

From the time that the Chandler Act brought Chapter X into effect through the time that the Bankruptcy Code came into effect in 1978, there was a "virtual cessation of corporate reorganization in bankruptcy" because Chapter X required the appointment of a trustee in large corporate reorganizations:[5]

> [T]he Chandler Act so effectively curbed the power of protective committees that they virtually ceased to exist within a few years of the Act's passage. Rule 10-211 was, for all intents and purposes, superfluous almost immediately after its passage. There was nothing left to regulate.[6]

Inasmuch as Rule 10-211 had become superfluous, so too was Rule 2019, which contains "not a single substantive difference" from its predecessor.[7] If anything, it is more superfluous because of additional protections built into the Bankruptcy Code:

> The Bankruptcy Code continues to limit the powers of [informal] committees . . . . For example, the debtor is given exclusive authority to propose and to solicit a plan of reorganization; . . . creditors in the same class must be treated equally; a trustee or examiner may be appointed for cause. Even if an informal committee were to try to exercise the powers formerly available to protective committees, it would be prevented by the Bankruptcy Code.[8]

---

[3] *Id.* at 13-15.
[4] *Id.* at 16-17.
[5] *Id.* at 24.
[6] *Id.* at 27.
[7] *See id.* at 26.
[8] *Id.* at 27.

2

John K. Rabiej

January 22, 2010

Based on the foregoing, Judge Sontchi concluded that the problem that Rule 2019 "was designed to address by requiring certain disclosures simply no longer exists."[9] I urge that the Advisory Committee examine the proposed amendment, with its stated purpose of "substantially . . . expand[ing] the scope of [Rule 2019's] coverage and the content of its disclosure requirements"[10] through the lens of Judge Sontchi's reasoning. Given that the proposed amendment is intended to make clear that the Rule applies to informal groups of creditors, I submit that it is an unneeded and counterproductive expansion of an unnecessary rule.

In closing, I anticipate that my testimony at the hearing on February 5, 2010, will be principally concerned with the following topics:

- How distressed investors benefit the reorganization process by providing an escape valve to creditors who lack the wherewithal either to participate in or to wait out a chapter 11 case;

- How groups of creditors, particularly of sophisticated creditors such as distressed investors, benefit the reorganization process by streamlining proceedings and negotiations;

- The confidential, proprietary and sensitive nature of the information that Rule 2019 would require distressed investors to disclose, and the chilling effect that that requirement has on their participation in the reorganization process; and

- The ways in which Rule 2019 has become little more than a font for wasteful and distracting litigation, while offering no palpable benefit to the reorganization process.

This letter is not intended to be a substitute for any comment that I may submit prior to the February 16, 2010 deadline. Please do not hesitate to contact me regarding these matters.

Sincerely,

*Thomas E Lauria /pjn*

Thomas E Lauria

TEL:pjn

Enclosure

---

[9] *Id.*
[10] Proposed Amendments to the Fed. R. Bankr. P., R. 2019 [hereafter Proposed R. 2019], adv. comm. n., *available at* http://www.uscourts.gov/rules/proposed0809/BK_Rules_Forms_Amendments.pdf (accessed Dec. 29, 2009).

3

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PREMIER INTERNATIONAL HOLDINGS, | ) | Case No. 09-12019 (CSS) |
| Inc., et al. | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | Re Docket No. 1283 |
| | ) | |

## OPINION[1]

Daniel J. DeFranceschi
L. Katherine Good
Zachary I. Shapiro
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
    -and-
Paul E. Harner
Steven T. Catlett
Christian M. Auty
Paul, Hastings, Janofsky
& Walker LLP
191 North Wacker Drive, 30th Floor
Chicago, IL 60606

Counsel for Debtors and
Debtors in Possession

Laura Davis Jones
Timothy P. Cairns
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
    -and-
Edward S. Weisfelner
Andrew Dash
Neal A. D'Amato
Brown Rudnick LLP
Seven Times Square
New York, NY 10036
    -and-
Steven B. Levin
Jeremy B. Coffey (Argued)
One Financial Center
Boston, MA 02111

Counsel for the Official Committee of
Unsecured Creditors of the Debtors

Dated: January 20, 2010

Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

1

Howard A. Cohen
Drinker Biddle & Reath LLP
1100 North Market Street, Suite 1000
Wilmington, DE 19801
    -and-
Ira S. Dizengoff
Abid Qureshi (Argued)
Shaya Rochester
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036

Counsel to the SFO Noteholders
Informal Committee

Bonnie Steingart
Fried, Frank, Harris, Shriver
& Jacobson LLP
One New York Plaza
New York, New York 10004

Counsel to Fidelity Management
& Research Co.

## INTRODUCTION

The issue before the Court is whether an "informal committee" of bondholders in this case is a "committee representing more than one creditor" under Rule 2019 of the Federal Rules of Bankruptcy Procedure. If so, the members of the informal committee would be subject to the disclosure requirements set forth in that rule.

Under the plain meaning of the rule's language, such a group is not a "committee representing more than one creditor" and, thus, its members need not make the disclosures required by Rule 2019. In addition, the legislative history behind Rule 2019 and its predecessor, Rule 10-211 under Chapter X of the Bankruptcy Act, supports the Court's interpretation based upon plain meaning. In so ruling, the Court respectfully declines to follow the holding in two recent cases addressing the virtually identical question: *In re Washington Mutual, Inc., et al.*, 419 B.R. 271 (Bankr. D. Del. 2009); and *In re Northwest Airlines Corp., et al.*, 363 B.R. 701 (Bankr. S.D.N.Y. 2007).

2

## JURISDICTION

This Court has subject matter jurisdiction under 28 U.S.C. § 1334(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409(a). This is a core proceeding under 28 U.S.C. §157(b)(2).

## STATEMENT OF FACTS

### I.   The Debtors And Their Capital Structure

The Debtors filed Chapter 11 on June 13, 2009. They own and operate 20 amusement parks throughout North America, 18 of which operate under the well-known "Six Flags" name. For purposes of the motion before the Court, the ownership and debt structure is simple.[2]

Six Flags, Inc. ("SFI") is the corporate parent. SFI owns Six Flags Operations Inc. ("SFO"), which, in turn, owns Six Flags Theme Parks, Inc. ("SFTP"). SFI is a holding company. The Debtors conduct virtually all of their operations through SFO. SFTP owns, either directly or indirectly, all of the Debtors' theme parks.

As of September 30, 2009, the Debtors had approximately $2.42 billion in aggregate debt plus approximately $39 million in unsecured trade debt. The Debtors' secured debt totals approximately $1.1 billion. SFTP is the borrower under the secured facility and SFO is a guarantor. SFI is not a guarantor of the secured debt.

---

[2] Of course, in reality, it is much more complex. These findings of fact are purposefully simplified and are made solely for purposes of deciding the motion before the Court.

SFO issued approximately $400 million in notes (the "SFO Notes"). SFI, in turn, is the issuer of approximately $870 million in notes (the "SFI Notes"). In addition, SFI is a guarantor of the SFO Notes.

## II.    The Committees

There are three committees involved in this case. The Official Committee of Unsecured Creditors (the "Official Committee") was formed in June, 2009. As set forth more fully below, the Official Committee has opposed both the Initial Plan and the Revised Plan.

The Informal Committee of SFO Noteholders was formed in early September, 2009, although its largest member, Avenue Capital Management II, L.P. ("Avenue"), had been active in the case from its inception. The members of the Informal Committee of SFO Noteholders hold approximately 95% of the outstanding SFO Notes. Both Avenue and the Informal Committee of SFO Noteholders have opposed the Initial Plan and support the Revised Plan.

The *Ad Hoc* Committee of SFI Noteholders was formed in early October, 2009. At last count, its members hold approximately 67% of the outstanding SFI Notes. The *Ad Hoc* Committee of SFI Noteholders has opposed the Initial Plan and the Revised Plan.

## III.    The Course Of Events

From 1998 through 2005, the Debtors amassed over $2.4 billion in debt. Commencing in late 2005, the Debtors began attempting to deleverage their balance sheet. The Debtors achieved limited success but, by early 2009, it became clear more significant action was needed. In Spring, 2009, the Debtors were negotiating with their

4

major creditors, including Avenue Capital Management II, L.P. ("Avenue"). Avenue was and is a participant in the pre-petition secured facility, the largest holder of the SFO Notes, and a significant holder of the SFI Notes. The Debtors and Avenue were attempting to reach an agreement for a pre-negotiated Chapter 11 in which the SFO Notes would be converted into the bulk of the equity in the reorganized debtors and the pre-petition secured facility would be reinstated. Unfortunately, negotiations between the Debtors and Avenue reached an impasse.

Immediately thereafter, the Debtors switched horses and entered into a plan support agreement with the "Participating Lenders" under the secured facility. Pursuant to the plan support agreement, in July, 2009, the Debtors filed their Initial Plan. Under the Initial Plan, the holders of the Debtors' secured debt were to convert their claims into 93% of the equity in reorganized SFI and a new term loan in the amount of $600 million. The holders of allowed unsecured claims against SFO, including the SFO Noteholders, were to receive 6% of the equity in reorganized SFI. The holders of allowed unsecured claims against SFI, including the SFI Noteholders, were to receive 1% of the equity in reorganized SFI. The Initial Plan was opposed by all three committees.

From September through November, 2009, the Debtors continued their negotiations with Avenue and the Informal Committee of SFO Noteholders. Those negotiation resulted in the Revised Plan. Under the Revised Plan, the holders of the Debtors' secured debt would be paid in full in cash out of the proceeds of: (i) an exit term loan in the amount of $650 million; and (ii) a rights offering in the amount of $450

5

million. The rights offering would be available to holders of allowed unsecured claims against SFO, including the SFO Noteholders, provided such holder votes in favor of the Revised Plan and is an accredited investor. Avenue has agreed to "back stop" the rights offering, i.e., pay the shortfall, in the event that the Debtors fail to raise the full $450 million. Ultimately, the participants in the rights offering will receive approximately 70% of the equity in reorganized SFI.

Apart from the rights offering, the holders of allowed unsecured claims against SFO, including the SFO Noteholders, will convert their claims into approximately 23% of the equity in reorganized SFI. The holders of allowed unsecured claims against SFI, including the SFI Noteholders, will convert their claims into approximately 7% of the equity in reorganized SFI. The Revised Plan is supported by the Informal Committee of SFO Noteholders and opposed by both the Official Committee and the *Ad Hoc* Committee of SFI Noteholders. A confirmation hearing on the Revised Plan is scheduled for March, 2010.

## IV.    The Motion To Compel

On December 29, 2009, the Official Committee filed the Motion Of The Official Committee Of Unsecured Creditors To Compel The SFO Noteholders Committee To Comply With Federal Rule Of Bankruptcy Procedure 2019 (the "Motion to Compel"). Through the Motion to Compel, the Official Committee seeks an order compelling the members of the Informal Committee of SFO Noteholders to comply with Rule 2019 by disclosing the amount of each of their respective claims (current and previously held) against each debtor, the dates such claims were acquired, the amounts paid for the

6

claims, and the dates and circumstances of any subsequent disposition of the claims. The Official Committee further requests that, unless and until the disclosures are made, the Court bar the participation of the Informal Committee of SFO Noteholders in this case. The Official Committee has not filed a similar motion requesting disclosures by the *Ad Hoc* Committee of SFI Noteholders.

In support of the Motion to Compel the Official Committee argues that the rule should be "strictly enforced" to require the requested disclosure. In addition, the Official Committee argues that enforcement of Rule 2019 is essential under the facts and circumstances of this case.

> Here, the SFO Noteholders Committee has affirmatively chosen to assume a central role in these cases; first seeking to terminate exclusivity to propose their own plan, and then striking a deal whereby the Debtors adopted and agreed to champion the SFO Plan. The Committee believes the Debtors' complicity in pushing the SFO Plan is based, at least in part, on the Debtors' acceptance of contemporaneous representations by the SFO Noteholders Committee that it represented the interests of holders of SFI Notes. And while the SFO Noteholders Committee has failed to disclose to the court prior holdings and dispositions of SFI Notes, the Committee believes the members of the SFO Noteholders Committee were engaged in transactions to save themselves from the negative treatment they were negotiating to impose on SFI Notes under the SFO Plan. At the same time the Debtors' management was failing to protect the rights of SFI Noteholders, the SFO Noteholders Committee was apparently securing management support through offers of continued employment and significant ownership stakes in the to-be-reorganized companies.

> Given the central role of the SFO Noteholders Committee has chosen to play in these cases, and the likely role it will play in trying to force confirmation of the SFO Plan over the objections of the committee and other unsecured creditors, it is critical for the Court and the Committee to be able to fairly evaluate the SFO Noteholder[s] Committee's credibility and motives in these cases, including through an understanding of: (a) the financial incentives created through debt holdings at multiple levels of the Debtors' capital structure; (b) the veracity of claims to have been acting consistent with the interests of

holders of SFI Notes during the negotiation of the SFO Plan; and (c) the securing of the Debtors' acquiescence to the SFO Plan through benefits promised to senior management.[3]

The Informal Committee of SFO Noteholders opposed the Motion to Compel and the Court held a hearing on January 8, 2010. At the conclusion of the hearing, the Court ruled from the bench, setting forth its reasoning and denying the Motion to Compel. On January 11, 2010, the Court entered an order denying the Motion to Compel and indicating that the Court would issue an opinion further explaining the basis for its ruling.

## ANALYSIS

I.    **Under The Plain Meaning Of Rule 2019 Of The Federal Rules Of Bankruptcy Procedure The SFO Noteholders Informal Committee Is Not A "Committee Representing More Than One Creditor."**

### A.    Statutory Interpretation

"[C]ontemporary Supreme Court jurisprudence establishes that the purpose of statutory interpretation is to determine congressional intent."[4] To that end, the starting point is to examine the plain meaning of the text of the statute or rule.[5] As the Supreme Court observed in *Hartford Underwriters Ins. Co. v. Union Planters Bank*, "when a statute's language is plain, the sole function of the courts, at least where the disposition by the

---

[3] Motion Of The Official Committee Of Unsecured Creditors To Compel The SFO Noteholders Committee To Comply With Federal Rule Of Bankruptcy Procedure 2019 [D.I. 1283], pp. 9-10.

[4] Hon. Thomas F. Waldron and Neil M. Berman, *Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA*, 81 AM. BANKR. L.J. 195, 211 (2007).

[5] *Id.* at 229 ("Statutory analysis . . . must start with the text at issue to determine if its meaning can be understood from the text."). *See also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").

text is not absurd, is to enforce it according to its terms."[6]    Additionally, the Supreme

Court has repeatedly stated that "[t]he United States Congress says in a statute what it

means and means in a statute what it says there."[7]

Notwithstanding the foregoing, applying the plain meaning of the statute or rule

is the default entrance – not the mandatory exit.[8]    If the text is ambiguous, the Court

must use other canons of statutory construction, including legislative history where

available.[9]    Moreover, regardless of whether the text is plain or ambiguous, it is

appropriate to identify, if possible, a congressional purpose consistent with the Court's

interpretation.[10]

## B.    The Provisions of Rule 2019 of the Federal Rules of Bankruptcy Procedure

In Chapter 11 cases, Rule 2019 of the Federal Rules of Bankruptcy Procedure

requires every "committee representing more than one creditor or equity security

---

[6] *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 7 (2000). *See also United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989); *Caminetti v. United States*, 242 U.S. 470, 485 (1917) ("It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.").

[7] *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting *Connecticut Nat. Bank*, 503 U.S. at 254).

[8] Waldron and Berman at 232.

[9] *See Price v. Delaware State Police Fed. Union (In re Price)*, 370 F.3d 362, 369 (3d Cir. 2004) ("Thus, ambiguity does not arise merely because a particular provision can, in isolation, be read in several ways or because a Code provision contains an obvious scrivener's error.  Nor does it arise if the ostensible plain meaning renders another provision of the Code superfluous.  Rather, a provision is ambiguous when, despite a studied examination of the statutory context, the natural reading of a provision remains elusive. In such situations of unclarity, 'where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived,' including pre-Code practice, policy, and legislative history.") (internal citations omitted).

[10] *Lamie v. U.S. Trustee*, 540 U.S. 526, 539 (2004) ("Though we find it unnecessary to rely on the legislative history behind the 1994 enactment of § 330(a)(1), we find it instructive that the history creates more confusion than clarity about the congressional intent. History and policy considerations lend support both to petitioner's interpretation and to the holding we reach based on the plain language of the statute.").

holder. . ."[11] to file a verified statement containing certain disclosures.[12]   The rule requires each member of a committee to disclose:

(1) the member's name and address;

(2) the nature and amount of the member's claim or interest and the time of acquisition thereof;

(3) the name or names of the entity or entities at whose instance, directly or indirectly, the committee was organized or agreed to act; and

(4) with reference to the organization or formation of the committee, the amounts of claims or interests owned by the members of the committee, the times when acquired, the amounts paid therefor, and any sales or other disposition thereof.[13]

In the event that the Court determines that there has been a failure to make the required disclosures, the court may (1) refuse to permit the committee to be heard further or to intervene in the case; (2) examine any representation provision of a deposit agreement, proxy, trust mortgage, trust indenture, or deed of trust, or committee or other authorization, and any claim or interest acquired by any committee in contemplation or in the course of a case under the Code and grant appropriate relief; and (3) hold invalid any authority, acceptance, rejection, or objection given, procured,

---

[11] The rule also applies to any indenture trustee (unless otherwise ordered by the Court) as well as any entity representing more than one creditor or equity security holder.

[12] Fed.R.Bankr.P. 2019(a).

[13] *Id.*

or received by a committee who has not complied with this rule or with § 1125(b) of the Code.[14]

### C. The Plain Meaning Of "A Committee Representing More Than One Creditor."

The question here is whether the SFO Noteholders Informal Committee is "a committee representing more than one creditor." If so, its members are subject to Rule 2019. The starting point of the analysis or "default entrance" is plain meaning.[15]

A "committee" is a "body of two or more people *appointed* for some special function by, and usu. out of a (usu. larger) body."[16] The use of the word "appointed" clearly contemplates some action be taken by the larger body.[17] Thus, a *self-appointed* subset of a larger group - whether it calls itself an informal committee, an *ad hoc* committee, or by some other name – simply does not constitute a committee under the plain meaning of the word. In order for a group to constitute a committee under Rule 2019 it would need to be formed by a larger group either by consent, contract or applicable law -- not by "self-help." This construct is supported by the rule's applicability to indenture trustees, which are delegated with certain rights and obligations on behalf of all holders of the debt *by operation of contract, i.e., the indenture.* Similarly, official committees under section 1102 of the Bankruptcy Code (although exempted from Rule 2019) receive their authority *from federal law, i.e., the Bankruptcy Code.*

---

[14] Fed.R.Bankr.P. 2019(b).

[15] Waldron and Berman at 232.

[16] I OXFORD SHORTER ENGLISH DICTIONARY 464 (6th ed. 2007) (emphasis added).

[17] "Appoint" means "[a]ssign or grant authoritatively (a thing to a person)." *Id.* at 104.

The meaning of "represent" is: "take the place of (another); be a substitute in some capacity for; act or speak for another by a deputed right."[18]  A deputed right is one that is assigned to another person.[19]  Thus, the plain meaning of "represent" contemplates an active appointment of an agent to assert deputed rights.  It is black letter law that a person cannot establish itself as another's agent such that it may bind the purported principal without that principal's consent unless the principal ratifies the agent's actions.[20]

Thus, under the plain meaning of the phrase "a committee representing more than one creditor," a committee must consist of a group representing the interests of a larger group with that larger group's consent or by operation of law.  As the SFO Noteholders Informal Committee does not represent any persons other than its members either by consent or operation of law, it is not a "committee" under Rule 2019 and, thus, its members need not make the disclosures required under the rule.

Although the Court's determination of the plain meaning of the text is determinative, it is appropriate to review the legislative history of Rule 2019 as a "reality check" on the Court's interpretation of the rule.[21]

---

[18] II OXFORD SHORTER ENGLISH DICTIONARY 2537.

[19] I OXFORD SHORTER ENGLISH DICTIONARY 652.

[20] Restatement (Third) of Agency §§ 1.01, 1.02, 3.01, 3.03, 4.01 and 6.11 (2006).

[21] *Lamie*, 540 U.S. at 539.

II.    **The Legislative History Of Rule 2019 Of The Federal Rules Of Civil Procedure Supports The Holding That The SFO Noteholders Informal Committee Is Not A "Committee Representing More Than One Creditor" Under The Rule.** [22]

Rule 2019 was promulgated in connection with the adoption of the Bankruptcy Code in 1978. For all intents and purposes, it is identical to Rule 10-211 under former Chapter X of the Bankruptcy Act. Rule 10-211 itself was adopted as part of an extensive overhaul of corporate reorganization practice in the 1930's. At first blush, the legislative history appears to support holding that the SFO Noteholders Official Committee is, indeed, a "committee representing more than one creditor." However, upon a careful review of the facts and circumstances leading to the rule's adoption as well as its intended purpose, it is clear that the informal and *ad hoc* committees *as they exist today* are very different from the "protective committees" that were the target of the reforms in the 1930's. Thus, the legislative history supports the Court's finding based upon the plain meaning of Rule 2019.

A.    **Equity Receiverships**

(1)    **Overview**

Although the applicable legislative history occurred over 70 years ago with the adoption of Rule 10-211, to understand Congress's action one must go back even further to the equity receivership practice that began in the 1890's.

Corporate reorganization as we know it today has its genesis in the railroad failures of the late 19th century. The periodic collapse of the railroads led to the first

---

[22] This recitation relies *heavily* on three books: DAVID A. SKEEL, JR., DEBT'S DOMINION: A HISTORY OF BANKRUPTCY LAW IN AMERICA (2001), DOUGLAS G. BAIRD, ELEMENTS OF BANKRUPTCY (4th ed. 2006); and JACOB I. WEINSTEIN, THE BANKRUPTCY LAW OF 1938: THE CHANDLER ACT (1938).

true reorganizations, which were called equity receiverships. Because the railroads were the nation's first large corporations, the courts did not have any existing mechanism in place for dealing with a railroad failure. As a result, reorganizers and courts cobbled together a new device from two powers that did have an established common-law pedigree: the courts' equitable authority to appoint receivers to preserve the value of a debtor's property; and the right of a mortgage holder to foreclose on mortgaged property if the debtor defaults.

The "classic" equity receiverships involved railroads whose tracks crossed several state lines, and which had issued common stock, preferred stock, and several different mortgage bonds to raise money over the years. Typically, the mortgage bonds were secured by different segments of the railroad. If the railroad encountered financial distress and failed to make the requisite interest payments on its bonds, a creditor would first file a "creditor's bill" asking the court to appoint a receiver to oversee the defaulting railroad's property. The principal reason for appointing a receiver was that putting the receiver in place technically shifted control of the railroad's assets to the receiver and out of the reach of prying creditors. If a creditor tried to obtain a lien against railroad property, for instance, the receiver would simply ask the court for an injunction.

The next step was to file a second "bill," the foreclosure bill. In form, the foreclosure bill asked the court to schedule a sale of property. In reality, the sale would be put off for months, often years, while the parties negotiated over the terms of a reorganization plan.

14

In the meantime, the investment banks that had underwritten the railroad's bonds would quickly form a *"protective committee"* to represent bondholders in the negotiations. If the firm had issued more than one class of bonds, several committees might be formed; and there might also be committees of common stockholders and preferred stockholders. The virtue of forming a committee was that it centralized the bargaining process and theoretically gave thousands of widely scattered bondholders a champion.

To ensure their authority, the committee representatives asked investors to "deposit" their bonds (or stock, for a stockholders committee) with the committee. By depositing their bonds investors gave the committee complete control over the bonds for the duration of the negotiations with one limitation, bondholders would have the right to withdraw their bond if they disapproved of the plan that the committee negotiated on their behalf.

The goal of the negotiations was to rework the railroad's capital structure, reducing its obligations so that it could get back on track financially after the receivership. Once there was an agreement on a plan, the committees were combined to form a single committee called the *reorganization committee*. It was the reorganization committee that purchased the railroad's assets at the foreclosure sale. Since the reorganization committee had all of the deposited securities at its disposal and could bid the face value of the securities as a substituted for cash, no one else bothered to bid at the auction.

As soon as the reorganization committee purchased the assets, it transferred them to a shell corporation that had been set up for just this purpose. The stock and other securities of the new corporation were then distributed to the old investors on the terms laid out in the reorganization plan.

### (2)   The Problem Of Insiders And Holdouts

The equity receivership process was an extremely clever adaptation of common law principles to a previously nonexistent problem. It resulted in an efficient reorganization of railroads and other corporations but it had at least two serious, related problems. First, the process was controlled by and for the benefit of insiders. Second, there was unequal treatment of holdouts.

The committees controlling the reorganization process were generally dominated by Wall Street investment firms working in concert with existing management. Dissenting creditors and stockholders had virtually no ability to participate in the process let alone to thwart the proposed reorganization. Moreover, the return for consenting creditors, i.e., committee members and depositors, was superior to that of non-consenting creditors.

Consider an example where the bondholders who did not participate through one of the committees would receive ten cents on the dollar, while those who did participate would get fifty cents on the dollar. The response of the committees to any complaint of disparate treatment was that the dissenters could have chosen to receive fifty cents on the dollar by depositing their bonds with the protective/reorganization committee. The dissenters would argue, in turn, that the reorganization imposed by the

committees forced the dissenters to choose between the lesser of two evils. Either their claims would be cashed out at ten cents on the dollar at a fictitious foreclosure sale or they would have to submit to whatever terms the committees dictated. None of the individual bondholders had enough of an investment in the railroad to go through the effort necessary to keep the committees from doing whatever they pleased. As a result, insiders remained in control of the process and ended up in control of the railroad.

In response, courts started setting "upset prices" for foreclosure sales in railroad reorganizations. The upset price was the lowest bid a court would accept at the sale. If the bid or bids came in under this amount, the court would simply prohibit the sale from going through. In theory, dissenting investors were the ones who benefited, since the upset price assured them that they would receive no less than their share of the specified amount. But, the courts were concerned that if the upset price were too high it would make reorganization more difficult. As a result, they set the upset prices extremely low, often at 10 to 80 percent less than the current market value of the bonds. The effect of the upset price was to force nearly everyone to agree to the reorganization, since the upset price was an unattractive alternative.

B.    The SEC Report

In 1933 and 1934, respectively, Congress codified the equity receivership process for railroads[23] and corporations.[24] Much to the chagrin of critics, the law, did not address what they perceived to be the improper dominance of "protective committees"

---

[23] Act of March 3, 1933, chap. 204, 47 Stat. 1474 (1933).

[24] Act of June 7, 1934, chap. 424, 48 Stat. 211 (1934).

17

controlled by insiders and Wall Street. The seeds of reform, however, were planted in an obscure provision of the Securities Exchange Act of 1934, which instructed the SEC to investigate and to report on the protective committees.[25]

Future Justice William Douglas, who was very critical of the existing equity receivership practice recently codified by Congress, was appointed to conduct the investigation and report its results. It was widely known at the time that receivership proceedings were dominated by the Wall Street investment bankers who set up and ran the protective committees used to effect a reorganization. It was not so much their dominance that drew the reformers' ire, though this surely was contributing factor, as the extent to which the bankers and lawyers seemed to further their own interests rather than those of their clients. In 1937, the SEC issued its four-volume report, which attacked the Wall Street banks and bankruptcy bar at every turn.

For example, the report asserted that the bankers paid themselves generous fees for running the reorganization, including a substantial underwriting fee when the firm used new securities to its old investors. In addition, the report noted that lawyers received their fees before anyone else was paid, and, because the cases sometimes lasted several years, those fees might run to millions of dollars.[26] The report also asserted that bankers and lawyers were compromised by their relationship, which usually predated bankruptcy, with the managers of the troubled firm. Rather than vigorously pursuing

---

[25] Securities Exchange Act of 1934, Public Law No. 73-291, sec. 211, 48 Stat. 881, 909 (1934).

[26] In 1937, $10 million was worth approximately $150 million in today's dollars.

18

litigation against managers who had mismanaged the firm the bankers and lawyers simply "looked the other way."[27]

The SEC's attack resonated deeply at a time when much of the public viewed Wall Street with suspicion. The SEC report concluded that ousting managers in favor of an independent trustee and curbing the role of Wall Street professionals was necessary to loosen Wall Street's stranglehold on large-scale corporate reorganization. The criticisms in the SEC Report of the long-standing equity receivership practice that was codified by Congress in 1933 and 1934 bore fruit in the Chandler Act of 1938.[28]

### C.    The Chandler Act of 1938 and Rule 10-211

The Chandler Act was passed in 1938 after strong lobbying in its favor by the SEC and William Douglas (then Chairman of the SEC) in particular. The result was a seismic change in corporate reorganization – the adoption of Chapter X of the Bankruptcy Act.

---

[27] Two examples of the criticism described by Professor Skeel in *Debt's Dominion* were:

> 'Management and bankers seek perpetuation of [their] control for the business patronage it commands,' the report complained. 'which they take themselves or allot to others, as they will. They seek also to perpetuate the control in order to stifle careful scrutiny of the past history of the corporation. Thereby, claims based on fraud or mismanagement are stilled.'
>
> * * *
>
> '[C]ounsel fees frequently constitute the largest single item on the list of reorganization fees,' the report noted. 'The vice is that the bar has been charging all that the traffic will bear. It has forsaken the tradition that its members are officers of the court, and should request and expect only modest fees.'

Skeel, ch. 4 at 111.

[28] Act of June 22, 1938, chap. 575, 52 Stat 840 (1938). Interestingly, Congress did not amend the codified equity receivership system for railroads.

The purpose of the Chandler Act was succinctly stated by a member of its drafting committee.

> *The outstanding innovations in chapter X are concerned with . . . the elimination of the domination of management and self-serving inner groups.* Congressional investigation and the exhaustive researches of the Commission have uncovered and focused attention upon many abuses inherent in such domination and control. New machinery has been designed to eliminate the control of the reorganization proceeding by management and underwriters, and to vest such control in the actual parties in interest-the creditors and stockholders. Provision has been made for searching examinations into the past activities of management and underwriters, also the dissemination of authentic information, the democratization of the formulation of plans, the scrutiny, supervision and control by the court of the formulation, consideration and submission of plans for acceptance, the regulation of the representation of creditors and stockholders, and the more active participation of the indenture trustee.[29]

The defining element of Chapter X was the mandatory appointment of a trustee in any case where the liabilities exceeded $250,000.[30] Unlike the equity receivership process where management continues to operate the business and the banks operate the reorganization, the business and the bankruptcy case were turned over to the trustee. Chapter X also put the power to formulate a reorganization plan squarely in the hands of the trustee – not the creditors.[31]

Neither the company's bankers nor its attorneys were eligible to serve as the trustee, who was required to be "disinterested."[32] The definition of disinterested specifically excluded underwriters of the debtor's securities.[33] In addition, attorneys

---

[29] WEINSTEIN at 192 (emphasis added).

[30] Chapter X, § 156.

[31] *Id.* at §§ 167 and 169.

[32] *Id.* at § 156.

[33] *Id.* at § 158.

were similarly required to be disinterested.[34]   These provisions were clearly targeted at Wall Street banks and their lawyers.   Critics complained that the law ensured that the process and the business would be run by someone who knew nothing of the debtor's business.

In addition to the power it vested in the mandatory trustee, the new law included a variety of other measures aimed at the Wall Street banks.   One source of the bankers' influence had been their informational advantage.   As the underwriter of a debtor's securities, the firm's bank knew who all of its security holders were and, as a result, had an enormous head start when it came time to organize a protective committee on their behalf.   The underwriter had a list (or could easily compile one) of all the investors who held a class of bonds it had underwritten.   If the corporation ran into trouble, the bank knew whom to contact and how to contact them as it tried to round up investors to form a protective committee.   Lacking this access, outside groups faced a substantial disadvantage if they wished to set up a competing committee.   By refusing to share the list, banks made it very difficult for their competition.   The new law cut through this arrangement by authorizing the court to insist that the bankers divulge the list.[35]

Even more dramatic were the new requirements for soliciting votes on a reorganization plan.   Chapter X prohibited anyone from soliciting either the acceptance of a plan, or the right to accept a plan, until *after* the court entered an order approving

---

[34] *Id.*

[35] *Id.* at § 165.

the plan in question.[36]  To appreciate how dramatically this altered the traditional process, recall that the whole point of the protective committee process had been to "solicit . . .the right to accept a plan" by lining up "deposits" before the bargaining began.  Under long-standing practice, the bank would contact the troubled firm's outstanding bondholders and ask them to deposit their securities with a protective committee.  If one deposited the bonds, the bondholder was giving the protective committee the right to accept a reorganization plan on her behalf.  In effect, Chapter X completely reversed the timing of the process.  Whereas the protective committee approach assumed that security holders would commit to the process first and that the parties *then* would negotiate the terms of the reorganization, the new law required that the plan be proposed and approved by the court before anyone could commit to it.[37]  As a result, nothing the Wall Street banks might do before bankruptcy could have any effect.

Included in the reforms was the adoption of section 211 of Chapter X, which provides:

> Every person or committee, representing more than twelve creditors or stockholders, and appearing in the proceeding, and every indenture trustee appearing in the proceeding, shall  file a sworn statement containing –
>
> (1)    a copy of every instrument under which any such representative is empowered to act on behalf of creditors or stockholders;
>
> (2)    the pertinent facts and circumstances in connection with the employment of such person or indenture trustee, and, in the

---

[36] *Id.* at §§ 174-176.

[37] *Id.*

case of a committee, the names of the persons who, directly or indirectly, arranged for such employment or at whose instance, directly or indirectly, the committee was organized or formed or agreed to act;

(3)     the amounts of claims or stock owned by such person, the members of such committee or such indenture trustee, when acquired, the amounts paid therefor, and any sales or any other disposition thereof, at or about the time of such employment of such person or the organization or formation of such committee or the appearance of the indenture trustee;

(4)     the claims or stock represented by such person or committee and the amounts thereof, a statement that each holder acquired his holding more than one year before the filing of the petition, otherwise, the time of acquisition.[38]

Rule 10-211 was adopted to implement section 211 by requiring disclosure relating to the solicitation and formation of protective committees. For example, subsection (a)(1) and (2) require disclosure of the committee members and their holdings, i.e., exactly who are the creditors controlling the reorganization. Subsection (a)(3) requires disclosure of the person or persons behind the formation of the committee – most likely a Wall Street bank and its lawyers. Subsection (a)(4) requires disclosure of the members' trading activity and the details of the deposit arrangement by which the committee obtained sufficient clout to control the process. Similarly, the remedy section of the rule was designed to enforce the new limitations on solicitation by Wall Street banks.[39] In short, Rule 10-211 was one of the procedural mechanisms for implementing and enforcing the strict limitations imposed on protective committees by the Chandler Act.

---

[38] *Id.* at § 211.

[39] Section 211 did not specifically provide for a violation of its terms.

The practical result of the adoption of the Chandler Act was as its critics predicted - the virtual cessation of corporate reorganization in bankruptcy. Within a few years, the Wall Street banks and their capital had exited the field. Cases under Chapter X were few and far between for the next 40 years. What reorganization activity that did exist was usually done under Chapter XI (designed for small businesses) because that chapter did not require the appointment of a trustee.

**D.   Rule 2019**

Corporate reorganization was, once again, overhauled in 1978. Some of the concepts and policies from the Chandler Act were adopted in the Bankruptcy Code. The mixture in the new Bankruptcy Code of elements of the old equity receivership practice, Chapter X and XI of the Bankruptcy Act, and brand new concepts led to some inconsistencies in the new law and rules. Among those was the adoption of old Rule 10-211 as Rule 2019 of the Federal Rules of Bankruptcy Procedure.

Notwithstanding the significant changes between Chapter X of the Bankruptcy Act and Chapter 11 of the Bankruptcy Code, Rule 2019 was adopted almost whole cloth from Rule 10-211. Set forth below is the text of Rule 10-211 marked to show the changes made upon its adoption as Rule 2019.

(a) Data required

~~Every person~~In a chapter 9 municipality or chapter 11 reorganization case, except with respect to a committee appointed pursuant to § 1102 or 1114 of the Code, every entity or committee representing more than one creditor or ~~stockholder,~~equity security holder and, unless otherwise directed by the court, every indenture trustee, shall file a ~~signed~~verified statement ~~with the court~~ setting forth (1) the ~~names~~name and ~~addresses~~address of ~~such creditors~~the creditor or ~~stockholder~~equity

24

security holder; (2) the nature and ~~amounts~~amount of ~~their claims~~the claim or ~~stock~~interest and the time of acquisition thereof unless ~~they are~~it is alleged to have been acquired more than one year prior to the filing of the petition; (3) a recital of the pertinent facts and circumstances in connection with the employment of ~~such person~~the entity or indenture trustee, and, in the case of a committee, the name or names of the ~~person~~entity or ~~persons~~entities at whose instance, directly or indirectly, ~~such~~the employment was arranged or the committee was organized or agreed to act; and (4) with reference to the time of the employment of ~~such person or~~the entity, the organization or formation of ~~such~~the committee, or the appearance in the case of any indenture trustee, ~~a showing of~~ the amounts of claims or ~~stock~~interests owned by ~~such person~~the entity, the members of ~~such~~the committee or ~~such~~the indenture trustee, the times when acquired, the amounts paid therefor, and any sales or other disposition thereof. The statement shall include a copy of the instrument, if any, whereby ~~such person~~the entity, committee, or indenture trustee is empowered to act on behalf of creditors or ~~stockholders.~~equity security holders. A supplemental statement shall be filed promptly, setting forth any material changes in the facts contained in the statement filed pursuant to this subdivision.

(b) Failure to comply; effect

~~The court on its own initiative or on application or~~On motion of any party in interest~~(1) may~~ or on its own initiative, the court may (1) determine whether there has been a failure to comply with the provisions of subdivision (a) of this rule or with any other applicable law regulating the activities and personnel of any ~~person~~entity, committee, or indenture trustee or any other impropriety in connection with any solicitation and, if it so determines, the court may refuse to permit that ~~any such person~~entity, committee, or indenture trustee to be heard further or to intervene in the case; (2)~~ may~~ examine any representation provision of a deposit agreement, proxy, trust mortgage, trust indenture, or deed of trust, or committee or other authorization, and any claim or ~~stock~~interest acquired by any ~~person~~ entity or committee in contemplation or in the course of a case under the ~~Act~~Code and grant appropriate relief ~~pursuant to the Act~~; and (3) ~~may~~ hold invalid any authority ~~or~~, acceptance, rejection, or objection given, procured, or received by an entity ~~person~~ or committee who has not complied with ~~subdivision (a) of~~this rule or with ~~Rule 10-304.~~ § 1125(b) of the Code.

25

As is readily apparent, there is not a single substantive difference between Rule 10-211 and Rule 2019.  Every change is made (i) to modernize style (e.g., excluding the antiquated use of "such"), (ii) to adapt to changes in definitions (e.g., changing "stock" to "interest"), or (iii) to reference the new operative provisions (e.g., inserting references to Chapters 9 and 11).

### E.   Application Of The Legislative History To Informal And *Ad Hoc* Committees Such As The SFO Noteholders Committee

The nub of the question is how the legislative history of Rules 10-211 and 2019 applies to the informal and *ad hoc* committees of today and, more specifically, the Informal Committee of SFO Noteholders.  Certainly there are parallels between the "protective committees" under equity receivership and the informal committees of today.  For example, both are usually composed of Wall Street banks and institutional investors.  Both are formed for the purpose of obtaining leverage in the reorganization that would not be available to disparate creditors.  Both are involved in the negotiation and formulation of a plan of reorganization.

The differences, however, far outweigh the similarities.  The "protective committees" that were the target of the reforms under the Chandler Act were able to control completely the entire reorganization – from inception to formulation to solicitation to implementation.  They were granted the authority to negotiate on behalf of and to bind creditors through the use of deposit agreements.  They were so intimately involved with management so as to be virtually in control of the business.  They could force disparate treatment of similarly situated creditors.  Finally, they were

able "to steal" the company for an inadequate "upset price" at a foreclosure sale by credit bidding their debt.

The informal and *ad hoc* committees of today have none of these expansive powers. Indeed, the Chandler Act so effectively curbed the power of protective committees that they virtually ceased to exist within a few years of the Act's passage. Rule 10-211 was, for all intents and purposes, superfluous almost immediately after its passage. There was nothing left to regulate.[40]

The Bankruptcy Code continues to limit the powers of committees, albeit in other ways. For example, the debtor is given exclusive authority to propose and to solicit a plan of reorganization; claims and interests may only be classified with substantially similar creditors; creditors in the same class must be treated equally; a trustee or examiner can be appointed for cause. Even if an informal committee were to try to exercise the powers formerly available to protective committees, it would be prevented by the Bankruptcy Code. Thus, Rule 2019 is also, for all intents and purpose, superfluous – the problem it was designed to address by requiring certain disclosures simply no longer exists.[41]

---

[40] This may help explain the paucity of cases related to Rule 10-211.

[41] The Court is well aware that it must be cautious in interpreting a statute such that some or all of it are a nullity. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 562, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (expressing "deep reluctance" to interpret statutory provisions "so as to render superfluous other provisions in the same enactment"). Nonetheless, the Court is compelled to reach its conclusion that Rule 2019 is superfluous based upon the extensive legislative history, the clear purpose behind the Chandler Act and Rule 10-211 and the changes implemented in the Bankruptcy Code. Moreover, the Court reiterates that the primary basis for its holding is the plain meaning of Rule 2019.

In any event, the Informal Committee of SFO Noteholders has not attempted to invoke the powers previously wielded by protective committees. Certainly, the committee has actively participated in the reorganization process both pre-petition and post-petition. The committee vigorously opposed the Debtors' Initial Plan and now vigorously supports the Revised Plan that it negotiated post-petition. But, the Informal Committee of SFO Noteholders has gone no farther. It doesn't have the ability to bind its members – they can vote any way they please. It cannot force disparate treatment of the SFO creditors. The list goes on. Based upon the legislative history, Rule 2019 is not intended to nor does it apply to the Informal Committee of SFO Noteholders in this case.

## III.   The Case Law To The Contrary Is Not Persuasive

Two separate bankruptcy courts recently addressed virtually the identical issue presented here. Those courts found that informal committees, such as the SFO Noteholders Informal Committee in this case, are "committees" under Rule 2019.

The issue was first addressed in the *Northwest Airlines* bankruptcy, in which the Court held that a self-styled *Ad Hoc* Committee of Equity Security Holders was a committee under Rule 2019.[42] The Court did not examine the plain meaning of "committee" in its analysis. Rather, it focused on the actions and representations of the *ad hoc* committee as well as the legislative history of Rule 2019.

As to the former point, the Court noted that the *ad hoc* committee repeatedly referred to itself as a committee and its members acted in concert through the

---

[42] *In re Northwest Airlines, Inc., et al.*, 363 B.R. 701 (Bankr. S.D.N.Y. 2007) ("*Northwest I*").

committee.[43]  Moreover, the Court noted that "[b]y appearing as a 'committee' . . . the members *purport* to speak for a group and *implicitly* ask the court and other parties to give their positions a degree of credibility appropriate to a unified group with large holdings."[44]

As to the latter point, i.e., legislative history, the Court discussed "the influential study in the 1930's by William O. Douglas for the Securities and Exchange Commission centered on the perceived abuses of unofficial committees in equity receiverships and the corporate reorganization."[45]

More recently, a member of this Court addressed a closely related issue in the *Washington Mutual, Inc.* (or "*WaMu*") bankruptcy.[46]  The *WaMu* Court begins its analysis by examining the plain meaning of Rule 2019.[47]  However, the issue in *WaMu* was not that considered here, i.e., whether an *ad hoc* committee could constitute a "committee" under Rule 2019.  Indeed, the *WaMu* Court assumed as much, stating that "[t]he Rule requires disclosure from any entity or *[unofficial]* committee representing more than one creditor or equity security holder."[48]  The opinion actually addresses the

---

[43] *Id.* at 703.

[44] *Id.* (emphasis added).

[45] *Id.* at 704.  *See also In re Northwest Airlines, Inc., et al.*, 363 B.R. 704, 707-8 (Bankr. S.D.N.Y. 2007) ("*Northwest II*") (examining legislative history).

[46] *Washington Mutual, Inc., et al.*, 419 B.R. 271 (Bankr. D. Del. 2009).

[47] *Id.* at 274-75.

[48] *Id.* at 274 (bracketed language in original).

related question of whether the self-styled "group" in that case was, in fact, an *ad hoc* committee."[49]  The Court decided it was and, thus, Rule 2019 was implicated.

The *WaMu* Court then turns to an endorsement of the holdings in *Northwest I* and *II*, and a recitation of the legislative history.[50]  As in *Northwest*, the Court focuses its examination of legislative history on the SEC report.  Finally, the Court notes that the Advisory Committee on Bankruptcy Rules has recommended changes to Rule 2019 to require disclosure of all types of a committee member's economic interests such as whether the committee member also holds a "short" position in the claims or equity that forms the basis for membership on the committee.[51]

This Court respectfully disagrees for a number of reasons with the holdings in these cases.  First, the *Northwest* Court did not address what this Court believes is the required analysis under the rules of statutory construction  - whether under the plain meaning of the words a self-appointed subgroup of creditors with neither the authority nor consent of the larger group constitutes a "committee" under Rule 2019.  As noted earlier, this Court holds that under the plain meaning of the rule such a group is not a "committee."[52]  The *WaMu* Court, in turn, does not specifically analyze whether an *ad*

---

[49] *Id.* at 275 ("[T]he Court finds that although the WMI Noteholders Group call themselves a Group, they are in fact acting as an *ad hoc* committee . . .").

[50] *Id.* at 275-79.

[51] *Id.* at 279-80.

[52] *Supra* at 8-12.

*hoc* committee is a "committee" under the rule but, rather, assumes that it is. Thus, *WaMu* is not applicable to the issue before this Court.[53]

Second, as discussed above, this Court disagrees with its sister Court's interpretation of the legislative history of Rule 2019. A thorough examination of the history surrounding the adoption of Rule 2019's predecessor, Rule 10-211, reveals the flaw in the parallel drawn by those Courts between the "protective committees" of the 1930's and the "informal" and *ad hoc* committees prevalent in today's reorganization practice.[54]

Third, this Court believes it is a mistake to focus on the conduct and role of the *ad hoc* committee to determine whether it is a committee under Rule 2019. Rule 2019 is a prophylactic rule designed to provide information to the Court and others at the inception of a case to preserve the integrity of the reorganization process to follow. It is turning the rule on its head to await events before determining whether to require disclosures that were meant to be made prior to the occurrence of these events. Any definition of "committee" under Rule 2019 must be sufficiently clear and objective so as to require its applicability from the inception of the case or the primary purpose of the rule will be frustrated.

The problem of awaiting developments before determining (if at all) that an informal or *ad hoc* committee is a "committee" under the rule is illustrated by the facts in this case. Here, the Official Committee, by filing its motion, is clearly engaged in a

---

[53] Notwithstanding the conclusion that *WaMu* is inapplicable, the Court will continue to analyze the case.

[54] *Supra* at 13-28.

litigation tactic to apply pressure on it current adversary, the Informal Committee of SFO Noteholders, as well as attempting to make an "end run" around a previous ruling denying the Official Committee's request for discovery seeking virtually the same information.    This conclusion is made self-evident by the fact that the Official Committee has not sought application of Rule 2019 to its current ally, the *Ad Hoc* Committee of SFI Noteholders.

Fourth, the *Northwest* Court held that Rule 2019 is applicable where an *ad hoc* committee has appeared in a case as "the formal organization of a group of creditors holding similar claims, who have elected to consolidate their collection efforts . . ." [55] The Court than applied this holding to the *ad hoc* committee at issue.[56] Nonetheless, the committee in the *Northwest* case was not formally organized.[57] The *Northwest* Court held, in effect, that all *ad hoc* committees qualify as "committees' under Rule 2019. This ignores the requirement of formal organization set forth in *Wilson*.[58] There is nothing formal in a legal sense in an *ad hoc* or informal committee. As discussed above, a formal committee requires the consent of the governed either by contract or operation of law. In no way can a group *purporting* to speak on behalf of others and *implicitly* requesting third parties to treat them as a representative of the larger group, be considered a "formal" committee.

---

[55] *Northwest I*, 363 B.R. at 703 (quoting *Wilson v. Valley Electric Membership Corp.*, 141 B.R. 309, 314 (E.D. La. 1992)).

[56] *Id.* ("That is exactly the situation in this case . . .").

[57] *Id.* at 701-02.

[58] *Wilson*, 141 B.R. at 314.

32

Finally, the *WaMu* Court identifies in support of its holding a proposed change to Rule 2019 to expand the required disclosure based the possibility that a creditor may hold other economic interests such that the creditor, while purporting to act on behalf of other similarly situated creditors, would have an incentive to work against the interest of those creditors.[59]    While noting that the problem of perverse incentives and hidden agendas could apply to any creditor, the *WaMu* Court was clearly most concerned with the operation of informal and *ad hoc* committees.

> [T]he unique problems associated with collective action by creditors through *ad hoc* committees or groups requires disclosure for those groups in particular. Collective action of creditors through the use of an *ad hoc* committee or group is a form of leverage, wherein the parties utilize other group members' holdings to obtain a greater degree of influence on the case. This enables theoretically better returns than if creditors were to act individually in a case. This is especially true, for example, where a group or committee controls one-third of a class of claims, which might allow the group to block confirmation of a plan.[60]

The existence of a proposed rule expanding the disclosures required of those already subject to the rule is of no moment with regard to whether the rule applies in the first place.  Moreover, this Court believes that there is nothing neither nefarious nor problematic, in and of itself, in disparate parties banding together to increase their leverage.  Indeed, enabling such is one of the primary rationales for the existence of the Bankruptcy Code.

Thus, with the utmost respect, this Court disagrees with the holdings in *Northwest* and *WaMu*.

---

[59] *WaMu*, 419 B.R. at 279-80.

[60] *Id.* at 280.

33

## CONCLUSION

For the foregoing reasons, by Order of the Court dated January 11, 2010, the

Court denied the Motion of the Official Committee of Unsecured Creditors to Compel

the SFO Noteholders Committee to Comply with Federal Rule of Bankruptcy Procedure

2019.