WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU-2297)
J. Christopher Shore (JS-6031)
Andrew Hammond (AH-0415)

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | ) Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al., | ) Case No. 08-13555 (JMP) |
| Debtors. | ) (Jointly Administered) |

**LIMITED OBJECTION OF THE AD HOC GROUP OF**
**LEHMAN BROTHERS CREDITORS TO THE DEBTORS'**
**MOTION TO APPROVE SETTLEMENT AGREEMENT**
**RELATING TO 1107 BROADWAY**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group"), by and through its undersigned counsel, hereby files this limited objection (the "Objection") to Lehman Brothers Holdings Inc.'s ("LBHI" together with its affiliated debtors in the above-referenced Chapter 11 cases, the "Debtors," and collectively with their non-debtor affiliates, "Lehman") Motion Pursuant to Section 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of a Settlement Agreement Relating to Real Property Located at 1107 Broadway (the "Motion") [Docket No. 17129]. In support of this Objection, the Ad Hoc Group respectfully states as follows:

NEWYORK 8171797 (2K)

**PRELIMINARY STATEMENT**

1.     The Debtors seek authorization to enter into a settlement (the "Settlement") that would cause them to release, at a steep discount, their secured, guaranteed claims against 1107 Broadway, LLC (the "Mortgage Borrower" and collectively with its affiliates, the "Borrowers") and Yitzchak Tessler ("Tessler" or the "Guarantor").[1]  Based on information provided to date, the Settlement appears to be a bad business deal that falls well below the range of reasonableness on any objective measure.  LBHI and its affiliates—who are owed approximately $300 million (including accrued but unpaid interest and certain protective advances)—are receiving only 47 cents on the dollar, and have agreed to accept tens of millions less than the market value of the Property securing the loan, as established by a stalking horse bid.  Meanwhile, the Mortgage Borrower is receiving at least $19 million, or approximately 45 percent of its equity investment in the Property, the right to recover 50 cents on every dollar received in excess of the stalking horse bid, and the ability to walk away from more than $100 million in potential liability.  In addition, the Guarantor is receiving a release of substantial obligations without contributing anything of value to the Settlement.

2.     The Debtors' purported justification for accepting this steep discount on their outstanding debt and guaranty claims is that litigation is expensive, time consuming, and fraught with risk.  However, this rationale does not support rushing into a one-sided deal in favor of the Borrowers and Guarantor.  First, it appears that LBHI and its affiliates, who obtained a first priority security interest in the Property, as well as other collateral and guaranties, have a strong litigation position against the Borrowers and Guarantor, who have defaulted on hundreds of millions in loans.  Second, there does not appear to be any need to cut a deal to monetize the Property now when creditors will not be receiving distributions under a plan for many months if

---

[1]     Capitalized terms used but not defined herein have the meaning ascribed to them in the Motion.

not years.  Finally, the Debtors have supplied no evidence that the Property is at risk of diminishing in value during the pendency of the litigation or that they are otherwise receiving a premium on the Property that would justify cutting a bad deal at this time.

3. As the Ad Hoc Group has done in the past, it raised its concerns over the Settlement with the Debtors.  To date, the Ad Hoc Group's concerns have not been adequately addressed, although discussions are ongoing.  Accordingly, the Ad Hoc Group files this limited objection in order to preserve its rights while it continues to work toward a consensual resolution.

## STATEMENT OF FACTS

4. On October 16, 2007, LBHI extended a loan to the Mortgage Borrower in the original principal amount of up to $246,000,000 (the "Mortgage Loan").  The Mortgage Loan was secured by certain mortgages, assignments of leases and rents, security agreements and fixture filing statements (collectively, the "Mortgage") executed by the Mortgage Borrower in favor of LBHI, creating a first priority security interest in the Property.  In connection therewith, Tessler provided LBHI with certain guaranties (the "Mortgage Loan Guaranties").

5. Contemporaneously therewith, LBHI extended an additional loan in the original principal amount of up to $59,200,000 (the "Senior Mezzanine Loan") to the Senior Mezzanine Borrower secured by, among other things, a pledge of the Senior Mezzanine Borrower's equity interests in the Mortgage Borrower (the "Senior Mezzanine Pledged Collateral").  In connection with the Senior Mezzanine Loan, Guarantor provided LBHI with certain guaranties (the "Senior Mezzanine Loan Guaranties").

6. The final component of the financing for the Property was provided by the Junior Mezzanine Lender, which extended a loan in the original principal amount of up to $38,200,000

(the "Junior Mezzanine Loan"; together with the Mortgage Loan and the Senior Mezzanine Loan, the "Loans") to the Junior Mezzanine Borrower secured by, among other things, a pledge of the Junior Mezzanine Borrower's equity interest in the Senior Mezzanine Borrower (the "Junior Mezzanine Pledged Collateral").  In connection with the Junior Mezzanine Loan, Guarantor provided the Junior Mezzanine Lender with certain guaranties (the "Junior Mezzanine Loan Guaranties," and collectively with the Mortgage Loan Guaranties and the Senior Mezzanine Loan Guaranties, the "Guaranties").

7. In total, LBHI and its affiliates agreed to extend up to $343.4 million in financing to the Borrowers.  Prior to the Petition Date, the Borrowers drew approximately $228.3 million on these Loans.  Upon information and belief, as of the date hereof, there is approximately $300 million, including accrued and unpaid interest and protective advances, outstanding under the Loans, all held by LBHI and its affiliates.

8. The Mortgage Borrower's obligations were supported by, among other things, three separate guaranties issued by Tessler.  In relevant part, the Guaranties provide:

> 1) Under the Recourse Guaranty, Tessler guaranteed certain full and partial recourse obligations of the Owner.  Significantly, Tessler guaranteed "losses" on any and all claims, suits and liabilities, as well as any and all "enforcement costs" which include legal expenses.[2]
>
> 2) Under the Carry Guaranty, the Lender can proceed against Tessler to "bring any action at law or in equity or both, or commence any proceeding, to compel Guarantor to pay to Lender any Guarantied Obligations outstanding or to collect Enforcement Costs . . ."[3]
>
> 3) Under the Completion Guaranty, Tessler guaranteed full and prompt payment of "all of Borrower's obligations under the

---

[2]  See Recourse Guaranty, §§ 1.3(iii) and 1.3(v).
[3]  See Carry Guaranty, § 1.5.

> Loan Documents to complete and pay for construction of the Conversion Work."[4]

The Debtor's Motion papers do not assert, or even suggest, that Tessler would be unable to satisfy his obligations under the various guaranties.[5]

9. The amount of the entire outstanding loan, including accrued but unpaid interest and certain protective advances, is approximately $300 million. The Loans matured on October 15, 2008, and, as of the date hereof, each remains unpaid. Accordingly, LBHI has commenced a foreclosure proceeding against the Property (the "<u>Mortgage Loan Foreclosure</u>") in the New York State Supreme Court, New York County, due to the alleged non-payment and other defaults of the Mortgage Borrower and the Guarantor. Similarly, LBHI and the Junior Mezzanine Lender have commenced mezzanine loan foreclosure proceedings under the Uniform Commercial Code (the "<u>Mezzanine Loan Foreclosures</u>," together with the Mortgage Loan Foreclosure, the "<u>Foreclosure Litigation</u>") for public sales of the Senior Mezzanine Pledged Collateral and the Junior Mezzanine Pledged Collateral, respectively.

10. In addition to seeking to foreclose on the Property, LBHI has also asserted claims against Tessler in the Mortgage Loan Foreclosure proceeding. In this respect, LBHI has asserted claims against Tessler under the Recourse Guaranty, claiming that his actions have given rise to a Full Recourse Event under the Recourse Guaranty. In addition, LBHI has asserted claims against Tessler under the Carry Guaranty and the Completion Guaranty.

11. On September 22, 2009, the Borrowers and the Guarantor filed four proofs of claim (the "Proofs of Claim") against LBHI.[6] The Proofs of Claim do not state the basis for the

---

[4] <u>See</u> Completion Guaranty, § 1.3(v).
[5] It appears also that Tessler provided Lehman with Guaranties with respect to the Senior Mezzanine Loan and Junior Mezzanine Loan. The Ad Hoc Group has not had an opportunity to review these guaranties and they were not attached to the Debtors' Motion papers.
[6] The Borrowers filed three Proofs of Claim (numbers 30018, 30019, and 30020), each in the amount of not less than $40 million. The Guarantor also filed Proof of Claim No. 30017 in the amount of not less than $6 million.

claims; rather, each merely alleges that "[t]his proof of claim is evidenced by various document and instruments, including without limitation, the Credit Agreement (Section 2.5) and Lock, Pledge, and Security Agreement both dated December 18, 2007, between Claimant and LBHI and all related documents, changes, amendments and modifications thereto." (See, e.g., Proof of Claim No. 30017.) The Motion papers do not reflect any information concerning the Debtors' assessment of the validity of the claims that have been asserted against them by the Mortgage Borrower and its affiliates, or the likely exposure associated with such claims.

12. The Debtors now seek authority to settle their dispute with the Borrowers and the Guarantor. Under the terms of the Settlement, the Mortgage Borrower has agreed to enter into a purchase and sale agreement with 1107 L&L (as defined in the Settlement). 1107 L&L has agreed to purchase the Property for $161.5 million plus certain additional taxes and carry costs that LBHI has incurred with respect to the Property, subject to an auction process where 1107 L&L will serve as the stalking horse. In addition, the Settlement will require the parties to release their claims against one another. Under the Settlement, the proceeds from the auction sale will be distributed as follows:

1) $142.5 million to Lehman

2) $19 million to the Mortgage Borrower

3) Any additional proceeds will be split 50-50 between Lehman and the Mortgage Borrower.

13. Assuming that LBHI and its affiliates hold approximately $300 million in claims (including accrued and unpaid interest and advances) against the Borrowers and Guarantor, Lehman will recover approximately 47 cents on its claims and all of its remaining claims (including claims against the Guarantor) will be extinguished and/or released. By contrast, upon information and belief, the Mortgage Borrower has an approximate $42 million equity

investment in the Property.  Under the proposed settlement, the Mortgage Borrower will recover at least $19 million or 45 percent of its investment in the Property, and will be entitled to receive 50 percent of each additional dollar in sale proceeds above the 1107 L&L bid, even before Lehman is paid in full.

**OBJECTION**

A.  **Standard For Evaluating A Proposed Settlement**

14.    A bankruptcy court may approve a compromise and settlement only after determining that it is fair, reasonable and adequately based on the facts and circumstances before the court.  See Motorola Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461-62 (2d Cir. 2007) (Bankruptcy Rule 9019 has a "clear purpose … to prevent the making of concealed agreements which are unknown to creditors and unevaluated by the court.") (quoting In re Masters, Inc., 141 B.R. 13, 16 (Bankr. E.D.N.Y. 1992)).

15.    When determining whether to approve a settlement, courts in the Second Circuit examine the factors set forth in Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) ("TMT Trailer Ferry").  See, e.g., Iridium, 478 F.3d at 462.  Those factors are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting and reviewing the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to

which the settlement is the product of arm's length bargaining." Id. (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)); see also TMT Trailer Ferry, 390 U.S. at 424.

16. Ultimately, the inquiry is whether "the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved." In re Texaco Inc., 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988) (quoting Barry v. Smith (In re New York, New Haven & Hartford R.R. Co.), 632 F.2d 955, 960 (2d Cir. 1980) cert. denied, 449 U.S. 1062 (1980)). Although the settlement need not result in the best possible outcome for the debtor, it must not fall beneath the lowest point in the range of reasonableness. Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

17. The proponent of the settlement bears the burden of convincing the Court that the settlement is reasonable and should be approved. In re Matco Electronics Group Inc., 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002); see also In re Remsen Partners, Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (trustee did not meet burden of establishing that settlement was reasonable). To conclude that a settlement is fair, "the Court must reach an 'informed, independent judgment supported by the factual background underlying the litigation and bankruptcy.'" In re Exide Techs., 303 B.R. 48, 67 (Bankr. D. Del. 2003) (internal citations omitted). As then-District Judge Sotomayor described:

> [A] bankruptcy court must make an independent determination when approving a settlement. A bankruptcy judge cannot "accept the trustee's word that the settlement is reasonable, nor may [the judge] merely 'rubber stamp' a trustee's proposal." The bankruptcy judge is ultimately responsible for an unbiased and informed assessment of a settlement's terms.

Nellis v. Shugrue, 165 B.R. 115, 122 (S.D.N.Y. 1994) (finding bankruptcy court did not abuse its discretion in approving settlement) (internal citations omitted); see also In re Cousins, No. 09

Civ. 1190 (RJS), 2010 WL 5298172, *4 (S.D.N.Y. Dec. 22, 2010) (noting trustee's "opinions are not to be automatically accepted as reasonable").

### B. The Settlement Should Not Be Approved At This Time

18. As an initial matter, the Settlement does not appear to be an exercise of the Debtors' sound business judgment. The Debtors (lenders in the transaction)—who contributed hundreds of millions of dollars toward the acquisition and pre-development of the Property in exchange for a first priority security interest, additional collateral, numerous guaranties and indemnity provisions—are recovering only 47 percent on their claims. By contrast, the Mortgage Borrower—who holds only a $42 million equity stake—will receive at least $19 million and the Guarantor will obtain a full release. In short, the Settlement weighs heavily in favor of the Borrowers and Guarantor.

19. The Settlement also does not appear to be a reasonable compromise of the Foreclosure Litigation. The Debtors contend that the Settlement accounts for the attendant litigation downsides of risk, delay and expense. However, none of these downsides appears significant here. See TMT Trailer Ferry, 390 U.S. at 424 ("the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise").

20. First, it appears that the Debtors have a high likelihood of success in the litigation. As described above, the Debtors bargained for collateral, guaranties and indemnity in exchange for providing hundreds of millions in financing. The loans matured on October 15, 2008, and remain unpaid. In addition, there does not appear to be any dispute that the Borrowers are in default and that numerous guaranty provisions have been triggered. In fact, the Motion acknowledges that "LBHI believes that it (i) would ultimately recover the Property through [the

Foreclosure Litigation], and (ii) is likely entitled to additional recoveries pursuant to certain guaranties that it holds in connection with these loan facilities . . . ." (Motion ¶ 4.)

21.     Second, while litigation may be time consuming, the Debtors have not shown that the value of the Property is likely to decrease during the pendency of the litigation (which is estimated to take twelve months). In addition, given that creditors will not receive any distribution under a plan of reorganization for some time, there does not appear to be a demonstrated need to cut a deal in order to monetize the Property at this time. Nor is there any indication that the Debtors would have to expend significant additional "resources in the Property to complete the development process and conduct a sale . . . ."[7] Indeed, there is currently a buyer for the Property in its present condition, and, upon information and belief, others are likely to express an interest in acquiring the Property. In addition, the Debtors do not appear to be receiving a premium on the Property in connection with the Settlement that would support providing the Borrowers and the Guarantor with an unjustified windfall at this time. Accordingly, the Ad Hoc Group sees little harm in continuing to litigate either to conclusion or until a fair deal can be achieved.

22.     Third, while litigation may be expensive, the Guarantor is obligated to reimburse LBHI for, <u>inter alia</u>, "any and all expenses, including legal expenses, attorneys' fees and expert witness fees . . . incurred in collecting any amount payable under the [Senior Loan Agreement] or the other Loan Documents."[8] Importantly, there is no indication that the Guarantor would not be able to meet his obligations under the guaranties that he issued in favor of the Debtors. Thus, the Ad Hoc Group questions whether it is truly necessary for LBHI to transfer $19 million of

---

[7]     Declaration of Jeffrey Fitts in Support of Lehman Brothers Holdings Inc.'s Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement Relating to Real Property Located at 1107 Broadway [Docket No. 17129, Ex. B] ¶ 4.

[8]     Amended and Supplemental Verified Complaint, Index No. 10-601084 [Docket No. 26] at Exhibit B (Guaranty of Recourse Obligations) and Exhibit E (Master Credit Agreement).

value to the Mortgage Borrower simply to monetize assets in the short term that will not be distributed to creditors for many months if not years. See TMT Trailer Ferry, 390 U.S. at 450 ("the need for expedition . . . is not a justification for abandoning proper [settlement] standards").

23.     Nor can the Debtors justify the Settlement based on the release of the claims asserted against LBHI in the Borrowers' and the Guarantor's Proofs of Claim. Close to $20 million is a steep price to pay to obtain a release of claims which, may be objectionable, and if allowed, would likely be subject to substantial setoff or recoupment. In this respect, the Debtors project that LBHI's general unsecured creditors will receive 19.8 cents on the dollar under the Debtors' Plan. Thus, the Settlement payment of $19 million to settle lender liability claims asserted against LBHI is only reasonable if the Borrowers and Guarantor are expected to obtain a $100 million judgment against LBHI. The Motion, however, does not even reference the nature of the Borrowers' claims, much less provide an estimate of the likely exposure that the Debtors face. See In re Adirondack Ry. Corp., 95 B.R. 867, 876 (N.D.N.Y. 1988) (denying settlement where potential outcome of litigation was not more adverse to the estate than the settlement terms).

24.     Given the dearth of information contained in the Motion, the Ad Hoc Group submits that the Debtors have failed to carry their burden to establish that the Settlement is the product of a valid exercise of business judgment or is otherwise in the best interest of the estate. While the Ad Hoc Group intends to continue a dialogue with the Debtors regarding this matter, it does not believe that the Settlement should be approved based on the record before the Court at this time.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court deny the Motion without prejudice to the Debtors' right to renew upon a more sufficient record of the Settlement's reasonableness.

Dated: June 8, 2011
      New York, New York

Respectfully submitted,

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Gerard Uzzi (GU-2297)
J. Christopher Shore (JS-6031)
Andrew Hammond (AH-0415)

By: */s/ Andrew Hammond*
     Andrew Hammond

ATTORNEYS FOR THE AD HOC GROUP
OF LEHMAN BROTHERS CREDITORS