**Hearing Date and Time: June 15, 2011 at 12:00 p.m. (Prevailing Eastern Time)**
**Objection Date and Time Extended to: June 13, 2011 at 6:00 p.m. (Prevailing Eastern Time)**

Carmine D. Boccuzzi Jr.
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for The Goldman Sachs Group, Inc. and*
*Goldman, Sachs & Co.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x
In re                                                               :   **Chapter 11 Case No.**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**                          :   **08-13555 (JMP)**
                                                                    :
                            Debtors.                                :   **(Jointly Administered)**
------------------------------------------------------------------- X

**OBJECTION OF THE GOLDMAN SACHS GROUP, INC. AND GOLDMAN, SACHS &
CO. TO DEBTORS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS,
AND CROSS-MOTION FOR A PROTECTIVE ORDER**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (together, "Goldman Sachs"), by and through their undersigned counsel, hereby file this objection (the "Objection") to the motion of Lehman Brothers Holdings, Inc. (together with its affiliated debtors, the "Debtors" or "Lehman") to compel the production of documents (the "Motion to Compel") and Cross-Motion for a Protective Order (the "Cross-Motion"). In support of this Objection and Cross-Motion, Goldman Sachs respectfully states as follows:

**PRELIMINARY STATEMENT**

1.  The Debtors' Motion to Compel Goldman Sachs to complete production on an expedited schedule is improper, premature, and wholly unnecessary given Goldman Sachs's

diligent progress in collecting, processing, searching, and reviewing documents since the May 16, 2011 Informal Conference before this Court to discuss the appropriate scope of Goldman Sachs's response to the Debtors' Supplemental Requests. Debtors filed this motion a scant two weeks after the Informal Conference despite their awareness that Goldman Sachs was making diligent progress and on the verge of being able supply a realistic production timeline based on initial testing of the Debtors' proposed search terms. The Motion to Compel seeks to force Goldman Sachs to produce documents on an arbitrary and unrealistic timeframe, despite the proposal by Goldman Sachs to complete its production by July 22, 2011, a mere three weeks after the deadline requested by the Debtors. It would also limit the parties' ability to refine the Debtors' now demonstrably overbroad search terms, which initial tests establish produce a large number of false "hits" or irrelevant documents.

2.      If granted, the relief demanded in the Motion to Compel would result in Goldman Sachs having to review volumes of irrelevant documents – a process which could be entirely averted if the parties proceeded on the schedule Goldman Sachs proposed to the Debtors. Accordingly, the Motion to Compel is designed purely to harass Goldman Sachs and should be denied as baseless, unnecessary and unwarranted, and the Debtors should be required to reimburse Goldman Sachs the costs it incurred in defending the Motion to Compel as well as fees and costs incurred in producing documents.

**BACKGROUND**

3.      On March 1, 2011, the Debtors sent a letter to Cleary Gottlieb demanding that Goldman Sachs produce documents (the "Supplemental Requests") relating, generally, to Lehman's financial condition and alleged false rumors regarding Lehman and the related short-selling of Lehman securities. Declaration of Nancy I. Ruskin ¶ 2 (the "Ruskin Decl.").

2

Goldman Sachs had already produced all of the documents to which the parties had agreed in response to a Rule 2004 subpoena served by the Debtors in April 2010.  Id.  While pursuant to the parties' agreement the Debtors had reserved the right to seek additional documents and Goldman Sachs had reserved its right to oppose any further production, it was Goldman Sachs's hope and expectation that no additional documents would be sought from Goldman Sachs if its trading records showed (as they in fact do) that it had no financial motive to harm Lehman.  Id.  Further, Goldman Sachs had also produced to the Debtors documents concerning alleged rumors that Goldman Sachs had previously produced to the U.S. Securities and Exchange Commission, the U.S. Attorney's Office, and the New Jersey Bureau of Securities.  Id.  That production should have been sufficient to satisfy the Debtors because those documents do not support any allegation of rumor mongering by Goldman Sachs.  Id.

4.      Nevertheless, Goldman Sachs proceeded to negotiate with the Debtors in good faith concerning the scope of the Supplemental Requests, the search terms that the Debtors had proposed, and the appropriate universe of custodians.  Id. at ¶ 3.  During those negotiations Goldman Sachs emphasized that the Supplemental Requests were overbroad particularly because, as demonstrated by the data already produced by Goldman Sachs to the Debtors in response to the Debtors' initial Rule 2004 subpoena, Goldman Sachs's stand-alone proprietary trading businesses had engaged in very limited trading in Lehman securities during the first nine months of 2008 prior to Lehman's bankruptcy filing, and for much of the period were generally long Lehman exposure.  Id.  In other words, there was no case to be made that Goldman Sachs had hastened Lehman's demise to benefit its trading position.  Id.  Nor, despite being asked to do so, have the Debtors provided even the slightest bit of evidence that anyone at Goldman Sachs was involved in any improper activity affecting Lehman.  Id.

3

5. Despite Goldman Sachs's good faith efforts to resolve the disputes over the scope of the Supplemental Requests, however, the parties were unable to do so and, by letter dated May 9, 2011, the Debtors requested an informal conference with the Court to discuss the remaining disputes (the "Informal Conference"). Id. at ¶ 4.

6. During the Informal Conference on May 16, 2011, the Court expressed its view that Goldman Sachs should proceed in responding to the Supplemental Requests. Id. at ¶ 5. Although the Debtors requested that the Court set a deadline for production, mentioning for the first time in passing that the Debtors were concerned about an unspecified statute of limitations, the Court declined to set a deadline. Id.

7. Despite the Debtors' implication in the Motion to Compel that there is an allegedly impending statute of limitations, and their baseless assertion that Goldman Sachs is trying to "run out" that limitations period, the purported looming statute of limitations deadline is, to date, nothing more than a red herring and a mere pretext for Debtors' motion. Id. at ¶ 6. In fact, the Debtors never mentioned any such concern or issue during their many discussions with Goldman Sachs regarding the Supplemental Requests, or in the parties' discussions on the initial Rule 2004 subpoena. Id. Indeed, the first time that the Debtors ever mentioned any purported statute of limitations issue to Goldman Sachs was their passing reference to it during the Informal Conference on May 16. Id. Even then, the Debtors failed to identify the potential claim to which the statute of limitations applied, when they believed any such claim accrued, or when they believed the statute of limitations would expire – and they never proposed a tolling agreement. Id. Nor did the Debtors ever suggest or specify the need for any particular deadline for production prior to filing the Motion to Compel. Id. Furthermore, when Goldman Sachs raised this issue with the Debtors after the Motion to Compel was filed, the Debtors affirmatively

4

refused to identify the alleged statute of limitations on which the Motion to Compel purports to be based. Id. at ¶ 13.

8.      After the Informal Conference, Goldman Sachs immediately began to collect documents, including e-mails and instant messages, from the requested custodians for the requested period. Id. at ¶ 7. Within three days, Goldman Sachs had collected the documents for many of the custodians, and over the course of the following week Goldman Sachs collected the files for the remaining custodians, providing the files to Cleary Gottlieb on a rolling basis via external hard drives. Id. This collection yielded an enormous volume of documents – 231 gigabytes of data comprised of over 3 million documents – and, accordingly, required a substantial effort from Goldman Sachs. Id. See also Declaration of Dawne Riley ¶¶ 4-5 (the "Riley Decl."). During this time, Cleary Gottlieb spoke twice with Kasowitz, Benson, Torres & Friedman LLP, special counsel to the Debtors, on May 18 and May 24, to keep them apprised of Goldman Sachs's progress. Ruskin Decl. ¶ 7.

9.      Shortly after receiving each hard drive from Goldman Sachs, Cleary Gottlieb provided it to the third-party vendor, AlphaLit, that had been selected to process and search the documents and then to load them on a platform for review. Id. at ¶ 8. After receiving the first hard drive, AlphaLit informed Cleary Gottlieb that the files for four of the custodians were corrupted and would need to be retrieved again. Id. See also Riley Decl. ¶ 2 n.3. Cleary Gottlieb analyzed the files on an additional hard drive and, after it determined that no additional files were corrupted, Goldman Sachs began work on retrieving the files for the affected custodians a second time. Ruskin Decl. ¶ 8. In the meanwhile, AlphaLit continued processing

5

the uncorrupted files, a technical process that can require several days, depending on volume,[1] and on May 31, 2011 began running the search terms provided by the Debtors on the first batch of processed files.  Id.  See also Riley Decl. ¶¶ 3-5.

      10.    On May 31, 2011, Cleary Gottlieb again spoke with Kasowitz and informed them of Goldman Sachs's progress.  Ruskin Decl. ¶ 9.  At that time, Kasowitz demanded that Goldman Sachs inform them when it would begin and complete the requested production.  Id.  Cleary Gottlieb informed Kasowitz that until it received information about the volume of documents returned by the search terms, which it expected to (and did) begin receiving as soon as the next day, it could not determine the length of time that would be required to review the documents and begin production.[2]  Id.  Although only two weeks had elapsed since the Informal Conference, Kasowitz informed Cleary Gottlieb that the Debtors were considering filing a motion to compel to expedite the process and requested that Cleary Gottlieb send them an e-mail when it had information on the search term results.  Id.  Cleary Gottlieb stressed to Kasowitz that Goldman Sachs was proceeding diligently and asked for advance notice in the event that the Debtors decided to file a motion to compel.  Id.  Despite Kasowitz's knowledge that Cleary Gottlieb planned to provide additional information the next day, Kasowitz e-mailed Cleary Gottlieb shortly before 4:30 p.m. that same day to inform us that the Debtors were proceeding to file the Motion to Compel, which they did a little over an hour later.  Id.

      11.    Even as Goldman Sachs prepared to respond to the Motion to Compel, it diligently continued the collection, processing, and searching of the documents for the requested

---

[1]    In all, the enormous volume of data collected by Goldman Sachs required a total of 126 hours to process.  Riley Decl. ¶ 4.

[2]    Because the search terms proposed by the Debtors were unusually complex, the work of several AlphaLit programmers and software developers was required to ensure that they could be applied appropriately.  Riley Decl. ¶ 5.

6

custodians. Id. at ¶ 10. Ultimately, the three pages of search terms provided by the Debtors (Dunn Decl. Ex. 1) returned a total of 61,512 documents as a result of the Debtors' overbroad search terms. Id.; Riley Decl. ¶ 5.

12. Goldman Sachs will incur great burden and expense in reviewing this sizeable volume of documents, particularly if it is forced to complete production on the Debtors' arbitrary proposed timetable – approximately two weeks from now. Ruskin Decl. ¶ 10. First, the expedited schedule limits the ability of the parties to fully explore the opportunity, which the Debtors themselves offered to Goldman Sachs both prior to and during the Informal Conference, of reducing the volume of documents that Goldman Sachs must review after working with the Debtors to narrow the search terms. Id. To do this, Goldman Sachs must first identify which search terms are overbroad and result in a large number of false hits or irrelevant documents. Id. Second, the expedited schedule imposes on Goldman Sachs the undue burden and expense of reviewing a very large e-mail production that is likely going to consist almost entirely of irrelevant information. Id. Indeed, Goldman Sachs has already determined, from its expedited preliminary review of some of the documents over the course of the last two weeks, that the search terms are returning a large volume of irrelevant documents. Id. at ¶ 11. For instance, in Goldman Sachs's initial review of documents for five of the custodians, including at least one from each of the requested businesses, fewer than eight percent of the documents were responsive. Id. While Goldman Sachs has preliminarily identified certain search terms responsible for large volumes of irrelevant documents, and has reached out to the Debtors to try to identify a way to effectively limit those the search terms, they have not yet been able to reach an effective solution. Id.

7

13. In an effort to resolve the Motion to Compel, on the morning of June 9, 2011 Cleary Gottlieb called Gary Dunn of Kasowitz to propose a timetable for Goldman Sachs's document production. Id. at ¶ 12. Based on the search terms results Cleary Gottlieb had received thus far from Alphalit and the time it had taken Cleary Gottlieb to review the documents of certain custodians, Cleary Gottlieb proposed that Goldman Sachs could start a rolling production of documents the following week (the week of June 12) and would finish production by July 22 at the latest. Id. This proposed completion date is, at most, just over three weeks after the date that the Debtors are seeking in their Motion to Compel. Id. On June 10, Cleary Gottlieb called Mr. Dunn again to see if he had a response to Goldman Sachs's proposal, and Mr. Dunn responded that he did not have a response because, while he had finally reached Michael Bowe, the Kasowitz partner he needed to contact, they had been unable to reach the client. Id. One the morning of June 13, Cleary Gottlieb again contacted Mr. Dunn and were again told that the Debtors did not yet have a response to Goldman Sachs's proposal. Id. Cleary Gottlieb called Mr. Dunn one last time that same afternoon, and were told that he still did not have a response from his client to Goldman Sachs's proposal. Id. Cleary Gottlieb asked Mr. Dunn if he could provide more information about the Debtors' time constraints and the purported statute of limitations that the Motion to Compel was based on, including when it might run and to what claims it purportedly applies, but Mr. Dunn refused to provide any of that information. Id.

14. As of the time of this Objection and Cross-Motion, four days after Goldman Sachs made its proposal to resolve the Motion to Compel, the Debtors have still not provided a response. Id. at ¶ 13. The schedule that Goldman Sachs proposed would give the Debtors' counsel more than sufficient time to review the relatively small volume of responsive documents that Cleary anticipates producing on behalf of Goldman Sachs from the mostly non-responsive

8

and irrelevant documents have had to be reviewed as a result of the Debtors' overbroad search terms. Id.

15. Goldman Sachs has already incurred substantial costs and expense in opposing the Motion to Compel and seeking a protective order, and has been forced to divert valuable time and resources defending itself against the Debtors' unreasonable demands when it could have devoted those resources to responding to the Supplemental Requests.

## ARGUMENT

16. A party or attorney issuing a Rule 2004 subpoena is obligated by Federal Rule 45(c)(1), as incorporated through Rule 9016 of the Bankruptcy Rules, to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," an obligation that the issuing court is bound to enforce. Fed. R. Civ. P. 45(c)(1). Whether a subpoena imposes an "undue burden" depends on "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 49 (S.D.N.Y. 1996) (citations omitted). For instance, when compliance with a subpoena is demanded in an unreasonable time frame, an undue burden exists. Digital Resource, LLC v. Abacor, Inc., (In re Digital Resource, LLC), 246 B.R. 357, 373 (8th Cir. B.A.P. 2000); Am. Int'l Life Assurance Co. of N.Y. v. Vazquez, No. 02 Civ. 141 (HB), 2003 U.S. Dist. LEXIS 2680 (S.D.N.Y. Feb. 25, 2003).

17. It is particularly true that an undue burden exists where, as here, the underlying subpoena is very broad and compliance with the subpoena would entail a substantial amount of time. See Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 53 (S.D.N.Y. 1996). Courts "give special weight to the burden on non-parties of producing documents to parties involved in

9

litigation." Travelers Indem. Co. v. Metropolitan Life Ins. Co., 228 F.R.D. 111, 113 (D. Conn. 2005). While discovery in the context of Rule 2004 is broad, it is not unlimited, and the Court has the discretion to require appropriate limitations on such discovery. See, e.g., In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) ("Rule 2004 as a discovery tool is not unlimited . . . [c]ourts have imposed limitations on the use of Rule 2004 examinations"); In re M4 Enters., Inc., 190 B.R. 471, 476 (Bankr. N.D. Ga. 1995) (limiting scope of Rule 2004 discovery); In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991) ("Rule 2004 requires that we balance the competing interests of the parties, weighing the relevance and necessity of the information sought by examination.").

18.     As recounted above, the relief that the Debtors seek in the Motion to Compel would impose a great – and wholly unnecessary – burden on Goldman Sachs, particularly in light of Goldman Sachs's diligent progress in preparing to respond to the Supplemental Requests and its proposal to complete production only a few weeks after the date sought by the Debtors. Moreover, in filing the Motion to Compel and seeking to force Goldman Sachs to review the entire universe of documents in a few weeks at breakneck speed, the Debtors have not left sufficient time for a meaningful analysis of the effectiveness of the search terms that they have proposed. In prematurely curtailing Goldman Sachs's ability to identify the search terms in need of further refinement, Debtors have prevented Goldman Sachs from significantly reducing its costs and burden of review.

19.     Accordingly, because the timeline that Debtors seek to impose in the Motion to Compel is arbitrary and will impose an undue burden on Goldman Sachs, the Court should deny the Motion to Compel and require the Debtors under Federal Rule 45(c)(1) to reimburse Goldman Sachs for its costs and fees in responding to the Motion to Compel. See Digital

Resource, LLC v. Abacor, Inc., (In re Digital Resource, LLC), 246 B.R. 357, 373 (8th Cir. B.A.P. 2000); Am. Int'l Life Assurance Co. of N.Y. v. Vazquez, No. 02 Civ. 141 (HB), 2003 U.S. Dist. LEXIS 2680 (S.D.N.Y. Feb. 25, 2003).  In addition, the Court should grant Goldman Sachs a protective order under Bankruptcy Rule 9016 to allow Goldman Sachs reasonable time for review and production of documents responsive to the Supplemental Requests, including a sufficient amount of time to work with the Debtors to more appropriately tailor the Debtors' proposed search terms, and require the Debtors to reimburse Goldman Sachs for the associated fees and costs of conducting such a massive undertaking.

[*Remainder of page intentionally left blank.*]

**CONCLUSION**

20.  For the foregoing reasons, Goldman Sachs respectfully requests that this Court: (i) deny the Motion to Compel, (ii) require the Debtors to reimburse the costs and fees incurred by Goldman Sachs in responding to the Motion to Compel, (iii) grant Goldman Sachs's Cross-Motion for a protective order and enter an order, in substantially the form attached hereto as Annex A, permitting Goldman Sachs to proceed according to the production schedule it proposed, according to which it would begin production on a rolling basis the week of June 12, 2011 and complete production by July 22, 2011 at the latest, and to be compensated by the Debtors for any fees and costs it has and will incur in responding to the Supplemental Requests, and (iv) grant such further relief as is appropriate.

Dated: June 13, 2011
       New York, New York

        CLEARY GOTTLIEB STEEN & HAMILTON LLP
        One Liberty Plaza
        New York, New York 10006
        Telephone: (212) 225-2000
        Facsimile: (212) 225-3999
        Carmine D. Boccuzzi
        cboccuzzi@cgsh.com

        By: /s/ Carmine D. Boccuzzi
            Carmine D. Boccuzzi
            A Member of the Firm

        *Attorneys for The Goldman Sachs Group, Inc. and Goldman, Sachs & Co.*