UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x
In re                                                                  :     Chapter 11 Case No.
                                                                       :
LEHMAN BROTHERS HOLDINGS INC., et al.,                                 :     08-13555 (JMP)
                                                                       :
                                        Debtors.                       :     (Jointly Administered)
---------------------------------------------------------------------- X

### DECLARATION OF NANCY I. RUSKIN

Pursuant to 28 U.S.C. § 1746, I, Nancy I. Ruskin, do hereby declare as follows:

1.      I am a member of the Bar of this Court and counsel with the law firm of Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), attorneys for The Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (together, "Goldman Sachs") in the above-captioned proceedings. I submit this declaration, pursuant to Local Bankruptcy Rule 7007-1, on personal knowledge unless otherwise noted, in opposition to the motion of Lehman Brothers Holdings, Inc. and its affiliated debtors (together, the "Debtors") to compel the production of documents[1] and in support of the cross-motion of Goldman Sachs for a protective order (the "Objection and Cross-Motion").

2.      On March 1, 2011, the Debtors sent a letter to Cleary Gottlieb demanding that Goldman Sachs produce documents (the "Supplemental Requests") relating, generally, to Lehman's financial condition and alleged false rumors regarding Lehman[2] and the related short-selling of Lehman securities. Goldman Sachs had already produced all of the documents to which the parties had agreed in response to a Rule 2004 subpoena served by the Debtors in April

---

[1]    Motion of Lehman Brothers Holdings, Inc. to Compel the Production of Documents From Goldman Sachs & Co. and Goldman Sachs Group, Inc. (Docket No. 17231), In re Lehman Brothers Holdings Inc. et al., No. 08-13555 (Bankr. S.D.N.Y. May 31, 2011) (the "Motion to Compel").

[2]    Capitalized terms used but not defined herein shall have the meaning given to them in the Objection and Cross-Motion.

2010. While pursuant to the parties' agreement the Debtors had reserved the right to seek additional documents and Goldman Sachs had reserved its right to oppose any further production, it was Goldman Sachs's hope and expectation that no additional documents would be sought from Goldman Sachs if its trading records showed (as they in fact do) that it had no financial motive to harm Lehman. Further, Goldman Sachs had also produced to the Debtors documents concerning alleged rumors that Goldman Sachs had previously produced to the U.S. Securities and Exchange Commission, the U.S. Attorney's Office, and the New Jersey Bureau of Securities. That production should have been sufficient to satisfy the Debtors because those documents do not support any allegation of rumor mongering by Goldman Sachs.

        3.      Nevertheless, Goldman Sachs proceeded to negotiate with the Debtors in good faith concerning the scope of the Supplemental Requests, the search terms that the Debtors had proposed, and the appropriate universe of custodians. In those negotiations Goldman Sachs emphasized that the Supplemental Requests were overbroad particularly because, as demonstrated by the data already produced by Goldman Sachs to the Debtors in response to the Debtors' initial Rule 2004 subpoena, Goldman Sachs's stand-alone proprietary trading businesses had engaged in very limited trading in Lehman securities during the first nine months of 2008 prior to Lehman's bankruptcy filing, and for much of the period were generally long Lehman exposure. In other words, there was no case to be made that Goldman Sachs had hastened Lehman's demise to benefit its trading position. Nor, despite being asked to do so, have the Debtors provided even the slightest bit of evidence that anyone at Goldman Sachs was involved in any improper activity affecting Lehman.

        4.      Despite good faith efforts to resolve the disputes over the scope of the Supplemental Requests, however, the parties were unable to do so and, by letter dated May 9,

2011, the Debtors requested an informal conference with the Court to discuss the remaining disputes (the "Informal Conference").

5.     During the Informal Conference on May 16, 2011, the Court expressed its view that Goldman Sachs should proceed in responding to the Supplemental Requests.  Although the Debtors requested that the Court set a deadline for production, mentioning for the first time in passing that the Debtors were concerned about an unspecified statute of limitations, the Court declined to set a deadline.

6.     Despite the Debtors' implication in its Motion to Compel that there is an allegedly impending statute of limitations, and their assertion that Goldman Sachs is trying to "run out" that limitations period, the Debtors never mentioned any such concern or issue during their many discussions with Goldman Sachs regarding the Supplemental Requests, or in the parties' discussions on the initial Rule 2004 subpoena.  Indeed, the first time that the Debtors ever mentioned any purported statute of limitations issue to Goldman Sachs was their passing reference to it during the Informal Conference on May 16.  Even then, the Debtors failed to identify the potential claim to which the statute of limitations applied, when they believed any such claim accrued, or when they believed the statute of limitations would expire – and they never proposed a tolling agreement.  Nor did the Debtors ever suggest or specify the need for any particular deadline for production prior to filing the Motion to Compel.

7.     Contrary to the Debtors' assertion of delay, after the Informal Conference Goldman Sachs immediately began to collect documents, including e-mails and instant messages, from the requested custodians for the requested period.  Within three days, Goldman Sachs had collected the documents for many of the custodians, and over the course of the following week Goldman Sachs collected the files for the remaining custodians, providing the

files to Cleary Gottlieb on a rolling basis via external hard drives. This collection yielded an enormous volume of documents – according to AlphaLit, 231 gigabytes of data comprised of over 3 million documents – and, accordingly, required a substantial effort from Goldman Sachs. During this time, Carmine Boccuzzi (a partner at Cleary Gottlieb) and Lisa Gouldy (an associate at Cleary Gottlieb) spoke twice with Gary Dunn from Kasowitz, Benson, Torres & Friedman LLP, special counsel to the Debtors, on May 18 and May 24, to keep him apprised of Goldman Sachs's progress.

8. Shortly after receiving each hard drive from Goldman Sachs, Cleary Gottlieb provided it to the third-party vendor, AlphaLit, that had been selected to process and search the documents and then to load them on a platform for review. After receiving the first hard drive, AlphaLit informed Cory Eskenazi of Cleary Gottlieb that the files for four of the custodians were corrupted and would need to be retrieved again. Ms. Eskenazi analyzed the files on an additional hard drive and, after she determined that no additional files were corrupted, Goldman Sachs began work on retrieving the files for the affected custodians a second time. In the meanwhile, AlphaLit continued processing the uncorrupted files, a technical process that can require several days, depending on volume, and on May 31, 2011 began running the search terms provided by the Debtors on the first batch of processed files.

9. On May 31, 2011, Ms. Gouldy and I spoke with Gary Dunn from Kasowitz and informed him of Goldman Sachs's progress. At that time, Mr. Dunn demanded that Goldman Sachs inform him when it would begin and complete the requested production. I informed Mr. Dunn that until we received information about the volume of documents returned by the search terms, which we expected to begin receiving as soon as the next day, we could not determine the length of time that would be required to review the documents and begin production. Although

4

only two weeks had elapsed since the Informal Conference, Mr. Dunn informed us that the Debtors were considering filing a motion to compel to expedite the process and requested that we send him an e-mail when we had information on the search term results. I stressed to Mr. Dunn that Goldman Sachs was proceeding diligently and asked for advance notice in the event that the Debtors decided to file a motion to compel. Despite his knowledge that we planned to provide additional information the next day, Mr. Dunn e-mailed me shortly before 4:30 p.m. that same day to inform us that the Debtors were proceeding to file the Motion to Compel, which they did a little over an hour later.

10.  Even as Goldman Sachs prepared to respond to the Motion to Compel, it diligently continued the collection, processing, and searching of the documents for the requested custodians. Ultimately, according to AlphaLit, the three pages of search terms provided by the Debtors (Dunn Decl. Ex. 1) returned a total of 61,512 documents as a result of the Debtors' overbroad search terms. Goldman Sachs will incur great burden and expense in reviewing this sizeable volume of documents, particularly if it is forced to complete production on the Debtors' arbitrary proposed timetable – approximately two weeks from now. First, the expedited schedule limits the ability of the parties to fully explore the opportunity, which the Debtors themselves offered to Goldman Sachs both prior to and during the Informal Conference, of reducing the volume of documents that Goldman Sachs must review after working with the Debtors to narrow the search terms. To do this, Goldman Sachs must first identify which search terms are overbroad and result in a large number of false hits or irrelevant documents. Second, the expedited schedule imposes on Goldman Sachs the undue burden and expense of reviewing a very large e-mail production that is likely going to consist almost entirely of irrelevant information.

5

11. We have already determined, from our expedited preliminary review of some of the documents over the course of the last two weeks, that the search terms are returning a large volume of irrelevant documents. For instance, in our initial review of documents for five of the custodians, including at least one from each of the requested businesses, fewer than eight percent of the documents were responsive. While we have preliminarily identified certain search terms responsible for large volumes of irrelevant documents, and have reached out to the Debtors to try to identify a way to effectively limit those the search terms, we have not yet been able to reach an effective solution. In seeking to force Goldman Sachs to review the entire universe of documents in a few weeks at breakneck speed, the Debtors have not left sufficient time for a meaningful analysis of the effectiveness of the search terms that they have proposed. Through their Motion to Compel, the Debtors seek to curtail Goldman Sachs's ability to identify the search terms in need of further refinement, preventing Goldman Sachs from significantly reducing its costs and burden of review.

12. On the morning of June 9, 2011, Ms. Gouldy and I called Mr. Dunn to propose a timetable for Goldman Sachs's document production and thereby to resolve the Debtors' motion. Based on the search terms results we had received thus far from AlphaLit and the time it had taken Cleary Gottlieb to review the documents of certain custodians, we proposed that Goldman Sachs could start a rolling production of documents the following week (the week of June 12) and would finish production by July 22 at the latest, which is, at most, just over three weeks after the date that the Debtors are seeking in their Motion to Compel. We called Mr. Dunn again on June 10 to see if he had a response to our proposal, and he said that he did not because, while he had finally reached Michael Bowe, the Kasowitz partner he needed to contact, they had been unable to reach the client. We called Mr. Dunn again this morning, and were again told that the

Debtors did not yet have a response to Goldman Sachs's proposal.  We called Mr. Dunn one last time this afternoon, and were told that he still did not have a response from his client to Goldman Sachs's proposal.  I asked Mr. Dunn if he could give us any more information about the Debtors' time constraints and the purported statute of limitations that the Motion to Compel was based on, including when it might run and to what claims it purportedly applies, but Mr. Dunn refused to provide any of that information.

13.    As of the time of this Declaration, four days after Goldman Sachs made its proposal to resolve the Motion to Compel, the Debtors have still not provided a response.  The schedule that Goldman Sachs proposed would give the Debtors' counsel more than sufficient time to review the relatively small volume of responsive documents that Cleary anticipates producing on behalf of Goldman Sachs from the mostly non-responsive and irrelevant documents that we have had to review as a result of the Debtors' overbroad search terms.

14.    Goldman Sachs has already incurred substantial costs and expense in opposing the Motion to Compel and seeking a protective order, and has been forced to divert valuable time and resources defending itself against the Debtors' unreasonable demands when it could have devoted those resources to responding to the Supplemental Requests.  Accordingly, the Motion to Compel should be denied and Goldman should be permitted to proceed according to the schedule that it proposed.  Additionally, Goldman Sachs should be reimbursed for the fees and costs it has and will incur indulging a wasteful and ultimately pointless discovery exercise.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 13, 2011
  New York, New York

                                              /s/ Nancy I. Ruskin
                                              Nancy I. Ruskin