**Exhibit A**

| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO  80202 | |
|---|---|
| Plaintiff:<br><br>ROGER TROUT<br><br>v.<br><br>Defendant:<br><br>ROARING FORK INVESTMENTS, L.L.C. and LB ROSE RANCH, L.L.C. | ▲  COURT USE ONLY  ▲<br><br>Case Number: 01CV4208<br><br>Ctrm: 7 |
| **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** | |

THIS MATTER is before the Court following a trial to the Court held on April 26 – 30, 2004. Plaintiff Roger Trout is represented by Richard Shearer and Robert Anderson. Defendant Roaring Fork Investments, L.L.C. is represented by William Shay. Defendant LB Rose Ranch, L.L.C. is represented by John Madden. Upon consideration of the testimony and exhibits received at the trial, and having considered the arguments of counsel and being sufficiently advised in the premises, the Court issues the following findings of fact, conclusions of law and order.

## PROCEDURAL HISTORY

Plaintiff's complaint in 01CV4208 asserts claims involving a parcel of land located in Garfield County, Colorado, a residential lot adjacent to that property, and a series of agreements regarding, and easements upon, those properties executed in conjunction with the development of a golf course and residential community adjacent to the properties. The complaint asserts a claim for breach of contract based on allegations that Defendants failed to provide liability and property damage insurance, as well as a reasonable indemnification agreement, as required by the agreements. The complaint also alleges that, as the result of the design and development of the golf course, Defendants breached the covenant of Plaintiff's quiet use and enjoyment of the



1

residential lot and easement. The complaint alternatively asserts a claim for rescission, based upon alleged false representations made by Defendants, as well as a claim for reformation based upon alleged mutual mistakes of fact.

Defendant LB Rose Ranch, LLC filed a separate complaint in Garfield District Court in 02CV231, asserting a claim for breach of contract and specific performance, based on allegations that Roger Trout breached an agreement to provide a recordable easement consistent with the course of a golf cart path as constructed upon Trout's property. In that action, Trout filed counterclaims to quiet title and asserted claims of trespass, breach of contract, and rescission, all based upon allegations that LB Rose Ranch constructed a golf cart path on his property outside the boundaries of the easement established by the parties as part of the golf course development.

Case number 02CV231 was subsequently consolidated into case number 01CV4208, and all claims were tried to the Court without a jury.

## PRELIMINARY STATEMENT

All of the findings of fact and conclusions made herein are based upon what the Court determines to be a preponderance of the admissible, credible, and persuasive evidence. As the fact finder on this case, the Court has assessed the credibility of the witnesses by applying the same standards that jurors are required or permitted to apply, as set forth in CJI 4th 3:16. The findings of fact herein reflect and incorporate the Court's credibility assessments.

## FINDINGS OF FACT

1. In 1969, Plaintiff's father, Robert Trout, acquired a 40-acre parcel of property in Garfield County, Colorado, south of Glenwood Springs and west of the Roaring Fork river (hereafter "the Trout property"). The mountainous property is bisected north to south by a canyon with a dry creek bed at the bottom and steep sides. The property is adjacent to the south and east to property owned, at the time of purchase, by Defendant Roaring Fork Investments, L.L.C. ("Roaring Fork"). Although proximate to county road 109, the Trout property was essentially landlocked and accessible only by foot via the canyon from the north.

2. In late March or early April 1997, Ron Heggemeier of Roaring Fork approached Plaintiff's father in an attempt to acquire the Trout property in connection with Roaring Fork's development of its adjacent property as a golf course and residential community. Of specific concern to Roaring Fork was the acquisition of the Trout property as a means to connect the lower portion of Roaring Fork's golf course located in the valley east of county road 109 to its landlocked[1] property on a mesa

---

[1] Access to the upper holes was possible from the south of Roaring Fork's property from an area referred to as the "overlook," and a road was partially constructed through that area. However, due to the terrain and other considerations, including an eagle preserve in the area, Roaring Fork concluded that access via the overlook would be impracticable and cost prohibitive.

2

west of county road 109, which was the intended location of Roaring Fork's "upper" golf holes.

3. Plaintiff's father, who at the time was aged and ill, directed Heggemeier to negotiate with Plaintiff. Shortly thereafter, a meeting occurred at Heggemeier's law office in Parker, Colorado, at which Heggemeier generally outlined for Plaintiff Roaring Fork's development plans and its desire to either acquire the Trout property outright or acquire an easement upon the property in order to connect its lower and upper golf holes. During the meeting, Heggemeier utilized a variety of demonstrative materials including, at a minimum, an aerial overview, initial development drawings, and a survey of the property, then known as the "Rose Ranch" property.

4. Following the initial meeting, Plaintiff visited the Trout property with his daughter and "brainstormed" ideas regarding its potential uses. A second meeting between Plaintiff and Heggemeier occurred several days later at Heggemeier's office, at which the parties began to outline more specific details of a potential transaction. Heggemeier explained that he was required to submit his development plans to the Garfield County Planning Commission by June 13, 1997, including specific plans to link the lower and upper golf holes. As such, he was motivated to obtain either the Trout property or an easement upon the property (hereafter the "golf cart path easement"), and he was willing to work out any reasonable deal with Plaintiff. Heggemeier explained that the easement upon the Trout property would generally follow the bottom of the canyon, upon which a path would be constructed to be used by golf carts, maintenance vehicles, bicyclists, and pedestrians. The path would also be used by construction vehicles and equipment during the construction of the upper holes.

5. As part of the potential transaction, and as additional consideration, the parties discussed the conveyance to Plaintiff of a parcel of property owned by Roaring Fork that was adjacent to the Trout property that could be used by Plaintiff as a residential building site (hereafter the "residential lot"), as well as the granting by Roaring Fork of an easement (hereafter the "access easement") that would provide Plaintiff access not only to the residential lot but also to the otherwise landlocked Trout property. The proposed access easement and residential lot was west of county road 109 and contiguous to what was originally to be golf hole 11 and ultimately hole number 14 (hereafter "hole number 14").

6. During the discussions, Heggemeier outlined the general location of hole number 14 in relation to the residential site and he showed Plaintiff various illustrative plans of the proposed golf course, some of which depicted the tee-box to hole number 14 to the north of the residential lot and others depicted that tee-box to the south of the lot. All of the plans depicted golf play on hole 14 to the west of county road 109 and from north to south. At the time of the initial discussions and prior to the execution of the agreements, however, the design of the golf course was in a preliminary stage and the

3

specific routing of the golf holes and placement of the tee boxes had not been accomplished. As such, the Court finds that no representations were made by Heggemeier as to the anticipated location of the tee boxes for hole number 14, and that testimony to the contrary lacks credibility.

7. As the result of the parties' negotiations, Roaring Fork and Plaintiff entered into three written agreements on June 13, 1997, including an Easement and Transfer Agreement (hereafter "the Agreement"), a Golf Cart Path Easement, and an Access Easement. Based on the testimony at trial, the Court finds that there was a meeting of the minds as to the agreements, and that the documents executed contained all of the material terms.[2]

8. Pursuant to the Agreement, Roaring Fork conveyed[3] to Plaintiff the residential lot by special warranty deed (¶ 2), granted Plaintiff a 30 foot non-exclusive access easement to the residential lot (¶ 3), and paid Plaintiff $30,000.00 (¶ 9).[4] In return, Plaintiff granted Roaring Fork a non-exclusive easement across the Trout property (¶ 4) with provisions that Roaring Fork maintain and insure the easement area and indemnify Plaintiff from any loss or damage occasioned by use of the easement area (¶ 6). Acknowledging that Roaring Fork had not yet surveyed the golf cart path easement area, the Agreement required Plaintiff to "execute any and all additional documents necessitated for connection or further clarification and definition of the legal description" for the easement area after a survey was obtained (¶ 11). In addition, at the time the Agreement was executed, Roaring Fork had not yet obtained an additional easement from the Westbank Homeowners Association that was necessary to connect the lower and upper golf holes. The Agreement accordingly contemplated Plaintiff granting an "alternative easement" through the Trout property in the event that efforts to obtain the easement from Westbank were unsuccessful; albeit, such an easement was subject to Plaintiff's approval and at his sole discretion (¶ 10)[5].

9. The Golf Cart Path Easement, also executed on June 13, 1997, granted Roaring Fork a 100 foot construction easement, "fifty feet on either side of the centerline described in Exhibit A," and a 40 foot permanent easement "twenty feet on either side of the centerline described in Exhibit A." Sometime after January 23, 1998 and before February 11, 1998, Plaintiff and Heggemeier initialed a six page Exhibit A, with pages designated A-1 through A-6, attached it to the June 13, 1997 Golf Cart Path Easement, and had it recorded in the records of Garfield County, Colorado. The Court finds that pages A-1 and A-2 describe the construction easement, and pages A-

---

[2] The parties also discussed a golf membership for Plaintiff and his family as additional consideration. The Court finds that such discussions are not a material term of the negotiations or the eventual agreements.

[3] Roaring Fork actually conveyed the residential lot to Plaintiff pursuant to the special warranty deed on September 29, 1997.

[4] The agreement also provided for Roaring Fork to reimburse Plaintiff for his attorney fees in connection with the advice he received for his attorney's review of the agreements.

[5] Roaring Fork subsequently obtained an easement from the Westbank Homeowners Association.

4

3 through A-6 describe the "alternative easement" through the Trout property. The descriptions comprising Exhibit A were prepared by High County Engineering by means of an aerial survey, although both Plaintiff and Heggemeier believed they were the product of a ground survey.

10. Both parties agree that the centerline described in Exhibit A, which was attached to the Golf Cart Path Easement, was intended to be the centerline for the 100 foot wide construction easement. Plaintiff contends that the Agreement contemplates only "one easement" through the Trout property, that the description in Exhibit A (A-1 and A-2) constitutes the centerline for both the construction easement and the permanent easement, and that any additional easements require his express approval.[6] Defendants contend that Exhibit A (A-1 and A-2) describes only the centerline for the construction easement, and that the Agreement contemplates a subsequent clarification of the permanent easement once the golf cart path is completed. Both Plaintiff and Heggemeier testified that, prior to June 13, 1997, they discussed issues regarding placement of the golf cart path, including the possible necessity of routing the path around rocks and other physical obstacles. In light of these discussions and the acknowledged uncertainties regarding the placement and actual construction of the cart path, the Court is not persuaded that the parties nevertheless contemplated a permanent easement within a narrow 40 foot corridor of an as yet undetermined centerline. To the contrary, the Court finds credible Heggemeier's testimony that the parties' agreement took into account such uncertainties and the practicalities of construction, including the necessity of "adjusting" the centerline as construction proceeded. The Court accordingly finds that, prior to executing the agreements and easements in June 1997, the parties contemplated an eventual clarifying easement upon the completion of construction to determine the exact location of the permanent easement. The conclusion is consistent with the express language of paragraph 11 of the Agreement.[7]

11. On November 15, 2000, Defendant LB Rose (hereafter "LB") acquired title to the Ironbridge Golf Course, also known as LB Rose Ranch Golf Course, from Roaring Fork and became its successor in interest under the Agreement, the Golf Cart Path Easement and the Access Easement. LB is a subsidiary and successor of Lehman Brothers, Roaring Fork's lender as of July 1997, and is the assignee of Roaring Fork. The court finds that, as of July 1997, Lehman Brothers was actively involved in monitoring the Rose Ranch project as a lender with a "participation interest,"

---

[6] It is undisputed that, subsequent to the execution of the operative documents, neither Roaring Fork or its successors consulted with or obtained Plaintiff's approval for any additional easement through the Trout property.
[7] The Court is not persuaded by Plaintiff's assertion that such a "clarifying" easement constitutes an "additional" easement requiring his express approval which, admittedly, was never sought or obtained. Provisions governing "additional" easements, which are at the sole discretion and subject to the express approval of Plaintiff, are set forth in paragraph 10 of the Agreement, and pertain to the "alternate easement" in the event Defendants were unable to obtain an easement from Westbank Homeowners Association. Paragraph 11, entitled "Further Modification of Legal Description for Easement Across Trout Parcel," separately addresses "further clarification and definition" of the legal description of the permanent easement, and *requires* Plaintiff's cooperation.

5

meaning it would share in any profits as well as receive interest on the money it invested in the project in the form of a loan to Roaring Fork. LB also had a right of first refusal, which was recorded in August 1997, as well as the right to purchase Roaring Fork's interest in the project. In September 1997, LB hired William Hatch as its Asset Manager, who was charged with reviewing and approving all expenditures and discussing all material issues related to the project with Heggemeier. As such, the Court finds that LB was not an arms-length lender. Upon acquiring title in November 2000, LB took the project over and proceeded with the residential development and construction of the golf course.

12. In December 2000, LB commenced construction of the golf course and the golf cart path across the Trout property. Shortly after construction began, LB constructed an earthen berm arising approximately twenty feet in height from, and running parallel to, county road 109 on LB's property adjacent to the east boundary of the residential lot. The berm was a by-product of grading necessary to complete construction of hole number 14, and was intended to insulate hole 14 from the traffic on county road 109 to enhance the "golf experience" of the hole. As initially constructed, the berm completely blocked use of the access easement. In the spring of 2001, Plaintiff contacted LB to discuss removal of the berm from the access easement, and LB subsequently removed a substantial portion from the access easement to within one or two feet of the original grade. Prior to the construction of the berm, the access easement was accessible by foot, but not by vehicle, due to a natural drainage culvert crossing the access easement.

13. From July 1997, following the execution of the operative agreements, through May 2000, Plaintiff had numerous communications, personally and through counsel, with LB in an attempt to obtain evidence verifying insurance coverage for the golf cart path easement in accordance with paragraph 6 of the Agreement. In 2000, LB provided a Certificate of Insurance that was subsequently supplemented with a more complete copy of the insurance policy following a hearing on Plaintiff's motion for a preliminary injunction. Based upon the testimony and exhibits presented at trial, the Court finds that, at the time construction commenced on the golf cart path through the Trout property, liability insurance in the amount of $1,000,000.00 had been obtained by LB which included coverage as to the golf cart path easement. Although Plaintiff complained that the policy contained certain exclusions, such as exclusion of coverage for certain sporting activities, the Court finds that no such sporting activities (such as golf and bicycling) had not commenced inasmuch as the golf course and the golf cart path had not yet been completed. The Court finds no credible preponderance of evidence sufficient to establish that Roaring Fork or LB failed to obtain insurance during and subsequent to the construction of the golf course and the construction upon the golf cart path easement, as required by the Agreement.

14. Also during the time period of July 1997 through May 2000, Plaintiff made numerous attempts to obtain from Roaring Fork and LB a suitable indemnification agreement

6

pursuant to paragraph 6 of the agreement. Plaintiff and Heggemeier discussed a provision in which Roaring Fork (and any successor) would indemnify Plaintiff from any loss or damage resulting from the use of the golf cart path during their preliminary negotiations, and indemnification constituted a material term of the Agreement. The Court finds credible Plaintiff's testimony that the intent of the parties was to shift all risk of loss or damage related to use of the golf cart path to Roaring Fork and its successors, including any claims related to loss or damage caused by Plaintiff's own negligence or conditions on Plaintiff's property. Ultimately, counsel for Plaintiff forwarded a proposed indemnification agreement, which LB found unacceptable, and LB subsequently forwarded its proposed indemnification agreement, which Plaintiff found acceptable. The Court finds that neither party's draft agreement complied with the Agreement,[8] and as of the date of trial no indemnification agreement has been executed by the parties.[9]

15. Construction of the golf cart path on the golf cart path easement commenced in late 2000. The cart path, as ultimately constructed, consists of an 8 to 10 foot wide concrete path that is entirely within the 100 foot construction easement described in Exhibit A (A-1 and A-2) of the Golf Cart Path Easement. Based upon a ground survey conducted by James Ackerman, approximately 10 to 15 percent of the cart path as constructed falls outside the 40 foot corridor from the centerline described in Exhibit A. The Court finds credible the testimony of LB's engineer, Joe Hope of High Country Engineering, that the cart path was constructed in the most practical fashion possible, and in a manner designed to maximize the safety for ultimate users of the path and to minimize the impact on the canyon, including the waters of the United States. The Court further finds credible Hope's testimony that constructing the path entirely within the 40 corridor of the centerline described in Exhibit A was neither practical, given the physical terrain and obstacles within the canyon, nor would it have been safe for eventual users of the path given the slopes and grades of various portions of the canyon. Hope also testified credibly that, in his professional opinion, it would not be possible, let alone cost effective, to relocate the cart path entirely within the 40 foot corridor of the centerline described in Exhibit A.

---

[8] For example, LB's proposed agreement provided that a newly formed homeowners association, and not LB, would indemnify Plaintiff, and required Plaintiff to agree to indemnify the homeowners association for any loss caused by his negligence, if any. Plaintiff's proposed agreement, for example, contained provisions requiring insurance coverage far in excess of that required by paragraph 6 of the Agreement and referenced beneficiaries not included within the Agreement.

[9] Paragraph 6 of the Agreement provides that Defendants "will execute indemnity agreements indemnifying Trout from any loss and damage occasioned by use of the easement area on or before July 31, 1997." The Court finds the quoted language ambiguous. Heggemeier testified that the provision contemplated indemnification by Defendants for loss or damage *that occurred* on or before July 31, 1997. Plaintiff testified that the provision required the indemnification agreement *to be drafted* and executed on or before July 31, 1997. The quoted language is susceptible of both meanings. Based upon the negotiations of the parties prior to July 13, 1997, the subsequent conduct of Heggemeier and LB to draft a suitable indemnification agreement several years after the Agreement was executed, and the fact that the time frame of "on or before July 31, 1997" was included at the insistence of Plaintiff (*see* Exhibit 58), the Court finds Plaintiff's interpretation more credible.

7

16. The Court finds no credible preponderance of evidence of any safety concerns due either to the construction of the golf cart path or as to cart path as currently constructed. No evidence was presented as to any claims or threatened claims regarding the construction or subsequent use of the golf cart path, or as to any other damages regarding the golf cart path or Plaintiff's property adjacent to the cart path. Based upon the exhibits presented at trial, the Court also finds no credible evidence that the construction of the golf cart path unnecessarily and negatively impacted the canyon visually. Accordingly, the Court finds that Plaintiff has proven no damages regarding the construction or use of the golf cart path or the Golf Cart Path Easement.

17. A boundary survey was conducted of the Golf Cart Path Easement area by High County Engineering which fairly and accurately describes the area of the 40 foot permanent easement for the golf cart path as constructed, as provided by paragraph 11 of the Agreement. *See* Defendant's Exhibit FF.

18. The golf course, as ultimately constructed, includes hole number 14 that is adjacent to the residential lot with three tee boxes located south of the access easement and adjacent to the east border of the residential lot, and a "back" tee box located north of the access easement. Both parties offered expert testimony from golf course architects regarding the design of the golf hole and the placement of the tee boxes. While both experts possess impressive credentials and testified credibly, they offered contrary opinions regarding the relative safety of hole 14 as designed and constructed. Christopher Wilczynski, the principal golf course architect, recognized early in his course design that the "back" tee box, that was initially positioned further north beyond the northern-most boundary of the residential lot, created a safety concern with respect to the residential lot, inasmuch as the lot fell within the "safety zone" for golf shots hit from that back tee. However, he testified that the back tee, as ultimately re-positioned closer to the access easement, resolved the safety issue. Dan Bucko, a golf course architect retained by Plaintiff, opined to the contrary that, even as re-positioned, the back tee creates an unreasonable risk that errant tee shots could intrude upon the "safety zone" within a portion of the residential lot. The evidence establishes that, as of the time of trial, only a negligible number of golf balls have actually been recovered from the residential lot.

19. It is undisputed that hole number 14's "back" tee box is positioned directly behind, and adjacent within one to two feet of, the access easement. The Court does not find credible Wilczynski's testimony that the current position of that tee box does not create a safety concern. To the contrary, the Court agrees with Bucko that the current positioning not only increases the likelihood of "conflict" between golfers and users of the access easement, but that it unreasonably exposes users of the access easement to the danger of being hit by golf balls at high velocity at nearly "point blank" range. The danger is increased because the earthen berm, in its present location, blocks sightlines between the back tee box and the access easement, and from the access

8



easement to county road 109, making entry onto and exit from the access easement hazardous to both golfers and users of the easement. In fact, the photographic evidence presented by Plaintiff convincingly demonstrates that, due to the restricted sightlines, users entering the access easement from county road 109 would have no awareness of golfers accessing the back tee box until the two are in nearly direct proximity of each other.

20. Both Wilczynski and Buck agree that hole number 14's back tee box could be repositioned or eliminated at minimal relative cost and with minimal impact upon the golf hole and golf course as a whole. Neither expert opined that the three existing forward tee boxes on the fourteenth hole pose any safety issues vis a vis the residential lot.

21. As of the date of trial, Plaintiff has not developed or placed any improvements upon the residential lot or the access easement.

22. The Court finds no preponderance of credible evidence of any diminution of value of either the residential lot or access easement due to the construction of hole number 14, including the placement of the berm adjacent to county road 109. The Court specifically finds Plaintiff's lay opinion as to diminution of value to lack credibility.

## CONCLUSIONS OF LAW

### 1. Rescission

23. Having found that the parties had a meeting of the minds on all of the material terms of the Agreement and that Defendants made no material misrepresentations causing Plaintiff to be fraudulently induced to enter into the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of rescission.

### 2. Reformation

24. In light of the finding that the documents executed by the parties set forth all of the material terms of the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of reformation.

### 3. Breach of Contract

25. To prevail on a claim of breach of contract, the plaintiff must establish the existence of an enforceable contract and breach thereof. Proof of actual damages is not required for a court to enter judgment on a breach of contract claim. The Agreement in the instant action provides that, in the event of a breach of the terms or conditions,



9

the non-breaching party is entitled to bring an action for specific performance, damages, or both.

26. The Court concludes that the preponderance of credible evidence establishes the existence of a binding and enforceable contract. Based upon the Court's findings of fact as entered herein, the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence that Defendant Roaring Fork and its successor LB Rose breached the Agreement by failing to obtain liability and property damage insurance as required by paragraph 6. However, the Court concludes that the preponderance of credible evidence presented by Plaintiff establishes that Defendant Roaring Fork and its successor LB Rose failed to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area and, as such, is in breach of that portion of paragraph 6 of the Agreement. In light of the Court's finding that Plaintiff has sustained no actual damages due to Defendants' breach, the Court will award Plaintiff nominal damages and order specific performance of that portion of paragraph 6 of the Agreement requiring the execution of an indemnification agreement.

27. The Court further concludes that Plaintiff has failed to establish by preponderance of the evidence that the placement of the back tee box on the fourteenth hole creates an unreasonable risk of errant golf balls upon the residential lot such as to constitute a breach of the covenant of quiet use and enjoyment of that property. However, the preponderance of the credible evidence establishes that the placement of that back tee box creates a substantial risk of conflict between golfers and users of the access easement and creates a sufficiently dangerous condition as to constitute a breach of the covenant use and enjoyment of the access easement.

28. Based upon the Courts findings of fact regarding the nature, location and description of the golf cart path easement, the Court concludes that Plaintiff has breached paragraph 11 of the Agreement by failing to execute necessary documents for clarifying and further defining the easement area for the permanent easement. The Court concludes that Defendants sustained no damages as a result of the breach, and the Court accordingly will award Defendants nominal damages. The Court further concludes, however, that Defendants are entitled to specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

### 4. Quiet Title

29. Based upon the foregoing findings of fact and conclusions, the Court concludes that Plaintiff owns clear title to his original parcel and the residential lot, and is entitled to exclusive possession of all parts of his original 40 acres with the sole exception of the 40 foot wide non-exclusive easement as specifically described in the July 27, 2002

10

legal description by High County Engineering, and as set forth in Defendant's Exhibit FF. Inasmuch as an easement was obtained from the Westbank Homeowners Association permitting construction of the golf cart path in the lower portions of the canyon, the alternate easement described in Exhibit A (A-3 through A-6) of the Golf Cart Path Easement is of no force and effect.

### 5. Trespass

30. To prevail on a claim for trespass, Plaintiff must establish that Plaintiff was the owner of the subject property and that Defendants intentionally entered upon the property without Plaintiff's consent. In light of the Court's previously entered findings of fact regarding the nature, location and description of the construction and permanent easements, as contemplated by the Agreement, the Court concludes that Plaintiff has failed to prove both elements of the claim by a preponderance of the evidence.

### 6. Attorney Fees and Costs

31. Paragraph 18 of the agreement provides that, "in the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action." In a civil action, the prevailing party is one who succeeds on a significant issue in the case and whose claim furthers the purpose of the fee shifting provision. *Spencer Contractor, Inc, v. City of Aurora*, 884 P.2d 326 (Colo. 1994). In the instant matter, the Court finds that both parties succeeded on several significant issues in the case, and that both parties successfully defended on equally significant issues in the case. As such, the Court concludes that neither party is the "prevailing party" within the meaning of the Agreement.

### FINAL JUDGMENT AND ORDERS

Based on the foregoing findings of fact and conclusions of law, the Court enters the following final judgment and orders:

1. Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's claims for rescission, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

2. Judgment is entered in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the Agreement. There being no actual damages, the Court awards nominal damages to Plaintiff in the sum of one dollar ($1.00). The Court also orders specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage

occasioned by use of the easement area from June 13, 1997 forward. The indemnification agreement shall be prepared and executed in a form substantially similar to that contained in Defendant's Exhibit X, with the exception that the agreement will not exclude loss or damage caused by the action or inaction of the owner of Plaintiff's property, and will indemnify Plaintiff for reasonable attorney fees, costs and expenses incurred defending claims related to use of the golf cart path or to enforce the indemnification agreement itself.

3. Judgment is entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the back tee box of golf hole number 14 as presently designed and located on the fourteenth hold of the Ironbridge Golf Course, Garfield County, Colorado.

4. Judgment is entered in favor of Defendants and against Plaintiff on Defendants' breach of contract claim for failure to execute additional documents pursuant to paragraph 11 of the Agreement. There being no actual damages, the Court awards nominal damages to Defendants in the sum of one dollar ($1.00). The Court also orders specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

5. Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's trespass claim.

6. All parties shall pay their own attorney fees, costs and expenses.

7. Pursuant to the Court's Pre-Trial Order, each party shall retail in their original condition all exhibits offered and received at trial until the time for filing post-judgment or appellate pleadings has expired.

8. All performance required by the orders herein shall be accomplished within 30 days of this Order.

SO ORDERED this ___ day of _____, 2004.

BY THE COURT:

_____
District Court Judge

cc: Richard Shearer, Esq.
    John Madden, Esq.
    William Shay, Esq.