## **Exhibit B**

COLORADO COURT OF APPEALS

_____

Court of Appeals No.: 04CA1862
City and County of Denver District Court No. 01CV4208
Honorable Martin F. Egelhoff, Judge

_____

Roger R. Trout,

Plaintiff-Appellant,

v.

Roaring Fork Investments, L.L.C. and LB Rose Ranch, L.L.C.,

Defendant-Appellees.

_____

JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by: JUDGE J. JONES
Casebolt and Carparelli, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(f)**
Announced: August 3, 2006

_____

Ireland, Stapleton, Pryor & Pascoe, P.C., Richard L. Shearer, J. Alan Call, Denver, Colorado, for Plaintiff-Appellant

William Dixon Shay, Jr., Denver, Colorado, for Defendant-Appellee Roaring Fork Investments, L.L.C.

Madden & Madden, John W. Madden, III, John W. Madden IV, Denver, Colorado, for Defendant-Appellee LB Rose Ranch, L.L.C.

the entry of judgment in Trout's favor on the parties' easement claims.

## I. Background

Trout owns a forty-acre parcel of steep mountain property in Garfield County, Colorado. There are no roads leading into the landlocked property; it is only accessible through the northern canyon by foot. In the spring of 1997, Ron Heggemeier of LB Rose Ranch's predecessor-in-interest, Roaring Fork Investments, L.L.C., began negotiating with Trout in an attempt to acquire a portion of the Trout property. Roaring Fork wanted to develop the adjacent property as a golf course and residential community, and needed an easement across the Trout property to connect the lower golf course holes with the upper golf course holes, which were located on a landlocked mesa above the Trout property.

The parties' negotiations focused on a golf cart path easement which would generally follow the bottom of the canyon and would provide access to the upper holes of the golf course. A temporary path would be used mainly by construction vehicles, and a permanent path would be used by golf carts, bicycles, and pedestrians. In exchange for the easement, Roaring Fork would

convey to Trout a residential building site adjacent to the lower Trout property line and the 14th hole, an easement across the 14th hole which would give Trout access to the residential lot and to the rest of the Trout property from County Road 109, and $30,000.

Roaring Fork was required to submit a development plan, which included an easement that would connect the upper and lower holes of the golf course, to the Garfield County Planning Commission by mid-June 1997. To enable Roaring Fork to meet the impending deadline, Roaring Fork and Trout executed three written agreements on June 13, 1997: (1) an Easement and Transfer Agreement which specifies, in relevant part, that Trout would allow a golf cart path easement through the canyon on the Trout property in exchange for title to a residential lot along his lower property line; (2) an easement agreement granting Roaring Fork a 100-foot-wide temporary construction easement and a forty-foot-wide permanent easement for a golf cart path through the canyon located on the Trout property (the Golf Cart Path Easement Agreement); and (3) an easement agreement by which Roaring Fork granted Trout an access easement to the residential lot (the Access Easement Agreement).

The Easement and Transfer Agreement grants the golf cart path easement across the Trout property in paragraph 4.

> 4. **TROUT GRANT OF EASEMENT**. Trout hereby grants Roaring Fork and others a perpetual non-exclusive easement, described and depicted on the attached Exhibit I, for the purposes described therein and agrees to record the same in the real estate records simultaneous with the recording of the easement granted by Roaring Fork which is specified in Paragraph 3 above.

Though there was no "Exhibit I" attached to the Easement and Transfer Agreement, Heggemeier's testimony was that the Golf Cart Path Easement Agreement was that document.

As of June 13, 1997, when the easement agreements were executed, a survey had not been completed. However, paragraph 11 of the Easement and Transfer Agreement and paragraph 1 of the Golf Cart Path Easement Agreement provide for the creation of a description of the easement based upon a subsequent survey of the bottom of the canyon. Specifically, paragraph 11 of the Easement and Transfer Agreement states:

> 11. **FURTHER MODIFICATION OF LEGAL DESCRIPTION FOR EASEMENT ACROSS TROUT PARCEL**. Due to the fact that Roaring Fork has not yet surveyed the easement area which is being granted by Trout in Paragraph 4 above, Trout agrees to execute any and all additional documents necessitated for

connection or further clarification and definition of the legal description for said easement area after Roaring Fork obtains a survey for said easement area.

The Golf Cart Path Easement Agreement provides as follows with respect to the location of the temporary construction easement and the permanent easement:

The Grantor hereby grants to the Grantee for and in consideration of the sum of TEN AND NO/100 dollars ($10.00) paid to the Grantor by the Grantee, an easement and right-of-way over and across the property described in Exhibit A attached hereto and made a part hereof. The terms and conditions governing the easement shall be as follows:

1. **Width and Location**. There shall be a construction easement one-hundred feet (100') in width and fifty feet (50') on either side of the centerline described in Exhibit A and a permanent easement forty feet (40') and twenty feet (20') on either side of the centerline described in Exhibit A.

Paragraph 1 goes on to list the allowable purposes for the permanent easement.

"Exhibit A" was not attached to the Golf Cart Path Easement Agreement at the time it was executed by the parties. To create that document, Roaring Fork subsequently hired High Country Engineering to survey the bottom of the canyon and locate the centerline. High Country Engineering performed an aerial survey of

5

the Trout property and used the survey to create the legal description of the centerline of the bottom of the canyon on September 23, 1997. Roaring Fork labeled this centerline survey "Exhibit A." Exhibit A actually contains two "centerline" surveys, one labeled "Cart Path Construction Easement," and a second labeled "Golf Cart Easement Description." The parties stipulated, however, that the Golf Cart Easement Description, set forth on pages A-3 to A-6 of Exhibit A, does not relate to the golf cart path at issue in this appeal, and was created in the event that Roaring Fork could not obtain a connecting lower easement across the land of a third party (the Westbank property). However, Roaring Fork subsequently obtained an easement across the Westbank property.

Pages A-1 to A-2 of Exhibit A depict a metes and bounds legal description of the centerline of the bottom of the canyon. Exhibit A and the Golf Cart Path Easement Agreement were initialed by Trout and Heggemeier, and then recorded by Roaring Fork in the real property records of Garfield County on February 11, 1998.

On November 15, 2000, LB Rose Ranch acquired title to the golf course property from Roaring Fork and became its successor-in-interest under the easement agreements. In late 2000, LB Rose

Ranch began construction of the golf course adjacent to the Trout property.

After LB Rose Ranch began construction, Trout filed suit against Roaring Fork and LB Rose Ranch in Denver District Court on August 7, 2001. Trout's complaint stated a single claim for breach of contract arising out of Roaring Fork's and LB Rose Ranch's alleged failure to comply with certain terms of the June 13, 1997 contracts. Specifically, Trout's complaint alleged that Roaring Fork and LB Rose Ranch failed to provide proof of $1 million in liability and property damage insurance, failed to provide a reasonable indemnification agreement that would protect Trout from liability in the event of any damage caused by use of the golf cart path easement, and failed to allow Trout the use and enjoyment of his access easement because the access easement to his property was completely blocked by dirt.

Trout later filed an amended complaint, adding new allegations. He alleged that his quiet use and enjoyment of the residential lot was hampered by the danger of golf balls hit from the 14th hole tee box; Roaring Fork misrepresented that the golf course

would be public; and Roaring Fork falsely represented to Trout that he would not need a membership to the golf course.

After Trout filed suit in Denver District Court, LB Rose Ranch hired High Country Engineering to conduct a survey of the easement area and to prepare a legal description of the location of the golf cart path "as constructed." The survey is dated July 27, 2002. As constructed, the golf cart path is located entirely within the 100-foot-wide construction easement corridor, as described in Exhibit A of the Golf Cart Path Easement Agreement. However, approximately ten to fifteen percent of the golf cart path is located outside of the forty-foot-wide corridor calculated from twenty feet on either side of the centerline described on pages A-1 to A-2 of Exhibit A.

LB Rose Ranch filed a separate action against Trout in Garfield County District Court on July 15, 2002, asserting a claim for breach of contract, based on the allegation that Trout breached paragraph 11 of the Easement and Transfer Agreement by refusing to provide a "clarifying" easement consistent with the "as constructed" golf cart path. Trout filed counterclaims to quiet title to that portion of the golf cart path outside of the agreed upon

easement area, and for trespass and breach of contract, also
alleging that LB Rose Ranch constructed a golf cart path on his
property outside of the boundaries of the permanent golf cart path
easement agreed to by the parties.

In its answer to Trout's counterclaims, LB Rose Ranch averred
that it was "entitled under the Easement and Transfer Agreement to
an easement across the Trout property which is not limited to the
specifically described boundaries of the Golf Cart Path Easement
[Agreement] and which includes the real property across which the
present golf cart path is constructed . . . . " According to LB Rose
Ranch, the "permanent easement" described in Exhibit A was
intended to be only "temporary" or "preliminary," and would be
"adjusted" after construction to account for where LB Rose Ranch
actually decided to construct the golf cart path.

The Garfield County case was ultimately consolidated with the
Denver case. The consolidated cases were tried to the Denver
District Court.

As relevant to this appeal, in addition to those facts set forth
above, the trial court also found that there was a meeting of the
minds as to the three written agreements that were executed on

June 13, 1997; those documents contained all the material terms of the parties' agreement regarding the easement; and pages A-1 and A-2 of Exhibit A portray only the temporary construction easement. The trial court did not find that the easement agreements were ambiguous. Nevertheless, in finding that the canyon centerline depicted in Exhibit A applies only to the temporary construction easement, the trial court relied on evidence of discussions predating the agreements. Based on these discussions, the trial court found that the parties did not contemplate construction of the golf cart path within a narrow forty-foot corridor, running twenty feet on either side of the centerline of the bottom of the canyon, as set forth in paragraph 1 of the Golf Cart Path Easement Agreement. Instead, the trial court found, the parties contemplated that the centerline of the permanent easement would need to be "adjusted" after construction began, and that an eventual clarifying easement agreement would need to be prepared upon completion of construction.

Accordingly, the trial court entered judgment in favor of Roaring Fork and LB Rose Ranch on their claim against Trout for breach of contract and on Trout's trespass and breach of contract

10

claims relating to the golf cart path easement. The trial court also ruled that Trout did not have clear title to those portions of the forty-foot nonexclusive easement described in the July 27, 2002 legal description provided by High Country Engineering that are outside of the area twenty feet on either side of the canyon centerline, but he owned clear title to his original forty-acre parcel. Because the trial court found that LB Rose Ranch did not suffer any actual damages by virtue of Trout's breach of contract, the trial court awarded only nominal damages; however, the trial court also ordered specific performance as to the clarifying easement requested by LB Rose Ranch.

## II. Discussion

Trout contends the trial court erred in finding that he breached the Easement and Transfer Agreement by not providing a clarifying easement for the golf cart path "as constructed"; in requiring specific performance as to the clarifying easement; and in entering judgment in favor of Roaring Fork and LB Rose Ranch on his quiet title, trespass, and breach of contract claims pertaining to the easement. In essence, as noted above, Trout challenges the trial court's reliance on parol evidence to interpret the agreements,

contending that those agreements unambiguously provide that the golf cart path easement would be an area twenty feet on either side of the canyon centerline described in Exhibit A.  We agree with Trout.

## A.  Standard of Review

Whether a written contract is ambiguous and, if not deemed ambiguous, how the unambiguous contractual language should be construed, are questions of law, which we review de novo.  Lake Durango Water Co., Inc. v. Public Utilities Comm'n, 67 P.3d 12, 20 (Colo. 2003); accord Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 374 (Colo. 1990); KN Energy, Inc. v. Great Western Sugar Co., 698 P.2d 769, 776 (Colo. 1985); Union Rural Elec. Ass'n v. Public Utilities Comm'n, 661 P.2d 247, 251 (Colo. 1983); Fire Ins. Exch. v. Rael, 895 P.2d 1139, 1142 (Colo. App. 1995).  Accordingly, we need not defer to any finding of the trial court on those questions.  Lake Durango Water Co., supra, 67 P.3d at 20; Dorman v. Petrol Aspen, Inc., 914 P.2d 909, 912 (Colo. 1996); Fibreglas Fabricators, supra, 799 P.2d at 374; Fire Ins. Exch., supra, 895 P.2d at 1142-43.

However, once a term of a contract is deemed ambiguous, the meaning of the ambiguous term is a question of fact to be

determined and reviewed in the same manner and with the same

deference as other questions of fact. Pepcol Mfg. Co. v. Denver

Union Corp., 687 P.2d 1310, 1314 (Colo. 1984); Union Rural Elec.

Ass'n, supra, 661 P.2d at 251 n.5; Fire Ins. Exch., supra, 895 P.2d

at 1143.   Therefore, if we determine that the relevant provisions of

the parties' agreements are ambiguous, we may overturn the trial

court's finding regarding the meaning of those provisions only if

those findings are clearly erroneous. Page v. Clark, 197 Colo. 306,

313, 592 P.2d 792, 796 (1979); Rocky Mountain Health Maint. Org.,

Inc. v. Colo. Dep't of Health Care Policy & Financing, 54 P.3d 913,

919 (Colo. App. 2001); Nat'l Propane Corp. v. Miller, 18 P.3d 782,

787 (Colo. App. 2000).   A trial court's factual finding is clearly

erroneous only if it has no support in the record. Page, supra, 197

Colo. at 313, 592 P.2d at 796; Nat'l Propane Corp., supra, 18 P.3d

at 787.

  B. Applicable Principles of Contract Interpretation

  The intent of the parties to a written contract must be

determined primarily from the written terms. KN Energy, supra,

698 P.2d at 776.   Where, as here, the parties execute multiple

agreements at the same time, all dealing with the same subject

13

matter, they must be construed together to determine the parties' intent. Harty v. Hoerner, 170 Colo. 506, 509, 463 P.2d 313, 314 (1969); O'Reilly v. Physicians Mut. Ins. Co., 992 P.2d 644, 648-49 (Colo. App. 1999); Bledsoe v. Hill, 747 P.2d 10, 12 (Colo. App. 1987).

The mere fact that the parties urge different interpretations of a contract does not establish the existence of an ambiguity. Dorman, supra, 914 P.2d at 912; Fibreglas Fabricators, supra, 799 P.2d at 374. "In determining whether a contractual provision is ambiguous, 'the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used,' with reference to all of the agreement's provisions, and a provision is ambiguous 'if it is fairly susceptible to more than one interpretation.'" Dorman, supra, 914 P.2d at 912 (quoting in part Fibreglas Fabricators, supra, 799 P.2d at 374); see also Fire Ins. Exch., supra, 895 P.2d at 1143. "It is only where the terms of [the] agreement are ambiguous or are used in some special or technical sense not apparent from the contractual document itself that the court may look beyond the four corners of the

agreement in order to determine the meaning intended by the parties." Pepcol Mfg. Co., supra, 687 P.2d at 1314.

The question of whether an ambiguity exists, however, need not be resolved solely by reference to the four corners of the document. Rather, certain extrinsic evidence may be considered, including evidence of local usage, technical meaning, and the circumstances surrounding the making of the contract. Public Service Co. v. Meadow Island Ditch Co. No. 2, 132 P.3d 333, 339 (Colo. 2006); Columbus Invs. v. Lewis, 48 P.3d 1222, 1228 (Colo. 2002); KN Energy, supra, 698 P.2d at 776-77; Fire Ins. Exch., supra, 895 P.2d at 1143; see also 2 E. Allen Farnsworth, Farnsworth on Contracts §§ 7.10, 7.12, 7.12a (2d ed. 1998).

An important limitation on the consideration of extrinsic evidence in this context – and one particularly applicable in this case – is that the court may not consider the parties' extrinsic expressions of intent. Public Service Co., supra, 132 P.3d at 339; KN Energy, supra, 698 P.2d at 777; Fire Ins. Exch., supra, 895 P.2d at 1143. Likewise, while extrinsic evidence may be admissible to show the existence of an ambiguity by demonstrating that a term which is apparently unambiguous on its face in fact carries a

15

different meaning under the circumstances, it is never admissible to

contradict the plain meaning of a term. See Cheyenne Mountain

School Dist. No. 12 v. Thompson, 861 P.2d 711, 715 (Colo. 1993);

Employment Television Enterprises, LLC v. Barocas, 100 P.3d 37,

43 (Colo. App. 2004) (evidence of usage of trade is admissible if it

suggests an alternative meaning); 2 Farnsworth, supra, § 7.12; cf.

Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1235

(Colo. 1998) (noting that extrinsic evidence may be admitted

provisionally to determine whether a deed granting an easement is

ambiguous, but not to vary or contradict the writing; citing 4

Samuel Williston, A Treatise on the Law of Contracts § 601, at 311

(Jaeger ed. 1961)).

In the event that the court, after considering all the relevant

evidence, determines that a contract is not ambiguous, "the court

must, in the absence of a showing that the contract is voidable on

grounds such as mistake, fraud, duress, undue influence, or the

like, or unless the result would be an absurdity, give effect to the

contract as written." Lake Durango Water Co., supra, 67 P.3d at

20. If, however, the court determines that the contract is

ambiguous, the court may consider extrinsic evidence to explain or

16

supplement – but not to contradict – the contract, including

evidence of prior negotiations; local, special, or technical usage; the

circumstances surrounding the making of the contract; and the

parties' course of dealing under the contract.  Cheyenne Mountain,

supra, 861 P.2d at 715; Benham v. Pryke, 744 P.2d 67, 72 (Colo.

1987); KN Energy, supra, 698 P.2d at 776-77; Atmel Corp. v.

Vitesse Semiconductor Corp., 30 P.3d 789, 792 (Colo. App. 2001);

Fire Ins. Exch., supra, 895 P.2d at 1143.

With these principles in mind, we turn our attention to the

parties' arguments.

### C.  Analysis

1. Trout did not waive his right to raise the parol evidence rule
on appeal.

LB Rose Ranch challenges Trout's right to raise the parol

evidence rule on appeal, arguing that he waived the issue because

his counsel failed to object to the introduction of parol evidence at

trial, elicited testimony from Heggemeier at trial about precontract

discussions, and stated during argument to the trial court that the

documents are ambiguous.  We disagree.

17

It is well established that the parol evidence rule is one of substantive law, not merely one of evidence. "Therefore, if . . . a contract is unambiguous, then parol evidence, even if received without objection, must be ignored by the trial court." Magnetic Copy Servs., Inc. v. Seismic Specialists, Inc., 805 P.2d 1161, 1164 (Colo. App. 1990). Thus, "the parol evidence rule can be raised on appeal despite the absence of an objection." Magnetic Copy, supra, 805 P.2d at 1164.

LB Rose Ranch's contention that Trout waived the parol evidence issue because his counsel asked Heggemeier questions at trial about precontract discussions fares no better. The law is clear that evidence may be offered and admitted for one purpose even if it would not be admissible for another purpose. Higgs v. Dist. Court, 713 P.2d 840, 860 (Colo. 1985); Spencer v. People, 163 Colo. 182, 188, 429 P.2d 266, 270 (1967); see CRE 105. Here, Trout's primary argument at trial was that the parties' written agreements unambiguously provided for a permanent easement located within twenty feet on either side of the centerline described in Exhibit A. He expressly argued in the alternative that if the court should find an ambiguity, the ambiguity should be resolved in his favor, or the

documents should be reformed (to comport with his understanding of the location of the easement), or the transaction should be rescinded for lack of a meeting of the minds. Thus, Trout was entitled to offer evidence to support those alternative claims, and in so doing did not waive his primary contention.

Nor did Trout waive the right to raise the parol evidence argument on appeal by virtue of statements made by his counsel in closing argument. Trout's counsel clearly argued in closing argument that the documents, when read together, unambiguously called for the permanent easement to be located within twenty feet on either side of the centerline described in Exhibit A. The statements in the record to which LB Rose Ranch points appear to relate only to the meaning of Exhibit A standing alone (as it contained two centerline descriptions) and to the alternative easement.

2. The Easement and Transfer Agreement and the Golf Cart Path Easement Agreement are unambiguous.

Paragraph 1 of the Golf Cart Path Easement Agreement expressly states that the width of both the "construction easement" and the "permanent easement" shall be calculated "on either side of

the centerline described in Exhibit A." Despite this apparently clear language, the trial court found that while the parties intended that this centerline would apply to the construction easement, they did not intend that it would apply to the permanent easement, but instead intended that there would be a second centerline determined after construction of the golf cart path.

Read in context, paragraph 1 is not fairly susceptible of an interpretation that there would be one centerline for the construction easement and a second one for the permanent easement, to be determined after construction. Paragraph 1 refers to "the centerline," necessarily implying a single centerline. Heggemeier testified at trial that the plain language of paragraph 1 calls for a single centerline, not two different centerlines. That Exhibit A, as ultimately prepared, contains two centerlines does not establish an ambiguity in paragraph 1 because, as the parties stipulated, the second of those two centerlines does not pertain to either the construction easement or the permanent easement, and therefore does not pertain to paragraph 1.

We also note that LB Rose Ranch does not contend, and appears never to have contended, that the first use of the phrase

"the centerline described in Exhibit A" – in connection with the

construction easement – is ambiguous.  Indeed, the trial court

found that paragraph 1 means exactly what it says with respect to

the construction easement.  Yet, LB Rose Ranch incongruously

argues, and the trial court incongruously found, that the second

use of the identical phrase, in the same sentence, means something

different.  Under both LB Rose Ranch's and the trial court's

interpretation, the centerline for the permanent golf cart path

easement, unlike the centerline for the construction easement, is

not "described in Exhibit A."

Consistent with LB Rose Ranch's argument and Heggemeier's

testimony about his precontract discussions with Trout, the trial

court concluded that paragraph 1 of the Golf Cart Path Easement

Agreement was intended to set forth only a "temporary" or

"preliminary" description of the location of the golf cart path

easement.  Paragraph 1, however, expressly applies to the

"permanent" easement, and neither it nor any other provision of the

parties' agreements speaks in terms of a "temporary" or

"preliminary" description, to be followed after construction by a

different "permanent" description.  To the contrary, paragraph 11 of

the Easement and Transfer Agreement plainly contemplates "a

survey" to establish the location of the easement, not multiple

surveys at different points in time. Thus, Heggemeier's testimony

contradicted paragraph 1 and could not be considered as merely

explaining it.

In effect, the trial court's interpretation of paragraph 1 of the

Golf Cart Path Easement Agreement reads the clause pertaining to

the permanent easement out of paragraph 1, and substitutes

therefor a different understanding based on extrinsic expressions of

the parties' intent. This was error. See KN Energy, supra, 698 P.2d

at 777; Fire Ins. Exch., supra, 895 P.2d at 1143.

We observe in this regard that, just as paragraph 1 expressly

contemplated, Exhibit A was later prepared by Roaring Fork,

showing a single centerline for the canyon. That survey and the

Golf Cart Path Easement Agreement were subsequently recorded by

Roaring Fork. Though, as LB Rose Ranch points out, that survey

was entitled "Cart Path Construction Easement," paragraph 1 of the

Golf Cart Path Easement Agreement plainly contemplates that the

centerline in Exhibit A would be the centerline for both the

23

construction easement and the permanent easement. No unilateral act of labeling the survey by Roaring Fork could change that fact.

Contrary to LB Rose Ranch's argument on appeal, paragraph 11 of the Easement and Transfer Agreement does not support the trial court's finding. True, paragraph 11 contemplates that the "easement area" would be surveyed at a later date and that Trout would execute any document necessary for clarification of the legal description for the easement area. But paragraph 11 says nothing about an "as built" permanent easement or a postconstruction survey; rather, as noted above, it contemplates a single survey. And Trout agreed to a clarifying document by initialing the September 23, 1997 aerial survey, Exhibit A, which bears the "Colorado Registered Professional Land Surveyor" stamp and was performed by High Country Engineering. This clarification complied with paragraph 11.

LB Rose Ranch also contends that the term "easement area" as used in paragraph 11 requires a metes and bounds description of the boundary of the easement, and Exhibit A does not contain such a description. We disagree.

The area of a linear space is measured by length and width. Paragraph 1 of the Golf Cart Path Easement Agreement and Exhibit A thereto, when read together, plainly describe both the length and the width of the easement.  In this regard, we observe that Joe Hope, an engineer with, and the president of, High Country Engineering, testified that either an aerial centerline survey or a boundary survey could accurately depict the legal description of the location of an easement, and he agreed that a boundary survey is not required to "be recordable and to tell you where it is."

Finally, it is also clear that paragraph 1 of the Golf Cart Path Easement Agreement is consistent with paragraph 4 of the Easement and Transfer Agreement.  Paragraph 4 contemplates preparation of a document describing and depicting "a perpetual non-exclusive easement" and describing the "purposes of" the easement. Paragraph 1, together with Exhibit A, plainly accomplishes both functions.

Nonetheless, LB Rose Ranch also argues that the Easement and Transfer Agreement and the Golf Cart Path Easement Agreement are only partially integrated, and therefore evidence of the parties' precontract discussions may be considered to

"supplement" those documents. Initially we note that both agreements contain integration clauses stating that they constitute the entire agreement of the parties and supersede any prior discussions. The trial court expressly found that the agreements contain all the material terms, a finding which is supported by the record. In any event, even where a document is only partially integrated, parol evidence may not be used to contradict it. <u>See</u> Restatement (Second) of Contracts §§ 213 cmt. b, 215. As discussed above, the trial court used such evidence to contradict paragraph 1 of the Golf Cart Path Easement Agreement.

In sum, we conclude that the parties' written agreements unambiguously provide that the permanent golf cart path easement would be located within twenty feet on either side of the centerline described in Exhibit A. The trial court erred in relying on parol evidence to contradict the written agreements.

3. LB Rose Ranch's alternative defenses are without merit.

LB Rose Ranch also contends, presumably in the alternative, that the agreements were modified by a subsequent oral agreement. LB Rose Ranch did not assert any such modification in the trial court, and the trial court did not make any finding of a

modification. Because modification seeks to avoid liability on a contract, it is an affirmative defense that must be pleaded in a party's answer or otherwise timely raised in the trial court to be preserved. Lease Northwest, Inc. v. Davis, 400 N.W.2d 220, 224 (Neb. 1987); Metrocon Constr. Co., Inc. v. Gregory Constr. Co., Inc., 663 S.W.2d 460, 463 (Tex. App. 1983); see also C.R.C.P. 8(c) (matters constituting an avoidance or affirmative defense must be set forth in a party's answer); cf. Ice v. Benedict Nuclear Pharm., Inc., 797 P.2d 757, 760 (Colo. App. 1990) (rescission is an affirmative defense). Therefore, we deem this argument waived. See Crocker v. Colo. Dep't of Rev., 652 P.2d 1067, 1070-71 (Colo. 1982); Rudd v. Rogerson, 162 Colo. 103, 107, 424 P.2d 776, 779 (1967); Drake v. Tyner, 914 P.2d 519, 521 (Colo. App. 1996); Miller v. Solaglas Cal., Inc., 870 P.2d 559, 563 (Colo. App. 1993).

Even were we to conclude that LB Rose Ranch had not waived the defense of modification, we would nevertheless reject it on the merits. Though LB Rose Ranch states in its brief that there was a "discussion and agreement between Trout and Heggemeier subsequent to [the execution of the Golf Cart Path Easement Agreement] in June 1997," it cites no evidence in the record of such

a discussion or of the precise matters discussed.  For its part, the

trial court expressly relied only on precontract discussions.  There

is simply no evidence in the record to support LB Rose Ranch's

allegation of a subsequent oral modification.

Lastly, LB Rose Ranch argues, again apparently in the

alternative, that the accommodation doctrine of easements should

be applied in this case to allow for relocation of the easement.  We

disagree.

Again, LB Rose Ranch did not raise this claim in any of its

pleadings or in the trial management order.  It raised the claim for

the first time in its trial brief.  It is therefore doubtful that LB Rose

Ranch preserved this claim for appeal.  See Crocker, supra, 652

P.2d at 1070-71.  Assuming, without deciding, that LB Rose Ranch

nonetheless preserved this claim, the doctrine does not apply here

as a matter of law.

The accommodation doctrine allows a servient estate or

burdened property owner to alter an easement in order to maximize

the economic potential of its own property, provided that such

alteration does not injure the owner of the easement.  Roaring Fork

Club, L.P. v. St. Jude's Co., 36 P.3d 1229, 1234-36 (Colo. 2001).

An important tenet of the accommodation doctrine is that, before alteration of the easement, the servient estate must obtain consent from the easement owner or a court order. Roaring Fork, supra, 36 P.3d at 1231, 1237-38.

Here, the servient estate is not requesting the alteration; it is the easement owner requesting the alteration. In Roaring Fork Club, supra, the court relied in part on § 4.8 of the Restatement (Third) of Property (Servitudes), which addresses the relocation of easements. Comment f to that section provides that the rule allowing the servient owner to relocate the easement "is not reciprocal. It permits unilateral relocation only by the owner of the servient estate; it does not entitle the owner of the easement to relocate the easement."

Moreover, the grantor's consent was not obtained before the golf cart path was built partially outside of the permanent easement area. Nor did LB Rose Ranch seek a court order of accommodation prior to constructing the golf cart path partially outside the easement agreed to by the parties.

4. Trout's remedies must be reconsidered.

Though the trial court found that LB Rose Ranch had not breached the agreements with respect to the location of the golf cart path, it nevertheless found that Trout did not suffer any damages by virtue of the location of the golf cart path. Trout does not challenge that finding on appeal.

Trout argues, however, that the trial court erred in refusing to order specific performance of LB Rose Ranch's obligation to construct the golf cart path within twenty feet on either side of the centerline described in Exhibit A. The trial court, explicitly relying on Joe Hope's testimony, which it found to be credible, concluded that requiring LB Rose Ranch to relocate the golf cart path was not possible or cost effective. Our review of the record, however, leads us to conclude that Hope did not testify that building the golf cart path entirely within the area twenty feet on either side of the canyon centerline was impossible. Rather, he testified that he had not made an effort to construct the golf cart path entirely within that corridor, and that he could probably have done so (provided the necessary permits were obtained), but he was not sure. In light of our decision to remand the case for further proceedings, we

direct the trial court to reexamine the feasibility of relocating the golf cart path entirely within the corridor described in Exhibit A, under the legal standards applicable to requests for specific performance. See Greeley & Loveland Irrigation Co. v. McCloughan, 140 Colo. 173, 181, 342 P.2d 1045, 1050 (1959); Tayyara v. Stetson, 521 P.2d 185, 189 (Colo. App. 1974) (not published pursuant to C.A.R. 35(f)).

Finally, Trout requests that we order the trial court to enter an injunction prohibiting further trespasses on his property by means of the golf cart path. In light of its resolution of the merits of the parties' claims for relief, the trial court did not rule on this request following the trial, and we decline to do so in the first instance. Therefore, on remand, the trial court should consider the merits of this request for relief in conjunction with any other remedies necessitated by this opinion.

### III.  Conclusion

Those portions of the judgment against Trout and in favor of Roaring Fork and LB Rose Ranch on Trout's quiet title, trespass, and breach of contract claims, and on LB Rose Ranch's breach of contract claim are reversed. The case is remanded for entry of

judgment in Trout's favor and against Roaring Fork and LB Rose

Ranch on those claims and for further proceedings consistent with

this opinion, including a reexamination of Trout's requests for

specific performance and an injunction, and a reassessment of

whether Trout is entitled to an award of attorney fees under the fee-

shifting provisions of the Easement and Transfer Agreement and the

Golf Cart Path Easement Agreement.

JUDGE CASEBOLT and JUDGE CARPARELLI concur.