# Exhibit D

Reception#: 776842
10/26/2009 01:12:32 PM Jean Alberico
1 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

DISTRICT COURT, DENVER COUNTY, COLORADO
Court Address:
Denver City and County Building
1437 Bannock St   Rm 256
Denver, CO 80202-0000

^ COURT USE ONLY ^

Case Number: 01CV-004208

Div.: 7

Plaintiff:  TROUT, ROGER R.

Defendant:  ROARING FORK INV LLC  et al

## TRANSCRIPT OF JUDGMENT

Original Judgment Amount:          $1.00   Judgment Date: July 30, 2004

Revived Judgment Amount:           $.00   Judgment Date:

Judgment Status:    UNSATISFIED

Additional Remarks:

Debtor(s):   ROARING FORK INV LLC
             LB ROSE RANCH LLC

Creditor(s): ROGER R TROUT

Balance of Judgment to Date:           $1.00

I hereby certify that the above is a true and complete transcript of  the
judgment in the above-referenced case which is retained in my office.

Sabra  Millett
Clerk of Court
DISTRICT COURT, DENVER COUNTY

BY _____
Deputy Clerk

DATE: September 28, 2009

SEP 2 8 2009

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
2 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

| | |
|---|---|
| District Court, City & County of Denver, State of Colorado 1437 Bannock Street, Room 256, Denver, Colorado 80202 **Plaintiffs: ROGER R. TROUT,** <br><br> v. <br><br> **Defendants: ROARING FORK INVESTMENTS, LLC and LB ROSE RANCH, LLC.** | ▲ COURT USE ONLY ▲ |
| Kenneth J. Buechler, #: 30906 <br> Sender & Wasserman, P.C. <br> 1660 Lincoln Street, Suite 2200 <br> Denver, Colorado 80264 <br> Tel: (303) 296-1999 <br> Fax: (303) 296-7600 <br> ken@sendwass.com | Case Number: 01CV004208 <br><br> Div. 7        Ctrm. |

## NOTICE OF LIEN OF A JUDGMENT

On July 30, 2004, the District Court, City and County of Denver, Colorado entered Judgment in favor of Roger R. Trout and against Roaring Fork Investments, LLC and LB Rose Ranch, LLC in the amount of $1.00. (A judgment was also entered the same day against Mr. Trout and in favor of Roaring Fork Investments, LLC and LB Rose Ranch, LLC. Such Judgment was appealed.) On Appeal, the Colorado Court of Appeals found in favor of Mr. Trout and reversed the Judgment against him. On remand, the District Court, City and County of Denver, again found in favor of Mr. Trout. Copies of the Findings of Fact, Conclusions of law, and Order, dated July 30, 2004 of the District Court, the August 3, 2005 Opinion of the Colorado Court of Appeals, and the Order from the District Court dated June 20, 2008, are collectively attached hereto.

Pursuant to C.R.S. §13-52-102 (2009), Mr. Trout intends to perfect his judgment against Roaring Fork Investments, LLC and LB Rose Ranch, LLC. Mr. Trout does not intend to execute on his July 30, 2004 Judgment by this recording. *See Rocky Mountain Ass'n of Credit Mgmt., v. District Court*, 193 Colo. 344, 565 P.2d 1345 (Colo. 1977).

Mr. Trout's July 30, 2004 Judgment relates to and arises out of that Easement Agreement dated June 13, 1997, recorded with the Clerk and Recorder of Garfield County on February 11, 1998, at Reception Number 520281. Mr. Trout asserts that his July 30, 2004 Judgment is a burden upon real property located in Garfield County described as Exhibit A hereto. Mr. Trout's claim underlying his Judgment is more fully detailed below.

## Summary of Total Amount of Claim

| | | |
|---|---|---|
| 1. | Date of Judgment: | July 30, 2004 |
| 2. | Amount of Judgment: | $1.00 |
| 3. | Total Attorney's Fees and Costs requested to be awarded pursuant to paragraph 10 of the Easement Agreement: | $588,032.55 |
| 4. | Total Number of days of Interest: | 1655 |
| 5. | Interest compounded at 18%: | $748,905.75 |
| 6. | Total: | $1,336,939.30 |

DATED this 2b\_ day of October, 2009.

Respectfully submitted,
SENDER & WASSERMAN, P.C.

Kenneth J. Buechler, #30906
Sender & Wasserman, P.C.
1660 Lincoln Street, Suite 2200
Denver, Colorado 80264
Tel: (303) 296-1999
Fax: (303) 296-7600
ken@sendwass.com

Reception#: 776842
10/26/2009 01:12:32 PM    Jean Alberico
4 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO



Exhibit A

## CART PATH CONSTRUCTION EASEMENT DESCRIPTION
### (THROUGH TROUT)

A 50.00 FOOT WIDE STRIP OF LAND SITUATED IN LOT 26 AND 27, SECTION 1,
TOWNSHIP 7 SOUTH, RANGE 89 WEST OF THE SIXTH PRINCIPAL MERIDIAN,
COUNTY OF GARFIELD, STATE OF COLORADO; SAID STRIP OF LAND LYING
25.00 FEET TO EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 1, A BLM BRASS
CAP IN PLACE; THENCE N 50°30'32" E 1335.39 FEET TO A POINT ON THE
NORTHERLY LINE OF SAID LOT 26, SAID POINT ALSO BEING ON SAID
CENTERLINE, THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID
NORTHERLY LINE S 08°04'58" W ALONG SAID CENTERLINE 38.58 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
RIGHT HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 79°39'45",
A DISTANCE OF 34.76 FEET(CHORD BEARS S 31°44'55" W 32.03 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE S 71°34'47" W 11.95 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
RIGHT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 21°47'02",
A DISTANCE OF 19.01 FEET(CHORD BEARS S 82°28'18" W 18.90 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE N 81°44'27" W 16.83 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
LEFT HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 95°09'44", A
DISTANCE OF 41.52 FEET (CHORD BEARS S 50°40'40" W 36.91 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE S 01°01'23" W 29.68 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
RIGHT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 31°40'51",
A DISTANCE OF 27.65 FEET(CHORD BEARS S 16°51'49" W 27.30 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE S 32°42'14" W 88.36 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
LEFT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 26°01'54", A
DISTANCE OF 22.72 FEET (CHORD BEARS S 19°41'17" W 22.52 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE S 06°40'20" W 19.05 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
LEFT HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 60°30'09", A
DISTANCE OF 26.40 FEET (CHORD BEARS S 23°34'44" E 25.19 FEET); THENCE
CONTINUING ALONG SAID CENTERLINE S 53°49'49" E 8.59 FEET; THENCE
CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE
RIGHT HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 28°56'52",

923 Cooper Avenue • Glenwood Springs, CO 81601
Telephone: (970) 945-8676 • FAX: (970) 945-2555

## Exhibit A

A DISTANCE OF 12.63 FEET(CHORD BEARS S 39°21'22" E 12.50 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 24°52'56" E 10.28 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 25.00 FEET AND A CENTRAL ANGLE OF 42°02'11", A DISTANCE OF 18.34 FEET(CHORD BEARS S 03°51'51" E 17.93 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 17°09'15" W 46.43 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 10°32'50", A DISTANCE OF 18.41 FEET(CHORD BEARS S 22°25'40" W 18.38 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 27°42'05" W 49.78 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 46°09'03", A DISTANCE OF 40.27 FEET (CHORD BEARS S 04°37'33" W 39.19 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 18°26'59" E 9.34 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 41°51'43", A DISTANCE OF 36.53 FEET(CHORD BEARS S 02°28'53" W 35.72 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 23°24'44" W 52.26 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 39°55'48", A DISTANCE OF 34.85 FEET (CHORD BEARS S 03°26'50" W 34.14 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 16°31'04" E 8.35 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 48°53'14", A DISTANCE OF 42.66 FEET (CHORD BEARS S 07°55'33" W 41.38 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 32°22'11" W 27.64 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 50.00 FEET AND A CENTRAL ANGLE OF 26°24'43", A DISTANCE OF 23.05 FEET (CHORD BEARS S 19°09'49" W 22.85 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 05°57'27" W 107.09 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 05°31'35", A DISTANCE OF 9.65 FEET (CHORD BEARS S 03°11'40" W 9.64 FEET); THENCE CONTINUING ALONG SAID CENTERLINE S 00°25'52" W 48.93 FEET; THENCE CONTINUING ALONG SAID CENTERLINE ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 100.00 FEET AND A CENTRAL ANGLE OF 09°55'00", A DISTANCE OF 17.31 FEET(CHORD BEARS S 05°23'22" W 17.29 FEET) TO A POINT ON THE SOUTHERLY LINE OF LOT 26 OF SAID SECTION 1, THE TERMINUS; WHENCE THE SOUTHWEST CORNER OF SAID SECTION 1 BEARS N 88°08'24" W 801.05 FEET.

SEPTEMBER 23, 1997
97942.03
CARTWB2.DES

A-2

Reception#: 776842
00/26/2009 01:12:32 PM  Jean Alberico
6 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

## Exhibit A

PAGE NO. 2
GOLF CART DESCRIPTION

       15.00 FEET AND A CENTRAL ANGLE 128°21'12", A DISTANCE OF 33.60 FEET (CHORD BEARS S 76°34'00" W 27.00 FEET)

15. N 39°15'24" W 201.59 FEET

16. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 37°13'03", A DISTANCE OF 9.74 FEET (CHORD BEARS N 57°51'56" W 9.57 FEET)

17. N 76°28'27" W 23.68 FEET

18. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 93°27'27", A DISTANCE OF 24.47 FEET (CHORD BEARS S 56°47'49" W 21.84 FEET)

19. S 10°04'06" W 34.66 FEET

20. S 07°21'29" W 168.56 FEET

21. ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 51°38'41", A DISTANCE OF 13.52 FEET (CHORD BEARS S 33°10'49" W 13.07 FEET)

22. S 59°00'10" W 41.71 FEET

23. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 47°49'58", A DISTANCE OF 12.52 FEET (CHORD BEARS S 35°05'11" W 12.16 FEET)

24. S 11°10'12" W 176.00 FEET

25. S 14°20'09" W 107.55 FEET

26. ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 46°32'55", A DISTANCE OF 12.19 FEET (CHORD BEARS S 37°36'37" W 11.85 FEET)

27. S 60°53'05" W 39.93 FEET

28. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 66°07'04", A DISTANCE OF 17.31 FEET (CHORD BEARS S 27°49'33" W 16.36 FEET)

29. S 05°13'59" E 21.71 FEET TO A POINT ON THE SOUTHERLY LINE OF SAID SECTION 1, THE TERMINUS; WHENCE THE SOUTHWEST CORNER OF SAID SECTION 1 BEARS N 88°08'24" W 917.39 FEET.

JANUARY 23, 1998
97042.03
CART3.DES



Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
7 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO



Exhibit A

## GOLF CART EASEMENT DESCRIPTION

A 80.00 FOOT WIDE STRIP OF LAND SITUATED IN LOT 26 AND 27, OF SECTION 1, TOWNSHIP 7 SOUTH, RANGE 89 WEST, OF THE SIXTH PRINCIPAL MERIDIAN, COUNTY OF GARFIELD, STATE OF COLORADO; SAID STRIP OF LAND BEING 40.00 FEET TO EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE:

COMMENCING AT THE SOUTHWEST CORNER OF SECTION 1, A BLM BRASS CAP FOUND IN PLACE; THENCE S 88°08'24" E ALONG THE SOUTHERLY LINE OF SAID SECTION 1 A DISTANCE OF 1717.43 FEET TO A POINT ON SAID CENTER LINE, THE TRUE POINT OF BEGINNING; THENCE LEAVING SAID SOUTHERLY LINE THE FOLLOWING TWENTY-NINE (29) COURSES ALONG SAID CENTERLINE:

1. N 08°28'28" W 154.50 FEET
2. N 03°54'56" W 103.82 FEET
3. ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 56°35'32", A DISTANCE OF 14.82 FEET (CHORD BEARS N 24°22'50" E 14.22 FEET)
4. N 52°40'36" E 183.62 FEET
5. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 62°40'31", A DISTANCE OF 16.41 FEET (CHORD BEARS N 21°20'21" E 15.60 FEET)
6. N 09°59'55" W 208.76 FEET
7. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 32°16'43", A DISTANCE OF 8.45 FEET (CHORD BEARS N 26°08'16" W 8.34 FEET)
8. N 42°16'37" W 252.78 FEET
9. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 45°34'55", A DISTANCE OF 11.93 FEET (CHORD BEARS N 65°04'05" W 1.62 FEET)
10. N 87°51'32" W 205.10 FEET
11. ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 15.00 FEET AND A CENTRAL ANGLE OF 73°51'59", A DISTANCE OF 19.34 FEET (CHORD BEARS S 55°12'28" W 18.03 FEET)
12. S 18°16'29" W 231.06 FEET
13. S 12°23'24" W 118.00 FEET
14. ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
8 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

# Exhibit A

SW COR SEC 1
BLM BRASS CAP
FND

TROUT PROPERTY

LOT 26
SEC 1

S88'08'24"E

S88'08'24"E

917.39'

1717.43'

CP3C12
CP3L16
CP3L15
CP3L14
CP3L17
CP3C11
CP3C10
CP3C9
CP3L13
CP3L12
CP3L11
CP3C8
CP3C7
CP3L10
CP3L9
CP3L8
CP3C6
CP3L7

Reception#: 776842
10/26/2009 01 12:32 PM  Jean Alberico
9 of 60 Rec Fee:$306 00 Doc Fee:0 00 GARFIELD COUNTY CO

## Exhibit A

| LINE | DIRECTION | DISTANCE |
|------|-----------|----------|
| CP3L1 | N08°26'28"W | 154.50' |
| CP3L2 | N03°54'56"W | 103.82' |
| CP3L3 | N52°40'36"E | 183.62' |
| CP3L4 | N09°59'55"W | 208.76' |
| CP3L5 | N42°16'37"W | 252.78' |
| CP3L6 | N87°51'32"W | 205.10' |
| CP3L7 | S18°16'29"W | 231.06' |
| CP3L8 | S12°23'24"W | 118.00' |
| CP3L9 | N39°15'24"W | 201.59' |
| CP3L10 | N76°28'27"W | 23.68' |
| CP3L11 | S10°04'06"W | 34.66' |
| CP3L12 | S07°21'29"W | 168.56' |
| CP3L13 | S59°00'10"W | 41.71' |
| CP3L14 | S11°10'12"W | 176.00' |
| CP3L15 | S14°20'09"W | 107.55' |
| CP3L16 | S60°53'05"W | 39.93' |
| CP3L17 | S05°13'59"E | 21.71' |

| CURVE | RADIUS | LENGTH | CHORD | BEARING | DELTA |
|-------|--------|--------|-------|---------|-------|
| CP3C1 | 15.00' | 14.82' | 14.22' | N24°22'50"E | 56°35'32" |
| CP3C2 | 15.00' | 16.41' | 15.60' | N21°20'21"E | 62°40'31" |
| CP3C3 | 15.00' | 8.45' | 8.34' | N26°08'15"W | 32°16'43" |
| CP3C4 | 15.00' | 11.93' | 11.62' | N55°04'05"W | 45°34'55" |
| CP3C5 | 15.00' | 19.34' | 18.03' | S55°12'28"W | 73°51'59" |
| CP3C6 | 15.00' | 33.60' | 27.00' | S76°34'00"W | 128°21'12" |
| CP3C7 | 15.00' | 9.74' | 9.57' | N57°51'56"W | 37°13'03" |
| CP3C8 | 15.00' | 24.47' | 21.84' | S56°47'49"W | 93°27'27" |
| CP3C9 | 15.00' | 13.52' | 13.07' | S33°10'49"W | 51°38'41" |
| CP3C10 | 15.00' | 12.52' | 12.16' | S35°05'11"W | 47°49'58" |
| CP3C11 | 15.00' | 12.19' | 11.85' | S37°36'37"W | 46°32'55" |
| CP3C12 | 15.00' | 17.31' | 16.36' | S27°49'33"W | 66°07'04" |

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
10 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

# Exhibit B

PROPERTY DESCRIPTION
PARCEL B

A PARCEL OF LAND SITUATED IN LOTS 23 AND 28 OF SECTION 1 AND LOTS 4, 5, 6, 7, 14, THE NW1/4NW1/4 AND THE SW1/4NW1/4 OF SECTION 12, TOWNSHIP 7 SOUTH, RANGE 89 WEST OF THE SIXTH PRINCIPAL MERIDIAN, COUNTY OF GARFIELD, STATE OF COLORADO; SAID PARCEL OF LAND BEING MORE PARTICULARLY AS DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 1, A BLM BRASS CAP IN PLACE, THE TRUE POINT OF BEGINNING; THENCE S 88°08'24" E ALONG THE NORTHERLY LINE OF THE NW1/4NW1/4 AND LOT 5 OF SAID SECTION 12 1975.15 FEET TO THE SOUTHWEST CORNER OF LOT 28 OF SAID SECTION 1; THENCE N 01°16'57" W ALONG THE WESTERLY LINE OF LOTS 28 AND 23 OF SAID SECTION 1 1161.75 FEET TO A POINT ON THE WESTERLY RIGHT-OF-WAY OF COUNTY ROAD 109; THENCE LEAVING THE WESTERLY LINE OF SAID LOT 23 THE FOLLOWING SEVEN (7) COURSES ALONG THE WESTERLY RIGHT-OF-WAY OF SAID COUNTY ROAD 109:

1.  ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 458.09 FEET AND A CENTRAL ANGLE OF 36°07'56", A DISTANCE OF 288.88 FEET (CHORD BEARS S 30°48'59" E 284.12 FEET)
2.  S 12°45'01" E 247.15 FEET
3.  ALONG THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 1095.00 FEET AND A CENTRAL ANGLE OF 08°59'23", A DISTANCE OF 171.80 FEET (CHORD BEARS S 08°15'19" E 171.63 FEET)
4.  S 03°45'38" E 70.62 FEET
5.  ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 1930.00 FEET AND A CENTRAL ANGLE OF 05°38'57", A DISTANCE OF 190.29 FEET (CHORD BEARS S 06°35'06" E 190.21 FEET)
6.  S 09°24'35" E 1739.96 FEET
7.  S 09°32'11" E  545.09 FEET (TO A POINT WHENCE AN ONE INCH

IRON PIPE BEARS S 80°39'46" W 15.01 FEET); THENCE LEAVING SAID WESTERLY RIGHT-OF-WAY S 80°39'46" W ALONG THE NORTHERLY LINE EXTENDED AND THE NORTHERLY LINE OF RECEPTION NO. 402764 156.56 FEET TO AN ONE INCH IRON PIPE IN PLACE; THENCE CONTINUING ALONG SAID NORTHERLY LINE S 46°49'46" W 319.59 FEET TO THE NORTHWEST CORNER OF SAID RECEPTION NO. 402764, A REBAR AND CAP IN PLACE; THENCE S 08°30'14" E ALONG THE WESTERLY LINE OF SAID RECEPTION NO. 402764 AND RECEPTION NO. 418590, 302.72 FEET TO THE SOUTHWEST CORNER OF SAID RECEPTION NO. 418590; THENCE S 80°45'44" W ALONG THE NORTHERLY LINE OF RECEPTION NO. 397182, 177.17 FEET TO THE NORTHWEST CORNER OF SAID RECEPTION NO. 397182; THENCE S 17°25'15" W ALONG THE WESTERLY LINE OF RECEPTION NO. 397182 AND RECEPTION NO. 411767, 741.91 FEET TO THE NORTHWEST CORNER OF LOT 21 OF SAID SECTION 12, ALSO BEING THE NORTHWEST CORNER OF TELLER SPRINGS SUBDIVISION; THENCE S 00°00'34" W ALONG THE WESTERLY LINE OF SAID TELLER SPRINGS SUBDIVISION AND THE EASTERLY LINE OF LOT 14 OF SAID SECTION 12 768.25 FEET TO THE SOUTHEAST CORNER OF SAID LOT 14; THENCE LEAVING THE WESTERLY LINE OF TELLER SPRINGS SUBDIVISION S 89°00'59" W ALONG THE SOUTHERLY LINE OF SAID LOT 14 468.99 FEET TO THE SOUTHWEST CORNER OF SAID LOT 14; THENCE N 00°22'13" E ALONG THE WESTERLY LINE OF SAID LOT 14 1378.08 FEET TO THE NORTHWEST CORNER OF SAID LOT 14; THENCE N 89°07'53" W ALONG THE SOUTHERLY LINE OF THE SW1/4NW1/4 OF SAID SECTION 12 1347.91 FEET TO THE WEST QUARTER CORNER OF SAID SECTION 12, AN ALUMINUM CAP IN PLACE; THENCE N 00°33'14" W ALONG THE WESTERLY LINE OF SAID SECTION 12 2728.80 FEET TO THE TRUE POINT OF BEGINNING, SAID PARCEL OF LAND CONTAINING 166.607 ACRES, MORE OR LESS.

Reception#: 776842
10/26/2009 01:12:32 PM Jean Alberico
11 of 60 Rec Fee:$306.00 Doc Fee 0.00 GARFIELD COUNTY CO

COURT OF APPEALS
STATE OF COLORADO
Certified to be a full, true and correct copy

Clerk of Court of Appeals

By _____
Deputy Clerk

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| **Plaintiff:**<br><br>ROGER TROUT<br><br>v.<br><br>**Defendant:**<br><br>ROARING FORK INVESTMENTS, L.L.C. and LB ROSE RANCH, L.L.C. | ▲ **COURT USE ONLY** ▲<br><br>Case Number: 01CV4208<br><br>Ctrm: 7 |
| **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** | |

THIS MATTER is before the Court following a trial to the Court held on April 26 – 30, 2004. Plaintiff Roger Trout is represented by Richard Shearer and Robert Anderson. Defendant Roaring Fork Investments, L.L.C. is represented by William Shay. Defendant LB Rose Ranch, L.L.C. is represented by John Madden. Upon consideration of the testimony and exhibits received at the trial, and having considered the arguments of counsel and being sufficiently advised in the premises, the Court issues the following findings of fact, conclusions of law and order.

## PROCEDURAL HISTORY

Plaintiff's complaint in 01CV4208 asserts claims involving a parcel of land located in Garfield County, Colorado, a residential lot adjacent to that property, and a series of agreements regarding, and easements upon, those properties executed in conjunction with the development of a golf course and residential community adjacent to the properties. The complaint asserts a claim for breach of contract based on allegations that Defendants failed to provide liability and property damage insurance, as well as a reasonable indemnification agreement, as required by the agreements. The complaint also alleges that, as the result of the design and development of the golf course, Defendants breached the covenant of Plaintiff's quiet use and enjoyment of the

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
12 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

residential lot and easement. The complaint alternatively asserts a claim for rescission, based upon alleged false representations made by Defendants, as well as a claim for reformation based upon alleged mutual mistakes of fact.

Defendant LB Rose Ranch, LLC filed a separate complaint in Garfield District Court in 02CV231, asserting a claim for breach of contract and specific performance, based on allegations that Roger Trout breached an agreement to provide a recordable easement consistent with the course of a golf cart path as constructed upon Trout's property. In that action, Trout filed counterclaims to quiet title and asserted claims of trespass, breach of contract, and rescission, all based upon allegations that LB Rose Ranch constructed a golf cart path on his property outside the boundaries of the easement established by the parties as part of the golf course development.

Case number 02CV231 was subsequently consolidated into case number 01CV4208, and all claims were tried to the Court without a jury.

## PRELIMINARY STATEMENT

All of the findings of fact and conclusions made herein are based upon what the Court determines to be a preponderance of the admissible, credible, and persuasive evidence. As the fact finder on this case, the Court has assessed the credibility of the witnesses by applying the same standards that jurors are required or permitted to apply, as set forth in CJI 4th 3:16. The findings of fact herein reflect and incorporate the Court's credibility assessments.

## FINDINGS OF FACT

1. In 1969, Plaintiff's father, Robert Trout, acquired a 40-acre parcel of property in Garfield County, Colorado, south of Glenwood Springs and west of the Roaring Fork river (hereafter "the Trout property"). The mountainous property is bisected north to south by a canyon with a dry creek bed at the bottom and steep sides. The property is adjacent to the south and east to property owned, at the time of purchase, by Defendant Roaring Fork Investments, L.L.C. ("Roaring Fork"). Although proximate to county road 109, the Trout property was essentially landlocked and accessible only by foot via the canyon from the north.

2. In late March or early April 1997, Ron Heggemeier of Roaring Fork approached Plaintiff's father in an attempt to acquire the Trout property in connection with Roaring Fork's development of its adjacent property as a golf course and residential community. Of specific concern to Roaring Fork was the acquisition of the Trout property as a means to connect the lower portion of Roaring Fork's golf course located in the valley east of county road 109 to its landlocked[1] property on a mesa

---

[1] Access to the upper holes was possible from the south of Roaring Fork's property from an area referred to as the "overlook," and a road was partially constructed through that area. However, due to the terrain and other considerations, including an eagle preserve in the area, Roaring Fork concluded that access via the overlook would be impracticable and cost prohibitive.

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
13 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

west of county road 109, which was the intended location of Roaring Fork's "upper" golf holes.

3.      Plaintiff's father, who at the time was aged and ill, directed Heggemeier to negotiate with Plaintiff. Shortly thereafter, a meeting occurred at Heggemeier's law office in Parker, Colorado, at which Heggemeier generally outlined for Plaintiff Roaring Fork's development plans and its desire to either acquire the Trout property outright or acquire an easement upon the property in order to connect its lower and upper golf holes. During the meeting, Heggemeier utilized a variety of demonstrative materials including, at a minimum, an aerial overview, initial development drawings, and a survey of the property, then known as the "Rose Ranch" property.

4.      Following the initial meeting, Plaintiff visited the Trout property with his daughter and "brainstormed" ideas regarding its potential uses. A second meeting between Plaintiff and Heggemeier occurred several days later at Heggemeier's office, at which the parties began to outline more specific details of a potential transaction. Heggemeier explained that he was required to submit his development plans to the Garfield County Planning Commission by June 13, 1997, including specific plans to link the lower and upper golf holes. As such, he was motivated to obtain either the Trout property or an easement upon the property (hereafter the "golf cart path easement"), and he was willing to work out any reasonable deal with Plaintiff. Heggemeier explained that the easement upon the Trout property would generally follow the bottom of the canyon, upon which a path would be constructed to be used by golf carts, maintenance vehicles, bicyclists, and pedestrians. The path would also be used by construction vehicles and equipment during the construction of the upper holes.

5.      As part of the potential transaction, and as additional consideration, the parties discussed the conveyance to Plaintiff of a parcel of property owned by Roaring Fork that was adjacent to the Trout property that could be used by Plaintiff as a residential building site (hereafter the "residential lot"), as well as the granting by Roaring Fork of an easement (hereafter the "access easement") that would provide Plaintiff access not only to the residential lot but also to the otherwise landlocked Trout property. The proposed access easement and residential lot was west of county road 109 and contiguous to what was originally to be golf hole 11 and ultimately hole number 14 (hereafter "hole number 14").

6.      During the discussions, Heggemeier outlined the general location of hole number 14 in relation to the residential site and he showed Plaintiff various illustrative plans of the proposed golf course, some of which depicted the tee-box to hole number 14 to the north of the residential lot and others depicted that tee-box to the south of the lot. All of the plans depicted golf play on hole 14 to the west of county road 109 and from north to south. At the time of the initial discussions and prior to the execution of the agreements, however, the design of the golf course was in a preliminary stage and the

specific routing of the golf holes and placement of the tee boxes had not been accomplished. As such, the Court finds that no representations were made by Heggemeier as to the anticipated location of the tee boxes for hole number 14, and that testimony to the contrary lacks credibility.

7.  As the result of the parties' negotiations, Roaring Fork and Plaintiff entered into three written agreements on June 13, 1997, including an Easement and Transfer Agreement (hereafter "the Agreement"), a Golf Cart Path Easement, and an Access Easement. Based on the testimony at trial, the Court finds that there was a meeting of the minds as to the agreements, and that the documents executed contained all of the material terms.[2]

8.  Pursuant to the Agreement, Roaring Fork conveyed[3] to Plaintiff the residential lot by special warranty deed (¶ 2), granted Plaintiff a 30 foot non-exclusive access easement to the residential lot (¶ 3), and paid Plaintiff $30,000.00 (¶ 9).[4]  In return, Plaintiff granted Roaring Fork a non-exclusive easement across the Trout property (¶ 4) with provisions that Roaring Fork maintain and insure the easement area and indemnify Plaintiff from any loss or damage occasioned by use of the easement area (¶ 6). Acknowledging that Roaring Fork had not yet surveyed the golf cart path easement area, the Agreement required Plaintiff to "execute any and all additional documents necessitated for connection or further clarification and definition of the legal description" for the easement area after a survey was obtained (¶ 11). In addition, at the time the Agreement was executed, Roaring Fork had not yet obtained an additional easement from the Westbank Homeowners Association that was necessary to connect the lower and upper golf holes. The Agreement accordingly contemplated Plaintiff granting an "alternative easement" through the Trout property in the event that efforts to obtain the easement from Westbank were unsuccessful; albeit, such an easement was subject to Plaintiff's approval and at his sole discretion (¶ 10)[5].

9.  The Golf Cart Path Easement, also executed on June 13, 1997, granted Roaring Fork a 100 foot construction easement, "fifty feet on either side of the centerline described in Exhibit A," and a 40 foot permanent easement "twenty feet on either side of the centerline described in Exhibit A." Sometime after January 23, 1998 and before February 11, 1998, Plaintiff and Heggemeier initialed a six page Exhibit A, with pages designated A-1 through A-6, attached it to the June 13, 1997 Golf Cart Path Easement, and had it recorded in the records of Garfield County, Colorado. The Court finds that pages A-1 and A-2 describe the construction easement, and pages A-

---

[2] The parties also discussed a golf membership for Plaintiff and his family as additional consideration. The Court finds that such discussions are not a material term of the negotiations or the eventual agreements.

[3] Roaring Fork actually conveyed the residential lot to Plaintiff pursuant to the special warranty deed on September 29, 1997.

[4] The agreement also provided for Roaring Fork to reimburse Plaintiff for his attorney fees in connection with the advice he received for his attorney's review of the agreements.

[5] Roaring Fork subsequently obtained an easement from the Westbank Homeowners Association.

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
15 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

3 through A-6 describe the "alternative easement" through the Trout property. The descriptions comprising Exhibit A were prepared by High County Engineering by means of an aerial survey, although both Plaintiff and Heggemeier believed they were the product of a ground survey.

10.    Both parties agree that the centerline described in Exhibit A, which was attached to the Golf Cart Path Easement, was intended to be the centerline for the 100 foot wide construction easement. Plaintiff contends that the Agreement contemplates only "one easement" through the Trout property, that the description in Exhibit A (A-1 and A-2) constitutes the centerline for both the construction easement and the permanent easement, and that any additional easements require his express approval.[6] Defendants contend that Exhibit A (A-1 and A-2) describes only the centerline for the construction easement, and that the Agreement contemplates a subsequent clarification of the permanent easement once the golf cart path is completed. Both Plaintiff and Heggemeier testified that, prior to June 13, 1997, they discussed issues regarding placement of the golf cart path, including the possible necessity of routing the path around rocks and other physical obstacles. In light of these discussions and the acknowledged uncertainties regarding the placement and actual construction of the cart path, the Court is not persuaded that the parties nevertheless contemplated a permanent easement within a narrow 40 foot corridor of an as yet undetermined centerline. To the contrary, the Court finds credible Heggemeier's testimony that the parties' agreement took into account such uncertainties and the practicalities of construction, including the necessity of "adjusting" the centerline as construction proceeded. The Court accordingly finds that, prior to executing the agreements and easements in June 1997, the parties contemplated an eventual clarifying easement upon the completion of construction to determine the exact location of the permanent easement. The conclusion is consistent with the express language of paragraph 11 of the Agreement.[7]

11.    On November 15, 2000, Defendant LB Rose (hereafter "LB") acquired title to the Ironbridge Golf Course, also known as LB Rose Ranch Golf Course, from Roaring Fork and became its successor in interest under the Agreement, the Golf Cart Path Easement and the Access Easement. LB is a subsidiary and successor of Lehman Brothers, Roaring Fork's lender as of July 1997, and is the assignee of Roaring Fork. The court finds that, as of July 1997, Lehman Brothers was actively involved in monitoring the Rose Ranch project as a lender with a "participation interest,"

---

[6] It is undisputed that, subsequent to the execution of the operative documents, neither Roaring Fork or its successors consulted with or obtained Plaintiff's approval for any additional easement through the Trout property.
[7] The Court is not persuaded by Plaintiff's assertion that such a "clarifying" easement constitutes an "additional" easement requiring his express approval which, admittedly, was never sought or obtained. Provisions governing "additional" easements, which are at the sole discretion and subject to the express approval of Plaintiff, are set forth in paragraph 10 of the Agreement, and pertain to the "alternate easement" in the event Defendants were unable to obtain an easement from Westbank Homeowners Association. Paragraph 11, entitled "Further Modification of Legal Description for Easement Across Trout Parcel," separately addresses "further clarification and definition" of the legal description of the permanent easement, and *requires* Plaintiff's cooperation.

meaning it would share in any profits as well as receive interest on the money it invested in the project in the form of a loan to Roaring Fork. LB also had a right of first refusal, which was recorded in August 1997, as well as the right to purchase Roaring Fork's interest in the project. In September 1997, LB hired William Hatch as its Asset Manager, who was charged with reviewing and approving all expenditures and discussing all material issues related to the project with Heggemeier. As such, the Court finds that LB was not an arms-length lender. Upon acquiring title in November 2000, LB took the project over and proceeded with the residential development and construction of the golf course.

12. In December 2000, LB commenced construction of the golf course and the golf cart path across the Trout property. Shortly after construction began, LB constructed an earthen berm arising approximately twenty feet in height from, and running parallel to, county road 109 on LB's property adjacent to the east boundary of the residential lot. The berm was a by-product of grading necessary to complete construction of hole number 14, and was intended to insulate hole 14 from the traffic on county road 109 to enhance the "golf experience" of the hole. As initially constructed, the berm completely blocked use of the access easement. In the spring of 2001, Plaintiff contacted LB to discuss removal of the berm from the access easement, and LB subsequently removed a substantial portion from the access easement to within one or two feet of the original grade. Prior to the construction of the berm, the access easement was accessible by foot, but not by vehicle, due to a natural drainage culvert crossing the access easement.

13. From July 1997, following the execution of the operative agreements, through May 2000, Plaintiff had numerous communications, personally and through counsel, with LB in an attempt to obtain evidence verifying insurance coverage for the golf cart path easement in accordance with paragraph 6 of the Agreement. In 2000, LB provided a Certificate of Insurance that was subsequently supplemented with a more complete copy of the insurance policy following a hearing on Plaintiff's motion for a preliminary injunction. Based upon the testimony and exhibits presented at trial, the Court finds that, at the time construction commenced on the golf cart path through the Trout property, liability insurance in the amount of $1,000,000.00 had been obtained by LB which included coverage as to the golf cart path easement. Although Plaintiff complained that the policy contained certain exclusions, such as exclusion of coverage for certain sporting activities, the Court finds that no such sporting activities (such as golf and bicycling) had not commenced inasmuch as the golf course and the golf cart path had not yet been completed. The Court finds no credible preponderance of evidence sufficient to establish that Roaring Fork or LB failed to obtain insurance during and subsequent to the construction of the golf course and the construction upon the golf cart path easement, as required by the Agreement.

14. Also during the time period of July 1997 through May 2000, Plaintiff made numerous attempts to obtain from Roaring Fork and LB a suitable indemnification agreement

pursuant to paragraph 6 of the agreement. Plaintiff and Heggemeier discussed a provision in which Roaring Fork (and any successor) would indemnify Plaintiff from any loss or damage resulting from the use of the golf cart path during their preliminary negotiations, and indemnification constituted a material term of the Agreement. The Court finds credible Plaintiff's testimony that the intent of the parties was to shift all risk of loss or damage related to use of the golf cart path to Roaring Fork and its successors, including any claims related to loss or damage caused by Plaintiff's own negligence or conditions on Plaintiff's property. Ultimately, counsel for Plaintiff forwarded a proposed indemnification agreement, which LB found unacceptable, and LB subsequently forwarded its proposed indemnification agreement, which Plaintiff found acceptable. The Court finds that neither party's draft agreement complied with the Agreement,[8] and as of the date of trial no indemnification agreement has been executed by the parties.[9]

15.    Construction of the golf cart path on the golf cart path easement commenced in late 2000. The cart path, as ultimately constructed, consists of an 8 to 10 foot wide concrete path that is entirely within the 100 foot construction easement described in Exhibit A (A-1 and A-2) of the Golf Cart Path Easement. Based upon a ground survey conducted by James Ackerman, approximately 10 to 15 percent of the cart path as constructed falls outside the 40 foot corridor from the centerline described in Exhibit A. The Court finds credible the testimony of LB's engineer, Joe Hope of High Country Engineering, that the cart path was constructed in the most practical fashion possible, and in a manner designed to maximize the safety for ultimate users of the path and to minimize the impact on the canyon, including the waters of the United States. The Court further finds credible Hope's testimony that constructing the path entirely within the 40 corridor of the centerline described in Exhibit A was neither practical, given the physical terrain and obstacles within the canyon, nor would it have been safe for eventual users of the path given the slopes and grades of various portions of the canyon. Hope also testified credibly that, in his professional opinion, it would not be possible, let alone cost effective, to relocate the cart path entirely within the 40 foot corridor of the centerline described in Exhibit A.

---

[8] For example, LB's proposed agreement provided that a newly formed homeowners association, and not LB, would indemnify Plaintiff, and required Plaintiff to agree to indemnify the homeowners association for any loss caused by his negligence, if any. Plaintiff's proposed agreement, for example, contained provisions requiring insurance coverage far in excess of that required by paragraph 6 of the Agreement and referenced beneficiaries not included within the Agreement.

[9] Paragraph 6 of the Agreement provides that Defendants "will execute indemnity agreements indemnifying Trout from any loss and damage occasioned by use of the easement area on or before July 31, 1997." The Court finds the quoted language ambiguous. Heggemeier testified that the provision contemplated indemnification by Defendants for loss or damage *that occurred* on or before July 31, 1997. Plaintiff testified that the provision required the indemnification agreement *to be drafted* and executed on or before July 31, 1997. The quoted language is susceptible of both meanings. Based upon the negotiations of the parties prior to July 13, 1997, the subsequent conduct of Heggemeier and LB to draft a suitable indemnification agreement several years after the Agreement was executed, and the fact that the time frame of "on or before July 31, 1997" was included at the insistence of Plaintiff (*see* Exhibit 58), the Court finds Plaintiff's interpretation more credible.

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
18 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

16.     The Court finds no credible preponderance of evidence of any safety concerns due either to the construction of the golf cart path or as to cart path as currently constructed. No evidence was presented as to any claims or threatened claims regarding the construction or subsequent use of the golf cart path, or as to any other damages regarding the golf cart path or Plaintiff's property adjacent to the cart path. Based upon the exhibits presented at trial, the Court also finds no credible evidence that the construction of the golf cart path unnecessarily and negatively impacted the canyon visually. Accordingly, the Court finds that Plaintiff has proven no damages regarding the construction or use of the golf cart path or the Golf Cart Path Easement.

17.     A boundary survey was conducted of the Golf Cart Path Easement area by High County Engineering which fairly and accurately describes the area of the 40 foot permanent easement for the golf cart path as constructed, as provided by paragraph 11 of the Agreement. *See* Defendant's Exhibit FF.

18.     The golf course, as ultimately constructed, includes hole number 14 that is adjacent to the residential lot with three tee boxes located south of the access easement and adjacent to the east border of the residential lot, and a "back" tee box located north of the access easement. Both parties offered expert testimony from golf course architects regarding the design of the golf hole and the placement of the tee boxes. While both experts possess impressive credentials and testified credibly, they offered contrary opinions regarding the relative safety of hole 14 as designed and constructed. Christopher Wilczynski, the principal golf course architect, recognized early in his course design that the "back" tee box, that was initially positioned further north beyond the northern-most boundary of the residential lot, created a safety concern with respect to the residential lot, inasmuch as the lot fell within the "safety zone" for golf shots hit from that back tee. However, he testified that the back tee, as ultimately re-positioned closer to the access easement, resolved the safety issue. Dan Bucko, a golf course architect retained by Plaintiff, opined to the contrary that, even as re-positioned, the back tee creates an unreasonable risk that errant tee shots could intrude upon the "safety zone" within a portion of the residential lot. The evidence establishes that, as of the time of trial, only a negligible number of golf balls have actually been recovered from the residential lot.

19.     It is undisputed that hole number 14's "back" tee box is positioned directly behind, and adjacent within one to two feet of, the access easement. The Court does not find credible Wilczynski's testimony that the current position of that tee box does not create a safety concern. To the contrary, the Court agrees with Bucko that the current positioning not only increases the likelihood of "conflict" between golfers and users of the access easement, but that it unreasonably exposes users of the access easement to the danger of being hit by golf balls at high velocity at nearly "point blank" range. The danger is increased because the earthen berm, in its present location, blocks sightlines between the back tee box and the access easement, and from the access

easement to county road 109, making entry onto and exit from the access easement hazardous to both golfers and users of the easement. In fact, the photographic evidence presented by Plaintiff convincingly demonstrates that, due to the restricted sightlines, users entering the access easement from county road 109 would have no awareness of golfers accessing the back tee box until the two are in nearly direct proximity of each other.

20. Both Wilczynski and Buck agree that hole number 14's back tee box could be repositioned or eliminated at minimal relative cost and with minimal impact upon the golf hole and golf course as a whole. Neither expert opined that the three existing forward tee boxes on the fourteenth hole pose any safety issues vis a vis the residential lot.

21. As of the date of trial, Plaintiff has not developed or placed any improvements upon the residential lot or the access easement.

22. The Court finds no preponderance of credible evidence of any diminution of value of either the residential lot or access easement due to the construction of hole number 14, including the placement of the berm adjacent to county road 109. The Court specifically finds Plaintiff's lay opinion as to diminution of value to lack credibility.

## CONCLUSIONS OF LAW

### 1. Rescission

23. Having found that the parties had a meeting of the minds on all of the material terms of the Agreement and that Defendants made no material misrepresentations causing Plaintiff to be fraudulently induced to enter into the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of rescission.

### 2. Reformation

24. In light of the finding that the documents executed by the parties set forth all of the material terms of the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of reformation.

### 3. Breach of Contract

25. To prevail on a claim of breach of contract, the plaintiff must establish the existence of an enforceable contract and breach thereof. Proof of actual damages is not required for a court to enter judgment on a breach of contract claim. The Agreement in the instant action provides that, in the event of a breach of the terms or conditions,

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
20 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

the non-breaching party is entitled to bring an action for specific performance, damages, or both.

26.  The Court concludes that the preponderance of credible evidence establishes the existence of a binding and enforceable contract. Based upon the Court's findings of fact as entered herein, the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence that Defendant Roaring Fork and its successor LB Rose breached the Agreement by failing to obtain liability and property damage insurance as required by paragraph 6.  However, the Court concludes that the preponderance of credible evidence presented by Plaintiff establishes that Defendant Roaring Fork and its successor LB Rose failed to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area and, as such, is in breach of that portion of paragraph 6 of the Agreement.  In light of the Court's finding that Plaintiff has sustained no actual damages due to Defendants' breach, the Court will award Plaintiff nominal damages and order specific performance of that portion of paragraph 6 of the Agreement requiring the execution of an indemnification agreement.

27.  The Court further concludes that Plaintiff has failed to establish by preponderance of the evidence that the placement of the back tee box on the fourteenth hole creates an unreasonable risk of errant golf balls upon the residential lot such as to constitute a breach of the covenant of quiet use and enjoyment of that property.  However, the preponderance of the credible evidence establishes that the placement of that back tee box creates a substantial risk of conflict between golfers and users of the access easement and creates a sufficiently dangerous condition as to constitute a breach of the covenant use and enjoyment of the access easement.

28.  Based upon the Courts findings of fact regarding the nature, location and description of the golf cart path easement, the Court concludes that Plaintiff has breached paragraph 11 of the Agreement by failing to execute necessary documents for clarifying and further defining the easement area for the permanent easement.  The Court concludes that Defendants sustained no damages as a result of the breach, and the Court accordingly will award Defendants nominal damages.  The Court further concludes, however, that Defendants are entitled to specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

### 4.  Quiet Title

29.  Based upon the foregoing findings of fact and conclusions, the Court concludes that Plaintiff owns clear title to his original parcel and the residential lot, and is entitled to exclusive possession of all parts of his original 40 acres with the sole exception of the 40 foot wide non-exclusive easement as specifically described in the July 27, 2002

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
21 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

legal description by High County Engineering, and as set forth in Defendant's Exhibit FF. Inasmuch as an easement was obtained from the Westbank Homeowners Association permitting construction of the golf cart path in the lower portions of the canyon, the alternate easement described in Exhibit A (A-3 through A-6) of the Golf Cart Path Easement is of no force and effect.

### 5.  Trespass

30.    To prevail on a claim for trespass, Plaintiff must establish that Plaintiff was the owner of the subject property and that Defendants intentionally entered upon the property without Plaintiff's consent. In light of the Court's previously entered findings of fact regarding the nature, location and description of the construction and permanent easements, as contemplated by the Agreement, the Court concludes that Plaintiff has failed to prove both elements of the claim by a preponderance of the evidence.

### 6.  Attorney Fees and Costs

31.    Paragraph 18 of the agreement provides that, "in the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action." In a civil action, the prevailing party is one who succeeds on a significant issue in the case and whose claim furthers the purpose of the fee shifting provision. *Spencer Contractor, Inc, v. City of Aurora,* 884 P.2d 326 (Colo. 1994). In the instant matter, the Court finds that both parties succeeded on several significant issues in the case, and that both parties successfully defended on equally significant issues in the case. As such, the Court concludes that neither party is the "prevailing party" within the meaning of the Agreement.

### FINAL JUDGMENT AND ORDERS

Based on the foregoing findings of fact and conclusions of law, the Court enters the following final judgment and orders:

1.  Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's claims for rescission, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

2.  Judgment is entered in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the Agreement. There being no actual damages, the Court awards nominal damages to Plaintiff in the sum of one dollar ($1.00). The Court also orders specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
22 of 60 Rec Fee:$306 00 Doc Fee:0 00 GARFIELD COUNTY CO

occasioned by use of the easement area from June 13, 1997 forward.   The indemnification agreement shall be prepared and executed in a form substantially similar to that contained in Defendant's Exhibit X, with the exception that the agreement will not exclude loss or damage caused by the action or inaction of the owner of Plaintiff's property, and will indemnify Plaintiff for reasonable attorney fees, costs and expenses incurred defending claims related to use of the golf cart path or to enforce the indemnification agreement itself.

3.  Judgment is entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the back tee box of golf hole number 14 as presently designed and located on the fourteenth hold of the Ironbridge Golf Course, Garfield County, Colorado.

4.  Judgment is entered in favor of Defendants and against Plaintiff on Defendants' breach of contract claim for failure to execute additional documents pursuant to paragraph 11 of the Agreement.   There being no actual damages, the Court awards nominal damages to Defendants in the sum of one dollar ($1.00).  The Court also orders specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

5.  Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's trespass claim.

6.  All parties shall pay their own attorney fees, costs and expenses.

7.  Pursuant to the Court's Pre-Trial Order, each party shall retail in their original condition all exhibits offered and received at trial until the time for filing post-judgment or appellate pleadings has expired.

8.  All performance required by the orders herein shall be accomplished within 30 days of this Order.

SO ORDERED this ____ day of _____, 2004.

BY THE COURT:

_____
District Court Judge

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
23 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

cc:  Richard Shearer, Esq.
     John Madden, Esq.
     William Shay, Esq.

Reception#: 776842
10/26/2009 01 12 32 PM  Jean Alberico
24 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

-DISTRICT COURT, CITY AND COUNTY OF
DENVER, COLORADO

Court Address: 1437 Bannock Street
                Denver, Colorado 80202

ROGER R. TROUT
Plaintiff,

v.

L.B. ROSE RANCH, L.L.C.

Defendant:

▲ COURT USE ONLY ▲

Case Number: 01CV4208
Ctrm: 7

## ORDER

This matter is before the Court following remand from the Colorado Court of Appeals. The Court of Appeals directed this Court to enter judgment in Plaintiff's favor and against LB Rose Ranch LLC on Trout's quiet title, trespass, and breach of contract claims. The Court of Appeals further ordered this Court to conduct further proceedings consistent with the mandate, including reexamination of Trout's requests for specific performance and an injunction, and a reassessment of whether Trout is entitled to an award of attorney's fees under the fee-shifting provisions of the Easement and Transfer Agreement and the Golf Cart Path Easement agreement.

As ordered, the Judgment was amended on August 16, 2008. A Bench trial was conducted May 5, 2008 thru May 8, 2008 for determination of the remaining matters.

This Court has considered the testimony of the witnesses named herein; the exhibits; the arguments of counsel and the Court of Appeals opinion as well as the Trial Court's Findings of Fact, to the extent those findings were not rejected by the Court of Appeals, and enters the following Findings of Fact; Conclusions of Law and Judgment. Judge Egelhoff's Findings as limited above are incorporated herein.

### FINDINGS OF FACT

This Court recognizes the Court of Appeals conclusion that the "permanent golf cart easement would be located within 20 feet on either side of the centerline described in the [Easement and Transfer Agreement]." The 100 foot construction easement was therefore temporary and has reverted to Mr. Trout. Mr. Trout has stipulated that L.B. Rose Ranch may use the area of the former construction easement to rebuild the cart path within the Golf Cart Path Easement, if the Court so orders. They may also use the construction easement area for the passage of carts, during that reconstruction.

Reception#: 776842
10/26/2009 01:12:32 PM    Jean Alberico
25 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

Mr. Hope, through his company, High County Engineering designed the non complying cart path and provided construction administration. Hope informed Haggemeier, L B Rose Ranch's agent that they would need to be able "to move the path around as it progressed up the ravine." Haggemeier negotiated with Trout, attempting to secure for a wider easement, but Trout declined, wanting to maintain the character and view of the site. Hope did not contact Trout directly about building outside the easement and Haggemeier never got back to Hope about Trout's response to the requested change. Hope was never told that Trout agreed to allow the path to be "moved around" outside the easement, but that was how he designed it and that is how it was built. There is no "as built easement", although Hope assumed there was or soon would be. Hope made no effort to build within the permanent easement because he thought the path could be built anywhere within the one hundred foot construction easement. Hope reviewed and relied upon the easement agreement for direction regarding the width of the construction easement. Hope also conferred with Messrs. Hatch and Nash, also agents for L B Rose Ranch regarding the placement of the path. Hope also testified at the first trial that Hatch was "the one that made the final decision as to everything that was done and when there were choices to be made."

LB Rose Ranch and its agents were aware that the technique employed by Hope was in violation of the agreements as early as May 2002. At that time, Mr. Jacobs, then attorney for LB Rose Ranch sent a letter to Hope. This letter acknowledged that the cart path encroached onto Trout's property, and put Hope on notice that LB Rose Ranch would be looking to Hope for any damages.

Hope has re-drawn plans that satisfy the easement limits. His company remains the engineer of record, although Scott Gregory is now in charge of the project. Mr. Hope designed the plan the Hobbs bid on and won. Mr. Hope found the same areas outside the easement as did Mr. Gordon, Trout's expert, except that he made the areas between bridges seven and eight and eight and nine separate areas of reconstruction. Hope is not critical of Gordon's approach. Both would work.

Building the path may have required obtaining additional permits from the Army Corp of Engineers to ensure there was no impact on the "waters of the United States." This requirement could have been met and still maintained the proper easement.

All of the civil engineers generally agreed that the path was outside the easement in three separate locations: the northeast corner of bridge 1, which may encompass as little as several inches to one foot of area. The area between bridges five and six which encompasses seventeen feet outside the allowed area would require replacement of four ten foot sections of concrete in order to provide horizontal transition from the nearest construction joint. The area between bridges six and nine would require the removal of bridges six, seven, eight, and nine as well as the cart path between these bridges. The bridges themselves are within the easement; however their orientation would have to be changed in order to line up with the reconstructed path.

Mr. Gordon, Plaintiff's expert estimated that it would cost approximately $79,500 to do the necessary demolition. He further estimates reconstruction to be $677,000. Mr. Gordon is not critical of Hope's re-drawn plans, although the construction concepts differ. Mr. Gordon's plan would take about five months, including permitting.

Although there is some remote possibility, the Court finds there is no probability that there is a wetland problem that would interfere with construction of the

2

Reception#: 776842
10/26/2009 01:12:32 PM Jean Alberico
26 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

path entirely within the easement. Even if there were, the weight of the testimony indicates the proper permits could be obtained with a minimum of cost or delay.

Gordon testified there is no reason to believe that reconstruction of the path within the easement would be either unfeasible or impossible.

There are underground utility and water pipes, which were placed by L.B. Rose Ranch to service the cart path that are outside the easement. It will cost between 2,400 and 4,000 dollars to remove them. They could also be abandoned and rerouted.

The Court has also considered the testimony of Stewart Hobbs, owner of Hobbs Excavating and Trucking. He generated an estimate to reconstruct the easement using the staking done by Gordon and the plans drawn by Hope. His estimate was approximately 293,000 dollars to reconstruct the path. Hobbs saw "no reason to believe it (reconstruction within the easement) could not be done." "It seemed to be very possible." Hobbs agrees with Gordon that it would take approximately four months to complete this task.

Demolition could be done in the winter months, however concrete could not be poured during that time. Hobbs suggested that if the process was begun in January it would be completed by the time the golf season begins in May. It would not be possible for patrons to continue playing while the cart path was being reconstructed.

The Easement and Transfer Agreement at Paragraph 12 permits the non-breaching party (Trout) to be entitled to an action for specific performance and or damages or both. Trout has always maintained his desire for the path to be built as was agreed.

The Easement Agreement at Paragraph 4 permits the non-breaching party (Trout) to be entitled to an action for injunctive relief and or specific performance and or damages. Trout again has always insisted that the path be built as agreed and that LB Rose Ranch stop trespass on his property.

In his Order, Judge Egelhoff determined that Trout suffered no damages by L.B. Rose Ranch's breach. That determination was not appealed. It was and has been clear to Judge Egelhoff, the Court of Appeals and this Court that LB Rose Ranch was in breach of this agreement, before the path was completed. They allowed the breaching project to continue, never attempting to remedy their breach, but only to change the agreement or shift financial responsibility for the breach to Hope.

In its opinion, the Court of Appeals directed this Court to reexamine the feasibility of relocating the golf cart path entirely within the corridor of [the easement agreements]under the legal standards applicable to requests for specific performance, referencing *Greeley & Loveland Irrigation Co. v. McCloughan*, 342 P.2d 1045 [Specific performance is not a matter of right, but rests in sound discretion of court, and equity will not enforce such extraordinary remedy unless contract be fair, equal, and just in its terms, consideration be not grossly inadequate, and remedy be not inequitable, unconscionable, or oppressive]; and *Tayyara v. Stetson*, 521 P.2d 185. [It is true that a court of equity may refuse to grant a decree of specific performance where a unilateral mistake is material to the contract, and the enforcement of the written contract under the circumstances would be inequitable or a hardship on the defendant, even though plaintiff is in no way responsible for the mistake and has no knowledge of it. However, specific performance is proper where, as here, defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect.]



3

Reception#: 776842
10/26/2009 01 12 32 PM Jean Alberico
27 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

This Court was also directed to rule on Trout's request for injunctive relief concerning LB Rose Ranch's continued trespass. That determination is to be based on the same standards as above.

It is Defendants position that Trout has suffered no damages and minimal impact from the location of the golf cart path and an injunction or specific will result only in economic waste in requiring L B Rose Ranch to move the offending portions of the path at substantial and unnecessary cost with no resulting benefit to Trout.

Over Defendants objection, the Court has received and reviewed the Securities and Exchange Commission Quarterly report for the period ended February 29, 2008. The Court finds this to be relevant because although L B Rose Ranch is a separate entity, it appears to be a wholly owned subsidiary of Lehman Brother' Holdings. Representatives of Lehman Brothers were closely involved with the construction of the path, and based upon the testimony of Mr. Schmit, remain closely involved in the operation of the construction project as well the golf course. In fact, Mr. Schmidt, who sat thru the trial as the representative of L B Rose Ranch, reports to representatives of Lehman Brothers. This is relevant to the determination of whether an order of specific performance would result in an unconscionable or oppressive outcome. According to said report, Lehman Brothers' cash and cash equivalents as of February 28, 2008 totaled $7,564,000,000.

The Court of Appeals also directed this Court to reassess whether Trout is entitled to an award of attorney fees under the fee-shifting provisions of the Easement and Transfer Agreement [Paragraph 18, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action]; and the Golf Cart Path Easement [Paragraph 10, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action.]

In his ruling, Judge Egelhoff found for Defendants on Plaintiffs claims for recession, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

He found in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the agreement (awarding nominal damages). He ordered specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area from June 13, 1997 forward. Judgment was entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the "back tee box." Judgment was entered for Defendants and against Plaintiffs on Plaintiffs trespass claim.

Finally, the trial court found that each party had succeeded and defended on several significant issues in the case and neither was the prevailing party.

As noted those conclusions finding for L.B. Rose Ranch and against Trout were reversed by the appellate court. Specifically, the case was remanded with directions to the trial court to enter judgment in Trout's favor and against L B Rose Ranch on the quiet title, trespass and breach of contract claims.

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
28 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO



It is L B Rose Ranch's position that since Judge Egelhoff found in their favor on the recession and reformation claims, that those claims are significant and not reversed on appeal, that they are in fact the prevailing party.

At the end of the day, LB Rose Ranch has succeeded on nothing but the recession and reformation claims. Although LB Rose Ranch very artfully argues that it was Trout's intention all along to rescind the contract in order to hold Defendant "hostage," there was simply no credible evidence to support that notion, at least before this Court on remand. On the other hand, Trout filed the first lawsuit to enforce the terms of the contract regarding the berm and access routes. L B Rose Ranch responded with the Garfield County suit to impose an "as built easement." All of the credible evidence points out that these cases have always been about the nature and extent of the easements. Even the Court of Appeals recognized that

> ..."Trout's *primary argument* was that the parties written agreements unambiguously provided for a permanent easement located within twenty feet on either side of the centerline... He expressly argued in the alternative that if the court should find an ambiguity, the ambiguity should be resolved in his favor, or the documents should be reformed (to comport with his understanding of the location of the easement), or the transaction should be rescinded for lack of meeting of the minds. Thus, Trout was entitled to offer evidence to support those *alternative claims* and in so doing did not waive his *primary contention*.

This Court notes that at least in the Court of Appeals mind, recession was the last alternative.

## CONCLUSIONS OF LAW

Based on the testimony of the engineers, the Court finds that rebuilding the cart path within the easement is feasible. The choice of remedies was Trout's. He has never requested monetary damages, but only the equitable relief of Specific Performance and or Injunction.

Having found the rebuilding of the cart part to feasible, the Court ORDERS that it be done in specific accord with the agreements of the parties. While it is clear, pursuant to the cases cited by the Court of Appeals that the Court must consider whether specific performance would be inequitable, unconscionable, or oppressive, the Court must also consider whether defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect. Here, the equities favor Trout. Not only was the "mistake" unilateral, it was knowing and continuous.

Sometimes a slight and harmless encroachment is held to be within the rule 'de minimis,' and generally the courts require that he who seeks equity should do equity and come with clean hands. Where the encroachment is deliberate and constitutes a willful and intentional taking of another's land, equity may well require its restoration regardless of the expense of removal as compared with damage suffered therefrom; but where the encroachment was in good faith, the court should weigh the circumstances so

Reception#: 776842
10/26/2009 01 12 32 PM Jean Alberico
29 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

that it shall not act oppressively. *Golden Press, Inc. v. Rylands*, 124 Colo. 122, 235 P.2d
592, (Colo. 1951)

This behavior, a knowing and continuous breach of the agreement outweighs
any hardship or financial oppression Defendant may suffer in building an easement
compliant pathway.

## JUDGMENT

For the reasons set forth above, Defendants are **ENJOINED** from further
trespass on Trout's property. As stipulated by Trout, Defendants may use the former
construction easement during the reconstruction of the cart part. The underground utility
and water systems are to be abandoned and rerouted. As use of the golf course during
construction would hamper the workers, endanger the golfers and closing of the course
would cause further financial losses to Defendants, this Injunction is **STAYED** until
December 1, 2008.

In a civil action, the prevailing party is one who succeeds on a significant
issue in the case and whose claim furthers the purpose of the fee shifting provision.

> "The purpose of a contractual attorney fee-shifting provision is to deter parties from
> breaching the contractual agreement. To deny attorney fees to the non-breaching party
> merely because the jury determines that the party suffered no injury would render
> meaningless the fee-shifting provision in the settlement agreement to which the parties
> stipulated, and which the parties intended to enforce. Such a result would encourage
> parties to breach contractual agreements and would cause unwarranted litigation." *Dennis
> I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326, 333, n. 14. (Colo. 1994).

As noted above the easement provisions were not only significant issues in
this case, they were the primary issues. These are alternate claims not "multi-claims." Mr.
Trout's claims for rescission and reformation of the contract are clearly alternative and
inconsistent claims for relief with respect to Mr. Trout's claim for breach of contract. The
fact that he prevailed on the breach of contract claim necessarily forecloses the possibility
of prevailing on recession and reformation. LB Rose Ranch's argument that they
"escaped" the ruinous ramifications of recession and therefore have prevailed makes no
sense. They "escaped" recession because they lost the primary contract claim. Trout has
prevailed on all meaningful issues and is therefore entitled to his attorney's fees and
costs. Plaintiff's Bill of Costs is to be submitted within fifteen days of this order.

BY THE COURT     this 20th day of June 2008

William D. Robbins

District Judge

6

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
30 of 60 Rec Fee:$306.00 Doc Fee:0.00  GARFIELD COUNTY CO



COLORADO COURT OF APPEALS

---

Court of Appeals No.: 04CA1862
City and County of Denver District Court No. 01CV4208
Honorable Martin F. Egelhoff, Judge

---

Roger R. Trout,

Plaintiff-Appellant,

v.

Roaring Fork Investments, L.L.C. and LB Rose Ranch, L.L.C.,

Defendant-Appellees.

---

JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS

Division IV
Opinion by: JUDGE J. JONES
Casebolt and Carparelli, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(f)**
Announced: August 3, 2006

---

Ireland, Stapleton, Pryor & Pascoe, P.C., Richard L. Shearer, J. Alan Call, Denver, Colorado, for Plaintiff-Appellant

William Dixon Shay, Jr., Denver, Colorado, for Defendant-Appellee Roaring Fork Investments, L.L.C.

Madden & Madden, John W. Madden, III, John W. Madden IV, Denver, Colorado, for Defendant-Appellee LB Rose Ranch, L.L.C.

the entry of judgment in Trout's favor on the parties' easement claims.

## I. Background

Trout owns a forty-acre parcel of steep mountain property in Garfield County, Colorado. There are no roads leading into the landlocked property; it is only accessible through the northern canyon by foot. In the spring of 1997, Ron Heggemeier of LB Rose Ranch's predecessor-in-interest, Roaring Fork Investments, L.L.C., began negotiating with Trout in an attempt to acquire a portion of the Trout property. Roaring Fork wanted to develop the adjacent property as a golf course and residential community, and needed an easement across the Trout property to connect the lower golf course holes with the upper golf course holes, which were located on a landlocked mesa above the Trout property.

The parties' negotiations focused on a golf cart path easement which would generally follow the bottom of the canyon and would provide access to the upper holes of the golf course. A temporary path would be used mainly by construction vehicles, and a permanent path would be used by golf carts, bicycles, and pedestrians. In exchange for the easement, Roaring Fork would

ReceptionH: 776842
10/26/2009 01:12:32 PM  Jean Alberico
32 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

convey to Trout a residential building site adjacent to the lower Trout property line and the 14th hole, an easement across the 14th hole which would give Trout access to the residential lot and to the rest of the Trout property from County Road 109, and $30,000.

Roaring Fork was required to submit a development plan, which included an easement that would connect the upper and lower holes of the golf course, to the Garfield County Planning Commission by mid-June 1997. To enable Roaring Fork to meet the impending deadline, Roaring Fork and Trout executed three written agreements on June 13, 1997: (1) an Easement and Transfer Agreement which specifies, in relevant part, that Trout would allow a golf cart path easement through the canyon on the Trout property in exchange for title to a residential lot along his lower property line; (2) an easement agreement granting Roaring Fork a 100-foot-wide temporary construction easement and a forty-foot-wide permanent easement for a golf cart path through the canyon located on the Trout property (the Golf Cart Path Easement Agreement); and (3) an easement agreement by which Roaring Fork granted Trout an access easement to the residential lot (the Access Easement Agreement).

3

The Easement and Transfer Agreement grants the golf cart

path easement across the Trout property in paragraph 4.

> 4. **TROUT GRANT OF EASEMENT**.  Trout hereby
> grants Roaring Fork and others a perpetual non-
> exclusive easement, described and depicted on the
> attached Exhibit I, for the purposes described therein and
> agrees to record the same in the real estate records
> simultaneous with the recording of the easement granted
> by Roaring Fork which is specified in Paragraph 3 above.

Though there was no "Exhibit I" attached to the Easement and

Transfer Agreement, Heggemeier's testimony was that the Golf

Cart Path Easement Agreement was that document.

As of June 13, 1997, when the easement agreements were

executed, a survey had not been completed.  However, paragraph

11 of the Easement and Transfer Agreement and paragraph 1 of the

Golf Cart Path Easement Agreement provide for the creation of a

description of the easement based upon a subsequent survey of the

bottom of the canyon.  Specifically, paragraph 11 of the Easement

and Transfer Agreement states:

> 11.  **FURTHER MODIFICATION OF LEGAL
> DESCRIPTION FOR EASEMENT ACROSS TROUT
> PARCEL**.  Due to the fact that Roaring Fork has not
> yet surveyed the easement area which is being granted
> by Trout in Paragraph 4 above, Trout agrees to execute
> any and all additional documents necessitated for

4

Reception#: 776842
10/26/2009 01:12:32 PM Jean Alberico
34 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

connection or further clarification and definition of the legal description for said easement area after Roaring Fork obtains a survey for said easement area.

The Golf Cart Path Easement Agreement provides as follows with respect to the location of the temporary construction easement and the permanent easement:

> The Grantor hereby grants to the Grantee for and in consideration of the sum of TEN AND NO/100 dollars ($10.00) paid to the Grantor by the Grantee, an easement and right-of-way over and across the property described in Exhibit A attached hereto and made a part hereof. The terms and conditions governing the easement shall be as follows:

> 1. **Width and Location**. There shall be a construction easement one-hundred feet (100') in width and fifty feet (50') on either side of the centerline described in Exhibit A and a permanent easement forty feet (40') and twenty feet (20') on either side of the centerline described in Exhibit A.

Paragraph 1 goes on to list the allowable purposes for the permanent easement.

"Exhibit A" was not attached to the Golf Cart Path Easement Agreement at the time it was executed by the parties. To create that document, Roaring Fork subsequently hired High Country Engineering to survey the bottom of the canyon and locate the centerline. High Country Engineering performed an aerial survey of

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
35 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

the Trout property and used the survey to create the legal
description of the centerline of the bottom of the canyon on
September 23, 1997.  Roaring Fork labeled this centerline survey
"Exhibit A."  Exhibit A actually contains two "centerline" surveys,
one labeled "Cart Path Construction Easement," and a second
labeled "Golf Cart Easement Description."  The parties stipulated,
however, that the Golf Cart Easement Description, set forth on
pages A-3 to A-6 of Exhibit A, does not relate to the golf cart path at
issue in this appeal, and was created in the event that Roaring Fork
could not obtain a connecting lower easement across the land of a
third party (the Westbank property).  However, Roaring Fork
subsequently obtained an easement across the Westbank property.

Pages A-1 to A-2 of Exhibit A depict a metes and bounds legal
description of the centerline of the bottom of the canyon.  Exhibit A
and the Golf Cart Path Easement Agreement were initialed by Trout
and Heggemeier, and then recorded by Roaring Fork in the real
property records of Garfield County on February 11, 1998.

On November 15, 2000, LB Rose Ranch acquired title to the
golf course property from Roaring Fork and became its successor-
in-interest under the easement agreements.  In late 2000, LB Rose

6

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
36 of 60 Rec Fee: $306.00 Doc Fee: 0.00 GARFIELD COUNTY CO

Ranch began construction of the golf course adjacent to the Trout property.

After LB Rose Ranch began construction, Trout filed suit against Roaring Fork and LB Rose Ranch in Denver District Court on August 7, 2001.  Trout's complaint stated a single claim for breach of contract arising out of Roaring Fork's and LB Rose Ranch's alleged failure to comply with certain terms of the June 13, 1997 contracts.  Specifically, Trout's complaint alleged that Roaring Fork and LB Rose Ranch failed to provide proof of $1 million in liability and property damage insurance, failed to provide a reasonable indemnification agreement that would protect Trout from liability in the event of any damage caused by use of the golf cart path easement, and failed to allow Trout the use and enjoyment of his access easement because the access easement to his property was completely blocked by dirt.

Trout later filed an amended complaint, adding new allegations.  He alleged that his quiet use and enjoyment of the residential lot was hampered by the danger of golf balls hit from the 14th hole tee box; Roaring Fork misrepresented that the golf course

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
37 of 60 Rec Fee:$306.00 Doc Fee 0.00 GARFIELD COUNTY CO



would be public; and Roaring Fork falsely represented to Trout that he would not need a membership to the golf course.

After Trout filed suit in Denver District Court, LB Rose Ranch hired High Country Engineering to conduct a survey of the easement area and to prepare a legal description of the location of the golf cart path "as constructed." The survey is dated July 27, 2002. As constructed, the golf cart path is located entirely within the 100-foot-wide construction easement corridor, as described in Exhibit A of the Golf Cart Path Easement Agreement. However, approximately ten to fifteen percent of the golf cart path is located outside of the forty-foot-wide corridor calculated from twenty feet on either side of the centerline described on pages A-1 to A-2 of Exhibit A.

LB Rose Ranch filed a separate action against Trout in Garfield County District Court on July 15, 2002, asserting a claim for breach of contract, based on the allegation that Trout breached paragraph 11 of the Easement and Transfer Agreement by refusing to provide a "clarifying" easement consistent with the "as constructed" golf cart path. Trout filed counterclaims to quiet title to that portion of the golf cart path outside of the agreed upon

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
38 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

easement area, and for trespass and breach of contract, also

alleging that LB Rose Ranch constructed a golf cart path on his

property outside of the boundaries of the permanent golf cart path

easement agreed to by the parties.

In its answer to Trout's counterclaims, LB Rose Ranch averred

that it was "entitled under the Easement and Transfer Agreement to

an easement across the Trout property which is not limited to the

specifically described boundaries of the Golf Cart Path Easement

[Agreement] and which includes the real property across which the

present golf cart path is constructed . . . . " According to LB Rose

Ranch, the "permanent easement" described in Exhibit A was

intended to be only "temporary" or "preliminary," and would be

"adjusted" after construction to account for where LB Rose Ranch

actually decided to construct the golf cart path.

The Garfield County case was ultimately consolidated with the

Denver case.  The consolidated cases were tried to the Denver

District Court.

As relevant to this appeal, in addition to those facts set forth

above, the trial court also found that there was a meeting of the

minds as to the three written agreements that were executed on

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
39 of 60 Rec Fee $306.00 Doc Fee 0 00 GARFIELD COUNTY CO



June 13, 1997; those documents contained all the material terms of

the parties' agreement regarding the easement; and pages A-1 and

A-2 of Exhibit A portray only the temporary construction easement.

The trial court did not find that the easement agreements were

ambiguous.  Nevertheless, in finding that the canyon centerline

depicted in Exhibit A applies only to the temporary construction

easement, the trial court relied on evidence of discussions predating

the agreements.  Based on these discussions, the trial court found

that the parties did not contemplate construction of the golf cart

path within a narrow forty-foot corridor, running twenty feet on

either side of the centerline of the bottom of the canyon, as set forth

in paragraph 1 of the Golf Cart Path Easement Agreement.  Instead,

the trial court found, the parties contemplated that the centerline of

the permanent easement would need to be "adjusted" after

construction began, and that an eventual clarifying easement

agreement would need to be prepared upon completion of

construction.

Accordingly, the trial court entered judgment in favor of

Roaring Fork and LB Rose Ranch on their claim against Trout for

breach of contract and on Trout's trespass and breach of contract

Reception#: 776842
10/26/2009 01:12.32 PM   Jean Alberico
40 of 60 Rec Fee:$306.00 Doc Fee:0.00  GARFIELD COUNTY CO

claims relating to the golf cart path easement. The trial court also

ruled that Trout did not have clear title to those portions of the

forty-foot nonexclusive easement described in the July 27, 2002

legal description provided by High Country Engineering that are

outside of the area twenty feet on either side of the canyon

centerline, but he owned clear title to his original forty-acre parcel.

Because the trial court found that LB Rose Ranch did not suffer any

actual damages by virtue of Trout's breach of contract, the trial

court awarded only nominal damages; however, the trial court also

ordered specific performance as to the clarifying easement

requested by LB Rose Ranch.

## II. Discussion

Trout contends the trial court erred in finding that he

breached the Easement and Transfer Agreement by not providing a

clarifying easement for the golf cart path "as constructed"; in

requiring specific performance as to the clarifying easement; and in

entering judgment in favor of Roaring Fork and LB Rose Ranch on

his quiet title, trespass, and breach of contract claims pertaining to

the easement. In essence, as noted above, Trout challenges the

trial court's reliance on parol evidence to interpret the agreements,

11

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
41 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

contending that those agreements unambiguously provide that the golf cart path easement would be an area twenty feet on either side of the canyon centerline described in Exhibit A. We agree with Trout.

### A.  Standard of Review

Whether a written contract is ambiguous and, if not deemed ambiguous, how the unambiguous contractual language should be construed, are questions of law, which we review de novo. <u>Lake Durango Water Co., Inc. v. Public Utilities Comm'n</u>, 67 P.3d 12, 20 (Colo. 2003); <u>accord Fibreglas Fabricators, Inc. v. Kylberg</u>, 799 P.2d 371, 374 (Colo. 1990); <u>KN Energy, Inc. v. Great Western Sugar Co.</u>, 698 P.2d 769, 776 (Colo. 1985); <u>Union Rural Elec. Ass'n v. Public Utilities Comm'n</u>, 661 P.2d 247, 251 (Colo. 1983); <u>Fire Ins. Exch. v. Rael</u>, 895 P.2d 1139, 1142 (Colo. App. 1995). Accordingly, we need not defer to any finding of the trial court on those questions. <u>Lake Durango Water Co.</u>, supra, 67 P.3d at 20; <u>Dorman v. Petrol Aspen, Inc.</u>, 914 P.2d 909, 912 (Colo. 1996); <u>Fibreglas Fabricators</u>, supra, 799 P.2d at 374; <u>Fire Ins. Exch.</u>, supra, 895 P.2d at 1142-43.

However, once a term of a contract is deemed ambiguous, the meaning of the ambiguous term is a question of fact to be

Reception#: 776842
10/26/2009 01.12 32 PM   Jean Alberico
42 of 60 Rec Fee.$306.00 Doc Fee 0 00 GARFIELD COUNTY CO

determined and reviewed in the same manner and with the same

deference as other questions of fact. Pepcol Mfg. Co. v. Denver

Union Corp., 687 P.2d 1310, 1314 (Colo. 1984); Union Rural Elec.

Ass'n, supra, 661 P.2d at 251 n.5; Fire Ins. Exch., supra, 895 P.2d

at 1143. Therefore, if we determine that the relevant provisions of

the parties' agreements are ambiguous, we may overturn the trial

court's finding regarding the meaning of those provisions only if

those findings are clearly erroneous. Page v. Clark, 197 Colo. 306,

313, 592 P.2d 792, 796 (1979); Rocky Mountain Health Maint. Org.,

Inc. v. Colo. Dep't of Health Care Policy & Financing, 54 P.3d 913,

919 (Colo. App. 2001); Nat'l Propane Corp. v. Miller, 18 P.3d 782,

787 (Colo. App. 2000). A trial court's factual finding is clearly

erroneous only if it has no support in the record. Page, supra, 197

Colo. at 313, 592 P.2d at 796; Nat'l Propane Corp., supra, 18 P.3d

at 787.

B. Applicable Principles of Contract Interpretation

The intent of the parties to a written contract must be

determined primarily from the written terms. KN Energy, supra,

698 P.2d at 776. Where, as here, the parties execute multiple

agreements at the same time, all dealing with the same subject

Reception#: 776842
10/26/2009 01:12 32 PM  Jean Alberico
43 of 60 Rec Fee $306 00 Doc Fee 0 00 GARFIELD COUNTY CO

matter, they must be construed together to determine the parties'
intent. Harty v. Hoerner, 170 Colo. 506, 509, 463 P.2d 313, 314
(1969); O'Reilly v. Physicians Mut. Ins. Co., 992 P.2d 644, 648-49
(Colo. App. 1999); Bledsoe v. Hill, 747 P.2d 10, 12 (Colo. App.
1987).

The mere fact that the parties urge different interpretations of
a contract does not establish the existence of an ambiguity.
Dorman, supra, 914 P.2d at 912; Fibreglas Fabricators, supra, 799
P.2d at 374. "In determining whether a contractual provision is
ambiguous, 'the instrument's language must be examined and
construed in harmony with the plain and generally accepted
meaning of the words used,' with reference to all of the agreement's
provisions, and a provision is ambiguous 'if it is fairly susceptible to
more than one interpretation.'" Dorman, supra, 914 P.2d at 912
(quoting in part Fibreglas Fabricators, supra, 799 P.2d at 374); see
also Fire Ins. Exch., supra, 895 P.2d at 1143. "It is only where the
terms of [the] agreement are ambiguous or are used in some special
or technical sense not apparent from the contractual document
itself that the court may look beyond the four corners of the

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
44 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

agreement in order to determine the meaning intended by the

parties." Pepcol Mfg. Co., supra, 687 P.2d at 1314.

The question of whether an ambiguity exists, however, need

not be resolved solely by reference to the four corners of the

document.  Rather, certain extrinsic evidence may be considered,

including evidence of local usage, technical meaning, and the

circumstances surrounding the making of the contract.  Public

Service Co. v. Meadow Island Ditch Co. No. 2, 132 P.3d 333, 339

(Colo. 2006); Columbus Invs. v. Lewis, 48 P.3d 1222, 1228 (Colo.

2002); KN Energy, supra, 698 P.2d at 776-77; Fire Ins. Exch.,

supra, 895 P.2d at 1143; see also 2 E. Allen Farnsworth,

Farnsworth on Contracts §§ 7.10, 7.12, 7.12a (2d ed. 1998).

An important limitation on the consideration of extrinsic

evidence in this context – and one particularly applicable in this

case – is that the court may not consider the parties' extrinsic

expressions of intent.  Public Service Co., supra, 132 P.3d at 339;

KN Energy, supra, 698 P.2d at 777; Fire Ins. Exch., supra, 895 P.2d

at 1143.  Likewise, while extrinsic evidence may be admissible to

show the existence of an ambiguity by demonstrating that a term

which is apparently unambiguous on its face in fact carries a

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico  GARFIELD COUNTY CO
45 of 60 Rec Fee:$306.00 Doc Fee:0.00

different meaning under the circumstances, it is never admissible to

contradict the plain meaning of a term. See Cheyenne Mountain

School Dist. No. 12 v. Thompson, 861 P.2d 711, 715 (Colo. 1993);

Employment Television Enterprises, LLC v. Barocas, 100 P.3d 37,

43 (Colo. App. 2004) (evidence of usage of trade is admissible if it

suggests an alternative meaning); 2 Farnsworth, supra, § 7.12; cf.

Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1235

(Colo. 1998) (noting that extrinsic evidence may be admitted

provisionally to determine whether a deed granting an easement is

ambiguous, but not to vary or contradict the writing; citing 4

Samuel Williston, A Treatise on the Law of Contracts § 601, at 311

(Jaeger ed. 1961)).

   In the event that the court, after considering all the relevant

evidence, determines that a contract is not ambiguous, "the court

must, in the absence of a showing that the contract is voidable on

grounds such as mistake, fraud, duress, undue influence, or the

like, or unless the result would be an absurdity, give effect to the

contract as written." Lake Durango Water Co., supra, 67 P.3d at

20. If, however, the court determines that the contract is

ambiguous, the court may consider extrinsic evidence to explain or

supplement – but not to contradict – the contract, including

evidence of prior negotiations; local, special, or technical usage; the

circumstances surrounding the making of the contract; and the

parties' course of dealing under the contract.  Cheyenne Mountain,

supra, 861 P.2d at 715; Benham v. Pryke, 744 P.2d 67, 72 (Colo.

1987); KN Energy, supra, 698 P.2d at 776-77; Atmel Corp. v.

Vitesse Semiconductor Corp., 30 P.3d 789, 792 (Colo. App. 2001);

Fire Ins. Exch., supra, 895 P.2d at 1143.

With these principles in mind, we turn our attention to the

parties' arguments.

### C.  Analysis

#### 1.  Trout did not waive his right to raise the parol evidence rule on appeal.

LB Rose Ranch challenges Trout's right to raise the parol

evidence rule on appeal, arguing that he waived the issue because

his counsel failed to object to the introduction of parol evidence at

trial, elicited testimony from Heggemeier at trial about precontract

discussions, and stated during argument to the trial court that the

documents are ambiguous.  We disagree.

Reception#: 776842
10/26/2009 01 12 32 PM  Jean Alberico
47 of 60 Rec Fee:$306.00 Doc Fee:0 00 GARFIELD COUNTY CO

It is well established that the parol evidence rule is one of
substantive law, not merely one of evidence. "Therefore, if . . . a
contract is unambiguous, then parol evidence, even if received
without objection, must be ignored by the trial court." Magnetic
Copy Servs., Inc. v. Seismic Specialists, Inc., 805 P.2d 1161, 1164
(Colo. App. 1990). Thus, "the parol evidence rule can be raised on
appeal despite the absence of an objection." Magnetic Copy, supra,
805 P.2d at 1164.

LB Rose Ranch's contention that Trout waived the parol
evidence issue because his counsel asked Heggemeier questions at
trial about precontract discussions fares no better. The law is clear
that evidence may be offered and admitted for one purpose even if it
would not be admissible for another purpose. Higgs v. Dist. Court,
713 P.2d 840, 860 (Colo. 1985); Spencer v. People, 163 Colo. 182,
188, 429 P.2d 266, 270 (1967); see CRE 105. Here, Trout's primary
argument at trial was that the parties' written agreements
unambiguously provided for a permanent easement located within
twenty feet on either side of the centerline described in Exhibit A.
He expressly argued in the alternative that if the court should find
an ambiguity, the ambiguity should be resolved in his favor, or the

18

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
48 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

documents should be reformed (to comport with his understanding

of the location of the easement), or the transaction should be

rescinded for lack of a meeting of the minds.  Thus, Trout was

entitled to offer evidence to support those alternative claims, and in

so doing did not waive his primary contention.

Nor did Trout waive the right to raise the parol evidence

argument on appeal by virtue of statements made by his counsel in

closing argument.  Trout's counsel clearly argued in closing

argument that the documents, when read together, unambiguously

called for the permanent easement to be located within twenty feet

on either side of the centerline described in Exhibit A.  The

statements in the record to which LB Rose Ranch points appear to

relate only to the meaning of Exhibit A standing alone (as it

contained two centerline descriptions) and to the alternative

easement.

## 2.  The Easement and Transfer Agreement and the Golf Cart Path Easement Agreement are unambiguous.

Paragraph 1 of the Golf Cart Path Easement Agreement

expressly states that the width of both the "construction easement"

and the "permanent easement" shall be calculated "on either side of

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
49 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

the centerline described in Exhibit A." Despite this apparently clear
language, the trial court found that while the parties intended that
this centerline would apply to the construction easement, they did
not intend that it would apply to the permanent easement, but
instead intended that there would be a second centerline
determined after construction of the golf cart path.

Read in context, paragraph 1 is not fairly susceptible of an
interpretation that there would be one centerline for the
construction easement and a second one for the permanent
easement, to be determined after construction. Paragraph 1 refers
to "the centerline," necessarily implying a single centerline.
Heggemeier testified at trial that the plain language of paragraph 1
calls for a single centerline, not two different centerlines. That
Exhibit A, as ultimately prepared, contains two centerlines does not
establish an ambiguity in paragraph 1 because, as the parties
stipulated, the second of those two centerlines does not pertain to
either the construction easement or the permanent easement, and
therefore does not pertain to paragraph 1.

We also note that LB Rose Ranch does not contend, and
appears never to have contended, that the first use of the phrase

"the centerline described in Exhibit A" – in connection with the

construction easement – is ambiguous.  Indeed, the trial court

found that paragraph 1 means exactly what it says with respect to

the construction easement.  Yet, LB Rose Ranch incongruously

argues, and the trial court incongruously found, that the second

use of the identical phrase, in the same sentence, means something

different.  Under both LB Rose Ranch's and the trial court's

interpretation, the centerline for the permanent golf cart path

easement, unlike the centerline for the construction easement, is

not "described in Exhibit A."

Consistent with LB Rose Ranch's argument and Heggemeier's

testimony about his precontract discussions with Trout, the trial

court concluded that paragraph 1 of the Golf Cart Path Easement

Agreement was intended to set forth only a "temporary" or

"preliminary" description of the location of the golf cart path

easement.  Paragraph 1, however, expressly applies to the

"permanent" easement, and neither it nor any other provision of the

parties' agreements speaks in terms of a "temporary" or

"preliminary" description, to be followed after construction by a

different "permanent" description.  To the contrary, paragraph 11 of

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
51 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

the Easement and Transfer Agreement plainly contemplates "a
survey" to establish the location of the easement, not multiple
surveys at different points in time.  Thus, Heggemeier's testimony
contradicted paragraph 1 and could not be considered as merely
explaining it.

In effect, the trial court's interpretation of paragraph 1 of the
Golf Cart Path Easement Agreement reads the clause pertaining to
the permanent easement out of paragraph 1, and substitutes
therefor a different understanding based on extrinsic expressions of
the parties' intent.  This was error.  See KN Energy, supra, 698 P.2d
at 777; Fire Ins. Exch., supra, 895 P.2d at 1143.

We observe in this regard that, just as paragraph 1 expressly
contemplated, Exhibit A was later prepared by Roaring Fork,
showing a single centerline for the canyon.  That survey and the
Golf Cart Path Easement Agreement were subsequently recorded by
Roaring Fork.  Though, as LB Rose Ranch points out, that survey
was entitled "Cart Path Construction Easement," paragraph 1 of the
Golf Cart Path Easement Agreement plainly contemplates that the
centerline in Exhibit A would be the centerline for both the

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
52 of 60 Rec Fee:$306.00 Doc Fee 0.00 GARFIELD COUNTY CO

construction easement and the permanent easement. No unilateral act of labeling the survey by Roaring Fork could change that fact.

Contrary to LB Rose Ranch's argument on appeal, paragraph 11 of the Easement and Transfer Agreement does not support the trial court's finding. True, paragraph 11 contemplates that the "easement area" would be surveyed at a later date and that Trout would execute any document necessary for clarification of the legal description for the easement area. But paragraph 11 says nothing about an "as built" permanent easement or a postconstruction survey; rather, as noted above, it contemplates a single survey. And Trout agreed to a clarifying document by initialing the September 23, 1997 aerial survey, Exhibit A, which bears the "Colorado Registered Professional Land Surveyor" stamp and was performed by High Country Engineering. This clarification complied with paragraph 11.

LB Rose Ranch also contends that the term "easement area" as used in paragraph 11 requires a metes and bounds description of the boundary of the easement, and Exhibit A does not contain such a description. We disagree.

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
63 of 60 Rec Fee:$305.00 Doc Fee:0.00 GARFIELD COUNTY CO

The area of a linear space is measured by length and width.
Paragraph 1 of the Golf Cart Path Easement Agreement and Exhibit
A thereto, when read together, plainly describe both the length and
the width of the easement.  In this regard, we observe that Joe
Hope, an engineer with, and the president of, High Country
Engineering, testified that either an aerial centerline survey or a
boundary survey could accurately depict the legal description of the
location of an easement, and he agreed that a boundary survey is
not required to "be recordable and to tell you where it is."

Finally, it is also clear that paragraph 1 of the Golf Cart Path
Easement Agreement is consistent with paragraph 4 of the
Easement and Transfer Agreement.  Paragraph 4 contemplates
preparation of a document describing and depicting "a perpetual
non-exclusive easement" and describing the "purposes of" the
easement.  Paragraph 1, together with Exhibit A, plainly
accomplishes both functions.

Nonetheless, LB Rose Ranch also argues that the Easement
and Transfer Agreement and the Golf Cart Path Easement
Agreement are only partially integrated, and therefore evidence of
the parties' precontract discussions may be considered to

Reception#: 776842
10/26/2009 01 12 32 PM   Jean Alberico
54 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

"supplement" those documents.  Initially we note that both

agreements contain integration clauses stating that they constitute

the entire agreement of the parties and supersede any prior

discussions.  The trial court expressly found that the agreements

contain all the material terms, a finding which is supported by the

record.  In any event, even where a document is only partially

integrated, parol evidence may not be used to contradict it.  See

Restatement (Second) of Contracts §§ 213 cmt. b, 215.  As

discussed above, the trial court used such evidence to contradict

paragraph 1 of the Golf Cart Path Easement Agreement.

In sum, we conclude that the parties' written agreements

unambiguously provide that the permanent golf cart path easement

would be located within twenty feet on either side of the centerline

described in Exhibit A.  The trial court erred in relying on parol

evidence to contradict the written agreements.

3.  LB Rose Ranch's alternative defenses are without merit.

LB Rose Ranch also contends, presumably in the alternative,

that the agreements were modified by a subsequent oral agreement.

LB Rose Ranch did not assert any such modification in the trial

court, and the trial court did not make any finding of a

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
55 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

modification. Because modification seeks to avoid liability on a

contract, it is an affirmative defense that must be pleaded in a

party's answer or otherwise timely raised in the trial court to be

preserved. Lease Northwest, Inc. v. Davis, 400 N.W.2d 220, 224

(Neb. 1987); Metrocon Constr. Co., Inc. v. Gregory Constr. Co., Inc.,

663 S.W.2d 460, 463 (Tex. App. 1983); see also C.R.C.P. 8(c)

(matters constituting an avoidance or affirmative defense must be

set forth in a party's answer); cf. Ice v. Benedict Nuclear Pharm.,

Inc., 797 P.2d 757, 760 (Colo. App. 1990) (rescission is an

affirmative defense). Therefore, we deem this argument waived.

See Crocker v. Colo. Dep't of Rev., 652 P.2d 1067, 1070-71 (Colo.

1982); Rudd v. Rogerson, 162 Colo. 103, 107, 424 P.2d 776, 779

(1967); Drake v. Tyner, 914 P.2d 519, 521 (Colo. App. 1996); Miller

v. Solaglas Cal., Inc., 870 P.2d 559, 563 (Colo. App. 1993).

Even were we to conclude that LB Rose Ranch had not waived

the defense of modification, we would nevertheless reject it on the

merits. Though LB Rose Ranch states in its brief that there was a

"discussion and agreement between Trout and Heggemeier

subsequent to [the execution of the Golf Cart Path Easement

Agreement] in June 1997," it cites no evidence in the record of such



Reception#: 776842
10/26/2009 01:12:32 PM    Jean Alberico
56 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO

a discussion or of the precise matters discussed. For its part, the trial court expressly relied only on precontract discussions. There is simply no evidence in the record to support LB Rose Ranch's allegation of a subsequent oral modification.

Lastly, LB Rose Ranch argues, again apparently in the alternative, that the accommodation doctrine of easements should be applied in this case to allow for relocation of the easement. We disagree.

Again, LB Rose Ranch did not raise this claim in any of its pleadings or in the trial management order. It raised the claim for the first time in its trial brief. It is therefore doubtful that LB Rose Ranch preserved this claim for appeal. See Crocker, supra, 652 P.2d at 1070-71. Assuming, without deciding, that LB Rose Ranch nonetheless preserved this claim, the doctrine does not apply here as a matter of law.

The accommodation doctrine allows a servient estate or burdened property owner to alter an easement in order to maximize the economic potential of its own property, provided that such alteration does not injure the owner of the easement. Roaring Fork Club, L.P. v. St. Jude's Co., 36 P.3d 1229, 1234-36 (Colo. 2001).

Reception#: 776842
10/26/2009 01:12:32 PM    Jean Alberico
57 of 60 Rec Fee:$306.00 Doc Fee:0.00 GARFIELD COUNTY CO



An important tenet of the accommodation doctrine is that, before alteration of the easement, the servient estate must obtain consent from the easement owner or a court order. Roaring Fork, supra, 36 P.3d at 1231, 1237-38.

Here, the servient estate is not requesting the alteration; it is the easement owner requesting the alteration. In Roaring Fork Club, supra, the court relied in part on § 4.8 of the Restatement (Third) of Property (Servitudes), which addresses the relocation of easements. Comment f to that section provides that the rule



allowing the servient owner to relocate the easement "is not reciprocal. It permits unilateral relocation only by the owner of the servient estate; it does not entitle the owner of the easement to relocate the easement."

Moreover, the grantor's consent was not obtained before the golf cart path was built partially outside of the permanent easement area. Nor did LB Rose Ranch seek a court order of accommodation prior to constructing the golf cart path partially outside the easement agreed to by the parties.

ReceptionH: 776842
10/26/2009 01 12 32 PM  Jean Alberico  GARFIELD COUNTY CO
58 of 60 Rec Fee $306 00 Doc Fee:0 00

### 4. Trout's remedies must be reconsidered.

Though the trial court found that LB Rose Ranch had not

breached the agreements with respect to the location of the golf cart

path, it nevertheless found that Trout did not suffer any damages

by virtue of the location of the golf cart path.  Trout does not

challenge that finding on appeal.

Trout argues, however, that the trial court erred in refusing to

order specific performance of LB Rose Ranch's obligation to

construct the golf cart path within twenty feet on either side of the

centerline described in Exhibit A.  The trial court, explicitly relying

on Joe Hope's testimony, which it found to be credible, concluded

that requiring LB Rose Ranch to relocate the golf cart path was not

possible or cost effective.  Our review of the record, however, leads

us to conclude that Hope did not testify that building the golf cart

path entirely within the area twenty feet on either side of the

canyon centerline was impossible.  Rather, he testified that he had

not made an effort to construct the golf cart path entirely within

that corridor, and that he could probably have done so (provided

the necessary permits were obtained), but he was not sure.  In light

of our decision to remand the case for further proceedings, we

Reception#: 776842
10/26/2009 01:12:32 PM  Jean Alberico
59 of 60 Rec Fee $306.00 Doc Fee 0.00 GARFIELD COUNTY CO

direct the trial court to reexamine the feasibility of relocating the golf cart path entirely within the corridor described in Exhibit A, under the legal standards applicable to requests for specific performance. See Greeley & Loveland Irrigation Co. v. McCloughan, 140 Colo. 173, 181, 342 P.2d 1045, 1050 (1959); Tayyara v. Stetson, 521 P.2d 185, 189 (Colo. App. 1974) (not published pursuant to C.A.R. 35(f)).

Finally, Trout requests that we order the trial court to enter an injunction prohibiting further trespasses on his property by means of the golf cart path. In light of its resolution of the merits of the parties' claims for relief, the trial court did not rule on this request following the trial, and we decline to do so in the first instance. Therefore, on remand, the trial court should consider the merits of this request for relief in conjunction with any other remedies necessitated by this opinion.

## III.  Conclusion

Those portions of the judgment against Trout and in favor of Roaring Fork and LB Rose Ranch on Trout's quiet title, trespass, and breach of contract claims, and on LB Rose Ranch's breach of contract claim are reversed. The case is remanded for entry of

Reception#: 776842
10/26/2009 01:12:32 PM   Jean Alberico
60 of 60 Rec Fee $306.00 Doc Fee:0.00 GARFIELD COUNTY CO

judgment in Trout's favor and against Roaring Fork and LB Rose
Ranch on those claims and for further proceedings consistent with
this opinion, including a reexamination of Trout's requests for
specific performance and an injunction, and a reassessment of
whether Trout is entitled to an award of attorney fees under the fee-
shifting provisions of the Easement and Transfer Agreement and the
Golf Cart Path Easement Agreement.

JUDGE CASEBOLT and JUDGE CARPARELLI concur.