# **Exhibit E**

| *United States Bankruptcy Court/Southern District of New York* | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No of Debtor |
| LB ROSE RANCH LLC | 09-10560 (JMP) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Roger Trout
c/o Kenneth J. Buechler, Esq.
Sender & Wasserman, P.C.
1660 Lincoln Street, Suite 2200
Denver, CO 80264

Telephone number: 303-296-1999    Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim
Number: _____
*(if known)*

Filed on: _____

**NOTICE OF SCHEDULED CLAIM:**
Your Claim is scheduled by the indicated Debtor as:

UNSECURED
UNLIQUIDATED
DISPUTED
CONTINGENT
UNDETERMINED

DESCRIPTION:
-GENERAL LITIGATION

Name and address where payment should be sent (if different from above):
Roger Trout
PO Box 494
Kiowa, CO 80117
Telephone number: Text    Email Address: Text

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed: $ 1,336,938.30

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO** http://www.lehman-claims.com **AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. Basis for Claim: Breach of Easement, Breach Contract, Etc.
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☒ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: Golf Cart Easement, Garfield County, Colorado
Value of Property: $unknown    Annual Interest Rate 18 %
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$1,336,938.30    Basis for perfection: Easement & Judgment
Amount of Secured Claim: $1,336,938.30    Amount Unsecured: $unknown

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ _____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____
(See instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

SEP 21 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/18/2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br><br> Kenneth J. Buechler, Attorney for Roger Trout |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The Instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

_____

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

_____

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

9480.201

pldg

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| **Plaintiff:**<br><br>ROGER TROUT<br><br>v.<br><br>**Defendant:**<br><br>ROARING FORK INVESTMENTS, L.L.C. and LB ROSE RANCH, L.L.C. | ▲ COURT USE ONLY ▲<br><br>Case Number: 01CV4208<br><br>Ctrm: 7 |
| **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** | |

THIS MATTER is before the Court following a trial to the Court held on April 26 – 30, 2004. Plaintiff Roger Trout is represented by Richard Shearer and Robert Anderson. Defendant Roaring Fork Investments, L.L.C. is represented by William Shay. Defendant LB Rose Ranch, L.L.C. is represented by John Madden. Upon consideration of the testimony and exhibits received at the trial, and having considered the arguments of counsel and being sufficiently advised in the premises, the Court issues the following findings of fact, conclusions of law and order.

## PROCEDURAL HISTORY

Plaintiff's complaint in 01CV4208 asserts claims involving a parcel of land located in Garfield County, Colorado, a residential lot adjacent to that property, and a series of agreements regarding, and easements upon, those properties executed in conjunction with the development of a golf course and residential community adjacent to the properties. The complaint asserts a claim for breach of contract based on allegations that Defendants failed to provide liability and property damage insurance, as well as a reasonable indemnification agreement, as required by the agreements. The complaint also alleges that, as the result of the design and development of the golf course, Defendants breached the covenant of Plaintiff's quiet use and enjoyment of the



8/3/04 RLS,
JAC,
SMA

1

residential lot and easement. The complaint alternatively asserts a claim for rescission, based upon alleged false representations made by Defendants, as well as a claim for reformation based upon alleged mutual mistakes of fact.

Defendant LB Rose Ranch, LLC filed a separate complaint in Garfield District Court in 02CV231, asserting a claim for breach of contract and specific performance, based on allegations that Roger Trout breached an agreement to provide a recordable easement consistent with the course of a golf cart path as constructed upon Trout's property. In that action, Trout filed counterclaims to quiet title and asserted claims of trespass, breach of contract, and rescission, all based upon allegations that LB Rose Ranch constructed a golf cart path on his property outside the boundaries of the easement established by the parties as part of the golf course development.

Case number 02CV231 was subsequently consolidated into case number 01CV4208, and all claims were tried to the Court without a jury.

## PRELIMINARY STATEMENT

All of the findings of fact and conclusions made herein are based upon what the Court determines to be a preponderance of the admissible, credible, and persuasive evidence. As the fact finder on this case, the Court has assessed the credibility of the witnesses by applying the same standards that jurors are required or permitted to apply, as set forth in CJI 4th 3:16. The findings of fact herein reflect and incorporate the Court's credibility assessments.

## FINDINGS OF FACT

1.  In 1969, Plaintiff's father, Robert Trout, acquired a 40-acre parcel of property in Garfield County, Colorado, south of Glenwood Springs and west of the Roaring Fork river (hereafter "the Trout property"). The mountainous property is bisected north to south by a canyon with a dry creek bed at the bottom and steep sides. The property is adjacent to the south and east to property owned, at the time of purchase, by Defendant Roaring Fork Investments, L.L.C. ("Roaring Fork"). Although proximate to county road 109, the Trout property was essentially landlocked and accessible only by foot via the canyon from the north.

2.  In late March or early April 1997, Ron Heggemeier of Roaring Fork approached Plaintiff's father in an attempt to acquire the Trout property in connection with Roaring Fork's development of its adjacent property as a golf course and residential community. Of specific concern to Roaring Fork was the acquisition of the Trout property as a means to connect the lower portion of Roaring Fork's golf course located in the valley east of county road 109 to its landlocked[1] property on a mesa

---

[1] Access to the upper holes was possible from the south of Roaring Fork's property from an area referred to as the "overlook," and a road was partially constructed through that area. However, due to the terrain and other considerations, including an eagle preserve in the area, Roaring Fork concluded that access via the overlook would be impracticable and cost prohibitive.



west of county road 109, which was the intended location of Roaring Fork's "upper" golf holes.

3. Plaintiff's father, who at the time was aged and ill, directed Heggemeier to negotiate with Plaintiff. Shortly thereafter, a meeting occurred at Heggemeier's law office in Parker, Colorado, at which Heggemeier generally outlined for Plaintiff Roaring Fork's development plans and its desire to either acquire the Trout property outright or acquire an easement upon the property in order to connect its lower and upper golf holes. During the meeting, Heggemeier utilized a variety of demonstrative materials including, at a minimum, an aerial overview, initial development drawings, and a survey of the property, then known as the "Rose Ranch" property.

4. Following the initial meeting, Plaintiff visited the Trout property with his daughter and "brainstormed" ideas regarding its potential uses. A second meeting between Plaintiff and Heggemeier occurred several days later at Heggemeier's office, at which the parties began to outline more specific details of a potential transaction. Heggemeier explained that he was required to submit his development plans to the Garfield County Planning Commission by June 13, 1997, including specific plans to link the lower and upper golf holes. As such, he was motivated to obtain either the Trout property or an easement upon the property (hereafter the "golf cart path easement"), and he was willing to work out any reasonable deal with Plaintiff. Heggemeier explained that the easement upon the Trout property would generally follow the bottom of the canyon, upon which a path would be constructed to be used by golf carts, maintenance vehicles, bicyclists, and pedestrians. The path would also be used by construction vehicles and equipment during the construction of the upper holes.

5. As part of the potential transaction, and as additional consideration, the parties discussed the conveyance to Plaintiff of a parcel of property owned by Roaring Fork that was adjacent to the Trout property that could be used by Plaintiff as a residential building site (hereafter the "residential lot"), as well as the granting by Roaring Fork of an easement (hereafter the "access easement") that would provide Plaintiff access not only to the residential lot but also to the otherwise landlocked Trout property. The proposed access easement and residential lot was west of county road 109 and contiguous to what was originally to be golf hole 11 and ultimately hole number 14 (hereafter "hole number 14").

6. During the discussions, Heggemeier outlined the general location of hole number 14 in relation to the residential site and he showed Plaintiff various illustrative plans of the proposed golf course, some of which depicted the tee-box to hole number 14 to the north of the residential lot and others depicted that tee-box to the south of the lot. All of the plans depicted golf play on hole 14 to the west of county road 109 and from north to south. At the time of the initial discussions and prior to the execution of the agreements, however, the design of the golf course was in a preliminary stage and the

specific routing of the golf holes and placement of the tee boxes had not been accomplished. As such, the Court finds that no representations were made by Heggemeier as to the anticipated location of the tee boxes for hole number 14, and that testimony to the contrary lacks credibility.

7.   As the result of the parties' negotiations, Roaring Fork and Plaintiff entered into three written agreements on June 13, 1997, including an Easement and Transfer Agreement (hereafter "the Agreement"), a Golf Cart Path Easement, and an Access Easement. Based on the testimony at trial, the Court finds that there was a meeting of the minds as to the agreements, and that the documents executed contained all of the material terms. [2]

8.   Pursuant to the Agreement, Roaring Fork conveyed[3] to Plaintiff the residential lot by special warranty deed (¶ 2), granted Plaintiff a 30 foot non-exclusive access easement to the residential lot (¶ 3), and paid Plaintiff $30,000.00 (¶ 9).[4] In return, Plaintiff granted Roaring Fork a non-exclusive easement across the Trout property (¶ 4) with provisions that Roaring Fork maintain and insure the easement area and indemnify Plaintiff from any loss or damage occasioned by use of the easement area (¶ 6). Acknowledging that Roaring Fork had not yet surveyed the golf cart path easement area, the Agreement required Plaintiff to "execute any and all additional documents necessitated for connection or further clarification and definition of the legal description" for the easement area after a survey was obtained (¶ 11). In addition, at the time the Agreement was executed, Roaring Fork had not yet obtained an additional easement from the Westbank Homeowners Association that was necessary to connect the lower and upper golf holes. The Agreement accordingly contemplated Plaintiff granting an "alternative easement" through the Trout property in the event that efforts to obtain the easement from Westbank were unsuccessful; albeit, such an easement was subject to Plaintiff's approval and at his sole discretion (¶ 10)[5].

9.   The Golf Cart Path Easement, also executed on June 13, 1997, granted Roaring Fork a 100 foot construction easement, "fifty feet on either side of the centerline described in Exhibit A," and a 40 foot permanent easement "twenty feet on either side of the centerline described in Exhibit A." Sometime after January 23, 1998 and before February 11, 1998, Plaintiff and Heggemeier initialed a six page Exhibit A, with pages designated A-1 through A-6, attached it to the June 13, 1997 Golf Cart Path Easement, and had it recorded in the records of Garfield County, Colorado. The Court finds that pages A-1 and A-2 describe the construction easement, and pages A-

---

[2] The parties also discussed a golf membership for Plaintiff and his family as additional consideration. The Court finds that such discussions are not a material term of the negotiations or the eventual agreements.

[3] Roaring Fork actually conveyed the residential lot to Plaintiff pursuant to the special warranty deed on September 29, 1997.

[4] The agreement also provided for Roaring Fork to reimburse Plaintiff for his attorney fees in connection with the advice he received for his attorney's review of the agreements.

[5] Roaring Fork subsequently obtained an easement from the Westbank Homeowners Association.



3 through A-6 describe the "alternative easement" through the Trout property. The descriptions comprising Exhibit A were prepared by High County Engineering by means of an aerial survey, although both Plaintiff and Heggemeier believed they were the product of a ground survey.

10. Both parties agree that the centerline described in Exhibit A, which was attached to the Golf Cart Path Easement, was intended to be the centerline for the 100 foot wide construction easement. Plaintiff contends that the Agreement contemplates only "one easement" through the Trout property, that the description in Exhibit A (A-1 and A-2) constitutes the centerline for both the construction easement and the permanent easement, and that any additional easements require his express approval.[6] Defendants contend that Exhibit A (A-1 and A-2) describes only the centerline for the construction easement, and that the Agreement contemplates a subsequent clarification of the permanent easement once the golf cart path is completed. Both Plaintiff and Heggemeier testified that, prior to June 13, 1997, they discussed issues regarding placement of the golf cart path, including the possible necessity of routing the path around rocks and other physical obstacles. In light of these discussions and the acknowledged uncertainties regarding the placement and actual construction of the cart path, the Court is not persuaded that the parties nevertheless contemplated a permanent easement within a narrow 40 foot corridor of an as yet undetermined centerline. To the contrary, the Court finds credible Heggemeier's testimony that the parties' agreement took into account such uncertainties and the practicalities of construction, including the necessity of "adjusting" the centerline as construction proceeded. The Court accordingly finds that, prior to executing the agreements and easements in June 1997, the parties contemplated an eventual clarifying easement upon the completion of construction to determine the exact location of the permanent easement. The conclusion is consistent with the express language of paragraph 11 of the Agreement.[7]

11. On November 15, 2000, Defendant LB Rose (hereafter "LB") acquired title to the Ironbridge Golf Course, also known as LB Rose Ranch Golf Course, from Roaring Fork and became its successor in interest under the Agreement, the Golf Cart Path Easement and the Access Easement. LB is a subsidiary and successor of Lehman Brothers, Roaring Fork's lender as of July 1997, and is the assignee of Roaring Fork. The court finds that, as of July 1997, Lehman Brothers was actively involved in monitoring the Rose Ranch project as a lender with a "participation interest,"

---

[6] It is undisputed that, subsequent to the execution of the operative documents, neither Roaring Fork or its successors consulted with or obtained Plaintiff's approval for any additional easement through the Trout property.
[7] The Court is not persuaded by Plaintiff's assertion that such a "clarifying" easement constitutes an "additional" easement requiring his express approval which, admittedly, was never sought or obtained. Provisions governing "additional" easements, which are at the sole discretion and subject to the express approval of Plaintiff, are set forth in paragraph 10 of the Agreement, and pertain to the "alternate easement" in the event Defendants were unable to obtain an easement from Westbank Homeowners Association. Paragraph 11, entitled "Further Modification of Legal Description for Easement Across Trout Parcel," separately addresses "further clarification and definition" of the legal description of the permanent easement, and *requires* Plaintiff's cooperation.

meaning it would share in any profits as well as receive interest on the money it invested in the project in the form of a loan to Roaring Fork. LB also had a right of first refusal, which was recorded in August 1997, as well as the right to purchase Roaring Fork's interest in the project. In September 1997, LB hired William Hatch as its Asset Manager, who was charged with reviewing and approving all expenditures and discussing all material issues related to the project with Heggemeier. As such, the Court finds that LB was not an arms-length lender. Upon acquiring title in November 2000, LB took the project over and proceeded with the residential development and construction of the golf course.

12.    In December 2000, LB commenced construction of the golf course and the golf cart path across the Trout property. Shortly after construction began, LB constructed an earthen berm arising approximately twenty feet in height from, and running parallel to, county road 109 on LB's property adjacent to the east boundary of the residential lot. The berm was a by-product of grading necessary to complete construction of hole number 14, and was intended to insulate hole 14 from the traffic on county road 109 to enhance the "golf experience" of the hole. As initially constructed, the berm completely blocked use of the access easement. In the spring of 2001, Plaintiff contacted LB to discuss removal of the berm from the access easement, and LB subsequently removed a substantial portion from the access easement to within one or two feet of the original grade. Prior to the construction of the berm, the access easement was accessible by foot, but not by vehicle, due to a natural drainage culvert crossing the access easement.

13.    From July 1997, following the execution of the operative agreements, through May 2000, Plaintiff had numerous communications, personally and through counsel, with LB in an attempt to obtain evidence verifying insurance coverage for the golf cart path easement in accordance with paragraph 6 of the Agreement. In 2000, LB provided a Certificate of Insurance that was subsequently supplemented with a more complete copy of the insurance policy following a hearing on Plaintiff's motion for a preliminary injunction. Based upon the testimony and exhibits presented at trial, the Court finds that, at the time construction commenced on the golf cart path through the Trout property, liability insurance in the amount of $1,000,000.00 had been obtained by LB which included coverage as to the golf cart path easement. Although Plaintiff complained that the policy contained certain exclusions, such as exclusion of coverage for certain sporting activities, the Court finds that no such sporting activities (such as golf and bicycling) had not commenced inasmuch as the golf course and the golf cart path had not yet been completed. The Court finds no credible preponderance of evidence sufficient to establish that Roaring Fork or LB failed to obtain insurance during and subsequent to the construction of the golf course and the construction upon the golf cart path easement, as required by the Agreement.

14.    Also during the time period of July 1997 through May 2000, Plaintiff made numerous attempts to obtain from Roaring Fork and LB a suitable indemnification agreement



pursuant to paragraph 6 of the agreement. Plaintiff and Heggemeier discussed a provision in which Roaring Fork (and any successor) would indemnify Plaintiff from any loss or damage resulting from the use of the golf cart path during their preliminary negotiations, and indemnification constituted a material term of the Agreement. The Court finds credible Plaintiff's testimony that the intent of the parties was to shift all risk of loss or damage related to use of the golf cart path to Roaring Fork and its successors, including any claims related to loss or damage caused by Plaintiff's own negligence or conditions on Plaintiff's property. Ultimately, counsel for Plaintiff forwarded a proposed indemnification agreement, which LB found unacceptable, and LB subsequently forwarded its proposed indemnification agreement, which Plaintiff found acceptable. The Court finds that neither party's draft agreement complied with the Agreement,[8] and as of the date of trial no indemnification agreement has been executed by the parties.[9]

15. Construction of the golf cart path on the golf cart path easement commenced in late 2000. The cart path, as ultimately constructed, consists of an 8 to 10 foot wide concrete path that is entirely within the 100 foot construction easement described in Exhibit A (A-1 and A-2) of the Golf Cart Path Easement. Based upon a ground survey conducted by James Ackerman, approximately 10 to 15 percent of the cart path as constructed falls outside the 40 foot corridor from the centerline described in Exhibit A. The Court finds credible the testimony of LB's engineer, Joe Hope of High Country Engineering, that the cart path was constructed in the most practical fashion possible, and in a manner designed to maximize the safety for ultimate users of the path and to minimize the impact on the canyon, including the waters of the United States. The Court further finds credible Hope's testimony that constructing the path entirely within the 40 corridor of the centerline described in Exhibit A was neither practical, given the physical terrain and obstacles within the canyon, nor would it have been safe for eventual users of the path given the slopes and grades of various portions of the canyon. Hope also testified credibly that, in his professional opinion, it would not be possible, let alone cost effective, to relocate the cart path entirely within the 40 foot corridor of the centerline described in Exhibit A.

---

[8] For example, LB's proposed agreement provided that a newly formed homeowners association, and not LB, would indemnify Plaintiff, and required Plaintiff to agree to indemnify the homeowners association for any loss caused by his negligence, if any. Plaintiff's proposed agreement, for example, contained provisions requiring insurance coverage far in excess of that required by paragraph 6 of the Agreement and referenced beneficiaries not included within the Agreement.

[9] Paragraph 6 of the Agreement provides that Defendants "will execute indemnity agreements indemnifying Trout from any loss and damage occasioned by use of the easement area on or before July 31, 1997." The Court finds the quoted language ambiguous. Heggemeier testified that the provision contemplated indemnification by Defendants for loss or damage *that occurred* on or before July 31, 1997. Plaintiff testified that the provision required the indemnification agreement *to be drafted* and executed on or before July 31, 1997. The quoted language is susceptible of both meanings. Based upon the negotiations of the parties prior to July 13, 1997, the subsequent conduct of Heggemeier and LB to draft a suitable indemnification agreement several years after the Agreement was executed, and the fact that the time frame of "on or before July 31, 1997" was included at the insistence of Plaintiff (*see* Exhibit 58), the Court finds Plaintiff's interpretation more credible.

16.    The Court finds no credible preponderance of evidence of any safety concerns due either to the construction of the golf cart path or as to cart path as currently constructed. No evidence was presented as to any claims or threatened claims regarding the construction or subsequent use of the golf cart path, or as to any other damages regarding the golf cart path or Plaintiff's property adjacent to the cart path. Based upon the exhibits presented at trial, the Court also finds no credible evidence that the construction of the golf cart path unnecessarily and negatively impacted the canyon visually. Accordingly, the Court finds that Plaintiff has proven no damages regarding the construction or use of the golf cart path or the Golf Cart Path Easement.

17.    A boundary survey was conducted of the Golf Cart Path Easement area by High County Engineering which fairly and accurately describes the area of the 40 foot permanent easement for the golf cart path as constructed, as provided by paragraph 11 of the Agreement. *See* Defendant's Exhibit FF.

18.    The golf course, as ultimately constructed, includes hole number 14 that is adjacent to the residential lot with three tee boxes located south of the access easement and adjacent to the east border of the residential lot, and a "back" tee box located north of the access easement. Both parties offered expert testimony from golf course architects regarding the design of the golf hole and the placement of the tee boxes. While both experts possess impressive credentials and testified credibly, they offered contrary opinions regarding the relative safety of hole 14 as designed and constructed. Christopher Wilczynski, the principal golf course architect, recognized early in his course design that the "back" tee box, that was initially positioned further north beyond the northern-most boundary of the residential lot, created a safety concern with respect to the residential lot, inasmuch as the lot fell within the "safety zone" for golf shots hit from that back tee. However, he testified that the back tee, as ultimately re-positioned closer to the access easement, resolved the safety issue. Dan Bucko, a golf course architect retained by Plaintiff, opined to the contrary that, even as re-positioned, the back tee creates an unreasonable risk that errant tee shots could intrude upon the "safety zone" within a portion of the residential lot. The evidence establishes that, as of the time of trial, only a negligible number of golf balls have actually been recovered from the residential lot.

19.    It is undisputed that hole number 14's "back" tee box is positioned directly behind, and adjacent within one to two feet of, the access easement. The Court does not find credible Wilczynski's testimony that the current position of that tee box does not create a safety concern. To the contrary, the Court agrees with Bucko that the current positioning not only increases the likelihood of "conflict" between golfers and users of the access easement, but that it unreasonably exposes users of the access easement to the danger of being hit by golf balls at high velocity at nearly "point blank" range. The danger is increased because the earthen berm, in its present location, blocks sightlines between the back tee box and the access easement, and from the access



easement to county road 109, making entry onto and exit from the access easement hazardous to both golfers and users of the easement. In fact, the photographic evidence presented by Plaintiff convincingly demonstrates that, due to the restricted sightlines, users entering the access easement from county road 109 would have no awareness of golfers accessing the back tee box until the two are in nearly direct proximity of each other.

20. Both Wilczynski and Buck agree that hole number 14's back tee box could be repositioned or eliminated at minimal relative cost and with minimal impact upon the golf hole and golf course as a whole. Neither expert opined that the three existing forward tee boxes on the fourteenth hole pose any safety issues vis a vis the residential lot.

21. As of the date of trial, Plaintiff has not developed or placed any improvements upon the residential lot or the access easement.

22. The Court finds no preponderance of credible evidence of any diminution of value of either the residential lot or access easement due to the construction of hole number 14, including the placement of the berm adjacent to county road 109. The Court specifically finds Plaintiff's lay opinion as to diminution of value to lack credibility.

## CONCLUSIONS OF LAW

### 1. Rescission

23. Having found that the parties had a meeting of the minds on all of the material terms of the Agreement and that Defendants made no material misrepresentations causing Plaintiff to be fraudulently induced to enter into the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of rescission.

### 2. Reformation

24. In light of the finding that the documents executed by the parties set forth all of the material terms of the Agreement, the Court concludes that Plaintiff is not entitled to the remedy of reformation.

### 3. Breach of Contract

25. To prevail on a claim of breach of contract, the plaintiff must establish the existence of an enforceable contract and breach thereof. Proof of actual damages is not required for a court to enter judgment on a breach of contract claim. The Agreement in the instant action provides that, in the event of a breach of the terms or conditions,

the non-breaching party is entitled to bring an action for specific performance, damages, or both.

26. The Court concludes that the preponderance of credible evidence establishes the existence of a binding and enforceable contract. Based upon the Court's findings of fact as entered herein, the Court concludes that Plaintiff has failed to establish by a preponderance of the evidence that Defendant Roaring Fork and its successor LB Rose breached the Agreement by failing to obtain liability and property damage insurance as required by paragraph 6.   However, the Court concludes that the preponderance of credible evidence presented by Plaintiff establishes that Defendant Roaring Fork and its successor LB Rose failed to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area and, as such, is in breach of that portion of paragraph 6 of the Agreement. In light of the Court's finding that Plaintiff has sustained no actual damages due to Defendants' breach, the Court will award Plaintiff nominal damages and order specific performance of that portion of paragraph 6 of the Agreement requiring the execution of an indemnification agreement.

27. The Court further concludes that Plaintiff has failed to establish by preponderance of the evidence that the placement of the back tee box on the fourteenth hole creates an unreasonable risk of errant golf balls upon the residential lot such as to constitute a breach of the covenant of quiet use and enjoyment of that property. However, the preponderance of the credible evidence establishes that the placement of that back tee box creates a substantial risk of conflict between golfers and users of the access easement and creates a sufficiently dangerous condition as to constitute a breach of the covenant use and enjoyment of the access easement.

28. Based upon the Courts findings of fact regarding the nature, location and description of the golf cart path easement, the Court concludes that Plaintiff has breached paragraph 11 of the Agreement by failing to execute necessary documents for clarifying and further defining the easement area for the permanent easement. The Court concludes that Defendants sustained no damages as a result of the breach, and the Court accordingly will award Defendants nominal damages. The Court further concludes, however, that Defendants are entitled to specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

### 4.  Quiet Title

29. Based upon the foregoing findings of fact and conclusions, the Court concludes that Plaintiff owns clear title to his original parcel and the residential lot, and is entitled to exclusive possession of all parts of his original 40 acres with the sole exception of the 40 foot wide non-exclusive easement as specifically described in the July 27, 2002

legal description by High County Engineering, and as set forth in Defendant's Exhibit FF. Inasmuch as an easement was obtained from the Westbank Homeowners Association permitting construction of the golf cart path in the lower portions of the canyon, the alternate easement described in Exhibit A (A-3 through A-6) of the Golf Cart Path Easement is of no force and effect.

## 5. Trespass

30.    To prevail on a claim for trespass, Plaintiff must establish that Plaintiff was the owner of the subject property and that Defendants intentionally entered upon the property without Plaintiff's consent. In light of the Court's previously entered findings of fact regarding the nature, location and description of the construction and permanent easements, as contemplated by the Agreement, the Court concludes that Plaintiff has failed to prove both elements of the claim by a preponderance of the evidence.

## 6. Attorney Fees and Costs

31.    Paragraph 18 of the agreement provides that, "in the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action." In a civil action, the prevailing party is one who succeeds on a significant issue in the case and whose claim furthers the purpose of the fee shifting provision. *Spencer Contractor, Inc, v. City of Aurora,* 884 P.2d 326 (Colo. 1994). In the instant matter, the Court finds that both parties succeeded on several significant issues in the case, and that both parties successfully defended on equally significant issues in the case. As such, the Court concludes that neither party is the "prevailing party" within the meaning of the Agreement.

## FINAL JUDGMENT AND ORDERS

Based on the foregoing findings of fact and conclusions of law, the Court enters the following final judgment and orders:

1.  Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's claims for rescission, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

2.  Judgment is entered in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the Agreement. There being no actual damages, the Court awards nominal damages to Plaintiff in the sum of one dollar ($1.00). The Court also orders specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage

occasioned by use of the easement area from June 13, 1997 forward. The indemnification agreement shall be prepared and executed in a form substantially similar to that contained in Defendant's Exhibit X, with the exception that the agreement will not exclude loss or damage caused by the action or inaction of the owner of Plaintiff's property, and will indemnify Plaintiff for reasonable attorney fees, costs and expenses incurred defending claims related to use of the golf cart path or to enforce the indemnification agreement itself.

3. Judgment is entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the back tee box of golf hole number 14 as presently designed and located on the fourteenth hold of the Ironbridge Golf Course, Garfield County, Colorado.

4. Judgment is entered in favor of Defendants and against Plaintiff on Defendants' breach of contract claim for failure to execute additional documents pursuant to paragraph 11 of the Agreement. There being no actual damages, the Court awards nominal damages to Defendants in the sum of one dollar ($1.00). The Court also orders specific performance in the form of a clarifying easement from Plaintiff for the golf cart path as constructed and as described under the July 27, 2002 legal description by High County Engineering, and as set forth in Defendant's Exhibit FF.

5. Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's trespass claim.

6. All parties shall pay their own attorney fees, costs and expenses.

7. Pursuant to the Court's Pre-Trial Order, each party shall retail in their original condition all exhibits offered and received at trial until the time for filing post-judgment or appellate pleadings has expired.

8. All performance required by the orders herein shall be accomplished within 30 days of this Order.

SO ORDERED this _30_ day of _July_, 2004.

BY THE COURT:

_____
District Court Judge

cc: Richard Shearer, Esq.
    John Madden, Esq.
    William Shay, Esq.

| -DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br><br>Court Address: 1437 Bannock Street<br>　　　　　　　　Denver, Colorado 80202 | |
|---|---|
| **ROGER R. TROUT**<br>Plaintiff,<br><br>v.<br><br>**L.B. ROSE RANCH, L.L.C.**<br><br>Defendant: | ▲　**COURT USE ONLY**　▲ |
| | Case Number: 01CV4208<br>Ctrm: 7 |
| **ORDER** | |

This matter is before the Court following remand from the Colorado Court of Appeals. The Court of Appeals directed this Court to enter judgment in Plaintiff's favor and against LB Rose Ranch LLC on Trout's quiet title, trespass, and breach of contract claims. The Court of Appeals further ordered this Court to conduct further proceedings consistent with the mandate, including reexamination of Trout's requests for specific performance and an injunction, and a reassessment of whether Trout is entitled to an award of attorney's fees under the fee-shifting provisions of the Easement and Transfer Agreement and the Golf Cart Path Easement agreement.

As ordered, the Judgment was amended on August 16, 2008. A Bench trial was conducted May 5, 2008 thru May 8, 2008 for determination of the remaining matters.

This Court has considered the testimony of the witnesses named herein; the exhibits; the arguments of counsel and the Court of Appeals opinion as well as the Trial Court's Findings of Fact, to the extent those findings were not rejected by the Court of Appeals, and enters the following Findings of Fact; Conclusions of Law and Judgment. Judge Egelhoff's Findings as limited above are incorporated herein.

### FINDINGS OF FACT

This Court recognizes the Court of Appeals conclusion that the "permanent golf cart easement would be located within 20 feet on either side of the centerline described in the [Easement and Transfer Agreement]." The 100 foot construction easement was therefore temporary and has reverted to Mr. Trout. Mr. Trout has stipulated that L.B. Rose Ranch may use the area of the former construction easement to rebuild the cart path within the Golf Cart Path Easement, if the Court so orders. They may also use the construction easement area for the passage of carts, during that reconstruction.



Mr. Hope, through his company, High County Engineering designed the non complying cart path and provided construction administration. Hope informed Haggemeier, L B Rose Ranch's agent that they would need to be able "to move the path around as it progressed up the ravine." Haggemeier negotiated with Trout, attempting to secure for a wider easement, but Trout declined, wanting to maintain the character and view of the site. Hope did not contact Trout directly about building outside the easement and Haggemeier never got back to Hope about Trout's response to the requested change. Hope was never told that Trout agreed to allow the path to be "moved around" outside the easement, but that was how he designed it and that is how it was built. There is no "as built easement", although Hope assumed there was or soon would be. Hope made no effort to build within the permanent easement because he thought the path could be built anywhere within the one hundred foot construction easement. Hope reviewed and relied upon the easement agreement for direction regarding the width of the construction easement. Hope also conferred with Messrs. Hatch and Nash, also agents for L B Rose Ranch regarding the placement of the path. Hope also testified at the first trial that Hatch was "the one that made the final decision as to everything that was done and when there were choices to be made."

LB Rose Ranch and its agents were aware that the technique employed by Hope was in violation of the agreements as early as May 2002. At that time, Mr. Jacobs, then attorney for LB Rose Ranch sent a letter to Hope. This letter acknowledged that the cart path encroached onto Trout's property, and put Hope on notice that LB Rose Ranch would be looking to Hope for any damages.

Hope has re-drawn plans that satisfy the easement limits. His company remains the engineer of record, although Scott Gregory is now in charge of the project. Mr. Hope designed the plan the Hobbs bid on and won. Mr. Hope found the same areas outside the easement as did Mr. Gordon, Trout's expert, except that he made the areas between bridges seven and eight and eight and nine separate areas of reconstruction. Hope is not critical of Gordon's approach. Both would work.

Building the path may have required obtaining additional permits from the Army Corp of Engineers to ensure there was no impact on the "waters of the United States." This requirement could have been met and still maintained the proper easement.

All of the civil engineers generally agreed that the path was outside the easement in three separate locations: the northeast corner of bridge 1, which may encompass as little as several inches to one foot of area. The area between bridges five and six which encompasses seventeen feet outside the allowed area would require replacement of four ten foot sections of concrete in order to provide horizontal transition from the nearest construction joint. The area between bridges six and nine would require the removal of bridges six, seven, eight, and nine as well as the cart path between these bridges. The bridges themselves are within the easement; however their orientation would have to be changed in order to line up with the reconstructed path.

Mr. Gordon, Plaintiff's expert estimated that it would cost approximately $79,500 to do the necessary demolition. He further estimates reconstruction to be $677,000. Mr. Gordon is not critical of Hope's re-drawn plans, although the construction concepts differ. Mr. Gordon's plan would take about five months, including permitting.

Although there is some remote possibility, the Court finds there is no probability that there is a wetland problem that would interfere with construction of the

path entirely within the easement. Even if there were, the weight of the testimony indicates the proper permits could be obtained with a minimum of cost or delay.

Gordon testified there is no reason to believe that reconstruction of the path within the easement would be either unfeasible or impossible.

There are underground utility and water pipes, which were placed by L.B. Rose Ranch to service the cart path that are outside the easement. It will cost between 2,400 and 4,000 dollars to remove them. They could also be abandoned and rerouted.

The Court has also considered the testimony of Stewart Hobbs, owner of Hobbs Excavating and Trucking. He generated an estimate to reconstruct the easement using the staking done by Gordon and the plans drawn by Hope. His estimate was approximately 293,000 dollars to reconstruct the path. Hobbs saw "no reason to believe it (reconstruction within the easement) could not be done." "It seemed to be very possible." Hobbs agrees with Gordon that it would take approximately four months to complete this task.

Demolition could be done in the winter months, however concrete could not be poured during that time. Hobbs suggested that if the process was begun in January it would be completed by the time the golf season begins in May. It would not be possible for patrons to continue playing while the cart path was being reconstructed.

The Easement and Transfer Agreement at Paragraph 12 permits the non-breaching party (Trout) to be entitled to an action for specific performance and or damages or both. Trout has always maintained his desire for the path to be built as was agreed.

The Easement Agreement at Paragraph 4 permits the non-breaching party (Trout) to be entitled to an action for injunctive relief and or specific performance and or damages. Trout again has always insisted that the path be built as agreed and that LB Rose Ranch stop trespass on his property.

In his Order, Judge Egelhoff determined that Trout suffered no damages by L.B. Rose Ranch's breach. That determination was not appealed. It was and has been clear to Judge Egelhoff, the Court of Appeals and this Court that LB Rose Ranch was in breach of this agreement, before the path was completed. They allowed the breaching project to continue, never attempting to remedy their breach, but only to change the agreement or shift financial responsibility for the breach to Hope.

In its opinion, the Court of Appeals directed this Court to reexamine the feasibility of relocating the golf cart path entirely within the corridor of [the easement agreements]under the legal standards applicable to requests for specific performance, referencing *Greeley & Loveland Irrigation Co. v. McCloughan*, 342 P.2d 1045 [Specific performance is not a matter of right, but rests in sound discretion of court, and equity will not enforce such extraordinary remedy unless contract be fair, equal, and just in its terms, consideration be not grossly inadequate, and remedy be not inequitable, unconscionable, or oppressive]; and *Tayyara v. Stetson*, 521 P.2d 185. [It is true that a court of equity may refuse to grant a decree of specific performance where a unilateral mistake is material to the contract, and the enforcement of the written contract under the circumstances would be inequitable or a hardship on the defendant, even though plaintiff is in no way responsible for the mistake and has no knowledge of it. However, specific performance is proper where, as here, defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect.]

This Court was also directed to rule on Trout's request for injunctive relief concerning LB Rose Ranch's continued trespass. That determination is to be based on the same standards as above.

It is Defendants position that Trout has suffered no damages and minimal impact from the location of the golf cart path and an injunction or specific will result only in economic waste in requiring L B Rose Ranch to move the offending portions of the path at substantial and unnecessary cost with no resulting benefit to Trout.

Over Defendants objection, the Court has received and reviewed the Securities and Exchange Commission Quarterly report for the period ended February 29, 2008. The Court finds this to be relevant because although L B Rose Ranch is a separate entity, it appears to be a wholly owned subsidiary of Lehman Brother' Holdings. Representatives of Lehman Brothers were closely involved with the construction of the path, and based upon the testimony of Mr. Schmit, remain closely involved in the operation of the construction project as well the golf course. In fact, Mr. Schmidt, who sat thru the trial as the representative of L B Rose Ranch, reports to representatives of Lehman Brothers. This is relevant to the determination of whether an order of specific performance would result in an unconscionable or oppressive outcome. According to said report, Lehman Brothers' cash and cash equivalents as of February 28, 2008 totaled $7,564,000,000.

The Court of Appeals also directed this Court to reassess whether Trout is entitled to an award of attorney fees under the fee-shifting provisions of the Easement and Transfer Agreement [Paragraph 18, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action]; and the Golf Cart Path Easement [Paragraph 10, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action.]

In his ruling, Judge Egelhoff found for Defendants on Plaintiffs claims for recession, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

He found in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the agreement (awarding nominal damages). He ordered specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area from June 13, 1997 forward. Judgment was entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the "back tee box." Judgment was entered for Defendants and against Plaintiffs on Plaintiffs trespass claim.

Finally, the trial court found that each party had succeeded and defended on several significant issues in the case and neither was the prevailing party.

As noted those conclusions finding for L.B. Rose Ranch and against Trout were reversed by the appellate court. Specifically, the case was remanded with directions to the trial court to enter judgment in Trout's favor and against L B Rose Ranch on the quiet title, trespass and breach of contract claims.

It is L B Rose Ranch's position that since Judge Egelhoff found in their favor on the recession and reformation claims, that those claims are significant and not reversed on appeal, that they are in fact the prevailing party.

At the end of the day, LB Rose Ranch has succeeded on nothing but the recession and reformation claims. Although LB Rose Ranch very artfully argues that it was Trout's intention all along to rescind the contract in order to hold Defendant "hostage," there was simply no credible evidence to support that notion, at least before this Court on remand. On the other hand, Trout filed the first lawsuit to enforce the terms of the contract regarding the berm and access routes. L B Rose Ranch responded with the Garfield County suit to impose an "as built easement." All of the credible evidence points out that these cases have always been about the nature and extent of the easements. Even the Court of Appeals recognized that

> ..."Trout's *primary argument* was that the parties written agreements unambiguously provided for a permanent easement located within twenty feet on either side of the centerline... He expressly argued in the alternative that if the court should find an ambiguity, the ambiguity should be resolved in his favor, or the documents should be reformed (to comport with his understanding of the location of the easement), or the transaction should be rescinded for lack of meeting of the minds. Thus, Trout was entitled to offer evidence to support those *alternative claims* and in so doing did not waive his *primary contention*.

This Court notes that at least in the Court of Appeals mind, recession was the last alternative.

## CONCLUSIONS OF LAW

Based on the testimony of the engineers, the Court finds that rebuilding the cart path within the easement is feasible. The choice of remedies was Trout's. He has never requested monetary damages, but only the equitable relief of Specific Performance and or Injunction.

Having found the rebuilding of the cart part to feasible, the Court ORDERS that it be done in specific accord with the agreements of the parties. While it is clear, pursuant to the cases cited by the Court of Appeals that the Court must consider whether specific performance would be inequitable, unconscionable, or oppressive, the Court must also consider whether defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect. Here, the equities favor Trout. Not only was the "mistake" unilateral, it was knowing and continuous.

Sometimes a slight and harmless encroachment is held to be within the rule 'de minimis,' and generally the courts require that he who seeks equity should do equity and come with clean hands. Where the encroachment is deliberate and constitutes a willful and intentional taking of another's land, equity may well require its restoration regardless of the expense of removal as compared with damage suffered therefrom; but where the encroachment was in good faith, the court should weigh the circumstances so



that it shall not act oppressively. *Golden Press, Inc. v. Rylands*, 124 Colo. 122, 235 P.2d 592, (Colo. 1951)

This behavior, a knowing and continuous breach of the agreement outweighs any hardship or financial oppression Defendant may suffer in building an easement compliant pathway.

## JUDGMENT

For the reasons set forth above, Defendants are **ENJOINED** from further trespass on Trout's property. As stipulated by Trout, Defendants may use the former construction easement during the reconstruction of the cart part. The underground utility and water systems are to be abandoned and rerouted. As use of the golf course during construction would hamper the workers, endanger the golfers and closing of the course would cause further financial losses to Defendants, this Injunction is **STAYED** until December 1, 2008.

In a civil action, the prevailing party is one who succeeds on a significant issue in the case and whose claim furthers the purpose of the fee shifting provision.

> "The purpose of a contractual attorney fee-shifting provision is to deter parties from breaching the contractual agreement. To deny attorney fees to the non-breaching party merely because the jury determines that the party suffered no injury would render meaningless the fee-shifting provision in the settlement agreement to which the parties stipulated, and which the parties intended to enforce. Such a result would encourage parties to breach contractual agreements and would cause unwarranted litigation." *Dennis I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326, 333, n. 14. (Colo. 1994).

As noted above the easement provisions were not only significant issues in this case, they were the primary issues. These are alternate claims not "multi-claims." Mr. Trout's claims for rescission and reformation of the contract are clearly alternative and inconsistent claims for relief with respect to Mr. Trout's claim for breach of contract. The fact that he prevailed on the breach of contract claim necessarily forecloses the possibility of prevailing on rescission and reformation. LB Rose Ranch's argument that they "escaped" the ruinous ramifications of recession and therefore have prevailed makes no sense. They "escaped" recession because they lost the primary contract claim. Trout has prevailed on all meaningful issues and is therefore entitled to his attorney's fees and costs. Plaintiff's Bill of Costs is to be submitted within fifteen days of this order.

BY THE COURT      this 20th day of June 2008

William D. Robbins

District Judge

6

Attorney Fees Amortization Schedule for Trout vs. LB Rose Ranch

| Assumptions: | |
| --- | --- |
| Annual Interest Rate Compounded Daily: | 18% |
| Interest Calculated to: | July 1, 2008 |

| Recipient of Attorney's fees | Payment | Total Payments[1] | Total Interest Paid | Date | Total Days |
| --- | --- | --- | --- | --- | --- |
| Minuck | $180.33 | $765.04 | $584.71 | August 1, 2000 | 2891 |
| Minuck | $795.34 | $2,943.76 | $2,148.42 | May 1, 2001 | 2618 |
| Minuck | $165.90 | $604.60 | $438.70 | June 1, 2001 | 2587 |
| Minuck | $1,232.49 | $4,424.76 | $3,192.27 | July 1, 2001 | 2557 |
| Minuck | $847.48 | $2,995.76 | $2,148.28 | August 1, 2001 | 2526 |
| Minuck | $1,836.54 | $6,392.16 | $4,555.62 | September 1, 2001 | 2495 |
| Emerald Mountain Surveys | $4,387.50 | $11,212.45 | $6,824.95 | May 12, 2003 | 1877 |
| Emerald Mountain Surveys | $712.50 | $1,655.85 | $943.35 | November 18, 2003 | 1687 |
| 20th Judicial District | $316.00 | $793.15 | $477.15 | June 17, 2003 | 1841 |
| Henning | $1,380.25 | $4,804.02 | $3,423.77 | September 1, 2001 | 2495 |
| Applegate | $500.00 | $1,082.92 | $582.92 | April 7, 2004 | 1546 |
| Gordon Engineering | $3,110.00 | $3,212.71 | $102.71 | April 27, 2008 | 65 |
| Ireland Stapleton | $15,602.32 | $49,855.52 | $34,253.20 | February 19, 2002 | 2324 |
| Ireland Stapleton | $1,978.71 | $6,216.20 | $4,237.49 | March 25, 2002 | 2290 |
| Ireland Stapleton | $1,904.70 | $5,657.90 | $3,753.20 | July 15, 2002 | 2178 |
| Ireland Stapleton | $16,585.82 | $47,884.08 | $31,298.26 | September 10, 2002 | 2121 |
| Ireland Stapleton | $12,000.00 | $32,643.85 | $20,643.85 | January 7, 2003 | 2002 |
| Ireland Stapleton | $4,367.27 | $11,558.20 | $7,190.93 | March 3, 2003 | 1947 |
| Ireland Stapleton | $3,768.54 | $9,640.31 | $5,871.77 | May 10, 2003 | 1879 |
| Ireland Stapleton | $5,100.45 | $12,617.72 | $7,517.27 | July 16, 2003 | 1812 |
| Ireland Stapleton | $6,858.45 | $16,155.61 | $9,297.16 | October 22, 2003 | 1714 |
| Ireland Stapleton | $22,452.20 | $50,687.79 | $28,235.59 | January 15, 2004 | 1629 |
| Ireland Stapleton | $23,911.62 | $52,100.26 | $28,188.64 | March 26, 2004 | 1558 |
| Total | $129,994.41 | $335,904.60 | $205,910.19 | | |

[1] Represents value of total payments = initial payment + annual interest expense of 18% compounded daily over the life of the borrowing.



| -DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br><br>Court Address: 1437 Bannock Street<br>　　　　　　　　　　Denver, Colorado 80202 | |
| --- | --- |
| **ROGER R. TROUT**<br>Plaintiff,<br><br>v.<br><br>**L.B. ROSE RANCH, L.L.C.**<br><br>Defendant: | ▲  **COURT USE ONLY**  ▲<br><br>Case Number: 01CV4208<br>Ctrm: 7 |
| **ORDER** | |

This matter is before the Court following remand from the Colorado Court of Appeals. The Court of Appeals directed this Court to enter judgment in Plaintiff's favor and against LB Rose Ranch LLC on Trout's quiet title, trespass, and breach of contract claims. The Court of Appeals further ordered this Court to conduct further proceedings consistent with the mandate, including reexamination of Trout's requests for specific performance and an injunction, and a reassessment of whether Trout is entitled to an award of attorney's fees under the fee-shifting provisions of the Easement and Transfer Agreement and the Golf Cart Path Easement agreement.

As ordered, the Judgment was amended on August 16, 2008. A Bench trial was conducted May 5, 2008 thru May 8, 2008 for determination of the remaining matters.

This Court has considered the testimony of the witnesses named herein; the exhibits; the arguments of counsel and the Court of Appeals opinion as well as the Trial Court's Findings of Fact, to the extent those findings were not rejected by the Court of Appeals, and enters the following Findings of Fact; Conclusions of Law and Judgment. Judge Egelhoff's Findings as limited above are incorporated herein.

## FINDINGS OF FACT

This Court recognizes the Court of Appeals conclusion that the "permanent golf cart easement would be located within 20 feet on either side of the centerline described in the [Easement and Transfer Agreement]." The 100 foot construction easement was therefore temporary and has reverted to Mr. Trout. Mr. Trout has stipulated that L.B. Rose Ranch may use the area of the former construction easement to rebuild the cart path within the Golf Cart Path Easement, if the Court so orders. They may also use the construction easement area for the passage of carts, during that reconstruction.




Mr. Hope, through his company, High County Engineering designed the non complying cart path and provided construction administration. Hope informed Haggemeier, L B Rose Ranch's agent that they would need to be able "to move the path around as it progressed up the ravine." Haggemeier negotiated with Trout, attempting to secure for a wider easement, but Trout declined, wanting to maintain the character and view of the site. Hope did not contact Trout directly about building outside the easement and Haggemeier never got back to Hope about Trout's response to the requested change. Hope was never told that Trout agreed to allow the path to be "moved around" outside the easement, but that was how he designed it and that is how it was built. There is no "as built easement", although Hope assumed there was or soon would be. Hope made no effort to build within the permanent easement because he thought the path could be built anywhere within the one hundred foot construction easement. Hope reviewed and relied upon the easement agreement for direction regarding the width of the construction easement. Hope also conferred with Messrs. Hatch and Nash, also agents for L B Rose Ranch regarding the placement of the path. Hope also testified at the first trial that Hatch was "the one that made the final decision as to everything that was done and when there were choices to be made."

LB Rose Ranch and its agents were aware that the technique employed by Hope was in violation of the agreements as early as May 2002. At that time, Mr. Jacobs, then attorney for LB Rose Ranch sent a letter to Hope. This letter acknowledged that the cart path encroached onto Trout's property, and put Hope on notice that LB Rose Ranch would be looking to Hope for any damages.

Hope has re-drawn plans that satisfy the easement limits. His company remains the engineer of record, although Scott Gregory is now in charge of the project. Mr. Hope designed the plan the Hobbs bid on and won. Mr. Hope found the same areas outside the easement as did Mr. Gordon, Trout's expert, except that he made the areas between bridges seven and eight and eight and nine separate areas of reconstruction. Hope is not critical of Gordon's approach. Both would work.

Building the path may have required obtaining additional permits from the Army Corp of Engineers to ensure there was no impact on the "waters of the United States." This requirement could have been met and still maintained the proper easement.

All of the civil engineers generally agreed that the path was outside the easement in three separate locations: the northeast corner of bridge 1, which may encompass as little as several inches to one foot of area. The area between bridges five and six which encompasses seventeen feet outside the allowed area would require replacement of four ten foot sections of concrete in order to provide horizontal transition from the nearest construction joint. The area between bridges six and nine would require the removal of bridges six, seven, eight, and nine as well as the cart path between these bridges. The bridges themselves are within the easement; however their orientation would have to be changed in order to line up with the reconstructed path.

Mr. Gordon, Plaintiff's expert estimated that it would cost approximately $79,500 to do the necessary demolition. He further estimates reconstruction to be $677,000. Mr. Gordon is not critical of Hope's re-drawn plans, although the construction concepts differ. Mr. Gordon's plan would take about five months, including permitting.

Although there is some remote possibility, the Court finds there is no probability that there is a wetland problem that would interfere with construction of the



path entirely within the easement. Even if there were, the weight of the testimony indicates the proper permits could be obtained with a minimum of cost or delay.

Gordon testified there is no reason to believe that reconstruction of the path within the easement would be either unfeasible or impossible.

There are underground utility and water pipes, which were placed by L.B. Rose Ranch to service the cart path that are outside the easement. It will cost between 2,400 and 4,000 dollars to remove them. They could also be abandoned and rerouted.

The Court has also considered the testimony of Stewart Hobbs, owner of Hobbs Excavating and Trucking. He generated an estimate to reconstruct the easement using the staking done by Gordon and the plans drawn by Hope. His estimate was approximately 293,000 dollars to reconstruct the path. Hobbs saw "no reason to believe it (reconstruction within the easement) could not be done." "It seemed to be very possible." Hobbs agrees with Gordon that it would take approximately four months to complete this task.

Demolition could be done in the winter months, however concrete could not be poured during that time. Hobbs suggested that if the process was begun in January it would be completed by the time the golf season begins in May. It would not be possible for patrons to continue playing while the cart path was being reconstructed.

The Easement and Transfer Agreement at Paragraph 12 permits the non-breaching party (Trout) to be entitled to an action for specific performance and or damages or both. Trout has always maintained his desire for the path to be built as was agreed.

The Easement Agreement at Paragraph 4 permits the non-breaching party (Trout) to be entitled to an action for injunctive relief and or specific performance and or damages. Trout again has always insisted that the path be built as agreed and that LB Rose Ranch stop trespass on his property.

In his Order, Judge Egelhoff determined that Trout suffered no damages by L.B. Rose Ranch's breach. That determination was not appealed. It was and has been clear to Judge Egelhoff, the Court of Appeals and this Court that LB Rose Ranch was in breach of this agreement, before the path was completed. They allowed the breaching project to continue, never attempting to remedy their breach, but only to change the agreement or shift financial responsibility for the breach to Hope.



In its opinion, the Court of Appeals directed this Court to reexamine the feasibility of relocating the golf cart path entirely within the corridor of [the easement agreements]under the legal standards applicable to requests for specific performance, referencing *Greeley & Loveland Irrigation Co. v. McCloughan*, 342 P.2d 1045 [Specific performance is not a matter of right, but rests in sound discretion of court, and equity will not enforce such extraordinary remedy unless contract be fair, equal, and just in its terms, consideration be not grossly inadequate, and remedy be not inequitable, unconscionable, or oppressive]; and *Tayyara v. Stetson*, 521 P.2d 185. [It is true that a court of equity may refuse to grant a decree of specific performance where a unilateral mistake is material to the contract, and the enforcement of the written contract under the circumstances would be inequitable or a hardship on the defendant, even though plaintiff is in no way responsible for the mistake and has no knowledge of it. However, specific performance is proper where, as here, defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect.]



This Court was also directed to rule on Trout's request for injunctive relief concerning LB Rose Ranch's continued trespass. That determination is to be based on the same standards as above.

It is Defendants position that Trout has suffered no damages and minimal impact from the location of the golf cart path and an injunction or specific will result only in economic waste in requiring L B Rose Ranch to move the offending portions of the path at substantial and unnecessary cost with no resulting benefit to Trout.

Over Defendants objection, the Court has received and reviewed the Securities and Exchange Commission Quarterly report for the period ended February 29, 2008. The Court finds this to be relevant because although L B Rose Ranch is a separate entity, it appears to be a wholly owned subsidiary of Lehman Brother' Holdings. Representatives of Lehman Brothers were closely involved with the construction of the path, and based upon the testimony of Mr. Schmit, remain closely involved in the operation of the construction project as well the golf course. In fact, Mr. Schmidt, who sat thru the trial as the representative of L B Rose Ranch, reports to representatives of Lehman Brothers. This is relevant to the determination of whether an order of specific performance would result in an unconscionable or oppressive outcome. According to said report, Lehman Brothers' cash and cash equivalents as of February 28, 2008 totaled $7,564,000,000.

The Court of Appeals also directed this Court to reassess whether Trout is entitled to an award of attorney fees under the fee-shifting provisions of the Easement and Transfer Agreement [Paragraph 18, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action]; and the Golf Cart Path Easement [Paragraph 10, In the event that either party brings suit to enforce the agreement, the prevailing party shall be entitled to an award for reasonable attorney fees to be taxed by the court as costs of the action.]



In his ruling, Judge Egelhoff found for Defendants on Plaintiffs claims for recession, reformation, and breach of contract as to Plaintiff's liability and property damage insurance claims.

He found in favor of Plaintiff and against Defendants on Plaintiff's breach of contract claim as to the failure to execute an indemnification agreement pursuant to paragraph 6 of the agreement (awarding nominal damages). He ordered specific performance of that portion of paragraph 6 of the agreement requiring Defendants to execute an agreement indemnifying Plaintiff from any loss and damage occasioned by use of the easement area from June 13, 1997 forward. Judgment was entered in favor of Plaintiff for a permanent injunction against Defendants from the use of the "back tee box." Judgment was entered for Defendants and against Plaintiffs on Plaintiffs trespass claim.

Finally, the trial court found that each party had succeeded and defended on several significant issues in the case and neither was the prevailing party.

As noted those conclusions finding for L.B. Rose Ranch and against Trout were reversed by the appellate court. Specifically, the case was remanded with directions to the trial court to enter judgment in Trout's favor and against L B Rose Ranch on the quiet title, trespass and breach of contract claims.



It is L B Rose Ranch's position that since Judge Egelhoff found in their favor on the recession and reformation claims, that those claims are significant and not reversed on appeal, that they are in fact the prevailing party.

At the end of the day, LB Rose Ranch has succeeded on nothing but the recession and reformation claims. Although LB Rose Ranch very artfully argues that it was Trout's intention all along to rescind the contract in order to hold Defendant "hostage," there was simply no credible evidence to support that notion, at least before this Court on remand. On the other hand, Trout filed the first lawsuit to enforce the terms of the contract regarding the berm and access routes. L B Rose Ranch responded with the Garfield County suit to impose an "as built easement." All of the credible evidence points out that these cases have always been about the nature and extent of the easements. Even the Court of Appeals recognized that

> ..."Trout's *primary argument* was that the parties written agreements unambiguously provided for a permanent easement located within twenty feet on either side of the centerline... He expressly argued in the alternative that if the court should find an ambiguity, the ambiguity should be resolved in his favor, or the documents should be reformed (to comport with his understanding of the location of the easement), or the transaction should be rescinded for lack of meeting of the minds. Thus, Trout was entitled to offer evidence to support those *alternative claims* and in so doing did not waive his *primary contention*.



This Court notes that at least in the Court of Appeals mind, recession was the last alternative.



## CONCLUSIONS OF LAW

Based on the testimony of the engineers, the Court finds that rebuilding the cart path within the easement is feasible. The choice of remedies was Trout's. He has never requested monetary damages, but only the equitable relief of Specific Performance and or Injunction.

Having found the rebuilding of the cart part to feasible, the Court ORDERS that it be done in specific accord with the agreements of the parties. While it is clear, pursuant to the cases cited by the Court of Appeals that the Court must consider whether specific performance would be inequitable, unconscionable, or oppressive, the Court must also consider whether defendant's asserted unilateral mistake is the result of his own negligence or inexcusable neglect. Here, the equities favor Trout. Not only was the "mistake" unilateral, it was knowing and continuous.

Sometimes a slight and harmless encroachment is held to be within the rule 'de minimis,' and generally the courts require that he who seeks equity should do equity and come with clean hands. Where the encroachment is deliberate and constitutes a willful and intentional taking of another's land, equity may well require its restoration regardless of the expense of removal as compared with damage suffered therefrom; but where the encroachment was in good faith, the court should weigh the circumstances so





that it shall not act oppressively. *Golden Press, Inc. v. Rylands*, 124 Colo. 122, 235 P.2d 592, (Colo. 1951)

  This behavior, a knowing and continuous breach of the agreement outweighs any hardship or financial oppression Defendant may suffer in building an easement compliant pathway.

### JUDGMENT

  For the reasons set forth above, Defendants are **ENJOINED** from further trespass on Trout's property. As stipulated by Trout, Defendants may use the former construction easement during the reconstruction of the cart part. The underground utility and water systems are to be abandoned and rerouted. As use of the golf course during construction would hamper the workers, endanger the golfers and closing of the course would cause further financial losses to Defendants, this Injunction is **STAYED** until December 1, 2008.

  In a civil action, the prevailing party is one who succeeds on a significant issue in the case and whose claim furthers the purpose of the fee shifting provision.

> "The purpose of a contractual attorney fee-shifting provision is to deter parties from breaching the contractual agreement. To deny attorney fees to the non-breaching party merely because the jury determines that the party suffered no injury would render meaningless the fee-shifting provision in the settlement agreement to which the parties stipulated, and which the parties intended to enforce. Such a result would encourage parties to breach contractual agreements and would cause unwarranted litigation." *Dennis I. Spencer Contractor, Inc. v. City of Aurora*, 884 P.2d 326, 333, n. 14. (Colo. 1994).

  As noted above the easement provisions were not only significant issues in this case, they were the primary issues. These are alternate claims not "multi-claims." Mr. Trout's claims for rescission and reformation of the contract are clearly alternative and inconsistent claims for relief with respect to Mr. Trout's claim for breach of contract. The fact that he prevailed on the breach of contract claim necessarily forecloses the possibility of prevailing on recession and reformation. LB Rose Ranch's argument that they "escaped" the ruinous ramifications of recession and therefore have prevailed makes no sense. They "escaped" recession because they lost the primary contract claim. Trout has prevailed on all meaningful issues and is therefore entitled to his attorney's fees and costs. Plaintiff's Bill of Costs is to be submitted within fifteen days of this order.

BY THE COURT this 20th day of June 2008

William D. Robbins

*William D. Robbins*

District Judge

### Attachment to Proof of Claim
### Creditor: Roger R. Trout

### Summary of Attorneys' Fees, Costs and Interest

1.  Judgment. On June 20, 2008, judgment was entered in favor of Roger R. Trout against LB Rose Ranch, LLC and Roaring Fork Investments, LLC in the case styled *Roger Trout v. Roaring Fork Investments, LLC and LB Rose Ranch, LLC,* District Court, City and County of Denver, Colorado, Case No. 01CV4208 (the "Litigation"). A copy of the judgment is attached hereto as Exhibit 1. The court awarded Mr. Trout attorneys' fees and costs.

2.  Attorneys' Fees. All attorneys' fees charged to Mr. Trout for representation in the Litigation and in *Roger Trout v. Roaring Fork Investments, LLC and LB Rose Ranch, LLC,* Colorado Court of Appeals, Case No. 2008CA1574 (the "Appeal"), were time-based fees calculated by multiplying the time spent performing legal services by each timekeeper's applicable hourly billing rate. Throughout the history of the Litigation and the Appeal, Mr. Trout employed the following lawyers or law firms who or which charged him the total fees indicated below:

| Lawyer / Law Firm | Dates of Representation | Total Fees |
|---|---|---|
| Marcia Minuck, Esq. | 08/15/00 – 08/27/01 | $4,785.00 |
| Larry Henning, Esq. | 08/24/01 – 10/30/01 | $1,321.50 |
| Clanahan Tanner Downing & Knowlton, P.C. | 09/19/01 – 04/26/02 | $3,881.50 |
| Ireland Stapleton Pryor & Pascoe, PC | 05/14/02 – 02/11/09 | $483,506.40 |
| | TOTAL FEES: | $493,494.40 |

3.  Costs. Costs in the amount of $104,923.28 were incurred from 08/15/00 to 02/11/09 for the Litigation and the Appeal. Costs in the amount of $10,385.13 were withdrawn, resulting in total costs of $94,538.15.

## Summary of Interest Calculation and Total Amount of Claim

| | | |
|---|---|---|
| 1. | Total Attorney's Fees and Costs: | $588,032.55 |
| 2. | Date of Judgment: | July 30, 2004 |
| 3. | Date of Bankruptcy Filing: | February 9, 2009 |
| 4. | Total days between: | 1655 |
| 5. | Interest compounded at 18%: | $748,905.75 |
| 6. | Total: | $1,336,938.30 |