WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511

Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re | : | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| Debtors. | : | **(Jointly Administered)** |

---

**NOTICE OF FILING OF EXHIBIT**
**TO MOTION OF LEHMAN BROTHERS HOLDINGS INC.**
**PURSUANT TO SECTION 363 AND 105(a) OF THE BANKRUPTCY CODE**
**FOR AUTHORITY TO (I) SELL TWO PORTFOLIOS OF GINNIE MAE**
**REVERSE MORTGAGE LOANS TO METLIFE AND (II) ASSIGN ALL**
**RIGHTS AND DELEGATE ALL OBLIGATIONS THEREUNDER**

PLEASE TAKE NOTICE that, on May 24, 2011, Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession (together, the "Debtors") filed a motion seeking authority to sell certain

residential reverse mortgage loans and LBHI's interests in the unsecuritized balances of two

portfolios of fixed and floating rate reverse mortgage loans to MetLife Home Loans a Division

of MetLife Bank, N.A. ("MetLife") and to assign its rights and delegate its obligations in

connection with such loans and securitizations to MetLife (the "Motion") [Docket No. 17059].

PLEASE TAKE FURTHER NOTICE that to supplement the Motion, the Debtors

hereby file a draft of the Sale Agreement (as defined in the Motion) as Exhibit A to the Motion.

The copy of the Sale Agreement attached hereto is in substantially final form, however remains a

draft form and is still subject to revision by both LBHI and MetLife.

Dated:  June 14, 2011
           Houston, Texas


                                    /s/ Alfredo R. Pérez
                                    Alfredo R. Pérez

                                    WEIL, GOTSHAL & MANGES LLP
                                    700 Louisiana Street, Suite 1600
                                    Houston, Texas 77027
                                    Telephone:  (713) 546-5000
                                    Facsimile:  (713) 224-9511

                                    Attorneys for Debtors
                                    and Debtors in Possession

# EXHIBIT A

**(the Sale Agreement)**

PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") dated and effective as of the ____ day of June, 2011, by and between MetLife Home Loans, a Division of MetLife Bank, N.A., a national banking association ("Purchaser") and Lehman Brothers Holdings Inc., a Delaware corporation and debtor in possession under the Bankruptcy Code ("Seller"), having an office at 1271 Avenue of the Americas, 38th Floor, New York, New York 10020.

RECITALS:

WHEREAS, an affiliate of Seller acquired (i) certain home equity conversion mortgage loans that were sold by Purchaser, as seller, with respect to which participation interests are contained in the Government National Mortgage Association ("Ginnie Mae") HMBS pools set forth on Exhibit 1 attached hereto (the "HMBS Pools," and such loans, the "HMBS Loans"), (ii) the home equity conversion mortgage loans set forth on Exhibit 2 attached hereto with respect to which the Ginnie Mae participation interests previously included in the HMBS Pools have been repurchased from such HMBS Pools by Seller (the "Lehman Loans") and (iii) those additional loans as to which the Ginnie Mae participation interests previously included in the HMBS Pools are similarly repurchased from such HMBS Pools after the date hereof and prior to the Closing Date (such loans, the "Additional Lehman Loans", and collectively with the Lehman Loans and the HMBS Loans, the "HECM Loans"), pursuant to that certain Flow Purchase, Warranties and Servicing Agreement, dated November 1, 2006, as amended by Amendment No. 1, dated December 21, 2006, Amendment No. 2, dated April 2, 2007, and Amendment No. 3, dated September 26, 2007 (collectively, the "Purchase Agreement");

WHEREAS, Seller subsequently acquired the HECM Loans and sold participation interests in the HECM Loans to Ginnie Mae, which participation interests were later securitized under the Ginnie Mae HMBS Program (the "Securitization") pursuant to (i) that certain Guaranty Agreement, dated April 25, 2008, by and between Seller and Ginnie Mae, and (ii) that certain Guaranty Agreement, dated May 19, 2008, by and between Seller and Ginnie Mae (collectively, the "Guaranty Agreements");

WHEREAS, in connection with the Securitization, Seller entered into (i) that certain Amended and Restated Ginnie Mae HMBS Participation Agent Agreement, dated May 8, 2008, by and between Universal Master Servicing LLC, as participation agent ("Participation Agent"), and Seller, as Ginnie Mae issuer (the "Participation Agent Agreement"), pursuant to which Participation Agent master services the HMBS Loans, (ii) those certain Reconstituted Servicing Agreements, dated as of April 25, 2008, and May 21, 2008, in each case, by and between Seller and Purchaser (collectively, the "Servicing Agreement"), pursuant to which Purchaser services the HECM Loans on behalf of Seller, in its capacity as the Ginnie Mae issuer, and (iii) any Master Agreement for Participation Accounting by and between Seller, Ginnie Mae and Participation Agent executed in connection with the Securitization (together with the Guaranty Agreements and the Servicing Agreement being hereinafter sometimes referred to collectively as the "Securitization Documents").

WHEREAS, on September 15, 2008 Seller commenced the Bankruptcy Case under Chapter 11 of the Bankruptcy Code;

WHEREAS, subject to the terms and conditions set forth herein Seller desires to sell, convey and assign to Purchaser, and Purchaser desires to purchase and assume from Seller (i) all right, title, interest and obligations of the current lender in, to and under the HECM Loans, subject only to the participation interests in the HMBS Loans under the Securitization, including, without limitation, Seller's rights under the HMBS Loans arising out of amounts advanced under the HMBS Loans after the date of the Securitization, and the related Servicing Rights (as defined herein), (ii) all right, title, interest and obligations of the current lender in, to and under the Lehman Loans, (iii) all right, title, interest and obligations of the lender in, to and under the Additional Lehman Loans, and (iv) all rights, title, interest and obligations of the issuer and current lender, respectively, in, to and under each of the Guaranty Agreements and Loan Documents (as defined herein) (items (i)-(iv) shall be referred to collectively as the "Assets").

NOW, THEREFORE, in consideration of the promises and mutual agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions set forth herein, Purchaser and Seller, respectively, agree as follows:

ARTICLE 1

DEFINITIONS

Section 1.01. Definitions.    The following capitalized terms shall have the respective meanings set forth below.

Additional Balances: as defined in Section 3.01.

Additional Lehman Loans: as defined in the Recitals.

Agreement:  as defined in the Preamble.

Approvals: as defined in Section 6.01.

Assets:  as defined in the Recitals.

Assignment and Assumption Agreement: as defined in Section 8.02(c).

Assignment of Mortgage:  an individual assignment of mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction where the related Collateral is located to reflect the transfer of the related HECM Loan.

Balances: as defined in Section 3.01.

Bankruptcy Case:  the voluntary case commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, that has been assigned Case No. 08-13555.

Bankruptcy Code:  Title 11 of the United States Code.

Bankruptcy Court: the United States Bankruptcy Court for the Southern District of New York.

Business Day: any day other than a Saturday or Sunday, or a day on which any Federal Reserve Bank is authorized or obligated by law or executive order to remain closed.

Claims Survival Period: as defined in Section 5.04.

Closing: as defined in Section 8.01.

Closing Date: as defined in Section 8.01.

Collateral: all collateral securing the HMBS Loans, Lehman Loans, and Additional Lehman Loans.

Custodian: Wells Fargo Bank, N.A.

Custody Documents: the following with respect to the HECM Loans: the promissory note, note endorsements from the originating lender to Seller, note endorsements in blank, the loan agreement signed by all parties with all required exhibits, the title commitment showing borrowers vested in title or warranty deed reflecting transfer of ownership to borrowers, the final title policy, recorded mortgages or deeds of trust, and recorded intervening Assignments of Mortgage reflecting full chain of assignments from originating lender to Seller.

Deposit: as defined in Section 3.01(a).

Escrow Agent: [_____].

Final Determination: a final judgment of a court of competent jurisdiction or an administrative agency having the authority to determine the amount of, and liability with respect to, the failure to obtain the Approvals, together with a certificate of the presenting party to the effect that such judgment is final and from a court of competent jurisdiction or administrative agency having proper authority, upon which certificate the Escrow Agent shall be entitled to conclusively rely without further investigation.

Ginnie Mae: as defined in the Recitals.

Ginnie Mae Assignment Agreement: as defined in Section 4.01.

Ginnie Mae Claim Amendment: as defined in Section 7.01(e).

Ginnie Mae Deliverables: as defined in Section 4.01.

Ginnie Mae Guide: the Ginnie Mae Mortgage-Backed Securities Guide and all amendments or additions thereto.

Guaranty Agreements: as defined in the Recitals.

HECM Loans: as defined in the Recitals.

6

HMBS Loans: as defined in the Recitals.

HMBS Pools: as defined in the Recitals.

HUD:  the Department of Housing and Urban Development.

Lehman Loans: as defined in the Recitals.

Lists:  as defined in Section 5.03(n)(i).

Loan Balances:  as defined in Section 3.01.

Loan Documents:   all documents, instruments and/or agreements evidencing or securing the HECM Loans executed and delivered by the respective lender, borrower and/or any guarantor of the borrower's obligations under each of the HECM Loans, including, without limitation, each promissory note, mortgage or deed of trust evidencing or securing such HECM Loans.

Loss or Losses: as defined in Section 5.05(a).

MetLife Release:  as defined in Section 7.02(f).

Notice of Election:  as defined in Section 5.05(f).

OFAC: as defined in Section 5.03(m).

Order: as defined in Section 5.03(m).

Orders: as defined in Section 5.03(m).

Participation Agent: as defined in the Recitals.

Participation Agent Agreement: as defined in the Recitals.

Participation Agent Agreement Termination: as defined in Section 7.02(c).

Participation Agent Release: as defined in Section 7.02(g).

Person:  an individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

Purchase Price:  as defined in Section 3.01.

Purchaser:   as defined in the Preamble. [References to Purchaser herein shall include Purchaser's successors in interest and assigns as permitted hereunder.]

Purchaser's Participation Agent Agreement: as defined in Section 7.01(e).

Purchaser True-Up Amount: as defined in Section 3.01.

Release: as defined in Section 7.01(e).

Sale Approval Order:  a final order by the Bankruptcy Court and such other court having jurisdiction over the Bankruptcy Case that is no longer subject to any appeal that approves the terms and provisions of this Agreement and the rights and obligations of the parties hereto.

Securitization: as defined in the Recitals.

Seller:  as defined in the Preamble.

Seller's Bad Acts: the failure of Seller to take such actions or to execute such documents as may be required by this Agreement or as may be required by Ginnie Mae as a condition for granting such Approvals.

Seller True-Up Amount: as defined in Section 3.01.

Servicing Agreement: as defined in the Recitals.

Servicing Rights: the rights and obligations of Seller to service the HMBS Loans subject to the Guaranty Agreements and Ginnie Mae's HMBS Program, and related rights to compensation any other ancillary income, payments or monies, all escrow payments or other similar payments with respect to the HMBS Loans and any amounts actually collected by or on behalf of the Seller, all accounts, Loan Documents and other documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the HMBS Loans or pertaining to the past, present or prospective servicing or subservicing of the HMBS Loans, and all claims and rights to recovery against third parties associated with the servicing rights and HMBS Loans, subject to the participation interests in the Securitization.

Transaction Documents:  all operative agreements entered into in conjunction with this Agreement in order to carry out the transactions set forth herein.

UCC:  the Official Committee of Unsecured Creditors' appointed and acting as such in the Bankruptcy Case.

## ARTICLE 2

## PURCHASE AND SALE OF THE ASSETS

Section 2.01    Purchase and Sale.  Subject to the terms and conditions set forth herein, on the Closing Date, Seller agrees to sell, assign and convey unto Purchaser on an AS-IS, WHERE-IS basis, without, recourse, representation or warranty whatsoever of Seller, other than as set forth in Section 5.01 and 5.05 hereof but subject to the limitations set forth in Sections 5.02, 5.04 and 5.05, and Purchaser agrees to purchase, all of Seller's right, title and interest in and to the Assets and to assume all of the obligations of Seller arising under (i) the Guaranty

Agreements, in accordance with the Ginnie Mae guidelines, (ii) the Loan Documents from and after the Closing Date, and (iii) all other Assets from and after the Closing Date.

Section 2.02    Delivery of Documents.

(a)    On or prior to the Closing Date, Seller shall (i) deliver to Purchaser or Custodian any Loan Documents and Custody Documents in its possession, (ii) cause the internal delivery, by segregation, of the Loan Documents and Custody Documents in the Custodian's possession, in a manner sufficient to provide Purchaser with constructive possession and control of such Loan Documents, and (iii) direct the Custodian to deliver to Purchaser originals or copies of any other documents or files in the possession of the Custodian with respect to the origination, administration or servicing of the HECM Loans.  Upon Purchaser's request, Seller shall do, execute, acknowledge and deliver all and every such further acts, notices, transfers and assurances as may be reasonably required by the Purchaser for carrying out the intentions of this Subsection 2.02(a).

(b)    On or prior to the Closing Date, Seller shall cause the Custodian to review the Loan Documents and Custody Documents in its possession in accordance with Ginnie Mae custodial requirements and deliver to the Seller a custodian exception report.  If within thirty (30) days following Purchaser's receipt of the Loan Documents and Custody Documents, Purchaser provides Seller with a list of missing or deficient documents, excluding those listed on the exception report, that are required by the Purchaser in order to obtain certification or recertification of the HMBS Pools, then Seller agrees to use reasonable efforts to deliver (or cause to be delivered) any missing or deficient documents identified in Purchaser's list (unless such documents are missing or deficient due to Purchaser's failure to deliver or return any documents pursuant to the Purchase Agreement or Servicing Agreement, as applicable), and if Seller is unable to deliver such documents within thirty (30) days of delivery of the list by Purchaser, Purchaser may undertake its own efforts to obtain such missing or deficient documents, and Seller shall reasonably cooperate with and pay the reasonable costs and expenses incurred by Purchaser in connection with such effort, provided the Seller shall not be obligated to pay expenses in excess of twenty thousand dollars ($20,000).

(c)    Seller shall cause the Participation Agent to transfer and deliver to the Purchaser or its designee, in a form reasonably required by Purchaser and in compliance with Ginnie Mae requirements, the LAR files, SAR files, PAR files, RPB reports, and Pool to Security Reconciliation reports, on or before the date three (3) Business Days after the close of each calendar month, for the months of May and June, and if the Closing Date is delayed, for each subsequent calendar month preceding the Closing Date, and upon Purchaser's request, Seller shall do, execute, acknowledge and deliver all and every such further acts, notices, transfers and assurances as may be reasonably required by the Purchaser for carrying out the intentions of this Subsection 2.02(c).

Section 2.03    Assignments of Mortgage and Endorsements of Notes.

(a)    Seller shall, within one (1) Business Day after the date this Agreement is executed, provide twenty five (25) original limited powers of attorney substantially in the form attached as Exhibit C hereto, enabling Purchaser and/or its vendors to, on behalf of Seller, in

accordance with Ginnie Mae requirements, and in a manner reflecting transfers of each HECM Loan and related Servicing Rights to Purchaser: (i) promptly, and not later than thirty (30) days after the Closing Date, prepare and submit for recording (or cause to be prepared and submitted for recording) Assignments of Mortgage, and (ii) prior to the Closing Date, prepare and endorse or cause to be endorsed the related mortgage notes or allonges to the related mortgage notes. Purchaser shall bear the costs associated with the preparation, recording and tracking of recording of the Assignments of Mortgage, and the preparation of note endorsements and allonges.

(b)     Notwithstanding the foregoing provisions of this Section 2.03, if a HECM Loan already is registered with the Mortgage Electronic Registration System ("MERS") Seller shall follow the requirement of MERS to reflect in the records of MERS the transfer of the HECM Loans and the Servicing Rights from Seller to Purchaser, and Purchaser shall bear the costs associated therewith.

Section 2.04    Transfer of Escrows Funds, Custodial Funds, Advances and Reconciliation. On or before the date five (5) Business Days after the Closing Date, the Seller shall remit and deliver, or cause the remittance and delivery, to Purchaser or Purchaser's designee, all principal and interest funds and all funds for the payment of taxes, assessments, insurance premiums, ground rents, funds from hazard insurance loss drafts, other mortgage escrow and impound items and similar charges (including interest accrued thereon, if applicable), and all other funds and collections, the legal, right, title and interest to which are to be transferred to Purchaser on the Closing Date that Purchaser, as servicer, did not already have in its possession prior to the Closing Date.

ARTICLE 3

PURCHASE PRICE

Section 3.01    Purchase Price.  The total amount of the purchase price to be paid by Purchaser for the Assets (the "Purchase Price") shall be an amount equal to the sum of (a) eighty-one and one hundredth of one percent (81.01%) of the sum of (i) the aggregate unsecuritized balances of the HMBS Loans as of the close of business on the Business Day prior to the Closing Date, plus (ii) the aggregate outstanding balance of the Lehman Loans as of the close of business on the Business Day prior to the Closing Date (the sum of (i) and (ii) above being hereinafter referred to collectively as the "Loan Balances") plus (b) the aggregate outstanding balance of the Additional Lehman Loans as of the close of business on the Business Day prior to the  Closing Date (the "Additional Balances", together with the Loan Balances, the "Balances") plus (c) the product of $200.00 times the number of Additional Lehman Loans (representing the additional repurchase costs).  Within ten (10) Business Days after the Closing Date the Seller shall provide to Purchaser a statement setting forth the actual Balances based on actual data received after the Closing Date, together with supporting documentation and information necessary to permit Purchaser to reasonably confirm such information; and (x) if the Seller received cumulative payments of cash in excess of the amount to which it would have been otherwise entitled to pursuant to this Agreement, (such excess being referred to hereinafter as the "Seller True-Up Amount"), then the Seller shall make a special payment to the Purchaser in an amount equal to the Seller True-Up Amount simultaneously with delivery of such

statement and supporting documentation and information, or (y) if the Seller received cumulative payments of cash that is less than the amount to which it would have been otherwise entitled to pursuant to this Agreement, (such differential being referred to hereinafter as the "Purchaser True-Up Amount"), then the Purchaser shall make a special payment to the Seller in an amount equal to the Purchaser True-Up Amount within three (3) Business Days of its receipt of such statement and supporting documentation and information.    All monies payable under this Agreement, unless otherwise specified in this Agreement, shall be paid by the applicable party causing such monies to be wire transferred in immediately available federal funds at such bank account or accounts designated by the other party, and divided into such amounts designated by the other party as may be required to facilitate the consummation of the transactions contemplated by this Agreement.

        (a)      Simultaneously with the execution of this Agreement by Purchaser, Purchaser shall deliver to the Escrow Agent $4,500,000.00 to be deposited into the escrow account of Escrow Agent in accordance with the wire instructions set forth on Exhibit A (the "Deposit"), which Deposit shall be non-refundable when made except as otherwise provided in Section 3.01(b) below.  The balance of the estimated Purchase Price, based on the most recent available Balances as provided in a statement delivered by Seller to Purchaser together with supporting documentation and information necessary to permit Purchaser to reasonably confirm such information no later than five (5) Business Days prior to the Closing Date, and subject to the true up process described in Sections 3.01(x) or (y) as applicable, shall be paid at the Closing by bank wire transfer of immediately available funds to Seller's account or to the account or accounts of such other party or parties as may be designated by Seller in writing to Purchaser prior to the Closing Date.

        (b)      Escrow Agent shall deliver the Deposit to Seller or to Purchaser, as the case may be, under the following conditions:

        (i)      promptly following Escrow Agent's receipt of written demand from Purchaser stating that Purchaser has terminated this Agreement in accordance with Section 8.04(c) other than on the basis of a failure to obtain the Approvals (in which case subsection (ii) shall apply), or that the Seller has terminated this Agreement in accordance with Section 8.04(b) based on a failure of the closing conditions set forth in any of Section 7.01(e), (g) or (h), Escrow Agent shall release the full amount of the Deposit to Purchaser promptly following such termination; or

        (ii)      ten (10) Business Days following Escrow Agent's and Purchaser's receipt of written demand from Seller stating that Seller has terminated this Agreement in accordance with Section 6.01, Escrow Agent shall release the full amount of the Deposit to Seller, unless the Escrow Agent receives notice from Purchaser during or before such ten (10) Business Day period stating that the failure to obtain the Approvals was due to the Seller's Bad Acts, in which case the Escrow Agent shall not distribute to either party any portion of the Deposit until the Escrow Agent receives either (i) written instructions signed by the Seller and the Purchaser authorizing the distribution of the Deposit or (ii) a copy of a Final Determination establishing that either (x) the failure to obtain the Approvals was due to Seller's Bad Acts, in which case the Deposit shall be returned to the Purchaser, or (y) the failure to obtain the Approvals was due to anything other than

the Seller's Bad Acts, in which case the Deposit shall be returned to the Seller.  Upon receipt of such written instructions or such Final Determination, as the case may be, the Escrow Agent shall distribute to the applicable party a portion of the Deposit in accordance with such written instructions or to the non-defaulting party as determined by the Final Determination; or

        (iii)    promptly following Escrow Agent's receipt of written demand from Seller stating that Seller has terminated this Agreement in accordance with Section 8.04(b), other than on the basis of a failure to obtain the Approvals (in which case subsection (ii) shall apply), and other than based on a failure of the closing conditions set forth in any of Section 7.01(e), (g) or (h), Escrow Agent shall release the full amount of the Deposit to Seller promptly following such termination;

        (iv)    if this Agreement is terminated by the mutual written consent of the Purchaser and Seller, as jointly directed in writing by the Purchaser and Seller;  or

        (v)    if the Closing occurs, the Deposit shall be released to Seller by Escrow Agent on the Closing Date.

        Section 3.02.  <u>Escrow Agent</u>.    Escrow Agent may rely and act upon any instrument or other writing reasonably believed by Escrow Agent to be genuine and purporting to be signed and presented by any person or persons purporting to have authority to act on behalf of Seller or Purchaser, as the case may be, and shall not be liable in connection with the performance of any duties imposed upon Escrow Agent by the provisions of this Agreement, except for Escrow Agent's own gross negligence or willful misconduct.  Escrow Agent shall have no duties or responsibilities except those set forth herein.  Escrow Agent shall not be bound by any modification, cancellation or rescission of this Agreement unless the same is in writing and signed by Purchaser and Seller, and, if Escrow Agent's duties hereunder are affected, unless Escrow Agent shall have given prior written consent thereto.  Escrow Agent shall be reimbursed by Seller and Purchaser for any expenses (including reasonable legal fees and disbursements of outside counsel), including all of Escrow Agent's fees and expenses with respect to any interpleader action incurred in connection with this Agreement, and such liability shall be joint and several; provided, however, that, as between Purchaser and Seller, (a) the prevailing party in any dispute over the Deposit shall be entitled to reimbursement by the losing party of any such fees and expenses paid to Escrow Agent, and (b) absent any dispute over the Deposit, Purchaser and Seller shall each be responsible for one half of such fees and expenses, if any, and each party shall be entitled to reimbursement from the other party of amounts paid on behalf of the other party.  In the event that Escrow Agent shall be uncertain as to Escrow Agent's duties or rights hereunder, or shall receive instructions from Purchaser or Seller that, in Escrow Agent's opinion, are in conflict with any of the provisions hereof, Escrow Agent shall be entitled to hold the Deposit and may decline to take any other action.  After delivery of the Deposit in accordance herewith, Escrow Agent shall have no further liability or obligation of any kind whatsoever.

ARTICLE 4

GINNIE MAE ISSUER STATUS

Section 4.01.  <u>Substitution of Ginnie Mae Issuer</u>.

(a)    On the Closing Date, by executing and delivering the Assignment and Assumption Agreement, (i) the Seller shall assign all of its rights and delegate all of its obligations to the Purchaser under (A) the Guaranty Agreements, in accordance with the Ginnie Mae guidelines, (B) the Loan Documents from and after the Closing Date, and (C) all other Assets from and after the Closing Date (the "<u>Assigned Rights and Obligations</u>"); and (ii) the Purchaser shall (A) become a party to each of the Loan Documents and Guaranty Agreements to which Seller is a party as of the date hereof, with the same force and effect as if originally a party thereto, and (B) without limiting the generality of the foregoing, Purchaser shall irrevocably and unconditionally assume the Assigned Rights and Obligations, including, without limitation, all obligations of Seller as issuer under the Securitization, and any funding, payment or repurchase obligations, as applicable, under the Guaranty Agreements in accordance with the Ginnie Mae guidelines, and arising on or after the Closing Date under the Loan Documents.

(b)    In addition, on or before the Closing Date or such earlier date as required by Ginnie Mae, in accordance with Ginnie Mae's requirements, including Chapter 21-8 of the Ginnie Mae Guide (the "<u>Ginnie Mae Deliverables</u>"):

(i)    each of the Seller and the Purchaser shall execute and deliver to each other three (3) originals of the assignment agreement required by Ginnie Mae pursuant to Chapter 21-8 of the Ginnie Mae Guide, a form of which is attached as Appendix VIII-3 of the Ginnie Mae Guide (the "<u>Ginnie Mae Assignment Agreement</u>");

(ii)    each of the Seller and Purchaser shall provide to Ginnie Mae and to the other fully executed originals of Form HUD 11702 Resolution of Board of Directors and Certificate of Authorized Signatures (if current documents on file with Ginnie Mae are not up to date);

(iii)    Purchaser shall provide to Ginnie Mae fully executed originals of Form HUD 11707 Master Servicing Agreement (if applicable);

(iv)    Purchaser shall provide to Ginnie Mae fully executed originals of Form HUD 11709 Master Agreement for Servicer's Principal and Interest Custodial Account (if applicable);

(v)    Purchaser shall provide to Ginnie Mae a fully executed original Form HUD 11715 Master Custodial Agreement (if applicable);

(vi)    Purchaser shall provide to Ginnie Mae fully executed originals of Form HUD 11720 Master Agreement for Servicer's Escrow Custodial Account (if applicable);

(vii)    Purchaser shall provide to Ginnie Mae fully executed originals of Form HUD 11703II Master Agreement for Participation Accounting (if applicable);

(viii)    Seller shall provide a Pool Transfer System software diskette meeting the formatting requirements set forth in Appendix VIII-4 of the Ginnie Mae

Guide, which shall provide the pool or loan package numbers, issue dates, desired effective date of the requested transfer, remaining principal balance (RPB) of the securities affected by the transfer as of the most recent month end and Purchaser's document custodian number, and, if applicable, final certification or recertification dates;

(ix)    Seller shall deliver a corporate resolution authorizing the request for transfer, conforming to the requirements of Exhibit A to Appendix VIII-4 to the Ginnie Mae Guide; and

(x)    Seller shall deliver the fees payable to Ginnie Mae that are required pursuant to Chapter 6-2(D) of the Ginnie Mae Guide

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

Section 5.01.  <u>Representations and Warranties of Seller</u>.  Seller represents and warrants to Purchaser as of the date hereof and as of the Closing Date (except to the extent specifically stated otherwise below):

(a)    Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)    Subject only to approval by the Bankruptcy Court and entry of the Sale Approval Order in the Bankruptcy Case, Seller has full power, authority and legal right to execute, enter into and deliver, and perform and observe its obligations under, this Agreement and consummate the transactions contemplated hereby.

(c)    Subject only to entry of the Sale Approval Order in the Bankruptcy Case, this Agreement and the Transaction Documents have been duly and validly authorized, executed and delivered by Seller and constitute the valid, legal and binding agreement of Seller enforceable in accordance with their terms.

(d)    There are no conditions precedent to the effectiveness of this Agreement as against Seller that have not been satisfied or waived.

(e)    Subject only to entry of the Sale Approval Order, all actions necessary to authorize the execution, delivery and performance of this Agreement on behalf of Seller have been duly taken, and all such actions continue to be in full force and effect.

(f)    Other than the pending Bankruptcy Case and the Sale Approval Order, no consent of any other person, and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any person or any governmental authority, bureau or agency, is required in connection with the execution, delivery or performance by Seller of this Agreement or consummation by Seller of the transactions contemplated by this Agreement.

14

(g)    Upon entry of the Sale Approval Order, none of the execution, delivery or performance of this Agreement by Seller or the consummation of the transactions contemplated by this Agreement by Seller will violate or conflict with (i) any provision of the organizational documents of Seller or any agreement or instrument to which the Seller is now a party or by which it is bound or constitute a default or result in an acceleration under any of the foregoing, or (ii) violate any law, rule, regulation, judgment, order, injunction, decree or award of any court, arbitrator or governmental body against Seller or by which Seller is bound.

(h)    Except for Seller's request for entry of the Sale Approval Order in the pending Bankruptcy Case, there is no action, suit, proceeding or investigation pending or, to the best of Seller's knowledge, threatened against the Seller, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Seller contemplated herein.

(i)    As of the Closing Date, Seller is the sole legal and beneficial owner and holder of all right, title and interest in and to the Assets, which will be assigned free and clear of any liens, adverse claims or other charges or other encumbrances.  The transfer and assignment by Seller to Purchaser of the Assets, and the instruments required to be executed by Seller and delivered to Purchaser pursuant to this Agreement and Ginnie Mae requirements are, or will be on the Closing Date, valid and enforceable in accordance with their terms and will effectively vest in Purchaser good and marketable title to the Assets, free and clear of any and all liens, claims, or encumbrances.

(j)    As of May 31, 2011, the aggregate unsecuritized balance of the HMBS Loans was [$_____], and aggregate outstanding principal balance on the Lehman Loans was [$_____].

Section 5.02.    DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER.  EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE 5 HEREOF, THE ASSETS ARE BEING SOLD "AS IS" AND "WHERE IS" WITHOUT ANY RECOURSE, REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE, EXPRESS OR IMPLIED.    PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE ASSETS.  PARTICULARLY, BUT WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, SELLER HAS NOT MADE ANY REPRESENTATIONS OR WARRANTIES TO PURCHASER, EITHER EXPRESSED OR IMPLIED, REGARDING: (I) THE COLLECTIBILITY OF THE HMBS LOANS OR THE LEHMAN LOANS; (II) THE CREDITWORTHINESS OF ANY OBLIGOR OR GUARANTOR OF THE HMBS LOANS OR LEHMAN LOANS; (III) THE VALUE OF ANY COLLATERAL OR THE ENVIRONMENTAL CONDITION OF ANY COLLATERAL; (IV) THE ABSENCE OF ANY LIENS AND ENCUMBRANCES ON ANY COLLATERAL, IN WHOLE OR IN PART (OTHER THAN AS PROVIDED IN SECTION 5.01(i)); (V) THE

PRIORITY OF SECURITY INTERESTS IN OR LIENS ON ANY COLLATERAL; (VI) THE EXECUTION, LEGALITY, VALIDITY, GENUINENESS, SUFFICIENCY, VALUE, TRANSFERABILITY OR ENFORCEABILITY OF ANY LOAN DOCUMENTS SUPPORTING THE HMBS LOANS OR LEHMAN LOANS; (VII) THE STATUS, PAYMENT OR NONPAYMENT OF ANY AMOUNTS DUE OR PAST DUE UNDER THE LOAN DOCUMENTS OR ANY REAL ESTATE TAXES OR ASSESSMENTS WITH RESPECT TO ANY COLLATERAL; (VIII) THE LEASES, RENTS, INCOME OR EXPENSES OF ANY OF THE COLLATERAL; OR (IX) THE COMPLIANCE OF THE COLLATERAL WITH ANY APPLICABLE BUILDING CODES, ZONING ORDINANCES OR REGULATIONS. PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT AUTHORIZED ANY EMPLOYEE, AGENT, REPRESENTATIVE, BROKER, THIRD PARTY OR OTHER PARTY TO MAKE AND, TO THE EXTENT SO MADE, SPECIFICALLY NEGATE AND DISCLAIM, ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES. PURCHASER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY, IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT, TO INSPECT THE ASSETS, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE ASSETS AND THE TERMS OF THIS AGREEMENT. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER WITH RESPECT TO THE ASSETS WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.

Section 5.03. <u>Representations and Warranties of Purchaser</u>. Purchaser represents and warrants to Seller as of the date hereof and as of the Closing Date (except to the extent specifically stated otherwise below):

(a)    Purchaser is duly organized, validly existing and in good standing under the laws of the United States.

(b)    Purchaser has full power, authority and legal right to execute, enter into and deliver, and perform and observe its obligations under, this Agreement and consummate the transactions contemplated hereby.

(c)    This Agreement and the Transaction Documents have been duly and validly authorized, executed and delivered by Purchaser and constitute the valid, legal and binding agreement of Purchaser enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(d)    There are no conditions precedent to the effectiveness of this Agreement as against Purchaser that have not been satisfied or waived.

(e)     All actions necessary to authorize the execution, delivery and performance of this Agreement on behalf of Purchaser have been duly taken, and all such actions continue to be in full force and effect.

(f)     Purchaser has not dealt with any broker, investment banker, agent or other person engaged by Purchaser, that may be entitled to any commission or compensation in connection with the sale of the Assets.

(g)     No consent of any other person, and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any person or any governmental authority, bureau or agency, is required in connection with the execution, delivery or performance by Purchaser of this Agreement or consummation by Purchaser of the transactions contemplated by this Agreement.

(h)     None of the execution, delivery or performance of this Agreement by Purchaser or the consummation of the transactions contemplated by this Agreement by Purchaser will violate or conflict with (i) any provision of the organizational documents of Purchaser or any agreement or instrument to which the Purchaser is now a party or by which it is bound or constitute a default or result in an acceleration under any of the foregoing or (ii) violate any judgment, order, injunction, decree or award of any court, arbitrator or governmental body against Purchaser or by which Purchaser is bound.

(i)     Except for Seller's request for entry of the Sale Approval Order in the pending Bankruptcy Case, there is no action, suit, proceeding or investigation pending or, to the best of Purchaser's knowledge, threatened against the Purchaser, before any court, administrative agency or other tribunal regarding the invalidity of this Agreement, which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Purchaser contemplated herein.

(j)     The Purchaser is a Ginnie Mae-approved issuer of Ginnie Mae Home Equity Conversion Mortgage Backed Securities, with the facilities, procedures, and experienced personnel necessary for the sound servicing of HECM Loans. The Purchaser is a HUD-approved mortgagee pursuant to Section 203 of the National Housing Act and is in good standing to service mortgage loans for Ginnie Mae and HUD, and no event has occurred, including but not limited to a change in insurance coverage, which would make such Purchaser unable to comply with Ginnie Mae and HUD eligibility requirements or which would require notification to Ginnie Mae or HUD.

(k)     Purchaser is a sophisticated investor and has and will independently make its own analysis of the Assets to be purchased hereunder and has been provided with and reviewed the Loan Documents and Loan Purchase Agreements, the documents related to the Securitization and all other documents and materials that it considers appropriate to make its evaluations thereof. Purchaser acknowledges that no employee or representative of Seller has been authorized to make, and Purchaser has not relied on any statements or representations or warranties made other than those expressly set forth in this Agreement and the transfer of the Assets by Seller pursuant to this Agreement shall be irrevocable without recourse to Seller, except as otherwise set forth herein.

(l)     Purchaser has the requisite financial resources and does not require any financing to complete the purchase of the Assets and the related transactions contemplated by this Agreement or any other agreement executed and delivered at Closing.

(m)     Purchaser, and all direct owners of Purchaser, are in compliance with the requirements of Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Asset Control, Department of Treasury ("OFAC") and in any enabling legislation or other Executive Orders in respect thereof (collectively, the "Orders").

(n)     On the date hereof, through and including at Closing, neither Purchaser nor the direct owner of Purchaser:

(i)     is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists");

(ii)     has been arrested for money laundering or for predicate crimes to money laundering, convicted or pled nolo contendere to charges involving money laundering or predicate crimes to money laundering;

(iii)     has been determined by competent authority to be subject to the prohibitions contained in the Orders;

(iv)     is controlled by any Person on the Lists or any other Person who has been determined by competent authority to be subject to the prohibitions contained in the Orders;

(v)     shall transfer or permit the transfer of any interest in Purchaser to any Person who is listed on the Lists; or

(vi)     shall assign this Agreement or any interest herein, to any Person who is listed on the Lists or who is engaged in illegal activities;

(o)     If, prior to the Closing Date, Purchaser obtains actual knowledge that Purchaser or any of its direct owners become listed on the Lists or are indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Purchaser shall immediately notify Seller.  Purchaser shall have ten (10) Business Days to remove such party from any interest in Purchaser or Seller may terminate this Agreement upon written notice to Purchaser, whereupon neither party shall have any further obligations hereunder except for any obligations that expressly survive a termination of this Agreement; and

(p)     Purchaser has an adjusted net worth and fidelity and mortgagee errors and omissions insurance in amounts sufficient to meet Ginnie Mae's requirements for the aggregate remaining principal balance of the HMBS Loans.

Section 5.04. <u>Limitations on Representations and Warranties</u>.  The parties hereto agree that the representations and warranties contained in this Article 5 and in any other agreement executed and delivered at Closing shall survive the Closing for a period of [twelve (12)] months from the Closing Date (the "<u>Claims Survival Period</u>").  Each party shall only be liable for a breach of a representation or warranty with respect to which a claim is made by the non-breaching party prior to the expiration of the Claims Survival Period (even if liability with respect to such claim is determined after expiration of the Claims Survival Period). Notwithstanding anything to the contrary contained herein, but subject to Section 5.05 hereof, the Seller's aggregate liability for a breach of representation or warranty with respect to which Purchaser first had knowledge following the Closing Date shall be limited to the amount of the Purchase Price received by Seller pursuant to Section 3.01 hereof for all such breaches in the aggregate; provided, however, if the Closing occurs, Purchaser hereby expressly waives, relinquishes and releases any right or remedy available to it at law, in equity, under this Agreement or otherwise to make a claim against Seller for damages that Purchaser may incur, or to rescind this Agreement or the transactions contemplated hereby, as the result of any of Seller's representation or warranties being untrue, inaccurate or incorrect if Purchaser had knowledge that such representation or warranty was untrue, inaccurate or incorrect at the time of the Closing.  For the purposes of this Section 5.04, "knowledge" shall mean the actual knowledge, without inquiry, of executives or employees of Purchaser with principal operating responsibility for servicing of the HECM Loans or the purchase of the Assets.

Section 5.05. <u>Indemnification</u>.

(a)      Seller hereby agrees to indemnify and hold Purchaser and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assignees harmless from and against any and all third party claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees, and reasonable expenses (each, a "<u>Loss</u>" or collectively, the "<u>Losses</u>") based upon, attributable to or resulting from (x) the breach of its representation contained in Section 5.01, to the extent such representation expressly survives the Closing, (y) the failure of Seller to perform its covenants and other obligations under this Agreement; provided, however, that (i) Seller's aggregate liability for such indemnification shall be limited to the amount of the Purchase Price received by Seller pursuant to Section 3.01 and (ii) Seller's obligation to provide such indemnification shall terminate upon the expiration of the Claims Survival Period, or (z) if and until the Participation Agent Termination Agreement is received by Purchaser, any claim by the Participation Agent under the Participation Agent Agreement.

(b)      Purchaser hereby agrees to indemnify and hold Seller and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assignees harmless from and against any and all Losses based upon, attributable to or resulting from (x) the breach of its representation contained in Section 5.03, to the extent such representation expressly survives the Closing, or (y) the failure of Purchaser to perform its covenants and other obligations under this Agreement; provided, however, that (i) Seller's aggregate liability for such indemnification shall be limited to the amount of the Purchase Price received by Seller pursuant to Section 3.01 and (ii) Purchaser's obligation to provide such indemnification shall terminate upon the expiration of the Claims Survival Period.

(c)      Purchaser hereby agrees to indemnify and hold Seller and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assignees harmless from and against any and all Losses, liabilities, obligations, damages, causes of action, costs and expenses based upon or arising out of any obligation or liability of Seller under the Loan Documents, the Guaranty Agreements, and any additional obligations and liabilities assumed by Purchaser in connection herewith, including, but not limited to those related to the servicing of the Assets, arising and accruing from and after the Closing Date including, without limitation, as a result of the transaction set forth in this Agreement.

(d)      Purchaser hereby agrees to indemnify and hold Seller and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assignees harmless from and against any and all Losses, liabilities, obligations, damages, causes of action, costs and expenses based upon or arising directly out of the use of the Seller's issuer identification number from and after the Closing Date until the date that Ginnie Mae has updated its system to allow the Purchaser to use its own issuer number.

(e)      The indemnified party agrees to give the indemnifying party prompt written notice of any claim for which the indemnified party seeks indemnification; provided, however, any failure by the indemnified party to provide such notice will not relieve the indemnifying party of its indemnification obligations under the Agreement except to the extent such indemnifying party can demonstrate actual prejudice as a result of such failure.  Within thirty (30) days after receiving the indemnified party's notice of a claim, but no later than (10) days before the date on which any formal response to the claim is due, the indemnifying party will notify the indemnified party in writing as to whether the indemnifying party acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the claim (a "Notice of Election").  If the indemnifying party delivers a timely Notice of Election to the indemnified party, the indemnifying party will have the right to conduct the defense of the claim and, consistent with the rights of the indemnified party hereunder, all negotiations for its settlement; provided, however, that the indemnified party may participate in such defense or negotiations to protect its interests and that any settlement will be for the payment of money by the indemnifying party and will not, without the prior written consent of the indemnified party, obligate or impose liability on the indemnified party in any way, including without limitation to any determination or admission regarding the indemnified party's interest.  If the indemnifying party does not deliver a timely Notice of Election, the indemnified party may defend and/or settle the claim in such manner as it may deem appropriate, at the cost and expense of the indemnifying party, including payment of any settlement, judgment or award and the costs of defending or settling the claim.   The indemnifying party shall promptly reimburse the indemnified party upon demand for all losses suffered or incurred as a result of or in connection the claim.

(f)      The provisions of this Section 5.05 shall survive the Closing or earlier termination of this Agreement.

ARTICLE 6

20

GINNIE MAE APPROVALS

Section 6.01.  Timing of Submission for Approvals.

(a)    Purchaser and Seller shall immediately apply for the approvals from Ginnie Mae of the transactions contemplated herein (collectively, the "Approvals") including, but not limited to, the sale of the Assets, and substitution of the Purchaser as issuer in connection with the Securitization, if they have not done so prior to the Date of this Agreement.

(b)    Purchaser and Seller shall use all commercially reasonable efforts to obtain the Approvals no later than the Closing Date.  If the Approvals are not obtained in accordance with this Section 6.01, then Seller shall be entitled to the Deposit to the extent provided and subject to Section 3.01(b)(ii), and this Agreement shall terminate.

ARTICLE 7
CONDITIONS TO CLOSING

Section 7.01.  Conditions to Obligations of Seller.  The obligations of Seller to effect the Closing shall be subject to the fulfillment or waiver by Seller at or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties.  The representations and warranties of Purchaser contained in this Agreement shall be true and correct as of the Closing Date, as though made at and as of the Closing Date;

(b)    Performance of Obligations.  Purchaser shall have paid the Purchase Price, shall have caused the Deposit to be delivered to Seller, shall have delivered, or caused to be delivered, all of the items set forth in Section 8.03, and shall have performed all of its other obligations contained in this Agreement required to be performed on or before the Closing Date;

(c)    Approvals.  Seller shall have obtained the Approvals;

(d)    New Participation Agreement.  Purchaser shall be a party to a participation agent agreement with the participation agent of Purchaser's choice under which such participation agent shall master service the HMBS Loans, which agreement shall be effective upon or before Closing (the "Purchaser's Participation Agent Agreement");

(e)    Amendment of Claim.  Seller shall obtain from Ginnie Mae an amendment of its claim [#_____] and any amendment or supplement thereto filed in the Bankruptcy Case to remove that portion of such claim applicable to the Assets (the "Ginnie Mae Claim Amendment") in form and content reasonably satisfactory to Seller;

(f)    Release.  Seller shall obtain from Purchaser a general release that releases Seller from any and all claims related to or arising from the Assets, including, but not limited to, claims related to or arising from the Servicing Agreement, in the form of Exhibit C attached hereto (the "MetLife Release");

21

(g)    Release.  Seller shall obtain from Participation Agent a general release that releases Seller from any and all claims related to or arising under the Participation Agent Agreement (the "Participation Agent Release"); and

(h)    Sale Approval Order.  Seller shall have obtained entry of the Sale Approval Order in form and substance reasonably acceptable to Purchaser approving Seller's entry into and compliance with this Agreement and consummation of the transactions described herein.

Section 7.02.  Conditions to Obligations of Purchaser.    The obligations of Purchaser to effect the Closing shall be subject to the fulfillment or waiver by Purchaser at or prior to the Closing Date of the following conditions:

(a)    Representations and Warranties.    The representations and warranties of Seller contained in this Agreement shall be true and correct as of the Closing Date, as though made at and as of the Closing Date;

(b)    Approvals.  Seller shall have obtained the Approvals;

(c)    Sale Approval Order.    Seller shall have obtained entry of the Sale Approval Order in form and substance reasonably acceptable to Purchaser approving Seller's entry into and compliance with this Agreement and consummation of the transactions described herein;

(d)    Termination of Participation Agreement.  Seller shall have terminated the agreement with the Participation Agent effective upon Closing (the "Participation Agent Agreement Termination");

(e)    Performance of Obligations.    Seller shall have delivered, or caused to be delivered, all of the items set forth in Section 8.02, and shall have performed all of its other obligations contained in this Agreement required to be performed on or before the Closing Date; and

(f)    Amendment of Claim.  Seller shall deliver to Purchaser the Ginnie Mae Claim Amendment in form and content reasonably satisfactory to Purchaser.

ARTICLE 8

CLOSING AND TERMINATION

Section 8.01.Closing.  Subject to Article 7 hereof, the closing of the transactions contemplated hereunder (the "Closing") shall occur, and the documents referred to in Sections 8.02 and 8.03 shall be delivered at 10:00 A.M., New York time, on July 1, 2011 (the "Closing Date") at the offices of Seller's attorneys, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153.

Section 8.02.  <u>Closing Documents by Seller</u>.  At the Closing or such earlier date as required by this Agreement, Seller shall deliver to Purchaser (or such other applicable Person):

(a)    an original assignment and assumption agreement duly executed by Seller assigning all of Seller's right, title and interest to the Assigned Rights and Obligations, substantially in the form of <u>Exhibit B</u> attached hereto (the "<u>Assignment and Assumption Agreement</u>") and, if in Seller's possession, the originally executed Loan Documents and Loan Purchase Agreements;

(b)    the Ginnie Mae Deliverables required to be delivered by the Seller pursuant to Section 4.01 of this Agreement;

(c)    UCC-3 financing statements, if necessary, assigning to Purchaser of all of Seller's right, title and interest in the UCC-1 financing statements filed with respect to the Assets; and

(e)    the Participation Agent Agreement Termination.

Except as otherwise provided in this Agreement, recording or filing of any applicable closing documents shall be the sole responsibility of Purchaser and shall be at Purchaser's sole cost and expense.

Section 8.03.  <u>Closing Documents by Purchaser</u>.  At the Closing or such earlier date as required by this Agreement, Purchaser shall deliver to Seller (or such other applicable Person):

(a)    the estimated Purchase Price, calculated in accordance with Section 3.01(a), less the Deposit;

(b)    instructions to the Escrow Agent to deliver the Deposit to Seller;

(c)    an original of the Assignment and Assumption Agreement duly executed by Purchaser;

(d)    an original MetLife Release substantially in the form of <u>Exhibit C</u>; and

(e)    the Ginnie Mae Deliverables required to be delivered by the Purchaser pursuant to Section 4.01 of this Agreement.

Section 8.04.  <u>Termination of Agreement</u>.  This Agreement may be terminated as follows:

(a)    by mutual written consent of Purchaser and Seller;

(b)    by Seller, if any condition to the obligations of Seller set forth in Section 7.01 shall have not been fulfilled (unless previously waived by the Seller) on or prior to the Closing Date;

(c)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 7.02 shall have not been fulfilled (unless previously waived by the Purchaser) on or prior to the Closing Date; or

(d)     by Seller in accordance with Section 5.03(m) or Section 6.01 hereof.

Section 8.05.  <u>Procedure Upon Termination</u>.  In the event of termination by Purchaser or Seller, or both, pursuant to Section 8.04 hereof or as otherwise expressly provided in this Agreement, written notice thereof shall forthwith be given to the other party or parties, the Deposit shall be distributed to the party entitled thereto in accordance with Section 3.01(b), this Agreement shall terminate, and the purchase of the Assets hereunder shall be abandoned, without further action by Purchaser or Seller.  If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

Section 8.06.  <u>Effect of Termination</u>

(a)     In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination (other than any such obligations that expressly survive such termination), and such termination shall be without liability to Purchaser or Seller except as otherwise provided in this Agreement.

(b)     Subject to Section 9.11, and except as otherwise specifically set forth in this Agreement, Purchaser's sole remedy shall be to seek specific performance of the Seller's obligation to close on the purchase and sale of the Assets in accordance with this Agreement.

(c)     PURCHASER RECOGNIZES AND ACKNOWLEDGES THAT SELLER IS RELYING ON PURCHASER'S AGREEMENT TO PURCHASE THE ASSETS, AND THAT SELLER WILL SUFFER SUBSTANTIAL DETRIMENT IN THE EVENT PURCHASER FAILS TO PERFORM PURCHASER'S OBLIGATIONS UNDER THIS AGREEMENT.  ACCORDINGLY, PURCHASER SPECIFICALLY AGREES THAT SELLER SHALL BE ENTITLED TO COMPENSATION AS PROVIDED IN THIS SECTION 8.06(c) FOR THE DETRIMENT THAT WOULD BE CAUSED TO SELLER BY REASON OF PURCHASER'S DEFAULT HEREUNDER.   SELLER AND PURCHASER AGREE IF PURCHASER DEFAULTS IN ITS OBLIGATION TO PURCHASE THE ASSETS AS REQUIRED UNDER THIS AGREEMENT FOLLOWING ENTRY IN THE BANKRUPTCY CASE OF THE SALE APPROVAL ORDER APPROVING THIS TRANSACTION, SELLER SHALL BE ENTITLED TO THE FULL AMOUNT OF THE DEPOSIT AS LIQUIDATED DAMAGES.  BOTH PARTIES AGREE THAT THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES IN THE EVENT OF A DEFAULT BY PURCHASER IN ITS OBLIGATION TO PURCHASE THE ASSETS IN ACCORDANCE WITH THE TERMS OF THIS AGREEMENT FOLLOWING ENTRY OF THE SALE APPROVAL ORDER AND ON OR PRIOR TO THE CLOSING DATE AND SUCH AMOUNT SHALL BE SELLER'S SOLE REMEDY FOR PURCHASER'S FAILURE TO PURCHASE THE ASSETS IN ACCORDANCE WITH THE TERMS HEREOF WHICH

REMEDY SHALL BE IN LIEU OF ANY OTHER MONETARY AND/OR OTHER RELIEF TO WHICH SELLER MAY OTHERWISE BE ENTITLED BY VIRTUE OF THIS AGREEMENT OR BY OPERATION OF LAW ARISING BY REASON OF PURCHASER'S DEFAULT. THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER.

Section 8.07. Servicing Agreements.    The Servicing Agreements shall be automatically terminated with respect to the HECM Loans on the Closing Date without fee, charge or penalty; provided, however that Purchaser shall provide a report of the amount of the unreimbursed advances made by the Purchaser, in its capacity as servicer under the Servicing Agreement, with respect to the HECM Loans during the period from June 1, 2011 through the Closing Date, and Seller shall reimburse or cause to be reimbursed such amounts to the Purchaser, all in accordance and subject to the terms of the Servicing Agreement.

ARTICLE 9

MISCELLANEOUS

Section 9.01.  Entire Agreement.  This Agreement contains all of the terms agreed upon between Seller and Purchaser with respect to the subject matter hereof, and all prior agreements, understandings, representations and statements, oral or written, between Seller and Purchaser are merged into this Agreement.

Section 9.02.  Amendments.  This Agreement may not be changed, modified or terminated, except by an instrument executed by Seller and Purchaser.

Section 9.03.  Notices. All notices, demands, requests or other communications required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national overnight delivery service, or (c) email (provided that the original shall be simultaneously delivered by national overnight delivery service or personal delivery), or (d) personal delivery, addressed as follows:

If to Seller:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
38th Floor
New York, New York  10020
Attention:  Ronald Dooley
Tel:  646-285-9478
Fax: 646-285-9305
Email:  ronald.dooley@lehmanholdings.com

and:

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
38th Floor
New York, New York  10020
Attention:  Eli Glanz
Tel:  646-285-9014
Fax: 646-285-9305
Email: daniel.glanz@lehmanholdings.com

with a copy to:

Richard Morrison, Esq.
Weil, Gotshal & Manges, LLP
767 5th Avenue
New York, New York 10153-0119
Tel:  212-310-8000
Fax:  212-310-8007
Email:  richard.morrison@weil.com

If to Purchaser:

Alfred Chang
4000 Horizon Way
Irving, Texas 750163
Tel: 214-441-5425
Fax: 214-441-5497
Email: achang4@metlife.com

and:

Karen Crawford, Esq.
4000 Horizon Way
Irving, Texas 750163
Tel:  214-441-5310
Fax: 214-441-5312
Email: kcrawford@metlife.com

with a copy to:

Eric J. Edwardson, Esq.
1601 K Street N.W.
Washington, D.C. 20006
Email: eric.edwardson@klgates.com

Any such notices, demands, requests or other communications so sent by certified or registered
mail, national overnight delivery service or personal delivery shall be deemed given on the date
of receipt or refusal as indicated on the return receipt, or the receipt of the national overnight

delivery service or personal delivery service.  Any such notices, demands, requests or other communications sent by email shall be deemed given when received.  The parties hereto may designate additional or substitute notice addresses in accordance with the terms of this Section.

Section 9.04.  <u>Partial Invalidity</u>.  If any term or provision of this Agreement or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the fullest extent permitted by law.

Section 9.05.  <u>Section Headings</u>.  The headings of the various sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.

Section 9.06.  <u>Governing Law</u>.  This Agreement shall be deemed to have been made in the State of New York.  This Agreement shall be governed by the internal laws of the State of New York, without giving effect to its choice of law rules and principles.

Section 9.07.  <u>Parties; Assignment and Recording</u>.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon Seller and Purchaser and their respective successors and permitted assigns.  Neither party may assign this Agreement without the consent of the other.

Section 9.08.  <u>Intentionally Omitted</u>.

Section 9.09.  <u>Further Assurances</u>.  Seller and Purchaser will do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices, transfers and assurances as may be reasonably required by the other party for carrying out the intentions or facilitating the consummation of this Agreement.

Section 9.10.  <u>Third Party Beneficiary</u>.  This Agreement is an agreement solely for the benefit of Seller and Purchaser (and their permitted successors and assigns).  No other Person shall have any rights hereunder nor shall any other Person be entitled to rely upon the terms, covenants and provisions contained herein.

Section 9.11.  <u>Jurisdiction and Service of Process</u>.  (1)  Commencing on September 15, 2008, the Seller and certain of its affiliates filed voluntary petitions for relief in the Bankruptcy Case.  The Seller is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The parties hereto agree that no action relating to the interpretation and enforcement of this Agreement may be brought in a court that is not located within the State of New York.  To the maximum extent permissible by law, the parties hereto expressly consent and submit to the exclusive jurisdiction of the Bankruptcy Court over such actions. Each of the parties hereto agrees that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this

Agreement shall affect any right that the Purchaser, Seller or any other party may otherwise have to bring any action or proceeding to enforce any HMBS Loan, Lehman Loan, Additional Lehman Loan or any of the documents, instruments or agreements evidencing or securing any HMBS Loan, Lehman Loan or Additional Lehman Loan or otherwise relating to any HMBS Loan, Lehman Loan or Additional Lehman Loans against any obligor thereunder or its respective properties in the courts of any jurisdiction.

(2)    Each party to this Agreement hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, (A) any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any document executed pursuant hereto in any court referred to in paragraph (1) of this subsection; and (B) the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(3)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.03 hereof.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.12. Waiver of Trial by Jury.  WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH OR IN RESPECT OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF ANY PARTY OR ARISING OUT OF ANY EXERCISE BY ANY PARTY OF ITS RESPECTIVE RIGHTS UNDER THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH OR IN ANY WAY RELATING TO THE ASSETS (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH AND WITH RESPECT TO ANY CLAIM OR DEFENSE ASSERTING THAT THIS AGREEMENT OR ANY OF THE DOCUMENTS, INSTRUMENTS OR AGREEMENTS EXECUTED IN CONNECTION HEREWITH WAS FRAUDULENTLY INDUCED OR IS OTHERWISE VOID OR VOIDABLE).  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF THE PARTIES HERETO ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.  THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT.

Section 9.13. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

Section 9.14. <u>Attorneys' Fees</u>. In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation.

Section 9.15. <u>Expenses</u>.   Except as otherwise expressly provided herein, (a) whether or not the transactions contemplated hereunder are completed, Purchaser and Seller shall be responsible for the payment of their own expenses including, without limitation, legal fees and expenses of conducting of any due diligence investigation and negotiating and carrying out their obligations under this Agreement and (b) all other costs and expenses incurred in connection with the transfer and delivery of the Assets including, without limitation, fees and expenses for the filing of the UCC-3 financing statement and, except as otherwise provided in this Agreement, recording or filing of any other documents evidencing the transfer of the Assets to Purchaser shall be paid by Purchaser.

Section 9.16. <u>Limitation of Damages</u>.   Notwithstanding anything to the contrary contained herein, no party shall, in any event, be liable to any other Person for any consequential, incidental, indirect, special or punitive damages of such other Person, including loss of future revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to the breach or alleged breach hereof (provided that nothing in this Section 9.16 shall limit Seller's right to damages under the circumstances described in Sections 8.06(c)).

Section 9.17. <u>No Recourse</u>.   Purchaser acknowledges and agrees that with respect to the Assets and the Loan Documents, Purchaser may ultimately receive from obligors and/or guarantors under the Loan Documents or a purchaser of the collateral secured by the Assets or following the foreclosure sale thereof an amount less than the Purchase Price and Purchaser shall have no recourse against Seller for any deficiency of amounts owing under the Loan Documents; provided, however that nothing in this Section 9.17 is intended or shall be deemed to limit or diminish any of the Seller's indemnification obligations under Section 5.05 hereof.

Section 9.18.  <u>Time of the Essence</u>.  Time is of the essence with respect to each and every provision of this Agreement.  Whenever any action must be taken (including the giving of notice and the delivery of documents) under this Agreement during a certain period or time (or by a particular date) that ends (or occurs) on a day which is not a Business Day, then such period (or date) shall be extended until the next succeeding Business Day.

Section 9.19.  <u>Intentionally Omitted</u>.

Section 9.20. <u>Not an Offer</u>.  The submission of a draft, or a marked up draft, of this Agreement by one party to another is not intended by either Seller or Purchaser to be an offer to enter into a legally binding contract with respect to the purchase and sale of the Assets.

Seller and Purchaser shall be legally bound with respect to the purchase and sale of the Assets pursuant to the provisions of this Agreement or otherwise only if and when Seller and Purchaser have negotiated all of the provisions of this Agreement in a manner acceptable to Seller and Purchaser in their respective discretion, including, without limitation, all of the schedules and exhibits hereto, and each of Seller and Purchaser have fully executed and delivered to each other a counterpart of this Agreement signed by it.  Unless and until each of Seller and Purchaser have fully executed and delivered to each other a counterpart of this Agreement signed by it, either party may discontinue negotiations, in which event, neither party hereto shall have any right to make any claim for damages or otherwise at law or in equity.

Section 9.21. <u>Survival</u>.  The provisions of Sections 3.01(b), 3.02, 5.02, 5.04, 5.05, 9.01 through 9.07, 9.10 through 9.16, and 9.19 though this 9.21 shall survive the Closing or the termination hereof.  The provisions of Sections 8.05 and 8.06 shall survive the termination hereof.  The provisions of Article II, the first paragraph of Section 3.01, Sections 3.01(a), 4.01, 9.09 and 9.17 shall survive the Closing.  The provisions of Sections 5.01 and 5.03 shall survive the Closing or the termination hereof for the period set forth in Section 5.04.

-Remainder of Page Intentionally Left Blank-

     IN WITNESS WHEREOF, the parties hereto have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

PURCHASER:

METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A., a national banking association

By:    _____
Name:  _____
Title:   _____


SELLER:


LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, as debtor and debtor in possession in its Chapter 11 case in the United States Bankruptcy Court for the Southern District of New York, Case No. 08-13555 (JMP)

By:    _____
Name:  _____
Title:   _____


Acknowledged and Accepted:

[_____], as Escrow Agent

By:    _____
Name:  _____
Title:   _____

Exhibit 1

HMBS Pools

| Loan Type | Ginnie Mae Pool Number |
|-----------|------------------------|
| Arms      | 891588                 |
| Fixed     | 690041                 |

Exhibit 2

Lehman Loans

| FHA Case Number | FMA Loan Number | Client Loan Number | Loan Number | Borrower |
|---|---|---|---|---|
| 484499305 | 1652000142 | 1652000142 | 1005205 | Kroese |
| 221868580 | 1650000243 | 1650000243 | 1001825 | Phillips |
| 914106353 | 1138006837 | 1138006837 | 1001222 | Wilson |
| 4417894558 | 1138007073 | 1138007073 | 1001301 | Parker |
| 613083675 | 1640000593 | 1640000593 | 1008217 | Tozzo |

Exhibit A

<u>Wire Instructions</u>

[TO BE PROVIDED]

Exhibit B

Assignment and Assumption Agreement

Exhibit C

Release