| United States Bankruptcy Court/Southern District of New York | **PROOF OF CLAIM** |
|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No of Debtor |
| Lehman Brothers Holding, Inc. | 08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000067043

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Olivant Investments Switzerland SA
C/O O'Melveny & Myers LLP
Two Embarcardero Center, 28th Floor
San Francisco, CA 94111-3823
Attn: Suzzanne Uhland

Telephone number: 415-984-8941   Email Address: suhland@omm.com

☑ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 22636
(If known)

Filed on: 9/21/09

Name and address where payment should be sent (if different from above)

Olivant Investments Switzerland SA, 13-15 Avenue De La Liberte
L-1931 Luxembourg, Grand Duchy of Luxembourg
Attn: Luqman Arnold

Telephone number: +352 2689 01   Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 1,418,925,283.45

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attachment*
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
 3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☑ Other
Describe: Constructive Trust
Value of Property: $ 1,720,021,620.41 ⊞ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $ 1,418,925,283.45 ⊞ Amount Unsecured: $_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**FILED / RECEIVED**
SEP 01 2010
**EPIQ BANKRUPTCY SOLUTIONS, LLC**

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
| 8/20/10 | |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

\* The attachments hereto are fully incorporated herein and made a part hereof by this reference.

| United States Bankruptcy Court/Southern District of New York | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holding, Inc. | Case No. of Debtor<br>08-13555 | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Olivant Investments Switzerland SA
C/O O'Melveny & Myers LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Attn: Suzzanne Uhland

Telephone number: 415-984-8941   Email Address: suhland@omm.com

☑ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 22636
(If known)

Filed on: 9/21/09

Name and address where payment should be sent (if different from above)

Olivant Investments Switzerland SA, 13-15 Avenue De La Liberte
L-1931 Luxembourg, Grand Duchy of Luxembourg
Attn: Luqman Arnold

Telephone number: +352 2689 01   Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 1,418,925,283.45

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** See attachment*
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☑ Other

Describe: Constructive Trust

Value of Property: $ 1,720,021,620.41 ✚ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____

Amount of Secured Claim: $1,418,925,283.45 ✚ Amount Unsecured: $_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**
SEP 0 1 2010
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 8/20/10   Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

* The attachments hereto are fully incorporated herein and made a part hereof by this reference.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is one of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

**UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | 08-13555 (JMP) |
| Debtors. | Jointly Administered |

**AMENDED PROOF OF CLAIM OF
OLIVANT INVESTMENTS SWITZERLAND
S.A. (BREACH OF CONTRACT; BREACH
OF FIDUCIARY DUTY; NEGLIGENCE;
NEGLIGENT MISREPRESENTATION;
FRAUD; CONSTRUCTIVE FRAUD;
UNJUST ENRICHMENT)**

## ATTACHMENT TO AMENDED PROOF OF CLAIM

Name and Address of Creditor:

> OLIVANT INVESTMENTS SWITZERLAND S.A.
> c/o O'Melveny & Myers LLP
> Pursuant to Power of Attorney
> Two Embarcadero Center, 28th Floor
> San Francisco, CA 94111
> Attn: Suzzanne Uhland

## BACKGROUND

1.      In early 2008, Olivant Investments Switzerland S.A. ("OISSA"), a public

limited liability company (*société anonyme*) incorporated under the laws of the Grand Duchy

of Luxembourg, and its affiliate Olivant Limited ("OL") set out to effectuate a strategic

investment and acquire a significant voting interest in the Swiss financial institution UBS AG.

As described more fully below, Lehman Brothers International (Europe) ("LBIE," and together

with Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers, Inc., and other U.S. and

European affiliates, individually or collectively, "Lehman Brothers") and other members of

Lehman Brothers were engaged by OL, in March 2008, and by OISSA itself in April 2008, to

provide advisory and other services for OL's and OISSA's strategic investment in UBS AG

shares. OL and OISSA referred to this strategic investment as "Project Red."

2.      On or about March 10, 2008, OL contacted Jeremy M. Isaacs (a member of

Lehman Brothers' executive committee who at the time served as CEO for Lehman Brothers'

European, Middle East, and Asia-Pacific groups) and Michael Tory (at that time head of

Lehman Brothers' Corporate Finance group in the UK and OL's relationship manager at

Lehman Brothers) to inquire whether Lehman Brothers would advise and assist with Project

Red, including acting as advisor and custodian of the shares and providing brokerage and

trading services. Full disclosure of the nature of the project and its objectives was made to

Messrs. Isaacs and Tory in order for Lehman Brothers to decide whether it would act as

advisor and securities custodian for Project Red, including Lehman Brothers' compliance with

the requirement that the investors have constant access to the UBS AG shares.

3.      Upon information and belief, Mr. Isaacs consulted with Richard Fuld (then

global CEO and Chairman of Lehman Brothers) over the weekend of March 15-16, 2008,

before confirming that Lehman Brothers would assist OL and subsequently OISSA in

accomplishing Project Red, including accumulating and maintaining the UBS AG shares.

4.      Accordingly, at all material times, the very highest levels of Lehman Brothers

leadership in both Europe and the U.S. were fully aware of Project Red's objectives, including

that the UBS AG investment was a strategic stake and that OISSA would require access to its

shares in UBS AG at all times in order to exercise influence over UBS AG, including voting its

shares. The very highest levels of Lehman Brothers leadership agreed to assist OISSA with its

investment plans and to hold accumulated UBS AG shares for OISSA's benefit so that OISSA

would be able to exercise control and influence over UBS AG. OISSA relied upon the ability

of Lehman Brothers to effectuate this investment strategy in deciding to invest in the UBS AG

shares through Lehman Brothers.

5.    Upon information and belief, and as discussed in greater detail in the

Examiner's Report filed in these cases, at the time the agreement with OISSA was reached,

Lehman Brothers was aware that there was a significant risk that it might become insolvent and

was also aware that its financial condition posed extraordinary risks to clients such as OISSA.

Indeed, at this very point in time, Lehman Brothers was executing numerous undisclosed

"Repo 105" transactions in an effort to shield from investors just how financially unstable

Lehman Brothers had become. Lehman Brothers failed to disclose these risks to OISSA when

OISSA consulted Lehman Brothers regarding Project Red. Upon information and belief,

Lehman Brothers intended to use the UBS AG shares accumulated by OISSA in a manner

contrary to the goals of OISSA's investment strategy at the time the agreement with OISSA

was reached, but failed to disclose this intent to OISSA, including the intent to transfer UBS

AG shares accumulated by OISSA jeopardizing OISSA's ability to vote these shares and

exercise influence over UBS AG. Indeed, in agreeing to help with Project Red, Lehman

Brothers falsely represented, without reasonable grounds for so doing and with intent to

deceive, that it would not deal with the shares in a manner inconsistent with Project Red.

6.    On or around March 28, 2008, LBIE's brokerage department provided OL with

draft client documentation, including a standard LBIE Prime Brokerage Agreement (the

"Provisional OL PBA"). Shortly thereafter, LBIE indicated to OL that it would be necessary

for OL to sign the Provisional OL PBA as a temporary measure pending the negotiation of an

agreement specifically tailored to Project Red's objectives, in order to enable LBIE to

3

immediately begin acquiring UBS shares on OL's behalf (with a view to transferring them in

due course to a special purpose vehicle (ultimately OISSA) once it was fully operational).  In

this context, on or around March 30, 2008, Piers Le Marchant, LBIE's Head of Legal, sent the

following e-mail to Jan Atkinson of OL:

> As I mentioned and discussed, given the timetable I would suggest that we sign the
> standard PB as a temporary measure.  Lehman would agree to negotiate the agreement on a
> reasonable timetable to be set by you.  Lehman agrees that they would carry out such
> negotiations in a commercially reasonable manner and acknowledge that the signing of the
> temporary agreement would in no circumstances bind Olivant directly or indirectly into
> accepting any of the terms of the temporary agreement in the final negotiated agreement.
>
> With best wishes,
>
> Piers

7.      In reliance on this representation, Olivant executed the Provisional OL PBA.

Under the Provisional OL PBA, LBIE purchased 12,000,000 shares of UBS AG between

March 31, 2008, and April 15, 2008.

8.      Thereafter, to structure the acquisition and maintenance of the shares in

furtherance of Project Red, on April 15, 2008, OISSA and LBIE entered into a provisional

Prime Brokerage Agreement (the "Provisional OISSA PBA") on the same terms as the

Provisional OL PBA; *i.e.*, as a temporary measure pending the negotiation of an agreement that

was specifically tailored to Project Red's objectives.  The Provisional OISSA PBA is attached

hereto as Exhibit A.  Between April 15 and July 16, 2008, in furtherance of OISSA's strategic

objectives and without knowing Lehman Brothers' high risk of insolvency and contrary

intentions, OISSA acquired through Lehman Brothers approximately a 2.78% stake in UBS

AG, the value of which at the time of purchase was approximately CHF 2.26 billion (or

approximately USD 2.20 billion as of July 16, 2008).  In executing share purchase orders,

OISSA deposited cash into an LBHI account.  Neither during the discussions leading up to the

4

execution of the Provisional OISSA PBA, nor in later fulfilling share purchase orders, did

Lehman Brothers indicate that its treatment of the UBS AG shares would be contrary to Project

Red's goals.

9.    Upon information and belief, OISSA's position in UBS AG was held initially

through LBIE.  However, after LBIE entered into administration proceedings in the UK and

after Lehman Brothers Holdings Inc. (the "Debtor") and several of its affiliates filed for

bankruptcy proceedings before this Court, OISSA obtained information indicating that its stock

in UBS AG originally held by LBIE may have been transferred by LBIE to its Lehman

Brothers affiliates in the United States, including the Debtor.

A.    Communications with LBIE's UK Administrators revealed that a
significant amount of LBIE's holdings and cash were transferred to
Lehman Brothers entities in New York in the days immediately before the
Petition Date.  The LBIE UK Administrators have instructed LBIE's
clients not to rely on any information provided by any Lehman Brothers
source after 07:56 on September 15, 2008.

B.    OL received a UBS AG proxy form for an October 2, 2008 Extraordinary
General Meeting from "Lehman Brothers Prime Brokerage."  The UBS
AG proxy form is attached hereto as Exhibit B.  Lehman Brothers Prime
Brokerage has a New York address.  The account number on the proxy
form is "056068414," while OISSA's account number for the prime
brokerage account opened with LBIE is "05606841."  The proxy form also
refers to "Olivant Limited PBCG," which is similar to references made in
other documents generated by LBIE regarding OISSA's prime brokerage
account.  This proxy form apparently relates to OISSA's holdings through
Lehman Brothers of UBS AG stock.

C.    Upon information and belief, Lehman Brothers Prime Brokerage was a
business unit of Lehman Brothers, Inc. ("LBI").

D.    In communications dated November 16, 2009, and December 18, 2009,
the LBIE UK Administrators informed OISSA that OISSA's 81,600,280
UBS AG shares were rehypothecated as of the date of LBIE's
administration, September 15, 2008.  These communications appear to be
an admission by the UK Administrators that LBIE did not control
OISSA's assets as of September 15, 2008, and no longer controls them
today.  OISSA has not verified the information contained in these

communications, and OISSA reserves any and all rights it has or may have with respect to these communications.

10.    Accordingly, upon information and belief, the Debtor or one of its US subsidiaries received OISSA's UBS AG shares from LBIE with notice that those shares were to be held for OISSA as a client of both LBIE and the Debtor, and that OISSA needed to maintain access to these shares in order to effectuate its investment strategy.

11.    OISSA has attempted in written and oral communications to ascertain which entity or entities currently control or exercise custody over the UBS AG shares. In its search, OISSA has written to Lehman Brothers, the Trustee for the liquidation of LBI under the Securities Investor Protection Act of 1970, as amended (the "SIPA Proceeding"), the UK administrators for LBIE, and counsel to Barclays Capital Inc. and Citibank N.A., which on information and belief might have served in the spring of 2008 as a custodian for LBIE for OISSA's UBS AG shares. OISSA has since gained access to Citibank trading data showing that substantial amounts of UBS shares were transferred out of Lehman accounts between May and July 2008, without corresponding incoming transfers. Therefore, upon information and belief, Lehman Brothers may have sold or otherwise transferred to a third party the UBS AG shares accumulated by OISSA.

## THE CLAIMS

As of September 15, 2008 (the "Petition Date"), the Debtor is indebted and liable to Claimant as set forth herein:

12.    As of the Petition Date, Lehman Brothers held 81,600,280 shares of UBS AG common stock for credit to OISSA. Attached hereto as Exhibit C is a Lehman Brothers position report dated September 12, 2008, showing the number of UBS AG shares in OISSA's

Lehman Brothers account number 05606841. OISSA has not withdrawn or otherwise caused the transfer of any UBS AG shares to any third party since the September 12, 2008 position report was generated. Based on the closing price for UBS AG shares on the Swiss stock exchange on September 12, 2008, of chf 23.52 per share, and the applicable exchange rate on September 15, 2008, the value of the OISSA account on the Petition Date was USD 1,720,021,620.41. In addition, as of September 15, 2008, OISSA had margin obligations of 335,629,610.72 chf and EUR 19.20, as well as accrued interest of 340,384.39 chf. Therefore, the net value of OISSA's account as of September 15, 2008, was USD 1,418,925,283.45.

13.     Pursuant to the agreement by Lehman Brothers' senior management to assist in the investment strategy, Lehman Brothers was obligated to hold OISSA's shares in UBS AG either as custodian or in trust for OISSA's benefit. Senior executives at Lehman Brothers were aware of OISSA's need to maintain access to the UBS AG shares at all times in order to vote the shares, and OISSA relied upon Lehman Brothers to maintain these securities for OISSA's benefit and to effectuate Project Red. Upon information and belief, based on the statements made by the UK administrators, the information contained in the UBS AG proxy form delivered by Lehman Brothers Prime Brokerage, and OISSA's review of Citibank's trading data, OISSA's securities were transferred out of LBIE's accounts into other accounts held by Lehman Brothers or other third-party accounts without the OISSA's prior knowledge consent . Moreover, Lehman Brothers failed to acknowledge or report to OISSA concerning the transfer of the shares, and therefore failed to acknowledge or report the correct status of OISSA's account, and Lehman Brothers has still not disclosed to OISSA any details of the transfer.

14.     As a result of Lehman Brothers' acts or omissions, OISSA has been denied its ability to access and exercise any and all rights as the entitlement holder of its UBS AG shares,

including voting rights. Project Red has been thwarted, and OISSA's economic interest in the

shares has been jeopardized. In addition, since the commencement of the Debtor's chapter 11

case, the SIPA Proceeding, and the LBIE UK administration, OISSA has been unable to

mitigate any economic losses it has incurred as a result of its inability to access the UBS AG

shares.

15.    Based on the foregoing, and upon information and belief, OISSA asserts the

following claims against the Debtor:

A.    Breach of Lehman Brothers' oral and written contractual agreements with
OISSA regarding Project Red and Lehman Brothers' agreement to hold
UBS AG shares for credit to OISSA's account.

B.    Breach of Lehman Brothers' oral and written agreements to redeliver the
UBS AG shares to OISSA.

C.    Breach of fiduciary duties owing to OISSA based upon Lehman Brothers'
agreement to maintain the UBS AG shares for the purpose of enabling
OISSA to exercise its voting rights and control over the UBS AG shares,
Lehman Brothers' breach of this agreement through the transfer of the
UBS AG shares to a third party, and the resulting harm to OISSA through
the inability to effectuate its investment strategy.

D.    Negligence for Lehman Brothers' failure to exercise reasonable care in
managing the OISSA account, failure to disclose the significant risk of
Lehman Brothers' insolvency and the harm that such insolvency would
cause to OISSA's investment strategy, and failure to reasonably carry out
Lehman Brothers' duties to OISSA as its financial advisor and broker.

E.    Negligent misrepresentation for Lehman Brothers' false and misleading
representations, made without reasonable grounds, that it would assist
OISSA in carrying out the investment strategy by accumulating and
maintaining the UBS AG shares and that accumulating and maintaining
these shares through a Lehman Brothers account would enable the
execution of the investment strategy, which misrepresentations OISSA
relied upon to its detriment by agreeing to purchase and hold the UBS AG
shares through Lehman Brothers.

F.    Fraud through Lehman Brothers' representations to OISSA that Lehman
Brothers would enable the execution of the investment strategy, which
representations, upon information and belief, were false or misleading
when made and known by Lehman Brothers to be false or misleading

8

when made, at the time when Lehman Brothers offered to help OISSA execute the investment strategy, and were made to induce OISSA to entrust Lehman Brothers with its shares. OISSA was unaware of the falsity or misleading nature of the representations and reasonably relied upon these representations in deciding to engage Lehman Brothers as financial advisor and broker to effectuate the investment strategy.

G.  Constructive fraud through Lehman Brothers' agreement to give OISSA investment advice and to hold the UBS AG shares as a fiduciary of OISSA, and through Lehman Brothers' representations to OISSA in this fiduciary capacity that Lehman Brothers would enable the execution of the investment strategy. Upon information and belief, these representations were false and misleading when made. OISSA was unaware of the falsity or misleading nature of these representations at the time they were made and reasonably relied upon these representations in deciding to engage Lehman Brothers as financial advisor and broker and to purchase and hold UBS AG shares through Lehman Brothers.

H.  Unjust enrichment due to Lehman Brothers obtaining the benefit to transfer and control the UBS AG shares at the expense of OISSA's investment strategy, which was thwarted by Lehman Brothers' wrongful transfer of the shares held for OISSA as entitlement holder thereto.

16.  As a result of Lehman Brothers' acts or omissions, OISSA sustained damages in an amount exceeding the USD 1,418,925,283.45 value of the OISSA account (net of margin obligations) in UBS AG shares. Additional damages include lost dividends, return of capital, potential future stock appreciation, and other stock rights. Damages also include consequential damages such as the loss of voting rights at UBS AG shareholder meetings since the Petition Date and punitive damages for the egregious, malicious, and willful misconduct stemming from Lehman Brothers' fraud and breach of its fiduciary duties owing to OISSA. OISSA hereby asserts an additional unliquidated claim for these damages.

17.  Unless and until OISSA receives full delivery of its shares or payment in lieu thereof under the Provisional OISSA PBA, which OISSA terminated by notice dated February 23, 2009, OISSA hereby further asserts its entitlement to a redelivery of any of the UBS AG shares that Lehman Brothers credited or should have credited to its account and still controls.

(OISSA has asserted a customer claim to those shares in the SIPA Proceeding.) Alternately,

OISSA asserts its right to an imposition of a trust on those shares to protect its interest in them.

With respect to any of OISSA's UBS AG shares that Lehman Brothers sold, OISSA asserts a

secured claim in the form of a constructive trust over the proceeds of any such sale.

## **RESERVATION OF RIGHTS**

18.     This claim is submitted based on information presently available to OISSA.

OISSA may hold additional claims or interests against the Debtor or any of its affiliates.

However, information supporting such additional claims or interests is presently unavailable to

OISSA.

19.     OISSA has made, and continues to make, every possible effort to identify the

correct debtor liable for these claims.  To the extent a debtor in a related bankruptcy case is

jointly or individually liable, OISSA asserts such claim against that debtor and reserves all

rights to amend and/or supplement related proofs of claim or file additional proofs of claim as

necessary.  OISSA has filed a proof of claim against LBI in its liquidation proceeding under

the Securities Investor Protection Act of 1970, as amended, as well as a customer claim in that

proceeding, based in part on information OISSA has received that indicates that LBI might

have held OISSA's shares on behalf of the Debtor.  In addition, OISSA has filed a proof of

claim against the Debtor based on its unconditional guarantee of payment of all of LBIE's

liabilities, obligations, and commitments.

20.     OISSA reserves the right to amend or to supplement this Proof of Claim and to

set forth in additional detail the basis and nature of the claim, to assert a claim based on a

different legal theory, to assert pre-petition and post-petition claims held by OISSA other than

those set forth herein, to state further amounts owing to OISSA by the Debtor arising out of the

claim, including, without limitation, post-petition interest and fees to the extent allowed.
OISSA further reserves the right to assert a claim for payment under 11 U.S.C. §§ 503(b), 506,
or 507(b), the right to assert claims for additional amounts to the extent any unliquidated
portion of its claim becomes liquidated, and the right to seek an accounting for any amounts
due.

21.    OISSA reserves the right to later assert its claim through other entities,
including other creditors or affiliates of the Debtor, or by participating in a claim brought by
any insolvency administrator, liquidator, conservator, receiver, trustee, custodian, or other
similar official.

22.    OISSA reserves the right to seek declaratory relief with respect to entitlement to
the shares, including, without limitation, to determine that the shares constitute customer
property belonging to OISSA.

23.    The filing of this Proof of Claim shall not constitute a waiver of OISSA's right
to have any and all final orders in any and all non-core matters entered only after *de novo*
review by a United States District Court Judge or OISSA's right to trial by jury in any
proceeding as to any and all matters so triable, whether or not the same be designated legal or
private rights, or in any case or controversy or proceeding related thereto, notwithstanding the
designation of such matter as "core proceedings" pursuant to 28 U.S.C. §157(b) or otherwise,
and whether such jury trial is pursuant to statute or the United States Constitution.

24.    OISSA does not waive its right to assert any service, *forum non conveniens*, or
jurisdictional defenses it has or may have to any claims rendered against it by the Debtor or
any other person or persons.

11

25.    OISSA does not waive any right to any security held by or for it or any right to claim an interest in specific assets or any other rights or causes of action that OISSA has or may have against the Debtor, any of the Debtor's US affiliates, LBIE, or any other person or persons, including a right to adequate protection, and expressly reserves all such rights.

26.    OISSA reserves any and all rights it has or may have with respect to any agreements that may exist between itself and the Debtor, any of the Debtor's US affiliates, LBIE, or any other person or persons, including, without limitation, any rights of setoff and recoupment. OISSA further reserves the right to assert the existence of one or more executory contracts with the Debtor or to assert or dispute whether any agreement is an executory contract, or to assert a claim for rejection damages or demand for cure.

27.    OISSA does not admit liability to any party in connection with this proof of claim and reserves all defenses to any and all claims of any party.

**PENALTY FOR PRESENTING FRAUDULENT CLAIMS**
**FINE OF NOT MORE THAN $500,000 OR IMPRISONMENT FOR NOT MORE THAN**
**FIVE YEARS, OR BOTH, 18 U.S.C. §§ 152 AND 3571.**

## Exhibit A

Provisional OISSA PBA

15 APRIL 2008

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

OLIVANT INVESTMENTS SWITZERLAND S.A.

---

INTERNATIONAL PRIME BROKERAGE
AGREEMENT

---

FRESHFIELDS BRUCKHAUS DERINGER

CONTENTS

CLAUSE

PAGE

1.    DEFINITIONS AND CONSTRUCTION ................................................. 1
2.    SCOPE OF AGREEMENT ................................................................ 2
3.    TRANSACTIONS, PAYMENTS AND DELIVERIES ............................. 2
4.    PROVISION OF FINANCE ............................................................... 3
5.    SECURITIES AND CASH ACCOUNTS .............................................. 4
6.    MARGIN REQUIREMENT ............................................................... 5
7.    PAYMENT AND DELIVERY ............................................................ 6
8.    INCOME, CORPORATE EVENTS AND VOTING .............................. 8
        Income ....................................................................................... 8
        Corporate Events ........................................................................ 8
        Voting ........................................................................................ 9
9.    FEES AND INTEREST .................................................................... 10
10.    SECURITY ..................................................................................... 11
11.    RIGHT OF USE .............................................................................. 15
12.    EVENTS OF DEFAULT ................................................................... 15
13.    CLOSE-OUT ................................................................................... 17
14.    INDEMNITY AND LIABILITY .......................................................... 18
15.    GUARANTEE AND INDEMNITY ...................................................... 20
        Guarantee .................................................................................. 20
        Exclusion of Defences ................................................................. 21
        Indemnity ................................................................................... 22
16.    REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS ........... 22
17.    CUSTODY ...................................................................................... 25
18.    ADMINISTRATION OF AGREEMENT .............................................. 25
19.    CONFLICTS OF INTEREST ............................................................. 26
20.    TERMS .......................................................................................... 26
21.    ADVICE .......................................................................................... 27
22.    CONFIDENTIALITY ........................................................................ 27
23.    NOTICES ....................................................................................... 27
24.    INSTRUCTIONS ............................................................................. 28
25.    DETERMINATION .......................................................................... 28
26.    NON-ASSIGNABILITY; TERMINATION ........................................... 28
27.    FORCE MAJEURE ........................................................................... 29

28.     GOVERNING LAW AND JURISDICTION ..........................................30
29.     WAIVER OF IMMUNITY..............................................................30
30.     RECORDING..............................................................................30
31.     CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999 .......................30
SCHEDULE 1  PROCEDURES.............................................................32
        1.      Third Party Transactions ...............................................32
        2.      Principal Transactions...................................................33
        3.      Deliveries and payments to the Prime Broker ....................34
        4.      Deliveries and payments to the Counterparty.....................34
        5.      Miscellaneous ............................................................34
SCHEDULE 2  CUSTODY.................................................................35
        1.      Powers and Duties of the Prime Broker ............................35
        2.      Segregation of Assets ..................................................35
        3.      Short Positions ...........................................................35
        4.      Confirmation of Oral Instructions/Security Devices...........36
        5.      Acting on Instructions/Unclear Instructions......................36
        6.      Instructions Contrary to Law/Market Practice...................36
        7.      Sub-custodians and Securities Depositories ......................36
        Appointment...........................................................................36
        Liability for Other Sub-Custodians ............................................37
        8.      Holding of Registered and Bearer Securities......................37
        9.      Omnibus Accounts.......................................................37
        10.     United Kingdom Regulatory Matters.................................37
        11.     Fractions/Redemptions by Lot.......................................38
        12.     Statements ................................................................38
        13.     Disclosure of Information..............................................39
SCHEDULE 3  DEFINITIONS.............................................................40
SCHEDULE 4  AUTHORISED PERSONS ..............................................47

This INTERNATIONAL PRIME BROKERAGE AGREEMENT (this "*Agreement*")
is made on    15 April 2008

BETWEEN

(1)   LEHMAN BROTHERS INTERNATIONAL (EUROPE) of 25 Bank Street,
Canary Wharf, London, E14 5LE, United Kingdom, a company incorporated under
the laws of England and Wales (the "*Prime Broker*") for itself and as agent and
trustee for and on behalf of the Lehman Companies (as defined in Schedule 3); and

(2)   OLIVANT INVESTMENTS SWITZERLAND S.A. organised under the laws of
the Grand Duchy of Luxembourg ("*Luxembourg*") as a Société Anonyme subject
to, and authorised under, the Luxembourg act of 10 August 1915 as amended from
time to time and consolidated on 1 June 2003, relating to commercial companies
with registered office at 9 rue Sainte-Zithe, L-2763, Luxembourg, registered with
the Luxembourg register of commerce and companies under the number B 135492
(the "*Counterparty*")

WHEREAS

(A)   The Counterparty wishes to appoint the Prime Broker as its prime broker on the
terms of this Agreement.

(B)   Pursuant to the accounting conventions of the Prime Broker:

(a)   the receipt of securities delivered to the Prime Broker shall be recorded as a
"debit" to the Counterparty's Securities Account and a transfer or advance of
securities made to the Counterparty by the Prime Broker shall be recorded as
a "credit" to the Counterparty's Securities Account;

(b)   the payment, transfer or advance of cash to the Counterparty or to its order
shall be recorded as a "debit" to the Counterparty's Cash Account and the
receipt of cash by the Prime Broker shall be recorded as a "credit" to the
Counterparty's Cash Account.

IT IS AGREED AS FOLLOWS:

1.   DEFINITIONS AND CONSTRUCTION

1.1   In this Agreement, capitalised terms not otherwise specifically defined shall have
the meanings given to them in Schedule 3.

1.2   In this Agreement, unless the context otherwise requires -

(a)   References to the singular shall include the plural and vice versa;

(b)   A reference to a "Clause" is to the relevant clause in the main body of this
Agreement and, unless otherwise stated, a reference to a "Paragraph" is to
the paragraph of that number in the Schedule to this Agreement in which the
reference appears.

2.    SCOPE OF AGREEMENT

2.1    This Agreement applies to all acquisitions and disposals of securities, and the provision of any advances of cash and securities in respect thereof, in the form of a Principal Transaction, a Third Party Transaction, a Collateral Contract or a Novated Third Party Contract (each, a "*Transaction*" and together the "*Transactions*").

2.2    All Transactions and ancillary arrangements contemplated by this Agreement are entered into by the Parties in reliance on the fact that this Agreement and all settlement requests, acknowledgements, Instructions, term sheets, confirmations and all other documents identified as being related to a Transaction contemplated by this Agreement form a single agreement between the parties. Except to the extent that any other document or notice is expressly referred to in this Agreement (including, without limitation, the Customer Agreements) the terms of this Agreement constitute the entire agreement between the parties as to its subject matter and, to the extent of any inconsistency between the terms of this Agreement and any such other document or notice, the terms of this Agreement will prevail.

2.3    The Prime Broker's rights under this Agreement are cumulative and are in addition to its rights under general law. Any failure to exercise or any delay in exercising any such rights will not operate as a waiver or variation of those rights and any defective or partial exercise of any such rights will not preclude any further exercise of those rights.

2.4    The Prime Broker is authorised and regulated by the FSA and is subject to its Rules. Affiliates of the Prime Broker may not be authorised by the FSA and certain services provided overseas pursuant to this Agreement may not be regulated by the Rules.

2.5    The performance by the Prime Broker of its obligations under this Agreement shall be subject to applicable laws and regulations, including the Rules or other applicable rules of any regulator or exchange including, without limitation, those applicable to the Prime Broker or the Counterparty and the Prime Broker may take or refrain from taking such course of action as it may deem necessary in order to ensure compliance with such laws, regulations or rules, notwithstanding any term of this Agreement and no such action shall constitute a breach of this Agreement. However, notwithstanding that, as between the Prime Broker or its Affiliates and its regulators, the Prime Broker and its Affiliates may be regulated by the Rules or equivalent regulations in the relevant jurisdiction, such Rules or regulations shall not be incorporated into this Agreement.

2.6    The Counterparty confirms its acceptance of and agreement to be bound by the provisions of the Schedules to this Agreement.

3.    TRANSACTIONS, PAYMENTS AND DELIVERIES

3.1    Wherever the Counterparty wishes the Prime Broker to enter into a Transaction, or the Counterparty requests the Prime Broker to settle a Transaction on the Counterparty's behalf, or to make or receive any other delivery or payments to, from or on behalf of the Counterparty, it shall issue a Principal Transaction Request or a Third Party Transaction Request, as applicable, to the Prime Broker, in the manner specified in Schedule 1.

3.2    The Counterparty agrees and accepts that the Prime Broker or its Affiliates may act as agent for the Counterparty in settling Transactions or delivering securities and making payments and such parties are authorised to do so.

3.3    The Counterparty shall be responsible for complying with all exchange notification requirements.

3.4    The Prime Broker shall not be obliged to make any payments and or deliveries to a third party, except as contemplated by this Agreement.

4.    PROVISION OF FINANCE

4.1    The Prime Broker may in its absolute discretion .

(a)    lend money to the Counterparty;

(b)    as a result of the Counterparty's sales or purchases of securities pursuant to Transactions advance securities to the Counterparty;

(c)    discharge any obligation of the Counterparty to pay money or deliver securities under or in connection with a Transaction or pursuant to this Agreement and the Counterparty irrevocably authorises it to do so. Except to the extent that cash of the relevant currency is for the time being credited to the Counterparty's Cash Accounts or, as the case may be, securities of the description and amount in question are for the time being debited to the Counterparty's Securities Accounts and in either case available for the purpose, any such discharge shall be treated as a Loan or, as the case may be, an advance by the Prime Broker to the Counterparty of the securities so delivered.

4.2    Where the Prime Broker agrees to advance to the Counterparty securities which are Hong Kong securities, the Prime Broker will advance such securities by lending the securities to the Counterparty under the Stock Lending Agreement.  The Counterparty shall not be required to issue a Borrowing Request (as defined in the Stock Lending Agreement) in respect of such loan.

4.3    Where the Prime Broker agrees to loan to the Counterparty securities which are South African listed securities (as defined in Section 1 of the Stock Exchange Control Act, 1985 (Act No. 1 of 1985) the Counterparty warrants that:

(a)    the entering into of such Transactions under this Agreement is and will not be for the purposes of avoiding any tax liability under South African law, nor for the purposes of keeping a position open for more than 12 months;

(b)    on-delivery of the South African listed securities will be effected within 10 Business Days of the date of the transfer of the South African listed securities by the Prime Broker to the Counterparty;

(c)    Equivalent Securities will be returned to the Prime Broker within a period of 12 months as from the delivery of the South African listed securities by the Prime Broker to the Counterparty in respect of each Transaction; and

(d)   The Prime Broker will be compensated for any distributions in respect of the South African listed securities to which the Prime Broker would have been entitled to receive had such Transactions under this Agreement not been entered into.

4.4   The Counterparty will indemnify and hold the Prime Broker harmless in respect of any uncertificated securities tax which may become payable by the Prime Broker pursuant to the provisions of the Uncertificated Securities Tax, 1998 of South Africa in relation to any Transaction.

4.5   The Counterparty shall on demand by the Prime Broker –

(a)   repay any Loan (together with fees and interest thereon);

(b)   deliver securities equivalent to any Advanced Securities (together with fees and interest on the value thereof) and shall make such payments as are provided by Clause 8 with respect to income on such securities. Where the Advanced Securities are Hong Kong securities, the Counterparty shall deliver Equivalent Securities to the Prime Broker in accordance with the Stock Lending Agreement and such delivery shall discharge the Counterparty's obligation under this Clause.

4.6   The Counterparty may not use the proceeds of any Loan in any way, directly or indirectly, for any purpose which is unlawful under any applicable law nor for the making, instigation or conducting of a takeover of, or tender offer for, any person or any other action which, when complete, will have the effect of acquiring control of any such person. The Prime Broker shall be entitled to assume (without any enquiry on its part) that the purpose of any Loan falls within the investment guidelines and requirements of the Fund and will be used only in connection with the prime brokerage business contemplated by this Agreement.

4.7   The Counterparty shall not request the Prime Broker to advance any securities or discharge any obligation of the Counterparty to deliver securities in accordance with Clause 4.1 where such request will result in the aggregate Market Value Equivalent of Advanced Securities in respect of which Equivalent Securities have not been delivered by the Counterparty to the Prime Broker exceeding any limits notified by the Prime Broker to the Counterparty from time to time.

5.   SECURITIES AND CASH ACCOUNTS

5.1   The Prime Broker shall open and maintain one or more Cash Accounts and Securities Accounts to which -

(a)   in the case of Cash Accounts there shall be -

(i)   debited the amount of any Loan and all cash paid or deemed or treated as paid by the Prime Broker to or on behalf of the Counterparty; and

(ii)   credited all cash paid or deemed or treated as paid to the Prime Broker, by or on behalf of the Counterparty (including sums received by the Prime Broker in settlement of Third Party Transactions); and

(b)    in the case of Securities Accounts there shall be -

(i)    debited all securities delivered to the Prime Broker by or on behalf of the Counterparty (including securities received by the Prime Broker in settlement of Third Party Transactions) or delivered or deemed or treated as delivered by or on behalf of the Counterparty to the Prime Broker; and

(ii)   credited all securities advanced by the Prime Broker to the Counterparty (including Hong Kong securities advanced under the Stock Lending Agreement) or delivered or deemed or treated as advanced, by the Prime Broker to or on behalf of the Counterparty,

and the Prime Broker may combine such accounts where it considers appropriate.

5.2    The parties acknowledge and agree that any cash held by us for you is received by us as collateral with full ownership under a collateral arrangement and is subject to the security interest contained in the Agreement.  Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules.  Such cash held by the Prime Broker will not be segregated from the money of the Prime Broker or any other counterparty of the Prime Broker and will be held free and clear of all trusts.  The parties further agree that the Prime Broker will use such cash in the course of its business and the Counterparty will, therefore, rank as a general creditor of the Prime Broker in respect of such cash.

6.     MARGIN REQUIREMENT

6.1    For the purpose of this Agreement, "*Net Equity*" means the aggregate of -

(a)    the sum of -

(i)    the absolute value of all credit balances on the Cash Accounts; and

(ii)   the Market Value Equivalent of all securities comprised in all debit balances on the Securities Accounts;

(b)    less the sum of -

(i)    the absolute value of all debit balances on the Cash Accounts; and

(ii)   the Market Value Equivalent of all securities comprised in all credit balances on the Securities Accounts; and

(iii)  the absolute value of all sums due to the Prime Broker pursuant to this Agreement (to the extent not debited from the Cash Accounts).

6.2    The Counterparty shall ensure that at all times the Net Equity is not less than the Margin Requirement.

6.3    If, for the purposes of determining the credit or debit balances on the Cash Accounts or the Securities Accounts (including for the purposes of calculating the Net Equity), the relevant cash or securities are denominated in a currency other than the Base Currency, then the Prime Broker may convert such currencies as are necessary for the

purposes of such determination into the Base Currency at the Spot Rate prevailing at such time.

6.4     If at any time there is a Margin Deficit, the Counterparty shall pay or deliver (whether or not pursuant to a Margin Call) to the Prime Broker such cash or securities acceptable to the Prime Broker as will ensure that, following such payment or delivery, such Margin Deficit will be eliminated.

6.5     When calculating the value of any balance on any account for the purposes of Clause 6.1, the Prime Broker may in its absolute discretion take into account any variation or potential variation in the value of cash or securities due to the availability, liquidity, solvency or market volatility of such asset or other market variable applicable to that asset.

6.6     In the event of a Margin Call, the Counterparty shall make such payment or delivery within such period as is notified by the Prime Broker in its absolute discretion and, if no such period is specified, not later than close of business on the Business Day following that on which the Margin Call is made.

6.7     Any cash paid and any securities delivered by or on behalf of the Counterparty to the Prime Broker pursuant to a Margin Call or otherwise under Clause 6.4 shall (in the case of cash) be credited to the Cash Accounts and (in the case of securities) be debited to the Securities Accounts.

6.8     The Prime Broker may from time to time specify general principles, criteria and margin rates which it intends to adopt in connection with its calculation of the Margin Requirement applicable to any Transactions and positions. Such specified information may be notified by the Prime Broker to the Counterparty in such manner as the Prime Broker considers appropriate including, without limitation, by means of any Terms.

6.9     If at any time the Counterparty is required to provide margin or collateral to the Prime Broker under a Customer Agreement which may be a title transfer agreement, to the extent that there is a Margin Excess, the Counterparty authorises and requests the Prime Broker to transfer from the appropriate Cash Account or Securities Account cash or securities with a Market Value Equivalent sufficient to fulfil that requirement or otherwise to designate in its books and records an amount sufficient to fulfil that requirement.

7.     PAYMENT AND DELIVERY

7.1     Subject to Clause 7.2 -

(a)     upon reasonable request, the Prime Broker shall repay the Counterparty any cash standing for the time being to the credit of a Cash Account;

(b)     upon reasonable request, the Prime Broker shall deliver to the Counterparty securities equivalent to any securities standing for the time being to the debit of a Securities Account.

7.2     The Prime Broker shall not be required to make a payment or delivery under Clause 7.1 if –

(a)    an Event of Default or Potential Event of Default has occurred and is continuing; or

(b)    the Prime Broker is entitled to apply the amount of cash so payable or securities so deliverable in respect of a debt or obligation owed to it by or on behalf of the Counterparty or (in the case of cash) to reduce or eliminate a debit balance on the Cash Accounts or (in the case of securities) to increase or create a debit balance to the Securities Accounts.

7.3    The Counterparty undertakes to pay any amount payable under this Agreement on the due date without deduction or the exercise of any right of equity, set-off or counterclaim that the Counterparty may have or allege against the Prime Broker.

7.4    The Prime Broker may in its sole and absolute discretion refuse to accept (or accept on such terms as it may in its sole and absolute discretion determine) any delivery of securities or Equivalent Securities by or on behalf of the Counterparty.

7.5    The Prime Broker may refuse to effect any request to make any payment or delivery under this Agreement or any Customer Agreement where this would result in the creation of, or an increase in, a Margin Deficit.

7.6    Securities or Equivalent Securities delivered to the Prime Broker are only accepted by the Prime Broker when transferred into the sole name of the Prime Broker or its nominee.

7.7    The Counterparty shall pay any Taxes arising in respect of a Transaction and acknowledges and agrees that the filing of tax returns, payment of tax liabilities, and all other actions related to its tax affairs shall be the responsibility of the Counterparty.

7.8    Subject to Clause 8, all cash payable by one party to the other shall be paid free and clear of, and without withholding or deduction for, any Taxes of whatsoever nature imposed, levied, collected, withheld or assessed by any authority having power to tax, unless the withholding or deduction is required by law. In that event, the paying party shall pay such additional amounts as will result in the net amounts receivable by the other party (after taking account of such withholding or deduction) being equal to such amounts as would have been received by it had no such Taxes been required to be withheld or deducted; provided that -

(a)    to the extent any amount is recovered in respect of such withholding or deduction by any party receiving such additional amounts, an amount equal to that recovered shall be paid promptly following receipt to the paying party or (where any such payment recovered is to be made to the Counterparty) credited to any Cash Accounts;

(b)    no such additional amounts shall be payable by the Prime Broker to the Counterparty in respect of any payment by that party under Clause 13.2; and

(c)    no such additional amounts shall be payable by the Prime Broker in respect of any payment made by the Prime Broker under Clause 8 or Clause 10.6(d).

7.9   If the Counterparty is, at any time, required to make any payment of cash or any delivery of securities to the Prime Broker under any provision of this Agreement, including, without limitation, in respect of Margin under Clause 6, fees or interest under Clause 9 and cash or Equivalent Securities under Clause 11, the Counterparty hereby authorises the Prime Broker to debit or credit the relevant Cash Account or Securities Account in order to effect such payment or delivery.

8.   INCOME, CORPORATE EVENTS AND VOTING

Income

8.1   If income is paid or distributed by the issuer of any securities comprised in the balances on the Securities Accounts -

(a)   in respect of securities standing to the credit of a Securities Account, the Counterparty will (subject to Clause 8.2) pay to the Prime Broker an amount equal to, and in the same currency as, the amount paid by the issuer or, in the case of income in the form of securities, deliver to the Prime Broker securities equivalent to such securities;

(b)   in respect of securities standing to the debit of a Securities Account, the Prime Broker will (subject to Clause 8.3) pay to the Counterparty an amount equal to, and in the same currency as, the amount paid by the issuer or, in the case of income in the form of securities, deliver to the Counterparty securities equivalent to such securities. The Prime Broker will credit the relevant Cash Account in respect of the amount so payable or, as the case may be, debit the relevant Securities Account in respect of the securities so deliverable.

8.2   The amount debited or credited under Clause 8.1(a) shall include but not be restricted to –

(a)   any amount which is deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities, and

(b)   any additional tax credits to which a holder of such securities as specified by the Prime Broker would be entitled in respect of such income.

8.3   Any amount credited or debited pursuant to Clause 8.1(b) shall not -

(a)   include any amount in respect of cash or securities which is -

(i)   deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities;

(ii)   required to be accounted for to the United Kingdom Inland Revenue in respect of the income in question; or

(iii)   might be recovered by the Prime Broker or any other holder of the securities from any relevant taxation authority outside the United Kingdom in respect of the income in question; and

(b)   exceed the amount of cash (or the amount of securities comprising income) which the Counterparty would have received from the issuer in respect of the income, had the Counterparty been the holder of such securities on the relevant date, net of any amount which is or, as the case may be, would have been, held or deducted or withheld in respect of tax by or on behalf of the issuer of the relevant securities. In this Clause, *"relevant date"* means, in relation to any income, the date by reference to which the identity is determined of those holders to whom that income is paid.

8.4   The Prime Broker will use reasonable efforts to claim dividends and interest payments on the Counterparty's securities but will not have any duty to take steps to recover any amounts due in respect of which the issuer or its registrar, paying agent or other agent defaults.

## Corporate Events

8.5   The Prime Broker shall inform the Counterparty if it becomes aware of the occurrence or prospective occurrence of any conversion, subscription, sub-division, consolidation, redemption, rights issue, takeover or other offer, capital reorganisation, call, capitalisation issue or distribution of, or a granting of, an entitlement to receive securities or any other corporate event (each a *"Corporate Event"*) with respect to any securities comprised in any debit balance on the Securities Accounts.

8.6   Where a Corporate Event giving rise to a right or option occurs, the Counterparty (in respect of securities debited to the Securities Accounts) or the Prime Broker (in respect of securities credited to the Securities Accounts) may within a reasonable time before the latest time for the exercise of the right or option give notice to the other party that it wishes to receive Equivalent Securities or other assets in such form as will arise if the right is exercised in such manner as is stated in the notice.

8.7   The Prime Broker may, upon service of such notice, credit or debit the relevant Cash Account or the relevant Securities Account (or both) with such amounts of cash or, as the case may be, securities as would reflect the performance of the instructions in such notice by the Prime Broker. If the Counterparty does not serve notice under Clause 8.6, the Prime Broker shall credit or debit the relevant Cash Account or the relevant Securities Account (or both) to reflect the taking of such action as the Prime Broker in its absolute discretion deems appropriate. The Counterparty acknowledges that Equivalent Securities, or other assets required to be delivered under Clause 8.6, may be the subject of a loan made by the Prime Broker to third parties and that reasonable notice must be given to the Prime Broker to provide for the return of such Equivalent Securities or other assets.

8.8   A notice served by the Counterparty under Clause 8.6 shall not be effective -

(a)   where it refers to an event which involves the payment of money by the holder of securities, unless the Counterparty pays to the Prime Broker, for value not later than the due date of the relevant payment, an amount equal to that which is required to be paid by such a holder of securities; or

(b)   if the exercise of the right or option stated in the notice would create or increase a Margin Deficit.

8.9    If a call becomes payable in respect of partly-paid securities, the Prime Broker may debit the Cash Accounts with a sum equal to the amount so payable, but shall have no liability whatsoever for the consequences of a failure to satisfy any calls made.

8.10   Where the Prime Broker or any third party holding securities on behalf of the Prime Broker is legally liable to meet any payment due or to become due in respect of such securities, the Counterparty will provide the Prime Broker or such other person (as the case may be) with funds to meet such payment, for value not later than the day on which the call is payable.

Voting

8.11   If a right to vote (other than a right contemplated by Clause 8.5) arises in respect of any securities comprised in a debit balance on the Securities Accounts, the Prime Broker may in its absolute discretion –

    (a)    deliver such securities to the Counterparty or to its order within a reasonable time before the latest time for the exercise of such vote; or

    (b)    request instructions from the Counterparty in respect of such voting rights and use its reasonable endeavours to arrange for such voting rights to be exercised in accordance with such instructions provided those instructions are received within such period as the Prime Broker reasonably requires.

in the absence of such instructions, the Prime Broker may exercise the right to vote as it in its absolute discretion deems appropriate.

8.12   The provisions of this Clause 8 shall apply to Advance Securities which are Hong Kong securities.

9.     FEES AND INTEREST

9.1    The Counterparty shall pay fees and remuneration to the Prime Broker in respect of Transactions, at such rates, at such times and calculated in such manner as may from time to time be notified by the Prime Broker to the Counterparty, whether generally (including by means of the Terms) or in respect of a particular Transaction, such notification to have immediate effect unless otherwise specified in the notification. Such fees and remuneration at the commencement of this Agreement are set out in the last Terms provided by the Prime Broker to the Counterparty.

9.2    The Prime Broker may pay interest to the Counterparty on any credit balance on a Cash Account. The Counterparty shall pay interest to the Prime Broker on any debit balances on a Cash Account. Such interest shall be at such rates as may be notified by the Prime Broker to the Counterparty from time to time (including by means of the Terms).

9.3    Any amount payable by one party to the other under this Agreement which is not paid when due shall bear interest (compounded on a daily basis) from the date on which such payment became due until the date of actual payment at a rate equal to LIBOR plus two per cent.

## 10.    SECURITY

10.1    As continuing security for the payment and discharge of all the Liabilities (as defined below), the Counterparty hereby, with full title guarantee and free from any encumbrances whatsoever, charges in favour of the Prime Broker for itself and as trustee for the other Lehman Companies by way of first fixed charge -

(a)    all right, title and interest in and to securities and any other assets not falling within sub-paragraphs (b) to (f) constituted for the time being by debits to any Securities Account;

(b)    all securities and other assets which, or the certificates or documents of title to which, are for the time being deposited with or held by a Lehman Company;

(c)    all other securities and all rights, cash (including without limitation dividends) and property whatsoever which may from time to time accrue on, be derived from or be offered in respect of any assets referred to in sub-paragraphs (a) and (b) above, whether by way of Corporate Event or otherwise;

(d)    all cash for the time being credited to any Cash Account;

(e)    all rights of the Counterparty arising in respect of any securities, assets or cash referred to in sub-paragraphs (a) to (d) above, including, without limitation, any rights against any custodian, banker or other person;

(f)    all rights of the Counterparty under this Agreement including, without limitation, all rights of the Counterparty to delivery of Equivalent Securities;

(g)    all rights of the Counterparty to receive payment of the Net Default Amount payable under any Customer Agreement,

but in each case so that the covenants implied by the Law of Property (Miscellaneous Provisions) Act 1994 in the charges contained in or created pursuant to this Agreement are construed with the omission of -

(i)    the words "other than any charges, encumbrances or rights which that person does not and could not reasonably be expected to know about" in section 3(1) of that Act; and

(ii)    section 6(2) of that Act.

10.2    "*Liabilities*" at any time, means the aggregate (as determined by the Prime Broker, including without limitation in accordance with Clause 13) of all monies, debts, liabilities and obligations, whether present or future, actual or contingent, owing or incurred by the Counterparty to the Prime Broker or any Lehman Company under or in connection with this Agreement, any Transaction, the Customer Agreements, any other contract or otherwise (in each case, whether alone or jointly (or jointly and severally) with any other person, whether actually or contingently and whether as principal, surety or otherwise), plus any costs and expenses (including, without limitation, legal fees) which the Prime

Broker may incur in enforcing, perfecting or maintaining any of its rights, whether pursuant to the terms of this Agreement or any Transaction, contract or otherwise, including without limitation:

  (a)    the amounts of principal, interest, fees, remuneration, Margin Requirement and other monies due and payable; and

  (b)    any loss of bargain, the cost of funding or currency exchange and, to the extent not already covered, any loss incurred by the Prime Broker in liquidating, obtaining or re-establishing any hedge or related position.

10.3    The security provided under this Clause 10 is continuing security and will extend to the ultimate balance of the Liabilities, regardless of any intermediate payment or discharge in whole or in part by or on behalf of the Counterparty.

10.4    Subject to Clause 10.14, if the Prime Broker is satisfied that all the Liabilities have been irrevocably paid in full and that all facilities which might give rise to Liabilities have terminated, the Prime Broker shall, at the request and cost of the Counterparty, release, reassign or discharge (as appropriate) the Charged Assets from the security created pursuant to this Clause 10.

10.5    Upon or at any time after the occurrence of an Event of Default in relation to the Counterparty, all sums provided to be paid and securities provided to be delivered by the Counterparty pursuant to the terms of this Agreement shall become immediately due and payable or deliverable (as applicable) and the Prime Broker shall not be obliged to accept any further Instructions from the Counterparty in respect of the Charged Assets, including without limitation, the exercise of any rights in respect of the events described in Clause 8. Without prior notice or demand, the Prime Broker (for itself and as agent, or as the case may be, trustee for the Lehman Companies) may enforce the Security and exercise all powers and rights of a mortgagee conferred by statute or otherwise.

10.6    Without limiting Clause 10.5, the Counterparty hereby irrevocably authorises the Prime Broker, at any time after an Event of Default in relation to the Counterparty and without notice to the Counterparty, to sell or otherwise realise the Charged Assets in such manner as it may deem appropriate and apply the proceeds of sale as follows –

  (a)    first, in or towards payment of all costs and expenses incurred by the Prime Broker in connection with such disposal;

  (b)    secondly, in or towards payment and satisfaction of any sum due to the Prime Broker pursuant to Clause 13 in such order and manner as the Prime Broker may determine;

  (c)    thirdly, in or towards payment and satisfaction of any other sum and liability comprising the Liabilities due from the Counterparty to the Prime Broker and the Lehman Companies in such order and manner as the Prime Broker may determine; and

  (d)    fourthly, in payment of any surplus to the Counterparty.

10.7   For all purposes, including any legal proceedings, a certificate by any officer of the Prime Broker as to the sums or Liabilities for the time being due to or incurred by the Prime Broker or any Lehman Company shall be conclusive in the absence of manifest error.

10.8   Sections 93 (restriction of right of consolidation) and 103 (regulation of exercise of power of sale) of the Law of Property Act 1925 will not apply to this Agreement.

10.9   The Counterparty shall not create or permit to subsist any mortgage, charge, pledge, lien or other security interest securing any obligation of any person (or any other agreement or arrangement having a similar effect), over the Charged Assets except for the security created or expressed to be created by or pursuant to this Agreement in favour of the Prime Broker, nor shall it seek or agree to dispose of such Charged Assets, save in accordance with this Agreement.

10.10   The Prime Broker may, at the request of the Counterparty, in its absolute discretion permit the Counterparty to deal with or otherwise dispose of any of the Charged Assets, subject to the other provisions of this Agreement.  If at any time the Prime Broker consents to such a dealing or disposition, that consent shall in no way constitute a waiver of the Prime Broker's right to refuse to give its consent to any other request.  If the Prime Broker permits such a dealing or disposition of any of the Charged Assets, then on such dealing or disposition the relevant Charged Assets shall be automatically released from the Security.

10.11   For the purpose of perfecting or enforcing the Security, if the Prime Broker so requests at any time or times, the Counterparty will promptly execute and sign all such transfers, assignments, powers of attorney, further assurances or other documents and do all such other acts and things as may reasonably be required to vest or to realise the Security or any of it in the Prime Broker or any Lehman Company or to its order or to a purchaser or transferee to perfect or preserve the rights and interests of the Prime Broker and the Lehman Companies in respect of the Security (including, without limitation, the institution and conduct of legal proceedings) or for the exercise by the Prime Broker of all or any of the powers, authorities and discretions conferred on the Prime Broker by this Agreement.

10.12   The Counterparty by way of security hereby irrevocably appoints the Prime Broker as its attorney on the Counterparty's behalf and in the Counterparty's name or otherwise to execute any transfers, assignments, further assurances or other documents as may reasonably be required to vest or to realise the Security or any of it in the Prime Broker or to its order or any Lehman Company or to its order or to a purchaser or transferee to perfect or preserve the rights and interests in respect of the Security of the Prime Broker and the Lehman Companies (including, without limitation, the institution and conduct of legal proceedings) or for the exercise by any Lehman Company of all or any of the powers, authorities and discretions conferred on them by this Agreement.   The Counterparty hereby ratifies and confirms and agrees to ratify and confirm whatever the Prime Broker shall do in the exercise or purported exercise of the above power of attorney.

10.13   The powers conferred on the Prime Broker pursuant to this Agreement in relation to the Charged Assets or any part thereof shall be in addition to and not in substitution for the powers conferred on mortgagees under the Law of Property Act 1925 and where there

is any ambiguity or conflict between the powers contained in such Act and those conferred by this Agreement, this Agreement shall prevail.

10.14  If the Prime Broker reasonably determines that any payment received or recovered by the Prime Broker or any Lehman Company may be avoided or invalidated after the Liabilities have been discharged in full, and after any facility which might give rise to such Liabilities has been terminated, this Agreement (and the Security created hereby) will remain in full force and effect and neither the Prime Broker nor any Lehman Company will be obliged to release any Charged Assets until the expiry of such period as the Prime Broker or that Lehman Company as the case may be shall reasonably determine.

10.15  No payment which may be avoided or adjusted under any law, including any enactment relating to bankruptcy or insolvency, and no release, settlement or discharge given or made by the Prime Broker or any Lehman Company on the faith of any such assurance, security or payment, shall prejudice or affect the right of the Prime Broker or any Lehman Company to recover the Liabilities from the Counterparty or to enforce the Security to the full extent of the Liabilities.

10.16  At any time following (i) the Prime Broker or any Lehman Company receiving notice (either actual or otherwise) of any subsequent security interest affecting any assets subject to the Security or (ii) the occurrence of any Act of Insolvency in respect of the Counterparty, the Prime Broker may open a new Cash Account or Securities Account (or both) in the Counterparty's name (whether or not the Prime Broker permits any existing account to continue).  If the Prime Broker does not open such a new account, the Prime Broker will nevertheless be treated as if the Prime Broker had done so at the time, as the case may be, when the notice was received or deemed to have been received of the subsequent security interest or at the time of the Act of Insolvency.  No cash or assets thereafter paid or delivered into any Cash Account or Securities Account, whether new or continuing, shall discharge or reduce the amount receivable pursuant to this Agreement.

10.17  No person dealing with the Prime Broker shall be concerned to enquire whether any event has happened upon which any of the powers, authorities and discretions conferred by or pursuant to this Agreement, and conditions in relation to the Charged Assets or any part thereof, are or may be exercisable by the Prime Broker, or otherwise as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers, authorities and discretions, and all the protections to purchasers contained in Sections 104 and 107 of the Law of Property Act 1925 shall apply to any person purchasing from or dealing with the Prime Broker in like manner as if the statutory powers of sale in relation to the Charged Assets hereby charged had not been varied or extended by this Agreement.

10.18  The receipt of the Prime Broker shall be an absolute and a conclusive discharge to a purchaser and shall relieve the purchaser of any obligation to see to the application of any moneys paid to or by the direction of the Prime Broker or any Lehman Company, as the case may be.

10.19  The Prime Broker may credit any amounts received or recovered by it in exercise of its rights under this Agreement to, and require the same to be paid to it for crediting to, an interest bearing suspense account for so long and in such manner as it may determine.

11.    RIGHT OF USE

11.1    The Counterparty hereby authorises the Prime Broker at any time or times to borrow, lend, charge, hypothecate, dispose of or otherwise use for its own purposes any securities which are included in the Charged Assets by transferring such securities to itself or to another person without giving notice of such transfer to the Counterparty. The Counterparty agrees that the Prime Broker may retain for its own account all fees, profits and other benefits received in connection with any such borrowing, loan, charge, hypothecation, disposal or use.

11.2    Upon –

(a)    a borrowing, lending, disposal or other use, such securities will become the absolute property of the Prime Broker (or that of the transferee) free from the Security and from any equity, right, title or interest of the Counterparty;

(b)    a charge or hypothecation of any of the Counterparty's securities, all of those securities, including the Counterparty's interest in those securities, will be subject to the charge or other security interest created by such charge or rehypothecation.

11.3    Upon any such borrowing, lending, charge, hypothecation, disposal or use, the Counterparty will have a right against the Prime Broker for the delivery of securities equivalent to those securities. Where, in respect of any securities, the Counterparty has instructed the Prime Broker to exercise any rights under Clause 8, the Prime Broker shall deliver securities equivalent to those securities in such form as has resulted from the exercise of such rights.

11.4    If on the due date for delivery thereof the Prime Broker shall for any reason be unable to deliver any Equivalent Securities to the Counterparty, the Prime Broker may, pending such delivery, credit the Cash Accounts in an amount equal to the Market Value Equivalent of those Equivalent Securities. Upon delivery of those Equivalent Securities to the Counterparty, the Prime Broker will debit the relevant Cash Account in the amount of the cash so credited.

11.5    Upon delivery or payment to the Counterparty of Equivalent Securities or Collateral, such Equivalent Securities or Collateral will become subject to the Security and constitute Charged Assets and shall be subject to all the provisions of this Agreement including, without limitation, those of Clause 10 and this Clause 11.

12.    EVENTS OF DEFAULT

12.1    Each of the following events is an "*Event of Default*" in relation to the relevant party (the "*Defaulting Party*", the other party being the "*Non-Defaulting Party*"):

(a)    the Counterparty fails to eliminate a Margin Deficit on the due date in accordance with Clause 6 and the Prime Broker serves a Default Notice on the Counterparty; or

(b)    the Counterparty fails to make any other payment of cash or delivery of securities by the due date, such failure is not remedied within 24 hours

following written notice of such failure given to the Counterparty by the Prime Broker, and the Prime Broker serves a Default Notice on the Counterparty; or

(c)   the Counterparty fails to comply with or perform any other agreement or obligation in accordance with this Agreement and such failure, if capable of remedy, is not remedied within 24 hours following written notice of such failure given to the Counterparty by the Prime Broker, and the Prime Broker serves a Default Notice on the Counterparty; or

(d)   an Act of Insolvency occurs in relation to the Counterparty (including any general partner, managing member or analogous representative entity) or, where applicable, the Fund or the Agent; or

(e)   an Act of Insolvency occurs in relation to the Prime Broker and the Counterparty serves a Default Notice on the Prime Broker; or

(f)   any representations made or deemed to have been made or repeated by the Counterparty or the Agent are incorrect or untrue in any material respect, and the Prime Broker serves a Default Notice on the Counterparty or the Agent; or

(g)   the Counterparty admits to the Prime Broker that it is unable to, or intends not to, perform any of its obligations under this Agreement, and the Prime Broker serves a Default Notice on the Counterparty; or

(h)   the Counterparty or, where applicable, the Fund or the Agent is suspended or expelled from or surrenders its membership of or participation in any securities exchange or association or other self-regulating organisation, or is suspended from dealing in securities by any government agency, or any of the assets of the Counterparty or the assets of an investor held by, or to the order of, the Counterparty are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation, and the Prime Broker serves a Default Notice on the Counterparty; or

(i)   there is a material adverse change in the business affairs of the Counterparty or the Agent or their respective affiliates and the Prime Broker serves a Default Notice on the Counterparty; or

(j)   an event of default or equivalent event occurs under a Customer Agreement, or under any other agreement between the Counterparty or the Agent or its affiliates and the Prime Broker or any of its Affiliates and the Prime Broker serves a Default Notice on the Counterparty; or

(k)   a financial obligation of the Counterparty or the Agent or any of their respective affiliates in an amount greater than US$[5,000,000] (or its equivalent in another currency) is not paid in accordance with its terms and the Prime Broker serves a Default Notice on the Counterparty; or

(l)     any material document or constitutional document (including, without limitation, the investment policies or guidelines) of the Counterparty or, where applicable, the Fund or the Agent is modified in a manner which, in the sole and absolute discretion of the Prime Broker, may have a material adverse effect on any Transaction or on such party's ability to perform its obligations under this Agreement or any Customer Agreement; or

(m)     the General Partner of the Counterparty resigns or there is a change in the management or control of, or a loss of a key person (including incapacity) of, the Counterparty or, where applicable, the Fund or the Agent which, in the sole and absolute discretion of the Prime Broker, may be prejudicial to the interests of the Prime Broker or to its ability to continue to offer its services under this Agreement; or

(n)     the Counterparty or, where applicable, the Fund suffers a decline in net asset value of such amount and for such period as may from time to time be specified in any Terms.

12.2   Each party shall immediately notify the other if an Event of Default occurs in relation to it.

13.     CLOSE-OUT

13.1   Upon the occurrence of an Event of Default, the Non-Defaulting Party may, by written notice to the Defaulting Party, terminate this Agreement with effect from the time of the Event of Default (the date of such occurrence being the "*Termination Date*"). On the Termination Date, the following shall immediately occur -

(a)     any obligation of the Prime Broker to settle any Transaction, on behalf of the Counterparty shall cease;

(b)     the Loan shall be immediately repayable;

(c)     all other outstanding obligations of each party to deliver securities or Equivalent Securities or to pay cash to the other under this Agreement shall become due for performance immediately (and shall be effected only in accordance with the following provisions of this Clause 13);

(d)     the Prime Broker shall establish, as at the date of the Event of Default, the Default Market Values of all cash and securities to be delivered or paid by each party under paragraph (c) above and the Net Default Amount payable under any Customer Agreement that has been terminated.

13.2   On the basis of the sums so established, an account shall be taken (as at the Termination Date) of what is due from each party to the other under this Agreement (on the basis that each party's claim against the other in respect of the transfer to it of securities or Equivalent Securities equals the Default Market Value therefor) and the sums due from one party shall be set off against the sums due from the other and only the balance of the account shall be payable (by the party having the claims valued at the lower amount) and such balance shall be due and payable on the next following Business Day. For the purpose of this calculation, all sums not denominated in the Base Currency shall

be converted by the Prime Broker into the Base Currency at the Spot Rate prevailing at the relevant time.

## 14.   INDEMNITY AND LIABILITY

14.1   The Counterparty shall indemnify and hold the Prime Broker, and its agents and Affiliates, and their respective directors, officers, employees and agents (the "*Indemnitees*") harmless from and against all Losses which they may incur or have asserted against them and which arise directly or indirectly in connection with the entry into, or acting in respect of, this Agreement or any Transaction, including, without limitation, those arising directly or indirectly in connection with -

(a)   any breach of the obligations, warranties and representations of the Counterparty or the Agent under this Agreement; or

(b)   any Instructions, request, communication or purported instructions believed in good faith by the Prime Broker to have been given by the Agent or any other Authorised Person;

(c)   any liability for Taxes arising in respect of a Transaction; or

(d)   the settlement or attempted settlement of any Transaction or any failure to settle any such Transaction; or

(e)   the entry into and performance of any agreements with third parties pursuant to this Agreement; or

(f)   the costs of the Prime Broker in defending itself successfully against any claims of fraud, gross negligence or wilful default; or

(g)   any action taken by a third party (which is not a signatory to this Agreement) to gain control of cash or securities governed by this Agreement.

14.2   If, in the Prime Broker's sole and absolute discretion, any sum owed by the Counterparty under or in connection with this Agreement or any Transaction, or any order or judgment given or made in relation to this Agreement or any Transaction, has to be converted from the currency in which such sum is payable into another currency for the purposes of this Agreement, then the Counterparty shall indemnify the Prime Broker from and against any loss suffered or incurred as a result of any discrepancy between (a) the rate of exchange used for such conversion and (b) the rate or rates of exchange available to the Prime Broker at the time of such receipt of such sum owing by the Counterparty.

14.3   The Prime Broker accepts no liability and shall not be liable to the Counterparty or, where applicable, the Fund or the Agent for any Losses whatsoever which any such party may incur (in connection with this Agreement and any Transaction) as a result directly or indirectly from -

(a)   the general risks of investing; or

(b)   investing or holding assets in a particular country (including, but not limited to, Losses arising from nationalisation, expropriation or other governmental

actions; regulations of the banking or securities industries; currency restrictions, devaluations or fluctuations; and market conditions affecting the orderly execution of securities transactions or affecting the value of assets);or

(c) acting on Instructions or in relation to notices, requests, waivers, consents, receipts, corporate actions or other documents which the Prime Broker in good faith believes to be genuine and to have been given or signed by Authorised Persons, and the Counterparty will be bound by the same; or

(d) the collection, deposit or credit of invalid, fraudulent or forged securities or cash transfers; or

(e) effecting delivery or payment against an expectation of receipt save where such delivery or payment was contrary to local market practice; or

(f) an Instruction to deliver securities to a broker, even if the Prime Broker might have information tending to show that this course of action, or the choice of a particular broker for a transaction, was unwise; or

(g) the Prime Broker's inability to deliver securities on the same day that such securities are received for the Counterparty's Securities Accounts,

and such exclusion of liability shall extend, without limitation, to obligations in tort, any indirect, punitive Special or Consequential loss or damage, even if the Prime Broker was previously informed of the possibility of such loss or damage, provided that this does not apply to any loss or damage caused by fraud on the part of the Prime Broker or to death or personal injury arising from any failure on the part of the Prime Broker to take reasonable care or exercise reasonable skill.

14.4    Where the Prime Broker has been found to be liable, the Prime Broker shall only be liable to the Counterparty to the extent that the Prime Broker has been grossly negligent, fraudulent or is in wilful default of its duties as set out in this Agreement save that nothing in this Agreement shall restrict any liability owed by the Prime Broker to the Counterparty under the Financial Services and Markets Act 2000 or the Rules or disclaim any liability to an extent not permitted by such Act or the Rules. The parties agree that, as a genuine pre-estimate of loss, the Prime Broker's liability to the Counterparty shall be determined based only upon the Market Value of the relevant cash or securities as at the date of the discovery of loss and without reference to any special circumstances, indirect or consequential losses, or subsequent variations to the Market Values of the relevant cash or securities.

14.5    The Prime Broker shall not be responsible for any Losses resulting from an act or omission of any broker or any other third party, whether or not appointed by the Prime Broker, which is beyond the control of the Prime Broker and shall not be obliged to request such broker or any third party to comply with its obligations. Payments of income and settlement proceeds are at the risk of the Counterparty. If the Prime Broker, at the Counterparty's request, appoints a broker or agent to effect any transaction on behalf of the Counterparty, the Prime Broker shall have no liability whatsoever in respect of such broker's duties, actions, omissions or solvency and such broker or agent is not the agent of Prime Broker for any purpose.

14.6    The Counterparty acknowledges that the Prime Broker will not be monitoring the suitability of any Transaction or any of the Cash Accounts or Securities Accounts for the purposes of evaluating their composition or their or the Counterparty's performance and will not be aware of or monitoring the Counterparty's overall financial position, investment objectives or investment restrictions.

14.7    The holding of assets in, and investing in, foreign jurisdictions may involve risks of loss or other special features and the Counterparty accepts that the consequences of so investing and holding assets in such foreign jurisdictions shall be entirely at the risk of the Counterparty. The Prime Broker or any of its divisions or Affiliates may be in possession of information tending to show that the Instructions received may not be in the best interests of the Counterparty. The Prime Broker is not under any duty to disclose any such information.

14.8    The Prime Broker is not obliged to maintain any insurance cover for the benefit of the Counterparty.

14.9    References in this Clause 14 to the Prime Broker shall include any Affiliate of the Prime Broker.

14.10    The obligation of the Counterparty to make payments to the Prime Broker in the currency in which they are due shall be enforceable as a separate cause of action.

14.11    Without prejudice to Clause 13, all sums due to the Prime Broker shall be paid free and clear of any equity, set-off or counterclaim.

15.    GUARANTEE AND INDEMNITY

Guarantee

15.1    The Prime Broker and each Affiliate (each a *Lehman Group Company* and together the *Lehman Group Companies*), in consideration of the Counterparty undertaking to indemnify each Lehman Group Company on the terms of Clause 15.6, hereby, unconditionally and irrevocably, as a continuing obligation, guarantees and, as principal debtor and not merely as surety, undertakes to pay to any other Lehman Group Company on demand, if the Counterparty fails to pay them or any part thereof, all Liabilities from time to time owing to that Lehman Group Company.

15.2    A Lehman Group Company's liability under this Guarantee shall not exceed the net amount owing from that Lehman Group Company to the Counterparty under this Agreement and the Customer Agreements on the date of demand on it hereunder after taking into account any Liabilities owed to it (whether or not due and payable at the date of demand and whether or not demand shall have been made therefor on it).

15.3    Any release, compromise or discharge of the obligations of a Lehman Group Company under this Guarantee shall be deemed to be made subject to the condition that it will be void if any payment, performance or security which the Counterparty may receive or have received is set aside or proves invalid for whatever reason.

15.4    The obligations of each Lehman Group Company under this Clause 15 are, and will remain, in full force and effect by way of continuing security until the Agreement and

LDN1746470 (032320-0516)                                    Page 20

the Customer Agreements have been terminated and each of the Lehman Group Companies has irrevocably received or recovered all amounts payable under the Customer Agreements and this Agreement. Furthermore, the obligations of each Lehman Group Company hereunder are additional to, and not in place of, any security or other guarantee at any time existing in favour of any of the Lehman Group Companies and may be enforced without first having recourse to the Counterparty, any other person, any security or any other guarantee.

Exclusion of Defences

15.5    A Lehman Group Company's liability hereunder shall remain in force notwithstanding any act, omission, neglect, event or matter whatsoever whether or not known to the Lehman Group Company, the Counterparty or any other Lehman Group Company (other than irrevocable payment to the relevant Lehman Group Company of the amounts guaranteed hereunder) and nothing shall impair or discharge the liabilities or obligations of a Lehman Group Company under this Guarantee and the foregoing shall apply, without limitation, in relation to -

(a)    anything which would have discharged a Lehman Group Company (wholly or in part) whether as surety, co-obligor or otherwise or which would have afforded a Lehman Group Company any legal or equitable defence;

(b)    the existence, validity, taking or renewal of any other guarantee, security, right of recourse, set-off or combination or other right or interest held or had by any Lehman Group Company in relation to this Agreement or any demand or enforcement of, neglect to perfect, failure to demand or enforce or the release or waiver of any such guarantee, security, right of recourse, set-off or combination or other right or interest;

(c)    any amendment, variation, assignment, novation or departure (however substantial or material) of, to or from the Agreement or any Customer Agreement or any security or other document relating to the Agreement or any Customer Agreement which shall be binding upon the Lehman Group Company in all circumstances, notwithstanding it may increase or otherwise affect the liability of the Lehman Group Company;

(d)    any release of or granting of time or any other indulgence to the Counterparty or any third party;

(e)    any winding up, dissolution, reconstruction or reorganisation, legal limitation, disability, incapacity or lack of corporate power or authority or other circumstances of, or any change in the constitution or corporate identity or loss of corporate identity by, the Counterparty or any other person (or any act taken by the Lehman Group Company or the Counterparty in relation to such event);

(f)    any other circumstances which might render void or unenforceable the obligations of the Counterparty under the Agreement or any Customer Agreement or which might affect the ability of any Lehman Group Company to recover amounts from the Client; or

(g)    any defence or counterclaim which the Counterparty may be able to assert against any Lehman Group Company.

**Indemnity**

15.6    The Counterparty irrevocably undertakes and covenants to each Lehman Group Company that it will indemnify the Lehman Group Company on demand against any Claims relating to or arising out of this Clause 15. For the avoidance of doubt, the Counterparty hereby acknowledges and confirms that its obligation to indemnify each Lehman Group Company pursuant to this Clause will arise as soon as a liability (including any contingent liability) is incurred by a Lehman Group Company pursuant to this Clause 15, and accordingly that the obligation to indemnify a Lehman Group Company shall arise whether or not a Lehman Group Company has paid any amounts to any other Lehman Group Company pursuant to this Clause 15, and whether or not such other Lehman Group Company has made a demand on the Counterparty. For the avoidance of doubt, the Counterparty's indemnity obligations shall be liabilities secured by and subject to the provisions of this Agreement.

In the event that any amount is paid by a Lehman Group Company under the guarantee set out in Clause 15 and all or part of the corresponding amount payable to that Lehman Group Company by the Counterparty pursuant to the indemnity set out in Clause 15 becomes repayable by such Lehman Group Company (the amount of such repayment being the *Repayment*) then, whichever Lehman Group Company received the guarantee payment, shall pay to that Lehman Group Company the amount of such Repayment, and an amount equal to such Repayment will fall due from the Counterparty to that Lehman Group Company.

*Claims* means all direct and indirect costs, charges, fees, expenses, damages, liabilities and losses, including any consequential losses and damages and including any costs, charges, fees, expenses, damages, liabilities and losses incurred or sustained by the Prime Broker or an Affiliate from time to time in accordance with or as a result of terminating, liquidating, obtaining or re-establishing any hedge or related trading position including, without limitation, break costs and any legal costs of enforcing or protecting or attempting to enforce or protect any of the Prime Brokers' or Affiliate's rights under this Agreement or any Customer Agreement.

16.    REPRESENTATIONS, WARRANTIES AND UNDERTAKINGS

16.1    Each party represents and warrants to the other that -

(a)    it is duly incorporated or organised under the laws of its country of incorporation or organisation;

(b)    it is duly authorised to execute and deliver this Agreement, to enter into the Transactions contemplated under this Agreement and to perform its obligations thereunder and in the case of the Counterparty, it has all obtained all necessary authorisations and consents, and taken all necessary corporate actions to deposit and control the cash and securities in the Cash Accounts and Securities Accounts, as appropriate, to grant the Security, generally to appoint Sub-Custodians (and specifically to use the Prime Broker as a

custodian) in accordance with the terms of this Agreement and to borrow money and enter into foreign exchange transactions;

(c)    except in the case of the Agent, it enters into this Agreement as principal;

(d)    the person signing this Agreement on its behalf is, and any person representing it in entering into a Transaction is and will be, duly authorised to do so on its behalf;

(e)    in the case of the Counterparty and, where applicable, the Fund –

(i)    any partnership deed or agreement has not been dissolved or terminated and no party has taken steps towards the same; and

(ii)    no Act of Insolvency has occurred or is pending in respect of such party or in respect of any general partner, managing member or analogous representative entity signing this Agreement;

(f)    it has obtained all authorisations of any governmental or regulatory body required in connection with this Agreement and the Transactions contemplated and such authorisations are in full force and effect;

(g)    the execution, delivery and performance of its obligations under this Agreement and all Transactions will not violate any law, ordinance, charter, bye-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected and this Agreement is its legal, valid and binding obligation, enforceable in accordance with its terms;

(h)    except where the Counterparty is the trustee of a trust, the Counterparty beneficially owns all cash and securities held by the Prime Broker in the Cash Accounts and the Securities Accounts, free of all encumbrances and other adverse interests (other than arising under this Agreement);

(i)    at any time the Counterparty delivers or procures the delivery of securities to the Prime Broker it will have the full and unqualified right to make such delivery and all securities will be delivered fully paid and free from any lien, prohibition, impediment or restriction (on transfer or otherwise) imposed by law, regulation, agreement or by any constitutional document;

(j)    in connection with this Agreement and each Transaction it is not relying on any advice (whether written or oral) of the other party;

(k)    the Counterparty understands the nature and risks of all Transactions and the subject matter of this Agreement and has obtained such independent advice (if any) as it consider appropriate;

(l)    at the time it delivers, or is treated as delivering, to the other party any securities or Equivalent Securities it will have the full and unqualified right to make such delivery;

(m) the Counterparty will, at the Prime Broker's request, provide any necessary certificate of non-residence or other appropriate documentation necessary to minimise the incidence of UK taxation in respect of income arising in respect of securities that are the subject of any Transaction or standing to the credit or debit of the Securities Accounts; and

(n) the Counterparty is not an ERISA Plan or a person acting on behalf of an ERISA Plan and the Counterparty's assets do not constitute assets of an ERISA Plan.

16.2    Where the Counterparty enters into this Agreement as the trustee of a trust it represents and warrants to the Prime Broker that –

(a) it has been properly appointed as trustee of the trust, is empowered under the trust deed to enter into and deliver this Agreement and any other documentation relating to this Agreement, to enter into each Transaction or contract entered into pursuant thereto and to perform its obligations thereunder and is entitled to deal with all relevant trust assets and that it has complied with the internal management procedures of the trust and any other procedural requirements;

(b) it is absolutely entitled to pass full legal and beneficial ownership of all assets provided by it under this Agreement and each Transaction free of all encumbrances and adverse interests (other than those arising under this Agreement);

(c) it is not in breach of the trust and has the right to be indemnified out of the assets of the trust for all obligations under this Agreement and each Transaction;

(d) it has not lost and will not do anything or omit to do anything which may jeopardise or cause it to lose or in any way compromise its right to be indemnified in full out of the trust assets in respect of its obligations under this Agreement and each Transaction;

(e) it has an express right of indemnity from the assets of the trust in respect of Transactions entered into which are in breach of any aspect of the relevant terms of the trust; and

(f) it is not acting in breach of its fiduciary duties in entering into this Agreement or any Transaction.

16.3    Each party acknowledges and agrees that –

(a) they have not relied on any representation, warranty or other statement of another party in entering into this Agreement other than those expressly set out in this Clause 16; and

(b) in the case of the Counterparty, the Counterparty further represents and warrants to the Prime Broker that –

(i)    it has not relied on any oral or written representation made by the Prime Broker or any person on behalf of the Prime Broker, and acknowledges that this Agreement sets out to the fullest extent the duties of the Prime Broker;

(ii)    it understands the nature and risks of the subject matter of this Agreement and all Transactions and shall seek independent advice where necessary;

(iii)    the cash and securities are not subject to any encumbrance or security interest, save for the charge created pursuant to Clause 10; and

(iv)    it is neither a "United States person" nor a "foreign person controlled by a United States person" as such terms are defined in Regulation X of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 224 (Regulation X defines (1) "United States person" to include "a person which is organised or exists under the laws of any state of the United States of America or, in the case of a natural person, a citizen or resident of the United States; a domestic estate; or a trust in which one or more of the foregoing persons has a cumulative direct or indirect beneficial interest in excess of 50% of the value of the trust" and (2) "foreign person controlled by a United States person" to include "any non corporate entity in which United States persons directly or indirectly have more than a 50% beneficial interest, and any corporation in which one or more United States persons, directly or indirectly, own stock possessing more than 50% of the total combined voting power of all classes of stock entitled to vote, or more than 50% of the total value of shares of all classes of stock").

16.4    On the day on which any Transaction is entered into and on each day on which securities or Equivalent Securities are to be transferred or a payment is to be made under this Agreement, each party shall each be deemed to repeat all of the foregoing representations. For the avoidance of doubt, the Counterparty will be liable as a principal for its obligations under this Agreement.

16.5    A party shall notify the other immediately in writing if any of the representations or warranties in this Clause 16 ceases to be true and correct or, with the service of notice or passage of time, would cease to be true and correct.

16.6    The Counterparty undertakes that it will supply the Prime Broker with monthly net asset value calculations and audited annual financial statements (or more frequent calculations or statements if available) promptly after their production and, in any event, upon demand by the Prime Broker.

17.    CUSTODY

17.1    With the exception of any assets transferred to the Prime Broker pursuant to Clause 11, any securities debited to the Securities Accounts shall be held by the Prime Broker as custodian, and the Counterparty hereby appoints the Prime Broker, and the Prime Broker agrees to act, as its custodian, in accordance with the terms of Schedule 2.

18.    ADMINISTRATION OF AGREEMENT

18.1    The Counterparty hereby authorises the Prime Broker to accept and act on –

(a)    all and any Instructions, requests, information or other information believed by the Prime Broker in good faith to have been made or given by the Counterparty without any duty on the Prime Broker to make further enquiries;

(b)    any other Instructions of the Counterparty in any respect concerning the Cash Accounts and Securities Accounts (including, without limitation, delivering or otherwise transferring investments and paying cash to the Counterparty or otherwise as the Counterparty may order or direct).

18.2    The Counterparty hereby ratifies all and any actions taken in its name under the Agreement.

19.    CONFLICTS OF INTEREST

19.1    The Counterparty hereby authorises the Prime Broker to act hereunder notwithstanding that the Prime Broker, or any of its divisions or Affiliates may have a material interest in the transaction or that circumstances are such that the Prime Broker may have a potential conflict of duty or interest, including the fact that the Prime Broker or any of its Affiliates may -

(a)    deal as principal or act as a market maker or broker fund adviser in the securities to which Instructions relate;

(b)    provide broking services to other persons;

(c)    act as financial adviser to the issuer of such securities;

(d)    act in the same Transaction as agent for more than one person;

(e)    have a material interest in the issue of the securities; or

(f)    earn profits from any of the activities listed herein;

and none of the Prime Broker, its agents or Affiliates shall have any fiduciary duties to the Counterparty.

20.    TERMS

20.1    In relation to any Terms notified by the Prime Broker to the Counterparty from time to time -

(a)    the Prime Broker may in its sole and absolute discretion amend such Terms (in whole or in part) with immediate effect by notification to the Counterparty of revised Terms (subject to the terms of any applicable notice periods); and

(b)    where any fact, criterion or qualitative issue falls to be determined by the Prime Broker under any Terms, the Prime Broker will be entitled to exercise such determination in its sole and absolute discretion; and

(c)    in the event of any inconsistency between the terms of this Agreement and any Terms, the terms of this Agreement will prevail.

21.   ADVICE

21.1   The Counterparty acknowledges that nothing in this Agreement nor any act, omission, communication or course of conduct of the Prime Broker or its agents pursuant to this Agreement shall constitute the giving of advice.

22.   CONFIDENTIALITY

22.1   Subject to Clause 22.2, the Counterparty undertakes with the Prime Broker that it will keep confidential (and will ensure that its officers, employees, agents and professional and other advisers keep confidential) any information which relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement). The Counterparty shall not use for its own business purposes or disclose to any third party any such confidential information without the consent of the Prime Broker.

22.2   Clause 22.1 shall not apply to any information which the Counterparty discloses –

    (a)   in accordance with any legal or regulatory requirement by which it is bound; or

    (b)   with the Prime Broker's consent.

23.   NOTICES

23.1   Any notice to be given under this Agreement -

    (a)   shall be in English and, except where expressly otherwise provided in this Agreement, shall be given in writing or by facsimile or such other means of communication and subject to such security measures as may be agreed between the parties hereto;

    (b)   may be given and shall be effective -

        (i)   if in writing and delivered in person or by courier, at the time when it is delivered;

        (ii)   if sent by facsimile, at the time when the transmission is received by a responsible employee of the recipient in legible form;

        (iii)   if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), at the time when the mail is delivered or its delivery attempted;

except that any notice or communication received, or delivery of which is attempted, after close of business, or on a day which is not a Business Day, shall be treated as given at the opening of business on the next Business Day. Notices and communications served on any Agent shall be effective as if served directly on the Counterparty.

23.2   The Prime Broker may make a Margin Call by e-mail or any other electronic messaging system and such a Margin Call shall be effective when received by the Counterparty.

24. INSTRUCTIONS

24.1   The Counterparty may make any request to make payments of cash or deliveries of securities to or on behalf of the Counterparty ("*Instructions*") orally, by e-mail or by such electronic means of communication as the parties may agree from time to time. The Prime Broker may require the Counterparty to confirm oral Instructions in writing (by letter, facsimile or electronically) at any time. Instructions shall be given in accordance with this Clause 24 and the Counterparty confirms that such persons as may be notified orally or in writing by the Counterparty from time to time ("Authorised Persons") has the authority to give Instructions to the Prime Broker.

24.2   The Counterparty further confirms that each of the persons listed in Schedule 4 and such other persons as may be notified in writing by the Counterparty from time to time has the authority give cash payment instructions or instructions for the free delivery of securities from the Securities Account to the Prime Broker ("Payment Authorised Person").

24.3   The Prime Broker shall be entitled without further inquiry to execute or otherwise act upon Instructions, requests, information or other communication believed in good faith by the Prime Broker to have been made or given by any Authorised Person or Payment Authorised Person, notwithstanding that any such Instruction, request, information or other communication may afterwards be found not to have been genuine or not to have been made or given by an Authorised Person or Payment Authorised Person. Such execution or action shall in the absence of gross negligence, wilful default or fraud by the Prime Broker constitute a good discharge by the Prime Broker of its obligations and it shall not be liable for any actions taken or omitted to be taken in good faith.

24.4   The Counterparty undertakes –

(a)   to ensure that no person other than an Authorised Person shall give Instructions to the Prime Broker;

(b)   to comply with any security procedures specified by the Prime Broker from time to time; and

(c)   to notify the Prime Broker immediately of any unauthorised access or if it has reasonable grounds to suspect any unauthorised use of any user name or password.

25. DETERMINATION

25.1   Where matters are referred to in this Agreement as being for the determination of the Prime Broker, such determination shall, in the absence of manifest error, be conclusive and binding upon the parties.

26. NON-ASSIGNABILITY; TERMINATION

26.1   Subject to Clause 26.2 below, the rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned or charged, provided however that this Agreement and all Transactions shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. The Prime Broker may, however,

delegate to a third party the performance of its obligations under this Agreement or all or any part of a Transaction on such terms as it considers appropriate.

26.2   Notwithstanding the foregoing, the Prime Broker may, in its sole and absolute discretion, novate, assign or charge any rights, benefits and obligations under this Agreement to any of its Affiliates, provided that such Affiliate has, or its obligations are guaranteed by an entity which has, a credit rating at least equal to or higher than that of the Prime Broker at the time of such assignment or charge.

26.3   Notwithstanding the provisions of Clause 13.1, a party may terminate this Agreement by giving written notice to the other parties, provided that:

(a)   this Agreement shall remain applicable to all Transactions and Liabilities then outstanding, provided further that the parties shall use reasonable endeavours to close out all such Transactions and discharge such Liabilities as soon as practicable in accordance with their terms;

(b)   all remedies under this Agreement shall survive termination;

(c)   the Counterparty may not terminate this Agreement if, at the time of termination a Margin Deficit would be created or increased, save where (i) the Defaulting Party is the Prime Broker and (ii) no Event of Default has occurred or is continuing in respect of the Counterparty ; and

(d)   Clauses 9, 10, 13, 15, 22, 28 and 29 and this Clause 26 shall survive termination of this Agreement.

27.   FORCE MAJEURE

27.1   The Prime Broker shall not be liable for taking or not taking and shall not be obliged to take or refrain from taking any action which is beyond its power to take or refrain from taking wholly or partly as a result of a state of affairs (including any change of applicable regulations or any directive or policy) which it was beyond the Prime Broker's control to prevent and the effect of which is beyond its power to avoid.

27.2   The Prime Broker will not be liable to the other parties for any delay in performance, or for the non-performance of any of its obligations hereunder by reason of any cause beyond the Prime Broker's (or that of any Sub-Custodian) reasonable control or for any losses caused by the occurrence of any contingency beyond the Prime Broker's (or that of any Sub-Custodian) reasonable control. This includes without limitation any breakdown or failure of transmission, communication or computer facilities, postal or other strikes or similar industrial action, acts of war or terrorism, insurrection, revolution, nuclear fusion, fission or radiation, acts of God and the failure of any relevant exchange, clearing house and/or broker for any reason to perform its obligations.

27.3   Any delay in performance or non-performance of any of its obligations under this Agreement by the Prime Broker by reason of the application of this Clause 27 shall not constitute an event for the purposes of Clause 12 which would, upon the serving of a Default Notice or otherwise, be an Event of Default in respect of the Prime Broker.

27.4    References in this Clause 27 to the Prime Broker shall include any Affiliate of the Prime Broker.

28.    GOVERNING LAW AND JURISDICTION

28.1    This Agreement shall be governed by and construed in accordance with the laws of England.

28.2    The parties agree that the courts of England are to have exclusive jurisdiction to settle any dispute (including claims for set-off and counterclaims) which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, this Agreement or otherwise arising in connection with this Agreement and for such purposes irrevocably submit to the jurisdiction of the English courts.

28.3    The agreement in Clause 28.2 is concluded for the benefit of the Prime Broker alone. The Prime Broker retains the right to bring proceedings against the Counterparty in its absolute discretion in the courts of any other country which may have jurisdiction including the courts of the jurisdiction in which the Counterparty is located (as specified on page 1 of this Agreement), to whose jurisdiction the Counterparty irrevocably submits.

28.4    The Counterparty hereby irrevocably appoints Olivant Advisors Limited at present having its offices at 2 Basil Street London, SW3 1AA, England as its agent to receive on its behalf service of process in such courts, and service upon such agent shall constitute good service notwithstanding any failure by such agent to notify the Counterparty of such service. If such agent ceases to be its agent, the Counterparty shall promptly appoint, and notify the Prime Broker of the identity of, a new agent in England. Nothing in this Clause 28 shall however affect the right to serve process in any other manner permitted by law.

29.    WAIVER OF IMMUNITY

29.1    The Counterparty hereby waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, attachment (both before and after judgement) and execution to which it might otherwise be entitled in any country or jurisdiction, relating in any way to this Agreement or any Transaction, and agrees that it will not raise, claim or cause to be pleaded any such immunity at or in respect of any such action or proceeding.

30.    RECORDING

30.1    The parties agree that each may without further notice electronically record all telephone conversations between them and such recordings may be admitted in evidence in any proceedings relating to this Agreement.

31.    CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

31.1    Other than Affiliates of the Prime Broker and the directors, officers, employees and agents of the Prime Broker or its Affiliates, a person who is not a party to this Agreement shall have no right under the Contract (Rights of Third Parties) Act 1999 to enforce any of its terms.

Lehman Brothers International (Europe) )
By: _____ )
Title: _____ )
Date: _____ )

EXECUTED AS A DEED for and on behalf of the Counterparty

By: Luqman Arnold
Title: Class 9 Director
Date: 15 April 2008

By: _____ )
Title: _____ )
Date: _____ )

SCHEDULE 1

PROCEDURES

1.    THIRD PARTY TRANSACTIONS

1.1    Whenever the Counterparty wishes the Prime Broker to settle a Third Party Transaction, it shall request the Prime Broker to do so by giving Instructions (a "*Third Party Transaction Request*") to the Prime Broker in writing or by facsimile or by such other means of communication as may be agreed to by the parties which may include, without limitation, LehmanLive, Bloomberg, or another form of electronic messaging system.

1.2    The Prime Broker may at any time before settlement of a Third Party Transaction and in its absolute discretion reject the relevant Third Party Transaction Request by giving oral or written notice to that effect to the Counterparty. Within one Business Day following receipt by the Prime Broker of a Third Party Transaction Request the Prime Broker may send a confirmation of the Third Party Transaction to the Counterparty by facsimile or email. The Prime Broker shall be deemed to have accepted the terms of a Third Party Transaction only on settling such Third Party Transaction.

1.3    Unless any particular settlement method is specified in the Third Party Transaction Request, the Prime Broker may effect settlement of the relevant Third Party Transaction, or attempt to do so, by any means it considers appropriate; including without limitation, a means which does not provide for delivery-versus-payment.

1.4    Save where a Third Party Transaction is novated in accordance with Paragraph 1.5, the Prime Broker shall, as between the Prime Broker and the third party or its agent, act as the Counterparty's agent in settling any Third Party Transaction and the Prime Broker may inform the third party, or its agent, that the Prime Broker is acting as agent of the Counterparty.

1.5    The Prime Broker may, in its absolute discretion, agree to a Novated Third Party Contract. The Counterparty appoints the Prime Broker as its agent to agree any such novation with a third party on its behalf upon such terms as the Prime Broker sees fit without consultation with the Counterparty. Upon novation of a Third Party Transaction there shall arise a Collateral Contract.

1.6    The Prime Broker shall not be liable for any Losses incurred in respect of any failure by the third party to settle its obligations under a Third Party Transaction (including any Novated Third Party Contract) on the Contractual Settlement Date or at all.

1.7    The Prime Broker shall give oral or written notice to the Counterparty of the failure of any Third Party Transaction (including any Novated Third Party Contract) or any Collateral Contract to settle on the Contractual Settlement Date as soon as reasonably practicable after becoming aware of such failure.

1.8    The Prime Broker shall, on the Contractual Settlement Date of -

(a)     a Third Party Transaction, credit any cash received from, or debit any cash payable to, the relevant third party to or from the Cash Accounts or, as appropriate, debit any securities received from, or credit any securities deliverable to, the relevant third party from or to the Securities Accounts;

(b)     a Collateral Contract, debit any cash payable by, or credit any cash payable to the Counterparty from or to the Cash Accounts or, as appropriate, credit any securities deliverable by, or debit any securities deliverable to, the Counterparty to or from the Securities Accounts.

1.9     The Prime Broker may reverse any entries made under Paragraph 1.8 if the Transaction fails to settle within such period following the relevant Contractual Settlement Dates as the Prime Broker considers reasonable. Any costs associated with any such failure to settle or such a reversal shall be for the account of the Counterparty.

## 2.     PRINCIPAL TRANSACTIONS

2.1     Whenever the Counterparty wishes to enter into an agreement to purchase from, or sell to, the Prime Broker securities or a sum of specified currency, it shall submit a Principal Transaction Request to the Prime Broker in writing or by facsimile or by such other means of communication as may be agreed to by the parties which may include, without limitation, LehmanLive, Bloomberg. or another form of electronic messaging system.

2.2     Service of a Principal Transaction Request shall constitute an offer by the Counterparty to enter into the Principal Transaction specified in the Principal Transaction Request, and that offer may be amended or revoked only with the consent of the Prime Broker.

2.3     Within one Business Day following acceptance by the Prime Broker of a Principal Transaction Request the Prime Broker may send a confirmation to the Counterparty by facsimile or email. Such confirmation shall not be deemed to be a binding acceptance by the Prime Broker of the Principal Transaction Request and the Prime Broker may reject any Principal Transaction Request by giving oral or written notice to that effect to the Counterparty at any time up to and including the Contractual Settlement Date. The Prime Broker shall be deemed to have accepted the terms of such a Principal Transaction only on settling such Principal Transaction.

2.4     Subject to the provisions of Clause 6 and unless the parties otherwise agree, securities or cash which would otherwise fall to be delivered or paid by one party to the other on the Contractual Settlement Date of a Principal Transaction shall not be delivered or paid but shall:

(a)     be credited to, (in the case of cash payable to the Counterparty), or be debited from, (in the case of cash payable to the Prime Broker), the relevant Cash Account; or

(b)     be debited to, (in the case of securities deliverable to the Counterparty), or be credited to, (in the case of securities deliverable to the Prime Broker), the relevant Securities Account.

LON:746470 (052820-0518)

2.5    Securities debited or cash credited to an account pursuant to Paragraph 2.4 shall, for the purposes of Clause 6, be treated for accounting purposes as having been delivered or paid by the Counterparty to the Prime Broker.

3.    **DELIVERIES AND PAYMENTS TO THE PRIME BROKER**

3.1    Subject to the provisions of Clause 5, whenever the Counterparty wishes to deliver securities or pay cash to the Prime Broker it shall notify the Prime Broker of its intention to do so. Upon receipt of such securities or cash the Prime Broker shall, if such securities are of a type acceptable to the Prime Broker or such cash is of a currency acceptable to the Prime Broker, debit such securities to the relevant Securities Account or credit such cash to the relevant Cash Account.

4.    **DELIVERIES AND PAYMENTS TO THE COUNTERPARTY**

4.1    Whenever the Counterparty wishes the Prime Broker to deliver securities or pay cash to it or to its order, the Counterparty shall request the Prime Broker to do so in the form notified to the Counterparty by the Prime Broker from time to time.

4.2    The Prime Broker may, at any time before delivery or payment and in its absolute discretion reject any delivery or payment request by giving written or oral notice to that effect to the Counterparty. The Prime Broker shall be deemed to have accepted a delivery or payment request only on making the relevant delivery or payment. The Prime Broker shall not be obliged to accept or give effect to any delivery or payment request which would result in the creation of, or an increase in, a Margin Deficit.

4.3    Unless a delivery request is rejected, the Prime Broker shall deliver the requested securities or cash in accordance with the delivery request, except that the Prime Broker may deliver the securities or cash at the earliest time it is reasonably practicable for the Prime Broker to make the requested delivery or payment, having regard to customary market practice and the time and date on which the delivery request is received, if that date is later than the settlement date requested by the Counterparty.

4.4    Securities and cash delivered to the Counterparty pursuant to Paragraph 4.3 shall, except to the extent securities of the amount and description in question or, as appropriate, cash of the amount and currency in question. are for the time being debited to a Securities Account or, as the case may be, credited to a Cash Account and available for the purpose, be treated as having been advanced or loaned by the Prime Broker to the Counterparty. The Counterparty shall, subject to the terms of this Agreement, be obliged to deliver to the Prime Broker, on demand, Equivalent Securities in respect of any securities advanced to the Counterparty and to repay on demand cash loaned to the Counterparty.

5.    **MISCELLANEOUS**

5.1    The Counterparty warrants to and for the benefit of the Prime Broker that it will not make any payments of cash to the Prime Broker under this Schedule other than pursuant to or for the purpose of or in connection with Transactions made or to be made with or through the Prime Broker.

SCHEDULE 2

CUSTODY

1. **POWERS AND DUTIES OF THE PRIME BROKER**

1.1    The Prime Broker shall receive, hold, release and deliver (or instruct any Sub-Custodian to receive, hold, release and deliver) securities to or from the Securities Accounts (as appropriate) only on receipt of Instructions. The Counterparty authorises the Prime Broker to (or to instruct any Sub-Custodian to) allocate and deliver securities to the Securities Accounts and to transfer securities from the Securities Accounts to the Counterparty, only in accordance with such Instructions. The Prime Broker shall have full authority to do whatever it reasonably deems necessary in order to effect such Instructions. In addition, the Counterparty hereby authorises the Prime Broker to do whatever the Prime Broker deems necessary in its absolute discretion to effect such transfers of securities to and from the Securities Accounts as are required pursuant to the terms of this Agreement.

1.2    The Prime Broker shall be under no duty to take or omit to take any action with respect to any of the securities except in accordance with this Agreement.

1.3    The Prime Broker does not make any warranties, representations or other statements whatsoever in respect of the validity or sufficiency of the securities, the enforceability of any rights or interests relating thereto or whether it is appropriate, necessary or desirable to take or omit to take any action in relation thereto, and these matters shall be the exclusive concern of the Counterparty.

1.4    The Prime Broker shall have no duty to advise or make recommendations to the Counterparty in connection with the securities and the Prime Broker shall not be responsible for advising the Counterparty as to the investment merits of such securities.

2. **SEGREGATION OF ASSETS**

2.1    The Prime Broker will identify in its books and records that the securities belong to the Counterparty.

2.2    The Prime Broker will require that any Sub-Custodian or nominee appointed by it, or any Securities Depositary which it uses to hold the securities pursuant to this Agreement, will identify in its books and records that the securities belong to the customers of the Prime Broker (to the extent permitted by applicable mandatory law, regulation, or market practice) so that it is readily apparent that such securities do not belong to the Prime Broker.

3. **SHORT POSITIONS**

3.1    The Prime Broker is not obliged to process transactions which will result in a short position on the Cash Accounts or the Securities Accounts. The Counterparty agrees that delivery Instructions will not be issued and acknowledges that the Prime Broker is not obligated to deliver any securities unless the Prime Broker has received evidence satisfactory to it that the relevant securities will have been received by the Prime Broker in time for delivery in accordance with the Counterparty's Instructions.

LDN1746470 (052026/05-8)

4.     CONFIRMATION OF ORAL INSTRUCTIONS/SECURITY DEVICES

Any Instructions delivered to the Prime Broker by telephone shall promptly thereafter be confirmed in writing by an Authorised Person (which confirmation may bear the facsimile signature of such person). The Prime Broker is authorised to follow such Instructions notwithstanding the failure of an Authorised Person to send such confirmation in writing or the failure of such confirmation to conform to the telephone Instructions received and the Prime Broker shall be indemnified by the Counterparty accordingly. The Counterparty shall be responsible for safeguarding any testkeys, identification codes or other security devices which the Prime Broker shall make available to the Counterparty or any Authorised Person.

5.     ACTING ON INSTRUCTIONS/UNCLEAR INSTRUCTIONS

The Counterparty authorises the Prime Broker to accept and act upon any Instructions received by it without enquiry. The Prime Broker may (without prejudice to the foregoing) seek clarification or confirmation of an Instruction from an Authorised Person and may decline to act upon an Instruction if it does not receive clarification or confirmation satisfactory to it. The Prime Broker shall not be liable for any loss arising from any delay whilst it obtains such clarification or confirmation or from exercising its right to decline to act in the absence of such clarification or confirmation.

6.     INSTRUCTIONS CONTRARY TO LAW/MARKET PRACTICE

The Prime Broker need not act upon Instructions which it reasonably believes to be contrary to law, regulation or market practice but is under no duty to investigate whether any Instructions comply with any applicable law, regulation or market practice, which, for the avoidance of doubt, shall be the sole responsibility for the Counterparty. The Prime Broker shall be entitled (but not bound), if it deems possible to do so to amend an Instruction in such a manner to comply with what the Prime Broker reasonably believes to be applicable law, regulation or market practice.

7.     SUB-CUSTODIANS AND SECURITIES DEPOSITORIES

Appointment

7.1     The Prime Broker is authorised under this Agreement to act through and hold the securities with Sub-Custodians being such other entities as the Prime Broker may appoint as sub-custodian (each a "*Sub-Custodian*"). In addition, the Prime Broker and each Sub-Custodian appointed by it may deposit securities with, and hold securities in any Securities Depository on such terms as such systems customarily operate. References in this Agreement to other Sub-Custodians which the Prime Broker may appoint shall include Affiliates of the Prime Broker but not Securities Depositaries. The Prime Broker reserves the right to add, replace or remove other Sub-Custodians and the Prime Broker shall give notice to the Counterparty of any such act as soon as reasonably practicable thereafter.

7.2     The Prime Broker will use reasonable skill, care and diligence in the selection of any Sub-Custodian appointed by it pursuant to this Agreement and shall be responsible to the Counterparty for satisfying itself as to the ongoing suitability of such Sub-Custodian, for the maintenance of an appropriate level of supervision over such Sub-Custodian and

for making periodic enquiries to confirm that the obligations of such Sub-Custodian to the Prime Broker are discharged in a satisfactory manner.

7.3    The Customer acknowledges and agrees that Prime Broker may grant to any Sub-Custodian or Securities Depository a lien, right of retention or sale over any securities held by, or deposited with, that Sub-Custodian or Securities Depository in respect of amounts owing to that Sub-Custodian or Depository.

**Liability for Other Sub-Custodians**

7.4    The Prime Broker shall be liable for losses arising out of the insolvency, acts or omissions of any Sub-Custodian that is an Affiliate of the Prime Broker but not of any other Sub-Custodian or of any Securities Depository.

8.    HOLDING OF REGISTERED AND BEARER SECURITIES

8.1    The Prime Broker is authorised to hold:

(a)    in bearer form, such securities as are customarily held in bearer form; and

(b)    registered in the name of (at the Prime Broker's discretion) the Counterparty or the Prime Broker or another Sub-Custodian appointed by the Prime Broker or any nominee of the Prime Broker or another Sub-Custodian appointed by the Prime Broker, such securities as are customarily held in registered form.

8.2    The Prime Broker shall not be liable for any loss suffered howsoever caused as a result of an Instruction to hold securities with, or have them registered in the name of, any person not chosen by the Prime Broker.

9.    OMNIBUS ACCOUNTS

9.1    The Counterparty authorises the Prime Broker to hold securities in fungible accounts holding securities of other customers of the Prime Broker (but not securities of the Prime Broker), such accounts being designated as customer accounts. The Counterparty authorises the Prime Broker to hold securities in accounts with Sub-Custodians appointed by the Prime Broker on the basis that such accounts are fungible accounts which hold securities of other customers of the relevant Sub-Custodian (but not securities of such Sub-Custodians). The Counterparty will accept delivery of securities of the same class and denomination as those deposited with the Prime Broker or any other Sub-Custodian appointed by the Prime Broker.

10.    UNITED KINGDOM REGULATORY MATTERS

10.1    The Rules require the Prime Broker to inform the Counterparty that:

(a)    where securities are held overseas there may be different settlement, legal and regulatory requirements in those jurisdictions from those applying in the United Kingdom, together with different practices for the separate identification of securities;

(b) in providing the services described in this Agreement, the Prime Broker may hold securities with other Sub-Custodians who are in the same group as the Prime Broker;

(c) although securities will ordinarily be registered in the name of a nominee, the Prime Broker may from time to time (where, due to the nature of the law or market practice of an overseas jurisdiction, it is in the Counterparty's best interests or it is not feasible to do otherwise) register or record securities in the name of a Sub-Custodian, or the Prime Broker itself subject always to Paragraph 2. Securities may also be registered in the name of the Counterparty. Subject always to Paragraph 2, if securities are registered in the name of the Prime Broker, such securities may not be segregated from assets of the Prime Broker, and, in the event of insolvency of the Prime Broker, such securities may not be as well protected. Arrangements with Sub-Custodians are such that securities held with them shall be in a separate account containing assets belonging only to customers of the Prime Broker and not the Prime Broker's proprietary assets. In any event, the Prime Broker will notify the Counterparty of the registration name used in respect of securities which are registrable securities;

(d) the Prime Broker accepts the same level of liability for any nominee company controlled by the Prime Broker or by an Affiliate as for itself;

(e) the omnibus accounts referred to in Paragraph 8 are a form of pooling;

(f) if the Counterparty instructs the Prime Broker to hold securities with or register or record securities in the name of a person not chosen by the Prime Broker, the consequences of doing so are at the Counterparty's own risk and the Prime Broker shall not be liable therefore.

## 11.   FRACTIONS/REDEMPTIONS BY LOT

The Counterparty shall not be entitled to any fraction or other entitlement arising as a result of the Prime Broker holding securities in omnibus accounts, which is not directly referable solely to the holding of the Counterparty and such fractions or entitlements shall be at the disposal of the Prime Broker. On partial redemptions, the Prime Broker shall use whatever method it deems fair to determine how shares will be redeemed.

## 12.   STATEMENTS

12.1   The Prime Broker will issue statements to the Counterparty at times mutually agreed identifying the amounts of cash in the Cash Accounts and identifying the securities in the Securities Accounts, and otherwise on request. A certificate or statement by the Prime Broker as to any cash or any securities held in a Cash Account or a Securities Account shall be conclusive in the absence of manifest error. Prices and other information contained in any statement sent to the Prime Broker have been obtained from sources the Prime Broker believes in good faith to be reliable. The Prime Broker does not, however, make any representation as to the accuracy of such information, nor that the prices specified necessarily reflect the proceeds that would be received on a disposal of the relevant securities.

12.2    References in this Agreement to statements include any statements in electronic form.

12.3    Where the Counterparty is ordinarily resident outside the United Kingdom, the Prime Broker may, at the Counterparty's request, arrange for custody statements to be retained by the Prime Broker.

12.4    The Counterparty agrees that the information, statements and other communications provided to it pursuant to the terms of this Agreement shall be in satisfaction of any obligation of the Prime Broker to deliver a confirmation, contract note or statement.

13.    DISCLOSURE OF INFORMATION

The Prime Broker shall be entitled to disclose any information relating to the Counterparty or the securities and/or cash held for the Counterparty as is required by any law, court, legal process, professional adviser or banking or other regulatory or examining authorities (whether governmental or otherwise).

## SCHEDULE 3

### DEFINITIONS

"*Act of Insolvency*" occurs in respect of a party upon:

(a)   its making a general assignment for the benefit of, or entering into a reorganisation, arrangement, or composition with creditors; or

(b)   its admitting in writing that it is unable to pay its debts as they become due; or

(c)   its seeking, consenting to or acquiescing in the appointment of any trustee, administrator, examiner, receiver or liquidator or analogous officer of it or any material part of its property; or

(d)   except in the case of the Prime Broker, the presentation or filing in any jurisdiction of a petition in respect of it in any court or before any agency alleging or for the bankruptcy, winding-up or insolvency of such party (or any analogous proceeding) or seeking any reorganisation, arrangement, composition, re-adjustment, administration, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such petition (except in the case of a petition for winding-up or any analogous proceeding) not having been stayed or dismissed within 15 days of its filing; or

(e)   except where such appointment is made in respect of the Prime Broker whilst the Prime Broker remains solvent, the appointment of a receiver, administrator, liquidator or trustee or analogous officer of such party or over all or any material part of such party's property. For the avoidance of doubt, the reference to any receiver, administrator, liquidator or trustee or analogous officer shall include any *commissaire de surveillance* appointed in the course of the admittance of such party to the regime of a *sursis de paiement et gestion controlee*; or

(f)   the convening of any meeting of its creditors for the purposes of considering a voluntary arrangement as referred to in section 3 of the Insolvency Act 1986 (or any analogous proceeding); or

(g)   except in the case of the Prime Broker, any act preparatory or analogous to any of (a) - (f) above; or

(h)   the occurrence of any procedure equivalent or analogous to the foregoing (a) to (g) in any other jurisdiction.; or

(i)   in respect of the Counterparty which is a limited partnership or limited liability company, the occurrence of any event or procedure referred to in paragraphs (a) to (h) above in relation to the general partner or any limited partner or, as the case may be, managing member.

"*Advanced Securities*" means securities advanced or treated as advanced to the Counterparty by the Prime Broker under Clause 4.1 including, for the avoidance of doubt, Hong Kong securities advanced by the Prime Broker under the Stock Lending Agreement;

"*Affiliate*" of the Prime Broker means an entity that is a subsidiary or holding company, or a subsidiary of a holding company, of the Prime Broker and the terms "subsidiary" and "holding company" have the meanings given them in Section 736 of the Companies Act 1985 (or any statutory modification or re-enactment thereof);

"*Authorised Persons*" has the meaning in Clause 24.1;

"*Base Currency*" means the currency agreed as the base currency or, in the absence of such agreement, US dollars;

"*Business Day*" means a day on which the Prime Broker and a day on which commercial banks are generally open for business in London;

"*Cash Account*" means an account for the payment of cash made and received (or deemed to have been made and received) pursuant to this Agreement and all Transactions relating thereto and such other payments as the Prime Broker and the Counterparty may from time to time agree;

"*Charged Assets*" means securities and other assets which are charged to the Prime Broker under Clause 10.1;

"*Collateral*" means cash or securities in which the Counterparty is not prohibited from investing by its investment guidelines, as notified to the Prime Broker from time to time;

"*Collateral Contract*" means a contract between the Prime Broker and the Counterparty, on identical terms to the Novated Third Party Contract to which it relates, except that:

(a)     the rights and obligations of the Prime Broker and the Counterparty under the Collateral Contract shall be equivalent to the rights and obligations of the third party and the Prime Broker respectively under the related Novated Third Party Contract; and

(b)     the Prime Broker shall be obliged to perform its obligations under the Collateral Contract only if and to the extent that the third party performs its obligations under the related Novated Third Party Contract;

"*Consequential loss or damage*" means loss or damage of a kind or extent which was or was not reasonably foreseeable at the time this Agreement was entered into as a serious possibility in the event of the breach of obligation in question, including without limitation, any breach of agreements entered into between the Counterparty and third parties, loss of profits or loss of business resulting from the breach of obligation in question;

"*Contractual Settlement Date*" means the date specified as the settlement date in the relevant confirmation sent by the Prime Broker to the Counterparty;

"*Customer Agreement*" means any contract for differences agreement or ISDA Master Agreement, or Master Institutional Futures Customer Agreement entered into between the Counterparty and the Prime Broker or between the Counterparty and any Affiliate, the Stock Lending Agreement and such other agreement between the Counterparty and the

Prime Broker or the Counterparty and any Affiliate as the Prime Broker and the Counterparty may from time to time agree;

*"Default Market Value"* means -

(e)    with respect to any cash on any date, the Market Value of such cash at the Default Valuation Time, and

(b)    with respect to any securities on any date -

    (i)    in the case of securities to be delivered to the Defaulting Party, the Market Value of such securities at the Default Valuation Time, adjusted for the market impact of such default by the Prime Broker acting in its absolute discretion, less all costs, fees and expenses that would be incurred in connection with a sale by the Prime Broker of such securities as determined by the Prime Broker; and

    (ii)    in the case of securities to be delivered by the Defaulting party, the amount it would cost to buy such securities at the Default Valuation Time at the best available offer price therefore on the most appropriate market, adjusted for the market impact of such default by the Prime Broker acting in its absolute discretion, together with all costs, fees and expenses that would be incurred in connection therewith in each case as determined by the Prime Broker;

*"Default Notice"* means a written notice served by the Non-Defaulting Party on the Defaulting Party stating that an event specified in Clause 11 shall be treated as an Event of Default for the purposes of this Agreement;

*"Default Valuation Time"* means, with respect to any cash or securities -

(a)    if the relevant Event of Default occurs during normal business hours on a dealing day in the most appropriate market for the relevant cash and securities (as determined by the Prime Broker), the close of business in that market on the following dealing day; and

(b)    in any other case, at such time as determined by the Prime Broker but in any event no later than the close of business on the second dealing day in that market after the day on which the relevant Event of Default occurs;

*"Defaulting Party"* has the meaning in Clause 12.1;

*"ERISA"* means the U.S. Employment Retirement Income Security Act of 1974 as amended.

*"ERISA plan"* means an employee benefit plan as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the US Internal Revenue Code of 1986, as amended;

*"Equivalent Securities"* means with respect to any security, securities of the same issuer, issue and of an identical type, nominal value and description as such security and shall

include the certificates and other documents of or evidencing title and transfer in respect of the foregoing (as appropriate). If and to the extent that the relevant securities are partly-paid or have been converted, subdivided, consolidated, redeemed, made the subject of a takeover, capitalisation issue or rights issue, or any event similar to the foregoing, Equivalent Securities shall have the following meaning -

(a)     in the case of conversion, sub-division or consolidation, securities equivalent to the securities into which the relevant securities has been converted, subdivided or consolidated;

(b)     in the case of redemption, a sum of money equivalent to the proceeds of the redemption;

(c)     in the case of a takeover, a sum of money or securities equivalent to the money or securities which was or were the consideration or alternative consideration;

(d)     in the case of a call on partly paid securities, securities equivalent to the relevant securities after such call has been paid up provided that the Counterparty has paid to the Prime Broker an amount of money equal to the sum due in respect of the call;

(e)     in the case of a capitalisation issue, securities equivalent to the relevant securities together with securities equivalent to the securities allotted by way of a bonus on securities of that kind;

(f)     in the case of a rights issue, securities equivalent to the relevant securities, together with the securities equivalent to securities allotted thereon, provided that the Counterparty has paid to the Prime Broker all sums due in respect thereof;

(g)     if a payment of interest, dividends or other distributions is made in respect of the relevant securities in the form of securities or a certificate which may at a future date be exchanged for securities, securities equivalent to the relevant securities, together with securities or a certificate equivalent to those allotted;

(h)     in the case of any event similar to any of the foregoing, securities equivalent to the relevant securities, together with or replaced by a sum of money or securities equivalent to that received in respect of the relevant securities resulting from such event;

and "*equivalent to*" shall be construed accordingly.

"*Event of Default*" has the meaning in Clause 12.1;

"*FSA*" means the Financial Services Authority;

"*Fund*" means, where the Counterparty is the trustee of a fund, that fund, as specified on page 1 of this Agreement;

"*Indemnitees*" has the meaning in Clause 14.1;

"*Instructions*" has the meaning in Clause 24.1;

"*Liabilities*" has the meaning in Clause 10.2;

"*Lehman Company*" means any Affiliate which is party to a Customer Agreement;

"*Loan*" means any loan made or treated as made under Clause 4.1;

"*Losses*" means all Taxes, fees, expenses, claims, actions, liabilities, damages, costs, losses, proceedings or other analogous matters;

"*Margin Call*" means a notification by the Prime Broker to the Counterparty of its obligation to deliver margin in order to eliminate a Margin Deficit;

"*Margin Deficit*" means the amount by which the Net Equity is less than the Margin Requirement as determined by the Prime Broker in its absolute discretion on a trade date or settlement date basis;

"*Margin Excess*" means the amount by which the Net Equity is greater than the Margin Requirement as determined by the Prime Broker in its absolute discretion on a trade date or settlement date basis;

"*Margin Requirement*" means the amount calculated by the Prime Broker in its sole and absolute discretion by reference to the Net Equity and notified by the Prime Broker to the Counterparty from time to time as the Margin Requirement including, without limitation, any initial and subsequent Margin Requirement notified to the Counterparty in such manner as Prime Broker considers appropriate including, without limitation, by means of any Terms;

"*Market Value*" means -

(a)    with respect to cash, the amount of such cash (converted, if necessary, into Base Currency at a spot rate obtained from a source selected by the Prime Broker in its sole and absolute discretion); and

(b)    with respect to securities, the price for such securities obtained from a source selected by the Prime Broker in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange. the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Prime Broker in its sole and absolute discretion. Market Value is determined by the Prime Broker solely for the purposes of determining Margin Requirements and should not be relied on by the Counterparty for any other purposes.

"*Market Value Equivalent*" means, in respect of cash or securities as of any time on any day as determined by the Prime Broker in its absolute discretion, an amount equal to the Market Value of such cash or securities;

"*Net Default Amount*" in respect of any Customer Agreement, means the amount if any payable by one party to the other following the operation of the close-out and netting provisions of that Customer Agreement, as determined in accordance with that agreement;

"*Net Equity*" has the meaning in Clause 6.1;

"*Novated Third Party Contract*" means a Third Party Transaction which the Prime Broker and the Counterparty have agreed to be novated on terms that the rights and obligations of the Counterparty in respect of the Third Party Transaction shall be assumed by the Prime Broker;

"*Payment Authorised Persons*" has the meaning in Clause 24.2;

"*Potential Event of Default*" means an event which with the service of notice or passage of time, or both, would be or would in the opinion of the Prime Broker be likely to be an Event of Default;

"*Principal Transaction*" means a Transaction specified in a Principal Transaction Request;

"*Principal Transaction Request*" means the form of request submitted by the Counterparty to the Prime Broker from time to time for the purpose of Paragraph 2.1 of Schedule 1;

"*Rules*" means the rules of the Financial Services Authority;

"*Securities Account*" means an account for the deliveries of securities made and received (or deemed to have been made and received) pursuant to this Agreement and all Transactions relating thereto;

"*Securities Depositary*" means any securities depository, settlement system, dematerialised book entry system, clearance system or similar system;

"*Security*" means the security created by or pursuant to this Agreement;

"*Spot Rate*" means the spot rate of exchange quoted by Lehman Brothers Inc. for the sale by it of the relevant currency against the purchase of the Base Currency;

"*Stock Lending Agreement*" means the stock lending agreement entered into between the Prime Broker and the Counterparty in the form of the Overseas Securities Lender's Agreement or the Global Master Securities Lending Agreement published by the International Securities Lenders Association;

"*Sub-Custodian*" means any person appointed by the Prime Broker as sub-custodian in accordance with Paragraph 7.1 of Schedule 2;

"*Taxes*" for this purpose means any present or future tax, applicable VAT, duty, stamp duty, stamp duty reserve tax, transfer tax, levy, impost or charge of a similar nature payable to or imposed by any supra-national or national government, federal state, provincial, local, municipal taxing authority, body or official, of any jurisdiction (together with any related penalties, damages, fines, interest, surcharges and similar charges);

"*Termination Date*" has the meaning in Clause 13.1;

"*Terms*" means any terms notified by the Prime Broker to the Counterparty setting out the fees, interest rates and Margin Requirement, which the Prime Broker in its absolute

discretion intends to apply to the Transactions, as amended from time to time, and if more than one, the last terms provided by the Prime Broker to the Counterparty;

"*Third Party Transaction*" means a Transaction established between the Counterparty and a third party;

"*Third Party Transaction Request*" has the meaning in Paragraph 1.1 of Schedule 1;

"*Transaction*" has the meaning in Clause 2.1 and, for the purposes of Clause 14, includes a loan of Hong Kong securities made under the Stock Loan Agreement.

## SCHEDULE 4

### AUTHORISED PERSONS

Name:                                          )
Luqman Arnold                                  )
Position:                                      )
Class A Director                               )
Specimen signature:                            )
                                               )
                                               )
                                               )

Name:                                          )
................................               )
Position:                                      )
................................               )
Specimen signature:                            )
................................               )

Name:                                          )
................................               )
Position:                                      )
................................               )
Specimen signature:                            )
................................               )

Name:                                          )
................................               )
Position:                                      )
................................               )
Specimen signature:                            )
................................               )

Name:                                          )
................................               )
Position:                                      )
................................               )
Specimen signature:                            )
................................               )

Lehman Brothers International (Europe) )
By: _____ )
Title: _____ )
Date: _____ )

EXECUTED AS A DEED for and on behalf of the Counterparty

By: _Luqman Arnold_ )
Title: _Class A Director_ )
Date: _15 April 2008_ )


By: __Johan Dejans__ )
Title: _Class B director_ )
Date: _15 April 2008_ )


By: Paul Lamberts
Title: Class B director
Date: 15 April 2008

# **Exhibit B**

UBS AG Proxy Form for an October 2, 2008 Extraordinary General Meeting

S34993    2097153O2498    0666790163334

22,882

24510

UBS AG SPECIAL MEETING TO BE HELD ON 10/02/08
FOR HOLDERS AS OF 08/03/08
24510    3-0230

YOU MAY ENTER YOUR VOTING INSTRUCTIONS AT 1-800-454-8683,
OR WWW.PROXYVOTE.COM UP UNTIL 11:59 PM EASTERN TIME THE
DAY BEFORE THE CUT-OFF OR MEETING DATE.

H89231338

DIRECTORS

0666 7801 6334

PROPOSAL(S)

1A - ELECTION OF DIRECTOR: SALLY BOTT

1B - ELECTION OF DIRECTOR: RAINER-MARC FREY

1C - ELECTION OF DIRECTOR: BRUNO GEHRIG

1D - ELECTION OF DIRECTOR: WILLIAM G. PARRETT

2 - AMENDMENTS TO THE ARTICLES OF ASSOCIATION: ADJUSTMENT TO THE NEW —>>>
UBS CORPORATE GOVERNANCE EFFECTIVE AS OF 1 JULY 2008

3 - IN CASE OF AD-HOC SHAREHOLDERS' MOTIONS DURING THE EXTRAORDINARY —>>>
GENERAL MEETING, I/WE AUTHORIZE MY/OUR PROXY TO ACT IN
ACCORDANCE WITH THE BOARD OF DIRECTORS

*NOTE* PLEASE BE ADVISED THAT THE ONLY VALID VOTING OPTIONS FOR
THE ABOVE PROPOSAL ARE EITHER "FOR" OR "AGAINST" ONLY

*NOTE* SUCH OTHER BUSINESS AS MAY PROPERLY COME BEFORE THE
MEETING OR ANY ADJOURNMENT THEREOF
*NOTE* IN ORDER TO HAVE YOUR SHARES VOTED, YOUR INSTRUCTIONS
MUST BE RECEIVED NO LATER THAN SEPTEMBER 26, 2008 AT 12:00 P.M.
EDT

DIRECTORS
RECOMMEND

FOR —>>>

FOR —>>>

FOR —>>>

FOR —>>>

FOR —>>>

RECEIVED
06 OCT 2008

DIRECTORS
(MARK "X" FOR ONLY ONE BOX)
THIS SPACE INTENTIONALLY LEFT BLANK

PLEASE INDICATE YOUR VOTING

INSTRUCTIONS FOR EACH PROPOSAL

UBS AG
10/02/08

USE NUMBER ONLY

FOR    AGAINST    ABSTAIN

1A

1B

1C

FOR    AGAINST    ABSTAIN

1D

2

DO NOT USE

FOR    AGAINST    ABSTAIN

3

DO NOT USE

DO NOT USE

FOR    AGAINST    ABSTAIN

DO NOT USE

DO NOT USE

DO NOT USE

FOR    AGAINST    ABSTAIN

DO NOT USE

DO NOT USE

DO NOT USE

PLEASE INDICATE YOUR PROPOSAL SELECTION BY
FIRMLY PLACING AN "X" IN THE APPROPRIATE
NUMBERED BOX WITH BLUE OR BLACK INK

SEE VOTING INSTRUCTION NO. ___ 3 ___ ON REVERSE

A/C: 056068414

H89231338

0666 7901 6334

77Q

PLACE "X" HERE IF YOU PLAN TO ATTEND
AND VOTE YOUR SHARES AT THE MEETING

LEHMAN BROTHERS PRIME BROKERAGE

745 7TH AVENUE 8 FLR
NEW YORK, NY 10019

01

X

OLIVANT LIMITED
PICS
REGENCY COURT
GLATERRY ESPLANADE
ST PETER PORT GY13NQ
GG



NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

**BUSINESS REPLY MAIL**

FIRST-CLASS MAIL    PERMIT NO. 1319    FARMINGDALE NY

POSTAGE WILL BE PAID BY ADDRESSEE

PROXY SERVICES

FARMINGDALE NY 11735-9585

URGENT
(IF NOT VOTING BY TELEPHONE OR VIA THE INTERNET)
To Expedite Processing of Your Vote Please Ensure
- Please Sign and Date Form.
- P.O. Box 9138 Appears in the Front Window.
- Bar Code Appears in Window to the Left.

Before sealing make sure barcode appears through window above

**REMINDER: FOR YOUR CONVENIENCE, VOTE BY PHONE OR INTERNET**
If you have a touch-tone telephone, please utilize our toll free proxy voting service. To register
your vote, simply call the number on the upper left portion of your voting form. To vote via the
Internet, visit our website at www.proxyvote.com. If you respond by telephone or Internet, do not
return your voting form, keep it for your records.

**POSTAGE MUST BE AFFIXED IF MAILED OUTSIDE THE UNITED STATES**

 **UBS**

UBS AG
P.O. Box, CH-8098 Zurich
Tel. +41-44-234 11 11

Board of Directors

Tel. +41-44-236 67 69
Fax +41-44-235 82 20
sh-shareholder-services@ubs.com

8 September 2008

**Extraordinary General Meeting of UBS AG on 2 October 2008, 10.30 a.m.,
St. Jakobshalle, Brüglingerstrasse 21, Basel**

Dear Shareholder

On behalf of our Board of Directors, we would like to invite you to the Extraordinary General Meeting of Shareholders. Please find enclosed the agenda with explanations to the different items. If you plan to attend the Extraordinary General Meeting in person or to appoint a proxy of your choice, we kindly ask you to return enclosure 1 to us, duly completed and signed, so that an admission card may be issued. Only registered shareholders who are entered in the share register may be appointed as proxies. Spouses who are not shareholders in their own right may not act as proxies.

We shall, however, be glad to represent your shares at the Extraordinary General Meeting as a corporate proxy. If this is your preference, we invite you to fill out the form of proxy with your voting instructions and return it to us.

If you appoint us as proxy without expressly indicating how you wish your votes to be cast, your shares will be voted in accordance with the proposals of the Board of Directors.

Sincerely yours,

UBS AG

Peter Kurer
Chairman

Luzius Cameron
Company Secretary

 **UBS**

**Request for an Admission Card**                                    **Enclosure 1**

Registered shareholder with voting rights

I/we request UBS AG to issue an admission card for the Extraordinary General Meeting on 2 October 2008, made out to:

❑  my/our name                        Family name   _____

❑  my/our proxy                       Given name    _____

                                      Address       _____

                                      City/State    _____

                                      Postal code   _____

and to send it to:

❑  my/our address

❑  my/our proxy

Date   _____      Signature   _____

**Please reply by 25 September 2008**

�֍ UBS

# Invitation
# to the Extraordinary General
# Meeting of UBS AG

**Thursday, 2 October 2008, 10:30 a.m.**
(Doors open at 9:30 a.m.)

**St. Jakobshalle**
Brüglingerstrasse 21, Basel

✖ UBS

UBS AG
P.O. Box, CH-8098 Zurich
P.O. Box, CH-4002 Basel

www.ubs.com

Extraordinary General Meeting of UBS AG | 2 October 2008

**A. Motion**
The Board of Directors proposes to adjust the Articles of Association to the new UBS corporate governance effective as of 1 July 2008 and that the title of Article 20, Articles 20 para. 1, 21 para. 2, 24 lit. e, 29 and 30 of the Articles of Association be replaced by the following:

| Current Version | Proposed New Version |
|---|---|
| *Title of Article 20* | *Title of Article 20* |
| Organization, Chairman's Office | Organization |
| *Article 20 para. 1* | *Article 20 para. 1* |
| ¹The Board of Directors shall elect a Chairman's Office from among its members. It shall be composed of the Chairman and at least one Vice Chairman. | ¹The Board of Directors shall elect a Chairman and at least one Vice Chairman from among its members. |
| *Article 21 para. 2* | *Article 21 para. 2* |
| ²The Board of Directors shall also be convened if one of its members or the Group Executive Board submits a written request to the Chairman's Office to hold such a meeting. | ²The Board of Directors shall also be convened if one of its members or the Group Chief Executive Officer submits a written request to the Chairman to hold such a meeting. |
| *Article 24 lit. e* | *Article 24 lit. e* |
| e) Appointment and removal of the President and the members of the Group Executive Board and the head of Group Internal Audit | e) Appointment and removal of (i) the Group Chief Executive Officer, (ii) such other members of the Group Executive Board as the Organization Regulations require to be appointed by the Board of Directors, and (iii) the Head of Group Internal Audit |
| *Article 29* | *Article 29* |
| The Group Executive Board is composed of the President and at least three other members. | The Group Executive Board is composed of the Group Chief Executive Officer and at least three other members as further set forth in the Organization Regulations. |

10

# Organizational Issues

**Admission Cards for the Extraordinary General Meeting**
Shareholders recorded in the Share Register of UBS AG in *Switzerland* may order their admission cards by sending the order form attached to this invitation to the following address until 25 September 2008: UBS AG, Shareholder Services, P.O. Box, CH-8098 Zurich.

Shareholders recorded in the Share Register *in the United States of America* may request their admission cards, in writing, at the following address until 25 September 2008: BNY Mellon Shareowner Services, Proxy Processing, P.O. Box 3510, S. Hackensack, NJ 07606-9210.

Previously issued admission cards will become invalid if the corresponding shares are sold prior to the Extraordinary General Meeting. These cards will be recalled if the Share Register is informed of the sale.

**Total number of shares and voting rights**
The total number of shares issued by UBS AG currently stands at 2,932,574,213. Each share carries one vote, meaning that 2,932,574,213 voting rights currently exist. Pursuant to Art. 659a para. 1 of the Swiss Code of Obligations, the voting rights of treasury shares and the rights associated therewith are suspended. The same applies to shares that have not been entered in the Share Register (dispo-shares) and shares that have been registered without voting rights. The total number of shares that entitle holders to attend and vote at the Extraordinary General Meeting is 1,617,965,602.

**Representation at the Extraordinary General Meeting**
Shareholders may be represented at the Extraordinary General Meeting by their legal representative or, with a written proxy, by their custodial bank or by any other shareholder entitled to vote at the Extraordinary General Meeting. In addition, every shareholder has the option of having his or her shares represented at the Extraordinary General Meeting, free of charge, by:
– UBS AG, P.O. Box, CH-8098 Zurich as a corporate or custody proxy
– Altorfer Duss & Beilstein AG (Dr. Urs Zeltner, Attorney and Notary) P.O. Box, CH-8010 Zurich as an independent proxy

Basel and Zurich, 8 September 2008

UBS AG
For the Board of Directors:

Peter Kurer, Chairman

3

**1.4. William G. Parrett**

*A. Motion*

The Board of Directors proposes that William G. Parrett be elected as an independent member of the Board of Directors.

*B. Explanations*

William G. Parrett (1945) served his entire career with Deloitte Touche Tohmatsu, a global organization of member firms that operates with 160,000 people in nearly 140 countries. He was Chief Executive Officer from 2003 until his retirement in 2007. Between 1999 and 2003, he was a Managing Partner of Deloitte & Touche USA LLP. William G. Parrett founded the U.S. National Financial Services Industry Group (1995) and the Global Financial Services Industry Group (1997) of Deloitte, both of which he led as Chairman. In his 40 years of experience in professional services, William G. Parrett served public, private, governmental, and state-owned clients worldwide with distinction in order to achieve superior financial performance and growth.

In addition, William G. Parrett is an independent director of Eastman Kodak Co., USA, Blackstone Group LP, USA, and Thermo Fisher Scientific Inc., USA. He also is the Chairman of the Boards of Directors of the United States Council for International Business and of United Way of America, a member of the Board of Trustees of Carnegie Hall, and a member of the Executive Committee of the International Chamber of Commerce. William G. Parrett has a Bachelor in accounting of the St. Francis College, New York, and is a certified public accountant. He is a US citizen.

Subject to his election, the Board of Directors intends to appoint William G. Parrett as a member of the Audit Committee.

# Item 1

**Election of New Members of the Board of Directors**

The Board of Directors proposes that Sally Bott, Rainer-Marc Frey, Bruno Gehrig and William G. Parrett be elected to the Board of Directors for a term of office to expire at the 2009 Annual General Meeting.

5

## 1.1. Sally Bott

### A. Motion

The Board of Directors proposes that Sally Bott be elected as an independent member of the Board of Directors.

### B. Explanations

Sally Bott (1949) serves as Group Human Resources Director of BP plc, which she joined in early 2005, and is a member of its Group Executive Committee. Sally Bott spent most of her career in finance. Between 2000 and 2005 she was a Managing Director at Marsh & McLennan, a US based global risk and insurance services business, and Head of HR for Marsh, Inc. From 1994 to 1997, she served for Barclays plc in different Human Resources roles. In 1970, she joined Citibank as a Research Analyst, where she subsequently took her first HR role as Director and rose steadily working primarily across investment and wholesale banking with a range of geographic responsibilities until 1993.

In addition, Sally Bott is a member of the Board of the Royal College of Music in London. She has a Bachelor in Economics of the Manhattanville College, USA, and followed courses towards a Masters in Economics at the New York University. She is a US citizen.

Subject to her election, the Board of Directors intends to appoint Sally Bott as a member of the Human Resources and Compensation Committee.

## 1.2. Rainer-Marc Frey

### A. Motion

The Board of Directors proposes that Rainer-Marc Frey be elected as an independent member of the Board of Directors.

### B. Explanations

Rainer-Marc Frey (1963) is the founder and Chairman of Horizon21, a thematically based investment manager which takes long-term investment views on various industry sectors. In 1992 he founded RMF Investment Group (RMF), one of the first hedge fund groups in Europe, and became Chief Executive Officer. RMF was acquired by Man Group Plc in 2002. Between 2002 and 2004, he held a number of senior roles within Man Group Plc and was the largest individual shareholder. From 1989 to 1992, prior to founding RMF, Rainer-Marc Frey served as a Director at Salomon Brothers Inc. in Zurich, Frankfurt and London, where he mainly was involved with equity derivatives. Between 1987 and 1989 he worked for Merrill Lynch Inc. covering equity, fixed income and swaps markets with the primary focus on equity derivatives.

In addition, Rainer-Marc Frey is a member of the Board of Directors of DKSH, Zurich, and a member of the Advisory Board of Invision Private Equity AG, Zug. He holds a degree in economics from the University of St. Gallen (Switzerland). He is a Swiss citizen.

Subject to his election, the Board of Directors intends to appoint Rainer-Marc Frey as a member of the Risk Committee and of the Strategy Committee.

## 1.3. Bruno Gehrig

### A. Motion

The Board of Directors proposes that Bruno Gehrig be elected as an independent member of the Board of Directors.

### B. Explanations

Bruno Gehrig (1946) has been Chairman of Swiss Life Holding since 2003. Between 1996 and 2003 he served at the Swiss National Bank starting as a member of the Governing Board and becoming Vice Chairman in 2000. From 1992 to 1996, he was a Professor at the University of St. Gallen and concurrently served as a member of the Swiss Federal Banking Commission. Between 1989 and 1991, he held the position of CEO at Cantrade Private Banking Group. Bruno Gehrig worked for the former Union Bank of Switzerland (UBS) between 1981 and 1989, where he started as Chief Economist before assuming responsibility for Securities Sales & Trading.

In addition, Bruno Gehrig is the Vice Chairman of the Board of Directors of Roche Holding AG, Basel, and the Chairman of the Swiss Luftfahrtstiftung, Zug. He studied Economics at the University of Berne (Switzerland), where he also did his PhD studies. He completed postgraduate studies at the University of Rochester, New York. He is a Swiss citizen.

Subject to his election, the Board of Directors intends to appoint Bruno Gehrig as a member of the Audit Committee.

Extraordinary General Meeting of UBS AG | 2 October 2008

# Status Report of the Board of Directors

**The Chairman of the Board of Directors will report on the following matters:**

(i)   New corporate governance of UBS AG as of 1 July 2008

(ii)  Strategic repositioning of UBS AG including implementation

(iii) Implementation of the remediation programme following the investigation of the Swiss Federal Banking Commission

The Board of Directors will make this status report for information purposes and outside of the agenda items of the Extraordinary General Meeting. No resolution will be adopted under this item.

4

# Item 2

**Amendments to the Articles of Association**
Adjustment to the new UBS corporate governance effective as of 1 July 2008 (Title of Article 20, Articles 20 para. 1, 21 para. 2, 24 lit. e, 29 and 30 of the Articles of Association)

5

**Status Report of the Board of Directors**

**Agenda Item 1**
**Elections of New Members**
**of the Board of Directors**

1.1.  Sally Bott
1.2.  Rainer-Marc Frey
1.3.  Bruno Gehrig
1.4.  William G. Parrett

**Agenda Item 2**
**Amendments to the Articles**
**of Association**

Adjustment to the new UBS corporate governance effective as of 1 July 2008 (Title of Article 20, Articles 20 para. 1, 21 para. 2, 24 lit. e, 29 and 30 of the Articles of Association)

# Introduction

**Requests for the Inclusion of Items on the Agenda**

On 13 August 2008, UBS AG published a notice in the Swiss Official Commercial Gazette (Schweizerisches Handelsamtsblatt), various Swiss and international newspapers as well as on its website at *www.ubs.com/shareholder-meeting*. Qualifying shareholders were invited to submit their requests for the inclusion of individual items on the agenda by 29 August 2008. No requests were submitted.

*Article 20*

[1] The Group Executive Board is responsible for the management of the Group. It is the supreme executive body as defined by the Swiss Federal Law on Banks and Savings Banks. It implements the Group strategy decided by the Board of Directors and ensures the execution of the decisions of the Board of Directors and the Chairman's Office. It is responsible for the Group's results.

[2] The Group Executive Board has the following principal responsibilities:

a) Preparing and proposing Group strategy and the fundamental policy decisions necessary for their implementation, the Organization Regulations and the basic organizational structure of the Group

b) Exercising such functions and authorities as shall be assigned to it by the Organization Regulations

c) Regularly informing the Board of Directors, as prescribed by Art. 25, item b of these Articles of Association, and submitting the documents in accordance with Art. 25, items a and c of these Articles of Association

[3] The functions and authorities of the Group Executive Board and other management units designated by the Board of Directors are to be defined by the Organization Regulations.

*Article 30*

[1] The Group Executive Board, acting under the leadership of the Group Chief Executive Office, is responsible for the management of the Group. It is the supreme executive body as defined by the Swiss Federal Law on Banks and Savings Banks. It implements the Group strategy decided by the Board of Directors and ensures the execution of the decisions of the Board of Directors. It is responsible for the Group's results.

[2] The responsibilities and authorities of the Group Executive Board and other management units designated by the Board of Directors are defined by the Organization Regulations.

---

*B. Explanations*

As of 1 July 2008, the Board of Directors amended the governance structure of UBS AG and the new organization regulations of the company became effective as of the same date. The new model clarifies the separation of responsibilities between the Board and the Group Executive Board and abolishes the Chairman's Office.

As a result, the Articles of Association will have to be amended accordingly.

11

# **Exhibit C**

Positions Report Dated September 12, 2008

LEHMAN BROTHERS | Capital Markets Prime Services

# TD Positions - Detail (Long/Short)

FUND: OLIVANT INV SWITZERLAND SA
CLIENT: OLIVANT LIMITED PROD3
BASE: CHF    PERIOD: Sep-12-08 to Sep-12-08

Page 1 of 1
ACCOUNT: 05058941
RUN DATE: Sep-12-08 11:13:45 PM

| DESCRIPTION | LEHMAN IDENTIFIER | QUANTITY | MARKET PRICE | LOCAL MARKET VALUE | BASE MARKET VALUE | % PORTFOLIO |
|---|---|---|---|---|---|---|
| **CHF - Swiss Franc : Equity** | | | | | | |
| **Long** | | | | | | |
| Ubs AG    Shr    Chf 0.10chf | B18YFJ4 | 81,600,280.00 | 23.520000 | 1,919,238,585.60 | 1,919,238,585.60 | 100.00 |
| **Total Long : Equity** | | | | | 1,919,238,585.60 | 100.00 |
| **Total Swiss Franc : Equity** | | | | | 1,919,238,585.60 | 100.00 |
| **Total Swiss Franc** | | | | | 1,919,238,585.60 | 100.00 |
| **Grand Total** | | | | | 1,919,238,585.60 | 100.00 |

This report or file has been produced as a courtesy to Lehman Brothers' clients and does not take the place of customer account statement(s) or any trade confirmation. To the extent there is a conflict between this report and a customer account statement(s) or trade confirmation, the customer account statement(s) or trade confirmation shall control. Please refer to your customer account statement(s) or the relevant trade confirmation to be regarded as authoritative. The information and data in this report or file ("Information"), including but not limited to prices, quotes, statistics and analytics, may have been obtained from external sources ("Providers"). Lehman Brothers, on its behalf and on behalf of the Providers, disclaims all representations and warranties that the Information is accurate or complete, and neither Lehman Brothers nor the Providers are responsible or liable for actions that you take or do not take based on the Information. Further, the Information is intended solely for your internal use and except as required by applicable law or regulation, Clients trading or contracts for differences or an equity swaps basis do not have ownership of any underlying stock or any right to give instructions with regard to voting of the stock. The information is not intended for tax or regulatory purposes and may not be used as the basis for any tax or regulatory submission or claim. Please consult your tax advisor or legal advisor as appropriate.IRS Circular 230 Disclosure: Lehman Brothers and its affiliates do not provide tax advice. Accordingly, please be advised that any discussion of US tax matters contained within the Information is not intended or written to be used and cannot be used for the purpose of (i) avoiding US tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

Times Square Tower
7 Times Square
New York, New York 10036

TELEPHONE  (212) 326-2000
FACSIMILE  (212) 326-2061
www.omm.com

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

SINGAPORE

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
635,015-0001

August 31, 2010

WRITER'S DIRECT DIAL
(212) 326-2138

**VIA FEDEX**

WRITER'S E-MAIL ADDRESS
dshamah@omm.com

Epiq Bankruptcy Solutions
Attn:  Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

Re:    _In re Lehman Brothers Holding, Inc., Case no. 08-13555 (JMP)_

To Whom It May Concern:

Enclosed please find an original and a copy of two amended proofs of claim filed by Olivant Investment Switzerland SA.  Once recorded, please return the stamped copies of the claims to the undersigned.

Thank you for your attention to this matter.

Sincerely,

Daniel S. Shamah

Enclosures

From:    Origin ID: NYCA   (212)326-2000
Daniel S. Shamah
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 100366537


FedEx
Express

C 01 11982162124

SHIP TO: (646)282-2500          BILL SENDER
**Attn: Lehman Bros Holdings Claims**
**Epiq Bankruptcy Solutions**
**757 Third Avenue, 3rd Floor**

**New York, NY 10017**

Ship Date: 31AUG10
ActWgt: 1 LB
CAD: 2731163/WBUS0200

Delivery Address Bar Code



Ref #   0635015.00001-Shamah
Invoice #
PO #
Dept #

RECEIVED
SEP 01 2010
By_____

TRK#     7916 0498 2423
0201

**WED - 01SEP          A1**

**PRIORITY OVERNIGHT**
**DSR**

**10017**
NY-US
**EWR**

# EB OGSA



- - - - - - - →   **FOLD on this line and place in shipping pouch with bar code and delivery address visible**

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.