OFFERING CIRCULAR

*Exhibit 2*

# LEHMAN BROTHERS UK CAPITAL FUNDING LP

*(a limited partnership organised under the laws of England and Wales)*

€225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting

Non-cumulative Perpetual Preferred Securities

having the benefit of a subordinated guarantee of

## LEHMAN BROTHERS HOLDINGS PLC

*(incorporated with limited liability in England and Wales with registered number 1854685)*

### Issue Price: €1,000 Per Preferred Security

The €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities (the "**Preferred Securities**"), each with a liquidation preference of €1,000, comprising limited partnership interests in Lehman Brothers UK Capital Funding LP (the "**Issuer**"), are proposed to be issued on 30th March, 2005 (the "**Closing Date**").

See "**Investment Considerations**" for a discussion of certain factors that should be considered by prospective investors.

As an English limited partnership, the Issuer will not be a legal entity separate from its partners. The Preferred Securities will benefit from a subordinated guarantee to be dated the Closing Date (the "**Subordinated Guarantee**") entered into by Lehman Brothers Holdings plc (the "**Guarantor**" or "**UK Holding**") of declared dividends and redemption amounts, all as more fully described herein under "*Subordinated Guarantee*".

Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange and the Official Segment of the Stock Market of Euronext Amsterdam N.V. ("**Euronext Amsterdam**"). This Offering Circular constitutes a prospectus for the purposes of the Listing and Issuing Rules (*Fondsenreglement*) Euronext Amsterdam N.V.

Lead Manager

LEHMAN BROTHERS

Co-Managers

| | |
|---|---|
| BANCAJA | BANCO ESPÍRITO SANTO DE INVESTMENTO |
| SANTANDER CENTRAL HISPANO | CALYON CORPORATE AND INVESTMENT BANK |
| FORTIS BANK | HSBC |

ING FINANCIAL MARKETS

The date of this Offering Circular is 29th March, 2005

LB GP No. 1 Ltd. in its capacity as the General Partner (the "**General Partner**") and the Guarantor confirm, after having made all reasonable enquiries, that this Offering Circular contains all information with regard to the Issuer, the General Partner, the Guarantor and its subsidiaries (together, the "**Guarantor Group**") and the Preferred Securities which is material in the context of the issue and offer of the Preferred Securities, that the information contained or incorporated by reference in this Offering Circular is true and accurate in all material respects and is not misleading, that the opinions and intentions expressed in this Offering Circular with regards to the Issuer and the Guarantor Group are honestly held, have been reached after considering all relevant circumstances and are based on reasonable assumptions, and that there are no other facts in relation to the Issuer, the Guarantor, the Guarantor Group or the Preferred Securities the omission of which makes this Offering Circular as a whole, or any such information or the expression of any such opinion or intention, misleading in any material respect. Each of the General Partner and the Guarantor accepts responsibility accordingly.

No person is or has been authorised to give any information or to make any representation not contained or incorporated in or consistent with this Offering Circular and, if given or made, such information or representation must not be relied upon as having been authorised by the Issuer, the General Partner, the Guarantor or the Managers (as defined under "*Subscription and Sale*" below). Neither the delivery of this Offering Circular nor any subscription, sale or purchase made in connection herewith shall, in any circumstances, create any implication that there has been no change in the affairs of the Issuer, the General Partner, the Guarantor or the Guarantor Group since the date hereof. This Offering Circular may only be used for the purpose for which it has been published.

Neither this Offering Circular nor any other information supplied in connection with the Preferred Securities (i) is intended to provide the basis of any credit or other evaluation or (ii) should be considered as a recommendation by the Issuer, the General Partner, the Guarantor, the Guarantor Group or the Managers that any recipient of this Offering Circular or any other information supplied in connection with the Preferred Securities should purchase the Preferred Securities. Each prospective investor contemplating purchasing Preferred Securities should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Issuer and the Guarantor.

Prospective investors should inform themselves as to the legal requirements and tax consequences within the countries of their residence and domicile for the acquisition, holding or disposal of Preferred Securities and any foreign exchange restrictions that might be relevant to them. This Offering Circular does not constitute an offer of, or an invitation by or on behalf of, the Issuer or any of its partners, the General Partner, the Guarantor or the Managers to subscribe for or purchase any of the Preferred Securities.

Prospective investors should satisfy themselves that they understand all of the risks associated with making investments in the Preferred Securities. If a prospective investor is in any doubt whatsoever as to the risks involved in investing in the Preferred Securities, he should consult his professional advisers.

The distribution of this Offering Circular and the offering of the Preferred Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Issuer, the General Partner, the Guarantor and the Managers to inform themselves about, and to observe, any such restrictions.

In respect of the United Kingdom, this Offering Circular is directed only at (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Offering Circular may be communicated lawfully. Preferred Securities are only available to such persons. Persons who (i) do not have such professional experience in participating in unregulated schemes and in matters relating to investments and/or (ii) do not fall within said article 22(2) and 49(2) and/or (iii) are not persons to whom this Offering Circular may be communicated lawfully should not rely on this Offering Circular.

No action has been taken to permit a public offering of the Preferred Securities in any jurisdiction (other than The Netherlands) where action would be required for such purpose. Accordingly, the Preferred Securities may not be offered or sold, directly or indirectly, and neither this Offering Circular nor any advertisement or other offering material may be distributed or published in any jurisdiction, except in accordance with the legal requirements applicable in that jurisdiction. In particular, the Preferred Securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"). The Preferred Securities may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons. A further description of certain restrictions on the offering and sale of the Preferred Securities and on the distribution of this Offering Circular is given under "*Subscription and Sale*" below.

**IN CONNECTION WITH THE ISSUE OF THE PREFERRED SECURITIES, LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE PREFERRED SECURITIES AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL FOR A LIMITED PERIOD. HOWEVER THERE MAY BE NO OBLIGATION ON LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT TO DO THIS. SUCH STABILISING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME AND MUST BE BROUGHT TO AN END AFTER A LIMITED PERIOD AND IN ANY EVENT NO LATER THAN 30 DAYS AFTER THE ISSUE DATE. STABILISATION TRANSACTIONS CONDUCTED ON EURONEXT AMSTERDAM MUST BE CONDUCTED IN ACCORDANCE WITH ALL APPLICABLE LAWS AND REGULATIONS OF EURONEXT AMSTERDAM AND ARTICLE 32 (AND ANNEX 6) OF THE FURTHER REGULATIONS ON MARKET CONDUCT SUPERVISION OF THE SECURITIES TRADE 2002 (*NADERE REGELING GEDRAGSTOEZICHT EFFECTENVERKEER 2002*), AS AMENDED AND WILL END 30 DAYS AFTER THE ISSUE DATE OF THE PREFERRED SECURITIES.**

All references in this Offering Circular to "**EUR**", "**€**" and "**euro**" are to the single currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended from time to time. All references in this Offering Circular to "**US$**" and "**$**" are to United States dollars.

## TABLE OF CONTENTS

*Page*

Documents Incorporated by Reference .................................................................. 4

Investment Considerations .................................................................................... 5

Summary of the Preferred Securities and Subordinated Guarantee ...................... 7

Description of the Preferred Securities ................................................................. 13

Summary of Provisions Relating to the Preferred Securities in Global Form ......... 26

Subordinated Guarantee ....................................................................................... 28

Use of Proceeds .................................................................................................... 34

Lehman Brothers UK Capital Funding LP ............................................................ 35

Lehman Brothers Holdings plc .............................................................................. 37

Non-consolidated Capitalisation and Indebtedness of the Guarantor .................... 38

Summary Financial Information of the Guarantor ................................................. 39

Lehman Brothers Holdings Inc.............................................................................. 40

Consolidated Capitalisation and Indebtedness of LBHI ........................................ 43

Summary Financial Information of LBHI ............................................................... 44

Taxation ................................................................................................................ 46

Subscription and Sale............................................................................................ 49

General Information ............................................................................................... 51

## DOCUMENTS INCORPORATED BY REFERENCE

The annual reports (including the audited non-consolidated annual financial statements) of the Guarantor as of and for the years ended 30th November, 2003, 2002 and 2001, the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement) of the Issuer and the Articles of Association of the Guarantor shall be deemed to be incorporated in, and to form part of, this Offering Circular.

The Issuer will, at the specified offices of the Paying and Transfer Agents, provide, free of charge, a copy of this Offering Circular and any document incorporated by reference in this Offering Circular.

## INVESTMENT CONSIDERATIONS

*Prospective investors should carefully consider the following information in conjunction with the other information contained or incorporated by reference in this Offering Circular. Capitalised terms used but not defined in this section shall bear the respective meanings ascribed to them under the "Description of the Preferred Securities".*

### Risks Associated with the Guarantor's Financial Condition

The Issuer is a newly established limited partnership with no previous operating history or revenues. It is expected that the Issuer's sole source of funds to pay Distributions on the Preferred Securities will be payments which it receives from its investment in Subordinated Notes issued by the Guarantor or any Eligible Investments replacing the Subordinated Notes.

The rights of Holders shall be represented solely by the Subordinated Guarantee and the Preferred Securities, and under no circumstances will the rights of Holders be represented by the Subordinated Notes or any Eligible Investment replacing the Subordinated Notes nor shall Holders be entitled to receive or hold the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes or any payments due in respect of the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes.

The Preferred Securities are guaranteed on a limited and subordinated basis by the Guarantor pursuant to the terms of the Subordinated Guarantee. Accordingly, if the Guarantor's financial condition were to deteriorate, the Holders may suffer direct and materially adverse consequences, including non-payment of Distributions on the Preferred Securities or of payments under the Subordinated Guarantee.

### Limitations to Remedies of Holders under the Subordinated Guarantee

In the event that the Guarantor is in breach of its payment obligations under the Subordinated Guarantee, the terms of the Subordinated Guarantee do not confer rights in favour of the Holders to petition for the winding-up of the Guarantor.

### Distributions are Discretionary and Not Cumulative

Distributions on the Preferred Securities are not cumulative. The discretion of the General Partner to resolve that a Distribution should not be paid is unfettered. As set out in *"Description of the Preferred Securities"*, Distributions on the Preferred Securities will be paid on each Distribution Payment Date out of interest received by the Issuer from its investment in the Subordinated Notes and from other resources legally available, if any, and only if the General Partner has not published a No Payment Notice. If a No Payment Notice is published, the Holders will not be entitled to receive such Distributions (or any payment under the Subordinated Guarantee in respect of such Distributions) or have any claim in respect thereof.

### Perpetual Nature of the Preferred Securities

The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Although the General Partner may redeem the Preferred Securities in whole but not in part in certain circumstances, in each case at the Optional Redemption Price, there are limitations on the General Partner's ability to do so. Therefore, Holders should be aware that they may be required to bear the financial risks of an investment in the Preferred Securities for an indefinite period of time.

### Substitution

If a Trigger Event occurs and is continuing, the General Partner will, provided that (if required at such time) no relevant Supervisory Authority has objected, take all reasonable steps to cause the substitution of the Preferred Securities with depositary shares representing fully paid non-cumulative preferred stock issued directly by Lehman Brothers Holdings Inc. ("**LBHI**"). A Trigger Event shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes

subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term.

Although LBHI has undertaken that, in the event that the Preferred Securities are substituted by depositary shares representing Substituted Preferred Stock, LBHI will apply for a listing for the Substituted Preferred Stock outside of the United States, there can be no assurance that a recognised stock exchange will agree to list any such Substituted Preferred Stock. In addition, the tax treatment for holders of Substituted Preferred Stock may be different from that for Holders of the Preferred Securities.

## No Limitation on Senior Debt

The obligations of the Guarantor under the Subordinated Guarantee will rank junior as to payments to all liabilities to creditors of the Guarantor (including without limitation depositors, general creditors and subordinated debt holders) and claims of holders of senior ranking securities. In the event that the Guarantor is wound-up, liquidated or dissolved, the assets of the Guarantor would be available to pay obligations under the Subordinated Guarantee only after all payments have been made on such senior liabilities and claims. The Guarantor is not prohibited from issuing, guaranteeing or otherwise incurring further debt ranking *pari passu* with, or senior to, its obligations under the Subordinated Guarantee. The issue of any such debt may reduce the amount recoverable by Holders of the Preferred Securities under the Subordinated Guarantee. Accordingly, on the winding-up of the Guarantor and after payment of senior creditors, there may not be a sufficient amount to satisfy the amounts owing to the Holders of the Preferred Securities.

## Distribution and Capital Stopper

In the event that any Distribution is not made, LBHI has undertaken not to:

(a)    declare or pay any dividend on its shares of common stock; or

(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

Although the Guarantor does not make an equivalent agreement, LBHI is the ultimate holding company of the Lehman Brothers' group of companies.

## Absence of Prior Public Markets

The Preferred Securities constitute a new issue of securities by the Issuer. Prior to this issue, there will have been no public market for the Preferred Securities. Although application has been made for the Preferred Securities to be listed on the Luxembourg Stock Exchange and on Euronext Amsterdam, there can be no assurance that an active public market for the Preferred Securities will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The liquidity and the market prices for the Preferred Securities can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Guarantor and other factors that generally influence the market prices of securities.

## SUMMARY OF THE PREFERRED SECURITIES AND
## SUBORDINATED GUARANTEE

*The following summary is qualified in its entirety by the more detailed information included elsewhere in this Offering Circular. Capitalised terms used but not defined in this summary shall bear the respective meanings ascribed to them under "Description of the Preferred Securities". Prospective investors should also consider carefully, amongst other things, the factors set out under "Investment Considerations".*

| | |
|---|---|
| **Issuer:** | Lehman Brothers UK Capital Funding LP (the "**Issuer**"), an English limited partnership formed and registered under the Limited Partnerships Act 1907 (the "**Act**").

The business of the partnership, as administered by, or on behalf of, the General Partner, will include the following:

• raising and providing finance and financial support to the Guarantor;

• acquiring and holding the Issuer's assets;

• monitoring the Issuer's assets and determining whether they continue to be suitable; and

• functions necessary or incidental thereto.

On the Closing Date, the Issuer's principal assets will be debt instruments issued by UK Holding (the "**Subordinated Notes**").

The Subordinated Notes will have, in all material commercial respects, pricing terms which are equivalent to the Preferred Securities. |
| **General Partner:** | LB GP No. 1 Ltd. (incorporated with limited liability in England and Wales with registered number 5355491) a wholly owned Subsidiary of Lehman Brothers Holdings Inc. ("**LBHI**"). |
| **Preferential Limited Partner:** | LB Investment Holdings Ltd. (incorporated with limited liability in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax.

The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments, as the case may be, in excess of those required to make payments in respect of the Preferred Securities. |
| **Guarantor:** | Lehman Brothers Holdings plc (incorporated with limited liability in England and Wales with registered number 1854685). |
| **Issue:** | €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities, each with a liquidation preference of €1,000 (the "**Liquidation Preference**"), comprising interests in a limited partnership share in the Issuer. |
| **Use of Proceeds:** | The proceeds of the issue of the Preferred Securities will augment the Guarantor Group's regulatory capital base. The Issuer will use the proceeds raised from the issuance of the Preferred Securities to |

subscribe for the Subordinated Notes (see *"Eligible Investments"* below).

**Subordinated Guarantee:**

The Guarantor will provide a subordinated guarantee to be executed by the Guarantor on 30th March, 2005 as a deed poll (the "**Subordinated Guarantee**") in respect of:

- any declared but unpaid Distributions;

- payments on redemption of the Preferred Securities; and

- any Additional Amounts,

which will be in favour of the Holders.

The Subordinated Guarantee will rank *pari passu* with the non-cumulative perpetual preferred securities or preference shares of the Guarantor (whether or not in issue).

The Guarantee will not cover payments on liquidation of the Issuer. See *"Rights upon Liquidation"* below.

**Distribution Rate:**

The Preferred Securities will entitle Holders to receive (subject as described below) non-cumulative preferential cash distributions (the "**Distributions**").

Distributions will be payable out of the Issuer's own legally available resources annually in arrear on 30th March in each year (each a "**Distribution Payment Date**").

In respect of each Distribution Period during the period from and including the Closing Date to but excluding 30th March, 2007, Distributions will accrue on the Preferred Securities at a rate of 6.625 per cent. per annum. For each subsequent Distribution Period, Distributions will accrue on the Preferred Securities at a rate equal to the aggregate of the prevailing Reference Rate and the Margin, subject to a maximum rate of 8.00 per cent. per annum.

The "**Margin**" is 0.10 per cent. per annum.

The "**Reference Rate**" means in respect of a relevant Distribution Period, the 10-year mid-swap rate in EUR (annual, 30/360) versus 6-month EURIBOR (Semi-annual, ACT/360) which appears on Reuters Page "ISDAFIX2" under the heading "EURIBOR BASIS" and above the caption "11:00 AM CET" (as such headings and captions may appear from time to time) as of 11:00a.m. (Central European time), on the Distribution Determination Date.

The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, which would otherwise have been used by the Issuer (being the holder thereof) to fund such Distribution, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

**Distribution and Capital Stopper:**  In the event that Distributions are not paid on the Preferred Securities, LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:

(a)  declare or pay any dividend on its shares of common stock; or

(b)  repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

**Trigger Event and Substituted Preferred Stock**  If a Trigger Event occurs and is continuing, then, provided that (if required at such time) any relevant Supervisory Authority has not objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock.

On the substitution date, each Preferred Security of €1,000 in nominal amount will be substituted for one depositary share representing Substituted Preferred Stock which will have a nominal amount of €1,000.

The General Partner will notify Holders if a Trigger Event occurs. In the notice, the General Partner will include information on the procedures for effecting the substitution.

**Optional Redemption:**  If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes will be also granting a consent for the redemption of the Preferred Securities.

**Capital Disqualification Event:**

If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed in whole, but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Tax Event:**

If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will be redeemed in whole, but not in part, by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Ranking of the Preferred Securities:**

The Preferred Securities, together with the Subordinated Guarantee, are intended to provide Holders with rights on liquidation equivalent to non-cumulative preference shares of the Guarantor, whether or not issued.

Claims under the Preferred Securities in respect of any Liquidation Distributions will rank:

(i)     senior to the rights of the General Partner and the Preferential Limited Partner in respect of other partnership interests issued by the Issuer; and

(ii)    junior to the claims of creditors of the Issuer (if any).



**Rights upon Liquidation:**

In the event of the dissolution of the Issuer, Holders will be entitled to receive, subject as set out below, for each Preferred Security a Liquidation Distribution out of the assets of the Issuer legally available for distribution.

LBHI has undertaken that, so long as any of the Preferred Securities is outstanding:

(a)     unless a Trigger Event occurs or LBHI is being wound up, LBHI will not take any action that would or might cause, the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and

(b)     the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.

**Withholding Tax and Additional Amounts:**

The Issuer will pay such additional amounts ("**Additional Amounts**") as may be necessary in order that the net payment received by each Holder in respect of the Preferred

Securities after deduction for or on account of any taxes imposed by tax authorities in the United Kingdom upon payments made by or on behalf of the Issuer, will equal the amount which would have been received in the absence of any such deduction or withholding of or on account of taxes, subject to customary exceptions.

The Subordinated Guarantee will contain a similar provision.

**Administrator:**

The Issuer will appoint an administrator to perform those operational matters in relation to the Issuer required under the Financial Services and Markets Act 2000 to be performed by a person authorised by the United Kingdom Financial Services Authority to establish, operate and wind-up collective investment schemes.

**Eligible Investments:**

The proceeds raised by the Issuer of the Preferred Securities will be used by the Issuer to purchase the Subordinated Notes.

The Subordinated Notes will be issued by UK Holding, will have a maturity of 30 years and will be redeemable by UK Holding on 30th March, 2010 or any interest payment date thereafter, subject to there being no objection from any relevant Supervisory Authority.

Unless the Preferred Securities are redeemed prior to or simultaneously with the maturity of the Subordinated Notes, then on maturity of the Subordinated Notes or any replacement Eligible Investments, the General Partner will, subject to prior consent of the relevant Supervisory Authority (if required at such time), reinvest the proceeds of redemption of the Subordinated Notes or Eligible Investments in Eligible Investments (or further Eligible Investments) that will contain the same terms as the Subordinated Notes in respect of tenor, principal amount, interest payment dates and redemption (including redemption for tax reasons) and will be callable on any interest payment date. However, upon issuance of such Eligible Investments (or further Eligible Investments), the interest applicable will be the Reference Rate plus a margin. Such margin will be determined by the then prevailing market conditions for instruments of similar risk and 30 year maturity.

**Voting Rights:**

Except as described in "*Description of the Preferred Securities - Meetings*" and as provided in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

**Form of the Preferred Securities:**

The Preferred Securities will be in registered form.

On or about the Closing Date, a single global certificate (the "**Global Certificate**") in respect of the Preferred Securities will be deposited with JPMorgan Chase Bank N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear Bank SA./N.V. as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**"). Such certificate will be issued, and the Preferred Securities will be registered, in the name of Chase Nominees Limited (the "**Initial Limited Partner**") as nominee of the Common Depositary.

11

the Preferred Securities are deposited and registered *as described* above, book-entry interests in the Preferred Securities will be shown on, and transfers thereof will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

Definitive certificates will not be made available to Holders other than in certain limited circumstances. See *"Summary of Provisions Relating to the Preferred Securities in Global Form"*.

**Listings:**

Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange and Euronext Amsterdam.

**Ratings:**

The Preferred Securities are expected to be assigned, on issue, a rating of "BBB+" by Standard & Poor's, "A3" by Moody's and "A-" by Fitch IBCA. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the relevant rating organisation.

**Governing Law:**

The Limited Partnership Agreement establishing the Issuer, the Preferred Securities and the Subordinated Guarantee will be governed by, and construed in accordance with, English law.

## DESCRIPTION OF THE PREFERRED SECURITIES

*The Preferred Securities are limited partnership interests in the Issuer. The following description should be read in conjunction with, and is subject to the terms of, the Limited Partnership Agreement (as defined below), a copy of which is available for inspection as described under "General Information".*

### 1.    Definitions and Interpretation

In this description of the Preferred Securities, except to the extent that the context otherwise requires:

**"Act"** means the Limited Partnerships Act 1907, as amended and/or restated from time to time;

**"Additional Amounts"** means the additional amounts which may be payable by the Issuer in respect of the Preferred Securities as a result of the imposition of UK withholding taxes as described in paragraph 6;

**"Agency Agreement"** means the agency agreement dated 30th March, 2005 relating to the Preferred Securities between, *inter alios,* the Guarantor, the Registrar and the Paying and Transfer Agents;

**"Business Day"** means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in London and on which the TARGET System, or any successor thereto, is operating;

A **"Capital Disqualification Event"** shall occur if:

(a)    the Preferred Securities do not qualify as regulatory capital pursuant to the Relevant Rules upon either LBHI or the Guarantor becoming subject to supervision by a relevant Supervisory Authority; or

(b)    if following any such person becoming subject to the Relevant Rules a change of such Relevant Rules results in the Preferred Securities no longer so qualifying;

**"Clearstream, Luxembourg"** means Clearstream Banking, société anonyme or its successor;

**"Closing Date"** means 30th March, 2005;

**"Distribution Determination Date"** means with respect to any Distribution Period, the second TARGET Business Day prior to the first day of such Distribution Period;

**"Distribution Payment Date"** means 30th March in each year;

**"Distribution Period"** means the period from, and including, the Closing Date to, but excluding, the first Distribution Payment Date and each period thereafter from, and including, one Distribution Payment Date to, but excluding, the next following Distribution Payment Date;

**"Distribution Rate"** means, in respect of a Distribution Period, the percentage rate determined pursuant to paragraph 2.2;

**"Distributions"** means the non-cumulative distributions in respect of the Preferred Securities as described under paragraph 2;

**"Eligible Investments"** means

(a)    subordinated debt securities (other than the Subordinated Notes) that are issued or guaranteed by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time), or

(b)    provided that (if required) the relevant Supervisory Authority has not objected, such other instruments issued by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time),

*provided that* in both cases:

13

(i)    for the avoidance of doubt, if the Eligible Investments are securities of a UK company, the Eligible Investments shall, in the event of their issuance, be the subject of an application for listing on a recognised stock exchange in accordance with section 841 of the Income and Corporation Taxes Act 1988; and

(ii)    the Preferential Limited Partner shall not be the principal obligor of the Eligible Investments;

"**Euroclear**" means Euroclear Bank S.A./N.V. as operator of the Euroclear system or its successor;

"**Euronext Amsterdam**" means the Official Segment of the Stock Market of Euronext Amsterdam N.V.;

"**Euro-zone**" means the region comprised of the member states of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community (signed in Rome on 25th March, 1957) as amended;

"**General Partner**" means LB GP No. 1 Ltd. (incorporated in England and Wales with registered number 5355491), a wholly owned Subsidiary of LBHI;

"**Group**" means LBHI and its Subsidiaries;

"**Guarantor**" means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time;

"**Initial Limited Partner**" means Chase Nominees Limited (incorporated in England and Wales with registered number 00248239);

"**Issuer**" means Lehman Brothers UK Capital Funding LP;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to the Subordinated Guarantee and the Parity Securities;

"**LBHI**" means Lehman Brothers Holdings Inc.;

"**Limited Partnership Agreement**" means an agreement dated 22nd March, 2005 between, *inter alios*, the General Partner, the Preferential Limited Partner and the Initial Limited Partner establishing the Issuer, as supplemented by a first supplemental limited partnership agreement dated 24th March, 2005 between the same parties, as the same may be amended and/or further supplemented from time to time;

"**Liquidation Distribution**" means the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts, in each case in cash only;

"**Liquidation Preference**" means the liquidation preference of €1,000 per Preferred Security;

"**Margin**" means 0.10 per cent. per annum;

"**No Payment Notice**" means a notice which is published pursuant to paragraph 2.4;

"**Optional Redemption Price**" means, in respect of each Preferred Security, the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts payable, in each case in cash only;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under the Subordinated Guarantee and includes the sterling and

US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of the Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with the Subordinated Guarantee;

**"Paying and Transfer Agents"** means the Principal Paying and Transfer Agent, J.P. Morgan Bank Luxembourg S.A. and ING Bank N.V. and/or such other entities as are appointed by the General Partner on behalf of the Issuer and notified to the Holders as described under paragraph 10;

**"Permitted Reorganisation"** means a solvent reconstruction, amalgamation, reorganisation, merger or consolidation whereby all or substantially all of the business, undertaking and assets of the Guarantor are transferred to a successor entity which assumes all of the Guarantor's obligation under the Subordinated Guarantee;

**"Preferential Limited Partner"** means, on the Closing Date, LB Investment Holdings Ltd. (incorporated in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax;

**"Preferred Capital Contribution"** means, in relation to the Preferred Securities, the aggregate contribution to the assets of the Issuer (being a whole multiple of €1,000) paid in cash by the Holders;

**"Preferred Securities"** means the outstanding Fixed Rate to CMS-Linked Guaranteed Non-Voting Non-Cumulative Perpetual Preferred Securities of the Issuer, originally issued on the Closing Date in the principal amount of €225,000,000, each such security representing an interest of a Holder in the Issuer attributable to each €1,000 of the Preferred Capital Contribution and including any further Preferred Securities of the Issuer of the same series issued after the Closing Date and ranking *pari passu* with the Preferred Securities as regards participation in the profits and assets of the Issuer and **"Preferred Security"** shall be construed accordingly;

**"Principal Paying and Transfer Agent"** means JPMorgan Chase Bank N.A., London Branch or such other entity as is appointed by the General Partner on behalf of the Issuer and notified to the Holders as described in paragraph 10;

**"Redemption Date"** means the date fixed for redemption under a notice given under paragraph 4.2 or 4.3;

**"Reference Rate"** means in respect of a relevant Distribution Period, the 10-year mid-swap rate in EUR (annual, 30/360) versus 6-month EURIBOR (Semi-annual, ACT/360) which appears on the Relevant Screen Page under the heading "EURIBOR BASIS" and above the caption "11:00 AM CET" (as such headings and captions may appear from time to time) as of 11:00a.m. (Central European time), on the Distribution Determination Date;

**"Relevant Screen Page"** means Reuters Page "ISDAFIX2";

**"Register"** means the register of Holders maintained outside the United Kingdom on behalf of the Issuer;

**"Registrar"** means J.P. Morgan Bank Luxembourg S.A. or such other entity appointed by the Issuer and notified to the Holders as described under paragraph 10;

**"Relevant Rules"** means at any time the regulations, requirements, guidelines and policies of any relevant Supervisory Authority relating to capital adequacy of financial institutions in the jurisdiction of such Supervisory Authority.

**"Stock Exchanges"** means the Luxembourg Stock Exchange, Euronext Amsterdam and/or such other stock exchange approved by the General Partner on which the Preferred Securities may be listed from time to time;

**"Subordinated Guarantee"** means the subordinated guarantee in respect of the Preferred Securities executed by the Guarantor on 30th March, 2005 as a deed poll;

15

"**Subordinated Notes**" means the Fixed Rate to CMS-Linked Subordinated Notes, originally issued on the Closing Date in the principal amount of €225,000,000, by UK Holding and held by the Issuer as initial partnership assets, or any Eligible Investments which are held by the Issuer as partnership assets thereafter;

"**Subsidiary**" means, in relation to any entity, any company (i) in which that entity holds a majority of the voting rights or (ii) of which that entity is a member and has the right to appoint or remove a majority of the board of directors or (iii) of which that entity is a member and controls a majority of the voting rights, and includes any company which is a Subsidiary of a Subsidiary of that entity;

"**Substituted Preferred Stock**" means fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the Preferred Securities, having no voting rights (except as required by law) and being subject to optional redemption in the same manner as the Preferred Securities;

"**Supervisory Authority**" means in respect of any jurisdiction, any organisation or authority having supervisory responsibility for the prudential supervision of financial institutions engaged in regulated activities carried on by LBHI in such jurisdiction;

"**TARGET**" means the Trans European Real-Time Gross Settlement Express Transfer (TARGET) System;

"**TARGET Business Day**" means a day on which TARGET is operating;

"**Tax**" means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any political subdivision of or by any authority therein or thereof having power to tax;

"**Tax Event**" means a UK Tax Event or a US Tax Event;

"**Tier 1 Capital**" has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisory Policy or any successor publication replacing such guide; and

"**Trigger Event**" shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority, in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term;

"**UK Holding**" means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

"**UK Regulator**" means the Financial Services Authority or such other national or supranational regulatory authority as may at the relevant time have responsibility for the regulation and supervision of banks in the United Kingdom (or, if the Guarantor becomes domiciled in a jurisdiction other than the United Kingdom, in such other jurisdiction);

"**UK Tax Event**" means that, as a result of any change (each a "**Relevant Change**") in, or prospective or actual amendment to, the laws of the United Kingdom or any political subdivision or authority thereof having power to tax, or any change in the application of such laws, or in the official or generally published interpretation of such laws (including the enactment of any legislation, any judicial decision or any regulatory determination in the UK), or any interpretation or pronouncement by any relevant tax authority that provides for a position with respect to such laws or regulations that differs from the previously generally accepted position in relation to similar transactions or which differs from any specific written confirmation given by a tax authority in respect of the Preferred Securities and/or the Subordinated Notes, which change or amendment becomes effective or is to take effect, on or after 29th March, 2005, there is more than an insubstantial risk that:

(i)    the Issuer or the General Partner would be subject to more than a *de minimis* amount of tax in respect of the Subordinated Notes or the Preferred Securities in the UK (except, in the case of the General

Partner only, for any such tax that would arise as a result of (a) profits arising to it as a result of payments received by it from the Issuer or (b) activities (if any) carried on by it other than those permitted or contemplated in the Limited Partnership Agreement in respect of the Subordinated Notes and the Preferred Securities);

(ii)   payments to Holders (including payments in respect of the Preferred Securities and the Subordinated Guarantee) would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iii)   payments in respect of the Subordinated Notes would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iv)   payments of interest made or accrued or treated as being made or accrued on the Subordinated Notes will be treated as "distributions" within the meaning of Section 832(1) of the Income and Corporation Taxes Act 1988 (or such other Section and/or Act as may from time to time supersede or replace Section 832(1) of the Income and Corporation Taxes Act 1988 for the purposes of such definition) for UK tax purposes or otherwise will cease to be deductible in full for the purposes of UK corporation tax; or

(v)   the Guarantor would not be entitled to surrender a deduction or other relief for interest on the Subordinated Notes to other companies with which it is grouped (or with which it would be grouped but for the Relevant Change) for applicable UK tax purposes to offset against their profits (whether under the group relief system in Sections 402 to 413 of the Income and Corporation Taxes Act 1988 current as at 29th March, 2005 or any similar system or systems having like effect as may from time to time exist); and

"**US Tax Event**" means that, as a result of (a) any amendment to, change in or announced proposed change in the laws (or any regulations thereunder whether in proposed, temporary or final form) of the United States or any political subdivision or taxing authority thereof or therein, (b) a judicial decision interpreting, applying or clarifying such laws or regulations, (c) an administrative pronouncement or action that represents an official position (including a clarification of an official position (of the governmental authority or regulatory body making such administrative pronouncement or taking such action, or (d) a threatened challenge asserted in connection with an audit of the Issuer, LBHI, or the General Partner, or a threatened challenge asserted in writing against any other taxpayer that has raised capital through the issuance of securities similar to the Subordinated Notes, Eligible Investments or the Preferred Securities, which amendment or change is adopted or which decision, pronouncement or proposed change is announced or which action, clarification or challenge occurs on or after the date of the issuance of the Preferred Securities, there is more than an insubstantial risk that:

(i)   the Issuer is or would be subject to more than a *de minimis* amount of tax or similar assessments in the United States; or

(ii)   payments to holders are or would be subject to deduction or to withholding of or on account of tax imposed by a governmental authority in the United States.

In this description of the Preferred Securities any reference to a particular time shall, unless otherwise specified, be to Central European time.

## 2.    Distributions

2.1   Subject as provided in paragraphs 2.3 and 2.4, non-cumulative distributions (the "**Distributions**") on the Preferred Securities will accrue from the Closing Date (or, in the case of any further preferred securities issued pursuant to paragraph 8.4, from their respective dates of issue) and shall be payable out of the Issuer's own legally available resources annually in arrear on each Distribution Payment Date.

2.2   In respect of each Distribution Period during the period from and including the Closing Date to but excluding 30th March 2007 the Distribution Rate shall be 6.625 per cent. per annum. The Distribution Amount payable on 30th March, 2006 in respect of the first Distribution Period shall be €66.25 per

Preferred Security. Thereafter, the Distribution Rate will be determined by the Principal Paying and Transfer Agent for each Distribution Period on the basis of the following provisions.

On each Distribution Determination Date, the Principal Paying and Transfer Agent will determine the Reference Rate as at 11.00 a.m. (Central European time). The Distribution Rate for the relevant Distribution Period shall be the aggregate of the relevant Reference Rate plus the Margin and provided that if the Distribution Rate for any Distribution Period would otherwise be greater than 8.00 per cent. per annum, it will be deemed to be 8.00 per cent. per annum for such Distribution Period.

If the Reference Rate does not appear on the Relevant Screen Page on the relevant Distribution Determination Date, the rate for that date will be a percentage determined on the basis of the mid-market annual swap rate quotations provided by five leading swap dealers in the eurozone interbank market selected by the Principal Paying and Transfer Agent with the approval of the General Partner (the "**Reference Banks**") at approximately 11.00 a.m. (Central European Time), on the Distribution Determination Date.

For this purpose, the "**mid-market annual swap rate**" means the arithmetic mean of the bid and offered rates for the annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating euro interest rate swap transaction with a 10 year maturity commencing on the first day of that Distribution Period and in an amount that is representative for a single transaction in the relevant market at the relevant time with an acknowledged dealer of good credit in the swap market, where the floating leg, calculated on an Actual/360 day count basis, is equivalent to "EUREURIBOR-Telerate", with a maturity of six months.

The Principal Paying and Transfer Agent will request the principal office of each of the Reference Banks to provide a quotation of its rate. If at least three quotations are provided, the rate for the first day of that Distribution Period will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest).

The Principal Paying and Transfer Agent will, as soon as practicable after 11.00 a.m. (Central European Time) on each Distribution Determination Date, determine the Distribution Rate in respect of the relevant Distribution Period and calculate the amount of the Distribution payable per Preferred Security on the Distribution Payment Date for the relevant Distribution Period (the "**Distribution Amount**") by applying the Distribution Rate for such Distribution Period to the Liquidation Preference, multiplying such sum by the number of days elapsed in the period using a calendar year of 360 days consisting of 12 months of 30 days each (unless (i) the last day of the Distribution Period is the 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (ii) the last day of the Distribution Period is the last day of February, in which case, February shall not be considered to be lengthened to a 30-day month) divided by 360 and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

The Principal Paying and Transfer Agent shall cause the relevant Distribution Amount and each Distribution Amount payable in respect of the relevant Distribution Period to be notified to the Issuer, the Bank, the Stock Exchanges and the Holders of Preferred Securities (in accordance with the provisions of paragraph 10) as soon as possible after their determination but in any event not later than the second Business Day thereafter. The Distribution Amount so notified may subsequently be amended (or appropriate alternative arrangements made by way of adjustment) without notice in the event of proven or manifest error.

2.3    The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

2.4    Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

2.5    No Holder shall have any claim in respect of any Distribution or part thereof not payable as a result of the limitation set out in paragraph 2.4. Accordingly, such amounts will not cumulate for the benefit of Holders or entitle the Holders to any claim in respect thereof against the Issuer or against the Guarantor under the Subordinated Guarantee.

2.6    Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid to the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

*LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:*

*(a)    declare or pay any dividend on its shares of common stock; or*

*(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,*

*until such time as Distributions on the Preferred Securities have been paid in full for one year.*

## 3.    Liquidation Distributions

3.1    In the event of the dissolution of the Issuer, the Holders will be entitled to receive the Liquidation Distribution, in respect of each Preferred Security held, out of the assets of the Issuer available for distribution to such Holders under the Act. Such entitlement will arise (a) before any payments due to the General Partner and the Preferential Limited Partner and (b) before any distribution of assets is made to the General Partner, but such entitlement will rank equally with the entitlement of the holders of all other preferred securities issued by the Issuer which rank *pari passu* with the Preferred Securities, if any.

3.2    After payment of all Liquidation Distributions, or the Relevant Proportion thereof if applicable, the General Partner will be entitled to any remaining assets of the Issuer representing proceeds of the sale or redemption of the Issuer's partnership assets and the Holders will have no right or claim to any of the remaining assets of the Issuer or the Guarantor. For the avoidance of doubt, Holders will have no right to receive the Subordinated Notes or any replacement Eligible Investment.

*LBHI has undertaken that, as long as any of the Preferred Securities is outstanding:*

*(a)    unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and*

*(b)    the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.*

3.3    Subject to the Act, other than in the events referred to in paragraphs 4.2, 4.3, 4.4 and 5, unless (if required at such time) the UK Regulator has not objected, the General Partner will not permit, or take any action that would or might cause, the liquidation or dissolution of the Issuer. No Holder shall have any claim (whether against the Issuer or the Guarantor) in respect of any Liquidation Distribution or part thereof not paid when it would, but for the operation of this paragraph 3.3, otherwise have become due.

**4.    Redemption**

4.1    The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Any redemption is subject to the provisions of the Act.

4.2    If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed, in whole but not in part, by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.3    If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed, in whole but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

4.4    If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will also be redeemed by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.5    Prior to the publication of any notice of redemption pursuant to paragraph 4.3 or paragraph 4.4, the General Partner shall deliver to the Registrar a certificate signed by two members of the board of directors of the Guarantor stating that the Issuer is entitled to effect such redemption and an opinion of counsel to the Guarantor experienced in such matters to the effect that either a Tax Event has occurred (and specifying which of the clauses as set out in the definition of "Tax Event" is applicable) or a Capital Disqualification Event has occurred. Upon the expiry of such notice, the Issuer shall be dissolved and the General Partner as liquidation agent shall be bound to redeem each of the Preferred Securities accordingly by payment of an amount equal to the Optional Redemption Price.

4.6    Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time). As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes will be also granting their consent for the redemption of the Preferred Securities. The relevant Supervisory Authority may impose conditions on any such redemption.

4.7    All Preferred Securities which are redeemed will forthwith be cancelled and accordingly may not be reissued or resold.

**5.    Substitution for Preferred Stock**

5.1    If a Trigger Event occurs, then, provided that (if required at such time) no relevant Supervisory Authority has objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock (the "**Preferred Securities Substitution**") on the Substitution Date, as defined below.

As soon as reasonably practicable following the occurrence of a Trigger Event, the General Partner shall cause notice (the "**Trigger Event Notice**") to be given to the Holders (in accordance with paragraph 10) and to the Stock Exchanges that the depositary shares representing Substituted Preferred Stock will be available from the date (the "**Substitution Date**") specified in the Trigger Event Notice for the purpose.

Until such time as the Trigger Event Notice is given by the General Partner (in accordance with paragraph 10), Holders will continue to be entitled to receive Distributions and/or a Liquidation Distribution in respect of the Preferred Securities but thereafter Holders will have no further rights, title or interest in or to their Preferred Securities except to have them substituted in the manner and to the persons described below.

The Trigger Event Notice will contain a form of substitution confirmation (the "**Preferred Securities Substitution Confirmation**") to be completed by each Holder (or, for so long as the Preferred

Securities are registered in the name of a nominee of a common depositary for Euroclear and Clearstream, Luxembourg, by each accountholder named in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in the Preferred Securities). The form of Preferred Securities Substitution Confirmation shall also be made available at the offices of each Paying and Transfer Agent. To receive Substituted Preferred Stock in respect of its holding of Preferred Securities, a Paying and Transfer Agent must receive from the Holder (or such accountholder, as the case may be) a Preferred Securities Substitution Confirmation together with the certificate representing the relative holding of Preferred Securities or other evidence of entitlement satisfactory to the General Partner.

Each share of Substituted Preferred Stock allotted will rank for any dividend from the immediately preceding Distribution Payment Date but otherwise will have no entitlement to any accrued Distributions or any other payment in respect of the Preferred Securities.

Upon a Preferred Securities Substitution, each Holder (or, as the case may be, accountholder) shall receive in respect of each €1,000 Liquidation Preference of Preferred Securities, one depositary share representing Substituted Preferred Stock with a nominal amount of €1,000.

No Preferred Securities Substitution will take place and the Holders will continue to hold their Preferred Securities and all their rights thereunder if prior to the Substitution Date, a winding-up of LBHI occurs.

*LBHI has undertaken that it will pay any taxes or capital duties or stamp duties payable in the UK arising on the allotment and issue of the depositary shares representing Substituted Preferred Stock. LBHI will not be obliged to pay, and each Holder (or, as the case may be, accountholder) delivering Preferred Securities and a duly completed Preferred Securities Substitution Confirmation to a Paying and Transfer Agent must pay, any other taxes, stamp duty reserves taxes and capital, stamp, issue and registration duties arising on the relevant Preferred Securities Substitution. LBHI will not be obliged to pay and each recipient must pay all, if any, taxes arising by reference to any disposal or deemed disposal of a Preferred Security in connection with such Preferred Securities Substitution.*

5.2   The General Partner will use all reasonable endeavours to procure that certificates (if any) for depositary shares representing Substituted Preferred Stock issued on a Preferred Securities Substitution will be despatched by mail free of charge (but uninsured and at the risk of the person entitled thereto) within one month after receipt of a duly completed Preferred Securities Substitution Confirmation.

## 6.   Additional Amounts

All payments in respect of the Preferred Securities by the Issuer will be made without withholding or deduction for, or on account of, any Tax, unless the withholding or deduction of such Tax is required by law. In that event, each Holder will be entitled to receive, as further distributions, such additional amounts (the **"Additional Amounts"**) as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Preferred Securities in the absence of such withholding or deduction; except that no such Additional Amounts will be payable to a Holder (or to a third party on his behalf) with respect to any Preferred Security:

(a)   to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)   where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)   where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required,

and except that the Issuer's obligation to make any such payments is subject to the limitations provided in paragraphs 2 and 3.

## 7.    Payments

7.1    Distributions will be payable in accordance with the Act on the relevant Distribution Payment Date (or where any Distribution Payment Date is not a TARGET Business Day on the next TARGET Business Day (without interest in respect of such delay)) to the Holders of record as they appear on the Register on the relevant distribution record date, which will be five TARGET Business Days prior to the relevant Distribution Payment Date.

If the General Partner gives a notice of redemption pursuant to paragraph 4.2, 4.3 or 4.4 or in respect of the Preferred Securities, then on the relevant Redemption Date the General Partner shall procure that the Optional Redemption Price will be paid by the Registrar or by the Paying and Transfer Agents on behalf of the Issuer to the Holders. Upon such payment, all rights of Holders to participate in the assets of the Issuer or to be returned any amount in respect of the Preferred Securities (including the Preferred Capital Contribution (or any part thereof) made by or on behalf of the Holders) will be extinguished and the Holders shall thereupon cease to be limited partners of the Issuer provided their holding of Preferred Securities are redeemed in accordance with the foregoing, and the Preferred Capital Contribution will, on payment of the Optional Redemption Price, be deemed repaid.

7.2    Subject to all applicable fiscal or other laws and regulations:

7.2.1   each payment in respect of Distributions will be made by cheque and mailed to the Holder of record at such Holder's address as it appears on the Register on the relevant record date for the Preferred Securities; and

7.2.2   any payment in respect of the Optional Redemption Price or the Liquidation Distribution in respect of any Preferred Security will be made by cheque against presentation and surrender of the relevant certificate of entitlement at the office of the Registrar or a Paying and Transfer Agent,

provided, however, that a Holder may receive such payment by direct transfer if appropriate direct transfer instructions have been received by the Registrar in sufficient time prior to the relevant date of payment. Holders will not be entitled to any interest or other payment for any delay after the due date in receiving the amount due if the due date is not a TARGET Business Day, if the Holder is late in surrendering certificates (if required to do so) or if a cheque mailed in accordance with this paragraph arrives after the due date for payment.

In the event that payment of the Optional Redemption Price in respect of any Preferred Security is improperly withheld or refused and not paid by the Issuer, Distributions on such Preferred Security, subject as described in paragraphs 2.3 and 2.4, will continue to accrue, from the relevant Redemption Date to the date of actual payment of such Optional Redemption Price.

7.3    The General Partner will, and the Guarantor has undertaken in the Subordinated Guarantee that it will procure that the General Partner will, maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, a Paying and Transfer Agent in Luxembourg, (b) whilst the Preferred Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, a Paying and Transfer Agent in Amsterdam, (c) a Registrar having its office outside the United Kingdom and (d) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive.

## 8.    Meetings

8.1    Except as described below and provided for in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

8.2    The consent in writing of the Holders of at least a simple majority in Liquidation Preference of the outstanding Preferred Securities or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities, shall be required in order to give effect to any variation or abrogation of the rights, preferences and privileges of the Preferred Securities by way of amendment of the Limited Partnership Agreement or otherwise (unless otherwise provided in the terms of the Preferred Securities or as required by applicable law).

8.3    No such sanction shall be required if, as determined by the General Partner, the change is solely of a formal, minor or technical nature or is to correct an error or cure an ambiguity or which does not adversely affect the rights of Holders (provided that the change does not reduce the amounts payable to Holders, impose any obligation on the Holders or any modification of the terms of the Preferred Securities) in which case the General Partner shall be authorised to approve and implement such change.

8.4    Notwithstanding the foregoing, the General Partner may, without the consent or sanction of the Holders, take such action as is required in order to amend the Limited Partnership Agreement:

8.4.1    to allow an increase in the level of the Preferred Capital Contributions and the corresponding number of Preferred Securities; or

8.4.2    to authorise, create and issue one or more other series of securities or partnership interests in the Issuer ranking junior, as regards participation in the profits and assets of the Issuer, to the Preferred Securities and to admit, if relevant, new holders in respect thereof.

Thereafter the Issuer may, provided that the circumstances for non-payment of Distributions in paragraph 2.4 are not subsisting, without the consent of the Holders issue any such further securities either having the same terms and conditions as the Preferred Securities in all respects (or in all respects except for the first payment of Distributions on them) and so that such further issue shall be consolidated and form a single series with the Preferred Securities or upon such other terms as aforesaid. References herein to the Preferred Securities include (unless the context requires otherwise) any other securities issued pursuant to this paragraph and forming a single series with the Preferred Securities.

8.5    Notwithstanding the foregoing, no vote of the Holders will be required for the redemption, cancellation or substitution of the Preferred Securities or withdrawal of a Holder in accordance with the Limited Partnership Agreement.

8.6    The General Partner will cause a notice of any meeting at which Holders are entitled to vote and any voting forms to be mailed to each Holder. Each such notice will include a statement setting forth (a) the date, time and place of such meeting, (b) a description of any resolution to be proposed for adoption at such meeting on which such Holders are entitled to vote and (c) instructions for the delivery of proxies.

## 9.    Covenant of the General Partner

The General Partner undertakes not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listing of the Preferred Securities and any other partnership interests in the Issuer (where applicable), the Register, the Registrar, the Paying and Transfer Agents and a listing agent in respect of the Preferred

Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of a custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

## 10.  Notices

All notices to the Holders will be mailed to the Holder of record and, if and for so long as the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, in a daily newspaper of general circulation in Luxembourg, which for the time being shall be the *d' Wort* and if and for so long as the Preferred Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, in a daily newspaper of general circulation in The Netherlands, which for the time being shall be *Het Financieele Dagblad*, and in the Daily Official List (*Officiële Prijscourant*) of Euronext Amsterdam N.V. In addition, notices will be published in one English language daily newspaper of general circulation in Europe. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

## 11.  Transfers and Form

The Preferred Securities will be in registered form each with a Liquidation Preference of €1,000 and multiples thereof.

If definitive certificates are made available in respect of Preferred Securities they will be available from the Registrar and from each of the Paying and Transfer Agents, and will be posted to the relevant Holders at the address shown in the Register or, as applicable, in the relevant instrument of transfer within three Business Days in London of issue, by uninsured post at the risk of such Holders. Transfers of Preferred Securities if represented by definitive certificates may be effected by presentation of the relevant certificate (with the transfer certificate attached thereto duly completed on behalf of the transferor and transferee) at the specified office of the Registrar or any Paying and Transfer Agent. Where a Holder transfers some only of the Preferred Securities represented by any such certificate he shall be entitled to a certificate for the balance without charge at the specified office of the Registrar or any Paying and Transfer Agent. All transfers of Preferred Securities by Holders must be effected in accordance with the Act and subject to the provisions of the Limited Partnership Agreement.

## 12.  Replacement of Certificates

If a certificate is damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same Preferred Securities may be issued on payment of such fee and on such terms (if any) as to evidence and indemnity and the payment of out-of-pocket expenses as the General Partner may think fit and on payment of the costs of the General Partner incidental to its investigation of the evidence and, if damaged or defaced, on delivery up of the old certificate at the office of the Registrar or any Paying and Transfer Agent.

## 13.  Prescription

Claims against the Issuer for payment of Distributions and sums in respect of the Optional Redemption Price or Liquidation Distribution of the Preferred Securities will be prescribed in accordance with English law unless made within 10 years from the date on which such payment becomes due or, if later, the date on which the Issuer makes such payment available to Holders.

**14.   Governing Law**

The Limited Partnership Agreement and the Preferred Securities shall be governed by, and construed in accordance with, English law.

**15.   Additional Obligations**

If and so long as the Preferred Securities are listed on Euronext Amsterdam, the Issuer will comply with Article 2.1.20 of Schedule B of the Listing and Issuing Rules (*Fondsenreglement*) of Euronext Amsterdam N.V., as amended from time to time.

## SUMMARY OF PROVISIONS RELATING TO THE PREFERRED SECURITIES IN GLOBAL FORM

### Initial Issue of Preferred Securities

The Preferred Securities will be issued in registered form and will be initially represented by interests in a Global Certificate which will be deposited with JPMorgan Chase Bank N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear and Clearstream, Luxembourg. The Preferred Securities will be registered in the name of the Initial Limited Partner, as nominee for the Common Depositary. For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers of such interests will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

### Exchange

If either or both of Euroclear and Clearstream, Luxembourg is or are closed for business for a continuous period of 14 days (other than for the purposes of a public holiday) or announces an intention permanently to cease business, then a number of Preferred Securities corresponding to its book-entry interest in the Preferred Securities represented by the Global Certificate held by the Common Depositary referred to above will, subject to such reasonable requirements as the General Partner may require, be transferred to each holder of an interest in the Preferred Securities whose name is notified by the Common Depositary to the Registrar. Each such holder will be registered as a Holder in the Register and registered with the Registrar at Companies House in Cardiff on the Limited Partnerships Register accordance with the Act and will receive a certificate made out in its name. Other than in the circumstances referred to in this paragraph, definitive certificates will not be available to Holders.

### Accountholders

So long as the Preferred Securities are registered in the name of a nominee for a common depositary for Euroclear and Clearstream, Luxembourg, the nominee for Euroclear and Clearstream, Luxembourg will be the sole registered owner or holder of the Preferred Securities represented by the Global Certificate for all purposes under the Limited Partnership Agreement. Except as set forth under *"Description of Preferred Securities – Transfers and Form"* and under *"Transfers of Interests"* below, the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system as the holders of the Preferred Securities evidenced by the Global Certificate (each an "**Accountholder**") will not be entitled to have Preferred Securities registered in their names, will not receive or be entitled to receive physical delivery of definitive certificates evidencing interests in the Preferred Securities and will not be considered registered owners or holders thereof under the Limited Partnership Agreement. Accordingly, each Accountholder must rely on the rules and procedures of Euroclear and Clearstream, Luxembourg, as the case may be, to exercise any rights and obligations of an investor in Preferred Securities.

### Payment

Each Accountholder must look solely to Euroclear or Clearstream, Luxembourg, as the case may be, for its share of each payment made by the Issuer to the registered holder of the Preferred Securities and in relation to all other rights arising under the Global Certificate, subject to and in accordance with the respective rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be. Such persons shall have no claim directly against the Issuer in respect of payments due on the Preferred Securities for so long as the Preferred Securities are represented by the Global Certificate and such obligations of the Issuer will be discharged by payment to the registered holder of the Preferred Securities in respect of each amount so paid.

**Transfers of Interests**

Accountholders will only be able to transfer their beneficial interests in the Preferred Securities in accordance with the restrictions described under *"Description of Preferred Securities – Transfers and Form"* and the rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be.

## SUBORDINATED GUARANTEE

*The following is the Subordinated Guarantee substantially in the form to be executed by the Guarantor.*

THIS DEED OF GUARANTEE (the "**Subordinated Guarantee**"), dated 30th March, 2005, is executed and delivered by Lehman Brothers Holdings plc (the "**Guarantor**") for the benefit of the Holders (as defined below).

WHEREAS the Guarantor desires to issue this Subordinated Guarantee for the benefit of the Holders, as provided herein.

NOW, THEREFORE the Guarantor executes and delivers this Subordinated Guarantee as a deed poll for the benefit of the Holders.

## 1.    Definitions

As used in this Subordinated Guarantee, capitalised terms not defined herein shall have the meanings ascribed to them in the Limited Partnership Agreement and otherwise the following terms shall, unless the context otherwise requires, have the following meanings:

"**Guaranteed Payments**" means (without duplication) collectively payments by the Guarantor in respect of an amount equal to (i) all Distributions due on the Preferred Securities, (ii) any Distributions on the Preferred Securities which would have been due had the Issuer had sufficient legally available resources but only if, and to the extent that, the Issuer did not have such legally available resources solely due to a failure by the issuer of the Subordinated Notes or Eligible Investments replacing such Subordinated Notes to pay interest thereon as and when due under the terms thereof, (iii) the Optional Redemption Price and (iv) any Additional Amounts;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time, save that for as long as the Preferred Securities are registered in the name of a common depositary (or of a nominee for a common depositary) for Euroclear and Clearstream, Luxembourg, each person (other than Euroclear and Clearstream, Luxembourg) who is for the time being shown in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in any Preferred Securities (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the number of Preferred Securities standing to the account of any person shall be conclusive and binding for all purposes) shall be treated by the Issuer, the Guarantor and any Paying and Transfer Agent as the holder of Preferred Securities in a nominal amount equal to such interest for all purposes other than with respect to payments, the right to which shall be vested in the name of the person appearing as the relative limited partner in the Register;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to this Subordinated Guarantee and the Parity Securities;

"**Limited Partnership Agreement**" means the Limited Partnership Agreement dated 22nd March, 2005 establishing the Issuer, as supplemented by a First Supplemental Limited Partnership Agreement dated 24th March, 2005, as the same may be amended and/or further supplemented from time to time;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under this Subordinated Guarantee including the sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with this Subordinated Guarantee;

"**Preferred Securities**" means the outstanding Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of the Issuer, originally issued on 30th March, 2005 in the

principal amount of €225,000,000, together with any further such preferred securities issued after the date of this Subordinated Guarantee, the Holders of which are entitled to the benefits of this Subordinated Guarantee as evidenced by the execution of this Subordinated Guarantee and **"Preferred Security"** shall be construed accordingly;

**"Tax"** means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any subdivision of or by any authority therein or thereof having power to tax;

**"Tier 1 Capital"** has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisor Policy or any successor publication replacing such guide; and

**"Tier 1 Securities"** mean any obligation of the Guarantor or, as the case may be, a Subsidiary or other entity which is treated, or is capable of being treated, as Tier 1 Capital of the Guarantor.

## 2.    Guarantee

2.1    Subject to the exceptions and limitations contained in the following provisions of this clause 2, the Guarantor irrevocably agrees to pay in full to the Holders the Guaranteed Payments, as and when due, to the extent that such payments shall not have been paid when due and payable by the Issuer regardless of any defence, right of set-off or counterclaim which the Issuer may have or assert. This Guarantee is continuing, irrevocable and absolute. The rights and claims of the Holders against the Guarantor under this Guarantee are subordinated as described in paragraph 2.9.

2.2    All Guaranteed Payments made hereunder will be made without withholding or deduction for or on account of any Tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event, the Guarantor will, provided that (if required at such time) the UK Regulator has not objected, pay such additional amounts (the **"Guarantor Additional Amounts"**) as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable under this Subordinated Guarantee in the absence of such withholding or deduction; except that no such Guarantor Additional Amounts will be payable to a Holder (or a third party on his behalf):

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)    where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required.

2.3    The Guarantor hereby waives notice of acceptance of this Subordinated Guarantee and of any liability to which it applies or may apply, presentment, demand for payment, protest, notice of non-payment, notice of dishonour, notice of redemption and all other notices and demands.

2.4    The obligations, covenants, agreements and duties of the Guarantor under this Subordinated Guarantee shall in no way be affected or impaired by reason of the happening from time to time of any of the following:

(a)    the release or waiver, by operation of law or otherwise, of the performance or observance by the Issuer of any express or implied agreement, covenant, term or condition relating to the Preferred Securities to be performed or observed by or on behalf of the Issuer;

(b)    the extension of time for the payment by or on behalf of the Issuer of all or any portion of any Distribution, the Optional Redemption Price, the Liquidation Distribution or any other sums payable under the terms of the Preferred Securities or the extension of time for the performance of any other obligation under, arising out of, or in connection with, the Preferred Securities;

(c)    any failure, omission, delay or lack of diligence on the part of Holders to enforce, assert or exercise any right, privilege, power or remedy conferred on the Holders pursuant to the terms of the Preferred Securities, or any action on the part of the Issuer granting indulgence or extension of any kind;

(d)    the voluntary or involuntary winding-up, dissolution, amalgamation, reconstruction, sale of any collateral, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganisation, arrangement, composition or readjustment of debt of, or other similar proceedings affecting, the Issuer or any of the assets of the Issuer;

(e)    any invalidity of, or defect or deficiency in, the Preferred Securities; or

(f)    the settlement or compromise of any obligation guaranteed hereby or hereby incurred.

There shall be no obligation on the Holders to give notice to, or obtain consent of, the Guarantor with respect to the occurrence of any of the foregoing.

2.5    This Subordinated Guarantee shall be deposited with and held by the Registrar until all the obligations of the Guarantor have been discharged in full. The Guarantor hereby acknowledges the right of every Holder to the production of, and the right of every Holder to obtain a copy of, this Subordinated Guarantee from the Registrar.

2.6    A Holder may enforce this Subordinated Guarantee directly against the Guarantor, and the Guarantor waives any right or remedy to require that any action be brought against the Issuer or any other person or entity before proceeding against the Guarantor. All waivers contained in this Subordinated Guarantee shall be without prejudice to the right to proceed against the Issuer and the General Partner as permitted by the terms of the Preferred Securities. The Guarantor agrees that this Subordinated Guarantee shall not be discharged except by complete performance of all obligations of the Guarantor under this Subordinated Guarantee.

2.7    The Guarantor shall be subrogated to any and all rights of the Holders against the assets of the Issuer in respect of any amounts paid to the Holders by the Guarantor under this Subordinated Guarantee. The Guarantor shall not (except to the extent required by mandatory provisions of law) exercise any rights which it may acquire by way of subrogation or any indemnity, reimbursement or other agreement, in all cases as a result of a payment under this Subordinated Guarantee, if, at the time of any such payment, any amounts are due and unpaid under this Subordinated Guarantee. If the Guarantor shall receive or be paid any amount with respect to the Preferred Securities in violation of the preceding sentence, the Guarantor agrees to pay over such amount to the Holders.

2.8    The Guarantor acknowledges that its obligations hereunder are several and independent of the obligations of the Issuer with respect to the Preferred Securities and that the Guarantor shall be liable as principal and sole obligor hereunder to make Guaranteed Payments pursuant to the terms of this Subordinated Guarantee, notwithstanding the occurrence of any event referred to in clause 2.5.

2.9    Subject to applicable law, the Guarantor agrees that its obligations hereunder constitute unsecured obligations of the Guarantor subordinated in right of payment to Senior Creditors and will at all times rank:

(a)    junior to all liabilities of the Guarantor including subordinated liabilities (in each case other than any liability of the Guarantor which constitutes or would, but for any applicable limitation on the amount of such capital, constitute Tier 1 Capital or which is referred to in (b) or (c) below and any other liability expressed to rank *pari passu* with or junior to this Subordinated Guarantee) (the "**Senior Creditors**");

(b) *pari passu* with Parity Securities, if any, issued by the Guarantor and any guarantee or support agreement of the Guarantor ranking *pari passu* with this Subordinated Guarantee and issued in respect of Parity Securities issued by the Issuer or any Subsidiary; and

(c) senior to the Junior Share Capital of the Guarantor.

2.10 No Holder shall following any breach by the Guarantor of any of its obligations under this Subordinated Guarantee be entitled to exercise any right of set-off or counterclaim which may be available to it against amounts owing by the Guarantor to such Holder. Notwithstanding the provisions of the foregoing sentence, if any of the said rights and claims of any Holder against the Guarantor is discharged by set-off, such Holder will immediately pay an amount equal to the amount of such discharge to the Guarantor or, in the event of its winding-up, the liquidator of the Guarantor and until such time as payment is made will hold a sum equal to such amount in trust for the Guarantor, or the liquidator of the Guarantor, and accordingly any such discharge will be deemed not to have taken place.

2.11 In the event of the winding-up of the Guarantor if any payment or distribution of assets of the Guarantor of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Guarantor being subordinated to the payment of amounts owing under this Subordinated Guarantee, shall be received by any Holders, before the claims of Senior Creditors have been paid in full, such payment or distribution shall be held in trust by the Holder, as applicable, and shall be immediately returned by it to the liquidator of the Guarantor and in that event the receipt by the liquidator shall be a good discharge to the relevant Holder. Thereupon, such payment or distribution will be deemed not to have been made or received.

## 3.    Undertaking of the Guarantor

The Guarantor will procure that it will maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules and regulations of the Luxembourg Stock Exchange so require, a Paying and Transfer Agent with a specified office in Luxembourg, (b) whilst the Preferred Securities are listed on Euronext Amsterdam and the rules and regulations of Euronext Amsterdam so require, a Paying and Transfer Agent with a specified office in Amsterdam (c) a Registrar having its office outside the United Kingdom and (d) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive.

## 4.    Termination

With respect to the Preferred Securities, this Subordinated Guarantee shall terminate and be of no further force and effect upon the earliest of:

4.1    full payment of the Optional Redemption Price; or

4.2    purchase and cancellation of all Preferred Securities,

4.3    dissolution of the Issuer,

provided however that this Subordinated Guarantee will continue to be effective or will be reinstated, as the case may be, if at any time payment of any sums paid in respect of the Preferred Securities or under this Subordinated Guarantee must be restored by a Holder for any reason whatsoever.

**5.    Transfer; Amendment; Notices**

5.1    Subject to operation of law, all guarantees and agreements contained in this Subordinated Guarantee shall bind the successors, assigns, receivers, trustees and representatives of the Guarantor and shall inure to the benefit of the Holders. The Guarantor shall not transfer its obligations hereunder without (i) the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or (ii) the sanction of a resolution, passed by Holders representing at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities and otherwise convened and held in accordance with procedures contained in Schedule 2 to the Limited Partnership Agreement and applicable law.

5.2    Except for those changes (a) required by clause 3.1 hereof; or (b) which do not adversely affect the rights of Holders (in any of which cases no agreement will be required), this Subordinated Guarantee shall be changed only by agreement in writing signed or sealed by the Guarantor with the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities.

5.3    Any notice, request or other communication required or permitted to be given hereunder to the Guarantor shall be given in writing by delivering the same against receipt therefor or be addressed to the Guarantor, as follows, to:

Lehman Brothers Holdings plc

| | |
|---|---|
| Address: | 25 Bank Street |
| | London E14 5LE |
| | England |
| Attention: | Head of Legal Department |
| Telephone: | +44 20 7102 1000 |

The address of the Guarantor may be changed at any time and from time to time and shall be the most recent such address furnished in writing by the Guarantor to the Registrar.

Any notice, request or other communication required or permitted to be given hereunder to the Holders shall be given by the Guarantor in the same manner as notices sent on behalf of the Issuer to Holders.

5.4    This Subordinated Guarantee is solely for the benefit of the Holders and is not separately transferable from their interests in respect of the Preferred Securities.

**6.    Governing Law**

This Subordinated Guarantee is governed by, and shall be construed in accordance with, English law.

IN WITNESS WHEREOF this Subordinated Guarantee has been executed as a deed poll on behalf of the Guarantor.

EXECUTED as a DEED by                    )

LEHMAN BROTHERS HOLDINGS PLC             )
acting by
and                                      )

## USE OF PROCEEDS

The net proceeds of the issue of the Preferred Securities, amounting to approximately €220,500,000, will augment the capital base of LBHI and the Guarantor. The Issuer will use the net proceeds of the issue of the Preferred Securities to subscribe for the Subordinated Notes.

## LEHMAN BROTHERS UK CAPITAL FUNDING LP

### Introduction

The Issuer was registered in England and Wales on 23rd March, 2005 under the Limited Partnerships Act 1907, with LB GP No. 1 Ltd. as the general partner (in such capacity, the "**General Partner**"), LB Investment Holdings Ltd. as the preferential limited partner (the "**Preferential Limited Partner**") and Chase Nominees Limited as the initial limited partner (in such capacity, the "**Initial Limited Partner**"). The General Partner, the Preferential Limited Partner and the Initial Limited Partner have, *inter alios*, entered into a limited partnership agreement on 22nd March, 2005 and a first supplemental limited partnership agreement on 24th March, 2005 (as so supplemented, the "**Limited Partnership Agreement**") for the purpose of establishing the Issuer. The Issuer is not a legal entity separate from its partners and has no subsidiaries. The Limited Partnership Agreement does not create a trust relationship between any of the partners.

The General Partner, incorporated with limited liability in England and Wales with registered number 5355491 is a wholly owned subsidiary of LBHI and is the sole general partner of the Issuer. As such, the General Partner solely manages the Issuer (subject to the appointment by the Issuer of the Administrator as described below). The Guarantor will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either the Guarantor itself or a directly or indirectly wholly-owned subsidiary of the Guarantor.

The Preferential Limited Partner, incorporated with limited liability in England and Wales with registered number 4385277, is a wholly owned Subsidiary of LBHI. The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments (each as defined herein under *"Description of the Preferred Securities"*), as the case may be, in excess of those required to make payments in respect of the Preferred Securities.

Provided that they do not become involved with the administration of the limited partnership, and subject to compliance with the provisions of the Act, the liability of persons registered as limited partners of the Issuer pursuant to the Act for the debts or obligations of the limited partnership will be limited to the amount of partnership capital which they have contributed or agreed to contribute to the partnership, i.e. €1,000 per Preferred Security.

No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements. It is not intended that the Issuer will publish interim financial statements.

### Activity

The business of the Issuer is generally to raise finance for the Group and is more particularly described in the Limited Partnership Agreement. The Issuer has carried out no operations since its registration other than in relation to the creation of the Preferred Securities. The capital contributions to be made by the Limited Partners will be used by the Issuer to subscribe for the Subordinated Notes.

### Administration

For UK regulatory purposes, the Issuer will be operated by the General Partner or, insofar as the General Partner is not so authorised, by an administrator (the "**Administrator**") authorised by the Financial Services Authority under the Financial Services and Markets Act 2000 (the "**FSMA**") to establish, operate and wind-up collective investment schemes. The registered office of the Issuer and the General Partner is 25 Bank Street, London E14 5LE. Neither the Initial Limited Partner nor any Holder may participate in the administration of the Issuer.

The General Partner has agreed to contribute capital from time to time to the extent required for the Issuer to meet any operating expenses which it may have. The General Partner has also agreed that it will at all

35

times maintain sole ownership, whether directly or indirectly, of its general partner interest in the Issuer, subject to the terms of the Limited Partnership Agreement. The Limited Partnership Agreement provides that all of the Issuer's business and affairs will be conducted by the General Partner save for those operational matters required to be performed by an Administrator under the FSMA. The General Partner will have unlimited liability for the debts and obligations of the Issuer to the extent that these cannot be satisfied out of partnership assets.

If the Issuer is dissolved, the Limited Partnership Agreement provides that the General Partner will only be entitled to any assets of the Issuer remaining after (i) all debts and other liabilities of the Issuer have been satisfied in full and (ii) the full Liquidation Preference to which the Holders are entitled and all other amounts to which the holders of any other partnership interests are entitled have been paid to, or irrevocably set aside for, such holders.

## Capitalisation

In addition to the initial capital contribution by the General Partner, the initial capital contribution of €1.00 of the Preferential Limited Partner and the capital contribution of €225,000,000 to be made by the Initial Limited Partner in relation to the Preferred Securities on the date of issue of the Preferred Securities and such other capital contributions as may be made by the General Partner from time to time to meet certain operating expenses of the partnership, the General Partner may accept additional limited partners and additional capital contributions to the Issuer in accordance with the provisions of the Limited Partnership Agreement.

## Indebtedness

Since the date of its registration, the Issuer has not had any loan capital outstanding, has not incurred any borrowings, has had no contingent liabilities, has not granted any guarantees and does not intend to have outstanding any such loan capital, incur any such borrowings, have any such contingent liabilities or grant any such guarantees other than in connection with the issue of the Preferred Securities and other partnership interests in the Issuer. The General Partner has undertaken in the Limited Partnership Agreement not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listings of the Preferred Securities, the Register, the Registrar, the Paying and Transfer Agents and listing agents in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of any custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

**LEHMAN BROTHERS HOLDINGS PLC**

## General

The Guarantor was incorporated in England on 11th October, 1984 (with registration number 1854685) as a private limited company for an unlimited duration under the Companies Act 1948-81 and was re-registered as a public limited company under the Companies Act 1985 on 6th August, 1986. The Guarantor is a wholly-owned subsidiary of LBHI. The Guarantor was originally organised to act as a UK holding company of LBHI's UK incorporated businesses, but in 1986 its objects were amended and since then its principal activity has been to act as a UK finance company supporting the working capital needs of a selected limited group of European subsidiaries of LBHI. The Guarantor has a number of subsidiary undertakings including wholly-owned subsidiaries Lehman Brothers International (Europe), Lehman Brothers Europe Ltd and Lehman Brothers Limited. The average number of persons employed by the Guarantor during 2004 was 7 and, as at the date of this Offering Circular, is 7.

The registered office and principal place of business of the Guarantor is at 25 Bank Street, London, E14 5LE.

## Directors of the Guarantor

Set forth below are the names, the principal occupations and principal outside activities (if any) of the current members of the board of directors of the Guarantor.

|  | *Principal Occupation within the Guarantor* | *Principal Outside Activities* |
| --- | --- | --- |
| Ian Lowitt ......................................................... | Director | |
| Paolo R. Tonucci ................................................ | Director | |
| Richard J.A. Amat.............................................. | Director | |
| Peter A. Gamester .............................................. | Director | |
| Kevin Hayes ...................................................... | Director | |
| Ian Jameson....................................................... | Director | |
| Justin van Wijngaarden...................................... | Director | |

All of the directors of the Guarantor are executive directors.

The business address of each of the above is 25 Bank Street, London, E14 5LE, except that the business address of Ian Lowitt, is 745 Seventh Avenue, New York, NY 10019, USA.

## NON-CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF THE GUARANTOR

All of the financial information below is extracted without material adjustment from the unaudited non-consolidated financial statements of the Guarantor for the year ended 30th November, 2004.

|  | *30th November, 2004* |
|---|---|
|  | *(unaudited) ($,000)* |
| Long-Term Indebtedness | 0 |
| Short-Term Loans | 0 |
| Commercial Paper | 0 |
| Ordinary Shares, £1.00 par value; 79,750,000 authorised: 40,021,100 allotted, called up and fully-paid | 66,266 |
| Ordinary Shares, $1.00 par value; 1,000,000,000 authorised: 653,800,000 allotted, called up and fully-paid | 653,800 |
| Ordinary B Shares, £1.00 par value; 250,000 authorised; zero called up and fully-paid | 0 |
| Preference Shares, non-cumulative, redeemable, £1.00 par value; 20,000,000 authorised: 20,000,000 allotted, called up and fully-paid | 33,116 |
| Preference Shares, non-cumulative, redeemable, $1.00 par value; $2,000,000,000 authorised: 1,210,000,000 allotted, called up and fully-paid | 1,210,000 |
| Capital reserves | 3,312 |
| Other reserves | 162,587 |
| Profit and Loss | 236,812 |
| Total capital and reserves | 2,365,893 |
| **Total indebtedness and capital and reserves** | **2,365,893** |

Notes:

(1)    On 2nd February, 2005, the Guarantor issued $50,000,000 non-cumulative redeemable preference shares.

(2)    Save as described above, there has been no material change in the non-consolidated capitalisation and indebtedness of the Guarantor since 30th November, 2004.

## SUMMARY FINANCIAL INFORMATION OF THE GUARANTOR

The following table sets forth selected non-consolidated financial information on the Guarantor as of the dates and for the periods indicated. The selected non-consolidated financial information set out are below is extracted without material adjustment from the audited non-consolidated financial statements of the Guarantor for the year ended 30th November 2003.

### Profit and Loss Account Data

| | Year ended 30th November, 2003 | Year ended 30th November, 2002 |
|---|---|---|
| | (in U.S.$ thousands) | |
| **Operating Income**.................................................................................... | 322,255 | 162,942 |
| Administrative expenses............................................................................ | (2,883) | (1,561) |
| **Operating Profit** ..................................................................................... | 319,372 | 161,381 |
| Interest receivable and similar income...................................................... | 11,692 | 12,687 |
| Interest payable and similar charges ........................................................ | (182,706) | (158,071) |
| **Profit on Ordinary Activities before Taxation**.................................... | 148,358 | 15,997 |
| Tax on profit on ordinary activities ......................................................... | – | – |
| **Profit/(Loss) on Ordinary Activities after Taxation** ........................... | 148,358 | 15,997 |
| Dividend paid ........................................................................................... | – | – |
| **Profit/(Loss) Retained for the Year**..................................................... | 148,358 | 15,997 |

### Balance Sheet Data

| | Year ended 30th November, 2003 | Year ended 30th November, 2002 |
|---|---|---|
| | (in U.S.$ thousands) | |
| Total assets ............................................................................................. | 5,897,981 | 5,130,202 |
| Total current liabilities[1] ......................................................................... | 4,535,948 | 4,173,993 |
| Long-term liabilities[1].............................................................................. | 3,041 | 8,968 |
| Total shareholders' funds ........................................................................ | 1,358,992 | 947,241 |
| Total capital (shareholders' funds and long-term liabilities) ................... | 1,362,033 | 956,209 |

Note:

1.    For the years ended 30th November, 2003 and 30th November, 2002, the total liabilities of the Guarantor consist of the sum of the Total current liabilities and the Long-term liabilities.

## LEHMAN BROTHERS HOLDINGS INC.

LBHI, together with its subsidiaries (collectively, "**Lehman Brothers**" or the "**Group**"), is an innovator in global finance, serving the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Group, through predecessor entities, was founded in 1850.

Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate Lehman Brothers' market-making activities, it is a member of all principal securities and commodities exchanges in the United States and it holds memberships or associated memberships on several principal international securities and commodities exchanges including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Lehman Brothers' principal business activities are investment banking, capital markets facilitation and investment management. Through this investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client/customer business model which is based on Lehman Brothers' principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates customer flow revenues from institutional, corporate, government and high net worth clients/customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios and diversify risks across different market cycles; (iii) providing investment management and advisory services; and (iv) acting as an underwriter to clients. As part of Lehman Brothers' customer flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary trading positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its customer flow orientation helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Investment Banking, Capital Markets and Investment Management.

Lehman Brothers is engaged primarily in providing financial services. Other businesses in which it is engaged represent less than 10 percent of each of consolidated assets, revenues and pre-tax income.

LBHI was incorporated with limited liability for an unlimited duration in the State of Delaware on 29th December, 1983. LBHI's principal executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A.

Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. (Further information about these requirements and restrictions is contained in "Management's Discussion and Analysis - Liquidity, Funding and Capital Resources" and in Note 17 of the Notes to Consolidated Financial Statements in LBHI's 2004 Annual Report, included in its most recent Annual Report on Form 10-K.) Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinate to the claims of creditors of the subsidiary.

**Management**

**Board of Directors of LBHI**

Set forth below are the names, the principal occupations and principal outside activities of the current members of the board of directors of LBHI, each of whose business address in their capacity as a director is at LBHI's principal place of business:

| Name | Principal Occupation | Principal Outside Activities |
|------|---------------------|----------------------------|
| Richard S. Fuld, Jr | Chairman and Chief Executive Officer of LBHI | Trustee of the Mount Sinai Medical Center and the Mount Sinai Children's Center Foundation, member of the Executive Committee of the Partnership for New York City, Business Roundtable and The Business Council, Director of The Ronald McDonald House of New York, Trustee of Middlebury College. |
| Michael L. Ainslie | Private Investor and Former President and Chief Executive Officer of Sotheby's Holdings | Director of St. Joe Company and Lehman Brothers Bank, FSB, Trustee of Vanderbilt University, Chairman of the Posse Foundation and Director of the U.S. Tennis Association Foundation. |
| John F. Akers | Retired Chairman of International Business Machines Corporation | Director of W. R. Grace & Co., The New York Times Company, PepsiCo, Inc. and Hallmark Cards, Inc. |
| Roger S. Berlind | Theatrical Producer | Theatrical producer and principal of Berlind Productions and Governor of the League of American Theatres and Producers. |
| Thomas H. Cruikshank | Retired Chairman and Chief Executive Officer of Halliburton Company | Director of Lehman Brothers Inc. |
| Sir Christopher Gent | Non-Executive Chairman of GlaxoSmithKline plc | Director of the International Advisory Board of Hakluyt & Co. and a Senior Advisor to Bain & Company, Inc. |
| Marsha Johnson Evans | President and Chief Executive Officer of the American Red Cross | Director of The May Department Stores Company and Weight Watchers International Inc., member of the Advisory Board of the Pew Partnership for Civic Change, a project of the Pew Charitable Trusts, Director of the Naval Academy Foundation and a Presidential Appointee to the Board of Visitors of the United States Military Academy at West Point. |

41

| Name | Principal Occupation | Principal Outside Activities |
| --- | --- | --- |
| Henry Kaufman | President of Henry Kaufman & Company, Inc. | Member (and the Chairman Emeritus) of the Board of Trustees of the Institute of International Education, a Member of the Board of Trustees of New York University, a Member (and the Chairman Emeritus) of the Board of Overseers of the Stern School of Business of New York University, a Member of the Board of Trustees of the Animal Medical Center, a Member of the Board of Trustees of the Whitney Museum of American Art, a Member of the International Advisory Committee of the Federal Reserve Bank of New York, a Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan, a Member of the Board of Governors of Tel-Aviv University and Treasurer (and former Trustee) of The Economic Club of New York. |
| John D. Macomber | Principal of JDM Investment Group | Director of AEA Investors Inc., Mettler-Toledo International, Sovereign Specialty Chemicals, Inc. and Textron Inc. Chairman of the Council for Excellence in Government and Vice Chairman of the Atlantic Council, Director of the National Campaign to Prevent Teen Pregnancy and the Smithsonian Institute and a Trustee of the Carnegie Institution of Washington and the Folger Library. |
| Dina Merrill | Director and Vice Chairman of RKO Pictures, Inc. and Actress | Vice President of the New York City Mission Society, Trustee of the Eugene O'Neill Theater Foundation, Director of Orbis International, the Juvenile Diabetes Foundation and the Museum of Television and Radio. |

**Executive Officers of LBHI**

| | |
| --- | --- |
| Richard S. Fuld, Jr. | Chairman and Chief Executive Officer |
| Jonathan E. Beyman | Chief of Operations and Technology |
| David Goldfarb | Chief Administrative Officer |
| Joseph M. Gregory | President and Chief Operating Officer |
| Christopher M. O'Meara | Chief Financial Officer |
| Thomas A. Russo | Executive Vice President and Chief Legal Officer |

**Employees**

As of 30th November, 2004, Lehman Brothers employed approximately 19,600 persons, including 14,100 in North America and 5,500 internationally. Lehman Brothers considers its relationship with its employees to be good.

## CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF LBHI

All of the financial information below is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004 filed with the SEC. The following table sets forth the audited consolidated capitalisation and indebtedness of LBHI and its subsidiaries as of 30th November, 2004 and 2003[1]:

|  | At 30th November, 2004 | At 30th November, 2003 |
|---|---|---|
|  | *(U.S.$ millions)* | |
| **Commercial paper and short-term debt** | 2,857 | 2,331 |
| **Long-term indebtedness:** | | |
| Senior notes | 53,561 | 41,303 |
| Subordinated indebtedness[2] | 2,925 | 2,226 |
| Total long-term indebtedness | 56,486 | 43,529 |
| Total commercial paper, short- and long-term indebtedness | 59,343 | 45,860 |
| Preferred securities subject to mandatory redemption | – | 1,310 |
| **Stockholders' equity:** | | |
| Preferred Stock[2]: 38,000,000 shares authorised: | | |
| Shares issued: 848,000 and 728,000 at 30th November, 2004 and 2003, respectively | 1,345 | 1,045 |
| Common Stock: $0.10 par value: 600,000,000 shares authorised: | | |
| Shares issued: 297,796,197 in 2004 and 294,575,285 in 2003; | | |
| Shares outstanding: 274,159,411 in 2004 and 266,679,056 in 2003 | 30 | 29 |
| Additional paid-in capital | 5,865 | 6,164 |
| Accumulated other comprehensive income (net of tax) | (19) | (16) |
| Retained earnings | 9,240 | 7,129 |
| Other stockholders' equity, net | 741 | 1,031 |
| Common Stock in treasury at cost: 23,636,786 shares in 2004 and 27,896,229 shares in 2003 | (2,282) | (2,208) |
| Total stockholders' equity | 14,920 | 13,174 |
| Total commercial paper, short- and long-term indebtedness, trust preferred securities and stockholders' equity | 74,263 | 60,344 |

Notes:

1.  There has been no material change in the capitalisation, indebtedness and contingent liabilities of LBHI since 30th November, 2004. For more information about LBHI's common stock, preferred stock, short-term financings, long-term debt and contingent liabilities, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

2.  LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption. Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption. See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

## SUMMARY FINANCIAL INFORMATION OF LBHI

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated. The selected consolidated financial information as of and for the twelve month periods ended 30th November, 2001, 2002, 2003 and 2004 are extracted without material adjustment from the audited consolidated financial statements of LBHI included or incorporated by reference in LBHI's Annual Report on Form 10-K for the twelve month period ended 30th November, 2004, 2003, 2002 or 2001 filed with the SEC.

### Statement of Income Data

| | Year ended 30th November, 2004 | Year ended 30th November, 2003 | Year ended 30th November, 2002 | Year ended 30th November, 2001 |
|---|---|---|---|---|
| | (in U.S.$ millions) | | | |
| **Revenues:** | | | | |
| Principal transactions .................................. | 5,699 | 4,272 | 1,951 | 2,779 |
| Investment banking .................................... | 2,188 | 1,722 | 1,731 | 2,000 |
| Commissions .............................................. | 1,537 | 1,210 | 1,286 | 1,091 |
| Interest and dividends ................................ | 11,032 | 9,942 | 11,728 | 16,470 |
| Other ......................................................... | 794 | 1418 | 85 | 52 |
| Total revenues ........................................... | 21,250 | 17,287 | 16,781 | 22,392 |
| Interest expense ......................................... | 9,674 | 8,640 | 10,626 | 15,656 |
| Net revenues .............................................. | 11,576 | 8,647 | 6,155 | 6,736 |
| **Non-Interest Expenses:** | | | | |
| Compensation and benefits .......................... | 5,730 | 4,318 | 3,139 | 3,437 |
| Other expenses .......................................... | 2,328 | 1,793 | 1,617 | 1,551 |
| **Total non-interest expenses** ...................... | 8,058 | 6,111 | 4,756 | 4,988 |
| Income before taxes and dividends on trust preferred securities ................................................. | 3,518 | 2,536 | 1,399 | 1,748 |
| Provision for income taxes ......................... | 1,125 | 765 | 368 | 437 |
| Dividends on trust preferred securities ........................ | 24 | 72 | 56 | 56 |
| Net income ................................................ | 2,369 | 1,699 | 975 | 1,255 |
| Net income applicable to common stock ................... | 2,297 | 1,649 | 906 | 1,161 |
| **Earnings per common share (diluted):** ................... | 7.90 | 6.35 | 3.47 | 4.38 |

**Balance Sheet Data**

| | At 30th November, 2004 | At 30th November, 2003 | At 30th November, 2002 | At 30th November, 2001 |
|---|---|---|---|---|
| | (in U.S.$ millions) | | | |
| Total assets | 357,168 | 312,061 | 260,336 | 247,816 |
| Net assets[1] | 175,221 | 163,182 | 140,488 | 141,354 |
| Commercial paper and short-term debt | 2,857 | 2,331 | 2,369 | 3,992 |
| Long-term debt[2] | 56,486 | 43,529 | 38,678 | 38,301 |
| Total liabilities | 342,248 | 297,577 | 250,684 | 238,647 |
| Total stockholders' equity | 14,920 | 13,174 | 8,942 | 8,459 |
| Total capital[3] | 71,406 | 58,013 | 48,330 | 47,470 |

Notes:

1. Net assets represent total assets excluding cash and securities segregated and on deposit for regulatory and other purposes, securities received as collateral, securities purchase under agreements to resell, securities borrowed and identifiable intangible assets and goodwill. LBHI believes net assets is a more useful measure than total assets to investors when comparing companies in the securities industry because it excludes certain assets considered to have a low risk profile and identifiable intangible assets and goodwill. Net assets as presented by LBHI is not necessarily comparable to similarly titled measures presented by other companies in the securities industry because of different methods of calculation.

2. Long-term debt includes senior notes and subordinated debt and includes $1.0 billion of junior subordinated debentures at 30th November, 2004. LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption. Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption. See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

3. Total capital includes long-term debt (including, at 30th November, 2004, junior subordinated debt issued to trusts) and stockholders' equity.

# TAXATION

*The following is a summary of certain UK and Dutch taxation considerations relevant to persons who purchase, own and dispose of Preferred Securities. This summary addresses only the taxation consequences to holders that acquire Preferred Securities pursuant to the offering at the initial offering price and does not apply to certain classes of holders such as dealers, financial traders and certain persons who are exempt from UK taxation on their income.*

*This summary does not address the position of persons who are resident in the UK or have some connection with the UK beyond the holding of Preferred Securities.*

*This summary is for general information only based on law and practice at the date hereof in the UK and The Netherlands and is not exhaustive. Prospective investors are advised to consult with their own taxation advisers as to the taxation consequences of the purchase, ownership and disposition of Preferred Securities, including the effect of tax laws in countries other than the UK and The Netherlands.*

## United Kingdom

(a)    **UK Taxation Treatment for Non-UK Residents**

Non-UK tax-resident corporate or individual Holders which hold their interest in Preferred Securities as an investment should be liable to UK taxation only to the extent that UK taxation is deducted at source from any payment to such a Holder made in respect of the Preferred Securities.

The same treatment should apply to a non-UK tax-resident corporate or individual Holder which holds its interest in the Preferred Securities as a trading asset, provided that the Issuer is not carrying on its business as a trade or a venture in the nature of a trade and the Holder does not otherwise carry on a trade in the UK through a branch or agency through or from which the Preferred Securities are held or the income from them arises (or, where that Holder is a company, that Holder does not carry on a trade in the United Kingdom through a permanent establishment through or from which the Preferred Securities are held or the income from them arises).

(b)    **Distributions on the Preferred Securities**

The Guarantor understands that the Issuer should be classified as a partnership for UK taxation purposes and should not constitute a "unit trust scheme" for the purposes of UK taxation. On the basis that the Issuer is treated for the purposes of UK taxation as a partnership, payments of Distributions on Preferred Securities may be made without withholding for or on account of UK taxation.

(c)    **Stamp Duty and Stamp Duty Reserve Tax ("SDRT")**

No UK stamp duty will be chargeable in respect of the issue of Preferred Securities to a Holder. Transfers of the Preferred Securities within a clearing system will not be chargeable to UK stamp duty. In practice, UK stamp duty is not likely to be chargeable in respect of a transfer of the Preferred Securities either because such a transfer is effected within a clearing system or, if the transfer is outside a clearing system, because the Issuer will invest in exempt loan capital for UK stamp duty purposes. The Guarantor understands that no liability to SDRT should arise in respect of the issue or subsequent transfer of the Preferred Securities.

## Netherlands

(a)    **General**

The following summary describes the principal Netherlands tax consequences of the acquisition, holding, redemption and disposal of Preferred Securities and Substituted Preferred Stock for residents of The Netherlands. This summary does not purport to be a comprehensive description of all Netherlands tax considerations that may be relevant to a decision to acquire, to hold, and to dispose

of the Preferred Securities. This summary does not address The Netherlands tax consequences of a holder of Preferred Securities who holds, alone or together with his or her partner or certain other related persons, directly or indirectly, 5 per cent. or more of the Preferred Securities of the Issuer or the rights to acquire, directly or indirectly, such interest *(aanmerkelyk lelang)*. Each prospective holder of Preferred Securities should consult a professional adviser with respect to the tax consequences of an investment in the Preferred Securities. The discussion of certain Netherlands taxes set forth below is included for general information purposes only.

This summary is based on The Netherlands tax legislation, published case law, treaties, rules, regulations and similar documentation, in force as of the date of this Offering Circular, without prejudice to any amendments introduced at a later date and implemented with retroactive effect.

For the purpose of the principal Netherlands tax consequences described herein, it is assumed that the Issuer is neither a resident nor deemed to be a resident of The Netherlands for Netherlands tax purposes.

**(b)    Netherlands Withholding Tax**

No Netherlands withholding tax is due upon payments on the Preferred Securities or upon payments on any Substituted Preferred Stock .

**(c)    Netherlands Corporate Income Tax and Individual Income Tax**

*Residents of The Netherlands*

If the holder of Preferred Securities is subject to Netherlands corporate income tax and the Preferred Securities are attributable to its (deemed) business assets, income derived from the Preferred Securities and gains realised upon the redemption and disposal of the Preferred Securities and any gains realised on any substitution of the Preferred Securities into the Substituted Preferred Stock are generally taxable in The Netherlands.

If the holder of Preferred Securities is an individual, resident or deemed to be resident of The Netherlands for Netherlands tax purposes (including the individual holder of Preferred Securities who has opted to be taxed as a resident of The Netherlands), the income derived from the Preferred Securities and the gains realised upon the redemption and disposal of the Preferred Securities and any gains realised on the possible substitution of the Preferred Securities into the Substituted Preferred Stock are taxable at the progressive rates of the Income Tax Act 2001, if:

(i)    the holder of Preferred Securities has an enterprise or an interest in an enterprise, to which enterprise the Preferred Securities are attributable; or

(ii)    such income or gains qualify as "income from miscellaneous activities" *(resultaat uit overige werkzaamheden)* within the meaning of Section 3.4 of the Income Tax Act 2001, which include the performance of activities with respect to the Preferred Securities that exceed "regular, active portfolio management" *(normaal, actief vermogensbeheer)*.

If neither condition (i) nor condition (ii) applies to the individual holder of Preferred Securities, the actual income derived from the Preferred Securities and the actual gains realised with respect to the Preferred Securities and the gains realised on any substitution of the Preferred Securities into the Substituted Preferred Stock will not be taxable. Instead, such holder of Preferred Securities will be taxed at a flat rate of 30 per cent. on deemed income from "savings and investments" *(sparen en beleggen)* within the meaning of Section 5.1 of the Income Tax Act 2001. This deemed income amounts to 4 per cent. of the average of the individual's "yield basis" *(rendementsgrondslag)* within the meaning of article 5.3 of the Income Tax Act 2001 at the beginning of the calendar year and the individual's yield basis at the end of the calendar year, insofar the average exceeds a certain threshold. The fair market value of the Preferred Securities will be included in the individual's yield basis.

Tax consequences for holders of Substituted Preferred Stock after substitution with respect to income derived from the Substituted Preferred Stock or gains realised upon redemption of disposal of the Substituted Preferred Stock are the same as described above for holders of Preferred Securities.

**(d)    Netherlands Gift and Inheritance Taxes**

*Residents of The Netherlands*

Generally, gift and inheritance taxes will be due in The Netherlands in respect of the acquisition of the Preferred Securities or Substituted Preferred Stock by way of a gift by, or on the death of, a holder of Preferred Securities or Substituted Preferred Stock who is a resident or deemed to be a resident of The Netherlands for the purposes of Netherlands gift and inheritance tax at the time of the gift or his or her death.

An individual of The Netherlands nationality is deemed to be a resident of The Netherlands for the purposes of The Netherlands gift and inheritance tax, if he or she has been resident in The Netherlands during the ten years preceding the gift or his or her death. An individual of any other nationality is deemed to be a resident of The Netherlands for the purposes of The Netherlands gift and inheritance tax only if he or she has been residing in The Netherlands at any time during the twelve months preceding the time of the gift.

Treaties may limit the Dutch sovereignty to levy gift and inheritance tax.

**EU Directive on the Taxation of Savings Income**

On 3rd June, 2003, the European Council of Economics and Finance Ministers adopted a Directive on the taxation of savings income. Under the Directive Member States will (if equivalent measures have been introduced by certain non-EU countries) be required, from 1st July, 2005, to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria will instead be required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other countries).

## SUBSCRIPTION AND SALE

Pursuant to a Subscription Agreement (the "**Subscription Agreement**") dated 29th March, 2005, Lehman Brothers International (Europe), Banco Espírito Santo de Investimento S.A., Banco Santander Central Hispano, S.A., Caja de Ahorros de Valencia, Castellon y Alicante, Bancaja, CALYON, Fortis Bank nv-sa, HSBC Bank plc and ING Belgium SA/NV (together, the "**Managers**") have jointly and severally agreed to subscribe for the Preferred Securities at a price of €1,000 per Preferred Security. The Managers will receive a combined selling, management and underwriting commission of €20 per Preferred Security. In addition, the Managers shall be reimbursed for certain of their expenses in connection with the issue of the Preferred Securities. The Managers are entitled to terminate the Subscription Agreement in certain circumstances before the issue of the Preferred Securities.

### United States

The Preferred Securities have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act ("**Regulation S**").

Each Manager has agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver the Preferred Securities (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the Closing Date within the United States or to, or for the account or benefit of, U.S. persons and that it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Preferred Securities from it during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the Preferred Securities within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S.

In addition, until 40 days after the commencement of the offering, an offer or sale of Preferred Securities within the United States by any dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

### United Kingdom

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement:

(a)     it has not offered or sold, and prior to the expiry of six months from the Closing Date will not offer or sell, any Preferred Securities to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the UK within the meaning of the Public Offers of Securities Regulations 1995;

(b)     it has only offered or sold and will only offer or sell Preferred Securities to (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Offering Circular may be communicated lawfully;

(c)     it has in place and will have in place proper systems and procedures to prevent any person other than those persons described in (b) above from participating in the Preferred Securities;

(d)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of

Section 21 of the FSMA) received by it in connection with the issue of the Preferred Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Guarantor; and

(e)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Securities in, from or otherwise involving the United Kingdom.

## Republic of Italy

The offering of the Preferred Securities has not been cleared by CONSOB (the Italian Securities Exchange Commission) pursuant to Italian securities legislation and, accordingly, no Preferred Securities may be offered, sold or delivered, nor may copies of this Offering Circular (in preliminary or final form) or of any other document relating to the Preferred Securities be distributed in the Republic of Italy, except:

(i)    to professional investors (*"operatori qualificati"*), as defined in Article 31, second paragraph, of CONSOB Regulation No. 11522 of 1st July, 1998, as amended; or

(ii)    in circumstances which are exempted from the rules on solicitation of investments pursuant to Article 100 of Legislative Decree No. 58 of 24th February, 1998 (the **"Financial Services Act"**) and Article 33, first paragraph, of CONSOB Regulation No. 11971 of 14th May, 1999, as amended.

Any offer, sale or delivery of the Preferred Securities or distribution of copies of this Offering Circular (in preliminary or final form), Preliminary Offering Circular or any other document relating to the Preferred Securities in the Republic of Italy under (i) or (ii) above must be:

(a)    made by an investment firm, bank or financial intermediary permitted to conduct such activities in the Republic of Italy in accordance with the Financial Services Act and Legislative Decree No. 385 of 1st September, 1993 (the **"Banking Act"**), as amended; and

(b)    in compliance with Article 129 of the Banking Act and the implementing guidelines of the Bank of Italy pursuant to which the issue or the offer of securities in the Republic of Italy may need to be preceded and followed by an appropriate notice to be filed with the Bank of Italy depending, *inter alia*, on the aggregate value of the securities issued or offered in the Republic of Italy and their characteristics; and

(c)    in accordance with any other applicable laws and regulations.

## France

Each of the Managers and the General Partner on behalf of the Issuer has represented and agreed that it has not offered or sold and will not offer or sell, directly or indirectly, Preferred Securities to the public in the Republic of France, and has not distributed or caused to be distributed and will not distribute or cause to be distributed to the public in France, this Offering Circular or any other offering material relating to the Preferred Securities, and that such offers, sales and distributions have been and shall only be made in France to qualified investors (*investisseurs qualifiés*) acting for their own account as defined in and in accordance with Articles L.411-1 and L.411-2 of the *Code Monétaire et Financier* and *décret* No. 98-880 dated 1st October, 1999.

## General

No action has been or will be taken in any country or jurisdiction (other than The Netherlands) by the Issuer, the Guarantor or the Managers that would, or is intended to, permit a public offering of the Preferred Securities or possession or distribution of any offering material relating thereto, in any country or jurisdiction where any such action for that purpose is required. Persons into whose hands this Offering Circular comes are required by the Issuer, the Guarantor and the Managers to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Preferred Securities or have in their possession or distribute such offering material, in all cases at their own expense.

50

## GENERAL INFORMATION

### Authorisations

The Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement) to establish the Issuer was duly authorised by resolutions of the board of directors of the General Partner passed on 22nd March, 2005 and 24th March, 2005.

The entering into of the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement), the Agency Agreement, the Administration Agreement, the Subscription Agreement and the Subordinated Guarantee by the Guarantor was authorised by resolutions of the board of directors of the Guarantor passed on 21st March, 2005 and 23rd March, 2005.

All consents, approvals, authorisations or other orders of all regulatory authorities required by the Issuer and/or the Guarantor under the laws of England and Wales have been given for the issue of the Preferred Securities and for the Issuer, the General Partner and the Guarantor, as the case may be, to undertake and perform their respective obligations as appropriate under the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement), the Subscription Agreement, the Agency Agreement, the Preferred Securities and the Subordinated Guarantee.

### Listings

Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange. For the purposes of the Luxembourg Stock Exchange rules and regulations only, the Preferred Securities will be considered debt securities. A legal notice relating to the issue of the Preferred Securities and the constitutional documents of the Issuer are being lodged with the Registrar of Commerce and Companies in Luxembourg (*Registre du Commerce et des Sociétés*) where such documents may be examined and copies obtained. According to Chapter VI, article 3, point A/11/2 of the rules and regulations of the Luxembourg Stock Exchange the securities shall be freely transferable and therefore no transaction made on the Luxembourg Stock Exchange shall be cancelled.

Application has been made to list the Preferred Securities on Euronext Amsterdam, the Issuer will comply with the provisions set forth in Article 2.1.20, sections a-g of Schedule B of the Listing and Issuing Rules (*Fondsenreglament*) of Euronext Amsterdam N.V.

### Clearing Systems

The Preferred Securities have been accepted for clearance through Euroclear and Clearstream, Luxembourg. The ISIN for this issue is XS0215349357 and the Common Code is 021534935. The *Fondscode* on Euronext Amsterdam is 15278.

### No significant change

Save as disclosed herein, there has been no significant change in the financial or trading position of the Guarantor or the Guarantor Group since 30th November, 2003 or of the Issuer since its establishment and there has been no material adverse change in the financial position or prospects of the Guarantor or the Guarantor Group since 30th November, 2003 in the case of the Guarantor and the Guarantor Group and since its establishment in the case of the Issuer.

### Litigation

There are no legal, arbitration or administrative proceedings involving any of the Issuer, the Guarantor or any subsidiary of the Guarantor Group (and no such proceedings are pending or threatened) which may have or have had in the 12 months preceding the date of this Offering Circular a significant effect on the financial position of the Issuer, the Guarantor or any subsidiary of the Guarantor Group.

**Auditors**

The auditors of the Issuer and the Guarantor are Ernst & Young LLP, Chartered Accountants and Registered Auditors, of 1 More London Place, London SE1 2AF.

The Guarantor's auditors have made reports under Section 235 of the Companies Act 1985 on statutory accounts in respect of the Guarantor for the years ended 30th November, 2003, 2002 and 2001 which were not qualified within the meaning of Section 262 of the Companies Act 1985 and did not contain any statements made under Section 237(2) or (3) of the Companies Act 1985. The report of the Guarantor's auditors stated that to the fullest extent permitted by law, the auditors do not accept or assume responsibility to anyone other than the Issuer and the Issuer's members as a body, for their audit work, for the audit report, or for the opinions the Guarantor's auditors have formed.

The inclusion of such a statement was recommended in recent guidance issued by the Institute of Chartered Accountants in England and Wales for inclusion in all Section 235 audit reports produced by audit firms.

The Issuer is newly established and does not currently have any financial statements (see also "*Documents*" below).

**Documents**

Copies of the following financial statements will be available free of charge from the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)    the annual reports (including the audited non-consolidated financial statements) of the Guarantor in respect of the financial years ended 30th November, 2003, 2002 and 2001 (as at the date of this Offering Circular, the audited non-consolidated financial statements of the Guarantor in respect of the financial year ended 30th November, 2004 are not available); and

(b)    the most recently published annual reports (including the audited annual non-consolidated financial statements) of the Guarantor and the most recently published unaudited interim non-consolidated financial statements of the Guarantor (if any).

The Guarantor currently prepares audited non-consolidated financial statements on an annual basis. The Guarantor does not currently publish consolidated financial statements or interim financial statements.

The first financial statements of the Issuer are expected to be prepared for the period ending on 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements.

Copies of the most recently published annual reports (if any) and audited annual financial statements of the Issuer will be available free of charge at the offices of the Paying and Transfer Agents. It is not intended that the Issuer will publish interim financial statements.

In addition, the following documents are available for inspection at the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)    the Subscription Agreement;

(b)    the Subordinated Guarantee;

(c)    the Limited Partnership Agreement;

(d)    the Administration Agreement;

(e)    the Agency Agreement; and

(f)    the Memorandum and Articles of Association of the Guarantor.

**Notices**

Notices to the Holders of Preferred Securities, including notices for meetings of Holders of the Preferred Securities and non-payment of distributions or other amounts in relation to the Preferred Securities will be mailed to the holder of record and will be published, for so long as the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, in a daily newspaper of general circulation in Luxembourg, which for the time being shall be the *d' Wort* and for so long as the Preffered Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, in a daily newspaper of general circulation in The Netherlands, which for the time being shall be *Het Financieele Dagblad,* and in the Daily Official List (*Officiële Prijscourant*) of Euronext Amsterdam. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

**Redemption**

It is the Issuer's intention (although there is no obligation to do so nor any guarantee of future behaviour) to redeem the Preferred Securities in accordance with paragraph 4 of the *"Description of the Preferred Securities"*, in whole (but not in part) only to the extent LBHI or any of its subsidiaries has raised funds in the period of six (6) months preceding such redemption by the issuance of any securities ranking *pari passu* or junior (including any class of share capital) to the Preferred Securities, in an aggregate amount at least equal to the Liquidation Preference of the Preferred Securities.

| ISSUER | GUARANTOR |
|---|---|
| **Lehman Brothers UK Capital Funding LP**<br>25 Bank Street<br>London E14 5LE<br>England | **Lehman Brothers Holdings plc**<br>25 Bank Street<br>London E14 5LE<br>England |

## PRINCIPAL PAYING AND TRANSFER AGENT

**JPMorgan Chase Bank N.A., London Branch**
Trinity Tower
9 Thomas More Street
London E1W 1YT
England

## PAYING AND TRANSFER AGENTS

| **J.P. Morgan Bank Luxembourg S.A.**<br>European Bank & Business Centre<br>6, route de Treves<br>L-2633 Senningerberg<br>Grand Duchy of Luxembourg | **ING Bank N.V. Securities Services**<br>Van Heenvlietlaan 220<br>1083 CN Amsterdam<br>The Netherlands |
|---|---|

## REGISTRAR

**J.P. Morgan Bank Luxembourg S.A.**
European Bank & Business Centre
6, route de Treves
L-2633 Senningerberg
Grand Duchy of Luxembourg

## LEGAL ADVISERS

*as to English and New York law*

**Allen & Overy LLP**
One New Change
London EC4M 9QQ
England

## AUDITORS

**Ernst & Young LLP**
1 More London Place
London SE1 2AF
England

| LUXEMBOURG LISTING AGENT | AMSTERDAM LISTING AGENT |
|---|---|
| **The Bank of New York Europe Limited**<br>One Canada Square<br>London E14 5AL<br>England | **ING Bank N.V.**<br>Foppingadreef 7<br>1102 BD Amsterdam<br>The Netherlands |