**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                    Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL, INC.,<br><br>                    Defendant. | Adv. Proc. No. 09-01731 (JMP) |

**BARCLAYS' MEMORANDUM IN OPPOSITION**
**TO LBHI'S MOTION AND IN SUPPORT OF BARCLAYS' MOTION FOR**
**SUMMARY JUDGMENT ON COUNT II OF LBHI'S ADVERSARY COMPLAINT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

June 22, 2011

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

COUNTERSTATEMENT OF FACTS ..........................................................................4

    A.    The "Comp" Liabilities The APA Required Barclays To Assume As "Consideration" Included All Bonus, Severance, And Related Tax Payments........................................................................................................5

    B.    The Amount Of Bonus, Severance, And Related Tax Payments Barclays Was Obligated To Pay With Respect To The Transferred Employees Was Not Known At The Time Of The Sale, And Therefore Could Only Be Estimated. .............................................................................................7

    C.    The $2 Billion Number On The 9/16/08 Financial Schedule Was An Estimate Of The "Comp" Liabilities Barclays Assumed Under The APA, Including Both Bonus And Severance Liabilities. ...................................9

    D.    LBHI Falsely Asserts That Bart McDade Testified That Barclays Had An Obligation To Pay $2 Billion In Bonuses.............................................15

    E.    LBHI Has Admitted That The "Amounts Accrued" For 2008 Bonuses Were Less Than $1.5 Billion..............................................................18

    F.    LBHI Has Admitted That Barclays Paid At Least $1.5 Billion In Bonuses, And Approximately $2 Billion In Bonus, Severance, And Related Tax Payments With Respect To The Transferred Employees.....................................21

    G.    LBHI Had No Legal Obligation To Pay Bonuses To All The Transferred Employees, And Has Suffered No Damage As A Result Of Barclays' Alleged Breach. ..................................................................................26

ARGUMENT ..............................................................................................................27

  I.    THE COURT SHOULD DENY LBHI'S MOTION FOR SUMMARY JUDGMENT...............................................................................................27

    A.    The Court's Statements Relied On By LBHI Have No Collateral Estoppel Effect Because They Were Not "Essential" To The Court's Denial Of The Rule 60(b) Motions.................................................................................28

    B.    Both The Plain Terms Of The APA And The Extrinsic Evidence Demonstrate That LBHI's Motion Must Be Denied. .............................35

i

C.      The Court Should Deny LBHI's Motion For The Independent Reason That LBHI Has Not Established, And Cannot Establish, That It Suffered Any Damages As A Result Of Barclays' Alleged Contractual Breach. ........................43

II.      THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR BARCLAYS AND DISMISS COUNT II WITH PREJUDICE. ...............................50

A.      As A Matter Of Law, Section 9.1(c) Did Not Impose An Obligation On Barclays To Pay $2 Billion Solely In Bonuses. ....................................................50

B.      There Is No Genuine Dispute That The $2 Billion Entry On The 9/16/08 Financial Schedule Was An Estimate, Not A Guarantee Or Representation. ...................................................................................................52

C.      There Is No Genuine Dispute That Barclays Paid Bonuses To Transferred Employees "Equal In An Amount To 100 Percent Of The Bonus Pool Amounts Accrued In Respect Of Amount Payable For Incentive Compensation." ................................................................................................53

D.      There Is No Genuine Dispute That LBHI Has Suffered No Damage As A Result Of Barclays' Alleged Breach. ...................................................................53

CONCLUSION ...............................................................................................................54

# TABLE OF AUTHORITIES

## Cases

*Adams v. Jersey Cent. Power & Light Co.*,
120 A.2d 737 (N.J. 1956) ........................................................................................51

*Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*,
362 F. App'x 151 (2d Cir. 2010) ..............................................................................30

*Aquavella v. Harvey*,
330 N.Y.S.2d 560 (N.Y. Sup. Ct. 1972).................................................................44

*Banker's Trust Co. of W. N.Y. v. Steenburn*,
409 N.Y.S.2d 51 (N.Y. Sup. Ct. 1978)...................................................................45

*Buschmann v. Prof'l Men's Ass'n*,
405 F.2d 659 (7th Cir. 1969) ...................................................................................45

*Calbria v. Associated Hosp. Serv.*, 459 F. Supp. 946 (S.D.N.Y. 1978) ........................43

*Capital City Gas Co. v. Phillips Petroleum Co.*,
373 F.2d 128 (2d Cir. 1967) .....................................................................................35

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
56 F.3d 359 (2d Cir. 1995) .......................................................................................29

*Clarke v. Frank*,
960 F.2d 1146 (2d Cir. 1992) ...................................................................................29

*Colditz v. E. Airlines, Inc.*,
329 F. Supp. 691 (S.D.N.Y. 1971) ...........................................................................32

*Commodity Futures Trading Comm'n v. Bd. of Trade*,
657 F.2d 124 (7th Cir. 1981) ...................................................................................34

*Control Data Sys., Inc. v. Computer Power Grp., Ltd.*,
No. 94 Civ. 5396 (JSM), 1998 WL 178775 (S.D.N.Y. Apr. 15, 1998) ..................45

*Coreth v. Barclays Capital Inc.*,
09-01045, 09-01130, 2011 WL 722601 (Bankr. S.D.N.Y. Feb. 22, 2011) ...............8

*Croker v. New York Trust Co.*,
245 N.Y. 17 (1927).....................................................................................................45

*Eden v. Miller*,
37 F.2d 8 (2d Cir. 1930) ...........................................................................................45

*Eichler v. Town of Cortlandt*,
    833 N.Y.S.2d 216 (N.Y. App. Div. 2007).................................................................................43

*Fowler v. American Lawyer Media, Inc.*, 761 N.Y.S.2d 176 (N.Y. App. Div. 2003)...................43

*Galli v. Metz*,
    973 F.2d 145 (2d Cir. 1992) ..........................................................................................37, 51

*Gelb v. Royal Globe Ins. Co.*,
    798 F.2d 38 (2d Cir. 1986) .................................................................................................32

*Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*,
    962 F.2d 268 (2d Cir. 1992) ...................................................................................30, 37, 51

*In re Bean*,
    252 F.3d 113 (2d Cir. 2001) ...............................................................................................29

*In re Chateaugay Corp.*,
    154 B.R. 843 (Bankr. S.D.N.Y. 1993) ................................................................................45

*Isaacs v. Westchester Wood Works, Inc.*,
    718 N.Y.S.2d 338 (App. Div. 2000).....................................................................................38

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2009) ..........................................................................................38, 51

*James v. Jamie Towers Hous. Co., Inc.*,
    743 N.Y.S.2d 85 (N.Y. App. Div. 2002)...............................................................................37

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.*,
    937 F.2d 729 (2d Cir. 1991) ...............................................................................................29

*John v. State of Louisiana*,
    757 F.2d 698 (5th Cir. 1985) ..............................................................................................34

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009) .................................................................................................30

*Johnson v. Watkins*,
    101 F.3d 792 (2d Cir. 1996) ...............................................................................................33

*Krumme v. WestPoint Stevens Inc.*,
    238 F.3d 133 (2d Cir. 2000) ...............................................................................................51

*May Dep't Stores Co. v. Int'l Leasing Corp., Inc.*,
    88 Civ. 4300, 1995 WL 656986 (S.D.N.Y. Nov. 8, 1995).....................................................30

*Narumanchi v. Am. Home Assurance. Co.*,
    317 F. App'x 56 (2d Cir. 2009) ...........................................................................................31

*Net2Globe Intern., Inc. v. Time Warner Telecom of N.Y.*,
    273 F. Supp. 2d 436 (S.D.N.Y. 2003) ................................................................... 37

*NLRB v. Babad*,
    785 F.2d 46 (2d Cir. 1986) ..................................................................................... 29

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997),
    *aff'd*, 166 F.3d 1201 (2d Cir. 1998) ...................................................................... 38

*Oscar Gruss & Son, Inc. v. Hollander*,
    337 F.3d 186 (2d Cir. 2003) ................................................................................... 46

*Penn v. San Juan Hosp., Inc.*,
    528 F.2d 1181 (10th Cir. 1975) .............................................................................. 34

*Reape v. New York News, Inc.*,
    504 N.Y.S.2d 469 (N.Y. App. Div. 1986) ............................................................. 52

*Reda v. Eastman Kodak Co.*,
    649 N.Y.S.2d 555 (N.Y. App. Div. 1996) ............................................................. 37

*Rentways Inc. v. O'Neill Milk & Cream Co.*,
    308 N.Y. 342 (1955) .............................................................................................. 51

*Rudd v. Cornell*,
    171 N.Y. 114 (1902) .............................................................................................. 32

*Russul Corp. v. Zim Am. Integrated Shipping Serv. Co.*,
    No. 06 Civ. 0037 (JCF), 2009 WL 3247141 (S.D.N.Y. Oct. 5, 2009) ................... 30

*Schlaifer Nance & Co. v. Estate of Warhol*,
    119 F.3d 91 (2d Cir. 1997) ..................................................................................... 51

*Stonewall Corp. v. Conestoga Title Ins. Co.*,
    No. 04 CV 9867 (KMW) (GWG), 2009 WL 3075661 (S.D.N.Y. Sept. 25, 2009) ................ 31

*Straus-Duparquet, Inc. v. Local Union No. 3 IBEW*,
    386 F. 2d 649 (2d Cir. 1967) .................................................................................. 51

*T.S. Haulers, Inc. v. Cardinale*,
    No. 09 CV 0451 (SJF)(ARL), 2010 WL 4275310 (E.D.N.Y. Feb. 16, 2010) ........ 30

*Ullman-Briggs, Inc. v. Salton, Inc.*,
    754 F. Supp. 1003 (S.D.N.Y. 1991) ...................................................................... 43

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) .............................................................................................. 34

*Update Art, Inc. v. Charnin*,
    110 F.R.D. 26 (S.D.N.Y. 1986) ........................................................................34

*Woe v. Cuomo*,
    801 F.2d 627 (2d Cir. 1986) ...........................................................................35

**Statutes**

26 U.S.C. § 3111 ......................................................................................................7

**Other Authorities**

*Black's Law Dictionary* 301 (8th ed. 1999) ...................................................10

Bureau of Labor Statistics, U.S. Dept. of Labor, Rep. No. 923, Glossary of Compensation
    Terms 18 (1998) ......................................................................................10

Glossary of Terms Significant to the Human Resource Management Function ..........................10

Restatement (Second) of Contracts ........................................................38, 44, 51

Restatement (Second) of Judgments .....................................................29, 30, 32, 33

**Rules**

Fed. R. Bankr. P. 7056 ..............................................................................................5

Fed. R. Civ. P. 56 .................................................................................................5, 40

Barclays Capital Inc. ("Barclays") hereby submits its memorandum of law in opposition to the summary judgment motion filed by Lehman Brothers Holdings Inc. ("LBHI") on May 18, 2011, and in support of the Barclays motion seeking summary judgment dismissing Count II of LBHI's complaint filed November 16, 2009.

## PRELIMINARY STATEMENT

1.     In December 2009, LBHI entered into a stipulation, which this Court "so Ordered," in which it agreed that Count II of its Complaint would be stayed pending the resolution of the Rule 60(b) motions filed by LBHI and the other Movants, and that Count II "shall not be resolved through the resolution of the Rule 60 Motions."  The stipulation also provided that it was "without prejudice" to the parties seeking to resolve any of the stayed claims (including Count II) through motions "based on or informed by" this Court's resolution of the Rule 60(b) motions.  This Court has now denied the Rule 60(b) motions.  LBHI has recognized that the *denial* of its Rule 60(b) motion requires the *dismissal* of most of the stayed counts in its Complaint.  However, it takes precisely the opposite approach with respect to Count II:  it asks the Court to hold that statements made in the Court's decision *denying* the LBHI Rule 60(b) motion require summary judgment *in LBHI's favor* on the "bonus claim" advanced in Count II of its Complaint.  LBHI bases this argument, and its entire motion, on the doctrine of collateral estoppel.

2.     LBHI is wrong.  It is black-letter law that collateral estoppel does not apply to any findings or rulings that were not essential to a court's ultimate judgment.  Here, any finding the Court may have made that was favorable to LBHI with respect to section 9.1(c) of the APA cannot, by definition, have been "essential" to its ultimate decision to *deny* LBHI's Rule 60(b) motion.  Therefore, as a matter of law, such findings cannot have collateral estoppel effect against Barclays.

1

3.      Thus, the law requires LBHI's motion for summary judgment to be decided based upon the normal inquiry into whether the contract unambiguously requires judgment in its favor, and whether there is any genuine dispute concerning a fact material to its claim.  As shown below, the contract does not unambiguously require judgment in LBHI's favor, and there are numerous factual assertions that are material to LBHI's claim and that Barclays genuinely disputes.  Indeed, the language of the contract and the relevant facts so overwhelmingly support the Barclays position as to eliminate any basis for genuine dispute that it is Barclays, not LBHI, that is entitled to summary judgment.

4.      Section 9.1(c) of the APA provides that Barclays was obligated to pay 2008 bonuses to the Transferred Employees in amounts "that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability")."  In the Rule 60(b) proceeding, LBHI asserted that the bonus "accrual" — *i.e.*, the amount constituting "100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary)" — was substantially *less* than $2 billion.  Specifically, LBHI asserted that the accrued amount may be as low as $700 million or as high as $1.3 billion, but in any event less than $1.5 billion.  LBHI also asserts that Barclays paid approximately $1.5 billion in bonuses.  Thus, LBHI has admitted that Barclays paid bonuses in an amount that exceeded the amount required by the "amounts accrued" language of section 9.1(c).

5.      LBHI ignores this admission.  Instead, it bases its claim on the phrase "and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by

2

an officer of each of Holdings and Purchaser." Based on this language, LBHI asserts that Barclays was required to pay the $2 billion amount listed for the line item of "Comp" on the 9/16/08 Financial Schedule initialed by Lehman's Steve Berkenfeld. This assertion should be rejected for the following reasons. The word "Comp" unambiguously is broader than just "bonus." Moreover, to the extent there is any ambiguity in the word "Comp" and its relation to the bonus liability in section 9.1(c) of the APA, the testimony of both the Barclays and Lehman negotiators, including in particular Bart McDade and Harvey Miller, overwhelmingly confirmed that the $2 billion entry for "Comp" on the financial schedule included an estimate for both the bonus and the severance obligations assumed by Barclays, and hence was *not* limited to just bonuses. Finally, if the Court were to accept the LBHI interpretation that the "reflected on" language required Barclays to pay $2 billion, that would (a) create a direct conflict with the "amounts accrued" language, which as shown above, LBHI admits referred to an amount *less* than $2 billion, and (b) would render the "amounts accrued" language redundant and meaningless. The law requires a contract to be interpreted in a manner that avoids creating internal inconsistencies, and avoids rendering provisions redundant. Thus, the Court should interpret section 9.1(c) in a manner that is consistent with the unambiguous meaning of the word "Comp" and the uniform testimony of the negotiators: the $2 billion amount listed for "Comp" was an estimate of the exposure Barclays was assuming for *all* compensation obligations, which *included* the "amounts accrued" for bonus, but was not limited to bonuses.

6.        In any event, even if the Court were to accept LBHI's claim of an alleged breach, the Court should deny the LBHI motion and grant the Barclays motion for the independent reason that LBHI has failed to demonstrate that it has suffered any damages as a result of the alleged breach. There is no factual basis for LBHI's suggestion that if the parties had known at

the time of the Sale that Barclays would end up spending $1.951 billion in bonuses, severance, and related taxes pursuant to its obligations under the APA, then that would have somehow caused Barclays to increase its cash consideration to LBHI.  The evidence all confirms that no such thing would have occurred; instead, the fact that Barclays ended up paying $1.951 billion in bonus, severance, and related tax payments merely confirms the reasonableness of the "estimate" of "approximately $2 billion" in "exposure" assumed by Barclays.  Thus, LBHI is in exactly the same economic position today that it would have been in if Barclays had paid precisely $2 billion solely in bonuses.  For this reason alone, LBHI's motion must be denied and Barclays' motion must be granted.

7.        Finally, even if the Court disregarded all other arguments, there is at a minimum a genuine factual dispute over the precise amount of 2008 bonuses Barclays paid to the Transferred Employees:  (a) LBHI contends Barclays paid only "approximately $1.5 billion" in such bonuses; (b) the evidence shows that Barclays paid over $1.8 billion in bonuses.[1]  At an absolute minimum, the Court cannot grant the LBHI motion in the face of that genuine dispute (in addition to the genuine disputes over all the other facts LBHI relies on, as explained below).

### COUNTERSTATEMENT OF FACTS

8.        The evidence directly contradicts the factual assertions on which LBHI's summary judgment motion is based.  As set forth below and in Barclays' response to the LBHI Rule 56.1 statement, there is at a minimum a genuine basis for disputing LBHI's factual

---

[1]  As explained below and in the Barclays Response to LBHI's Rule 56.1 Statement, Barclays paid at least $1.674 billion in bonuses, as testified to by Paul Exall at trial and shown on his Compensation Schedule. In addition, as explained in declarations attached to this brief, Barclays paid an additional bonus amount of approximately $137 million, which Barclays has previously characterized as "severance" solely because it was paid to terminated employees.  While part of the overall severance packages paid out to terminated employees, this $137 million amount reflected (a) amounts paid in excess of what the terminated employees were entitled to under section 9.1(b) of the APA, and (b) the only bonus amounts paid to these terminated employees pursuant to section 9.1(c) of the APA.

assertions, which therefore precludes summary judgment for LBHI. Indeed, as shown below,

there is no genuine basis for disputing the facts set forth in Barclays' Rule 56.1 statement

submitted in support of its own summary judgment motion, and therefore that motion should be

granted.

> **A.    The "Comp" Liabilities The APA Required Barclays To Assume As
> "Consideration" Included All Bonus, Severance, And Related Tax Payments.**

9.       LBHI asserts that Barclays was required to pay $2 billion in bonuses as part of the

"Consideration" it was paying under the APA.   LBHI asserts that this $2 billion obligation is

proven by an entry of $2 billion for "Comp" set forth on the September 16, 2008 financial

schedule initialed by Steve Berkenfeld of Lehman (the "9/16/08 Financial Schedule").   LBHI's

assertions ignore the fact that the "Comp" liabilities Barclays was assuming as part of its

"Consideration" under the APA included more than just bonus payments, and in particular

included severance and compensation-related tax liabilities.

10.      Section 3.1 of the APA provides that "[t]he aggregate consideration for the

Purchased Assets shall be (a) the Cash Amount, and (b) the assumption of the Assumed

Liabilities by Purchaser." BCI Ex. 1 at § 3.1 (Hume Decl. Ex. 1).

11.      Section 2.3(c) of the APA provides that the Assumed Liabilities include "*all*

Liabilities assumed under Article IX." BCI Ex. 1 at § 2.3(c) (emphasis added) (Hume Decl. Ex.

1)[2]. Under Article IX of the APA, Barclays assumed the liability to pay "Transferred

---

[2] Citations herein are in the form used in Barclays' Post-Trial Memorandum of Law and Fact. The
documents referred to herein are either contained within the record of the hearings on the Rule 60(b)
motions, or are being presented to the Court in conformity with Fed. R. Bankr. P. 7056 (applying Fed. R.
Civ. P. 56 to adversary proceedings). For the Court's convenience, all documents referred to herein are
attached as exhibits to the Declaration of Hamish P.M. Hume In Support of Barclays' Memorandum in
Opposition to LBHI's Motion and In Support of Barclays' Motion for Summary Judgment on Count II of
LBHI's Adversary Complaint dated June 22, 2011 ("Hume Decl.").

Employees" *both* bonus payments *and* severance payments, as follows:

- Barclays was obligated to offer employment to all active employees who were "employed primarily in connection with the Business at the Closing." BCI Ex. 1 at § 9.1(a) (Hume Decl. Ex. 1).

- The employees who accepted the Barclays offer were defined to be the "Transferred Employees." *Id.*

- Article IX provides that if Barclays terminated any Transferred Employee before December 31, 2008 by reason of a "reduction in force" or a "job elimination," then Barclays shall provide "severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing." *Id.* at § 9.1(b).

- Article IX further provides that Barclays would pay each Transferred Employee "an annual bonus ("<u>08 Annual Bonuses</u>"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "<u>Accrued 08 FY Liability</u>")." *Id.* at § 9.1(c).

12.    Thus, the APA's definition of Consideration includes *both* the bonus liabilities *and* the severance liabilities that Article IX required Barclays to assume. Indeed, in defining the Assumed Liabilities that constitute the Consideration, the APA draws no distinction between these two different types of compensation liabilities: it simply refers to "*all* Liabilities assumed under Article IX." *Id.* at § 2.3(c) (emphasis added).

13.    Moreover, by requiring Barclays to hire the Transferred Employees and to make certain bonus and severance payments to those employees, Article IX also caused Barclays to assume certain tax liabilities with respect to those employees. Most importantly, the Federal Insurance Contributions Act ("FICA"), which is part of the Internal Revenue Code, imposes on employers a tax related to its employees' "Old-Age, Survivors, and Disability Insurance" (*i.e.*, Social Security), and also a tax related to its employees' "Hospital Insurance" (*i.e.*, Medicare).

6

*See* 26 U.S.C. §§ 3111(a) & (b).  Barclays incurred these tax liabilities automatically as a direct consequence of the provisions of Article IX of the APA.  They are therefore properly included in the liabilities Barclays assumed under Article IX of the APA, and are thus included in the APA's definition of "Assumed Liabilities and "Consideration."

14.    In addition, section 2.3(f) of the APA provides that the Assumed Liabilities include "all other Liabilities *to the extent related to* the Business, the Purchased Assets, or *the Transferred Employees* arising after the Closing."  BCI Ex. 1 at § 2.3(f) (emphasis added) (Hume Decl. Ex. 1).  Any taxes Barclays was required to pay on the bonus and severance payments made to Transferred Employees are "other Liabilities … related to … the Transferred Employees."  Thus, even if the Court concluded that the tax liabilities assumed by Barclays on the bonus and severance payments imposed by Article IX of the APA were not themselves imposed by virtue of Article IX (which they were), those tax liabilities nonetheless are included in the definition of Assumed Liabilities by virtue of § 2.3(f) of the APA, and therefore are included within the definition of Consideration under § 3.1 of the APA.

**B.    The Amount Of Bonus, Severance, And Related Tax Payments Barclays Was Obligated To Pay With Respect To The Transferred Employees Was Not Known At The Time Of The Sale, And Therefore Could Only Be Estimated.**

15.    During the week in which the Sale Transaction was negotiated, approved and finally closed (September 15-22, 2008), it was not possible to know what the total dollar amounts would be that Barclays would have to pay with respect to Transferred Employees in 2008 bonuses, in severance payments, or in any related tax payments.  There were numerous unknown variables that made it impossible to determine any of these numbers before the Closing.  First, it was not known how many of the employees who were eligible for bonus and severance payments under Article IX of the APA would accept the Barclays offer and become Transferred Employees.  Miller Dep. Tr. at 81:5-14 (Hume Decl. Ex. 32); *see also* Burian Dep.

7

Tr. at 289:20-290:12 (Hume Decl. Ex. 37).  Second, the vast majority of potential Transferred

Employees did not have contracts with Lehman that guaranteed them a specific bonus amount

for 2008; instead, their 2008 bonus was a discretionary amount that might fall within a range, but

was not specifically determined.  Moreover, under the APA, Barclays was not obligated to

assume the relatively small number of specific employment contracts that Lehman had with

certain executives and that did guarantee specific bonus amounts.  *Coreth v. Barclays Capital

Inc.,* 09-01045, 09-01130, 2011 WL 722601, at *9 (Bankr. S.D.N.Y. Feb. 22, 2011).  Thus,

during the week of the Sale, the specific amount that any given potential Transferred Employee

would be paid in bonus was uncertain:  it depended upon whether that employee accepted the

offer to join Barclays, what that employee might have received as a bonus from Lehman, and

what that employee (or his or her group) was able to negotiate from Barclays in exchange for

committing to join Barclays.[3]

16.    Similarly, the amount Barclays would have to pay to Transferred Employees as

severance was highly uncertain.  The Sale was negotiated under emergency circumstances, and

there was no time for Barclays to conduct the type of integration analysis that would normally

have been conducted in an acquisition of this magnitude.[4]  Thus, during the week of the Sale, it

was not possible to know how many of the potential Transferred Employees would be retained,

or how many would be declared redundant and paid severance under § 9.1(b) of the APA.

17.    Reflecting these various uncertainties, the Court was specifically told at the Sale

Hearing that the dollar amount of the compensation liabilities Barclays was assuming under the

APA was *an estimate* of the *exposure* Barclays was assuming.  In proffering Bart McDade's

---

[3]  Miller Dep. Tr. at 81:5-14 (Hume Decl. Ex. 32); BCI Ex. 579 (Hume Decl. Ex. 12); McGee Dep. Tr. at 30:7-32:19, 72:15-74:9, 74:13-24 (Hume Decl. Ex. 34).

[4]  4/28/10 Tr. at 114:7-25 (Miller) (Hume Decl. Ex. 41); *see also*  4/30/10 Tr. at 86:20-87:14 (Clackson) (Hume Decl. Ex. 43).

testimony at the Sale Hearing, Lehman's lead lawyer Harvey Miller stated: "Barclays will also *assume exposure for the employees* that accept offers of employment, which is *estimated* to have a value of approximately — an *exposure of approximately* two billion dollars." BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (emphasis added) (Hume Decl. Ex. 3). In his deposition in this proceeding, Harvey Miller confirmed that the compensation estimate was "very contingent," because "nobody knew" "how many how many employees Barclays would ultimately keep." Miller Dep. Tr. at 81:5-14 (Hume Decl. Ex. 32). And at trial, Mr. Miller confirmed that the $2 billion amount given for Barclays' "exposure" for compensation liabilities was an "estimate." 4/28/10 Tr. at 32:20-5 (Miller) (Hume Decl. Ex. 41).

18.     Consistent with the foregoing evidence, this Court made the following finding in its February 22, 2011 Opinion:

> The Court finds that the estimates for comp and cure that the parties presented at the Sale Hearing were just that — *good faith estimates*, and *not guarantees or representations that these were firm numbers*. . . . Indeed, the comp and cure estimates necessarily were *uncertain and contingent*.

Opinion at 55 (citing and paraphrasing Miller testimony) (emphasis added) (Hume Decl. Ex. 31).

### C.     The $2 Billion Number On The 9/16/08 Financial Schedule Was An Estimate Of The "Comp" Liabilities Barclays Assumed Under The APA, Including Both Bonus And Severance Liabilities.

19.     As stated above, Harvey Miller told the Court at the Sale Hearing that the compensation liabilities Barclays was assuming under the APA were "estimated" to have "an *exposure* of *approximately* two billion dollars." BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (emphasis added) (Hume Decl. Ex. 3). This same $2 billion "estimated" amount of Barclays' "exposure" is found as the amount listed for "Comp" on a financial schedule dated September

16, 2008, and initialed by Lehman's Steve Berkenfeld ("9/16/08 Financial Schedule").[5]  LBHI

asserts that this is the schedule referenced in paragraph 9.1(c) of the APA.

20.      LBHI asserts that the $2 billion figure for "Comp" on the 9/16/08 Financial

Schedule was a number that related *solely to bonuses*, and not to any other forms of

compensation.  The record evidence demonstrates that is false.

21.      First, the 9/16/08 Financial Schedule does not contain the word "bonus."  It

contains an entry for "Comp" for $2 billion.  BCI Ex. 106 (M.2) (Hume Decl. Ex. 4).  There are

no separate entries for bonuses or severance or any other compensation liabilities.  *Id.*  The term

"Comp" is short for "Compensation," which, by definition, is a broader category than just bonus

(which is but one kind of compensation).[6]  Since the APA clearly required Barclays to assume

both bonus and severance obligations with respect to the Transferred Employees, it inexorably

follows that the "Comp" reference on the 9/16/08 Financial Schedule also included both

liabilities.  Certainly, there is no other entry on that schedule which could be said to encompass

any of the non-bonus "Comp" liabilities Barclays was assuming.

22.      Second, when Mr. Miller provided the $2 billion estimate to the Court at the Sale

Hearing (proffering Mr. McDade's testimony), his statement was in no way limited to bonuses.

---

[5]  *See generally* 4/26/10 Tr. at 31:25-33:2 (Miller) (Hume Decl. Ex. 39) (Harvey Miller described the $2 billion "comp" estimate on the Financial Schedule as an estimate of Barclays' exposure, just as the $2 billion estimate was described at the Sale Hearing).  Moreover, LBHI has presented no evidence, and there is none, that could support the assertion that the $2 billion estimate at the Sale Hearing reflects anything other than the $2 billion estimate on the 9/16/08 Financial Schedule.

[6]  The U.S. Department of Labor defines "compensation" as a concept "used to encompass the entire range of wages and benefits, both current and deferred, that workers receive out of their employment." Bureau of Labor Statistics, U.S. Dept. of Labor, Rep. No. 923, Glossary of Compensation Terms 18 (1998), *available at* http://www.bls.gov/ncs/ocs/sp/ncbl0062.pdf. (Hume Decl. Ex. 21).  The definition of "compensation" includes "pay, incentives, and benefits provided employees."  Glossary of Terms Significant to the Human Resource Management Function, *available at* http://www.brockport.edu/hr/resources/glossary.html#C (last visited June 21, 2011) (Hume Decl. Ex. 22); *see also Black's Law Dictionary* 301 (8th ed. 1999) (defining compensation as "remuneration and other benefits received in return for services rendered") (Hume Decl. Ex. 23).

He stated that "Barclays will also assume exposure *for the employees that accept offers of employment*, which is estimated to have a value of approximately — an exposure of approximately two billion dollars."  BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (emphasis added) (Hume Decl. Ex. 3).  The APA imposed both a bonus and a severance obligation on Barclays with respect to "the employees that accept offers of employment," and therefore by its terms, Mr. Miller's McDade proffer was not limited to bonuses.  To the contrary, as Mr. Miller further explained at the Sale Hearing:  "At the same time, the jobs of thousands of employees would be saved and will be entitled to substantial benefits from Barclays in the form of *compensation, bonuses and severance payments* that are based upon the employee's prior performance while with Lehman."  *Id.* at 101:23-102:2.  Thus, Mr. Miller made clear that the $2 billion "estimated" amount of Barclays' "exposure for the employees" related to *all* the compensation exposure to Transferred Employees that Barclays was assuming, which included both severance and bonus payments.

23.    Third, every witness who testified at trial about this subject agreed that the $2 billion "Comp" number was an estimate that included both bonus and severance liabilities.  Lehman's principal negotiator, Bart McDade, and Lehman's principal lawyer, Harvey Miller, both testified that the $2 billion number reflected an estimate of *all* of Barclays' obligations for "Comp" under the APA, including both bonus and severance payments.

24.    Mr. McDade testified at trial:

Q.    The other part of that question had to do with compensation, sir.

A.    Right.  Barclays also assumed a two billion compensation liability with respect to *the combination of the employees' bonus process and the severance proces*s with respect to — they agreed to hire all of the Lehman North American employees, and then there was a period of time, I believe ninety days, that they had to make ultimate determination, in terms of whether or not those would

11

> become permanent employees of the — of the bar cap going
> forward.

4/26/10 Tr. at 161:1-10 (McDade) (emphasis added) (Hume Decl. Ex. 39).

25.    Mr. Miller was asked about the $2 billion estimate listed in the 9/16/08 Financial

Schedule, 4/28/10 Tr. at 32:3-5 (Miller) (Hume Decl. Ex. 41), and testified that:

> In connection with the compensation, that also was an estimate as to the
> possible exposure for Lehman employees going over to Barclays *who
> would either be terminated or were entitled to bonuses*.  So it was
> supposed to cover *both severance pay and bonuses*.  And as I said before,
> it was an estimate.

4/28/10 Tr. at 32:20-5 (Miller) (emphasis added) (Hume Decl. Ex. 41).

26.    Another key Lehman negotiator, Mark Shapiro, also testified that the $2 billion

"Comp" estimate was intended to include both bonus and severance:

> Q.    Now, the reference on M-2 is to comp, do you see that?
>
> A.    Yes.
>
> Q.    It doesn't say bonus, it doesn't say severance, it says comp, is that
>        correct?
>
> A.    That's right.
>
> Q.    And at the time that you were working on the APA and on this
>        transaction, did you have an understanding of what was
>        encompassed within the term comp?
>
> A.    At the time my belief was that it was *a combination of the bonuses*
>        that they would pay and if into the extent that they weren't paying
>        someone a bonus because they were terminating that person's
>        bonus it would include *severance* for that person.  That was my
>        recollection at the time.

8/23/10 Tr. at 120:12-24 (Shapiro) (Hume Decl. Ex. 47).

27.     Indeed, Mr. Berkenfeld himself, who initialed the 9/16/08 Financial Schedule,
testified at trial that "I didn't think that the schedule stood for that there was an obligation to pay
comp for two billion." 4/27/10 Tr. at 168:6-169:5 (Hume Decl. Ex. 40). He also testified that
the "estimated amount of 2 billion was for bonuses and severance and other types of
compensation," and that "*I believe that you are reading too much into the schedule to say that
comp means bonuses*." Berkenfeld Dep. Tr. at 24:11-26:23, 93:17-94:13 (emphasis added)
(Hume Decl. Ex. 33).

28.     The Barclays negotiators likewise testified that the $2 billion "Comp" estimate for
compensation-related obligations included *both* bonus *and* severance. 5/7/10 Tr. at 149:11-13
(Ricci) (Hume Decl. Ex. 45); *see also* 4/30/10 Tr. at 90:22-91:9 (Clackson) (Hume Decl. Ex.
43).[7]

29.     Similarly, when LBHI's current CEO, Bryan Marsal, was asked about the $4.2
billion in estimated liabilities for "Comp" ($2 billion) and "Cure" ($2.25 billion) on the 9/16/08
financial schedule, he testified that it was his understanding that these estimates included
"assumed cure, assumed bonus *and assumed severance*." 6/21/10 Tr. at 56:23-57:5 (Marsal)
(emphasis added) (Hume Decl. Ex. 46).

---

[7] The only purportedly contrary testimony LBHI has identified is from Alvin Brown, a Simpson Thacher
partner who testified at deposition that he understood the $2 billion figure to be "the number for accrued
bonuses for the Lehman employees for that year." Brown Dep. Tr. at 20:13-21 (Hume Decl. Ex. 38).
That assertion is directly contradicted by LBHI's own admission that "the number for accrued bonuses"
was *less* than $2 billion. *See* Barclays Rule 56.1 Statement at ¶ 10. Moreover, Mr. Brown was not
involved in negotiating the terms of the Sale, and explained that his understanding was second-hand and
came "from one of the participants or part of the team that was involved in negotiating but I don't recall
specifically who it was." Brown Dep. Tr. at 25:22-26:3 (Hume Decl. Ex. 38). Further, Mr. Brown never
communicated his understanding to anyone at Barclays. Kohn Decl. at ¶ 10 (Hume Decl. Ex. 19). In any
event, even if it were relevant, Mr. Brown's second-hand understanding, which LBHI falsely asserts was
"undisputed," cannot possibly outweigh the testimony cited above of the Lehman executives (McDade
and Shapiro) and lead attorney (Miller) directly responsible for negotiating the economic terms of the
Sale, nor the testimony of current LBHI CEO Marsal.

30.     Indeed, in an October 8, 2008 presentation prepared right after the Closing, LBHI summarized the main assets acquired and liabilities assumed by Barclays in the Sale Transaction, and the *only* compensation-related liability they chose to list under "Liabilities Assumed" was the "Assumed Severance Liability," with no reference at all to the bonus liability.  *See* BCI Ex. 131a (Hume Decl. Ex. 5).  LBHI summarized the deal as follows:

> A.    <u>Sale of Lehman Brothers, Inc./Broker Dealer to Barclays (Fogarty)</u>
>
> - Assets Purchased
>
>   o  $43.1 Billion Repo Assets — Book value per Lehman 'state' marks; negotiated a $5.0 billion reduction;
>
>   o  $1.9 Billion Unencumbered Box;
>
>   o  $1.5 Billion Building and Data Centers;
>
>   o  $0.8 Billion 15-c-3-3- Securities — any excess will accrue to Lehman Brothers, Inc.
>
> - Liabilities Assumed
>
>   o  $38.0 Billion Extinguished Liability;
>
>   o  Assumed Cure Liability;
>
>   o  ***<u>Assumed Severance Liability</u>***.
>
> - Cash Consideration of $1.79 Billion

BCI Ex. 131a (emphasis added) (Hume Decl. Ex. 5).

31.     This summary of the Sale by LBHI right after the Closing is completely inconsistent with LBHI's current assertion that the only estimate given for a compensation-related liability during the week of the Sale related *solely to bonuses* — a liability which is not even listed in LBHI's summary — and did *not even include* the "Assumed Severance Liability," which is listed there.

32.     Finally, even Saul Burian, the Creditors' Committee 30(b)(6) representative (and the financial adviser responsible for informing the Committee about the terms of the Sale), testified that the Committee understood the $2 billion number on the 9/16/08 Financial Schedule as referring to "all the accrued compensation and severance liabilities of the 10 to 12,000 Lehman employees that were supposed to — that were going to go over to Barclays and — and that included the severance for people who declined to go to Barclays and the accrued comp for those who went to Barclays."  Burian Dep. Tr. at 266:17-267:10 (Hume Decl. Ex. 37); *see also* 5/6/10 Tr. at 108:21-23 (Burian) (Hume Decl. Ex. 44).[8]

**D.     LBHI Falsely Asserts That Bart McDade Testified That Barclays Had An Obligation To Pay $2 Billion In Bonuses.**

33.     In its post-trial brief, LBHI presented the following proposed finding of fact:

> McDade testified that this $2 billion *for bonuses* to former Lehman employees was an 'agreed number' (4/26/10 [McDade] 164:6-8), and reflected a 'full requirement for Barclays to pay,' (4/26/10 [McDade] 215:13-18).

LBHI Post-Trial Br. at ¶ 134 (emphasis added) (Hume Decl. Ex. 30).

---

[8] LBHI relies upon the stipulated recollection of one of Barclays' outside auditors (Michael Guarnuccio of PwC) about a conversation he had with Paul Exall of Barclays.  LBHI Br. at ¶ 24.  Neither Mr. Guarnuccio nor Mr. Exall had any involvement at all in negotiating or working on any portion of the Sale, including the compensation and bonus provisions. 8/24/10 Tr. at 13:17-14:7 (Exall) (Hume Decl. Ex. 48).  Moreover, Mr. Exall testified that in September 2008, when he and Mr. Guarnuccio first discussed the issue, Mr. Exall did not have a clear understanding regarding the nature of Barclays' legal obligations under the APA. 8/23/10 Tr. at 187:16-19, 188:1-15 (Exall) (Hume Decl. Ex. 47).  He testified that his conversation with Mr. Guarnuccio was "around Barclays' overall compensation plans" and that Mr. Guarnuccio may have misunderstood what Mr. Exall said during the conversation. *Id.* at 187:8-11, 188:1-8 (Exall).  In any event, whatever Mr. Exall or Mr. Guarnuccio might have thought or said in that conversation, it does not reflect what any negotiator of the Sale believed, intended, or communicated in negotiating the terms of the APA. 4/28/10 Tr. at 32:23-24 (Miller) (Hume Decl. Ex. 41); 8/23/10 Tr. at 120:20-24 (Shapiro) (Hume Decl. Ex. 47); 4/26/10 Tr. at 161:1-3 (McDade) (Hume Decl. Ex. 39).

34.     This assertion by LBHI is demonstrably false.  First, as shown above, Mr.

McDade testified that the $2 billion number did *not* reflect solely bonuses, but instead reflected

"*the combination of the employees' bonus process and the severance process.*"  4/26/10 Tr. at

161:1-10 (McDade) (emphasis added) (Hume Decl. Ex. 39).  Contrary to LBHI's proposed

finding, Mr. McDade *never testified* that the $2 billion number reflected solely bonuses.

35.     Second, LBHI has misrepresented the record evidence it cites in support of this

assertion.  The McDade testimony cited by LBHI *does not refer to "bonuses" at all*.  To the

contrary, the testimony cited by LBHI reflects artfully asked questions by LBHI's counsel who,

having heard Mr. McDade's testimony about the "Comp" estimate including both bonus and

severance, carefully avoided using the word "bonus," and instead asked Mr. McDade the

following:

> Q.     And with respect to the *compensation* number, was that an agreed
> number, two billion dollars?
>
> A.     That was a number that was ultimately agreed, yes.

4/26/10 Tr. at 164:6-8 (question of Bart McDade by LBHI counsel) (emphasis added) (Hume

Decl. Ex. 39).

> Q.     At any point during the week, from the time that you were
> involved in the initial negotiations through the sale hearing, had
> you had any concept or had anybody ever said anything to you that
> that *two billion dollars* was anything other than a full requirement
> for Barclays to pay?
>
> A.   It was a full requirement.

4/26/10 Tr. at 215:13-18 (question of Bart McDade by LBHI counsel) (emphasis added) (Hume

Decl. Ex. 39).

36.     Thus, Mr. McDade's responses regarding the "agreed number" and the "full requirement" referred to the entire "*compensation*" amount of "two billion dollars" (which he testified included both bonus *and* severance), and was not limited solely to "bonus," as LBHI has misleadingly asserted.[9]

37.     Moreover, Mr. McDade's testimony also made clear that while the $2 billion number was an "agreed number," and while Barclays had a "full requirement to pay" the compensation obligations that were estimated to be $2 billion, the actual amount of that "full requirement" might be different from the "estimated" "exposure" of $2 billion:

> Q.     Let me turn to the subject of compensation and the exposure to compensation that Barclays was taking over. First, you were present when a proffer was given to the Court concerning what your testimony would have been with respect to this subject matter, correct?
>
> A.     Yes, I was.
>
> Q.     *And the Court was told that you would have testified that the exposure for employees -- Barclays' exposure for employees that accepted offers of employment was estimated to be an exposure of approximately two billion dollars, correct?*
>
> A.     *That's correct.*
>
> Q.     *And you recognized that that was Barclays' exposure. It was not necessarily what Barclays would actually end up paying, correct?*
>
> A.     *Yes.*

4/27/10 Tr. at 48:1-15 (McDade) (emphasis added) (Hume Decl. Ex. 40).  Similarly, Mr. McDade also testified that for the deal to be consistent with his understanding, the $2 billion

---

[9]  The Court's February 22 Opinion incorporates LBHI's misleading proposed finding in a section that appears to recite LBHI's allegations, without necessarily endorsing them as express findings.  Opinion at 46 (Hume Decl. Ex. 31).  LBHI now relies on the Court's recitation of LBHI's own misleading assertion as a basis to claim collateral estoppel.  LBHI Br. at ¶ 2.

number had to be "a good faith estimate" of what Barclays would pay.  4/26/10 Tr. at 168:13-

169:19 (McDade) (Hume Decl. Ex. 39); *see also id.* at 170:13-21 (McDade).[10]

### E.    LBHI Has Admitted That The "Amounts Accrued" For 2008 Bonuses Were Less Than $1.5 Billion.

38.    In seeking the Rule 2004 discovery that led to this proceeding, LBHI asserted that

"[w]hile we have insufficient information to determine with any degree of precision the total

bonus pool for the Transferred Employees, it is estimated to be in the region of $700 million (or

$1.2 billion if the equity portion is included) for the period from December 2007 to August

2008."[11]  After taking Rule 2004 discovery, in pursuing relief under Rule 60(b), LBHI confirmed

its view that Lehman's accrued amount for 2008 bonuses at the time of the Sale was *less* than $2

billion — *i.e.*, on the order of either $1 billion or $1.3 billion in total.  *See* LBHI Rule 60(b) Br.

at ¶ 10 (Hume Decl. Ex. 25); LBHI Rule 60(b) Reply Br. at ¶ 63 (Hume Decl. Ex. 28).  In

making these assertions, LBHI has relied upon contemporaneous documents and witness

testimony indicating that Lehman's books and records showed a bonus accrual for the

Transferred Employees — *i.e.*, the "bonus pool amounts accrued in respect of amounts payable

for incentive compensation (but not base salary)" — that was less than $1.5 billion.[12]

---

[10] LBHI relies upon internal Barclays emails from the week of the Sale expressing a concern about a potential "650 million dollar problem" relating to the APA's compensation provisions, as well as testimony from Rich Ricci and Patrick Clackson relating to those emails.  LBHI Br. at ¶¶ 18-20.  However, Mr. Clackson and Mr. Ricci made clear in their testimony that they both understood the $2 billion number on the Financial Schedule to be an estimate for *all* of Barclays' "Comp" obligations. 4/30/10 Tr. at 90:22-91:9 (Clackson) (Hume Decl. Ex. 43); 5/7/10 Tr. at 149:11-13 (Ricci) (Hume Decl. Ex. 45); *see also id.* at 125:25-126:4 (Ricci).  As Mr. Clackson testified at trial, the concern that gave rise to his emails was driven not by a question over how much Barclays would end up having to *pay* in "Comp" liabilities, but in whether those liabilities would have to be *accrued on the Barclays acquisition balance sheet*, or instead on its future income statements.  4/29/10 Tr. at 257:6-259:1, 260:8-25 (Clackson) (Hume Decl. Ex. 42); 4/30/10 Tr. at 86:20-91:9 (Clackson) (Hume Decl. Ex. 43).

[11] BCI Ex. 862 at ¶ 8 (Hume Decl. Ex. 13).

[12] *See* LBHI Post-Trial Br. at ¶ 139 (citing M.7 and 4/28/10 Tr. at 200:10-16 (Kelly)) (Hume Decl. Ex. 30); LBHI Rule 60(b) Br. at ¶ 61 (citing Kelly Dep. Tr. at 56:17-23, 109:23-11:4, 116:19-117:14) (Hume

39.     Thus, LBHI has previously admitted that the actual bonus *accrual* for the

Transferred Employees was less than $1.5 billion.  It has not presented any evidence to revise

that admission in this proceeding.

40.     As Barclays has previously explained, and as Bart McDade testified at trial, a

bonus accrual of less than $1.5 billion is entirely consistent with an estimate for all "Comp"

obligations of approximately $2 billion.  *See, e.g.,* Barclays Opp. to Rule 60(b) at ¶¶ 282-283

(Hume Decl. Ex. 27).  First, while LBHI has pointed to an accrual amount of approximately

$700 million, the evidence shows that was not an annualized accrual, but instead, as Mr.

McDade testified, "represented three-quarters of the year." 4/27/10 Tr. at 48:7-9 (McDade)

(Hume Decl. Ex. 40).  If annualized, a $700 million accrual amount would be increased to

approximately $933 million (assuming the $700 million represented an accrual for three-quarters

of the Lehman fiscal year, which ended on November 30, *see generally* BCI Ex. 980).  In

addition, as Mr. McDade also testified and as LBHI has admitted, the accrual did not include the

significant equity component of the bonuses Lehman normally paid:  Mr. McDade explained that

Lehman "paid bonuses both partly in stock and partly in cash," and indeed "gave a higher

proportion of its bonus in stock than other Wall Street firms," but "Lehman only accrued on its

books that portion of the bonus that represented the cash portion."  4/27/10 Tr. at 49:10-18

(McDade) (Hume Decl. Ex. 40).  As LBHI has asserted, the equity component of the bonuses

Lehman potentially would have paid the Transferred Employees was approximately $500

---

Decl. Ex. 25); LBHI Rule 60(b) Reply Br. at ¶ 63 (citing M.135) (Hume Decl. Ex. 28); *Id.* at ¶ 133 (citing
BCI Ex. 161).

million.[13]  Thus, if the Lehman accrual is annualized and adjusted to reflect the normal equity

component paid by Lehman, the amount increases to approximately $1.4 - $1.5 billion.[14]

41.        Second, even this adjustment of the accrued amount does not include additional

"Comp" liabilities that Barclays was clearly exposed to paying, including (a) the higher bonus

amounts Barclays might have to pay, not because they were "accrued amounts," but because they

would be necessary to ensure that the top performing Lehman employees would join Barclays (as

it turned out, Barclays ended up paying over $1.8 billion in bonuses, as shown below); (b) the

potentially significant severance liability Barclays assumed under Article IX of the APA, which

(as Mr. McDade and Mr. Miller both confirmed) was impossible to predict since it was unknown

how many of the Transferred Employees Barclays would end up terminating;[15] (c) the amounts

Barclays would have to pay in base salary through the end of 2008 while it was trying to

determine which employees it wanted and which it did not need; and (d) the social taxes

Barclays was obligated to pay on all of these various compensation liabilities.  Once all of these

"uncertain" and "contingent" amounts are added to the adjusted amount of what was "accrued,"

it is clear that, as Mr. McDade testified, "it was fair" for the "estimated exposure" that Barclays

was assuming to be estimated at approximately $2 billion.  4/27/10 Tr. at 50:13-25 (McDade)

(Hume Decl. Ex. 40).

---

[13]   BCI Ex. 862 at ¶ 8 (explaining that the accrual for Transferred Employees was estimated to be $700
million, or $1.2 billion if the equity compontent of the expected bonus payment was included) (Hume
Decl. Ex. 13).

[14]   Barclays is not admitting that § 9.1(c) required the accrual to be annualized and adjusted to include the
normal equity amount, but only that if these adjustments were made, then a reasonable estimate of what
Barclays was likely to have to spend would also increase.

[15]   *See* 4/27/10 Trial Tr. at 49:19-50:3 (McDade) (Hume Decl. Ex. 40); 4/28/10 Tr. at 114:7-25 (Miller)
(Hume Decl. Ex. 41); Miller Dep. Tr. at 81:5-14 (Hume Decl. Ex. 32).

**F.    LBHI Has Admitted That Barclays Paid At Least $1.5 Billion In Bonuses, And Approximately $2 Billion In Bonus, Severance, And Related Tax Payments With Respect To The Transferred Employees.**

42.    LBHI asserts that Barclays paid the Transferred Employees "approximately $1.5 billion" in 2008 bonuses.  LBHI Br. at ¶¶ 4, 27-34.  While that number is too low, it is nonetheless an admission by LBHI that Barclays paid the Transferred Employees 2008 bonuses that, in the aggregate, *exceeded* "100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation."

43.    LBHI also admits that Barclays paid a total of approximately $1.951 billion in fulfilling its bonus, severance, and related tax payment obligations under the APA with respect to the Transferred Employees.  BCI Ex. 142 (Hume Decl. Ex. 6).  This $1.951 billion amount is set forth on the Barclays' "Compensation Schedule" (BCI Ex. 142 (Hume Decl. Ex. 6)) that was an exhibit at trial, and that was the subject of testimony by Barclays HR executive Paul Exall.  *Id.*; 8/23/10 Tr. at 189:2-16 (Exall) (Hume Decl. Ex. 47).

44.    The $1.951 billion amount consists entirely of 2008 compensation payments owed under the APA.  It does not include any base salary payments (aside from $12 million in pre-acquisition payroll items).  It is estimated that the base salary payments for the Transferred Employees for the three months from September 22, 2008 to the end of December 2008 would have easily exceeded $50 million.  Exall Decl. at ¶ 7 (Hume Decl. Ex. 16).

45.    The $1.951 billion total amount on the Compensation Schedule includes $265 million that Barclays paid to the Transferred Employees who were terminated and hence received severance pursuant to the APA.  BCI Ex. 142 (Hume Decl. Ex. 6); Exall Dep. Tr. at 110:22-111:16, 115:8-18 (Hume Decl. Ex. 35).  This $265 million amount consists of two components:  (a) approximately $128 million that resulted from the application of the Lehman severance plans to the terminated Transferred Employees, and (b) approximately $137 million in

"enhanced severance" that was paid "in lieu of bonus" to these terminated Transferred

Employees, and in exchange for receiving a release of any and all claims against Barclays for

any additional bonus payments.  Exall Decl. at ¶ 4 (Hume Decl. Ex. 16); Kurman Decl. at ¶ 9

(Hume Decl. Ex. 18).   Since these terminated Transferred Employees did not receive any other

bonus payment under § 9.1(c) of the APA, it would be appropriate to characterize these

"enhanced payments," which were made in consideration of a release covering, among other

things, any bonus payment, to have been made in satisfaction of § 9.1(c) of the APA.[16]

46.     If these enhanced severance payments are characterized as payments made under

§ 9.1(c) of the APA, then the $1.951 billion listed on the Compensation Schedule consists of (a)

$1.811 billion in bonus and related tax payments made pursuant to § 9.1(c) of the APA, (b) $128

million in severance payments made in accordance with Lehman's severance plans and in

fulfillment of § 9.1(b) of the APA, and (c) $12 million in "payroll items" which reflects tax

payments made on behalf of expatriate Lehman employees, as well as base salary amounts that

Barclays paid to the Transferred Employees as part of their first payroll after the Closing, but

which were attributable to pre-acquisition activity.[17]

---

[16]  In its proposed findings of fact after the trial, Barclays treated the enhanced payments as "severance" only because they were paid to the terminated employees.  FOF ¶ 11.4 (Hume Decl. Ex. 29).  Barclays also made clear that its summary of the "bonus" amounts listed excluded "the bonus component of severance payments."  *Id.* at ¶ 11.3.  The characterization of the $137 million in "enhanced payments" made "in lieu of bonus" as either "bonus" or "severance" is a purely legal (and somewhat artificial) one. *See* Exall Decl. at ¶ 4 (Hume Decl. Ex. 16).  Nonetheless, LBHI cannot dispute that (a) these payments were paid to Transferred Employees who were terminated; (b) they represented payments that were in excess of what was required under the written Lehman severance plan, *see* Kurman Decl. at ¶ 4 and Ex. 1, ¶ 9 (Hume Decl. Ex. 18)); and (3) the Transferred Employees who received these payments received no other bonus under § 9.1(c).

[17]  If instead the "enhanced payments" are treated as severance payments made under § 9.1(b) of the APA (instead of pursuant to § 9.1(c), which would be a more appropriate characterization), then the $1.951 billion listed on the Compensation Schedule consists of (a) $1.674 billion in bonus and related tax payments made pursuant to § 9.1(c) of the APA, (b) $265 million in severance payments, and (c) $12 million in pre-acquisition "payroll items."

47.    LBHI inaccurately asserts that Barclays paid only "approximately $1.5 billion" in

2008 bonuses to the Transferred Employees.  LBHI Br. at ¶¶ 4, 27-34.  LBHI reaches this result

by excluding all of the severance payments (including the $137 million paid "in lieu of bonus"

and in exchange for a release of any claim to a bonus), as well as numerous bonus items that

were itemized separately on the Compensation Schedule.  In particular, LBHI improperly

excludes the following categories of bonus payments from its bonus calculation:

48.    <u>$56 million in bonus awarded as "ISP Awards."</u>  Paul Exall testified that "ISP"

refers to the "incentive share plan" that is "the name of the stock award program we have in

place at Barclays," Exall Dep. Tr. at 141:24-142:3 (Hume Decl. Ex. 35), and that the $56 million

in "ISP Awards" "directly relates" to the $258 million in *equity bonuses* provided to the

Transferred Employees.  *Id.* at 142:10-15, 149:20-150:7, 151:5-14; 8/24/10 Tr. at 81:14-82:17

(Exall) (Hume Decl. Ex. 48); *see also* Exall Decl. at ¶ 6 (Hume Decl. Ex. 16).  There is,

therefore, no basis for disputing the fact that the $56 million of "ISP Awards" made to the

Transferred Employees is properly characterized as a bonus.

49.    <u>$53 million in "Acquisition Buyout vesting over 2 years".</u>  As Mr. Exall testified,

this $53 million "related to *performance bonus awards* that were due and payable to an

individual under his contract with Lehman Brothers that Barclays matched as part of the

acquisition."  8/23/10 Tr. at 193:17-23 (Exall) (emphasis added) (Hume Decl. Ex. 47); *see also*

Exall Dep. Tr. at 128:12-21 (the $53 million was "a bonus relating to pre-acquisition

performance.") (Hume Decl. Ex. 35); BCI Ex. 142 (describing the $53 million as "[b]onus

relating to performance for 1 Jan to 22 Sept 08….") (Hume Decl. Ex. 6); Exall Decl. at ¶ 6

(Hume Decl. Ex. 16).

50.    <u>$11 million in "Replacement RSUs."</u>  As Mr. Exall testified, "Replacement RSUs" were "cash awards that Barclays gave to former Lehman Brothers employees to replace the lost value of bonus awards that they had received earlier in 2008 from Lehman Brothers." 8/23/10 Tr. at 191:20-22 (Exall) (Hume Decl. Ex. 47).  These were, therefore, additional bonus amounts that were paid entirely with respect to the 2008 fiscal year.  Exall Decl. at ¶ 6 (Hume Decl. Ex. 16).  When questioned at trial whether the $11 million in "Replacement RSUs" on the Compensation Spreadsheet is "a bonus item," Mr. Exall testified, "I would categorize it as such, yes."  8/23/10 Tr. at 191:23-24 (Exall) (Hume Decl. Ex. 47); *see also* 8/24/10 Tr. at 70:6-10 (Exall) (agreeing that the "Replacement RSUs" represent "Barclays' assuming a stock bonus obligation that Lehman previously owed") (Hume Decl. Ex. 48).

51.    <u>$11 million in "IBD Grad Programmes."</u>  As Mr. Exall testified, payments for "IBD Grad Programmes" "were the annual bonuses payable to graduates that were on our investment banking graduate program."  8/23/10 Tr. at 192:7-14 (Exall) (Hume Decl. Ex. 47); Exall Dep. Tr. at 102:14-103:4 (testifying that the $11 million in "IBD Grad Programmes" were "for all intents and purposes in general the[] annual bonus" for those Transferred Employees in the Investment Banking Division's graduate program) (Hume Decl. Ex. 35); 8/24/10 Tr. at 72:6-9 (Exall) (agreeing that the $11 million in "IBD Grad Programmes" represents "Barclays assuming a bonus type obligation that Lehman used to owe….") (Hume Decl. Ex. 48); *see also* Exall Decl. at ¶ 6 (Hume Decl. Ex. 16).

52.    <u>$14 million in tax payments shown on the Barclays Compensation Schedule:</u>  The summary of all of Barclays' non-base salary compensation to the Transferred Employees for their pre-acquisition 2008 service includes the following tax payments:  (a) $9 million of "Payroll tax on Equity compensation"; (b) $3 million in "Payroll taxes on Acq. Buyout,"

referring to the $53 million in "Acquisition buyout vesting over 2 years"; and (c) $2 million in

"Payroll taxes on ISP Awards." *See* BCI Ex. 142 (Hume Decl. Ex. 6). All of the foregoing

represent tax liabilities that Barclays accrued solely because of the bonus obligation it assumed

under section 9.1(c) of the APA. Thus, all of these amounts should be included in the calculation

of the amount Barclays spent in satisfying its bonus obligation under § 9.1(c) of the APA.

53.     In addition to excluding the foregoing items from the calculation of the amounts

Barclays spent in satisfying its bonus obligation under § 9.1(c) of the APA, LBHI also

incorrectly excludes a $50 million amount that it inaccurately asserts was an additional amount

of "social taxes" Barclays paid on the bonuses. The Compensation Schedule includes a line item

for "Bonus including social tax" of $1.529 billion. BCI Ex. 142 (Hume Decl. Ex. 6). In

deposing Mr. Exall, counsel for LBHI asked Mr. Exall to guess what portion of this $1.529

billion line item consisted of social taxes. Exall Dep. Tr. at 139:8-140:21 (Hume Decl. Ex. 35).

Mr. Exall made clear that he did not know; he then guessed — and made clear that he was

guessing — that the amount of social tax might be in the region of $50 million. *Id.* LBHI now

asserts that "guessed" amount as a fact, and improperly subtracts that from the total amount of

bonuses paid by Barclays. LBHI Br. at ¶ 33. Mr. Exall has now confirmed that the precise

amount of social tax contained within the $1.529 billion entry is $17 million. This amount was

paid by Barclays solely because of the bonus obligation Barclays assumed in § 9.1(c) of the

APA. Exall Decl. at ¶ 5 (Hume Decl. Ex. 16). It should therefore be included in any calculation

of the total amount Barclays paid as a result of § 9.1(c) of the APA.[18]

---

[18] LBHI also excludes from its bonus calculation the $12 million entry for "Pre 22/9 payroll items."
Barclays agrees that this amount is not a "bonus" payment, but asserts that it must be included in any
measure of the amount Barclays incurred in satisfaction of the "Comp" obligations set forth in the APA.

G.    **LBHI Had No Legal Obligation To Pay Bonuses To All The Transferred Employees, And Has Suffered No Damage As A Result Of Barclays' Alleged Breach.**

54.    As a general matter, neither LBHI nor LBI had a legal obligation to pay 2008 bonuses to the vast majority of their employees.  While there may have been a small number with guaranteed bonuses set forth in their individual contracts, for most employees, the year-end bonuses were paid on a discretionary basis.  *See* Kohn Decl. at ¶ 6 (Hume Decl. Ex. 19).  The "amount accrued" for bonuses reflected an *estimate* by Lehman of the amount it was *likely* to pay on a discretionary basis — not a legal obligation.

55.    In addition, the vast majority (over 80%) of the bonus payments paid to the Transferred Employees prior to 2008 were made by *LBI*, not by LBHI.  *See* Angley Decl. at ¶ 4 (Hume Decl. Ex. 17).  By and large, these employees worked for LBI, not LBHI.  *Id.*

56.    Thus, section 9.1(c) of the APA did not relieve LBHI of a legal liability of $2 billion or any comparable amount.  Instead, it obligated Barclays to assume an obligation to pay what for both LBHI and LBI were discretionary bonus obligations; in so doing, it confirmed that the Transferred Employees would indeed receive a 2008 bonus.  The principal purpose of this provision was not to relieve LBHI of a legal obligation, but to ensure that the employees knew they would receive a bonus, which would encourage them to remain with the Business that Barclays was acquiring.  *See* Kohn Decl. at ¶ 5 (Hume Decl. Ex. 19).

57.    LBHI has not suffered any damages as a result of Barclays' having paid the Transferred Employees bonuses that, in the aggregate, were slightly less than $2 billion.  LBHI cannot claim that it is exposed to liability to pay any bonuses to Transferred Employees.  And LBHI has no support for its suggestion that if the amount Barclays would spend in 2008 bonuses had been known at the time of the Sale, that would have caused Lehman to demand more cash consideration from Barclays:  to the contrary, all of the testimony, including that of Bart McDade

(on whom LBHI relies) confirms that if the parties had known that Barclays was going to spend approximately $2 billion in bonus, severance, and related tax payments, that would have been consistent with their understanding of the Sale, and would not have caused Barclays to pay more consideration of any kind.

## ARGUMENT

## I.   THE COURT SHOULD DENY LBHI'S MOTION FOR SUMMARY JUDGMENT

58.    LBHI's motion for summary judgment should be denied for the following reasons: *First*, Barclays is not collaterally estopped by any statements or findings in this Court's February 22 Opinion relating to the bonus issue.  The $2 billion compensation estimate was raised by the Movants in connection with their Rule 60(b) motions, and the Court denied those motions.  As a matter of law, therefore, any statements or findings this Court made relating to the $2 billion compensation estimate cannot be collateral estoppel against Barclays.  *Second*, the facts overwhelmingly demonstrate that Barclays satisfied its obligations under Article IX of the APA.  As shown in Section II, below, these facts are so overwhelming they allow no basis for any genuine dispute, and, rather than supporting LBHI's motion for summary judgment, require summary judgment in Barclays' favor, dismissing Count II of LBHI's Complaint.  At a minimum, they demonstrate that the Court cannot accept as undisputed the factual assertions on which LBHI relies for its motion.  *Third*, even if it could be shown that Barclays had failed to pay a required amount of bonuses under section 9.1(c) of the APA (which cannot be shown), LBHI has suffered no damages as a result of that alleged breach, and has no right to recover the alleged shortfall.  For this independent reason, its claim must fail as a matter of law.

A.     **The Court's Statements Relied On By LBHI Have No Collateral Estoppel Effect Because They Were Not "Essential" To The Court's Denial Of The Rule 60(b) Motions.**

59.     LBHI asserts that "this Court has found that" (a) "the APA required Barclays to pay $2 billion in bonuses to former Lehman employees," LBHI Br. at 22, title of section B, and (b) "Barclays paid only $1.5 billion in bonuses," *id.* at 23, title of section C.  LBHI then argues that "Barclays is collaterally estopped from contesting the Court's factual findings." *Id.* at 25, title of section D.

60.     LBHI is wrong.  First, it is far from clear that this Court made the "findings" that LBHI asserts.  Second, even if the Court made those findings, it did so as part of its overall rejection of the LBHI Rule 60(b) motion, and therefore its findings do not have collateral estoppel effect against Barclays in this (or any other) proceeding.

1.     The Court found that the $2 billion number was a "good faith estimate," and *not* a "guarantee or representation" that Barclays failed to fulfill.

61.     In support of its Rule 60(b) motion, LBHI argued that Barclays failed to pay an allegedly required amount of $2 billion in bonuses.  LBHI Rule 60(b) Br. at ¶¶ 10, 64, 74, 151-54, 160-61 (Hume Decl. Ex. 25).  This Court denied the LBHI motion, ruling for Barclays and holding as follows:  "*The Court finds* that the estimates for comp and cure that the parties presented at the Sale Hearing were just that — good faith estimates, and not guarantees or representations that these were firm numbers."  Opinion at 55 (Hume Decl. Ex. 31).  The Court held that the "estimates necessarily were *uncertain* and *contingent*." *Id.* at 56 (emphasis added).  Thus, the Court's ultimate findings on the "comp" issue refute the premise of LBHI's motion for summary judgment — *i.e.*, that there was an obligation to pay exactly $2 billion in bonuses.

62.     The statements that LBHI relies on to support its motion, by contrast, appear in a section of the Opinion entitled "[t]he Rule 60(b) Standard and *Background of Movants' 60(b)*

28

*Claims*." Opinion at 37 (title of Section III) (emphasis added) (Hume Decl. Ex. 31). The

statements are not described or presented as "findings" or "conclusions," and are contained in a

section of the Opinion that does not make any ultimate holdings. *See generally* Opinion at 45-49

(Hume Decl. Ex. 31).

> 2. <u>Whether characterized as findings or not, the Court's statements on the</u>
> <u>bonus issue cannot have collateral estoppel effect against Barclays.</u>

63.     Even if the statements in the Opinion relied upon by LBHI are treated as

"findings," they do not have collateral estoppel (or law of the case) effect. The Court ultimately

*denied* the motions for Rule 60(b) relief. To whatever extent the statements were intended to be

*favorable* to LBHI, they obviously were not essential to the *denial* of LBHI's motion.

64.     Collateral estoppel (and law of the case) preclude relitigation of issues that were

"actually litigated and decided in the prior proceeding" if, but only if, the "determination was

*essential*" to the judgment. *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56

F.3d 359, 368 (2d Cir. 1995) (emphasis added). If the finding was dicta or otherwise

unnecessary to the actual decision, it "cannot have any collateral estoppel effect." *In re Bean*,

252 F.3d 113, 118 (2d Cir. 2001); *accord Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir. 1992)

(only applies to findings essential to the judgment); *Jim Beam Brands Co. v. Beamish &*

*Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991) (same); *NLRB v. Babad*, 785 F.2d 46, 49 n.4

(2d Cir. 1986) (collateral estoppel does not apply to issues not essential to the judgment);

Restatement (Second) of Judgments § 27, § 27 cmt. h, § 27 illus. 13-14 (same); § 28 cmt. a

(collateral estoppel does not apply if "the party who lost on the issue obtained a judgment in his

favor"); *see also Russul Corp. v. Zim Am. Integrated Shipping Serv. Co.*, No. 06 Civ. 0037

(JCF), 2009 WL 3247141, at *4 (S.D.N.Y. Oct. 5, 2009) (same rule as to law of the case).[19]

65.     To whatever extent the Court intended to make a finding that Barclays was

contractually required to pay $2 billion in bonuses and failed to do so, that finding was plainly

not *essential* to the Court's decision to *deny* Rule 60(b) relief.  Even if Barclays "lost on the

issue," collateral estoppel and law of the case do not apply because Barclays obtained "a

judgment in [its] favor."  *See* Restatement of Judgments § 28 cmt. a.  LBHI does not have a

credible argument that any finding favorable to it was essential to the decision denying its

motion.

66.     LBHI acknowledges that collateral estoppel applies only if the issue previously

litigated was "necessary to support a valid and final judgment on the merits." LBHI Br. at ¶ 50

(quoting *T.S. Haulers, Inc. v. Cardinale*, No. 09 CV 0451 (SJF)(ARL), 2010 WL 4275310, at *8

(E.D.N.Y. Feb. 16, 2010)).  But LBHI fails to explain how this requirement could be met here.

LBHI's sole argument on this issue is as follows:

> The bonus and cure provisions of the Asset Purchase Agreement, and in
> particular the relation of the $2 billion "comp" figure in the 9/16/08
> Financial Schedule to Barclays' bonus obligation under Paragraph 9.1(c),

---

[19] As an initial matter, collateral estoppel applies only where there are two *different* proceedings, and where the second proceeding is not a "continuation" of the initial proceeding.  *See Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*, 362 F. App'x 151, 154-55 (2d Cir. 2010) (concluding that collateral estoppel did not apply based on decision in a prior proceeding because the subsequent action, even though in a different court and before a different judge, was really "a continuation of the original action").  Where a party is asking a court to adhere to a prior decision made in the same proceeding, it must invoke the law-of-the-case doctrine, not collateral estoppel.  *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("the law of the case doctrine does not rigidly bind a court to its former decisions, but is only addressed to its good sense."); *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992).  The law-of-the-case doctrine is never binding when a court is considering the effect of its prior decision or that of a coordinate court (a court can always refuse to apply it), and, like collateral estoppel does not apply to statements that are not a necessary part of the court's holding.  *Russul Corp.*, 2009 WL 3247141, at *4; *May Dep't Stores Co. v. Int'l Leasing Corp., Inc.*, 88 Civ. 4300, 1995 WL 656986, at *2 (S.D.N.Y. Nov. 8, 1995) ("the law of the case doctrine does not apply to dicta from prior holdings").

were all addressed by both sides, who presented witnesses, deposition
testimony and documents concerning these issues. This was done in
connection with adjudicating LBHI's claims of non-disclosure, fraud and
bad faith, and the Court necessarily decided these facts in deciding the
merits of those legal questions.

LBHI Br. at ¶ 53 (citing *Stonewall Corp. v. Conestoga Title Ins. Co.*, No. 04 CV 9867 (KMW)

(GWG), 2009 WL 3075661, at *8 (S.D.N.Y. Sept. 25, 2009)).

67.    Again, LBHI is simply wrong. The only issues the Court "necessarily decided" in

"deciding the merits" of LBHI's claims of "non-disclosure, fraud and bad faith" were that there

was *no bad faith*, *no fraud*, and *no grounds for Rule 60(b) relief*. Opinion at 7, 29-30, 52-56

(Hume Decl. Ex. 31). Those are the only things that the Court "necessarily decided," and they

do not support LBHI's claims for breach of contract. The *Stonewall* case LBHI cites merely

confirms that LBHI is wrong: it held that Stonewall was collaterally estopped by a prior decision

that ruled *against* Stonewall. *Stonewall*, 2009 WL 3075661, at *8 ("[w]ithout these conclusions,

[the court] could not have found that the United States' interest in Center Point Mortgage was

superior to Stonewall's"). That is the opposite of the situation here, where the *losing* party is

claiming that the *prevailing* party is estopped by statements made in a decision that ruled against

the losing party.[20]

68.    LBHI appears to be relying on the fact that, because this Court has already

conducted an extensive trial, and because one of the many issues addressed in that trial was

whether the $2 billion estimate for the compensation obligations assumed by Barclays was

mistaken or misleading, collateral estoppel somehow must apply so as to foreclose the possibility

of any further trial. That is not the law. First, the precise issue presented in the Rule 60(b) trial

---

[20]  For example, in *Narumanchi v. Am. Home Assurance. Co.*, 317 F. App'x 56 (2d Cir. 2009), a case
LBHI relies on, collateral estoppel was applied to prevent a losing party from relitigating an issue which
he previously lost. Furthermore, collateral estoppel applied only because the prior verdict in defendants'
favor *required* the jury to find against Narumanchi on the issue of causation. *Id.* at 59.

was distinct from the issue presented by LBHI's breach of contract claim.  LBHI Rule 60(b) Br.

at ¶ 154 (Hume Decl. Ex. 25).  In the Rule 60(b) trial, the issue was whether there was a

"mistake" or "misrepresentation" sufficient to warrant modification of the Sale Order under Rule

60(b).  In the breach of contract claim, the issues are the precise meaning of section 9.1(c) of the

APA, whether Barclays complied with that provision, and whether LBHI suffered damages from

any alleged breach of contract.  Those issues (while similar in some respects to the "comp" issue

in the Rule 60(b) trial) were not presented for resolution in the Rule 60(b) trial.

69.    Second, the law is very clear that even when a court resolves a factual dispute

between two parties in one proceeding, if that resolution does not satisfy the requirements for

collateral estoppel, then the issue must be relitigated in any subsequent proceeding between the

two parties.  This is illustrated quite clearly in the Restatement of Judgments, as follows:

> A, as owner of a trademark, brings an action against B for infringement.
> B denies the validity of the trademark and denies infringement.  The court
> finds that the trademark is valid, but that B had not infringed it, and gives
> judgment for B.  Thereafter A brings an action against B alleging that
> since the rendition of the judgment B infringed the trademark.  B is not
> precluded from defending this action on the ground that the trademark is
> invalid.

Restatement (Second) of Judgments, § 27 illus. 14; *see also id*. cmt. h, illus. 13.[21]

70.    Similarly, it is black-letter law that collateral estoppel does not apply to adverse

findings that a prevailing party cannot challenge on appeal.  *See Gelb v. Royal Globe Ins. Co.*,

798 F.2d 38, 44 (2d Cir. 1986) ("a winning party may not appeal issues determined adversely to

---

[21] *See also Colditz v. E. Airlines, Inc.*, 329 F. Supp. 691, 695 (S.D.N.Y. 1971) ("'A judgment does not operate as an estoppel in a subsequent action between the parties as to immaterial or unessential facts, even though put in issue by the pleadings and directly decided. It is final only as to such facts as are litigated and decided, which have such a relation to the issue that their determination was necessary to the determination of that issue'") (quoting *Rudd v. Cornell*, 171 N.Y. 114, 128 (1902)).

it by the trial court and, as a consequence, is not barred from relitigating such issues"); *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) ("If review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of collateral estoppel is inapplicable on its own terms") (quoting Restatement (Second) of Judgments § 28(1) cmt. a).  As Barclays obtained a judgment on LBHI's Rule 60(b) motion in its favor, it has no ability to appeal adverse findings (if any) contained within the Rule 60(b) portion of the Opinion. Therefore, such findings cannot form the basis of collateral estoppel against Barclays.

71.    Thus, even if the Court had expressly ruled that Barclays failed to fulfill its contractual obligations under section 9.1(c) of the APA, any such ruling would not have been necessary to the final judgment denying the Rule 60(b) motions and would not have been appealable by Barclays, and therefore would not preclude Barclays, in this breach of contract action, from demonstrating that it did, in fact, fulfill its obligations under section 9.1(c).  In sum, the law simply does not permit the Court to use any statements or findings from its decision denying the Rule 60(b) motions as a basis for granting LBHI's motion for summary judgment.

3.    <u>The parties did not agree that the stayed claims "would be resolved" through motions "informed by or based on" the Court's resolution of the Rule 60(b) motions.</u>

72.    Perhaps recognizing that its collateral estoppel argument is meritless, LBHI asserts that Barclays knew "full well that LBHI's breach of contract claim (Count II) was to be decided in a later proceeding before this Court, as 'informed' by the results of the Rule 60(b) hearings."  LBHI Br. at ¶ 53.  LBHI supports this assertion by citing to the Adversary Complaint Stipulation, which stayed certain claims in the Adversary Complaints (including LBHI's Count II), and which LBHI inaccurately describes as including "*the agreement that the parties would then seek resolution* of these [stayed] claims 'through motions informed by or based on the Court's . . . resolution of the Rule 60 motions.'"  LBHI Br. at p. 1.

73.    LBHI's assertions are false.  First, the Adversary Complaint Stipulation expressly provides that the stayed claims, including Count II of LBHI's Complaint, "*shall not be resolved through the resolution of the Rule 60 Motions*."  Jan. 13, 2010 Stipulation at ¶ 3 (Hume Decl. Ex. 26).  It then provided that the stay of those claims was "*without prejudice* to any party's ability to seek resolution of those [stayed] claims through motions informed by or based on the Court's prior resolution of the Rule 60 Motions." *Id.* at ¶ 4.  This "without prejudice" clause was *not* (as LBHI inaccurately asserts) an "*agreement that the parties would*" seek resolution of all the stayed claims "through motions informed by or based on" the Court Rule 60(b) decision, and certainly was not an agreement that the claims would be resolved in this way; rather, it was simply an acknowledgement that the stipulated stay of certain claims was "without prejudice" to any party seeking this result.  As it turns out, the Movants have acknowledged that most of their claims have to be dismissed because they are collaterally estopped by the Court's denial of the Rule 60(b) motions (or, in some instances, because they are moot).  But that does not mean that *every* stayed claim was to be resolved "based upon or informed by" the Court's Rule 60(b) decision.  Contrary to LBHI's insinuation, there is nothing in the Adversary Complaint Stipulation that allows LBHI to by-pass the legal requirements of collateral estoppel.  As explained above, those requirements show that the doctrine of collateral estoppel does *not* apply, and therefore LBHI's motion for summary judgment must be denied.[22]

---

[22]  Given that the parties stipulated that Count II of LBHI's Complaint was stayed and "shall not be resolved through the resolution of the Rule 60 Motions," the Court must reject any suggestion by LBHI that Barclays had notice that the Rule 60(b) trial would be the one and only opportunity for a trial on the stayed Count II.  The law requires "clear and unambiguous notice" that an evidentiary hearing will be a party's "final day in court," and such notice obviously cannot be given when the parties stipulate that a particular claim is stayed and "*shall not*" be resolved through an upcoming trial on other claims. *See generally John v. State of Louisiana*, 757 F.2d 698, 704 (5th Cir. 1985); *Commodity Futures Trading Comm'n v. Bd. of Trade*, 657 F.2d 124, 127 (7th Cir. 1981); *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1187 (10th Cir. 1975); *Update Art, Inc. v. Charnin*, 110 F.R.D. 26, 36 (S.D.N.Y. 1986); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (parties should receive "clear and unambiguous notice" that

**B.**    **Both The Plain Terms Of The APA And The Extrinsic Evidence Demonstrate That LBHI's Motion Must Be Denied.**

74.    LBHI's summary judgment motion is based solely on its collateral estoppel argument; thus, the motion should be denied based solely upon the inescapable fact that collateral estoppel does not apply, as shown above.  But even if LBHI were now to argue that it is entitled to summary judgment on some basis other than its flawed collateral estoppel argument, the plain terms of the APA and the relevant evidence both demonstrate that LBHI is not entitled to summary judgment.

1.    The plain terms of the APA do *not* require Barclays to pay $2 billion in bonuses.

75.    The plain text of the APA does *not* require Barclays to spend $2 billion on bonuses.  In particular, the plain text of section 9.1(c) does not contain the number $2 billion.  If the parties had intended for section 9.1(c) to impose an obligation to pay $2 billion in bonuses, they would have said so plainly and unambiguously in section 9.1(c).  4/27/10 Tr. at 132:22-133:16, 168:15-169:24 (Berkenfeld) (Hume Decl. Ex. 40); Kohn Decl. at ¶ 11 (Hume Decl. Ex. 19).  Instead, section 9.1(c) provides that Barclays shall pay each Transferred Employee "an annual bonus ('08 Annual Bonuses'), in respect of the 2008 Fiscal Year that, *in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary)* and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the 'Accrued 08 FY Liability')."  BCI Ex. 1 at § 9.1(c) (Hume Decl. Ex. 1).

---

preliminary injunction hearing will be treated as trial on the merits);  *Woe v. Cuomo*,  801 F.2d 627, 629-30 (2d Cir. 1986) (remanding case "for the purpose of affording appellants a fair opportunity to present evidence at the trial in chief" because appellants had not been given "clear and unambiguous notice" that trial on the merits would be consolidated with hearing on motion for preliminary injunction); *Capital City Gas Co. v. Phillips Petroleum Co.*, 373 F.2d 128, 131 (2d Cir. 1967) (same).

76.     As shown above, there is no dispute that the "bonus pool amounts accrued" by
Lehman were less than $1.5 billion.  *See* Barclays Rule 56.1 Statement at ¶¶ 10, 39.  Likewise,
there is no dispute that Barclays paid bonuses to the Transferred Employees that were equal to at
least $1.5 billion (Barclays asserts it paid bonuses of over $1.8 billion, but even LBHI admits
that Barclays paid bonuses of "approximately $1.5 billion").  *Id.* at ¶ 11.   Thus, there is no
dispute that Barclays satisfied its obligation to pay bonuses in an amount that "in the aggregate,
are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts
payable for incentive compensation (but not base salary)."

77.     LBHI relies upon the phrase in section 9.1(c) "and reflected on the financial
schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of
Holdings and Purchaser."  BCI Ex. 1 at § 9.1(c) (Hume Decl. Ex. 1).  LBHI asserts that this is a
reference to the 9/16/08 Financial Schedule that was initialed by Steve Berkenfeld for Lehman
(but not by anyone from Barclays), and that because the schedule contains a $2 billion entry for
"Comp," that means Barclays was obligated to pay $2 billion solely in bonuses.  LBHI Br. at ¶¶
11-12.  This assertion must be rejected for at least two different reasons.

78.     First, the 9/16/08 Financial Schedule does not contain an entry for "bonuses," but
instead contains an entry only for "Comp."  BCI Ex. 106 (M. 2) (Hume Decl. Ex. 4).  The plain
meaning of the phrase "Comp" is necessarily broader than just bonuses.  Moreover, since there is
no separate entry for "bonus," "severance," or any other compensation-related liability Barclays
was assuming under the APA, the entry for "Comp" necessarily must include an estimate for all
of these "Comp" liabilities, and cannot be limited solely to bonuses.   Thus, the only reasonable
interpretation of the APA and the schedule is that Barclays was assuming an obligation to pay
bonuses in an amount equal to the accrued amount, and that this accrued amount was included

with the other compensation-related liabilities in the $2 billion in "Comp" as listed on the schedule.

79.    Second, if the Court were to accept LBHI's assertion that the "reflected on" language of section 9.1(c) imposes an obligation to pay $2 billion solely in bonuses, that would create an internal inconsistency in section 9.1(c): the Court would be interpreting the provision as requiring Barclays to pay bonuses "equal in amount to" (a) "100 percent of the bonus pool amounts accrued," which the parties do not dispute was *less than* $1.5 billion; and (b) the $2 billion listed for "Comp" on the Financial Schedule. As a matter of law, section 9.1(c) cannot be interpreted as imposing an obligation to pay bonuses "equal in an amount to" both $2 billion and an amount less than $1.5 billion. The law requires the Court to interpret a contract in a way that *avoids* any internal inconsistency or conflict, and that harmonizes any potentially conflicting provisions. *See generally Net2Globe Intern., Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 445 (S.D.N.Y. 2003) ("courts interpret a contract so as to give effect to all of its provisions and cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms inoperable, and creates a conflict where one need not exist.") (internal quotations omitted).[23] LBHI's interpretation of the "reflected on" language violates these established principles of contractual interpretation by creating an internal inconsistency in section 9.1(c), and by rendering meaningless and redundant the entire clause "100 percent of the bonus pool amounts accrued in respect of incentive compensation (and not base salary)."[24]

---

[23]    *See also James v. Jamie Towers Hous. Co., Inc.*, 743 N.Y.S.2d 85, 88 (N.Y. App. Div. 2002) ("where two seemingly conflicting contract provisions reasonably can be reconciled, we are required to do so and to give both effect") (internal quotations and citation omitted); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 556 (N.Y. App. Div. 1996) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms") (internal quotation and citation omitted).

[24]    *See generally Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (ellipses in original); *Goodheart Clothing Co*, 962 F.2d at

80.    By contrast, the Barclays interpretation of section 9.1(c) harmonizes the "amounts accrued" clause and the "reflected on" clause.  The "amounts accrued" clause refers to an amount less than $1.5 billion, and the "and reflected on" clause refers to that same amount as being included in, and consistent with, the $2 billion entry for all "Comp" liabilities Barclays was assuming under the APA.  This interpretation creates no inconsistency, and renders no language meaningless or redundant.

81.    Finally, even if the Court does not agree that the Barclays interpretation is the *only* reasonable interpretation of section 9.1(c) (as argued above), it should at a minimum hold that it is *a* reasonable interpretation, which would mean that there is an ambiguity in the contract that must be resolved by reference to extrinsic evidence.[25]  As shown below, the extrinsic evidence overwhelmingly confirms the Barclays interpretation.

2.    <u>The extrinsic evidence shows that the $2 billion entry on the 9/16/08 Financial Schedule was an estimate of all Barclays' compensation obligations under the APA, not just the bonus obligation.</u>

82.    The extrinsic evidence confirms the Barclays interpretation of section 9.1(c) by proving beyond any genuine dispute that *both Barclays and Lehman* intended for the $2 billion entry on the 9/16/08 Financial Schedule to be (a) an *estimate* that (b) reflected all of Barclays' compensation obligations under the APA, not just bonuses.  This evidence proves that the parties

272-73 (2d Cir. 1992) (noting that a "court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms"); *Isaacs v. Westchester Wood Works, Inc.*, 718 N.Y.S.2d 338 (App. Div. 2000) ("conflicting contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without force and effect."); Restatement (Second) of Contracts § 203(a) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

[25]  *See generally JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396-97 (2d Cir. 2009) ("ambiguous language is language that is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business") (internal quotation omitted); *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 299 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1998) ("Contract language is ambiguous if it is reasonably susceptible of more than one interpretation").

did not intend for the $2 billion number to be the guaranteed amount that Barclays was contractually obligated to pay solely in bonuses.

83.    First, at the Sale Hearing, in proffering the testimony of Lehman negotiator Bart McDade, Lehman's lead lawyer Harvey Miller described this $2 billion amount as reflecting an "estimate" of the "exposure" Barclays faced for the Lehman employees, not as a fixed contractual obligation that applied solely to bonuses:  "Barclays will also assume *exposure* for the employees that accept offers of employment, which is *estimated* to have a value of approximately — an *exposure* of *approximately* two billion dollars."  BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (emphasis added) (Hume Decl. Ex. 3).  If Mr. Miller's law firm and client had negotiated a contract that *required* Barclays to pay exactly $2 billion *just in bonuses*, with additional amounts to be paid as severance for any Transferred Employees that were terminated, then he obviously would not have described the $2 billion amount as an "estimated" amount of "exposure."

84.    Consistent with Harvey Miller's statements at the Sale Hearing, in denying the Rule 60(b) motions, this Court expressly found that the $2 billion compensation number, along with the "cure" estimate, were "good faith estimates and not guarantees or representations that these were firm numbers," and were "uncertain and contingent."  Opinion at 55-56 (Hume Decl. Ex. 31).  That finding alone, and the indisputable evidence on which it is based, requires the LBHI motion — premised as it is on the contrary contention that $2 billion was a firm number — to be denied.[26]

---

[26]    *See generally Dienes Corp. v. Long Island R.R. Co.*, No. 01-CV-4272, 2002 WL 603043, at *3 (E.D.N.Y. Mar. 19, 2002) ("Providing an estimate does not transform a requirements contract into a fixed quantity contract"); *see also Brawley v. United States*, 96 U.S. 168 (1877); *Canusa Corp. v. A & R Lobosco, Inc.*, 986 F. Supp. 723, 730 (E.D.N.Y. 1997).

85.     Second, in their testimony during the Rule 60(b) trial, both Mr. Miller and Mr.

McDade confirmed that the $2 billion amount was not limited to bonuses.  Mr. McDade testified

that "Barclays also assumed a two billion compensation liability with respect to *the combination*

*of the employees' bonus process and the severance process*."  4/26/10 Tr. at 161:1-10 (McDade)

(emphasis added) (Hume Decl. Ex. 39).  His testimony directly refutes the LBHI assertion that

the $2 billion amount referred solely to bonuses, and did not include the severance liability.  Mr.

Miller likewise confirmed this in unambiguous testimony:

> In connection with the compensation, that also was an estimate as to the
> possible exposure for Lehman employees going over to Barclays *who*
> *would either be terminated or were entitled to bonuses*.  So it was
> supposed to cover *both severance pay and bonuses*.  And as I said before,
> it was an estimate.

4/28/10 Tr. at 32:20-5 (Miller) (emphasis added) (Hume Decl. Ex. 41).

86.     As shown above in the Counter-Statement of Facts, and in the Barclays Rule 56.1

statement, numerous other witnesses also confirmed that the $2 billion entry for "Comp" on the

9/16/08 Financial Schedule was (a) an *estimate*, and (b) was intended to include both bonus and

severance amounts, and was not limited to bonuses.  *See* Barclays' Rule 56.1 Statement at ¶¶ 17-

23.

87.     In the face of this overwhelming evidence, the Court cannot grant summary

judgment for LBHI.  It either must hold that there is no genuine basis for disputing the fact that

the $2 billion entry was intended as an estimate for all compensation obligations under the APA

(and hence grant summary judgment for Barclays), or else must hold that a trial is required to

hear any evidence that LBHI can present to demonstrate that the parties intended for the $2

billion amount to refer solely to bonuses (if, indeed, LBHI is able to point to the existence of any

such evidence).  *See* Fed. R. Civ. P. 56(a).

3. <u>Barclays would present additional evidence confirming that the parties never intended section 9.1(c) of the APA to impose an obligation to pay $2 billion solely in bonuses.</u>

88.     If the Court concludes that the evidence recited above is somehow not sufficient to establish beyond all genuine dispute that the parties never intended for the $2 billion number to refer solely to the bonus obligation (and otherwise denies Barclays' arguments for summary judgment), Barclays is entitled to present additional evidence confirming this fact.  First, Barclays would present additional testimony from the negotiators to confirm what they have already stated, and to remove any ambiguity the Court may believe exists in terms of what was intended by section 9.1(c).  Second, Barclays would present testimony from its outside counsel at Cleary Gottlieb who was involved in the drafting of section 9.1(c), and who would confirm that the provision was never intended to impose a $2 billion bonus obligation onto Barclays.  *See* Kohn Decl. at ¶¶ 4-11 (Hume Decl. Ex. 19).  Third, Barclays would present expert testimony from a compensation expert, who would testify that any professional in the field of employee relations or compensation would read section 9.1(c) as referring to the Lehman bonus accrual, and would understand the entry of "Comp" on the 9/16/08 Financial Schedule as including more than just bonuses.  Johnson Decl. at ¶¶ 5-7 (and attached Expert Report at pp. 4, 12) (Hume Decl. Ex. 20).

89.     While Barclays believes the Court should grant it summary judgment because there is no genuine basis for disputing the facts on which Barclays relies, if the Court disagrees with that, then Barclays is entitled to a trial at which it would present evidence demonstrating the correctness of its interpretation of section 9.1(c).

4.      There are genuinely disputed facts regarding the amount Barclays spent on 2008 bonuses for the Transferred Employees.

90.      Even if this Court rejected all of Barclays' arguments regarding the interpretation of the APA and the extrinsic evidence that confirms that interpretation, it still could not accept LBHI's assertions regarding the amount that Barclays actually spent in bonuses.  First, LBHI improperly excludes from its bonus calculation over $170 million that was shown by the unrebutted testimony of Paul Exall to have been paid out as 2008 bonus payments to Transferred Employees.  *See* Exall Decl. at ¶ 6 (Hume Decl. Ex. 16).  There is literally *no evidence* to rebut that testimony, and therefore there is no basis for finding that Barclays paid anything less than $1.674 billion in 2008 bonus payments to the Transferred Employees — not the "approximately $1.5 billion" amount asserted by LBHI in its motion.

91.      Second, Barclays is entitled to present additional evidence that was not presented in the Rule 60(b) trial, and that is relevant to rebutting the allegations made in Count II of LBHI's Complaint.  That evidence would show that approximately $137 million of the amount paid to the Transferred Employees who were terminated should be characterized as "bonus" for purposes of determining how much Barclays spent in fulfilling its obligations under section 9.1(c).  Exall Decl. at ¶ 4 (Hume Decl. Ex. 16); Kurman Decl. at ¶ 9 (Hume Decl. Ex. 18).  Barclays acknowledges that it has previously categorized this $137 million amount as included in a total of $265 million paid out as "severance," for the simple reason that these were the total payments made to terminated Transferred Employees, and in that sense can be characterized as severance.  However, the $137 million in payments were paid in addition to the amounts required under the Lehman severance plans, and hence were amounts paid over and above the amount required by section 9.1(b) of the APA; in addition, the Transferred Employees who received these payments received no other bonus payment under section 9.1(c) of the APA — in

42

other words, the only "bonus" paid to the terminated Transferred Employees were the payments

that comprised the $137 million amount.  Exall Decl. at  ¶ 4 (Hume Decl. Ex. 16).  For purposes

of showing in the Rule 60(b) trial that the $2 billion estimate for Barclays' compensation

liabilities (which included both bonus and severance) was reasonable, it did not matter how this

$137 million was characterized.  However, if the Court believes that to resolve Count II of

LBHI's Complaint it is necessary to determine the precise amount paid by Barclays pursuant to

section 9.1(c) of the APA, then these "enhanced payment" amounts should be treated as section

9.1(c) bonus payments, not as section 9.1(b) severance payments.  *See generally* Kurman Decl.

at ¶¶ 5-9 (Hume Decl. Ex. 18).

**C.    The Court Should Deny LBHI's Motion For The Independent Reason That LBHI Has Not Established, And Cannot Establish, That It Suffered Any Damages As A Result Of Barclays' Alleged Contractual Breach.**

92.    Under New York law, a plaintiff suing for breach of contract must establish

damages as an element of its claim.  *See, e.g.*, *Calbria v. Associated Hosp. Serv.*, 459 F. Supp.

946 (S.D.N.Y. 1978); *Fowler v. American Lawyer Media, Inc.*, 761 N.Y.S.2d 176 (N.Y. App.

Div. 2003).   In addition, since LBHI seeks summary judgment awarding it $500 million in

damages, it bears the burden of demonstrating that it suffered $500 million in damages.  *See*

*generally Ullman-Briggs, Inc. v. Salton, Inc.*, 754 F. Supp. 1003, 1008 (S.D.N.Y. 1991) ("It is

well-settled that a plaintiff in a contract action must demonstrate both that his damages were

caused by the alleged breach and that the alleged loss is capable of proof with reasonable

certainty."); *Eichler v. Town of Cortlandt*, 833 N.Y.S.2d 216, 217 (N.Y. App. Div. 2007)

(denying summary judgment in breach of contract action where "plaintiff failed to carry his

burden" of "proving that the defendant's alleged breach ... caused any damage to the plaintiff").

93.    LBHI cannot satisfy its legal burden to demonstrate any damages, let alone $500

million worth of damages.  Thus, even if the Court accepted LBHI's assertion that Barclays

failed to fulfill its contractual obligations under section 9.1(c) of the APA, it should nonetheless

deny LBHI's motion (and grant summary judgment to Barclays) because LBHI has failed to

present any evidence that it has been damaged by the alleged breach.

     1.    <u>LBHI misrepresents the law in an effort to avoid having to establish
damages.</u>

94.    LBHI falsely asserts that "Where, as here, a contract requires payment to another

in lieu of a direct payment to the promisee, the promisee can recover the underpayment for itself

in the event of a breach." LBHI Br. at ¶ 48.  That is false.[27]  It is well-established that a promisee

*cannot* recover damages allegedly suffered by a third party to whom the promisor is supposed to

have provided a benefit under the contract. *See* Restatement (Second) of Contracts § 307 cmt. b

("The promisee cannot recover damages suffered by the beneficiary"); *Aquavella v. Harvey*, 330

N.Y.S.2d 560, 564 (N.Y. Sup. Ct. 1972) (noting that plaintiff "could suffer no monetary damage

by reason of [defendant's] default, since he was not personally obligated for the debts" that were

to be paid; thus, "plaintiff may not recover a money judgment because he himself has not

suffered money damages").

95.    LBHI misleadingly cites a number of cases that, it suggests, provide support for

its assertion that where "a contract requires payment to another in lieu of a direct payment to the

promisee, the promisee can recover the underpayment for itself in the event of a breach."  LBHI

Br. at ¶ 48.  *None of those cases support that assertion.*  Indeed, LBHI does not cite a single case

holding that a contractual *promisee* was entitled to recover sums that the contractual promisor

was allegedly obligated to pay to a *third party*.  Instead, the cases cited by LBHI hold only that

the promisee may sue for a declaratory judgment that the defendant owes the money *to the third*

---

[27] As a threshold matter, there is nothing in the APA providing that Barclays must pay the Transferred
Employees bonuses "in lieu of a direct payment" to Lehman.

*party* (not to the promisee), or for an order of specific performance directing the defendant to pay the contractual amount, again *to the third party* (not to the promisee). *See Control Data Sys., Inc. v. Computer Power Grp., Ltd.*, No. 94 Civ. 5396 (JSM), 1998 WL 178775, at \*3 (S.D.N.Y. Apr. 15, 1998) (ordering payment to the beneficiary, not to the promisee); *In re Chateaugay Corp.*, 154 B.R. 843, 846 (Bankr. S.D.N.Y. 1993) (declaratory judgment); *Croker v. New York Trust Co.*, 245 N.Y. 17, 20 (1927) (specific performance). Here, LBHI has not sought such declaratory relief or specific performance, so these cases are inapposite.

96.     LBHI also cites *Eden v. Miller*, 37 F.2d 8 (2d Cir. 1930), *Banker's Trust Co. of W. N.Y. v. Steenburn*, 409 N.Y.S.2d 51, 65-66 (N.Y. Sup. Ct. 1978), and *Buschmann v. Prof'l Men's Ass'n*, 405 F.2d 659, 662-63 (7th Cir. 1969). These cases concern whether a shareholder may sue individually rather than derivatively when the defendant breaches an obligation to the promisee to provide financing to the corporation. For example, in *Eden*, it was alleged that the plaintiffs and defendants agreed to organize a corporation and defendant promised that he would contribute $60,000 in working capital to the new company. The Second Circuit held that the plaintiffs had a cause of action, for "their, *not the corporation's*, damages," and thus the plaintiffs did *not* have a claim for the allegedly unpaid $60,000, but instead could claim only "*such damage as they can prove*" as a result of their "taking employment, and making an investment in [the new corporation], in reliance upon the now broken promise of the defendant." 37 F.2d at 9 (emphasis added).

97.     As shown below, LBHI cannot demonstrate that it has suffered any economic harm as a result of Barclays' alleged failure to pay Transferred Employees $2 billion in bonuses.

 2. <u>LBHI has not presented facts demonstrating that it has suffered any</u>
<u>damages as result of Barclays' alleged breach.</u>

98. "Under New York law, damages for breach of contract should put the plaintiff in

the same economic position he would have occupied had the breaching party performed the

contract." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003). Here, even

if LBHI's alleged claim of breach had merit, LBHI would still be in the same economic position.

If it were true that Barclays owed the Transferred Employees $2 billion in 2008 bonuses but had

failed to pay that amount, then it would be the Transferred Employees, not LBHI, who would

have suffered economic harm as a result of the alleged breach. To rectify that, LBHI could in

theory seek specific performance or a declaratory judgment. But it has not done so. Instead, it is

trying to recover *for itself* the $500 million in allegedly unpaid bonuses that it claims should have

been paid out to the Transferred Employees. It has no right to any such recovery.

99. LBHI has made virtually no effort to demonstrate that it has suffered any

economic harm as a result of Barclays' alleged breach. It does not assert, and cannot assert, that

it faces legal liability in the form of claims for 2008 bonuses by the Transferred Employees. It

knows that those employees have been fully paid their 2008 bonuses, and further knows that

most of those employees never had a *legal* right to a 2008 bonus. Rather, most of the

Transferred Employees were simply eligible to receive a discretionary bonus for 2008, and LBHI

wanted to ensure that they would receive such a bonus in an amount that, in the aggregate, was

consistent with the Lehman accrual for what would have been paid had Lehman not gone into

bankruptcy. *See* Kohn Decl. at ¶¶ 5-7 (Hume Decl. Ex. 19). That is exactly what the

Transferred Employees received, in complete fulfillment of the intent behind section 9.1(c) of

the APA.

100.    LBHI's sole attempt to suggest that it suffered damages can be found in its fact statement, where it asserts that "to the extent Barclays did not pay the entire amount of the bonus or cure liabilities, Barclays should have paid more cash consideration to Lehman."  LBHI Br. at ¶ 16.  The only support LBHI offers for this assertion is deposition testimony from Bart McDade, whose testimony related to a series of questions about his understanding of the relationship between the "accrued liabilities" for "comp and cure" and the value of the assets being delivered to Barclays.  *See* McDade Dep. Tr. at 140:18-147:4 (Hume Decl. Ex. 36).

101.    For numerous reasons, Mr. McDade's testimony falls far short of supporting a finding that LBHI has suffered $500 million in damages as a result of Barclays' alleged breach of section 9.1(c) of the APA.  First, Mr. McDade never testified that Lehman would have demanded more consideration from Barclays if it had known at the time of the Sale that the total amount Barclays would actually end up spending on bonuses, severance, and related tax payments was equal to $1.951 billion (*i.e.*, approximately $2 billion).  To the contrary, Mr. McDade testified that the $2 billion "comp" number included both bonus and severance, and therefore his testimony (like that of all other witnesses) confirms that if it had been possible to know at the time of the Sale how much Barclays would spend on these compensation liabilities, it would have been entirely consistent with the estimates made during the week of the Sale, and would not have caused Lehman to demand any additional consideration.[28]

102.    Second, regardless of what Lehman may or may not claim it would have demanded, there is zero support for the proposition that *Barclays* would, under any circumstances, have agreed to provide more consideration.  In particular, there is absolutely no

---

[28]  4/26/10 Tr. at 161:1-10 (McDade) (Hume Decl. Ex. 39); 4/28/10 Tr. at 32:20-5 (Miller) (Hume Decl. Ex. 41); 8/23/10 Tr. at 120:12-24 (Shapiro) (Hume Decl. Ex. 47); 4/27/10 Tr. at 27:18-23 (McDade) (Hume Decl. Ex. 40) (testifying that there was no representation or warranty in the contract that the deal would be balanced); *see also* BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (Hume Decl. Ex. 3).

factual basis for asserting that if it had been possible to know the precise amount that Barclays would end up having to pay to satisfy its compensation liabilities under the APA, then somehow Barclays would have agreed to pay $500 million in additional cash consideration to Lehman.  To the contrary, the fact that Barclays has paid approximately $2 billion in bonus, severance, and related tax payments is consistent with the estimates made during the week of the Sale, and is *inconsistent* with the notion that Barclays would have agreed to pay any additional consideration (let alone $500 million worth).

103.    Third, the McDade testimony on which LBHI relies is the same line of testimony that LBHI invoked in asserting that the Sale was supposed to be a "wash."[29]  This Court has already properly rejected that assertion in the course of denying the Rule 60(b) motions.  Opinion at 19-20, 56 (Hume Decl. Ex. 31).  Given the extremely uncertain values of the assets and liabilities included in the Sale, it was never agreed that Barclays would increase its cash consideration if one of the accrued liabilities ended up being lower than originally estimated.  Barclays took the risk that the assets it was acquiring would be worth less than estimated (and would be impossible to sell given their illiquid nature), and that the liabilities it was agreeing to assume might be greater than estimated.  Barclays never agreed to a deal in which it would owe more in consideration if *one* of the liabilities turned out to be less than estimated.

104.    Finally, as shown above, the "Consideration" Barclays was paying under the APA included the severance payments just as much as it did the bonus payments.  The fact that Barclays paid approximately $2 billion in "Comp" consideration through a combination of bonus and severance payments, rather than solely through bonus payments, obviously does not damage LBHI:  it makes absolutely no economic difference to LBHI whether the money paid to the

---

[29]  *See generally* LBHI Rule 60(b) Br. at ¶ 36 (arguing "wash" based on McDade Dep. Tr. 107:3-11, 185:20-186:5, 216:23-217:23) (Hume Decl. Ex. 36).

Transferred Employees was characterized by Barclays (for its own accounting purposes) as "bonus" or as "severance."  Even if the Court accepts LBHI's unfounded assertion that the $2 billion was supposed to be all paid in bonus, there was no guarantee that Barclays would pay *anything* in severance.  Thus, LBHI never had a right to expect (and has never claimed) that the consideration Barclays was obligated to pay under Article IX was in excess of $2 billion.  As Harvey Miller testified, no one knew how many Transferred Employees Barclays would keep and how many it would terminate, and therefore no one could know what if any severance liability Barclays would have.  Miller Dep. Tr. at 81:5-14 (Hume Decl. Ex. 32).  If Barclays had terminated zero Transferred Employees, triggering zero severance liability, and had used all of the money it spent in severance to increase the aggregate amount paid in bonuses, that would not have had any economic impact on LBHI; yet, under LBHI's theory of the case, it would substantially reduce its damages claim.  It makes no sense for LBHI's damages claim to depend on whether Barclays used money to pay Transferred Employees "severance" or "bonuses."  LBHI simply cannot claim to have suffered damages just because Barclays ended up paying $2 billion to Transferred Employees in the form of bonus *and* severance, instead of just in bonus, as LBHI claims should have been the case.

3.    It was LBI, not LBHI, that was responsible for the vast majority of bonuses paid to the Transferred Employees.

105.    LBHI also ignores the fact that, prior to the Sale, it was not even the entity responsible for paying bonuses to most of the Transferred Employees.  The Transferred Employees consisted of "each active employee employed primarily in connection with the Business at the Closing" and who accepted an offer of employment at Barclays.  BCI Ex. 1 at § 9.1(a) (Hume Decl. Ex. 1).  The "Business," as defined in the APA, was essentially the North American broker-dealer and investment banking business, which was operated by LBI.  That is

why the vast majority of the 2007 bonuses paid to the Transferred Employees were paid by LBI,

not LBHI.  Angley Decl. at ¶ 4 (Hume Decl. Ex. 17).  Moreover, as stated above, since the vast

majority of these bonuses were paid on a purely discretionary basis, neither LBI nor LBHI had

any contractual obligation to make such payments.  Thus, even if it were to try to do so, LBHI

has neither standing nor any factual basis to claim that it is exposed to liability as a result of

Barclays' alleged failure to pay the full amount of bonuses.

## II.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR BARCLAYS AND DISMISS COUNT II WITH PREJUDICE.

106.    As shown above, there is no merit to Count II of LBHI's Complaint, and LBHI's

motion for summary judgment must be denied.  In addition, because the facts demonstrating the

meritless nature of Count II are not genuinely disputable, the Court should grant summary

judgment for Barclays by dismissing Count II.  In support of its summary judgment motion,

Barclays relies upon all of its arguments set forth above, and in particular on the absence of any

genuine dispute over the following points — each one of which forms an independent basis for

dismissing Count II.

### A.    As A Matter Of Law, Section 9.1(c) Did Not Impose An Obligation On Barclays To Pay $2 Billion Solely In Bonuses.

107.    The only reasonable interpretation of section 9.1(c) is that it obligates Barclays to

pay bonuses to the Transferred Employees in an aggregate amount equal to the amount

"accrued" by Lehman for bonuses, and that this aggregate amount is reflected within the $2

billion estimate for all "Comp" liabilities that Barclays assumed under the APA.  Any other

interpretation is unreasonable and illogical, for the following reasons:

- If the parties intended there to be a $2 billion bonus liability irrespective of the Lehman accrual, they would simply have provided for that in section 9.1(c), without reference to the amount "*accrued in respect of amounts payable for*

50

*incentive compensation.*"  That phrase is rendered meaningless if LBHI's interpretation is accepted.[30]

- The amount "reflected on" the 9/16/08 Financial Schedule is phrased as "Comp," and the plain meaning of "Comp" is broader than just "bonus."[31]

- If the $2 billion estimate for "Comp" on the 9/16/08 Financial Schedule had been intended to relate solely to "bonuses," there necessarily would have been a separate listing in the "Liabilities" column for severance and payroll tax obligations, which Barclays was also assuming.  These liabilities cannot be found anywhere other than under the entry for "Comp."[32]

108.    Thus, the only logical interpretation of the APA and the 9/16/08 Financial Schedule is that the bonus obligation was equal to the Lehman accrual, and was merely a component of, and hence necessarily less than, the $2 billion estimate.  As a matter of law, the Court should reject LBHI's contrary interpretation as unreasonable and illogical.  *See Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 100 (2d Cir. 1997) (if possible, contract should be read to create a "harmonious whole"); *Galli*, 973 F.2d at 149  (courts must consider the entire contract and choose the interpretation "which best accords with the sense of the remainder of the contract") (quoting *Rentways Inc. v. O'Neill Milk & Cream Co.,* 308 N.Y. 342, 347 (1955));

---

[30]  *See generally Goodheart Clothing Co.*, 962 F.2d at 272-73 ("a court should interpret a contract in a way that ascribes meaning, if possible, to all of its terms"); *Galli*, 973 F.2d at 149 ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.") (ellipses in original); Restatement (Second) of Contracts § 203(a) ("An interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.").

[31]  *See Straus-Duparquet, Inc. v. Local Union No. 3 IBEW*, 386 F. 2d 649, 651 (2d Cir. 1967) ("Severance pay is 'a form of compensation'") (quoting *Adams v. Jersey Cent. Power & Light Co.*, 120 A.2d 737, 747 (N.J. 1956).

[32]  In other words, to the extent the Court holds that the 9/16/08 Financial Schedule is being referenced in section 9.1(c), it must interpret the schedule according to its plain meaning.  *See generally JA Apparel Corp.*, 568 F.3d at 405 ("each term is to be assigned its fair and reasonable meaning"); *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (words and phrases of a contract are interpreted in accordance with their plain meaning).

*Reape v. New York News, Inc.*, 504 N.Y.S.2d 469, 470 (N.Y. App. Div. 1986) (courts should reject any interpretation that "would lead to an absurd result").[33]

### B.   There Is No Genuine Dispute That The $2 Billion Entry On The 9/16/08 Financial Schedule Was An Estimate, Not A Guarantee Or Representation.

109.   This Court has already found that the $2 billion number for the "Comp" liabilities Barclays was assuming was a good faith estimate that was "uncertain" and "contingent," and was *not* a guarantee or representation.  Opinion at 55-56 (Hume Decl. Ex. 31).  One need look no further than Harvey Miller's proffer of Bart McDade's testimony at the Sale Hearing to demonstrate that this fact is beyond genuine dispute:  the $2 billion was described as an approximate number that was an "estimate" of Barclays' "exposure."  BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller) (Hume Decl. Ex. 3).[34]  Barclays obviously cannot be held to be in breach of an obligation to pay an amount that was only an estimate of exposure, *not* a guarantee.  Thus, the

---

[33]  As shown above, this interpretation is also the only one that is consistent with the overwhelming weight of the testimony from both the Barclays and Lehman negotiators, including Bart McDade and Harvey Miller — all of whom testified that the $2 billion estimate was intended to include both bonus and severance.  4/26/10 Tr. at 161:1-10 (McDade) (Hume Decl. Ex. 39); 4/28/10 Tr. at 32:3-5, 32:20-5, 80:7-16 (Miller) (Hume Decl. Ex. 41); *see*  8/23/10 Tr. at 120:12-24 (Shapiro) (Hume Decl. Ex. 47).  The only witness LBHI can identify whose testimony can be read to support the assertion that the $2 billion entry for "Comp" applied solely to bonuses was Alvin Brown, one of LBHI's lawyers at Simpson Thacher.  LBHI Br. at ¶¶ 21-22.  But the fact that one of LBHI's lawyers disagrees with the testimony of his client (Bart McDade) and his client's lead lawyer (Harvey Miller) is not a basis for finding a genuine dispute, or for adopting an irrational interpretation of the contract.  Mr. Brown did not negotiate the terms of the Sale, and was not involved in calculating the $2 billion number.  Brown Dep. Tr. at 9:21-11:6 (Hume Decl. Ex. 38); *id.* at 21:6-11.  Moreover, Mr. Brown's deposition testimony is inadmissible hearsay, and irrelevant because it is, at most, unexpressed subjective intent from a source Mr. Brown could not even identify.

[34]  Bart McDade's testimony about Barclays having a "full requirement" to pay the $2 billion is not to the contrary.  McDade also testified that the $2 billion amount was not necessarily the same as what Barclays would "actually end up" having to pay.  4/27/10 Tr. at 48:7-15 (McDade) (Hume Decl. Ex. 40).  The only way to harmonize his testimony is to recognize that his statements about Barclays having a "full requirement" were simply confirming that Barclays was obligated to make both bonus payments and severance payments to all terminated employees, and had no discretion to avoid those payments (as it did, for example, with respect to the cure payments).  Nevertheless, as Harvey Miller told the Court, the precise amount of those obligations could only be estimated at "approximately" $2 billion.

Court's finding that the $2 billion number was only a good faith estimate is an independent reason summary judgment should be granted for Barclays.

### C. There Is No Genuine Dispute That Barclays Paid Bonuses To Transferred Employees "Equal In An Amount To 100 Percent Of The Bonus Pool Amounts Accrued In Respect Of Amount Payable For Incentive Compensation."

110.    As shown above, LBHI has admitted that the Lehman accrual for bonus amounts to be paid to the Transferred Employees was less than $1.5 billion, even when annualized and grossed up to reflect the equity component of the bonus amounts.[35]  While there is a genuine dispute over the precise amount Barclays paid in bonuses, there is no dispute that Barclays paid at least $1.5 billion (as Barclays shows above, the correct number is over $1.8 billion).  *See* LBHI Br. at 4, 27-34.  Thus, Barclays paid bonuses that were at least equal to, if not significantly greater than, "100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary)."  BCI Ex. 1 at § 9.1(c) (Hume Decl. Ex. 1).  The Court should therefore grant summary judgment for Barclays.

### D. There Is No Genuine Dispute That LBHI Has Suffered No Damage As A Result Of Barclays' Alleged Breach.

111.    As shown above, LBHI has failed to present any evidence that could provide a plausible basis for finding that it has suffered any damages as a result of Barclays' alleged breach.  Thus, there is no genuine dispute over the fact that LBHI did not suffer any damage.  This is yet another, wholly independent basis for granting summary judgment to Barclays.

---

[35]  *See* BCI Ex. 862 at ¶ 3 (Hume Decl. Ex. 13); Barclays Rule 56.1 Statement at ¶ 10.

## CONCLUSION

For the foregoing reasons, the Court should deny the LBHI summary judgment motion,

and grant the Barclays' summary judgment motion by dismissing Count II of LBHI's Complaint.


Dated:          New York, New York
                As of June 22, 2011

                                    Respectfully submitted,

                                    BOIES, SCHILLER & FLEXNER LLP


                                    By:      /s/   Jonathan D. Schiller
                                          Jonathan D. Schiller
                                          Jack G. Stern
                                          575 Lexington Avenue
                                          New York, New York 10022
                                          Tel: (212) 446-2300
                                          Fax: (212) 446-2350
                                          Email: JSchiller@bsfllp.com
                                                  JStern@bsfllp.com

                                          Hamish P. M. Hume
                                          5301 Wisconsin Avenue, N.W.
                                          Washington, D.C. 20015
                                          Tel: (202) 237-2727
                                          Fax: (202) 237-6131
                                          Email: HHume@bsfllp.com

                                          *Attorneys for Barclays Capital Inc.*