**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL, INC.,<br><br>Defendant. | Adv. Proc. No. 09-01731 (JMP) |

**RESPONSE OF BARCLAYS CAPITAL INC. TO LBHI'S STATEMENT
OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT ON COUNT II OF ITS ADVERSARY
COMPLAINT AND STATEMENT OF ADDITIONAL MATERIAL
FACTS PRECLUDING LBHI'S MOTION FOR SUMMARY JUDGMENT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

Pursuant to Local Rule 56.1, made applicable to this proceeding by Local Rule of

Bankruptcy Rule 7056-1, Barclays Capital Inc. ("Barclays") hereby responds to LBHI'S

Statement Of Undisputed Material Facts In Support Of Its Motion For Summary Judgment On

Count II Of Its Adversary Complaint Pursuant To Local Bankruptcy Rule 7056-1.

1.      The Asset Purchase Agreement, dated September 16, 2008, among Barclays,
LBHI, LBI and LB 745 LLC (the "APA"), was a valid and enforceable contract.  (*See* M.1 at 1
(Hine Decl. Ex. 1))

**Response:** Barclays does not dispute that the final Purchase Agreement (defined herein

as defined in the Sale Order), including both the APA and the Clarification Letter, is a valid and

enforceable contract.  BCI Ex. 16 (H. Hume Decl. Ex. 2); *see* 2/22/11 Opinion at pp. 8, 27-28 (H.

Hume Decl. Ex. 31).[1]

2.      The APA was finalized and signed by all parties on September 16, 2008. (4/27/10
[Berkenfeld] 111:3-7 (Hine Decl. Ex. 6))

**Response:**  Barclays does not dispute the statement in paragraph 2.

3.      The APA was signed by Steven Berkenfeld on behalf of LBHI and LBI and by
Gerard LaRocca on behalf of Barclays. (M.1 at 43 (Hine Decl. Ex. 1); April 2010 Stipulations of
Fact (LBHI Docket No. 13825, Ex. 1) ¶¶ 10, 157-158 (Hine Decl. Ex. 19))

**Response:**  Barclays does not dispute the statement in paragraph 3.

---

[1] Citations herein are in the form used in Barclays' Post-Trial Memorandum of Law and Fact.  The documents
referred to herein are either contained within the record of the hearings on the Rule 60(b) motions, or are being
presented to the Court in conformity with Fed. R. Bankr. P. 7056 (applying Fed. R. Civ. P. 56 to adversary
proceedings).  For the Court's convenience, all documents referred to herein are attached as exhibits to the
Declaration of Hamish P.M. Hume In Support of Barclays' Memorandum in Opposition to LBHI's Motion and In
Support of Barclays' Motion for Summary Judgment on Count II of LBHI's Adversary Complaint dated June 22,
2011 ("Hume Decl.").

4.      The executed APA was submitted to the Court for approval. (M.118 [Sale
Motion] attaching APA (Hine Decl. Ex. 20); *see* 4/27/10 [Berkenfeld] 141:23-143: I (Hine Decl.
Ex. 6))

**Response:** Barclays does not dispute the statement in paragraph 4.


5.      After conducting hearings on September 17 and September 19, 2008 on the
proposed Sale Transaction, the Court on September 20, 2008 issued a Sale Order approving the
deal under the terms set forth in the APA. (Order Under 11 U.S.C. §§ 105(a), 363, and 365 and
Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the
Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and
Assignment of Executory Contracts and Unexpired Leases (LBHI Docket No. 258) at 12 (Hine
Decl. Ex. 21))

**Response:** Barclays does not dispute that the Court approved the Sale Transaction based

on the terms set forth in the Court's Sale Order.  BCI Ex. 16 (H. Hume Decl. Ex. 2).


6.      Upon the closing of the Sale Transaction, Lehman transferred billions of dollars
worth of assets, including valuable real estate, securities, accounts, cash, and other assets related
to its broker-dealer business, to Barclays. (*See* Opinion on Motions Seeking Modification of the
Sale Order Pursuant to Rule 60(B), the Trustee's Motion For Relief Under the SIPA Sale Order,
Barclays' Cross-Motion to Enforce the Sale Orders and Adjudication of Related Adversary
Proceedings, so ordered on February 22, 2011 [LBHI Docket No. 14612] (the "Opinion") at 41-
44 (Hine Decl. Ex. 4); *see also* M.1 at 6-8 (def'n of "Purchased Assets") (Hine Decl. Ex. 1))

**Response:** The statement in paragraph 6 is ambiguous in not specifying which Lehman

entity is intended by the reference to "Lehman," is vague in terms of the precise timing of the

asset transfers and the precise nature of the assets transferred, and is incomplete because it does

not refer to the $45 billion in cash advanced by Barclays or the other risks assumed by Barclays,

but Barclays does not otherwise dispute the statement..

7.    In the APA, Barclays is defined as the "Purchaser," and LBHI and LBI are defined as "Sellers." (*See id.* at 1)

**Response:**  Barclays does not dispute the statement in paragraph 7, except refers to the APA for the precise definitions of the terms used in the APA.  BCI Ex. 1 (H. Hume Decl. Ex. 1).

8.    The APA included several forms of consideration to be paid by Barclays, including its paying liabilities associated with bonuses and contract cures. (*Id.* at 14)

**Response:**  Barclays does not dispute that the APA provided that the definition of the "consideration" for the Purchased Assets included the Assumed Liabilities, which included liabilities to pay compensation expenses, including bonuses, as well any cure amounts owed on contracts Barclays chose to assume.  BCI Ex. 1 (H. Hume Decl. Ex. 1).

9.    Paragraph 3.1 of the APA stated: "The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser." (*Id.* at 14)

**Response:**  Barclays does not dispute the statement in paragraph 9.

10.    The Assumed Liabilities included Barclays' obligation to pay bonuses. Paragraph 2.3 of the APA (*Id.* at 11-12) described the Assumed Liabilities Barclays was to pay as part of the contract consideration, including "(c) all Liabilities assumed under Article IX," *i.e.*, the provisions concerning payments for Transferred Employees. (M.118 [Sale Motion] attaching APA, at 11 (Hine Decl. Ex. 20))

**Response:**  Barclays does not dispute the statement in paragraph 10, except refers to the APA for a complete statement of its provisions.  BCI Ex. 1 (H. Hume Decl. Ex. 1).

11.    Paragraph 9.1(c) of the APA addresses the bonuses portion of the consideration to be paid by Barclays. (M.1 at 35 (Hine Decl. Ex. 1))

**Response:**  Barclays does not dispute the statement in paragraph 11, except refers to the APA for a complete statement of its provisions.  BCI Ex. 1 (H. Hume Decl. Ex. 1).

12.    Paragraph 9.1(c) of the APA provided that:

On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability").

(*Id.* at 35)

**Response:** Barclays does not dispute the statement in paragraph 12.

13.    Paragraph 9.1(c) did not include severance payments. In its Opinion, the Court found that: "Paragraph 9.1(b) of the APA separately defines the obligation of Barclays to make severance payments to Transferred Employees who were later laid off." (Opinion at 46 n.18 (Hine Decl. Ex. 4); *See also* M.1 at 34 (Hine Decl. Ex. 1); 8/24/10 [Exall] 28:5-19 (Hine Decl. Ex. 10); 8/23/10 [Shapiro] 92:5-94:22 (he reviewed the APA to ensure it accurately reflected the deal, and Paragraph 9.1 (b) does not refer to the 9/16/08 Financial Schedule) (Hine Decl. Ex. 8); Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection C") (Hine Decl. Ex. 27))

**Response:** Barclays does not dispute that section 9.1(c) does not contain the word severance.  Barclays disputes the statement in paragraph 13 only to the extent it is intended to imply that the $2 billion estimate listed for "Comp" on the 9/16/08 Financial Schedule related solely to bonus payments.

Barclays agrees that the Court's opinion contains the quoted statement in paragraph 13, but disputes that this statement is a finding made by the Court.

The APA imposed obligations on Barclays with respect to both bonus and severance payments for the Transferred Employees.  *See* BCI Ex. 1 at § 9.1(b)-(c) (H. Hume Decl. Ex. 1). As the Lehman and Barclays negotiators, and the lead Lehman lawyer, all testified at trial, the "Comp" reference on the 9/16/08 Financial Schedule was an estimate that was intended to

include both of these obligations.  *See* 4/26/10 Tr. at 161:1-10 (McDade) (H. Hume Decl. Ex.

39); 4/28/10 Tr. at 32:3-5, 32:20-5 (Miller) (H. Hume Decl. Ex. 41); 8/23/10 Tr. at 120:12-24

(Shapiro) (H. Hume Decl. Ex. 47); 5/7/10 Tr. at 149:11-13 (Ricci) (H. Hume Decl. Ex. 45);

6/21/10 Tr. at 56:23-57:5 (Marsal) (H. Hume Decl. Ex. 46); 4/30/10 Tr. at 90:22-91:9 (Clackson)

(H. Hume Decl. Ex. 43).  Alvin Brown, a Simpson Thacher partner, whose testimony is cited in

paragraph 13, testified that his understanding of the compensation estimate on the 9/16/08

Financial Schedule was second-hand and came "from one of the participants or part of the team

that was involved in negotiating but I don't recall specifically who it was."  Brown Dep. Tr. at

25:22-26:3 (H. Hume Decl. Ex. 38).  Mr. Brown did not negotiate the terms of the Sale, and was

not involved in calculating the $2 billion number.  *Id.* at 9:21-11:6, 21:6-11.  Mr. Brown's

second-hand understanding, which LBHI falsely asserts was "undisputed," cannot possibly

outweigh the testimony cited above of the Lehman executives (McDade and Shapiro) and lead

attorney (Miller) directly responsible for negotiating the economic terms of the Sale.


14.     In its Opinion, the Court found that: "To guide the documentation of the sale to
Barclays, during the course of Lehman Week the parties prepared a schedule showing the value
of certain assets that were to be transferred to Barclays and the liabilities to be assumed by
Barclays (the '9/16/08 Financial Schedule')." (Opinion at 45 (citations omitted) (Hine Decl. Ex.
4))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 14, but disputes that this statement is a finding made by the Court.  The evidence

shows that the parties made a conscious decision not to attach the 9/16/08 Financial Schedule to

the APA because it was not part of the contract.  4/27/10 Tr. at 132:22-133:16; 168:15-174:19

(Berkenfeld) (H. Hume Decl. Ex. 40); 8/31/10 Tr. at 37:24-38:23 (Lewkow) (H. Hume Decl. Ex.

50); *see* 4/27/10 Tr. at 123:19-124:22 (Berkenfeld) (H. Hume Decl. Ex. 40).

15.    Barclays executives admitted that the "financial schedule" (which contained the "Accrued 08 FY Liability") referred to in Paragraph 9.1(c) of the APA, was the 9/16/08 Financial Schedule put in evidence at the Rule 60(b) trial as Exhibit M.2. (*See* M.2 (Hine Decl. Ex. 5); 8/23110 [Shapiro] 91:11-92:4 (Hine Decl. Ex. 8); 8/24/10 [Exall] 17:18-18:16 (Hine Decl. Ex. 10); *see also* 4/29/10 [Clackson] 218:19-219:12, 257:6-259:1 (Hine Decl. Ex. 26); M.24 (Hine Decl. Ex. 11))

**Response:**  Barclays disputes the statement in paragraph 15 that 9/16/08 Financial

Schedule was admitted to be the "financial schedule" referenced in Paragraph 9.1(c) of the APA.

The 9/16/08 Financial Schedule was not initialed by Barclays, and therefore was not initialed by

both parties; it therefore does not satisfy the plain meaning of the words used in section 9.1(c) to

describe a "financial schedule delivered to Purchaser on September 16, 2008 and initialed by an

officer of each of Holdings and Purchaser."  *Compare* M.2 *with* BCI Ex. 1 at 9.1(c).  The 9/16/08

Financial Schedule initialed by Steve Berkenfeld also was not attached to the APA.  *See* M.118

(H. Hume Decl. Ex. 15) (Sale Motion attaching the APA without attaching the 9/16/08 Financial

Schedule).

Barclays does not dispute that Mr. Shapiro testified that he believed the 9/16/08 Financial

Schedule was intended to be the schedule referenced in Paragraph 9.1(c) of the APA, but notes

that Mr. Shapiro also testified that the $2 billion estimate for "Comp" included both bonus and

severance.  8/23/10 Tr. at 120:12-24 (Shapiro) (H. Hume Decl. Ex. 47).  Mr. Exall, whose

testimony is cited in paragraph 15, had no role in the negotiations surrounding the sale

transaction or the compensation provisions in the APA.  8/24/10 Tr. at 13:17-14:7 (Exall) (H.

Hume Decl. Ex. 48).  Further, Mr. Exall had no first-hand knowledge about the 9/16/08 Financial

Schedule, which was represented to him as being the schedule referenced in the APA by Mr.

Clackson after the Closing.  *Id.* at 17:18-18:16 (Exall).  Mr. Clackson, whose testimony is also

cited in paragraph 15, testified that he was not directly involved in the negotiations.  4/29/10 Tr.

at 190:3-17 (H. Hume Decl. Ex. 42); *see id.* at 259:2-23 (Clackson).  Mr. Clackson also testified

that he did not see the 9/16/08 Financial Schedule until after the APA had been signed and was

focused on the accounting treatment of the amount Barclays would pay for compensation-related

liabilities.  *Id.* at 218:19-219:12, 257:6-259:1 (Clackson).

16.    The 9/16/08 Financial Schedule shows a liability for "Comp" of 2.0 billion
dollars.  (M.2 (Hine Decl. Ex. 5))

**Response:**  Barclays does not dispute the statement in paragraph 16, except states that the

$2 billion figure was understood to be an estimate of all the compensation-related liabilities

Barclays was exposed to under the APA, and was not a fixed liability solely for bonuses.

The Court recognized that the comp and cure liability figures were estimates and found

that "the Court did not rely on the pinpoint accuracy of these estimates when it approved the sale

to Barclays."  Op. at pp. 13-14 (H. Hume Decl. Ex. 31).  Further, the Court found that the

liability estimates for comp and cure were "good faith estimates," and "not guarantees or

representations that these were firm numbers," as the liability amounts were necessarily

"uncertain and contingent."  Op. at 55 (H. Hume Decl. Ex. 31).

17.    Under the terms of Paragraph 9.1(c) of the APA, bonuses were required to be paid
in full on or before March 15, 2009, so that the aggregate amount awarded equaled the two
billion dollars "Accrued 08 FY Liability" referred to in the APA.  (M.1 ¶ 9.1(c) (Hine Decl. Ex.
1))

**Response:**  Barclays disputes the statement in paragraph 17 and refers to the APA for its

precise terms, definitions and requirements.  In particular, Barclays notes that section 9.1(c) of

the APA provides that the 2008 bonuses "shall be awarded on or before March 15, 2009 in such

forms, and proportions as are consistent with Purchaser's customary practices," without any

further discussion of any vesting periods for certain awards.  Barclays further states that, as the

Court recognized in its opinion, the $2 billion figure was only an estimate of the compensation-

related liabilities Barclays agreed to assume, Op. at pp. 13-14 (H. Hume Decl. Ex. 31), and the

trial record establishes that the $2 billion estimate covered all forms of compensation, not just

bonuses.  4/26/10 Tr. at 161:1-10 (McDade) (H. Hume Decl. Ex. 39); 4/28/10 Tr. at 32:3-5,

32:20-5 (Miller) (H. Hume Decl. Ex. 41); 8/23/10 Tr. at 120:12-24 (Shapiro) (H. Hume Decl. Ex.

47); 5/7/10 Tr. at 149:11-13 (Ricci) (H. Hume Decl. Ex. 45); 6/21/10 Tr. at 56:23-57:5 (Marsal)

(H. Hume Decl. Ex. 46); 4/30/10 Tr. at 90:22-91:9 (Clackson) (H. Hume Decl. Ex. 43); BCI Ex.

131a(H. Hume Decl. Ex. 5);.


18.    In its Opinion, the Court found that: "Paragraph 9.1 (c) of the APA addresses the
obligation of Barclays to pay 2008 bonuses to Transferred Employees - *i.e.,* former Lehman
executives who transferred to Barclays - and expressly references the 9/16/08 Financial
Schedule." (Opinion at 45-46 (citations omitted) (Hine Decl. Ex. 4))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 18, but disputes that this statement is a finding made by the Court and disputes that the

statement is supported by the trial record.  The trial record establishes that the $2 billion "comp"

estimate on the 9/16/08 Financial Schedule was meant to cover all forms of compensation-

related liabilities being assumed by Barclays.  Barclays also incorporates by reference its

responses to paragraphs 13-17.


19.    In its Opinion, the Court found that: "Thus, the aggregate amount of such 2008
bonus payments was established by the $2 billion figure set forth on the 9/16/08 Financial
Schedule." (Opinion at 46 (citations omitted))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 19, but disputes that this statement is a finding made by the Court and disputes that the

statement is supported by the trial record.  Barclays also incorporates by reference its responses

to paragraphs 13-18.

20.    In its Opinion, the Court found that: "The plain language of ... Paragraph 9.1 (c) of the APA specifically refers only to bonuses, not severance." (Opinion at 46; *see also* M.1 at 35 (Hine Decl. Ex. 1))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in paragraph 20, but disputes that this statement is a finding made by the Court and disputes that the statement is supported by the trial record.  Barclays also incorporates by reference its responses to paragraphs 13-19.

21.    In its Opinion, the Court found that: "Moreover, the $2 billion figure for bonuses was an 'agreed number' that reflected a 'full requirement for Barclays to pay.'" (Opinion at 46 (citations omitted) (Hine Decl. Ex. 4))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in paragraph 21, but disputes that this statement is a finding made by the Court and disputes that the statement is supported by the trial record.  The quoted statement from the Opinion is a direct quote from LBHI's Post-Trial Brief at ¶ 134 and is not supported by the cited evidence.  In the testimony cited in support of that statement, Mr. McDade was asked a question related to "compensation," *not* "bonuses."  4/26/10 Tr. at 164:6-8, 215:13-18 (H. Hume Decl. Ex. 39).  Thus, Mr. McDade's response to the question relates to his understanding of Barclays' *compensation* obligations as a whole, not just bonuses.  Further, Mr. McDade testified that the $2 billion figure was a good faith estimate. 4/26/10 Tr. at 169:11-170:1 (McDade) (H. Hume Decl. Ex. 39).  Barclays also incorporates by reference its responses to paragraphs 13-20.

22.    In its Opinion, the Court found that: "Paragraph 9.1 (b) does not reference the 9/16/08 Financial Schedule." (Opinion at 46 n.18 (citations omitted); *see also* M.1 at 34 (Hine Decl. Ex. 1))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in paragraph 22, but disputes that this statement is a finding made by the Court.  Barclays also

disputes any implication that the $2 billion estimate on the 9/16/08 Financial Schedule related

solely to bonuses simply because Paragraph 9.1(b) of the APA does not explicitly reference the

9/16/08 Financial Schedule.  To the contrary, the trial record establishes that the $2 billion

estimate related to all forms of compensation, not just to bonuses.  Barclays also incorporates by

reference its responses to paragraphs 13-21.

      23.     Barclays stipulated at the Rule 60(b) hearing that: "if called to testify at trial,
Michael Guarnuccio of Price Waterhouse Coopers would testify as follows:

> Michael Guarnuccio recalls that at some time in September 2008,
> after the Barclays/Lehman transaction closed, he spoke with Paul
> Exall. And Mr. Exall stated that he believed the two billion dollar
> estimate was for bonus payments only not for severance pay.

(6/25/10 Tr. 5:15-21 (Hine Decl. Ex. 32))

    **Response:**  Barclays does not dispute that Barclays entered into a stipulation regarding

the statement in paragraph 23, but does dispute that Mr. Guarnuccio's recollection of his

conversation with Mr. Exall is relevant to the intent of the parties who negotiated the Sale.  Mr.

Exall was not a negotiator of any portion of the Sale, including the compensation and bonus

provisions.  8/24/10 Tr. at 13:17-14:7 (Exall) (H. Hume Decl. Ex. 48).  Mr. Exall testified that in

September 2008 he did not have a clear understanding regarding the precise nature of Barclays'

legal obligations under the APA.  8/23/10 Tr. at 187:16-19, 188:1-15 (Exall) (H. Hume Decl. Ex.

47).  Mr. Exall testified that his conversation with Mr. Guarnuccio was "around Barclays' overall

compensation plans" and that Mr. Guarnuccio may have misunderstood what Mr. Exall said in

the conversation.  8/23/10 Tr. at 187:8-11, 188:1-8 (Exall) (H. Hume Decl. Ex. 47).  In any

event, whatever Mr. Exall or Mr. Guarnuccio might have thought or said in that conversation, it

does not reflect what any negotiator of the Sale believed or intended in negotiating the terms of

the APA.  4/28/10 Tr. at 32:23-24 (Miller) (H. Hume Decl. Ex. 41); 8/23/10 Tr. at 120:20-24

(Shapiro) (H. Hume Decl. Ex. 47); 4/26/10 Tr. at 161:1-3 (McDade) (H. Hume Decl. Ex. 39);

5/7/10 Tr. at 147:24-148:1 (Ricci) (H. Hume Decl. Ex. 45); 6/21/10 Tr. at 56:23-57:5 (Marsal)

(H. Hume Decl. Ex. 46); *see also* BCI Ex. 131a (October 8, 2008, Alvarez & Marsal presentation

to the Committee which summarizes the main assets and liabilities in the Sale, and lists the

"severance" liability but not the "bonus" liability).

     24.    On January 26, 2009, in connection with PwC's audit, Guarnuccio wrote an e-
mail to Martin Kelly and James Walker, in which he wrote:

> We discussed this with HR (Paul Exall) back in September and it
> was confirmed to us then that the $2 billion was only for bonus and
> the severance amounts to be paid were separate.

(M.150 at 00009520 (Hine Decl. Ex. 34))

    **Response:**  Barclays does not dispute that Mr. Guarnuccio wrote an email containing the

statement quoted in paragraph 24, but does dispute that Mr. Guarnuccio's understanding, at the

time that the email was sent, accurately reflected Barclays' compensation-related obligations.

Barclays created an opening balance sheet relating to compensation for its outside auditors at

PricewaterhouseCoopers.  BCI Ex. 142 (H. Hume Decl. Ex. 6); Exall Dep. Tr. at 20:16-21:9 (H.

Hume Decl. Ex. 35).  This opening balance sheet showed that Barclays' accounting for the $2

billion estimate of compensation-related liabilities included payments for bonus, severance, and

other compensation related payments, such as taxes.  BCI Ex. 142 (H. Hume Decl. Ex. 6).  This

is consistent with Barclays' Acquisition Balance Sheet, which showed that Barclays accrued a

liability of $2 billion for its bonus, severance, and related tax obligations.  BCI Ex. 133 (H.

Hume Decl. Ex. 24); 9/2/10 at 40:5-9 (Romain) (H. Hume Decl. Ex. 51).

PricewaterhouseCoopers approved the Barclays' Acquisition Balance Sheet, including Barclays'

accounting for compensation-related liabilities, *i.e.*, that the $2 billion amount included not only

bonuses but also severance obligations.  *Id.*; 8/23/10 Tr. at 188:18-189:1 (Exall) (H. Hume Decl.

Ex. 47); 8/24/10 Tr. at 43:25-45:4 (Exall) (H. Hume Decl. Ex. 48).

25.    In its Opinion, the Court found that: "Mr. Exall, the [Barclays] executive charged
with monitoring the compensation paid to former Lehman employees who transferred to
Barclays, was instructed immediately after the closing of the sale to plan on paying bonuses to
former Lehman employees of approximately $1.4 billion, not the $2 billion set forth in the
APA." (Opinion at 46-47 (citations omitted) (Hine Decl. Ex. 4))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 25, but disputes that this statement is a finding made by the Court and disputes that the

statement is consistent with the evidence.  Mr. Exall explained that, immediately after the

Closing, he believed that Barclays might well have to pay over $1.6 billion or $1.7 billion in

bonus payments.  In addition, neither these initial estimates nor the $1.4 billion estimate included

payments Barclays would also have to make for severance payments to terminated employees.

M.91 at p. 3 (H. Hume Decl. Ex. 14); 8/24/10 Tr. at 54:17-57:8; 89:25-92:22 (Exall) (H. Hume

Decl. Ex. 48).

26.    In its Opinion, the Court found that: "Exall ... prepared a spreadsheet showing
that, in the aggregate, Barclays paid to transferred Lehman employees approximately $1.951
billion in all forms of compensation [but] [s]everal entries on the spreadsheet, however, do not
relate to bonuses." (Opinion at 47 (citations omitted))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 26, but disputes that this statement is a finding made by the Court and disputes that the

statement is consistent with the evidence.  The statement is not supported by the cited evidence

which demonstrates that the payments listed on the compensation spreadsheet were bonus

payments even if not included in the line item for "Bonus including social tax."  Mr. Exall's

testimony specifically explained that the payments for "IBD Grad Programmes," "Acquisition

Buyout vesting over 2 years," "ISP Awards," and "Replacement RSUs" were all bonus-related.

8/23/10 Tr. at 191:16-193:23 (Exall) (H. Hume Decl. Ex. 47); Exall Dep. Tr. at 86:9-88:9,

100:14-103:4, 128:8-17, 141:24-143:24, 151:6-14 (H. Hume Decl. Ex. 35); Exall Decl. at ¶ 4-7

(H. Hume Decl. Ex. 16).  He has confirmed this in a declaration submitted with the Barclays'

opposition brief.  In addition, both Mr. Exall and Mr. Kurman from Barclays' Human Resources

department have submitted declarations establishing that approximately $137 million of the $265

million in severance payments were made "in lieu of bonus" and in excess of the amounts

required under the Lehman or Barclays severance plans.  Exall Decl. at ¶ 4 (H. Hume Decl. Ex.

16); Kurman Decl. at ¶ 9 (H. Hume Decl. Ex. 18).  This demonstrates that, while Mr. Exall

characterized the entire $265 million amount as severance because it was paid to terminated

employees, $137 million of this amount should more prioperly be characterized as bonus paid

under section 9.1(c) of the APA.


27.    In its Opinion, the Court found that: "In the end, subtracting out all non-bonus
payments, Barclays paid approximately $1.5 billion in bonuses to Transferred Employees."
(Opinion at 47 (citations omitted))

**Response:**  Barclays agrees that the Court's opinion contains the quoted statement in

paragraph 27, but disputes that this statement is a finding made by the Court and disputes that the

statement is consistent with the evidence.  The statement is not supported by the evidence, which

shows that Barclays paid over $1.81 billion in bonus-related payments for the Transferred

Employees.  *See* BCI Ex. 142 (H. Hume Decl. Ex. 6) (bonus-related items include Replacement

RSUs, Bonus including social tax, IBD Grad Programmes, Acquisition Buyout vesting over 2

years, and ISP awards); Exall Decl. at ¶¶ 4-7 (H. Hume Decl. Ex. 16); Kurman Decl. at ¶ 9 (H.

Hume Decl. Ex. 18).  Barclays incorporates by reference its response to paragraph 26.

13

28.     The evidentiary hearing on the Movants' Rule 60(b) Motions (the "Evidentiary
Hearing") involved a trial on numerous factual issues concerning the APA and the Sale
Transaction. (*See* Opinion)

**Response:**  Barclays does not dispute the statement in paragraph 28, except refers to the

trial record for an accurate reflection of the factual issues presented at trial and refers to the

Opinion and related orders for an accurate description of the Court's holdings.


29.     During the Evidentiary Hearing, extensive evidence and argument were presented
by able counsel over a several month period. (*See id.* at 4 ("The evidentiary hearings relating to
the 60(b) Motions took place over a thirty-four day period from April through October 2010 ...
The trial itself was a showcase of outstanding advocacy uniformly conducted at the highest
professional level."), 29 (trial record was "extensive"), 52 (same))

**Response:**  Barclays does not dispute the statement in paragraph 29, except incorporates

its response to paragraph 28.


30.     During the Evidentiary Hearing, all parties had a great incentive and initiative to
present their position.  (*See id.* at 5 (approximately 13 billion dollars were at stake; litigation was
"highly visible"; relief being sought was "extraordinary"; circumstances of the proceedings were
"exceptional"))

**Response:**  Barclays does not dispute the statement in paragraph 30, except incorporates

by reference its responses to paragraphs 28-29, and disputes any suggestion that Barclays had a

great incentive to litigate Count II of LBHI's Complaint, which the parties had explicitly

stipulated, and the Court has "so Ordered," was stayed and was not being resolved in the Rule

60(b) proceeding.  Jan. 13, 2010 Stipulation and Proposed Order between the Debtors, Trustee,

Committee, and Barclays Capital Inc. Concerning Certain Claims Made in Adversary

Complaints Filed by LBHI, SIPA Trustee and Creditors Committee at ¶ 3.

31.    During the Evidentiary Hearing, the bonus and cure provisions of the APA, as
well as their relation to the two billion dollar "Comp" figure in the 9/16/08 Financial Schedule
were addressed by both sides. (*See id.* at 45-49)

**Response:**  Barclays disputes the statement in paragraph 31 to the extent that it is

intended to suggest that the elements of LBHI's breach of contract claim were before the Court,

or that all of the specific factual issues presented by that contractual claim were "addressed by

both sides."  Barclays agrees that the issues presented in the Rule 60(b) proceeding included the

reasonableness of the $2 billion estimate for "Comp" liabilities, as reflected in the 9/16/08

Financial Schedule, and that the Court held that this $2 billion number was a good faith estimate,

and not a guarantee or representation.  Barclays also incorporates by reference its responses to

paragraphs 28-30.

32.    During the Evidentiary Hearing, Barclays and the Movants presented witnesses,
deposition testimony and documents concerning the bonus and cure provisions of the APA, as
well as their relationship to the two billion dollar "Comp" figure in the 9/16/08 Financial
Schedule. (*See id.* at 45-49)

**Response:**  Barclays does not dispute the statement in paragraph 32 to the extent that it

refers to the evidence presented regarding the reasonableness of the $2 billion estimate for

"Comp" shown on the 9/16/08 Financial Schedule, but does dispute that the elements of LBHI's

breach of contract claim were before the Court.  Barclays also incorporates by reference its

responses to paragraphs 13, 17, and 28-31.

33.    The amount Barclays was required to pay and the amount Barclays actually paid
under the bonus provisions of the APA was placed at issue and determined by the Court as part
of the Rule 60(b) Motions. (*See id.* at 45-49)

**Response:**  Barclays disputes the statement in paragraph 33.  The parties stipulated, and

the Court "so Ordered," that the specific contractual issue described in paragraph 33 was stayed,

and was not being resolved in the Rule 60(b) proceeding.  *See* Jan. 13, 2010 Stipulation and

Proposed Order between the Debtors, Trustee, Committee, and Barclays Capital Inc. Concerning

Certain Claims Made in Adversary Complaints Filed by LBHI, SIPA Trustee and Creditors

Committee at ¶ 3 (H. Hume Decl. Ex. 26).  The related issue of whether the $2 billion estimate

for "Comp" was reasonable was presented, and the Court held that the $2 billion "Comp"

number was a good faith estimate, not a guarantee or representation of a fixed number.   Barclays

incorporates by reference its responses to paragraphs 28-32.

### STATEMENT OF ADDITIONAL MATERIAL FACTS PRECLUDING LBHI'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, made applicable to this proceeding by Local Rule of Bankruptcy

Rule 7056-1, Barclays states that there are additional material facts that preclude the Court from

granting LBHI's Motion for Summary Judgment:

1.        Barclays incorporates by reference its Statement of Undisputed Material Facts in

Support of Its Motion For Summary Judgment On Count II of LBHI's Adversary Complaint,

which is being filed concurrently with this response to LBHI'S Statement Of Undisputed

Material Facts In Support Of Its Motion For Summary Judgment On Count II Of Its Adversary

Complaint Pursuant To Local Bankruptcy Rule 7056-1.

2.        LBHI relies upon the following statement from the Court's Opinion, which was

adopted directly from an LBHI proposed finding of fact submitted in its post-trial brief:

"McDade testified that this $2 billion for bonuses to former Lehman employees was an 'agreed

number' (4/26/10 [McDade] 164:6-8 (H. Hume Decl. Ex. 39)), and reflected a 'full requirement

for Barclays to pay,' (4/26/10 [McDade] 215:13-18 (H. Hume Decl. Ex. 39))."  LBHI Post-Trial

Br. at ¶ 134 (emphasis added) (H. Hume Decl. Ex. 30).  That proposed finding is demonstrably

false:  the cited evidence shows that McDade's answered questions about a "fixed number" and

"full requirement to pay," but also shows that neither McDade nor the LBHI counsel asking the

questions ever used the word "bonus," but instead used the word "compensation."  Moreover,

McDade confirmed in other testimony that the $2 billion number was a good faith estimate.  *See*

4/26/10 Tr. at 168:13-169:19 (McDade) (H. Hume Decl. Ex. 39); *see also* 4/26/10 Tr. at 170:13-

21 (McDade) (H. Hume Decl. Ex. 39).

       3.     Barclays paid over $1.8 billion in fulfillment of its obligation to pay bonuses to

Transferred Employees under section 9.1(c) of the APA.  BCI Ex. 142 (H. Hume Decl. Ex. 6);

Exall Decl. at ¶ 4 (H. Hume Decl. Ex. 16); Kurman Decl. at ¶ 9 (H. Hume Decl. Ex. 18).

       4.     The $265 million figure amount consists of two components:  (a) approximately

$128 million that resulted from the application of the Lehman severance plans to the terminated

Transferred Employees, and (b) approximately $137 million on "enhanced severance" that was

paid "in lieu of bonus" to these terminated Transferred Employees, and in exchange for receiving

a release of any and all claims against Barclays for any additional bonus payments.  *See* Exall

Decl. at ¶ 4 (H. Hume Decl. Ex. 16); Kurman Decl. at ¶¶ 5-9 (H. Hume Decl. Ex. 18).

       5.     The Transferred Employees who received the "enhanced severance payments" did

not receive any other bonus payment under § 9.1(c) of the APA.  *See* Kurman Decl. at ¶ 5 (H.

Hume Decl. Ex. 18).  Thus, the $137 million amount is properly considered part of the total

amount of bonuses paid pursuant to section 9.1(c) of the APA.  Kurman Decl. at ¶ 9 (H. Hume

Decl. Ex. 18); Exall Decl. at ¶ 4 (H. Hume Decl. Ex. 16).

6.      Barclays awarded the Transferred Employees $56 million in "ISP Awards," which Paul Exall testified refers to the "incentive share plan" that is "the name of the stock award program we have in place at Barclays."  BCI Ex. 142 (H. Hume Decl. Ex. 6); Exall Dep. Tr. at 141:20-142:21 (H. Hume Decl. Ex. 35).

7.      At his deposition and at trial, Paul Exall testified that the $56 million in "ISP Awards" on the Compensation Schedule was awarded to the Transferred Employees based solely on the pre-acquisition service of those Transferred Employees.  Exall Dep. Tr. at 151:5-14 (H. Hume Decl. Ex. 35); 8/24/10 Tr. at 81:14-82:17 (Exall) (H. Hume Decl. Ex. 48).

8.      At his deposition, Paul Exall testified that the $56 million in "ISP Awards" "directly relates to the $258,000,000 further up in the Equity column under Bonus Including Social Taxes" on the Compensation Schedule.  Exall Dep. Tr. at 142:10-15 (H. Hume Decl. Ex. 35).

9.      At his deposition, Paul Exall testified that the $56 million in "ISP Awards" "directly relates to the $258 million insofar as the $56 million is derived specifically from the $258 million reflected on the schedule."  Exall Dep. Tr. at 149:20-150:7 (H. Hume Decl. Ex. 35). Since the $258 million number is equity component of the "Bonus including social tax" entry on the Compensation Schedule, Mr. Exall's testimony clearly established that the $56 million ISP Awards "directly relates" to bonuses paid to the Transferred Employees.

10.      At trial, Paul Exall explained the payroll taxes related to the $56 million in "ISP Awards" were "a cost of the bonuses," and thereby confirmed again that the ISP Awards were themselves "bonuses."  8/23/10 Tr. at 193:12-16 (Exall) (H. Hume Decl. Ex. 47) (agreeing that the "Payroll Taxes on ISP Awards" were "a cost of the bonuses").

11.    At trial, Paul Exall testified as follows regarding the ISP Awards: "The amount
of stock units that they would have received in May would have been substantially lower than
the amount of stock units they would have received in March.  In March, people were told the
dollar value of the awards they were going to get in stock. But they would have received a
substantially higher number of units in March….In May, given the share price appreciation, they
would receive substantially fewer stock units. Consequently, this award is directly related to the
original value of the stock awarded and it's to compensate them in part for the loss of value in
the sense that they would have gotten fewer stock units."  8/24/10 Tr. at 81:24-82:14 (Exall) (H.
Hume Decl. Ex. 48).

12.    At his deposition and at trial, Paul Exall explained that the $53 million in
payments for "Acquisition Buyout vesting over 2 years" on the Compensation Spreadsheet
referred to bonus payments to a trader with a contractually guaranteed bonus from Lehman for
2008, which Barclays agreed to match in order to ensure that the trader would join Barclays.
Exall Dep. Tr. at 128:12-21, 129:12-130:7 (H. Hume Decl. Ex. 35); 8/24/10 Tr. at 75:8-19
(Exall) (H. Hume Decl. Ex. 48).

13.    At his deposition, Paul Exall testified that the "Acquisition Buyout vesting over 2
years" figure on the Compensation Spreadsheet refers to "a *bonus* relating to pre-acquisition
performance by an individual or individuals that worked for Lehman Brothers and now work for
Barclays.  These are commitments that we assumed and embodied in contracts in respect of this
individual or individuals to deliver this $53 million over the next two years."  Exall Dep. Tr. at
128:12-21 (emphasis added) (H. Hume Decl. Ex. 35).

14.     At trial, Paul Exall testified that the "Acquisition Buyout vesting over 2 years"
figure on the Compensation Spreadsheet "related to performance bonus awards that were due
and payable to an individual under his contract with Lehman Brothers that Barclays matched as
part of the acquisition."  8/23/10 Tr. at 193:17-23 (Exall) (H. Hume Decl. Ex. 47).

15.     The Compensation Spreadsheet describes the $53 million "Acquisition Buyout
vesting over 2 years" line item as a "[b]onus relating to performance for 1 Jan to 22 Sept 08…."
BCI Ex. 142 (H. Hume Decl. Ex. 6).

16.     At trial, Paul Exall testified that the $11 million in "Replacement RSUs" on the
Compensation Spreadsheet were "cash awards that Barclays gave to former Lehman Brothers
employees to replace the lost value of *bonus* awards that they had received earlier in 2008 from
Lehman Brothers."  8/23/10 Tr. at 191:20-22 (Exall) (emphasis added) (H. Hume Decl. Ex. 47).

17.     When questioned at trial whether the $11 million in "Replacement RSUs" on the
Compensation Spreadsheet is "a bonus item," Paul Exall testified, "I would categorize it as such,
yes."  8/23/10 Tr. at 191:23-24 (Exall) (H. Hume Decl. Ex. 47).

18.     At trial, Paul Exall agreed that the $11 million in "Replacement RSUs" represents
"Barclays' assuming a stock bonus obligation that Lehman previously owed" and further
explained that Barclays "replaced them with cash."  8/24/10 Tr. at 70:6-10 (Exall) (H. Hume
Decl. Ex. 48).

19.     At his deposition, Paul Exall explained that the $11 million in "IBD Grad
Programmes" referred to the annual bonus payments which, as part of a standardized program,

were paid at mid-year (rather than at year-end) to Transferred Employees who had been recruited

by Lehman from graduate school.  *See* Exall Dep. Tr. at 100:13-103:4 (H. Hume Decl. Ex. 35).

20.    At his deposition, Paul Exall testified that the $11 million in "IBD Grad

Programmes" were "for all intents and purposes in general the[] annual bonus" for those

Transferred Employees in the Investment Banking Division's graduate program.  Exall Dep. Tr.

at 102:14-103:4 (H. Hume Decl. Ex. 35).

21.    At trial, Paul Exall testified that the "IBD Grad Programmes" figure on the

Compensation Schedule represents "the annual bonuses payable to graduates that were on our

investment banking graduate program.  But they were former Lehman Brothers graduates that we

obviously took on as part of the acquisition."  8/23/10 Tr. at 192:7-14 (Exall) (H. Hume Decl.

Ex. 47).

22.    At trial, Paul Exall agreed that the $11 million in "IBD Grad Programmes"

represents "Barclays assuming a bonus type obligation that Lehman used to owe…."  8/24/10 Tr.

at 72:6-9 (Exall) (H. Hume Decl. Ex. 48).

23.    While characterized separately on the Compensation Schedule because they were

paid in a slightly different form or as part of distinct programs, the $56 million paid in "ISP

Awards," the $53 million paid as "Acquisition Buyout vesting over 2 years," the $11 million

paid in "Replacement RSUs," and the $11 million under the "IBD Grad Programmes" all

constitute bonus payments to Transferred Employees for 2008 pre-acquisition service.  *See* Exall

Decl. at ¶ 6(a) (H. Hume Decl. Ex. 16).

24.     In deposing Mr. Exall, counsel for LBHI asked Mr. Exall to "ballpark" what portion of the $1.529 billion line item for "Bonus including social tax" related to "social tax." Exall Dep. Tr. at 139:8-140:21 (H. Hume Decl. Ex. 35).

25.     When asked at his deposition to "ballpark" what portion of the $1.529 billion line item for "Bonus including social tax" related to "social tax," Paul Exall testified:  "Crickey.  If I had to guess I'd say maybe $50 million."

26.     Mr. Exall has now confirmed that the amount of social tax contained within the $1.529 billion entry is $17 million.  Exall Decl. at ¶ 5 (H. Hume Decl. Ex. 16).

Dated:          New York, New York
                As of June 22, 2011
                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP


                                        By:      /s/   Jonathan D. Schiller
                                                Jonathan D. Schiller
                                                Jack G. Stern
                                                575 Lexington Avenue
                                                New York, New York 10022
                                                Tel: (212) 446-2300
                                                Fax: (212) 446-2350
                                                Email: JSchiller@bsfllp.com
                                                        JStern@bsfllp.com

                                                Hamish P. M. Hume
                                                5301 Wisconsin Avenue, N.W.
                                                Washington, D.C. 20015
                                                Tel: (202) 237-2727
                                                Fax: (202) 237-6131
                                                Email: HHume@bsfllp.com

                                                *Attorneys for Barclays Capital Inc.*