# Exhibit 15

*HEARING TO CONSIDER ENTRY OF*
*SALE PROCEDURES ORDER*
HEARING DATE AND TIME: September 17, 2008 at 11:00 a.m. (Eastern Time)

*HEARING TO CONSIDER ENTRY OF*
*SALE ORDER*
HEARING DATE AND TIME: TBA
OBJECTION DEADLINE: TBA

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
In re                                                       :    Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.*                     :    08-13555 (JMP)
                                                            :
            Debtors.                                        :    (Jointly Administered)
                                                            :
------------------------------------------------------------x

DEBTORS' MOTION TO (A) SCHEDULE A SALE HEARING; (B) ESTABLISH
SALES PROCEDURES; (C) APPROVE A BREAK-UP FEE; AND (D) APPROVE
THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC ("LB 745"), as

debtors and debtors in possession (collectively, the "Debtors" and, collectively with their

nondebtor affiliates, "Lehman" ), respectfully represent:

Δ π EXHIBIT *4(4*
Deponent *Kobat*
Date *2/1/09* Rpr. *KK*
WWW.DEPOBOOK.COM

MOVANTS' TRIAL
EXHIBIT
___118___

## Background

1.    On September 15, 2008 (the "Commencement Date"), LBHI commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On September 16, 2008, LB 745 commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### Lehman's Businesses

2.    Lehman is the fourth largest investment bank in the United States, and for most of its 158 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman offers a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management, and private equity. LBHI's non-debtor subsidiary, Lehman Brothers Inc. ("LBI"), is a registered broker dealer. Lehman's worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. On the Commencement Date, Lehman employed over 25,000 employees.

3.    Information as to Lehman's businesses, capital structure, and the circumstances leading to the commencement of the chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed with the Court on September 15, 2008 (the "First Day Affidavit").

### Jurisdiction and Venue

4.     This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

5.     The Debtors are requesting, pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and 9006, (i) an order (the "Sale Hearing Order") substantially in the form attached hereto as Exhibit 1 (a) setting the time, date, and place of a hearing (the "Sale Hearing") to consider the sale of the Purchased Assets[1] and (b) approving the procedures for the conduct of the sale, (c) approving the Break-Up Fee (as defined below), and (ii) an order approving (a) a sale of the Purchased Assets pursuant to that Asset Purchase Agreement (the "Purchase Agreement"), among Barclays Capital Inc. ("Purchaser"), the Debtors, and LBI (collectively, the "Seller"), dated September 16, 2008, a copy of which is annexed hereto as Exhibit 2, free and clear of all liens, claims, encumbrances, and other interests, (b) the assumption and assignment of certain executory contracts and unexpired leases related to the Purchased Assets (collectively, the "Contracts"), pursuant to section 365 of the Bankruptcy Code, and (c) entry of an order substantially in the form attached hereto as Exhibit 3 approving the Purchase Agreement (the "Sale Order").

6.     The sale of the Purchased Assets, is critical to the stabilization of value. Each day that the Purchased Assets are subject to the vagaries and vicissitudes of the marketplace and the impact of bankruptcy diminishes the value of such assets. Time is of the essence. The Purchase Agreement represents a reasonable exercise of business judgment by the

---

[1]     Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the Purchase Agreement.

Debtors. The sale is in the best interests of the Debtors, their employees and their economic
stakeholders. The relief requested in this Motion should be granted.

### The Need for an Expeditious Sale

7.      As set forth in the First Day Affidavit, as a financial services firm,
Lehman is materially affected by conditions in the global financial markets and by worldwide
economic conditions. For most of 2008, Lehman operated in an extremely unfavorable global
business environment. The events of the past week that drove down Lehman's credit standing
were particularly harmful to the ability of Lehman to sustain its operations. The combination of
low levels of liquidity and the requirement that financial companies de-leverage their balance
sheets resulted in downward pressure on financial asset prices. These global and national
economic conditions, in the aggregate, depressed both the valuations of Lehman's inventory
positions as well as transactional volumes and market activity levels in which Lehman's capital
markets and investment banking business segments operated. Ultimately, the instability in the
financial and credit markets caused significant liquidity problems and credit downgrades for
Lehman. These factors resulted in a chain reaction of adverse economic consequences that
impeded its ability to maintain normal business operations. Attempts to pursue strategic
alternatives were thwarted by its financial deterioration and lack of support from other entities.

8.      As a result, the Debtors commenced their chapter 11 cases to preserve and
maximize the value, protect their public customers, limit turmoil in the financial markets and
benefit Lehman's creditors and employees. The proposed sale will maximize the value of the
Purchased Assets and avoid rapid erosion of their value.

9.      Pursuant to the Purchase Agreement, the Purchaser will pay approximately
$1.7 billion in cash for the Purchased Assets plus assume other obligations and expenses. The
Purchased Assets include designated assets relating to LBI's business which are owned by LBI

as well as certain assets which are owned by LBHI and related to the business of LBI. These include Lehman's worldwide headquarters which is owned by LB 745.

10.    Upon consummation of the transaction, the Purchaser will assume ownership of substantially all operations of LBI, including assumption of Seller's liabilities under assumed contracts, and performance under Seller's obligations as to securities and other transactions. All remaining customer accounts will be transferred to the Purchaser. The Purchaser also will assume substantial liabilities relating to LBI's employees, estimated at approximately $2.5 billion. The sale will relieve LBHI of exposure based upon its guarantees of many of LBI's obligations.

11.    LBI is a valuable, but highly sensitive, asset of LBHI. Its value is greatly dependent upon its ability to assure its clients and customers of its financial and operational integrity. In the circumstances of Lehman's instability, Lehman cannot instill that assurance in its clients and customers. Consequently, it is urgent to sell the Purchased Assets now or face material disruption of their value. Hence, the instant motion.

12.    To effectuate the critical sale and provide the Purchaser with its required protections pursuant to section 363 of the Bankruptcy Code, the Purchase Agreement contemplates that, prior to the Sale Hearing, LBI will consent to the commencement of a case under the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa, *et seq*. In that proceeding, the Debtors will request that the SIPA Trustee consent to the sale and request the SIPA Court's approval thereof. The Securities Investor Protection Corporation ("SIPC") and the Securities and Exchange Commission (the "SEC"), as well as the Federal Reserve Bank, have been apprised of the sale and the need for immediate approval of the sale by the SIPA

Trustee and the SIPA Court in order to preserve the value of the Purchased Assets and assist in

the stabilization of the financial markets.

13.    The expeditious consummation of the sale pursuant to the Purchase

Agreement maximizes the value of the Purchased Assets and serves the best interests of all

parties.

### The Purchase Agreement

14.    The Purchase Agreement includes the following salient provisions:[2]

- Closing Date. The Closing must occur on or before September 23, 2008.

- Purchase and Sale of Purchased Assets. On the terms and subject to the
  conditions set forth in the Purchase Agreement, at the Closing, the
  Purchaser shall purchase the Purchased Assets, free and clear of all Liens,
  pursuant to Section 363(f) of the Bankruptcy Code. The Purchased Assets
  include LBI's assets, as well as three real properties, including Lehman's
  corporate headquarters and two data centers. Buyer will also purchase the
  "Lehman" name and associated trademarks, but will license the use of that
  name back to the estate and other Lehman affiliates for a period of time.

- Purchase Price and Assumed Liabilities. In exchange for the Purchased
  Assets, Buyer will pay Sellers approximately $1.7 billion in cash. In
  addition, Buyer is assuming various liabilities of Sellers, including transfer
  taxes, accounts payable in the ordinary course of business, cure costs, and
  future liabilities under assigned contracts and leases.

- Assumption of Contracts. The Purchaser shall have the right, but not the
  obligation, to take assignment of contracts and leases which are designated
  for assumption and assignment by Purchaser. The parties estimate that the
  cure costs associated with such assumptions and assignments will be
  approximately $1.5 billion.

- Continued Employment for Domestic Employees. All domestic
  employees of LBI will have the opportunity to continue their employment
  with Purchaser on the same terms they currently have with Lehman
  through December 31, 2008. If such employees are terminated by
  Purchaser without cause, they will be given their severance in an amount

---

[2] To the extent there are any inconsistencies between the summary description of the Purchase Agreement contained
herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.

equal to what they would have been paid if they had continued to be employed by Lehman.

• <u>Transition Services</u>. The Purchaser will provide certain transition services until the Closing.

<u>Extraordinary Provisions in the Purchase Agreement</u>

15.    <u>Break-Up Fee</u>. The Purchase Agreement provides that Seller shall pay Purchaser a break-up fee in an amount equal to $100 million plus up to $25 million for expense reimbursement (the "<u>Break-Up Fee</u>") on the first Business Day following the date of consummation of a Competing Bid, if no material breach by Purchaser of this Agreement has occurred.

16.    The United States Court of Appeals for the Second Circuit has approved break-up fees in bankruptcy cases, where warranted and consistent with market practices. *See Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). Specifically, the Second Circuit has held that break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. *Id.* at 657. The approval of break-up fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code have become an established practice in chapter 11 cases. Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the "business judgment rule," pursuant to which deference is granted to the actions of a board of directors taken in good faith and in the exercise of honest judgment.[3]

---

[3] For instance, in *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003), this Court approved a break-up fee of $20 million, equal to approximately 2% of the purchase price on the grounds

17.    The Break-Up Fee of $100 million required by the Purchaser meets the "business judgment rule" standard. Moreover, it recognizes the enormity of the effort made by the Purchaser in the negotiation of the Purchase Agreement. The proposed sale is unique because of the fragile and highly vulnerable nature of the Purchased Assets. Break-up fees enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable.    *See also, e.g., In re Footstar, Inc.*, Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. 2004); *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003); *In re Magellan Health Services, Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003); *In re Adelphia Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002); *In re Global Crossing Ltd.*, Case No. 02-40187 (REG) (Bankr. S.D.N.Y. 2002); *In re Bethlehem Steel Corp.*, Case Nos. 01-15288 through 01-15302, 01-15308 through 01-15315 (BRL) (Bankr. S.D.N.Y. 2001); *In re Rhythms Netconnections Inc.*, Case No. 01-14283 (BRL) (Bankr. S.D.N.Y. 2001).

18.    The proposed Break-Up Fee is reasonable in the context of these cases, and the Break-Up Fee should be approved.

19.    <u>Employment of Key Employees and Critical Employees.</u>    Approximately 200 employees of the Sellers have been designated as key to the success of the business, and 8 employees have been designated as critical to the success of the business. The retention of a substantial majority of key employees, and all 8 critical employees, is a condition precedent to the Closing. This provision represents a reasonable recognition by Purchaser that the

---

that such fee was reasonable, did not hamper the bidding process, and the relationship among the parties was not tainted by self-dealing. Similarly in *In re Magellan Health Services, Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. 2003), Judge Beatty approved a break-up fee of 2% of the purchase price. Bidding protections similar to those requested by the Debtors have routinely been approved by courts in this district. *See, e.g., In re Adelphia Business Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving termination fee and reimbursement of expenses).

relationships between key employees and Lehman customers represents a significant portion of the inherent value of the business. Without these employees, the Purchaser may lose critical human capital that it needs for business continuity.

20.    In addition, the Purchaser will offer continued employment to approximately ten thousand plus U.S.-based employees of LBI for a period of 90 days. To the extent of job eliminations during that period, the Purchaser shall pay such employees severance benefits equal to what would have been received under LBI's severance policy. That amount is equal to twenty percent of the employee's compensation for the prior year. It is estimated that the potential cost to the Purchaser will be $2.5 billion.

### Sale Notice Provisions

21.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors with twenty (20) days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), the Debtors are required to notify their creditors of the proposed sale of the Purchased Assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the sale, and the deadline for filing any objections. It is necessary to shorten the customary notice period, pursuant to Bankruptcy Rule 9006, to avoid erosion of the value of the Purchased Assets.

22.    The Debtors propose to serve a notice of the Sale Hearing (the "Sale Notice"), by electronic mail, facsimile, or overnight delivery, upon (a) the Office of the United States Trustee for the Southern District of New York, (b) the attorneys for any statutory committee appointed in this case; (c) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates; (d) all parties who have requested notice in the chapter 11 cases, (e) any party that previously expressed an interest in the Purchased Assets, (f) parties to

Contracts that may be assumed and assigned to Purchaser, and (f) any other parties as required by the Court, so as to be received by September 18, 2008. The Debtors propose that the Sale Notice direct parties in interest to an internet site (the "Website"), which will contain all the relevant information pertaining to the Purchase Agreement and the Sale Hearing, including (a) the Sale Notice, (b) the Purchase Agreement, and (c) the Procedures Order.

### Sale of the Purchased Assets

23.    Ample authority exists for approval of the proposed sale. Section 363 of the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same). Moreover, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re International Wire Group, Inc., et al.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.)*, 233

B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted

by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right

of chapter 11 debtor to transfer assets by private sale); *In re Comlere Corp.*, 228 B.R. 615

(Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the

standards of section 363(b) were met).

       24.    The proposed sale will result in the highest and best recovery for the

Debtors. In the pursuit of strategic alternatives, LBHI has attempted to sell the Purchased Assets

together with other Lehman assets. Indeed, the financial community is well aware that the

Purchased Assets were for sale. The only serious offeror is the Purchaser.

       25.    Section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1). To sell property under section

363(b), the Debtors must demonstrate to the Court a "good business reason" for the proposed

action. *See Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d. Cir 1997)

("A sale of a substantial part of a [c]hapter 11 estate other than in the ordinary course of business

may be conducted if a good business reason exists to support it."); *Comm. of Equity Sec. Holders

v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (in considering a sale

outside a plan of reorganization, a judge must not be shackled with unnecessarily rigid rules

when exercising the broad administrative power granted him under the Bankruptcy Code, but

must simply find "a good business reason" supporting the sale ); *In re Global Crossing, Ltd.*, 295

B.R. 726, 743 (Bankr. S.D.N.Y. 2003). As this Court has stated, "[w]here the debtor articulates

a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or

capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of*

*Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 60 B.R. 612,

616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the

debtor's decision to use property out of the ordinary course of business with a strong

presumption that "'in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best

interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*

*(In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*,

488 A.2d 858, 872 (Del. 1985)).

Sale of the Purchased Assets Free and
Clear of Liens, Claims, Encumbrances, and Interests

26.     It is appropriate for the Purchased Assets to be sold to the Purchaser free

and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the

Bankruptcy Code, with any such liens, claims, encumbrances, or interests to attach to the net sale

proceeds of the sale of the Purchased Assets. *See MacArthur Co. v. Johns-Manville Corp.*, 837

F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed

of free and clear of third-party interests, the third party is adequately protected if his interest is

assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank & Trust (In*

*re Circus Time, Inc.),* 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the Court's power to sell

property free and clear of liens has long been recognized); *see also In re Riverside Inv. P'ship*,

674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed

on the proceeds of the sale and discharged at the time of sale....").

27.     Any lien, claim, encumbrance, or interest in the Purchased Assets will be

adequately protected by attachment to the net proceeds of the sale, subject to any claims and

defenses the Debtors may possess with respect thereto. *See In re Circus Time, Inc.*, 5 B.R. at 7.

Moreover, each of the parties that may hold liens on the Purchased Assets could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. Thus, sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code. Accordingly, the Purchased Assets are to be transferred to Purchaser free and clear of all liens, claims, encumbrances, and interests, with any such liens, claims, encumbrances, and interests to attach to the net sale proceeds realized from the sale.

Assumption and Assignment of Contracts

28.    To facilitate and effect the sale of the Purchased Assets, the Debtors seek authorization to assume and assign the Contracts to the Purchaser. In order to provide counterparties with adequate notice of such assumption and proposed adequate cure amounts (the "Cure Amounts"), the Contracts have been divided into two categories. The first category is comprised of those Contracts that the Purchaser requires be assumed and assigned on the Closing Date (the "Closing Date Contracts"). The second category is comprised of Contracts as to which the Purchaser has sixty days within which to decide whether it wants to pay the Cure Amounts and assume the obligations thereunder (the "Designated Contracts").

29.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures*

*Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993).

30.     The assumption and assignment of the Contracts to the Purchaser is in the best interests of their estates and a proper exercise of business judgment. It allows the Debtors to avoid rejection damages if those contracts or leases would otherwise be rejected. Purchaser has agreed to pay all undisputed Cure Amounts associated with the Contracts, which are estimated to be approximately $1.5 billion.

31.     Section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure, or provide adequate assurance that they will promptly cure, any outstanding defaults under the Contracts that they will assume or assume and assign to the Purchaser. The Debtors and the Purchaser intend to develop a list of Closing Date Contracts, calculate the Cure Amounts relating thereto, and notify the counterparties thereto as soon as practicable, and in any event prior to the Sale Hearing. With respect to the Designated Contracts, the Debtors intend to file a motion setting forth the proposed procedure for notice and payment of Cure Amounts.

32.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Corlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (citation omitted); *see olso In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In*

*re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

33.    Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

34.    At the Sale Hearing, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the financial credibility, willingness, and ability of Purchaser to perform under the Closing Date Contracts. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Purchaser to provide adequate assurance of future performance under the Closing Date Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code. Accordingly, the Debtors respectfully request that at the conclusion of the Sale Hearing, the proposed assumption and assignment the Closing Date Contracts should be approved, to be effective upon entry of the order approving the Motion.

35.    Notwithstanding any anti-assignment language in a Closing Date Contract, the Debtors seek permission to assign such Closing Date Contract, provided that the Debtors first assume the Closing Date Contract and then provide adequate assurance of future performance by the Purchaser. To facilitate the assumption and assignment of the Closing Date Contracts, the

Debtors therefore request that the Court find all anti-assignment provisions of the Closing Date

Contracts to be unenforceable under section 365(f) of the Bankruptcy Code.[4]

36.    Section 365(k) of the Bankruptcy Code provides that assignment by the

debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for

any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k).

Pursuant to section 365(k), the Debtors and the estates shall be relieved from any liability for any

breach of any Closing Date Contract after such assignment to and assumption by the Purchaser

upon entry of an order approving the Motion.

### Good Faith Purchaser

37.    Section 363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under subsection (b) or
> (c) of this section of a sale or lease of property does not affect the validity of a
> sale or lease under such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  Section 363(m) thus provides that a purchaser of property of the estate is

protected from the effects of a reversal on appeal of the authorization to sell such property as

long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale.

38.    Although the Bankruptcy Code does not define the meaning of "good-faith

purchaser," most courts have adopted a traditional equitable definition: "one who purchases the

---

[4] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of
the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the
trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that
"Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that
terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a
right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract,
lease, right, or obligation may not be terminated or modified under such provision because of the assumption or
assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

assets for value, in good faith and without notice of adverse claims." *See, e.g., Licensing by Paolo*, 126 F.3d at 390. The Second Circuit has stated that:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not he made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'

*Id.* (internal citations omitted).

39.    The terms and conditions of the Purchase Agreement were negotiated by the Debtors and Purchaser at arm's length and in good faith. Each party was represented by sophisticated counsel. Accordingly, the Debtors request that the Court determine that the Purchaser has acted in good faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

### Request for Relief Under Bankruptcy Rules 6003(b), 6004(g), and 6006(d)

40.    Bankruptcy Rule 6003(b) permits a debtor to use, sell, lease, or otherwise incur an obligation regarding property of the estate during the first 20 days of a case only to the extent it is necessary to avoid immediate and irreparable harm. As set forth in greater detail above, it is necessary to sell the Purchased Assets during the first 20 days of these cases to avoid the immediate deterioration of value that will result without consummation of the proposed sale. Accordingly, Bankruptcy Rule 6003(b) has been satisfied.

41.    Bankruptcy Rule 6004(h) provides an "order authorizing the use, sale, or lease of property is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d). In light of the fragility of the Purchased Assets

and the need to stabilize the business of LBI and consummate the sale, the order approving the sale of the Purchased Assets, if granted, and the assumption and assignment of the Closing Date Contracts to the Purchaser in accordance with this Motion must be effective immediately upon entry of such order. Therefore, waiver of the ten-day stay under Bankruptcy Rules 6004(h) and 6006(d) is requested.

### Notice

42.    No trustee, examiner, or statutory creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on (i) the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates, (iii) the SEC, (iv) the Internal Revenue Service, (v) the United States Attorney for the Southern District of New York, (vi) counsel for the Purchaser, (vii) SIPC, (viii) Rock-Forty-Ninth LLC, (ix) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, and (x) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be given.

43.    No previous request for the relief sought herein has been made to this or

any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested and such other and further relief as is just.

Dated: September 17, 2008
New York, New York

*Jacqueline Marcus*

Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                :
In re                                           :    Chapter 11 Case No.
                                                :
LEHMAN BROTHERS HOLDINGS INC., *et al.*         :    08-13555 (JMP)
                                                :
                   Debtors.                     :    (Jointly Administered)
                                                :
------------------------------------------------------------x

### ORDER (I) APPROVING THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT, (II) CERTAIN MATTERS RELATING TO COMPETING BIDS, IF ANY, (III) APPROVING THE FORM AND MANNER OF SALE NOTICES AND (IV) SETTING THE SALE HEARING DATE IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' ASSETS

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008 (the "Purchase

Agreement"), among the Debtors, Lehman Brothers Inc. ("LBI" and, collectively with the

Debtors, the "Seller") and Barclays Capital, Inc. (the "Purchaser"); (B) establishing sales

procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of certain

of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances

and interests and the assumption and assignment of certain prepetition executory contracts and

unexpired leases (the "Contracts") relating to the Purchased Assets to the Purchaser or the

Successful Bidder(s); and upon the Court's consideration of the Motion and the record of the

---

[1] Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Agreement.

Sale Hearing held on September 17, 2008 with respect to procedural matters set forth in the

Motion, including the testimony and evidence admitted at the Hearing; and after due deliberation

thereon, and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this matter and over the property of the Debtors

and their respective bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is

a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N), and (O). The statutory predicates

for the relief sought herein are 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P.

("Bankruptcy Rules") 2002, 6004, 6006, 9006 and 9014. Venue of these cases and the Sale

Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The relief requested in the Sale Motion is in the best interests of the Debtors, their

estates, LBI, the stakeholders of the foregoing, and other parties-in-interest.

C.    Good cause exists to shorten the applicable notice periods in Bankruptcy Rules

2002, 6004 and 6006 and the applicable notice periods in the Local Rules.

D.    The Debtors' estates will suffer immediate and irreparable harm if the preliminary

relief requested in Sale Motion is not granted on an expedited basis consistent with the

provisions set forth herein.

E.    The notice of the Sale Motion and the Hearing given by the Debtors constitutes

due and sufficient notice thereof given the wasting nature of the Purchased Assets and the

exigent circumstances relating to this case.

F.    The Debtors have articulated good and sufficient reasons for the Court to (i)

approve the Break-Up Fee and Expense Reimbursement (each as defined on Exhibit A attached

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate. See Fed. R. Bankr. P. 7052.

hereto) as provided in the Purchase Agreement and in this Order, (ii) approve certain matters relating to competing bids, if any, (iii) approve the form and manner of notice of the Sale Motion, the Sale Hearing, and the assumption and/or assignment of the Contracts and (iv) set the Sale Hearing.

      G.    The Break-Up Fee and Expense Reimbursement shall be payable in accordance with the terms, conditions, and limitations of the Purchase Agreement, this Order and Exhibit A and (i) if triggered, shall be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503 of the Bankruptcy Code, (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size and nature of the Sale, the wasting nature of the Debtors' assets, and the efforts that have been and will be expended by the Purchaser notwithstanding that the proposed Sale is subject to higher or better Qualified Bids (as defined below) for the Purchased Assets, (iv) has been negotiated by the parties and their respective advisors at arms' length and in good faith and (v) is necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Purchased Assets. The Break-Up Fee and Expense Reimbursement are material inducements for, and conditions of, the Purchaser's entry into the Purchase Agreement. The Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Purchase Agreement unless it is assured of payment of the Break-Up Fee and Expense Reimbursement. Thus, assurance to the Purchaser of payment of the Break-Up Fee and Expense Reimbursement promotes the possibility of competitive bidding. Thus, the Purchaser has provided a benefit to the Debtors' estates by leaving its bid open for a period of time.

3

H.    The matters set forth on Exhibit A attached hereto are reasonable and appropriate and represent the best method for maximizing the realizable value of the Purchased Assets.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:

1.    The procedures set forth in the Sale Motion and the Break-Up Fee and Expense Reimbursement are approved.

2.    All objections filed or asserted in response to the Sale Motion are hereby overruled, to the extent that they relate to the procedures.

The Purchaser's Bid

3.    The transaction contemplated by the Purchase Agreement is designated as the "Purchaser's Bid."

Bid Matters

4.    The matters set forth on Exhibit A attached hereto and incorporated herein by reference, are hereby approved and shall govern all matters relating to any competing bids to the Purchaser's Bid for the Purchased Assets.

5.    If the Sellers do not receive any Qualified Bids, other than the Purchaser's Bid, by the Bid Deadline (as defined on Exhibit A), the Debtors shall seek approval of the Purchaser's Bid pursuant to the Purchase Agreement at the Sale Hearing (as defined below).

6.    The failure specifically to include or reference a particular provision of the matters set forth on Exhibit A in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the matters set forth on Exhibit A be authorized and approved in their entirety as modified by this Order.

Sale Hearing

7.    The Court shall hold a hearing on September 19, 2008 at    .m (New York time) (the "Sale Hearing") in the United States Bankruptcy Court for the Southern District of New

4

York in the courtroom of the Honorable James M. Peck, at which time the Court shall consider
the Sale Motion and approve the Successful Bidder. Objections to the Sale Motion, if any, shall
be filed and served on each of the Notice Parties (defined below) no later than 4:00 p.m. (New
York time) on September 18, 2008 (the "Objection Deadline"). The Sale Hearing shall not be
adjourned or canceled without prior consent of the Purchaser.

      8.     The failure of any objecting person or entity to timely file and serve its objection
by the Objection Deadline shall be a bar to the assertion, at the Sale Hearing or thereafter, of any
objection to the Motion, the Sale, or the Debtors' consummation and performance of the
Purchase Agreement (including the transfer of the Purchased Assets and the Closing Date
Contracts free and clear of liens, claims, and encumbrances).

      9.     The Sale Hearing may be adjourned by the Debtors with the prior consent of the
Purchaser from time to time without further notice to creditors or parties-in-interest other than by
announcement of the adjournment in open court or an entry of an order on the Court's docket.

Break-Up Fee and Expense Reimbursement

      10.    The Debtors are authorized and shall pay the Break-Up Fee and the Expense
Reimbursement upon the occurrence of any Break-Up Fee Event as provided under the Purchase
Agreement without further order of the Court. The Break-Up Fee shall be $100,000,000, and
shall be paid no later than two (2) business days after it becomes payable as set forth in the
Purchase Agreement. In addition, the Expense Reimbursement shall be paid by the Debtors no
later than five (5) business days after delivery of an invoice to the Debtors, subject to an
aggregate cap of $25,000,000 (the "Expense Reimbursement Cap").

      11.    The Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, as
provided by the Purchase Agreement, this Order and Exhibit A hereto shall be joint and several,
shall survive termination of the Purchase Agreement, shall constitute a superpriority

5

administrative priority claim against each of the Debtors pursuant to sections 105(a) and

364(c)(1) of the Bankruptcy Code until paid in accordance with the Purchase Agreement. In the

event that the Debtors (or any of their affiliates) receive any proceeds from an Alternate

Transaction prior to their payment of the Break-Up Fee or Expense Reimbursement, such

proceeds in an amount equal to the unpaid portion of the Break-Up Fee and the Expense

Reimbursement Cap shall be held in trust for the Purchaser until the Break-Up Fee and the

Expense Reimbursement are paid in full pursuant to this Order and the Purchase Agreement.

Notice

12.    Notice of (a) the Motion, (b) the Sale Hearing and (c) the proposed assumption

and/or assignment of the Closing Date Contracts to the Purchaser pursuant to the Purchase

Agreement or to a different Successful Bidder shall be good and sufficient, and no other or

further notice shall be required, if given as follows:

(a)    Notice of Sale Hearing. Within one (1) day after entry of this Order (the "Mailing Date"), the Debtors (or their agent) shall make a copy of this Order (including Exhibit A to this Order) (the "Sale Notice"), the Sale Motion, the Purchase Agreement and the proposed Sale Approval Order (as defined in the Sale Motion) available and shall provide notice of the Sale in a form which is reasonably acceptable to the Purchaser by email, facsimile, federal express or other overnight delivery service, upon (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Closing Date Contracts, (vii) the United States Attorney's office, (viii) the United States Department of Justice, (ix) the Securities and Exchange Commission (the "SEC"), (x) the Federal Reserve Bank of New York ("FRBNY"), (xi) the Securities Investor Protection Corporation. (xii) the Internal Revenue Service, and (xiii) all persons who have filed a notice of appearance in these cases.

(b)    Assumption, Assignment and Cure Notice. At least one (1) day prior to the Sale Hearing, the Debtors shall file with this Court and serve on each non-Debtor party to an Contract by federal express, or other overnight delivery service, a notice of assumption, assignment and cure in a form reasonably acceptable to the Purchaser (the "Assumption, Assignment and Cure Notice"). The Assumption, Assignment and Cure Notice shall state that parties to Contracts may find out whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). If the Contract is one which the

6

Purchaser designates for assumption and assignment at the closing (a "Closing Date Contract"), the Debtors will compute the appropriate cure amount (the "Cure Amount") for such Closing Date Contract and will list such Cure Amounts on the Website. If the Contract is one which the Purchaser designates for assumption and assignment within the 60 days after the Closing (a "Designated Contract"), the Debtors will file a motion for approval of procedures with respect to Designated Contracts at a later date.

(c)    Any non-Debtor party to a Closing Date Contract shall file and serve on the Notice Parties any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than the Sale Hearing. If no objection is timely received, (x) the non-Debtor party to the Closing Date Contract shall be deemed to have consented to the assumption and assignment of the Closing Date Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) any Cure Amount identified pursuant to the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Closing Date Contract, or any other document, and the non-Debtor party to a Closing Date Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Closing Date Contract against the Debtors or the Purchaser, or the property of any of them.

(d)    Successful Competing Bidder Other Than Purchaser. If a Successful Bidder other than the Purchaser is declared by the Debtors' Board of Directors, then no later than one (1) business day after that declaration, the Debtors shall send a subsequent Assumption, Assignment and Cure Notice to each non-Debtor party to an Contract identifying the Successful Competing Bidder.

13.    This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.


Dated: New York, New York
      September __, 2008


                                   _____
                                   UNITED STATES BANKRUPTCY JUDGE

7

## Exhibit A

### LEHMAN BROTHERS HOLDINGS INC.

By order of the Bankruptcy Court, set forth below are certain matters to be employed with respect to the proposed sale (the "Sale") of the Purchased Assets of the Debtors as set forth in the Purchase Agreement (as defined below). On September 16, 2008 the Debtors executed that certain Asset Purchase Agreement (the "Purchase Agreement") with Barclays Capital, Inc. (the "Purchaser"). The transaction contemplated by the Purchase Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court (as defined below) pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), and certain other closing conditions.

On September 17, 2008, the Debtors filed the Sale Motion seeking entry of the Orders: (I)(A) authorizing a Break-Up Fee and Expense Reimbursement, (B) approving certain matters relating to competing bids, if any, (C) the form and manner of sale notices and (D) a date for the Sale Hearing, and (II) (A) authorizing and approving the Sale of certain of the Debtors' assets free and clear of all liens, claims and encumbrances, (B) authorizing and approving the assumption and assignment of certain prepetition executory contracts and unexpired leases (the "Contracts") to the Purchaser or the Successful Bidder(s) and (C) granting related relief. On September ___, 2008, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") entered an Order: (I) authorizing a Break-Up Fee and Expense Reimbursement, (B) approving certain matters relating to competing bids, if any, as set forth in the Purchase Agreement, (C) approving the form and manner of sale notices and (D) fixing a date for the Sale Hearing (such order, the "Break-Up Fee and Competing Bid Order"). Terms used but not defined herein shall have the meanings ascribed to them in the Break-Up Fee and Competing Bid Order. The Break-Up Fee and Competing Bid Order set [September ___], 2008 as the date when the Bankruptcy Court will conduct a hearing (the "Sale Hearing") to authorize the Debtors to enter into the Purchase Agreement.

1.    No Competing Bids to be Evaluated by the Debtors Other than Qualified Bids

The Debtors shall not consider or evaluate putative competing bids for the Purchased Assets except in accordance with the provisions set forth below (such bids meeting the criteria set forth herein, "Qualified Bids"). The manner in which bidders and bids become Qualified Bidders (as defined below) and Qualified Bids, respectively, the provision of confidential information to bidders, the receipt and negotiation of bids received, the ultimate selection of the Successful Bidder(s), and the Bankruptcy Court's approval thereof (the "Bid Matters") are discussed below. In the event that the Debtors and any party disagree as to any Bid Matters, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

1

2.    Debtors Shall Not Solicit or Engage In Discussions Regarding Proposals for
Competing Transactions

From the date of execution of the Purchase Agreement until the earlier of (i) the
Closing and (ii) the termination of the Purchase Agreement in accordance with its terms,
none of Debtors, any of the Debtors' direct or indirect subsidiaries, or any agent or
advisor to the Debtors or any of the Debtors' direct or indirect subsidiaries shall, directly
or indirectly, through any officer, director, employee, agent, professional, advisor, other
representative ("Representatives") or otherwise, (A) solicit, initiate, encourage or
facilitate any proposal or offer from any Person (other than the Purchaser) relating to any
financing, refinancing, acquisition, divestiture, business combination or reorganization or
similar transaction involving a material portion the Business, the Purchased Assets or the
business, assets or operations of LBI or any of its subsidiaries or the equity securities of
LBI or any of its subsidiaries (a "Competing Transaction"), (B) enter into discussions or
negotiations regarding a Competing Transaction, (C) furnish any information with
respect to, enter into any agreement or understanding with respect to, otherwise assist or
participate in, or facilitate in any other manner any Competing Transaction (including,
without limitation, executing any confidentiality agreement with any other Person with
respect to a Competing Transaction), (D) waive any rights under any existing standstill or
waiver agreements, or (E) seek or support Bankruptcy Court approval of a motion
regarding bid procedures or expense reimbursement or break up fee for the benefit of any
party with respect to a Competing Transaction or take any action inconsistent in any way
with the Purchase Agreement or achieving the Closing by 5:00pm (New York time) on
September 24, 2008 (any action described in clauses (A) through (E), a "Prohibited
Action").

3.    Debtors Permitted to Take Certain Prohibited Actions in Certain Circumstances

Notwithstanding the foregoing provisions of Section 2, in the event Debtors
receive an unsolicited *bona fide* offer or proposal for a Competing Transaction prior to
the entry of the Sale Order and Debtors' Boards of Directors conclude in good faith (after
consultation with its outside financial and legal advisors) that such offer or proposal
constitutes or is reasonably likely to result in a Superior Proposal, then, prior to the entry
of the Sale Order, Debtors may, and may permit their subsidiaries and Representatives to,
take any Prohibited Action described in clause (B) or (C) (other than enter into any
agreement) of Section 2; provided that (x) prior to providing any nonpublic information
permitted to be provided pursuant to this sentence, Debtors shall have entered into a
confidentiality agreement with such third party on customary terms and which in any
event is no less favorable to Debtors than the Confidentiality Agreement, and (y)
concurrently with providing such information, Debtors shall also furnish to Purchaser a
copy of any confidential data or information that it is furnishing to any third party
pursuant to this Section 3 to the extent not previously furnished to Purchaser. "Superior
Proposal" means any *bona fide* written proposal or offer with respect to a Competing
Transaction made by a Qualified Bidder (A) to acquire, directly or indirectly, 100% of
the Business for consideration consisting of cash and/or securities (with a value of at least
$1,875,000,000) and the assumption of substantially all liabilities required to be assumed
by Purchaser under the Purchase Agreement, and (B) which is otherwise on terms which

2

the Boards of Directors of the Debtors determine in its reasonable good faith judgment (after consultation with its financial advisor and outside counsel), taking into account, among other things, all legal, financial, regulatory and other aspects of the proposal or offer, (1) if consummated, would result in a transaction that is more favorable, from a financial point of view, to the Debtors' stakeholders than the transactions contemplated by the Purchase Agreement and (2) is reasonably capable of being promptly consummated, including with respect to receipt of all required regulatory approvals. "Qualified Bidder" means a third party that (i) enters into or arranges for one or more credit or liquidity facilities with respect to the obligations of Debtors and the Business that are at least equivalent to the financing facilities to be provided to Debtors and their Affiliates by Purchaser and its Affiliates (which credit or liquidity facilities shall take effect simultaneously with the termination of, and shall supersede, and the proceeds of which shall be used to repay in full, such facilities to be provided by Purchaser and its Affiliates) and (ii) arranges for the termination of any Master Repurchase Agreement, Master Securities Lending Agreement, Master Open Market Agreement or any other financing between any of the Debtors and FRBNY, no later than the opening of business, New York time, on Monday, September 22, 2008 and provides adequate assurance of performance of such obligations in a manner satisfactory to FRBNY.

4.    Bidder Required to Provide Certain Information in Connection with Other Competing Bids

Debtors will within 24 hours advise Purchaser orally and in writing following receipt of (1) any offer or proposal for a Competing Transaction or indication by any person that it is considering making an offer or proposal relating to a Competing Transaction, (2) any request for nonpublic information relating to Debtors or its subsidiaries or access to the properties, books or records of Debtors of any of its subsidiaries, other than requests in the ordinary course of business and unrelated to an offer or proposal relating to a Competing Transaction, or (3) any inquiry or request for discussions or negotiations regarding an offer or proposal relating to a Competing Transaction. Debtors will promptly (within 24 hours) provide Purchaser with a copy (if in writing) and summary of the related material terms of any such offer or proposal or request (including the identity of the person making or considering such offer or proposal or making such request) and will keep Purchaser apprised of any material developments, discussions and negotiations on a reasonably current basis (and in any event within 24 hours).

5.    Debtors Obligated to Negotiate

Notwithstanding anything herein to the contrary, prior to entering into an agreement in connection with any Competing Transaction, Debtors shall have provided prior written notice to Purchaser, at least 48 hours in advance (the "Notice Period"), of its intention to take such action with respect to such Competing Transaction, specifying the material terms and conditions of any such Competing Transaction (including the identity of the party proposing to effect such Competing Transaction) and furnishing to Purchaser a copy of the relevant proposed transaction agreements with the party proposing to effect such Competing Transaction and other material documents) and (B) during the Notice

3

Period, and in any event prior to taking such action, Debtors have negotiated, and have caused its financial and legal advisors to negotiate, with Purchaser in good faith (to the extent Purchaser desires to negotiate) to make such adjustments in the terms and conditions of the Purchase Agreement so that such proposal or offer for a Competing Transaction ceases to constitute a Superior Proposal.

6.    Break-Up Fee and Expense Reimbursement

Recognizing the Purchaser's expenditure of time, energy, and resources, the Debtors have agreed that if the Purchaser is not the Successful Bidder, the Debtors will, in certain circumstances, pay to the Purchaser a fee in the amount of $100,000,000 (the "Break-Up Fee") and reimbursement for the Purchaser's expenses (including the fees and expenses of Purchaser's legal counsel and financial advisors) incurred in connection with the Purchase Agreement, the Sale Motion, Sale Order, and the Bid Matters or the Break-Up Fee and Competing Bid Order and financings or proposed financings (the "Expense Reimbursement"), subject to the Expense Reimbursement Cap. The payment of the Break-Up Fee and Expense Reimbursement will be governed by the provisions of the Purchase Agreement and the Break-Up Fee and Competing Bid Order. Under no circumstances will a break-up fee, expense reimbursement or other similar bid protections be provided by the Debtors to any potential bidder or bidder other than the Purchaser that submits a Qualified Bid.

7.    Additional Bids by Qualified Bidders With an Initial Qualified Bid and the Purchaser

With respect to additional bids by the Purchaser and any Qualified Bidder which makes a Qualified Bid, subsequent or otherwise higher or better offers shall be in minimum bids with a purchase price of at least an additional $100 million in cash consideration over the last highest offer, with any subsequent bid increases of bids to be made in minimum increments of at least $100 million in cash consideration. The Debtors shall notify the Purchaser of the bid and the value of such bid that their Boards of Directors believe to be the highest offer.

8.    The Sale Hearing

The Sale Hearing will be held before the Honorable Judge James M. Peck on September 19, 2008 at 11:00 a.m. (New York time) in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY. The Sale Hearing may be adjourned or rescheduled with the consent of the Purchaser without further notice by an announcement of the adjourned date at the Sale Hearing. If the Debtors do not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), the Debtors will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Purchaser following entry of the Sale Order.

EXHIBIT 2

EXECUTION COPY

~~DRAFT – September 16, 2008~~

~~CONFIDENTIAL~~

ASSET PURCHASE AGREEMENT

AMONG

LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS INC.

LB 745 LLC

AND

BARCLAYS CAPITAL INC.

Dated as of September 16, 2008

1

[New York #1948695 v2]

TABLE OF CONTENTS

Page

"745"

## ASSET PURCHASE AGREEMENT

Delaware

ASSET PURCHASE AGREEMENT, dated as of September 16, 2008 (this "Agreement"), among LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), LEHMAN BROTHERS INC., a Delaware corporation ("LBI" and, together with LBHI, the "Seller"), LB 745 LLC, a [——] limited liability company (collectively, "Seller"), and BARCLAYS CAPITAL INC., a Connecticut corporation ("Purchaser").

## WITNESSETH:

LBHI

WHEREAS, [———] is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Case No. [08-13555]) (the "Bankruptcy Case");

WHEREAS, the Seller and its Subsidiaries presently conduct the Business;

and 745      and 745

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Purchased Assets and Assumed Liabilities, all as more specifically provided herein; and

WHEREAS, Purchaser has agreed to provide to LBHI a debtor-in-possession facility (the "DIP Facility") and has agreed to provide to LBI certain other financing;

an Affiliate of

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1    Certain Definitions.

For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms

ERROR! UNKNOWN DOCUMENT PROPERTY NAME

1

[New York #1948695 v2]

"controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities by contract or otherwise.

"Ancillary Agreements" means [_____]

"Breakup Fee and Competing Bid Order" means an order of the Bankruptcy Court in the form attached as Exhibit [] hereto. "Business" means the U.S. and Canadian investment banking and capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease or other agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to or necessary for the conduct of the Business and the Purchased Assets in each case whether or not in electronic form.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" shall mean the following assets, properties, interests and rights of Seller and its Subsidiaries:

(a)     the shares of capital stock, limited liability company membership, general and limited partnership, and other equity interests, of Seller and its Subsidiaries (other than (i) the capital stock of Townsend Analytics and (ii) the capital stock or other equity interest of any other Subsidiary that Seller and Purchaser may agree shall be a Purchased Asset prior of the entry of the Sale Order);



[New York #1948695 v2]

[handwritten annotations: "(the", "than", "Reserved", "all intercompany receivables"]

(b)    all cash, cash equivalents, bank deposits or similar cash items of LBI and its Subsidiaries other than the $1.3 billion in cash, cash equivalents, bank deposits or similar cash items held on the date hereof (and any securities, property or assets of any type purchased or otherwise acquired directly or indirectly therewith) (the "Retained Cash");

[handwritten: Reserved]

(c)    securities not listed on Exhibit A and any securities, property or assets of any of type purchased or otherwise acquired directly or indirectly therewith;

(d)    the Excluded Contracts, including any accounts receivable to the extent arising out of any Excluded Contract;

[handwritten: Rights that does not constitute Purchased Intellectual Property]

(e)    any Excluded Intellectual Property [PLEASE DESCRIBE];

(f)    any (i) confidential personnel and medical records pertaining to any Excluded Employee; (ii) other books and records that LBI is required by Law to retain, including, but not limited to, books and records required to be retained by Rules 17a-3 and 17a-4 of the Exchange Act with respect to the Purchased Assets or that LBHI reasonably determines are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets; and (iv) minute books, stock ledgers and stock certificates of Subsidiaries..

(g)    any claim, right or interest of LBHI or any of its Subsidiaries in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date;

(h)    all insurance policies or rights to proceeds thereof relating to the assets, properties, business or operations of Seller or any of its Subsidiaries other than customer account insurance supplemental to SIPC coverage included in the Business;

[handwritten: those]

(i)    any rights, claims or causes of action of Seller or any of its Subsidiaries against third parties relating to assets, properties, business or operations of Seller or any of its Subsidiaries other than primarily related to Purchased Assets arising out of events occurring on or prior to the Closing Date;

(j)    commercial real estate investments (including commercial loans, equity investments in such commercial real estate and other commercial real estate assets), private equity investments and hedge fund investments;

(k)    50% of each position in residential real estate mortgage securities;

[handwritten: and all Archstone debt and equity positions]

3

*[handwritten: primarily]*

(l)    assets related to the soliciting, placing, clearing and executing of buy and sell orders for futures and derivatives contracts by Lehman Brothers Derivative Products Inc. and all activities related or ancillary thereto;

(m)    all artwork owned by Seller and its Subsidiaries;

(n)    all assets related to the IMD Business and derivatives contracts;

(o)    any assets set aside, segregated, or otherwise specifically identified as being held for the purpose of satisfying Excluded Liabilities referred to in Section 2.4(e); and    *[handwritten: 1.1(a)]*

(p)    all real property leases of Seller and its Subsidiaries, and all rights and obligations appurtenant thereto, as set forth on Schedule [•], other than the Transferred Real Property Leases; *[handwritten: (;) ; and]*

(q)    the assets set forth on Schedule [•]    *[handwritten: (q) Lehman Commercial Paper Inc. and any assets thereof,]*

"Excluded Contracts" means all of the Contracts of Seller and its Subsidiaries, other than the Purchased Contracts.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or used by Seller and its Subsidiaries in the conduct of the Business, including all desks, chairs, tables, Hardware, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Hardware" means any and all computer and computer-related hardware, networks and peripherals, including, but not limited to, information and communication systems, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

4

"IMB Business" means [the investment management business of Seller and its Subsidiaries.]

"Intellectual Property Rights" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether owned or held for use under license, whether registered or unregistered, including without limitation such rights in and to: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon (collectively, "Patents") and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto (collectively, "Marks"), (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights (collectively, "Copyrights"), (iv) all Software, Technology and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Intellectual Property Licenses" means (i) any grant to a third Person of any license, immunity, a covenant not to sue or otherwise any right to use or exploit, any of the Purchased Intellectual Property owned by Seller or any of its Subsidiaries, and (ii) any grant to Seller or its Subsidiaries of a license, immunity, a covenant not to sue or otherwise any right to use or exploit any Purchased Intellectual Property which is not owned by Seller or any of the Subsidiaries.

"Knowledge of Seller" means the knowledge after due inquiry, as of the date of this Agreement, of the senior officers and directors of Seller and its Subsidiaries.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation (including rules of any self-regulatory organization).

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings or investigations by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude,

5

[New York #1948695 v2]

proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business through September 14, 2008 consistent with past practice.

"Permits" means any approvals, authorizations, consents, licenses, permits, registrations or certificates of a Governmental Body.

"Permitted Exceptions" means all (i) defects, exceptions, restrictions, easements, rights of way and encumbrances of record, (ii) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings provided an appropriate reserve is established therefor; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; (vi) Liens arising under the DIP Facility; and (vii) the terms and provisions of the ground lease and related documents affecting the property located at 745 Seventh Avenue, New York, NY (the "745 Seventh Ground Lease").

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Purchased Assets" means all of the assets of Seller ~~and its Subsidiaries~~ used in connection with the Business (excluding the Excluded Assets), ~~including~~;  *Stet*

(a)    the Retained Cash;

(b)    all deposits (including customer deposits, security deposits for rent, electricity, telephone or otherwise and required capital deposits) and prepaid charges and expenses of Seller and its Subsidiaries associated with the Business, other than any deposits or prepaid charges and expenses paid in connection with or relating to any Excluded Assets;

(c)    ~~all rights of Seller and its Subsidiaries under [real property / real property leases]~~, together with all improvements, fixtures and other appurtenances thereto and rights in respect thereof;

*the Transferred Real Property Leases*

6

(collectively, "Long Positions")

*with a book value as of the date hereof of approximately $70 billion*

(d) government securities, commercial paper, ~~mortgage loans~~ corporate debt, corporate equity, exchange traded derivatives and collateralized short-term agreements;

securities;

(e) 50% of each position in the residential real estate mortgage

(f) the Furniture and Equipment;

(g) the Purchased Intellectual Property and all income, royalties, damages and payments due or payable at the Closing or thereafter relating to the Purchased Intellectual Property (including damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover damages for past or future infringements or misappropriations thereof and the right to fully and entirely stand in the place of Seller in all matters related thereto;

(h) the Purchased Contracts;

(i) all Documents that are used in, held for use in or intended to be used in, or that arise in connection with, or are necessary to carry on or are related to the operation of the Business, including Documents relating to products, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), account agreements, books and records required to be maintained in connection with the Business under applicable Law, compliance manuals, supervisory policies and procedures, customer lists, supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, but excluding (i) personnel files for Excluded Employees of Seller or its Subsidiaries who are not Transferred Employees, (ii) such files as may be required under applicable Law regarding privacy, (iii) Documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any Documents primarily related toany Excluded Assets;

(j) all Permits used by Seller in the Business to the extent assignable under applicable Law;

(k) all supplies owned by Seller and used in connection with the Business;

(l) all rights of Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees, contractors and agents of Seller or its Subsidiaries or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m) ~~to the extent specifically provided in Article IX, the assets, if any, that constitute a part of the Qualified Plans, the VEBA and the Business Plans;~~

7

*(handwritten)* (t) any insurance proceeds from the occurrence after the date hereof and prior to the Closing, of any casualty or event loss with respect to any Transferred Real Property Lease or any properties subject thereto,

(n)   rights to "Lehman" indices and analytics that support the indices; *(handwritten: and all other indices and analytics used in the Business)*

(o)   general trading tools supporting the Business;

(p)   the stock of Townsend Analytics and the stock, equity interests or assets of any other Subsidiary of LBI that the Seller and Purchaser may mutually agree on prior of the entry of the Sale Order and of which a notice has been provided to any statutory committee;

(q)   the equity interests or assets (at the election of Purchaser in its sole discretion prior to the entry of the Sale Order) of Eagle Energy Management LLC;

(r)   all past and present goodwill and other intangible assets associated with or symbolized by the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property; ~~and~~ *(handwritten: ; and)*

(s)   Mercantile Exchange license agreements with respect to 335 South LaSalle Street, Chicago, IL and 400 South LaSalle Street, Chicago, IL/

"Purchased Contracts" means all Contracts associated with *(handwritten: or arising from)* ~~or necessary to carry on or are related to the operation of the Business, including those Contracts set forth on Schedule 1.1(c) (not including an assets listed under Excluded Assets)~~ *(handwritten: designated as Purchased Contracts pursuant to Section 2.5)*

"Purchased Intellectual Property" means the Purchased Marks and all other Intellectual Property Rights throughout the world that are used in, related to, or otherwise necessary for the Business, including all Intellectual Property Rights embodied in the Furniture and Equipment, *(handwritten: , Software and Technology)* ~~the Software, the Technology and the Documents that are included in Purchased Assets.~~

~~"Purchaser Procedures Order" means an order of the Bankruptcy Court substantially in the form attached as Exhibit A. [NTD: Fix Exhibit numbering]~~

"Purchased Marks" means the Mark "LEHMAN" and "LEHMAN BROTHERS" throughout the world, all other Marks throughout the world containing or incorporating the name "LEHMAN," the Internet domain name www.lehman.com, all other Internet domain names containing or incorporating any Purchased Marks, and any other Mark throughout the world that is used in, related to, or otherwise necessary for the Business; in each case, together with all of the goodwill associated therewith and all registrations and applications for the foregoing and all common law rights thereto.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Breakup Fee and Competing Bid Order and Sale Order.

"Sale Order" shall be an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller approving this Agreement and all of the terms and conditions hereof, and approving and authorizing Seller to

8

[New York #1948695 v2]

consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Purchaser pursuant to this Agreement shall be transferred to Purchaser free and clear of all Liens (other than Liens created by Purchaser and Permitted Exceptions) and claims, such Liens and claims to attach to the Purchase Price; (ii) Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (iii) this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; (iv) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 13.3 hereof; and (v) this Agreement and the transactions contemplated hereby may be specifically enforced against and binding upon, and not subject to rejection or avoidance by, Seller or any chapter 7 or chapter 11 trustee of Seller.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means any Person of which a majority of the outstanding voting securities or other voting equity interests are owned, directly or indirectly, by Seller.

"Tax Authority" means any state or local government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials,

9

[New York #1948695 v2]

specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or confidential information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"Transferred Real Property Leases" means the leases listed on Schedule [•] attached hereto and any rights and obligations appurtenant thereto.

1.1(b)

1.2     Other Definitional and Interpretive Matters

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

10

[New York #1948693 v2]

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES    *and 7.45*

2.1     Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing (as defined below), Purchaser shall purchase, acquire and accept from the Seller, and Seller shall sell, transfer, assign, convey and deliver (or cause to be sold, transferred, assigned, conveyed and delivered) to Purchaser, all of Seller's and its applicable Subsidiaries' right, title and interest in, to and under the Purchased Assets free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code.

2.2     Excluded Assets. Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets.

2.3     Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities of Seller and its Subsidiaries (collectively, the "Assumed Liabilities"):

(a)     all Liabilities of Seller incurred, after the Closing, in connection with the Business;

(b)     all Liabilities of Seller under the Purchased Contracts arising after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code;

(c)     all Liabilities assumed under Article IX;

(d)     accounts payable incurred in the Ordinary Course of Business of Seller after, with respect to each entity comprising Seller, the date on which such entity commenced a voluntary case or cases under Chapter 11 or Chapter 7, as the case may be, of the Bankruptcy Code, associated with the Business other than any accounts payable

11

{New York #1943695 v2}

*short positions and "repos" relating to any securities or interests of the types included in the definition of "Long Positions" (collectively, "Short Positions" and, together with the Long Positions, ~~the~~ "Positions")*

arising out of one in connection with any Excluded Contract (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable);

(e)    all Transfer Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(f)    all other Liabilities to the extent related to the Business, the Purchased Assets or the Transferred Employees arising after the Closing;

*(with a book value as of the date hereof of approximately $69 billion*

(g)    all Liabilities under Transferred Real Property Leases from the date of Closing forward;

(h)    all Liabilities relating to amounts required to be paid by Purchaser hereunder; and

(i)    all ~~liabilities relating to the short Positions. [NFD. Where is "Positions" defined?]~~

2.4    Excluded Liabilities. Notwithstanding anything herein to the contrary, Purchaser will not assume or be liable for any Excluded Liabilities. "Excluded Liabilities" shall mean all Liabilities of Seller and its Subsidiaries to the extent they do not arise out of the Business and the following Liabilities:

(a)    all Liabilities arising out of Excluded Assets, including Contracts that are not Purchased Contracts;

(b)    except as otherwise provided in [Article XIII], all Liabilities for Taxes of Seller for any Tax periods (or portions thereof) ending on or before the Closing Date;

(c)    except as otherwise provided in this Agreement, *(and)* liabilities incurred in the Ordinary Course of Business existing prior to the filing of the Bankruptcy Case that are subject to ~~compromise under the Bankruptcy Case~~ (the "Compromised Liabilities") *(other than any Cure Amounts that Purchaser is required to pay pursuant to Section 2.5)*    *M.C.*    *l.C.*

(d)    except as expressly assumed pursuant to Article IX hereof, any Liabilities relating to the employment, potential employment or termination of employment of any Person relating to or arising out of any period prior to the Closing, including without limitation any Liability under or relating to any employee benefit plan, program, agreement or arrangement, including in respect of equity compensation plans and tax-qualified or not tax-qualified pension or saving plans as to which the parties agree there shall be no transfer to or assumption of liabilities by the Purchaser;    *M.C.*

(e)    all Liabilities relating to amounts required to be paid by Seller, hereunder, including upon any breach;

12

[New York #1948695 v2]

*[handwritten: (g) all intercompany payables;]*

*[handwritten: a Contract not designated as a Purchased Contract(]*

(f)    all Liabilities under Excluded Real Property Leases and Transferred Real Property Leases other than Liabilities under Transferred Real Property Leases from the date of Closing forward *[handwritten: ( and )]*

2.5    Cure Amounts. *[handwritten: v]* *[handwritten: ( : )]* *[handwritten: " )"]*

*[handwritten: This Section will not apply to Transferred Real Property Leases]*

For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from the Seller by Purchaser or its Affiliates (the "Related Contracts") as either (1) a Purchased Contract or (2) a Rejected Contract. Until a Related Contract is so designated, Buyer shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof. If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof. In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court.

*[handwritten: Purchased]* *[handwritten: real property leases]*

2.6    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Seller shall, or shall cause its Affiliates to, make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, without further consideration, Seller and Purchaser shall, and shall cause their respective Affiliates to, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further conveyances, deeds, assignments, notices, assumptions, releases, acquaintances, powers of attorney and assurances (including any notarization, authentication, legalization and consularization of the signatures of Seller's and its Subsidiaries' representatives), and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Seller Documents, and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(c)    If any third-party consent is required for the assignment of any Intellectual Property Licenses to Purchaser and such consent cannot be obtained, then, to the extent permitted by Applicable Law, Seller shall sublicense whatever rights they are permitted to sublicense under the respective Intellectual Property Licenses, provided such sublicense is at no cost to Seller. If, however, Seller is permitted to sublicense only at a

13

one time, fixed payment or an ongoing fee, Seller shall notify Purchaser thereof and, only if Purchaser agreed in writing to be responsible to such payment or fee, as applicable, Seller shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property Licenses, subject to the payment or fee being paid by Purchaser.

2.7     Bulk Sales Laws.  Purchaser hereby waives compliance by Seller and its Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

ARTICLE III

CONSIDERATION

3.1     Consideration.  The aggregate consideration for the Purchased Assets shall be (a) the Cash Amount and (b) the assumption of the Assumed Liabilities by Purchaser. The "Cash Amount" shall equal an amount in cash equal to the sum of (i) $250 million, (ii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Lehman headquarters at 745 Seventh Avenue in New York City less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, (iii) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Cranford New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing, and (iv) the appraised value (as reasonably determined by an independent, recognized appraiser) of the Piscataway New Jersey Data Center less a reasonable market commission that would be paid assuming a sale of such property as of the Closing. For illustrative purposes only, the parties note that as of the date hereof they expect that the Cash Amount will be approximately $1.7 billion (less the aforementioned assumed commissions).

3.2     Payment of Cash Amount.  On the Closing Date, Purchaser shall pay the Cash Amount to Seller, which shall be paid by wire transfer of immediately available funds into an account designated by Seller.

*Position*

3.3     Adjustment to Cash Amount.  Promptly following the first anniversary of the Closing Date, Purchaser shall determine with respect to each Position (long or short, including repos) that was part of the Purchased Assets and was sold on or prior to such first anniversary, the profit or loss realized from such sale (such profit or loss determined by reference to LBI's mark (book value) for such position as of the date hereof). Purchaser shall provide reasonable supporting information to Seller with respect to such calculation of profit or loss. If the aggregate amount of all such profits exceeds the aggregate amount of all such losses (a) by up to $500 million, Purchaser shall promptly pay Seller such net amount, or (b) by more than $500 million, Purchaser shall promptly pay Seller the sum of $500 million plus one-half of the excess of such net amount over $500 million (but in no event shall Purchaser pay Seller more than $750 million pursuant

*exceeds*

to this Section 3.3). For purposes of this Section 3.3, the time value of money shall be disregarded and no interest shall be deemed earned.

## ARTICLE IV

## CLOSING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Weil, Gotshal & Manges LLP located at 767 Fifth Avenue, New York, New York 10153 (or at such other place as the parties may designate in writing) at 10 a.m (New York time) on the day of, or at Purchaser's election the day following, the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of Seller to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

*Business*

*M.C.*

4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)    a duly executed, reasonably customary bill of sale in the form of Exhibit A hereto;

(b)    duly executed, reasonably customary assignment and assumption agreements (including, with respect to the 745 Seventh Ground Lease, all assignments that were entered into in connection with Seller's acquisition of such lease) and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

*and Canadian*

*and Canadian*

(c)    a certificate, duly executed by Seller, that Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(d)    the Seller Subleases; and

(e)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary to convey the Purchased Assets to Purchaser or as Purchaser may reasonably request, including such instruments of conveyance and transfer in form and substance comparable to the

*duly executed )is*    *and the Purchaser Subleases*

instruments of conveyance and transfer exchanged in connection with Seller's acquisition of the 745 Seventh Ground Lease.

4.3    Deliveries by Purchaser. At the Closing, Purchaser shall deliver to Seller:

(a)    the Purchase Price, in immediately available funds, as set forth in Section 3.2 hereof;

(b)    a duly executed, reasonably customary assignment and assumption agreement ~~in the form attached hereto as Exhibit B~~ hereto; and

*(duly executed)*    (c)    the Purchaser Subleases *(and the Seller Sublease)*

4.4    Termination of Agreement. This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or Seller, if the Closing shall not have occurred by the close of business on September 24, 2008 (the "Termination Date");

(b)    by mutual written consent of Seller and Purchaser;

(c)    by Seller or Purchaser if there shall be in effect a final nonappealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that the parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)    by Purchaser upon ~~(A) a Seller's selection of a Successful Bidder (as defined in the Breakup Fee and Competing Bid Order) other than Purchaser in the Auction, (B) the completion of the Auction if Sellers have not selected a Successful Bidder, (C)~~ the entry of an order by the Bankruptcy Court authorizing a Competing Transaction, *(or)* ~~(D) a Seller's selection of a Person other than Purchaser as the purchaser in an Alternative Transaction, regardless of whether or not an order authorizing such transaction has been entered by such date, (E) any breach by a Seller of Article VII, or (F) any breach by a Seller of the terms of the Breakup Fee and Competing Bid Order; or [TO BE CHANGED BASED ON CHANGES TO BPO WHICH ARE IN PROGRESS;]~~

(e)    by Purchaser if the Breakup Fee and Competing Bid Order is not approved by the Bankruptcy Court in the form attached hereto as Exhibit [ *(A)* ].

4.5    Procedure Upon Termination. In the event of termination and abandonment by Purchaser or Seller, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein each party shall redeliver all documents, work papers and other material of any

16

[New York #1948695 v2]

other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6    Effect of Termination.    ⑤    [and 8.6]

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the obligations of the parties set forth in Section Error! Reference source not found., Section 4.6 and Article XIII hereof shall survive any such termination and shall be enforceable hereunder.

(b)    Nothing in this Section 4.6 shall relieve Purchaser or Seller of any liability for a material breach of this Agreement prior to the date of termination. The damages recoverable by the non-breaching party shall include all attorneys' fees reasonably incurred by such party in connection with the transactions contemplated hereby.

(c)    The Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or Seller of their obligations under the Confidentiality Agreement; provided, that upon the termination of this Agreement, the non-solicitation obligations of Purchaser and its Affiliates under the Confidentiality Agreement shall be of no further force and effect.

(d)    In the event that Purchaser terminates this Agreement pursuant to Section 4.4(d), Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order.

(e)    In the event that Purchaser or Seller terminates this Agreement pursuant to Section 4.4(a) and at any time after the date of this Agreement and prior to such termination a proposal for a Competing Transaction shall have been publicly disclosed or otherwise communicated to the Sellers and shall not have been irrevocably [bona fide] withdrawn, Sellers shall pay to Purchaser (i) the Break-Up Fee promptly upon such termination and (ii) the Expense Reimbursement as provided in the Breakup Fee and Competing Bid Order

[then if a Qualified Bid shall be consummated within twelve months after such termination]

(f)    The parties hereto acknowledge that the agreements contained in this Section 4.6 are an integral part of the transactions contemplated by this Agreement. The Sellers shall be jointly and severally liable for any amount due to Purchaser pursuant to this Section 4.6. In the event that the Sellers shall fail to pay any amounts due pursuant to this Section 4.6, the Sellers shall reimburse Purchaser for all reasonable costs and expenses actually incurred or accrued by Purchaser (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of this Section 4.6.

[on the date of such Consummation]

[; provided further that upon the Closing, the non-solicitation obligation of Purchaser and its Affiliates under the Confidentiality Agreement with respect to non-U.S. employees of the broker-dealer and investment banking business shall ... of ... further force and effect.]

[New York #1948695] 21

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Seller is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not have a material adverse effect.

5.2    Authorization of Agreement. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, or instrument or certificate contemplated by this Agreement or to be executed by Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by Seller which is a party thereto and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale Order, and, with respect to Seller's obligations under Section 4.4, the entry of the Breakup Fee and Competing Bid Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller or, as the case may be, its Subsidiary in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    Conflicts; Consents of Third Parties.

(a)    None of the execution and delivery by Seller of this Agreement or by Seller and its Subsidiaries of the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by Seller and its Subsidiaries with any of the provisions hereof or thereof will conflict with, or result in any violation of

18

or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller or any Subsidiary; (ii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; other than, in the case of clause (ii), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller or any Subsidiary in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by Seller or any Subsidiary with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby nr the taking by Seller or any Subsidiary of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, (ii) the entry of the Sale Order, (iii) the entry of the Breakup Fee and Competing Bid Order with respect to Seller's obligations under Section Error! Reference source not found., (iv) filings of applications and notices with, and receipt of consents, authorizations, approvals, exemptions or non-objections from, the Securities and Exchange Commission (the "SEC"), foreign and state securities authorities, the Financial Industry Regulatory Authority ("FINRA"), the Commodity Futures Trading Commission ("CFTC"), National Futures Association ("NFA") applicable securities, commodities and futures exchanges, the Financial Services Authority ("FSA") and other industry self-regulatory organizations ("SRO"), and (v) the filing of any other required applications, filings or notices with the Board of Governors of the Federal Reserve System (the "Federal Reserve"), any foreign, federal or state banking, other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities, and (iv) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not have a material adverse effect.

5.4    Title to Purchased Assets.    Except as set forth in Schedule 5.4, and other than the Real Property subject to the Real Property Leases, intellectual property licensed to Seller and the personal property subject to the Personal Property Leases, Seller owns (directly or indirectly) each of the Purchased Assets, and Purchaser will be vested with good and exclusive title to such Purchased Assets, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. The Purchased Assets, together with all of Seller's agreements hereunder and under the Seller Documents, constitute all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated.

19

5.5    Compliance with Laws; Permits.

(a)    Seller and its Subsidiaries, and their respective personnel, are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not have a material adverse effect. Neither Seller nor any of its Subsidiaries has received any written notice of or been charged with the violation of any Laws applicable to their respective operations or assets or the Business, except where such violation would not have a material adverse effect.

(b)    Seller and its Subsidiaries currently have all Permits which are required for the operation of the Business as presently conducted, except where the absence of which would not have a material adverse effect. Neither Seller nor any of its Subsidiaries is in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party required for the operation of the Business as presently conducted, except where such default or violation would not be material.

5.6    No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, its Subsidiaries, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller or any of their respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a material adverse effect.

20

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1    Organization and Good Standing.  Purchaser is a corporation duly
organized, validly existing and in good standing under the laws of the State of
Connecticut and has all requisite corporate power and authority to own, lease and operate
its properties and to carry on its business as now conducted.

6.2    Authorization of Agreement.  Purchaser has full corporate power and
authority to execute and deliver this Agreement and each other agreement, document,
instrument or certificate contemplated by this Agreement or to be executed by Purchaser
in connection with the consummation of the transactions contemplated hereby and
thereby (the "Purchaser Documents"), and to consummate the transactions contemplated
hereby and thereby.  The execution, delivery and performance by Purchaser of this
Agreement and each Purchaser Document have been duly authorized by all necessary
corporate action on behalf of Purchaser.  This Agreement has been, and each Purchaser
Document will be at or prior to the Closing, duly executed and delivered by Purchaser
and (assuming the due authorization, execution and delivery by the other parties hereto
and thereto) this Agreement constitutes, and each Purchaser Document when so executed
and delivered will constitute, the legal, valid and binding obligations of Purchaser,
enforceable against Purchaser in accordance with their respective terms, subject to
applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting
creditors' rights and remedies generally, and subject, as to enforceability, to general
principles of equity, including principles of commercial reasonableness, good faith and
fair dealing (regardless of whether enforcement is sought in a proceeding at law or in
equity).

6.3    Conflicts; Consents of Third Parties.

(a)    Except as set forth on Schedule 6.3.  None of the execution and    M.C.
delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation
of the transactions contemplated hereby or thereby, or the compliance by Purchaser with
any of the provisions hereof or thereof will conflict with, or result in any violation of or
default (with or without notice or lapse of time, or both) under, or give rise to a right of
termination or cancellation under any provision of (i) the certificate of incorporation and
by-laws of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by
which Purchaser or its properties or assets are bound, (iii) any Order of any
Governmental Body applicable to Purchaser or by which any of the properties or assets of
Purchaser are bound or (iv) any applicable Law.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or
declaration or filing with, or notification to, any Person or Governmental Body is
required on the part of Purchaser in connection with the execution and delivery of this

21

[New York #1948695 v2]

*[handwritten margin note: regulatory regimes referred to in Section 5.3(b) or as would not have a material adverse effect.]*

Agreement or the Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby or for Purchaser to conduct the Business, except for compliance with the applicable requirements of [~~——~~] *[handwritten: Cash Amount]*

6.4    Financial Capability.  Purchaser (i) has, and at the Closing will have, sufficient internal funds) available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

6.5    Condition of the Business.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof (as modified by the Schedules hereto as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article V hereof (as modified by the Schedules hereto as supplemented or amended). Purchaser further represents that neither Seller nor any of its Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller or any of its Subsidiaries, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of Seller, any of its Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential memoranda distributed on behalf of Seller relating to the Business or other publications or data room information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Business and the transactions contemplated hereby. Purchaser acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied on the results of its own independent investigation.

ARTICLE VII

BANKRUPTCY COURT MATTERS [~~TO DISCUSS~~]

7.1    ~~Breakup Fee and Competing Bid Order~~ Competing Transaction.  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid") From the date

22

hereof (and any prior time) and until the transaction contemplated by this Agreement is consummated, Seller is permitted to cause its representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Purchased Asset and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and the assets of Seller to prospective purchasers.

[Reserved]

7.1

No Shop. From the date of execution of this Agreement until the earlier of (i) the Closing and (ii) the termination of this Agreement in accordance with its terms, none of Seller, any of the Seller's direct or indirect Subsidiaries, or any agent or advisor to the Seller or any of the Seller's direct or indirect Subsidiaries shall, directly or indirectly, through any officer, director, employee, agent, professional, advisor, other representative or otherwise, (A) solicit, initiate, encourage or facilitate any proposal or offer from any Person (other than the Purchaser) relating to any financing, refinancing, acquisition, divestiture, business combination or reorganization or similar transaction involving the Business, the Purchased Assets or the business, assets or operations of LBI or any of its Subsidiaries or the equity securities of LBI or any of its Subsidiaries (a "Competing Transaction"), (B) enter into discussions or negotiations regarding a Competing Transaction, (C) furnish any information with respect to, enter into any agreement or understanding with respect to, otherwise assist or participate in, or facilitate in any other manner any Competing Transaction (including, without limitation, executing any confidentiality agreement with any other Person with respect to a Competing Transaction), (D) waive any rights under any existing standstill or waiver agreements, or (E) seek or support Bankruptcy Court approval of a motion regarding bid procedures or expense reimbursement or break up fee for the benefit of any party with respect to a Competing Transaction or take any action inconsistent in any way with this Agreement or achieving the Closing by 5:00pm (New York time) on September 12, 2008. Notwithstanding anything in the foregoing to the contrary, prior to the entry of the Sales Order, the Seller may take any action expressly permitted by the Breakup Fee and Competing Bid Order in response to bona fide Qualified Bid (as defined in the Purchaser Protection Order) submitted by a Qualified Bidder (as defined in the Breakup Fee and Competing Bid Order) provided such Qualified Bid was not submitted in violation of clause (A) above.

7.2    Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, Seller shall file with the Bankruptcy Court the Sale Motion seeking entry of the Sale Order and the Breakup Fee and Competing Bid Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Breakup Fee and Competing Bid Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the

23

Bankruptcy Court for the purposes. among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. Purchaser shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Purchased Assets hereunder. In the event the entry of the Sale Order or the Breakup Fee and Competing Bid Order shall be appealed, Seller and Purchaser shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII

## COVENANTS

8.1     Access to Information.  Seller agrees that, until the earlier of the Closing and termination of this Agreement, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of Seller and its Subsidiaries to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller or any of its Subsidiaries to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Seller or any of its Subsidiaries is bound. *Seller*

8.2     Conduct of the Business Pending the Closing.  In order to attempt to preserve the going concern value of the Business, Purchaser shall have the right to be on-site and shall coordinate and consult with representatives of ~~Purchaser~~ regarding the business, operations and management of the Business  In addition, until the earlier of the Closing and termination of this Agreement, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser:

(a)     Seller shall, and shall use its best efforts to cause its Subsidiaries *whose equity or assets constitute Purchased Assets* to:

(i)     conduct the Business only in the Ordinary Course of Business (recognizing its current distressed state); and

24

(ii)    use its commercially reasonable efforts to (A) preserve the [+o] present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with customers and suppliers of the Business and Seller's Subsidiaries (recognizing that Seller reserves the right to cause any of its Subsidiaries, other than a Subsidiary the equity or assets of which constitutes a Purchased Asset, to commence a proceeding under the Bankruptcy Code or other applicable state or foreign law); and

(b)    Seller shall not, and shall not permit its Subsidiaries to, solely as it relates to the Business:

(i)    other than in the Ordinary Course of Business, (A) materially increase the annual level of compensation of any director or executive officer of [        ] or any of its Subsidiaries, (B) increase the annual level of compensation payable or to become payable by Seller or any of its Subsidiaries to any such director or executive officer, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any such director or executive officer, or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller or any of its Subsidiaries is a party or involving any such director or executive officer, except, in each case, as required by applicable Law from time to time in effect or by any existing employee benefit plans;

*[handwritten margin notes: Seller; whose equity or assets constitute Purchased Assets]*

(ii)    make or rescind any material election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent tax returns;

(iii)    subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iv)    cancel or compromise any material debt or claim or waive or release any material right of Seller or any of its Subsidiaries that constitutes a Purchased Asset except in the Ordinary Course of Business;

*[handwritten margin note: (v) Reserved]*

(v)    enter into any commitment for capital expenditures in excess of $[        ] for any individual commitment and $[        ] for all commitments in the aggregate].

(vi)    enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

25

(vii)    other than (A) in the Ordinary Course of Business or (B) secured borrowings from the Federal Reserve Bank under the Primary Dealer Facility, incur any indebtedness for borrowed money, issue any debt securities, assume, guarantee, endorse or otherwise become responsible for the obligations of any other individual, corporation or other entity, or make any loan or advance or capital contribution to, or investment in, any person, in any case that would be related to the Business or constitute an Assumed Liability;

(viii)    set any record date or payment date for the payment of any dividends on its capital stock or make, declare or pay any dividend, or make any other distribution on, or directly or indirectly redeem, purchase or otherwise acquire, any shares of its capital stock or any securities or obligations convertible (whether currently convertible or convertible only after the passage of time or the occurrence of certain events) into or exchangeable for any shares of its capital stock;

(ix)    sell, transfer, pledge, lease, license, mortgage, encumber or otherwise dispose of any of Purchased Assets (including pursuant to securitizations) to any individual, corporation or other entity or cancel, release or assign any material amount of indebtedness related to the Business to any such person or any claims held by any such person, other than any such transactions as are in the Ordinary Course of Business;

(x)    transfer ownership, or grant any license or other rights, to any person or entity of or in respect of any Purchased Intellectual Property, other than grants of non-exclusive licenses pursuant to license agreements entered into in the Ordinary Course of Business;

(xi)    in connection with the Business, make any investment in, or any acquisition of, any business entity or division, by merger, consolidation, asset purchase or other business combination, or by contributions to capital; or make any property transfers or purchases of any property or assets, in or from any other individual, corporation, joint venture or other entity;

(xii)    in connection with the Business, conduct its operations or take actions related to trading or credit extension in any manner other than in the Ordinary Course of Business;

(xiii)    change in any material respect the policies, practices and procedures governing operations of the Business;

(xiv)    amend or otherwise modify, except in the Ordinary Course of Business, or knowingly violate in any material respect the terms of, any Purchased Contract, or (ii) except as may be required by applicable Law, create or renew any agreement or contract or other binding obligation related to the Business containing (A) any material restriction on the ability of Purchaser to

26

conduct the Business as it is presently being conducted or (B) any material restriction on the ability of Purchaser to engage in any type of activity or business after the Closing;

(xv)    abandon, cancel, let lapse, fail to renew, fail to continue to prosecute, protect, or defend, or dispose of, any Purchased Intellectual Property;

(xvi)    commence or settle any claim, action or proceeding related to the Business, other than settlements resulting solely in the payment of monetary damages in amounts not in excess of $500,000 in the aggregate; or

(xvii)    agree to do anything prohibited by this Section 8.2.

8.3    Consents. Seller shall use (and shall cause each of its Subsidiaries to use) its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals required to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

8.4    Regulatory Approvals.

(a)    If necessary, Purchaser and Seller shall (a) make or cause to be made all filings required of each of them or any of their respective Subsidiaries or subsidiaries, as applicable, or Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 1 Business Day after the date of this Agreement, (b) comply at the earliest practicable date with any request under such Laws for additional information, documents, or other materials received by each of them or any of their respective Subsidiaries or subsidiaries, as applicable, from any other Governmental Body in respect of such filings or such transactions, and (c) cooperate with each other in connection with any such filing and in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Each such party shall use best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable law in connection with the transactions contemplated by this Agreement. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any such transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda,

27    {other than Purchaser solely with respect to a Governmental Body in the United Kingdom}

briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)      Each of Purchaser and Seller shall use its best efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under [the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws")]. In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any [Antitrust Law], each of Purchaser and Seller shall cooperate and use its best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests.

8.5      Further Assurances.

(a)      Each of Seller and Purchaser shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement.

(b)      In the event that, for any reason including a determination by a court of competent jurisdiction that any sale, transfer, assignment, conveyance or delivery contemplated by this Agreement is ineffective or invalid to vest or confirm such title, any conveyance, assignment, assumption, allocation or other action is necessary or appropriate to vest in or confirm to Purchaser full title to any of the Purchased Assets vested in Purchaser pursuant to Section 2.1, or to cause Purchaser to assume any Liabilities allocated to Purchaser pursuant to Section 2.3, then Seller shall, and shall cause its Subsidiaries to, execute and deliver all such instruments and take all such actions necessary in order to convey, assign or allocate such Purchased Assets or Liabilities to Purchaser.

28

8.6    Confidentiality.

*September 11*

(a)    Purchaser acknowledges that the Confidential Information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between Purchaser and Seller dated _____, 2008 (the "Confidentiality Agreement"), the terms of which are incorporated herein by reference. Effective upon, and only upon, the Closing Date, the Confidentiality Agreement shall terminate with respect to information relating solely to the Business or otherwise included in the Purchased Assets; provided, however, that Purchaser acknowledges that any and all other Confidential Information provided to it by Seller or its representatives concerning Seller and its Subsidiaries shall, other than Purchased Assets, remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. For purposes of this Section 8.6, "Confidential Information" shall mean any confidential information with respect to, including, methods of operation, customers, customer lists, products, prices, fees, costs, Technology, inventions, Trade Secrets, know-how, Software, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters.

(b)    From and after the Closing, Seller shall, and shall cause its Subsidiaries to, use the same efforts to maintain the confidentiality of any proprietary or confidential information regarding the Purchased Intellectual Property as Seller and/or its Subsidiaries used to maintain the confidentiality of such information prior to the Closing.

8.7    Preservation of Records. Seller and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Business for a period of seven (7) years from the Closing Date (or such longer period as may be required by applicable Law) and shall make such records and personnel available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Seller or Purchaser wishes to destroy such records before or after that time (and such proposed destruction is not in violation of applicable Law), such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such ninety (90) day period, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.8    Publicity. Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this

29

*for any of its existing uses*

Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

(a)

8.9    Trademark License. (From and after the closing Purchaser hereby grants Seller a perpetual, worldwide, nonexclusive, full paid, royalty-free license under the trademarks "LEHMAN" and "LEHMAN BROTHERS," including any logos containing such names (collectively, the "Licensed Marks") ~~for a period of [six(6) months] as of the Closing Date, for use outside the United States and Canada~~ or in connection with [the IMD Business and the unwinding of any of its other operations] including use in corporate or other entity names. The foregoing license as it relates to the IMD Business shall be assignable by Seller without the need for further consent to a purchaser of all or substantially all of the equity interests in or assets of the IMD Business. Seller shall have the right to sublicense the foregoing license to any of its Subsidiaries and an assignee in connection with a sale of all or substantially all of the IMD Business and have a right to sublicense such right to any of its Affiliates in connection with the conduct of that business, provided that any such sublicense shall terminate on the date when Seller's or its assignee's license terminates. In the remainder of this provision, the licensee or sublicense (Seller or Seller's assignee or their sublicensees) shall be referred to as "Licensee." Each Licensee acknowledges Purchaser's ownership of the Licensed Marks and the validity of the Licensed Marks and shall not register any confusingly similar mark in any jurisdiction. All goodwill arising from use of the Licensed Marks shall inure to Purchaser's benefit. Each Licensee shall use each Licensed Mark in connection with any markings or other notices as required by law. Purchaser shall have the right to supervise and control  the use of the Licensed Marks by each Licensee, including by reviewing specimens of use of the Licensed Marks, with respect to the nature and quality of the products and services designed, performed, distributed, sold or otherwise commercialized by such Licensee and the materials used to promote such products and services for the purpose of protecting and maintaining the validity of the Licensed Marks and the goodwill associated with the Licensed Marks. Each Licensee shall at all times use the Licensed Marks only in connection with goods and services of quality at least as high as that offered by Seller and its Affiliates under such marks immediately prior to the Closing. Any use of the Licensed Marks in connection with the IMD Business shall include a disclaimer in a form reasonably acceptable to Purchaser indicating that the IMD Business is not affiliated with Seller. Seller or its assignee shall be responsible for each Licensee's compliance with the terms of this Section 8.11 and shall be liable to Purchaser for any non-compliance by any such Licensee with any such terms.~~Licensee.~~ Purchaser hereby grants to [Seller] a perpetual, irrevocable, worldwide, nonexclusive, fully-paid, royalty-free license under all non-Mark Purchased Intellectual Property used in or covering any business of the Seller and/or its Affiliates other than the Business [in the fields of investment management, investment research, portfolio management and other fields of the IMD Business] as well as the unwinding of any of Seller's other operations, solely for use in connection with such business outside of the Business. The foregoing license as it relates to the IMD Business shall be assignable without the requirement of

(b)

q

30

further consent by Seller in connection with a sale of all or substantially all of the assets
of the IMD Business and may be sublicensed to any entity conducting the IMD Business
and any successor of the IMD Business and any contractor providing services to such
business or successor. The foregoing license shall be under Purchased Intellectual
Property acquired by Purchaser hereunder that was previously owned by Seller or its
Affiliates as well as Purchased Intellectual Property owned by third parties as to which
Purchaser shall have after Closing has the right to grant a sublicense without requirement
of additional consent or payment of additional consideration.

8.10    Use of Purchased Intellectual Property. Except as permitted under
subsections 8.11 and 8.12 above, after the Closing Date, neither the Seller nor any of its
Subsidiaries will, directly or indirectly, in any jurisdiction: (i) exploit or make use of, or
authorize any third party to exploit or make use of, any of the Purchased Intellectual
Property, or any Marks confusingly similar to the Purchased Marks; (ii) attempt to
register the Purchased Marks or any mark confusingly similar thereto; (iii) challenge or
otherwise contest the Purchaser's efforts to register, or enforce its trademark registrations
for and trademark rights in, the Purchased Marks or its rights in other Purchased
Intellectual Property.

8.11    Deferred Transfers.

31

(a)    If and to the extent that the allocation to and vesting in Purchaser of any Purchased Assets pursuant to Section 2.1 or otherwise would be a violation of applicable Law or require any Consent or the approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by the Purchaser prior to the Closing then, unless the Parties shall otherwise agree, the allocation to and vesting in Purchaser of such Purchased Asset shall, without any further action by any Party, be automatically deferred and any allocation or vesting of such Purchased Asset pursuant to Section 2.1 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled. Any such Purchased Asset shall be deemed a "Deferred Transfer Purchased Asset."

(b)    If and to the extent that the allocation to Purchaser of, and Purchaser's becoming responsible for, any Assumed Liabilities pursuant to Section 2.3 or otherwise would be a violation of applicable Law or require any Consent or approval of any Governmental Body or the fulfillment of any condition that cannot be fulfilled by Seller prior to the Closing, then, unless the Parties shall otherwise agree, the allocation to Purchaser of, and Purchaser's becoming responsible for, such Assumed Liability shall, without any further action by any Party, be automatically deferred and any allocation or responsibility for such Assumed Liability pursuant to Section 2.3 or otherwise shall be null and void until such time as all violations of applicable Law are eliminated, such Consents or approvals of Governmental Bodies are obtained, and such conditions are fulfilled. Any such Assumed Liability shall be deemed a "Deferred Transfer Assumed Liability."

(c)    With respect to any Deferred Transfer Purchased Asset or any Deferred Transfer Assumed Liability, insofar as it is reasonably possible, (i) Seller shall, and shall cause any applicable Subsidiary to, following the Closing, hold such Deferred Transfer Purchased Asset for the use and benefit of Purchaser and its Subsidiaries (at the expense of Purchaser) and (ii) Purchaser shall, or shall cause its applicable Subsidiary to, pay or reimburse Seller for all amounts paid or incurred in connection with the retention of such Deferred Transfer Assumed Liability. In addition, Seller shall, and shall cause any applicable Subsidiary to, insofar as reasonably possible and to the extent permitted by applicable Law, hold and treat such Deferred Transfer Purchased Asset in the Ordinary Course of Business in accordance with past practice and take such other actions as may be reasonably requested by Purchaser in order to place Purchaser, insofar as permissible under applicable Law and reasonably possible, in the same position as if such Deferred Transfer Purchased Asset had been transferred to and vested in Purchaser or an applicable Subsidiary at the Closing and so that, to the extent possible, all the benefits and burdens relating to such Deferred Transfer Purchased Asset, including possession, use, risk of loss, potential for gain, and dominion, control and command over such Deferred Transfer Purchased Asset, are to inure from and after the Closing to Purchaser or its applicable Subsidiary entitled to the receipt of such Deferred Transfer Purchased Asset.

32

(d)    If and when the Consents, approvals of Governmental Bodies and/or conditions, the absence or non-satisfaction of which caused the deferral or transfer of any Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability pursuant to Section 8.12(a), are obtained or satisfied, the transfer, allocation or novation of the applicable Deferred Transfer Purchased Asset or Deferred Transfer Assumed Liability shall be effected in accordance with and subject to the terms of this Agreement and/or the applicable [Ancillary Agreement].

(e)    Seller shall not be obligated, in connection with the foregoing, to expend any money unless the necessary funds are advanced, assumed or agreed in advance to be reimbursed by Purchaser, other than reasonable attorney's fees and recording or similar fees, all of which shall be promptly reimbursed by Purchaser. *Date*

(f)    For a period of nine months after the Closing, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, to the extent Excluded Employees occupied real property subject to a Transferred Real Property Lease prior to Closing, such Excluded Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Excluded Employees prior to the Closing, without charge or consideration. *after the Closing Date*

(g)    For a period of nine months, subject to reasonable security procedures and giving due regard to regulatory considerations (e.g., segregation) including the right to relocate such employees within the applicable premises, after the Closing, to the extent Transferred Employees occupied real property is not subject to a Transferred Real Property Lease prior to Closing, such Transferred Employees shall be permitted to continue to occupy and use such real property to the same extent and for the same purposes as such real property was occupied and used by such Transferred Employees prior to the Closing, without charge or consideration.

(h)

8.12    Release of Guarantees.    Purchaser shall deliver to the respective beneficiaries of any and all guarantees relating to or arising under any Purchased Contracts, Transferred Real Property Leases or Assumed Liabilities ("Seller Guarantees") such replacement guarantees from Purchaser and its Affiliates, letters of credit, collateral, or other credit support, as shall be required pursuant and in accordance with any Purchased Contract, Transferred Real Property Leases or Assumed Liability. In the event that the respective beneficiaries under any of the Seller Guarantees do not agree to release (the "Guarantee Release") Seller and its Subsidiaries from any and all liability arising thereunder after the Closing, prior to the Closing, then Purchaser shall cause to be delivered to Seller, as beneficiary, at the Closing an indemnification agreement and guarantee, dated and effective as of the Closing Date and in form and substance reasonably satisfactory to Seller and from a creditworthy obligor as shall be satisfactory to Seller (collectively, "Backstop Documents"), pursuant to which Seller and its

33

Affiliates shall, from and after the Closing, be indemnified, reimbursed and held harmless from any and all liabilities, losses, claims, costs and expenses under or arising out of the relevant Seller Guarantee. From and after the Closing, Purchaser shall not permit any Contract to which a Seller Guarantee relates to be renewed, extended, amended or modified unless the Purchaser obtains and delivers to Seller the related Guarantee Release duly executed by the beneficiaries of the related Seller Guarantee.

8.13    Transition Services. The Purchaser and Seller shall use commercially reasonable efforts to enter into a Transition Services Agreement in a form reasonably acceptable to Seller and Purchaser in order for each of Seller and Purchaser to continue to receive the services provided between LBI and LBHI on the Closing Date.

8.14    Subleases.

(a)    For the leased premises located in 555 California Street, San Francisco, CA, Seller shall sublet to Purchaser pursuant to a sublease agreement (the "Seller Sublease"), reasonably acceptable to both Purchaser and Seller and subject to the terms of the applicable underlying lease, a portion of the demised premises in such location subject to the terms of the applicable lease and obtaining the landlord's consent to the Sublease or Bankruptcy Court approval. Purchaser shall bear its portion of the occupancy cost for such location based on the relative square footage sublet. Seller and Purchaser shall enter into the Seller Sublease at Closing to memorialize the provisions of this Section.

(b)    For the leased premises located in 125 High Street, Boston, MA, 190 S. LaSalle Street, Chicago, IL and 10250 Constellation Boulevard, Los Angeles, CA Seller shall assume such leases in connection with Seller's bankruptcy proceedings and assign such leases to Purchaser. Purchaser shall then sublet to Seller or a designee of Seller, in either event with credit reasonably acceptable to Purchaser, pursuant to three separate subleases (each, a "Purchaser Sublease", collectively the "Purchaser Subleases"), reasonably acceptable to both Purchaser and Seller and subject in all cases to the terms of the underlying lease, a portion of the demised premises in such locations shall be subject to obtaining the landlord's consent to each Sublease or Bankruptcy Court approval. Seller shall bear its portion of the occupancy cost for each such location based on the relative square footage sublet. Seller and Purchaser shall enter into each Sublease at Closing to memorialize the provisions of this Section.

8.15    Landlord Notice. Seller shall give notice, on the date hereof, to Rock-Forty-Ninth LLC in accordance with the terms of the 745 Seventh Ground Lease, regarding the transactions contemplated hereunder and shall provide Rock-Forty-Ninth LLC with the appropriate bankruptcy filings in order to provide adequate notice thereof under applicable Law.


Rider 34A

34

Rider 34 A

8.16    Artwork. Purchaser shall have the right to possess, for a period of one-year after the Closing, all of the artwork at the Seller's headquarters located at 745 Seventh Avenue, New York, New York. At any time during such period, Purchaser shall have the option to purchase any or all of the artwork for a price equal to its appraised value (as determined by an independent, recognized appraiser). To the extent Purchaser does not exercise such option on any or all of the artwork by the first anniversary of the Closing, then Purchaser shall return such artwork to the Seller.

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Employee Benefits.

*identified persons shall*

(a)    Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to, continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law), or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree. For purposes of this Agreement, the term "Offeree" means each active employee employed primarily in connection with the Business at the Closing, other than such employees who are identified by Purchaser to Seller prior to Closing, such names not to include any person who is in the targeted population referred to in Section 10.1(b). Each Offeree who accepts Purchaser's or one of its subsidiaries' offer of employment, together with each person whose employment transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law, shall be referred to herein as a "Transferred Employee." Each Person who is not a Transferred Employee shall be referred to herein as an "Excluded Employee". An Offeree who performs work at his then applicable place of employment on the first Business Day immediately following the Closing shall be deemed for all purposes of this Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(b)    Without limiting any additional rights that each Transferred Employee may have, Purchaser shall, or shall cause its Subsidiaries, for a period commencing at the Closing and ending on December 31, 2008, to provide to each Transferred Employee whose employment is terminated during such period by the Purchaser by reason of a "reduction in force" or a "job elimination" (as those terms are customarily applied in good faith, consistent with past practice) severance payments and benefits at levels that are no less favorable than such levels as the Transferred Employee would have been entitled to receive pursuant to the provisions of the Seller's severance plans or agreements covering such Transferred Employee as in effect immediately prior to the Closing. Nothing contained in this Section 9.1 or elsewhere in the Agreement shall be construed to prevent, from and after the Closing, the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any Transferred Employee.

35

[New York #19436695 v2]

*from its initial level, in the same proportion as the reduction in Transferred Employees below 90% of the initial number of Transferred Employees compared to 90% of the initial number of Transferred Employees.*

    (c)    On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred Employee an annual bonus ("08 Annual Bonuses"), in respect of the 2008 Fiscal Year that, in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary) and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser (the "Accrued 08 FY Liability"). Such 08 Annual Bonuses shall be awarded on or before March 15, 2009 in such forms and proportions as are consistent with Purchaser's customary practices, so that the aggregate amount awarded shall equal the Accrued 08 FY Liability. Any amounts that would have been allocated in respect of any Transferred Employee who voluntarily terminates employment before such award is made shall instead be allocated among the remaining Transferred Employees (who include, for this purpose, those Transferred Employees who are terminated without cause by Purchaser or its affiliates prior to the time the awards are made) (collectively, the "Remaining Transferred Employees"). However, the Accrued 08 FY Liability shall be reduced if, prior to the time such awards are made, both (x) 10% of the Transferred Employees have voluntarily terminated their employment with the Purchaser and (y) such terminated Transferred Employees would have been expected to receive at least 10% of the 08 Annual Bonuses had no such Transferred Employee's employment in fact terminated. In that case, the Purchaser may adjust the Accrued 08 FY Liability proportionately, in a good faith and reasonably equitable manner to account for the Transferred Employees to whom 08 Annual Bonuses will not be payable, and thereby to reduce the aggregate 08 Annual Bonuses. Any such reduction shall take into account the length of service, seniority within the Business and contribution of the Remaining Transferred Employees, relative to the allocation of the Accrued 08 FY Liability, in accordance with the principles enumerated herein.

ARTICLE X

CONDITIONS TO CLOSING

    10.1    Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

    (a)    Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

    (b)    at least 70% of the U.S. and Canadian Persons identified by Seller and reasonably accepted by Purchaser, acting in good faith, not later than two Business Days after the date hereof as the targeted population are actively employed in the

36

Business immediately prior to the Closing and as to whom management of Seller has made a good faith assessment that they will continue in employment with the Business as of the Closing Date;

(c)    [Seller shall cause creditworthy Persons to execute subleases for the three properties on the terms specified in Schedule [ ]]

(d) .    [the Bankruptcy Court shall have entered a final order permitting Seller to sell the premises at 745 Seventh Avenue, New York, New York to Purchaser as contemplated by Section ]

(e)    [the mortgage in favor of the Seller's Affiliate with respect to the premises at 745 Seventh Avenue, New York, New York shall have been fully repaid and extinguished]; and

(f)    Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2.

10.2    Conditions Precedent to Obligations of Seller.  The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

Insert Rider 38A

(a)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)    Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3    Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

[Adjustment to purchase to be discussed if building can't be transferred.]

37

[New York #1948695 v3]

(b)    the Bankruptcy Court shall have entered the Breakup Fee and Competing Bid Order, in form and substance reasonably acceptable to Seller and Purchaser;

(c)    the Bankruptcy Court shall have entered the Sale Order and any stay period applicable to the Sale Order shall have expired or shall have been waived by the Bankruptcy Court;

(d)    LBI shall have commenced a case under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court; *and*

*Substantially in the manner*

(e)    Purchaser shall have obtained regulatory approval under the HSR Act and all other material regulatory, self-regulatory, exchange, clearing organization and governmental approvals, authorizations, waivers and/or licenses required to conduct the transferred Business following the Closing as it was conducted immediately prior to the Closing and, after giving effect to the Closing (subject to such exceptions as shall not, in the aggregate, be material));

*Rider 38A*

(f)    Purchaser shall have obtained confirmation from the SEC and CFTC that Purchaser will be eligible, following the Closing, to compute its net capital under Appendix E to SEC Rule 15c3-1 and adjusted net capital in accordance with the provisions of CFTC Rule 1.17(c)(6);

(g)    Purchaser shall have obtained from the SEC confirmation reasonably satisfactory to Purchaser regarding (i) the transition period during which Purchaser will be permitted to come into compliance with the consolidated holding company supervisory framework applicable to ultimate holding companies that have a principal regulator under SEC Rule 15c3-1e and g, and (ii) the scope of the deference to be extended by the SEC to the Federal Reserve and/or the home country consolidated supervisor of Purchaser's ultimate parent company in connection with the SEC's administration of the framework described in clause (i) of this subsection

*; and*

*10.4*

10.3  Frustration of Closing Conditions.  Neither Seller nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

ARTICLE XI

[RESERVED]

ARTICLE XII

TAXES

12.1    Transfer Taxes.  Purchaser shall be responsible for (and shall indemnify and hold harmless Seller and its directors, officers, employees, Affiliates, agents,

*(i) The Sellers headquarters building at 745 Seventh Avenue, New York, NY shall be substantially habitable.*

successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated by this Agreement ("Transfer Taxes"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Purchased Assets shall be free and clear of any stamp or similar taxes under Bankruptcy Code Section 1146(c). Seller and Purchaser shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

12.2    Prorations. Seller and Purchaser shall enter into customary prorations for the Purchased Assets as of the Closing.

12.3    Purchase Price Allocation. Seller and Purchaser shall allocate the purchase price (including the Assumed Liabilities) among the Purchased Assets as specified in Schedule 12.3 and, in accordance with such allocation, Purchaser shall prepare and deliver to Seller copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Seller from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation. The purchase price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Purchaser to Seller, and all income Tax Returns and reports filed by Purchaser and Seller shall be prepared consistently with such allocation.

12.4    Adjustment to Purchase Price. The parties agree that any payment made under this Article XII shall be treated by such parties as an adjustment to the Purchase Price.

## ARTICLE XIII

## MISCELLANEOUS

13.1    Expenses. Except as otherwise provided in this Agreement, each of Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in

[New York #1948695 v2]

this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

13.5    Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), the Transition Services Agreements and the Confidentiality Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any

40

[New York #1968695 v2]

*(handwritten margin note): the Dip Facility, the Interim Support and Cooperation Agreement, master Repurchase Agreement*

*(handwritten margin note left): 2.c,*

party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Facsimile: (646) 758-4226
Attention: Steven Berkenfeld, Esq.

With a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Facsimile: (212) 310-8007
Attention: Thomas Roberts
            ⌒ Michael Lubowitz
and a copy (which shall not constitute notice) to:

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Facsimile: (212) 455-2502
Attention:   John Finley
             Andrew Keller

If to Purchaser, to:

Barclays Capital Inc.

41

[New York #1948695 v2]



200 Park Avenue
New York, NY 10166
Facsimile: Jonathan Hughes, Esq.
Attention: _____

(212) 412-7519

With a copy to:

Jonathan Hughes, Esq.

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Facsimile: 212-225-3999
Attn: Victor I. Lewkow
      David Leinwand
      Duane McLaughlin

Attention

and

Sullivan & Cromwell LLP
125 Broad St.
New York, NY 10004
Facsimile: 212-558-3580
Attn: Mitchell S. Eitel
      Jay Clayton

Attention

Facsimile: _____
Attention: _____

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required

42

[New York #1948695 v2]

*[handwritten annotation: or to designate its rights to acquire any assets hereunder to its Affliates]*

consents shall be void, provided that Purchaser shall be entitled to assign its rights and obligations in whole or in part to its Affiliates. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

13.10  Non-Recourse.  No past, present or future director, officer, employee, incorporator, member, partner or equityholder of Seller shall have any liability for any obligations or liabilities of Seller under this Agreement or the Seller Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

13.11  Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*[signature page follows]*

*[handwritten: 13.12  Scope of Purchased Assets. This Agreement is not intended to convey and does not convey assets and liabilities from the non-U.S. and Canadian operations of Seller.]*

*[handwritten: non-]*

[New York #1948695 v2]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
      Name:
      Title:

LEHMAN BROTHERS INC.

By: _____
      Name:
      Title:

LB 745 LLC

By: _____
      Name:
      Title:

BARCLAYS CAPITAL INC.

By: _____
      Name:
      Title:

44

[New York #1948695 v2]

EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                :

In re                              :     Chapter 11 Case No.

LEHMAN BROTHERS HOLDINGS INC., *et al.*   :     08-13555 (JMP)
                                :
        Debtors.                :     (Jointly Administered)
                                :
------------------------------------------------------------x

ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND
FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004
AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF
PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER
INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008 (the "Purchase

Agreement"), among the Debtors, Lehman Brothers Inc. ("LBI" and, collectively with the

Debtors, the "Seller") and Barclays Capital, Inc. (the "Purchaser"); (B) establishing sales

procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of certain

of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims, encumbrances

and interests and the assumption and assignment of certain prepetition executory contracts and

unexpired leases (the "Contracts") relating to the Purchased Assets to the Purchaser or the

---

[1]   Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the
    Agreement.

NY2:\1916186\03\152RQ03!.DOC\73683.1045

Successful Bidder(s); and upon the Court's consideration of the Motion and the record of the
Sale Hearing held on September 19, 2008 with respect to the Motion, including the testimony
and evidence admitted at the Hearing; and after due deliberation thereon, and sufficient cause
appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    Jurisdiction and Venue.  This Court has jurisdiction to consider this
Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).
Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Statutory Predicates.  The statutory predicates for the relief sought in the
Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006
and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern
District of New York (the "Local Rules").

C.    Notice.  As evidenced by the affidavits of service filed with this Court and
based upon the representations of counsel at the Sale Hearing and as approved under the Order
(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to
Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting
the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-
Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and
the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the
Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement (the "Sale"),
including the assumption and assignment of the Contracts and Cure Amounts with respect
thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,
Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate under the circumstances of these chapter 11 cases; (iv) good cause exists to shorten the applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or the Sale (including the assumption and assignment of the Contracts), is or shall be required.

      D.    **Irreparable Harm.**    The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Motion is not granted on an expedited basis consistent with the provisions set forth herein and the Purchase Agreement, particularly given the wasting nature of the Purchased Assets.

      E.    **LBI.** LBI is the subject of a proceeding under the Securities Investors Protection Act of 1970 ("SIPA") which was filed on September __, 2008. The Purchase Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the extent applicable, has the same material terms as this Order is otherwise in form and substance reasonably satisfactory to the Purchaser.

      F.    **Opportunity to Object.**  A reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein has been given, in light of the exigent circumstances in these cases, to all interested persons and entities, including the following: (i) the Office of the United States Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors, (iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date Contracts"), (vii) the United States

Attorney's office, (viii) the United States Department of Justice, the Securities and Exchange

Commission, (ix) the Securities Investor Protection Corporation, (x) the Internal Revenue

Service, (xi) all persons, if any, who have filed objections to the Sale Motion; and (xiii) all

persons who have filed a notice of appearance in the chapter 11 cases.

G.    Corporate Authority.  The Debtors (i) have full corporate power and

authority to execute the Purchase Agreement and all other documents contemplated thereby and

the Debtors' sale of the Assets has been duly and validly authorized by all necessary corporate

action, (ii) have all of the corporate power and authority necessary to consummate the

transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action

necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

provided for in the Purchase Agreement, are required for the Debtors to consummate such

transactions.

H.    Sale in Best Interests.  Good and sufficient reasons for approval of the

Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is

in the best interests of the Debtors, their estates, their creditors and other parties in interest.

I.    Business Justification.  The Debtors have demonstrated both (i) good,

sufficient and sound business purposes and justifications and (ii) compelling circumstances for

the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b)

before, and outside of, a plan of reorganization in that, among other things, the immediate

consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value

of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of

an order approving the Purchase Agreement and all the provisions thereof is a necessary

condition precedent to the Purchaser's consummation of the transactions set forth in the
Purchase Agreement.

J.      Arm's-Length Sale. The Purchase Agreement was negotiated, proposed
and entered into by the Sellers and the Purchaser without collusion, in good faith and from
arm's-length bargaining positions. The Purchaser is not an "insider" of the Debtors, as that term
is defined in Bankruptcy Code section 101(31). Neither the Debtors nor the Purchaser have
engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under
Bankruptcy Code section 363(n). Specifically, the Purchaser has not acted in a collusive manner
with any person and the purchase price was not controlled by any agreement among bidders.

K.      Good Faith Purchaser. The Purchaser is a good faith Purchaser of the
Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,
entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in
all respects in connection with this proceeding.

L.      Highest and Best Offer. The Purchase Agreement constitutes the highest
and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors'
estates than would be provided by any other available alternative. The Debtors' determination
that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets
constitutes a valid and sound exercise of the Debtors' business judgment.

M.      Consideration. The consideration constitutes reasonably equivalent value
or fair consideration, as the case may be (as those terms are defined in each of the Uniform
Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the
Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the
United States, any state, territory, possession or the District of Columbia. The Purchase

·Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

        N.    Free and Clear. The Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances, obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing Date. For avoidance of doubt, all Interests shall attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

Further, the assumption and assignment of any Closing Date Contracts is likewise free and clear of all Interests.

O.    **Free and Clear Findings Needed by Purchaser**.  The Purchaser asserts that it would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Purchased Assets to the Purchaser and the assumption and assignment of the Contracts to the Purchaser was not free and clear of all Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

P.    **No Liability Findings Needed by Purchaser**.  Purchaser asserts that it will not consummate the transactions contemplated by the Purchase Agreement unless the Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability.

Q.    **Satisfaction of 363(f) Standards**.  The Sellers may sell the Purchased Assets free and clear of any Interests of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  The person or entity with any Interest in the Purchased Assets: (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.  Those holders of Interests who did not object to the Motion are deemed, subject to the

terms of this Order, to have consented pursuant to Bankruptcy Code section 363(f)(2). All

holders of Interests are adequately protected by having their Interests attach to the proceeds

ultimately attributable to the Purchased Assets against or in which such Interests are asserted,

subject to the terms of such Interests, with the same validity, force and effect, and in the same

order of priority, which such Interests now have against the Purchased Assets or their proceeds,

subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess

with respect thereto.

        R.    <u>No Fraudulent Transfer</u>.  The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and

under the laws of the United States, any state, territory, possession, or the District of Columbia.

Neither Debtors nor Purchaser is entering into the transactions contemplated by the Purchase

Agreement fraudulently.

        S.    <u>No Successor Liability</u>.  Except for the Assumed Liabilities, the transfer

of the Purchased Assets to the Purchaser under the Purchase Agreement shall not result in (i) the

Purchaser having any liability or responsibility for any claim against the Debtors or against an

insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to the Debtors

except as is expressly set forth in the Purchase Agreement. Without limiting the effect or scope

of the foregoing, to the fullest extent permitted by law, the transfer of the Purchased Assets from

the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates,

successors or assigns or their respective properties (including the Purchased Assets) to any

liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the

Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under the

laws of the United States or any state, territory or possession thereof applicable to such transactions, including, without limitation, any successor liability.

T.    Cure/Adequate Assurance.  The assumption and assignment of the Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. The Debtors have: (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A). The Purchaser's promise to perform the obligations under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any objections to either the Cure Amount (as defined below) or the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled. Any counterparties to Closing Date Contracts that did not object to the Cure Amount (as defined below) of their respective Closing Date Contracts or the assumption and assignment of their respective Closing Date Contracts to the Purchaser are deemed to have consented to such Cure Amounts and the assignments of their respective Closing Date Contracts to the Purchaser.  The procedures with respect to assumption, assignment and cure of the Contracts that are the subject of the Purchaser's designation rights (the "Designated Contracts")

will be set forth in one or more separate orders of the Court which will be entered at a later date or dates.

U.  **Prompt Consummation**. The Sale must be approved and consummated promptly in order to preserve the viability of the business subject to the sale as going concerns, to maximize the value of the Debtors' estates. Time is of the essence in consummating the Sale.

V.  **Personally Identifiable Information**. The Sale may include the transfer of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A). No Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because Purchaser has agreed to adhere to any privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.  **Motion is Granted**. The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.  **Objections Overruled**. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.  **Approval**. The Purchase Agreement and all of the terms and conditions thereto are hereby approved. The Debtors are hereby authorized and directed to (1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated

thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement.

        4.    Free and Clear. Except as expressly provided for in the Purchase Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Purchased Assets to the Purchaser and, as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets free and clear of all Interests of any kind or nature whatsoever, including but not limited to the Liens and Excluded Liabilities, with all such Interests to attach to the proceeds ultimately attributable to the property against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

        5.    Valid Transfer. As of the Closing Date, (a) the transactions contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such Purchased Assets free and clear of all Interests and Excluded Liabilities and (b) the Purchase Agreement and the transactions and instruments contemplated hereby shall be specifically performable and enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with respect thereto.

        6.    General Assignment. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sellers' interests in the Purchased Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and

instruments necessary and appropriate to consummate the transactions contemplated by the
Purchase Agreement.

       7.   Injunction.  Except as expressly permitted by the Purchase Agreement or
by this Sale Order, all persons and entities, including, but not limited to, all debt security holders,
equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors,
litigation claimants and other creditors, holding Interests or Claims of any kind or nature
whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether
legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent,
liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or
in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors'
businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased
Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently
enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its
successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets,
such persons' or entities' Interests or Claims. Following the Closing Date, no holder of an
Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and
enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests
or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and
attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order
of their priority, with the same validity, force and effect which they have against such Purchased
Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates
and Debtors, as applicable, may possess with respect thereto.

8.    Release of Interests.  This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Debtors or the Purchased Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    Direction to Release Interests.   On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    No Successor Liability.  Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility for any claim against the Debtors or against an insider of the

Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.

11.    Examples of No Successor Liability.  Without limiting the effect or scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date.

12.    Assumption and Assignment of Contracts.  In accordance with Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts, including customer account agreements, to which they are a party to the Purchaser.

13.    The Sellers shall provided notice, together with the Notice of Assumption and Assignment of, and Amounts Necessary to Cure Defaults under, Contracts and Leases

Proposed to be Assumed and Assigned to the Purchaser on September 17, 2008 (an "Assumption Notice") to the counterparty to a Closing Date Contract which the Debtors seek to assume and assign, which included the prepetition cure amount, if any (the "Cure Amount"), asserted by the Sellers with respect to such Closing Date Contract, and the effective date of such assumption and assignment (the "Assignment Effective Date"). The counterparty to such Closing Date Closing Date Contract had until the date of the Sale Hearing to object to the assumption and assignment of the Closing Date Contract. All counterparties to Closing Date Closing Date Contracts that have not filed an objection by the date of the Sale Hearing are deemed to consent to (i) the Cure Amount, if any, and (ii) the assumption and assignment of the Closing Date Contract, and the Closing Date Contract shall be assumed and assigned as of the Assignment Effective Date. Any objections to either the Cure Amount or the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled. The Purchaser shall pay any Cure Amount due on, or as soon as practicable, after the Assignment Effective Date.

14.    Bankruptcy Code Sections 365(b)(1) and 365(f)(2). The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Closing Date Contracts.

15.    Binding Effect of Order. This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents

or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

16.    Ipso Facto Clauses Ineffective. Upon the Debtors' assignment of the Contracts to the Purchaser under the provisions of this Sale Order and any additional order contemplated by the Purchase Agreement, no default shall exist under any Closing Date Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a default by the Purchaser under such Closing Date Contract or otherwise take action against the Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Closing Date Contract.

17.    Binding on Successors. The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all creditors of (whether known or unknown) and holders of equity interests in, either Debtor, Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

18.    Bankruptcy Code Section 363(n). The consideration provided by Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

19.    Good Faith. The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

       20.   Fair Consideration. The consideration provided by the Purchaser to the Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

       21.   Retention of Jurisdiction. This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d) enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the Designated Contracts.

       22.   Surrender of Possession. All entities that are currently, or on the Closing Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an interest hereby are directed to surrender possession of the Purchased Assets either to (i) the Debtors or LBI before the Closing Date, or (ii) to Purchaser on the Closing Date.

23.    Fees and Expenses. Any amounts payable by the Debtors under the
Purchase Agreement or any of the documents delivered by the Debtors in connection with the
Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,
shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and
Competing Bid Order, entered on September ____, 2008, without further order of this Court,
shall be an allowed administrative claim in an amount equal to such payments in accordance
with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections
provided in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified
or otherwise affected by any reorganization plan for the Debtors, except by an express agreement
with Purchaser, its successors, or assigns.

24.    Sale Proceeds. Any and all valid and perfected Interests in Purchased
Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon
receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order
of priority, and with the same validity, force and effect which they now have against such
Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any
trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any
limitations on the use of such proceeds pursuant to any provision of this Order, except as
required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest
shall be used or disbursed by the Debtors without the express consent of the party or parties
asserting an Interest therein or further order of the Court after notice (to all parties who have
asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the
Bankruptcy Code.

25.    <u>Non-material Modifications</u>.  The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

26.    <u>Subsequent Plan Provisions</u>.  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order.

27.    <u>Failure to Specify Provisions</u>.  The failure specifically to include any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety; <u>provided</u>, <u>however</u>, that this Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

28.    <u>No Stay of Order</u>.  Notwithstanding the provisions of Interim Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon entry.  Time is of the essence in closing the transactions referenced herein, and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Any party

objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk

its appeal being foreclosed as moot.

Dated: New York, New York
        ————————, 2008

                                   —————————————————
                                   HONORABLE JAMES M. PECK
                                   UNITED STATES BANKRUPTCY JUDGE