Exhibit 16

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>Debtor. | Case No. 08-01420 (JMP) |

<u>**DECLARATION OF PAUL EXALL**</u>

I, Paul Exall, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I make this declaration on my personal knowledge. If called to testify, I would testify competently as follows.

2. I am currently Global Head of Compensation for Corporate and Investment Banking at Barclays ("Barclays"). In 2008, I was Head of Compensation Analytics for Investment Banking and Investment Management at Barclays, which involved managing aspects of the compensation of former Lehman employees who transferred to Barclays as a result of the sale transaction between Lehman and Barclays in September 2008 (the "Transferred Employees").

3. During the process of accounting for the sale transaction, I worked with Barclays Finance personnel to account for the compensation payments Barclays made to Transferred Employees. As part of this work, I assisted in Finance in tracking compensation spend and developed and maintained a spreadsheet recording an accrual for categories of compensation payments to be made to or on behalf of the former Lehman employees who joined Barclays ("Transferred Employees") for their 2008 pre-acquisition service (the "Compensation

Spreadsheet"). I was questioned about the Compensation Spreadsheet during the Lehman/Barclays trial in 2010.

4. The Compensation Schedule shows that Barclays made $265 million in payments for the Transferred Employees who were terminated by Barclays as part of a reduction in force. I characterized those payments on the Compensation Schedule and in my testimony as "severance" solely because these were payments made to terminated employees. Based upon information I have received from the Barclays Human Resources department, the Lehman severance plan did not require that the total amount of $265 million be paid. Of that total amount of $265 million, approximately $137 million was paid in excess of what was required by the Lehman severance plan based on the information I have received from the Barclays Human Resources department. This $137 million amount consisted of payments that were generally calculated as 10% of 2007 bonus amounts for employees who were below Managing Director level, and as 20% of the 2007 bonus amounts for Managing Directors. In exchange for all of the payments they were receiving from Barclays, the terminated employees agreed to release Barclays from any obligation to make any additional compensation payments. I characterized the $137 million in enhanced payments as severance on the Compensation Spreadsheet because they were paid to terminated employees. It is possible that others might characterize those payments as "bonuses" or as "a bonus component of severance," since they were paid in excess of the amount required under the Lehman severance plan as I understand it. That potential difference in characterization was not significant to me in preparing the Compensation Schedule, which was focused on collecting the data showing all compensation for the Transferred Employees pre-acquisition 2008 services.

5. I understand that LBHI asserts I testified that, of the $1.529 billion line item on my schedule labeled "Bonus including social tax," $50 million represents social tax. That is not an accurate representation of my testimony. In deposition, I was asked how much of this total figure represents the social tax portion. I testified that I did not know the answer. I was then asked to give as "ball park" number, and as shown on page 139 of my deposition transcript, I responded by saying "Crikey. If I had to guess, I'd say maybe $50 million." At trial, when reminded of this deposition testimony, I testified that I recalled estimating the amount at $50 million, and had no reason to change that estimate. I have now had a more accurate estimate determined from our financial records. A more accurate estimate representing the amount of tax included in the total of $1.529 billion for the line item of "Bonus including social tax" is approximately $17 million, not $50 million. That $17 million amount related solely to the $1.271 billion paid out in cash bonus (the social tax relating to the equity portion of the bonus is listed separately on the schedule). Most of these amounts paid to the Transferred Employees were subject only to the Medicare social tax, and not to the higher Social Security (or FICA) tax (which is paid only on a certain capped amount of compensation, and not any amounts above that cap).

6. I also understand that Lehman is asserting that certain other payments listed on the Compensation Spreadsheet "do not relate to bonuses." As I have explained previously in my testimony during deposition and at trial, the amounts on the Compensation Spreadsheet are indisputably compensation payments made to Transferred Employees from Lehman for their 2008 pre-acquisition service. These amounts were broken out into separate line items solely because they were paid out in slightly different forms, or as part of various distinct incentive

compensation programs.  The payments I understand Lehman to be calling "not related to bonuses" include:

(a) $56 million paid out to Transferred Employees in the form of "ISP Awards" (which as I explained in my trial and deposition testimony are "incentive share" awards and directly related to the equity component of the 2008 bonus payments);

(b) $53 million paid out to a Transferred Employee as an "Acquisition Buyout vesting over 2 years"; a portion of that payment vested over two years, but *all* of it related to 2008 pre-acquisition services (which as I explained in deposition and trial was a performance bonus performance award for 2008 pre-acquisition services);

(c) $11 million in cash payments to Transferred Employees described on the Compensation Spreadsheet as "Replacement RSUs" (which as I explained at trial is also a bonus-related item in respect of 2008 pre-acquisition services); and

(d) $11 million of payments to Transferred Employees paid out as part of Barclays' "IBD Grad Programmes" (which as I explained in deposition and trial is also a bonus-related item in respect of 2008 pre-acquisition services).

Since all of these payments were (a) compensation payments to Transferred Employees for 2008 pre-acquisition service, (b) not base salary payments, and (c) not paid to terminated employees and therefore not severance, Lehman's assertion that these payments are "not related to bonuses" does not make sense to me, and appears either to misconstrue or to mischaracterize my testimony and the Compensation Spreadsheet that I testified about.

7. Finally, the Compensation Schedule does not include the base salary payments Barclays paid to Transferred Employees for the period of time after they joined Barclays.  I have

4

determined that over and above the payments summarized above, the approximate amount that Barclays spent on base salary payments for the three months from September 22, 2008 to December 31, 2008 was $254 million, consisting of (a) approximately $14 million in base salary for those Transferred Employees who were terminated prior to December 31, 2008, and (b) approximately $240 million for those Transferred Employees who remained at Barclays through December 31, 2008. These estimates exclude any social taxes. For example, Medicare charges at 1.45% related to the $254 million would be calculated at $3.7 million and those related to the $14m would be calculated at $0.2 million.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21 st day of June, 2011, in London, England.

Paul Exall

Exhibit 17

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                        .

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

Chapter 11 Case No.
08-13555 (JMP)
(Jointly Administered)

LEHMAN BROTHERS HOLDINGS INC.,

Plaintiff,

v.

BARCLAYS CAPITAL, INC.,

Defendant.

Adv. Proc. No. 09-01731 (JMP)

## DECLARATION OF SHARYN ANGLEY

I, Sharyn Angley, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.  I am currently employed by Staffmark and have been a Contractor for Barclays Capital Inc. ("Barclays") since 2009.  I am currently working in the Compensation and Benefits team.  Prior to this, I was employed by Barclays as a Director from 2008-2009.

3.  Before joining Barclays, I was employed by Lehman Brothers Holdings Inc. ("LBHI") and worked as a Vice President in the Compensation and Benefits Group within Finance.  As a part of my work in the Finance department, I reviewed and became familiar with compensation accruals and payments by legal entity.  The Finance department collected data from the Human Resources department that allowed Finance to determine, among other things, the extent to which incentive

1

compensation accruals and payments were made by Lehman Brothers Inc. ("LBI") and other legal

entities, including LBHI and LBHI affiliates.

4. The compensation accrual and payment data demonstrates that the vast majority of

employees transferred to Barclays received their incentive compensation payments from LBI rather

than LBHI (or any other LBHI affiliates). The data includes the amounts of 2007 bonuses paid to each

employee as well as estimated bonus values for any Lehman employees who did not receive bonuses in

2007 because they were hired in 2008. For employees hired in 2008, any 2008 bonus guarantee or, in

the absence of a guarantee, an estimate was used as a proxy for the calculation of the bonus accrual.

This was Lehman's ordinary practice relating to the calculation of bonus accruals for employees who

did not receive bonuses prior to the accrual year. The data shows that over 80 percent of the

transferred employees' incentive compensation was paid by or attributable to LBI, and that roughly 16

percent of those employees' incentive compensation was paid by or attributable to LBHI and other

LBHI affiliates. This is consistent with the fact that LBI, not LBHI, was the employer for the vast

majority of the employees who transferred to Barclays.

5. It is my understanding that a significant majority of Lehman employees did not have a

guaranteed bonus and that bonuses at Lehman were, as a general matter, discretionary.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22 day

of June, 2011, in New York, New York.

Sharyn Angley

# Exhibit 18

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
| Debtors. | |
| LEHMAN BROTHERS HOLDINGS INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 09-01731 (JMP) |
| BARCLAYS CAPITAL, INC., | |
| Defendant. | |

## DECLARATION OF MARK KURMAN

I, Mark Kurman, Pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I make this declaration on my personal knowledge. If called to testify, I would testify competently as follows:

2.    I am currently Head of Employee Relations for the Americas and a Director at Barclays Capital Inc. ("Barclays"). I have been employed in the Human Resources department at Barclays since 1997. Prior to joining Barclays, I worked for approximately ten years at Salomon Brothers, during which time I spent approximately eight years in employee relations. In my position at Barclays, and beginning after the Closing, I was involved with compensation issues relating to former Lehman employees who transferred to Barclays ("Transferred Employees") and who were later terminated as

1

part of reductions in force. I was not involved in negotiating any aspect of the sale transaction.

3.     Before September 22, 2008, it would not have been possible to determine the total amount that Barclays would pay to these terminated employees because the number of employees who would accept the offer of employment was not known, the number of employees who would be terminated was not known, and therefore the amount of severance to be paid to any such terminated employees could not be known.

4.     Barclays offered severance to those Transferred Employees who were terminated prior to December 31, 2008, in accordance with the Lehman severance plan. A copy of that plan is attached as Exhibit 1.

5.     In addition to the severance payment suggested by the Lehman severance plan, the terminated employees were offered an enhanced payment in lieu of bonus. Aside from the severance payment and the enhanced payment made in lieu of bonus, the terminated employees did not receive any other bonus payment for 2008. Barclays does not have any established policy or practice of making such enhanced payments to terminated employees, but made them in this instance because the terminated employees were legacy Lehman employees who had not received a 2008 bonus.

6.     In exchange for receiving all of these payments, the terminated employees signed a release and separation agreement. The release included a release from any future claim for additional compensation from Barclays, which would include any additional bonus payments. A redacted example of the separation agreement and the release is attached as Exhibit 2.

7.    The enhanced payment that each terminated employee was offered was generally based on the bonus payment that the employee received in 2007. Employees were offered an enhanced payment of 10 percent, 20 percent, or up to 25 percent of their 2007 bonus depending on their title and department.

8.    In addition to the Transferred Employees who were terminated prior to December 31, 2008, there was a relatively small number of Transferred Employees terminated in January 2009. As a technical matter, these terminated employees received the Barclays severance plan, which is, on the whole, generally equivalent to the Lehman severance plan. The amount of severance offered to these terminated employees was still based upon a calculation of their prior service, virtually all of which was their service with Lehman prior to the acquisition. Because these terminated employees were legacy Lehman employees who had not received a bonus for 2008, they were also offered an enhanced payment in lieu of bonus, as described above. Barclays does not normally offer such an enhanced payment in lieu of bonus, but offered it in this instance because these were legacy Lehman employees who had not received a 2008 bonus.

9.    The total payments Barclays made for all of the terminated Transferred Employees described above was $265 million. Of this amount, $137 million represented the enhanced payment in lieu of bonus. This was in excess of what was required under either the Lehman or Barclays severance plans and was paid in "lieu of bonus." In effect, it could be characterized as a payment made to satisfy any claim, legal or otherwise, that those terminated Transferred Employees might have to a 2008 bonus.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22 day of June, 2011.

_____
Mark Kurman

# Exhibit 1

Life @ Lehman    Benefits    Life Balance    Finances    Learning and Development    Mobility

# Severance Plan

## Overview

Lehman Brothers Inc. and certain of its affiliated companies (the "Firm") may offer severance pay, notice pay, accrued unused vacation pay and/or other separation payments if employment with the Firm is terminated involuntarily due to a "reduction in force." A "reduction in force" occurs when an employee's job is eliminated, his/her office location is closed, or there is a general reduction in the work force. The Lehman Brothers Inc. Severance Plan (the "Plan") is intended to help bridge terminated employees to their next employment opportunity. An individual who is terminated as a result of unsatisfactory performance or for other disqualifying reasons is not eligible for payments under the Plan.

## Eligibility

"Covered employees" are employees on the payroll of Lehman Brothers Inc. and certain of its affiliated companies, based in the United States, excluding Aurora Loan Services Inc. or any other affiliate excluded by the Plan Administrator in his/her sole and absolute discretion. Further, covered employees include only those described above who receive regular salary or wages and do not include those who are considered by the Firm to be paid on a commission or production basis, even if the employees receives a draw, "guaranteed" draw or other salary equivalent. In no event will covered employees include individuals classified by the Firm as consultants, vendor representatives, vendor employees or "temps" (employees of temporary agencies) or other contingent workers.

Benefits under the Plan are payable solely upon a termination of employment in connection with a "reduction in force," as described above. Further, an employee is not eligible to receive such payments if:

- The employee resigns.
- The employee is discharged for cause. For purposes of the Plan, "cause" includes (but is not limited to) misconduct, absenteeism or lateness, dishonesty, violation of Firm policy or procedures, violation of laws or regulations, failure to perform satisfactorily up to the scheduled separation date, and conduct detrimental to the interests of the Firm.
- The employee declines an offer of a comparable or better position with the Firm within a reasonable commuting distance (35 miles) of his/her primary residence or the job location from which the employee is being separated.
- The employee is a temporary, seasonal, hourly or part-time (scheduled to work less than 20 hours per week) employee.
- The employee is paid on a commission or production basis.
- The employee fails to sign a separation agreement, which includes a waiver of claims against the Firm and other terms, in the form supplied by the Plan Administrator.
- The employee is on a medical leave of absence or any other inactive status (e.g., personal leave, suspension, long term disability, etc.) and his/her job guarantee has expired prior to the scheduled separation date.
- There is a "change of control" and the employee is ineligible as described below.
- The employee is terminated as a result of a filing of bankruptcy proceedings by or against the Firm.
- The employee will receive further payments pursuant to a compensation agreement (compensation "guarantee") in an amount equal to or in excess of the total amount of severance, notice pay, accrued unused vacation pay and other separation payments for which the employee might otherwise be eligible under the Plan.

The determination as to whether any person is eligible to receive severance pay, notice pay, accrued unused vacation pay and/or other separation payments, and the amount of such pay, if any, shall be made by the Plan Administrator in his/her sole discretion. The decisions of the Plan Administrator shall be final and binding (subject to the appeals procedure described below). The Plan Administrator also shall have the sole authority and absolute discretion to interpret the provisions of the Plan and its applicability to any particular situation. The interpretations of the Plan Administrator shall be controlling and final in all cases.

BCI Exhibit No.
935

## Severance Payment

Severance pay is based on "years of service," "base salary," and corporate title.

A "year of service" is a 12-month period during which an employee was employed by the Firm and includes all periods before and after any break in service.

"Base salary" means gross annualized base salary at the time the reduction in force occurs. Base salary does not include any bonus payment, overtime pay, floor brokerage, fixed and/or variable cash flow, sales points, commissions (for any year), draw against commissions (or other periodic special payments to employees paid by commissions) or compensation deferred in any prior year, whether or not paid in the year the individual is terminated. Additionally, base salary does not include any expense reimbursements (such as tuition, travel or entertainment reimbursements), pending salary increases or any other special payment or salary supplement. The amount an employee may be offered under this Plan is determined as follows and is subject to offsets as described below.

### Severance Per Policy

| Years of Service | Number of weeks of Base Salary |
|---|---|
| Less than 5 years | 1 week per year with a minimum of 2 weeks. |
| 5 years or more, but less than 10 years | 2 weeks per year. |
| 10 years or more | 3 weeks per year with a maximum of 52 weeks. |

*Notwithstanding the schedule above, the following schedule applies to those who hold the designated corporate titles as set forth below.*

| Corporate Title | Number of weeks of Base Salary |
|---|---|
| Vice President | The greater of the above schedule or 6 weeks base salary. |
| Senior Vice President | The greater of the above schedule or 13 weeks base salary. |
| Managing Director and above | The greater of the above schedule or 26 weeks base salary. |

## Notice of Separation

Salaried, bonus-eligible corporate officers (Vice Presidents and above) will receive notice, or compensation in lieu of notice, in accordance with the Firm's Notice Policy or applicable written agreement. For all other employees, the following provisions will apply.

The Plan Administrator will decide, in his/her sole and absolute discretion, whether an employee involved in a reduction in force will receive 2 weeks' notice during which he/she will be needed to continue working for the Firm, or 2 weeks' notice pay with an immediate termination of his/her job responsibilities.

If the Plan Administrator decides that an employee will be needed to work during the two-week notice period, the employee's failure to work the entire period may result in a loss of eligibility for all severance benefits. During the entire notice period, the employee will continue to receive his/her current rate of pay, with regular salary payments being made. He/she will also continue to receive benefits during such period, subject to applicable law or regulation, employee elections and changes to or termination of Firm benefits plans. Such an employee is not eligible, however, for any pending salary increase.

## Accrued Unused Vacation

Employees terminated because of a reduction in force may be eligible for up to 10 days accrued, unused vacation pay, unless otherwise provided under state law. Under most circumstances, unused vacation eligibility will be determined by subtracting the number of vacation days taken since the first of the year from the total vacation days for which the employee is eligible.

## Additional Separation Payments

The Plan Administrator will decide, in his/her sole and absolute discretion, whether an employee involved in a reduction in force will be offered an additional special separation payment. The amount of any such special separation payment shall be determined by the Plan Administrator in his/her sole and absolute discretion.

CONFIDENTIAL

BCI-CG00004388

## Offsets

The total amount offered to eligible employees under this Plan (severance, notice and vacation pay, as well as any additional separation payments) will be reduced by any or all of the following, except as may be determined by the Plan Administrator in his/her sole and absolute discretion:

1. The amount payable to an employee pursuant to applicable law or regulation requiring "notice" or other payments in the event of an employment separation (including, but not limited to, payments made pursuant to the U.S. Worker Adjustment Retraining Notification ("WARN") Act or similar state or local laws;
2. In those states or localities requiring the payment of accrued unused vacation, the amount of such accrued unused vacation which is required to be paid but such offset shall not exceed the 10 days for which the employee might otherwise be eligible under this Plan;
3. The total amount of any payments still to be made to the employee pursuant to a compensation agreement (compensation "guarantee"); and
4. The amount of an employee's severance, notice pay, accrued unused vacation (or comparable payments pursuant to local requirements, practice or custom) offered and/or paid to the employee with respect to a prior separation of employment from the Firm, if the prior service was taken into account in determining the amount of severance for which the employee is currently eligible.

## Procedure for Severance Pay

In order to be eligible to receive severance pay, accrued unused vacation pay or any other separation payment, an employee must sign a separation agreement that includes a waiver of any claims the employee may have against the Firm, and other terms as supplied by the Plan Administrator. After the employee returns the signed separation agreement and any applicable revocation period has expired, the employee will receive his/her payments, generally, in a single lump sum, although other methods of payment may be approved by the Plan Administrator in his/her sole and absolute discretion.

## Re-Hire

If an employee is re-hired by the Firm before the expiration of the number of weeks for which he/she was paid severance, notice pay and vacation pay, the Plan Administrator, at his/her sole discretion, may require the employee to repay the Firm for the difference between the number of weeks for which the employee was paid and the number of weeks that the employee was not actively employed at the Firm.

## Medical Care/Benefits

An employee terminated because of a reduction in force may be eligible to pay the Firm to extend his/her coverage under the Firm's Medical Plan, generally for up to 18 months, in accordance with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Firm will advise an employee of his/her rights under COBRA upon separation.

## General

Except as otherwise provided by law or regulation, or in applicable Firm plans or policies, no employment benefits or privileges continue beyond an employee's separation date. Nothing in the Plan or other Lehman Brothers plans shall give an employee the right to remain in the employ of the Firm or affect the Firm's right to terminate any person's employment with or without cause.

## Change of Control

A "change of control" means a sale of assets, stock or any other arrangement (including outsourcing) whereby control of the Firm (or any business unit, partial business unit or function thereof) is transferred to some other entity. In the event of a change of control, an employee will not receive any severance, accrued unused vacation, notice pay or any other separation payment if: he/she (i) retains employment with the successor employer; (ii) turns down an offer for a comparable or better position with the successor employer; or (iii) does not fully cooperate in the transition period.

## Transfers

CONFIDENTIAL

BCI-CG00004389



An employee who accepts an offer to transfer to a comparable or better position with the Firm -- whether or not it is within 35 miles of his/her primary residence or current Firm location -- waives his/her right to severance pay, notice pay, vacation pay or other separation payment.

## Claims Denial and Appeal Procedure

An employee who believes that he/she is entitled to a benefit that he/she is not receiving should submit a written claim to the Plan Administrator.

Generally, an employee will receive a response -- payment or a denial of application for a benefit -- within 90 days after a claim is properly filed. This period can be extended up to an additional 90 days if the employee is given prior written notice of the date a decision is expected and the reason for the delay.

If an employee's claim is denied either in whole or in part, he/she will receive written notification from the Plan Administrator. The notification will include the specific reason for the denial, along with additional information that might be used for appeal.

Within 60 days after receiving the denial, an employee may appeal by filing a written request with the Plan Administrator.

Generally, the Plan Administrator will review the appeal and, within 60 days (or 120 days in special circumstances), will provide a written response explaining the reasons for the decision with specific reference to the Plan provisions upon which the decision is based. An employee who does not receive notice within these time limits should consider his/her claim denied. The Plan Administrator's decision will be binding unless otherwise provided by law.

*Benefits under the Lehman Brothers Inc. Severance Plan are not insured by the Pension Benefit Guaranty Corporation or any other governmental agency and are not pre-funded. The Plan Administrator is the Firm's Director of Human Resources or his/her designee. The Firm reserves the right to change or terminate the Plan at any time.*

## Technical Information

**Name of Plan:**
Lehman Brothers Inc. Severance Plan

**Name and Address of Sponsoring Employer:**
Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019

**Plan Year:**
January 1-December 31

**Agent for Service of Legal Process:**
Director of Human Resources
Lehman Brothers Inc.
1271 Sixth Avenue, 45th Floor
New York, NY 10020

**Type of Plan:**
Welfare Benefit Plan

**Identification Numbers:**
Company EIN 13-2518466; Plan No. 508

**Plan Administrator:**
Director of Human Resources
Lehman Brothers Inc.
1271 Avenue of the Americas, 45th Floor
New York, NY 10020

**Changing or Terminating the Plan:**
The Firm reserves the right to change or terminate the Plan at any time without prior notice or consent.

CONFIDENTIAL

BCI-CG00004390



**Funding the Plan:**

Benefits under Plan are not pre-funded and are paid out of the assets of the Firm.

**Rights under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"):**

Each employee eligible to participate in the Plan is entitled to certain rights and protections under ERISA. ERISA provides that all Plan participants are entitled to the following:

- A participant may examine, without charge all Plan documents at the Plan Administrator's office. This document constitutes both the Plan and the Summary Plan Description of the Plan. In addition, each participant may also examine copies of all documents filed by the Plan with the U.S. Department of Labor. These documents include annual reports and Plan descriptions.
- Each participant may obtain copies of all Plan documents and other Plan Information by making a written request to the Plan Administrator. A charge may be made for these copies.
- In addition to creating rights for Plan participants, ERISA imposes obligations upon the persons who are responsible for the operation of the Plan. These persons are referred to as "fiduciaries" under the law. Fiduciaries must act solely in the interest of the Plan participants and must exercise prudence in the performance of their duties.
- A participant may not be fired or otherwise discriminated against to prevent him/her from obtaining her/his benefits under the Plan or from exercising his/her rights under ERISA.
- If a participant's claim for a benefit under the Plan is denied in whole or in part, he/she must receive a written explanation of the reason for the denial. He/she has the right to have the claim reviewed.
- Under ERISA, there are steps a participant can take to enforce the above rights. For instance, if a participant requests materials from the Plan in writing, and if the participant does not receive them within 60 days, the participant may file suit in a federal court. In such case, the court may require the Plan Administrator to provide the materials and to pay up to $100 a day until the participant receives the materials, unless they were not sent because of reasons beyond the control of the Plan Administrator. If a participant has a claim for benefits which is denied or ignored, in whole or in part, the participant may file suit in a federal or state court. If it should happen that the Plan fiduciaries misuse the Plan's money, or if a participant is discriminated against for asserting his or her rights, the participant may seek assistance from the U.S. Department of Labor, or may file suit in federal court. The court will decide who should pay court costs and legal fees. If the participant is successful, the court may order the person the participant has sued to pay these costs and fees. If the participant loses, the court may order the participant to pay these costs and fees.
- If a participant has any questions about these statements or about his or her rights under ERISA, the participant should contact the Plan Administrator or the nearest Area Office of the United States Labor Management Service Administration, Department of Labor.

This plan is effective for terminations occurring on or after May 12, 2008 and supersedes both the Shearson Lehman Brothers Inc. Severance Plan for Lehman Brothers Division Employees (Effective for Terminations Occurring on or After April 5, 1993) and any other plan or policy previously in effect for employees covered by this Plan.

CONFIDENTIAL

BCI-CG00004391

# Exhibit 2



# BARCLAYS CAPITAL

1301 Avenue of the Americas
5th Floor
New York NY 10019
USA

Tel +1 (212) 526-7000

Arshia Talu
VICE PRESIDENT

RECEIVED
NOV 10 2008
Lehman Brothers
Employee Relations Department

October 28, 2008

By Hand

Dear

This is an agreement ("Separation Agreement") concerning your separation from employment by Barclays Capital (the "Bank"). If you sign and comply with this Separation Agreement and the attached Waiver and General Release, you will receive the payments and benefits discussed below. **Please note that you must sign both documents.**

## Effective Dates, Payments and Benefits

1.  October 28, 2008 will be the last day that you are expected to report to work.

2.  Provided you sign and comply with this Separation Agreement, you are eligible to continue to receive your current base salary and benefits coverage through the earlier of January 24, 2009 or the date on which you become actively employed with another firm (the "separation date"), as follows:

    a.  You will continue to remain an active employee through November 27, 2008 (the "working notice period"), provided you adhere to all policies, procedures and other requirements applicable to your employment, including meeting performance, attendance and compliance standards as evaluated by Bank management. Although you do not need to report to the office every day during the working notice period, you must remain available to the Bank for consultation concerning your areas of responsibility and must also remain "on call" to report to Bank offices during regular business hours, as requested. For your employment during this working notice period, you will continue to receive your current base salary and benefits coverage.

    b.  Immediately after you complete the working notice period, you will no longer be required to report to work but will be eligible to continue to receive your current base salary and benefits continuation through December 27, 2008 (the "notice period").

    c.  Immediately after the notice period and in lieu of a lump sum separation payment consisting of 2 weeks of severance pay 2 weeks of unused vacation pay, you will continue to receive your current base salary and certain benefits continuation, including medical benefits, through January 24, 2009.

Salary continuation will be paid on a biweekly basis at your current biweekly base salary rate, in accordance with the Bank's regular payroll practices. While you are on salary continuation, you will be eligible to continue your benefits coverage under the terms of our



page 2

plans.    All payments will be subject to withholding, payroll taxes and other applicable deductions.

3.  In addition, you will receive a special lump sum payment in the total amount of $3003 less withholding, payroll tax and any other applicable deductions to be paid on or about March 1, 2009.

4.  In satisfaction of the Bank's obligation to provide you with return airfare to your home country, you will receive a lump sum payment in the net amount of $2,500 within the next 30 days.  You will receive this payment whether or not you sign this Agreement or the General Waiver and Release.

5.  The Bank has retained Lee Hecht Harrison to provide you with outplacement counseling services.  These services are designed to assist you with counseling on resume writing, interviewing skills, networking techniques, and a job search campaign.  We encourage you to take advantage of these services in order to ensure a smooth career transition.  To sign up, please call Sasha Hohri at (866) 949-3325.

6.  You and your covered dependents, pursuant to the COBRA law, may be eligible to continue health insurance coverage for up to 18 months from your separation date, at your own expense.  Your right to continue or convert coverage (including COBRA coverage) after your separation date will be governed by the terms of our plans.

7.  Your rights to benefits under any employee benefits plans will be determined in accordance with the terms of such plans.  Our employee benefits plans may be modified or terminated at any time.

8.  Should you become employed by another firm as an employee, consultant or independent contractor at any time while you are on salary continuation, you are obligated to inform the Bank so that you can be terminated from the payroll at that time.  This date will be your separation date for purposes of this Separation Agreement.  As of this separation date, your salary and benefits coverage continuation will end.  Provided you have signed and complied with this Separation Agreement and the attached Waiver and General Release, you will receive a lump sum payment representing the remainder of the payments described in paragraphs 2 and 3 payable within 4 weeks of your separation date.

9.  Should you be rehired by the Bank or any of its subsidiaries or affiliates as an employee, consultant or independent contractor at any time through your separation date you will no longer be eligible to receive the remainder of the payments described in paragraphs 2 and 3.

9.  If you are currently registered with the Bank, your registration will cease as of your last day of active employment.  Once you join another firm, you should immediately contact the new firm's Registration Department to transfer your registrations, as the transfer does not occur automatically.  Your new firm should have you complete a new U-4 form.

10.  **Waiver and General Release.**    In consideration of, and as a condition to receiving, the payments and benefits set forth in this Separation Agreement, you must review and sign the Waiver and General Release attached to this document.

BARCLAYS CAPITAL Inc.
1301 AVENUE OF THE AMERICAS NY, NY 10019
(212) 526-7000



page 3

You acknowledge that you have read this Separation Agreement, understand it and are voluntarily entering into it.

BARCLAYS CAPITAL

Arshia Tala

Date 10/31/2008

## Waiver and General Release

Date: October 28, 2008

Name: ███████

In exchange for the payments and benefits set forth in my Separation Agreement , I hereby release
Barclays Capital (the "Bank"), and all of its past and /or present divisions, affiliates, parents,
subsidiaries, officers, directors, stockholders, trustees, employees, agents, representatives,
administrators, attorneys, insurers, fiduciaries, predecessors, successors and assigns, in their
individual and/or representative capacities (hereinafter collectively referred to as "the Barclays
Group"), from any and all causes of action, suits, agreements, promises, damages, disputes,
controversies, contentions, differences, judgments, claims and demands of any kind whatsoever
("Claims") which I or my heirs, executors, administrators, successors and assigns ever had, now have
or may have against the Barclays Group, whether known or unknown to me, by reason of my
employment, and/or cessation of my employment, with the Bank or with Lehman Brothers, or
otherwise involving facts which occurred on or prior to the effective date of this Waiver and General
Release, except to the extent that any such Claim concerns an allegation that the Bank has failed to
make the payment(s) set forth above. Such released Claims include, but are not limited to, breach of
contract, impairment of economic opportunity, defamation, intentional infliction of emotional
distress, wrongful discharge, and any other contract, tort or common law claim. Such released
claims also include, but are not limited to, any and all Claims under Title VII of the Civil Rights Act
of 1964, the Age Discrimination in Employment Act of 1967, the Civil Rights Act of 1871, the Civil
Rights Act of 1991, the Fair Labor Standards Act, the Employee Retirement Income Security Act, the
Conscientious Employee Protection Act, which generally prohibits retaliation due to an employee's whistle
blowing-related activities, the Americans with Disabilities Act, the Family and Medical Leave Act of
1993, the New York State Labor Law, the New York State Human Rights Law, the New York City
Human Rights Law, and any and all other federal, state and local laws, statutes, rules and regulations
pertaining to employment.

I understand and agree that I am waiving any relief available to me (including, for example,
monetary damages or reinstatement), under any of the Claims waived in the foregoing paragraph,
including but not limited to financial benefit or monetary recovery from any lawsuit filed or
settlement reached by the EEOC or anyone else with respect to any Claims released and waived in
this Waiver and General Release. I agree that I will not seek or accept any monetary award or
settlement from any source or proceeding (including but not limited to any proceeding brought by
any other person or by any government agency) with respect to any Claims waived in this Waiver
and General Release, and I also represent that as of the date I sign this Waiver and General Release, I
have not commenced any proceedings or filed any claim, charge, or complaint of any kind with any
local, state or federal court, administrative agency or arbitral forum against any of the Barclays
Group based on any Claims or matters waived.

Initials ███    Date 10/31/2008

In accordance with my existing and continuing obligations to the Bank, I have returned or will immediately return to the Bank, all Bank property (including but not limited to keys and credit cards) and all Barclays Group Information (as hereinafter defined), including files, software, records, computer access codes, business equipment (including fax machines, telephones, and personal computers) and instruction manuals which I have in my possession or control no matter where located. I further agree not to keep any copies or portions of Barclays Group Information. I affirm my obligation to keep all Barclays Group Information confidential and not to disclose it to any third party in the future except as authorized in writing by the Bank. I understand that the term "Barclays Group Information" means: (a) confidential information, including information received during my employment with Lehman Brothers or from third parties under confidential conditions, and (b) other technical, marketing, business or financial information, or information relating to personnel or former personnel of the Barclays Group or any of its predecessors.

I affirm that I have submitted all outstanding business expense requests for reimbursement to the Bank, including all supporting documentation, and that I have paid all outstanding personal expenses which I owe or owed to the Bank.

I understand and agree that the Bank's payment(s) to me and my signing of this Waiver and General Release do not in any way indicate that I have any viable Claims against the Barclays Group or that the Barclays Group admits any liability to me whatsoever.

I agree to keep the Waiver and General Release and the Separation Agreement to which it is attached confidential and not to reveal its existence or contents to anyone except my lawyer, my immediate family and my financial or tax consultant or except as required by law, and if I do so, I further agree to immediately tell my lawyer, my immediate family and my financial or tax consultant that they must all keep the existence and contents of this Waiver and General Release confidential.

I agree not to make or publish any statement (orally or in writing), or to instigate, assist or participate in the making or publication of any statement, which would or could adversely affect, libel, slander or disparage (whether or not such disparagement legally constitutes libel or slander) or expose to hatred, contempt or ridicule (a) the Bank; (b) any of its services, affairs or operations; or (c) the reputations of any of its past or present directors, officers, employees or shareholders.

Notwithstanding the foregoing paragraphs, I understand that nothing in this Waiver and General Release shall limit my right under applicable law to provide truthful information to regulatory, judicial, administrative or other governmental authorities.

I have read this Waiver and General Release carefully, have been given fourteen (14) days to consider all of its terms have been advised to consult with an attorney and any other advisor of my choice, and fully understand that by signing below I am waiving and releasing all Claims against the Barclays Group as described above. I have not been forced or pressured in any manner whatsoever to sign this Waiver and General Release, and I agree to all of its terms voluntarily.

Initials ▮    Date    10 / 31 / 2008

This Waiver and General Release and the Separation Agreement to which it is attached constitutes the complete settlement of all disputes existing between me and the Barclays Group as of the date hereof, and may not be modified except by a suitable writing signed by both myself and the Bank. This Waiver and General Release and the Separation Agreement to which it is attached supersedes and cancels all prior oral and written agreements and understandings concerning the matters described herein. My rights and duties under this Waiver and General Release shall not be assignable without the written consent of the Bank. I acknowledge that no representative of the Bank has made any promises, oral or written, relating to my employment, the termination thereof, the terms of any severance arrangement, or concerning any other related matter, that are not reflected in this Waiver and General Release and the Separation Agreement to which it is attached, and the Bank asserts that it has made no representation that is not reflected in this Waiver and General Release and the Separation Agreement to which it is attached.

I agree to reasonably cooperate with the Barclays Group, its financial and legal advisors and/or government officials in connection with any business matters in which I was involved or any claims, investigations, administrative proceedings or lawsuits which relate to my employment with the Barclays Group or its predecessors.

I understand and agree that this Waiver and General Release and the Separation Agreement to which it is attached will be governed by New York law, without giving effect to its choice of law provisions. I further agree that the only venue for Claims I might make against the Barclays Group, or for an action to enforce the terms of this Waiver and General Release and the Separation Agreement to which it is attached, shall be in a court of appropriate jurisdiction located in the County of New York.

In the event that any one or more of the provisions contained herein shall for any reason be held to be unenforceable in any respect under the law of the United States of America, or any state thereof, such unenforceability shall not affect any other provision of this Waiver and General Release, but this Waiver and General Release shall then be construed as if such unenforceable provision or provisions had never been contained herein.

I understand that if I breach any term of this Waiver and General Release, the Bank may seek appropriate relief, including but not limited to repayment of the amounts paid to me under this Waiver and General Release and my Separation Agreement, and further, the obligation to make any further payments under the terms of this Waiver and General Release and my Separation Agreement at the time of the breach will be null and void.

Initials ▮▮    Date 10/31/2008

Please initial and date (where indicated) each of the preceding pages of this agreement and send a hard copy to Arshia Tala.

10/31/2008
Date

10/31/2008
Date

Paul A. Howells
Notary Public

PAUL A HOWELLS
Notary Public - New Jersey
Middlesex County
My Commission Expires September 15, 2013

Initials ██  Date 10/31/2008

# Exhibit 19

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |
| | |
| LEHMAN BROTHERS HOLDINGS INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 09-01731 (JMP) |
| BARCLAYS CAPITAL, INC., | |
| Defendant. | |

## DECLARATION OF ARTHUR KOHN

I, Arthur Kohn, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a partner with the law firm of Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"). My practice focuses on compensation and benefit matters, including executive compensation, pension compliance and investment, employment law, and related matters.

2. I served on the Cleary Gottlieb team representing Barclays Capital Inc. ("Barclays") in connection with the potential acquisition of a substantial portion of the worldwide businesses and assets of Lehman Brothers Holdings Inc. ("LBHI"). Following LBHI's bankruptcy filing on September 15, 2008, we were contacted to start work on the potential acquisition by Barclays of the North American brokerage and investment banking business of Lehman Brothers Inc. ("LBI").

1

3.  I base this Declaration on my personal knowledge and my review of the transaction documents.  In preparing this Declaration, I have neither relied on nor disclosed privileged communications.

4.  Beginning on Monday, September 15, 2008, I was involved in meetings and discussions between LBI and Barclays personnel and representatives concerning what became Article IX of the Asset Purchase Agreement ("APA"), entitled "Employees and Employee Benefits."

5.  Based on my discussions with Lehman representatives, it was my understanding that the purpose of Section 9.1(c) of the APA was to ensure that the Lehman employees who accepted employment at Barclays would receive, in the aggregate, the same bonuses from Barclays that they would have received from Lehman had Lehman not declared bankruptcy. This is a fairly common type of provision in mergers and acquisitions, as it allows the Seller to make clear that it is taking care of its employees, and allows the Buyer to encourage the employees to stay with the Business despite the change in ownership.

6.  I also understood that Lehman, like other major financial institutions, would accrue on its financial statements certain amounts that it planned to pay to its employees for their year end bonuses.  Even though most of those bonuses were discretionary and not paid pursuant to guaranteed contracts, as a matter of standard practice banks like Lehman estimate the amount they expect they are likely to pay out as bonus.  Thus, the concept behind section 9.1(c) was for Barclays to assume whatever Lehman believed it needed to accrue to cover the estimated bonus amounts for 2008.  Of course, I also understood that Barclays might decide it needed to offer even more than that amount in order to ensure certain employees would stay with the Business.

2

7. Section 9.1(c) fulfilled the overall purpose I describe above by providing that Barclays would pay bonuses to the Transferred Employees in amounts that, "in the aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary)." This language was intended to capture the accrual amount described above. During my work on the transaction prior to the Closing, no one ever told me what that accrued amount was.

8. Section 9.1(c) also refers to a 9/16/08 financial schedule initialed by an officer of both Barclays and Lehman. Prior to the execution of the APA (including during the drafting of section 9.1(c)), I never saw or received a copy of such a schedule or anything similar to such a schedule. Since the Closing, I have seen a copy of a 9/16/08 schedule that was initialed by Steve Berkenfeld of Lehman, but not by anyone from Barclays, and have seen that this schedule includes an entry for "Comp" of $2 billion. The schedule does not appear to have any other entry containing any other compensation liabilities.

9. As someone who has spent his career working in the area of employee benefits and compensation, I understand the term "Comp" to be broader than just bonuses. "Comp" is a term generally used to include all forms of compensation liabilities, including bonus, severance, vacation, pension, related tax liabilities, and many other items of a typical pay package, including fringe benefits. Therefore, I do not and could not understand the term "Comp" on the 9/16/08 Financial Schedule to be limited solely to bonus.

10. During my work on the Sale Transaction prior to the Closing, I never heard anyone from Lehman, Weil Gotshal, or Simpson Thacher communicate anything about the $2 billion number, or suggest that the purpose of Section 9.1(c) was to obligate Barclays to pay $2 billion in bonuses to the Lehman employees who would be joining Barclays.

3

11. It is my understanding that section 9.1(c) was not intended to obligate Barclays to spend $2 billion in bonuses. If the parties had intended for Section 9.1(c) to obligate Barclays to pay $2 billion in bonuses to those employees, we would have expressly and unambiguously provided for that in the APA, rather than refer to the accrued amount.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of June, 2011, in New York, New York.

_____
Arthur Kohn