Exhibit 20

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

Chapter 11 Case No.
08-13555 (JMP)
(Jointly Administered)

LEHMAN BROTHERS HOLDINGS INC.,

Plaintiff,

v.

BARCLAYS CAPITAL, INC.,

Defendant.

Adv. Proc. No. 09-01731 (JMP)

<u>DECLARATION OF ALAN M. JOHNSON</u>

I, Alan M. Johnson, pursuant to 28 U.S.C. § 1746 declare as follows:

1.      I make this declaration on my personal knowledge.  If called to testify, I would testify competently as follows.

2.      I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm located in New York City.  My firm specializes in analyzing and advising the financial services industry, including major investment and commercial banks, insurance companies, asset management firms, hedge funds and other alternatives, and brokerage firms.

3.      I have devoted my entire career to executive compensation consulting work.  I have extensive experience with a wide range of executive compensation issues and am familiar with all facets of executive compensation  I have consulted on

compensation practices in the financial services industry for many years and I am commonly quoted in the press regarding compensation issues in the financial services industry and across the broader economy.

4.      I have reviewed Lehman Brothers Holdings Inc.'s ("LBHI") Memorandum of Law in Support of its Motion for Summary Judgment on Count II of its Adversary Complaint Against Barclays Capital, Inc. and understand that LBHI asserts that Barclays was obligated to pay $2 billion figure in bonuses only.  It is my understanding that LBHI bases this assertion upon the language of section 9.1(c) of the Asset Purchase Agreement ("APA"), and the entry of $2 billion for "Comp" on the financial schedule dated September 16, 2008 and initialed by Steve Berkenfeld of Lehman.

5.      As I stated in my expert report dated January 8, 2010, which I attach as an Addendum to this declaration, it is my opinion, based on over 30 years of professional experience in the executive compensation analytics and consulting industry (the "Industry"), that the only reasonable interpretation of the term "Comp" is as an estimate of the total compensation amount attributable to the Transferred Employees, and not just to their "bonuses." *See* Addendum (BCI Ex. 339, attached to Barclays' January 29, 2010 Opposition Brief), at 10-11.

6.      As I explained in my expert report, even if I assume that the September 16, 2008 financial schedule initialed by Steve Berkenfeld (but not by Barclays) (the "Financial Schedule") is the schedule referenced in section 9.1(c) of the APA, and even though I recognize that section 9.1(c) is a provision that deals with bonuses and not other forms of compensation, it is still my opinion that the only reasonable way to understand

the $2 billion entry for "Comp" on the Financial Schedule is as encompassing more than

just bonuses. First, the customary use of the term "Comp" in the Industry is as a

reference to all of the different kinds of expenditures that are made in order to

compensate employees – including bonus payments, severance payments, base salary

payments, and all related tax payments. Second, since Barclays was assuming explicit

compensation liabilities under the APA that were not limited to bonuses, it is my expert

opinion that no Industry professional could reasonably interpret the term "Comp" on the

Financial Schedule as including only bonuses, but none of the other compensation-related

liabilities Barclays was assuming.

    7.  My opinion is further confirmed by the fact that section 9.1(c) of the APA

provides that Barclays shall pay bonuses in an amount that "in the aggregate, are equal in

amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable

for incentive compensation (but not base salary)". That language reflects a customary

reference to the amount that Lehman would have "accrued" in anticipation of paying

2008 bonuses. It is customary practice for large financial institutions to make rough

estimations of what they will end up paying in year-end bonuses, and to "accrue" those

amounts on their financial statements. I understand from the testimony given by

Lehman's former President Bart McDade that Lehman's accrued bonus amount had to be

adjusted to reflect the equity component of annual bonuses and the need to annualize

those accrued estimates. The first point, about adjusting to include the equity component

of bonuses, is also made by LBHI's consultant at Alvarez & Marsal, Rajesh Ankalkoti,

who estimated the Lehman accrual for the Transferred Employees for 2008 to be

approximately $1.2 billion (once the equity component is included; it is not clear if that

number is annualized or not). This is consistent with the understanding that the estimated

accrual for the Lehman employees was less than $2 billion, and was merely one very

significant component of the overall estimate of $2 billion in "Comp" liabilities assumed

by Barclays.

I declare under penalty of perjury that the foregoing is true and correct. Executed

this 22nd day of June, 2011, in New York, New York.

Alan M. Johnson

# ADDENDUM

# BCI EXHIBIT

# 339

Contains Highly Confidential Information

# Expert Report on Compensation Issues

### In Re: Lehman Brothers Holdings, Inc., et al., Debtors

### and

### In Re: Lehman Brothers, Inc., Debtor

## Alan M. Johnson

## January 8, 2010

CONTAINS HIGHLY CONFIDENTIAL INFORMATION

**Contains Highly Confidential Information**

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Introduction | | 2 |
| Qualifications | | 2 |
| Documents Reviewed | | 3 |
| I. | Summary of Conclusions | 3 |
| II. | Market Compensation Context | 4 |
| | A. The 2008 Financial Crisis Was Unprecedented In Modern Times | 4 |
| | B. Compensation Market Practice | 4 |
| | C. Assessment Methodology | 5 |
| III. | Executive Compensation Issues | 6 |
| | A. Market Practice On Executive Treatment | 6 |
| | B. Reasonable Expectations | 7 |
| | C. Barclays' Treatment Of Key Lehman Brothers' Executives (i.e. Barclays' General Compensation Formula) | 9 |
| | D. Analyses for Executive Compensation | 10 |
| IV. | Aggregate Compensation Spend | 10 |
| V. | Conclusion | 12 |
| Appendix A: Curriculum Vitae | | 13 |
| Appendix B: 2008 Agreements of Top 9 vs. Template and 2008 Agreements of Other Executives vs. Template | | 14 |
| Appendix C: Multi-Year Bonus (Cash and Equity) Agreements for Executives | | 17 |
| Appendix D: Other Transactions – Executive Compensation Treatment Summary | | 18 |
| Appendix E: Key Employees Employment Agreement Termination Provisions | | 20 |
| Appendix F: Aggregate Compensation Spend Build Up | | 21 |
| Appendix G: Documents Reviewed | | 23 |

Contains Highly Confidential Information

## Introduction

I have been retained in this matter to analyze Barclays Capital Inc.'s ("Barclays") retention in 2008 of key Lehman Brothers' executives under the circumstances of Barclays' acquisition of Lehman Brothers' North American broker dealer business ("LBI" or the "Business") (collectively, the "Barclays/LBI transaction"). This expert report discusses market practice for treatment of executives considered key to the success of a business during an acquisition such as the Barclays/LBI transaction, including how compensation packages are determined. Additionally, this report discusses the market norm for the elements of compensation and assesses the aggregate compensation spend by Barclays for former Lehman Brothers' employees. This report also considers the unusual/emergency circumstances in the finance industry at the time of the Barclays/LBI transaction.

My firm, Johnson Associates, was the designated compensation consultant to the compensation committee of LBI's parent company, Lehman Brothers Holdings Inc., from 2004–2008, but not at the time of the Barclays/LBI transaction. Although I, and others at my firm, are knowledgeable about Lehman Brothers Holdings Inc. and its compensation practices, we had no involvement in the Barclays/LBI transaction. Neither I, nor anyone at my firm, is using any confidential information for this report that we learned as a result of having advised Lehman Brothers Holdings Inc.

## Qualifications

I am an executive compensation consultant, and my firm, Johnson Associates, is a prominent boutique compensation consulting firm. My firm specializes in analyzing and advising the financial services industry, including major investment and commercial banks, insurance companies, asset management firms, hedge funds and other alternatives, and brokerage firms.

I have devoted my entire career to executive compensation consulting work. Prior to founding my own firm in 1992, I was a consultant at several of the leading compensation advisory firms in the country, including Hewitt Associates (consultant 1980-1983), Sibson & Company (principal 1983-86), Frederick W. Cook & Co. (partner/shareholder 1986-1989), Handy Associates (Managing Director 1989-1990), and GKR (Managing Director 1990-1992).

I have extensive experience with a wide range of executive compensation issues and am familiar with all facets of executive compensation. I have consulted on compensation practices in the financial services industry for many years and I am commonly quoted in the press regarding compensation issues in the financial services industry and across the broader economy. Most of my engagements are confidential so I will not list them here, but clients have included many of the world's most significant financial institutions and numerous prominent executives. My work has included the following:

- Analyzing compensation issues for acquisitions and troubled situations.

Contains Highly Confidential Information

- Designing annual and long-term incentive compensation programs and analysis of the impact of such programs on management behavior and performance.

- Consulting major financial firms and executives on total compensation programs, employment and severance agreements, and contracts governing change in control provisions.

- Providing advice regarding compensation aspects of mergers and acquisitions, public offerings, LBO transactions, recapitalizations, and restructurings.

- Reviewing practices and intentions of firms across business cycles and the entry/exit of firms from the financial services space.

- Participating frequently in compensation conferences and executive compensation programs.

- Serving as an expert witness in various cases involving executive compensation.

I attended the U.S. Naval Academy from 1973-1975, received a B.A. in History and Economics from the University of Florida in 1977, studied Economics at the graduate level at the University of Virginia, and obtained an M.B.A. in Finance from the University of Chicago in 1980.

A copy of my curriculum vitae is attached at Appendix A.

## Documents Reviewed

I reviewed extensive case materials, documents, and depositions relating to this litigation to prepare this report. I also relied on my significant experience in the executive compensation and financial services industry. I reserve the right to supplement or amend my opinions in response to new information or analyses.

## I.    Summary of Conclusions

Having considered extensive case materials, documents and depositions relating to this litigation, certain facts regarding the compensation and titles of various former LBI employees provided to me by counsel that I was asked to accept as true, and my own experience in the executive compensation industry, it is my opinion that it was both reasonable and necessary under the circumstances of the Barclays/LBI transaction for Barclays to make offers to the top Lehman Brothers' executives - some of whom are alleged to have been involved in negotiating the transaction - before closing in order to preserve the value of the Business. The amount and the timing of those offers were reasonable and to be expected.

There is nothing about the oral or written offers that suggests anything other than a business need on the part of Barclays to retain the top talent at LBI so as to purchase the Business without it disintegrating. Rival firms would have had the opportunity to poach the top talent from

Contains Highly Confidential Information

LBI at the time of the Barclays/LBI transaction and that fact created a serious business risk to Barclays in its acquisition of LBI. In fact, it would have run counter to best market practice for Barclays to fail to attempt to sign up the top Lehman Brothers' executives as quickly as possible in order to keep the Business intact.

There is nothing about the oral or written offers that suggests bad faith. The employment agreements I reviewed, as a group, reflect the economics and variations that would have been expected at the time. Said another way, the agreements were consistent with those found in the marketplace at that point in time, and consistent with Barclays' need to ensure that the talent needed to run the business it was buying would stay.

It is also my expert opinion based on industry standards that the estimate for "Comp" set forth in the financial schedule referenced by the Asset Purchase Agreement would be understood by compensation professionals to include multiple elements, such as cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the industry. Further, I find that the $2 Billion estimate for "Comp" was not unreasonable at that time or under the circumstances of this transaction.

## II.    Market Compensation Context

The compensation aspects of this transaction cannot be fairly evaluated without recognizing the extraordinary circumstances that existed at the time of the Barclays/LBI transaction in September 2008, not the least of which was the high degree of uncertainty in the financial industry.

### A.    The 2008 Financial Crisis Was Unprecedented In Modern Times

The 2008 financial crisis was an important consideration in my report. The crisis resulted in the demise of Bear Stearns and Lehman Brothers, and the severe wounding of many major financial firms both in the U.S. and globally, including Citibank, Morgan Stanley, Bank of America, and Merrill Lynch.

This report considers those extreme circumstances and perspectives that formed the atmosphere in which the Barclays/LBI transaction took place. Industry and compensation norms have evolved rapidly since the Barclays/LBI transaction and a number of proposals have been put forth since that time regarding how compensation should operate going forward. This report focuses on industry compensation practices and perspectives in place in September 2008, however, not on currently evolving ideas or future concepts.

### B.    Compensation Market Practice

Compensation is of significant importance to executives in the high-end financial services industry (the "Industry"). A primary reason why many employees work in the Industry is the opportunity to earn high compensation vis-à-vis other industries and careers. The Industry is demanding and competitive, often characterized by short-careers in which to accumulate savings and prepare for post-Industry employment.

4

**Contains Highly Confidential Information**

Employee compensation is by far the most significant cost for most Industry firms; it commonly consumes approximately 50% of total net revenue. The bulk of total annual compensation (often 70% - 95%) for most executives is delivered in a discretionary, year-end bonus comprised of an immediate cash payment and a deferred compensation award, which usually includes, or is entirely composed of, firm equity (e.g., restricted stock, stock options).

## C.    Assessment Methodology

In reaching my opinions, I considered the following important market issues:

The Barclays/LBI transaction occurred near the end of 2008. The fact that the transaction was near the end of the calendar year placed immense pressure on Barclays to make compensation commitments to LBI and to its employees regarding year-end 2008 bonuses. The stress and uncertainty in the financial markets only increased these pressures on Barclays.

Even if LBI had not required Barclays to commit to retaining their employees and paying 2008 year-end bonuses as a condition of the transaction, Lehman Brothers' employees generally would have wanted assurances they would be paid competitive bonuses for 2008 and competitive salaries/bonuses going forward. Lehman Brothers' executives, in particular, would have been looking to Barclays for competitive compensation and career commitments to keep them from looking elsewhere, especially considering the fact that Barclays was not as well known as LBI in the United States.

The labor market opportunities for financial service professionals had been generally robust in 2005-2007, with a weakening in 2008. In September 2008, however, there was not yet a clear indication of how difficult the market would become by the first quarter of 2009. In September 2008, the prevailing view in the Industry was that the labor market would be better than it turned out to be. The firms deciding what compensation to offer and the professionals deciding what compensation to demand or accept both made decisions according to that prevailing view. Firms believed they had greater retention needs, and professionals thought more opportunities would be available over the next 3-6 months.

Barclays' efforts to quickly retain key Lehman Brothers' employees with market-competitive compensation offers before they entered the labor market would have been viewed as standard market practice. Industry firms consider both their own financial results (e.g., profitability, ability to pay) and the anticipated actions of relevant competitors in determining annual total compensation levels and the mix of cash vs. deferred stock in bonus payments. There is a clear, long-standing view in the Industry that a firm has limited flexibility to vary from competitive norms without endangering its ability to retain and recruit talent.

Contains Highly Confidential Information

## III.    Executive Compensation Issues

### A.    Market Practice On Executive Treatment

It is generally considered important to retain key senior executives when acquiring a financial services firm such as LBI. Senior executives must be committed to the business and not spend major efforts developing their next career. The criticality of this issue is heavily dependent on the particular facts and circumstances. I believe the facts of the Barclays/LBI transaction suggest that a heavier than normal weight on retaining key senior executives was appropriate for the reasons I explain further below.

The executives considered "key" to a company may vary depending on the nature of the transaction and the companies involved. Barclays had a relatively small U.S. presence compared to the Lehman Brothers' businesses and therefore required the immediate retention of a team of local managers in the U.S. to run the Business in the short-to-intermediate term. In addition, LBI was heavily dependent on certain professional skills to operate, which Barclays did not necessarily have immediate access to in the United States. Barclays did not have a large retail branch system, brokerage business, conventional lending, or other businesses in the U.S. from which to draw specific professional skills that would have reduced its dependence on LBI's senior talent.

The Barclays/LBI transaction's timing in relation to hiring season in the Industry did not permit Barclays to be passive about retaining key talent. The typical Industry hiring season begins in January-February and, as stated above, Industry expectations at the time of the Barclays/LBI transaction were that there would be a reasonable labor market in early 2009 for executives. Therefore, both Barclays and Lehman Brothers' employees expected that rival firms would have the opportunity and incentive to poach top Lehman Brothers' talent in late 2008. It would have been poor market practice for Barclays to ignore this reality and sit idly by while key executives were approached by and tempted to accept offers at other firms, as some testified they were. Barclays simply could not abstain from or timidly approach retention of key executives without creating a serious risk to keeping the Business intact. Additionally, if Barclays did not act to retain Lehman Brothers' key executives critical to the Business, the Business could have dissipated due to the lack of institutional knowledge and the potential exodus of clients and other Lehman Brothers' professionals.

These concerns were only magnified by the 2008 financial crisis. Industry financials were in disarray, and historical financials and patterns could not be relied upon due to the difficulty of fairly valuing illiquid assets. LBI's parent company, Lehman Brothers Holdings Inc., had filed for bankruptcy, a SIPA proceeding was in process for LBI, and LBIE had entered into the equivalent of bankruptcy proceedings in the United Kingdom. Barclays needed employees with specific and immediate knowledge of LBI's business challenges to succeed in taking over the Business. Market perceptions were that turnover was high and it was unclear at the time of the Barclays/LBI transaction whether a firm such as LBI, which was dependent on the skills of senior professionals, could be kept together under such stressed conditions. Market perceptions regarding the Bear Stearns/J.P. Morgan transaction, which had occurred a few months prior to the Barclays/LBI transaction, had not been positive in terms of the approach to retention of professionals by the acquirer. All of those circumstances created tremendous uncertainty for Barclays surrounding

Contains Highly Confidential Information

survival of the Business overall, including maintaining its clients, relationships, and employees. Any acquirer of LBI would have an even greater need in these conditions to retain key employees to preserve continuity with clients and employees.

## B.    Reasonable Expectations

It was reasonable for Barclays under the circumstances present in September 2008, some of which I outline above, to demand as a condition of the transaction the continued involvement of a small group (i.e., 8 or 9 key executives) and 70% of the top 200 Lehman Brothers' employees. It was also reasonable for Barclays to provide immediate, competitive compensation assurances to key senior employees so that those individuals remained focused on the success of the Business and did not look for jobs elsewhere.

Barclays was negotiating to buy a business whose key assets are its personnel. If Barclays could not be assured that those key assets would remain part of what it was buying, it would have had good reason to reconsider its willingness to engage in the transaction. As explained above, Barclays needed to have a team of leaders that could provide perspectives, guidance and institutional knowledge over the short-to-intermediate term. Executives in the positions held by the top eight or nine Lehman Brothers' individuals[1] would ordinarily have been viewed in the market as the types of executives most likely able to provide that leadership and services to Barclays. In addition, senior financial executives who receive offers from a new employer generally want to know before committing to the new employer if key members of their team, or other key professionals, will receive offers as well. Therefore, it is common for the number of commitments and contracts to expand somewhat in order to address these concerns.

The reasonableness of retaining select key senior executives was heightened because the visible, long-standing historical leader of Lehman Brothers, Richard Fuld, would not be going to Barclays. Mr. Fuld had been the only chief executive officer of Lehman Brothers Holdings Inc. since it went public in 1994. Moreover, there had been an exodus of senior management and a public feud concerning control of Lehman Brothers Holdings Inc. earlier in 2008. Several long-term key Lehman Brothers' executives had been pushed out over business disputes during that time. Therefore, it was even more critical than in a normal acquisition for Barclays to retain other key Lehman Brothers' executives so as to suggest some degree of Business leadership continuity to Lehman Brothers' employees, clients, and the public.

As to the specific facts involved during the week of the Barclays/LBI transaction negotiations, it is my understanding that there were up to 9 key executives that Barclays considered to be critically important to retain with the firm because they were generally the heads of the relevant businesses that Barclays was focused on, and one was LBI President Bart McDade. Barclays drew up proposed contracts early that week for those 9 executives (see Deposition Exhibit 101). However, it is my understanding that Barclays was told by counsel for LBI not to discuss an offer with Bart McDade, and therefore Barclays did not pursue such discussions with

---

[1] President, COO (Mr. McDade), Co-Heads of Fixed Income (Mr. Felder, Mr. Lee), CFO (Mr. Lowitt), Head of U.S. Equities (Mr. Donini), Managing Director and Head of Investment Banking (Mr. McGee), Senior Manager of Equity Administration (Mr. Nagpal), Head of Capital Markets (Mr. Gelband), Senior Manager of Fixed Income Administration (Mr. Humphrey).

Contains Highly Confidential Information

him. Two of the other executives signed contracts prior to closing (Mr. Felder and Mr. Lowitt), but some did not sign agreements until after the closing (Messrs. Donini, Humphrey, Hyung, McGee, and Nagpal), and two did not sign agreements at all (Mr. McDade and Mr. Gelband).[2] Some of those key executives had conversations with Barclays about their teams coming prior to closing as well. For example, according to Mr. Tonucci's deposition, Mr. Lowitt approached Mr. Tonucci on September 19th about coming to Barclays. This suggests that Mr. Lowitt may have discussed with key members of his team the likelihood that they would be assured employment. This is reasonable and to be expected because the nature of LBI's business was one where Barclays had to preserve human capital immediately with competitive, aggressive offers or executives would leave quickly. Given the competitiveness of the Industry and the high level of these key executives, it is not surprising that it took several weeks to negotiate many of the contracts. I also have reviewed the specific offers made to the key individuals. Some were a little higher than 2007, some were a little lower, and there were an expected number of outliers. This distribution is predictable due to different negotiating tactics, changing market values of some executives from 2007, and the role they would play at Barclays. The ultimate offers for these key executives were reasonable in amount and timing.

It is common in similar situations (both typical acquisitions and crisis environment acquisitions) to have compensation discussions with key senior executives prior to closing a deal, even if they are part of the team negotiating the deal, as part of the due diligence process. The form and degree of those conversations will vary with the facts of the transaction.

I believe the relevant facts in the Barclays/LBI transaction necessitated an explicit, focused set of conversations and agreements.

Time was remarkably short for Barclays. Barclays did not have time to establish relationships and start with broad, general conversations with the key employees it needed to retain. Although there was uncertainty for Barclays surrounding the Barclays/LBI transaction, it is important to note that the Lehman Brothers senior executives would *not* have been uncertain about their personal market value to Barclays. Barclays did not have as well known a brand in the U.S. as Lehman Brothers, a fact that was undoubtedly important to Lehman Brothers' executives. At that time, there was no reason for Lehman Brothers' professionals to necessarily understand or believe that Barclays would provide compensation on a scale that Lehman Brothers' executives expected or that was competitive with U.S. market norms. LBI's key U.S. competitors (e.g., Goldman Sachs, Citigroup) were unquestionably approaching senior Lehman Brothers' executives about jobs, as would be expected and is referenced in deposition testimony. Lehman Brothers senior executives would have felt justified in demanding to be compensated by Barclays above and beyond what they would expect from Goldman or the like because they could view it as risky to come to Barclays. These are not theoretical concerns, as is evidenced by the fact that an important Lehman Brothers' executive, Mark Shafir, a Managing Director and Co-Head of M & A, left for Citigroup in the middle of negotiations. In addition, loyalty can be a strong motivator in the Industry and Barclays had to consider the fact that encouraging these top executives to come would likely mean that their teams would agree to come as well. These facts show that it was reasonable and necessary for serious personal compensation discussions, not to mention actual

---

[2] Mr. McDade did join Barclays briefly and solely in order to assist with the transition. He did not sign a contract and received only a base salary identical to his base salary at LBI.

Contains Highly Confidential Information

agreements or understandings, to occur between key Lehman Brothers' executives and Barclays
prior to the close of the Barclays/LBI transaction. Barclays would not have had the certainty it
needed to close the deal without such negotiations and agreements.

Experienced advisors and counsel to LBI and Barclays would have anticipated and
expected the existence of such discussions. For example, the existence of similar discussions was
explicitly mentioned in the J.P. Morgan/Bear Stearns and Bank of America/Merrill Lynch SEC
filings, similar to the LBHI 8K. The discussions that occurred in those deals were similar in
nature to the discussions that occurred in the Barclays/LBI transaction and, occurred pre-closing as
well. (*See* Appendix D for executive retention language in their respective SEC filings filed pre-
closing.)

It is common market practice and expected that the timing and content of agreements with
executives will vary depending on individual circumstances. Some are, by nature, more trusting.
Some may have client relationships or expertise with clear market value. Some have significant
net worth. Since every executive is different, each requires a differing degree of negotiation to
reach a compensation agreement. While contracts and agreements are often put in place prior to
acquisition for select senior executives in firms being acquired, as they were in this case, it is
almost universally true that those same executives have input into the content of their agreements
and, thus, not all contracts are signed prior to the acquisition being completed.

C.    **Barclays' Treatment Of Key Lehman Brothers' Executives (i.e. Barclays' General
      Compensation Formula)**

An important reasonableness test as to the amount of the offers is whether the final
agreements reflect market norms for similar positions. Market norms are observed because there
is an assumption in the market that a market-based agreement provides no obvious incentive to
deviate from appropriate behavior by either side. My understanding is that Barclays' general
compensation formula/model (the "Template") was used as an internal reference point and
estimated the pool requirement for 75% of 2007 total compensation for 175-200 employees for
2008 and an additional median of 35% of 2007 total compensation, with significant variations,
paid over two years as a retention payment. This was consistent with market practice at the time
of the Barclays/LBI transaction.

Since Barclays' Template applied to a population level comprised of roughly the top 200
executives (i.e., not to individuals specifically), variation from the Template among individuals at
the senior range of that level would be expected. Importantly, based on other transactions and
situations I have observed over my career, it would be expected that some senior executives would
receive better treatment than the Template would dictate. (*See* Appendix D for examples of other
such transactions in the Industry.) These senior executives would be likely to receive higher
compensation due to their symbolic importance in persuading other key executives to remain with
the firm, role changes, or due to their negotiating leverage. As a general matter, the Barclays'
agreements with Lehman Brothers' employees that I reviewed followed a consistent pattern. I
specifically reviewed the compensation packages offered to members of the group of the top 9 key
employees, to additional top level executives identified by either Lehman Brothers Holdings Inc.
Debtor or the Official Committee of Unsecured Creditors filings as allegedly having been

9

Contains Highly Confidential Information

involved in negotiation of the LBI/Barclays transaction, and other representative senior executives. Those individuals were generally given offers at, or below (about 15% - 20%), their 2007 compensation. There were some expected exceptions to that trend, since, as I mentioned previously, executives negotiate with different personal characteristics, different market value, and different strategies. (*See* Appendix B for comparison of numbers for senior executives' 2007 compensation vs. Template compensation vs. actual compensation in Barclays' agreements.)

**D.    Analyses For Executive Compensation**

The following support the summary conclusions expressed here:

1)    The Template for Lehman Brothers' top 200 employees had 75% of 2007 total compensation as the reference point, with an additional median of 35% of 2007 total compensation, with significant variations, earned for continuing employment over 2010-2011. Differences likely reflect criticality to business vis-à-vis other professionals, role changes, and negotiation skills. Normally, I would expect key executives to be paid relatively better than the remainder of top 200 executives and other employees generally. (*See* Appendix B.)

2)    There were a moderate number of compensation agreements for 2009 among all the senior executive agreements I reviewed. These agreements were all at or below each individual's 2008 compensation levels. Based on my review, I believe these amounts were reasonable and not unexpected. (*See* Appendix C.)

3)    Disclosed executive treatment in other transactions highlights the prevalence of pre-closing agreements and other common practices in the treatment of top executives. (*See* Appendix D.)

4)    Comparison of employment agreement termination provisions offered by Barclays to Lehman Brothers' executives against the general market shows Barclays provided market competitive terms. (*See* Appendix E.)

5)    My significant, on-going experience advising major financial service firms on difficult executive compensation issues across industry cycles further confirms my conclusions.

**IV.    Aggregate Compensation Spend**

Section 9.1(c) of the Asset Purchase Agreement refers to Barclays' obligation to pay each Transferred Employee a 2008 bonus that is equal to the "bonus pool amounts accrued...and reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of Holdings and Purchaser....Bonuses shall be awarded...in such forms and proportions as are consistent with Purchaser's customary practices[.]" (*See* APA at § 9.1(c).) I have not seen a September 16, 2008 financial schedule initialed by a Barclays' officer. I am assuming for discussion purposes, however, that the schedule referenced is that which was initialed by LBI employee Steve Berkenfeld (the "Berkenfeld Schedule"). The Berkenfeld Schedule states 2 0 for a line item called "Comp." It is my understanding that this represents a $2.0 Billion estimated number for Lehman Brothers' Transferred Employees 2008 compensation spend, including bonuses (*See* Berkenfeld Schedule reference to "Comp 2 0" under "Liabilities.)

**Contains Highly Confidential Information**

The reference to "Comp" in this schedule, rather than just bonus, indicates to me as an expert in this field that the estimate covers both cash bonuses and deferred equity, as well as other forms of compensation expenses, such as severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry. It also would appear to me as an expert that the estimate for "Comp" should include severance because the Asset Purchase Agreeement explicitly requires Barclays to assume an obligation to pay severance payments to the Transferred Employees. Thus, looking at all parts of section 9.1 and the reference to "Comp" in the Berkenfeld Schedule reinforces my conclusion that the "Comp" estimate would include both bonus and severance.

Indeed, even if I focus solely on the term "bonus pool," Industry convention and practice is typically to define a "bonus pool" as referring to a wide range of compensation, including cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry. Severance payments are typically included in a "bonus pool," especially near the end of the calendar year, since severance obligations are likely to be much larger (due to the build-up of a longer term of employment), and one's upcoming bonus is typically considered to be part, and often the bulk, of a severance package. It is not Industry practice to define bonus pool as including other types of compensation such as general payroll, benefits (e.g., health care, pension), or commissions paid to retail and high-net worth brokers. However, it is certainly possible that these items could be included in the more generic term "Comp."[3]

I do not have an accounting background and I am not commenting herein on accounting issues related to the 2008 figure. My findings below are based on my significant, on-going experience in helping clients develop compensation and bonus pools across industry cycles.

Based on that experience and my knowledge of where Industry thinking on compensation issues stood in September of 2008, it is my opinion that an estimate of $2.0 Billion for "Comp" for the approximately ten thousand employees involved was reasonable.

I have considered LBI historical data and Industry practice at the time to establish whether the estimate was reasonable. LBI had an intense process for determining 2007 compensation, and without an acquisition, LBI's (and therefore Barclays') starting place for 2008 year-end bonuses would have been 2007 year-end bonuses. As stated in Appendix F, from my reading of Deposition Exhibit 284B, the 2007 estimated total bonus for LBI employees was $2,481.9 Million. Even assuming some downward adjustment in 2008 as a conservative assumption, the estimate for the Lehman Brothers' employees' bonuses would have been their actual year-end bonus in 2007, adjusted for some of the conditions of the market for 2008. Using conservative assumptions of this adjustment, as shown in Appendix F, the adjustment would result in $1,737 Million as an estimated market level total bonus figure. To this must be added the other elements of compensation covered by the estimate such as severance and taxes: as explained above, these elements are included in the standard Industry understanding of "bonus pool" and are also certainly included in the standard Industry understanding of what "Comp" in the financial schedule would cover, given the obligations assumed by Barclays under the Asset Purchase Agreement. Any estimate for severance would necessarily have been tremendously uncertain,

---

[3] The term "Comp," on its face, would encompass a broader range of compensation than a "bonus pool."

**Contains Highly Confidential Information**

given that Barclays was taking on an entire business in a short amount of time, and could not know how many Transferred Employees would accept offers, how many Barclays would need, and how many would be terminated as redundant. When reasonable estimates for these highly uncertain elements are included, the total figure is approximately $2.1 Billion. (*See* analysis at Appendix F.)

Based on my extensive review of case materials, documents, and depositions, I believe the $2.0 Billion estimated compensation figure was a reasonable approximation of the potential exposure for 2008 compensation liabilities assumed by Barclays for the acquired Lehman Brothers' employees when considering the customary elements and considering the extreme circumstances of the Barclays/LBI transaction, where there was little time to conduct any due diligence, and no time to determine how many employees would be needed or would accept offers.

## V. Conclusion

For the many reasons I address above and as detailed further in the appendices below, it is my opinion that it was both reasonable and necessary under the circumstances of the Barclays/LBI transaction for Barclays to make offers to the top Lehman Brothers' executives to preserve the value of the Business – even when such offers were made prior to closing the Barclays/LBI transaction and to employees alleged to have been involved in negotiations. It is also my opinion that the amount and the timing of those offers was reasonable and to be expected and in no way indicative of bad faith.

In addition, it is my expert opinion based on Industry standards that the estimated "Comp" or "bonus pool" described in the Barclays/LBI transaction documents would include multiple elements, especially as late in the year as September, such cash bonus, deferred equity, severance, social tax, special awards, replacement awards, other future payable awards, and payroll taxes typically expected in the Industry. It is my opinion that the $2.0 Billion compensation estimate was a reasonable figure for potential exposure for 2008 LBI compensation liabilities, especially considering the lack of information available and the uncertainty created by the financial crisis and LBI's instability.

Dated: January 8, 2010

*[signature]*

Alan M. Johnson
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, N.Y. 10036

12

Contains Highly Confidential Information

**Appendix A: Curriculum Vitae**

**Alan M. Johnson**
Johnson Associates, Inc.
19 West 44th Street, Suite 511
New York, NY 10036
(212) 221-7400

**Professional Experience**

- Entire career as executive compensation consultant

| Years | Firm | Title or Equivalent | Duties |
|---|---|---|---|
| 1980 - 1983 | Hewitt Associates | Consultant | Executive Compensation Consultant |
| 1983 - 1986 | Sibson & Company | Principal | Executive Compensation Consultant |
| 1986 - 1989 | Frederic W. Cook & Co. | Partner/Shareholder | Executive Compensation Consultant |
| 1989 - 1990 | Handy Associates | Managing Director | Executive Compensation Consultant |
| 1990 - 1992 | GKR | Managing Director | Executive Compensation Consultant |
| 1992 - Present | Johnson Associates, Inc. | Managing Director | Executive Compensation Consultant |

**Education**

| | |
|---|---|
| 1973 - 1975 | U.S. Naval Academy |
| 1975 - 1977 | University of Florida, B.A. (History/Economics) |
| 1977 - 1978 | University of Virginia, Graduate Economics |
| 1978 - 1980 | University of Chicago, M.B.A. (Finance) |

**Consulting focus:**

- Since about 1990 the bulk of my consulting efforts have involved advising major financial and professional service firms. I consult on the design and magnitudes of compensation programs for senior executives on a regular basis. I am quoted extensively in the press on compensation issues related to major financial service firms.

**Contains Highly Confidential Information**

## Appendix B: 2008 Agreements of Top 9 vs. Template [1]

- Assessment reflects 2008 total compensation (i.e. 75% of 2007 total compensation) as the Template for Top 200

- The 75% of 2007 compensation Template is consistent with our market perspective. Select executives would receive better treatment than broader template.

| | | | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| | all data in $000's | | Lehman | Barclays Template (75% of 2007 Comp) | Barclays (Employment Agreement) |
| Executive | LBI Title | Barclays Title | Total Comp | Total Comp | Total Comp |

Note: Total compensation includes both cash and deferred equity

**Top 9**

| Executive | LBI Title | Barclays Title | | | |
|---|---|---|---|---|---|
| Donini, Gerald [2] | Head, U.S. Equities | MD, Global Head of Equities | | | |
| Felder, Eric [3] | Co-Head, Fixed Income | MD, Head of Global Credit Trading | | | |
| Gelband, Michael [4] | Head, Capital Markets | Not Established | | | |
| Humphrey, Thomas | Senior Manager, Fixed Income Administration | MD, Head of U.S. FICC Sales | | | |
| Lee, Hyung [5] | Co-Head, Fixed Income | Not Established | | | |
| Lowitt, Ian | CFO | MD, Infrastructure Manager [6] | | | |
| McDade, Bart | President, COO | Transitional President, Lehman Brothers U.S. | | | |
| McGee, Hugh "Skip" | Global Head, Investment Banking | MD, Head of Investment Banking | | | |
| Nagpal, Ajay | Senior Manager, Equity Administration | MD, Global Head of Prime Services | | | |

1) Data based on depositions and other materials provided. As I created this chart, certain information reflected in this chart was not readily available in the depositions I reviewed for this matter. Where such information was not available, counsel for Barclays provided me with the figures and titles provided in this chart and asked me to assume they were true.

2) In 2007, the LBI U.S. Equities business was run by Mr. McDade, with Mr. Donini as his deputy. In 2008, Mr. Donini was promoted (upon Mr. McDade's promotion to President/COO) to head up the U.S. Equity business. Mr. Donini then joined Barclays as Head of the Global Equities business. As a result, his 2008 compensation is higher than his 2007 compensation, reflecting his promotion to a larger, global role.

3) Larger role with Barclays; from Co-Head of Fixed Income at LBI to Head of Global Credit Trading at Barclays. Mr. Felder had received a ███ 2008 cash bonus advance from Lehman Brothers that, it is my understanding, he subsequently repaid to Lehman Brothers. As a result, Barclays simply matched his 2008 compensation at Lehman Brothers.

4) Mr. Gelband had been fired in 2007 and then brought back in mid 2008, with a salary of ███ and no bonus. He came to Barclays but did not sign an agreement though one had been drafted for him, which included a 2008 bonus of ███ He left Barclays in October 2008 and was given his 2008 bonus as part of his separation agreement, which is expected to be reasonable.

5) After Mr. Lee signed his employment agreement, Barclays made the decision to terminate his employment. His employment agreement obligated Barclays to pay a guaranteed bonus of ███ and a two-year "special cash award" of ███ Upon termination, there was a dispute surrounding whether Barclays was obligated to honor the special payment portion of his contract. Barclays offered Mr. Lee the ███ bonus, but he pursued litigation as he felt he was entitled to the additional ███ Ultimately, the parties settled to give Mr. Lee ███ of the ███ special cash award.

6) Mr. Lowitt described his starting job at Barclays as Director of Integration for Lehman businesses. (Lowitt Dep. Tr. at 9:10.)

14

Contains Highly Confidential Information

## Appendix B: 2008 Agreements of Other Executives vs. Template [1]

| | | | 2007 Actual | 2008 Template | 2008 Actual |
|---|---|---|---|---|---|
| all data in $000's | | | Lehman | Barclays Template (75% of 2007 Comp) | Barclays (Employment Agreement) |
| Executive | LBI Title | Barclays Title | Total Comp. | Total Comp. | Total Comp. |

Note: Total compensation includes both cash and deferred equity

**Other Identified Executives [2]**

| Executive | LBI Title | Barclays Title | | | |
|---|---|---|---|---|---|
| Azerad, Robert | Global Head, Assets and Liabilities Management | Director, Strategy & Planning | ▉ | ▉ | ▉ |
| Berkenfeld, Steven | Chief Investment Officer, Private Equity Division; Head, Legal, Compliance and Audit Division. | MD, IBD/Commitment & Credit | ▉ | ▉ | ▉ |
| Blackwell, Alastair | Global Head of Operations | MD, Operations Management | ▉ [3] | ▉ | ▉ |
| Fuld, Dick [4] | CEO | Not Applicable | ▉ | | |
| Hraska, James | SVP, Secured Financing Operations | Director, Global Financing | ▉ | ▉ | ▉ [5] |
| Kelly, Martin [6] | Global Financial Controller | MD, CFO Americas | ▉ | ▉ | ▉ |
| Kirk, Alex [7] | Global Head, Principal Businesses | Not Established | ▉ | ▉ | |
| Shafir, Mark [8] | MD, Co-Head of M&A | Not Applicable | ▉ | ▉ | |
| Shapiro, Mark | Co- Head, Restructuring IB | MD, Head of Restructuring & Finance | ▉ | ▉ | |
| Tonucci, Paolo | Global Treasurer | U.S. Treasurer | ▉ | ▉ | ▉ [9] |

**Other Representative Executives [10]**

| Executive | LBI Title | Barclays Title | | | |
|---|---|---|---|---|---|
| Coghlan, John | MD, Prime Services | MD, Prime Services | ▉ | ▉ | ▉ [11] |
| Gatto, Joseph | Co- Head, Corporate Finance; Chairman M&A | Co- Head, Corporate Finance (M&A) | ▉ | ▉ | ▉ |
| Hash, Steven | Head, Global Investment Banking | No Data Available | ▉ | ▉ | |
| Parker, Paul | Global Head, M&A | Global Head, M&A | ▉ | ▉ | |
| Stephenson, Ros | Co-Head, Corporate Finance | Co-Head, Corporate Finance | ▉ | ▉ | ▉ |
| Weiss, Jeffrey | Global Head, FIG Investment Banking | Head of Global Financial Institutions | ▉ | ▉ | |
| Wieseneck, Larry | Head, Global Finance | Head, Global Finance & Risk Solutions | ▉ | ▉ | ▉ |

(1) Data based on depositions and other material provided. As I created this chart, certain information reflected in this chart was not readily available in the depositions I reviewed for this matter. Where such information was not available, counsel for Barclays provided me with the figures and titles provided in this chart and asked me to assume they were true.

(2) Lehman employees identified in either the Lehman Brothers Holdings Inc. Debtor or Official Committee of Unsecured Creditors filings as allegedly having been involved in negotiation of the LBI/Barclays transaction, other than the top 9 already listed in the previous chart.

**Contains Highly Confidential Information**

(3) Mr. Balckwell's 2007 LBI full figure total compensation was ███████

(4) There is no indication of any intention by Barclays to offer employment to Mr. Fuld.

(5) Mr. Hraska's 2008 Barclays full figure total compensation was ███████

(6) Role significantly changed at Barclays; from Global Financial Controller at LBI to CFO at Barclays.

(7) Mr. Kirk came to Barclays but did not sign an agreement, although he said in his deposition that Barclays had offered him his LBI annual salary, ███████ and a ███████ 2008 bonus. He left the first week of November 2008 and was given his 2008 bonus as part of his separation agreement, which is expected and reasonable. (Kirk Dep. Tr. at 9:25-11:2; 18:11.)

(8) Mr. Shafir left Lehman on September 17, 2008 to accept a position with Citigroup. (McDade Dep. Tr. at 121:16 123:7.)

(9) Mr. Tonucci's 2008 Barclays full figure total compensation was ███████

(10) Other top executives viewed by me as important team leaders.

(11) Mr. Coughlan's 2008 the full figure compensation appears to be ███████ but the contract was difficult to read and this number may be slightly off.

16

Contains Highly Confidential Information

### Appendix C: Multi-Year Bonus (Cash and Equity) Agreements for Executives

- Multi-year agreements in financial services were not uncommon and not unexpected for key executives.

- Barclays provided 2008 and 2009 agreements in employment agreements for select executives. I am aware of the following based on the contracts I reviewed, although my understanding is that there were more individuals who received 2009 agreements.



| all data in $000's | | 2008 Actual | 2009 Actual |
| --- | --- | --- | --- |
| | | Barclays (Employment Agreement) | Barclays (Employment Agreement) |
| Executive | LBHI Title | Total Bonus | Total Bonus |

Note: Total bonus includes both cash and deferred equity

**Top 9**

| Donini, Gerald | Global Head Equities | | |
| --- | --- | --- | --- |

**Other Representative Executives**

| Parker, Paul | Global Head, M&A | | |
| --- | --- | --- | --- |
| Weiss, Jeffrey | Global Head, FIG Investment Banking | | |
| Stephenson, Ros | Co-Head, Corporate Finance | | |
| Wieseneck, Larry | Head, Global Finance | | |
| Gatto, Joseph | Co- Head, Corporate Finance; Chairman M&A | | |
| Blackwell, Alastair | Global Head of Operations | | |

- 2009 agreements generally were equal to 2008 levels, and Barclays likely would have paid that amount anyway for 2009, with improving business conditions.
- 2009 agreements offered by Barclays would not be charged against 2008 bonus.

Contains Highly Confidential Information

## Appendix D: Other Transactions – Executive Compensation Treatment Summary

- Past transactions in the Industry show a focus on retaining key employees from the acquired firm is common practice and expected.
  - It is important to consider different fact patterns across transactions.
  - Discussions on compensation for key employees is common practice and vary from specific, individual level to general pool.
  - Employment agreements commonly provide protection and accelerated vesting on existing equity.

(Emphasis Added)

| Acquirer | Acquiree | SEC Filing Date | Transaction Announced | Transaction Value (in $ Billions) | Accelerated Vesting of Existing Equity | Severance Benefits Change of Control | New Employee Arrangements (at the Executive Level) | Comments from SEC Filings |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Merrill Lynch | 10/1/08 | 1/1/09 | $50.0 | Yes | Not disclosed | Yes | • Bank of America has engaged in discussions with Merrill Lynch top 3 executives concerning the terms of their employment following completion of the merger and has discussed certain compensatory arrangements with each of them<br>• Proposed arrangements seek to ensure continued service and align the executives' interests with the combined company after consummation of the merger |
| JPMorgan Chase | Bear Stearns | 4/11/08 | 5/30/09 | $31.1 ($1.1 equity value, $30 Federal Reserve special financing) | No unless terminated within 1 year | Not disclosed | Yes | • JPMorgan Chase has an oral agreement with Head of Fixed Income and Chairman<br>• Executive officers other than Head of Fixed Income and Chairman may have had and/or may have conversations from time to time with JPMorgan Chase regarding employment and/or retention opportunities with JPMorgan Chase, which could result in such executive officers entering into employment arrangements with JPMorgan Chase on terms that are different from the retention guidelines |

Contains Highly Confidential Information

## Appendix D: Other Transactions – Executive Compensation Treatment Summary

(Emphasis Added)

| | Acquiree | Agreement Date | Completion/ Termination Date | Termination Value (per proxy) ($B) | Accelerated Vesting on Equity | Guaranteed Employment, Severance, Change of Control | New Employee and/or Board of Directors Guarantee | Summary from SEC Filings |
|---|---|---|---|---|---|---|---|---|
| Bank of America | Countrywide Financial | 2/13/08 | 7/1/08 | $4.1 | Yes | $62 million total for 11 executives | Yes | • $37 million retention pool<br><br>• In connection with the merger agreement and a retention program previously implemented for other employees, Countrywide approved the grant of retention awards to named executive officers at the time that versions of this Registration Statement were filed<br><br>• Each name executive received a retention incentive payment on March 14, 2008 in respect of their annual bonus awards for Countrywide's 2007 fiscal year, and on February 1, 2008 were granted a cash-settled restricted stock unit award |
| JPMorgan Chase | Bank One | 2/20/04 | 7/1/04 | $58.0 | Yes | 2x sum of executive officer's 2005 guaranteed base salary and cash bonus | Yes | • Upon completion of the merger (or with respect to two executive officers, seven months following the merger) executive officers of Bank One selected by Bank One and JPMorgan Chase (other than CEO) provided a restricted stock unit award, guaranteed levels of compensation through 2005 (provided the executive officer remains employed) and severance protection for three years following the merger<br><br>• The restricted stock unit awards will generally have a value equal to 1.5X the sum of 2003 base salary and 2003 total annual incentive award consisting of cash and restricted stock units<br><br>• The restricted stock units will vest on the second anniversary of the completion of the merger, but will become immediately vested if the executive officer's employment is terminated without cause or if the executive officer resigns with good reason |
| Bank of America | MBNA | 6/2/05 | 1/1/06 | $34.2 | Yes | $37 million for senior executives | Not disclosed | •To reduce the incentive of MBNA executives to resign so as to collect such severance benefits, to better preserve management continuity and to align the interests of the executives with Bank of America's overall business strategy, Bank of America commenced discussions with certain of the executives regarding retention agreements<br><br>• As a result of these discussions, Bank of America has entered into retention agreements, effective on consummation of the merger with certain of such executives (four 4 executives) that replace the change of control agreements (or in the case of one other executive officer, coverage under the MBNA change of control severance pay plan) |
| Bank of New York | Mellon Financial | 2/23/07 | 7/1/07 | $18.5 | Yes | 2x executive's highest base pay + 2x highest bonus paid in last 3 years | Yes | • Recommended at the organizational meeting of the Human Resources and Compensation Committee of Newco's Board of Directors that a special team equity award program be established in which certain Bank of New York executive officers who become members of Newco's executive management team upon the completion of the transaction would participate<br><br>• Under which such individuals will be granted special team bonus awards in the form of restricted share units that will vest and become payable on the third anniversary of the completion of the transaction, subject to any accelerated vesting or forfeiture provisions contained in the program |
| Capital One Financial | North Fork | 4/28/06 | 12/1/06 | $14.6 | Yes | $13.3 million for CEO, $9.2 million for Head of Commercial Banking, $5.4 million for CFO | Not disclosed | • $50 million retention pool<br><br>• In connection with the execution of the merger agreement, Capital One entered into restricted share agreements with CEO and Head of Commercial Banking to be effective upon completion of the merger in consideration of their future service<br><br>• Additionally a five year non-competition and non-solicitation covenants for the above executives |

Contains Highly Confidential Information

## Appendix E: Key Employees Employment Agreement Termination Provisions

- Termination Provisions in Barclays' offers appear market competitive. These terms could change or implementation of the terms could vary based on individual negotiations, particularly with senior executives. For example, in the event of involuntary termination, a firm may choose to vest 50% of remaining unvested amounts or add 1 year of service to vesting.

| | Barclays' Offers to Key Lehman Employees[1] | Market Practice |
|---|---|---|
| **Cash Bonus** | • Forfeit if quit or are fired for cause before award date (February 2009)<br><br>• Entitled to payment if employed or terminated involuntary without cause before payment date | • Standard Market Practice |
| **Stock Award** | • Forfeit if voluntary resign to go to a competitor or terminated for cause<br><br>• Entitled to award in the event of involuntary termination without cause subject to non-solicit | • Standard Market Practice<br><br>• Standard Market Practice<br>– Some firms may (i) vest 50% of remaining unvested amounts or (ii) add 1 year of service to vesting |
| **Special Cash Award** | • Forfeit if voluntary resign to go to a competitor or terminated for cause<br><br>• Entitled to award in the event of involuntary termination without cause | • Standard Market Practice |
| **Notice Periods and Post-Employment Obligations** | • 3 month garden leave<br><br>• Additional 3 months of non-solicit restrictions post termination | • Typically 6 months non-solicit<br><br>• Solicitation of employees treated similarly to "for cause" cases |

(1) Reflects summary of terms from Deposition Exhibit 292B.

Contains Highly Confidential Information

### Appendix F: Aggregate Compensation Spend Build-Up

- The first figure in Chart B below, as explained further in footnote seven, was in a Barclays document I reviewed which contained this number as the LBI 2007 total bonus figure. It is unclear whether the 2007 LBI total bonus figure represents only cash/equity or the full bonus pool spend (with additional forms of compensation such as severance and compensation associated taxes). However, my analysis in Chart B shows that if one adjusts for the conditions of the market for 2008, even without including the additional bonus pool elements listed below (other special awards, severance, taxes), the $2.0 Billion for "Comp" was still a reasonable estimated compensation exposure for Barclays.

**CHART A: Barclays' 2008 Compensation Spend [1] for LBI Employees (Deposition Exhibit 281B)**

| Acquisition Balance Sheet Summary | Total (in million) |
|---|---|
| I. Payments | |
| Pre 22/9 payroll items [2] | $12 |
| Replacement RSUs [3] | $11 |
| Bonus including social tax | $1,529 |
| IBD Grad programmes [4] | $11 |
| Severance | $238 |
| + | |
| II. Payable in future | |
| Severance | $27 |
| Payroll tax on Equity compensation | $9 |
| Acquisition Buyout vesting over 2 years [5] | $53 |
| Payroll taxes on Acq buyout | $3 |
| + | |
| III. Other Items [6] | |
| ISP Awards [6] | $56 |
| Payroll taxes on ISP awards | $2 |
| = | |
| Total Barclays Spend | $1,951 |

**CHART B: Market 2008 Compensation Spend Build-Up for LBI Employees**

| Summary | Total (in million) |
|---|---|
| I. 2007 LBI Actual Cash/Equity Bonus [7] | $2,481.9 |
| II. Mv Johnson Associates 2008 Market Analysis [8] (September 2008 Estimate) | Down 30% (From 2007) |
| = | |
| III. 2008 Estimate of LBI Employees Cash/Equity Bonus (Not Including other items below) | $1,737 (Not including other items below) |
| + | |
| IV. Additional bonus pool elements for 2008 [9]: | |
| Payments | Total (in million) |
| Severance | $238 |
| Payable in future: | |
| Severance | $27 |
| Payroll tax on Equity compensation | $9 |
| Acquisition Buyout vesting over 2 years | $53 |
| Payroll taxes on Acq buyout | $3 |
| Other Items | |
| ISP Awards | $56 |
| Payroll taxes on ISP awards | $2 |
| = | |
| 2008 Market Estimated Total Bonus | $2,125 |

1) This is a replication of part of a document discussed in and attached to Mr. Exall's deposition and the Rule 60 Motions of the LBHI Committee of Unsecured Creditors and LBHI Debtor, respectively. Mr. Exall explained in his deposition that it was an updated version of an original schedule provided around the middle of July 2009 and reflected "an accurate picture of the discharge of compensation to previous -- former Lehman Brothers' employees in respect of their prior pre-acquisition service." (Exall Dep. Tr. at 62:11-63:12; Deposition Exhibit 281B.) (*See also* Creditor Committee Rule 60 Motion at page 36 and Exhibit 54; Debtor Rule 60 Motion at page 8 and Exhibit A.137.)

2) $5 Million of this figure was payroll and therefore, not related to the bonus pool. (Exall Dep. Tr. at 80:22-81:11.)

3) RSUs are defined as restricted stock award units. (*See* "Source" under Deposition Exhibit 281B and Exall Dep. Tr. at 86:23-88:13.)

**Contains Highly Confidential Information**

4)  IBD Grad programmes are defined as 2008 bonuses paid in June 2009 to people in a particular Lehman graduate school program that had been in place pre-acquisition. (*See* "Source" under Deposition Exhibit 281B and Exall Dep. Tr. at 100:16-103:41-105.)

5)  Acquisition Buyout is defined as a bonus relating to pre-acquisition performance by LBI people. (*See* "Source" in Deposition Exhibit 281B and Exall Dep. Tr. at 128:14-21.)

6)  ISP Awards are defined as an incentive share plan stock award program which was part of the 2008 bonus for former LBI employees. (*See* "Source" under Deposition Exhibit 281B and 141:24-143:19.)

7)  LBI 2007 annual bonus assumed to include only cash and equity for LBI employees transferred to Barclays after transaction based on my review of the headcount listed in Deposition Exhibit 284B, "Attachment 3." Amount does not include approximately 1,400 recent joiners who did not receive a bonus in 2007, which would cost an estimated additional $75 Million to $100 Million. (*See* Deposition Exhibit 284B, Attachments 3-4.)

8)  Based on my firm, Johnson Associates' median 2008 2Q compensation estimates, which have been produced for more than 10 years and are sent to 600+ contacts. Please refer to our document on our website: http://www.johnsonassociates.com/2008CompEst.pdf.

9)  Same equity bonus, severance and related tax items and amounts listed in Chart A of this page, as explained above in footnotes 1-6.

22

Contains Highly Confidential Information

## Appendix G: Documents Reviewed

"Barclays' Employment Contracts and/or Drafts of Contracts with the Following Individuals:
Steven Berkenfeld, Alastair Blackwell, John F. Coghlan, Gerald Donini, Eric Felder, Daniel
Fleming, Joseph D. Gatto, Michael Gelband, Steven Hash, James Hraska, Thomas P. Humphrey,
Martin Kelly, Alex Kirk, Hyung Lee, Ian T. Lowitt, Herbert McDade III, Hugh E. McGee III,
Ajay Nagpal, Paul G. Parker, Mark J. Shapiro, Ros Stephenson, Paolo Tonucci, Jeffrey L. Weiss,
and Larry S. Wieseneck".

"Deposition of Robert Azerad". Robert Azerad, United States Bankruptcy Court Southern District
of New York, Case No. 08-13555 (JMP) (August 17, 2009).

"Deposition of Steven Berkenfeld". Steven Berkenfeld, United States Bankruptcy Court Southern
District of New York, Case No. 08-13555 (JMP) (August 6, 2009).

"Deposition of Alastair Blackwell". Alastair Blackwell, United States Bankruptcy Court Southern
District of New York, Case No. 08-13555 (JMP) (August 7, 2009).

"Deposition of John Coghlan". John Coghlan, United States Bankruptcy Court Southern District
of New York, Case No. 08-13555 (JMP) (August 13, 2009).

"Deposition of Nancy Denig". Nancy Denig, United States Bankruptcy Court Southern District of
New York, Case No. 08-13555 (JMP) (August 21, 2009).

"Deposition of Eric Felder". Eric Felder, United States Bankruptcy Court Southern District of
New York, Case No. 08-13555 (JMP) (July 31, 2009).

"Deposition of Daniel Fleming". Daniel Fleming, United States Bankruptcy Court Southern
District of New York, Case No. 08-13555 (JMP) (August 28, 2009).

"Deposition of James Hraska". James Hraska, United States Bankruptcy Court Southern District
of New York, Case No. 08-13555 (JMP) (August 14, 2009).

"Deposition of Martin Kelly (Day One)". Martin Kelly, United States Bankruptcy Court Southern
District of New York, Case No. 08-13555 (JMP) (August 18, 2009).

"Deposition of Martin Kelly (Day Two)". Martin Kelly, United States Bankruptcy Court Southern
District of New York, Case No. 08-13555 (JMP) (November 20, 2009).

"Deposition of Paul Exall". Paul Exall, United States Bankruptcy Court Southern District of New
York, Case No. 08-13555 (JMP) (August 27, 2009).

"Deposition of Alex Kirk". Alex Kirk, United States Bankruptcy Court Southern District of New
York, Case No. 08-13555 (JMP) (August 31, 2009).

"Deposition of Ian Lowitt". Ian Lowitt, United States Bankruptcy Court Southern District of New
York, Case No. 08-13555 (JMP) (August 20, 2009).

**Contains Highly Confidential Information**

"Deposition of Bart McDade". Bart McDade, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (September 2, 2009).

"Deposition of Hugh McGee". Hugh McGee, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 10, 2009).

"Deposition of David Petrie". David Petrie, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 26, 2009).

"Deposition of James Seery". James Seery, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (September 3, 2009).

"Deposition of Mark Shapiro". Mark Shapiro, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 7, 2009).

"Deposition of Paolo Tonucci". Paolo Tonucci, United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP) (August 14, 2009).

"Acquisition Balance Sheet Summary". BCI-EX-00077287. Deposition Exhibit 280B.

"Acquisition Balance Sheet Summary". BCI-EX-00115843. Deposition Exhibit 281B.

Evans, Michael. "Summary of Current Spend – 08h30, 23 Sept 2008". (September 23, 2008).

Evans, Michael. "Summary of Current Spend – 08h30, 26 Sept 2008". (September 26, 2008).

Debtors' Motion to Schedule a Sale Hearing; Establish Sales Procedures; Approve A Break-Up Fee; and Approve The Sale of the Purchased Assets and Assumption and Assignment of Contracts Relating to the Purchased Assets. (September 17, 2008).

"Waiver and General Release – Alex Kirk". Barclays Capital. (November 3, 2008).

"Waiver and General Release – Hyung Lee". Barclays Capital. (October 30, 2008).

Anthony Collerton May 7, 2009 Email cited as Deposition Exhibit 292B

Michael Evans September 23, 2008 Email cited as Deposition Exhibit 284B

"Affidavit of Rajesh Ankalkoti". Daniel McIsaac, United States Bankruptcy Court Southern District of New York, Case No. 08-01420 (JMP) SIPA (October 5, 2009).

"Adversary Complaint". United States Bankruptcy Court Southern District of New York, Case No. 08-01420 (JMP) SIPA (November 16, 2009).

"Asset Purchase Agreement Among Lehman Brothers Holding Inc. Lehman Brothers Inc. LB 745 LLC. and Barclays Capital Inc". (September 16, 2008).

Master Repurchase Agreement between Lehman Brothers, Inc. and Barclays Capital, Inc. dated as of July 23, 1998.

Contains Highly Confidential Information

"First Amendment to Asset Purchase Agreement". (September 19, 2008).

"Clarification Letter (between LBHI, LBI, LB 745, and Barclays) and Schedules A and B". (September 20, 2008).

"The Trustee's Motion for Relief Pursuant to the Sale Order, Alternatively, For Certain Relief Under Rule 60(b)" (Rule 60 Motion). (September 15, 2009).

LBHI Subsidiary Bankruptcy Filings as of 2009.05.28.doc. (May 28, 2009).

"Creditors Committee Rule 60 Motion and Exhibits". United States Bankruptcy Court Southern District of New York, Case No. 08-13555 (JMP).

"Berkenfeld Schedule". (date stamped September 16, 2008).

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and Merrill Lynch". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/70858/000095012308013817/g15211a2sv4za.htm.

"Amendment No. 4 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and Countrywide Financial". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/70858/000095014408004454/g11537a4sv4za.htm.

"Amendment No. 1 to Form S-4 Registration Statement Under the Securities Act of 1933 - Bank of America and MBNA". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/70858/000095014405009662/g96430a1sv4za.htm.

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 – JPMorgan Chase and Bear Stearns". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/19617/000119312508090606/ds4a.htm.

"Amendment No. 3 to Form S-4 Registration Statement Under the Securities Act of 1933 – JPMorgan Chase and Bank One". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/19617/000095012304004755/y93320a3sv4za.htm.

"Amendment No. 2 to Form S-4 Registration Statement Under the Securities Act of 1933 – Bank of New York and Mellon Financial". U.S. Securities and Exchange Commission (Retrieved 1/8/2010).
http://www.sec.gov/Archives/edgar/data/1390777/000095012307005516/y30440a2sv4za.htm.

"Amendment No. 3 to Form S-4 Registration Statement Under the Securities Act of 1933 – Capital One Financial and North Fork". U.S. Securities and Exchange Commission (Retrieved 1/8/2010). http://www.sec.gov/Archives/edgar/data/927628/000119312506143322/ds4a.htm.

"Financial Services Compensation: Second Quarter Trends and Year-End Projections". Johnson Associates. (Retrieved 1/8/2010). http://www.johnsonassociates.com/2q08compest.pdf.

Exhibit 21

# Glossary
# of Compensation
# Terms



U.S. Department of Labor
Alexis M. Herman, Secretary

Bureau of Labor Statistics
Katharine G. Abraham, Commissioner

August 1998

Report 923

# **Preface**

Individuals interested in employee compensation are likely to encounter the terms listed in this glossary. Definitions are brief and may not reflect all usage. Some terms have a specific legal meaning, either through legislative enactment or judicial interpretations, which may differ from the usual definition. Readers who need more precise meanings for these terms should consult standard textbooks or legal reference materials available at bookstores and libraries. This glossary also provides examples of how some of the terms are used in National Compensation Survey publications; the terms may be used differently in other Bureau of Labor Statistics programs.

The Bureau's new National Compensation Survey will integrate three major programs—The Employment Cost Index, the Occupational Compensation Survey program, and the Employee Benefits Survey—into one comprehensive compensation program by the end of this decade. The NCS program will produce information on the Employment Cost Index, employer costs for employee compensation, occupational wage levels, and the incidence of and provisions in employee benefit plans.

This glossary is based in part on an earlier one, *Glossary of Current Industrial Relations and Wage Terms* (BLS Bulletin 1438, 1965). Richard K. Yeast, an economist in the Division of Compensation Data Analysis and Planning, prepared this report. Kenneth J. Hoffmann, an economist in the same division, assisted in the preparation. Leon Lunden, formerly with the same division, was the original coordinator of the project.

The Bureau of Labor Statistics welcomes comments on the usefulness of the glossary and the adequacy of its definitions. Please send any comments to the Division of Compensation Data Analysis and Planning, Room 4175, 2 Massachussetts Ave., NE, Washington, DC 20212. E-mail address: *ocltinfo@bls.gov*

Information in this publication is available to sensory impaired individuals. Voice phone: (202) 606-7828; TDD phone: (202) 606-6897; TDD message referral phone: 1-800-326-2577. This information is in the public domain and, with appropriate credit, may be reproduced without permission.

*Glossary* 1

# $\mathbf{A}$CCIDENTAL DEATH AND DISMEMBERMENT (AD&D)
## INSURANCE

Insurance that provides payment for accidental loss of life,
limb, hearing, or sight. Insurance usually covers both occu-
pational and nonoccupational deaths and injuries, but cover-
age may be limited to one or the other. Double indemnity
provisions of life insurance plans are considered to be AD&D
if they provide benefits for both accidental death and dismem-
berment.

## ACCRUAL LEAVE PLANS

Employees earn a specified number of vacation hours or sick
leave hours each pay period. For example, new Federal gov-
ernment employees earn 4 hours of vacation leave and 4 hours
of sick leave each pay period.

## ACROSS-THE-BOARD WAGE CHANGE

A general wage change affecting all or most employees in a
plant, company, or industry, because of a cents-per-hour or
percentage increase or decrease.

## ADMINISTRATIVE SERVICES ONLY (ASO) PLAN

An employees benefit plan that is administered by an insur-
ance company or other third party. The employer is entirely
at risk for paying employee claims.

## ADOPTION ASSISTANCE

Financial aid given to employees for the purpose of covering
all or part of the cost of adoption.

## ADOPTION LEAVE

Excused leave accorded to employees for attending legal pro-
ceedings leading to adoption and also, like maternity or pa-
ternity leave, for a period of time after adoption of a child.
(See Family and Medical Leave Act of 1993 (FMLA).

## AFL-CIO (AMERICAN FEDERATION OF LABOR AND
## CONGRESS OF INDUSTRIAL ORGANIZATIONS)

Federation of over 70 autonomous national and international

2 *Glossary*

unions created by the merger of the American Federation of
Labor (AFL) and the Congress of Industrial Organizations
(CIO) in December 1955.  The initials AFL-CIO after the
name of a union indicate that the union is an affiliate.

### AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (ADEA)

Federal law prohibiting bias against older workers in hiring,
discharge, compensation, or other terms, conditions or privi-
leges of employment.  Applies to workers aged 40 or older
working for firms of 20 employees or more. (See Older Work-
ers Benefit Protection Act of 1990.)

### AGENCY SHOP (see Union Security)

### AGREEMENT (COLLECTIVE BARGAINING AGREE-MENT, UNION CONTRACT)

Written contract between an employer (or an association of
employers) and a union (or unions), usually for a specified
term, defining conditions of employment (wages, hours, va-
cations, holidays, overtime payments, working conditions,
etc.); detailing rights of workers, the union, and management;
and describing procedures to be followed in settling disputes
or handling issues that arise during the life of the contract.

### AMERICANS WITH DISABILITIES ACT OF 1990 (ADA)

Federal law barring discrimination against qualified individu-
als who have disabilities in job application procedures, hir-
ing, firing, advancement, compensation, benefits, job train-
ing, and other terms, conditions and privileges of employ-
ment.  The law also requires reasonable accommodation to
the employee's disabling condition.  Rehabilitation Act (Sec-
tion 503)-Bars discrimination and requires reasonable accom-
modations by Federal contractors and subcontractors.  (See
Equal Employment Opportunity Commission.)

### ANNIVERSARY YEAR VACATION PLAN

Time-based vacation plan offering additional vacation time
to employees on certain "anniversary years."  For example,

employees receive an extra week of vacation at 10 or 20 years
of service (but not during intervening years).

### ANNUITY

A form of distribution from a retirement plan providing peri-
odic payments. Straight-life annuities provide payments, usu-
ally monthly, for the lifetime of a retiree. Joint-and-survivor
annuities provide payments to a retiree, and upon the retiree's
death, payments to a surviving spouse.

### APPRENTICE

A learner or beginner who enters into a formal agreement to
achieve journey-level worker status in a skilled trade. The
agreement requires that the person undergo supervised prac-
tical training and experience and receive technical off-the-
job or classroom instruction related to the skilled trade, usu-
ally for a specified period of time.

### APPRENTICE RATES

Schedule of wage rates applicable to workers' formal appren-
ticeship training. The rates usually rise gradually until ap-
prentices achieve journey-level status and the rates that ac-
company journey-level status.

### ARBITRATION (VOLUNTARY, COMPULSORY, ADVI-
SORY)

Method of settling labor-management disputes through an im-
partial third party, whose decision is usually final and bind-
ing. Arbitration is *voluntary* when both parties agree to sub-
mit disputed issues to arbitration, and *compulsory* if required
by law. A court order to enforce a voluntary arbitration agree-
ment is not usually considered compulsory arbitration. *Advi-
sory arbitration* - As provided in Federal Government agree-
ments, arbitration without a final and binding award.

### ARBITRATOR

An impartial third party to whom disputing parties submit
their differences for decision (award). An *ad hoc arbitrator*

4 *Glossary*

acts in a specific case or a limited group of cases. A *permanent arbitrator* serves for the life of the contract or a stipulated term, hearing all disputes that arise during this period.

AREA DIFFERENTIALS (see Wage Differentials)

AT RISK PAY

Pay that an employee is not guaranteed to receive but may receive under certain circumstances. Examples include commissions, piece rates, and various kinds of bonuses such as safety or attendance awards.

ATTENDANCE BONUS

Payment or other type of reward (e.g., a day off) for employees whose work attendance record meets certain standards. (See Bonus - (Production and Nonproduction).)

AUTOMATIC PROGRESSION

Policy by which workers' pay rates are automatically increased at fixed time intervals. Also refers to automatic movement from trainee rate to job classification rate or to the minimum of a rate range.

AVERAGE HOURLY RATE

Rate that is calculated by taking an employee's earnings and dividing by the hours worked.

# **B**ACK LOADED

Multiyear collective bargaining contract in which wage or employee benefit increases or both, are greater in the later years of the agreement than in the first year. (See Front Loaded.)

BACK PAY

Payment of part or all of an employee's wages for a particular prior period of time, arising from arbitration, court, or board awards, grievance settlements, errors in computation of pay, misinterpretation of wage legislation, etc.

BARGAINING AGENT (BARGAINING REPRESENTATIVE)
A union designated by an appropriate government agency,
such as the National Labor Relations Board, or recognized
voluntarily by the employer, as the exclusive representative
of all employees in the bargaining unit for purposes of collec-
tive bargaining.

BARGAINING RIGHTS
Legally recognized right of unions to represent workers in
dealings with employers.

BARGAINING UNIT
Group of employees in a craft, department, plant, firm, or
industry recognized by the employer or group of employers,
or designated by an authorized agency such as the National
Labor Relations Board, as appropriate for representation by
a union for purposes of collective bargaining.

BASE RATE
Wage rate for work performed during a unit of time, most
commonly expressed as a rate per hour. It may, however, be
expressed as an amount per day, week, month, or year. Does
not include overtime or incentive rates. Under an incentive
pay system, base rate may refer to the rate of pay for work
that does not meet an incentive production standard or for
downtime. Sometimes differs from the guaranteed rate.

BENEFICIARY
The person designated by an employee or retiree to receive
benefit payments in the event of the employee's or retiree's
death.

BENEFIT REOPENER (see Reopening Clause)

BENEFITS
Nonwage compensation provided to employees. The National
Compensation Survey groups benefits into five categories:
Paid leave (vacations, holidays, sick leave); supplementary

### 6 *Glossary*

pay (premium pay for overtime and work on holidays and
weekends, shift differentials, nonproduction bonuses); retire-
ment (defined benefit and defined contribution plans); insur-
ance (life insurance, health benefits, short-term disability, and
long-term disability insurance) and legally required benefits
(Social Security and Medicare, Federal and State unemploy-
ment insurance taxes, and workers' compensation).

BEREAVEMENT PAY ( see Funeral Leave)

BILINGUAL PAY DIFFERENTIAL
An hourly, weekly or monthly addition to pay for employees
who have qualified in a second language and are assigned to
jobs that necessitate its use.  Sign language for the hearing
impaired may qualify for the differential.

BLACK LUNG BENEFITS
A Federal program providing cash benefits to miners who
suffer from black lung, a respiratory disease resulting from
the inhalation of coal dust.

BLUE CIRCLE RATE (GREEN CIRCLE RATE)
Pay rate of a non-probationary worker that falls below the
established rate ranges for workers performing the same du-
ties.

BLUE-COLLAR WORKERS
Manual workers, usually those employed in production, main-
tenance, and related occupations, and paid by the hour or on
an incentive basis.  The National Compensation Survey's se-
ries for blue-collar occupations cover the following occupa-
tional groupings:  Precision production, craft, and repair;
machine operators, assemblers, and inspectors; transportation
and material moving; and handlers, equipment cleaners, help-
ers, and laborers.  (See Production Workers; White-Collar
Workers.)

BONUS (PRODUCTION AND NONPRODUCTION)
*Production Bonus*:   Extra payment based on production in
excess of a quota or on completion of a job in less than stan-

dard time.  In the National Compensation Survey, production bonuses are included in wages and salaries measures.

*Nonproduction Bonus*:  A cash payment that is not directly related to the output of either the employee or a group of employees.  Examples include attendance, Christmas, profit-sharing, safety, and year-end bonuses.  In the National Compensation Survey, lump-sum payments, and all nonproduction bonuses, are excluded from wages and salaries measures but are included in the benefits component of total compensation.

### BREAK IN SERVICE

Descriptive of the loss of seniority that occurs when an employee quits, is discharged, is laid off for a given time period, etc.  If the employee is subsequently reemployed, seniority starts as if the employee has never worked before for the company.  The employee loses previous status relative to other employees for layoffs, promotions, choice of vacation periods, etc.

### BREAK TIME (see Rest Period)

### BROAD BANDING

A method of grouping a number of similar jobs into only a few broad banded jobs.  The grouping may be across various occupations that differ but have a common thread (e.g., all are skilled trade jobs) or across various grades within a job, or a combination of both.  For example, 18 skilled trade job titles might be reclassified into two broad banded groups of jobs:  Skilled Trade Worker I and Skilled Trade Worker II.

# CAFETERIA PLAN (see Flexible Benefit Plans)

### CALL-IN PAY (CALLBACK PAY)

Pay guaranteed to a worker recalled to work after completing the regular work shift.  Call-in pay is a synonym for reporting pay.  (See Reporting Pay.)

8 *Glossary*

CASH BALANCE PENSION PLAN
A defined benefit plan in which an account is maintained for each plan participant. Each participant's account is credited with employer contributions to fund retirement benefits.

CASH OR DEFERRED ARRANGEMENT (CODA) (see 401(k) Plans)

CASH PROFIT-SHARING
Cash payments made to workers, often determined by a formula based on company profits. Such payments are not intended for retirement and individual accounts are not established. (See Deferred Profit-Sharing Plan; Bonus.)

CASUAL WORKERS
Workers who have no steady employer, but who shift from employer to employer. Also refers to workers not regularly attached to a particular work group. Sometimes applied to temporary workers. (See Contingent Workforce; Hiring Hall; Migratory Workers.)

CHILD CARE BENEFIT
Employers' full or partial payment for the cost of caring for an employee's children in a nursery, day care center, or by a baby-sitter, on or off the employer's premises, while the employee is at work. (See Elder Care.)

CHRISTMAS BONUS (see Bonus (Production and Nonproduction)

CIVIL RIGHTS ACT OF 1964
Under Title VII of this Federal act, private employers, unions, and employment agencies are required to treat all persons equally, regardless of race, color, religion, sex, or national origin, in all phases of employment, including hiring, promotion, compensation, firing, apprenticeship, job assignments, and training. An Equal Employment Opportunity Commission was created to assist in carrying out this section of the

act. The act has been amended by the Equal Employment Opportunity Act of 1972 and the Pregnancy Discrimination Act of 1978. The latter prohibits discrimination in employment against women affected by pregnancy, childbirth, or related medical conditions. (See Equal Employment Opportunity Commission (EEOC).)

## CIVIL SERVICE REFORM ACT OF 1978 (CSRA)
Federal law protecting the rights of Federal employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions affecting them. Supersedes Executive Order 10988, which recognized the right of Federal employees to bargain with management. Title VII specifies the duties and authority of the Federal Labor Relations Authority (FLRA).

## CIVILIAN LABOR FORCE
The total of all civilian employed and unemployed persons.

## CLEANUP TIME (WASHUP TIME)
Paid time allowed to workers to clean their workplaces or tools or to wash before leaving the plant at the close of the workday or for lunch. (See Clothes Changing Time.)

## CLOSED SHOP (see Union Security)

## CLOTHES CHANGING TIME
Time allotted within the paid workday for changing from street wear to work clothes or from work clothes to street wear, or both. (See Cleanup Time.)

## CLOTHING ALLOWANCE (UNIFORM ALLOWANCE)
Monetary allowance for clothing or its upkeep or both, granted by an employer to employees who are required to wear special clothing, such as uniforms or safety garments, in the performance of their work.

## COBRA RATE
The Consolidated Omnibus Budget Reconciliation Act (CO-

## 10 *Glossary*

BRA) of 1985 includes provisions that apply to group health
plans of employers with 20 or more employees on a typical
working day. COBRA gives participants and their beneficia-
ries the right to maintain, at their own expense, coverage un-
der their health plan that would be lost due to a qualifying
event at a cost that is comparable to what it would be if they
were still members of the employer's group. Qualifying events
include an employee's death, termination, reduced hours of
employment, entitlement to Medicare, or bankruptcy. Former
employees usually receive benefits under COBRA for up to
18 months following the qualifying event. The cost of the
COBRA coverage is normally paid for by the former em-
ployee, although some employers may pay a portion of the
benefit's cost. The COBRA rate, which is the rate charged to
the former employee or employee's beneficiary, is the actu-
arially determined plan premium plus an additional 2 percent
fee to cover administrative costs.

COFFEE BREAK (see Rest Period)

COINSURANCE
The amount of a health benefit's cost which will not be paid
by a plan. For example, a health benefit plan may include a
coinsurance rate of 10 percent for medical services. Plan par-
ticipants are responsible for paying 10 percent of the cost for
medical services with the health benefit plan paying 90 per-
cent of the cost. Plans may have different coinsurance rates
for different types of services, such as hospital room and board,
outpatient surgery, etc. (See Deductible.)

COLLECTIVE BARGAINING
Method whereby representatives of employees (unions) and
employers determine the conditions of employment through
direct negotiation, normally resulting in a written contract set-
ting forth the wages, hours, and other conditions to be ob-
served for a stipulated period (e.g., 3 years). Term also ap-
plies to union-management dealings during the term of the
agreement.

### COMMISSION EARNINGS

Compensation to salespeople based on a predetermined formula, for example, a percentage of the value of sales or the gross margin of goods or services sold. May be in addition to a guaranteed salary rate or may constitute total pay. (See Incentive Wage System.)

### COMPARABLE WORTH

A method of setting compensation providing for equal pay for work of equal value. It has been used as a means of achieving parity in pay for women and minorities who have been relegated to specific jobs whose pay has been traditionally low. (See Equal Pay Act of 1963; Equal Pay for Equal Work.)

### COMPENSATION (see Earnings)

### COMPENSATORY LEAVE

Time off to compensate an employee for time worked in excess of the work schedule. Compensatory leave may be a substitute for premium pay for overtime for workers who are exempt from the Fair Labor Standards Act.

### COMPRESSED WORKWEEK

Refers to completing standard weekly hours (e.g., 36, 37 1/2, 40 hours) in fewer days than the traditional 5-day workweek by increasing daily hours worked. Usually, the 40-hour workweek is scheduled over 4 days of 10 hours.

### CONSOLIDATED LEAVE PLANS (see Leave Banks)

### CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT (see Cobra Rate)

### CONSUMER PRICE INDEX (CPI)

A measure of the average change in prices paid by urban consumers for a fixed group of goods and services. It is calculated and issued monthly by the Bureau of Labor Statistics.

12 *Glossary*

CONTINGENT COMPENSATION

The linking of a portion of employees' pay or benefits to changes in some other measure, such as company profits, plant output, the Consumer Price Index, or the market price of a commodity. Contingent compensation payments may take the form, for example, of a lump sum payment in cash or company stock, or a wage rate increase.

CONTINGENT WORKER

A person employed to fill a temporary need for labor stemming from absence of regular employees, seasonal or irregular increases in need for workers, or other temporary or short-term circumstances. Contingent workers may be employees of the company for which they work, independent contractors, or employees of temporary help firms. (See Casual Workers; Hiring Hall; Migratory Workers; Part-Time Employee.)

CONTRACT (see Agreement)

CONTRACTING OUT (SUBCONTRACTING, FARMING OUT, OUTSOURCING)

Practice of having certain operations of the firm, such as parts of a manufacturing process, plant maintenance, security, or payroll preparation, performed by outside contractors, rather than using employees of the firm.

CONTRACT SIGNING BONUS

A nonproduction bonus given to unionized employees upon signing of a new labor-management agreement. (See Signing Bonus.)

CONTRIBUTORY PLAN

Employee benefit plan, which is not 100 percent, paid for by the employer. To receive plan benefits, an employee must contribute (pay) a specified amount towards the full cost of the plan. For example, employer pays 100 percent of the cost of health insurance for the employee but pays only 40 percent of the cost of health care services for employee's dependents.

COPAYMENT

Small payment made by a health benefits plan participant each time a service is required. For example, a plan may require a $5 or $10 copayment for each physician's office visit. (See Deductible and Coinsurance.)

COST-OF-LIVING ADJUSTMENT

An across-the-board wage or salary change, or a supplemental payment, reflecting changes in the cost of living. Cost-of-living adjustments are sometimes included in collective bargaining agreements, with the amount of the periodic adjustments determined by the change in the Consumer Price Index published by the Bureau of Labor Statistics. Cost-of-living adjustments may also be applied to pension payments. (See Consumer Price Index.)

CRAFT

A skilled occupation requiring a thorough knowledge of processes involved in the work, often gained through formal apprenticeship, the exercise of considerable independent judgment, usually a high degree of manual dexterity, and in some instances, extensive responsibility for valuable products or equipment.

# DAVIS-BACON ACT OF 1931 (PREVAILING WAGE LAW)

The Davis-Bacon Act applies to contractors and subcontractors performing on federally funded or assisted contracts in excess of $2,000 for the construction, alteration, or repair, including painting, of public buildings or public works. The Act requires that contractors and subcontractors pay their laborers and mechanics not less than the wage rates and benefits determined by the Secretary of Labor to be prevailing in the area for corresponding classes of laborers and mechanics employed on projects of a similar nature.

DEADHEADING (see Travel Time)

14 *Glossary*

### DEDUCTIBLE

The amount of money a benefit plan participant must pay during a year before the plan begins to provide coverage and pay for all or a portion of the benefit. For example, a health benefits plan may include a $50 deductible per year per individual to receive reimbursement for prescription drugs. (See Coinsurance and Copayment.)

### DEFERRED EARNINGS

Earnings that an employee voluntarily places in a retirement account established as a 401(k) plan. Deferred earnings are not taxed as income at the time the money is earned—income taxes are deferred until benefits are distributed from the retirement account.

### DEFERRED PROFIT SHARING PLAN

A defined contribution plan under which a company credits a portion of company profits to employees' accounts. Plans may set a fixed formula for sharing profits but this is not a requirement. Most plans hold money in employee accounts until their retirement, disability, or death.

### DEFERRED WAGE CHANGE

A negotiated wage change (almost always an increase) that will become effective at a specified date beyond the effective date of the contract. Usually found in multi-year contracts.

### DEFINED BENEFIT PENSION PLAN (see 401(k), 403 (b), 457 Plans)

A retirement plan that uses a specific, predetermined formula to calculate the amount of an employee's future benefit. In the private sector, defined benefit plans are typically funded exclusively by employer contributions. In the public sector, defined benefit plans often require employee contributions.

### DEFINED CONTRIBUTION PLAN

A retirement plan in which the employer makes specified contributions but the amount of the retirement benefit is not speci-

fied.  Defined contribution plans may be wholly or partially
funded by employers.

### DENTAL MAINTENANCE ORGANIZATION
An organization that provides prepaid dental care services.

### DENTAL PLAN
An insurance plan that provides services or payment (usually
partial) for preventive and restorative dental care.  Preven-
tive care typically includes checkups, cleanings, and xrays.
Restorative care may involve fillings, surgery, inlays, or
crowns.

### DEPENDENT CARE REIMBURSEMENT ACCOUNTS (see Reimbursement Accounts)

### DIFFERENTIAL PIECE RATES
Plan under which piece rates vary at different levels of out-
put.

### DISABILITY
Any injury or illness, temporary or permanent, that prevents
a worker from carrying on his usual occupation. (See Perma-
nent and Total Disability.)

### DISABILITY RETIREMENT
Retirement brought on as the result of a totally disabling in-
jury or illness prior to an employee's eligibility for normal or
early retirement.  The participant often has to meet a service
requirement, usually 10 years or more.  Benefits may be im-
mediate or deferred, and immediate benefits may or may not
be reduced.

### DISCHARGE
Dismissal of a worker from his employment.  Term implies
discipline for unsatisfactory performance and is thus usually
limited to dismissals for cause relating to the individual (e.g.,

16 *Glossary*

---

insubordination, absenteeism, inefficiency, etc.). (See Employment-at-Will.)

### DISCRIMINATION

Prejudice against or unequal treatment of workers in hiring, employment, pay or conditions of work, because of race, national origin, creed, color, sex, age, marital status, sexual orientation, disabilities, union membership or activity, or any other characteristic not related to ability or job performance. (See also Civil Rights Act of 1964; Equal Employment Opportunity Commission.)

DISMISSAL PAY (see Severance Pay)

### DISPLACED WORKERS

Those who lost or left jobs due to plant or company closings or moves, slack work, or the abolishment of their positions or shifts.

### DOMESTIC PARTNERS

Couples in a committed relationship other than the conventional marital affinity. The term applies to heterosexual and also gay and lesbian couples. *Domestic partner benefits* are the equivalent of traditional spousal benefits, (e.g., covering, health insurance and family leave) .

### DONATED LEAVE (LEAVE SHARING)

Transfer of leave from one employee to a second who has exhausted leave. Leave from several workers may be accumulated in a bank and withdrawn in emergencies, such as personal or family illness, by the employee who has exhausted leave.

### DOUBLE TIME

Penalty or premium rate (e.g., for overtime work, for work on Sundays and holidays) amounting to twice the employee's regular rate of pay for each hour worked.

DOWNTIME (DEAD TIME; DELAY TIME; WAITING TIME)
A brief period during which workers are unable to perform their tasks because they are waiting for materials or for machinery repair.

DRAW ACCOUNT
Usually, an allowance given to sales people working on a straight commission as an advance against commission payments.

DRUG ABUSE (see Substance Abuse)

DUTY HOURS (DUTY TIME) (see Work Schedule)

# **E**ARLY RETIREMENT (EARLY OUT)
A retirement plan provision that gives an immediate pension to retiring employees prior to normal retirement. The participant must meet certain age or service requirements or both or a combined total of age and service. The pension is generally reduced to reflect a longer payout. Some employers may offer special incentives (early retirement windows) under an early out program to encourage individuals to retire before the normal retirement age.

EARNINGS (HOURLY; DAILY; WEEKLY; ANNUAL; AVERAGE; GROSS; STRAIGHT-TIME; COMPENSATION)
Remuneration (pay, wages) of a worker or group of workers for services performed during a specific period of time. The term invariably carries a defining word or a combination, e.g., straight-time average hourly earnings. Since a statistical concept is usually involved in the term and its variations, the producers and users of earnings data have an obligation to define them. In the absence of such definition, the following may serve as rough guides: *Hourly, daily, weekly, annual* - Period of time to which earnings figures, as stated or computed, relate. The context in which annual earnings (sometimes weekly earnings) are used may indicate whether the reference includes

## 18 *Glossary*

earnings from one employer only or from all employment plus
other sources of income; *average*- usually the arithmetic mean;
that is, total earnings (as defined) of a group of workers (as
identified) divided by the number of workers in the group;
*gross* - usually total earnings, including, where applicable,
overtime payments, shift differentials, production bonuses,
cost-of-living allowances, commissions, etc.; *straight-time* -
usually gross earnings excluding overtime payments and (with
variations at this point) shift differentials and other monetary
payments. *Compensation* - a concept sometimes used to en-
compass the entire range of wages and benefits, both current
and deferred, that workers receive out of their employment.

The National Compensation Survey defines hourly earn-
ings as the straight-time hourly wages or salaries paid to em-
ployees. They include incentive pay (commissions, piece rate
payments, and production bonuses), cost-of-living adjust-
ments, hazard pay, and payments for income deferred due to
participation in a salary reduction plan. Excluded are pre-
mium pay for overtime, holidays, and weekends, shift differ-
entials, draws, nonproduction bonuses, tips, and uniform and
tool allowances .

#### EDUCATION LEAVE

Leave, typically without pay, to employees wishing to attend
an accredited college or university or recognized trade, voca-
tional or technical school to take a course of study or training
related to their jobs or employment opportunities at the com-
pany.

#### EDUCATIONAL ASSISTANCE (TUITION AID; TUITION PAYMENT PLAN)

A program that provides full or partial payment for tuition or
books or both for training or educational courses.

#### EDUCATIONAL PAY DIFFERENTIAL

Usually for professional occupations such as teachers, edu-
cational pay differentials provide for progressively higher
salary rates based upon the employee's completion of speci-
fied academic requirements. For example, a person having a

Ph.D. would receive higher pay than another having a master's degree, or an employee with a master's degree would receive a higher salary than another having a bachelor's degree.

### ELDER CARE
A program that provides paid or unpaid time off for the purpose of caring for sick or elderly parents, and employer sponsored or subsidized adult day care. (See Family and Medical Leave Act of 1993.)

### ELIGIBILITY REQUIREMENT
Requirement(s) that an employee must meet to be covered by a benefit plan. For example, employees must be scheduled to work a minimum of 32 hours per week to be covered under a company's health benefits plan.

### EMPLOYEE
An employed wage earner or salaried worker. Used interchangeably with "worker" in the context of a work situation, but a "worker" is not an "employee" when he is no longer on the payroll.

### EMPLOYEE ASSISTANCE PROGRAM (EAP)
A structured, separate plan (independent from health insurance) that provides employee referral services, or referral and counseling services concerning substance abuse, marital difficulties, financial, emotional, and legal problems.

### EMPLOYEE BENEFIT PLAN
A plan established or maintained by an employer, employee organization or both (through negotiated agreement or unilaterally) to provide employees with welfare or retirement benefits or both. (See Benefits.)

EMPLOYEE BUYOUT (see Employee Stock Ownership Plan Plan (ESOP))

### EMPLOYEE LEASING COMPANIES
Firms that provide other companies with personnel. The leas-

20 *Glossary*

ing company is the legal employer of the leased personnel
and is therefore responsible for hiring, reviewing, and firing.
The leasing companies pay wages, benefits, and payroll taxes.

### EMPLOYEE PURCHASES AND DISCOUNTS (PERQUISITES; PERKS)

Opportunities offered to employees to receive free, or to purchase at discounted prices, the goods and services of the employer (e.g., discounts on automobiles and trucks or electrical appliances, or free or discounted electrical, gas, telephone, transit, and transportation services, etc.).

### EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 (ERISA)

This act sets uniform minimum standards to assure that private sector employee benefit plans are established and maintained in a fair and financially sound manner. Employee benefit plans include pension plans and employee welfare plans, providing health benefits, disability benefits, death benefits, prepaid legal services, vacation benefits, day care centers, scholarship funds, apprenticeship and training benefits, or other similar benefits. ERISA sets standards for administering these plans, including a requirement that financial and other information be disclosed to plan participants and beneficiaries and other requirements for processing claims for benefits under the plans.

### EMPLOYEE STOCK OWNERSHIP PLANS (ESOP)

A defined contribution plan in which the employer contributes to a fund that invests primarily in company stock and makes distributions in stock or cash. The plan must be specifically designated in its name or official description as an "employee stock ownership plan."

### EMPLOYER

Any individual, corporation, or other operating group that hires workers (employees). The terms "employer" and "management" are often used interchangeably when there is no intent

to draw a distinction between owners and managers.

### EMPLOYERS' ASSOCIATION

Voluntary membership organization of employers established to deal with problems common to the group. It may be formed specifically to handle industrial relations and to negotiate with a union or unions. Employers' associations may arrange with third parties to provide their employees health or other benefits.

### EMPLOYMENT-AT-WILL

The theory that employers have the power to hire and fire workers solely at their own discretion.

### EMPLOYMENT COST INDEX (ECI)

A fixed-employment-weighted index which tracks quarterly changes in labor costs (wages, salaries, and employer costs for employee benefits), free from the influence of employment shifts among occupations and industries. Occupations in the private sector and State and local government are surveyed. The ECI is published quarterly by the Bureau of Labor Statistics.

### ENTRANCE RATE

Wage rate at which an employee starts a job. The rate may apply to a new hire or to a worker who changes jobs within the establishment.

### EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC)

An independent agency enforcing a variety of Federal laws barring discrimination in the public and private sectors, among them, Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the Age Discrimination in Employment Act (ADEA), and the Americans with Disabilities Act of 1990 (ADA). The EEOC receives and investigates charges of discrimination, conciliates, and, if necessary, litigates. It seeks relief for victims of discrimination and remedies designed to correct the discrimination and to prevent its recurrence.

22 *Glossary*

### EQUAL PAY ACT OF 1963
An amendment to the Fair Labor Standards Act prohibiting gender-based differences in wages and benefits, unless the differential can be justified by factors not based on sex (e.g., seniority). The principal enforcement agency is the Equal Employment Opportunity Commission.

### EQUAL PAY FOR EQUAL WORK
A policy denoting, or a demand for, payment of equal compensation to all employees in an establishment performing the same kind or amount of work, regardless of race, sex, or other characteristics of individual workers not related to ability or performance. (See Comparable Worth.)

### ESTABLISHMENT
An economic unit that produces goods and services (e.g., factory, store, etc.) at a single location and is engaged in one type of economic activity. An establishment is not necessarily identical with a company, which may consist of one or more establishments. For example, a grocery store company may operate seven individual establishments.

### EXCLUSIVE PROVIDER ORGANIZATION (EPO)
Groups of hospitals and physicians that contract to provide comprehensive medical services. Participants are required to obtain services from members of the organization to receive plan benefits.

### EXEMPT/NONEXEMPT EMPLOYEES
*Exempt employees* are not subject to the provisions of the Fair Labor Standards Act (e.g., executive, administrative, and professional employees; employees of Federal, State and local governments, etc.). *Nonexempt employees* are covered by the provisions of the Fair Labor Standards Act (e.g., employees engaged in, or producing goods and services for, interstate commerce; employees of certain hotels, restaurants, or motels; etc.).

### EXPERIENCE RATING
Process of basing tax rates or insurance premiums on the

employer's own record - as in workers' compensation, unemployment insurance, and commercially insured health and insurance programs - so that the employer may benefit from a good record.

## EXTENDED UNEMPLOYMENT INSURANCE BENEFITS
Benefits that are paid during periods when unemployment levels exceed certain percentages. Individuals who have exhausted their regular benefits or whose benefits end within an extended benefit period are eligible for these benefits if they otherwise meet the requirements for regular benefits and are not disqualified for any reason.

## FAIR LABOR STANDARDS ACT OF 1938 (FLSA; WAGE-HOUR LAW)
Federal law which prohibits oppressive child labor and establishes a minimum hourly wage and premium overtime pay for hours in excess of a specific level (now time and one-half after 40 hours per week) for all workers engaged in, or producing goods for, interstate commerce. The minimum wage and the coverage of the Act have been modified several times since enactment.

## FAMILY AND MEDICAL LEAVE ACT OF 1993 (FMLA)
A Federal law entitling employees up to 12 weeks of job-protected, unpaid leave during any 12-months for the following reasons: Birth and care of the employee's child or placement for adoption or foster care of a child with the employee, to care for an immediate family member (spouse, child, parent), or for the employee's own serious health condition. The FMLA applies to private sector employers engaged in commerce, or in any industry affecting commerce, that have 50 or more employees each working day during at least 20 calendar weeks or more in the current or preceding calendar year. State and local government agencies, including schools, and most Federal government employees are also covered.

## FAMILY CARE DEVELOPMENT FUNDS
Funds jointly administered by management and unions, pri-

marily in the telephone industry, to encourage an increase in
the number of child care and elder care facilities and to ex-
pand the capabilities and quality of professional care organi-
zations and their staffs.

### FAMILY CARE LEAVE

A variety of family-related paid or unpaid leave including
leave for maternity, adoption, care of a newborn child (i.e.,
parental leave), and family illness. Also included is short-
term leave, generally paid time off from work for reasons such
as a child's medical appointments or parent-teacher confer-
ences. (See Child Care; Elder Care; Family and Medical Leave
Act of 1993 (FMLA).)

### FEDERAL MEDIATION AND CONCILIATION SERVICE (FMCS)

An independent Federal agency that provides mediators to
assist the parties involved in negotiations, or in a labor dis-
pute, in reaching a settlement; provides lists of suitable arbi-
trators on request; and engages in various types of "preven-
tive mediation." Mediation services are also provided by sev-
eral State agencies.

### FEE-FOR-SERVICE PLAN

A health care plan that reimburses care providers or patients
after services have been rendered. Fee-for-service plans al-
low workers to select the health care providers (physicians
and hospitals) of their choice.

### FINANCIAL COUNSELING

Education provided to employees to increase their knowledge
and understanding of personal financial decisions, financial
planning, and financial investments.

### FIRST DOLLAR COVERAGE

A feature of a health benefits plan in which the plan does not
require its participants to pay any deductibles or copayments
before benefits are received. Basic benefits are usually re-
ferred to as this, because initial expenses are paid by the plan
rather than by the patient.

FLAGGED RATE (see Red Circle Rate)

FLAT RATE (see Single Rate)

FLEXIBLE BENEFIT PLAN (CAFETERIA PLAN)
A plan that provides employees with options to choose among
a number of plans covering several different benefits. They
often consist of a "core" package of benefits (vacations, low
option health insurance, etc.) that employees must take. In
addition, an optional package may be offered from which em-
ployees can select specific benefits (high option health, life
and long-term disability insurance, extra vacation days, child
care expenses, etc.) that they desire.

FLEXIBLE WORK SCHEDULE PLAN (FLEXITIME)
A work schedule plan that allows employees to determine
their own work hours within generally set parameters. Typi-
cally, employees are required to be at work a minimum num-
ber of "core" hours each day (e.g., from 10 a.m. to 3 p.m.),
but the start and end time or total hours worked varies ac-
cording to employee preference.

FLEXIBLE WORKPLACE (FLEXIPLACE)
Arrangements permitting employees to work at home several
days of the workweek. Such arrangements are especially com-
patible with work requiring the use of computers linking home
to the central office. (See Homework; Telecommuting.)

FLOATING HOLIDAY
A holiday that can vary from year to year, the day on which
the holiday is observed being selected by the employer or the
employee.

401(k), 403(b), 457 PLANS
Defined contribution benefits plan established under Section
401(k) of the Internal Revenue Code (IRC) permit employ-
ees to make pre-tax contributions via salary reduction agree-
ments. IRC Section 403(b) plans are deferred compensation
plans for employees of certain not-for-profit organizations and
public schools. IRC Section 457 plans are deferred compen-

26 *Glossary*

---

sation plans for employees of State and local governments
and tax-exempt organizations.

FRINGE BENEFITS (see Benefits)

FRONT-LOADED
A multiyear collective bargaining agreement in which wage
or benefit increases or both are greater in the first year of the
agreement than in subsequent years. (See Back-Loaded.)

FUND (TRUST FUND)
Money and investments set aside in a separate account, usu-
ally administered by trustees, to take care of the payment of
pensions, supplemental unemployment benefits, strike ben-
efits, etc.

FUNERAL LEAVE (BEREAVEMENT LEAVE)
Paid time off due to a death in the family.

# GAINSHARING PLAN
A form of contingent compensation in which a portion of
employee pay varies with the ability of groups of employees
to reach or exceed predetermined goals in cost savings, earn-
ings improvements, quality gains, or profit improvements.
Included are Scanlon Plans, Rucker Plans, Improshare, etc.
Payments are made in the form of annual bonuses, not added
to basic wage rates.

GARNISHMENT
Legal attachment of an employee's wages to pay a debt owed
by the employee to someone other than the employer.

GOING RATE (see Prevailing Rate)

GRANDFATHERED BENEFIT
Benefit (or benefit provision) available only to employees
meeting certain criteria, usually having been employed and

participating in a benefit plan prior to it being eliminated or its provisions changed.

GRAVEYARD SHIFT (see Shift)

GREEN CIRCLE RATE (see Blue Circle Rate)

GROUP HEALTH PLAN
A plan that provides medical benefits for the employer's own employees and their dependents through insurance or otherwise (such as a trust, health maintenance organization, self-funded pay-as-you-go basis, etc.).

GROUP INCENTIVE PLAN
Payment of incentive earnings based on the output of a group of workers (team, department, etc.) rather than the output of the individual worker.

GUARANTEED RATE, TIME
Rate of hourly or weekly pay promised to a worker under an incentive system, regardless of whether incentive pay is earned. For example, piece rate workers may be guaranteed an hourly pay rate of $6.25 plus any piece rate payments earned. Also, term is sometimes used for wage or employment assurances. For example, a guarantee of 8 hours' pay for employees called to work at a construction site, although the actual number of hours worked may be less than 8.

# HARDSHIP ALLOWANCE
Additional payment for working under adverse conditions, for example, outside during periods of extremely cold weather.

HAZARD PAY
Extra pay to an individual worker or a group of workers working under dangerous or undesirable conditions.

HEALTH CARE COST CONTAINMENT PROVISIONS
Provisions included in some health benefits plans in an at-

## 28 *Glossary*

tempt to address the rise in medical care costs. Examples
include mandatory second surgical opinions and preadmission
certification before being admitted to a hospital, incentives
for employees to audit hospital and medical services bills,
and incentives for child deliveries in lower cost birthing cen-
ters rather than in hospitals.

### HEALTH CENTER

Usually a clinic administered by a union, or by trustees repre-
senting employers and unions, where members and their fami-
lies may receive medical examinations and treatment free or
at a nominal charge.

### HEALTH MAINTENANCE ORGANIZATION (HMO)

Organization that provides prepaid comprehensive health care
services. HMOs both insure and deliver health care services.
Enrollees usually reside within a fixed geographic area and
are required to obtain services only from providers affiliated
with the HMO. An exception to this case is *Point of Service
Open-Ended HMOs,* which allow enrollees the option of ob-
taining services from physicians and facilities not affiliated
with their HMO.

### HELPERS

Semi-skilled workers who assist other workers who usually
have higher levels of competence or expertise. Helpers per-
form a variety of duties such as furnishing another worker
with materials, tools, and supplies; cleaning work areas, ma-
chines, and equipment; holding materials or tools; and per-
forming other routine tasks.

### HIGH TIME PAY

Extra pay for workers engaged in a job high above ground,
and, thus, dangerous or uncomfortable, as in construction.
Sometimes also applied to work below ground level with ex-
tra dangers or discomforts. (See Hazard Pay.)

### HIRING HALL

An office maintained by a union, or jointly by employers and
union, for referring workers to jobs or for the actual hiring

operation. Common in maritime and longshore industries. (See Casual Workers; Contingent Workforce.)

## HIRING RATE (see Entrance Rate)

## HOLIDAY (see Paid Holiday)

## HOLIDAY PREMIUM PAY
Pay to workers at premium rates (e.g., double time) for work on holidays. (See Paid Holiday.)

## HOME WORK
Production of goods by workers in their homes from materials supplied by the employer. Such activities are sometimes referred to as "cottage industries". (See also Flexible Workplace (Flexiplace); Telecommuting.)

## HOSPITALIZATION BENEFITS
Health benefits coverage for hospital room and board charges, routine nursing care, prescription drugs, and surgical dressings, etc.

## HOURLY RATE
Usually, the rate of pay, expressed in dollars and cents per hour, for manual and other workers paid on a time basis. Also used to designate the earned rate per hour under incentive methods of wage payment.

## HUMAN RESOURCE MANAGEMENT (HRM)
Involves the employer's management of its workforce. Human resource management broadly encompasses personnel responsibilities including HRM planning, job design and job analysis, selection and staffing, employee training and development, performance appraisal, compensation, communications, and employee involvement.

# INCENTIVE WAGE SYSTEM
General term for methods of wage payment that relate earn-

30 *Glossary*

ings of workers to their actual production, individually or as
a group. (See Group Incentive Plan; Piecework.)

INDEPENDENT CONTRACTOR
A worker who receives compensation for performing services
for an establishment outside the normal employer-employee
relationship. The Internal Revenue Service has established
20 factors or guidelines to clarify whether a worker is an em-
ployee or an independent contractor. The guidelines include
compliance with instructions, training, set hours of work, work
done on employer's premises, tools and materials, working
for more than one firm at a time, etc.

INDIVIDUAL PRACTICE ASSOCIATION (see IPA)

INDIVIDUAL RETIREMENT ACCOUNT (IRA)
A type of retirement plan that workers may establish and con-
tribute to regardless of whether they are covered by an em-
ployer-sponsored pension plan.Usually, an employee may con-
tribute up to $2,000 per year. Provisions related to deduct-
ibility of contributions, taxation of earnings, and timing of
withdrawals vary.

INDUSTRIAL CLASSIFICATION (see North American Indus-
try Classification System Manual)

INDUSTRIAL RELATIONS
Matters of mutual concern to employers and employees; the
relationships, formal and informal, between employer and em-
ployees or their representatives; government actions and law
bearing upon these relationships; an area of specialization in
a company focusing on labor-management relations.

INSURANCE
A method of providing or purchasing protection against some
or all of the economic consequence of a loss. For employee
benefits purposes, it is full or partial coverage for the finan-
cial losses and expenses that can result from employee injury,

illness, disability, or death. (See Insurance Carrier; Insurance Policy.)

### INSURANCE CARRIER

A commercial insurer that underwrites or administers insurance policies or does both for such programs as life insurance, health care, short-term disability, and long-term disability benefits.

### INSURANCE POLICY

The contract between an insurance carrier and an insured employer under which the carrier agrees to pay the policy benefits when specific losses occur, providing the carrier receives the required premiums.

The policy presents in detail the benefit plan provisions.

### INVERSE SENIORITY (INVERSE LAYOFFS)

The waiver of seniority rights in layoff. This permits senior employees to avoid placement on relatively undesirable or low paying jobs, and allows junior workers, those more likely to have families with young children, to continue employment.

### IPA (INDIVIDUAL PRACTICE ASSOCIATION)

A form of HMO that contracts with medical care providers in the community who practice out of their own offices and see HMO members there.

IRA (see Individual Retirement Account)

## JOB ANALYSIS

Systematic study of a job to discover its specifications, its mental, physical, and skill requirements, its relation to other jobs in the establishment, etc., usually for wage setting or job simplification purposes. (See Job Description.)

### JOB CLASSIFICATION

Arrangement of tasks in an establishment or industry into a

limited series of jobs or occupations, rated in terms of skill, responsibility, experience, training, and similar considerations, usually for wage setting purposes. This term, or job class, refers to a single cluster of jobs of approximately equal "worth."

### JOB DESCRIPTION
A written statement listing the elements of a particular job or occupation, e.g., purpose, duties, equipment used, qualifications, training, physical and mental demands, working conditions, etc.

### JOB EVALUATION (JOB GRADING; JOB RATING)
Determination of the relative importance or ranking of jobs in an establishment, for wage setting purposes, by systematically rating them on the basis of selected factors, such as skill, responsibility, experience, etc. Ordinarily used as a means of determining relative levels, not the actual rate structure as a whole.

### JOB SECURITY
The protection of workers from the loss of job and earnings for reasons not related to a worker's performance or behavior. Employment security is the certainty that the employee's attachment to the employer will continue even though the employee's specific job may disappear because of technological change, work reorganization, etc.

### JOB SHARING
The division of a full-time position into two part-time jobs. The duties and responsibilities of the job are assigned to two employees who share accountability, pay, and benefits. In recent years, it has been used to employ or retain workers whose obligations (e.g., education, child care, illness in the family, etc.) prevent them from taking a full time job. In a period of slack work, it also refers to sharing the available work to forestall layoff. In this event, the sharing occurs among groups of workers rather than two workers sharing one job. Layoffs may follow if the number of weekly hours falls below designated levels.

JOB TITLE

A label for a job or occupation, which distinguishes it from other jobs or occupations.  For example, Cost Accountant Level III or Emissions Mechanic-Trainee.

JOURNEY LEVEL

A fully qualified skilled trade or crafts worker, generally having mastered a trade by completing a formal apprenticeship program.  Also used to designate fully-qualified workers in other jobs.

JOURNEY LEVEL RATE

Rate of pay for a fully qualified worker in a skilled trade or craft, usually as distinguished from apprentice rate, helpers' rate, probationary rate, etc.

JURY DUTY LEAVE

Fully paid, partially paid, or unpaid leave from work when an employee is summoned to serve as a juror.

LABOR GRADES

One of a series of rate steps (single rate or a range of rates) in the wage structure of an establishment's occupations. Labor grades are typically the outcome of some form of job evaluation, or of wage rate negotiations, by which different occupations are grouped, so that occupations of approximately equal "value" or "worth" fall into the same grade and, thus, command the same rate of pay. (See Job Classification and Job Evaluation.)

LABOR-MANAGEMENT COOPERATION (EMPLOYEE INVOLVEMENT; QUALITY OF WORK LIFE; UNON-MANAGEMENT COOPERATION; WORKER PARTICIPATION)

A process in which employees participate in making decisions, ordinarily made by managers, that affect their work and work environment. Activities may include goal setting, identification and solution of problems, and developing the

34 *Glossary*

means of implementing decisions. The goal is to improve the quality of products and services, job satisfaction, the skills and abilities of workers, etc.

### LABOR MANAGEMENT RELATIONS ACT 1947 (TAFT-HARTLEY ACT)

Federal law amending the National Labor Relations Act (Wagner Act), 1935, which, among other changes, defined and made illegal a number of unfair labor practices by unions. It preserved the guarantee of the right of workers to organize and bargain collectively with their employers, or to refrain from such activities, and retained the definition of unfair labor practices as applied to employers. The Act does not apply to employees in a business or industry where a labor dispute would not affect interstate commerce. Other major exclusions are: Employees subject to the Railway Labor Act, agricultural workers, government employees, nonprofit hospitals, domestic servants, and supervisors. Amended by the Labor-Management Reporting and Disclosure Act of 1959. (See National Labor Relations Act of 1935 (Wagner Act); National Labor Relations Board.)

### LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959 (LANDRUM-GRIFFIN ACT)

Federal law designed "to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants" and others. Its seven titles include: A bill of rights which sets forth certain basic rights which Congress believed should be guaranteed to union members by Federal law, requirements for the filing of information and financial reports, regulations governing trusteeships over subordinate unions, standards for elections of union officers, and fiduciary responsibility of union officers.

### LABOR STANDARDS

The minimum levels or floors, established through collective bargaining or by law, for wages, hours, benefits, and working conditions that together define the standard of living for work-

ers and their families. The Fair Labor Standards Act (FLSA), for example, establishes levels of minimum wages and weekly hours for workers and sets age levels and the nature of jobs (e.g., nonhazardous) in which children may be employed. The Public Contracts Act (Walsh-Healey Act) applies similar standards to workers under Federal contracts. The Occupational Safety and Health Act (OSHA) authorizes the establishment of worksite safety and health standards. (See Living Wage.)

LANDRUM-GRIFFIN ACT (see The Labor-Management Reporting and Disclosure Act of 1959)

LAYOFF (REDUCTION IN FORCE; FURLOUGH)
Involuntary separation from employment for a temporary or indefinite period, without prejudice, that is, resulting from no fault of the workers. Layoffs may be caused by a decline in sales of a company's product or service, a merger of one company with another, or a decrease in labor requirements brought about through automation. Although "layoff" usually implies eventual recall, or at least an intent to recall workers to their jobs, the term is occasionally used for separations plainly signifying permanent loss of jobs, as in plant shutdowns. *Reduction in force* usually signifies permanent layoffs.

LEARNER
Normally, a beginner learning a job for which extensive technical training or experience is not required. (See Apprentice.)

LEARNER RATE (BEGINNER RATE)
Rate or, more frequently, schedule of rates applicable to workers inexperienced in the job for which they are employed, until they attain the necessary competence. (See Entrance Rate.)

LEARNER'S CERTIFICATE
Certificates issued by the U. S. Department of Labor, under the provisions of the Fair Labor Standards Act of 1938, which permit employers to pay rates below the statutory minimum

to learners, messengers, apprentices, and disabled workers
so as not to curtail opportunities for their employment.

### LEAVE BANK (CONSOLIDATED LEAVE PLAN)
Provides several different types of leave, such as vacations,
holidays, sick leave, etc., under a single plan.

### LEAVE OF ABSENCE
Normally, excused time (unpaid) away from work, usually
for a week or more, without loss of job or seniority.

### LEAVE SHARING (see Donated Leave)

### LEGALLY REQUIRED BENEFITS
The National Compensation Survey benefit grouping that in-
cludes railroad retirement, railroad supplemental retirement,
railroad unemployment, workers' compensation, Social Se-
curity, Medicare, State unemployment insurance, State re-
quired disability insurance, and the Federal Unemployment
Tax Act.

### LEGAL SERVICES PLAN
A prepaid plan providing to workers and their families a vari-
ety of basic legal services (e.g., drafting of wills, reviewing
legal documents, etc.). For more complex legal problems,
plans usually provide discounts from usual and customary fees.

### LIFE INSURANCE
Provides a lump-sum payment to a designated beneficiary or
beneficiaries of deceased employees. Companies may pro-
vide a basic amount of life insurance benefits, which may
vary depending on an employee's age, income, or occupa-
tion, and allow employees to pay for additional amounts of
coverage.

### LIVING WAGE
A wage sufficiently high to permit a worker to keep a given
standard of living. (See Labor Standards.)

LONGEVITY PAY
A specified increase in hourly pay rate, a lump sum payment, or a form of bonus (e.g., government savings bond, add-on to severance pay, etc.) paid to employees based upon their length of service.

LONG TERM CARE BENEFITS
Long-term care benefits, normally provided through an insurance plan, cover expenses related to home care, nursing home care, or custodial care. Benefit payments normally last for more than 1 year. Employers may offer plans that are financed entirely by the employees at group insurance rates. Employees may purchase policies for themselves, a spouse, or other family members.

LONG TERM DISABILITY INSURANCE (LTD)
Provides a monthly benefit to employees who, due to illness or injury, are unable to work for an extended period of time. Usually LTD benefit payments begin after 3 or 6 months of disability and continue until retirement age is reached, or for a specified number of months, depending on the employee's age at the time of the disability. Payments typically equal a fixed percent of predisability earnings.

LUMP-SUM PAYMENTS
These are made to employees in lieu of a general wage rate increases. The payment may be a fixed amount as set forth in a labor agreement or an amount determined by a formula. For example, 2.5 percent of an employee's earnings (wages, cost-of-living allowance payments, shift differential payments) during the prior year. Lump-sum payments are not incorporated into an employee's base pay rate or salary.

# MAJOR MEDICAL INSURANCE
This insurance is typically offered in two forms. Supplemental plans offer additional coverage, subject to deductibles and coinsurance requirements, to what is provided in a basic health

plan by covering expenses that exceed the limits of the basic
plan and expenses not covered by the basic plan. Compre-
hensive major medical plans are offered where there is no
basic plan; they cover a wide range of medical services, with
payment of benefits subject to a deductible and a coinsurance
requirement.

### MAKEUP PAY

The difference between actual piecework earnings and earn-
ings at guaranteed rates or statutory minimum rates. The term
is also associated with the practice of permitting employees
to earn a full week's wages by making up for lost time.

### MANAGED HEALTH CARE

These plans integrate the financing and delivery of appropri-
ate health care services to covered individuals. Managed care
usually involves some or all of the following elements: Ar-
rangements with selected health care providers to furnish a
comprehensive set of services; explicit standards for the se-
lection of health care providers; formal programs for ongo-
ing quality assurance and utilization review; and significant
financial incentives for members of the plan to use providers
and procedures covered by the plan. Health maintenance or-
ganizations and preferred provider organizations use managed
health care concepts.

### MANAGEMENT

The employer and his or her representatives, or corporation
executives who are responsible for the administration and di-
rection of an enterprise. (See Employer.)

### MATERNITY LEAVE (PREGANCY LEAVE)

Paid or unpaid leave provided to women at the time of the
birth of their baby. Unpaid maternity leave may usually be
taken after regular paid leave is used and can continue for a
fixed period of time. Employees returning from employer
approved maternity leave can expect to return to their own or
similar jobs.

MCNAMARA-O'HARA ACT (see Service Contract Act)

MEALTIME (see Paid Lunch Period)

MEDIATION (CONCILIATION)

An attempt by a third party, voluntarily agreed to by the par-
ties, to help in negotiations or in the settlement of a dispute
through suggestion, advice, or other ways of stimulating agree-
ment, short of dictating its provisions (a characteristic of ar-
bitration). Most of the mediation in the United States is un-
dertaken through Federal and State mediation agencies. *Me-
diator*: a person who undertakes mediation of a dispute. *Con-
ciliation*: in practice, synonymous with mediation; the term
lives on mainly in the name of the chief mediation agency.
(See Federal Mediation and Conciliation Service.)

MEDIATION-ARBITRATION (MED-ARB)

A dispute resolution process in which a third party neutral
attempts to mediate outstanding issues and then arbitrates those
that remain after mediation. In some instances, one neutral
may mediate and then pass off remaining unsettled issues to
another neutral for arbitration.

MEDICAL LEAVE (see Sick Leave)

MEDICARE

The Federal health insurance program under Social Security.
It consists of two parts: Part A covers hospital insurance and
Part B covers supplementary medical insurance to help pay
for physicians' services, outpatient hospital services, and other
medical supplies and services not covered by Part A. The
Medicare program is funded through a joint employer-em-
ployee paid tax applied to covered earnings.

MERIT INCREASE

An increase in the wage rate of a worker, usually given on the
basis of certain criteria of worth (e.g., efficiency and perfor-
mance).

MERIT PROGRESSION (see Wage Progression)

MERIT SYSTEMS PROTECTION BOARD
Independent Federal agency charged with protecting the integrity of Federal merit systems and the rights of Federal employees working in the systems. The Board conducts special studies, hears and decides charges of wrongdoing and employee appeals of adverse agency actions. It may order corrective and disciplinary actions when appropriate.

MIGRATORY WORKERS
Persons whose principal income is earned from temporary employment (usually in farming) and who, in the course of the year, move one or more times, often through several States.

MILITARY LEAVE
Provides employees an unpaid, partially paid, or fully paid absence from work to fulfill their military commitments. Some employers pay the difference between an employee's regular earnings and the amount they receive from the military.

MINIMUM PREMIUM PLAN
Arrangement, used by self-insured health care plans, that provides insurance coverage to pay claims above a specified amount, limiting the employer's liability in the case of catastrophic expenses. (See Self-Funding (Self-Insurance) Plans.)

MINIMUM WAGE
Rate of pay, established by law or through collective bargaining, below which workers cannot be employed. Exceptions are frequently made for learners and disabled workers. Usually expressed as an hourly rate. (See Fair Labor Standards Act of 1938.)

MONEY PURCHASE PENSION PLAN
A defined contribution plan with fixed employer contributions, typically a percent of employee earnings. Contributions are allocated to individual accounts established for each

employee. Upon retirement, the contributions and investment earnings are used to purchase an annuity or to provide for some other form of retirement income. Some plans may allow employee contributions but employees are seldom required to make any contributions.

MOVING ALLOWANCE (see Relocation Allowance)

MULTI-EMPLOYER BARGAINING

Collective bargaining between a union or unions and a group of employers, usually represented by an employer association, resulting in a uniform or master agreement. Typically found in construction, maritime, retail food, trucking, and apparel industries.

MULTI-EMPLOYER (UNION) PENSION PLAN

Plan in which employers, usually in the same industry, contribute to a fund which is administered by a union or professional association, or jointly by an employer(s) and an union. Employer contributions are determined by the solvency of the pension fund, and in the case of union plans, the amount of the employer contribution is usually in terms of cents per hour worked and set during the negotiation for a labor-management agreement. Multi-employer plans are generally defined benefit pension plans.

MULTIPLANT BARGAINING (COMPANYWIDE BARGAINING)

Collective bargaining between a company and the union or unions representing workers in more than one of its plants, usually resulting in a master agreement. If all or most plants are involved, the term "companywide" is appropriately used.

MULTIPLE EMPLOYER WELFARE ARRANGEMENTS (MEWAs)

MEWAs, also referred to as multiple employer trusts (METs) or association health plans (AHPs), sell health and welfare benefit plans to employers.

42 *Glossary*

---

## NAFTA (NORTH AMERICAN FREE TRADE AGREEMENT)

A 1994 agreement by the United States, Canada, and Mexico opening each country's borders to free trade with the other participating Nations.

## NAFTA-TAA (NAFTA-TRANSITIONAL ADJUSTMENT ASSISTANCE PROGRAM)

An agency established in the U.S. Department of Labor to help workers who lose jobs or are threatened with job loss because of the increase in imports from Canada and Mexico that are competitive with products or services of their employers. Assistance, available through the combined efforts of Federal and State agencies, include skill training, job search help, relocation allowance, and income support.

## NATIONAL LABOR RELATIONS ACT, 1935 (WAGNER ACT)

The basic Federal act guaranteeing workers the right to organize and bargain collectively through representatives of their own choosing. The Act also defined "unfair labor practices" of employers. Amended by the Labor Management Relations Act, 1947 (Taft-Hartley Act), and the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act).

## NATIONAL LABOR RELATIONS BOARD (NLRB)

Federal agency created by the National Labor Relations Act, 1935, and continued through subsequent amendments, whose functions are to define appropriate bargaining units, to hold elections to determine whether a majority of workers want to be represented by a specific union or no union, to certify unions to represent employees, to interpret and apply the Act's provisions prohibiting certain employer and union unfair practices, and otherwise to administer the provisions of the Act. (See Labor Management Relations Act, 1947.)

## NATIONAL MEDIATION BOARD

Federal agency established by the Railway Labor Act, 1926, to provide aid in settling disputes between railway compa-

nies and unions over union representation, negotiation of changes in agreements, and interpretation of agreements reached through mediation. The provisions of the RLA were later extended to airlines. (See Railway Labor Act of 1926. )

### NATIONAL RAILROAD ADJUSTMENT BOARD
Federal agency established in 1934 which functions as a board of arbitration, handing down final and binding decisions on disputes arising out of grievances, or the application and interpretation of agreements, in the railroad industry (airline industry not covered). Board is composed of 36 members, 18 of whom represent and are paid by the carriers and 18 by national railway labor organizations.

### NIGHT SHIFT (see Shift)

### NONCONTRIBUTORY PLAN
An employee benefit plan that is completely paid for by the employer. (See Contributory Plan.)

### NONEXEMPT EMPLOYEES (see Exempt/Nonexempt Employees)

### NONPRODUCTION BONUS (see Bonus (Production and Nonproduction)

### NONQUALIFIED DEFERRED COMPENSATION PLAN
Deferred compensation plans that do not receive favorable tax treatment, usually because they are offered to only a few executives or managers of a company leading to the plan not meeting the government's nondiscrimination rules or because they offer benefits in excess of those allowed by the rules.

### NONWAGE CASH PAYMENTS
Nonproduction bonuses and lump sum payments given in lieu of wage rate increases.

### NORTH AMERICAN FREE TRADE AGREEMENT (see NAFTA)

44 *Glossary*

NORTH AMERICAN INDUSTRY CLASSIFICATION SYS-
TEM (NAICS)

*The North American Industry Classification System (NAICS)
Manual* replaces the *1987 Standard Industrial Classification
(SIC) Manual*. The *NAICS Manual,* as was the *SIC Manual,*
is used by Federal Government statistical agencies to define
and classify industries in the economy in a consistent manner
based on their primary economic activity. It will take several
years for the NAICS Manual to be adopted by statistical
programs. In the meantime statistics will be published using
the classification scheme of the *1987 SIC Manual's*. The
governments of Canada, Mexico, and the United States
developed the *NAICS Manual*, which became effective
January 1997.

# Occupation

A job, or family of jobs, common to many industries and ar-
eas. For example, carpenter, administrative assistant, or ac-
countant.

OCCUPATIONAL CLASSIFICATION SYSTEM (see *Standard
Occupational Classification System Manual*)

OCCUPATIONAL RATES

Wage rates (single or rate ranges) for particular occupations
in an establishment, industry, or area.

OLD AGE, SURVIVORS AND DISABILITY INSURANCE
BENEFITS (OASDI)

Retirement income and survivors' and disability payments
available to eligible workers covered by Federal social secu-
rity legislation.

OLDER WORKERS BENEFIT PROTECTION ACT OF 1990

Clarifies that employee benefits and benefit plans are subject
to the Age Discrimination in Employment Act of 1967.

ON CALL PAY

Pay received by employees for being ready to report to work
if necessary. Employees receiving on call pay usually are
required to be readily available by phone or pager, within a
reasonable distance from the workplace, and able to report
promptly to work.

OPEN SEASON

A period of time during which employees may change their
prior selection of benefit plans offered by their employer. For
example, an employer may allow employees to change health
benefit plan providers during November of each year.

OTHER LEAVE PLANS

A National Compensation Survey benefit grouping that in-
cludes personal leave, military leave, funeral leave, jury duty,
and family leave.

OUT OF LINE RATE  (see Red Circle Rate)

OUT OF TOWN WORK PAYMENTS

Payments, in addition to per diem or meal allowances, to em-
ployees required to work outside of their normal living area.
For example, construction workers may receive an out of town
payment of 15 percent of their normal pay rate. (See Travel
Time. )

OUT OF WORK BENEFITS

Payments made by a union to unemployed members.

OUTPLACEMENT ASSISTANCE

Help, usually provided by the employer, union or a public agency
or all three, to displaced workers who have lost jobs for reasons
other than cause (e.g., downsizing, restructuring, plant closing,
etc.). Among the help provided are job search assistance, resume
development, training for job interviews, etc.

46 *Glossary*

OUTSOURCING (see Contracting Out)

OVERTIME
  Work performed in excess of basic workday or workweek, as
  defined by law, collective bargaining agreement, or company
  policy. Sometimes applied to work performed on Saturdays,
  Sundays, and holidays at premium rates.

OVERTIME PAY
  Payment at premium rates (e.g., time and one-half, double
  time) for work defined as overtime.


# $P$AID ABSENCE ALLOWANCE
  Payment for lost working time available to workers for vari-
  ous types of leave not otherwise compensated, for example
  excused personal leave.

PAID HOLIDAY LEAVE
  Holidays are days of special religious, cultural, social, or pa-
  triotic significance on which work and business ordinarily
  ceases. Workers typically receive time-off from work, at full
  pay or partial pay, on a specified number of holidays each
  year. Some employers also include "personal holidays," such
  as an employee's birthday or "floating holidays" that vary
  from year-to-year as determined by the employer or employee
  or both.

PAID LUNCH (MEALTIME)
  Period of time, normally 30 minutes to one hour, for employ-
  ees to eat and rest.

PAID VACATIONS
  Time-off from work normally taken in days or weeks that pro-
  vide employees with a rest or break from work. The amount
  of time-off may vary based on an employee's length-of-ser-
  vice with the employer or it may be a fixed number of days or

weeks. The time-off is normally paid for at an employee's
normal hourly rate or salary.

### PARENTAL LEAVE

Paid or unpaid leave for a new mother or father to use to care
for a child. Parental leave plans are separate from an
employee's other leave plans, such as sick leave and paid va-
cations. Unpaid maternity and paternity leave usually can be
taken after regular paid leave is used and can continue for a
fixed period of time. Employees can expect to return to their
own or similar jobs following approved parental leave.

### PART-TIME EMPLOYEES

Workers employed on a temporary or regular basis for a work-
week shorter than the scheduled workweek for full-time em-
ployees.

### PATERNITY LEAVE (see Parental Leave)

### PATTERN BARGAINING (see Wage Pattern)

### PAY COMPRESSION

A lessening of the pay differential among workers in differ-
ent pay grades. Pay compression can be caused by workers
receiving across-the-board flat sum pay increases or by work-
ers at higher pay grades receiving smaller percentage increases
in pay than those at lower pay grades.

### PAY EQUITY (see Comparable Worth)

### PAY-FOR-KNOWLEDGE (SKILL-BASED PAY)

An alternative compensation system in which pay is based,
not upon the specific job the employee performs, but upon
the number of skills or tasks the employee is capable of per-
forming. Such pay systems are linked to flexible work as-
signments or both, rotating jobs, typical of self-managed work
teams. Also called skill-based pay, knowledge-based pay, or
multiskill compensation.

48 *Glossary*

PAYROLL DEDUCTIONS
  Amounts withheld from employees' earnings by the employer
  for Social Security, Federal and State income taxes, and other
  governmental levies, union dues, group insurance premiums,
  and other authorized wage assignments.

PAYROLL PERIOD
  Frequency with which workers' wages are calculated and paid,
  usually weekly, biweekly, or semimonthly. Also used by wage
  and salary surveys to designate the reference date of survey
  data. For example, the BLS Employment Cost Index data are
  collected for the payroll period including the 12th day of the
  survey months of March, June, September, and December.

PEACE CORPS/VISTA LEAVE
  Time off from work for an extended period of time (e.g., 1 or
  2 years) to take an assignment in the Peace Corps or VISTA.
  Company policy and relevant collective bargaining provisions
  usually protect seniority during the time off as well as the
  right to return to work.

PENALTY RATE
  Extra rate paid for particularly hazardous or onerous work.
  The term may apply to any premium or overtime rate. (See
  Hazard Pay; Premium Pay.)

PENSION BENEFIT GUARANTY CORPORATION (PBGC)
  A Federal agency established under the Employee Retirement
  Income Security Act of 1974 (ERISA) to guarantee the pay-
  ment of basic retirement benefits, within limits set by law, to
  participants of private defined benefit pension plans. PBGC
  programs are financed by premiums levied on employers spon-
  soring covered plans, investment returns on PBGC assets, and
  recoveries from employers responsible for underfunded ter-
  minated plans.

PENSION PLAN (RETIREMENT PLAN)
  Pension or retirement plans are designed to provide funds to

*Glossary* 49

retirees. (See Defined Contribution Plans; Defined Benefit
Plans.)

#### PENSION PORTABILITY
Ability to maintain and transfer years of credited service or
accumulated pension benefits from one employer to another.

#### PER DIEM ALLOWANCE
Daily add-on to pay for workers in travel status. Usually cov-
ers lodging, meals, and miscellaneous expenses related to
travel.

#### PERKS  (see Employee Purchases and Discounts)

#### PERQUISITES  (see Employee Purchases and Discounts)

#### PERSONALIZED RATE (see Red Circle Rate)

#### PERSONAL LEAVE
Also known as general leave, personal leave provides em-
ployees with time-off from work for various purposes not cov-
ered by other types of leave plans.

#### PIECE RATE
Predetermined amount paid per unit of output to worker un-
der a piecework incentive plan.

#### PIECEWORK
Method of wage payment based on the number of units pro-
duced, or any work for which piece rates are paid.

#### POINT OF SERVICE HEALTH PLANS
A type of health maintenance organization (HMO) that al-
lows employees the option of using doctors and facilities ex-
ternal to the HMO. Employees who use the option typically
pay a higher fee for the health services than if they were pro-
vided by the HMO's own physicians. These plans are some-
times called *open-ended HMOs*.

## PORTAL-TO-PORTAL PAY

Payment for time spent traveling to and from the plant or mine entrance to the working site, or conceptually, for all time in the plant rather than time at the workplace. (See Travel Time.)

## POST-RETIREMENT PENSION INCREASES

Adjustments to pension benefits being received by already retired employees. Postretirement pension increases may be at the discretion of the former employer or pension fund or may be automatic, usually based on changes in the Consumer Price Index.

## PREADMISSION CERTIFICATION

Authorization given by a health benefits provider to a benefit recipient prior to hospitalization or before the delivery of certain health care benefits. Failure to obtain a preadmission certificate in nonemergency situations reduces or eliminates the health benefit provider's obligation to pay for services rendered.

## PREFERENTIAL HIRING

Agreed upon arrangement whereby the employer gives preference in hiring to union members, to applicants with previous training and experience in the industry, to workers displaced from another plant or from another part of a particular plant, or by order of the National Labor Relations Board to employees found to be discharged on a discriminatory basis.

## PREFERRED PROVIDER ORGANIZATION (PPO)

Preferred Provider Organization health plans offer a higher benefit for services rendered by designated health care providers although plan participants are free to choose any provider they wish.

## PREGNANCY DISCRIMINATION ACT OF 1978 (PDA)

Federal act barring discrimination in hiring or at the workplace because a woman is pregnant or affected by childbirth or related medical conditions.

PREGNANCY LEAVE  (see Maternity Leave)

PREMIUM PAY
Compensation at greater than regular rate. May refer to overtime, shift differentials, or penalty rates.

PRESCRIPTION DRUG PLAN
Health benefits plan provision covering outpatient drug prescriptions.  Benefits may be subject to an annual deductible or may include a minimal copayment per prescription.

PREVAILING RATE (GOING RATE)
Term may be used in varying contexts. May refer to average level of wages paid by employers for specific occupations in a community or area; or rate most commonly paid; or rate paid to most workers; or rate established by union contracts.

PREVAILING WAGE LAW (see Davis-Bacon Act of 1931)

PROBATIONARY PERIOD
Usually a stipulated period of time (e.g., 30, 60, or 90 days) during which a newly hired employee is on trial prior to establishing seniority or otherwise becoming a regular employee. Sometimes used in relation to discipline (e.g., a period during which a regular employee, accused of misbehavior, is on trial). *Probationary employee* - a worker in a probationary period.  Where informal probation is the practice, a worker who has not yet attained the status of regular employee may be called a *temporary employee*. (See Regular Employee.)

PROBATIONARY RATE
Trial rate of pay for an experienced and otherwise qualified worker during the initial period of his employment on a new job in a new plant.

PRODUCTION BONUS (see Bonus (Production and Nonproduction)

52 *Glossary*

PRODUCTION WORKERS

Usually, employees directly involved in manufacturing or operational processes, as distinguished from supervisory, sales, executive, and office employees. The term "production and related workers" as used in Federal Government statistics is commonly defined specifically for survey purposes.

PROFIT SHARING (see Cash Profit-Sharing; Deferred Profit-Sharing)

PROGRESSION SYSTEM (see Wage Progression)

PROMOTION (see Upgrading)

PUSH MONEY

Money paid by a supplier of goods or services, directly or indirectly through the employer, to retail salespeople as an incentive to increase sales of the goods or services. Department store cosmetics sales persons often receive push money payments.

PYRAMIDING

Double payment of overtime rates for overtime work that may result from paying both daily and weekly overtime rates for the same hours of work; sometimes applied to any premium added to another premium rate.

# QUALITY CIRCLES

Structured employee involvement groups operating in designated work areas that meet regularly to identify work related problems and to suggest solutions or improvements to management.

QUALITY OF WORK LIFE COMMITTEES

Committees existing at multiple organizational levels within a company charged with developing changes to improve performance and the quality of employees' work life. If committees are established as part of a labor-management

agreement they do not address contractual issues such as pay
and benefits.

### QUASI-GOVERNMENT ESTABLISHMENT

Establishments that are controlled both by the government
and private sectors through joint ownership of stock or joint
membership on boards of directors or other controlling bodies.

# RAILROAD RETIREMENT ACT OF 1935 (RRA)

Federal act establishing a nationwide program providing rail-
road employees with retirement benefits (old age, disability,
and survivors' benefits) based on the individual worker's earn-
ings and length of service in the railroad industry. Railroad
workers are not covered by the Social Security Act.

### RAILWAY LABOR ACT OF 1926 (RLA)

Federal law that established a framework for labor-manage-
ment relations in the railroad industry and, later, the airline
industry. Two agencies administer the Act: the National Me-
diation Board and the National Railroad Adjustment Board.

### RATE CUTTING

A reduction by management of established incentive or time
wage rates in the absence of comparable changes in job con-
tent, or any actions by companies in reducing wages.

### RATE RANGE

The lower and upper limits of wage rates paid to workers in
an occupation. For example, the rate range for a parts deliv-
ery driver job might be $5.75 to $7.25 per hour.

### RATE SETTING

Process of establishing wage or piece rates for a job or opera-
tion.

### REAL WAGES

Purchasing power of money wages, or the amount of goods

555-mg  Doc 17982-9  Filed 06/22/11  Entered 06/22/11 20:08:37  F
                       20-35    Pg 90 of 323

54 *Glossary*

and services that can be acquired with money wages. An in-
dex of real wages takes into account changes over time in
earnings levels as measured by an appropriate index (e.g., the
Consumer Price Index).

RED CIRCLE RATE (OUT OF LINE RATE; FLAGGED RATE)
A wage rate exceeding the formal pay rate or range of rates
for a job due to such factors as the employee's long service
with the company, superior skills, or other factors.

REDUCTION IN FORCE (see Layoff)

REFERRAL BONUS
Money payment made to an employee as a bonus for aiding
in the recruitment of another person hired by the company.

REGULAR EMPLOYEE
Usually, a full-time employee who has fulfilled formal or in-
formal probationary requirements, as distinguished from sea-
sonal, part-time, probationary, and temporary employees. (See
Probationary Period.)

REGULAR RATE
Usually, basic rate of pay or the straight-time rate. The Fair
Labor Standards Act defines "regular rate of pay" for over-
time pay computations; collective bargaining agreements also
usually define the term for calculation purposes (vacation pay,
overtime, etc.).

REIMBURSEMENT ACCOUNTS
Accounts funded by employee pretax contributions to pay for
health care deductibles, coinsurances, costs of services not
covered by a health care plan, child care expenses, and the
nonmedical expenses that allow a person to work while en-
suring a qualified dependent's well-being. Accounts may be
partially funded by employers.

RELIEF TIME
Time during which a worker is permitted to leave his work-

place, usually for personal needs, with his place being taken by a substitute when necessary. (See Rest Period.)

### RELOCATION ALLOWANCE (MOVING ALLOWANCE)

Money paid to an employee to cover the cost of moving from one locality to another as a result of a permanent change in duty station. Payment may cover costs of moving personal items, real estate brokerage fees, the loss of money on the sale of the employee's residence, or the living costs for a period of time spent looking for a residence in the new locality.

### REOPENING CLAUSE (WAGE REOPENER; BENEFIT RE-OPENER)

Clause in a collective bargaining agreement stating the time or the circumstances under which negotiations can be requested, prior to the expiration of the contract. Reopenings are usually restricted to wage or benefit issues and, perhaps, other specified economic issues, not to the contract as a whole.

### REPORTING PAY

Minimum pay guaranteed to a worker who is scheduled to work, reports for work, and finds no work available, or less work than can be done in the guaranteed period (usually 4 hours). Sometimes identified as "call-in pay." (See Call-In Pay.)

### REST PERIOD (COFFEE BREAK; BREAK TIME)

A short period of time set aside as a paid break from work.

### RETIREMENT

Withdrawal from working life because of age, disability, etc. Traditionally, retirement occurs at age 65, when full Social Security benefits are available. The age at which such full benefits are available will gradually rise to age 67 for those born after 1937. Privately sponsored retirement plans typically provide *normal retirement benefits* at age 65 or earlier. *Early retirement benefits* are reduced benefits available at an earlier age, with reductions designed to account for the longer receipt of benefits. Plans may also offer *disability retirement*

56 *Glossary*

*benefits* for those workers unable to continue working due to poor health. Also, *special early retirement benefits* may be provided by companies to encourage workers to retire as a result of a firm's merger with another firm, downsizing, etc. (See Pension Plan; Social Security Act.)

RETIREMENT PLAN (see Pension Plan)

RETRAINING
Development of new skills for workers through a defined program of on-the-job training or study or both, so that employees are able to qualify for new or different work, or new careers.

RETROACTIVE PAY
Wages due for past services, frequently required when wage increases are made effective as of an earlier date; or when contract negotiations are extended beyond the expiration date. (See Back Pay.)

ROLL UP
Incorporation of cost-of-living allowances or longevity pay into an employee's regular base pay rate or salary.

ROTATING SHIFT (see Shift)

ROUND THE CLOCK OPERATIONS (see Continuous Operations)

ROYALTY
As used by some unions, term for employer payments to health, welfare, or retirement funds. For professional workers, royalties are payments for work based upon a percentage of money received from the sale of a product (an invention, book, musical composition, etc.).

RUCKER PLAN (see Gainsharing)

RUNAWAY RATE (LOOSE RATE)
Piece rate or other incentive rate which, because of changed

technology or faulty rate setting, yields earnings that are substantially higher than earnings on other jobs with similar job requirements.

# SABBATICAL LEAVE

Traditionally, for professional occupations (e.g., teachers, nurses, etc.) time off with pay usually up to 1 year following an eligibility period (e.g., 5 years, 7 years, etc.) to pursue projects that enhance and enrich professional knowledge. For nonprofessional workers, usually a shorter time period with pay (e.g., 5 weeks, 9 weeks, but up to 1 year) after completion of a longer eligibility period (e.g., 10, 15, or 20 years), but without limiting the time off to educational purposes.

### SAFETY BONUS

A nonproduction bonus paid to employees for maintaining a high level of safety in the workplace. For example, all plant employees receive $50 if the number of workplace accidents falls below a specified level. (See Bonus- (Production and Nonproduction Bonus.)

### SALARY (SALARY RATE)

For workers hired on a weekly, monthly, or annual basis (e.g., clerical, technical, managerial employees), the rate of pay normally expressed in terms of dollars per week, month, or year, as opposed to payment for an hour of work.

### SALARY REDUCTION PLAN (SAVINGS PLAN; THRIFT PLAN)

Plan authorized under Section 401(k) of the Internal Revenue Code that allows employees to divert a portion of their salary or wages to fund benefit plans. The money contributed to the benefit plan is not subject to Federal income tax.

SCALE (see Union Rate)

58 *Glossary*

---

SCANLON PLAN

A formal program that has as its general objective the reduction of labor costs through increased efficiency and the sharing of the resultant savings among workers. The scope and details of the few plans bearing this name vary considerably. (See Gainsharing.)

SEASONAL EMPLOYMENT

Employment during part of the year only, arising out of the seasonal character of an industry or weather conditions at the location of an establishment. Agriculture, canning, construction, and logging are examples of industries that may have seasonal employment.

SELF-FUNDING (SELF-INSURANCE) PLANS

A fully non-insured (or minimally insured) plan in which no insurance company or service plan collects premiums and assumes risk for payment of benefits. The employer assumes the role of an insurance company and is responsible for paying all benefit claims by using money set aside for that purpose. The employer may also be self-funded (or self-insured) for only a set amount of claims with an insurance company assuming responsibility for claims in excess of a set amount per year. (See Stop Loss Insurance, Minimum Premium Plan.)

SENIORITY

Term used to designate an employee's status relative to other employees, as in determining order of promotion, layoff, vacations, etc. *Straight seniority* -seniority acquired solely through length of service. *Qualified seniority* - other factors such as ability considered with length of service. *Departmental or unit seniority* - seniority applicable in a particular section of a plant, rather than in the entire establishment. *Plantwide or companywide seniority* - seniority applicable throughout the plant or company. *Seniority list* - individual workers ranked in order of seniority. (See Superseniority; Inverse Seniority.)

SEP (see Simplified Employee Pension)

### SERVICE CONTRACT ACT (SCA)

The McNamara-O'Hara Service Contract Act covers contracts entered into by Federal and District of Columbia agencies where the purpose of the contract is to furnish services (laundry and dry cleaning, janitorial, food, security, etc.) through the use of service employees. The Act requires contractors and subcontractors performing services on prime contracts in excess of $2,500 to pay service employees in various work classes no less than the wage rates and benefits found prevailing in the locality. For contracts equal to or less than $2,500, contractors are required to pay the Federal minimum wage.

### SERVICE WORKER

Worker in a protective service, food service, health service (health and dental aides), cleaning and building service, or personal service occupation.

### SETTLEMENT

The changes occurring in wages and salaries, benefits, and working conditions as a result of negotiations between the employer and the union representative of the employees. In first contract situations, it refers to the full agreement reached between the parties following recognition or certification of the union representative.

### SEVERANCE PAY (DISMISSAL PAY OR ALLOWANCE; TERMINATION PAY; SEPARATION PAY; LAYOFF ALLOWANCE)

Monetary allowance paid by employer to displaced employees, generally upon permanent termination of employment with no chance of recall, but often upon indefinite layoff with recall rights intact. Plans usually graduate payments by length of service.

### SHIFT (TOUR OF DUTY; TURN)

The daily working schedule of employees. *Day shift* -usually the daylight hours; *evening shift* - work schedule ending at or near midnight; *night (graveyard) shift* - work schedule start-

60 *Glossary*

ing at or near midnight. *Fixed shift* - scheduled hours remain
the same, week after week, for each group of workers. *Oscil-
lating shift* - policy under which the work schedule of a work
force alternates between two shifts. *Rotating shift* - practice
whereby crews change their work schedules at periodic inter-
vals, rotating between more than two shifts. *Split shift* - daily
work schedule is divided into two parts or more. *Swing shift*
- the fourth or rotating shift used on continuous 7-day or "round
the clock" operations.

### SHIFT DIFFERENTIAL (SHIFT PREMIUM)

Additional compensation (cents per hour or percentage of day
rate) paid to workers employed at other than regular daytime
hours.

### SHORT-TERM DISABILITY PLAN

A benefit plan that provides full, partial, or a combination of
full and partial pay, to employees who are unable to work
because of a non-work related accident or illness. Short-term
disability payments are normally paid for only a fixed num-
ber of weeks, typically 26 weeks. The benefit payment is
either a percentage of an employee's earnings or a fixed dol-
lar amount per week.

### SIC (STANDARD INDUSTRIAL CLASSIFICATION) (see
North American Industry Classification System)

### SICK LEAVE

Provides full or partial pay for time-off while an employee
cannot work due to non-work related illness or injury. Work-
ers may also be able to use sick leave for a doctor's appoint-
ment or to take care of a sick child. Employees typically
receive a specified number of allowed sick leave days per
year, although some employers may allow workers to carry
over and accumulate sick leave from year to year up to a speci-
fied maximum number. Sick leave plans may also provide
additional sick leave days based on the length of service of

*Glossary* 61

workers. For example, 10 days of sick leave are granted workers after 1 year of service, 14 days after 5 years, and 18 days after 10 years.

SICKNESS AND ACCIDENT BENEFITS (see Short-term Disability Plans)

SIGNING BONUS
A form of lump sum payment provided to employees upon ratification and signing of the agreement. May also refer to a bonus paid when an employee signs an employment contract. (See Bonus (Production and Nonproduction) and Contract Signing Bonus.)

SIMPLE PLAN (Savings Incentive Match Plan for Employees of Small Employers)
These plans allow businesses with 100 or fewer employees a way to offer retirement benefits through employee salary reductions and matching contributions, similar to those found in 401(k) plans. Eligible employees can contribute up to $6,000 each year through payroll deductions. Employers may offer matching contributions equal to employee contributions (up to 3 percent of employee wages) or fixed contributions equal to 2 percent of employee wages.

SIMPLIFIED EMPLOYEE PENSION (SEP)
Specifically intended for small businesses, SEPs involve individual retirement accounts created by a firm for each of its eligible employees. In years that the employer makes contributions they must be made for all eligible employees. Employees have a vested right to the employer contributions made to their accounts and they have complete control over the investment and distribution of the employer contributions.

SINGLE RATE JOB
A job where the rate of pay is the same for all workers in the same job or job classification, without any longevity pay rates or pay steps.

62 *Glossary*

SKILL BASED PAY (see Pay-For-Knowledge)

SOCIAL SECURITY ACT OF 1935
Federal law establishing a national social insurance program. The law provides for: Old-age, survivors' and disability benefits (an all-Federal program); public assistance to the aged, the blind, and to needy families; and unemployment insurance (both Federal-State programs). The coverage and other provisions have been modified several times since enactment of the program in 1935. (See Retirement.)

SPENDABLE EARNINGS (DISPOSABLE INCOME)
Earnings available for spending. As used by the Bureau of Labor Statistics, gross average weekly earnings less the estimated amount of the workers' Social Security and income tax liability. (See Take Home Pay.)

SPLIT SHIFT (see Shift)

STANDARD OCCUPATIONAL CLASSIFICATION MANUAL
The 1997 manual provides a classification system for the collection and publication of statistics covering occupations. It is used by Federal statistical agencies to classify the economy's occupations in a consistent manner.

STANDARD RATE
Usually, a uniform rate of pay established for an occupation or craft in an area or industry through collective bargaining or by law.

STATE UNEMPLOYMENT INSURANCE (SUI)
A legally required employee benefit that provides payments to workers who have been laid off from their jobs. The amount of the benefit payments and their duration in terms of number of weekly payments vary by each state program. Nearly all private sector establishments are covered by SUI laws, while State and local government agencies normally reimburse the state programs for any benefits paid to their former employees.

*Glossary* 63

STEP RATES

Fixed levels between the minimum and maximum rates for an occupation in a wage progression system. (See Wage Progression.)

STINT WORK

Employment for a length of time covering only the completion of a particular project, for example, the delivery of new telephone directories. May also refer to payment of a fixed amount of money regardless of the amount of time required to complete an assigned task or job.

STOCK BONUS PLAN

A defined contribution plan financed solely by the employer, or jointly by the employer and employee. Contributions are placed in a separate trust fund that invests in securities, including those of the employing company. Upon retirement or separation from the company, proceeds from the trust fund are paid out to eligible employees in the form of company stock or cash.

STOCK OPTION PLAN

Plan allowing employees or officers the privilege of purchasing company stock (shares) at a certain price at a time of their own choosing, usually within time limits set by the employer.

STOCK PURCHASE PLAN

Plan enabling employees to purchase stock (shares) in the company, with or without employer contributions, usually under more favorable terms than are available on the open market.

STOP LOSS INSURANCE

Insurance that limits the amount of money an employer's self-insured benefits plan must pay from its own resources. Once claims for benefit payments reach a specified level, the company providing the stop loss insurance assumes responsibility for payment of claims.

64 *Glossary*

STRAIGHT TIME PAY

Payment for work at an employee's regular pay rate (base
rate), as distinguished from pay based on an employee's over-
time pay rate, typically 1 ½ times the regular pay rate.

STRIKE BENEFITS

Union payments made to members who are on strike.

STRIKE FUND

Money allocated by a union or set aside in a separate account
to pay strike benefits and to defray other expenses of strikes.

STRIKE INSURANCE

Payment by companies that are members of an association to
a fund, or for the purchase of insurance, to reimburse a struck
member company for lost business resulting from a strike by
workers.

SUB (see Supplemental Unemployment Benefits)

SUBSIDIZED COMMUTING

Program where employers subsidize employees' cost of com-
muting to and from work via public transportation, a com-
pany sponsored van pool, discounted subway or bus fares,
etc.

SUBSISTENCE ALLOWANCE

Payment to a worker for expenses of meals and lodging (and
sometimes transportation) while traveling for the employer;
or reimbursement of living expenses required by the nature
of the job.

SUBSTANDARD RATE

Rate of pay below the established plant or occupational mini-
mum, allowed for workers who are physically or otherwise
unable to meet the production quota. The term also applies to
rates below Federal or State minimum wages, "prevailing"
levels, or union scales.

SUPERANNUATED WORKERS

Employees who are unable to perform their jobs, or any job, at the normal level because of advanced age and its attendant infirmities. *Superannuated rate* - rate of pay set below the regular pay level for a job and paid only to superannuated workers.

SUPERSENIORITY

A position on the seniority list ahead of what the employee would acquire solely on the basis of length of service or general seniority factors. Usually such favored treatment is reserved to union stewards, or other workers entitled to special consideration in connection with layoff and recall to work. (See Inverse Seniority.)

SUPPLEMENTAL PAY

Premium pay for overtime and work on weekends and holidays; shift differential pay; and nonwage cash payments.

SUPPLEMENTAL UNEMPLOYMENT BENEFIT PLANS
(SUB)

Introduced by agreement between the Ford Motor Co. and the United Auto Workers in mid-1955 and subsequently adopted in the automobile, steel, and related industries, these plans provide regular weekly payments to laid off workers receiving State unemployment insurance, through funds financed by the employer. Other benefits (e.g., short workweek benefits and severance pay) were added to many plans.

SURVIVOR INCOME INSURANCE

An element of a life insurance plan that provides benefits as installments (annuity) to a beneficiary upon an employee's death. Only dependents of the deceased employee are eligible to be beneficiaries of this benefit.

SWING SHIFT (see Shift)

66 *Glossary*

$T$AFT-HARTLEY ACT (see Labor Management Relations Act 1947)

TAKE HOME PAY
Usually, earnings for a payroll period, less deductions (legal and authorized); the amount of cash the worker "takes home."

TARGET BENEFIT PLAN
A defined contribution plan where employer contributions are based upon an actuarial valuation designed to provide a "target benefit" to each plan participant upon their retirement. The plan does not guarantee that the "target benefit" amount will actually be paid. (This would be a requirement under a defined benefit plan.) A target benefit plan's only obligation is to pay whatever benefit can be provided by the amount in each participant's account. Target benefit plans are a hybrid of a money purchase plan and a defined benefit plan.

TAX DEFERRED DEFINED CONTRIBUTION PLANS (see Defined Contribution Plans)

TELECOMMUTING
Work at satellite offices or at home using a computer and related equipment that links the telecommuter to the employer's main office. The telecommuter may be required to spend some time (e.g., 1 or 2 days each week) in the main office. (See Homework; Flexible Workplace. )

TEMPORARY DISABILITY INSURANCE (see Short-Term Disability Insurance)

TEMPORARY EMPLOYEES (see Contingent Worker)

TEMPORARY RATES
Wage or piece rates set tentatively on new job tasks performed by workers in an occupation; sometimes called experimental or trial rates.

TERMINATION PAY OR ALLOWANCE (see Severance Pay)

THIRD PARTY ADMINISTRATOR (TPA)
An entity other than the employer or employee organization that administers a benefit plan or benefit trust fund. TPAs may provide services related to benefit claims administration and payment, COBRA rate administration, data management and government forms reporting, managed health care plans, prescription drug card administration, hospital concurrent review, second medical opinions, employee assistance plans, actuarial services, etc.

THRIFT PLAN (see Salary Reduction Plan)

TONNAGE RATE
Pay on the basis of tons of material handled, common in basic iron and steel and coal mining.

TOOL ALLOWANCE
Allowance to an employee, paid by the employer, as reimbursement for the cost of tools and their upkeep, where the employee furnishes his own tools or is responsible for their maintenance.

TOTAL COMPENSATION
All types of employee compensation combined: Wages and salaries, non-wage cash payments, and the employer's cost of employee benefits.

TRADE UNION (see Union)

TRAINEE
A worker receiving formal on-the-job training.

TRAVEL ACCIDENT INSURANCE
A specific form of accidental death and dismemberment insurance providing payments to beneficiaries in the event of death or injury of an employee who is traveling on company business.

68 *Glossary*

#### TRAVEL TIME

Time spent traveling to and from a designated point and the work site. Such time may be paid for as portal-to-portal pay in mining, deadheading on railroads, and out-of-town work in construction.

#### TRUSTEE

A person, bank, or trust company who administers and takes responsibility for a trust fund, or a person who is a member of a board of trustees. (See also Fund.) Sometimes may be applied to the person appointed to administer the affairs of a union placed under trusteeship in accordance with a union constitution, or appointed by a Federal court in accordance with Federal law.

TUITION PAY PLAN (see Educational Assistance)

TURN (see Shift)

#### TWO-TIER WAGE OR BENEFIT SYSTEMS

Wage payment structures in which employees hired after a specified date are paid a lower wage rate or a lower level of benefits than employees hired before that date. In some labor-management contracts, provision may be made to merge the two tiers into one with payment based on the higher wage rate after passage of a specified time period.

## UNEMPLOYMENT INSURANCE (UNEMPLOYMENT COMPENSATION)

Joint Federal-State program, established in 1935 under the Social Security Act and subject to the standards set forth in the Federal Unemployment Tax Act, under which State administered funds obtained through payroll taxes provide payments to eligible unemployed persons for specified periods of time. Levels of benefits and tax rates are established by each State. Generally excluded groups include, among others, railroad workers (covered by Railroad Unemployment

Insurance Act), agricultural workers, State and municipal employees, and workers in nonprofit institutions. The Federal part of the program is administered by the U.S. Department of Labor. See also Supplemental Unemployment Benefit Plans (SUB).

UNIFORM ALLOWANCE (see Clothing Allowance)

UNION (TRADE UNION; LABOR UNION; LABOR ORGANIZATION)

Any organization in which workers participate as members, which exists for the purpose of dealing with employers concerning grievances, wages, hours, and conditions of employment. Unions are voluntary organizations and need no license from the government to operate. Unions may incorporate if they wish.

UNION CONTRACT (see Agreement)

UNION DUES

Fee paid periodically, usually monthly, by members of a union, typically as a condition of continued membership. Each union sets its own dues requirements. Under some collective bargaining agreements, nonmembers may be required to pay the equivalent of union dues or a portion as a condition of continued employment.

UNION LEAVE

Paid or unpaid, but excused, leave for union representatives, shop stewards, etc., to attend to union business (e.g., participating in union conventions, investigating grievances, etc.).

UNION-MANAGEMENT COOPERATION (see Labor-Management Cooperation)

UNION MEMBER

In broad terms, a union member is a worker who has met the union's qualifications for membership, has joined the union,

70 *Glossary*

and maintained his or her membership rights. Each union usually determines its own qualifications. *Dues paying members* pay dues regularly to the union. *Members in good standing* - include dues paying members and members exempted for various reasons (unemployed, on strike, ill, etc.) but still carried on the union rolls as full-fledged members. *Book members* - are listed on the union rolls, whether they pay dues or not.

UNION RATE (SCALE)

Minimum rate (hourly or weekly) paid to qualified workers in a specific occupation or trade under the terms of a union agreement.

UNION SECURITY

Protection of a union's status by a provision in the collective bargaining agreement establishing a closed shop, union shop, or agency shop. *Closed shop* provisions require an employer to hire and retain only union members in good standing. *Union shop* provisions require newly hired employees to become union members within a specified period of time, typically 30 days, and to remain as members of the union as a condition of continued employment. *Agency shop* provisions require that all employees who do not join a union pay a fixed amount monthly, usually the equivalent of union dues, as a condition of employment to help defray the union's expenses in acting as the bargaining agent. The payments may be allocated to the union's health and welfare fund or to a charity group. Union security may also be enhanced by *maintenance of membership arrangements,* whereby employees who are members of a union at the time a contract is negotiated, or who join the union subsequently, must maintain their membership for the duration of the contract as a condition of continued employment.

UNION SHOP (see Union Security)

UPGRADING

Process of raising the pay level of a job relative to other jobs

or of advancing workers to jobs with higher skills and rates of pay.

## USUAL, CUSTOMARY, AND REASONABLE CHARGES (UCR)

Standard applied to charges assessed by health care providers. Normally refers to not more than a physician's usual charge, within the customary range of fees in the locality, and reasonable, based on the patient's medical circumstances. Normally a health benefits plan will pay all or a portion of expenses incurred up to the UCR charge; expenses above the UCR charges must be paid by the patient.

# VACATION PAY

Wages received by an employee for his vacation period. See also Paid Vacation. *Pay in lieu of vacation* - vacation pay to workers who do not take the actual time off, paid in addition to wages for time worked.

## VESTING (VESTED RIGHTS)

Amount of time an individual must work before earning a nonforfeitable right to a pension benefit. When a worker is fully vested, the accrued benefit will be retained even if the worker leaves the company before reaching retirement age. Usually employees are fully vested if they are employed by the company when they reach the pension plan's normal retirement age. Under ERISA rules, employees must also be able to earn a vested right to an accrued benefit through completing specific amounts of service.

## VISION CARE PLAN

Benefits cover eyeglasses and with few exceptions, eye examinations. Plans may also include coverage for contact lenses.

72 *Glossary*

# $W$AGE (see Wage Rate)

### WAGE ASSIGNMENT
Voluntary transfer by a worker of some of his or her earned wages to another party, e.g., for the payment of purchases or debts, union dues or assessments, or charity contributions. (See Garnishment.)

### WAGE DETERMINATION
Process of establishing wage rates and wage structures through collective bargaining, employer determination, arbitration, or other methods.

### WAGE DIFFERENTIALS
Differences in wages among occupations, plants, areas, industries, type of worker, etc.

### WAGE FREEZE
Action taken to freeze all employees at their current wage or salary rate, nullifying anticipated increases due to longevity pay, merit increases, cost-of-living adjustments, within-grade pay increases, etc. Normally taken as a temporary measure in response to poor sales or a decrease in company profits.

WAGE-HOUR LAW (see Fair Labor Standards Act of 1938)

### WAGE LEADERSHIP
Influence exercised by the wage settlement reached by a large firm or group of firms on other negotiations in the same industry or area.

### WAGE PATTERN
A wage (or benefit) change negotiated by a major company that is followed by similar changes in other companies in the industry or area.

### WAGE PROGRESSION
Plan providing within grade pay increases, generally at speci-

fied time intervals or on a merit basis, for workers in occupa-
tions having established minimum and maximum wage rates.
(See Automatic Progression; Step Rates.)

### WAGE RATE
Monetary compensation paid by an employer to a worker for
a given unit of worktime, normally an hour, exclusive of pre-
mium payments for overtime, shift differentials, cost-of-liv-
ing allowances, etc.

### WAGE REOPENER (see Reopening Clause)

### WAGE SCALE (WAGE SCHEDULE)
A schedule specifying the pay structure for an establishment,
industry, or locality. May also refer to a single rate. (See Union
Rate.)

### WAGNER ACT (see National Labor Relations Act, 1935)

### WAITING PERIOD
Duration of time between beginning of a benefit qualifying
event and the start of actual benefit receipt. For example, a
short-term disability plan may have a 5-day waiting period
before benefits will be paid. Other benefits, such as sick leave,
may be available during this waiting period.

### WAITING TIME (see Downtime)

### WELLNESS BENEFITS
Preventive insurance benefits such as payments for annual
physical examinations, mammograms, and children's vacci-
nations.

### WELLNESS PROGRAMS
Programs encouraging employees to improve their physical
well being including on-site exercise programs or health clubs,
programs to help employees stop smoking, stress manage-
ment, high blood pressure control, weight control, health risk

74 *Glossary*

appraisals, back care, nutrition education, etc.

### WHITE-COLLAR WORKERS

Office, clerical, administrative, sales, professional, and technical employees, as distinguished from production and maintenance employees who are usually referred to as blue-collar workers. The National Compensation Survey's series for white-collar workers cover the following four occupational groupings: Professional specialty and technical; executive, administrative, and managerial; sales; and administrative support, including clerical. (See Blue-Collar Workers.)

### WORK SCHEDULE (DUTY HOURS; DUTY TIME)

A listing of the starting and stopping times of work for individuals or groups of employees. Especially useful in planning coverage in industries where the demand for workers varies with service hours (e.g., retail trade) or in continuous operations industries having rotating shifts (e.g., steel).

### WORKERS' COMPENSATION

A system of insurance required by State law and financed by employers which provides payment to workers or their families for occupational illness, injuries, or fatalities resulting in loss of wage income.

### WORKWEEK (WORK SCHEDULE)

Usually, the expected or actual period of employment for the week, usually expressed in number of hours. Some uses of the term may relate to the outside dimensions of a week (e.g., 7 consecutive days).

YEAR END BONUS (see Bonus (Production and Nonproduction)

# Bureau of Labor Statistics
# Regional Offices

**Region I**
JFK Federal Building, E-310
15 New Sudbury Street
**Boston**, MA 02203-1603
Phone: (617) 565-2327
Fax: (717) 565-4182

**Region II**
Room 808
201 Varick Street
**New York**, NY 10014-4811
Phone: (212) 337-2400
Fax: (212) 337-2532

**Region III**
Gateway Building, Suite 8000
3535 Market Street
P.O. Box 13309
**Philadelphia**, PA 19101-3309
Phone: (215) 596-1154
Fax: 215( 596-4263

**Region IV**
61 Forsyth Street, SW
Room 7T50
**Atlanta**, GA 30303
Phone: (404) 331-3415
Fax: (404) 331-3445

**Region V**
Federal Office Building, 9th Floor
230 S. Dearborn Street
**Chicago**, IL 60604-1595
Phone: (312) 353-1880
Fax: (312) 353-1886

**Region VI**
Federal Building
525 Griffith Street, Room 221
**Dallas**, TX 75202-5028
Phone: (214) 767-6970
Fax: (214) 767-3720

**Regions VII and VIII**
City Center Square
1100 Main Street, Suite 600
**Kansas City**, MO 64105-2112
Phone: (816) 426-2481
Fax: (816) 426-6537

**Regions IX and X**
71 Stevenson Street
P.O. Box 3766
**San Francisco**, CA 94119-3766
Phone: (415) 975-4350
Fax: (415) 975-4371

U.S. DEPARTMENT OF LABOR
Bureau of Labor Statistics
Postal Square Building, Rm. 2850
2 Massachusetts Ave., NE
Washington, DC 20212-001
─────────────────────────────

Official Business
Penalty for Private Use, $300
Address Service Requested

Exhibit 22



# Glossary of Terms Significant to the Human Resource Management Function for the State University of New York

Following is a glossary of terms that are significant to the human resource function. While many of the terms are specifically defined as they apply to employment in the State University of New York or other employment in the civil service of the State of New York, many relate to the human resource function in general. A unique feature of this glossary is the inclusion, in italics, of active verbs that could be used in job descriptions to differentiate levels of duties and responsibilities.

An alphabetical index is provided to assist you in locating the reference you seek. Also, you will note that the parenthetical notations often appearing following a term are an attempt to identify the source for a definition: **(SUNY)** refers to the Policies of the Board of Trustees; **(NYS CSL)** refers to the Civil Service Law; **(NYS Class & Comp)** refers to materials prepared by the Classification and Compensation section of the Civil Service Department; **(NYS Taylor Law)** refers to the Public Employees' Fair Employment Act; **(Federal)** refers to definitions from federal government statutes, rules, regulations, and executive orders; **(NYS Payroll)** refers to the NYS Payroll Manual prepared by the Office of the State Comptroller; **(NYS Pers Manual)** refers to the Personnel Manual prepared by the NYS Department of Civil Service; **(NYS Budget)** refers to budget bulletins and other materials relating to the budget process in State agencies; and **(Contract)** refers to at least one of the collective bargaining agreements between the State and the unions that represent university employees.

|A | B | C | D | E | F | G | H | I | K | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z |

ACADEMIC EMPLOYEE (SUNY):

an <u>academic rank</u> or <u>qualified academic rank</u> employee in the Professional Services Negotiating Unit.

ACADEMIC RANK (SUNY):

rank held by those members of the professional staff having the title of professor, associate professor, assistant professor, instructor, including geographic full-time faculty members having such titles, and rank held by members of the professional staff having the titles of librarian, associate librarian, senior assistant librarian, and assistant librarian.

ACADEMIC STAFF (SUNY):
> the staff comprised of those persons having academic rank or qualified academic rank.

ACADEMIC YEAR OBLIGATION (SUNY):
> an annual obligation of service for the academic year, not to exceed 10 months.

***ACCOUNTABILITY***:
> the correct use of delegated authority to meet a specific responsibility.

ACRONYMS (SUNY/NYS):
> For a list of acronyms associated with the SUNY Human Resources function, go to: Acronyms. Most of these acronyms also are included in this glossary.

ADA: (See Americans With Disabilities Act)

***ADMINISTER***:
> manage or direct the execution of affairs.

ADMINISTRATIVE SALARY PLAN (SUNY)
> SUNY Board of Trustees approved salary plan for Presidents of the State-operated campuses, the Chancellor, Executive Vice Chancellor, Senior Vice Chancellor and Provost.

ADMINISTRATIVE SERVICES UNIT (ASU) (NYS Taylor Law):
> ative support staff, **currently represented by the Civil Service Employees' Association, Inc. (CSEA)**. See related information at:
>
> - ASU NU Info a negotiating unit in NYS service composed of classified service employees, primarily office and administrrmation or

***ADOPT***:
> to take up and practice as one's own.

***ADVISE***:
> to recommend a course of action; offer an informed opinion based on specialized knowledge.

ADVISORY ARBITRATION:
> a proceeding where an arbitrator issues a decision which is **not** final and binding on the parties.

AFFECTED CLASS:
> those groups of persons, and protected by anti-discrimination laws, who because of past discrimination, may continue to suffer the effects of such discrimination. Affected class status may be determined by statistical analysis and/or court decision.

AFFIDAVIT:
> a written declaration of facts made voluntarily under oath. This is made without notice to an opposing party and without the opportunity for cross-examination.

AFFIRMATIVE ACTION:
> any action intended to correct effects of past discrimination, to eliminate present discrimination, or to prevent discrimination for the future.

AFFIRMATIVE ACTION GROUPS:
> those persons identified by the federal and state laws to be specifically protected from employment discrimination.

AFFIRMATIVE ACTION PLAN:
> a statement of goals, timetables, and programs indicating how the employer plans to move the current status to parity. Also, a document required of government contractors under the regulations of the Office of Federal Contract Compliance Programs (OFCCP). The employer is obliged to compare the internal distribution of minorities and females to their incidence in the external labor market and to determine whether or not the employer is at parity with the external labor market.

AGE DISCRIMINATION and EMPLOYMENT ACT of 1967 (ADEA) as amended (Federal):
> Specifies it is unlawful for an employer to fail or refuse to hire or to discharge an individual or otherwise <u>discriminate</u> against an individual with respect to compensation, terms, conditions, or privileges of employment, because of an individual's age. For more information go to <u>Age Discrimination (ADEA)</u>

AGENCY FEE:
> a fee deducted from the salary of New York State employees who are non-members of the employee organization chosen by their <u>negotiating unit</u>, if any, to represent them for purposes of <u>collective bargaining</u>. The fee deduction is equivalent to the dues deducted for members. It is considered payment for services or benefits provided to non-members of the employee organization as a result of collective bargaining. See related information at: <u>Agency Fee Payroll Deduction</u>.

ALIEN:
> an individual born in, and a citizen of, a country other than the country in which he or she is living.

ALLOCATE (NYS Class & Comp):
> to assign a class to a particular salary grade in the salary schedule.

ALTERNATE WORK SCHEDULE: <u>(See Executive Order 68)</u>

AMERICAN SOCIETY FOR TRAINING AND DEVELOPMENT (ASTD):
> a professional organization. For more information go to: <u>American Society for Training and Development</u>.

AMERICANS WITH DISABILITIES ACT OF 1990 (ADA):
> the ADA prohibits discrimination on the basis of disability in employment, programs and services provided by state and local governments, goods and services provided by private companies, and in commercial facilities. For more information go to: <u>ADA Information on the WEB</u>.

AMICUS CURIAE:
> a party not involved in a lawsuit but who has an interest in its outcome and who submits arguments to the court in an effort to aid the court in reaching its judgment.

***ANALYZE***:
> separate into elements and critically examine.

ANNUITY:
> a fixed amount of money payable periodically for life or for a fixed number of years which has been bequeathed, donated, or purchased.

ANSWER:
> a response by the person who is sued, or response to a question.

ANTE (NYS Budget):
> Refers to the maximum expenditure which may be authorized. For positions, the maximum amount which may be paid to an incumbent. (At not to exceed).

***ANTICIPATE***:
> foresee and deal with in advance.

APPEAL (NYS Class & Comp) (NYS CSL):
> application to the Civil Service Commission to review a determination of the Director of Classification and Compensation. Also includes application to the Civil Service Commission to review decisions of the Department of Civil Service on minimum qualifications, comparability of title for examination, and test grades. Also, the act of a plaintiff who wishes to test a Civil Service Commission decision in court under Article 78 of the Civil Practice Laws and Rules. Action moving a Step One grievance decisions to Step Two, etc.

APPELLANT:
> the party who appeals a decision.

APPENDIX A (SUNY):

a list of professional services negotiating unit positions not eligible for permanent appointment found at the end of Article XI in the SUNY Policies of the Board of Trustees. In lieu of permanent appointments, appointees to Appendix A titles must be given 5-year term appointments after an initial 1 year probationary appointment.

APPLICATION:

the act of requesting. Includes a request to the Director of Classification and Compensation for a change in title and/or salary as provided by the NYS Civil Service Law and other requests for review of administrative actions of the Department of Civil Service. Also includes requests for consideration for employment from candidates for positions and employee requests for promotion. An Application Blank is the formal record of a person's request to be employed.

APPOINTING AUTHORITY or APPOINTING OFFICER (NYS CSL) (SUNY):

the officer, commission or body having the power of appointment to subordinate positions. In SUNY, each campus President is an appointing authority.

APPOINTMENT:

the act of placing a person in a position or office.

APPOINTMENT YEAR (SUNY):

unless the terms of appointment otherwise provide, the normal appointment year shall be from September 1 to August 31, regardless of payroll mode; provided however, that an academic year employee may be required to commence her/his professional obligation at a date reasonably prior to September 1 as may be necessitated by a college's operating requirements.

***APPRAISE***:

give an expert opinion/judgment of worth or merit.

***APPROVE***:

accept as satisfactory; exercise final authority with regard to the commitment of resources.

ARBITRARY:

something done capriciously or at pleasure; without adequate determining principle; non-rational.

ARBITRATION (NYS Taylor Law):

a procedure through which a third party neutral arbitrator examines facts in a hearing and renders an award to settle a dispute. Sometimes referred to as "Rights Arbitration" in contrast to "Interest Arbitration".

ARBITRATOR:

an impartial person selected by the parties to a dispute who is empowered to make a determination concerning the issues in dispute.

***ARRANGE***:

make preparation for an event; put in proper order.

ARTICLE 78 PROCEEDING:

a proceeding brought in New York State Supreme Court for review of governmental action pursuant to Article 78 of the Civil Practice Law and Rules.

***ASSEMBLE***:

collect or gather together in a predetermined order from various sources.

***ASSIGN***:

specify or designate tasks or duties to be performed by others.

***ASSUME***:

undertake; take for granted.

***ASSURE***:

give confidence, make certain of.

ASTD (Organization): (See: American Society for Training and Development).

ASU (NYS Taylor Law): (See: Administrative Services Unit)

AUTHORITY:

    refers to the right a manager has to control the activities of subordinates. Decision-making power.

***AUTHORIZE***:

    approve; empower through vested authority.

BARGAINING AGENT:

    the employee organization chosen by employees in a negotiating unit to have exclusive representation rights for them in collective bargaining.

BARGAINING UNIT: (See: Negotiating Unit)

BASE ANNUAL SALARY:

    the base salary before the addition of overtime pay or of any temporary or "emergency" increases approved for a limited period or purpose, or any extra service compensation or additional stipend or pay for other services such as service as department chair.

BASIC WORKWEEK CLASSIFIED EMPLOYEES (NYS CSL):

    the basic workweek shall be 40 hours; provided, however, that where a shorter workweek would not interfere with the proper performance of government functions, an appointing authority may establish a basic workweek of not less than 37 1/2 hours. (See Workweek)

BLUE CROSS - BLUE SHIELD

    a health insurance provider. A major product is the managed care program offered by the "Blue Choice" (HMO) plan. More information is available at: Blue Cross - Blue Shield.

BONA FIDE OCCUPATIONAL QUALIFICATION - BFOQ or BOQ.

    a minimum qualification requirement needed as a prerequisite to being able to do a particular job. BFOQs, if challenged, must be demonstrated to be valid by the employer. The courts have interpreted BFOQs very narrowly, especially with regard to sex. Each applicant must be treated as an individual in comparing his or her skills to the skills required to perform the job.

BRIEF:

    a paper written by a lawyer to serve as a basis for his or her later oral argument to the court. Its use is largely to inform the court of the lawyer's argument, authorities on questions of law, and desired interpretation of the case.

BUDGET:

    financial statement of a plan.

BUDGET CERTIFICATE (NYS Payroll): (See Certificate of Approval)

BUMP (NYS CSL):

    the displacement of one classified service employee by another who is being laid off and has greater seniority and is serving in the next higher level direct line title in the layoff unit.

BURDEN OF PROOF:

    the responsibility for demonstrating to the requisite degree the truth of one's claim; the affirmative duty of proving or disapproving the claim at issue.

BUSINESS NECESSITY:

    Supreme Court's touchstone for determining lawfulness under Title VII of a discriminatory effect. Must be essential to the safe and efficient operation of a business. Generally involves whether the employer would be committed to additional costs or a safety hazard if the discriminatory practice were abandoned. Savings gained by shorter training periods, preserving or improving an employer's image, customer or co-worker preferences, superior or inferior ability to perform

non-essential aspects of a job, or need to maintain harmony or decorum at the place of business do NOT qualify as business necessities.

**CAFETERIA PLAN:**
> a form of benefit compensation in which employees may choose between two or more taxable or non-taxable benefits (i.e., life insurance, health insurance, tax deferred annuities, etc.).

**CALENDAR YEAR OBLIGATION (SUNY):**
> an annual obligation of service for a full year, (i.e., 12 months).

**CANVASS:**
> an inquiry as to whether an eligible candidate for a classified service vacancy would be willing to accept appointment, if offered.

**CAPRICIOUS:**
> subject to, led by, or indicative of a sudden, unpredictable change without apparent or adequate motive.

**CAREER:**
> a sequence of jobs held during a person's work life.

**CAREER LADDER:**
> composed of jobs requiring related and increasingly more responsible duties, through which employees advance by experience, in-service training, and testing.

**CASUAL EMPLOYEE (SUNY):**
> unclassified service employee whose employment relationship is so limited as not to justify assignment to a <u>negotiating unit.</u>

**CENTRALIZATION:**
> upper level management retains major decision making authority, creating all major policies and programs, and preserving the authority to make significant changes.

**CEO:**
> Chief Executive Officer.

**CERT (NYS Payroll):** <u>(See Certificate of Approval)</u>
> Budget Certificate.

**CERTIFICATE OF APPROVAL (NYS Payroll):**
> a listing, ordered by payroll line item number, of positions and salaries approved by the NYS Division of Budget for funding from a NYS appropriation for personal service regular expenditures. The NYS Office of the State Comptroller cannot pay more on a line item than the amount which is authorized on the certificate of approval. Also known as Schedule of Positions (SOP).

**CERTIFICATION (NYS Budget), (NYS CSL), or (NYS Taylor Law):**
> May refer to DOB certifying positions and the Department of Civil certifying appointment to the payroll. May also refer to the <u>Public Employment Relations Board's (PERB)</u> certifying an employee organization as the exclusive representative for a unit of employees.

**CHAOS:**
> a condition created when an organization changes the rules in response to every new situation.

**CHARGING PARTY:**
> person alleging that he or she is aggrieved as the result of an unlawful employment practice.

**CHIEF ADMINISTRATIVE OFFICER (SUNY):**
> the head of a college or contract college whether called president, dean, provost, director, or otherwise. (CAO)

**CIVIL SERVICE (NYS CSL):**

encompasses all offices and employments in the service of the State or any of its
civil divisions, except offices and employments in the Division of Military and Naval
Affairs. The Civil Service is divided into the <u>unclassified</u> and <u>classified</u> service.

CIVIL SERVICE COMMISSION (NYS CSL):
considered the "watchdog" of the New York State merit system, the Civil Service
Commission is composed of three members appointed by the Governor. From the
three, one is appointed by the Governor to serve as President. The President is
the administrative head of the <u>Department of Civil Service</u>. The Commission
promulgates rules, hears appeals, and conducts investigations.

CIVIL SERVICE LAW (NYS CSL):
law under which NYS employment in the classified service is governed. For a
summary of the law go to: <u>Civil Service Law Summary</u>.

CIVIL SERVICE RULES (NYS CSL):
the rules of the Civil Service Commission implement the Civil Service Law, provide
procedures and other details for carrying out the law, and have the force of law
themselves.

CLASS or CLASS OF POSITIONS (NYS Class & Comp):
one or more positions sufficiently similar in respect to duties and responsibilities
that the same title may be used to designate each position in the group, the same
salary may be equitably applied, the same qualifications required, and the same
examination used to select qualified employees.

CLASS ACTION:
a lawsuit or grievance initiated by one or more member(s) of a larger group of
persons on behalf of all the members of the group.

CLASSIFIED SERVICE (NYS CSL):
the classified service shall comprise all offices and positions not included in the
<u>unclassified service</u>. The offices and positions in the classified service shall be
divided into four classes, to be designated as the <u>exempt class</u>, the <u>non-
competitive class</u>, the <u>labor class</u>, and the <u>competitive class</u>.

CLASSIFY (NYS Class & Comp):
to group positions according to their duties and responsibilities and assign a class
title.

CLASS SPECIFICATION: <u>(See Specification)</u>

CLASS TITLE: <u>(See Title)</u>

***CLEAR***:
gain approval of others.

COBRA (Federal): <u>(See: Consolidated Omnibus Budget Reconciliation Act of 1985 (Federal)</u>.

*COLLABORATE*:
work jointly with, cooperate with others.

***COLLECT***:
gather or amass.

COLLECTIVE BARGAINING (NYS Taylor Law):
statutory mechanism for employees to participate collectively in the determination
of their terms and conditions of employment through meetings between their
elected representatives and their employer at which their terms and conditions of
employment are negotiated. Also used to resolve labor disputes.

COLLECTIVE BARGAINING AGREEMENT:
An agreement reached through collective negotiations between management and
representatives of employee unions. Go to: <u>Links to Collective Bargaining
Agreements</u> to view current agreements.

COLLEGE AND UNIVERSITY PERSONNEL ASSOCIATION (CUPA):
an organization that supports personnel administration in higher education. For
more information go to: <u>College and University Personnel Association</u>.

COLLEGE YEAR OBLIGATION (SUNY):
>an annual obligation of service for any period less than the full year (for professional employees).

COMPARABLE WORTH:
>the principle that jobs can be compared which may be dissimilar in nature but equal or equivalent in terms of skill, effort, responsibility, and working conditions; used to achieve salary equity; popularly tied to sex discrimination.

COMPENSATION:
>remuneration for services rendered or for damages incurred. Includes pay, incentives, and benefits provided employees.

COMPETENT:
>capable of doing a certain thing; having capacity to understand, and act reasonably.

COMPETITIVE CLASS (NYS CLS):
>the competitive class shall include all positions for which it is practicable to determine the merit and fitness of applicants by competitive examination. See: Classified Service Competitive Examination Announcements for information about examinations.

***COMPILE***:
>put together information, collect from other documents.

COMPLAINT:
>an informal grievance; a gripe; a non-contract dispute; the first paper filed by a plaintiff.

COMPLIANCE:
>within statutory limits and court interpretations, acts by an employer to bring practices into line with civil rights legislation through training managers, supervisors and employees; changing policies, procedures; altering compensation levels; making physical plant changes; changing working hours; etc.

COMPLIANCE AGENCIES:
>organizations established under the Office of Federal Contract Compliance as internal sub-units of major government departments or agencies, including, for example, the Department of Labor, Department of Commerce, the Department of Defense. They are charged with the administration of Executive Order 11246, Revised Orders No. 4 and No. 14, and with the collection and analysis of Equal Employment Opportunity (EEO) Reports and Affirmative Action Plans. Their powers of enforcement include the ability to deny government business to contractors found in violation. For more information go to: Office of Federal Contract Compliance Programs (OFCCP)

COMPRESSED WORKWEEK:
>work schedules with fewer than five workdays a week.

COMPULSORY ARBITRATION:
>when the law authorizes either party or an outside agency to impose a settlement after an arbitration hearing.

CONCILIATION:
>a settlement of a dispute through discussion rather than formal hearings and/or a trial. Sometimes called mediation. Used by Equal Employment Opportunity Commission (EEOC), PERB, and Division of Human Rights, among others.

***CONCUR***:
>agree with a position, statement, action, or opinion.

CONCURRENT:
>to run together, in conjunction with; to exist together.

***CONDUCT***:
>carry on; direct the execution of.

***CONFER***:
> consult with others to compare views.

CONFIDENTIAL (NYS Taylor Law): (See: Management/Confidential).

CONSENT DECREE:
> by comparison, the judicial counterpart to conciliation; a formal court document approved by a judge.

***CONSOLIDATE***:
> bring together.

CONSOLIDATED OMNIBUS BUDGET RECONCILIATION ACT OF 1985 (COBRA) (Federal):
> this law requires that most employers sponsoring group health plans offer employees and their families the opportunity for a temporary extension of health care and union Employee Benefit Fund coverage called "continuation coverage" at group rates in certain instances where coverage under the program would otherwise end.

***CONSULT***:
> seek the advice of others.

CONTINGENT PERMANENT (NYS CSL):
> an appointment, transfer, or reinstatement to a temporarily vacant position of a person meeting all merit and fitness requirements for such appointment. Except in the case of the return of a prior incumbent, contingent permanent appointees have all rights and benefits of permanent appointees.

CONTINUING APPOINTMENT (SUNY):
> an appointment to a position of academic rank which shall not be affected by changes in such rank and shall continue until resignation, retirement, or termination. (See: Tenure).

CONTRACTOR OR EMPLOYEE (Federal): Employee/Contractor

CONTRIBUTORY PENSION PLAN:
> the employee and employer share the cost of pension benefits.

***CONTROL***:
> measure, interpret, and evaluate actions for conformance with plans and/ or desired results.

***CONTROLLING***:
> staying with the plan making sure the objectives are met and changing the plan as necessary.

***COORDINATE***:
> regulate, adjust or combine the actions of others to attain harmony.

COORDINATION:
> the relationships between various positions within an organization. Includes reporting and supervisory relationships per organization chart.

***CORRELATE***:
> establish a reciprocal relationship.

***CORRESPOND***:
> communicate in writing with.

COUNSELING:
> a private supervisory conference between a supervisor and a subordinate employee at which the employee's performance deficiencies are discussed. The motivation for such counseling sessions is to improve the employee's performance and eliminate the performance deficiencies. For more information about counseling go to: Counseling

COUNSELING MEMORANDUM:
> a written follow-up to an employee **following counseling** which confirms the reason for the counseling, a summary of the effect of the employee's deficiencies,

a summary of the employee's response to the counseling, and the corrective actions expected.

CUPA (Organization): (See: College and University Personnel Association).

---

DATA:
facts and figures.

DECENTRALIZATION:
significant decision making authority is delegated throughout the organization to lower management levels.

DECISION:
a determination or judgment. The result of an administrative or judicial review. In judicial cases, possible results include dismissal of charges, injunction, and awards for damages or punishment.

DEDUCTION: (See: Payroll Deduction).

DEFENDANT:
the person(s) or organization(s) being sued.

DEFINED BENEFIT PLAN:
a retirement program under which the retirement benefit to be paid is some percentage of final salary rather than simply the return on investment of the retirement fund. See related information about retirement programs available for SUNY employees at: Retirement Benefits.

DEFINED CONTRIBUTION PLAN:
a retirement program under which an employee contributes a percentage of salary and the return on investment determines the retirement benefit. See related information about retirement programs available for SUNY employees at: Retirement Benefits.

*DELEGATE*:
commission another to perform tasks or duties that may carry specific degrees of accountability. Ideally authority should be passed to the lowest level within the organization capable of making an effective decision.

DEPARTMENTALIZATION:
the process of combining jobs into work units and grouping similar work units.

DEPARTMENT OF CIVIL SERVICE (NYS CSL):
in New York State, it is the State's primary personnel management arm, responsible for the classification and allocation of classified service State positions, the recruitment and selection of candidates for State classified service employment, and the development and maintenance of statewide agency personnel systems. For more information go to: NYS Department of Civil Service

DEPARTMENT OF LABOR (NYS):
Go to: NYS Department of Labor

DEPARTMENT OF TAXATION AND FINANCE (NYS):
visit this site at: NYS Tax Department.

DEPOSITION:
a written declaration of facts made voluntarily out of court but under oath in the presence of the opposing party, who may conduct cross-examination in front of a court reporter.

*DESIGN*:
conceive, create, and execute according to plan.

DESK AUDIT (NYS Class & Comp):
a review and discussion of the duties and responsibilities of a position made at an employee's desk or other regular place of work.

*DETERMINE*:
resolve; fix conclusively or authoritatively.

**DEVELOP**:
>    disclose, discover, perfect or unfold a plan or idea.

**DEVISE**:
>    come up with something new.

Dictionary of Occupational Titles (Federal):
>    a dictionary of titles and descriptive information about their classification created
>    and maintained by the federal government.

**DIRECT**:
>    guide operations through the establishment of objectives, policies, rules, practices,
>    methods, and standards.

DIRECT DEPOSIT OF PAYROLL:
>    making direct deposit of payroll to employee bank accounts via electronic transfer
>    rather than writing pay checks. For more information go to: Direct Deposit.

DISABILITY:
>    state of not being fully capable of performing all essential functions whether
>    mental or physical.

DISCHARGE:
>    termination of a person's employment by his or her employer.

DISCIPLINE:
>    action taken against an employee for misconduct or incompetence when other
>    efforts (i.e., counseling) fail or when a single incident is so severe as to warrant it.
>    In NYS service, disciplinary penalties can only be imposed after an employee has
>    been formally charged and has exhausted his/her appeal rights. Disciplinary
>    penalties range from official reprimands, suspension without pay, fines, loss of
>    accrued leave credits, and reduction in grade, to dismissal from service. Except for
>    cases of extreme misconduct, discipline, where required, should be progressive
>    and consistent. An employee should be notified that a problem exists and given a
>    chance to improve before being disciplined. For more information about discipline
>    go to: Discipline.

DISCOVERY:
>    the legal term for the investigation phase after a complaint is filed and the
>    defendant has answered.

DISCRIMINATION:
>    the act of distinguishing between and among different things. It is also a charge
>    brought by people alleging the operation of prejudice. When discrimination is done
>    in a way that disadvantages individuals because of accident of birth or condition, it
>    is unlawful. Thus discrimination may also be a conclusion of the courts that
>    plaintiffs have shown an adverse impact with regard to the employment of
>    protected class persons and employers have failed to demonstrate business
>    necessity.

**DISCUSS**:
>    exchange views for the purpose of arriving at a conclusion.

DISPARATE EFFECT or DISPARATE IMPACT:
>    the result of an employment policy, practice, or procedure that, in application, has
>    less favorable consequences for an affirmative action group than for the dominant
>    group.

**DISPOSE**:
>    get rid of.

**DISSEMINATE**:
>    spread or disperse information.

**DISTRIBUTE**:
>    deliver to proper destinations.

DISTRIBUTION RATE:

the degree (percentage) to which a given <u>protected class</u> is employed in the
various job titles, job classes, and other units within the employing organization,
and the degree to which individuals of a given protected class are involved in
various employment transactions (for example, applications for employment,
hiring, placement, promotion, separation, etc.).

DIVISION OF HUMAN RIGHTS (NYS):

Go to: <u>NYS Division of Human Rights</u>

DOT (Federal): <u>Dictionary of Occupational Titles.</u>

***DRAFT***:

prepare papers or documents in preliminary form.

DRY PROMOTION:

refers to an increase in responsibility and status without an increase in pay.

DUES CHECKOFF:

the privilege granted to the bargaining agent to have exclusive payroll deduction of
membership dues.

DUTY:

several tasks which are related by some sequence of events.

---

EAP:

Employee Assistance Program. Programs designed with the goal of assisting
employees and their family members to solve personal and work related problems
which affect job performance.

EARMARK (NYS Class & Comp):

the term used when a position has been designated for restudy when vacant to
determine its proper classification before being refilled.

EDUCATION:

concerned with increasing our general knowledge, understanding, and
background. <u>(See training)</u> for contrast.

EEO: <u>(See: Equal Employment Opportunity)</u>

EEOC (Federal): <u>(See: Equal Employment Opportunity Commission")</u>

ELIGIBLE LIST (NYS CSL):

a certified list of candidates for a competitive title ranked in order of their
respective final examination ratings, including seniority and veterans credits.

EMPIRE PLAN (NYS Health Insurance Option)

a health insurance option for New York State employees. For more information go
to: <u>The Empire Plan</u>

EMPLOYEE (Federal):

person working for another person or an organization for compensation. In certain
circumstances it is difficult to determine whether a person is an **employee** or an
**independent contractor**. As a guide, see <u>Contractor or Employee</u> to see 20
factors provided by the <u>Internal Revenue Service</u> to assist employers in making
this interpretation.

EMPLOYEE ORGANIZATION NYS Taylor Law):

means an organization of any kind having as its primary purpose the improvement
of terms and conditions of employment of public employees.

EMPLOYEE POLYGRAPH PROTECTION ACT OF 1988 (Federal):

for information, go to: <u>EPPA Employee Polygraph Protection Act</u>

EMPLOYMENT PARITY:

when the proportion of <u>affirmative action groups</u> in the external labor market is
equivalent to their proportion in the company work force without reference to
classification.

EMPLOYMENT PROCESS:

under Title VII, the employment process includes recruitment, application flow, hiring, job placement, compensation, promotion, transfer, termination, shift assignments, geographical and departmental assignments, and all other such activities.

EMPLOYEE RETIREMENT INCOME SECURITY ACT (Federal) (ERISA):

Employee Retirement Income Security Act of 1974. Does not apply directly to SUNY or public, as opposed to private, employers For more information, go to: ERISA

EMPLOYEES' RETIREMENT SYSTEM (NYS):

a defined benefit retirement program for NYS and NYS municipal employees. For more information go to: Employees' Retirement System

EPPA (Federal): (See: Employee Polygraph Protection Act).

***ENDORSE***:

support or recommend.

ERS (NYS): See: Employees' Retirement System

EQUAL EMPLOYMENT OPPORTUNITY.

civil rights requirement for all citizens to have equal opportunity for employment.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION (EEOC) (Federal):

federal agency responsible for administration of several statutes which prohibit discrimination; has power to subpoena witnesses, issue guidelines that have the force of law, render decisions, provide technical assistance to employers, provide legal assistance to complainants, etc. For more information go to: U.S. Equal Employment Opportunity Commission

EQUAL PAY ACT OF 1963 (Federal):

makes it unlawful to pay wages to members of one sex at a rate lower than paid to members of the other sex for equal jobs that require equal skill, effort, and responsibility. Jobs must be substantially equal based on job content.

ERISA (Federal): (See Employee Retirement Income Security Act of 1974).

***ESTABLISH***:

bring into existence.

***ESTIMATE***:

forecast future requirements or happenings.

ETHICS (NYS)

usually a reference to New York State Ethics Commission which was established by the Public Officers' Law. Go to: NYS Ethics Commission for more information.

ETHNIC CATEGORIES (Federal):

- **American Indian or Alaskan Native**; a person having origins in any of the original peoples of North America who maintains cultural identification through tribal affiliation or community recognition;
- **Asian or Pacific Islander** a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Sub-continent, or the Pacific Islands;
- **Black** a person, not of Hispanic origin, having origins in any of the black racial groups of Africa;
- **Hispanic** a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race; or
- **White** a person, not of Hispanic origin, having origins in any of the original peoples of Europe, North Africa, or the Middle East.

***EVALUATE***:

determine or fix the value of. See Performance Evaluation for information about employee evaluations.

***EXECUTE***:
> put into effect or carry out.

EXECUTIVE ORDER 6:
> The New York State executive order giving the New York State Civil Service Commission President responsibility to enforce the State's policy of insuring full and equal employment opportunities for minorities, women, the disabled and Vietnam-era veterans. State agencies are required to submit written affirmative action plans to the President.

EXECUTIVE ORDER 68:
> New York State executive order which authorized and encourages State agencies to establish alternate work schedules (i.e., flextime, 4 day workweek, etc.). Procedural guidelines for submitting alternative work schedule proposals are contained in Budget Bulletin G-1008, 5/1/78.

EXECUTIVE ORDER 11246 (Federal):
> requires affirmative action by government contractors. For more information go to: Executive Order 11246

EXEMPT CLASS (NYS CLS):
> the following offices and positions shall be in the exempt class: (a) one secretary of each state department or division, temporary state commission or other state office; authorized by law to appoint a secretary; (b) the deputies of principal executive officers; (c) one secretary of each municipal board or commission; (d) one clerk and one deputy clerk if authorized by law, of each court; (e) all other subordinate offices or positions for the filling of which competitive or non-competitive examination may be found to be not practicable. (No office of position shall be deemed to be in the exempt class unless it is specifically named in such class in the civil service rules).

EXEMPT EMPLOYEES (Federal):
> employees in jobs that are purely management, administrative, or professional that perform without close supervision and consequently, they are exempt from coverage under the Fair Labor Standards Act. Rules regarding overtime and wages do not apply.

***EXERCISE***:
> to put into action, practice, or use; to make use of privileges or powers; to exert.

***EXPEDITE***:
> accelerate the process or progress of.

EXPERT WITNESS:
> an individual qualified by credentials to give opinion testimony. Although this term has to be limited to a specific application, generally, in test validation at least, a master's degree in psychology and experience in the field is required.

EXTERNAL LABOR AREA:
> the geographic area from which an employer may reasonably be expected to recruit new workers. In a compliance sense, this total labor market has sub-markets within it, comprised of persons with the requisite skills, experience, etc. to fill given jobs.

EXTERNAL LABOR MARKET:
> the civilian work force within an external labor area.

EXTRA LONGEVITY RATE (NYS Class & Comp):
> salary resulting from the addition of two extra increments provided to employees who have rendered continuous and satisfactory service for ten years after having attained the normal maximum pay of their salary grade.

EXTRA SERVICE (NYS Payroll):
> work performed by an employee in a payroll agency other than the payroll agency to which the employee is assigned regularly. See:

- <u>Extra Service Policies</u> for more information, and/or
- <u>SUNY Brockport Extra Service Procedures</u>.

FACT-FINDING:
> a formalized procedure in which a third party examines the cause and status of a dispute through oral and/or written presentation.

FACTOR COMPARISON:
> a method of evaluating jobs on a systematic basis by comparing key jobs with each other on a pre-determined number of factors so that each key job is ranked in its relative order of importance on each factor. Factor values are determined by apportioning the current rate being paid for the job among the various factors. Ratings for all other jobs are determined by comparison with the key jobs on each factor; the sum of the factor values awarded is the job rate.

FACTOR POINT:
> a quantitative method of evaluating jobs or groupings of jobs on a systematic basis using a pre-determined number of factors which are divided into a number of defined levels or degrees, each of which is assigned a value expressed in points. The sum of all the points awarded to the job determines its relative value among the others being evaluated.

FAIR LABOR STANDARDS ACT of 1938 (Federal):
> law enacted to establish a minimum wage, to limit work hours, and to discourage oppressive child labor. Referred to as the Wage Hour Act because it ensures fair treatment of employees with respect to wages and hours. Act defines exempt and nonexempt employees. For more information go to:

- <u>Fair Labor Standards Act Handbook</u> or
- <u>Fair Labor Standards Act Regulations</u>

FAMILY MEDICAL LEAVE ACT (Federal)
> Family Medical Leave Act. For more information, go to:

- <u>Family Medical Leave Act Handbook (FMLA)</u> OR
- <u>Family Medical Leave Act Regulations</u>

FINANCIAL EXIGENCY:
> an imminent financial crisis which threatens the survival of the institution as a whole and which cannot be alleviated by less drastic means than layoffs.

FINDINGS OF FACT:
> decision of a judge, jury, hearing officer, or hearing body on issues of fact in a dispute.

FLEXIBLE COMPENSATION/BENEFIT SYSTEM:
> one in which each employee has a choice in the form of all or a portion of his/ her compensation package.

FLEXIBILITY LEGISLATION:
> Refers to a 1986 act of the NYS Legislature which granted SUNY statutory authority, primarily fiscal, to exercise greater independence than other State agencies.

FLEXTIME:
> allows employees to follow different schedules of work each day of the workweek.

FLSA (Federal): <u>(See: Fair Labor Standards Act</u>

FMLA (Federal): <u>(See: Family Medical Leave Act).</u>

***FORMULATE***:
>  develop or devise.

FREEDOM OF INFORMATION ACT (Federal):
>  establishes that any person has the right to request access to federal agency
>  records or information. For more information go to: <u>Freedom of Information</u>

FTE:
>  Full Time Equivalent. An accounting term used to equate an employee or the total
>  number of employees to a full time equivalent. For example, a part time employee
>  who works one half of the time required of a full time employee would be counted
>  as 1/2 FTE. (The total number of employees, headcount, will always be more than
>  the total FTE if there are part time employees in the workforce).

FUNCTION:
>  work than can be distinguished from other work. The kind of action or activity
>  proper to a person, employee, organizational unit, or institution. The primary
>  purpose of a position within an organization.

***FURNISH***:
>  provide with what is needed; supply.

GED: <u>(See: General Education Diploma)</u>.

GENERAL EDUCATION DIPLOMA:
>  General Educational Diploma - the GED is the high school equivalency certificate,
>  generally recognized as equal to a high school diploma for all practical purposes.

GENERAL INCREASE (NYS Class & Comp):
>  a salary adjustment which requires the permanent or temporary revision of the
>  salary schedule specified in Section 130 of the Civil Service Law, which governs
>  the pay of most employees. Such an increase may be granted only by action of
>  the Legislature with the approval of the Governor. Generally, a similar adjustment
>  is provided for those employees compensated under other schedules or by some
>  other method.

GEOGRAPHIC DIFFERENTIAL (NYS Payroll):
>  additional compensation over an employee's basic annual salary which may be
>  authorized by the Director of Classification and Compensation subject to approval
>  by the Director of the Budget. The pay differential may be prescribed for those
>  employees in the same or related occupations who are employed in a particular
>  geographic area or location.

GEOGRAPHIC FULL-TIME FACULTY MEMBER (SUNY):
>  a person serving on the faculty of a medical center who is not employed on a full-
>  time basis for the purpose of fixing compensation payable by the State but all of
>  whose professional services and activities are conducted at the medical center or
>  its affiliated hospitals and are available to the State on a full-time basis for clinical
>  and instructional purposes.

GOALS:
>  good faith quantitative objectives an employer voluntarily sets as the minimum
>  progress that can be achieved within a certain time period through all-out efforts at
>  outreach recruitment, validating selection criteria, creation of trainee positions,
>  career ladders, etc. Setting goals and objectives are considered proper and legal
>  responses to underutilization of minority groups by the various federal agencies.

GOER (NYS): (See: <u>Governor's Office of Employee Relations)</u>.

GOOD CAUSE:
>  substantial or legally sufficient reason for doing something.

GOOD FAITH:
>  having no intention to seek an unfair advantage or to defraud another party;
>  making an honest and sincere effort to fulfill obligations.

GOVERNOR'S OFFICE OF EMPLOYEE RELATIONS:
> responsible for negotiating State-wide labor agreements and seeing that they are
> properly administered. Click here: GOER for more information.

GROUP OF CLASSES (NYS Class & Comp):
> two or more closely related classes having a common basis of duties,
> responsibilities, and qualification requirements but differing in some particular,
> such as the nature of specialization, which is essential from the standpoint of
> recruitment and selection and requires that each class in the group be treated
> individually. Such classes have the same basic title but are distinguished by a
> parenthetic

HARD-CORE UNEMPLOYED:
> those without jobs whose lack of useful job skills results in extended periods
> without employment.

HEALTH INSURANCE (NYS):
> See: Health Insurance (NYSHIP)

HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 (Federal):
> a law that protects people from loss of health insurance. For more information go
> to: Health Insurance Portability.

HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996
(HIPAA)(Federal):
> created changes to COBRA. For more information go to: HIPAA.

HIGHER MINIMUM (NYS Class & Comp):
> a salary step above the normal minimum of a salary range, authorized by the
> Director of Classification and Compensation, used temporarily to recruit personnel
> in specific instances where the Director has determined that it is impracticable to
> recruit at the minimum salary.

HIPAA (Federal): (See: Health Insurance Portability and Accountability Act.

HIRING RATE STUDY (NYS Class & Comp):
> an annual study of hiring rates paid for selected beginning level positions by large
> manufacturing and non-manufacturing employers throughout New York State. Has
> been conducted among the same employers each year since 1951 as one basis
> for comparison of New York State rates with those paid elsewhere.

HOLIDAY PAY (NYS PAYROLL):
> additional compensation for time worked by an employee during regularly
> scheduled hours on a date observed as a holiday by the State.

HOOK: (See Parenthetic)

I-9 FORM (Federal:
> form required of all appointees to verify their U.S. citizenship, or if they are aliens,
> their eligibility for employment in accordance with the Immigration and
> Naturalization Act of 1986. See: I-9 requirements for more information.

IHRIM (Organization): See: International Association for Human Resources Information
Management.

IMMIGRATION AND NATURALIZATION ACT OF 1986 (Federal):
> for information go to: INA Immigration and Naturalization Act

IMMIGRATION AND NATURALIZATION SERVICE (Federal):
> for information about the INS, go to: Immigration and Naturalization Service.

IMPASSE:
> a point in negotiations where the parties appear to be unable to reach an
> agreement.

**IMPLEMENT**:
> carry out; execute a plan or program.

***IMPROVE***:
> make something better.

INA (Federal): <u>(See: Immigration and Naturalization Act)</u>.

INCENTIVE:
> a part of compensation that recognizes the results of an employee's efforts.
> Reward designed to encourage performance and productivity.

INCIDENCE RATE:
> a measurement of the degree to which a specific protected class is involved in any
> of the various steps of the employment process. If, out of a group of 100 black
> males, twenty-five are promoted, the incidence rate is 25 percent. As a measure of
> compliance, the incidence rate is compared with the degree to which the specific
> protected class is represented in the external labor market.

INCONVENIENCE PAY (NYS PAYROLL):
> additional compensation over an employee's basic annual salary which is
> authorized for employees who are required to work four or more hours between
> 6:00 P.M. and 6:00 A.M. in their regular tour of duty.

INCREASED MINIMUM: <u>(See Higher Minimum)</u>

INCREMENT (NYS Class & Comp):
> an established salary increase between steps of a given salary grade, marking a
> steady progression from the minimum of the grade to the maximum.

INFORMATION:
> data (facts and figures), organized so that they are useful to the manager.

***INITIATE***:
> start or introduce.

INJUNCTION:
> may either require that a certain practice be stopped or that something be done in
> the future; orders other actions, such as relief, to affected class members.

***INSPECT***:
> critically examine for suitability.

INS (Federal): <u>(See: Immigration and Naturalization Service)</u>.

INSTITUTIONAL SERVICES UNIT (ISU) (NYS Taylor Law):
> a <u>negotiation unit</u> in NY State service composed mostly of those classified service
> employees responsible for providing therapeutic and custodial care in the State's
> institutions, currently represented by the Civil Service Employees' Association, Inc.
> (CSEA). See related information at:
>
> - <u>ISU NU Information</u> or
> - <u>CSEA Statutory Salary Chart</u>

INSUBORDINATION:
> the intentional and willful refusal to accept the valid authority of a supervisor ... the
> refusal to act on a direct order.

INTERNAL CONTROLS:
> for a definition of internal controls and a review of some of the policies and
> procedures that make up SUNY's internal control system go to: <u>Internal Controls</u>

INTERNAL REVENUE SERVICE (IRS)(Federal):
> agency of the federal government that is responsible for the administration of tax
> statutes and the collection of taxes. For more information, go to: <u>Internal Revenue
> Service</u>

INTEREST ARBITRATION(NYS Taylor Law):
> involves use of an arbitrator to resolve an impasse in contract negotiations.

INTERNATIONAL ASSOCIATION OF HUMAN RESOURCE INFORMATION
MANAGEMENT (IHRIM):

an association of professionals involved in managing human resource information. For more information go to: International Association of HRIM.

INTERNATIONAL PERSONNEL MANAGEMENT ASSOCIATION (IPMA):

a professional organization. For more information go to: International Personnel Management Association.

**INTERPRET**:

explain something to others.

INTERROGATORIES:

written questions drawn up and served on an opposing party with a prescribed time period to answer. The party must then serve answers to the questions under oath. Sometimes used in the deposition procedure.

**INVESTIGATE**:

study through close examination or systematic inquiry.

IPMA (Organization): (See: International Personnel Management Association).

IRS (Federal): If you really don't know, go to: Internal Revenue Service.

**ISSUE**:

put forth or distribute officially.

ISU (NYS Taylor Law): (See Institutional Services Unit).

ITEM NUMBER (NYS Budget): (See: Line Item Number)

JOB:

one or more positions within an organization. A job constitutes the smallest unit of the organizational structure into which the activities of the enterprise can be divided.

JOB AUDIT: (See Desk Audit)

JOB DESCRIPTION:

a written summary of tasks, duties, and responsibilities of a job.

JOB DESIGN:

consideration of the content, functions, and relationships of jobs directed toward the accomplishment of organizational purposes and satisfaction of the personal needs of individual job holders.

JOB ENLARGEMENT:

increases the tasks performed and tries to eliminate boredom.

JOB ENRICHMENT:

program designed to increase worker satisfaction derived from the work itself.

JOB EVALUATION:

the systematic determination of the relative worth of jobs within the organization, which results in a pay system within the organization.

JOB SHARING:

dividing full time jobs into two or more positions often without particular regard for how the full time job is divided.

JOB SPECIFICATION:

the minimum skills, education, and experience necessary for an individual to perform a job.

JOB SPLITTING:

dividing the tasks of a single job into two entirely separate part time positions.

JOB SUMMARY:

one to three statements which describe the essence of the job.

JURISDICTIONAL CLASSIFICATION (NYS CSL):

means the assignment of positions in the classified service to the competitive, non-competitive, exempt, or labor classes.

JURY TRIAL:

more formal than a bench trial; a jury hears the case.

KEY RESULT AREA:

a distinct and important function in the operation of an organization.

LABOR CLASS (NYS CSL):

the labor class shall comprise all unskilled laborers in the service of the state and each of its civil divisions except those whose positions can be examined for competitively.

LAYOFF:

a layoff separates surplus employees from the payroll.

LEAVE DONATION PROGRAM (NYS):

See: Leave Donation Program

LINE AUTHORITY:

empowers the supervisor with the right to command subordinates.

LINE FUNCTION:

any function that is vital and contributes directly toward the accomplishment of the major organizational objective.

LINE ITEM NUMBER (NYS PAYROLL):

the unique number assigned to a position to identify it for payroll, accounting, and budget certificate purposes.

LITIGATION:

a judicial controversy; lawsuits.

LOCATION PAY (NYS PAYROLL):

additional compensation granted to an employee whose principal place of employment or official station is located in the city of New York or in the county of Rockland, Westchester, Nassau, Suffolk or Monroe.

LONGEVITY RATE (NYS Class & Comp):

salary resulting from the addition of one extra increment provided to employees who have rendered continuous and satisfactory service for five years after having attained the normal maximum pay of their salary grade.

LOST TIME (NYS PAYROLL):

employee absence not covered by allowable leave credits results in a lost-time pay deduction.

***MAINTAIN***:

keep in an existing/current state.

MAKING WHOLE:

award of back pay employees would have received but for the effects of unlawful practice.

MANAGEMENT:

accomplishing the objectives of the organization through assigned resources.

MANAGEMENT/CONFIDENTIAL (NYS TAYLOR LAW):

persons designated by PERB as managerial or confidential are excluded from coverage of the Taylor Law. Such persons are not eligible to be represented by an employee organization for the purpose of collective negotiations. They cannot belong to or hold office in an employee organization that represents or seeks to represent public employees employed by the public employer. Criteria for designation as **managerial** are:

a. formulates policy;
b. may reasonably be required on behalf of the employer to assist directly in preparation for and conduct of collective negotiations; and

    c.  has a major role in administration of agreements or in personnel administration not routine or clerical and requiring exercise of independent judgment. See related information at:
- o  <u>Management NU13 Information</u> or
- o  <u>Non-Statutory Management NU13 Salary Chart (SUNY Unclassifed)</u>

**Confidential** employees assist or act in confidential capacity to managerial persons who have a labor relations responsibility. See related information at:

- <u>Confidential NU06 Information</u> or
- <u>Confidential NU06 Salary Chart (State Classified)</u>

MANAGER:

proactive, rather than reactive, people who are responsible for planning and controlling.

MANDAMUS:

an order issued by a court to a private or municipal corporation; an executive, judicial, or administrative officer; or to an inferior court commanding the performance of a particular act with the responsibility of the latter party.

M/C: <u>(See Management/Confidential)</u>

MEDIATION:

the intercession of a neutral into a dispute for the purpose of aiding the parties to come to an agreement. The mediator serves as a catalyst, as well as a liaison between the parties, to stimulate both sides toward settlement.

MEDICARE (Federal):

medicare provides health insurance to people age 65 and over and those who have permanent kidney failure and certain people with disabilities. For more information go to: <u>Medicare</u>.

MENTAL HEALTH PARITY ACT OF 1996 (Federal):

a new law that creates new demands on HMOs and other health insurance programs that include mental health benefits. For more information go to: <u>Mental Health Parity Act</u>.

MERIT:

determined by job performance and employee potential for development.

MERIT SYSTEM:

a system which attempts to match people with jobs based upon the merit, qualifications, and fitness of the people to perform the tasks, duties, responsibilities, and functions of the organization. To the extent possible, merit and fitness are determined by competitive examination.

MINIMUM QUALIFICATIONS (NYS Class & Comp):

education, training, and/or experience requirements denoting the minimum standards that all candidates are required to possess to give reasonable assurance that they can perform satisfactorily.

MINIMUM WAGE (Federal):

the minimum hourly rate an employee may be paid for employment in the United States by federal statute. For more information go to: <u>Minimum Wage;</u> also, for more history of the minimum wage <u>click here.</u>

***MONITOR***:

watch, observe, or check for a specific purpose.

NACUBO (Organization): <u>(See National Association of College and University Business Officers)</u>.

NATIONAL ASSOCIATION OF COLLEGE AND UNIVERSITY BUSINESS OFFICERS
(NACUBO):

> a professional organization of college/university business officers. For more
> information go to: National Association of College and University Business
> Officers.

NATIONAL COMMITTEE FOR QUALITY ASSURANCE (NCQA):

> a professional organization that evaluates and accredits managed care plans
> including HMOs. For more information or to check the rating for a particular
> managed care plan go to: National Committee for Quality Assurance.

NCQA (Organization): (See National Committee for Quality Assurance).

***NEGOTIATE***:

> confer with others with an eye to reaching agreement.

NEGOTIATING UNIT (NYS Taylor Law):

> a negotiating unit is the grouping of employees for the purpose of collective
> negotiations. When it is agreed or determined which employees shall make up a
> unit, the employees then select the employee organization they want to represent
> them in negotiations. In New York State the groupings are usually determined by,
> the Public Employees' Relations Board, on the basis of job class.

NEWBORNS AND MOTHERS' HEALTH PROTECTION ACT OF 1996 (Federal):

> a new law that, among other things, regulates the period of hospital stay for
> newborns and mothers. For more information, go to: Newborns and Mothers
> Health Protection.

NEW YORK STATE:

> links to New York State governmental agencies and departments may be found at:
> New York State.

NON-COMPETITIVE CLASS (NYS CSL):

> the non-competitive class shall include all positions that are not in the exempt or
> the labor class and for which it is found by the commission having jurisdiction to be
> not practicable to ascertain the merit and fitness of applicants by competitive
> examination.

NON-CONTRIBUTORY PENSION PLAN:

> pension plan financed entirely by employer.

NON-STATUTORY OR NS (NYS Class & Comp):

> designates a position, the salary of which is not fixed by statute but is established
> by the Director of the Division of Budget.

NOTICE REQUIREMENTS (SUNY):

> professional staff appointed to term appointments in SUNY have to be given
> appropriate advance notice if their term appointments are not going to be
> renewed. For specific policy requirements go to: Notice Requirements.

***NOTIFY***:

> make known to.

NS: (See Non-statutory)

---

OBJECTIVES:

> similar to goals, a good faith effort to meet numerical goals through modifications
> in employment procedures and practice. Goals and objectives are set after careful
> external and internal labor analysis.

OCCUPATIONAL SAFETY AND HEALTH ACT (Federal):

> a federal act that sets and regulates health and safety standards for the work
> place. For more information go to:

> - OSHA Summary or go to
> - OSHA Home Page

OCCUPATIONAL PARITY:

> when the proportion of affirmative action group employees in all occupational levels is equivalent to their respective availability in the qualified external labor market. Eventually, with the goal of equal educational and training opportunities, employment parity and occupational parity may be equal.

OCCUPATIONAL SURVEY (NYS Class & Comp):

> a study of all positions in a given class, series of classes, or occupational group in whatever departments or agencies they may be located.

OFCC (Federal):

> Office of Federal Contract Compliance - has set guidelines for all federal contractors with respect to nondiscrimination and affirmative action. For more information go to: Office of Federal Contract Compliance Programs (OFCCP)

Office of the State Comptroller (OSC):

> The Office of the State Comptroller in New York State is responsible for the audit and control function, for payroll auditing, for legal opinions, and for managing the NYS defined benefit retirement programs. For more information, go to: Office of the State Comptroller

"OFFICE" TITLE (NYS Class & Comp):

> a title which differs from the classified title assigned to a job and which is used to describe a particular position for other than payroll, budget, or official civil service purposes. For example, a Head Clerk position might have an "office" title of Office Supervisor.

OJT:

> on-the -job-training is job instruction given by an employee's supervisor or experienced employee. After being shown how to do the tasks and duties, the employee works closely with the trainer until the job is performed at an expected level of performance.

OPEN-COMPETITIVE LIST (NYS CSL):

> a certified list of appointment eligibles containing the names of candidates who passed an open competitive examination for a title ranked by examination scores. **Transfer lists, preferred lists, reemployment rosters, and promotional lists, if any, take precedence.** (See Eligible List).

***OPERATE***:

> perform an activity or series of activities.

OPERATIONAL SERVICES UNIT (NYS Taylor Law):

> a negotiating unit in NYS service composed of craft workers, maintenance and repair personnel and machine operators, currently represented by the Civil Service Employees' Association, Inc., (CSEA). See related information at:

> - OSU NU Information or
> - CSEA Statutory Salary Chart

ORGANIZATION:

> a structural framework which establishes the basis for determining the responsibility, authority, and relationships of the members of the enterprise. (how the resources are arranged to meet objectives). Organizational design should address function, coordination, authority, responsibility, and accountability.

OSC (State): (See: Office of the State Comptroller).

OSHA (Federal): (See: Occupational Safety and Health Act).

OSU (NYS Taylor Law): (See Operational Services Unit)

OTHER STATUTE (OS) (NYS Class & Comp):

> designates a position, the salary of which is established by a statute other than the Civil Service Law.

OUT-OF-TITLE WORK (NYS Class & Comp):
>duties performed by an incumbent of a position which are not appropriate to the class to which the position has been assigned.

OVERTIME SERVICE (NYS PAYROLL):
>shall mean hours worked in excess of The required 40 or 37 1/2 hours in the basic workweek as the case may be. Overtime in excess of 40 hours must be paid at a time and one-half rate. Employees whose basic workweek is 37 1/2 hours accrue compensatory time for hours worked in excess of 37 1/2 hours but not in excess of 40 hours in a basic workweek.

PARENTHETIC (NYS Class & Comp):
>a descriptive designation in parentheses following a common base title, to distinguish a specialty within a given field, as Senior Personnel Technician (Classification), Senior Personnel Technician (Examinations), etc. Sometimes referred to as a "HOOK" placed after a base title.

PARITY:
>the long-term goal of affirmative action, reached when employment and occupational parity are identical.

***PARTICIPATE***:
>take part in.

PARTICIPATION RATE:
>(1) the percentage of incumbents of a job title, class, department, or organizational unit (including the whole organization) who belong to a given protected class; and (2) the percentage of individuals involved in an employee process transaction (for example, application for employment, hiring, placement, promotion, separation) who belong to a given protected class.

PAY:
>the monetary compensation paid an employee for services. May be wages or salary.

PAY EQUITY or SALARY EQUITY (Federal)
>concept that pay (wages/salary) should be "equal" for jobs having "equal" job content. (See Equal Pay Act of 1963).

PAYROLL DEDUCTION:
>an after-tax deduction from an employee's pay check for payment of taxes, insurance premiums, unions dues, health insurance premiums, etc. To see the current deductions or locate deduction codes for deductions currently authorized on the New York State payroll system go to: NYS Deduction Codes.

PERB (NYS Taylor Law): (See: Public Employment Relations Board).

PENSION AND WELFARE BENEFITS ADMINISTRATION (Federal):
>a federal administrative agency with responsibility for administering pension and welfare benefit laws. Information on changes in Health Care Law and other information on pensions and benefits can be found at: Pension and Welfare Benefits.

***PERFORM***:
>fulfill or carry out some action.

PERFORMANCE APPRAISAL: (see PERFORMANCE EVALUATION).

PERFORMANCE EVALUATION:
>a method of evaluating the behavior of employees in the workplace, normally including both the quantitative and qualitative aspects of job performance. For more information about evaluation go to:

>- Evaluation Procedures or
>- Evaluation Calendar.

PERMANENT APPOINTMENT (NYS CSL):

an appointment to an unencumbered NYS CSL) position of a candidate who has met all of the merit and fitness requirements for such appointment, including passing the necessary competitive examination and being reachable for appointment from an eligible list, if necessary. An appointment other than a Contingent Permanent, Temporary, or Provisional appointment. After completion of a probationary term a permanent appointment continues until retirement, layoff, termination for incompetence or misconduct, resignation, or death.

PERMANENT APPOINTMENT (SUNY):

an appointment of a professional employee in a professional title, except those titles listed in Appendix A of the SUNY Policies of the Board of Trustees, which shall continue until a change in such title, resignation, retirement, or termination. (See: Tenure).

PER SE:

a violation for which there is no defense.

PERSONAL RESPONSIBILITY AND WORK OPPORTUNITY RECONCILIATION ACT OF 1996 (Federal):

among mandates, requires States to report all new hires to the Federal Parent Locator Service by 10/1/97. States must conduct data matches between the case registry and new hire directory by 5/1/98. Employers must report new hires within 20 days after the hire or first pay. Employers have the option of using the W-4 form or an equivalent to report to the State. For more information see: Welfare Reform

PERSONNEL MANAGEMENT (NYS Pers Manual):

there are many definitions of personnel management, but all basically say that it is: attracting and developing competent employees and creating the organizational conditions which result in their full utilization and encourages them to put forth their best efforts.

PERT:

simultaneous scheduling technique resulting in time graph. Project Evaluation Review Technique.

PLACE:

locate and choose positions for.

PLAINTIFF:

the person who initiates litigation.

PLANNING:

the process of deciding what objectives to pursue during a future time period and what to do to achieve those objectives. (object statement, activities, resources, schedule).

POINT FACTOR: (See Factor Point)

POLICIES:

guides to management thinking which help management achieve the organizations objectives. For a link to SUNY Policies go to: Internal Control

POLITICAL PATRONAGE:

appointment of public employees by the political party in power on the basis of political party loyalty and service rather than the candidates qualifications. (See Spoils System).

POSITION (NYS Class & Comp):

an assigned group of duties and responsibilities, temporary or permanent, requiring the full-time or part-time employment of one person. It may be occupied or vacant.

POSITION CLASSIFICATION (NYS CSL):

a grouping together, under common and descriptive titles, of positions that are substantially similar in the essential character and scope of their duties and responsibilities and in the qualification requirements therefor, OR the act of writing a job description and processing the paper work necessary to classify a position.

POSITION RANKING:

a method of comparing jobs on a "whole job" basis for the purpose of ranking such jobs in a hierarchy from highest to lowest. Usually the basis for ranking is unspecified but frequently includes consideration of organizational level of the position, perceived importance of the position to the organizations mission, personal status of the incumbent, etc.

PR-50 DOWNGRADE (NYS PAYROLL):

a transaction required by the NYS Department of Audit and Control when an appointee is appointed to a lesser title, rank, or class than the title, rank, or class of the budgeted position to which the appointment is being made.

***PRACTICE***:

perform work repeatedly to gain proficiency. Also, the habitual, normal, or customary performance, operating procedure, or method.

PREFERRED LIST (NYS CSL):

a certified list of employees laid off from a title ranked by their seniority date. Preferred list candidates have absolute preference for positions based upon the "rule of one". Appointing officers must either reinstate the number one eligible willing to accept appointment or leave the position vacant. (see Eligible List).

PREMIUM OVERTIME PAY:

additional compensation over an employee's basic annual salary which may be authorized by the Director of the Budget for employees who are required to work beyond a normal work week, but who are ineligible to accrue overtime credits. PREPARE: make ready for a particular purpose.

PRIMA FACIE:

violation where evidence is shown that an employment practice has an adverse impact affecting an individual as a member of a similarly affected class covered by Title VII. It shifts the burden to the defendant. The elements necessary to support the claim have been presented and unless evidence can be presented to rebut the previous arguments, the claim will be supported. In the EEO area, statistics of underutilization can be sufficient to make a prima facie case for discrimination. It is then the responsibility of the employer to justify those statistics through "business necessity", or BFOQs, etc.

PRIVACY ACT (Federal):

establishes rules for records maintenance and disclosure. For more information go to: Privacy Act

PROBABLE CAUSE:

reasonable on the basis of the evidence but not certain or proved. Before initiating court action, the EEOC makes a determination of no cause, probable cause, or cause. In incidents of probable cause, pretrial negotiations and conciliation generally resolve the issue before the case can get to court.

PROBATIONARY TERM (NYS CSL):

every permanent appointment from an open competitive list and every original permanent appointment to the noncompetitive, exempt, or labor class shall be subject to a probationary period of not less than 26 weeks. If the probationer's service is less than satisfactory, employment may be terminated any time after the completion of eight weeks.

PROCEDURES:

serve to implement policies by prescribing the course of action to be taken in the administration of the policies. PROCEED: begin to carry out an action. For a link to the SUNY Procedures Manual go to: Internal Controls.

***PROCESS***:

subject something to special treatment; handle in accordance with prescribed procedure.

PROFESSIONAL EMPLOYEE (SUNY):

an employee in the Professional Services Negotiating Unit, other than an employee with academic rank or qualified academic rank.

PROFESSIONAL OBLIGATION (SUNY):

the professional obligation of an employee consistent with his or her academic rank or professional title, shall include teaching, research, University service, and other duties and responsibilities required of him or her during the term of the professional obligation. Except for part-time or temporary employment where the obligation may be less, the term of professional obligation will be calendar year, or academic year, or college year.

PROFESSIONAL, SCIENTIFIC AND TECHNICAL SERVICES UNIT (PS&T) (NYS Taylor Law):

a negotiating unit in NYS service composed primarily of professional classified service personnel, often with professional experience or a college degree prerequisite; currently represented by the Public Employee Federation (PEF). See related information at:

- PS&T NU Information or
- PEF Statutory Salary Chart

PROFESSIONAL SERVICES UNIT (PSU) (NYS Taylor Law):

a negotiating unit in NYS service composed primarily of academic employees and professional employees of the State University of New York, **currently represented by United University Professions, Inc., (UUP)**. See related information at:

- PSU NU Information or
  - o   Faculty Non-Statutory Salary Chart
  - o   Librarian Non-Statutory Salary Chart
  - o   Professional Employee Non-Statutory Salary Chart

PROFESSIONAL STAFF:

all persons occupying positions designated by the Chancellor as being in the unclassified service.

PROFESSIONAL TITLE (SUNY):

the title of a position in the Professional Services Negotiating Unit, other than a position of academic or qualified academic rank, as shown on the budget certificate for the position on file with the State Director of the Budget.

PROMOTE:

advance to a higher level or position generally resulting in increasing demands in terms of skills, abilities, and responsibilities; also to support or try to sell as in an idea.

PROMOTIONAL LIST (NYS CSL):

a certified list of appointment eligibles containing the names of candidates who successfully passed a promotional examination for a title ranked by examination

scores. Promotional lists take precedence over open-competitive lists but are subordinate to preferred lists. (see Eligible List).

***PROPOSE***:

declare a plan or intention.

PROTECTED CLASS:

legally identified groups (by race, color, sex, and national origin) that are specifically protected by statute against employment discrimination.

***PROVIDE***:

supply what is needed.

PROVISIONAL APPOINTMENT (NYS CLS):

a stopgap appointment to an unencumbered permanent position which may be made when no appropriate eligible list of at least three persons willing to accept appointment is available to fill a vacancy in the <u>competitive class</u>.

PS&T (NYS Taylor Law): <u>(See: Professional, Scientific and Technical Services Unit:)</u>

PSU (NYS Taylor Law): <u>(See Professional Services Unit)</u>

PUBLIC EMPLOYMENT RELATIONS BOARD-PERB (NYS Taylor Law):

a board created under the Taylor Law (NYS Public Employees' Fair Employment Act, Article 14 of the New York State Civil Service Law, Sections 200 et seq.) to serve as an independent neutral agency to administer the law. Go to: <u>PERB</u> to visit its website.

QUALIFIED ACADEMIC RANK (SUNY):

rank held by those members of the academic staff having titles of lecturer, or titles of academic rank preceded by the designations "clinical", or "visiting" or other similar designations. Service in qualified academic rank does not count in meeting the service requirements for tenure.

QUALITY CIRCLES:

groups of 8-10 employees who are called together to work on common problems in the work place.

QUALS: <u>(See Minimum Qualifications)</u>

QUOTAS:

fixed hiring and promotion rates based on race, sex, etc., which must be met at all costs and do not take into account or consideration the availability, education, or training of the external labor market of protected class members, or the employer's internal labor situation with respect to projected work force requirements. Quotas are considered to be last resort measures available only for the courts to impose when good faith efforts do not exist.

QWL:

Quality of Working Life refers to the extent to which employee's personal needs and values are met through their work.

RANK IN PERSON:

the method of establishing pay primarily on the basis of an employee's qualifications with less consideration, or none, given to the actual duties and responsibilities performed by the employee.

REACHABLE:

a person ranking by test score among the top three on an eligible list who are willing and able to accept appointment to a position in the competitive class. (see RULE OF THREE).

REALLOCATE(NYS Class & Comp):

to change the existing allocation of a class to a different salary grade in the schedule.

REASSIGNMENT (NYS CSL):

the change, without further examination, of a permanent employee from one
position to a position in the same title under the jurisdiction of the same appointing
authority.

REBUTTAL:

an answer to an argument, a primie facie case, or a presumption.

RECALL (NYS PAYROLL):

an employee eligible to earn overtime compensation who is recalled to work
overtime, after having completed his/ her scheduled work period and left the
scheduled work station, is considered to have worked a minimum of one-half day
for the purpose of computing overtime compensation. An employee working a 40
hour week is credited with 4 hours; and employee working a 37 1/2 hour week,
with 3 3/4 hours.

RECLASSIFY (NYS Class & Comp):

to reassign a position to a different class based upon a reexamination of the duties
and responsibilities of the position.

RECOGNITION (NYS TAYLOR LAW):

a public employer may voluntarily recognize an employee organization as
negotiating agent.

***RECOMMEND***:

advise or counsel a course of action; offer or suggest for adoption.

RECRUITMENT:

the process of acquiring a pool of applicants who are available and qualified to fill
positions in the organization.

RED CIRCLED EMPLOYEES:

the term red circled is used to identify employees who are currently being paid
more than the maximum of their pay grade due to longevity or specialized skills
possessed by the individual.

RELEVANT LABOR POOL:

the total number of incumbent employees who are in a position for a specific
promotion, or all candidates who could conceivably be considered for a promotion.

REMAND:

to send back. For example, if a court of appeals finds further action is necessary in
a case or if further testimony is needed to decide the case, it will remand the case
to the lower court.

REPORT:

give an account of; furnish information or data.

***REPRESENT***:

act in place of or for.

***RESEARCH***:

inquire into a specific matter from several sources.

RESOURCES:

capital, materials, equipment, people.

RESPONDANT:

that person against whom an administrative charge of discrimination is filed.

RESPONSIBILITY:

what must be done with delegated authority. A recruiter with authority to hire is
responsible for keeping department adequately staffed. (see Organization).

RESUME':

a brief statement of the personal, educational, and professional qualifications and
experience of a candidate for a position.

RETRENCHMENT (SUNY):

termination of the employment of any academic or professional employee during
any appointment other than a temporary appointment as a result of financial

exigency, reallocation of resources, reorganization, or curtailment of programs or functions. (see LAYOFFS).

***REVIEW***:

examine or reexamine.

***REVISE***:

rework in order to correct or improve.

RIF:

Reduction In Force (see LAYOFF)

RULE OF THREE (NYS CSL):

the "rule of three" requires that appointment or promotion to <u>classified service</u> positions in the <u>competitive class</u> from an eligible list must be made by the selection of one of the three highest ranking eligibles willing to accept appointment.

SALARY:

pay which is usually stated as a monthly or annual figure and is monetary compensation for employee contributions without regard to the specific hours required of them to complete their responsibilities.

SALARY SURVEY (NYS Class & Comp):

a study of salaries paid by other employers for work comparable to that of selected classes in New York State Service.

SALARY CHARTS OR TABLES: <u>(See salary charts)</u>

***SCHEDULE***:

plan a timetable.

SCHEDULE OF POSITIONS (SOP) (NYS Budget): <u>(See Certificate of Approval)</u>

SCHEDULED OVERTIME (NYS BUDGET):

overtime which is susceptible to scheduling and approval in advance of need.

SCOPE:

range of duties of a job or how long it takes a worker to complete the total task.

***SECURE***:

gain possession of; make safe.

SECURITY SERVICES UNIT (NYS Taylor Law):

a <u>negotiating unit</u> in NYS service composed of security personnel such as correction officers, campus public safety officers, and institution safety officers, currently represented by Council 82. See related information at:

- <u>SSU NU Information</u> or
- <u>Security Services Statutory Salary Chart</u>

SEC. SUPR. (NYS Taylor Law): <u>(See: Security Supervisors Unit)</u>.

SECURITY SUPERVISORS UNIT (NYS Taylor Law):

a <u>negotiating unit</u> in NYS service composed of supervisors of corrections and safety employees, mostly lieutenants, currently represented by Council 82. See related information at:

- <u>SEC. SUPR. NU Information</u> or
- <u>Security Services Statutory Salary Chart</u>

SELECTION:

process of choosing qualified individuals who are available to fill positions in the organization.

SENIORITY:

refers to an employee's length of continuous service with the State or at a campus; sometimes may also refer to an employee's time in title or rank, or appointment type, or length of service in a position or positions represented by a particular bargaining unit.

SERIES SPECIFICATION (NYS Class & Comp):

a specification describing all classes which are closely related to each other in kind of work, regardless of dissimilarity in location, title, or jurisdictional classification.

SHIFT PAY DIFFERENTIAL (NYS PAYROLL) :

additional compensation over an employee's basic annual salary which may be authorized by the Director of Classification and Compensation subject to approval by the Director of the Budget. The pay differential may be prescribed for those employees on a night shift, four or more hours of which fall between 6:00 P.M. and 6:00 A.M. The authorization is for a particular position and may be within a specific geographical area.

SHRM (Organization): (See: Society for Human Resource Management.

SIGN:

formally approve a document by affixing a signature.

SMSA:

Standard Metropolitan Statistical Area - the area of employee recruitment against which parity and utilization levels are compared. The SMSA may vary depending upon level of job class, availability of applicants, location of work station, etc.

SOCIAL SECURITY (Federal):

a federal retirement and disability income program. For more information go to:

- Current Payroll Tax Rate:
- Current Retiree Earning Limits; or
- Frequently Asked Questions; or
- Social Security Administration Home Page.

SOCIETY FOR HUMAN RESOURCE MANAGEMENT(SHRM):

a professional organizational personnel managers. For more information go to: Society for Human Resource Management.

SOP (NYS Budget):

schedule of positions. (See: Certificate of Approval

SPAN OF CONTROL:

refers to the number of key result areas for which a position is accountable.

SPECIFICATION (NYS Class & Comp):

a written description of a class, covering duties, responsibilities, minimum qualification requirements, and other distinguishing features.

**SPECIFY**:

state precisely in detail or name explicitly.

SPOILS SYSTEM:

a system under which political party loyalty and service were the "tests" for obtaining government jobs.

SS (Federal): (See: Social Security).

SSU (See: Security Services Unit).

STAFF AUTHORITY:

is supportive and may be defined as the right to advise and provide service to other organizational members.

STAFF FUNCTION:

functions that do not contribute directly toward the basic objective but rather do so indirectly by facilitating and assisting in the performance of line work.

STAFFING:
> involves determining future needs, and recruiting, selecting, and training the organization's work force.

STANDARD:
> an established criterion or model against which actual results can be counted.

STANDBY ON-CALL PAY (NYS PAYROLL):
> additional compensation authorized by the Director of the Budget for employees eligible to accrue overtime credits who are required to be available for immediate recall, and who must be prepared to return to duty within a limited period of time.

STATE UNIVERSITY OF NEW YORK (SUNY):
> the State University of New York System. For more information go to: State University of New York.

STIPULATION:
> an agreement between the opposing parties, somewhat akin to a contract, identifying which facts or issues are not disputed. Used as a time-saving device to narrow a case down to essential matters.

STRATEGIC PLAN:
> long term plans.

***SUBMIT***:
> yield or present for the discretion or judgment of others.

SUBPOENA:
> an order of the court commanding individuals (or documents) to appear and give testimony. Derived from the Latin sub (under) and poena (penalty) because failure to appear may be considered contempt of court. A subpoena for documents is known as a duces tecum.

SUMMARY JUDGMENT:
> could be issued by the court at the point where there is no dispute of material facts.

SUNY (Organization): (See: State University of New York).

***SUPERVISE***:
> oversee, direct, inspect or guide the work of others with responsibility for meeting performance standards. See Supervise for additional information.

SYSTEMATIC DISCRIMINATION:
> equal employment opportunity may be denied as the inevitable consequence of some established business practice, persisting over a period of time, rather than of a specific overt action against an aggrieved party. Such a result of the "system" is systemic discrimination and has been the root of most Title VII settlements to date. Inadvertent and usually unintentional, the disparate effect produced by systemic discrimination constitutes a prime area or vulnerability for most businesses.

TACTICAL PLAN:
> short term detailed plan; usually for one year.

TASK:
> a distinct work activity which has an identifiable beginning and end.

TAX DEPARTMENT (NYS)
> Go to: NYS Tax Department

TB SERVICE or TBS (NYS Class & Comp) :
> a parenthetic designation attached to the title of a position the incumbent of which works in close and regular association with patients having active tuberculosis. In recognition of the hazard of infection, such positions receive a salary grade higher than that of other positions classified to the same basic title.

TEACHERS' RETIREMENT SYSTEM (NYS):

a defined benefit retirement program for NYS teachers. For more information go
to: Teachers' Retirement System

TECHNOLOGICAL UNEMPLOYMENT:

loss of jobs through the development of new machines or techniques of work.

TEMPORARY APPOINTMENT (NYS CSL):

an appointment to a position which is established for only a temporary, short
duration, or an appointment to a permanent position which is temporarily vacant.

TEMPORARY APPOINTMENT (SUNY):

an appointment which may be terminated at any time. Temporary appointments
ordinarily shall be given only when service is to be part-time, voluntary, or
anticipated to be for a period of one year or less, or when an employee's initial
appointment is made to a position vacated by a professional employee who is
serving a probationary appointment in another position. A temporary appointment
is also appropriate whenever a position has been vacated by an employee on an
approved leave.

TENURE:

status granted to an employee, usually after completion of a probationary period,
assuring him or her of the permanency of his or her employment.

TERM APPOINTMENT (SUNY):

except as provided in section 6 of Title D of Article XI of the SUNY Policies of the
Board of Trustees, a term appointment shall be an appointment for a specified
period of not more than three years which shall automatically expire at the end of
the period unless terminated earlier because of resignation, retirement, or
termination.

TERMS AND CONDITIONS OF EMPLOYMENT (NYS TAYLOR LAW):

means salaries, wages, hours and other terms and conditions of employment.

THEORY X:

theory that people do not like to work and therefore must be forced to do so.
(Douglas McGregor).

THEORY Y:

theory that people want to be free to accomplish something and do not want to be
strictly controlled.

THEORY Z:

theory that people will work better if they have an opportunity to participate in
decision making in their organizations. (William Ouchi) (see Quality Circles).

TIMETABLES:

consecutive time (usually in affirmative action, a timetable covers one year) during
which the specific quantitative goals and objectives for that period are to be met
and evaluations of progress made before beginning the subsequent timetable with
its own specific goals and objectives.

TITLE (NYS Class & Comp):

the "label" used to officially designate a class. It is descriptive of the work
performed and its relative level.

TITLE I (Federal):

provides criminal penalties for interferences with an individual's employment rights
because of race, color, religion, or ethnic origin.

TITLE STRUCTURE CHANGE (NYS Class & Comp):

reclassification of one or more classes to a new title for the purpose of improving
State title structure, involving no change in duties or responsibilities. The
elimination of a title by substitution of a more appropriate title without any change
in duties or responsibilities of the positions involved.

TITLE VI (Federal):

prohibits discrimination in federally assisted programs. For more information go to: Title VI

TITLE VII (Federal):

Title VII of the Civil Rights Act of 1964 (as amended by the Equal Employment Opportunity Act of 1972). The first legislation to make it an unlawful employment practice to discriminate on the basis of race, color, sex, or national origin. All other federal and state EEO legislation is patterned after and/or supportive of Title VII.

TITLE IX (Federal):

grants authority to the US Attorney General to intervene in Civil Rights cases of general public interest.

TITLE IX EDUCATIONAL AMENDMENTS OF 1972 (Federal):

prohibits sex discrimination in educational programs that receive federal assistance. For more information go to: Title IX (Sex Discrimination)

**TRAIN**:

teach or guide others in order to bring work up to a predetermined standard.

TRAINING:

any process by means of which skill and knowledge are increased to do a particular job.

TRAINING COUNCIL (NYS):

Go to: NYS Training Council

**TRANSCRIBE**:

transfer data from one form of record to another or from one method of preparation to another without changing the nature of the data.

TRANSFER:

a transfer involves an employee's reassignment to a job with similar pay, status, duties, and responsibilities. Whereas a promotion involves upward movement, a transfer entails horizontal movement from one job to another. In New York State, service transfer means the change, without further examination, of a permanent employee from a position under the jurisdiction of one appointing authority to a position under the jurisdiction of another appointing authority or to a position in a different title in the same or a higher salary grade under the jurisdiction of the same appointing authority.

TRS (NYS): See: Teachers' Retirement System

UNCLASSIFIED SERVICE (NYS CLS):

the unclassified service shall comprise of the following:

a. all elective offices;
b. all offices filled by election or appointment by the legislature on joint ballot;
c. all officers and employees of the state legislature, and all officers and employees of any other legislative body whose principal functions and duties are directly related to the performance of the legislative functions of such body;
d. all offices filled by appointment by the governor;
e. the head or heads of any department of the government who vested with authority, direction and control over a department, and who have power and authority to appoint and remove officers and employees therein;
f. all members, officers, and employees of boards of elections;
g. all persons employed by any title whatsoever as members of the teaching and supervisory staff of a school district, board of cooperative educational services or county vocational education and extension board, as certified by the state commission by the commissioner of education;

h.  all positions in the state university in the professional service as defined in subdivision three of section three hundred fifty-five-a of the education law, (See <u>Section 355(a)</u> which positions shall be determined by the chancellor of the state university and certified by him to the civil service commission;

i. all positions in community colleges in the professional services;

j. all persons, other than persons covered under paragraphs (g), (h), or (i) above, whose principal functions are teaching or the supervision of teaching in a public school, academy or college;

k.  all positions in the professional service in the New York State School for the Blind and the New York State School for the Deaf.

USERRA (Federal): <u>(See: Uniformed Services Employment and Reemployment Rights Act</u>

UNDER-EMPLOYED:

those who have jobs that provide incomes below minimal acceptable levels.

UNDERUTILIZATION:

terms used to describe a lower number of affirmative action group employees than parity would predict. Once underutilization is quantitatively established, the burden of proof rests with the employer to demonstrate that the underutilization is the legitimate effect of BFOQ and valid criteria of business necessity.

UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994 (Federal):

federal statute that provides certain civilian employment and reemployment rights when military personnel separate from service. For information go to: <u>USERRA Uniformed Services Rights</u>

UNITY OF COMMAND:

no position should be accountable to more than one other position for the same activity (key result area).

UNSCHEDULED OVERTIME (NYS Budget):

overtime which is necessitated by emergency conditions which cannot be anticipated in advance.

VALIDITY:

the extent to which a test, criterion, or qualification measures the trait (some performance ability) for which it is being used, rather than some other trait. "Business necessity" considerations are addressed to the usefulness of the test in predicting job performance and the minimum cut-off scores.

VARIABLE HOURS:

employees have a wide latitude in defining their hours to be worked.

VARIABLE MINIMUM: (see HIGHER MINIMUM)

***VERIFY***:

confirm or establish authenticity; substantiate.

VESTED:

protected or held by a person; ownership. (i.e., an employee who has met service requirements for vesting his or her retirement benefit has a right to a retirement benefit from his/her employer even if separation from service occurs before the employee is actually eligible to retire).

VETERANS CREDITS (NYS CSL):

qualifying disabled veterans who pass competitive examinations are given ten points additional credits on their examination scores in open-competitive examinations and five points in promotional examinations. Non-disabled qualifying veterans receive five points and two points respectively. Veterans also have right of preference in retention in the event of a reduction in force (RIF) in the competitive class.

VIETNAM ERA VETERANS READJUSTMENT ACT of 1974 (Federal)
     requires employers to take affirmative action to employ and advance disabled
     veterans and qualified veterans of the Vietnam era.
VITAE:
     a brief biographical statement of a person's career.
VOCATIONAL REHABILITATION ACT of 1973 (Federal)
     requires federal contractors to take affirmative action to employ and promote
     qualified handicapped persons.

WAGES:
     pay for services rendered by employees which is directly related to time (hours)
     worked.
WORK SIMPLIFICATION:
     the process of designing routine tasks so that employee controlled machines can
     perform them.
WORKERS COMPENSATION (NYS):
     Insurance protection for employees injured on the job. See: <u>NYS Workers'
     Compensation Board</u> and <u>The State Insurance Fund</u>.
WORKWEEK (NYS Budget):
     a regularly recurring period of 168 hours in the form of seven consecutive 24-hour
     periods. A workweek need not coincide with the calendar week - it may begin any
     day of the week and any hour of the day. Each workweek stands alone. Once
     fixed, however, it must remain the same unless any change is intended to be
     permanent.

X

Y

ZIP CODE (Federal):
     a mail routing code developed and maintained by the U.S. Postal Service. To find
     a zip code for an address, go to: <u>Zip Code Lookup</u>.
ZONE OF EMPLOYMENT:
     that physical area within which injuries to an employee are compensable by
     workers' compensation laws; it denotes the place of employment and surrounding
     areas, including the means of ingress and egress.

Exhibit 23

**Westlaw**

COMPENSATION                                                                                      Page 1

Black's Law Dictionary (9th ed. 2009) , *adequate compensationdeferred compensationjust compensationunemployment compensationunreasonable compensation*

## COMPENSATION

**compensation** (kom-p<<schwa>>n-**say**-sh<<schwa>>n), *n.* (14c) **1.** Remuneration and other benefits received in return for services rendered; esp., salary or wages. [Cases: Labor and Employment k168.]

"*Compensation* consists of wages and benefits in return for services. It is payment for work. If the work contracted for is not done, there is no obligation to pay. [Compensation] includes wages, stock option plans, profit-sharing, commissions, bonuses, golden parachutes, vacation, sick pay, medical benefits, disability, leaves of absence, and expense reimbursement." Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment Contracts* § 3.17, at 68 (1991).

**2.** Payment of damages, or any other act that a court orders to be done by a person who has caused injury to another. • In theory, compensation makes the injured person whole. [Cases: Damages 15.] **3.**SETOFF (2). — **compensatory,** (k<<schwa>>m-**pen**-s<<schwa>>-tor-ee), **compensational** (kom-p<< schwa>>n-**say**-sh<<schwa>>-n<<schwa>>l), *adj.*

*accrued compensation.*(1919) Remuneration that has been earned but not yet paid.

*adequate compensation.*See *just compensation.*

*deferred compensation.*(1926) **1.** Payment for work performed, to be paid in the future or when some future event occurs. [Cases: Labor and Employment k 177.] **2.** An employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan.

*just compensation.*(16c) Under the Fifth Amendment, a payment by the government for property it has taken under eminent domain — usu. the property's fair market value, so that the owner is theoretically no worse off after the taking. — Also termed *adequate compensation*; *due compensation*; *land damages*. [Cases: Eminent Domain 122–150.]

*unemployment compensation.*Compensation paid at regular intervals by a state agency to an unemployed person, esp. one who has been laid off. — Also termed *unemployment insurance.* [Cases: Unemployment Compensation 1.]

*unreasonable compensation.*(1946) *Tax.* Compensation that is not deductible as a business expense because the compensation is out of proportion to the services actually rendered or because it exceeds statutorily defined limits. IRC (26 USCA) § 162. [Cases: Internal Revenue 3323]

© 2009 Thomson Reuters

Bryan A. Garner, Editor in Chief

END OF DOCUMENT

Exhibit 24

| | B | C | D |
|---|---|---|---|
| 1 | | | |
| 2 | | Fair values | Fair values |
| 3 | | $m | £m |
| 4 | | | |
| 5 | Assets | | |
| 6 | Cash | 1,550 | 841 |
| 7 | Trading portfolio assets | 44,781 | 24,290 |
| 8 | Derivative financial instruments | 0 | 0 |
| 9 | Loans and advances to banks | 37 | 20 |
| 10 | Loans and advances to customers | 6,715 | 3,642 |
| 11 | Available-for-sale financial investments | 2,757 | 1,495 |
| 12 | Other assets | 75 | 41 |
| 13 | Intangible assets | 1,637 | 888 |
| 14 | Property, plant and equipment | 1,633 | 886 |
| 15 | | | |
| 16 | Total assets | 59,185 | 32,103 |
| 17 | | | |
| 18 | Liabilities | | |
| 19 | Derivative financial instruments | 1,104 | 599 |
| 20 | Customer Accounts | 4,534 | 2,459 |
| 21 | Repurchase agreements and cash collateral on securities lent | 45,000 | 24,409 |
| 22 | Other liabilities | 1,934 | 1,049 |
| 23 | Deferred tax liabilities | 531 | 288 |
| 24 | | | |
| 25 | Total liabilities | 53,103 | 28,804 |
| 26 | | | |
| 27 | Net assets acquired | 6,082 | 3,299 |
| 28 | | | |
| 29 | Equity-settled share schemes | 300 | 163 |
| 30 | | | |
| 31 | Net shareholders' equity (excluding gain on acquisition) | 5,782 | 3,137 |
| 32 | | | |
| 33 | Acquisition cost | | |
| 34 | Cash paid | 1,538 | 834 |
| 35 | Attributable costs | 74 | 40 |
| 36 | | | |
| 37 | Total consideration | 1,612 | 874 |
| 38 | | | |
| 39 | Gain on acquisition | 4,170 | 2,262 |

Highly Confidential



EXHIBIT
377A

BCI-EX-00115843

BCI Exhibit No.
133

BCI-EX-00115844

Highly Confidential

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Lehman/BarCap - Acquisition Balance Sheet (detail) | | | | | | | | | Entity split | | | | | | |
| 2 | | | | | Notes | | BCI | LUC-A | LUC-B | LUC-C | LUC-F | LLC-C | BarCom | CayCo | | Sterling |
| 3 | | | | | | | \$b | \$b | \$b | \$b | \$b | \$b | \$b | \$b | | |
| 6 | RBM Inventory - PCG mkt | | 42.61 | | | | 40.28 | 2.33 | | | | | | | | 23.11 |
| 7 | JPM Inventory - PCG mkt | | 3.82 | | | | 0.69 | | | | | | | 3.23 | | 2.13 |
| 8 | Accrued interest | | 0.35 | | | | 0.35 | 0.02 | | | | | | | | 0.16 |
| 9 | CC Collateral receivables | | 0.30 | | | | 0.30 | | | | | | | | | 0.18 |
| 10 | Additional unrecognized assets | | 0.71 | | | | 0.04 | | | | | | | 0.64 | | 0.33 |
| 11 | Market adjustment | | (2.09) | | (2) | | (1.96) | (0.13) | | | | | | (0.10) | | (1.13) |
| 12 | Inventory | | 45.79 | | | | 40.27 | 1.82 | | | | | | 3.69 | | 24.81 |
| 13 | Exchange traded options | | 0.21 | | | | 0.21 | | | | | | | | | 0.11 |
| 14 | 15C lease | | 0.77 | | (2) | | | | | | | | | 0.77 | | 0.42 |
| 15 | PM customer balance | | (0.01) | | (2) | | (0.01) | | | | | | | | | (0.01) |
| 16 | Futures customer balances | | 1.19 | | (2) | | 1.19 | | | | | | | | | 0.64 |
| 17 | OCC Collateral paid/received through | | 0.18 | | | | 0.08 | | | | | | | | | 0.05 |
| 18 | Cash received from JPM | | 1.25 | | | | 1.25 | | | | | | | | | 0.66 |
| 21 | Financial Assets | | 90.16 | | | | 43.89 | 1.82 | | | | | | 4.46 | | 27.21 |
| 23 | Subordinated 13 mezzanine > Downstead | | 0.03 | | | | | | | | | | 0.02 | | | 0.02 |
| 24 | FD Avenue | | 0.06 | | | | | | | | | | | 0.02 | | 0.02 |
| 25 | Debt Centres | | 0.33 | | | | 0.90 | 0.11 | | | | 0.01 | | | | 0.16 |
| 26 | Transition to subclose/opening NAS | | 1.45 | | (1) | | 0.22 | | | | 0.01 | | | | | 0.19 |
| 27 | Prepayment/disposals | | 0.07 | | | | 0.07 | | | | | | | | | 0.04 |
| 29 | Failed, filings, solvency, etc. | | 0.32 | | | | 0.45 | 0.08 | | | | 0.02 | | | | 0.28 |
| 30 | Total Assets | | 53.54 | | | | 45.64 | 3.59 | 0.17 | | | 0.05 | 0.02 | 4.48 | | 29.04 |
| 31 | LBI repos/apply | | 45.00 | | | | 45.00 | | | | | | | | | 24.41 |
| 32 | Card payroll | | 0.22 | | | | 0.22 | | | | | 0.00 | | | | 0.01 |
| 33 | Bonus - cash interest | | 1.70 | | | | 1.50 | 1.80 | | | | 0.00 | 0.01 | | | 0.92 |
| 35 | Total Liabilities | | 46.92 | | | | 45.32 | 1.80 | | | | 0.00 | 0.01 | | | 25.44 |
| 39 | Net assets | | 6.61 | | | | 0.61 | 1.91 | 0.17 | | | 0.04 | 0.02 | 4.48 | | 3.59 |
| 41 | Credit to equity - stock element of Bonus | | 0.30 | | | | | 0.50 | | | | | | | | 0.16 |
| 43 | Consideration: | | | | | | | | | | | | | | | |
| 44 | AS/DS | | 0.25 | | | | | | | | | | | | | 0.14 |
| 45 | FD Avenue | | 0.06 | | | | | | | | | | | | | 0.02 |
| 46 | Debt Centres | | 0.33 | | | | | | | | | | | | | 0.18 |
| 47 | Purchase price costs | | 0.03 | | | | | | | | | | | | | 0.02 |
| 48 | Stamp Duty | | 0.04 | | | | | | | | | | | | | 0.02 |
| 50 | Total Consideration | | 1.61 | | | | 0.00 | 1.22 | 0.17 | | | 0.00 | 0.02 | 0.00 | 0.57 | 0.67 |
| 52 | Negative goodwill (pre-deferred tax) | | 4.70 | | | | | | | | | | | | | 2.55 |
| 54 | FX mid @ close | | 1.84558 | | | | | | | | | | | | | |
| 55 | GBP equivalent (pre-deferred tax) | | 2.55 | | | | | | | | | | | | | |
| 57 | Deferred tax liabily | | (0.56) | | | | | | | | | | | | | (0.29) |
| 59 | GBP negative goodwill (PAT impact) | | 2.16 | | | | | | | | | | | | | 2.16 |
| 62 | Notes: | | | | | | | | | | | | | | | |
| 64 | (1) Will not be recognised in the basis acquired by BCI under US GAAP | | | | | | | | | | | | | | | |
| 65 | (2) These are net amounts - the actual bookings are grossed up to reflect the relevant assets, receivables and payables (see next tab) | | | | | | | | | | | | | | | |

BCI-EX-00115845

Highly Confidential

Lehman Bros. Gross Acquisition Balance Sheet (final)

| # | Description (A) | Classification (C) | E | F | G/H | Notes (I) |
|---|---|---|---|---|---|---|
| 6 | | | 3b | 3b | | Source/details |
| 9 | Initial inventory - PCG mid | See above | 4.01 | | | |
| 10 | Sell Inventory - PCG over | Trading portfolio assets | 2.92 | | | |
| 11 | Accrued interest | Trading portfolio assets | 0.55 | | | |
| 12 | Cash collateral received | Cash | 0.50 | | | |
| 13 | Additional unencumbered assets | Loans & Advances to customers | 0.707 | | | |
| 14 | Unrealised adjustment | Trading portfolio assets | (2.09) | | | |
| 15 | Inventory | | | 43.79 | | |
| 16 | OCC margin against exchange traded options | Loans and advances to customers | 1.31 | | | |
| 17 | 1502 asset | Loans and advances to customers | 0.77 | | | |
| 20 | [Pledged asset] | Spot Above | 3.28 | | | |
| 21 | PM customer receivables | Loans and advances to customers | 1.59 | | | |
| 22 | PM assets | Loans and advances to customers | 0.52 | | | |
| 23 | Total PM asset | | | 1.92 | | |
| 24 | | Loans & Advances to customers | 0.02 | | | |
| 25 | OCC customer and clearing margin | Available-for-sale financial investments | 0.97 | | | |
| 26 | | Spot Above | 0.98 | 0.98 | | |
| 27 | Cash receivable from JPM | Cash | 1.05 | 1.05 | | |
| 29 | Financial Assets | | | 55.60 | 55.60 | |
| 30 | | Spot Sovereignty | 0.00 | 0.00 | | |
| 31 | Subsidiaries (3 overseas + 1 Dominion) | Property plant & equipment | 0.22 | 0.96 | | |
| 32 | PP Assets | Property plant & equipment | 1.10 | 0.30 | | |
| 33 | Data Centres | Property plant & equipment | 1.93 | 1.45 | | |
| 34 | | Intangible assets | 2.60 | 0.07 | | |
| 35 | Prepayments/deposits | Other Assets | 1.70 | 0.07 | | |
| 36 | Fixtures, fittings, software, etc | Property plant & equipment/intangibles | | 0.53 | | Estimated software costs included as intangibles rather than PP&E |
| 38 | Total Assets | | | 55.19 | | |
| 40 | LB repo liability | Repos | (0.00) | | | |
| 41 | | Other Liabilities | 0.22 | | | |
| 42 | Customer related costs - derivative MTM | Derivative liabilities | 1.10 | | | |
| 43 | PM customer payables | Customer accounts | 1.93 | | | |
| 44 | | Customer accounts | 2.60 | | | |
| 45 | Bonus + cash element | Other Liabilities | 1.70 | | | |
| 47 | Total Liabilities | | | 52.58 | | |
| 49 | Net assets | | | 6.61 | | |
| 51 | Credit to equity - attach element of bonus | Reserves | 0.30 | 0.30 | | |
| 54 | Consideration: | | | | | |
| 55 | Assets | Cash paid consideration | 0.26 | | | |
| 56 | TM Assets | Cash paid consideration | 0.96 | | | |
| 57 | Data Centres | Cash paid consideration | 0.33 | | | |
| 58 | Spare Land | Attributable costs consideration | 0.03 | | | |
| 59 | Acquisition costs | Attributable costs consideration | 0.04 | | | |
| 61 | Total consideration | | | 1.81 | | |
| 63 | Negative goodwill (pre-deferred tax) | | | 4.791 | | |
| 65 | FX result pose | | | 1,943.56 | | |
| 67 | GBP equivalent (pre-deferred tax) | | | 2.45 | | |

BCI-EX-00115846

| # | A | B | C | E | F | G |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | 2895/8790 | 2904/8824 | 2905/8623 | | |
| 6 | Description | Townsend | SudAmerica | Canada | Total Subs | |
| 7 | | $ | $ | $ | | |
| 8 | | | | | | |
| 9 | Property plant & Equipment | 23,944,164 | | | 23,944,164 | |
| 10 | Intangible Assets | 13,057,219 | | | 13,057,219 | |
| 11 | Loans and Advances to Banks | 5,320,514 | 0 | 32,138,139 | 37,458,653 | |
| 12 | Other Assets | 4,213,868 | | | 4,213,868 | |
| 13 | Total Assets | 46,536,036 | 0 | 32,138,139 | 78,674,175 | |
| 14 | | | | | | |
| 15 | Other Liabilities | (1,523,979) | 0 | (8,046,823) | (9,570,802) | |
| 16 | Bonus Accrual | (4,500,000) | 0 | (6,657,894) | (11,157,894) | |
| 17 | Total Liabilities | (6,023,979) | 0 | (14,704,717) | (20,728,696) | |
| 18 | | | | | | |
| 19 | Additional Paid in Share Capital | (40,512,057) | 0 | (17,433,421) | (57,945,478) | |
| 20 | | 0 | 0 | 0 | 0 | |
| 21 | | 0 | 0 | 0 | 0 | |
| 22 | | | | | | |
| 23 | | | | | | |
| 24 | Exclusion of fixed assets, goodwill and bonus accrual to avoid double-counts | | | | | 32,101,719 |

Highly Confidential

# Exhibit 25

**Hearing Date and Time:  October 15, 2009 at 2:00 p.m.**
**Objection Deadline:  October 9, 2009 at 4:00 p.m.**

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:   (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |

**DEBTOR'S MOTION FOR AN ORDER, PURSUANT TO FED. R. CIV. P. 60
AND FED. R. BANKR. P. 9024, MODIFYING THE SEPTEMBER 20, 2008
SALE ORDER AND GRANTING OTHER RELIEF**

*FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER*

NYI-4215277v1

(iv) "terminating" the Repurchase Agreement, all presumably to avoid the mandate of

Section 559.  They did this in two paragraphs in the Clarification Letter that was finalized and

signed only after the Sale Order was entered.  These major changes to the deal were never

brought to the attention of the Court or the creditors.

       9.     The undisclosed gains for Barclays did not end with the delivery to Barclays of

this $5 billion windfall.  Evidence uncovered in discovery also shows that on the day the Sale

Hearing was conducted, and into the weekend following issuance of the Sale Order, a scramble

was going on inside Lehman to find billions more in assets to turn over to Barclays, without

additional consideration and without disclosure.  On the purported basis that Lehman had fallen

short of what it was supposed to deliver under the Asset Purchase Agreement – which, of course,

did not take the undisclosed discount into account – Barclays executives demanded even more

assets.  Lehman executives agreed to turn over an *additional* $5 billion in assets to Barclays.

These assets consisted of approximately $800 million in so-called "15c3-3 assets" and at least

$1.9 billion worth of unencumbered assets contained in so-called "clearance boxes."  In addition,

by inserting various clauses in the post-hearing Clarification Letter, additional assets, worth

approximately $2.3 billion more, supposedly were transferred to Barclays, also without

consideration, disclosure or the Court's approval.

       10.    Discovery also has revealed that -- from the very beginning -- the consideration

Barclays was to pay in the Sale Transaction, in the form of assumed liabilities, was significantly

and intentionally inflated.  The Court was told that, as consideration in the Sale Transaction,

Barclays would assume approximately $2 billion in 2008 bonus liabilities to Lehman employees

who transferred to Barclays.  The accrual upon which this assumed liability was based had, in

fact, been deliberately inflated by $1 billion.  And, in any event, Barclays ultimately paid no

more than about $1.5 billion in 2008 bonuses to transferred Lehman employees, allowing

Barclays to pocket the difference.  (*See* A. 9 [Exall] 108:11-109:9; A. 137 (spreadsheet showing

approximately $1.55 billion paid in 2008 bonuses, excluding payroll items, taxes, severance and

other non-bonus items).)  Documents produced in discovery by Barclays reveal that this was its

plan all along.

11.    Similarly, the Court was told Barclays would assume liability for contract cure

payments in a range of up to $1.5 billion.  This number, too, was intentionally inflated and, in

any event, Barclays actually paid only about $238 million for contract cures.  (*See* A. 136.)

12.    The Sale Transaction was described to the Court as an equivalent exchange of

value, or a net benefit to Lehman.  Instead, because of these undisclosed and unauthorized

features of the deal, Barclays received billions more than the value it paid.  Because discovery

has not been completed since LBHI first brought this issue before the Court late in June, LBHI

cannot calculate at this point the precise amount of Barclays' windfall.  On the record developed

thus far, the available evidence indicates that Barclays received approximately $8.2 billion in

excess Lehman assets, between (i) at least $5 billion in excess collateral in the Repurchase

Agreement; (ii) $2.7 billion in so-called "additional value" added to the deal at Barclays'

demand while the Sale Hearing was in progress; and (iii) $2.3 billion in OCC margin deposits

added after the sale hearing ended, less (iv) the $1.738 billion in liabilities Barclays actually

assumed.  The number may be even larger.  According to one Barclays document, for example,

Barclays estimated its receipt of excess collateral on the Repurchase Agreement alone at

$7,190,000,000.  (A. 77; *see also* A. 75 (haircut summary putting excess value at $7.17 billion).)

13.    Given what has now been revealed in discovery, it is not particularly surprising

that, in February 2009, Barclays announced it had enjoyed a gain of $4.2 billion "on acquisition"

> the *"discount" between the value of the assets acquired and the
> purchase price* not be subject to the 46% marginal U.S. tax rate
> applicable to BCI.

(A. 61 (emphasis added).)

35.     According to Montondy, the immediate gain for Barclays (as to at least a portion

of the acquired portfolios) was in the range of $2.5 billion.  She wrote:

> U.S. Tax recognized immediately Wednesday am that U.S.
> Equities acquired to be used as part of BAU EDG would need to
> be booked in BSCL and gains subject to 46% tax as a result of
> current transf[e]r pricing.  *The gain on the equities is day one $2.5
> billion USD.*

(*Id.* (emphasis added).)  One Barclays e-mail attributes at least part of the gain, estimated at $2.7

billion, to the fact that the $4.25 billion in assumed liabilities for compensation and cure -- upon

which the Sale Transaction was premised--would in reality be only $1.3 billion, leaving $2.7

billion for "negative goodwill," *i.e.*, an immediate gain for Barclays.  (A. 71.)[20]  Another

Barclays' document indicates an even larger immediate gain.  *See* A. 134 at BCI-EX-00109160

(spreadsheet Barclays sent to its auditors showing $4.701 billion in "negative goodwill" *i.e.*, the

amount paid over fair market value, as a result of the Lehman acquisition).)[21]

36.     Similarly, on Sunday, September 21, 2008, the night before the transaction closed,

Lehman's Robert Azerad (who worked for Kelly) circulated an "Opening Balance Sheet" to

Barclays and Lehman personnel showing Barclays would have $3.38 billion in "Equity," *i.e.*,

---

[20]  Kelly appears to have put the amount of the windfall, just based on the Purchase Agreement itself,
higher.  Kelly testified that Barclays valued the securities (and related short positions) it ultimately received at
approximately $50 billion and his comparison of Lehman's book value to Barclays "proceeds" indicated that, once
the inflated compensation liability was taken into account, the loss to Lehman on the transaction (and, thus,
Barclays' gain) was approximately $5.25 billion.  (A. 14 [Kelly] 214:8-23, 221:2-229:13 (referring to A. 44 (Kelly's
notes)).)

[21]  A July 31, 2009 cover letter from Barclays' counsel described the spreadsheet as "[a] spreadsheet
containing information that was provided to Barclays' auditors relating to the acquisition balance sheet."  (A. 131.)
Barclays produced a "corrected" spreadsheet in the middle of depositions, but this "negative goodwill" number
remained the same.  (A. 135.)

profit, on the very first day. (A. 104.) McDade testified he had not seen this document at the

time, but that if it accurately reflected that Barclays gained $3.38 billion in equity it would not be

consistent with the deal he made, or the deal described to the Court:

> Q:       If there were an equity component in the deal on the
> opening day, sir, of $3.38 billion, that deal would not be in balance
> is that right?
>
> * * *
>
> A:       That's correct.
>
> Q:       And the deal you made was one to be in balance; is that
> right?
>
> * * *
>
> A:       That's correct.
>
> Q:       So if the opening day balance sheet for the deal reflected
> that Barclays had $3.38 billion in equity, that's not the deal you
> made, is it?
>
> A:       That's correct.
>
> * * *
>
> Q:       And it wouldn't be consistent with the deal you made,
> would it?
>
> A.       It would not be consistent, that's correct.

(A. 20 [McDade] 216:23-217:23 (objections omitted); *see also id.* at 107:3-11 (the deal would be

a wash with liabilities equivalent to assets).)[22] McDade also recognized that, given the

description of the Sale Transaction to the Court, an immediate gain to Barclays should have been

disclosed:

---

[22] McDade's counterpart at Barclays said exactly the opposite. Barclays President, Diamond, testified that "the asset liability mismatch had to have a mismatch in favor of a positive capital accretion [for Barclays] or we weren't authorized to do the deal." (A. 8 [Diamond] 86:14-87:5; *see id.* at 87:23-90:5.)

Q:      And given what you heard in the bankruptcy hearing on the
19th of September, where you heard the deal described to the judge
as essentially a balance –

A:      Right.

Q:      -- it would have been important in your view, sir, to tell the
judge if it was not in balance because that's a different deal, is it
not?

A:      Most definitely, yes, sir.

(*Id.* at 185:20-186:5.)[23]

37.     Discovery to date has not revealed precisely how Barclays accounted for the

windfall it received on Lehman's discounted assets.  What is clear is that, on a deal described to

the Court and creditors as a balanced exchange of equivalent value (or as a net benefit to

Lehman) there was in fact an enormous embedded gain for Barclays.  By February 2009,

Barclays had calculated the gain at £2.62 billion (approximately $4.2 billion).  Barclays

announced:

> The excess of the fair value of net assets acquired [from Lehman]
> over consideration paid [to Lehman] resulted in £2,262 m[illion] of
> gains on acquisition.

(A. 130 ("Barclays PLC Results Announcement, Figures 2008") at 95.)[24]

---

[23] Again, Diamond testified differently.  He claimed not to know whether the "capital accretion" to
Barclays caused by the imbalance had been disclosed to the Court, saying "I have never had a discussion with Judge
Peck."  (A. 8 [Diamond] 66:13-24.)

[24] Gary Romain, Barclays Head of Technical Account and Private Equity Finance, testified about Barclays'
announced gain on acquisition and revealed that post-closing accounting adjustments Barclays made had the effect
of reducing Barclays' announced gain by over $6 billion.  (A. 24 [Romain] 18:13-20:6, 82:11-18 (testimony
regarding write-downs on assets after receipt and after the Sale Transaction closed); *see also* A. 135 ("final version"
of acquisition balance sheet showing $4.17 billion gain); A. 132 (Barclays' write-down of assets received from
Lehman, through Bank of New York, by $4.4 billion from BONY valuations), A. 133 (Barclays write-down of
assets transferred through JP Morgan Chase by $2 billion from September 2008 values); *see also* A. 131 (a July 31,
2009 cover letter from Barclays' counsel describing the spreadsheets at A. 132 and A. 133 as "[t]wo spreadsheets
containing information that were provided to Barclays' auditors relating to values that Barclays booked for the
securities received from Lehman and JPM").)  Absent these internal adjustments to third-party valuations, Barclays'
announced gain on acquisition would have been billions of dollars more.  When these marked down assets are sold
Barclays stands to earn a trading gain of several billion dollars.

Exhibit 26

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                       :
In re:                                 :   Chapter 11
                                       :
LEHMAN BROTHERS HOLDINGS INC., et al., :   Case No. 08-13555 (JMP)
                                       :
                    Debtors.           :   (Jointly Administered)
                                       :
-------------------------------------------------------------x
-------------------------------------------------------------x
LEHMAN BROTHERS HOLDINGS, INC.,        :
                                       :
                    Plaintiff,         :
                                       :   Adv. Proc. No. 09-01731 (JMP)
v.                                     :
                                       :
BARCLAYS CAPITAL, INC.                 :
                                       :
                    Defendant.         :
-------------------------------------------------------------x
```

## STIPULATION AND ORDER BETWEEN THE DEBTORS, TRUSTEE, COMMITTEE, AND BARCLAYS CAPITAL INC. CONCERNING CERTAIN CLAIMS MADE IN ADVERSARY COMPLAINTS FILED BY LBHI, SIPA TRUSTEE AND CREDITORS COMMITTEE

WHEREAS, the following motions have been filed with the Court seeking, *inter alia*, modifications of (i) the Court's Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008, or (ii) the Court's Order Approving, and Incorporating by Reference for Purposes of this Proceeding, an Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding; or both such Orders (individually or collectively, the "Sale Order"):

(1)  Debtor's Motion for An Order, Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2008 Sale Order and Granting Other Relief, dated September 15, 2009 ("LBHI's Motion");

(2)  The Trustee's Motion for Relief Pursuant to the Sale Order or, Alternatively, for Certain Limited Relief Under Rule 60(b), dated September 15, 2009 ("Trustee's Motion"); and

(3)  Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., Pursuant to 11 U.S.C. §§ 105(a), Fed. R. Civ. P. 60(b), and Fed. R. Bankr. P. 9024, For Relief From Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rule of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases, dated September 20, 2008 (and Related SIPA Sale Order) and Joinder In Debtor's and SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify Sale Order ("Committee's Motion");

(4)  Motion of Lehman Brothers Holdings Inc., Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. P. 9024, Modifying The SIPA Sale Order and Joinder in Official Committee of Unsecured Creditors' Motion for Relief From SIPA Sale Order ("LBHI's Joinder"); and

(5)  The Trustee's Motion to Join in Debtors' Motion for an Order Pursuant to Fed. R. Civ. P. 60 and Fed. R. Bankr. 9024, Modifying the September 20, 2009 Sale Order and Granting Other Relief ("LBI's Joinder," and collectively with the above-referenced motions, the "Rule 60 Motions").

WHEREAS, pursuant to paragraph 1 of the Scheduling Order concerning Certain

Motions Filed by LBHI, SIPA Trustee and Creditors Committee "so ordered" by the Court on

October 27, 2009, the following adversary complaints have also been filed with the Court:

(A)  Lehman Brothers Holdings Inc., v. Barclays Capital, Inc., Adv. Proc. No. 09-01731 (JMP) ("LBHI's Adversary Complaint");

(B)  James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc., v. Barclays Capital Inc., Adv. Proc. No. 09-01732 (JMP) ("Trustee's Adversary Complaint"); and

(C)  The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.v. Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC, and Barclays Capital Inc., Adv. Proc. No. 09-01733 (JMP) ("Committee's Adversary Complaint," and collectively with the above-referenced adversary complaints, the "Rule 60 Movants' Adversary Complaints").

WHEREAS, pursuant to paragraph 1 of the Scheduling Order concerning Certain

Motions Filed by LBHI, SIPA Trustee and Creditors Committee "so ordered" by the Court on

October 27, 2009, the parties have met and conferred on November 25, 2009 and on December 1, 2009 to attempt to agree upon which claims in the Rule 60 Movants' Adversary Complaints shall be resolved through the resolution of the Rule 60 Motions and which claims shall be stayed pending such resolution.

WHEREAS, counsel for Barclays Capital Inc. ("Barclays"), Lehman Brothers Holdings Inc. ("LBHI"), James W. Giddens, as Trustee for the SIPA liquidation of Lehman Brothers Inc. (the "Trustee"), and the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. ("Creditors Committee") have agreed that certain claims made in the Rule 60 Movants' Adversary Complaints shall necessarily be resolved through the resolution of the Rule 60 Motions, while certain other claims made in the Rule 60 Movants' Adversary Complaints may not be resolved through the resolution of the Rule 60 Motions, but may instead require further adjudication.

NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:

1.    All claims made in the Rule 60 Movants' Adversary Complaints are stayed for purposes of any formal response deadlines or other deadlines governing adversary proceedings set forth in the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure, or Local Rules of the United States Bankruptcy Court for the Southern District of New York.Barclays, LBHI and the Trustee consent to the Creditors Committee's intervention in this adversary proceeding.  The Creditors Committee will have any and all rights that are available to it as a party in interest to intervene in the adversary proceedings initiated by LBHI's Adversary Complaint and the Trustee's Adversary Complaint under Rule 24 of the Federal Rules of Civil Procedure as made applicable by Rule 7024 of the Federal Rules of Bankruptcy Procedure.

2.   The following claims made in the Rule 60 Movants' Adversary Complaints

shall be resolved through the resolution of the Rule 60 Motions because the issues raised by

those claims are also raised by the Rule 60 Motions; accordingly, the parties' Rule 60 briefs,

including the Rule 60 Motions, shall be treated as dispositive motions, and any evidentiary

hearing that is required by the Court to resolve the Rule 60 Motions shall also be used to resolve

these claims:

> <u>Claims made in LBHI's Adversary Complaint</u>:  Count III (Unauthorized Post-
> Petition Transfers – Bankruptcy Code § 549); Count IV (Recovery of Avoided
> Transfers – Bankruptcy Code § 550); Count V (Recovery of Excess Collateral on
> Liquidation of Repurchase Agreement – Bankruptcy Code § 542 and 559); Count
> VI (Disallowance of Claims Under Bankruptcy Code § 502(d)); and Count IX
> (Declaratory Judgment – 28 U.S.C. §§ 2201, 2202).
>
> <u>Claims made in the Trustee's Adversary Complaint</u>:  Count I (Declaratory
> Judgment under 28 U.S.C. § 2201 - DTCC Clearance Box Assets); Count II
> (Declaratory Judgment under 28 U.S.C. § 2201- OCC Margin and Clearing
> Funds); Count III (Declaratory Judgment under 28 U.S.C. § 2201 - Funds at Other
> Exchanges); Count IV (Declaratory Judgment under 28 U.S.C. § 2201 - $769
> Million in Rule 15c3-3 Securities Or Substantially Similar Securities); Count V
> (Avoidance of Transfers and Recovery of Property under §§ 549 and 550 of the
> Bankruptcy Code); Count VII (Turnover of Property under § 542 of the
> Bankruptcy Code); Count VIII (Recovery of Approximately $1.1 Billion in
> DTCC Clearance Box Securities under § 548 of the Bankruptcy Code); Count IX
> (Fraudulent Conveyance under § 273 of the New York Debtor & Creditor Law, as
> made applicable by § 544(b) of the Bankruptcy Code); Count X (Recovery of the
> Excess Value of the Repo Securities under §§ 559 and 542 of the Bankruptcy
> Code); and Count XIV (Disallowance of Claims under § 502(d) of the Bankruptcy
> Code).
>
> <u>Claims made in the Committee's Adversary Complaint</u>:  Count I (Declaratory
> Judgment as to Clarification Letter pursuant to 28 U.S.C. §§ 2201, 2202); Count
> II (Accounting); and Count III (Attorneys' Fees, 28 U.S.C. § 2202).

3.   The following claims made in the Rule 60 Movants' Adversary Complaints

shall not be resolved through the resolution of the Rule 60 Motions; any response (whether by

Answer or motion) to these claims shall be due thirty (30) days after entry by the Court of an

order resolving the Rule 60 Motions or such other time as the Court may determine:

> <u>Claims made in LBHI's Adversary Complaint</u>:  Count I (Aiding and Abetting
> Breach of Fiduciary Duty); Count II (Breach of Contract); Count VII (Unjust
> Enrichment); and Count VIII (Conversion).
>
> <u>Claims made in the Trustee's Adversary Complaint</u>:  Count VI (Avoidance of
> Transfer and Return of Customer Property under SIPA); Count XI (Breach of
> Contract); Count XII (Conversion – Money Had and Received); and Count XIII
> (Aiding and Abetting Breach of Fiduciary Duty).

4.    The stay of claims referenced in paragraph 3, above, is without prejudice to

any party's ability to seek resolution of those claims through motions informed by or based on

the Court's prior resolution of the Rule 60 Motions.

5.    Subject to an exception for Count VI (Avoidance of Transfer and Return of

Customer Property under SIPA) in the Trustee's Adversary Complaint, the stay of claims

referenced in paragraph 3, above, shall not operate to delay delivery or return of any assets that

the Court orders to be delivered or returned as part of its resolution of the Rule 60 Motions.  This

paragraph is without prejudice to any party's ability to seek an appeal or a stay pending appeal or

to seek immediate enforcement of the Court's order resolving the Rule 60 motions regardless of

the stay of Count VI, on the ground that the Court's order requires dismissal of that claim.

Dated:  New York, New York
       December <u>18</u>, 2009

By:   <u>*s/Hamish P.M. Hume*</u>
    Jonathan D. Schiller
    Hamish P.M. Hume
    Jack G. Stern
BOIES, SCHILLER & FLEXNER LLP
    575 Lexington Avenue
    New York, NY 10022
    (212) 446-2300

Attorneys for Barclays Capital Inc.

By:   <u>*s/James Tecce*</u>
    James Tecce
    Erica Taggart
QUINN EMANUEL URQUHART OLIVER
& HEDGES, LLP
    51 Madison Avenue
    New York, NY 10010
    (212) 849-7000

Special Counsel to the Official Committee
of Unsecured Creditors of Lehman
Brothers Holdings, Inc., et al.

By:   <u>*s/Robert W. Gaffey*</u>
    Robert W. Gaffey
    William J. Hine
JONES DAY
    222 East 41st Street
    New York, NY 10017
    (212) 326-3939

Special Counsel to Debtors and Debtors in
Possession

By:   <u>*s/Neil J. Oxford*</u>
    William R. Maguire
    Seth D. Rothman
    Neil J. Oxford
HUGHES HUBBARD & REED LLP
    One Battery Park Plaza
    New York, New York 10004
    (212) 837-6000

Attorneys for James W. Giddens,
Trustee for the SIPA Liquidation of
Lehman Brothers Inc.

**SO ORDERED:**

Dated:  New York, New York
       January 13, 2010

    <u>*s/ James M. Peck*</u>
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

Exhibit 27

Hearing date:  March 25, 2010

Objections Date for Movants' Rule 60
Motions:  January 29, 2010

Objections Date for Motion by Barclays Capital Inc.
to Enforce the Sale Order and Secure Delivery of All
Undelivered Assets:  March 4, 2010

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>              Debtors. | Chapter 11 Case No.<br>08-13555 (JMP)<br>(Jointly Administered) |
| In re<br><br>LEHMAN BROTHERS INC.,<br><br>              Debtor. | Case No. 08-01420 (JMP) |

**MEMORANDUM OF BARCLAYS CAPITAL INC. IN OPPOSITION TO THE RULE 60 MOTIONS AND IN SUPPORT OF MOTION OF BARCLAYS CAPITAL INC. TO ENFORCE THE SALE ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

As of January 29, 2010
[Corrected Version March 4, 2010]

also (b) an amount that, if limited solely to bonus payments, was "deliberately inflated" because the Transferred Employees were not entitled to a full $2 billion in bonuses. LBHI Br. at ¶¶ 60-64. This makes no sense, and contradicts the record evidence.

282.    LBHI bases its confused position upon a deliberate misreading of an email sent at 5:10 in the morning by the Lehman controller Martin Kelly. LBHI Br. at ¶ 60. That email references that the final deal included "an extra $1 b in comp beyond our accrual." BCI Ex. 184 [Email chain including Sept. 16, 2008 5:10 am email from M. Kelly to I. Lowitt, *et al.*].[120]    As LBHI knows, and as the record evidence establishes, this reference to "an extra $1 b in comp beyond our accrual" is easily explained:  The $2 billion "comp" estimate was an estimate for all compensation, including both the cash and equity component of any bonuses, plus any potential severance payments, plus any associated payroll tax payments.[121]    By contrast, Lehman's "accrual" reflected only the *cash* portion of expected *bonus* payments, which represented only a part of the total value of the bonus payments paid by Lehman each year. BCI Ex. 85 [McDade Dep. Tr.] at 286:8-287:25; BCI Ex. 44 [Ankalkoti Decl.] at ¶ 8; *see also* BCI Ex. 83 [Lowitt Dep. Tr.] at 53:14-54:16 (the total compensation estimate would have included both a cash component and an equity component).  Lehman paid a higher portion of its annual bonus in the form of equity versus cash than average for Wall Street firms, including Barclays. BCI Ex. 85 [McDade Dep. Tr.] at 286:12-23.  This obviously made the "cash accrual" a poor indicator for

---

[120] LBHI claims that "[a]t his deposition, Kelly admitted that the 'compensation' accrual had been inflated by $1 billion solely for the purpose of the transaction." LBHI Br. at ¶ 61.  That is false.  In fact, here is what Mr. Kelly said at his deposition:  "Q. When you wrote this email to Mr. Lowitt, did you have an understanding of why the compensation liability would be assumed Barclays would exceed an estimate that Lehman had on its books by about a billion dollars? A. No."  BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 60:15-20.

[121] BCI Ex. 86 [McGee Dep. Tr.] at 86:13-18; BCI Ex. 97 [Shapiro Dep. Tr.] at 73:20-75:9, 126:8-15; BCI Ex. 64 [Exall Dep. Tr.] at 55:12-56:9; BCI Ex. 55 [Berkenfeld Dep. Tr.] at 26:11-23; BCI Ex. 75 [Aug. 18, 2009 Kelly Dep. Tr.] at 62:18-63:5; BCI Ex. 91 [Ricci Dep. Tr.] at 37:24-38:6.

the total economic cost to Barclays of providing a bonus to all Transferred Employees roughly

equivalent to what they would have received at Lehman.[122]

283.    Thus, in estimating the total economic cost to Barclays of paying both bonuses

and severance, it is not surprising for the estimate to be greater than the amount of the accrual for

purely the cash portion of the Lehman bonuses.  *See, e.g.* BCI Ex. 83 [Lowitt Dep. Tr.] at

213:10-17; BCI Ex. 85 [McDade Dep. Tr.] at 286:24-287:25.[123]  When estimates for these

elements are included, the $2 billion estimate was reasonable.  BCI Ex. 339 [Johnson Report] at

p. 12.

284.    Furthermore, there was nothing secretive about this estimate.  The $2 billion

"comp" estimate was based upon information from Lehman.  BCI Ex. 91 [Ricci Dep. Tr.] at

37:4-6, 62:12-19 ("Lehman presented me and others with a number of roughly $2 billion that

they felt they needed to compensate the Lehman staff" and "McGee told me there needs to be a

bonus pool of 2 billion."); BCI Ex. 85 [McDade Dep. Tr.] at 99:20-100:4 (Mr. McDade testified

that the $2 billion number was "absolutely" a good faith estimate "[b]ecause the data was

rigorously provided by Lehman and rigorously reviewed and modeled by Barclays.")

---

[122] Furthermore, the historical LBI bonus data that Barclays had showed a total 2007 bonus for LBI employees as almost $2.5 billion.  BCI Ex. 295 [Sept. 23, 2008 9:15 am email from M. Evans to B. Diamond, *et al.* with attachments] at Attachment 3.  It is reasonable that Barclays' starting place for estimating 2008 year-end bonuses would have been the amount spent on 2007 year-end bonuses, adjusted for some of the conditions of the market for 2008.  BCI Ex. 339 [Johnson Report] at pp. 11-12, 21-22.  It would be industry convention and practice to also consider other elements of compensation in the estimate, such as severance and taxes.  BCI Ex. 339 [Johnson Report] at pp. 10-11.  Any estimate for severance would necessarily have been tremendously uncertain, given that Barclays was taking on an entire business in a short amount of time, and could not know how many Transferred Employees would accept offers, how many Barclays would need, and how many would be terminated as redundant.  BCI Ex. 339 [Johnson Report] at pp. 11-12.

[123] This is especially true because Lehman's accrual as of mid-September reflected only the amount accrued for part of the year, and therefore needed to be annualized to reflect a full year's bonus.  BCI Ex. 85 [McDade Dep. Tr.] at 47:6-23.  While § 9.1(c) of the APA refers to a bonus payment equal to the "amounts accrued in respect of the amounts payable," it is not clear that this is a direct reference to the formal accrual on Lehman's books, versus a reference to the general concept of the amount payable for the entire 2008 year.  Certainly, Lehman's chief negotiator, Bart McDade, appeared to understand that Barclays would be obligated to pay a full year's bonus.  *Id.*

Exhibit 28

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:   (212) 326-3939
Facsimile:    (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 |
| Debtors. | (Jointly Administered) |
| ------------------------------------------------------------------ | |
| In re: | SIPA Proceeding |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**DEBTOR'S REPLY BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR AN
ORDER, PURSUANT TO FED. R. CIV. P. 60 AND FED. R. BANKR. P. 9024,
MODIFYING THE SEPTEMBER 20, 2008 SALE ORDER AND GRANTING OTHER
RELIEF AND IN OPPOSITION TO BARCLAYS' MOTION TO ENFORCE THE SALE
ORDER AND SECURE DELIVERY OF ALL UNDELIVERED ASSETS**

- Lowitt's and Kelly's testimony and documents showing there was an intentional write up of Lehman's accrual for compensation and cure.  (*See* LBHI Mot. ¶¶ 60-62; A. 37.)

**B.    Barclays' Factual Recharacterizations Are Inconsistent and Inaccurate**

61.    Faced with these indisputable facts, Barclays offers diversions from the central

disclosure issue, that are inconsistent and misleading.

**1.    Barclays' contention that Debtor's assets were being purchased "irrespective of their value."  (Barclays Opp. ¶¶ 56-62, 193, 194-203.)**

62.    This assertion simply ignores the facts and defies common sense.  In essence, it

means that Barclays paid $250 million for all of Lehman's assets without regard for their value.

The Sale Transaction was based on a "balance sheet" covering assets selected by Barclays and

offsetting liabilities included in the deal, *i.e.,* the 9/16/08 Financial Schedule (A. 31).[33]  In fact,

Mr. McDade testified at the Sale Hearing that although "closing balance sheet" was not prepared

due to "the speed of which we're operating," detailed and specific valuations of the assets being

transferred to Barclays were conducted throughout the week.  (BCI Ex. 49 [LBHI Docket No.

318], 9/19/08 Tr. at 109:21-111:3.)  The parties also spent countless hours trying to value the

assets and liabilities in the Sale Transaction.  Barclays' opposition concedes as much.  (*See*

Barclays Opp. ¶¶ 65-66, 131-36.)

63.    In addition, the balance sheet embodied in the 9/16/08 Financial Schedule was

central to the transaction, as confirmed by recently-produced Barclays' internal documents,

including a spreadsheet prepared the very next day and reviewed by Barclays' key financial

personnel, including Messrs. Clackson and Romain.  (A. 179 (9/17/08 Barclays email attaching

---

[33]  Why Barclays purchased any assets at all deserves consideration.  It easily could have purchased the building, back office operations, trademarks and intellectual property, and recruited Lehman's employees if all it wanted to do was buy "the business."  The explanation offered by Barclays that the assets were necessary to Lehman's operations is not convincing.  One of its primary negotiators, Mr. Klein, testified "one of the discussions was, well, maybe we just don't have a transaction that has any assets at all.  I mean, this is a business purpose.  If the assets are getting taken by others in different ways, just do a business deal."  (BCI Ex. 79 [Klein] 86:3-8.)  Hence, the real reason Barclays took assets was because the price was steeply discounted, guaranteeing an immediate gain.

"Long Island Acquisition Summary") at BCI-EX-(S)-00211334-35.)  The spreadsheet shows

"negative goodwill" of "2.75" including accounting for a "bonus accrual" of only "1.30."  (*Id.*)

This shows that Barclays knew on September 17 of a built-in gain, and that the $2.0 billion

"comp" accrual on the 9/16/08 Financial Schedule was inflated by at least $700 million.  In

addition, while Barclays tries to portray the 9/16/08 Financial Schedule as meaningless, the e-

mail chain shows how Barclays directly compared the inflated liabilities on the 9/16/08 Financial

Schedule with what they knew was the truth.  The e-mail says:

> [T]his is completion balance sheet from draft docks, LI side not
> Barcap, gives the final split – **neg goodwill from this method is
> the sum of 2.25+2 = 4.25 – 1.35 (a/cing liab) = 2.9**

(*Id.* (emphasis added).)  This is a *direct* comparison of Barclays' internal calculations with the

compensation and cure liabilities shown on the 9/16/08 Financial Schedule (*i.e.*, "2.25+2"), and

shows Barclays knew those liabilities were inflated.  (*See* A. 174 at BCI-EX-(S)-00210900-902

(9/16/08 Barclays email confirming it expected to make $3.0 billion in negative goodwill for

consideration of only $250 million); A. 173 at 2 (9/16/08 Barclays pro forma balance sheet

stating "Baltimore [Barclays] may assume liabilities with lower fair value than the assets

acquired generating negative goodwill").)[34]

    64.    The record is replete with assessments of the values of assets and liabilities to be

transferred.  For example, in a conference call with analysts, Barclays discussed the due

diligence it had done and how it was able, as a result, to value and choose the assets being

acquired.  (A. 46 at 3; *see id.* at 4 ("we got to choose which inventory came with the deal"; "we

had just completed 72 hours of due diligence on every position … and we were able to establish

the marks"); *see also* A. 190 [Dep. Ex. 581B] (Barclays 9/16/08 Board minutes, ¶ 3: "The assets

---

[34] Barclays' reliance on the 9/16/08 Financial Schedule in this regard demonstrates the disingenuous
nature of Barclays' asserting in its opposition that "[t]here is in fact no version of any September 16, 2008 financial
schedule that was initialed by an officer of Barclays, as referenced in § 9.1(c) of the APA."  (Barclays Opp. ¶ 92.)

creditors, and A&M but instead may have provided undisclosed benefits to Barclays.  As Marsal

testified:

> [w]e were told [the Sale Transaction] was a push.  The creditors
> were told it was a push.  We think the bankruptcy judge was told it
> was a push . . . . And [when we asked for information] all we got
> was stonewalled . . . . And then it was followed by the fact that in
> the first quarter along comes some bravado from somebody
> indicating – at Barclays that they made a profit on the transaction
> of umpteen dollars.  We said, well, wait a minute.  Nobody talked
> about a profit, a built-in profit.  Where is that built-in profit?  But
> all of this dialogue, none of this happened until the middle of the
> first quarter.

(BCI Ex. 84 [Marsal] 136:14-137:18.)  This release prompted A&M to begin examining the

assets and liabilities that had been transferred to Barclays.  (*Id.* at 144:17-145:10.)

### 8.    In Light of Barclays' Recalcitrance, A&M and LBHI Began Focusing on the Terms of the Sale Transaction

133.    Right after Barclays issued its Results Announcement, the LBHI estate asked

Barclays for information.  Barclays stonewalled.  On February 19, 2009, LBHI wrote Barclays

requesting information about its payments of the bonus and contract cure amounts (the "February

19 Letter").  (A. 166 [LBHI Docket No. 3596] Rule 2004 Mot., Ex. B.); *see also* BCI Ex. 81

[Kruse] 209:8-21, 233:5-234:5; BCI Ex. 84 [Marsal] 196:5-211:3.)  The February 19 Letter

stated that LBHI had conducted "a preliminary review of the accrual for bonuses as of August

31, 2008, and it appears that the consolidated global accrual on the books of LBHI as of that date

was only $1.3 billion."  (A. 166 [LBHI Docket No 3596] Rule 2004 Mot., Ex. B.)  The letter

requested a meeting with Barclays and supporting documentation to explain the amounts paid, or

to be paid, by Barclays.  (*Id.*; BCI Ex. 84 [Marsal] 196:5-211:3.)

134.    On February 23, 2009, Barclays responded, stating that it purportedly wanted to

avoid addressing queries on a piecemeal basis, but actually providing no answers at all.  (A. 166

[LBHI Docket No. 3596] Rule 2004 Mot., Ex B.)  Barclays did not agree to meet with LBHI

Exhibit 29

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | |
| LEHMAN BROTHERS INC., | Case No. 08-01420 (JMP) |
| Debtor. | |

**ADDENDUM 1 TO POST-TRIAL**
**MEMORANDUM OF BARCLAYS CAPITAL INC.**

**<u>PROPOSED FINDINGS OF FACT</u>**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-2300
Facsimile:  (212) 446-2350
*Attorneys for Barclays Capital Inc.*

November 22, 2010

**11.    Barclays Paid Over $1.95 Billion In Bonus, Severance, And Related Tax Obligations Pursuant To Its Obligations Under The APA.**

11.1.    As Paul Exall, Barclays' Head of Compensation Analytics, testified, as early as September 23, 2008, Barclays' compensation modeling indicated that Barclays would have to spend as much as $1.77 billion on 2008 bonuses for Transferred Employees, not counting severance payments (which ultimately totaled $265 million).  8/23/10 Tr. at 185:8-14 (Exall); 8/24/10 Tr. at 54:17-55:4, 56:23-57:11, 89:25-91:2 (Exall); *see* M. 91 at 2 (discussion of "Sensitivity Analysis"); BCI Ex. 142 (entries for "Severance").

11.2.    Barclays' Paul Exall created a schedule for use by Barclays' outside auditor, PwC, to show the amount Barclays paid or committed to pay to or on behalf of Transferred Employees for pre-acquisition services — including bonus, severance payments, and related taxes.  BCI Ex. 142.

    11.2.1.    Paul Exall created the schedule identified as BCI Ex. 142 (the "Compensation Schedule").  8/23/10 Tr. at 189:2-6 (Exall); Exall Dep. Tr. at 61:21-62:10 (Discussing Dep. Exhibit 281B, which was marked at Trial as BCI Ex. 142).

    11.2.2.    The Compensation Schedule was created for use by Barclays' outside auditor PricewaterhouseCoopers.  Exall Dep. Tr. at 20:16-21:9; 74:2-9; 75:2-8.

    11.2.3.    As Mr. Exall testified, the Compensation Schedule details "the discharge of our obligations to former Lehman Brothers employees in respect of their prior service and compensation for their prior service for Lehman Brothers."  Exall Dep. Tr. at 74:2-9.

11.3.    Excluding the bonus component of severance payments it has made or committed to make, Barclays has incurred $1.674 billion in 2008 bonus payments and related taxes to, or on behalf of, Transferred Employees.

    11.3.1.    The Compensation Schedule includes an entry under "Payments" for "Bonus including social tax" of $1.529 billion.  This amount includes $1.271 billion in cash bonus amounts and $258 million in equity bonus awards.  BCI Ex. 142.

        11.3.1.1    The Compensation Schedule includes a "Payable in future" entry for "Payroll tax on Equity compensation" of $9 million.  This amount relates to the $258 million in equity bonus awards, and is therefore properly characterized as bonus.

    11.3.2.    The Compensation Schedule includes an entry under "Payments" for "IBD Grad Programmes" of $11 million.  BCI Ex. 142.

        11.3.2.1    As Mr. Exall testified, payments for "IBD Grad Programmes" "were the annual bonuses payable to graduates that were on our investment banking graduate program.  But they were former Lehman Brothers graduates that we obviously took on as part of the acquisition."  8/23/10 Tr. at 192:7-14 (Exall).

11.3.2.2    The entry of $11 million for "IBD Grad Programmes" is therefore properly characterized as a bonus.

11.3.3.    The Compensation Schedule includes an entry under "Payable in future" for "Acquisition Buyout vesting over 2 years," of $53 million.  BCI Ex. 142.

11.3.3.1    As Mr. Exall testified, payments for "Acquisition Buyout vesting over 2 years" "related to performance bonus awards that were due and payable to an individual under his contract with Lehman Brothers that Barclays matched as part of the acquisition."  8/23/10 Tr. at 193:17-23 (Exall).

11.3.3.2    The entry of $53 million for "Acquisition Buyout vesting over 2 years" is therefore properly characterized as a bonus.

11.3.3.3    The Compensation Schedule includes a "Payable in future" entry for "Payroll taxes on Acq. buyout" of $3 million.  This amount relates to the $53 million in "Acquisition Buyout" performance bonus awards, and is therefore properly characterized as bonus.

11.3.4.    The Compensation Schedule includes an entry under "Other items" for "ISP Awards" of $56 million.  BCI Ex. 142.

11.3.4.1    As Mr. Exall testified, the "incentive share plan" ("ISP") is "the name of the stock award program we have in place at Barclays." Exall Dep. Tr. at 141:24-142:3.

11.3.4.2    As Mr. Exall further testified, the figure for ISP awards on BCI Ex. 142 relates solely to pre-acquisition obligations of Transferred Employees.  Exall Dep. Tr. at 151:5-14.

11.3.4.3    The entry of $56 million for "ISP Awards" is therefore properly characterized as a bonus.

11.3.4.4    The Compensation Schedule includes an "Other Items" entry for "Payroll taxes on ISP awards" of $2 million.  This amount relates to the $56 million in "ISP Awards," and is therefore properly characterized as bonus.

11.3.5.    The Compensation Schedule includes an entry under "Payments" for "Replacement RSUs" of $11 million.

11.3.5.1    As Mr. Exall testified, Replacement RSUs were "cash awards that Barclays gave to former Lehman Brothers employees to replace the lost value of bonus awards that they had received earlier in 2008 from Lehman Brothers."  8/23/10 Tr. at 191:20-22 (Exall).

       11.3.5.2      The entry of \$11 million for "Replacement RSUs" is therefore properly characterized as a bonus.

11.4.    Barclays has paid or committed to pay approximately \$265 million in severance payments to Transferred Employees in connection with their pre-acquisition services for Lehman.

    11.4.1.    The Compensation Schedule includes a "Payments" entry for "Severance" of \$238 million.

    11.4.2.    The Compensation Schedule includes a "Payable in future" entry for "Severance" of \$27 million.

11.5.    Barclays has paid or committed to pay \$12 million in payroll amounts for Transferred Employees in connection with their pre-acquisition services for Lehman.

    11.5.1.    The Compensation Schedule includes a "Payments" entry for "Pre 22/9 payroll items" of \$12 million. *See also* Exall Dep. Tr. at 79:4-80:15.

11.6.    Pursuant to its obligations under the APA, Barclays has paid or committed to pay a total of \$1.951 billion in compensation to, or on behalf of, Transferred Employees in connection with their pre-acquisition services for Lehman — including predominantly bonus, severance payments and related taxes. This total is consistent with the \$2 billion estimate provided to the Court on September 19, 2008, and set forth on the Berkenfeld Schedule. BCI Ex. 142. BCI Ex. 49 (9/19/08 Tr.) at 99:22-25 (Miller); BCI Ex. 106; *see also* FOF ¶10.

Exhibit 30

JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
Robert W. Gaffey
Jayant W. Tambe
William J. Hine
Tracy V. Schaffer

Attorneys for Debtors
And Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 Case No. |
| LEHMAN BROTHERS HOLDINGS INC., et al., | 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| In re | SIPA Proceeding Case No. |
| LEHMAN BROTHERS, INC., | 08-01420 (JMP) |
| Debtor. | |

## LBHI'S POST-TRIAL MEMORANDUM AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

reflected the deal, and Subparagraph 9.1(b) does not refer to the 9/16/08 Financial

Schedule); Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection C") .)

134.    McDade testified that this $2 billion for bonuses to former Lehman

employees was an "agreed number" (4/26/10 [McDade] 164:6-8), and reflected a "full

requirement for Barclays to pay," (4/26/10 [McDade] 215:13-18).

135.    Contemporaneous documents and statements by Barclays' employees and

their auditors also confirm their understanding of this $2 billion obligation to be related

only to bonuses.  When Clackson reviewed Paragraph 9.1(c) of the Asset Purchase

Agreement to figure out how much to pay transferring Lehman employees, he understood

that Barclays had committed itself to pay the full $2 billion in bonuses only, exclusive of

its severance obligations.  In an e-mail to Ricci, he termed this a "$650 million problem."

(M.24; 4/29/10 [Clackson] 257:6-260:16; *see infra* ¶¶ 348-352.)  When Paul Exall[54] was

brought in by Barclays to monitor payments to former Lehman employees, he came to

the same conclusion.  He shared that conclusion with Barclays' auditors at PwC.  (M.150

("We [PwC] discussed this with HR (Paul Exall) back in September and it was confirmed

to us then that the $2 billion was only for bonus and the severance amounts to be paid

were separate").)  Indeed, Barclays stipulated to this conversation.  (6/25/10 Tr. 5:13-21

(If called to testify, Michael Guarnuccio of PwC would testify that he "recalls that at

some time in September 2008, after the Barclays/Lehman transaction closed, he spoke

with Paul Exall.  And Mr. Exall stated that he believed the two billion dollar estimate was

---

[54] Paul Exall is Barclays' Head of Compensation Analytics for Barclays Capital, Barclays
Corporate and Barclays World.  (8/23/10 [Exall] 185:6-22.)  After the Closing, Exall was asked to track
how much Barclays actually paid to former Lehman employees who transferred to Barclays in bonuses,
severance (for later terminated employees), and other forms of compensation.  (8/23/10 [Exall] 189:2-
194:8.)

amount owed in bonuses to those expected to move to Barclays, and if it turned out that

was not the case, McDade said that would not have been consistent with the deal he

made.  (4/26/10 [McDade] 169:11-19.)  Further, McDade testified that to the extent the

number came down, it should consequently have reduced the number of assets to be

transferred in order for the deal to remain in balance.  (4/26/10 [McDade] 215:9-18;

4/27/10 [McDade] 73:12-16 (Barclays' payment of $2 billion for bonuses was a "full

requirement" for Barclays to pay and a reduction in the comp figure should reduce the

number of assets that are transferred to Barclays for the deal to stay in balance).)

138.    It was Kelly's job to monitor the accrual for compensation maintained on

Lehman's books.  (4/28/10 [Kelly] 171:22-24.)  Lehman provided data to Barclays

concerning that accrual, but Barclays was the "ultimate determiner" of the figure used in

the parties' agreement.  (4/26/10 [McDade] 162:12-163:7.)  McDade never saw any

calculations concerning compensation from Barclays' "model."  (Stip. ¶ 127.)  In the end,

Barclays agreed to the inclusion of $2 billion in the 9/16/08 Financial Schedule and to its

reference in Section 9.1(c) of the Asset Purchase Agreement.

139.    As Kelly revealed in his September 16, 2008, 5:10 a.m. e-mail to Lowitt

and Tonucci, however, the terms of the deal were based on an inflation of this assumed

liability by "an extra $1 b[illion] of comp beyond our accrual[.]"  (M.7; M.8; *see also*

4/28/10 [Kelly] 200:10-16 ("My understanding was that it was approximately a billion

dollars over -- over Lehman's accrual for the year to that point in time"); 4/29/10

[Lowitt] 121:15-23 (agreeing that bonus liability amount was not derived from Lehman's

accruals, but rather was a negotiated number).)[56]  Barclays has tried to explain this away

by saying Lehman had not yet accrued on its books all of its compensation liabilities

beyond the third quarter of 2008.  (Barclays Opp. ¶¶ 282-283.)  McDade agreed,

however, that the billion dollar difference noted in Kelly's e-mail, a 100% increase over

Lehman's accruals, could not be accounted for by annualizing.  (4/27/10 [McDade]

70:13-19.)  In other words, even if Lehman had not yet fully accrued its bonus liabilities

for the last quarter, that could not account for an additional $1 billion in liabilities.

140.    No matter how the figure was derived, it is undisputed that $2 billion for

bonus liabilities was a negotiated and agreed number, and this number was then included

on the 9/16/08 Financial Schedule, which in turn was expressly referenced in Section

9.1(c) of the Asset Purchase Agreement.  (*See*, *e.g.*, 4/28/10 [Kelly] 200:3-16; 4/26/10

[McDade] 164:6-8, 168:13-169:10, 178:14-180:18, 215:13-18; 4/29/10 [Lowitt] 121:15-

23; 8/23/10 [Shapiro] 89:15-92:4.)

141.    The overstatement of bonus liabilities Barclays was to assume is relevant

to whether the disclosures made to the Court about the Sale Transaction were accurate

and complete.  Along with the evidence indicating the $2 billion figure was inflated

beyond Lehman's accruals, the evidence also showed that Barclays never, in fact,

intended to pay $2 billion in bonuses.  (*See infra* ¶¶ 353-364.)  For example, even during

the week of September 15, before the Sale Hearing on September 19, Kelly created, or

had created for him, documents that show the increase of both the compensation and

contract cure liabilities as "transaction adjustments."  (See *e.g*., M.32; M.34; M.17 at

---

[56] Incredibly, Lowitt, Lehman's CFO, claimed to have never seen the Asset Purchase Agreement
and disclaimed any knowledge of its contents.  (4/29/10 [Lowitt] 110:3-113:2.)

Exhibit 31

FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------
                                                    :    Chapter 11
In re                                               :
                                                    :    Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :
                                                    :    (Jointly Administered)
                        Debtors.                    :
                                                    :
-------------------------------------------------------------
                                                    :
In re                                               :
                                                    :    Case No. 08-01420 (JMP) SIPA
LEHMAN BROTHERS INC.,                               :
                                                    :
                        Debtor.                     :
                                                    :
-------------------------------------------------------------


**OPINION ON MOTIONS SEEKING MODIFICATION OF THE SALE ORDER**
**PURSUANT TO RULE 60(B), THE TRUSTEE'S MOTION FOR RELIEF UNDER THE**
**SIPA SALE ORDER, BARCLAYS' CROSS-MOTION TO ENFORCE THE SALE**
**ORDERS AND ADJUDICATION OF RELATED ADVERSARY PROCEEDINGS**


JONES DAY
*Attorneys for Lehman Brothers Holdings Inc., et al.*
222 East 41st Street
New York, New York 10017

      Robert W. Gaffey, Esq.
      Jayant W. Tambe, Esq.
      William J. Hine, Esq.
      Tracy V. Schaffer, Esq.

QUINN EMANUEL URQUHART & SULLIVAN LLP
*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*
51 Madison Avenue, 22nd Floor
New York, New York 10010

      Susheel Kirpalani, Esq.
      James C. Tecce, Esq.
      Eric M. Kay, Esq.
      Robert K. Dakis, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004-1482

      William R. Maguire, Esq.
      Seth D. Rothman, Esq.
      Neil J. Oxford, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
1775 I Street, N.W., Suite 600
Washington, D.C. 20006

      John F. Wood, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
575 Lexington Avenue
New York, New York 10022

      Jonathan D. Schiller, Esq.
      Jack G. Stern, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

      Hamish P. M. Hume, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
333 Main Street
Armonk, New York 10504

     David Boies, Esq.


U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for U.S. Securities and Exchange Commission*
100 F Street, N.E.
Washington, D.C. 20549-8030B

     Jacob H. Stillman, Solicitor
     Katharine B. Gresham, Assistant General Counsel
     Mark Pennington, Assistant General Counsel
     Dimple Gupta, Attorney


U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for the U.S. Securities and Exchange Commission*
3 World Financial Center
New York, New York 10281

     Alistaire Bambach, Esq.
     Patricia Schrage, Esq.


SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for the Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, D.C. 20005

     Josephine Wang, General Counsel
     Kenneth J. Caputo, Senior Associate General Counsel


**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

I.     <u>Introduction</u>

A.     *Overview of Opinion*

     These matters arise out of the hurried, at times harried and now challenged sale of assets

to Barclays Capital Inc. ("Barclays") under Section 363 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  Before the Court are motions for relief under Federal

Rule of Civil Procedure 60(b) (the "60(b) Motions") from the order approving the sale to

Barclays entered on September 20, 2008 (the "Sale Order"), a related motion by Barclays to

secure delivery of certain undelivered assets (the "Disputed Assets") and three separate adversary

proceedings brought against Barclays by each of the moving parties (the "Movants[1]") that filed

the 60(b) Motions.   The proceedings have illuminated the factual background of the largest,

most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy

history – the sale to Barclays by Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers

Inc. ("LBI") and certain of their affiliates (together, "Lehman") of assets collectively comprising

the bulk of Lehman's North American investment banking and capital markets business (the

"Broker-Dealer Business").

      The lengthy trial provided an opportunity to review in slow motion and from multiple

vantage points the circumstances of an acquisition that had to proceed so very quickly due to the

need for speed to salvage the Broker-Dealer Business after LBHI's unplanned bankruptcy filing

on September 15, 2008.  The evidentiary hearings relating to the 60(b) Motions took place over a

thirty-four day period from April through October 2010.  Following the close of the record, the

parties submitted post-trial briefs and proposed findings of fact and conclusions of law in late

November.  These submissions are encyclopedic in their scope and attention to detail, and they

offer insights as to the motivations and behavior of many of the key actors during the most

momentous week of the greatest financial crisis of our lives.  The trial itself was a showcase of

outstanding advocacy uniformly conducted at the highest professional level.

---

[1] The Movants are Lehman Brothers Holdings Inc., the Official Committee of Unsecured Creditors (the
"Committee") and the Trustee of Lehman Brothers Inc. under the Securities Investor Protection Act (the "SIPA
Trustee").

Approximately thirteen billion dollars is at issue, but the amount in dispute is only one of the reasons that this litigation has attracted so much attention. Foundational principles of bankruptcy jurisprudence are also being tested. The 60(b) Motions constitute a most unusual after the fact challenge to the fairness of a transaction of global significance, a transformative business combination in the financial services industry that was accomplished at a time of fear and major dislocation in the markets. The resulting litigation is highly visible due to interest in the Lehman bankruptcy, the large sums involved and the extraordinary nature of the relief being sought. Because the 60(b) Motions seek to overcome the finality and binding effect of the Sale Order that was entered at the height of the financial crisis and *that has also been affirmed on appeal*, these motions are unprecedented in challenging the very same order that the Movants themselves (other than the Committee) defended throughout the appellate process.

The circumstances of these proceedings may be exceptional, but the core legal principles are familiar ones that are generally applicable in other chapter 11 cases. The issues governing the right to relief under Federal Rule of Civil Procedure 60(b) ("Rule 60(b)") are the same ones that might arise in any challenge to a final order authorizing a sale of assets under Section 363 of the Bankruptcy Code. These issues are grounded in the tension between the right of aggrieved parties to obtain relief from final orders for cause shown and the right of purchasers of assets from a chapter 11 debtor to rely with confidence on the integrity and enforceability of final sale orders that have been entered by the bankruptcy courts, especially those that have been affirmed following appellate review.

This tension relating to finality naturally exists to some extent in every motion under Rule 60(b), but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice. Sale orders

ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are truly special circumstances that warrant judicial intervention and the granting of relief from the binding effect of such orders.  The Court is well aware, however, that the language of Rule 60(b) setting forth grounds for relief from a final order has general application to all orders including sale orders and that no order is exempt from this type of relief for cause shown.

This broadly framed right to relief under Rule 60(b) in the case of sale orders must be balanced against the well-recognized bankruptcy policy that encourages third parties to buy assets from debtors for the ultimate benefit of creditors and that protects third parties that have purchased assets from a debtor in good faith reliance on an order of the bankruptcy court.  A basic question addressed in this Opinion is whether the Movants have shown sufficient special circumstances to authorize the granting of relief from the Sale Order that was entered here in the face of a profound emergency, that thereafter was affirmed by the United States District Court for the Southern District of New York (the "District Court") and that Movants did not challenge until one year later after the financial crisis of 2008 had subsided and markets had stabilized. Because the Sale Order was the essential means to the end of completing this crucial acquisition, the Court believes that something greater than ordinary mistake or inadvertence must be proven to overcome the finality and binding effect of that order.

As explained in this opening narrative and in the following sections of this Opinion, Movants have proven that some very significant information was left out of the record of the hearing on Lehman's motion to approve the sale of the Broker-Dealer Business to Barclays held on September 19, 2008 (the "Sale Hearing") — facts that in a more perfect hearing the Court would have known.  Despite what in retrospect appears to be a glaring problem of flawed disclosure, Movants have not carried their burden in establishing a right to relief from the Sale

Order under Rule 60(b) because this new information would not have changed the outcome of
the Sale Hearing or altered the form and content of the Sale Order in any material respect.
Importantly, the failure to disclose material information in this case does not involve fraud,
misrepresentation or misconduct.  If the evidence had demonstrated such improprieties and
abuses, relief under Rule 60(b) in all likelihood would have been granted.

A number of the issues in dispute also depend upon the enforceability and interpretation
of a document dated September 20, 2008 and finalized on September 22, 2008.  The parties
identify the document as the clarification letter (the "Clarification Letter").  The Clarification
Letter is identified in the text of the Sale Order and was in the early stages of being drafted when
that order was entered.  The document went through a number of revisions during the weekend
immediately following the Sale Hearing, but the final form of the Clarification Letter was never
presented for bankruptcy court approval.  Instead, the parties decided among themselves that
approval was not required and then caused the executed Clarification Letter to be filed on the
docket on September 22, 2008.  Thereafter, the parties to this letter agreement relied upon the
document as if it had been approved under the original Sale Order and for all purposes treated
the Clarification Letter as a binding agreement.  The Clarification Letter stands out as a critically
important transaction document that purports to change and "clarify" some fundamental terms of
that certain Asset Purchase Agreement dated as of September 16, 2008 among LBHI, LBI, LB
745 LLC and Barclays (together with the First Amendment To Asset Purchase Agreement, dated
September 19, 2008,[2] the "APA") even though it was not formally blessed by separate order.

The failure to obtain such an order adds a layer of extra doubt to consideration of the
demands by Barclays to recover the Disputed Assets and leads to some nagging questions about
the enforceability and binding effect of what amounts to a vital side letter or amendment to the

---

[2] The First Amendment Clarifying Asset Purchase Agreement is referred to herein as the First Amendment.

APA – one never presented to the Court for approval – that makes major changes to the structure

of the acquisition and that affects property rights of entities that quite obviously are subject to the

Court's jurisdiction under the Bankruptcy Code and provisions of the Securities Investor

Protection Act of 1970 ("SIPA").

The Clarification Letter includes any number of clarifications that are really more than

that – they are important additions or alterations designed to match the documentation for the

transaction with the evolving business understandings of the parties.  Some of these provisions

are either radically different from anything presented at the Sale Hearing or in actual conflict

with statements made during that hearing.  This is a document that should have been subjected to

further judicial oversight, either to confirm that it was in fact covered by the language of the

existing Sale Order or to obtain express bankruptcy court approval for these agreed changes to

the APA.  The Court has little doubt that such a further hearing would have been requested if

there had not been such inordinate timing pressure to immediately close the acquisition.

Despite the lack of explicit bankruptcy court approval and in recognition of the conduct

of the parties in relying on the Clarification Letter as a controlling document, the Court has

decided to treat the document as having been approved by virtue of the combination of

references made to the Clarification Letter in the Sale Order and the conduct of the parties

demonstrating unequivocal reliance on the document.  Consequently, the Clarification Letter is

enforceable and will be interpreted in a manner that is consistent with the record of the Sale

Hearing.  That record makes clear that Lehman cash is excluded from the purchase and does not

expressly mention certain additional categories of assets that were specified for the first time in

drafting the Clarification Letter.  These newly described assets were identified or discovered on

the morning of the Sale Hearing in the course of a final search by Barclays for additional assets

(the so-called "asset scramble").  The asset scramble yielded the three disputed asset classes that

are now the subject of the motion by Barclays to compel delivery of the Disputed Assets.  These

assets, described more fully below, are the 15c3-3 assets (the "15c3-3 Assets"), margin related to

exchange traded derivatives (the "Margin Assets") and assets in clearance boxes (the "Clearance

Box Assets").

The Court denies relief under Rule 60(b) to the Movants, grants the motion of Barclays to

recover the Clearance Box Assets, and denies that motion as it relates to the Margin Assets and

the 15c3-3 Assets.  The decision to deny 60(b) relief is based on the failure of the Movants to

show that the outcome of the Sale Hearing would have been different if all material facts

(including those relating to the structure of the transaction and the value of the acquired assets)

had been disclosed.  The determination of the motion by Barclays to recover the Disputed Assets

depends upon a nuanced interpretation of the Clarification Letter in light of the record of the Sale

Hearing, the language of the document and extrinsic evidence concerning the negotiation and

drafting of that language.  The immediately following sections of this Introduction provide

observations regarding a number of the key issues presented in this litigation.

B.      *The 60(b) Motions Have Emphasized Information That the Court Did Not Know and
        Should Have Known, But This Information Would Not Have Changed the Outcome of the
        Sale Hearing*

The 60(b) Motions rest on the proposition that the Court was not fully informed when it

entered the Sale Order approving the sale of the Broker-Dealer Business and that Barclays, with

the active and complicit assistance of certain senior executives of Lehman with allegedly

conflicting loyalties, ended up with too favorable a deal during a period of market turmoil,

uncertainty and confusion.  Stated simply, the 60(b) Motions allege that Barclays should forfeit

the protections of the Sale Order, even though that order is final and has been affirmed on

appeal, because it achieved a substantial windfall gain as a result of buying financial assets at a

deep discount from fair value to the detriment of all creditors of the Lehman estates.  These

motions are premised on the troubling notion that material information relating both to the value

of the assets being sold and the means for implementing the transaction was not disclosed to the

Court.  Barclays disagrees strongly with this assertion and submits that the Court acted properly

and was given all necessary evidence under the exigent circumstances to approve the sale, that

the 60(b) Motions should be denied in all respects and that Barclays should be awarded the

Disputed Assets.

Barclays points out, among other things, that the Movants knew about the so-called

discount yet chose to align themselves with Barclays and steadfastly supported the Sale Order

throughout the appellate process that led to the decision of the District Court affirming the Sale

Order.  Barclays has portrayed the Movants as parties who were content to accept the obvious

benefits of the Sale Order while the markets were unsettled during the early stages of the

bankruptcy case and who now are pursuing claims for incremental consideration from Barclays

after the markets have recovered and it has become safe for them to seek extraordinary relief.

Barclays has denied that there are legally sufficient grounds to support such relief and has

explained that the acquisition was structured from the outset to include a favorable spread

between long and short positions (described by its senior officers as a "buffer"), that this feature

of the transaction was publicly disclosed immediately after signing of the APA (although not

disclosed in so many words to the Court), that its acquisition balance sheet (the "Acquisition

Balance Sheet") fairly reflects sound valuation and accounting judgments made after

consultation with its independent auditors and that its multi-billion dollar gain on acquisition

reflected the negative goodwill of a business combination that, from the perspective of Barclays,

always was intended to be capital accretive and to include an assortment of intangible assets that

were of no value to the estate after filing for bankruptcy and were not separately valued at the

time of the acquisition.

The urgent sale to Barclays took place during the terribly stressful days immediately

following LBHI's bankruptcy filing and was one of the landmark events of the extraordinary

week from September 15 through September 22, 2008 (labeled by the Court as "Lehman Week"

for purposes of this Opinion).  At the time, the transaction was regarded by many as an

admirable, even heroic, achievement that helped to salvage jobs, preserve going concern values

and provide for the orderly transition of many thousands of brokerage accounts to a financially

secure firm with the resources to manage and service the financial assets held in those accounts.

The widely-held belief was that without the virtually immediate rescue by Barclays the direct

and indirect damage to Lehman, its customers, creditors, and the entire financial system resulting

from the bankruptcy would have been even more devastating.  The perception during Lehman

Week was that the transaction with Barclays benefitted all interested parties, mitigated systemic

risk and helped to save every one of us from an even greater economic calamity.  Nothing in the

voluminous record presented to the Court in these protracted proceedings has done anything to

change that undeniably correct perception.

The sale was the only available transaction at a time of unrivaled worldwide financial

distress bordering on panic.  The APA needed to be approved, not conditionally with exposure to

the potential risks of hindsight challenges, but absolutely and finally.  In exercising its discretion

to approve the transaction described in the APA, the Court recognized that it was dealing with an

uncommon emergency but is satisfied that it still managed to comply with all applicable

requirements of the Bankruptcy Code and of procedural due process.  The District Court

11

affirmed the correctness of that conclusion in an appeal in which the Movants collectively

supported (or, in the case of the Committee, did not oppose) this Court's approval of the sale.

The 60(b) Motions do, however, prompt the Court to engage now in a careful inquiry as

to whether what was not disclosed regarding the transaction so impaired the Court's ability to

properly evaluate the overall fairness of the terms of the acquisition that Barclays should lose the

protections of the Sale Order and become exposed to multi-billion dollar claims for additional

consideration.  Having dwelled at some length on this question, the Court concludes that nothing

in the current record, if presented at the Sale Hearing, would have changed the outcome of that

hearing.  The Court still would have entered the very same Sale Order because there was no

better alternative and, perhaps most importantly, because the sale to Barclays was the means both

to avoid a potentially disastrous piecemeal liquidation and to save thousands of jobs in the

troubled financial services industry.

C.       *The Broker-Dealer Business Had to Be Sold in a Great Hurry to Save Jobs, Preserve
         Going Concern Value and Minimize Claims Against the Estate*

The APA represented the best possible alternative for Lehman's employees at a time

when the proverbial "ice cube" was melting.  The Court knew that the Broker-Dealer Business

was being sold to the one buyer in a position to employ thousands, to protect customers and to

maintain the on-going operations of what had been Lehman's core business.  While it is true that

a number of highly relevant and clearly important disclosures were not made at the Sale Hearing,

those failures to disclose are far outweighed by the fact that the Court was well enough informed

to approve the acquisition with complete confidence that it was better than any alternative.

Indeed, it was the only alternative.

Effective management of a financial services business requires a highly-skilled

workforce.  That was true for Lehman, and the value of its Broker-Dealer Business depended

12

upon the relationships, sophisticated knowledge and experience of that workforce.  In the

aftermath of the bankruptcy filing, employees were leaving the firm in great numbers, and

without a going concern sale that provided assurances of continued employment, there would be

nothing left for Lehman to sell other than a substantial book of assets discounted by the

distressed circumstances of a liquidation sale in a most uncertain market.  That reality and the

desire to save the enterprise drove the professionals responsible for documenting the acquisition

to work under extraordinary time pressure to accomplish within a few days what ordinarily

would take weeks or longer.

Knowing that approval of the transaction would save a multitude of financial sector jobs

probably was the most significant single factor influencing the Court's thinking when it

considered the sale.  The transaction included offers of employment to most members of the

Lehman work force that not only helped these individuals at a most difficult time on Wall Street,

but also unquestionably was good for the estate, brokerage customers and the general economy.

A going concern sale to Barclays also was the one way to eliminate claims of employees for lost

wages and benefits as well as claims of counterparties for potential damages arising under a

variety of executory contracts with Lehman.  Assumption of these obligations by Barclays meant

that the Lehman bankruptcy estate would avoid exposure to liability for many claims that could

only be estimated.

The trial has focused attention on whether the estimates in the APA for these

compensation and cure expenses ("comp and cure") were inflated as part of a conscious effort to

make it appear that Barclays was paying more for the acquired assets, but the Court has not given

much weight to this evidence in its current deliberations.  It is true that the estimates were

incorrect and turned out to be excessive in relation to the actual amounts paid by Barclays for

comp and cure, but the Court did not rely on the pinpoint accuracy of these estimates when it

approved the sale to Barclays (although it did believe that the numbers provided were reasonable

and represented the best good faith estimates of potential exposure at the time).  The number

provided for cure costs turned out to be materially overstated and unreliable, but the Court does

not conclude that the discrepancy is the result of a deliberate effort to make it appear that

Barclays would be paying more for these liabilities.  What mattered most to the Court about

comp and cure was the knowledge that Barclays was picking up all of these expenses, whatever

they might turn out to be, thereby satisfying the entire universe of comp and cure claims that

might otherwise have been asserted against the estate.

D.      *Context Matters, and the Urgency of Lehman Week Is an Inescapable Factor Impacting
        Both the Expedited Approval of the Sale to Barclays and the Decision Not to Revisit that
        Sale Now*

The sale to Barclays was and remains to this day truly extraordinary in that Barclays,

without prior planning, agreed to purchase the Broker-Dealer Business almost immediately after

the bankruptcy filing, and the sale process itself was expedited to the point of raising some very

real due process concerns. The Sale Order was entered only five days after commencement of the

LBHI case and within hours after the filing of the LBI case.  That is a speed that takes ordinary

transactional coping skills to the breaking point and beyond.  This was also all occurring at a

time of market disruptions unlike anything ever experienced since the dawn of the age of

electronic trading and globally connected markets, and sophisticated market participants were

unsteady and losing their composure.

Lehman Week certainly was no ordinary week.  Each day brought with it a new systemic

shock.  Merrill Lynch had just been sold to Bank of America in a hastily-arranged transaction.

Lehman filed for bankruptcy relief in the early morning hours on September 15th (the "Filing

Date") after running out of options, and AIG was bailed out by the Federal Reserve the very next day. Seasoned observers too young to recall the Great Depression had never seen anything to match these disastrous events. By the end of the week, Goldman Sachs and Morgan Stanley had sought refuge under the Bank Holding Company Act to achieve greater operational stability and security. By virtue of astonishingly fast-moving market forces, venerable Wall Street institutions were toppling, being rescued or restructured on a daily basis. Financial counterparties had reason to distrust the soundness of blue chip firms with once seemingly unimpeachable credentials.

This loss of confidence was fueled by widespread skepticism concerning the underlying financial strength and reliability of balance sheets that included illiquid and hard-to-value securities backed by subprime assets. These securities and other structured financial products had been widely disseminated to financial institutions throughout the world. Just about every major bank had to make tough judgment calls as to the valuation of these highly-complex and now-suspect structures and faced questions as to the fair value of these assets. This difficult week ushered in an uncertain and volatile period when trust was in very short supply and incremental risk was something to be avoided.

At this very time of market turmoil and reduced tolerance for risk, Barclays chose to act boldly and seized the opportunity to greatly expand its business platform in North America. Barclays was particularly well situated to move forward opportunistically because in the days immediately preceding the Lehman bankruptcy, it had been engaged in intense negotiations to purchase Lehman's global business operations in their entirety. Those prepetition negotiations, while unsuccessful, served as a prelude to and essential preparation for a high-speed emergency

bankruptcy acquisition and placed Barclays in a uniquely advantageous position relative to any other institution that might be interested in competing for the Lehman franchise.

After the bankruptcy, Barclays, at the suggestion of Lehman's President Bart McDade, promptly renewed discussions regarding a possible acquisition and, by September 16, had come to terms on the elements of a transaction in which it would purchase Lehman's investment banking business as detailed in the terms and conditions of the APA. The impact of the transaction was enormous for both parties. For Lehman, it meant a going concern sale that would save the jobs of about ten thousand employees and allow for the orderly transfer of customer accounts, thereby minimizing further market disruptions. For Barclays, it was a strategic acquisition that, virtually overnight, would enable it to become a leading player in the North American capital markets. Given the tumultuous and unpredictable state of the financial markets at the time, this was a bold business decision for Barclays that required full-time attention and immediate execution. Everything happened very quickly, and, in retrospect, especially in light of all of the litigation that has ensued, perhaps too quickly.

The Broker-Dealer Business was "melting." Images of employees leaving with their office possessions in cardboard boxes portrayed an unplanned exodus of the firm's human resources; employees quite literally were walking out the door apparently with the expectation of never returning. Lehman had a desperate need for an expedited sale to preserve jobs and to hold on to what it could of its going concern value and the firm's intellectual capital. Barclays knew that it had to act at once and that it had the luxury of leverage because achieving its strategic objective was optional and would only occur on terms favorable to Barclays.

Barclays was unwilling to allow its transformative corporate vision to potentially impair its own capital base, especially at a time of such unusual turbulence in the markets. Its board

instructed management that the transaction could only proceed if it were capital accretive. This

directive from the board of Barclays was not communicated by anyone to the Court. The Court

only knew what could be gleaned from pleadings, the statements of counsel and the evidence

presented at the hearing to approve bidding procedures on September 17 (the "Bid Procedures

Hearing") and the Sale Hearing that commenced on September 19 in the late afternoon and

concluded in the early morning hours of September 20.

The Court knew while presiding at the Sale Hearing that everything was happening so

fast that errors, omissions and miscommunications were bound to occur. Also, given the scale

and complexity of the matters being presented and the limited time to process all of this

information, it was impossible to fully comprehend every aspect of the acquisition, which had

changed between the Bid Procedures Hearing on the 17th and the start of the Sale Hearing on

afternoon of the 19th, or to precisely determine the fair value of all of the assets that were being

transferred.

The Court has coined the term the "fog" of Lehman to characterize the confusion,

ambiguity and uncertainty that prevailed during Lehman Week, something akin to the classic

expression the "fog of war." Time was compressed and work was being performed under

inordinately stressful conditions. Many of the smartest and most sophisticated people on Wall

Street were confronting a frightening array of challenges and had to make decisions with

imperfect information, draft documents and act so quickly that events began to blur.

As if describing a scene from a war zone, witness after witness during the trial conveyed

recollections of personal experiences, perceptions and understandings during the chaos and

confusion of Lehman Week. Repeatedly, witnesses described scenes in which countless

unnamed individuals (lawyers, traders and bankers) participated in around-the-clock separate

negotiating sessions that were occurring simultaneously in multiple conference rooms at

Lehman's headquarters building at 745 Seventh Avenue and the offices of Weil, Gotshal &

Manges, Lehman's bankruptcy counsel.  Coordination was difficult.  Just about everyone

involved during this catastrophic week also was sleep deprived and stressed out.  No one

individual possibly could have had a complete appreciation for what was taking place during

these marathon negotiating and drafting sessions.  Bart McDade, who served as Lehman's chief

negotiator and Harvey Miller, Lehman's lead outside lawyer, probably come the closest to being

the most fully informed at a senior level.  They each tell a story of an honest effort to make the

best of a very bad situation, and their testimony does not support relief from the Sale Order.

The APA and the Clarification Letter, the two most centrally important documents in this

litigation, were generated during this highly-pressurized atmosphere described as organized

chaos by Harvey Miller, a description validated by the testimony of other witnesses.  Given the

chaotic circumstances, some misunderstandings, mistakes and disagreements relating to the

transaction in general and these two documents in particular were foreseeable, but the Court

finds no support for the proposition that the resulting disclosure problems and disputes were

caused by willful misconduct, deliberate misrepresentations or the intentional withholding or

concealment of relevant information during the Sale Hearing.  Instead, it appears that the failure

to provide a coherent and complete narrative of the transaction was circumstantial and not due to

any conscious decision to hide the truth.  The need for speed, while not an excuse for inadequate

disclosure, is the best explanation for those lapses in full disclosure at the Sale Hearing that have

become the main focus of this litigation.

E.    *The Court Did Not Know About the "Buffer" Required By Barclays or the "Take Out" By
Barclays of the New York Fed, But Knowledge of These Facts Would Not Have Affected
the Sale Order*

Movants have changed from supporters to opponents on the basis of  information about

the transaction that they assert came to light as a result of discovery conducted after the

conclusion of the appeal to the District Court.  In particular, they argue that they are entitled to

relief from the Sale Order because the Court knew nothing about the existence of a multi-billion

dollar discount in the value of acquired financial assets and was not told about a major structural

change to the transaction involving the agreement by Barclays to "take out" Lehman's

obligations to the New York Federal Reserve Bank (the "New York Fed") under a repurchase

agreement that enabled Barclays to achieve its acquisition objective of a $5 billion "buffer"

between the value of acquired assets and related liabilities to the New York Fed.

Indisputably, facts regarding this "buffer" were not disclosed during the Sale Hearing, but

the Court has determined that the revelations on this subject are not entitled to much weight now

because the Court was not concerned, one way or the other, about the existence of a spread

between the value of assets and liabilities.  The numbers involved, of course, are huge and

represent a significant potential recovery for the Movants.  While evidence of the buffer is

indicative of material information that the Court did not know when it approved the sale, these

disclosures do not support relief from the Sale Order because the overall transaction with

Barclays, notwithstanding the buffer, provided the means for the most favorable disposition of

these assets with the least amount of risk.

At the Sale Hearing, no one represented that there was to be any rough equivalence

between the value of assets and liabilities, and the Court did not base its approval of the sale on

the concept of a "wash" or on any conclusion as to the reasonableness or presumed accuracy of

the $47.4 billion value ascribed to the loosely-described assortment of financial assets that was

being acquired by Barclays.  Lori Fife, LBHI's counsel, mentioned that number at the start of the

Sale Hearing to illustrate the sharp and unexpected drop in value from the $70 billion figure that

had appeared a few days earlier in the APA, but that number was referenced only once in

colloquy as an indication of the terrible market conditions during Lehman Week and played no

role whatsoever in the deliberations regarding approval of the sale.  That information, however,

did contribute to a greater sense of urgency to proceed immediately with the sale rather than to

run the risk of an even greater drop in values that might result from the forced liquidation of

these assets.

The Court placed considerable reliance on the offers of proof and testimony that

supported approval of the sale and the emphatic endorsements of the transaction made in open

court by representatives of the federal regulators.  These representatives of the regulators were

unanimous and unqualified in their support, and the unmistakable impression was that approval

of the APA with Barclays most definitely was in the public interest and was needed to contain

incremental systemic risk and to protect customers and creditors alike.

Approval ultimately rested on the strength of a general proposition, supported by the

testimony of Barry Ridings of Lazard, that this going concern sale to Barclays manifestly was

more favorable than any other disposition of Lehman's assets.  Mr. Ridings stands by that

testimony and offered the same opinion in his video deposition that was played during the trial.

The Court agrees with the position articulated by Barclays that the Court had an adequate record

to support all findings in the Sale Order and that the newly-presented facts, while very significant

to be sure, do not change the essence of the approval process and would not have made any

difference in the Court's ruling.

The Court concludes on the basis of the mostly congruent and consistent testimony of those who took part in the expedited negotiations of this acquisition that the APA and the Clarification Letter were the product of arm's-length negotiations, that Barclays acted in good faith (while still pressing hard for the very best deal it could get), and that mark-to-market valuation judgments during Lehman Week were uncertain at best due to extreme market volatility.  Whatever the Court did not know at the time about the specifics of the sale does not appear to have been withheld deliberately.

Greater transparency always is preferable but is not always feasible.  The conclusion reached here is that the disclosure that took place during the Sale Hearing was adequate under the circumstances and additional disclosure, while highly desirable, would not have made any difference in the outcome.  Also, in evaluating the evidence, the Court thinks that the mismatch in valuation is something of a red herring.  The Movants, in seeking relief from the Sale Order, have stressed what the Court did not know and the importance to the Court's deliberations of not having been told about the now-revealed five billion dollar mismatch between the values of the financial assets and related liabilities, but the Court, having reflected on its role during Lehman Week, is unconvinced that knowing about the mismatch would have changed anything.

While this was not an "anything goes" situation, the reality is that the transaction with Barclays would have been approved in any event because, taken as a whole, it was demonstrably better for all parties than any alternative, and no evidence has been presented to the contrary. Importantly, the trial record makes clear that Barclays at all times intended for there to be a generous buffer in its favor with respect to the trading book of acquired financial assets but does not demonstrate that there was anything improper about the marking down of stale or inflated asset values or that the amount actually paid for these assets was less than reasonably equivalent

21

value at the time of the sale.  That is one of the critical elements of proof missing from the trial

record – there has been a strong implication of duplicitous behavior by certain Lehman

employees or of preferential treatment having been shown to Barclays in the marking down of

the asset values, but it has not been established that the marking down process was arbitrary or

unfair under the atypical market conditions that prevailed during Lehman Week or, perhaps most

importantly, that the aggregate amount paid was not a fair price for these assets.

F.    *Movants Did Not Establish That Barclays Received an Unfair Gain on the Acquisition*

The Court was unimpressed with the opinion testimony presented by the entire team of

expert witnesses retained by the Movants who endeavored to show that Barclays realized a

multi-billion dollar windfall gain.  Their opinions were based on a hindsight challenge to the

valuations ascribed to various categories of financial assets acquired by Barclays.  These

opinions were effectively challenged on cross-examination and were not convincing.  The

opinions, reflecting an unsurprising litigation bias, came across as having been designed and

manufactured for the trial and were not at all persuasive, particularly when compared with the

comprehensive and compelling testimony presented by Barclays' expert witness, Professor Paul

Pfleiderer.

The Court also does not believe that any Lehman employees breached their duties of

loyalty to the estate because of the prospect of future employment or as a consequence of signing

lucrative employment contracts with Barclays.  That aspect of the Movants' case is built on a

faint aroma of venality and conflicted loyalty, but no breach of duty or other misconduct was

demonstrated.  Despite the insinuations of wrongdoing, the Court concludes that the marking

down of asset values during Lehman Week appears to have been consistent with an attempt,

apparently undertaken in good faith, by employees of both Lehman and Barclays to estimate

market values for assets that were difficult to value at a time of extreme uncertainty in the

financial markets.  Barclays also may have been endeavoring to increase its buffer and take

advantage of Lehman's vulnerable position at a time when its own negotiating leverage was at its

peak.  That may well be true, but the Court does not find that Barclays received assets that

collectively were worth any more in the market than it paid for them.

The Court has made this determination notwithstanding the damaging testimony of

certain witnesses (Martin Kelly for one) from Barclays who were so thoroughly prepared for trial

that it damaged their own credibility.  The evidence is clear that traders from Barclays engaged

in an exercise of discounting the value of assets before the Sale Hearing for purposes of lowering

the values assigned to various classes of assets and increasing the so-called "haircut" applicable

to these assets.  These activities were a deliberate departure from customary mark-to-market

practices within Lehman and yielded what some have called "liquidation" values (although what

was actually meant by the use of that term is unclear).  Movants have stressed that the Court was

not told about this unconventional procedure at the time of the Sale Hearing and have noted the

discrepancy between the term "book value" as used in the APA and these liquidation values that

were privately being developed by the traders.  Their point is that Barclays acquired these assets

at an undisclosed discount from Lehman's own regularly updated internal valuations thereby

raising well-founded suspicions as to the fairness of the pricing from Lehman's perspective.

While these facts certainly raise disturbing questions about the accuracy of statements

made at the Sale Hearing as to the real reason that values assigned to the trading assets had

dropped from $70 billion to $47.4 billion, it has not been shown that this *ad hoc* reduction in

Lehman's marks resulted in a material understatement of realizable fair market values of the

assets within the trading book.  This conclusion is bolstered by the fact that many of the assets

were complex structured financial products that were difficult to value with any degree of

confidence.  The valuation witnesses offered by Barclays, including Stephen King who

impressed the Court with his knowledge of the subject matter, stressed that valuation judgments

as to many asset classes were uncertain and fraught with risk after the LBHI bankruptcy.  Given

that uncertainty, the Court is unable to conclude that the "marking down" process, while facially

suspect, actually resulted in an arbitrary or unfair discount relative to fair market value for these

assets or that the discount caused the estate to lose any otherwise realizable value from these

assets.

Barclays' audited Acquisition Balance Sheet prepared under the direction of Gary

Romain is also consistent with a finding that Barclays received and accounted for assets that

were fairly valued (or at least not unfairly valued) and does not show any direct linkage between

the substantial gain on acquisition recognized by Barclays and the book of acquired trading

assets.  The Acquisition Balance Sheet, with remarkable symmetry, happens to carry these

trading assets at the very same aggregate number ($45.5 billion) that had been assigned to the

assets as a result of the marking down process within Lehman immediately before the Sale

Hearing.

Movants have questioned the credibility of that astounding coincidence – and astounding

is the right word for it – and have intimated that the numbers used in the Acquisition Balance

Sheet must have been tweaked or adjusted by members of Barclays' Product Control Group as

part of a deliberate effort to lower the basis applicable to the acquired assets in order to create or

boost future trading profits, but it has not been shown by any direct evidence that the numbers

were manipulated in any way or that the Acquisition Balance Sheet is unreasonable in its

depiction of accounting reality, and Movants do not even attempt to show that the audited

24

financial statements of Barclays for the period in question are misleading.  Movants have

expressed their doubts regarding the accounting treatment of the acquisition but have not

established that the treatment was inappropriate under applicable accounting standards.

G.    *Considering the Unequal Bargaining Positions, Barclays Structured a Favorable
      Acquisition for Itself That Did Not Take Unfair Advantage of Lehman*

The testimony of the most senior ranking executives from Barclays, former Chairman

John Varley and President (now Chairman) Robert Diamond, confirms that Barclays conditioned

the acquisition on the requirement that it be capital accretive and include substantial negative

good will by operation of applicable accounting principles in the United Kingdom.  Barclays

always intended a transaction that would allow it to expand its operations in North America

while augmenting its own balance sheet and allowing it to realize a material first day gain on

acquisition.  This self-interested but understandable business reality was not communicated to

the Court at any time during the Sale Hearing.

The Court believes that no bank, domestic or foreign, at the height of the financial crisis

of 2008, would have considered an acquisition such as this one that was not structured to

minimize risks to the buyer as much as possible, and the Court is not surprised that Barclays, in

pursuing this transformative transaction, was focused on its own objectives and took aggressive

steps to protect itself.  To do otherwise would not have been rational.  The pivotal question,

however, is whether Barclays took unfair advantage of Lehman and its creditors in connection

with the sale and whether the failures to disclose material variations to the transaction described

in the APA compromised the integrity of the approval process to the point of justifying relief

from the Sale Order.

The record does not support such a conclusion or such negative perceptions of Barclays.

Barclays never agreed to assume any risks relating to Lehman's internal marks and never agreed

that the trading assets and liabilities would be in approximate balance with one another.  It is important to note the obvious – this was a quintessential distressed sale, and there was no reason to regard the transaction as being characterized by equal bargaining power or to assume that the buyer would treat the seller gently.  The seller was in bankruptcy and had no leverage — time was short, key employees were leaving and the markets were tanking.  And to make matters even worse from the seller's perspective, there were no other buyers.  In this tough bargaining environment, the Court did not need to be told that Barclays was on the scene purely as an opportunistic "white knight."  The only reasonable inference was that Barclays was structuring an acquisition that had a high likelihood of being very beneficial for Barclays.

Thus, the Court understood, without having to be told in so many words, that this had to be a very good deal for Barclays, perhaps even an outstanding one, but the Court also perceived that the transaction was beneficial to the estate because it allowed the Broker-Dealer Business to remain intact, paid the appraised value for the real estate, and included $250 million for the intangible attributes of the Broker-Dealer Business.  But there were other benefits as well – it also provided for the orderly transfer of approximately 72,000 customer accounts, avoided a piecemeal liquidation of assets at a time of turmoil in the financial markets, assumed comp and cure liabilities and provided for the retention of about ten thousand employees.  The fact that the transaction as modified was structured to also include a spread equivalent to the "haircut" obtained by the New York Fed in its financing of the operations of LBI during Lehman Week is new information, but that disclosure does not support relief under Rule 60(b).  Rather, it serves to demonstrate that Barclays, by substituting itself for Lehman with respect to the repo and becoming a borrower from the New York Fed, adopted a valuation spread that was consistent

with financings arranged by the New York Fed during Lehman Week and that followed the

valuation example set by the New York Fed.

H.    *While Not Formally Approved, the Clarification Letter Is Enforceable to the Extent*
      *Consistent With the Record of the Sale Hearing*

The Sale Hearing came to an end in the early morning hours on Saturday when the Court

issued its bench ruling approving the sale.  The Sale Order was entered shortly thereafter, and the

transaction closed on the morning of Monday, September 22 following a weekend of intense

negotiations that produced the Clarification Letter, an agreement that clarifies, modifies and

supplements the terms and conditions set forth in the APA.

If there had not been such an urgent need to close right away, it is most likely that the

parties, acting prudently, would have chosen to obtain a separate order approving the

Clarification Letter.  That did not happen, but the parties did what they must have believed to be

the next best thing.  The agreement was filed on the docket on September 22, 2008, the date it

was finalized, thereby giving broad notice of its terms.  Despite such notice and subsequent

proceedings in the bankruptcy court and District Court that referenced this letter, no one within a

period of over two years has ever sought formal approval of the Clarification Letter or a

determination that it should not be enforced in accordance with its terms.

The parties have relied on the Clarification Letter as a binding and enforceable

transaction document, and so despite the lack of formal approval, the Court is willing to do the

same.  Reliance is not, and ordinarily should not be, a substitute for actual approval, but the

combination of circumstances surrounding the execution of the Clarification Letter leads to the

conclusion that it is appropriate to treat this document as if it had been approved.  Those parts of

the Clarification Letter that amplify, clarify or bring the transaction into better alignment with

the actual structure of the transaction and agreement of the parties are enforceable to the extent

27

that these provisions are not inconsistent with the record of the Sale Hearing and the language of the Sale Order.

The failure to obtain bankruptcy court approval, however, leads to a vexing problem relating to assets identified during the asset scramble that were added to the definition of Purchased Assets[3] under the APA.  One such addition involves the 15c3-3 Assets, securities held in reserve pursuant to Rule 15c3-3, the Customer Protection Rule promulgated by the United States Securities and Exchange Commission (the "SEC").  Another change purports to grant rights to Barclays in the Margin Assets – the Lehman cash held by exchanges as margin to support the trading and clearance of exchange traded derivatives.  The Clearance Box Assets, the third category of assets claimed by Barclays, facilitate the clearance of securities trading. Barclays relies on the Clarification Letter in seeking to recover all three categories of assets in its motion to compel delivery of the Disputed Assets.

All of these Disputed Assets were identified as a result of last-minute demands made by Barclays for additional assets on the morning of the scheduled Sale Hearing with the threat that Barclays might otherwise be unwilling to close the acquisition.  That demand for incremental value to sweeten the deal was not disclosed during the Sale Hearing, and the Court knew nothing about this exercise of leverage by Barclays at the eleventh hour.  Among other things, the Clarification Letter reflects the addition of these final "sweeteners" to the deal.  For reasons stated in Section VI of this Opinion, based upon the Court's interpretation of the Clarification Letter in light of the record of the Sale Hearing, Barclays does not have an unconditional right to the 15c3-3 Assets and is not entitled to the Margin Assets, but does have a right to the Clearance Box Assets.

---

[3] The APA defines those assets that Barclays agreed to purchase thereunder as "Purchased Assets."

I.      *The Court's Own Experience During the Sale Hearing Is a Factor That Cannot Be*
        *Ignored in Deciding That Relief Under Rule 60(b) Is Not Warranted and That Barclays Is*
        *Not Entitled to Any "Lehman Cash"*

In reaching the conclusions expressed here, the Court does not write on a "clean slate"

and cannot disregard applicable personal experiences from the Sale Hearing.  Thus, in addition to

the evidence in these proceedings, the author of this Opinion has his own vivid recollections and

impressions of what occurred during the Sale Hearing and of the atmosphere both in the

courtroom and in the financial markets immediately following the bankruptcy of LBHI.  The

events of those early urgent days of the Lehman bankruptcy are sealed forever in the memories

of all participants, including the Court.  Because the same individual who presided at the Sale

Hearing also presided during these proceedings, the deliberative process as reflected in this

Opinion necessarily is affected by the Court's own experience.

The Court has applied that experience in considering the facts presented in an extensive

trial record, in deciding that Rule 60(b) relief is not appropriate and in considering claims arising

under the Clarification Letter.  The Court is convinced that the deal made and approved so

hurriedly was a good one both for Lehman and Barclays and was the best and only transaction

for the Broker-Dealer Business that could have been accomplished.  As detailed here, the Court

has had the privilege of learning a great deal more about the acquisition than it knew or could

have known when it entered the Sale Order.  The Court and other parties in interest undoubtedly

would have been better informed if the Sale Hearing had included more disclosures about

changes to the structure and economics of the transaction that occurred after execution of the

APA, but these omissions are not sufficient cause to grant relief from the Sale Order.  The 60(b)

Motions were presented well, but, as explained in the following sections of this Opinion, they

fail to persuade the Court that grounds exist to undo what has already has been done or to change the economics of the fully-consummated transaction.

Similarly, certain of the claims made by Barclays to obtain even greater economic benefits from the acquisition based upon the Clarification Letter are directly contradicted by the declarative statement made and repeated several times during the Sale Hearing that still resonates. That memorable statement, in plain language, confirmed that no Lehman cash would be going to Barclays. The Court relied on that clear representation that was given to assure the Court and parties who had objected to the sale that the assets being acquired by Barclays would not include cash.

The words used are absolute, unconditional and easily understood without regard to the language of the APA. "No cash" quite simply means "no cash." The Court has interpreted the Clarification Letter based on the language used in drafting that agreement and with reference to the testimony of those who negotiated the language of the document. That interpretation is influenced by the announcement at the Sale Hearing that Lehman cash would not be going to Barclays. For that reason, Barclays should not now be entitled to Margin Assets that constitute Lehman proprietary cash and should return any such cash that it may have received.

## II.    Procedural History

The Sale Order was entered during the early morning hours on September 20, 2008. An appeal (the "Bay Harbour Appeal") from that order by Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks (collectively, "Bay Harbour") was prosecuted in the District Court. *See* District Court Case Nos. 08-cv-08869, 08-cv-08914. The Movants filed

pleadings in the District Court in opposition to the Bay Harbour Appeal.[4]  On March 13, 2009,

the District Court issued its Opinion & Order affirming the Sale Order.  District Court Case No.

08-cv-08869, ECF No. 18; District Court Case No. 08-cv-08914, ECF No. 19.  Bay Harbour

pursued a further appeal of this decision, but ultimately abandoned its efforts to obtain relief

from the United States Court of Appeals for the Second Circuit (the "Second Circuit").  On May

28, 2009, the Clerk of Court of the Second Circuit entered an order dismissing the appeal due to

Bay Harbour's failure to respond to the Second Circuit's prior order to show cause.  *See* District

Court Case No. 08-cv-08869, ECF No. 21.  At that point, the Sale Order became final and no

longer was subject to further appellate review.

Despite the procedural finality of the Sale Order, LBHI initiated a discovery process that

marked the beginning of efforts to obtain relief from the Sale Order.  The Court observed a

preview of this discovery initiative at a December 22, 2008 hearing on a motion to approve a

settlement agreement (the "Settlement Agreement") between Barclays, LBI and JPMorgan Chase

("JPMorgan"), LBI's collateral agent.  The Settlement Agreement was the result of long

negotiations (later revealed to have included accusations of fraud by JPMorgan) following a

high-level and high-stakes dispute between Barclays and JPMorgan that eventually required the

intervention (at Barclays' request) of the New York Fed.  M Ex. 119A (Leventhal Decl.) ¶ 21;

9/7/10 Tr. 155:3-14 (Leventhal).

---

[4] In addition to LBHI's counter-designations of bankruptcy record on appeal, LBHI filed Answering Brief of
Lehman Brothers Holdings Inc., et al. in Opposition to Bay Harbour Appeal, and the SIPA Trustee filed Brief of
Appellee James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc.  District Court Case No.
08-cv-08869, ECF Nos. 4, 5, 8, 12; District Court Case No. 08-cv-08914, ECF Nos. 3, 4, 10, 13; BCI Ex. 33 (M Ex.
405); M Ex. 552.  The Committee did not participate in the Bay Harbour Appeal.  The Committee did, however, file
a Counter-Statement of Official Committee of Unsecured Creditors of Issues Presented on Appeal and Counter-
Designation of Additional Items to be Included in the Record on Appeal in the later-withdrawn appeal of a group of
creditors that called themselves the Informal Noteholder Group.  District Court Case No. 08-cv-09108, ECF No. 5;
BCI Ex. 398.

The dispute centered around a $7 billion "box loan" provided by JPMorgan to LBI in connection with the so-called Lehman III transaction.[5]  The $7 billion was transferred into Barclays' account at JPMorgan and then later removed by JPMorgan, allegedly due to Barclays' failure to renew a $15.8 billion repurchase agreement secured by Lehman assets.  This caused LBI to have to borrow $15.8 billion from JPMorgan.  JPMorgan wanted Barclays to "take out" this financing in a similar fashion to what Barclays had done with respect to a repurchase agreement between LBI and the New York Fed.[6]  *See* 6/21/10 Tr. 201:5-202:8 (Diamond); 9/7/10 Tr. 152:1-153:21 (Leventhal).  Barclays realized that the $7 billion was not in its account after the sale transaction had closed and the Clarification Letter had been signed.  M Ex. 119A (Leventhal Decl.) ¶¶ 19-21; M Ex. 119C (LaRocca Decl.) ¶ 11; 9/7/10 Tr. 27:19-22, 133:23-134:8 (Leventhal); 6/21/10 Tr. 201:5-202:8 (Diamond).

After Barclays and JPMorgan (with the help of the New York Fed) reached agreement, the parties sought the help of the SIPA Trustee in filing a motion to seek approval of the settlement.  *See* M Ex. 642.  Barclays, JPMorgan and LBI signed the Settlement Agreement on December 5, 2008; on that same day, the SIPA Trustee filed a motion seeking approval of the Settlement Agreement (the "Settlement Motion").  BCI Ex. 30 (M Ex. 119).

The Committee, which had been given only a cursory preview of the Settlement Agreement, filed an objection to the Settlement Motion on December 19, 2008.  *See* M Ex. 852; M Ex. 860; BCI Ex. 37 (M Ex. 398).  The Committee raised specific concerns about alleged undisclosed changes made to the sale transaction following entry of the Sale Order.  BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 45:11-50:7 (Kirpalani, Peck).  At the hearing on the Settlement

---

[5] The Lehman III transaction and the circumstances surrounding the $7 billion "box loan" are discussed *infra* at 42-45.

[6] The repurchase agreement between LBI and the New York Fed, defined as the "Fed Repo," and Barclays' agreement with the New York Fed to "take out" its financing obligation thereunder are discussed *infra* at 41-45.

Motion, LBHI expressed similar concerns, but did not object to the settlement because the

proposed order did not bar any future discovery or claims.  BCI Ex. 50 (M Ex. 262) (12/22/08

Tr.) 32:6-34:21 (Miller).  Counsel to JPMorgan and Barclays confirmed that the settlement

would not pose any collateral estoppel effect and that parties would be free to pursue claims

related to the "overall sales transaction."  BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 35:3-5, 40:9-11,

41:7-12 (Schiller), 39:13-20 (Novikoff).  The Court approved the Settlement Motion

> based on the record and the representations that have been made including the comments
> confirming that the settlement is not to have collateral estoppel impact that would
> preclude further investigation of the circumstances surrounding the original sales
> transaction between the estates and Barclays Capital approved by order entered
> September 20[, 2008].

BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 58:11-18 (Peck).

On May 18, 2009, some five months after approval of the Settlement Agreement, LBHI

filed a motion of for an order authorizing discovery from Barclays.  (the "2004 Motion").  Case

No. 08-13555, ECF No. 3596.  In the 2004 Motion, LBHI sought discovery related to the sale to

Barclays "specifically focused on whether the estate received appropriate value."  2004 Motion ¶

1. Each of the Committee and the SIPA Trustee subsequently filed papers joining in the 2004

Motion.  Case No. 08-13555, ECF No. 3778 (Committee); Case No. 08-13555, ECF No. 4074

(SIPA Trustee).  Barclays opposed the 2004 Motion.  Case No. 08-13555, ECF No. 3776.

After a hearing on June 3, 2009, the Court granted the 2004 Motion and entered an order

authorizing discovery (the "Discovery Order").  Case No. 08-13555, ECF No. 4164.  The

Discovery Order granted the relief requested in the 2004 Motion, and led to an extensive

examination of the facts surrounding the sale of the Broker-Dealer Business to Barclays.  This

discovery became the basis for the filing of the 60(b) Motions.

On September 15, 2009, one year to the day after LBHI filed its voluntary bankruptcy

petition, each of LBHI, the Committee and the SIPA Trustee[7] moved for relief from the Sale

Order by filing separate motions under Rule 60(b).[8]  Case No. 08-13555, ECF No. 5148 (the

"LBHI Motion"); Case No. 08-13555, ECF No. 5169 and Case No. 08-01420, ECF No. 1686

(collectively, the "Committee Motion"); Case No. 08-01420, ECF No. 1682 (the "SIPA Trustee

Motion") .  Since that date, the parties have worked together cooperatively to coordinate and

manage the 60(b) litigation and related adversary proceedings as described below.  Given the

complexity and importance of the issues presented, the case is a model of efficient case

management.  All counsel worked with each other and with the Court in a manner that

minimized unnecessary and distracting procedural disputes.

On October 27, 2009 the Court entered a scheduling order concerning these motions (the

"Scheduling Order").  Case No. 08-13555, ECF No. 5636; Case No. 08-01420, ECF No. 1989.

The Scheduling Order contemplated the possible filing of adversary complaints in relation to the

60(b) Motions, and set a deadline of November 16, 2009 for commencing these actions.  The

Scheduling Order set forth other deadlines and agreements of the parties relating to the

prosecution and management of this litigation, including dates by which Barclays would submit

its consolidated opposition to the 60(b) Motions and would file its motion to enforce the Sale

Order and secure delivery of the Disputed Assets.

---

[7] The SIPA Trustee's motion addresses both the Sale Order and the Order Approving, and Incorporating by
Reference for the Purposes of this Proceeding, and Order Authorizing the Sale of Purchased Assets and Other Relief
in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding (the "SIPA Sale Order").  Case No. 08-01420, ECF
No. 3.

[8] The SIPA Trustee also filed a motion to join in LBHI's 60(b) motion.  Case No. 08-13555, ECF No. 5173.  LBHI
filed its own 60(b) motion addressing the SIPA Sale Order.  Case No. 08-01420, ECF No. 1702.

On November 16, 2009, each of the Movants filed an adversary complaint (each, an

"Adversary Complaint" and collectively, the "Adversary Complaints") under Fed. R. Bankr. P.

7001, commencing the following adversary proceedings:

> Lehman Brothers Holdings, Inc. v. Barclays Capital Inc. (the "LBHI Adversary"), Adv.
> Proc. No. 09-01731(JMP);

> James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. v.
> Barclays Capital Inc. (the "SIPA Trustee Adversary"), Adv. Proc. No. 09-01732(JMP);
> and

> The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.
> v. Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays
> Capital Inc. (the "Committee Adversary"), Adv. Proc. No. 09-01733(JMP).

As the parties anticipated in the Scheduling Order, each Adversary Complaint to some

extent overlaps with one or more of the 60(b) Motions, and so the parties have entered into a

stipulation (the "Adversary Proceeding Stipulation") providing for the resolution of certain

claims in the Adversary Complaints in conjunction with resolution of the 60(b) Motions and

deferring certain claims for further adjudication.  The Adversary Proceeding Stipulation was "so

ordered" by the Court.  Adv. Proc. No. 09-01731, ECF No. 4; Adv. Proc. No. 09-01732, ECF

No. 5; Adv. Proc. No. 09-01733, ECF No. 3.

The Adversary Proceeding Stipulation provides that (i) the following claims in each

respective Adversary Proceeding shall be resolved through the resolution of the 60(b) Motions,

(ii) the 60(b) Motions (and all documents filed in connection therewith, including any opposition

papers submitted by Barclays) shall be treated as dispositive motions with respect to the listed

claims and (iii) any evidentiary hearing that is required by the Court to resolve the 60(b) Motions

also shall be used to resolve the claims:

> In the LBHI Adversary: Count III (Unauthorized Post-Petition Transfers – Bankruptcy
> Code § 549), Count IV (Recovery of Avoided Transfers – Bankruptcy Code § 550),
> Count V (Recovery of Excess Collateral on Liquidation of Repurchase Agreement –

Bankruptcy Code §§ 542 and 559), Count VI (Disallowance of Claims Under Bankruptcy Code § 502(d), and Count IX (Declaratory Judgment – 28 U.S.C. §§ 2201, 2202);

<u>In the SIPA Trustee Adversary</u>:  Count I (Declaratory Judgment Under 28 U.S.C. § 2201 – DTCC Clearance Box Assets), Count II (Declaratory Judgment Under 28 U.S.C. § 2201 – OCC Margin and Clearing Funds), Count III (Declaratory Judgment Under 28 U.S.C. § 2201 – Funds at Other Exchanges), Count IV (Declaratory Judgment Under 28 U.S.C. § 2201– $769 Million in Rule 15c3-3 Securities or Substantially Similar Securities), Count V (Avoidance of Transfers and Recovery of Property under §§ 549 and 550 of the Bankruptcy Code), Count VII (Turnover of Property under § 542 of the Bankruptcy Code), Count VIII (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities Under § 548 of the Bankruptcy Code), Count IX (Fraudulent Conveyance Under § 273 of the New York Debtor & Creditor Law, as Made Applicable by § 544(b) of the Bankruptcy Code), Count X (Recovery of the Excess Value of the Repo Securities Under §§ 559 and 542 of the Bankruptcy Code), and Count XIV (Disallowance of Claims Under § 502(d) of the Bankruptcy Code); and

<u>In the Committee Adversary</u>:  Count I (Declaratory Judgment as to Clarification Letter Pursuant to 28 U.S.C. §§ 2201, 2202), Count II (Accounting), and Count III (Attorneys' Fees, 28 U.S.C. § 2202).

Adversary Proceeding Stipulation ¶ 2.

In accordance with the Scheduling Order, on January 29, 2010, Barclays opposed the 60(b) Motions and filed its motion addressed to the SIPA Trustee to enforce the Sale Order and secure the delivery of the Disputed Assets (the "Barclays Motion").  Case No. 08-13555, ECF No. 6814; Case No. 08-01420, ECF No. 2581.  On March 18, 2010, each of the Movants filed a reply memorandum in further support of their 60(b) Motions and, in the case of the SIPA Trustee, in opposition to the Barclays Motion.  Case No. 08-13555, ECF No. 7641 and Case No. 08-01420, ECF No. 2843 (collectively, the "LBHI Response"); Case No. 08-13555, ECF No. 7667 and Case No. 08-01420, ECF No. 2857 (Committee); Case No. 08-01420, ECF No. 2847 (SIPA Trustee).  Barclays completed the initial round of briefing on the 60(b) Motions on April 5, 2010 with the filing of its reply memorandum in further support of the Barclays Motion.  Case No. 08-13555, ECF No. 8076; Case No. 08-01420, ECF No. 2996 (the "Barclays Reply").

On April 9, 2010, the Court heard oral argument on the 60(b) Motions and the Barclays

Motion.  At the outset of this hearing, the Court noted that it would not be deciding the 60(b)

Motions on the papers, that an evidentiary hearing would be necessary and that arguments on the

Motions would be treated as opening arguments for the evidentiary hearing.  4/9/10 Tr. 10:20-24

(Peck).

April 26, 2010 was the first day of what developed into a 34-day trial.  The Court heard

live testimony from 37 witnesses[9] and admitted 1,787 exhibits (some for limited purposes) into

the record.  On November 22, 2010, each of the Movants and Barclays filed a post-trial

memorandum, including proposed findings of fact and conclusions of law.[10]  Case No. 08-13555,

ECF No. 12950 and Case No. 08-01420, ECF No. 3909 (collectively, the "LBHI Post-Trial

Memorandum"); Case No. 08-13555, ECF No. 12970 and Case No. 08-01420, ECF No. 3916

(collectively, the "Committee Post-Trial Memorandum"); Case No. 08-13555, ECF No. 12971

and Case No. 08-01420, ECF No. 3917 (collectively, the "Barclays Post-Trial Memorandum");

Case No. 08-01420, ECF No. 3911 (the "SIPA Trustee Post-Trial Memorandum").

## III.     The Rule 60(b) Standard and Background of Movants' 60(b) Claims

Rule 60(b) applies in all cases under the Bankruptcy Code, except for certain

circumstances not relevant to this decision.  Fed. R. Bankr. P. 9024.  Rule 60(b) lists multiple

grounds upon which a court may relieve a party from final judgment, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been
>     discovered in time to move for a new trial under Rule 59(b);
> (3) fraud …, misrepresentation, or misconduct by an opposing party;

---

[9] The Court also heard video deposition testimony from four witnesses, and read designated deposition testimony from eighteen witnesses.

[10] The SEC and the Securities Investor Protection Corporation ("SIPC") also filed post-trial memoranda. Case No. 08-13555, ECF  No. 12961 and Case No. 08-01420, ECF No. 3914 (collectively, the "SEC Post-Trial Memorandum"); Case No. 08-01420, ECF No. 3912 (SIPC).

    (4) the judgment is void;

    (5) the judgment has been satisfied, released or discharged; it is based on an earlier
       judgment that has been reversed or vacated; or applying it prospectively is no
       longer equitable; or

    (6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Rule 60(b) "should be liberally construed when substantial justice will … be served." *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) (quoting *Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963)).  However, courts should not "lightly reopen[]" final judgments under Rule 60(b).  *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citations omitted).  Thus, such a motion generally is "not favored and is properly granted only upon a showing of exceptional circumstances." *Enron*, 352 B.R. at 369 (quoting *U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001)).  A motion seeking 60(b) relief is "addressed to the sound discretion of the [trial] court with appellate review limited to determining whether that discretion has been abused." *Nemaizer*, 793 F.2d at 61-62 (citations omitted).

Movants seek relief under four separate subsections of Rule 60(b) – 60(b)(1) (mistake, inadvertence or excusable neglect); 60(b)(2) (newly-discovered evidence); 60(b)(3) (innocent or intentional misrepresentation or fraud by an opposing party) and 60(b)(6) (fraud by any other party or fraud on the court).  LBHI Mot. ¶¶ 145-170; Committee Mot. ¶¶ 63-77; SIPA Trustee Mot. 89-105.  Movants also reference Federal Rule of Civil Procedure 60(d), which provides that "[Rule 60]" does not limit a court's power to, *inter alia*, "set aside a judgment for fraud on the court."  Fed. R. Civ. P. 60(d)(3); LBHI Mot. ¶¶ 167-70.

All of these claims are based on the allegation that certain crucial facts surrounding the sale to Barclays were not disclosed to the Court.  Movants submit that such a failure to disclose

at best qualifies as mistake, inadvertence or excusable neglect under Rule 60(b)(1).  LBHI Resp.

¶¶ 150-161.  Movants further assert that

> [w]hen the evidence is reviewed in terms of scienter, motive, opportunity, justification,
> excuse and any number of other considerations, the Court could very well determine that
> these "mistakes" were more than that, which might justify findings of bad faith, breach of
> fiduciary duty, misrepresentation or even fraud[,]

thus bringing their claims under the purview of Rule 60(b)(3), 60(b)(6) and/or 60(d).  LBHI

Resp. ¶ 150, n. 63.  During the trial, Movants focused on three broad categories of "mistake"

surrounding the sale – (i) Barclays' multi-billion dollar day-one gain on the sale, (ii) the non-

disclosure to the Court of the structural shift from the purchase of assets described in the APA to

the "take out" by Barclays of the New York Fed and (iii) the actual amounts paid for

compensation obligations and contract cures in comparison with the much higher estimated

amounts disclosed to the Court at the Sale Hearing.[11]  Movants base their Rule 60(b)(2) claim on

the allegation that they were justifiably ignorant of these "mistakes" despite their reasonable

efforts and diligence.

A.    *The Acquisition Gain and the Changing Character and Structure of the Sale*

At trial, the parties spoke of and characterized three separate negotiated structures of an

asset purchase by Barclays, described in shorthand as Lehman I, Lehman II and Lehman III.  The

negotiations surrounding "Lehman I" encompassed a potential acquisition of Lehman's global

business and commenced either late Thursday, September 11, 2008 or early Friday, September

12, 2008.  4/26/10 Tr. 145:10-146:7 (McDade).  Those discussions ended on Sunday, September

14, 2008, when Barclays informed Lehman of its "inability to consummate" the transaction.

4/26/10 Tr. 146:21-147:1 (McDade); 6/21/10 Tr. 137:7-12 (Diamond); 6/22/10 Tr. 81:9-11

(Varley).  That inability was followed almost immediately by the filing by LBHI of its

---

[11] By virtue of the SIPA Trustee's Joinder, he is a party to this argument, but he also bases his 60(b) claims, at least
in part, on issues surrounding the Clarification Letter.  These claims are discussed on pages 97-99 of this Opinion.

bankruptcy petition on September 15, 2010.  4/28/10 Tr. 11:12-18 (Miller); Case No. 08-13555,
ECF No. 1.

Discussions between representatives from Barclays and Lehman concerning an
alternative structure and a potential Lehman II transaction commenced early on Monday,
September 15.  4/26/10 Tr. 146:21-147:3 (McDade); 4/28/10 Tr. 11:12-21 (Miller).  Lehman II is
the transaction for the acquisition of the Broker-Dealer Business reflected in the APA; the
negotiations surrounding Lehman II took place in a compressed time frame, and, as described by
participants, were conducted within a "scene of organized chaos" and with a "sense of frenzy,
distress."  4/28/10 Tr. 11:22-12:21 (Miller); 4/29/10 Tr. 15:18-18:11 (Lowitt); BCI Ex. 365
(Lowitt Decl.) ¶7.  The negotiations continued into the early morning hours of September 16,
2008, when the parties signed the APA.  4/26/10 Tr. 150:14-24 (McDade); 4/28/10 Tr. 150:17-
151:15 (Kelly); 4/29/10 Tr. 63:4-20, 77:13-18 (Lowitt); 4/27/10 Tr. 110:8-111:7 (Berkenfeld);
4/28/10 Tr. 13:4 (Miller); BCI Ex. 1 (M Ex. 1) at 1.

Movants contend that during the course of the negotiations, certain Lehman executives
(who were given offers of employment by Barclays) agreed to prices for Lehman's assets that
were fixed below Lehman's marks.  Barclays counters that because Lehman last closed its books
on September 12, 2008, the Lehman marks were stale and needed to be adjusted to account for
the impact of the events of Lehman Week on the financial markets.  *See, e.g.*, 4/29/10 Tr. 93:6-
17 (Lowitt) (traders from both Lehman and Barclays were meeting to agree on "what was the
appropriate value for those securities given the nature of the environment and the market they
were dealing with … [and] there was a difference between what was on [LBHI's] books and what
was the outcome of that process … [of] around five billion dollars").

Regardless of the reasons given for the mark-down procedure, the evidence shows that the parties had negotiated a value for the Purchased Assets that was discounted from Lehman's marks by approximately $5 billion. M Ex. 7 (9/16/08 e-mail from Martin Kelly to Ian Lowitt and Paolo Tonucci at the conclusion of the negotiations for Lehman II, stating that the "[f]inal price did not change meaningfully – approx a $5b all in economic loss versus our marks"); 4/28/10 Tr. 155:12-18 (Kelly) (explaining that $5b all in economic loss means that "the transaction included an approximately five billion dollar difference between the values that had been negotiated for the assets that were moving, and their most recent book values on the books of Lehman").

Before the APA was presented to the Court for approval, the New York Fed had agreed to provide financing to LBI through a series of short-term funding agreements (collectively, the "Fed Repo") so that LBI could continue to operate as a broker-dealer for a limited period of time. Stip.[12] ¶¶ 130,165. As part of the Fed Repo, LBI had to post collateral to the New York Fed. Stip. ¶ 131. As is typical in repo transactions, the New York Fed required LBI to post as collateral securities valued in excess of the principal amount advanced by the New York Fed. Stip. ¶ 132. The amount by which the value of securities transferred exceeds the amount paid for them is referred to as a "haircut." Stip. ¶ 133. The "haircut" is measured at market value. 9/7/10 Tr. 52:22-53:19 (Leventhal).

By the close of business on Wednesday, September 17, LBI had posted collateral valued at approximately $50.62 billion in exchange for financing from the New York Fed of approximately $46.22 billion. M Ex. 119A (Leventhal Decl.) ¶ 9. This "haircut" reflected excess

---

[12] All references to "Stip." as used herein shall be to the Stipulations of Fact agreed to and signed by the parties in April 2010. *See* 4/26/10 Tr. 73:3-13 (Gaffey) (describing Stipulations of Fact to the Court).

collateral of $4.4 billion.  *See* Tonucci Dep. Tr. 17:5-15 (describing a "haircut" as "the difference between the market value and the cash received").

When the New York Fed learned that Barclays planned to purchase the Broker-Dealer Business, it became insistent that it be relieved of its short-term financing role for LBI and that Barclays take on the role of providing such financing to LBI.[13]  Stip. ¶ 134; *see also* 4/29/10 Tr. 113:15-19 (Lowitt); M Ex.119A (Leventhal Decl.) ¶ 7; 9/7/10 Tr. 7:9-8:23, 23:5-24:8 (Leventhal).  This arrangement in which Barclays became the source of financing to LBI is the transaction termed Lehman III – the transaction that actually was consummated but that was not fully disclosed to the Court or other parties in interest.

In order to facilitate the Lehman III transaction, the New York Fed agreed to provide Barclays with financing and a cash advance.  *See* M Ex. 844 (describing financing mechanism); 9/7/10 Tr. 103:3-105:5 (Leventhal).  Barclays relieved the New York Fed of its short-term financing role by means of a repurchase agreement between LBI and Barclays (the "September 18 Repurchase Agreement").  *See*, M Ex.119A, (Leventhal Decl.) ¶ 12; Stip. ¶ 135.

On the morning of September 18, 2008, steps were taken to effect the transition from the Fed Repo to the September 18 Repurchase Agreement.  This involved unwinding the Fed Repo, and the return by the New York Fed to LBI of securities that had been pledged as collateral. Later that day, pursuant to the September 18 Repurchase Agreement, Barclays forwarded to LBI approximately $45 billion in cash (its advance from the New York Fed) and LBI was to post as collateral securities valued at approximately $50 billion, reflecting an approximate $5 billion

---

[13] By September 16, 2008, Barclays had negotiated the terms of an agreement with the New York Fed (the "Take-Out Agreement").  *See* M Ex. 874 (e-mail sent at 1:37 a.m. on September 17, 2008 from the New York Fed to counsel to Barclays attaching draft of Take-Out Agreement).  Under the terms of the Take-Out Agreement, which was signed on September 17, 2008, Barclays agreed to purchase from the New York Fed the entirety of its positions in the Fed Repo in exchange for all of the collateral posted in connection therewith.  BCI Ex. 4 (M Ex. 348).  The Court knew nothing about the Take-Out Agreement at the time of the Sale Hearing.

"haircut" in the value of LBI's collateral. *See* M Ex. 119A (Leventhal Decl.) ¶¶ 10-12; 9/7/10 Tr.

118:25-122:13 (Leventhal); Stip. ¶ 136.  When asked to review the pool of collateral Barclays

was to take over from the New York Fed, Stephen King concluded that Barclays would be

sufficiently collateralized in loaning $45 billion against this pool of securities.[14]  8/25/10 Tr.

49:19-53:2, 55:2-10 (King); King Dep. Tr. 75:6-77:20.

     Due to operational problems, by the close of business on September 18, LBI had not

transferred all of the pledged collateral to Barclays.  Instead of approximately $50 billion in

collateral, LBI transferred at least $42.7 billion[15] in collateral under the September 18

Repurchase Agreement.  M Ex.119A (Leventhal Decl.) ¶ 14; 4/30/10 Tr. 183:18-184:7 (Hughes);

4/29/10 Tr. 272:4-24 (Clackson).   To make up the difference, LBI took a so-called "box loan" of

$7 billion, provided by JPMorgan and secured by an equivalent amount of securities held in

LBI's clearance boxes at JPMorgan.  M Ex. 36; M Ex. 50; M Ex. 66; 9/7/10 Tr. 122:21-123:17

(Leventhal); 4/30/10 Tr. 183:18-184:7 (Hughes).  LBI paid the full cash proceeds of this loan

over to Barclays as a replacement for the portion of collateral that could not be transferred on

September 18.[16]  Hraska I Dep. Tr. (8/14/09) 50:8-22;  9/7/10 Tr. 24:9-28:2 (Leventhal); 4/30/10

Tr. 183:18-184:7 (Hughes).  Thus, Barclays received at least $49.7 billion in collateral and cash

---

[14] Barclays later claimed that it was worried about the value of the securities posted as collateral for the September 18 Repurchase Agreement, and threatened not to close if Lehman did not come up with more assets. *See* Section VI.A of this Opinion for a description of the so-called "asset scramble."

[15] Bank of New York, as Barclays' collateral agent, valued the transferred collateral at approximately $45 billion. M Ex. 102; 8/25/10 Tr. 157:17-158:3 (King).

[16] *See* 31-33, *supra*, for a discussion regarding the ensuing dispute between JPMorgan and Barclays over this $7 billion.

to secure LBI's obligations for the $45 billion advanced to it under the September 18 Repurchase Agreement.[17]  9/7/10 Tr. 123:18-124:7 (Leventhal).

On September 19, 2008, pursuant to a Complaint and Application of SIPC, the District Court entered an Order Commencing Liquidation, which (i) found that the customers of LBI were in need of the protection afforded by SIPA, (ii) appointed a trustee "for the liquidation of the business of LBI with all the duties and powers of a trustee as prescribed in SIPA" and (iii) referred the liquidation proceeding (the "SIPA Liquidation Proceeding") to this Court.  Case No. 08-1420, ECF No.1.  The SIPA Liquidation Proceeding constituted a defined event of default under the September 18 Repurchase Agreement.  BCI Ex. 8 (M Ex. 4) (Master Repurchase Agreement) ¶¶ 2(a), 11; M Ex. 38 (Notice of Termination).  As a result of that default, Barclays immediately issued a Notice of Termination under the September 18 Repurchase Agreement.  M Ex. 38.

Barclays claims that the issuance of the Notice of Termination was inadvertent or a mistake.  8/31/10 Tr. 64:23-65:8 (Lewkow) (recalling "being told at some point" that "some back office person" unintentionally sent notice); Lewkow Dep. Tr. 68:17-69:14.  The parties addressed the issue after the Sale Hearing, when they continued their negotiations over the following weekend.  They included a paragraph in the Clarification Letter that purported to rescind the earlier termination and then terminate the September 18 Repurchase Agreement retroactively, all effective at Closing.  It provides, in relevant part, that

> [e]ffective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 [Repurchase Agreement] shall be deemed to constitute part of the Purchased Assets …, (ii) Seller and Purchaser shall be deemed to have no further obligations

---

[17] From the Court's perspective, the fact that Barclays had effectively "purchased" these assets one day *before* commencement of the Sale Hearing is troublesome, to say the least.  While no improprieties have been shown, it is curious that any financial institution would take on any exposure at a time of such upheaval in the markets *prior to* the entry of a court order approving the acquisition.

> to each other under the [September 18] Repurchase Agreement …,
> and (iii) the [September 18] Repurchase Agreement shall
> terminate.  Additionally, the Notice of Termination relating to the
> [September 18] Repurchase Agreement dated September 19, 2008
> is hereby deemed rescinded and void *ab initio* in all respects.

BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 13.

As a result of the insertion of this paragraph, all of the collateral pledged in connection

with the September 18 Repurchase Agreement – including the $5 billion "haircut" that under

Section 559 of the Bankruptcy Code otherwise would have had to be returned to the LBI estate –

was transferred to Barclays.  Thus, upon the signing of the Clarification Letter, Lehman III was

consummated and Barclays maintained a gain on acquisition equivalent to what it had negotiated

under Lehman II.  It is important to note, however, that the Court did not know at the Sale

Hearing that the structure of the transaction had changed from Lehman II to Lehman III.

B.      *Comp and Cure Payments*

To guide the documentation of the sale to Barclays, during the course of Lehman Week

the parties prepared a schedule showing the value of certain assets that were to be transferred to

Barclays and the liabilities to be assumed by Barclays (the "9/16/08 Financial Schedule").  BCI

Ex. 106 (M Ex. 2); 4/27/10 Tr. 115:2-10, 118:12-16, 123:19-124:22 (Berkenfeld); *see also*

8/31/10 Tr. 36:9-23 (Lewkow) (describing Berkenfeld signing 9/16/08 Financial Schedule);

8/23/10 Tr. 69:10-70:22 (Shapiro) (describing development of 9/16/08 Financial Schedule).

Two categories of liabilities on the 9/16/08 Financial Schedule are "Comp" and "Cure Pmt."

BCI Ex. 106 (M Ex. 2).

Paragraph 9.1(c) of the APA addresses the obligation of Barclays to pay 2008 bonuses to

Transferred Employees – *i.e.*, former Lehman employees who transferred to Barclays – and

expressly references the 9/16/08 Financial Schedule.  BCI Ex. 1 (M Ex. 1) ¶ 9.1(c); BCI Ex. 106

(M Ex. 2); 4/26/10 Tr. 177:17-180:23 (McDade); 8/23/10 Tr. 89:15-92:4 (Shapiro); 8/31/10 Tr.

97:2-9 (Lewkow); 8/24/10 Tr. 27:16-28:4 (Exall); M Ex. 24. Thus, the aggregate amount of

such 2008 bonus payments was established by the $2 billion figure set forth on the 9/16/08

Financial Schedule. BCI Ex. 106 (M Ex. 2); 4/26/10 Tr. 168:13-169:9, 177:17-180:23

(McDade); 8/24/10 Tr. 27:16-28:4 (Exall). The plain language of the Paragraph 9.1(c) of the

APA specifically refers only to bonuses, not severance.[18] Moreover, the $2 billion figure for

bonuses was an "agreed number" that reflected a "full requirement for Barclays to pay." 4/26/10

Tr. 164:6-8, 215:13-18 (McDade).

Barclays contends, however, that it can (and did) satisfy this obligation by including in

the total payments of severance, taxes and other forms of compensation and argues that

"according to a document prepared by Barclays' Paul Exall regarding compensation to former

Lehman employees for their pre-acquisition services (the 'Exall Spreadsheet'), Barclays has paid

or promised to pay for 2008 approximately $1.66 billion in bonuses, $265 million in severance

payments, and approximately $21 million in taxes." Barclays Mot. ¶ 300. According to

Barclays, "[t]hese liabilities total $1.946 billion, an amount fully consistent with the $2 billion

estimate of the parties." Barclays Mot. ¶ 300; *see also* 8/23/10 Tr. 189:2-194:8 (Exall); 8/24/10

Tr. 8:21-9:17, 61:11-62:22 (Exall) (discussing prepared chart showing total for bonus, severance

and taxes of $1.951 billion); BCI Ex. 142A (M Ex. 107).

Mr. Exall, the executive charged with monitoring the compensation paid to former

Lehman employees who transferred to Barclays, was instructed immediately after the closing of

the sale to plan on paying bonuses to former Lehman employees of approximately $1.4 billion,

not the $2 billion set forth in the APA. *See* BCI Ex. 295 (M Ex. 91) at 2; 8/24/10 Tr. 45:5-13

---

[18] Paragraph 9.1(b) of the APA separately defines the obligation of Barclays to make severance payments to
Transferred Employees who were later laid off. Paragraph 9.1(b) does not reference the 9/16/08 Financial Schedule.
*See* 8/24/10 Tr. 28:5-19 (Exall); 8/23/10 Tr. 92:5-94:23 (Shapiro) (describing having reviewed the APA to ensure it
accurately reflected the deal, and noting that Paragraph 9.1(b) does not refer to the 9/16/08 Financial Schedule);
Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection c").

(Exall); M Ex. 92 at 2; M Ex.130 (9/16/08 e-mail reflecting $1.3 billion "bonus accrual"); M

Ex.134 (9/17/08 e-mail, showing $1.3 billion "bonus accrual"); M Ex. 43 (9/18/08 e-mail to

Ricci stating that "[w]e have assumed only $1.5bn of comp accrual is required rather than $2bn

in completion balance sheet").  Exall's team prepared twice-daily reports tracking bonus

payments.  8/24/10 Tr. 46:4-47:11 (Exall).  Exall also prepared a spreadsheet showing that, in the

aggregate, Barclays paid to transferred Lehman employees approximately $1.951 billion in all

forms of compensation.  M Ex.107; 8/24/10 Tr. 8:21-9:17, 65:18-66:2 (Exall).  Several entries on

the spreadsheet, however, do not relate to bonuses.[19]  BCI Ex. 142A (M Ex. 107); 8/24/10 Tr.

66:3-83:11 (Exall); Exall Dep. Tr. 78:22-84:3; 110:22-115:18; 124:22-125:6; 128:8-137:7;

141:5-144:12, 151:15-23.  In the end, subtracting out all non-bonus payments, Barclays paid

approximately $1.5 billion in bonuses to Transferred Employees.  BCI Ex. 142A (M Ex. 107).

As set forth in the 9/16/08 Financial Schedule, the estimated cost of cure payments to be

assumed by Barclays was $2.25 billion.  BCI Ex. 106 (M Ex. 2).  Martin Kelly was the Lehman

executive responsible for estimating the amount of cure liabilities that Barclays would pay.

4/27/10 Tr. 52:13-18 (McDade); 4/29/10 Tr. 90:17-92:19, 121:24-122:17 (Lowitt); 8/23/10 Tr.

94:23-95:20 (Shapiro) (explaining that the estimate was prepared to answer an inquiry by Cox

from Barclays); 6/22/10 Tr. 224:18-225:11 (Cox) (stating that cure estimates came from Martin

Kelly).  As of September 16, 2008, Kelly came up with an estimate for cure of $2.25 billion, the

number set forth on the 9/16/08 Financial Schedule.  4/26/10 Tr. 161:11-19, 163:8-169:10

(McDade).

---

[19] For example, Exall's chart reflects Barclays' payments to various taxing authorities in the total amount of
approximately $71 million.  M Ex. 107.  These taxes were not paid to individual employees, but rather to the
applicable taxing authority.  8/24/10 Tr. 67:4-68:9, 70:14-71:4, 71:16-72:5 (Exall).  This includes some $50 million
included in Exall's entry for "Bonus including social tax."  M Ex. 107; 8/24/10 Tr. 70:11-71:15 (Exall).

By the time of the September 17, 2008 hearing on the Debtors' Motion to (A) Schedule a

Sale Hearing; (B) Establish Sale Procedures; (C) Approve a Break-Up Fee; and (D) Approve the

Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the

Purchased Assets (the "Bid Procedures Motion"), the cure liability estimate had declined to

$1.5 billion – the number that was disclosed to the Court.  BCI Ex. 11 (M Ex. 118) ¶ 14

(explaining that "[t]he parties estimate that the cure costs associated with such assumptions and

assignments will be approximately $1.5 billion"); 4/26/10 Tr. 161:20-23 (McDade); BCI Ex. 48

(M Ex. 260), 9/17/08 Tr. 24:1-5 (Miller) (stating that "in connection with the assumption and

assignment of contracts, the cure amounts and other payments in connection with the contracts,

are estimated to be a billion five hundred million dollars").

Barclays, however, had its own estimate of $200 million for cure payments related to

contracts that it deemed to be "mission critical."  BCI Ex. 107 (M Ex. 11); 6/22/10 Tr. 225:16-

229:15 (Cox) (confirming that his notes in M Ex. 11 read, in pertinent part, that "[t]he 200 mill is

for more than 3,000 contracts mission critical[,]"acknowledging that Barclays' liability for

mission-critical contracts had been estimated at $200 million and conceding that there was a

swing of roughly $1.3 billion of what was told to the Court).  Barclays' $200 million estimate

was never disclosed to the Court.  6/22/10 Tr. 228:19-229:15, 205:2-3, 206:4-24 (Cox).  By

September 19, 2008, Barclays had developed internally an "official line" regarding cure

payments – namely, that they "are optional and tho [sic] some will be incurred, most will be

covered by our ongoing supplier relationships and fall into monthly expenses."  M Ex. 41;

4/30/10 Tr. 16:3-12 (Clackson).  Ultimately, after taking over the Broker-Dealer Business,

Barclays paid only $238,200,978 in cure liabilities through July 14, 2009.  Stip. ¶¶ 128, 152,

162; *see* BCI Ex. 133 (M Ex. 105) at 00115845 line 41; 9/2/10 Tr. 41:23-42:1, 47:2-25

(Romain).

C.      *Disclosures Made to the Court*

On September 17, 2008, LBHI and LB 745 LLC filed the Bid Procedures Motion,

seeking approval of the sale to Barclays.  BCI Ex. 11 (M Ex. 118).  The Bid Procedures Motion

describes the sale to Barclays as a transaction that was to be consummated on the terms and

conditions set forth in the APA.  BCI Ex. 11 (M Ex. 118) ¶ 5.  Because events were taking place

so quickly and the elements of Lehman III had not yet fallen into place, the Bid Procedures

Motion does not disclose the existence or set forth the terms of Lehman III, nor does it reveal a

discounted price for the Purchased Assets or clarify the estimates for compensation and cure

payments.  BCI Ex. 11 (M Ex. 118).

On that same day, the Court held the Bid Procedures Hearing.  At that hearing, counsel to

Lehman described the nature and overall value of the sale to the Court in connection with a

request for a break-up fee and outlined the components of the Lehman II transaction.  BCI Ex. 48

(M Ex. 260) (9/17/08 Tr.) 22:8-24:17 (Miller).  The Committee had only just been appointed and

retained its counsel.  It therefore requested an adjournment so that it could study the transaction,

but the Court denied that request due to the extraordinary need to move quickly to preserve the

Broker-Dealer Business.  BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 27:10-35:1 (Despins, Peck,

Miller).

Although the September 18 Repurchase Agreement was about to become the centerpiece

of the sale transaction, the Court was told virtually nothing about it.  Counsel to LBHI described

the repurchase agreements superficially as a means to continue short term financing so that LBI

could get through the week – not as a centrally important mechanism for structuring the

acquisition and establishing a mismatch between the value of acquired assets and assumed

liabilities.  BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 24:9-17 (Miller) ("And then, Your Honor, in

the interim, LBI has entered into an arrangement with the prospective purchaser where there's a

repo agreement in which they are backing up and allowing these repos to be settled and to be

financed ...")

 With respect to cure liability, the $1.5 billion estimate was specifically disclosed to the

Court in connection with the Bid Procedures Motion.  First, the Bid Procedures Motion stated

that "[t]he parties estimate that the cure costs associated with such assumptions and assignments

will be approximately $1.5 billion."  BCI Ex. 11 (M Ex. 118) ¶ 14.  Additionally, in his

presentation to the Court, counsel to LBHI explained that "in connection with the assumption

and assignment of contracts, the cure amounts and other payments in connection with the

contracts are estimated to be a billion five hundred million dollars."  BCI Ex. 48 (M Ex. 260)

(9/17/08 Tr.) 24:1-5 (Miller); *see also* 6/22/10 Tr. 230:8-24 (Cox) (Lehman was making a "good

faith estimate" with respect to cure liability).

 There was little more disclosed to the court at the Sale Hearing.  With respect to the

nature of the sale, the Court's understanding at the time was that the transaction had not changed

and that the subject matter was the same APA with a lower value for the Purchased Assets than

had been described just two days earlier.

 It is true that counsel explained to the Court that there were "many changes" to the

transaction by the time of the Sale Hearing (and that a Clarification Letter documenting such

changes would be forthcoming).  Statements from counsel indicated that there was a positive

difference between the Purchased Assets and the Assumed Liabilities:

> In terms of the economic changes, they result largely because of the markets,
> unfortunately. And from the time that the transaction was actually entered

into till [sic] now, the markets dropped and the value of the securities dropped as
well. So, originally, we were selling assets that had a value of seventy —
approximately seventy billion dollars. And today, Your Honor, we're only
selling assets that have a value of 47.4 billion dollars. Barclays is assuming
liabilities, however, of 45.5 billion dollars in connection with those assets. So
that has not changed from the original transaction.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 46:21-47:7 (Fife).  Counsel to LBHI mentioned the

September 18 Repurchase Agreement only in passing, however, stating that "Barclays basically

stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit

Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral

that Lehman posted in connection therewith."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 63:18-22

(Miller).

Regarding the estimate for comp, the Court was told that "Barclays will also assume

exposure for the employees that accept offers of employment, which is estimated to have a value

of approximately – an exposure of approximately two billion dollars."  BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 99:22-25 (McDade Proffer).

With respect to cure, the disclosure was that "Barclays is also assuming the cure amounts

relating to contracts and leases that will be assumed pursuant to the asset purchase agreement.

And that has a potential exposure … of 1.5 billion dollars … ."  BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 100:1-4 (McDade Proffer).

## IV.    Notwithstanding Incomplete and Flawed Disclosure, Cause Does Not Exist for 60(b) Relief

The evidence is clear and shows beyond all doubt that the Court did not know some very

basic information regarding the transaction that evolved over the course of Lehman Week.  The

Court finds, however, that the failure to disclose this information is not cause for relief under

Rule 60(b). Based on the record of the trial, the Court concludes that the parties negotiated in good faith and at arm's length, and that there was no effort to conceal relevant facts.[20]

After careful deliberation and consideration of an extensive record, the Court concludes that nothing in that record would have changed the outcome of the Sale Hearing – *i.e.*, the Court still would have entered an order approving the sale to Barclays even if it had known about the $5 billion "buffer" producing a gain to Barclays on day one of the sale, the differences in the comp and cure estimates versus the amount actually paid (or expected to be paid) and/or the existence and terms of Lehman III. Of particular importance is the lack of any substantial evidence to support a finding that the Sale Order was procured by fraud, misrepresentation, or wrongdoing of any kind. The disclosure problems are real, but they are due to the "fog" of Lehman and an emergency of a magnitude unlike any that has ever occurred in any sale hearing. These failings are, as a result, both understandable and forgivable.

A.      *The Sale was Negotiated in Good Faith and at Arm's Length*

Movants suggest but fail to establish that certain former Lehman executives breached their fiduciary duties because of conflicted loyalties relating to their lucrative employment agreements with Barclays. LBHI Br. Supp. 60(b) Mot. ¶¶ 14, 18, notes 2-12, 26, 115. Throughout the trial, Movants continued to insinuate bad faith on the part of these executives, implying that they were acting in bad faith on behalf of Lehman due to their pending employment at Barclays. During their questioning of Ian Lowitt and Martin Kelly – the only such former Lehman executives that Movants called to testify at trial – however, Movants failed to establish that there was any sort of *quid pro quo* between any Lehman executive and Barclays or any other demonstrated breach of duty. *See* 4/28/10 Tr. 130:10-262:10, 286:13-287:15

---

[20] For example, Archibald Cox, then-Chairman of Barclays America, testified, "Barclays wanted the Court to be in the position to make the right decision" and at no point did he have "any concern that any of the information being provided to the Court was in any way inaccurate or incomplete." 4/30/10 Tr. 206:20-24, 207:18-21 (Cox).

(Kelly); 4/29/10 Tr. 10:13-131:20, 165:7-179:23 (Lowitt). Numerous witnesses involved in the

negotiations confirm that the sale was negotiated at arm's length and in good faith.

That is not to say that Mr. Kelly was a credible witness. The opposite is true. He

appeared to be anything but candid and seemed to have been coached to a degree that the Court

might well discount everything that he said. The Court believes that he engaged in a process of

marking down asset values, but finds no basis for concluding that the valuation process was

corrupted by his expectation of becoming a Barclays employee.

The testimony of several of Movants' own witnesses – Harvey Miller, Michael Ainslie,

Bryan Marsal and Barry Ridings – supports the conclusion that all parties acted in good faith

during the negotiation process. Miller Dep. Tr. 59:18-60:7 (no former Lehman executive acted

in bad faith); 4/26/10 Tr. 139:5-9 (Ainsle) (no Lehman employee breached his duty of care or

loyalty to Lehman during the negotiations); Marsal Dep. Tr. 76:9-16 (not aware of "any

evidence" that any of the Lehman executives involved in negotiating the sale to Barclays

breached his fiduciary duties to Lehman); Ridings Dep. Tr. 49:13-50:11 ("no reason to believe"

that any former Lehman executive acted in bad faith). Moreover, Lehman's lead negotiator Bart

McDade testified both at the Sale Hearing and at trial that the negotiations were in good faith and

at arm's length. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 96:6-9 (McDade Proffer); 4/27/10 Tr.

37:14-22, 38:15-20 (McDade).

Also supporting the integrity of the negotiations was testimony regarding the extremely

challenging and stressful circumstances under which the negotiations were conducted. Multiple

witnesses to the negotiations testified that the negotiations were rigorous, with vigorous

disagreements between Lehman and Barclays, and that the negotiations were conducted at arm's

length. 8/23/10 Tr. 26:18-27:11, 31:1-4 (Shapiro); 8/27/10 Tr. 25:15-27:24, 40:25-42:6 (Klein);

8/31/10 Tr. 14:18-15:5, 16:5-21, 17:12-20, 228:22-229:14 (Lewkow); 9/7/10 Tr. 21:18-22:2

(Leventhal).

Movants highlighted the fact that a number of the senior Lehman executives who were

negotiating the sale to Barclays on behalf of Lehman at the same time were negotiating their own

employment contracts with Barclays.  LBHI Br. Supp. 60(b) Mot. ¶1, notes 2-12.  However,

Barclays and Lehman disclosed publicly in the Bid Procedures Motion and at the Sale Hearing

that Barclays would retain the top executives from Lehman and pay them bonuses.  BCI Ex. 11

(M Ex. 118) ¶ 19; BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 149:11-16 (Ridings).  Employee

retention, especially at senior levels, was a necessary feature of the acquisition.  Indeed, in order

to keep the business intact and to prevent the loss of key personnel, Barclays needed to include

competitive bonus commitments in its employment offers to top executives.  8/27/10 Tr. 15:11-

17 (Klein); 8/23/10 Tr. 50:16-25 (Shapiro); 8/31/10 Tr. 15:6-23 (Lewkow).  The existence of

such incentives is not surprising, and, more importantly, has not been shown to have influenced

the behavior of these executives.

Barclays made no effort to keep secret the fact that it expected and planned for the sale

transaction to result in a day-one acquisition gain.  BCI Ex. 110 (M Ex. 16); 6/22/10 Tr. 91:2-24

(Varley); 6/21/10 Tr. 141:16-142:5 (Diamond); 5/7/10 Tr. 146:21-147:2 (Ricci).  Moreover,

Stephen King, who was head of the Portfolio Mortgage Trading Group at Barclays during

Lehman Week, testified that Lehman's trading assets were exceptionally difficult to value

because so many of them were illiquid.  8/25/10 Tr. 26:18-28:3, 32:24-34:9, 60:23-61:15, 66:24-

68:1 (King).  In addition, the identity of Lehman's trading assets was constantly changing – many

of the assets in the repo collateral actually delivered to Barclays were different from those that

had been pledged to the New York Fed.  8/25/10 Tr. 15:10-16:6, 23:20-24:17, 55:11-56:6, 153:1-154:1 (King).

At the Sale Hearing, certain parties in interest objected to the sale transaction on the basis that Barclays was receiving a "discount value" or "a fire-sale deal," and contended that there was insufficient evidence as to "whether the proposed purchase price represents a fair value for these assets."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 170:8-14, 174:6-8 (Golden), 227:5-14 (Angelich). Counsel for a group of creditors urged the Court to allow more time for possible competing offers.  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 167:20-168:3, 171:16-172:2, 174:9-21 (Golden).

In response, counsel to LBHI explained to the Court that

the proceeds of the sale, the 250 million dollars, is going
to the SIPC trustee, the one billion 290 million dollars is going to the
estate. There is a creditors' committee. Those proceeds are safe.
Hopefully, we're going to go into the more conventional procedures of
Chapter 11. I don't want to use the melting ice cube. It's already half
melted, Your Honor. The steps have had [sic] happened, the things that have
happened since Wednesday, make it imperative that this sale be approved.
In the interest of all of the stakeholders, including Mr. Golden's clients,
they will benefit by this, Your Honor, because if the alternative happens,
there will be very little to distribute to creditors, if anything.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 244:11-24 (Miller).  The Sale Order (which Movants supported on appeal to the District Court)[21] expressly denied and overruled those creditor objections on the merits with prejudice.  BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 2; see also BCI Ex. 17 (M Ex. 444) (SIPA Sale Order).

The Court finds that the estimates for comp and cure that the parties presented at the Sale Hearing were just that – good faith estimates, and not guarantees or representations that these were firm numbers.  Barclays did not have the time and information needed for a comprehensive

---

[21] On December 12, 2008, LBHI filed a brief opposing a creditor's appeal of the Sale Order and invoked the terms of the Clarification Letter as a reason for denying the appeal and affirming the Sale Order "in all respects."  BCI Ex. 33 (M Ex. 405) at 4, 9, 12, 18, 23, 26.  The Trustee filed a brief adopting LBHI's brief. M Ex. 552 at 4, n. 1.  *See also* 30-31, *supra*, for a discussion of the procedural history of Sale Order.

analysis to determine which contracts it would need to assume, and therefore it could not know

how much it would have to pay in cure payments.  4/30/10 Tr. 72:1-12, 74:2-75:14 (Clackson);

4/28/10 Tr. 114:22-115:19 (Miller); 8/23/10 Tr. 44:6-45:15 (Shapiro); 8/31/10 Tr. 92:16-25,

93:9-12, 235:20-236:7 (Lewkow).  Indeed, the comp and cure estimates necessarily were

uncertain and contingent.  4/28/10 Tr. 32:8-19 (Miller) (describing the $1.5 billion figure for

cure payments as "contingent"); Miller Dep. Tr. 81:5-14 (total amount that Barclays would end

up having to pay in bonuses and severance payments uncertain and contingent).

As explained in the Introduction to this Opinion, the Court did not base its approval of

the sale transaction on any specific number or on any perception of a "wash" or a balanced

transaction.  Just as the APA contained no total valuations and no representations or warranties

as to values (and no "true up" to the extent that valuations might change over time), the Court

made no findings of specific valuations, and could not have made any such findings given the

character and description of the assets and the emergency nature of the hearing.

The circumstances presented during the Sale Hearing were truly extraordinary and

unique.  The Court approved the Sale because "the consequences of not approving a transaction

could prove to be truly disastrous," and "[t]he harm to the debtor, its estates, the customers,

creditors, generally, the national economy and the global economy could prove to be

incalculable."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:16-21 (Peck).  That conclusion is as

true today as it was at the time of the Sale Hearing.

B.      *Barclays Was the Sole Purchaser in a Position to Purchase the Assets as a Going
        Concern and Prevent a Liquidation that Would Have Caused a Disintegration of the
        Enterprise*

The reality is that Barclays was the only purchaser for Lehman's assets.  The Court knew

at the Sale Hearing facts that had been widely reported in the media in the months preceding the

Filing Date – Lehman had been looking for a strategic buyer or investor for some time with no

success. *See, e.g.,* BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 25:10-18 (Miller) ("For months now,

Lehman Brothers has been pursuing strategic alternatives …. [T]he public, the financial markets

knew that these assets were for sale").  During Lehman Week, Lazard also contacted various

entities that had expressed interest in a transaction with Lehman "but not one of them, nor any

other entity, had expressed the desire or ability to step into Barclays' shoes."  BCI Ex. 49 (M Ex.

261) (9/19/08 Tr.) 145:5-13 (Ridings Proffer).  The Committee refrained from objecting to the

sale due to the "lack of a viable alternative."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 67:9-14

(Despins).  Barclays was the one qualified buyer in a position to promptly complete a going

concern acquisition – it is as simple as that.

Importantly, throughout the 34 days of trial, the Movants did not present any evidence

that other potential bidders would have come forward had any of the information not disclosed to

the Court been made public.  *See generally* M Ex. 151; M Ex. 152; M Ex. 153; M Ex. 154; M

Ex. 154B; M Ex. 155B; M Ex. 156B; M Exs. 821-825; 9/20/10 Tr. (Zmijewski); 9/21/10 Tr.

(Zmijewski, Garvey, Schneider); 9/29/10 Tr. (Schwaba); 9/30/10 Tr. (Slattery); 10/04/10 Tr.

(Olvany).  What the evidence does demonstrate is that the disintegration of the enterprise and the

liquidation that would have occurred had there had been no sale to Barclays would have resulted

in greater economic harm and losses in the financial markets than actually were experienced in

September 2008 and succeeding months of the financial crisis. *See, e.g.*, BCI Ex. 48 (M Ex. 260)

(9/17/08 Tr.) 64:19-65:4 (Leventhal); BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 60:1-61:13 (Miller),

67:9-14 (Despins), 93:6-94:20, 102:19-103:7 (McDade Proffer), 143:17-19, 144:18-19, 144:22-

24, 146:4-14 (Ridings Proffer), 244:11-24 (Miller), 250:13-21 (Peck); BCI Ex. 16 (M Ex. 257)

(Sale Order) ¶ 1; 4/26/2010 Tr. 242:23-243:6 (McDade); 6/25/2010 Tr. 61:4-20 (Despins);

5/6/2010 Tr. 118:6-7 (Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-37:15, 65:10-15; 8/23/2010

Tr. 57:19-58:9 (Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-29:8

(Diamond); 6/22/2010 Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-25 (Pfleiderer).  As Michael

Ainslie, member of the board of directors of LBHI, testified, in the absence of the sale to

Barclays, LBI's liquidation could result in an "open-ended negative series of claims" on the

estate.  4/26/10 Tr. 96:7-12 (Ainslie).

Witnesses consistently testified that the Barclays Sale was the best available transaction

for the estate and was far better than an LBI liquidation. 4/26/2010 Tr. 243:3-11 (McDade);

4/28/2010 Tr. 22:20-24 (Miller); 6/25/2010 Tr. 61:4-20 (Despins); 5/6/2010 Tr. 118:6-12

(Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-36:20, 65:4-15; 8/23/2010 Tr. 57:19-58:9

(Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-25 (Diamond); 6/22/2010

Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-85:21 (Pfleiderer).

The "most important[]" factor for the court in determining whether to approve a § 363

sale is whether the asset is decreasing in value.  *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

Thus, a sale should be approved when the court is faced with the situation of a so-called "melting

ice cube," a sale that would prevent "further, unnecessary losses," the failure of other potential

buyers to appear despite "well-publicized efforts," and where the only alternative "is an

immediate liquidation that would yield far less for the estate" and creditors.  *Ind. State Police

Pension Trust v. Chrysler LLC (In re Chrysler LLC)*[22], 576 F.3d 108, 118-19 (2d Cir. 2009).

---

[22] After the Second Circuit reaffirmed in a full opinion its earlier summary affirmance of the bankruptcy court's order authorizing a Section 363 sale of the assets of the former Chrysler LLC "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez," the Indiana State Pension Police Trust filed a petition for certiorari to the United States Supreme Court.  *Chrysler*, 576 F.3d 108 at 111.  During the pendency of the cert petition, the sale of Chrysler's assets was consummated.  On December 14, 2009, the Supreme Court issued a summary order granting certiorari, vacating the judgment of the Second Circuit, and remanding with instructions to dismiss the appeal as moot. *Ind. State Police Pension Trust v, Chrysler LLC*, 130 S. Ct. 1015 (2009) (vacating 576 F.3d 108 (2d Cir. 2009)); *see also In re Chrysler LLC*, 592 F.3d 370, 370 (2d Cir. 2010)  (per curiam) (dismissing the appeal on remand), *In re Motors Liquidation Company*, 428 B.R. 43, 50 n.6 (S.D.N.Y. 2010) (describing procedural history).

With this legal standard from *Lionel* in mind, and having been presented with clear and

convincing evidence of the quickly dissipating assets remaining in the estate, the Court approved

the sale transaction:

> One could be a theoretical bankruptcy jurist and say transactions such as this should
> always be subject to more time so that parties can better assess the consequences of the
> transactions .… This is Friday. This case was filed on Monday. What we're doing is
> unheard of but imperative. I am completely satisfied that I am fulfilling my duty as a
> United States bankruptcy judge in approving this transaction and in finding that there is
> no better or alternative transaction for these assets, that the consequences of not
> approving a transaction could prove to be truly disastrous. And those adverse
> consequences are meaningful to me as I exercise this discretion. The harm to the debtor,
> its estates, the customers, creditors, generally, the national economy and the global
> economy could prove to be incalculable.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:5-21 (Peck).

 The evidence at trial supports the statements made during the Sale Hearing.  Movants

offered no evidence to contradict the proffered Sale Hearing testimony of Mr. Ridings that "the

sale of LBI must be immediately consummated or there will be little or nothing to sell," that

"these assets have substantially greater value if they are sold as a going concern," and that

"[w]ithout Barclays, Lehman would be forced to sell [discrete] assets for a fraction of the value

that will be realized from this transaction."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 143:17-19,

144:18-19, 144:22-24 (Ridings Proffer).

 Some 2 ½ years after the Sale Hearing and almost two years since the Sale Order was

affirmed on appeal, the Court also is mindful of the well-established public policy of upholding

the finality of sale orders issued by bankruptcy courts to encourage potential acquirers to make

bids on assets in bankruptcy.  *See, e.g., In re Chung King, Inc.*, 753 F.2d 547, 549-50 (7th Cir.

1985) (finality policy necessary to encourage bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d

Cir. 2002) (citations omitted) (finality policy "particularly important" in the context of a

---

Notwithstanding this procedural history, the references to a "melting ice cube" in the *Chrysler* opinion provide a
most persuasive rationale for expedited sale hearings.

bankruptcy sale order).  Because the finality of bankruptcy sales is necessary to encourage

serious bidders, the Court has limited discretion to vacate a sale order.  *See Chung King,* 753

F.2d 547, 549-50 (7th Cir. 1985) (to overturn a confirmed sale, a court must find "a fundamental

defect which would shock the conscience"); *accord, In re General Insecticide Co.*, 403 F.2d 629,

630-31 (2d Cir. 1968) (citations omitted) (strict standard for setting aside sale unless "tinged with

fraud, error or similar defects" due to emphasis on finality in judicial sales).

In the Sale Order, the Court specifically held that Barclays was "entitled to all of the

benefits and protections afforded by Bankruptcy Code Section 363(m)."  BCI Ex. 16 (M Ex.

257) (Sale Order) ¶ 18.  Section 363(m) affords purchasers of a debtor's assets an "assurance of

finality" with respect to "who has rights to estate property."  *In re Gucci*, 126 F.3d 380, 387 (2d

Cir. 1997); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (conclusion to

uphold terms of sale under Section 363(m) "furthers the policy of finality in bankruptcy sales").

Where, as here, (i) a significant amount of time has passed, (ii) the Sale Order has been affirmed

on appeal, and (iii) the appellate court has rejected challenges to the Sale Order's core provisions,

held that the sale was adequately noticed, and found that the purchaser acted in good faith, the

Court should apply a strict "shocks the conscience" standard.  Under this standard, Rule 60(b)

relief is warranted only if the new evidence presented would have changed the outcome of the

Sale Hearing.

Many Courts have denied Rule 60(b) relief without a reason of "such importance that it

probably would have changed the outcome" of the case. *Teamsters*, 247 F.3d 370, 392 (2d Cir.

2001) (citations omitted) (no relief despite proof of perjury, because result would have been the

same); *see also Fitzgerald v. Field*, No. 98-7574, U.S. App. LEXIS at *6 (2d Cir. 1999)

(affirming rejection of Rule 60(b) fraud claim where the alleged fraud "could not have affected

the outcome"); *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999) ("Rule 60(b)(1)

affords a party relief from a material mistake that changed the outcome of the court's judgment").

Courts regularly have applied the "changed the outcome" test to claims under all

subsections of Rule 60(b). *BOUSA, Inc. v. United States (In re Bulk Oil (USA) Inc.)*, No. 89-B-

13380, 2007 U.S. Dist. LEXIS 27346, at *29-31 (S.D.N.Y. Apr. 11, 2007) (Rule 60(b)(1));

*Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (same); *In re Vitta*, 409 B.R. 6, 12

(Bankr. E.D.N.Y. 2009) (same); *Teamsters*, 247 F.3d at 392 (Rule 60(b)(2)); *Epps v. Howes*, 573

F. Supp. 2d 180, 184 (D. D.C. 2008) (same); *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161,

174 (Bankr. S.D.N.Y. 2004) (same); *Bettis v. Kelly*, No. 02 Civ. 104, 2004 U.S. Dist. LEXIS

1543 at *5-6 (S.D.N.Y. Aug. 9, 2004), *aff'd*, 137 F. App'x 381 (2d Cir. 2005) (Rule 60(b)(3));

*Creamer v. Laidlaw Transit, Inc.*, 76 F. App'x 273, 275 (10th Cir. 2003) (Rule 60(b)(6)).  Based

on this standard, and for the reasons stated, the Court finds that Movants are not entitled to relief

on their Rule 60(b) claims.

## V.    The Expert Testimony Supports the Conclusion that Barclays Did Not Receive a Windfall

The decision not to grant relief under Rule 60(b) also is supported by an assessment and

weighing of the expert testimony presented by the parties.  The Court heard this testimony over

an eight-day period and admitted into evidence the expert reports of eight witnesses.  During this

phase of the trial, Movants sought to prove that Barclays obtained a huge economic benefit due

to the undisclosed discounting of the value of the acquired financial assets and that Barclays

adopted "low-ball" numbers on its Acquisition Balance Sheet that by coincidence exactly

matched the amounts ascribed to these assets by the negotiating teams for Lehman and Barclays.

Movants raised questions about the credibility of the valuation judgments made by Barclays, but

they have not succeeded in proving that these judgments were erroneous.  Largely on the

strength of the testimony of Professor Paul Pfleiderer, who was the final witness for Barclays and

who testified for two days, Barclays was able to convincingly establish its defense to the

allegation that it obtained a windfall in connection with the acquisition.

A.    *Barclays' Valuation Expert*

Barclays called Professor Paul Pfleiderer as an expert witness whose testimony tied

together all of the evidence relating to valuation in a most persuasive and comprehensive

manner.  He testified regarding a number of issues, notably whether the APA misstated the book

value of the assets being acquired by Barclays, and the value of the repo collateral that was

actually acquired by Barclays in the sale transaction.  10/6/10 Tr. 10:14-25 (Pfleiderer).

Notwithstanding the efforts of the Movants to show that Professor Pfleiderer was being used as a

mouthpiece for witnesses from the Product Control Group of Barclays and from Pricewaterhouse

Coopers ("PWC") who did not appear at trial, the Court accepted Professor Pfleiderer as an

expert in financial economics and valuation and found his testimony to be most helpful.  10/6/10

Tr. 14:21-25, 15:1 (Pfleiderer).[23]

Professor Pfleiderer has a Ph.D. in economics from Yale University and has been a

professor of finance at Stanford Graduate School of Business for almost thirty years.  10/6/10 Tr.

6:20-25, 7:1-1 (Pfleiderer).  Professor Pfleiderer primarily teaches finance courses devoted to

valuation to graduate students in the MBA program.  10/6/10 Tr. 7:4-16 (Pfleiderer).  He also

currently teaches a corporate finance course at Stanford Law School.  10/6/10 Tr. 7:6-8

(Pfleiderer).  As was true of his testimony as a valuation expert in the *Iridium* case, the Court

again finds Professor Pfleiderer to be "an especially credible witness" and that Professor

---

[23] Barclays also called Anthony Leitner as an expert in the exchange-traded derivatives industry.  Mr. Leitner's
opinions do not relate to the value of the assets stated in the APA or the value of the repo collateral, but rather relate
to the Disputed Assets, and specifically, whether Barclays was entitled to the margin and related property in
connection with its acquisition of Lehman's exchange traded derivatives portfolio.

Pfleiderer once again "responded to questions, both on direct examination and during cross examination, with great candor." *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* 373 B.R. 283, 337 (Bankr. S.D.N.Y. 2007).

Based upon his review of Lehman's financial records, Professor Pfleiderer concluded that the book value of the assets being acquired by Barclays was not understated in the APA by any significant amount, particularly not by $5 billion, and that the book value according to Lehman's financial records was approximately $70 billion or less.  10/6/10 Tr. 19:15-20, 49:7-13 (Pfleiderer).  Professor Pfleiderer also concluded that the repo collateral was reasonably valued. 10/6/10 Tr. 19:22-25, 20:1-2 (Pfleiderer).

In testifying regarding the value of the repo collateral, Professor Pfleiderer explained that the repo collateral included many financial assets that were illiquid and difficult to value under normal circumstances, judgment is required in valuing such assets, reasonable people may have different opinions concerning such valuations and, therefore, there is not one reasonable valuation for such assets, but a range of reasonable valuations.  10/6/10 Tr. 93:10-94:25, 95:23-96:5, 123:22-124:7 (Pfleiderer); 10/7/10 Tr. 7:17-8:22 (Pfleiderer).  Moreover, Professor Pfleiderer testified that it was even more difficult to value the repo collateral due to the market turmoil that existed during September 2008.  10/7/10 Tr. 6:21-7:3 (Pfleiderer).

Professor Pfleiderer indicated that in forming his opinion as to the reasonable valuation of the repo collateral he considered it important that the Barclays' personnel who conducted the valuation and made the difficult valuation judgments were active participants in the market with a feel for the specific market conditions that existed in late September 2008 and that independent PWC personnel reviewed the reasonableness of these judgments.  10/7/10 Tr. 88:20-89:13, 177:10-178:6 (Pfleiderer).  Professor Pfleiderer further testified that he did not find anything to

indicate that Barclays attempted to mislead in its valuation, and he was reassured by the

knowledge that PWC had extensively audited Barclays' valuation judgments.  10/7/10 Tr.

185:18-22 (Pfleiderer); 10/6/10 Tr. 120:16-121:3, 143:16-144:6, 146:9-147:1, 181:8-10, 182:10-

14, 193:16-21 (Pfleiderer); *see also* 10/7/10 Tr. 94:17-96:17 (Pfleiderer).  He observed that the

process of an outside audit of the valuation, such as the audit conducted by PWC, generally will

produce a more reliable valuation.  10/7/10 Tr. 95:11-96:17 (Pfleiderer).

Additionally, Professor Pfleiderer expressed the opinion that in a so-called "fire sale"

liquidation of the assets transferred to Barclays it is "almost inconceivable" that Lehman would

have realized as much consideration as it received for the assets from Barclays and that the

likelihood is that a "fire sale" liquidation would yield "significantly less" for such assets.  10/7/10

Tr. 186:21-187:9 (Pfleiderer).  He also testified that Lehman "did better than what it would have

done if it would [have] had a liquidation" and that there was no doubt in his mind that this was

"the case with very, very strong probability."  10/6/10 Tr. 208:19-21 (Pfleiderer).  Furthermore,

Professor Pfleiderer stated that Lehman "couldn't have done better; the estate could not have

done better by selling it to another bidder for more, because there wasn't another bidder."

10/6/10 Tr. 208:22-24 (Pfleiderer).

The Court accepts Professor Pfleiderer's conclusions regarding the value of the assets

sold to Barclays and the valuation of the repo collateral.  He was persuasive in pointing out that

these hard to value assets were being valued by persons who were intimately familiar with both

the assets and the relevant markets at a time of unusual market disruptions, and that such

valuations were independently audited by a third-party auditor and found to be reasonable.  His

cogent and coherent testimony also supports the ultimate conclusion that Barclays did not

64

receive an unfair advantage when it purchased the Broker-Dealer Business and further

demonstrates that there is no cause to grant 60(b) relief.

B.      *Movants' Valuation Experts*

The Movants' called a total of six experts to testify with respect to valuation matters, all

of whom are either employed by or affiliated with Navigant Economics (Chicago Partners), an

"economic consulting firm that consults primarily in the litigation or dispute space," or its parent

Navigant Consulting Inc.  9/21/10 Tr. 27:7-8, 12-14 (Garvey); 9/20/10 Tr. 8:15-17 (Zmijewski);

9/21/10 Tr. 147:6-10 (Schneider); M Ex. 154B (Corrected Expert Report of Joseph Schwaba) ¶

1; 9/30/2010 Tr. 19:11-13 (Slattery); 10/4/10 Tr. 10:20-25 (Olvany).  The Court accepted

Professor Mark Zmijewski as an expert in accounting, financial analysis and valuation; John

Garvey as an expert in accounting, auditing and financial analysis issues; John Schneider as an

expert in the area of custodial services, particularly with respect to the policies and procedures

followed by custodians in dealing with repurchase agreements; Joseph Schwaba as an expert in

the valuation of municipal securities; Mark Slattery as an expert in the valuation of fixed-income

securities; and John Olvany as an expert in the valuation of corporate securities.  9/20/10 Tr.

15:4-12 (Zmijewski); 9/21/10 Tr. 33:1-3, 40:1-20 (Garvey); 9/21/10 Tr. 151:8-13 (Schneider);

9/29/10 Tr. 53:13-16 (Schwaba); 9/30/10 Tr. 21:14-17 (Slattery); 10/4/10 Tr. 14:14-17 (Olvany).

Despite the individual and cumulative expertise of these multiple witnesses called by the

Movants, they were not at all convincing at trial and uniformly appeared to be working in

concert to achieve a desired outcome for the Movants.  Movants' experts were not themselves

market participants, and they performed their valuations specifically in connection with this

litigation knowing that the Movants alleged that Barclays had undervalued the assets and were

seeking a quantification of such undervaluation.  9/20/20 Tr. 108:7-109:3, 110:22-111:7, 111:21-

112:9 (Zmijewski); M Ex. 151 (Expert Report of John P. Garvey) ¶6, App. 1; M Ex. 153A (App. II to John J. Schneider Expert Report, Curriculum Vitae); M Ex. 154A (App. I to Expert Report of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr. 75:8-18 (Schwaba); M Ex. 155A (App. I to Expert Report of Mark E. Slattery, CFA, Curriculum Vitae); 9/30/10 Tr. 59:13-15, 60:3-11 (Slattery); M Ex. 152A (App. I to Expert Report of John J. Olvany, Curriculum Vitae); 10/4/10 Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany). They were hired to reach a certain conclusion, and that is what they did.

However, counsel for Barclays was able to challenge the methods used and conclusions reached by certain of these witnesses. Cross-examination raised doubts as to their opinions.[24] Additionally, these experts did not express any views that the Acquisition Balance Sheet, which was audited by PWC, understated the value of the assets acquired by Barclays in the sale transaction. Mr. Garvey specifically testified that he was not giving an opinion with respect to whether Barclays' financials were materially misstated under applicable law, whether the Acquisition Balance Sheet was unreasonable or incorrect, or whether there were any material misstatements included in the Acquisition Balance Sheet. 9/21/10 Tr. 46:3-9, 84:17-25, 85:1-86:4 (Garvey).

C.    *Legal Standards Regarding the Reliability and Credibility of Expert Testimony*

A proponent of expert testimony must demonstrate that the proffered testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993);

---

[24] For example, Barclays' cross-examination of Mr. Slattery revealed that the summary spreadsheet prepared by Mr. Slattery in connection with his valuation of the Agency Residential Mortgage Backed Securities portfolio misleadingly demonstrated that in valuing the portfolio Mr. Slattery calculated the "bid" price by reducing the "mid" price by a "mid-to-bid" liquidity factor adjustment when for certain securities he actually started with a "bid" price and reverse-engineered, or "grossed up" the "bid" price to create the "mid" price. 9/30/10 Tr. 102:1-107:2, 111:7-112:3 (Slattery).

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) *(quoting Daubert,*

*509 U.S. at 597).*

The *Daubert* factors apply not only to the admissibility of evidence, but also apply to

weight and credibility determinations. *See e.g., Elliot v. Commodity Futures Trading Comm'n*,

202 F.3d 926, 934-35 (7th Cir. 2000) (affirming district court's decision to ignore unreliable

testimony and finding that a "fact-finder should employ the reliability benchmark in situations …

in which unreliable expert testimony somehow makes it in front of the fact-finder, and assign the

unreliable testimony little if any weight"); *Libas, Ltd. v. U.S.*, 193 F.3d 1361, 1366 (Fed. Cir.

1999) (reliability of expert testimony applies to the weight accorded to that testimony as well as

its admissibility).

To assess whether expert testimony meets the requisite standards the court should

undertake "a rigorous examination of the facts on which the expert relies, the method by which

the expert draws an opinion from those facts, and how the expert applies the facts and methods to

the case at hand." *Amorgianos*, 303 F.3d at 267.

An expert's opinion that is not "based on sufficient facts or data" nor "the product of

reliable principles and methods properly applied," should be rejected. *Lippe v. Bairnco Corp.*,

288 B.R. 678, 686 (S.D.N.Y. 2003) aff'd 99 F. App'x. 274 (2d Cir. 2004); *In re Rezulin Prods.*

*Liab. Litig.*, 369 F. Supp.2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony where "the

plaintiff's experts have ignored a large amount of information that calls many aspects of the

[expert's theory] into question" and explaining that "any theory that fails to explain information

that otherwise would tend to cast doubt on that theory is inherently suspect")

Expert opinion is unreliable and not based on sufficient facts and data when the expert

"made no attempts to reconcile his view [] with a number of real world events" and "fail[s] to

67

acknowledge and account for these events." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676, at *24, *33-35, *43 (S.D.N.Y. Feb. 23, 2004). "[F]ailure to look" at facts, "even for a reality check" means that an expert lacks sufficient facts and renders his opinion unreliable. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005).

D.    *The Expert Opinions Regarding Valuation Offered by the Movants are Not Persuasive*

The Court gives little weight to the testimony of Movants' experts. As discussed above, the expert witnesses proffered by the Movants, none of whom were market participants in September 2008, all prepared their valuations for the express purpose of this litigation. 9/20/20 Tr. 108:7-109:3, 110:22-111:7, 111:21-112:9 (Zmijewski); M Ex. 151 (Expert Report of John P. Garvey) ¶6, App. 1; M Ex. 153A (App. II to John J. Schneider Expert Report, Curriculum Vitae); M Ex. 154A (App. I to Expert Report of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr. 75:8-18 (Schwaba); M Ex. 155A (App. I to Expert Report of Mark E. Slattery, CFA, Curriculum Vitae); 9/30/10 Tr. 59:13-15, 60:3-11 (Slattery); M Ex. 152A (App. I to Expert Report of John J. Olvany, Curriculum Vitae); 10/4/10 Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany). They presented a mosaic of conclusions based upon their valuations of particular classes of assets acquired by Barclays. These witnesses engaged in a result-oriented exercise of looking retrospectively and critically at the judgments made by Barclays, on a CUSIP-by-CUSIP basis, as part of a concerted effort of trying to find a windfall. Experts who are valuing assets with such a litigation bias are not as compelling as those who actually had a "feel for this particular market in late September 2008." 10/7/10 Tr. 177:25-178:5 (Pfleiderer).

The Court agrees with Professor Pfleiderer's observation that a "de novo after the fact valuation" given in a litigation context is of limited merit in determining whether

contemporaneous valuation judgments performed by Barclays were reasonable.  10/6/10 Tr.

89:1-9 (Pfleiderer).  This is particularly true in a setting such as this in which the after-the-fact

judgments are seeking to upset the valuation determinations of market participants that were

made during a period of unusually severe market volatility.

It was a time of such upheaval that the only thing that was certain was uncertainty.  Given

the unparalleled circumstances of the financial markets in the fall of 2008 and heightened

uncertainty regarding the reliability of valuation judgments, the Movants' experts were

challenged with effectively calling into question the judgments made during this period by

Barclays' personnel such as Stephen King, who seems to have been one of the masters of that

valuation universe.  The Court finds that Movants' experts failed to prove that the assets were

valued improperly and, based on the examination and cross-examination of the Movants' experts,

the Court is left with the strong impression that their valuations are unreliable.

Theirs was a difficult task.  Among other things, they needed to disprove the

reasonableness of the accounting judgments made by Barclays in its Acquisition Balance Sheet,

but they were unable to do so at least in part because they do not assert that Barclays' audited

financial statements are misleading.  9/21/10 Tr. 46:3-9, 84:17-25, 85:1-86:4 (Garvey).  Their

decision not to challenge these financial statements is an indication that for the purposes of

public disclosure Barclays' valuation judgments appear to be adequate (or at least not

misleading).

The Court finds that the hindsight valuation performed by Movants' experts (i) does not

take into consideration the judgments of those actively participating in the market in September

2008 and the real world events and unique circumstances of that market, (ii) is not based on

sufficient facts and data and (iii) is not sufficiently reliable to support a finding that Barclays

received a windfall.  *See Point Prods. A.G.,* 2004 U.S. Dist. LEXIS 2676, at *24, *43.

## VI.    **Resolution of Claims to the Three Classes of Disputed Assets**

Barclays claims that the Clarification Letter unconditionally entitles it to the three classes

of Disputed Assets: (i) the 15c3-3 Assets, (ii) the Margin Assets, and (iii) the Clearance Box

Assets.  In addressing issues relating to the Clarification Letter, the Court must first determine

whether the conduct of the parties in relying on both the Sale Order and the Clarification Letter,

as was expressly anticipated by the Sale Order, is a reasonable substitute for actual approval by

the Court.  To the extent that the Clarification Letter is treated as an enforceable document, the

Court must interpret its plain language to determine which party is entitled to each of the three

classes of Disputed Assets.  As explained below, the letter is enforceable and supports recovery

of the Clearance Box Assets but does not support Barclays' claims to an unconditional right to

the 15c3-3 Assets or to recovery of the Margin Assets.

A.    *The Court Did Not Approve the Clarification Letter as it Relates to the Disputed Assets*

The sale transaction evolved significantly throughout the week immediately preceding

the Sale Hearing.  Even during the Sale Hearing, the Court was aware that certain details of the

transaction remained outstanding and would be subject to final documentation before closing[25]

but understood that the language of the Clarification Letter would not "materially" modify the

terms of the transaction approved by the Sale Order in a way that would adversely impact

Lehman's bankruptcy estates.  *See* BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 25.[26]  Absent such a

---

[25] At the Sale Hearing, the lawyers from Weil Gotshal representing LBHI and LBI explained that the transaction documentation was not yet complete.  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife).

[26] Moreover, the Sale Order authorized the Debtor to enter into final documentation "provided that such additional documents do not materially change its terms."  BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 3.

material change, the Sale Order did not require the parties to present additional documentation to the Court for approval.[27]

Rather than contacting the Court to request a hearing concerning the form and content of the letter agreement that was being revised throughout the weekend,[28] the parties elected not to present the Clarification Letter to the Court for approval and simply filed the Clarification Letter as an exhibit to the notice of filing of the APA. *See* Case No. 08-13555, ECF No. 280 (Notice of Filing of Purchase Agreement, Ex. C). Given the content of the document and the inability to be sure about the materiality of the changes, this decision in retrospect appears expedient and probably in error. To the extent that Barclays intended to rely on the language of the Clarification Letter in asserting rights to the Disputed Assets, it would have been proper (and certainly better practice) to have sought the Court's explicit "blessing" of such a key transactional document. As a sophisticated party seeking to purchase assets from a bankruptcy estate, Barclays should have taken all appropriate steps to confirm that all transfers were indisputably authorized.

Barclays, however, insists that additional approval of the Clarification Letter was not necessary because it did not materially change the transaction described to the Court at the Sale Hearing and was, therefore, already "approved" by the Court pursuant to the Sale Order. *See, e.g.,* 10/21/10 Tr. 133:24-134:10 (Boies) ("[T]he Sale Order then went on to expressly approve the purchase agreement including the clarification letter …"); 10/21/10 Tr. 139:8-9 (Boies) (the Clarification Letter "is part of the Purchase Agreement. It is expressly approved in that Sale

---

[27] Nonetheless, at the Sale Hearing, the parties announced their intent to present the final documentation of the transaction to the Court for approval at a subsequent date. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife) ("And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here").

[28] The Court announced that it would be available to discuss the Clarification Letter during the weekend following the Sale Hearing.

Order").  Barclays argues that although the portion of the Clarification Letter relating to the

Disputed Assets was never presented for approval, it can be effectively "deemed" approved

because the transfer of such assets was sufficiently contemplated by the Court at the time of the

Sale Order.  *See* Barclays Post-Trial Mem. ¶ 150 ("Whether the Clarification Letter is viewed as

having been approved in its then-existing oral form or prospectively in its final written form, the

Sale Order expressly approves the Clarification Letter … ").  According to Barclays, such assets

were necessarily part of the transaction approved by the Sale Order because that order approved

Barclays' acquisition of LBI's entire "Business."  *See* Barclays Post-Trial Mem. ¶¶ 225, 242,

247.[29]

The Court repeatedly has rejected this circular aspect of Barclays' argument.  *See*

10/21/10 Tr. 136:22-137:12 (Peck) ("Let me be clear about something . . . I never approved the

clarification letter . . . I said that at the opening and I'm saying it again at the closing. . . No

proceedings took place before this Court to approve the clarification letter *per se* … I'm just

letting you know that that's an aspect of your argument that I reject").  The Court believes that

separate approval of the Clarification Letter should have been requested because provisions of

the document relating to the Disputed Assets materially modified the transaction that was

approved by the Court at the Sale Hearing.  Approval of the transaction necessarily was premised

on there being an alignment between the substance of the transaction as understood by the parties

and the elements of the transaction that were disclosed at the Sale Hearing.

Given the many moving parts, the complexity of the acquisition, and the extreme time

pressure, the Court knew that the Sale Order needed to be flexible enough to accommodate

---

[29] The APA broadly defined "Purchased Assets" to include "all of the assets of Seller … used in connection with the
Business (excluding the Excluded Assets) …."  BCI Ex. 1 (M Ex. 1) (APA) § 1.1.  The "Business," in turn, was
broadly defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller …."  BCI
Ex. 1 (M Ex. 1) (APA) § 1.1.

changes to the APA.  This concept was reflected in the Sale Order, which contemplated final

documentation materially consistent with its terms.  But the Court was not aware at the time of

the Sale Hearing that the transaction included the Disputed Assets nor did the Court know

anything about the so-called asset scramble in which Barclays used the threat of walking from

the deal to demand more assets.  In fact, as to certain of the Disputed Assets, the Court had the

exact opposite understanding and believed, for example, that all cash, including the Margin

Assets, was excluded from the transaction.[30]

Although the Court approved Barclays' acquisition of LBI's "Business" as a whole, its

authorization was not limitless.  The transfer of such significant previously-undisclosed classes

of assets from the LBI estate constitutes a "material adverse" modification of the transaction

compared with previous disclosures to the Court, notwithstanding any ancillary benefits that may

have been received pursuant to other portions of the Clarification Letter.  *See* Barclays Post-Trial

Mem. ¶ 157 ("But even if the Clarification Letter had added additional assets that were not part

of the Purchased Assets in the APA (it did not), the Clarification Letter also made many changes

favorable to the Movants, which must be considered in assessing whether the Clarification Letter

had a material adverse effect on the estates").

B.      *Despite the Lack of Formal Court Approval, the Clarification Letter is Nonetheless
        Enforceable*

Although the provisions of the Clarification Letter relating to the Disputed Assets were

never approved by the Court, the parties relied upon the letter as a whole and treated the letter as

binding and enforceable.  The Movants also actively defended the validity of the letter on appeal

---

[30] The cash-free nature of the sale constituted a critically important structural component of the sale approved by the
Court.  *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 253:5-8 (Peck) ("I'm satisfied that given the fact that Barclays is
not taking cash and the only thing that came in to the debtor from Europe was cash that in practical terms we should
be safe").

before the District Court. *See* BCI Ex. 33 (M Ex. 405); M Ex. 552.  The SIPA Trustee opposed

"vacating the Sale Orders because of the havoc such a result would cause in the SIPA proceeding

that he administers, in which many decisions have been made based on the entry of the Sale

Orders, and during which many billions of dollars of property have changed hands."  M Ex. 552

at 1.

       The conduct of the Movants confirms widespread reliance on the letter.  For example, in

a joint submission with Barclays dated September 29, 2008, LBHI described the Clarification

Letter as "clarify[ing] the intention of the Parties with respect to certain provisions of the

Purchase Agreement, amend[ing] the Purchase Agreement in certain respects, and … binding …

the Parties.  As more fully described in the Clarifying Letter, the Schedules contain lists of

securities and trading positions transferred under the Purchase Agreement."  *See* BCI Ex. 19 ¶ 7.

In the Settlement Motion, the SIPA Trustee cited and relied upon the Clarification Letter.  BCI

Ex. 29 ¶ 16 ("The Clarification Letter provided that the Replacement Transaction was

terminated, and that the securities that had actually been delivered were 'deemed to constitute

part of the Purchased Assets' under the Purchase Agreement"); BCI Ex. 50 (M Ex. 262)

(12/22/08 Tr.) 23:21-24 (Kobak) ("And again, I just want to make it clear that what this

settlement really accomplishes is completing the very transaction contemplated in the purchase

agreement as approved by this Court").  Even as late as August 6, 2009 (and just five weeks

before the filing of the 60(b) Motions), the SIPA Trustee stipulated that the Clarification Letter

was part of the approved APA:  "On September 20, 2008, the Court entered the sale order (the

'Sale Order') approving the Asset Purchase Agreement, as modified, clarified, and/or amended by

the First Amendment, and a letter agreement, dated as of September 20, 2008, clarifying and

supplementing the Asset Purchase Agreement."  BCI Ex. 377 at 2 (emphasis in original).

Similarly, Barclays acted in reliance on the Clarification Letter and treated the letter as
binding when it agreed to close the transaction based on the terms of the Clarification Letter.
Barclays accepted the transfer of thousands of customer accounts, and offered employment,
made bonus payments, and provided severance protection to thousands of former Lehman
employees.  *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 98:10-12, 101:18-102:2 (McDade
Proffer).  Barclays assumed contracts and made related cure payments.  BCI Ex. 1 (M Ex. 1)
(APA) § 2.5.  Operationally, Barclays integrated Lehman's North American business into its
existing operations, and did so on the basis of the APA as modified by the Clarification Letter.
*See* 6/21/10 Tr. 232:3-5 (Diamond).

In light of this reliance and the conduct of the parties in treating the Clarification Letter as
a valid expression of their agreement, the Clarification Letter is enforceable notwithstanding the
lack of formal bankruptcy court approval.  Although the omission from the Sale Hearing of any
meaningful discussion of the Disputed Assets may have deviated from the core principles of
disclosure underlying Section 363 of the Bankruptcy Code, such a failure does not render the
Clarification Letter unenforceable in this instance because the parties themselves have acted in
reliance upon the Clarification Letter and have treated the document as enforceable.  *See, e.g.*,
*Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997)
(noting that Section 363 prohibits a debtor from selling estate property out of the ordinary course
of business "until creditors and other interested parties are given notice of the proposed
transaction and the opportunity for a hearing if they object").  By their conduct, including the
decision not to seek further approval of the letter, they have acted as if the Sale Order embraces
the Clarification Letter.

Accordingly, despite the failure to obtain explicit approval of the Clarification Letter, the Court will regard the document as having been approved under the broad language of the Sale Order.  Furthermore, even within the context of this litigation, both Barclays and the SIPA Trustee agree that it is appropriate to enforce the Clarification Letter according to its plain terms — the parties simply disagree as to the meaning of those plain terms.  *See* SIPA Trustee Post-Trial Mem. ¶ 416 (The Court "need not reach the question of whether it approved the final version of the Clarification Letter … [i]t is only if the Court were to agree with Barclays' reading of the Clarification Letter that it must consider whether … it approved the transfers that Barclays now seeks"); Barclays Post-Trial Mem. ¶ 223 ("[A]s a matter of straightforward contractual interpretation, [Barclays] is entitled to each of the Disputed Assets").  In light of this uniform reliance on the Clarification Letter and conduct of the parties that recognizes the legally binding nature of its terms, the Court will interpret the Clarification Letter as an enforceable agreement to the same extent as if it had been separately approved after notice and hearing.

C.    *Barclays Does Not Have an Unconditional Right to the 15c3-3 Assets and Is Not Entitled to Margin Assets But Is Entitled to Transfer of the Clearance Box Assets*

The relevant agreements are governed by New York law and must be interpreted according to familiar principles of contractual construction.  *See Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139, 146 (2d Cir. 2010) (principles of state law govern the interpretation of contractual provisions in bankruptcy).  The Court must therefore endeavor to ascertain the intent of the parties "from the plain meaning of the language employed in the agreements."  *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (citation omitted).

Where the Court finds the contractual language ambiguous, it may consider extrinsic evidence of the parties' intent.  *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989)

(where a provision is ambiguous, "courts look to the … circumstances surrounding execution of the ambiguous term to ascertain the parties' intent").  Extrinsic evidence includes "the history and education of the parties, the nature of the contract, the purposes of the parties and all other relevant circumstances."  *In re LaToya Jackson*, 434 B.R. 159, 166 (Bankr. S.D.N.Y. 2010) (quoting *In re Delta Airlines, Inc.*, 608 F.3d at 145-6).

Close inspection of the plain text of the Clarification Letter, as well as the extrinsic evidence surrounding its negotiation, execution, and implementation, reveals that there simply was no agreement to unconditionally transfer the 15c3-3 Assets or to transfer any of the Margin Assets to Barclays.  Moreover, regardless of the language in the Clarification Letter, Lehman cash was excluded from the APA.

i.      *The 15c3-3 Assets*

The 15c3-3 Assets consist of (i) $769 million in securities segregated by LBI for its customers in compliance with SIPA and Rule 15c3-3[31] and (ii) $507 million in assets posted by LBI as margin with the Options Clearing Corporation (the "OCC") and listed as a debit item in LBI's reserve calculation for purposes of Rule 15c3-3.[32]  Any transfer of these 15c3-3 Assets is thus governed by the two complementary regulatory regimes of SIPA and Rule 15c3-3.  First, SIPA requires that broker-dealers such as LBI set aside securities and other assets sufficient to "satisfy net equity claims of customers."  15 U.S.C. § 78fff(a)(1)(B).  Second, Rule 15c3-3

---

[31] *See* 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3").

[32] According to Barclays, Rule 15c3-3 does not prohibit the transfer of the $507 million in margin deposits because these deposits were held outside of LBI's Rule 15c3-3 reserve account.  *See* Letter (the "Barclays Letter") from Counsel to Barclays to the Court, copying Counsel to Movants and the SEC, dated December 20, 2010, responding to December 16, 2010 Letter from SEC to the Court (Case No. 08-13555, ECF No. 13517 and Case No. 08-01420, ECF No. 3987) (The Barclays Letter was not filed on the docket of any proceeding before this Court.)  The SEC and SIPC plainly disagree.  *See* SEC Post-Trial Mem. at 9 ("Transferring [the $507 million] Would Cause a Violation of the Rule If the Transfer Would Increase the Deficiency in the Reserve Bank Account …"); Case No. 08-01420, ECF No. 2989 (Statement of SIPC in Support of Trustee's Motion for Relief) at 13-15.  The Court agrees with the SEC and SIPC.  To the extent any deficit exists, it would be exacerbated by the transfer of the $507 million and, in so doing, violate Rule 15c3-3.

requires the maintenance of reserves of customer property to ensure full recovery for its

customers in the event of its liquidation. Rule 15c3-3 accomplishes this objective primarily

through two requirements: (i) the broker-dealer's reserve account should contain sufficient funds

"at all times" to allow a firm to promptly return customer property and (ii) such assets may only

be withdrawn if they constitute a surplus over the required minimum balance. 17 C.F.R. §

240.15c3-3(e)(1), (2); 17 C.F.R. § 240.15c3-3(g). To that end, Rule 15c3-3 provides a "Reserve

Formula" to calculate the minimum required balance for a broker-dealer's reserve account. *See*

SEC Post-Trial Mem. at 9-10.

The Clarification Letter respects the interplay between this regulatory regime and the

15c3-3 Assets. Specifically, it provides that Barclays shall be entitled to receive the 15c3-3

Assets only if "permitted by applicable law." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8

("In connection therewith, Purchaser shall receive … (ii) ***to the extent permitted by applicable***

***law***, and as soon as practicable after the Closing, $769 million of securities, as held by or on

behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934,

as amended, or securities of substantially the same nature and value") (emphasis added). Thus,

this provision is conditional and recognizes that in the event of a deficit in LBI's customer

reserve accounts,[33] SIPA and Rule 15c3-3 may prevent the SIPA Trustee from transferring any

property from these accounts.

Barclays argues that Rule 15c3-3 does not constitute "applicable law" as referred to in the

Clarification Letter because it does not apply to a liquidating broker-dealer such as LBI. *See*

---

[33] The Trustee and Barclays have stipulated to defer consideration of the factual issue as to whether a deficit or
excess exists with respect to LBI's customer reserve accounts, and no findings are being sought with respect to that
issue. *See* Case No. 08-13555, ECF No. 13824 and Case No. 08-1420, ECF No. 4020 (Stipulation and Order
Between the Trustee and Barclays Concerning Certain Claims Under Paragraph 8(ii) of the Clarification Letter
Made in the Motion and Adversary Complaint Filed by the Trustee and the Motion to Enforce the Sale Order Filed
by Barclays).

Barclays Post-Trial Mem. ¶ 270.  But the post-trial brief filed by the SEC contradicts Barclays'

position.  *See* SEC Post-Trial Mem. at 5-8.  To carry out the requirements of SIPA, trustees of a

liquidating broker-dealer such as LBI must continue to effect securities transactions, such as

purchasing securities to satisfy customer claims for missing securities and closing out open

securities contracts.  15 U.S.C. § 78fff-2(d), (e).  To engage in these transactions, a liquidating

broker-dealer must remain registered with the SEC and subject to relevant SEC Rules, including

Rule 15c3-3.  15 U.S.C. § 78o(a)(1).  Moreover, adopting Barclays' argument would undermine

the policy objective underlying Rule 15c3-3.  That objective is the retention of sufficient funds to

make the customer whole in the event of an insolvency.  Indeed, the customer protections

intended by Rule 15c3-3 are perhaps most needed following the failure of a broker-dealer.

In the alternative, Barclays argues that the Clarification Letter, when properly construed,

actually entitles Barclays, not the SIPA Trustee, to the 15c3-3 Assets.  It argues that the phrase

"to the extent permitted by applicable law" only limits Barclays' ability to receive those

particular 15c3-3 Assets held in LBI's customer reserve accounts at the time of the execution of

the Clarification Letter.  In the event that applicable law prevents such a transfer, according to

Barclays, then the Clarification Letter would still entitle Barclays to receive "securities of

substantially the same nature and value."  *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(ii).

The Court declines to interpret this language in the manner proposed by Barclays.  To do

so would convert a conditional agreement into an unconditional one.  Barclays attributes

unwarranted significance to the phrase "securities of substantially the same nature and value."  It

appears that this phrase was used to account for the possibility that, while attempting to obtain

SEC approval, there might be a change in the particular securities held in the accounts.  *See*

Messineo Dep. Tr. 16:7-20; 24:2-26:21 (phrase was added "to take account of the potential for

there to be a change in the specific securities held in the customer reserve accounts between

September 22 and the date when it became permissible to withdraw securities from the customer

reserve accounts").  Barclays urges the Court to disregard this interpretation, arguing that Mr.

Messineo's understanding of the plain text was merely his "unexpressed subjective intent," but

more is involved here than drafter's intent.  *See* Barclays Reply ¶ 109 ("[Messineo's] testimony

about his 'understanding' is irrelevant to the Court's interpretation of the … phrase"); Barclays

Post-Trial Mem. ¶ 273 ("The only extrinsic evidence the Trustee relies upon to support his

interpretation of the 'or' clause is legally irrelevant because it is nothing more than unexpressed

subjective intent").  The disputed phrase should be construed to elevate the rights of LBI's

customers in order to avoid an interpretation that would conflict with governing law.  *See, e.g.,*

*NLRB v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003)

("ambiguously worded contracts should not be interpreted to render them illegal and

unenforceable where the wording lends itself to a logically acceptable construction that renders

them legal and enforceable") (quoting *Walsh v. Schlecht*, 429 U.S. 401, 408 (1976)); *Venizelos,*

*S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970) ("[I]f an agreement is fairly

capable of a construction that will make it valid and enforceable, that construction will be given

it").

Barclays offers a self-interested construction of the language that would give it an

unconditional right to $769 million in securities, effectively reading out of the letter the phrase

"to the extent permitted by applicable law."  The Court's conditional reading, on the other hand,

reconciles the two phrases and thereby construes the language to give meaning to each term.

*See, e.g., Goodheart Clothing Co., Inc., v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272-73

(2d Cir. 1992) ("[a] court should interpret a contract in a way that ascribes meaning, if possible,

to all of its terms") (quoting *U. S. Naval Inst. v. Charter Commc'n, Inc.*, 875 F.2d 1044, 1049 (2d

Cir. 1989)).

In addition to the text of the Clarification Letter, Barclays argues that counsel for LBI

agreed to transfer the 15c3-3 Assets without conditions and without regard to regulatory

approval, but the evidence of such an agreement is inconclusive at best.  Barclays' witnesses

alternatively testified as to a "grunt" or "nod" or "smile" that gave Barclays' counsel a "feeling"

that such an agreement constituted "the economic substance of the negotiation."  8/24/10 Tr.

147:6-13 (Rosen).

Described in this manner, the "unexpressed subjective intent" may in fact have been the

intent of counsel for Barclays.  A grunt, nod, or smile is not the same as a meeting of the minds

by means of unambiguous words.  The chief Lehman negotiator on this point, lead bankruptcy

counsel Harvey Miller, was clear in stating that he never agreed to an unconditional transfer of

the 15c3-3 Assets to Barclays.  *See* 4/28/10 Tr. 83:22-84:11 (Miller) ("absolutely no

commitment").  Mr. Miller recalled that he participated in a tense discussion with representatives

of Barclays in a hallway at Weil Gotshal's offices and informed Barclays that the 15c3-3 Assets

could not be transferred without SEC consent.  4/28/10 Tr. 83:1-6 (Miller).  Similarly, Mr.

McDade, whose authorization would have been necessary to any such agreement, confirmed that

he never agreed to grant Barclays an unconditional right to the 15c3-3 Assets.  Mr. McDade

testified that he understood that the transfer of the 15c3-3 Assets was "potentially questionable,

given it needed regulatory authority to be able to be transferred over."  4/26/10 Tr. 198:4-11

(McDade).

Other extrinsic evidence confirms that Barclays knew the transfer of the 15c3-3 Assets

hinged on regulatory approval.  For one thing, the SEC communicated this point before LBI's

liquidation.  *See* M Ex. 437.  As a result, the Barclays negotiating team was on notice that

regulatory approval was needed to obtain the 15c3-3 Assets. *See* 8/27/10 Tr. 201:2-203:10

(Klein) (testifying that the he reviewed an internal Lehman e-mail indicating that the SEC had

consented to the release of a portion of the reserved assets).  Barclays itself confirmed knowing

about this condition in internal conversations with its audit committee.  *See* M Ex. 436 ("the

release of [the 15c3-3] deposit is subject to SEC approval").  Several of Barclays' officers and

representatives echoed this understanding, and recognition of the need for regulatory approval is

reflected in efforts to ascertain whether a deficit existed for purposes of Rule 15c3-3 during the

negotiation of the Clarification Letter.  *See* 6/21/10 Tr. 252:18-25 (Diamond) (recalling that the

agreement regarding the 15c3-3 Assets to be transferred to Barclays included only "the excess

collateral"); 4/30/10 Tr. 227:1-12 (Hughes) (recalling that the 15c3-3 assets had to be "excess

and capable of being delivered"); 4/28/10 Tr. 246:9-15 (Kelly) (recalling that during the sale

negotiations the parties endeavored to "determine if there was excess or a surplus" in the

Customer Reserve Accounts).  These efforts would have been unnecessary if, as Barclays now

asserts, it was entitled to $769 million in securities irrespective of Rule 15c3-3 and the existence

of a deficit in LBI's Customer Reserve Account.

Alternatively, Barclays argues that even if the Clarification Letter conditions its receipt of

the 15c3-3 Assets upon "applicable law," Section 8(f) of SIPA[34] authorizes the transfer.  *See*

Barclays Reply ¶ 90 ("whether the assets in the Reserve Account are considered LBI property or

customer property, the SIPA Trustee was authorized to transfer that property to Barclays as part

of the overall sale of the Business to Barclays").  This section of SIPA authorizes the satisfaction

---

[34] *See* 15 U.S.C. § 78fff-2(f) ("In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor").

of customer obligations through the transfer of customer accounts to a solvent broker-dealer, but

it is not applicable to the present dispute in which Barclays is seeking to compel the transfer of

customer accounts for its own benefit.  *See Togut v. RBC Dain Correspondent Servs. (In re S.W.*

*Bach & Co.)*, 435 B.R. 866, 887 (Bankr. S.D.N.Y. 2010) (explaining that Section 8(f) "is

designed to facilitate a speedy transfer of accounts to give the customer prompt control over his

assets").  Interpreting Section 8(f) to authorize the transfer of the 15c3-3 Assets to Barclays

would be inconsistent with and would frustrate the section's underlying purpose.  Such an

interpretation also would be contrary to the broad principles underlying SIPA, namely its

objective of giving priority treatment to customers of a liquidating broker-dealer.  *See* 15 U.S.C.

§ 78fff-2(c) (customer claims receive priority on any property falling within SIPA's definition of

"customer property").

        Independent of the Clarification Letter, Barclays asserts that the APA gives Barclays a

right to all assets "used in connection" with the "Business" including the 15c3-3 Assets.  *See* BCI

Ex. 1 (M Ex. 1) (APA) § 1.1 (Definition of "Purchased Assets").  Barclays states that these assets

were "used in connection" with the "Business," namely the "capital markets businesses of Seller

including the fixed income and equities cash trading, brokerage, dealing, trading and advisory

businesses, investment banking operations and LBI's business as a futures commission

merchant."  *See* Barclays Post-Trial Mem. ¶ 247.  Alternatively, Barclays argues that the 15c3-3

Assets are "deposits … associated with the Business."  *See* BCI Ex. 1 (M Ex. 1) (APA) § 1.1.

Thus, according to Barclays, the Clarification Letter merely used explicit language to confirm a

transfer of the 15c3-3 Assets that is already the subject of plain language in the original APA.

        The 15c3-3 Assets, however, were never considered part of the "Business" that Barclays

acquired pursuant to the APA.  They were not even discussed by the parties to the transaction

83

until the Friday asset scramble.  *See* 4/26/10 Tr. 194:3-195:15 (McDade).  Furthermore, the

15c3-3 Assets naturally were unrelated to the "Business" because they are, by their very

definition, creatures of a regulatory regime.  Having been segregated by regulatory mandate,

these assets could not be transferred without consideration of regulatory constraints.  These

assets were set aside to protect customers, were never available unconditionally as extra

consideration for Barclays and were not part of the purchased "Business."

Accordingly, Barclays does not have an unconditional right to the 15c3-3 Assets, and its

motion to recover these assets is denied without prejudice until such time as it may be

determined whether any deficit exists in LBI's customer reserve accounts and whether the

transfer of all or any portion these assets is permitted by applicable law.

ii.      *The Margin Assets*

The Margin Assets that are in dispute consist of a total of approximately $4 billion in

cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain

banks, and certain foreign futures brokers in connection with derivatives trading.  This total

includes nearly $2.3 billion in assets posted by LBI at the OCC, primarily in connection with

LBI's options trading business, an additional $1.2 billion at foreign brokers or affiliates and

approximately $400 million at domestic exchanges in connection with LBI's futures trading.  The

Margin Assets consist of LBI property used to support trading conducted by LBI on its own

behalf and on behalf of its customers and affiliates.

The parties disagree as to whether these Margin Assets were purchased in connection

with the acquisition or were excluded from the sale to Barclays.  The APA's definition of

Excluded Assets contains two separate sub-parts that independently encompass the Margin

Assets.  First, clause (b) of the definition of "Excluded Assets" excludes "all cash, cash

equivalents, bank deposits or similar cash items." BCI Ex. 1 (M Ex. 1) (APA) § 1.1. Second,

clause (n) of the definition of "Excluded Assets" excludes "all assets primarily related to the

IMD Business and derivatives contracts." BCI Ex. 1 (M Ex. 1) (APA) § 1.1.[35] These exclusions,

as modified by the Clarification Letter, are at the heart of the dispute concerning the proper

disposition of the Margin Assets.

    The Court understood at the time of the Sale Hearing that the sale was supposed to

exclude all cash. Counsel made this point with great clarity at the Sale Hearing and stated

plainly that no cash was being transferred to Barclays. Most prominently, Ms. Fife told the

Court "[t]here's no cash that's being transferred to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08

Tr.) 53:20-25 (Fife). Mr. Miller was similarly unequivocal, informing the Court that "[Lehman

is] not transferring any cash to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 242:11-16

(Miller). Even Barclays' team at the Sale Hearing recognized that cash was excluded from the

deal. *See* 6/22/10 Tr. 210:11-13 (Cox) (testifying that he understood that "no Lehman cash was

going from Lehman to Barclays").

    The Court relied upon these representations regarding the exclusion of cash when it

entered the Sale Order. In particular, this explicit exclusion became the rationale for resolving

the concerns raised by LBIE and other objectors at the Sale Hearing relating to the risk that

Barclays might end up taking billions of dollars that allegedly had been transferred to New York

from London a few days prior to the bankruptcy. The representation that Barclays would not be

---

[35] Barclays insists that clause (n) of the definition of "Excluded Assets" does not encompass the Margin Assets
because clause (n) applies only to margin relating to "over-the-counter" derivatives, as opposed to exchange-traded
derivatives. *See* Barclays Post-Trial Mem. ¶ 248 ("paragraph (n) *does not deal with exchange-traded derivatives*; to
the contrary, it deals with 'derivative contracts' … which was used solely to describe over-the-counter derivatives,
which were *indisputably* excluded from the deal") (emphasis in original). But the plain language of clause (n) does
not differentiate between margin associated with either type of derivative. Moreover, the Clarification Letter carries
forward the clause (n) exclusion of assets primarily related to derivatives contracts and further adds a separate
exclusion for over-the-counter derivatives. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c) ("The following shall
also be Excluded Assets … over-the-counter derivatives").

acquiring any Lehman cash, thus, was a key inducement to entry of the Sale Order in the face of

unresolved conflicting claims to cash held by or for the benefit of Lehman.  The "no cash to

Barclays" statements are unambiguous and have only one meaning – no cash, and that also

means no Margin Assets to Barclays.

Consequently, the Court rejects Barclays' argument that the Margin Assets necessarily

must have been included in the transaction because of their connection to the "Business"

acquired under the APA.  *See* Barclays Post-Trial Mem. ¶ 242 ("It is *undisputed* that LBI's ETD

businesses were part of the 'Business' Barclays was acquiring …") (emphasis in original).  In

other words, Barclays argues, the Margin Assets must have been Purchased Assets because the

APA provided Barclays with all assets relating to the "Business," and clearing houses and

exchanges require margin to support trading.  *See* 8/30/10 Tr. 9:11-15 (James); 8/24/10 Tr.

100:5-101:9 (Rosen).  But the fact that exchanges typically require margin deposits or that

purchasers of other businesses involved in the trading of derivatives typically acquire such

deposits does not bear one way or another on the question of whether the Margin Assets were

included by the parties in this unique transaction.[36]  The evidence with respect to the acquisition

by Barclays of the Broker-Dealer Business is overwhelming — the parties agreed to exclude

cash.[37]

---

[36] For this reason, the Court is not persuaded by the testimony of Barclays' expert Anthony J. Leitner that "no
rational purchaser" would agree to the transaction without the Margin Assets.  *See* BCI Ex. 340 at 49.  The likely
conduct and decision making of a hypothetical "rational purchaser" is not persuasive when the parties to this
particular transaction agreed to exclude the Margin Assets.

[37] Barclays offers the testimony of Liz James to show that in fact the parties agreed to transfer the Margin Assets to
Barclays.  8/30/10 Tr. 20:7-9 (James) (testifying that there was "an actual discussion in which it was expressly
discussed that margin would be transferred").  But Ms. James admitted to having had no role whatsoever in the
negotiation or documentation of the sale documents that memorialize the agreement of the parties.  8/30/10 Tr.
60:14-22 (James).

The Clarification Letter carries forward the APA's exclusion of cash from the transaction: "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits, or similar cash items."  BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c).  The Clarification Letter further specified that although LBI's government securities trading operations were part of the "Business" sold to Barclays, the government securities themselves were excluded from the sale.  BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(b) ("For the avoidance of doubt, the 'Business' includes LBI's commodities business, government securities trading operations and mortgage-backed securities trading operations of LBI (***but not any securities of such nature held by seller*** …")) (emphasis added).

Notwithstanding this language, Barclays asserts that the Clarification Letter should be read to capture the Margin Assets as a Purchased Asset.[38]  Specifically, Barclays relies on the inclusion of a parenthetical — "(and any property that may be held to secure obligations under such derivatives)" — after the words "exchange-traded derivatives" in the definition of "Purchased Assets."  *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(C).

This parenthetical reference simply cannot override the exclusions of the APA or the representations made during the Sale Hearing.  The evidence presented at trial also supports a conclusion that the parties to the Clarification Letter never agreed as to the language or significance of this parenthetical, and the words made their way into the document without there being a meeting of the minds or a mutual agreement to include them.

---

[38] Independent of the Clarification Letter, Barclays also claims that the Transfer and Assumption Agreement entered into between the Trustee and the OCC transferred the Margin Assets to Barclays.  However, this ancillary agreement never was presented to the Court, and so cannot be dispositive as to the parameters of the deal that the Court approved.  In any event, the evidence indicates that the Trustee understood this ancillary agreement merely to facilitate the transfer of customer assets to Barclays.  *See* 5/4/10 Tr. 184:4-10; 185:2-24 (Kobak).

The negotiating history confirms that the parties did not intend this parenthetical statement to modify the APA's exclusion of all cash, including the Margin Assets, from the sale. Immediately following the Sale Hearing, an outside lawyer for Barclays with significant experience in derivatives, Cleary Gottlieb's Edward Rosen, received an e-mail alerting Barclays to the existence of the Margin Assets.  BCI Ex. 242.  Shortly thereafter, Barclays proposed new language for the definition in paragraph 1(d) of "Excluded Assets" that, with clarity and precision, would have transferred the Margin Assets to Barclays.  BCI Ex. 249 ¶ 1(d) (proposed language carved out of the definition of Excluded Assets any "cash, cash equivalents, bank deposits, or similar cash items maintained … by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI …").  In response, counsel for LBHI forwarded the proposed language to the SIPA Trustee on September 21, 2008 and highlighted Barclays' proposed cash margin carve-out as an unsettled issue subject to ongoing discussion.  M Ex. 629. Early the next morning, counsel to LBHI circulated a revised proposed draft of the Clarification Letter striking Barclays' proposed language relating to the Margin Assets.  *See* M Ex. 447 ¶¶ 1(c), 8.[39]  As a result, the subsequent draft circulated at 6:03 a.m., approximately three hours before the execution of the Clarification Letter on September 22, 2008, continued to omit the stricken language.  *See* M Ex. 448.  Without any further discussion or notice to the SIPA Trustee, Mr. Rosen unilaterally inserted the now-disputed parenthetical phrase into the execution version of the Clarification Letter.  8/24/10 Tr. 215:2-14, 216:3-8 (Rosen).

The SIPA Trustee never consciously agreed to this new parenthetical.  Notably, Mr. Rosen added the language within the parenthetical to the "Purchased Assets" subsection instead

---

[39] At trial, Barclays claimed that this deletion of the disputed language by counsel for LBHI was in fact unintentional.  *See* 8/31/10 Tr. 209:12-210:2 (Lewkow).  Barclays presented no evidence of any such mistake.

of the "Excluded Assets" subsection that had been the earlier focus of attention.  Moreover, the words within the parenthetical do not include "cash" or "margin," in contrast with the previously-contested language that had touched directly on these subjects.[40]  The SIPA Trustee never reviewed the inserted parenthetical provision before closing because the last draft had omitted the disputed language, and he was not informed of any last-minute revisions.  5/4/10 Tr. 197:4-22 (Kobak); 5/5/10 Tr. 58:8-17 (Kobak).  In fact, for administrative reasons, the SIPA Trustee's representative executed the signature page for the Clarification Letter hours earlier and was not provided with a new signature page or agreement.

In light of this negotiating history, and being mindful of the stated exclusion of Lehman cash, the Court concludes that the best reading of the disputed language within the parenthetical is one that interprets the parenthetical phrase as applying only to customer property "held" by LBI for the benefit of customers, as opposed to margin that LBI may have "posted" in connection with its own trading positions.  Various regulations and rules require customers to deposit collateral with their broker-dealer or, in the case of futures, their futures commission merchant, to support trading of futures and options contracts.  *See, e.g.*, 17 C.F.R. § 30.7.

This collateral, which is deposited by customers with the broker-dealer or futures commission merchant and held for the benefit of customers, constitutes the "property that may be held to secure obligations" under exchange-traded derivatives.  In fact, LBI held approximately $2 billion in customer property as margin for futures positions of customers, along with additional customer property held as margin for the options positions of customers.  *See* BCI Ex. 353 ¶ 15, Ex. 2.  The language within the parenthetical would authorize a transfer of these customer funds to Barclays (for the benefit of those customers) in connection with the transfer of

---

[40]  Mr. Rosen testified that he designed the phrase so as to avoid scrutiny that could "embroil" Barclays in continued negotiations.  8/24/10 Tr. 203:5-20 (Rosen).

those customer accounts.  This interpretation of the parenthetical is consistent with other

provisions of the Clarification Letter that are intended to ensure the transfer of customer property

to Barclays.[41]  It also is consistent with the record of the Sale Hearing in which counsel

emphasized that no Lehman cash was being transferred to Barclays.

iii.    *The Clearance Box Assets*

The Clearance Box Assets are within the third category of Disputed Assets and consist of

approximately $1.9 billion in unencumbered securities held in LBI's "clearance box" accounts at

The Depository Trust & Clearing Corporation (with its clearing agency subsidiaries, "DTCC").[42]

These assets facilitated securities trading by providing collateral to secure open trading positions.

DTCC looked to this collateral as a means to manage risks associated with its daily clearing

operations.  In the event of a default by LBI, DTCC could look to the Clearance Box Assets to

cover any potential liability arising from failed trades.  From DTCC's perspective, therefore, any

transfer of the Clearance Box Assets to Barclays threatened to leave it unprotected in the event of

failed trades during the transition of securities trading operations to Barclays.

At the time of the Sale Hearing, the parties believed that they had reached an agreement

that allayed DTCC's concerns.  Under this agreement, as documented in the First Amendment,

DTCC would consent to the transfer of the Clearance Box Assets and Barclays would provide

DTCC with a $250 million guarantee along with a pledge of billions of dollars in residential

---

[41] For example, paragraph 8(i) of the Clarification Letter entitles Barclays to receive "for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer ..."  BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(i).  Similarly, paragraph 1(c) of the Clarification Letter clarifies that "property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer" would not be considered an Excluded Asset.  BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c).

[42] The vast majority of these assets were held in box number 074 at the DTCC, with the rest held in LBI clearance boxes at Euroclear and a Canadian depository.  SIPA Trustee Post-Trial Mem. ¶ 279, n.38.

mortgage-backed securities as collateral.[43]  This understanding fell apart after the Sale Hearing

when the residential mortgage-backed securities could no longer be made available to DTCC as

collateral.  Extensive negotiations took place over the closing weekend to deal with this problem.

During the negotiations, DTCC insisted that Barclays fully guarantee any potential

DTCC liability in exchange for the transfer of the Clearance Box Assets.  *See* 5/6/10 Tr. 19:16-

19 (Montal).  Barclays, however, refused to provide an unlimited guarantee of LBI's trading

obligations.  *See* 4/26/10 Tr. 233:13-20 (McDade) (Barclays' continued refusal to provide more

than a $250 million guarantee threatened to derail the transaction over the weekend).

Ultimately, these negotiations culminated in Barclays entering into two separate

agreements – the Clarification Letter and the DTCC Letter – that contain seemingly

contradictory provisions purporting to govern the transfer of the Clearance Box Assets.  The

Clarification Letter, on the one hand, provides that the Clearance Box Assets are Purchased

Assets acquired by Barclays.  *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(B)

("Purchased Assets" include all "securities and other assets held in LBI's 'clearance boxes' as of

the time of the Closing … as specified on Schedule B"); Schedule B (identifying assets to be

transferred, and more than 98% of the listed assets were in LBI's DTC clearance boxes).  The

DTCC Letter, on the other hand, provides that the Clearance Box Assets are "Excluded Assets"

under the APA and requires Barclays to provide a $250 million cash deposit as a limited

guarantee to cover potential liability from failed trades.  *See* BCI Ex. 6 (M Ex. 449) ¶ 1

("Barclays has indicated, and hereby agrees, that all of the accounts LBI maintained at the

Clearing Agencies Subsidiaries (the "Accounts") constitute "Excluded Assets" within the

---

[43] The Court was advised of this agreement at the Sale Hearing.  *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 49:8-17
(Fife).  Although the Clearance Box Assets were not specifically mentioned at the Sale Hearing, the evidence
suggests that they were included in the $47.4 billion worth of financial assets described by Ms. Fife at the hearing.
*See* 5/3/10 Tr. 183:13-185:5 (Seery).

meaning of the APA"); BCI Ex. 6 (M Ex. 449) ¶ 2 ("To secure the Guaranty, Barclays shall wire

transfer $250 million …").[44]

Notwithstanding these apparently contradictory terms, Barclays attempts to reconcile the

two agreements by arguing that the DTCC Letter, read properly, does not limit its claim to the

Clearance Box Assets because of the distinction between the "Accounts" and the assets within

those accounts. *See* Barclays Post-Trial Mem. ¶ 228 ("[T]here is no conflict or inconsistency

between the DTCC Letter and the Clarification Letter … While the DTCC Letter explains that

Barclays was not acquiring *the LBI accounts themselves*, it did not purport in any way to modify

the Purchase Agreement's grant of *the assets within those accounts* to Barclays") (emphasis in

original).

Barclays' attempt to reconcile the contradictory provisions of the two agreements is

strained and implausible.  An agreement giving DTCC a right to the "Accounts" as Excluded

Assets, while transferring the contents of those accounts, borders on the nonsensical and would

not have accomplished any purpose.  Such a distinction defies logic, as the DTCC would not

benefit from maintaining accounts without the corresponding securities in those accounts.  5/4/10

Tr. 207:24-208:4 (Kobak).[45]  The interpretation of the DTCC Letter urged by Barclays, while

possible, would lead to a most unlikely reading of the language as part of a struggle to find

consistency.  *See, e.g., Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y. 2d 582, 589, 671 N.E.2d 534

(1996) ("[w]e should not adopt a construction of [a provision] which would frustrate one of the

explicit central purposes of the agreement").

---

[44]  The testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC, was credible and
corroborated the plain text of the DTCC Letter.  *See* 5/6/10 Tr. 20:20-21:13 (Montal) ("ultimately, [the negotiations]
culminated into the discussion at around midnight in which we were told that they weren't taking anything").

[45] Moreover, such a reading is inconsistent with the other sections of the DTCC Letter that relate to the transfer of
securities, not accounts. *See* BCI Ex. 6 (M Ex. 449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee
hereby authorizes DTC to accept and act upon instructions from NSCC ***to deliver securities*** …") (emphasis added).

However, the alternative interpretation of the DTCC Letter offered by Barclays does demonstrate an apparent ambiguity in the text of that letter, especially when the language used in the DTCC Letter is juxtaposed and compared with the obviously inconsistent language of the Clarification Letter.  The two letters, read literally, naturally lead the reader to reach opposite conclusions.  As a result of this ambiguity, the Court may consider extrinsic evidence of the parties' intent with respect to the provisions of the two agreements relating to the Clearance Box Assets.  *See Roberts*, 893 F.2d at 24.

Extrinsic evidence relating to what was actually intended is not entirely consistent.  The Court has considered the testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC.  His credible testimony would support a finding that Barclays gave up any claim to the Clearance Box Assets.  He recalls three separate telephone calls that occurred on September 21, 2008 between Barclays and the DTCC and remembers that on the last of these calls Barclays agreed to exclude the Clearance Box Assets from the transaction.  5/6/10 Trial Tr. (Montal) 10:22-11:4.

However, Mr. Montal's testimony must be balanced against other evidence indicating that the parties intended that Barclays would receive the Clearance Box Assets.  The negotiating history reveals that the reference to Schedule B in the Clarification Letter was the result of the drafters' initial concern that language in the Clarification Letter was too narrow and would have failed to transfer all of the Clearance Box Assets to Barclays.  *See* Barclays Post-Trial Mem. ¶ 237 ("…46 minutes after [circulating a revised draft of the Clarification Letter], Weil Gotshal circulated another draft Clarification Letter, which … broadened the language conveying the clearance box assets to Barclays").  The testimony of Barclays' lawyers and negotiators further

confirmed this intent to transfer the Clearance Box Assets to Barclays. *See* 5/3/10 Tr. 56:11-57:2 (Hughes); 8/24/10 Tr. 132:13-133:20 (Rosen).

Additionally, after the closing of the transaction, the parties engaged in conduct manifesting their intent to transfer the Clearance Box Assets to Barclays. For example, after the closing on September 22, 2008, Weil Gotshal and Lehman personnel worked with Barclays and its representatives to finalize the list of Clearance Box Assets in Schedule B. *See* BCI Ex. 309; BCI Ex. 742. After closing, the Movants, their representatives and advisors prepared numerous documents showing that the Purchased Assets acquired by Barclays included the Clearance Box Assets. *See* BCI Ex. 742; BCI Ex. 756.

Written extrinsic evidence from Sheldon Hirshon, DTCC's outside counsel, further confirms the intent of the parties to transfer the Clearance Box Assets to Barclays. An e-mail written by Mr. Hirshon recounts his understanding that, during the weekend of negotiations following the Sale Hearing, DTCC agreed to relinquish the Clearance Box Assets and accept only the $250 million limited guarantee. *See* BCI Ex. 376 ("DTCC accepted the revised deal" after "the resi's were pulled from the deal leaving only the Barclays guarantee"). Notably, Mr. Hirshon's e-mail does not indicate any expectation that the Clearance Box Assets would be provided to DTCC to mitigate potential exposure. This understanding of the parties' intent is consistent with the ultimate commercial reality of the transaction, as DTCC incurred losses in connection with failed trades arising from the bankruptcy in the amount of approximately $55 million, far less than the full $250 million protection provided by Barclays in its limited guarantee. *See* 5/6/10 Tr. 72:2-73:15 (Montal).

The Court concludes that the Clarification Letter, not the DTCC Letter, best reflects the agreement between Barclays and the SIPA Trustee with respect to the Clearance Box Assets.

The plain text of the Clarification Letter clearly confirms the agreement to transfer the Clearance Box Assets to Barclays, and the SIPA Trustee is unable to explain away the plain meaning of the words used in this agreement. *See* SIPA Trustee Mot. ¶ 81; 5/5/10 Tr. 71:8-10 (Kobak) ("Q: Now you don't have any disagreement that the clarification letter lists [Clearance Box Assets] as a purchased asset, correct? A: No, I don't disagree with that").

The SIPA Trustee and Barclays simply agreed in the Clarification Letter that the Clearance Box Assets belong to Barclays. Importantly, that letter, along with the APA, constituted the principal documents memorializing the transaction. These documents necessarily delineated the assets that were being transferred to Barclays as part of that sale. In contrast, the DTCC Letter had a different principal purpose and was drafted as an implementing transitional document created to deal with the potential exposure of DTCC arising from the transfer of securities trading positions. Although the SIPA Trustee was a signatory to the DTCC Letter, the letter came into existence as a result of DTCC's request to address its potential liability.[46]

In his effort to reconcile the discrepancies between the two letter agreements in a manner favorable to his litigation position, the SIPA Trustee must argue that the true agreement between the parties with respect to the Clearance Box Assets is best manifested not by the central documents that define the transaction but by an ancillary side-agreement which was prepared to address concerns of DTCC. But given the relative stature of these two documents and the scope of each of them, the Court considers the Clarification Letter to be more compelling and comprehensive in describing with greater precision the universe of assets that the SIPA Trustee

---

[46] It appears that the most meaningful negotiations leading to the finalizing of the DTCC Letter occurred between Barclays and DTCC. *See* SIPA Trustee Post-Trial Mem. ¶ 414 ("Barclays was uniquely positioned to ensure that the two agreements did not conflict … [because n]o other party… *including the Trustee and his representatives* … was involved in negotiating and drafting both agreements") (emphasis added); BCI Ex. 479 (e-mail correspondence early Monday September 22, 2008 in connection with finalizing the DTCC Letter was exchanged between representatives of Barclays and DTCC, and not with the Trustee or his representatives).

agreed to transfer to Barclays pursuant to the transaction.  Because these two contemporaneous

documents are in conflict with one another as to the same subject matter, one of them must

control the outcome.

    The unambiguous text of the Clarification Letter contains more detail and is more

specific with respect to the Clearance Box Assets than the DTCC Letter.  Although each

agreement purports to govern the transfer of the Clearance Box Assets, Schedule B to the

Clarification Letter specifically identifies individual Clearance Box Assets, whereas the DTCC

Letter has no similar itemized list of securities.  In expressing a preference for the more specific

of the two documents, the Court's conclusion affirms the well-established legal principle that

where two agreements refer to the same subject matter, the more specific agreement controls.

*See, e.g., Liberty Surplus Ins. Corp. v. Segal Co.*, 142 F. App'x. 511, 515 (2d Cir. 2005) (where

there is tension between the provisions of two agreements, "it is axiomatic that particularized

contract language takes precedence …") (quoting *John Hancock Mut. Life Ins. Co. v. Carolina*

*Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983)).

    Notwithstanding the SIPA Trustee's arguments to the contrary, the Court's elevation of

the Clarification Letter over the DTCC Letter with respect to the Clearance Box Assets neither

"ignores" nor "nullifies" the DTCC Letter.  *See* SIPA Trustee Post-Trial Mem. ¶¶ 410, 413.

Rather, the Court recognizes that the DTCC Letter, even without the provisions regarding the

Clearance Box Assets, provided a significant benefit to DTCC in the form of a $250 million

limited guarantee to protect against potential exposure from failed trades and the grant of

authority needed to close out pending transactions.  Moreover, the DTCC Letter functioned in

accordance with the intention of the parties and provided DTCC with the comfort that it needed

to close securities transactions that were pending at the time of closing.  *See* BCI Ex. 6 (M Ex.

449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee hereby authorizes DTC to

accept and act upon instructions from NSCC to deliver securities from the DTC LBI Account

…").

D.      *The SIPA Trustee is Not Entitled to Relief Under Rule 60(b) With Respect to the Transfer
        of the Clearance Box Assets to Barclays*

The SIPA Trustee requests conditional relief from the Sale Order[47] under Rule 60(b) in

the event that the Court interprets the Clarification Letter to authorize transfer of the Disputed

Assets to Barclays.  *See* SIPA Trustee Post-Trial Mem. ¶ 445 ("To the extent that the Sale Orders

can be read to authorize the transfers that Barclays now seeks, the Court should grant the Trustee

relief under Rule 60(b) based on the non-disclosures to the Trustee").  In light of the conclusion

reached that the Clarification Letter does not unconditionally entitle Barclays to the 15c3-3

Assets or grant rights to the Margin Assets, the Court does not need to rule on those aspects of

the SIPA Trustee's contingent request for relief and will focus on the impact of the ruling that the

Clearance Box Assets should be transferred to Barclays.

As fully set forth in detail in Section III of this Opinion, Federal Rule of Bankruptcy

Procedure 9024 provides that Rule 60(b) shall apply in all cases under the Bankruptcy Code.

Fed. R. Bankr. P. 9024.  Rule 60(b), in turn, lists several grounds upon which a court may relieve

a party from final judgment, including mistake, inadvertence, excusable neglect, and newly

discovered evidence.

The SIPA Trustee alleges several independent grounds for relief under Rule 60(b)

applicable to the Clearance Box Assets, including that the transfer of these assets "was never

intended" nor disclosed to the Court or the SIPA Trustee, that the transfer results from "mistake

---

[47] The Trustee requests conditional relief from both the Sale Order and the SIPA Sale Order.

or inadvertence," and that the transfer should be disfavored on grounds of "equity and justice."
*See* SIPA Trustee Mot. ¶¶ 89, 98, 102, 107.

The SIPA Trustee is not entitled to relief under Rule 60(b) with respect to the Clearance
Box Assets because his request is premised on the notion that the Court, the SIPA Trustee, and
other relevant parties in interest did not know during the Sale Hearing and the closing weekend
that the Clarification Letter contemplated the transfer of the Clearance Box Assets to Barclays.
That proposition is incorrect.  The agreement that existed between DTCC, Barclays, and the
SIPA Trustee at the time of the Sale Hearing contemplated the very same kind of transfer at issue
here.  Although that particular agreement was never consummated, the subsequent agreement
ultimately memorialized in the Clarification Letter is identical to its predecessor with respect to
the Clearance Box Assets – under each agreement the Clearance Box Assets are transferred to
Barclays.  The public disclosure of this agreement distinguishes the SIPA Trustee's request for
relief under Rule 60(b) from the request made by LBHI.  Unlike the "newly-discovered" facts
alleged by LBHI as grounds for relief under Rule 60(b), the provisions of the Clarification Letter
transferring the Clearance Box Assets to Barclays were publicly available to all parties, including
the SIPA Trustee.

The SIPA Trustee's request for Rule 60(b) relief also disregards the very agreement that
he made to transfer the Clearance Box Assets to Barclays.  For this reason, the SIPA Trustee's
allegation that "he would not have authorized the signing of the Clarification Letter if he had
known it might be read" to award the Clearance Box Assets to Barclays does not meet the
standards for relief under Rule 60(b).  The SIPA Trustee cannot plead ignorance of the facts.  He
must have known that the Clarification Letter authorized the transfer of the Clearance Box

Assets, because the plain text of the letter that he signed supports transferring the Clearance Box

Assets to Barclays.

## VII.    <u>Timeliness and Other Legal Issues Relating to 60(b) Relief</u>

Barclays presented a number of defenses seeking to preclude relief under the 60(b)

Motions as a matter of law, but there is no need to consider these arguments because of the

decision to deny 60(b) relief on the merits.  Specifically, Barclays has argued that (i) the release

contained in the court-approved December 22, 2008 settlement between the SIPA Trustee,

Barclays, and JPMorgan bars all Movants from bringing any claims relating to the repo

collateral; (ii) Movants were unable to justify their one-year delay in bringing their claims; (iii)

the doctrines of unclean hands and *in pari delicto* bar Movants' claims; (iv) the Court does not

have jurisdiction to grant Movants' claims under the Mandate Rule; (v) Movants' claims are

barred by the doctrines of equitable mootness, judicial estoppel, equitable estoppel and waiver;

and (vi) the Takings Clause of the Constitution prohibits modification of the APA absent a state

law basis for reformation of the agreement.  Barclays Post-Trial Mem. ¶¶ 175-185, 187-195,

198-199, 200-222.

It is unnecessary to address any of these now-moot defenses because of the findings and

conclusions stated in this Opinion.  The Court reviewed these various defenses but did not need

to consider them in deciding not to grant relief from the Sale Order.  Furthermore, with respect to

any timeliness arguments made by Barclays in connection with the Disputed Assets, timeliness is

not an issue because Barclays brought its own motion to recover the Disputed Assets, and

Barclays could have brought that motion at any time.  *See* Barclays Mot.

For similar reasons, the arguments made by the Committee regarding the timeliness of its

own claims have no bearing on the outcome of this litigation and also are moot.  To excuse and

explain its alleged delay in seeking Rule 60(b) relief, the Committee has written at great length about the many challenges that it faced in gathering and analyzing information about the sale. The Committee argues that it was forced by circumstances to "drink from a fire hose" and if it had known all of the facts surrounding the alleged $5 billion discounting of the financial assets, it would have opposed the sale to Barclays at the Sale Hearing.  Committee Post-Trial Mem. ¶¶ 9-10.  The Committee further asserts that it did not sit on its rights, but rather consistently pursued discovery of facts from Barclays and simply waited to bring the Committee Motion until after obtaining the facts necessary to support such a motion.  Committee Post-Trial Mem. ¶¶ 15-16.

However, the question of what the Committee knew and when it was finally in a position to fully appreciate the significance of what it knew is irrelevant to the conclusions reached in this Opinion.  What was or was not disclosed to the Committee, whether the Committee had reason to comprehend the facts that were provided to its advisors and in reports given to the Committee, and the timing of disclosure to the Committee are of no importance and play no role in the Court's thinking about the 60(b) issues.  As discussed above and for the reasons stated in this Opinion, the Court finds that even if it had known all of the undisclosed facts at the time of the Sale Hearing the Court still would have approved the sale to Barclays.  Consequently, all issues relating to timeliness of the Committee Motion simply do not matter.  Even accepting as true all of the Committee's arguments regarding timeliness, 60(b) relief is not appropriate.

## VIII.  <u>Conclusion</u>

With such vast sums involved, growing market turmoil, uncertainty as to true asset values, transactional complexity and precious little time for careful consideration of the critical events during Lehman Week, perhaps it was inevitable that the urgent, hastily-arranged sale to

Barclays would be followed by some combination of buyer's or seller's remorse and heavily-litigated, good-faith disputes regarding contract interpretation.  The unique circumstances of that week produced both a sale of the Broker-Dealer Business at breathtaking speed and the present rigorous, slow-moving litigation.

For the reasons stated,[48] having reflected at length on the circumstances of the Sale Hearing and the evidence presented at trial, the Court concludes that the lapses in disclosure at the Sale Hearing did not affect the fairness or alter the outcome of the hearing and were not characterized by either the deliberate withholding of material information or willful misconduct. Although Movants have shown that the Court did not know everything about the transaction that it should have known, the Court was not deceived in a manner that should now be permitted to upset the integrity of the Sale Order.  The sale process may have been imperfect, but it was still adequate under the exceptional circumstances of Lehman Week.  Especially due to the procedural and substantive importance of maintaining the finality of orders approving the sale of assets under Section 363 of the Bankruptcy Code, based on the evidence justice does not require relief from the Sale Order under Rule 60(b).

With respect to the motion by Barclays to recover the Disputed Assets under provisions of the Clarification Letter, the Court has determined that the Clarification Letter is a binding and enforceable agreement even though it was not completed and executed until after entry of the Sale Order and the parties did not return to the bankruptcy court to obtain specific approval of the various changes to the transaction that are reflected in the Clarification Letter.  Although it certainly would have been prudent and doubtless better practice to seek further approval from the Court in the form of a separate order authorizing the parties to enter into the Clarification Letter

---

[48] The text of this Opinion constitutes the Court's findings of facts and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 9014.

and approving the provisions of that letter, the failure to do so will be overlooked here because (i) the Sale Order anticipated that this letter was being drafted, (ii) the letter was filed on the docket on the same day that it was executed, (iii) no party in interest ever sought approval of the Clarification Letter or to obtain relief from its terms due to the lack of formal approval and (iv) the parties themselves uniformly have regarded the document as a binding and enforceable statement of their agreement to amend and clarify the APA and have continued to rely upon all of its provisions.  While not expressly approved in so many words, the Clarification Letter is deemed approved by virtue of these facts.

Interpreting relevant provisions of the Clarification Letter in light of evidence concerning the negotiating and drafting of this agreement and the record of the Sale Hearing, the Court denies Barclays' Motion to compel delivery of assets in relation to the 15c3-3 Assets based on the conditional language used in the Clarification Letter.  Barclays' right, if any, to any of these assets depends upon a later determination of any deficit in the customer reserve accounts.  The Barclays' Motion also is denied as to the Margin Assets related to exchange traded derivatives but is granted in relation to delivery of the Clearance Box Assets.

The parties shall submit within ten days separate proposed forms of order, agreed as to

form and consistent with this Opinion as follows:  (i) separate orders denying each of the 60(b)

Motions, (ii) orders applicable to each of the Adversary Proceedings resolving those counts of

the complaints that are impacted by denial of relief under the 60(b) Motions, and (iii) an order

granting in part and denying in part the Barclays' Motion to recover Disputed Assets.   The

parties also may arrange a status conference to be held with the Court at a mutually convenient

time to schedule any further proceedings that may be required in light of this Opinion and, if

needed, to resolve any disagreements concerning the form of these proposed orders.


        IT IS SO ORDERED.


Dated: New York, New York
        February 22, 2011
                                        _____s/ James M. Peck_____
                                        Honorable James M. Peck
                                        United States Bankruptcy Judge

Exhibit 32

Page 1

1                         H. MILLER

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4      ----------------------x

5    In Re:

6                              Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

                  Debtors.

10

     ----------------------x

11

12

13

14    VIDEOTAPED DEPOSITION OF HARVEY R. MILLER

15              New York, New York

16              January 7, 2010

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 26535

1               H. MILLER
2    necessary, to you or Ms. Fife as the principal
3    Weil Gotshal lawyer standing up at the hearings
4    on the 17th and the 19th, is that correct?
5            MR. BOISE:  Object to the form.
6        A.   I would say it was broader than that.
7    Communicated to the people who were working on
8    the Asset Purchase Agreement and then probably,
9    in turn, to us.
10       Q.   And none of Weil Gotshal's activities
11   on the 15th -- for the week of the 15th through
12   the 19th included any independent assessment of
13   the values being discussed with respect to the
14   assets being transferred; is that correct?
15           MR. BOISE:  Objection.
16       A.   That is correct.
17       Q.   Directing your attention back to
18   Exhibit 20, Mr. Miller.
19       A.   Yes.
20       Q.   You see that it -- let me read it,
21   portions of it, into the record:  "Well, it took
22   all night and lots of back and forth, but the
23   deal is done and ready for the board.  Final
24   price did not change meaningfully - approx a 5b
25   all in economic loss versus our marks and 3.6

1               H. MILLER
2    billion of resi assets left behind."
3            Do you see that portion of the --
4        A.   I do.
5        Q.   And were you or anyone else at Weil
6    Gotshal privy to any discussions concerning a
7    negotiated -- a negotiation of an overall $5
8    billion loss versus Lehman's marks?
9        A.   I don't believe so.
10       Q.   Were you or anyone else at Weil
11   Gotshal involved in any discussions concerning a
12   negotiated discount that Lehman on the one hand
13   agreed to give to Barclays on the other from
14   Lehman's book values?
15           MR. BOISE:  Objection.
16       A.   No, I never heard the expression
17   "discount."  I did sit in a room listening to
18   groups talk about the marks and the different
19   opinions on the marks.
20       Q.   Did it come to your attention in any
21   way, sir, prior to the time that you described
22   the transaction to Judge Peck on the 17th, one
23   way or the other, that there was a negotiated
24   agreement for Lehman to give Barclays a $5
25   billion discount from Lehman's marks as part of

1               H. MILLER
2    this transaction?
3            MR. BOISE:  Objection.
4        A.   No.
5        Q.   If you could turn your attention,
6    please, Mr. Miller, to Exhibit 21.
7        A.   Yes.
8        Q.   Actually, I beg your pardon.  Could
9    you go back to 20 for just one second.
10       A.   Sure.
11       Q.   Thank you.  Also, in 20, Mr. Miller,
12   there is a -- let me read another sentence from
13   Mr. Kelly's e-mail:  "Also, an extra 1 billion
14   of comp beyond our accrual and assumption of all
15   trade payables in LBI and LBHI."  Do you see
16   that, sir?
17       A.   I do.
18       Q.   Did you -- was it communicated to you
19   or anyone else at Weil Gotshal, sir, prior to
20   the time you described the transaction to Judge
21   Peck on the 17th, that there had been a write-up
22   of the amounts shown on Lehman's books accrued
23   for compensation for the purposes of the
24   transaction?
25           MR. BOISE:  Objection.

1               H. MILLER
2        A.   You're using the expression a
3    "write-up"?
4        Q.   Yes, sir.
5        A.   No, I never heard of anybody talking
6    about a write-up.  The figures on comp and also
7    the figure on the assumption of executory
8    contracts was always a very contingent figure.
9    Thus, nobody knew what contracts were going to
10   be assumed and how many employees Barclays would
11   ultimately keep.
12       Q.   The estimates were made in the first
13   instance by Lehman personnel, correct?
14       A.   That's correct.
15       Q.   Do you know who within Lehman made
16   those estimates?
17       A.   No, I do not.
18       Q.   Did you ever speak to Mr. Kelly at or
19   around -- at or before the time you described
20   the transaction to Judge Peck?
21       A.   I don't believe I've ever spoken with
22   Mr. Kelly.
23       Q.   Okay.  Did you -- when you -- the
24   estimates that we're talking about for
25   compensation --

Exhibit 33

Page 1

1          HIGHLY CONFIDENTIAL - S. BERKENFELD

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     ---------------------x

5     In Re:

6                              Chapter 11

7     LEHMAN BROTHERS        Case No. 08-13555(JMP)

8     HOLDINGS, INC., et al.,    (Jointly Administered)

9

                    Debtors.

10

      ---------------------x

11

12         * * *HIGHLY CONFIDENTIAL* * *

13     DEPOSITION OF STEVEN BERKENFELD

14          New York, New York

15          August 6, 2009

16

17

18

19

20

21

22

23     Reported by:

24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25     JOB NO. 24035

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    A.   I don't recall.  I don't believe this
3    was given to me on the 22nd.
4    Q.   Is there a reason it's dated the 22nd
5    that you know?
6    A.   No.
7    Q.   I would direct your attention, sir, to
8    the categories of that entitled Compensation
9    2008 Guaranteed Cash Bonus, 2008 EPP
10   Recommendation and Special Cash Award.  Do you
11   see where we are on the document?
12   A.   Yes.
13   Q.   And the guaranteed cash bonus is set
14   at $3,435,000?
15   A.   That's correct.
16   Q.   And was to be paid in February of
17   2009.  Were you paid that amount in February of
18   2009?
19   A.   I was paid that amount.  I believe it
20   was February.  It might have been March.  I
21   don't recall.
22   Q.   And that is in respect of services in
23   2008, correct?
24   A.   That's correct.
25   Q.   And why was Barclays giving you a cash

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    bonus in respect of services in 2008?
3    A.   I don't know that I can answer that
4    question why Barclays was doing it.  Could you
5    be more precise on the question?
6    Q.   Sometime in February or March of 2009,
7    Barclays gave you $3,435,000, correct?
8    A.   Yes.
9    Q.   Why did they give you that?
10   A.   I don't know why, what motivated them
11   to do it.
12   Q.   To your knowledge, was that in some
13   part required by the Asset Purchase Agreement
14   that you signed on September 16?
15   A.   To my knowledge, it was not required
16   by the Asset Purchase Agreement for them to pay
17   me this amount.
18   Q.   Was that in some sense a replacement
19   of a bonus that you would have been paid at
20   Lehman in respect of your services in 2008?
21   A.   That's the way I thought of it, but I
22   don't know why Barclays decided to pay it and I
23   don't --
24   Q.   Well, sir, were you pleasantly
25   surprised when they gave you $3.4 million for a

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    period of time when you didn't work for them?
3    MR. STERN:  Excuse me.  I don't think
4    you finished your answer.  You may have, but
5    I'm not sure.
6    A.   I'm okay.
7    Q.   You're okay.  So I have an unanswered
8    question.
9    A.   I would characterize my reaction as
10   happy and pleased.
11   Q.   Okay.  Did you have any, as you sit
12   here now, sir, do you have any knowledge of why
13   Barclays paid you a bonus for 2008 other than
14   the fact that it's written in this agreement
15   before you?
16   MR. STERN:  Objection to the form.
17   A.   Can you repeat the question?
18   (Record read.)
19   A.   I believe there were a group of
20   employees that were identified by others from
21   Lehman who received offers of employment and
22   written employment agreements.
23   Q.   How large was that group?
24   A.   That's speculation on my part.
25   Q.   What's your best estimate?

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2    A.   About 150.
3    Q.   And do you have any knowledge of
4    whether that 150 were paid a cash bonus in
5    respect of 2008?
6    A.   That was my understanding.
7    Q.   And is it your understanding that that
8    was to make up for bonuses that they didn't get
9    from Lehman?
10   A.   That was my understanding.
11   Q.   And was it your understanding that
12   that payment of bonuses that they didn't get
13   from Lehman was in any way connected to the
14   Asset Purchase Agreement?
15   A.   In any way connected?
16   MR. STERN:  I'll object to the form,
17   but you can answer, if you understand the
18   question.
19   A.   I am aware that the Asset Purchase
20   Agreement had a provision in it that created an
21   obligation on the part of Barclays to pay a
22   certain amount of compensation to employees.
23   That compensation took the form, many different
24   forms, including severance payments and bonus
25   payments.

Page 26

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  Q.  Was the guaranteed bonus that you were
3  paid, the 2008 guaranteed bonus that you were
4  paid by Barclays paid to you pursuant to that
5  provision?
6  A.  I believe that the bonus I was paid
7  was counted towards the obligation in that
8  provision.  I've worded it differently that you
9  have asked it.
10  Q.  I hear that.
11      What was the total amount that
12  Barclays was obliged to pay under that
13  provision, do you recall?
14  A.  That's a more complicated question,
15  but the provision made reference to an amount of
16  estimated amount of 2 billion.
17  Q.  And your understanding, sir, is that
18  estimated amount of 2 billion was for bonuses
19  and severance and other types of compensation; I
20  think that's what you said?
21  A.  Correct.
22  Q.  Not just limited to bonuses?
23  A.  Correct.
24  Q.  We'll come to that agreement.
25  Obviously, I'm going to spend some time with it

TSG Reporting - Worldwide  (877) 702-9580

Page 27

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  today, but do you have a general recollection --
3  let me ask you, were you involved in the
4  negotiations of Asset Purchase Agreement?
5  A.  I was involved in the preparation and
6  drafting of the Asset Purchase Agreement.
7  Q.  Okay.  Those are different verbs than
8  I asked.  Let me -- I want to get the best idea
9  I can of --
10  A.  The distinction I'm drawing is that
11  the negotiation of the Asset Purchase Agreement
12  covers, in my mind, negotiation of the business
13  deal.  I was not involved in the negotiation of
14  the business deal.  I was involved in the
15  lawyering of the Asset Purchase Agreement.
16      That's another verb, but I think that
17  best describes it.
18  Q.  Thank you.  Who was involved in
19  negotiating the business deal on Lehman's
20  behalf?
21  A.  To my recollection, Bart McDade, Skip
22  McGee, and Mark Shafir.
23  Q.  Would you spell "Shafir" for the
24  reporter, please?  Is it S-H-A-F-I-R.
25  A.  S-H-A-F-I-R.

TSG Reporting - Worldwide  (877) 702-9580

Page 28

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  Q.  Thank you.
3      Anyone else?
4  A.  I believe Mark Shapiro was involved.
5  Jim Seery was involved.  Alex Kirk I believe was
6  involved.
7  Q.  Kirk?
8  A.  Kirk.  K-I-R-K.
9      There may be a few additional bankers
10  that were involved in but in more secondary roles.
11  Q.  Who were they?
12  A.  To my recollection, Jeff Weiss may
13  have been involved.  Brad Whitman may have been
14  involved.  That's recollection, and that may not
15  be --
16  Q.  There could be others, you just don't
17  remember?
18  A.  And their role may have been minor.
19  Q.  Now, in order to do the --
20  A.  Excuse me.  And -- just to finish --
21  and there may have been others that I don't
22  recall.
23  Q.  Yeah, that's what I said, there may
24  have been more.  Just so our record is clear,
25  that may not be a complete list.  That's the

TSG Reporting - Worldwide  (877) 702-9580

Page 29

HIGHLY CONFIDENTIAL - S. BERKENFELD

1
2  best you can recall as you sit here?
3  A.  That's correct.  It may not be a
4  complete list.  There may have been others.
5  Q.  When you say Dave McGee and Shapiro,
6  who you identified as -- never mind.  The record
7  is clear.
8      Now, can you give me a little more
9  detail on what your role was when you say you
10  were involved in the drafting and the, to use
11  your verb, lawyering of the APA?
12  A.  After the bankruptcy filing, as you
13  can imagine, there were hundreds, thousands of
14  issues that no one had ever considered or had
15  prepared for.  Over the course of the next few
16  days, after the bankruptcy filing, I was trying
17  to deal with as many of those issues as
18  possible.
19      While I was spending much of my time
20  doing that, negotiations had commenced with
21  Barclays on a proposed asset purchase.  Over the
22  course of Monday and Tuesday, I became more
23  involved in those negotiations or lawyering, not
24  in the negotiations of the business deal but in
25  the preparation of the documentation, and at

TSG Reporting - Worldwide  (877) 702-9580

Page 90

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2      A.   And then there was going to be a
3  transfer over of assets and liabilities.
4      Q.   Okay.  Now, with respect to the
5  transfer of the assets, was there ever any
6  discussion of a so-called matched book, you
7  know, there was a matched book concept in this
8  deal that the liabilities that Barclays assumed
9  in connection with the transferred assets would
10  roughly equal the transferred assets?
11      MR. STERN:  Objection to the form.
12      A.   I don't recall any specific
13  discussions around a matched book.
14      Q.   What I want to know is whether that
15  term was used, "matched book," to your
16  knowledge.
17      A.   To my recollection, I don't remember
18  if the term was used or not.
19      Q.   Okay.  Now, if you would turn, please,
20  Mr. Berkenfeld, to page 11.  It's Article 2,
21  entitled Purchase and Sale of Assets, Assumption
22  of Liabilities?
23      A.   Yes.
24      Q.   Now, one of the agreements that
25  Barclays made in this contract was set out in
TSG Reporting - Worldwide  (877) 702-9580

Page 91

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2  Section 2.3 entitled Assumption of Liabilities.
3  Do you see that?
4      A.   Yes.
5      Q.   And there are in subsections "A"
6  through "I" descriptions of the liabilities that
7  Barclays would assume, correct?
8      A.   Correct.
9      Q.   And the assumption of those
10  liabilities, to your understanding as the
11  signatory to the agreement, was part of the
12  consideration that Barclays gave for the assets
13  purchased, correct?
14      A.   Yes.
15      Q.   And among the liabilities that
16  Barclays agreed to assume were all liabilities
17  assumed under Article 9, and I'm referring there
18  to Section 2.3, subsection C, you with me?
19      A.   Yes.
20      Q.   Okay.  And Article 9 brings us back to
21  page --
22      MR. STERN:  34.
23      Q.   -- 34, entitled Employees and Employee
24  Benefits, yes?
25      A.   Yes.
TSG Reporting - Worldwide  (877) 702-9580

Page 92

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2      Q.   And in Article 9(B), there is a
3  reference -- there's a description and a
4  discussion of severance payments and benefits
5  that Barclays would give to terminated
6  transferred employees.  By "transferred
7  employees," I mean people who meant from Lehman
8  to Barclays.  Is that right?
9      A.   9.1(B), you said?
10      Q.   9.1(B).
11      A.   Yes.
12      Q.   Put in short form, 9.1(B) deals with
13  severance benefits, yes?
14      A.   Yes.
15      Q.   And 9.1(C) deals with bonuses?
16      A.   I would have to read 9.1(C) again.
17      Q.   Take your time and read it.
18      (Document review.)
19      A.   Okay.
20      Q.   Okay.  Now, you've had a chance to
21  look through the language of 9.1(C)?
22      A.   Yes.
23      Q.   My question was 9.1(C) deals with
24  bonuses, correct?
25      A.   That is correct.
TSG Reporting - Worldwide  (877) 702-9580

Page 93

HIGHLY CONFIDENTIAL - S. BERKENFELD
1
2      Q.   Okay.  And as between 9.1(B) and
3  9.1(C), the only one that refers to the
4  schedule, the financial schedule, the one we've
5  marked as Exhibit 19, is 9.1(C), correct?
6      A.   Correct.
7      Q.   So, using the logic that or the
8  reasoning that you gave to me with respect to
9  the definitions of "purchased assets" and the --
10  and not mentioning the schedule there, would you
11  agree with me, sir, that that must mean that the
12  financial schedule we have marked as Exhibit 19
13  bears no relation to the requirements of Section
14  9.1(B) regarding severance?
15      MR. STERN:  Objection to the form.
16      A.   No, I don't agree with that.
17      Q.   Okay.  So not referring to it in the
18  definition of "purchased assets" has meaning,
19  but not referring to it in Section 9.1(B)
20  doesn't -- requires a different analysis?  Could
21  you explain that?
22      MR. STERN:  Objection to the form.
23      A.   I think you have to look at the words
24  very carefully.  Purchaser shall or shall cause
25  it subs to pay each transferred employee an
TSG Reporting - Worldwide  (877) 702-9580

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   annual bonus. In respect of 2008, that in the
3   aggregate are equal in amount to 100 percent of
4   the bonus pool amounts. Accrued and respect
5   amounts payable in respect of compensation and
6   reflected, reflected on the financial schedule
7   delivered to.
8       Q.   Uh-huh. And the amount --
9       A.   Not set forth on the financial
10  schedule, not in the amount specified, but
11  reflected. So I believe that you are reading
12  too much into the schedule to say that comp
13  means bonuses.
14      Q.   How much time did you spend when you
15  were drafting this document deliberately
16  choosing the precise verb "reflected" to make
17  sure that that was what was meant by that
18  provision, sir?
19      MR. STERN: Objection to the form.
20      Q.   Did you spend a lot of time on that?
21      MR. STERN: Objection to the form.
22      Q.   Is that the verb that M&A lawyers use
23  to mean the schedule might mean less than it
24  says?
25      MR. STERN: Objection to the form.

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   You can answer if you remember.
3       Q.   Do you remember? It's not a remember
4   question. It's a drafting technique question.
5       A.   Which question? I think you asked
6   four or five.
7       Q.   How deliberate was your choice of the
8   verb "reflecting" --
9       MR. STERN: Objection to the --
10      Q.   -- when you agreed to it when you
11  signed the Asset Purchase Agreement, as opposed
12  to the other verbs that you pointed out are not
13  used here?
14      A.   I don't believe I choose the verb
15  "reflecting."
16      Q.   Do you know who did choose the verb
17  "reflecting"?
18      A.   I don't know.
19      Q.   So is your assessment of the meaning
20  of the verb "reflecting" a sort of retroactive
21  assessment? It wasn't one you were involved in
22  at the time of the drafting of the agreement; is
23  that right?
24      MR. STERN: Object to the form.
25      A.   I think that's a mischaracterization

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2   of the point I made earlier that the schedule
3   was meant as guidance. It was referred to in
4   the section.
5       Q.   Right.
6       A.   But it was never attached to the
7   agreement, and even in this provision -- let me
8   finish -- could have been attached to the
9   agreement or the number itself could have been
10  put in the agreement, that wouldn't have taken
11  too much difficulty, instead of writing all
12  these extra words that say in the financial
13  schedule or so and so. They could have just, if
14  your interpretation was correct, said 2 billion.
15      Q.   All right. So --
16      A.   So that was not done. This schedule,
17  again, was meant as guidance. It had
18  significance because in a very short timeframe
19  we were trying to pull a deal together, and
20  there were provisions in this agreement that
21  didn't have schedules attached where an
22  agreement customarily would say these are
23  specifically the assets you are buying, these
24  are specifically the liabilities you are
25  assuming.

1    HIGHLY CONFIDENTIAL - S. BERKENFELD
2       Q.   Right.
3       A.   As an unnecessary and gratuitous
4   remark, you can compare this purchase agreement
5   to many other purchase agreements done in a
6   normal timeframe that would have attached to
7   them --
8       Q.   A schedule?
9       A.   -- hundreds of pages of schedules that
10  would list every piece of furniture and
11  equipment that might go on a particular
12  transaction.
13      Q.   Okay.
14      A.   So I'm answering your question beyond
15  where I think you asked it, but to kind of maybe
16  take a step forward instead of going around it.
17      Q.   No, I appreciate that.
18      A.   We could have --
19      Please let me finish.
20      Q.   Sure.
21      A.   We could have put specific numbers in
22  this agreement. We could have attached specific
23  schedules to this agreement. Even this
24  reference to the schedule is done in a fairly
25  imprecise way --

Exhibit 34

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4     ------------------------------x

      In Re:                    Chapter 11

5     LEHMAN BROTHERS            Case No. 08-13555 (JMP)

      HOLDINGS, INC., et al.,    (Jointly Administered)

6     ------------------------------)

7

8          * * * HIGHLY CONFIDENTIAL * * *

9          DEPOSITION OF HUGH McGEE

10             New York, New York

11          Monday, August 10, 2009

12

13

14

15

16

17

18

19

20    Reported by:

      FRANCIS X. FREDERICK, CSR, RPR, RMR

21    JOB NO. 24038

22

23

24

25

Page 30

1    H. McGEE - HIGHLY CONFIDENTIAL
2  that was one of two conversations you had with
3  Mr. Diamond.
4      A.   (Witness nods.)
5      Q.   When was the second one?
6      A.   Later that same evening.  Night.
7      Q.   And describe that conversation for
8  me; what did you say, what did he say?
9      A.   Well, in the first conversation I
10  expressed concern that a significant number of
11  our most highly valued employees already had
12  contracts in hand from competitors at numbers
13  that were flat to '07 and were two-year
14  transactions.  So I expressed concern about
15  making sure that we were able to actually
16  deliver a franchise because the franchise was
17  like a -- you know, an ice cube on the
18  pavement in the middle of the summer.  It was
19  melting quickly.  Very quickly.  Part of the
20  reason for that is that historical Lehman
21  compensation, a senior employee got more than
22  50 percent of their compensation in stock
23  which had a five-year vest.  So the senior
24  employees of Lehman Brothers had always been
25  somewhat untouchable to the street because
        TSG Reporting - Worldwide  (877) 702-9580

Page 31

1    H. McGEE - HIGHLY CONFIDENTIAL
2  they were all carrying around five years of
3  deferred restricted stock units that hadn't
4  vested.  Now, all of a sudden, all of these
5  senior employees at a minimum, had they sold
6  all of their stock every time it matured, they
7  had just lost two and a half years of
8  earnings, assuming 50 percent, five years.
9      They had never wanted to leave.
10  They had been very loyal.  So it was open
11  season for the senior employees of Lehman
12  Brothers.
13      So when Bob first came to me and
14  said I'm thinking about this kind of a deal
15  for you and for the Lehman people, and he said
16  one-year transaction at either -- I think
17  maybe he said down 30 percent from '07.
18      I said let me reflect on that and
19  I'll come back to you.  I thought about it for
20  a second -- oh, and I didn't say I'll come
21  back to you.  I said let me think about that.
22  And then I came back to him right there in
23  that sitting.  I said that feels a little bit
24  like relative to what I see as the bid away
25  for our top people.  Because I assumed his
        TSG Reporting - Worldwide  (877) 702-9580

Page 32

1    H. McGEE - HIGHLY CONFIDENTIAL
2  discussion with me was a proxy for what was
3  going to happen for the division.
4      And do you want me to go to the
5  second conversation now?
6      Q.   Yes, please.
7      A.   So in the second conversation he
8  came back and said what about a down
9  20 percent one-year deal.  And I said I'm not
10  going to hold this deal up, I'm not going to
11  hold up saving 11,000 jobs, I'm fine, I'll
12  agree.  I'm in.  But I still think we're going
13  to have a harder time landing the plane with
14  the rest of the franchise at that kind of
15  level knowing as I did that I had entire
16  swaths of bankers that already had two-year
17  deals from Citi, from JPMorgan, whatever, and
18  I was going to have to try to keep those
19  people in the boat.
20      Q.   Now, when Mr. Diamond was talking
21  to you about the -- about your joining
22  Barclays after the transaction that Monday
23  night, did he make you a dollar offer?
24      A.   Well, he described it in terms of
25  down 20 percent.
        TSG Reporting - Worldwide  (877) 702-9580

Page 33

1    H. McGEE - HIGHLY CONFIDENTIAL
2      Q.   And can you describe your
3  compensation for me at Barclays for the year
4  2009?
5      I shouldn't restrict it to year.
6  Just tell me what your compensation package
7  was with Barclays when you joined them.
8      A.   It was exactly as be described.
9  It was down the 20 percent.  So it was, you
10  know, 80 percent of the 23 number which is
11  something like 18 four.  I believe the salary
12  is the same.  It's the 450.  And the
13  difference is that the Barclays mix is
14  different from Lehman or at least it was for
15  this year, was 75 percent cash, 25 percent
16  equity.
17      Q.   And was that -- to your knowledge,
18  was the fact that Mr. Diamond had made an
19  employment offer to you during the
20  negotiations disclosed to the boards of Lehman
21  Brothers Holdings and Lehman Brothers, Inc.?
22      MR. STERN:  Objection to the form.
23      Q.   Do you know one way or the other?
24      A.   I have no idea.
25      Q.   And do you know if the discussions
        TSG Reporting - Worldwide  (877) 702-9580

H. McGEE - HIGHLY CONFIDENTIAL
1  be transferred over to Barclays?
2      A.   No, I did not.  My understanding
3  was that the structure of the transaction was
4  an asset purchase and there was still work
5  being done to agree on exactly what the assets
6  were to be purchased.
7      Q.   Do you know, sir, if there was any
8  discount off the book value of the assets
9  transferred, any agreed discount off the book
10 value?
11     A.   I was not involved in that process
12 so I have no idea.
13     Q.   Did you review the asset purchase
14 agreement when it was finalized and signed?
15     A.   No, I did not.
16     Q.   Have you reviewed it since?
17     A.   No, I have not.
18     Q.   Did anyone ask you to review it at
19 the time that it was signed?
20     A.   No.
21          With the exception of the
22 provision relating to compensation and
23 employees.
24     Q.   Okay.

H. McGEE - HIGHLY CONFIDENTIAL
1      (Pause on the record.)
2      Q.   Now, Mr. McGee, I've put before
3  you what we previously have marked as
4  Deposition Exhibit 1.
5          Do you recognize the document?
6      A.   Actually, I don't recognize it.
7  But I take it for what it's labeled to be.
8      Q.   Okay.  And that would be the asset
9  purchase agreement between Lehman Brothers
10 Holdings, Lehman Brothers, Inc., LB 745, LLC
11 and Barclays Capital, dated as of September
12 16th, 2008?
13     A.   That is what it says on the cover.
14 Yes, sir.
15     Q.   Prior to today, have you ever seen
16 this document that we've marked as Exhibit 1?
17     A.   No.  Have not.
18     Q.   Would you take a look, please,
19 at --
20     A.   Have not seen in it in its
21 entirety.  I have seen a provision
22 (indicating).
23     Q.   Okay.  You're pointing to a
24 provision.  Which one are you pointing to?

H. McGEE - HIGHLY CONFIDENTIAL
1  Page 34?
2      A.   Page 34.
3      Q.   Okay.
4      A.   That my counsel has helpfully
5  paged me to.
6      Q.   And page 34 is the beginning of
7  Article 9 entitled Employees and Employee
8  Benefits, correct?
9      A.   Correct.
10     Q.   And if you would take a look, sir,
11 please, through -- you'll note it has three
12 subsections, (a), (b), and (c), right?
13     A.   Yes.
14     Q.   Were you involved in the drafting
15 or the finalizing of the language in
16 Exhibit -- in Section 9.1 of the asset
17 purchase agreement?
18     A.   Yes, I was.
19     Q.   Describe for me as best -- with it
20 in front of you, describe for me as best you
21 remember exactly what your role was in
22 drafting or finalizing that language.
23     A.   Again, as I mentioned earlier, I
24 had very real-time and serious concerns about

H. McGEE - HIGHLY CONFIDENTIAL
1  the franchise of Lehman Brothers and
2  preserving some value in that franchise.
3  Headhunters were conducting very aggressive
4  campaigns to hire senior employees, groups of
5  employees, entire industry groups.  We had
6  very significant numbers of employees,
7  certainly in investment banking that already
8  had contracts in hand from competitors.  And I
9  was worried about the value of Lehman Brothers
10 was about to walk out the front door if this
11 wasn't handled the right way.
12         So I was involved in the
13 discussion of these provisions.  Two places
14 where I was the most involved had to do with
15 what would happen with employees who didn't
16 end up having a job, would they be treated
17 fairly and appropriately severed because there
18 was bound to be redundancies and I wanted to
19 make sure that the severance program was
20 consistent with the kind of severance program
21 that Lehman had historically utilized.
22         The second was to make sure that,
23 in fact, there was a bonus pool and bonuses
24 paid for employees because, as I mentioned

1  H. McGEE - HIGHLY CONFIDENTIAL
2  previously, if you're a senior employee you
3  work for a salary which is ultimately a
4  fraction of your compensation and it's about
5  the year-end bonus or year-end compensation.
6  And if we didn't have -- if we did
7  not have an adequate answer to this question I
8  worried about our ability to retain the
9  franchise represented by the employees.
10  **Q.  Are you finished with your answer,**
11  **sir?**
12  A.  Yes.
13  **Q.  Okay.  Why were you worried about**
14  **Barclays' ability to retain employees after**
15  **the transaction?  Why was that a matter of**
16  **concern to you?**
17  A.  Because if we couldn't represent
18  to the employees that there was a program to
19  take care of them they were going to leave.
20  They had offers away.
21  **Q.  Okay.  And --**
22  A.  And without employees the client
23  relationships, the -- there's no value to the
24  business.  At least that was my view.
25  **Q.  Do you know if any part of the**

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  **consideration paid in the asset purchase**
3  **agreement was consideration paid for the**
4  **franchise value of Lehman?**
5  A.  My understanding was that there
6  was a "goodwill" number that was included in
7  the transaction.
8  **Q.  Can you remember what the**
9  **"goodwill" number was?**
10  A.  250 million was what I had heard.
11  **Q.  And did you have a view at the**
12  **time as to whether the Lehman franchise was**
13  **worth $250 million?**
14  MR. STERN:  Objection to the form.
15  A.  I would say that that's a very
16  difficult question to answer.  What I would
17  say was that that number was very rapidly
18  speeding to zero.  And the more employees --
19  the more key employees that left to go to
20  other firms, it was quite certainly going to
21  zero.
22  **Q.  Now, when the agreement was being**
23  **negotiated prior -- the agreement being the**
24  **asset purchase agreement before it's signed --**
25  **what's contemplated, as I understand it, is a**

1  **H. McGEE - HIGHLY CONFIDENTIAL**
2  **sale of assets; the building, the two data**
3  **centers, the balance sheet assets.**
4  **Can you describe for me what**
5  **interest Lehman Brothers Holdings or Lehman**
6  **Brothers, Inc. would have in the continued**
7  **viability of the franchise after Barclays**
8  **bought those assets?**
9  THE WITNESS:  Could you repeat the
10  question.
11  (Record read.)
12  A.  Well, I can't speculate as to what
13  their interests are or should have been but I
14  would -- I would assume that one would be
15  interested in the franchise staying intact
16  through the transaction so that the purchaser
17  actually carried through with the transaction
18  and actually purchased.
19  If there was no franchise, if
20  there was no people and most of the key
21  employees had left to go do other things and
22  the only employees that were remaining were
23  those that generally couldn't find
24  opportunities elsewhere, I would think that
25  what was there for any potential purchaser was

1  H. McGEE - HIGHLY CONFIDENTIAL
2  much less valuable and, therefore, what was
3  then realized in any transaction was much
4  lower.
5  **Q.  So when you spoke about the**
6  **severance program before you said there were**
7  **two main topics that were of concern to you;**
8  **one was how severed, terminated employees**
9  **would be treated because there would be**
10  **redundancies; and the other was the**
11  **establishment of a bonus pool.**
12  **Let's talk about the first piece,**
13  **the severance piece.  Is the agreement**
14  **regarding severance that was reached the one**
15  **that's reflected in paragraph 9.1(b) of the**
16  **asset purchase agreement?**
17  A.  I believe that to be true.  I
18  looked at drafts of just this article.
19  **Q.  Um-hum.**
20  A.  And worked on some of the
21  language.  I didn't reread the entire document
22  as signed.  But my understanding is that it
23  was -- that this is consistent.
24  **Q.  You just said something that went**
25  **back to the question I asked a few moments ago**

# Exhibit 35

Page 1

1

2          UNITED STATES BANKRUPTCY COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------x

     In Re:                    Chapter 11

5    LEHMAN BROTHERS            Case No. 08-13555 (JMP)

     HOLDINGS, INC., et al.,    (Jointly Administered)

6    -------------------------------)

7

8         * * * HIGHLY CONFIDENTIAL * * *

9           DEPOSITION OF PAUL EXALL

10             New York, New York

11          Thursday, August 27, 2009

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 24380

22

23

24

25

Page 18

**P. EXALL - HIGHLY CONFIDENTIAL**
1
2  were you passed that agreement?
3      A.   I can't recall the exact date but
4  it would have been on or around the 22nd of
5  September or shortly thereafter.
6      Q.   Okay.  And did you need to consult
7  that agreement to do your job from then on?
8      A.   It was a point of reference, yes.
9      Q.   Okay.  Were you passed any other
10  documents related to compensation in
11  connection with this transaction?
12      A.   Yes.
13      Q.   Like what?
14      A.   I requested to see a copy of the
15  schedule referred to in the APA.
16      Q.   Okay.
17      A.   The sale agreement.
18      Q.   Okay.
19      A.   And I was passed what was
20  represented to me as being that schedule.
21      Q.   Okay.  Anything else?
22      A.   I don't recall getting any other
23  specific sale-related documentation in that
24  regard, no.
25      Q.   Okay.  Have you ever seen a copy

Page 19

**P. EXALL - HIGHLY CONFIDENTIAL**
1
2  of the first amendment to the Asset Purchase
3  Agreement?
4      A.   I don't believe so, no.
5      Q.   Okay.  Fair to say you don't have
6  any use for that document in connection with
7  the work you've performed with respect to
8  compensating former Lehman employees?
9          MR. GREEN:  Object to the form of
10  the question.
11          MR. HINE:  It was a bad question.
12  Let me try again.
13      Q.   Is it fair to say you haven't had
14  need to consult with the first amendment of
15  the APA in connection with the work you
16  performed with respect to compensation for
17  former Lehman employees?
18      A.   I did not consult it.
19      Q.   Okay.
20      A.   Consequently, I do not know if I
21  needed to.
22      Q.   Okay.  Fair enough.
23          Have you ever seen a document
24  called a clarification letter that was agreed
25  to between Barclays and Lehman in connection

Page 20

**P. EXALL - HIGHLY CONFIDENTIAL**
1
2  with the Asset Purchase Agreement?
3      A.   I don't recall specifically seeing
4  that document.  I know of its existence but I
5  don't recall actually either seeing it or
6  having read it in any great detail.
7      Q.   Okay.
8      A.   If I did see it.
9      Q.   Do you have any understanding of
10  its purpose?
11      A.   No.  Not particularly.
12      Q.   Do you have any understanding of
13  how it relates in any way, if at all, to
14  compensation issues?
15      A.   No.
16      Q.   Okay.  Is it fair to say that
17  you've been able to do your job with respect
18  to compensation of former Lehman employees
19  without consulting the clarification letter?
20      A.   I believe so.
21      Q.   Okay.  And I believe you said
22  earlier that you prepared the spreadsheet that
23  we're going to be discussing here today?
24      A.   I did.
25      Q.   Okay.  And is that something that

Page 21

**P. EXALL - HIGHLY CONFIDENTIAL**
1
2  you prepared in the normal course of your
3  employment?
4      A.   It was prepared in the normal
5  course of business in support of various
6  requirements from PriceWaterhouseCoopers as
7  part of their annual audit as well as the
8  ancillary or related regulatory filings that
9  they may or may not have had to prepare.
10      Q.   So when was it prepared?
11          MR. GREEN:  Object to the form.
12  You mean the spreadsheet?  When was the
13  original spreadsheet prepared?
14          MR. HINE:  Well, we'll just wait
15  till I get to the spreadsheet.  I just
16  want to get some background here.
17      Q.   We'll put that question aside.
18          So when did you learn of the
19  Lehman/Barclays sale transaction?
20      A.   I learned -- I don't recall
21  actually specifically learning when it
22  occurred.  I was aware that the initial
23  discussions were being held in New York
24  amongst various parties in relation to the
25  original form of the transaction whereby, I

Page 58

1       P. EXALL - HIGHLY CONFIDENTIAL
2   cash and stock.
3       **Q.   Right.**
4       A.   Whereby above a certain threshold
5   an amount of the annual bonus was deferred or
6   delivered through a stock vehicle which would,
7   based at the time, through a tax table kind of
8   approach so above a certain threshold a
9   proportion was deferred or delivered in stock
10  and beyond a certain -- another step more
11  stock was delivered.
12      **Q.   Okay.  And was this -- when you**
13  **said tax table you threw me there.  What did**
14  **you mean there?**
15      A.   Sorry.  It's a term I use.  I
16  shouldn't use it.  We colloquially refer to it
17  as a tax table.  It's in effect if your bonus
18  is X, then there is no deferral into stock.
19  If it's above a certain threshold, a certain
20  proportion of the entire bonus is delivered in
21  stock.  If it's above another threshold,
22  further proportion of that bonus is delivered
23  in stock.
24      **Q.   Okay.  And as a general matter**
25  **what percentage of bonus is provided in stock?**

Page 59

1       **P. EXALL - HIGHLY CONFIDENTIAL**
2       A.   In general, our customary practice
3   prior to 2008 was that any bonus -- and there
4   were regional fluctuations here based on the
5   exchange rate -- so I will quote this in
6   pounds.  Any bonus below 150,000 pounds
7   sterling there was no deferral or no delivery
8   in stock.  Any amounts above 150,000 pounds
9   but below 250,000 pounds of annual bonus,
10  10 percent of the entire amount was delivered
11  in stock.  Any amounts over and above 250,000
12  pounds, the first 250,000 pounds were
13  delivered -- 10 percent of that was delivered
14  in stock.  Any amount above 250,000 25 percent
15  was delivered in stock.
16      **Q.   And this stock vested over time?**
17      A.   That's correct.  Subject to the
18  rules of the stock -- of the plan itself, the
19  standard practice was to cliff vest at the end
20  of a three-year period.
21      **Q.   Okay.  I saw that term cliff vest.**
22  **What does many mean?**
23      A.   In general that means that it
24  vests in equal tranches, so to speak, so some
25  of our competitors in a stock award would --

Page 60

1       P. EXALL - HIGHLY CONFIDENTIAL
2   let's say, as an example, if you had a hundred
3   pounds of an amount deferred into stock,
4   vesting over four years, if -- you can either
5   have pro rata vesting which is you could take
6   a quarter, a quarter, a quarter, and 25 would
7   accrue at the end of one, 25 after -- et
8   cetera.
9           Cliff vesting means that it only
10  vests at the end of the period concerned.  So
11  you'd only get the full hundred in this
12  example at the end of the fourth year.
13      **Q.   And it was a custom to have a**
14  **three-year cliff vest period for stock**
15  **bonuses?**
16      A.   It was our custom, yes.
17      **Q.   All right.  And has this changed**
18  **since 2008?  You said prior to 2008.**
19      A.   2008 was a unique year for
20  compensation and we delivered at Barclays
21  Capital -- at Barclays in a different way
22  subject to a different type of arrangement.
23      **Q.   Are you talking about the former**
24  **Lehman employees when you say that or --**
25      A.   No.  They were subject to our

Page 61

1       P. EXALL - HIGHLY CONFIDENTIAL
2   standard practice that was employed prior to
3   this.
4       **Q.   Okay.  So as a general matter, and**
5   **I know there's individuals, but as a general**
6   **rule this practice -- the prior practice that**
7   **you just described was applied to the former**
8   **Lehman employees that came to work at**
9   **Barclays?**
10      A.   I believe that to be the case yes,
11  in most cases, yeah.
12          (Deposition Exhibit 280B, document
13      bearing production number
14      BCI-EX-00077287, marked for
15      identification as of this date.)
16          (Deposition Exhibit 281B, document
17      bearing production number
18      BCI-EX-00115843, marked for
19      identification as of this date.)
20  BY MR. HINE:
21      **Q.   Mr. Exall, I'm handing you two**
22  **exhibits.  One is marked as Exhibit 280B which**
23  **is Bates stamped BCI-EX-00077287 which I**
24  **understand to be the original version of the**
25  **schedule that was provided to us.  And the**

P. EXALL - HIGHLY CONFIDENTIAL

1  P. EXALL - HIGHLY CONFIDENTIAL
2  second document is marked as Exhibit 281B
3  which is Bates stamped BCI-EX-00115843 which,
4  Chris, I think you'll agree is the updated
5  schedule that was recently provided to us.
6      My first question, Mr. Exall, have
7  you ever seen these documents before?
8      A.  Yes.
9      Q.  You prepared these documents?
10      A.  I did.
11      Q.  Okay.  I want to -- and am I
12  correct that 281B is an updated replacement
13  version of 280B?
14      A.  Yes.
15      Q.  Okay.  Before we put away 280B
16  could you explain to me the differences and
17  why you had to update it?
18      A.  Sure.  280B as you referred to
19  here was the original schedule provided around
20  the middle of July I understand.  It reflected
21  what we believed to be an accurate picture of
22  the discharge of compensation to previous --
23  former Lehman Brothers employees in respect of
24  their prior pre-acquisition service.
25          It was thought to be accurate at

1      P. EXALL - HIGHLY CONFIDENTIAL
2  that time, although we were still
3  investigating certain items reflected on the
4  schedule.  Subsequent to those investigations
5  and the correction of a couple of
6  typographical errors as well as some of the
7  text was cut off from the narrative on the
8  right-hand side of the original schedule, the
9  updated schedule reflects a more accurate --
10  an accurate picture of the discharge of those
11  compensation items as of the date it was
12  produced.
13      Q.  Okay.  Now, other than typos is it
14  fair to say the main differences have to do
15  with severance entries?
16      A.  Yes.
17      Q.  Okay.  Just take a step back a
18  minute.  Why was this schedule -- and I'll
19  refer to them generically now, why was this
20  schedule prepared?
21      A.  The schedule was prepared in the
22  normal course of business to support the -- or
23  for production to -- primarily for production
24  to PriceWaterhouseCoopers as part of their
25  annual audit as well as any ancillary filings

1      P. EXALL - HIGHLY CONFIDENTIAL
2  they may or may not have had to provide as
3  part of their normal course of business as
4  auditors of Barclays.
5      Q.  Okay.  So this is someone from PwC
6  requested a schedule of compensation related
7  to the Lehman acquisition?
8      A.  I was instructed that this would
9  be needed in support of the annual audit and
10  other related filings by my finance
11  colleagues.
12      Q.  Who told you that?
13      A.  Mr. Romaine.
14      Q.  Romaine?
15      A.  Gary Romaine.
16      Q.  Okay.  And he is -- what was his
17  position?
18      A.  I believe -- I don't know -- I
19  can't recall his exact title but he's a
20  technical accountant in the finance
21  department.
22      Q.  Okay.  He's not in the HR
23  department, correct?
24      A.  No, no.
25      Q.  So is it correct to say that the

1      P. EXALL - HIGHLY CONFIDENTIAL
2  finance department requested this type of
3  schedule from your department?
4      A.  Mr. Romaine requested it of me,
5  yes.
6      Q.  Okay.  Any other purpose behind
7  this other than to assist PwC?
8      A.  No.  The primary purpose of this
9  was to assist PwC.
10      Q.  Any other purposes?
11      A.  I think we in general in support
12  of our own internal accounting records would
13  have prepared the schedule.  But the primary
14  purpose would be to support the annual audit
15  and regulatory filings that were required.
16      MR. GREEN:  Bill, I'm sorry.
17  Could we go off the record for one
18  second?
19      MR. HINE:  Sure.
20      (Discussion held off the record.)
21  BY MR. HINE:
22      Q.  Mr. Exall, I think you had
23  something you wanted to clarify?
24      A.  If you could repeat that question
25  in respect of why the schedule was prepared

Page 74

P. EXALL - HIGHLY CONFIDENTIAL

1        P. EXALL - HIGHLY CONFIDENTIAL
2        A.   I was asked to prepare the
3    schedule in respect of detailing the discharge
4    of our obligations to former Lehman Brothers
5    employees in respect of their prior service
6    and compensation for their prior service for
7    Lehman Brothers.  And this is what the
8    schedule represents.  It's items relating to
9    pre-acquisition services.
10       Q.   Okay.  But were you ever told that
11   it should be a total of $2 billion?
12       A.   No.
13       Q.   Do you have any understanding of
14   how this schedule and the compensation listed
15   in this schedule relates to the 9/16 balance
16   sheet or the schedule we looked at previously?
17       MR. GREEN:  The Exhibit 19?
18       Q.   Exhibit 19.
19       A.   The only reference point between
20   schedules 280B and 281B and the schedule you
21   have as Exhibit 19 is the OBS compensation
22   accrual line which is reflected on both 280B
23   and 281B.  The source referenced here is the
24   APA which references the $2 billion described
25   as comp on Exhibit 19.

Page 75

1        P. EXALL - HIGHLY CONFIDENTIAL
2        Q.   Okay.  So let's look at
3    Exhibit 281B.  I don't want to confuse the
4    record here.
5        A.   Okay.
6        Q.   281B is the most recent version of
7    this schedule, right?
8        A.   That's correct.
9        Q.   Just so I understand what you just
10   said, when you see on the -- OBS Compensation
11   Accrual, OBS stands for opening balance sheet;
12   is that right?
13       A.   Yes.  That's my understanding.
14       Q.   Okay.  And the source for the $2
15   billion number is the APA, correct?
16       A.   Yes.
17       Q.   And by that you mean the source
18   for the $2 billion is Exhibit 19 that we just
19   pointed to?
20       A.   That's correct.
21       Q.   Okay.  So now how do you -- I just
22   want to walk through preparing this schedule.
23   How do you get from the $2 billion number --
24   how do you break it into 17 -- into
25   1.7 billion in cash versus 300 million in

Page 76

1        P. EXALL - HIGHLY CONFIDENTIAL
2    equity?
3        A.   I was requested by Mr. Romaine
4    to -- for accounting purposes to estimate the
5    stock component of any such compensation that
6    may total 2 billion with the assumption that
7    we applied -- oh, sorry.  Let me say it again.
8        I was asked to estimate the stock
9    potential of any compensation that may be
10   represented by this 2 billion.
11       Q.   Okay.
12       A.   And the 300 million is an estimate
13   based on historic norms and experience under
14   the Barclays Capital stock deferral scheme.
15       Q.   Is that the scheme we talked about
16   earlier, the normal practice of Barclays?
17       A.   That is correct, yes.
18       Q.   Okay.  And when did he ask you to
19   do this?
20       A.   I believe it's a technical
21   accounting matter.  And it's really a question
22   for Mr. Romaine.
23       MR. GREEN:  I'm sorry.  Did you
24   say when or why?
25       MR. HINE:  Why.

Page 77

1        P. EXALL - HIGHLY CONFIDENTIAL
2        MR. GREEN:  Oh, I'm sorry.
3        A.   It's a technical accounting matter
4    in respect of how the -- my understanding is
5    how the acquisition is accounted for in the
6    books and records of Barclays PLC.  I don't
7    know the technical aspects behind it.
8        Q.   Okay.  Just a general question.
9    Has this allocation between cash and equity
10   changed at all since the fourth quarter of '08
11   when you first started preparing the schedule
12   to the present?
13       A.   Not to my recollection.  Again,
14   that would have to be something for Mr.
15   Romaine.
16       Q.   Okay.  And again I'm happy if you
17   tell me it's someone else's department.  I'm
18   not trying to get you to testify about things
19   you have no knowledge about.
20       A.   No, I understand.
21       Q.   In the next -- could you just tell
22   in the general structure here.  You have
23   payments -- I see payments in future and other
24   items.  Payments are cash outflows or expenses
25   that have already taken place?

Page 86

1    P. EXALL - HIGHLY CONFIDENTIAL
2    million, does not include payments for
3    October, November and December for those
4    employees; is that right?
5        A.    That is right.
6        Q.    Okay.  The next item we see is
7    replacement RSUs.  Could you tell us what that
8    is?
9        A.    RSU is an acronym to stand for
10   restricted stock units.
11       Q.    Okay.  And what are they?
12       A.    They are effectively in general
13   stock awards made to individuals that are
14   restricted in the sense that they either do
15   not vest immediately or can't be sold
16   immediately.
17       Q.    Okay.  Now, these are a form of
18   compensation that Lehman had previously used?
19       A.    Yes.
20       Q.    Okay.  Did Barclays previously use
21   these?
22       A.    Yes, we have.
23       Q.    Okay.  Now, I see that you cite
24   here $11 million and I just want to read your
25   source.  It says new RSUs granted as

Page 87

1    P. EXALL - HIGHLY CONFIDENTIAL
2    replacements for ex-Lehman employees granted
3    to them in 2008 prior to the acquisition.
4        So just explain to me what's going
5    on here.  This is Barclays replacing some RSUs
6    that Lehman had previously granted to its
7    employees?
8        MR. GREEN:  Object to form.  You
9    may answer.
10       A.    There was a population of people
11   that were given stock awards by Lehman
12   Brothers earlier in 2008.  At the time of the
13   acquisition the value of those awards had
14   declined to zero.
15       Q.    Right.
16       A.    For these specific employees it
17   was decided that as a goodwill gesture,
18   Barclays would give restricted stock awards in
19   respect of that zero -- that original award
20   now valued at zero in effect to split the loss
21   50/50.
22       So as a hypothetical example if
23   the individual had been -- received an award
24   of stock to the value of $100 from Lehman
25   Brothers that had gone to zero at the time of

Page 88

1    P. EXALL - HIGHLY CONFIDENTIAL
2    the bankruptcy, Barclays' goodwill gesture in
3    respect of that employee would have been to
4    give them a stock award to the value of 50 in
5    Barclays stock.
6        Q.    So it's in Barclays stock now.
7        A.    It's in Barclays stock but relates
8    to the value of stock awarded prior to the
9    acquisition by Lehman Brothers.
10       Q.    And that's based on the value of
11   Barclays stock as of around September '08,
12   correct?
13       A.    That's normal practice, yes.
14       Q.    And does this vest over a period
15   of time?
16       A.    It would have, yes.  I don't know
17   the specific vesting for this particular award
18   but that would be the normal course of events,
19   yes.
20       Q.    Would it be the three-year cliff
21   vest that you mentioned earlier?
22       A.    It may or may not have been.
23   Often -- in many cases we will mirror the
24   original vesting of an award at a previous
25   employer with a replacement award.  I can't

Page 89

1    P. EXALL - HIGHLY CONFIDENTIAL
2    testify to what the vesting period because I
3    don't know it for this particular award.
4        Q.    Okay.  Well, if it vested over
5    time, would it be entered on the balance sheet
6    for this year?
7        A.    Sorry.  Excuse me?
8        Q.    If it had vested over time would
9    it be entered on the acquisition balance sheet
10   for this year?
11       MR. GREEN:  Object to the form of
12   the question.  You may answer if you
13   know.
14       A.    I believe that's a technical
15   accounting question.  I believe the answer to
16   be yes but I can't pass an exact accounting
17   opinion.  You should refer that to Mr.
18   Romaine.
19       Q.    Okay.  And when you say this is a
20   goodwill gesture are you saying that Barclays
21   wasn't obligated to do this under the APA?
22       MR. GREEN:  Objection to the form
23   of the question.  It calls for a legal
24   conclusion.
25       A.    I don't know what the APA

Page 102

1    P. EXALL - HIGHLY CONFIDENTIAL
2    that is different to let's say non-graduate
3    employees.
4    **Q.   So this isn't a bonus.  This is a**
5    **compensation -- this is an extra form of**
6    **compensation to them because they went to**
7    **graduate school?**
8    A.   No.  It's an extra form of
9    compensation because they're on the graduate
10    program and as part of that program they're
11    entitled to certain awards at certain points
12    in time.  June 2009 being the point in time at
13    which they were entitled to them.
14    **Q.   Okay.  I guess I'm just not**
15    **understanding that.  You've recruited them out**
16    **of -- Lehman has recruited them out of a grad**
17    **school and this is a payment they get as an**
18    **extra incentive to come work for Lehman?**
19    MR. GREEN:  Objection to form.
20    You may answer.
21    A.   This is for all intents and
22    purposes in general their annual bonus, okay?
23    Their timing is different than the general
24    population for whatever reason.  That's
25    standard practice at -- it was standard

Page 103

1    P. EXALL - HIGHLY CONFIDENTIAL
2    practice at Lehman -- the cycle of their bonus
3    awards or payments were midyear.  Whereas
4    everyone else it's year end.
5    **Q.   Okay.  But they are still in grad**
6    **school still?**
7    A.   No, no.  They have left grad
8    school.  They're all graduates.  But they're
9    part of our formal graduate program having
10    been recruited from grad school.
11    **Q.   Okay.  And how are they eventually**
12    **transitioned from this program into becoming a**
13    **regular -- like, how do they transition to the**
14    **normal bonus cycle?**
15    A.   I can't speak for the exact Lehman
16    policy but in general my understanding of the
17    graduate program that we have is that they
18    rotate for a certain period of time within the
19    business in which they work.  They learn their
20    business.  They, you know, work, they learn,
21    et cetera.  And as and when they -- the
22    graduate program is generally a finite amount
23    of time.  In Barclays Capital traditionally it
24    was 18 months.  The graduates did a bunch of
25    rotations in various business areas and they

Page 104

1    P. EXALL - HIGHLY CONFIDENTIAL
2    were either employed or not employed at the
3    end of that cycle by Barclays Capital.
4    **Q.   Okay.  So --**
5    A.   But I -- if the Lehman Brothers
6    scheme is the same in general as the Barclays
7    Capital scheme, that's how think I would
8    transition into what I would term as the
9    general population.
10    **Q.   Okay.  I think I understand it.**
11    **So this is -- these are folks who had been in**
12    **this graduate program as of September 22nd and**
13    **now are able to continue in that same program**
14    **at Barclays?**
15    A.   Yes.  That's my understanding of
16    it.
17    **Q.   Okay.  So the $11 million here is**
18    **in lieu of an annual bonus for them?**
19    A.   It's exactly the same for all
20    intents and purposes as any other compensation
21    delivered to any other ex-Lehman employee.
22    It's just that the timing is different.
23    **Q.   Well, do they also receive a base**
24    **salary?**
25    A.   Yes, they do.

Page 105

1    P. EXALL - HIGHLY CONFIDENTIAL
2    **Q.   Okay.  So they have a base salary**
3    **and then an additional amount paid in or**
4    **around June of every year; is that correct?**
5    A.   That's correct.
6    **Q.   And is this only the additional**
7    **amount or does this also include the base**
8    **salary?**
9    A.   This is the additional amount.
10    **Q.   And where does their base salary**
11    **fall?**
12    A.   In the normal books and records of
13    Barclays Capital.
14    **Q.   So that would be up in the first**
15    **item, the $5 million we talked about earlier?**
16    MR. GREEN:  Object to the form.
17    A.   I would say that insofar as the
18    IBD graduates may or may not have -- may have
19    been in the payrolls that Barclay made good
20    the answer would be yes.
21    In general, I don't believe -- I
22    believe that most of those investment banking
23    graduates were not part of that payroll cycle
24    and consequently any salary paid to them
25    pre-acquisition would have been borne -- the

Page 110

P. EXALL - HIGHLY CONFIDENTIAL

1 compensation he has a base salary of 200,000.
2 Do you see that?
3 A.   Yep.  I do.
4 Q.   Is that on your spreadsheet at all
5 within any entries?
6 A.   No.
7 Q.   And why is that?
8 A.   Because that salary would have
9 been paid to him post-acquisition.  The
10 schedule does not reflect any post-acquisition
11 obligations.
12 Q.   I understand.  So that is
13 compensation he's receiving for work he's
14 performing for Barclay post-acquisition.
15 A.   That would be correct.  The only
16 way that that -- some of that 200,000 would
17 have been part of this schedule is if it was
18 part of the pre-2009 payroll we discussed
19 previously.
20 Q.   I understand.  Okay.
21 The next entry you'll see is
22 entitled Severance.  Could you tell me what
23 that is meant to cover?
24 A.   That relates to payments and

Page 111

P. EXALL - HIGHLY CONFIDENTIAL

1 ancillary -- payments to individuals.
2 Withholding taxes and ancillary liabilities in
3 respect of the reduction in force exercise
4 implemented in Q4 2008 and Q1 2009 in respect
5 of former Lehman Brothers employees.
6 Q.   Okay.  When I see RIF in the
7 source that's reduction in force?
8 A.   That acronym stands for reduction
9 in force, yes.
10 Q.   And what does that VIG stand for?
11 A.   I don't know what VIG actually
12 stands for.  It is meant to refer to the Q1
13 2009 reduction in force exercise.
14 Q.   So RIF refers to the fourth
15 quarter '08 reduction in force?
16 A.   That's my understanding.
17 Q.   And the second acronym refers to
18 the first quarter of '09 reduction?
19 A.   That's my understanding.
20 Q.   Okay.  And you got lists of --
21 what do your lists show from HR?  I see a
22 reference from HR.
23 A.   We maintained -- we, HR,
24 maintained databases of payments made to

Page 112

P. EXALL - HIGHLY CONFIDENTIAL

1 individuals and related items on a
2 name-by-name-basis reflecting these items
3 totalling these amounts on the schedule.
4 Q.   Okay.  Now, these individuals came
5 to work for Barclays at or around September
6 22nd and had left since then?
7 A.   These are former Lehman Brothers
8 employees that came and worked for Barclays
9 and then were part of the reduction in force
10 exercises, yes.
11 Q.   Okay.  So they're not -- that list
12 does not include people who ever came to
13 Barclays at all?
14 A.   That's not my -- I believe that to
15 be the case, yes.
16 Q.   Okay.  So if they received
17 severance it was from Lehman, not Barclays,
18 correct?
19 MR. GREEN:  Object to the form of
20 the question.  You can answer if you
21 know.
22 A.   I don't know.
23 Q.   Okay.  Fair enough.
24 A.   I don't know.

Page 113

P. EXALL - HIGHLY CONFIDENTIAL

1 Q.   And how was their severance
2 calculated?
3 A.   The standard severance policy of
4 Lehman Brothers was applied in respect to --
5 in most cases in respect of former Lehman
6 Brothers employees and the application of that
7 policy resulted in severance payments being
8 calculated and awarded to individuals
9 concerned.
10 Q.   Okay.  Now, this is -- these
11 severance payments are separate from the bonus
12 payments we talked about earlier.
13 A.   Yes, they are.
14 Q.   Okay.  So these are -- is it
15 correct all of these payments have been made
16 to people who no longer work for Barclays,
17 correct?
18 A.   Yes.
19 Q.   Now, why in the entry do we have
20 some severance and it looks like it's payable
21 in the future?  Do you see the entry I'm
22 talking about?  The $27 million?
23 A.   I do.
24 Q.   What is that meant to cover?

Page 114

1          P. EXALL - HIGHLY CONFIDENTIAL
2          A.    These are meant to cover exactly
3    the same thing in that they are severance
4    related to former Lehman Brothers employees
5    that are part of the reduction in force
6    exercise.  But these are amounts that had not
7    at the time of the production of the schedule
8    either been paid or had been reconciled fully
9    to the extent that they had -- we can trace
10   the item to a payroll.
11         Q.    Can you explain that last part to
12   me.
13         A.    For the most part these amounts
14   have been paid.  Have actually been discharged
15   and the cash has left the account.  The 27
16   million reflect payments that have not as yet
17   been made.  All are still in the process of
18   being reconciled.
19         Q.    Meaning negotiating with the
20   individuals leaving?
21         A.    No.  Reconciling between what
22   people originally estimated their -- an
23   individual severance to be and what they were
24   eventually paid on the payroll.  There may be
25   differences between those two points.

Page 115

1          P. EXALL - HIGHLY CONFIDENTIAL
2          Q.    So am I correct to say that that
3    27 million entails either a reconciliation
4    issue that you just mentioned or something
5    that's been promised to someone after they
6    left but that's payable in the future.
7          A.    That's my understanding, yes.
8          Q.    Okay.  So if I wanted to know the
9    total amount of severance paid to former
10   Lehman employees or to be paid to former
11   Lehman employees I would add up the 238 and
12   the 27 million, correct?
13         A.    Yes.  And that would cover not
14   only the payment made to individuals and the
15   withholding associated with those but also an
16   estimate for ancillary benefits and amounts
17   that may be payable on those amounts to
18   various regulatory bodies.
19         Q.    So do you have any understanding
20   whether these severance entries related in any
21   way to the clause 9.1(c) of the APA that we
22   discussed earlier which talked about bonuses?
23             MR. GREEN:  Object to the form to
24         the extent it calls for a legal
25         conclusion.

Page 116

1          P. EXALL - HIGHLY CONFIDENTIAL
2          A.    I don't have a specific -- I don't
3    have specific knowledge as to how the two are
4    tied together or not as the case may be.  I'm
5    not qualified to interpret that.  What I can
6    say is that again these are severance related
7    to former Lehman Brothers employees related to
8    their service with Lehman pre-acquisition.
9          Q.    Okay.  In the Future Severance
10   entry in your note you talk about the RIF and
11   VIG list from HR and then you write, "And
12   includes 25 percent for benefits for RIF."
13             What does that refer to?
14         A.    We have made an estimate in these
15   amounts in this 27 million in respect of, as I
16   mentioned earlier, payments that may be due
17   and payable to regulatory bodies in respect of
18   benefits or people that are on salary
19   continuation.  So these are people that don't
20   get their severance upfront, they take it over
21   a period of time, and they're still covered by
22   benefits.  So those are payments, estimates in
23   respect of the benefit amounts that they're
24   still covered for during the period of their
25   severance.

Page 117

1          P. EXALL - HIGHLY CONFIDENTIAL
2          Q.    So is it correct to say 25 percent
3    of the 27 million is that type of benefit?
4          A.    I don't know if that's the exact
5    calculation.  I haven't got an answer for
6    that.
7          Q.    Okay.  If you refer back to
8    Exhibit 19 are these severance payments part
9    of the $2 billion in comp that you see listed
10   there or do you have any understanding about
11   that?
12             MR. GREEN:  Object.  Calls for a
13         legal conclusion.
14         A.    I don't know what that represents.
15   So I can't say whether those services are
16   included or not.
17         Q.    When you said that you were
18   pointing to the $2 billion on figure 19?
19         A.    Described as comp, yes.
20         Q.    Oh, okay.  When I looked at the
21   prior version, 280B, it says Severance 2 as
22   the title.  Or is that just a typo?
23         A.    Typo.
24         Q.    Okay.  And now you might have
25   covered this already but how did the severance

Page 126

**P. EXALL - HIGHLY CONFIDENTIAL**

1       A.    It relates to the $258 million
2  of -- in the equity column of bonuses
3  including social taxes. I should point out
4  here if you do a calculation of 1.79 on the
5  258 you don't get 9.
6       Q.    **Right. That's my question.**
7       A.    The difference is the growth in
8  the Barclays stock price subsequent to the
9  award being made. The tax will be payable,
10 due and payable, based on the ultimate value
11 of those awards when the vest. So that 9
12 could increase over time.
13      Q.    **Well, so this 1.79 assumes a**
14 **growth in the value of the stock that's**
15 **vesting over that three-year period, right?**
16      A.    The 1.79 is the blended -- my
17 understanding is that the 1.79 is the blended
18 rate applied to the equity award respect of
19 tax.
20      Q.    **Right.**
21      A.    You will notice that's being
22 increased by a multiple of 2 on the
23 spreadsheet.
24      Q.    **Right.**

Page 127

**P. EXALL - HIGHLY CONFIDENTIAL**

1       A.    The reflects the fact that between
2  the date of award of these stock -- these
3  amounts of stock and the date at which these
4  schedules were prepared, the stock price of
5  Barclays underpinning the value of these
6  awards had roughly doubled.
7       Q.    **From when to when? From**
8  **September --**
9       A.    These stock awards were made in
10 May 2009. And the schedule is done as you see
11 it with all these -- it is an estimate of a
12 liability that is due and payable at some
13 future time. That liability may or may not be
14 $9 million. It could be different.
15      Q.    **Okay. But at present you're**
16 **estimating it at 9 million.**
17      A.    That's correct.
18      Q.    **And that's assuming or it's based**
19 **on an increase in the value of the Barclays**
20 **stock which is the item that you multiple by**
21 **1.79.**
22      A.    My calculation would be the $258
23 million multiplied by 1.79 percent times 2,
24 the 2 factor representing the growth of the

Page 128

**P. EXALL - HIGHLY CONFIDENTIAL**

1  Barclay stock price.
2       Q.    **Okay. And now this $9 million**
3  **doesn't get paid to former Lehman employees,**
4  **right? It gets paid to regulatory authorities**
5  **around the globe?**
6       A.    Yes.
7       Q.    **The next entry talks about**
8  **acquisition buyout vesting over two years.**
9            **Do you see that?**
10      A.    I do.
11      Q.    **$53 million. What is that meant**
12 **to encompass?**
13      A.    As described here, it's a bonus
14 relating to pre-acquisition performance by an
15 individual or individuals that worked for
16 Lehman Brothers and now work for Barclays.
17 These are commitments that we assumed and
18 embodied in contracts in respect of this
19 individual or individuals to deliver this
20 $53 million over the next two years.
21      Q.    **Okay. Now, let's turn back to Mr.**
22 **Lowitt's contract.**
23      A.    Yeah.
24      Q.    **Do you see the special cash award**

Page 129

**P. EXALL - HIGHLY CONFIDENTIAL**

1  to be awarded over two years?
2       A.    I do.
3       Q.    **Is that this 50 -- part of this**
4  **$53 million you're talking about?**
5       A.    No.
6       Q.    **Okay. So I don't see any other**
7  **entries here that could be that. You're**
8  **saying that he's not one of the recipients of**
9  **the $53 million that you're talking about**
10 **here?**
11      A.    No, he is not.
12      Q.    **Okay. And who is getting that**
13 **money?**
14          MR. GREEN:  You can go ahead and
15      answer.
16      A.    A gentleman by the name of Mr.
17 Jonathan Hoffman.
18      Q.    **And who is he?**
19      A.    He is a principal trader in the
20 global markets business at Barclays Capital.
21      Q.    **And why is he getting this money?**
22      A.    The amount was owed -- was due and
23 payable to him by Lehman Brothers under his
24 contract with Lehman Brothers pre-acquisition.

Page 130

1      P. EXALL - HIGHLY CONFIDENTIAL
2    Barclays assumed that liability as part of the
3    acquisition process and embodied these amounts
4    of that compensation amongst others in that
5    contract and those amounts are due and payable
6    to him over time as specified in that
7    contract.
8       Q.   Okay.  Now, this is all -- the
9    entire 53 million goes to this one individual?
10      A.   That is correct.
11      Q.   Over a three-year period?
12      A.   He receives two tranches of $20
13   million in February '10 and February '11.  And
14   the additional 13 will effectively be
15   delivered in February of 2010.
16      Q.   Okay.  When I -- just for
17   clarification when it says February '10 that
18   means February 2010?
19      A.   That's correct.
20      Q.   And February '11 means February
21   2011?
22      A.   That is correct.
23      Q.   And maybe you explained this but
24   is this -- what is this to reflect as far as
25   his performance at Lehman?

Page 131

1       P. EXALL - HIGHLY CONFIDENTIAL
2       A.   He was owed -- under his contract
3    with Lehman Brothers, that was the amount due
4    and payable to him -- well, that is not the
5    entire amount.  But that is the amount
6    included on this spreadsheet.  Well, the
7    entire amount is included on this spreadsheet.
8    There's another element sitting in bonus
9    including social taxes.  The 53 million
10   represents the amount outside of the bonus
11   including social taxes amount and is in
12   respect -- the entire amount is in respect of
13   the contract that he had at Lehman Brothers
14   which guaranteed him a payout on his trading
15   performance.  And the amount relates to the
16   trading performance he did, for want of a
17   better word, pre-acquisition.
18      Q.   Okay.  So this is a con -- he had
19   a contract with Lehman that provided him X
20   amount of compensation based on his trading
21   performance and this number is the amount due
22   and payable to him up to September 22nd, 2008
23   under that contract?
24         MR. GREEN:  Object to the form of
25    the question.

Page 132

1       P. EXALL - HIGHLY CONFIDENTIAL
2       A.   That's correct.
3          MR. GREEN:  Well, could we go off
4    the record for one second?  Because I
5    think the record is unclear.  Or I can
6    add a clarification.
7          MR. HINE:  You want to add a
8    clarification?
9          MR. GREEN:  But I don't want to
10   testify.
11         MR. HINE:  No, no.  You can take a
12   break.
13         MR. GREEN:  Take a short break.
14         (Recess taken.)
15         MR. HINE:  Let's go back on the
16   record.
17      A.   A clarification of the previous
18   question perhaps is relevant.  The amounts --
19   the amounts payable to Mr. Hoffman were
20   amounts that were due and payable to him under
21   the contract with Lehman Brothers.  And the
22   clarification is they had not as yet at that
23   time been paid to him at all.  They were just
24   due and payable to him.  He hadn't received
25   any of that compensation.

Page 133

1       P. EXALL - HIGHLY CONFIDENTIAL
2       Q.   So Barclays undertook that
3    obligation to pay him what he was owed by
4    Lehman.
5       A.   That is correct.
6       Q.   Okay.  But in your note here it
7    says bonus relating to performance for one
8    January to 22 September '08.
9          Do you see that?
10      A.   I do.
11      Q.   Then it says but with future time
12   served criteria and a portion linked to future
13   production.
14         What does that mean?
15      A.   I can't -- I'll give you my
16   general interpretation of the terms.  The
17   specific legal interpretation of the
18   forfeiture clauses I can't really speak to all
19   that.
20      Q.   Sure.
21      A.   The intention was to deliver two
22   payments or two tranches of $20 million in
23   each of February 2010 and February 2011.
24   Those payments could be reduced -- each
25   payment could be reduced by up to 10 million

Page 138

1      P. EXALL - HIGHLY CONFIDENTIAL
2     A.  Yes.
3     Q.  So when you have an entry in here
4 on payroll tax, for example, is that -- where
5 it says payroll tax on equity compensation, do
6 you remember that discussion?
7     A.  Yes.
8     Q.  Is that just a withholding tax or
9 is it an obligation of Barclays to pay the tax
10 authorities?
11     MR. GREEN:  Object to the form.
12     A.  I actually don't know the answer
13 to that.  It is a tax that's due and payable
14 to the regulatory authorities.  As to whom
15 that liability relates, I don't know.
16     Q.  Okay.  And would that be the same
17 answer with respect to the social tax up in
18 the bonus entry?
19     A.  Yes.
20     Q.  Okay.
21     A.  What I can say is that the
22 withholding taxes that you referred to that
23 are -- these are the gross amounts payable to
24 those individuals in terms of -- so if I were
25 again back to Mr. Lowitt's contract, we've got

Page 139

1      P. EXALL - HIGHLY CONFIDENTIAL
2 to pay him a cash advance of $4.56 million.
3 That's a gross amount payable to him.  He in
4 his individual capacity has to pay income tax
5 which we will withhold in entirety.  The
6 entire 4.56 is embodied in the 1,271 cash
7 component effectively.
8     Q.  Okay.  And I don't think I asked
9 you this but if we go to that bonus entry with
10 social tax, do you see that?
11     A.  Yes.
12     Q.  The 1.529 billion.  Could you give
13 me a percentage -- how much of that is the
14 social tax portion and how much is the actual
15 bonus paid to that individual?
16     MR. GREEN:  Object to form.
17     Q.  Gross bonus paid to that
18 individual.
19     A.  I don't have the exact amount but
20 I would categorize it as not significant.
21     Q.  Can you ball park percentages?
22     A.  Crickey.
23     If I had to guess I'd say maybe
24 $50 million.
25     Q.  $50 million?  Okay.  And --

Page 140

1      P. EXALL - HIGHLY CONFIDENTIAL
2     A.  And the reason I say that -- and,
3 again, not being a payroll professional I
4 can't speak for every social tax that may or
5 may not be payable as part of a payroll.
6     Q.  Sure.
7     A.  But one of the --the only one is
8 the FICA taxes that are payable to the US tax
9 authorities in whichever form that may be.
10 That's -- I know is 1 point something percent.
11 It's a very small percentage.  So I'm basing
12 my estimate on that primarily.
13     I do not believe that that -- if I
14 was to look at that line and if you -- I would
15 categorize the social tax item as being not
16 significantly material.
17     Q.  Okay.  And there are documents
18 somewhere at Barclays that would specify how
19 much that social tax is with respect to those
20 bonuses?
21     A.  Yes.
22     Q.  Okay.  How about the payroll tax
23 on equity compensation?
24     A.  What's your question?
25     Q.  That's a separate entry so I don't

Page 141

1      P. EXALL - HIGHLY CONFIDENTIAL
2 need to ask that question.  I apologize.  I
3 misunderstood that.
4     A.  Okay.
5     Q.  Okay.  The payroll tax on
6 acquisition buyout, what is that?
7     A.  The $3 million reflected on the
8 schedule, I believe or I understand the
9 calculation to be similar to the one
10 referenced in the payroll tax and equity tax
11 line in compensation of $53 million shown
12 directly above it on the schedule.
13     Q.  So that relates only to Mr.
14 Hoffman's deal with Barclays?
15     A.  That's my understanding.
16     Q.  And that money doesn't get paid to
17 him; it gets paid to a regulatory
18 authority?
19     A.  That's my understanding.
20     Q.  Can we skip down to ISP awards.
21 Could you explain to me what that is?
22     A.  The acronym?
23     Q.  Yes.
24     A.  The ISP stands for incentive share
25 plan.  It is a stock award program -- it's the

Page 142

1    P. EXALL - HIGHLY CONFIDENTIAL
2 name of the stock award program we have in
3 place at Barclays and which we will utilize to
4 make these relevant awards.
5    Q.   Is this a plan that was in place
6 at Lehman prior to the acquisition?
7    A.   This plan was not in place at
8 Lehman, no.  They had similar stock award
9 programs under their own compensation schemes.
10    Q.   Okay.  And so what is this
11 $56 million being paid for?
12    A.   Okay.  So these -- the $56 million
13 directly relates to the $258,000,000 further
14 up in the Equity column under Bonus Including
15 Social Taxes.
16        The sequence of events was as
17 follows.  Under normal Barclays policy stock
18 awards are made in March of every year.  So
19 under the normal practice Barclays would have
20 made stock awards to individuals in March of
21 2009 in respect of their 2008 annual bonuses.
22    Q.   Okay.
23    A.   The stock awards for various
24 reasons were made in May 2009.  The value of
25 the awards -- well, because of the unforeseen

Page 143

1    P. EXALL - HIGHLY CONFIDENTIAL
2 and unanticipated delay in making the awards
3 to individuals, during that period the stock
4 price at Barclays appreciated substantially
5 and in effect individuals received an amount
6 of stock units of less than what they would
7 have received had the awards been made under
8 the normal process in March 2009 because of
9 the increase in the stock price.
10        The $56 million reflects
11 additional shares awarded to those -- to
12 former Lehman Brothers employees and the
13 awards were not exclusive to former Lehman
14 Brothers employees.  This just reflects the
15 component related to former Lehman Brothers
16 employees to compensate them for that loss of
17 value that they had suffered as a result of
18 the normal process not having been followed in
19 that particular year.
20    Q.   So just so I understand why --
21 what caused the delay in the award of the
22 bonus -- of the stock bonuses?
23    A.   I can't speak for the specific
24 reason why.  I know there was a delay.
25    Q.   Was it related to the

Page 144

1    P. EXALL - HIGHLY CONFIDENTIAL
2 Barclays/Lehman acquisition?
3    A.   No.  Not to my knowledge.
4    Q.   Okay.  So this -- if I understand
5 you correctly, this $56 million only relates
6 to stock awards granted to former Lehman
7 employees, right?
8    A.   This $56 million dollars, yes.
9    Q.   All right.  And it's to compensate
10 them for the delay in awarding that award from
11 March until May.
12    A.   That's correct.
13    Q.   But aren't the Lehman Brothers
14 employees granted their award back in
15 September?
16    A.   They were given a value, a dollar
17 value of award.  When it comes to granting an
18 amount of stock units they get an amount of
19 stock units based on the prevailing share
20 price at the time of the award grant.
21        So they would have received --
22 I'll give you a hypothetical example.  An
23 individual would have had $100 worth of stock
24 of value that was to be delivered to him in
25 March of 2009.  Assume the stock price in

Page 145

1    P. EXALL - HIGHLY CONFIDENTIAL
2 March 2009 was a dollar.  He would have got a
3 hundred shares.  Those awards were never made
4 in March.  What happened was they were made in
5 May.  In May let's assume for argument's sake
6 the stock was $2.  He would only have got 50
7 shares.  He got -- and he's lost the stock
8 price appreciation he would have got on the
9 hundred shares had he been awarded them three
10 months prior.
11        The $56 million is to compensate
12 him for that loss of value in the respect of
13 the fewer amounts of shares that he ultimately
14 received.
15    Q.   Okay.  So it's actually the --
16 it's the value of the appreciation of the
17 stock he would have received from March to
18 May.
19    A.   It's not the entire value.  It's
20 to compensate him for that loss of value.  I
21 don't believe that the entire value is
22 reflected in this number.  It was to
23 compensate him for an extent of that, yes.
24    Q.   Well, here's my question.  If he's
25 granted in September $100 worth of stock bonus

Page 146

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2   he would have gotten a hundred shares in
3   **March -- or he would have gotten a hundred**
4   **shares in March if the price was a dollar**
5   **using your hypothetical, right?  He would also**
6   **have gotten his hundred shares in May if he**
7   **gets 50 shares at $2.  Why --**
8        MR. GREEN:  Object to the form.
9   **Q.   Well, I'm trying to use your**
10  **hypothetical.**
11       A.   My hypothetical is that he would
12  not have got the hundred shares in May.  He
13  would have only got 50 shares in May.
14  **Q.   But it would be worth $2 at that**
15  **time.**
16       A.   That's correct.  The value would
17  have been the same.  But he has lost that.
18  Rewind to March.  If he had been awarded the
19  shares in March he would have a hundred shares
20  worth a dollar.  Those shares by May would
21  have been worth 200 at the stock price of 2.
22  **Q.   Okay.**
23       A.   You're giving him only a hundred
24  of value in May.
25  **Q.   Okay.**

Page 147

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2       A.   That's the difference.
3   **Q.   I see.  So this is done not only**
4   **for the former Lehman employees.  It's also**
5   **done for all the other Barclays employees who**
6   **suffered this same type of loss, right?**
7        A.   They were granted for the
8   majority -- for other Barclays Capital
9   employees that received stock awards at the
10  time for the most part, yes.
11  **Q.   So this is not --**
12       A.   This is a subset of a wider
13  population.
14  **Q.   This program, this ISP award was**
15  **not granted to former Lehman employees.  It**
16  **was granted Barclays wide to those who**
17  **qualified, right?**
18       A.   To my knowledge, it was not
19  granted Barclays wide.  It was Barclays
20  Capital wide.
21  **Q.   Okay.**
22       A.   I don't -- I can't testify as to
23  if it was that specific, but there were more
24  individuals concerned than this.  I cannot say
25  it was a Barclays wide policy.  I don't know

Page 148

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2   that to be true.
3   **Q.   But it's not a former Lehman**
4   **employees policy only.**
5        A.   Not only, no.
6   **Q.   Okay.  So then why is this**
7   **award -- how is this award related to the work**
8   **they performed at Lehman?  Because, I mean,**
9   **basically it's compensating them for a delay**
10  **in a stock payment while at Barclays.**
11       MR. GREEN:  Object to the form.
12       A.   The amount of the award is derived
13  directly from the equity awards that would
14  have been made under the normal course of
15  business.  And insofar as they are related to
16  pre-acquisition service on behalf of Lehman
17  Brothers, these -- the value of these awards,
18  the economic cost of these awards relate to
19  that pre-acquisition service.  It relates to
20  the delivery of the stock component of
21  compensation in many cases embodied in
22  contracts such as Mr. Lowitt's here.  Had they
23  been awarded in the normal course of business
24  in March of 2009.
25  **Q.   Okay.  But --**

Page 149

**P. EXALL - HIGHLY CONFIDENTIAL**

1
2       A.   They all relate to the awards
3   embodied -- well, if I take Mr. Lowitt as an
4   example, any additional shares he would have
5   been awarded under that program relate to the
6   2008 EPP recommendations that embodied in his
7   contract and the value thereof.
8   **Q.   I understand how they relate to**
9   **it.  But the award -- isn't it true that the**
10  **award itself of the ISP is to compensate them**
11  **for mistakes or whatever problems occurred at**
12  **Barclays that caused this delay from March to**
13  **May, right?**
14       MR. GREEN:  Object to the form.
15       A.   I can say that the $56 million has
16  nothing to do with post-acquisition service of
17  Barclays PLC.  It has everything to do with
18  the services that they provided
19  pre-acquisition to Lehman Brothers.
20  **Q.   I'm not sure you've answered my**
21  **question.  I understand that the 258 million**
22  **comes from their pre-acquisition services.**
23  **But this additional 56 million, isn't it the**
24  **case, is paid to them because of some mistakes**
25  **or whatever happened at Barclays that caused**

Page 150

P. EXALL - HIGHLY CONFIDENTIAL

1  P. EXALL - HIGHLY CONFIDENTIAL
2  this delay in awarding the bonus, right?
3       MR. GREEN:  Object to the form.
4       A.   It directly relates to the $258
5  million insofar as the $56 million is derived
6  specifically from the $258 million reflected
7  on the schedule.
8       Q.   All right.  I understand how it's
9  derived from the 258 million and I understand
10 how the 258 million is derived from their
11 pre-acquisition work.  But the 56 million is
12 not compensation for pre-acquisition work.
13      MR. GREEN:  Asked and answered.
14 Bill, I think you've asked this question
15 three times and he's given you his
16 answer.
17      MR. HINE:  Well, I'm getting what
18 seems to be an evasive answer.
19      MR. GREEN:  No.  He's given you an
20 answer and it's an entirely appropriate
21 answer and there's no reason to ask it
22 until you get the answer you want.
23      MR. HINE:  All right.  I just want
24 an answer to the last one I asked.
25      MR. GREEN:  Could you repeat the

Page 151

1  P. EXALL - HIGHLY CONFIDENTIAL
2  question?
3       (Record read.)
4       Q.   Is that right?
5       A.   No.  In my personal opinion it is
6  not.  The $56 million would have been
7  valued -- would have accrued to these
8  individuals had they received their stock
9  awards under the normal course of business.
10 It was directly compensation related to
11 pre-acquisition services in relation to Lehman
12 Brothers as derived from the shares that they
13 would have got had the normal course of
14 business been followed.
15      Q.   Okay.  Now, the payroll tax on
16 those awards, what is that?
17      A.   The calculation of those again is
18 an accounting -- is an estimate similar to the
19 one reflected previously on the schedule
20 entitled Payroll Tax on Equity Compensation.
21      Q.   So same method of estimating only
22 now you're estimating it based on 56 million?
23      A.   That's correct.
24      Q.   Okay.  Back to the 56 million for
25 a second.  It says here Additional shares

Page 152

1  P. EXALL - HIGHLY CONFIDENTIAL
2  awarded at 25P.  What does that P mean?
3       A.   Pence.  English pence.  English
4  pounds.
5       Q.   So is that the equivalent of
6  25 percent?
7       A.   Yes.  25 cents on the dollar.
8       Q.   Okay.  So 25 cents on the dollar
9  as measured against the value of a Barclays
10 share from March to May?
11      A.   No.  That's not correct.  So if
12 you related back to the 258 it's roughly a
13 quarter.
14      Q.   Oh, I gottcha.  25 cents on the
15 dollar as compared to the 258 million.
16      A.   That would be correct.
17      Q.   Okay.  And 25 cents is not total
18 compensation for the value increase in
19 Barclays' share but it's a portion of the --
20 it's based on the -- as a portion of the
21 increase in Barclays' share price from March
22 to May?
23      MR. GREEN:  Object to form.
24      A.   I don't recall the loss of value
25 or the notional loss of value.  I don't recall

Page 153

1  P. EXALL - HIGHLY CONFIDENTIAL
2  the exact amounts.  I don't believe it's an
3  exact lack-for-lack replacement.  I can't
4  speak to whether it was more or less but I
5  believe it was less.
6       Q.   Okay.  Substantially less or
7  just --
8       A.   I don't recall.
9       Q.   Okay.  But if I wanted to find
10 that out I would take the share price from
11 Barclays in March and compare it to May?
12      A.   You would think so.  That's not
13 practically how things work.  The stock awards
14 at any point in time are generally based on an
15 average stock price calculated over a number
16 of days in which stock would have been
17 purchased in the market to hedge the awards.
18      So there is a process underpinning
19 it.  There is some math -- there is
20 mathematical calculations behind all this that
21 had been produced.  But you can't simply just
22 take a spot price at a point in time.
23      Q.   I gottcha.
24      Now, if I look at the bottom line
25 it says Total Spend.  Do you see that?