# Exhibit 36

1       HIGHLY CONFIDENTIAL - B. McDADE

2       UNITED STATES BANKRUPTCY COURT

3       SOUTHERN DISTRICT OF NEW YORK

4    ----------------------x

5    In Re:

6                         Chapter 11

7    LEHMAN BROTHERS        Case No. 08-13555(JMP)

8    HOLDINGS, INC., et al.,    (Jointly Administered)

9

             Debtors.

10

     ----------------------x

11

12       * * *HIGHLY CONFIDENTIAL* * *

13       DEPOSITION OF BART McDADE

14         New York, New York

15         September 2, 2009

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 24045

1    HIGHLY CONFIDENTIAL - B. McDADE
2  above the assumption of short positions against
3  the long position?
4    A.   These were responsibilities and
5  expenses that clearly would have to be paid and
6  honored to run the businesses going forward.
7    Q.   Let me put the question another way.
8  Did you understand the transaction at issue here
9  to be basically a wash from the perspective of
10  LBI, the broker-dealer, an equivalent exchange
11  of assets?
12    MR. HUME: Objection.  Vague and
13  ambiguous.
14    A.   I understood the transaction to be an
15  assumption of the assets and liabilities.  It's
16  clear Barclays was negotiating, as any purchaser
17  would, in their opinion, in its most efficient
18  fashion, and we were responsible as Lehman to
19  negotiate against their efficient process.
20    Q.   If I understand your last answer, sir,
21  correctly, you're essentially describing to me
22  that a purchaser wants to pay the least amount
23  possible and the seller wants to get the most?
24    A.   Correct.
25    Q.   My question goes to the end result,

1    HIGHLY CONFIDENTIAL - B. McDADE
2  not the goals of the negotiators.
3    Did you understand the end results of
4  this transaction to be, from the perspective of
5  LBI, essentially a wash, an equivalent -- with
6  Barclays assuming liabilities, including
7  employee liabilities and contract cure
8  amounts --
9    A.   Yes.
10    Q.   -- basically equivalent to the assets?
11    A.   Yes.
12    Q.   And did that equivalent exchange
13  include or exclude the $4.25 billion in assumed
14  liabilities shown on that financial schedule?
15    A.   It ultimately included what those
16  figures ultimately ended up being, but did
17  not -- it did not --
18    Are you talking about the final
19  transaction consummated or are you talking
20  about --
21    In concept, yes.
22    Q.   Okay.  When you say "in concept, yes,"
23  you're talking about the deal as it was --
24    A.   Cure payments -- as the final details
25  of cure payments and compensation.

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.   Let's do this with time periods, okay?
3  So --
4    A.   Fine.
5    Q.   -- on the 16th, as reflected in the
6  Asset Purchase Agreement dated as of September
7  16th and signed on that day, was it contemplated
8  that this would be an equivalent exchange of
9  assets, a wash?
10    A.   It ended up being an equivalent
11  exchange of assets and liabilities, yes.  Yes.
12    Q.   On the 16th?
13    A.   On the 16th, yes.
14    Q.   And for it to be an equivalent
15  exchange of assets -- withdrawn.
16    And within that equivalent exchange of
17  assets --
18    MR. BUCKLEY:  Assets and liabilities.
19    MR. GAFFEY:  That's sort of where I'm
20  going.
21    Q.   Within that equivalent exchange would
22  be included the $4.25 billion in assumed
23  liabilities, correct?
24    A.   Yes.
25    Q.   And in order for it to be an

1    HIGHLY CONFIDENTIAL - B. McDADE
2  equivalent exchange of assets, the $4.25 billion
3  in assumed liabilities would have to be
4  accurately stated?
5    A.   Correct.
6    Q.   And if the actual assumed liabilities
7  were less than $4.25 billion, it would not be an
8  equivalent exchange of assets, correct?
9    A.   That's correct.
10    Q.   It would be a deal to Barclays'
11  benefit if the assumed liabilities were lower
12  than $4.25 billion, correct?
13    A.   That's correct.
14    Q.   And I think you told me over the week
15  the amount of accrued liabilities for cure
16  dropped from 2 billion to between 7 and 8
17  hundred million dollars?
18    A.   Correct.
19    Q.   Was there any change in the assets
20  that would be delivered to keep it in equivalent
21  exchange?
22    A.   The assets changed over the course of
23  the week dramatically.
24    Q.   Okay.  Was it --
25    A.   So there was a different nature of the

Page 138

HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    Let me try and rephrase it.  The
3 quantum of securities available that can
4 delivered to Barclays drops because of those
5 three factors you told me about, correct?
6    A.    Yes.
7    Q.    Do you know if that quantum was more
8 or less than the amount of the financing
9 Barclays supplied in connection with the repo,
10 the 45 billion?
11    A.    I understand.
12       I don't know the answer.
13    Q.    Do you know if the quantum of those
14 securities dropped below the amount in the
15 Barclays repo consisting of the amount financed
16 plus the haircut, the higher number?
17    A.    Yes.
18    Q.    And I take it from your testimony
19 before the break that one of the things that was
20 under discussion was finding assets sufficient
21 to deliver a particular amount to Barclays,
22 correct?
23    A.    That's correct.
24    Q.    What was the amount?
25    A.    Again, the process that we went

Page 139

HIGHLY CONFIDENTIAL - B. McDADE
2 through over the course of the week was to find
3 the market valuation of the assets that were
4 available.
5       In this case, the quantum of assets,
6 using your term, had changed.  We were going
7 through a process again of finding the value of
8 those assets that were available to be purchased
9 by the purchaser, in this case, Barclays.  They
10 still were in the position where the value of
11 the liabilities was reasonably similar.  The
12 form had changed in terms of it being their repo
13 now, but there were still the responsibilities
14 around cure payments and the compensation.
15       So we were looking for, at that point
16 of view, as a result of the current process of
17 valuing assets, for more assets within Lehman
18 that weren't part of the process of the repo,
19 all of the repo.
20    Q.    So you were looking for assets outside
21 the scope of the repo?
22    A.    Correct.
23    Q.    To add to the body of assets that
24 could be transferred to Barclays?
25    A.    Correct.

Page 140

HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    So maybe I'm asking the same question,
3 but what was the total amount of -- total value
4 of assets you were looking for?  You knew you
5 wanted to add to what was in the repo, right?
6 Yes?
7    A.    That's -- that's correct.
8    Q.    How much more did you want to add to
9 what was in the repo?
10    A.    We were still going through the
11 process of valuing.  We knew we had a gap.  I
12 wasn't part of the specific meeting, so I can't
13 answer the question specifically, but there was
14 still a gap.
15    Q.    Okay.  A gap between what and what?
16    A.    The rough assets and liabilities
17 matching.
18    Q.    So, in the search for additional
19 assets to deliver to Barclays, one of the tasks
20 was to find enough assets to match the
21 liabilities that Barclays was undertaking,
22 correct?
23    A.    Our task was to understand all the
24 assets -- within Lehman, our task was to
25 understand all the assets and make sure we had

Page 141

HIGHLY CONFIDENTIAL - B. McDADE
2 proper valuation in terms of understanding the
3 value of those assets and to get the best price
4 for Lehman for those assets.
5    Q.    Okay.
6    A.    It was clear, yes, I have stated I
7 think previously, it was clear Barclays was
8 trying to find a means to provide against the
9 liabilities of cure payments and compensation.
10    Q.    Okay.  So I just want to run down the
11 liability side sort of full by category from the
12 bottom up.  It's the comp liability, correct?
13    A.    Correct.
14    Q.    The cure liability, correct?
15    A.    Correct.
16    Q.    And the liabilities that are incident
17 to the securities themselves, correct?
18    A.    Correct.
19    Q.    The short side of long position, yes?
20    A.    Yes.
21    Q.    Okay.  And included in the mathematics
22 of the total amount of liabilities that Barclays
23 would be undertaking were whatever the amounts
24 were of comp and cure, correct?
25    A.    That's correct.

Page 142

1          HIGHLY CONFIDENTIAL - B. McDADE
2     Q.    Okay.  So as the amount of -- as over
3  the week the amount of liability for cure
4  dropped, you would agree with me then that the
5  price -- that the amount of value that had to be
6  given to Barclays should have dropped in
7  accordance with that, correct?
8     A.    Correct.
9     Q.    So when the value of the cure
10 liability dropped from its original number of
11 2.25 and then to 1.5 and then down to the range
12 of 7 or 8 hundred million, the value of
13 securities attributable to that as it were
14 should have dropped, correct?
15    A.    I want to make a correction to the
16 statement I made earlier.  I was confusing the
17 15c3 7 to 8 hundred figure with cure.  So the
18 last figure that I do recall is the billion and
19 a half in cure.
20    Q.    As the number dropped from 2.25 to --
21    A.    To 1.5.
22    Q.    -- to 1.5?
23    A.    To answer your question, though, yes.
24    Q.    So, to follow up on your clarification
25 a little bit, your memory is not now that it

Page 143

1          HIGHLY CONFIDENTIAL - B. McDADE
2  dropped from 1.5 further during the week?
3     A.    That's correct.
4     Q.    It stayed at 1.5 from --
5     A.    To the best of my recollection, yes.
6     Q.    Let me put the "from" and "to" in
7  there so we have a good record.
8          It stayed at 1.5 from September 17 to
9  the closing on September 22?
10    A.    To the best of my recollection, yes.
11    Q.    Was any work being done between
12 September 17 and September 22 to fine-tune that
13 number?  Was Mr. Kelly continuing to look at it?
14    A.    Yes, he was.
15    Q.    And when Mr. Kelly and his crew
16 continued to look at it, did they ever change
17 that number from $1.5 billion?
18    A.    I don't know.
19    Q.    I'll go back to a question I asked you
20 before the break.  Having now sort of refreshed
21 your recollection about whether or not there was
22 this other drop, do you have a better
23 recollection now of whether or not Mr. Kelly
24 came to you during the week and told you the
25 trade payable number was overstated by about a

Page 144

1          HIGHLY CONFIDENTIAL - B. McDADE
2  billion dollars?
3     A.    I don't have a -- I don't have a
4  better recollection.  I tried to describe my
5  recollection of the week with Mr. Kelly being in
6  and around Ian Lowitt's office and in and around
7  my office several times, some of which we were
8  obviously talking because I was imploring
9  accurate assessment of what the cure payment
10 number was.
11    Q.    Who were you imploring to give an
12 accurate assessment of what the cure payment
13 was?
14    A.    Ian Lowitt and Martin Kelly.
15    Q.    And you were imploring Lowitt and
16 Martin Kelly to get an accurate assessment of
17 the cure payment number because it related to
18 the amount of value that Lehman had to give to
19 Barclays, correct?
20    A.    Exactly.  And the number was changing.
21    Q.    So as the number dropped -- looking at
22 Exhibit 19, the financial statement upon which
23 the original transaction was based, that number
24 drops from 2.25 for cure.  The assets to be
25 delivered should drop dollar for dollar, right?

Page 145

1          HIGHLY CONFIDENTIAL - B. McDADE
2     A.    That's correct.
3     Q.    Was there a point --
4     A.    Assuming that they were all the same
5  assets and the markets hadn't changed.
6     Q.    We were going to have to take into
7  account this --
8     A.    That would be correct.
9     Q.    -- dynamic, as you call it, that takes
10 place during the week, but as a basic matter in
11 the deal as it was contemplated, as the accrued
12 liabilities dropped, the value to Barclays
13 should also drop, yes?
14    A.    That's correct.
15    Q.    And I guess it's also so that, to the
16 extent the value of any assets went up, the
17 price should change as well, correct?
18    A.    Absolutely.
19    Q.    Barclays should take on more
20 liabilities, yes?  Or pay more cash?
21    A.    Or pay more cash.
22    Q.    And if there's an imbalance at the end
23 of the day between the accrued liability for, to
24 pick one, cure?
25    A.    Uh-huh.

Page 146

1    HIGHLY CONFIDENTIAL - B. McDADE
2    Q.    And the total value that Barclays
3    is -- actually, withdrawn.
4        I want to ask you to put one other
5    piece in here before I ask you this question.
6    Part of the transaction contemplated a cash
7    payment from Barclays to Lehman of $250 million,
8    correct?
9    A.    Yes, that's correct.
10    Q.    And as far as -- apart from the real
11    estate?
12    A.    That's correct.
13    Q.    That's the only cash that's moving
14    from Barclays to Lehman, right?
15    A.    That's correct.
16    Q.    Everything else in the form of
17    consideration is in the form of assumed
18    liabilities, correct?
19    A.    That's correct.
20    Q.    So if an imbalance occurs at the end
21    of the week where the -- when the deal is closed
22    where the amounts of the accrued -- of the
23    assumed liabilities drops, then either you have
24    to give them fewer assets or they have to pay a
25    bigger cash price to make the deal balanced,

Page 147

1    HIGHLY CONFIDENTIAL - B. McDADE
2    correct?
3    A.    To make the deal balanced, that's
4    correct.
5    Q.    And it was always the view that the
6    deal should balance, correct?
7    A.    It was always Barclays' view that the
8    deal should balance.  It was always our view to
9    get the market value for the assets and the
10    businesses we were selling at the best price.
11    Q.    I beg your pardon.  Did you finish
12    your answer?
13    A.    I did.
14    Q.    You wanted either a balance or better,
15    in Lehman's favor, correct?
16    A.    We wanted the best price for Lehman,
17    right.
18    Q.    At any point did you think you were
19    selling the assets of Lehman for less than their
20    value?
21    A.    No.  The context of the marketplace,
22    the illiquidity in the marketplace, the
23    volatility, the tumultuous, cannot begin to
24    describe how illiquid all the markets were over
25    the course of the preceding weeks and especially

Page 148

1    HIGHLY CONFIDENTIAL - B. McDADE
2    that week.
3    Q.    And that type of illiquidity would be
4    reflected when a regulator broker-dealer would
5    mark its books in the market, wouldn't it?
6    A.    It would be reflected in marking to
7    market on a regular basis, yes, absolutely.
8    Q.    And it would be the responsibility of
9    the CFO to make sure that that illiquidity was
10    taken into account when marking to market was
11    done on the books of company, correct?
12    A.    That's correct.
13    Q.    Whether or not that illiquidity was
14    taken into account in marking the books to
15    market would be a question you would ask of the
16    CFO, Ian Lowitt, correct?
17    A.    I would ask that, yes.
18    Q.    To go back to the point that you
19    clarified, sir, with regard to your memory of
20    the drop in the amount of assumed liability for
21    cure, we still have a drop here from 2.25 to
22    1.5, correct?
23    A.    Correct.
24    Q.    Is it still your testimony that was
25    reflected in the Clarification Letter?

Page 149

1    HIGHLY CONFIDENTIAL - B. McDADE
2    A.    I believe I read that in the -- I
3    remember that from the actual bankruptcy,
4    Mr. Miller talking to the bankruptcy.
5    Q.    And that was when Mr. Miller told the
6    bankruptcy court that the assumption of
7    liabilities --
8    A.    Was 1.5.
9    Q.    That would be when Mr. Miller on the
10    19th told the bankruptcy court that the
11    assumption of liabilities for cure and comp
12    would be the same as he had described at the
13    prehearing on the 17th, correct?
14    A.    Exactly, which is the 1.5 figure.
15    Q.    And the 20.0 including Barclays'
16    modeling?
17    A.    Correct.
18    Q.    To your knowledge, sir, can you tell
19    me anyplace in what was filed or told to the
20    court that the fact that the $2 billion was
21    based on Barclays' modeling was disclosed?
22    A.    I don't recall the specifics of
23    whether Barclays modeling was described, no.
24    Q.    My question -- I guess my question
25    should be a little more general.  Do you recall

Page 182

HIGHLY CONFIDENTIAL - B. McDADE
1
2     A.    I don't know.
3     Q.    Did you talk to Mr. Ricci, talk or
4  otherwise communicate with Mr. Ricci about this
5  Friday project to find additional value to
6  transfer to Barclays?
7     A.    Did I talk to Mr. Ricci specifically?
8  No, I did not.  Other than he would have been
9  present, I believe, in the morning meeting.
10    Q.    Do you recall Mr. Ricci saying to you
11 in substance that he wouldn't let this trade
12 blow up by being piggish?
13    A.    No, Mr. Ricci never said that to me.
14    Q.    You're certain he never said that to
15 you?
16    A.    He never said that to me.  I'm
17 certain.
18    Q.    How much additional value was found in
19 15c3 and unencumbered assets?
20    A.    I believe the 15c3 was the figure that
21 I was confusing before, was between 750 and 800
22 million of value, and I believe the unencumbered
23 assets was a billion-9.
24    Q.    So with 2.7 billion in additional
25 value, did the deal now balance, in your view?

Page 183

HIGHLY CONFIDENTIAL - B. McDADE
1
2     A.    Yes.
3     Q.    Did you know whether it balanced with
4  an addition 2.7 billion in additional value?
5     A.    I knew that the deal team had gone
6  through the same process through the course of
7  all the way into the afternoon and evening.  I
8  specifically was unable at that moment in time,
9  given where I was sitting and obligated to do.
10    Q.    Uh-huh.
11    A.    But, yes, I felt comfortable given who
12 was in the process and what was process was.
13    Q.    And the balance, this concept of a
14 balance in the transaction at this point still
15 depended on the 1.5 billion in assumed
16 liabilities for trade payables and 2 billion in
17 assumed liabilities for compensation, correct?
18    A.    Yes, that's correct.
19    Q.    And it also depended on an accurate
20 valuation of the collateral actually being
21 transferred, correct?
22    A.    Yes, that's correct.
23    Q.    When those three elements are added
24 up -- I'm sorry, when those elements are
25 compared, your view of the deal was they should

Page 184

HIGHLY CONFIDENTIAL - B. McDADE
1
2  balance and there would be no immediate gain to
3  Barclays, correct?
4     A.    That's correct.
5     Q.    Did Barclays share with you or with
6  anyone on the Lehman team the value that they
7  did determine applied to the collateral in the
8  Repurchase Agreement?
9     A.    No.
10    Q.    Did they ever tell you what the amount
11 of the --
12    A.    To me?
13    Q.    You or, to your knowledge, anyone
14 under your supervision.
15    A.    Of course they would have gone through
16 the process of valuing the collateral, just as
17 they had done, again, all week in terms of the
18 assets.
19    Q.    Yes.
20    A.    So the answer:  The deal team, yes.
21 To me, no.
22    Q.    Did you learn from the deal team that
23 Barclays said we're short by X amount?
24    A.    Yes, absolutely.  Over the course of
25 time.

Page 185

HIGHLY CONFIDENTIAL - B. McDADE
1
2     Q.    And over the course of time did the
3  deal team let you know what X amount was, what
4  the shortfall was?
5     A.    Ultimately, the shortfall --
6  ultimately, the satisfaction of the process of
7  the deal teams working together got to a point
8  where Barclays would do a transaction.
9          So, again, you're pushing towards this
10 notion of something that we were pushing toward
11 correct valuation of the assets that we had on
12 our books.  They were pushing for a deal on the
13 best terms.  There was no target given other
14 than continued valuation of these assets and
15 trying to get and extract market valuation for
16 them.  In the process, it ultimately consummated
17 with Barclays being comfortable with the
18 transaction which ultimately contemplated in
19 roughly the assets and liabilities matching.
20    Q.    And given what you heard in the
21 bankruptcy hearing on the 19th of September,
22 where you heard the deal described to the judge
23 as essentially a balance --
24    A.    Right.
25    Q.    -- it would have been important in

Page 186

HIGHLY CONFIDENTIAL - B. McDADE

1  your view, sir, to tell the judge if it was not
2  in fact in balance because that's a different
3  deal, is it not?
4      A.  Most definitely, yes, sir.
5      Q.  Mr. McDade, I'm handing you what has
6  previously been marked as Exhibits 24 and 25.
7  Ask you if you recognize those documents?
8      A.  Yes, I do.
9      Q.  What are they?
10      A.  The First Amendment to the purchase
11  agreement and second is the clarifying -- I
12  believe the clarifying letter.
13      Q.  Now, did you have any involvement with
14  the negotiation of the business terms of the
15  First Amendment?
16      A.  Yes.
17      Q.  Can you briefly describe to me what
18  your involvement was?
19      A.  As I said, the involvement that I had
20  had to do with the excluded assets and purchased
21  assets change with respect to the residential
22  mortgages.
23      Q.  And then the Clarification Letter,
24  sir, dated as of September 20, Exhibit 25, were

Page 187

HIGHLY CONFIDENTIAL - B. McDADE

1  you involved in the negotiation of the business
2  terms of this letter?
3      A.  I was involved in some of the
4  negotiation terms of some of this, yes.
5      Q.  Which parts?
6      A.  For example, clarification around the
7  IMD business.
8      Q.  That's paragraph 2?
9      A.  Paragraph 2 on page 3.  I certainly
10  was understanding and knowledgeable about the
11  cash, the DTC issue, which is paragraph D up
12  above; the clarification of the Lehman name and
13  licensing for two years; the subleases for
14  offices I would have been involved in, page 5,
15  since they inherited certain business
16  obligations.
17          That's it, to the best of my
18  recollection.
19      Q.  Did you have any involvement in the
20  negotiation of the terms reflected in paragraph
21  1, Purchased Assets?
22      A.  Specifically, no.  Generally, I was
23  aware of.
24      Q.  Who on the team of businesspeople was

Page 188

HIGHLY CONFIDENTIAL - B. McDADE

1  involved in negotiating the terms of paragraph
2  1, Purchased Assets?
3      A.  So that would have been -- that would
4  have been our -- that would have been a
5  combination of Kelly, Lowitt, Kirk, McGee,
6  Berkenfeld.
7      Q.  Any others?
8      A.  Our advisors, our advisors from Weil.
9  That's it.
10      Q.  Would you turn to paragraph 13.
11  Actually --
12      A.  Page 13 or paragraph?
13      Q.  Actually, I'm in the wrong place.
14  Hold on one second.
15          Would you turn to page 4, paragraph 9,
16  please.  You with me?
17      A.  Uh-huh.
18      Q.  That section concerns the deletion of
19  a purchase price adjustment?
20      A.  Right, the original deal had
21  contemplated a hold-back, if you will, if
22  Barclays earned profits and profits going back
23  to the Lehman estate.
24      Q.  Do you recall, we can show you, but

Page 189

HIGHLY CONFIDENTIAL - B. McDADE

1  maybe to save a little time, do you recall
2  generally that the terms of that purchase price
3  adjustment were that Lehman would share in the
4  upside of any profit on the long position up to
5  a cap of 750 million?
6      A.  I recall a cap and I recall a
7  construct of -- you know, I don't know all the
8  specifics, but yes.
9      Q.  Why did that come out in the
10  Clarification Letter?
11      A.  Because the original balance sheet
12  changed so dramatically from Tuesday to Friday,
13  and a combination of the changes, the Barclays
14  assumption of the repo and negotiation, to be
15  blunt.
16      Q.  When you say "negotiation, to be
17  blunt," the fact is Barclays just said that's
18  got to come out for us to do the deal; is that
19  right?
20      A.  Well, Barclays was ascribing a value
21  to it like we were, and as part of the process,
22  no, I'm not -- I'm not suggesting Barclays
23  said -- those are your words, no.
24          Over the course of the week, value

Page 214

HIGHLY CONFIDENTIAL - B. McDADE

1    finance area.
2        Q.   Did he work under Kelly and Lowitt or
3    with Kelly and Lowitt?
4        A.   Yes.  Yes, he did.
5        Q.   Under?
6        A.   Under.
7        Q.   And you recognize the names in the
8    "to" line here, Gary Romain, James Walker, TJ
9    Gavenda?
10       A.   No, sir.
11       Q.   Now, you'll see on the -- the e-mail
12   itself reads "Copy of Opening Balance Sheet," do
13   you see that?
14       A.   Uh-huh.
15       Q.   And that balance sheet, sir, covers
16   first cash and cash equivalent and then a
17   variety of inventory and the 15c3 stuff that
18   we've been talking about, do you see that?
19       A.   Uh-huh.
20       Q.   And it also covers the accrued bonuses
21   at 2 billion and the cure payments at the
22   original number of 250, do you see that?
23       A.   Uh-huh.
24       Q.   And it reflects a valuation of the

Page 215

HIGHLY CONFIDENTIAL - B. McDADE

1    inventory, and by this point, by the point of
2    this -- by the date this is sent, which is
3    Sunday, September 21, the inventory we're
4    talking about in the transaction is the
5    inventory in the repo, correct?
6        A.   Yes.
7        Q.   Okay.  And this values the inventory
8    of the repo at 44,880,000,000; is that right?
9        A.   That's what this document says.
10       Q.   And it puts the 15c3 amount at a
11   billion, do you see that?
12       A.   Yes, I do.
13       Q.   And when you add in the cash and cash
14   equivalents, it comes out to 52.8 billion, do
15   you see that?
16       A.   Yes, I do.
17       Q.   And below the "Asset" line is the cash
18   received from Barclays, and it recounts the 45
19   billion for the repo.  We talked about that
20   number, right?
21       A.   Yes.
22       Q.   And the $250 million cash payment?
23       A.   Yes.
24       Q.   Totals at 45-billion-250 and then

Page 216

HIGHLY CONFIDENTIAL - B. McDADE

1    takes accounts of the accrued bonuses and the
2    cure payments, right?
3        A.   Yes.
4        Q.   And then there's a provision of equity
5    of $3.38 billion.  Now, as I read this, sir,
6    that would be equity to Barclays after the
7    transaction, correct?
8        A.   I have not seen this document.  I
9    don't know what this is in terms of the equity
10   line.
11       Q.   Well, if the equity line is meant to
12   indicate the equity to Barclays in the amount of
13   3.380, given what we've talked about about the
14   deal being in balance --
15       A.   I didn't create the document.  I've
16   never seen the document before.
17       Q.   I understand.
18       A.   I prefer not to interpret it.
19           MR. BUCKLEY:  Let the witness answer.
20       A.   I prefer not to interpret it.  I don't
21   know what it means.
22       Q.   If there were an equity component in
23   the deal on the opening day, sir, of $3.38
24   billion, that deal would not be in balance; is

Page 217

HIGHLY CONFIDENTIAL - B. McDADE

1    that right?
2            MR. BUCKLEY:  Objection to form and
3        foundation.
4        A.   That's correct.
5        Q.   And the deal that you made was one to
6    be in balance; is that right?
7            MR. BUCKLEY:  Objection.
8            MR. HUME:  Objection.  Vague and
9        ambiguous.
10       A.   That's correct.
11       Q.   So if the opening day balance sheet
12   for the deal reflected that Barclays had $3.38
13   billion in equity, that's not the deal you made,
14   is it?
15           MR. HUME:  Objection to form and calls
16       for a legal conclusion.
17           MR. BUCKLEY:  Objection.  Foundation.
18       A.   That's correct.
19       Q.   And it wouldn't be consistent with the
20   deal that you made, would it?
21       A.   It would not be consistent, that's
22   correct.
23       Q.   Now, was there ever a time, sir,
24   where -- at around the time of the hearing

# Exhibit 37

1

2                UNITED STATES BANKRUPTCY COURT

3               SOUTHERN DISTRICT OF NEW YORK

4       ------------------------x

5      In Re:

6                            Chapter 11

7      LEHMAN BROTHERS        Case No. 08-13555(JMP)

8      HOLDINGS, INC., et al,   (Jointly Administered)

9               Debtors.

10      ------------------------x

11

12              DEPOSITION OF SAUL BURIAN

13                 New York, New York

14                 December 17, 2009

15

16     Reported by:

17     MARY F. BOWMAN, RPR, CRR

18     JOB NO. 26532

19

20

21

22

23

24

25

Page 266

BURIAN

1
2    Q.   OK, was there anything else you
3    thought I should know about Exhibit 338-B?
4        MS. TAGGART:  Objection to form.
5    A.   Yeah, yeah, I think the most important
6    part of the whole conversation was the right
7    side of the balance sheet, not the left, and
8    that is Michael Klein said, hey, we are owed 45
9    and a half billion dollars, as you know, Saul,
10   the extra liabilities we are assuming on the
11   cures and employee severance is 4 and a quarter.
12   Even after taking the 1.9 billion of additional
13   securities, and that, and this is about as
14   close to a quote as I can tell you, is you made
15   2 billion dollars this weekend.  If anything,
16   you should be happy.
17   Q.   Now, the 4.25 billion, what did you
18   understand that to be comprised of?
19   A.   There was, in some notes it is 4
20   billion, some it is 4.25, but that was described
21   as Barclays -- Barclays was supposed to --
22   whether they did or not, we can talk about if
23   you want, but at this time, my understanding was
24   Barclays was going to be responsible for paying
25   all the accrued compensation and severance

Page 267

BURIAN

1
2    liabilities of the 10 to 12,000 Lehman employees
3    that were supposed to -- that were going to go
4    over to Barclays and -- and that included the
5    severance for people who declined to go to
6    Barclays and the accrued comp for those who went
7    to Barclays and the other portion of this was
8    someone's estimate of what the cure costs were
9    for those contracts necessary to deliver the
10   franchise to Barclays.
11   Q.   OK.  On the comp portion of what you
12   just discussed, what did you understand the
13   estimate of Barclays' potential exposure to be?
14   A.   I only understood what people told me
15   and I can go look at the balance sheet that's
16   Exhibit 19, if it was 2 or 225, one of them had
17   a 25 at the end.  Whether it was the cure or the
18   severance, but so someone -- I was told that
19   that number was either 2 billion or 2.25
20   billion, was the assumed liabilities in respect
21   of employees.
22   Q.   You had the APA though, didn't you?
23   A.   Sure.
24   Q.   And you -- did you read the APA on,
25   provisions on compensation and severance for

Page 268

BURIAN

1
2    transferred employees?
3    A.   I did.
4    Q.   And from that, did you understand what
5    Barclays' potential exposure was?
6    A.   No.
7    Q.   Nobody gave you an estimate?
8    A.   I just told you what the estimate was
9    and then you asked me if I got it from the APA.
10   The APA has words, it says I am picking up
11   liabilities.  I got the estimate from Weil and
12   Lehman and at the court hearings.  I didn't get
13   that from the APA.  I don't believe the APA has
14   a number.
15   Q.   But you had access to the APA?
16   A.   I had more than access to the APA.  I
17   had a copy of the APA.
18   Q.   And with respect to cure payments, did
19   you understand that under Section 2.5 of the
20   APA, Barclays had discretion concerning which
21   contracts it would and would not assume?
22       MS. TAGGART:  Objection, form, calls
23   for a legal conclusion.  The document speaks
24   for itself.
25   A.   I understood that Barclays had the

Page 269

BURIAN

1
2    right to cherry-pick those contracts necessary
3    for the operation of the Business, capital B.
4        My comment earlier was not about cure,
5    it was about the severance and accrued comp,
6    not about the cure.
7    Q.   What did you understand Weil Gotshal
8    to have told the court concerning Barclays'
9    exposure with respect to cure payments?
10       MS. TAGGART:  Object to form.
11       MS. SCHAFFER:  Objection.
12   A.   Again, at the hearings I was at, you
13   know, I don't remember particularly every single
14   reference.  I can tell you that my understanding
15   at the time was that the liabilities that
16   Barclays -- that Barclays was going to assume
17   the cure, severance, and accrued comp of the
18   Lehman employees.
19   Q.   Did you understand that there was some
20   uncertainty concerning the actual cure payments
21   that Barclays would ultimately make?
22       MS. TAGGART:  Object to form,
23   foundation.
24   A.   Sure.  I understood that there was
25   still open as to which contracts Barclays would

Page 286

```
 1                  BURIAN
 2          THE VIDEOGRAPHER:  The time is now
 3   4:57 p.m., we are now off the record.
 4          (Recess)
 5          THE VIDEOGRAPHER:  This is the start
 6   of tape number 6.  The time is now 5:10 p.m.
 7   we are now back on the record.
 8      Q.   We were on the subject of whether
 9   there was a balance in the transaction between
10   assets and liabilities.  Was it your
11   understanding prior to the closing that there
12   would be perfect, equivalent, mathematical
13   balance between purchased assets and assumed
14   liabilities?
15      A.   I'm struggling with the word "perfect
16   mathematical balance."  And I don't know if
17   there is a special meaning your attaching to
18   that term.  And certainly there was not a
19   balance with respect to the 250 million for the
20   franchise.
21          We believed and we still believe the
22   franchise was worth more than that.  But I
23   did believe that when it came to the
24   securities side and either the set-off or the
25   repo, plus the liabilities assumed in respect
```

Page 287

```
 1                  BURIAN
 2   of employees and cures, that the intent of
 3   the transaction was that, based on the
 4   estimates as of closing, they would be in
 5   balance.
 6      Q.   So that view is limited to the
 7   tradeable financial assets?
 8          MS. TAGGART:  Object to form,
 9   mischaracterizes the testimony.
10      A.   Yeah, tradeable -- some of these
11   stocks were ill-liquids, they didn't trade much.
12   But when you talk about the kind of things you
13   find on Exhibits A and B, the securities, the --
14   they were supposed to -- I will get yelled at
15   for not answering the question, so I am trying
16   to be very, very careful to answer exactly the
17   question.
18          So my understanding was that the other
19   parts of the transaction were what they were,
20   but vis-a-vis the Fed and then Barclays
21   liabilities plus those assumed liabilities I
22   referred to, they were supposed to match the
23   assets, and net, net, net, what this
24   transaction was about, was getting rid of the
25   book, which is supposed to be a benefit to
```

Page 288

```
 1                  BURIAN
 2   us, and selling the real estate.
 3          You could argue whether that was pure
 4   balance on the real estate, the appraisals
 5   were what they were, and I'm not challenging
 6   those appraisals, and then 250 for the
 7   franchise which that franchise could be worth
 8   more or less.  So there was no balance there.
 9      Q.   OK. And you understood that there
10   were a number of additional purchased assets in
11   addition to the securities, correct?
12          MS. SCHAFFER:  Objection.
13      A.   There was a real estate, yes, there
14   was the real estate and assets associated with
15   the business, the franchise.
16      Q.   And the list of purchased assets that
17   we went through earlier today?
18          MS. TAGGART:  Object to form.
19      A.   I don't know if you are saying that as
20   in addition to what I said or as further
21   clarification to what I said because most of the
22   list of assets and purchased assets relate to
23   lawyers being careful in my understanding to
24   define what is the franchise being transferred
25   for 250 million dollars.
```

Page 289

```
 1                  BURIAN
 2      Q.   You did not have a definite valuation
 3   for all purchased assets in the aggregate as of
 4   the closing, is that right?
 5      A.   Yes.
 6      Q.   You did not have a definite valuation
 7   of all the assumed liabilities in the aggregate
 8   as of the closing, is that correct?
 9      A.   Define valuation.  We had -- we,
10   again, 45.5 doesn't require a valuation.  It is
11   a number I'm told.  There is a loan.  The
12   balance is rounded to approximately 45.5, that's
13   a number.  It is not a valuation.
14          So I had that and I had on the other
15   liabilities, I had a description of how they
16   were derived.  One wouldn't value those
17   liabilities.  One would describe them and would
18   perhaps, using your words from before, provide
19   the estimate of them.
20      Q.   So you did not have a definite
21   valuation of all the assumed liabilities in the
22   aggregate as of the closing?
23          MS. TAGGART:  Object to form, asked
24   and answered.
25      Q.   Am I right about that?
```

Page 290

BURIAN

1  
2     A.   I did not know at the closing which  
3  contracts you were going to take. I did not  
4  know at the closing the precise exact number of  
5  what the severance and accrued comp was for  
6  employees. I didn't know if an employee might  
7  have died between Saturday and Monday. I just  
8  didn't know that.  
9     Q.   In other words, there were conditions  
10  that might bear on the amounts ultimately paid  
11  for comp and severance?  
12     A.   On the comp and severance side, sure.  
13     Q.   If you look at your copy of the APA  
14  which is in front of you tab A of Exhibit 92.  
15     A.   Exhibit 92.  
16     Q.   This is the exhibit you have in front  
17  of you, I am sorry, Exhibit 26. Exhibit 26.  
18  Looking at Exhibit 26, tab A, page 11, do you  
19  see there under Section 2.3, there is a list of  
20  assumed liabilities.  
21     A.   There are.  
22     Q.   Did you have a valuation for the  
23  assumed liabilities listed under categories A,  
24  B, D, E, and F?  
25     A.   You said A, I was reading A, what --

Page 291

BURIAN

1  
2     Q.   B, D, E, and F. My question is  
3  whether you had a valuation or an estimated  
4  valuation for those categories as of the  
5  closing?  
6     A.   No.  
7     Q.   And looking at the next page, looking  
8  at categories G and H, did you have a valuation  
9  or an estimated valuation for those categories  
10  of assumed liabilities?  
11     A.   Not a specific valuation, no.  
12     MR. STERN: Let's mark as the next  
13  exhibit e-mail dated September 19, 2008.  
14     (Exhibit 475-B, e-mail dated September  
15  19, 2008 marked for identification, as of  
16  this date.)  
17     Q.   I have put in front of you Exhibit  
18  475-B. I will ask you to look at it and tell me  
19  if you recognize it?  
20     A.   I do not. I recognize it is an e-mail  
21  from Barry Ridings to Mark Shapiro.  
22     Q.   That's the e-mail at the top and then  
23  below that, there is an e-mail from Eric Siegert  
24  to Barry Ridings copying you. Do you see that?  
25     A.   Yup.

Page 292

BURIAN

1  
2     Q.   Mr. Siegert writes, and this is as of  
3  September 19, I believe it is listed as  
4  Minneapolis, so I believe in New York, it's  
5  about 10:11 a.m. Mr. Siegert writes, how did  
6  the Fed actions --  
7     A.   Minneapolis is one-hour difference?  
8     Q.   Is it one or two?  
9     A.   I think it is one, right?  
10     Q.   In any event, it is 8:11 a.m. in  
11  Minneapolis. And Mr. Siegert writes, "How did  
12  the Fed actions potentially impact the value of  
13  the book. Will Barclays maybe get a windfall  
14  selling our marked down book at some stupid  
15  price to the Feds. We can't let that happen."  
16     Do you recall seeing that message from  
17  Mr. Siegert to Mr. Ridings?  
18     A.   I remember talking about this issue.  
19  I don't remember this particular e-mail.  
20     Q.   What was the issue that this e-mail  
21  addresses?  
22     A.   I mean, shortly after the Fed let --  
23  after the government let Lehman fail, they  
24  announced a rescue package of some sort that  
25  allowed a modification to the program under

Page 293

BURIAN

1  
2  which real estate and other types of securities  
3  could be borrowed against to preserve liquidity  
4  in the system and the question was whether or  
5  not there was -- whether or not that change in  
6  the Fed -- the first step was whether or not we  
7  were eligible for the Fed program because did  
8  we -- could we get liquidity and preserve the  
9  value of the assets that way.  
10     And secondly, whether there was a  
11  quick flip going on where we were going to  
12  give assets based on Lehman's marks of value,  
13  but then the government program would ascribe  
14  higher values for the purposes of collateral  
15  to those same exact securities.  
16     Q.   And when Mr. Siegert referred to our  
17  marked down book, what do you understand he was  
18  referring to?  
19     MS. TAGGART: Objection, foundation.  
20     A.   He was -- I believe he was referring  
21  to "our" as in Lehman, we take our -- we take  
22  things personally, and we were told that values  
23  had been dropping over the four to nine weeks  
24  prior to the sales transaction, and therefore,  
25  the assumption was that fair market value was

Exhibit 38

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------x
     In Re:                    Chapter 11
5    LEHMAN BROTHERS            Case No. 08-13555 (JMP)
     HOLDINGS, INC., et al.,    (Jointly Administered)
6    ------------------------------)

7

8        * * * HIGHLY CONFIDENTIAL * * *

9       VIDEOTAPED DEPOSITION OF ALVIN H. BROWN

10           New York, New York

11         Friday, January 8, 2010

12

13

14

15

16

17

18

19

20   Reported by:

     FRANCIS X. FREDERICK, CSR, RPR, RMR

21   JOB NO. 27031

22

23

24

25

Page 6

1        A. BROWN - HIGHLY CONFIDENTIAL
2    Creditors Committee.
3        MS. LEE:  Shinzong Lee from
4    Simpson Thacher.
5        MR. ROTHMAN:  Seth Rothman from
6    Hughes Hubbard on behalf of the SIPA
7    Trustee.
8        MR. THOMAS:  And let me just note
9    that this is part two of a 30(b)(6)
10    deposition of Simpson Thacher as opposed
11    to an individual deposition of the
12    witnesses.
13            * * *
14    A L V I N   B R O W N,  called as a witness,
15    having been duly sworn by a Notary
16    Public, was examined and testified as
17    follows:
18    EXAMINATION BY
19    MR. THOMAS:
20        Q.    Mr. Brown, good afternoon.
21        A.    Good afternoon.
22        Q.    Would you please state your full
23    name?
24        A.    Alvin Howard Brown.
25        Q.    And have you been deposed before?
TSG Reporting - Worldwide     877-702-9580

Page 7

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.    I have.
3        Q.    So you understand how this process
4    works.  If at any point you're not sure what
5    question I'm asking, please ask me to
6    rephrase.  I'll be happy to try.
7        A.    Yes.
8        Q.    Do you understand you've been
9    designated by Simpson to be the 30(b)(6)
10    witness on a couple of topics here today?
11        A.    Yes.
12        Q.    And those topics include generally
13    the compensation and cure liabilities assumed
14    by Barclays and the employment offered to
15    Lehman executives by Barclays.
16        A.    I just didn't understand -- after
17    "compensation" what was the next word that
18    you --
19        Q.    Cure payments, liabilities.
20        A.    Okay.
21        Q.    We'll work through it and see how
22    we do.
23        A.    Fine.
24        Q.    How long have you been with
25    Simpson?
TSG Reporting - Worldwide     877-702-9580

Page 8

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.    Since May of 1983.  So about 26
3    years.
4        Q.    And what is your area of practice?
5        A.    I'm the head of the Executive
6    Compensation and Employee Benefits Group at
7    the firm.
8        Q.    And when was the first time you
9    became involved in the Lehman/Barclays
10    transaction?
11        A.    September of 2008.  It was after
12    Labor Day.  I don't -- I don't remember the
13    exact date.
14        Q.    And had you worked previously for
15    or with Lehman Brothers?
16        A.    During the course of my time at
17    Simpson?
18        Q.    Yes.
19        A.    Yes.
20        Q.    Had they been a regular client of
21    the firm for many years?
22        A.    Yes.
23        Q.    And can you describe what work you
24    have done for Simpson over the years?  You
25    personally?
TSG Reporting - Worldwide     877-702-9580

Page 9

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.    For Simpson?
3        Q.    Or excuse me.  For Lehman.  What
4    work have you done for -- on behalf of Lehman
5    while at Simpson?
6        MR. AMER:  Do you mean in very
7    general terms?
8        MR. THOMAS:  Yes.
9        A.    Actually, my involvement was in my
10    early years at Simpson generally and I
11    addressed some questions related to ERISA or
12    compensation.  But hadn't worked with them for
13    years until this.
14        Q.    And when this came up, the
15    transaction with Barclays, why were you
16    brought into the matter?
17        A.    Because my partner in the group
18    had a personal issue conflict that he couldn't
19    be available for the weekend that was going to
20    be relevant and I was asked to step in.
21        Q.    Do you recall the week that Lehman
22    Brothers Holding filed bankruptcy being
23    roughly September 15th?  Is that consistent
24    with your recollection?
25        A.    Yeah.  That's consistent.
TSG Reporting - Worldwide     877-702-9580

Page 10

1      A. BROWN - HIGHLY CONFIDENTIAL
2      Q.    And do you recall whether you were
3   over -- physically went over to Lehman
4   Brothers' building on that Monday after the
5   filing?
6      A.    Yes.
7      Q.    And you spent a good part of the
8   day there?
9      A.    Yes.
10     Q.    And what were you doing there?
11     A.    Negotiating the benefit provisions
12  of an acquisition agreement.
13     Q.    And can you elaborate a little
14  more on the benefit provisions, what precisely
15  you mean?
16     A.    There were provisions in the
17  agreement that related to the treatment or
18  handling of the employees of the Lehman
19  entities.  And I was addressing those issues
20  along with two partners from Weil Gotshal.
21     Q.    And who were they?
22     A.    Andy Gaines and Amy Rubin.
23     Q.    And did you continue to work on
24  those issues through the week or just for a
25  couple of days, or do you recall?

TSG Reporting - Worldwide    877-702-9580

Page 11

1      A. BROWN - HIGHLY CONFIDENTIAL
2      A.    My recollection, yes, but
3   intermittently.
4      Q.    So through the time of closing?
5      A.    Really, after the agreement was
6   signed my involvement was pretty attenuated.
7      Q.    And by agreement, are you
8   referring to the original executed APA?
9      A.    Correct.
10     Q.    Let me go ahead and show you this.
11  I might refer to it later.  It was previously
12  marked as Exhibit 1.  Take a moment and review
13  and just confirm whether that's the agreement
14  that you were involved in negotiating and
15  drafting.
16     A.    I mean the title of it is the same
17  title as the agreement.  You know, without --
18  I'm assuming that if it is, it is the one that
19  I worked on.
20     Q.    If you would --
21     A.    It's certainly the same title.
22     Q.    Sure.  And if you'd flip to
23  Section 9.
24     A.    (Witness complies.)
25     Q.    Are those sections or issues some

TSG Reporting - Worldwide    877-702-9580

Page 12

1       A. BROWN - HIGHLY CONFIDENTIAL
2   of the sections and issues that you worked on?
3      A.    Yes.
4      Q.    Let's put that aside for a second.
5   And let me show you a document -- we'll refer
6   back to that in a minute.  But let me show you
7   a document marked Exhibit 489 which is the
8   LBHI board minutes.
9          (Document review.)
10     Q.    Let me start by asking if you
11  recognize the document itself.
12     A.    Only because it's identified.  But
13  I'm not sure.
14     Q.    Have you had occasion to read this
15  document before?
16     A.    I have read it in connection with
17  preparing for this deposition.
18     Q.    Okay.
19     A.    I'm not sure I saw it before that.
20  But I...
21     Q.    Do you recall attending this board
22  meeting described here?
23     A.    Yes.
24     Q.    And you're listed as a present on
25  the first page.

TSG Reporting - Worldwide    877-702-9580

Page 13

1       A. BROWN - HIGHLY CONFIDENTIAL
2          Do you see that?
3      A.    Yes.
4      Q.    If you would turn, please to page
5   number 3 of this document.
6      A.    (Witness complies.)
7      Q.    The second paragraph reads, "Mr.
8   Roberts -- " do you understand that to be a
9   Weil Gotshal lawyer?
10     A.    I don't remember who he was with.
11     Q.    Okay.
12         It reads, "Mr. Roberts resumed by
13  describing that it is a condition to the
14  transaction that eight specific firm employees
15  enter into employment agreements with
16  Barclays.  He stated that Mr. McGee was one of
17  those employees, so interested firm employees
18  were involved in the transaction negotiations
19  on behalf of the team."
20         Do you see that?
21     A.    Yes.
22     Q.    And so Simpson was aware at the
23  time the deal was being negotiated that
24  members of Lehman negotiating the deal were at
25  the same time negotiating employment

TSG Reporting - Worldwide    877-702-9580

1     A. BROWN - HIGHLY CONFIDENTIAL
2  firm's employees which they were going to be
3  buying?
4     A.   Yes.
5     Q.   And did that make sense to you in
6  this environment that Barclays was concerned
7  that they were essentially buying the
8  business, that they be able to retain the
9  Lehman employees that made up the business?
10     MR. HINE:  Object to the form.
11     A.   Yes.
12     Q.   Let me show you a document that
13  we'll mark as Exhibit 531.
14        (Deposition Exhibit 531, document
15        bearing production number STB 09661,
16        marked for identification as of this
17        date.)
18  BY MR. THOMAS:
19     Q.   And let me know when you've had a
20  chance to review it.
21        (Document review.)
22     A.   Okay.
23     Q.   Do you recognize this as an e-mail
24  from yourself to a couple people at Lehman and
25  other Simpson attorneys dated September 17th,

TSG Reporting - Worldwide    877-702-9580

1     A. BROWN - HIGHLY CONFIDENTIAL
2  2008?
3     A.   Yes.
4     Q.   And in here you write in part in
5  the second paragraph, "I wanted to be sure
6  that you knew that I would be happy to speak
7  to you or any of the Big 8 or other senior
8  executives as they worked through the
9  employment letters or other arrangements with
10  Barclays."
11     Do you see that?
12     A.   I do.
13     Q.   Do you recall if you ever ended up
14  doing further work in terms of the substance
15  of the employment letters?
16     A.   I -- yes.
17     Q.   And did you?
18     A.   No.
19     Q.   Turning back to the original APA
20  and that Section 9.  Section 9.1.  Is it fair
21  to say that Section 9.1 addresses two types of
22  employment -- employee benefits; one involving
23  severance payments and one involving bonus
24  payments?
25     A.   Could you repeat the question?

TSG Reporting - Worldwide    877-702-9580

1     A. BROWN - HIGHLY CONFIDENTIAL
2     Q.   Sure.  Within Section 9.1 which is
3  Employment Benefits there's both an assumed
4  liability by the purchaser in terms of
5  severance and bonus payments, correct?
6     MR. HINE:  Object to the form.
7     MR. AMER:  You can answer.
8     A.   Yes.
9     Q.   Do you know if there was ever any
10  effort to calculate that liability?
11     A.   I don't recall.
12     Q.   Do you have any recollection of a
13  $2 billion number?
14     A.   Yes.
15     Q.   Is it your recollection that $2
16  billion number was someone's estimate of
17  potential liability under Section 9.1?
18     MR. HINE:  Object to the form.
19     A.   Yes.  But not with respect to the
20  section that you just were referencing.  The
21  $2 billion number really related to subsection
22  C.
23     Q.   Do you recall ever seeing it on
24  a -- where do you recall seeing the $2 billion
25  number?

TSG Reporting - Worldwide    877-702-9580

1     A. BROWN - HIGHLY CONFIDENTIAL
2     A.   It was on a schedule.
3     Q.   And did the schedule have a
4  separate line item for severance?
5     A.   I don't recall.
6     Q.   And do you know who calculated the
7  $2 billion figure?
8     A.   I do not.
9     Q.   Were you involved in that process
10  in any way?
11     A.   In calculating the number?
12     Q.   Yes.
13     A.   No.
14     Q.   Do you have any understanding what
15  it entailed specifically?
16     A.   Yes.
17     Q.   And -- let me go ahead and show
18  you a document we'll mark as 532.
19        (Deposition Exhibit 532, document
20        bearing production number LBHI 013444
21        with attached spreadsheet, marked for
22        identification as of this date.)
23     A.   Okay.
24     Q.   Have you ever seen this document
25  before?

TSG Reporting - Worldwide    877-702-9580

Page 22

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.  No.
3        Q.  Let me ask you to take a moment to
4   review the attachment to the e-mail.
5        A.  The attachment to --
6        Q.  The cover is an e-mail --
7        A.  Oh, I see.  Okay.  Sorry.
8        Q.  The cover is an e-mail from Kelly
9   Martin to Richard Krasnow, an attorney at Weil
10  Gotshal, dated September 18th, 2008.
11       A.  Right.
12       Q.  The spreadsheet attachment, do you
13  recall whether as part of your work with
14  respect to the Barclays sales transaction, you
15  ever reviewed sheets like this?
16       A.  Yes.
17       Q.  And did you?
18       A.  Yes.  But not this one.
19       Q.  How do you -- how are you certain
20  a year later that it's not this one?
21       A.  I've just never seen it before.
22       Q.  Did you see a lot of spreadsheets?
23       A.  No.  Well, in this transaction?
24  No.
25       Q.  Have you seen more than one?
        TSG Reporting - Worldwide    877-702-9580

Page 23

1        A. BROWN - HIGHLY CONFIDENTIAL
2        A.  Not that I recall.
3        Q.  When you say spreadsheet, are you
4   referring to just a one-page schedule?
5        A.  Correct.
6        Q.  You never saw any of the backup as
7   to how that schedule was built up?
8        A.  (Witness shakes head.)
9            MR. AMER:  You have to answer.
10           THE WITNESS:  Oh.
11       A.  No.
12       Q.  If you would look at the last page
13  of this document under the Liabilities column,
14  do you see the fourth section there, Payables?
15       A.  Yes.
16       Q.  And do you see Compensation
17  Payable?
18       A.  Yes.
19       Q.  And do you see that there was a
20  transaction adjustment to that payable?
21       A.  Yes.
22       Q.  Were you aware at the time that
23  there was a transaction adjustment to the
24  estimate for compensation payables?
25       A.  Not that I recall.
        TSG Reporting - Worldwide    877-702-9580

Page 24

1        A. BROWN - HIGHLY CONFIDENTIAL
2        Q.  You don't recall having
3   discussions with Weil Gotshal lawyers about
4   that issue?
5        A.  No.
6        Q.  Do you have an understanding of
7   why there would be a transaction adjustment?
8            MR. GATTO:  Object to the form of
9        the question.
10       Q.  To the compensation payable.
11           MR. AMER:  Same objection.  Since
12       he doesn't recall there being an
13       adjustment.
14       A.  No.  I mean...
15       Q.  Do you have any knowledge as to
16  whether this line item, Compensation Payable,
17  includes severance?
18       A.  No.
19       Q.  Do you know whether Lehman pays a
20  larger or smaller percentage of its yearly
21  bonuses as cash than Barclays does?
22           MR. AMER:  Object to the form of
23       the question.
24       A.  I don't recall.
25       Q.  Do you know whether the $2 billion
        TSG Reporting - Worldwide    877-702-9580

Page 25

1        A. BROWN - HIGHLY CONFIDENTIAL
2   figure you're referring to was adjusted in
3   order to allow for the fact that Barclays pays
4   a higher percentage of cash compensation?
5            MR. HINE:  Object to the form.
6        A.  No.
7        Q.  Do you understand whether there
8   was any adjustment to the figure in order to
9   cover the entire Lehman fiscal year for the
10  compensation amounts due?
11           MR. HINE:  Object to the form.
12       A.  No.
13       Q.  Do you have any understanding of
14  where that $2 billion figure came from or how
15  it was calculated?
16       A.  Yes.
17       Q.  Can you tell me.
18       A.  My understanding was that that was
19  the number for the accrued bonuses for the
20  Lehman employees for that year.  It had been
21  agreed to and was put on the schedule.
22       Q.  And where did that understanding
23  come from?
24       A.  I don't -- it was from one of the
25  participants or part of the team that was
        TSG Reporting - Worldwide    877-702-9580

Page 26

1         A. BROWN - HIGHLY CONFIDENTIAL
2   involved in negotiating but I don't recall
3   specifically who it was.
4         Q.   Do you recall which party it was
5   from?
6         A.   No.
7         Q.   Is this something that you
8   actually recall from a year and a half ago or
9   is it something that you've learned in
10  preparation for this deposition?
11        MR. HINE:  Well, hold on.  Before
12      you answer that --
13        MR. THOMAS:  That's a timing
14      question.  That can't be privileged.
15        MR. HINE:  I'm cautioning him not
16      to reveal privileged information he
17      might have learned after September 30th.
18      We have a waiver here.  So if your
19      answer entails something that you
20      learned after September 30th you're not
21      allowed to waive the privilege.
22        A.   I'm not -- could you repeat the
23  question because I'm not sure --
24        Q.   Your understanding about this $2
25  billion figure, is this an actual recollection
TSG Reporting - Worldwide    877-702-9580

Page 27

1         A. BROWN - HIGHLY CONFIDENTIAL
2   of yours from a year and a half ago or is it
3   something you've come to understand more
4   recently in connection with this deposition?
5         MR. HINE:  Same warning.
6         A.   When you say my understanding of
7   this, I mean, what I told you was my
8   understanding and I really hadn't had
9   discussions that changed that since then.
10        Q.   So this is based on your
11  recollection from a year ago.
12        A.   My recollection.
13        Q.   Now, what did you do to prepare
14  for today's deposition?
15        A.   I met with my counsel.
16        Q.   Anything else?
17        A.   Actually, no.
18        Q.   If -- so turning back to the --
19  Section 9.1 of the original APA did you draft
20  this language in any part of the 9.1?
21        A.   Yes.
22        Q.   Which portions did you draft?
23        A.   That I can't recall.
24        Q.   Were you the original drafter?
25        A.   No.
TSG Reporting - Worldwide    877-702-9580

Page 28

1         A. BROWN - HIGHLY CONFIDENTIAL
2         Q.   Do you know who was?
3         A.   Somebody at Cleary.  I dealt with
4   Arthur Cohen who's a partner at Cleary but I
5   don't -- the draft came originally to me and
6   my understanding was it had been drafted by
7   Cleary and then I marked it up.
8         Q.   Do you recall any changes you made
9   to (b) or (c)?  Section (b) or (c) of 9.1.
10        A.   I don't recall the specifics.
11        Q.   Okay.  Is it your under -- let's
12  say that after Barclays -- the Barclay
13  transaction was consummated 90 percent of the
14  employees were severed.  Barclays would have
15  to pay severance for those employees, correct,
16  pursuant to 9.1(b)?
17        MR. AMER:  Objection to the form
18      of the question.
19        Q.   9(c).  Strike that.
20        If Barclays -- under 9.1 Barclays
21  would have to pay severance payments to
22  employees severed prior to the end of the
23  year; is that correct?
24        A.   Correct.
25        Q.   And if there were a lot of
TSG Reporting - Worldwide    877-702-9580

Page 29

1         A. BROWN - HIGHLY CONFIDENTIAL
2   severances -- strike that.
3         And you know if that would involve
4   paying those employees all of their accrued
5   2008 bonus money.
6         A.   Yes.
7         Q.   So there's potentially a lot of
8   assumed liability by taking on that severance
9   obligation; is that correct?
10        MR. HINE:  Objection.
11        A.   Correct.  Yes.
12        Q.   Is it your belief that if Barclays
13  had terminated 90 percent of the employees,
14  that the remaining 10 percent of the employees
15  would have to get paid $2 billion?
16        MR. ROTHMAN:  Objection to the
17      form.
18        MR. HINE:  Same objection.
19        MR. AMER:  You can answer.
20        A.   No.  That's not my understanding.
21  Or my belief.
22        Q.   In that event if that -- in that
23  scenario, would some of the $2 billion be sent
24  to pay bonuses to the retained employees and
25  severance to the severed employees?
TSG Reporting - Worldwide    877-702-9580

Exhibit 39

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 08-13555(JMP)

5    Adv. Case No. 08-01420(JMP)(SIPA)

6    - - - - - - - - - - - - - - - - - - -x

7    In the Matter of:

8    LEHMAN BROTHERS HOLDINGS INC., et al.,

9                     Debtors.

10   - - - - - - - - - - - - - - - - - - -x

11   SECURITIES INVESTOR PROTECTION CORPORATION,

12                     Plaintiff,

13          -against-

14   LEHMAN BROTHERS INC.,

15                     Debtor.

16   - - - - - - - - - - - - - - - - - - -x

17               U.S. Bankruptcy Court

18               One Bowling Green

19               New York, New York

20               April 26, 2010

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 30

- 30 -

1  This is --

2      (Begin playback of clip)

3  "Q. One of Deloitte & Touche's tasks is to create a balance

4  sheet for LBI as of the start of the SIPA liquidation, is that

5  correct?

6  "A. We asked them to do that at some point.

7  "Q. And they have not yet completed that, correct?

8  "A. That's correct."

9      (End playback of clip)

10      MR. HUME: And now, Your Honor, the 30(b)(6)

11  representative from Deloitte who was asked about their work on

12  that opening balance sheet:

13      (Begin playback of clip)

14  "Q. Did Deloitte at any time attempt to value any of the

15  assets listed under the purchased assets?

16  "A. The only time we attempted to value -- or, sorry, we did

17  not attempt to value anything related to this listing.

18  "Q. Can I ask -- well, it seems like you were clarifying your

19  language. Was there something you were going to say before

20  that?

21  "A. We had been in process of creating a draft balance sheet,

22  but Deloitte hasn't been doing the valuations.

23  "Q. Who was, then, doing the valuations for the draft balance

24  sheet?

25  "A. The valuations have been coming from third-party sources

Page 31

- 31 -

1  and Barclays.

2  "Q. What were the third-party sources?

3  "A. They're publicly available sources. The two that I

4  remember are Bloomberg and IBSI.

5  "Q. Is that work still going on?

6  "A. Yes.

7  "Q. When did Deloitte first work on in any way a balance sheet

8  for LBI?

9  "A. Started in late '08. We did not have access to the books

10  and records until around that time to be able to get the

11  details to start creating a balance sheet.

12  "Q. What was the purpose of creating a balance sheet?

13  "A. To determine what the assets and liabilities existed as of

14  9/19/08, the date of liquidation.

15  "Q. And Deloitte is still working on that balance sheet today?

16  "A. Yes."

17      MR. HUME: Your Honor, so if they're trying to put

18  together a balance sheet for the broker-dealer as of the date

19  of the liquidation, that is going to show the values of the

20  assets and liabilities; it's going to show whether they're

21  doing it themselves or relying on other people. And I did ask

22  the trustee's 30(b)(6) (sic) in deposition are these assets

23  difficult to value, since it's taken a year, or more now, to

24  actually produce this opening balance sheet. And he said yes,

Page 32

- 32 -

1  I think some of them are very difficult to value. And if

2  they're accepting Barclays' valuations, that undercuts the

3  arguments of the other movants.

4      We're entitled to know what they thought that balance

5  sheet looked like, what they thought we were getting from that

6  balance sheet at the time. It's directly relevant to our

7  claims. It's not work product. It's work they would be doing

8  if -- wholly independent of this litigation and which, I assume

9  in good faith, no one was thinking about at that time, since,

10  if they were, then it wouldn't be new evidence; they would have

11  had that evidence.

12      Now, Your Honor asked a second question, which is why

13  is -- why are we bringing this at this time; is it -- and how

14  do we explain what Your Honor called the last-minute nature of

15  it.

16      Your Honor, we did bring a motion, as you'll recall,

17  after the Rule 60 motions were filed, seeking a broad --

18  arguing that there had been a broad waiver of both attorney-

19  client privilege and attorney work product.

20      And if I may have slide A-8.

21      In response to that motion, the movants argued that

22  all of their claims were objective, based on objective

23  evidence, what was told to the Court; nothing to do with what

24  they knew. And they made all these arguments in their

25  opposition then, and they made it in their oppositions to our

Page 33

- 33 -

1  second motion to compel. And Your Honor accepted those

2  arguments on page -- I think it's 116 to -17 of the December

3  16th transcript. When you read your opinion denying our

4  motion, you said "I view these claims as objective," as based

5  upon what was told to the Court, nothing to do with what the

6  movants knew.

7      And, Your Honor, we respectfully disagreed with that,

8  but we, obviously, respected the Court's decision. And we made

9  our arguments in our brief to explain why legally there is no

10  way they can bring the claims they're bringing without showing

11  their own subjective lack of understanding of the terms of this

12  deal.

13      Judge Peck, there's no case that has ever allowed a

14  Rule 60(b) modification of a sale order that was affirmed on

15  appeal. There are virtually none that have had any 60(b)

16  modification of the sale order; none after an appeal. They

17  argue new evidence under 60(b)(2), a required element of which

18  is that they subjectively did not understand the terms of the

19  sale.

20      Because there's a -- so that's one reason they must

21  show they didn't understand. There's also a mandate from the

22  district court, which is a jurisdictional mandate. The sale

23  order had been affirmed. There's arguably no exception to that

24  mandate, but any such exception must again rely on their

25  ability to show they didn't understand the sale they were

9 (Pages 30 - 33)

In re et al., SIPC v. LBI

Page 158

- 158 -

1  to-market basis, is that right?

2  A.  Yes, we did.

3  Q.  And does the book value of securities on a mark-to-market

4  basis contemplate the sale of securities in bulk to your

5  understanding?

6  A.  Not in distress.

7  Q.  And would book value of a financial institution reflect

8  moving the entire book the next morning?

9  A.  No, it would not.

10  Q.  And in the course of your discussions with Barclays, was

11  there any suggestion that it was their intention to move the

12  purchased assets the next day in bulk?

13  A.  Could you repeat that question?  I'm sorry.

14  Q.  Let me shoot it and try something simpler.  Did Barclays

15  say anything along the lines of they were going to resell the

16  assets in bulk the day after they purchased them?

17  A.  No.

18  Q.  Had you, on the 16th, spoken to anyone who had told you

19  that Lehman had been unable to mark its books on the 16th?

20  A.  No, I had not spoken to anyone.

21  Q.  Had you at the time?

22  A.  At the time, I had not spoken to anyone.

23  Q.  And at the time, had you spoken to anyone who told you

24  Lehman was unable to mark its books as of the 15th of

25  September?

Page 159

- 159 -

1  A.  No, I don't have that recollection.

2  Q.  So as you sit here today, sir, do you know if Lehman's

3  books had been marked as the 15th and 16th of September, do

4  you have any knowledge of that?

5  A.  As I sit here today, I don't have knowledge.

6  Q.  Was Paolo Tonucci involved in the negotiations, sir?

7  A.  Paolo Tonucci was the treasurer of Lehman.  He was

8  involved as the week went on, not early on in the negotiations,

9  to the best of my knowledge.

10  Q.  Now, I don't want to miss each other, here.  With regard

11  to the negotiations, I take it there's ac -- let's be clear on

12  what terms we're using, okay?  With regard to the negotiations,

13  I'm not asking if they were involved in the haggling, in the

14  horse-trading at the table.  Do you know if Mr. Tonucci had a

15  role early in the week around those negotiations, you know, in

16  any other role?

17  A.  I would have thought he would, yes.

18  Q.  Why would you think that?

19  A.  Given his role as a treasurer.

20  Q.  Okay, and let me ask you the same question with respect to

21  Mr. Kelly.  Would he have had involvement around the

22  negotiations?

23  A.  Yes, he would have.

24  Q.  And with respect to Mr. Lowitt in that early part of the

25  week, would he have had involvement around the negotiations?

Page 160

- 160 -

1  A.  Yes, he would.

2  Q.  When you learned the terms of the transaction, sir -- when

3  the terms of the transaction were reached in the early morning

4  of the 16th, what, if any, provisions in the structured

5  agreement --

6     MR. GAFFEY:  Withdrawn.

7  Q.  When an agreement was reach early on in the morning of the

8  16th, sir, were there any agreements with respect to Barclays'

9  assuming liabilities for compensation or for trade payable

10  cure?

11  A.  Yes, there were.

12  Q.  Could you describe them to the Court, please?

13  A.  Barclays would need to -- well, start with the cure.

14  Barclays would need to get a list of the contracts that

15  heretofore Lehman had had responsibility for in terms of those

16  that affected the running of the businesses that they were

17  purchasing.  And they agreed, in principle, to honor those --

18  those contracts after the process of being able -- given we

19  were unable during the course of that week -- to actually start

20  any integration process of any consequence.  After they were

21  given the information, they were given a period of time, I

22  believe sixty days, to be able to go through the process and

23  understand those contracts and make the determination at that

24  point in time whether or not those were necessary for running

25  the business and franchise going forward.

Page 161

- 161 -

1  Q.  The other part of that question had to do with

2  compensation, sir.

3  A.  Right.  Barclays also assumed a two billion compensation

4  liability with respect to the combination of the employees'

5  bonus process and the severance process with respect to -- they

6  agreed to hire all of the Lehman North American employees, and

7  then there was a period of time, I believe ninety days, that

8  they had to make ultimate determination, in terms of whether or

9  not those would become permanent employees of the -- of the bar

10  cap going forward.

11  Q.  And at the time, around the 15th or the 16th -- I'm still

12  in that early part of the week -- was any number put up as an

13  estimate of the amount Barclays would pay in trade payables?

14  A.  Trade payables, I believe the number at that point in time

15  was 2.25 billion.

16  Q.  And who calculated that number?

17  A.  They're not calculations.  They're an attempt to extract

18  from the Lehman systems the list of those contracts and

19  obligations.  That would have been Martin Kelly.

20  Q.  And did there come a time during the course of the week

21  where that number changed from 2.25?

22  A.  As information became clearer, that number changed from

23  2.25; I believe by Friday, it was 1.5 billion.

24  Q.  And in your understanding at the time, sir, was that an

25  estimate of an amount that Barclays actually would pay

Page 162

- 162 -

1 A.  That was an estimate of an amount that Barclays had the
2 potential to pay.
3 Q.  And was any estimate done -- did you have any discussions
4 with Barclays -- you or anyone on the negotiating team have
5 discussions with Barclays about whether Barclays intended to
6 pay amounts in that range?
7 A.  No, I did not.
8 Q.  Was it an issue that came up in the negotiations between
9 the Lehmanites and the Barclays side of the table at all, as
10 far as you know?
11 A.  Not that I was involved in.
12 Q.  And who calculated the two billion dollar numbers -- the
13 two billion dollar figure for compensation?
14 A.  The compensation process was a process that I would
15 describe where Lehman provided Barclays -- Lehman -- I believe
16 it started in the work stream with the HR professionals.
17 Lehman provided the data that existed on the Lehman accrual at
18 that point in time, and then provided that data to -- as
19 historical pay data -- historical pay data, as well, to
20 Barclays and obviously cooperated in terms of all the flow of
21 information that Barclays needed.  It's certainly my
22 understanding that Barclays would have been the ultimate
23 determiner given that it was such an important part of what
24 they were buying, which is the services of the good employees
25 of Lehman, that they would have reflected on that compensation

Page 163

- 163 -

1 process.  So they would have been the ultimate determiners, in
2 my opinion, of the compensation figure.  But given a lot of
3 cooperation and a lot of information from Lehman.
4 Q.  And when you say ultimate determiner of the compensation
5 figure, are you referring to what compensation figure would be
6 used in connection with making the agreement?
7 A.  Correct.
8 Q.  To your knowledge, did Mr. Kelly participate in the
9 estimation of -- did Mr. Kelly review Lehman's accruals for
10 trade payables as part of the process of estimating the cure
11 liability?
12 A.  Yes.
13 Q.  At the time, sir, did you have any knowledge whether or
14 not Mr. Kelly made transaction adjustments that wrote those
15 numbers up?
16 A.  No, I had no knowledge of that.
17 Q.  Did you ever have a discussion with him along those lines?
18 A.  Around writing up the -- no, I have not -- did not have a
19 conversation with him.
20 Q.  Would it have surprised you if he had?
21 A.  Absolutely.
22 Q.  Why would it have surprised you?
23 A.  Because he's someone I worked with for many years and a
24 man of great integrity.
25 Q.  Was the process of attempting to estimate trade

Page 164

- 164 -

1 liabilities meant to be a process to determine what Barclays
2 was likely to pay once it bought the business?
3 A.  The process was to collect the data and make sure we
4 understood the actual obligations needed to pay.  There was no
5 process around the likely outcome of that figure.
6 Q.  And with respect to the compensation number, was that an
7 agreed number, two billion dollars?
8 A.  That was a number that was ultimately agreed, yes.
9 Q.  Okay, if you would turn, sir, in your book to tab M2, or
10 2, Movants' Exhibit 2?  Are you with me on the document, sir?
11 Movants' Exhibit 2?
12 A.  Yes, I am.
13 Q.  Have you seen the document before?
14 A.  Yes, I have.
15 Q.  What were the circumstances under which you first saw the
16 document?
17 A.  This was a document that I described a little earlier that
18 became a guidance document for all the participants, including
19 advisors, with respect to the deal and its structuring and
20 coming together.
21 Q.  And when you first saw the document, were you with other
22 people?
23 A.  I don't have a specific recollection of that.
24 Q.  You see that the document's initialed in the upper right-
25 hand corner?

Page 165

- 165 -

1 A.  Yes, I do.
2 Q.  Do you recognize the initials?
3 A.  Steve Berkenfeld.
4 Q.  Okay, and above that is the date, September 16th, '08 and
5 the word "final".  Were you there when Mr. Berkenfeld put his
6 initials on the document?
7 A.  I don't recall -- no, I don't think so.
8 Q.  Okay, does this document bear any relation to the sale
9 transaction as you understand it, sir?
10 A.  It has a strong resemblance, yes.
11 Q.  Could you describe what you mean by that?
12 A.  This was, again, the guidance document used for the first
13 hearing in this courtroom.
14 Q.  And when you say the guidance document used for the first
15 hearing in the courtroom, is it fair to say these are the
16 numbers upon which the deal was based on the 16th?
17 A.  Yes.
18 Q.  And on the asset side of this financial schedule, sir, who
19 generated those -- who or what process generated those numbers?
20 A.  That process that I described before of the different risk
21 partners from both organizations.
22 Q.  Okay, and the asset side numbers that total -- well, the
23 asset side numbers, are they the agreed numbers or are they
24 numbers that are taken directly from Lehman's books?
25 A.  They are the agreed numbers.

42 (Pages 162 - 165)

Page 166

- 166 -

1 Q.  And the asset side numbers on this schedule, sir, did they

2 have that same delta between the agreed number and the Lehman

3 books that we talked about before?

4 A.  That's what I would understand.

5 Q.  And would that be about that five billion dollar element

6 we talked about?

7 A.  I don't have specific knowledge of the exact number, but

8 yes.

9 Q.  It would be in the range of five billion?

10 A.  Right.

11 Q.  Now, do you know, sir, if Lehman's books were ever marked

12 to reflect the agreed valuation by the usual mark-to-market

13 methods?

14 A.  I don't know that.

15 Q.  And who would you ask if you wanted to know the answer to

16 that?

17 A.  Martin Kelly.

18 Q.  Would you ask Mr. Lowitt, as well?

19 A.  Yes, he should've known.

20 Q.  Did the agreed valuation that's reflected in Exhibit 4

21 include any kind of haircut to reflect market volatility?

22 A.  I'm sorry, is this Exhibit 4?

23 A.  Yes.

24 A.  Okay.

25         UNIDENTIFIED SPEAKER:  2.

Page 167

- 167 -

1 Q.  I beg your pardon, 2.

2 A.  Could you repeat the question?  I apologize.

3 Q.  Does the --

4 A.  Yes.

5 Q.  -- calculation asset side here reflect any haircut to

6 reflect market volatility?

7 A.  It was the most unusual week in my twenty-five years of

8 market experience, so clearly they had to reflect -- the

9 valuation in that process had to reflect that uncertainty of

10 times.

11 Q.  Well, when -- would that have been consistent with your

12 understanding of the transaction, if the valuation that was

13 agreed included a haircut to reflect market volatility?

14 A.  The transaction was an agreement for Barclays to purchase

15 the assets.  That negotiation would have included in a time and

16 place where literally five million dollar trades in fixed

17 income were unusual would have included all sorts of different

18 assumptions in terms of the process.

19 Q.  Well, if there had been negotiations of a haircut, an

20 agreement to apply a haircut to reflect future market

21 volatility, would that have been consistent with your

22 understanding of the transaction?

23 A.  No, there weren't negotiations to agree to a haircut.

24 There were negotiations in the best sense that were possible in

25 a forty-eight hour period, roughly speaking, at that moment

Page 168

- 168 -

1 when this -- or less -- when that moment was this -- this

2 document was created.  That reflected the ability to find a

3 price to transact.

4 Q.  And the price to transact was not Lehman's book value as

5 of the 16th of September.  Is that right?

6 A.  To the best of my understanding, yes.

7 Q.  Now, when Lehman did make mark to mark judgments in its

8 books, did it take illiquidity into account?

9         MR. GAFFEY:  Let me withdraw that.

10 Q.  When Lehman recorded marks on its books, was illiquidity

11 taken into account?

12 A.  Yes, it was.

13 Q.  Now, on the liability side of this schedule, sir, you'll

14 see at the lower right-hand corner, items for cure, payment and

15 comp.  Do you see that?

16 A.  Yes, I do.

17 Q.  And the comp number is put at 2.25.  We understand this

18 number to be billions, right, sir?

19 A.  These are billions.  You said comp or cure?

20 Q.  The cure payment is put at 2.25 billion?

21 A.  Yes, it is.

22 Q.  And comp is put at 2.0 billion.  Is that right?

23 A.  Yes.  Yes, I see that.

24 Q.  And is the 2.25 shown on that schedule the same 2.25 you

25 referred to a few moments ago?

Page 169

- 169 -

1 A.  Yes, it is.

2 Q.  And the two billion for comp is the same two billion you

3 testified about a few moments ago, correct?

4 A.  Yes.  Yes, it is.

5 Q.  Now, does this schedule reflect that those two components

6 were part of the price in the asset purchase agreement?

7         MR. GAFFEY:  Withdrawn.

8 Q.  Does this schedule reflect that those two components were

9 part of the price in the transaction that was agreed?

10 A.  The price in the transaction, yes.

11 Q.  Now, if the compensation accrual on that schedule, sir, of

12 two billion dollars was not a good-faith estimate of what

13 Barclays would actually pay, would that be consistent with the

14 deal that you made?

15 A.  If it was not a good-faith estimate?

16 Q.  Yes.  If it was not a good-faith estimate of what Barclays

17 would actually wind up paying, would that be consistent with

18 the deal that you made?

19 A.  No.

20 Q.  And were you taking any steps during the week, sir, to

21 ensure the accuracy of the estimates regarding cure payments?

22 A.  Yes, I was.

23 Q.  What were you doing in that regard?

24 A.  I actually recall having a meeting with Martin and Ian to

25 make sure that we had accurate information to deliver to

43 (Pages 166 - 169)

In re: et al. SIPC v. LBI

Page 170

- 170 -

1 Barclays.

2 Q.  And was one of the reasons that you wanted accurate

3 information, is that it related to the amount of value that

4 Lehman had to give to Barclays in the transaction?

5 A.  It was just a core part of the actual -- one of the deal

6 imperatives, so we needed the accurate information with respect

7 to what that number would be.

8 Q.  Well, apart from its accuracy, sir, my question is a

9 little different.  And it is whether it was important that it

10 be accurate, because it related to the amount of value that

11 Lehman was going to get from Barclays?

12 A.  Yes.

13 Q.  So in your mind, negotiating the transaction, coming up

14 with an accurate estimate of the cure payments that Barclays

15 would assume, was an important component of the deal.  Was that

16 right?

17 A.  An accurate estimate of the potential cure payments they

18 would assume?  Yes.

19 Q.  And an accurate estimate of the comp that they were going

20 to pay?

21 A.  Yes.

22 Q.  Now, you mentioned before that the cure number dropped

23 from 2.25 down to 1.5, and you thought that was the number at

24 the end of the week.  Do you recall that?

25 A.  Yes, I do.

Page 171

- 171 -

1 Q.  And do you know why the number dropped from 2.25 to 1.5?

2 A.  It -- I don't know the specifics.  I can only guess that

3 given all of the challenges that we were having operationally,

4 that would be one of the reasons.  But no, I don't have the

5 specifics.

6 Q.  Did there come a point during the week when Martin Kelly

7 told you that the trade payables were moving from a higher to a

8 lower number?

9 A.  Yes.

10 Q.  Do you recall that?

11 A.  Yes.

12 Q.  Was that after -- do you recall at what point in the week

13 that happened?

14 A.  If I recall, it was later in the week, as more information

15 was available to him from his teams.

16 Q.  I know it was a pretty tumultuous week, sir, but was it

17 closer to Thursday or Friday, or closer to Monday or Tuesday?

18 Do you have it -- what's your best recollection of when during

19 the week that happened?

20 A.  It was closer to Thursday-Friday.

21 Q.  And was it dropping below the 1.5?

22 A.  The figure was never an accurate number over the course of

23 the week.  I don't have specific recollections in terms of what

24 each individual number, nor was I part of the process of

25 collecting that from Martin.  I knew we were having generally,

Page 172

- 172 -

1 just a tough problem getting the actual ascertained data.

2 Q.  Now, do you agree, sir, that with regard to the

3 transaction you negotiated, that a drop in the cure number

4 would mean the consideration Barclays was giving would go down?

5 A.  Yes.

6 Q.  Is there any reason you could think of, sir, that would

7 justify increasing the amount of the estimate for cure over the

8 amount shown on Lehman's books?

9 A.  There's no reason why.

10 Q.  Now, with reference to the process you described before,

11 of looking at open trade payable contracts, trying to figure

12 how many there were out there and coming up with a number, is

13 it correct that -- at least as far as you understand, the

14 amount that would have been accrued on Lehman's books would

15 have reflected what it thought would be its trade payables,

16 correct?

17 A.  Yes.  Yes.

18 Q.  So would there be any good reason you can think why, to

19 adjust with regard to this transaction, the accruals on

20 Lehman's books for trade payables, would have to be increased

21 to fit onto that schedule?

22 A.  I'm not sure I understand your question.

23 Q.  Well, the amount accrued on Lehman's books would show a

24 cap, would show a ceiling of what Lehman thought it would have

25 to pay in trade payables, yes?

Page 173

- 173 -

1 A.  Yes.

2 Q.  And if the amount ultimately agreed upon in this transa --

3 ultimately shown in this transaction exceeded that, can you

4 think of any rational reason to go over that amount accrued on

5 Lehman's books?

6 A.  No, I cannot.

7 Q.  Because there aren't going to be any more trade payable

8 contracts than Lehman's already got, right?

9 A.  That's correct.

10 Q.  Did you ever, in the course of that week, see any of Mr.

11 Kelly's work product in connection with estimating the cure

12 number?

13 A.  No, I did not.

14 Q.  Did you ever see any calculations or work product

15 generated by anyone who worked for Mr. Kelly, with regard t

16 that cure number?

17 A.  No, I did not.

18 Q.  Did Mr. Kelly ever talk to you about the process by which

19 he was estimating that cure number?

20 A.  No, he did not.

21 Q.  Now, you mentioned before, sir, that Exhibit M-2, this

22 financial schedule, bore a significant resemblance to the deal?

23 A.  Yes.

24 Q.  Do you mean a significant relation -- you don't mean it

25 looked like the deal, do you?  I mean, I just want to clear up

44 (Pages 170 - 173)

Lehm, et al. SIPC v. LBI

Page 198

- 198 -

1 target, and you give folks the task of finding additional
2 value, how do they know when to stop, sir?  What's the measure
3 for when they should stop adding value to the deal?
4 A.   We went through the same process over the course of the
5 week, so that the ultimate determination, find options, we
6 found the two options; 15c3 was still, in our minds, of
7 potentially questionable, given it needed regulatory authority
8 to be able to be transferred over.  So really we were focusing
9 on making sure that we got appropriate value for the
10 unencumbered assets.  Although, obviously, both were in the
11 transaction.
12       The process at the end was the team at Lehman at that
13 point in time, finishing the process in terms of the ultimate
14 determination of the -- you know, whether or not to include,
15 and "was there enough".  There were no other assets.  Lehman
16 was extremely motivated -- we were extremely motivated, given
17 what had happened in the marketplace and in the marketplace to
18 us, to move assets in this transaction, because we were in no
19 position to risk-manage assets, given all that had happened to
20 us, by market participants, and given the changes in our
21 personnel over the course of the week.
22 Q.   Okay.  There were some assets that was contemplated by the
23 transaction, would be left behind, correct?  Under the original
24 asset purchase agreement, it wasn't Barclays taking all the
25 assets?

Page 199

- 199 -

1 A.   I believe that it was customer -- some sort of customer
2 assets.
3 Q.   Okay.  And there comes a point on the Friday morning where
4 Barclays says in sum or essence, this repo collateral is
5 worrisome, we need more.  Right?
6 A.   That's correct.
7 Q.   And if we don't get more, we're not going to close, right?
8 A.   That's correct.
9 Q.   And you give Mr. Kirk, who enlists Mr. Lowitt and Mr.
10 Kelly and some others, the task of going to find more for
11 Barclays, right?
12 A.   That's correct.
13 Q.   And they go and look for more for Barclays, yes?
14 A.   Yes.
15 Q.   In the meantime, you're headed down to this courthouse for
16 the sale hearing, correct?
17 A.   That's right.
18 Q.   And did you travel with your lawyers, or did you meet them
19 here?
20 A.   I traveled with Weil.  I had been at Weil's office.  I
21 traveled with Weil.
22 Q.   Okay.  And who at Weil did you travel with?
23 A.   Tom Roberts, Harvey Miller and Lori Fife.
24 Q.   Okay.  And at some point you learn, here in the
25 courthouse, that the project of adding additional value has

Page 200

- 200 -

1 been completed, correct?
2 A.   Correct.
3 Q.   And did you learn the amount that had been added?
4 A.   I learned the amount of the unencumbered assets.
5 Q.   So you learned 1.9?
6 A.   Um-hum.
7 Q.   Did you learn about the fact of the 15c3, if not its
8 amount?
9 A.   The fact, yes.
10 Q.   Okay.  And did you learn that any other assets had been
11 added apart from unencumbered box and 15c3?
12 A.   No.
13 Q.   And did there come a point where you, sir, were
14 comfortable now that enough value had been added?
15 A.   The team -- given I was part of a separate process now --
16 the team had become comfortable, yes.
17 Q.   Based on the process that you've described, sir, where
18 Barclays doesn't have a target, isn't it necessary that
19 Barclays is the arbiter of when people should stop looking for
20 more value?  How does Mr. Kirk, Mr. Tonucci, Mr. Kelly and the
21 others know when to stop looking for more value?
22 A.   I would again, just repeat my previous answer, which is,
23 number one, we had no other assets; number two, so we had found
24 all the options; and number two (sic), we'd gone through that
25 process of working through and valuing the assets over the

Page 201

- 201 -

1 course of the week.  So there would have been a consistency in
2 terms of the approach.  Clearly we were not in a great
3 negotiating position, as you described.  But this is the same
4 consistent approach in terms of making sure that we went
5 through a process of trying to ascertain the value of those
6 assets that would be conveyed.
7 Q.   Well, speaking of negotiating position, I know it was a
8 tough week from start to finish.  But did you have less
9 leverage by the end of the week than you had at the beginning?
10 Did you have less leverage just before the sale hearing began
11 than you had overnight from Monday to Tuesday?
12 A.   We had very little leverage.  I wouldn't describe -- I
13 don't know how to describe it as we started with an empty tank
14 and ended with one.
15 Q.   You would agree with me that overnight from Monday the
16 15th into the early morning of the 16th, there was back-and-
17 forth on price, wasn't there?
18 A.   There was always back-and-forth on price.
19 Q.   Okay.  On the Friday morning, when additional assets were
20 being added, was there back-and-forth between Lehman and
21 Barclays as to how much more needed to be added?
22 A.   To the best of my knowledge, yes.
23 Q.   And was there ever a point where Barclays demanded more
24 and Lehman refused, saying no, that ought to be enough for you?
25 A.   No.  Not in ultimately how the deal got done.

51 (Pages 198 - 201)

Page 214

- 214 -

1 the opening day of 3.38 billion, the deal would not be in
2 balance. Is that correct?
3 A. The deal would not be in balance using all of the assets
4 and liabilities as we collectively divined the total value of
5 the transaction. That's correct.
6 Q. And the deal you made was one to be in balance, correct?
7 A. That's correct.
8 Q. So if the opening day balance sheet for the deal reflected
9 that Barclays had 3.38 billion in equity, that would not be
10 consistent with the deal you made, would it?
11 A. That's correct. But these numbers don't reflect specific
12 parts of that deal.
13 Q. Did Mr. Kelly ever inform you or anyone else, as far as
14 you know, that he was working on an opening day balance sheet
15 for Barclays?
16 A. He did not inform me, to the best of my knowledge.
17 Q. And just turning your attention back to Exhibit 74, sir,
18 to the balance sheet itself, do you see the item for cure
19 payments? I'm just directing your attention to that line.
20 A. In this same document?
21 Q. Yes, sir.
22 A. Yes.
23 Q. You see after that it says, "Placeholder for actual
24 accrual"? Do you have any idea what that meant?
25 A. No. I've not seen the document, so I can't --

Page 215

- 215 -

1 Q. At any point during that week, had it ever come to your
2 attention that the number for cure was just a placeholder for
3 the actual accrual?
4 A. No. We were trying to determine the accurate figures, as
5 I've described before.
6 Q. And the accurate figure would be the amount that Barclays
7 was most likely going to have to undertake?
8 A. Potential to undertake.
9 Q. Okay. And the accrued bonuses of two billion dollars, it
10 says "assumed to be all accrued." Do you have an idea of what
11 that would mean?
12 A. No, I do not.
13 Q. At any point during the week, from the time that you were
14 involved in the initial negotiations through the sale hearing,
15 had you had any concept or had anybody ever said anything to
16 you that that two billion dollars was anything other than a
17 full requirement for Barclays to pay?
18 A. It was a full requirement.
19 Q. If you would turn your attention, sir, to tab 100 in your
20 book, which is Exhibit M-100 in evidence, also BCI Exhibit 132
21 in evidence. You'll see it's a Barclays' results announcement
22 for 2008. If I could ask you, sir, to turn to page 95 of that
23 results announcement. And again, I'll ask you to just skim,
24 sir, directing your attention to the item marked number 11,
25 "Acquisitions." If you'd just read through it enough to become

Page 216

- 216 -

1 roughly familiar with it. There's a particular provision to
2 which I want to direct your attention. Let me know when you've
3 had a chance to look at that.
4     (Pause)
5 A. Okay.
6 Q. Directing your attention, sir, to the penultimate
7 paragraph on that page. I'll read it into the record: "The
8 excess of the fair value of net assets acquired over
9 consideration paid resulted in 2.262 billion pounds sterling of
10 gains on acquisition."
11     I'll represent to you, sir, that that translates to about
12 4.2 billion dollars on that day. Was a 4.2 billion dollar gain
13 derived from excess of the fair value of net assets acquired
14 over consideration paid on acquisition, contemplated by the
15 deal you made?
16 A. No.
17 Q. Did anybody ever suggest otherwise to you in the period
18 between September 15th, when the negotiations began, and the
19 conclusion of the sale hearing, at shortly after midnight on
20 the 20th of September?
21 A. No.
22 Q. Did anybody ever suggest otherwise to you in the period
23 between the end of the sale hearing, shortly after midnight on
24 the 20th of September and the closing on the 22nd of September?
25 A. No.

Page 217

- 217 -

1 Q. Did anybody ever suggest that to you at any other time?
2 A. The first I saw it was when we talked about it at the
3 deposition.
4 Q. That would be September of 2009?
5 A. Correct.
6 Q. Now, in that provision, sir, there's a reference to the
7 fair value of net assets. Was that part of your calculus in
8 determining whether or not the deal was a wash?
9 A. I can't comment on the term used in Barclays' document.
10 Q. I think I'm confusing the picture here.
11 A. Okay.
12 Q. Shut the book. Let's not talk about that document. I
13 want to get an -- I want to know what your conception was, Mr.
14 McDade. When you had reached your conclusion that the deal was
15 a wash, that it was a rough equivalent exchange of assets and
16 liabilities, you took into account that the liabilities had
17 some value, correct?
18 A. That's correct.
19 Q. So the deal couldn't be done irrespective of the value of
20 those liabilities, correct?
21 A. That's correct.
22 Q. And the formula you had to determine whether it was an
23 equivalent exchange of assets and liabilities took into account
24 the value of the assets, correct?
25 A. Yes.

55 (Pages 214 - 217)

# Exhibit 40

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              April 27, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

- 38 -

1 opinion that people engage in all the time. So he's not really
2 being asked as an expert. He's being asked, in his capacity as
3 a senior officer of Lehman at the time, his belief. I can
4 weigh it for whatever probative value it has which may be zero.
5 He can answer the question.
6 Q.  I think you -- did you answer the question?
7 A.  I think I did.
8 Q.  And just for the record, what was the answer?
9 A.  If you could --
10 Q.  I'll put the question again.
11     MR. GAFFEY:  Your Honor, I can stipulate the answer
12 was "No, I did not."
13     MR. BOIES:  Okay.
14     MR. GAFFEY:  The beauty of LiveNote again, Your Honor.
15 And why -- why was that?
16 A.  I had worked with all of the individuals that potentially
17 were part of that conflicted group for a long period of time.
18 In fact, in most cases, well into decade plus I knew them of
19 great integrity.  And I think I described in my deposition, I
20 knew they bled Lehman green.
21 Q.  Now, you are now aware that there came a time when the
22 Barclays transaction was considered by the Lehman board,
23 correct?
24 A.  Yes.
25 Q.  You were not personally involved in any of the board

- 39 -

1 meetings relating to the Barclays transaction, correct?
2 A.  I don't have a recollection of that.
3 Q.  You reviewed the APA prior to the time it was signed to
4 make sure that it accurately reflected the final agreement,
5 correct?
6 A.  Yes, I did.
7 Q.  After the APA was signed, is it fair to say that the
8 valuation process started all over again at the end of that
9 week?
10 A.  The valuation process continued through the week, yes.
11 Q.  And at some point it became clear that the securities that
12 could be delivered to Barclays had decreased significantly
13 between Tuesday when the APA was signed and Thursday.
14 A.  The composition of the assets had changed dramatically,
15 yes.
16 Q.  And that was, in part, because of market decline, correct?
17 A.  In part, yes.
18 Q.  And it was, in part, because there was some collateral
19 stuck at JPMorgan?
20 A.  Correct.
21 Q.  And it was, in part, because Lehman's positions had been
22 wiped out or closed out at a number of places, correct?
23 A.  That's correct.
24 Q.  Can you describe some examples of where Lehman positions
25 were wiped out or closed out during the course of the week of

- 40 -

1 September 15th?
2 A.  I would use the example of the call that we got late in
3 the week from the CME with respect to positions that we had had
4 on that exchange.
5 Q.  And what happened there?
6 A.  Despite our asking for it not to happen, our positions
7 were put out into an open auction process.  And ultimately, we
8 were taken out of those positions and the margin associated
9 with those positions.
10 Q.  Let me be sure I understand what you're saying there.  At
11 the CME, you had certain positions and you had certain margin
12 on deposit as collateral for those positions, correct?
13 A.  That's correct.
14 Q.  And when your positions were closed out by the CME, you
15 lost your margin or collateral, correct?
16 A.  Correct.
17 Q.  And how much was involved there approximately, if you
18 recall?
19 A.  I don't have the specific recollection but it was in
20 excess of a billion dollars, to the best of my recollection.
21 Q.  Now, you were asked some questions about the repo
22 financing.  Do you recall that?
23 A.  Yes.
24 Q.  And just for context, that was financing that was
25 originally provided by the Fed to Lehman Brothers, is that

- 41 -

1 correct?
2 A.  Yes, it is.
3 Q.  And then on the week of September 15th, the Fed asked
4 Barclays to substitute Barclays for the Fed, correct?
5 A.  Yes, it did.
6 Q.  And so it was necessary, as part of this process, for
7 there to be the same kind of valuation of the assets included
8 in the repo as had been done previously in the week, correct?
9     MR. GAFFEY:  Objection.
10     THE COURT:  What's the basis for the objection?
11     MR. GAFFEY:  Foundation, Your Honor.  No personal
12 knowledge of how the repo valuations were done.
13     THE COURT:  All right.  That objection is sustained.
14 We can ask a few questions to get to the same point.
15 Q.  Do you have any understanding one way or the other as to
16 whether the process for valuing the repo assets was the same
17 process that you have described that went on earlier in the
18 week in terms of trying to value Lehman's assets?
19 A.  I have an understanding that the process would have been
20 similar, yes, and many of the assets would have been the same
21 assets.
22 Q.  Let me follow up on that.  What do you mean by many of the
23 assets would have been the same assets?
24 A.  The inventory from Schedule 19 was -- and the marked
25 process that we went through, that was originally financed

11 (Pages 38 - 41)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 46

- 46 -

1 those negotiations, correct?

2 A. That's correct.

3 Q. Who was involved in the negotiations with respect to

4 exchange-traded derivatives and their collateral?

5 A. I don't have a specific answer or knowledge of that.

6 Q. Okay. You did recognize at the time that the margin or

7 collateral that Lehman had with respect to exchange-traded

8 derivatives, including at the OCC, could be wiped out if those

9 positions were closed, correct?

10 A. It had happened during the week already as an example with

11 the CME so yes.

12 Q. And the OCC was, in fact, threatening to close out

13 Lehman's positions, correct, during that week?

14 A. I have no knowledge of that.

15 Q. One way or the other?

16 A. No idea.

17 Q. And because of what had happened at the CME, you had no

18 confidence that Lehman would ever realize any value from the

19 margin or collateral that it had at OCC, correct?

20 A. No. I wouldn't make that a correct statement, no.

21 Q. Let me ask you to look at page 275 of your deposition and,

22 particularly, at line 3. And perhaps, for context, let me go

23 to page 274, line 20:

24 "Q. And those are positions and derivatives that LBI had?

25 "A. Yes, exchange-traded.

Page 47

- 47 -

1 "Q. The exchange-traded, do those include derivatives that

2 were traded on the Options Clearing Corporation or OCC?

3 "A. Yes.

4 "Q. Did you understand that in addition to the long positions

5 and the short positions that Lehman had at OCC, it also had

6 additional cash and assets that were deposited as margin and

7 also clearing funds deposited at the OCC?

8 "A. Yes, I did. But keep in mind the context, that we had had

9 assets like that, for example, at the CME and they lost those

10 assets over the course of the week. So we had no confidence

11 that those were potentially our assets given what had been

12 transpiring."

13    Do you see that?

14 A. Yes.

15 Q. And was that accurate testimony at the time you gave it?

16 A. That was accurate testimony, sir. I wouldn't have used

17 those assets in a transaction of -- because I wasn't confident

18 that we had those assets to give.

19 Q. Right. So you didn't have any confidence you had those

20 assets to give at that time?

21 A. Correct.

22 Q. And you didn't have any confidence, as you say here, "that

23 those were potentially our assets given what had been

24 transpiring", correct?

25 A. Correct.

Page 48

- 48 -

1 Q. Let me turn to the subject of compensation and the

2 exposure to compensation that Barclays was taking over. First,

3 you were present when a proffer was given to the Court

4 concerning what your testimony would have been with respect to

5 this subject matter, correct?

6 A. Yes, I was.

7 Q. And the Court was told that you would have testified that

8 the exposure for employees -- Barclays' exposure for employees

9 that accepted offers of employment was estimated to be an

10 exposure of approximately two billion dollars, correct?

11 A. That's correct.

12 Q. And you recognized that that was Barclays' exposure. It

13 was not necessarily what Barclays would actually end up paying,

14 correct?

15 A. Yes.

16 Q. And I'd like to go through some of the components of that

17 exposure. It included bonuses that Barclays was obligated to

18 pay employees, correct?

19 A. It included bonuses that Barclays would be paying

20 employees, yes.

21 Q. That is, it included an exposure -- I said obligated and I

22 shouldn't have. And you corrected me and that's correct -- and

23 I appreciate that. This included bonuses that Barclays was

24 exposed to possibly paying, correct?

25 A. Correct.

Page 49

- 49 -

1 Q. And the bonuses that Barclays was exposed to possibly

2 paying employees were greater than the bonuses that were

3 accrued on Lehman's books, correct?

4 A. That's correct.

5 Q. And that was true for a number of reasons, correct?

6 A. That's correct.

7 Q. One of the reasons is that the bonuses that had been

8 accrued had not been annualized, correct?

9 A. They represented three-quarters of the year, yes.

10 Q. Another reason is that Lehman paid bonuses both partly in

11 stock and partly in cash, correct?

12 A. That's correct.

13 Q. And Lehman gave a higher proportion of its bonus in stock

14 than other Wall Street firms, correct?

15 A. Yes, we did.

16 Q. And Lehman only accrued on its books that portion of the

17 bonus that represented the cash portion, correct?

18 A. Correct.

19 Q. Now, in addition, Barclays was exposed to possibly paying

20 severances for people that were terminated, correct?

21 A. Barclays was definitively exposed to severance for those

22 that wouldn't be hired after the ninety-day period.

23 Q. And the amount of severance would depend on how many

24 people were actually terminated, correct?

25 A. How many people and a constituent of who those people

13 (Pages 46 - 49)

LEHMAN BROTHERS HOLDINGS INC., et al.

- 50 -

1 were.

2 Q.  That is, how much severance they were due.

3 A.  Correct.

4 Q.  In addition, Barclays was required to hire all of Lehman's

5 employees at the time of the closing, correct?

6 A.  Yes, that's correct.

7 Q.  And it was required to keep those people employed, I

8 think, for -- was it ninety days?

9 A.  Ninety days.

10 Q.  So Barclays was also exposed to paying the salaries of

11 people that it didn't want for that ninety-day period, correct?

12 A.  Yes.  I agree.

13 Q.  Did you make any effort to determine how much Barclays was

14 exposed to pay for employees that it was taking on in addition

15 to what was on Lehman's books?

16 A.  Did I personally?

17 Q.  Yes.

18 A.  I personally had reviewed the process that had taken place

19 between mostly the human resources teams on both sides.  But I

20 personally did not go through the specific information or the

21 specific data.

22 Q.  Based on your review of what the two sides had done, did

23 you think that the estimated exposure that they had come up

24 with was a reasonable one?

25 A.  Yes.  I thought it was fair.

- 51 -

1 Q.  Okay.  Let me turn next to something that has been

2 referred to sometimes as cure payments.

3 A.  Yes.

4 Q.  And you're familiar with that term, are you not?

5 A.  Yes, I am.

6 Q.  And the fact that Barclays had certain potential cure

7 payments to make was one of the things that was included in the

8 consideration of the deal that you were involved in, correct?

9 A.  Yes, it was.

10 Q.  Now, Lehman had on its books certain estimates of cure

11 payments, correct?

12 A.  Yes.

13 Q.  Now, the cure payments that were on Lehman's books only

14 included cure payments that were already overdue, correct?

15 A.  I'm not aware in that specific detail.

16 Q.  Okay.  That is, you don't know whether the numbers on

17 Lehman's books included cure payments for what the estimate was

18 that was going to be owed or only what was already past due?

19 A.  Yes.  I have no knowledge of that.

20 Q.  Okay.  Did some of the vendors that provided services and

21 that were owed money provide invoices to Lehman's affiliates

22 rather than to LBI directly?

23 A.  I have no knowledge of that.

24 Q.  Do you know whether the cure estimates on Lehman's books

25 included amounts owed to vendors who performed services for

- 52 -

1 LBI's business but who had contracts with Lehman affiliates?

2 A.  I have no knowledge of that.

3 Q.  Do you know whether the cure payment accrual numbers on

4 Lehman's books included amounts owed for services that had

5 already been performed but for which the vendor had not sent an

6 invoice?

7 A.  I have no knowledge of that.

8 Q.  Do you know whether the accrual payments on Lehman's books

9 included amounts for services to be performed during the sixty-

10 day period following closing which Barclays was required to pay

11 under Section 2.5 of the APA.

12 A.  I have no specific knowledge, again, of that.

13 Q.  Did you participate in coming up with the cure estimate

14 that was included in some of the schedules relating to this

15 transaction with Barclays?

16 A.  I did not participate in a specific way, no.

17 Q.  Who was responsible for that?

18 A.  That would have been Martin Kelly, the controller.

19 Q.  Did you recognize that whatever estimate Mr. Kelly came up

20 with represented a ceiling or maximum exposure.

21 A.  It was described as a potential exposure.

22 Q.  A potential exposure.  And you recognized that that

23 exposure might or might not actually result in payments by

24 Barclays, correct?

25 A.  Yes.  Yes, I did.

- 53 -

1 Q.  And you understood that Barclays had sixty days under the

2 agreement to determine which contracts to assume, correct?

3 A.  Yes, I did.

4 Q.  And which contracts Barclays assumed would determine what

5 its cure payments were, correct?

6 A.  That's correct.

7 Q.  And the process of determining what contracts Barclays was

8 going to assume was not going to start until after the closing,

9 correct?

10 A.  It couldn't start until after the closing given all the

11 significant integration issues that had to take place.

12 Q.  And you understood that Barclays had complete discretion

13 as to what contracts to accept and what contracts to reject,

14 correct?

15 A.  Yes, I did.

16     MR. BOIES:  Your Honor, may I have a moment?  Or would

17 this be a convenient time for the --

18     THE COURT:  You may have more than a moment if you'd

19 like a --

20     MR. BOIES:  Thank you.

21     THE COURT:  We're very close to our morning break.

22     MR. BOIES:  Thank you, Your Honor.

23     THE COURT:  Are you --

24     MR. BOIES:  Could we take a break now?

25     THE COURT:  Are you ready for a break?  That's fine.

14 (Pages 50 - 53)

LEHMAN BROTHERS HOLDINGS INC., et al.

- 122 -

1 still be used in the same manner.

2      MR. GAFFEY:  Thank you, Your Honor.

3 BY MR. GAFFEY:

4 Q.  Mr. Berkenfeld, would you take a look through Movants'

5 Trial Exhibit 254, and tell me if the collection of schedules

6 annexed to that document are documents -- are documents of the

7 type that you saw before you signed Movants' Exhibit 2?

8 A.  I don't recall having seen any of these schedules.  I

9 certainly don't recall any schedule that had two columns in it,

10 like the one on page 1 and 2.  This -- I've never seen these

11 before.  I've never seen the cover note.  I have no knowledge

12 of this.

13 Q.  Now, do you recall, sir, that when the final schedule, the

14 one that you initialed, was put together, it was delivered into

15 the room of negotiators by Mr. Kelly and Mr. Tonucci?

16 A.  I recall that it was delivered into the room of lawyers,

17 not negotiators, in the corner conference room where everyone

18 was sitting around the table working through the agreement.

19 That's where I saw it.  I don't know what was delivered into

20 the negotiators.

21 Q.  So what you remember is Mr. Kelly and Mr. Tonucci bringing

22 that schedule into the room for lawyers working on the drafting

23 of the asset purchase agreement?

24 A.  My recollection is I remember Martin Kelly bringing it in,

25 not them bringing it in together.

- 123 -

1 Q.  Now, do you know the source of the numbers on Movants'

2 Exhibit 2?

3 A.  I do not.

4 Q.  Well, you know, sir, that it was from the finance

5 department, correct?

6 A.  Yes.

7 Q.  And by the finance department, you included Kelly and

8 Tonucci, correct?

9 A.  Yes.

10 Q.  And the adjusted total assets number on that schedule,

11 sir, of 72.65 billion, do you recall, sir, that this was an

12 estimate of the assets that would be transferred over from

13 Lehman to Barclays?

14 A.  Maybe it's best if I describe what I thought this schedule

15 was?

16 Q.  I don't mean to be rude, sir, but if you'd answer my

17 question --

18 A.  Could you repeat your question?

19 Q.  -- I would prefer it.  Do you recall that schedule

20 was an estimate of the assets that would be transferred over

21 from Lehman to Barclays?

22 A.  I viewed this schedule as an estimate, as guidance, of

23 what the allocation of securities would be that was referenced

24 in the purchase agreement.  The reason it was important to me,

25 important enough to initial, is that the purchase agreement

- 124 -

1 said that there would be assets with a book value of

2 approximately seventy billion and it listed government

3 securities, commercial paper, corporate debt, corporate equity.

4 It didn't say whether that was sixty-nine billion of government

5 securities and one billion of corporate equities or whether it

6 was one billion of government securities and sixty-nine billion

7 of corporate equities.  It just said seventy billion of all

8 these different types of securities.  And to me the

9 significance of this schedule was that it gave guidance, a

10 rough estimate of how that seventy billion -- and also on the

11 liability side, too, on the short positions, how that was

12 allocated across these very different -- different risk

13 profile, different volatility securities.  So, it mattered to

14 me a lot whether the government number was forty, as indicated,

15 or sixty-nine or one.  And so, to me the significance of the

16 schedule was not that it defined the agreement, it was not part

17 of the agreement.  It wasn't attached to the agreement.  It

18 really -- it wasn't incorporated by reference.  The agreement

19 was the purchase agreement.  To me, the point of this was to

20 provide some guidance around what was meant by the purchase

21 agreement when there was a number for long positions and a

22 number for short positions.

23 Q.  And the long position that you're referring to is the long

24 position described in the asset purchase agreement itself, yes?

25 A.  Yes.

- 125 -

1 Q.  And what this schedule is meant to do is to take that

2 seventy billion dollar book value long position described in

3 the asset purchase agreement and break it down into its

4 component parts?

5 A.  That's correct.

6 Q.  And the reason that that adds up to more than seventy

7 billion is it also takes into account the residential -- the

8 resis, the mortgage basket, correct?

9 A.  Yes.  The mortgages were covered in another subsection of

10 the purchase agreement.

11 Q.  Okay.  When you take the 2.7 shown on the asset side for

12 mortgages out of the total of assets, you come to roughly the

13 seventy billion dollar book value long position described in

14 the asset purchase agreement, is that right?

15 A.  That's correct.

16 Q.  And that's how that schedule relates to the asset purchase

17 agreement that was executed on the 16th of September, correct?

18 A.  In my mind that's how it related, yes.

19 Q.  And that's what you mean when you describe it as guidance

20 for the deal, is that right?

21 A.  A guidance for that provision of the asset purchase

22 agreement, yes.

23 Q.  And in total, it was guidance for the value of the total

24 assets that it purported to allocate that would be transferred

25 in the long position, correct?

Page 130

- 130 -

1  Q.  Do you have your deposition there?

2  A.  Yes, I do.

3  Q.  Could you turn to page 62, please?  And directing your

4  attention to line 20 through page 63, line 7.  Are you there?

5  A.  Um-hmm.

6  Q.  And you, just for context, sir, you'll see that Movants'

7  Exhibit 2 was Deposition Exhibit 19?  You notice that?  I just

8  want to put the question in context for you.

9  A.  Um-hum.

10  Q.  Okay.

11  A.  Yes.

12  "Q.  Again, for 19, sir, do you know if the figures there on

13  the asset side for those asset classes of government agency,

14  commercial paper, etcetera, bore any relation to the marks at

15  which they were shown on Lehman's books?

16  "A.  My understanding is that they were based on the marks.

17  "Q.  How did you get that understanding?

18  "A.  From the same source.  Again, in the delivery of the

19  schedule from Martin and Paolo.

20  "Q.  Did they say something to you?

21  "A.  I don't recall exactly what they said."

22      Were those answer's truthful when you gave them at your

23  deposition?

24  A.  They were and I think they're consistent with what I said.

25  The valuations were based on marks that started as of Friday

Page 131

- 131 -

1  and then were revised to reflect what the mark should have been

2  as of Monday and Tuesday.

3  Q.  We'll come to that, sir.

4  A.  Okay.

5  Q.  Was that truthful testimony when you gave it?

6  A.  Yes.

7  Q.  Your understanding is that the figures on the schedule

8  that were delivered to you by Kelly and Tonucci were based on

9  Lehman's marks?

10  A.  Well, I said they were based on "the" marks.  When you say

11  just "the" marks --

12  Q.  Do you think they were based on Barclays' marks, sir?

13  A.  No.

14  Q.  All right.  What marks were you referring to when you said

15  "the marks" in your deposition?  Are you referring to Lehman's

16  marks?

17  A.  I don't think we had then current marks as of Monday.

18  It's sort of within the context of what was going on where we

19  had just filed for bankruptcy and the markets were as chaotic

20  as imaginable.  I don't think that there was a real time

21  marking going on by these guys at a Lehman system independent.

22      So, based on the marks at the time -- there wasn't a close

23  of books on Monday with Lehman's marks in the ordinary course

24  of business, as I understand it, like there had been for all

25  the prior days in the week before and the years before.  It was

Page 132

- 132 -

1  a different situation, different context.  Do I believe that

2  they were based on the marks?  Yes.  Do I believe that they

3  started with the marks on Friday to arrive at marks that were

4  relevant for Monday and then Tuesday?  Yes.

5  Q.  So, at your deposition when you said, "My understanding is

6  that they were based on the marks", what you were trying to

7  tell me was they were based on Friday's marks as adjusted into

8  Monday based on a process in which you were not involved.  Am I

9  understanding your testimony correctly, sir?

10  A.  No.  At the time I gave -- I answered a question that you

11  posed to me at the time and you didn't ask me any follow-up

12  questions at the time.  And that was a truthful answer at the

13  time.  They were based on the marks.  But it was a more

14  complicated question and it required a more complicated answer.

15  Q.  I just want to explore a little bit by you meant with the

16  two word phrase, "the marks" at your deposition.  By "the

17  marks", did you mean the number that was generated through a

18  process that was not in the ordinary course of business to

19  generate what should have been the marks?

20  A.  I meant they were based on the then relevant current

21  marks.

22  Q.  And the then relevant current marks were as of the 16th of

23  September when that schedule marked as M-2 was generated?

24  A.  Yes.

25  Q.  And that's what the asset purchase agreement described it

Page 133

- 133 -

1  to be.  Is that correct?

2  A.  The asset purchase agreement, again, separating the

3  schedule and the asset purchase agreement, the asset -- the

4  schedule was not part of the asset purchase agreement.  It very

5  easily could have been.  It would have taken two words to

6  attach it to the back of it and say this is what we mean by

7  book value of seventy billion of securities positions.  It

8  wasn't.  It deliberately wasn't.

9      Again, I think that the significance of the schedule is

10  somewhat overstated.  You know, there were a lot of

11  sophisticated lawyers in that room from the top law firms.

12  They knew that schedule was being prepared.  It would have been

13  a very simple matter to just incorporate it and it wasn't done.

14  It was not meant as part as the asset purchase agreement.  And

15  I think -- you know, I said that at the time of my deposition

16  too.

17  Q.  Would you take a look, sir, at the asset purchase

18  agreement which is in evidence as Exhibit M-1?  It's in your

19  book.  And turn to page -- well, first let's turn to the last

20  page.  And just for the sake of good order, sir, is that your

21  signature?

22  A.  For Lehman Brothers Holdings and Lehman Brothers, Inc.,

23  yes it is.

24  Q.  You signed for both entities?

25  A.  Yes.

34 (Pages 130 - 133)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 166

- 166 -

1  A.  I didn't really focus on those two parts in the context of
2  the schedule.  I think that for those two lines, I look to the
3  asset purchase agreement.
4      Going back to what I testified before, to me, the purpose
5  of the schedule was to allocate the securities positions to be
6  clear, those assets; the governments, the corporate debt, the
7  corporate equity, and the short positions, trading positions.
8      Again, the schedule is not the agreement.  It was not
9  meant to be a balance sheet of the deal.  It just never had
10  that significance to it; that meaning.  And we had a lot of
11  lawyers sitting around the table.  We all could have agreed or
12  someone could have suggested let's put this on the back of the
13  agreement.  Let's submit it to the Court.  None of that was the
14  purpose of this agreement.  It was relevant as guidance to how
15  those securities positions should be allocated because without
16  it, there were lots of different ways it could have been
17  allocated.  And it was changing and I did initial it and say
18  this one should be final so we have a sense that out of that
19  seventy billion, forty is governments.  Not one, not sixty-
20  nine.
21      But with regard to compensation and cure payments, in my
22  mind, the cure payments and the compensation were dealt with
23  specifically in the asset purchase agreement and I would look
24  to the asset purchase agreement in terms of what the
25  obligations of the parties were.

Page 167

- 167 -

1  Q.  Do you have your deposition transcript there?
2  A.  Yeah.
3  Q.  Would you turn to page 104, please and directing your
4  attention to 104 at line 13 through 105, line 4.
5      MR. GAFFEY:  Steve, would you put the schedule up
6  there so we can see its deposition exhibit number?  The whole
7  thing.  Shrink it.
8  Q.  Just before I read that to you, sir, you recall that this
9  schedule we've been talking about today, marked as M-2, was
10  Deposition Exhibit 19 at your deposition?  You can take a look
11  at the tag on it.
12  A.  I'm sorry, the tag 19 on my deposition?
13  Q.  No, sir.  Take a look at the tab -- actually, if you --
14  can you see the screen?
15  A.  Yes.
16  Q.  You see that's called "Deposition Exhibit 19" as well?
17  A.  Yes.
18  Q.  Okay.  I just want you to understand the question as I
19  read it to you.
20  A.  Okay.
21  Q.  And now, back on page 104 of your deposition starting at
22  line 13.
23  "Q.  Did anyone ever suggest to you in sum or substance, sir,
24  when you saw the financial schedule marked as Exhibit 19 that
25  the comp and cure numbers were just plug numbers to make it

Page 168

- 168 -

1  balanced?
2  "A.  To my recollection, no one had ever suggested that to me.
3  "Q.  Was it the contemplation?  Was it part of the structure of
4  the transaction that Barclays was, in fact, going to undertake
5  to assume liabilities in roughly the amounts guided by the
6  schedule marked as Exhibit 19?
7  "A.  I believe it was the understanding that Barclays would
8  assume liabilities that were at the time estimated roughly to
9  be in this amount."
10      When I asked that question and you gave that answer, was
11  that truthful testimony, sir?
12  A.  Yes, it was.  I should have said I believe it was my
13  understanding.  I can't speak to others, but yes.  And I think
14  that's consistent with what I just said.
15  Q.  Okay.  So, let's go back to the question I asked you a
16  moment ago with regard to Exhibit M-2, the financial schedule.
17      MR. GAFFEY:  Can we have that up here, please, Steve?
18  Q.  Now, do you recall I asked you a few moments ago whether
19  or not the comp and cure numbers were plug numbers to make this
20  sheet appear to be balanced?  You told me, no.
21  A.  That's correct.
22  Q.  Okay.  And then I asked you if -- whether it was the
23  contemplation, was it part of the structure of the transaction
24  with Barclays, in fact, was going to assume -- was going to
25  undertake to assume liabilities in roughly the amounts guided

Page 169

- 169 -

1  by that exhibit, M-2?
2  A.  I believe my answer was I wasn't looking at the schedule
3  for guidance for that.  I wasn't looking to the schedule.
4  There was an understanding, my understanding, my impression,
5  that there would be comp and cure payments in about those
6  amounts and my recollection, again, from reading things before
7  testimony was that the numbers that were represented to the
8  Court around comp and cure payments were not those numbers.
9  They were two and half for comp and one and a half for cure, I
10  think.  But regardless, the cure payments was something that
11  was going to be determined over time.  And there might have
12  been estimates that were made; I'm not sure where they came
13  from.  But I didn't view this as a obligation on the part of
14  Barclays to assume cure payment liabilities of 2.25 billion.  I
15  didn't think the schedule stood for that.  And I didn't think
16  that the schedule stood for that there was an obligation to pay
17  comp for two billion.
18      From the person who initialed it, that's not what I
19  thought this schedule was.  I think there were provisions on
20  the asset purchase agreement on those points.  It would have
21  been easy enough to incorporate those numbers to get the
22  schedule to bring those numbers into the asset purchase
23  agreement or to make the schedule part of the asset purchase
24  agreement and that wasn't done.
25  Q.  And with regard to the schedules, sir, when the agreement

43 (Pages 166 - 169)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 170

- 170 -

1 that was going to be submitted to the Court was finalized, was
2 it your understanding that Barclays would assume liabilities
3 that were estimated roughly in those amounts?
4 A.  My understanding, when it was presented to the Court, was
5 that Barclays could be assuming liabilities up to the amounts
6 that were presented to the Court, not based on what was in the
7 schedule.
8 Q.  Now, when you say Barclays could have been assuming
9 liabilities up to the amounts, did you track whether the Court
10 was told that the estimates of liabilities for comp and cure
11 were ceilings as opposed to estimates of what Barclays actually
12 would pay?
13 A.  Poor choice of words on my part to say up to but I don't
14 think it was -- I don't recall it being a ceiling.  I think it
15 was for cure payments an open-ended question.  It depended on
16 what -- what contracts were going to be assumed and what
17 Barclays felt it needed to conduct the business in the ordinary
18 course.
19 Q.  Let's talk about the comp number for a minute.  Let's stay
20 away from what contracts would be assumed.  We'll come to that,
21 but let's look at the comp number for a minute.  Was it your
22 understanding when you signed the asset purchase agreement that
23 Barclays was going to pay compensation amounts in roughly the
24 amount shown on Exhibit M-2, two billion dollars?
25 A.  My understanding of the comp amount came from the asset

Page 171

- 171 -

1 purchase agreement.  It didn't come from the schedule.
2 Q.  Sir, I'm going to have to ask you look again at page 104
3 of your deposition starting at line 20 and reading over to line
4 4 on page 105.  Question --
5     MR. SCHILLER:  Your Honor?
6     THE COURT:  Yes.
7     MR. SCHILLER:  Respectfully, I would like to object on
8 the grounds of completeness and ask that my friend read the
9 next question and the next answer as well.  That is line 5 on
10 page 105 through line 24 on that page, Your Honor.  Thank you.
11     THE COURT:  Okay.  There's been a request for some
12 additional context.
13     MR. GAFFEY:  Can I read what I want and get an answer,
14 and then I'll read that?  How's that?
15     THE COURT:  That sounds fine to me.
16     MR. SCHILLER:  I object to that.
17     THE COURT:  Well, this is -- this is the examination
18 within the movant's case of a current Barclays employee and
19 without getting into who's hostile to whom at this point, I'm
20 going to let the questioning proceed in the manner proposed by
21 Mr. Gaffney over your objection.  He'll then read the material
22 that you'd like him to read and, trust me, I can process this
23 information in whatever order it's presented.
24     MR. SCHILLER:  I appreciate it, Judge.
25     THE COURT:  Thank you.

Page 172

- 172 -

1 BY MR. GAFFNEY:
2 Q.  So, Mr. Berkenfeld, let's go back to page 104, line 20, of
3 your deposition through 105, line 4.
4 "Q.  Was it the contemplation, was it part of the structure of
5 the transaction that Barclays was in fact going to undertake to
6 assume liabilities in roughly the amounts guided by the
7 schedule marked as Exhibit 19?
8 "A.  I believe it was the understanding Barclays would assume
9 liabilities that were at the time estimated roughly to be in
10 this amount."
11     Was your testimony in response to that question truthful
12 at the time you gave it?
13 A.  Yes, it was and I didn't say in my answer "guided by the
14 schedule".  That was in your question.  It was not in my
15 answer.  I said that "it was my understanding that Barclays
16 would assume liabilities that were at the time estimated
17 roughly to be in this amount" but I didn't think it was guided
18 by the schedule.
19 Q.  Let's -- can we -- I just want to go back to this.  So,
20 when I ask you was it -- the contemplation, "was it part of the
21 structure of the transaction that Barclays was, in fact, going
22 to undertake to assume liabilities in roughly the amounts
23 guided by the schedule marked as Exhibit 19", are you telling
24 us now your answer had nothing to do with whether it was guided
25 by the schedule marked as Exhibit 19?

Page 173

- 173 -

1 A.  I think the distinction I'm trying to make, which I was
2 making before, is that --
3 Q.  Sir, with respect, could I have an answer to the question
4 I asked?  My question was when I asked you a question that
5 ended "in roughly the amounts guided by this schedule marked as
6 Exhibit 19", was your answer meant not to relate to the amounts
7 guided by the schedule marked in Exhibit 19?  That's a yes or
8 no question, sir?
9 A.  Then I guess my answer is, no.
10 Q.  So, you understood the question that I asked you "to
11 include whether or not the amounts were guided by the schedule
12 marked as Exhibit 19" when I asked you that question?
13 A.  I don't remember what I was thinking at the time but what
14 I was saying was that the amounts, the rough estimates, were
15 consistent.  They weren't guided by the schedule.  It's a
16 comment I've been making throughout my testimony.
17     The schedule is not the agreement.  It wasn't even
18 attached.  These numbers weren't brought in.  So, I didn't view
19 the deal -- let's talk about the tail wagging the dog.  I
20 didn't view the schedule as guiding the deal.  The schedule to
21 me had a purpose of allocating assets.  The asset purchase
22 agreement was the deal between the parties, not the schedule.
23 It was not meant to be a balance sheet of the transaction.  I've
24 never viewed it that way.  I didn't initial it in that context.
25 It doesn't include all the elements of the transaction.  It

44 (Pages 170 - 173)

Page 174

- 174 -

1  wasn't contemplated that way.  And so, at the time of my
2  deposition and today, I consistently say that these decisions
3  weren't guided by the schedule.  It makes it sound like the
4  schedule was the agreement between the parties, and it wasn't.
5  The asset purchase agreement was the agreement between the
6  parties.
7  Q.  Did it come to your attention during the week when the
8  hearings were held in this court on the 17th and the 19th that
9  the two billion dollar comp number was given to the Court?
10 A.  My understanding was that a comp number was given to the
11 Court that originally was higher than the two billion but at
12 the time, I think of Friday was at two billion.
13 Q.  And did the two billion dollar number that was given the
14 Court, sir, bear any relation to the two billion dollar number
15 on that schedule?
16 A.  Well, the numbers aren't consistent.
17 Q.  Okay.  Did it bear any relation to the calculation of two
18 billion dollars for comp on that schedule?
19 A.  Bear relation, yes.
20 Q.  And at some point, I believe by the 17th, that is the time
21 between the preparation of this schedule and the submission of
22 the sale motion, the calculation for cure came to 1.5, reduced
23 from two and a quarter, do you recall that?
24 A.  I -- I don't recall how it got from one number to the
25 other.  I wasn't part of those discussions.

Page 175

- 175 -

1  Q.  Okay.  You do recall the fact that it went from two and a
2  quarter to 1.5?
3  A.  I recall that a 1.5 number was presented to the Court.
4  Q.  Okay.  And you were working closely with the lawyers who
5  were preparing and drafting the asset purchase agreement and
6  who were preparing the sale motion to be submitted to the
7  Court, correct?
8  A.  Working closely when?
9  Q.  On the 16th of September.
10 A.  Well, I described before what I was doing, but this was
11 one piece of many things that I was doing.  And so was I with
12 my sleeves rolled up, there around the clock, working through
13 the agreement?  No, that's not correct.
14 Q.  You had a general idea that estimates for comp and cure
15 were being given to the Court as part of the package of
16 materials submitted to seek the Court's approval of a
17 transaction, yes?
18 A.  Yes, that's correct.
19 Q.  And was it your understanding that the estimates for comp
20 and cure that were given to the Court as part of the package
21 for seeking its approval were meant to be understood to be
22 estimates of what Barclays actually would wind up paying?
23 A.  My understanding, my impression, was that they were rough
24 estimates of what Barclays might be paying.  In particular on
25 the cure, though, I think it was -- is extre -- exceedingly

Page 176

- 176 -

1  rough estimate that there were going to be a lot of factors
2  that were going to weigh into exactly what --
3  Q.  Okay.
4  A.  -- it was going to pay.
5  Q.  And -- but the 1.5 that was given to the Court, rough, I
6  hear what you're saying, but the 1.5 was meant to be an
7  estimate to the Court -- an estimate to the Court of what
8  Barclays could wind up paying in cure amounts?
9  A.  My impression of it was it was sort of the -- the best
10 good faith effort -- estimate at the time --
11 Q.  Okay.
12 A.  -- and could be made at the time.
13 Q.  And when you had that understanding that it was the best
14 good faith effort that could be had at the time, did you have
15 any information about what Barclays' plan was with respect to
16 the amounts that it would undertake for contract cure?
17 A.  No, I did not.
18 Q.  And did you have any information as to Barclays' plan for
19 how much it would spend for compensation?
20 A.  No, I did not.
21 Q.  And was it known to you when the schedule was prepared on
22 the 16th of September, that the comp amount shown on that
23 schedule was a billion dollars in excess of the amount accrued
24 on Lehman's books?
25 A.  I was not aware of that.

Page 177

- 177 -

1  Q.  Did that ever come to your attention before the asset
2  purchase agreement was submitted?
3  A.  No, it did not.
4  Q.  Just to return a bit, sir, to the topic of marking books.
5  If you wanted to know whether the books -- whether Lehman's
6  books accurately reflected market values on the 15th or 16th of
7  September, you would ask the chief financial officer, correct?
8  A.  I would start with chief financial officer, Ian Lowitt and
9  the controller.
10 Q.  And another person you would ask would be Martin Kelly,
11 correct?
12 A.  Correct.
13 Q.  Now, do you know if the values that were calculated which
14 wound up being collected in this allocation on Exhibit 2 were
15 done an asset-by-asset basis -- an asset class-by-class basis
16 or any other basis?
17 A.  I don't know.
18 Q.  Did you have any understanding at the time when you signed
19 the schedule?
20 A.  No, I -- I don't think I did.  I wasn't involved in that
21 process, I wasn't participating or observing.  It came to me as
22 more of a completed process.
23 Q.  Now, to your knowledge, sir, none of the lawyers involved
24 in the drafting of the asset purchase agreement were aware of
25 any loss on assets in the structure of the deal?  Is that

Exhibit 41

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              April 28, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

- 30 -

1  Q.  Okay.  Taking a look at the balance sheet that's marked as

2  Movants' Trial Exhibit 2 --

3  A.  Yes.

4  Q.  -- did this balance sheet come to the attention of you or

5  your team members at Weil Gotshal at around the time that the

6  asset purchase agreement was being negotiated?

7  A.  I can only speak for myself.

8  Q.  Sure.

9  A.  There were a number of balance sheets -- or I wouldn't

10  call them balance sheets.  People were sitting at PCs making

11  various assumptions.  You have to understand that the system

12  wasn't exactly working when LBIE, the English entity went into

13  administration in the United Kingdom.  It basically closed down

14  the system.  So getting information was very difficult.

15      Also, in the context of the chaos that prevailed, getting

16  information was very difficult.  So my recollection is seeing

17  people sitting around the table with PCs making assumptions and

18  spitting out paper.

19      I wouldn't call this a balance sheet.  I mean, there's so

20  many zeros on it that I'm not sure what it reflects.

21  Q.  Have you seen the document before?

22  A.  I did see the document before.

23  Q.  When did you first see it?

24  A.  I don't have a specific recollection.  I would say

25  probably on Tuesday or Wednesday.

- 31 -

1  Q.  Okay.  And did you see it in connection with your work

2  regarding the asset purchase agreement?

3  A.  I'm sorry?

4  Q.  What was the context in which you saw it?

5  A.  Probably in connection with the preparation for the

6  hearings.

7  Q.  Okay.  And who provided you with the document?

8  A.  I think it came internally through somebody at Weil.

9  Q.  Okay.  And in preparing Mr. McDade for his testimony at

10  the sale hearing, did you review the document with him?

11  A.  No.

12  Q.  In discussions with your colleagues at Weil Gotshal or

13  with the Lehman businesspeople involved in the drafting of the

14  asset purchase agreement, did you have any discussions with

15  them about the document?

16  A.  No.  By Wednesday of that week, the value of the assets

17  had deteriorated so substantially that this document was

18  virtually useless.

19  Q.  Was there a discussion about that document?

20  A.  There was a discussion about the deterioration in the

21  values.

22  Q.  Was the discussion related to the document marked as

23  Exhibit M-2?

24  A.  No.

25  Q.  And did Weil Gotshal have any role in preparing the

- 32 -

1  document marked as Exhibit M-2?

2  A.  I don't believe so.  I'd be shocked if they did.

3  Q.  Now, I direct your attention, Mr. Miller, to the figures

4  in the lower right-hand corner on the "Liabilities" side.

5  A.  Yes.

6  Q.  -- for "Comp and Cure".  Do you know the basis for those

7  numbers?

8  A.  Well, the cure amount, which I think changed -- I don't

9  recall.  The cure amount was an estimate of the potential

10  exposure in connection with the transaction.  Under the terms

11  of the transaction, there was an opportunity for Barclays to

12  take assignments of executory contracts and perhaps leases.

13  Obviously, in the short time frame, there had been no

14  determination as to what executory contracts or what leases

15  would be assumed.  And a figure was derived as to the potential

16  exposure.  This was a contingent figure.  If they assumed -- I

17  mean, if all those contracts were assumed by the debtor-in-

18  possession and then assigned to Barclays, these -- this amount

19  might be the cure amount.

20      In connection with the compensation, that also was an

21  estimate as to the possible exposure for Lehman employees going

22  over to Barclays who would either be terminated or were

23  entitled to bonuses.  So it was supposed to cover both

24  severance pay and bonuses.

25      And as I said before, it was an estimate.  I don't

- 33 -

1  remember -- I don't recall -- I don't think I ever knew who

2  really made the estimate.

3  Q.  Do you know -- did you ever speak to Martin Kelly about

4  those estimates?

5  A.  I have never spoken to Martin Kelly.  I don't believe I've

6  ever spoken to him up through today.

7  Q.  Have you ever spoken to Paolo Tonucci about those

8  estimates?

9  A.  Oh, yes.  Not this.

10  Q.  About these numbers?

11  A.  Not about these numbers, no.

12  Q.  And I take it from your answer, sir, you don't have

13  knowledge as to how these figures were derived, how they were

14  calculated.

15  A.  They were calculated on the basis of somebody at Lehman

16  reviewing the executory contracts and leases and coming up with

17  the estimate.  On the compensation, I think they looked at the

18  compensation records for 2007.

19  Q.  In the course of dealing with the Barclays side of the

20  table on the negotiations, do you know, sir, if any Lehman

21  personnel or representatives of Lehman personnel inquired of

22  Barclays as to what it planned to pay in terms of comp and cure

23  after the transaction?

24  A.  I think that's covered by the asset purchase agreement.

25  Q.  I'm sorry, sir.  I didn't hear your answer.

9 (Pages 30 - 33)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 114

- 114 -

1  A.  Yes, I do.

2  Q.  Was there -- and you described the melting iceberg which

3  you dramatically reviewed with the Court that important evening

4  of September 19th.  It's 2010 now but that ice cube was melting

5  in September of 2008, wasn't it?

6  A.  I would say with some speed.

7  Q.  Was there time for an integration analysis for Barclays

8  and Lehman as in an ordinary merger, to sit down and see how

9  these businesses could be merged?

10  A.  This was not an ordinary transaction in any sense of the

11  word.

12  Q.  Was there any time --

13  A.  Can I finish?

14  Q.  I'm sorry; yes, sir.

15  A.  This was, as I said before, the most hectic, difficult

16  transaction I've ever been involved in, different from any

17  financial crisis, maybe 10,000 times more difficult than the

18  Refco case in terms of a transaction.

19     In the context that this was not peculiar to Lehman, we

20  were in an economy which was going through the floor and that's

21  why the federal government was actively involved.

22  Q.  And there was precious little time to do a synergistic

23  review of what contracts would be assumed, if those contracts

24  could even be identified and located, correct?

25  A.  I believe that to be correct.

Page 115

- 115 -

1  Q.  There was no way to know what the number for cure would be

2  in the amount of time available to negotiate the sale that

3  week.

4  A.  My recollection is, there were thousands of contracts that

5  had to be reviewed.  We wanted to set up a process that would

6  not be a tremendous burden on the court, were parties would,

7  in effect, negotiate whether the contract should be assumed,

8  cured, defaults waved, etcetera, and there was a process that

9  was being set up, almost like an EDR process.

10  Q.  No one knew what contracts would be assumed?

11  A.  On the 19th and over the weekend certainly not.

12  Q.  And no one knew, on the 19th or over the weekend, whether

13  Barclays would get a bargain from the vendor on any of those

14  contracts?

15  A.  That's correct.

16  Q.  So there was, it's fair to say, a wide range of what

17  Barclays would choose to do and expend between some number and

18  1.5 billion, correct?

19  A.  Could be.

20  Q.  Okay.  You were not concerned, I think you've indicated

21  already, with what Barclays ultimate accounting treatment for

22  cure payments would be, is that right?

23  A.  I didn't have any major concern about that.  The -- how

24  you treat things for accounting purpose always mystified me.

25  Q.  In fact, you generally considered Barclays' accounting

Page 116

- 116 -

1  irrelevant to what you were doing with your colleagues that

2  week?

3  A.  I don't think accounting for negative good will was a

4  particularly important thing.

5  Q.  And with respect to the two billion dollar estimate of

6  exposure for both bonus and severance, which you addressed

7  briefly, that number could be known with precision either

8  because it wasn't known how many employees would accept at

9  Barclays or how many would terminate and for those accepted how

10  long they'd be there.

11  A.  I think I testified to that.

12  Q.  You were asked earlier about discussion of whether to take

13  the clarification letter back to court on the evening before

14  the closing was completed, Sunday night, do you remember that?

15  Subject earlier in the --

16  A.  Over the weekend there was a discussion about that.

17  Q.  Yes, over the weekend.

18  A.  Yes.

19  Q.  Now in April of 2010 our economy is a different place then

20  it was, as you described the economy in the circumstances of

21  Lehman in September 2008, correct?

22  A.  Is the economy different now?

23  Q.  Yes.

24  A.  Then it was back in September of 2008?

25  Q.  It's much improved, isn't it?

Page 117

- 117 -

1  A.  I guess you can say so.  I think the president might say

2  so.

3  Q.  On April 9th, movants said to this Court that it was an

4  egregious mistake for Weil Gotshal and other lawyers involved

5  in Lehman, not to bring the clarification letter back to the

6  Court.

7      MR. GAFFEY:  Misquotes the papers, Your Honor

8      MR. SCHILLER:  "Egregious mistake" is in the

9  transcript, Judge.

10      MR. GAFFEY:  Those two words are in it but not as Mr.

11  Schiller just read it, Your Honor

12      THE COURT:  Right.  It's a misleading question then.

13  Why don't you rephrase it?

14  Q.  If my friend referred to the decision not to bring the

15  clarification letter back as a mistake what is your view of

16  that?

17  A.  The issues was whether there was any material change in

18  the basic transaction which had been presented to the Court.

19  And after discussion with a number of people including, I

20  think, the creditors' committee representatives who where there

21  the conclusion was there was no material change that required

22  going back to the Court.

23      In fact, as late as I, I think, two months after the closing

24  in a meeting with the attorneys for the creditors' committee

25  the question was raised again and the issue, which was

30 (Pages 114 - 117)

# Exhibit 42

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              April 29, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 190

- 190 -

1  doing to understand what we were taking on, and to understand
2  how those things were valued.
3  Q.   And if you were going to err, you were going to err at
4  least on the asset side towards having a lower value than a
5  higher value, correct?
6  A.   As I said earlier, in terms of taking on the assets there
7  was a process which happened, a negotiation process, which I
8  wasn't directly involved in.  It was an arm's length process in
9  terms of Barclays and Lehmans negotiating what the fair market
10  value of the assets were.  As you say that was a very difficult
11  thing in some cases to work out.  But from what I saw it was
12  actually an arm's length, and sometimes acrimonious.  It was
13  quite a difficult process agreeing well what is the value of
14  this asset, and what is a fair value.  So it wasn't something
15  where we were able just to say, you know, the value is X
16  because that was a low value.  There was an arm's length
17  process from what I saw.
18  Q.   I guess what you're describing is some kind of a process
19  by which traders from Barclays and traders from Lehmans sat
20  across from each other and tried to come up with valuations,
21  correct?
22  A.   Yes, that's precisely what I mean.
23  Q.   Is it fair to say that Barclays wasn't bidding up the
24  value of those assets during that week?
25  A.   We were trying to get to the market value of those assets,

Page 191

- 191 -

1  yes.  So --
2  Q.   That generally meant bidding down those prices, correct,
3  sir?
4  A.   At that -- yes, that's correct.  At that time the markets
5  were in freefall, and so we were trying to get the assets to
6  what the current market was.  And, you're right, the markets
7  had all been collapsing at that time.
8  Q.   And you believed, and Barclays believed, did it not, that
9  Lehman's marks for asset classes were too high, correct?
10  A.   Yes.  There were traders, as you said, the traders and the
11  heads of the desk were doing that exercise.
12  Q.   One of the traders that was doing that exercise was Mr.
13  Keegan, right?
14  A.   Yes, that's correct.  He's one of them.
15  Q.   And Stephen King was another one of them?
16  A.   Yes, that's correct.
17  Q.   Okay.  And, Mr. Stephen King, what's his position at
18  Barclays?
19  A.   So Stephen King actually is no longer at Barclays.  But at
20  the time Stephen King was a trader who ran some of the
21  securitized products books, so the asset-backed securities.
22  Q.   And when you describe the asset-backed securities group is
23  that referred to within Barclays as the PMTG group?
24  A.   Yes, it was described.  I'm not sure -- back at that point
25  it was.  But for quite a long period it was described as the

Page 192

- 192 -

1  PMTG group which he ran.
2  Q.   And in terms of the assets that Mr. King was responsible
3  for trading you mentioned securitized products and asset-backed
4  products, correct?
5  A.   That's correct.
6  Q.   And those were the very products that were highly volatile
7  during that particular week, correct?
8  A.   Actually, all the markets were highly volatile during that
9  week.  But, you're right, those illiquid products were probably
10  falling in value more rapidly than the other markets.
11  Q.   And during the course of that week could you briefly
12  describe what was Mr. King's role; what was he doing, what did
13  you observe him doing?
14  A.   So the traders -- and as you said, it wasn't just Mr.
15  King, there were various different traders who were specialists
16  in different areas.  And what they were doing is they were
17  negotiating with their Lehman counterparts, so the traders on
18  the Lehman side, so the people who spent the time in the
19  markets who understood what the markets were doing, what the
20  current market price was.  And I saw Stephen negotiating with
21  his counterparts who were the traders of those products at
22  Lehman.
23  Q.   And from time to time during the week would Mr. King, and
24  other traders like Mr. King, report back to you what the
25  results were with of the negotiations with Lehman?

Page 193

- 193 -

1  A.   Yes.  So some of those traders were coming back to Mr.
2  Ricci and myself with the updates, and where they were in their
3  work.  There were areas where they were getting to agreement,
4  there were some areas where they had disagreement.  I remember
5  at some point when they got to disagreement we, on both sides,
6  said we're not going to come to agreement, so we took some
7  transactions out of the deal because we said we couldn't agree
8  on the price.
9  Q.   Let's just drill down into that a little bit more.  So
10  there were assets or types of particular securities where if
11  you couldn't agree with Lehman on a price those were excluded
12  from the transaction, correct?
13  A.   Yeah, that's what I remember during that first time.
14  Q.   So that's just roughly on the asset side.  Let's just talk
15  a little bit about the liability side, and we'll go back over
16  all of this in more detail.
17      So on the asset side, generally you're being conservative,
18  you're not being a cowboy, and Barclays' view, if any, is to
19  put the values down as opposed to pushing them up, correct?
20  A.   Just to confirm what I said, it -- we were trying to get
21  to a fair market value.  So the market value reflecting that
22  market at that point in time.
23  Q.   And on the liability side, similarly, you had to make an
24  educated guess, an assessment of what the assumed liabilities
25  were going to be, correct?

49 (Pages 190 - 193)

Page 218

- 218 -

1  estimate of the cost of 2 billion, we thought there was a
2  further 700 million which was payable to the rest of the Lehman
3  staff, the people we didn't have and hadn't agreed contractual
4  bonuses to.  And we didn't know at that time whether the rest
5  of the Lehman staff were going to be paid bonuses or whether,
6  when we looked at the Lehman staff and the Barclays staff,
7  there would be overlap, and we'd have to get rid of them, we'd
8  have to have severance costs for those staff.
9  Q.  So that explanation that you just gave us, that's not
10  something you knew on the 16th of September when the schedule
11  came across your desk, correct?
12  A.  The --
13  Q.  Correct?
14  A.  -- I didn't know what the 700 million -- you're right.  So
15  I knew I had an estimate of 2 billion in total.  What I knew
16  was the bit which was a fixed liability at that point, was the
17  1.3.  What I didn't know was how much of the other 700
18  million -- I didn't know the spread of that 700 million.
19  Q.  And in fact, when you looked further into the nature of
20  the comp liability, the assumed liability that was being
21  assumed by Barclays, you realized that, in fact, you would have
22  to account for the full two billion, correct, sir?
23  A.  Yes, you're right.  So --
24  Q.  And you saw that as a 650 million dollar problem when you
25  noticed that, correct?

Page 219

- 219 -

1  A.  -- so I think as I said, when I saw this schedule here --
2  well, sorry, the work we did on this schedule, I thought I was
3  only going to have to accrue 1.3 billion in the acquisition
4  balance sheet.  The other 700 million, which I thought I was
5  going to spend, I thought would be charged against my earnings,
6  so going to my profit and loss account in subsequent months.
7  Yes, you're right.  Later on, when I saw a document which said
8  that the contractual liability I was taking on per the asset
9  purchase agreement was two billion, what I realized was the 700
10  million, which I thought was going to be charged for future
11  earnings, would actually be a liability I'd have to assume on
12  day one against my acquisition balance sheet.
13  Q.  And in fact, that was a big problem for you, because that
14  was 650 million dollars less of negative goodwill -- the result
15  of raising that assumed liability from 1.3 to 2 billion, was it
16  ate into your negative goodwill, correct?
17  A.  Yes.  So whilst it didn't change the economics, it changed
18  the day-one negative goodwill.
19  Q.  And had an impact on your regulatory capital requirements,
20  correct?
21  A.  On the day-one requirements, yes.
22  Q.  Now, the information that you received from Mr. Romain
23  goes on, then, to list consideration and net assets of 5.2
24  billion and the negative goodwill of 3.7 billion, correct?
25  A.  That's correct, yes.

Page 220

- 220 -

1  Q.  And that's the number that then gets reported to the board
2  of directors of Barclays and -- when they're asked to approve
3  this transaction, correct?  It's a number just south of 3.7.  I
4  think 3 billion is what you reported?
5  A.  Yeah.  As I said, there were a number of changes to these
6  documents over time.  So I think this is a slightly different
7  point in time to where we sent stuff to the board of directors.
8  Q.  Well, slightly different was four hours later, correct,
9  sir?
10  A.  Yeah.  And you had to think of a time scale of when this
11  deal was done.  So, you know, this was one o'clock in the
12  morning, having arrived at Lehman's at about middle of the day
13  and done the work.  So four hours later was quite a lot of time
14  in the time scale of this deal.  The deal was consumed over --
15  you know, over twenty hours or so -- overnight.
16  Q.  If you can turn to Exhibit 6 -- tab 6 in your binder?
17     MR. TAMBE:  This document, too, Your Honor, has been
18  admitted into evidence.  It has been admitted into evidence.
19     THE COURT:  All right, fine.
20  Q.  You recognize this cover document -- cover page, as an
21  e-mail from you to James Walker.  Do you see that?
22  A.  Yes.
23  Q.  And who is Mr. Walker?
24  A.  Mr. Walker was our CFO of Barclays Capital in the
25  Americas.

Page 221

- 221 -

1  Q.  And you are forwarding Mr. Walker the board deck.  Do you
2  see that?
3  A.  Yes, I see it.
4  Q.  And the board deck is the document that is attached to
5  this cover e-mail.  Do you see that?
6  A.  Yes, that's correct.
7  Q.  If you look at the time that your e-mail was sent to Mr.
8  Walker, that was on the 16th at 9:52 Greenwich Mean Time, GMT.
9  Do you see that?
10  A.  Yes, I can see that.  I think, as I said, I was in New
11  York.  So that would have been -- I think it was four hours
12  earlier, so 5:52 in the morning, New York time.
13  Q.  And you'd received the other e-mail around 1 or 2 o'clock
14  in the morning?
15  A.  That's right.  Several hours earlier.
16  Q.  All right.  So turning to the board deck -- you may need
17  to turn your binder around for that.
18     (Pause)
19  Q.  You have the executive summary that appears on page 2.
20  You had reviewed this document before forwarding it, correct?
21  A.  Yes.  So at the time, yes, I did see this document.
22  Q.  Okay.  And you had worked with Gary Romain and others in
23  preparing the financial information, the numbers that went into
24  this document?
25  A.  Yes, Gary Romain and team would have fed the financial

56 (Pages 218 - 221)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 254

- 254 -

1  A.  No, the estimates we had -- I think I've told you the
2  estimates we had.  We had a 2.25 billion estimate from Lehman
3  and a 1.5 billion estimate from Lehman.  I think there's one
4  other number which you may be confusing with that which was,
5  there was some critical day-one contracts.  So a subsection of
6  the total supplier contracts were critical day-one contracts
7  which we needed to be in place at the time of the closing.  So
8  we said the business would fall over if those weren't in place
9  on day one.
10      And I think there was a list which -- of those which was
11  submitted to the Court on Friday which I thought came to about
12  200 million or something less than 200 million.  But that --
13  that list wasn't all of the supplier contracts.  It was just
14  the critical day-one contracts we needed to keep the business
15  running over the weekend and into Monday.
16  Q.  So if I understand all of this testimony then, through the
17  week of the 15th to the 22nd, you don't have an estimate of
18  what you are going to incur in terms of cure liability from the
19  Barclays side.  Is that fair?
20  A.  Is that what I said?
21  Q.  You haven't done those calculations?
22  A.  The only estimates we had were the figures we had from
23  Lehman --
24  Q.  And you had received figures from Lehman and you used
25  those figures, correct?

Page 255

- 255 -

1  A.  That is correct.
2  Q.  And you know those figures were submitted to the Court,
3  correct?
4  A.  That's -- yes.
5  Q.  You know that?
6  A.  Yeah, I was aware.
7  Q.  And those figures were used as a component for the
8  consideration for this transaction.  Do you understand that?
9  A.  Yeah, I understand in the agreement we took on various
10  assets, we assumed various liabilities, and those were some of
11  the liabilities we assumed, yes.  That's correct.
12  Q.  Did you believe that any part of the 1.5 billion that
13  Lehman was suggesting as an estimate were costs that you
14  actually expected to incur had you made that decision at any
15  point during the week of the 15th through the 22nd?
16  A.  I think, as I said earlier, we didn't have the ability to
17  make that decision, because we hadn't seen the data, so we
18  hadn't got the data, so we didn't know what we were going to
19  incur and what we weren't going to incur.
20  Q.  And to the extent you had to record any assumed liability
21  for cure, that would have reduced your negative goodwill,
22  correct?
23  A.  No -- well, I think at that point, as I said, in terms of
24  the accounting, I didn't think that -- because of the way the
25  documents were written, I didn't think we could recognize any

Page 256

- 256 -

1  accounting liability in our day-one acquisition balance sheet.
2  So whatever we paid for cure, I thought, would be a charge
3  which would go through our earnings, subsequent to doing the
4  deal.
5  Q.  Going back to the attachment to 135.  You have an item
6  there, again, for nonfinancial assets of 1.5 billion.  Do you
7  see that?
8  A.  Yes, I can see that.
9  Q.  And again, as far as you know, that component was never
10  conveyed to the Court, that there was a nonfinancial assets
11  category of 1.5 billion.  Is that right?
12  A.  I think that's -- looks like a subtotal to me, summing the
13  Seventh Avenue building and the data center building -- the one
14  billion for Seventh Avenue and the 500 million for the data
15  centers, summing to 1.5 billion.  And I think that amount was
16  conveyed to the Court, was my understanding.
17  Q.  So the 1.2 billion that you had earlier on for
18  nonfinancial centers that was separate from the Seventh Avenue
19  item, that item had now simply dropped out of your acquisition
20  summary?
21  A.  Yes.  And as I said, I think as we were going through and
22  trying to fine tune things, Gary, who was doing this work, you
23  know, was updating it based on his latest understanding, and
24  his latest understanding was, we shouldn't reflect that number,
25  so he took it out.

Page 257

- 257 -

1  Q.  And that, too, had an impact on your negative goodwill
2  calculation, correct?
3  A.  Well, the negative goodwill is a balance of the assets and
4  liabilities, yes.  So anything which goes into that will have
5  an effect on the balance.
6  Q.  Now, earlier we had this discussion about the comp accrual
7  and the bonus payment.  And if you can turn to Exhibit 24 in
8  your binder.  That's an e-mail --
9      MR. TAMBE:  This is admitted in evidence, Your Honor.
10  Q.  This is an e-mail exchange between you and Michael Evans,
11  Rich Ricci.  Do you see that?
12  A.  That's correct, yes.
13  Q.  All right.  And this is in the middle of the week,
14  Wednesday, September 17th.  Do you see that?
15  A.  Yes, I can see that.
16  Q.  And you title your e-mail "650 million dollar problem"?
17  A.  That's correct, yes.
18  Q.  Because you have now discovered, in the course of your
19  work, that as opposed to 1.35 you're going to have to record
20  2.0 billion on your first-day acquisition balance sheet,
21  correct?
22  A.  So --
23  Q.  Is that right?
24  A.  -- so -- that is correct.  But let me just explain that so
25  we're clear.

65 (Pages 254 - 257)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 258

- 258 -

1  Q.  I think you've explained it a couple of times already.

2  A.  Well, I just wanted to reiterate it, just to make sure

3  there wasn't any confusion.

4  Q.  I don't think there is any confusion.

5  A.  So we had -- I thought we had an estimated two billion

6  total liability we were going to take on.  Some of that two

7  billion, we had a name-by-name list of what we were paying

8  people, which I thought I had to reflect in my opening balance

9  sheet on day one.  There was some of it, about 650, where we

10  didn't have a name-by-name list, which I thought was going to

11  be bonus for the other people or severance for the other

12  people, if there ended up being people we didn't need.  I

13  thought that 650 million, which would get charged against our

14  earnings but not against our day-one, so it wouldn't be part of

15  our negative goodwill calculation.

16      Now, when I read the documents here, and the documents

17  cross-referred to another document which said the amount was

18  two billion, it appeared that we had a contractual liability

19  for two billion in total, which meant I had to show the whole

20  two billion on my acquisition balance sheet.  So though the

21  amount I was going to pay wouldn't change, what happened is

22  that was going to go into my acquisition balance sheet, so it

23  would reduce my negative goodwill.  So I have a lower charge

24  for earnings, but I'd have lower negative goodwill.  And my

25  negative goodwill would fall by 650 million, which is the

Page 259

- 259 -

1  problem which I mentioned here.

2  Q.  In your e-mail to Michael Evans and Rich Ricci, you say,

3  "I was relying on you guys telling me I needed 1.35 billion,

4  which gave me the 650 million off the goodwill."  Do you see

5  that?

6  A.  Yes, I can see that.

7  Q.  And in fact, had Mr. Ricci told you that you needed only

8  the 1.35 billion, which helped you calculate the 650 million --

9  A.  Yes, I --

10  Q.  -- off the goodwill?

11  A.  -- I think -- I think I probably got that from Rich Ricci,

12  who would have got the data from Michael Evans, who, as I said

13  earlier, was working with the Lehman HR department to work out

14  what the contractual bonuses were going to be.

15  Q.  And you see the response from Mr. Ricci further up in that

16  e-mail to you, where in fact he tells you, "Never agreed to

17  it."  Do you see that?

18  A.  That's true, yes.

19  Q.  All right.  And he says, "Never agreed to it.  Archie,

20  this is the problem."  He's referring to Archie Cox, correct?

21  A.  Yes.

22  Q.  And who's Archie Cox?

23  A.  Archie Cox was one of our negotiators.

24  Q.  And Rich Ricci, at that point says, "We can't have this

25  clause, I don't think."  Do you see that?

Page 260

- 260 -

1  A.  Yes, I can see that.

2  Q.  Did you have any discussions with Mr. Ricci as to

3  whether -- as to the fact that it had never been agreed to --

4  the clause that you were pointing out had never been agreed to?

5  A.  Yes, I did have discussions with Mr. Ricci, and I had

6  discussions with Archie Cox as well to try and work out, you

7  know, how this clause had got into the document.

8  Q.  Right.  Because you were trying real hard not to have to

9  report the 2.0 as assumed liabilities in your acquisition

10  balance sheet.  You needed the 650 million of negative

11  goodwill, correct?

12  A.  Yes.  So, as I said earlier, I thought, in my acquisition

13  balance sheet, I was assuming we had 1.35 of contractual

14  bonuses would be a charge, and 650 would cover the other

15  bonuses and the severance costs for the other staff, so, yeah.

16  So this was different from my understanding.

17  Q.  And that was about the terms of what you recorded on your

18  acquisition balance sheet, you recorded 1.55, correct?

19  A.  No, we ended up recording two billion or very close to two

20  billion on our acquisition balance sheet, was our final

21  position.

22  Q.  Because you included in that not just bonus, but also

23  severance, correct?

24  A.  Yeah.  So we included the bonus and the severance of the

25  relevant staff.

Page 261

- 261 -

1  Q.  As you go through the week, and the transaction moves from

2  Lehman 2 to Lehman 3, what is your understanding of what

3  resulted in that transaction moving from the formulation that

4  it had at the beginning of the week, the Lehman 2 formulation,

5  to ultimately what got transacted at the end of the week?

6  A.  I think, as I said earlier, my understanding was the risk

7  of the transaction had dramatically increased, and for two

8  different reasons.  One, we had had an offsetting for the long

9  and short positions we were taking on.  And that was no longer

10  the case.  We now just had some naked long positions, so we had

11  a huge long inventory position.  And the second reason was,

12  beforehand we'd been able to do some due diligence, have

13  negotiations, understanding what the assets were, knowing that

14  we had the fair market values.  Some of the assets in the later

15  transaction, we hadn't seen before, so we hadn't been able to

16  work out what the fair value of those assets was.

17  Q.  You learned towards the end of the week, the 19th --

18  Friday the 19th in particular, that the traders at Barclays had

19  done an analysis of the assets that had come over as part of

20  the Fed repo, correct?

21  A.  It was completely hectic around that time.  So I know they

22  were getting some information, they were trying to do some

23  work.  I -- my recollection is that they hadn't got everything

24  by that time.  But I know they were -- they were running

25  around, I mean, there were -- I can't remember exactly, but I

66 (Pages 258 - 261)

Exhibit 43

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11    In the Matter of:

12

13    LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              April 30, 2010

21

22

23    B E F O R E:

24    HON. JAMES M. PECK

25    U.S. BANKRUPTCY JUDGE

Page 86

- 86 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1  Q. Others have objected to my questions from time to time,
2  and you should feel free to do that too. If we look at the
3  first line of that e-mail to Bill, you said here, Mr. Clackson,
4  it's a Long Island side, LI side, not BarCap, in terms of where
5  this information comes from; do you see that?
6  A. Yes, that's correct. I -- sorry. Yes, I can see that.
7  Q. So you're relying on their estimate at that point, as
8  you've mentioned?
9  A. Yes.
10  Q. And now you have this accounting liability issue. You've
11  taken the cure, as I think you explained to the Court
12  yesterday, the 2.25, completely off the acquisition balance
13  sheet and over in the direction of your profit and loss to be
14  charged as these contracts are assumed and paid. Is that
15  right?
16  A. Yeah. So that was my understanding at the time that, as
17  we did the work on cure and worked out the payments we'd have
18  to make, those would be charged against our accounting results
19  subsequent to the acquisition.
20  Q. And the 1.35, once again for me and for His Honor, what
21  does that refer to in terms of the comp? What are you moving
22  off of the acquisition balance sheet in terms of comp and over
23  toward your profit and loss statement?
24  A. So the estimate we had for comp there was the number 2 in
25  that formula. So I think we had an estimate that we were going

Page 87

- 87 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1  to pay two billion dollars. And in terms of what accounting
2  liability we'd reflect in the opening balance sheet or the
3  completion balance sheet, at the time we thought we would only
4  reflect accounting liability for bonuses, where we had a name-
5  by-name list of the bonuses we were going to guarantee to
6  individuals.
7   So of that two billion, the 1.35 was the amount where I
8  thought we had a name-by-name list. The balance, the 650
9  million dollars balance, I think as I said yesterday, was money
10  which we're expected to spend for the other individuals who
11  were taking on the other of the 10,000 people we were taking
12  on. We didn't know how many of those we would keep or whether
13  they would go, and so we didn't know whether that conversation
14  on liability related to bonus or severance.
15  Q. If this Court were told that that 1.35 number is the
16  amount that Barclays is planning to spend on comp and cure,
17  would that have been accurate?
18  A. No. That wasn't my understanding at the time. As I said,
19  the 1.35 is a subset of the amounts which were guaranteed. I
20  didn't have any better data from my human resources people
21  other than the two billion dollar estimate at that time.
22   MR. SCHILLER: May we look at the April 9 transcript
23  at page 35, lines 6 through 10, please?
24  Q. Mr. Clackson, please look with me at this section of the
25  transcript. It refers to what the Court has been told, and it

Page 88

- 88 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1  says -- this is Lehman's balance sheet and it gives the final
2  asset split. And this is what Mr. Clackson writes, referring
3  to this e-mail:
4   "Negative goodwill from this method is the sum of 2.25
5  plus 2, which comes to 4.25, minus 1.35. That's the amount
6  Barclays is planning to spend."
7   Is that accurate, sir?
8  Q. No, I think this is a misreading of the document, because
9  1.35, I think as I've just said, isn't the amount we plan to
10  spend; 1.35 was the accounting liability which we thought we
11  would have to reflect in our opening balance sheet. And as I
12  said earlier, we didn't know how much we were going to spend in
13  terms of a cure.
14  Q. Let me show you Movants' 2, if I may. You were -- had
15  been asked about that.
16   MR. SCHILLER: That is in evidence, as you know, Your
17  Honor.
18  Q. Now, if you look at the cure payment set forth on this
19  piece of paper there, and you say -- this isn't your balance
20  sheet, but what you've described from your U.K. accounting --
21  A. Sorry. What's the date of --
22  Q. This is --
23  A. I --
24  Q. -- 9/16/08, handwritten at the top of the page. Do you
25  see that?

Page 89

- 89 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1  A. Okay, yes, I could see that.
2  Q. And I'm pointing down to the 2.25 number on cure that
3  appears on this document, and it is in a balance sheet setting
4  of assets and liabilities in the transaction, some of them.
5  And there's, here, the 2.25 number that you've been testifying
6  about. And if you were to move that number from your
7  acquisition balance sheet to a profit and loss accounting, it
8  would not be part of an asset and liabilities comparison.
9  Correct?
10  A. Yes, that's correct. So if it was charged through our
11  profit and loss statement, it means we wouldn't on day one have
12  to recognize a liability. So we're saying on day one we
13  wouldn't recognize a liability, but we would recognize a
14  liability as we settled with the customers. And at the time
15  you recognize a liability, there would be a charge which would
16  go through our profit and loss account. So that was our
17  understanding of how we would treat that.
18  Q. And in terms of the comp number, which appears there as
19  two billion, you explained to the Court that a portion of that
20  would also be moved off your acquisition balance sheet at that
21  point in the transaction. Also on a charged basis under P&L?
22  A. Yes, so we thought, because we didn't have at the time,
23  you know, a detailed list of either the -- for the 650 million,
24  we didn't think it would appear as a liability because we
25  didn't know who would end up getting severance or who would end

23 (Pages 86 - 89)

Page 90

- 90 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1 up getting bonus or how much. We didn't think that we could
2 show that as a liability on day one.
3    And so we would have to accrue those charges either as
4 they arose or, you know, during the relevant period for the
5 rest of the year. That was our understanding.
6 Q. And so if 650 or 700 million were also taken off this
7 sheet of paper as it was for you on your acquisition balance
8 sheet, how would the total financial assets compare to the
9 total financial liabilities?
10 A. So the assets would obviously exceed, in this case for
11 liabilities, by the amount you took off. So if you took off
12 2.25 and 650, there would be -- the assets would be 2.9 billion
13 greater from the liabilities, which means, for accounting
14 purposes, on that day one acquisition balance sheet you would
15 realize a negative goodwill gain, which is effectively what my
16 earlier e-mail described.
17 Q. And that would be an acquisition accounting gain based on
18 the numbers you've just described, a buffer between the assets
19 and the liabilities as one basis for that?
20    MR. SCHILLER: I withdraw the question.
21    THE WITNESS: Yeah.
22 Q. The -- in terms of the two billion dollar comp liability,
23 Mr. Clackson, I want to be clear. I'd like the Court to
24 understand your view as to what comprised that two billion at
25 the time this transaction closed. Did that mean to you two

Page 91

- 91 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1 billion in bonuses, or were there other elements to the two
2 billion dollars?
3 A. My understanding was we were taking on compensation
4 liabilities for the 10,000 or so employees we're taking on. A
5 portion of that, as I've said before, comprised bonuses which
6 have been fixed. There was a portion where we didn't know
7 whether people would receive severance payments or bonuses, and
8 therefore my understanding was that included both bonus,
9 severances and any related payroll taxes on those amounts.
10 Q. So if the Court were told -- Mr. Clackson, if His Honor
11 was told by movants that Barclays had signed and realized that
12 it expressly mandatorily makes Barclays responsible to pay two
13 billion for bonuses, would that be complete or incomplete?
14    MR. TAMBE: Objection, Your Honor. It calls in part
15 for legal -- for a legal conclusion, because he's being asked
16 to compare that representation with what the contract may or
17 may not require Barclays to do. I don't think he's competent
18 to testify to that.
19    THE COURT: I'm going to sustain the objection for the
20 reasons stated and for another reason, because it's a question
21 that ties into a hypothetical representation to the Court. If
22 you ask it as a purely factual matter without the reference to
23 the representation, I think it's a better question. And I also
24 think that this witness is not in a position in terms of
25 representations to the Court. He's only in a position to talk

Page 92

- 92 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1 about what he knows about comp and cure. That's it.
2    MR. SCHILLER: Thank you, Judge. And he has testified
3 as to that, so I'm not going to go over that again with him.
4    THE COURT: Okay.
5    MR. SCHILLER: I think it's important, at least it is
6 to us, that the trier of fact see what has been alleged
7 compared to what his evidence is, and I tried to dramatize that
8 for you. I won't do that again, Judge.
9    THE COURT: No, it's okay. You can be as dramatic as
10 you like.
11 BY MR. SCHILLER:
12 Q. I'd like to return to Exhibit 110.
13    MR. SCHILLER: And I have to distribute that, with the
14 Court's permission. May I approach?
15    THE COURT: Sure.
16    (Pause)
17    MR. SCHILLER: Your Honor, this is an unobjected to
18 exhibit of a Barclays public announcement on the 17th of
19 September, 2008.
20 Q. Do you see that --
21 A. Yes, I --
22 Q. -- Mr. Clackson?
23 A. -- see that.
24 Q. And it references John Varley and his address. Can you
25 describe to the Court, if you recall, what Mr. Varley was

Page 93

- 93 -

LEHMAN BROTHERS HOLDINGS INC., et al.

1 describing that morning and generally to whom?
2 A. Mr. --
3    MR. TAMBE: Your Honor, I'm not sure foundation was
4 laid as to this witness' knowledge about this presentation.
5 Q. Are you familiar with this announcement in Exhibit 110,
6 Mr. Varley (sic).
7    MR. TAMBE: Mr. Clackson.
8    MR. SCHILLER: Mr. Clackson, yeah.
9    THE COURT: I'm not familiar with it at all. I'm
10 about to be. If there's a foundation objection, the foundation
11 objection is granted. Lay your foundation and we'll proceed.
12    MR. SCHILLER: Okay. Thank you, Judge. I'm sorry.
13 Didn't mean to interrupt.
14 A. Yes. No --
15 Q. Did you contribute any data to Mr. Varley's remarks that
16 day?
17 A. Yeah, we would have -- my team and myself contributed all
18 the financial data which went into his announcement to the
19 market.
20 Q. May I ask you to turn to the second page of Mr. Varley's
21 announcement to the market on September 17th, two days before
22 the hearing before His Honor? And turn to the third paragraph,
23 the second sentence, in which Mr. Varley says "We are acquiring
24 trading assets with a current value estimated" -- "a current
25 estimated value of seventy-two billion dollars and trading

24 (Pages 90 - 93)

Exhibit 44

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9                Debtors.

10   - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14                Debtor.

15   - - - - - - - - - - - - - - - - - - -x

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                May 6, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

- 106 -

1  of the corporates, they've lost three to five percent of their
2  pass-throughs. I've now learned my understanding may be
3  mistaken. But at the time I believe that's what I was writing.
4       He was trying to give me comfort that in fact they cut
5  a deal on the Lehman name, that we could actually use the
6  Lehman name in foreign jurisdictions, as I -- for two years, in
7  order to have the ability to liquidate. Again, my focus was,
8  what were the issues that would affect me -- me -- the estate
9  and my ability to maximize value for the estate going forward?
10  And he was pointing out that there was a deal vis-a-vis the
11  Lehman name.
12       I don't remember what "contract" stands for. It could
13  be a number of things. I just don't remember. Your Honor, I
14  can guess, if you like, but I don't honestly fully remember.
15  There were a number of issues relating to contracts that would
16  not directly relate to the contracts in cure that Barclays was
17  taking.
18       And here was an important comment that, you know, no
19  resis. If you remember, in the asset purchase agreement, there
20  was this idea that Barclays was getting fifty percent of the
21  resis, we were getting fifty -- we were keeping fifty percent.
22  Now, he was telling me that no residential mortgages, I believe
23  he was saying, were being retained; that we need to include
24  residential mortgages to Barclays because of the loss of assets
25  and the deterioration of the market value of those assets, to

- 107 -

1  make them comfortable they were getting the balanced benefit of
2  the bargain transaction --
3  Q.  What --
4  A.  -- as I said -- I'm sorry?
5  Q.  -- I'm just saying, what's the -- the handwriting is
6  hard -- the two words on the right, starts with a "P",
7  underneath that line, that curve?
8  A.  I believe what it says is "position movement." The
9  positions are moving around and changing. He then said to me,
10  hey, we have 47.4 billion of assets against 45.5 billion of
11  liabilities, plus the cure and the employees is roughly 4
12  billion. So, you know, the estate is 2 billion dollars ahead.
13  I frankly, at this point, was thoroughly confused in a sense of
14  I wasn't sure, you know, the 20 to 30 billion, where it came
15  from; how the 47 just matched up with the 45.5 longs; and how
16  the resis fit in. And I'm not proud of this, but I was -- I
17  did get a little annoyed. And I did say to him, you know
18  something, you're talking to me -- you know, as if I know
19  what's going on in your head, as if what deal you thought was
20  happening this morning and how it changed from last night. I
21  know what you told us last night. I know what the deal was
22  Wednesday and where we were Thursday. Can you just give it to
23  me simple?
24       And I turned the page and a little aggressively, he might
25  say -- obnoxiously said, just start from the beginning and go

- 108 -

1  to the end. What was filed on Wednesday, what has changed? I
2  don't want to hear about any interim things. I just want to
3  know what is different from what you told the judge, not from
4  where you thought you were going to be etcetera. I turned the
5  page, and at this point it was getting late. I had the
6  committee on hold, and I said to him, I just need to know where
7  we stand. We turned the page -- I turned the page, and I think
8  Mark Shapiro was on the phone at the time, I can't swear to
9  that, but Jim took a deep breath and said fine.
10       He had 72 billion dollars of assets and 68 billion of
11  liabilities as of what we told the judge, the way it was in the
12  contract. That's no longer true. We now have 47.4 billion of
13  assets and 45.5 billion of liabilities. These liabilities are
14  no longer third-party liabilities or shorts or derivatives.
15  These are now essentially money we owe Barclays. So we have a
16  net difference of assets to liabilities of 2.4 billion, in my
17  mind, matching up -- you know, all talking book value of
18  assets. The cure, it was 2.25 billion, it's now 2.25 billion.
19  I now know he misspoke. As Ms. Fife made clear to the Court,
20  it was really 1.75 or something like that, but it was -- you
21  know, he told me nothing had changed. Employee comp and
22  severance, no change, 2 billion, 2 billion. Goodwill, no
23  change, 250-250.
24       You can see, the center column are the issues I cared
25  about, that I wanted him to tell me what changed. 745 Seventh

- 109 -

1  Avenue which was, you know, the headquarter building in Times
2  Square, essentially no change. New Jersey data, we thought it
3  was 450 -- I didn't write down the number, I don't know why. I
4  was probably writing the rest of my list of what I wanted to
5  ask him next, but we know it was 100 million change. Profit
6  sharing -- that was my shorthand for purchase price adjustment,
7  we talked about earlier. Yes, it was in the prior deal; no,
8  it's not in the current deal.
9       DTC settlements -- this is some of the confusion from the
10  prior page. Before, Barclays was not helping us -- was not
11  guaranteeing or providing funds in order to allow for -- again,
12  this is my understanding -- that to the extent that customers
13  had trades within the broker dealer that had not closed prior
14  to our closing, DTC had raised issues regarding who was going
15  to guarantee those trades. And in business shorthand, Barclays
16  was not stepping to the plate or providing any comfort in the
17  old deal, now they were stepping up and solving that issue. I
18  found out later about negotiations around that issue, but as of
19  that afternoon, all I know is yes, Barclays was assuming the
20  liability or solving that issue.
21       Purchased assets. Were they taking more? Were they
22  grabbing more? Do I have to worry about the integrity of the
23  estate going forward? No, no, no. The PIM business, which
24  relates to those brokers, is in LB -- I honestly don't even
25  know what this is -- student -- I don't know, or LB Canada --

28 (Pages 106 - 109)

Exhibit 45

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14             Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             May 7, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

## Page 122

- 122 -

1 remaining estates.

2 Q.  Okay.

3      MR. KIRPALANI:  Nothing further, Your Honor.

4      THE COURT:  Is there anything more from anyone else?

5      MR. BOIES:  Just two questions, Your Honor to follow-

6 up.

7 RECROSS-EXAMINATION

8 BY MR. BOIES:

9 Q.  Mr. Burian, counsel just asked you about Movants' Exhibit

10 394, and he introduced the line of questioning saying that I

11 had talked to you about book value.  And he asked you to look

12 at the pages.  And he said do you see liquidation value

13 mentioned anywhere; do you recall those questions?

14 A.  I do.

15 Q.  You don't see book value mentioned on those pages, do you,

16 sir?

17 A.  No, it was --

18 Q.  Okay.

19 A.  -- market value.

20 Q.  And he said you considered or you told him that you

21 considered suing under the TAA, do you recall that?

22 A.  The TSA, sir.

23 Q.  TSA.  You didn't sue under the TSA, did you?

24 A.  By the way, sue, just 'cause I know you're not a

25 bankruptcy person, what we were talking about the time, was

## Page 123

- 123 -

1 coming to court to compel compliance, not -- you know, motion

2 practice, not suing someone.

3 Q.  Did you do that?

4 A.  We -- no, we didn't.

5 Q.  Okay.  When was the first time you considered Barclays --

6 when you considered suing Barclays in connection with anything

7 to do with the APA, including the clarification letter, that

8 transaction?

9 A.  Are you including -- the TSA was part of the APA, sir.

10 Are you including the TSA or not including it?

11 Q.  I'm not talking about going to court because you thought

12 they weren't cooperating; I'm talking about going to Court

13 because you thought that somehow the transaction was not the

14 transaction that you thought had occurred.

15      MR. KIRPALANI:  Objection.

16 Q.  The thing that brings us here today.

17 A.  Right.

18      MR. KIRPALANI:  I have an objection, Your Honor.

19      THE COURT:  What's the objection?

20      MR. KIRPALANI:  The objection is this is beyond the

21 scope of my redirect and was extensively covered in his cross-

22 examination.

23      THE COURT:  I think that's true.  I think we've been

24 down this road a few times.

25      MR. BOIES:  The only thing I wanted to be clear, and I

## Page 124

- 124 -

1 think counsel has clarified it, I just want to be clear that

2 the testimony he had given before about when he considered

3 suing Barclays wasn't related to this TSA issue; it was related

4 to the substance of what we're talking about here.  That was

5 the only point I wanted to bring -- I wanted to clarify.  And I

6 think counsel has agreed to that.

7      THE COURT:  So does that end the examination?

8      MR. BOIES:  Yes, Your Honor.

9      THE COURT:  Mr. Burian, you're excused.

10      THE WITNESS:  Thank you very much, Your Honor.

11      THE COURT:  I'm sure you're very pleased to hear those

12 words.

13      THE WITNESS:  Yes, sir.

14      THE COURT:  And we'll call the next witness.

15      MR. GAFFEY:  Your Honor, may I approach with the

16 witness?

17      THE COURT:  Yes.

18      MR. RICCI:  Thank you.

19      THE COURT:  Mr. Ricci, I'm going to swear you in once

20 people have settled down.

21      MR. RICCI:  Should I remain standing, Your Honor?

22      THE COURT:  You might as well stand, you're going to

23 be sitting for a long time.

24      (Pause)

25      THE COURT:  You ready?

## Page 125

- 125 -

1      MR. GAFFEY:  Yes, Your Honor.

2      THE COURT:  Mr. Ricci, please raise your right hand.

3      (Witness duly sworn)

4      THE COURT:  Be seated, please.

5      MR. GAFFEY:  May I proceed, Your Honor?

6      THE COURT:  Please do.

7 DIRECT EXAMINATION

8 BY MR. GAFFEY:

9 Q.  Good afternoon, Mr. Ricci.

10 A.  Good afternoon.

11 Q.  We've not met.  My name is Robert Gaffey, and I'm from

12 Jones Day.  We're counsel to the debtors.

13 A.  How do you do, Mr. Gaffey?

14 Q.  Mr. Ricci, by whom are you employed, sir?

15 A.  Barclays Bank.

16 Q.  How long have you been employed by Barclays Bank?

17 A.  Over fifteen years.

18 Q.  And as I understand it, sir, you're currently the chief

19 operating officer of the investment banking and management

20 division of Barclays Capital?

21 A.  I've got a different title now since we last met.

22 Q.  Okay.

23 A.  I'm the co-chief executive of the corporate investment

24 bank.

25 Q.  You were employed by Barclays Capital in September of

32 (Pages 122 - 125)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 126

- 126 -

1 2008, correct, sir?

2 A.  Yes, that's correct.

3 Q.  What was your title then?

4 A.  I was the COO of the corporate investment bank.

5 Q.  And briefly, sir, what were your responsibilities as COO?

6 A.  As COO my day-to-day responsibilities involved managing

7 all of the infrastructure functions.  So risk, legal

8 compliance, technology, human resources, as well as serving on

9 the executive committee of the -- of Barclays Capital.

10 Q.  And at that time, sir, you reported to Robert Diamond?

11 A.  That's correct.

12 Q.  And Robert Diamond was at the time, and is, president of

13 Barclays Capital, is that right?

14 A.  That is correct.

15 Q.  Thank you.  And were you a direct report to Mr. Diamond?

16 A.  Yes.

17 Q.  And did you work, sir, with a man named Mr. Clackson?

18 A.  Yes.

19 Q.  What was the reporting relationship vis-a-vis Mr.

20 Clackson.  Was he next to you, a report to you, where did he

21 fit in the organization chart?

22 A.  Mr. Clackson reported to me.

23 Q.  Okay.  Now, sir, you understand obviously that what's

24 brought us here today is the sale transaction that we discussed

25 in September of 2008.  I want to ask you first about a brief

Page 127

- 127 -

1 period before the filing of the Lehman bankruptcy, when I

2 understand there were discussions between Barclays on the one

3 hand and Lehman on the other about the purchase of the entire

4 Lehman firm.  Do you recall those few days?

5 A.  Yes.

6 Q.  And were you involved in those negotiations?

7 A.  Yes.

8 Q.  In fact, you were appointed by Mr. Diamond, essentially,

9 as the lead negotiator on those negotiations, is that right?

10 A.  I was appointed by Mr. Diamond as the -- the head of the

11 whole transaction.  So part of my responsibilities were those

12 negotiations, yes.

13 Q.  And you were more or less teed up to be the senior person

14 to lead the discussions on the Barclays side, correct?

15 A.  That's correct.  I had a large team working with me, but

16 that's correct, I was a senior person.

17 Q.  And those negotiations with regard to a potential purchase

18 of the entire Lehman firm took place for several days beginning

19 on or about September 12th, the Thursday, is that correct?

20 A.  That's correct, I believe.  Yes.

21 Q.  And that deal did not come to fruition, as I understand

22 it, is that right?

23 A.  That deal did not happen.  That is correct.

24 Q.  And that deal died on the Saturday?

25 A.  On the Sunday.

Page 128

- 128 -

1 Q.  On the Sunday.  And in the course of the work from

2 Thursday the 12th through Sunday the 15th, did you have a team

3 of Barclays people working with you in connection with the

4 negotiations?

5 A.  We had a team of Barclays people as well as lawyers and

6 advisors, as well.

7 Q.  And the lawyers and the advisors and the Barclays people

8 were able to do some degree of due diligence, albeit on a

9 somewhat hurried schedule, is that right?

10 A.  It was a very limited amount of due diligence, yes.

11 Q.  But included in the due diligence that Barclays was able

12 to do, sir, was some review of values of various classes of

13 securities held by Lehman, is that correct?

14 A.  Amongst other assets, yes.  Limited, though.  I would

15 emphasis on limited.

16 Q.  And in the course of that work -- and, again, I'm in the

17 prebankruptcy period, Mr. Ricci, in the course of that due

18 diligence, and other work around those negotiations, did you

19 have occasion to work with a man named Martin Kelly?

20 A.  I don't believe I directly worked with Martin Kelly during

21 that weekend, no.

22 Q.  Who were the main Lehman people you worked with in that

23 prebankruptcy period?

24 A.  I would have spent most of my time with Mr. McDade.  Mr.

25 Kirk, I spent some time with Mr. Fuld.  Really at that level of

Page 129

- 129 -

1 the house, top of the house.

2 Q.  And in connection with those prebankruptcy discussions

3 between Barclays and Lehman, your team included Jerry del

4 Missier, correct?

5 A.  That is correct, yes.

6 Q.  And Mike Keegan, correct?

7 A.  Mike Keegan.

8 Q.  And what was Mike Keegan's role?

9 A.  Mike Keegan was playing a -- a variety of roles.  He did

10 work on the asset valuations of some of the securities and some

11 of the other assets.

12 Q.  And did Mr. Keegan report up to you?

13 A.  He reports to Mr. Del Missier directly.  On the project,

14 we had a whole team of people, but reporting to me.

15 Q.  And Mr. Stephen King was on the team, as well?

16 A.  I don't recall if Stephen was on the team that weekend.

17 He --

18 Q.  I could jump ahead a bit, because you know we're going to

19 talk about after the bankruptcy too, but he was involved in the

20 postbankruptcy negotiations, correct?

21 A.  That is correct, yes.

22 Q.  And what was Mr. Keegan's general area of responsibility?

23 A.  Mr. Keegan?

24 Q.  Yes.

25 A.  Mr. Keegan's general area of responsibility were valuing

33 (Pages 126 - 129)

Page 146

- 146 -

1  Q.  I'd like you to focus in terms of conversations with Mr.
2  Diamond on the period Monday the 15th through Tuesday the 16th.
3  It's a fact, sir, is it not, that early in the morning on the
4  16th of September an agreement was reached, an agreement in
5  principle was reached?  We'll talk about changes to that deal
6  over the week, but on the Tuesday morning a deal was reached.
7  Is that right?
8  A.  We had an agreement in principle on a deal structure, yes.
9  Q.  Okay, and did you have a conversation with Mr. Diamond
10  before you agreed, in principle, to that deal structure?
11  A.  I don't recall.  I really don't recall having a
12  conversation with Mr. Diamond.  It was, again, lots of moving
13  parts, fast and furious, up all night type of thing.
14  Q.  When you described the deal structure to Mr. Diamond did
15  you discuss with him whether or not it was capital accretive?
16  A.  Yes, as we were preparing for an investment announcement
17  on the Wednesday to the public, you know, certainly my
18  conversation with Mr. Diamond would have -- would have said
19  look, there's positive accretion here.  This is what we need to
20  tell the market, et cetera, et cetera.
21  Q.  And did you have discussions with Mr. Diamond or any of
22  the other members of senior management of Barclays as to
23  whether there would be a gain, an economic gain to Barclays on
24  acquisition -- of the deal as contemplated on the 16th?
25  A.  Yes.  I mean, we announced it publicly on the Wednesday,

Page 147

- 147 -

1  so, certainly, there was conversations with Mr. Diamond, Mr.
2  Varley, among others.
3  Q.  Okay, and was it your understanding in the negotiation of
4  that transaction that it was a requirement, a Barclays
5  precondition, that there be a first day economic gain, a gain
6  on acquisition for Barclays?
7  A.  As I've said several times, we certainly intended to have
8  one, and we wanted one.  As I said to you previously, I don't
9  recall if we -- if we didn't have that would we have gone
10  through with the deal or not, I don't know.  But, certainly, it
11  was our intent to have one.
12  Q.  Okay, and was it a fact, in your view, when an agreement
13  in principle was reached on the 16th of September, was there a
14  first day economic gain in the deal?
15  A.  As I recall there was a first day economic gain in the
16  deal, yes.
17  Q.  And the first day economic gain in the deal was derived
18  from the excess of the assets purchased over the liabilities
19  assumed and the cash paid, correct?
20  A.  Yes, I believe that's correct.  Yes.
21  Q.  And the basic structure of the deal to which Barclays and
22  Lehman agreed on the 16th of September was one in which
23  Barclays would receive, among other things, securities assets
24  of Lehman, correct?
25  A.  We purchased some securities, yes, and assumed some

Page 148

- 148 -

1  liabilities.
2  Q.  And that bucket of securities was one of a list of
3  different assets purchased, yes?
4  A.  There's a ton of categories, yes.
5  Q.  And on the consideration side Barclays paid 250 million,
6  correct?
7  A.  250 million plus the cost of the buildings, yes.
8  Q.  Plus the cost of the buildings.  And away from the
9  building, well, plus the cost of the buildings, and it assumed
10  certain liabilities, correct?
11  A.  That -- yes, we assumed certain liabilities.
12  Q.  And those liabilities fell into two broad categories.  One
13  was contract cure, correct?
14  A.  Contract cure was one.
15  Q.  And the other was compensation, correct?
16  A.  It was compensation, yes.
17  Q.  And the liability that Barclays agreed to assume -- do you
18  need a moment here, sir?
19  A.  No.  It's just a fly.
20  Q.  Okay.
21  A.  Sorry.  I hope it's not me.
22  Q.  The compensation liability --
23      THE COURT:  He does seem quite attracted to you.
24      MR. GAFFEY:  I've never seen anybody say that
25  literally, sir.

Page 149

- 149 -

1  Q.  The compensation liability that Barclays agreed to assume,
2  sir, was agreed between you and Mr. McDade, the amount.  Is
3  that right?
4  A.  That's correct.
5  Q.  You agreed with Mr. McDade that the amount that Barclays
6  would assume would be two billion dollars.  Is that right?
7  A.  Two billion dollars.
8  Q.  And when the deal came to be documented you understood
9  that that assumption of liability for comp at a two billion
10  dollar level was properly documented in the deal?
11  A.  My understanding was that it was and that the two billion
12  dollar assumption was to cover all comp and -- compensation,
13  which included bonuses as well as severance.
14  Q.  Well, I wasn't actually asking about --
15  A.  There were some concerns around the documentation of a
16  certain clause, if I recall, that I wasn't happy with.
17  Q.  I hadn't, actually, asked you that, sir, although we'll --
18  A.  All right.
19  Q.  -- go into it in a while, so, for the moment, let's agree
20  to disagree about what the two billion covered and just talk
21  about the number.
22  A.  Okay.
23  Q.  The number was two billion for the comp-related assumption
24  of liability, correct?
25  A.  Yes.  Two billion dollars.

38 (Pages 146 - 149)

Exhibit 46

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              June 21, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

- 54 -

1 whether the valuation placed on Lehman's trading assets
2 represented the book value of those assets for purposes of the
3 Barclays transaction?
4 A. No. I had no knowledge of the book value. My assumption
5 was it was the market value that was being exchanged.
6 Q. And was it your assumption that the market value that was
7 being exchanged was less than the book value of the Lehman
8 assets because the book value stopped being updated on
9 September 12th?
10 A. I didn't know that. I mean, I didn't know whether it was
11 higher or lower. I knew that the market -- what I thought was
12 the market value equal to liabilities being assumed, the market
13 value of the assets.
14 Q. Is it your testimony that you don't know whether the
15 market value of Lehman's assets declined after September 12th,
16 2008?
17 A. The assets being exchanged?
18 Q. Yes.
19 A. Yes.
20 Q. You don't know that?
21 A. I don't know that, no.
22 Q. All right. Did you ever make any effort to investigate
23 that?
24 A. I did not.
25 Q. Did you ever have any concern that Barclays might have

- 55 -

1 negotiated a discount from the market value of the Lehman
2 assets that it was acquiring?
3 A. No.
4 Q. Were you ever told that Barclays had obtained a discount
5 on the valuation of the Lehman assets for purpose of the
6 transaction?
7 A. No.
8 Q. Well, you actually saw a presentation in which was talked
9 about a negotiated five billion dollar discount in October
10 2008, correct, sir?
11 A. That was pricing negotiation.
12 Q. I'm sorry. What?
13 A. That was pricing negotiation was my interpretation,
14 counselor.
15 Q. By pricing negotiation, you mean they were negotiating the
16 price at which Barclays would acquire the assets?
17 A. Well, if you were at Barclays and you set a price on a
18 security and Lehman sets a price on a security, you might not
19 agree. You have a negotiation as to figure out what the fair
20 market value price of that is. That's I assume what happened.
21 I assume the five billion dollars was a deterioration in the
22 price during that chaotic week, yeah.
23 Q. And if the five billion dollars was a deterioration during
24 that chaotic week, that would have meant that the market value
25 of Lehman's assets was declining during that week, correct?

- 56 -

1 A. Correct.
2 Q. Did you ever come to understand what the value of the
3 severance assumed liabilities were for Barclays?
4 A. No.
5 Q. When you refer to assumed severance liability here --
6 A. Yes.
7 Q. -- am I correct that that includes liability for certain
8 accrued bonuses?
9 A. No, sir. It could be -- that line I just assumed was
10 severance liability. The assumed cure liability would have
11 been --
12 Q. No, not cure. I'm sorry. I may have misspoke or you may
13 have misspoke. I didn't say cure. I didn't mean to say cure
14 if I did. And I don't think I did. What I was talking
15 about --
16 A. You did.
17 Q. -- the -- it was bonus liability.
18 A. Well, there's nowhere on that schedule -- I don't know
19 whether the bonus accrual is in that line or the line above. I
20 don't know. Again, the geography I don't know about. It's --
21 the 4.2 million dollar num -- billion dollar number had those
22 three components.
23 Q. Okay. So the 4.2 billion dollar item had assumed cure,
24 assumed bonus and assumed severance, is that correct?
25 A. That's my understanding.

- 57 -

1 Q. And that 4.2 billion dollar number, have you ever seen
2 that in writing any place?
3 A. Yes. I saw it on a schedule that Steve Berkenfeld showed
4 me. That was a schedule -- it was -- again, I don't recall
5 that schedule now but I saw it on a schedule somewhere.
6 Q. When did he show you that schedule?
7 A. Maybe he showed me that schedule right about the time he
8 was describing the transaction.
9 Q. When was that?
10 A. The week of the 15th.
11 Q. Did he tell you who prepared that schedule?
12 A. No, he did not.
13 Q. Did you understand that the estimates for severance and
14 bonuses and cure changed between the preparation of that
15 schedule and the closing of the transaction?
16 A. I did not know that.
17 Q. Did you ever come to know that?
18 A. I came to know that after the fact, yes.
19 Q. Okay. And when did you come to know that?
20 A. I came to know that after I got the response back from
21 Jonathan Hughes --
22 Q. And --
23 A. -- in the first quarter of 2009.
24 Q. And do you now know how the total of comp and severance
25 and cure and bonus liabilities were described to the Court,

Exhibit 47

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14                U.S. Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                August 23, 2010

19

20

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 118

1 going to ask you to turn to Tab 14 which is a multi page
2 document and it is Movant's Trial Exhibit 147 in evidence. And
3 I'm not going to take you through the whole thing. So, I'm
4 going to ask you take a look at the last page. Page number 70.
5 A. It's the very last page. Okay.
6      MR. GAFFEY: Steve, can we have that on screen,
7 please?
8 A. This is the schedule here?
9 Q. Yes. Just before we get on screen, have you ever seen
10 that before?
11 A. Only in connection with preparation for this trial.
12 Q. Did you see it at or around -- I take it, then, you did
13 not see it at or around the time that the Court was being asked
14 to –approve this transaction.
15 A. I did not.
16 Q. And I take it, then, sir, you never had any conversations
17 with Mr. Seery about negotiations with Barclays to arrive at a
18 value of what price could you obtain if you sold the securities
19 quickly, in a hurry?
20 A. I did not.
21 Q. So, when you sat at the sale hearing on the 19th, sir, and
22 you heard the number 47.4 given to the Court, you had no
23 knowledge of any such activity taking place?
24 A. I had no knowledge of that what you just described, no.
25      MR. GAFFEY: Your Honor, may I just have one moment to

Page 119

1 consult with my colleagues? I may be finished.
2      THE COURT: Surely.
3      (Pause)
4      MR. GAFFEY: Nothing further for Mr. Shapiro, Your
5 Honor. Thank you for your time, sir.
6      THE WITNESS: Thank you.
7      THE COURT: No questions from -
8      UNIDENTIFIED SPEAKER: No questions from me.
9      THE COURT: Any movants, redirect?
10      MR. BOIES: Yes, thank you, Your Honor.
11 REDIRECT EXAMINATION
12 BY MR. BOIES:
13 Q. I'd like to begin by asking about the comp or compensation
14 issue that you asked about by counsel.
15 A. Okay.
16 Q. And that connection he directed your attention to the
17 witness binder that you have with your name on it.
18 A. Okay.
19 Q. And Movant's Exhibit 1 which is the APA and he directed
20 your attention first to paragraph 9.1(c).
21 A. Yes.
22 Q. And then he directed your attention to Movant's Exhibit 2
23 and said this is that schedule. Do you recall that?
24 A. Yes, I do.
25 Q. Now, 9.1(c) talks about a schedule that is initialed by an

Page 120

1 officer of both parties, correct?
2 A. Correct.
3 Q. Is Movant's Exhibit 2 initialed by an officer of both
4 parties?
5 A. I see -- I just see one SB initial, I don't see another
6 set of initials.
7 Q. Are you aware of any schedule like this that was initialed
8 by an officer of both parties as provided for in the APA?
9 A. I'm not aware, that's why I -- at the time when he asked
10 me the question before I wasn't quite sure which financial
11 schedule this referred to.
12 Q. Now, the reference on M-2 is to comp, do you see that?
13 A. Yes.
14 Q. It doesn't say bonus, it doesn't say severance, it says
15 comp, is that correct?
16 A. That's right.
17 Q. And at the time that you were working on the APA and on
18 this transaction, did you have an understanding of what was
19 encompassed within the term comp?
20 A. At the time my belief was that it was a combination of the
21 bonuses that they would pay and if into the extent that they
22 weren't paying someone a bonus because they were terminating
23 that person's bonus it would include severance for that person.
24 That was my recollection at the time.
25 Q. Now, Mr. Gaffney showed you some materials that related to

Page 121

1 Mr. McDade's testimony at trial.
2 A. Yes.
3 Q. And I'd like to direct your attention to April 26th, the
4 official transcript, page 160.
5 A. I'm sorry, what tab should I be looking at?
6 Q. We're going to put it on the screen.
7 A. Okay.
8 Q. Because I know in advance what questions I'm going to ask
9 you but I don't know what questions he's going to ask you. And
10 if we could look at line 24 it says,
11 "Q. The other part of that question had to do with
12 compensation, sir.
13 "A. Right. Barclays also assumed a two billion compensation
14 liability with respect to the combination of the employee's
15 bonus process and the severance process."
16 Q. Do you see that?
17 A. I do.
18 Q. And as you testified to counsel, Mr. McDade was the lead
19 negotiator for Lehman, is that correct?
20 A. That's correct.
21 Q. And you agree with this statement that he makes?
22 A. Yes, I do.
23 Q. And let me direct your attention to what Mr. Miller said
24 at trial in the April 28th, 2010 official transcript at page
25 32, line 20. "In connection with the compensation, that also

31 (Pages 118 - 121)

Page 186

1  Q.  You were not involved in the sale negotiations, correct?

2  A.  No.

3  Q.  Did you come to New York at some point to do work related

4  to the sale?

5  A.  Yes, I did.

6  Q.  And when was that?

7  A.  On or around the 22nd of September, 2008.

8  Q.  And what was the purpose of your coming to New York?

9  A.  Mr. Evans (ph.) requested that I come and assist him in my

10  general responsibilities but specifically in respect of the

11  sale and tracking and monitoring and modeling various

12  commitments that Barclays were taking on as part of the

13  transaction.

14  Q.  And were you aware that Barclays had taken on certain

15  compensation or "comp" obligations under the APA?

16  A.  I had seen a copy of the APA; I saw that there were

17  articles within the version of the APA that I had seen but I

18  had no specific understanding as to what Barclays' obligations

19  were, in fact, under that APA.

20  Q.  Was it your responsibility to develop that understanding

21  or was that somebody else's job?

22  A.  It wasn't my responsibility.

23  Q.  I want to direct your attention to a conversation on -- I

24  believe there is evidence that you had a with a PWC auditor

25  whose first name is Mike and second name I have some difficulty

Page 187

1  pronouncing but it starts with a G.

2  A.  I think it's Mike Guarnuccio.

3  Q.  Yes.

4  A.  Yes.

5  Q.  And meaning no disrespect to the gentleman, I'm going to

6  refer to him as "Mike".

7  A.  Right.

8  Q.  Did you have a conversation with Mike concerning the bonus

9  obligation that Barclays had under the APA?

10  A.  I recall that we had a conversation at around the time --

11  around Barclays' overall compensation plans.

12  Q.  And when would that conversation have been?

13  A.  As I said, at around the time of my arrival in New York at

14  the beginning of my work.  As I say, I can't be precise about

15  the dates.  I could not find it in my diary.

16  Q.  And at the time that you had this conversation with Mike,

17  did you have, yourself, an understanding of exactly what

18  Barclays' obligations were?

19  A.  No, I did not.

20  Q.  At the time of that conversation, if Mike understood that

21  you were telling him that Barclays was going to make a two

22  billion dollar payment for bonuses only, not other compensation

23  or severance but for bonuses only, what would your reaction be

24  to that?

25  A.  Sir, could you repeat the question, please?

Page 188

1  Q.  Yes.  If somebody told you that Mike believed that you had

2  told him that Barclays was going to pay two billion dollars for

3  bonuses only, not for other compensation aspects like severance

4  but for bonuses only, what would your reaction be to that?

5  A.  I would be surprised at that.  My immediate reaction would

6  be that he presume -- I believe he would have misinterpreted

7  the extent of my knowledge, or lack thereof, around the

8  obligations under the sale and the APA in general.  And

9  misunderstood or inferred too much from the conversation that

10  we did, in fact, have.

11  Q.  Now, after this period of time when you'd just arrived in

12  New York, did you ultimately come to understand what the two

13  billion dollar figure encompassed?

14  A.  Not -- not in terms of Barclays' obligations under the

15  APA, no.

16  Q.  Because that was not your responsibility?

17  A.  No.

18  Q.  Did PWC ultimately sign off on the accruals that Barclays

19  made in connection with the sales transaction?

20  A.  Yes, I believe I did and that they signed the audit report

21  supporting the report of accounts at Barclays PLC of which that

22  was a part.

23  Q.  And do you know, from your own personal knowledge, what

24  those accounting entries amounted to in terms of the bonus

25  amount that was being paid or accrued?

Page 189

1  A.  Not the bonus amount, no.

2  Q.  Let me ask you to turn to Tab 3 in your book.  And this is

3  Barclays' Exhibit 142A.

4  A.  Um-hum.

5  Q.  And can you identify this document?

6  A.  Yes.  This is the schedule that I was asked to prepare.

7  Q.  And who asked you to prepare this?

8  A.  Gary Romain -- Mr. Gary Romain who works in our finance

9  department.

10  Q.  And what was the purpose of this being prepared, if you

11  know?

12  A.  Gary asked me to prepare the schedule to track -- to

13  identify and track all compensation-related items in terms of

14  compensation delivered or planned to be delivered to former

15  Lehman Brothers employees in respect to their pre-acquisition

16  services.

17  Q.  And when was this prepared?

18  A.  We prepared several iterations of this throughout a period

19  of time.  I don't recall precisely when we began this process

20  but it would have been -- I believe it would have been within

21  the period after -- obviously after the sale had took place but

22  I can't -- I can't be precise, unfortunately.

23  Q.  Now, at the top, there are four columns.  And the third

24  column says "Total Dollars in Millions".  Do you see that?

25  A.  Yes, I do.

48 (Pages 186 - 189)

LEHMAN BROTHERS HOLDINGS INC., et al.

## Page 190

1 Q.  And under that there is something that says "OBS

2 Compensation Accrual".  Do you see that?

3 A.  Yes.

4 Q.  And what does that represent?

5 A.  That represents the opening balance sheet compensation

6 accrual.

7 Q.  And this in connection with the APA, is that correct?

8 A.  I was advised to use this by Mr. Romain.

9 Q.  I'm sorry, what?

10 A.  I was advised to use this as a reference point by Mr.

11 Romain for the schedule.

12 Q.  And where it says "Source, APA"?

13 A.  That was what he informed me.

14 Q.  Okay.  So he informed you that this was -- that the APA

15 was the source of this accrual?

16 A.  Yes.

17 Q.  And the amount of this accrual was two billion dollars, is

18 that correct?

19 A.  That's what he informed me, yes.

20 Q.  And did he inform you of all of the other numbers that are

21 here?

22 A.  No.

23 Q.  Who informed you of these numbers?

24 A.  We -- as I mentioned, he requested that I track and

25 collate and aggregate up all items related to pre-employment --

## Page 191

1 pre-acquisition services performed by former Lehman Brothers

2 employees.  These items came up as we -- as events unfolded and

3 I had a team of finance professionals and HR professionals that

4 supported me in generating the schedule.

5 Q.  And I want to -- I want to go through them and ask you

6 about some of these specific items.

7 A.  Okay.

8 Q.  First, where it talks about "Pre-22/9 Payroll Items", do

9 you see that?

10 A.  I do.

11 Q.  What does that relate to?

12 A.  Those were -- in substance there were two issues that --

13 that these were items that were paid for the -- to or for the

14 benefit of former Lehman Brothers employees in respect of a

15 pre-acquisition payroll -- or payroll-related item.

16 Q.  And the next item says "Replacement RSUs", do you see

17 that?

18 A.  Yes.

19 Q.  And what does that relate to?

20 A.  Those were cash awards that Barclays gave to former Lehman

21 Brothers employees to replace the lost value of bonus awards

22 that they had received earlier in 2008 from Lehman Brothers.

23 Q.  So was this included as -- is that a bonus item?

24 A.  I would categorize it as such, yes.

25 Q.  The next item says "Bonus Including Social Tax".  And what

## Page 192

1 does that relate to?

2 A.  Those were all annual bonus awards made to individuals

3 that were in our compensation database as part of the 2008

4 compensation round at Barclays Capital.

5 Q.  And these are bonuses for the ex-Lehman Brother employees?

6 A.  Absolutely, former Lehman Brother employees, yes.

7 Q.  And then the next one says "IBD Grad Programs", do you see

8 that?

9 A.  I do.

10 Q.  And what does that relate to?

11 A.  Those were the annual bonuses payable to graduates that

12 were on our investment banking graduate program.  But they were

13 former Lehman Brothers graduates that we obviously took on as

14 part of the acquisition.

15 Q.  So these were also bonuses for the former Lehman Brothers

16 personnel?

17 A.  Yes.

18 Q.  And then the next two items are "Severance" and then

19 "Severance Payable in the Future", is that correct?

20 A.  Correct.

21 Q.  And all of these numbers related to the former Lehman

22 Brothers personnel, correct?

23 A.  Yes, all the items on the schedule relate to former Lehman

24 Brothers employees.

25 Q.  The next item says "Payroll Tax and Equity Compensation".

## Page 193

1 And what does that relate to?

2 A.  Those are payroll taxes that we had estimated would be

3 payable on the granting of equity compensation awards to former

4 Lehman Brothers employees in respect to their pre-acquisition

5 service.  It's derived from the numbers in the equity column on

6 the schedule and of -- you know, bonus-related in the sense

7 that they're directly linked to the bonuses reflected on the

8 schedule.

9 Q.  So this was part of the cost of the bonuses, is that

10 correct?

11 A.  Yes, it was.

12 Q.  And let me just jump down near the bottom where it says

13 "Payroll Taxes on ISP Awards", you see that?

14 A.  I do.

15 Q.  And was that also a cost of the bonuses?

16 A.  Yes.

17 Q.  And then going back up to where it says "Acquisition

18 Buyout Investing Over Two Years", do you see that?

19 A.  Yes.

20 Q.  And what does that relate to?

21 A.  That related to performance bonus awards that were due and

22 payable to an individual under his contract with Lehman

23 Brothers that Barclays matched as part of the acquisition.

24 Q.  And was that, as with all of these amounts, amounts that

25 related to pre-acquisition services for the former Lehman

49 (Pages 190 - 193)

Exhibit 48

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14             Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16             United States Bankruptcy Court

17             One Bowling Green

18             New York, New York

19

20             August 24, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 10

1 to a litigation position. We're going to limit our questions
2 to the chart.
3      MR. HINE: Okay, Your Honor. You can take the chart
4 down.
5 Q. Mr. Exall, you were designated as a 30(b)(6) witness in
6 this case with respect to bonus and severance payments made to
7 former Lehman employees who came over to Barclays, isn't that
8 right?
9 A. I believe that was the categorization of my witness in
10 relation to the schedule that was prepared.
11 Q. Okay. And let's just take a look at your deposition
12 notice -- or your 30(b)(6) notice that relates to you.
13      MR. HINE: Could you please put up M766?
14 Q. And that's in your binder as well, Mr. Exall. M766.
15 A. 766. Bear with me. Okay.
16 Q. You recognize this document, Mr. Exall?
17      (Pause)
18 A. I may have seen it.
19 Q. Okay. You saw this before your deposition, correct?
20 A. I don't specifically recall it but --
21 Q. Okay. Any reason to doubt that this is the deposition --
22 30(b)(6) deposition notice to which Barclays was responding
23 when they designated you as their witness on bonus and
24 severance payments?
25 A. I have no reason to doubt it, no.

Page 11

1 Q. Okay. And you generally reviewed this document before
2 your deposition, right?
3 A. I don't specifically recall it but I probably did, yes.
4 Q. Okay. Well, you understood you were being deposed as a
5 30(b)(6) witness, correct?
6 A. Yeah. I recall the phrase and I recall discussion around
7 what that meant, yes.
8 Q. Okay. And just for clarity sake, could you please turn to
9 Schedule A of this document?
10 A. Okay.
11 Q. And you recognize that as the topics on which you were
12 designated as a 30(b)(6) witness, correct?
13 A. It makes sense to me.
14 Q. Excuse me?
15 A. It does make sense to me, yes.
16 Q. Okay.
17      MR. HINE: Your Honor, we'd move this document into
18 evidence.
19      MR. BOIES: No objection, Your Honor.
20      THE COURT: Fine. It's admitted.
21 (Movants' Exhibit 107, deposition notice designating Paul Exall
22 as Barclays' 30(b)(6) witness on bonus and severance payments,
23 was hereby received into evidence as of this date.)
24 Q. Just for a point of clarity, Mr. Exall, you'll see on
25 Schedule A there's a Bates number, what we call a Bates number

Page 12

1 referring to a particular spreadsheet. Do you see that?
2 A. Could you highlight it for me, please?
3 Q. About the third line down, it talks about a spreadsheet
4 produced by Barclays and numbered BCI --
5 A. Yes.
6 Q. -- EX000077287. Do you see that?
7 A. I see that.
8 Q. And now that is not the same Bates number on the M107 that
9 we just looked at.
10 A. Okay.
11 Q. Correct?
12 A. If you say so.
13 Q. Well, let's look at M107 again. You'll see the
14 number in the lower right-hand corner. It's a different
15 number.
16 A. Yes.
17 Q. You might want to keep your finger on the M107 tab --
18 A. Okay.
19 Q. -- 'cause we'll be going back to it. I just want to
20 clarify that apparent discrepancy. The reason the numbers are
21 different is because M107 is an updated version of an earlier
22 spreadsheet that you sent -- prepared in connection with this
23 case, right?
24 A. That's correct.
25 Q. And so, the earlier version was sent to the movants and

Page 13

1 that was what is referenced in the 30(b)(6) notice, right?
2 A. I recall that there were two schedules. And this one here
3 is the updated one, yes.
4 Q. Okay. So M107 is the updated version, correct?
5 A. Yes.
6 Q. And that's the version about which you testified at your
7 deposition, correct?
8 A. That's correct. I recall the other one was -- we
9 discussed that at the deposition, yeah.
10 Q. It was superseded and M107 replaced the one that was
11 referred to --
12 A. Yes.
13 Q. -- in the deposition notice, is that right?
14 A. Yes. That's accurate.
15 Q. Okay.
16      MR. HINE: You can take that down, please.
17 Q. Now, Mr. Exall, understanding that you were designated for
18 certain topics as a 30(b)(6) witness, I just want to go over a
19 little bit of your background. You had no role whatsoever in
20 the negotiations surrounding the sale transaction between
21 Lehman and Barclays, is that right?
22 A. I did not have any role, no.
23 Q. Right. Okay. So you had no role in negotiating the
24 compensation provisions that are embodied in the asset purchase
25 agreement, correct?

4 (Pages 10 - 13)

LEHMAN BROTHERS HOLDINGS INC., et al.

1 A.  No.

2 Q.  Okay.  You had no role in disclosures that were made to

3 the Court about compensation issues, is that right?

4 A.  No.  I was not involved.

5 Q.  Okay.  And you weren't at any of the sale hearings -- the

6 hearing on September 19th, correct?

7 A.  No.  I was not there.

8 Q.  In fact, you weren't even in New York then, right?

9 A.  That's my recollection.  I was I London, yes.

10 Q.  You came to New York sometime around the 21st or 22nd of

11 September, is that right?

12 A.  I believe I landed Sunday -- Sunday evening, yes.

13 Q.  Okay.

14 A.  The 21st.

15 Q.  So even after you came to New York, you didn't review

16 copies of the clarification letter that relates to the

17 Lehman/Barclays transaction, correct?

18 A.  That's correct.

19 Q.  Okay.  So it's safe to say you have no first-hand

20 knowledge about what exactly took place and the negotiations

21 between the parties to the sale transaction right?

22 A.  I have no first-hand knowledge of the events at the time,

23 yeah.

24 Q.  Right.  And so if you wanted to learn what had happened in

25 those negotiations, you would have to confer with someone who

1 was actually involved, right?

2 A.  That would be correct.

3 Q.  Okay.  And you would necessarily defer to someone who was

4 involved in the negotiations if you had to develop an

5 understanding of the intent of the parties and what took place

6 in those negotiations.  Isn't that fair to say?

7 A.  It's fair to say.  If I had a question of events at the

8 time, I would have discussed those, if relevant, with people

9 involved, yes.

10 Q.  Right.  Right.  Now when you did come over to New York in

11 late September of 2008, you were asked to undertake a role in

12 tracking, monitoring and modeling how much money Barclays was

13 paying to former Lehman employees who came over to Barclays,

14 right?

15 A.  Yes.  That was my functions, yes.

16 Q.  Okay.  That's one of the reasons you were asked to come

17 over here, correct?

18 A.  That was one of the reasons, yes.

19 Q.  Okay.  And on or about September 22nd was the first time

20 you were handed a copy of the asset purchase agreement,

21 correct?

22 A.  I believe so, yes.

23 Q.  Okay.  And Mr. Romaine gave you a copy of that agreement?

24 A.  He sent me a copy of -- and I don't -- I'm not certain

25 whether it was the final version, but he sent me a copy

1 thereof, yes.

2 Q.  He thought you would need that in connection with this

3 function you were going to perform for Barclays, right?

4 A.  That's correct.

5 Q.  Okay.  And you were also given a copy of the September

6 16th financial schedule that's referred to in the APA?

7 A.  I was given the schedule which when I asked -- sorry.  Let

8 me start that again.  I asked for the schedule referred to in

9 Article 9 of the draft that I had seen.

10 Q.  Okay.

11 A.  And I was given a schedule that was purported to be that

12 schedule referred to.

13 Q.  Okay.  So you read the asset purchase agreement and you

14 saw in Article 9 a reference to a schedule and you asked for a

15 copy?

16 A.  That's correct.

17 Q.  Okay.  And Mr. Clackson (ph.) gave you a copy of that

18 schedule?

19 A.  I believe it was Mr. Clackson, yes.

20 Q.  And Mr. Clackson represented to you that that was the

21 schedule referred to in Section 9.1(c) of the APA, isn't that

22 right?

23 A.  I don't recall exactly what he said to me about it, but I

24 had asked for a copy of that schedule and that's what I

25 received.

1 Q.  But in fact -- well -- it was represented to you -- isn't

2 it correct that that was the schedule that was referred to in

3 Section 9.1(c) of the APA, right?

4 A.  As I said, I requested a copy of the schedule referred to

5 in Article 9 and that's what I received from finance.

6 Q.  Okay.  Mr. Exall, could you turn to -- in your binder is a

7 copy of the transcript from your deposition.

8 A.  Sure.

9 Q.  And I refer you to page 38.

10 A.  Sorry.  Where --

11 Q.  Page 38.  Should be a tab marked "Deposition".

12 A.  Page 38?

13 Q.  Page 38.  And you'll see a series of questions starting

14 on -- let's go to line 2.  You'll see -- well, I'm sorry.  I

15 have to go to the prior page.  I apologize.  Page 37 on line

16 22.  Excuse me.

17 A.  Yes.

18 Q.  And you'll see we're talking about the schedule and I ask:

19     "Okay.  Who gave you that schedule?"

20 "A.  Mr. Clackson passed me the schedule."

21     Now if we continue on to the next page:

22 "Q.  What did he tell you about it?"

23 "A.  He represented this as being the schedule referred to in

24 the APA."

25     Now that's the testimony that you gave under oath at your

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 18

1 deposition, is that right?

2 A. Yes.

3 Q. Okay. And that was true testimony when you gave it?

4 A. Yes. That's my testimony.

5 Q. Okay.

6 A. I would add that further on, it states that I don't recall

7 what he told me about it.

8 Q. I understand.

9    MR. HINE: Now can we put up Exhibit M-2, Steve?

10 Q. If you turn in your binder to Exhibit M2, Mr. --

11 A. M2?

12 Q. M2, yes.

13 A. Okay.

14 Q. And can you confirm that that is, in fact, the copy of the

15 schedule that Mr. Clackson gave you?

16 A. I believe that's the schedule that was passed to me, yes.

17 Q. Okay. And in performing this function, you were -- in

18 tracking payments to former Lehman employees, you operated

19 under the assumption that that was the schedule referred to in

20 Section 9.1(c) of the APA, right?

21 A. No. I didn't have a real view as to what the schedule was

22 that related to Article 9. It was unclear to me in that the

23 draft of the APA that I was reading referred to a schedule that

24 had been initialed by two parties. This has only been

25 initialed by one. The -- Article 9 also referred to bonus on

Page 19

1 several occasions. This schedule doesn't have the word bonus

2 on it. I was unclear as to what the schedule actually

3 represented. And in fact, it was not necessary for me to

4 understand that for the purposes of my role.

5 Q. I understand that's your position. But my question is

6 were you given any other schedules?

7 A. In relation to the APA?

8 Q. In relation to your work in tracking payments to Barclays'

9 employees -- or Lehman employees --

10 A. I received --

11 Q. -- under the APA.

12 A. On a day to day basis, I received many schedules on many

13 topics.

14 Q. Were you given any schedules that were represented to you

15 as that -- as referred to in Section 9.1(c) of the APA?

16 A. No. This is the only schedule that was passed to me.

17 Q. Okay. Now let's look over a copy of the APA, please,

18 which is M1. Now this is the copy of the APA that you were

19 given, Mr. Exall?

20 A. I don't recall if this is the specific copy --

21 Q. Okay.

22 A. -- but I received a draft version of it, as I said.

23 Q. Okay. In general, you reviewed this agreement generally.

24 But is it fair to say you focused on Section 9.1 of the APA?

25 A. It'll be fair to say I read Article 9 as you've described

Page 20

1 and, for wont of a better word, skimmed the rest.

2 Q. Fair enough. And the reason you read Article 9 is 'cause

3 that related to the work you were going to be doing in tracking

4 payments to former Lehman employees, right?

5 A. No. Mr. Romaine directed me to Article 9 to say this may

6 be something that you may be interested in.

7 Q. Okay. And so you -- Article 9 or the APA became kind of a

8 point of reference for you in tracking the payments to former

9 Lehman employees, right?

10 A. No, it did not.

11 Q. It did not? Can you turn in your deposition to page 17.4

12 --

13 A. 17?

14 Q. -- 17, please?

15 A. 17.

16 Q. 17 at the very bottom starting on line 25. I ask:

17    "Okay. And when were you passed that agreement?

18 "A. I can't recall the exact date but it would have been

19 around the 22nd of September or shortly thereafter.

20 "Q. Okay. And did you need to consult that agreement to do

21 your job from then on?

22 "A. It was a point of reference, yes."

23    That's the testimony you gave at your deposition, right?

24 A. Okay.

25 Q. So the APA was a point of reference for your future work,

Page 21

1 right?

2 A. Apologies for the previous -- but yes. I read it. It

3 became part of my understanding. And it -- and from then on,

4 it did not play a major part in what I actually did.

5 Q. Right. But I -- and I understand you testified yesterday

6 that you didn't have a specific understanding of the exact

7 provisions of the APA as they relate to compensation, right?

8 A. No.

9 Q. No, you did not testify to that effect or --

10 A. No. I -- in reading Article 9 and referencing the

11 schedule that was passed to me, I had no clear understanding of

12 what Barclays' obligations may or may not have been under the

13 APA.

14 Q. You didn't have a legal understanding, right?

15 A. No legal --

16 Q. It's fair to say you had a general familiarity with

17 Article 9, correct?

18 A. I read the clause.

19 Q. Okay. So when you're doing your chart, you have to know,

20 for example, what's a bonus and what's a severance, right, in

21 order to prepare your chart, correct?

22 A. I do know what a bonus and what a severance is.

23 Q. Yeah, 'cause you have to know that. You have to know the

24 cutoff dates for bonuses and severance that are set forth in

25 Article 9 in order to determine whether to put those payments

6 (Pages 18 - 21)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 42

1 requested from Finance a copy of the schedule --

2 Q. Correct.

3 A. -- which was passed to me by Finance. And I'm effectively

4 sending the same schedule that they sent to me back to them.

5 Q. Sure. Sure. Well, you're sufficiently --

6 A. Yes.

7 Q. -- sufficiently familiar with the paragraph 9.1(c) to know

8 that that's what he was talking about when he was asking you,

9 correct?

10 A. It's the same question I had asked earlier, so yes.

11 Q. Okay. And you'll see later on up the e-mail chain

12 apparently they forward your schedule to -- they forward that

13 schedule to PwC, correct?

14 A. That's correct.

15 Q. Okay. And in response to your forwarding the schedule, no

16 one said, hey, you got the wrong schedule, right?

17 A. I don't believe so.

18 Q. Okay. No one said, hey, that schedule's not initialed by

19 a Barclays officer. We shouldn't send it to PwC. Did they?

20 A. I can't tell -- I mean Finance responded to an audit

21 request.

22 Q. Okay. But you don't recall anyone saying that and not

23 forwarding it to PwC 'cause it wasn't initialed by a Barclays

24 officer, do you?

25 A. No. We, in fact, did forward it to PwC.

Page 43

1 Q. Okay.

2 A. I do recall --

3 Q. Do you recall --

4 A. -- discussions at the time -- sorry -- to elaborate, I do

5 recall discussions at the time where I said, hey, this is

6 initialed by one person but this is the schedule that was

7 passed to me. And their OC passed it on to PwC as requested.

8 Q. Okay. So you read the APA sufficiently to know that there

9 was a provision in there that talked about a schedule being

10 initialed by both parties, right?

11 A. Sure.

12 Q. Sure. Okay. And when you forwarded this -- when they

13 forwarded the schedule on to PwC, no one said -- provided you

14 any feedback and said, hey wait, this schedule applies to both

15 bonus and severance, did they?

16 A. I don't recall anyone coming back to me on that either

17 from Finance or PwC.

18 Q. Okay. And it's fair to say that the discussions between

19 Mr. Guarnuccio and members of Barclays continued even after

20 November on this type of -- this topic, right?

21 A. Certainly. The accounts were only signed by PwC, I would

22 say, in and around February 2009. And I recall being on a

23 conference call with Mr. Guarnuccio as well as some of our

24 finance people in late January 2009.

25 Q. Okay. So you were on a conference call on January 27th,

Page 44

1 2009 scheduled at 8 a.m. between Mr. Guarnuccio and his team

2 and yourself to discuss what may have to be paid out of two

3 billion dollars, right?

4 A. I believe Mr. Guarnuccio had some questions of Gary

5 Romaine. And we -- I believe a conference call had been

6 arranged to discuss those questions at that meeting prior to

7 the PwC signing off on the audit.

8 Q. And you recall --

9 A. -- which then affected --

10 Q. You recall that conversation -- that conference call

11 taking place, right?

12 A. Absolutely.

13 Q. And you were on it?

14 A. I was on it.

15 Q. So you had sufficient understanding of the issues to be on

16 a conference call with PwC relating to this discussion,

17 correct?

18 A. PwC had some questions that they wanted to discuss.

19 Q. And sometime after that conference call, PwC eventually

20 signed off on how Barclays was accounting for the compensation

21 payments to Lehman employees, right?

22 A. I believe so. They signed our report of accounts which

23 would eventually -- as their official auditors of which the

24 acquisition accounting was a part.

25 Q. Okay. And that's -- you testified about that yesterday,

Page 45

1 right? At some point, PwC -- at some point after January of

2 '09, PwC signed off on your report of accounts, correct?

3 A. Yes. I believe most of the queries -- or all of the

4 queries must have been resolved by then, so yes.

5 Q. Okay. I want to take you back to September 2008 again --

6 A. Okay.

7 Q. -- when you first began tracking or working on this

8 project to track the bonus payments or any kind of compensation

9 payments paid to Lehman employees. When you first began

10 tracking the bonus payments, you used a number that was

11 considerably lower than two billion dollars, right?

12 A. I used -- I was instructed to use in the daily updates

13 that I was preparing a reference point of 1.4 billion.

14 Q. Correct.

15    MR. HINE: Could we see one of those documents?

16 Q. It's under tab M91 of your book.

17 A. Yep.

18 Q. And you recognize the covering e-mail as an e-mail

19 forwarding from Michael Evans to several other people on

20 September 23rd an update chart that you prepared, right?

21 A. Yes. I prepared that document.

22 Q. Michael Evans is your boss, correct?

23 A. Michael Evans was my direct line manager and the

24 recipients of the executive committee at Barclays Capital.

25 Q. Okay. So you -- and if we turn to the next page, we'll

12 (Pages 42 - 45)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 54

1 correct?

2 A. That's correct.

3 Q. And there's no bonus payment included in the next block

4 for those people there. They're not -- Barclays isn't expected

5 to pay them a bonus, right?

6 A. They would be eligible for severance.

7 Q. They would get severance not a bonus, correct.

8 A. Yes. But as I mentioned before, oftentimes when you're

9 negotiating a settlement of severance, there will be some

10 consideration of prior year bonus and that may or may not be

11 included in the final settlement amount.

12 Q. But you're not -- aside from that distinction, those

13 people are entitled to severance in Barclays' view but not a

14 bonus, correct?

15 A. They would be eligible for severance in the plan

16 redundancy, yes.

17 Q. Right. And if we look down at Footnote 1 -- well, before

18 we get to Footnote 1, that leaves a total of about 6700 some

19 odd people. And the plan at that point was to pay them an

20 aggregate amount of 538 million dollars in bonus, correct?

21 A. That's not the plan. That's just a simple mathematical

22 calculation. You have to read this document in its entirety

23 because it required a plan at this time. But the reference

24 point of 1.4 billion of bonus was clearly insufficient to

25 deliver the kind of compensation plans that Barclays had in

Page 55

1 fact at the time. If you turn the page to page 2, there's a

2 sensitivity analysis section which identifies that issue

3 further and suggests that we're between 270 and 370 million

4 dollars lacked on the 1.4 billion reference point.

5 Q. Okay. So the reference point that you're using is what's

6 entitled "Total Pool Funding of Hours". Do you see that?

7 A. I see that, yes.

8 Q. And that's 1.4 billion?

9 A. That's what it says.

10 Q. Correct? And that's the number you were given by Mr.

11 Evans?

12 A. That was the reference point Mr. Evans asked me to use for

13 that chart.

14 Q. Mr. Evans is your boss?

15 A. Correct.

16 Q. Okay. And so, according to this chart, there was a pool

17 available of 1.4 billion to pay bonuses, 862 million of which

18 was going to go to the 402 most senior people. And the balance

19 would be left to be divided up against the 6700 others,

20 correct?

21 A. Taken in isolation, that's what it says. Again, you have

22 to read the document to put it in full context.

23 Q. I -- we'll get there. And before we get there, let's talk

24 about Footnote 1. You say in Footnote 1 that this is -- and

25 this is in relation to the residual pool of people left. "All

Page 56

1 the moving" -- I'm sorry. I can't read it myself. "Still

2 moving and a net of an expected 3300 redundancies expected to

3 cost about a hundred million. Not funded out of the 2008 bonus

4 pool." You see that?

5 A. Yes.

6 Q. So the funding for the severance was coming out of a

7 separate pool from the bonus pool, right?

8 A. I think what I'm referring to here is the 1.4 billion --

9 Q. Right.

10     THE COURT: -- which is described here as "Pool

11 Funding".

12 Q. Right. So the --

13 A. So it's not coming out of that 1.4 billion --

14 Q. The hundred million --

15 A. -- that's being used for this chart.

16 Q. Right. The expectation, at least at the time you prepared

17 this chart was that the 3300 people would get a hundred million

18 dollars in aggregate in severance, correct?

19 A. They would have -- that's what it says.

20 Q. Right. And that is separate and apart from the 1.4 that's

21 in this bonus pool for a bonus, correct.

22 A. It's separate to this reference point, yes.

23 Q. Right. So this chart maps an expectation of having to pay

24 a total of 1.5 billion dollars in severance and bonus, correct?

25 If you add the one hundred to the 1.4 billion, I get to 1.5

Page 57

1 billion dollars, right?

2 A. If you do the mental arithmetic, that's what this chart in

3 isolation says. However, I would say that as this document

4 clearly identifies, at the time, we were very clear. This went

5 to the executive committee at Barclays Capital. The 1.4

6 billion reference point was going to be insufficient to the

7 tune of 270 to 370 million dollars as modeled to deliver the

8 kind of compensation that Barclays in fact wanted to do.

9 Q. Wanted to do?

10 A. Well, was planning to do in terms of the target as

11 specified in this document.

12 Q. Well, so you're referring further down on this page to the

13 funding pressures that you highlight that are putting pressure

14 on the original bonus pool estimate of 1.4 billion, is that

15 right?

16 A. That's it.

17 Q. And the rest of this memo is to highlight the executive

18 committee, the fact that we might blow the 1.4 pool, correct?

19 A. That's what this document is intended to demonstrate. And

20 my personal opinion was that we were going to substantially

21 exceed the 1.4 billion which is, in fact, what we did.

22 Q. Okay. Now you were told to use this 1.4 billion dollar

23 pool by your superiors, correct?

24 A. That's correct, as a reference point.

25 Q. Okay. And that is on or before September 23rd, 2008 you

15 (Pages 54 - 57)

1 Q.  Okay.  Now this five billion (sic) explains the difference

2 between Barclays' brief where they used the 1.946 number and

3 your chart which is 1.951, isn't that right?

4 A.  Mathematically, that's the case.  I don't know whether

5 that's the reason.

6 Q.  Okay.  Fair enough.  Let's move on to the next item on the

7 chart.  I think you testified yesterday about replacement RSUs.

8 Those are, in fact, Barclays' assuming a stock bonus obligation

9 that Lehman previously owed, right?

10 A.  A portion thereof, yes.  And we replaced them with cash.

11 Q.  Okay.  Now the next item is "Bonus including social tax".

12 Do you see that?

13 A.  I do.

14 Q.  So a portion of that is bonus and a portion of that is a

15 tax, right?

16 A.  Relevant taxes, yes.

17 Q.  Okay.  And you would agree with me that those tax payments

18 were paid to some tax authority not to the individual employees

19 themselves, correct?

20 A.  That would be the case.

21 Q.  Okay.  And --

22 A.  They are clearly bonus related.

23 Q.  Excuse me?

24 A.  They're clearly bonus related.

25 Q.  Sure.

1 A.  They're related specifically to these bonuses.

2 Q.  The bonus was paid to the individuals but the tax was paid

3 to a taxing authority, correct?

4 A.  That's the norm.

5 Q.  Okay.  And at your deposition, you estimated the amount of

6 social tax embodied in that to be about fifty million dollars,

7 right?

8 A.  I recall that it's quite low given the low social taxes in

9 the U.S., yes.

10 Q.  Do you think it might be higher than that?

11 A.  No.

12 Q.  Okay.  So it's about fifty million dollars?  We can agree

13 on that?

14 A.  That's what I estimated in my deposition.  I have no

15 reason to change that.

16 Q.  Okay.  And like any -- so we don't have to go through all

17 the taxes, all the tax entries on here were paid to a tax

18 authority and not to the individual employees themselves,

19 right?

20 A.  That's correct, although I would say that any cash bonus

21 paid to any employees are subject to any withholding tax at any

22 point in time --

23 Q.  Sure.

24 A.  -- and payable to any tax authority.

25 Q.  Sure.

1 A.  So in that sense, it's not really different.

2 Q.  I understand.  I'm just saying the taxes were not paid to

3 the individuals themselves.  They were paid to a taxing

4 authority, correct?

5 A.  That's correct.

6 Q.  All right.  Next you have IBD grad programs which is again

7 just Barclays assuming a bonus type obligation that Lehman used

8 to owe, correct?

9 A.  Yes.

10 Q.  Okay.  Now you see two entries for severance.  The first

11 one is 238 million dollars.  You see that?

12 A.  Yes.

13 Q.  And that's with respect to two different reduction in

14 force exercises that took place at properties, right?

15 A.  Yes.

16 Q.  And that's in reference on the right as RIF and VIG are

17 two different reduction in force programs?

18 A.  Yes.  One was in Q4 2008 and one was in Q1 2009.

19 Q.  So the RIF is in the fourth quarter of '08?

20 A.  I think so.  I can't recall the specific -- I mean, RIF

21 stands for reduction in force, clearly.  VIG -- I have no idea

22 what that stands for.

23 Q.  Okay.  But VIG is in the first quarter of '09, correct?

24 A.  It's one or the other.  I'm sorry I'm --

25 Q.  One of them --

1 A.  One of them is Q4 and one of them is Q1 2009.

2 Q.  Okay.  And if we turn back to Section 9.1(b) --

3     (Pause)

4 Q.  -- you'll agree with me that Section 9.1(b) provides for

5 the payment of severance for employees who -- for the period

6 from the closing up until December 31st, 2008, right?

7 A.  It references the date December 31st, 2008, correct.

8 Q.  So it doesn't apply to the reduction in force the

9 following year, does it?

10 A.  I don't know what this applies to.

11 Q.  Okay.

12     MR. HINE:  Let's go back to the chart, please?

13 Q.  Now, in any event, this severance payment, when that

14 severance payment is calculated, it's calculated in reference

15 to the severance program that was in place at Lehman before

16 these folks came over to Barclays, right?

17 A.  Believe so, yes.

18 Q.  Yes.  Okay.  But you have no real understanding, I think

19 you said -- or at your deposition, you have no real

20 understanding how this severance payment relates to 9.1(c) and

21 the obligations under 9.1(c) of the APA.  Is that fair to say?

22 A.  I have no understanding -- I had no understanding of what

23 9.1(c) obligates Barclays to do or not.

24 Q.  Okay.  And the same would be true of the severance

25 payment, the twenty-seven million and future severance

LEHMAN BROTHERS HOLDINGS INC., et al.

---

Page 74

1  payments, right?

2  A.  Sorry.  I don't understand your question.

3  Q.  Well, the next entry is twenty-seven million in severance

4  payments that had not been paid at the time you prepared this

5  chart, right?

6  A.  Yes.  The June payroll hadn't as yet physically been paid.

7  Q.  Okay.  And same question, you would not -- you have no

8  understanding of how that severance payment relates to the

9  obligations of 9.1(c) under the APA, correct?

10  A.  No.  I have no idea what --

11  Q.  Okay.

12  A.  -- had no idea what 9.1(c) obligates us to do.

13  Q.  Okay.  And if we wanted to compare these severance numbers

14  to Barclays' brief excerpt that we saw, I'd add up 238 and 27

15  and I would come to 265 million in total severance that

16  Barclays has paid, right?

17  A.  That total is 265, yes.

18  Q.  Right.  So your numbers agree with the excerpt from the

19  brief that we looked at.

20  A.  They appear to, yeah.

21  Q.  Yes.  Okay.  Next is an item, a tax item.  We've talked

22  about that.  That's another payment to a tax authority,

23  correct?  Nine billion?

24  A.  I believe so, yes.

25  Q.  Okay.

---

Page 75

1  A.  Or just to clarify, they may or may not have those yet

2  been paid.  It depends on the timing of the actual payments to

3  the tax authority and, in fact, the value of that tax payment -

4  --

5  Q.  Okay.

6  A.  -- is -- depends on when the equity actually vests, I

7  believe.

8  Q.  Okay.  The next items is a fifty-three million dollar

9  position buyout investing over two years.  Do you see that?

10  A.  I do.

11  Q.  And that relates to one individual trader who came from

12  Lehman to Barclays, right?

13  A.  That's correct.

14  Q.  Mr. Hoffman?

15  A.  Correct.

16  Q.  And Mr. Hoffman had a contract with Lehman.  It's a

17  performance based contract where he would make x amount of

18  dollars depending on how well he traded, right?

19  A.  That's reasonably fair to say.

20  Q.  And Barclays assumed that contract so now he does that

21  work for Barclays, right?

22  A.  Barclays issued him with a similar contract.

23  Q.  Okay.  And at the time you were preparing this chart, you

24  expected him to receive twenty million dollar tranches, one of

25  February of 2010 and one of February of 2011, correct?

---

Page 76

1  A.  That's correct.  In fact, he's received the one on

2  February 2010.

3  Q.  Okay.  And he was going to get the balance -- the thirteen

4  million was --

5  A.  He received that as well.

6  Q.  He's received that as well?

7  A.  Correct.

8  Q.  And was paid on February 2010, correct?

9  A.  It was delivered to him in whatever form outstanding

10  delivery parcel.  But, yes, he received value to that effect.

11  Q.  Okay.  And in connection with this assuming this contract,

12  Barclays retained the right to reduce these amounts if he

13  traded poorly, correct?

14  A.  In general, yes.

15  Q.  So if he accumulated a lot of losses in his trading,

16  Barclays could reduce those twenty million dollars payment by,

17  I believe you testified, up to ten million dollars, correct?

18  A.  That's correct.

19  Q.  So at least in part, you would agree that Barclays'

20  willingness to pay that fifty-three million dollars depended on

21  his performance after he went to Barclays, correct?

22  A.  We committed to this fifty-three million dollars

23  contractually to pay to Mr. Hoffman.  Delivery thereof was

24  contingent on -- delivery of a portion thereof was contingent

25  on future performance.

---

Page 77

1  Q.  So ten million dollars on two different tranches, at least

2  a substantial portion of it, is contingent on how well he

3  performs after he moves to Barclays, isn't that right?

4  A.  Those -- the twenty million tranches were subject to that

5  reduction under the contract, yes.

6  Q.  Right.  So that's --

7  A.  Well, as I've stated, he's received the first twenty.

8  He's received the thirteen.  And in fact, he's on track to

9  receive --

10  Q.  Okay.  That wasn't my question, Mr. Exall.

11  A.  I'm just giving --

12  Q.  But the question is Barclays assumed that contract.

13  Barclays' willingness to pay the fifty-three million dollars in

14  total was at least in substantial part dependant on how well he

15  traded when he went to Barclays, correct?

16  A.  The fifty-three million dollars that we had committed to

17  were subject to -- a certain portion thereof was subject to

18  future performance.

19  Q.  And it's also contingent on the fact that he has to stay

20  at Barclays till February of 2011, right?

21  A.  I can't recall the exact interpretation of the contract

22  but if that's what it says then, in general, that's probably

23  the case.

24  Q.  Well, let's --

25  A.  For certain awards you receive in stock or something,

---

20 (Pages 74 - 77)

Page 78

1 there are vesting conditions that are required. Some of them
2 require service. I can't recall exactly the specifics of Mr.
3 Hoffman's replacement contract.
4 Q.  Okay. Let me direct your attention to page 135 of your
5 deposition.
6 A.  Okay.
7 Q.  I'm sorry. It's page 136. I apologize.
8 A.  Okay.
9 Q.  Starting at line 9, we're talking about Mr. Hoffman's
10 arrangement. The question is:
11     "Barclays' willingness to pay that is contingent at least
12 in substantial part on how well he performs for Barclays
13 thereafter, correct?"
14 "A. That is correct as well as Mr. Hoffman being in employment
15 with Barclays at the time."
16     Is that the testimony you gave at your deposition?
17        MR. BOIES: Your Honor, for context, could we have the
18 next question and answer, please?
19        THE COURT: Let's do that.
20        MR. HINE: Sure, Your Honor.
21 Q.  The following question says:
22     "Okay. So he has to stay an employee at Barclays at least
23 through the third payment?"
24 "A. I don't know that for certain. Again, I can't interpret
25 the specific leaving clauses or termination clauses under his

Page 79

1 agreement. But in general, that's, you know, I would say, it's
2 based on future time served criteria as well as trading
3 performance."
4     That was your testimony --
5 A.  That's what I said.
6 Q.  -- at your deposition, right?
7 A.  That's what I said.
8 Q.  And that's still a true statement?
9 A.  I believe so.
10 Q.  Okay. Let's go back -- refer back to paragraph 9.1(c)
11 once more.
12     (Pause)
13 Q.  You'll see in that paragraph, about the seventh or eighth
14 line down, Mr. Exall, it says, "Such annual bonuses shall be
15 awarded on or before March 15th, 2009." You see that?
16 A.  That's what it says.
17 Q.  You would agree with me that the payments Mr. Hoffman
18 received were well after March 15th, 2009, is that right?
19 A.  Which payments?
20 Q.  The payments that he was to receive in February of 2010
21 and February of 2011.
22 A.  He received a contract for March 15th, 2009 and we
23 stipulated Barclays' obligations under that contract.
24 Q.  Right. But his payments he didn't receive until February
25 of 2010 or February of 2011, correct?

Page 80

1 A.  He certainly didn't receive certain payments until that
2 time. But it's -- again, I don't really know what this clause
3 means, but it does say "shall be awarded".
4 Q.  Yes.
5 A.  And he was given a contract with those terms inside it.
6 Q.  He didn't get the money until February of 2010, is that
7 right?
8 A.  In certain instances, yes.
9 Q.  As to the ones we were just talking about, right?
10 A.  That's correct, although I would go on to say that certain
11 individuals -- well, under normal stock programs they're
12 given -- people are given awards of stock. They don't
13 necessarily receive the cash value before the 15th of March
14 2009. But they may well have received the actual reward value
15 in a letter.
16 Q.  Okay. Can we go back to your chart? And just one point
17 of clarity. Mr. Hoffman, in addition to this fifty-three
18 million dollar entry, he also received a bonus that falls
19 within the 1.529 number further up, correct?
20 A.  That's correct.
21 Q.  So he received both a bonus within that category of
22 payments and a separate contractual performance based contract,
23 right?
24 A.  He received an amount embodied in the 1.529 number. And
25 he received awards for the value of fifty-three million dollars

Page 81

1 as stipulated on the schedule.
2 Q.  Okay. And following that fifty-three number, you'll see
3 there's a payroll tax associated with his payments, is that
4 right?
5 A.  I believe so, yeah.
6 Q.  Okay. And then the last large item is ISP awards. Do you
7 see that? Fifty-six million?
8 A.  Yes.
9 Q.  Now, as I understand it, those are shares of stock, the
10 stock bonuses that Barclays paid to employees to compensate
11 them for the fact that they did not receive their normal bonus
12 in March but rather received it in May, is that right?
13 A.  I wouldn't categorize it that way, no.
14 Q.  Okay. Well, let me try to break it down. The normal
15 practice at Barclays would be to pay stock awards in March,
16 correct?
17 A.  The normal practice for Barclays is to make awards to
18 individuals and communicate their compensation in late
19 February, make cash payments then make stock awards related
20 to those in March having purchased the stock on an open market.
21 Q.  Okay. And for some reason, 2009 -- those awards were paid
22 in May instead of March, right?
23 A.  I do recall there was a delay.
24 Q.  Okay. And this is to compensate the recipients of those
25 awards for the fact that Barclays stock appreciated in value in

21 (Pages 78 - 81)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 82

1 that interim period, right?

2 A.  That's correct.  The amount of stock units that they would

3 have received in May would have been substantially lower than

4 the amount of stock units they would have received in March.

5 In March, people were told the dollar value of the awards they

6 were going to get in stock.  But they would have received a

7 substantially higher number of units in March.

8 Q.  Right.

9 A.  In May, given the share price appreciation, they would

10 receive substantially fewer stock units.  Consequently, this

11 award is directly related to the original value of the stock

12 awarded and it's to compensate them in part for the loss of

13 value in the sense that they would have gotten fewer stock

14 units.

15 Q.  I understand it's related to their original awards but

16 it's --

17 A.  It's directly related to the original awards.

18 Q.  -- it's payment to compensate them for the fact that

19 Barclays' normal procedures weren't followed and they were paid

20 several months later, isn't that right?

21 A.  No.  People got awards of value in March as a normal

22 course of business.

23 Q.  Right.

24 A.  They were not told the amount of stock  units they

25 received until later.

Page 83

1 Q.  Right.

2 A.  And this is to compensate them for the fact that they, in

3 May, doing a mathematical calculation based on the strike price

4 that we would have received in having hedged or purchased the

5 shares on the market, they would have received fewer shares

6 than they otherwise would have received.  It's directly related

7 to the value of the stock awards made at the time.

8 Q.  But it's due to the -- it's paid due to the fact that

9 their normal process wasn't followed that year, right?

10 A.  For various reasons, yes.

11 Q.  Right.  Okay.

12       MR. HINE:  Your Honor, I have nothing further.

13       THE COURT:  Do you have any redirect?

14       MR. BOIES:  Excuse me, Your Honor?

15       THE COURT:  Do you have any redirect?

16       MR. BOIES:  I do, Your Honor.

17       THE COURT:  About how long do you think you might be,

18 Mr. Boies?

19       MR. BOIES:  I would say certainly much less than the

20 cross.  I would say maybe thirty, forty minutes.  I think we

21 should take a break at this point.  It's ten after 11.  Let's

22 resume at twenty after 11.

23       MR. BOIES:  Thank you, Your Honor.

24       (Recess from 11:10 a.m. until 11:29 a.m.)

25       THE COURT:  Be seated, please.  Please proceed, Mr.

Page 84

1 Boies.

2       MR. BOIES:  Thank you, Your Honor.

3 REDIRECT EXAMINATION

4 BY MR. BOIES:

5 Q.  Good morning, Mr. Exall.

6 A.  Good morning.

7 Q.  Counsel asked you a number of questions about a

8 conversation that you had with Mr. Guarnuccio.  And he took you

9 through the fact that you were not present even in New York

10 when the APA was signed.  Is that correct?

11 A.  I wasn't in New York till the 22nd -- or 21st of

12 September.

13 Q.  Of September?

14 A.  Yeah.  I don't know when the APA was actually signed.

15 Q.  And you spoke to Mr. Guarnuccio shortly after arriving in

16 New York in September of 2008, is that correct?

17 A.  I recall it being at or around the time.  I can't be

18 precise about the date.  I don't -- I couldn't find it in my

19 diary and I have no notes of the meeting.

20 Q.  You don't have any reason to doubt Mr. Guarnuccio's

21 statement that it was in September of 2008, correct?

22 A.  No.

23 Q.  And at the time you spoke to Mr. Guarnuccio, this was when

24 you were just beginning to examine the bonus and severance

25 issues, is that correct?

Page 85

1 A.  Yes.  This was at the beginning of my work associated with

2 the sale, yes.

3 Q.  Now, Mr. -- counsel gave you a copy of Movants' Exhibit 2.

4 And that's in the book that they gave you.  This is the

5 schedule that is initialed by Mr. Berkenfeld?

6 A.  Yes.

7 Q.  And is there any place on this schedule that references

8 bonus payments?

9 A.  Not that I can see.

10 Q.  There is a reference to comp, is that correct?

11 A.  Correct.

12 Q.  And you understand that to mean compensation, correct?

13 A.  That would be my interpretation of that.

14 Q.  And that shows a total for compensation of two billion

15 dollars, is that correct?

16 A.  That's what it seems to show.

17 Q.  And as you use the terms, "comp" and "compensation" as an

18 HR person, does that include severance as well as bonuses?

19 A.  Absolutely.  Compensation encompasses all forms of award

20 and compensation for services rendered including bonus,

21 severance, annual, long term incentive awards if necessary,

22 stock awards, benefits, monthly salary, all sorts of

23 compensation.

24 Q.  Now you were shown some materials from our brief in the

25 trial record.  I'd like to show you a couple of pieces also.

22 (Pages 82 - 85)

Page 86

1 Do you happen to know who Mr. McDade is?

2 A.  I don't know him personally but I know who he is.

3 Q.  And he was the lead negotiator for Lehman in this sales

4 transaction.  Were you aware of that?

5 A.  I have heard that.

6 Q.  Let me show you some testimony that Mr. McDade gave at

7 this trial, the official trial transcript of April 26th, 2010

8 at page 160.  And this -- in particular, I want to go to line

9 24 and the question that carries over to the next page.  And

10 I'd like you to look at this on the screen:

11 "Q.  The other part of that question had to do with

12 compensation, sir.

13 A.  Right.  Barclays also assumed a two billion dollar

14 compensation liability with respect to the combination of the

15 employees' bonus process and the severance process."

16     Do you see that?

17 A.  I do.

18 Q.  Did you come across anything in your work that was

19 inconsistent with that?

20 A.  Well, I believe so.

21 Q.  Now, going back just for a moment to Movants' Exhibit 2,

22 it's initialed up in the right-hand corner.  Do you know whose

23 initials those are?

24 A.  No, I don't.

25 Q.  Didn't anyone ever tell you that was Mr. Berkenfeld?  Yes

Page 87

1 or no?

2 A.  Not during the process.

3 Q.  Okay.

4 A.  I happened to be --

5 Q.  There's some testimony in the record that this was Mr.

6 Berkenfeld's initials.

7 A.  Okay.

8 Q.  And I ask you to assume that just for the moment.  And let

9 me show you -- and the cure and comp number totals 4.2 billion

10 dollars, correct?  4.25 billion dollars?

11 A.  That's correct.

12 Q.  Let me show from the official trial transcript, June 21st,

13 2010.  This is Mr. Marsal's testimony at lines 9 through 14 of

14 page 45:

15 "Q.  Was it your understanding in October of 2008 that the

16 assumed cure liability that is listed here and the assumed

17 severance liability that was listed here together added up to

18 4.2 billion dollars?

19 A.  That was my assumption based on the conversation with

20 Steven Berkenfeld, yes."

21     And did you find anything in your work that was

22 inconsistent with the inclusion of severance in that 4.2

23 billion dollars?

24 A.  If severance -- well, no.  No, I didn't.  If these are the

25 references you're making then, no, I don't see anything

Page 88

1 inconsistent with that.

2 Q.  Let me ask you to look at page 38 of your deposition.  And

3 you will recall that counsel asked you some questions about

4 that and directed your attention to the testimony at the top of

5 the page.  And you said in your answer, yes, you had testified

6 as he indicated at the top but there was also some testimony at

7 the bottom that you thought was relevant?

8 A.  Yes.

9 Q.  And I'd like to now give you a chance to look at that

10 portion at the bottom beginning at line 17 to 24:

11 "Q.  What did Mr. Clarkson (sic) tell you about that schedule?

12 "A.  I don't recall what he told me about it.  I asked for a

13 copy of it as part of my own reading of the relevant sections

14 of the APA."

15     And did you give that testimony also at the time?

16 A.  Yes, I did.

17 Q.  Let me ask you to look next at Movants' Exhibit 801 that

18 is in the book that counsel gave you.  And you'll recall that

19 counsel asked you about the e-mail at the bottom of the page

20 which was from James Walker to you with a copy to Gary Romaine

21 dated November 3, 2008.

22 A.  Yes.

23 Q.  Do you recall that?  And where he is requesting a copy of

24 the schedule that I think we've identified as Movants' Exhibit

25 2.  And he says that -- or James says that there is a request

Page 89

1 for a copy of the schedule that shows the two billion bonus

2 liability to Lehman folks.  Do you recall that?

3 A.  I see that there.

4 Q.  Now when you reply to that, you don't use the term

5 "bonus", correct?

6 A.  No, I didn't.

7 Q.  In fact, when you replied to that, which is the middle e-

8 mail on the same exhibit, you say "Here is a scanned copy.  You

9 will see the two billion dollars described as 'comp'."  Do you

10 see that?

11 A.  I do.

12 Q.  And why did you do that?

13 A.  I wanted to be precise about what I saw in the schedules

14 that have been given to me from Finance in relation to

15 Clause -- Article 9.  And I'm very careful, generally, to use

16 precise terms.  I realize that there is oftentimes confusion

17 when dealing with noncomp professionals.  For example, in my

18 day-to-day, I deal with finance people all the time.  They'll

19 use colloquialisms.  And in the comp world, certain things mean

20 certain things to different people.  So I try to be as precise

21 as I can when answering the question.

22 Q.  Let me ask you to look next at Movants' Exhibit 91 which

23 was another exhibit that counsel showed you.

24 A.  Yes.

25 Q.  And you said in response to a couple of questions that the

23 (Pages 86 - 89)

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 90

1  1.4 billion dollar reference number was believed this time to
2  be insufficient. And I'd like to give you a chance to explain
3  what you meant by that.
4  A.  The 1.4 billion dollars was given to me as a reference
5  point for the chart on the first page of this attached
6  document, summary report. If you turn to the second page, we
7  are looking at sensitivity analysis around that number. And
8  what we were trying to understand is with that reference point
9  and the guaranteed contracts that had been written and issued
10 to people at the time, what would the impact be on the residual
11 population that are not being guaranteed at that time.
12     Our target was to deliver in an aggregate for those people
13 without guarantees sixty-five percent of their 2007 total bonus
14 in 2008. And the sensitivity analysis that we performed at
15 this time almost from day 1 indicated that the residual amount
16 available for those nonguaranteed people was at least 270
17 million dollars short on the model basis. And if you adjust it
18 for people that may have received a zero bonus in 2007 and it
19 should be normalized in the normal course of events, you could
20 add another seventy-five to a hundred million dollars on top of
21 that.
22     So at this time, we were realizing that the 1.4 billion
23 dollar reference point was at least -- was anywhere between, on
24 a model basis, 270 and 370 million dollars short.
25     Now this is a bonus model only. It excluded, as you see

Page 91

1  on the front page, severances that may or may not be payable to
2  eligible employees as part of the redundancy program.
3  Q.  Now, in that connection, I'd like to ask you to look at
4  Movants' Exhibit Trial Exhibit 145, which you were also asked
5  about. And in particular, go on to the second page and at the
6  bottom, under "Strawman Approaches", one of the strawman
7  approaches that you identified is to try to manage within the
8  overall 1.4 billion dollar number. Do you see that?
9  A.  I see that.
10 Q.  And you were asked about that. And there are a list of
11 risks or disadvantages to this. And there are several. And
12 counsel asked you about the very last one which was spending
13 more than one billion dollars is "dilutive to current negative
14 goodwill calculation". Do you see that?
15 A.  More than 1.4 billion.
16 Q.  Yes. And what I'd like to do is ask you about the very
17 first disadvantage of the several that are listed here, not the
18 last one, which is "contrary to original principles". And can
19 you explain what you meant by that?
20 A.  What I meant by that was there was an original plan to
21 issue guarantee bonus contracts to the top 175 to 200 people.
22 And we were going to go beyond that estimate. We were going to
23 issue guarantee bonus contracts to more than that given the
24 substantial pressures that we were under to retain staff and
25 solidify the franchise. I think if you continue on under those

Page 92

1  disadvantages to the second last one, we were referencing the
2  fact that a finite pool, which is the 1.4 billion dollar
3  reference point, would mean a furtherance of substantial
4  squeeze on nonguaranteed people and lead to flight risk which
5  is what we were seeing at the time. And I think at this time,
6  we realized that 1.4 billion dollars was just not going to be
7  sufficient if we were going to address these concerns of the
8  business.
9  Q.  Let me ask you -- incidentally, before I go on to the next
10 exhibit, in addition to the guaranteed -- the people you were
11 going to guarantee the bonuses to, was it the plan to give
12 bonuses to additional people?
13 A.  Yes. People that were not issued guaranteed contracts
14 were eligible for compensation.
15 Q.  And from the beginning, was it intended that some amount
16 of money would be spent on bonuses for pre-acquisition services
17 for former Lehman employees who were not given guarantee
18 contracts?
19 A.  That's correct. The original targets, rules of the road
20 for wont of a colloquialism that we use, was to try and deliver
21 an aggregate to those people an amount equivalent to sixty-five
22 percent of their 2007 bonus.
23 Q.  Okay. Now let me go on to Movants' Trial Exhibit 107
24 which is another version of an exhibit that I had used with you
25 during my examination yesterday. And in this connection,

Page 93

1  counsel asked you a number of questions about taxes and payment
2  of taxes to tax authorities. Do you recall that generally?
3  A.  Yes.
4  Q.  Now, typically, if you pay a bonus to an individual, do
5  the taxing authorities require you to withhold a certain amount
6  of that bonus and pay it to the tax authorities?
7  A.  In most tax jurisdictions, that's correct.
8  Q.  And when you do that, is your belief that when you pay it
9  to the tax authorities, you're paying it on behalf of the
10 employee?
11 A.  It will be their liability to the tax amount in that
12 jurisdiction, correct. And the employer is effectively acting
13 as a collection agent for --
14 Q.  And do you include the amount of the withholding that
15 you're paying to the tax authorities as part of what you
16 ordinarily consider to be the bonus that is being paid to the
17 individual?
18 A.  Yes. That's the value that would be drawn to or awarded
19 to the individual, the gross number.
20     MR. BOIES: Your Honor, I have no more questions.
21     THE COURT: Is there anything more?
22     MR. HINE: No questions, Your Honor.
23     THE COURT: You're excused. Thank you.
24     THE WITNESS: Thank you, Your Honor.
25     MR. BOIES: Our next witness, Your Honor, is Mr.

24 (Pages 90 - 93)

# Exhibit 49

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   Case No. 08-01420 (JMP) (SIPA)

6   - - - - - - - - - - - - - - - - - - - -x

7   In the Matter of:

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9         Debtors.

10  - - - - - - - - - - - - - - - - - - - -x

11  In the Matter of:

12  LEHMAN BROTHERS INC.,

13        Debtor.

14  - - - - - - - - - - - - - - - - - - - -x

15

16                  U.S. Bankruptcy Court

17                  One Bowling Green

18                  New York, New York

19

20                  August 27, 2010

21

22

23  B E F O R E:

24  HON. JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

LBHI et al.; LBI

Page 18

1  A.  No.  To my knowledge, it was not at any point defined as a

2  balance sheet transaction.  The transaction at the outset,

3  prior to bankruptcy, was the acquisition of a global business,

4  a substantial expansion of Barclays' global franchise in

5  capital markets, advisory wholesale banking.  The transaction

6  that was attempted pre-bankruptcy was specifically, if you

7  will, to exclude elements of the balance sheet that was known

8  to be risky.  The transaction that then was contemplated on the

9  Monday and Tuesday was specifically an attempt to acquire the

10  business as had been described to us, the North American

11  capital markets business.  There was no sense of what, quote,

12  "balance sheet" may exist.

13       And the idea that one would step in Barclays with their

14  extremely strong business and put their complete business at

15  risk reputationally against this big announced expansion into

16  new business lines and a new geography, it was never -- well,

17  it was not described to me that it was ever contemplated as the

18  purchase of, quote, "a balance sheet" or a set of assets.

19  Q.  Based on your understanding of the nature of Lehman's

20  records and what Lehman understood and could demonstrate about

21  its assets and liabilities, would it have been possible to have

22  a balance sheet transaction?

23       MR. GAFFEY:  Objection, Your Honor.

24       THE COURT:  What's the basis of the objection?

25       MR. GAFFEY:  I think it goes beyond his fact

Page 19

1  knowledge --

2       (Coughing)

3       MR. GAFFEY:  I beg your pardon.

4       It goes beyond factual knowledge and asks for an

5  opinion.

6       THE COURT:  Well, he's asking the witness if it's

7  possible.  And given this witness' involvement in the

8  transaction and the questions that have been asked to this

9  point about the nature of the financial information, including

10  his comment that this was not a balance sheet transaction, I'll

11  treat it as a lay opinion, if in fact it's an opinion at all.

12  And he can answer the question, but the answer is not likely to

13  be given very much weight.

14  A.  The question of possible is -- it's a very big concept.  I

15  don't believe at the time that there was an ability -- as I

16  understand a balance sheet, which is a full listing of assets

17  and a full listing of liabilities -- that anyone could have

18  delivered or that there was a possibility to deliver, in the

19  time frame we were working, the specific listing and the

20  specific valuation of each asset that was provided to us as I

21  understood it at the time.

22  Q.  In connection with the transaction that was contemplated

23  and the transaction that was done, was Lehman guaranteeing the

24  value of any of the assets it was providing?

25  A.  No, not that I'm aware of.  I don't believe that Lehman

Page 20

1  could or attempted to warrant any valuation.

2  Q.  Was Lehman providing any warranty or representation or

3  guarantee of what its liabilities were?

4  A.  I don't -- my apologies in that those are some more

5  specific legal terms.  It's my understanding that there were

6  assumptions of specific liabilities as part of the overall

7  consideration.  There was an estimate of two groupings of

8  formal liabilities, what was an estimate for compensation, an

9  estimate of a potential exposure for something called cure,

10  which I learned about, frankly, in this process; I hadn't been

11  aware of it before.  There were ongoing expenses of doing

12  business, because this was an ongoing business and, with 10,000

13  employees, they would generate expenses, as by their nature.

14  There was clearly going to be potential exposure on a

15  commercial basis, not on a legal basis but for clients who

16  might have done business with Lehman who had just a concern

17  about some particular event.  That was a potential, not

18  necessarily legal but commercial.

19       And of course there was a grouping of liabilities that

20  were the directly attributable liabilities attached to the

21  trading book, because the trading book, which were part of the

22  direct overall assets associated with the broker-dealer, was a

23  net book at the time of the transaction.  It had hedged

24  positions, it had funding positions, as trading books, as I

25  understand, do.  So those liabilities were part -- the ability

Page 21

1  to guarantee what any of those particular liabilities were or

2  the totality of those liabilities, I'm not aware that was done.

3  Q.  Was Lehman, as you understood it, guaranteeing that the

4  employees would stay with the business?

5  A.  No, not that I'm aware of.  I think that, as I understood

6  it, Barclays committed to give roles for a defined time period

7  to the employees.  If they decided not to keep certain

8  employees, they would in fact terminate those employees and pay

9  them a severance.  There were a certain group of employees that

10  I believe there was an attempt to negotiate agreements with; I

11  wasn't part of that.  But I don't think Lehman did or could

12  guarantee that any individual employee or collective grouping

13  of employees could stay.

14  Q.  Was Lehman guaranteeing that its customers and

15  counterparties would stay with the business as opposed to

16  taking their business elsewhere?

17  A.  No, I don't believe that Lehman was making any

18  representations in terms of which clients existed and continued

19  to exist or could continue to exist.  No, I'm not aware of

20  that.

21  Q.  During the period of September 15th and 16th, what role

22  did you play in working with Lehman representatives to agree

23  upon a basic structure for the transaction?

24  A.  The 15th and the 16th was the Monday, Tuesday.  And as I

25  indicated, we got a call early in the morning at about, I

6 (Pages 18 - 21)

Exhibit 50

Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  LEHMAN BROTHERS HOLDINGS INC., et al.

9            Debtors.

10 - - - - - - - - - - - - - - - - - - - -x

11 In the Matter of:

12

13 LEHMAN BROTHERS INC.

14            Debtor.

15 - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            August 31, 2010

21

22

23 B E F O R E:

24 HON. JAMES M. PECK

25 U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

1 like. You want to know what it is you're buying and the more
2 information you have the better to have a sense of that. I
3 think Barclays -- you mentioned the press release that they
4 issued that showed that there was a positive difference between
5 the value of the trading assets and the trading liabilities.
6 And that was important -- it was very important to Barclays
7 given the markets that existed. We had seen this over the
8 Friday and over the prior weekend, that Friday, Saturday,
9 Sunday. It was important if Barclays was going to do this that
10 it appear to be knowing what is was doing in the public
11 environment and to its regulators and the like and that was all
12 important. So they cared on the assets. And Lehman, obviously
13 -- I mean, they were advised by Mr. Miller and others and
14 obviously with great expertise and they needed to have a sense
15 of value, as much information as they could to conclude
16 whether, in fact, this was in the best alternative available to
17 Lehman in terms of that there was no other bid and that they
18 wouldn't be better off liquidating the portfolio, et cetera.
19 So it was important to both sides, sure.
20 Q. Was there a lot of effort as you observed it by Barclays'
21 traders to value these assets in order to determine whether
22 there was a positive difference as you've defined it?
23 A. Yes. There were -- and as I said -- I testified earlier
24 there were a lot of rooms and a lot of things going on at one
25 point all over that Monday and Tuesday at Lehman Brothers on

Page 35

1 that one floor. And in one of the rooms there were traders
2 from both Lehman and Barclays who were going through the Lehman
3 portfolio. Those of us in the -- what I referred to earlier as
4 the corner lawyers' room, we'd get reports from time to time.
5 And both sides were in there. It was -- we were told that
6 there were differences, substantial differences in views as to
7 the appropriateness of the marks. Lehman -- there had been
8 lots of newspaper stories and other things for some months
9 suggesting that -- weeks, at least -- that suggested that maybe
10 Lehman had unrealistic marks on some of its portfolio.
11 Barclays was going through that. There were traders sitting
12 together, as I understood it. I may have walked past that room
13 at least once. But the -- and so that was going on. There was
14 also the question of even if they hadn't been overstated
15 previously whether they were stale with each passing day and
16 each passing hour and therefore overstated. And there was at
17 least, at one page, the story was reported in the room that I
18 was in, again, with lawyers from both sides present, and maybe
19 some businesspeople, in which it was mentioned as an example of
20 why the Barclays traders were dubious about the marks. There
21 was some security that Barclays had on its own -- in its own
22 portfolio that where Barclays had a senior tranche of the
23 security and had marked it at a lower percentage of nominal
24 value then Lehman had a junior tranche marked at. Well, that
25 certainly makes one dubious as to not only that mark but other

Page 36

1 marks that were on the Lehman -- in the Lehman portfolio. So
2 there was -- there were discussions of that sort.
3     I've rambled. I apologize, Your Honor.
4 Q. Well, that's all right, Mr. Lewkow. It's important. You
5 mentioned that there was an effort on the part of Barclays, if
6 not both parties, to understand what some of these trading
7 assets were at that point in the week. You mentioned, I think,
8 in your answer that there was some confusion about that.
9     Let me show you Exhibit 106 which has been referred to as
10 Mr. Berkenfeld's document, BCI 106. Do you recall seeing this
11 document during the negotiations?
12 A. Yeah. At some point, Mr. Berkenfeld came into the -- back
13 into the room -- or came into the room. We were close to
14 finalizing -- it was pretty late Tuesday night. I couldn't put
15 a time on it. But -- is there -- there may even be a time on
16 this document. But -- and --
17 Q. There's a date in the upper right-hand corner handwritten.
18 It says September 16th.
19 A. Yeah. 9/16/08, yeah. It was that Tuesday -- and said
20 just want to make sure this is what we're talking about. These
21 are the categories of assets and liabilities we're talking
22 about. And at some point, he said, with a little bit of flare,
23 said let's initial it. So we know when he initialed it.
24 Q. Can you move the microphone just a bit closer to you --
25 A. Oh, I'm sorry. I --

Page 37

1 Q. -- so His Honor can hear you.
2 A. -- came down with a cold last night. So I'm getting a
3 little bit of laryngitis. I apologize.
4 Q. Thank you. Don't hesitate to drink water.
5 A. I've gone almost through a bottle.
6 Q. Now, you had mentioned initialing the document. And you
7 see there that there are some initials below that signature.
8 Did this schedule include all of the purchased assets or all of
9 the assumed liabilities that Barclays was acquiring from
10 Lehman?
11 A. Well, it certainly didn't include all of the assets. It
12 was, at most, certain of the -- certain of the assets we
13 were -- we were buying all the assets except, as I said
14 earlier, except as expressly excluded. And even the specific
15 enumeration in the agreement of assets went beyond these kind
16 of purely financial assets.
17 Q. Mr. Lewkow, this exhibit which is in evidence has only one
18 individual signature on it. Did Barclays sign this document in
19 any way, put initials on it, do you know?
20 A. Not that I recall but I wouldn't swear to it one way or
21 the other.
22 Q. Well, let me ask you this, 'cause you are under oath --
23 A. Yes, I know. That's why --
24 Q. Did the lawyers for the parties discuss -- did you discuss
25 with Lehman's lawyers whether this document should be a part of

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

1 the APA or attached to the APA?

2 A.  Yes.  There was a discussion.  Someone suggested on the

3 Lehman -- I think it was on the Lehman side.  Someone

4 suggested -- it might have been Mr. Berkenfeld, I just don't

5 recall.  Let's attach it as an exhibit or something along that

6 line.  And we said -- and I say "we" but I'm pretty sure it was

7 me -- said no.  This is -- we just spent the last thirty-six

8 hours negotiating this thing, the asset purchase agreement.  It

9 lays out a whole bunch of aspects of this transaction.  It

10 can't be replaced by what this one page, which we haven't

11 really audited and reviewed or anything -- and I don't want to

12 attach it as an exhibit and sort of imply the entire asset

13 purchase agreement should be interpreted as based on this

14 document.  I don't know what the implications of doing that

15 would be and we're not prepared to do that.  And it was

16 dropped.

17 Q.  So did Mr. Miller --

18 A.  There was one mention made of this document, but --

19 Q.  Did Mr. Miller agree with you not to attach it to the APA?

20 A.  Yeah.  As I said, somebody suggested -- might have been

21 Mr. Berkenfeld, I don't recall.  I gave my little speech.  And

22 it was totally dropped.  This was not heavily negotiated or

23 anything like that.

24 Q.  Did the figures that are set forth in this document change

25 during the week as far as you know?

Page 39

1 A.  Everything changed constantly during the week.  It was

2 that kind of week, yes.

3 Q.  Now let me ask you about the reference in the APA to a

4 book value.  Do you recall the circumstances under which the

5 words "with a book value as of the date hereof of approximately

6 seventy billion dollars" was added to the description of the

7 long positions in the APA?

8 A.  Yes.  I know that -- Exhibit 4, which is what I'm

9 looking -- or tab 4 which is whatever exhibit number it is

10 that's in this book that you asked me to look at earlier.

11 Q.  It's BCI --

12 A.  When I looked at it --

13 Q.  -- Exhibit --

14 A.  -- the first thing I looked at is which version of the

15 execution version was this included.  The version I remember

16 best was the one that had inked in changes that I know is the

17 version we filed early hours of Wednesday morning because we

18 were anxious to get it on file.  And word processing those last

19 minute changes would have possibly delayed things further.  So

20 we filed it and then it was refiled with the word processing

21 changes made.  One of -- those were last minute changes made as

22 we all sat around the room.  One of the young lawyers on the

23 Lehman side of the table sat between me and one of the

24 partners -- in fact, it was a Simpson Thacher partner and not a

25 Weil partner but the Weil partners were also in the room.  And

Page 40

1 when we -- if there was a change, it went in in ink.  And she

2 had much better handwriting than I would have had.  And those

3 were the last minute changes.  And there was -- somebody made

4 the suggestion that to give some order of magnitude in the

5 document, some sort of -- just to be helpful, it was useful to

6 add that reference, the approximately seventy billion.  And

7 there's a similar language on the short positions,

8 approximately sixty-eight or whatever the numbers -- I would

9 have to look -- billion.  And the person who originally -- and

10 again, I don't remember who it was.  The person who originally

11 proposed adding words of that nature used the term "marks".

12 And someone -- and again, it may have been me.  I don't -- it

13 could well have been.  But somebody said well, "marks" isn't a

14 very technical term.  Don't we mean book value?  And that's the

15 words that we used in the document when it was written in hand.

16 Q.  Did the lawyers for the parties or, to your knowledge, the

17 parties discuss whether the figures of approximately seventy

18 billion and approximately sixty-nine billion were intended to

19 be representations or warranties of approximate value?

20 A.  It was clearly not that, absolutely not.

21 Q.  Now, comparing the long positions as a purchased asset and

22 a short -- the short positions that you've just outlined -- and

23 you may have mentioned this earlier.  Was there a buffer

24 between the two?

25 A.  Well, it wasn't -- there was but it's not just that.  I

Page 41

1 mean, there were other -- in the first place, again, there were

2 other assets including nonfinancial assets.  But there was

3 also, as part of the financial assets, there were a number of

4 other things that added to -- I don't know if at the time I

5 used the word "buffer" but what I -- furthermore, it was a

6 positive difference.  It included the fact that in addition to

7 the net long and net short positions you're referring to, we

8 were -- Barclays was going to get in the so-called resis, the

9 residential mortgage portfolio.  And there was also the

10 provision for the retained cash concept that was also, I

11 believe, was in the APA for a billion two or a billion three

12 that we were -- that Barclays was going to get.

13 Q.  So the retained cash estimated at a billion two or a

14 billion three would add to the positive difference between the

15 trading assets and the trading liabilities that you saw in the

16 APA?

17 A.  Yes.

18 Q.  And these resis that you mentioned, do you recall hearing

19 whether they had value as far as Lehman was concerned?

20 A.  Yes.  Lehman thought -- in that environment,

21 knowing what value anything was was hard.  But Lehman thought

22 it had very substantial value in -- well into the single digit

23 billions.  I don't remember if it was six or seven or eight or

24 something.  But they thought it had a substantial value and

25 that over time might have a lot more value.

11 (Pages 38 - 41)

# Exhibit 51

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.

9            Debtors.

10   - - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14            Debtor.

15   - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            September 2, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 38

1 Q. And had assumed other obligations and liabilities in the
2 sale transaction?
3 A. Yes.
4 Q. Let's flip back to tab 5, the third page. Just let me --
5 I neglected to do one thing earlier. The document at tab 30,
6 which doesn't have any date or name on it, which is the
7 worksheet you prepared, or had prepared to determine how much
8 of the financial inventory was on Schedule B, was that work
9 done during this litigation?
10 A. Yes, it was, yes.
11 Q. And we produced it to the other side. Do you remember
12 roughly when?
13 A. I think it was maybe -- just maybe December 2009.
14 Q. Sometime during the litigation?
15 A. Yeah.
16 Q. It was -- as you said earlier, and just to be clear, in
17 the process that led up to the determination of the acquisition
18 balance sheet published in February 2009, did you or your team
19 of valuation professionals at product control group, make any
20 effort to distinguish between repo collateral and Schedule B
21 clearance box assets?
22 A. The first time I knew that the repo collateral was on the
23 balance sheets at 45.5 billion was when we performed this
24 analysis as part of the litigation.
25 Q. Well, while we're on that subject, just so it's clear,

Page 39

1 believe it or not, at tab 45 of the binder, there's another
2 document with the number 45 on it. Could you go to it? It's
3 Movants' 147. This is a document produced from Jim Seery's
4 files.
5     Do you know who Jim Seery is or do you know him
6 personally?
7 A. No.
8     MR. HUME: Can we have the second page, please? We
9 need to go to page 0007. Okay.
10 Q. This document shows a list of categories of assets in the
11 fed repo. Is this a document you used at all in preparing the
12 acquisition balance sheet?
13 A. No.
14 Q. Had you seen it before this litigation?
15 A. No.
16 Q. See at the bottom it says 45.5?
17 A. Yup.
18 Q. Are you aware of the fact, given your work in reviewing
19 expert reports by movants and their briefs in defending those
20 experts, that the movants have suggested or stated or
21 insinuated that the reason your acquisition balance sheet has a
22 repo collateral value of 45.5 billion is to match that number?
23 A. Yeah, I'm aware of that, yeah.
24 Q. Is it true?
25 A. No.

Page 40

1 Q. Is it plausible?
2 A. No.
3 Q. Let's go back to tab 5. Let's talk about the liabilities
4 now.
5     How much did Barclays accrue in compensation liabilities
6 to cover its obligations to pay bonuses and severance to Lehman
7 employees who came over to Barclays at the time of the
8 acquisition?
9 A. The accrual was two billion dollars.
10 Q. Can you show the Court where that is on the acquisition
11 balance sheet?
12 A. Yeah. It's the summation of two lines. So it's 1.7
13 billion is included in line 45 and 300 million included in line
14 52.
15 Q. Now, line 45 says bonus. Is it your understanding that
16 that number is only bonus or includes perhaps some cash bonus,
17 some cash severance?
18 A. It's my understanding that it includes bonus and
19 severance.
20 Q. And is the same true for line 52 where it says stock
21 element of bonus? Could it include both bonus and severance?
22 A. Yeah.
23 Q. And the reason the credit to equity line is not considered
24 a liability, is that just an accounting? Is that a function of
25 how it's accounted for?

Page 41

1 A. Yeah. It's purely an accounting classification item, if
2 we're expecting to settle a proportion in stock crop and cash,
3 then it's put into a different section of the balance sheet.
4 But it's still accrued and deducted as part of the negative
5 goodwill calculation.
6 Q. I believe the -- did Paul Exall help gather the
7 information of how much was actually spent for bonuses and
8 severance and associated payroll taxes?
9 A. Yes.
10 Q. And is the document at tab 13, the document he prepared to
11 assist you gathering that information, BCI Exhibit 142-A?
12 A. Yeah, that's it.
13 Q. And does it show a total of 1.951 billion?
14 A. Yes, it does.
15 Q. Can you explain why its total is 1.951 and you have a full
16 two billion on the acquisition balance sheet?
17 A. Well, the accrual in the acquisition balance sheet was our
18 best estimate of what we'd pay to settle the obligation. It
19 ended up being close to two billion, but slightly less. The
20 difference from a financial reporting perspective wasn't
21 especially material to go back and change the balance sheet
22 we'd already published.
23 Q. Let's go back to tab 5, to 133-B in the third page. And
24 can you show the Court here what was accrued on the acquisition
25 balance sheet for cure payment obligations?

11 (Pages 38 - 41)

# Exhibit 52

Page 1

- 1 -

1

2    UNITED STATES BANKRUPTCY COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5    - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LEHMAN BROTHERS HOLDINGS INC., et al.

9              Debtors.

10   - - - - - - - - - - - - - - - - - - -x

11   In the Matter of:

12

13   LEHMAN BROTHERS INC.

14              Debtor.

15   - - - - - - - - - - - - - - - - - - -x

16              United States Bankruptcy Court

17              One Bowling Green

18              New York, New York

19

20              June 25, 2010

21

22

23   B E F O R E:

24   HON. JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

Page 2

- 2 -

1
2  CONTINUED EVIDENTIARY HEARING re (i) Motion of Debtor to Modify
3  the September 20, 2008 Sale Order and Granting Other Relief;
4  (ii) Motion of the Trustee for Relief Pursuant to the Sale
5  Orders or, Alternatively, for Certain Limited Relief Under Rule
6  60(b); (iii) the Motion of Official Committee of Unsecured
7  Creditors of Lehman Brothers Holdings Inc., Authorizing and
8  Approving (A) Sale of Purchased Assets Free and Clear of Liens
9  and Other Interests and (B) Assumption and Assignment of
10  Executory Contracts and Unexpired Leases, Dated September 20,
11  2008 (and Related SIPA Sale Order) and Joinder in Debtors' and
12  SIPA Trustee's Motions for an Order Under Rule 60(b) to Modify
13  Sale Order; (iv) All Joinders Thereto and Related Adversary
14  Proceedings; and (v) Motion of Barclays Capital Inc. to Enforce
15  the Sale Order and Secure Delivery of All Undelivered Assets
16
17
18
19
20
21
22
23
24
25  Transcribed by: Lisa Bar-Leib

Page 4

- 4 -

1
2  BOIES, SCHILLER & FLEXNER LLP
3       Attorneys for Barclays Capital, Inc.
4       333 Main Street
5       Armonk, NY 10504
6
7  BY:  DAVID BOIES, ESQ.
8
9  STUTMAN TREISTER & GLATT LLP
10       Attorneys for Elliott Management
11       1901 Avenue of the Stars
12       12th Floor
13       Los Angeles, CA 90067
14
15  BY:  WHITMAN L. HOLT, ESQ.
16       REBECCA S. REVICH, ESQ.
17       (TELEPHONICALLY)
18
19
20
21
22
23
24
25

Page 3

- 3 -

1
2  A P P E A R A N C E S :
3  JONES DAY
4       Attorneys for the Movant, LBHI
5       222 East 41st Street
6       New York, NY 10017
7
8  BY:  ROBERT W. GAFFEY, ESQ.
9
10  HUGHES HUBBARD & REED LLP
11       Attorneys for Movant, James W. Giddens, SIPC Trustee
12       One Battery Park Plaza
13       New York, NY 10004
14
15  BY:  NEIL J. OXFORD, ESQ.
16
17  QUINN EMANUEL URQUHART & SULLIVAN, LLP
18       Attorneys for the Movant, Official Committee of Unsecured
19        Creditors
20       51 Madison Avenue
21       22nd Floor
22       New York, NY 10010
23
24  BY:  JAMES C. TECCE, ESQ.
25       SUSHEEL KIRPALANI, ESQ.

Page 5

- 5 -

1                P R O C E E D I N G S
2       THE COURT:  Be seated, please.  Good morning.
3       MR. KIRPALANI:  Good morning, Your Honor.  Susheel
4  Kirpalani from Quinn Emanuel on behalf of the creditors'
5  committee.  I believe Mr. Gaffey has one housekeeping matter.
6  And then we're going to call our witness.  Thank you.
7       THE COURT:  Okay.
8       MR. GAFFEY:  Your Honor, we're able to eliminate the
9  need for one witness today, Mr. Guarnuccio, because we've
10  reached a stipulation with Barclays as to a fact.  If I could
11  read it into the record --
12       THE COURT:  Go right ahead.
13       MR. GAFFEY:  -- because our witness -- we've agreed
14  that: "Barclays Capital Inc. (Barclays) and Movants stipulate
15  that if called to testify at trial, Michael Guarnuccio of
16  PricewaterhouseCoopers would testify as follows:
17       "Michael Guarnuccio recalls that at some time in
18  September 2008, after the Barclays/Lehman transaction closed,
19  he spoke with a Paul Exall.  And Mr. Exall stated that he
20  believed the two billion dollar estimate was for bonus payments
21  only not for severance pay."
22       And if Mr. Boies can confirm that's our agreement --
23       MR. BOIES:  Yes, Your Honor.
24       MR. GAFFEY:  -- we can excuse Mr. Guarnuccio as a
25  witness.

2 (Pages 2 - 5)

Exhibit 53

Page 1

- 1 -

1

2     UNITED STATES BANKRUPTCY COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     Case Nos. 08-13555(JMP); 08-01420(JMP)(SIPA)

5     - - - - - - - - - - - - - - - - - - -x

6     In the Matter of:

7

8     LEHMAN BROTHERS HOLDINGS INC., et al.

9                Debtors.

10    - - - - - - - - - - - - - - - - - - -x

11    In the Matter of:

12

13    LEHMAN BROTHERS INC.

14                Debtor.

15    - - - - - - - - - - - - - - - - - - -x

16                United States Bankruptcy Court

17                One Bowling Green

18                New York, New York

19

20                June 22, 2010

21

22

23    B E F O R E:

24    HON. JAMES M. PECK

25    U.S. BANKRUPTCY JUDGE

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

- 34 -

1 recognized that there may be issues around that, so we're clear
2 that if there were regulatory issues around the excess
3 collateral in 15c3-3 that we would take other value in
4 consideration.
5     But, certainly, as you said, the clearance box was a
6 critical part that Friday. And the exchange-traded derivatives
7 were a critical part both to the regulators, the OCC, and to
8 us. And if you had pulled any of those pieces -- and I'm sure
9 there's others but I think you mentioned those three or those
10 three have come up -- I don't think we would have gone forward
11 with the deal, no.
12     MR. BOIES: I have no more questions, Your Honor.
13     THE COURT: Is there any redirect?
14     MR. GAFFEY: Yes, Your Honor, a little redirect.
15 REDIRECT EXAMINATION (AS ON RECROSS)
16 BY MR. GAFFEY:
17 Q. Mr. Diamond, would you -- the book is still in front of
18 you, isn't it?
19 A. Yep.
20 Q. Would you turn to tab M-16, please? That's the transcript
21 of the analyst call. And Mr. Boies asked you about the
22 statement at page 5 concerning where Mr. Varley describes the
23 buffer. Do you recall that?
24 A. I do. Yes, sir.
25 Q. And he asked you to confirm, and you did, your view that

Page 35

- 35 -

1 the buffer being described there is the buffer between trading
2 assets and trading liabilities. Do you recall that?
3 A. Yes, sir.
4 Q. And that's your understanding of what Mr. Varley meant
5 when he referred to the buffer here?
6 A. Yes, sir.
7 Q. And you viewed the statements made at the analyst call as
8 indicative of the openness and transparency that Barclays
9 brought to this transaction, is that correct?
10 A. I don't recall doing that. But we certainly --
11 Q. Then I'll ask you that now.
12 A. We certainly try and be as open and straightforward as we
13 can, yes.
14 Q. Okay. And in discussing the buffer and the match or
15 mismatch between trading assets and trading liabilities, is
16 there a reason, sir, that no one in the entire analyst call
17 ever mentioned the assumption of liabilities for compensation
18 and cure?
19 A. I don't recall if that question came up, no.
20 Q. I can represent to you, sir, and we can take the time if
21 you'd like, there's no reference to it anywhere in the analyst
22 call. Was there a reason for that?
23 A. I don't recall.
24 Q. You do agree, sir, that the transaction that was being
25 announced and the one that this Court was told about included a

Page 36

- 36 -

1 provision that Barclays would assume liabilities for
2 compensation and for cure, correct?
3 A. That went back and forth over a period of time. And I
4 know there were times when it was in and time when it was out
5 and different accounting treatment. I don't recall this point
6 exactly how the accounting treatment on that worked.
7 Q. Okay. Well, apart from the accounting treatment, sir, I'm
8 talking about the deal that was made, the deal that was
9 described to the Court. To your knowledge, sir, on the 17th of
10 September, the same day as this analyst call, do you know if
11 anyone told this Court that Barclays would be assuming cure
12 liabilities in an amount of approximately 1.5 billion dollars?
13 A. I don't recall any specifics about that, no, sir.
14 Q. Okay. You do recall that Barclays did agree to assume
15 cure liabilities in roughly that amount?
16 A. My understanding is different. But I'm not an expert in
17 that. But my understanding is there was a period of time for
18 Barclays to come back and confirm. But I certainly don't
19 expect to be an expert for you, sir, on that specific part of
20 the contract, no.
21 Q. My question goes more, sir, to what is said in different
22 venues. In the analyst call, nobody mentions the assumption of
23 cure liabilities. We've agreed on that, yes?
24 A. I don't know, sir.
25 Q. Okay. Well, do you -- was any thought given, to your

Page 37

- 37 -

1 recollection, of discussing the assumption of liabilities for
2 compensation and cure before the analyst call?
3     MR. BOIES: Objection, Your Honor. Scope. I didn't
4 go into compensation and cure at all with this witness.
5     MR. GAFFEY: This goes to the assum --
6     THE COURT: Well, you didn't, Mr. Boies. But you did
7 spend some time going through the analyst call. And I think
8 that what was considered at the time is fair game and you
9 opened the door to that as far as I'm concerned.
10 Q. So, sir, was any consideration given prior to the analyst
11 call of saying anything in it about the assumption of
12 liabilities by Barclays for compensation and for cure?
13 A. Well, one of the reasons it's difficult -- two reasons
14 it's difficult for me to go back in that amount of detail, if
15 you would give me a chance to say that, is, one, I had been in
16 New York negotiating. And as you know, John Varley and Chris
17 Lucas had put the presentation together. And I joined on the
18 phone. So I don't know the specifics of whether that was
19 thought through or not.
20     And the second reason is, this was very, very early in the
21 process. And this was not the transaction that concluded. So
22 it doesn't -- a lot of this period of time doesn't have the
23 memory of the actual deal that we did since this deal never
24 occurred.
25 Q. Okay.

10 (Pages 34 - 37)