**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et Consignations,
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Jay S. Hellman
Brett S. Silverman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re                                                                    Chapter 11

LEHMAN BROTHERS HOLDING INC., *et al.*              Case No. 08-13555 (JMP)

                                    Debtors.                          (Jointly Administered)
------------------------------------------------------------------X

### CAISSE DES DÉPÔTS ET CONSIGNATIONS' MOTION FOR ENTRY OF AN ORDER TO PERMIT A LATE-FILED CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006(b)(1)

Caisse des Dépôts et Consignations ("CDC"), by and through its undersigned counsel, seeks the entry of an order to permit a late-filed claim against Lehman Brothers Special Financing Inc. ("LBSF," and together with its jointly administered co-debtors, "Lehman" or the "Debtors") in accordance with due process under the United States Constitution and Federal Rule of Bankruptcy Procedure 9006(b)(1), with such claim being deemed timely filed (the "Motion"), and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.   By this motion, CDC respectfully requests that this Court enter an Order extending CDC's time to file a proof of claim and Questionnaires, based upon excusable neglect, pursuant to Bankruptcy Rule 9006(b)(1).

2.   This motion seeks to correct the due process violation that would occur if the Debtors were permitted to discharge the claim of a known creditor who did not receive notice of the Bar Date or Questionnaire Deadlines. CDC holds a claim against LBSF in the amount of $3,077,434.00 (€ 2,101,500), plus accrued interest, costs and expenses (the "Claim"), arising

out of a certain ISDA Master Agreement (the "Master Agreement") between CDC and LBSF.[1]

3. LBSF was undeniably aware of the Claim since it listed CDC as a party to an unexpired executory contract on Schedule "G" of its petition with reference to "Derivative Master Account Number 080494CDDC". Despite the fact that this information was readily ascertainable, LBSF's noticing agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), did not send the Bar Date Notice (defined below) to the precise address specifically required by in the Master Agreement.[2] Consequently, the Bar Date Notice was returned to Epiq marked "undeliverable." Inexplicably, Epiq did not make any further attempts to provide CDC with the Bar Date Notice and, consequently, CDC never filed a proof of claim.

4. One of the key principals of bankruptcy is that known creditors be provided with actual notice of important dates and deadlines so that they can participate in the reorganization process and guard against the unjustified discharge of their claims. This Motion is made to prevent the injustice that would result from allowing the Debtors to escape liability under the Claim, despite their failure to properly serve CDC with the Bar Date Notice.

5. Under the circumstances, CDC respectfully requests that this Court enter the annexed, proposed order permitting CDC to file a proof of claim pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1), and that upon such filing, the proof of claim shall be deemed timely filed.

**BACKGROUND**

6. CDC is a public institution with special status under the French Parliament's

---

[1] The amount was calculated by multiplying the value of the Claim in Euros, before accrued interest, costs and expenses, based upon the exchange rate as of September 25, 2008, the Early Termination Date of the Master Agreement, designated in a letter from CDC noticing LBSF of the default under the Master Agreement, which rate was then $1.4643987649 per € 1.00.

[2] As more fully set forth herein, CDC is a large institution with numerous offices spread throughout France, and more than ten (10) offices in Paris alone. Furthermore, CDC employs more than 73,000 people and receives more than 1,000 pieces of mail per day. Understandably, and on account of the very departmentalized nature of CDC, notification processes, such as the notice required in the Master Agreement, are set up specifically designed to remedy notice issues that plague this very large entity.

supervision and guarantee.[3]

7.  CDC was formed in 1816 for the purpose of safeguarding funds (during various financial crises and while the French State faced a significant war debt) including the pension funds and retirement accounts of France's civil servants. Thereafter, in the same spirit of confidence and security, many other missions of public interest have been entrusted to CDC.

8.  On July 29, 1994, CDC and LBSF entered into the Master Agreement, which was to govern certain future transactions by and between CDC and LBSF.  (A copy of the Master Agreement is annexed as Exhibit "A" to the Declaration of Olivier Ritz dated May 31, 2011 (the "Ritz Declaration"), which has been annexed hereto as **Exhibit "1"**.)

9.  In connection with the Master Agreement, LBSF also executed a Guarantee of Lehman Brothers Holdings Inc. ("Guarantee") and a Master Pledge Agreement ("Pledge Agreement"), dated November 4, 1994, whereby LBSF is the "Pledgor" to CDC as "Pledgee." (Copies of the Guarantee and the Pledge Agreement have been annexed to the Ritz Declaration as Exhibits "B" and "C" respectively.)

10.  CDC and its subsidiaries employ approximately 73,500 people and manage 48 different pension programs for French workers.  CDC is a large institution with numerous offices spread throughout France, including numerous office locations within the city of Paris.  CDC averages more than 1,000 pieces of mail per day.

11.  Due to the massive size and the expansive, non-contiguous layout of CDC's offices throughout Paris, CDC always includes *specific* noticing provisions in all of its contracts and transactional documents which, if not adhered to, can cause notice to go undelivered to its intended party.

12.  The Master Agreement was no exception.  CDC included a specific noticing

---

[3] CDC is a public-law institution and, together with its subsidiaries, they form a group of public interests, dedicated to the economic development of France.  CDC is placed under the supervision of the French Parliament pursuant to article L. 518-2 of the French Monetary and Financial Code.

060177/873093.3/BSS

provision to ensure that any notifications were delivered to the proper departments. Such a specific noticing provision was included in Part 4(a) of the Schedule ("Schedule") to the Master Agreement, which requires that all communications to CDC in connection with the Master Agreement be directed to:

> Caisse des Dépôts et Consignations
> 56 rue de Lille
> 75356 Paris Cedex-France
> **Attention: Service FMP 20/Back Office Monétaire**[4]

13. On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). LBSF filed a voluntary petition under chapter 11 of the Bankruptcy Code on October 3, 2008.

14. Pursuant to section 5(a)(vii) of the Master Agreement, it is an event of default if a party to the agreement "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof." In addition, the bankruptcy of LBHI (as "Credit Support Provider" of LBSF under the provisions of Section 5(a)(vi) of the Master Agreement) is a "Cross Default" under the Master

---

[4] Section 13(c) of the Master Agreement contains noticing procedures for direct disputes between the parties to the Master Agreement and for any business transacted through CDC Capital, Inc. ("CDC Capital"). CDC Capital was an entity through which the CDC transacted certain business. In or about 2007, however, CDC sold all of its interests in CDC Capital.

Although CDC Capital was no longer affiliated with CDC at the time of the bankruptcy filing, the Bar Date Notice was apparently sent in any event to CDC Capital. Serving CDC Capital, however, was improper under the terms of the Master Agreement, because no business relating to the Claim was conducted through CDC Capital and the Bar Date does not constitute a "dispute" between the parties to the Master Agreement.

4                                                                                               060177/873093.3/BSS

Agreement. Upon an event of default (including a "Cross Default"), the Master Agreement provides that "the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."

15. On September 19, 2008, CDC sent LBSF notice of its default under the Master Agreement as a result of the bankruptcy filing of LBHI, an affiliate of LBSF, and designated September 25, 2008, as the Early Termination Date for all outstanding transactions. LBSF received the letter on September 24, 2008.

16. On September 29, 2008, CDC sent LBSF notice of the amount due on the Early Termination Date, which notice was received by LBSF on October 1, 2008.

17. Pursuant to CDC's rights upon termination of the Master Agreement, the Claim was calculated pursuant to Section 6(d)(ii) of the Master Agreement, which is the principal balance of $3,023,035.26 (€2,101,500), together with interest accrued thereon from and including the Early Termination Date to the date of payment at the Applicable Rate.[5]

18. CDC is a known creditor of LBSF because the Master Agreement is listed on Schedule "G" of the Debtors' chapter 11 petitions as an unexpired executory derivative contract with reference to Master Derivative Account Number 080494CDDC. (A copy of the Debtors' Schedule "G" is annexed to the Ritz Declaration as Exhibit "D".)

19. By Order dated July 2, 2009, this Court established September 22, 2009 (the "Bar Date") as the deadline for filing proofs of claims based upon pre-petition claims against the Debtors (the "Bar Date Order"). In addition to the official proof of claim form, the Order also required the submission by October 22, 2009 of a Derivative Questionnaire for claims based on

---

[5] Pursuant to Section 14 of the Master Agreement, the "Applicable Rate" for this purpose is the "Default Rate", which is CDC's cost of funds plus 1% per annum. From the Early Termination Date to the date of the notice, CDC's cost of funds was 4.50% and, therefore, the Applicable Rate during such period was 4.285% per annum plus 21.5 basis points. CDC reserved its right to apply a different cost of funds for the purpose of calculating the Applicable Rate from the date of the notice.

derivative contracts and a Guarantee Questionnaire (collectively "Questionnaires") for claims based on a guarantee (the "Questionnaire Deadline").

20.     On March 15, 2010 the Debtors filed a Joint Chapter 11 Plan (the "Plan") and Disclosure Statement and, on April 14, 2010, the Debtors filed a revised version of the Plan.

21.     On May 5, 2010, CDC received an e-mail from LBHI estate's director, Mr. Dermot Doyle, purporting to have authority to settle CDC's claim against LBSF and asking if CDC submitted a proof of claim.  On May 10, 2010, CDC telephoned Mr. Doyle to tell him that it seemed to be that, so far, no proof of claim had been filed and to ask him if any notice had been sent to CDC to inform CDC of the necessity of such proof of claim filing.  Mr. Doyle answered that he would get in touch with the LBHI estate's lawyers.

22.     After conducting an internal investigation, CDC discovered that the Bar Date had passed and contacted LBSF, who provided CDC with a color scan of an unopened envelope which allegedly contained the Bar Date Notice, which was errantly addressed as follows:

> CAISSE DES DEPOTS ET CONSIGN ATIONS [SIC]
> 56 RUE DE LILLE
> 75356 PARIS
> CEDEX 07
> FRANCE

(A copy of the returned envelope holding the Bar Date Notice is annexed to the Ritz Declaration as Exhibit "E".)

23.     As mentioned above, despite being mailed to the proper street address, the Bar Date Notice was not **specifically** addressed to **Service FMP 20/Back Office Monétaire**, as required by the Master Agreement.  As a result, because the Bar Date Notice could not be routed to the correct personnel at CDC, it was marked to be returned to the sender as undeliverable.  Accordingly, CDC was not aware of the Bar Date, and thus, CDC did not file a proof of claim.

24.     Although CDC had a general understanding that the Debtors had filed for bankruptcy protection, CDC never received notice of the Bar Date Order because such notice

was improperly addressed by Epiq, causing the notice to be returned as undeliverable.

25. As a result of CDC's justified reliance on the notice provisions in the Master Agreement, as well as its unfamiliarity with bankruptcy proceedings in the United States, CDC was not aware that it did not receive notice of the critical Bar Date, nor was it aware that it should have received such notice.

26. Although CDC is a large institution, it does very little business within the United States or with entities based in the United States.

27. CDC does business almost exclusively in the French language. Very few CDC employees speak English. In fact, by French law nº 94-665 dated August 4, 1994, relating to the use of French language ("relative à l'emploi de la langue française") all contracts to which CDC is a party must be written in French unless certain exceptions are met.

28. Consequently, CDC has virtually no familiarity with the bankruptcy laws and procedures in the United States.

29. CDC is a massive, complex organization with numerous offices distributed throughout France and it is comprised of countless discrete entities and departments. In Paris alone, CDC occupies more than approximately ten buildings distributed over a large geographical area, each of them accommodating many departments. As mentioned above, the average mail volume is more than 1,000 pieces per day. Moreover, CDC's mail and other parcels are delivered to a central location. Once received, the mail is then routed to the proper departments, in the various locations throughout France. If the mail is not addressed properly, which includes specifying the relevant department or personnel to receive the mail, such mail is returned to sender as undeliverable. Accordingly, it is *essential* that mail be addressed to the proper department and personnel within CDC so that it can be delivered accurately. Therefore, CDC necessarily includes very specific noticing provisions in all of its contracts, such as section 12(a) of the Master Agreement and 4(a) of the Schedule thereto.

30. Because the Bar Date Notice was not properly directed to the attention of

7                                                           060177/873093.3/BSS

"***Service FMP 20/Back Office Monétaire***," the CDC mail department that received the envelope could not determine how to properly route it and, therefore, refused delivery.

31. Although Epiq received the returned mail it appears that, no further attempt was made to verify CDC's address or to attempt to resend the Bar Date Notice.

32. After conducting an internal investigation once Mr. Doyle raised the Bar Date issues, CDC contacted American counsel to gain an understanding of the situation.

33. After discussions with American counsel and continued investigations into the facts that caused CDC to miss the Bar Date, CDC retained American counsel to file the instant Motion.

34. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334, as well as the Standing Order of Reference from the United States District Court for the Southern District of New York signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is Bankruptcy Rule 9006(b)(1).

## **REQUESTED RELIEF**

35. By this motion, CDC respectfully requests that this Court enter an order extending CDC's time to file a proof of claim and Questionnaires pursuant to Bankruptcy Rule 9006(b)(1), and deem such claim as timely filed.

CDC's Claim Should Not Be Time Barred
<u>Because It Did Not Receive Notice Of The Bar Date</u>

36. CDC should be permitted to file a late claim due to the Debtors' failure to provide proper notice of the Bar Date as required by the Master Agreement.

37. Due Process mandates that a known creditor receive actual notice of a bar date before its claim can be discharged in a debtor's bankruptcy. *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110 (Bankr. S.D.N.Y. July 30, 2003) (allowing late-filed proof of claim for excusable neglect despite finding that creditor received notice of the bar date); *In re*

*Thomson McKinnon Sec., Inc.* 159 B.R. 146 (Bankr. S.D.N.Y. 1993) (allowing a creditor to file a proof of claim more than two and one-half years after the bar date where the creditor did not receive actual notice of the bar date); *In re Waterman S.S. Corp.*, 157 B.R. 220, 222 (Bankr. S.D.N.Y.) (holding that "[w]hen the bar date was sent out, all . . . known to be actual or potential claimants . . . were entitled to actual personal notice."); *Adam Glass Svc., Inc. v. Federated Dep't. Stores*, 173 B.R. 840 (E.D.N.Y. 1994) (holding that claim of unscheduled creditor who did not receive notice of the bar date and did not file a proof of claim was not discharged by debtor's confirmed plan, despite the creditor's knowledge of the pending bankruptcy). "The statutory command for notice embodies a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." *City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 297 (1953).

38.    Furthermore, "[a]ctual knowledge of the filing of a bankruptcy petition does not negate the statutory notice requirements nor does it place a duty on creditors to inquire regarding time limitations for filing claims." *In re Spring Valley Farms, Inc.,* 85 B.R. 593, 595 (N.D. Ala. 1988) (emphasis added) (*citing New York, New Haven & Hartford R.R. Co.,* 344 U.S. at 297); *Adam Glass Svc., Inc. v. Federated Dep't. Stores*, 173 B.R. at 843 ; *In re Joseph B. Dahlkeyer Co., Inc.*, 170 B.R. 853, 861 (Bankr. W.D. Pa. 1994); *In re Uiterwyk Corp.*, 105 B.R. 103, 105 (Bankr. M.D. Fla.). Thus "claims of creditors who were known to debtor and who had actual knowledge of the chapter 11 proceeding, but who did not receive the required notice of the bar date, [are] not discharged upon plan confirmation." *In re Joseph B. Dahlkeyer Co., Inc.*, 170 B.R. at 861.

39.    Court's have held that, where an address is slightly incorrect, no presumption of receipt can arise unless "there is sufficient evidence from which to presume that the addressee nonetheless received the incorrectly addressed notice." *In re Randbre Corp.*, 66 B.R. 482, 486 (Bankr. S.D.N.Y. 1986) (permitting vacatur of an order expunging a creditor's claim where the address on the notice for the motion to expunge was mailed contained an extra zero). Here, the

060177/873093.3/BSS

address was more than slightly incorrect; it completely omitted the routing information that was specified under the Master Agreement and critical to delivery within CDC-a large, public institution. Furthermore, even assuming, *arguendo*, that the Bar Date Notice was only slightly mis-addressed, no presumption of receipt can arise because there is conclusive evidence that CDC never received it, because the Bar Date Notice could not be routed by CDC's mail department. *See* Ritz Declaration.

40.     Here, there is no doubt that CDC was a known creditor of LBSF who did not receive notice of the Bar Date before its expiration. Thus, it would be contrary to fundamental notions of fairness and due process to disallow CDC's claim without an opportunity to participate in the reorganization process. Furthermore, despite CDC's knowledge of the Lehman bankruptcy filing generally, it had no duty to independently inquire about the claims Bar Date and was legally justified in relying on the Debtors' obligation to provide notice thereof.

41.     In *In re Joseph B. Dahlkemper Co.*, *supra,* a creditor did not receive notice of the bar date because the debtor listed the address of its predecessor-in-interest on the schedules and mailed notice of the bar date to that address. *Dahlkemper*, 170 B.R. at 856-57. After the creditor was granted leave to file a proof of claim, the Debtor objected to the claim on several grounds, including that it was time-barred. *Id.* at 858. In addressing the timeliness argument, the court noted that the claims of known creditors in chapter 11 cases could not be discharged unless the creditor had received actual notice of the bar date. *Id.* at 861. However, rather than except this claim from the debtor's discharge, the court held that "no portion of [the creditor's] proof of claim [was] time-barred." *Id.*

42.     Similarly, in *In re Uiterwyk Corp.*, 105 B.R. 103 (Bankr. M.D. Fla. 1989), creditors of the debtor were neither listed on the debtor's schedules nor sent actual notice of the bankruptcy filing or the bar date. Despite the debtor's allegations that the creditors were well aware of the bankruptcy, the court explained "it is clear that under controlling case law, the concept of due process compels the conclusion that even if a creditor is aware of the pendency

of a bankruptcy case, it is entitled to receive notice of the bar date to file proof of claims." *Id.* at 105. Thus, the court concluded that:

> the [creditors] were clearly entitled to be given formal notice of these proceedings, especially the bar date fixed by the Court. For this reason, they should be allowed to file their proof of claim and to deny their right to file a proof of claim would be denial of due process to which they are entitled.

*Id.* (citations omitted).

43. Here, as in *Dahlkemper* and *Uiterwyk*, CDC was a known creditor of LBSF who did not receive notice of the Bar Date. Despite LBSF's knowledge that the Bar Date Notice mailed to CDC was returned as undeliverable, no further attempt was made to provide the notice that due process mandates. Consequently, CDC respectfully requests that it be permitted to file a proof of claim and that its proof of claim be deemed timely filed.

CDC Should Be Granted An Extension Of Time
To File A Proof Of Claim For Excusable Neglect

44. In the alternative, CDC respectfully submits that the time for CDC to file a proof of claim should be enlarged pursuant to Rule 9006(b)(1) because its failure to timely file a proof of claim was the result of excusable neglect.

45. Rule 9006(b)(1) empowers the court, in its discretion, to extend a deadline "where the failure to act was the result of excusable neglect." Fed. R. Bankr. P. 9006(b). The United States Supreme Court has construed the phrase "excusable neglect" as used in Rule 9006 and concluded that "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388 (1993). The Court added that "what sorts of neglect will be considered 'excusable,' . . . is at bottom an equitable [determination], taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. Some relevant factors (but by no means exclusive) include "[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason

for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Id.* at 395.

46.    Not all factors, however, need favor the moving party. *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110, at *11 (Bankr. S.D.N.Y. 2003).   "[N]o single circumstance controls, nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other." *Id.* at *12 (quotation and citation omitted).

<u>Reason For The Delay</u>

47.    This Motion is critically distinguishable from those addressed in the Court's Opinion of May 20, 2010, in that none of the claimants addressed in this Court's Opinion contested actual notice of the Bar Date, a point this Court recognized. *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 119, 122, 127 n.31. CDC's sole reason for missing the Bar Date is a lack of notice. Additionally, CDC's status as a foreign creditor with no familiarity with American bankruptcy laws or procedures further excuses any delay because CDC did not have the background to know of or to investigate the Bar Date. CDC respectfully submits that because it did not receive actual notice of the Bar Date — the first factor of the *Pioneer* analysis weighs overwhelmingly in its favor.

48.    Furthermore, in the two prior instances when this Court has granted motions to file proofs of claim after the Bar Date, the Court found that the "delay was the result of justifiable confusion over the application of the bar date to their particular claims." *Lehman*, 433 B.R. at 127. CDC respectfully submits that, if confusion over application of the bar dates constitutes excusable neglect, then complete lack of notice of the Bar Date must also form a sufficient basis for excusable neglect.

<u>Prejudice To The Estates</u>

49.    There is no danger that granting this Motion would prejudice the Debtors' estates. As explained herein, this Motion presents exceptionally narrow circumstances where a

known creditor did not receive actual notice of the Bar Date due to an improperly addressed notice. The Debtors were on actual notice of CDC's claim, as evidenced by the fact that LBSF listed CDC on it's Schedule "G" of unexpired, executory derivatives contracts. There is no danger that granting the relief sought herein will open the floodgates to other similarly situated creditors. It is significant that, as the Court previously observed, of the seven motions addressed in its May 20, 2010 Opinion and the two addressed prior thereto, not one of the nine movants alleged an actual lack of notice. *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 122, 127 n.31 (Bankr. S.D.N.Y. 2010). The dearth of similar motions in these cases of unprecedented size and complexity empirically demonstrates the *de minimis* risk that granting CDC permission to file a late proof of claim under these exceptional circumstances would cause prejudice to the Debtors. Consequently, CDC respectfully submits that the lack of prejudice to the Debtors compels a finding of excusable neglect.

The Length Of The Delay

50. There is no bright-line rule governing what length of delay should be considered too long. *Id.* at 121. Thus, "the lateness of a claim must be considered in the context of the proceedings as a whole." *Id.* (quotation and citation omitted). The present case presents very little risk of disruption or delay of the bankruptcy proceeding. Indeed, LBSF had actual knowledge of the Claim in the scheme of this reorganization, in which $899 billion of aggregate liquidated claims has been filed. Thus, although the Debtors have filed a plan, allowing CDC's claim does not threaten to derail the reorganization or complicate administration of the estates. Consequently, CDC respectfully submits that the length of the delay in filing its claim is a non-issue.

Good Faith

51. CDC has at all times acted in good faith. Upon discovering the lack of notice of the Bar Date, CDC undertook to investigate the reasons therefore, to evaluate its options, and to correct the error that occurred as a result of the improper mailing of the Bar Date Notice.

060177/873093.3/BSS

Consequently, CDC respectfully submits that its good faith compels a finding of excusable neglect.

## NOTICE

52. Notice of this Motion has been provided pursuant to the Amended Order Implementing Certain Notice and Case Management Procedures entered in this proceeding [Docket No. 2837].

53. No prior request for the relief sought in this Motion has been made by CDC to this or any other Court.

## CONCLUSION

**WHEREFORE,** CDC respectfully requests that this Court: (i) enter the proposed order attached hereto as **Exhibit "2"** granting the relief sought herein, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: Jericho, New York
      June 23, 2011

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et Consignations,

By: s/ Jay S. Hellman
    Ronald J. Friedman
    Jay S. Hellman
    Brett S. Silverman
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300