**Hearing Date and Time:  July 20, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  July 13, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                              :
**In re**                                                     :    **Chapter 11 Case No.**
                                                              :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :    **08-13555 (JMP)**
                                                              :
                                   **Debtors.**               :    **(Jointly Administered)**
                                                              :
-----------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO (I) EXPAND THE SCOPE OF LEGAL COSTS THAT THEY MAY ADVANCE TO FORMER EMPLOYEES AND (II) TO ADVANCE LEGAL COSTS TO CURRENT DIRECTORS

        **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "Motion")

of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors in possession (the "Debtors"), for authorization to (i) expand the

scope of legal costs that they may advance to former employees and (ii) to advance legal costs to

current directors, all as more fully described in the Motion, will be held before the Honorable

James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court,

Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New

York 10004 (the "Bankruptcy Court"), on **July 20, 2010 at 10:00 a.m. (Prevailing Eastern**

**Time)** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), and shall be filed with the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; and served upon (i) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., attorneys for the Debtors; (ii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., Elisabetta G. Gasparini, Esq.; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (iv) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **July 13, 2010 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated:  June 28, 2011
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**Hearing Date and Time:  July 20, 2011 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  July 13, 2011 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                         :

| | |
|---|---|
| **In re** | **:**     **Chapter 11 Case No.** |
| | **:** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | **:**     **08-13555 (JMP)** |
| | **:** |
| **Debtors.** | **:**     **(Jointly Administered)** |
| | **:** |

---------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT**
**TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY**
**CODE FOR AUTHORIZATION TO (I) EXPAND THE SCOPE OF**
**LEGAL COSTS THAT THEY MAY ADVANCE TO FORMER EMPLOYEES**
**AND (II) TO ADVANCE LEGAL COSTS TO CURRENT DIRECTORS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

                 Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors in possession (the "Debtors" and, collectively with their

non-debtor affiliates, "Lehman"), file this motion (the "Motion") and respectfully represent:

**Preliminary Statement**

The Former Employee Legal Costs Fund

                 1.       On December 3, 2008, the Court entered an order (the "Legal Costs Fund

Order") authorizing the Debtors to pay the legal costs incurred by certain former employees in

connection with investigations, arbitrations and other legal actions that were not covered by an

applicable insurance policy, or where an insurer asserted non-coverage, up to an aggregate cap of

$3 million (the "<u>Legal Costs Fund</u>"),[1] ECF No. 2052.  The Legal Costs Fund was subsequently

used to primarily pay the costs associated with certain arbitration proceedings relating to auction

rate securities (the "<u>Arbitration Proceedings</u>").  Although the Debtors' insurers of director and

officer insurance policies had initially denied coverage with respect to the Arbitration

Proceedings, such insurers eventually recognized the Arbitration Proceedings as within the

insurance coverage and the Debtors were, therefore, reimbursed for funds disbursed in

connection with defending such Arbitration Proceedings.  Consequently, the Legal Costs Fund

currently has a balance of approximately $3 million.

        2.      As described more fully below, the Debtors have primary and excess

insurance policies covering Claims[2] against their current and former directors, officers and

employees asserted in the year 2007-2008, and other policies covering Claims against such

individuals asserted in the year 2008-2009 (as expanded from time to time through the purchase

of "tail" coverage until May 16, 2011).  There currently is a dispute with the insurers that issued

certain of the policies as to whether particular Claims fall within the 2007-2008 policy year or

the 2008-2009 policy year.  For each of these policy years, there is a "tower" of one primary and

multiple excess policies that provide coverage of up to $250 million in the aggregate.  Given that

certain of the excess policies under the 2007-2008 policy year have been exhausted, the

---

[1] The term "Legal Costs Fund" is used for convenience purposes only and is not intended to suggest or require that the Debtors set aside or segregate a separate amount in funds from which the proposed advances have been or will be made.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the 2008-09 D&O Policies (as defined in the Motion) attached hereto as <u>Exhibit A</u>, except that "Claims", as it relates to the 2007-08 D&O Policies (as defined in the Motion) does not include:
- Any official request for Extradition of any Insured Person; and
- The execution of a warrant for the arrest of an Insured Person where such execution is an element of Extradition.

resolution of this dispute may impact the availability of insurance to former employees if their

Claims are not covered under the 2008-2009 policy year; as a result, former employees may seek

resorting to the Legal Costs Fund to satisfy their defense costs.

3.      If the pending dispute is not satisfactorily resolved, the Debtors and one or

more former employees may need to commence an action seeking a determination of insurance

policy coverage.  The legal costs of such an action would not be covered by the insurance

policies and also is not currently within the scope of the authorized use of the Legal Costs Fund,

even though the objective of any action would, if successful, potentially reduce the use of the

Legal Costs Fund to pay defense costs in connection with underlying arbitrations and actions.

Accordingly, the Debtors seek to expand the scope of the matters for which former employees

may seek reimbursement of their legal costs from the Legal Costs Fund to include potential and

actual litigation costs with insurers regarding coverage disputes.  The Legal Costs Fund would,

however, still be subject to the $3 million cap and the conditions set forth in the Legal Costs

Fund Order.

<u>Current Director Costs Fund</u>

4.      In May 2009, and again on or about June 2010, the Debtors', pursuant to

Court authorization, ECF Nos. 1398 and 9643, purchased two separate one year tail extensions

of their 2008-2009 policy.  The last such tail expired on May 16, 2011.  The cost of the tails was

approximately $14.2 million for the first extension and approximately $11.9 million for the

second extension.  Rather than incur the significant costs that would be associated with the

purchase of an additional tail extension, estimated at approximately $12 million, the Debtors

concluded that it would be preferable, and in their best interests, to provide up to $2 million for

their current directors (the "Current Directors ")[3] to enable payment of only legal costs (i.e. not

payment of settlements or judgments) associated with Claims that are (i) asserted against them

prior to the confirmation and effective date of a chapter 11 plan for LBHI becoming effective in

these chapter 11 cases and (ii) based upon assertions, first made from May 17, 2011, to LBHI's

emergence from chapter 11, of improper acts or omissions by Current Directors from the

"Pending and Prior Litigation Date", as defined in the 2008-09 D&O Policies (as defined below),

to May 16, 2009, in their capacity as directors of LBHI (the "Current Directors' Costs Fund").[4]

The Debtors seek authority to implement the Current Directors' Costs Fund.

The Creditors' Committee Position

       5.     The Debtors have conferred with the statutory committee of unsecured

creditors (the "Creditors' Committee") as to the relief requested by this Motion.  They have been

advised that the Creditors' Committee supports both the proposed expansion of the scope of the

Legal Costs Fund as well as the implementation of the Current Directors' Costs Fund.

## Background

       6.     Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

---

[3] The Current Directors are: Michael L. Ainslie; John F. Akers; Roger S. Berlind; Thomas H. Cruikshank; Marsha Johnson Evans; Sir Christopher Gent; Roland A. Hernandez; and John D. Macomber.

[4] The term "Current Directors' Costs Fund" is used for convenience purposes only and is not intended to suggest or require that the Debtors set aside or segregate a separate amount in funds from which the proposed advances have been or will be made.

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

7.     On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the Creditors' Committee.

8.     On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009, ECF No. 2583, the Court approved the U.S. Trustee's appointment of the Examiner.

On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report"), ECF

No. 7531.

## Jurisdiction

9.     This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Relief Requested

10.     The Debtors seek authorization pursuant to sections 105(a) and 363(b)(1)

of the Bankruptcy Code to (i) expand the scope of the matters covered under the Legal Costs

Fund and (ii) advance legal costs to Current Directors, as described, up to an aggregate amount

of $2 million to implement the Current Directors' Costs Fund.

## The Legal Costs Fund

11.     As is customary for almost every business and standard in the Debtors'

industry, the Debtors regularly purchased primary directors and officers liability insurance

policies to cover any claims asserted against their officers, directors and/or employees in their

capacities as officers, directors and/or employees of the company ("Individual Insureds").  The

Debtors purchased primary directors liability insurance from XL Specialty Insurance Company

("XL") plus additional excess coverage from sixteen (16) other carriers of up to $250 million in

the aggregate.  For the policy period of May 16, 2007 to May 16, 2008, LBHI purchased from

XL a Management Liability and Company Reimbursement Insurance Policy, Policy No.

ELU097792-07, with an aggregate Limit of Liability of $20 million and an additional $230

million in excess coverage (the "2007-08 D&O Policies").  Upon the expiration of the 2007-08

D&O Policies, LBHI purchased from XL a Management Liability and Company Reimbursement

Insurance Policy, Policy No. ELU104715-08, also with an aggregate Limit of Liability of $20

million and with substantially the same terms and conditions as the 2007-08 D&O Policies (the

"2008-09 D&O Policies", as later extended through the purchase of "tail" coverage to May 16,

2011).  Both the 2007-08 D&O Policies and the 2008-09 D&O Policies provide coverage for the

Individual Insureds in connection with civil, criminal, regulatory and other actions and

investigations.

        12.      Both prior to and after the Commencement Date, various securities actions

were commenced against certain of the Individual Insureds in both federal and state courts and

before various regulatory agencies (the "Investigations").  A number of the Investigations are in

connection with the sale of auction rate securities by Lehman.  In addition, the Arbitration

Proceedings (together with the Investigations, the "Actions") were commenced against various

Lehman entities, such as Lehman Brothers Inc., by the Financial Industry Regulatory Authority

and other private institutions.  The Arbitration Proceedings primarily relate to the sale of auction

rate securities, but also include various employment disputes against former managers of

Lehman.

        13.      During the course of the Investigations, several of Lehman's former

employees were advised that they were under investigation and/or were required to appear as

witnesses before various grand juries or regulatory authorities.  Additionally, certain former

employees have been individually named as respondents in the Arbitration Proceedings.
Initially, the insurers that had issued directors insurance policies to the Debtors denied coverage
as to the foregoing employees.  The Debtors' subsequently sought authorization to establish the
Legal Costs Fund, in part, because if the Individual Insureds' legal costs associated with the
Actions were unpaid, the Debtors believed that many, if not all, of the Individual Insureds'
would be unable or unwilling to obtain adequate representation to the potential detriment of the
Debtors.  As a result of the complexity and significance of the Actions, if the Individual
Insureds', who otherwise have indemnification claims, were not represented by attorneys in
connection with insurance coverage disputes, the Debtors potentially would be exposed to
serious consequences, including inadvertent and harmful disclosures and testimony by such
inexperienced persons that could prejudice the Debtors' ability to later prosecute claims held by
the estates.  Moreover, a finding of wrongdoing or liability against the former employees might
be used, or attempt to be used, to prejudice or prosecute claims against the Debtors on the basis
of collateral estoppel, res judicata or other bases.  To protect the interests of estates, the Debtors
obtained authority for the establishment of the Legal Costs Fund limited to aggregate advances
of $3 million.

14.     The legal costs incurred in connection with the Actions, which were
included in the prepetition unsecured claims for indemnity in the proof of claim filed by all or
substantially all of the former employees, were paid pursuant to the Legal Costs Fund Order.
Eventually, the particular insurers recognized that such legal costs incurred by the former
employees are covered under either the 2007-08 D&O Policies or the 2008-09 D&O Policies and
the Debtors recovered the funds initially paid to the former employees in the Actions.
Consequently, the balance of the Legal Costs Fund approximates $3 million.

15.    Currently, the aggregate amount available under the 2007-08 D&O Policies is approximately $150 million.  Numerous claims that were made against the Individual Insureds have been covered under the 2007-08 D&O Policies, as reflected by the significantly diminished aggregate coverage amount remaining available under those policies.  The potential proceeds under the 2007-08 D&O Policies have been substantially reduced by the payment of Losses (i.e., defense costs, expenses, settlements, and judgments).  Although some claims have been asserted against the 2008-09 D&O Policies, less than $1 million of insurance proceeds have been paid under those policies.  Currently, the 2008-09 D&O Policies have a balance of approximately $249 million.

16.    The current dispute between the Debtors and certain former employees,[5] and one or more of the Debtors' insurance carriers is whether certain claims fall under the 2007-08 D&O Policies or the 2008-09 D&O Policies.  The Debtors and the former employees assert that the claims fall within the 2008-09 D&O Policies, which has substantial remaining available coverage.  The insurers contend that the Claims fall within the 2007-08 D&O Policies.  If the insurers prevail, the employees may have no coverage because of the exhaustion of the insurance.  Resolution of the dispute may require judicial adjudication.  The legal fees of these former employees who would participate in such litigation (the "Coverage Litigation") would not be covered by any insurance policies nor would they come within the current scope of the legal fees that could be paid from the Legal Costs Fund.

17.    Under the circumstances, it is appropriate and good business judgment to expand the scope of the legal fees that are coverable by the Legal Costs Fund to include the Coverage Litigation.  It is anticipated that the Debtors will play a lead role in any such litigation,

---

[5] The "former employees" may include former independent directors of one or more of the Debtors other than LBHI.

and, therefore, the legal fees attributable to former employees should not be substantial and significantly less than the former employees' legal fees that would be covered by the Legal Costs Fund if no insurance coverage is otherwise available.

### The Current Directors' Costs Fund

18.     In May 2009, pursuant to general authorization that the Debtors were authorized to maintain their directors and officers insurance programs, ECF No. 1398, the Debtors purchased an initial one-year tail on the 2008-09 D&O Policies that extended the policy period from May 16, 2009 through May 16, 2010.  On June 17, 2010, the Debtors were authorized to purchase an additional one-year tail extension that extended the policy period from May 16, 2010 through May 16, 2011, ECF No. 9643.  The purchase of the second tail was deemed a necessary consequence of the filing of the Examiner's Report that generated substantial investigations into potential claims that may be covered by the 2008-09 D&O Policies.  The second tail extension preserved the interests of the Debtors in the substantial proceeds of the 2008-09 D&O Policies.  Further, if the 2008-09 D&O Policies coverage period expired before Claims were asserted, the proceeds of the 2008-09 D&O Policies would be unavailable to satisfy any judgments or settlements that may be recoverable by the Debtors' against covered persons.

19.     As noted above, the costs of purchasing both tail extensions were significant, totaling approximately $26 million.  In the circumstances, the Debtors have concluded that purchasing a third tail is not warranted.  Nonetheless, the Debtors believe that during this critical stage of the chapter 11 cases requiring focus and attention by the LBHI Current board of directors on plan formulation and confirmation that the Current Directors not be diverted by any potential defense costs that they would incur relating to a limited pre-chapter 11

period that would not be covered by any insurance policies, and that their recourse would be limited to the filed pre-chapter 11 proof of indemnity claim.

20.    Accordingly, the Debtors developed an alternative that is expedient, less costly and advantageous to them.  It is in the best interests of the administration of the Debtors' cases to provide comfort to the Current Directors to pay only legal costs that may be incurred to defend any Claims relating to the period from the "Pending and Prior Litigation Date", as defined in the 2008-09 D&O Policies, to May 16, 2009, that may be asserted, but only to the extent such Claims are initiated on or after May 17, 2011, and prior to the confirmation and effective date of LBHI's chapter 11 plan, not to exceed $2 million in the aggregate.  As of this date, no such claims have been asserted and there is no basis to believe that any such claims will be asserted.  The Current Directors' Costs Fund provides assurances to Current Directors that if any such claims are asserted, to the extent provided, their legal costs will be paid, subject to the aggregate $2 million cap.

### Protocol for Release of Funds From the Current Directors' Costs Fund

21.    The Debtors propose to distribute funds from the Current Directors' Costs Fund in a manner similar, as applicable, to the process in place under the Legal Costs Fund Order.  The various attorneys for the Current Directors will submit monthly bills and expenses subject to review by the Debtors and the Creditors' Committee.  In addition, before any disbursements are made, the Debtors would require (i) that each of the applicable Current Directors execute (a) a written affirmation of the Current Director's belief that he or she has conducted himself or herself in good faith and reasonably believed that such conduct was in the best interests of the Debtors, and (b) a written undertaking to repay the Debtors legal costs paid by the Debtors if it is determined that the Current Director has acted in bad faith; and (ii) the fees

and expenses of the various law firms representing the Current Directors must be reviewed for

reasonableness by the Debtors and the Creditors' Committee.

### Sound Business Reasons Support the Relief Requested

22.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  When considering a transaction outside

the ordinary course of business, courts in the Second Circuit, and others, require that such

transaction be based upon the sound business judgment of the debtor.  *Comm. of Equity Sec.*

*Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re*

*Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991));

*Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*),

780 F.2d 1223, 1226 (5th Cir. 1986).

23.    It is generally understood that "[w]here the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville*

*Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company."  *In*

*re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488

A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

24.    For the reasons described above, there is ample business justification warranting both the expansion of the Legal Costs Fund Order and advancing legal costs pursuant to the Current Directors' Costs Fund.

25.    In addition to the Legal Costs Fund Order, courts in this district have granted similar relief in other chapter 11 cases.  *See In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005), ECF No. 198, (authorizing debtors' to advance legal costs up to an aggregate cap of $5 million for employees, including 19 former employees, engaged in defending shareholder class actions and participating in investigations initiated by the Securities and Exchange Commission); *In re Worldcom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Oct. 15, 2002), ECF No. 1607, (authorizing advancement of legal fees and related costs, including settlement amounts for employees named individually in lawsuits up to $3 million and legal costs for employees named as witnesses in government investigations up to a cap of $1 million).

### Notice

26.    No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases, ECF No. 9635, on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases. No other or further notice need be provided.

27.    Other than with respect to the Legal Costs Fund, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: June 28, 2011
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **<u>EXHIBIT A</u>**

**2008-09 D&O POLICIES**

| Policy Number: | **ELU104715-08** | ☐ | **Greenwich Insurance Company** |
|---|---|---|---|
| Renewal of Number | ELU097792-07 | ☒ | **XL Specialty Insurance Company** |

Members of the XL America Companies

---

**MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE POLICY DECLARATIONS**

Executive Offices
70 Seaview Avenue
Stamford, CT 06902-6040
Telephone 877-953-2636

---

THIS IS A CLAIMS MADE POLICY. EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY THE PAYMENT OF DEFENSE EXPENSES. THIS POLICY PROVIDES FOR THE INSURER TO DEFEND ANY CLAIM MADE AGAINST AN INSURED EXCEPT UNDER THOSE CERTAIN SPECIFIED CIRCUMSTANCES WHERE THE INSURED CHOOSES TO PROVIDE ITS OWN DEFENSE. PLEASE READ AND REVIEW THE POLICY CAREFULLY.

---

**Item 1.**     **Name and Mailing Address of Parent Company:**

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020

---

**Item 2.**     **Policy Period:**     **From:**     May 16, 2008     **To:**     May 16, 2009

At 12:01 A.M. Standard Time at your Mailing Address Shown Above

---

**Item 3.**     **Limit of Liability:**

$20,000,000 Aggregate each **Policy Period** (including Defense **Expenses**)

---

**Item 4.**     **Retentions:**

$0     each **Insured Person** under INSURING AGREEMENT I (A)

$25,000,000     each **Claim** under INSURING AGREEMENT I (B)

N/A     each **Claim** under INSURING AGREEMENT I (C)

---

**Item 5.**     **Optional Extension Period:**

Length of Optional Extension Period:

(Either one year or two years after the end of the **Policy Period**, at the election of the **Parent Company**)

Premium for Optional Extension Period:     One Year:     $3,900,000.00
                                             Two Years:     N/A
                                             Three Years:     N/A

---

**Item 6.**     **Pending and Prior Litigation Date:**     March 31, 1989

---

**Item 7.**     **Notices required to be given to the Insurer must be addressed to:**

Executive Liability Underwriters
One Constitution Plaza, 16th Floor
Hartford, CT 06103
Toll Free Telephone: 877-953-2636

---

DO 70 00 11 01

## MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT POLICY DECLARATIONS

| Item 8. | Premium: | |
|---------|----------|---|
| | Taxes, Surcharges or Fees: | $0.00 |
| | Total Policy Premium: | $2,600,000.00 |

**Item 9.**  **Policy Forms and Endorsements Attached at Issuance:**

DO 71 00 09 99   XL 82 00 07 07   XL 80 24 03 03   DO 72 46 03 07   DO 96 04 02 00   DO 96 02 02 00
DO 72 44 03 07   DO 80 142 10 01   Manuscript 8481 06 08   Manuscript 1150 06 04   DO 80 266 03 04
Manuscript 6189 05 06   DO 80 122 06 01   DO 80 44 07 00   Manuscript 1034 02 04
Manuscript 6191 05 06   DO 80 48 07 00   DO 80 353 05 06   Manuscript 1102 05 04   DO 83 33 08 01
XL 80 22 05 02   DO 83 134 01 07   Manuscript 6192 05 06   DO 80 286 08 04   Manuscript 6193 05 06
Manuscript 87 01 01   Manuscript 6190 05 06   DO 80 354 05 06   Manuscript 6473 09 06   DO 80 02 03 00
DO 80 118 05 01   Manuscript 7142 05 07   Manuscript 7573 10 07   Manuscript 8616 07 08
Manuscript 6474 10 07   Manuscript 7141 05 07   DO 80 218 04 03   DO 80 412 05 07   DO 80 481 06 08
DO 83 148 12 07

Countersigned: _____   By: _____
                            Date                              Authorized Representative

---

THESE **DECLARATIONS** AND THE POLICY, WITH THE ENDORSEMENTS, ATTACHMENTS, AND THE **APPLICATION** SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE **INSURED** RELATING TO THIS INSURANCE.

---

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page, if required by law, by a duly authorized representative of the Insurer.**

*Nicholas M. Brown, Jr.*                     *Theresa M. Morgan*

Nicholas M. Brown, Jr.                       Theresa M. Morgan
President                                     Secretary

**Greenwich Insurance Company**

*Nicholas M. Brown, Jr.*                     *Theresa M. Morgan*

Nicholas M. Brown, Jr.                       Theresa M. Morgan
President                                     Secretary

**XL Specialty Insurance Company**

DO 70 00 11 01                                                   Page 2 of 2

# MANAGEMENT LIABILITY AND COMPANY REIMBURSEMENT INSURANCE COVERAGE FORM

**THIS IS A CLAIMS MADE POLICY WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ AND REVIEW THE POLICY CAREFULLY.**

In consideration of the payment of the premium, and in reliance on all statements made and information furnished to Executive Liability Underwriters, the Underwriting Manager for the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:

## I.  INSURING AGREEMENTS

(A)  The Insurer shall pay on behalf of the **Insured Persons Loss** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)  The Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**.

(C)  The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act**.

## II.  DEFINITIONS

(A)  **"Application"** means:

   (1)  the application attached to and forming part of this Policy; and

   (2)  any materials submitted therewith, which shall be retained on file by the Insurer and shall be deemed to be physically attached to this Policy.

(B)  **"Change In Control"** means:

   (1)  the merger or acquisition of the **Parent Company,** or of all or substantially all of its assets by another entity such that the **Parent Company** is not the surviving entity;

   (2)  the acquisition by any person, entity or affiliated group of persons or entities of the right to vote, select or appoint more than fifty percent (50%) of the directors of the **Parent Company**; or

   (3)  the appointment of a Receiver, Conservator, Liquidator, Trustee,  Rehabilitator, or any comparable authority, with respect to the **Parent Company**.

(C)  **"Claim"** means:

   (1)  a written demand for monetary or non-monetary relief;

   (2)  any civil proceeding in a court of law or equity, or arbitration;

(3)   any criminal proceeding which is commenced by the return of an indictment; and

(4)   a formal civil, criminal, administrative regulatory proceeding or formal investigation of an **Insured Person** or the **Company** (but with respect to the **Company** only for a **Company Wrongful Act**) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such **Insured Person** or the **Company** as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any **Employment Practices Wrongful Act**.

(D)   "**Company**" means the **Parent Company** and any **Subsidiary** created or acquired on or before the Inception Date set forth in ITEM 2 of the Declarations or during the **Policy Period**, subject to GENERAL CONDITIONS VI (D).

(E)   "**Company Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the **Company** in connection with a **Securities Claim**.

(F)   "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense of any **Claim** including the premium for an appeal bond, attachment bond or similar bond but will not include applying for or furnishing such bond. **Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees, or benefits of its directors, officers or employees.

(G)   "**Employment Practices Wrongful Act**" means any actual or alleged:

(1)   wrongful termination of employment whether actual or constructive;

(2)   employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status;

(3)   sexual or other harassment in the workplace; or

(4)   wrongful deprivation of career opportunity, employment related misrepresentations, retaliatory treatment against an employee of the **Company**, failure to promote, demotion, wrongful discipline or evaluation, or refusal to hire.

(H)   "**Employment Practices Claim**" means a **Claim** alleging an **Employment Practices Wrongful Act**.

(I)   "**Insured**" means the **Insured Persons** and the **Company**.

(J)   "**Insured Person**" means:

(1)   any past, present or future director or officer, or member of the Board of Managers, of the **Company** and those persons serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary** operating or incorporated outside the United States;

(2)   any past, present or future employee of the **Company** to the extent any **Claim** is a **Securities Claim**;

(3)   an individual identified in (J)(1) above who, at the specific written request of the **Company**, is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**;

(4)   any individual identified in (J)(1) above who, at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**; or

(5)   the lawful spouse of any person set forth in the above provisions of this definition, but only to the extent the spouse is a party to any **Claim** solely in their capacity as a spouse of such persons and only for the purposes of any **Claim** seeking damages recoverable from marital community property, property jointly held by any such person and spouse, or property transferred from any such person to the spouse.

In the event of the death, incapacity or bankruptcy of an individual identified in (J)(1), (2), (3), (4) or (5) above, any **Claim** against the estate, heirs, legal representatives or assigns of such individual for a **Wrongful Act** or **Employment Practices Wrongful Act** of such individual will be deemed to be a **Claim** against such individual.

(K)   "**Interrelated Wrongful Acts**" means any **Wrongful Act, Company Wrongful Act,** or **Employment Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(L)   "**Joint Venture**" means any corporation, partnership, joint venture, association or other entity, other than a **Subsidiary,** during any time in which the **Parent Company,** either directly or through one or more **Subsidiary(s);**

(1)   owns or controls at least thirty three percent (33%), but not more than fifty percent (50%), in the aggregate of the outstanding securities or other interests representing the right to vote for the election or appointment of those persons of such an entity occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company,** regardless of the name or title by which such position is designated, of a **Joint Venture;** or

(2)   has the right, by contract, ownership of securities or otherwise, to elect, appoint or designate at least thirty three (33%) of those persons described in (L)(1) above.

(M)   "**Loss**" means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law) and **Defense Expenses** in excess of the Retention that the **Insured** is legally obligated to pay. **Loss** will not include:

(1)   the multiplied portion of any damage award;

(2)   fines, penalties or taxes imposed by law; or

(3)   matters which are uninsurable under the law pursuant to which this Policy is construed.

**NOTE:** With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law. If, based on the written opinion of counsel for the **Insured,** punitive damages are insurable under applicable law the Insurer will not dispute the written opinion of counsel for the **Insured**.

(N)   "**Non-Profit Entity**" means a corporation or organization other than the **Company,** which is exempt from taxation under Section 501(c)(3), (4) and (10) of the Internal Revenue Code as amended or any rule or regulation promulgated thereunder.

(O)   "**Parent Company**" means the entity named in ITEM 1 of the Declarations.

(P)   "**Policy Period**" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations or to any earlier cancellation date.

(Q)    "**Securities Claim**" means a **Claim** made against an **Insured** for:

(1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

(2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the **Company**, whether such purchase, sale or offer involves a transaction with the **Company** or occurs in the open market.

(R)    "**Subsidiary**" means any entity during any time in which the **Parent Company** owns, directly or through one or more **Subsidiary(s)**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors.

(S)    "**Wrongful Act**" means any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty by any **Insured Person** while acting in his or her capacity as an:

(1)    **Insured Person** of the **Company** or a person serving in a functionally equivalent role for the **Parent Company** or any **Subsidiary**;

(2)    **Insured Person** of the **Company** who at the specific written request of the **Company** is serving as a director, officer, trustee, regent or governor of a **Non-Profit Entity**; or

(3)    **Insured Person** of the **Company**, who at the specific written request of the **Company** is serving in an elected or appointed position having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture**.

## III.    EXCLUSIONS

The Insurer shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured Person**, or with respect to INSURING AGREEMENT (C), the **Company**:

(A)    for any actual or alleged bodily injury, sickness, mental anguish, emotional distress, libel, slander, oral or written publication of defamatory or disparaging material, disease or death of any person, or damage or destruction of any tangible property including loss of use thereof; however, this EXCLUSION (A) will not apply to any allegations of libel, slander, defamation, mental anguish or emotional distress if and only to the extent that such allegations are made as part of an **Employment Practices Claim** for an **Employment Practices Wrongful Act**;

(B)    for any actual, alleged or threatened discharge, dispersal, release, escape, seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste. With respect to a **Claim** made under INSURING AGREEMENT (A) only, this EXCLUSION (B) will not apply to a **Claim** unless a court of competent jurisdiction specifically determines the **Company** is not permitted to indemnify the **Insured Person**;

**NOTE:** EXCLUSIONS (A) and (B) above will not apply with respect to a **Securities Claim** brought by a security holder of the **Company**, or a derivative action brought by or on behalf of, or in the name or right of, the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, an **Insured**.

(C)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation;

(D)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding or arbitration which was brought prior to the Pending and Prior Litigation Date set forth in ITEM 6 of the Declarations;

(E)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any fact, circumstance, situation, transaction, event or **Wrongful Act, Company Wrongful Act** or **Employment Practices Wrongful Act** which, before the Inception Date of this Policy, was the subject of any notice given under any other Management Liability policy, Directors and Officers liability policy or similar policy;

(F)    brought about or contributed to in fact by any:

(1)    intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

(2)    profit or remuneration gained by any **Insured** to which such **Insured** is not legally entitled;

as determined by a final adjudication in the underlying action or in a separate action or proceeding;

(G)    by, on behalf of, or at the direction of the **Company**, except and to the extent such **Claim:**

(1)    is brought derivatively by a security holder of the **Company** who, when such **Claim** is made and maintained, is acting independently of, and without the solicitation, assistance, participation or intervention of an **Insured Person** or the **Company**; or

(2)    is brought by the Bankruptcy Trustee or Examiner of the **Company** or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the **Company**;

(H)    by, on behalf of, at the direction of or in the name or right of any **Non-Profit Entity** or **Joint Venture** against an **Insured Person** for a **Wrongful Act** or **Employment Practices Wrongful Act** while acting in his or her capacity as a director, officer, trustee, regent or governor of such, or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of an **Insured Person** of the **Company**, regardless of the name or title by which such position is designated; or

(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an **Insured Person** acting in their capacity as a **Insured Person** of any entity other than the **Company, Non-Profit Entity** or **Joint Venture.**

No conduct of any **Insured Person** will be imputed to any other **Insured** to determine the application of any of the above EXCLUSIONS.

## IV.    LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS

(A)    The Insurer shall pay the amount of **Loss** in excess of the applicable Retention(s) set forth in ITEM 4 of the Declarations up to the Limit of Liability set forth in ITEM 3 of the Declarations.

(B)    The amount set forth in ITEM 3 of the Declarations shall be the maximum aggregate Limit of Liability of the Insurer under this Policy. Payment of **Loss**, including **Defense Expenses**, by the Insurer shall reduce the Limit of Liability.

(C)    With respect to the **Company's** indemnification of its **Insured Persons**, the certificate of incorporation, charter, by-laws, articles of association, or other organizational documents of the **Parent Company**, each **Subsidiary** and each **Non-Profit Entity** or **Joint Venture**, will be deemed to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(D)    The Retention applicable to INSURING AGREEMENT (B) shall apply to any **Loss** as to which indemnification by the **Company, Non-Profit Entity** or **Joint Venture** is legally permissible, whether or not actual indemnification is made unless such indemnification is not made by the **Company, Non-Profit Entity** or **Joint Venture** solely by reason of its financial insolvency. In the event of financial insolvency, the Retention(s) applicable to INSURING AGREEMENT (A) shall apply.

(E)    If different retentions are applicable to different parts of any **Loss**, the applicable Retention(s) will be applied separately to each part of such **Loss**, and the sum of such Retention(s) will not exceed the largest applicable Retention set forth in ITEM 4 of the Declarations.

(F)    Notwithstanding the foregoing, solely with respect to a **Securities Claim**, no Retention shall apply to such **Claim** and the Insurer will reimburse those **Defense Expenses** incurred by the **Insured** if:

    (1)    the **Securities Claim** is dismissed, or there is a stipulation to dismiss the **Securities Claim**, with or without prejudice and without the payment of any monetary consideration by the **Insured**;

    (2)    there is a final judgment of no liability obtained prior to or during trial, in favor of the **Insured**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

    (3)    there is a final judgment of no liability obtained after trial, in favor of the **Insured**, after the exhaustion of all appeals.

    Any reimbursement in the case of (F)(1), (2), or (3) above will only occur if ninety (90) days after the date of dismissal, stipulation, final judgment of no liability is obtained and only if:

        (a)    the same **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is not brought again within that time; and

        (b)    the **Insured** provides the Insurer with an Undertaking in a form acceptable to the Insurer that such reimbursement of the applicable Retention(s) will be paid back to the Insurer in the event the **Securities Claim** (or a **Securities Claim** containing **Interrelated Wrongful Acts**) is brought after the ninety (90) day period.

## V.    DEFENSE, SETTLEMENT AND ALLOCATION OF LOSS

(A)    It shall be the duty of the **Insured** and not the duty of the Insurer to defend any **Claim** under this Policy.

(B)    No **Insured** may incur any **Defense Expenses** or admit liability for, make any settlement offer with respect to, or settle any **Claim** without the Insurer's consent, such consent not to be unreasonably withheld.

(C)    Upon the written request of an **Insured**, the Insurer will advance **Defense Expenses** on a current basis in excess of the applicable Retention, if any, before the disposition of the **Claim** for which this policy provides coverage. As a condition of the advancement of **Defense Expenses**, the Insurer may require a written undertaking, in a form satisfactory to the Insurer, which will guarantee the repayment of any **Loss** including **Defense Expenses** paid to or on behalf of the **Insured** if it is finally determined that the **Loss** incurred is not covered under this Policy.

(D)    If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred, either because a **Claim** made against the **Insured** contains both covered and uncovered matters, or because a **Claim** is made against both the **Insured** and others (including the **Company** for **Claims** other than **Securities Claims**) not insured

under this Policy, the **Insured** and the Insurer will use their best efforts to determine a fair and appropriate allocation of **Loss** between that portion of **Loss** that is covered under this Policy and that portion of **Loss** that is not covered under this Policy. Additionally, the **Insured** and the Insurer agree that in determining a fair and appropriate allocation of **Loss**, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the **Claim** by, the **Insured** and others.

(E)   In the event that an agreement cannot be reached between the Insurer and the **Insured** as to an allocation of **Loss**, as described in (D) above, then the Insurer shall advance that portion of **Loss** which the **Insured** and the Insurer agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

## VI.   GENERAL CONDITIONS

### (A)   NOTICE

(1)   As a condition precedent to any right to payment under this Policy with respect to any **Claim**, the **Insured** shall give written notice to the Insurer of any **Claim** as soon as practicable after it is first made.

(2)   If, during the **Policy Period**, the **Insured** first becomes aware of a specific **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** and if, during the **Policy Period**, the **Insured**:

(a)   provides the Insurer with written notice of the specific **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act**, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the **Insured** first became aware of such **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act**; and

(b)   requests coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act**;

then any **Claim** subsequently made arising out of such **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** will be treated as if it had been first made during the **Policy Period**.

(3)   All notices under GENERAL CONDITIONS (A)(1) and (2) must be sent by certified mail or the equivalent to the address set forth in ITEM 7 of the Declarations; Attention: Claim Department.

### (B)   INTERRELATED CLAIMS

All **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the time at which the earliest such **Claim** is made or deemed to have been made pursuant to GENERAL CONDITIONS (A)(1) above or GENERAL CONDITIONS (A)(2), if applicable.

### (C)   OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES

(1)   All **Loss** payable under this Policy will be specifically excess of and will not contribute with any other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically excess of this Policy. This Policy will not be subject to the terms of any other insurance policy.

(2)    All coverage under this Policy for **Loss** from **Claims** made against the **Insured Persons** while acting in their capacity as a director, officer, trustee, regent or governor of a **Non-Profit Entity** or persons occupying elected or appointed positions having fiduciary, supervisory or managerial duties and responsibilities comparable to those of the **Insured Persons** of the **Company**, regardless of the name or title by which such position is designated, of a **Joint Venture** will be specifically excess of and will not contribute with, any other insurance or indemnification available to such **Insured Person** from such **Non-Profit Entity** or **Joint Venture** by reason of their service as such.

## (D)    MERGERS AND ACQUISITIONS (CHANGES IN EXPOSURE OR CONTROL)

(1)    If during the **Policy Period**, the **Company** acquires any assets, acquires a **Subsidiary**, or acquires any entity by merger, consolidation or otherwise, or assumes any liability of another entity, coverage shall be provided for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** occurring after the consummation of the transaction.

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, **Subsidiary** or liabilities so acquired or so assumed, exceed thirty five percent (35%) of the total assets or liabilities of the **Company**, as represented in the **Company's** most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any **Loss** involving a **Claim** for a **Wrongful Act**, **Company Wrongful Act**, or **Employment Practices Wrongful Act** that occurred after the transaction has been consummated. Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate.

(3)    With respect to the acquisition, assumption, merger, consolidation or otherwise of any entity, asset, **Subsidiary** or liability as described in (D)(1) and (2) above, there will be no coverage available under this Policy for **Claims** made against the acquired, assumed, merged, or consolidated entity, asset, **Subsidiary**, liability, or **Insured Person** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed any time during which such entity, asset, liability or **Subsidiary** is not an **Insured**.

(4)    If during the **Policy Period** any entity ceases to be a **Subsidiary**, the coverage provided under this Policy shall continue to apply to the **Insured Persons** who, because of their service with such **Subsidiary**, were covered under this Policy but only with respect to a **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** that occurred or allegedly occurred prior to the time such **Subsidiary** ceased to be a **Subsidiary** of the **Company**.

(5)    If, during the **Policy Period**, there is a **Change In Control**, the coverage provided under this Policy shall continue to apply but only with respect to a **Claim** against an **Insured** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed or allegedly committed up to the time of the **Change In Control**; and

(a)    coverage will cease with respect to any **Claim** for a **Wrongful Act**, **Company Wrongful Act** or **Employment Practices Wrongful Act** committed subsequent to the **Change In Control**; and

(b)    the entire premium for the Policy will be deemed to be fully earned immediately upon the consummation of a **Change In Control**.

(E)    **CANCELLATION AND RENEWAL OF COVERAGE**

(1)    Except for the nonpayment of premium, as set forth in (E)(2) below, the **Parent Company** has the exclusive right to cancel this Policy. Cancellation may be effected by mailing to the Insurer written notice when such cancellation shall be effective, provided the date of cancellation is not later than the Expiration Date set forth in ITEM 2 of the Declarations. In such event, the Insurer shall retain the customary short rate portion of the earned premium. Return or tender of the unearned premium is not a condition of cancellation.

(2)    The Insurer may only cancel this Policy for nonpayment of premium. The Insurer will provide not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled. Notice of cancellation will be sent to the **Parent Company** and the agent of record for the **Insured**, if applicable.

(3)    The Insurer is under no obligation to renew this Policy upon its expiration. Once the Insurer chooses to non-renew this Policy, the Insurer will deliver or mail to the **Parent Company** written notice stating such at least sixty (60) days before the Expiration Date set forth in ITEM 2 of the Declarations.

(F)    **OPTIONAL EXTENSION PERIOD**

(1)    If either the **Parent Company** or the Insurer does not renew this Policy, the **Parent Company** shall have the right, upon payment of an additional premium set forth in ITEM 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any **Claim** first made during the period of time set forth in ITEM 5 of the Declarations after the Policy Expiration Date, but only with respect to a **Wrongful Act, Company Wrongful Act,** or **Employment Practices Wrongful Act,** occurring prior to the Policy Expiration Date.

(2)    As a condition precedent to the right to purchase the Optional Extension Period the total premium for this Policy must have been paid in full. The right of the **Parent Company** to purchase the Optional Extension Period will be immediately terminated if the Insurer does not receive written notice by the **Parent Company** advising it wishes to purchase the Optional Extension Period together with full payment of the premium for the Optional Extension Period within thirty (30) days after the Policy Expiration Date.

(3)    If the **Parent Company** elects to purchase the Optional Extension Period as set forth in (F)(1) and (2) above, the entire premium for the Optional Extension Period will be deemed to be fully earned at the Inception Date for the Optional Extension Period.

(4)    The purchase of the Optional Extension Period will not in any way increase the Limit Of Liability set forth in ITEM 3 of the Declarations, and the Limit of Liability with respect to **Claims** made during the Optional Extension Period shall be part of and not in addition to the Limit of Liability for all **Claims** made during the **Policy Period**.

(G)    **ASSISTANCE, COOPERATION AND SUBROGATION**

(1)    The **Insured** agrees to provide the Insurer with all information, assistance and cooperation that the Insurer may reasonably request, and further agree that they will do nothing which in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery.

(2)    In the event of any payment under this Policy, the Insurer shall be subrogated to all of the potential or actual rights of recovery of the **Insured**. The **Insured** shall execute all papers required and will do everything necessary to secure such rights including but not limited to the execution of such documents as are necessary to enable the Insurer to effectively bring suit in their name, and will provide all other assistance and cooperation which the Insurer may reasonably require.

(H)    **EXHAUSTION**

If the Insurer's Limit of Liability as set forth in ITEM 3 of the Declarations is exhausted by the payment of **Loss**, the premium as set forth in ITEM 8 of the Declarations will be fully earned, all obligations of the Insurer under this Policy will be completely fulfilled and exhausted, and the Insurer will have no further obligations of any kind whatsoever under this Policy.

(I)    **REPRESENTATION CLAUSE**

The **Insured** represents that the statements and particulars contained in the **Application** as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy. No knowledge or information possessed by any **Insured** will be imputed to any other **Insured** except for material facts or information known to the person(s) who signed the **Application**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured** who knew of such untruth or to whom such knowledge is imputed.

(J)    **ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY**

     (1)    No action may be taken against the Insurer unless, as a condition precedent thereto:

         (a)    there has been full compliance with all of the terms and conditions of this Policy; and

         (b)    the amount of the obligation of the **Insured** has been finally determined either by judgment against the **Insured** after actual trial, or by written agreement of the **Insured**, the claimant and the Insurer.

     (2)    Nothing contained herein shall give any person or entity any right to join the Insurer as a party to any **Claim** against the Insurer to determine their liability, nor may the **Insured** implead the Insurer in any **Claim**.

     (3)    Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed hereon.

     (4)    Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Insurer will not cause a waiver or change in any part of this Policy or prevent the Insurer from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations may only be waived or changed by written endorsement.

(K)    **AUTHORIZATION AND NOTICES**

It is understood and agreed that the **Parent Company** will act on behalf of the **Company** and the **Insured Persons** with respect to:

     (1)    the payment of the premiums;

     (2)    the receiving of any return premiums that may become due under this Policy;

     (3)    the giving of all notices to the Insurer as provided herein; and

     (4)    the receiving of all notices from the Insurer.

(L)    **ENTIRE AGREEMENT**

The **Insured** agrees that the Declarations, Policy, including the endorsements, attachments and the **Application** shall constitute the entire agreement between the Insurer or any of its agents and the **Insured** relating to this insurance.

# POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM
## INSURANCE COVERAGE

**Coverage for acts of terrorism is already included in your current policy. You are hereby notified that under the Terrorism Risk Insurance Program Reauthorization Extension Act of 2007, the definition of "act of terrorism" has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in concurrence with the Secretary of the State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your existing coverage, any losses caused by certified acts of terrorism may be partially reimbursed by the United States under a formula established by federal law. Under this formula, the United States generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. However, your policy may contain other exclusions that may affect your coverage. The Terrorism Risk Insurance Program Reauthorization Extension Act contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.**

**The portion of your annual premium that is attributable to coverage for acts of terrorism is: $ waived. Any premium waiver is only valid for the current Policy Period.**

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE PROGRAM REAUTHORIZATION EXTENSION ACT OF 2007, ANY LOSSES CAUSED BY CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE WILL BE PARTIALLY REIMBURSED BY THE UNITED STATES AND I HAVE BEEN NOTIFIED OF THE AMOUNT OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

Name of Insurer: **XL Specialty Insurance Company**

Policy Number: **ELU104715-08**

_____
Signature of Insured

_____
Print Name and Title

_____
Date

# IN WITNESS ENDORSEMENT

XL SPECIALTY INSURANCE COMPANY

ADMINISTRATIVE OFFICE:    SEAVIEW HOUSE
70 SEAVIEW AVENUE
STAMFORD, CT 06902-6040

STATUTORY HOME OFFICE:    1201 NORTH MARKET STREET
SUITE 501
WILMINGTON, DE 19801

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

| | |
|---|---|
| John R. Glancy | Kenneth P. Meagher |
| President | Secretary |

IL MP 9104 0406 XLS

## NOTICE TO POLICYHOLDERS

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as "Specially Designated Nationals and Blocked Persons". This list can be found on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# PRIVACY POLICY

The XL America, Inc. insurance group ("We" or "Our Group"), respects the privacy of all personal information. Thus, the information We collect from our customers, or potential customers, is treated with the highest degree of privacy.

We have developed a Privacy Policy for Our Group that:
1) ensures the security of your information; and
2) complies with state and federal privacy laws.

The term "personal information" includes all information we obtain about a customer and maintain in our files. All persons with access to personal information are required to follow this policy.

## Our Privacy Promise

Your privacy rights are important to us. Analysis of your private information allows us to provide to you excellent service and products. Your trust in us depends upon the security and integrity of our records. Thus, We promise to:

1) Follow strict security standards. This will protect any information you share with us, or that we receive about you.
2) Verify and exchange data regarding your credit and financial status only for the purposes of: underwriting; policy administration; or risk management. We will obtain only reputable references and services.
3) Collect and use the least amount of information necessary to:
   a. advise you and deliver excellent service and products; and
   b. conduct our business.
4) Train our employees to securely handle private information. We will only permit authorized employees to have access to such information.
5) Not disclose data about you or your business to any organization outside Our Group or to third party providers unless:
   a. we disclose to you our intent to do so; or
   b. we are required to do so by law.
6) Not disclose medical information unless:
   a. you give us written consent to do so; or
   b. We disclose for any exception provided in the law.
7) Attempt to keep our records complete and exact.
8) Advise you how and where to access your account (unless prohibited by law).
9) Advise you how to correct errors or make changes to your account.
10) Inspect our procedures to ensure your privacy.

## Collection and Sources of Information

We collect only the personal information needed to:
1) determine suitability for a product or service;
2) manage the product or service; and
3) advise customers about our products and services.

The information we collect comes from the following sources:
- **Submission** – In the application, you provide: your name; address; phone number; e-mail address; and other types of private information.
- **Quotes** – We collect information to determine:
  1) your eligibility for an insurance product; and
  2) your coverage cost.

The data we collect will vary with the type of insurance you seek.
- **Transactions** – We maintain records of all transactions with Our Group and our third party providers. Our records include:

1)    your coverage choices;
2)    premiums; billing; and payment records,
3)    claims history; and
4)    other data related to your account.

- **Claims** – We maintain records on any claims that are made under your policies. The investigation of a claim involves collection of a broad range of information. It also involves many issues, some of which do not directly involve you. We will share with you facts that we collect about your claim; unless prohibited by law. The process of claim investigation also involves advice; opinions; and comments from many people. These may include attorneys and experts. This will help us determine how best to handle your claim. To protect the legal and privileged aspects of opinions and advice, we will not disclose this information to you.
- **Credit and Financial Reports** – We may receive your credit history. This is to support information you provided during the submission and quote processes. This history will help to underwrite your coverage.

## Retention and Correction of Personal Information

We retain personal information only as long as required by law; or as required by our business methods. If we become aware that any information may be incorrect, we will make reasonable effort to correct it.

## Storage of Personal Information

Safeguards are in place to protect data and paper files containing personal information.

## Sharing/Disclosing of Personal Information

We do not share personal information with a third party outside of Our Group for marketing purposes. This is true unless such sharing is permitted by law. Information may be shared with a third party for necessary servicing of the product. It may also be disclosed for other business reasons as permitted by law.

We do not share personal data outside of Our Group for servicing or joint marketing reasons. We will only disclose such data when a contract containing non-disclosure language has been signed by us and the third party.

Unless a consumer consents, we do not disclose "consumer credit report" type information outside of Our Group. "Consumer credit report type information" means such things as: net worth; credit worthiness; hobbies (piloting, boating, etc.); solvency; etc.

We also do not disclose outside of Our Group personal information for use in marketing. We may share information within Our Group regarding our experience and dealings with the customer.

We may disclose private information about a customer as allowed or otherwise required by law. The law allows us to share a customer's financial data within Our Group for marketing purposes. The law does not allow customers to limit or prevent such disclosures.

We may also disclose personal information about you or your business to:
- your independent agent or broker;
- an independent claim adjuster; investigator; attorney; or expert;
- persons or groups that conduct scientific studies. This includes actuaries and accountants;
- a medical care facility or professional to verify coverage for a covered person;
- an insurance support group;
- another insurer if to prevent fraud;
- another insurer to properly underwrite a risk;
- insurance regulators;
- governmental authorities pursuant to law;
- an authority in response to a valid administrative or judicial order. This includes a warrant or subpoena;
- a party for the following purposes regarding a book of business: sale; transfer; merger; or consolidation. This applies whether the transaction is proposed or complete;

- a professional peer review group.  This includes reviewing the service or conduct of medical care facilities or personnel;
- a covered person for providing the status of a transaction; or
- any of the following: a lienholder; mortgagee; assignee; lessor; or other person of record having a legal interest in the policy.

## Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer; unless consent is obtained from that customer.  However, such consent shall not be prohibited, limited or sought for certain insurance functions.  This includes, but is not limited to:

  a.    claims administration;
  b.    fraud prevention;
  c.    underwriting; policy placement or issuance; loss control or auditing.

## Access to Your Information

The following persons will have access to personal information we collect:
employees of Our Group and third party service providers.  Information will only be collected as is needed in transactions with you.

## Violation of the Privacy Policy

Any person violating this Policy will be subject to discipline. This may include termination.


For questions regarding this privacy statement, please contact your broker.

XL 82 00 07 07

**Endorsement No.: 1**                                    **Effective: May 16, 2008**
**Named Insured: Lehman Brothers Holdings Inc.**          **12:01 A.M. Standard Time**
**Policy No.: ELU104715-08**                              **Insurer: XL Specialty Insurance Company**

# CHANGE OF INSURER ADDRESS AND PREAMBLE ENDORSEMENT

(1)      The Declarations of the Policy are amended as follows:

**Notices required to be given to the Insurer must be addressed to:**

**Notice to Claim Dept:**                              **All other Notices:**

XL Professional                                        XL Professional
One Hundred Constitution Plaza, 18th Floor             One Hundred Constitution Plaza, 17th Floor
Hartford, CT 06103                                     Hartford, CT 06103
Attn: Claim Dept.                                      Attn: Underwriting

All references in the policy to other addresses for Notice to the Insurer shall be deemed amended.

(2)      The preamble to this Policy is amended to read in its entirety as follows:

**In consideration of the payment of the premium, and in reliance on all statements made and information furnished to the Insurer identified in the Declarations (hereinafter the Insurer) including the Application and subject to all of the terms, conditions and limitations of all of the provisions of this Policy, the Insurer, the Insured Persons and the Company agree as follows:**

All other terms, conditions and limitations of this Policy shall remain unchanged.

XL 80 24 03 03

**Endorsement No.: 2**                      **Effective: May 16, 2008**
**Named Insured: Lehman Brothers Holdings Inc.**    **12:01 A.M. Standard Time**
**Policy No.: ELU104715-08**                **Insurer: XL Specialty Insurance Company**

# TERRORISM PREMIUM ENDORSEMENT

Please note: **The** portion of your annual premium set forth in Item 8. of the Declarations that is attributable to coverage for acts of terrorism is: $ waived.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 3                                    Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.          12:01 A.M. Standard Time
Policy No.: ELU104715-08                              Insurer: XL Specialty Insurance Company

# NEW YORK ADDENDUM TO DECLARATIONS

1.  The Declarations to the Management Liability and Company Reimbursement Insurance Policy is amended by the addition of the following:

    THIS IS A CLAIMS MADE POLICY. EXCEPT AS PROVIDED IN SECTION VI.(2), WHICH PERMITS INSUREDS TO GIVE NOTICE OF WRONGFUL ACTS, COMPANY WRONGFUL ACTS OR EMPLOYMENT PRACTICES WRONGFUL ACTS, THIS POLICY ONLY APPLIES TO CLAIMS FIRST MADE DURING THE POLICY PERIOD, THE AUTOMATIC EXTENSION PERIOD OR, IF APPLICABLE, THE OPTIONAL EXTENSION PERIOD.  NO COVERAGE EXISTS FOR CLAIMS MADE AFTER THE END OF THE POLICY PERIOD OR THE AUTOMATIC EXTENSION PERIOD UNLESS, AND TO THE EXTENT, THE OPTIONAL EXTENSION PERIOD APPLIES.  UPON TERMINATION OF COVERAGE FOR ANY REASON, A 60-DAY AUTOMATIC EXTENSION PERIOD WILL APPLY.  FOR AN ADDITIONAL PREMIUM AN OPTIONAL EXTENSION PERIOD OF AT LEAST ONE YEAR CAN BE PURCHASED AS INDICATED IN ITEM 5 OF THE DECLARATIONS. NON-PROFIT ENTITIES ARE ENTITLED TO PURCHASE AN OPTIONAL EXTENSION PERIOD OF THREE YEARS. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC EXTENSION PERIOD OR, IF PURCHASED, THE OPTIONAL EXTENSION PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT SUBSEQUENTLY PROVIDED BY ANOTHER INSURER.  DURING THE FIRST SEVERAL YEARS OF A CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

2.  Item 5. is deleted in its entirety and amended to read as follows:

    Item 5. Optional Extension Period and Premium (if purchased at the election of the Parent Company):

    | Length of Optional Extension Period | Optional Extension Premium |
    |---|---|
    | 1 year | 90% of policy premium |
    | 2 years | 180% of policy premium |
    | 3 years | 205% of policy premium |

3.  Item 7. is deleted and replaced by the following:

    Item 7. Notices required to be given to the Insurer must be addressed to:

    Notice to Claim Dept:                      All other Notices:
    XL Professional                            XL Professional
    One Hundred Constitution Plaza, 18th Floor One Hundred Constitution Plaza, 17th Floor
    Hartford, CT 06103                         Hartford, CT 06103
    Attn: Claim Dept.                          Attn: Underwriting

    Notice of claim may also be sent to the Insurer's authorized agent in the state of New York at the following address:

    XL Specialty Insurance Company
    140 Broadway
    Suite 5101
    New York, NY 10005
    (212) 820 6100

Endorsement No.: 4                                    Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.          12:01 A.M. Standard Time
Policy No.: ELU104715-08                              Insurer: XL Specialty Insurance Company

# NEW YORK DEFENSE EXPENSES DISCLOSURE

Defense Expenses reduce and may completely exhaust the Limit of Liability.  To the extent the Limit of Liability is exceeded, the Insurer shall not be liability for Defense Expenses or for the amount of any judgment or settlement. Defense Expenses are also applied to the Retention.

This form shall be attached to and made part of the Policy.

The below Officer of the Parent Company, on behalf of the Insureds, acknowledges that he/she read this form and understands the above provisions.


_____
Officer of Parent Company Signature


_____
Print Name


_____
Title

**Endorsement No.: 5**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# NEW YORK DISCLOSURE STATEMENT

This Policy is a claims-made policy.

Coverage under this Policy or any subsequent renewal of this Policy, subject to the terms of the applicable policy, applies only to any "Claim" (as defined herein) made against the Insureds, or specific Wrongful Act, Employment Practices Wrongful Act or Company Wrongful Act reported during the Policy Period of this Policy or the applicable renewal policy.  All coverage under this Policy ceases upon Termination of Coverage, except for the Automatic Extension Period unless the Optional Extension Period is purchased.

The below officer of the Parent Company, on behalf of the Insureds, acknowledges that he/she has received information from the Insurer or its agent explaining the limitations and potential gaps in coverage of a claims-made policy and that he/she understands these limitations and potential gaps in coverage.

This Policy includes a 60-day automatic extended reporting period, referred to as the Automatic Extension Period.

This Policy provides the Insured with the option to purchase for an additional premium at least a one-year Optional Extension Period from the termination of this Policy.  The premium for the Optional Extension Period is indicated in Item 5. of the Policy's Declarations.

During the first several years of a claims-made relationship between the Insureds and the Insurer, claims-made rates are relatively lower than occurrence rates, and the Insured can expect substantial annual premium increases independent of overall rate level increases, until the claims-made relationships reaches maturity.

| | |
|---|---|
| Endorsement No.: 6 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# NEW YORK AMENDATORY ENDORSEMENT

**NOTICE: WHERE THERE IS A CONFLICT BETWEEN THIS NEW YORK AMENDATORY ENDORSEMENT AND ANY OTHER ENDORSEMENT, THE PROVISIONS OF THIS NEW YORK AMENDATORY ENDORSEMENT WILL PREVAIL.**

1.  Clause II. DEFINITIONS (C) is amended by the addition of the following:

    Provided, however, solely with respect to criminal proceedings as set forth in Clause II. (C)(3) and (4) above, this Policy shall not cover Loss other than Defense Expenses.

    A Claim shall be deemed first made when the Insurer receives written notice of a Claim or suit from the Insured or a third party.

2.  Clause II. DEFINITIONS (G)(2) is deleted and replaced by the following:

    (2)   vicarious liability for employment discrimination of any kind including violation of any federal, state or local law involving employment or discrimination in employment which would deprive or potentially deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, or other protected status; or disparate impact discrimination in employment;

3.  Clause II. DEFINITIONS (G)(3) is deleted and replaced by the following:

    (3)   vicarious liability for sexual or other harassment in the workplace; or

4.  Clause II. DEFINITIONS (M) is deleted and replaced by the following:

    (M)   "Loss" means damages, judgments, settlements or other amounts and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay.  Loss will not include:

        (1)   punitive damages or exemplary damages or the multiplied portion of any damage award;

        (2)   fines, penalties or taxes imposed by law;

        (3)   wages, or

        (4)   matters which are uninsurable under the law pursuant to which this Policy is construed.

5.  Clause II. DEFINITIONS is amended by the addition of the following:

    (T)   "Termination of Coverage" means (1) the cancellation or nonrenewal of this Policy by an insured or the Insurer, or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the insured.

6.  Clause IV. LIMIT OF LIABILITY, INDEMNIFICATION AND RETENTIONS is amended by the addition of the following:

    In the event this Policy provides coverage solely for Defense Expenses arising from an administrative proceeding or other non-judicial dispute resolution forum or in litigation, where the only remedies or relief sought are non-pecuniary in nature, such Defense Expenses shall reduce

no more than twenty-five percent (25%) of the Policy's Limit of Liability. Such Defense Expenses shall be applied against the applicable Retention(s) set forth in ITEM 4 of the Declarations and shall be subject to the Policy's maximum aggregate Limit of Liability. Provided, however, that such defense-only coverage may not be provided for a claim of legal liability that could be covered by a policy of liability insurance in New York.

7.   Notwithstanding anything to the contrary in the Declarations and Clause VI. GENERAL CONDITIONS (A), notice of any Claim may also be provided to any authorized agent of the Insurer located within the state of New York.

8.   Clause VI. GENERAL CONDITIONS (C) OTHER INSURANCE AND SERVICE IN CONNECTION WITH NON-PROFIT ENTITIES AND JOINT VENTURES (1) is deleted and replaced by the following:

     (1)   If any Loss resulting from any Claim is insured under any other policy(ies), this Policy shall apply only to the extent Loss exceeds the amount paid under such other valid and collectible insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over this Policy in order to avoid duplication of payment of Claims.

9.   Clause VI. GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (2) is deleted and replaced by the following:

     (2)   The Insurer may only cancel this Policy for nonpayment of premium.  The Insurer will mail or deliver not less than twenty (20) days written notice stating the reason for cancellation and when the Policy will be canceled.  Notice of cancellation will be sent to the Parent Company and the agent of record or broker for the Insured, if applicable. at the mailing address shown in the Policy. The notice of cancellation shall state the amount due.

10.  Clause VI. GENERAL CONDITIONS (E) CANCELLATION AND RENEWAL OF COVERAGE (3) is deleted and replaced by the following:

     (3)   The Insurer is under no obligation to renew this Policy upon its expiration.  Once the Insurer chooses to non-renew this Policy or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of 10% (exclusive of any premium increase generated as a result of increased exposure limits or as a result of experience rating, loss rating, retrospective rating or audit), then the Insurer shall mail or deliver written notice of the refusal to renew or the conditional renewal to the Parent Company at the mailing address shown on the Policy and to the Insureds' authorized agent or broker at least sixty (60) days but not more than one  hundred and twenty (120) days in advance of the expiration date of the Policy.  Such notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

     If the Insurer does not provide notice of nonrenewal or conditional renewal as provided in Clause VI.(E)(3), coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until 60 days after such notice is mailed or delivered, unless the Parent Company, during this 60-day period, has replaced the coverage or elects to cancel.

     If the Insurer provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another Policy Period, at the lower of the current rates or the prior period's rates, unless the Parent Company, during the additional Policy Period, has replaced the coverage or elects to cancel. The Limit of Liability of the expiring Policy will be increased in proportion to the Policy extension provided for in this paragraph.

The Insurer will not send the Insureds notice of nonrenewal or conditional renewal if the Insureds, their authorized agent or broker or another insurer of the Insureds mail or deliver notice that the Policy has been replaced or is no longer desired.

If the Insureds elect to accept the terms, conditions and rates of the conditional renewal notice pursuant to Clause VI.(E)(3), a new aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the Superintendent of Insurance.

11.     Clause VI. GENERAL CONDITIONS (F) OPTIONAL EXTENSION PERIOD is deleted and replaced by the following:

(F)     OPTIONAL EXTENSION PERIOD

(1)     In the event of a Termination of Coverage, without any additional premium being required, there shall be an automatic extension of the coverage granted by this Policy with respect to any Claim first made during a period of sixty (60) days immediately following the Termination of Coverage, but only with respect to a Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act committed before the Termination of Coverage provided such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act is otherwise covered by this Policy. This 60-day period shall be referred to as the 'Automatic Extension Period'.

(2)     In the event of a Termination of Coverage, the Parent Company shall have the right, upon payment of an additional premium set forth in Item 5 of the Declarations, to an extension of the coverage provided by this Policy with respect only to any Claim first made during the period of time set forth in Item 5 of the Declarations after the date upon which the Automatic Extension Period ends. However, the extension of coverage applies only to a Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act committed before the Termination of Coverage provided such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act is otherwise covered by this Policy. This additional period of coverage shall be referred to as the "Optional Extension Period". Except in the Declarations to the Policy and this Clause VI., the Automatic Extension Period may also be referred to as the Optional Extension Period.

(3)     The Limit of Liability applicable to the Automatic Extension Period and the Optional Extension Period, if any, shall be at least equal to the amount of coverage remaining in the Policy's Limit of Liability set forth in Item 3. of the Declarations.

(4)     The Insurer shall provide written notice to the Parent Company of the Optional Extension Period and the availability of, the premium for, and the importance of purchasing, the Optional Extension Period within thirty (30) days after the Termination of Coverage.

(5)     The right to purchase the Optional Extension Period shall terminate unless written notice is given to the Insurer within sixty (60) days from the Termination of Coverage, or within thirty (30) days after the mailing or delivery of the notice provided by the Insurer under Clause VI.(4), above, whichever is greater, together with full payment of the premium for the Optional Extension Period. If such notice and premium payment are not so given to the Insurer, the Parent Company will not be able to exercise the right to purchase the Optional Extension Period.

(6)     If the claims-made relationship has continued for less than one year and the Policy was canceled for non-payment of premium, the two paragraphs immediately preceding this paragraph shall not apply and the Parent Company shall not have the right to purchase the Optional Extension Period.

(7)     If the Optional Extension Period is purchased, the entire premium shall be deemed earned at its commencement and if the Parent Company terminates the Optional Extension Period before its term, the Insurer shall not be liable to return any portion of the

premium paid for the Optional Extension Period. The premium charged for the Optional Extension Period shall be based upon the rates in effect on the date this Policy was issued or last renewed.

(8)  In the event the Parent Company is in liquidation or bankruptcy, or permanently ceases operation, and if the Parent Company or its designated trustee, although entitled to, does not purchase the Optional Extension Period, any Insured Persons who request the Optional Extension Period within 120 days of the Termination of Coverage may purchase the Optional Extension Period, as provided in Clause VI.(2), above.

(9)  A person employed or otherwise affiliated with the Insured and covered by this Policy during such affiliation shall continue to be covered under this Policy and any Optional Extension Period after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

(10)  Upon Termination of Coverage, any return premium due the Insured shall be applied to the premium for the Optional Extension Period if the Insured elects to purchase such coverage. Where the premium is due to the Insurer, any payment received by the Insurer from the Insured as payment for the Optional Extension Period shall be first applied to any premium due for the Policy.

(11)  In the event similar insurance to that provided by this Policy is in force during the Optional Extension Period, the coverage afforded during the Optional Extension Period shall be excess over any such valid and collectible insurance.

12.  Clause VI. GENERAL CONDITIONS (I) REPRESENTATION CLAUSE is amended by the addition of the following:

However, no misrepresentation shall be deemed material unless knowledge by the Insured of the facts misrepresented would have led to a refusal by the Insurer to issue the Policy.

13.  Clause VI. GENERAL CONDITIONS (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (1)(b) is deleted and replaced by the following:

(b)  the amount of the obligation of the Insured has been determined either by judgment against the Insured or by written agreement of the Insured, the claimant and the Insurer.

14.  Clause VI. GENERAL CONDITIONS (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (1) is amended by the addition of the following:

(c)  If the Insurer does not pay any judgment covered by the terms of this Policy within thirty (30) days from the service of notice of the judgment upon the Insured or its attorney and the Insurer, then an action may be brought against the Insurer under the terms of the Policy for the amount of judgment not exceeding the amount of the applicable Limit of Liability under the Policy, except during a stay or limited stay of execution against the Insured on such judgment.

15.  Clause VI. GENERAL CONDITIONS (J) ACTION AGAINST THE INSURER, ASSIGNMENT, AND CHANGES TO THE POLICY (4) is deleted and replaced by the following:

Notice given by or on behalf of the Insured or written notice by or on behalf of the injured person or any other claimant, to any licensed agent to the Insurer in this state shall be deemed notice to the Insurer.

Provided, however, that failure by the Insureds and the Parent Company to give such notice shall not invalidate any Claim under the Policy if the Insureds and the Parent Company show that it was not reasonably possible to do so and that notice was given as soon as was reasonably possible.

16.  This Policy is amended by the addition of the following:

DO 72 44 03 07                                                                                                      Page 4 of 5

The insolvency or bankruptcy of the Insureds, or the insolvency of their estates, shall not release the Insurer from the payment of Loss not otherwise excluded under this Policy.

Loss Information

Upon written request by the Parent Company or the Parent Company's authorized agent or broker, the Insurer shall mail or deliver the following Loss information to the Parent Company for the time the Policy was in effect within ten (10) days of such request:

1.    information on closed Claims, including the date and description of the Claim, and any payments,

2.    information on open Claims, including the date and description of the Claim, and amounts of any payments; and

3.    information on notice of any Wrongful Acts, including the date and description of such notice.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# AMEND SECTION IV ENDORSEMENT

In consideration of the premium charged, Section IV Limit of Liability, Indemnification and Retentions (F) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| Endorsement No.: 8 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# AMEND DEFINITION OF LOSS ENDORSEMENT

In consideration of the premium charged, Section II Definitions (M) of the Policy is amended to read in its entirety as follows:

"(M)    'Loss' means damages, judgments, settlements or other amounts (including punitive or exemplary damages, where insurable by law and any prejudgment and post-judgment interest awarded on any judgment) and Defense Expenses in excess of the Retention that the Insured is legally obligated to pay. Loss will not include:

(1)    the multiplied portion of any damage award;

(2)    fines, penalties or taxes imposed by law; provided however, that Loss shall specifically include:

(i)    civil penalties assessed against any Insured Person pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B); and

(ii)    pecuniary penalties awarded against an Insured Person in and under the laws of Australia or New Zealand, provided that the Insurer is not legally prohibited from paying such penalties;

(3)    taxes or wages; or

(4)    matters which are uninsurable under the law pursuant to which this Policy is construed.

NOTE:    With respect to judgments in which punitive damages are awarded, the coverage provided by this Policy shall apply to the broadest extent permitted by law.  If, based on the written opinion of counsel for the Insured, punitive damages are insurable under applicable law, the Insurer will not dispute the written opinion of the counsel for the Insured."

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| **Endorsement No.: 9** | **Effective: May 16, 2008** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU104715-08** | **Insurer: XL Specialty Insurance Company** |

# GENERAL E&O ENDORSEMENT
# (WITH MANAGEMENT CARVE-BACK)

In consideration of the premium charged:

(1)     No coverage will be available under this Policy for Claims for any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or actual or alleged failure to render, any services for others or for a fee or commission or on any other compensated basis by any person or entity otherwise entitled to coverage under this Policy; provided that this exclusion will not apply solely with respect to a Claim to which Insuring Agreement (A) applies.

(2)     Paragraph (1) above is not intended, however, nor shall it be construed, to apply to a Claim against an Insured to the extent that such Claim is for a Wrongful Act by such Insured in connection with the management or supervision of any division, Subsidiary or group of the Parent Company offering any of the aforementioned services.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 10                              Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.     12:01 A.M. Standard Time
Policy No.: ELU104715-08                          Insurer: XL Specialty Insurance Company

# DELETE INSURING AGREEMENT (C) ENDORSEMENT

In consideration of the premium charged:

(1)    Section I Insuring Agreement (C) of the Policy is deleted in its entirety and all references in the Policy to Insuring Agreement (C) are deleted.

(2)    The term "Company Wrongful Act," as defined in Section II Definitions (E) of the Policy, is deleted in its entirety and all references in the Policy to "Company Wrongful Act" are deleted.

(3)    Section II Definitions (Q) is deleted in its entirety and replaced by the following:

   (Q)    "Securities Claim" means a Claim made against an Insured Person for:

      (1)    any actual or alleged violation of the Securities Act of 1933 as amended, the Securities Exchange Act of 1934 as amended, any similar federal or state statute or any rules or regulations promulgated thereunder; or

      (2)    any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty arising from or in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market;

      (3)    any actual or alleged violation of any federal, state or local law (whether statutory or common law), rule or regulation in connection with the purchase or sale of, or offer to purchase or sell any securities issued by the Company, whether such purchase, sale or offer involves a transaction with the Company or occurs in the open market."

(4)    Item 4. of the Declarations Page is deleted and replaced by the following:

   Item 4    Retentions:

               $0 each Insured Person under INSURING AGREEMENT I(A)
         $25,000,000 each Claim under INSURING AGREEMENT I(B)"

(5)    Solely with respect to Securities Claims made against any of the Insured Persons, Item 4 of the Declarations is amended to read as follows:

   Item 4    Retentions:

               $0 each Insured Person under INSURING AGREEMENT I(A)
         $25,000,000 each Claim under INSURING AGREEMENT I(B)"

   With respect to all other Claims, Item 4 of the Declarations shall remain unchanged.

(6)    Solely in the event of a Securities Claim made against an Insured Person(s) and the Company, if both Loss covered by this Policy and loss not covered by this Policy are incurred because such Securities Claim is made against both the Insured Person and the Company (which is not insured under this Policy), the portion of Loss allocated to Insured Persons under this Policy shall in no event be less than one hundred percent (100%).

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 11                          Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc. 12:01 A.M. Standard Time
Policy No.: ELU104715-08                      Insurer: XL Specialty Insurance Company

Manuscript 6189 05 06

# PRIORITY OF PAYMENTS ENDORSEMENT

In consideration of the premium charged, it is understood and agreed that if Loss, including Defense Expenses, shall be payable under more than one of the INSURING AGREEMENTS, then the Insurer shall, at the request of the chief financial officer of the Parent Company, to the maximum extent practicable and subject at all times to the Insurer's maximum aggregate Limit of Liability as set forth in ITEM 3 of the Declarations, pay such Loss as follows:

(1)   first, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Insured Persons under INSURING AGREEMENT (A);

(2)   second, the Insurer shall pay that Loss, if any, which the Insurer may be liable to pay on behalf of the Company under INSURING AGREEMENT (B); and

(3)   third, the Insurer shall make such other payments which the Insurer may be liable to make under INSURING AGREEMENT (C) or otherwise.

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| **Endorsement No.: 12** | **Effective: May 16, 2008** |
| **Named Insured: Lehman Brothers Holdings Inc.** | **12:01 A.M. Standard Time** |
| **Policy No.: ELU104715-08** | **Insurer: XL Specialty Insurance Company** |

# AMEND MERGERS & ACQUISITIONS ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (D)(2) of the Policy is amended to read in its entirety as follows:

(2)    If, however, by reason of the transaction (or series of transactions) described in (D)(1) above, the entity, assets, Subsidiary or liabilities so acquired or so assumed, exceed twenty percent (20%) of the total assets or liabilities of the Company, as represented in the Company's most recent audited consolidated financial statements, coverage under this Policy shall be provided for a period of ninety (90) days for any Loss involving a Claim for a Wrongful Act, Company Wrongful Act, or Employment Practices Wrongful Act that occurred after the transaction has been consummated.  Coverage beyond the ninety (90) day period will be provided only if:

(a)    the Insurer receives written notice containing full details of the transaction(s); and

(b)    the Insurer at its sole discretion, agrees to provide such additional coverage upon such terms, conditions, limitations, and additional premium that it deems appropriate."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 13**                              **Effective: May 16, 2008**
**Named Insured: Lehman Brothers Holdings Inc.**      **12:01 A.M. Standard Time**
**Policy No.: ELU104715-08**                          **Insurer: XL Specialty Insurance Company**

# AMEND NOTICE OF CLAIM

In consideration of the premium charged, for purposes of Section VI (A) Notice, the Insured will be deemed to have given the Insurer notice of a Claim as soon as practicable after such Claim is first made if the Director of Insurance Risk Management gives the Insurer written notice of such Claim as soon as practicable after first becoming aware thereof.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 14**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# INSURING AGREEMENT (A) ENDORSEMENT

In consideration of the premium charged, solely with respect to Claims made under Section I Insuring Agreements (A) of the Policy, the Insurer may not void and/or rescind this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| Endorsement No.: 15 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# LIMITED LIABILITY COMPANY ENDORSEMENT

In consideration of the premium charged:

(1)    The term "Subsidiary", as defined in Section II Definitions (R) of the Policy, is amended to include any limited liability company organized under the laws of any state, during any time in which the Company and/or the Insured Persons own(s), directly or indirectly, the right to elect, appoint or designate fifty percent (50%) or more of the members of such company's Board of Managers provided that the Company has "management control" of such entity and has an obligation to indemnify such entity's Insured Persons.

(2)    The term "Change In Control," as defined in Section II Definitions (B) of the Policy, is amended to read in its entirety as follows:

"(B)    'Change In Control' means:

(1)    the acquisition of the Parent Company by another entity, or the merger of the Parent Company into another entity such that the Parent Company is not the surviving entity, or the consolidation of the Parent Company with another entity, or the acquisition of substantially all of the assets of the Parent Company by another entity; or

(2)    the acquisition at any time or over a period of time during the Policy Period of record or beneficial ownership or control by any person, entity or affiliated group of persons or entities of fifty percent (50%) or more of the outstanding securities representing the present right to vote for the election of directors or member of the Board of Managers, as the case may be, of the Parent Company."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 16**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND DEFINITION OF COMPANY

In consideration of the premium charged, Section II (D), Definition of "Company," is amended to include:

Any Non Profit foundation that is under management control of the Company

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 17**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND NON-PROFIT ENTITY ENDORSEMENT

In consideration of the premium charged, the term "Non-Profit Entity," as defined in Section II Definitions (N) of the Policy, is amended to read in its entirety as follows:

    (N)    'Non-Profit Entity' means any not-for-profit entity or not-for-profit organization.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 353 05 06

Page 1 of 1

**Manuscript 1102 05 04**

**Endorsement No.: 18**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# CLARIFICATION ENDORSEMENT

In consideration of the premium charged, in the event that there is an inconsistency between a state amendatory attached to this Policy and any term or condition of this Policy, then it is understood and agreed that, where permitted by law, the Insurer shall apply those terms and conditions of either the state amendatory or the Policy which are more favorable to the Insured.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 83 33 08 01

| | |
|---|---|
| Endorsement No.: 19 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# AMEND EXCLUSION (F) ENDORSEMENT

In consideration of the premium charged, Section III Exclusions (F) of the Policy is amended to read in its entirety as follows:

(F)     brought about or contributed to in fact by any:

    (1)     intentionally dishonest, fraudulent or criminal act or omission or any willful violation of any statute, rule or law; or

    (2)     profit or remuneration gained by any Insured to which such Insured is not legally entitled;

    as determined by a final adjudication."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 20                          Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.    12:01 A.M. Standard Time
Policy No.: ELU104715-08                      Insurer: XL Specialty Insurance Company

# DEBTOR IN POSSESSION ENDORSEMENT

In consideration of the premium charged, the term "Insured" shall include the Company as a debtor in possession, as such term is used in Chapter 11 of the United States Bankruptcy Code.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 21                              Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.     12:01 A.M. Standard Time
Policy No.: ELU104715-08                         Insurer: XL Specialty Insurance Company

# AMEND INSURED v. INSURED EXCLUSION

In consideration of the premium charged: Section III Exclusions (G) of the Policy is amended to read in its entirety as follows:

"(G)    by, on behalf of, or in the name or right of, the Company or any Insured Person, except and to the extent such Claim:

(1)    is brought derivatively by a security holder of the Company who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person or the Company (other than any solicitation, assistance or participation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of an applicable federal, state, local or foreign securities law, affords protection to such Insured);

(2)    is in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an Insured Person which is part of or results directly from a Claim which is not otherwise excluded by the terms of this Policy;

(3)    is brought by an Insured Person and brought and maintained in a jurisdiction outside the United States of America, including its territories and possessions;

(4)    is brought and maintained by an Insured Person:

(a)    who has not served as a director, officer, member of the Board of Managers, or employee of the Company for at least four (4) years prior to the date such Claim is first made; and

(b)    who is acting independently of, and without the solicitation, assistance, participation or intervention of an Insured Person or the Company;

(5)    is an Employment Practices Claim; or

(6)    is brought by the Bankruptcy Trustee or Examiner of the Company of any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator, or Liquidator or comparable authority of the Company."

All other terms, conditions and limitations of this Policy shall remain unchanged.

| | |
|---|---|
| Endorsement No.: 22 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# AMEND ERISA EXCLUSION

In consideration of the premium charged, Section III Exclusions (C) of the Policy is amended to read in its entirety as follows:

"(C)    for any actual or alleged violation of the Employee Retirement Income Security Act of 1974 (ERISA) as amended or any regulations promulgated thereunder or any similar law, federal, state or local law or regulation; provided that this EXCLUSION (C):

    (1)    will not apply to a Securities Claim brought by a security holder of the Company other than an Insured Person;

    (2)    will only apply to any pension, employee benefit or welfare plan sponsored by the Company; and

    (3)    will not apply to Claims made under Section I Insuring Agreement (A) of the Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 23                              Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.     12:01 A.M. Standard Time
Policy No.: ELU104715-08                          Insurer: XL Specialty Insurance Company

# DOMESTIC PARTNER ENDORSEMENT

In consideration of the premium charged, Section II Definition (J)(5) of the Policy shall include the domestic partner of any person set forth in Section II Definition (J)(1) – (J)(4), but only to the extent the domestic partner is a party to any Claim solely in their capacity as a domestic partner to such persons and only for the purposes of any Claim seeking damages recoverable from community property, property jointly held by any such person and domestic partner, or property transferred from any such person to the domestic partner.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 24                                    Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.           12:01 A.M. Standard Time
Policy No.: ELU104715-08                               Insurer: XL Specialty Insurance Company

Manuscript 6193 05 06

# FOREIGN JURISDICTION ENDORSEMENT

In consideration of the premium charged:

(1)     Where legally permissible, this Policy shall apply to any Claim made against an Insured Person anywhere in the world.

(2)     With respect to any Claim brought and maintained solely in a Foreign Jurisdiction, as defined below, against an Insured Person of a Foreign Company, as defined below, for a Wrongful Act committed or allegedly committed in such Foreign Jurisdiction, the Insurer shall apply those terms and conditions (and related provisions) of the Foreign Policy, as defined below, registered with the appropriate regulatory body in such Foreign Jurisdiction that are more favorable to the Insured Person than the terms and conditions of this Policy; provided, however, this paragraph (2) shall only apply to the following sections of the Policy and the comparable provisions of the Foreign Policy:

Sections I, II, III, VI (D), VI (E), VI (F), VI (G), VI (I), VI (J) and VI (K)

In addition, this paragraph shall not apply to the non-renewal or claims made and reported provisions of any policy.

(3)     Solely for the purposes of this endorsement, the following terms shall have the meanings set forth below:

(a)     "Foreign Company" means any Company formed and operating in any Foreign Jurisdiction.

(b)     "Foreign Jurisdiction" means any jurisdiction, other than the United States of America or any of its territories or possessions.

(c)     "Foreign Policy" means the Insurer's or an affiliated company of the Insurer's (collectively "XL"), management liability policy (including all mandatory endorsements, if any) approved by XL to be sold within the Foreign Jurisdiction that provides coverage substantially similar to the coverage afforded under this Policy.  If more than one such policy exists, then "Foreign Policy" means the standard policy most recently registered in the local language of the Foreign Jurisdiction, or if no such policy has been registered, then the policy most recently registered in that Foreign Jurisdiction.  The term "Foreign Policy" shall not include any partnership managerial, pension trust or professional liability coverage.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 25**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND REPRESENTATION CLAUSE ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (I) of the Policy is amended to read in its entirety as follows:

"(I)      REPRESENTATION CLAUSE

The Insured represents that the statements and particulars contained in the Application as well as any prior application submitted to the Insurer are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and constitute a part of this Policy, are material to the risk assumed and form the basis of this Policy.  No knowledge or information possessed by any Insured will be imputed to any other Insured. In the event that any of the particulars or statements in the Application are untrue, this Policy will be void with respect to any Insured who knew of such untruth."

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 26**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# LOCAL TAX ENDORSEMENT

In consideration of the premium charged, in the event the Insurer is unable to pay any Loss in the country where such Loss is incurred because of local law or otherwise, to the degree allowable, such Loss shall be paid in the United States of America.  In the event of the payment of such Loss by the Insurer, the Insurer shall also pay the Insured an additional amount required to offset any tax(es) on income as a result of local tax(es) on income payable by the Insured in the country of payment, that accrues because of such payment, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability for all Loss from all Claims under this Policy as set forth in Item 3 of the Declarations.  Any such additional amount shall be reduced to the extent of any reduction in tax(es) on income as a result of local tax treatment of the loss in the country where the loss occurred.

All other terms, conditions and limitations of this Policy shall remain unchanged.

DO 80 354 05 06

Endorsement No.: 27
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU104715-08

Effective: May 16, 2008
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# SPECIFIED OTHER INSURANCE ENDORSEMENT

In consideration of the premium charged:

(1)    Solely with respect to any Employment Practices Claim, it is understood and agreed that the coverage provided under this Policy will be specifically excess of, and will not contribute with, Policy Number BM00023596EP08A issued by XL Insurance (Bermuda) Ltd. and any other policy or policies excess thereof issued to the Insured, and no coverage will be available under this Policy for Claims as to which such other insurance applies unless and until the limit or limits of liability of such other insurance shall have been completely exhausted by the payment of loss thereunder.  Nothing herein shall be construed to limit, restrict or otherwise affect coverage under this Policy for Loss, including Defense Expenses, not covered under such other insurance.

(2)    Nothing in this endorsement is intended, nor shall it be construed, to make this Policy subject to any terms of any other insurance policy.

(3)    Section VI General Conditions (C) of the Policy shall be deemed to have been amended as necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Manuscript 6473 09 06**

**Endorsement No.: 28**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND SUBSIDIARY DEFINITION ENDORSEMENT

In consideration of the premium charged, Section II Definition (R) of the Policy is amended to read in its entirety as follows:

"(R)   'Subsidiary' means any entity during any time in which the Parent Company owns, directly or through one or more Subsidiary(s), fifty percent (50%) or greater of the outstanding securities representing the right to vote for the election of such entity's directors provided that, only in the case where the Parent Company owns, directly or through one or more Subsidiary(ies), fifty percent (50%) of the outstanding securities representing the right to vote for the election of such entity's directors, the Company has "management control" of such entity and has an obligation to indemnify such entity's Insured Persons."

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 29
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU104715-08

Effective: May 16, 2008
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND DEFINITION OF INSURED PERSON

In consideration of the premium charged, the term "Insured Person" shall include those individuals holding the following positions for the Company:

> Position(s)
> De Facto Directors

All other terms, conditions and limitations of this policy shall remain unchanged.

DO 80 118 05 01

**Endorsement No.: 30**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AMEND GENERAL CONDITIONS (A)(2) ENDORSEMENT

In consideration of the premium charged, Section VI General Conditions (A)(2) of the Policy is amended to read in its entirety as follows:

(2)    If, during the Policy Period, or if applicable the Optional Extension Period, the Insured first becomes aware of a specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act and if, during the Policy Period, or if applicable the Optional Extension Period, the Insured:

(a)    provides the Insurer with written notice of the specific Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act, the consequences which have resulted or may result therefrom (including but not limited to actual or potential damages), the identities of the potential claimants, the circumstances by which the Insured first became aware of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act; and

(b)    requests coverage under this Policy for any subsequently resulting Claim for such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act;

then any Claim subsequently made arising out of such Wrongful Act, Company Wrongful Act or Employment Practices Wrongful Act will be treated as if it had been first made during the Policy Period.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 7142 05 07

| | |
|---|---|
| Endorsement No.: 31 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# EMPLOYED LAWYERS ENDORSEMENT
# (WITH SUBLIMIT)

In consideration of the premium charged:

(1)     The coverage afforded under this Policy will, subject to all of its terms, conditions, limitations and exclusions, be extended to apply to Loss resulting from a Claim made against any Employed Lawyer of the Company (an "Employed Lawyer Claim").

(2)     The term "Employed Lawyer" means any employee of the Company if and to the extent such employee is or, during the course of such person's employment was,"

    (a)     admitted to the practice of law; and

    (b)     employed within the Company for the purpose of providing legal services to or for the benefit of the Company.

(3)     The term "Insured Person" also includes any Employed Lawyer.

(4)     The term "Wrongful Act" also includes any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Employed Lawyer, but only in connection with an Employed Lawyer's performance of, or actual or alleged failure to perform, legal services to or for the benefit of the Company within the scope of his or her employment.

(5)     No coverage will be available under this endorsement for Loss, including Defense Expenses, from any Claim against an Employed Lawyer based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

    (a)     the service by any such person in any capacity, whether or not with the Company, other than those explicitly set forth in this endorsement; or

    (b)     an Employed Lawyer's performance of, or actual or alleged failure to perform, any legal services other than legal services to or for the benefit of the Company within the scope of the Employed Lawyer's employment.

(6)     It is understood and agreed that Endorsement No. 9 shall not apply to the coverage afforded by this Endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 7573 10 07

| | |
|---|---|
| Endorsement No.: 32 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# AMEND DEFINITION OF INSURED PERSON ENDORSEMENT

In consideration of the premium charged, Section II Definition (J)(1) of the Policy is amended to include those individuals holding the following position(s) for the Company; provided that the Company indemnifies such individuals with respect to such position(s):

<u>Position(s)</u>

Trustees
Consultants
Officials or Advisors to the Company's Board of Directors
Advisory Board Members

All other terms, conditions and limitations of this Policy shall remain unchanged.

Manuscript 8616 07 08

| | |
|---|---|
| Endorsement No.: 33 | Effective: May 16, 2008 |
| Named Insured: Lehman Brothers Holdings Inc. | 12:01 A.M. Standard Time |
| Policy No.: ELU104715-08 | Insurer: XL Specialty Insurance Company |

# SPECIFIED OTHER INSURANCE ENDORSEMENT

In consideration of the premium charged:

(1)     With respect to any Claim made or deemed made during the Policy Period, it is understood and agreed that the coverage provided under this Policy will be specifically excess of, and will not contribute with, the Tishman Speyer Real Estate Venture VII (Governance) LP's Directors, Officers and Company Liability Policy for Members of the National Association of Real Estate Investment Trusts, policy number AR02405507 and any other policy or policies excess thereof issued to Tishman Speyer Real Estate Venture VII (Governance) LP, or any renewal or replacement of such policy or policies, and no coverage will be available under this Policy for Claims to the extent that such other insurance applies unless and until the limit or limits of liability of such other insurance shall have been completely exhausted by the payment of loss thereunder by the Insured or the insurer.  Nothing herein shall be construed to limit, restrict or otherwise affect coverage under this Policy for Loss, including Defense Expenses, not covered under such other insurance.

(2)     Nothing in this endorsement is intended, nor shall it be construed, to make this Policy subject to any terms of any other insurance policy.

(3)     Section VI General Conditions (C) of the Policy shall be deemed to have been amended as necessary to effect the purpose and intent of this endorsement.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 34
Named Insured: Lehman Brothers Holdings Inc.
Policy No.: ELU104715-08

Effective: May 16, 2008
12:01 A.M. Standard Time
Insurer: XL Specialty Insurance Company

# AMEND INSURED PERSON ENDORSEMENT

In consideration of the premium charged:

I.      The definition of "Insured Person," as set forth in Section II Definition (J) of the Policy, is amended to include the following:

"(6)     an individual identified in (J)(1) above who, at the request of the Company, is, was or will be serving as a director, officer, regent, governor, trustee, observer, observer or an advisory board member of an Outside Entity;

(7)     the following individuals, in their capacity as a director, officer, regent, governor, trustee, observer, or an advisory board member of the entities set forth below:

Henry Lentz – Peabody Energy Corp.
James Peet – SevenSpace, Inc.
James Peet – OpenReach, Inc.
James Peet – Network Telephone Corporation
James Peet – EpicRealm, Inc.
John Cecil – CP Kelco
Peter Cohen – First Capital Holdings
Richard Descherer – First Capital Holdings
William Mack – First Capital Holdings
Hingge Hsu - Aerovance
Hingge Hsu – Fluidigm
Hingge Hsu – Peak Surgical
Keith Greengrove – Grande Asset Development Public Co. Ltd.
Erik Van Kuelen – Grande Asset Development Public Co. Ltd.
Jason Dunn – Grande Asset Development Public Co. Ltd.
Xie Bingwu – Grande Asset Development Public Co. Ltd.
Mark Newman – Grande Asset Development Public Co. Ltd.
Kenneth Burd – Grande Asset Development Public Co. Ltd.
Jerome Calvet – SOFCO
Glenn McKenzie – Lehman Brothers Private Equity Advisers LLC and its portfolio companies
Nick Hill – Carpeta Center Comercio Internacional e Servicos Lda
Nick Hill – Lusotel – Industria Hoteleira Lda
Nick Hill – Sociedade Hoteleira Sao Lourenco Lda
Nick Hill – Sociedade Turistica da Penina SA
Richard E. Wenz – Hunter Fan Company
Richard E. Wenz – Hunter Fan Holdings, Inc.
Emilio Novela – Patentes Talgo
Jack Pope – Patentes Talgo
David Williams – European Seafood 1 Sarl, Heinz Seafood Luxemborg
David Williams – MW Brands SAS, Heinz Seafood France
Jose Arozamena - European Seafood 1 Sarl, Heinz Seafood Luxemborg
Jose Arozamena - MW Brands SAS, Heinz Seafood France
Michael Castleman – Touchstone Health Partnership Inc.
Michael Castleman – FuelQuest, Inc.

Martin Laguerre – AAER Inc.
Joshua Collins – Mediterranean Resources, LLC
Joshua Collins – Enduring Resources, LLC
Joshua Collins – Evergreen Copyright Acquisitions, LLC
Joshua Collins – Cross Group, Inc.
David Willmott – Evergreen Copyright Acquisitions, LLC
David Willmott – Cross Group, Inc.
Dennis King – Data Systems Consulting
Paul Tice – Lightfoot Capital Partners GP LLC
David Munoz – D&S Consultants Inc.
Dennis King – Amquip Holdings LLC
Andreas Boquist – Voss of Norway
Stephen Kincade, Paul Tice, Rick Rieder and Thomas Durney – 505 Capital Partners LP

(8)     an individual identified in (J)(1) above who, at the request of the company is, was or will be serving as a director, officer, regent, governor, trustee, observer, or an advisory board member of any entity as described in Section III of this endorsement, other than a Shadow Director Entity;

(9)     William Wesp in his capacity as a director, officer, regent, governor, trustee, observer, or an advisory board member of Conseco Inc.;

(10)    an individual identified in (J)(1) above who is, was or will be serving as a Shadow Director of any Shadow Company (other than a Company or Joint Venture) that is incorporated or domiciled in the United Kingdom, as defined in Section 741 of the Companies Act 1985 (such entity, "Shadow Director Entity");

(11)    the lawful spouse or domestic partner of any person set forth in subparagraph (6)-(10) above, but only to the extent the spouse is a party to any Claim solely in their capacity as a spouse or domestic partner of such persons, and only for the purposes of any Claim seeking damages recoverable from marital community property, property jointly held by any such person and spouse or domestic partner, or property transferred from such person to the spouse.


In the event of the death, incapacity or bankruptcy of an individual identified in J(1)-(10) above, any Claim against the estate, heirs, legal representatives or assigns of such individual for a Wrongful Act or Employment Practices Wrongful Act of such individual will be deemed to a Claim against such individual."

II.     For purposes of this endorsement, the following terms shall have the meanings set forth below:

(1)      "Outside Entity" means any Non-Profit Entity (regardless if private or public) or any non-public for-profit entity, other than any Company or Joint Venture.

(2)     "New Public Outside Entity" means any public, for-profit entity, other than any Company, Joint Venture, Specified Entity, as described in Section III of this Endorsement, or Shadow Director Entity.

(3)     "Specified Entity" means:

(a)     the entities set forth in Section I paragraph (J)(7) of this Endorsement; and

(b)     the following entities:

Peabody Energy Corp
Seven Space, Inc.
Open Reach, Inc.

Network Telephone Corporation
Epic Realm, Inc.
CP Kelco APS
First Capital Holdings
St. Mary's NHS Trust
RSI Holding Corporation
Newcastle Investment Holdings Corp.
Weatherford International Ltd.
Gulfmark Offshore, Inc.
Link Energy, LLC
Walter Industries, Inc.
Interstate Hotels Corp./Interstate Hotels & Resorts Inc.
Blount International, Inc.
R.G. Barry Corp.
Automatic Data Processing
Delta – Galil Industries Ltd.
L-3 Communications Corporation
Imperial Sugar Company
Mahogany Capital Limited
Antero Resources Corporation
Pacific Energy Management LLC
Gulfmark International
Pemstar, Inc.
Regeneration Technologies, Inc.
Flagstone Reinsurance Holdings Limited
Medi-Clinic
Lpath, Inc.

(4)    "Directorship Entity" means any Outside Entity, New Public Outside Entity, Specified Entity, Non-Profit Entity, or Shadow Director Entity.

III.    New Positions

If, during the Policy Period, an individual identified in Section II Definition (J)(1) of the Policy provides service as a director, officer, regent, governor, trustee, observer, or an advisory board member of a New Public Outside Entity upon the request of the Company, it shall be the Company's responsibility to report such position to the Insurer within 30 days of Company's risk management group's knowledge of such position.  Upon receiving such notice from the Company, the Insurer will then have 30 days, from its date of notice, to underwrite the risk and advise the Company if it will: (1) provide coverage for such Insured Person's service with the New Public Outside Entity pursuant to Section IV(1) of this Endorsement for no additional premium; (2) provide coverage for such Insured Person's service with the New Public Outside Entity pursuant to Section IV(1) of this Endorsement for an additional premium; or (3) provide coverage for such Insured Person's service with the New Public Outside Entity specifically excess of and without contributing to any other insurance or indemnification available to such Insured Person from any source, including from such New Public Outside Entity or the Company pursuant to Section IV(2) of this Endorsement.  If the Insurer does not provide the Company with its determination within 30 days, coverage for such New Public Outside Entity position will apply pursuant to Section IV.(1) of this Endorsement.

IV.

(1)    All coverage under this Policy for Loss from Claims made against the Insured Persons while acting their capacity as a director, officer, regent, governor, trustee, observer, or an advisory board member of an Outside Entity, Specified Entity, New Public Outside Entity or Shadow Director Entity (if applicable), will be specifically

excess of and will not contribute with any other insurance or indemnification available to such Insured Person from such Outside Entity, Specified Entity, New Public Outside Entity or Shadow Director Entity.

(2)    All coverage under this Policy for Loss from Claims made against the Insured Persons while acting in their capacity as a director, officer, regent, governor, trustee, observer, or an advisory board member of any New Public Outside Entity so designated by the Insurer pursuant to Section III of this Endorsement will be specifically excess of and will not contribute with any other insurance or indemnification available to such Insured Person from any source, including from such New Public Outside Entity or the Company.  Accordingly, coverage is only available under this Policy in connection with Loss arising under Insuring Agreement (A) of the Policy.

(3)    All coverage under this Policy for Loss from Claims made against William Wesp in his capacity as a director, officer, regent, governor, trustee, observer, or an advisory board member of Conseco Inc., as set forth in Section II Definition (J)(9), as amended above, will be specifically excess of and will not contribute with any other insurance or indemnification available to such Insured Person from any source, including from Conseco Inc. or the Company.  Accordingly, coverage is only available under this Policy in connection with Loss arising under Insuring Agreement (A) of the Policy.

(4)    With respect to any Directorship Entity's indemnification of its Insured Persons, the certificate of incorporation, charter, partnership agreement or other organizational and operational documents of such Directorship Entity, including bylaws and resolutions, shall be deemed to provide indemnification to the Insured Person for his or her service with respect to such Directorship Entity to the fullest extent permitted by law.


V.  Wrongful Act

The definition of "Wrongful Act," as set forth in Section II Definition (S)(2) of the Policy, is amended to read in its entirety as follows:

"(2)    Insured Person of the Company who, at the request of the Company is serving as a director, officer, regent, governor, trustee, observer, or an advisory board member of a Directorship Entity."


VI.    Exclusions

(1)    Section III Exclusions is amended to include the following paragraphs:

"(J)    by, on behalf of, at the direction or in the name or right of any Directorship Entity (including any parent company, holding company, controlling entity of any kind or subsidiary thereof, of any Directorship Entity) or past, present or future director, officer, regent, governor, trustee, observer, or an advisory board member thereof, except and to the extent that such Claim:

(1)    is brought derivatively by a security holder of the Directorship Entity (including any subsidiary thereof) who, when such Claim is made and maintained is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person, a Directorship Entity (including any subsidiary thereof) or any director, officer, regent, governor, trustee, observer, or an advisory board member of the Directorship Entity (including any subsidiary thereof), (other than any solicitation, assistance or participation for which Section 806 of the Sarbanes-Oxley Act of 2002, or any similar "whistleblower" protection provision of any applicable federal, state, local or foreign securities law, affords protection to such Insured Person or director, officer, regent, governor, trustee, observer, or an advisory board member of the Directorship Entity) ;

(2)    alleges an Employment Practices Wrongful Act by a director, officer, regent, governor, trustee, observer, or an advisory board member of the Directorship Entity (including any subsidiary thereof);

(3)     is brought and maintained by a director, officer, regent, governor, trustee, observer, or an advisory board member, or those persons serving in a functionally equivalent role, of any Directorship Entity (including any subsidiary thereof) and brought and maintained in a jurisdiction outside the United States of America, including its territories and possessions;

(4)     is brought in the form of a crossclaim, third party claim or other claim for contribution or indemnity by a director, officer, regent, governor, trustee, observer, or an advisory board member which is part of or results directly from a Claim which is not otherwise excluded by the terms of this policy;

(5)     is brought by the Bankruptcy Trustee or Examiner of the Directorship Entity (including any subsidiary thereof) or any assignee of such Trustee or Examiner, or any Receiver, Conservator, Rehabilitator or Liquidator or comparable authority of the Directorship Entity (including any subsidiary thereof);

(6)     is brought and maintained by a director, officer, regent, governor, trustee, observer, or an advisory board member of any Directorship Entity (including any subsidiary thereof):

(a)     who has not served as a director, officer, regent, governor, trustee, observer, or an advisory board member of such Directorship Entity (including any subsidiary thereof) for at least four years prior to the date such Claim is first made; and

(b)     who is acting independently of, and without the active solicitation, assistance, participation or intervention of an Insured Person, a Directorship Entity (including ay subsidiary thereof) or any director, officer, regent, governor, trustee, observer, or an advisory board member of the Directorship Entity (including any subsidiary thereof);"

(2)     Section III Exclusion (I) of the Policy is amended to read in its entirety as follows:

"(I)    based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an Insured Person acting in their capacity as an Insured Person of any entity other than the Company, Joint Venture or Directorship Entity.

VII.    Miscellaneous

(a)     If any Claim made against any Insured Person gives rise to coverage under both this Policy and under any other policy or policies of management liability and company reimbursement, directors and officers liability or other similar insurance issued by the Insurer to any Directorship Entity, the Insurer's maximum aggregate limit of liability under all such policies for all Loss, including Defense Expenses, in respect of such Claim shall not exceed $35,000,000.  It is understood and agreed that to the extent that there are any excess insurers that follow form to the terms and conditions of this policy and this Section (VII)(a) of this Endorsement is pertinent with respect to coverage hereunder, such excess insurers shall treat such event as exhaustion of this policy as though the Insurer paid such Loss under this Policy.

(b)     In the event loss resulting from a Claim is covered in part under this Policy and in part under any other policy or policies of management liability and company reimbursement, directors and officers liability or other similar insurance issued by the Insurer to any Directorship Entity, the applicable retention or deductible, as the case may be, set forth in the Declarations of each such policy, and the sum of the retentions or deductibles, as the case may be so, shall constitute the Retention applicable to all Loss resulting from such Claim; provided, however, that the total Retention as finally determined shall in no event exceed the largest single retention or deductible, as the case may be, set forth in the Declarations of either policy.

(c)     Nothing in this endorsement is intended, nor shall it be construed, to obligate or require the Insurer to pay Loss, including Defense Expenses, under the Policy in respect of such Claim in any amount exceeding the available Limit of Liability under this Policy.  Nothing in this endorsement is intended, nor shall it be construed, to obligate or require the Insurer to pay loss, including all costs and expenses of defense, under any other policy in respect to any such Claim in any amount exceeding the available limit of liability under such other policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 35**
**Named Insured: Lehman Brothers Holdings Inc.**
**Policy No.: ELU104715-08**

**Effective: May 16, 2008**
**12:01 A.M. Standard Time**
**Insurer: XL Specialty Insurance Company**

# AUSTRALIAN CLAIM ENDORSEMENT

In consideration of the premium charged, solely with respect to Defense Expenses, Section III Exclusion (G) will not apply to the extent a Claim is brought and maintained in Australia.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 36                          Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.  12:01 A.M. Standard Time
Policy No.: ELU104715-08                      Insurer: XL Specialty Insurance Company

# AMEND DEFINITION OF CHANGE IN CONTROL ENDORSEMENT

In consideration of the premium charged, Section II Definitions (B)(3) of the Policy is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 37**                             **Effective: May 16, 2008**
**Named Insured: Lehman Brothers Holdings Inc.**    **12:01 A.M. Standard Time**
**Policy No.: ELU104715-08**                        **Insurer: XL Specialty Insurance Company**

# EXTRADITION ENDORSEMENT

In consideration of the premium charged:

(1)    The term "Claim," as defined in Section II Definitions (C) of the Policy, is amended to include:

     (a)    any official request for Extradition, as defined below, of any Insured Person; and

     (b)    the execution of a warrant for the arrest of an Insured Person where such execution is an element of Extradition.

(2)    The term "Defense Cost," as defined in Section II Definitions (F) of the Policy, is amended to include reasonable and necessary fees, costs and expenses incurred through legal counsel and consented to by the Insurer resulting from an Insured Person lawfully:

     (a)    opposing, challenging, resisting or defending any request for or any effort to obtain the Extradition of such Insured Person; or

     (b)    appealing any order or other grant of Extradition of such Insured Person.

(3)    Solely for the purposes of this endorsement, the term "Extradition" means any formal process by which an Insured Person located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**Endorsement No.: 38**　　　　　　　　　**Effective: May 16, 2008**
**Named Insured: Lehman Brothers Holdings Inc.**　　**12:01 A.M. Standard Time**
**Policy No.: ELU104715-08**　　　　　　　**Insurer: XL Specialty Insurance Company**

# SECTION 11 & 12 ENDORSEMENT

In consideration of the premium charged:

(1)　　Notwithstanding  Endorsement No. 8 to this Policy, Section II Definitions (M)(4) of the Policy is further amended to read in its entirety as follows:

　　　"(4)　　matters which are uninsurable under the law pursuant to which this Policy is construed; provided that the Insurer will not assert that the portion of any Defenses Expenses or settlement in a Securities Claim arising from an initial or subsequent public offering of the Company's securities constitutes uninsurable loss due to the alleged violations of Section 11 and/or 12 of the Securities Act of 1933 as amended."

(2)　　Section III Exclusion (F)(2) of the Policy will not apply to allegations in a Securities Claim asserted against any Insured Person under Section 11 and/or 12 of the Securities Act of 1933 as amended arising out of an initial or subsequent public offering of the Company's securities.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Endorsement No.: 39                                Effective: May 16, 2008
Named Insured: Lehman Brothers Holdings Inc.       12:01 A.M. Standard Time
Policy No.: ELU104715-08                            Insurer: XL Specialty Insurance Company

# AMEND POLLUTION EXCLUSION

In consideration of the premium charged, Section III Exclusion (B) of the Policy is amended to read in its entirety as follows:

"(B)   for any actual, alleged or threatened discharge, dispersal, release, escape,  seepage, transportation, emission, treatment, removal or disposal of pollutants, contaminants, or waste of any kind including but not limited to nuclear material or nuclear waste or any actual or alleged direction, request or voluntary decision to test for, abate, monitor, clean up, recycle, remove, recondition, reclaim, contain, treat, detoxify or neutralize pollutants, contaminants or waste of any kind including but not limited to nuclear material or nuclear waste; provided however, that this exclusion shall not apply to any Claim made under Insuring Agreement (A) of the Policy;"

All other terms, conditions and limitations of this Policy shall remain unchanged.

**PROPOSED ORDER**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
                    Debtors.            :    (Jointly Administered)
                                        :
---------------------------------------------------------------------x
```

**ORDER GRANTING DEBTORS' MOTION PURSUANT
TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY
CODE FOR AUTHORIZATION TO (I) EXPAND THE SCOPE OF
LEGAL COSTS THAT THEY MAY ADVANCE TO FORMER EMPLOYEES
AND (II) TO ADVANCE LEGAL COSTS TO CURRENT DIRECTORS**

Upon the motion, dated June 28, 2011 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors in possession (the "Debtors"), pursuant to sections 105(a) and 363(b)(1) of title 11 to the

United States Code (the "Bankruptcy Code"), for an order authorizing the Debtors to (i) expand

the scope of legal costs that they may advance to former employees and (ii) to advance legal

costs to current directors, all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in accordance with the procedures set forth in the

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

second amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases, ECF No. 9635, on (i) the U.S. Trustee; (ii) the attorneys for the

Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue

Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties

who have requested notice in these chapter 11 cases, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest

and that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that the scope of the Legal Costs Fund is expanded to include

potential and actual litigation with the Debtors' insurers regarding coverage disputes, as more

fully set forth in the Motion; and it is further

ORDERED that pursuant to sections 105(a) and 363(b)(1), the Debtors are

authorized to advance funds for the Current Directors' Costs Fund subject to the conditions

stated immediately below; and it is further

ORDERED that before the legal costs of the any of the Current Directors are paid:

(i) that each of the applicable Current Directors execute (a) a written affirmation of the Current

Director's belief that he or she has conducted himself or herself in good faith and reasonably

believed that such conduct was in the best interests of the Debtors, and (b) a written undertaking

to repay the Debtors legal costs paid by the Debtors if it is determined that the Current Director

has acted in bad faith; and (ii) the fees and expenses of the various law firms representing the

Current Directors must be reviewed for reasonableness by the Debtors and the Creditors'

Committee; and it is further

ORDERED that nothing in this Order or the Motion nor the payment of legal costs by the Debtors shall prejudice any claims or rights that the Debtors or Current Directors may have against any insurance provider with respect to the legal costs incurred by the Current Directors and paid by the Debtors pursuant to this Order; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion; and it is further

ORDERED that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: July __, 2011
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE