WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
            Debtors.                    :    (Jointly Administered)
                                        :
-------------------------------------------------------------------x
```

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO (I) ENTER INTO THE SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE LEHMAN CREDITORS AND THE SUNCAL TRUSTEE ON BEHALF OF THE SUNCAL INVOLUNTARY DEBTORS IN EIGHT OF THE SUNCAL INVOLUNTARY DEBTORS' CASES; (II) ENTER INTO THE SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE LEHMAN LENDERS IN ELEVEN OF THE SUNCAL VOLUNTARY DEBTORS' CASES; AND (III) <u>PARTICIPATE IN ANY AUCTION OF THE SUNCAL DEBTORS' ASSETS</u>

    **PLEASE TAKE NOTICE** that a hearing on the annexed motion (the "<u>Motion</u>")[1]

of Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced

chapter 11 cases, including Lehman Commercial Paper Inc. ("<u>LCPI</u>"), as debtors-in-possession

(the "<u>Debtors</u>"), pursuant to section 363 of title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>") and Rule 9019 of the Federal Rules of Bankruptcy Procedure authorizing LCPI to (i)

enter into, along with Lehman ALI, Inc. ("<u>Lehman ALI</u>") and certain of LCPI's other non-debtor

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

affiliates, the second amended joint chapter 11 plan being jointly proposed with the duly

appointed trustee (the "SunCal Trustee") of the SunCal Involuntary Debtors in the chapter 11

cases of eight of the direct or indirect debtor subsidiaries and/or affiliates of SunCal

Acquisitions, Inc., whose involuntary chapter 11 cases are being jointly administered in the

United States Bankruptcy Court for the Central District of California (the "California Bankruptcy

Court"); (ii) enter into the second amended joint chapter 11 plan being jointly proposed with

Lehman ALI in the chapter 11 cases of eleven of the SunCal Voluntary Debtors, whose

voluntary chapter 11 cases are being administered in the California Bankruptcy Court; and (iii)

directly or with LBHI through any of their debtor or non-debtor affiliates or subsidiaries, to

participate in any auction of the SunCal Debtors' assets, all as more fully described in the

Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at

the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **July 20, 2011 at**

**10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

    **PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion

shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of

New York, shall set forth the name of the objecting party, the basis for the objection and the

specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance

with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users

of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch

disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based

word processing format (with two hard copies delivered directly to Chambers), and shall be filed

with the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York

10004, Courtroom 601; and served upon (i) Weil Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153, Attn:  Alfredo R. Pérez, Esq., attorneys for the Debtors; (ii) the

Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York,

New York 10004 Attn:  Tracy Hope Davis, Esq., Andrea B. Schwartz, Esq., Elisabetta G.

Gasparini, Esq.; (iii) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck,

Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and

(iv) The Lobel Firm, LLP, 840 Newport Center Drive, Suite 750, Newport Beach, CA 92660,

Attn:  William N. Lobel, attorneys for the SunCal Trustee, so as to be so filed and received by no

later than **July 13, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing. If an objection

is filed the moving and objecting parties are required to attend the hearing, and failure to appear

may result in relief being granted or denied upon default.


Dated: June 28, 2011
      Houston, Texas

                   /s/ Alfredo R. Pérez
                   Alfredo R. Pérez

                   WEIL, GOTSHAL & MANGES LLP
                   700 Louisiana Street, Suite 1600
                   Houston, Texas  77002
                   Telephone: (713) 546-5000
                   Facsimile: (713) 224-9511

                   Attorneys for Debtors
                   and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                          :
In re                                     :    Chapter 11 Case No.
                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,    :    08-13555 (JMP)
                                          :
                          Debtors.        :    (Jointly Administered)
                                          :
------------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT**
**TO SECTION 363 OF THE BANKRUPTCY CODE AND**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR**
**AUTHORITY TO (I) ENTER INTO THE SECOND AMENDED JOINT**
**CHAPTER 11 PLAN PROPOSED BY THE LEHMAN CREDITORS AND THE SUNCAL**
**TRUSTEE ON BEHALF OF THE SUNCAL INVOLUNTARY DEBTORS IN EIGHT OF**
**THE SUNCAL INVOLUNTARY DEBTORS' CASES; (II) ENTER INTO THE SECOND**
**AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE LEHMAN LENDERS IN**
**ELEVEN OF THE SUNCAL VOLUNTARY DEBTORS' CASES; AND (III)**
**PARTICIPATE IN ANY AUCTION OF THE SUNCAL DEBTORS' ASSETS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, including Lehman Commercial Paper Inc. ("LCPI"), as debtors-in-possession (the "Debtors," and collectively with their non-debtor affiliates, "Lehman"), file this motion (the "Motion") and respectfully state:

## Preliminary Statement

1.      Prior to the commencement of the Debtors' chapter 11 cases, LCPI and

three non-Debtor Lehman affiliates, Lehman ALI, Inc. ("Lehman ALI"), OVC Holdings LLC

("OVC Lender"), and Northlake Holdings LLC ("Northlake Lender, and together with LCPI,

Lehman ALI and OVC Lender, the "Lehman Creditors") provided approximately $1.8 billion in

senior secured financing (the "Financing") to certain direct or indirect subsidiaries and/or

affiliates of SCC Acquisitions, Inc. ("SCC Acquisitions"), pursuant to various separate loan

agreements.  The Financing was used by such subsidiaries and/or affiliates to acquire and

develop certain real estate projects located in California.

2.      After the commencement of the Debtors' chapter 11 cases, certain of such

subsidiaries and/or affiliates of SCC Acquisitions became involuntary debtors (the "SunCal

Involuntary Debtors")[2] or voluntary debtors (the "SunCal Voluntary Debtors"[3] and together with

the SunCal Involuntary Debtors, the "SunCal Debtors") in cases under chapter 11 of title 11 of

the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Central District of California, Santa Ana Division (the "California Bankruptcy Court").  The real

estate projects owned by the SunCal Debtors are collectively referred to herein as the "SunCal

Properties".  Following the commencement of the chapter 11 cases of the SunCal Involuntary

---

[2] The SunCal Involuntary Debtors are:  SunCal Oak Knoll, LLC ("SunCal Oak Knoll"); SunCal Torrance Properties, LLC ("SunCal Torrance"); SunCal Marblehead, LLC ("SunCal Marblehead"); SunCal Heartland, LLC ("SunCal Heartland"); LB/L-SunCal Northlake, LLC ("SunCal Northlake"); LB/L-SunCal Oak Valley, LLC ("SunCal Oak Valley"); SunCal PSV, LLC ("SunCal PSV"); Delta Coves Venture, LLC ("Delta Coves"); and SunCal Century City, LLC ("SunCal Century").

[3] The SunCal Voluntary Debtors are: Palmdale Hills Property, LLC ("Palmdale"); SunCal Bickford Ranch, LLC ("Bickford Ranch"); Acton Estates, LLC ("Acton"); SunCal Summit Valley, LLC ("Summit Valley"); SCC Communities LLC ("SCC Communities"); Tesoro SF, LLC ("Tesoro"); SunCal Communities I, LLC ("SunCal I"); Seven Brothers, LLC ("Seven Brothers"); Kirby Estates, LLC ("Kirby"); SunCal Beaumont Heights, LLC ("Beaumont Heights"); SunCal Johannson Ranch, LLC ("Johannson Ranch"); SJD Development Corp.; SunCal Communities III, LLC; SCC/Palmdale, LLC; SJD Partners, Ltd.; North Orange Del Rio Land, LLC ("Del Rio"); and SunCal Emerald Meadows, LLC ("SunCal Emerald").

Debtors (the "SunCal Involuntary Debtors' Cases"), Steven Speier was appointed as trustee (the "SunCal Trustee") to administer such cases.

3.    The Lehman Creditors filed no proofs of claim against SunCal Century City, as to which the relevant loan originally made by Lehman ALI to such SunCal Debtor was transferred to Danske Bank.  As to the other eight SunCal Involuntary Debtors (collectively, the "TD Plan Debtors"), the Lehman Creditors filed proofs of claim in the SunCal Cases for over $1.1 billion in respect of that portion of the Financing provided to the TD Plan Debtors (the "Involuntary Debtors' Financing").  The aggregate value of the TD Plan Debtors' assets is significantly less than the aggregate amount of such claims.

4.    Two of the Lehman Creditors, LCPI and Lehman ALI (collectively, as agents and/or lenders under the Voluntary Debtors' Financing (as defined below), the "Lehman Lenders") filed proofs of claim in the chapter 11 cases of the SunCal Voluntary Debtors (the "SunCal Voluntary Debtors' Cases") in respect of that portion of the Financing provided to the SunCal Voluntary Debtors (the "Voluntary Debtors' Financing").  The portion of the Voluntary Debtors' Financing owed, collectively, by certain SunCal Voluntary Debtors (collectively, the "VD Plan Debtors")[4] is in excess of $700 million.  The aggregate value of the VD Plan Debtors' assets is significantly less than the aggregate amount of such claims.

5.    On September 9, 2009, the Lehman Creditors filed a non-consensual chapter 11 plan of reorganization and accompanying disclosure statement for 24 of the 26 SunCal Debtors, Cal. Bankr. ECF Nos. 567 and 568, in order to increase the prospect of recovery

---

[4] The VD Plan Debtors referenced herein are (a) Palmdale; Bickford; Acton; Summit Valley; SCC Communities; Tesoro; and SunCal Communities I (collectively, the "Group I Debtors"); and (b) Seven Brothers; Kirby; Beaumont Heights; and Johannson Ranch (collectively, the "Group II Debtors").

of the Financing provided to the SunCal Debtors.[5]  In the summer of 2010, the Lehman Creditors

and the SunCal Trustee reached agreement on a plan for the TD Debtors.  On September 30,

2010, the Lehman Creditors and the SunCal Trustee filed their joint chapter 11 plan and

accompanying disclosure statement in the applicable SunCal Involuntary Debtors' Cases, Cal.

Bankr. ECF Nos. 1420 and 1421, (the "Initial Lehman/Trustee TD Plan"), and the Lehman

Lenders filed a joint chapter 11 plan and accompanying disclosure statement for the VD Plan

Debtors and SunCal Emerald, Cal. Bankr. ECF Nos. 1423 and 1424 (the "Initial Lehman VD

Plan").  On March 28, 2011, the Initial Lehman VD Plan and accompanying disclosure statement

were amended, Cal. Bankr. ECF Nos. 1873 and 1874; among the modifications made to the

Initial Lehman VD Plan was the deletion of SunCal Emerald from the plan (the "First Amended

Lehman VD Plan").

        6.      The Debtors obtained approval from this Court on October 20, 2010 (the

"Initial Lehman/Trustee TD Plan Approval Order"), ECF No. 12217, to enter into a settlement

with the SunCal Trustee, on behalf of the TD Plan Debtors, reflected in the Initial

Lehman/Trustee TD Plan.  The Initial Lehman/Trustee TD Plan Approval Order provided that,

among other things, LCPI could amend the Initial Lehman/Trustee TD Plan without seeking

additional court approval so long as such change did not have a material adverse effect on the

Debtors' estates.  On March 28, 2011, the Lehman Creditors and the SunCal Trustee filed a first

amended joint chapter 11 plan with respect to the Initial Lehman/Trustee TD Plan, ECF No.

1875 (the "First Amended Lehman/Trustee TD Plan").  The First Amended Lehman/Trustee TD

Plan did not contain any changes to the Initial Lehman/Trustee TD Plan that had a material

adverse effect on the Debtors' estates.

---

[5] The chapter 11 plan of reorganization and accompanying disclosure statement for all such SunCal Debtors was amended on October 13, 2009, Cal. Bankr. ECF Nos. 710 and 711.

*The Second Amended Lehman/Trustee TD Plan*

7.      The Lehman Creditors determined, as of June 1, 2011, that their initial good faith estimation of the funding needed to consummate the Initial TD Plan, and later the First Amended Lehman/Trustee TD Plan, of $45 million plus the amount of administrative loans from the Lehman Creditors made August 10, 2010, and $20 million for payment to certain unsecured, non-priority claims, would be exceeded.  After consultation with the professionals for and counsel to the Creditors' Committee, on June 20, 2011, the Lehman Creditors and the SunCal Trustee filed a second amended joint chapter 11 plan (the "Second Amended Lehman/Trustee TD Plan") for the TD Plan Debtors, Cal. Bankr. ECF 2249,[6] in which the aforementioned thresholds are increased to $55 million and $23 million, respectively, each approximately 15% over the actual, current estimates.

*The Second Amended Lehman VD Plan*

8.      On June 20, 2011, the Lehman Lenders filed a second amended joint chapter 11 plan for the VD Plan Debtors (the "Second Amended Lehman VD Plan"), Cal. Bankr. ECF No. 2246.[7]  If the SunCal VD Plan is confirmed by the California Bankruptcy Court, LCPI may be required to and LCPI and/or LBHI may, among other things: (i) pay allowed administrative, priority and certain secured claims of the VD Plan Debtors, (ii) pay all or a portion, as provided in the plan, of allowed non-priority, unsecured claims, (iii) pay plan confirmation expenses in the SunCal Voluntary Debtors' Cases up to a specified maximum; and (iv) arrange for reimbursements due under certain settlement agreements with certain settling

---

[6] A copy of the Second Amended Lehman/Trustee TD Plan is attached as Exhibit A to the declaration of Alfredo R. Pérez in connection with this Motion, filed contemporaneously herewith.

[7] A copy of the Second Amended Lehman VD Plan is attached as Exhibit B to the declaration of Alfredo R. Pérez in connection with this Motion, filed contemporaneously herewith.

surety bond issuers.  In exchange for providing the necessary plan funding, the Lehman Lenders

will receive conveyance, directly or through any other persons designated by the Lehman

Lenders, of the SunCal Properties and other assets owned by the VD Plan Debtors.  The Second

Amended Lehman VD Plan could require LCPI to use certain assets of their estates outside the

ordinary course of its business.

<em>Role and Obligations of LCPI</em>

9.      The Debtors are seeking approval of the role and obligations, including

funding obligations, of LCPI under the Second Amended Lehman/Trustee TD Plan and the

Second Amended Lehman VD Plan (together, the "<u>Lehman Plans</u>") and any documents or

agreements contemplated to be entered into by LCPI in connection with the confirmation or

effectiveness of the Lehman Plans.

<em>LBHI Plan Funding</em>

10.     As a result of the consummation of a settlement transaction relating to a

repurchase transaction between LCPI and Fenway Capital, LLC and a commercial paper

program with Fenway Funding, LLC involving LBHI which was approved by this Court by an

order entered on May 13, 2010, ECF No. 9030, LBHI acquired certain economic interests

previously held by Fenway Funding, LLC in certain of the loans, or portions thereof, comprising

the Financing (collectively, the "<u>Fenway Loans</u>"), and consequently, it may be appropriate for

LBHI to provide a portion of the Lehman Plan Funding (as defined below) commensurate with

LBHI's economic interests in the Fenway Loans.  In addition, as a direct or indirect parent of

each of the Lehman Creditors, it may be necessary or desirable for LBHI to provide funds to the

Lehman Creditors for all or a portion of the Lehman Plan Funding under one or both of the

6

Lehman Plans.  The Debtors are seeking approval of any such funding by LBHI (the "LBHI Plan Funding").

### *Sale of The SunCal Properties*

11.     On June 20, 2011, the SunCal Voluntary Debtors and SunCal Acquisitions (the "SunCal Plan Proponents") filed six plans of reorganization for the SunCal Debtors (collectively, the "SunCal Plans" and each a "SunCal Plan") seeking, among other things, to sell, at a public auction, all of the SunCal Properties and other assets of the SunCal Debtors.[8]  The SunCal Plans attempt to prohibit LCPI and its affiliates from exercising their rights to credit bid at any auction of the SunCal Properties.  To the extent that any of the SunCal Plans are confirmed, the applicable SunCal Properties implicated under such SunCal Plan (which comprise, directly or indirectly, the collateral of the Lehman Creditors in which LBHI and LCPI have a direct or indirect interest) may be sold at prices that do not reflect the true market value of such properties and/or at prices that will not enable the applicable Lehman Creditors to maximize their recovery with respect to the Financing.  Consequently, to protect their interests, LBHI and LCPI request authorization to fully participate in and to cash bid at any auction of the SunCal Properties, whether conducted pursuant to a SunCal Plan or otherwise (a "SunCal Property Auction"), either directly or indirectly through any of their debtor or non-debtor subsidiaries or affiliates.   Failure to fully participate in any such sale will be detrimental to the Lehman Creditors' (and thus, LBHI's and LCPI's) ability to maximize the value of their investments in the SunCal Properties.

---

[8] The SunCal Proponents also filed two plans in connection with SJD Partners, SJD Development and SunCal Century.  These plans do not seek to conduct a market sale, but rather, intend to commence litigation proceedings against certain Lehman entities to recover certain assets.

**Relief Requested**

12.      The Debtors request, pursuant to section 363 of the Bankruptcy Code and

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as

applicable, authority for (i) LCPI to enter in to the Second Amended Lehman/Trustee TD Plan

and the Second Amended Lehman VD Plan and to consummate the transactions contemplated

thereunder including, without limitation, providing the Lehman Plan Funding under each Plan,

(ii) LBHI to provide the LBHI Plan Funding, and (iii) LBHI and/or LCPI, directly or indirectly

through any of their debtor or non-debtor subsidiaries or affiliates, to fully participate in and to

cash bid at any SunCal Property Auction or other sale of the SunCal Debtors' assets.

**Background**

13.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), LBHI and the other Debtors commenced with this

Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' chapter 11 cases

have been consolidated for procedural purposes only and are being jointly administered pursuant

to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage

their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.

14.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the Creditors' Committee pursuant to

section 1102 of the Bankruptcy Code (the "Creditors' Committee").

15.      On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as

examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January

20, 2009, ECF No. 2583, the Court approved the U.S. Trustee's appointment of the Examiner.

The Examiner issued a report at his investigation pursuant to section 1106 of the Bankruptcy Code on March 11, 2010, ECF No. 7531.

### Jurisdiction

16.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

### Lehman's Business

17.    Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

18.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008, ECF No. 2.

### The TD Plan Debtors

19.    Prepetition, the Lehman Creditors became the SunCal Involuntary Debtors' largest funding source, pursuant to various loan agreements and guarantees (collectively, the "TD Loan Agreements"), under which the SunCal Involuntary Debtors' obligations were secured by deeds of trust on each of the SunCal Involuntary Debtors' real estate projects and certain cash and other collateral and assets of the SunCal Involuntary Debtors' estates.  In the aggregate, the SunCal Involuntary Debtors owe in excess of $1.1 billion in respect of the Involuntary Debtors' Financing under the TD Loan Agreements.

20.     The obligations of the TD Plan Debtors under the TD Loan Agreements are secured by first priority deeds of trust on certain real estate development projects, together with all rights, remedies, privileges and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto (collectively, the "TD Projects").  The TD Projects include the real estate developments known as Northlake, Oak Valley Champions, Marblehead, Heartland, Delta Coves, Palm Springs Village, Oak Knoll and Del Amo. Appraisals obtained by the Lehman Creditors in early 2009 indicate an aggregate value for the TD Projects of approximately $352 million; however, this figure is not necessarily indicative of current market value.  In light of the approximate aggregate value of the TD Projects and the fact that the outstanding loans from the Lehman Creditors under the TD Loan Agreements alone total almost $1.1 billion, the Lehman Creditors are undersecured.

## The Second Amended Lehman/Trustee TD Plan[9]

21.     Entry into the Initial Lehman/Trustee TD Plan, which was authorized on October 20, 2010, primarily provided for the Lehman Creditors to enter into a settlement with the SunCal Trustee, which was reflected in the Initial Lehman/Trustee TD Plan.  The essential terms of the Initial Lehman/Trustee TD Plan and the settlement set forth therein are still reflected in the Second Amended Lehman/Trustee TD Plan.  Principally, in exchange for providing, among other things, the TD Plan Funding,[10] the Lehman Creditors will receive a conveyance of the TD Projects (to one or more entities designated by the Lehman Creditors).

[9] Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Second Amended Lehman/Trustee TD Plan.

[10] The TD Plan Funding consists of obligations to (a) pay in full all allowed administrative expense claims, allowed priority non-tax claims and all other amounts required, under the Bankruptcy Code, to be paid on the effective date of the Second Amended Lehman/Trustee TD Plan; (b) pay a percentage of allowed secured and unsecured claims as described below, and (c) the payment of post-confirmation expenses of the liquidating trustee (subject to a maximum amount provided for in the Second Amended Lehman/Trustee TD Plan).

22.    In preparing the Initial Lehman/Trustee TD Plan, the Lehman Creditors estimated that the TD Plan Funding would not exceed $45 million (plus the amount of the Lehman Creditors' administrative loans made after August 10, 2010) and estimated that the aggregate amount of certain non-priority, unsecured claims would not exceed $20 million.  Thus, the Initial Lehman/Trustee TD Plan included a condition permitting the Lehman Creditors to withdraw the plan if their good faith estimate of their plan funding exceeded such $45 million threshold (plus the amount of the Lehman Creditors' administrative loans made after August 10, 2010) and a condition that began dropping the recovery for holders of Reliance Claims from 50% (to no lower than a floor of 40%) once the aggregate amount of certain non-priority, unsecured claims exceeded $20 million.  However, as of June 1, 2011, taking into account the Lehman Creditors' good faith estimates of Claims reductions based on preliminary reviews of Claims, prior conversations with SCC Acquisitions' affiliate, SunCal Management, LLC, or its other affiliates, and certain anticipated successes in objecting to Claims prior to confirmation, the Lehman Creditors' good faith estimates are that the monetary thresholds of $45 million and $20 million would be exceeded.  Thus after consultation with professionals of and counsel to the Creditors' Committee, the Lehman Creditors elected to increase the two relevant monetary thresholds from $45 million to $55 million and $20 million to $23 million.

23.    The salient terms of the Second Amended Lehman/Trustee TD Plan, are as follows:[11]

---

[11] This summary is intended to be used for informational purposes only and shall not, in any way, affect the meaning or interpretation of the Second Amended Lehman/Trustee TD Plan.  The summary is qualified in its entirety by the provisions of the Second Amended Lehman/Trustee TD Plan.  In the event of any inconsistency between this summary and the Second Amended Lehman/Trustee TD Plan, the Second Amended Lehman/Trustee TD Plan shall control.

| | |
|---|---|
| ***Conveyance of Projects*** | The TD Projects will be conveyed by the SunCal Involuntary Debtors to one or more entities designated by the Lehman Creditors. The conveyance will be made free and clear of all liens and encumbrances (except the existing deeds of trust in favor of the Lehman Creditors and other liens and encumbrances acceptable to the Lehman Creditors) pursuant to section 363 of the Bankruptcy Code. The conveyance will be made pursuant to the terms of the Second Amended Lehman/Trustee TD Plan. |
| ***Dismissal of Adversary Proceedings*** | Upon confirmation of the Second Amended Lehman/Trustee TD Plan, the SunCal Trustee and the TD Plan Debtors will dismiss their equitable subordination and other claims under the Adversary Proceeding, with prejudice, against all defendants. |
| ***Releases*** | SunCal Involuntary Debtors and the SunCal Trustee will provide a full release to all defendants in the Adversary Proceeding (including the Lehman Creditors), all affiliates thereof including those entities designated by the Lehman Creditors who received a conveyance of the TD Projects and all future owners of the TD Projects (collectively, the "<u>Lehman Released Parties</u>") (excluding claims arising under the Second Amended Lehman/Trustee TD Plan). In addition, any creditor holding a Reliance Claim or General Unsecured Claim will need to provide a release to the Lehman Released Parties in order to obtain a distribution in excess of 1% of the allowed amount of its claim. Although the claims of the Lehman Creditors would continue to exist after the effective date of the Joint Plan, the Lehman Creditors would agree not to take any distribution in respect of such claims from the SunCal Involuntary Debtors' assets except as otherwise provided in the Second Amended Lehman/Trustee TD Plan with respect to the Projects (and related property subject to a security interest in favor of the Lehman Creditors) and any collateral of the Lehman Creditors. |
| ***TD Plan Funding*** | TD Plan Funding consists of the Lehman Post-Confirmation Expense Funding (*i.e.*, to fund up to $500,000 of Post-Confirmation Expenses incurred during the 2 years following the Plan's Effective Date) and the Lehman Creditor Distribution Funding. The Lehman Creditor Distribution Funding will fund, among others, the following payments to Creditors: <ul><li>amounts payable under the Second Amended Lehman/Trustee TD Plan for Senior Claims (certain claims with priority or security); and, also amounts payable under the Second Amended Lehman/Trustee TD Plan for each Holder of a Reliance Claim or General Unsecured Claim, consisting of: (i) the Lehman Guaranteed Minimum Distribution (of 1% of an Allowed Claim); and (ii) the Lehman Distribution Enhancement.</li></ul> |

| | |
|---|---|
| *Confirmation Expenses* | The Lehman Creditors will agree to provide for the payment in full of all allowed administrative expense claims, allowed priority non-tax claims and all other amounts required, under the Bankruptcy Code, to be paid on the effective date of the Second Amended Lehman/Trustee TD Plan (collectively, the "<u>Confirmation Expenses</u>"). |
| | ▪ Lehman Creditors will pay all Confirmation Expenses (provided that they may elect to pay certain Confirmation Expenses such as property and other types of taxes, over a 5-year period as provided by the Bankruptcy Code). |
| | ▪ Lehman Creditors will pay 100% of the allowed secured claims that have priority over the secured claims of the Lehman Creditors (also subject to an election to pay certain of these allowed claims, such as real property taxes, over a 5-year period as provided by the Bankruptcy Code). |
| *Lehman Distribution Enhancement* | The Lehman Distribution Enhancement is a payment to an accepting Creditor for its execution and delivery of a certain release -- the Creditor's Assignment / Release for Lehman. The offer to each Holder of an Allowed General Unsecured Claim is to increase the payment to such Creditor to 5% of its Allowed Claim, despite such Claim lacking what the Lehman Creditors view as the threshold characteristics for their potential litigation exposure. Because Allowed Reliance Claims, as defined, meet what the Lehman Creditors view as the threshold characteristics for at least their potential litigation exposure, the offer to each Holder thereof, as more fully set forth below, is to increase the payment to such Holder to up to 50% of its Allowed Claim. |

13

| | |
|---|---|
| ***Treatment of Reliance Claimants*** | If the Creditor holding an Allowed Reliance Claim elects to receive the Lehman Distribution Enhancement, which it can do by electing on its Ballot to provide the Lehman Released Parties a Creditor's Assignment / Release for Lehman, it will receive a Cash Distribution of 40% of its Allowed Claim. If such election is made, and the Classes 6 and 7 Claims Amount (the aggregate amount of all Allowed Reliance Claims and Allowed General Unsecured Claims, subject to certain exclusions) is no greater than $23 million, after such determination is made, the Creditor will receive another 10% of its Claim. |
| | As of June 1, 2011, the Lehman Creditors estimate that electing holders of Allowed Reliance Claims will receive the additional 10%, increasing their distribution recovery to 50%, and that Classes 6 and 7 Claims Amount will approximate $20 million. |
| | If the Creditor does not elect to receive the Lehman Enhanced Distribution, it will receive an unconditional, guaranteed Cash Distribution equal to 1% of its Allowed Claim. Payment will be made after the Effective Date within a short time after a Claim is determined to be Allowed (and, if such Claim is a Future Obligation, after it is no longer a Future Obligation). Creditors will also receive a pro rata share of any Residual Cash, if any, but the Residual Cash is expected to be nominal in amount. |
| ***Settlement with Bond Issuers***[12] | Confirmation of the Second Amended Lehman/Trustee TD Plan is conditioned upon a settlement between the Lehman Creditors (and/or other Lehman entities) and each of the issuers of surety bonds with respect to the TD Projects. Unless waived by the Lehman Creditors, if a settlement is not reached with respect to each bond issuer that asserts an allowed claim (other than for subrogation) against any of the SunCal Involuntary Debtors, the confirmation of the Second Amended Lehman/Trustee TD Plan will not occur. |
| ***Use of Available Cash*** | All cash collateral of the Lehman Creditors and/or Lehman ALI, as the provider of debtor-in-possession financing to the SunCal Involuntary Debtors, will be available to the Lehman Creditors to be used towards the satisfaction of the Lehman Plan Funding. |

24.    The Second Amended Lehman/Trustee TD Plan provides that the Lehman

Creditors can withdraw the Second Amended Lehman/Trustee TD Plan if their good faith

---

[12] The Debtors will file an additional motion for approval of any settlements between the Lehman Creditors (and/or other Lehman entities) and the relevant surety bond issuers once the terms of such settlements have been finalized. Extensive negotiations with the bond issuers have been ongoing and are anticipated to be concluded in the near future resulting in settlement agreements with the applicable surety bond issuers on all projects to be conveyed pursuant to the Second Amended Lehman/Trustee TD Plan.

estimate, as indicated above, prior to the effective date, of the likely maximum amount for

Allowed Class 6 and 7 Claims (certain of the non-priority, unsecured claims) exceeds $30

million and/or the TD Plan Funding exceeds $55 million (plus the amount of any new Lehman

Administrative Loans made after August 10, 2010).  If these thresholds are exceeded, the

Lehman Creditors will consult with the Creditors' Committee prior to determining whether to

consummate the Second Amended Lehman/Trustee TD Plan.

### The VD Plan Debtors

25.    The Second Amended Lehman VD Plan is proposed with respect to eleven

of the seventeen SunCal Voluntary Debtors.  The six SunCal Voluntary Debtors not included in

the Second Amended Lehman VD Plan either possess no real property or real property that has

already been conveyed to the Lehman Lenders', or the inclusion of such entity in the Second

Amended Lehman VD Plan, particularly in terms of a conveyance to the Lehman Lenders, is

premature due to ongoing litigation with respect to ownership and other significant claims.  Of

the eleven VD Plan Debtors, the Lehman Lenders have claims against the seven Group I Debtors

and for the four Group II Debtors, the Lehman Lenders hold no direct claims but have received a

pledge of the equity interests in such Group II Debtors from their parent companies, each a

Group I Debtor.

26.    The Lehman Lenders hold claims against the Group I Debtors in the

aggregate amount of approximately $711 million, arising from loans made under various

separate loan and guarantee agreements (collectively, the "VD Loan Agreements"), the

obligations under which are secured by deeds of trust on certain property of the VD Plan

Debtors, by such debtors' cash balances and certain other assets.  The obligations under the VD

Loan Agreements are secured by first priority deeds of trust on certain real estate development

projects, together with all rights, remedies, privileges, and easements appurtenant thereto and all other real and personal, tangible and intangible, property related thereto and/or by a pledge of equity interests in the project owner entities (collectively, the "VD Projects").  The VD Projects include the real estate developments known as Acton, Ritter Ranch, Joshua Ridge, Bickford Ranch, Summit Valley, Tesoro Project, Beaumont Heights, and Johannson Ranch.

27.    The Lehman Lenders' collateral, including the VD Projects, collectively, is worth substantially less than the aggregate amount of the Lehman Lenders' claims.  Appraisals obtained by the Lehman Lenders in early 2009 indicate an aggregate value for the VD Projects of no more than approximately $93 million.

28.    The Lehman Lenders also hold a substantially undisputed lien on a major part (and undisputed or disputed liens on substantially all) of the VD Plan Debtors' cash, receivables, and other rights relating to the VD Projects against which the Lehman Lenders assert liens.

### The Second Amended Lehman VD Plan[13]

29.    The Second Amended Lehman VD Plan shares significant similarities with the Second Amended Lehman/Trustee TD Plan.  Pursuant to the Second Amended Lehman VD Plan, the Lehman Lenders are required to provide funds to pay a specified percentage of allowed claims, all administrative claims, priority claim and other plan confirmation expenses as well as certain post-confirmation expenses in the VD Plan Debtors' chapter 11 cases (the "VD Plan Funding").  The Lehman Lenders estimate that the VD Plan Funding will not exceed $22 million with respect to Group I Debtors and, as to the Group II Debtors, estimate that the Allowed Senior Claims of the Group II Debtors (administrative, priority and certain secured

---

[13] Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Lehman VD Plan.

claims) will not exceed $3 million.  The Second Amended Lehman VD Plan provides that the

Lehman Lenders, in their sole discretion, can withdraw the Second Amended Lehman VD Plan

if, prior to the effective date of the Second Amended Lehman VD Plan, the Lehman Lenders

estimate in good faith that the above estimates would be exceeded by more than 15%, that is, if

the VD Plan Funding is estimated to exceed $22 million with respect to the Group I Debtors or if

the Allowed Senior Claims of the Group II Debtors are estimated to exceed $3 million.

        30.     The salient terms of the Second Amended Lehman VD Plan are as

follows:[14]

| | |
|---|---|
| ***Conveyance of VD Projects*** | The VD Projects will be conveyed by the VD Plan Debtors to one or more entities designated by the Lehman Lenders.  The conveyance will be made free and clear of all liens and encumbrances (except the existing deeds of trust in favor of the Lehman Lenders and other liens and encumbrances acceptable to the Lehman Lenders). |
| ***Releases*** | The VD Plan Debtors and each non-priority, unsecured creditor receiving the full settlement payment being offered to other creditors in the same class as that creditor, will give a full release to the Lehman Lenders and the other defendants in the Adversary Proceedings commenced in 2009 by the SunCal Debtors (the "<u>Adversary Proceedings</u>") seeking, among other things, to equitably subordinate all of the Lehman Creditors' claims to payment in full of all unsecured claims asserted against the SunCal Debtors (the "<u>ES Action</u>"). |

---

[14] This summary is intended to be used for informational purposes only and shall not, in any way, affect the meaning or interpretation of the Lehman VD Plan.  The summary is qualified in its entirety by the provisions of the Lehman VD Plan.  In the event of any inconsistency between this summary and the Lehman VD Plan, the Lehman VD Plan shall control.

| | |
|---|---|
| ***Dismissal of Adversary Proceedings*** | The dismissal, with prejudice, as to the estates of all the VD Plan Debtors, all litigation pending against a Lehman Released Party on behalf of any VD Plan Debtors' estate, including, without limitation, (a) dismissal of any action seeking equitable subordination, avoidance of fraudulent transfers or other relief against any Lehman Released Party, specifically the Adversary Proceedings including the ES Action, (b) dismissal of any appeals adverse to a Lehman Related Party, and (c) withdrawal of any opposition to any appeals filed by any Lehman Related Party. |
| ***VD Plan Funding*** | The VD Plan Funding consists of the Lehman Post-Confirmation Expense Funding (*i.e.*, to fund up to $500,000 of Post-Confirmation Expenses incurred during the 2 years following the Second Amended Lehman VD Plan's Effective Date) and the Lehman Creditor Distribution Funding. The Lehman Creditor Distribution Funding will fund, among others, the following payments to Creditors:<br><br>  ▪ amounts payable under the Second Amended Lehman VD Plan for Senior Claims (certain claims with priority or security); and, also amounts payable under the Second Amended Lehman VD Plan for each Holder of a Reliance Claim[15] or General Unsecured Claim, consisting of: (i) the Lehman Guaranteed Minimum Distribution (of 1% of an Allowed Claim); and (ii) the Lehman Distribution Enhancement. |
| ***Confirmation Expenses*** | The Lehman Lenders will agree to provide for the payment in full of all allowed administrative expense claims, allowed priority non-tax claims and all other amounts required, under the Bankruptcy Code, to be paid on the effective date of the Second Amended Lehman VD Plan (collectively, the "<u>Confirmation Expenses</u>").<br><br>  ▪ Lehman Lenders will pay all Confirmation Expenses (provided that they may elect to pay certain Confirmation Expenses such as property and other types of taxes, over a 5-year period as provided by the Bankruptcy Code).<br><br>  ▪ Lehman Lenders will pay 100% of the allowed secured claims that have priority over the secured claims of the Lehman Lenders (also subject to an election to pay certain of these allowed claims, such as real property taxes, over a 5-year period as provided by the Bankruptcy Code). |

---

[15] Reliance Claims are certain non-priority, unsecured claims against Group I Debtors that meet what the Lehman Lenders view as the threshold characteristics for at least their potential litigation exposure.

| | |
|---|---|
| *Lehman Distribution Enhancement* | The Lehman Distribution Enhancement is a payment to an accepting Creditor for its execution and delivery of a certain release -- the Creditor's Assignment / Release for Lehman. The offer to each Holder of an Allowed General Unsecured claim is to increase the payment to such creditor to 5% of its Allowed Claim, despite such claim lacking what the Lehman Lenders view as the threshold characteristics for their potential litigation exposure. Because Allowed Reliance Claims, as defined, meet what the Lehman Lenders view as the threshold characteristics for at least their potential litigation exposure, the offer to each Holder thereof, as more fully set forth below, is to increase the payment to such Holder to up to 40% or 50% of its Allowed Claim. |
| *Treatment of Reliance Claimants* | If the Creditor holding an Allowed Reliance Claim elects to receive the Lehman Distribution Enhancement, which it can do by electing on its Ballot to provide the Lehman Released Parties a Creditor's Assignment / Release for Lehman, it will receive a Cash Distribution of 40% of the Allowed Claim against the applicable Group I Debtor.  The Distribution will be increased to 50% through the Projected Distribution Bump Up if the Classes 6 and 7 Distribution Amount for a Group I Debtor (the aggregate amount payable to all holders of Class 6 and Class 7 Claims, subject to certain specified exclusions) does not exceed its Bump Up Threshold (defined specifically in the definitions of the Second Amended Lehman VD Plan and which thresholds aggregate to $2.5 million). |
| | As of June 1, 2011, the Lehman Lenders estimate that the Projected Distribution Bump Up will be available such that electing holders of Allowed Reliance Claims will receive the additional 10%, increasing their distribution recovery to 50%, and that none of the Bump Up Thresholds will be exceeded. |
| | If a Creditor does not elect to receive the Lehman Enhanced Distribution, it will receive an unconditional, guaranteed Cash Distribution equal to 1% of its Allowed Claim.  Payment will be made after the Effective Date within a short time after a claim is determined to be Allowed (and, if such claim is a Future Obligation, after it is no longer a Future Obligation).  Creditors will also receive a pro rata share of any Residual Cash, if any, but the Residual Cash is expected to be nominal in amount. |
| *Settlement with Bond Insurers[16]* | Confirmation of the Second Amended Lehman VD Plan is conditioned upon a settlement between the Lehman Lenders (and/or other Lehman entities) and each of the insurers of surety bonds with respect to the VD Projects.  Unless waived by the Lehman Lenders, if a settlement is not reached with respect to each bond insurer that asserts an allowed claim (other than for subrogation) against any of the VD Plan Debtors, the confirmation of the Second Amended Lehman VD Plan will not occur. |

---

[16] The Debtors will file an additional motion for approval of any settlements between the Lehman Lenders (and/or other Lehman entities) and the relevant surety bond issuers once the terms of such settlements have been finalized.

| Use of Available Cash | All cash collateral of the Lehman Lenders and/or Lehman ALI, as the provider of debtor-in-possession financing to the VD Plan Debtors, will be available to the Lehman Lenders to be used towards the satisfaction of the VD Plan Funding. |
| --- | --- |

31.    In light of the value of the VD Plan Debtors' assets and the uncertainty and cost associated with the Adversary Proceedings, the Debtors believe that the Second Amended Lehman VD Plan and the settlements and other transactions contemplated therein are the best solution to maximize recovery for the Debtors' estates.

## Participation in SunCal Property Auctions

32.    On June 20, 2011, the SunCal Proponents filed the SunCal Plans seeking to continue the litigation against the Lehman Creditors and certain of their affiliates.  A few of such plans offer a settlement to certain creditors of the SunCal Debtors in the form of an option for such creditors to sell their claims against such SunCal Debtors to an entity identified under the SunCal Plans as "LitCo" which is defined under the SunCal Plans as a newly formed Delaware limited liability company that will be purchasing such claims.  In exchange for certain creditors entering into the aforementioned settlement, the SunCal Plans provide payment to such creditors of $.50 - $.60 per dollar of their claim.

33.    If any of the SunCal Plans are confirmed, the SunCal Properties owned by the SunCal Debtors and other assets of the SunCal Debtors will be liquidated through a sale at a public auction with no bidder having the right to credit bid.  The SunCal Plans also propose sales procedures under which SCC Acquisitions or its affiliates have a role in selecting the highest bid and, at the same time, SCC Acquisitions or its affiliates may themselves be bidders or associated

Extensive negotiations with the bond issuers have been ongoing and are anticipated to be concluded in the near future resulting in settlement agreements with the applicable surety bond issuers on all projects to be conveyed pursuant to the Second Amended Lehman VD Plan.

with bidders.  The Lehman Creditors intend to contest the terms of the SunCal Property Auction,

particularly with respect to its violation of the Lehman Creditors' rights to credit bid.

34.    In light of the SunCal Plan Proponents' intent, under the SunCal Plans, to

force a sale of the SunCal Properties to the highest bidder without any credit bid rights for the

Lehman Creditors or any other person, LBHI and LCPI seek authorization to fully participate in

and cash bid at any SunCal Property Auction should any of the SunCal Plans be confirmed, to

the extent the Lehman Creditors are prohibited from credit bidding at any such SunCal Property

Auction, or any other sale of the SunCal Properties.  The qualifying bids for each of the SunCal

Plans range from $10,000 to $100,000 depending on which of the SunCal Plan Proponents and

respective SunCal Properties are involved.  LBHI and LCPI should be permitted to fully

participate, in their business judgment, in any SunCal Property Auction or any other sale of the

SunCal Properties and cash bid up to an amount which is approved by the Debtors' Board of

Directors and the consent of the Creditors' Committee.

### The Relief Requested Should be Approved Pursuant to Rule 9019 and Section 363 of the Bankruptcy Code

35.    Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the [debtor

in possession] and after notice and a hearing, the court may approve a compromise or

settlement."  FED. R. BANKR. P. 9019(a).  Bankruptcy Rule 9019 empowers bankruptcy courts to

approve settlements "if they are in the best interests of the estate."  *Vaughn v. Drexel Burnham

Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr.

S.D.N.Y. 1991); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R.

618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994).  A decision to accept or reject a compromise or settlement is

21

within the sound discretion of the Court.  *Drexel Burnham Lambert Group*, 134 B.R. at 505.

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements."  *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).  The

settlement need not result in the best possible outcome for the debtor, but must not "fall beneath

the lowest point in the range of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at

505; *see also Cosoff v. Rodman* (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); *In re

Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997).

    36.  The court may give weight to the "informed judgments of the . . . debtor-

in-possession and their counsel that a compromise is fair and equitable, and consider the

competency and experience of counsel who support the compromise."  *Drexel Burnham Lambert

Group*, 134 B.R. at 505 (internal citations omitted); *see also In re Purofied Down Prods. Corp.*,

150 B.R. 519, 522-23 (S.D.N.Y. 1993); *accord In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802

(Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my

judgment for the Trustee's, but only that I test his choice for reasonableness. . . .  If the Trustee

chooses one of two reasonable choices, I must approve that choice, even if, all things being

equal, I would have selected the other.") (internal citations omitted).

    37.  Significantly, there is no requirement that "the value of the compromise …

be dollar-for-dollar the equivalent of the claim."  *Ionosphere Clubs, Inc.*, 156 B.R. at 427.

Instead, "there is no reason, at least in theory, why a satisfactory settlement could not amount to

a hundredth or even a thousandth part of a single percent of the potential recovery."  *Id.* at 427-

28 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n.2 (2nd Cir. 1974)).

    38.  Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of the

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

to authorize the sale, disposition, or other use of a debtor's assets, courts in the Second Circuit, in

applying this section, have required that it be based upon the sound business judgment of the

debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143-45 (2d Cir. 1992) (holding that a judge

reviewing a section 363(b) application must find from the evidence presented a good business

reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  In addition, section 105 of the Bankruptcy

Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that

is necessary or appropriate to carry out the provisions of [title 11]."  11 U.S.C. § 105(a).

      39.    It is generally understood that "[when] the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"  *In

re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.

*Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

      40.    The Second Amended Lehman/Trustee TD Plan satisfies the legal

standard established under Bankruptcy Rule 9019 and is in the best interests of the Debtors'

estates.  The terms of the Second Amended Lehman/Trustee TD Plan are the product of a good-

faith, arms' length negotiation process between the Lehman Creditors and the SunCal Trustee.

The parties to the Second Amended Lehman/Trustee TD Plan were each represented by counsel

and have participated in numerous meetings and discussions.  The SunCal Trustee and the

Lehman Creditors have negotiated the terms of the Second Amended Lehman/Trustee TD Plan

over the course of several months, and as a result of this successful negotiation process, the

parties have arrived at the agreed set of terms described herein that provide mutually acceptable

benefits and burdens to all concerned.  Further, this Court has already approved the Initial

Lehman/Trustee TD Plan and, with the exception of an increase in certain claims and distribution

thresholds as described above, the Second Amended Lehman/Trustee TD Plan is not materially

different than the Initial Lehman/Trustee TD Plan.

   41. The Second Amended Lehman/Trustee TD Plan is intended to account for:

(i) the Lehman Creditors' awareness that, despite holding first priority liens on the TD Projects,

the TD Plan Debtors have (and will have) no ability to pay, in the foreseeable future, the full

amount of the debt owed under the TD Loan Agreements, and, thus, the Lehman Creditors desire

immediate ownership of their collateral; and (ii) the SunCal Trustee's belief that in exchange for

conveying the TD Projects, the TD Plan Funding and the agreements and compromises with the

Lehman Creditors are in the best interests of the TD Plan Debtors' estates and their creditors.

   42. The cost of entering into the Second Amended Lehman/Trustee TD Plan,

namely payment by the Lehman Creditors of the TD Plan Funding, is outweighed by the benefits

of obtaining, on a consensual basis, conveyance of the TD Projects, the withdrawal of the

Adversary Proceedings by the TD Plan Debtors and the SunCal Trustee, and releases from the

TD Plan Debtors and the SunCal Trustee.  In light of such benefits, the Second Amended

Lehman/Trustee TD Plan is fair and reasonable.  As a result, the Second Amended

Lehman/Trustee TD Plan benefits the Debtors, their estates, and their creditors and should be approved.

43.    Pursuant to section 363 of the Bankruptcy Code, entering into the Lehman Plans is an appropriate exercise of the Debtors' business judgment and should be approved. While the Lehman Creditors believe that they have a strong case in the Adversary Proceedings, the Lehman Creditors' prospects for success are uncertain, and the litigation of such action will be prolonged and costly.  The Lehman Plans resolve the uncertainty attendant in litigating the Adversary Proceedings, including the ES Action.  After analyzing various alternatives, the Lehman Creditors have determined that the Lehman Plans provide the best framework for preserving and maximizing the prospects of a recovery of the Financing and resolving disputes with the TD Plan Debtors and VD Plan Debtors, respectively.

44.    Additionally, the Lehman Plans strike a balance between competing interests by providing plan funding in exchange for certain releases and the conveyance of the TD Projects and VD Projects to entities designated by the Lehman Creditors.  If confirmed, the Lehman Plans would put the Lehman Creditors in the position of taking title to the TD Projects and VD Projects and allow the Debtors an opportunity to recover through subsequent sales, joint venture arrangements with third party investors, and/or through the execution of development plans.  To the extent LBHI is called on to provide the LBHI Plan Funding, such action is an appropriate exercise of the Debtors' business judgment in light of LBHI's economic interests in the Fenway Loans, and potential benefits, particularly with respect to the conveyance of the SunCal Properties under the Lehman Plans, that may inure to LBHI as a direct or indirect parent of each of the Lehman Creditors.

45.       Participating in and cash bidding at any SunCal Property Auction conducted pursuant to any of the SunCal Plans, or any other market sale of the SunCal Properties, is an appropriate exercise of the Debtors' business judgment and should be approved. If any of the SunCal Plans are confirmed and a SunCal Property Auction is held pursuant thereto or the SunCal Properties are otherwise sold, the Debtors believe it is imperative that LBHI and LCPI be permitted to fully participate, and to the extent necessary, cash bid on the auctioned properties. The Debtors will suffer a significant disadvantage if LBHI and LCPI are unable to fully participate in a SunCal Property Auction. Similarly, LBHI and LCPI would be at a strategic disadvantage if it were known what they determined any of the SunCal Properties are worth or if LBHI or LCPI were subject to a publicly known cap on what they would be able to bid at a SunCal Property Auction as to any particular SunCal Property or portfolio of SunCal Properties. As such, it is in the best interests of the estates and Debtors' creditors that LBHI and LCPI be able to fully participate in any SunCal Property Auction subject to the business judgment of the Debtors' Board of Directors and the consent of the Creditors' Committee.

46.       For the reasons set forth above, granting authority for (i) LCPI to enter into and undertake its role and obligations under the Second Amended Lehman VD Plan and the Second Amended Lehman/Trustee TD Plan, (ii) LBHI and LCPI to fully participate in any SunCal Property Auction or any other market sale of the SunCal Properties, including having the ability to cash bid for any SunCal Property, and (iii) LBHI to provide the LBHI Plan Funding, is in the best interests of the Debtors' estates and is, in the Debtors' judgment, the best mechanism to enable the Debtors to maximize the prospect of a recovery on the Financing extended to the TD Plan Debtors and VD Plan Debtors. In light of the direct and indirect benefits inuring to the Debtors and their estates and creditors, LCPI's entry into the Lehman Plans and LBHI's and

LCPI's ability to cash bid in any SunCal Property Auction is a proper exercise of the Debtors'

business judgment and should be approved.

## Reservation of Rights

47.    Nothing contained in the Lehman Plans or in this Motion shall be deemed

to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or

remedies of LBHI, LCPI or any other Lehman Creditor, that such entity may have or choose to

assert on behalf of itself or its respective estate, as applicable, under any provision of the

Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third

parties.

48.    Further, as among the Debtors and non-Debtor affiliates, all pre- and post-

petition rights, claims and defenses, including, but not limited to those associated with the costs

and benefits of the Lehman Plans and this Motion, are preserved.

## Notice

49.    No trustee has been appointed in these chapter 11 cases.  The Debtors

have served notice of this Motion in accordance with the procedures set forth in accordance with

the procedures set forth in the second amended order entered on June 17, 2010 governing case

management and administrative procedures for these cases, ECF No. 9635, on (i) the U.S.

Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern

District of New York; (vi) counsel to the SunCal Trustee; and (vii) all parties who have

requested notice in these chapter 11 cases.  No other or further notice need be provided.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as is just.

Dated: June 28, 2011
      Houston, Texas

/s/ Alfredo R. Pérez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Debtors
and Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                        :

In re                                :       Chapter 11 Case No.
                                          :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :       08-13555 (JMP)
                                          :

                  Debtors.       :       (Jointly Administered)
                                          :

------------------------------------------------------------------x

### ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR AUTHORITY TO (I) ENTER INTO THE SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE LEHMAN CREDITORS AND THE SUNCAL TRUSTEE ON BEHALF OF THE SUNCAL INVOLUNTARY DEBTORS IN EIGHT OF THE SUNCAL INVOLUNTARY DEBTORS' CASES; (II) ENTER INTO THE SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY THE LEHMAN LENDERS IN ELEVEN OF THE SUNCAL VOLUNTARY DEBTORS' CASES; AND (III) PARTICIPATE IN ANY AUCTION OF THE SUNCAL DEBTORS' ASSETS

Upon the motion (the "Motion"),[1] of Lehman Brothers Holdings Inc. ("LBHI")

and its affiliated debtors in the above-referenced chapter 11 cases, including Lehman

Commercial Paper Inc. ("LCPI"), as debtors (the "Debtors"), pursuant to section 363 of title 11

of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") for an order authorizing LCPI to (i) enter into,

along with Lehman ALI and certain of LCPI's other non-debtor affiliates, the second amended

joint chapter 11 plan being jointly proposed with the SunCal Trustee in the chapter 11 cases of

eight of the SunCal Involuntary Debtors; (ii) enter into the second amended joint chapter 11 plan

being jointly proposed with Lehman ALI in the chapter 11 cases of eleven of the SunCal

Voluntary Debtors; and (iii) directly or with LBHI through any of their debtor or non-debtor

affiliates or subsidiaries, to participate in any auction of the SunCal Debtors' assets, all as more

---

[1] Capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Motion.

particularly described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing

Order M-61 Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the second amended order entered on June 17, 2010 governing case management and

administrative procedures for these cases, ECF No. 9635, on (i) the U.S. Trustee; (ii) the

attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the

Internal Revenue Service; (v) the United States Attorney for the Southern District of New York;

(vi) counsel to the SunCal Trustee; and (vii) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and the Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefore, it is

      ORDERED that the Motion is granted as provided herein; and it is further

      ORDERED that, pursuant to section 363 of the Bankruptcy Code and Bankruptcy

Rule 9019, the Debtors are duly authorized, but not directed, to (i) enter into the Second

Amended Lehman/Trustee TD Plan and consummate all of the transactions contemplated

thereunder, as described in the Motion; (iii) execute and deliver such documents, instruments,

certificates agreements and to take such other actions as may be reasonably necessary to

consummate the transactions contemplated under the Second Amended Lehman/Trustee TD

Plan, and (iv) consent to any amendment, restatement, waiver, supplement or other modification

of any of the documents contemplated under the Second Amended Lehman/Trustee TD Plan, it

being understood that any actions described in this paragraph taken by the Debtors or their

affiliates may be taken without the necessity of (x) any further court proceedings or approval or

(y) any consent of any third party, and shall be conclusive and binding in all respects on all

parties in interest in these cases; and it is further

      ORDERED that the Debtors are authorized, but not directed, to make all

payments contemplated under the Second Amended Lehman/Trustee TD Plan, as described in

the Motion, subject to the terms of the Second Amended Lehman/Trustee TD Plan; *provided*,

*however*, that if, prior to such plan's effective date, the Lehman Creditors' good faith estimate of

the amount of the funding the Lehman Creditors could be required to provide exceeds $55

million, plus the amount of the administrative loans any of them made after August 10, 2010, the

Debtors will consult with the Creditors' Committee prior to determining whether to consummate

the Second Amended Lehman/Trustee TD Plan; and it is further

      ORDERED pursuant to section 363 of the Bankruptcy Code, the Debtors are duly

authorized, but not directed, to (i) enter into the Second Amended Lehman VD Plan and

consummate all of the transactions contemplated thereunder, as described in the Motion; (ii)

execute and deliver such documents, instruments, certificates agreements and to take such other

actions as may be reasonably necessary to consummate the transactions contemplated under the

Second Amended Lehman VD Plan, and (iv) consent to any amendment, restatement, waiver,

supplement or other modification of any of the documents contemplated under the Second

Amended Lehman VD Plan, it being understood that any actions described in this paragraph

taken by the Debtors or their affiliates may be taken without the necessity of (x) any further court

proceedings or approval or (y) any consent of any third party, and shall be conclusive and

binding in all respects on all parties in interest in these cases; and it is further

ORDERED that the Debtors are authorized, but not directed, to make all

payments contemplated under the SunCal VD Plan, as described in the Motion, subject to the

terms of the SunCal VD Plan; *provided*, *however*, that if, prior to such plan's effective date,

either (a) the Lehman Lenders' good faith estimate of the amount of funding the Lehman

Lenders could be required to provide under the plan exceeds $22 million with respect to the

Group I Debtors or (b) the Lehman Lenders' good faith estimate of "Allowed Senior Claims" (as

defined in the Second Amended Lehman VD Plan) exceeds $3 million with respect to the Group

II Debtors, the Debtors will consult with the Creditors' Committee prior to determining whether

to consummate the Second Amended Lehman VD Plan; and it is further

ORDERED that the LCPI and/or LBHI may cash bid in the SunCal Property

Auction or any market sale of the SunCal Properties, *provided, however*, any such cash bids are

subject to the business judgment of the Debtors' Board of Directors and the consent of the

Creditors' Committee; and it is further

ORDERED that LBHI may provide for the LBHI Plan Funding; and it is further

ORDERED that nothing contained herein shall be deemed to be a waiver or the

relinquishment of any rights, claims, interests, obligations, benefits or remedies of LCPI, LBHI,

or any other Lehman entity that is party to the SunCal Plans, that such Lehman entity may have

or choose to assert on behalf of itself or its respective estate, as applicable, under any provision

of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or

third parties, and the Debtors are hereby authorized and directed to execute such further

documents to evidence such reservations; and it is further

ORDERED that nothing contained in the SunCal Plans or in the Motion shall be deemed to be a waiver or the relinquishment of any rights, claims, interests, obligations, benefits or remedies of LBHI or any Lehman Creditor, that such entity may have or choose to assert on behalf of itself or its respective estate, as applicable, under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including against each other or third parties; and it is further

ORDERED that any and all pre- and post-petition claims, rights and obligations that the Debtors may have against each other in connection with the subject matter of the Motion or the transactions contemplated by the SunCal Plans are hereby fully preserved and shall not be prejudiced by the entry of this Order; and it is further

ORDERED that the allocation of costs and benefits between or among the Debtors and non-Debtor affiliates in connection with the SunCal Plans is preserved; and it is further

ORDERED that the SunCal Plans may be modified, amended or supplemented by the proponents thereof without further order of the Court, and any agreements, documents or other instruments related to the SunCal Plans, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, in consultation with the Creditors' Committee and without further order of the Court, *provided* that, in each case, any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation and/or interpretation of this Order.

Dated: July __, 2011
       New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE