Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555-jmp

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS, INC., ET AL.,

9

10          Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14              U.S. Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              June 30, 2011

19              10:06 AM

20

21   B E F O R E :

22   HON. JAMES M. PECK

23   U.S. BANKRUPTCY JUDGE

24

25

1

2  Debtors' Thirty-Fifth Omnibus Objection to Claims (Valued

3  Derivative Claims)

4

5  Debtors' Fortieth Omnibus Objection to Claims (Late-Filed

6  Claims)

7

8  Debtors' Sixty-Seventh Omnibus Objection to Claims (Valued

9  Derivative Claims)

10

11  Debtors' Seventy-Fourth Omnibus Objection to Claims (To

12  Reclassify Proofs of Claim as Equity Interests)

13

14  Debtors' One Hundred Third Omnibus Objection to Claims (Valued

15  Derivative Claims)

16

17  Debtors' One Hundred Eleventh Omnibus Objection to Claims (No

18  Liability Claims)

19

20  Debtors' One Hundred Twenty-Seventh Omnibus Objection to Claims

21  (Settled Derivatives Claims)

22

23  Debtors' One Hundred Thirty-Third Omnibus Objection to Claims

24  (To Reclassify Proofs of Claim as an Equity Interest)

25

Page 3

1    Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims

2     (To Reclassify Proofs of Claim as an Equity Interest)

3

4    Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims

5     (To Reclassify Proofs of Claim as an Equity Interest)

6

7    Debtors' One Hundred Thirty-Sixth Omnibus Objection to Claims

8     (Misclassified Claims)

9

10    Debtors' One Hundred Thirty-Seventh Omnibus Objection to Claims

11     (Valued Derivative Claims)

12

13    Debtors' One Hundred Thirty-Eighth Omnibus Objection to Claims

14     (No Liability Derivatives Claims)

15

16    Debtors' One Hundred Thirty-Ninth Omnibus Objection to Claims

17     (Inconsistent Debtor Claims)

18

19    Debtors' One Hundred Fortieth Omnibus Objection to Claims

20     (Duplicative of Indenture Trustee Claims)

21

22    Debtors' One Hundred Forty-First Omnibus Objection to Claims

23     (No Supporting Documentation Claims)

24

25    Debtors' One Hundred Forty-Second Omnibus Objection to Claims

Page 4

1   (Amended and Superseded Claims)

2

3   Debtors' One Hundred Forty-Third Omnibus Objection to Claims

4   (Late-Filed Claims)

5

6   Debtors' One Hundred Forty-Fourth Omnibus Objection to Claims

7   (To Reclassify Proofs of Claims as Equity Interests)

8

9   Debtors' One Hundred Forty-Fifth Omnibus Objection to Claims

10   (Settled Derivatives Claims)

11

12   Debtors' One Hundred Forty-Sixth Omnibus Objection to Claims

13   (Settled Derivatives Claims)

14

15   Debtors' One Hundred Forty-Seventh Omnibus Objection to Claims

16   (Partially Settled Guarantee Claims)

17

18   Debtors' Ninety-Eighth Omnibus Objection to Claims

19   (Insufficient Documentation)

20

21   Debtors' Ninety-Ninth Omnibus Objection to Claims (Insufficient

22   Documentation)

23

24   Debtors' One Hundred Ninth Omnibus Objection to Claims

25   (Insufficient Documentation)

1

2    Motion of Counsel to Mark Glasser to Withdraw

3

4    First Motion of Mark Glasser to Extend Time for Claim

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dena Page

```
 1
 2    A P P E A R A N C E S :
 3    WEIL, GOTSHAL & MANGES LLP
 4         Attorneys for Debtors
 5         767 Fifth Avenue
 6         New York, NY 10153
 7
 8    BY:   MARK I. BERNSTEIN, ESQ.
 9          TERESA C. BRADY, ESQ.
10
11
12    WEIL, GOTSHAL & MANGES LLP
13         Attorneys for Debtors
14         200 Crescent Court
15         Suite 300
16         Dallas, TX 75201
17
18    BY:   SARAH MOORE DECKER, ESQ.
19
20
21
22
23
24
25
```

Page 7

1

2    REILLY POZNER LLP

3            Attorneys for Debtors

4            1900 Sixteenth Street

5            Suite 1700

6            Denver, CO 80202

7

8    BY:    MICHAEL A. ROLLIN, ESQ.

9

10

11    ALSTON & BIRD LLP

12            Attorneys for Wilmington Trust Co., as Trustee of Certain

13                Securitization Trusts

14            90 Park Avenue

15            New York, NY 10016

16

17    BY:    JOHN SPEARS, ESQ.

18

19

20

21

22

23

24

25

Page 8

1

2    BERNSTEIN SHUR

3         Attorneys for Citibank, N.A. and Wilmington Trust Company

4          as indenture trustees

5         100 Middle Street

6         P.O. Box 9729

7         Portland, ME 04104

8

9    BY:   MICHAEL A. FAGONE, ESQ.

10

11

12   BURNS & LEVINSON, LLP

13        Attorneys for Burns & Levinson, LLP

14        125 Summer Street

15        Boston, MA 02110

16

17   BY:   TAL UNRAD, ESQ.   (TELEPHONICALLY)

18

19

20

21

22

23

24

25

Page 9

1

2    CHAPMAN AND CUTLER LLP

3          Attorneys for U.S. Bank as Indenture Trustee

4          330 Madison Avenue

5          34th Floor

6          New York, NY 10017

7

8    BY:   CRAIG M. PRICE, ESQ.

9

10

11   GUSRAE, KAPLAN, BRUNO & NUSBAUM PLLC

12          Attorneys for Mr. Glasser

13          120 Wall Street

14          New York, NY 10005

15

16   BY:   BRIAN D. GRAIFMAN, ESQ.

17

18

19   JAMES K. OPENSHAW, ATTORNEY AT LAW

20          Attorney for California Department of Water Resources

21          1515 K Street

22          Suite 200

23          Sacramento, CA  95814

24

25   BY:   JAMES K. OPENSHAW, ESQ.  (TELEPHONICALLY)

Page 10

```
 1
 2    MORRISON & FOERSTER
 3         Attorneys for CGKL Ventures LLC
 4         425 Market Street
 5         San Francisco, CA 94105
 6
 7    BY:   VINCENT J. NOVAK, ESQ.   (TELEPHONICALLY)
 8
 9
10    MILBANK, TWEED, HADLEY & MCCLOY LLP
11         Attorneys for UCC
12         One Chase Manhattan Plaza
13         New York, NY 10005
14
15    BY:   BRADLEY SCOTT FRIEDMAN, ESQ.
16         DENNIS C. O'DONNELL, ESQ.
17
18
19    NIXON PEABODY LLP
20         Attorneys for Deutsche Bank National Trust Company
21         437 Madison Avenue
22         New York, NY 10022
23
24    BY:   CHRISTOPHER M. DESIDERIO, ESQ.
25
```

Page 11

1

2   RUTAN & TUCKER, LLP

3         Attorneys for LINC - Redondo Beach Seniors, Inc.

4         611 Anton Boulevard

5         Suite 1400

6         Costa Mesa, CA 92626

7

8   BY:   CAROLINE R. DJANG, ESQ.   (TELEPHONICALLY)

9

10

11   W. DOZORSKY, ATTORNEY AT LAW

12         Attorneys for Rosalindo Barrios

13         2445 West Chapman Avenue

14         Orange, CA  92868

15

16   BY:   W. DOZORSKY, ESQ.   (TELEPHONICALLY)

17

18

19   ALSO PRESENT (TELEPHONICALLY):

20         CHRISTINA KIM, In Propria Persona

21         GURDIP REHAL, California Department of Water Resources

22         A. JAMES BOYAJIAN, ESQ., Attorney for Jeffery K. Wardell

23

24

25

LEHMAN BROTHERS HOLDINGS, INC.

1              P R O C E E D I N G S

2          THE COURT:  Be seated please.  Good morning.

3          MR. BERNSTEIN:  Good morning, Your Honor.  Mark

4    Bernstein from Weil, Gotshal & Manges on behalf of the Lehman

5    Chapter 11 debtors.  We are here for a claims hearing, this

6    morning.  We have a number of uncontested items and then a few

7    contested items that mostly revolve around a similar issue.  As

8    usual, we may take some of the uncontested items out of order

9    to avoid people getting up and down.

10         At this point, I'll turn the podium over to my

11   colleague, Teresa Brady, to handle the first portion.

12         THE COURT:  Okay.

13         MS. BRADY:  Good morning, Your Honor.  Teresa Brady

14   from Weil, Gotshal & Manges on behalf of debtors.  I will be

15   addressing agenda items number 1, 3, 5, and 12.  Each of these

16   are nonconsensual reduce and allow omnibus objections, and each

17   of these are uncontested today.

18         THE COURT:  Okay.

19         MS. BRADY:  Turning to agenda items number 1 and

20   number 3, this was omnibus objection thirty-five and sixty-

21   seven.  Since the last claims hearing on June 2nd, the debtors

22   have successfully settled two additional claims on the thirty-

23   fifth omnibus objection -- this was the Central Puget Transit

24   Authority -- and six additional claims on the sixty-seventh

25   omnibus objection; this was with the counterparties Citibank,

LEHMAN BROTHERS HOLDINGS, INC.

Page 13

1    Lloyds, TSB Bank, and Pentwater Growth Fund.  So we therefore

2    respectfully request that Your Honor grant a fourth

3    supplemental order on the thirty-fifth omnibus objection and a

4    fourth supplemental order on the sixty-seventh omnibus

5    objection reducing and allowing these claims to the settlement

6    amount.

7             THE COURT:  I will do that.

8             MS. BRADY:  Thank you, Your Honor.

9             Turning to agenda item number 5, this is the 103rd

10   omnibus objection.  Your Honor previously granted an amended

11   order on this objection on May 19th which reduced and allowed

12   the number of claims in this omni.  One of the claims that was

13   reduced in that amended order belonged to a counterparty,

14   Pinnacle American Core Plus Bond Fund.  Pinnacle never filed a

15   timely response and to date still has not filed a response or

16   tried to contact the debtors to our knowledge.  Nonetheless,

17   the debtors have since discovered that due to inadvertent

18   error, the reduce and allow amount as to Pinnacle on that

19   amended order was incorrect, and therefore, we respectfully

20   request that Your Honor consider a second supplemental order

21   which would revise that modified amount actually in Pinnacle's

22   favor.

23            THE COURT:  Happy to do that.

24            MS. BRADY:  And finally, turning to agenda item number

25   12, this is the 137th omnibus objection.  The debtors, in this

1    omni, are seeking to reduce and allow twenty-one claims

2    belonging to nine counterparties.  Three of these

3    counterparties did not respond at all to the omnibus objection.

4    The debtors, therefore, seek to reduce and allow their five

5    claims on an uncontested basis.

6         With respect to the balance of the claims on this

7    omni, the counterparties have either filed timely responses or

8    been granted extensions to the time to respond by the debtors,

9    and we have actually spoken by telephone or by e-mail to each

10   of these counterparties, so therefore, we respectfully request

11   that these claims be adjourned to a future hearing so that we

12   can try to have some meaningful settlement negotiations.

13         THE COURT:  So this is just an adjournment as to this?

14         MS. BRADY:  It is -- we're seeking an order as to the

15   five claims which the respondents did not respond to this

16   omnibus objection, and then an adjournment as to the balance of

17   the claims on this omni.

18         THE COURT:  Fine, I'll grant that relief.

19         MS. BRADY:  Thank you, Your Honor.  And if there are

20   no further questions, I'd like to turn the podium over to my

21   colleague, Sarah Decker.

22         THE COURT:  That's fine.

23         MS. DECKER:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MS. DECKER:  Sarah Decker with Weil Gotshal for the

LEHMAN BROTHERS HOLDINGS, INC.

Page 15

1    debtors.  I'll be covering agenda items numbers 2, 4, 7, and 14

2    through 22 in the uncontested portion of today's agenda.

3            Agenda item number 2 is a carryover item from the

4    debtors' omnibus objection to claims which Your Honor

5    previously granted.  The fortieth omnibus objection sought to

6    disallow and expunge claims that were filed after the

7    applicable bar date.  This matter is going forward today solely

8    as to the five PIMCO claims that are listed on Exhibit 2 to

9    this morning's agenda.  Those claims are claims number 35173,

10   34745, 34746, 36788, and 35141.  The debtors have determined

11   that PIMCO no longer opposes the relief sought in the objection

12   with respect to those claims.  Accordingly, the debtors

13   respectfully request that the Court grant the fortieth omnibus

14   objection with respect to the five PIMCO claims listed on

15   Exhibit 2.

16           THE COURT:  It's granted as to those claims.

17           MS. DECKER:  Thank you, Your Honor.

18           Agenda item number 4 is a carryover item from the

19   debtors' seventy-fourth omnibus objection to claims which Your

20   Honor had previously granted.

21           The seventy-fourth omnibus objection seeks to

22   reclassify as equity interest proofs of claim that are based on

23   ownership of stock in the debtors.  This matter is going

24   forward solely on an uncontested basis with respect to the

25   claims of Federated Strategic Income Fund and Federated Bond

1    fun, claim numbers 15065 and 15066, respectively.  The debtors

2    have determined that the Federated Funds no longer oppose the

3    relief sought in the objection with respect to those claims.

4    Accordingly, the debtors respectfully request that the Court

5    grant the seventy-fourth omnibus objection with respect to the

6    Federated Funds claims, numbers 15065 and 15066.

7              THE COURT:  It's granted as to those two claims.

8              MS. DECKER:  Thank you, Your Honor.

9              Agenda item number 7 is a carryover item from the

10   127th omnibus objection to claims which Your Honor heard and

11   granted at the hearing on June 2nd.  The 127th omnibus

12   objection seeks to modify and allow claims for which the

13   parties have reached an agreement with respect to the claim

14   amount, classification, and/or debtor entity that is not

15   reflected on the claimant's proof of claim.  The matter is

16   going forward today solely as to the claims of Fannie Mae and

17   City View Plaza, claim numbers 40611 and 36803 respectively.

18   The objection, as to all other claims, was previously granted,

19   withdrawn, or otherwise resolved.

20             Fannie Mae filed a response to the 127th omnibus

21   objection and it later withdrew that response after debtors

22   clarified the relief that was sought in the objection.

23   Additionally, City View Plaza have indicated that they do not

24   oppose the relief sought by the objection.  Accordingly, the

25   debtors respectfully request that the Court grant the 127th

LEHMAN BROTHERS HOLDINGS, INC.

Page 17

1    omnibus objection with respect to Fannie Mae and City View

2    Plaza's claims, numbers 40611 and 36803.

3            THE COURT:  The 127th omnibus objection to claims is

4    granted as to those two claims.

5            MS. DECKER:  Thank you, Your Honor.

6            Moving to agenda item number 14, which is the debtors'

7    139th omnibus objection to claims, that objection seeks to

8    modify claims on the claims register so that the claims are

9    asserted against LBHI, which appear to be the debtor against

10   whom the claim is asserted.  Certain of the claims subject to

11   this objection have conflicting information with respect to the

12   debtor and/or case number.  For example, a proof of claim may

13   list LBHI as a debtor against who the claim is asserted, but

14   then the claim lists the incorrect case number.  In other

15   instances, the proof of claim indicates that a guarantee claim

16   is being asserted against LBHI, but the proof of claim lists

17   the debtor as the primary obligor.  So the debtors are merely

18   seeking to modify the claims register to reflect the fact that

19   the claims are being asserted against LBHI, which is the

20   creditor against whom the claims are intended to be asserted.

21           The debtors did not receive any responses contesting

22   the modification of the debtor to LBHI and we are proceeding on

23   an uncontested basis.  Accordingly, the debtors respectfully

24   request that the Court grant the 139th omnibus objection to

25   claims.

1          THE COURT:  The 139th omnibus objection to claims is

2    granted.

3          MS. DECKER:  Thank you, Your Honor.

4          Agenda item number 15 is the 140th omnibus objection

5    to claims.  This objection seeks to disallow and expunge

6    individual and noteholder claims that are duplicative of the

7    claims filed by Wilmington Trust, Bank of New York Mellon,

8    and/or U.S. Bank Indenture as indenture trustee for those

9    notes.  The debtors are only proceeding with respect to the

10   uncontested claims objections that have not been adjourned or

11   otherwise resolved.  And accordingly, the debtors respectfully

12   request that the Court grant the 140th omnibus objection to

13   claims.

14         THE COURT:  140th omnibus objection to claims is

15   granted on an uncontested basis.

16         MS. DECKER:  Thank you, Your Honor.

17         Agenda item number 16 is the 141st omnibus objection

18   to claims.  That objection seeks to disallow and expunge claims

19   that violate the Court's bar date order as they were submitted

20   without any supporting documentation.  The debtors are

21   proceeding only with respect to those claims that are

22   uncontested and not been adjourned or otherwise resolved.

23   Accordingly, the debtors respectfully request that the Court

24   grant the 141st omnibus objection to claims.

25         THE COURT:  The 141st omnibus objection to claims is

LEHMAN BROTHERS HOLDINGS, INC.

Page 19

1     granted on an uncontested basis.

2           MS. DECKER:  Thank you.

3           Agenda item number 17 is the 142nd omnibus objection

4     to claims.  That objection seeks to disallow and expunge claims

5     that were amended and superseded by subsequently filed claims.

6     The debtors are proceeding only with respect to the uncontested

7     claims objections that have not been adjourned or otherwise

8     resolved.  Accordingly, the debtors respectfully request that

9     the Court grant the 142nd omnibus objection to claims.

10          THE COURT:  The 142nd omnibus objection to claims is

11    granted on an uncontested basis.

12          MS. DECKER:  Thank you, Your Honor.

13          Agenda item number 18 is the 143rd omnibus objection

14    to claims.  That omnibus objection seeks to disallow and

15    expunge claims that were filed after the applicable bar date.

16    The debtors are proceeding only with respect to those claims

17    that are uncontested and have not been adjourned or otherwise

18    resolved.  Accordingly, the debtors respectfully request that

19    the Court grant the 143rd omnibus objection to claims.

20          THE COURT:  The 143rd omnibus objection to claims is

21    granted on an uncontested basis.

22          MS. DECKER:  Thank you, Your Honor.

23           Agenda item number 19 is the 144th omnibus objection

24    to claims.  That omnibus objection seeks to reclassify as

25    equity interests proofs of claim that are based on the

LEHMAN BROTHERS HOLDINGS, INC.

Page 20

1    ownership of stock in the debtors.  Again, the debtors are

2    proceeding only with respect to those claims that are

3    uncontested and have not been adjourned or otherwise resolved.

4    Accordingly, the debtors respectfully request that the Court

5    grant the 144th omnibus objection to claims.

6           THE COURT:  The 144th omnibus objection to claims is

7    granted on an uncontested basis.

8           MS. DECKER:  Thank you, Your Honor.

9           Agenda item number 20 is the 145th omnibus objection

10   to claims.  That objection seeks to the modification and

11   allowance of claims for which the parties have reached an

12   agreement with respect to the claim amount, classification, or

13   entity that is not reflected on the claimant's proof of claim.

14   This objection seeks to modify the claims to conform to the

15   parties' agreement.  Counsel negotiated a small modification to

16   the language of the order on the 127th omnibus objection and I

17   have a redline for Your Honor's review, if I may approach.

18          THE COURT:  You may.  Thank you.

19          MS. DECKER:  The order on the 127th omnibus objection

20   was modified to address a concern raised by Poudre Valley

21   Healthcare whose claims have been settled against some but not

22   all of the debtors.  Accordingly, the revised order now limits

23   the claimant's rights to distribution from the applicable

24   debtor or debtors, as opposed to all debtors.  The debtors did

25   not receive any responses to this 145th omnibus objection, and

Page 21

1    we are proceeding on an uncontested basis.  Accordingly, the

2    debtors respectfully request that the Court grant the 145th

3    omnibus objection to claims.

4            THE COURT:  The 145th omnibus objection to claims is

5    granted on the basis of the revised order that you have

6    submitted to me.

7            MS. DECKER:  Thank you, Your Honor.

8            Agenda item number 21 is the 146th omnibus objection

9    to claims.  The 146th omnibus objection seeks the disallowance

10   and expungement of derivative claims that have been settled

11   between the parties either with a payment owing to the debtors

12   with no amounts being due to the parties or with a counterparty

13   being granted an allowed claim against one or more debtors in

14   exchange for a release of all the other derivatives claims that

15   are asserted by the claimant relating thereto.  The 146th

16   omnibus objection seeks to expunge those claims as necessary to

17   effectuate the parties' agreement.

18           The debtors received one response to this objection

19   which was filed by Goldman Sachs Lending Partners, LLC in

20   regards to its claim number 17601.  Goldman's limited response

21   and reservation of rights simply clarifies that they do not

22   oppose the relief sought in the 146th omnibus objection.

23   Accordingly, the debtors respectfully request that the Court

24   grant the 146th omnibus objection to claims.

25           THE COURT:  The 146th omnibus objection to claims is

Page 22

1    granted.

2              MS. DECKER:  Thank you, Your Honor.

3              Agenda item number 22 is the 147th omnibus objection.

4    That objection seeks to reduce, reclassify, and/or allow a

5    portion of certain guarantee claims that are asserted against

6    LBHI while permitting the remaining portion of those claims to

7    remain on the claims register pending resolution.

8              The parties have entered into agreements partially

9    resolving the claims, and the objection seeks, simply, to

10   bifurcate those claims that have been partially settled to

11   effectuate the settlement of a portion of the claim while the

12   remaining portion of the claim remains unresolved and pending

13   on the claims register.  The debtors did not receive any

14   responses to the 147th omnibus objection, and we are proceeding

15   on an uncontested basis.  Accordingly, the debtors respectfully

16   request that the Court grant the 147th omnibus objection to

17   claims.

18             THE COURT:  The 147th omnibus objection to claims is

19   granted on an uncontested basis.

20             MS. DECKER:  Thank you, Your Honor.  And with that,

21   I'd like to hand the podium back over to Mark Bernstein who

22   will continue this morning's agenda beginning with item number

23   6.

24             THE COURT:  Okay, thank you.

25             MS. DECKER:  Thank you.

LEHMAN BROTHERS HOLDINGS, INC.

Page 23

1          MR. BERNSTEIN:  Mark Bernstein from Weil on behalf of

2     the Lehman Chapter 11 debtors.

3          The next item on the agenda that I will be handling is

4     item number 6, which is the 111th omnibus objection.  This

5     objection was previously heard in a related-to claims based on

6     various litigations that were commenced against Lehman

7     affiliates but to which any debtor -- to which no debtor was

8     actually a party.  These -- two parties objected to the

9     objection.  We worked out some additional language to add to

10    these parties that nothing in this order has any effect on

11    their claims against any nondebtor defendant in that

12    litigation.  Subject to the addition of that language, these

13    parties have no further objection to their claims being

14    disallowed.

15         And with that, we respectfully request Your Honor

16    grant the supplemental order for the 111th omnibus objection to

17    claims.

18         THE COURT:  It's granted.

19         MR. BERNSTEIN:  Thank you.

20         Agenda items number 8, 9, and 10 relate to objections

21    133, 134, and 135.  Each of these objections relates to claims

22    based on restricted stock units which are held by former

23    employees of the Lehman enterprise.  These stock units entitle

24    the employees only to receive common stock of LBHI at some

25    point in the future.  As a result, the debtors are seeking to

1    reclassify these claims as equity interests, as opposed to

2    claims against LBHI.

3            We're going forward today on an uncontested basis.

4    Any responses we've received have been adjourned to a future

5    hearing.  As a result, we request Your Honor grant the 133rd,

6    134th, and 135th omnibus objection to claims.

7            THE COURT:  Those three omnibus objections are granted

8    on an uncontested basis.

9            MR. BERNSTEIN:  Thank you, Your Honor.

10           Agenda item number 11 relates to omnibus objection

11   136.  This objection seeks to reclassify claims that were filed

12   as secured claims as unsecured claims against the debtors.  The

13   claims either checked the box on a proof of claim form that

14   asserted they were secured or included some sort of language in

15   an appendix that said they were secured by some sort of right.

16   In many cases, it was a reservation of rights that we may be

17   secured by a right of setoff at some point in the future.  The

18   debtors are not seeking at this point to affect the parties'

19   rights to setoff, and we've added the language to the order to

20   that effect.

21           In addition, it was -- sometimes it was unclear

22   whether the party was filing as a secured claim or an unsecured

23   claim, but for the avoidance of doubt, we included those on

24   these objections to reclassify them.

25           To the extent anybody responded, we've adjourned that;

LEHMAN BROTHERS HOLDINGS, INC.

Page 25

1    we're going forward today on an uncontested basis.  And we

2    respectfully request Your Honor grant the 136th omnibus

3    objection.

4            THE COURT:  The 136th omnibus objection is granted on

5    an uncontested basis.

6            MR. BERNSTEIN:  Thank you, Your Honor.  The last

7    uncontested item is the 138th omnibus objection.  It's number

8    13 on the agenda.  This relates to derivative contracts for

9    which claims were filed where the debtors analyzed the

10   derivatives and determined that, actually, the debtors are in

11   the money on these derivative contracts or no money is owed by

12   the debtors.

13           There were a couple responses received.  The debtors

14   are seeking to work those matters out with the parties

15   separately.  So we're going forward on an uncontested basis

16   today and respectfully request Your Honor grant the 138th

17   omnibus objection to claims.

18           THE COURT:  The 138th omnibus objection to claims is

19   granted on an uncontested basis.

20           MR. BERNSTEIN:  Thank you, Your Honor.  That concludes

21   the uncontested portion of the agenda.  We do have a few

22   contested items on the agenda today, and I'm going to turn the

23   podium over to Mike Rollin of Reilly Pozner who's going to be

24   representing the debtors in these matters.

25           THE COURT:  Okay.

LEHMAN BROTHERS HOLDINGS, INC.

Page 26

1        MR. ROLLIN:  Good morning, Your Honor.

2        THE COURT:  Good morning.

3        MR. ROLLIN:  Your Honor, my name is Michael Rollin,

4    and I'm with Reilly Pozner in Denver, Colorado.  We are special

5    counsel to the debtors for residential mortgage-backed

6    securities and secondary market litigation.  We primarily

7    prosecute and defend claims related to representations and

8    warranties and RMBS transactions.

9        I'll be handling agenda items number 23, 24, and 25

10   this morning, which are debtors' 98th, 99th, and 109th omnibus

11   objection to claims respectively.  A couple of these are

12   proceeding on an uncontested basis.  I'm going to take care of

13   them first.  Those are claims with respect to -- objections

14   with respect to claims brought by the Bank of New York Mellon.

15   Those are proceeding on an uncontested basis.  I've spoken with

16   counsel for Bank of New York Mellon.  They are not proceeding

17   and they have not responded.  The claims to be disallowed and

18   expunged on an uncontested basis are found in Exhibit 18, and I

19   respectfully request that the Court disallow and expunge those

20   claims.

21       THE COURT:  As to the ones you've identified on that

22   exhibit, the objection is granted.

23       MR. ROLLIN:  Thank you.  The other uncontested matter

24   that's identified in this particular omnibus objection relates

25   to HSBC in its capacity of trustee as well.  Those are also

LEHMAN BROTHERS HOLDINGS, INC.

Page 27

1    proceeding uncontested.  They have not filed a response; they

2    have agreed to allow the claims to be disallowed and expunged,

3    and I request the Court do so.

4              THE COURT:  That is also granted on an uncontested

5    basis.

6              MR. ROLLIN:  And for the clarification of the record,

7    those are found in Exhibit 16 to this morning's agenda.

8              THE COURT:  Okay.

9              MR. ROLLIN:  What is proceeding on a contested basis,

10   Your Honor, are objections to claims of Citibank and Wilmington

11   Trust Company as indenture trustee and successor indenture

12   trustee respectively, and to U.S. Bank in its capacity as

13   trustee.  And those objections and those claimants in the

14   briefing share many common elements.  And in the interest of

15   economy, I'll address them together, with the Court's

16   permission, drawing distinctions where appropriate.

17             Your Honor, after giving a little bit of background,

18   I'd like to hit on three narrow points.  One is that these

19   claimants have provided no facts that would allow anyone to

20   assess the validity of the claims that are at issue in this

21   hearing.  These are insufficient documentation objections.

22             Number two, as a result, the claims do not meet the

23   information and documentation requirements for the bar date

24   order and the relevant case law, and as a consequence, they do

25   not rise to the level of a properly filed claim under Rule

Page 28

1    3001, are not entitled to a presumption of validity, and should

2    be disallowed and expunged.

3            But by way of background, and just to give the Court a

4    little bit of context, I'd like to speak about the general

5    transaction structure and the representations and warranties

6    that are at issue.  I think that'll help frame the further

7    discussion.

8            As the Court is aware, Lehman bought residential

9    mortgage loans on the secondary mortgage market through

10   affiliates from third parties and also some that were

11   originated by affiliates, and they transferred through the

12   chain of companies and were deposited into securitization

13   trusts.  Trustees like Citi, Wilmington, and U.S. Bank were

14   appointed to administer the trust in accordance with the trust

15   documents, and servicers and master servicers were appointed to

16   interact with borrowers, handle remittances and those types of

17   things.

18           Now, the trust agreements contain representations and

19   warranties about the quality and characteristics of the

20   underlying mortgage loans, and it's these representations and

21   warranties that form the significant basis of the claims at

22   issue.  But it's worth noting -- and we'll come back to this

23   point later because it's an important one -- that not all the

24   representations and warranties were given by the debtors.  In

25   quite a number of instances, the representations and warranties

1   of the unaffiliated sellers were simply passed into the trust.

2        The trust agreements also had a separate obligation,

3   and that was to require the depositor to tender the loan

4   documents on a loan-by-loan basis, and they would go to a

5   custodian that was working for the trustee who would verify

6   that there were no errors or omissions in the documents and

7   they would provide -- they call those document exceptions --

8   and they would provide an exception report and under certain

9   circumstances, the depositor would have an obligation to cure

10  those.  And that is also a very significant portion of U.S.

11  Bank's claim.  I believe Citi has document exceptions, as well;

12  they just haven't provided us any information about them.

13        Both the representation and warranty claims and the

14  document exception claims have a series of elements and

15  conditions precedent set forth in the relevant contracts, and

16  those are all governed by state contract law as to whether

17  liability arises.

18        As to the claims in this case, the trustees' combined

19  claims cover just over 1.1 million residential mortgage loans:

20  about a million from U.S. Bank and about 70,000 from the

21  City/Wilmington group.  And the trustees demand payment for the

22  entire aggregate unpaid principal balance of all 1.1 million

23  loan.

24        Now, what we did was, to the extent that the claimants

25  provided any information whatsoever that purported to support a

1    loan-level breach, that is, any breach information at all,

2    regardless of whether it satisfied all of the elements of

3    liability under the contracts, or if they provided us a

4    document exception, whether or not it was material and whether

5    or not it was harmful, two of which are required elements for

6    liability, to that extent, we are not pursuing disallowance at

7    this time.  We want to -- we'll review those, determine whether

8    there's a -- how to proceed, based on that.  But if they gave

9    us anything, we're not proceeding.  And the schedules attached

10   to our reply papers lay that distinction out.

11          What we are proceeding with and what we are asking the

12   Court to disallow are approximately -- claims based on

13   approximately 800,000 residential mortgage loans for which the

14   claimants have provided no factual basis for liability, no

15   breach evidence or specific allegation at all.  About 740,000

16   of those are within the U.S. Bank group, and approximately

17   70,000, save maybe 60 or so loans, are in the City/Wilmington

18   Trust Company group.  Not only have they not provided us any

19   information, there's actually evidence to support -- that would

20   contradict the validity of these claims.

21          With respect to Citi, attached to the declaration of

22   Keri Reed, which is part of our reply papers, is a notice and

23   request for direction sent by Citibank to the certificate

24   holders in all of the deals.  And it tells them, page 2,

25   paragraph 3, that the trustee has not independently analyzed

LEHMAN BROTHERS HOLDINGS, INC.

Page 31

1   whether the claims set forth in the proofs of claim will be

2   allowed.  And on page 1 at paragraph 2, the proofs of claim

3   were filed by the trustee as a protective matter in order to

4   avoid the loss of rights against the debtors.  In other words,

5   they haven't analyzed whether they have a claim at all.  They

6   filed the claims prophylactically.  In fact, Your Honor, their

7   loans that are in these deals are performing at a rate of just

8   over eight-one percent; that's also, I believe, in Keri Reed's

9   declaration.

10          Now, loan performance doesn't necessarily tell you

11   whether there's a breach or not.  You can have a breach where a

12   loan doesn't go into default.  You can have a loan that goes

13   into default that doesn't have a breach.  But an eight-one

14   percent in those deals is indicative of whether there are

15   material breaches, certainly in the aggregate, which was the

16   nature of their claim.  In fact, Citi concedes that if you

17   demand -- and this is exactly what they did -- but if you

18   demand the entire unpaid principal balance of the loan pools,

19   that that would be -- their quote -- "it would grossly

20   overstate the amount of the claims".  Their language is:  "The

21   Trustees do not contend that the claims should be allowed in an

22   amount equal to the aggregate amount of the underlying mortgage

23   loans in each transaction; doing so would grossly overstate the

24   amount of the claims."  That's from their response brief at

25   page 8.  But that's exactly what they did, until we objected.

Page 32

1    And they still haven't modified their claim amount.  They're

2    still -- technically, their demand is for the entire UPB.  The

3    same is true for U.S. Bank, and the same is true for lots of

4    trustees.  Rather than vetting, they just sort of dumped it and

5    claim liability on every single loan in every single pool.

6         U.S. Bank's -- the evidence that calls U.S. Bank's

7    claims into question, I think, is even more compelling, Your

8    Honor.  U.S. Bank also made a claim for the aggregate unpaid

9    principal balance for all of the mortgage loans in all of their

10   deals.  Now, their securitizations are performing at a rate of

11   sixty-seven percent, but more importantly, U.S. Bank sends out

12   remittance reports to its certificate holders, and in 60 of the

13   226 at-issue transactions, they state right on their remittance

14   reports -- and these are only two months old -- that they know

15   of no material breaches, and yet they've made a claim against

16   the debtors for material breaches for every single one.  Your

17   Honor, they've not evaluated whether they have claims with

18   respect to those 800,000 loans, and they haven't provided us

19   any information with which we can evaluate whether there's

20   liability as to those 800,000 loans.  I've pointed out some of

21   the things, even without having an opportunity to review any

22   documentation, that suggest that their claims are grossly

23   overstated.

24         THE COURT:  Well, let me ask you this; how could that

25   be done?

1             MR. ROLLIN:  How could what be done?

2             THE COURT:  What you just said; how would you

3     determine material breaches with respect to the pool of loans.

4             MR. ROLLIN:  Sure, I'm glad to answer that.  I'm glad

5     to answer that because that's exactly what I and my firm do on

6     behalf of the debtors when we're prosecuting representation and

7     warranty claims out there in courts across the country and are

8     doing so now.  We -- the debtors have a process by which -- and

9     this is on their whole loan portfolio, right, loans and losses

10    that are Lehman's and have not been securitized.  We simply --

11    the servicer has mechanisms and the debtors have mechanisms.

12    We have an infrastructure by which we evaluate loans using

13    whatever criteria we think are appropriate to determine whether

14    there's been a breach.

15            So here are the elements.  You have to have a breach

16    of a representation and warranty that causes a material and

17    adverse impairment on the value of the loan and there's a

18    contractually-defined repurchase price that's used.  Then you

19    have an obligation to give notice.  The debtors have that

20    mechanism and have used that mechanism pre-bankruptcy for quite

21    a number of years.  I've been doing this since 2007; they've

22    had other lawyers who were doing it beforehand.

23            So there is a mechanism to go through your loans,

24    using whatever criteria you want.  For example, you have an

25    originator that you think is problematic or that you had to

1    terminate because of some problem.  You think there may be

2    problems with their loans.  You go through their loans and

3    figure out whether or not there's a potential for breaches.

4    You dig down.  If you find them, you prosecute them, you plead

5    them, or you at least give notice and try to work it out.  So

6    that -- now, the fact that it can be done is reflected by the

7    fact that U.S. Bank, for example, found 727 breaches, and they

8    sent that information to us after we filed the objection and

9    asked for it.  And we are no longer seeking disallowance for

10   those claims.

11        So it's capable of being done; we do it in courts

12   across the country.  U.S. Bank and Citi have participated in

13   loan repurchase litigation, primarily through Aurora Loan

14   Services, the master servicer, at least since the end of 2006.

15   So you vet the loans, you find the breaches, you give notice.

16   If the counterparty doesn't respond, you prosecute, if that's

17   what you choose to do in your business judgment.

18        THE COURT:  So how could this have been done

19   differently by these institutions approaching the bar date.  Is

20   it your position that what they should have done was to go

21   through a loan-by-loan review to determine the existence of

22   breaches?

23        MR. ROLLIN:  Well --

24        THE COURT:  Because that doesn't seem like a

25   reasonable exercise.

1          MR. ROLLIN:  Let me see if I can -- here's how it

2     works in practice, and I think their lawyers will agree, if

3     they know.  In practice, the trustee or, through its servicer,

4     doesn't even begin to look for breaches until a loan goes into

5     default.  As I said before, a default isn't necessary to have

6     breach.  You can have a breach without a default.  But as a

7     business decision, that's what they choose do to because they

8     think it would be -- and I agree -- it would be a significant

9     task to do otherwise, but that's not to say that you can't, or

10    that in the interest of the parties who you're trying to

11    protect, you shouldn't.  You can look at pools and see that

12    they have a very significant, for example, default rate and

13    then grow concerned about that.  Use analytics, and then dig in

14    a little bit deeper.  And I think that they could have done

15    that and they have done that and they did that pre-bankruptcy.

16    And pre-bankruptcy, they knew to sue the transferors, where

17    liability -- in our briefing, we talked about the different

18    channels through which Lehman acquired loans.  There are bulk

19    sellers who are called transferors in the trust documents,

20    there are correspondent lenders that sell on a more fluid basis

21    through Lehman Brothers Bank to Lehman Brothers Holdings, and

22    then there are some Lehman originations.  Well, under the trust

23    documents, including the trust documents provided as exhibits

24    by Tim Pillar from U.S. Bank just yesterday or the day before,

25    it's -- the trust agreements specifically say that if you

1    have -- if a trustee has a representation and warranty claim on

2    a transferor-originated loan, the first channel, their only

3    recourse is against that transferor, and specifically not

4    against Lehman.  In pre-bankruptcy, that's precisely what they

5    did through Aurora Loan Services who was prosecuting the claims

6    at the time.  But now that we're in bankruptcy, they just took

7    everything, their entire portfolio, and dumped it on the

8    debtors and then placed on the debtors the burden of going

9    through it finding out, no, this is a transferor loan or this

10   is a loan for which you didn't give notice, which is the

11   condition of proceeding.  So they can do it; they have done it.

12   As a business decision, in these cases, they've chosen not to

13   do it, and instead, placed the burden on the debtors to do it.

14          Does that answer the Court's question?

15          THE COURT:  I think you have answered the question,

16   but I'm still a little confused as -- well, I'll express

17   confusion when the objectors come forward, as well, as to what

18   relief you're seeking today with respect to these matters as to

19   which issue has been joined because it seems to me that there

20   is an exercise that probably needs to be done on a loan-by-loan

21   basis that presumably servicers are capable of doing.  And are

22   you suggesting that what you are seeking today is, in effect,

23   disallowance of all claims to the extent those claims have not

24   yet been proven to the satisfaction of the debtor by virtue of

25   at least the identification of loan defaults.

1            MR. ROLLIN:  We'll not even ask that they be proven to

2       the satisfaction --

3            THE COURT:  I understand; to the extent that anybody

4       has come forward with even a scintilla of proof with respect to

5       the existence of a loan default, you are not seeking relief.

6       But you are seeking what amounts to elimination of all claims

7       to the extent that no one has come forward with any proof of

8       any sort with respect to loan defaults as to the balance of the

9       loans; do I understand that right?

10           MR. ROLLIN:  I don't think that loan defaults are the

11      issue.  It is -- the issue is whether they've identified a

12      breach.  And so what we're asking be disallowed are all claims

13      on all loans for which no breach of any representation of

14      warranty has been identified.

15           THE COURT:  Okay.

16           MR. ROLLIN:  Thank you.

17           THE COURT:  And there's no equivalence between

18      breaches and defaults?

19           MR. ROLLIN:  There -- to say there's no -- I'm not

20      saying there's no equivalence; I'm saying that default is not a

21      requirement of breach and breach is not a requirement of

22      default, although servicers and trustees do use default as a

23      way to limit the population of loans they go through, because

24      they don't start looking at them until they go into default for

25      breaches of representations and warranties, and in fact, even

Page 38

1    then, they don't go through all of them.  They typically make

2    decisions based on whether it's a particularly troublesome or

3    concerning originator or whether it's a very high loss.  I

4    can't speak specifically to what these trustees have done; I

5    understand that's the general practice.

6         THE COURT:  Okay.

7         MR. ROLLIN:  But one point to make in that context,

8    Your Honor, is that these are pre-petition breaches, right?

9    The contract was breached, if at all, at the time of the

10   closing of the deal because the representations and warranties

11   were as of the closing.  The document exceptions, they'd have

12   to give those to us, to the debtors -- specifically to the

13   depositor 180 days after closing and only if the depositor then

14   didn't cure material document exception that was to be agreed

15   upon in good faith by the parties, process that didn't take

16   place, only then would a breach -- so these are all pre-

17   petition.  They would like to characterize them as contingent,

18   but by not looking for them because that's your business

19   decision, that does not make a pre-petition noncontingent claim

20   a contingent claim.

21        Now, Your Honor, under the bar date order, as you

22   know, they are required -- claimants are required to provide

23   the factual and legal bases for their claims and the order

24   requires that they do so with specificity.  And in practice in

25   the courts, including in bankruptcy courts in this district is

08-13555-mg   Doc 18251   Filed 07/01/11   Entered 07/01/11 15:38:33   Main Document
Pg 39 of 79
LEHMAN BROTHERS HOLDINGS, INC.

Page 39

1    in the context of mortgage-based claims, you provide a summary

2    of information and then make the underlying documents available

3    to the debtors because everybody realizes it is very

4    voluminous.  And that is exactly the process the debtors tried

5    to implement.  In the fall or so in 2010, we began a series of

6    ongoing communications with the claimants including these

7    claimants, and we created a spreadsheet, a form spreadsheet

8    that they could fill out with key data points for each loan,

9    and we asked them to complete it.  Citi gave us six loans; U.S.

10   Bank gave us zero loans.  Only after we filed the objection did

11   some more information come in:  727 loans from U.S. Bank, the

12   same 6 loans from Citi.  To the extent that we had rights --

13   and this is an issue I'll talk about in a moment, but to the

14   extent that debtors have rights to information, we found a few

15   more breaches:  twenty-five for U.S. Bank, fifty-three for

16   Citi.  And we're not seeking disallowance for those, of course.

17   But only after we filed the objection did they give us some

18   information and this summary, and otherwise, otherwise nothing.

19        Now, without information about the claims, we have no

20   way -- the debtors have no way to determine the validity, and

21   this is all the more true when we consider that there is

22   evidence that the creditors themselves don't know whether they

23   have claims.  They just filed prophylactic claims in the entire

24   aggregate amount for every single loan in their deals.  Under

25   the procedure order, Your Honor, insufficient documentation --

1    a document that is -- pardon me -- when a claim does not

2    provide sufficient documentation for the debtors to evaluate

3    the validity of a claim, that is a ground for disallowance, the

4    rationale being that insufficiently documented claims of these

5    types are simply not properly filed under Rule 3001, and are,

6    therefore, invalid.  No presumption of validity arises.

7           Now, briefly to touch on the claimant's responses, we

8    talked about one of them a moment ago, and that is they

9    characterize these claims as contingent claims.  But these are

10   not contingent claims in the meaning of the Code.  These

11   breached occurred under state law well before the petition, and

12   merely not looking for them or not creating an infrastructure

13   to look for them or making the business decision to not look

14   for them does not convert them to contingent claims.  There's

15   no future event upon which liability will be determined.

16          The other reason they say that they don't have to

17   provide information is they say the debtors have access to the

18   information.  Well, the debtors don't.  Aurora Loan Services is

19   a nondebtor subsidiary that serves as a master servicer for a

20   great many of these loans, but Aurora Loan Services has a

21   separate contractual relationship with the trustees that's

22   created in the trust documents, and they can only provide that

23   information to the trustees.  We've asked them, and they won't

24   give it to us except with these exceptions.  There are certain

25   transactions for which SASCO, the depositor, does have rights

 1    to the information, and where SASCO has those rights, the

 2    debtors have used them and obtained at least facial breach

 3    information for the loans that I just identified:  twenty-five

 4    additional loans for U.S. Bank and fifty-three additional loans

 5    for the Citi/Wilmington Group.  And so their argument on that

 6    is just incorrect.  It doesn't reflect a thorough understanding

 7    of the transaction and the relative rights and responsibilities

 8    of the parties.

 9            So, Your Honor, back to my original three points,

10    they've not provided us -- they have a requirement to provide

11    sufficient documentation to evaluate the claims both under the

12    rules and under the bar date order.  They have not provided

13    that information, and as a result, we respectfully request that

14    the claims to that extent be disallowed and expunged.

15            If the Court doesn't have any other questions, I will

16    sit down.

17            THE COURT:  No, I'm interested in hearing from the

18    objectors.

19            MR. ROLLIN:  Thank you, Your Honor.

20            THE COURT:  In any order you choose.

21            MR. FAGONE:  Good morning, Your Honor.  Michael Fagone

22    on behalf of Citibank, N.A. and Wilmington Trust Company in

23    their respective indenture trustee capacities.

24            Your Honor, like my colleague, I have three main

25    points that I'd like to emphasize, and I'll articulate --

 1              THE COURT:  Are they the same points?

 2              MR. FAGONE:  They're the same points, but maybe the

 3     opposite side --

 4              THE COURT:  Fine.

 5              MR. FAGONE:  -- of those points, Your Honor.  First,

 6     Your Honor, the trustees, we don't believe, have been dilatory

 7     in providing information to the debtors or discussing these

 8     claims with the debtors.

 9              Second, Your Honor, we don't believe that the debtors

10     are correctly comprehending the claims either as filed or as

11     they've later been described to the debtors.

12              And third, we believe that the requisite specificity

13     for the claims has, in fact, been provided, and we believe that

14     we met both the letter and the spirit of the Court's bar date

15     order.  So those are the three points, Your Honor, and I'll

16     touch on them briefly, if I might.

17              THE COURT:  Okay.

18              MR. FAGONE:  On the first point, I think it's worth

19     noting that the proofs of claim were filed in September of

20     2009.  And we first heard from the debtors regarding these

21     claims in October of 2010, more than two years after these

22     cases were commenced.  We recognize that the debtors and all of

23     their professionals have been extraordinarily busy in this

24     case, and we're not suggesting that they should have come to us

25     sooner.  We are only pointing out, however, that it's not

Page 43

1    entirely correct to suggest that the trustees have waited for

2    two and a half years to engage in a dialogue with the debtors

3    about the claims.  That's not accurate.

4         THE COURT:  Well, is it correct that these were, in

5    effect, protected proofs of claim that were filed without

6    conducting any meaningful diligences to the true amount of the

7    claims?

8         MR. FAGONE:  These -- yes, Your Honor.  These claims

9    were filed as contingent and/or unliquidated, and I think

10   that's a point that the debtors may be missing, here, is we

11   filed them and indicated on the addenda that we weren't sure

12   what the amount of the claims was.  The reason that we weren't

13   sure of that, Your Honor, is something that I think you hit on

14   in colloquy with counsel:  doing a loan-by-loan analysis of the

15   claims would be extraordinarily expensive and burdensome, and

16   that's something that we hope to avoid through discussion with

17   the debtors, but we were in a position, we believed, where we

18   needed to file the claims or risk having them be barred for

19   failure to meet the bar date.  So we filed them and we tried

20   to -- and I think we were successful -- indicate that they were

21   contingent and/or unliquidated as to amount.  So -- and we

22   don't stand before this Court and suggest that the claims

23   should be allowed in the total aggregate unpaid principal

24   balance of the mortgage loans in each trust.  That would not be

25   an accurate presentation of what we think the amount would be.

Page 44

1        THE COURT:  But isn't there a problem, when you come

2   right down to it, that goes to the true nature of the claim and

3   whose burden it is to determine that because the notion of the

4   bar date is to put the debtor on actual notice of actual

5   claims, not claims that are theoretical.  And to put in a claim

6   for the full amount is to be protective, but also to be

7   completely misleading.

8        MR. FAGONE:  Two things, Your Honor.  Yes, I agree

9   that the purpose of the bar date is to put the debtor on notice

10   of claims.  Had we simply filed proofs of claims that listed

11   the aggregate unpaid principal balance of the mortgage loans

12   and said that's our claim, we would like it allowed, I would

13   agree with Your Honor that that would be misleading.  But

14   that's not what we did.  Our -- the addenda to our proof of

15   claim which is attached to our response, in our view, made it

16   very clear that we were saying we don't know yet; we don't know

17   yet whether any of these 80,000 loans will go into default such

18   that the master servicer will then investigate whether there

19   has been a breach of a rep or a warranty or whether there's a

20   mortgage loan defect claim.  So that -- there was no intention

21   to mislead anyone.

22        Subsequent to the filing of the proofs of claims, the

23   debtors have asked for some information.  They've asked for

24   loan-level data -- they've never once asked us for the

25   exception reports -- they've asked us for the loan-level data,

Page 45

1    and we went to the master servicer and asked for it.  What we

2    received, we provided.  We haven't chased down every last bit

3    of information the debtors have provided for two reasons.  One,

4    that would involve incredible expense and time, and two, the

5    debtors have consistently maintained the position that there

6    will never be any sort of estimation of unliquidated claims of

7    this type in this case.  So for us, we had difficulty seeing

8    why the trustee should be put to the burden of chasing down

9    this information, if we were only then going to be faced with

10   the response, that's great, but you didn't know the amount of

11   the claim as of the bar date; therefore, the claims are

12   disallowed.

13          Your Honor, I think it's worth noting that the debtors

14   acknowledge that there are valid, legitimate claims here.  And

15   I point just briefly, Your Honor, to the disclosure statement

16   that the debtor filed yesterday.  And under the heading

17   "residential mortgage loan representation/warranty claims"

18   which appears at page 45, the debtors write, and I'll just read

19   briefly, if I could, "Based on the debtors' review of claims to

20   date and the debtors' knowledge of the success rate of asserted

21   repurchase and indemnity claims in the market, the debtors

22   estimate that the amount of the allowed claims, based on the

23   debtors' repurchase and indemnity obligations for residential

24   mortgage loans could ultimately be approximately 10.4 billion."

25   Those are the debtors' words.  These are not fictitious claims.

 1          We concede, Your Honor, in light of the debtors'

 2     objection, that the proofs of claim may not carry prima facie

 3     effect as to amount, but we believe that they do carry prima

 4     facie effect as to validity, and I think the debtor may be

 5     confusing those two separate concepts:  validity on one hand

 6     and amount on the other.

 7          That, Your Honor, leads me to my second point, which

 8     I've touched on, and that is we don't assert that these are

 9     noncontingent liquidated fixed claims.  That's not -- that was

10     never the assertion, and that's not the position we're taking

11     before the Court this morning.  What we don't know, and we

12     admit we don't know, is whether there are defaults.  The Reed

13     declaration suggests that eighty-one percent of the loans in

14     the transaction are performing.  And if that's true -- I don't

15     know whether it is, but if that's true, there's a substantial

16     likelihood that additional breaches will be discovered in the

17     future.  And those breaches may give rise to liability on the

18     part of the debtors, liability that I believe the debtors have

19     admitted.  The loan documents -- the transaction documents are

20     reasonably clear.

21          It's reasonable, then, I believe, to assume that some

22     portion of the nineteen percent of the loans that aren't

23     performing, which is some 15,000 mortgage loans, may result in

24     losses for which the debtors might be liable.  We don't know

25     that because when there's a default and a breach that's

1    discovered, there will need to be a complicated analysis of a

2    multitude of documents that are involved, as counsel alluded

3    to.  Some of these transactions involved origination by

4    correspondence and reps and warranties were passed along, and

5    in certain instances, the debtors are insulated from liability

6    if those transferors have liability.  But there are a lot of

7    documents that are going to have to be looked at and analyzed

8    to decide whether there is liability by the debtors, and if so,

9    the amount of that liability once breaches are discovered.  But

10    the --

11             THE COURT:  Can I ask you a very --

12             MR. FAGONE:  Yes, certainly.

13             THE COURT:  -- basic question about this distinction

14    between defaults and breaches?  It's the same confusion that I

15    exhibited during the debtors' presentation.  Do you acknowledge

16    that there is no equivalence between defaults and breaches of

17    these warranties, and then I really have a question that goes

18    to ordinary course practice?  I assume that it is possible,

19    although it might be very expensive, to identify whether or not

20    there are any breaches in the entire portfolio that includes

21    performing loans, and that based upon what you said, there's an

22    ordinary course practice of not looking for breaches until

23    there is a default.  Is that correct?

24             MR. FAGONE:  I believe so, Your Honor, yes.  I believe

25    it's possible for someone to take a mortgage loan file and

Page 48

```
1    examine it and determine whether any of the representations or
2    warranties made by the debtors or the transferors are
3    materially incorrect.  So the answer to that is yes.  And I
4    believe that the answer to Your Honor's question about the
5    ordinary course is also correct.  When these loans -- when the
6    borrowers on these underlying mortgage loans are making their
7    monthly mortgage payment and they're paying their taxes, and
8    they're otherwise doing what they're supposed to be doing, I
9    don't believe that there's any reason to or that the business
10   practice involves taking the loan file out and auditing that
11   file to see if there's a problem.  So I think there is an
12   equivalence, Your Honor, from a practical sense; maybe not from
13   a legal sense in terms of what the documents require or
14   describe, but I believe that there is an equivalence.
15            THE COURT:  Okay.
16            MR. FAGONE:  Have I answered Your Honor's question?
17            THE COURT:  That answers it; thank you.
18            MR. FAGONE:  Okay, thank you.
19            Just moving on, Your Honor, lastly -- I'm sorry, on
20   this distinction between validity and amount, we don't believe
21   that the inability today, at this particular stage of the
22   contested matter, to know the precise amount of the claims
23   means that the claims should be disallowed, which is what I
24   understand the debtors to be seeking.  Nothing in Section 502
25   provides for that disallowance on that basis; in fact, Section
```

LEHMAN BROTHERS HOLDINGS, INC.

Page 49

1  502(b) prohibits disallowance, simply because a claim is

2  contingent or unmatured.  There needs to be something else, I

3  think, under 502(b)(1) before a claim can be disallowed, at

4  least on that basis, and the debtors haven't suggested any

5  other basis than 502(b).

6       Section 502(c) deals with estimation of contingent or

7  unliquidated claims in certain circumstances that may not be

8  present here, but the existence of that section, combined with

9  Section 502(b), in our view, shows that an inability to know

10  the amount doesn't translate to disallowance, as the debtors

11  suggest.

12       Just moving on lastly, Your Honor, to the bar date

13  issue briefly, we think that we met the bar date.  We recognize

14  that the bar date order was the product of protracted

15  negotiation and that it has some custom-made features.  We

16  think, however, we complied with its terms by providing

17  supporting documentation.  We admit that we did not provide

18  every single transaction document or all of the exception

19  reports when we filed the proofs of claim.  We think that would

20  have been burdensome on the trustees, burdensome on the debtors

21  at that stage, and burdensome on the claims agent.  The bar

22  date order required certain types of information with respect

23  to derivatives claims and with respect to guarantee claims, as

24  I'm sure Your Honor recalls.  It didn't say anything about

25  specific information on residential mortgage loans.

LEHMAN BROTHERS HOLDINGS, INC.

Page 50

1    Notwithstanding that, we made a good faith effort to put the

2    debtors and the estates on notice of the bases for our claims,

3    and we think that was all that was required.  The debtors, in

4    fact, concede that in our proof of claim, we identified the

5    contractual provisions that might give rise to liability.  So

6    we think that that was sufficient to meet the bar date order's

7    requirements, Your Honor.

8            And lastly, in conclusion, we agree with the debtors'

9    suggestion that evaluating these claims would be difficult and

10   expensive.  We agree with that.  We also believe, however, that

11   unless the parties can come up with some sort of a resolution

12   for these types of claims, the Bankruptcy Code requires a

13   process to determine the amount of the claims.  And I think the

14   Court should be aware that there have been discussions between

15   the debtors and between similarly-situated trustees about a

16   process that could be used to resolve a significant universe of

17   claims in these cases.  Those discussions haven't materialized,

18   but they are ongoing, and if they're not fruitful, we believe

19   that the parties will be required to undertake significant

20   effort at significant expense to determine the amount of the

21   claims for purposes of allowance.

22           And that's all I have, unless there are questions.

23           THE COURT:  I do have a question in reference to your

24   last comment.  Is it your view that these objections should not

25   be allowed so that a process can go forward which would result

LEHMAN BROTHERS HOLDINGS, INC.

Page 51

1    in potentially a consensual agreement as to some percentage of

2    loans or some percentage of claim amount that might be deemed

3    allowed, or alternatively, that there would be a need to go

4    through these loan files, loan-by-loan, regardless of default

5    in order to actually determine the breaches?

6         MR. FAGONE:  The former, Your Honor.  In other words,

7    I want to be careful because I don't want to inform the Court

8    of the precise discussions that have been taking place, but --

9         THE COURT:  I don't want to know about that.

10        MR. FAGONE:  Understood.  But no, Your Honor, I think

11   the expectation is that if these objections are overruled, one

12   of two things would happen.  First, the parties would continue

13   working toward some sort of efficient resolution of the claims,

14   whether it's via a protocol like the one that was used in New

15   Century, or whether it's through some other mechanism, I don't

16   know yet.  That's one option.  The other option, Your Honor, is

17   that the debtors join the issue by raising objections on the

18   merits and the parties are tasked with coming up with a

19   scheduling order for hearing to determine the amount of the

20   claims, which I think would involve expert testimony and

21   analysis and analytics of the type that counsel referred to in

22   his remarks to the Court.  So those are the two options that I

23   see that we think would be appropriate, under the

24   circumstances.

25        THE COURT:  All right, thank you.

1           MR. FAGONE:  Thank you, Your Honor.

2           MR. ROLLIN:  Your Honor, just speaking with counsel

3      for U.S. Bank, it might be useful for the Court if I just have

4      some brief reply remarks with respect to Citi, and then U.S.

5      Bank proceed, and then reply with respect to them just to keep

6      things a little bit more organized.  Would that be all right?

7           THE COURT:  Wasn't what I had in mind, but if it's --

8           MR. ROLLIN:  We'll do whatever the Court has in mind.

9           THE COURT:   What I have in mind is hearing all the

10     objectors, and then you can respond in whatever order you

11     prefer.

12          MR. ROLLIN:  Yes, Your Honor.

13          MR. PRICE:  Good morning, Your Honor.  Craig Price on

14     behalf of U.S. Bank which serves as trustee in these cases for

15     more than 200 residential real estate trusts.  As both the

16     debtors and Citibank has made clear, the objections relate to,

17     first, representation and warranty claims, as well as document

18     deficiency claims.  The various trust agreements contain about

19     twenty -- generally twenty representations and warranties that

20     needs typically relate to the quality of the mortgages that

21     were placed into the trust.  While many of these, as the

22     debtors have made clear, specified that the originators, not

23     necessarily the debtors, will be responsible for the breaches,

24     the debtors did specifically retain a number of representation

25     and warranties in the trust agreements.

 1          In addition, an affiliate of the debtors has also

 2     served as an originator.  The trustee does not administer the

 3     individual loans.  These various loans are administered by

 4     servicers who are overseen by master servicers.  In order to

 5     make a claim for the breaches of representation and warranties,

 6     the trustee has requested from the master servicers a list of

 7     all the mortgages known with breaches of representation and

 8     warranties.  The trustee has provided this information to the

 9     debtors, as the debtors made clear, and the debtors assert to

10     date that there have been claims for approximately 800

11     individual mortgage loans.

12          As I said before, the mortgage loan deficiencies

13     relate to the documents actually inside the mortgage files.

14     These documents are retained by custodians who review each of

15     them for a nonsubstantive basis to determine whether all the

16     appropriate documents are there.  They don't look at -- they

17     don't make inquiries to whether if a document's executed that

18     an actual individual executed that, that the proper person

19     executed it.  They just make sure these documents are signed.

20     And we have transmitted reports from the custodians to the

21     debtors that approximately twenty-six percent of the loan files

22     contain possible deficiency claims, which, considering that

23     U.S. Bank has over a million mortgages, that's 260,000 files

24     that contain possible deficiencies.

25          Contrary to the debtors' claims, U.S. Bank has

 1     provided over a million pages of documents to the debtors.

 2     These include all of the transactional documents with respect

 3     to over 200 securitization transactions.

 4              THE COURT:  Let me just understand --

 5              MR. PRICE:  Sure.

 6              THE COURT:  -- what that process has been, though.

 7     You didn't provide those documents at the time of filing the

 8     proof of claim.  I assume those --

 9              MR. PRICE:  That -- that's right.

10              THE COURT:  -- documents had been filed with the

11     debtor as part of some ongoing process of --

12              MR. PRICE:  That's right.

13              THE COURT:  -- updating the claims.

14              MR. PRICE:  We created an extranet site where we

15     uploaded all of those documents because it's my understanding

16     even the documents that the debtors themselves were involved

17     with they didn't have those, so we created a -- essentially a

18     web site for all of the transactional documents.  And we've

19     been -- that's been an ongoing process.  I know as recently as

20     two weeks ago they asked for certain certifications, and we've

21     given them those.  So it's been an ongoing process for quite

22     some time that's involved an incredible amount of expense and

23     time by numerous parties.

24              THE COURT:  Okay.  At this instance, did that

25     process -- was that something that you wanted to do, or

1    something the debtor --

2        MR. PRICE:  That was the debtors' request.

3        THE COURT:  -- requested, or something that was agreed

4    to by both parties?

5        MR. PRICE:  It was agreed to by both parties that we

6    would do it.  And we generally have been responding to the

7    debtors' requests for documents, but we've also contacted them,

8    and you know asked, what do you need; what documents do you

9    want?  So I think we've been very cooperative and tried to do

10   this as a process together in terms of getting them the

11   documents that they need.

12       THE COURT:  Okay.  Well, beyond this factual predicate

13   faired argument, what are your legal arguments?

14       MR. PRICE:  Okay.  Well, just let me finish by saying

15   that the debtors have -- with respect to all the individual

16   loan files that we have given them, they've withdrawn their

17   claims.

18       So what we're talking about are those claims that have

19   yet to be revealed to the debtors or given to them with regard

20   to specific breaches of individual loan files.  And what we

21   would say is that, you know, most of these files, while we

22   don't know if they have defects or not, they're essentially

23   latent defects.  They remain hidden in these files.  We can't

24   look in an individual loan file and know that a particular

25   person is going to, you know -- if their mortgage -- if action

LEHMAN BROTHERS HOLDINGS, INC.

Page 56

1   is taken with regard to mortgage, for instance, if the person

2   goes into default, that they will then claim that they didn't

3   actually sign this document, or that they were fraudulently

4   induced into, you know, a mortgage that they couldn't afford,

5   or that the appraisal was wrong.  We can't -- just from an --

6   on a loan-by-loan basis, even if we undertook this sort of

7   investigation that the debtors are suggesting that we

8   undertake, we couldn't possibly find that information because

9   on a review of the file you wouldn't know if someone was

10  fraudulently induced into a mortgage that they couldn't afford,

11  or that they didn't actual -- even if there's a signature, that

12  someone else signed this, or that there -- that they -- there

13  was insufficient documentation about their income.  I mean you

14  just wouldn't be able to find that.  And so a substantive

15  review of every single mortgage file wouldn't be sufficient in

16  this instance in order to recognize where claims for breaches

17  of representation and warranties exist.  It just -- it wouldn't

18  happen, and that process in of itself would be incredibly

19  expensive.

20          And if you looked at all of the files, you also

21  wouldn't know which ones are going to go into default, for

22  instance; they may be performing.  There may be reps and

23  warranty violations that exist, but the people are paying their

24  mortgage on time.  So the process of going -- of doing that,

25  it's the reason why in the ordinary course they don't do that.

08-13555-mg    Doc 18251    Filed 07/01/11    Entered 07/01/11 15:38:33    Main Document
Pg 57 of 79
LEHMAN BROTHERS HOLDINGS, INC.

Page 57

1    They look; they wait until some sort of action has been taken.

2            And those 800 mortgage files that we have given to the

3    debtors, those are ones where we know that there are breaches.

4    But the remaining, you know, million mortgages minus these 800,

5    we don't know if those people will go into default.  We don't

6    know if there are latent breaches with regard to any of those

7    mortgages, and that's why we filed our proof of claim for the

8    entire amount.  But as Citibank made clear, we did it the same

9    way.

10           We were clear that this was done as a prophylactic

11    measure, as a protective measure for the bank, and that this is

12    an unliquidated amount.  We never tried to mislead them and say

13    we're seeking the entire amount of all of the mortgages and

14    their -- it's just that we can't possibly know.  We're not

15    going to re-underwrite every single mortgage because even if we

16    did that we wouldn't possibly know what -- and you know, for

17    instance, there's an example involving the GreenPoint

18    transaction, which is one of the transactions that's at issue

19    here.  There's an insurer, actually, in this transaction, and

20    that insurer has sued because -- claiming that these loans were

21    not what they were made out to be.  The originator has sued --

22    has defended that by saying that these aren't mortgages that

23    should have ever been securitized.  In that instance, there --

24    and we've told the debtors about this.  They've been in receipt

25    of all the litigation documents and various letters going back

LEHMAN BROTHERS HOLDINGS, INC.

Page 58

1    and forth that, if the originator succeeds, all of these

2    mortgages would need to be repurchased because that would be

3    one of the reps and warranties that they were allowed to be

4    transferred.  So that litigation hasn't been finalized in any

5    way, so there's no possible way of knowing whether these

6    mortgages have breached their representation and warranties.

7    And those mortgages may be performing mortgages, so an

8    individual review of the files within that transaction, they

9    may be -- that may be my mortgage, and I --

10          THE COURT:  So recognizing that this is a problem that

11   ranges between difficult to impossible, what are you proposing?

12          MR. PRICE:  Well, I think that -- I think there's two

13   things.  One, we would propose there's a lot of different ways

14   that this could be done.  A reserve could be set up, and that's

15   been done in several different cases:  the Conseco Finance

16   case, the DVI bankruptcy proceeding.  I know in Conseco that

17   involved something somewhat similar in that it was manufactured

18   housing, these breaches in representation and warranties.  They

19   put a mechanism in place that actually, you know, provided

20   money for when there was a loss that it would be paid out, and

21   that's one way we could do that.

22          Another way is to develop some formula to liquidate

23   the claim, and that's been done before in American Home

24   Mortgage, New Century, and the Aegis Mortgage cases.  In order

25   to -- and that would have the effect of not, you know, forcing

08-13555-mg   Doc 18251   Filed 07/01/11   Entered 07/01/11 15:38:33   Main Document
Pg 59 of 79
LEHMAN BROTHERS HOLDINGS, INC.

Page 59

1    the debtors and the trustees to expend vast amounts of money

2    investigating files, which even after that investigation they

3    wouldn't be able to determine whether there were actual

4    breaches of representation and warranties in these files.

5            And the only other thing I would like to say in terms

6    of a legal argument is the two cases that were -- have been

7    cited by the debtors that require that the actual mortgage loan

8    file by file be attached were both Chapter 13 cases where there

9    was one individual.  And in that case, they did require the

10   mortgage to be attached, but we have a million mortgages:  we

11   couldn't possibly attach all of those to our proof of claim

12   form.  And even we did, it wouldn't be helpful to both to the

13   debtors or to the trustee because we still wouldn't know which

14   of those individual loans has a problem.  If we located one

15   that did have a problem, it may be performing.

16           THE COURT:  So is it your position that the

17   insufficient documentation objection is, in effect, one that

18   should be overruled because there is simply a practical

19   impossibility to comply with the documentation requirement?

20           MR. PRICE:  That's right.  I mean I think it's

21   impossible --

22           THE COURT:  I'm just trying to understand your

23   position as a matter of law.

24           MR. PRICE:  Right.  I think that in terms of

25   document -- insufficient documentation, we've given them

Page 60

1   millions of pages of documents, but we --

2           THE COURT:  But you didn't do that in connection with

3   the proof of claim as much as you did it in connection with a

4   process that the parties adopted subsequent thereto.

5           MR. PRICE:  Well, that's correct, but we certainly, in

6   our proof of claim addendum, said that we would provide any

7   documents that the debtors requested.  But we did it as part of

8   a process with the debtors whereby we attempt -- we're

9   attempting to cooperate in order to resolve these claims and in

10  order to set up some sort of process by which --

11          THE COURT:  And what you're saying is that while you

12  provided information that demonstrates that there are certain

13  residential mortgage loans that you believe may involve

14  breaches, there's a whole class of residential mortgage loans

15  where it's not possible to know now whether there are breaches

16  or potential breaches?

17          MR. PRICE:  That's right.

18          THE COURT:  Is that right?

19          MR. PRICE:  That's right.

20          THE COURT:  Okay.  Thank you.

21          MR. PRICE:  Okay.  One other thing that I'd just like

22  to mention because it does involve a number of the objection --

23  of the claims that are being objected to is a class of

24  resecuritization claims.  These were trusts where the actual

25  certificates from these residential mortgage trusts were put

Page 61

1    into a different trust.  They don't have actual mortgage loans

2    as part of the assets of the trust; they have certificates from

3    trusts which have mortgage loans in them.  We have provided the

4    debtors with all the transaction documents in those instances,

5    and we've been working with the debtors.

6         There's a few instances where certain certificates --

7    and those are from the SASCO Series 2003-37(a) and the SASCO

8    Series 2003-31(a) -- these certificates were supposed to be put

9    into these various trusts and they never were.  I think we

10   believe that they were taken as collateral right before the

11   bankruptcy occurred.  And we've been working with the debtor to

12   try to find those an order to put those into these various

13   trusts.  On those, we don't know what other documents that the

14   debtors are seeking to have.  There are no individual mortgage

15   loans.  The only reason that they're included in this is not --

16   is because in a roundabout way they have a tide of residential

17   mortgages, but those -- and we don't know what else to do

18   besides provide them with these transaction documents.  They

19   haven't requested any other documentation, and we think that

20   the objections with respect to those should be adjourned until

21   the debtors can point to specific documents that they're

22   seeking.

23        THE COURT:  Okay.

24        MR. PRICE:  Is there any other questions?

25        Okay.  Thank you.

LEHMAN BROTHERS HOLDINGS, INC.

Page 62

1           THE COURT:  None at this time.  Is there anyone else

2     who is going to be speaking?  Okay.

3           MR. ROLLIN:  Anybody else?

4           THE COURT:  Your turn.

5           MR. ROLLIN:  Thank you, Your Honor.  I think I'll take

6     U.S. Bank first, although some issues will cross.  I think both

7     of the creditors, both of the trustees have told us that they

8     have provided all the information that they have where they

9     believe there's a loan specific breach that they can allege,

10    and that means that with respect to all the others they don't

11    have any proof or even allegation of a breach of representation

12    and warranty for which the debtors are liable.

13          THE COURT:  Well, here's a problem I'm having, and

14    maybe you can use this opportunity to explain your position in

15    a way that resolves my concern.  As I understand it, in the

16    universe of mortgages that we're talking about, there is a

17    commercial problem in identifying the existence of the breaches

18    that are at issue here, and that no rational trustee or loan

19    servicer would perform an inventory of each and every loan to

20    identify the existence of a possible breach in the absence of a

21    loan default because to do so would be both incredibly time-

22    consuming and expensive on the one hand, and probably of little

23    utility on the other because for reasons that have been

24    expressed it's very difficult to know whether or not there has

25    been a potential breach of a rep and warranty until sometime

LEHMAN BROTHERS HOLDINGS, INC.

Page 63

1    later in the process.  And so in my mind, and I may be making a

2    leap that is inappropriate, this is a little bit like an

3    asbestos case where it's impossible to know fully every

4    potential claimant by virtue of asbestos exposure, but

5    nonetheless plans of reorganization are developed to deal with

6    future claims, including those that haven't yet matured.  Why

7    is this not like that in the sense that we have a pool of

8    loans, some percentage of which may, in fact, include these rep

9    and warranty problems, but we don't know which ones yet, but

10   it's probably possible to identify some computer program that

11   can tell you with reasonable precision how many of these are

12   likely to be bad?  Those are my musings.  What's your response?

13           MR. ROLLIN:  There's a -- there are two questions

14   there, I think, Your Honor, and one has to do with whether it's

15   capable of being done, and that is identifying breaches before

16   they go into default, which often, as I say, the trigger for a

17   review.  And then the second one is coming up with some sort

18   of, what I think the Court is suggesting, an estimation based

19   on a model.  I'll address those in turn.

20           There's nothing about the event of a default that

21   creates an effect that would bear on the existence of a breach

22   of a representation and warranty. It is used as a shortcut as a

23   trigger to search, and it is done so as a business decision of

24   the trustee's.  That's the way they choose to operate.

25   Different trustees are more or less aggressive with respect to

Page 64

1    the identification and prosecution of representation and

2    warranty claims.  There are other claimants who are not before

3    the Court in these objections right now because they have

4    provided a very significant amount of information.  There are

5    these claimants who are before the Court only to the extent

6    they've provided no information but are not before the Court

7    with respect to they've provided any scintilla of evidence of a

8    loan level breach.  And so it's their choice how they want to

9    manage this operation on behalf of the certificate holders, and

10   they've chosen whatever they've chosen, but they've been able

11   to provide evidence as to some and no evidence, no scintilla,

12   as to others.

13          Now, with respect to estimating, estimations have been

14   used in other bankruptcies, and those are bankruptcies that are

15   filed by -- where the debtor is an originator.  We have a

16   different situation here.  We are in some case an originator,

17   but primarily the debtors' role in these issues is as a seller

18   into the securitization market and a depositor, and the debtors

19   have very significant risk-shifting and indemnification rights

20   as against third parties, the third party sellers.  And in

21   fact, one of things that I do is I prosecute those

22   indemnification rights rather successfully against not --

23   unaffiliated companies.  And so to establish a protocol,

24   estimation protocol, by which the debtors pay out sight unseen,

25   they don't obtain any of the information that would entitle the

1    estate to its indemnification from others, or appropriately

2    shift the risk to transferors.  We've talked about a number of

3    times that the -- many of these claims must be prosecuted

4    against other parties, and the language in the -- I set it

5    down, but the language in the trust agreement says the trustee

6    acknowledges that there's no liability for certain

7    representations and warranties, the type that are issue here,

8    and that the liability is that of the transferor.  Any sort of

9    an estimation protocol would do away with those protections

10   that would benefit the estate and that would benefit other

11   claimants.

12          The issue that Mr. Fagone spoke about, about the

13   negotiations that are ongoing -- I want to make sure we're

14   clear --- there is no proposal that -- and the debtors have no

15   interest in this for the reasons I just mentioned -- by which

16   based on some certain percentage all of the claims would be

17   paid out.  That's not a feature of the existing negotiations.

18   The negotiations would still require a loan-by-loan

19   determination.  And to Mr. Fagone's credit, he just wasn't part

20   of some of the more recent discussions; I'm not holding it

21   against him in any way.  He's been a terrific colleague, but

22   that's just not the case.  There still would involve a loan-by-

23   loan resolution if -- to the extent that they can't come

24   forward with the loan level breach they don't get paid.  Now --

25          THE COURT:  Yeah, but isn't there a problem with the

1    various objections here because if I were to grant relief you

2    seek, any of these claims that might exist on a loan-by-loan

3    basis go away; they're disallowed on the basis of insufficient

4    documentation?  But based upon the colloquy today, there seems

5    to be little dispute that the exercise of going through a loan-

6    by-loan review is both burdensome and commercially

7    impracticable.  There are just too many of the loans, and those

8    that are performing are more likely than not loans that will

9    not include breaches; they might, but they probably don't.  So

10   isn't there some injustice here in using the blunt instrument

11   of an omnibus objection to claims on the basis of documentation

12   in a setting in which it is very difficult to come up with the

13   documentation that you seek?  And in fact, there has been an

14   ongoing process to gain that documentation which while not an

15   admission is at least demonstrative proof that this is a

16   difficult process.

17          MR. ROLLIN:  The process that we're suggesting should

18   apply to the resolution of these claims is the process to which

19   the parties agreed in their contracts: nothing more, nothing

20   less.  If they wanted -- if a trustee or any other purchaser of

21   a mortgage loan from Lehman wanted to put that loan back or to

22   seek indemnity, they had the right to do so, and they had to

23   satisfy certain conditions precedent of notice, an opportunity

24   to cure, and then establish all of the elements of liability.

25          What the claimants are asking for now is relief from

Page 67

```
 1    their contractual agreement with the debtors with respect to

 2    the terms by which and the amount for which their claims would

 3    be resolved.  Now, if the mechanism at this juncture of

 4    disallowance, the blunt instrument as Your Honor refers, is in

 5    the Court's opinion too blunt, then I think we should take into

 6    consideration what Mr. Fagone conceded both in his papers and

 7    here.  And I, frankly, don't know exactly what U.S. Bank's

 8    position is on that, that there ought be no presumption of

 9    validity as to these claims.  They've provided no information.

10    And if there's no presumption of validity, then we can proceed

11    on that basis.

12             THE COURT:  I don't know what you just said --

13             MR. ROLLIN:  Sure.

14             THE COURT:  -- about --

15             MR. ROLLIN:  If there's --

16             THE COURT:  -- the presumption of validity.

17             MR. ROLLIN:  If there is no presumption of validity

18    with respect to the claims for the 800,000 loans, then, well,

19    frankly, they've had an opportunity to adduce evidence and have

20    not.

21             THE COURT:  He said there is a presumption of

22    validity.

23             MR. ROLLIN:  No, I believe Mr. Fagone in his papers,

24    in Citi's papers, states that they recognize that there may be

25    no presumption of validity, but --
```

1          THE COURT:  I -- did I misunderstand you?

2          MR. FAGONE:  No, you did not, Your Honor.  What I

3    meant to say and I believe I said was we concede that in light

4    of the objection there may not be a prima facie effect as to

5    the amount of the claims.  I was drawing the distinction

6    between amount and validity, and I apologize.

7          MR. ROLLIN:  No.

8          THE COURT:  That's  --

9          MR. ROLLIN:  I --

10          THE COURT:  -- what I thought you said.

11          MR. ROLLIN:  I stand corrected.  Well, then I won't

12    attribute the concession to either of the claimants, but I

13    think that's still an appropriate result that these don't rise

14    to the level of a claim.  I realize it's difficult, but they

15    still don't rise to the level of a claim to which a prima facie

16    validity should attach.  And if the Court's disinclined to

17    disallow it this time because the instrument is too blunt, then

18    we can proceed on appropriate proceedings to resolve on a loan-

19    by-loan basis if the parties can't reach an agreement.  I think

20    that's what the code and the procedures would call for in this

21    instance.

22          THE COURT:  Okay.  Do you have more?

23          MR. ROLLIN:  I'd only -- one last point, Your Honor,

24    and that is -- well, I hope that this is one last point.

25    Counsel for U.S. Bank raised some issues about GreenPoint.  To

LEHMAN BROTHERS HOLDINGS, INC.

Page 69

1    the extent that there's any issue with respect to GreenPoint, I

2    got a flurry of e-mails in the middle of the night last night

3    about GreenPoint.  I'm certainly willing to --

4              THE COURT:  Were you awake to read them?

5              MR. ROLLIN:  No, I found them this morning, Your

6    Honor.  But this is a very recent, within the last twenty-four

7    hours development.  I don't know if they've made a claim about

8    this, or whether they're making a claim now.  It's completely

9    unclear to us.  And honestly, in preparation for the hearing, I

10   haven't had an opportunity to review the ten or so e-mails with

11   attached documents from U.S. Bank.

12             THE COURT:  Okay.

13             MR. ROLLIN:  That's all I have, Your Honor.  Thank

14   you.

15             THE COURT:  Does the committee have anything to say

16   about any of this?

17             MR. O'DONNELL:  Your Honor, if I may, just briefly,

18   Your Honor, Dennis O'Donnell, Milbank, Tweed, Hadley & McCloy,

19   on behalf of the committee.  And just an observation having sat

20   through this argument, I think the thing that concerns us the

21   most is the burden and the financial burden and where it lays

22   in the resolution of these claims.  I heard a lot of things

23   about what can and cannot get done here.  I don't think I heard

24   it was utterly impossible to do a loan-by-loan review to

25   establish whether there are, in fact, breaches that could be

1      evidenced now.  What I heard was that it could be expensive.

2           But I think ultimately it should be the claimants'

3      burden with respect to expense to do a cost benefit analysis of

4      their own to determine which claims they could ultimately

5      prove, and not put that burden on the estate and the Court to

6      establish some kind of process where they would essentially get

7      a free pass to prove that over a period of time.  I think they

8      need to make a determination, and the Court can let them do so,

9      whether, in fact, they could ultimately prove and what quantity

10     of claims they could prove and go with those and not try to

11     prove the rest.  Otherwise, you are imposing on the estate the

12     burden of either litigation or a process that would not

13     otherwise be required with respect to other types of claims.  I

14     mean there are claimants who elect not to prosecute claims

15     because the cost of doing so would be -- would outweigh the

16     potential benefit.  And from our perspective, I think that is

17     one measure that should guide the Court here in determining who

18     should bear the burden.

19           THE COURT:  Okay.  I'm going to reserve judgment on

20     this and not decide this from the bench today.  And I think

21     that the presentations by all parties highlight the complexity

22     of the process of proving the existence and the amount of any

23     claim for these representation and warranty breaches in

24     residential loans.  I don't rely on this, but I take judicial

25     notice of the fact that problems in the residential loan

LEHMAN BROTHERS HOLDINGS, INC.

Page 71

1    origination market and the securitization of such loans are a

2    routine matter of concern in the business press, and as

3    recently as yesterday the settlement proposed in the matter of

4    Bank of America made headlines.  There may be no comparability

5    to that problem and the problem which is before the Court, but

6    I am not inclined to simply broadly disallow all of these

7    claims on the basis of an insufficient documentation objection.

8            I do think that the parties, while I am reserving

9    judgment, should be engaged in ongoing efforts to try to come

10   up with some reasonable, commercially practical approach to

11   dealing with the problem.  In theory, there may be no claims

12   here.  And at some point if there are claims, the trustees

13   would be put to their proof, and whether they can actually

14   succeed in carrying a burden of proof establishing residential

15   and mortgage loan  breaches is a matter as to which I am unable

16   to express any view at the moment.  It seems to me it would be

17   extraordinarily difficult.  So while these claims may reside in

18   some nether world of theory, it seems to me that in practice it

19   will be very difficult to establish these claims.

20           That having been said, I don't think that I am in a

21   position to simply automatically disallow them based upon the

22   statements that have been made today.  I will also note that

23   what we have had today is an argument and does not constitute

24   an evidentiary hearing to the extent that any party believes

25   that it would be useful to the process of reaching final

LEHMAN BROTHERS HOLDINGS, INC.

Page 72

1    resolution of the claims to present actual evidence as to how

2    one would go about identifying the existence of breaches and

3    the burden of doing so.  I am open to a request for the

4    scheduling of such a hearing, but I will do so only at the

5    request of a party.  Let's take on the next one.

6         MR. DOZORSKY:  Good morning, Your Honor.  This is

7    Attorney Dozorsky from California making a telephonic court

8    appearance.  Just to let the Court know this is regarding claim

9    number 67087; it's an individual creditor claimant, Rosalinda

10   Barrios.  Opposition to the objection to this claim was filed.

11   I'm not sure where we're at regarding these claim numbers, but

12   I just wish the Court to know that I am making a telephonic

13   appearance for this creditor.

14        THE COURT:  I understand you're on the line, but I

15   don't have that on my agenda.

16        MR. DOZORSKY:  Oh, really?  Because I received a

17   notice from the Court stating that this hearing was to cover an

18   objection to this particular claim.  This was really about a

19   time bar situation; however, in my opposition, I point out that

20   this creditor had no knowledge of the bankruptcy until she

21   filed her civil action against BNC Mortgage LLC, which is one

22   of the consolidated entities, and then she found out about this

23   bankruptcy.

24        THE COURT:  Well, I can tell you that I'm not -- I'm

25   happy to hear what you have to say, but this is not on the

1    agenda for today.

2             MR. DOZORSKY:  Okay.  Well, all right, because that's

3    not what the notice that I got says.  It may have mentioned

4    this hearing today.

5             THE COURT:  What do the debtors say about this?

6             MS. DECKER:  Your Honor, all contested late-filed

7    claims objections -- I'll repeat that:  all contested late-

8    filed objections were adjourned and will not be heard today.

9    And the debtors sent notices of adjournment approximately a

10   week and a half a go by overnight mail, so.

11            MR. DOZORSKY:  By, "adjournment," what does that mean

12   practically?  That the objection to the claim is dropped or

13   what, or is going to be continued, the hearing will be

14   continued to another date?  What does that really mean?

15            MS. DECKER:  The hearing will be continued at least

16   until the July 21st hearing which will occur at 10 a.m.  It may

17   be further adjourned by the debtors, in which case another

18   notice would be sent out.

19            MR. DOZORSKY:  Okay.  So I should be expecting a

20   notice that this -- as of now, the hearing on those types of

21   claims then is, in fact, continued to July 21st at 10 a.m., is

22   that correct?

23            MS. DECKER:  That is correct.

24            MR. DOZORSKY:  Okay.  Okay.  Very good.  Thank --

25            MS. DECKER:  Thank --

LEHMAN BROTHERS HOLDINGS, INC.

Page 74

1          MR. DOZORSKY:  -- you very much.

2          MS. DECKER:  Thank you.

3          MR. BERNSTEIN:  Your Honor, Mark Bernstein from Weil

4     on behalf of the Lehman debtors again.  We have one more

5     matter:  two separate motions on the agenda relating to a late-

6     filed claim motion filed more than a year ago by Mark Glasser.

7          THE COURT:  Right.

8          MR. BERNSTEIN:  The first motion, I guess, to be heard

9     today is motion of his counsel to withdraw as counsel to Mr.

10    Glasser.  And then I'm not sure if Mr. Glasser is here or not,

11    but originally scheduled today was also the evidentiary hearing

12    that he's been -- that has been adjourned several times.  So I

13    think counsel to Mr. Glasser is here to speak.

14         THE COURT:  Okay.  Let's -- let me find out if Mr.

15    Glasser is here.  Is Mr. Glasser here?

16         MR. GRAIFMAN:  I -- Your Honor, Brian Graifman,

17    Gusrae, Kaplan, Bruno & Nusbaum PLLC, counsel for Mr. Glasser.

18    I don't see him here, but I did speak with him on the phone

19    weeks ago about this.  He received notice.  He actually got

20    notice late because he had moved once again, although he had

21    not informed me, but he did receive notice by June 14th.  I did

22    speak with him, e-mailed -- extensive e-mail with him.  I gave

23    him a copy of the notice of motion, the operative second

24    amended order, a case management order, and essentially the

25    motion speaks for itself.  We're really, you know, not being

LEHMAN BROTHERS HOLDINGS, INC.

Page 75

1    paid for our work at this point in time and ask to withdraw as

2    counsel.

3            THE COURT:  I take it based upon your communications

4    with Mr. Glasser you can confirm that he does not oppose the

5    motion?

6            MR. GRAIFMAN:  He did not oppose -- he did not express

7    that he opposed the motion.  I offered him the -- I explained

8    in the notice of motion that he could file an opposition.  The

9    notice was actually a more fulsome notice than I would normally

10   give because of the pro se -- of the nature of him not being an

11   attorney.  He's a professional, however, and he has used other

12   attorneys, so he kind of knows the score in some respect.

13           THE COURT:  Okay.  I'm going to grant your motion to

14   withdraw as counsel.  I read the papers indicating both

15   nonpayment and an unspecified ethical concern, and on the basis

16   of that and the fact that Mr. Glasser has not appeared to

17   oppose your motion and has filed no papers in opposition to the

18   motion, the motion is granted as unopposed.

19           MR. GRAIFMAN:  Thank you, Your Honor.

20           THE COURT:  But you'll need to submit an order.

21           MR. GRAIFMAN:  Okay.

22           THE COURT:  And if you have one, you can just give it

23   to debtors' counsel who can collect orders for today's hearing.

24           MR. GRAIFMAN:  Right.  I don't have one with me, but

25   should I file it online, or give --

Page 76

1           THE COURT:  No, you should --

2           MR. GRAIFMAN:  -- give to debtors' counsel?

3           THE COURT:  You should either deliver an order to

4    chambers on a disk, or if you want coordinate with debtors'

5    counsel, they've generally been fairly good at managing the

6    flow of paper.

7           MR. GRAIFMAN:  Thank you, Your Honor.

8           THE COURT:  Okay.  Since Mr. Glasser is not present in

9    Court to prosecute on his own, his personal motion to extend

10   time for filing his claim I'm not hearing that today.  I think

11   in fairness to Mr. Glasser it would be useful to give him

12   direct notice that unless he takes steps on -- in his

13   individual capacity or through replacement counsel to prosecute

14   this matter which has been pending for well over a year, that

15   it would be reasonable for him to either voluntarily withdraw

16   the motion, or absent such withdrawal for it to be listed at

17   another omnibus hearing on claims objections.  At which point,

18   if he fails to show to prosecute the matter, I will deny his

19   motion with prejudice.

20          MR. GRAIFMAN:  Your Honor, I will provide Mr.

21   Bernstein with Mr. Glasser's current contact information:

22   address, phone, and e-mail.

23          THE COURT:  Okay.  Thank you.  Is there any more for

24   today?  Then we are adjourned.

25          (Whereupon these proceedings were concluded at 11:43 AM)

Page 77

```
 1

 2                            I N D E X

 3

 4                            RULINGS

 5                                          Page      Line

 6   Fourth supplemental order on the thirty-fifth  13       7

 7   omnibus objection granted

 8   Fourth supplemental order on the         13       7

 9   sixty-seventh omnibus objection granted

10   Amendment to 103rd omnibus objection granted  13      23

11   137th omnibus objection relief granted   14      18

12   Fortieth omnibus objection granted with  15      16

13   respect to the five PIMCO claims listed

14   on Exhibit 2

15   Seventy-fourth omnibus objection granted  16       7

16   with respect to the Federated Funds claims

17   numbers 15065 and 15066

18   127th omnibus objection to claims granted  17       3

19   as to claims number 40611 and 36803

20   139th omnibus objection to claims granted  18       1

21   140th omnibus objection to claims granted  18      14

22   141st omnibus objection to claims granted  18      25

23   142nd omnibus objection to claims granted  19      10

24   143rd omnibus objection to claims granted  19      20

25   144th omnibus objection to claims granted  20       6
```

Page 78

| | | | |
|---|---|---|---|
| 1 | 145th omnibus objection to claims granted | 21 | 4 |
| 2 | 146th omnibus objection to claims granted | 21 | 25 |
| 3 | 147th omnibus objection to claims granted | 22 | 18 |
| 4 | Supplemental order for the 111th omnibus | 23 | 18 |
| 5 | objection to claims granted | | |
| 6 | 133rd, 134th, and 135th omnibus objection to | 24 | 7 |
| 7 | claims are granted | | |
| 8 | 136th omnibus objection granted | 25 | 4 |
| 9 | 138th omnibus objection to claims is granted | 25 | 18 |
| 10 | 109th Omnibus objection granted as to claims | 26 | 21 |
| 11 | on Exhibit 18 | | |
| 12 | 109th Omnibus objection granted as to claims | 27 | 4 |
| 13 | on Exhibit 16 | | |
| 14 | Motion to withdraw as counsel to Mr. Glasser | 75 | 13 |
| 15 | granted | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

1

2                        C E R T I F I C A T I O N

3

4     I, Dena Page, certify that the foregoing transcript is a true

5     and accurate record of the proceedings.

6

7     Dena Page
                          Digitally signed by Dena Page
                          DN: cn=Dena Page, o, ou,
8     _____ email=digital1@veritext.com, c=US
                          Date: 2011.07.01 14:36:48 -04'00'

9     DENA PAGE

10

11    Also transcribed by: Shelia Watkins

12

13    Veritext

14    200 Old Country Road

15    Suite 580

16    Mineola, NY 11501

17

18    Date:  July 1, 2011

19

20

21

22

23

24

25