# EXHIBIT 1

| United States Bankruptcy Court/Southern District of New York | | PROOF OF CLAIM |
|---|---|---|
| Lehman Brothers Holdings Claims Processing Center c/o Epiq Bankruptcy Solutions, LLC FDR Station, P.O. Box 5076 New York, NY 10150-5076 | | |

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) | |
|---|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Holdings, Inc. | Case No. of Debtor Case No. 08-13555 (JMP) | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

US Airways, Inc.
SEND NOTICES TO:
Michael S. Kim
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022

Telephone number:  212-488-1200    Email Address:  Michael.Kim@kobrekim.com

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:    Email Address:

1. **Amount of Claim as of Date Case Filed:** $ 564,661,009.45 (estimated based on par value of illiquid securities, plus C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages)

(by filing this proof of claim, US Airways is not acknowledging that any insurance proceeds available to satisfy the claim are property of the estate but must be litigated or adjudicated through the estate)

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See attached. _____
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** 8470 _____ +
   3a. **Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
   Describe: _____

   Value of Property: $ _____    Annual Interest Rate _____ %
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $ _____    Basis for perfection: _____

   **Amount of Secured Claim:** $ _____    **Amount Unsecured:** $ _____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain: _____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

**Amount entitled to priority:**

$ _____

**FOR COURT USE ONLY**

FILED / RECEIVED

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

Date:
9/21/09

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Susan Bovee, Assoc. General Counsel
US AIRWAYS

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**Itemized Statement of Interest for US Airways, Inc.**

The total amount of claim is calculated based on the par value of the illiquid securities, plus the C.P.L.R. rate of 9% interest compounded annually from initial illiquidity of securities in approximately August 2007 to present, plus treble damages.

| | | |
|---|---|---|
| **Principal Amount of Claim** | = | 134,550,000.00 |
| **Interest (at 9%)** | = | 26,461,009.45 |
| **Treble Damages** | = | 403,650,000.00 |
| **TOTAL** | = | **564,661,009.45** |

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
---------------------------------------------------------x
In re                                      :
                                           :
LEHMAN BROTHERS HOLDINGS INC., ET AL. :     Case No.  08-13555 (JMP)
                                           :
                  Debtors.                 :
---------------------------------------------------------x
```

### SUPPLEMENTAL DOCUMENTATION TO PROOF OF CLAIM

1.    US Airways, Inc. ("US Airways") by and through its attorneys, Kobre & Kim LLP, submits the attached timely proof of claim.

2.    The facts and circumstances of US Airways' claims are set forth in the attached draft Statement of Claim (A redacted copy of the draft Statement of Claim is attached hereto as Exhibit A.)

3.    These claims arise out of the "Cash Management Brokerage Agreement and Limited Discretionary Authorization" (the "Agreement") entered into between US Airways and Lehman Brothers, Inc. (A redacted copy of the Agreement is attached hereto as Exhibit B.)

4.    The Agreement provides, *inter alia*, for "final and binding" arbitration in connection with "all claims and controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein."

5.      On September 15, 2008, a proceeding was commenced under Chapter 11 of the United States Bankruptcy Code with respect to Lehman Brothers Holdings, Inc. ("LBHI"). Accordingly, all actions against LBHI were stayed.

<div align="center">

**RELIEF REQUESTED**

</div>

6.      US Airways hereby reserves its rights to move the Court to lift the automatic stay and institute a FINRA arbitration in connection with the claims set forth in the attached draft Statement of Claim so as to resolve any disputes regarding Debtor's liability, the amount of damages, the priority of this claim, or any and all other matters that the parties agreed were to be decided by arbitration.

7.      US Airways also hereby reserves its rights to amend the attached Statement of Claim between the present time and the time the automatic stay may be lifted.

Dated: September 22, 2009
       New York, New York

Respectfully submitted,

KOBRE & KIM LLP

*Robert W. Henoch*

Michael S. Kim
Michael.Kim@kobrekim.com
Robert W. Henoch
Robert.Henoch@kobrekim.com

800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

*Attorneys for US Airways, Inc.*

# Exhibit A

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

BEFORE THE
FINANCIAL INDUSTRY REGULATORY AUTHORITY

————————————————————————— x
                                            :
                                            :
US AIRWAYS, INC.,                           :
                                            :
                    Claimant,               :    Case No. _____
                                            :
            v.                              :
                                            :
LEHMAN BROTHERS INC.,                       :
                                            :
                    Respondent.             :
                                            :
                                            :
————————————————————————— x

    Claimant US Airways, Inc. ("US Airways" or "Claimant"), by and through its

attorneys, Kobre & Kim LLP, for its statement of claim against Lehman Brothers Inc.

("Lehman" or "Respondent") submits as follows:

**Introduction**

    1.    US Airways is a holding company whose primary business activity is the

operation of a major network air carrier through its wholly owned subsidiaries.    US

Airways is the fifth largest airline in the United States and is listed on the New York

Stock Exchange.    US Airways held a cash management brokerage account numbered

███████ (the "Account") with Respondent Lehman, which Claimant used to manage

short-term cash needed for Claimant's business operations.

    2.    Upon information and belief, Respondent repeatedly recommended and

purchased numerous unsuitable securities for Claimant's Account.    These securities

(which will be described in greater detail below) are all complex, highly-structured, risky

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

securities (hereafter, "Complex Structured Securities") issued by just two untested and esoteric transactional structures, the first of which were issuers of "contingent capital facilities" established for bond insurers, and the second of which provides a source of no-recourse funding for a life insurance company's "redundant reserves," which provides securities holders such as Claimant with little, if any, recourse to the amounts invested. The securities were offered as auction rate securities, the functioning of which will be described in greater detail below.

3.      Beginning on or about August of 2007, the auctions associated with these Complex Structured Securities began to "fail." "Failed" auctions will be described in greater detail below, but in essence a failed auction means that an investor's money is trapped in the security, which the investor cannot sell. In the case of US Airways, Claimant is unable to sell all of the Complex Structured Securities in its Account, leaving Claimant indefinitely without access to approximately US $134.6 million of the funds it entrusted to Respondent.

4.      Respondent recommended these securities even though Respondent knew that the securities failed to satisfy the investment objectives that Claimant articulated in its Policies and Procedures Governing the Investment of Company Funds ("Investment Policy") that was provided to Respondent and reiterated by representatives of Claimant on numerous occasions in oral communications with Respondent. The primary goals of these investment objectives were to preserve Claimant's capital and to provide adequate liquidity to fund Claimant's business operations. The third goal of the Investment Policy was, "within the constraints of capital preservation and liquidity requirements . . . to

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

optimize after tax return on investments in instruments for which there exists an active

market." (Exhibit A.)

5.    Furthermore, the securities that Respondent repeatedly recommended and

purchased fall *outside* of all of the categories of "Eligible Investments" enumerated in the

Investment Policy. (*Id.*) The list of "Eligible Investments" identifies in significant detail

the categories of acceptable investments for US Airways' Account. (*Id.*) The auction

rate securities recommended and purchased for US Airways' Account were not identified

as eligible investments in the Investment Policy. Thus, by definition, these securities

were unsuitable for Claimant's Account.

6.    As registered representatives of FINRA, Respondent had an obligation to

recommend "suitable" securities in light of Claimant's investment objectives. Rather

than acting in a manner consistent with its obligations under the FINRA rules and general

standards of commercial practice, as discussed in further detail below, Respondent

recommended and purchased securities for Claimant's Account that were wildly

unsuitable in light of Claimant's investment objectives.

7.    Respondent consistently misled Claimant as to the nature of the securities

that Respondent was recommending, and the extent of risk to which these securities

exposed Claimant. Respondent repeatedly assured Claimant that the securities that

Respondent was recommending for purchase for Claimant's Account comported with

Claimant's Investment Policy, even though Respondent knew the securities did not.

8.    Respondent, moreover, recommended these Complex Structured

Securities even though the securities are also unregistered private placement securities,

and by this fact manifestly unsuitable given Claimant's Investment Policy and the

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

objectives that Claimant repeatedly articulated to Respondent. Since unregistered private placement securities can only be sold pursuant to narrow exemptions to the Securities Act of 1933 (the "Act") and to a limited number of purchasers, their liquidity is severely hindered and they are significantly more exposed to market risk. Such securities are, thus, clearly unsuitable for investors whose highest objectives are safety and liquidity.

9.    Upon information and belief, Respondent continued aggressively to recommend and purchase these manifestly unsuitable Complex Structured Securities to Claimant in spite of Respondent's awareness of the problems in the market for such securities. Upon information and belief, Respondent advised Claimant to purchase these Complex Structured Securities in order to prop up auctions that Respondent knew or should have known were in imminent danger of failing and becoming illiquid, thereby advancing Respondent's interests to Claimant's detriment.

10.    Lehman sought to forestall such auction failures because Lehman is affiliated with the issuers of the securities in various ways, serving as the "structuring advisor," "initial purchaser," and/or "designated broker-dealer" for all of the currently illiquid securities held in Claimant's Account. Upon information and belief, Lehman received fees from issuers for acting in all three of these capacities.

11.    In other words, Lehman, upon information and belief, recommended numerous manifestly unsuitable securities to Claimant in order to advance Lehman's own financial interests to the detriment of Claimant.

12.    By recommending the unsuitable Complex Structured Securities in order, upon information and belief, to prop up auctions it knew to be in imminent danger of failing, Respondent is liable for having: (i) breached its contract with Claimant; (ii)

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

recommended numerous unsuitable securities to Claimant; (iii) made unauthorized

purchases on Claimant's behalf; (iv) violated Section 10(b) of the Securities Exchange

Act and Rule 10b-5 promulgated thereunder; (v) made fraudulent misrepresentations to

Claimant, on which Claimant reasonably relied; (vi) converted Claimant's possessory

interest in the funds invested in the Complex Structured Securities; (vii) negligently

caused injury to Claimant; (viii) committed gross negligence; (ix) failed to supervise its

employees; and (x) sold securities to Claimant without obtaining a required Purchaser's

Letter, thereby rendering the sales null and void.

### Parties

13.    Claimant US Airways is a holding company whose primary business

activity is the operation of a major network air carrier through its wholly owned

subsidiaries. Claimant is the fifth largest airline in the United States and is listed on the

New York Stock Exchange. US Airways is headquartered in Phoenix, Arizona.

14.    Respondent Lehman Brothers Inc. is a FINRA registered broker-dealer

formerly headquartered at 745 Seventh Avenue, New York, New York 10019. Lehman

Brothers Inc. is currently the subject of liquidation proceedings pursuant to the Securities

Investor Protection Act in *In re Lehman Brothers, Inc.*, 08-01420 (JMP) SIPA, pending

in the United States Bankruptcy Court for the Southern District of New York.

### Jurisdiction and Hearing Location

15.    This matter is eligible for submission pursuant to Rule 12200 of the

FINRA Code of Arbitration Procedure for Customer Disputes.

16.    At all times material herein, Lehman Brothers was and is a broker-dealer

registered with FINRA and Respondent is a member of FINRA. The Agreement between

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Respondents and Claimant provides, *inter alia*, for "final and binding" arbitration in connection with "all claims and controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein." (Exhibit B.)

17.    The proper hearing location for this arbitration is Phoenix, Arizona, pursuant to Rule 12213 of the FINRA Code. The place of business for Claimant is Phoenix, Arizona.

### In the Course of Establishing the Account, Claimant Fully Communicated and Respondent Fully Understood That Claimant's Objectives Were to Preserve Capital and to Provide Liquidity

18.    Upon information and belief, Claimant began transferring funds to Lehman in or about 2004, and Claimant began discussing the possibility of opening a cash management account with Lehman. During these discussions, Claimant consistently and clearly communicated to Respondent that Claimant needed investments in its Account to be safe and liquid. To confirm this mutual understanding of Claimant's investment needs upon opening its Account, Claimant sent to Respondent a copy of Claimant's Investment Policy.

19.    This Investment Policy articulates the objectives Respondent were required to follow when recommending securities for purchase, the same objectives previously communicated to Lehman. (*See* Exhibit A.) The Investment Policy stipulates that all purchases must conform to the following investment objectives: (a) to preserve capital; (b) to provide adequate liquidity; and (c) within the constraints of capital preservation and liquidity requirements, to optimize after tax return on investments for

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

20.    As is consistent with these investment objectives, the Investment Policy
includes limitations on the types of securities Respondent were to recommend. First, the
Investment Policy states that no more than 5% of the Investment Portfolio may be
invested in securities of any single issuer, with the exception of US government
obligations, where no limit is imposed. US Airways included this limitation to ensure
that distress limited to a particular issuer would not significantly affect the liquidity and
capital preservation of the portfolio.

21.    Second, the Investment Policy limits the categories of securities available
for recommendation and purchase by Respondent. The Investment Policy provides a
comprehensive list of "Eligible Investments" for the Account, which notably includes
"Tax-Exempt and Tax-Advantaged Securities" and a type of auction rate security known
as "Dutch auction rate preferred stock." This list of "Eligible Investments" does not
reference any type of auction rate securities that are taxable (*i.e.*, *not* issued by municipal
or municipal-sponsored entities). Further, this list does not include securities issued in
connection with contingent capital facilities or redundant reserves for life insurance
companies, as were purchased for Claimant, nor any other type of private placement
securities.

22.    The Investment Policy did not permit Respondent to recommend or
purchase securities that varied from the Investment Policy's provisions. Upon receipt of
this Investment Policy, Respondent did not raise any questions, provide any revisions nor
otherwise suggest that it would be unable to recommend suitable securities pursuant to

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

the Policy. With the Investment Policy reviewed by both parties, upon information and

belief, Claimant and Respondent executed a Client Agreement, which served to establish

US Airways' Cash Management Brokerage Account with Lehman.

*Respondent Repeated Recommendations and Purchases of the*
*Complex, Structured Securities Violated the Obligations of FINRA Members In*
*Connection with Recommending Only Suitable Securities*

23.     Respondent's recommendation and purchase of these Complex, Structured

Securities additionally violated the obligations of broker-dealers and registered

representatives as set forth in the FINRA Rules.

24.     Respondent has a well-defined obligation to recommend and purchase

only "suitable" securities for Claimant's Account. This obligation is "fundamental to fair

dealing and is intended to promote ethical sales practices and high standards of

professional conduct." FINRA Rule IM-2310-3. In light of these obligations, FINRA

members must have a "reasonable basis for recommending a particular security or

strategy" and "a reasonably ground[] for believing the recommendation is suitable for the

customer to whom it is made." FINRA Rule IM-2310-3. These suitability requirements

apply "regardless of the financial circumstances of the customer." The high standards

that apply to a member in connection with its suitability obligations are "not diminished

by the fact that the member [is] dealing with an institutional customer." IM-2310-3.

25.     Respondent had no basis—let alone a reasonable basis—for

recommending and purchasing the Complex Structured Securities for Claimant's

Accounts. US Airways had clearly expressed the categories of acceptable securities for

its Account, its investment objectives of liquidity and preservation of capital and the

requirement that there be an active market. Further, Claimant repeatedly expressed its

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

need that the investments in the Accounts be available for Claimant to use for working capital. Rather than recommending and purchasing securities that satisfy these investment goals, Respondent abandoned its obligations under the FINRA rules and instead purchased securities that were demonstrably unsuitable.

### Respondent Recommended Complex Structured Securities That Were Highly Inappropriate and Completely Contrary to the Parties' Understanding Toward Safe and Liquid Investments

26.     From the inception of the account to the present, Respondent continually recommended to Claimant risky, complex, highly-structured securities ("Complex Structured Securities"), issued almost entirely by sellers of "contingent capital facilities" established for bond insurers and trusts established to fund "redundant reserves." Virtually all of these securities were also unregistered under the Securities Act of 1933 and could only be sold through narrow exemptions to securities regulations.

27.     These types of risky, complex, structured and unregistered auction rate securities were never contemplated by the Investment Policy and were unsuitable given Claimant's stated investment objectives of liquidity and preservation of principal.

28.     Upon information and belief, however, Respondent misled Claimant into believing that the Complex Structured Securities it recommended and purchased were the same as those authorized in the Investment Policy. Respondent never provided Claimant with any statements – oral or written – regarding the true nature of the securities being recommended.

29.     Upon information and belief, the recommendation and purchase of these securities, instead of the safe, liquid investments requested by Claimant, was motivated by Lehman's relationships with the issuers of these risky, complex, highly-structured

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

securities, and by Lehman's awareness of turmoil in the market for these particular securities. Upon information and belief, Lehman recommended and purchased these securities and misled Claimant as to their true nature in an ultimately unsuccessful attempt to generate sufficient demand for the securities to prevent failed auctions.

30.    Respondent continued this deception regarding the true nature of the Complex Structured Securities throughout the lifetime of the account. Because of this deception, by late August 2007, the portfolio owned by Claimant was allotted almost entirely to risky, complex, highly-structured securities not in compliance with Claimant's investment objectives and the Investment Policy. In fact, throughout the month of August 2007, approximately $134.6 million worth of Complex Structured Securities were purchased for Claimant's Account.

*Respondent Recommended Securities Whose Highly Complex and Risky Transactional Structures, As Detailed Below, Made Them Clearly Unsuitable, Given Claimant's Core Objectives of Low Risk and High Liquidity*

31.    Upon information and belief, virtually all of the risky Complex Structured Securities purchased by Respondent on Claimant's behalf fall into one of two categories: they are issued either by sellers of "contingent capital facilities" established for the benefit of bond insurers or trusts established to fund "redundant reserves." These categories will be described in greater detail below.

32.    As explained herein, Respondent's repeated recommendations of these Complex Structured Securities, many of which are Lehman's own products, resulted in Claimant losing its ability to access or invest a substantial portion of its cash.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

*Lehman Violated Claimant's Investment Objectives of Safety and Liquidity by Allocating*
*a Massive Portion of the US Airways' Account to Securities that are Heavily-Exposed to*
*the Troubled Bond Insurance Market*

33.     The first category of unsuitable securities purchased for the US Airways'
Account are issued by trusts set up as "contingent capital facilities" ("CCF Trusts").

34.     CCF Trusts are established by organizations, often insurance companies,
to protect against catastrophic losses by means of a capital injection that is agreed upon
before any loss occurs.

35.     All of the securities purchased for US Airways' Account that fit into this
category are issued by CCF Trusts established for the benefit of bond insurers.   In
purchasing these securities, therefore, Lehman concentrated a massive amount of risk in
the bond insurance industry.

36.     The securities are structured as follows:   A bond insurer establishes a
series of sub-trusts. Each of these sub-trusts enters into a put agreement with the bond
insurer, in which they are paid a premium for agreeing to a put option, which allows the
bond insurer to require that the sub-trust purchase preferred stock in the bond insurer.
The put option, in effect, sets up a line of credit for the bond insurer, allowing it to draw
cash from the sub-trust when it so desires.

37.     Each of the sub-trusts then issues securities to raise funds with which it
will purchase preferred stock in the bond insurer in the event that the put option is
exercised. Each of the sub-trusts also invests in "Eligible Assets." It uses the proceeds
from its investment in "Eligible Assets" and the put option premiums to make its interest
payments to the investors in the securities that it issues.

38.     The sub-trusts are established by the bond insurer.  Furthermore, in the

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

event that the put option is exercised, the investors in the sub-trusts will become owners of the preferred stock of the bond insurer. Consequently, the credit rating of the securities issued by the sub-trust will reflect the credit rating of the bond insurer; the safety and liquidity of the security will be directly affected by problems with the bond insurer.

39.    Over the last decade, the bond insurance industry has expanded by adding to its traditional municipal bond insurance portfolio a new line of business: providing insurance for structured securities, including CDOs. This shift has exposed bond insurers to significantly more risk.

40.    Furthermore, since a bond insurer's risk exposure derives from the risk exposure of every single bond that it insures, it is difficult to determine the safety and creditworthiness of a bond insurer. For this reason, tying such a massive portion of the US Airways' Account to bond insurers was manifestly unsuitable and failed to meet Claimant's expressed investment objectives of safety and liquidity.

*Respondent Violated Claimant's Investment Objectives and Investment Policy by Recommending Unsuitable Complex Structured Securities that are Issued to Provide No-Recourse Funding for Life Insurance Companies, and Whose Credit Ratings Are Based Entirely on the Rating of the Bond Insurer That Insures Them, Rather than on the Strength of the Underlying Issuer*

41.    The second type of unsuitable security purchased for the US Airways Account is issued by trusts established to provide a life insurance company with "no-recourse" funding for "redundant reserves" required under actuary regulations.

42.    This category of unsuitable securities in Claimant's account is structured in the following way:

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

43.    An insurance company establishes a "captive" reinsurance company, whose sole purpose is to enter into a reinsurance contract with the parent company.

44.    This captive reinsurance company raises funds by selling surplus notes to special purpose vehicles known as "capital trusts." These notes are not insured.

45.    The capital trusts, in turn, raise funds by issuing securities to investors. These securities are insured by a bond insurer.

46.    The captive reinsurance company entrusts the funds that it receives from selling surplus notes to the capital trusts, and that they, in turn, receive from selling securities to investors, to a reinsurance credit trust, with which it enters into an asset management agreement.

47.    These securities are identified as "no-recourse" securitizations because investors do not have recourse to the entity that actually benefits from the issuance of the securities. In the event of default, Claimant would not have recourse beyond the capital trusts that issued the securities. Claimant would be unable to bring a claim against the captive reinsurance company that established the capital trusts, or against the life insurance company that established the captive reinsurance company. Consequently, the safety and liquidity of the securities in its account are dependent upon the creditworthiness of the bond insurer that insures the securities issued by the capital trusts.

48.    Indeed, upon information and belief, many of the securities that fall within this second type do not have underlying ratings at all; instead, their credit-rating is entirely a reflection of the bond insurance on the security. These securities are referred to as "wrapped securities," since they are wrapped by the credit rating of the bond insurer.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

49.   The unavailability of any recourse to the life insurance companies, combined with the dependence of these securities on the strength of the bond insurance industry, makes these "redundant reserves" securities purchased for Claimant unsuitable, given Claimant's stated need for liquidity and preservation of principal.

**After Having Inappropriately Invested Claimant In These Unsuitable Securities, Respondent Further Violated Claimant's Rights By Continuing To Reinvest It In These Same Securities Despite Clear Warning Signs of Trouble In the Bond Insurance Market**

50.   In late July and early August 2007, several public announcements fueled widespread concerns about the safety of the bond insurance market, the creditworthiness of bond insurers, and the safety and liquidity of highly-structured securities, such as those purchased by Respondent.

51.   Having already breached its duties to Claimant and violated Claimant's rights by purchasing the unsuitable securities, Respondent further breached its duties and violated Claimant's rights by continuing to re-invest in these unsuitable securities despite increasingly turbulent market conditions.

52.   On or about July 31, 2007, Fitch Ratings announced that it was placing the bond insurer Radian, as well as 934 securities insured by Radian, on Rating Watch Negative, indicating that they were likely to be downgraded in the near future. The securities that were downgraded were "wrapped securities," like a number of the securities in US Airways' Account. Then, on or about August 6, 2007, Ram Holdings, Ltd., the parent company of Ram Re, announced that it had suffered a 44.5% drop in market value, following a 25% drop in its second-quarter earnings.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

53.     Since a bond insurer's business depends upon having a high rating, with which it can wrap the bonds it insures, the announcement that Radian was likely to be downgraded signaled significant problems with its business. Despite the clear material impact of this announcement on Claimant's portfolio, however, Lehman did not inform Claimant of any changes with respect to Radian or any other bond insurers, prior to the failure of securities in Claimant's Account.

54.     Additionally, upon information and belief, throughout the first half of August 2007, a wave of auction rate securities – for many of which Lehman served as designated broker-dealer – failed at auction. Upon information and belief, the securities involved in this initial wave of failure were of similar complexity and structure to those held in Claimant's Account; in fact, many of them were also established to fund bond insurers and "redundant reserves" of life insurance companies.

55.     These failed auctions should have alerted Respondent to the heightened risk of failed auctions occurring in Claimant's own account. As news of these initial failures became widespread, Respondents should have known investors would become concerned with the safety of Complex Structured Securities, causing demand for all Complex Structured Securities to decline and, thus, the likelihood of failed auctions for all Complex Structured Securities to grow.

56.     Despite the clear material impact of these failures, Lehman failed to inform Claimant of any illiquidity in similarly structured securities, even as the Claimant's securities began failing on or around August 21, 2007 and continued to fail throughout the rest of August 2007 into mid-September 2007.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

57.    As a fiduciary of Claimant in exercising the discretion entrusted to them, Respondent had a duty to act in Claimant's interests, and to keep Claimant informed of changes in market conditions that affected US Airways' Account with respect to the matters that had been entrusted to Respondent.    Furthermore, Respondent had a continuing duty to ensure that it had invested Claimant's funds in authorized and suitable securities.  In addition, Respondent continued to be responsible for investing Claimant's cash in a manner consistent with Claimant's investment principles.

58.    Despite these announcements and the widespread concerns about the safety of bond insurers that they prompted, Respondent failed to re-evaluate their own allocation of US Airways' Account, to limit Claimant's exposure to the troubled bond insurance market, or to inform Claimant of its significant risk exposure resulting from specific transactions that had been entrusted to Respondent's discretion.

59.    Respondent failed to inform Claimant of announcements signaling turmoil in the bond insurance industry and later in the market for Complex Structured Securities, despite these facts being material to the safety and security of Claimant's portfolio and, in particular, to securities owned by Claimant which were either issued by contingent capital facilities established by bond insurers or wrapped by bond insurers.  Instead, Respondent continued to reinvest Claimant's funds in the same unauthorized and unsuitable securities, which were unsuitable upon their purchase in the first place.

60.    As a result of Respondent's actions, Claimant has lost the ability to access or invest its approximately US $134.6 million.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

**Respondent Improperly Recommended Private Placement Securities, which Were
Unsuitable Given the Severe Restrictions on Their Liquidity, and the Purchase of
Which Violated Applicable Securities Laws**

61.    In addition to being unsuitable given their untested, novel, esoteric structures, the Complex Structured Securities that Respondent recommended were unsuitable because they were issued as "private placement" securities that have not been registered with the Securities and Exchange Commission.

62.    Respondent either knew or should have known that these private placement securities were unsuitable, since "private placements" were *not* included among the high quality and marketable securities listed in the Investment Policy.

63.    Furthermore, the private placement securities that Respondent recommended were clearly unsuitable in light of Claimant's express investment objective of liquidity, as well as Claimant's requirement that all holdings in the portfolio, with the exception of cash and cash equivalents (to which category the Complex Structured Securities do not belong), must be "actively traded to minimize transaction costs and facilitate accurate market valuation."

64.    Since the securities in question have not been registered with the Securities and Exchange Commission, they can be resold only through narrow exemptions to the Act.  These exemptions severely hinder the liquidity and marketability of the securities.

65.    Upon information and belief, Respondent understood that Claimant would not agree to purchase these securities were Claimant fully informed of the severe restrictions placed on their liquidity and marketability.  Respondent consistently misled

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Claimant, failing to provide material relevant information regarding the limitations on the securities' resale.

66.     Furthermore, upon information and belief, Respondent failed to provide or require that Claimant execute "Purchaser's Letters," which are typically affixed to the Private Placement Memoranda.   These Purchaser's Letters acknowledge that the purchaser is aware that the securities have not been and will not be registered under the Act, that the Purchaser is qualified to purchase the securities, and that the Purchaser understands the limitations placed on the liquidity of the securities.

67.     Upon information and belief, some, and potentially all, of the Private Placement Memoranda for the securities purchased by Respondent on Claimant's behalf state that the securities may only be sold to purchasers that have executed a Purchaser's Letter.  Additionally, several Private Placement Memoranda for the securities purchased by Respondent on Claimant's behalf state that the Purchaser must review the Private Placement memoranda before executing the Purchaser's Letter.

68.     Not only did Respondent mislead Claimant and fail to disclose material information in the process of recommending these private placement securities, Respondent also violated securities regulations in purchasing the securities on Claimant's behalf.

**Upon Information and Belief, Respondent Repeatedly Recommended Numerous Unsuitable Complex Structured Securities Because Respondent Wanted to Prop Up Auctions it Knew to be in Imminent Danger of Failing**

69.     In recommending the unsuitable Complex Structured Securities immediately before such securities began to fail at auction, Lehman, upon information and belief, was "stuffing" the portfolio of its customers with securities with whose issuers

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Lehman was closely associated, in an ultimately unsuccessful attempt to prevent auction

failures that Lehman recognized to be imminent.

     70.     Lehman was closely associated with all of the unsuitable securities that it

improperly recommended to Claimant, and this association, upon information and belief,

provided Respondent with an incentive to "stuff" Claimant's Account with these

unsuitable securities.

     71.     Lehman served in three different capacities with respect to a significant

number of the securities purchased for the Account. In many cases, Lehman served in

more than one or all three of these capacities with respect to a security.

     72.     Upon information and belief, Lehman served as the **structuring adviser**

for many of the unsuitable securities in the Account, meaning that Lehman advised the

issuers in the process of creating the securities.

     73.     Upon information and belief, Lehman served as the **initial purchaser** for

many of the unsuitable securities in the Account, meaning that Lehman purchased all of

the newly-issued securities from the issuer in order to sell to other buyers.

     74.     Upon information and belief, Lehman served as the **designated broker-
dealer,** and in many cases the **sole designated broker-dealer**, for many of the unsuitable

securities in the Account, meaning that Lehman was authorized by the issuer to solicit

and accept bids for the auction.

     75.     Each of these roles provided Lehman with a motive to prevent auction

failures. To understand auction failures and why Lehman would seek to prevent such an

outcome, it is necessary to describe the mechanics of the auction process in greater detail.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

76.    In general, an auction rate security is a long-term bond whose interest rate is reset periodically (typically every 7, 28, or 35 days) by means of a Dutch auction process.

77.    In a Dutch auction, the auction agent for an auction rate security collects bids from investors and ranks the various bids according to the interest rate each individual investor is willing to accept. The auction agent, based on these bid rates, determines the "clearing rate" for the auction, which is the lowest rate at which all of the securities of a given issue can be sold at par.

78.    If, however, an auction agent does not receive enough bids to buy securities at or below the maximum interest rate that the issuer of the securities is willing to pay, the auction agent cannot establish a clearing rate, and the auction "fails." A failed auction prevents investors who own positions in a given issue from exiting their positions. Even if such investors have submitted sell orders in the failed auction, they cannot sell all of their securities, but must retain at least a portion of their positions. In a failed auction the interest rate on the auction rate security reverts to a pre-determined fail rate.

79.    A failed auction renders the securities illiquid for an indeterminate period of time, potentially for as long as the maturity period of the security, which can be as long as 30 years in the case of debt securities, and perpetual in the case of preferred stock. A failed auction also typically raises serious concerns about the creditworthiness of the issuer. Thus, failed auctions are typically self-perpetuating. That is, once an auction fails, it is unlikely that it will subsequently succeed at a later auction in the absence of intervention (of which none is foreseeable here).

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

80.     Additionally, when an auction fails, the issuer must pay the pre-determined fail rate until the auction succeeds.  Consequently, issuers generally do not want the auctions for the securities that they issue to fail.

81.     Auction failures result from insufficient demand for the securities in question.  Upon information and belief, Lehman received fees from issuers for serving as structuring advisor and/or initial purchaser and/or designated broker-dealer for their auction rate securities.  Upon information and belief, Lehman's relationships with issuers provided it with an incentive to prevent auction failures.

82.     Upon information and belief, Lehman routinely recommended that its customers purchase securities for which Lehman acted as structuring advisor, initial purchaser, and/or designated broker-dealer, in order to prevent failed auctions.

83.     Although a document relating to Lehman's auction rate securities practices purports to disclose that Lehman may encourage bidders to place bids to prevent failed auctions, this document does not give Lehman license to recommend securities that it knows to be highly unsuitable given the customer's clearly-articulated investment objectives, categories of eligible investments, and risk tolerance.  Lehman's purported disclosure does not give Lehman license to mislead its customers or fail to disclose material information, to place the interests of issuers above those of its brokerage customers, or to enrich itself at the expense of its customers.

84.     Upon information and belief, at the same time that Lehman was aggressively recommending the unsuitable Complex Structured Securities to Claimant, thereby propping up auctions Lehman knew to be in imminent danger of failing, Lehman was simultaneously reducing the amount of its own capital invested in the same Complex

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

Structured Securities. In effect, Lehman, upon information and belief, was swapping itself out of its positions in the Complex Structured Securities by aggressively marketing the same Complex Structured Securities to its customers, including Claimant.

85.    At present, as a result of Respondent egregious' misconduct in recommending unsuitable Complex Structured Securities that it knew to be in imminent danger of failing, Claimant has lost the ability to access or invest its approximately US $134.6 million.

### First Count
### Breach of Contract

86.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

87.    Upon opening the US Airways Account at issue, Claimant delivered an Investment Policy to Respondent on or about the time the Cash Management Account was opened. Respondent was required to recommend securities that abided by the investment objectives set forth in the Investment Policy at the time of purchase.

88.    The Investment Policy expressly listed preservation of capital and providing adequate liquidity as objectives by which Respondent was to abide.

89.    Respondent was to manage the Account per the terms of the Investment Policy.

90.    Respondent breached the Cash Management Agreement contract by investing the US Airways Account in a manner that clearly contradicted the investment guidelines issued by Claimant including the Investment Policy and the mutual

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

understanding between Respondent and Claimant at the opening of the US Airways Account.

91.    As a direct and proximate result of said breach of contract, Claimant has suffered and continues to suffer damages as alleged herein.

92.    Claimant reserves the right to expand upon or amend its account of damages suffered.

<div align="center">

**Second Count**
**Unsuitability**

</div>

93.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

94.    A broker-dealer must have reasonable grounds for believing that a recommendation is suitable.  The broker-dealer is required to practice due diligence in learning the essential facts relevant to every customer.  Respondent had a duty to know and understand the financial position and investment objectives of Claimant.  Included within this duty to know and understand, Respondent was also charged with the duty to clarify any instructions or objectives that seem ambiguous to the broker-dealer.

95.    Claimant expressly informed Respondent of its need for a diversified portfolio composed of safe, liquid securities.  Claimant communicated its investment objectives of safety of principal and liquidity.  Claimant further communicated to Respondent the categories of investments that Claimant regarded as suitable.

96.    A broker-dealer also has a duty to recommend securities only after studying them sufficiently to be informed of their nature and financial prognosis, and to disclose to customers the risks involved with purchasing any particular security.

<div align="center">

Page 23 of 33

</div>

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

97.    Respondent knew or should have known that the securities recommended by Respondent did not meet the objectives set forth by Claimant, that the securities did not fall into the categories of eligible investments that Claimant communicated to Respondent, and that the securities were not suitable.

98.    Respondent failed to disclose material information relating to the suitability of the securities.

99.    Claimant justifiably relied to its detriment on Respondent's fraudulent conduct.

100.    As a direct and proximate result of said unsuitable purchases, Claimant has suffered and continues to suffer damages as alleged herein.

101.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Third Count
## Unauthorized Purchases

102.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

103.    Respondent had a responsibility to Claimant to manage the US Airways Account in accordance with investment objectives and risk tolerance of Claimant, as outlined in the Investment Policy. Prior to effecting any trades or recommending any purchases contrary to stated investment objectives and risk tolerance, Respondent was required to obtain from Claimant formal written authorization of a switch in investment strategy and acceptance of a substantially greater amount of risk.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

104.    Nevertheless, Respondent conducted transactions on behalf of Claimant that were contrary to stated objectives without seeking formal written authorization of a change in investment strategy.

105.    Having represented to Claimant that it would abide by the provisions of the Investment Policy and invest the US Airways Account in safe, liquid securities, Respondent instead invested in complex, highly-structured, securities, all of which were issued by sellers of "contingent capital facilities" and trusts established as a source for no-recourse funding for the "redundant reserves" of an insurance company.  Lehman knew, or should have known, the purchase of said securities would pose severe risks to the safety of principal and liquidity as well as the diversification of the portfolio. Respondent did not receive formal written authorization from Claimant for such a radical change of the allocation of the US Airways Account.

106.    As a direct and proximate result of said unauthorized purchases, Claimant has suffered and continues to suffer damages as alleged herein.

107.    Claimant reserves the right to expand upon or amend its account of damages suffered.

**Fourth Count**
**Violation of 10(b) and Rule 10b-5 of the Securities Exchange Act**

108.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

109.    Respondent unlawfully employed devices, schemes, and/or artifices of fraud, omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts,

practices, and/or courses of business which operate and/or would operate as a fraud and deceit upon any person, in connection with the purchase or sale of the securities described herein.

110.    Respondent had a duty to disclose to Claimant certain material facts, including the fact that the securities Respondent was recommending were complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves," and which violated Claimant's clearly-articulated investment objectives of safety of principal and liquidity. Respondent also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimant's behalf. Respondent also had the duty to disclose the material fact that, upon information and belief, Respondent was using customer funds to support auctions of Lehman products for its own benefit. Respondent failed to disclose and inform Claimant of such material facts. From these failures, it is manifest that Respondent intended to defraud Claimant and allow it to believe that the securities recommended were suitable investments.

111.    Claimant reasonably relied upon the fraudulent misrepresentations and omissions committed by Respondent.

112.    As a direct and proximate result of said fraudulent misrepresentations and omissions, Claimant has suffered and continues to suffer damages as alleged herein.

113.    Claimant reserves the right to expand upon or amend its account of damages suffered.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

### Fifth Count
### Fraudulent Misrepresentation

114.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

115.    Respondent purported to make representations to Claimant regarding the suitability of securities, while failing to disclose certain material facts that Respondent had a duty to disclose. Respondent had a duty to disclose to Claimant certain material facts, including the fact that the securities Respondent recommended were complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves," and which at the time violated Claimant's clearly articulated investment objectives of safety of principal and liquidity. Respondent also had the duty to communicate the material fact that these securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Claimant's behalf. Respondent also had the duty to disclose the material fact that, upon information and belief, Respondent were using customer funds to support auctions of Lehman products for its own benefit. Respondent failed to disclose and inform Claimant of such material facts. From these failures, it is manifest that Respondent intended to defraud Claimant and allow it to believe that securities were being purchased and had been purchased in accordance with its investment objectives.

116.    Claimant reasonably relied on Respondent's fraudulent misrepresentations and omissions in authorizing Lehman to purchase the unsuitable securities on its behalf.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

117.    As a direct and proximate result of said fraudulent misrepresentations and material omissions and Claimant's justifiable reliance on said misrepresentations and omissions, Claimant suffered and continues to suffer damages as alleged herein.

118.    Claimant reserves the right to expand upon or amend its account of damages suffered.

### Sixth Count
### Conversion

119.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

120.    Respondent has wrongfully converted approximately US $134.6 million of the funds that Claimant invested in the US Airways.

121.    Claimant owns and has a right to possess the US $134.6 million, as the funds belong to Claimant.

122.    Respondent has deprived Claimant of its right to possess the US $134.6 million by, having intentionally exercised dominion over those funds, intentionally and without formal written authorization investing them in unsuitable, complex, highly-structured securities, virtually all of which were issued by trusts set up as "contingent capital facilities" and trusts established to fund "redundant reserves." Claimant cannot sell these securities and therefore cannot access or use the US $134.6 million in funds.

123.    Upon information and belief, Respondent has also deprived Claimant of its right to possess the funds by using them to prop-up auctions in danger of failing. Specifically, Respondent used Claimant's money in an ultimately unsuccessful attempt to ensure that certain auctions would clear.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

124.    Respondent's actions constitute an unauthorized deprivation of Claimant's possessory rights in the approximately US $134.6 million and thus constitute a conversion of these funds.

125.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Seventh Count
### Negligence

126.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

127.    As Claimant's broker, Respondent owed Claimant a duty to recommend securities only after studying them sufficiently to be informed as to their nature and financial prognosis, a duty to inform the Claimant of the risks involved in purchasing or selling the securities, and a duty not to misrepresent facts material to the transaction.

128.    Respondent breached these duties by negligently recommending securities that it either knew, or should have known, failed to satisfy Claimant's investment objectives. Respondent breached these duties by negligently failing to inform Claimant of the severe risks to the safety and liquidity of the portfolio that these securities posed.

129.    Claimant has been injured and has sustained damages thereby as alleged herein.

130.    Respondent's negligence was the direct and proximate cause of Claimant's injuries and damages.

131.    Claimant reserves the right to expand upon or amend its account of damages suffered.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

## Eighth Count
## Gross Negligence

132.    Claimant incorporate by reference the foregoing paragraphs as if fully set forth herein.

133.    In injuring Claimant as described herein, Respondent not only acted carelessly but was so careless that it was equivalent to recklessness.

134.    Respondent's conduct evidences a reckless disregard for the rights of Claimant.

135.    As such, Respondent committed gross negligence.

136.    Claimant has been injured and has sustained damages thereby as alleged herein.

137.    Respondent's gross negligence was the direct and proximate cause of Claimant's injuries and damages.

138.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Ninth Count
## Failure to Supervise

139.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

140.    Lehman was responsible for supervising its employees who committed the various violations described herein.  Lehman failed to supervise reasonably to prevent said violations.  Lehman failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

purchases in the US Airways Account. Had Lehman implemented and enforced protocols for the review of purchases made by its employees, it would have known that unsuitable securities were recommended, that material misrepresentations and omissions were made, and that securities regulations were violated.

141.    It is manifest that Lehman failed to maintain and enforce a proper system of internal supervision over its employees. Lehman failed to provide adequate instruction with regard to recommendations made by its registered representatives.

142.    As a direct and proximate result of said failure to supervise, Claimant has suffered and continues to suffer damages as alleged herein.

143.    Claimant reserves the right to expand upon or amend its account of damages suffered.

## Tenth Count
### Rescission

144.    Claimant incorporates by reference the foregoing paragraphs as if fully set forth herein.

145.    The Private Placement Memoranda for many of the currently illiquid private placements in US Airways' Account state that the sale of the security to an investor who has not signed the Purchaser's Letter will be deemed null and void.

146.    Lehman's failure to acquire signed Purchaser's Letters for the private placement securities purchased on Claimant's behalf represents a substantial and material breach of the conditions laid out in the Private Placement Memoranda for the securities. Accordingly, the breach authorizes the rescission of the private placement security purchases which Respondent made for the US Airways Account.

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

147.    Furthermore, Lehman's recommendation of unsuitable and unauthorized securities for the US Airways' Account, and the fraudulent misrepresentations and omissions made by Lehman to Claimant, represent substantial and material breaches of the conditions laid out in the Investment Policy. Accordingly, these breaches authorize the rescission of the purchases of all currently illiquid securities which Respondent made for the Account.

148.    Respondent's breaches of the conditions laid out in the Purchaser's Letters, and the Investment Policy have damaged Claimant as described above.

149.    Claimant reserves the right to expand upon or amend its account of damages suffered.

### Prayer for Relief

150.    WHEREFORE, Claimant requests the following relief:

    a.    An order declaring that Respondent mismanaged Claimant's Account and violated the investment objectives and compelling Respondent to purchase from Claimant all currently illiquid securities, amounting to US $134.6 million, at par plus accrued interest; and

    b.    An award against Respondent for:

        i.    Damages in an amount to be determined at arbitration;

        ii.    Punitive damages of triple the damages suffered for a total of US $492 million;

        iii.    Interest;

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATIONS
DRAFT

        iv.  Reasonable attorneys' fees and costs of suit; and

        v.  Such other relief as is just, fair, and equitable.

Dated: January __, 2009
      New York, New York

                           Respectfully submitted,

                           KOBRE & KIM LLP

                           _____

                           Michael S. Kim
                           Robert W. Henoch
                           Ian N. Levy

                           800 Third Avenue
                           New York, New York 10022
                           Tel: 212.488.1200
                           Fax: 212.488.1220

                           *Attorneys for US Airways, Inc.*

# EXHIBIT A

# US AIRWAYS GROUP, INC.
## POLICIES AND PROCEDURES GOVERNING THE INVESTMENT OF COMPANY FUNDS
### JUNE 13, 2007

**I.    INTRODUCTION**

The policies and procedures contained herein will govern the manner in which the funds of US Airways Group, Inc. (the "Company") and its subsidiaries as applicable are to be invested. Such policies and procedures have been approved by the Company's Finance Committee of the Board of Directors (the "Committee") and any amendments thereto require the approval of the Committee.

**II.    PURPOSE**

A.    In general, it is the purpose of this policies and procedures statement to outline the philosophy and attitude, which will guide the investment of Company Funds toward the desired investment goals. It is intended to be sufficiently specific to be meaningful, yet adequately flexible to be practical.

B.    More specifically, the policies and procedures are set forth for the following purposes:

    1.    To establish a clear understanding of the objectives, policies and guidelines for investment of Company Funds.

    2.    To provide guidance to any third party on the investment of Company Funds.

    3.    To establish a basis for evaluating investment results.

**III.    DEFINITIONS**

A.    "Funds" represents the Company's investable unrestricted cash including "Restricted Funds" where the Company has control over the investments.

B.    "Investment Portfolio" is the aggregate of all cash investments. The Investment Portfolio will consist of two components, the "Liquidity Portfolio" and the "Return Portfolio".

1

C.    "Liquidity Portfolio" will include Funds needed for current operating expenses and capital requirements and also invested according to all debt and other covenants. The stated value of the Liquidity Portfolio should be not less than $750 million, unless the total of Funds is less than $750 million.

D.    "Return Portfolio" will include Funds available for longer-term investment. The amount available for investment in the Return Portfolio shall be Funds in excess of the Liquidity Portfolio.

E.    "Restricted Funds" are those encumbered Funds which legally collateralize credit obligations of the Company. The Company should strive to have Restricted Funds invested in accordance with this policy. At times, Restricted Funds may be invested outside of this policy, as the Company may have no decision regarding the investment of these funds. The Senior Investment Committee shall be made aware of all instances in which Restricted Funds are invested outside of this policy.

## IV.    INVESTMENT PORTFOLIO GOALS

A.    To comply with all debt and other covenants.

B.    To preserve capital.

C.    To provide adequate liquidity.

D.    Within the constraints of capital preservation and liquidity requirements, the goal is to optimize after tax return on investments in instruments for which there exists an active market.

## V.    INVESTMENT PORTFOLIO POLICIES

A.    The Chairman, Chief Executive Officer ("CEO"), the President, Chief Financial Officer ("CFO"), Controller or the Treasurer may act to implement the investment of Company Funds, including directing the purchase and/or sale of eligible securities within the established investment guidelines and to allocate funds to third parties (see V.C.). Any transactions exceeding $50 million require the approval of both the CFO and Controller or Treasurer.

2

B.   On a day-to-day basis there may be a need to delegate investment authority to other employees of the Finance Department who are knowledgeable of the Investment Policy. Such authority is limited to $50 million. The delegation of authority will be set forth in writing and specifying the names of the other personnel to whom the authority to make investment decisions shall be delegated along with the dollar limit of the delegation. All requests to delegate investment authority must be approved by the CFO or CFO and Treasurer if the Treasurer is delegating authority. The delegation limits are as follows:

1.   Managing Director - $50 million
2.   Director - $40 million
3.   Manager - $30 million
4.   Analyst - $20 million

C.   The Company may employ one or more third parties (typically broker/dealers) to assist in the investing of all or a portion of the Company's Funds. Such parties shall be granted discretion to purchase and sell eligible securities in accordance with this policies and procedures statement after discussion with management. The appointment of the third party, custodial entities and related allocation of funds require the approval of the CFO and the Treasurer, or if the position is vacant, one other member of the Senior Investment Committee. (See V.H.)

D.   The Company expects to receive "best execution" on purchases and sales.

E.   Upon the maturity of an investment, to the extent such Funds are not needed to meet current operating needs, principal and interest shall be reinvested immediately upon receipt so that there is no idle cash.

F.   The approval of the CEO, the President, the CFO, the Controller or the Treasurer (or their designees) shall be required to authorize the transfer of Funds among the various Company commercial bank or investment accounts for purposes other than those required in the normal course of business, i.e., wire transfer payments, concentration of funds, movement between operating accounts, internally directed investments, etc.

3

G.    A Senior Investment Committee will be established to review the Investment Portfolio at least once a quarter.  Such committee will be comprised of at least the CFO, the Controller, the Treasurer, the Managing Director Corporate Finance and the employee responsible for Corporate Audit.

## VI.    INVESTMENT PORTFOLIO GUIDELINES

A.    Funds needed for current operating expenses and capital requirements, known as the Liquidity Portfolio, must maintain a balance of $750 million and be invested according to all debt and other covenants, unless the total of Funds is less than $750 million in which all Funds should be categorized as part of the Liquidity Portfolio.

Funds available for longer-term investment, known as the Return Portfolio, will consist of all funds in excess of $750 million.

B.    The investment goals of the Liquidity Portfolio shall be:

1.    To comply with all debt and other covenants.

2.    To preserve capital by maintaining a target average duration over a market cycle of approximately one to three months and by maintaining a maximum duration of individual securities of < one year.

3.    To provide liquidity for operating expenses and capital requirements by maintaining a minimum of $200 million of the Liquidity Portfolio in securities with a duration of $\leq$30 days.

4.    To earn a total rate of return (net of fees and expenses) in excess of the return on the three-month Treasury Bills, plus any spread to be established by the Senior Investment Committee from time to time over a rolling twelve (12) month period or to earn a return in excess of the Government Institutional category on the iMoneyNet money fund report.

4

C.   The investment goals of the Return Portfolio shall be:

   1.   To preserve capital

   2.   To earn a higher return than the Liquidity Portfolio by maintaining a target average duration determined periodically by the Senior Investment Committee with a maximum duration of individual securities of five (5) years.

   3.   To earn a total rate of return (net of fees and expenses) established by the Senior Investment Committee based on current portfolio duration.

D.   Any investment which would exceed the investment durations set forth above shall require Finance Committee approval.

E.   All decisions regarding investment duration shall take into consideration expectations of future interest rate fluctuations.

F.   Eligible Investments

   1.   Direct obligations of the US Treasury such as Treasury Bills, Treasury Notes and Treasury Bonds.

   2.   Securities issued or guaranteed by the US Government, its agencies or instrumentalities   Obligations issued by US Government agencies and instrumentalities include such obligations as Government National Mortgage Association pass-through certificates (supported by the full faith and credit of the United States); securities of Federal Home Loan Banks (supported by the right of the issuer to borrow from the Treasury); and Federal National Mortgage Association obligations (sponsored by the US Government and supported by the credit of the instrumentality).

5

3.    Certificates of Deposit ("CD's"), Time Deposits ("TD's") and Bankers' Acceptances ("BA's")  CD's are short-term negotiable obligations of commercial banks.  TD's are non-negotiable deposits maintained in banking institutions for specified periods of time at stated interest rates.  BA's are time drafts drawn on commercial banks, usually in connection with international transactions.  CD, TD and BA investments are limited to those instruments issued by institutions with total assets in excess of $2 billion, and where the long term obligations are rated "A" or better by Moody's and "A" or better by Standard & Poor's and the short-term deposits are rated A-1 and P-1, respectively.  The foregoing investment guidelines for CD's and TD's may be set aside to the extent that Company indebtedness with a commercial bank may be offset by any outstanding investments or other accounts with the same commercial bank.

4.    Commercial Paper  Short-term, unsecured, negotiable promissory note of a domestic or foreign company. Commercial paper must have a rating of A2 and/or P2 or better by any two Nationally Recognized Statistical Rating Organizations (NRSRO).

5.    Money Market Mutual Funds ("Money Funds")  No-load mutual funds which seek to maximize current income for shareholders consistent with the preservation of capital by investing in a diverse portfolio of high quality, short-term instruments.  The funds strive to maintain a constant share price and offer daily purchase and redemption privileges.  The ratings of the issue/issuer must have a long term debt rating of "A" or better by any two NRSRO.

6.    Fixed and Floating Rate Corporate Debentures and Medium-Term Notes  Short to medium-term debt issuances of major corporations and financial institutions.  The ratings of the issue/issuer must have a long term debt rating of "A" or better by any two NRSRO.

7.    Asset-backed Securities  Securities collateralized with consumer receivables, such as automobile loans, credit card receivables, or home equity loans, which are owned by the issuer, but placed with a trustee for the benefit of the investor.  Asset-backed securities must be rated Aaa by Moody's Investor Services or AAA by S&P with a maximum final stated maturity of five (5) years.

8.    Mortgage Pass-Through Securities  Securities collateralized with residential mortgage loans, the principal and interest payments of which are distributed, or "passed-through" to the investor.  Many of these securities are issued by agencies of the federal government, including GNMA and FHLMC.  These securities must be issued by US government agencies with a maximum stated final maturity of five (5) years.

6

9.    <u>Collateralized Mortgage Obligations (CMOs)</u>   Classes of bonds which redistribute the cash flows of mortgage securities (and whole loans) to create securities which have different levels of prepayment risk, as compared to the underlying mortgage securities.  CMOs must be rated Aaa or AAA with stable cash flow characteristics and a duration of five (5) years or less under reasonable prepayment scenarios.

10.    <u>Tax-Exempt and Tax-Advantages Securities</u>   Limited to issues rated MIG1, A1, P1, or AA, or higher.

   a.    <u>Tax-exempt commercial paper</u>   Short-term commercial paper issued by tax-exempt entities.

   b.    <u>Variable rate demand obligations</u>   Long-term obligations of tax-exempt entities which have variable interest rates, and which reset periodically based on a specified index and formula.  Because these obligations always have current market interest rates, they trade near their par value, and thus, are considered short-term instruments.

   c.    <u>Fixed rate, fixed maturity municipal notes,</u> including long-term notes with a "put" at the sole option of the investor.

   d.    <u>"Dutch auction" rate preferred stock</u> (including tax-exempt trusts) rated AA or higher.  These are preferred stock issues, the dividend rate of which is established periodically by means of a Dutch auction, wherein all investors receive the highest dividend rate which "clears" the market.  Under current tax law, portions of dividends received by the Company from investments in preferred stock are subject, under certain condition, to exclusion from income for purposes of calculation of corporate income tax.

   The dividends from preferred stock issued by tax-exempt trusts are 100% free from federal corporate income tax.

11.    Any and all investments are specifically limited to those types of investments noted above.

12.    All investments must be denominated in US dollars.

G.    Investment Concentration Limitations

    1.    <u>Issuer limitation</u>  No more than 5% of the Investment Portfolio may be invested in securities of any single issuer, with the exception of the US government obligations, where no limit is imposed.

    2.    <u>Money Market Mutual Funds</u>  No limits in the aggregate.  However, the use of such funds are intended principally to invest residual amounts of "idle cash" and not as a principal investment vehicle unless the operating cash requirements as determined by the CFO or Treasurer warrants such investment.  The Money Market Mutual Fund's policies and guidelines shall closely match those of the Company as outlined in this policies and procedures statement.

    3.    <u>Corporate notes, CMOs and asset-backed securities</u>  Each of these categories is limited to a maximum of 30% of the portfolio.

## VII.  REPORTING AND REVIEWS

A.    Internal Reports

A summary listing of the Investment Portfolio shall be prepared by the Treasury Department and included in the Company's Investment Summary, including the following information:

- Name of financial institution, broker or Investment Manager
- Name of custodial entity, if applicable
- Investment Vehicle
- Interest rate and/or yield
- Maturity date
- Investment term
- Other pertinent information (i.e., securities involving market value different than underlying cost)

B.    Transactions and Investment Portfolio Holdings

    1.    Monthly statements of holdings and account activity are required from all custodians.  Reporting shall be on a calendar month end basis.

2.    The Treasurer and the Managing Director Corporate Finance shall review the Company's holdings on a weekly basis.

C.    Investment Portfolio Performance

1.    Reported and reviewed quarterly by the Senior Investment Committee.

2.    Evaluation of performance versus the stated objectives shall be performed by the Finance Committee of the Board of Directors at regularly scheduled Board of Directors meetings.

3.    The Senior Investment Committee will review (performance, compliance, etc.) of all third parties assisting the Company in the investing of Funds on at least an annual basis.

## VIII. AMENDMENTS

This policies and procedures statement is subject to amendment or change from time-to-time by the Company.  Any changes must be approved by the Finance Committee of the Board of Directors and communicated in writing.

# EXHIBIT B

**CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED
DISCRETIONARY AUTHORIZATION**

> **IMPORTANT CLIENT DISCLOSURE:** Your account is a brokerage account and not an advisory account. Our interests may not always be the same as yours. Please ask us questions to make sure you understand your rights and our obligations to you, including the extent of our obligations to disclose conflicts of interest and to act in your best interest. We are paid both by you and, sometimes, by people who compensate us based on what you buy. Therefore, our profits, and our salespersons' compensation, may vary by product and over time. If you have any questions regarding the specific nature of your account or the obligations owed to you, please contact the business control group at 212-526-9966.

### CASH MANAGEMENT BROKERAGE AGREEMENT AND LIMITED DISCRETIONARY AUTHORIZATION

This Cash Management Brokerage Agreement and Limited Discretionary Authorization (the "Agreement"), dated as of                , is entered into by and between Lehman Brothers Inc. ("Lehman Brothers") and America West Airlines, Inc. (the "Client") wherein the Client directs Lehman Brothers to handle the cash account referenced on Schedule I hereto pursuant to the instructions set forth in Schedule II (the "Account").

1.    **Investment Guidelines.** Lehman Brothers is to invest and reinvest the securities, cash and/or other investments held in the Account and to engage in such transactions as directed by the Client, provided; however, that all investments, reinvestments and transactions by Lehman Brothers shall at all times comply with the investment guidelines of Client attached hereto as Schedule II, which may be amended from time to time by the Client in writing. In connection with the handling of this account, Lehman Brothers is entitled to rely on the financial and other information provided by Client. Client agrees to inform Lehman Brothers promptly in writing of any material change in Client's circumstances or objectives which might affect the manner in which Client's assets should be invested and to provide Lehman Brothers with such other information as it shall reasonably request.

_____ Client understands that:

_____ Where the investment guidelines in Schedule II specifically state a limit or percentage of the Account to an issuer or security type, Lehman Brothers will interpret this to represent a parameter to be considered at the time of purchase only.

_____ Where the investment guidelines in Schedule II place a dollar limit to an issuer or security type, Lehman Brothers will not include accrued interest in this calculation. All securities will be valued at "par".

_____ Where the investment guidelines in Schedule II permit investments in securities that have perpetual interest rate reset features such as auction rate securities or floating rate notes, Lehman Brothers will calculate the maturity based on the rate reset period.

_____ For new debt issued by US Agencies, Lehman Brothers uses the "implied issuer ratings" as specific-issue ratings for these types of agency securities.

If the above discussion conforms with Client's interpretation of the Account's investment guidelines in Schedule II, please acknowledge by initialing in the space provided next to each item. If this is not the case, please contact your corporate cash manager.

**2.      Other Services.** Client will be furnished with confirmations of Account transactions and Account statements monthly. Client is responsible for reviewing statements and confirming and reporting any discrepancies to Lehman Brothers.

To the extent possible, Lehman Brothers will, at Client's option, maintain custody of the assets held in the Account, in which case it will, at no additional charge, credit the Account with dividends and interest paid on securities held in the Account and with principal paid on called or matured securities as and when received. If Lehman Brothers has custody of the assets, it will be responsible for the timely presentment of called bonds, but when assets are custodied elsewhere, Lehman Brothers will not be responsible for such redemptions. If the assets in the Account are custodied outside Lehman Brothers, Client shall instruct the custodian to provide Lehman Brothers with such periodic reports concerning the status of the Account as Lehman Brothers may reasonably request from time to time. The Client will not change the custodian without giving Lehman Brothers reasonable prior notice of its intention to do so together with the name and other relevant information with respect to the new custodian.

**3.      Discretionary Authorization.** Client hereby grants Lehman Brothers limited discretionary authorization, pursuant to and in accordance with Schedule II. Pursuant to such authorization, Lehman Brothers may and at Client's risk, purchase, sell, exchange, convert and otherwise trade in the securities and other investments in the Account, as well as arrange for delivery and payment in connection with the above, and act on behalf of the Client in all other matters necessary or incidental to the handling of the Account pursuant to and in accordance with Schedule II. Should Client appoint a custodian other than Lehman Brothers in connection with the Account, Client grants Lehman Brothers full authorization to issue such instructions to and engage in such transactions with custodian as may be appropriate in connection with the management of the Account.

This limited discretionary authorization is in addition to (and in no way limits or restricts) any rights which the parties hereto may have under any other agreement or agreements between the Client and Lehman Brothers.

The discretionary trading authorization is a continuing one and shall remain in full force and effect until terminated by Client or Lehman Brothers pursuant to the provisions of paragraph 10 of this Agreement. The termination of this authorization will constitute a termination of this Agreement. To terminate this authorization, the Client hereby agrees to submit a written notice addressed to Lehman Brothers at the address set forth on Schedule IV hereto, but such revocation shall not affect any liability in any way resulting from transactions initiated prior to such revocation.

This agreement shall inure to the benefit of the parties hereto and their respective successor corporation(s) or assigns.

4.    **Execution Services.** Lehman Brothers will act as a broker/dealer or use an affiliate as broker/dealer, although unaffiliated broker/dealers may be used as well. In selecting broker/dealers for a particular transaction, Lehman Brothers may consider all relevant factors, including the execution capabilities required by the transaction, the importance of speed, efficiency or confidentiality, familiarity with sources from whom or to whom particular securities might be purchased or sold, as well as any other relevant matters. Lehman Brothers may select broker/dealers which provide it with research or other transaction-related services and such research and other services may be used for its own and for other client accounts to the extent permitted by law.

In that this is a brokerage account, Client acknowledges and agrees that the rules governing investment advisers are not applicable. Accordingly, Lehman Brothers may execute transactions in a principle or agency capacity based on its discretionary trading authority, subject to applicable rules governing a broker/dealer and in accordance with Schedule II. In no event will Lehman Brothers or its affiliates be obligated to effect any transaction for Client which it or they believe would violate any applicable state or federal law, rule or regulation, or of the regulations of any regulatory or self-regulatory body.

5.    **Conflicts of Interest.** Client understands that the Account may be invested in investment products or services, including sweep vehicles, from which Lehman Brothers or its affiliates derive compensation and which Lehman Brothers has an incentive to use instead of other similar investments which could be more or less beneficial for Client. Client further understands that Lehman Brothers and its affiliates act in various capacities with respect to such products and services and receive fees for doing so. This Agreement shall have no effect on the application to Client of the terms of products or services that the Client invests in from which Lehman Brothers or its affiliates derive compensation.

The Client understands that transactions may be effected with Lehman Brothers as principal or dealer, or through Lehman Brothers as agent or broker, and that any such purchase may involve securities in the distribution of which Lehman Brothers may have an interest as underwriter, member of selling group, or otherwise.

6.    **Valuation.** Any securities or investments in the Account shall be valued at amortized cost or in such other manner as Lehman Brothers reasonably determines reflects fair market value. To the extent possible, all valuations will be performed by an independent portfolio information service, and will be relied upon by Lehman Brothers. Any valuation shall not be deemed a guarantee of any kind whatsoever with respect to the value of the assets of the Account.

7.    **Client Authority.** No written notice shall affect, in any matter, Lehman Brothers' rights under this Agreement with respect to any obligation arising prior to actual receipt of such written notice. Client represents and warrants that at all times during the term of the Agreement, (i) this Agreement has been duly authorized, executed and delivered by the Client and constitutes its

valid and binding obligation, enforceable against the Client in accordance with its terms, (ii) no governmental authorizations, approvals, consents or filings are required in connection with the execution, delivery or performance of this Agreement by the Client, (iii) the execution, delivery and performance of this Agreement by the Client will not violate or result in any default under the Client's certificate of incorporation or by-laws (or equivalent constituent documents), or any provision of any plan or trust governing the assets in the Account, any contract or other agreement to which the Client is a party or by which it or its assets may be bound or any statute or any rule, regulation or order of any governmental agency of body, (iv) the list of signatures attached hereto as Schedule III constitutes the valid signatures of all persons authorized by the Client to take action with respect to the Account (or all such persons to whom Client has delegated fiduciary responsibility to take action with respect to the Account) and Lehman Brothers shall be entitled to rely conclusively on any document executed by any of them, and (v) the Client is not an investment company (as that term is defined in the Investment Advisers Act of 1940). If the Client is an organization, the organization has authorized and empowered each of the individual(s) listed hereto as Schedule III to act on behalf of the organization; to open one or more accounts; enter orders; make and receive payments of money; give instructions; register, deliver, and accept delivery of securities; enter into and execute agreements and do all things necessary or advisable to effect transactions in all matters and business relating to the account.

**8.    Duty of Care.** Lehman Brothers is acting in the capacity of a broker in handling the Account and as such will handle the Account of Client in accordance with the responsibilities as required by the federal securities laws and the rules imposed by the self regulatory organizations, including the New York Stock Exchange, the National Association of Securities Dealers, and in accordance with Schedule II. Neither Lehman Brothers nor any of its officers, directors or employees shall be responsible hereunder for any action, performed or omitted to be performed in good faith, or for any errors in judgment in managing the Account other than those caused by failure to comply with Schedule II, gross negligence or willful misconduct. Client acknowledges that Lehman Brothers does not warrant the rate of return on or the market value of the investments in the Account. Lehman Brothers and its officers, directors and employees shall not be responsible for any loss incurred by reason of any act or omission of any broker, dealer or custodian; provided, however, that Lehman Brothers will make reasonable efforts to require that brokers/dealers perform their obligations with respect to the Account.

**9.    Confidentiality.** All material and information supplied by Client to Lehman Brothers, including but not limited to information concerning Client's marketing plans, investment strategy, business methods and financial results, is confidential and proprietary to Client ("Confidential Information"). Lehman Brothers will not disclose, sell or in any way transfer Confidential Information to any third party, unless it received Client's prior written approval of each such use. Upon written request or upon the termination of this Agreement, Lehman Brothers shall return to Client all Confidential Information in Lehman Brothers possession or control. This paragraph 9 will survive termination of this Agreement.

**10.    Termination of Agreement.** This Agreement may be terminated at any time upon written notice by either party and termination will become effective upon receipt of such notice. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination, including the provisions

regarding arbitration which shall survive any expiration or termination. Upon the termination of this Agreement, Lehman Brothers shall be under no obligation whatsoever to recommend any action with regard to, or to liquidate, the securities or other investments in the Account. Lehman Brothers retains the right, however, to complete any transaction open as of the termination date and to retain amounts in the Account sufficient to effect such completion. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding the disposition of any assets held in the Account and Lehman Brothers shall comply with such instructions. Client is responsible for providing Lehman Brothers with the name of another custodian at the time the Agreement is terminated if Client chooses not to maintain custody of the Account with Lehman Brothers.

**11. Arbitration.**

**This agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:**

**(a) Arbitration Disclosures.**

- **All parties to this agreement are giving up their right to sue each other in court, including the right to trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**
- **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**
- **The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**
- **The arbitrators do not have to explain the reason(s) for their award.**
- **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**
- **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**
- **The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.**

(b) Arbitration Agreement.

**Client and Lehman Brothers agree that all claims or controversies arising from or relating to the construction, performance or breach of this Agreement, or relating to any Account referenced herein, shall be resolved by arbitration conducted only at the New York Stock Exchange, Inc., National Association of Securities Dealers, Inc. or the American Stock Exchange, Inc., or any other self-regulatory organization or exchange of which Lehman Brothers or any affiliated broker/dealer is a member. Client may elect which of these arbitration forums shall hear the matter by sending a registered letter or telegram to: Lehman Brothers Inc., General Counsel's Office, 399 Park Avenue, New York 10022. If the Client fails to make such election before the expiration of ten (10) days after receipt of a**

written request from Lehman Brothers to make such election, Lehman Brothers shall have the right to choose the forum.

Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

The foregoing agreement to arbitrate does not entitle Client to obtain arbitration of claims that would be barred by the relevant statute of limitations, if such claims were brought in a court of competent jurisdiction. If at the time that a demand for arbitration is made or an election or notice of intention to arbitrate is served, the claims sought to be arbitrated would have been barred by the relevant statute of limitations or other time bar, any party to this Agreement may assert the limitations as a bar to the arbitration by applying to any court of competent jurisdiction, and Client expressly agrees that any issues relating to the application of a statute of limitations or other time bar are referable to such court. The failure to assert such bar by application to a court, however, shall not preclude its assertion before the arbitrators.

12.    Miscellaneous  In the event of any change in the identity or powers of persons authorized to act on the Client's behalf, the secretary or other designated officer of Client shall notify Lehman Brothers in writing which notification, when received, shall be adequate both to terminate the authorization of the persons previously authorized, and to authorize the persons thereby substituted.

Client agrees to promptly notify Lehman Brothers if it or any other persons or entities having a beneficial interest in the account are or become restricted, as such term is defined in the NASD's Rule 2790, from purchasing securities in certain public offerings.

Each of the parties hereto reserves the right to refuse to accept or renew this Agreement in its sole discretion and for any reason.

All paragraphs headings in this Agreement are for convenience of reference only, do not form part of this Agreement, and shall not affect in any way the meaning and interpretation of this Agreement.

Except for the election described in Section 11 hereof which shall be sent to the address set forth in such Section 11, all other written communication to Lehman Brothers from Client pursuant to this Agreement shall be sent to Lehman Brothers at the address set forth on Schedule IV hereto. All written communications to Client from Lehman Brothers shall be sent to the address set forth on Schedule IV hereto.

Neither party shall use the other party's name as a commercial reference to potential clients without the other party's prior written consent, which consent may be withheld at other party's sole discretion.

*[Remainder of this page has been intentionally left blank; signature page follows.]*

America West Airlines, Inc.

By: _Thomas T. Weir_ (signature)

Name: _Thomas T. Weir_

Title: _Vice President & Treasurer_

Lehman Brothers Inc.

By: _____

Name: _____

Title: _____

Date: _____

## SCHEDULE I

Account Name: America West Airlines, Inc.

Account Number:

**SCHEDULE II**

**INVESTMENT GUIDELINES**

**[MUST BE COMPLETED/PROVIDED BY THE CLIENT]**

**SCHEDULE III**

Persons Authorized to take Action on behalf of the Account:

| Signature | | |
|---|---|---|
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |
| Signature | | |
| Print Name | Title | Date |

## SCHEDULE IV

### Addresses for Notices

If to Lehman Brothers, addressed to:

Lehman Brothers Inc.
10250 Constellation Blvd.
25th Floor
Attn: Roland Hansalik
Los Angeles, CA 90067

In copy to: Lehman Brothers Inc.
10250 Constellation Blvd.
25th Floor
Attn: Melody Li
Los Angeles, CA 90067

If to Client, addressed to:
America West Airlines, Inc.
4000 E. Sky Harbor Blvd.
Mail Code CH-TRY
Phoenix, AZ 85034