**CURTIS, MALLET-PREVOST,**
**COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Tel.: (212) 696-6000
Fax : (212) 697-1559
Turner P. Smith (TS 8052)
L. P. Harrison 3rd (LH 5540)
Myles K. Bartley (MB 8431)

*Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                          :       Chapter 11
In re:                                                    :
                                                          :       Case No.:  08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                   :
                                                          :
                    Debtors.                              :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                          :
LEHMAN BROTHERS SPECIAL FINANCING INC.,                   :
                                                          :
                    Plaintiff,                            :
                                                          :
             -against-                                    :       Adversary Proceeding
                                                          :       No.: 11-_____ (JMP)
AMERICREDIT FINANCIAL SERVICES INC.,                      :
AMERICREDIT AUTOMOBILE RECEIVABLES                        :
TRUST 2005-B-M, AMERICREDIT                                :
AUTOMOBILE RECEIVABLES TRUST 2007                         :
-B-F, AND AMERICREDIT AUTOMOBILE                          :
RECEIVABLES TRUST 2007-D-F,                               :
                                                          :
                    Defendants.                           :
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## ADVERSARY COMPLAINT

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

Plaintiff Lehman Brothers Special Financing Inc. ("LBSF" or "Debtor"), a debtor in possession in the above-captioned jointly administered chapter 11 case, as for its Adversary Complaint against the AmeriCredit Automobile Receivables Trust 2005-B-M (the "2005 B-M Trust"); AmeriCredit Automobile Receivables Trust 2007-B-F (the "2007 B-F Trust"); and AmeriCredit Automobile Receivables Trust 2007-D-F (the "2007 D-F Trust," together with the 2007 B-F Trust, the "2007 Trusts" and, together with the 2005 B-M Trust, the "Trusts"), acting through AmeriCredit Financial Services Inc., in its capacity as servicer ("AmeriCredit" and, together with the Trusts, the "Defendants"), hereby alleges as follows:

## INTRODUCTION

1.       This adversary proceeding arises out of the Trusts' breach of their express contractual obligations concerning the proper valuation of amounts due to the Debtor upon the termination of certain interest rate swaps and their breach of the implied covenant of good faith and fair dealing inherent in the parties' contracts.

2.       LBSF entered into certain interest rate swaps with each Trust as an issuer-trust in separate automobile receivables securitizations sponsored and serviced by AmeriCredit. Under the securitizations, the Trusts issued an aggregate of $3.85 billion principal amount of fixed and variable rate notes and entered into the interest rate swaps with LBSF with respect to the variable rate tranches of notes. The Trusts were the fixed rate payers under the swaps, and LBSF was the floating rate payer, with the floating rate based on the one-month U.S. Dollar LIBOR interest rate plus a spread.

3.       AmeriCredit is the sponsor and servicer for the Trusts. Under the Servicing Agreements (defined below), AmeriCredit acts as agent for the Trusts to manage and administer the receivables and to perform certain other duties on behalf of the Trusts including

terminating the interest rate swaps and calculating the Early Termination Payments (defined below).

4.    It is undisputed that Defendants elected to terminate the swaps due to the commencement of a bankruptcy proceeding of Lehman Brothers Holdings Inc. ("LBHI").

5.    Under the express terms of an interest rate swap agreement, the 2005 B-M Trust and LBSF agreed to the standard Second Method and Market Quotation measure for determining Early Termination Payments.  Under this method, the 2005 B-M Trust was required to solicit quotations from four swap dealers as of, but not before, the Early Termination Date (defined below).  In the event fewer than three market quotations were received from swap dealers, the 2005 B-M Trust was required to use the Second Method and Loss measure for determining the Early Termination Payment.  Under the Second Method and Loss, the 2005 B-M Trust was required to reasonably determine in good faith its losses and costs or gain in connection with the termination of the 2005 Interest Swap (defined below) as of, but not before, the Early Termination Date, and the 2005 B-M Trust was permitted to refer to quotations of "relevant rates or prices from one or more leading dealers in the relevant markets."

6.    Under the express terms of the interest rate swap agreements with the 2007 Trusts, the 2007 Trusts and LBSF agreed to a modified Second Method and Market Quotation measure for determining the Early Termination Payment.  Using this measurement for both swaps, each of the 2007 Trusts was obligated to pursue bids, acting in a commercially reasonable manner, from potential replacement counterparties for replacement transactions with substantially the same terms and to provide to LBSF the consideration paid by the actual replacement counterparty to such 2007 Trust.

7.    In derogation of their contractual obligations, however, the Defendants failed to solicit bids and calculate the Early Termination Payment under any of the swaps in the

manner required by the relevant agreements, and substantially undervalued – and dramatically underpaid – the Early Termination Payments to which LBSF was contractually entitled.[1]

8.    Under each agreement, AmeriCredit, on behalf of the Trust that was LBSF's counterparty, determined the amounts due to LBSF. AmeriCredit has acknowledged that the determination of the amounts due to LBSF was based on bids made by the replacement counterparty on or about October 14, 2008. But those bids were already significantly below the market value of the swaps at that time. Further, the Trusts did not designate an Early Termination Date under any of the swaps until November 20, 2008. During that intervening five-week period, the one-month USD LIBOR interest rate declined sharply. Because LBSF was the floating rate payer under each of the swaps, and interest rates were therefore moving in LBSF's favor, the mark-to-market value of LBSF's positions under the swaps increased significantly between October 14 and November 20, 2008, which should have increased the price paid by the replacement counterparty that assumed LBSF's positions.

9.    Despite the drastically changed market conditions, the Defendants prematurely solicited bids in mid-September and early October and failed to take steps to cause the bids for any of the swaps to be refreshed or improved in any way. The Defendants failed to (i) require the replacement counterparty to increase its bid to reflect the movement of interest rates in LBSF's favor, (ii) return to the market to seek new bids based on then-current market

---

[1] References herein to "Early Termination Payment(s)" refer to the relevant party's determination of the termination amounts payable under the Interest Rate Swap Agreements upon designation of the Early Termination Date, including both (i) the Settlement Amount or valuation (*i.e.*, the  party's determination of the mark-to-market value of LBSF's position under the terminated Transactions or of its own loss or gain in connection with the termination) and (ii) the Unpaid Amounts (*i.e.*, the net periodic payments that were owed to LBSF but had been withheld by AmeriCredit). The dispute between the parties stems almost entirely from a dispute relating to the aggregate Settlement Amount due to LBSF with respect to the terminated Transactions. However, the disputed termination payments referenced herein are unadjusted and therefore reflect some relatively minor differences in the parties' determination of the relevant Unpaid Amounts.

Also, all amounts used herein have been rounded and therefore totals may not always add up exactly to the sum of individual amounts or sub-totals.

conditions, or (iii) actively pursue an indicative bid received in October from another dealer which nearly doubled the prices offered by the replacement counterparty.

10.    Thus, by summarily accepting bids that were far below market value as of October 14 and also failing to require those bids to be improved to account for the significant increase in value between October 14 and November 20, 2008, AmeriCredit and each of the 2007 Trusts breached its obligation to act in a commercially reasonable manner in connection with the valuation of its interest rate swaps with LBSF.

11.    By prematurely soliciting bids approximately two months before the Early Termination Date, each of AmeriCredit and the 2005 B-M Trust breached its obligation to solicit quotations from four Reference Market-makers, (i) in good faith and (ii) as of the Early Termination Date. Likewise, by using the replacement counterparty's below-market bid as the sole basis for determining Loss in respect of the 2005 Interest Swap, AmeriCredit and the 2005 B-M Trust failed to determine Loss (a) in good faith in a reasonable manner, (b) as of the Early Termination Date, or (c) based on relevant interest rates under current market conditions as of such date.

12.    Instead, in all instances, the applicable Trust and AmeriCredit impermissibly solicited bids prematurely, accepted a below-market bid and relied on stale information in determining the Early Termination Payment due to LBSF under the swaps, in breach of their obligations under the relevant agreements and in violation of the implied covenant of good faith and fair dealing.

13.    In order to recover amounts properly due to LBSF from Defendants and to determine the parties' respective legal rights, duties, and obligations under their agreements, the Bankruptcy Code, and applicable non-bankruptcy law, LBSF therefore brings this action for breach of contract and breach of the implied covenant of good faith and fair dealing.

## PARTIES

14.     Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under Title 11 of the United States Code (the "Bankruptcy Code"). LBSF commenced its chapter 11 case on October 3, 2008. LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). LBSF is a corporation organized and existing under the laws of the State of Delaware, has its principal place of business located at 1271 Sixth Avenue, New York, New York 10020, and is authorized to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

15.     Upon information and belief, defendant AmeriCredit is a Delaware corporation with its principal business address at 801 Cherry Street, Suite 3900, Fort Worth, TX 76102. AmeriCredit was a subsidiary of AmeriCredit Corp., a Texas corporation headquartered in Fort Worth, Texas. Upon Information and belief, AmeriCredit Corp. was acquired by the General Motors Company and has been renamed General Motors Financial Company, Inc.

16.     Defendant 2005 B-M Trust is a Delaware statutory trust whose owner trustee is Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001.

17.     Defendant 2007 B-F Trust is a Delaware statutory trust whose owner trustee is Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001.

18.     Defendant 2007 D-F Trust is a Delaware statutory trust whose owner trustee is Wilmington Trust Company, Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890-0001.

### JURISDICTION AND VENUE

19.     This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Section 13(b)(i) of the Master Agreements (defined below).

20.     LBSF initiates this adversary proceeding pursuant to Bankruptcy Rule 7001(1), and section 105(a) of the Bankruptcy Code.

21.     Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the chapter 11 case of *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-13555 (JMP).

22.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).

23.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### BACKGROUND

24.     LBHI was formerly the fourth largest investment bank in the United States.  For more than 150 years, LBHI served the financial needs of corporations, governmental entities, institutional clients and individuals worldwide.  LBHI's former headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

25.     Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its direct and indirect subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.

26.    At all relevant times, LBSF was an indirect wholly owned subsidiary of LBHI. LBSF commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LBSF's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered, together with affiliated cases, pursuant to Bankruptcy Rule 1015(b).

27.    LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## FACTUAL ALLEGATIONS

### I.    The Interest Rate Swap Agreements

28.    In 2005 and 2007, the parties entered into a series of agreements as set out below.

### A.    2005 Agreements

29.    On or about June 2, 2005, LBSF and the 2005 B-M Trust entered an interest swap (the "2005 Interest Swap") governed by the terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement dated as of June 2, 2005 (the "2005 Master Agreement"), as supplemented and/or modified by: (i) that certain Schedule to the 2005 Master Agreement, also dated as of June 2, 2005 (the "2005 Schedule"); (ii) that certain Credit Support Annex to the 2005 Schedule, also dated as of June 2, 2005 (the "2005 Credit Support Annex"); and (iii) the Confirmation dated as of June 2, 2005 and revised as of May 9, 2007 evidencing the 2005 Interest Swap (the "2005 Confirmation" and, together with the 2005 Master Agreement, the 2005 Schedule and the 2005 Credit Support Annex, the "2005 Interest Swap Agreement").

**B.    2007 Agreements**

30.    On or about April 19, 2007, LBSF and the 2007 B-F Trust entered certain interest swaps (the "2007 B-F Interest Swaps") governed by the terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement dated as of April 19, 2007 (the "2007 B-F Master Agreement"), as supplemented and/or modified by: (i) that certain Schedule to the 2007 B-F Master Agreement, also dated as of April 19, 2007 (the "2007 B-F Schedule"); (ii) that certain Credit Support Annex to the 2007 B-F Schedule, also dated as of April 19, 2007 (the "2007 B-F Credit Support Annex"); and (iii) those certain Confirmations dated as of April 19, 2007 evidencing the 2007 B-F Interest Swaps (the "2007 B-F Confirmations" and, together with the 2007 B-F Master Agreement, the 2007 B-F Schedule and the 2007 B-F Credit Support Annex, the "2007 B-F Interest Swap Agreement").

31.    On or about September 20, 2007, LBSF and the 2007 D-F Trust entered into certain interest swaps (the "2007 D-F Interest Swaps") governed by the terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement dated as of September 20, 2007 (the "2007 D-F Master Agreement" and, together with the 2007 B-F Master Agreement and the 2005 Master Agreement, the "Master Agreements"), as supplemented and/or modified by: (i) that certain Schedule to the 2007 D-F Master Agreement, also dated as of September 20, 2007 (the "2007 D-F Schedule," together with the 2007 B-F Schedule, the "2007 Schedules" and, together with the 2005 Schedule, the "Schedules"); (ii) that certain Credit Support Annex to the 2007 B-F Schedule, also dated as of September 20, 2007 (the "2007 D-F Credit Support Annex"); and (iii) those certain Confirmations dated as of September 20, 2007 evidencing the 2007 D-F Interest Swaps (the "2007 D-F Confirmations" and, together with the 2007 D-F Master Agreement, the 2007 D-F Schedule and the 2007 D-F Credit Support Annex, the "2007 D-F Interest Swap Agreement").

32.    Pursuant to the terms of the Interest Swap Agreements, LBHI was designated as LBSF's "Credit Support Provider," guaranteeing all of LBSF's obligations thereunder. *See* Exhibit A, 2005 Schedule, 2007 B-F Schedule and 2007 D-F Schedule, at Part 4(g) (Definition of "Credit Support Provider").

**II.    Related Agreements**

33.    The notes issued by each of the Trusts are governed by an indenture between the respective Trust and Wells Fargo Bank, N.A., serving as Indenture Trustee and Collateral Agent (together the "Indentures").  LBSF, as the Swap Provider, is a secured party and third-party beneficiary under each of the Indentures.

34.    AmeriCredit is the sponsor and servicer for the 2005 B-M Trust under a Sale and Servicing Agreement, dated as of May 25, 2005 (the "2005 Servicing Agreement"), for the 2007 B-F Trust under a Sale and Servicing Agreement, dated as of April 1, 2007 (the "2007 B-F Servicing Agreement"), and for the 2007 D-F Trust under a Sale and Servicing Agreement, dated as of September 12, 2007 (the "2007 D-F Servicing Agreement" and, together with the 2005 Servicing Agreement and the 2007 B-F Servicing Agreement, the "Servicing Agreement(s)").  Under the Servicing Agreements, AmeriCredit is authorized to act as agent for the Trusts to manage and administer the receivables and to perform certain other duties on behalf of the Trusts, including terminating the Interest Swaps and calculating the Early Termination Payment.  Each Servicing Agreement also provides that AmeriCredit is required to indemnify the respective Trust for any claims or losses arising out of AmeriCredit's breach, bad faith, negligence or other wrongful conduct in the performance of its duties thereunder.  LBSF is a third-party beneficiary under each Servicing Agreement.

-10-

### III.   Key Terms in Interest Swap Agreements

35.     Under the terms of each of the Interest Swap Agreements, the commencement of a bankruptcy proceeding by either party or its respective Credit Support Provider constitutes an Event of Default.  Section 5(a)(vii) of each Master Agreement expressly provides that an Event of Default shall occur with respect to a party whenever, *inter alia*:

> [t]he party [or] any Credit Support Provider of such party . . . institute or has instituted against it a proceeding seeking a judgment of solvency or bankruptcy or any other relief under any bankruptcy or insolvency law or an other similar law affecting creditors' rights ....

Exhibit A, Master Agreements, at § 5(a)(vii).

36.     Pursuant to Section 6(a) of each Master Agreement, "[i]f at any time an Event of Default with respect to a party (the 'Defaulting Party') has occurred and is then continuing, the other party (the 'Non-defaulting Party') may, by . . . notice to the Defaulting Party . . ., designate . . . an Early Termination Date [an 'Early Termination Date"] in respect of all outstanding Transactions." *Id.* at § 6(a).

37.     Pursuant to the terms of each of the Interest Swap Agreements, an amount payable in respect of an Early Termination Date (the "Early Termination Payment") shall be determined pursuant to Section 6(e) of the Master Agreement.

38.     In Part 1(i) of the 2005 Schedule and Part 1(e) of each of the 2007 Schedules, LBSF and the Trusts mutually agreed that any Early Termination Payment payable under the relevant Interest Swap Agreement was to be calculated using the "Second Method" and the "Market Quotation" payment measure. *See* Exhibit A, 2005 Schedule, at Part 1(i); 2007 B-F Schedule, at Part 1(e); 2007 D-F Schedule, at Part 1(e). Thus, pursuant to Section 6(e) of each of the Master Agreements, the Early Termination Payment payable upon early termination of the relevant interest swaps is required to include both a "Settlement Amount" and "Unpaid

Amounts" as those terms are defined in the respective Interest Swap Agreement.  *See* Note 1 and

Exhibit A, Master Agreements, at § 6(e)(i)(3).

      39.    The term "Market Quotation" is defined in Section 14 of each of the

Master Agreements.  *See* Exhibit A, Master Agreements, at § 14 (Definition of "Market

Quotation").  In the 2007 Schedules, however, the parties mutually agreed that, if LBSF were a

Defaulting Party in respect of any Event of Default, an alternative definition of Market Quotation

would apply.  Specifically, in Part 1(k)(i) of each of the 2007 Schedules, the parties provided

that, in the event LBSF were a Defaulting Party in respect of an Event of Default, "[t]he

definition of "Market Quotation" [contained in Section 14 of the 2007 Master Agreements] shall

be deleted in its entirety and replaced with the following":

> "*Market Quotation*" means, with respect to one or more Terminated
> Transactions, a Firm Offer which is (1) made by a Reference Market-
> maker that is an Eligible Replacement, (2) for an amount that would be
> paid to [the Trust] (expressed as a negative number) or by [the relevant
> Trust] (expressed as a positive number) in consideration of an agreement
> between [the Trust] and such Reference Market-maker to enter into a
> transaction (the '*Replacement Transaction*') that would have the effect of
> preserving for [the Trust] the economic equivalent of any payment or
> delivery .  .  .  by the parties .  .  .  in respect of such Terminated
> Transactions or group of Terminated Transactions that would, but for the
> occurrence of the relevant Early Termination Date, have been required
> after that date, (3) made on the basis that Unpaid Amounts in respect of
> the Terminated Transaction or group of Transactions are to be excluded ...
> and (4) made in respect of a Replacement Transaction with terms
> substantially the same as those of this Agreement (save for the exclusion
> of provisions relating to Transactions that are not intended to be
> replacements for Terminated Transactions).

Exhibit A, 2007 B-F Schedule, at Part l(k)(i); 2007 D-F Schedule, at Part l(k)(i) (emphasis in

original).

      40.    Like the term "Market Quotation," the term "Settlement Amount" is also

defined in Section 14 of each of the Master Agreements.  *See* Exhibit A, Master Agreement, at

§ 14 (Definition of "Market Quotation").  In the 2007 Schedules, however, the parties mutually

agreed that if LBSF were a Defaulting Party in respect of any Event of Default, an alternative

definition of "Settlement Amount" would apply.  Specifically, in Part 1(k)(ii) of each of the 2007

Schedules, the parties provided that, in the event LBSF were a Defaulting Party in respect of an

Event of Default, "[t]he definition of 'Settlement Amount' [contained in Section 14 of the 2007

Master Agreements] shall be deleted in its entirely and replaced with the following":

> "*Settlement Amount*" means, with respect to any Early Termination Date,
> an amount (as determined by [the Trust]) equal to the Termination
> Currency Equivalent of the amount (whether positive or negative) of any
> Market Quotation for the relevant Terminated Transaction or group of
> Terminated Transactions that is accepted by [the Trust] so as to become
> legally binding [*provided* that a Market Quotation has been accepted by
> the Trust so as to become legally binding on or before the Early
> Termination Date.]

Exhibit A, 2007 B-F Schedule, at Part l (k)(ii); 2007 D-F Schedule, at Part 1(k)(ii).

41.    Under each of the 2007 Schedules, the relevant Trust is expressly required

to act in a commercially reasonable manner in pursuing a Firm Offer for a Replacement

Transaction with substantially the same terms as those of the existing Interest Swap:

> For the purpose of clause (4) of the definition of Market Quotation, [the
> Trust] shall determine in its sole discretion, *acting in a commercially
> reasonable manner*, whether a Firm Offer is made in respect of a
> Replacement Transaction with commercial terms substantially the same as
> those of [the existing Interest Swap].

Exhibit A, 2007 B-F Schedule, at Part 1(k)(iii); 2007 D-F Schedule, at Part 1(k)(iii) (emphasis

added).

42.    Under the 2005 Interest Swap, the parties agreed that the standard

definitions of the terms "Market Quotation" and "Settlement Amount" as provided in Section 14

of the 2005 Master Agreement would apply in any case to calculate an Early Termination

Payment, including if LBSF were a Defaulting Party in respect of any Event of Default.

43.    In applying the standard Market Quotation measure under the 2005

Interest Swap, AmeriCredit and the 2005 B-M Trust were expressly required to act in good faith

-13-

in soliciting quotations from four Reference Market-makers in the interest rate swap market. In addition, AmeriCredit and the 2005 B-M Trust were required to act in good faith in selecting the day and time when the quotations would be provided. The quotations were to be provided as of, but not before, the Early Termination Date. If AmeriCredit and the Trust were unable to obtain three quotations from Reference Market-makers, the 2005 Interest Swap Agreement required that the 2005 B-M Trust calculate the Early Termination Payment using Loss as a payment measure, subject to the obligation that the Trust act reasonably and in good faith. *See* Exhibit A, Master Agreements, at § 14 (Definitions of "Market Quotation" and "Settlement Amount").

44.    Thus, pursuant to the express terms of the 2005 Interest Swap Agreement, whenever an Early Termination Date was designated in respect of an Event of Default as to which LBSF was the Defaulting Party, if AmeriCredit and the Trust were unable to obtain three Market Quotations, the "Settlement Amount" that is contractually required to be included in the resulting Early Termination Payment must be equal to the amount of the 2005 B-M Trust's "Loss," which is defined as "an amount that [the 2005 B-M Trust] *reasonably determines in good faith*" to be equal to its "total losses and costs (*or gain, in which case expressed as a negative number*) in connection with . . . [the 2005 B-M Interest Swaps] . . . including any . . . loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them) . . . *as of the Early Termination Date . . . .*" *See* Exhibit A, Master Agreement, at § 14 (Definition of "Loss") (emphasis added).

## IV.    Defendants Breached Their Agreements In Determining The Early Termination Payments

45.    As discussed above, LBHI commenced its chapter 11 case on September 15, 2008. Because LBHI was LBSF's Credit Support Provider, the commencement of LBHI's

bankruptcy proceeding constituted an Event of Default under Section 5(a)(vii)(4) of the Master Agreements.

### A.    Improper Calculation Statements Are Delivered To LBSF

46.    By letter dated November 20, 2008, a true and correct copy of which is annexed hereto as Exhibit B (the "2005 Interest Swap Early Termination Notice"), the 2005 B-M Trust notified LBSF that, as a consequence of the Event of Default arising from the bankruptcy filing by LBHI, the 2005 B-M Trust had elected to designate November 20, 2008 as the Early Termination Date in respect of the 2005 Interest Swap.

47.    By letter dated November 20, 2008, a true and correct copy of which is annexed hereto as Exhibit C (the "2007 B-F Interest Swap Early Termination Notice"), the 2007 B-F Trust notified LBSF that, as a consequence of the Event of Default arising from the bankruptcy filing by LBHI, the 2007 B-F Trust had elected to designate November 20, 2008 as the Early Termination Date in respect of the 2007 B-F Interest Swap.

48.    By letter dated November 20, 2008, a true and correct copy of which is annexed hereto as Exhibit D (the "2007 D-F Interest Swap Early Termination Notice" and, together with the 2007 B-F Interest Swap Early Termination Notice and the 2005 Interest Swap Early Termination Notice, the "Early Termination Notices" ), the 2007 D-F Trust notified LBSF that, as a consequence of the Event of Default arising from the bankruptcy filing by LBHI, the 2007 D-F Trust had elected to designate November 20, 2008 as the Early Termination Date in respect of the 2007 D-F Interest Swap.

49.    By letter dated November 21, 2008, a true and correct copy of which is annexed hereto as Exhibit E (the "2005 Interest Swap Calculation Statement"), the 2005 B-M Trust provided LBSF with a statement that purported to show the 2005 B-M Trust's calculation

-15-

of the Early Termination Payment in ostensible compliance with Sections 6(d)(i) and 6(e)(i)(3) of the 2005 Master Agreement and Part 1(i) of the 2005 Schedule.

50.    By letter dated November 21, 2008, a true and correct copy of which is annexed hereto as Exhibit F (the "2007 B-F Interest Swap Calculation Statement"), the 2007 B-F Trust provided LBSF with a statement that purported to show the 2007 B-F Trust's calculation of the Early Termination Payment in ostensible compliance with Sections 6(d)(i) and 6(e)(i)(3) of the 2007 B-F Master Agreement and Part 1(e) of the 2007 B-F Schedule.

51.    By letter dated November 21, 2008, a true and correct copy of which is annexed hereto as Exhibit G (the "2007 D-F Interest Swap Calculation Statement," together with the 2007 B-F Interest Swap Calculation Statement, the "2007 Calculation Statements" and, together with the 2005 Interest Swap Calculation Statement, the "Calculation Statements"), the 2007 D-F Trust provided LBSF with a statement that purported to show the 2007 D-F Trust's calculation of the Early Termination Payment in ostensible compliance with Sections 6(d)(i) and 6(e)(i)(3) of the 2007 D-F Master Agreement and Part 1(e) of the 2007 D-F Schedule.

52.    The Calculation Statements state that the Early Termination Payments to which LBSF was entitled were only:  $691,009 with respect to the 2005 Interest Swap; $11,096,248 with respect to the 2007 B-F Interest Swap; and $1,399,588 with respect to the 2007 D-F Interest Swap.

53.    In the 2005 Interest Swap Calculation Statement, AmeriCredit and the 2005 B-M Trust contended that they had failed to obtain at least three Market Quotations.  Thus, under the 2005 Master Agreement, the Market Quotation measure could not be determined and Loss measure would apply to determine the Settlement Amount.  AmeriCredit and the 2005 B-M Trust further stated that they had calculated Loss solely by reference to a quotation in the amount of $343,010 received from the replacement counterparty on November 20, 2008, which it

-16-

attached to the 2005 Calculation Statement. *See* Exhibit E. However, as described previously, this quotation was actually the same quotation received on October 14, 2008.

54.    In the 2007 Calculation Statements, AmeriCredit and the 2007 Trusts stated that they had calculated Settlement Amounts due to LBSF by reference to quotations in the amount of $9,255,485 with respect to the 2007 B-F Interest Swap and $972,305 with respect to the 2007 D-F Interest Swap, respectively, received from the replacement counterparty on November 20, 2008, which they attached to the respective Calculation Statements. *See* Exhibit F and Exhibit G. However, as described previously, this quotation was actually the same quotation received on October 14, 2008.

**B.    Defendants Breached The Interest Swap Agreements**

55.    On or about October 17, 2008, Defendants indicative bids on each of the Interest Swaps from another Reference Market-maker that nearly doubled the prices offered by the replacement counterparty. But Defendants failed to actively pursue this indicative bid. Instead, Defendants relied solely on the below-market bid submitted by the replacement counterparty on or about October 14.

56.    In addition, Defendants failed to take into account the changed market conditions between October 14 and November 20 when calculating the Early Termination Payments.

57.    On or about November 21, 2008, LBSF received Early Termination Payments from the Trusts in the aggregate amount of $13,186,845.00.

58.    As of November 20, 2008, the Early Termination Date, each of the Interest Swaps was heavily in-the-money to LBSF. But that is not reflected in the payments to LBSF because the payments were based on stale information and failed to account for changed market conditions.

59.     Indeed, on the basis of mark-to-market prices prevailing as of November 20, 2008, the market values of the swaps to LBSF were: $5,019,829 with respect to the 2005 Interest Swap; $26,881,727 with respect to the 2007 B-F Interest Swap; and $8,048,543 with respect to the 2007 D-F Interest Swap. Accordingly, after accounting for $346,885, $1,806,232 and $419,923 in Unpaid Amounts that were owed to LBSF as of November 20, 2008, under the 2005 Interest Swap, 2007 B-F Interest Swap and 2007 D-F Interest Swap, respectively, any contractually proper and commercially reasonable calculation should have resulted in Early Termination Payments, payable to LBSF, of approximately $5,366,714, $28,687,958 and $8,468,466 under the 2005 Interest Swap, 2007 B-F Interest Swap and 2007 D-F Interest Swap, respectively.

60.     Given that that the aggregate market value of LBSF's position under the Interest Swaps as of the Early Termination Date significantly exceeded the Early Termination Payments it received, the Settlement Amounts calculated by the Trusts were unreasonable and did not reflect market conditions at that time. Therefore, following the Early Termination Date and after LBSF's receipt of payment, LBSF wrote to AmeriCredit and requested, among other things, further information relating to the Interest Swap valuation process conducted by AmeriCredit on behalf of the Trusts and the timeline by which Market Quotations were obtained and negotiated.

61.     Information provided by the Defendants in response to LBSF's requests during the period from August 2009 to January 2010 revealed the following:

(i)     Beginning on or about September 15, 2008, more than two months before the Early Termination Date, Defendants solicited quotations on the Interest Swaps from several Reference Market-makers, including the replacement counterparty.

(ii)      The replacement counterparty submitted its bids on the swaps to AmeriCredit and the Trusts on or about October 14, 2008, a full five weeks before the Early Termination Date. But these bids were never updated, revised or improved in any way during that intervening five-week period.

(iii)      On or about October 17, 2008, Defendants received indicative bids on each of the Interest Swaps from another Reference Market-maker that nearly doubled the prices offered by the replacement counterparty. But Defendants failed to actively pursue these indicative bids or return to the market to seek new bids based on then-current market conditions.

(iv)      Defendants accepted the replacement counterparty's October 14 bids on or about November 20, 2008 without ever requiring that they be updated, revised or improved in any way.

62.      During the intervening five-week period between October 14 and November 20, 2008, the Early Termination Date, the one-month USD LIBOR rate sharply declined (from 4.18125% on October 17, 2008, to 1.395% on November 20, 2008). Since LBSF was the floating-rate payer under the Interest Swaps (meaning its payments were tied to fluctuations in the one-month USD LIBOR rate), such reduction in the one-month USD LIBOR rate further improved LBSF's in-the-money position *vis-à-vis* each Trust, which was the fixed-rate payer under its respective Interest Swap. That substantial drop in interest rates should have increased dramatically the price paid by the replacement counterparty that assumed LBSF's position. However, despite the significant change in market conditions, Defendants failed (i) to require the replacement counterparty to increase its bid to reflect the movement of interest rates in LBSF's favor, (ii) to return to the market to seek new bids based on then-current market conditions or (iii) to actively pursue the indicative bid received from another Reference Market-maker that nearly the prices offered by the replacement counterparty.

63.    By undervaluing the 2007 Interest Swaps as of October 14 and then compounding the error by failing to utilize the most current market information in determining the Settlement Amounts, Defendants breached their obligations under those swap agreements and failed to act in a commercially reasonable manner. It is patently commercially unreasonable to ignore a substantially higher indicative bid from a prominent financial institution and market participant. It is likewise commercially unreasonable to disregard five weeks of information demonstrating a dramatic increase in the value of LBSF's position when pricing the Interest Swap. Such conduct plainly amounts to a breach of the Defendants' obligation to act in a commercially reasonable manner.

64.    Similarly, in prematurely soliciting and obtaining market quotations on the 2005 Interest Swap in mid-September and early October, undervaluing the 2005 Interest Swap as of October 14 and failing to utilize the most current market information in determining the Loss as of the Early Termination Date, Defendants breached their obligations under the 2005 Interest Swap Agreement by not soliciting market quotations as of the Early Termination Date and not acting reasonably and in good faith.

65.    The Defendants' conduct was inconsistent with industry custom and practice. It is simply impermissible to ignore higher indicative bids and rely on stale market information when determining Settlement Amounts. Such conduct violates the implied covenant of good faith and fair dealing under parties' agreements.

### COUNT I
### Breach of Contract
### Against AmeriCredit and the 2005 B-M Trust

66.    LBSF repeats and realleges the allegations set forth above.

67.    LBSF and the 2005 B-M Trust had a valid and enforceable contract.

68.    On or about October 17, 2008, AmeriCredit and the 2005 B-M Trust received indicative bids on the 2005 Interest Swap that nearly doubled the price offered by the replacement counterparty.  But AmeriCredit failed to actively pursue this indicative bid. Accordingly, the replacement counterparty's bid on or about October 14 was already far below market value.

69.    Under the express terms of the 2005 Interest Swap Agreement, the 2005 B-M Trust and LBSF agreed to the standard Second Method and Market Quotation payment measure for determining Early Termination Payments, and to the Second Method and Loss in the event fewer than three market quotations were received, which AmeriCredit and the 2005 B-M Trust alleged was the case.

70.    Under the Second Method and Market Quotation, the 2005 B-M Trust was required to act in good faith in soliciting quotations from four Reference Market-makers as of the Early Termination Date.

71.    Under the Second Method and Loss, the 2005 B-M Trust was required to reasonably determine in good faith its losses and costs or gain in connection with the termination of the 2005 Interest Swap Agreement as of, but not before, the Early Termination Date, and the 2005 B-M Trust was permitted to refer to quotations of "relevant rates or prices from one or more leading dealers in the relevant markets."

72.    AmeriCredit and the 2005 B-M Trust acknowledged that they solicited market quotations beginning on or about September 15, 2008, more than two months before the Early Termination Date.

73.    AmeriCredit and the 2005 B-M Trust acknowledged that LBSF's Loss was determined based exclusively on the replacement counterparty's stale bid made as of October 14, 2008.

74.    On November 20, 2008, AmeriCredit and the 2005 B-M Trust designated that date as the Early Termination Date under the terms of 2005 Interest Swap Agreement. The 2005 B-M Trust premised its termination on the bankruptcy filing of LBHI, LBSF's Credit Support Provider under the swap agreement.

75.    That October 14, 2008 bid was not modified to take into account the sharp decline in applicable interest rates in the intervening five-week period before the designation of the Early Termination Date, during which time LBSF's position increased in value.

76.    Accordingly, AmeriCredit and the 2005 B-M Trust failed to determine Loss (i) in a reasonable manner, (ii) as of the Early Termination Date, or (iii) based on relevant interest rates under current market conditions as of such date. Thus, AmeriCredit and the 2005 B-M Trust's determination of the settlement amount was in breach of the express contractual requirements under Loss.

77.    Moreover, AmeriCredit and the 2005 B-M Trust failed to act in good faith in soliciting quotations from four Reference Market-makers as of the Early Termination Date in accordance with the Market Quotation payment measure before reverting to the Loss measure to determine the amount owed to LBSF. Thus, AmeriCredit and the 2005 B-M Trust breached the express contractual requirements under Market Quotation.

78.    Thus, the determination of the Early Termination Payment by AmeriCredit and the 2005 B-M Trust's was in breach of the express contractual obligations under the parties' swap agreement. As a result of these breaches, LBSF has been damaged in an amount to be determined at trial.

**COUNT II**
**Breach of Contract**
**Against AmeriCredit and the 2007 B-F Trust**

79.    LBSF repeats and realleges the allegations set forth above.

80.    LBSF and the 2007 B-F Trust had a valid and enforceable contract.

81.    On or about October 17, 2008, AmeriCredit and the 2007 B-F Trust received indicative bids on each of the Interest Swaps that nearly doubled the prices offered by the replacement counterparty. But AmeriCredit and the 2007 B-F Trust failed to actively pursue this indicative bid. Accordingly, the replacement counterparty's bids on or about October 14 were already far below market value.

82.    Under the express terms of the 2007-B-F Interest Swap Agreement, the 2007 B-F Trust and LBSF agreed to a modified Second Method and Market Quotation payment measure for determining Early Termination Payments. Using this measurement, the Trust, acting through AmeriCredit in a commercially reasonable manner, was obligated to pursue bids from potential replacement counterparties for replacement transactions with substantially the same commercial terms and to pay LBSF the amount of the offer made by the actual replacement counterparty that was accepted by AmeriCredit and the 2007 B-F Trust.

83.    AmeriCredit and the 2007 B-F Trust acknowledged that they determined the Early Termination Payment based on a bid made by the replacement counterparty on or about October 14, 2008.

84.    However, that bid was already significantly below the market value of the swaps at the time. Further, AmeriCredit and the 2007 B-F Trust did not designate the Early Termination Date for its swaps and did not accept the replacement bids until November 20, 2008.

85.    During the intervening five-week period between October 14 and November 20, 2008, the one-month USD LIBOR interest rate declined sharply. Because LBSF was the floating rate payer under the swap, and interest rates were moving in LBSF's favor, the

mark-to-market value of LBSF's position increased, which should have increased the price paid by the replacement counterparty that assumed LBSF's position.

86.     Despite the changed market conditions, AmeriCredit and the 2007 B-F Trust failed to (i) require the replacement counterparty to increase its bid to reflect the movement of interest rates in LBSF's favor, (ii) return to the market to seek new bids based on then-current market conditions, or (iii) actively pursue an indicative bid it had received in October from another dealer which nearly doubled the price offered by the replacement counterparty.

87.     Accordingly, the determination of the Early Termination Payment was based on a stale bid, was not commercially reasonable and therefore was in breach of its express contractual obligations under the parties' agreement.  As a result of this breach, LBSF has been damaged in an amount to be determined at trial.

**COUNT III**
**Breach of Contract**
**Against AmeriCredit and the 2007 D-F Trust**

88.     LBSF repeats and realleges the allegations set forth above.

89.     LBSF and the 2007 D-F Trust had a valid and enforceable contract.

90.     On or about October 17, 2008, AmeriCredit and the 2007 D-F Trust received indicative bids on each of the Interest Swaps that nearly doubled the prices offered by the replacement counterparty.  But AmeriCredit and the 2007 D-F Trust failed to actively pursue this indicative bid.  Accordingly, the replacement counterparty's bids on or about October 14 were already far below market value.

91.     Under the express terms of the 2007-D-F Interest Swap Agreement, the 2007 D-F Trust and LBSF agreed to a modified Second Method and Market Quotation payment measure for determining Early Termination Payments.  Using this measurement, the 2007 D-F

Trust, acting through AmeriCredit in a commercially reasonable manner, was obligated to pursue

bids from potential replacement counterparties for replacement transactions with substantially

the same commercial terms and to pay LBSF the amount of the offer made by the actual

replacement counterparty that was accepted by the 2007 D-F Trust.

92.    AmeriCredit and the 2007 D-F Trust acknowledged that they determined

the termination amount based on a bid made by the replacement counterparty on or about

October 14, 2008.

93.    However, that bid was already significantly below the market value of the

swaps at the time.  Further, AmeriCredit and the 2007 D-F Trust did not designate the Early

Termination Date for its swaps and did not accept the replacement bids until November 20,

2008.

94.    During the intervening five-week period between October 14 and

November 20, 2008, LIBOR interest rates declined sharply.  Because LBSF was the floating rate

payer under the swap, and interest rates were moving in LBSF's favor, the mark-to-market value

of LBSF's position increased, which should have increased the price paid by the replacement

counterparty that assumed LBSF's position.

95.    Despite the changed market conditions, AmeriCredit and the 2007 D-F

Trust failed to (i) require the replacement counterparty to increase its bid to reflect the

movement of interest rates in LBSF's favor, (ii) return to the market to seek new bids based on

then-current market conditions, or (iii) actively pursue an indicative bid it had received in

October from another dealer which nearly doubled the price offered by the replacement

counterparty.

96.    Accordingly, the determination of the Early Termination Payment was

based on a stale bid, was not commercially reasonable and therefore was in breach of express

contractual obligations under the parties' agreement.  As a result of this breach, LBSF has been damaged in an amount to be determined at trial.

### COUNT IV
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against AmeriCredit and the 2005 B-M Trust

97.    LBSF repeats and realleges the allegations set forth above.

98.    LBSF and the 2005 B-M Trust had a valid and enforceable contract.

99.    Inherent in that contract was the implied covenant that AmeriCredit and the 2005 B-M Trust act in good faith and fair dealing in their dealings with LBSF.

100.    As described above, under the 2005 B-M Interest Swap Agreement, the 2005 B-M Trust and LBSF agreed to a particular method to measure the Early Termination Payments.  According to industry custom and practice, AmeriCredit and the 2005 B-M Trust were obligated to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

101.    AmeriCredit and the 2005 B-M Trust breached the implied covenant with LBSF by using stale information to determine the  for the 2005 B-M Interest Swap Agreement. As a result of this breach, LBSF has been damaged in an amount to be determined at trial.

### COUNT V
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against AmeriCredit and the 2007 B-F Trust

102.    LBSF repeats and realleges the allegations set forth above.

103.    LBSF and the 2007 B-F Trust had a valid and enforceable contract.

104.    Inherent in that contract was the implied covenant that AmeriCredit and the 2007 B-F Trust act in good faith and fair dealing in their dealings with LBSF.

105.    As described above, under the 2007 B-F Interest Swap Agreement, the 2007 B-F Trust and LBSF agreed to a particular method to measure Early Termination

Payments. According to industry custom and practice, AmeriCredit and the 2007 B-F Trust were obligated to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

106.    AmeriCredit and the 2007 B-F Trust breached the implied covenant with LBSF by using stale information to determine the Early Termination Payment for the 2007 B-F Interest Swap. As a result of this breach, LBSF has been damaged in an amount to be determined at trial.

## COUNT VI
### Breach of Implied Covenant of Good Faith and Fair Dealing Against AmeriCredit and the 2007 D-F Trust

107.    LBSF repeats and realleges the allegations set forth above.

108.    LBSF and the 2007 D-F Trust had a valid and enforceable contract.

109.    Inherent in that contract was the implied covenant that AmeriCredit and the 2007 D-F Trust act in good faith and fair dealing in their dealings with LBSF.

110.    As described above, under the 2007 D-F Interest Swap Agreement, the 2007 D-F Trust and LBSF agreed to a particular method to measure Early Termination Payments. According to industry custom and practice, AmeriCredit and the 2007 D-F Trust were obligated to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

111.    AmeriCredit and the 2007 D-F Trust breached the implied covenant with LBSF by using stale information to determine the Early Termination Payment for the 2007 D-F Interest Swap Agreement. As a result of this breach, LBSF has been damaged in an amount to be determined at trial.

## COUNT VII
### Breach of Contract
### Against AmeriCredit Regarding The 2005 B-M Trust

112.    LBSF repeats and realleges the allegations set forth above.

113.    AmeriCredit and the 2005 B-M Trust had a valid and enforceable contract (the 2005 Servicing Agreement (defined above)).  Under the 2005 Servicing Agreement, AmeriCredit is obligated to perform the 2005 B-M Trust's duties under the 2005 Interest Swap and to indemnify the 2005 B-M Trust for any breach of the 2005 Servicing Agreement by AmeriCredit.

114.    LBSF was a third-party beneficiary of the 2005 Servicing Agreement and entitled to enforce the agreement's terms.

115.    AmeriCredit failed to perform the duties of the 2005 B-M Trust under the 2005 Interest Swap by failing to solicit market quotations in good faith as of the Early Termination Date and failing to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

116.    As a result of AmeriCredit's breach, any amounts due to the 2005 B-M Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy LBSF's damages, in an amount to be determined at trial.

## COUNT VIII
### Breach of Contract
### Against AmeriCredit Regarding The 2007 B-F Trust

117.    LBSF repeats and realleges the allegations set forth above.

118.    AmeriCredit and the 2007 B-F Trust had a valid and enforceable contract (the 2007 B-F Servicing Agreement (defined above)).  Under the 2007 B-F Servicing Agreement, AmeriCredit is obligated to perform the 2007 B-F Trust's duties under the 2007 B-F

Interest Swap and to indemnify the 2007 B-F Trust for any breach of the 2007 B-F Servicing Agreement by AmeriCredit.

119.    LBSF was a third-party beneficiary of the 2007 B-F Servicing Agreement and entitled to enforce the agreement's terms.

120.    AmeriCredit failed to perform the duties of the 2007 B-F Trust under the 2007 B-F Interest Swap by failing to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

121.    As a result of AmeriCredit's breach, any amounts due to the 2007 B-F Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy LBSF's damages, in an amount to be determined at trial.

**COUNT IX**
**Breach of Contract**
**Against AmeriCredit Regarding The 2007 D-F Trust**

122.    LBSF repeats and realleges the allegations set forth above.

123.    AmeriCredit and the 2007 D-F Trust had a valid and enforceable contract (the 2007 D-F Servicing Agreement (defined above)).  Under the 2007 D-F Servicing Agreement, AmeriCredit is obligated to perform the 2007 D-F Trust's duties under the 2007 D-F Interest Swap and to indemnify the 2007 D-F Trust for any breach of the 2007 D-F Servicing Agreement by AmeriCredit.

124.    LBSF was a third-party beneficiary of the 2007 D-F Servicing Agreement and entitled to enforce the agreement's terms.

125.    AmeriCredit failed to perform the duties of the 2007 D-F Trust under the 2007 D-F Interest Swap by failing to consider and pursue higher indicative bids and to not use stale information to measure the appropriate Early Termination Payments.

126.    As a result of AmeriCredit's breach, any amounts due to the 2007 D-F Trust as a result of AmeriCredit's duty to indemnify the trust shall be payable to LBSF to satisfy LBSF's damages, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, LBSF respectfully requests that the Court enter judgment against all Defendants in LBSF's favor:

A.  In an amount to be determined at trial;

B.  Awarding LBSF $13,044,043 from November 20, 2008 through July 13, 2011 on account of interest calculated using the Default Rate under the 2005 Interest Swap Agreement, 2007 B-F Interest Swap Agreement and the 2007 D-F Interest Swap Agreement;

C.  Awarding LBSF any other damages suffered as a result of Defendants' misconduct, in an amount to be determined at trial, in addition to statutory interest; and

D.  For such other relief as the Court deems just and proper, including costs and attorneys' fees.

Dated:  July 14, 2011

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By:___/s/ Turner P. Smith_____
    Turner P. Smith (TS 8052)
    L. P. Harrison 3rd (LH 5540)
    Myles K. Bartley (MB 8431)

101 Park Avenue
New York, New York 10178
(212) 696-6000
*Counsel for Lehman Brothers Special Financing Inc.*