WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION**
**PURSUANT TO SECTIONS 105 AND 363**
**OF THE BANKRUPTCY CODE AND FEDERAL RULE**
**OF BANKRUPTCY PROCEDURE 6004 FOR AUTHORIZATION**
**TO (I) ENTER INTO AN ASSET MANAGEMENT AGREEMENT FOR THE**
**MANAGEMENT OF THE DEBTORS' COMMERCIAL LOAN PORTFOLIO**
**AND (II) SELL COMMERCIAL LOANS TO SPECIAL PURPOSE ENTITIES IN**
**CONNECTION WITH THE ISSUANCE OF COLLATERALIZED LOAN OBLIGATIONS**

PLEASE TAKE NOTICE that a hearing on the annexed motion (the "Motion") of

Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc., and their affiliated debtors

in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the

"Debtors"), pursuant to sections 105 and 363 of title 11 of the United States Code and Rule 6004

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of the

entry into an asset management agreement for commercial loans held by the Debtors and the sale

of certain commercial loans to issuers of collateralized loan obligations, as more fully described

in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy

Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom

601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **August 17,**

**2011 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

            PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Bankruptcy Rules, shall set forth the name of the objecting

party, the basis for the objection and the specific grounds thereof, shall be filed with the

Bankruptcy Court electronically in accordance with General Order M-242 (which can be found

at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and

by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format

(PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies

delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Jacqueline

Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the

Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Tracy Hope

Davis, Esq., Andrea B. Schwartz, Esq., and Elisabetta Gasparini, Esq.; (iv) Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis

F. Dunne, Esq., Evan Fleck, Esq. and Dennis O'Donnell, Esq., attorneys for the Official

Committee of Unsecured Creditors appointed in these cases; and (v) Bingham McCutchen LLP,

399 Park Avenue, New York, New York, 20022, Attn: Jeffrey S. Sabin, Esq. and L. Kevin

Sheridan, Jr., Esq., attorneys for WCAS Fraser Sullivan Investment Management, LLC, so as to

be so filed and received by no later than **August 10, 2011, at 4:00 p.m. (prevailing Eastern**

**Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: July 27, 2011
      New York, New York

                              /s/ Jacqueline Marcus
                              Jacqueline Marcus

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**DEBTORS' MOTION**
**PURSUANT TO SECTIONS 105 AND 363**
**OF THE BANKRUPTCY CODE AND FEDERAL RULE**
**OF BANKRUPTCY PROCEDURE 6004 FOR AUTHORIZATION**
**TO (I) ENTER INTO AN ASSET MANAGEMENT AGREEMENT FOR THE**
**MANAGEMENT OF THE DEBTORS' COMMERCIAL LOAN PORTFOLIO**
**AND (II) SELL COMMERCIAL LOANS TO SPECIAL PURPOSE ENTITIES IN**
**CONNECTION WITH THE ISSUANCE OF COLLATERALIZED LOAN OBLIGATIONS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc.

("LCPI"), and their affiliated debtors in the above-referenced chapter 11 cases, as debtors and

debtors in possession (collectively, the "Debtors"), file this Motion and respectfully represent:

**Preliminary Statement**

1.      As of July 15, 2011, the Debtors, together with various non-Debtor entities

under the Debtors' corporate control (collectively, "Lehman"), held commercial loans issued by or

equity positions in 157 issuers with an aggregate outstanding principal balance of approximately

$3.8 billion, as well as unfunded commitments in the approximate amount of $1.5 billion (the

"Commercial Loan Portfolio"). The Debtors have determined that it is in the best interests of each of their estates to hire a third party to manage the Commercial Loan Portfolio. In addition, as part of their continuing effort to maximize the cash that will be available to make distributions to creditors promptly following the effective date of their plan of reorganization, the Debtors have explored various methods of monetizing the Commercial Loan Portfolio. The Debtors have determined that the most efficient and economical way to monetize the Commercial Loan Portfolio, while minimizing risk in connection with the management of such portfolio, may be to establish structures to issue collateralized loan obligations ("CLOs"), the net proceeds of which will be used to purchase a portion of the Commercial Loan Portfolio from the Debtors. Pursuant to the Asset Management Agreement, dated as of July 26, 2011, a copy of which is annexed hereto as Exhibit A (the "Asset Management Agreement"),[1] WCAS │ Fraser Sullivan Investment Management, LLC ("Fraser Sullivan") will manage the Commercial Loan Portfolio and may seek to establish the CLOs. Upon the closing of one or more CLOs, the Debtors and certain non-Debtor affiliates that sell loans to the CLOs will receive cash and the economic equity interests (which may be in the form of subordinated notes) in the CLOs. Through the retention of the equity interests, the Debtors and the non-Debtor affiliates will retain the benefits of the residual value of the portion of the Commercial Loan Portfolio sold to the CLOs that remains after the more senior securities issued by the CLO are repaid, and benefit from any increase in the value thereof. The decisions concerning whether to execute a CLO, the timing of the execution of a CLO and the terms of any CLOs are subject to the

---

[1] Schedule A to the Asset Management Agreement has been filed under seal in accordance with the Court's *Order Pursuant to Section 107 of the Bankruptcy Code and Bankruptcy Rule 9018 Authorizing the Debtors to File the List of Managed Assets On Schedule A to the Asset Management Agreement Between Lehman Brothers Holdings Inc. and WCAS│Fraser Sullivan Investment Management, LLC Under Seal*, entered on July 27, 2011.

approval by the Debtors in their sole discretion.  There can be no assurance that any CLO transactions will be executed.

2.        In order to ensure seamless management of the Commercial Loan Portfolio, Fraser Sullivan will also continue to manage the loans that are not sold to an issuer of CLO securities.  To provide for continuity in the management of the Commercial Loan Portfolio, the Asset Management Agreements provides that certain of the asset managers at LAMCO LLC ("LAMCO") who are currently managing the Commercial Loan Portfolio (the "Portfolio Management Team") will be hired by Fraser Sullivan upon the effectiveness of the Asset Management Agreement.  The engagement of Fraser Sullivan will enable the Debtors to maximize the value of the Commercial Loan Portfolio and provide for effective management of the Commercial Loan Portfolio through the final repayment of the loans.  The engagement of Fraser Sullivan will increase the Debtors' cost for the management of the Commercial Loan Portfolio, but not materially.

3.        The Debtors have explored various other means of monetizing the Commercial Loan Portfolio and have considered engaging managers other than Fraser Sullivan, but have determined that hiring Fraser Sullivan to manage the Commercial Loan Portfolio and effect the CLOs is in the Debtors' best interests.  The Debtors have determined that the engagement of Fraser Sullivan and the execution of the CLOs in accordance with the terms of the Asset Management Agreement provides the Debtors with the best overall terms for the management of the Commercial Loan Portfolio, and therefore, seek approval thereof.

**Background**

4.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this

Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.        On September 17, 2008, the United States Trustee for Region 2 (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6.        On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

7.        On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner") and by order, dated January 20, 2009 [Docket No. 2583] the Court approved the U.S. Trustee's appointment of the Examiner. On March 11, 2010, the Examiner filed its report with the Court (the "Examiner's Report") [Docket No. 7531]

8.        On July 1, 2011, the Debtors filed their second amended joint chapter 11 plan pursuant to section 1121 of the Bankruptcy Code [Docket No. 18204] (the "Second Amended Plan") and related disclosure statement pursuant to section 1125 of the Bankruptcy Code [Docket No. 18205]. A hearing for the approval of the disclosure statement is scheduled for August 30, 2011.

### Jurisdiction

9.        This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

## Lehman's Business

10.     Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman had been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

11.     Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

12.     Pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 6004,[2] the Debtors seek approval of the Asset Management Agreement, which provides for (i) the Debtors to hire Fraser Sullivan to manage the Commercial Loan Portfolio and (ii) the Debtors to sell commercial loans to CLO Issuers (as defined below), as and when the Debtors and Fraser Sullivan determine it is appropriate, and to take all other actions necessary, and pay all other fees and expenses necessary to structure, create and market the CLOs.  The Debtors and their non-Debtor affiliates will sell the commercial loans to the CLO Issuers in exchange for their proportionate share of (i) all net cash received by the CLO Issuers from the issuance of the CLO notes (after payment of fees and expenses incurred in connection with the CLOs and funding any CLO reserve accounts), and (ii) the economic equity interests in the respective CLO Issuers.  It is possible that the Debtors

---

[2] The Debtors are not seeking relief under, nor do they believe that the relief that they seek in this Motion requires relief under or otherwise invokes, as applicable, Section 327 or 328 of the Bankruptcy Code.

and their non-Debtor affiliates may also acquire certain notes issued by the CLO Issuers as part of the consideration for the loans.

13.    As described in more detail below, the proposed transactions may provide a significant amount of liquidity to the Debtors as well as preserve the Debtors' interest in the upside of the Commercial Loan Portfolio, and are in the best interest of the Debtors' estates.

**The Commercial Loan Portfolio**

14.    In the ordinary course of business prior to the Commencement Date, LCPI and LBHI engaged in originating, administering, syndicating, and trading commercial loans.  LCPI and LBHI often acted as lenders, syndication agents and/or administrative agents of commercial loans.  In addition, LCPI and LBHI purchased and sold loans originated by other financial institutions.  The portion of the Commercial Loan Portfolio owned by LCPI and LBHI includes term loans as well as lending commitments.

15.    In order to increase liquidity, from time to time the Debtors sold or participated loans to special purpose entities, including Spruce CCS, Ltd. ("Spruce"), Verano CCS, Ltd. ("Verano") and Restructured Assets with Enhanced Returns Series 2007-A Trust ("Racers"), which issued securities backed by the loans and the cash flow therefrom.  Where the Debtors sold participations in the loans, they typically remained the lender of record.  The Debtors also utilized their affiliates Aurora Bank FSB (f/k/a Lehman Brothers Bank) ("Aurora Bank") and Woodlands Bank, FSB (f/k/a Lehman Brothers Commercial Bank) ("Woodlands Bank") to increase liquidity by having Aurora and Woodlands act as lenders upon the origination of certain loans.

16.    The Debtors have taken various steps since the Commencement Date to maximize the value of the Commercial Loan Portfolio.  The Debtors sought, and the Bankruptcy Court entered, orders permitting the Debtors to (i) transfer the applicable Debtor's role as agent for a

syndicated loan or transfer the ownership of loans to parties to which the Debtors sold a US-style

100% participation in such loan [LCPI Docket No. 11], (ii) reject or assume open trades relating to

loans [Docket No. 3050], and (iii) terminate future funding obligations and modify the terms of

loans [Docket No. 3753].

17.     The Commercial Loan Portfolio is comprised of loans and equity interests

(and/or interests therein) held by various Debtors and non-Debtor affiliates. The following table sets

forth the approximate amount of loans, participations and equity interests therein owned by the

various entities:[3]

| Entity | Notional Amount of Loans and Market Value of Equity |
| --- | --- |
| LBHI | $70.5 million |
| LCPI | $1,920.1 million |
| LBSF | $23.1 million |
| LB 1 Group | $4.1 million |
| Spruce | $197.8 million |
| Verano | $435.0 million |
| Racers | $1,143.4 million |

18.     LAMCO is responsible for the management of all the loans in the Commercial

Loan Portfolio, whether or not they are owned by the Debtors.  Following the Commencement Date,

the Debtors determined that it was not in their best interest to sell the loans at the then-prevailing

depressed market prices.  Instead, the Debtors have retained and actively managed their loans in an

---

[3] As of July 15, 2011, Woodlands Bank held $455 million of loans.  The loans held by Woodlands Bank are not included as "Managed Assets" under the Asset Management Agreement at this time, but may be added to the list of "Managed Assets" in the future at such time as such bank is no longer a regulated entity or the Debtors acquire such loans from the bank.

effort to maximize their value.  When LAMCO was established, it proceeded to employ the team of

asset managers that had been managing the Commercial Loan Portfolio.  The Portfolio Management

Team has monitored the Commercial Loan Portfolio, communicated with the borrowers, and when

appropriate, modified, restructured or sold loans.  Commercial loan market conditions have

significantly improved and the market values of many of the commercial loans in the Commercial

Loan Portfolio have similarly improved from the historic lows that existed shortly after the

Commencement Date.

19.    The Debtors anticipate that many of the loans in the Commercial Loan

Portfolio will be repaid in full upon maturity.  However, the Commercial Loan Portfolio is scheduled

to mature over time.  30% of the funded portion of the Commercial Loan Portfolio is not scheduled

to mature until 2016 or later.  In connection with the Second Amended Plan, one of the Debtors'

goals is to accelerate distributions to creditors, while maximizing the value of their assets.  Since the

loans that comprise the Commercial Loan Portfolio will only convert to cash in installments over a

period of years, absent approval of the Asset Management Agreement and the closing of the

transactions contemplated herein, a significant portion of distributions to creditors would be

significantly delayed.

### Establishing the CLOs and Selling Commercial Loans to the CLO Issuers Is the Best Means for the Debtors to Monetize their Portfolio of Commercial Loans

20.    The Debtors have considered various means to monetize the Commercial

Loan Portfolio, including individual sales of the loans or a sale of the entire Commercial Loan

Portfolio.  However, due to the size of the Debtors' portfolio, as well as the sizeable position that the

Debtors hold in various loans, selling all or substantially all of the Commercial Loan Portfolio within

a short period of time would have an adverse impact on the value thereof.  Moreover, the current

market prices of many of the loans are less than the Debtors' anticipated recoveries if the loans are

held to maturity.  Alternatively, if individual loans were opportunistically sold over time, the

Debtors' estates would still bear the overhead costs associated with managing the remaining portion

of the Commercial Loan Portfolio, including the continued costs associated with the Portfolio

Management Team and the related fixed cost infrastructure.  Any reduction in such overhead costs

would not scale down proportionately to a reduction of the remaining Commercial Loan Portfolio.

21.     The Debtors also considered pledging the Commercial Loan Portfolio to a

bank as collateral for a loan.  Such a transaction would have the benefit of permitting the Debtors to

accelerate distributions to creditors, while retaining the potential upside in the value of the

Commercial Loan Portfolio.  The Debtors discussed this possibility with two large banks.  However,

the terms on which the banks were willing to lend against the Commercial Loan Portfolio were

unattractive, and create less value for the Debtors than the value expected to be realized as a result of

the Asset Management Agreement and the transactions contemplated thereby.  The interest rates the

banks would have charged and the proposed advance rates (i.e. the amount of the loan as a

percentage of the amount of the pledged collateral) made this option expensive, and would not have

provided the Debtors with the desired amount of liquidity.  In addition, the banks would have

required the right to require Debtors to pledge additional collateral in the future if the market value

of the loans decreased.  The potential additional collateral requirements would restrict the Debtors'

ability to accelerate distributions, as the Debtors would have to reserve cash in order satisfy any such

additional collateral requirements.

22.     The best alternative that the Debtors considered was establishing one or more

CLOs to issue securities supported by loans in the Commercial Loan Portfolio.  A CLO is a

securitization, pursuant to which a special purpose entity (the "CLO Issuer") is formed to acquire

and hold a portfolio of loans and to issue multiple tranches of securities, with varying priority, credit

ratings and interest rates, to third-party investors.  The CLO Issuer collects the proceeds of the loans and, based on a specified priority of payments and terms of each security, distributes net proceeds to the security holders.  A CLO Issuer will also issue a class of preferred interests or subordinated notes, which are effectively the economic equity in the CLO Issuer.  All proceeds of the loans, if any, that exceed the amounts owed on the notes issued by the CLO Issuer and certain fees and expenses of the CLO Issuer, are ultimately distributed to the holder of the preferred interests or subordinated notes.  A manager is typically hired to manage the loans held by the CLO Issuer and to take certain actions to maximize the value of the loans.  While the Debtors have determined that CLOs provide the optimal method of monetizing the portion of the Commercial Loan Portfolio that can be acquired by CLO Issuers, since not all loans in the Commercial Loan Portfolio would be eligible for inclusion in a CLO, the Debtors would retain the option to effect a secured financing of all or a portion of such remaining loans as described in paragraph 21 above.

23.    Initially, the Debtors discussed the possibility of creating one or more CLOs with Fraser Sullivan and another experienced CLO manager.  Based on such discussions, the Debtors determined that the interest rates that will be paid to the noteholders and the proceeds the Debtors will receive from a sale of commercial loans to the CLO Issuers were materially more favorable to the Debtors than the terms at which the banks were willing to lend to the Debtors.  The cash generated for the Debtors as a result of the issuance of CLOs was greater than the amount of financing available from the more traditional asset based lenders.  Based on the composition of the Commercial Loan Portfolio as of July 15, 2011 and discussions with Fraser Sullivan regarding current market conditions, the Debtors anticipate receiving approximately $1.6 to 2.0 billion in cash from the proceeds received from sale of the multiple tranches of securities issued by CLO Issuers.  The economic benefit Lehman and its creditors will receive from the receipt of such cash in advance

of the normal run-off of the loans based on their maturity schedules exceeds the anticipated costs associated with the CLOs.  The Debtors and non-Debtor affiliates that sell loans will acquire the economic equity interests in the CLO Issuers, which will provide each of the Debtors and the non-Debtor affiliates with their proportionate share of the upside of the Commercial Loan Portfolio.  Finally, engaging a CLO manager to manage the loans that will be sold to the CLO (the "CLO Assets"), as well as the loans that are not sold to a CLO, will provide the Debtors with the benefit of continuity of management.  The Debtors and their non-Debtor affiliates may transfer the loans directly to the CLO Issuers, or alternatively, may transfer the loans to one or more subsidiaries of one or more of the Debtors and/or non-Debtor affiliates which will then transfer the loans to the CLO Issuers.[4]  The decisions concerning whether to execute a CLO, the timing of the execution of a CLO and the terms of any CLOs are subject to the approval by the Debtors in their sole discretion.  There can be no assurance that any CLO transactions will be executed.

### Hiring Fraser Sullivan to Manage the Commercial Loans That Are Not Sold to the CLO Issuers Is In The Best Interests of the Debtors and Their Estates

24.     Not all of the loans in the Commercial Loan Portfolio will be included in a CLO for various reasons, including that the rating agencies may determine that such loans are not eligible to be included in a CLO.  The notes issued by a CLO are generally rated by credit rating agencies that provide criteria that must be satisfied in order for loans to be included in a CLO.  Among the reasons that loans may not be eligible to be included in a CLO are the following: (a) the loans contain unfunded commitments; (b) the borrowers' credit ratings are below certain levels; (c) the loans permit the borrowers to capitalize interest payments thereon; (d) the borrowers' repayment

---

[4]  Each time this Motion describes the transfer of loans to the CLO Issuers in exchange for cash and the economic equity interests in such entities, such references shall be deemed to contemplate either a direct or an indirect transfer as described herein.

obligations are subordinated to other obligations of the borrowers; or (e) a default has occurred on the loans.  The Debtors estimate, based on discussions with Fraser Sullivan, that loans in the Commercial Loan Portfolio (based on its composition as of July 15, 2011) with an outstanding principal balance of approximately $1.6 billion will not be included in any CLO (the "Non-CLO Assets").  In connection with the Debtors' discussions with loan managers regarding the CLOs, the Debtors have determined that they will garner additional benefits if the same manager that manages the CLO Assets also manages the Non-CLO Assets on behalf of the Debtors.

25.    Hiring a third party manager for the Non-CLO Assets will enable the Debtors to maximize the value of the Commercial Loan Portfolio.  As the Commercial Loan Portfolio runs off, it will be difficult for LAMCO to pay salaries that will incentivize key LAMCO employees to remain with the firm when such employees may have alternative opportunities.  Inasmuch as the need to actively manage the loans remains notwithstanding the reduced outstanding amount of the loans, if LAMCO cannot retain its key employees, it will not be able to continue to manage the Non-CLO Assets in the manner necessary to maximize their value.  Accordingly, the Debtors may have to sell the Non-CLO Assets at a discount, which could reduce the Debtors' realization in respect of the Commercial Loan Portfolio considerably.

26.    Engaging a third party to manage the Commercial Loan Portfolio will also provide the Debtors with the ability to shift to a scalable, variable cost structure compared to the fixed costs currently being incurred by the Debtors and likely to be incurred during the remaining life of the Commercial Loan Portfolio if LAMCO continues to manage the commercial loans.  Currently, LAMCO employs 11 managers and 23 support staff whose primary responsibility is the management of the Commercial Loan Portfolio.  In addition to the expense of employee

compensation, the Debtors bear the costs of information technology, subscriptions to news and financial information databases necessary to monitor the loans, and office space.

27.     One of the key considerations for the Debtors in selecting an asset manager was the need to ensure continuity of management.  The Portfolio Management Team is extremely knowledgeable about the loans in the Commercial Loan Portfolio and has developed relationships with many of the borrowers and other syndicated lenders.  A sudden change in the personnel managing the loans would, in the Debtors' view, impair the performance of the Commercial Loan Portfolio.  The three senior members of the Portfolio Management Team have entered into employment contracts with Fraser Sullivan.  The effectiveness of such contracts is subject to the occurrence of the effective date under the Asset Management Agreement (the "AMA Effective Date").  The Asset Management Agreement provides that certain other key LAMCO employees will be offered employment with Fraser Sullivan, which will commence on the AMA Effective Date. Fraser Sullivan will be required to retain such employees until at least December 31, 2011; *provided* that Fraser Sullivan will be required to retain at least two of the three senior managers for at least 2 years after the AMA Effective Date.  Upon the effectiveness of the Asset Management Agreement, the Portfolio Management Team will no longer be employees of LAMCO.  LAMCO and, therefore, the Debtors' estates will be spared the expenses associated with maintaining such employees. LAMCO will only have limited future liabilities with respect to such employees.  If any of the employees hired by Fraser Sullivan are terminated other than for cause in the first 12 months following the AMA Effective Date (or first 24 months in the case of the three senior managers), LAMCO will remain obligated to pay six months severance to such employees, which is consistent with such employees' current contracts with LAMCO.  Over time, LAMCO plans to wind down much of the the infrastructure currently used to monitor and manage the Commercial Loan Portfolio.

28.     Another of the critical provisions in the Asset Management Agreement is the agreement by Fraser Sullivan to comply with the Debtors' requested governance and reporting requirements.  The Debtors seek to maintain control over certain significant decisions regarding the Commercial Loan Portfolio. As debtors-in-possession, the Debtors have fiduciary duties to maximize the value of their assets and do not want to cede responsibility for significant decisions regarding the Commercial Loan Portfolio to a third party.  It was a requirement for their engagement as manager of the Commercial Loan Portfolio that Fraser Sullivan agree to terms in the Asset Management Agreement that permit the Debtors to retain ultimate decision making authority for certain actions.

29.     Fraser Sullivan is experienced in managing loans of the type included in the Commercial Loan Portfolio and has experience in structuring, marketing, closing and managing CLOs.  Fraser Sullivan has successfully completed five CLOs since 2006.  Three of these have closed since the most severe period of the recent financial crisis: one in January 2009, one in April 2010 and a third in February 2011.  All of Fraser Sullivan's managed CLOs have consistently performed well throughout their respective lives and, Fraser Sullivan has informed the Debtors that all of Fraser Sullivan's CLOs have made uninterrupted distributions to equity investors since inception

30.     With respect to the loans not included in CLOs, the Asset Management Agreement provides that the Debtors will pay Fraser Sullivan a management fee of 30 basis points per annum on the amount of the funded loans and the value of any defaulted loans or equity interests.  Fraser Sullivan may also receive a success fee of up to $5 million in the Debtors' sole and absolute discretion.  While the management fee payable with respect to the CLO Assets will not be established until a particular CLO is launched, the Asset Management Agreement provides that the

management fee paid by the applicable CLO Issuer to Fraser Sullivan is expected to be 25 basis points per annum based on the outstanding principal amount of the loans held by the CLO.  Upon the closing of any CLOs, the applicable management fee will be borne by the CLO Issuers and will no longer be a direct expense of the Debtors' estates.  Based upon the foregoing, the Debtors estimate that the aggregate management fees paid by the Debtors and the CLO Issuers to Fraser Sullivan for management of the Commercial Loan Portfolio will be approximately (a) $3 million for the period from September 1, 2011 through December 31, 2011, (b) $9 million the 2012 calendar year, and (c) $8 million for the 2013 calendar year.[5]  The management fees are tied to the aggregate outstanding amount of the loans and, therefore, as the loans mature and are repaid, the management fees paid in future years will decline.  Fraser Sullivan's fees, together with the Debtors' remaining fixed costs relating to the Commercial Loan Portfolio will increase the Debtors' overall costs related to the Commercial Loan Portfolio, but not in a material amount.

**Fraser Sullivan Submitted the Best Overall
Proposal for the Management of the Corporate Loan Portfolio**

31.    Following the Debtors' determination that a CLO strategy was in the best interests of their estates, the Debtors discussed the prospective material terms of the potential CLOs and the Asset Management Agreement with Fraser Sullivan.  The transactions and management terms proposed by Fraser Sullivan were more advantageous to the Debtors than those proposed by another CLO manager with which the Debtors initially negotiated.  Concurrently with the negotiation of the Asset Management Agreement, in order to ensure that the proposed transaction with Fraser Sullivan provided the most favorable terms available, the Debtors instructed Lazard Freres & Co. LLC ("Lazard"), their financial advisor, to seek offers from a number of qualified

---

[5] The actual amount may vary depending on when the CLOs are closed, the amount of loans sold to the CLOs, the management fees paid by the CLO Issuers and whether any of the loans are repaid prior to their maturity dates.

managers for the management of the Commercial Loan Portfolio and the CLOs.  The process was

specifically designed so as not to disclose to the broader market or the current LAMCO employees

that the Debtors had an interest in selling their Commercial Loan Portfolio or provide the details of

the portfolio to the public.  Such disclosures would have had detrimental effects on the value of the

Commercial Loan Portfolio, decreased the price at which the Debtors may ultimately be able to sell

the commercial loans, and resulted in significant numbers of LAMCO employees leaving the firm.

32.     The steps undertaken by the Debtors and Lazard to date are described below:

a.   The Debtors and Lazard prepared a "teaser" and provided it to nine qualified firms
     selected by the Debtors in consultation with Lazard and the advisors to the Creditors
     Committee.  The nine firms were selected in order to represent a cross section of
     qualified managers, on the basis of their experience in recently executing CLOs, their
     experience in managing commercial loan portfolios and CLOs, their investment
     approach, the amount of assets under management, and their geographic reach.  The
     "teaser" described the opportunity to manage the Commercial Loan Portfolio,
     provided limited information about the Commercial Loan Portfolio and indicated that
     the Debtors are seeking an asset manager willing to employ the Portfolio
     Management Team and adhere to strict governance requirements.  The "teaser" also
     set forth the details of the Debtors' selection process.  The "teaser" did not identify
     the name of the Lazard client which owned the Commercial Loan Portfolio.  On the
     basis of the "teaser," Lazard sought indications of interest from the nine firms.  All
     nine firms timely contacted Lazard and indicated an interest in the opportunity.  A
     copy of the "teaser" is attached hereto as Exhibit B.

b.   The Debtors negotiated the terms of a non-disclosure agreement with each firm that
     provided an indication of interest to ensure that such firms kept confidential all
     information provided in connection with the transaction and did not use such
     information for any purpose other than evaluating, negotiating and considering the
     proposed transaction.  The Debtors entered into non-disclosure agreements with all
     nine firms.

c.   Following execution of non-disclosure agreements, the Debtors provided the firms
     with a Request for Information and Proposal ("RFP") which indicated that the
     Debtors were interested in a transaction that maximized value, minimized risk and
     lowered overhead costs.  The RFP requested that each firm provide to the Debtors (i)
     general information about the firm and its qualifications and experience, specifically
     relating to the management of commercial loans and CLOs, (ii) an overview of its
     then-current commercial loan portfolio, (iii) an overview of the firm's experience in
     securitizations, and (iv) an indication that the firm was willing to (A) work to effect
     CLOs, (B) agree to the Debtors' reporting requirements and required consent rights

with respect to the management of the Commercial Loan Portfolio, and (C) hire the Portfolio Management Team and maintain offices for such employees in New York and London.  The RFP also inquired whether the firms had any alternate proposals that might satisfy the Debtors' goals.  The RFP indicated that once parties submitted a response to the RFP, the Debtors may, in their discretion, select one or more firms for a proposed transaction and would provide such firms with further information about the Commercial Loan Portfolio. A copy of the RFP is attached hereto as Exhibit C.  Eight of the nine firms responded to the RFP.  One firm elected not to respond to the RFP and was eliminated from the process.

d.    The Debtors reviewed the RFPs and eliminated two firms from consideration.  One firm was eliminated because it was not willing to comply with the Debtors' required consent rights with respect to the management of the Commercial Loan Portfolio.  The other firm was eliminated because it did not have the requisite experience managing commercial loan portfolios of the scale of the Commercial Loan Portfolio.  The Debtors and the three senior members of the Portfolio Management Team met with and provided detailed information about the Commercial Loan Portfolio to each of the six other firms.  The Debtors requested that such firms submit to the Debtors an indication of the terms on which they would be willing to enter into a management agreement to manage the Commercial Loan Portfolio and set forth the terms pursuant to which the CLOs would be executed.

e.    The Debtors received term sheets at the end of June 2011 from each of the six remaining firms.  The Debtors reviewed the term sheets in consultation with Lazard.  The Debtors also discussed such term sheets with the advisors to the Creditors' Committee.  Based primarily on (i) the manager's willingness to hire the Portfolio Management Team, (ii) the historical performance record of the managers; (iii) the fees such managers proposed to charge the Debtors and the CLOs, (iv) the expertise of the managers and their ability to execute the desired CLOs, and (v) the manager's willingness to comply with the Debtors' governance requirements, the Debtors selected two managers with which to continue negotiations in addition to Fraser Sullivan.

f.    The Debtors instructed Lazard to notify four of the managers that the Debtors had decided not to pursue further discussions with them.  The Debtors instructed Lazard to notify the remaining two managers that their proposals were under consideration, but the fees associated with their proposals were too high compared to other proposals received and to seek "best offers" from those two managers.  Both firms submitted revised proposals.

33.    The Debtors, in consultation with Lazard and the advisors to the Creditors' Committee, considered the responses to the RFPs and the financial terms submitted by the various firms and determined that Fraser Sullivan's offer was the best offer for the following reasons: the

offer provided for the continuity of management, Fraser Sullivan agreed to the Debtors' required

reporting requirements and consent rights with respect to the management of the Commercial Loan

Portfolio, Fraser Sullivan has demonstrated the requisite experience (particularly over the last three

years) to execute CLOs and perform the asset management duties contemplated by the Asset

Management Agreement, and the amount of the management fees to be charged by Fraser Sullivan.

The Debtors negotiated the Asset Management Agreement with Fraser Sullivan at arm's-length.  In

the Debtors' business judgment the terms of the Asset Management Agreement are fair and in the

best interests of the Debtors' estates and creditors.  The Debtors have been advised that the

Creditors' Committee supports the Debtors' entry into the Asset Management Agreement with

Fraser Sullivan and that the Creditors' Committee intends to file a statement with the Court with

respect to this Motion.

34.    The salient provisions of the Asset Management Agreement are summarized

below:

| | |
|---|---|
| **Appointment of Fraser Sullivan** | The Debtors appoint Fraser Sullivan to provide asset management and investment management services relating to the Commercial Loan Portfolio.  Such services include: (i) buying, selling, refinancing, restructuring, recapitalizing, hedging and similar asset management activities, (ii) reducing or monitoring unfunded commitments and letter of credit exposure, and (iii) monitoring corporate debt markets to determine appropriate exit strategies for the Debtors. |
| | Subject to certain consent rights set forth on Schedule D of the Asset Management Agreement, the Debtors delegate to Fraser Sullivan all of their powers, authority, privileges and rights with regard to the management, transfer, sale, disposition, refinancing and restructuring of the loans in the Commercial Loan Portfolio and appoint Fraser Sullivan as their agent in fact with full authority to manage the Commercial Loan Portfolio. |
| **Execution of CLOs** | Fraser Sullivan will, subject to market conditions, make commercially reasonable efforts to execute a series of CLOs involving (i) at least $500 million of loans no later than 180 days following the AMA Effective Date and (ii) at least an additional $500 million of loans no later than the first |

anniversary of the AMA Effective Date. The CLOs will contain the terms set forth on Schedule C to the Asset Management Agreement (unless otherwise agreed by the Debtors), and market terms to the extent such Schedule C does not provide for specific terms. The decision whether or not to execute CLOs, the timing of the execution of CLOs and all terms of the CLOs will be subject to the approval by the Debtors. The Debtors (together with any non-Debtor affiliates that sell loans to the CLO Issuers) will receive 100% of the equity interests in the CLO Issuers.

| | |
|---|---|
| **Standard of Care** | Fraser Sullivan will perform its obligations under the Asset Management Agreement subject to the fiduciary duties imposed on it as, or as if it were, a registered investment advisor under the Investment Advisors Act of 1940, as amended, and with a degree of skill and attention no less than that which Fraser Sullivan and its affiliates exercise with respect to comparable assets that they manage for themselves and others and in accordance with Fraser Sullivan's existing practices and procedures relating to assets of the nature and character of the Commercial Loan Portfolio. |
| **Reporting** | Fraser Sullivan will provide the Debtors with monthly reports containing information regarding the loans, including, (i) the amount, spread, maturity and rating of each loan, (ii) the market price of each loan, (iii) the changes in positions, including repayments, sales and pay-in-kind interest and (iv) any existing defaults. Fraser Sullivan will also provide any additional reporting reasonably requested by the Debtors. Fraser Sullivan will meet with the Debtors at least quarterly to discuss the Commercial Loan Portfolio. |
| **Management Fees** | The Debtors will pay Fraser Sullivan a fee in the amount of (i) 30 basis points per annum of the par amount of the funded loans, or in the case of loans that have uncured payment defaults, the value of such loans and (ii) 30 basis points per annum based on the carrying value of the Debtors' equity positions. The management fees will be payable on a monthly basis, in advance.

The Debtors may pay a success fee to Fraser Sullivan of up to $5 million if the Debtors determine in their sole and absolute discretion that Fraser Sullivan has successfully managed the Commercial Loan Portfolio and the CLOs. |
| **Expense Reimbursement** | The Debtors will reimburse Fraser Sullivan for all reasonable and documented third-party out of pocket expenses incurred in connection with the management of the Commercial Loan Portfolio, subject to the prior approval of the Debtors if such expenses exceed certain specified amounts. |
| **Limitation of Liability** | Fraser Sullivan and its affiliates and their partners, members, directors, officers, agents, advisors and employees and any person controlled by or controlling Fraser Sullivan will only be liable to the Debtors for expenses, losses or damages of any kind sustained by the Debtors on the Commercial |

Loan Portfolio arising out of acts or omissions that constitute gross negligence, willful misconduct, bad faith, material breach of any regulatory or legal requirements, fraud, breach of its standard of care or a willful or grossly negligent breach of the covenants relating to obtaining the consent of the Debtors prior to taking certain specified actions.

**Termination**

The Debtors may terminate the Asset Management Agreement (i) at any time, upon written notice to Fraser Sullivan if Fraser Sullivan breaches certain specified representations, warranties, covenants and obligations under the Asset Management Agreement, or materially breaches any other representations, warranties, covenants and obligations under the Asset Management Agreement, and such breach is not cured within 30 days of notice of such breach, or neither of the two key principals of Fraser Sullivan are employed by Fraser Sullivan and are actively involved in the management of the Commercial Loan Portfolio ("Good Reason"); and (ii) at any time, upon six months prior written notice to Fraser Sullivan for any reason other than Good Reason.

If the Debtors terminate the Asset Management Agreement, the Debtors will pay Fraser Sullivan the due and unpaid management fees and expenses through the termination date. In addition, if the Debtors terminate the Asset Management Agreement without Good Reason, the Debtors will pay Fraser Sullivan the lesser of (a) (i) if the termination occurs within one year of the AMA Effective Date, $7 million, (ii) if the termination occurs between one year and two years after the AMA Effective Date, $5 million, (iii) if the termination occurs between two years and three years after the AMA Effective Date, $3 million, or (iv) if the termination occurs after the third anniversary of the AMA Effective Date, $0, and (b) the management fees Fraser Sullivan would have earned from the date of termination through the third anniversary of the AMA Effective Date based on the composition of the Commercial Loan Portfolio as of the termination date of the Asset Management Agreement, without taking into account any amortization or decrease in the value of the Commercial Loan Portfolio after the termination date.

Either party may terminate the Asset Management Agreement if the AMA Effective Date has not occurred on or before December 31, 2011.

**Portfolio Management Team**

Fraser Sullivan has entered into employment contracts with the three senior members of the management team and has agreed to offer employment to all other employees identified on Schedule H to the Asset Management Agreement. All executed contracts and offers are subject to the occurrence of the AMA Effective Date. Fraser Sullivan has agreed that such employees may not be terminated, other than for cause, on or prior to December 31, 2011 and that such employees' compensation for the remainder of 2011 will be equal to or greater than that which such employees are entitled to receive from LAMCO for such period. Fraser Sullivan will not terminate more than one of the three identified senior

managers prior to the second anniversary of the AMA Effective Date, other than for certain specified reasons.

Fraser Sullivan will be obligated to pay all employment compensation to such employees accrued on and after the AMA Effective Date.

If any of the employees is terminated other than for cause within the first year after the AMA Effective Date, LAMCO will be obligated to pay such employee(s)' severance pay in an amount equal to six times such employee's monthly base pay for the last month prior to AMA Effective Date.

***AMA Effective Date***   The effective date of the Asset Management Agreement is subject to the entry of the order attached to this Motion and such order becoming a final order (which condition may be waived by Fraser Sullivan).

35.   As described above, the Asset Management Agreement requires Fraser Sullivan to make commercially reasonable efforts to consummate one or more CLOs on the terms set forth on Schedule C to the Asset Management Agreement.  Because of the manner in which CLOs are typically executed in the markets, it would be commercially impractical for the Debtors to determine all of the terms of the CLO or to file a motion and seek approval of the Court each time it seeks to execute a CLO.  The final structure and terms of a CLO are determined pursuant to negotiations among the CLO manager, the arranger and the purchasers of the securities issued by the CLO, in consultation with the applicable ratings agencies.  The size of each tranche of securities, the interests rates that will be paid on each tranche and the ratings assigned to each tranche are subject to change until shortly before closing.  Investors in CLOs make their investment decisions based upon offering documents that contain highly detailed information about the CLOs, but such information is subject to continued negotiation until shortly before the closing of the CLO.  Because of the risk of shifting market conditions (e.g., interest rates, loan pricing, credit ratings), investors in CLOs would be disinclined to commit to purchase securities in a CLO whose consummation, after terms have been finalized, is subject to delay pending court approval, especially if such investors have the opportunity to invest in securities that are not subject to such delays.  Accordingly, it would not be in

the Debtors' interest to have the final terms of each CLO subject to court approval before the CLO is consummated.

36.    This Court has previously authorized the Debtors to sell certain types of assets in the future where filing motions prior to each sale was commercially impractical.  *See Order Granting LBHI's Motion for Authorization Pursuant to Sections 105, 363 and 364 of the Bankruptcy Code, to Sell Certain Asset-Backed Securities and related relief*, [Docket No 6659] (authorizing LBHI to sell asset-backed securities at the prevailing market prices, where a requirement to obtain approval of the Court prior to each sale would diminish the price at which LBHI could sell the securities); *Order Authorizing Lehman  Brothers Special Financing Inc. to (I) Cause 1271 LLC to Issue Classes of Interests, (II) Sell Interests in 1271 LLC and (III) Make a Capital Contribution to 1271 LLC* [Docket No. 16938] (authorizing the Debtors to sell interests in 1271 LLC, where LBSF's inability to consummate sales quickly could hinder LBSF's ability to pursue an advantageous opportunity).

37.    Inasmuch as the terms of the CLOs will largely be consistent with Schedule C to the Asset Management Agreement, it is in the Debtors' best interests and is most efficient for the Court to authorize the Debtors to execute CLO transactions on the terms set forth in Schedule C to the Asset Management Agreement and other terms consistent with the prevailing market conditions at the time of such executions.  In summary, Schedule C provides for the following:

***Securities***    Multiple classes of securities will be issued by a Cayman Islands special purpose vehicle. The principal amount and interest rate of each class of securities will be determined collectively by the arranger, the Debtors and Fraser Sullivan.  The securities (other than the equity securities) will be rated by one or more rating agencies.

The Debtors (together with any non-Debtor affiliates that sell loans to the CLO Issuers) will acquire all of the equity interests (which may be in the form of subordinated notes) issued by the CLO Issuers.  It is possible that the Debtors and non-Debtor affiliates may also acquire notes issued by the

CLO Issuers.

| | |
|---|---|
| ***Trading and Sales of Loans*** | The CLO governing documents will restrict the CLO Issuer's ability to sell or purchase assets after the initial acquisition of the loans from the Debtors. The CLO Issuers will only be permitted to sell assets if the assets are impaired, defaulted or trading above their par value. |
| | If Fraser Sullivan determines that a CLO Issuer should sell an asset, the Debtors, and/or any other holder of the equity securities issued by the CLO Issuer, will have a right of first refusal with respect to the purchase of such asset. |
| ***Fees*** | The arranger's fees are expected to be between 1.0-1.5% of the par amount of the securities sold. |
| | Fraser Sullivan's fees as manager will be 25 basis points per annum, comprised of a senior and a subordinate management fee based on the principal balance of the loans held by the CLO. The senior management fee is expected to be between 10-15 basis points per annum and the subordinated management fee is expected to be 25 basis points per annum less the senior management fee. The subordinate management fee will be payable only after all interest due on the securities (other than the equity interests) has been paid. |
| | The trustee will be entitled to a fee calculated in accordance with prevailing market rates based on the principal balance of the CLO Assets. |
| ***Management Agreement*** | The collateral management agreement entered into between the CLO Issuers and Fraser Sullivan will be consistent, as appropriate, with the terms of the Asset Management Agreement and include the obligation of the CLO Issuer to obtain the consent of the Debtors before taking certain specified actions. |
| ***Loan Sales*** | The Debtors will transfer and effect a true sale of loans to the CLO Issuers (or a wholly-owned subsidiary of the Debtors that will then transfer such loans to the CLO Issuers). |

38.     Early in the negotiation process, Fraser Sullivan requested that the Debtors agree to a customary break-up fee and other "bid protections" and seek to have such terms approved by the Court. Due, in particular, to the expected termination of LAMCO employees, the Debtors were concerned that premature disclosure would adversely affect the value of the Commercial Loan Portfolio. As a result, the Debtors did not agree to seek such protections. Nevertheless, in view of the fact that Fraser Sullivan has spent a substantial amount of time and incurred expenses

considering the proposed transactions and negotiating the terms of the Asset Management

Agreement, the Debtors have provided Fraser Sullivan with a side letter in which the Debtors have

agreed to file a motion seeking authority to reimburse Fraser Sullivan for its out-of-pocket,

documented and reasonable costs and expenses, subject to a cap of $500,000, in the event that the

Asset Management Agreement is terminated because either (a) the Bankruptcy Court denies this

Motion or (b) the Effective Date shall not have occurred on or before December 31, 2011.  A copy

of the side letter is annexed hereto as Exhibit D.

> 39.    The respective rights and obligations of each of the Debtors and their non-

Debtor affiliates regarding their loans will be preserved in the transactions contemplated by the

Asset Management Agreement.  Specifically, for each loan beneficially owned by a Debtor or a non-

Debtor affiliate, such entity will (a) continue to be entitled to receive collections of principal, interest

or other proceeds from such loans that are Non-CLO Assets, (b) retain the decision making authority

for any actions for which Fraser Sullivan is required to seek approval from Lehman, (c) be entitled to

receive the portion of the consideration paid by any CLO Issuer that relates to its loans, (d) continue

to be obligated for any future funding obligations, and (e) be obligated  to pay its proportionate share

of the fees payable to and expenses of Fraser Sullivan incurred in connection with, and calculated

pursuant to, the Asset Management Agreement.  The Asset Management Agreement will not have

any effect on the current custody arrangements for the loans or on the manner in which collections

on the loans will be administered and accounted for.  In addition, until the effective date of the

Second Amended Plan, the Debtors will continue to comply with the existing protocols that require

the Debtors to provide notice and/or obtain the consent of the Creditors' Committee prior to entering

into certain types of specified transactions.

## The Relief Requested is Warranted
## and in the Best Interests of LCPI, LBHI and Their Estates

40.    While the proposed transaction may be one of the first times that a new CLO

is effected comprised of loans held by a debtor during a chapter 11 case, ample authority exists for

the approval of the Asset Management Agreement and the proposed sale of a portion of the

Commercial Loan Portfolio to the CLO Issuers.  Section 363 of the Bankruptcy Code provides, in

relevant part, "that a debtor, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of

the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court

to authorize the use, sale or disposition of a debtor's assets, courts in the Second Circuit and others,

in applying this section, have required that the transaction be based upon the sound business

judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a

judge reviewing a section 363(b) application must find from the evidence presented a good business

reason to grant such application); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Once a court is satisfied that there is a sound

business justification for the proposed use or sale, the court must then determine whether (i) the

debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is

fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See, e.g., In re Betty Owens

Sch.*, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); *accord In re Delaware and Hudson Ry. Co.*, 124

B.R. at 166; *In re Decora Indus., Inc.*, Case No.  00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del.

May 20, 2002).

41.    The Debtors believe that entering into the Asset Management Agreement with

Fraser Sullivan for the management of its Commercial Loan Portfolio and establishing and executing

one or more CLO transactions are exercises of their sound business judgment.  Hiring Fraser

Sullivan will enable the Debtors to wind down their operations and much of the infrastructure utilized to manage the Commercial Loan Portfolio.  Inasmuch as the Portfolio Management Team will be hired by Fraser Sullivan and continue to manage the loans, the institutional knowledge of and relationships with the borrowers will remain, and the well-established protocols, governance and procedures with which the Debtors have managed the Commercial Loan Portfolio will be preserved, resulting in a smooth transition of the management of the loans.

42.    Moreover, the establishment of one or more CLOs will provide substantial benefits to the Debtors' estates.  The Debtors expect that (based on the composition of the Commercial Loan Portfolio as of July 15, 2011 and discussions with Fraser Sullivan regarding current market conditions) they will receive approximately $1.6 to 2.0 billion from the contemplated sales of the loans into the CLOs.  The Debtors will be able to use such cash to accelerate distributions to creditors following confirmation of the Second Amended Plan.   Moreover, as part of the consideration for the sale of commercial loans to the CLOs, the Debtors (together with any non-Debtor affiliates that sell loans to the CLO Issuers) will receive all of the equity interests in the CLO Issuers, thereby preserving the upside of the Commercial Loan Portfolio.  The anticipated CLO transactions provide for a greater return to the Debtors' estates on the loans and are a more efficient and less costly means to monetize the loans than the alternative options, including a sale of each loan or the entire portfolio at a discount or an asset-backed loan.

43.    Generally, the CLO Issuer will purchase the loans from the Debtors and non-Debtor affiliates in exchange for (i) all net cash received by the CLO Issuer from the sale of the CLO securities, less certain expenses incurred in connection with the issuance of such securities and the funding of any of the CLO's reserve accounts, and (ii) all of the equity interests in the CLO issuers. Since the CLO transactions will be consummated periodically over the next year or more, it is

impossible at this time to determine the actual sale price of the loans into the CLOs.  However, inasmuch as the Debtors (together with any non-Debtor affiliates that sell loans to the CLO Issuers) are receiving the equity interests in the CLO Issuers as part of the purchase price, the actual cash purchase price is not critical to the value that the Debtors receive in exchange for the loans.  An increase in the cash component of the purchase price would in effect be offset by a decrease in the expected recovery by the Debtors on account of their equity interest in the CLO, and a decrease in the cash component of the purchase price would similarly be offset by an increase in the expected recovery by the Debtors on account of their equity interest in the CLO.   The only effect the purchase price has on the Debtors is the amount of cash they receive upon the execution of the CLO.

44.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  *See, e.g., In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re International Wire Group, Inc., et al.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.),* 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met).

45.    The Debtors' decision to pursue a transaction with Fraser Sullivan pursuant to a private sale as opposed to a public auction is supported by the fact that the Debtors explored

transactions with various other market participants.  The number of parties qualified to manage the

Commercial Loan Portfolio on the terms required by the Debtors is limited.  The Debtors and Lazard

designed a process to seek bids from various qualified firms.  The firms were selected to represent a

cross section of firms of different sizes and expertise.  The list of firms was discussed with the

Creditors' Committees' professionals.  The Debtors solicited offers from several other firms and

gave due consideration to such offers.  The Debtors considered numerous factors, including, without

limitation, the experience and qualifications of the firm, the willingness of the firm to provide for

continuity of management, the ability of the firm to execute CLO transactions, the proposed

management fees and the firm's willingness and ability to comply with the Debtors governance and

reporting requirements.  The Debtors and Lazard determined that Fraser Sullivan is qualified to

manage the Commercial Loan Portfolio and execute the CLOs and, in consultation with the advisors

to the Creditors' Committee, determined that Fraser Sullivan's offer is the best available to the

Debtors' estates and represents a transaction that is in the Debtors' best interests.

46.    Nonetheless, consistent with the Debtors' fiduciary duties to ensure the

greatest return to creditors and their estates and with the Debtors' practice in certain other private

sales conducted in their chapter 11 cases, the Asset Management Agreement remains, until the

hearing on this Motion, subject to higher or better offers.  The Debtors retain the right to determine,

in their sole discretion, the highest or otherwise best offer, and to reject any offer.  Subjecting the

Asset Management Agreement to higher or better offers will ensure that the Asset Management

Agreement with Fraser Sullivan or any higher or better offer that is ultimately accepted by the

Debtors (i) will represent the highest or best offer; (ii) will be fair and reasonable; and (iii) will

provide reasonably equivalent value and fair consideration for the loans and the management duties

in accordance with the Bankruptcy Code and non-bankruptcy law.

## Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

47.     The loans sold into a CLO will be sold free and clear of any interest of any

entity.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property

of the estate "free and clear of any interest in such property of an entity other than the estate" if

applicable nonbankruptcy law permits the sale of such property free and clear of such interest, if

such entity consents, if such interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute,

or if such entity could be compelled, in a legal or equitable proceeding, to accept a money

satisfaction of such interest.  11 U.S.C. § 363(f)(1) – (5). Although the Debtors do not believe that

the Commercial Loan Portfolio is subject to any liens, claims or encumbrances in favor of any third-

parties, the Debtors believe that they satisfy one or more of the conditions set forth in section 363(f).

## The Sale of the Loans Contemplated By the Asset Management
## Agreement Will Be the Product of Good Faith and Provides for Fair Consideration

48.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's

interest in property purchased from the debtor notwithstanding that the sale conducted under section

363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] …
> does not affect the validity of a sale … to an entity that purchased … such property in
> good faith, whether or not such entity knew of the pendency of the appeal, unless
> such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the

judgment of the bankruptcy court, but particularly to give finality to those orders and judgments

upon which third parties rely.'" *In re Chateaugay Corp.*, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y.

1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147).  *See also Allstate Ins. Co.

v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith

transfers of property will not be affected by the reversal or modification on appeal of an unstayed

order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

49.    The sale of the loans by the Debtors to the CLO Issuers will be the product of arm's length, good faith negotiations between the Debtors and Fraser Sullivan on behalf of the CLO Issuers as well as the arrangers, potential investors and the rating agencies. The purchase price of the loans will be determined primarily by prevailing market conditions. The terms of the sale of the loans will be determined in consultation with the arranger of the CLOs, the rating agencies and potential investors. The CLO Issuers will be good faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code.

## The Sales of the Loans to the CLO Issuers Will Constitute True Sales

50.    The Debtors intend the sales of loans to the CLO Issuers to be true sales. The agreements pursuant to which the Debtors transfer the loans to the CLO Issuers will provide that each transfer is a "true sale" of all interests and benefits of ownership in the loans, and that none of the transfers are intended to be characterized as financings. In determining whether a particular transaction is properly characterized as a sale or loan, courts frequently refer to the intent of the parties to the transaction. See, e.g., In re Evergreen Valley Resort, Inc., 23 B.R. 659, 661 (Bankr. D. Me. 1982) ("It is clear that an assignment may operate to transfer a security interest, rather than absolute ownership, if it is <u>intended</u> to create a security interest."). A necessary predicate to the closing of a CLO is a true sale of the loans into the securitization vehicle. The Debtors, therefore, are seeking a finding that, to the extent Lehman sells loans to the CLO Issuers and executes CLO transactions consistent with the terms set forth on Schedule C to the Asset Management Agreement, the transfers of the loans will constitute true sales.

**Relief Under Bankruptcy Rule 6004(h)**

51.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until expiration of 14 days after entry of the order, unless the Court orders otherwise." Fed. R. Bank. P. 6004(h).  Although pursuant to the terms of the Asset Management Agreement, such agreement may not become effective until the order approving such agreement becomes a final order, Fraser Sullivan does have the right to waive that condition.  The Debtors seek to have the Asset Management Agreement become effective immediately upon the entry of the proposed order so that they may consummate the proposed transactions expeditiously and take advantage of favorable market conditions.  Accordingly, waiver of the fourteen-day stay is requested.

**Notice**

52.     No trustee has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) the attorneys for Fraser Sullivan, and (viii) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these cases [Docket No. 9635].  The Debtors submit that no other or further notice need be provided.

53.     No previous request for the relief sought herein has been made by the Debtors

to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  July 27, 2011
        New York, New York


/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

## Asset Management Agreement

US_ACTIVE:\43714894\16\58399.0008

**EXECUTION VERSION**

**ASSET MANAGEMENT AGREEMENT**

**between**

**WCAS│FRASER SULLIVAN INVESTMENT MANAGEMENT, LLC**

**and**

**LEHMAN BROTHERS HOLDINGS INC.**

**AS OF JULY 26, 2011**

# TABLE OF CONTENTS

**Page**

1.  Appointment and Status as Asset Manager ........................................................ 1

2.  Management Services ....................................................................................... 1

3.  Representations by Client ................................................................................ 5

4.  Representations, Warranties and Covenants of Manager ................................. 5

5.  Portfolio Execution .......................................................................................... 6

6.  Aggregation and Allocation of Orders ............................................................. 6

7.  Conflicts of Interest; Affiliated Transactions ................................................. 7

8.  Periodic Reports, Valuations, Meetings and Other Communications ............. 7

9.  Compensation; Reimbursable Expenses ......................................................... 9

10. Custody ......................................................................................................... 10

11. Confidential Information ............................................................................... 10

12. Directions to Manager ................................................................................... 11

13. Limitation of Liability ................................................................................... 12

14. Non-Exclusive Management .......................................................................... 13

15. [Intentionally Omitted] ................................................................................. 13

16. Approvals; Effective Period of Agreement ................................................... 13

17. Amendments .................................................................................................. 13

18. Duration and Termination ............................................................................. 14

19. Employees and Employee Benefits ............................................................... 16

20. Transition Services; Intellectual Property .................................................... 20

21. Independent Contractor Status ...................................................................... 20

22. Assignment .................................................................................................... 20

23. No Third Party Beneficiaries ........................................................................ 21

24. Affiliates of Client ........................................................................................ 21

## TABLE OF CONTENTS
### (continued)

**Page**

25.    Severability ...................................................................................... 21

26.    Submission to Jurisdiction; Consent to Service of Process ............................................. 21

27.    Waiver of Right to Trial by Jury .................................................................. 22

28.    Governing Law ................................................................................... 22

29.    Entire Agreement ................................................................................ 22

30.    Notices and Other Communications ................................................................ 22

31.    Interpretation and Certain Defined Terms ......................................................... 23

32.    Headings; Internal References .................................................................... 27

33.    Counterparts .................................................................................... 27

**SCHEDULES**

A        Managed Assets
B        Affiliates of Client which hold Managed Assets
C        CLO Transactions
D        Loan Management Approval Protocols
E        Wall Street Office Report
F        Financial Institutions
G        Reimbursable Expenses
H        Identified Client Employees
I        Transition Services Agreement

# ASSET MANAGEMENT AGREEMENT

THIS AGREEMENT (together with all appendices, schedules and annexes hereto, which are hereby deemed a part hereof, and as amended, modified or supplemented from time to time, this "Agreement"), is made as of the 26th day of July, 2011, by and between: (i) Lehman Brothers Holdings Inc., a corporation organized under the laws of Delaware (the "Client"); and (ii) WCAS│Fraser Sullivan Investment Management, LLC, a limited liability company formed under the laws of New York (hereinafter called the "Manager"). Unless otherwise indicated, capitalized terms used in this Agreement shall have the meanings ascribed to them in Section 31.

<div align="center">WITNESSETH:</div>

WHEREAS, Client is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and, together with certain of its affiliates, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on September 15, 2008 in the United States Bankruptcy Court for the Southern District of New York (Manhattan) (the "Bankruptcy Court") (Jointly Administered Case No. 08-13555 (JMP)) (the "Bankruptcy Cases");

WHEREAS, Client believes it is in the best interests of Client to appoint Manager to provide asset management and investment management services with respect to the portfolio of corporate debt assets described on Schedule A (as same may be amended from time to time in accordance with the terms hereof, the "Managed Assets") of Client and its controlled affiliates on the terms and subject to the conditions set forth herein; and

WHEREAS, Client wishes that Manager close one or more CLO Transactions (as defined below) to monetize certain Managed Assets on the terms and subject to the conditions set forth herein;

NOW THEREFORE, for and in consideration of the premises and of the mutual covenants herein contained, the parties hereby agree as follows:

1.    Appointment and Status as Asset Manager. Effective from and after the Effective Date, Client hereby appoints Manager to provide asset management and investment management services as further described in this Agreement with respect to the Managed Assets and Manager does hereby accept said appointment.

2.    Management Services.

(a)    *Services and CLO Execution.* (i) Manager shall be responsible for providing to Client the following asset management and investment management services with respect to the Managed Assets: (A) active portfolio management (including all tasks typically undertaken with respect to the Managed Assets with the objective of maximizing returns and minimizing risks (including, buying, selling, refinancing, financing, restructuring, recapitalizing, hedging and all similar asset management activities undertaken in the ordinary course)); (B) reducing or monitoring unfunded commitments and letters of credit exposures (including notifying Client of any requests for advances under any existing unfunded commitments in respect of Non-CLO Assets) and (C) monitoring

<div align="center">1</div>

corporate debt markets to determine appropriate exit strategies with respect to the Managed Assets.

(ii)     The affiliates of Client listed on <u>Schedule B</u> are holders of the Managed Assets as of the date hereof.  The Managed Assets may be held or owned by and transferred, at the Client's sole and absolute discretion, between Client and any of its controlled affiliates (each a "<u>Managed Asset Affiliate</u>" and, collectively, the "<u>Managed Asset Affiliates</u>"), including the entities listed on <u>Schedule B</u>, and Client will provide Manager with prompt written notice of any such transfer; <u>provided</u> that each such transferred Managed Asset (other than an asset that is transferred to a CLO) shall continue, after giving effect to the applicable transfer, to be a Managed Asset for all purposes of this Agreement.

(iii)    [Intentionally Omitted]

(iv)     Subject to the Protocols, the Manager may enter into, acquire, maintain, restructure or terminate any bona fide short sales, assets, contracts, instruments or other arrangements designed to hedge or reduce one or more risks associated with, or to perform under, a Managed Asset ("<u>Bona Fide Hedging Transactions</u>"); provided that any such Bona Fide Hedging Transactions entered into with respect to a Managed Asset owned by Client or its affiliates shall be subject to the protocol set forth in the Bankruptcy Court's March 11, 2009 order [Docket No. 3047].

(v)      From and after the date of this Agreement, Manager and Client shall, acting reasonably, jointly determine which of the Managed Assets can be securitized (collectively, the "<u>CLO Eligible Assets</u>") into one or more static collateralized loan obligation transactions whose notes are rated by one or more credit rating agencies (each a "<u>CLO</u>") and which of the Managed Assets cannot be securitized (the "<u>Non-CLO Assets</u>").  Unless Manager is directed otherwise by Client, Manager shall make commercially reasonable efforts, subject to market conditions (as advised by the Arranger (as defined in <u>Schedule C</u>), to close a series of CLO transactions involving (A) at least $500 million (measured by par amount) of the CLO Eligible Assets no later than 180 calendar days from and after the Effective Date and (B) at least an additional $500 million (measured by par amount) of the CLO Eligible Assets no later than the first anniversary of the Effective Date, in each case, on the terms set forth on <u>Schedule C</u> and, to the extent a term is not set forth on or otherwise varies from <u>Schedule C</u>, market terms appropriate to the characteristics of the CLO Eligible Assets and the proposed CLO transaction (such transactions and such other CLO transactions consummated with CLO Eligible Assets, collectively, the "<u>CLO Transactions</u>").  Manager agrees to provide Client with prompt written notice if Manager becomes aware of market conditions which, in Manager's opinion, make it unlikely that the CLO Transactions described in clauses (A) and (B) of the immediately preceding sentence will be consummated in accordance with the schedule set forth above.  Manager and Client shall cooperate in good faith to close each CLO Transaction; <u>provided</u> that all terms of any CLO Transaction shall be subject to approval by Client in its sole and absolute discretion.  Client shall purchase 100% of the CLO Equity Securities (as defined in <u>Schedule C</u> and have the right to retain or sell all or any portion of the CLO Equity Securities).  From and after the closing of a CLO

Transaction, (x) the CLO Eligible Assets that comprise the assets of the relevant CLO (the "CLO Assets") and, in each case, any interest, dividend, other income and principal related thereto or any sale or other proceeds therefrom, shall cease to constitute Managed Assets unless repurchased by Client in accordance with documents governing the CLO Transaction(s) (the "CLO Transaction Documents") and (y) the provisions of the CLO Transaction Documents shall govern the management of the CLOs and the CLO Assets. For the avoidance of doubt, CLO Equity Securities are not Managed Assets and, after the closing of a CLO Transaction (unless repurchased by Client as aforesaid), the CLO Assets shall not constitute property of Client or any of its affiliates.

(vi)    This Agreement, including the Manager's duties and Client's and its affiliates' rights and obligations set forth herein, shall be subject to the Approval Order (as defined in Section 16), and any changes to this Agreement set forth in the Approval Order shall be incorporated by reference herein upon the Effective Date (as defined below).

(vii)    Upon the receipt of any Current Income or Disposition Proceeds from a Managed Asset (A) the portion of such income or proceeds comprised of cash shall not be a Managed Asset, and Manager shall, or shall request the applicable custodian of the Managed Assets to, on a daily basis (to the extent practical), deposit such cash into an account or accounts designated by Client for the receipt of such cash income or proceeds (which account shall be under the control of Client or, if appointed by Client, its custodian), and (B) any non-cash income or proceeds from such Managed Asset shall remain a Managed Asset, in accordance with the provisions of this Agreement, and the securities, instruments, assets or other interests comprising such non-cash income or proceeds shall be held, if appropriate, in the same accounts and manner as the Managed Asset from which they were generated or as otherwise directed by Client.

(viii)    Manager shall perform its obligations hereunder subject to the fiduciary duties imposed on it as, or as if it were, as applicable, a registered investment adviser under the Advisers Act, and together with any Sub-Adviser, Manager shall perform its services with a degree of skill and attention no less than that which Manager and its affiliates exercise with respect to comparable assets that they manage for themselves and others and in accordance with Manager's existing practices and procedures relating to assets of the nature and character of the Managed Assets.

(b)    *Authority and Delegation*.  In accordance with the provisions of this Agreement and subject to Section 2(a)(viii) and Client's approval rights set forth in Schedule D (together with Section 2(a)(viii), the "Protocols"), Client hereby delegates to Manager all of its powers, authority, privileges and rights with regard to the management, transfer, sale, disposition, refinancing or restructuring of the Managed Assets and any other transactions related thereto and hereby appoints Manager as its agent in fact with full authority and at its discretion to so manage and effect any such transactions (including Bona Fide Hedging Transactions) involving the Managed Assets in Client's name, on Client's behalf and at Client's risk as Manager deems appropriate from time to time in order to carry out Manager's responsibilities hereunder.  Said powers, duties and responsibilities shall be exercised exclusively by Manager pursuant to and in accordance

3

with the provisions of this Agreement or by any Sub-Adviser permitted by this Agreement.  In addition, subject to the Protocols, Manager shall provide at least three (3) Business Days prior written notice to Client of any of the following matters requiring action and shall be authorized to take the following actions, without any further consent or authorization from the Client, after giving such prior notice to Client: (i) vote, tender or convert any loans, securities or similar instruments comprising the Managed Assets of Client; (ii) execute waivers, consents and other instruments with respect to such loans, securities or similar instruments; and (iii) endorse, transfer or deliver such loans, securities or similar instruments or consent to any class action, plan of reorganization, merger, combination, consolidation, liquidation or similar plan with reference to such loans, securities or similar instruments.  For the avoidance of doubt, subject to the Protocols, Client retains sole responsibility for the performance and payment of all obligations (including future funding obligations) with respect to each Managed Asset as the record and beneficial owner thereof.  Manager shall not acquire any asset (other than a Bona Fide Hedging Transactions entered into in accordance with Section 2(a)(iv)), if the terms of such acquisition would impose a future funding obligation on Client without the prior written consent of Client.  Subject to the requirements of this Agreement and applicable law, Manager may act in its discretion with respect to the Managed Assets.  Manager may, with Client's prior written approval and, in the case of any delegation outside of the ordinary course of business proposed to be made prior to the Plan Effective Date, with the prior written approval of the Creditors' Committee, delegate any or all of its discretionary investment, advisory and other rights, powers, functions and obligations hereunder to any sub-adviser, which may be a third party or an affiliate of Manager (each, a "Sub-Adviser"); provided that each such delegation shall be (x) revocable by Manager upon notice to the delegatee and (y) Manager shall continue to be liable to Client for Manager's obligations hereunder and for all actions of any such third parties or affiliates to the same extent as Manager is liable for its own actions hereunder.  Manager shall not incur sub-advisory fees on behalf of Client without the written consent of Client and, in the case of any delegation outside of the ordinary course of business proposed to be made prior to the Plan Effective Date, without the prior written approval of the Creditors' Committee.

(c)      *Power of Attorney and Proxy*.  Client hereby irrevocably constitutes and appoints for the Term, the Manager, with full power of substitution, the true and lawful attorney-in-fact, proxy and agent of Client (and grants to Manager Client's full proxy, power and authority), to, subject to the Protocols, (i) execute, vote, acknowledge, verify, swear to, deliver, record and file, in its or its assignee's name, place and stead, all agreements, instruments, documents and certificates and (ii) take any and all actions, in each case, that Manager deems appropriate or necessary to enable Manager to perform its services (including the Disposition, restructuring, refinancing, or funding of any Managed Asset) in accordance with the terms of this Agreement.  The power of attorney and proxy granted herein shall be deemed to be coupled with an interest, shall be irrevocable, shall survive and not be affected by the Bankruptcy Cases or the dissolution, bankruptcy, incapacity or legal disability of Client and its affiliates and shall extend to its successors and assigns.  Any person dealing with Manager may conclusively presume and rely upon the fact that any instrument referred to above, executed by such attorney-in-fact, proxy and agent, is authorized, regular and binding, without further inquiry.  If required, Client

shall execute and deliver to Manager within five (5) Business Days after the receipt of a request therefor, such further designations, powers of attorney, proxies or other instruments as Manager shall reasonably deem necessary for the purposes of giving effect to the foregoing power of attorney or enabling Manager to perform its services under this Agreement.

(d)     *Certain Notices; Further Assurances.*  Manager agrees to inform Client, promptly in writing, if Manager becomes aware of a material breach of Sections 2(a)(viii), 4(a)(i), 4(a)(ii) or 7 of this Agreement or of any material obligation of Manager under this Agreement.  Client agrees to, and agrees to cause each Managed Asset Affiliate to, provide such information and execute and deliver or cause to be delivered such documents, instruments, certificates and opinions (including such documents, instruments, certificates and opinions that are required to allow Manager to give instructions directly to any Third-Party Custodian) with respect to itself, all of its subsidiaries and any of its Managed Assets as Manager may from time to time reasonably request (including in connection with any proposed CLO Transaction) to perform the services under this Agreement or to comply with any law, rule or regulation to which Manager may be subject or for any other reasonable purpose.

3.      <u>Representations by Client</u>.  Client hereby represents and warrants to, and agrees with, Manager that, subject to the receipt of the Approval Order: (i) this Agreement has been duly authorized, executed and delivered by Client and constitutes Client's legal, valid and binding obligation; (ii) Client has full legal authority to take all actions with respect to the assets of each Managed Asset Affiliate, including to cause such assets to be Managed Assets and to cause such assets to be transferred to a CLO under the terms of this Agreement; (iii) the execution and delivery by Client of, and compliance by Client with, this Agreement (including all provisions hereof relating to the assets of the Managed Asset Affiliates), will not violate the constituent documents of, or any material law, rule, regulation, order, decree or judgment binding on Client or any Managed Asset Affiliate or any of its or their respective assets or other properties, or any material contractual restriction binding on or affecting Client or any Managed Asset Affiliate or any of its or their respective assets or other properties and no governmental or other notice or consent is required in connection with the execution, delivery or performance of this Agreement by Client or, to Client's knowledge, of any agreements governing or relating to Client's obligations hereunder; (iv) Client shall have full and sole responsibility for payment of all taxes due on capital or income held or collected for the benefit of Client; and (v) the list of Managed Assets set forth on <u>Schedule A</u> is true and complete in all material respects as of July 15, 2011.

4.      <u>Representations, Warranties and Covenants of Manager</u>.  (a)  Manager hereby represents and warrants to, and agrees with, Client that: (i) Manager shall use commercially reasonable efforts to become duly registered as an investment adviser under the Advisers Act ("<u>Advisers Act Registration</u>"), no later than the deadline imposed by the SEC under the Private Fund Investment Advisers Registration Act of 2010 or such earlier time as Advisers Act Registration may be required; (ii) Manager, (A) prior to its Advisers Act Registration becoming effective, shall at all times act in accordance with, and be subject to the same duties and obligations with respect to Client and the Managed Assets as if

Manager was registered as an investment adviser under, the Advisers Act (except that Manager need not comply with the requirements that it complete, file with the SEC and deliver to its clients, as applicable, Parts 1 and 2 of Form ADV) and, (B) after its Advisers Act Registration is effective and for the term of this Agreement, shall remain duly registered as an investment adviser under the Advisers Act; (iii) this Agreement has been duly authorized, executed and delivered by Manager and constitutes Manager's legal, valid and binding obligation; (iv) the execution and delivery by Manager of, and compliance by Manager with, this Agreement, and the performance by Manager of the services hereunder, and the transactions and agreements which Manager enters into on behalf of Client with any counterparty pursuant to this Agreement will not violate the constituent documents of, or any material law, rule, regulation, order, decree or judgment binding on Manager, or any material contractual restriction binding on or affecting Manager or its properties and no governmental or other notice or consent is required in connection with the execution or delivery of this Agreement by Manager or, to Manager's knowledge, of any agreements governing or relating to Manager's obligations hereunder; and (v) Manager shall at all times act in accordance with (x) this Agreement (unless otherwise agreed to in advance by Client) and (y) any provision of Applicable Law, including by maintaining all necessary licenses, permits, requirements and other authorizations from the SEC and any other Governmental Authority.

(b)        Manager hereby covenants not to enter into any transaction or agreement on behalf of Client pursuant to this Agreement which Manager knows could result in a violation of applicable law.

5.        <u>Portfolio Execution</u>.  Client, unless it directs Manager to use a particular broker or dealer, hereby delegates to Manager sole and exclusive authority to designate the brokers or dealers through which all purchases and sales, or any other transactions related thereto, of Managed Assets on behalf of Client will be made.  To the extent permitted by applicable law, such brokers or dealers may include any firm that is an affiliate of Manager. Manager will determine the rate or rates, if any, to be paid for brokerage services provided to Client with respect to its Managed Assets.  Manager agrees that all purchases and sales of securities shall be made through such brokers as, in Manager's best judgment, shall offer the best combination of price and execution.  Manager, in seeking to obtain best execution of portfolio transactions for Client, may consider the quality and reliability of brokerage services, as well as research and investment information and other services provided by brokers or dealers.  Accordingly, Manager's selection of a broker or dealer for transactions with respect to the Managed Assets may take into account such relevant factors as (i) price, (ii) the broker's or dealer's facilities, reliability and financial responsibility, (iii) when relevant, the ability of the broker to effect securities transactions, particularly with regard to such aspects as timing, order size and execution of the order, (iv) the broker's or dealer's recordkeeping capabilities and (v) the research and other services provided by such broker or dealer to Manager in a manner that falls within the safe harbor of Section 28(e) of the Securities and Exchange Act of 1934, as amended, provided that all such research and other services are used by Manager for the benefit of Client.

6.        <u>Aggregation and Allocation of Orders</u>.

(a)    Subject to the Protocols, Client authorizes Manager, at Manager's discretion, to bunch or aggregate orders with respect to Client's Managed Assets with orders of other clients of Manager and/or its affiliates and to allocate the aggregate amount of the investment among accounts in a fair and equitable manner. When portfolio decisions are made on an aggregated basis, Manager may, in its discretion, place a large order to sell Managed Assets for Client and the accounts of several other clients of Manager and/or its affiliates.

(b)    In the event that Manager determines that a particular asset among the Managed Assets should be sold and such asset is owned by other clients of Manager and/or its affiliates who have similar investment objectives, then Manager's policy is to sell each asset on a *pro rata* basis on behalf of all clients with similar investment objectives and which have been designated by Manager as sellers of such asset.  For example, this could be the case when selling an asset that is experiencing or, in the judgment of Manager, may experience fundamental credit issues that could result in deterioration of value affecting the level of the capital structure in which funds managed by Manager invest. This policy will apply to the sale of any Managed Assets, such that when there is cross ownership of an asset among Client or a CLO and other clients of Manager and/or its affiliates, all such clients which have been designated by Manager as sellers of such asset will be factored into the *pro rata* allocation of partial sales of such asset.

(c)    Client acknowledges that: (i) it is frequently not possible to receive the same price or execution on the entire volume of loans or securities sold; (ii) if this occurs, the various prices may be averaged and Client may be charged or credited with the average price, and the effect of the aggregation may operate on some occasions to Client's disadvantage; (iii) although in such an instance Client may be charged the average price, Manager will make the information regarding the actual transactions available to Client upon Client's request; and (iv) Manager and its affiliates are not required to bunch or aggregate orders, and therefore Client may not receive the average price on any given trade.

7.    Conflicts of Interest; Affiliated Transactions.  If any matter arises with respect to one or more Managed Assets of Client that Manager determines in its good faith judgment may constitute a conflict of interest, Manager shall (i) provide prompt notice of such matter to Client, (ii) consult with Client, and (iii) take all actions consistent with and to effect the Protocols and procedures approved by Client, as it determines acting in good faith may be necessary or appropriate to ameliorate the conflict.  For the avoidance of doubt, the ownership of, and transactions with third parties in respect of, a Managed Asset by Client and one or more other clients of Manager and/or its affiliates will not by virtue of such ownership and/or transactions with third parties alone be a conflict of interest covered by this Section 7. The following are illustrative examples of circumstances requiring Manager to follow the steps set forth in (i) through (iii) above: principal transactions between Manager and Client and any cross trades between Client and another client of Manager; provided that (for the avoidance of doubt) no such principal transactions or cross trades shall be effected without prior notice to, and consent of, Client.

8.    Periodic Reports, Valuations, Meetings and Other Communications.

7

(a)    *Reports and Meetings.*  Manager shall (or shall cause a third party to) provide Client with monthly portfolio reports (each a "Monthly Portfolio Report"), which shall be in the form of a Wall Street Office report substantially in the form attached hereto as Schedule E with respect to the Managed Assets within ten (10) calendar days after the end of each calendar month.  Without derogating from the preceding sentence, each Monthly Portfolio Report shall include the following, as well as other usual and customary information that Manager provides to its clients: (i) position report information, including the amount, spread, maturity, rating and industry, (ii) pricing, including mark, market price, realization and changes, (iii) changes in positions, including repayments and sales, paid-in-kind interest, and the amounts received in respect thereof; and (iv) any defaults or continuing events of default under the Managed Assets.  Manager shall also provide such other reporting as may be reasonably requested by Client (or any of its affiliates) to meet any of its reporting obligations (or reporting obligations of its affiliates) in accordance with applicable law or pursuant to agreements with third parties.  Manager shall meet with Client or its representatives at least quarterly to discuss the portfolio of Managed Assets and each individual credit included in the Managed Assets and to discuss trends, the investment outlook (including expected recovery where applicable), strategy and action plans with respect thereto.  Manager will also be available on a reasonable basis for *ad hoc* meetings at Client's request.

(b)    *Valuation.*

(i)    The value of the Managed Assets (the "Value") shall consist of the estimated fair value, determined by Manager, as set forth below:

(1)    Manager shall obtain on a monthly basis independent market quotes from Loan X or LPC (or if neither service is available, a substantially similar pricing service reasonably acceptable to Client), or the financial institutions set forth on Schedule F.

(2)    If Manager in good faith determines that the independent market pricing quotes obtained as provided in Section 8(b)(i)(1) do not fairly or accurately determine the Value of a Managed Asset, Manager may make such adjustments or use such alternative valuation method as it deems appropriate under the circumstances.

(3)    The Value of any Managed Asset not available through these independent sources shall initially be determined in good faith by Manager, with a methodology that shall be consistent with the current methodology used by Client, taking into account such financial, structural, legal, economic, regulatory, market and other factors as Manager deems relevant under the circumstances.

(4)    The determination of the Value of the Managed Assets may be suspended (a "Suspension"), in the sole discretion of Manager, in each of the following circumstances: (A) during the existence of any state of affairs that renders the disposal of the Managed Assets, in the view of Manager, reasonably impracticable; (B) during any breakdown in the means of communication normally employed in determining the price of any of the Managed Assets or the current price on any exchange or market on which prices for such assets

8

are quoted; or (C) if Manager determines that such Suspension is in the best interests of Client, or if for any other reason circumstances exist as a result of which, in the opinion of Manager, it is not reasonably practical to determine the Value of the Managed Assets fairly or accurately. Upon the occurrence of a Suspension, Manager will use the most recent Value determination for purposes of determining the Management Fee (as hereinafter defined) and any threshold under the Protocols.

    (ii) Client acknowledges that valuation levels may not ultimately be realized due to, among other factors, market conditions, future operating results, transaction size, legal and contractual restrictions on transfers that may limit liquidity, any related transaction costs, the timing and manner of the sales, economic and political developments, interest rates and issuer-specific events, and sector positioning. Exchange rates determined by Manager in good faith to be reasonable under the circumstances will be applied in valuing holdings in foreign currency. Client agrees that Manager is only obligated to send to Client copies of any trade confirmations it receives upon written request of Client. Client acknowledges and agrees that (i) none of the information which Manager provides Client hereunder shall be deemed to be the official books and records of Client, which shall be maintained and kept by Client, for tax, accounting and all other purposes; provided that Manager acknowledges that any such reporting and valuation information produced by it may serve as supporting information with respect to the official books and records maintained and kept by Client; and (ii) Client will not publish, reproduce (except for internal or archival purposes) or disseminate any non public pricing information provided by Manager without Manager's consent; provided that such consent shall not be required with respect to any disclosure (a) to the Creditor's Committee or the advisors of the Creditors' Committee prior to the Plan Effective Date, or (b) otherwise required (as determined in Client's sole and absolute discretion) by law, legal process or other compulsory process or regulatory inquiry, including in connection with disclosures made in connection with the Bankruptcy Cases. Unless otherwise provided expressly in Section 2(b) of this Agreement, Manager shall be responsible for determining the value of the Managed Assets of Client.

    (c) Manager shall notify Client promptly upon becoming aware of (i) any changes or events that would reasonably be expected to materially and adversely affect the Managed Assets, the Value of the Managed Assets or Manager's management of such Managed Assets, including arising from any audit, investigation, inquiry, action or proceeding by any Governmental Authority involving Manager or such Managed Assets of which Manager has received notification from such Governmental Authority and (ii) any financial condition of or significant corporate event involving Manager that would reasonably be expected to materially and adversely affect its ability to satisfy contractual obligations under this Agreement or to perform its duties and obligations under any CLO Transaction Documents.

9. Compensation; Reimbursable Expenses. (a) In respect of Managed Assets, Client shall pay to Manager a management fee ("Management Fee") in the amount of (A) 30 basis points per annum of the par amount of the funded Managed Assets or, in the case of Managed Assets that have uncured payment defaults or of any obligor of which is in bankruptcy or insolvency proceedings, 30 basis points per annum of the Value of such

Managed Assets, and (B) 30 basis points per annum based on the carrying value of Client's equity positions, in each case as of the Business Day prior to the Management Fee Payment Date.

(b)    The Management Fee shall be payable on a monthly basis (i.e., 2.5 basis points per month, or pro-rated for any period of less than a month) in advance, commencing with the Effective Date and then on the first day of each month thereafter (each, a "Management Fee Payment Date").  The Management Fee will be payable by wire transfer of immediately available funds to an account designated by Manager.  To the extent this Agreement is terminated in accordance with Section 18 prior to the end of a month, the Management Fee shall be pro-rated for such month and Manager shall transfer to Client in immediately available funds any over-payment of such Management Fee within five (5) Business Days.

(c)    In the sole and absolute discretion of Client, a success fee of up to $5 million may be paid to Manager if Client determines that Manager has successfully managed both the Managed Assets and the CLOs.

(d)    In addition to the Management Fee, Client shall reimburse Manager for all Reimbursable Expenses, subject to the prior written approval of Client if the amount of any individual Reimbursable Expense, or any series of related Reimbursable Expenses, is expected to exceed $10,000, other than (i) expenses incurred for Wall Street Office (up to 2.75 basis points per annum of par amount of funded loan assets and unfunded loan commitments, plus up to an additional 0.03 basis points per annum of par amount of funded loan assets and unfunded loan commitments in respect of reconciliation charges), and (ii) the expenses set forth on Schedule G, in each case, to the extent incurred in managing the Managed Assets.

10.    Custody.  Manager and Client agree that, except in respect of the CLO Assets, (i) the current custodial arrangements related to the Managed Assets of Client shall remain unchanged unless otherwise agreed by Client and (ii) under the current custodial arrangements, such Managed Assets are held by Client or, to the extent required, a "qualified custodian" as defined in Rule 206(4)-2 of the Advisers Act (a "Qualified Custodian") that is not affiliated with Client or Manager (a "Third-Party Custodian").  To the extent that Client agrees to modify the current custodial arrangements with respect to the Managed Assets, Client may appoint and enter into an agreement with additional Third Party Custodians; provided, however, that, to the extent that Manager is a Qualified Custodian, Client may appoint Manager as custodian of the Managed Assets or any portion thereof.  Manager is authorized to give instructions (including, as applicable, with respect to particular Managed Assets of Client, in the exercise of its discretion in respect thereof) to such Third-Party Custodian with respect to all transaction and related decisions regarding such Managed Assets.  Notwithstanding Section 6, to the extent Manager has custody of Managed Assets of Client, Manager will segregate and keep separate and readily identifiable such Managed Assets from the assets of its other clients.

11.    Confidential Information.  Manager is and shall remain subject to the terms and conditions of the Existing Confidentiality Agreement for the term of such agreement and,

in addition, agrees with Client that it will, and will cause its officers, directors, affiliates and employees, agents and representatives to, at all times keep confidential and not divulge, furnish or make accessible to any person or entity, any confidential information, knowledge or data concerning or relating to this Agreement, Client or any of Client's Managed Assets, including positions, trading or other sale information, strategies, hedging and the like, or any other information related to any of the forgoing (Client's "Confidential Information") without the prior written consent of Client, except as follows:

(a)     Where disclosure is expressly permitted under the terms of this Agreement;

(b)     Where disclosure is required for the purpose of making, acquiring, restructuring, refinancing, settling, realizing, or engaging in any other transaction with respect to a Managed Asset of Client in accordance with the terms of this Agreement, including the Protocols;

(c)     Where disclosure is required by compulsory process, law or the order of any court or pursuant to any request or requirement of any Governmental Authority, bank examiner or statutory auditor;

(d)     Where the Confidential Information is or becomes public by no fault of Manager, any of its affiliates or any of their respective partners, members, directors, officers, employees, representatives or agents; or

(e)     With respect to the CLO Eligible Assets, the disclosure of such Confidential Information as is necessary or advisable and appropriate to the structuring, documenting, rating, marketing and distribution of a CLO;

but in an event under clause (c) above, and unless precluded from doing so by applicable law or the obligation of immediate disclosure, Manager shall give Client, before making the disclosure, an opportunity to oppose the disclosure, and shall coordinate the wording of such disclosure with Client (to the extent permitted by law and practicable under the circumstances).  Manager shall be entitled to disclose information received by Client to Manager's directors, employees, service providers and professional advisors wherever located with respect to this Agreement (provided that (i) such disclosure is for the purpose of supporting the provision of services under this Agreement and (ii) such directors, employees, service providers and professional advisors (A) are also bound by an obligation of confidentiality substantially similar to this Section 11 and (B) need to know such information for the purpose of supporting the provision of services under this Agreement).  In the event of any conflict between the terms of this Section 11 and the Existing Confidentiality Agreement, the terms of the Existing Confidentiality Agreement shall govern.

12.     Directions to Manager.  (a)  All directions by or on behalf of Client to Manager shall be in writing signed by any authorized officer of Client or other holder of Managed Assets, including Doug Lambert and Jeffrey Sell, as such list may be further supplemented from time to time by Manager and Client.  Manager shall be fully protected in relying upon

any direction in accordance with the previous sentence with respect to any instruction, direction or approval of Client, and shall be so protected also in relying upon a certification duly executed on behalf of Client as to the names of persons authorized to act for it and in continuing to rely upon such certification until notified by Client to the contrary.

(b)    Manager shall be fully protected in acting upon any instrument, certificate or other writing believed by it in good faith to be genuine and to be signed or presented by the proper persons or upon any statement contained in any such writing and may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.

13.    Limitation of Liability.  To the maximum extent permitted by law, neither Manager nor any of its affiliates and their partners, members, directors, officers, agents, advisors and employees and any person controlled by or controlling the Manager (each a "Manager Party" and collectively, the "Manager Parties")) shall be liable to Client or any of its controlled affiliates for any Losses arising out of any acts or omissions of Manager or any Manager Party, except to the extent that such Losses are the result of an act or omission taken or omitted by Manager or any other Manager Party during the term of this Agreement that constitutes gross negligence, willful misconduct, bad faith, material breach of any regulatory or legal requirements, fraud, a breach of Section 2(a)(viii), or a willful or grossly negligent breach of the Protocols (other than Section 2(a)(viii)). Without limitation, neither Manager nor any other Manager Party shall be liable to Client or any of its controlled affiliates for Losses to the extent resulting from (i) any action of Client or any Managed Asset Affiliate or any Third-Party Custodian of Client or any other controlled affiliate of Client or any of their other agents or advisers (other than Manager, Manager Parties and any person or entity to whom Manager has delegated its authority), (ii) any action of Manager following any direction of Client or Manager's failure to follow any unlawful direction of Client, (iii) force majeure events beyond the control of Manager, including any failure, default or delay in performance resulting from computer or other electronic or mechanical equipment failure, unauthorized access, strikes, failure of common carrier or utility systems, severe weather or breakdown in communications, in each case not reasonably within the control of Manager or other causes commonly known as "acts of god," (iv) following reasonable written notice from Manager of its obligation to perform, any failure or default by Client or any Managed Asset Affiliate to perform on any commitment it has with respect to any of its Managed Assets, including any capital commitment subject to draw-down, or (v) general market conditions unrelated to any violation of this Agreement by Manager.  Manager gives no warranty as to the performance or profitability of the Managed Assets, nor any guarantee that the investment objectives, expectations or targets described in this Agreement will be achieved, including any risk control, risk management or return objectives, expectations or targets.  The Managed Assets may suffer losses and income, if any, may fluctuate. Neither Manager nor any other Manager Party shall be responsible for the performance by any person not affiliated with Manager of such person's obligations in executing, completing or satisfying such person's obligations, except as provided in the penultimate sentence of Section 2(b) hereof.  Other than its responsibilities with respect to the Managed Assets as described herein and the CLO Assets as set forth in the CLO

Transaction Documents, Manager shall have no responsibility whatsoever for the management of any other assets of Client or any of its affiliates and shall incur no liability for any Losses which may result from the management of such other assets. Nothing herein shall constitute a waiver or limitation of any rights which Client and any Managed Asset Affiliate may have, if any, to the extent that such right may not be waived under any applicable U.S. federal and state securities laws.

14.     Non-Exclusive Management.  Client acknowledges and agrees that this advisory relationship is not exclusive and that Manager may furnish investment and asset management and advisory services to others, and that Manager shall be at all times free, in its discretion, to make recommendations to others which may be the same as, or may be different from those made to or on behalf of Client.  Client further understands that Manager, its affiliates, and any officer, director, stockholder, employee or any member of their families may or may not have an interest in securities or assets in respect of which transactions may be recommended by Manager.  Actions with respect to assets of the same kind may be the same as or different from the action which Manager, or any of its affiliates, or any officer, director, stockholder, employee or any member of their families, or other investors may take with respect thereto.

15.     [Intentionally Omitted].

16.     Approvals; Effective Period of Agreement.

Client shall prepare a motion in form and substance reasonably satisfactory to Manager (the "Motion") to seek the entry of an order ("Approval Order") in form reasonably satisfactory to the parties by the Bankruptcy Court approving adoption and performance by Client and its affiliates of this Agreement and the transactions contemplated herein, which shall include pre-approval of the sale of the CLO Eligible Assets in connection with the CLO Transactions and the consummation of such CLO Transactions.  Client shall file the Motion with the Bankruptcy Court within five (5) Business Days of the date hereof.  The parties shall have no obligations hereunder until, and this Agreement shall become effective on, the Effective Date.  Client shall use its commercially reasonable efforts to contest the reversal, material modification or appeal of the Approval Order and, after the entry of the Approval Order and so long as the Approval Order is in effect, neither Client nor any of its controlled affiliates shall take or support any action that interferes with, or is otherwise inconsistent with, the Approval Order and the enforceability and performance of this Agreement.

17.     Amendments.  To be binding and enforceable, any amendment to this Agreement shall be (i) in writing and (ii) duly signed by Client and Manager and any material amendment, modification, supplement or waiver to this Agreement shall also require the prior approval of the Creditors' Committee (prior to the Plan Effective Date) and the Bankruptcy Court.  Notwithstanding any other provision in this Section 17, (A) no amendment to Schedule A shall require approval of the Creditors' Committee and, if such amendment is an increase in the Managed Assets (to add loan assets which are substantially similar to the Managed Assets), then no consent or approval of Manager shall be required to effect such amendment, and (B) no change in the composition of the

13

Managed Assets resulting from any payment made in respect of any loan asset(s), including any final payment made in respect thereof and the termination of the related facility, shall be deemed an amendment of Schedule A or this Agreement.  Any amendment to Schedule A which does not require Manager's consent or approval shall be effected by written notice in accordance with Section 30 by Client to Manager setting forth the amendment to Schedule A.

18.    Duration and Termination.

(a)    This Agreement shall be effective from and after the Effective Date until the final repayment or disposition of the Managed Assets unless earlier terminated by Client pursuant to Section 18(b) below (the "Term").

(b)

(i)    This Agreement shall terminate immediately without further action by the parties hereto upon the denial by the Bankruptcy Court of the Motion seeking the Approval Order;

(ii)    Either Client or Manager shall have the right to terminate this Agreement immediately upon written notice to the other if the Effective Date shall not have occurred on or before December 31, 2011 (the "Outside Date").

(iii)    Client shall have the right to terminate this Agreement and its obligations hereunder on or after the Effective Date, (A) if other than for Good Reason, at any time, by six (6) months prior written notice to Manager; (B) if for Good Reason, at any time by written notice (on the termination date set forth in such notice) to Manager; or (C) after a Material Breach of Law at any time by written notice (on the termination date set forth in such notice) to Manager; provided that the termination of this Agreement pursuant to any provision of this Section 18(b)(iii) shall not result in a termination of Manager's management of any CLO Transaction, which termination will be governed by the terms of the applicable CLO Transaction Documents.

(iv)    Manager shall have the right to terminate this Agreement and its obligations hereunder on or after the Effective Date if Client has materially breached its obligation to pay the Management Fee pursuant to Sections 9(a) and (b) above and, following receipt of written notice from Manager identifying the alleged breach in reasonable detail, including the amount of the Management Fee owed to Manager, Clients fails to cure such breach within thirty (30) days of receipt of such written notice; provided that Manager shall not have the right to terminate this Agreement and its obligations hereunder pursuant to this Section 18(b)(iv) if, at the time of Client's alleged material breach or at the end of such 30 day cure period, Manager is then in breach of this Agreement and such breach would constitute Good Reason.

(c)    If:

(i)    Client terminates this Agreement pursuant to Section 18(b)(iii)(A), then Client shall pay to Manager the Termination Fee on the effective date of the termination,

and Manager's accrued and unpaid Management Fee and Reimbursable Expenses, in each case, through the termination date no later than five (5) Business Days after the termination date; or

(ii)    Client terminates this Agreement pursuant to Section 18(b)(iii)(B), then Client shall pay to Manager, its accrued and unpaid Management Fee and Reimbursable Expenses, in each case, through the termination date no later than five (5) Business Days after the termination date;

(iii)    Client terminates this Agreement pursuant to Section 18(b)(iii)(C), then Client shall (A) pay to Manager, its accrued and unpaid Management Fee and Reimburseable Expenses, in each case, through the termination date no later than five (5) Business Days after the termination date, and (B) if such termination is as a result of a Material Breach of Law described in clause (ii) of such defined term, place the Termination Fee in escrow on the effective date of termination.  If a Proceeding (as defined in the Glossary to Form ADV) regarding such Material Breach of Law is initiated by a Governmental Authority within eighteen (18) months from the date of termination, then the escrowed amount shall be released and (i) paid to Client upon a final determination by a Governmental Authority which indicates that Manager did commit a Material Breach of Law or (ii) paid to Manager upon a final determination which does not indicate that Manager committed a Material Breach of Law.  If a Proceeding regarding such Material Breach of Law is not initiated by a Governmental Authority within eighteen (18) months from the date of termination, then the escrowed amount shall be released and paid to Manager.  For the avoidance of doubt, if Client terminates this Agreement pursuant to Section 18(b)(iii)(C) as a result of a Material Breach of Law described in clause (i) of such defined term, no Termination Fee shall be payable.

The payment of the fees and/or expenses contemplated in any of Sections 18(c)(i), (ii) or (iii) shall be the sole and exclusive remedy of Manager in the event of termination of this Agreement pursuant to any provision of Section 18(b)(iii), respectively.

(d)    In consideration of the material financial obligations and allocation of resources which Manager and its affiliates will incur, and its agreements under Section 18 of this Agreement, in connection with the effectiveness, implementation and performance of this Agreement, if Client terminates this Agreement in accordance with and pursuant to Section 18(b)(iii)(A) or Section 18(b)(iii)(C) (but only if a Termination Fee is required to be paid pursuant to Section 18(c)(iii)(B)), or Manager terminates this Agreement pursuant to Section 18(b)(iv), in each case (i) from and after the Effective Date and prior to the first anniversary thereof, the termination fee shall be the lesser of $7.0 million and the Remainder Amount, (ii) from and after the first anniversary of the Effective Date and prior to the second anniversary thereof, the termination fee shall be the lesser of $5.0 million and the Remainder Amount, (iii) from and after the second anniversary of the Effective Date and prior to the third anniversary thereof, the termination fee shall be the lesser of $3.0 million and the Remainder Amount, and (iv) from and after the third anniversary of the Effective Date, no termination fee shall be paid (as applicable, the "Termination Fee").  Client acknowledges and agrees that the Termination Fee is (x) not a penalty, or otherwise intended as a means of preventing or discouraging Client from

terminating this Agreement, and (y) intended by Client and manager to serve as reasonable compensation and consideration for the financial obligations undertaken and resources committed by Manager in connection with this Agreement.  Client, on behalf of itself and each of its controlled affiliates, agrees, to the extent permitted by applicable law, to waive any claim, and to not assert any defense or claim, directly or indirectly asserting that all or any portion of the Termination Fee is unenforceable under applicable law or in equity.

(e)     The effective time of the termination of Manager's discretionary authority hereunder with respect to Client and the Managed Assets, including the termination of the power of attorney and proxy set forth in Section 2(c), shall be as set forth in Section 18(b); provided that, to the extent applicable with respect to any Managed Assets, Client shall honor any trades or other transactions entered into but not settled, closed or consummated, as applicable, before the date of any such termination.  Sections 2(d), 9 (in respect of expenses incurred and unpaid Management Fees accrued through the date of termination), 11 through 13, 18 through 19 (except as provided otherwise in such Section), 21, 23 and 25 through 33 shall survive the termination of this Agreement.

(f)     In the event of any termination of this Agreement by Client in respect of the Managed Assets, Manager shall cooperate in good faith and provide reasonable assistance in transitioning investment and management of such Managed Assets to an investment manager or other person or entity designated by Client and, in furtherance thereof, shall provide Client or its nominee with all documents, correspondence and other material reasonably necessary to manage the relevant Managed Assets, at Manager's expense.  Manager is entitled, for its records, to retain copies of all documents in Manager's possession related to the Managed Assets, at Manager's expense.

19.   Employees and Employee Benefits.

(a)     Prior to the Effective Date, Manager shall deliver, in writing, an offer of employment to each of the employees of Client set forth on Schedule H attached hereto to commence such employment with Manager or one of its affiliates conditional and immediately upon the Effective Date.  Each employee of Client or its affiliates to whom Manager has extended an offer and who accepts such offer of employment shall be referred to as an "Identified Client Employee."

(b)     With respect to the three Identified Client Employees identified as "Category A" on Schedule H to this Agreement (collectively, the "Senior Managers"), Manager represents that it has, on or prior to the date hereof, (i) entered into employment agreements (in form and substance satisfactory to Manager in its sole discretion) with each of the Senior Managers, which employment agreements shall become effective on the Effective Date (the "Employment Agreements") and (ii) provided copies of the executed Employment Agreements to Client.

(c)     Each offer of employment extended by Manager to an Identified Client Employee (other than a Senior Manager) shall (i) provide that such employee may not be terminated, other than for Cause, on or prior to December 31, 2011 and (ii) provide that

16

such employee's total cash compensation for the 2011 calendar year shall be equal to or greater than his or her expected cash compensation for the same period under his or her current agreement with LAMCO LLC, a limited liability company organized under the laws of Delaware and an affiliate of Client ("LAMCO"); provided that such guarantee shall include only a pro rata portion of such employee's 2011 incentive compensation (the balance of which shall be paid by Client); and provided further that Manager shall not be required to provide any assurances or guarantees to such Identified Client Employee with respect to his or her employment after the 2011 calendar year.  Manager's obligations under this Section 19(c) shall terminate upon the effective date of the termination of this Agreement, if this Agreement is terminated by (x) Client (other than in the case of termination for Good Reason), or (y) Manager pursuant to Section 18(b)(iv).

(d)    Manager shall not terminate the employment of (i) more than one of the Senior Managers on or prior to the second anniversary of the Effective Date and (ii) any Identified Client Employee (other than a Senior Manager) on or prior to the first anniversary of the Effective Date, in each case, other than (A) for Cause, (B) as a result of performance concerns (a) of which the applicable employee has been notified and (b) if capable of cure, which have not been cured to Manager's satisfaction within the period specified in such notice, or (C) in other circumstances, with the prior written consent of Client (such consent not to be unreasonably withheld).  Manager's obligations under this Section 19(d) shall terminate upon the effective date of the termination of this Agreement, if this Agreement is terminated by (x) Client (other than in the case of termination for Good Reason), or (y) Manager pursuant to Section 18(b)(iv).

(e)    Client shall have the obligation to pay all employment compensation of the Identified Client Employees accrued up to, but not including, the Effective Date, including incentive compensation (or a contractual bonus amount) attributable to the period through the day before the Effective Date.  Manager shall have the obligation to pay all employment compensation of the Identified Client Employees accrued from and after the Effective Date.

(f)    Pursuant to agreements to be entered into prior to the Effective Date between each Identified Client Employee and Client or one of its affiliates, if an Identified Client Employee is terminated other than for Cause within the first twelve months (or, in the case of the Senior Managers, within the first twenty-four months) after the Effective Date, Client or one of its affiliates (and not Manager) will pay (or provide Manager with the necessary funds to pay) such Identified Client Employee's severance pay in an amount equal to six times such Identified Client Employee's monthly base pay for the last month prior to the Effective Date; provided that such severance pay shall be (i) inclusive of any contractual notice and statutory redundancy payments due to such Identified Client Employees and (ii) made to an Identified Client Employee only upon such person executing a general release of all claims against Client and its affiliates, including LAMCO, relating to or arising from his or her prior employment with Client and its affiliates.

17

(g)    Notwithstanding any of the foregoing provisions, the following provisions of this Section 19(g) will apply in respect of the UK Employees ("UK Employees" meaning those Identified Client Employees who are listed on Schedule H as being employed in the United Kingdom, less any person whose employment does not transfer to Manager by reason of an objection by that person made pursuant to regulations 4(7) and 4(8) of the TUPE Regulations ("TUPE Regulations" meaning the Transfer of Undertakings (Protection of Employment) Regulations 2006)) and any other person referred to in Section 19(g)(iii) below.  It is the understanding of Client and Manager that the appointment of Manager to provide the asset management and investment management services under this Agreement will constitute a relevant transfer for the purposes of the TUPE Regulations and, accordingly, that the employment contracts of the UK Employees shall be transferred to Manager by operation of law pursuant to the TUPE Regulations with effect from the Effective Date and, in that case, Manager shall not be required to offer employment to the UK Employees in accordance with Section 19(a) above, provided, however, that: (i) nothing in this Section 19(g) will prevent Manager from agreeing to new employment agreements with any Senior Manager employed in the UK pursuant to Section 19(b) above; (ii) in addition to its obligations under the TUPE Regulations, Manager shall ensure that the UK Employees are also afforded such protection and guarantees as are set out and/or referred to above in Section 19 (in accordance with the terms of that section); and (iii) if it is held or alleged that any of the UK Employees do not transfer or have not transferred on the Effective Date under the TUPE Regulations as a result of the appointment of Manager under this Agreement, then the provisions of Section 19(a) above will apply.

Client and Manager, having each taken independent legal advice, acknowledge the duties imposed by Regulation 11 of the TUPE Regulations in respect of the provision of employee liability information and agree that such duties will not need to be satisfied by the Client or any of its affiliates that employs any UK Employee immediately prior to the Effective Date (an "Employer Affiliate").  Each of Manager and Client, for itself and on behalf of Employer Affiliates, agrees that it would not be just and equitable to pursue any claim or future claim in respect of employee liability information in the UK Employment Tribunal, and accordingly undertakes not to bring such a claim against Client or any Employer Affiliate.  Manager further agrees that if it should bring a claim in breach of its undertaking in this Section 19(g), it will indemnify, keep indemnified and hold harmless Client and Employer Affiliates fully in respect of all Losses of any kind arising from or in connection with such a claim.  For the purposes of this Section 19(g), "employee liability information" shall have the meaning given to it in the TUPE Regulations.

Manager will, no less than 21 days before the Effective Date, confirm in writing to Client any measures in connection with the transfer which Manager will take in relation to the UK Employees and Manager will indemnify, keep indemnified and hold harmless Client and Employer Affiliates fully in respect of all Losses arising from or in connection with any failure by Manager to provide such confirmation.  Manager will also indemnify, keep indemnified and hold harmless Client and Employer Affiliates fully in respect of all Losses of any kind arising from or in connection with the following: any substantial change in the working conditions and/or the terms of employment of any UK Employee to his or her material detriment occurring from the Effective Date; the employment by

Manager and/or any of its affiliates after the Effective Date of any of the UK Employees or the termination of the employment of any of them on or after the Effective Date; and any claim by any UK Employee for any remedy arising out of any act or omission, breach or default of Manager and/or any of its affiliates after the Effective Date in relation to the UK Employees (including but not limited to any liability arising out of the termination or dismissal of any UK Employee).

Save in respect of (and subject to) the foregoing, Client will indemnify, keep indemnified and hold harmless Manager and affiliates of Manager ("Manager Affiliates") fully in respect of all Losses of any kind arising from or in connection with the following:

(i)      any claim by any UK Employee arising out of or in connection with their employment or any act or omission, breach or default of the Client or Employer Affiliates or any event occurring, in any case on or prior to the Effective Date;

(ii)      any breach by Client or Employer Affiliates of its or their obligations under the TUPE Regulations (including, without limitation, under Regulations 13 or 14); or

(iii)      any claim by any employee of Client or Employer Affiliates or any third party who is not a UK Employee who claims, as a result of the transactions effected by this Agreement, to have become an employee of or have rights against Manager or Manager Affiliates by virtue of the TUPE Regulations (and in this connection if any contract of employment of any such employee has effect as if originally made between Manager or Manager Affiliates and such employee as a result of the TUPE Regulations), Manager or Manager Affiliates shall be entitled to terminate such contract and without limitation Client's indemnity shall apply to all Losses of any kind arising from or in connection with such termination  and to all Losses arising out of or in connection with such employee's employment or any act, omission, breach or default, or event occurring, on or prior to or after the Effective Date.

Without prejudice to the provisions of Section 19(g)(iii) above, Client shall use reasonable efforts to procure that any employee of Client or Employer Affiliates, who:

(i) is assigned to the asset management and investment management services referred to in this Agreement;

(ii) will be employed immediately before the relevant transfer referred to above; and

(iii) is not a UK Employee

and who might reasonably be expected by Client or Employer Affiliates to claim that he or she shall become an employee of or have rights against Manager or Manager Affiliates by virtue of the TUPE Regulations, formally objects to the relevant transfer referred to above, such that his or her employment will not so transfer (if practicable pursuant to a compromise agreement under which such employee enters into a full and effective waiver of all his or her claims against Manager and Manager Affiliates and Client and Employer Affiliates arising out of his or her employment or its termination (such waiver satisfying the conditions regulating compromise agreements set out in section 203, Employment

19

Rights Act 1996)), in each case before the Effective Date.  Manager shall, if requested to do so by Client, become a party (or procure that the relevant Manager Affiliate becomes a party) to any such compromise agreement in order that any waivers and releases given by such employee party may benefit Manager or the relevant Manager Affiliate (as well as Client and/or the relevant Employer Affiliate).

20.    <u>Transition Services; Intellectual Property</u>.

    (a)    On the Effective Date, Manager shall have launched a new office and operations in London, United Kingdom, which shall be comprised of three Identified Client Employees.  In connection with such launch, as well as the commencement of services in the United States under this Agreement, on the Effective Date Client and Manager shall enter into the Transition Services Agreement substantially in the form attached hereto as <u>Schedule I</u> pursuant to which Client shall provide transition services in the United States and the United Kingdom for a period of four months in accordance therewith.

    (b)    Client hereby grants Manager a limited, non-exclusive license under any patents, copyrights, trade secrets or similar intellectual property rights owned by Client or that Client has a right to license without payment of royalties, solely for (and to the extent necessary for) Manager to manage the Managed Assets in accordance with the terms of this Agreement.  The license granted hereunder shall remain in effect solely during the Term.

21.    <u>Independent Contractor Status</u>.  Manager shall, for all purposes of this Agreement, be an independent contractor.  Except as authorized by this Agreement, Manager shall have no authority to act for or represent Client in any way and shall not be deemed an agent of Client.  Client and Manager agree that, by entering into this Agreement, they do not form a partnership for any purpose and shall not be deemed to be partners in a joint venture or members of a joint enterprise in the conduct of any business.  The amounts paid by Client to Manager pursuant to this Agreement constitute compensation for asset management, investment management and administrative and custodial services rendered by Manager to Client.  Client shall have no ownership interest in Manager and shall not have direct or indirect control over the board of directors or other governance body of Manager.

22.    <u>Assignment</u>.  No assignment (as that term is defined in the Advisers Act) of this Agreement by Manager may be made without the prior written consent of Client and the Creditors' Committee, and any such assignment made without such consent shall be null and void for all purposes; <u>provided</u> that any such assignment proposed to be made on or after the Plan Effective Date shall not require prior written consent of the Creditors' Committee.  Client may assign this Agreement (a) with the consent of Manager (such consent not to be unreasonably withheld), (b) without the consent of Manager as required pursuant to an order issued in connection with the Bankruptcy Cases, <u>provided</u> that such assignment and order do not modify the terms of this Agreement in a manner reasonably likely to adversely affect Manager, or (c) to any successor or purchaser of Client in connection with (A) a merger of Client or (B) a sale of all or substantially all of the assets of Client.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns.

23.    <u>No Third Party Beneficiaries</u>.  This Agreement is solely for the benefit of the parties hereto (and, with respect to <u>Section 22</u> hereof, permitted assignees and, with respect to <u>Section 19(g)</u> any Employer Affiliates and Manager Affiliates) and the Managed Asset Affiliates, and should not be deemed to confer upon any other third parties (including any creditor of Client or its affiliates) any remedy, claim, liability, reimbursement, claim of action or other right.

24.    <u>Affiliates of Client</u>.  Notwithstanding anything to the contrary set forth herein, (i) the services to be provided by Manager hereunder in respect of Managed Assets owned by any Managed Asset Affiliate shall be provided for the benefit of such Managed Asset Affiliate and (ii) the duties set forth in this Agreement owed to the "Client" in respect of the services to be provided by Manager for the benefit of any Managed Asset Affiliate, including the duties of Manager set forth in <u>Sections 2(a)(viii)</u> and <u>7</u>, shall be owed by Manager to such Managed Asset Affiliate as if such entity was the "Client."  Each Managed Asset Affiliate shall be a client of Manager for all purposes of this Agreement and the Advisers Act.

25.    <u>Severability</u>.  Any term or provision of this Agreement which is invalid or unenforceable in any applicable jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms or provisions of the Agreement in any jurisdiction.

26.    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  (a)  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 30</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 30</u>.

27.   <u>Waiver of Right to Trial by Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

28.   <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to conflict of law principles thereof.

29.   <u>Entire Agreement</u>.  This Agreement, including the other appendices and schedules hereto, constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between Manager and Client with respect to the subject matter hereof.

30.   <u>Notices and Other Communications</u>.  All notices and written consents required or permitted to be sent under this Agreement shall be in writing, and shall be sent,

if to Manager:     WCAS Fraser Sullivan Investment Management, LLC
                   400 Madison Avenue, 9th Floor
                   New York, NY 10017
                   Attention:  John Fraser
                   or by facsimile to: (212) 339-5402
                   or by email to:  john@frasersullivan.com

                   With a copy to:
                   Bingham McCutchen LLP
                   399 Park Avenue
                   New York, NY 10022-4689
                   Attention: L. Kevin Sheridan, Jr.
                   or by facsimile to: (212) 508-1414
                   or by email to:  Kevin.sheridan@bingham.com

if to Client:      Lehman Brothers Holdings Inc.
                   1271 Avenue of the Americas
                   New York, NY 10020
                   Attention: Doug Lambert and Jeffrey Sell
                   or by facsimile to: (646) 285-9320
                   or by email to:
                   doug.lambert@lamcollc.com and
                   jeffrey.sell@lamcollc.com

                   With a copy to:

                   Lehman Brothers Holdings Inc.
                   1271 Avenue of the Americas
                   New York, NY 10020
                   Attention:  Martha Solinger and Thomas Hommel
                   or by facsimile to:  (646) 285-9337

22

or by email to:
martha.solinger@lehmanholdings.com and
thomas.hommel@lehmanholdings.com

With a copy to:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Jacqueline Marcus
or by facsimile to:  (212) 310-8007
or by email to:  Jacqueline.marcus@weil.com

if to the Creditors'
Committee:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, NY 10005-1413
Attention:  Evan Fleck
or by facsimile to:  (212) 822-5567
or by email to: efleck@milbank.com

With a copy to:
Houlihan Lokey Howard & Zukin Capital, Inc.
225 South Sixth St.
Suite 4950
Minneapolis, MN 55402
Attention:  Brad Geer
or by facsimile to:  (612) 338-2938
or by email to:  BGeer@HL.com

or such other name or address as may be given in writing to the other parties.  All notices and written consents hereunder shall be sufficient if delivered by facsimile, overnight mail, electronic mail or electronically via the internet using an id and password provided by Manager.  Any notices or written consent to Client shall be deemed given only upon sending in accordance herewith.

31.    <u>Interpretation and Certain Defined Terms</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine or the neuter gender shall include the masculine, the feminine and the neuter.  The words "<u>include,</u>" "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "<u>without limitation.</u>"  The words "<u>hereof,</u>" "<u>herein</u>" and "<u>hereunder</u>" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

The following capitalized terms used in this Agreement shall have the meanings set forth below:

"<u>Advisers Act</u>" shall mean the Investment Advisers Act of 1940, as amended.

"Advisers Act Registration" shall have the meaning set forth in <u>Section 4(a)</u>.

"Agreement" shall have the meaning set forth in the Preamble.

"Applicable Law" shall mean all laws applicable to Manager, its operations and the performance of its obligations under this Agreement, including the Advisers Act and all applicable rules and regulations of the SEC promulgated thereunder, and all other applicable rules, regulations and requirements of Governmental Authorities.

"Approval Order" shall have the meaning set forth in <u>Section 16</u>.

"Bankruptcy Cases" shall have the meaning set forth in the Recitals.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bona Fide Hedging Transactions" shall have the meaning set forth in <u>Section 2(a)(iv)</u>.

"Business Day" shall mean any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Cause" shall mean (i) in the case of a Senior Manager, the same meaning as set forth in the applicable employment agreement with such Senior Manager and (ii) in the case of any other Identified Client Employee, (1) fraud, embezzlement or other willful misconduct, (2) gross negligence in the performance of his or her duties for the Manager or Client, (3) indictment for or plea of no contest to any felony or other crime of moral turpitude, (4) willful breach of any material, written employment policies of Manager or Client, or (5) any additional events or circumstances that constitute "cause" under existing employment arrangements.

"Client" shall have the meaning set forth in the Preamble.

"CLO Assets" shall have the meaning set forth in <u>Section 2(a)(v)</u>.

"CLO Eligible Assets" shall have the meaning set forth in <u>Section 2(a)(v)</u>.

"CLO Transactions" shall have the meaning set forth in <u>Section 2(a)(v)</u>.

"CLO" shall have the meaning set forth in <u>Section 2(a)(v)</u>.

"Confidential Information" shall have the meaning set forth in <u>Section 11</u>.

"Creditors' Committee" shall mean the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al., which was appointed by the Office of the United States Trustee on September 17, 2008, as revised or supplemented.

"Current Income" shall mean interest, dividends and other income from Managed Assets other than Disposition Proceeds

24

"Disposition" shall mean the sale, transfer, exchange, redemption, repayment, repurchase, insolvency distribution or other disposition of all or any portion of a Managed Asset for cash, securities, instruments, assets or other interests.

"Disposition Proceeds" shall mean all amounts (whether cash, securities, instruments, assets or other interests) received upon the Disposition of a Managed Asset;

"Effective Date" shall mean the date that is five (5) Business Days after the Approval Order becomes a Final Order.

"Employer Affiliate" shall have the meaning set forth in Section 19(g).

"Employment Agreements" shall have the meaning set forth in Section 19(b).

"Existing Confidentiality Agreement" shall mean the Confidentiality and Non-Disclosure Agreement, dated December 17, 2010 by and between Lehman Commercial Paper, Inc., an affiliate of Client, and Manager.

"Final Order" shall mean an order or judgment of a court of competent jurisdiction that has not been reversed, vacated or stayed, and, unless waived by Manager, as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired, and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order(s) or judgment(s) of the court shall have been affirmed by the highest court to which such order(s) was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order(s), and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired.

"Good Reason" shall mean (1) any breach by Manager of its obligations under Sections 2(a)(i), (iv), (v), (vii) and (viii), 2(d), 4(a)(i) and (ii); (2)  a material breach of Section 8(a) of this Agreement; (3) any other material breach of Manager's material obligations under this Agreement, and, in the case of each of clauses (1)-(3) above, if such breach is capable of being cured, Manager's failure to cure such breach within thirty (30) days of receipt of written notice from Client identifying the alleged breach in reasonable detail (to the extent practicable under the circumstances) and requesting that it be cured or (4) neither John Fraser nor Tighe Sullivan remain employed by the Manager and actively involved in the management of the Managed Assets.

"Governmental Authority" shall mean any government or governmental or regulatory, judicial, or administrative body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality, or authority thereof, or any court or arbitrator (public or private) or any credit rating agency or any self-regulatory organization, including the SEC and Financial Industry Regulatory Authority.

"Identified Client Employee" shall have the meaning set forth in Section 19(a).

"LAMCO" shall have the meaning set forth in Section 19(c).

"<u>Losses</u>" shall mean any expenses, losses, damages, liabilities, demands, charges and claims of any kind or nature whatsoever (including (x) any legal expenses and costs and expenses relating to investigating or defending any demands, charges and claims and (y) for the avoidance of any doubt, any demands, charges and claims brought by any creditor of Client or its affiliates).

"<u>Managed Asset Affiliate(s)</u>" shall have the meaning set forth in <u>Section 2(a)</u>.

"<u>Managed Assets</u>" shall have the meaning set forth in the Recitals.

"<u>Management Fee</u>" shall have the meaning set forth in <u>Section 9(a)</u>.

"<u>Management Fee Payment Date</u>" shall have the meaning set forth in <u>Section 9(b)</u>.

"<u>Manager</u>" shall have the meaning set forth in the Preamble.

"<u>Manager Affiliates</u>" shall have the meaning set forth in <u>Section 19(g)</u>.

"<u>Manager Party</u>" or "<u>Manager Parties</u>" shall have the meaning set forth in <u>Section 13</u>.

"<u>Material Breach of Law</u>" shall mean (i) a final determination by a Governmental Authority that Manager has committed a violation of Applicable Law which could reasonably be expected to have a material adverse effect on Manager or Manager's ability to perform its obligations under this Agreement, or (ii) a notice or charge by a Governmental Authority of, or the commencement of a formal investigation by a Governmental Authority with respect to, a violation of Applicable Law by Manager which, if such violation occurred or is occurring, could reasonably be expected to have a material adverse effect on Manager or Manager's ability to perform its obligations under this Agreement.

"<u>Monthly Portfolio Report</u>" shall have the meaning set forth in <u>Section 8(a)</u>.

"<u>Motion</u>" shall have the meaning set forth in <u>Section 16</u>.

"<u>Non-CLO Assets</u>" shall have the meaning set forth in <u>Section 2(a)(v)</u>.

"<u>Outside Date</u>" shall have the meaning set forth in <u>Section 18(b)(ii)</u>.

"<u>Plan Effective Date</u>" shall mean the date on which a chapter 11 plan of Client becomes effective.

"<u>Protocols</u>" shall have the meaning set forth in <u>Section 2(b)</u>.

"<u>Qualified Custodian</u>" shall have the meaning set forth in <u>Section 10</u>.

"<u>Reimbursable Expenses</u>" shall mean reasonable and documented third party out-of-pocket fees, costs and expenses incurred in managing the Managed Assets (e.g., third party legal, custodial and consulting expenses, Wall Street Office costs, etc.).

"Remainder Amount" shall mean the amount equal to (A) the *sum of* (x) 30 basis points of the par amount of the funded Managed Assets (other than Managed Assets that have uncured payment defaults or of any obligor of which is in bankruptcy or insolvency proceedings) on the effective date of termination, (y) in the case of Managed Assets that have uncured payment defaults or of any obligor of which is in bankruptcy or insolvency proceedings, 30 basis points of the Value of such Managed Assets on the effective date of termination, and (z) 30 basis points per annum based on the carrying value of Client's equity positions on the effective date of termination, *multiplied by* (B) (x) the number of calendar days after the effective date of termination to and including the third anniversary of the Effective Date, *divided by* (y) 365.

"SEC" shall mean the Securities and Exchange Commission.

"Senior Managers" shall have the meaning set forth in Section 19(b).

"Sub-Adviser" shall have the meaning set forth in Section 2(b).

"Suspension" shall have the meaning set forth in Section 8(b)(i)(4).

"Term" shall have the meaning set forth in Section 18(a).

"Termination Fee" shall have the meaning set forth in Section 18(d).

"Third-Party Custodian" shall have the meaning set forth in Section 10.

"TUPE Regulations" shall have the meaning set forth in Section 19(g).

"UK Employees" shall have the meaning set forth in Section 19(g).

"Value" shall have the meaning set forth in Section 8(b)(i).

32.  Headings; Internal References.  When a reference is made in this Agreement to Sections, Annexes or Schedules, such reference shall be to a Section, Annex or Schedule to this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for convenience and reference purposes only and shall not be deemed to alter or affect in any way the meaning or interpretation of any provisions of this Agreement.

33.  Counterparts.  This Agreement may be executed in counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

*[Remainder of this page is intentionally left blank]*

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: Douglas F Lambert
Title: SVP

WCAS|FRASER SULLIVAN INVESTMENT MANAGEMENT, LLC

By: _____
Name:
Title:

[SIGNATURE PAGE TO ASSET MANAGEMENT AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:

**WCAS | FRASER SULLIVAN INVESTMENT MANAGEMENT, LLC**

By: _____
Name:    John W. Fraser
Title:    Managing Partner

**SCHEDULE A**

**Managed Assets**

(Filed Under Seal)

**SCHEDULE B**

**Affiliates of Client which hold Managed Assets**

**Debtors**

1.      Lehman Brothers Holdings Inc.

2.      Lehman Commercial Paper Inc.

3.      Lehman Brothers Special Financing Inc.

**Non-Debtor Controlled Affiliates**

1.      LB 1 Group Inc.

2.      Spruce CCS, Ltd.

3.      Verano CCS, Ltd.

4.      Restructured Assets with Enhanced Returns Series 2007-A Trust

**SCHEDULE C – CLO Transactions**

| | |
|---|---|
| Securities: | Multiple classes of investment grade and non-investment grade notes (collectively, the "Notes" and, each a "Note").  The lowest participating class will be a residual interest in the form of subordinated notes or preferred shares (the "CLO Equity Securities" and, together with the Notes, the "Securities") that will be received by Client on the closing date of a CLO.  Client may also acquire Notes other than CLO Equity Securities, including to the extent necessary or advisable in order to comply with any risk retention requirements under applicable law.  A non-participating, non-assessable class of common shares with paid-in capital of $1,000 or less may be issued to and held by a charitable trust or similar entity. |
| | |
| Issuers: | The investment grade Notes of the CLO will be issued by a Cayman Islands company, which will be the purchaser and owner of the CLO Assets (the "CLO Issuer").  Such Notes will also be co-issued by a US entity that does not own the CLO Assets and has minimal capitalization.  The non-investment grade Notes and CLO Equity Securities will be issued by the CLO Issuer alone. |
| | |
| Arranger: | Client and the Manager will cooperate to engage a bank with expertise in the CLO structuring and syndication market to act as arranger, structurer and lead-bookrunner for each CLO (the "Arranger"). The Arranger shall be responsible for structuring the CLO, negotiating with investors and rating agencies, and purchasing or placing the Securities.  Such engagement shall be pursuant to an agreement among the Arranger, Client and Manager in form and substance acceptable to Manager and Client, each acting reasonably, and among other things will contain customary indemnities, expense reimbursements and such other terms as are not inconsistent with this Agreement. |
| | |
| Trustee: | The CLO will engage a bank or trust company to act as indenture trustee, custodian, paying agent, collateral agent and/or to perform other ministerial functions with respect to the CLO (the "Trustee").  The Trustee will be subject to certain eligibility guidelines, including a credit rating and minimum amount of assets under custody.  The Trustee can be removed by certain holders of the Securities provided that a qualified replacement is engaged and rating agency confirmation is obtained in connection therewith. |
| | |
| Tranche Size and Coupon: | The principal amount of and interest rate applicable to each class of Securities will be determined by agreement between the Arranger, Client and the Manager, with a goal of providing Client with optimal financing terms for the CLO Eligible Assets. |
| | |

| | |
|---|---|
| Issuance Price: | The Notes other than the CLO Equity Securities will be sold or placed at par, net of the Arranger Fees (as defined below), except with respect to such Notes that, with Client's consent (to be granted or withheld at its sole and absolute discretion), may be sold at a discount to par.  Client or a non-debtor subsidiary of Client ("Client Sub") will receive the CLO Equity Securities for either (i) cash consideration (e.g., a portion of the proceeds of the sale of CLO Eligible Assets to the CLO Issuer) or (ii) in partial consideration of the sale of the CLO Eligible Assets to the CLO Issuer. |
| | |
| Interest Payments: | Interest on each class of Securities (except the CLO Equity Securities) will be due periodically, no less frequently than semi-annually, in accordance with a priority of payments set forth in the CLO Transaction Documents.  The CLO Equity Securities will not bear interest at a stated rate but will receive any residual remaining after payment of all senior amounts, including interest due and payable on the Securities (except the CLO Equity Securities), in accordance with the priority of payments.  Certain classes of Securities may be entitled to deferred or paid-in-kind interest until the earlier of their maturity date and the date on which funds are available to pay such interest. |
| | |
| Principal Payments and Redemptions: | Certain income of the CLO Issuer, including principal repayments and sales proceeds of the CLO Assets, will be available to pay principal on the Securities.  Once all of the principal of the Securities other than the CLO Equity Securities have been repaid, all income of the CLO Issuer net of Manager Fees (see below) and other servicer fees and expenses, and any indemnities, will be paid to the holder(s) of the CLO Equity Securities.  The CLO Transaction Documents will provide that in the event certain over-collateralization and/or other financial metrics are not met, amounts otherwise available to make Interest Payments (including residual payments to the holder(s) of the CLO Equity Securities) will instead be used to make mandatory redemptions of the Notes until compliance with such metrics is restored.  The CLO Transaction Documents may also provide for the redemption of the Securities in other circumstances, including if the CLO Issuer becomes subject to material taxes or, after a specified non-call period, at the election of the holder(s) of the CLO Equity Securities, including in connection with a refinancing of the CLO Securities. |
| | |
| Term of the Securities: | The Securities will have a stated maturity which is generally consistent with the market for CLOs. |
| | |
| CLO Eligible Assets Ownership: | Upon the closing of a CLO Transaction, Client will transfer, and effect a true sale of, the applicable CLO Eligible Assets to the applicable CLO Issuer. Such transfer may be accomplished either directly or by the transfer of such CLO Eligible Assets to Client Sub for further transfer |

| | |
|---|---|
| | thereby to the CLO Issuer. |
| | |
| Pledge of CLO Assets: | The CLO Issuer's rights in CLO Assets, as well as the CLO Issuer's rights under certain contracts, including the Collateral Management Agreement (see below) to be entered into in connection with the CLO Transaction, will be pledged to the Trustee for the benefit of the holders of the Securities (other than holders of CLO Equity Securities that are preferred shares), the service providers and any providers of Hedge Agreements (see below), provided that the Manager will manage the CLO Assets on behalf of the CLO Issuer, subject to the CLO Approval Protocols set forth in Annex I to this Schedule C, and the vesting of certain rights with the Trustee and/or Note holders following the occurrence of an Event of Default under and as defined in the CLO Transaction Documents. |
| | |
| Trading; Liquidation: | The CLO Transaction Documents will generally restrict the CLO Issuer's ability to sell or purchase assets after the CLO Issuer's acquisition of the CLO Assets on the closing date of the CLO.  As a general matter, the CLO Issuer will be prohibited from purchasing assets and will only be permitted to sell CLO Assets under certain limited circumstances, such as if the item of CLO Assets is impaired or in default, or is trading above par, or with Client's consent as set forth on Annex I to this Schedule C, as such Schedule may, with the consent of Client, be amended in connection with any CLO Transaction in order to accommodate the purchasers of the Notes of the applicable CLO.  Notwithstanding the foregoing, upon the occurrence of an Event of Default and an acceleration of the Securities, the CLO Assets may be subject to liquidation if certain requirements set forth in the CLO Transaction Documents are met. |
| | |
| Right of First Refusal; Additional Capital: | The CLO Transaction Documents will provide that should the Manager determine that it is in the best interests of the CLO Issuer to sell CLO Assets to a third party, the holder(s) of the CLO Equity Securities will have the right to purchase such CLO Assets on terms at least as favorable to the CLO Issuer as those available to the CLO Issuer through the arms-length sale of such CLO Assets to third parties unaffiliated with the Manager or Client.  Manager will demonstrate the arms-length nature of such sale to Client by (a) soliciting unaffiliated third-party bids for such CLO Assets from at least three dealers (at least two of which bids shall be solicited from dealers set forth on Schedule F to this Agreement, which list can be changed by Manager from time to time subject to the prior written consent, not to be unreasonably withheld of holder(s) of the CLO Equity Securities) or (b) if a firm bid cannot be obtained as contemplated by clause (a), selecting the mid-point of secondary market bid-ask quotations sourced by the Manager from Loan X or LPC (or if neither service is available, a substantially similar pricing service reasonably acceptable to Client). |

| | |
|---|---|
| | The holder(s) of the CLO Equity Securities shall have the right at any time and in its absolute discretion to contribute additional equity to any CLO Transaction; provided that if Client does not own 100% of the CLO Equity Securities of the applicable CLO, the other equity owners thereof will be offered a preemptive right to participate in the offering of such new equity on a proportionate basis. |
| Arranger Fees: | A fee or initial purchase discount will be payable to the Arranger of a CLO out of the closing proceeds of such CLO in accordance with prevailing and customary market rates, and is expected to be in the range of 1.0% - 1.5% of the par amount of the Notes placed by the Arranger. No fee will be payable to an Arranger in respect of a proposed CLO that does not close, subject to customary exceptions. |
| Manager Fees: | The Manager will be entitled to a management fee of 25 basis points per annum and comprised of a senior management fee and a subordinated management fee based upon the principal balance of the CLO Assets as of a specified date during the related payment period.  The senior management fee is expected to be between 10 – 15 basis points per annum and the subordinated management fee is expected to be 25 basis points per annum less the senior management fee, each based on the principal balance of the CLO Assets (or such other fee basis as set forth in the CLO Transaction Documents) as of a specified date during the related payment period.  The senior management fee will be paid prior to the payment of interest on any Securities.  The subordinated management fee will be payable only after all interest due on the Securities (other than the CLO Equity Securities, which bears no stated rate of interest) has been paid. Manager fees accrued but unpaid due to an insufficiency of available funds will accrue interest at LIBOR plus 3% and will be payable when funds become available therefore in accordance with the priority of payments set forth in the CLO Transaction Documents. |
| Trustee Fees: | The Trustee will be entitled to a fee calculated in accordance with prevailing and customary market rates based on the principal balance of the CLO Assets (or such other fee basis as set forth in the CLO Transaction Documents) as of a specified date during the related payment period. |
| Other Fees: | The CLO Issuer will incur fees to other service providers, including rating agencies, accountants and lawyers as well as transfer fees with respect to the transfer of the loans to the CLO Issuer, in accordance with prevailing and customary market rates for a CLO transaction. |
| Expenses: | Reasonable expenses of the Arranger, Manager, Trustee and other service providers may also be payable by the CLO Issuer. |

| | |
|---|---|
| Collateral Management Agreement: | The CLO Transaction Documents will include a collateral management agreement between the CLO Issuer and the Manager. The Collateral Management Agreement will be consistent with the terms of this Agreement and Annex I to this <u>Schedule C</u>, provided that in the event of any conflict, the Collateral Management Agreement shall control with respect to the related CLO Assets. |
| Removal of Collateral Manager: | The Collateral Management Agreement will provide that the Manager may be removed as collateral manager of the CLO for "<u>cause</u>" as specified under the applicable CLO Documentation, provided that a replacement is appointed and rating agency confirmation is obtained in connection therewith. The decision whether to remove and with whom to replace the Manager will be made by certain holders of the Securities as more specifically set forth in the CLO Transaction Documents. |
| Manager and Trustee: Duties and Standard of Care: | The Manager and the Trustee will have such duties with respect to the CLO Issuer, the CLO Assets and the Securities as is customary for CLO transactions. The Manager and the Trustee shall be required to perform their duties in accordance with a standard of care set forth in the CLO Transaction Documents which will include, at a minimum, acting in good faith and without gross negligence. |
| Hedge Agreements: | The CLO Issuer will be permitted to enter into hedge agreements, including interest rate, foreign exchange, timing and liquidity swaps, to hedge mismatches between its assets and liabilities. Hedge counterparties will be required to have certain credit ratings stated in the CLO Transaction Documents. |
| Rating Agencies: | Securities other than the CLO Equity Securities will be rated by one or more of Moody's and S&P and it will be a condition precedent to the closing of a CLO that the applicable ratings have been obtained. |
| Events of Default; Remedies: | The CLO Transaction Documents will contain standard CLO events of default ("<u>Events of Default</u>"), including the failure to pay interest when due on the senior-most class of securities, failure to pay principal and interest at maturity, the CLO Issuer's becoming a non-exempt investment company under the Investment Company Act of 1940 and the bankruptcy of the CLO Issuer. The Events of Default will not contain any financial covenants, though they may include an over-collateralization test. Following the occurrence of an Event of Default, the decision as to whether to accelerate the Securities and, if accelerated, whether to liquidate the CLO Assets, will be made by certain holders of the Securities as more specifically set forth in the CLO Transaction Documents. |
| | |

| | |
|---|---|
| Indemnities: | The CLO Issuer will indemnify the Arranger, Trustee and the Manager for certain expenses, losses and liabilities incurred by them in connection with the CLO Transaction, <u>provided</u> that such indemnification will not be available if such expenses, losses and liabilities are due to the gross negligence, fraud, willful misconduct or other improper acts or failures to act of the indemnitee set forth in the CLO Transaction Documents. |
| Periodic Reports and Meetings: | Manager will (or will cause a third party to) provide Security Holders with monthly portfolio reports in the form of a CLO trustee report substantially in the form attached hereto as <u>Annex II</u>.  Manager will meet with Client or its representatives at least quarterly to discuss the portfolio of CLO Assets and each individual credit included therein and to discuss trends, the investment outlook, strategy and action plans with respect thereto. |
| Assignment | Subject to customary permitted assignments, no assignment (as that term is defined in the Advisers Act) of the Collateral Management Agreement may be made without the prior written consent of the required majority of the holders of the CLO Equity Securities and otherwise in compliance with the terms of the CLO Transaction Documents. |

**ANNEX I TO SCHEDULE C**

**CLO Approval Protocols**

| Activity | CLO Assets | |
|---|---|---|
| | | |
| Technical Amendments (affirmative, non-financial covenant, non 100% vote) | Face Amount | Approval |
| | Any Amount | WCAS/FS |
| | | |
| Covenant Amendments (negative, financial and 100% lender approval required) | Face Amount | Approval |
| | Under $5mm | WCAS/FS |
| | $5mm or more | Estate/A&M |
| | | |
| New Commitments/Fundings, Maturity Extensions, Release of Collateral | Face Amount | Approval |
| | Under $2mm | WCAS/FS |
| | $2mm or more | Estate/A&M |
| | | |
| Restructurings & Debt Exchanges (reduction of principal, debt forgiveness and/or conversion) | Face Amount | Approval |
| | Under $2mm | WCAS/FS |
| | $2mm or more | Estate/A&M |
| | | |
| Trade/Sell Loans: At no loss (defined as last two-month avg. mark) | Face Amount | Approval |
| | Any Amount | WCAS/FS |
| | | |
| Trade/Sell Loans: At loss | If no greater than 50 bps below last two-month average mark and Face Amount under $10mm, WCAS/FS Approve | |
| | | |
| Trade/Sell Loans: All Other | Estate/A&M Approve | |

**ANNEX II TO SCHEDULE C**

**CLO Trustee Report**



*Sample CDO LTD*



### *Draft Report As Of 06/18/2007*

| Summary Page |
|:---:|

| Statistics | | | | | |
|---|---|---|---|---|---|
| | Original | Prior | Current | Trigger | Result |
| Class A/B OC Ratio Test | | 124.66% | 124.87% | 113.40% | Passed |
| Class C OC Ratio Test | | 116.45% | 116.64% | 108.20% | Passed |
| Class D OC Ratio Test | | 111.13% | 111.31% | 104.90% | Passed |
| Class E OC Ratio Test | | 106.27% | 106.44% | 102.00% | Passed |
| CERT Ratio | | 106.27% | 106.44% | 103.00% | Passed |
| Class A/B IC Test | | 144.17% | 140.78% | 120.00% | Passed |
| Class C IC Test | | 133.98% | 130.82% | 114.00% | Passed |
| Class D IC Test | | 126.71% | 123.73% | 110.00% | Passed |
| Class E IC Test | | 118.31% | 115.52% | 108.00% | Passed |

| Capital Structure | | | | |
|---|---|---|---|---|
| Term Notes | Original | Current | Rate | Projected Coupon |
| Class A-1-A Floating Rate Notes | $565,500,000.00 | $565,500,000.00 | 5.59900% | $16,710,682.10 |
| Class A-1-B Floating Rate Notes | $141,375,000.00 | $141,375,000.00 | 5.68400% | $4,241,092.92 |
| Class A-2 Floating Rate Notes | $177,500,000.00 | $177,500,000.00 | 5.61400% | $5,259,226.40 |
| Class B Floating Rate Notes | $90,625,000.00 | $90,625,000.00 | 5.76400% | $2,756,913.19 |
| Class C Floating Rate Deferrable Notes | $68,750,000.00 | $68,750,000.00 | 6.07400% | $2,203,934.03 |
| Class D Floating Rate Deferrable Notes | $50,000,000.00 | $50,000,000.00 | 6.77400% | $1,787,583.33 |
| Class E Floating Rate Deferrable Notes | $50,000,000.00 | $50,000,000.00 | 8.87400% | $2,341,750.00 |
| Subordinated Notes | $106,250,000.00 | $106,250,000.00 | 0.00000% | $0.00 |

| Quality Tests | | | | | |
|---|---|---|---|---|---|
| | Original | Prior | Current | Trigger | Result |
| Diversity Test | | 82 | 82 | 75 | Passed |
| Weighted Average Rating Test | | 2303 | 2297 | 2883 | Passed |
| Weighted Average Life Test | | 5.79 | 5.78 | N/A | N/A |
| Weighted Average Spread Test | | 2.303% | 2.337% | 2.200% | Passed |
| Weighted Average Coupon Test | | 9.211% | 8.755% | 8.000% | Passed |
| Weighted Average Recovery Rate (Moody's) | | 49.2 | 48.8 | 43.0 | Passed |
| Weighted Average Recovery Rate (S&P) | | 55.0 | 70.5 | 53.0 | Passed |
| Weighted Average Recovery Rate Test | | | | N/A | Passed |
| S&P CDO Monitor Test | | | | N/A | N/A |

| Cash Balances | | | |
|---|---|---|---|
| Cash Accounts: | Principal | Interest | Total |
| Collection Account | $8,954,622.42 | $31,435,713.96 | $40,390,336.38 |
| Expense Account | $82,743.51 | $0.00 | $82,743.51 |
| Variable Funding Account | $2,950,703.58 | $0.00 | $2,950,703.58 |
| Interest Reserve Account | $0.00 | $6,029,922.70 | $6,029,922.70 |




*Sample CDO LTD*

## *Draft Report As Of 06/18/2007*

### Notes Information

**Capital Structure**

| | Identifier | Original | Current | Factor % | Index | Spread | Coupon | Moody's Original | Moody's Current | Moody's Watch | S&P Original | S&P Current | S&P Watch |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Class A-1-A Floating Rate Notes | | $565,500,000.00 | $565,500,000.00 | 1.0000000000 | LIBOR (3 months) | .22500% | 5.59900% | Aaa | Aaa | N | AAA | AAA | N |
| Class A-1-B Floating Rate Notes | | $141,375,000.00 | $141,375,000.00 | 1.0000000000 | LIBOR (3 months) | .31000% | 5.68400% | Aaa | Aaa | N | AAA | AAA | N |
| Class A-2 Floating Rate Notes | | $177,500,000.00 | $177,500,000.00 | 1.0000000000 | LIBOR (3 months) | .24000% | 5.61400% | Aaa | Aaa | N | AAA | AAA | N |
| Class B Floating Rate Notes | | $90,625,000.00 | $90,625,000.00 | 1.0000000000 | LIBOR (3 months) | .39000% | 5.76400% | Aa2 | Aa2 | N | AA | AA | N |
| Class C Floating Rate Deferrable Notes | | $68,750,000.00 | $68,750,000.00 | 1.0000000000 | LIBOR (3 months) | .70000% | 6.07400% | A2 | A2 | N | A | A | N |
| Class D Floating Rate Deferrable Notes | | $50,000,000.00 | $50,000,000.00 | 1.0000000000 | LIBOR (3 months) | 1.40000% | 6.77400% | Baa2 | Baa2 | N | BBB | BBB | N |
| Class E Floating Rate Deferrable Notes | | $50,000,000.00 | $50,000,000.00 | 1.0000000000 | LIBOR (3 months) | 3.50000% | 8.87400% | Ba2 | Ba2 | N | BB | BB | N |
| Subordinated Notes | | $106,250,000.00 | $106,250,000.00 | 1.0000000000 | LIBOR (3 months) | .00000% | 0.00000% | | | | | | |
| | | **$1,250,000,000.00** | **$1,250,000,000.00** | | | | | | | | | | |

**Principal And Interest Activity**

| | | Current Par | Principal | Factor % | Interest |
|---|---|---|---|---|---|
| Class A-1-A Floating Rate Notes | | | | | |
| | 1/11/2007 | $565,500,000.00 | $565,500,000.00 | 1.0000000000 | $0.00 |
| Class A-1-B Floating Rate Notes | | | | | |
| | 1/11/2007 | $141,375,000.00 | $141,375,000.00 | 1.0000000000 | $0.00 |
| Class A-2 Floating Rate Notes | | | | | |
| | 1/11/2007 | $177,500,000.00 | $177,500,000.00 | 1.0000000000 | $0.00 |
| Class B Floating Rate Notes | | | | | |
| | 1/11/2007 | $90,625,000.00 | $90,625,000.00 | 1.0000000000 | $0.00 |
| Class C Floating Rate Deferrable Notes | | | | | |
| | 1/11/2007 | $68,750,000.00 | $68,750,000.00 | 1.0000000000 | $0.00 |
| Class D Floating Rate Deferrable Notes | | | | | |
| | 1/11/2007 | $50,000,000.00 | $50,000,000.00 | 1.0000000000 | $0.00 |
| Class E Floating Rate Deferrable Notes | | | | | |
| | 1/11/2007 | $50,000,000.00 | $50,000,000.00 | 1.0000000000 | $0.00 |
| Subordinated Notes | | | | | |
| | 1/11/2007 | $106,250,000.00 | $106,250,000.00 | 1.0000000000 | $0.00 |




*Sample CDO LTD*

### Draft Report As Of 06/18/2007

| Portfolio Criteria |
|---|

Maximum Investment Amount:  $1,217,478,122.21

| | Original | Prior | Current | Minimum Trigger | Maximum Trigger | Result |
|---|---|---|---|---|---|---|
| Senior Secured Loans, Qualifying Second Lien Loans, Senior Secured Notes and Eligible Investments | | 94.96% | 91.45% | 80.00% | | Passed |
| Second Lien Loans, Second Lien Sen Sec Notes, Snr Uns Loans, Snr Uns Notes & HY Bonds | | 10.76% | 8.55% | | 20.00% | Passed |
| High Yield Bonds | | 2.54% | 3.01% | | 10.00% | Passed |
| Largest single series or issue of Structured Finance Securities | | 0.0% | 0.0% | | 1.0% | Passed |
| Structured Finance Securities | | 0.00% | 0.00% | | 10.00% | Passed |
| Fixed Rate Assets | | 1.32% | 1.79% | | 10.00% | Passed |
| Participations and Synthetic Securities | | 0.00% | 0.00% | | 20.00% | Passed |
| Revolving Credit Facilities or Delayed Funding Term Loans | | 1.86% | 2.23% | | 10.00% | Passed |
| Obligor Concentration (max 2%, except up to 5 max 2.75%, except additional 5 max 2.5%) | | 0.00% | 0.00% | | | Passed |
| S&P Industry Concentration (max 8% except three up to 12%) | | 0.00% | 0.00% | | | Passed |
| Issuer organized outside of the US or Canada | | 3.57% | 3.57% | | 25.00% | Passed |
| Issuer organized in a Tax Advantaged jurisdiction | | 1.56% | 1.56% | | 15.00% | Passed |
| Issuer organized in the United Kingdom | | 0.00% | 0.00% | | 15.00% | Passed |
| Issuer organized in a Moody's Group Country | | 2.01% | 2.01% | | 20.00% | Passed |
| # of Moody's Group I Countries exceeding 10% of Maximum Investment Amount | | 0.00 | 0.00 | | 0.00 | Passed |
| Issuer organized in a Moody's Group I Country | | 1.62% | 1.55% | | 20.00% | Passed |
| # of Moody's Group II Countries exceeding 5% of Maximum Investment Amount | | 0.00 | 0.00 | | 0.00 | Passed |
| Issuer organized in a Moody's Group II Country | | 0.41% | 0.41% | | 10.00% | Passed |
| # of Moody's Group III Countries exceeding 5% of Maximum Investment Amount | | 0.00 | 0.00 | | 0.00 | Passed |
| Issuer organized in a Moody's Group III Country | | 0.05% | 0.05% | | 10.00% | Passed |
| # of Moody's Group IV Countries exceeding 3% of Maximum Investment Amount | | 0.00 | 0.00 | | 0.00 | Passed |
| Issuer organized in a Moody's Group IV Country | | 0.00% | 0.00% | | 6.00% | Passed |
| Specific Country Designation | | 0.00% | 0.00% | | 3.00% | Passed |
| Underlying Assets with a Moody's Rating <= Caa1 | | 1.30% | 1.53% | | 7.50% | Passed |
| Underlying Assets with an S&P Rating <= CCC+ | | 1.16% | 1.02% | | 7.50% | Passed |



*Sample CDO LTD*



### Draft Report As Of 06/18/2007

| | | | | |
|---|---|---|---|---|
| Moody rating derived from S&P | 0.00% | 0.00% | 10.00% | Passed |
| S&P rating derived from Moody's | 0.00% | 0.00% | 10.00% | Passed |
| Underlying Assets maturing on or after the stated maturity of the Senior Notes | 0.00% | 0.00% | 3.00% | Passed |
| Underlying Assets paying interest less frequently than quarterly | 2.67% | 2.57% | 12.50% | Passed |
| Current Pay Obligations | 0.00% | 0.00% | 10.00% | Passed |
| DIP Loans | 0.00% | 0.00% | 7.50% | Passed |
| Largest single DIP Loan | 0.0% | 0.0% | 2.0% | Passed |
| PIK Securities | 0.00% | 0.00% | 10.00% | Passed |
| Bridge Loan | 0.00% | 0.00% | 7.50% | Passed |
| Underlying Assets with debt or warrants attached | 0.00% | 0.00% | 10.00% | Passed |
| # of Counterparties or Selling Institutions rated A1/A+ in excess of 5.0% | 0.00 | 0.00 | 0.00 | Passed |
| # of Counterparties or Selling Institutions rated A2/A in excess of 5.0% | 0.00 | 0.00 | 0.00 | Passed |
| # of Counterparties or Selling Institutions rated Aa1/AA+ in excess of 10.0% | 0.00 | 0.00 | 0.00 | Passed |
| # of Counterparties or Selling Institutions rated Aa2/AA in excess of 10.0% | 0.00 | 0.00 | 0.00 | Passed |
| # of Counterparties or Selling Institutions rated Aa3/AA- in excess of 10.0% | 0.00 | 0.00 | 0.00 | Passed |
| # of Counterparties or Selling Institutions rated Aaa/AAA in excess of 20.0% | 0.00 | 0.00 | 0.00 | Passed |
| Counterparties or Selling Institutions rated A1/A+ | 0.00% | 0.00% | 15.00% | Passed |
| Counterparties or Selling Institutions rated A2/A | 0.00% | 0.00% | 10.00% | Passed |
| Counterparties or Selling Institutions rated Aa1/AA+ | 0.00% | 0.00% | 20.00% | Passed |
| Counterparties or Selling Institutions rated Aa2/AA | 0.00% | 0.00% | 20.00% | Passed |
| Counterparties or Selling Institutions rated Aa3/AA- | 0.00% | 0.00% | 20.00% | Passed |
| Counterparties or Selling Institutions rated Aaa/AAA | 0.00% | 0.00% | 20.00% | Passed |




*Sample CDO LTD*

### Draft Report As Of 06/18/2007

| Overcollateralization Ratio Test | | | | |
|---|---|---|---|---|
| | Calculation | Ratio | Trigger | Pass/Fail |
| Class A/B OC Ratio Test | A/(B+C) | 124.87% | 113.40% | Passed |
| Class C OC Ratio Test | A/(B+C+D) | 116.64% | 108.20% | Passed |
| Class D OC Ratio Test | A/(B+C+D+E) | 111.31% | 104.90% | Passed |
| Class E OC Ratio Test | A/(B+C+D+E+F) | 106.44% | 102.00% | Passed |
| CERT Ratio | A/(B+C+D+E+F) | 106.44% | 103.00% | Passed |

**Collateral:**

| | | |
|---|---|---|
| Aggregate Principal Amount of Collateral Obligations (excluding Defaults) | | $1,208,523,499.79 |
| Cash and Eligible Investments held in accounts (other than Expense Account and Variable Funding Account) | | $8,954,622.42 |

**Less:**

| | | |
|---|---|---|
| Deferred Interest Obligations | $0.00 | |
| Underlying Assets maturing after Stated Maturity (excess of 3% of MIA) | $0.00 | |
| Discounted Asset Purchases | $0.00 | |
| Current Pay Obligations | $0.00 | |
| Excess Caa/CCC Obligations | $0.00 | |
| Subtotal: | | $0.00 |

**Plus:**

| | | |
|---|---|---|
| Defaulted Obligation Amount | $0.00 | |
| Deferred Interest Obligation Amount | $0.00 | |
| Recovery Amount of Underlying Assets maturing after Stated Maturity (excess of 3% of MIA) | $0.00 | |
| Discounted Asset Purchase Amount | $0.00 | |
| Current Pay Obligation Amount | $0.00 | |
| Market Value of Excess Caa/CCC Obligations | $0.00 | |
| Purchased Accrued Interest | $0.00 | |
| Subtotal: | | $0.00 |

| | | |
|---|---|---|
| Net Collateral Principal Balance: | $1,217,478,122.21 | (A) |

**Notes:**

| | |
|---|---|
| Aggregate Outstanding Amount of Class A-1-A Notes | $565,500,000.00 |
| Aggregate Outstanding Amount of Class A-1-B Notes | $141,375,000.00 |
| Aggregate Outstanding Amount of Class A-2 Notes | $177,500,000.00 |





*Sample CDO LTD*

### Draft Report As Of 06/18/2007

| | | | |
|---|---|---|---|
| Aggregate Outstanding  Amount of Class A Notes: | | $884,375,000.00 | (B) |
| Aggregate Outstanding Amount of Class B Notes | $90,625,000.00 | | |
| Aggregate Outstanding Amount of Class B Notes: | | $90,625,000.00 | (C) |
| Outstanding Amount of Class C Notes | $68,750,000.00 | | |
| Class C Deferred Interest | $0.00 | | |
| Aggregate Outstanding Amount of Class C Notes: | | $68,750,000.00 | (D) |
| Outstanding Amount of Class D Notes | $50,000,000.00 | | |
| Class D Deferred Interest | $0.00 | | |
| Aggregate Outstanding Amount of Class D Notes: | | $50,000,000.00 | (E) |
| Outstanding Amount of Class E Notes | $50,000,000.00 | | |
| Class E Deferred Interest | $0.00 | | |
| Aggregate Outstanding Amount of Class E Notes: | | $50,000,000.00 | (F) |


*Sample CDO LTD*



### *Draft Report As Of 06/18/2007*

**OC Adjustments Detail**

**Calculation Summary**

| Adjustment Name | Par Amount | Market Value | Applicable Recovery |
|---|---|---|---|

**Adjustment Details**

| Issuer Name / Asset Description | Par Amount | Market Price | Applicable Recovery |
|---|---|---|---|

\* Denotes the the balances of this asset  were adjusted due to an excess threshold calculation




*Sample CDO LTD*

### *Draft Report As Of 06/18/2007*

## Interest Coverage Ratio Test

|  | Calculation | Ratio | Trigger | Pass/Fail |
|---|---|---|---|---|
| Class A/B IC Test | A/(B+C) | 140.78% | 120.00% | Passed |
| Class C IC Test | A/(B+C+D) | 130.82% | 114.00% | Passed |
| Class D IC Test | A/(B+C+D+E) | 123.73% | 110.00% | Passed |
| Class E IC Test | A/(B+C+D+E+F) | 115.52% | 108.00% | Passed |

**Interest Receipts Actual:**

| | |
|---|---|
| Interest Proceeds held in accounts | $31,435,713.96 |
| Net effect of treating annual paying securities as securities that accrue and pay on a semi-annual basis | $0.00 |

**Interest Receipts Projected:**

| | |
|---|---|
| Interest on Collateral Obligations | $10,212,956.05 |
| Reinvestment Interest | $16,872.43 |
| Interest on Account balances | $138,675.73 |
| Hedge Receipt Amounts | $0.00 |

**Less:**

| | |
|---|---|
| Purchased Accrued Interest | $0.00 |
| Amounts payable pursuant to 11.1(a)(i)-(iv) | $1,024,567.76 |

| | | |
|---|---|---|
| Net Collateral Interest Proceeds | $40,779,650.41 | (A) |

**Debt Payments:**

| | | |
|---|---|---|
| Class A-1-A Projected Interest Payment | $16,710,682.10 | |
| Class A-1-A Defaulted Interest | $0.00 | |
| Accrued interest on Class A-1-A Defaulted Interest | $0.00 | |
| Class A-1-B Projected Interest Payment | $4,241,092.92 | |
| Class A-1-B Defaulted Interest | $0.00 | |
| Accrued interest on Class A-1-B Defaulted Interest | $0.00 | |
| Class A-2 Projected Interest Payment | $5,259,226.40 | |
| Class A-2 Defaulted Interest | $0.00 | |
| Accrued interest on Class A-2 Defaulted Interest | $0.00 | |
| Total Interest on Class A Notes | $26,211,001.41 | (B) |
| Class B Projected Interest Payment | $2,756,913.19 | |
| Class B Defaulted Interest | $0.00 | |

*Sample CDO LTD*

**Draft Report As Of 06/18/2007**

| | | |
|---|---|---|
| Accrued interest on Class B Defaulted Interest | $0.00 | |
| Total Interest on Class B Notes | | $2,756,913.19 (C) |
| Class C Projected Interest Payment | $2,203,934.03 | |
| Class C Defaulted Interest | $0.00 | |
| Accrued interest on Class C Defaulted Interest | $0.00 | |
| Accrued interest on Class C Deferred Interest | $0.00 | |
| Total Interest on Class C Notes | | $2,203,934.03 (D) |
| Class D Projected Interest Payment | $1,787,583.33 | |
| Class D Defaulted Interest | $0.00 | |
| Accrued interest on Class D Defaulted Interest | $0.00 | |
| Accrued interest on Class D Deferred Interest | $0.00 | |
| Total Interest on Class D Notes | | $1,787,583.33 (E) |
| Class E Projected Interest Payment | $2,341,750.00 | |
| Class E Defaulted Interest | $0.00 | |
| Accrued interest on Class E Defaulted Interest | $0.00 | |
| Accrued interest on Class E Deferred Interest | $0.00 | |
| Total Interest on Class E Notes | | $2,341,750.00 (F) |






*Sample CDO LTD*

## *Draft Report As Of 06/18/2007*

### Interest Coverage Detail - Projections

Current Due Period Begin Date: **1/11/2007**

Current Due Period End Date: **7/11/2007**

Scheduled Interest Distributions **$10,212,956.14**

### *Non - Defaulted / Performing Assets*

| Issuer Name/Security Name | Market Identifier | Maturity | Payment Frequency | Coupon Type | Days In Accrual Period | Accrual Begin Date | Accrual End Date | Interest Accrual Method | Par Amount | All in Rate | Scheduled Interest Distribution | Next Payment Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 Hour Fitness - Term Loan B | LX044891 | 6/2/2012 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $2,842,000.00 | 7.85000% | $56,393.96 | 6/29/2007 |
| | | | | Floating | 92 | 4/4/2007 | 7/5/2007 | Actual/360 | $2,900,000.00 | 7.85000% | $58,177.22 | 7/5/2007 |
| Acco Brands Corp - US Term Loan | LX038129 | 8/17/2012 | 3 Months | | | | | | | | | |
| | | | | Floating | 92 | 3/20/2007 | 6/20/2007 | Actual/360 | $63,125.00 | 7.10000% | $1,145.37 | 6/20/2007 |
| Acosta Inc - Term Loan B | A000AC037TL01 | 7/28/2013 | 1 Month | | | | | | | | | |
| | | | | Floating | 30 | 5/30/2007 | 6/29/2007 | Actual/360 | $2,977,500.00 | 7.57000% | $18,783.06 | 6/29/2007 |
| Activant Solutions Inc - Term Loan | A000DP011TB01 | 5/2/2013 | 1 Month | | | | | | | | | |
| | | | | Floating | 31 | 6/1/2007 | 7/2/2007 | Actual/360 | $77,180.78 | 7.37500% | $490.15 | 7/2/2007 |
| Advanced Micro Devices Inc - Loans | 00AMDN026TB01 | 10/24/2013 | 2 Months | | | | | | | | | |
| | | | | Floating | 60 | 4/30/2007 | 6/29/2007 | Actual/360 | $10,186,923.94 | 7.34000% | $124,620.04 | 6/29/2007 |
| Advantage Sales & Marketing Inc - Term Loan B | A000DH019TB01 | 3/22/2013 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $547,500.00 | 7.35000% | $10,172.09 | 6/29/2007 |
| AES Corp - Term Loan | 00AESN077TB01 | 7/31/2011 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 4/5/2007 | 7/5/2007 | Actual/360 | $1,714,285.70 | 7.50000% | $32,500.00 | 7/5/2007 |



*Sample SDB LTD*



### Draft Report As Of 06/18/2007

| Issuer Name/Security Name | Market Identifier | Maturity | Payment Frequency | Coupon Type | Days In Accrual Period | Accrual Begin Date | Accrual End Date | Interest Accrual Method | Par Amount | All in Rate | Scheduled Interest Distribution | Next Payment Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Affiliated Computer Services Inc - First Securities Repurchase Increase Add On | LX047496 | 7/19/2013 | 1 Month | | | | | | | | | |
| | | | | Floating | 31 | 6/1/2007 | 7/2/2007 | Actual/360 | $1,989,974.94 | 7.32000% | $12,543.48 | 7/2/2007 |
| | | | | Floating | 30 | 6/11/2007 | 7/11/2007 | Actual/360 | $1,989,974.94 | 7.32000% | $12,138.85 | 7/11/2007 |
| Affiliated Computer Services Inc - Term Loan B | 00ACSN020TL01 | 3/20/2013 | 1 Month | | | | | | | | | |
| | | | | Floating | 35 | 5/25/2007 | 6/29/2007 | Actual/360 | $872,790.40 | 7.32000% | $6,211.36 | 6/29/2007 |
| | | | | Floating | 35 | 5/25/2007 | 6/29/2007 | Actual/360 | $114,709.60 | 7.32000% | $816.35 | 6/29/2007 |
| Alaska Communications Systems - Term Loan | 0ALSKO043TL01 | 2/1/2012 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $5,000,000.00 | 7.10000% | $89,736.11 | 6/29/2007 |
| Alliance Atlantis - Term Loan C | A000AU011TC01 | 12/20/2011 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $455,181.14 | 6.82000% | $7,847.07 | 6/29/2007 |
| Allied Security - Term Loan D | A000A5022TD01 | 6/30/2010 | 3 Months | | | | | | | | | |
| | | | | Floating | 94 | 3/30/2007 | 7/2/2007 | Actual/360 | $3,767,363.15 | 8.35000% | $82,138.98 | 7/2/2007 |
| Alm Media - Term Loan | LX045472 | 3/5/2010 | 3 Months | | | | | | | | | |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $9,851.81 | 7.85000% | $195.49 | 6/29/2007 |
| | | | | Floating | 91 | 3/30/2007 | 6/29/2007 | Actual/360 | $1,059,481.31 | 7.85000% | $21,023.35 | 6/29/2007 |
| AM General LLC - Term B Facility | 00A000AG030TB | 8/25/2013 | 3 Months | | | | | | | | | |
| | | | | Floating | 90 | 4/10/2007 | 7/9/2007 | Actual/360 | $2,758,064.51 | 8.36000% | $57,643.55 | 7/9/2007 |
| | | | | Floating | 90 | 4/10/2007 | 7/9/2007 | Actual/360 | $2,758,064.52 | 8.33563% | $57,475.51 | 7/9/2007 |
| | | | | Floating | 90 | 4/10/2007 | 7/10/2007 | Actual/360 | $2,903,225.81 | 8.35000% | $61,278.23 | 7/10/2007 |
| AM General LLC - Term L/C Facility | A000AG036LC01 | 11/1/2011 | 1 Month | | | | | | | | | |
| | | | | Floating | 31 | 6/4/2007 | 7/5/2007 | Actual/360 | $290,322.58 | 8.32000% | $2,080.00 | 7/5/2007 |




*Sample CDO LTD*

***Draft Report As Of 06/18/2007***

## Weighted Average Rating

| Issuer | Asset Description | Identifier Type | Identifier | Principal Balance | Rating | Rating Factor | Weighted Factor |
|---|---|---|---|---|---|---|---|
| 24 Hour Fitness | Term Loan B | LOANX_ID | LX044891 | $2,842,000.00 | B2 | 2720 | 7,730,240,000.00 |
| 24 Hour Fitness | Term Loan B | LOANX_ID | LX044891 | $2,900,000.00 | B2 | 2720 | 7,888,000,000.00 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $66,250.00 | Ba3 | 1766 | 116,998,000.00 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $68,125.00 | Ba3 | 1766 | 120,309,000.00 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $63,125.00 | Ba3 | 1766 | 111,479,000.00 |
| Acosta Inc | Term Loan B | LIN | A000AC037TL01 | $2,977,500.00 | B1 | 2220 | 6,610,050,000.00 |
| Activant Solutions Inc | Term Loan | LIN | A000DP011TB01 | $77,180.78 | B2 | 2720 | 209,932,000.00 |
| Activant Solutions Inc | Term Loan | LIN | A000DP011TB01 | $2,724,867.29 | B2 | 2720 | 7,411,640,000.00 |
| Acxiom Corporation | Term Loan | LIN | A000ED015TL01 | $10,000,833.33 | Ba3 | 1766 | 17,661,500,000.00 |
| Advanced Micro Devices Inc | Loans | LIN | 00AMDN026TB01 | $10,186,923.94 | B1 | 2220 | 22,615,000,000.00 |
| Advantage Sales & Marketing Inc | Term Loan B | LIN | A000DH019TB01 | $547,500.00 | B2 | 2720 | 1,489,200,000.00 |
| Advantage Sales & Marketing Inc | Term Loan B | LIN | A000DH019TB01 | $1,420,083.31 | B2 | 2720 | 3,862,630,000.00 |
| AES Corp | Term Loan | LIN | 00AESN077TB01 | $1,714,285.70 | B1 | 2220 | 3,805,710,000.00 |
| AES Corp | Term Loan | LIN | 00AESN077TB01 | $1,714,285.70 | B1 | 2220 | 3,805,710,000.00 |
| Affiliated Computer Services Inc | Add On Term Loan | LOANX_ID | LX047496 | $1,989,974.94 | Ba3 | 1766 | 3,514,300,000.00 |
| Affiliated Computer Services Inc | Add On Term Loan | LOANX_ID | LX047496 | $1,989,974.94 | Ba3 | 1766 | 3,514,300,000.00 |
| Affiliated Computer Services Inc | Term Loan B | LIN | 00ACSN020TL01 | $872,790.40 | Ba3 | 1766 | 1,541,350,000.00 |
| Affiliated Computer Services Inc | Term Loan B | LIN | 00ACSN020TL01 | $114,709.60 | Ba3 | 1766 | 202,577,000.00 |
| Agricore United Holdings | Tranche B Term Loan | LOANX_ID | LX046869 | $323,641.30 | B1 | 2220 | 718,484,000.00 |
| Alaska Communications Systems | Term Loan | LIN | 0ALSKO043TL01 | $5,000,000.00 | B1 | 2220 | 11,100,000,000.00 |
| Alliance Atlantis | Term Loan C | LIN | A000AU011TC01 | $455,181.14 | Ba3 | 1766 | 803,850,000.00 |
| Allied Security | Term Loan D | LIN | A000A5022TD01 | $3,767,363.15 | B2 | 2720 | 10,247,200,000.00 |
| Allied Security Escrow | ALYD 11.375 | CUSIP | 01950PAC6 | $1,000,000.00 | Caa1 | 4770 | 4,770,000,000.00 |
| Alm Media | Term Loan | LOANX_ID | LX045472 | $9,851.81 | B3 | 3490 | 34,382,800.00 |
| Alm Media | Term Loan | LOANX_ID | LX045472 | $1,059,481.31 | B3 | 3490 | 3,697,590,000.00 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,903,225.81 | Ba3 | 1766 | 5,127,100,000.00 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,758,064.51 | Ba3 | 1766 | 4,870,740,000.00 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,758,064.52 | Ba3 | 1766 | 4,870,740,000.00 |
| AM General LLC | Term L/C Facility | LIN | A000AG036LC01 | $290,322.58 | Ba3 | 1766 | 512,710,000.00 |
| American Axle & Manufacturing Inc. | Incremental Term Loan B | LOANX_ID | LX045948 | $1,000,000.00 | Ba3 | 1766 | 1,766,000,000.00 |



*Sample CDO LTD*



## Draft Report As Of 06/18/2007

| Issuer | Asset Description | Identifier Type | Identifier | Principal Balance | Rating | Rating Factor | Weighted Factor |
|---|---|---|---|---|---|---|---|
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $2,509,315.07 | B1 | 2220 | 5,570,680,000.00 |
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $91,232.88 | B1 | 2220 | 202,537,000.00 |
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $167,757.68 | B1 | 2220 | 372,422,000.00 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $530,555.55 | B2 | 2720 | 1,443,110,000.00 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $4,419,444.45 | B2 | 2720 | 12,020,900,000.00 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $12,500.00 | B2 | 2720 | 34,000,000.00 |
| American Safety Razor | Second Lien Term Loan | LIN | 0RAZR2043TC01 | $2,000,000.00 | B3 | 3490 | 6,980,000,000.00 |
| American Seafood Group | Term Loan B1 | LOANX_ID | LX039277 | $1,693,335.62 | B1 | 2220 | 3,759,210,000.00 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $44,318.18 | B3 | 3490 | 154,670,000.00 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $2,130,681.82 | B3 | 3490 | 7,436,080,000.00 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $312,500.00 | B3 | 3490 | 1,090,630,000.00 |
| ARG Holdings Inc - Alliant Resources | First Lien Term Loan | LOANX_ID | LX040351 | $1,975,000.00 | B3 | 3490 | 6,892,750,000.00 |
| ARG Holdings Inc - Alliant Resources | Second Lien Term Loan | LOANX_ID | LX040350 | $3,000,000.00 | Caa1 | 4770 | 14,310,000,000.00 |
| ARG Holdings Inc - Alliant Resources | Term Loan C | LOANX_ID | LX050874 | $997,500.00 | B3 | 3490 | 3,481,280,000.00 |
| Armstrong World Industries Inc | Tranche B Term Loan | LIN | 00ACKN038TB0 | $1,590,000.00 | Ba2 | 1350 | 2,146,500,000.00 |
| Arrowhead General Insurance Agency Inc | First Lien Term Loan | LIN | A000E7010TB01 | $1,307,692.30 | B2 | 2720 | 3,556,920,000.00 |
| Arrowhead General Insurance Agency Inc | First Lien Term Loan | LIN | A000E7010TB01 | $1,179,807.70 | B2 | 2720 | 3,209,080,000.00 |
| Asurion Corporation | Second Lien Term Loan | LIN | A000E8016TC01 | $2,000,000.00 | B1 | 2220 | 4,440,000,000.00 |
| Asurion Corporation | Term Loan B 1st Lien | LOANX_ID | LX047124 | $6,120,887.57 | B1 | 2220 | 13,588,400,000.00 |
| Atlantic Broadband | Tranche B-2 Term Loan | LOANX_ID | LX058890 | $8,466,258.69 | B2 | 2720 | 23,028,200,000.00 |
| Avis Budget Car Rental | 3L+2.5% 5/15/2014 | CUSIP | 053773AG2 | $9,274,000.00 | Ba2 | 1350 | 12,519,900,000.00 |
| Avis Budget Car Rental | Term Loan | LIN | A000DL010TB0 | $5,028,571.44 | Ba2 | 1350 | 6,788,570,000.00 |
| B&G Foods Inc | Term Loan | LOANX_ID | LX057829 | $3,391,304.35 | B2 | 2720 | 9,224,350,000.00 |
| Baldor Electric Co | Term Loan | LIN | B00NNN011TB0 | $6,615,000.00 | B1 | 2220 | 14,685,300,000.00 |
| Bankruptcy Management Solutions Inc | First Lien Term Loan | LIN | B0008B017TB0 | $4,975,000.00 | B3 | 3490 | 17,362,800,000.00 |
| Bankruptcy Management Solutions Inc | Second Lien Term Loan | LIN | B0008B015TC01 | $4,975,000.00 | Caa1 | 4770 | 23,730,800,000.00 |
| BE Aerospace Inc | Tranche B Term Facility | LIN | 0BEAVO055TB01 | $1,250,000.00 | Ba2 | 1350 | 1,687,500,000.00 |
| BE Aerospace Inc | Tranche B Term Facility | LIN | 0BEAVO055TB01 | $833,333.33 | Ba2 | 1350 | 1,125,000,000.00 |
| BE Aerospace Inc | Tranche B Term Facility | LIN | 0BEAVO055TB01 | $416,666.67 | Ba2 | 1350 | 562,500,000.00 |
| Belfor USA Group Inc | Tranche B Term Loan | LIN | B0008L015TB01 | $1,000,000.01 | Ba3 | 1766 | 1,766,000,000.00 |
| Birds Eye Foods fka Agrilink | Term Loan B | LIN | A0005U035TB01 | $1,000,000.00 | B1 | 2220 | 2,220,000,000.00 |
| Blount Inc | Term Loan B | LOANX_ID | LX032987 | $1,329,832.23 | Ba3 | 1766 | 2,348,480,000.00 |
| Blount Inc | Term Loan B | LOANX_ID | LX032987 | $1,363,930.49 | Ba3 | 1766 | 2,408,700,000.00 |





*Sample CDO LTD*

### Draft Report As Of 06/18/2007

| Weighted Average Spread/Coupon |
|---|

| | Result | Trigger | Pass/Fail |
|---|---|---|---|
| Weighted Average Coupon Test | 8.754% | 8.000% | Passed |
| Weighted Average Spread Test | 2.337% | 2.200% | Passed |

### Calculation Summary

| Description | Aggregate Balance | Total Weighted Value | Weighted Average Value | Minimum Value | Excess Value | Excess Value Used | Gross Excess Value | Gross Excess value Used | Value applied % | Final Value After Adjustemnt |
|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Rate Issues - Coupon | $21,750,000.00 | $190,406,250.00 | $190,406,250.00 | 8.000% | 0.754% | 0 | $16,406,250.00 | $0.00 | 0.000% | 8.754% |
| Floating Rate Issues - Spread | $1,183,535,404.55 | $2,761,197,604.74 | $2,761,197,604.74 | 2.300% | 0.033% | 0 | $39,066,174.28 | $0.00 | 0.000% | 2.333% |

### Calculation Details

| Issuer | Asset Description | Identifier Type | Identifier | Principal Balance | Security Level | Coupon / Spread | Interest Accrual Method |
|---|---|---|---|---|---|---|---|
| **Floating** | | | | | | | |
| 24 Hour Fitness | Term Loan B | LOANX_ID | LX044891 | $2,842,000.00 | Senior Secured | 2.500% | Actual/360 |
| 24 Hour Fitness | Term Loan B | LOANX_ID | LX044891 | $2,900,000.00 | Senior Secured | 2.500% | Actual/360 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $66,250.00 | Senior Secured | 1.750% | Actual/360 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $68,125.00 | Senior Secured | 1.750% | Actual/360 |
| Acco Brands Corp | US Term Loan | LOANX_ID | LX038129 | $63,125.00 | Senior Secured | 1.750% | Actual/360 |
| Acosta Inc | Term Loan B | LIN | A000AC037TL01 | $2,977,500.00 | Senior Secured | 2.250% | Actual/360 |
| Activant Solutions Inc | Term Loan | LIN | A000DP011TB01 | $77,180.78 | Senior Secured | 2.000% | Actual/360 |
| Activant Solutions Inc | Term Loan | LIN | A000DP011TB01 | $2,724,867.29 | Senior Secured | 2.000% | Actual/360 |
| Acxiom Corporation | Term Loan | LIN | A000ED015TL01 | $10,000,833.33 | Senior Secured | 1.750% | Actual/360 |
| Advanced Micro Devices Inc | Loans | LIN | 00AMDN026TB01 | $10,186,923.94 | Senior Secured | 2.000% | Actual/360 |
| Advantage Sales & Marketing Inc | Term Loan B | LIN | A000DH019TB01 | $547,500.00 | Senior Secured | 2.000% | Actual/360 |
| Advantage Sales & Marketing Inc | Term Loan B | LIN | A000DH019TB01 | $1,420,083.31 | Senior Secured | 2.000% | Actual/360 |
| AES Corp | Term Loan | LIN | 00AESN077TB01 | $1,714,285.70 | Senior Secured | 1.750% | Actual/360 |
| AES Corp | Term Loan | LIN | 00AESN077TB01 | $1,714,285.70 | Senior Secured | 1.750% | Actual/360 |
| Affiliated Computer Services Inc | First Securities Repurchase Increase Add On | LOANX_ID | LX047496 | $1,989,974.94 | Senior Secured | 2.000% | Actual/360 |
| Affiliated Computer Services Inc | First Securities Repurchase Increase Add On | LOANX_ID | LX047496 | $1,989,974.94 | Senior Secured | 2.000% | Actual/360 |
| Affiliated Computer Services Inc | Term Loan B | LIN | 00ACSN020TL01 | $872,790.40 | Senior Secured | 2.000% | Actual/360 |
| Affiliated Computer Services Inc | Term Loan B | LIN | 00ACSN020TL01 | $114,709.60 | Senior Secured | 2.000% | Actual/360 |
| Agricore United Holdings | Tranche B Term Loan | LOANX_ID | LX046869 | $323,641.30 | Senior Secured | 1.750% | Actual/360 |



*Sample CDO LTD*



### Draft Report As Of 06/18/2007

Calculation Details

| Issuer | Asset Description | Identifier Type | Identifier | Principal Balance | Security Level | Coupon / Spread | Interest Accrual Method |
|---|---|---|---|---|---|---|---|
| Alaska Communications Systems | Term Loan | LIN | 0ALSKO043TL01 | $5,000,000.00 | Senior Secured | 1.750% | Actual/360 |
| Alliance Atlantis | Term Loan C | LIN | A000AU011TC01 | $455,181.14 | Senior Secured | 1.500% | Actual/360 |
| Allied Security | Term Loan D | LIN | A000A5022TD01 | $3,767,363.15 | Senior Secured | 3.000% | Actual/360 |
| Alm Media | Term Loan | LOANX_ID | LX045472 | $9,851.81 | Senior Secured | 2.500% | Actual/360 |
| Alm Media | Term Loan | LOANX_ID | LX045472 | $1,059,481.31 | Senior Secured | 2.500% | Actual/360 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,903,225.81 | Senior Secured | 3.000% | Actual/360 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,758,064.51 | Senior Secured | 3.000% | Actual/360 |
| AM General LLC | Term B Facility | LIN | 00A000AG030TB | $2,758,064.52 | Senior Secured | 3.000% | Actual/360 |
| AM General LLC | Term L/C Facility | LIN | A000AG036LC01 | $290,322.58 | Senior Secured | 3.000% | Actual/360 |
| American Axle & Manufacturing Inc. | Incremental Term Loan B | LOANX_ID | LX045948 | $1,000,000.00 | Senior Secured | 4.250% | Actual/360 |
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $2,509,315.07 | Senior Secured | 2.250% | Actual/360 |
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $91,232.88 | Senior Secured | 2.250% | Actual/360 |
| American Medical System Inc | Term Loan | LOANX_ID | LX046253 | $167,757.68 | Senior Secured | 2.250% | Actual/360 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $530,555.55 | Senior Secured | 2.500% | Actual/360 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $4,419,444.45 | Senior Secured | 2.500% | Actual/360 |
| American Safety Razor | First Lien Term Loan | LIN | 0RAZR2045TB01 | $12,500.00 | Senior Secured | 2.500% | Actual/360 |
| American Safety Razor | Second Lien Term Loan | LIN | 0RAZR2043TC01 | $2,000,000.00 | Senior Unsecured | 6.250% | Actual/360 |
| American Seafood Group | Term Loan B1 | LOANX_ID | LX039277 | $1,693,335.62 | Senior Secured | 1.750% | Actual/360 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $44,318.18 | Senior Secured | 2.500% | Actual/360 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $2,130,681.82 | Senior Secured | 2.500% | Actual/360 |
| Applied Systems Inc | Term Loan | LOANX_ID | LX048653 | $312,500.00 | Senior Secured | 2.500% | Actual/360 |
| ARG Holdings Inc - Alliant Resources | First Lien Term Loan | LOANX_ID | LX040351 | $1,975,000.00 | Senior Secured | 3.000% | Actual/360 |
| ARG Holdings Inc - Alliant Resources | Second Lien Term Loan | LOANX_ID | LX040350 | $3,000,000.00 | Senior Unsecured | 7.250% | Actual/360 |
| ARG Holdings Inc - Alliant Resources | Term Loan C | LOANX_ID | LX050874 | $997,500.00 | Senior Secured | 3.000% | Actual/360 |
| Armstrong World Industries Inc | Tranche B Term Loan | LIN | 00ACKN038TB0 | $1,590,000.00 | Senior Secured | 1.750% | Actual/360 |
| Arrowhead General Insurance Agency Inc | First Lien Term Loan | LIN | A000E7010TB01 | $1,307,692.30 | Senior Secured | 3.000% | Actual/360 |
| Arrowhead General Insurance Agency Inc | First Lien Term Loan | LIN | A000E7010TB01 | $1,179,807.70 | Senior Secured | 3.000% | Actual/360 |
| Asurion Corporation | Second Lien Term Loan | LIN | A000E8016TC01 | $2,000,000.00 | Senior Unsecured | 6.250% | Actual/360 |
| Asurion Corporation | Term Loan B 1st Lien | LOANX_ID | LX047124 | $6,120,887.57 | Senior Secured | 3.000% | Actual/360 |
| Atlantic Broadband | Tranche B-2 Term Loan | LOANX_ID | LX058890 | $8,466,258.69 | Senior Secured | 2.250% | Actual/360 |
| Avis Budget Car Rental | 3L+2.5% 5/15/2014 | CUSIP | 053773AG2 | $9,274,000.00 | Senior Secured | 2.500% | Actual/360 |




*Sample CDO LTD*

### Draft Report As Of 06/18/2007

**Diversity Score**

| Current | Trigger | Pass/Fail |
|---|---|---|
| 82 | 75 | Passed |

| Total Par Amount | # of Obligors | Average Par Amount |
|---|---|---|
| $1,208,523,499.79 | 246 | $4,912,697.15 |

Diversity Score By Industry

| Industry | Aggregate Industry Equivalent Unit Score | Industry Diversity Score |
|---|---|---|
| Aerospace and Defense (1) | 4.4432 | 2.4667 |
| Automobile (2) | 3.0632 | 2.0333 |
| Banking (3) | 4.5839 | 2.5333 |
| Beverage, Food and Tobacco (4) | 5.4441 | 2.8000 |
| Broadcasting and Entertainment (33) | 11.5410 | 4.1500 |
| Buildings and Real Estate (5) | 2.9892 | 2.0000 |
| Cargo Transport (27) | 1.1560 | 1.1000 |
| Chemicals, Plastics and Rubber (6) | 4.3817 | 2.4667 |
| Containers, Packaging and Glass (7) | 1.1832 | 1.1000 |
| Diversified/Conglomerate Manufacturing (9) | 6.5453 | 3.1250 |
| Diversified/Conglomerate Service (10) | 8.5602 | 3.6500 |
| Ecological (12) | 2.6588 | 1.8500 |
| Electronics (13) | 9.9214 | 3.9750 |
| Farming and Agriculture (15) | 2.8614 | 1.9500 |
| Finance (14) | 3.0000 | 2.0000 |
| Grocery (16) | 1.4061 | 1.2000 |
| Healthcare, Education and Childcare (17) | 17.5761 | 4.7600 |
| Home and Office Furnishings, Housewares and Durable Consumer Products | 1.5459 | 1.2500 |
| Hotels, Motels, Inns and Gaming (19) | 4.1185 | 2.3667 |
| Insurance (20) | 6.7570 | 3.2000 |
| Leisure, Amusement, Motion Pictures, Entertainment (21) | 8.0611 | 3.5250 |
| Machinery (Non-Agriculture, Non-Construction and Non-Electronic) (22) | 5.4192 | 2.8000 |
| Mining, Steel, Iron and Non-Precious Metals (23) | 1.9317 | 1.4500 |
| Oil and Gas (24) | 4.7093 | 2.5667 |

*Sample CDO LTD*

### Draft Report As Of 06/18/2007



| | | |
|---|---|---|
| Personal and Non-Durable Consumer Products (Manufacturing Only) (8) | 4.8438 | 2.6000 |
| Personal Transportation (31) | 1.8540 | 1.4500 |
| Personal, Food and Miscellaneous Services (25) | 6.4591 | 3.1250 |
| Printing and Publishing (26) | 8.2460 | 3.5500 |
| Retail Store (28) | 6.7849 | 3.2000 |
| Telecommunications (29) | 6.7895 | 3.2000 |
| Textiles and Leather (30) | 4.1515 | 2.4000 |
| Utilities (32) | 4.7697 | 2.6000 |

Equivalent Unit Score by Industry, Obligor, Asset

| Industry | Obligor Name | Asset Name | Balance | Equivalent Unit Score |
|---|---|---|---|---|
| Aerospace and Defense (1) | | | $25,625,145.28 | 4.4432 |
| | Allied Security | | $4,767,363.15 | .9704 |
| | | ALYD 11.375 | $1,000,000.00 | |
| | | Term Loan D | $3,767,363.15 | |
| | AM General LLC | | $8,709,677.42 | 1.0000 |
| | | Term B Facility | $8,419,354.84 | |
| | | Term L/C Facility | $290,322.58 | |
| | BE Aerospace Inc | | $2,500,000.00 | .5089 |
| | | Tranche B Term Facility | $2,500,000.00 | |
| | Communications & Power Industries | | $1,296,296.31 | .2639 |
| | | Term Loan | $1,296,296.31 | |
| | DeCrane Aircraft Holdings | | $3,999,999.99 | .8142 |
| | | Term Loan B | $3,999,999.99 | |
| | DRS Technologies | | $808,181.82 | .1645 |
| | | Term Loan | $808,181.82 | |
| | MRO Acquisition LLC | | $2,242,389.53 | .4564 |
| | | Term Loan | $2,242,389.53 | |
| | Wyle Laboratories | | $1,301,237.06 | .2649 |
| | | First Lien Term Loan | $1,301,237.06 | |



*Sample CDO LTD*

### Draft Report As Of 06/18/2007

Equivalent Unit Score by Industry, Obligor, Asset

| Industry | Obligor Name | Asset Name | Balance | Equivalent Unit Score |
|---|---|---|---|---|
| Automobile (2) | | | $17,114,705.51 | 3.0632 |
| | American Axle & Manufacturing Inc. | | $1,000,000.00 | .2036 |
| | | Incremental Term Loan B | $1,000,000.00 | |
| | CSA Acquisition Corp (Cooper Standard) | | $4,258,276.90 | .8668 |
| | | Term Loan D | $1,548,362.34 | |
| | | Tranche B Term Loan | $750,008.11 | |
| | | Tranche C Term Loan | $1,959,906.45 | |
| | Hilite Industries | | $2,920,354.97 | .5945 |
| | | European Term Loan | $862,354.97 | |
| | | US Term Loan | $2,058,000.00 | |
| | Lear Corp | | $6,979,000.00 | 1.0000 |
| | | Term Loan B | $6,979,000.00 | |
| | Progressive Moulded Products Ltd | | $1,957,073.64 | .3984 |
| | | New Term Loan B | $1,957,073.64 | |
| Banking (3) | | | $30,719,947.56 | 4.5839 |
| | Bankruptcy Management Solutions Inc | | $9,950,000.00 | 1.0000 |
| | | First Lien Term Loan | $4,975,000.00 | |
| | | Second Lien Term Loan | $4,975,000.00 | |
| | iPayment, Inc | | $5,940,000.00 | 1.0000 |
| | | Term Facility | $5,940,000.00 | |
| | National Processing Company Group Inc | | $4,961,538.47 | 1.0000 |
| | | First Lien Term Loan | $4,961,538.47 | |
| | Residential Capital Corporation | | $7,000,000.00 | 1.0000 |
| | | Term Loan | $7,000,000.00 | |
| | TransFirst Holdings, Inc. | | $2,868,409.09 | .5839 |
| | | Term Loan | $2,868,409.09 | |



*Sample CLO LTD*

### Draft Report As Of 06/18/2007



Equivalent Unit Score by Industry, Obligor, Asset

| Industry | Obligor Name | Asset Name | Balance | Equivalent Unit Score |
|---|---|---|---|---|
| Beverage, Food and Tobacco (4) | | | $33,762,734.00 | 5.4441 |
| | American Seafood Group | | $1,693,335.62 | .3447 |
| | | Term Loan B1 | $1,693,335.62 | |
| | B&G Foods Inc | | $3,391,304.35 | .6903 |
| | | Term Loan | $3,391,304.35 | |
| | Birds Eye Foods fka Agrilink | | $1,000,000.00 | .2036 |
| | | Term Loan B | $1,000,000.00 | |
| | Bumble Bee Foods/Clover Leaf Seafoods | | $1,000,000.00 | .2036 |
| | | Term Loan B | $1,000,000.00 | |
| | Constellation Brands Inc | | $6,843,137.27 | 1.0000 |
| | | Term Loan B | $6,843,137.27 | |
| | Del Monte | | $4,738,956.76 | .9646 |
| | | Term Loan B | $4,738,956.76 | |
| | DS Waters LP | | $1,596,000.00 | .3249 |
| | | Term Loan | $1,596,000.00 | |
| | FSB Holdings Inc | | $3,000,000.00 | .6107 |
| | | First Lien 7 Yr Term Loan | $3,000,000.00 | |
| | Pinnacle Foods Holding Corporation | | $10,000,000.00 | 1.0000 |
| | | New Term Loan B | $10,000,000.00 | |
| | Reddy Ice | | $500,000.00 | .1018 |
| | | Term Loan B | $500,000.00 | |
| Broadcasting and Entertainment (33) | | | $96,148,286.42 | 11.5410 |
| | Alliance Atlantis | | $455,181.14 | .0927 |
| | | Term Loan C | $455,181.14 | |
| | Atlantic Broadband | | $8,466,258.69 | 1.0000 |
| | | Tranche B-2 Term Loan | $8,466,258.69 | |
| | Bragg Communications | | $2,977,040.82 | .6060 |




*Sample 3DI LTD*

**Draft Report As Of 06/18/2007**

## Collateral Detail

| Totals: | | | | $1,208,523,499.79 | $1,202,572,796.21 | $5,950,703.58 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Issuer / Security Name | CUSIP | ISIN | LIN | LoanX | Commitment Amount | Funded Amount | Unfunded Amount | DIP Loan | Country | Security Level | Lien Type | Maturity Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 Hour Fitness-Term Loan B | | | | LX044891 | $2,842,000.00 | $2,842,000.00 | $0.00 | | United States | Senior Secured | First Lien | 6/02/2012 |
| 24 Hour Fitness-Term Loan B | | | | LX044891 | $2,900,000.00 | $2,900,000.00 | $0.00 | | United States | Senior Secured | First Lien | 6/08/2012 |
| Acco Brands Corp-US Term Loan | | | | LX038129 | $66,250.00 | $66,250.00 | $0.00 | | United States | Senior Secured | First Lien | 8/17/2012 |
| Acco Brands Corp-US Term Loan | | | | LX038129 | $68,125.00 | $68,125.00 | $0.00 | | United States | Senior Secured | First Lien | 8/17/2012 |
| Acco Brands Corp-US Term Loan | | | | LX038129 | $63,125.00 | $63,125.00 | $0.00 | | United States | Senior Secured | First Lien | 8/17/2012 |
| Acosta Inc-Term Loan B | | | A000AC037TL01 | LX046234 | $2,977,500.00 | $2,977,500.00 | $0.00 | | United States | Senior Secured | First Lien | 7/28/2013 |
| Activant Solutions Inc-Term Loan | | | A000DP011TB01 | LX044351 | $77,180.78 | $77,180.78 | $0.00 | | United States | Senior Secured | First Lien | 5/02/2013 |
| Activant Solutions Inc-Term Loan | | | A000DP011TB01 | LX044351 | $2,724,867.29 | $2,724,867.29 | $0.00 | | United States | Senior Secured | First Lien | 5/02/2013 |
| Acxiom Corporation-Term Loan | 00512NAC4 | | A000ED015TL01 | LX048152 | $10,000,833.33 | $10,000,833.33 | $0.00 | | United States | Senior Secured | First Lien | 9/15/2012 |
| Advanced Micro Devices Inc-Loans | | | 00AMDN026TB01 | LX047750 | $10,186,923.94 | $10,186,923.94 | $0.00 | | United States | Senior Secured | First Lien | 10/24/2013 |
| Advantage Sales & Marketing Inc-Term Loan B | | | A000DH019TB01 | LX043680 | $547,500.00 | $547,500.00 | $0.00 | | United States | Senior Secured | First Lien | 3/22/2013 |
| Advantage Sales & Marketing Inc-Term Loan B | | | A000DH019TB01 | LX043680 | $1,420,083.31 | $1,420,083.31 | $0.00 | | United States | Senior Secured | First Lien | 3/22/2013 |
| AES Corp-Term Loan | | | 00AESN077TB01 | LX030978 | $1,714,285.70 | $1,714,285.70 | $0.00 | | United States | Senior Secured | First Lien | 7/31/2011 |
| AES Corp-Term Loan | | | 00AESN077TB01 | LX030978 | $1,714,285.70 | $1,714,285.70 | $0.00 | | United States | Senior Secured | First Lien | 7/31/2011 |
| Affiliated Computer Services Inc-First Securities Repurchase Increase Add On | | | | LX047496 | $1,989,974.94 | $1,989,974.94 | $0.00 | | United States | Senior Secured | First Lien | 7/19/2013 |
| Affiliated Computer Services Inc-First Securities Repurchase Increase Add On | | | | LX047496 | $1,989,974.94 | $1,989,974.94 | $0.00 | | United States | Senior Secured | First Lien | 7/19/2013 |
| Affiliated Computer Services Inc-Term Loan B | | | 00ACSN020TL01 | LX043309 | $872,790.40 | $872,790.40 | $0.00 | | United States | Senior Secured | First Lien | 3/20/2013 |
| Affiliated Computer Services Inc-Term Loan B | | | 00ACSN020TL01 | LX043309 | $114,709.60 | $114,709.60 | $0.00 | | United States | Senior Secured | First Lien | 3/20/2013 |
| Agricore United Holdings-Tranche B Term Loan | | | | LX046869 | $323,641.30 | $323,641.30 | $0.00 | | United States | Senior Secured | First Lien | 9/06/2013 |
| Alaska Communications Systems-Term Loan | | | 0ALSKO043TL01 | LX034110 | $5,000,000.00 | $5,000,000.00 | $0.00 | | United States | Senior Secured | First Lien | 2/01/2012 |
| Alliance Atlantis-Term Loan C | | | A000AU011TC01 | LX041455 | $455,181.14 | $455,181.14 | $0.00 | | Canada | Senior Secured | First Lien | 12/20/2011 |
| Allied Security-Term Loan D | | | A000A5022TD01 | LX046670 | $3,767,363.15 | $3,767,363.15 | $0.00 | | United States | Senior Secured | First Lien | 6/30/2010 |
| Allied Security Escrow-ALYD 11.375 | 01950PAC6 | US01950PAC68 | | | $1,000,000.00 | $1,000,000.00 | $0.00 | | United States | Senior Unsecured | | 7/15/2011 |
| Alm Media-Term Loan | | | | LX045472 | $9,851.81 | $9,851.81 | $0.00 | | United States | Senior Secured | First Lien | 3/05/2010 |
| Alm Media-Term Loan | | | | LX045472 | $1,059,481.31 | $1,059,481.31 | $0.00 | | United States | Senior Secured | First Lien | 3/05/2010 |
| AM General LLC-Term B Facility | | | 00A000AG030TB | LX047033 | $2,903,225.81 | $2,903,225.81 | $0.00 | | United States | Senior Secured | First Lien | 8/25/2013 |
| AM General LLC-Term B Facility | | | 00A000AG030TB | LX047033 | $2,758,064.51 | $2,758,064.51 | $0.00 | | United States | Senior Secured | First Lien | 8/25/2013 |
| AM General LLC-Term B Facility | | | 00A000AG030TB | LX047033 | $2,758,064.52 | $2,758,064.52 | $0.00 | | United States | Senior Secured | First Lien | 8/25/2013 |
| AM General LLC-Term L/C Facility | | | A000AG036LC01 | LX047569 | $290,322.58 | $290,322.58 | $0.00 | | United States | Senior Secured | First Lien | 11/01/2011 |




*Sample SPV LTD*

## Draft Report As Of 06/18/2007

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| American Axle & Manufacturing Inc.-Incremental Term Loan B | | | LX045948 | $1,000,000.00 | $1,000,000.00 | $0.00 | United States | Senior Secured | First Lien | 4/12/2010 |
| American Medical System Inc-Term Loan | | | LX046253 | $91,232.88 | $91,232.88 | $0.00 | United States | Senior Secured | First Lien | 7/20/2012 |
| American Medical System Inc-Term Loan | | | LX046253 | $2,509,315.07 | $2,509,315.07 | $0.00 | United States | Senior Secured | First Lien | 7/17/2012 |
| American Medical System Inc-Term Loan | | | LX046253 | $167,757.68 | $167,757.68 | $0.00 | United States | Senior Secured | First Lien | 7/20/2012 |
| American Safety Razor-First Lien Term Loan | | 0RAZR2045TB01 | LX047039 | $530,555.55 | $530,555.55 | $0.00 | United States | Senior Secured | First Lien | 7/31/2013 |
| American Safety Razor-First Lien Term Loan | | 0RAZR2045TB01 | LX047039 | $4,419,444.45 | $4,419,444.45 | $0.00 | United States | Senior Secured | First Lien | 7/31/2013 |
| American Safety Razor-First Lien Term Loan | | 0RAZR2045TB01 | LX047039 | $12,500.00 | $12,500.00 | $0.00 | United States | Senior Secured | First Lien | 7/31/2013 |
| American Safety Razor-Second Lien Term Loan | | 0RAZR2043TC01 | LX047041 | $2,000,000.00 | $2,000,000.00 | $0.00 | United States | Senior Unsecured | Second Lien | 1/30/2014 |
| American Seafood Group-Term Loan B1 | | | LX039277 | $1,693,335.62 | $1,693,335.62 | $0.00 | United States | Senior Secured | First Lien | 9/28/2012 |
| Applied Systems Inc-Term Loan | | | LX048653 | $44,318.18 | $44,318.18 | $0.00 | United States | Senior Secured | First Lien | 9/26/2013 |
| Applied Systems Inc-Term Loan | | | LX048653 | $2,130,681.82 | $2,130,681.82 | $0.00 | United States | Senior Secured | First Lien | 9/26/2013 |
| Applied Systems Inc-Term Loan | | | LX048653 | $312,500.00 | $312,500.00 | $0.00 | United States | Senior Secured | First Lien | 9/26/2013 |
| ARG Holdings Inc - Alliant Resources-First Lien Term Loan | | | LX040351 | $1,975,000.00 | $1,975,000.00 | $0.00 | United States | Senior Secured | First Lien | 11/30/2011 |
| ARG Holdings Inc - Alliant Resources-Second Lien Term Loan | | | LX040350 | $3,000,000.00 | $3,000,000.00 | $0.00 | United States | Senior Unsecured | Second Lien | 11/30/2011 |
| ARG Holdings Inc - Alliant Resources-Term Loan C | | | LX050874 | $997,500.00 | $997,500.00 | $0.00 | United States | Senior Secured | First Lien | 11/30/2012 |
| Armstrong World Industries Inc-Tranche B Term Loan | | 00ACKN038TB0 | LX049229 | $1,590,000.00 | $1,590,000.00 | $0.00 | United States | Senior Secured | First Lien | 10/02/2014 |
| Arrowhead General Insurance Agency Inc-First Lien Term Loan | 04279MAC1 | A000E7010TB01 | LX046949 | $1,307,692.30 | $1,307,692.30 | $0.00 | United States | Senior Secured | First Lien | 8/08/2012 |
| Arrowhead General Insurance Agency Inc-First Lien Term Loan | 04279MAC1 | A000E7010TB01 | LX046949 | $1,179,807.70 | $1,179,807.70 | $0.00 | United States | Senior Secured | First Lien | 8/08/2012 |
| Asurion Corporation-Second Lien Term Loan | | A000E8016TC01 | LX047126 | $2,000,000.00 | $2,000,000.00 | $0.00 | United States | Senior Unsecured | Second Lien | 1/13/2013 |
| Asurion Corporation-Term Loan B 1st Lien | | | LX047124 | $6,120,887.57 | $6,120,887.57 | $0.00 | United States | Senior Secured | First Lien | 7/13/2012 |
| Atlantic Broadband-Tranche B-2 Term Loan | | | LX058890 | $8,466,258.69 | $8,466,258.69 | $0.00 | United States | Senior Secured | First Lien | 3/07/2014 |
| Avis Budget Car Rental-3L+2.5% 5/15/2014 | 053773AG2 | US053773AG22 | | $9,274,000.00 | $9,274,000.00 | $0.00 | United States | Senior Secured | | 5/15/2014 |
| Avis Budget Car Rental-Term Loan | | A000DL010TB0 | LX044010 | $5,028,571.44 | $5,028,571.44 | $0.00 | United States | Senior Secured | First Lien | 4/19/2012 |
| B&G Foods Inc-Term Loan | | | LX057829 | $3,391,304.35 | $3,391,304.35 | $0.00 | United States | Senior Secured | First Lien | 2/26/2013 |
| Baldor Electric Co-Term Loan | | B00NNN011TB0 | LX055389 | $6,615,000.00 | $6,615,000.00 | $0.00 | United States | Senior Secured | First Lien | 1/29/2014 |
| Bankruptcy Management Solutions Inc-First Lien Term Loan | | B0008B017TB0 | LX046639 | $4,975,000.00 | $4,975,000.00 | $0.00 | United States | Senior Secured | First Lien | 7/31/2012 |
| Bankruptcy Management Solutions Inc-Second Lien Term Loan | | B0008B015TC01 | LX046641 | $4,975,000.00 | $4,975,000.00 | $0.00 | United States | Senior Unsecured | Second Lien | 7/28/2013 |
| BE Aerospace Inc-Tranche B Term Facility | | 0BEAVO055TB01 | LX047430 | $833,333.33 | $833,333.33 | $0.00 | United States | Senior Secured | First Lien | 8/24/2012 |
| BE Aerospace Inc-Tranche B Term Facility | | 0BEAVO055TB01 | LX047430 | $416,666.67 | $416,666.67 | $0.00 | United States | Senior Secured | First Lien | 8/24/2012 |
| BE Aerospace Inc-Tranche B Term Facility | | 0BEAVO055TB01 | LX047430 | $1,250,000.00 | $1,250,000.00 | $0.00 | United States | Senior Secured | First Lien | 8/22/2013 |
| Belfor USA Group Inc-Tranche B Term Loan | | B0008L015TB01 | LX049929 | $1,000,000.01 | $1,000,000.01 | $0.00 | United States | Senior Secured | First Lien | 11/03/2012 |



*Sample CDO I LTD*

### *Draft Report As Of 06/18/2007*

#### Issuer Detail

Totals:                     **$1,208,523,499.79**

| Rank | Obligor/Issuer Name | Commitment Amount | Obligor/Issuer Country | % of Maximum Investment Amount | Moody's Country Rating | Moody's Industry | S & P Country Rating | S & P Industry |
|---|---|---|---|---|---|---|---|---|
| 1 | **Univision Communications** | **$20,000,000.00** | United States | | | | | |
| | Univision Communications | $20,000,000.00 | United States | 1.64 % | Aaa | Broadcasting and Entertainment (33) | AAA | Broadcast radio and television (5) |
| 2 | **HCA Inc** | **$19,955,000.00** | United States | | | | | |
| | HCA Inc | $19,955,000.00 | United States | 1.64 % | Aaa | Healthcare, Education and Childcare (17) | AAA | Health care (25) |
| 3 | **Freescale Semiconductor Inc** | **$19,900,000.00** | United States | | | | | |
| | Freescale Semiconductor Inc | $19,900,000.00 | United States | 1.63 % | Aaa | Electronics (13) | AAA | Electronics/electric (17) |
| 4 | **Intelsat Corporation** | **$18,985,000.00** | Bermuda | | | | | |
| | Intelsat Corporation | $7,985,000.00 | Bermuda | 1.56 % | Aa1 | Telecommunications (29) | AA | Telecommunications (39) |
| | Intelsat Subsidiary Holding Co | $11,000,000.00 | Bermuda | 1.56 % | Aa1 | Telecommunications (29) | AA | Telecommunications (39) |
| 5 | **VNU Nielsen Finance LLC** | **$18,905,000.00** | Netherlands | | | | | |
| | VNU Nielsen Finance LLC | $18,905,000.00 | Netherlands | 1.55 % | Aaa | Printing and Publishing (26) | AAA | Publishing (33) |
| 6 | **Sorenson Communications** | **$18,172,461.33** | United States | | | | | |
| | Sorenson Communications | $18,172,461.33 | United States | 1.49 % | Aaa | Personal, Food and Miscellaneous Services (25) | AAA | Telecommunications (39) |
| 7 | **Energy Transfer Partners** | **$18,000,000.00** | United States | | | | | |
| | Energy Transfer Partners | $18,000,000.00 | United States | 1.48 % | Aaa | Oil and Gas (24) | AAA | Oil and Gas (32) |
| 8 | **RMK Acquisition fka Aramark** | **$17,768,339.48** | United States | | | | | |
| | RMK Acquisition fka Aramark | $17,768,339.48 | United States | 1.46 % | Aaa | Personal, Food and Miscellaneous Services (25) | AAA | Food service (23) |
| 9 | **TDS Investor Corp aka Travelport** | **$15,377,667.31** | United States | | | | | |
| | TDS Investor Corp aka Travelport | $15,377,667.31 | United States | 1.26 % | Aaa | Diversified/Conglomerate Service (10) | AAA | Conglomerates (12) |
| 10 | **Health Management Associates Inc** | **$15,000,000.00** | United States | | | | | |
| | Health Management Associates Inc | $15,000,000.00 | United States | 1.23 % | Aaa | Healthcare, Education and Childcare (17) | AAA | Health care (25) |
| 11 | **Idearc Inc** | **$14,962,500.00** | United States | | | | | |
| | Idearc Inc | $14,962,500.00 | United States | 1.23 % | Aaa | Printing and Publishing (26) | AAA | Publishing (33) |
| 12 | **SuperValu Inc** | **$14,720,000.00** | United States | | | | | |
| | SuperValu Inc | $14,720,000.00 | United States | 1.21 % | Aaa | Grocery (16) | AAA | Food/drug retailers (21) |
| 13 | **Avis Budget Car Rental** | **$14,302,571.44** | United States | | | | | |
| | Avis Budget Car Rental | $14,302,571.44 | United States | 1.17 % | Aaa | Personal Transportation (31) | AAA | Surface transport (37) |





*Sample CDO LTD*

### *Draft Report As Of 06/18/2007*

## Coupon Detail

Totals: $1,208,523,499.79    $1,202,572,796.21    $5,950,703.58

| Issuer/Security Name | Identifier Type | Identifier | Commitment Amount | Funded Amount | Unfunded Amount | Coupon Type | Accrual Method | Payment Period | Index Type | Current Spread | Base Rate | Interest Rate | Next Payment Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 Hour Fitness - Term Loan B | LOANX_ID | LX044891 | | | | | | | | | | | |
| | | | $2,900,000.00 | $2,900,000.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 2.500% | 5.350% | 7.850% | 07/05/2007 |
| Acco Brands Corp - US Term Loan | LOANX_ID | LX038129 | $2,842,000.00 | $2,842,000.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 2.500% | 5.350% | 7.850% | 06/29/2007 |
| | | | $66,250.00 | $66,250.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 1.750% | 5.360% | 7.110% | 07/19/2007 |
| | | | $68,125.00 | $68,125.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 1.750% | 5.360% | 7.110% | 08/22/2007 |
| | | | $63,125.00 | $63,125.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 1.750% | 5.350% | 7.100% | 06/20/2007 |
| Acosta Inc - Term Loan B | LIN | A000AC037TL01 | | | | | | | | | | | |
| | | | $2,977,500.00 | $2,977,500.00 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.250% | 5.320% | 7.570% | 06/29/2007 |
| Activant Solutions Inc - Term Loan | LIN | A000DP011TB01 | | | | | | | | | | | |
| | | | $77,180.78 | $77,180.78 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.000% | 5.375% | 7.375% | 07/02/2007 |
| | | | $2,724,867.29 | $2,724,867.29 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 2.000% | 5.375% | 7.375% | 08/02/2007 |
| Acxiom Corporation - Term Loan | LIN | A000ED015TL01 | | | | | | | | | | | |
| | | | $10,000,833.33 | $10,000,833.33 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 1.750% | 5.320% | 7.070% | 07/16/2007 |
| Advanced Micro Devices Inc - Loans | LIN | 00AMDN026TB01 | | | | | | | | | | | |
| | | | $10,186,923.94 | $10,186,923.94 | $0.00 | Floating | Actual/360 | 2 Months | LIBOR (2 months) | 2.000% | 5.340% | 7.340% | 06/29/2007 |
| Advantage Sales & Marketing Inc - Term Loan B | LIN | A000DH019TB01 | | | | | | | | | | | |
| | | | $1,420,083.31 | $1,420,083.31 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 2.000% | 5.360% | 7.360% | 08/29/2007 |
| | | | $547,500.00 | $547,500.00 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (3 months) | 2.000% | 5.350% | 7.350% | 06/29/2007 |
| AES Corp - Term Loan | LIN | 00AESN077TB01 | | | | | | | | | | | |
| | | | $1,714,285.70 | $1,714,285.70 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (6 months) | 1.750% | 5.440% | 7.190% | 08/02/2007 |
| | | | $1,714,285.70 | $1,714,285.70 | $0.00 | Floating | Actual/360 | 3 Months | LIBOR (8 months) | 1.750% | 5.750% | 7.500% | 07/05/2007 |
| Affiliated Computer Services Inc - First Securities Repurchase Increase Add On | LOANX_ID | LX047496 | | | | | | | | | | | |
| | | | $1,989,974.94 | $1,989,974.94 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.000% | 5.320% | 7.320% | 07/02/2007 |
| | | | $1,989,974.94 | $1,989,974.94 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.000% | 5.320% | 7.320% | 07/11/2007 |
| Affiliated Computer Services Inc - Term Loan B | LIN | 00ACSN020TL01 | | | | | | | | | | | |
| | | | $872,790.40 | $872,790.40 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.000% | 5.320% | 7.320% | 06/29/2007 |
| | | | $114,709.60 | $114,709.60 | $0.00 | Floating | Actual/360 | 1 Month | LIBOR (1 month) | 2.000% | 5.320% | 7.320% | 06/29/2007 |




*Sample CDO LTD*

### Draft Report As Of 06/18/2007

Moody's Rating Detail

Total:    $1,208,523,499.79

| Issuer Name / Asset Description | Commitment Amount | Market Identifier | Security Type | Corporate Family Rating | Corporate Family Rating - Watchlist Status | Senior Unsecured Issuer Rating | Senior Unsecured Issuer Rating - Watchlist Status | Security Rating | Security Rating - Watchlist Status | Defined Rating | Rating Factor | Recovery Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 Hour Fitness | $5,742,000.00 | | | B2 | Neutral | | | | | | | |
| Term Loan B | $5,742,000.00 | LX044891 | Loan | | | | | Ba3 | Neutral | B2 | 2720 | 60.00 % |
| Acco Brands Corp | $197,500.00 | | | Ba3 | Neutral | | | | | | | |
| US Term Loan | $197,500.00 | LX038129 | Loan | | | | | Ba1 | Neutral | Ba3 | 1766 | 60.00 % |
| Acosta Inc | $2,977,500.00 | | | | | | | | | | | |
| Term Loan B | $2,977,500.00 | A000AC037TL01 | Loan | | | | | | | B1 | 2220 | 50.00 % |
| Activant Solutions Inc | $2,802,048.07 | | | B2 | Neutral | B2 | Neutral | | | | | |
| Term Loan | $2,802,048.07 | A000DP011TB01 | Loan | | | | | B1 | Neutral | B2 | 2720 | 50.00 % |
| Acxiom Corporation | $10,000,833.33 | | | Ba2 | Possible Downgrade | | | | | | | |
| Term Loan | $10,000,833.33 | A000ED015TL01 | Loan | | | | | Ba2 | Possible Downgrade | Ba3 | 1766 | 45.00 % |
| Advanced Micro Devices Inc | $10,186,923.94 | | | B1 | Neutral | Ba3 | Neutral | | | | | |
| Loans | $10,186,923.94 | 00AMDN026TB01 | Loan | | | | | Ba2 | Neutral | B1 | 2220 | 60.00 % |
| Advantage Sales & Marketing Inc | $1,967,583.31 | | | | | | | | | | | |
| Term Loan B | $1,967,583.31 | A000DH019TB01 | Loan | | | | | | | B2 | 2720 | 45.00 % |
| AES Corp | $3,428,571.40 | | | B1 | Neutral | B1 | Neutral | | | | | |
| Term Loan | $3,428,571.40 | 00AESN077TB01 | Loan | | | | | Ba1 | Neutral | B1 | 2220 | 60.00 % |
| Affiliated Computer Services Inc | $4,967,449.88 | | | Ba2 | Possible Downgrade | | | | | | | |
| First Securities Repurchase Increase Add On | $3,979,949.88 | LX047496 | Loan | | | | | Ba2 | Possible Downgrade | Ba3 | 1766 | 45.00 % |
| Term Loan B | $987,500.00 | 00ACSN020TL01 | Loan | | | | | Ba2 | Possible Downgrade | Ba3 | 1766 | 45.00 % |
| Agricore United Holdings | $323,641.30 | | | Ba3 | Possible Downgrade | | | | | | | |
| Tranche B Term Loan | $323,641.30 | LX046869 | Loan | | | | | Ba3 | Possible Downgrade | B1 | 2220 | 45.00 % |
| Alaska Communications Systems | $5,000,000.00 | | | B1 | Neutral | | | | | | | |
| Term Loan | $5,000,000.00 | 0ALSKO043TL01 | Loan | | | | | B1 | Neutral | B1 | 2220 | 45.00 % |





*Sample CDO LTD*

### *Draft Report As Of 06/18/2007*

<div style="background:#C0392B;color:white">Caa1/CCC+ Detail</div>

| Issuer Name | Asset Description | Defined Rating | Principal Balance | Market Price | Market Value |
|---|---|---|---|---|---|
| **Moody's** | | | | | |
| Intelsat Corporation | 3L + 3.5% -01/2007 | Caa1 | $5,000,000.00 | 101.875 | $5,093,750.00 |
| Bankruptcy Management Solutions Inc | Second Lien Term Loan | Caa1 | $4,975,000.00 | 101.750 | $5,062,062.50 |
| ARG Holdings Inc - Alliant Resources | Second Lien Term Loan | Caa1 | $3,000,000.00 | 101.313 | $3,039,390.00 |
| Hilite Industries | US Term Loan | Caa1 | $2,058,000.00 | 97.000 | $1,996,260.00 |
| Allied Security Escrow | ALYD 11.375 | Caa1 | $1,000,000.00 | 102.000 | $1,020,000.00 |
| Huish Detergents Inc | Second Lien | Caa1 | $1,000,000.00 | 100.875 | $1,008,750.00 |
| Hilite Industries | European Term Loan | Caa1 | $862,354.97 | 97.333 | $839,355.96 |
| Mueller Water Products | MWA 7.375% 06/01/2017 | Caa1 | $750,000.00 | | $0.00 |
| | | | | | |
| **Standard and Poor's** | | | | | |
| Critical Homecare Solutions | First Lien Delayed Draw | CCC- | $3,198,125.00 | 100.000 | $3,198,125.00 |
| Hilite Industries | US Term Loan | CCC+ | $2,058,000.00 | 97.000 | $1,996,260.00 |
| Intertape Polymer Group Inc | Term Loan B | CCC+ | $1,500,000.00 | 100.125 | $1,501,875.00 |
| Hilite Industries | European Term Loan | CCC+ | $862,354.97 | 97.333 | $839,355.96 |
| Thermo Fluids | Term Loan | CCC- | $787,151.90 | 99.000 | $779,280.38 |
| Thermo Fluids | Term Loan | CCC- | $759,493.67 | 99.000 | $751,898.73 |
| Intertape Polymer Group Inc | Term Loan B | CCC+ | $618,750.00 | 100.125 | $619,523.44 |
| Critical Homecare Solutions | First Lien Delayed Draw | CCC- | $280,000.00 | 100.000 | $280,000.00 |
| Thermo Fluids | Term Loan | CCC- | $253,164.56 | 99.000 | $250,632.91 |
| Intertape Polymer Group Inc | Term Loan B | CCC+ | $117,500.00 | 100.125 | $117,646.88 |
| Thermo Fluids | Term Loan | CCC- | $33,357.13 | 99.000 | $33,023.56 |
| Intertape Polymer Group Inc | Term Loan B | CCC+ | $6,250.00 | 100.125 | $6,257.81 |
| Crosman Corporation | Term | CCC- | $25,000.00 | | $0.00 |
| Crosman Corporation | Term | CCC- | $1,950,000.00 | | $0.00 |



*Sample CDO LTD*



### Draft Report As Of 06/18/2007

**Moody's Industry Detail**

**Maximum Investment Amount**    **$1,217,478,122.21**

**Totals:**                                                                                                     $1,208,523,499.79

| Industry | Commitment Amount | % of Deal | % of Maximum Investment Amount |
|---|---|---|---|
| Healthcare, Education and Childcare (17) | $131,053,782.68 | 10.84 % | 10.76 % |
| Broadcasting and Entertainment (33) | $96,148,286.42 | 7.96 % | 7.90 % |
| Electronics (13) | $80,778,447.52 | 6.68 % | 6.63 % |
| Printing and Publishing (26) | $68,270,259.99 | 5.65 % | 5.61 % |
| Personal, Food and Miscellaneous Services (25) | $57,921,650.80 | 4.79 % | 4.76 % |
| Diversified/Conglomerate Service (10) | $57,693,840.77 | 4.77 % | 4.74 % |
| Leisure, Amusement, Motion Pictures, Entertainment (21) | $57,000,569.85 | 4.72 % | 4.68 % |
| Telecommunications (29) | $51,628,811.52 | 4.27 % | 4.24 % |
| Retail Store (28) | $45,905,893.21 | 3.80 % | 3.77 % |
| Diversified/Conglomerate Manufacturing (9) | $45,825,137.67 | 3.79 % | 3.76 % |
| Oil and Gas (24) | $41,464,628.78 | 3.43 % | 3.41 % |
| Machinery (Non-Agriculture, Non-Construction and Non-Electronic) (22) | $41,399,558.21 | 3.43 % | 3.40 % |
| Insurance (20) | $38,068,771.70 | 3.15 % | 3.13 % |
| Beverage, Food and Tobacco (4) | $33,762,734.00 | 2.79 % | 2.77 % |
| Utilities (32) | $33,163,421.69 | 2.74 % | 2.72 % |
| Personal and Non-Durable Consumer Products (Manufacturing Only) (8) | $31,449,229.31 | 2.60 % | 2.58 % |
| Banking (3) | $30,719,947.56 | 2.54 % | 2.52 % |
| Finance (14) | $28,508,490.46 | 2.36 % | 2.34 % |
| Textiles and Leather (30) | $26,739,598.44 | 2.21 % | 2.20 % |
| Aerospace and Defense (1) | $25,625,145.28 | 2.12 % | 2.10 % |
| Hotels, Motels, Inns and Gaming (19) | $23,406,666.67 | 1.94 % | 1.92 % |
| Ecological (12) | $22,149,224.66 | 1.83 % | 1.82 % |
| Chemicals, Plastics and Rubber (6) | $21,613,339.51 | 1.79 % | 1.78 % |
| Buildings and Real Estate (5) | $18,824,512.24 | 1.56 % | 1.55 % |
| Personal Transportation (31) | $18,498,071.44 | 1.53 % | 1.52 % |
| Automobile (2) | $17,114,705.51 | 1.42 % | 1.41 % |
| Grocery (16) | $16,715,000.00 | 1.38 % | 1.37 % |
| Farming and Agriculture (15) | $15,084,614.34 | 1.25 % | 1.24 % |
| Mining, Steel, Iron and Non-Precious Metals (23) | $12,902,774.11 | 1.07 % | 1.06 % |



*Sample DB LTD*



### *Draft Report As Of 06/18/2007*

**Totals:**                                                                                                          $1,208,523,499.79

| Industry | Commitment Amount | % of Deal | % of Maximum Investment Amount |
|---|---|---|---|
| Home and Office Furnishings, Housewares and Durable Consumer Products | $7,594,619.97 | .63 % | .62 % |
| Containers, Packaging and Glass (7) | $5,812,500.00 | .48 % | .48 % |
| Cargo Transport (27) | $5,679,265.48 | .47 % | .47 % |




*Sample CDO LTD*

## *Draft Report As Of 06/18/2007*

### S&P Industry Detail

**Maximum Investment Amount**    **$1,217,478,122.21**

**Totals:**                                                                                    $1,208,523,499.79

| Industry | Commitment Amount | % of Deal | % of Maximum Investment Amount |
|---|---|---|---|
| Health care (25) | $113,621,282.68 | 9.40 % | 9.33 % |
| Conglomerates (12) | $77,197,057.82 | 6.39 % | 6.34 % |
| Electronics/electric (17) | $76,788,447.52 | 6.35 % | 6.31 % |
| Telecommunications (39) | $69,801,272.85 | 5.78 % | 5.73 % |
| Broadcast radio and television (5) | $65,716,064.46 | 5.44 % | 5.40 % |
| Publishing (33) | $64,840,481.69 | 5.37 % | 5.33 % |
| Leisure (30) | $63,255,627.20 | 5.23 % | 5.20 % |
| Financial intermediaries (20) | $59,228,438.02 | 4.90 % | 4.86 % |
| Industrial equipment (28) | $54,746,819.93 | 4.53 % | 4.50 % |
| Retailers (other than food/drug) (35) | $45,905,893.21 | 3.80 % | 3.77 % |
| Oil and Gas (32) | $41,464,628.78 | 3.43 % | 3.41 % |
| Cable television (9) | $39,031,616.14 | 3.23 % | 3.21 % |
| Insurance (29) | $38,068,771.70 | 3.15 % | 3.13 % |
| Utilities (38) | $33,163,421.69 | 2.74 % | 2.72 % |
| Food service (23) | $31,271,689.46 | 2.59 % | 2.57 % |
| Clothing/textiles (11) | $27,729,598.44 | 2.29 % | 2.28 % |
| Aerospace and defense (1) | $25,625,145.28 | 2.12 % | 2.10 % |
| Hotels/motels/inns and casinos (27) | $23,406,666.67 | 1.94 % | 1.92 % |
| Ecological services and equipment (16) | $22,149,224.66 | 1.83 % | 1.82 % |
| Chemical/plastics (10) | $21,613,339.51 | 1.79 % | 1.78 % |
| Surface transport (37) | $19,981,836.92 | 1.65 % | 1.64 % |
| Food/drug retailers (21) | $19,390,835.62 | 1.60 % | 1.59 % |
| Building and development (7) | $18,824,512.24 | 1.56 % | 1.55 % |
| Farming/agriculture (19) | $18,064,614.34 | 1.49 % | 1.48 % |
| Cosmetics/toiletries (14) | $17,820,277.78 | 1.47 % | 1.46 % |
| Drugs (15) | $17,432,500.00 | 1.44 % | 1.43 % |
| Automotive (3) | $17,114,705.51 | 1.42 % | 1.41 % |
| Beverage and tobacco (4) | $16,178,094.03 | 1.34 % | 1.33 % |
| Business equipment and services (8) | $15,078,408.91 | 1.25 % | 1.24 % |



*Sample DB3 LTD*



**Draft Report As Of 06/18/2007**

**Totals:**                                                $1,208,523,499.79

| Industry | Commitment Amount | % of Deal | % of Maximum Investment Amount |
|---|---|---|---|
| Food products (22) | $14,891,304.35 | 1.23 % | 1.22 % |
| Forest products (24) | $14,411,028.30 | 1.19 % | 1.18 % |
| Nonferrous metals/minerals (31) | $12,902,774.11 | 1.07 % | 1.06 % |
| Home furnishings (26) | $7,594,619.97 | .63 % | .62 % |
| Containers and glass products (13) | $4,212,500.00 | .35 % | .35 % |



*Sample CDO LTD*



*Draft Report As Of 06/18/2007*

## Participations and Synthetics Detail

**Maximum Investment Amount  $1,217,478,122.21**

| | Totals | % | Aggregate Counterparty Totals | % | Individual Counterparty Totals | # in excess |
|---|---|---|---|---|---|---|
| Synthetic Securities: | $0.00 | .000% | | | | |
| Participations: | $0.00 | .000% | | | | |
| Counterparty Rated Aaa/AAA: | | | $0.00 | .000% | $0.00 | 0 |
| Counterparty Rated Aa1/AA+: | | | $0.00 | .000% | $0.00 | 0 |
| Counterparty Rated Aa2/AA: | | | $0.00 | .000% | $0.00 | 0 |
| Counterparty Rated Aa3/AA-: | | | $0.00 | .000% | $0.00 | 0 |
| Counterparty Rated A1/A+: | | | $0.00 | .000% | $0.00 | 0 |
| Counterparty Rated A2/A: | | | $0.00 | .000% | $0.00 | 0 |

| Counterparty Name | Counterparty Moody's Rating | Counterparty S&P Rating | Asset Description | Counterparty Type | Principal Balance | % |
|---|---|---|---|---|---|---|




*Sample CDO LTD*

## *Draft Report As Of 06/18/2007*

**Purchases and Sales**

Purchased Collateral:

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price |
|---|---|---|---|---|---|---|---|---|
| **Loan** | | | | | | | | |
| 06/07/2007 | 06/18/2007 | Cumulus Media | Term Loan | | $2,000,000.00 | $2,000,000.00 | $0.00 | 100.000 |
| 06/01/2007 | 06/18/2007 | TDS Investor Corp aka Travelport | Delayed Draw Term Loan | | $3,000,000.00 | $0.00 | $3,000,000.00 | 100.000 |
| 06/11/2007 | 06/15/2007 | NRG Energy | Synthetic Letter of Credit | | $702,821.42 | $702,821.42 | $0.00 | 100.000 |
| 06/11/2007 | 06/15/2007 | NRG Energy | Term Loan | | $1,697,178.58 | $1,697,178.58 | $0.00 | 100.000 |
| 03/14/2007 | 06/11/2007 | Western Refining | Term Loan | | $5,625,000.00 | $5,625,000.00 | $0.00 | 100.000 |
| 03/29/2007 | 06/11/2007 | Western Refining | First Lien Delayed Draw | | $1,375,000.00 | $0.00 | $1,375,000.00 | 100.000 |
| 06/01/2007 | 06/08/2007 | Edwards Limited | First Lien Term Loan | | $2,000,000.00 | $2,000,000.00 | $0.00 | 100.000 |
| 06/01/2007 | 06/08/2007 | Edwards Limited | Second Lien Term Loan | | $10,000,000.00 | $10,000,000.00 | $0.00 | 100.000 |
| 03/27/2007 | 06/06/2007 | Select Medical | Term Loan B Add-on | | $3,000,000.00 | $3,000,000.00 | $0.00 | 99.750 |
| 05/09/2007 | 06/05/2007 | Huish Detergents Inc | Second Lien | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 |
| 05/09/2007 | 06/05/2007 | Huish Detergents Inc | Tranche B Term Loan | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 05/30/2007 | 06/05/2007 | Kinder Morgan Inc. | Term Loan B | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 04/27/2007 | 06/05/2007 | RGIS Holdings LLC | Delayed Draw Term Loan | | $238,095.24 | $0.00 | $238,095.24 | 98.250 |
| 05/10/2007 | 06/05/2007 | RGIS Holdings LLC | Tranche B Term Loan | | $4,761,904.76 | $4,761,904.76 | $0.00 | 98.250 |
| 04/02/2007 | 06/04/2007 | Pinnacle Foods Holding Corporation | New Term Loan B | | $10,000,000.00 | $10,000,000.00 | $0.00 | 98.656 |
| 05/08/2007 | 06/01/2007 | Baker Corp | Tranche C Term Loan | | $200,000.00 | $200,000.00 | $0.00 | 100.000 |
| 05/30/2007 | 06/01/2007 | Claire's Stores | Term Loan B | | $2,000,000.00 | $2,000,000.00 | $0.00 | 99.500 |
| 05/14/2007 | 06/01/2007 | Michaels Stores Inc | Replacement Loan | | $6,000,000.00 | $6,000,000.00 | $0.00 | 100.000 |
| 05/04/2007 | 05/31/2007 | Dresser, Inc. | Second Lien Term Loan | | $10,000,000.00 | $10,000,000.00 | $0.00 | 100.000 |
| 05/14/2007 | 05/31/2007 | Royalty Pharma Finace Trust | Term Loan B | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 05/02/2007 | 05/25/2007 | Graphic Packaging International | Term Loan B | | $1,600,000.00 | $1,600,000.00 | $0.00 | 100.000 |
| 05/08/2007 | 05/24/2007 | Local TV Finance LLC | Term Loan | | $2,000,000.00 | $2,000,000.00 | $0.00 | 100.000 |
| 04/25/2007 | 05/23/2007 | PlayCore | Term Loan | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 05/09/2007 | 05/22/2007 | Discovery Communications | Term Loan B | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 05/09/2007 | 05/21/2007 | Dice Inc | Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 99.500 |
| 05/16/2007 | 05/16/2007 | UPC Financing Partnership | Tranche N1 Term Loan | | $3,394,338.50 | $3,394,338.50 | $0.00 | 100.188 |
| 05/16/2007 | 05/16/2007 | UPC Financing Partnership | Tranche N1 Term Loan | | $3,394,338.50 | $3,394,338.50 | $0.00 | 100.230 |
| 05/11/2007 | 05/11/2007 | Charter Communications Operating LLC | Existing Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 |




*Sample CDO LTD*

## Draft Report As Of 06/18/2007

Purchased Collateral:

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price |
|---|---|---|---|---|---|---|---|---|
| 01/19/2007 | 02/05/2007 | RMK Acquisition fka Aramark | US Term Loan | | $16,814,853.83 | $16,814,853.83 | $0.00 | 100.000 |
| 01/11/2007 | 02/02/2007 | Harrington Holdings Inc | Second Lien | | $1,750,000.00 | $1,750,000.00 | $0.00 | 100.000 |
| 01/24/2007 | 02/01/2007 | Brickman Group | Tranche B Term Loan | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 01/31/2007 | 01/31/2007 | Weight Watchers International | Term B | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 01/09/2007 | 01/31/2007 | Xerium Technologies Inc | Term Loan B | | $3,995,000.00 | $3,995,000.00 | $0.00 | 100.000 |
| 01/24/2007 | 01/30/2007 | Harrington Holdings Inc | First Lien | | $3,000,000.00 | $3,000,000.00 | $0.00 | 100.000 |
| 01/02/2007 | 01/26/2007 | Critical Homecare Solutions | First Lien Delayed Draw | | $3,500,000.00 | $3,220,000.00 | $280,000.00 | 100.000 |
| 01/24/2007 | 01/26/2007 | MRO Acquisition LLC | Term Loan | | $2,248,009.55 | $2,248,009.55 | $0.00 | 100.000 |
| 01/24/2007 | 01/26/2007 | Volnay Acquisitions - CGG | Term Loan | | $8,000,000.00 | $8,000,000.00 | $0.00 | 100.000 |
| 01/23/2007 | 01/23/2007 | RiskMetrics Group Holdings | First Lien Term Loan | | $7,000,000.00 | $7,000,000.00 | $0.00 | 100.000 |
| 12/27/2006 | 01/23/2007 | TPF Generation Holding | Synthetic LOC | | $1,279,613.02 | $1,279,613.02 | $0.00 | 100.000 |
| 12/27/2006 | 01/23/2007 | TPF Generation Holding | Synthetic Revolving Deposit | | $401,132.62 | $401,132.62 | $0.00 | 100.000 |
| 12/27/2006 | 01/23/2007 | TPF Generation Holding | Term Loan | | $6,819,254.36 | $6,819,254.36 | $0.00 | 100.000 |
| 01/22/2007 | 01/22/2007 | Energy Transfer Partners | Term Loan | | $18,000,000.00 | $18,000,000.00 | $0.00 | 100.000 |
| 01/16/2007 | 01/16/2007 | Chattem, Inc | Term Loan B | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 01/12/2007 | 01/12/2007 | Herbst Gaming | Delayed Draw Term B | | $2,666,666.67 | $0.00 | $2,666,666.67 | 100.000 |
| 01/12/2007 | 01/12/2007 | Herbst Gaming | Term Loan B | | $5,333,333.33 | $5,333,333.33 | $0.00 | 100.000 |
| 12/28/2006 | 01/12/2007 | Riverdeep Group Ltd | Term Loan | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 12/21/2006 | 01/12/2007 | Worldspan | First Lien Term Loan | | $1,800,000.00 | $1,800,000.00 | $0.00 | 100.000 |

**Bond**

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price |
|---|---|---|---|---|---|---|---|---|
| 05/24/2007 | 05/24/2007 | Mueller Water Products | MWA 7.375% 06/01/2017 | | $750,000.00 | $750,000.00 | $0.00 | 100.000 |
| 05/17/2007 | 05/17/2007 | MGM Mirage | MGM 7.50% 06/01/2016 | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $335,000.00 | $335,000.00 | $0.00 | 100.000 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $500,000.00 | $500,000.00 | $0.00 | 100.000 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $335,000.00 | $335,000.00 | $0.00 | 101.125 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $500,000.00 | $500,000.00 | $0.00 | 101.125 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $335,000.00 | $335,000.00 | $0.00 | 101.500 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $500,000.00 | $500,000.00 | $0.00 | 101.500 |
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $335,000.00 | $335,000.00 | $0.00 | 101.625 |




*Sample ID3 LTD*

## Draft Report As Of 06/18/2007

**Purchased Collateral:**

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price |
|---|---|---|---|---|---|---|---|---|
| 05/04/2007 | 05/04/2007 | USI Holdings | USIH Libor + 3.875% 11/15/2014 | | $500,000.00 | $500,000.00 | $0.00 | 101.625 |
| 01/12/2007 | 01/12/2007 | Intelsat Corporation | 3L + 3.5% -01/2007 | | $5,000,000.00 | $5,000,000.00 | $0.00 | 100.000 |
| **Senior Secured Note** | | | | | | | | |
| 03/05/2007 | 03/05/2007 | Seminole Hard Rock Ent | SEMHRK Libor + 2.50 | | $1,500,000.00 | $1,500,000.00 | $0.00 | 100.000 |

**Sold Collateral:**

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price | Sale Price | Gain/Loss | Reason For Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan** | | | | | | | | | | | |
| 06/05/2007 | 06/18/2007 | Charter Communications Operating LLC | Existing Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 100.063 | $625.00 | |
| 05/29/2007 | 06/11/2007 | Baker Corp | Tranche C Term Loan | | $200,000.00 | $200,000.00 | $0.00 | 100.000 | 100.625 | $1,250.00 | |
| 03/19/2007 | 06/01/2007 | Dex Media East LLC | Tranche B Term Loan | | $1,880,432.75 | $1,880,432.75 | $0.00 | 100.000 | 100.000 | $0.00 | Discretionary/Free Trade Basket |
| 03/19/2007 | 06/01/2007 | Dex Media East LLC | Tranche B Term Loan | | $709,578.05 | $709,578.05 | $0.00 | 98.827 | 100.000 | $8,326.90 | Discretionary/Free Trade Basket |
| 05/14/2007 | 05/23/2007 | PBM Holdings Inc | Term Loan | | $2,985,000.00 | $2,985,000.00 | $0.00 | 100.000 | 100.375 | $11,193.75 | Credit Improved Security |
| 05/16/2007 | 05/16/2007 | UPC Broadband Holding BV | Facility J2 | | $3,394,338.50 | $3,394,338.50 | $0.00 | 100.230 | 100.230 | $16.97 | Discretionary/Free Trade Basket |
| 05/16/2007 | 05/16/2007 | UPC Broadband Holding BV | Facility K2 | | $3,394,338.50 | $3,394,338.50 | $0.00 | 100.188 | 100.188 | $0.00 | Discretionary/Free Trade Basket |
| 03/19/2007 | 05/09/2007 | Cequel Communications LLC | First Lien Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 99.938 | 99.750 | ($1,875.00) | Credit Risk Security |
| 03/06/2007 | 05/09/2007 | Charter Communications Operating LLC | First Lien Term Loan | | $2,850,000.00 | $2,850,000.00 | $0.00 | 100.000 | 100.000 | $0.00 | Discretionary/Free Trade Basket |
| 04/04/2007 | 05/04/2007 | Cambium Learning Inc | Tranche B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 100.000 | $0.00 | Discretionary/Free Trade Basket |
| 04/23/2007 | 04/25/2007 | United Surgical Partners International Inc | Delayed Draw Term Loan | | $1,612,903.23 | $0.00 | $1,612,903.23 | 100.000 | 100.000 | $0.00 | Discretionary/Free Trade Basket |
| 03/19/2007 | 04/25/2007 | Yankee Candle Company Inc | Term Loan B | | $7,000,000.00 | $7,000,000.00 | $0.00 | 100.000 | 100.375 | $26,250.00 | Credit Improved Security |
| 03/19/2007 | 04/19/2007 | WideOpenWest Finance LLC | Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.232 | 100.875 | $6,430.00 | Credit Improved Security |
| 03/19/2007 | 04/18/2007 | United Components | Tranche D Term Loan | | $552,498.46 | $552,498.46 | $0.00 | 100.000 | 100.375 | $2,071.87 | Credit Risk Security |
| 03/19/2007 | 04/18/2007 | United Components | Tranche D Term Loan | | $1,972,727.26 | $1,972,727.26 | $0.00 | 100.501 | 100.375 | ($2,475.77) | Credit Risk Security |
| 03/19/2007 | 04/12/2007 | Hanger Orthopedic Group | New Term Loan B | | $1,290,250.00 | $1,290,250.00 | $0.00 | 100.521 | 100.375 | ($1,883.77) | Credit Risk Security |
| 03/14/2007 | 04/12/2007 | Reader's Digest | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 100.500 | $5,000.00 | Credit Risk Security |
| 03/19/2007 | 04/10/2007 | CSC Holdings Inc | Term Loan | | $862,784.26 | $862,784.26 | $0.00 | 99.953 | 100.375 | $3,640.95 | Credit Risk Security |
| 03/19/2007 | 04/09/2007 | WideOpenWest Finance LLC | Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.232 | 100.500 | $2,680.00 | Credit Improved Security |





*Sample DE3 LTD*

## Draft Report As Of 06/18/2007

Sold Collateral:

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price | Sale Price | Gain/Loss | Reason For Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/04/2007 | 04/04/2007 | Cequel Communications LLC | First Lien Term Loan | | $1,000,000.00 | $1,000,000.00 | $0.00 | 99.893 | 100.000 | $1,070.00 | Credit Risk Security |
| 03/19/2007 | 04/03/2007 | Open Solutions Inc | Term Advance | | $1,166,667.00 | $1,166,667.00 | $0.00 | 100.000 | 100.375 | $4,375.00 | Credit Improved Security |
| 03/19/2007 | 04/03/2007 | Open Solutions Inc | Term Advance | | $1,166,667.00 | $1,166,667.00 | $0.00 | 100.000 | 100.625 | $7,291.67 | Credit Improved Security |
| 03/19/2007 | 04/03/2007 | Open Solutions Inc | Term Advance | | $2,333,333.00 | $2,333,333.00 | $0.00 | 100.000 | 100.250 | $5,833.33 | Credit Improved Security |
| 03/19/2007 | 04/03/2007 | Open Solutions Inc | Term Advance | | $2,333,333.00 | $2,333,333.00 | $0.00 | 100.000 | 100.375 | $8,750.00 | Credit Improved Security |
| 03/19/2007 | 04/03/2007 | Sensata Technologies | US Term Loan | | $14,962.31 | $14,962.31 | $0.00 | 100.000 | 100.000 | $0.00 | Discretionary/Free Trade Basket |
| 04/02/2007 | 04/02/2007 | NEP II Inc | Term Loan B | | $1,500,000.00 | $1,500,000.00 | $0.00 | 100.000 | 100.625 | $9,375.00 | Credit Improved Security |
| 02/20/2007 | 03/30/2007 | Foamex LP | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 101.125 | $11,250.00 | Credit Improved Security |
| 03/19/2007 | 03/28/2007 | Constellation Brands Inc | Term Loan B | | $656,862.73 | $656,862.73 | $0.00 | 100.000 | 100.125 | $821.08 | Credit Improved Security |
| 03/19/2007 | 03/28/2007 | MCC Iowa LLC | Tranche D-1 Term Loan | | $1,252,437.50 | $1,252,437.50 | $0.00 | 100.000 | 99.875 | ($1,565.55) | Discretionary/Free Trade Basket |
| 03/19/2007 | 03/28/2007 | MCC Iowa LLC | Tranche D-1 Term Loan | | $510,088.50 | $510,088.50 | $0.00 | 99.899 | 100.000 | $515.19 | Discretionary/Free Trade Basket |
| 03/19/2007 | 03/28/2007 | MCC Iowa LLC | Tranche D-1 Term Loan | | $1,489,911.50 | $1,489,911.50 | $0.00 | 99.899 | 99.875 | ($357.58) | Discretionary/Free Trade Basket |
| 03/19/2007 | 03/27/2007 | CSC Holdings Inc | Term Loan | | $1,105,074.68 | $1,105,074.68 | $0.00 | 99.953 | 100.250 | $3,282.07 | Credit Risk Security |
| 03/02/2007 | 03/23/2007 | NEP II Inc | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 101.063 | $10,625.00 | Credit Improved Security |
| 03/20/2007 | 03/20/2007 | DeCrane Aircraft Holdings | Credit Linked Deposit | | $38,308.06 | $38,308.06 | $0.00 | 100.000 | 100.000 | $0.00 | |
| 03/01/2007 | 03/14/2007 | Camelbak Products | First Lien Term Loan | | $494,800.00 | $494,800.00 | $0.00 | 97.167 | 98.500 | $6,598.16 | Credit Risk Security |
| 03/01/2007 | 03/08/2007 | Camelbak Products | First Lien Term Loan | | $1,244,000.00 | $1,244,000.00 | $0.00 | 97.167 | 98.000 | $10,368.74 | Credit Risk Security |
| 02/15/2007 | 03/06/2007 | Foamex LP | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 100.812 | $8,125.00 | Credit Improved Security |
| 03/02/2007 | 03/02/2007 | Alm Media | Term Loan | | $1,072,013.15 | $1,072,013.15 | $0.00 | 100.094 | 100.000 | ($1,002.33) | |
| 02/07/2007 | 02/28/2007 | McJunkin Corp | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 100.750 | $7,500.00 | Credit Improved Security |
| 02/16/2007 | 02/28/2007 | McJunkin Corp | Term Loan B | | $1,000,000.00 | $1,000,000.00 | $0.00 | 100.000 | 101.125 | $11,250.00 | Credit Improved Security |
| 02/15/2007 | 02/27/2007 | McJunkin Corp | Term Loan B | | $3,000,000.00 | $3,000,000.00 | $0.00 | 100.000 | 100.875 | $26,250.00 | Credit Improved Security |
| 01/17/2007 | 02/06/2007 | US Investigations | Term Loan C | | $504,223.04 | $504,223.04 | $0.00 | 100.500 | 100.375 | ($630.28) | Credit Risk Security |
| 11/10/2006 | 02/01/2007 | Rural/Metro Corp | LC Facility Deposits | | $244,310.29 | $244,310.29 | $0.00 | 100.250 | 100.250 | $0.00 | Credit Risk Security |
| 11/10/2006 | 02/01/2007 | Rural/Metro Corp | Term Loan B | | $698,029.41 | $698,029.41 | $0.00 | 100.250 | 100.250 | $0.00 | Credit Risk Security |

**Bond**

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price | Sale Price | Gain/Loss | Reason For Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/19/2007 | 01/19/2007 | Harry & David Operations | HNDUS L + 5.0 3/1/2012 | | $719,000.00 | $719,000.00 | $0.00 | 98.500 | 100.000 | $10,785.00 | Credit Improved Security |




*Sample CDO LTD*

### Draft Report As Of 06/18/2007

Principal Reductions:

| Trade Date | Settle Date | Issuer Name | Asset Description | Identifier | Commitment | Funded | Unfunded | Purchase Price | Sale Price | Gain/Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| **Loan** | | | | | | | | | | |
| 06/15/2007 | 06/15/2007 | Acxiom Corporation | Term Loan | | $27,500.00 | $27,500.00 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/15/2007 | 06/15/2007 | NSG Holdings, LLC | Term Loan | | $13,227.63 | $13,227.63 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/15/2007 | 06/15/2007 | Sabre Holdings | Term Loan | | $49,751.24 | $49,751.24 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/08/2007 | 06/08/2007 | Belfor USA Group Inc | Tranche B Term Loan | | $133,333.33 | $133,333.33 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/06/2007 | 06/06/2007 | Emmis Operating Company | Term Loan B | | $85,714.29 | $85,714.29 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/05/2007 | 06/05/2007 | Cincinnati Bell | Tranche B Term Loan | | $50,000.00 | $50,000.00 | $0.00 | 100.500 | 100.000 | ($250.00) |
| 06/05/2007 | 06/05/2007 | Cincinnati Bell | Tranche B Term Loan | | $37,406.02 | $37,406.02 | $0.00 | 99.969 | 100.000 | $11.78 |
| 06/04/2007 | 06/04/2007 | Lifepoint Hospital Holdings | Tranche B Term Loan | | $1,316,180.64 | $1,316,180.64 | $0.00 | 100.250 | 100.000 | ($3,290.45) |
| 06/04/2007 | 06/04/2007 | Lifepoint Hospital Holdings | Tranche B Term Loan | | $509,813.69 | $509,813.69 | $0.00 | 99.708 | 100.000 | $1,488.66 |
| 06/04/2007 | 06/04/2007 | Sabre Holdings | Term Loan | | $41,459.37 | $41,459.37 | $0.00 | 100.000 | 100.000 | $0.00 |
| 06/01/2007 | 06/01/2007 | Cincinnati Bell | Tranche B Term Loan | | $50,000.00 | $50,000.00 | $0.00 | 100.500 | 100.000 | ($250.00) |
| 06/01/2007 | 06/01/2007 | Cincinnati Bell | Tranche B Term Loan | | $37,406.02 | $37,406.02 | $0.00 | 99.969 | 100.000 | $11.78 |
| 06/01/2007 | 06/01/2007 | Freescale Semiconductor Inc | Term Loan | | $50,000.00 | $50,000.00 | $0.00 | 98.250 | 100.000 | $875.00 |
| 06/01/2007 | 06/01/2007 | Toys R Us | Term Loan A | | $135,000.00 | $135,000.00 | $0.00 | 99.750 | 100.000 | $337.50 |
| 05/31/2007 | 05/31/2007 | Bragg Communications | Term Loan B | | $7,653.06 | $7,653.06 | $0.00 | 100.250 | 100.000 | ($19.13) |
| 05/31/2007 | 05/31/2007 | Freeport - McMoRan Copper & Gold Inc | Term Loan B | | $1,674,394.64 | $1,674,394.64 | $0.00 | 100.000 | 100.000 | $0.00 |
| 05/31/2007 | 05/31/2007 | Lifepoint Hospital Holdings | Tranche B Term Loan | | $189,530.01 | $189,530.01 | $0.00 | 100.250 | 100.000 | ($473.83) |
| 05/31/2007 | 05/31/2007 | Lifepoint Hospital Holdings | Tranche B Term Loan | | $73,413.17 | $73,413.17 | $0.00 | 99.708 | 100.000 | $214.37 |
| 05/31/2007 | 05/31/2007 | MultiPlan Inc | Term B Loan | | $4,968.95 | $4,968.95 | $0.00 | 100.250 | 100.000 | ($12.42) |
| 05/31/2007 | 05/31/2007 | MultiPlan Inc | Term B Loan | | $2,352.94 | $2,352.94 | $0.00 | 99.688 | 100.000 | $7.35 |
| 05/31/2007 | 05/31/2007 | TD Ameritrade Holding Corp | Term B Advance | | $463,636.36 | $463,636.36 | $0.00 | 100.250 | 100.000 | ($1,159.09) |
| 05/31/2007 | 05/31/2007 | TD Ameritrade Holding Corp | Term B Advance | | $463,636.37 | $463,636.37 | $0.00 | 100.008 | 100.000 | ($37.09) |
| 05/31/2007 | 05/31/2007 | WCP Exposition Services | Term Loan | | $104,998.36 | $104,998.36 | $0.00 | 100.625 | 100.000 | ($656.24) |
| 05/31/2007 | 05/31/2007 | WMG Acquisition Corp | Term Loan | | $9,587.90 | $9,587.90 | $0.00 | 100.514 | 100.000 | ($49.28) |
| 05/30/2007 | 05/30/2007 | NuSil Technology LLC | Tranche B Term Loan | | $96,000.00 | $96,000.00 | $0.00 | 100.000 | 100.000 | $0.00 |
| 05/30/2007 | 05/30/2007 | Rental Service Corp | Second Lien Term Loan | | $1,020,796.46 | $1,020,796.46 | $0.00 | 100.000 | 100.000 | $0.00 |
| 05/29/2007 | 05/29/2007 | B&G Foods Inc | Term Loan | | $2,608,695.65 | $2,608,695.65 | $0.00 | 100.000 | 100.000 | $0.00 |
| 05/18/2007 | 05/18/2007 | Harbor Freight Tools | Tranche C | | $184,188.61 | $184,188.61 | $0.00 | 99.985 | 100.000 | $28.55 |

**SCHEDULE D**

**<u>Loan Management Approval Protocols</u>**

| Activity | Non-CLO Assets | |
|---|---|---|
| Technical Amendments (affirmative, non-financial covenant, non 100% vote) | <u>Face Amount</u> | <u>Approval</u> |
| | Under $10mm | WCAS/FS |
| | $10mm or more | Estate/A&M |
| Covenant Amendments (negative, financial and 100% lender approval required) | <u>Face Amount</u> | <u>Approval</u> |
| | Under $5mm | WCAS/FS |
| | $5mm or more | Estate/A&M |
| New Commitments/Fundings, Maturity Extensions, Release of Collateral | <u>Face Amount</u> | <u>Approval</u> |
| | Any amount | Estate/A&M |
| Restructurings & Debt Exchanges (reduction of principal, debt forgiveness and/or conversion) | <u>Face Amount</u> | <u>Approval</u> |
| | Any amount | Estate/A&M |
| Trade/Sell Loans: At no loss (defined as last two-month avg. mark) | <u>Face Amount</u> | <u>Approval</u> |
| | No greater than $5mm | WCAS/|FS |
| Trade/Sell Loans: At loss | If no greater than 200 bps below last two-month average mark <u>and</u> Face Amount under $2mm, WCAS/FS Approve | |
| Trade/Sell Loans: All Other | Estate/A&M Approve | |

## SCHEDULE E

## Wall Street Office Report

# FS Management Report with LXID as of 07/21/2011

| Portfolio | Coupon Spread | Maturity Date | Moody Rating | Moody SIC | S&P SIC | Unit Cost | Mark Price | Market Value | Par Settled | Par Traded | Unrealized Gain/ | Total Issuance | Analyst | LoanXID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | No detail data matched the requested report criteria. | | | | | | | |
| **Grand Totals** | | | | | | | | 0.00 | 0.00 | 0.00 | 0.00 | | | |

**Run Date: 07/21/2011 1:58:01 PM**

**Produced By Wall Street Office**

**FS Management Report with LXID**

**as of 07/21/2011**

**Printed By: lisa**

**Page 1 of 2**

| Portfolio | Coupon Spread | Maturity Date | Moody Rating | Moody SIC | S&P SIC | Unit Cost | Mark Price | Market Value | Par Settled | Par Traded | Unrealized Gain/ | Total Issuance | Analyst | LoanXID |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

No detail data

## Report Parameters

| | |
|---|---|
| ActiveStatus | All |
| AmortizationMethod | Straight Line |
| ApplyCloseDateFilter | Use Global Setting |
| AsOfDate | 07/21/2011 |
| AssetFieldList | |
| AssetJoinType | Left |
| AssetTypes | ABS |
| AssociationType | |
| AssociationTypesFilter | Default |
| AssociationTypesList | All |
| BaseCurrency | US Dollars |
| CapitalizedCost | False |
| CDSParType | Actual Notional |
| CostMethod | Weighted Avg |
| EarnSales | To BV Cost |
| EquityParType | Cost |
| ExcludeNonPerforming | True |
| IncludeAccrualFeeTypes | All |
| LoanMarketValueType | Actual |
| LoanParType | Commitment |
| MapSwapPortfolios | False |
| MarkBy | Most Recent Mark |
| MarkLevel | Position |
| MarkType | MarkPrice |
| Portfolios | Fraser Sullivan Credit Strategies Funding Ltd Warehouse |
| UseFilterTables | Default |

## SCHEDULE F

### Financial Institutions

Banco Santander

Bank of America Merrill Lynch

Bank of Tokyo - Mitsubishi UFJ

Barclays Capital

BNP Paribas

Cantor Fitzgerald

Citadel Securities

Citigroup Global Markets, Inc.

Credit Suisse

Deutsche Bank

FBR Capital Markets

Goldman Sachs

Jefferies International

JP Morgan

Lazard Capital

Lloyds TSB Bank plc

Macquarie Capital

MF Global

Mizuho Securities USA

Morgan Stanley

Nomura

Nordea Bank

Royal Bank of Canada

Royal Bank of Scotland

Scotia Capital

Societe Generale

UBS

US Bank

Unicredit

Wells Fargo

**SCHEDULE G**

**Reimbursable Expenses**

One time/start-up expenses

$25,000 – WSO account set-up expense.  This is a one-time fee to set a portfolio up on WSO.

$60,000 – WSO Accounting Module.  This is a one-time fee for addition of the accounting module to the WSO portfolio management system.

As incurred – WSO Custom Reporting fees.  Charged by WSO to customize stock reporting templates.

$100,000 – Everest portfolio management platform implementation.  It is an overlay that sits on top of WSO and provides significantly more flexible portfolio analytic capabilities than WSO.

Recurring expenses

$60,000 – WSO Accounting Module annual license

$100,000 – Everest annual license

As incurred – pricing service fees

Trading expenses

As incurred – Distressed debt trade documentation and closing expenses.

Rating expenses

As incurred – fees paid to Moody's/S&P for asset specific ratings; reimbursable only to the extent not paid by CLOs after such assets are securitized.

**SCHEDULE H**

**Identified Client Employees**

| | Last Name | First Name | Title | Function | Location |
|---|---|---|---|---|---|
| * | Turner | Frank | Managing Director | Portfolio Mgmt | New York |
| * | Chang | Francis | Managing Director | Portfolio Mgmt | New York |
| * | Marshall | Patrick | Managing Director | Portfolio Mgmt | London |
| † | Hendry | Bruce | Managing Director | Legal | London |
| † | Ponticorvo | Benedetta | Vice President | Portfolio Mgmt | London |
| † | Goldsmith | Scott | Vice President | Portfolio Mgmt | New York |
| † | Wong | Ernest | Vice President | Portfolio Mgmt | New York |
| † | Chu | Enoch | Associate | Portfolio Mgmt | New York |
| † | Lee | Samuel | Associate | Portfolio Mgmt | New York |
| † | Rodriguez | Patricia | | Admin | New York |

"Category A" Identified Client Employees are indicated by the symbol "*"

"Category B" Identified Client Employees are identified by the symbol "†"

**SCHEDULE I**

**Transition Services Agreement**

**TRANSITION SERVICES AGREEMENT**

**by and among**

**WCAS│FRASER SULLIVAN INVESTMENT MANAGEMENT, LLC,**

**LEHMAN BROTHERS HOLDINGS INC. AND**

**LAMCO LLC**

**[•] [•], 2011**

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement (this "<u>Agreement</u>") is made this [●] day of [●], 2011 by and among WCAS⎮Fraser Sullivan Investment Management, LLC, a limited liability company formed under the laws of New York ("<u>Recipient</u>"), Lehman Brothers Holdings Inc., a corporation organized under the laws of Delaware ("<u>LBHI</u>") and LAMCO LLC, a limited liability company organized under the laws of Delaware ("<u>LAMCO</u>" and, together with LBHI, "<u>Provider</u>") (each of Provider and Recipient, a "<u>Party</u>" and collectively the "<u>Parties</u>").

**RECITALS:**

WHEREAS, Recipient and LBHI have entered into that certain Asset Management Agreement dated as of July 26, 2011 (as such may be amended, supplemented or otherwise modified from time to time, the "<u>Asset Management Agreement</u>") with respect to the Managed Assets;

WHEREAS, in connection with the consummation of the transactions contemplated by the Asset Management Agreement, the parties hereto desire that Provider perform or facilitate the performance of the Services (as defined herein) in accordance with the terms and subject to the conditions of this Agreement; and

WHEREAS, the Asset Management Agreement contemplates execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      INTERPRETATION AND CERTAIN DEFINED TERMS

Unless otherwise defined herein, any capitalized term used herein shall have the meaning ascribed to such term in the Asset Management Agreement.

The following capitalized terms used in this Agreement shall have the meanings set forth below:

"<u>Business Day</u>" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"<u>Governmental Authority</u>" means any government or governmental or regulatory, judicial, or administrative body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality, or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organization, including, but not limited to, the Financial Industry Regulatory Authority.

"Law" means any federal, state, local, or foreign law, statute, code, ordinance, rule or regulation of any Governmental Authority.

"Losses" means any expenses, losses, damages, liabilities, demands, charges, and claims of any kind or nature whatsoever, including any legal expenses and costs and expenses relating to investigating or defending any demands, charges, and claims.

"Person" means an individual, a corporation, a limited liability company, a joint venture, a partnership, an association, a trust, a division, or operating group of any of the foregoing or any other entity, including a Governmental Authority.

"Virus(es)" means any computer code or instructions that have a material adverse effect on the operation, security or integrity of (a) a computing, telecommunications or other electronic operating or processing system or environment, (b) software programs, data, databases or other computer files or libraries or (c) computer hardware, networking devices or telecommunications equipment, including (i) Trojan horses, time bombs, back door devices, worms or any other software routine or hardware component designed to permit unauthorized access, disable, erase or otherwise harm software, hardware or date or perform any other such harmful or unauthorized actions and (ii) similar code or data.

2.    SERVICES

(a)    During the term of this Agreement, Provider shall provide or cause to be provided to Recipient, those services listed on Schedule A (collectively, the "Services").  In connection with its obligations hereunder, Provider shall exercise commercially reasonable care and diligence.

(b)    In rendering the Services, Provider is and shall remain an independent contractor having responsibility to determine the methods to be adopted and the actions to be taken to carry out its duties and responsibilities.  Nothing in this Agreement shall render Provider an agent, employee, partner, or joint venturer of Recipient, and Provider shall not hold itself out as such.

(c)    Provider may subcontract with third parties ("Third Party Service Providers") to provide services in connection with all or any portion of the Services to be provided hereunder.  With respect to Services currently being provided to Provider by Third Party Service Providers, Provider shall only be required to provide Services to Recipient to the extent permissible under its existing agreements with Third Party Service Providers and Provider will use commercially reasonable efforts to mitigate any conflicts or delays relating to the provision of Services by Third Party Service Providers under agreements therewith.

(d)    Each of the Services shall include such functions, responsibilities, activities, and tasks, and the materials, documentation, resources, rights, and licenses to be used, granted or provided by Provider that are not specifically described in this Agreement as a part of such Service, that would normally be considered an inherent part

2

of, or necessary subpart included within, such Service or are otherwise necessary to provide, or to receive, such Service.  Any licenses that may be conveyed as a part of a Service shall be limited to a non-exclusive right to use such Service solely as provided for in this Agreement.

(e)    To the extent that the performance or receipt of Services hereunder requires Recipient to have access to Provider's intranet or other computer software, networks, hardware, technology, or computer-based resources (including third-party services, e-mail and access to computer networks, database and equipment) owned, licensed, leased or used by the Provider or its affiliates ("Required Technology"), Provider shall provide or cause to be provided limited access to such Required Technology, subject to the (x) satisfaction of any security requirements and (y) ongoing compliance with security, use, Virus protection, disaster recovery, confidentiality and other policies, procedures, and limitations of Provider and its affiliates, as they may be amended from time to time.  Recipient shall, and shall cause its personnel having access to the Required Technology to, comply with Provider's security guidelines and procedures (including physical security, network access, internet security, confidentiality and personal data security guidelines and procedures) and use Virus protection, disaster recovery and other policies, procedures and limitations of Provider, as they may be amended from time to time, that are applicable to the provision of any Service or access to any Facility.

(f)    While the Services are being provided hereunder, each Party shall take commercially reasonable measures to ensure that, in connection with the provision of any Services, no Virus or similar items are coded or introduced into either its own (including its affiliates') or the other Party's (including its affiliates') computer networks or databases.  If, in connection with the provision of any Services, a Virus is found to have been introduced into such computer networks or databases, each Party shall use commercially reasonable efforts to cooperate and to diligently work together with the other Party to eliminate the effects of such Virus.  The Parties shall, and shall cause their respective personnel and any Third Party Service Providers to, exercise commercially reasonable care to prevent unauthorized Persons from accessing the Services, or the computer and technology systems or networks of any of Provider or its affiliates.

(g)    Provider shall, and shall cause each of its affiliates to, use commercially reasonable efforts to maintain appropriate personnel required to provide the Services; provided that Provider shall not be required to hire any additional employees or consultants, to pay overtime to employees, or to acquire any additional equipment or software to provide any Service hereunder, or to pay any costs and expenses associated with those activities.

(h)    Throughout the term of this Agreement, (i) Provider and Recipient shall cooperate with one another and use their good faith and commercially reasonable efforts to effect the efficient and timely provision and receipt of the Services, and (ii) Recipient shall use its good faith and commercially reasonable efforts to transition away and wind down its use of the Services.

3

(i)    Each Party shall maintain its records (including financial and accounting services) regarding the Services and this Agreement in a proper, complete and accurate manner.  Each Party agrees to provide such records requested by the other Party as reasonably necessary to facilitate the ongoing provision of Services and for the requesting Party's financial accounting purposes.

(j)    Recipient shall make available on a timely basis to Provider all information and materials reasonably requested by Provider to enable it to provide the Services and shall provide reasonable access to Provider to Recipient's premises to the extent necessary for the purpose of providing the Services.

(k)    This Agreement shall not, except as explicitly set forth in this Agreement, assign any rights to technology or intellectual property between the parties hereto.

(l)    Notwithstanding anything to the contrary contained in this Agreement, Provider shall have no obligation to provide or cause to be provided any Service to the extent the performance of the Service would (i) render Provider in breach of a third party agreement, (ii) constitute a violation of applicable Law, including any requirement of any Governmental Body, or (iii) require Provider to obtain any third party consents (but Provider will reasonably assist Recipient in obtaining any such consents). If Provider cannot provide any Service for one or more of the reasons described above in this <u>Section 2(l)</u>, Provider shall provide Recipient with written notice thereof (together with a reasonable description of such Service and the applicable breach or violation). Upon receipt of such notice, Recipient may request that Provider (x) cooperate with Recipient to determine an alternative manner for the provision of any such Service or (y) assist in the mitigation of such loss of Service; <u>provided</u>, <u>however</u>, that Provider shall not have any obligation to incur any expenses (and shall be reimbursed by Recipient for same) or reimburse any expenses of Recipient in connection with its obligations under clauses (x) and (y).

3.    COSTS AND DISBURSEMENTS; PAYMENTS

(a)    Any Service to be provided by Provider hereunder shall be charged to Recipient (such charges the "<u>Service Charges</u>") at a cost equal to Provider's fully-loaded costs and expenses for providing such Service or causing the Third Party Service Providers to provide such Services ("<u>Provider's Cost</u>") (which, to the extent known as of the date hereof, are set forth on <u>Schedule A</u> across from the corresponding Services) plus 10% of Provider's Cost.  Service Charges shall include value-added taxes and all other taxes payable in respect of the provision of Services other than taxes imposed on the net income of Provider.  If Provider is required by Law, or to otherwise avoid legal penalties under Law, to pay, directly or indirectly, to an affiliate any transfer pricing markup or equivalent cost in order to deliver a Service, then such transfer pricing markup or cost shall be included in the relevant Service Charges, unless such mark-up or cost is subsequently recoverable by Provider.  Service Charges may increase or decrease (but shall in any event be determined in accordance with the applicable methodology set forth in <u>Schedule A</u>), including as a result of (i) an increase or decrease in the amount of such

4

Services being provided to Recipient (as compared to the amount of Services underlying the determination of a Service Charge), (ii) an increase or decrease in the rates or charges imposed by a Third Party Service Provider in providing the Services on Provider's behalf (as compared to the rates or charges underlying a Service Charge), (iii) an increase or decrease in the payroll or benefits (excluding severance) for any employees used by the Provider in providing the Services or (iv) any increase or decrease in costs relating to any changes requested by Recipient in the nature of Services provided (including relating to newly installed products or equipment or any upgrades to existing products or equipment).

(b)    Provider shall deliver an invoice to Recipient on a monthly basis (or, at the option of Provider, at such other frequency as is consistent with the basis on which the Service Charges are determined and, if applicable, charged to affiliates of Provider) in arrears for the Service Charges due to Provider under this Agreement. Recipient shall pay the amount of such invoice by wire transfer or check to Provider within fifteen (15) days of the date of such invoice as instructed by Provider; provided that to the extent consistent with past practice with respect to Services rendered outside the United States, payments may be made in local currency, at the option of Provider.  If Recipient fails to pay such amount by such date, Recipient shall be obligated to pay Provider, in addition to the amount due, interest at an interest rate of 1% per month over the Prime Rate, compounded semi-annually, accruing from the date the payment was due through the date of actual payment.  As soon as practicable after receipt of any reasonable written request by Recipient, Provider shall provide Recipient with data and documentation reasonably satisfactory to Recipient supporting the calculation of a particular Service Charge for the purpose of verifying the accuracy of such calculation. If, after reviewing such data and documentation, Recipient disagrees with Provider's calculation of any amount due to Provider, then the disagreement shall be considered a Dispute and the Parties shall follow the dispute resolution procedures set forth in Section 9 hereof.

(c)    Recipient shall pay the full amount of costs and disbursements incurred under this Agreement, and shall not set-off, counterclaim or otherwise withhold any other amount owed to Provider on account of any obligation owed by Provider to Recipient.

4.    DISCLAIMER FOR WARRANTIES; COMPLIANCE WITH APPLICABLE LAWS

(a)    Except as expressly set forth herein, the parties hereto acknowledge and agree that the Services are provided as-is, that Recipient assumes all risks and liabilities arising from or relating to its use of and reliance upon the Services and Provider makes no representation or warranty with respect thereto.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, PROVIDER HEREBY EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY,

5

MERCHANTABILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE.

(b)     Each of the Parties agrees to comply with all applicable Laws as they apply to the performance of such Party's obligations under this Agreement.

5.     LIMITATION ON LIABILITY

(a)     Neither Provider, its directors, officers and employees, and their affiliates, agents, advisors, consultants and representatives, including without limitation, the Third Party Service Providers (collectively, the "Provider Group") shall have any liability in contract, tort or otherwise, for or in connection with (a) the provision of Services to Recipient by any member of the Provider Group or (b) actions taken or omissions by the Provider Group in connection with the provision of Services, in each case, except to the extent that Recipient suffers Losses that result from any member of the Provider Group's gross negligence, willful misconduct or bad faith.  Without limiting the generality of the foregoing, the Provider Group will have no liability for any action or inaction taken or made in reliance upon the terms of this Agreement or at the direction or with the agreement of Recipient.  Recipient shall irrevocably waive any claim against any one or more members of Provider Group for Losses contemplated under this Section 5(a) if it does not provide written notice of such claim to Provider by the latest of (i) the date that is six (6) months after the termination of this Agreement; or (ii) the date that is six (6) months after Recipient becomes or ought to have become aware of the facts giving rise to such claim.

(b)     Notwithstanding any other provision contained in this Agreement, (i) the aggregate liability of Provider and its affiliates with respect to this Agreement shall not exceed the aggregate amount of Service Charges paid hereunder to Provider and (ii) no Party shall be liable for any exemplary, special, indirect, punitive, incidental or consequential losses, damages or expenses, including any damages due to business interruption or loss of profits.

6.     NOTICE

All notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, by electronic mail, or by overnight courier, to the addresses listed below, or to such other addresses as Provider may specify from time to time in writing.  Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth Business Day after deposit in the U.S. mail, postage prepaid and (b) overnight courier shall be deemed delivered on the next Business Day.

If to Recipient:

WCAS Fraser Sullivan Investment Management, LLC
400 Madison Avenue, 9th Floor
New York, NY 10017
Attention:  John Fraser

6

or by facsimile to: (212) 339-5402
or by email to:  john@frasersullivan.com

With a copy (which shall not constitute notice) to:

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022-4689
Attention: L. Kevin Sheridan, Jr.
or by email to:  Kevin.sheridan@bingham.com

If to Provider:

LAMCO LLC
1271 Avenue of the Americas
New York, New York 10020
Attention: Doug Lambert and Jeffrey Sell
or by facsimile to: (646) 285-9320
or by email to:
doug.lambert@lamcollc.com and
Jeffrey.sell@lamcollc.com

and

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention: Martha Solinger and Thomas Hommel
or by facsimile to: (646) 285-9337
or by email to:
Martha.solinger@lehmanholdings.com and
Thomas.hommel@lehmanholdings.com

And with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:     Jacqueline Marcus
or by facsimile to: (212) 310-8007
or by email to: Jacqueline.marcus@weil.com

7.    EXPENSES

Each of the Parties shall pay its own costs and expenses in connection
with the negotiation and execution of this Agreement.

7

8.     TERMINATION

The term of this Agreement shall commence as of the date hereof. Provider's obligation to provide any Service listed on <u>Schedule A</u> shall terminate upon the earliest to occur of (i) the date set forth next to such Service on <u>Schedule A</u>, (ii) such other date as mutually agreed upon by Provider and Recipient, (iii) Recipient's material breach of this Agreement and, if such breach is capable of being cured, Recipient's failure to cure such breach within fifteen (15) days of receipt of written notice from Provider identifying the alleged breach in reasonable detail (to the extent practicable under the circumstances) and requesting that it be cured, (iv) a termination of the Asset Management Agreement pursuant to Section 18 thereof, or (v) 120 days after the Effective Date.  The provisions of <u>Sections 4</u> through <u>16</u> hereof shall continue after termination.

9.     DISPUTE RESOLUTION

(a)     In the event of any dispute, controversy or claim arising out of or relating to the transactions contemplated by this Agreement, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including claims seeking redress or asserting rights under any Law (each, a "<u>Dispute</u>"), the Parties agree that Provider and Recipient (or such other Persons as Provider and Recipient may designate) shall negotiate in good faith in an attempt to resolve such Dispute amicably.  If such Dispute has not been resolved to the mutual satisfaction of Provider and Recipient within 10 days after the initial notice of the Dispute (or such longer period as the Parties may agree), then, a senior executive on behalf of Provider and a senior executive on behalf of Recipient shall negotiate in good faith in an attempt to resolve such Dispute for an additional 10 days (or such longer period as such parties may agree).  If such Dispute has not been finally resolved at the end of such 10-day period, then either party may pursue remedies in accordance with <u>Section 10</u>.  Notwithstanding the foregoing, Provider shall have no obligation to comply with this <u>Section 9</u> before exercising any rights or remedies to obtain interim or injunctive relief.

(b)     In any Dispute regarding the amount of a Service Charge, if after such Dispute is finally adjudicated pursuant to the dispute resolution and/or judicial process set forth in this <u>Section 9</u> or <u>Section 10</u>, it is determined that the Service Charge that Provider has invoiced Recipient, and that Recipient has paid to Provider, is greater or less than the amount that the Service Charge should have been, then (i) if it is determined that Recipient has overpaid the Service Charge, Provider shall within two Business Days after such determination reimburse Recipient an amount of cash equal to such overpayment, plus 1% per month over the Prime Rate, compounded semi-annually, accruing from the date of payment by Recipient to the time of reimbursement by Provider and (ii) if it is determined that Recipient has underpaid the Service Charge, Recipient shall within two Business Days after such determination reimburse Provider an amount of cash equal to such underpayment, plus 1% per month over the Prime Rate, compounded semi-annually, accruing from the date such payment originally should have been made by Recipient to the time of reimbursement by Recipient.

10.     GOVERNING LAW; SUBMISSION TO JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER OF JURY TRIAL.

(a)     THIS AGREEMENT, AND ALL CLAIMS OR CAUSES OF ACTION (WHETHER IN CONTRACT OR TORT) THAT MAY BE BASED UPON, ARISE OUT OF OR RELATE TO THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT), OR THE NEGOTIATION, EXECUTION OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY AMENDMENT, SUPPLEMENT OR WAIVER OF THIS AGREEMENT) AND THE TRANSACTIONS CONTEMPLATED HEREBY, SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK.

(b)     EACH OF THE PARTIES:

(1)     SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (MANHATTAN) OVER ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, AND AGREES THAT ALL CLAIMS IN RESPECT OF SUCH DISPUTE OR ANY SUIT, ACTION OR PROCEEDING RELATED THERETO MAY BE HEARD AND DETERMINED IN SUCH COURTS; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY CASES HAVE CLOSED, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK SITTING IN NEW YORK COUNTY OR THE COMMERCIAL DIVISION, CIVIL BRANCH OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND ANY APPELLATE COURT FROM ANY THEREOF, FOR THE RESOLUTION OF ANY SUCH CLAIM OR DISPUTE.

(2)     WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE;

(3)     AGREES THAT A JUDGMENT IN ANY SUCH
DISPUTE MAY BE ENFORCED IN OTHER
JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN
ANY OTHER MANNER PROVIDED BY LAW;

(4)     IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO
TRIAL BY JURY IN ANY LEGAL PROCEEDINGS
ARISING OUT OF OR RELATED TO THIS
AGREEMENT; AND

(5)     CONSENTS TO PROCESS BEING SERVED BY ANY
PARTY TO THIS AGREEMENT IN ANY SUIT,
ACTION OR PROCEEDING BY THE DELIVERY OF A
COPY THEREOF IN ACCORDANCE WITH THE
PROVISIONS OF <u>SECTION 6</u> HEREOF.

11.     HEADINGS

The headings to the various paragraphs of this Agreement shall have been
inserted for convenient reference only and shall not modify, define, limit or expand the
expressed provisions of this Agreement.

12.     ASSIGNMENT; BINDING EFFECT; NO THIRD PARTY
BENEFICIARIES

Neither this Agreement nor any of the rights, interests or obligations under
this Agreement shall be assigned, in whole or in part, directly or indirectly, including by
operation of law, by any of the Parties without the prior written consent of the Parties in
such Party's sole discretion, and any such assignment that is attempted without such
consent shall be null and void.  Subject to the preceding sentence, this Agreement shall
be binding upon, inure to the benefit of, and be enforceable by the Parties and their
respective successors and permitted assigns.  Except as expressly provided in <u>Section 5</u>
hereof, nothing in this Agreement shall create or be deemed to create any third party
beneficiary rights in any Person that is not a Party to this Agreement other than in respect
of the affiliates of Provider, which shall provide Services in accordance with the terms of
this Agreement.

13.     CONFIDENTIALITY

Except as required by applicable Law, the Parties agree to (i) maintain the
confidentiality of the terms of this Agreement and (ii) maintain the confidentiality of all
information and materials relating to the provision of Services under this Agreement (the
"<u>Service Information</u>").  The Parties will use their commercially reasonable efforts to
cause their respective controlled affiliates to maintain the confidentiality of the terms of
this Agreement and the Service Information.  The Parties will notify prospective Third
Party Service Providers that any Service Information is to be kept confidential, if not
already so marked.

10

14.    AMENDMENT AND WAIVERS

Neither this Agreement nor any provision hereof may be waived, amended, modified or terminated except pursuant to an agreement or agreements in writing entered into by the Parties.

15.    SEVERABILITY

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

16.    COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be an original but all of which shall constitute one instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or other means of electronic transmission (including via portable document format (pdf) transmission) shall be as effective as delivery of a manually executed counterpart of this Agreement.

[*The remainder of this page is intentionally left blank*]

11

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized officers as of the date first set forth above.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
    Name:
    Title:

LAMCO LLC

By:_____
Name:
Title:

WCAS │ FRASER SULLIVAN
INVESTMENT MANAGEMENT, INC.

By: _____
    Name:
    Title:

**SCHEDULE A – SERVICES**

| | SERVICE TO BE PROVIDED | DATE SUCH SERVICE WILL TERMINATE | FULLY LOADED COSTS AND EXPENSES |
|---|---|---|---|
| **RECORDS AND FILES** | 1.  Provider will transfer a copy of all physical or electronic files that it owns and which were used primarily in connection with the Managed Assets.  To the extent there are files warehoused by the Third Party Service Providers, Provider will use commercially reasonable efforts to facilitate transfer of a copy of those files.<br><br>2.  Cooperation between Recipient's IT consultant and Provider liaison to ensure an orderly and complete transition and transfer of agreed information. | 1.  When completed<br><br><br><br><br><br>2.  When completed | 1.  Provider to pay the Third Party Service Provider's Costs.<br><br><br><br><br>2.  Not applicable |
| **OCCUPANCY** | 1.  Recipient will be provided occupancy and all related services at the existing office space at 1271 Avenue of the Americas, New York, NY 10020-1300 (the "New York Office") or 111 Old Broad Street, London, EC2N 1LP, United Kingdom (the "London Office").  Occupancy to be charged on a total of 450 square feet in New York and a total of 150 square feet in London. | 1.  Earlier of move-out date from the New York Office or the London Office or December 31, 2011. | 1.  $65 per square foot per year on 450 square feet in New York, or £61 per square foot per year on 150 square feet in London plus £15 per person per month for the cost of consumables, such as stationary.  Payable monthly in advance to Provider. |

| | **SERVICE TO BE PROVIDED** | **DATE SUCH SERVICE WILL TERMINATE** | **FULLY LOADED COSTS AND EXPENSES** |
|---|---|---|---|
| **INFORMATION TECHNOLOGY** | 1. IT services will be provided to Recipient for as long as Recipient continues to occupy the office space used by them at the New York Office or the London Office. IT services to include software and licenses,[1] data and email services and storage,[2] including one Bloomberg terminal, Microsoft Office and Outlook, remote access, office telephony, printers and related supplies, LCD News and CreditSights subscriptions, IT services and maintenance, in each case, to the extent such services are available to the Identified Client Employees of Provider. No upgrades to equipment or applications will be provided. | Earlier of move-out date from the New York Office or the London Office or December 31, 2011. Date can be extended with Provider approval. | The cost and expense of the Information Technology services (excluding Bloomberg terminal and news subscriptions, which are set forth below) is $1,000 per person employed in the New York Office per month, and £520 per person employed in the London Office per month.<br><br>The cost of access to one Bloomberg terminal is $1,730 per month.<br><br>The cost of news subscriptions is $250 per person per month. |

---

[1] Software licenses are covered out of New York; therefore, monthly Information Technology costs out of New York covers software licenses in London.

[2] Historical email data will be made available only as necessary and only upon written request.

| | SERVICE TO BE PROVIDED | DATE SUCH SERVICE WILL TERMINATE | FULLY LOADED COSTS AND EXPENSES |
|---|---|---|---|
| | | | All such costs shall be payable monthly in advance to Provider. Recipient to be reimbursed pro rata if it vacates the New York Office or London Office before month end. |
| | 2.  Blackberry service will be supported for as long as Recipient continues to occupy the office space used by them at the New York Office or the London Office.  Recipient will be required to assume the blackberry contract when they vacate the New York Office or the London Office and assume all payments under the contract for service incurred after move-out and Provider will use commercially reasonable efforts to facilitate such transfer.  If Recipient chooses not to assume the Blackberry contract then Recipient will reimburse Provider for the remaining payments under the contract or pay the termination fee under the contract. | 1.  Earlier of move-out date from the New York Office or the London Office or December 31, 2011.  Date can be extended with Provider approval. | 1. Blackberry service costs included in general "Information Technology" costs above. |
| | 3.  "@lamcollc.co.uk.com" and "@lamcollc.com" Email Forwarding:  Provider to forward any emails received to new Recipient email addresses. | 3.  90 days after move-out from the New York Office York or the London Office. | 3.  Payable monthly in advance to Provider at a rate of $125 per person per month in New York and £78 per person per month in London. |

| | | SERVICE TO BE PROVIDED | DATE SUCH SERVICE WILL TERMINATE | FULLY LOADED COSTS AND EXPENSES |
|---|---|---|---|---|
| | | 4.  Telephone Number Porting:  Provider to facilitate the porting of "646" DIDs [●]) to Recipient's office in New York. | 4.  When completed at or around move-out from the New York Office. | 4.  Any third party costs and Provider costs with no mark-up to be covered by Recipient |
| | | 5.  Mail Forwarding:  Provider to provide mail forwarding to Recipient from the New York Office or the London Office to new address. | 1.  90 days after move-out from either the New York Office or the London Office. | 1.  Not applicable |
| EMPLOYEE BENEFITS: | | 1.  Provider will provide (i) the infrastructure to ensure the maintenance and continuity of payroll to transferring employees in London; and (ii) the insurance and benefit coverage under all employee benefit plans, policies, programs and arrangements that such transferring employees in London received prior to the Effective Date, provided that Recipient pre-funds all associated costs and expenses to Provider; it being understood that neither Provider nor any of its affiliates shall be responsible for payment of any compensation to such transferred employees, tax expenses or liabilities to taxing authorities relating to Recipient or such employees, associated with the period after the Effective Date. | 1.  December 31, 2011 or earlier if terminated by Recipient. | 1.  £127 per person employed in the London office per month. |

**EXHIBIT B**

**Teaser**

US_ACTIVE:\43714894\16\58399.0008

**Lazard has been engaged to seek proposals relating to its Client's portfolio of corporate loans, with the aim of maximizing current monetization and returns, mitigating risk and reducing portfolio management costs**

### OVERVIEW OF TRANSACTION

- **Client is seeking proposals from Asset Managers regarding the management of Client's portfolio of corporate loans**
  - Such proposal would likely be memorialized in an Asset Management Agreement
- **A potential proposal framework may include:**
  - A commitment from the Asset Manager to execute one (or more) Collateralized Loan Obligation ("CLO") transactions (likely in excess of $2bn), in order to monetize a significant portion of the loan portfolio
    - Client would retain 100% of the equity of the CLO(s)
  - Agreement by Asset Manager to manage loans that were not included in the CLO(s)
- **Client will require governance and control rights with respect to both CLO and non-CLO loans. Specifically, the Client requires approval rights for all activities except for de minimis amendments and trades.**
- **Client seeks an Asset Manager with a "hold to maturity" investment strategy**
- **Client seeks an Asset Manager who will provide continuity of management of the portfolio, which will include**:
  - Employing a team of employees of Client, who are based in the U.S. and the U.K. and have experience managing the loan portfolio
  - If the Asset Manager has New York or London offices (or both), integrating the team into such office(s) and, if necessary, for the office(s) that it does not have, establishing one or both office(s) for purposes of housing the team to manage Client's portfolio

### PORTFOLIO SUMMARY

- **Loan portfolio contains ~$5bn of funded loans**
  - High yield and high grade corporate loans, SPVs and securitizations, junior debt & equity (obtained through restructuring processes)
- **~200 borrowers (75% North American / 25% European and Middle Eastern)**
- **Weighted average maturity of ~3.5 years**
- **Credit metrics: WARF of ~2500 (B1/B2 area)**

### PROCESS OVERVIEW

- If you are interested in participating in the process, please send an affirmative indications of interest via email, to each of the below listed contacts on or before <u>5pm ET on May 13, 2011</u>
- Asset Managers who have indicated their interest will be required to execute a confidentiality agreement and, upon execution of such, will receive a copy of the Client's Request for Proposal ("RFP") for review and response
- Asset Managers who receive an RFP and are interested in further participation in the process are required to send a written response to the RFP via email, to each of the below listed contacts on or before <u>5pm ET on May 27, 2011</u>
- Based on a review of each response to the RFP, the Client may select Asset Manager(s) to submit, for its consideration, terms for a proposed transaction and will provide certain information related to the loan portfolio to assist Asset Manager(s) in doing so

### CONTACT DETAILS

**Lazard Frères & Co. LLC**
30 Rockefeller Plaza
New York, NY 10020

| | |
|---|---|
| **Matthew P. Whiting** | **Felix S Leslie** |
| *Director* | *Vice President* |
| matthew.whiting@lazard.com | felix.leslie@lazard.com |

*The information herein has been prepared by Lazard based upon information supplied by the Client or publicly available information. We have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for any independent verification of such information or any independent valuation or appraisal of any of the assets or liabilities of the Client, or any other entity, or concerning solvency or fair value of the Client or any other entity. Lazard make no representation or warranty to you, express or implied, with respect to the Company or the accuracy, completeness or adequacy of the information contained herein, any due diligence materials provided, or any publicly available information. These materials and the information contained herein are confidential and may not be disclosed publicly or made available to third parties. These materials shall not constitute an offer to sell or the solicitation of an offer to buy any securities.*



**EXHIBIT C**

**Request for Proposal**

HIGHLY CONFIDENTIAL | **MAY 2011** |

## MANAGEMENT OF LOAN PORTFOLIO

# Request for Information and Proposal

*The information herein has been prepared by Lazard based upon information supplied by Lehman Brothers Holdings Inc. (the "Client") or publicly available information. We have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for any independent verification of such information or any independent valuation or appraisal of any of the assets or liabilities of the Client, or any other entity, or concerning solvency or fair value of the Client or any other entity. Lazard make no representation or warranty to you, express or implied, with respect to the Company or the accuracy, completeness or adequacy of the information contained herein, any due diligence materials provided, or any publicly available information. These materials and the information contained herein are confidential and may not be disclosed publicly or made available to third parties. These materials shall not constitute an offer to sell or the solicitation of an offer to buy any securities.*



REQUEST FOR INFORMATION AND PROPOSAL

Our client, Lehman Brothers Holdings Inc. and its affiliates (collectively, "Lehman"), is evaluating strategies and alternatives for a corporate loan portfolio with the aim of maximizing value, minimizing risk and lowering management overhead costs.

Lehman is seeking proposals from experienced asset managers for such alternatives. Your responses to this Request for Proposal ("RFP") will be evaluated by Lehman and it advisors. Key criteria for selection include your firm's asset management capabilities, execution experience and ability to meet other requirements of Lehman. Based on your responses to this RFP, Lehman will determine whether or not to pursue a transaction with you.

Any transaction will be subject to bankruptcy court approval

## OVERVIEW OF CORPORATE LOAN PORTFOLIO

- **Loan portfolio contains ~$5bn of funded loans and ~$1.5bn unfunded loans**
  - High yield and high grade corporate loans, SPVs and securitizations, junior debt and equity securities (obtained through restructuring processes)
- **Approximately 200 borrowers**
  - 75% North American / 25% European and Middle Eastern
- **Weighted average maturity of ~3.5 years**
- **Credit metrics: WARF of ~2500 (B1/B2 area)**

## REQUEST FOR INFORMATION AND PROPOSAL

1. **Regarding your firm's ability and qualifications to manage a corporate loan portfolio, please provide:**

   1.1. **An overview of your firm, including but not limited to:**

      (a) Investment results

      (b) Investment philosophy and strategy

      (c) Available resources, including number and location of offices, number of employees, portfolio manager experience

      (d) Capabilities and experience regarding management of European and Middle Eastern credits

      (e) Relevant experience with on-boarding third-party loan assets

      (f) Internal credit rating and monitoring systems, including description of protocols and practices

      (g) Management experience or capabilities managing third-party loan assets or CLO/securitized vehicles

      (h) Loan workout capabilities and experience, including strategy for stressed/distressed credits

      (i) Manager's access to capital, including affiliation with and support from any private equity or other investor(s)

   1.2. **An overview of current corporate loan portfolio, including but not limited to:**

      (a) Funded loans by value, number of borrowers and geographic distribution

      (b) Unfunded loan commitments by amount, number of borrowers and geographic distribution
         - Method of monitoring unfunded loan commitments

(c) Number of funded loans and loan commitments covered by each portfolio manager

(d) If relevant, breakdown of loan portfolio by investment vehicle

**1.3. Overview of your firm's securitization experience, whether through a CLO or other structures**

(a) Describe manager's securitization experience

(b) Describe any recently completed CLO transactions, including acquisition of CLO management agreements or CLO offerings

- Provide relevant details, including summary structure and terms, investor demand and equity raised

- Identify underwriter/arranger for CLOs and securitizations effected since 2009

(c) For managed CLOs, describe manager track record statistics, including distributions to equity and IRRs

**2. Regarding your firm's potential proposal for alternatives regarding Lehman's corporate loan portfolio**

**2.1. Does your firm anticipate making a proposal to actively manage the corporate loan portfolio by including certain of the loan portfolio in a newly formed CLO(s) along with managing the loans not included in the CLO vehicle(s)?**

If <u>yes</u>:

(a) Subject to market conditions and due diligence and assuming eligibility of loans to be included, indicate whether you anticipate committing to effect one or more CLO(s) in excess of $2.0bn in assets

(b) Your firm's likely portfolio status reporting protocols:

- Frequency of reports
- Form of reports

(c) Subject to due diligence, your firm's anticipated willingness and ability to adhere to the form of governance protocols described in <u>Schedule A</u> attached hereto

- If any, a description of any concerns or likely required modifications to the protocols

(d) Describe your firm's proposed approach to ensuring continuity of management of the portfolio of corporate loans:

- Subject to due diligence, your firm's willingness and ability to hire and integrate a team of approximately 15 people who comprise the credit management team that currently manages the corporate loan portfolio (the "Credit Management Team")

- Subject to due diligence, your firm's willingness to hire the Credit Management Team for at least 3 years

If <u>no</u>:

(e) Subject to due diligence, describe alternative approaches that may be reflected in your firm's proposal, including

- Description of potential alternative transaction(s), in as much detail as possible, including

  - How your firm anticipates that such alternative(s) will address Lehman's aims as set out above

- Your firm's experience and capabilities in undertaking such transactions

- The results of such transactions

(f) Your firm's likely portfolio status reporting protocols:
- Frequency of reports
- Form of reports

(g) Subject to due diligence, your firm's anticipated willingness and ability to adhere to the form of governance protocols described in <u>Schedule A</u> attached hereto
- If any, a description of any concerns or likely required modifications to the protocols

(h) Describe your firm's proposed approach to ensuring continuity of management of the portfolio of corporate loans, and as a potential approach:
- Subject to due diligence, your firm's willingness and ability to hire and integrate the Credit Management Team
- Subject to due diligence, your firm's willingness to hire such managers for 3 years or more

### 3. Regarding your firm's willingness and ability to either open certain offices from which to manage Lehman's loan portfolio or to integrate the Credit Management Team into existing offices

#### 3.1. Does your firm currently have a London office?

If <u>yes</u>:

(a) Please describe such London operations, including:
- Location
- Number of employees
- Loan portfolio managed by such office, including dollar value of such loans, number of borrowers, dollar amount of committed but unfunded loans
- Any other European office(s)

(b) Subject to due diligence, is your firm willing and able to manage Lehman's European and Middle Eastern loan portfolio from such office(s), including:
- Your firm's willingness and ability to hire and integrate five members of the Credit Management Team who currently manage Lehman's European and Middle Eastern loan portfolio

If <u>no</u>:

(c) Subject to due diligence, is your firm willing to open a London office to manage Lehman's European and Middle Eastern loan portfolio?
- Describe how your firm plans to meet operational and regulatory requirements attendant to opening such office
- How long do you estimate that it would take to open such office?

#### 3.2. Does your firm currently have a New York office?

If <u>yes</u>:

(a) Please describe such New York operations, including:
- Location
- Number of employees

- Loan portfolio managed by such office, including dollar value of such loans, number of borrowers, dollar amount of committed but unfunded loans
- Any other U.S. office(s)

(b)   Subject to due diligence, is your firm willing and able to manage Lehman's U.S. loan portfolio from such office(s), including:

- Your firm's willingness and ability to hire and integrate ten members of the Credit Management Team who currently manage Lehman's U.S. loan portfolio

If <u>no</u>:

(c)   Subject to due diligence, is your firm willing to open a New York office to manage Lehman's U.S. loan portfolio?

- Describe how your firm plans to meet operational and regulatory requirements attendant to opening such office
- How long do you estimate that it would take to open such office?

## NEXT STEPS, OVERVIEW OF DUE DILIGENCE AND CONTACT DETAILS

- **In order to proceed, you are required to send a written response to the RFP via email, to each of the below listed contacts on or before 5pm ET on May 27, 2011**
- **Based on a review of the response to the RFP, Lehman may select one or more asset manager(s) to submit, for Lehman's consideration, terms for a proposed transaction and will provide certain information related to the loan portfolio to assist the asset manager(s) in doing so**
- **Lehman anticipates that such information may include:**
  - Profiles of the Lehman corporate loan portfolio by:
    - Geography
    - Industry
    - Credit rating
    - Maturity
    - Amount
    - Interest rate
    - Facility description
  - Data regarding the members of the Credit Management Team
  - Details on certain required or preferred terms and conditions relating to management of the Lehman corporate loan portfolio
  - Information about the identity of the borrowers will be provided at a later stage in the process

### CONTACT DETAILS

**Lazard Frères & Co. LLC**
30 Rockefeller Plaza
New York, NY 10020

| **Matthew P. Whiting** | **Felix S Leslie** |
|---|---|
| *Director* | *Vice President* |
| matthew.whiting@lazard.com | felix.leslie@lazard.com |

REQUEST FOR INFORMATION AND PROPOSAL

## SCHEDULE A: FORM OF LOAN MANAGEMENT GOVERNANCE PROTOCOLS

| Activity | CLO Assets | | Non-CLO Assets | |
|---|---|---|---|---|
| | Face Amount | Approval | Face Amount | Approval |
| **Technical Amendments (affirmative, non-financial covenant, non 100% vote)** | Under $20mm | Manager | Under $2mm | Manager |
| | $20mm or more | Estate/A&M | $2mm or more | Estate/A&M |
| **Covenant Amendments (negative and financial)** | Under $5mm | Manager | Under $2mm | Manager |
| | $5mm or more | Estate/A&M | $2mm or more | Estate/A&M |
| **New Commitments or Fundings, 100% Covenant Amendments, Maturity Extensions, Release of Collateral** | Under $2mm | Manager | Any Amount | Estate/A&M |
| | $2mm or more | Estate/A&M | | |
| **Restructurings & Debt Exchanges (reduction of principal, debt forgiveness and/or conversion)** | Under $2mm | Manager | Any amount | Estate/A&M |
| | $2mm or more | Estate/A&M | | |
| **Trade/Sell Loans At No Loss (defined as last two-month avg. mark)** | Under $25mm | Manager | No greater than $5mm | Manager |
| **Trade/Sell Loans At Loss** | If no greater than 50 bps below last two-month average mark <u>and</u> Face Amount under $10mm, Manager Approval | | If no greater than 200 bps below last two-month average mark <u>and</u> Face Amount under $2mm, Manager Approval | |
| **Trade/Sell Loans: All Other** | Estate/A&M Approval | | Estate/A&M Approval | |

**EXHIBIT D**

**Side Letter**

2

Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, NY 10020

July 26, 2011

WCAS | Fraser Sullivan
Investment Management, LLC
400 Madison Avenue
New York, NY 10017
Attention: John Fraser

Dear John:

Reference is made to the Asset Management Agreement (the "Agreement"), dated as of the date hereof, by and between Lehman Brothers Holdings Inc. ("Lehman") and WCAS | Fraser Sullivan Investment Management, LLC ("Fraser Sullivan"). To the extent not otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Agreement.

This letter will confirm that if the Agreement is terminated pursuant to Section 18(b)(i) or Section 18(b)(ii) as a result of the Motion being denied by the Bankruptcy Court or the Agreement not going into effect by the Outside Date, respectively, Lehman shall file a motion with the Bankruptcy Court seeking authority to reimburse Fraser Sullivan for its out-of-pocket, documented and reasonable costs and expenses up to $500,000 incurred in connection with the negotiation, documentation and execution of the Agreement. We have also agreed to provide Fraser Sullivan with a reasonable opportunity to review such motion prior to its filing.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Name: DOUGLAS J LAMBERT
Title: S VP

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                    :        Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                 :        08-13555 (JMP)
                                                         :
                              Debtors.                   :        (Jointly Administered)
-------------------------------------------------------------------x

<div align="center">

**ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE
BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY
PROCEDURE 2002 AND 6004 AUTHORIZING THE DEBTORS
TO (I) ENTER INTO AN ASSET MANAGEMENT AGREEMENT FOR
THE MANAGEMENT OF THE DEBTORS' COMMERCIAL LOAN PORTFOLIO
AND  (II) SELL COMMERCIAL LOANS TO SPECIAL PURPOSE ENTITIES IN
CONNECTION WITH THE ISSUANCE OF COLLATERALIZED LOAN OBLIGATIONS**

</div>

Upon the motion, dated July 27, 2011 (the "Motion"),[1] of Lehman Brothers Holdings

Inc. ("LBHI"), Lehman Commercial Paper Inc. ("LCPI") and their affiliated debtors in the above

referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors"),

pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004

authorizing the Debtors to enter into the Asset Management Agreement and to sell commercial

loans to issuers of collateralized loan obligations, and related relief, as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in

accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy

Judges for the Southern District of New York Any and All Proceedings Under Title 11, dated July

10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being

a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been

provided in accordance with the procedures set forth in the second amended order entered

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

June 17, 2010 governing case management and administrative procedures [Docket No. 9635];  and

a reasonable opportunity to object or be heard regarding the Motion having been afforded to all

such parties; and it appearing that no other or further notice need be provided; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors, their

estates and their creditors and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is hereby:

ORDERED that the Motion is GRANTED; and it is further

ORDERED that, pursuant to sections 105 and 363 of the Bankruptcy Code and

Bankruptcy Rules 2002 and 6004, the Asset Management Agreement is approved and the Debtors

are authorized to take all actions contemplated thereby; and it is further

ORDERED that as and when the Debtors determine it is appropriate, the Debtors are

authorized to sell loans to CLO Issuers (or to one or more subsidiaries of the Debtors that will sell

the loans to the CLO Issuers), and to take all other actions necessary, and pay all other fees and

expenses necessary to form the CLO Issuers and execute one or more CLO transactions; and it is

further

ORDERED that, pursuant to section 363(f) of the Bankruptcy Code, the Debtors'

right, title, and interest in the loans sold to the CLO Issuers shall be sold to the CLO Issuers free and

clear of any and all liens, claims, and encumbrances; and it is further

ORDERED that to the extent the Debtors, or one or more subsidiaries of the Debtors,

sell loans to the CLO Issuers and execute CLO transactions consistent with the terms set forth on

Schedule C to the Asset Management Agreement, the transfers of the loans will constitute true sales

of the loans; and it is further

ORDERED that upon the purchase of the loans from the Debtors, or one or more

subsidiaries of the Debtors, on the terms set forth on Schedule C to the Asset Purchase Agreement,

the CLO Issuers will be good faith purchasers and are granted the protections provided to a good

faith purchaser under section 363(m) of the Bankruptcy Code and consummation of the sales of the

loans shall not be affected by reversal or modification on any appeal of this Order; and it is further

ORDERED that the Debtors are authorized to perform all obligations under the

Asset Management Agreement and any agreements related to the creation and execution of the

CLOs and to execute such other documents and take such other actions as may be necessary or

appropriate to effectuate the Asset Management Agreement and the CLO transactions and the

provisions of this Order; and it is further

ORDERED that the respective rights and obligations of each of the Debtors and their

non-Debtor affiliates regarding their loans shall be preserved in the transactions contemplated by

the Asset Management Agreement; specifically, for each loan beneficially owned by a Debtor or a

non-Debtor affiliate, such entity shall (a) continue to be entitled to receive collections of principal

or interest or other proceeds from such loans that are Non-CLO Assets, (b) retain the decision

making authority for any actions for which Fraser Sullivan is required to seek approval from

Lehman, (c) be entitled to receive the portion of the consideration paid by any CLO Issuer that

relates to its loans, (d) continue to be obligated for any future funding obligations, and (e) be

obligated  to pay its proportionate share of the fees payable to and expenses of Fraser Sullivan

incurred in connection with, and calculated pursuant to, the Asset Management Agreement; and it is

further

ORDERED that until the effective date of the Second Amended Plan, the Debtors will continue to comply with the existing protocols that require the Debtors to provide notice and/or obtain the consent of the Creditors' Committee prior to entering into certain types of specified transactions; and it is further

ORDERED that any stay imposed by Bankruptcy Rule 6004(h) is hereby waived and this Order shall be immediately effective and enforceable.

ORDERED that that this Court shall retain jurisdiction to interpret and enforce this Order.

Dated: August __, 2011
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE