WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                              :
In re                                         :   Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., et al.,        :   08-13555 (JMP)
                                              :
                       Debtors.               :   (Jointly Administered)
                                              :
                                              :
------------------------------------------------------------x
```

**DECLARATION OF DOUGLAS LAMBERT IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY
CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004 FOR
AUTHORIZATION TO (I) ENTER INTO AN ASSET MANAGEMENT AGREEMENT
FOR THE MANAGEMENT OF THE DEBTORS' COMMERCIAL LOAN PORTFOLIO
AND (II) SELL COMMERCIAL LOANS TO SPECIAL PURPOSE ENTITIES IN
<u>CONNECTION WITH THE ISSUANCE OF COLLATERALIZED LOAN OBLIGATIONS</u>**

Pursuant to 28 U.S.C. § 1746, I, Douglas Lambert, declare:

1. I am over the age of 18 years and make these statements of my own personal knowledge. If called to testify, I could testify to the truth of the matters set forth herein.

2. I submit this declaration in support of the *Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6004 for Authorization to (I) Enter Into an Asset Management Agreement for the Management of the Debtors' Commercial Loan Portfolio and (II) Sell Commercial Loans to Special Purpose Entities in*

*Connection with the Issuance of Collateralized Loan Obligations* (the "<u>Motion</u>"),[1] dated July 27, 2011, of Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc., and their affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "<u>Debtors</u>").

3.  I am a Managing Director with Alvarez and Marsal ("<u>A&M</u>"). I was assigned to the Lehman matter on October 1, 2008. My areas of responsibility include managing the combined loan book and the bank platform assets of the Debtors. I am also the Chief Executive Officer of Lamco, LLC. I am familiar with the Debtors' portfolio of commercial loans and have overseen a team that has been managing the Commercial Loan Portfolio since October 2008. I have participated in the decision-making regarding the Debtors' decision to hire Fraser Sullivan to manage the Commercial Loan Portfolio (as defined below) and to execute and sell loans to CLOs. I worked with my A&M colleague Tom Baldasare in the selection of the appropriate asset manager for the Commercial Loan Portfolio and the negotiation of the terms of a potential transaction.

### The Commercial Loan Portfolio

4.  As of July 15, 2011, the Debtors, together with various non-Debtor entities under the Debtors' corporate control held commercial loans issued by or equity interests in 157 borrowers with an aggregate outstanding principal balance of approximately $3.8 billion as well as unfunded commitments in the approximate amount of $1.5 billion (the "<u>Commercial Loan Portfolio</u>"). The loans and equity interests in the Commercial Loan Portfolio are held (either directly or through participations) by the following Debtor and non-Debtor affiliated entities in the following approximate amounts:

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

| Entity | Notional Amount of Loans and Market Value of Equity |
|---|---|
| LBHI | $70.5 million |
| LCPI | $1,920.1 million |
| LBSF | $23.1 million |
| LB 1 Group | $4.1 million |
| Spruce | $197.8 million |
| Verano | $435.0 million |
| Racers | $1,143.4 million |

Many of the loans do not mature for several years. Approximately 30% of the Commercial Loan Portfolio is not scheduled to mature until 2016 or later. One of the Debtors' goals in their chapter 11 cases has been to make distributions to creditors in an expeditious manner. Holding the loans until maturity may allow the Debtors to recover the par value of such loans; however, this strategy would delay a significant portion of distributions to creditors.

5.   In an effort to generate cash and accelerate distributions to creditors beginning promptly following the effective date of the Second Amended Plan, the Debtors considered selling the loans individually or selling the entire Commercial Loan Portfolio. However, due to the size of the Commercial Loan Portfolio, a sale of individual loans would flood the market with supply of commercial loans which could decrease the prices. Moreover, the Debtors hold large positions in certain of the commercial loans, which could be difficult to sell at favorable prices. The current market prices for many of the loans in the Commercial Loan Portfolio are less than the amount the Debtors expect to recover if the loans are held to maturity, and

therefore, the Debtors determined not to proceed to sell the Commercial Loan Portfolio as a whole, or through sales of individual loans.

6. The Debtors also considered pledging the Commercial Loan Portfolio as collateral for a traditional secured loan. Under my supervision, the Debtors discussed a transaction of this type with two large banks. However, the interest rates the banks proposed to charge on the loan did not make this an economically attractive option. Moreover, the amount that the banks would have been willing to lend to the Debtors against the Commercial Loan Portfolio would not have generated the amount of cash the Debtors are seeking to raise in order to accelerate distributions.

7. Another common financing technique we considered was securitizing the Commercial Loan Portfolio. In consultation with various employees at LAMCO and A&M, I determined that the best overall means for the Debtors to receive the greatest recovery on the Commercial Loan Portfolio and to monetize the Commercial Loan Portfolio in a timely manner would be for the Debtors to establish and execute one or more CLO transactions. If the Debtors execute any CLO transactions, the Debtors will sell certain loans to a special purpose entity (the "CLO Issuer") that will hold the loans and will issue multiple tranches of securities, with varying priority, credit ratings and interest rates, to third-party investors. The CLO Issuer collects the proceeds of the loans and, based on a specified priority of payments and terms of each security, distributes such proceeds to the noteholders. The cash collected by the CLO Issuer from the sale of the notes (less certain expenses incurred in connection with the creation of the CLO Issuer and the sale of the notes) will be paid to the Debtors or their non-Debtor affiliates in exchange for the loans. Also as consideration for the loans, the CLO Issuer will issue equity securities to the applicable Debtors or non-Debtor affiliates which will entitle the seller to receive any upside in the value of the Commercial Loan Portfolio.

8.     The expenses of the creation and maintenance of the CLO transaction are less than the cost of the asset-backed loan proposed by the two banks. Based upon discussions with Fraser Sullivan, I estimate that, based on market conditions and the composition of the Commercial Loan Portfolio as of July 15, 2011, the Debtors will receive approximately $1.6 to 2.0 billion in cash from the proceeds received from sale of the multiple tranches of securities issued by CLO Issuers, which can be used to make distributions to creditors promptly following the effective date of the Second Amended Plan. Also, based on discussions with Fraser Sullivan, I estimate that loans in the Commercial Loan Portfolio (based on its composition as of July 15, 2011) with an outstanding principal balance of approximately $1.6 billion will not be included in any CLO (the "Non-CLO Assets").

### Management of The Commercial Loan Portfolio

9.     Currently, the Commercial Loan Portfolio is managed by LAMCO. The costs of having LAMCO manage the Commercial Loan Portfolio include compensation to employees, subscriptions to news and loan information services and office space, among others. As the outstanding principal amount of the loans in the Commercial Loan Portfolio winds down, many of these costs will remain fixed.

10.    I determined that it was in the best interests of the Debtors to hire a third party to manage the Commercial Loan Portfolio. The Debtors' current cost structure does not provide for a reduction of costs as the Commercial Loan Portfolio winds down. The management fee that Fraser Sullivan proposed to charge for management of the loans not included in CLOs is 30 basis points per annum on the aggregate outstanding amount (or value in certain circumstances) of the assets under management. While the management fee payable with respect to the CLO Assets will not be established until a particular CLO is launched, the Asset Management Agreement

provides that the management fee paid by the applicable CLO Issuer to Fraser Sullivan for the CLO Assets is expected to be 25 basis points per annum on the outstanding principal amount of the CLO Assets. Since the fees are tied to the outstanding amount of the loans under management, the fees will decrease as the loans are repaid. The aggregate management fees the Debtors and the CLO Issuers will pay to Fraser Sullivan for management of the Commercial Loan Portfolio will be approximately (a) $3 million for the period from September 1, 2011 through December 31, 2011, (b) $9 million the 2012 calendar year and (c) $8 million for the 2013 calendar year.[2] Fraser Sullivan's fees, together with the Debtors' remaining fixed costs relating to the Commercial Loan Portfolio will increase the Debtors' overall costs related to the Commercial Loan Portfolio, but not in a material amount.

11. In addition, as the Commercial Loan Portfolio runs off it will be difficult for LAMCO to pay salaries that will incentivize key LAMCO employees to remain when such employees may have alternative opportunities. Inasmuch as the need to actively manage the loans remains notwithstanding the reduced outstanding amount of the loans, if LAMCO cannot retain its key employees, it will have to sell the balance of the Commercial Loan Portfolio at a discount. If the estate were required to take a 15% discount off of the face amount of the remaining loans in order to fully monetize the portfolio in 2016, I estimate that could amount to a loss of approximately $174 million.

---

[2] The actual amount may vary depending on when the CLOs are closed and whether any of the loans are repaid prior to their maturity dates.

**The Selection of Fraser Sullivan to Manage the Commercial Loan Portfolio and the CLOs**

12.     In my opinion, entering into the Asset Management Agreement and hiring Fraser Sullivan to manage the Commercial Loan Portfolio is in the best interest of the Debtors' estates. In accordance with a process designed by Lazard, the Debtors solicited offers from nine firms, representing a cross-section of asset managers, for the opportunity to manage the Commercial Loan Portfolio. One firm voluntarily withdrew from the process. The Debtors eliminated two firms based on discussions with and information provided by such firms. One firm was eliminated because it was not willing to comply with the Debtors' required consent rights with respect to the management of the Commercial Loan Portfolio. The other firm was eliminated because it did not have the requisite experience managing commercial loan portfolios of the scale of the Commercial Loan Portfolio. Along with my A&M colleagues, I reviewed and evaluated each of the offers from the remaining six firms. Although the Portfolio Management Team met with all six remaining firms as part of the diligence process, they did not receive copies of the responses to the "Requests for Proposals" or term sheets or participate in the selection process. I considered many factors, including: (a) the willingness of the firm to hire the Portfolio Management Team; (b) the experience and expertise of the firm in the management of commercial loans and execution of CLOs; (c) the amount of the fees; and (d) the willingness of the firm to agree to the Debtors' reporting requirements and required consent rights with regard to the management of the loans. In consultation with Lazard, I determined that Fraser Sullivan's overall offer was better for the Debtors than any other offer submitted to the Debtors. I shared my conclusion with Houlihan Lokey, financial advisor to the Creditors' Committee.

13.     Over the life of the Commercial Loan Portfolio, the fees that will be paid to Fraser Sullivan under the Asset Management Agreement are less than the fees that would have been

paid by the Debtors had they selected most of the other firms that submitted proposals. While some firms submitted offers with fees that were in the aggregate less than Fraser Sullivan's fees for the management of the Commercial Loan Portfolio, such firms were not willing to hire the Portfolio Management Team. The willingness of Fraser Sullivan to agree to hire the Portfolio Management Team was critical to the Debtors' selection of Fraser Sullivan. The Portfolio Management Team is extremely knowledgeable about the loans in the Commercial Loan Portfolio and has developed relationships with many of the borrowers and other syndicated lenders. In addition, the Portfolio Management Team is well versed in the Debtors' strategies for maximizing the value of the loans. A sudden change in the personnel managing the loans would impair the performance of the Commercial Loan Portfolio and decrease the estates' ultimate recoveries from the Commercial Loan Portfolio.

14.     The difference between Fraser Sullivan's fees and the fees proposed by other firms does not outweigh the benefits to the Debtors' estates from the continuity of management. In my business judgment, Fraser Sullivan's offer is the best offer the Debtors received for the management of the Commercial Loan Portfolio.

15.     I have reviewed the terms of the Asset Management Agreement and believe that such terms were negotiated vigorously in good faith and that the Asset Management Agreement is in the best interests of the Debtors' estates.

**Sale of Loans to CLO Issuers**

16.     In connection with the execution of CLOs, the Debtors will sell loans to the CLO Issuers in exchange for the cash received by the CLO Issuers (less certain costs, expenses and the funding of reserve accounts) plus the economic equity interests in the CLO Issuers. Inasmuch as the Debtors are receiving the economic equity interests, the cash component of the purchase

price that the Debtors receive from the sale of the loans to the CLO Issuers is not critical to determining the value received by the Debtors for the loans. A decrease in the cash component of the purchase price will result in an increase in the anticipated recoveries on the equity in the CLO Issuers. Therefore, the only effect of the cash component of the purchase price is the time at which the Debtors will receive the cash. The Debtors' goal is to maximize the cash component of the purchase price to enable the Debtors to accelerate distributions to creditors; however, the purchase price will ultimately be determined by the market conditions.

17.     Due to the manner in which CLOs are executed, it is commercially impractical for the Debtors to seek Court approval of the terms of each sale of loans to a CLO Issuer. The terms of CLOs, including, the purchase price for the loans, the amount and priority of securities issued, and the rating of the securities, among other terms, are determined only a short time prior to the closing of a CLO transaction. Because of possible market volatility, investors in CLO securities would be reluctant to commit to purchase securities, the issuance of which is dependent upon a court approval process.

## **Conclusion**

18.     The respective rights and obligations of each of the Debtors and their non-Debtor affiliates regarding their loans will be preserved in the transactions contemplated by the Asset Management Agreement. Specifically, for each loan beneficially owned by a Debtor or a non-Debtor affiliate, such Lehman entity will (a) continue to be entitled to receive collections of principal, interest or other proceeds from such loans that are Non-CLO Assets, (b) retain the decision making authority for any actions for which Fraser Sullivan is required to seek approval from Lehman, (c) be entitled to receive the portion of the consideration paid by any CLO Issuer that relates to its loans, (d) continue to be obligated for any future funding obligations, and (e) be

obligated to pay its proportionate share of the fees to and expenses of Fraser Sullivan incurred in connection with, and calculated pursuant to, the Asset Management Agreement. The Asset Management Agreement will not have any effect on the current custody arrangements for the loans or on the manner in which collections on the loans will be administered and accounted for.

19. The Asset Management Agreement and the sale of certain loans to CLO Issuers should be approved. The consummation of the transactions will result in the Debtors monetizing a significant portion of the Commercial Loan Portfolio, while retaining the upside from any increase in value of the Commercial Loan Portfolio. In my business judgment, these transactions are in the best interests of the Debtors' estates.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 27th day of July 2011.

/s/ Douglas Lambert
Douglas Lambert