# EXHIBIT C

FOR PUBLICATION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ :    Chapter 11
                                               :
In re                                        :    Case No. 08-13555 (JMP)
                                       :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    (Jointly Administered)
                                       :
           Debtors.                     :
                                       :
------------------------------------------------------------ :
                                       :
In re                                        :
                                        :    Case No. 08-01420 (JMP) SIPA
LEHMAN BROTHERS INC.,               :
                                        :
           Debtor.                      :
                                        :
------------------------------------------------------------ :

**OPINION ON MOTIONS SEEKING MODIFICATION OF THE SALE ORDER PURSUANT TO RULE 60(B), THE TRUSTEE'S MOTION FOR RELIEF UNDER THE SIPA SALE ORDER, BARCLAYS' CROSS-MOTION TO ENFORCE THE SALE ORDERS AND ADJUDICATION OF RELATED ADVERSARY PROCEEDINGS**

JONES DAY
*Attorneys for Lehman Brothers Holdings Inc., et al.*
222 East 41st Street
New York, New York 10017

      Robert W. Gaffey, Esq.
      Jayant W. Tambe, Esq.
      William J. Hine, Esq.
      Tracy V. Schaffer, Esq.

QUINN EMANUEL URQUHART & SULLIVAN LLP
*Special Counsel to the Official Committee of Unsecured*
*Creditors of Lehman Brothers Holdings Inc., et al.*
51 Madison Avenue, 22nd Floor
New York, New York 10010

> Susheel Kirpalani, Esq.
> James C. Tecce, Esq.
> Eric M. Kay, Esq.
> Robert K. Dakis, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
One Battery Park Plaza
New York, New York 10004-1482

> William R. Maguire, Esq.
> Seth D. Rothman, Esq.
> Neil J. Oxford, Esq.

HUGHES HUBBARD & REED LLP
*Attorneys for James W. Giddens, as*
*Trustee for the SIPA Liquidation of Lehman Brothers Inc.*
1775 I Street, N.W., Suite 600
Washington, D.C. 20006

> John F. Wood, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
575 Lexington Avenue
New York, New York 10022

> Jonathan D. Schiller, Esq.
> Jack G. Stern, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015

> Hamish P. M. Hume, Esq.

BOIES, SCHILLER & FLEXNER LLP
*Attorneys for Barclays Capital Inc.*
333 Main Street
Armonk, New York 10504

    David Boies, Esq.

U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for U.S. Securities and Exchange Commission*
100 F Street, N.E.
Washington, D.C. 20549-8030B

    Jacob H. Stillman, Solicitor
    Katharine B. Gresham, Assistant General Counsel
    Mark Pennington, Assistant General Counsel
    Dimple Gupta, Attorney

U.S. SECURITIES AND EXCHANGE COMMISSION
*Attorneys for the U.S. Securities and Exchange Commission*
3 World Financial Center
New York, New York 10281

    Alistaire Bambach, Esq.
    Patricia Schrage, Esq.

SECURITIES INVESTOR PROTECTION CORPORATION
*Attorneys for the Securities Investor Protection Corporation*
805 15th Street, N.W., Suite 800
Washington, D.C. 20005

    Josephine Wang, General Counsel
    Kenneth J. Caputo, Senior Associate General Counsel

**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

## I.   <u>Introduction</u>

*A.   Overview of Opinion*

    These matters arise out of the hurried, at times harried and now challenged sale of assets

to Barclays Capital Inc. ("Barclays") under Section 363 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code").  Before the Court are motions for relief under Federal

Rule of Civil Procedure 60(b) (the "60(b) Motions") from the order approving the sale to

Barclays entered on September 20, 2008 (the "Sale Order"), a related motion by Barclays to

secure delivery of certain undelivered assets (the "Disputed Assets") and three separate adversary

proceedings brought against Barclays by each of the moving parties (the "Movants[1]") that filed

the 60(b) Motions.  The proceedings have illuminated the factual background of the largest,

most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy

history – the sale to Barclays by Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers

Inc. ("LBI") and certain of their affiliates (together, "Lehman") of assets collectively comprising

the bulk of Lehman's North American investment banking and capital markets business (the

"Broker-Dealer Business").

     The lengthy trial provided an opportunity to review in slow motion and from multiple

vantage points the circumstances of an acquisition that had to proceed so very quickly due to the

need for speed to salvage the Broker-Dealer Business after LBHI's unplanned bankruptcy filing

on September 15, 2008.  The evidentiary hearings relating to the 60(b) Motions took place over a

thirty-four day period from April through October 2010.  Following the close of the record, the

parties submitted post-trial briefs and proposed findings of fact and conclusions of law in late

November.  These submissions are encyclopedic in their scope and attention to detail, and they

offer insights as to the motivations and behavior of many of the key actors during the most

momentous week of the greatest financial crisis of our lives.  The trial itself was a showcase of

outstanding advocacy uniformly conducted at the highest professional level.

---

[1] The Movants are Lehman Brothers Holdings Inc., the Official Committee of Unsecured Creditors (the
"Committee") and the Trustee of Lehman Brothers Inc. under the Securities Investor Protection Act (the "SIPA
Trustee").

Approximately thirteen billion dollars is at issue, but the amount in dispute is only one of the reasons that this litigation has attracted so much attention. Foundational principles of bankruptcy jurisprudence are also being tested. The 60(b) Motions constitute a most unusual after the fact challenge to the fairness of a transaction of global significance, a transformative business combination in the financial services industry that was accomplished at a time of fear and major dislocation in the markets. The resulting litigation is highly visible due to interest in the Lehman bankruptcy, the large sums involved and the extraordinary nature of the relief being sought. Because the 60(b) Motions seek to overcome the finality and binding effect of the Sale Order that was entered at the height of the financial crisis and *that has also been affirmed on appeal*, these motions are unprecedented in challenging the very same order that the Movants themselves (other than the Committee) defended throughout the appellate process.

The circumstances of these proceedings may be exceptional, but the core legal principles are familiar ones that are generally applicable in other chapter 11 cases. The issues governing the right to relief under Federal Rule of Civil Procedure 60(b) ("Rule 60(b)") are the same ones that might arise in any challenge to a final order authorizing a sale of assets under Section 363 of the Bankruptcy Code. These issues are grounded in the tension between the right of aggrieved parties to obtain relief from final orders for cause shown and the right of purchasers of assets from a chapter 11 debtor to rely with confidence on the integrity and enforceability of final sale orders that have been entered by the bankruptcy courts, especially those that have been affirmed following appellate review.

This tension relating to finality naturally exists to some extent in every motion under Rule 60(b), but the Court views final sale orders as falling within a select category of court order that may be worthy of greater protection from being upset by later motion practice. Sale orders

ordinarily should not be disturbed or subjected to challenges under Rule 60(b) unless there are

truly special circumstances that warrant judicial intervention and the granting of relief from the

binding effect of such orders. The Court is well aware, however, that the language of Rule 60(b)

setting forth grounds for relief from a final order has general application to all orders including

sale orders and that no order is exempt from this type of relief for cause shown.

This broadly framed right to relief under Rule 60(b) in the case of sale orders must be

balanced against the well-recognized bankruptcy policy that encourages third parties to buy

assets from debtors for the ultimate benefit of creditors and that protects third parties that have

purchased assets from a debtor in good faith reliance on an order of the bankruptcy court. A

basic question addressed in this Opinion is whether the Movants have shown sufficient special

circumstances to authorize the granting of relief from the Sale Order that was entered here in the

face of a profound emergency, that thereafter was affirmed by the United States District Court

for the Southern District of New York (the "District Court") and that Movants did not challenge

until one year later after the financial crisis of 2008 had subsided and markets had stabilized.

Because the Sale Order was the essential means to the end of completing this crucial acquisition,

the Court believes that something greater than ordinary mistake or inadvertence must be proven

to overcome the finality and binding effect of that order.

As explained in this opening narrative and in the following sections of this Opinion,

Movants have proven that some very significant information was left out of the record of the

hearing on Lehman's motion to approve the sale of the Broker-Dealer Business to Barclays held

on September 19, 2008 (the "Sale Hearing") — facts that in a more perfect hearing the Court

would have known. Despite what in retrospect appears to be a glaring problem of flawed

disclosure, Movants have not carried their burden in establishing a right to relief from the Sale

6

Order under Rule 60(b) because this new information would not have changed the outcome of

the Sale Hearing or altered the form and content of the Sale Order in any material respect.

Importantly, the failure to disclose material information in this case does not involve fraud,

misrepresentation or misconduct. If the evidence had demonstrated such improprieties and

abuses, relief under Rule 60(b) in all likelihood would have been granted.

     A number of the issues in dispute also depend upon the enforceability and interpretation

of a document dated September 20, 2008 and finalized on September 22, 2008. The parties

identify the document as the clarification letter (the "Clarification Letter"). The Clarification

Letter is identified in the text of the Sale Order and was in the early stages of being drafted when

that order was entered. The document went through a number of revisions during the weekend

immediately following the Sale Hearing, but the final form of the Clarification Letter was never

presented for bankruptcy court approval. Instead, the parties decided among themselves that

approval was not required and then caused the executed Clarification Letter to be filed on the

docket on September 22, 2008. Thereafter, the parties to this letter agreement relied upon the

document as if it had been approved under the original Sale Order and for all purposes treated

the Clarification Letter as a binding agreement. The Clarification Letter stands out as a critically

important transaction document that purports to change and "clarify" some fundamental terms of

that certain Asset Purchase Agreement dated as of September 16, 2008 among LBHI, LBI, LB

745 LLC and Barclays (together with the First Amendment To Asset Purchase Agreement, dated

September 19, 2008,[2] the "APA") even though it was not formally blessed by separate order.

     The failure to obtain such an order adds a layer of extra doubt to consideration of the

demands by Barclays to recover the Disputed Assets and leads to some nagging questions about

the enforceability and binding effect of what amounts to a vital side letter or amendment to the

---

[2] The First Amendment Clarifying Asset Purchase Agreement is referred to herein as the First Amendment.

APA – one never presented to the Court for approval – that makes major changes to the structure

of the acquisition and that affects property rights of entities that quite obviously are subject to the

Court's jurisdiction under the Bankruptcy Code and provisions of the Securities Investor

Protection Act of 1970 ("SIPA").

The Clarification Letter includes any number of clarifications that are really more than

that – they are important additions or alterations designed to match the documentation for the

transaction with the evolving business understandings of the parties.  Some of these provisions

are either radically different from anything presented at the Sale Hearing or in actual conflict

with statements made during that hearing.  This is a document that should have been subjected to

further judicial oversight, either to confirm that it was in fact covered by the language of the

existing Sale Order or to obtain express bankruptcy court approval for these agreed changes to

the APA.  The Court has little doubt that such a further hearing would have been requested if

there had not been such inordinate timing pressure to immediately close the acquisition.

Despite the lack of explicit bankruptcy court approval and in recognition of the conduct

of the parties in relying on the Clarification Letter as a controlling document, the Court has

decided to treat the document as having been approved by virtue of the combination of

references made to the Clarification Letter in the Sale Order and the conduct of the parties

demonstrating unequivocal reliance on the document.  Consequently, the Clarification Letter is

enforceable and will be interpreted in a manner that is consistent with the record of the Sale

Hearing.  That record makes clear that Lehman cash is excluded from the purchase and does not

expressly mention certain additional categories of assets that were specified for the first time in

drafting the Clarification Letter.  These newly described assets were identified or discovered on

the morning of the Sale Hearing in the course of a final search by Barclays for additional assets

8

(the so-called "asset scramble").  The asset scramble yielded the three disputed asset classes that are now the subject of the motion by Barclays to compel delivery of the Disputed Assets.  These assets, described more fully below, are the 15c3-3 assets (the "15c3-3 Assets"), margin related to exchange traded derivatives (the "Margin Assets") and assets in clearance boxes (the "Clearance Box Assets").

The Court denies relief under Rule 60(b) to the Movants, grants the motion of Barclays to recover the Clearance Box Assets, and denies that motion as it relates to the Margin Assets and the 15c3-3 Assets.  The decision to deny 60(b) relief is based on the failure of the Movants to show that the outcome of the Sale Hearing would have been different if all material facts (including those relating to the structure of the transaction and the value of the acquired assets) had been disclosed.  The determination of the motion by Barclays to recover the Disputed Assets depends upon a nuanced interpretation of the Clarification Letter in light of the record of the Sale Hearing, the language of the document and extrinsic evidence concerning the negotiation and drafting of that language.  The immediately following sections of this Introduction provide observations regarding a number of the key issues presented in this litigation.

B.    *The 60(b) Motions Have Emphasized Information That the Court Did Not Know and Should Have Known, But This Information Would Not Have Changed the Outcome of the Sale Hearing*

The 60(b) Motions rest on the proposition that the Court was not fully informed when it entered the Sale Order approving the sale of the Broker-Dealer Business and that Barclays, with the active and complicit assistance of certain senior executives of Lehman with allegedly conflicting loyalties, ended up with too favorable a deal during a period of market turmoil, uncertainty and confusion.  Stated simply, the 60(b) Motions allege that Barclays should forfeit the protections of the Sale Order, even though that order is final and has been affirmed on

9

appeal, because it achieved a substantial windfall gain as a result of buying financial assets at a

deep discount from fair value to the detriment of all creditors of the Lehman estates. These

motions are premised on the troubling notion that material information relating both to the value

of the assets being sold and the means for implementing the transaction was not disclosed to the

Court. Barclays disagrees strongly with this assertion and submits that the Court acted properly

and was given all necessary evidence under the exigent circumstances to approve the sale, that

the 60(b) Motions should be denied in all respects and that Barclays should be awarded the

Disputed Assets.

Barclays points out, among other things, that the Movants knew about the so-called

discount yet chose to align themselves with Barclays and steadfastly supported the Sale Order

throughout the appellate process that led to the decision of the District Court affirming the Sale

Order. Barclays has portrayed the Movants as parties who were content to accept the obvious

benefits of the Sale Order while the markets were unsettled during the early stages of the

bankruptcy case and who now are pursuing claims for incremental consideration from Barclays

after the markets have recovered and it has become safe for them to seek extraordinary relief.

Barclays has denied that there are legally sufficient grounds to support such relief and has

explained that the acquisition was structured from the outset to include a favorable spread

between long and short positions (described by its senior officers as a "buffer"), that this feature

of the transaction was publicly disclosed immediately after signing of the APA (although not

disclosed in so many words to the Court), that its acquisition balance sheet (the "Acquisition

Balance Sheet") fairly reflects sound valuation and accounting judgments made after

consultation with its independent auditors and that its multi-billion dollar gain on acquisition

reflected the negative goodwill of a business combination that, from the perspective of Barclays,

always was intended to be capital accretive and to include an assortment of intangible assets that
were of no value to the estate after filing for bankruptcy and were not separately valued at the
time of the acquisition.

The urgent sale to Barclays took place during the terribly stressful days immediately
following LBHI's bankruptcy filing and was one of the landmark events of the extraordinary
week from September 15 through September 22, 2008 (labeled by the Court as "Lehman Week"
for purposes of this Opinion). At the time, the transaction was regarded by many as an
admirable, even heroic, achievement that helped to salvage jobs, preserve going concern values
and provide for the orderly transition of many thousands of brokerage accounts to a financially
secure firm with the resources to manage and service the financial assets held in those accounts.
The widely-held belief was that without the virtually immediate rescue by Barclays the direct
and indirect damage to Lehman, its customers, creditors, and the entire financial system resulting
from the bankruptcy would have been even more devastating. The perception during Lehman
Week was that the transaction with Barclays benefitted all interested parties, mitigated systemic
risk and helped to save every one of us from an even greater economic calamity. Nothing in the
voluminous record presented to the Court in these protracted proceedings has done anything to
change that undeniably correct perception.

The sale was the only available transaction at a time of unrivaled worldwide financial
distress bordering on panic. The APA needed to be approved, not conditionally with exposure to
the potential risks of hindsight challenges, but absolutely and finally. In exercising its discretion
to approve the transaction described in the APA, the Court recognized that it was dealing with an
uncommon emergency but is satisfied that it still managed to comply with all applicable
requirements of the Bankruptcy Code and of procedural due process. The District Court

11

affirmed the correctness of that conclusion in an appeal in which the Movants collectively

supported (or, in the case of the Committee, did not oppose) this Court's approval of the sale.

The 60(b) Motions do, however, prompt the Court to engage now in a careful inquiry as

to whether what was not disclosed regarding the transaction so impaired the Court's ability to

properly evaluate the overall fairness of the terms of the acquisition that Barclays should lose the

protections of the Sale Order and become exposed to multi-billion dollar claims for additional

consideration. Having dwelled at some length on this question, the Court concludes that nothing

in the current record, if presented at the Sale Hearing, would have changed the outcome of that

hearing. The Court still would have entered the very same Sale Order because there was no

better alternative and, perhaps most importantly, because the sale to Barclays was the means both

to avoid a potentially disastrous piecemeal liquidation and to save thousands of jobs in the

troubled financial services industry.

C.     *The Broker-Dealer Business Had to Be Sold in a Great Hurry to Save Jobs, Preserve
        Going Concern Value and Minimize Claims Against the Estate*

The APA represented the best possible alternative for Lehman's employees at a time

when the proverbial "ice cube" was melting. The Court knew that the Broker-Dealer Business

was being sold to the one buyer in a position to employ thousands, to protect customers and to

maintain the on-going operations of what had been Lehman's core business. While it is true that

a number of highly relevant and clearly important disclosures were not made at the Sale Hearing,

those failures to disclose are far outweighed by the fact that the Court was well enough informed

to approve the acquisition with complete confidence that it was better than any alternative.

Indeed, it was the only alternative.

Effective management of a financial services business requires a highly-skilled

workforce. That was true for Lehman, and the value of its Broker-Dealer Business depended

upon the relationships, sophisticated knowledge and experience of that workforce.  In the

aftermath of the bankruptcy filing, employees were leaving the firm in great numbers, and

without a going concern sale that provided assurances of continued employment, there would be

nothing left for Lehman to sell other than a substantial book of assets discounted by the

distressed circumstances of a liquidation sale in a most uncertain market.  That reality and the

desire to save the enterprise drove the professionals responsible for documenting the acquisition

to work under extraordinary time pressure to accomplish within a few days what ordinarily

would take weeks or longer.

Knowing that approval of the transaction would save a multitude of financial sector jobs

probably was the most significant single factor influencing the Court's thinking when it

considered the sale.  The transaction included offers of employment to most members of the

Lehman work force that not only helped these individuals at a most difficult time on Wall Street,

but also unquestionably was good for the estate, brokerage customers and the general economy.

A going concern sale to Barclays also was the one way to eliminate claims of employees for lost

wages and benefits as well as claims of counterparties for potential damages arising under a

variety of executory contracts with Lehman.  Assumption of these obligations by Barclays meant

that the Lehman bankruptcy estate would avoid exposure to liability for many claims that could

only be estimated.

The trial has focused attention on whether the estimates in the APA for these

compensation and cure expenses ("comp and cure") were inflated as part of a conscious effort to

make it appear that Barclays was paying more for the acquired assets, but the Court has not given

much weight to this evidence in its current deliberations.  It is true that the estimates were

incorrect and turned out to be excessive in relation to the actual amounts paid by Barclays for

comp and cure, but the Court did not rely on the pinpoint accuracy of these estimates when it approved the sale to Barclays (although it did believe that the numbers provided were reasonable and represented the best good faith estimates of potential exposure at the time). The number provided for cure costs turned out to be materially overstated and unreliable, but the Court does not conclude that the discrepancy is the result of a deliberate effort to make it appear that Barclays would be paying more for these liabilities. What mattered most to the Court about comp and cure was the knowledge that Barclays was picking up all of these expenses, whatever they might turn out to be, thereby satisfying the entire universe of comp and cure claims that might otherwise have been asserted against the estate.

D.    *Context Matters, and the Urgency of Lehman Week Is an Inescapable Factor Impacting Both the Expedited Approval of the Sale to Barclays and the Decision Not to Revisit that Sale Now*

The sale to Barclays was and remains to this day truly extraordinary in that Barclays, without prior planning, agreed to purchase the Broker-Dealer Business almost immediately after the bankruptcy filing, and the sale process itself was expedited to the point of raising some very real due process concerns. The Sale Order was entered only five days after commencement of the LBHI case and within hours after the filing of the LBI case. That is a speed that takes ordinary transactional coping skills to the breaking point and beyond. This was also all occurring at a time of market disruptions unlike anything ever experienced since the dawn of the age of electronic trading and globally connected markets, and sophisticated market participants were unsteady and losing their composure.

Lehman Week certainly was no ordinary week. Each day brought with it a new systemic shock. Merrill Lynch had just been sold to Bank of America in a hastily-arranged transaction. Lehman filed for bankruptcy relief in the early morning hours on September 15th (the "Filing

Date") after running out of options, and AIG was bailed out by the Federal Reserve the very next day. Seasoned observers too young to recall the Great Depression had never seen anything to match these disastrous events. By the end of the week, Goldman Sachs and Morgan Stanley had sought refuge under the Bank Holding Company Act to achieve greater operational stability and security. By virtue of astonishingly fast-moving market forces, venerable Wall Street institutions were toppling, being rescued or restructured on a daily basis. Financial counterparties had reason to distrust the soundness of blue chip firms with once seemingly unimpeachable credentials.

This loss of confidence was fueled by widespread skepticism concerning the underlying financial strength and reliability of balance sheets that included illiquid and hard-to-value securities backed by subprime assets. These securities and other structured financial products had been widely disseminated to financial institutions throughout the world. Just about every major bank had to make tough judgment calls as to the valuation of these highly-complex and now-suspect structures and faced questions as to the fair value of these assets. This difficult week ushered in an uncertain and volatile period when trust was in very short supply and incremental risk was something to be avoided.

At this very time of market turmoil and reduced tolerance for risk, Barclays chose to act boldly and seized the opportunity to greatly expand its business platform in North America. Barclays was particularly well situated to move forward opportunistically because in the days immediately preceding the Lehman bankruptcy, it had been engaged in intense negotiations to purchase Lehman's global business operations in their entirety. Those prepetition negotiations, while unsuccessful, served as a prelude to and essential preparation for a high-speed emergency

bankruptcy acquisition and placed Barclays in a uniquely advantageous position relative to any

other institution that might be interested in competing for the Lehman franchise.

After the bankruptcy, Barclays, at the suggestion of Lehman's President Bart McDade,

promptly renewed discussions regarding a possible acquisition and, by September 16, had come

to terms on the elements of a transaction in which it would purchase Lehman's investment

banking business as detailed in the terms and conditions of the APA. The impact of the

transaction was enormous for both parties. For Lehman, it meant a going concern sale that

would save the jobs of about ten thousand employees and allow for the orderly transfer of

customer accounts, thereby minimizing further market disruptions. For Barclays, it was a

strategic acquisition that, virtually overnight, would enable it to become a leading player in the

North American capital markets. Given the tumultuous and unpredictable state of the financial

markets at the time, this was a bold business decision for Barclays that required full-time

attention and immediate execution. Everything happened very quickly, and, in retrospect,

especially in light of all of the litigation that has ensued, perhaps too quickly.

The Broker-Dealer Business was "melting." Images of employees leaving with their

office possessions in cardboard boxes portrayed an unplanned exodus of the firm's human

resources; employees quite literally were walking out the door apparently with the expectation of

never returning. Lehman had a desperate need for an expedited sale to preserve jobs and to hold

on to what it could of its going concern value and the firm's intellectual capital. Barclays knew

that it had to act at once and that it had the luxury of leverage because achieving its strategic

objective was optional and would only occur on terms favorable to Barclays.

Barclays was unwilling to allow its transformative corporate vision to potentially impair

its own capital base, especially at a time of such unusual turbulence in the markets. Its board

16

instructed management that the transaction could only proceed if it were capital accretive. This directive from the board of Barclays was not communicated by anyone to the Court. The Court only knew what could be gleaned from pleadings, the statements of counsel and the evidence presented at the hearing to approve bidding procedures on September 17 (the "Bid Procedures Hearing") and the Sale Hearing that commenced on September 19 in the late afternoon and concluded in the early morning hours of September 20.

The Court knew while presiding at the Sale Hearing that everything was happening so fast that errors, omissions and miscommunications were bound to occur. Also, given the scale and complexity of the matters being presented and the limited time to process all of this information, it was impossible to fully comprehend every aspect of the acquisition, which had changed between the Bid Procedures Hearing on the 17th and the start of the Sale Hearing on afternoon of the 19th, or to precisely determine the fair value of all of the assets that were being transferred.

The Court has coined the term the "fog" of Lehman to characterize the confusion, ambiguity and uncertainty that prevailed during Lehman Week, something akin to the classic expression the "fog of war." Time was compressed and work was being performed under inordinately stressful conditions. Many of the smartest and most sophisticated people on Wall Street were confronting a frightening array of challenges and had to make decisions with imperfect information, draft documents and act so quickly that events began to blur.

As if describing a scene from a war zone, witness after witness during the trial conveyed recollections of personal experiences, perceptions and understandings during the chaos and confusion of Lehman Week. Repeatedly, witnesses described scenes in which countless unnamed individuals (lawyers, traders and bankers) participated in around-the-clock separate

negotiating sessions that were occurring simultaneously in multiple conference rooms at Lehman's headquarters building at 745 Seventh Avenue and the offices of Weil, Gotshal & Manges, Lehman's bankruptcy counsel. Coordination was difficult. Just about everyone involved during this catastrophic week also was sleep deprived and stressed out. No one individual possibly could have had a complete appreciation for what was taking place during these marathon negotiating and drafting sessions. Bart McDade, who served as Lehman's chief negotiator and Harvey Miller, Lehman's lead outside lawyer, probably come the closest to being the most fully informed at a senior level. They each tell a story of an honest effort to make the best of a very bad situation, and their testimony does not support relief from the Sale Order.

The APA and the Clarification Letter, the two most centrally important documents in this litigation, were generated during this highly-pressurized atmosphere described as organized chaos by Harvey Miller, a description validated by the testimony of other witnesses. Given the chaotic circumstances, some misunderstandings, mistakes and disagreements relating to the transaction in general and these two documents in particular were foreseeable, but the Court finds no support for the proposition that the resulting disclosure problems and disputes were caused by willful misconduct, deliberate misrepresentations or the intentional withholding or concealment of relevant information during the Sale Hearing. Instead, it appears that the failure to provide a coherent and complete narrative of the transaction was circumstantial and not due to any conscious decision to hide the truth. The need for speed, while not an excuse for inadequate disclosure, is the best explanation for those lapses in full disclosure at the Sale Hearing that have become the main focus of this litigation.

E.    *The Court Did Not Know About the "Buffer" Required By Barclays or the "Take Out" By*
      *Barclays of the New York Fed, But Knowledge of These Facts Would Not Have Affected*
      *the Sale Order*

Movants have changed from supporters to opponents on the basis of information about

the transaction that they assert came to light as a result of discovery conducted after the

conclusion of the appeal to the District Court. In particular, they argue that they are entitled to

relief from the Sale Order because the Court knew nothing about the existence of a multi-billion

dollar discount in the value of acquired financial assets and was not told about a major structural

change to the transaction involving the agreement by Barclays to "take out" Lehman's

obligations to the New York Federal Reserve Bank (the "New York Fed") under a repurchase

agreement that enabled Barclays to achieve its acquisition objective of a $5 billion "buffer"

between the value of acquired assets and related liabilities to the New York Fed.

Indisputably, facts regarding this "buffer" were not disclosed during the Sale Hearing, but

the Court has determined that the revelations on this subject are not entitled to much weight now

because the Court was not concerned, one way or the other, about the existence of a spread

between the value of assets and liabilities. The numbers involved, of course, are huge and

represent a significant potential recovery for the Movants. While evidence of the buffer is

indicative of material information that the Court did not know when it approved the sale, these

disclosures do not support relief from the Sale Order because the overall transaction with

Barclays, notwithstanding the buffer, provided the means for the most favorable disposition of

these assets with the least amount of risk.

At the Sale Hearing, no one represented that there was to be any rough equivalence

between the value of assets and liabilities, and the Court did not base its approval of the sale on

the concept of a "wash" or on any conclusion as to the reasonableness or presumed accuracy of

the $47.4 billion value ascribed to the loosely-described assortment of financial assets that was

being acquired by Barclays. Lori Fife, LBHI's counsel, mentioned that number at the start of the

Sale Hearing to illustrate the sharp and unexpected drop in value from the $70 billion figure that

had appeared a few days earlier in the APA, but that number was referenced only once in

colloquy as an indication of the terrible market conditions during Lehman Week and played no

role whatsoever in the deliberations regarding approval of the sale. That information, however,

did contribute to a greater sense of urgency to proceed immediately with the sale rather than to

run the risk of an even greater drop in values that might result from the forced liquidation of

these assets.

    The Court placed considerable reliance on the offers of proof and testimony that

supported approval of the sale and the emphatic endorsements of the transaction made in open

court by representatives of the federal regulators. These representatives of the regulators were

unanimous and unqualified in their support, and the unmistakable impression was that approval

of the APA with Barclays most definitely was in the public interest and was needed to contain

incremental systemic risk and to protect customers and creditors alike.

    Approval ultimately rested on the strength of a general proposition, supported by the

testimony of Barry Ridings of Lazard, that this going concern sale to Barclays manifestly was

more favorable than any other disposition of Lehman's assets. Mr. Ridings stands by that

testimony and offered the same opinion in his video deposition that was played during the trial.

The Court agrees with the position articulated by Barclays that the Court had an adequate record

to support all findings in the Sale Order and that the newly-presented facts, while very significant

to be sure, do not change the essence of the approval process and would not have made any

difference in the Court's ruling.

The Court concludes on the basis of the mostly congruent and consistent testimony of those who took part in the expedited negotiations of this acquisition that the APA and the Clarification Letter were the product of arm's-length negotiations, that Barclays acted in good faith (while still pressing hard for the very best deal it could get), and that mark-to-market valuation judgments during Lehman Week were uncertain at best due to extreme market volatility.  Whatever the Court did not know at the time about the specifics of the sale does not appear to have been withheld deliberately.

Greater transparency always is preferable but is not always feasible.  The conclusion reached here is that the disclosure that took place during the Sale Hearing was adequate under the circumstances and additional disclosure, while highly desirable, would not have made any difference in the outcome.  Also, in evaluating the evidence, the Court thinks that the mismatch in valuation is something of a red herring.  The Movants, in seeking relief from the Sale Order, have stressed what the Court did not know and the importance to the Court's deliberations of not having been told about the now-revealed five billion dollar mismatch between the values of the financial assets and related liabilities, but the Court, having reflected on its role during Lehman Week, is unconvinced that knowing about the mismatch would have changed anything.

While this was not an "anything goes" situation, the reality is that the transaction with Barclays would have been approved in any event because, taken as a whole, it was demonstrably better for all parties than any alternative, and no evidence has been presented to the contrary.  Importantly, the trial record makes clear that Barclays at all times intended for there to be a generous buffer in its favor with respect to the trading book of acquired financial assets but does not demonstrate that there was anything improper about the marking down of stale or inflated asset values or that the amount actually paid for these assets was less than reasonably equivalent

21

value at the time of the sale. That is one of the critical elements of proof missing from the trial

record – there has been a strong implication of duplicitous behavior by certain Lehman

employees or of preferential treatment having been shown to Barclays in the marking down of

the asset values, but it has not been established that the marking down process was arbitrary or

unfair under the atypical market conditions that prevailed during Lehman Week or, perhaps most

importantly, that the aggregate amount paid was not a fair price for these assets.

F.      *Movants Did Not Establish That Barclays Received an Unfair Gain on the Acquisition*

The Court was unimpressed with the opinion testimony presented by the entire team of

expert witnesses retained by the Movants who endeavored to show that Barclays realized a

multi-billion dollar windfall gain. Their opinions were based on a hindsight challenge to the

valuations ascribed to various categories of financial assets acquired by Barclays. These

opinions were effectively challenged on cross-examination and were not convincing. The

opinions, reflecting an unsurprising litigation bias, came across as having been designed and

manufactured for the trial and were not at all persuasive, particularly when compared with the

comprehensive and compelling testimony presented by Barclays' expert witness, Professor Paul

Pfleiderer.

The Court also does not believe that any Lehman employees breached their duties of

loyalty to the estate because of the prospect of future employment or as a consequence of signing

lucrative employment contracts with Barclays. That aspect of the Movants' case is built on a

faint aroma of venality and conflicted loyalty, but no breach of duty or other misconduct was

demonstrated. Despite the insinuations of wrongdoing, the Court concludes that the marking

down of asset values during Lehman Week appears to have been consistent with an attempt,

apparently undertaken in good faith, by employees of both Lehman and Barclays to estimate

market values for assets that were difficult to value at a time of extreme uncertainty in the
financial markets. Barclays also may have been endeavoring to increase its buffer and take
advantage of Lehman's vulnerable position at a time when its own negotiating leverage was at its
peak. That may well be true, but the Court does not find that Barclays received assets that
collectively were worth any more in the market than it paid for them.

The Court has made this determination notwithstanding the damaging testimony of
certain witnesses (Martin Kelly for one) from Barclays who were so thoroughly prepared for trial
that it damaged their own credibility. The evidence is clear that traders from Barclays engaged
in an exercise of discounting the value of assets before the Sale Hearing for purposes of lowering
the values assigned to various classes of assets and increasing the so-called "haircut" applicable
to these assets. These activities were a deliberate departure from customary mark-to-market
practices within Lehman and yielded what some have called "liquidation" values (although what
was actually meant by the use of that term is unclear). Movants have stressed that the Court was
not told about this unconventional procedure at the time of the Sale Hearing and have noted the
discrepancy between the term "book value" as used in the APA and these liquidation values that
were privately being developed by the traders. Their point is that Barclays acquired these assets
at an undisclosed discount from Lehman's own regularly updated internal valuations thereby
raising well-founded suspicions as to the fairness of the pricing from Lehman's perspective.

While these facts certainly raise disturbing questions about the accuracy of statements
made at the Sale Hearing as to the real reason that values assigned to the trading assets had
dropped from $70 billion to $47.4 billion, it has not been shown that this *ad hoc* reduction in
Lehman's marks resulted in a material understatement of realizable fair market values of the
assets within the trading book. This conclusion is bolstered by the fact that many of the assets

23

were complex structured financial products that were difficult to value with any degree of
confidence. The valuation witnesses offered by Barclays, including Stephen King who
impressed the Court with his knowledge of the subject matter, stressed that valuation judgments
as to many asset classes were uncertain and fraught with risk after the LBHI bankruptcy. Given
that uncertainty, the Court is unable to conclude that the "marking down" process, while facially
suspect, actually resulted in an arbitrary or unfair discount relative to fair market value for these
assets or that the discount caused the estate to lose any otherwise realizable value from these
assets.

Barclays' audited Acquisition Balance Sheet prepared under the direction of Gary
Romain is also consistent with a finding that Barclays received and accounted for assets that
were fairly valued (or at least not unfairly valued) and does not show any direct linkage between
the substantial gain on acquisition recognized by Barclays and the book of acquired trading
assets. The Acquisition Balance Sheet, with remarkable symmetry, happens to carry these
trading assets at the very same aggregate number ($45.5 billion) that had been assigned to the
assets as a result of the marking down process within Lehman immediately before the Sale
Hearing.

Movants have questioned the credibility of that astounding coincidence – and astounding
is the right word for it – and have intimated that the numbers used in the Acquisition Balance
Sheet must have been tweaked or adjusted by members of Barclays' Product Control Group as
part of a deliberate effort to lower the basis applicable to the acquired assets in order to create or
boost future trading profits, but it has not been shown by any direct evidence that the numbers
were manipulated in any way or that the Acquisition Balance Sheet is unreasonable in its
depiction of accounting reality, and Movants do not even attempt to show that the audited

financial statements of Barclays for the period in question are misleading. Movants have

expressed their doubts regarding the accounting treatment of the acquisition but have not

established that the treatment was inappropriate under applicable accounting standards.

G.    *Considering the Unequal Bargaining Positions, Barclays Structured a Favorable*
      *Acquisition for Itself That Did Not Take Unfair Advantage of Lehman*

The testimony of the most senior ranking executives from Barclays, former Chairman

John Varley and President (now Chairman) Robert Diamond, confirms that Barclays conditioned

the acquisition on the requirement that it be capital accretive and include substantial negative

good will by operation of applicable accounting principles in the United Kingdom. Barclays

always intended a transaction that would allow it to expand its operations in North America

while augmenting its own balance sheet and allowing it to realize a material first day gain on

acquisition. This self-interested but understandable business reality was not communicated to

the Court at any time during the Sale Hearing.

The Court believes that no bank, domestic or foreign, at the height of the financial crisis

of 2008, would have considered an acquisition such as this one that was not structured to

minimize risks to the buyer as much as possible, and the Court is not surprised that Barclays, in

pursuing this transformative transaction, was focused on its own objectives and took aggressive

steps to protect itself. To do otherwise would not have been rational. The pivotal question,

however, is whether Barclays took unfair advantage of Lehman and its creditors in connection

with the sale and whether the failures to disclose material variations to the transaction described

in the APA compromised the integrity of the approval process to the point of justifying relief

from the Sale Order.

The record does not support such a conclusion or such negative perceptions of Barclays.

Barclays never agreed to assume any risks relating to Lehman's internal marks and never agreed

that the trading assets and liabilities would be in approximate balance with one another. It is
important to note the obvious – this was a quintessential distressed sale, and there was no reason
to regard the transaction as being characterized by equal bargaining power or to assume that the
buyer would treat the seller gently. The seller was in bankruptcy and had no leverage — time
was short, key employees were leaving and the markets were tanking. And to make matters even
worse from the seller's perspective, there were no other buyers. In this tough bargaining
environment, the Court did not need to be told that Barclays was on the scene purely as an
opportunistic "white knight." The only reasonable inference was that Barclays was structuring
an acquisition that had a high likelihood of being very beneficial for Barclays.

Thus, the Court understood, without having to be told in so many words, that this had to
be a very good deal for Barclays, perhaps even an outstanding one, but the Court also perceived
that the transaction was beneficial to the estate because it allowed the Broker-Dealer Business to
remain intact, paid the appraised value for the real estate, and included $250 million for the
intangible attributes of the Broker-Dealer Business. But there were other benefits as well – it
also provided for the orderly transfer of approximately 72,000 customer accounts, avoided a
piecemeal liquidation of assets at a time of turmoil in the financial markets, assumed comp and
cure liabilities and provided for the retention of about ten thousand employees. The fact that the
transaction as modified was structured to also include a spread equivalent to the "haircut"
obtained by the New York Fed in its financing of the operations of LBI during Lehman Week is
new information, but that disclosure does not support relief under Rule 60(b). Rather, it serves
to demonstrate that Barclays, by substituting itself for Lehman with respect to the repo and
becoming a borrower from the New York Fed, adopted a valuation spread that was consistent

with financings arranged by the New York Fed during Lehman Week and that followed the

valuation example set by the New York Fed.

H.    *While Not Formally Approved, the Clarification Letter Is Enforceable to the Extent
Consistent With the Record of the Sale Hearing*

The Sale Hearing came to an end in the early morning hours on Saturday when the Court

issued its bench ruling approving the sale.  The Sale Order was entered shortly thereafter, and the

transaction closed on the morning of Monday, September 22 following a weekend of intense

negotiations that produced the Clarification Letter, an agreement that clarifies, modifies and

supplements the terms and conditions set forth in the APA.

If there had not been such an urgent need to close right away, it is most likely that the

parties, acting prudently, would have chosen to obtain a separate order approving the

Clarification Letter.  That did not happen, but the parties did what they must have believed to be

the next best thing.  The agreement was filed on the docket on September 22, 2008, the date it

was finalized, thereby giving broad notice of its terms.  Despite such notice and subsequent

proceedings in the bankruptcy court and District Court that referenced this letter, no one within a

period of over two years has ever sought formal approval of the Clarification Letter or a

determination that it should not be enforced in accordance with its terms.

The parties have relied on the Clarification Letter as a binding and enforceable

transaction document, and so despite the lack of formal approval, the Court is willing to do the

same.  Reliance is not, and ordinarily should not be, a substitute for actual approval, but the

combination of circumstances surrounding the execution of the Clarification Letter leads to the

conclusion that it is appropriate to treat this document as if it had been approved.  Those parts of

the Clarification Letter that amplify, clarify or bring the transaction into better alignment with

the actual structure of the transaction and agreement of the parties are enforceable to the extent

27

that these provisions are not inconsistent with the record of the Sale Hearing and the language of the Sale Order.

The failure to obtain bankruptcy court approval, however, leads to a vexing problem relating to assets identified during the asset scramble that were added to the definition of Purchased Assets[3] under the APA.  One such addition involves the 15c3-3 Assets, securities held in reserve pursuant to Rule 15c3-3, the Customer Protection Rule promulgated by the United States Securities and Exchange Commission (the "SEC").  Another change purports to grant rights to Barclays in the Margin Assets – the Lehman cash held by exchanges as margin to support the trading and clearance of exchange traded derivatives.  The Clearance Box Assets, the third category of assets claimed by Barclays, facilitate the clearance of securities trading.  Barclays relies on the Clarification Letter in seeking to recover all three categories of assets in its motion to compel delivery of the Disputed Assets.

All of these Disputed Assets were identified as a result of last-minute demands made by Barclays for additional assets on the morning of the scheduled Sale Hearing with the threat that Barclays might otherwise be unwilling to close the acquisition.  That demand for incremental value to sweeten the deal was not disclosed during the Sale Hearing, and the Court knew nothing about this exercise of leverage by Barclays at the eleventh hour.  Among other things, the Clarification Letter reflects the addition of these final "sweeteners" to the deal.  For reasons stated in Section VI of this Opinion, based upon the Court's interpretation of the Clarification Letter in light of the record of the Sale Hearing, Barclays does not have an unconditional right to the 15c3-3 Assets and is not entitled to the Margin Assets, but does have a right to the Clearance Box Assets.

_____

[3] The APA defines those assets that Barclays agreed to purchase thereunder as "Purchased Assets."

*I.    The Court's Own Experience During the Sale Hearing Is a Factor That Cannot Be
Ignored in Deciding That Relief Under Rule 60(b) Is Not Warranted and That Barclays Is
Not Entitled to Any "Lehman Cash"*

In reaching the conclusions expressed here, the Court does not write on a "clean slate"

and cannot disregard applicable personal experiences from the Sale Hearing.  Thus, in addition to

the evidence in these proceedings, the author of this Opinion has his own vivid recollections and

impressions of what occurred during the Sale Hearing and of the atmosphere both in the

courtroom and in the financial markets immediately following the bankruptcy of LBHI.  The

events of those early urgent days of the Lehman bankruptcy are sealed forever in the memories

of all participants, including the Court.  Because the same individual who presided at the Sale

Hearing also presided during these proceedings, the deliberative process as reflected in this

Opinion necessarily is affected by the Court's own experience.

The Court has applied that experience in considering the facts presented in an extensive

trial record, in deciding that Rule 60(b) relief is not appropriate and in considering claims arising

under the Clarification Letter.  The Court is convinced that the deal made and approved so

hurriedly was a good one both for Lehman and Barclays and was the best and only transaction

for the Broker-Dealer Business that could have been accomplished.  As detailed here, the Court

has had the privilege of learning a great deal more about the acquisition than it knew or could

have known when it entered the Sale Order.  The Court and other parties in interest undoubtedly

would have been better informed if the Sale Hearing had included more disclosures about

changes to the structure and economics of the transaction that occurred after execution of the

APA, but these omissions are not sufficient cause to grant relief from the Sale Order.  The 60(b)

Motions were presented well, but, as explained in the following sections of this Opinion, they

fail to persuade the Court that grounds exist to undo what has already has been done or to change the economics of the fully-consummated transaction.

Similarly, certain of the claims made by Barclays to obtain even greater economic benefits from the acquisition based upon the Clarification Letter are directly contradicted by the declarative statement made and repeated several times during the Sale Hearing that still resonates. That memorable statement, in plain language, confirmed that no Lehman cash would be going to Barclays. The Court relied on that clear representation that was given to assure the Court and parties who had objected to the sale that the assets being acquired by Barclays would not include cash.

The words used are absolute, unconditional and easily understood without regard to the language of the APA. "No cash" quite simply means "no cash." The Court has interpreted the Clarification Letter based on the language used in drafting that agreement and with reference to the testimony of those who negotiated the language of the document. That interpretation is influenced by the announcement at the Sale Hearing that Lehman cash would not be going to Barclays. For that reason, Barclays should not now be entitled to Margin Assets that constitute Lehman proprietary cash and should return any such cash that it may have received.

## II.    **Procedural History**

The Sale Order was entered during the early morning hours on September 20, 2008. An appeal (the "Bay Harbour Appeal") from that order by Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2, and Institutional Benchmarks (collectively, "Bay Harbour") was prosecuted in the District Court. *See* District Court Case Nos. 08-cv-08869, 08-cv-08914. The Movants filed

pleadings in the District Court in opposition to the Bay Harbour Appeal.[4] On March 13, 2009,

the District Court issued its Opinion & Order affirming the Sale Order. District Court Case No.

08-cv-08869, ECF No. 18; District Court Case No. 08-cv-08914, ECF No. 19. Bay Harbour

pursued a further appeal of this decision, but ultimately abandoned its efforts to obtain relief

from the United States Court of Appeals for the Second Circuit (the "Second Circuit"). On May

28, 2009, the Clerk of Court of the Second Circuit entered an order dismissing the appeal due to

Bay Harbour's failure to respond to the Second Circuit's prior order to show cause. *See* District

Court Case No. 08-cv-08869, ECF No. 21. At that point, the Sale Order became final and no

longer was subject to further appellate review.

Despite the procedural finality of the Sale Order, LBHI initiated a discovery process that

marked the beginning of efforts to obtain relief from the Sale Order. The Court observed a

preview of this discovery initiative at a December 22, 2008 hearing on a motion to approve a

settlement agreement (the "Settlement Agreement") between Barclays, LBI and JPMorgan Chase

("JPMorgan"), LBI's collateral agent. The Settlement Agreement was the result of long

negotiations (later revealed to have included accusations of fraud by JPMorgan) following a

high-level and high-stakes dispute between Barclays and JPMorgan that eventually required the

intervention (at Barclays' request) of the New York Fed. M Ex. 119A (Leventhal Decl.) ¶ 21;

9/7/10 Tr. 155:3-14 (Leventhal).

---

[4] In addition to LBHI's counter-designations of bankruptcy record on appeal, LBHI filed Answering Brief of
Lehman Brothers Holdings Inc., et al. in Opposition to Bay Harbour Appeal, and the SIPA Trustee filed Brief of
Appellee James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. District Court Case No.
08-cv-08869, ECF Nos. 4, 5, 8, 12; District Court Case No. 08-cv-08914, ECF Nos. 3, 4, 10, 13; BCI Ex. 33 (M Ex.
405); M Ex. 552. The Committee did not participate in the Bay Harbour Appeal. The Committee did, however, file
a Counter-Statement of Official Committee of Unsecured Creditors of Issues Presented on Appeal and Counter-
Designation of Additional Items to be Included in the Record on Appeal in the later-withdrawn appeal of a group of
creditors that called themselves the Informal Noteholder Group. District Court Case No. 08-cv-09108, ECF No. 5;
BCI Ex. 398.

The dispute centered around a $7 billion "box loan" provided by JPMorgan to LBI in connection with the so-called Lehman III transaction.[5]  The $7 billion was transferred into Barclays' account at JPMorgan and then later removed by JPMorgan, allegedly due to Barclays' failure to renew a $15.8 billion repurchase agreement secured by Lehman assets.  This caused LBI to have to borrow $15.8 billion from JPMorgan.  JPMorgan wanted Barclays to "take out" this financing in a similar fashion to what Barclays had done with respect to a repurchase agreement between LBI and the New York Fed.[6]  *See* 6/21/10 Tr. 201:5-202:8 (Diamond); 9/7/10 Tr. 152:1-153:21 (Leventhal).  Barclays realized that the $7 billion was not in its account after the sale transaction had closed and the Clarification Letter had been signed.  M Ex. 119A (Leventhal Decl.) ¶¶ 19-21; M Ex. 119C (LaRocca Decl.) ¶ 11; 9/7/10 Tr. 27:19-22, 133:23-134:8 (Leventhal); 6/21/10 Tr. 201:5-202:8 (Diamond).

After Barclays and JPMorgan (with the help of the New York Fed) reached agreement, the parties sought the help of the SIPA Trustee in filing a motion to seek approval of the settlement.  *See* M Ex. 642.  Barclays, JPMorgan and LBI signed the Settlement Agreement on December 5, 2008; on that same day, the SIPA Trustee filed a motion seeking approval of the Settlement Agreement (the "Settlement Motion").  BCI Ex. 30 (M Ex. 119).

The Committee, which had been given only a cursory preview of the Settlement Agreement, filed an objection to the Settlement Motion on December 19, 2008.  *See* M Ex. 852; M Ex. 860; BCI Ex. 37 (M Ex. 398).  The Committee raised specific concerns about alleged undisclosed changes made to the sale transaction following entry of the Sale Order.  BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 45:11-50:7 (Kirpalani, Peck).  At the hearing on the Settlement

---

[5] The Lehman III transaction and the circumstances surrounding the $7 billion "box loan" are discussed *infra* at 42-45.

[6] The repurchase agreement between LBI and the New York Fed, defined as the "Fed Repo," and Barclays' agreement with the New York Fed to "take out" its financing obligation thereunder are discussed *infra* at 41-45.

Motion, LBHI expressed similar concerns, but did not object to the settlement because the

proposed order did not bar any future discovery or claims. BCI Ex. 50 (M Ex. 262) (12/22/08

Tr.) 32:6-34:21 (Miller). Counsel to JPMorgan and Barclays confirmed that the settlement

would not pose any collateral estoppel effect and that parties would be free to pursue claims

related to the "overall sales transaction." BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 35:3-5, 40:9-11,

41:7-12 (Schiller), 39:13-20 (Novikoff). The Court approved the Settlement Motion

> based on the record and the representations that have been made including the comments
> confirming that the settlement is not to have collateral estoppel impact that would
> preclude further investigation of the circumstances surrounding the original sales
> transaction between the estates and Barclays Capital approved by order entered
> September 20[, 2008].

BCI Ex. 50 (M Ex. 262) (12/22/08 Tr.) 58:11-18 (Peck).

On May 18, 2009, some five months after approval of the Settlement Agreement, LBHI

filed a motion of for an order authorizing discovery from Barclays. (the "2004 Motion"). Case

No. 08-13555, ECF No. 3596. In the 2004 Motion, LBHI sought discovery related to the sale to

Barclays "specifically focused on whether the estate received appropriate value." 2004 Motion ¶

1. Each of the Committee and the SIPA Trustee subsequently filed papers joining in the 2004

Motion. Case No. 08-13555, ECF No. 3778 (Committee); Case No. 08-13555, ECF No. 4074

(SIPA Trustee). Barclays opposed the 2004 Motion. Case No. 08-13555, ECF No. 3776.

After a hearing on June 3, 2009, the Court granted the 2004 Motion and entered an order

authorizing discovery (the "Discovery Order"). Case No. 08-13555, ECF No. 4164. The

Discovery Order granted the relief requested in the 2004 Motion, and led to an extensive

examination of the facts surrounding the sale of the Broker-Dealer Business to Barclays. This

discovery became the basis for the filing of the 60(b) Motions.

On September 15, 2009, one year to the day after LBHI filed its voluntary bankruptcy

petition, each of LBHI, the Committee and the SIPA Trustee[7] moved for relief from the Sale

Order by filing separate motions under Rule 60(b).[8]  Case No. 08-13555, ECF No. 5148 (the

"LBHI Motion"); Case No. 08-13555, ECF No. 5169 and Case No. 08-01420, ECF No. 1686

(collectively, the "Committee Motion"); Case No. 08-01420, ECF No. 1682 (the "SIPA Trustee

Motion").  Since that date, the parties have worked together cooperatively to coordinate and

manage the 60(b) litigation and related adversary proceedings as described below.  Given the

complexity and importance of the issues presented, the case is a model of efficient case

management.  All counsel worked with each other and with the Court in a manner that

minimized unnecessary and distracting procedural disputes.

On October 27, 2009 the Court entered a scheduling order concerning these motions (the

"Scheduling Order").  Case No. 08-13555, ECF No. 5636; Case No. 08-01420, ECF No. 1989.

The Scheduling Order contemplated the possible filing of adversary complaints in relation to the

60(b) Motions, and set a deadline of November 16, 2009 for commencing these actions.  The

Scheduling Order set forth other deadlines and agreements of the parties relating to the

prosecution and management of this litigation, including dates by which Barclays would submit

its consolidated opposition to the 60(b) Motions and would file its motion to enforce the Sale

Order and secure delivery of the Disputed Assets.

---

[7] The SIPA Trustee's motion addresses both the Sale Order and the Order Approving, and Incorporating by Reference for the Purposes of this Proceeding, and Order Authorizing the Sale of Purchased Assets and Other Relief in the Lehman Brothers Holdings Inc. Chapter 11 Proceeding (the "SIPA Sale Order").  Case No. 08-01420, ECF No. 3.

[8] The SIPA Trustee also filed a motion to join in LBHI's 60(b) motion.  Case No. 08-13555, ECF No. 5173.  LBHI filed its own 60(b) motion addressing the SIPA Sale Order.  Case No. 08-01420, ECF No. 1702.

On November 16, 2009, each of the Movants filed an adversary complaint (each, an

"Adversary Complaint" and collectively, the "Adversary Complaints") under Fed. R. Bankr. P.

7001, commencing the following adversary proceedings:

> Lehman Brothers Holdings, Inc. v. Barclays Capital Inc. (the "LBHI Adversary"), Adv.
> Proc. No. 09-01731(JMP);

> James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers Inc. v.
> Barclays Capital Inc. (the "SIPA Trustee Adversary"), Adv. Proc. No. 09-01732(JMP);
> and

> The Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.
> v. Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB 745 LLC and Barclays
> Capital Inc. (the "Committee Adversary"), Adv. Proc. No. 09-01733(JMP).

As the parties anticipated in the Scheduling Order, each Adversary Complaint to some

extent overlaps with one or more of the 60(b) Motions, and so the parties have entered into a

stipulation (the "Adversary Proceeding Stipulation") providing for the resolution of certain

claims in the Adversary Complaints in conjunction with resolution of the 60(b) Motions and

deferring certain claims for further adjudication. The Adversary Proceeding Stipulation was "so

ordered" by the Court. Adv. Proc. No. 09-01731, ECF No. 4; Adv. Proc. No. 09-01732, ECF

No. 5; Adv. Proc. No. 09-01733, ECF No. 3.

The Adversary Proceeding Stipulation provides that (i) the following claims in each

respective Adversary Proceeding shall be resolved through the resolution of the 60(b) Motions,

(ii) the 60(b) Motions (and all documents filed in connection therewith, including any opposition

papers submitted by Barclays) shall be treated as dispositive motions with respect to the listed

claims and (iii) any evidentiary hearing that is required by the Court to resolve the 60(b) Motions

also shall be used to resolve the claims:

> In the LBHI Adversary: Count III (Unauthorized Post-Petition Transfers – Bankruptcy
> Code § 549), Count IV (Recovery of Avoided Transfers – Bankruptcy Code § 550),
> Count V (Recovery of Excess Collateral on Liquidation of Repurchase Agreement –

Bankruptcy Code §§ 542 and 559), Count VI (Disallowance of Claims Under Bankruptcy Code § 502(d), and Count IX (Declaratory Judgment – 28 U.S.C. §§ 2201, 2202);

In the SIPA Trustee Adversary:  Count I (Declaratory Judgment Under 28 U.S.C. § 2201 – DTCC Clearance Box Assets), Count II (Declaratory Judgment Under 28 U.S.C. § 2201 – OCC Margin and Clearing Funds), Count III (Declaratory Judgment Under 28 U.S.C. § 2201 – Funds at Other Exchanges), Count IV (Declaratory Judgment Under 28 U.S.C. § 2201– $769 Million in Rule 15c3-3 Securities or Substantially Similar Securities), Count V (Avoidance of Transfers and Recovery of Property under §§ 549 and 550 of the Bankruptcy Code), Count VII (Turnover of Property under § 542 of the Bankruptcy Code), Count VIII (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities Under § 548 of the Bankruptcy Code), Count IX (Fraudulent Conveyance Under § 273 of the New York Debtor & Creditor Law, as Made Applicable by § 544(b) of the Bankruptcy Code), Count X (Recovery of the Excess Value of the Repo Securities Under §§ 559 and 542 of the Bankruptcy Code), and Count XIV (Disallowance of Claims Under § 502(d) of the Bankruptcy Code); and

In the Committee Adversary:  Count I (Declaratory Judgment as to Clarification Letter Pursuant to 28 U.S.C. §§ 2201, 2202), Count II (Accounting), and Count III (Attorneys' Fees, 28 U.S.C. § 2202).

Adversary Proceeding Stipulation ¶ 2.

In accordance with the Scheduling Order, on January 29, 2010, Barclays opposed the 60(b) Motions and filed its motion addressed to the SIPA Trustee to enforce the Sale Order and secure the delivery of the Disputed Assets (the "Barclays Motion").  Case No. 08-13555, ECF No. 6814; Case No. 08-01420, ECF No. 2581.  On March 18, 2010, each of the Movants filed a reply memorandum in further support of their 60(b) Motions and, in the case of the SIPA Trustee, in opposition to the Barclays Motion.  Case No. 08-13555, ECF No. 7641 and Case No. 08-01420, ECF No. 2843 (collectively, the "LBHI Response"); Case No. 08-13555, ECF No. 7667 and Case No. 08-01420, ECF No. 2857 (Committee); Case No. 08-01420, ECF No. 2847 (SIPA Trustee).  Barclays completed the initial round of briefing on the 60(b) Motions on April 5, 2010 with the filing of its reply memorandum in further support of the Barclays Motion.  Case No. 08-13555, ECF No. 8076; Case No. 08-01420, ECF No. 2996 (the "Barclays Reply").

On April 9, 2010, the Court heard oral argument on the 60(b) Motions and the Barclays

Motion. At the outset of this hearing, the Court noted that it would not be deciding the 60(b)

Motions on the papers, that an evidentiary hearing would be necessary and that arguments on the

Motions would be treated as opening arguments for the evidentiary hearing. 4/9/10 Tr. 10:20-24

(Peck).

April 26, 2010 was the first day of what developed into a 34-day trial. The Court heard

live testimony from 37 witnesses[9] and admitted 1,787 exhibits (some for limited purposes) into

the record. On November 22, 2010, each of the Movants and Barclays filed a post-trial

memorandum, including proposed findings of fact and conclusions of law.[10] Case No. 08-13555,

ECF No. 12950 and Case No. 08-01420, ECF No. 3909 (collectively, the "LBHI Post-Trial

Memorandum"); Case No. 08-13555, ECF No. 12970 and Case No. 08-01420, ECF No. 3916

(collectively, the "Committee Post-Trial Memorandum"); Case No. 08-13555, ECF No. 12971

and Case No. 08-01420, ECF No. 3917 (collectively, the "Barclays Post-Trial Memorandum");

Case No. 08-01420, ECF No. 3911 (the "SIPA Trustee Post-Trial Memorandum").

## III.    The Rule 60(b) Standard and Background of Movants' 60(b) Claims

Rule 60(b) applies in all cases under the Bankruptcy Code, except for certain

circumstances not relevant to this decision. Fed. R. Bankr. P. 9024. Rule 60(b) lists multiple

grounds upon which a court may relieve a party from final judgment, including:

> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud …, misrepresentation, or misconduct by an opposing party;

---

[9] The Court also heard video deposition testimony from four witnesses, and read designated deposition testimony from eighteen witnesses.

[10] The SEC and the Securities Investor Protection Corporation ("SIPC") also filed post-trial memoranda. Case No. 08-13555, ECF No. 12961 and Case No. 08-01420, ECF No. 3914 (collectively, the "SEC Post-Trial Memorandum"); Case No. 08-01420, ECF No. 3912 (SIPC).

(4) the judgment is void;

(5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

Rule 60(b) "should be liberally construed when substantial justice will ... be served." *In re Enron Corp.*, 352 B.R. 363, 369 (Bankr. S.D.N.Y. 2006) (quoting *Radack v. Norwegian America Line Agency, Inc.*, 318 F.2d 538, 542 (2d Cir. 1963)). However, courts should not "lightly reopen[]" final judgments under Rule 60(b). *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986) (citations omitted). Thus, such a motion generally is "not favored and is properly granted only upon a showing of exceptional circumstances." *Enron*, 352 B.R. at 369 (quoting *U.S. v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001)). A motion seeking 60(b) relief is "addressed to the sound discretion of the [trial] court with appellate review limited to determining whether that discretion has been abused." *Nemaizer*, 793 F.2d at 61-62 (citations omitted).

Movants seek relief under four separate subsections of Rule 60(b) – 60(b)(1) (mistake, inadvertence or excusable neglect); 60(b)(2) (newly-discovered evidence); 60(b)(3) (innocent or intentional misrepresentation or fraud by an opposing party) and 60(b)(6) (fraud by any other party or fraud on the court). LBHI Mot. ¶¶ 145-170; Committee Mot. ¶¶ 63-77; SIPA Trustee Mot. 89-105. Movants also reference Federal Rule of Civil Procedure 60(d), which provides that "[Rule 60]" does not limit a court's power to, *inter alia*, "set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3); LBHI Mot. ¶¶ 167-70.

All of these claims are based on the allegation that certain crucial facts surrounding the sale to Barclays were not disclosed to the Court. Movants submit that such a failure to disclose

at best qualifies as mistake, inadvertence or excusable neglect under Rule 60(b)(1). LBHI Resp.

¶¶ 150-161. Movants further assert that

> [w]hen the evidence is reviewed in terms of scienter, motive, opportunity, justification,
> excuse and any number of other considerations, the Court could very well determine that
> these "mistakes" were more than that, which might justify findings of bad faith, breach of
> fiduciary duty, misrepresentation or even fraud[,]

thus bringing their claims under the purview of Rule 60(b)(3), 60(b)(6) and/or 60(d). LBHI

Resp. ¶ 150, n. 63. During the trial, Movants focused on three broad categories of "mistake"

surrounding the sale – (i) Barclays' multi-billion dollar day-one gain on the sale, (ii) the non-

disclosure to the Court of the structural shift from the purchase of assets described in the APA to

the "take out" by Barclays of the New York Fed and (iii) the actual amounts paid for

compensation obligations and contract cures in comparison with the much higher estimated

amounts disclosed to the Court at the Sale Hearing.[11] Movants base their Rule 60(b)(2) claim on

the allegation that they were justifiably ignorant of these "mistakes" despite their reasonable

efforts and diligence.

A.    *The Acquisition Gain and the Changing Character and Structure of the Sale*

At trial, the parties spoke of and characterized three separate negotiated structures of an

asset purchase by Barclays, described in shorthand as Lehman I, Lehman II and Lehman III. The

negotiations surrounding "Lehman I" encompassed a potential acquisition of Lehman's global

business and commenced either late Thursday, September 11, 2008 or early Friday, September

12, 2008. 4/26/10 Tr. 145:10-146:7 (McDade). Those discussions ended on Sunday, September

14, 2008, when Barclays informed Lehman of its "inability to consummate" the transaction.

4/26/10 Tr. 146:21-147:1 (McDade); 6/21/10 Tr. 137:7-12 (Diamond); 6/22/10 Tr. 81:9-11

(Varley). That inability was followed almost immediately by the filing by LBHI of its

---

[11] By virtue of the SIPA Trustee's Joinder, he is a party to this argument, but he also bases his 60(b) claims, at least
in part, on issues surrounding the Clarification Letter. These claims are discussed on pages 97-99 of this Opinion.

bankruptcy petition on September 15, 2010.  4/28/10 Tr. 11:12-18 (Miller); Case No. 08-13555,

ECF No. 1.

Discussions between representatives from Barclays and Lehman concerning an

alternative structure and a potential Lehman II transaction commenced early on Monday,

September 15.  4/26/10 Tr. 146:21-147:3 (McDade); 4/28/10 Tr. 11:12-21 (Miller).  Lehman II is

the transaction for the acquisition of the Broker-Dealer Business reflected in the APA; the

negotiations surrounding Lehman II took place in a compressed time frame, and, as described by

participants, were conducted within a "scene of organized chaos" and with a "sense of frenzy,

distress."  4/28/10 Tr. 11:22-12:21 (Miller); 4/29/10 Tr. 15:18-18:11 (Lowitt); BCI Ex. 365

(Lowitt Decl.) ¶7.  The negotiations continued into the early morning hours of September 16,

2008, when the parties signed the APA.  4/26/10 Tr. 150:14-24 (McDade); 4/28/10 Tr. 150:17-

151:15 (Kelly); 4/29/10 Tr. 63:4-20, 77:13-18 (Lowitt); 4/27/10 Tr. 110:8-111:7 (Berkenfeld);

4/28/10 Tr. 13:4 (Miller); BCI Ex. 1 (M Ex. 1) at 1.

Movants contend that during the course of the negotiations, certain Lehman executives

(who were given offers of employment by Barclays) agreed to prices for Lehman's assets that

were fixed below Lehman's marks.  Barclays counters that because Lehman last closed its books

on September 12, 2008, the Lehman marks were stale and needed to be adjusted to account for

the impact of the events of Lehman Week on the financial markets.  *See, e.g.*, 4/29/10 Tr. 93:6-

17 (Lowitt) (traders from both Lehman and Barclays were meeting to agree on "what was the

appropriate value for those securities given the nature of the environment and the market they

were dealing with … [and] there was a difference between what was on [LBHI's] books and what

was the outcome of that process … [of] around five billion dollars").

Regardless of the reasons given for the mark-down procedure, the evidence shows that

the parties had negotiated a value for the Purchased Assets that was discounted from Lehman's

marks by approximately $5 billion. M Ex. 7 (9/16/08 e-mail from Martin Kelly to Ian Lowitt

and Paolo Tonucci at the conclusion of the negotiations for Lehman II, stating that the "[f]inal

price did not change meaningfully – approx a $5b all in economic loss versus our marks");

4/28/10 Tr. 155:12-18 (Kelly) (explaining that $5b all in economic loss means that "the

transaction included an approximately five billion dollar difference between the values that had

been negotiated for the assets that were moving, and their most recent book values on the books

of Lehman").

Before the APA was presented to the Court for approval, the New York Fed had agreed

to provide financing to LBI through a series of short-term funding agreements (collectively, the

"Fed Repo") so that LBI could continue to operate as a broker-dealer for a limited period of time.

Stip.[12] ¶¶ 130,165. As part of the Fed Repo, LBI had to post collateral to the New York Fed.

Stip. ¶ 131. As is typical in repo transactions, the New York Fed required LBI to post as

collateral securities valued in excess of the principal amount advanced by the New York Fed.

Stip. ¶ 132. The amount by which the value of securities transferred exceeds the amount paid for

them is referred to as a "haircut." Stip. ¶ 133. The "haircut" is measured at market value. 9/7/10

Tr. 52:22-53:19 (Leventhal).

By the close of business on Wednesday, September 17, LBI had posted collateral valued

at approximately $50.62 billion in exchange for financing from the New York Fed of

approximately $46.22 billion. M Ex. 119A (Leventhal Decl.) ¶ 9. This "haircut" reflected excess

---

[12] All references to "Stip." as used herein shall be to the Stipulations of Fact agreed to and signed by the parties in April 2010. *See* 4/26/10 Tr. 73:3-13 (Gaffey) (describing Stipulations of Fact to the Court).

collateral of $4.4 billion. *See* Tonucci Dep. Tr. 17:5-15 (describing a "haircut" as "the difference between the market value and the cash received").

When the New York Fed learned that Barclays planned to purchase the Broker-Dealer Business, it became insistent that it be relieved of its short-term financing role for LBI and that Barclays take on the role of providing such financing to LBI.[13] Stip. ¶ 134; *see also* 4/29/10 Tr. 113:15-19 (Lowitt); M Ex.119A (Leventhal Decl.) ¶ 7; 9/7/10 Tr. 7:9-8:23, 23:5-24:8 (Leventhal). This arrangement in which Barclays became the source of financing to LBI is the transaction termed Lehman III – the transaction that actually was consummated but that was not fully disclosed to the Court or other parties in interest.

In order to facilitate the Lehman III transaction, the New York Fed agreed to provide Barclays with financing and a cash advance. *See* M Ex. 844 (describing financing mechanism); 9/7/10 Tr. 103:3-105:5 (Leventhal). Barclays relieved the New York Fed of its short-term financing role by means of a repurchase agreement between LBI and Barclays (the "September 18 Repurchase Agreement"). *See*, M Ex.119A, (Leventhal Decl.) ¶ 12; Stip. ¶ 135.

On the morning of September 18, 2008, steps were taken to effect the transition from the Fed Repo to the September 18 Repurchase Agreement. This involved unwinding the Fed Repo, and the return by the New York Fed to LBI of securities that had been pledged as collateral. Later that day, pursuant to the September 18 Repurchase Agreement, Barclays forwarded to LBI approximately $45 billion in cash (its advance from the New York Fed) and LBI was to post as collateral securities valued at approximately $50 billion, reflecting an approximate $5 billion

---

[13] By September 16, 2008, Barclays had negotiated the terms of an agreement with the New York Fed (the "Take-Out Agreement"). *See* M Ex. 874 (e-mail sent at 1:37 a.m. on September 17, 2008 from the New York Fed to counsel to Barclays attaching draft of Take-Out Agreement). Under the terms of the Take-Out Agreement, which was signed on September 17, 2008, Barclays agreed to purchase from the New York Fed the entirety of its positions in the Fed Repo in exchange for all of the collateral posted in connection therewith. BCI Ex. 4 (M Ex. 348). The Court knew nothing about the Take-Out Agreement at the time of the Sale Hearing.

"haircut" in the value of LBI's collateral. *See* M Ex. 119A (Leventhal Decl.) ¶¶ 10-12; 9/7/10 Tr. 118:25-122:13 (Leventhal); Stip. ¶ 136. When asked to review the pool of collateral Barclays was to take over from the New York Fed, Stephen King concluded that Barclays would be sufficiently collateralized in loaning $45 billion against this pool of securities.[14] 8/25/10 Tr. 49:19-53:2, 55:2-10 (King); King Dep. Tr. 75:6-77:20.

Due to operational problems, by the close of business on September 18, LBI had not transferred all of the pledged collateral to Barclays. Instead of approximately $50 billion in collateral, LBI transferred at least $42.7 billion[15] in collateral under the September 18 Repurchase Agreement. M Ex.119A (Leventhal Decl.) ¶ 14; 4/30/10 Tr. 183:18-184:7 (Hughes); 4/29/10 Tr. 272:4-24 (Clackson). To make up the difference, LBI took a so-called "box loan" of $7 billion, provided by JPMorgan and secured by an equivalent amount of securities held in LBI's clearance boxes at JPMorgan. M Ex. 36; M Ex. 50; M Ex. 66; 9/7/10 Tr. 122:21-123:17 (Leventhal); 4/30/10 Tr. 183:18-184:7 (Hughes). LBI paid the full cash proceeds of this loan over to Barclays as a replacement for the portion of collateral that could not be transferred on September 18.[16] Hraska I Dep. Tr. (8/14/09) 50:8-22; 9/7/10 Tr. 24:9-28:2 (Leventhal); 4/30/10 Tr. 183:18-184:7 (Hughes). Thus, Barclays received at least $49.7 billion in collateral and cash

---

[14] Barclays later claimed that it was worried about the value of the securities posted as collateral for the September 18 Repurchase Agreement, and threatened not to close if Lehman did not come up with more assets. *See* Section VI.A of this Opinion for a description of the so-called "asset scramble."

[15] Bank of New York, as Barclays' collateral agent, valued the transferred collateral at approximately $45 billion. M Ex. 102; 8/25/10 Tr. 157:17-158:3 (King).

[16] *See* 31-33, *supra*, for a discussion regarding the ensuing dispute between JPMorgan and Barclays over this $7 billion.

to secure LBI's obligations for the $45 billion advanced to it under the September 18 Repurchase Agreement.[17] 9/7/10 Tr. 123:18-124:7 (Leventhal).

On September 19, 2008, pursuant to a Complaint and Application of SIPC, the District Court entered an Order Commencing Liquidation, which (i) found that the customers of LBI were in need of the protection afforded by SIPA, (ii) appointed a trustee "for the liquidation of the business of LBI with all the duties and powers of a trustee as prescribed in SIPA" and (iii) referred the liquidation proceeding (the "SIPA Liquidation Proceeding") to this Court. Case No. 08-1420, ECF No.1. The SIPA Liquidation Proceeding constituted a defined event of default under the September 18 Repurchase Agreement. BCI Ex. 8 (M Ex. 4) (Master Repurchase Agreement) ¶¶ 2(a), 11; M Ex. 38 (Notice of Termination). As a result of that default, Barclays immediately issued a Notice of Termination under the September 18 Repurchase Agreement. M Ex. 38.

Barclays claims that the issuance of the Notice of Termination was inadvertent or a mistake. 8/31/10 Tr. 64:23-65:8 (Lewkow) (recalling "being told at some point" that "some back office person" unintentionally sent notice); Lewkow Dep. Tr. 68:17-69:14. The parties addressed the issue after the Sale Hearing, when they continued their negotiations over the following weekend. They included a paragraph in the Clarification Letter that purported to rescind the earlier termination and then terminate the September 18 Repurchase Agreement retroactively, all effective at Closing. It provides, in relevant part, that

> [e]ffective at Closing, (i) all securities and other assets held by Purchaser under the September 18, 2008 [Repurchase Agreement] shall be deemed to constitute part of the Purchased Assets ..., (ii) Seller and Purchaser shall be deemed to have no further obligations

---

[17] From the Court's perspective, the fact that Barclays had effectively "purchased" these assets one day *before* commencement of the Sale Hearing is troublesome, to say the least. While no improprieties have been shown, it is curious that any financial institution would take on any exposure at a time of such upheaval in the markets *prior to* the entry of a court order approving the acquisition.

> to each other under the [September 18] Repurchase Agreement ...,
> and (iii) the [September 18] Repurchase Agreement shall
> terminate. Additionally, the Notice of Termination relating to the
> [September 18] Repurchase Agreement dated September 19, 2008
> is hereby deemed rescinded and void *ab initio* in all respects.

BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 13.

As a result of the insertion of this paragraph, all of the collateral pledged in connection

with the September 18 Repurchase Agreement – including the $5 billion "haircut" that under

Section 559 of the Bankruptcy Code otherwise would have had to be returned to the LBI estate –

was transferred to Barclays. Thus, upon the signing of the Clarification Letter, Lehman III was

consummated and Barclays maintained a gain on acquisition equivalent to what it had negotiated

under Lehman II. It is important to note, however, that the Court did not know at the Sale

Hearing that the structure of the transaction had changed from Lehman II to Lehman III.

*B.*     *Comp and Cure Payments*

To guide the documentation of the sale to Barclays, during the course of Lehman Week

the parties prepared a schedule showing the value of certain assets that were to be transferred to

Barclays and the liabilities to be assumed by Barclays (the "9/16/08 Financial Schedule"). BCI

Ex. 106 (M Ex. 2); 4/27/10 Tr. 115:2-10, 118:12-16, 123:19-124:22 (Berkenfeld); *see also*

8/31/10 Tr. 36:9-23 (Lewkow) (describing Berkenfeld signing 9/16/08 Financial Schedule);

8/23/10 Tr. 69:10-70:22 (Shapiro) (describing development of 9/16/08 Financial Schedule).

Two categories of liabilities on the 9/16/08 Financial Schedule are "Comp" and "Cure Pmt."

BCI Ex. 106 (M Ex. 2).

Paragraph 9.1(c) of the APA addresses the obligation of Barclays to pay 2008 bonuses to

Transferred Employees – *i.e.*, former Lehman employees who transferred to Barclays – and

expressly references the 9/16/08 Financial Schedule. BCI Ex. 1 (M Ex. 1) ¶ 9.1(c); BCI Ex. 106

(M Ex. 2); 4/26/10 Tr. 177:17-180:23 (McDade); 8/23/10 Tr. 89:15-92:4 (Shapiro); 8/31/10 Tr.

97:2-9 (Lewkow); 8/24/10 Tr. 27:16-28:4 (Exall); M Ex. 24. Thus, the aggregate amount of

such 2008 bonus payments was established by the $2 billion figure set forth on the 9/16/08

Financial Schedule. BCI Ex. 106 (M Ex. 2); 4/26/10 Tr. 168:13-169:9, 177:17-180:23

(McDade); 8/24/10 Tr. 27:16-28:4 (Exall). The plain language of the Paragraph 9.1(c) of the

APA specifically refers only to bonuses, not severance.[18] Moreover, the $2 billion figure for

bonuses was an "agreed number" that reflected a "full requirement for Barclays to pay." 4/26/10

Tr. 164:6-8, 215:13-18 (McDade).

Barclays contends, however, that it can (and did) satisfy this obligation by including in

the total payments of severance, taxes and other forms of compensation and argues that

"according to a document prepared by Barclays' Paul Exall regarding compensation to former

Lehman employees for their pre-acquisition services (the 'Exall Spreadsheet'), Barclays has paid

or promised to pay for 2008 approximately $1.66 billion in bonuses, $265 million in severance

payments, and approximately $21 million in taxes." Barclays Mot. ¶ 300. According to

Barclays, "[t]hese liabilities total $1.946 billion, an amount fully consistent with the $2 billion

estimate of the parties." Barclays Mot. ¶ 300; *see also* 8/23/10 Tr. 189:2-194:8 (Exall); 8/24/10

Tr. 8:21-9:17, 61:11-62:22 (Exall) (discussing prepared chart showing total for bonus, severance

and taxes of $1.951 billion); BCI Ex. 142A (M Ex. 107).

Mr. Exall, the executive charged with monitoring the compensation paid to former

Lehman employees who transferred to Barclays, was instructed immediately after the closing of

the sale to plan on paying bonuses to former Lehman employees of approximately $1.4 billion,

not the $2 billion set forth in the APA. *See* BCI Ex. 295 (M Ex. 91) at 2; 8/24/10 Tr. 45:5-13

---

[18] Paragraph 9.1(b) of the APA separately defines the obligation of Barclays to make severance payments to Transferred Employees who were later laid off. Paragraph 9.1(b) does not reference the 9/16/08 Financial Schedule. *See* 8/24/10 Tr. 28:5-19 (Exall); 8/23/10 Tr. 92:5-94:23 (Shapiro) (describing having reviewed the APA to ensure it accurately reflected the deal, and noting that Paragraph 9.1(b) does not refer to the 9/16/08 Financial Schedule); Brown Dep. Tr. 20:15-22 ("$2 billion really related to subsection c").

(Exall); M Ex. 92 at 2; M Ex.130 (9/16/08 e-mail reflecting $1.3 billion "bonus accrual"); M Ex.134 (9/17/08 e-mail, showing $1.3 billion "bonus accrual"); M Ex. 43 (9/18/08 e-mail to Ricci stating that "[w]e have assumed only $1.5bn of comp accrual is required rather than $2bn in completion balance sheet"). Exall's team prepared twice-daily reports tracking bonus payments. 8/24/10 Tr. 46:4-47:11 (Exall). Exall also prepared a spreadsheet showing that, in the aggregate, Barclays paid to transferred Lehman employees approximately $1.951 billion in all forms of compensation. M Ex.107; 8/24/10 Tr. 8:21-9:17, 65:18-66:2 (Exall). Several entries on the spreadsheet, however, do not relate to bonuses.[19] BCI Ex. 142A (M Ex. 107); 8/24/10 Tr. 66:3-83:11 (Exall); Exall Dep. Tr. 78:22-84:3; 110:22-115:18; 124:22-125:6; 128:8-137:7; 141:5-144:12, 151:15-23. In the end, subtracting out all non-bonus payments, Barclays paid approximately $1.5 billion in bonuses to Transferred Employees. BCI Ex. 142A (M Ex. 107).

As set forth in the 9/16/08 Financial Schedule, the estimated cost of cure payments to be assumed by Barclays was $2.25 billion. BCI Ex. 106 (M Ex. 2). Martin Kelly was the Lehman executive responsible for estimating the amount of cure liabilities that Barclays would pay. 4/27/10 Tr. 52:13-18 (McDade); 4/29/10 Tr. 90:17-92:19, 121:24-122:17 (Lowitt); 8/23/10 Tr. 94:23-95:20 (Shapiro) (explaining that the estimate was prepared to answer an inquiry by Cox from Barclays); 6/22/10 Tr. 224:18-225:11 (Cox) (stating that cure estimates came from Martin Kelly). As of September 16, 2008, Kelly came up with an estimate for cure of $2.25 billion, the number set forth on the 9/16/08 Financial Schedule. 4/26/10 Tr. 161:11-19, 163:8-169:10 (McDade).

---

[19] For example, Exall's chart reflects Barclays' payments to various taxing authorities in the total amount of approximately $71 million. M Ex. 107. These taxes were not paid to individual employees, but rather to the applicable taxing authority. 8/24/10 Tr. 67:4-68:9, 70:14-71:4, 71:16-72:5 (Exall). This includes some $50 million included in Exall's entry for "Bonus including social tax." M Ex. 107; 8/24/10 Tr. 70:11-71:15 (Exall).

By the time of the September 17, 2008 hearing on the Debtors' Motion to (A) Schedule a

Sale Hearing; (B) Establish Sale Procedures; (C) Approve a Break-Up Fee; and (D) Approve the

Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the

Purchased Assets (the "Bid Procedures Motion"), the cure liability estimate had declined to

$1.5 billion – the number that was disclosed to the Court. BCI Ex. 11 (M Ex. 118) ¶ 14

(explaining that "[t]he parties estimate that the cure costs associated with such assumptions and

assignments will be approximately $1.5 billion"); 4/26/10 Tr. 161:20-23 (McDade); BCI Ex. 48

(M Ex. 260), 9/17/08 Tr. 24:1-5 (Miller) (stating that "in connection with the assumption and

assignment of contracts, the cure amounts and other payments in connection with the contracts,

are estimated to be a billion five hundred million dollars").

Barclays, however, had its own estimate of $200 million for cure payments related to

contracts that it deemed to be "mission critical." BCI Ex. 107 (M Ex. 11); 6/22/10 Tr. 225:16-

229:15 (Cox) (confirming that his notes in M Ex. 11 read, in pertinent part, that "[t]he 200 mill is

for more than 3,000 contracts mission critical[,]"acknowledging that Barclays' liability for

mission-critical contracts had been estimated at $200 million and conceding that there was a

swing of roughly $1.3 billion of what was told to the Court). Barclays' $200 million estimate

was never disclosed to the Court. 6/22/10 Tr. 228:19-229:15, 205:2-3, 206:4-24 (Cox). By

September 19, 2008, Barclays had developed internally an "official line" regarding cure

payments – namely, that they "are optional and tho [sic] some will be incurred, most will be

covered by our ongoing supplier relationships and fall into monthly expenses." M Ex. 41;

4/30/10 Tr. 16:3-12 (Clackson). Ultimately, after taking over the Broker-Dealer Business,

Barclays paid only $238,200,978 in cure liabilities through July 14, 2009. Stip. ¶¶ 128, 152,

162; *see* BCI Ex. 133 (M Ex. 105) at 00115845 line 41; 9/2/10 Tr. 41:23-42:1, 47:2-25

(Romain).

C.    *Disclosures Made to the Court*

On September 17, 2008, LBHI and LB 745 LLC filed the Bid Procedures Motion,

seeking approval of the sale to Barclays. BCI Ex. 11 (M Ex. 118). The Bid Procedures Motion

describes the sale to Barclays as a transaction that was to be consummated on the terms and

conditions set forth in the APA. BCI Ex. 11 (M Ex. 118) ¶ 5. Because events were taking place

so quickly and the elements of Lehman III had not yet fallen into place, the Bid Procedures

Motion does not disclose the existence or set forth the terms of Lehman III, nor does it reveal a

discounted price for the Purchased Assets or clarify the estimates for compensation and cure

payments. BCI Ex. 11 (M Ex. 118).

On that same day, the Court held the Bid Procedures Hearing. At that hearing, counsel to

Lehman described the nature and overall value of the sale to the Court in connection with a

request for a break-up fee and outlined the components of the Lehman II transaction. BCI Ex. 48

(M Ex. 260) (9/17/08 Tr.) 22:8-24:17 (Miller). The Committee had only just been appointed and

retained its counsel. It therefore requested an adjournment so that it could study the transaction,

but the Court denied that request due to the extraordinary need to move quickly to preserve the

Broker-Dealer Business. BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 27:10-35:1 (Despins, Peck,

Miller).

Although the September 18 Repurchase Agreement was about to become the centerpiece

of the sale transaction, the Court was told virtually nothing about it. Counsel to LBHI described

the repurchase agreements superficially as a means to continue short term financing so that LBI

could get through the week – not as a centrally important mechanism for structuring the

49

acquisition and establishing a mismatch between the value of acquired assets and assumed

liabilities.  BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 24:9-17 (Miller) ("And then, Your Honor, in

the interim, LBI has entered into an arrangement with the prospective purchaser where there's a

repo agreement in which they are backing up and allowing these repos to be settled and to be

financed ...")

    With respect to cure liability, the $1.5 billion estimate was specifically disclosed to the

Court in connection with the Bid Procedures Motion.  First, the Bid Procedures Motion stated

that "[t]he parties estimate that the cure costs associated with such assumptions and assignments

will be approximately $1.5 billion."  BCI Ex. 11 (M Ex. 118) ¶ 14.  Additionally, in his

presentation to the Court, counsel to LBHI explained that "in connection with the assumption

and assignment of contracts, the cure amounts and other payments in connection with the

contracts are estimated to be a billion five hundred million dollars."  BCI Ex. 48 (M Ex. 260)

(9/17/08 Tr.) 24:1-5 (Miller); *see also* 6/22/10 Tr. 230:8-24 (Cox) (Lehman was making a "good

faith estimate" with respect to cure liability).

    There was little more disclosed to the court at the Sale Hearing.  With respect to the

nature of the sale, the Court's understanding at the time was that the transaction had not changed

and that the subject matter was the same APA with a lower value for the Purchased Assets than

had been described just two days earlier.

    It is true that counsel explained to the Court that there were "many changes" to the

transaction by the time of the Sale Hearing (and that a Clarification Letter documenting such

changes would be forthcoming).  Statements from counsel indicated that there was a positive

difference between the Purchased Assets and the Assumed Liabilities:

> In terms of the economic changes, they result largely because of the markets,
> unfortunately. And from the time that the transaction was actually entered

50

into till [sic] now, the markets dropped and the value of the securities dropped as
well. So, originally, we were selling assets that had a value of seventy —
approximately seventy billion dollars. And today, Your Honor, we're only
selling assets that have a value of 47.4 billion dollars. Barclays is assuming
liabilities, however, of 45.5 billion dollars in connection with those assets. So
that has not changed from the original transaction.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 46:21-47:7 (Fife).   Counsel to LBHI mentioned the

September 18 Repurchase Agreement only in passing, however, stating that "Barclays basically

stepped into the shoes of the Federal Reserve in connection with the Primary Dealer Credit

Facility as to the 45.5 billion dollars Lehman borrowed last Monday and received the collateral

that Lehman posted in connection therewith."  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 63:18-22

(Miller).

    Regarding the estimate for comp, the Court was told that "Barclays will also assume

exposure for the employees that accept offers of employment, which is estimated to have a value

of approximately – an exposure of approximately two billion dollars."  BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 99:22-25 (McDade Proffer).

    With respect to cure, the disclosure was that "Barclays is also assuming the cure amounts

relating to contracts and leases that will be assumed pursuant to the asset purchase agreement.

And that has a potential exposure … of 1.5 billion dollars … ."  BCI Ex. 49 (M Ex. 261)

(9/19/08 Tr.) 100:1-4 (McDade Proffer).

## IV.   Notwithstanding Incomplete and Flawed Disclosure, Cause Does Not Exist for 60(b) Relief

    The evidence is clear and shows beyond all doubt that the Court did not know some very

basic information regarding the transaction that evolved over the course of Lehman Week.  The

Court finds, however, that the failure to disclose this information is not cause for relief under

Rule 60(b). Based on the record of the trial, the Court concludes that the parties negotiated in good faith and at arm's length, and that there was no effort to conceal relevant facts.[20]

After careful deliberation and consideration of an extensive record, the Court concludes that nothing in that record would have changed the outcome of the Sale Hearing – *i.e.*, the Court still would have entered an order approving the sale to Barclays even if it had known about the $5 billion "buffer" producing a gain to Barclays on day one of the sale, the differences in the comp and cure estimates versus the amount actually paid (or expected to be paid) and/or the existence and terms of Lehman III. Of particular importance is the lack of any substantial evidence to support a finding that the Sale Order was procured by fraud, misrepresentation, or wrongdoing of any kind. The disclosure problems are real, but they are due to the "fog" of Lehman and an emergency of a magnitude unlike any that has ever occurred in any sale hearing. These failings are, as a result, both understandable and forgivable.

A.    *The Sale was Negotiated in Good Faith and at Arm's Length*

Movants suggest but fail to establish that certain former Lehman executives breached their fiduciary duties because of conflicted loyalties relating to their lucrative employment agreements with Barclays. LBHI Br. Supp. 60(b) Mot. ¶¶ 14, 18, notes 2-12, 26, 115. Throughout the trial, Movants continued to insinuate bad faith on the part of these executives, implying that they were acting in bad faith on behalf of Lehman due to their pending employment at Barclays. During their questioning of Ian Lowitt and Martin Kelly – the only such former Lehman executives that Movants called to testify at trial – however, Movants failed to establish that there was any sort of *quid pro quo* between any Lehman executive and Barclays or any other demonstrated breach of duty. *See* 4/28/10 Tr. 130:10-262:10, 286:13-287:15

---

[20] For example, Archibald Cox, then-Chairman of Barclays America, testified, "Barclays wanted the Court to be in the position to make the right decision" and at no point did he have "any concern that any of the information being provided to the Court was in any way inaccurate or incomplete." 4/30/10 Tr. 206:20-24, 207:18-21 (Cox).

(Kelly); 4/29/10 Tr. 10:13-131:20, 165:7-179:23 (Lowitt). Numerous witnesses involved in the

negotiations confirm that the sale was negotiated at arm's length and in good faith.

That is not to say that Mr. Kelly was a credible witness. The opposite is true. He

appeared to be anything but candid and seemed to have been coached to a degree that the Court

might well discount everything that he said. The Court believes that he engaged in a process of

marking down asset values, but finds no basis for concluding that the valuation process was

corrupted by his expectation of becoming a Barclays employee.

The testimony of several of Movants' own witnesses – Harvey Miller, Michael Ainslie,

Bryan Marsal and Barry Ridings – supports the conclusion that all parties acted in good faith

during the negotiation process. Miller Dep. Tr. 59:18-60:7 (no former Lehman executive acted

in bad faith); 4/26/10 Tr. 139:5-9 (Ainsle) (no Lehman employee breached his duty of care or

loyalty to Lehman during the negotiations); Marsal Dep. Tr. 76:9-16 (not aware of "any

evidence" that any of the Lehman executives involved in negotiating the sale to Barclays

breached his fiduciary duties to Lehman); Ridings Dep. Tr. 49:13-50:11 ("no reason to believe"

that any former Lehman executive acted in bad faith). Moreover, Lehman's lead negotiator Bart

McDade testified both at the Sale Hearing and at trial that the negotiations were in good faith and

at arm's length. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 96:6-9 (McDade Proffer); 4/27/10 Tr.

37:14-22, 38:15-20 (McDade).

Also supporting the integrity of the negotiations was testimony regarding the extremely

challenging and stressful circumstances under which the negotiations were conducted. Multiple

witnesses to the negotiations testified that the negotiations were rigorous, with vigorous

disagreements between Lehman and Barclays, and that the negotiations were conducted at arm's

length. 8/23/10 Tr. 26:18-27:11, 31:1-4 (Shapiro); 8/27/10 Tr. 25:15-27:24, 40:25-42:6 (Klein);

8/31/10 Tr. 14:18-15:5, 16:5-21, 17:12-20, 228:22-229:14 (Lewkow); 9/7/10 Tr. 21:18-22:2

(Leventhal).

Movants highlighted the fact that a number of the senior Lehman executives who were

negotiating the sale to Barclays on behalf of Lehman at the same time were negotiating their own

employment contracts with Barclays.  LBHI Br. Supp. 60(b) Mot. ¶1, notes 2-12.  However,

Barclays and Lehman disclosed publicly in the Bid Procedures Motion and at the Sale Hearing

that Barclays would retain the top executives from Lehman and pay them bonuses.  BCI Ex. 11

(M Ex. 118) ¶ 19; BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 149:11-16 (Ridings).  Employee

retention, especially at senior levels, was a necessary feature of the acquisition.  Indeed, in order

to keep the business intact and to prevent the loss of key personnel, Barclays needed to include

competitive bonus commitments in its employment offers to top executives.  8/27/10 Tr. 15:11-

17 (Klein); 8/23/10 Tr. 50:16-25 (Shapiro); 8/31/10 Tr. 15:6-23 (Lewkow).  The existence of

such incentives is not surprising, and, more importantly, has not been shown to have influenced

the behavior of these executives.

Barclays made no effort to keep secret the fact that it expected and planned for the sale

transaction to result in a day-one acquisition gain.  BCI Ex. 110 (M Ex. 16); 6/22/10 Tr. 91:2-24

(Varley); 6/21/10 Tr. 141:16-142:5 (Diamond); 5/7/10 Tr. 146:21-147:2 (Ricci).  Moreover,

Stephen King, who was head of the Portfolio Mortgage Trading Group at Barclays during

Lehman Week, testified that Lehman's trading assets were exceptionally difficult to value

because so many of them were illiquid.  8/25/10 Tr. 26:18-28:3, 32:24-34:9, 60:23-61:15, 66:24-

68:1 (King).  In addition, the identity of Lehman's trading assets was constantly changing – many

of the assets in the repo collateral actually delivered to Barclays were different from those that

had been pledged to the New York Fed. 8/25/10 Tr. 15:10-16:6, 23:20-24:17, 55:11-56:6, 153:1-154:1 (King).

At the Sale Hearing, certain parties in interest objected to the sale transaction on the basis that Barclays was receiving a "discount value" or "a fire-sale deal," and contended that there was insufficient evidence as to "whether the proposed purchase price represents a fair value for these assets." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 170:8-14, 174:6-8 (Golden), 227:5-14 (Angelich). Counsel for a group of creditors urged the Court to allow more time for possible competing offers. BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 167:20-168:3, 171:16-172:2, 174:9-21 (Golden).

In response, counsel to LBHI explained to the Court that

> the proceeds of the sale, the 250 million dollars, is going
> to the SIPC trustee, the one billion 290 million dollars is going to the
> estate. There is a creditors' committee. Those proceeds are safe.
> Hopefully, we're going to go into the more conventional procedures of
> Chapter 11. I don't want to use the melting ice cube. It's already half
> melted, Your Honor. The steps have had [sic] happened, the things that have
> happened since Wednesday, make it imperative that this sale be approved.
> In the interest of all of the stakeholders, including Mr. Golden's clients,
> they will benefit by this, Your Honor, because if the alternative happens,
> there will be very little to distribute to creditors, if anything.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 244:11-24 (Miller). The Sale Order (which Movants supported on appeal to the District Court)[21] expressly denied and overruled those creditor objections on the merits with prejudice. BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 2; see also BCI Ex. 17 (M Ex. 444) (SIPA Sale Order).

The Court finds that the estimates for comp and cure that the parties presented at the Sale Hearing were just that – good faith estimates, and not guarantees or representations that these were firm numbers. Barclays did not have the time and information needed for a comprehensive

---

[21] On December 12, 2008, LBHI filed a brief opposing a creditor's appeal of the Sale Order and invoked the terms of the Clarification Letter as a reason for denying the appeal and affirming the Sale Order "in all respects." BCI Ex. 33 (M Ex. 405) at 4, 9, 12, 18, 23, 26. The Trustee filed a brief adopting LBHI's brief. M Ex. 552 at 4, n. 1. *See also* 30-31, *supra*, for a discussion of the procedural history of the Sale Order.

analysis to determine which contracts it would need to assume, and therefore it could not know how much it would have to pay in cure payments. 4/30/10 Tr. 72:1-12, 74:2-75:14 (Clackson); 4/28/10 Tr. 114:22-115:19 (Miller); 8/23/10 Tr. 44:6-45:15 (Shapiro); 8/31/10 Tr. 92:16-25, 93:9-12, 235:20-236:7 (Lewkow). Indeed, the comp and cure estimates necessarily were uncertain and contingent. 4/28/10 Tr. 32:8-19 (Miller) (describing the $1.5 billion figure for cure payments as "contingent"); Miller Dep. Tr. 81:5-14 (total amount that Barclays would end up having to pay in bonuses and severance payments uncertain and contingent).

As explained in the Introduction to this Opinion, the Court did not base its approval of the sale transaction on any specific number or on any perception of a "wash" or a balanced transaction. Just as the APA contained no total valuations and no representations or warranties as to values (and no "true up" to the extent that valuations might change over time), the Court made no findings of specific valuations, and could not have made any such findings given the character and description of the assets and the emergency nature of the hearing.

The circumstances presented during the Sale Hearing were truly extraordinary and unique. The Court approved the Sale because "the consequences of not approving a transaction could prove to be truly disastrous," and "[t]he harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:16-21 (Peck). That conclusion is as true today as it was at the time of the Sale Hearing.

B.     *Barclays Was the Sole Purchaser in a Position to Purchase the Assets as a Going Concern and Prevent a Liquidation that Would Have Caused a Disintegration of the Enterprise*

The reality is that Barclays was the only purchaser for Lehman's assets. The Court knew at the Sale Hearing facts that had been widely reported in the media in the months preceding the

Filing Date – Lehman had been looking for a strategic buyer or investor for some time with no success. *See, e.g.,* BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 25:10-18 (Miller) ("For months now, Lehman Brothers has been pursuing strategic alternatives …. [T]he public, the financial markets knew that these assets were for sale"). During Lehman Week, Lazard also contacted various entities that had expressed interest in a transaction with Lehman "but not one of them, nor any other entity, had expressed the desire or ability to step into Barclays' shoes." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 145:5-13 (Ridings Proffer). The Committee refrained from objecting to the sale due to the "lack of a viable alternative." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 67:9-14 (Despins). Barclays was the one qualified buyer in a position to promptly complete a going concern acquisition – it is as simple as that.

Importantly, throughout the 34 days of trial, the Movants did not present any evidence that other potential bidders would have come forward had any of the information not disclosed to the Court been made public. *See generally* M Ex. 151; M Ex. 152; M Ex. 153; M Ex. 154; M Ex. 154B; M Ex. 155B; M Ex. 156B; M Exs. 821-825; 9/20/10 Tr. (Zmijewski); 9/21/10 Tr. (Zmijewski, Garvey, Schneider); 9/29/10 Tr. (Schwaba); 9/30/10 Tr. (Slattery); 10/04/10 Tr. (Olvany). What the evidence does demonstrate is that the disintegration of the enterprise and the liquidation that would have occurred had there had been no sale to Barclays would have resulted in greater economic harm and losses in the financial markets than actually were experienced in September 2008 and succeeding months of the financial crisis. *See, e.g.,* BCI Ex. 48 (M Ex. 260) (9/17/08 Tr.) 64:19-65:4 (Leventhal); BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 60:1-61:13 (Miller), 67:9-14 (Despins), 93:6-94:20, 102:19-103:7 (McDade Proffer), 143:17-19, 144:18-19, 144:22-24, 146:4-14 (Ridings Proffer), 244:11-24 (Miller), 250:13-21 (Peck); BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 1; 4/26/2010 Tr. 242:23-243:6 (McDade); 6/25/2010 Tr. 61:4-20 (Despins);

5/6/2010 Tr. 118:6-7 (Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-37:15, 65:10-15; 8/23/2010

Tr. 57:19-58:9 (Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-29:8

(Diamond); 6/22/2010 Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-25 (Pfleiderer).  As Michael

Ainslie, member of the board of directors of LBHI, testified, in the absence of the sale to

Barclays, LBI's liquidation could result in an "open-ended negative series of claims" on the

estate.  4/26/10 Tr. 96:7-12 (Ainslie).

      Witnesses consistently testified that the Barclays Sale was the best available transaction

for the estate and was far better than an LBI liquidation. 4/26/2010 Tr. 243:3-11 (McDade);

4/28/2010 Tr. 22:20-24 (Miller); 6/25/2010 Tr. 61:4-20 (Despins); 5/6/2010 Tr. 118:6-12

(Burian); Ridings Dep. Tr. 12:18-13:4, 35:19-36:20, 65:4-15; 8/23/2010 Tr. 57:19-58:9

(Shapiro); *see also* 5/4/2010 Tr. 62:16-21 (Seery); 6/22/2010 Tr. 28:22-25 (Diamond); 6/22/2010

Tr. 183:10-20 (Varley); 10/6/10 Tr. 84:16-85:21 (Pfleiderer).

      The "most important[]" factor for the court in determining whether to approve a § 363

sale is whether the asset is decreasing in value. *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

Thus, a sale should be approved when the court is faced with the situation of a so-called "melting

ice cube," a sale that would prevent "further, unnecessary losses," the failure of other potential

buyers to appear despite "well-publicized efforts," and where the only alternative "is an

immediate liquidation that would yield far less for the estate" and creditors. *Ind. State Police

Pension Trust v. Chrysler LLC (In re Chrysler LLC)*[22], 576 F.3d 108, 118-19 (2d Cir. 2009).

---

[22] After the Second Circuit reaffirmed in a full opinion its earlier summary affirmance of the bankruptcy court's order authorizing a Section 363 sale of the assets of the former Chrysler LLC "for the reasons stated in the opinions of Bankruptcy Judge Gonzalez," the Indiana State Pension Police Trust filed a petition for certiorari to the United States Supreme Court. *Chrysler*, 576 F.3d 108 at 111.  During the pendency of the cert petition, the sale of Chrysler's assets was consummated.  On December 14, 2009, the Supreme Court issued a summary order granting certiorari, vacating the judgment of the Second Circuit, and remanding with instructions to dismiss the appeal as moot. *Ind. State Police Pension Trust v, Chrysler LLC*, 130 S. Ct. 1015 (2009) (vacating 576 F.3d 108 (2d Cir. 2009)); *see also In re Chrysler LLC*, 592 F.3d 370, 370 (2d Cir. 2010) (per curiam) (dismissing the appeal on remand), *In re Motors Liquidation Company*, 428 B.R. 43, 50 n.6 (S.D.N.Y. 2010) (describing procedural history).

With this legal standard from *Lionel* in mind, and having been presented with clear and

convincing evidence of the quickly dissipating assets remaining in the estate, the Court approved

the sale transaction:

> One could be a theoretical bankruptcy jurist and say transactions such as this should
> always be subject to more time so that parties can better assess the consequences of the
> transactions .... This is Friday. This case was filed on Monday. What we're doing is
> unheard of but imperative. I am completely satisfied that I am fulfilling my duty as a
> United States bankruptcy judge in approving this transaction and in finding that there is
> no better or alternative transaction for these assets, that the consequences of not
> approving a transaction could prove to be truly disastrous. And those adverse
> consequences are meaningful to me as I exercise this discretion. The harm to the debtor,
> its estates, the customers, creditors, generally, the national economy and the global
> economy could prove to be incalculable.

BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 250:5-21 (Peck).

The evidence at trial supports the statements made during the Sale Hearing. Movants

offered no evidence to contradict the proffered Sale Hearing testimony of Mr. Ridings that "the

sale of LBI must be immediately consummated or there will be little or nothing to sell," that

"these assets have substantially greater value if they are sold as a going concern," and that

"[w]ithout Barclays, Lehman would be forced to sell [discrete] assets for a fraction of the value

that will be realized from this transaction." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 143:17-19,

144:18-19, 144:22-24 (Ridings Proffer).

Some 2 ½ years after the Sale Hearing and almost two years since the Sale Order was

affirmed on appeal, the Court also is mindful of the well-established public policy of upholding

the finality of sale orders issued by bankruptcy courts to encourage potential acquirers to make

bids on assets in bankruptcy. *See, e.g., In re Chung King, Inc.*, 753 F.2d 547, 549-50 (7th Cir.

1985) (finality policy necessary to encourage bidders); *In re Lawrence*, 293 F.3d 615, 621 (2d

Cir. 2002) (citations omitted) (finality policy "particularly important" in the context of a

---

Notwithstanding this procedural history, the references to a "melting ice cube" in the *Chrysler* opinion provide a
most persuasive rationale for expedited sale hearings.

bankruptcy sale order). Because the finality of bankruptcy sales is necessary to encourage serious bidders, the Court has limited discretion to vacate a sale order. *See Chung King,* 753 F.2d 547, 549-50 (7th Cir. 1985) (to overturn a confirmed sale, a court must find "a fundamental defect which would shock the conscience"); *accord, In re General Insecticide Co.*, 403 F.2d 629, 630-31 (2d Cir. 1968) (citations omitted) (strict standard for setting aside sale unless "tinged with fraud, error or similar defects" due to emphasis on finality in judicial sales).

In the Sale Order, the Court specifically held that Barclays was "entitled to all of the benefits and protections afforded by Bankruptcy Code Section 363(m)." BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 18. Section 363(m) affords purchasers of a debtor's assets an "assurance of finality" with respect to "who has rights to estate property." *In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997); *see also United States v. Salerno*, 932 F.2d 117, 123 (2d Cir. 1991) (conclusion to uphold terms of sale under Section 363(m) "furthers the policy of finality in bankruptcy sales"). Where, as here, (i) a significant amount of time has passed, (ii) the Sale Order has been affirmed on appeal, and (iii) the appellate court has rejected challenges to the Sale Order's core provisions, held that the sale was adequately noticed, and found that the purchaser acted in good faith, the Court should apply a strict "shocks the conscience" standard. Under this standard, Rule 60(b) relief is warranted only if the new evidence presented would have changed the outcome of the Sale Hearing.

Many Courts have denied Rule 60(b) relief without a reason of "such importance that it probably would have changed the outcome" of the case. *Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001) (citations omitted) (no relief despite proof of perjury, because result would have been the same); *see also Fitzgerald v. Field*, No. 98-7574, U.S. App. LEXIS at *6 (2d Cir. 1999) (affirming rejection of Rule 60(b) fraud claim where the alleged fraud "could not have affected

the outcome"); *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999) ("Rule 60(b)(1)

affords a party relief from a material mistake that changed the outcome of the court's judgment").

Courts regularly have applied the "changed the outcome" test to claims under all

subsections of Rule 60(b). *BOUSA, Inc. v. United States (In re Bulk Oil (USA) Inc.)*, No. 89-B-

13380, 2007 U.S. Dist. LEXIS 27346, at *29-31 (S.D.N.Y. Apr. 11, 2007) (Rule 60(b)(1));

*Avedis v. Herman*, 192 F.R.D. 477, 478 (S.D.N.Y. 2000) (same); *In re Vitta*, 409 B.R. 6, 12

(Bankr. E.D.N.Y. 2009) (same); *Teamsters*, 247 F.3d at 392 (Rule 60(b)(2)); *Epps v. Howes*, 573

F. Supp. 2d 180, 184 (D. D.C. 2008) (same); *In re St. Stephen's 350 E. 116th St.*, 313 B.R. 161,

174 (Bankr. S.D.N.Y. 2004) (same); *Bettis v. Kelly*, No. 02 Civ. 104, 2004 U.S. Dist. LEXIS

1543 at *5-6 (S.D.N.Y. Aug. 9, 2004), *aff'd*, 137 F. App'x 381 (2d Cir. 2005) (Rule 60(b)(3));

*Creamer v. Laidlaw Transit, Inc.*, 76 F. App'x 273, 275 (10th Cir. 2003) (Rule 60(b)(6)). Based

on this standard, and for the reasons stated, the Court finds that Movants are not entitled to relief

on their Rule 60(b) claims.

## V.    The Expert Testimony Supports the Conclusion that Barclays Did Not Receive a Windfall

The decision not to grant relief under Rule 60(b) also is supported by an assessment and

weighing of the expert testimony presented by the parties. The Court heard this testimony over

an eight-day period and admitted into evidence the expert reports of eight witnesses. During this

phase of the trial, Movants sought to prove that Barclays obtained a huge economic benefit due

to the undisclosed discounting of the value of the acquired financial assets and that Barclays

adopted "low-ball" numbers on its Acquisition Balance Sheet that by coincidence exactly

matched the amounts ascribed to these assets by the negotiating teams for Lehman and Barclays.

Movants raised questions about the credibility of the valuation judgments made by Barclays, but

they have not succeeded in proving that these judgments were erroneous. Largely on the

strength of the testimony of Professor Paul Pfleiderer, who was the final witness for Barclays and who testified for two days, Barclays was able to convincingly establish its defense to the allegation that it obtained a windfall in connection with the acquisition.

A.    *Barclays' Valuation Expert*

Barclays called Professor Paul Pfleiderer as an expert witness whose testimony tied together all of the evidence relating to valuation in a most persuasive and comprehensive manner.  He testified regarding a number of issues, notably whether the APA misstated the book value of the assets being acquired by Barclays, and the value of the repo collateral that was actually acquired by Barclays in the sale transaction.  10/6/10 Tr. 10:14-25 (Pfleiderer). Notwithstanding the efforts of the Movants to show that Professor Pfleiderer was being used as a mouthpiece for witnesses from the Product Control Group of Barclays and from Pricewaterhouse Coopers ("PWC") who did not appear at trial, the Court accepted Professor Pfleiderer as an expert in financial economics and valuation and found his testimony to be most helpful.  10/6/10 Tr. 14:21-25, 15:1 (Pfleiderer).[23]

Professor Pfleiderer has a Ph.D. in economics from Yale University and has been a professor of finance at Stanford Graduate School of Business for almost thirty years.  10/6/10 Tr. 6:20-25, 7:1-1 (Pfleiderer).  Professor Pfleiderer primarily teaches finance courses devoted to valuation to graduate students in the MBA program.  10/6/10 Tr. 7:4-16 (Pfleiderer).  He also currently teaches a corporate finance course at Stanford Law School.  10/6/10 Tr. 7:6-8 (Pfleiderer).  As was true of his testimony as a valuation expert in the *Iridium* case, the Court again finds Professor Pfleiderer to be "an especially credible witness" and that Professor

---

[23] Barclays also called Anthony Leitner as an expert in the exchange-traded derivatives industry.  Mr. Leitner's opinions do not relate to the value of the assets stated in the APA or the value of the repo collateral, but rather relate to the Disputed Assets, and specifically, whether Barclays was entitled to the margin and related property in connection with its acquisition of Lehman's exchange traded derivatives portfolio.

Pfleiderer once again "responded to questions, both on direct examination and during cross examination, with great candor." *Statutory Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* 373 B.R. 283, 337 (Bankr. S.D.N.Y. 2007).

Based upon his review of Lehman's financial records, Professor Pfleiderer concluded that the book value of the assets being acquired by Barclays was not understated in the APA by any significant amount, particularly not by $5 billion, and that the book value according to Lehman's financial records was approximately $70 billion or less. 10/6/10 Tr. 19:15-20, 49:7-13 (Pfleiderer). Professor Pfleiderer also concluded that the repo collateral was reasonably valued. 10/6/10 Tr. 19:22-25, 20:1-2 (Pfleiderer).

In testifying regarding the value of the repo collateral, Professor Pfleiderer explained that the repo collateral included many financial assets that were illiquid and difficult to value under normal circumstances, judgment is required in valuing such assets, reasonable people may have different opinions concerning such valuations and, therefore, there is not one reasonable valuation for such assets, but a range of reasonable valuations. 10/6/10 Tr. 93:10-94:25, 95:23-96:5, 123:22-124:7 (Pfleiderer); 10/7/10 Tr. 7:17-8:22 (Pfleiderer). Moreover, Professor Pfleiderer testified that it was even more difficult to value the repo collateral due to the market turmoil that existed during September 2008. 10/7/10 Tr. 6:21-7:3 (Pfleiderer).

Professor Pfleiderer indicated that in forming his opinion as to the reasonable valuation of the repo collateral he considered it important that the Barclays' personnel who conducted the valuation and made the difficult valuation judgments were active participants in the market with a feel for the specific market conditions that existed in late September 2008 and that independent PWC personnel reviewed the reasonableness of these judgments. 10/7/10 Tr. 88:20-89:13, 177:10-178:6 (Pfleiderer). Professor Pfleiderer further testified that he did not find anything to

indicate that Barclays attempted to mislead in its valuation, and he was reassured by the

knowledge that PWC had extensively audited Barclays' valuation judgments.  10/7/10 Tr.

185:18-22 (Pfleiderer); 10/6/10 Tr. 120:16-121:3, 143:16-144:6, 146:9-147:1, 181:8-10, 182:10-

14, 193:16-21 (Pfleiderer); *see also* 10/7/10 Tr. 94:17-96:17 (Pfleiderer).  He observed that the

process of an outside audit of the valuation, such as the audit conducted by PWC, generally will

produce a more reliable valuation.  10/7/10 Tr. 95:11-96:17 (Pfleiderer).

Additionally, Professor Pfleiderer expressed the opinion that in a so-called "fire sale"

liquidation of the assets transferred to Barclays it is "almost inconceivable" that Lehman would

have realized as much consideration as it received for the assets from Barclays and that the

likelihood is that a "fire sale" liquidation would yield "significantly less" for such assets.  10/7/10

Tr. 186:21-187:9 (Pfleiderer).  He also testified that Lehman "did better than what it would have

done if it would [have] had a liquidation" and that there was no doubt in his mind that this was

"the case with very, very strong probability."  10/6/10 Tr. 208:19-21 (Pfleiderer).  Furthermore,

Professor Pfleiderer stated that Lehman "couldn't have done better; the estate could not have

done better by selling it to another bidder for more, because there wasn't another bidder."

10/6/10 Tr. 208:22-24 (Pfleiderer).

The Court accepts Professor Pfleiderer's conclusions regarding the value of the assets

sold to Barclays and the valuation of the repo collateral.  He was persuasive in pointing out that

these hard to value assets were being valued by persons who were intimately familiar with both

the assets and the relevant markets at a time of unusual market disruptions, and that such

valuations were independently audited by a third-party auditor and found to be reasonable.  His

cogent and coherent testimony also supports the ultimate conclusion that Barclays did not

receive an unfair advantage when it purchased the Broker-Dealer Business and further

demonstrates that there is no cause to grant 60(b) relief.

B.    *Movants' Valuation Experts*

The Movants' called a total of six experts to testify with respect to valuation matters, all

of whom are either employed by or affiliated with Navigant Economics (Chicago Partners), an

"economic consulting firm that consults primarily in the litigation or dispute space," or its parent

Navigant Consulting Inc. 9/21/10 Tr. 27:7-8, 12-14 (Garvey); 9/20/10 Tr. 8:15-17 (Zmijewski);

9/21/10 Tr. 147:6-10 (Schneider); M Ex. 154B (Corrected Expert Report of Joseph Schwaba) ¶

1; 9/30/2010 Tr. 19:11-13 (Slattery); 10/4/10 Tr. 10:20-25 (Olvany). The Court accepted

Professor Mark Zmijewski as an expert in accounting, financial analysis and valuation; John

Garvey as an expert in accounting, auditing and financial analysis issues; John Schneider as an

expert in the area of custodial services, particularly with respect to the policies and procedures

followed by custodians in dealing with repurchase agreements; Joseph Schwaba as an expert in

the valuation of municipal securities; Mark Slattery as an expert in the valuation of fixed-income

securities; and John Olvany as an expert in the valuation of corporate securities. 9/20/10 Tr.

15:4-12 (Zmijewski); 9/21/10 Tr. 33:1-3, 40:1-20 (Garvey); 9/21/10 Tr. 151:8-13 (Schneider);

9/29/10 Tr. 53:13-16 (Schwaba); 9/30/10 Tr. 21:14-17 (Slattery); 10/4/10 Tr. 14:14-17 (Olvany).

Despite the individual and cumulative expertise of these multiple witnesses called by the

Movants, they were not at all convincing at trial and uniformly appeared to be working in

concert to achieve a desired outcome for the Movants. Movants' experts were not themselves

market participants, and they performed their valuations specifically in connection with this

litigation knowing that the Movants alleged that Barclays had undervalued the assets and were

seeking a quantification of such undervaluation. 9/20/20 Tr. 108:7-109:3, 110:22-111:7, 111:21-

112:9 (Zmijewski); M Ex. 151 (Expert Report of John P. Garvey) ¶6, App. 1; M Ex. 153A (App.

II to John J. Schneider Expert Report, Curriculum Vitae); M Ex. 154A (App. I to Expert Report

of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr. 75:8-18 (Schwaba); M Ex. 155A (App. I to

Expert Report of Mark E. Slattery, CFA, Curriculum Vitae); 9/30/10 Tr. 59:13-15, 60:3-11

(Slattery); M Ex. 152A (App. I to Expert Report of John J. Olvany, Curriculum Vitae); 10/4/10

Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany).  They were hired to reach a certain conclusion, and

that is what they did.

However, counsel for Barclays was able to challenge the methods used and conclusions

reached by certain of these witnesses.  Cross-examination raised doubts as to their opinions.[24]

Additionally, these experts did not express any views that the Acquisition Balance Sheet, which

was audited by PWC, understated the value of the assets acquired by Barclays in the sale

transaction.  Mr. Garvey specifically testified that he was not giving an opinion with respect to

whether Barclays' financials were materially misstated under applicable law, whether the

Acquisition Balance Sheet was unreasonable or incorrect, or whether there were any material

misstatements included in the Acquisition Balance Sheet.  9/21/10 Tr. 46:3-9, 84:17-25, 85:1-

86:4 (Garvey).

C.      *Legal Standards Regarding the Reliability and Credibility of Expert Testimony*

A proponent of expert testimony must demonstrate that the proffered testimony is both

reliable and relevant.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993);

---

[24] For example, Barclays' cross-examination of Mr. Slattery revealed that the summary spreadsheet prepared by Mr. Slattery in connection with his valuation of the Agency Residential Mortgage Backed Securities portfolio misleadingly demonstrated that in valuing the portfolio Mr. Slattery calculated the "bid" price by reducing the "mid" price by a "mid-to-bid" liquidity factor adjustment when for certain securities he actually started with a "bid" price and reverse-engineered, or "grossed up" the "bid" price to create the "mid" price. 9/30/10 Tr. 102:1-107:2, 111:7-112:3 (Slattery).

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) *(quoting Daubert, 509 U.S. at 597)*.

The *Daubert* factors apply not only to the admissibility of evidence, but also apply to weight and credibility determinations. *See e.g., Elliot v. Commodity Futures Trading Comm'n*, 202 F.3d 926, 934-35 (7th Cir. 2000) (affirming district court's decision to ignore unreliable testimony and finding that a "fact-finder should employ the reliability benchmark in situations ... in which unreliable expert testimony somehow makes it in front of the fact-finder, and assign the unreliable testimony little if any weight"); *Libas, Ltd. v. U.S.*, 193 F.3d 1361, 1366 (Fed. Cir. 1999) (reliability of expert testimony applies to the weight accorded to that testimony as well as its admissibility).

To assess whether expert testimony meets the requisite standards the court should undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267.

An expert's opinion that is not "based on sufficient facts or data" nor "the product of reliable principles and methods properly applied," should be rejected. *Lippe v. Bairnco Corp.*, 288 B.R. 678, 686 (S.D.N.Y. 2003) aff'd 99 F. App'x. 274 (2d Cir. 2004); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp.2d 398, 425 (S.D.N.Y. 2005) (rejecting expert testimony where "the plaintiff's experts have ignored a large amount of information that calls many aspects of the [expert's theory] into question" and explaining that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect")

Expert opinion is unreliable and not based on sufficient facts and data when the expert "made no attempts to reconcile his view [] with a number of real world events" and "fail[s] to

acknowledge and account for these events." *Point Prods. A.G. v. Sony Music Entm't, Inc.*, No.

93 Civ. 4001 (NRB), 2004 U.S. Dist. LEXIS 2676, at *24, *33-35, *43 (S.D.N.Y. Feb. 23,

2004). "[F]ailure to look" at facts, "even for a reality check" means that an expert lacks

sufficient facts and renders his opinion unreliable. *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,

395 F.3d 416, 418 (7th Cir. 2005).

D.    *The Expert Opinions Regarding Valuation Offered by the Movants are Not Persuasive*

        The Court gives little weight to the testimony of Movants' experts.  As discussed above,

the expert witnesses proffered by the Movants, none of whom were market participants in

September 2008, all prepared their valuations for the express purpose of this litigation.  9/20/20

Tr. 108:7-109:3, 110:22-111:7, 111:21-112:9 (Zmijewski); M Ex. 151 (Expert Report of John P.

Garvey) ¶6, App. 1; M Ex. 153A (App. II to John J. Schneider Expert Report, Curriculum

Vitae); M Ex. 154A (App. I to Expert Report of Joseph Schwaba, Curriculum Vitae); 9/29/10 Tr.

75:8-18 (Schwaba); M Ex. 155A (App. I to Expert Report of Mark E. Slattery, CFA, Curriculum

Vitae); 9/30/10 Tr. 59:13-15, 60:3-11 (Slattery); M Ex. 152A (App. I to Expert Report of John J.

Olvany, Curriculum Vitae); 10/4/10 Tr. 44:2-5, 83:7-84:22, 87:17-88:8 (Olvany).  They

presented a mosaic of conclusions based upon their valuations of particular classes of assets

acquired by Barclays.  These witnesses engaged in a result-oriented exercise of looking

retrospectively and critically at the judgments made by Barclays, on a CUSIP-by-CUSIP basis,

as part of a concerted effort of trying to find a windfall.  Experts who are valuing assets with

such a litigation bias are not as compelling as those who actually had a "feel for this particular

market in late September 2008."  10/7/10 Tr. 177:25-178:5 (Pfleiderer).

        The Court agrees with Professor Pfleiderer's observation that a "de novo after the fact

valuation" given in a litigation context is of limited merit in determining whether

contemporaneous valuation judgments performed by Barclays were reasonable. 10/6/10 Tr.

89:1-9 (Pfleiderer). This is particularly true in a setting such as this in which the after-the-fact

judgments are seeking to upset the valuation determinations of market participants that were

made during a period of unusually severe market volatility.

It was a time of such upheaval that the only thing that was certain was uncertainty. Given

the unparalleled circumstances of the financial markets in the fall of 2008 and heightened

uncertainty regarding the reliability of valuation judgments, the Movants' experts were

challenged with effectively calling into question the judgments made during this period by

Barclays' personnel such as Stephen King, who seems to have been one of the masters of that

valuation universe. The Court finds that Movants' experts failed to prove that the assets were

valued improperly and, based on the examination and cross-examination of the Movants' experts,

the Court is left with the strong impression that their valuations are unreliable.

Theirs was a difficult task. Among other things, they needed to disprove the

reasonableness of the accounting judgments made by Barclays in its Acquisition Balance Sheet,

but they were unable to do so at least in part because they do not assert that Barclays' audited

financial statements are misleading. 9/21/10 Tr. 46:3-9, 84:17-25, 85:1-86:4 (Garvey). Their

decision not to challenge these financial statements is an indication that for the purposes of

public disclosure Barclays' valuation judgments appear to be adequate (or at least not

misleading).

The Court finds that the hindsight valuation performed by Movants' experts (i) does not

take into consideration the judgments of those actively participating in the market in September

2008 and the real world events and unique circumstances of that market, (ii) is not based on

69

sufficient facts and data and (iii) is not sufficiently reliable to support a finding that Barclays

received a windfall. *See Point Prods. A.G.,* 2004 U.S. Dist. LEXIS 2676, at *24, *43.

## VI.    Resolution of Claims to the Three Classes of Disputed Assets

Barclays claims that the Clarification Letter unconditionally entitles it to the three classes

of Disputed Assets: (i) the 15c3-3 Assets, (ii) the Margin Assets, and (iii) the Clearance Box

Assets.  In addressing issues relating to the Clarification Letter, the Court must first determine

whether the conduct of the parties in relying on both the Sale Order and the Clarification Letter,

as was expressly anticipated by the Sale Order, is a reasonable substitute for actual approval by

the Court.  To the extent that the Clarification Letter is treated as an enforceable document, the

Court must interpret its plain language to determine which party is entitled to each of the three

classes of Disputed Assets.  As explained below, the letter is enforceable and supports recovery

of the Clearance Box Assets but does not support Barclays' claims to an unconditional right to

the 15c3-3 Assets or to recovery of the Margin Assets.

*A.      The Court Did Not Approve the Clarification Letter as it Relates to the Disputed Assets*

The sale transaction evolved significantly throughout the week immediately preceding

the Sale Hearing.  Even during the Sale Hearing, the Court was aware that certain details of the

transaction remained outstanding and would be subject to final documentation before closing[25]

but understood that the language of the Clarification Letter would not "materially" modify the

terms of the transaction approved by the Sale Order in a way that would adversely impact

Lehman's bankruptcy estates.  *See* BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 25.[26]  Absent such a

---

[25] At the Sale Hearing, the lawyers from Weil Gotshal representing LBHI and LBI explained that the transaction
documentation was not yet complete.  BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife).

[26] Moreover, the Sale Order authorized the Debtor to enter into final documentation "provided that such additional
documents do not materially change its terms."  BCI Ex. 16 (M Ex. 257) (Sale Order) ¶ 3.

material change, the Sale Order did not require the parties to present additional documentation to the Court for approval.[27]

Rather than contacting the Court to request a hearing concerning the form and content of the letter agreement that was being revised throughout the weekend,[28] the parties elected not to present the Clarification Letter to the Court for approval and simply filed the Clarification Letter as an exhibit to the notice of filing of the APA. *See* Case No. 08-13555, ECF No. 280 (Notice of Filing of Purchase Agreement, Ex. C). Given the content of the document and the inability to be sure about the materiality of the changes, this decision in retrospect appears expedient and probably in error. To the extent that Barclays intended to rely on the language of the Clarification Letter in asserting rights to the Disputed Assets, it would have been proper (and certainly better practice) to have sought the Court's explicit "blessing" of such a key transactional document. As a sophisticated party seeking to purchase assets from a bankruptcy estate, Barclays should have taken all appropriate steps to confirm that all transfers were indisputably authorized.

Barclays, however, insists that additional approval of the Clarification Letter was not necessary because it did not materially change the transaction described to the Court at the Sale Hearing and was, therefore, already "approved" by the Court pursuant to the Sale Order. *See, e.g.,* 10/21/10 Tr. 133:24-134:10 (Boies) ("[T]he Sale Order then went on to expressly approve the purchase agreement including the clarification letter ..."); 10/21/10 Tr. 139:8-9 (Boies) (the Clarification Letter "is part of the Purchase Agreement. It is expressly approved in that Sale

---

[27] Nonetheless, at the Sale Hearing, the parties announced their intent to present the final documentation of the transaction to the Court for approval at a subsequent date. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 48:8-10 (Fife) ("And we've clarified in a clarification letter which we're hoping to finalize and actually present to Your Honor whenever it comes down here").

[28] The Court announced that it would be available to discuss the Clarification Letter during the weekend following the Sale Hearing.

Order"). Barclays argues that although the portion of the Clarification Letter relating to the

Disputed Assets was never presented for approval, it can be effectively "deemed" approved

because the transfer of such assets was sufficiently contemplated by the Court at the time of the

Sale Order. *See* Barclays Post-Trial Mem. ¶ 150 ("Whether the Clarification Letter is viewed as

having been approved in its then-existing oral form or prospectively in its final written form, the

Sale Order expressly approves the Clarification Letter ... "). According to Barclays, such assets

were necessarily part of the transaction approved by the Sale Order because that order approved

Barclays' acquisition of LBI's entire "Business." *See* Barclays Post-Trial Mem. ¶¶¶ 225, 242,

247.[29]

The Court repeatedly has rejected this circular aspect of Barclays' argument. *See*

10/21/10 Tr. 136:22-137:12 (Peck) ("Let me be clear about something . . . I never approved the

clarification letter . . . I said that at the opening and I'm saying it again at the closing. . . No

proceedings took place before this Court to approve the clarification letter *per se* ... I'm just

letting you know that that's an aspect of your argument that I reject"). The Court believes that

separate approval of the Clarification Letter should have been requested because provisions of

the document relating to the Disputed Assets materially modified the transaction that was

approved by the Court at the Sale Hearing. Approval of the transaction necessarily was premised

on there being an alignment between the substance of the transaction as understood by the parties

and the elements of the transaction that were disclosed at the Sale Hearing.

Given the many moving parts, the complexity of the acquisition, and the extreme time

pressure, the Court knew that the Sale Order needed to be flexible enough to accommodate

---

[29] The APA broadly defined "Purchased Assets" to include "all of the assets of Seller ... used in connection with the
Business (excluding the Excluded Assets) ...." BCI Ex. 1 (M Ex. 1) (APA) § 1.1. The "Business," in turn, was
broadly defined as "the U.S. and Canadian investment banking and capital markets businesses of Seller ...." BCI
Ex. 1 (M Ex. 1) (APA) § 1.1.

changes to the APA. This concept was reflected in the Sale Order, which contemplated final documentation materially consistent with its terms. But the Court was not aware at the time of the Sale Hearing that the transaction included the Disputed Assets nor did the Court know anything about the so-called asset scramble in which Barclays used the threat of walking from the deal to demand more assets. In fact, as to certain of the Disputed Assets, the Court had the exact opposite understanding and believed, for example, that all cash, including the Margin Assets, was excluded from the transaction.[30]

Although the Court approved Barclays' acquisition of LBI's "Business" as a whole, its authorization was not limitless. The transfer of such significant previously-undisclosed classes of assets from the LBI estate constitutes a "material adverse" modification of the transaction compared with previous disclosures to the Court, notwithstanding any ancillary benefits that may have been received pursuant to other portions of the Clarification Letter. *See* Barclays Post-Trial Mem. ¶ 157 ("But even if the Clarification Letter had added additional assets that were not part of the Purchased Assets in the APA (it did not), the Clarification Letter also made many changes favorable to the Movants, which must be considered in assessing whether the Clarification Letter had a material adverse effect on the estates").

B.    *Despite the Lack of Formal Court Approval, the Clarification Letter is Nonetheless Enforceable*

Although the provisions of the Clarification Letter relating to the Disputed Assets were never approved by the Court, the parties relied upon the letter as a whole and treated the letter as binding and enforceable. The Movants also actively defended the validity of the letter on appeal

---

[30] The cash-free nature of the sale constituted a critically important structural component of the sale approved by the Court. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 253:5-8 (Peck) ("I'm satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the debtor from Europe was cash that in practical terms we should be safe").

before the District Court. *See* BCI Ex. 33 (M Ex. 405); M Ex. 552.  The SIPA Trustee opposed

"vacating the Sale Orders because of the havoc such a result would cause in the SIPA proceeding

that he administers, in which many decisions have been made based on the entry of the Sale

Orders, and during which many billions of dollars of property have changed hands."  M Ex. 552

at 1.

   The conduct of the Movants confirms widespread reliance on the letter.  For example, in

a joint submission with Barclays dated September 29, 2008, LBHI described the Clarification

Letter as "clarify[ing] the intention of the Parties with respect to certain provisions of the

Purchase Agreement, amend[ing] the Purchase Agreement in certain respects, and … binding …

the Parties.  As more fully described in the Clarifying Letter, the Schedules contain lists of

securities and trading positions transferred under the Purchase Agreement." *See* BCI Ex. 19 ¶ 7.

In the Settlement Motion, the SIPA Trustee cited and relied upon the Clarification Letter.  BCI

Ex. 29 ¶ 16 ("The Clarification Letter provided that the Replacement Transaction was

terminated, and that the securities that had actually been delivered were 'deemed to constitute

part of the Purchased Assets' under the Purchase Agreement"); BCI Ex. 50 (M Ex. 262)

(12/22/08 Tr.) 23:21-24 (Kobak) ("And again, I just want to make it clear that what this

settlement really accomplishes is completing the very transaction contemplated in the purchase

agreement as approved by this Court").  Even as late as August 6, 2009 (and just five weeks

before the filing of the 60(b) Motions), the SIPA Trustee stipulated that the Clarification Letter

was part of the approved APA:  "On September 20, 2008, the Court entered the sale order (the

'Sale Order') approving the Asset Purchase Agreement, as modified, clarified, and/or amended by

the First Amendment, and a letter agreement, dated as of September 20, 2008, clarifying and

supplementing the Asset Purchase Agreement."  BCI Ex. 377 at 2 (emphasis in original).

Similarly, Barclays acted in reliance on the Clarification Letter and treated the letter as binding when it agreed to close the transaction based on the terms of the Clarification Letter. Barclays accepted the transfer of thousands of customer accounts, and offered employment, made bonus payments, and provided severance protection to thousands of former Lehman employees. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 98:10-12, 101:18-102:2 (McDade Proffer). Barclays assumed contracts and made related cure payments. BCI Ex. 1 (M Ex. 1) (APA) § 2.5. Operationally, Barclays integrated Lehman's North American business into its existing operations, and did so on the basis of the APA as modified by the Clarification Letter. *See* 6/21/10 Tr. 232:3-5 (Diamond).

In light of this reliance and the conduct of the parties in treating the Clarification Letter as a valid expression of their agreement, the Clarification Letter is enforceable notwithstanding the lack of formal bankruptcy court approval. Although the omission from the Sale Hearing of any meaningful discussion of the Disputed Assets may have deviated from the core principles of disclosure underlying Section 363 of the Bankruptcy Code, such a failure does not render the Clarification Letter unenforceable in this instance because the parties themselves have acted in reliance upon the Clarification Letter and have treated the document as enforceable. *See, e.g., Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997) (noting that Section 363 prohibits a debtor from selling estate property out of the ordinary course of business "until creditors and other interested parties are given notice of the proposed transaction and the opportunity for a hearing if they object"). By their conduct, including the decision not to seek further approval of the letter, they have acted as if the Sale Order embraces the Clarification Letter.

75

Accordingly, despite the failure to obtain explicit approval of the Clarification Letter, the Court will regard the document as having been approved under the broad language of the Sale Order. Furthermore, even within the context of this litigation, both Barclays and the SIPA Trustee agree that it is appropriate to enforce the Clarification Letter according to its plain terms — the parties simply disagree as to the meaning of those plain terms. *See* SIPA Trustee Post-Trial Mem. ¶ 416 (The Court "need not reach the question of whether it approved the final version of the Clarification Letter ... [i]t is only if the Court were to agree with Barclays' reading of the Clarification Letter that it must consider whether ... it approved the transfers that Barclays now seeks"); Barclays Post-Trial Mem. ¶ 223 ("[A]s a matter of straightforward contractual interpretation, [Barclays] is entitled to each of the Disputed Assets"). In light of this uniform reliance on the Clarification Letter and conduct of the parties that recognizes the legally binding nature of its terms, the Court will interpret the Clarification Letter as an enforceable agreement to the same extent as if it had been separately approved after notice and hearing.

C.   *Barclays Does Not Have an Unconditional Right to the 15c3-3 Assets and Is Not Entitled to Margin Assets But Is Entitled to Transfer of the Clearance Box Assets*

The relevant agreements are governed by New York law and must be interpreted according to familiar principles of contractual construction. *See Northwestern Mut. Life Ins. Co. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 608 F.3d 139, 146 (2d Cir. 2010) (principles of state law govern the interpretation of contractual provisions in bankruptcy). The Court must therefore endeavor to ascertain the intent of the parties "from the plain meaning of the language employed in the agreements." *Katel Ltd. Liab. Co. v. AT&T Corp.*, 607 F.3d 60, 64 (2d Cir. 2010) (citation omitted).

Where the Court finds the contractual language ambiguous, it may consider extrinsic evidence of the parties' intent. *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989)

76

(where a provision is ambiguous, "courts look to the ... circumstances surrounding execution of the ambiguous term to ascertain the parties' intent"). Extrinsic evidence includes "the history and education of the parties, the nature of the contract, the purposes of the parties and all other relevant circumstances." *In re LaToya Jackson*, 434 B.R. 159, 166 (Bankr. S.D.N.Y. 2010) (quoting *In re Delta Airlines, Inc.*, 608 F.3d at 145-6).

Close inspection of the plain text of the Clarification Letter, as well as the extrinsic evidence surrounding its negotiation, execution, and implementation, reveals that there simply was no agreement to unconditionally transfer the 15c3-3 Assets or to transfer any of the Margin Assets to Barclays. Moreover, regardless of the language in the Clarification Letter, Lehman cash was excluded from the APA.

i.    *The 15c3-3 Assets*

The 15c3-3 Assets consist of (i) $769 million in securities segregated by LBI for its customers in compliance with SIPA and Rule 15c3-3[31] and (ii) $507 million in assets posted by LBI as margin with the Options Clearing Corporation (the "OCC") and listed as a debit item in LBI's reserve calculation for purposes of Rule 15c3-3.[32] Any transfer of these 15c3-3 Assets is thus governed by the two complementary regulatory regimes of SIPA and Rule 15c3-3. First, SIPA requires that broker-dealers such as LBI set aside securities and other assets sufficient to "satisfy net equity claims of customers." 15 U.S.C. § 78fff(a)(1)(B). Second, Rule 15c3-3

---

[31] *See* 17 C.F.R. § 240.15c3-3 ("Rule 15c3-3").

[32] According to Barclays, Rule 15c3-3 does not prohibit the transfer of the $507 million in margin deposits because these deposits were held outside of LBI's Rule 15c3-3 reserve account. *See* Letter (the "Barclays Letter") from Counsel to Barclays to the Court, copying Counsel to Movants and the SEC, dated December 20, 2010, responding to December 16, 2010 Letter from SEC to the Court (Case No. 08-13555, ECF No. 13517 and Case No. 08-01420, ECF No. 3987) (The Barclays Letter was not filed on the docket of any proceeding before this Court.) The SEC and SIPC plainly disagree. *See* SEC Post-Trial Mem. at 9 ("Transferring [the $507 million] Would Cause a Violation of the Rule If the Transfer Would Increase the Deficiency in the Reserve Bank Account ..."); Case No. 08-01420, ECF No. 2989 (Statement of SIPC in Support of Trustee's Motion for Relief) at 13-15. The Court agrees with the SEC and SIPC. To the extent any deficit exists, it would be exacerbated by the transfer of the $507 million and, in so doing, violate Rule 15c3-3.

requires the maintenance of reserves of customer property to ensure full recovery for its

customers in the event of its liquidation. Rule 15c3-3 accomplishes this objective primarily

through two requirements: (i) the broker-dealer's reserve account should contain sufficient funds

"at all times" to allow a firm to promptly return customer property and (ii) such assets may only

be withdrawn if they constitute a surplus over the required minimum balance. 17 C.F.R. §

240.15c3-3(e)(1), (2); 17 C.F.R. § 240.15c3-3(g). To that end, Rule 15c3-3 provides a "Reserve

Formula" to calculate the minimum required balance for a broker-dealer's reserve account. *See*

SEC Post-Trial Mem. at 9-10.

   The Clarification Letter respects the interplay between this regulatory regime and the

15c3-3 Assets. Specifically, it provides that Barclays shall be entitled to receive the 15c3-3

Assets only if "permitted by applicable law." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8

("In connection therewith, Purchaser shall receive ... (ii) *to the extent permitted by applicable*

*law*, and as soon as practicable after the Closing, $769 million of securities, as held by or on

behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934,

as amended, or securities of substantially the same nature and value") (emphasis added). Thus,

this provision is conditional and recognizes that in the event of a deficit in LBI's customer

reserve accounts,[33] SIPA and Rule 15c3-3 may prevent the SIPA Trustee from transferring any

property from these accounts.

   Barclays argues that Rule 15c3-3 does not constitute "applicable law" as referred to in the

Clarification Letter because it does not apply to a liquidating broker-dealer such as LBI. *See*

---

[33] The Trustee and Barclays have stipulated to defer consideration of the factual issue as to whether a deficit or
excess exists with respect to LBI's customer reserve accounts, and no findings are being sought with respect to that
issue. *See* Case No. 08-13555, ECF No. 13824 and Case No. 08-1420, ECF No. 4020 (Stipulation and Order
Between the Trustee and Barclays Concerning Certain Claims Under Paragraph 8(ii) of the Clarification Letter
Made in the Motion and Adversary Complaint Filed by the Trustee and the Motion to Enforce the Sale Order Filed
by Barclays).

Barclays Post-Trial Mem. ¶ 270. But the post-trial brief filed by the SEC contradicts Barclays'

position. *See* SEC Post-Trial Mem. at 5-8. To carry out the requirements of SIPA, trustees of a

liquidating broker-dealer such as LBI must continue to effect securities transactions, such as

purchasing securities to satisfy customer claims for missing securities and closing out open

securities contracts. 15 U.S.C. § 78fff-2(d), (e). To engage in these transactions, a liquidating

broker-dealer must remain registered with the SEC and subject to relevant SEC Rules, including

Rule 15c3-3. 15 U.S.C. § 78o(a)(1). Moreover, adopting Barclays' argument would undermine

the policy objective underlying Rule 15c3-3. That objective is the retention of sufficient funds to

make the customer whole in the event of an insolvency. Indeed, the customer protections

intended by Rule 15c3-3 are perhaps most needed following the failure of a broker-dealer.

In the alternative, Barclays argues that the Clarification Letter, when properly construed,

actually entitles Barclays, not the SIPA Trustee, to the 15c3-3 Assets. It argues that the phrase

"to the extent permitted by applicable law" only limits Barclays' ability to receive those

particular 15c3-3 Assets held in LBI's customer reserve accounts at the time of the execution of

the Clarification Letter. In the event that applicable law prevents such a transfer, according to

Barclays, then the Clarification Letter would still entitle Barclays to receive "securities of

substantially the same nature and value." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(ii).

The Court declines to interpret this language in the manner proposed by Barclays. To do

so would convert a conditional agreement into an unconditional one. Barclays attributes

unwarranted significance to the phrase "securities of substantially the same nature and value." It

appears that this phrase was used to account for the possibility that, while attempting to obtain

SEC approval, there might be a change in the particular securities held in the accounts. *See*

Messineo Dep. Tr. 16:7-20; 24:2-26:21 (phrase was added "to take account of the potential for

79

there to be a change in the specific securities held in the customer reserve accounts between
September 22 and the date when it became permissible to withdraw securities from the customer
reserve accounts").  Barclays urges the Court to disregard this interpretation, arguing that Mr.
Messineo's understanding of the plain text was merely his "unexpressed subjective intent," but
more is involved here than drafter's intent.  *See* Barclays Reply ¶ 109 ("[Messineo's] testimony
about his 'understanding' is irrelevant to the Court's interpretation of the ... phrase"); Barclays
Post-Trial Mem. ¶ 273 ("The only extrinsic evidence the Trustee relies upon to support his
interpretation of the 'or' clause is legally irrelevant because it is nothing more than unexpressed
subjective intent").  The disputed phrase should be construed to elevate the rights of LBI's
customers in order to avoid an interpretation that would conflict with governing law.  *See, e.g.,*
*NLRB v. Local 32B-32J Serv. Employees Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003)
("ambiguously worded contracts should not be interpreted to render them illegal and
unenforceable where the wording lends itself to a logically acceptable construction that renders
them legal and enforceable") (quoting *Walsh v. Schlecht*, 429 U.S. 401, 408 (1976)); *Venizelos,*
*S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 465 (2d Cir. 1970) ("[I]f an agreement is fairly
capable of a construction that will make it valid and enforceable, that construction will be given
it").

Barclays offers a self-interested construction of the language that would give it an
unconditional right to $769 million in securities, effectively reading out of the letter the phrase
"to the extent permitted by applicable law."  The Court's conditional reading, on the other hand,
reconciles the two phrases and thereby construes the language to give meaning to each term.
*See, e.g., Goodheart Clothing Co., Inc., v. Laura Goodman Enters., Inc.,* 962 F.2d 268, 272-73
(2d Cir. 1992) ("[a] court should interpret a contract in a way that ascribes meaning, if possible,

to all of its terms") (quoting *U. S. Naval Inst. v. Charter Commc'n, Inc.*, 875 F.2d 1044, 1049 (2d

Cir. 1989)).

In addition to the text of the Clarification Letter, Barclays argues that counsel for LBI

agreed to transfer the 15c3-3 Assets without conditions and without regard to regulatory

approval, but the evidence of such an agreement is inconclusive at best.  Barclays' witnesses

alternatively testified as to a "grunt" or "nod" or "smile" that gave Barclays' counsel a "feeling"

that such an agreement constituted "the economic substance of the negotiation."  8/24/10 Tr.

147:6-13 (Rosen).

Described in this manner, the "unexpressed subjective intent" may in fact have been the

intent of counsel for Barclays.  A grunt, nod, or smile is not the same as a meeting of the minds

by means of unambiguous words.  The chief Lehman negotiator on this point, lead bankruptcy

counsel Harvey Miller, was clear in stating that he never agreed to an unconditional transfer of

the 15c3-3 Assets to Barclays. *See* 4/28/10 Tr. 83:22-84:11 (Miller) ("absolutely no

commitment").  Mr. Miller recalled that he participated in a tense discussion with representatives

of Barclays in a hallway at Weil Gotshal's offices and informed Barclays that the 15c3-3 Assets

could not be transferred without SEC consent.  4/28/10 Tr. 83:1-6 (Miller).  Similarly, Mr.

McDade, whose authorization would have been necessary to any such agreement, confirmed that

he never agreed to grant Barclays an unconditional right to the 15c3-3 Assets.  Mr. McDade

testified that he understood that the transfer of the 15c3-3 Assets was "potentially questionable,

given it needed regulatory authority to be able to be transferred over."  4/26/10 Tr. 198:4-11

(McDade).

Other extrinsic evidence confirms that Barclays knew the transfer of the 15c3-3 Assets

hinged on regulatory approval.  For one thing, the SEC communicated this point before LBI's

81

liquidation. *See* M Ex. 437. As a result, the Barclays negotiating team was on notice that

regulatory approval was needed to obtain the 15c3-3 Assets. *See* 8/27/10 Tr. 201:2-203:10

(Klein) (testifying that the he reviewed an internal Lehman e-mail indicating that the SEC had

consented to the release of a portion of the reserved assets). Barclays itself confirmed knowing

about this condition in internal conversations with its audit committee. *See* M Ex. 436 ("the

release of [the 15c3-3] deposit is subject to SEC approval"). Several of Barclays' officers and

representatives echoed this understanding, and recognition of the need for regulatory approval is

reflected in efforts to ascertain whether a deficit existed for purposes of Rule 15c3-3 during the

negotiation of the Clarification Letter. *See* 6/21/10 Tr. 252:18-25 (Diamond) (recalling that the

agreement regarding the 15c3-3 Assets to be transferred to Barclays included only "the excess

collateral"); 4/30/10 Tr. 227:1-12 (Hughes) (recalling that the 15c3-3 assets had to be "excess

and capable of being delivered"); 4/28/10 Tr. 246:9-15 (Kelly) (recalling that during the sale

negotiations the parties endeavored to "determine if there was excess or a surplus" in the

Customer Reserve Accounts). These efforts would have been unnecessary if, as Barclays now

asserts, it was entitled to $769 million in securities irrespective of Rule 15c3-3 and the existence

of a deficit in LBI's Customer Reserve Account.

Alternatively, Barclays argues that even if the Clarification Letter conditions its receipt of

the 15c3-3 Assets upon "applicable law," Section 8(f) of SIPA[34] authorizes the transfer. *See*

Barclays Reply ¶ 90 ("whether the assets in the Reserve Account are considered LBI property or

customer property, the SIPA Trustee was authorized to transfer that property to Barclays as part

of the overall sale of the Business to Barclays"). This section of SIPA authorizes the satisfaction

---

[34] *See* 15 U.S.C. § 78fff-2(f) ("In order to facilitate the prompt satisfaction of customer claims and the orderly liquidation of the debtor, the trustee may, pursuant to terms satisfactory to him and subject to the prior approval of SIPC, sell or otherwise transfer to another member of SIPC, without consent of any customer, all or any part of the account of a customer of the debtor").

of customer obligations through the transfer of customer accounts to a solvent broker-dealer, but it is not applicable to the present dispute in which Barclays is seeking to compel the transfer of customer accounts for its own benefit. *See Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 887 (Bankr. S.D.N.Y. 2010) (explaining that Section 8(f) "is designed to facilitate a speedy transfer of accounts to give the customer prompt control over his assets"). Interpreting Section 8(f) to authorize the transfer of the 15c3-3 Assets to Barclays would be inconsistent with and would frustrate the section's underlying purpose. Such an interpretation also would be contrary to the broad principles underlying SIPA, namely its objective of giving priority treatment to customers of a liquidating broker-dealer. *See* 15 U.S.C. § 78fff-2(c) (customer claims receive priority on any property falling within SIPA's definition of "customer property").

Independent of the Clarification Letter, Barclays asserts that the APA gives Barclays a right to all assets "used in connection" with the "Business" including the 15c3-3 Assets. *See* BCI Ex. 1 (M Ex. 1) (APA) § 1.1 (Definition of "Purchased Assets"). Barclays states that these assets were "used in connection" with the "Business," namely the "capital markets businesses of Seller including the fixed income and equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking operations and LBI's business as a futures commission merchant." *See* Barclays Post-Trial Mem. ¶ 247. Alternatively, Barclays argues that the 15c3-3 Assets are "deposits ... associated with the Business." *See* BCI Ex. 1 (M Ex. 1) (APA) § 1.1. Thus, according to Barclays, the Clarification Letter merely used explicit language to confirm a transfer of the 15c3-3 Assets that is already the subject of plain language in the original APA.

The 15c3-3 Assets, however, were never considered part of the "Business" that Barclays acquired pursuant to the APA. They were not even discussed by the parties to the transaction

until the Friday asset scramble. *See* 4/26/10 Tr. 194:3-195:15 (McDade). Furthermore, the

15c3-3 Assets naturally were unrelated to the "Business" because they are, by their very

definition, creatures of a regulatory regime. Having been segregated by regulatory mandate,

these assets could not be transferred without consideration of regulatory constraints. These

assets were set aside to protect customers, were never available unconditionally as extra

consideration for Barclays and were not part of the purchased "Business."

Accordingly, Barclays does not have an unconditional right to the 15c3-3 Assets, and its

motion to recover these assets is denied without prejudice until such time as it may be

determined whether any deficit exists in LBI's customer reserve accounts and whether the

transfer of all or any portion these assets is permitted by applicable law.

ii.    *The Margin Assets*

The Margin Assets that are in dispute consist of a total of approximately $4 billion in

cash and cash equivalents held at the OCC, other clearing corporations and exchanges, certain

banks, and certain foreign futures brokers in connection with derivatives trading. This total

includes nearly $2.3 billion in assets posted by LBI at the OCC, primarily in connection with

LBI's options trading business, an additional $1.2 billion at foreign brokers or affiliates and

approximately $400 million at domestic exchanges in connection with LBI's futures trading. The

Margin Assets consist of LBI property used to support trading conducted by LBI on its own

behalf and on behalf of its customers and affiliates.

The parties disagree as to whether these Margin Assets were purchased in connection

with the acquisition or were excluded from the sale to Barclays. The APA's definition of

Excluded Assets contains two separate sub-parts that independently encompass the Margin

Assets. First, clause (b) of the definition of "Excluded Assets" excludes "all cash, cash

equivalents, bank deposits or similar cash items." BCI Ex. 1 (M Ex. 1) (APA) § 1.1. Second,

clause (n) of the definition of "Excluded Assets" excludes "all assets primarily related to the

IMD Business and derivatives contracts." BCI Ex. 1 (M Ex. 1) (APA) § 1.1.[35] These exclusions,

as modified by the Clarification Letter, are at the heart of the dispute concerning the proper

disposition of the Margin Assets.

   The Court understood at the time of the Sale Hearing that the sale was supposed to

exclude all cash. Counsel made this point with great clarity at the Sale Hearing and stated

plainly that no cash was being transferred to Barclays. Most prominently, Ms. Fife told the

Court "[t]here's no cash that's being transferred to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08

Tr.) 53:20-25 (Fife). Mr. Miller was similarly unequivocal, informing the Court that "[Lehman

is] not transferring any cash to Barclays." BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 242:11-16

(Miller). Even Barclays' team at the Sale Hearing recognized that cash was excluded from the

deal. *See* 6/22/10 Tr. 210:11-13 (Cox) (testifying that he understood that "no Lehman cash was

going from Lehman to Barclays").

   The Court relied upon these representations regarding the exclusion of cash when it

entered the Sale Order. In particular, this explicit exclusion became the rationale for resolving

the concerns raised by LBIE and other objectors at the Sale Hearing relating to the risk that

Barclays might end up taking billions of dollars that allegedly had been transferred to New York

from London a few days prior to the bankruptcy. The representation that Barclays would not be

---

[35] Barclays insists that clause (n) of the definition of "Excluded Assets" does not encompass the Margin Assets
because clause (n) applies only to margin relating to "over-the-counter" derivatives, as opposed to exchange-traded
derivatives. *See* Barclays Post-Trial Mem. ¶ 248 ("paragraph (n) *does not deal with exchange-traded derivatives*; to
the contrary, it deals with 'derivative contracts' ... which was used solely to describe over-the-counter derivatives,
which were *indisputably* excluded from the deal") (emphasis in original). But the plain language of clause (n) does
not differentiate between margin associated with either type of derivative. Moreover, the Clarification Letter carries
forward the clause (n) exclusion of assets primarily related to derivatives contracts and further adds a separate
exclusion for over-the-counter derivatives. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c) ("The following shall
also be Excluded Assets ... over-the-counter derivatives").

acquiring any Lehman cash, thus, was a key inducement to entry of the Sale Order in the face of

unresolved conflicting claims to cash held by or for the benefit of Lehman. The "no cash to

Barclays" statements are unambiguous and have only one meaning – no cash, and that also

means no Margin Assets to Barclays.

Consequently, the Court rejects Barclays' argument that the Margin Assets necessarily

must have been included in the transaction because of their connection to the "Business"

acquired under the APA. *See* Barclays Post-Trial Mem. ¶ 242 ("It is *undisputed* that LBI's ETD

businesses were part of the 'Business' Barclays was acquiring ...") (emphasis in original). In

other words, Barclays argues, the Margin Assets must have been Purchased Assets because the

APA provided Barclays with all assets relating to the "Business," and clearing houses and

exchanges require margin to support trading. *See* 8/30/10 Tr. 9:11-15 (James); 8/24/10 Tr.

100:5-101:9 (Rosen). But the fact that exchanges typically require margin deposits or that

purchasers of other businesses involved in the trading of derivatives typically acquire such

deposits does not bear one way or another on the question of whether the Margin Assets were

included by the parties in this unique transaction.[36] The evidence with respect to the acquisition

by Barclays of the Broker-Dealer Business is overwhelming — the parties agreed to exclude

cash.[37]

---

[36] For this reason, the Court is not persuaded by the testimony of Barclays' expert Anthony J. Leitner that "no rational purchaser" would agree to the transaction without the Margin Assets. *See* BCI Ex. 340 at 49. The likely conduct and decision making of a hypothetical "rational purchaser" is not persuasive when the parties to this particular transaction agreed to exclude the Margin Assets.

[37] Barclays offers the testimony of Liz James to show that in fact the parties agreed to transfer the Margin Assets to Barclays. 8/30/10 Tr. 20:7-9 (James) (testifying that there was "an actual discussion in which it was expressly discussed that margin would be transferred"). But Ms. James admitted to having had no role whatsoever in the negotiation or documentation of the sale documents that memorialize the agreement of the parties. 8/30/10 Tr. 60:14-22 (James).

The Clarification Letter carries forward the APA's exclusion of cash from the transaction:
"Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall
include any cash, cash equivalents, bank deposits, or similar cash items." BCI Ex. 5 (M Ex. 3)
(Clarification Letter) ¶ 1(c). The Clarification Letter further specified that although LBI's
government securities trading operations were part of the "Business" sold to Barclays, the
government securities themselves were excluded from the sale. BCI Ex. 5 (M Ex. 3)
(Clarification Letter) ¶ 1(b) ("For the avoidance of doubt, the 'Business' includes LBI's
commodities business, government securities trading operations and mortgage-backed securities
trading operations of LBI (*but not any securities of such nature held by seller* ...")) (emphasis
added).

Notwithstanding this language, Barclays asserts that the Clarification Letter should be
read to capture the Margin Assets as a Purchased Asset.[38] Specifically, Barclays relies on the
inclusion of a parenthetical — "(and any property that may be held to secure obligations under
such derivatives)" — after the words "exchange-traded derivatives" in the definition of
"Purchased Assets." *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(C).

This parenthetical reference simply cannot override the exclusions of the APA or the
representations made during the Sale Hearing. The evidence presented at trial also supports a
conclusion that the parties to the Clarification Letter never agreed as to the language or
significance of this parenthetical, and the words made their way into the document without there
being a meeting of the minds or a mutual agreement to include them.

---

[38] Independent of the Clarification Letter, Barclays also claims that the Transfer and Assumption Agreement entered
into between the Trustee and the OCC transferred the Margin Assets to Barclays. However, this ancillary agreement
never was presented to the Court, and so cannot be dispositive as to the parameters of the deal that the Court
approved. In any event, the evidence indicates that the Trustee understood this ancillary agreement merely to
facilitate the transfer of customer assets to Barclays. *See* 5/4/10 Tr. 184:4-10; 185:2-24 (Kobak).

The negotiating history confirms that the parties did not intend this parenthetical statement to modify the APA's exclusion of all cash, including the Margin Assets, from the sale. Immediately following the Sale Hearing, an outside lawyer for Barclays with significant experience in derivatives, Cleary Gottlieb's Edward Rosen, received an e-mail alerting Barclays to the existence of the Margin Assets. BCI Ex. 242. Shortly thereafter, Barclays proposed new language for the definition in paragraph 1(d) of "Excluded Assets" that, with clarity and precision, would have transferred the Margin Assets to Barclays. BCI Ex. 249 ¶ 1(d) (proposed language carved out of the definition of Excluded Assets any "cash, cash equivalents, bank deposits, or similar cash items maintained ... by or on behalf of any clearing agency or clearing organization to collateralize, guaranty, secure (whether as margin, guaranty fund deposit or in any other form) the obligations of LBI ..."). In response, counsel for LBHI forwarded the proposed language to the SIPA Trustee on September 21, 2008 and highlighted Barclays' proposed cash margin carve-out as an unsettled issue subject to ongoing discussion. M Ex. 629. Early the next morning, counsel to LBHI circulated a revised proposed draft of the Clarification Letter striking Barclays' proposed language relating to the Margin Assets. *See* M Ex. 447 ¶¶ 1(c), 8.[39] As a result, the subsequent draft circulated at 6:03 a.m., approximately three hours before the execution of the Clarification Letter on September 22, 2008, continued to omit the stricken language. *See* M Ex. 448. Without any further discussion or notice to the SIPA Trustee, Mr. Rosen unilaterally inserted the now-disputed parenthetical phrase into the execution version of the Clarification Letter. 8/24/10 Tr. 215:2-14, 216:3-8 (Rosen).

The SIPA Trustee never consciously agreed to this new parenthetical. Notably, Mr. Rosen added the language within the parenthetical to the "Purchased Assets" subsection instead

---

[39] At trial, Barclays claimed that this deletion of the disputed language by counsel for LBHI was in fact unintentional. *See* 8/31/10 Tr. 209:12-210:2 (Lewkow). Barclays presented no evidence of any such mistake.

of the "Excluded Assets" subsection that had been the earlier focus of attention.  Moreover, the

words within the parenthetical do not include "cash" or "margin," in contrast with the previously-

contested language that had touched directly on these subjects.[40]  The SIPA Trustee never

reviewed the inserted parenthetical provision before closing because the last draft had omitted

the disputed language, and he was not informed of any last-minute revisions.  5/4/10 Tr. 197:4-

22 (Kobak); 5/5/10 Tr. 58:8-17 (Kobak).  In fact, for administrative reasons, the SIPA Trustee's

representative executed the signature page for the Clarification Letter hours earlier and was not

provided with a new signature page or agreement.

In light of this negotiating history, and being mindful of the stated exclusion of Lehman

cash, the Court concludes that the best reading of the disputed language within the parenthetical

is one that interprets the parenthetical phrase as applying only to customer property "held" by

LBI for the benefit of customers, as opposed to margin that LBI may have "posted" in

connection with its own trading positions.  Various regulations and rules require customers to

deposit collateral with their broker-dealer or, in the case of futures, their futures commission

merchant, to support trading of futures and options contracts.  *See, e.g.,* 17 C.F.R. § 30.7.

This collateral, which is deposited by customers with the broker-dealer or futures

commission merchant and held for the benefit of customers, constitutes the "property that may be

held to secure obligations" under exchange-traded derivatives.  In fact, LBI held approximately

$2 billion in customer property as margin for futures positions of customers, along with

additional customer property held as margin for the options positions of customers.  *See* BCI Ex.

353 ¶ 15, Ex. 2.  The language within the parenthetical would authorize a transfer of these

customer funds to Barclays (for the benefit of those customers) in connection with the transfer of

---

[40]  Mr. Rosen testified that he designed the phrase so as to avoid scrutiny that could "embroil" Barclays in continued
negotiations.  8/24/10 Tr. 203:5-20 (Rosen).

those customer accounts. This interpretation of the parenthetical is consistent with other provisions of the Clarification Letter that are intended to ensure the transfer of customer property to Barclays.[41] It also is consistent with the record of the Sale Hearing in which counsel emphasized that no Lehman cash was being transferred to Barclays.

### iii.    The Clearance Box Assets

The Clearance Box Assets are within the third category of Disputed Assets and consist of approximately $1.9 billion in unencumbered securities held in LBI's "clearance box" accounts at The Depository Trust & Clearing Corporation (with its clearing agency subsidiaries, "DTCC").[42] These assets facilitated securities trading by providing collateral to secure open trading positions. DTCC looked to this collateral as a means to manage risks associated with its daily clearing operations. In the event of a default by LBI, DTCC could look to the Clearance Box Assets to cover any potential liability arising from failed trades. From DTCC's perspective, therefore, any transfer of the Clearance Box Assets to Barclays threatened to leave it unprotected in the event of failed trades during the transition of securities trading operations to Barclays.

At the time of the Sale Hearing, the parties believed that they had reached an agreement that allayed DTCC's concerns. Under this agreement, as documented in the First Amendment, DTCC would consent to the transfer of the Clearance Box Assets and Barclays would provide DTCC with a $250 million guarantee along with a pledge of billions of dollars in residential

---

[41] For example, paragraph 8(i) of the Clarification Letter entitles Barclays to receive "for the account of the customer, any and all property of any customer, including any held by or on behalf of LBI to secure the obligations of any customer ..." BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 8(i). Similarly, paragraph 1(c) of the Clarification Letter clarifies that "property of any customer, or maintained by or on behalf of LBI to secure the obligations of any customer" would not be considered an Excluded Asset. BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(c).

[42] The vast majority of these assets were held in box number 074 at the DTCC, with the rest held in LBI clearance boxes at Euroclear and a Canadian depository. SIPA Trustee Post-Trial Mem. ¶ 279, n.38.

mortgage-backed securities as collateral.[43] This understanding fell apart after the Sale Hearing

when the residential mortgage-backed securities could no longer be made available to DTCC as

collateral. Extensive negotiations took place over the closing weekend to deal with this problem.

During the negotiations, DTCC insisted that Barclays fully guarantee any potential

DTCC liability in exchange for the transfer of the Clearance Box Assets. *See* 5/6/10 Tr. 19:16-

19 (Montal). Barclays, however, refused to provide an unlimited guarantee of LBI's trading

obligations. *See* 4/26/10 Tr. 233:13-20 (McDade) (Barclays' continued refusal to provide more

than a $250 million guarantee threatened to derail the transaction over the weekend).

Ultimately, these negotiations culminated in Barclays entering into two separate

agreements – the Clarification Letter and the DTCC Letter – that contain seemingly

contradictory provisions purporting to govern the transfer of the Clearance Box Assets. The

Clarification Letter, on the one hand, provides that the Clearance Box Assets are Purchased

Assets acquired by Barclays. *See* BCI Ex. 5 (M Ex. 3) (Clarification Letter) ¶ 1(a)(ii)(B)

("Purchased Assets" include all "securities and other assets held in LBI's 'clearance boxes' as of

the time of the Closing … as specified on Schedule B"); Schedule B (identifying assets to be

transferred, and more than 98% of the listed assets were in LBI's DTC clearance boxes). The

DTCC Letter, on the other hand, provides that the Clearance Box Assets are "Excluded Assets"

under the APA and requires Barclays to provide a $250 million cash deposit as a limited

guarantee to cover potential liability from failed trades. *See* BCI Ex. 6 (M Ex. 449) ¶ 1

("Barclays has indicated, and hereby agrees, that all of the accounts LBI maintained at the

Clearing Agencies Subsidiaries (the "Accounts") constitute "Excluded Assets" within the

---

[43] The Court was advised of this agreement at the Sale Hearing. *See* BCI Ex. 49 (M Ex. 261) (9/19/08 Tr.) 49:8-17
(Fife). Although the Clearance Box Assets were not specifically mentioned at the Sale Hearing, the evidence
suggests that they were included in the $47.4 billion worth of financial assets described by Ms. Fife at the hearing.
*See* 5/3/10 Tr. 183:13-185:5 (Seery).

meaning of the APA"); BCI Ex. 6 (M Ex. 449) ¶ 2 ("To secure the Guaranty, Barclays shall wire transfer $250 million …").[44]

Notwithstanding these apparently contradictory terms, Barclays attempts to reconcile the two agreements by arguing that the DTCC Letter, read properly, does not limit its claim to the Clearance Box Assets because of the distinction between the "Accounts" and the assets within those accounts. *See* Barclays Post-Trial Mem. ¶ 228 ("[T]here is no conflict or inconsistency between the DTCC Letter and the Clarification Letter … While the DTCC Letter explains that Barclays was not acquiring *the LBI accounts themselves*, it did not purport in any way to modify the Purchase Agreement's grant of *the assets within those accounts* to Barclays") (emphasis in original).

Barclays' attempt to reconcile the contradictory provisions of the two agreements is strained and implausible. An agreement giving DTCC a right to the "Accounts" as Excluded Assets, while transferring the contents of those accounts, borders on the nonsensical and would not have accomplished any purpose. Such a distinction defies logic, as the DTCC would not benefit from maintaining accounts without the corresponding securities in those accounts. 5/4/10 Tr. 207:24-208:4 (Kobak).[45] The interpretation of the DTCC Letter urged by Barclays, while possible, would lead to a most unlikely reading of the language as part of a struggle to find consistency. *See, e.g., Ronnen v. Ajax Elec. Motor Corp.*, 88 N.Y. 2d 582, 589, 671 N.E.2d 534 (1996) ("[w]e should not adopt a construction of [a provision] which would frustrate one of the explicit central purposes of the agreement").

---

[44] The testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC, was credible and corroborated the plain text of the DTCC Letter. *See* 5/6/10 Tr. 20:20-21:13 (Montal) ("ultimately, [the negotiations] culminated into the discussion at around midnight in which we were told that they weren't taking anything").

[45] Moreover, such a reading is inconsistent with the other sections of the DTCC Letter that relate to the transfer of securities, not accounts. *See* BCI Ex. 6 (M Ex. 449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee hereby authorizes DTC to accept and act upon instructions from NSCC *to deliver securities* …") (emphasis added).

However, the alternative interpretation of the DTCC Letter offered by Barclays does demonstrate an apparent ambiguity in the text of that letter, especially when the language used in the DTCC Letter is juxtaposed and compared with the obviously inconsistent language of the Clarification Letter. The two letters, read literally, naturally lead the reader to reach opposite conclusions. As a result of this ambiguity, the Court may consider extrinsic evidence of the parties' intent with respect to the provisions of the two agreements relating to the Clearance Box Assets. *See Roberts*, 893 F.2d at 24.

Extrinsic evidence relating to what was actually intended is not entirely consistent. The Court has considered the testimony of Isaac Montal, a managing director and deputy general counsel of the DTCC. His credible testimony would support a finding that Barclays gave up any claim to the Clearance Box Assets. He recalls three separate telephone calls that occurred on September 21, 2008 between Barclays and the DTCC and remembers that on the last of these calls Barclays agreed to exclude the Clearance Box Assets from the transaction. 5/6/10 Trial Tr. (Montal) 10:22-11:4.

However, Mr. Montal's testimony must be balanced against other evidence indicating that the parties intended that Barclays would receive the Clearance Box Assets. The negotiating history reveals that the reference to Schedule B in the Clarification Letter was the result of the drafters' initial concern that language in the Clarification Letter was too narrow and would have failed to transfer all of the Clearance Box Assets to Barclays. *See* Barclays Post-Trial Mem. ¶ 237 ("…46 minutes after [circulating a revised draft of the Clarification Letter], Weil Gotshal circulated another draft Clarification Letter, which … broadened the language conveying the clearance box assets to Barclays"). The testimony of Barclays' lawyers and negotiators further

93

confirmed this intent to transfer the Clearance Box Assets to Barclays. *See* 5/3/10 Tr. 56:11-57:2 (Hughes); 8/24/10 Tr. 132:13-133:20 (Rosen).

Additionally, after the closing of the transaction, the parties engaged in conduct manifesting their intent to transfer the Clearance Box Assets to Barclays. For example, after the closing on September 22, 2008, Weil Gotshal and Lehman personnel worked with Barclays and its representatives to finalize the list of Clearance Box Assets in Schedule B. *See* BCI Ex. 309; BCI Ex. 742. After closing, the Movants, their representatives and advisors prepared numerous documents showing that the Purchased Assets acquired by Barclays included the Clearance Box Assets. *See* BCI Ex. 742; BCI Ex. 756.

Written extrinsic evidence from Sheldon Hirshon, DTCC's outside counsel, further confirms the intent of the parties to transfer the Clearance Box Assets to Barclays. An e-mail written by Mr. Hirshon recounts his understanding that, during the weekend of negotiations following the Sale Hearing, DTCC agreed to relinquish the Clearance Box Assets and accept only the $250 million limited guarantee. *See* BCI Ex. 376 ("DTCC accepted the revised deal" after "the resi's were pulled from the deal leaving only the Barclays guarantee"). Notably, Mr. Hirshon's e-mail does not indicate any expectation that the Clearance Box Assets would be provided to DTCC to mitigate potential exposure. This understanding of the parties' intent is consistent with the ultimate commercial reality of the transaction, as DTCC incurred losses in connection with failed trades arising from the bankruptcy in the amount of approximately $55 million, far less than the full $250 million protection provided by Barclays in its limited guarantee. *See* 5/6/10 Tr. 72:2-73:15 (Montal).

The Court concludes that the Clarification Letter, not the DTCC Letter, best reflects the agreement between Barclays and the SIPA Trustee with respect to the Clearance Box Assets.

94

The plain text of the Clarification Letter clearly confirms the agreement to transfer the Clearance Box Assets to Barclays, and the SIPA Trustee is unable to explain away the plain meaning of the words used in this agreement. *See* SIPA Trustee Mot. ¶ 81; 5/5/10 Tr. 71:8-10 (Kobak) ("Q: Now you don't have any disagreement that the clarification letter lists [Clearance Box Assets] as a purchased asset, correct? A: No, I don't disagree with that").

The SIPA Trustee and Barclays simply agreed in the Clarification Letter that the Clearance Box Assets belong to Barclays. Importantly, that letter, along with the APA, constituted the principal documents memorializing the transaction. These documents necessarily delineated the assets that were being transferred to Barclays as part of that sale. In contrast, the DTCC Letter had a different principal purpose and was drafted as an implementing transitional document created to deal with the potential exposure of DTCC arising from the transfer of securities trading positions. Although the SIPA Trustee was a signatory to the DTCC Letter, the letter came into existence as a result of DTCC's request to address its potential liability.[46]

In his effort to reconcile the discrepancies between the two letter agreements in a manner favorable to his litigation position, the SIPA Trustee must argue that the true agreement between the parties with respect to the Clearance Box Assets is best manifested not by the central documents that define the transaction but by an ancillary side-agreement which was prepared to address concerns of DTCC. But given the relative stature of these two documents and the scope of each of them, the Court considers the Clarification Letter to be more compelling and comprehensive in describing with greater precision the universe of assets that the SIPA Trustee

---

[46] It appears that the most meaningful negotiations leading to the finalizing of the DTCC Letter occurred between Barclays and DTCC. *See* SIPA Trustee Post-Trial Mem. ¶ 414 ("Barclays was uniquely positioned to ensure that the two agreements did not conflict ... [because n]o other party... *including the Trustee and his representatives* ... was involved in negotiating and drafting both agreements") (emphasis added); BCI Ex. 479 (e-mail correspondence early Monday September 22, 2008 in connection with finalizing the DTCC Letter was exchanged between representatives of Barclays and DTCC, and not with the Trustee or his representatives).

agreed to transfer to Barclays pursuant to the transaction. Because these two contemporaneous

documents are in conflict with one another as to the same subject matter, one of them must

control the outcome.

The unambiguous text of the Clarification Letter contains more detail and is more

specific with respect to the Clearance Box Assets than the DTCC Letter. Although each

agreement purports to govern the transfer of the Clearance Box Assets, Schedule B to the

Clarification Letter specifically identifies individual Clearance Box Assets, whereas the DTCC

Letter has no similar itemized list of securities. In expressing a preference for the more specific

of the two documents, the Court's conclusion affirms the well-established legal principle that

where two agreements refer to the same subject matter, the more specific agreement controls.

*See, e.g., Liberty Surplus Ins. Corp. v. Segal Co.*, 142 F. App'x. 511, 515 (2d Cir. 2005) (where

there is tension between the provisions of two agreements, "it is axiomatic that particularized

contract language takes precedence ...") (quoting *John Hancock Mut. Life Ins. Co. v. Carolina

Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983)).

Notwithstanding the SIPA Trustee's arguments to the contrary, the Court's elevation of

the Clarification Letter over the DTCC Letter with respect to the Clearance Box Assets neither

"ignores" nor "nullifies" the DTCC Letter. *See* SIPA Trustee Post-Trial Mem. ¶¶ 410, 413.

Rather, the Court recognizes that the DTCC Letter, even without the provisions regarding the

Clearance Box Assets, provided a significant benefit to DTCC in the form of a $250 million

limited guarantee to protect against potential exposure from failed trades and the grant of

authority needed to close out pending transactions. Moreover, the DTCC Letter functioned in

accordance with the intention of the parties and provided DTCC with the comfort that it needed

to close securities transactions that were pending at the time of closing. *See* BCI Ex. 6 (M Ex.

449) (DTCC Letter) ¶ 1 ("As part of this closeout process, the Trustee hereby authorizes DTC to

accept and act upon instructions from NSCC to deliver securities from the DTC LBI Account

...").

D.     *The SIPA Trustee is Not Entitled to Relief Under Rule 60(b) With Respect to the Transfer
       of the Clearance Box Assets to Barclays*

The SIPA Trustee requests conditional relief from the Sale Order[47] under Rule 60(b) in

the event that the Court interprets the Clarification Letter to authorize transfer of the Disputed

Assets to Barclays. *See* SIPA Trustee Post-Trial Mem. ¶ 445 ("To the extent that the Sale Orders

can be read to authorize the transfers that Barclays now seeks, the Court should grant the Trustee

relief under Rule 60(b) based on the non-disclosures to the Trustee").  In light of the conclusion

reached that the Clarification Letter does not unconditionally entitle Barclays to the 15c3-3

Assets or grant rights to the Margin Assets, the Court does not need to rule on those aspects of

the SIPA Trustee's contingent request for relief and will focus on the impact of the ruling that the

Clearance Box Assets should be transferred to Barclays.

As fully set forth in detail in Section III of this Opinion, Federal Rule of Bankruptcy

Procedure 9024 provides that Rule 60(b) shall apply in all cases under the Bankruptcy Code.

Fed. R. Bankr. P. 9024.  Rule 60(b), in turn, lists several grounds upon which a court may relieve

a party from final judgment, including mistake, inadvertence, excusable neglect, and newly

discovered evidence.

The SIPA Trustee alleges several independent grounds for relief under Rule 60(b)

applicable to the Clearance Box Assets, including that the transfer of these assets "was never

intended" nor disclosed to the Court or the SIPA Trustee, that the transfer results from "mistake

---

[47] The Trustee requests conditional relief from both the Sale Order and the SIPA Sale Order.

or inadvertence," and that the transfer should be disfavored on grounds of "equity and justice."
*See* SIPA Trustee Mot. ¶¶ 89, 98, 102, 107.

The SIPA Trustee is not entitled to relief under Rule 60(b) with respect to the Clearance
Box Assets because his request is premised on the notion that the Court, the SIPA Trustee, and
other relevant parties in interest did not know during the Sale Hearing and the closing weekend
that the Clarification Letter contemplated the transfer of the Clearance Box Assets to Barclays.
That proposition is incorrect. The agreement that existed between DTCC, Barclays, and the
SIPA Trustee at the time of the Sale Hearing contemplated the very same kind of transfer at issue
here. Although that particular agreement was never consummated, the subsequent agreement
ultimately memorialized in the Clarification Letter is identical to its predecessor with respect to
the Clearance Box Assets – under each agreement the Clearance Box Assets are transferred to
Barclays. The public disclosure of this agreement distinguishes the SIPA Trustee's request for
relief under Rule 60(b) from the request made by LBHI. Unlike the "newly-discovered" facts
alleged by LBHI as grounds for relief under Rule 60(b), the provisions of the Clarification Letter
transferring the Clearance Box Assets to Barclays were publicly available to all parties, including
the SIPA Trustee.

The SIPA Trustee's request for Rule 60(b) relief also disregards the very agreement that
he made to transfer the Clearance Box Assets to Barclays. For this reason, the SIPA Trustee's
allegation that "he would not have authorized the signing of the Clarification Letter if he had
known it might be read" to award the Clearance Box Assets to Barclays does not meet the
standards for relief under Rule 60(b). The SIPA Trustee cannot plead ignorance of the facts. He
must have known that the Clarification Letter authorized the transfer of the Clearance Box

Assets, because the plain text of the letter that he signed supports transferring the Clearance Box Assets to Barclays.

## VII.    Timeliness and Other Legal Issues Relating to 60(b) Relief

Barclays presented a number of defenses seeking to preclude relief under the 60(b) Motions as a matter of law, but there is no need to consider these arguments because of the decision to deny 60(b) relief on the merits. Specifically, Barclays has argued that (i) the release contained in the court-approved December 22, 2008 settlement between the SIPA Trustee, Barclays, and JPMorgan bars all Movants from bringing any claims relating to the repo collateral; (ii) Movants were unable to justify their one-year delay in bringing their claims; (iii) the doctrines of unclean hands and *in pari delicto* bar Movants' claims; (iv) the Court does not have jurisdiction to grant Movants' claims under the Mandate Rule; (v) Movants' claims are barred by the doctrines of equitable mootness, judicial estoppel, equitable estoppel and waiver; and (vi) the Takings Clause of the Constitution prohibits modification of the APA absent a state law basis for reformation of the agreement. Barclays Post-Trial Mem. ¶¶ 175-185, 187-195, 198-199, 200-222.

It is unnecessary to address any of these now-moot defenses because of the findings and conclusions stated in this Opinion. The Court reviewed these various defenses but did not need to consider them in deciding not to grant relief from the Sale Order. Furthermore, with respect to any timeliness arguments made by Barclays in connection with the Disputed Assets, timeliness is not an issue because Barclays brought its own motion to recover the Disputed Assets, and Barclays could have brought that motion at any time. *See* Barclays Mot.

For similar reasons, the arguments made by the Committee regarding the timeliness of its own claims have no bearing on the outcome of this litigation and also are moot. To excuse and

explain its alleged delay in seeking Rule 60(b) relief, the Committee has written at great length about the many challenges that it faced in gathering and analyzing information about the sale. The Committee argues that it was forced by circumstances to "drink from a fire hose" and if it had known all of the facts surrounding the alleged $5 billion discounting of the financial assets, it would have opposed the sale to Barclays at the Sale Hearing. Committee Post-Trial Mem. ¶¶ 9-10. The Committee further asserts that it did not sit on its rights, but rather consistently pursued discovery of facts from Barclays and simply waited to bring the Committee Motion until after obtaining the facts necessary to support such a motion. Committee Post-Trial Mem. ¶¶ 15-16.

However, the question of what the Committee knew and when it was finally in a position to fully appreciate the significance of what it knew is irrelevant to the conclusions reached in this Opinion. What was or was not disclosed to the Committee, whether the Committee had reason to comprehend the facts that were provided to its advisors and in reports given to the Committee, and the timing of disclosure to the Committee are of no importance and play no role in the Court's thinking about the 60(b) issues. As discussed above and for the reasons stated in this Opinion, the Court finds that even if it had known all of the undisclosed facts at the time of the Sale Hearing the Court still would have approved the sale to Barclays. Consequently, all issues relating to timeliness of the Committee Motion simply do not matter. Even accepting as true all of the Committee's arguments regarding timeliness, 60(b) relief is not appropriate.

## VIII.    Conclusion

With such vast sums involved, growing market turmoil, uncertainty as to true asset values, transactional complexity and precious little time for careful consideration of the critical events during Lehman Week, perhaps it was inevitable that the urgent, hastily-arranged sale to

100

Barclays would be followed by some combination of buyer's or seller's remorse and heavily-litigated, good-faith disputes regarding contract interpretation. The unique circumstances of that week produced both a sale of the Broker-Dealer Business at breathtaking speed and the present rigorous, slow-moving litigation.

For the reasons stated,[48] having reflected at length on the circumstances of the Sale Hearing and the evidence presented at trial, the Court concludes that the lapses in disclosure at the Sale Hearing did not affect the fairness or alter the outcome of the hearing and were not characterized by either the deliberate withholding of material information or willful misconduct. Although Movants have shown that the Court did not know everything about the transaction that it should have known, the Court was not deceived in a manner that should now be permitted to upset the integrity of the Sale Order. The sale process may have been imperfect, but it was still adequate under the exceptional circumstances of Lehman Week. Especially due to the procedural and substantive importance of maintaining the finality of orders approving the sale of assets under Section 363 of the Bankruptcy Code, based on the evidence justice does not require relief from the Sale Order under Rule 60(b).

With respect to the motion by Barclays to recover the Disputed Assets under provisions of the Clarification Letter, the Court has determined that the Clarification Letter is a binding and enforceable agreement even though it was not completed and executed until after entry of the Sale Order and the parties did not return to the bankruptcy court to obtain specific approval of the various changes to the transaction that are reflected in the Clarification Letter. Although it certainly would have been prudent and doubtless better practice to seek further approval from the Court in the form of a separate order authorizing the parties to enter into the Clarification Letter

---

[48] The text of this Opinion constitutes the Court's findings of facts and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 9014.

and approving the provisions of that letter, the failure to do so will be overlooked here because
(i) the Sale Order anticipated that this letter was being drafted, (ii) the letter was filed on the
docket on the same day that it was executed, (iii) no party in interest ever sought approval of the
Clarification Letter or to obtain relief from its terms due to the lack of formal approval and (iv)
the parties themselves uniformly have regarded the document as a binding and enforceable
statement of their agreement to amend and clarify the APA and have continued to rely upon all
of its provisions. While not expressly approved in so many words, the Clarification Letter is
deemed approved by virtue of these facts.

Interpreting relevant provisions of the Clarification Letter in light of evidence concerning
the negotiating and drafting of this agreement and the record of the Sale Hearing, the Court
denies Barclays' Motion to compel delivery of assets in relation to the 15c3-3 Assets based on
the conditional language used in the Clarification Letter. Barclays' right, if any, to any of these
assets depends upon a later determination of any deficit in the customer reserve accounts. The
Barclays' Motion also is denied as to the Margin Assets related to exchange traded derivatives
but is granted in relation to delivery of the Clearance Box Assets.

The parties shall submit within ten days separate proposed forms of order, agreed as to form and consistent with this Opinion as follows: (i) separate orders denying each of the 60(b) Motions, (ii) orders applicable to each of the Adversary Proceedings resolving those counts of the complaints that are impacted by denial of relief under the 60(b) Motions, and (iii) an order granting in part and denying in part the Barclays' Motion to recover Disputed Assets.   The parties also may arrange a status conference to be held with the Court at a mutually convenient time to schedule any further proceedings that may be required in light of this Opinion and, if needed, to resolve any disagreements concerning the form of these proposed orders.

IT IS SO ORDERED.

Dated: New York, New York
       February 22, 2011

                              ___s/ James M. Peck_____
                              Honorable James M. Peck
                              United States Bankruptcy Judge