**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Chapter 11 Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC., | |
| Plaintiff, | |
| v. | Adv. Proc. No. 09-01731 (JMP) |
| BARCLAYS CAPITAL, INC., | |
| Defendant. | |

**BARCLAYS' REPLY MEMORANDUM IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

**BOIES, SCHILLER & FLEXNER LLP**
575 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Barclays Capital Inc.*

August 5, 2011

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................. 4

A. There Is No Genuine Dispute That Barclays Satisfied Its Obligation Under
Section 9.1(c) Of The APA By Paying Bonuses To The Transferred Employees
Totaling More Than The "Amounts Accrued" By Lehman With Respect To
Those Employees ...................................................................................................... 4

1. Barclays Is Not Collaterally Estopped By Any Findings The Court May Have
Made Concerning Article IX Of The APA .................................................... 5

a. This Court Has Never Addressed The Argument Regarding How To
Harmonize the "Amounts Accrued" And "Reflected On" Clauses In
Section 9.1(c) ......................................................................................... 5

b. LBHI Grossly Misstates The Law Of Collateral Estoppel By Failing To
Recognize That It Does Not Apply To Findings Unfavorable To The
Prevailing Party. ..................................................................................... 6

c. LBHI Flatly Misrepresents The Law In Arguing That A Prevailing Party
Has The Right To Appeal Any Adverse Fact Findings ........................ 10

2. The Plain Terms Of The APA And Extrinsic Evidence Demonstrate That
Barclays Satisfied Its Obligations Under Article IX Of The APA ............. 14

a. LBHI Has Failed To Present Evidence To Create A Genuine Dispute That
The "Amounts Accrued" For Bonuses Were Less Than $1.5 Billion, And
Hence Less Than The Amount Barclays Paid. ..................................... 15

b. LBHI's Contractual Interpretation Arguments Are Inapposite And
Meritless. .............................................................................................. 18

c. LBHI Ignores All The Relevant Extrinsic Evidence In Favor Of Barclays'
Interpretation Of The APA. ................................................................. 21

B. There Is No Genuine Dispute That The $2 Billion "Comp" Number Was A Good
Faith Estimate, Not A Representation Or Guarantee That It Was A Firm Number .......... 23

C. There Is No Genuine Dispute That LBHI Has Not Established, And Cannot
Establish, That It Suffered Any Damages As A Result Of Barclays' Alleged
Contractual Breach. ................................................................................................. 25

CONCLUSION .............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aquavella v. Harvey,*
    330 N.Y.S.2d 560 (N.Y. Sup. Ct. 1972)..........................................................26, 29

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) ..................................................................................................11

*Banker's Trust Co. of W. N.Y. v. Steenburn,*
    409 N.Y.S.2d 51 (N.Y. Sup. Ct. 1978)....................................................................27

*Bobby v. Bies,*
    129 S. Ct. 2145 (2009) ....................................................................................6, 7, 8

*Buschmann v. Prof'l Men's Ass'n,*
    405 F.2d 659 (7th Cir. 1969)...................................................................................27

*California v. Rooney,*
    483 U.S. 307 (1987) ...........................................................................................11, 14

*Camreta v. Greene,*
    - - U.S. - -, 131 S. Ct. 2020 (2011) ..................................................................12, 13

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,*
    56 F.3d 359 (2d Cir. 1995) ........................................................................................6

*Clarke v. Frank,*
    960 F.2d 1146 (2d Cir. 1992) ....................................................................................8

*Colditz v. E. Airlines, Inc.,*
    329 F. Supp. 691 (S.D.N.Y. 1971) ...........................................................................8

*Concerned Citizens of Cohocton Valley, Inc. v. N.Y. State Dep't of Env. Conservation,*
    127 F.3d 201 (2d Cir. 1997) ....................................................................................11

*Control Data Sys., Inc. v. Computer Power Group,*
    No. 94 Civ. 5396,1998 WL 178775 (S.D.N.Y. Apr. 15, 1998) ........................26, 28

*Croce v. Kurnit,*
    737 F.2d 229 (2d Cir. 1984) ..............................................................................19, 20

*Croker v. N.Y. Trust Co.,*
    245 N.Y. 17 (1927)............................................................................................26, 29

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980) ..........................................................................................12, 13

*Diamond v. Charles,*
    476 U.S. 54 (1986) ...................................................................................11

*Eden v. Miller,*
    37 F.2d 8 (2d Cir. 1930) ...........................................................................27

*Elec. Fittings Corp. v. Thomas & Betts Co.,*
    307 U.S. 241 (1939) .............................................................................12, 13

*Freund v. Wash. Square Press, Inc.,*
    357 N.Y.S.2d 857 (N.Y. Ct. App. 1974) ...................................................30

*Galli v. Metz,*
    973 F.2d 145 (2d Cir. 1992) ......................................................................18

*Gelb v. Royal Globe Ins. Co.,*
    798 F.2d 38 (2d Cir. 1986) ...................................................................10, 14

*Goodheart Clothing Co. v. Laura Goodman Enters.,*
    962 F.2d 268 (2d Cir. 1992) ......................................................................19

*In re Bean,*
    252 F.3d 113 (2d Cir. 2001) ........................................................................8

*In re Cosmopolitan Aviation Corp.,*
    763 F.2d 507 (2d Cir. 1985) ......................................................................14

*In re DES Litig.,*
    7 F.3d 20 (2d Cir. 1993) ............................................................................13

*In re O'Brien,*
    184 F.3d 140 (2d Cir. 1999) ......................................................................14

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.,*
    936 F.2d 744 (2d Cir.1991) .......................................................................14

*Isaacs v. Westchester Wood Works, Inc.,*
    718 N.Y.S.2d 338 (N.Y. App. Div. 2000) ................................................19

*James v. Jamie Towers Hous. Co.,*
    743 N.Y.S.2d 85 (N.Y. App. Div. 2002) ..................................................18

*Jim Beam Brands Co. v. Beamish & Crawford Ltd.,*
    937 F.2d 729 (2d Cir. 1991) ........................................................................8

*Johnson v. Watkins,*
    101 F.3d 792 (2d Cir. 1996) ..................................................................10, 14

*Net2Globe Int'l., Inc. v. Time Warner Telecom of N.Y.*,
   273 F. Supp. 2d 436 (S.D.N.Y. 2003) ................................................................. 18

*NLRB v. Babad*,
   785 F.2d 46 (2d Cir. 1986) ................................................................................... 8

*Oscar Gruss & Son, Inc. v. Hollander*,
   337 F.3d 186 (2d Cir. 2003) ............................................................................... 30

*Paneccasio v. Unisource Worldwide, Inc.*,
   532 F.3d 101 (2d Cir. 2008) ......................................................................... 19, 20

*Partmar Corp. v. Paramount Pictures Theatres Corp.*,
   347 U.S. 89 (1954) ....................................................................................... 7, 12

*Reda v. Eastman Kodak Co.*,
   649 N.Y.S.2d 555 (N.Y. App. Div. 1996) ........................................................... 18

*United States v. Cheung Kin Ping*,
   555 F.2d 1069 (2d Cir. 1977) ............................................................................... 7

*Yeiser v. GMAC Mortg. Corp.*,
   535 F. Supp. 2d 413 (SDNY 2008) ...................................................................... 9

## Other Authorities

11 Samuel Williston & Richard A. Lord,
   A Treatise on the Law of Contracts (4th ed. 2011) ............................................ 19

15A Fed. Prac. & Proc. Juris. (2d ed.) ..................................................................... 11

James W. Moore et al., Moore's Fed. Practice - Civil (2011) ..................................... 6

Restatement (Second) of Contracts ............................................................. 18, 27, 29

Restatement (Second) of Judgments ................................................................ 7, 10, 14

Barclays Capital Inc. ("Barclays") hereby submits its reply memorandum of law in further support of its motion for summary judgment dismissing Count II of Lehman Brothers Holdings Inc.'s ("LBHI") adversary complaint filed November 16, 2009.

## PRELIMINARY STATEMENT

1.      In its Opposition, LBHI asserts that Barclays is not entitled to summary judgment dismissing Count II of LBHI's complaint because (a) "The premises of Barclays' motion are directly contrary to the Court's factual findings," which LBHI argues have collateral estoppel effect on Barclays, and (b) "in the event the Court were to abandon its prior findings — which it should not do — all of these premises would again be genuinely disputed by LBHI."  LBHI's Reply Memorandum of Law in Further Support of Its Motion for Summary Judgment and in Opposition to Barclays Capital, Inc.'s Cross-Motion for Summary Judgment ("LBHI Opp.") at ¶ 68.

2.      The Court should reject these assertions, and should grant Barclays' motion for summary judgment, for each one of the following, independent reasons.  *First*, Barclays is entitled to summary judgment based upon the plain meaning of Section 9.1(c), which required Barclays to pay bonuses that in the aggregate were "100 percent of the bonus pool amounts accrued."  LBHI has failed to present any evidence that could create a genuine basis for disputing the fact that Barclays paid 2008 bonuses to Transferred Employees that totaled more than that "accrued" amount.  To the extent this argument is in any way inconsistent with statements in the Court's February 22, 2011 Opinion (the "Opinion"), that is not a basis for rejecting it.  Barclays is not collaterally estopped by any potentially adverse statements or findings in this Court's Opinion relating to the "Comp" or bonus issue.  In arguing otherwise, LBHI ignores black-letter law holding that findings adverse to a prevailing party cannot ever be given collateral estoppel effect against that prevailing party.  Thus, Barclays is legally entitled to

1

a decision on the merits of the dispute over the contractual interpretation of Section 9.1(c), and

that decision must be made as if there were no prior findings.[1]

3.      *Second*, even if the Court were to consider its prior findings, it should rule for

Barclays based upon its finding that the $2 billion "Comp" number, together with the $1.5 billion

cure estimate, were "good faith estimates and not guarantees or representations that these were

firm numbers."  Op. at 55 (Hume Decl. Ex. 31).[2]  LBHI argues that while the $2 billion may

"originally" have been an estimate, it later became a contractual obligation when Barclays agreed

to it in the APA.  LBHI Opp. at ¶ 27.  That assertion is illogical and impossible to support.  The

estimate was given to the Court during the Sale Hearing on the evening of September 19, 2008

— three days *after* the APA was executed and the 9/16/08 Financial Schedule was created.  If, as

LBHI asserts, Barclays and LBHI had contractually agreed on September 16, 2008 that Barclays

would pay exactly $2 billion to the Transferred Employees *solely in bonuses*, then on the evening

of September 19, 2008, LBHI's President and lead lawyer would not have told the Court that the

$2 billion amount was an "*approximate*[]" number that represented the "*estimated*" amount of

the "*exposure*" Barclays faced "for the employees that accept offers of employment," who would

receive "compensation, bonuses and severance payments."  BCI Ex. 49 [9/19/08 Tr.] at 99:22-

25, 101:23-102:2 (emphasis added) (Hume Decl. Ex. 3).  Thus, LBHI cannot reconcile its claim

under Count II with this Court's indisputably correct finding that the $2 billion number was a

---

[1]  LBHI argues that Barclays is in effect seeking an "improper" motion for reconsideration.  LBHI Opp. at ¶¶ 14-22.  That is not correct.  Barclays did not move for reconsideration.  This motion presents a separate claim that was previously stayed, and Barclays is not collaterally estopped by anything in the Court's Opinion relating to Article IX.

[2]  Citations to documents herein are in the form used in Barclays' Post-Trial Memorandum of Law and were attached to the June 22, 2011 Barclays' Memorandum In Opposition to LBHI's Motion and In Support of Barclays' Motion for Summary Judgment on Count II of LBHI's Adversary Complaint ("Barclays Br.") as exhibits to the Declaration of Hamish P.M. Hume ("Hume Decl.").

good faith estimate, not a guarantee or representation. For this independent reason, Barclays is entitled to summary judgment.[3]

4.    *Third*, even if the Court accepted all of LBHI's arguments regarding collateral estoppel and the existence of a contractual breach, it should still grant Barclays' motion because, as a matter of law, LBHI is not entitled to recover damages for the alleged breach. The alleged breach is a failure to pay the full, aggregate amount of 2008 bonuses to the Transferred Employees that LBHI alleges Barclays was obligated to pay to those employees. It is well-established that the only remedy available for such an alleged breach (assuming a breach could be established, which it cannot) is a declaratory judgment or an order for specific performance, not the recovery of damages. LBHI has not sought a declaratory judgment or specific performance, but instead seeks to recover for itself amounts that it claims were supposed to be paid to the Transferred Employees. The law does not allow that, and therefore Count II must be dismissed.[4]

---

[3] To be clear, Barclays seeks summary judgment not based upon the Court's "estimate" finding as such, but based upon the fact that, consistent with the Court's finding, it is beyond genuine dispute that the $2 billion was an estimate, and not a guarantee or representation. *See* Barclays Br. at ¶¶ 107-110.

[4] Indeed, we note that the Trustee for LBI has taken a different approach: he does not assert that the amounts Barclays allegedly failed to pay in bonuses to Transferred Employees should be automatically treated as damages (which the law clearly does not permit); instead, he has reserved his right to bring a claim against Barclays for allegedly unpaid bonus amounts if, but only if, it is determined that certain Transferred Employees have a valid claim for unpaid 2008 bonuses against the LBI estate. Stipulation and Order Amending the Trustee's Adversary Complaint at pp. 2-3 (Docket No. 09-1732, ECF No. 9) (attached hereto as Exhibit A). While less obviously contrary to law than LBHI's claim, such a claim would still have no merit because (in addition to the fact no breach can be established) (a) the vast majority of Transferred Employees had no legal right to a discretionary 2008 bonus payment from LBI (or LBHI), and (b) even for those that may have had such a right, Barclays did not agree to pay specific bonus amounts to specific individuals.

## ARGUMENT

**A.    There Is No Genuine Dispute That Barclays Satisfied Its Obligation Under Section 9.1(c) Of The APA By Paying Bonuses To The Transferred Employees Totaling More Than The "Amounts Accrued" By Lehman With Respect To Those Employees.**

5.      The plain text of Section 9.1(c) provides that Barclays shall pay to each

Transferred Employee "an annual bonus ('08 Annual Bonuses'), in respect of the 2008 Fiscal

Year that, in the aggregate, are *equal in amount to 100 percent of the bonus pool amounts*

*accrued in respect of amounts payable for incentive compensation* (but not base salary) and

reflected on the financial schedule delivered to Purchaser on September 16, 2008 and initialed by

an officer of each of Holdings and Purchaser (the 'Accrued 08 FY Liability')."  BCI Ex. 1 at

9.1(c) (emphasis added) (Hume Decl. Ex. 1).

6.      As Barclays showed in its opening memorandum, there is no genuine basis for

disputing that:

- "100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation" was less than $1.5 billion.  Barclays Br. at ¶¶ 38-41.

- Barclays paid at least $1.5 billion in 2008 bonuses to the Transferred Employees (in fact, Barclays paid over $1.8 billion in such bonuses, but even LBHI admits Barclays paid "approximately $1.5 billion").  *Id.* at ¶¶ 42-53.

- Therefore, Barclays satisfied its obligation under Section 9.1(c) of the APA.

- The reference in Section 9.1(c) to the 9/16/08 Financial Schedule, which contains an entry of $2 billion for "Comp," cannot be interpreted to mean that Barclays had an obligation to pay $2 billion *solely in bonuses*: doing so would either make the "amounts accrued" clause meaningless, which the law does not allow; or it would create an irreconcilable conflict between the "amounts accrued" clause and the "reflected on" clause, which the law also does not allow.  *Id.* at ¶¶ 75-81.

- Instead, the only reasonable interpretation is that Section 9.1(c) required Barclays to pay bonuses equal to Lehman's accrued amount, and the $2 billion entry for "Comp" on the 9/16/08 Financial Schedule represented an estimate of the *total* compensation liabilities assumed by Barclays, *including but not limited to* that accrued bonus amount.  *Id.*  This interpretation is confirmed beyond any genuine dispute by the

4

extrinsic evidence, most importantly the testimony of every negotiator, including Bart McDade and Harvey Miller — each of whom unambiguously testified the $2 billion number includes both bonuses and severance. *Id.* at ¶¶ 82-85.

7.    LBHI's principal response to the foregoing is to assert that Barclays is collaterally estopped from disputing that Section 9.1(c) required Barclays to pay $2 billion solely in bonuses. As explained below, that is simply false as a matter of law. As also explained below, the few responses LBHI provides to the actual merits of Barclays' argument are contrary to law and insufficient to raise any genuine factual dispute, and therefore should be rejected.

> 1.    <u>Barclays Is Not Collaterally Estopped By Any Findings The Court May Have Made Concerning Article IX Of The APA.</u>

8.    LBHI asserts that this Court has already decided the meaning of section 9.1(c) of the APA, and that Barclays is collaterally estopped from challenging that (alleged) finding. LBHI is wrong on both counts.

> a.    <u>This Court Has Never Addressed The Argument Regarding How To Harmonize the "Amounts Accrued" And "Reflected On" Clauses In Section 9.1(c).</u>

9.    As an initial matter, LBHI admits that the Barclays argument about the proper interpretation of the actual language of Section 9.1(c) is a "new" argument that was not raised or considered during the Rule 60(b) proceeding. LBHI Opp. at ¶¶ 24-25. Barclays did not raise this argument during the Rule 60(b) proceeding for the simple reason that LBHI's breach of contract claim based upon its interpretation of Section 9.1(c) was *stayed*; the "Comp" issue before the Court during the Rule 60(b) proceeding was whether the disclosures to the Court were reasonable, not how to harmonize the different sub-clauses of Section 9.1(c). Thus, since the

Court has never had an opportunity to address the Barclays argument summarized above, the Court's Opinion should not be read to foreclose it.[5]

> **b.**    LBHI Grossly Misstates The Law Of Collateral Estoppel By Failing To Recognize That It Does Not Apply To Findings Unfavorable To The Prevailing Party.

10.    LBHI argues that Barclays offers a "distortion of the 'necessarily decided' element of collateral estoppel, positing instead a newly-created rule whereby the 'losing party' can never assert collateral estoppel — on any issue — against the 'prevailing party' even based on particular court findings that went against the 'prevailing' party."  LBHI Opp. at ¶ 34.

11.    Far from positing a "newly-created rule," Barclays relies solely on black-letter law, which holds that collateral estoppel applies only if the determination was "essential to the judgment," and that "[a] determination ranks as necessary or essential *only when the final outcome hinges on it*."  *Bobby v. Bies*, 129 S. Ct. 2145, 2152 (2009) (emphasis added); *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) (collateral estoppel applies only if the "determination was essential to the judgment").  "When the jury or the court makes findings of fact, but the judgment is not dependent on those findings, they are not conclusive between the parties in a subsequent action."  18 James W. Moore, *et al.*, Moore's Fed. Practice - Civil ¶ 132.03 (2011).

12.    Precisely because of this "essential to the judgment" requirement, collateral estoppel can never apply to a finding that was unfavorable to the party that prevailed in the first proceeding.  Indeed, LBHI has not cited, and cannot cite, a *single case* in which collateral

---

[5] Barclays acknowledges that when the doctrine of collateral estoppel applies (which it clearly does not in this matter), it applies to issues that were decided explicitly or by necessary implication.  Since the doctrine does not apply here, this rule of law is inapplicable.  Moreover, it is not obvious what the "necessary implication" of the Court's Opinion is with respect to the meaning of the "amounts accrued" clause of Section 9.1(c) (other than that, if LBHI's position were accepted, the implication would be that the "amounts accrued" clause would be rendered entirely meaningless).

estoppel was applied against a prevailing party "based on particular court findings that went against the 'prevailing' party." We are not aware of any such case. The reason for that is clear: any finding that "went against the prevailing party" in the first proceeding was, by definition, *not* "essential" or "necessary" to the judgment in favor of the prevailing party. Accordingly, any finding that was unfavorable to the prevailing party in the first proceeding cannot, as a matter of law, form the basis for collateral estoppel in a later proceeding.[6]

13.    This is not a "newly-created rule" that Barclays has invented, as LBHI falsely asserts. To the contrary, over three decades ago the Second Circuit held that "determinations adverse to the winning party do not have preclusive effect." *United States v. Cheung Kin Ping*, 555 F.2d 1069, 1076 (2d Cir. 1977). Likewise, the Restatement of Judgments states that if "the party who lost on the issue obtained a judgment in his favor, the general rule of § 27 [*i.e.,* collateral estoppel] is inapplicable by its own terms." Restatement (Second) of Judgments § 28 cmt. a.

14.    Indeed, the Supreme Court has recently confirmed that "final judgment losers" cannot invoke the doctrine of collateral estoppel, because the doctrine applies only to those findings that are "essential to the judgment." *Bobby*, 129 S. Ct. at 2149, 2152 (quoting Restatement (Second) of Judgments § 27). In *Bobby*, the Court addressed a claim by a convicted felon who was found to be mentally handicapped in the course of a proceeding in which, *despite* that mitigating finding, he was sentenced to death. *Id.* at 2149-50. In a later proceeding, the convicted felon argued that this finding of mental incapacity had collateral estoppel effect. After

---

[6] In one unusual and obviously inapposite case, collateral estoppel was applied against the prevailing party based on a finding that was *helpful* to that prevailing party in the first proceeding, and harmful to the losing party in that first proceeding. *See Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89 (1954). In that case, the prevailing party in the first case *changed its position* on a particular issue in the second case, and therefore was held to be estopped by its victory on that issue in the first case. *Id.* at 95-99. Here, where Barclays' position has been consistent throughout this litigation and the findings at issue were not essential to the judgment in Barclays' favor, *Partmar* is entirely inapposite.

the Sixth Circuit accepted this argument, the Supreme Court unanimously reversed on the

grounds that the finding *could not have been* "essential" to the outcome in the prior proceeding,

since that final outcome was reached *despite* the finding, not because of it:

> Most grave among the Sixth Circuit's misunderstandings, *issue preclusion is a plea available to prevailing parties*. The doctrine bars relitigation of determinations necessary to the ultimate outcome of a prior proceeding. The Ohio courts' recognition of Bies' mental state as a mitigating factor was hardly essential to the death sentence he received. On the contrary, the retardation evidence cut against the final judgment. *Issue preclusion, in short, does not transform final judgment losers, in civil or criminal proceedings, into partially prevailing parties*.

*Bobby*, 129 S. Ct. at 2149 (emphasis added).

15.     Thus, LBHI flatly misstates the law when it argues that a finding satisfies the

requirement of being "necessary" to the final outcome so long as it was clearly addressed in the

prior proceeding. LBHI even goes so far as to assert that "*all the factual findings in the Opinion*

*were 'necessarily decided' on the merits of the Rule 60(b) motions*." LBHI Opp. at ¶ 38

(emphasis added). That is obviously false, as a matter of law. As quoted above, the Supreme

Court (and numerous other courts) have made clear that "[a] determination ranks as necessary or

essential *only when the final outcome hinges on it*." *Bobby*, 129 S. Ct. at 2152 (emphasis

added).[7] Thus, LBHI's version of the law cannot be squared with the Supreme Court's decision

in *Bobby*, which held that the mental handicap finding was not "necessary" for collateral

estoppel purposes *even though it was clearly addressed in the prior proceeding, and even though*

*the lower court had a duty to address the issue before it could rule for either party. Id.* at 2153

(the Court rejected the argument that collateral estoppel should apply because the court was

---

[7] *See also, e.g., Cent. Hudson.*, 56 F.3d at 368; *In re Bean*, 252 F.3d 113, 118 (2d Cir. 2001); *Clarke v. Frank*, 960 F.2d 1146, 1150 (2d Cir. 1992) (only applies to findings essential to the judgment); *Jim Beam Brands Co. v. Beamish & Crawford Ltd.*, 937 F.2d 729, 734 (2d Cir. 1991) (same); *NLRB v. Babad*, 785 F.2d 46, 49 n.4 (2d Cir. 1986) (same); Restatement (Second) of Judgments § 27, § 27 cmt. h, § 27 illus. 13-14 (same); § 28 cmt. a; *Colditz v. E. Airlines, Inc.*, 329 F. Supp. 691, 695 (S.D.N.Y. 1971); Barclays Br. at ¶¶ 64-69.

under a "mandatory duty" to decide the issue before it could rule for either party, noting that

such "reasoning conflates a determination necessary to the bottom-line judgment with a

subsidiary finding that, standing alone, is not outcome determinative").

16.    In its effort to show that the "essential to the judgment" requirement somehow

applies to *all* fact findings in a decision, LBHI misleadingly quotes from cases addressing a

completely different issue:  whether a particular finding that is necessary to a particular judgment

must be *explicitly* stated, or whether it can be a necessary implication of the judgment.   LBHI

Opp. at ¶¶ 36-37.  For example, LBHI block quotes a statement from *Yeiser v. GMAC Mortg.*

*Corp.*, 535 F. Supp. 2d 413, 425 (S.D.N.Y. 2008), to suggest that the "essential to the judgment"

requirement is satisfied if the issue has been "properly raised by the pleadings or otherwise

placed in issue and actually determined in the prior proceeding."  LBHI Opp. at ¶ 36 (quoting

*Yeiser*).   But that quote has nothing to do with the "essential to the judgment" requirement.

Rather, it addresses whether there was a sufficient "identity of issue" between the first and the

second proceedings.  In *Yeiser*, there was no dispute and no discussion regarding the requirement

that the prevailing party's judgment must have "hinged upon" the determination of the issue in

its favor.  Moreover, as is invariably the case, in *Yeiser* it was the *prevailing party* from the first

proceeding who sought to invoke the doctrine of collateral estoppel — not the "final judgment

loser," as is the case here.  *Yeiser*, 535 F. Supp. 2d at 425.

17.    Tellingly, LBHI does not even try to argue that the Court's denial of the Rule

60(b) motions "hinges upon" the statements made in the Opinion, on which LBHI relies,

regarding Section 9.1(c) of the APA.  It thus tacitly concedes, as it must, that the judgment in

Barclays' favor on Movants' Rule 60(b) motions did *not* "hinge" on any statement the Court

made regarding the amount of bonus payments Article IX obligated Barclays to pay.[8]  As a

matter of law, therefore, the statements in the Court's Opinion about Section 9.1(c) of the APA

cannot have collateral estoppel effect against Barclays.

> c.    <u>LBHI Flatly Misrepresents The Law In Arguing That A Prevailing
> Party Has The Right To Appeal Any Adverse Fact Findings.</u>

18.    As Barclays demonstrated in its opening brief, collateral estoppel does not apply

for the separate reason that Barclays cannot appeal any findings made in the Opinion concerning

Barclays' obligations under Article IX of the APA.  Barclays Br. at ¶ 70.  *See Gelb v. Royal*

*Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986) ("a winning party may not appeal issues

determined adversely to it by the trial court and, as a consequence, is not barred from relitigating

such issues"); *Johnson v. Watkins*, 101 F.3d 792, 795 (2d Cir. 1996) ("If review is unavailable

because the party who lost on the issue obtained a judgment in his favor, the general rule of

collateral estoppel is inapplicable by its own terms.") (quoting Restatement (Second) of

Judgments § 28(1) cmt. a).

19.    Recognizing that this rule is fatal to its collateral estoppel argument, LBHI asserts

that Barclays "is simply incorrect in asserting that, as the overall prevailing party on LBHI's

Rule 60(b) motion, it is barred from seeking appellate review of the factual findings in the

Opinion."  LBHI Opp. at ¶ 48.  According to LBHI, "the United States Supreme Court has held

that a 'prevailing' party can appeal adverse findings in an opinion that rules in its favor on the

ultimate issue where, as here, the party retains an interest in correcting findings that may have

collateral estoppel effect against it in later proceedings."  LBHI Opp. at ¶ 48.

---

[8] As we pointed out in our opening brief, the statements upon which LBHI relies appear in a section of the
Opinion entitled "[t]he Rule 60(b) Standard and *Background of Movants' 60(b) Claims*."  Op. at 37
(emphasis added) (Hume Decl. Ex. 31).  Whether they are findings or not, they clearly were not
"essential" or "necessary" to the Court's ultimate decision to deny the Rule 60(b) motions.

20.    LBHI has misrepresented the law.  The Supreme Court has long held that "[t]he standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) (citing *Diamond v. Charles*, 476 U.S. 54, 62 (1986)).  In order to demonstrate Article III standing to appeal, an appellant must demonstrate "injury caused *by the judgment* rather than injury caused by the underlying facts."  15A Fed. Prac. & Proc. Juris. § 3902 (2d ed.) (emphasis added).  Thus, the Supreme Court has held that the party that prevails in the lower court is "not in a position to appeal" *even if* some of the lower court's reasoning or findings are unfavorable to that prevailing party.  *California v. Rooney*, 483 U.S. 307, 314 (1987).  That is because an appellate court "reviews judgments, not statements in opinions."  *Id.* at 311; *see also id.* ("The Court of Appeal's use of analysis that may have been adverse to the State's long-term interests does not allow the State to claim status as a losing party for purposes of this Court's review").  The Second Circuit has likewise confirmed that "a party generally does not have standing to appeal when the judgment terminates the case in his favor," even if the judgment includes findings or statements with which the prevailing party disagrees.  *Concerned Citizens of Cohocton Valley, Inc. v. N.Y. State Dep't of Env. Conservation*, 127 F.3d 201, 204 (2d Cir. 1997) ("if a court grants the ultimate relief requested, even though on grounds other than those urged by the prevailing party, that party is generally not 'aggrieved' by the judgment and may not appeal").

21.    Contrary to LBHI's assertion, the Supreme Court has never held that a prevailing party has standing to appeal where it "retains an interest in correcting findings that may have collateral estoppel effect against it in later proceedings."  LBHI Opp. at ¶ 48.  Instead, the

Supreme Court cases invoked by LBHI address extremely narrow and obviously inapposite

exceptions to the general rule as follows:

- o In *Camreta v. Greene*, - - U.S. - -, 131 S. Ct. 2020 (2011), the Court permitted a
  government official to appeal a finding that his actions had been unconstitutional,
  even though he had prevailed on qualified immunity grounds.  131 S. Ct. at 2029-31.
  The Court permitted the appeal on policy grounds because it recognized that the
  finding of a constitutional violation would have a significant future effect on the
  conduct of government officials.  *Id.* at 2031-32.  But the Court underscored that its
  decision was intended to do "no more than exempt *one special category of cases* from
  [its] usual rule against considering prevailing parties' petitions."  *Id.* at 2033
  (emphasis added).  The Court gave no indication that its decision had anything to do
  with "collateral estoppel."

- o In *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980), the Court permitted
  named plaintiffs in a putative class action to appeal from denial of class certification,
  after "judgment was entered in their favor by the court *without their consent* and the
  case was dismissed *over their continued objections*" because the defendant tendered
  offers of settlement in full satisfaction of their individual claims.  445 U.S. at 333
  (emphasis added).  The trial court's judgment denied class certification, which was a
  portion of the relief that the plaintiffs had sought; accordingly, the plaintiffs did not
  fully prevail on their claim.  In addition, the Court recognized that "policy
  considerations" required that the plaintiffs be permitted to appeal the denial of class
  certification because to have held otherwise would have allowed class defendants to
  forever preclude appellate courts from reviewing denials of class certification.  *Id.* at
  332-34.  Again, the Court's decision made no mention of collateral estoppel.

- o In *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241 (1939), the adverse
  finding was expressly set forth *in the actual judgment*, and therefore the Supreme
  Court remanded solely to excise that finding from the judgment, but not to revisit the
  merits of the case.  Far from supporting LBHI's position, this case confirmed that "[a]
  party may not appeal from a judgment or decree in his favor, for the purpose of
  obtaining a review of the findings he deems erroneous which are not necessary to
  support the decree."  *Id.* at 241.  The only reason for the exception from this rule in
  *Electrical Fittings* was that the adverse finding, though "immaterial" to the decree,
  was improperly included in the decree itself.  By contrast, this Court's July 15, 2011
  final Orders do not include any findings adverse to Barclays.[9]

---

[9] LBHI also cites *Partmar Corp. v. Paramount Pictures Theatres Corp.*, 347 U.S. 89 (1954), but that case
did not involve a prevailing party seeking to appeal, and is therefore inapposite and does not support
LBHI's argument that Barclays has standing to appeal.  To the extent LBHI cites *Partmar* to show that a
prevailing party like Barclays can be subject to collateral estoppel, that is not accurate:  as explained
above in footnote 6, *Partmar* held merely that a finding *favorable* to the prevailing party would estop the
prevailing party from later changing its position and adopting exactly the opposite position in a
subsequent proceeding.

22.     While the Second Circuit has not yet had a chance to address the decision in

*Camreta* (which deals with declarations of unconstitutional conduct by government officials and

hence is obviously inapposite to this case), it has made clear that the decisions in *Electrical*

*Fittings* and *Deposit Guaranty* have no application here.  The Second Circuit has expressly held

that the holding of *Electrical Fittings* does not apply where, as here, the adverse findings being

challenged by a prevailing party "do not appear on the face of the judgment, as was the case with

the finding of validity in *Electrical Fittings*."  *In re DES Litig.*, 7 F.3d 20, 25 (2d Cir. 1993).

Rather, where the prevailing party seeks to challenge unfavorable findings that were merely in

the lower court's opinion, but not in the judgment itself, then the court is "confronted with an

'appellant' that seeks no modification of the judgment as entered," which means that "appellate

jurisdiction is improperly invoked."  *Id.*  Similarly, the Second Circuit has held that the decision

in *Deposit Guaranty* is based on the fact that a plaintiff seeking class certification is not really

the "prevailing party" when class certification is denied:  in particular, the decision "rests on the

fact that, by not obtaining certification, plaintiffs would not be able to shift a portion of the costs

of litigation to other members of the class."  *Id.* at 25 n.5 (internal citations omitted).

Accordingly, the Second Circuit has confirmed that neither *Deposit Guaranty* nor *Electrical*

*Fittings* allow a prevailing party to appeal adverse findings that are not contained in the actual

judgment being appealed.  *Id.* at 25.[10]

23.     Indeed, in part by citing *Electrical Fittings* (one of the cases cited by LBHI), the

Second Circuit has left absolutely no doubt that a party may not appeal from an order in its favor

simply because the lower court also made adverse findings:

---

[10] *See also Camreta*, 131 S. Ct. at 2039-40 (Kennedy, J., dissenting) ("The parties seeking appeal in *Electrical Fittings* and *Deposit Guaranty* might be compared with plaintiffs who have requested $1,000 in relief but obtained only $500.  Such parties have prevailed in part, but have not 'receive[d] all that [they] ha[d] sought.'") (alteration in original).

> It is a fundamental principle of jurisprudence that "[a] party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Elecrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242, 59 S. Ct. 860, 83 L. Ed. 1263 (1939); *see also Abbs v. Sullivan,* 963 F.2d 918, 924 (7th Cir.1992) ("[A] winner cannot appeal a judgment merely because there are passages in the court's opinion that displease him—that may indeed come back to haunt him in a future case.") (citing *California v. Rooney,* 483 U.S. 307, 107 S. Ct. 2852, 97 L.Ed.2d 258 (1987) (*per curiam*); *Electrical. Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 59 S. Ct. 860, 83 L. Ed. 1263). This is no minor point. Standing is not merely a prudential doctrine but an Article III limitation on the scope of federal judicial power. For this reason, "in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a 'person aggrieved'—a person 'directly and adversely affected pecuniarily by' the challenged order of the bankruptcy court." *International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 747 (2d Cir.1991) (quoting *In re Cosmopolitan Aviation Corp.,* 763 F.2d 507, 513 (2d Cir. 1985)).

*In re O'Brien*, 184 F.3d 140, 141-42 (2d Cir. 1999).

24.     In sum, the case law unambiguously holds that "a winning party may not appeal issues determined adversely to it by the trial court," *Gelb*, 798 F.2d at 44, and that "[i]f review is unavailable because the party who lost on the issue obtained a judgment in his favor, the general rule of collateral estoppel is inapplicable by its own terms." *Johnson*, 101 F.3d at 795 (quoting Restatement (Second) of Judgments § 28(1) cmt. a).[11]

> 2.     The Plain Terms Of The APA And Extrinsic Evidence Demonstrate That Barclays Satisfied Its Obligations Under Article IX Of The APA.

25.     Aside from its erroneous collateral estoppel assertion, LBHI has little to say in response to the fact that it violates established principles of contractual interpretation to construe Section 9.1(c) as imposing an obligation to pay $2 billion solely in bonuses: specifically, any such interpretation is improper because (a) it renders meaningless the clause in Section 9.1(c) which states that the aggregate amount of bonuses should equal "100 percent of the bonus pool

---

[11] Thus, it is irrelevant for LBHI to cite cases holding that collateral estoppel applies where a party *was legally entitled to appeal*, but chose not to do so. *See* LBHI Opp. at ¶¶ 53-54. These cases do not involve a situation where, as here, a prevailing party could not appeal an adverse finding in the first instance.

amounts accrued in respect of amounts payable for incentive compensation (but not base salary)"; and (b) it creates an irreconcilable conflict between that "amounts accrued" clause and the clause that refers to the 9/16/08 Financial Schedule. Thus, the only way to harmonize the "amounts accrued" language with the reference to the 9/16/08 Financial Schedule is to recognize that Barclays was obligated to pay bonuses equal to the "amounts accrued," which was "reflected on" the 9/16/08 Financial Schedule because those "amounts accrued" were *one component* of the $2 billion *estimate* for all "Comp" liabilities Barclays was assuming. *See* Barclays Br. at ¶¶ 75-80.

26.    As explained below, the few responses LBHI offers to this argument are meritless.

>    a.    <u>LBHI Has Failed To Present Evidence To Create A Genuine Dispute That The "Amounts Accrued" For Bonuses Were Less Than $1.5 Billion, And Hence Less Than The Amount Barclays Paid.</u>

27.    In its opening brief, Barclays showed that, in arguing for Rule 60(b) relief, LBHI repeatedly asserted that the Lehman "accrual" for bonuses payable to the Transferred Employees was approximately $1 billion *less* than the $2 billion estimate for "Comp." Barclays Br. at ¶ 38; Barclays Statement of Undisputed Facts at ¶ 10. Thus, LBHI has admitted that (a) the "amounts accrued" language in Section 9.1(c) of the APA refers to an amount that is substantially less than $2 billion, which cannot be reconciled with LBHI's argument that Section 9.1(c) imposes an obligation to pay $2 billion solely in bonuses, and (b) the "amounts accrued" language refers to an amount that is less than what LBHI admits Barclays paid in 2008 bonuses (*i.e.*, it is less than "approximately $1.5 billion," the amount LBHI claims was paid by Barclays).

28.    LBHI's only response to the foregoing is to take issue with one, but only one, of the numerous LBHI assertions identified by Barclays where LBHI admitted that the Lehman

bonus accrual for the Transferred Employees was less than $1.5 billion.  Specifically, LBHI

responds solely to the assertion made in a declaration from Alvarez & Marsal, submitted in

support of LBHI's motion for Rule 2004 discovery, asserting that "While we have insufficient

information to determine with any degree of precision the total bonus pool for the Transferred

Employees, it is estimated to be in the region of $700 million (or $1.2 billion if the equity portion

is included) for the period from December 2007 to August 2008."  BCI Ex. 862 at ¶ 8 (Hume

Decl. Ex. 13).  LBHI focuses on the fact that this declaration states that Alvarez & Marsal had

"insufficient information" to provide more than an estimate of what this bonus accrual was.

LBHI Opp. at ¶ 24.  But that is both untrue and irrelevant:  even before the Rule 2004 discovery,

LBHI had access to the financial systems and internal emails and documents of Lehman

employees necessary to obtain the information relevant to the bonus accrual; more

fundamentally, LBHI completely ignores the fact that *after* it conducted its extensive Rule 2004

discovery, and indeed even after the Rule 60(b) trial was completed, it *continued to assert* that

the Lehman bonus accrual for the Transferred Employees was an amount substantially less than

$1.5 billion, as follows:

- o  In its Rule 60(b) brief submitted on September 15, 2009, after its extensive Rule 2004 discovery, LBHI asserted that "the accrual" for bonuses was approximately $1 billion:  "**The Court was told that, as consideration in the Sale Transaction, Barclays would assume approximately $2 billion in 2008 bonus liabilities to Lehman employees who transferred to Barclays.  The accrual upon which this assumed liability was based had, in fact, been deliberately inflated by $1 billion**."  LBHI Rule 60 Br. at ¶ 10 (emphasis added) (Hume Decl. Ex. 25);

- o  In its Rule 60(b) reply brief, submitted on March 18, 2010, after discovery ended, LBHI asserted that the "bonus accrual" was $1.3 billion:  "**The spreadsheet shows 'negative goodwill' of '2.75' including accounting for a 'bonus accrual' of only '1.30.' (***Id.***) This shows that Barclays knew on September 17 of a built-in gain, and that the $2.0 billion 'comp' accrual on the 9/16/08 Financial Schedule was inflated by at least $700 million**."  LBHI Rule 60 Reply Br. at ¶ 63 (emphasis added) (Hume Decl. Ex. 28);

16

o   In its November 22, 2010 post-trial brief, submitted after months of trial, LBHI
    asserted that the Lehman "accrual" was approximately $1 billion less than $2 billion:
    "**As Kelly revealed in his September 16, 2008, 5:10 a.m. e-mail to Lowitt and
    Tonucci, however, the terms of the deal were based on an inflation of this
    assumed liability by 'an extra $1 b[illion] of comp beyond our accrual[.]'** . . .
    **McDade agreed, however, that the billion dollar difference noted in Kelly's e-
    mail, a 100% increase over Lehman's accruals, could not be accounted for by
    annualizing. (4/27/10 [McDade] 70:13-19.)  In other words, even if Lehman had
    not yet fully accrued its bonus liabilities for the last quarter, that could not
    account for an additional $1 billion in liabilities.**"  LBHI Post-Trial Br. at ¶ 139
    (emphasis and ellipsis added; alterations in original) (Hume Decl. Ex. 30).

29.    LBHI makes no effort to address these admissions.  They confirm that LBHI has

never wavered from the assertion that the Lehman bonus accrual for the Transferred Employees

was anywhere from $700 million to $1.2 billion, but in all events, *less* than $2 billion and *less*

than $1.5 billion.[12]  Moreover, even if LBHI could somehow disavow these admissions, it has

made no effort to present any affirmative evidence whatsoever regarding the "amounts accrued"

for bonuses payable to the Transferred Employees.  LBHI has therefore failed to create any

genuine dispute over the fact that the "amounts accrued" was less than $1.5 billion, and therefore

less than the aggregate bonus amount LBHI admits Barclays paid.[13]

---

[12]  To be sure, as Barclays has repeatedly explained, the fact that Lehman's bonus accrual was less than
$1.5 billion does not mean that the $2 billion "Comp" estimate was "deliberately inflated" or in any way
misleading.  To the contrary, the parties recognized that (a) Barclays would likely have to pay more than
the "amounts accrued" in order to ensure that the most important (and most valuable) of the Transferred
Employees would stay with the Business (and indeed Barclays did have to pay bonuses of over $1.8
billion, well in excess of the accrual), and (b) Barclays was also obligated to pay an unpredictable amount
in severance payments under Section 9.1(b) (which Barclays also paid).  Barclays Br. at ¶¶ 40-41.  For
these reasons, as Bart McDade explained at trial and as this Court found in its Opinion, the $2 billion
estimate for all "Comp" liabilities was more than reasonable.  4/27/10 Tr. at 48:1-50:3 (McDade) (Hume
Decl. Ex. 40); Op. at 55-56 (Hume Decl. Ex. 31).

[13]  As shown in our opening memorandum, Barclays actually paid bonus amounts in excess of $1.8
billion.  Barclays Br. at ¶¶ 44-53.  Nevertheless, for purposes of the Barclays motion for summary
judgment, it is sufficient that LBHI has admitted that Barclays paid at least "approximately $1.5 billion."
LBHI Opp. at ¶¶ 4, 27-34.

       b.      LBHI's Contractual Interpretation Arguments Are Inapposite And Meritless.

30.      LBHI argues that Barclays "ignores the rule of contractual interpretation that the specific governs the general — *i.e.,* the specific and 'agreed' $2 billion number trumps any allusion to undefined and unknown 'amounts accrued.'"  LBHI Opp. at ¶ 29.

31.      That is not correct.  Under the guise of the "specific governs the general," this argument would have the Court eliminate as meaningless and redundant the following language from Section 9.1(c):  "*equal in amount to 100 percent of the bonus pool amounts accrued in respect of amounts payable for incentive compensation (but not base salary).*"  BCI Ex. 1 (APA) at § 9.1(c) (Hume Decl. Ex. 1).  Under LBHI's view, this language is just an "allusion to undefined and unknown 'amounts accrued.'"  LBHI Opp. at ¶ 29.  Thus, LBHI effectively argues that this language should be ignored and treated as meaningless.

32.      The "specific governs the general" doctrine does not allow such an extreme result. To the contrary, it is well-established that an "interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."  Restatement (Second) of Contracts § 203(a).  Indeed, "where two seemingly conflicting contract provisions reasonably can be reconciled, we are *required* to do so and to give both effect."  *James v. Jamie Towers Hous. Co.,* 743 N.Y.S.2d 85, 88 (N.Y. App. Div. 2002) (emphasis added)  (internal quotations and citation omitted).[14]

---

[14] *See also Net2Globe Int'l., Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 445 (S.D.N.Y. 2003) ("courts interpret a contract so as to give effect to all of its provisions and cannot and should not accept an interpretation that ignores the interplay of the terms, renders certain terms inoperable, and creates a conflict where one need not exist.") (internal quotations omitted); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (ellipsis in original); *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d 555, 556 (N.Y. App. Div. 1996) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms") (internal quotation and citation omitted); *Goodheart Clothing Co. v. Laura*

33.     Indeed, a court must *first* implement the "primary" rule of contractual

interpretation requiring it to harmonize "seemingly" conflicting provisions *before* it ever

considers "secondary" rules of contract interpretation like the "specific governs the general"

doctrine.  As Professor Williston explains:

> Rules of interpretation may be divided into two classes, primary and secondary.
> Primary rules of interpretation are always used by the courts to determine the
> meaning of particular words or clauses found in a contract, and the contract as a
> whole, regardless of whether the parties' writing is clear or ambiguous.
> *Secondary rules, by contrast, are only used to determine the meaning of those
> words or clauses whose meaning remains unclear or ambiguous after and despite
> the application of the primary rules to the parties' writing.*

11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32.1 (4th ed.

2011) (emphasis added, footnote omitted).  Williston also makes clear that the harmonization

rule is a primary rule, while the "specific governs the general" doctrine is secondary.  *Id.* at §§

32:5, 32:10.   This is consistent with the Second Circuit's repeated holdings that where the

contractual language can be harmonized, resort to the "specific governs the general" doctrine is

inappropriate.  *See Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008)

(where "there is no conflict of language" and "there is no inconsistency," the "factual predicate"

does not exist for applying the specific governs the general doctrine) (internal citations omitted);

*Croce v. Kurnit*, 737 F.2d 229, 237-38 (2d Cir. 1984) (same).

34.     Here, it is indeed possible to interpret Section 9.1(c) in a manner that eliminates

any potential inconsistency, and gives effect to all of the terms:  *i.e.*, Barclays was obligated to

pay aggregate bonuses to the Transferred Employees equal to the "amounts accrued" by Lehman

---

*Goodman Enters*, 962 F.2d 268, 272-73 (2d Cir. 1992) (noting that a "court should interpret a contract in
a way that ascribes meaning, if possible, to all of its terms") (internal quotation and citation omitted);
*Isaacs v. Westchester Wood Works, Inc.*, 718 N.Y.S.2d 338, 339 (N.Y. App. Div. 2000) ("conflicting
contract provisions should be harmonized, if reasonably possible, so as not to leave any provision without
force and effect").

with respect to those employees, and that accrual amount was "reflected on" the 9/16/08

Financial Schedule because it was one component of the overall estimate of $2 billion for the

"Comp" liabilities being assumed by Barclays.  That interpretation eliminates any potential

conflict or inconsistency, and thereby removes the predicate for even applying the "specific

governs the general" doctrine.  *See generally Paneccasio*, 532 F.3d at 111; *Croce*, 737 F.2d at

237-38.

35.    In any event, even if the "specific governs the general" doctrine were to be

applied, it cuts in favor of Barclays, not LBHI.  The language requiring payment equal to "100

percent of the bonus pool amounts accrued in respect of amounts payable for incentive

compensation (but not base salary)" is *more specific* than the general reference to "Comp" on the

9/16/08 Financial Schedule.  "Comp" is a generic and general term; "bonus" is more specific,

and "100 percent of the bonus pool amounts accrued" is more specific still.  Thus, even if it is

applied, the doctrine does not support LBHI's position.

36.    LBHI also contends that Barclays' interpretation would make the "amounts

accrued" clause determine both the amount of the bonus obligation and the amount of the

severance obligation, with "severance being, under Barclays' theory, the difference between this

undefined [accrued] amount and $2 billion."  LBHI Opp. at ¶ 29.  LBHI argues that this would

render the severance obligation "unduly vague" and would also render Section 9.1(b)

"superfluous."  These arguments rest on an obvious misrepresentation of Barclays' argument:

Barclays has never suggested that its severance obligation was determined by subtracting the

"amounts accrued" for bonuses from the $2 billion; rather, the Barclays severance obligation was

plainly stated in Section 9.1(b), which required severance payments no less generous than

Lehman would have paid under its established severance policies.  The only thing Barclays has

said is what Harvey Miller, Bart McDade, and all other negotiators testified at trial:  the $2

billion was an estimate of all the compensation liabilities Barclays was assuming under the APA,

including both bonuses and severance.

> c.    LBHI Ignores All The Relevant Extrinsic Evidence In Favor Of
>        Barclays' Interpretation Of The APA.

37.    In its opening memorandum, Barclays showed that the testimony of Bart

McDade, Harvey Miller, Steve Berkenfeld, Mark Shapiro, Rich Ricci, Patrick Clackson, Bryan

Marsal, Saul Burian, and Luc Despins all confirmed the fact that the $2 billion estimate for

"Comp" included *both bonus and severance*.  Barclays Br. at ¶¶ 23-32.  This overwhelming

evidence confirms Barclays' interpretation that Section 9.1(c) of the APA required Barclays to

pay bonuses equal in the aggregate to the "amounts accrued" for bonuses, and the $2 billion

entry for "Comp" on the 9/16/08 Financial Schedule was an estimate that included that bonus

amount, but also included other amounts it was estimated Barclays would likely have to pay.

38.    LBHI ignores all this evidence.  They have no answer to it.  Their only response is

to say that this Court has already found otherwise, and to invoke collateral estoppel — which, as

shown above, clearly does not apply.

39.    Indeed, LBHI does not even try to respond to Barclays' showing that LBHI

misrepresented the record in the proposed findings of fact it submitted to the Court after the Rule

60(b) trial.  Barclays Br. at ¶¶ 33-37.  Mr. McDade testified that Barclays "assumed a two billion

compensation liability with respect to *the combination of the employees' bonus process and the*

*severance process*."  4/26/10 Tr. at 161:1-10 (McDade) (emphasis added) (Hume Decl. Ex. 39).

LBHI falsely asserted Mr. McDade testified that "$2 billion *for bonuses* to former Lehman

employees was an 'agreed number' and reflected a 'full requirement for Barclays to pay.'"

LBHI Post-Trial Br. at ¶ 134 (Hume Decl. Ex. 30); *see* Barclays Br. at ¶¶ 33-37.  But as shown

in Barclays' memorandum, Mr. McDade's testimony about a "full requirement to pay" concerned the "two billion dollar" "*compensation number*," which he previously testified included *both bonus and severance*. Barclays Br. at ¶¶ 33-36.[15] LBHI makes no effort either to justify or to correct its false assertion.

40.     Instead of addressing the testimony of Bart McDade or Harvey Miller, LBHI relies upon what they call the "first hand" testimony of Alvin Brown. LBHI Opp. at ¶ 21. But Alvin Brown admitted that his understanding was *not* first hand, but instead came "from one of the participants or part of the team that was involved in negotiating but I don't recall specifically who it was." Brown Dep. Tr. at 25:22-26:3 (Hume Decl. Ex. 38). Thus, Brown's testimony is inadmissible hearsay, to which Barclays objects, and is therefore insufficient to create a genuine dispute of fact. Moreover, even if it were considered, Brown's testimony is indisputably false as a factual matter (the Lehman accrual was not $2 billion, as he inaccurately understood), and his mistaken understanding could not trump the contrary testimony of all direct participants in the negotiations, including that of Bart McDade and Harvey Miller.

*****

41.     In sum, both the plain language of the APA and the extrinsic evidence demonstrate that Barclays proffers the only reasonable interpretation of Section 9.1(c): *i.e.*, that Barclays was obligated to pay bonuses to Transferred Employees that in the aggregate equaled "100 percent of the bonus pool amounts accrued," and that amount was "reflected on" the 9/16/08 Financial Schedule as a component of a $2 billion estimate for all "Comp" liabilities, including both bonus and severance liabilities. LBHI has failed to present any evidence that

---

[15] Mr. McDade also gave testimony that qualified his agreement with the "full requirement to pay" language, by making clear that the $2 billion number was Barclays' "exposure" for "Comp" liabilities, not necessarily what Barclays would actually end up having to pay. *See* Barclays Br. at ¶ 37 (quoting 4/27/10 Tr. at 48:1-15).

could create a genuine basis for disputing that Lehman's "amounts accrued" for bonuses payable

to its Transferred Employees was less than $1.5 billion.  LBHI has admitted that Barclays paid

bonuses to the Transferred Employees equal to "approximately $1.5 billion."  LBHI Opp. at ¶¶ 4,

27-34.

42.      Thus, based on the foregoing, there is no genuine dispute that Barclays has

complied with its obligations under Section 9.1(c) of the APA, and therefore the Court should

grant Barclays' motion for summary judgment dismissing Count II of LBHI's complaint.

**B.      There Is No Genuine Dispute That The $2 Billion "Comp" Number Was A
Good Faith Estimate, Not A Representation Or Guarantee That It Was A
Firm Number.**

43.      As shown above, Barclays is not collaterally estopped by this Court's statements

relating to Article IX of the APA.  Nevertheless, even if this Court were to disagree with that

conclusion, it still should grant Barclays' summary judgment motion seeking dismissal of Count

II of LBHI's complaint, for either of two independent reasons.  First, as shown in this section,

the Court correctly found that the $2 billion number for "Comp" was a good faith estimate, not a

contractual guarantee.  Second, as shown in section C, below, LBHI is not entitled to recover

damages, and therefore its claim to recover $500 million in damages must be dismissed as a

matter of law.

44.      In support of its motion for summary judgment, Barclays submitted a statement of

undisputed facts that included ten different facts demonstrating that the $2 billion "Comp"

number was *an estimate*, not a contractual guarantee.  *See* Barclays' Statement of Undisputed

Facts at ¶¶ 14-23.  These facts formed the basis for this Court's finding that the $2 billion

number was a good faith estimate, and was *not* a guarantee or representation that the $2 billion

amount was a firm number.  Op. at 55-56 (Hume Decl. Ex. 31).

45.     In response, LBHI essentially has only one answer:  "The Court found that the $2 billion figure *originally* was arrived at as an estimate, and this relates to whether disclosures were made in good faith under the circumstances and other issues then before the Court.  But no matter how the number was *initially* calculated, once it was expressly incorporated into a valid and enforceable contract, like the APA, it imposed a specific amount Barclays was required to pay."  LBHI Opp. at ¶ 27 (emphasis added).

46.     This explanation is simply false.  This Court did not find that the $2 billion was "originally" or "initially" an estimate.  Rather, this Court found that the $2 billion number "that the parties presented *at the Sale Hearing*" was a good faith estimate.  Op. at 55 (emphasis added) (Hume Decl. Ex. 31).  That Sale Hearing occurred on the night of September 19, 2008, which was three days after the APA was executed and the 9/16/08 Financial Schedule was initialed by Steve Berkenfeld.  BCI Ex. 1 [APA] (Hume Decl. Ex. 1).  Thus, the Court found that the $2 billion number for "Comp" was still only an estimate, and not a guarantee, even three days *after* the APA had been fully executed.

47.     Moreover, the undisputed facts simply do not allow for LBHI's effort to explain away the Court's "estimate" finding.  If on September 16, 2008, the APA had contractually obligated Barclays to pay $2 billion *solely* in bonuses (before taking into account all other compensation payments, such as severance), then three days later Harvey Miller would not have proffered the testimony of Bart McDade as follows:  "Barclays will also assume exposure for the employees that accept offers of employment, which is estimated to have a value of approximately — an exposure of approximately two billion dollars."  BCI Ex. 49 [9/19/08 Tr.] at 99:22-25 (Hume Decl. Ex. 3).  Indeed, in proffering Mr. McDade's testimony, Mr. Miller made clear to the Court that Barclays was assuming liabilities with respect to the Transferred

Employees that included "compensation, bonuses *and severance* payments." *Id.* at 101:23-102:2

(emphasis added). If the bonus piece of these liabilities was alone *guaranteed* to be at least $2

billion, Mr. Miller and Mr. McDade would not have told the Court that $2 billion was merely an

"estimate" for the entire "exposure" Barclays was assuming.

48.     Thus, this Court's "estimate" finding with respect to the $2 billion "Comp"

number is wholly incompatible with LBHI's breach of contract claim. Instead, it confirms that

Barclays is correct in its interpretation of Section 9.1(c) of the APA, and therefore is entitled to

summary judgment.

**C.      There Is No Genuine Dispute That LBHI Has Not Established, And Cannot
        Establish, That It Suffered Any Damages As A Result Of Barclays' Alleged
        Contractual Breach.**

49.     Even if the Court determines that Barclays has breached Section 9.1(c) of the

APA, Barclays is still entitled to summary judgment for the independent reason that the law does

not entitle LBHI to the remedy it seeks.

50.     LBHI argues that "where, as here, a contract requires payment to another in lieu

of a direct payment to the promisee, the promisee can recover the underpayment for itself in the

event of a breach." LBHI Opp. at ¶ 59. That is simply false. LBHI does not cite *a single case* in

which the contract required payment to a third party in lieu of a direct payment to the promisee,

and the court held that "the promisee can recover the underpayment *for itself* in the event of a

breach." We are not aware of any case that so holds. To the contrary, where a promisor fails to

pay amounts owed to third parties, the law does not treat that underpayment as "damages"

recoverable by the promissee; instead, the law holds that the promisee may obtain a declaratory

judgment or an order of specific performance *to ensure that the third parties* are paid.[16]

51.    For example, in a case where the defendant contractually agreed with the plaintiff

to pay certain amounts to third parties but then failed to do so, a New York court rejected the

claim of the plaintiff to recover the unpaid amount as damages, but held that the proper remedy

was specific performance:  "plaintiff could suffer no monetary damage by reason of

[defendant's] default, since he was not personally obligated for the debts" that were to be paid;

thus, "plaintiff may not recover a money judgment because he himself has not suffered money

damages."  *Aquavella v. Harvey*, 330 N.Y.S.2d 560, 564 (N.Y. Sup. Ct. 1972).  In another case

where the plaintiff entered into a contract with his father in which the plaintiff would transfer

property to his father in exchange for his father's promise to pay an equal amount to the

plaintiff's brother and sister, and where the father then failed to do so, the court held that the

plaintiff "has suffered no pecuniary damage by the failure of the promisor to perform his

agreement," and therefore should be awarded specific performance, not damages.  *Croker v. N.Y.

Trust Co.*, 245 N.Y. 17, 19-20 (1927).  Similarly, in a case in which the plaintiff successfully

sued a defendant for failure to pay promised amounts to a third party, the court modified its

judgment to make clear that the defendant should be compelled to pay the unpaid amounts *to the

third party*, not to the plaintiff.  *Control Data Sys., Inc. v. Computer Power Group*, No. 94 Civ.

5396, 1998 WL 178775, at *3 (S.D.N.Y. Apr. 15, 1998).  Consistent with all of the foregoing,

the Restatement explains that where a contract provides for the promisor to make payments to a

---

[16]  As explained below, the rare instances in which the law allows the promisee to recover damages
caused by a promisor's failure to pay a third party are where the promisee can establish damages by
showing *more* than just the existence of that underpayment.

third party, but the promisor then fails to make such payments, then "[t]he promisee cannot recover damages suffered by the beneficiary." Restatement (Second) of Contracts § 307 cmt. b.

52.       In an effort to circumvent these clear-cut legal authorities, LBHI relies on three wholly inapposite cases, *none of which* hold that a promisee is automatically entitled to recover the amount that a promisor fails to pay to a third party. Two of these cases address the damages available to a promisee who intends to form a corporation and where the promisor agrees to transfer or lend money to the corporation. After the contract is entered, the promisee undertakes actions and investments in reliance upon the promisor's agreement to transfer or lend money to the corporation; when the promisor breaches, the promisee is permitted to recover *not* the amount that should have been contributed or loaned by the promisor, but rather the costs it incurred in reliance on the breached promise. *See generally Eden v. Miller*, 37 F.2d 8, 9-10 (2d Cir. 1930); *Banker's Trust Co. of W. N.Y. v. Steenburn*, 409 N.Y.S.2d 51, 65-66 (N.Y. Sup. Ct. 1978). LBHI does not even attempt to analogize its situation to those present in *Eden* and *Banker's Trust*, as they are obviously inapposite.

53.       In the third case, the promisor's failure to make payment to a third party meant that the promisee became liable as a guarantor; thus, the court held the promisee could recover from the promisor the amounts it was liable to pay to the third party as a result of the promisor's breach. *Buschmann v. Prof'l Men's Ass'n*, 405 F.2d 659, 662-63 (7th Cir. 1969). Again, this case is inapposite: LBHI has not established, and cannot establish, that it is or will be liable to *any* Transferred Employee as a result of Barclays' alleged failure to pay any amounts under Section 9.1(c) of the APA.[17]

---

[17] As noted in the Preliminary Statement, the LBI Trustee reserves the right to bring a claim based on any liability it may have to the Transferred Employees for 2008 bonuses. Thus, its claim would at least come closer to being consistent with the holding in *Buschmann*, though it would still be without merit: Section 9.1(c) did not require Barclays to pay precise amounts to each specific Transferred Employee; instead, it

54.    LBHI also argues that Barclays' damages argument is inconsistent with the Barclays position, recently adopted by the Court, that because the APA has a provision denying third party beneficiary status to any third parties, the Transferred Employees do not have the right to enforce Article IX of the APA.  LBHI Opp. at ¶ 61.  For this reason, LBHI argues that Barclays "is really arguing for the erasure of Paragraph 9.1(c)."  LBHI Opp. at ¶ 63.  But that is obviously not true.  Barclays is arguing that the appropriate remedy for any alleged breach of Section 9.1(c) is *specific performance*, not a damage payment to LBHI.  The existence of a remedy that requires *precise compliance* with the alleged requirements of Section 9.1(c) obviously does not, as LBHI falsely asserts, "render this material contract provision a dead letter."  LBHI Opp. at ¶ 62.  To the contrary, it guarantees strict compliance with the provision, ensuring that it is given full force and effect.  In other words, while the Transferred Employees do not have standing to enforce the APA, Barclays has admitted that both LBHI and LBI do have that right:  *if* they can establish a breach of Section 9.1(c) of the APA (which they cannot do, as explained above), then they have the right to seek specific performance.  That is precisely what Judge Martin held was the proper outcome in *Control Data*:  there, the court agreed that a "no third party beneficiaries" clause precluded a suit by the party whom the promisor was supposed to pay, but rejected the argument that this eliminated any remedy, because, as the court also held, the promisee was entitled to seek specific performance.  *Control Data*, 1998 WL 178775 at *3 ("Thus, even though [the third-party payee] was precluded by Section 15.14 from instituting suit in its own right, [the promisee] had the right to sue [the promisor] to enforce its obligation to indemnify [the third-party payee] for the amount of the French judgment and expenses.").

---

simply called for Barclays to pay bonuses that in the aggregate were equal to the "amounts accrued" by Lehman with respect to those employees.

55.     LBHI also argues that "LBHI would not be entitled to seek specific performance, as the conduct in issue is not of a unique nature and breach is readily compensable with damages."  LBHI Opp. at ¶ 63.  This argument ignores all of the case law cited above holding that where a contract requires the promisor to make payments to a third party, the promisee *is* entitled to specific performance precisely because the promisee has not suffered damages to itself, and cannot recover damages suffered by the beneficiary.[18]

56.     Finally, LBHI relies upon its assertion that it is entitled to recover the "unpaid consideration it, as the Seller, was promised by Barclays, the Purchaser."  LBHI Opp. at ¶ 64.  But this simplistic assertion ignores the fact that where the consideration was to be paid to a third party, the law does not entitle LBHI to recover the allegedly unpaid amounts for itself; instead, as explained above, the law permits LBHI to enforce the provision in the Purchase Agreement only by seeking declaratory relief or specific performance.  *See supra*, ¶¶ 50-55; Barclays Br. at ¶¶ 94-97 (citing cases and Restatement).  The consideration that LBHI alleges Barclays failed to pay was the payment of specified bonus amounts to Transferred Employees; in the event of a breach, an order of specific performance would ensure that precisely this consideration was paid.

57.     Indeed, by seeking to recover for itself the amounts it claims should have been paid to the Transferred Employees, LBHI is seeking to recover damages based upon a *theoretical* contract it claims it *would have entered into* had it known what Barclays would end up spending in bonuses for the Transferred Employees.  LBHI itself justifies its claim as follows:  "As Mr. McDade testified, to the extent Barclays was not going to pay that consideration in the form of bonuses, as it agreed in the APA, LBHI *would have gotten it in some other form*, such as more

---

[18]  *See Aquavella*, 330 N.Y.S.2d at 564 (specific performance awarded because "plaintiff may not recover a money judgment because he himself has not suffered money damages."); *Croker,* 245 N.Y. at 19-20 (same); Restatement (Second) of Contracts § 307 cmt. b ("The promisee cannot recover damages suffered by the beneficiary.").

cash consideration." LBHI Opp. at ¶ 64 (emphasis added).  Thus, the LBHI "damages" claim is

in reality a claim for "more cash consideration" that LBHI alleges it "would have gotten" if it

had known what Barclays was going to end up spending on bonuses.

58.    This claim is legally impermissible:  contract law does not allow a plaintiff to

recover damages based upon speculation concerning what the contract *may have provided had*

*circumstances been different than they were*.  It is a fundamental principle of contract law that

"damages for breach of contract should put the plaintiff in the same economic position he would

have occupied had the breaching party performed the contract."  *Oscar Gruss & Son, Inc. v.*

*Hollander*, 337 F.3d 186, 196 (2d Cir. 2003).  Thus, a court should resist any effort by the non-

breaching party to "recover more from the breach than he would have gained had the contract

been fully performed."  *Freund v. Wash. Square Press, Inc.*, 357 N.Y.S.2d 857, 860 (1974).

Here, if Barclays had paid exactly $2 billion in bonuses to the Transferred Employees, LBHI

would be in exactly the same economic position it is in today.  LBHI does not cite any law, and

there is none, to support its claim for "additional cash consideration" based upon a contract it

claims (contrary to the facts) it would have entered into had it known the precise amount

Barclays would end up paying.

59.    In sum, LBHI is in the same position that it would have been in had Barclays paid

exactly $2 billion in 2008 bonuses to the Transferred Employees, instead of more than $1.8

billion (as Barclays asserts) or "approximately $1.5 billion," as LBHI asserts.  Since it is in the

same position that it would have been in but for the alleged breach, LBHI is not entitled to

recover $500 million as "additional cash consideration."  At most, it is entitled to seek specific

performance, which it has chosen not to do.

## CONCLUSION

For the foregoing reasons, the Court should grant Barclays' summary judgment motion

by dismissing Count II of LBHI's Complaint.

Dated:          New York, New York
                August 5, 2011

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP

                                        By:     /s/   Jonathan D. Schiller
                                                Jonathan D. Schiller
                                                Jack G. Stern
                                                575 Lexington Avenue
                                                New York, New York 10022
                                                Tel: (212) 446-2300
                                                Fax: (212) 446-2350
                                                Email: JSchiller@bsfllp.com
                                                        JStern@bsfllp.com

                                                Hamish P. M. Hume
                                                5301 Wisconsin Avenue, N.W.
                                                Washington, D.C. 20015
                                                Tel: (202) 237-2727
                                                Fax: (202) 237-6131
                                                Email: HHume@bsfllp.com

                                                *Attorneys for Barclays Capital Inc.*