EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re LEHMAN BROTHERS INC.<br><br>　　　　Debtor. | Case No. 08-01420 (JMP)<br>SIPA |
| JAMES W. GIDDENS, as TRUSTEE for the<br>SIPA LIQUIDATION of LEHMAN<br>BROTHERS INC.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL INC.,<br><br>　　　　Defendant. | Adversary No. 09-01732 (JMP) |

**STIPULATION AND ORDER**
**AMENDING THE TRUSTEE'S ADVERSARY COMPLAINT**

**WHEREAS**, on November 16, 2009, James W. Giddens, as trustee ("Trustee") for the

SIPA liquidation of Lehman Brothers Inc. ("LBI") filed an Adversary Complaint against

Barclays Capital Inc. ("Barclays") in Adv. Proc. No. 09-01732 (JMP) ("Trustee's Adversary

Complaint," ECF No. 1);

**WHEREAS**, the Asset Purchase Agreement, dated September 16, 2008 ("APA"), states:

"On or after the Closing, Purchaser shall, or shall cause its Subsidiaries to, pay each Transferred

Employee an annual bonus ('08 Annual Bonuses'), in respect of the 2008 Fiscal Year that, in the

aggregate, are equal in amount to 100 percent of the bonus pool amounts accrued in respect of

amounts payable for incentive compensation (but not base salary) and reflected on the financial

schedule delivered to Purchaser on September 16, 2008 and initialed by an officer of each of

Holdings and Purchaser."  (Movants' Ex. 1 (APA) § 9.1(c));

**WHEREAS**, a number of former LBI employees have filed priority or general creditor claims against the LBI estate seeking bonus amounts that allegedly accrued in their favor in respect of the 2008 fiscal year (the "Employee Claims");

**WHEREAS**, the Trustee has not determined the Employee Claims;

**WHEREAS**, the parties agree, based upon the terms set forth below, that the Trustee's Adversary Complaint is hereby amended to withdraw Count XI (Breach of Contract) to the extent it relates to Barclays' alleged failure to pay bonus amounts under the APA, and that this withdrawal is without prejudice to the Trustee's right to file a claim against Barclays for failure to pay bonus amounts under the APA in the event it is determined that there are valid Employee Claims.

**IT IS HEREBY STIPULATED AND AGREED, AND UPON COURT APPROVAL HEREOF, IT IS ORDERED THAT:**

1.      The Trustee's Adversary Complaint is hereby amended to withdraw Count XI (Breach of Contract) to the extent it relates to Barclays' alleged failure to pay bonus amounts under the APA as reflected in Exhibit A hereto, and such amendment is hereby effective immediately upon entry of this stipulated Order.

2.      The Trustee is directed to docket the Trustee's Amended Adversary Complaint with the Court.

3.      Nothing herein nor anything in the amendments to the Trustee's Adversary Complaint shall waive or have any preclusive effect whatsoever on the Trustee's right to file a claim against Barclays for failure to pay bonus amounts under the APA in the event it is determined that there are valid Employee Claims.

4.      In the event it is determined that there are valid Employee Claims and as a result

the Trustee brings a claim against Barclays for failure to pay bonus amounts under the APA, the

recovery sought by the Trustee in any such claim shall be the allowed amount of the Employee

Claims.  If it is determined that there are no valid Employee Claims, the Trustee shall not file any

claim against Barclays in connection with Barclays' alleged failure to pay bonus amounts under

the APA.

5.      This stipulated Order shall not be construed as an admission by Barclays that it is

responsible for any Employee Claims, whether determined to be valid or otherwise, and shall be

without prejudice to Barclays' right to raise any defense or counterclaim with respect to any

claim by the Trustee based on the Employee Claims that Barclays would have been entitled to

raise in response to the Trustee's Adversary Complaint, but which was stayed pending resolution

of the Rule 60(b) motions.  In addition, this stipulated Order shall be without prejudice to

Barclays' right to seek dismissal of any claim the Trustee may bring against Barclays based upon

the Court's adjudication of Count II of Lehman Brothers Holdings Inc.'s complaint against

Barclays.

By:  /s/ William R. Maguire                            By:  /s/ Jonathan D. Schiller
     William R. Maguire                                     Jonathan D. Schiller
     Seth D. Rothman                                        Hamish P.M. Hume
     Neil J. Oxford                                         Jack G. Stern

Dated: July 12, 2011                                   Dated: July 12, 2011

HUGHES HUBBARD & REED LLP                              BOIES SCHILLER & FLEXNER LLP
One Battery Park Plaza                                 575 Lexington Avenue
New York, New York 10004-1482                          New York, NY  10022
(212) 837-6000 (telephone)                             (212) 446-2300
(212) 422-4726 (facsimile)

*Attorneys for James W. Giddens, as*                   *Attorneys for Barclays Capital Inc.*
*Trustee for the SIPA Liquidation of*
*Lehman Brothers Inc.*

3

**SO ORDERED:**

Dated: New York, New York
        July 15, 2011

_____/s James M. Peck_____
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

William R. Maguire
Seth D. Rothman
Neil J. Oxford
**HUGHES HUBBARD & REED LLP**
One Battery Park Plaza
New York, New York 10004
(212) 837-6000 (telephone)
(212) 422-4726 (facsimile)
maguire@hugheshubbard.com

John F. Wood
**HUGHES HUBBARD & REED LLP**
1775 I Street, N.W., Suite 600
Washington, D.C.  20006
(202) 721-4600 (telephone)
(202) 721-4646 (facsimile)
woodj@hugheshubbard.com

Attorneys for James W. Giddens, as
Trustee for the SIPA Liquidation of Lehman Brothers Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re LEHMAN BROTHERS INC.<br><br>    Debtor. | Case No. 08-01420 (JMP)<br>SIPA |
| JAMES W. GIDDENS, as TRUSTEE for the SIPA LIQUIDATION of LEHMAN BROTHERS INC.,<br><br>    Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL INC.,<br><br>    Defendant. | Adversary No. 09-01732(JMP) |

**AMENDED ADVERSARY COMPLAINT**

Plaintiff James W. Giddens (the "Trustee"), as trustee for the SIPA liquidation of

Lehman Brothers Inc. ("LBI" or "Debtor"), as and for his Complaint against defendant Barclays

Capital Inc. ("Barclays"), alleges as follows:

## NATURE OF THE ACTION

1.      By this action, the Trustee seeks among other things:  (i) to recover approximately

$2.9 billion in cash and securities that are in the possession of or were wrongfully transferred to

Barclays, including approximately $1.3 billion in cash that was held by the Options and Clearing

Corporation ("OCC") and approximately $1.6 billion in securities from LBI's clearance boxes at

the Depository Trust & Clearing Corporation ("DTCC"); (ii) a judgment declaring that these

assets, as well as certain other assets, having an aggregate value of approximately $6.7 billion

(the "Disputed Assets"), were not sold to Barclays and therefore remain a part of the LBI estate;

and (iii) to recover all other undisclosed benefits that Barclays obtained at the expense of the LBI

estate.

2.      The Disputed Assets include:

(a)  approximately $2.4 billion in assets that were in LBI's
clearance boxes, primarily at the DTCC, consisting of the
approximately $1.6 billion that was wrongfully transferred to
Barclays and approximately $800 million that remains in the
boxes;

(b)  approximately $2.5 billion in assets at the OCC, consisting of
the approximately $1.3 billion in cash that was wrongfully
transferred to Barclays and approximately $1.2 billion in securities
and letters of credit still held by the OCC;

(c) as much as $1 billion in assets at other derivatives exchanges;
and

(d)  $769 million of securities that LBI had maintained in a reserve
account for the exclusive benefit of customers pursuant to SEC
Rule 15c3-3 or securities of substantially the same nature and
value.

3.      The Disputed Assets were not included in the transaction that was contemplated by the Asset Purchase Agreement, dated as of September 16, 2008 (the "APA") or presented to the Court on Friday, September 19, 2008 and early Saturday morning, September 20, 2008 (the "Sale Hearing").

4.      At the Sale Hearing, the Court was advised of the changes that the parties had agreed to make to the APA.  As presented to, and approved by, the Court, the revised deal called for Barclays to acquire the Business (as defined in the APA), certain real estate properties, and $47.4 billion of additional assets in exchange for a payment of $250 million, the appraisal value of the real estate, and Barclays' assumption of $45.5 billion in liabilities and certain cure costs and employee-related obligations.

5.      Barclays has already obtained more than $47.4 billion in assets as a result of the sale and has failed to assume the full extent of the cure cost obligations described to the Court. Yet Barclays claims that the so-called "Clarification Letter" and, with respect to the assets at the OCC, a Transfer and Assumption Agreement (the "TAA Letter"), entitle it to as much as $6.7 billion in additional LBI assets.

6.      Barclays is not entitled to the Disputed Assets.  As a matter of contractual interpretation, the Clarification Letter does not convey the Disputed Assets to Barclays. Moreover, the Court never approved the Clarification Letter or the TAA Letter, and never authorized the transfer of the Disputed Assets to Barclays.

7.      With respect to the clearance box assets mentioned in paragraph 2(a) above, Barclays, the Trustee and the DTCC entered into a separate letter agreement that expressly specified that the clearance box assets at DTCC were "Excluded Assets" within the meaning of the APA.  With respect to the assets at the OCC and other derivatives exchanges mentioned in

3

paragraphs 2(b) and (c) above, the Clarification Letter does not include these assets as "Purchased Assets."  Finally, with respect to the securities mentioned in paragraph 2(d) above, the Clarification Letter clearly provides that the $769 million of securities would be transferred to Barclays "to the extent permitted by applicable law," which means that they could be transferred only if, among other things, there was a sufficient excess in LBI's Rule 15c3-3 reserve account.

8.      The Clarification Letter and the TAA Letter must be read to give effect to the purpose of the transaction, which was to protect customers and their property and to maximize the value of the estate.  The Trustee, along with SIPC and various regulatory authorities, supported the sale because, at a time of great financial tumult in the United States markets, the sale was supposed to protect LBI's customers.  Among other things, the sale would deliver their accounts to solvent broker-dealers, preserve their right of recovery, and ensure that the Trustee had sufficient assets remaining in the LBI estate to satisfy customer claims.

9.      The Disputed Assets are of vital importance to the LBI estate.  Their loss would not only strip the LBI estate of assets that should be used to repay customers, but would award Barclays an unintended windfall.  Accordingly, the Trustee seeks to recover the cash and securities wrongfully transferred to Barclays and obtain a declaration that the Disputed Assets were not sold to Barclays and remain a part of the LBI estate.

## JURISDICTION AND VENUE

10.      The Trustee brings this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

11.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157, 1334 and 2201.  This is a core proceeding arising under 28 U.S.C. § 157.

12.     The Court has personal jurisdiction over Barclays pursuant to Rule 7004 of the

Federal Rules of Bankruptcy Procedure.  In addition, Barclays consented to the jurisdiction of

this Court in the Asset Purchase Agreement.

13.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  In

addition, Barclays has consented to venue and agreed that any and all proceedings relating to the

Asset Purchase Agreement be maintained exclusively in this Court.

## PARTIES

14.     Plaintiff James W. Giddens is the Trustee for the SIPA liquidation of LBI.

15.     Defendant Barclays is a Connecticut corporation with its principal place of

business in New York, New York.

## FACTUAL ALLEGATIONS

**The Asset Purchase Agreement**

16.     LBI had long been prominent within the securities industry as a brokerage and

clearing firm, SIPC member and SEC-registered broker-dealer.  LBI was a subsidiary of Lehman

Brothers Holdings, Inc. ("LBHI") and formed part of a worldwide Lehman Brothers business

that included affiliated entities in North America, Europe and Asia.

17.     On September 15, 2008, LBHI filed a voluntary petition under chapter 11 of the

Bankruptcy Code.  The liquidation proceeding pertaining to LBI did not commence that day in

the hope of preserving the value of the business as a going concern, and thereby maximizing the

opportunity for an orderly cessation of LBI's activities as a broker-dealer and an orderly

disposition of LBI customer accounts.

18.     On September 16, 2008, LBHI, LBI and LB 745 LLC entered into the APA,

which provided for the sale of certain assets related to the LBI business.  (LBHI Docket No.

280.)

5

19.    Pursuant to the APA, Barclays was to pay approximately $1.7 billion for certain "Purchased Assets," and to assume other obligations and expenses.  (APA § 3.1.)

20.    The Purchased Assets included, among other enumerated assets, certain proprietary securities having a book value of approximately $70 billion (the "Long Positions"), approximately $700 million in cash, the Lehman worldwide headquarters located at 745 Seventh Avenue, New York, New York, and two New Jersey data centers.  (*Id.* § 1.1.)  The APA did not include any mention of the Disputed Assets.

21.    As consideration for the Purchased Assets, Barclays agreed to, among other things:  (i) pay a cash amount consisting of the sum of $250 million plus the appraised value of the real estate (together, the "Cash Amount"), and (ii) assume certain liabilities, including short positions and repurchase agreements relating to enumerated types of securities positions (the "Short Positions").  (*Id.* §§ 2.3(i), 3.1.)  The Cash Amount was expected to be approximately $1.7 billion, and the book value of the Short Positions was approximately $69 billion.  (*Id.*)

22.    Barclays also agreed to assume certain contract cure costs.  (*Id.* § 2.5.)

23.    In summary, the APA describes a transaction that would provide Barclays with the LBI broker-dealer business and tens of thousands of customer accounts, but would not provide Barclays with an immediate net gain or the estate with any net loss.

**The September 17 Hearing**

24.    On September 17, 2008, the LBHI debtors moved the Court to (a) schedule a sale hearing, (b) establish sales procedures, (c) approve a break-up fee, and (d) approve the sale of the Purchased Assets.  (LBHI Docket No. 60.)

25.    The Court was told that time was of the essence and that the assets to be sold were deteriorating in value.  (September 17, 2008 Hearing Tr. at 21:2-22:2.)  This was at a time of extraordinary distress in the financial markets, and the parties feared that if they could not close

6

the sale quickly, there would be no LBI business left to sell.  (*Id.* at 26:1-9, 29:1-12.)  At no time

during this hearing was reference made to any of the Disputed Assets.  On the basis of these and

similar representations, the Court scheduled the Sale Hearing on shortened notice for Friday,

September 19, 2008.  (*Id.* at 74:2-6.)

**The Trustee's Appointment**

26.     On September 19, 2008, the Honorable Gerard E. Lynch of the United States

District Court for the Southern District of New York entered the Order Commencing Liquidation

pursuant to the provisions of SIPA.  Among other things, the LBI Liquidation Order appointed

the Trustee and removed the case to this Court.  (Case No. 08-CIV-8119 (GEL), Docket No. 3

(S.D.N.Y.).)

27.     At the hearing before Judge Lynch, Kenneth Caputo of SIPC asked the Court to

take immediate action to protect public customers and protect fair and orderly markets, noting

that the LBI Liquidation Order permitted the Trustee to effect pending transactions so that public

customers could get access to their funds and those accounts could be transferred in the orderly

course of business.  (September 19, 2008 Hearing Tr. at 4:17-5:1.)  Mr. Caputo also explained

that the proposed sale would permit customer accounts to be moved to acquiring broker-dealer

entities, which would afford customers immediate access to their accounts and provide again for

fair and orderly markets.  (*Id.* at 5:5-8.)

**The Sale Hearing**

**The Court Is Informed That The Deal Has Changed**

28.     Later that day, the Sale Hearing commenced.  At the hearing, the Court was

informed that the deal had changed since the execution of the APA.  Instead of the

approximately $70 billion in Long Positions and $69 billion in Short Positions set forth in the

APA, Barclays would be purchasing $47.4 billion in assets and assuming $45.5 billion in liabilities relating to those assets.

29.    Counsel for LBHI explained:

> So, originally, we were selling assets that had a value of seventy -- approximately seventy billion dollars.  And today, Your Honor, we're only selling assets that have a value of 47.4 billion dollars. Barclays is assuming liabilities, however, of 45.5 billion dollars in connection with those assets. . . .  Barclays is still agreeing to pay the cure amounts on any leases that it assumes or that we assume and assign to it.  Barclays is also agreeing to the same employee compensation agreements.  And it is also agreeing to pay the 250 million dollars of goodwill to LBI.

(Sale Hearing Tr. at 47:1-15.)

30.    There was no mention of any of the Disputed Assets.  Nor was there any disclosure that Barclays was (a) seeking certain repo securities that by themselves were worth more than the $47.4 billion that was described to the Court, (b) assuming liabilities that were overstated, or (c) intending that the sale would include a mismatch of assets over liabilities in favor of Barclays to provide Barclays an immediate gain at the expense of the estate.

**The Disclosure of Material Changes**

31.    The Court was informed that the parties were drafting a letter agreement to reflect the changes to the deal and clarify certain ambiguities in the APA.  (Sale Hearing Tr. at 48:7-13, 54:8-10.)  The Court was told that all of the material changes to the deal had been disclosed, and counsel agreed with the Court's admonition that even a $500 million change would be material. (*Id.* at 54:18-23.)  This was intended to assure the Court that the letter agreement would not deviate in material ways from what had been described at the Sale Hearing.

32.    Nobody suggested that Barclays would seek to obtain a transfer of any additional assets from the LBI estate.  Indeed, the draft version of the Clarification Letter that existed at the time of the Sale Hearing made no reference to any of the Disputed Assets, and the Court was told

8

that the sale would leave approximately $20 billion of assets in the LBI estate.  (*Id.* at 55:23-56:3.)

### Cash Is Excluded from the Sale

33.    The Court was also told that cash was being excluded from the deal.  Counsel for LBHI explained that the deal originally "required the debtors to transfer 700 million dollars in cash to Barclays.  And that is no longer the case.  There's no cash that's being transferred to Barclays."  (Sale Hearing Tr. at 53:21-25.)

34.    This change addressed an objection lodged by Lehman Brothers Inc. (Europe) ("LBIE"), which was concerned that its funds might be swept up in any cash transfer to Barclays.  (*See id*. at 205:17-208:5.)

35.    Counsel for both Barclays and LBHI assured the Court that this possibility had been avoided by removing the cash from the deal.  Counsel for Barclays stated that "Barclays is making this transaction possible to claims by subsidiary creditors … [by] los[ing] the 700 million dollars in cash it was originally going to receive."  (*Id*. at 200:7-12.)  Counsel for LBHI reiterated that "we're not transferring any cash to Barclays, that's out of the agreement."  (*Id*. at 242:11-16.)

36.    On the basis of these representations, the Court noted, "I'm satisfied that given the fact that Barclays is not taking cash and the only thing that came in to the debtor from Europe was cash that in practical terms we should be safe."  (*Id*. at 253:5-8.)

37.    The Disputed Assets include approximately $1.3 billion in cash that was at the OCC.  This cash was improperly transferred to Barclays, and Barclays' claim to it is directly contrary to the representations to the Court that cash was excluded from the sale.

### The Court Approves A Sale That Will Protect Customers

38.     The Sale Hearing continued into the early hours of Saturday morning, September 20, 2008.  The Court heard from a number of individuals, including Mr. Caputo of SIPC and the Trustee, both of whom spoke in support of the transaction.  Mr. Caputo urged the sale to close "[a]s soon as possible" to "provide certainty to parties and counterparties so that they can take the actions that they deem necessary to protect their clients" and to "provide[ ] certainty to the hundreds of thousands of customers [of LBI]."  (*Id.* at 73:20-24.)

39.     The Trustee had not been involved in the negotiation of the APA, and was provided with only limited information regarding the economics of the sale and the financial condition of LBI.  Based on the information provided to him, the Trustee believed the sale to Barclays to be in the best interests of LBI customers.  Among other things, the Trustee believed that the deal would facilitate the transfer of customer accounts to solvent broker-dealers with minimal disruption to the customers' ability to access their accounts and that there would be sufficient customer property in the reserve account or otherwise segregated or available at depositories to support the transfer of the great bulk of customer accounts and satisfy any remaining customer claims.  The Trustee emphasized that the "first role of a SIPC proceeding is to maintain orderly markets and to try to preserve normalcy for customer accounts."  (*Id.* at 76:18-21.)

40.     There were also representatives of the SEC, the Federal Reserve Bank of New York, and the CFTC who appeared in support of the sale.  The Court incorporated into the record comments that these regulators had made at the September 17 hearing.  (*Id.* at 157:21-25.)

41.     At the conclusion of the hearing, the Court approved the sale as it had been presented.  The Court stated, "I understand this deal, not in every aspect but certainly in broad outline.  I have notice."  (*Id.* at 84:18-19.)  The Court also noted that "[t]he essential terms of the

10

transaction, with modifications, have been understood at least for the last few days." (*Id.* at 85:7-8.)

42.     The Court observed that there was no better alternative transaction because, among other things, "[o]nly Barclays can deliver the customer accounts to safe harbors." (*Id.* at 249:3-11.)  In particular, the Court concluded that "the customer property, which is the principal concern of the SIPC trustee, a case which is also pending before me now, will be best protected by virtue of approving the sale." (*Id.*)

43.     The Court further remarked that the adverse consequences of not approving the sale could be "truly disastrous," noting that "those adverse consequences are meaningful to me as I exercise this discretion.  The harm to the debtor, its estates, the customers, creditors, generally, the national economy and the global economy could prove to be incalculable." (*Id.* at 250:13-21.)

**The Sale Orders**

44.     In the early morning hours of September 20, 2008, the Court entered a Sale Order in the LBHI proceeding.  (LBHI Docket No. 258.)  The LBHI Sale Order defines the "Purchase Agreement" as "that certain Asset Purchase Agreement, dated September 16, 2008, . . . collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008." (LBHI Sale Order at 1.)

45.     The LBHI Sale Order finds that "[t]he Debtors' estates will suffer immediate and irreparable harm if the relief in the Motion [seeking approval of the sale] is not granted on an expedited basis consistent with the provisions set forth herein and the Purchase Agreement, particularly given the wasting nature of the Purchased Assets." (*Id.* ¶ D.)  The LBHI Sale Order

11

further finds that "the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest." (*Id.* ¶ H.)

46.     The LBHI Sale Order approves "[t]he Purchase Agreement and all of the terms and conditions thereto." (*Id.* at ¶ 3.)  It authorizes and directs the Debtors to "(1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement." (*Id.*)

47.     The LBHI Sale Order provides that "[t]he Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and is agreed to between the Committee, the Debtors and the Purchaser." (*Id.* at ¶ 25.)  The LBHI Sale Order further provides that in the event of an inconsistency between the "Purchase Agreement (including all ancillary documents executed in connection therewith)" and the Order, the "Order shall govern." (*Id.* at ¶ 27.)

48.     The Court also entered a concurrent order in the SIPA liquidation of LBI, authorizing the Trustee to consummate the sale transaction on behalf of LBI. (SIPA Liquidation Docket No. 3.)

**The Clarification Letter**

49.     Over the weekend of September 20 and 21, 2008, the parties reworked the Clarification Letter.  This was done in harried and extraordinary circumstances.  Numerous issues arose that had to be resolved, and many of the individuals involved had already been working around the clock for days.  Indeed, as the Court has commented:  "things were happening very, very quickly.  Very skillful lawyers and businesspeople put together an extraordinary transaction in virtually no time.  And it's conceivable that mistakes were made." (June 24, 2009 Hearing Tr. at 47:17-20.)

50.     Having just been appointed the day before, the Trustee was not involved in the drafting process or in the negotiations concerning the Clarification Letter.  The Trustee first received a draft of the Clarification Letter on Sunday evening and received additional drafts later that night and on early morning Monday, only hours before the deal was to be closed.  Based on the representations made to the Court, the Trustee believed that the Clarification Letter would simply give effect to the deal that had been described at the Sale Hearing.

51.     The Clarification Letter was executed in the early hours of Monday morning, September 22, 2008.  Later that day, it was filed with the Court as an exhibit to the notice of filing of the "Purchase Agreement."  (LBHI Docket No. 280.)

52.     In relevant part, the Clarification Letter amends the definition of "Purchased Assets" in the Asset Purchase Agreement and replaces the "Long Positions" and the cash that previously was to be transferred to Barclays with:

> (A)  the securities owned by LBI and transferred to Purchaser or its Affiliates under the Barclays Repurchase Agreement (as defined below) as specified on Schedule A . . . .
>
> (B)   such securities and other assets held in LBI's "clearance boxes" as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B . . . .

13

(C)  exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) and collateralized short-term agreements.

(Clarification Letter ¶ 1(a)(ii).)

53.    The Clarification Letter also provides for the transfer, "to the extent permitted by applicable law," of "$769 million of securities, as held by or on behalf of LBI on the date hereof pursuant to Rule 15c3-3 of the Securities Exchange Act of 1934, as amended, or securities of substantially the same nature and value."  (*Id.* ¶ 8(ii).)

54.    Although the Clarification Letter amends the definition of "Purchased Assets" and mentions certain assets, such as the clearance box assets and the 15c3-3 securities, the Trustee did not believe that it effected any fundamental change in the sale or granted Barclays assets above the $47.4 billion in assets disclosed to the Court.

**Barclays' Agreement To Exclude The Clearance Box Assets At The DTCC**

55.    Barclays claims that the addition of paragraph (B), above, entitles it to approximately $2.4 billion in additional assets.  While the draft of the Clarification Letter that the Trustee's advisors obtained on Sunday night indicated a transfer of certain assets in LBI's clearance boxes at the DTCC, in the face of serious concerns raised by the DTCC, Barclays expressly agreed to exclude those assets from the sale.

56.    The DTCC is a privately-owned company that, through various subsidiaries, provides clearing, settlement and information services to the domestic and global securities industry.  In the week before the Sale Hearing, the DTCC grew concerned about LBI's ability to satisfy its liabilities to the DTCC in connection with its open trading positions.  On September 17, 2008, the DTCC informed LBHI and Barclays that Barclays "would be required to assume the liabilities associated with the accounts maintained by LBI at the DTCC and its subsidiaries . . . in their entirety and irrespective of whether the assets or liabilities in a particular account

14

were the subject of the Purchase Agreement or were owned by LBI or an affiliate of LBI."

(LBHI Sale Order ¶ E.)

57.    Barclays ultimately refused to assume LBI's liabilities to the DTCC beyond a limited $250 million amount (in effect funded solely by LBI).  This left the DTCC exposed to losses that might be incurred in clearing hundreds of billions of dollars of open LBI trades.  Barclays' proposal to acquire LBI's assets at the DTCC increased the DTCC's potential exposure by threatening to deprive it of an important source of collateral.

58.    As the DTCC's concerns threatened to derail the entire transaction, Barclays agreed that it would exclude the assets at the DTCC from the sale.  The parties recorded this agreement in the DTCC Letter, which the DTCC drafted between late Sunday night and Monday morning.

59.    On early Monday morning, September 22, 2008, the DTCC, Barclays, and the Trustee executed the DTCC Letter.  To satisfy the DTCC's concern regarding LBI's ability to honor its liabilities to the DTCC arising from the winding down and closing out of the LBI accounts, the DTCC Letter specifically defines LBI's accounts as "Excluded Assets" under the APA.

60.    The DTCC Letter provides:

> Winding Down of Accounts.  Barclays has indicated, and hereby agrees, that all of the accounts of LBI maintained at the Clearing Agencies Subsidiaries (the "Accounts") constitute "Excluded Assets" within the meaning of the APA.  Accordingly, pursuant to the authority granted to the Trustee in the Orders, the Trustee hereby instructs the Clearing Agency Subsidiaries to close out the pending transactions in the Accounts of the Clearing Agency Subsidiaries and to use the proceeds in accordance with the Rules and Procedures of the Clearing Agency Subsidiaries.  Such liquidation transactions shall be transferred to, and closed out by, the relevant Clearing Agency Subsidiary, in the same manner as it

15

closes out positions of Participants/Members for whom it has
ceased to act.

As part of this closeout process, the Trustee hereby authorizes
DTC to accept and act upon instructions from NSCC to deliver
securities from the DTC LBI Account to NSCC's account, in order
to reduce or eliminate LBI's outstanding delivery obligations to
NSCC.

(DTCC Letter ¶ 1 (SIPA Liquidation Docket No. 1684).)

**The Transfers of DTCC Securities**

61.    On Friday, September 19, 2008, LBI transferred approximately $1.1 billion in
securities from its DTCC box to Barclays.  Barclays did not purchase these securities as part of
the sale and is not entitled to them.

62.    On September 29 and September 30, 2008, the Trustee transferred approximately
$500 million in securities to Barclays.  To the extent these securities were, as Barclays has now
claimed, clearance box securities listed on Schedule B to the Clarification Letter, they were
Excluded Assets pursuant to the DTCC Letter, should not have been transferred to Barclays, and
need to be returned to the LBI estate.

**The Rule 15c3-3 Securities**

63.    SEC Rule 15c3-3 requires broker-dealers such as LBI to maintain separately one
or more cash reserve accounts containing the net amount of money the broker-dealer owes its
customers.  This statutory minimum requirement is calculated weekly, and has to be segregated
in the form of cash or qualified securities in a "Special Reserve Bank Account for the Exclusive
Benefit of Customers" (the "Reserve Account").

64.    With respect to custody of customer fully paid and excess margin securities, the
rule provides that the broker-dealer may not pledge, hypothecate, or use such securities to
support borrowing by the broker-dealer, but must maintain them free of liens at good control

locations, available for prompt return to the customer. To the extent that the broker-dealer is not in compliance with custody requirements, the Reserve Account deposit must be correspondingly increased.

65.    Although Barclays claims that paragraph 8(ii) of the Clarification Letter grants it an absolute right to $769 million in securities, the transfer of securities contemplated by this provision was to be made only "to the extent permitted by applicable law." In the first instance, this meant that there had to be a sufficient excess in LBI's Rule 15c3-3 Reserve Account above the amount that was required to be reserved for the protection of customers.

66.    LBI attempted to calculate its 15c3-3 requirement over the weekend of September 20 and 21, 2008, but due to various difficulties, including a large number of fails and stock record breaks, it could not reliably determine whether there was a surplus or a deficit in the Reserve Account as of September 19, 2008. In fact, there was a deficit in the Reserve Account as of that date.

67.    The release of the $769 million in securities also required regulatory approval, which Barclays never obtained. The SEC refused to approve the release of LBI's 15c3-3 assets because of questions regarding whether there was an excess in the Reserve Account.

68.    The transfer of the $769 million in securities was never intended to be unconditional and the conditions for this transfer were not met. As a result, Barclays never obtained the right to the $769 million in securities that it seeks under the Clarification Letter. Moreover, to the extent the transfer of these securities would transfer assets to Barclays beyond the $47.4 billion in assets that were disclosed to the Court, that transfer was never disclosed to, or approved by, the Court. Thus, even if the Clarification Letter could be read to grant Barclays an unconditional right to these securities in violation of the rules required to protect customers, to

17

the extent that such a transfer exceeded the $47.4 billion in assets that were disclosed, that transfer would be avoidable.

**Margin And Clearing Funds**

69.     Barclays also claims approximately $2.5 billion in margin and clearing funds at the OCC and has demanded as much as $1 billion in funds at other exchanges.  Barclays claims entitlement to these assets by virtue of the addition of the parenthetical expression "(and any property that may be held to secure obligations under such derivatives)" to the Clarification Letter's paragraph 1(a)(ii)(C), quoted above.

70.     The parenthetical on which Barclays relies does not mention margin or clearing funds, let alone the approximately $2.5 billion in margin and funds that was at the OCC or as much as $1 billion in funds at other exchanges.  Barclays' reading of this parenthetical is also inconsistent with the intent of the parties as reflected in the course of their negotiations and the drafting history of the Clarification Letter.

71.     The approximately $2.5 billion in assets at the OCC was never a part of any business deal between LBI and Barclays.  Thus, neither the APA nor the Clarification Letter makes any mention of any margin or clearing funds at the OCC or at any other derivatives exchange.  At some point, there was a specific clause in a draft of the Clarification Letter that would have transferred to Barclays LBI's "margin" and "guaranty fund deposit" maintained in relation to customer property at any clearing agency.  But this provision was deleted from the Clarification Letter and never reappeared.

**The Transfer And Assumption Agreement**

72.     Over the course of the weekend following the Sale Hearing, the Trustee, Barclays and the OCC executed the TAA Letter.  Specifically, the TAA Letter provides:

18

> Lehman hereby sells, assigns, transfers, and sets over to Barclays
> . . . all of Lehman's rights, title, interests, powers, privileges,
> remedies, obligations, and duties in, to, under, and in respect of
> [LBI's accounts at the OCC], as of the Effective Date including
> with respect to:  (i) the Clearing Fund Deposit; (ii) all margin
> deposits held by OCC with respect to the Account; (iii) all
> settlement obligations with regards to transactions in cleared
> contracts; and (iv) all rights and obligations in respect of exercises
> of <u>option contracts</u> and assignments of such exercises.

(TAA Letter ¶ 1(a) (emphasis in original) (SIPA Liquidation Docket No. 1684).)

73.    The purpose of the TAA Letter was to protect the OCC from losses associated

with winding down LBI's open option positions, without having to take the step of precipitously

liquidating all of LBI's open positions at the OCC.  The TAA Letter was not intended to

materially change the deal from the purchase of $47.4 billion in assets that had been represented

to the Court.

74.    To the extent that Barclays claims that the TAA Letter transfers to it

approximately $2.5 billion in margin and clearing funds, the TAA Letter effects a material

adverse change to the terms of the Purchase Agreement.  There was no disclosure to the Trustee,

the Court, or anyone of the magnitude of the sums involved.

75.    The Court never approved this material change.  The TAA Letter was never filed

with the Court or presented to the Court for approval, and while the LBHI Sale Order authorized

additional agreements to implement the Purchase Agreement, it did not authorize any such

agreement to materially change its terms.

76.    Moreover, the property at the OCC included approximately $1.3 billion in cash,

which had been excluded from the sale.  Nonetheless, Barclays took possession of this

approximately $1.3 billion in cash and has recorded it as a gain on its balance sheet.  As these

funds were not part of the sale, and were in fact specifically excluded, they need to be returned to

the LBI estate.

**The Repo Discount**

77.     The Clarification Letter defines as a "Purchased Asset" the securities owned by LBI and transferred to Barclays under a repurchase agreement (the "Repo"). These securities were meant to be specified on Schedule A to the Clarification Letter.

78.     The Repo between LBI and Barclays contemplated that LBI would pledge certain collateral to secure a loan of approximately $45 billion. The difference between the amount pledged and the amount of the loan reflected a discount or a "haircut" of approximately $5 to $7 billion in the value of LBI's collateral.

79.     At the September 17, 2008 hearing, the Repo between LBI and Barclays was described to the Court as a means to continue short term financing so that LBI could continue trading through the week.

80.      On September 19, 2008, LBI was placed into liquidation, an event of default under the Repo Agreement. Barclays issued a Notice of Default that afternoon.

81.     The Clarification Letter purports to terminate the Repo retroactively and to provide Barclays with all of the Repo collateral, which was valued at approximately $50 billion to $52 billion and therefore included approximately $5 billion to $7 billion in excess collateral. This excess value was not disclosed to the Court, which was told simply that Barclays was purchasing $47.4 billion in assets.

82.     Moreover, in exchange for the Repo collateral, Barclays forgave a $45 billion loan, yet the Court was told that the liabilities that Barclays was assuming in connection with the purchased assets amounted to $45.5 billion. Thus, Barclays received an additional undisclosed benefit by overstating the consideration relating to the Repo securities by $0.5 billion.

**Cure Costs**

83.     Under the APA, Barclays also agreed to assume certain contract cure costs.  On a September 16, 2008 financial schedule, the parties estimated that these cure costs would be approximately $2.25 billion.  This number was not based on actual expectations, but was artificially inflated to make it appear that Barclays was assuming a greater liability than it actually was.  By the time of the Sale Hearing, this number had been revised, and counsel told the Court that the cure costs would be approximately $1.5 billion.  (Sale Hearing Tr. at 100:1-4.) On information and belief, as of February 2009, Barclays had paid approximately $240 million in cure costs.

84.     The parties represented to the Court that Barclays would be assuming cure costs as part of the consideration it was giving for the assets purchased in the sale.  Barclays' failure to pay the expected amounts for these obligations and costs tilted the sale in its favor and caused Barclays to receive a windfall at the expense of the estate.

## <u>COUNT I</u>

### (Declaratory Judgment under 28 U.S.C. § 2201 DTCC Clearance Box Assets)

85.     The Trustee repeats and realleges paragraphs 1 - 84 as if fully set forth herein.

86.     The Trustee and Barclays are parties to the Clarification Letter and the DTCC Letter.  The parties dispute the meaning and enforceability of these agreements, particularly as to whether the agreements transfer the DTCC clearance box assets to Barclays or exclude them from the sale.

87.     An actual controversy exists that is ripe and justiciable.  A declaratory judgment will clarify the legal relationship between the parties.

21

88.     The clearance box assets demanded by Barclays are not a part of the sale.  As Barclays agreed in the DTCC Letter, the DTCC clearance box assets are deemed to be Excluded Assets.

89.     Additionally, the Court never approved the transfer of approximately $2.4 billion in DTCC clearance box assets to Barclays.  This transfer was not referred to in the APA and was not disclosed to the Court at the Sale Hearing.  The Court was told that Barclays was acquiring $47.4 billion in financial assets, and there was no disclosure of any additional transfers of financial assets from the LBI estate.

90.     While the LBHI Sale Order refers to "that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008," the Clarification Letter was supposed to be consistent with what the Court was told at the Sale Hearing.  Barclays is estopped from asserting positions that are fundamentally and materially inconsistent with what the Court, customers, and creditors were told.

91.     Indeed, if the parties had wanted to provide for the transfer of any additional assets to Barclays above and beyond the $47.4 billion that the Court approved, then they needed to return to the Court for approval.  The parties, however, never pursued this option and the Clarification Letter was never submitted to the Court as part of a formal motion for approval.

92.     The Trustee is entitled to a declaratory judgment that the DTCC clearance box assets were not transferred to Barclays and remain the property of the LBI estate.  The Trustee is also entitled to the return of the approximately $1.6 billion in DTCC clearance box assets already transferred to Barclays.

## COUNT II

**(Declaratory Judgment under 28 U.S.C. § 2201
OCC Margin and Clearing Funds)**

93.     The Trustee repeats and realleges paragraphs 1 - 92 as if fully set forth herein.

94.     The Trustee and Barclays are parties to the Clarification Letter and the TAA Letter.  The parties dispute the meaning and enforceability of these agreements, particularly as to whether these agreements operate to transfer to Barclays approximately $2.5 billion in OCC margin and clearing funds.

95.     There is an actual controversy that is ripe and justiciable.  A declaratory judgment will clarify the legal relationship between the parties.

96.     The OCC margin and clearing funds were not part of the sale.  The LBI negotiators never contemplated that Barclays would acquire billions of dollars in margin and clearing funds held at the OCC.  The approximately $1.3 billion in cash at the OCC and hundreds of millions of dollars of cash equivalents were subject to the parties' undertaking that cash was excluded from the sale.  Moreover, LBI had included approximately $507 million of its funds at the OCC as a debit item in LBI's computation of the reserve it needed to maintain for the protection of customer property pursuant to Rule 15c3-3.  Transferring such assets would have caused a deficiency in LBI's Reserve Account for the protection of customer property in violation of the Rule.

97.     The TAA Letter was never submitted or disclosed to the Court.  The Court authorized the execution of  additional agreements only if they did not have a material effect on the debtors' estates and were agreed to between the debtors, Barclays, and the Creditors' Committee.  To the extent that the Clarification Letter or the TAA Letter purport to transfer

approximately $2.5 billion in OCC assets to Barclays, those transfers were not authorized by the Court or by the Sale Order.

98.     The Trustee is entitled to a declaratory judgment that the OCC margin and clearing funds were not transferred to Barclays and remain the property of the LBI estate.  The Trustee is also entitled to the return of the approximately $1.3 billion in cash that has already been transferred to Barclays.

## COUNT III

**(Declaratory Judgment under 28 U.S.C. § 2201
Funds at Other Exchanges)**

99.     The Trustee repeats and realleges paragraphs 1 - 98 as if fully set forth herein.

100.     The Trustee and Barclays are parties to the Clarification Letter.  The parties dispute the meaning and enforceability of the Clarification Letter, especially as to the parenthetical phrase "(and any property that may be held to secure obligations under such derivatives)."

101.     There is an actual controversy that is ripe and justiciable.  A declaratory judgment will clarify the legal relationship between the parties.

102.     The as much as $1 billion in funds at other exchanges that is demanded by Barclays was not a part of the sale and was not transferred by the Clarification Letter.  To the extent that the Clarification Letter purports to transfer as much as $1 billion in funds at other exchanges, it was not approved by the Court or by the Sale Order.

103.     The Trustee is entitled to a declaratory judgment that the margin and clearing funds at foreign exchanges were not transferred to Barclays and remain the property of the LBI estate.

24

## COUNT IV

### (Declaratory Judgment under 28 U.S.C. § 2201
### $769 Million In Rule 15c3-3 Securities
### Or Substantially Similar Securities)

104.    The Trustee repeats and realleges paragraphs 1 - 103 as if fully set forth herein.

105.    The Trustee and Barclays are parties to the Clarification Letter.  The parties

dispute the meaning and enforceability of the Clarification Letter, particularly with respect to

whether paragraph 8 of the Clarification Letter transfers to Barclays $769 million in securities.

106.    There is an actual controversy that is ripe and justiciable.  A declaratory judgment

will clarify the legal relationship between the parties.

107.    The transfer of $769 million in securities demanded by Barclays was not a part of

the sale.  The transfer of these securities was not and is not permissible by law.

108.    To the extent the Clarification Letter purports to transfer the $769 million in

securities to Barclays, it was not approved by the Court or by the Sale Order.

109.    The Trustee is entitled to a declaratory judgment that the $769 million in

securities was not transferred to Barclays and remains the property of the LBI estate.

## COUNT V

### (Avoidance of Transfers and Recovery of Property
### under §§ 549 and 550 of the Bankruptcy Code)

110.    The Trustee repeats and realleges paragraphs 1- 109 as if fully set forth herein.

111.    Section 549 of the Bankruptcy Code permits the Trustee to avoid transfers of

estate property that occurred after the commencement of the case and which were not authorized

under the Code or by the Court.  Section 550 of the Code authorizes the Trustee to recover, for

the benefit of the estate, the property transferred to Barclays or, if the Court so orders it, the

value of the property transferred to Barclays.

112.    The Disputed Assets are property of the LBI estate and their purported transfer to Barclays was not authorized by the Court.  The Trustee is therefore entitled to avoid these transfers.

113.    To the extent that the Disputed Assets have already been transferred to Barclays, the Trustee is entitled to recover those assets or, if the Court so orders it, their value.

114.    The Trustee is also entitled to avoid and obtain the return of any transfer of value from the LBI estate that the Court did not authorize.  This includes, without limitation, the undisclosed discount on the Repo securities of approximately $5 billion to $7 billion, and the undisclosed benefits that Barclays received on the liabilities that it assumed.

## COUNT VI

### (Avoidance of Transfers and
### Return of Customer Property under SIPA)

115.    The Trustee repeats and realleges paragraphs 1- 114 as if fully set forth herein.

116.    The Disputed Assets constitute customer property within the meaning of SIPA. The transfers of the Disputed Assets are voidable or void under sections 544, 547, 548 and 549 of title 11.

117.    To the extent that customer property is not sufficient to satisfy customer claims in full, the Trustee is entitled to avoid the transfers to Barclays under the provisions of SIPA, 15 U.S.C. § 78fff-2(c)(3).

## COUNT VII

### (Turnover of Property under § 542 of the Bankruptcy Code)

118.    The Trustee repeats and realleges paragraphs 1- 117 as if fully set forth herein.

119.    Barclays is in possession of property belonging to the LBI estate, consisting of approximately $1.3 billion in cash that was held by the OCC, approximately $1.6 billion in

26

securities from the DTCC clearance box, and $5 billion to $7 billion in excess Repo collateral. This is property the Trustee may use or sell within the meaning of section 542 of the Bankruptcy Code.

120.     Section 542 of the Bankruptcy Code requires Barclays to deliver to the Trustee the approximately $1.3 billion in cash that was held by the OCC, the approximately $1.6 billion in securities from the DTCC clearance box, and the $5 billion to $7 billion in excess Repo collateral (or cash or securities of equivalent value).

## COUNT VIII

### (Recovery of Approximately $1.1 Billion in DTCC Clearance Box Securities under § 548 of the Bankruptcy Code )

121.     The Trustee repeats and realleges paragraphs 1- 120 as if fully set forth herein.

122.     On the morning of September 19, 2008, LBI transferred approximately $1.1 billion in DTCC clearance box securities to Barclays.  This transfer occurred within hours of the commencement of the SIPA liquidation proceeding.

123.     This transfer of approximately $1.1 billion in securities from the DTCC clearance box was made at a time when LBI was insolvent.  LBI did not receive reasonably equivalent value in exchange for the transfer of these assets.

124.     The Trustee is entitled to avoid the transfer of the approximately $1.1 billion in DTCC clearance box securities as a fraudulent transfer under section 548 of the Bankruptcy Code.

## COUNT IX

### (Fraudulent Conveyance under § 273 of the New York Debtor & Creditor Law, as made applicable by § 544(b) of the Bankruptcy Code)

125.     The Trustee repeats and realleges paragraphs 1- 124 as if set forth fully herein.

27

126.     The transfers of property to Barclays, consisting of approximately $1.3 billion in cash at the OCC and approximately $1.6 billion in securities from the DTCC clearance box were made at a time when LBI was insolvent.

127.     LBI received less than fair consideration in exchange for the transfer of these assets.

128.     The Trustee is entitled to avoid these transfers as fraudulent conveyances under section 273 of the New York Debtor & Creditor Law, as made applicable by section 544(b) of the Bankruptcy Code.

## COUNT X

### (Recovery of the Excess Value of the Repo Securities under §§ 559 and 542 of the Bankruptcy Code)

129.     The Trustee repeats and realleges paragraphs 1- 128 as if fully set forth herein.

130.     Section 559 of the Bankruptcy Code requires that excess collateral on a repo default be returned to the debtor's estate.  Section 559 states in relevant part:

> In the event that a repo participant or financial participant liquidates one or more repurchase agreements with a debtor . . . any excess of the market prices received on liquidation of such assets (or if any such assets are not disposed of on the date of liquidation of such repurchase agreements, at the prices available at the time of liquidation of such repurchase agreements from a generally recognized source or the most recent closing bid quotation from such a source) over the sum of the stated repurchase prices and all expenses in connection with the liquidation of such repurchase agreements shall be deemed property of the estate, subject to the available rights of set-off.

131.     After LBI's liquidation proceeding commenced, Barclays liquidated the Repo by sending a Notice of Termination to LBI.  Thus, the "excess of the market prices" of the assets subject to the Repo over the "stated repurchase prices" for those same securities is property of the LBI estate.

28

132.    Under section 542 of the Bankruptcy Code, Barclays is obligated to return to the Trustee the excess value that it realized on the Repo -- an amount of approximately $5 billion to $7 billion.

## COUNT XI

### (Breach of Contract)

133.    The Trustee repeats and realleges paragraphs 1 - 132 as if fully set forth herein.

134.    The APA required Barclays to assume liabilities and permitted Barclays to acquire assets as described above.

135.    Barclays breached the terms of the APA by taking assets in excess of what the APA permitted and by failing to pay the liabilities it assumed.

136.    The Trustee is entitled to judgment in an amount to be determined, together with interest, costs, attorneys' fees (under Section 4.6(b) of the APA), and such further and different relief as the Court finds just and proper.

## COUNT XII

### (Conversion – Money Had and Received)

137.    The Trustee repeats and realleges paragraphs 1 - 136 as if fully set forth herein.

138.    Barclays is in wrongful possession of property belonging to the LBI estate.

139.    This property consists of $1.3 billion in funds from LBI's margin account at the OCC and $1.6 billion in securities from LBI's clearance boxes at the DTCC.

140.    These amounts were wrongfully transferred to and retained by Barclays.

141.    The Trustee is entitled to judgment in an amount not less than $2.9 billion, together with interests, costs and such other and different relief as the Court may find just and proper.

29

## COUNT XIII

### (Aiding and Abetting Breach of Fiduciary Duty)

142.    The Trustee repeats and realleges paragraphs 1 - 141 as if fully set forth herein.

143.    The officers of Lehman Brothers owed fiduciary duties of loyalty, care, and candor to LBI.  In connection with the sale of LBI assets to Barclays, these officers owed a duty to LBI to exercise their best efforts and judgment solely in the interests of LBI, and not in the interests of Barclays or in their own pecuniary interests.  These officers also had a duty to disclose to the Lehman Boards, Lehman's senior management, and Lehman's lawyers all information germane to the sale of LBI's assets.

144.    The LBI officers breached their duty of loyalty, care, and candor to LBI by, among other things, assisting Barclays in obtaining an undisclosed mismatch of assets and liabilities in favor of Barclays at the expense of the LBI estate and otherwise failing to negotiate or obtain the best deal possible for LBI.  The LBI officers further breached their fiduciary duty to LBI by not disclosing to the Lehman Boards, Lehman's senior management, or Lehman's lawyers all information that was germane to the sale.

145.    Barclays induced and participated in the Lehman officers' breaches of their fiduciary duties by procuring a sale involving a mismatch of assets and liabilities that Barclays knew was undisclosed and was at the expense of the estate.

146.    The Trustee is entitled to judgment against Barclays for aiding and abetting the breach of fiduciary duty committed by the Lehman officers.

## COUNT XIV

### (Disallowance of Claims under § 502(d) of the Bankruptcy Code)

147.    The Trustee repeats and realleges paragraphs 1- 146 as if set forth fully herein.

30

148.    Barclays is the transferee of transfers by LBI which are voidable and recoverable from Barclays under the Bankruptcy Code or applicable state law.

149.    Under section 502(d) of the Bankruptcy Code, any claims held by Barclays against LBI must be disallowed unless Barclays turns over the voided transfers or their value to the Trustee.

**RESERVATION OF RIGHTS**

150.    The Trustee believes that additional claims in favor of the LBI estate and against Barclays may exist.  The Trustee reserves any and all rights to bring such claims to the extent authorized by the Court or by applicable law.

**PRAYER FOR RELIEF**

Wherefore, the Trustee requests that the Court enter:

(a)  judgment, pursuant to 28 U.S.C. § 2201, declaring that the Disputed Assets were not transferred to Barclays in the sale and remain the property of the LBI estate, together with attorneys' fees pursuant to 28 U.S.C. § 2202;

(b)  alternatively, an order, pursuant to Bankruptcy Code §§ 542, 548, 549 and 550, voiding the transfers of the Disputed Assets to Barclays and directing Barclays to turn over to the Trustee any Disputed Assets in its possession or which may come into its possession;

(c)  an order, pursuant to Bankruptcy Code §§ 548, 549 and 550, 15 U.S.C. § 78fff-2(c)(3), and N.Y. Debtor & Creditor Law § 273, made applicable by Bankruptcy Code § 544(b), permitting the Trustee to recover and requiring Barclays to turn over to the Trustee the assets that were already transferred to Barclays, consisting of approximately $1.6 billion in DTCC clearance box securities and $1.3 billion in cash that was at the OCC;

(d) an order, pursuant to Bankruptcy Code §§ 542, 549 and 550, avoiding and permitting the Trustee to recover any unauthorized transfer of value from the LBI estate,

31

including, without limitation, the approximately $5 billion to $7 billion in excess value on the

Repo securities, the $0.5 billion discount that Barclays received on the liabilities relating to those

securities, and the windfall that Barclays realized with respect to the contractual cure costs;

(e) an order, pursuant to Bankruptcy Code §§ 542 and 559, requiring Barclays to

turn over to the Trustee the excess $5 billion to $7 billion of estate property it retained as a result

of liquidating the Repo;

(f) judgment on Counts XI-XIII in an amount to be determined, together with

interest, costs, and attorneys' fees, as allowable;

(g) an order, pursuant to Bankruptcy Code § 502(d), disallowing any claims held

by Barclays against the LBI estate, unless the transfers or their value are turned over to the

Trustee;

(h) an order directing an accounting of all assets that Barclays has received or to

which it claims entitlement in connection with the sale and all liabilities that Barclays assumed in

connection with the sale; and

(i)  such further and different relief as the Court finds just and proper.

Dated:  New York, New York
         July 15, 2011

                              HUGHES HUBBARD & REED LLP

                              By:  /s/ William R. Maguire
                                       William R. Maguire

                              Seth D. Rothman
                              Neil J. Oxford
                              One Battery Park Plaza
                              New York, New York 10004
                              (212) 837-6000 (telephone)
                              (212) 422-4726 (facsimile)
                              maguire@hugheshubbard.com

                              John F. Wood
                              1775 I Street, N.W., Suite 600
                              Washington, D.C.  20006
                              (202) 721-4600 (telephone)
                              (202) 721-4646 (facsimile)
                              woodj@hugheshubbard.com


                              *Attorneys for James W. Giddens*
                              *as Trustee for the SIPA Liquidation*
                              *of Lehman Brothers Inc.*