1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555(JMP)

5   - - - - - - - - - - - - - - - - - - - -x

6

7   In the Matter of:

8

9   LEHMAN BROTHERS HOLDINGS INC., et al.

10

11              Debtors.

12

13   - - - - - - - - - - - - - - - - - - - -x

14

15              United States Bankruptcy Court

16              One Bowling Green

17              New York, New York

18

19              August 9, 2011

20              2:03 PM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25

Page 2

1

2    UNCONTESTED MATTER re Amended Motion for Approval of Procedures

3    for Determining the Allowed Amount of Claims filed Based on

4    Structured Securities Issued or Guaranteed by Lehman Brothers

5    Holdings Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

```
 1
 2   A P P E A R A N C E S :
 3   WEIL, GOTSHAL & MANGES LLP
 4        Attorneys for Debtors and Debtors-in-Possession
 5        700 Louisiana
 6        Suite 1600
 7        Houston, TX 77002
 8
 9   BY:   ALFREDO R. PEREZ, ESQ.
10
11   MILBANK, TWEED, HADLEY & MCCLOY LLP
12        Attorneys for the Official Committee of Unsecured
13         Creditors
14        One Chase Manhattan Plaza
15        New York, NY 10005
16
17   BY:   EVAN R. FLECK, ESQ.
18
19
20
21
22
23
24
25
```

Page 4

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5          International Square Building

6          1850 K Street, NW

7          Washington, DC 20006

8

9    BY:   DAVID S. COHEN, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12         Attorneys for the SIPA Trustee

13         One Batter Park Plaza

14         New York, NY 10004

15

16   BY:   JEFFREY S. MARGOLIN, ESQ.

17

18   DAVIS POLK & WARDWELL LLP

19         Attorneys for Lehman Brothers International (Europe)

20         450 Lexington Avenue

21         New York, NY 10017

22

23   BY:   DARREN S. KLEIN, ESQ.

24

25

Page 5

1

2    DEWEY & LEBOEUF LLP

3         Attorneys for Undersigned Holders of Notes Issued by

4          Lehman Brothers Treasury Company B.V.

5         333 South Grand Avenue

6         Suite 2600

7         Los Angeles, CA 90071

8

9    BY:   MONIKA S. WIENER, ESQ.

10

11   BROWN RUDNICK LLP

12        Attorneys for Undersigned Holders of Notes Issued by

13         Lehman Brothers Treasury Company B.V.

14        One Financial Center

15        Boston, MA 02111

16

17   BY:   STEVEN B. LEVINE, ESQ.

18

19

20

21

22

23

24

25

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 6 of 36

Page 6

1                    P R O C E E D I N G S

2              THE COURT:  Good afternoon.  Be seated, please.  Mr.

3    Perez?

4              MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

5    on behalf of the debtors.  Your Honor, first, thank you very

6    much for this setting this afternoon.  I know it's not the

7    normal time, but I really do appreciate it.  Your Honor, this

8    motion is really the culmination of work that has been being

9    done at the company for the past two years.  We really have to

10   commend everyone at Lehman and at A&M for the all the work that

11   they've done to get to where we are.

12             I personally have been devoting a substantial portion

13   of my time since January of 2010 on this motion.  This

14   represents --

15             THE COURT:  My condolences.

16             MR. PEREZ:  Well, Your Honor, at times I felt that

17   way.  Most of the times not, but at times I felt that way.

18             Your Honor, this motion is a critical component of the

19   plan.  It deals with approximately 21,000 of the almost 60,000

20   claims that have been filed.  And it addresses the Lehman

21   program securities.  These securities were sold primarily

22   through LBIE but they were sold by other Lehman entities,

23   primarily issued by the foreign entities, although LBHI did

24   issue some.  And they're very bespoke.  Some of them were plain

25   vanilla, what we would call par-par notes.  But a lot of them,

Page 7

1    although lesser amount in dollars, but many more in number,

2    were really very bespoke securities.

3          And so what the people at Lehman had to do was compare

4    what was on the books and records to what people were holding.

5    And it's complicated by the fact that there are no indenture

6    trustees.  These are held by individuals.  Sometimes they're

7    held in a -- through a custodian at a bank.  Sometimes they're

8    held in street name.  But there is no trustee.

9          So we went through an extensive process.  We filed an

10   original motion back in April.  As a result of some further

11   discussions, that motion was withdrawn.  We now have filed a

12   subsequent motion.  And the goal of the motion, Your Honor, is

13   to allow us to send out notices to the individual claimants as

14   to what their claim will be for voting and distribution

15   purposes under the plan.  It's not a final determination.  In

16   connection with this motion, we have made various compromises

17   with the people who we've been negotiating, to come up with

18   these amounts.  But in total, they probably total about thirty-

19   seven billion dollars of debt that would otherwise be dealt

20   with either as a guarantee or directly against LBHI.

21         Your Honor, I did want to -- and in connection with

22   this, Your Honor, there was objection by the Steven Holder

23   Trust.  I've spoken with them yesterday.  They authorized me to

24   represent that the objection is withdrawn.  I don't know

25   whether they're going to make an appearance today, but they

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 8 of 36

Page 8

1    authorized me to make that representation.

2        We've had two statements, one by the committee, and

3    one by one of the people that we've been primarily negotiating,

4    represent by Brown Rudnick and Dewey Valentine (sic).  And we

5    did file, Your Honor, an amended order which addresses some of

6    the concerns that some of the -- the committee and some of the

7    other holders voiced, and an affidavit by Mr. Ehrmann, who has

8    kind of led this charge.  And he actually walked through how we

9    ended up allocating the money.

10       But I do want to, just for -- to give the Court a

11   little bit of a flavor for this, just show the one note --

12   there were two notes that were addressed in the motion.  One

13   was a fair market value note and the other one was a par-par

14   note.  I have a copy of the fair market value note.  I just

15   want to show it to the Court because I think it will give the

16   Court a good flavor for this.  And I've tabbed page 13, which

17   is kind of the critical page.  If I may approach, Your Honor?

18       THE COURT:  You may approach.

19       MR. PEREZ:  Your Honor, if you'd go to page 13, that

20   is the formula how you determine what the price of the note is.

21   And --

22       THE COURT:  I didn't take a high enough math course to

23   be able to figure that out.

24       MR. PEREZ:  And then -- but then, that's not even it.

25   So the weight is determined by indices.  And if you turn to the

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 9 of 36

Page 9

1    very last page, the indices are twelve different stocks on the

2    Stockholm stock exchange, weighted differently with different

3    share amounts.

4         THE COURT:  Well, let me break in.  Because this

5    illustration actually calls to mind a concern I have.  And I

6    just want to address it.  And I recognize this is a largely

7    uncontested matter at the moment.  But I looked through the

8    motion and the attachments.  I looked at Mr. Ehrmann's

9    affidavit of August 5th and the calculations that are set forth

10   on it.  I've read the supporting papers filed by the creditors'

11   committee, and I'll deem it a supporting paper filed by parties

12   who have filed plan support agreements along with you.

13        And so there's a collective judgment that procedures

14   along these lines are absolutely necessary at this stage of the

15   game.  And I don't debate that.

16        But given the complexity of determining what's being

17   divided -- first of all what something is worth based upon fair

18   value; how blocking numbers contribute to a right to

19   participate in what's being valued; and then the determination

20   by the debtor being delivered to all these holders of what

21   their allowed claim amount will be deemed to be for purposes of

22   voting and distribution; how is a holder going to be in a

23   position to respond other than to put it away in a file and

24   wait for a distribution some day?  I don't understand how there

25   can be a meaningful process of notice and response to the

                                                              Page 10

1    extent that there's disagreement.

2           MR. PEREZ:  Well, Your Honor, let me respond to that

3    in a couple ways.  And to some extent, this is -- these are the

4    issues that have been raised by the committee, and frankly,

5    other holders as well.  So we've been dealing with that very

6    same issue.

7           First of all, Your Honor, these are -- two-thirds of

8    them are plain vanilla debt instruments.  So in terms of

9    amount, two-thirds of them are plain vanilla debt instruments.

10   So we --

11          THE COURT:  So two-thirds of thirty-seven billion,

12   more or less?

13          MR. PEREZ:  Correct, Your Honor.  Just so I'm clear,

14   about twenty-four of the thirty-seven billion are plain vanilla

15   debt instruments that are not fair market value notes.  Another

16   2.2 billion are zero coupons, again, which are not fair market

17   value notes.  There are some in there that are -- we don't

18   really know what they are, because we don't have documents, and

19   that's another issue that we're working through.

20          So we're talking --

21          THE COURT:  Did I just hear you say we don't really

22   know what they are?

23          MR. PEREZ:  Your Honor, we have some amount on our --

24   a small amount on our debt database that we have not been a --

25   that we show as being owed, that we have not been able to find

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 11 of 36

Page 11

1    instruments for.

2           THE COURT:  Okay.

3           MR. PEREZ:  Okay.

4           THE COURT:  I'm not shocked to hear that.

5           MR. PEREZ:  A small amount, but unfortunately -- and

6    literally, Mr. Ehrmann's team has visited every single

7    depository, clearing agency in Europe, some in the Pacific, to

8    get as much of the information as possible.  But there is a

9    small number that we still have not been able to characterize.

10   And in fact, in our discussions with some of the holders, we've

11   actually been given information that we didn't have.  And

12   that's been kind of an iterative process.

13          So we're talking about eleven -- approximately eleven

14   billion out of the thirty-seven that is the subject of a fair

15   market value calculation.  This one is probably a little bit

16   more complicated than most.  Most of them were a bet on either

17   a particular stock or on a particular index that if it was

18   above -- if the index of these stocks went up, you know, ten

19   percent, you got a thirty percent return versus -- and vice

20   versa.  So they were a little bit more complicated.

21          Most of these instruments were sold through brokers.

22   And in many cases, almost all of our discussions have been with

23   substantial institutions such as banks in Italy, banks in Japan

24   and other places that have these in their customer accounts.

25   So our primary dialog has been with institutions who have

Page 12

1    clients who are invested in these accounts.

2         Back in April -- I'm sorry, in October of last year,

3    we published for the first time, on an ISIN by ISIN basis, what

4    we believed to be the total maximum amount on an ISIN by ISIN

5    basis.  So if an ISIN had a hundred million dollar notional, we

6    published what it would be if a hundred -- if people who had

7    proofs of claim totaling the entire issuance had filed proofs

8    of claim.  That has gone through many iterations.  That was

9    filed.  We issued an 8-K at the time.  We put it on the

10   website.

11        In January, in connection with the amended plan that

12   was filed, we updated those numbers, again issued a 10-K and

13   again posted it on the website.  So for the past ten months or

14   nine months, these numbers have been available and we have had

15   significant discussion with holders with respect to how we went

16   about doing it, how we classified it.

17        Second, Your Honor, anybody who has called us who has

18   requested information about why we classify them the way we

19   did, why we treat them the way we did, et cetera, we have

20   responded to all of those inquiries.  And we have done that

21   throughout.  And there's been a team of people that have

22   responded to inquiries all along.  And we've had many

23   inquiries.  And there are people who do this a lot.  In

24   connection with the discussions with the committee, we put in

25   the proposed form of revised order that we would continue to do

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 13 of 36

Page 13

1    that in the ordinary course of business.  To the extent

2    somebody asked us, we will investigate and respond.

3         Third, Your Honor, what we're really talking about is

4    procedures as to really how to even tee this up.  This is

5    really what we're talking about.  And to the extent that

6    somebody has a question or a concern, they can easily -- I

7    mean, they can respond and say we don't understand, we don't

8    agree.  And that will start a dialog process.  And we've agreed

9    that to the extent, you know, a person who holds ten percent of

10   an ISIN, we make a correction that we will then fix the entire

11   ISIN, number one; number two, that we'll publish everything

12   that we have done to, you know, all of the inquiries that we've

13   gotten and all of the responses that we've made.

14        Fourth, Your Honor, in connection with our recent

15   discussions with the committee, we've agreed that on a real

16   time basis, we will include them in all of the e-mails that we

17   are getting or questions that we're getting about notes,

18   whether they should be classified one way or another; and in

19   our responses.

20        So, Your Honor, I think the Court raises a very, very

21   good issue.  I think under the circumstances, we have done

22   really the best we can, other than just what would have been

23   kind of a claim objection process, which is what we really

24   don't want to have.  Because this would -- it would be -- we

25   would never be able to get it done in any reasonable period of

Page 14

1    time.  And our hope would be that a very large number of

2    parties review these, have questions, can be answered, so that

3    we don't have a large overhang in the claim objection process.

4         THE COURT:  Well, let me ask you a question which is

5    perhaps naive on my part, but I'm going to ask it anyway.  I

6    reviewed these papers and came to the conclusion that these

7    were difficult to value instruments and that if one were

8    involved in an uncontrolled process of attempting to determine

9    the value, it would be very time-consuming, labor-intensive,

10   and would potentially threaten the timeliness of plan

11   confirmation.

12        But I also drew the conclusion that the debtors were

13   engaged in a process of doing a fair job of calculating the

14   value of these securities, but nonetheless, some judgment was

15   being exercised in determining what the value was of each of

16   the structured securities.  To the extent that some judgment is

17   being exercised, presumably that's an area where people could

18   have disagreements.

19        How do third parties know about the assumptions that

20   underlie a particular valuation methodology for a security?  Or

21   am I wrong in my basic premise?

22        MR. PEREZ:  Your Honor, I don't think you're wrong in

23   either premise.  But I do think that the second comment is

24   only -- it's correct, but it's not the whole issue.  By their

25   very nature, Your Honor, these securities have judgments built

Page 15

1    in.  So if you take the price of, you know, Saab or Electrolux

2    at 11 o'clock in the morning versus Saab or Electrolux at 12

3    o'clock, there might be a difference there.  So two people

4    could very easily go to the room, get their information, and

5    come back with slightly different answers that could both be

6    correct.  So that's absolutely -- it's not a situation where

7    there is a correct answer.

8         What we did, Your Honor, was Lehman, in the ordinary

9    course of business, valued these on a mark-to-market basis,

10   basically every day.  So we have a mark as of the 12th.  We

11   then added in interest for the ones that were true debt,

12   through the 15th, and in essence said, the mark that existed as

13   of the 12th, which is the last business day before the filing,

14   is the mark.  That's where we started.  And Lehman did this in

15   the ordinary course of business, basically, every day.  They

16   would value.

17        The problem is that --

18        THE COURT:  Well, there's another problem.  Because if

19   you get into the reliability of Lehman's marks as of any

20   particular point in time, that has been a subject of litigation

21   in this court, as you're well aware.

22        MR. PEREZ:  Absolutely, they were.

23        THE COURT:  So you're just accepting, for purposes of

24   this exercise, the reliability of the marks as of September

25   12th.

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 16 of 36

Page 16

1          MR. PEREZ:  As the starting point.

2          THE COURT:  As the starting point.

3          MR. PEREZ:  As the starting point.  Okay?  So we

4    didn't go out and revalue, you know.  And it's approximately --

5    it would be 2,700 issuances that we would have to revalue if we

6    did all the fair market values.  So that's the starting point.

7    To that we made changes to address concerns that we had and

8    concerns that were raised to us.

9          So on our initial books and records, these were at

10   about twenty-six -- in total, including both fair market value

11   and par-par -- they were at about -- and I'm just talking about

12   LBT, Your Honor, which is -- LBT is thirty out of the thirty-

13   seven billion.  So that's really the main one, the Dutch

14   company represented by Mr. Mayer.  We started out with what we

15   thought claims should be at about twenty-six to twenty-seven

16   billion.  And after the various iterations with the parties, we

17   ended up with claims of about 30.7 billion.  So we made

18   concessions in connection with these discussions as to changes

19   that people suggested that we make to address them.

20         But, Your Honor, I don't want to leave the Court with

21   the impression that we don't think these are good numbers.  We

22   do think these are good numbers.  There's been a lot of people

23   who've spent a tremendous amount of time to validate these

24   numbers.  We think these are good numbers.  We think that they

25   accurately reflect the notes.

1         The information -- the problem, Your Honor, was, is

2    that the information that was available to Lehman on an ongoing

3    basis is not necessarily available now.  The feeds that fed

4    into the various valuations, we have to reproduce.  Some of

5    them may not be available.  In the cases where we obviously --

6    where we had the feed or had the information on an historical

7    basis, that was easy.  But on the ones that we had to reproduce

8    it, revalue them, that was much more difficult.  So I don't

9    want to give the Court the impression that this is a guess on

10   our part.  It isn't.

11        THE COURT:  No.  I wasn't suggesting that I believed

12   that to be the case at all.  I was just trying to understand

13   how a claimant is supposed to respond to the notice of

14   determination in any way other than to ask for information as

15   to how you did it on a particular security, which gets you into

16   what could turn out to be the very time-consuming process that

17   this procedure is designed to avoid.

18        MR. PEREZ:  Correct, Your Honor.  Absolutely correct.

19   But I think if we started by engaging in, in essence, what

20   would be a discovery process before the fact, then I think

21   we're at that same place.

22        I do think, Your Honor, that we take a little bit of

23   comfort in that most -- a lot of these guaranties and notes

24   have traded.  So we know that, for instance, the people that

25   we've been negotiating with probably have twenty percent of

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 18 of 36

Page 18

1    them at least.  So I mean, obviously twenty percent of a

2    thirty-seven million dollar number is a lot, but it's not the

3    whole thing.  But I do believe that there are concentrated

4    amounts held in sophisticated people who have taken advantage

5    of the fact that these have been on our website, you know, for

6    eight, nine months, to do their valuation.

7           THE COURT:  Okay.  And I understand from what you

8    said, and I realize this is a very complicated process, and

9    we're not engaged in an evidentiary hearing, we're just having

10   a conversation, that each one of the securities has been valued

11   using a methodology that the debtor believes is defensible and

12   that those who are supporting the present procedures motion

13   believes to be defensible.  And that while there may be some

14   judgment calls that people might make differently, as to how to

15   mark a particular security on the 12th, at least there was a

16   consistent methodology applied.  Do I understand that to be

17   true?

18          MR. PEREZ:  Correct, Your Honor.  And we've gone the

19   further point of saying if there's an error -- what we call a

20   manifest error -- if there is an error, either in the math or

21   in our reading of the note, then we'll correct that.  And we've

22   been correcting them.  We've been -- people have brought us

23   errors and we've been correcting them.

24          THE COURT:  And somebody must be doing square roots.

25          MR. PEREZ:  Your Honor, when I first started working

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 19 of 36

Page 19

1    on this, I couldn't believe that anybody who was actually not

2    in some altered state could have actually written something

3    like this.  I mean, it's just mind boggling the complexity in

4    some of these cases.

5              THE COURT:  Is there an algorithm of some sort that is

6    applied to the valuation of various classes of securities to

7    make this easy, or is each one of the valuations, to some

8    extent, the function of a unique calculation?

9              MR. PEREZ:  Your Honor, for the most part, the fair

10   market value notes are bespoke, so they are not the same.

11   They're variations on a theme, like the -- you know, an index,

12   or a lot of people wanted to buy stocks in India and you

13   couldn't do it, so you would buy a structured note in order to

14   buy -- in order to hedge the Indian market.  And some of these

15   notes are long versus some of them being short.  So some people

16   would bet against the Indian market using one of these notes,

17   as opposed to going long on the Indian stock market using these

18   notes.

19             THE COURT:  I think I've asked enough.

20             MR. PEREZ:  Okay.  Thank you, Your Honor.

21             MR. FLECK:  Good afternoon, Your Honor.  Evan Fleck of

22   Milbank Tweed on behalf of the official committee.  Your Honor

23   let me just start out by saying that the committee does not

24   object to the relief requested from the motion.  And so we

25   probably could stop there.  But as Your Honor's questions have

Page 20

1    suggested, this has been one of if not the most challenging

2    issues that the committee has faced during the course of these

3    cases.

4            We're pleased to have gotten to a point where we're

5    not objecting to the motion.  But it has been quite a long ride

6    that we've been on.  And I wanted to spend the time, if the

7    Court will indulge this presentation, explaining how we got to

8    this point and why we are comfortable with the relief

9    requested.

10           And there are a couple of data points that drove the

11   committee's inquiry.  And the first was that -- and they're

12   remarkably consistent with the questions or the answers to the

13   questions that Your Honor was getting to during Mr. Perez's

14   presentation.  And I think the committee will be pleased that

15   its concerns were consistent with the Court's concerns, and

16   what had driven the committee throughout this process to keep

17   pushing its advisors was something that the Court would also be

18   interested in.

19           The first was that, again, this is an extremely

20   difficult problem.  And if there was an easy solution, one

21   where we had all the documents and they were before us, we had

22   all the models, we wouldn't have spent all the time and

23   resources on this.  It would be much more straightforward like

24   you might have seen in other cases.  But as Mr. Perez said, we

25   don't.  And so it required people to actually think creatively

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 21 of 36

Page 21

1    and outside the box, as we've done with the debtors,

2    successfully, on a number of times in these cases and hope to

3    continue to do.

4         But the first data point was that we had to be

5    comfortable with the valuation methodology.  If we couldn't get

6    comfortable that this was an acceptable way of valuing -- and

7    I'm speaking specifically to the fair market value notes --

8    then that really was the end of the inquiry.  And the second

9    is, if the committee could be comfortable with the methodology,

10   was there an appropriate and sufficiently robust process in

11   place for creditors to be able to engage with the debtors,

12   engage, if they chose to do so, with other fiduciaries of the

13   estate, possibly the committee, and then ultimately with the

14   Court, if they wanted to have an opportunity to dispute a

15   valuation of their notes.

16        And again, I am pleased and the committee's pleased to

17   be in a position today that in response to both of those

18   questions I can say yes, we're comfortable that the valuation

19   methodology is acceptable under the circumstances that we're

20   dealing with and the circumstances that the debtors were

21   dealing with in the first instance, to try to develop a

22   valuation methodology suitable for these notes.  And on the

23   second question, it's an affirmative answer as well, because we

24   believe, particularly with the enhancements, that the process

25   is appropriate and that the questions that Your Honor asked

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 22 of 36

Page 22

1    about what is a noteholder to do when they get a number, that

2    there actually is a process in place; that they're not just

3    either forced to say I don't like the number, this can't be

4    right, I object, because that doesn't work; or feel compelled

5    to say I accept it because I don't know any better.

6            Neither of those options was acceptable to the

7    committee, that a claimant would be forced into the situation.

8    And we think that because a claimant in the first instance has

9    some information and they've already been provided with the

10    publications that have been to referred to in the pleadings and

11    on the record.  And so some people are very sophisticated in

12    this process, and knew what to do with that information.  They

13    asked certain questions.  I think some of those parties are

14    represented by counsel today that filed a statement in support

15    of the motion.  And that was important to the committee to know

16    that there were sophisticated parties that hold these notes

17    that support these procedures.

18            But it didn't get us there ultimately, because that's

19    one class of creditors that fall within the committee's

20    constituency.  But there are other classes that are less

21    sophisticated and probably need a little bit more of a robust

22    process to get them the due process they need.

23            And so the first step is, for those creditors, after

24    they've seen some numbers listed on a publication, is for them

25    to have the ability to reach out in an informal way to the

Page 23

1   debtors and ask questions.  And as Mr. Perez reported to the

2   Court that they have received questions; we have been looped in

3   on that.  But they will -- the debtors will continue to respond

4   to those inquiries.

5           We didn't want to set up a process and we didn't want

6   to try to get the debtors to agree to a process where we were

7   setting up mini discovery before a creditor had even raised his

8   or her hand and said I may have a problem here.  Because that

9   would be unworkable, and in our view, would have defeated the

10  objectives of having a streamlined efficient process.  But we

11  felt, with this informal interim step before a response needs

12  to be filed, that if someone could raise their hand or send in

13  an e-mail and present a question at that point, and get a

14  response that's crafted, of course, in good faith and with an

15  effort to try to provide information that's reasonably within

16  the debtors' possession, then that helped us to get comfortable

17  that people aren't just going to be stuck with a number and

18  with the untenable choice of just saying reflexively, I object,

19  or saying I accept it because I have no other recourse than

20  engaging in a difficult legal process.

21          And we also felt that particularly because, as an

22  estate fiduciary and as a party that has, for better or worse,

23  become quite knowledgeable about these notes as well, that we,

24  as the committee, and FTI as the financial advisor to the

25  committee, could also help in that process.  And that's why we

Page 24

1    felt it was important that the committee know about inquiries

2    and be -- on a real time basis be made aware of the responses

3    that are being given.

4          I want to be clear about something -- hopefully I've

5    been clear about everything I've said thus far.  But I want to

6    be perfectly clear that we recognize that there needs --

7    there's a balance here; that claimants are asserting claims

8    against the estate for recoveries, and our duties flow to all

9    the unsecured creditors to maximize recoveries.  And the duty

10   of the committee, as we understand it, is not to maximize every

11   creditor's claim and every creditor's claim vis-a-vis other

12   creditors.  So we're not looking to create a process, and we

13   don't think we helped to create a process, where individual

14   creditors are getting a leg up on other creditors and getting

15   help to craft a compelling claim or an argument that the

16   debtors mis-valued a particular note.

17         We just want to make sure that creditors, to the

18   extent they are paying attention, and we think they should be,

19   will have an opportunity, before they fully engage in the

20   response process -- and I'm using that defined term from the

21   debtors' procedures -- that they can ask a question and get an

22   answer that will help them along the way to understanding what

23   we all have come to realize are extremely complicated

24   securities; that we understand they purchased, so it's not as

25   though these were thrust upon them.  But we also are mindful of

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 25 of 36

Page 25

1    the fact that they may need a little bit extra help before we

2    get to the response phase.

3        And then the next steps in the process also were very

4    important to the committee.  So it's not a formal legal

5    pleading before this Court.  Someone can submit a response

6    that's much less formal.  And we think it's also important that

7    the committee receive those.  The debtors have agreed that we

8    will be part of that process so that we can also be monitoring

9    what's happening here.

10       And I think because of the fact that these are -- this

11   is such an unusual situation with such unusual securities,

12   perhaps unique is the right word, what we tried to help the

13   debtors to craft was a process that would have some -- would e

14   somewhat fluid.  So if we need to flexible about the type of

15   information and communication with creditors, we expect to

16   reengage with the debtors and have that dialog, all with the

17   same four goals in mind that I set out at the beginning.

18       One, we're very satisfied that we're comfortable that

19   this is a reasonable valuation methodology under the

20   circumstances; and two, that the process be appropriate under

21   the facts and circumstance here.

22       We allow for the fact that, and expect that some

23   creditors will ultimately get to the point, notwithstanding the

24   information they receive, they will file responses.  They will

25   take issue with their valuation, and they will challenge the

08-13555-mg   Doc 19143   Filed 08/10/11   Entered 08/11/11 11:34:20   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 26 of 36

Page 26

1    assumptions.  And that's fine.  That's the process that --

2    that's kind of the ordinary process that you would expect to

3    happen.  And that's a sign, to the committee at least, that

4    someone has taken the information that's been provided to them,

5    availed themselves of the process that we've collectively

6    crafted, and then at that point, sought the intervention of

7    perhaps an ADR process or the Court, if that's necessary.

8            So -- and lastly, I just wanted to comment on the

9    manifest error point, because we raised it in our statement.

10    We have, as part of our process of working with the debtors,

11    talked about manifest errors, and we have reached an

12    understanding that those manifest errors -- first of all, the

13    debtors have agreed to search the population of structured

14    securities to correct manifest errors, and we will continue the

15    cooperative process that the committee and the debtors have

16    had, particularly over the most recent period, to correct those

17    manifest errors, hopefully in time for the publication on the

18    15th.  But if not, they will be corrected.  And that further

19    assures a process with which the committee can be comfortable.

20            One process point we think is just an issue for good

21    order.  The -- as Mr. Perez indicated and as I repeated, in the

22    procedures, the debtors have agreed to provide the committee

23    with copies of inquiries -- inbound inquiries and then the

24    debtors' responses to those inquiries, before the response

25    phase.  They have agreed to do that.  We've represented on the

1    record the committee has requested, as a matter of consistency

2    for the way we've interacted with the debtors in the past, and

3    also for creditors who look at the order, that that be included

4    in the proposed order that the Court will hopefully enter

5    today.

6           And with that, I would conclude my remarks.  I'm happy

7    to take any questions if there are any.

8           THE COURT:  I don't have any questions for you.

9           MR. FLECK:  Thank you.

10          MR. LEVINE:  Good afternoon, Your Honor.  Steven

11   Levine, Brown Rudnick.  I don't want to take up too much of

12   your time, but I wanted to try to alleviate some of your

13   concerns.

14          We represent roughly two and a half billion dollars'

15   worth of holders of what has been referred to here as the

16   bespoke notes.  These are very sophisticated institutions.

17   They're very sophisticated people who've had great fun, at my

18   expense, whenever I've tried to work through one of those

19   formulas and found my high school algebra to be wanting.

20          Amongst them, they hold a pretty good cross section of

21   the notes.  They're not concentrated in any particular notes.

22   And each of them hold different ones.  As we stated in our

23   pleading, the clients uniformly support the adoption of this

24   procedure, primarily because any other procedure anyone can

25   think about would just turn in to morass.  And for the reason

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 28 of 36

Page 28

1    that the Court mentioned, Messrs. Perez and Fleck mentioned,

2    these valuation principles were done pre-petition without

3    anybody having a particular axe to grind in terms of trying to

4    maximize or minimize a claim.  There's some rough consistency.

5    And again, in working through them very carefully amongst

6    themselves and in dialog with the debtors and the committee,

7    they feel that these numbers are roughly fair.

8            It's not to say that in certain circumstances, if

9    somebody were trying to game the system and act like people

10   typically act in a claims objection procedure, and come up with

11   the maximum possible claim, for certain of these claims, people

12   could come up with very colorable theories as to why they would

13   be higher.  But on a systematic approach, in terms of valuing

14   these notes in time to get the plan done and to allow for

15   distribution, again, on a practical basis, we can see of no

16   better alternative.

17           You know, we continue to discuss specific notes with

18   the debtor where we think there's been manifest error.  As

19   recently as a couple of weeks ago, we came across one note

20   where there was a statement of final terms that my client had

21   that the debtor didn't have, and we're in a dialog about that.

22   There's some other more esoteric discussions.  But it's all

23   being done in a very constructive, good-faith basis.  And we're

24   optimistic that those types of issues can get resolved.

25           In terms of how important we think this is, as we

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 29 of 36

Page 29

1    stated in our papers, we've made sure that people who signed

2    plan support agreements would get their claims valued in

3    accordance with this methodology.  And while they're not before

4    the Court, plan support agreements that my clients have signed,

5    have an out if the claims are valued through some other

6    methodology.

7            Again, it's not that these are perfect or do

8    maximization of our claims, but we can't think of any other

9    alternative.  And I think while there's not a perfect

10   correlation with every note, the Court should take some comfort

11   that some very sophisticated people have looked through a wide

12   cross section of notes and determined this procedure be roughly

13   fair.  Thank you.

14           THE COURT:  All right.  Thank you.

15           MS. WIENER:  Good afternoon, Your Honor.  Monika

16   Wiener of Dewey & LeBoeuf on behalf of certain other holders.

17   We were the other party that joined in the statement that Mr.

18   Levine's clients filed as well.

19           The only thing I want to -- I don't want to belabor

20   anything that Your Honor has already heard here.  But the only

21   point I did want to make is that our clients represent sort of

22   a swing towards the more plain vanilla par-par side of things

23   in terms of the notes that they hold.  Obviously, there's a

24   very wide variety, both from Mr. Levine's clients and my

25   clients, although the balance for our clients tends to shift

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 36

Page 30

 1    more in the par-par direction.

 2            And I think it is telling that both our clients, who

 3    are equally sophisticated, and Mr. Levine's clients, who hold

 4    sort of different balances in terms of the mixes of notes that

 5    they hold, are supportive of these procedures.  And you know,

 6    for any argument that you might make that the value should be

 7    higher, there would probably be arguments on the other side

 8    that the value should be lower.  So -- in terms of the FMB

 9    notes.

10            So I think it's telling that our two groups of clients

11    are in agreement on this, and indeed, others as well, I think,

12    who may not be represented here today.  So I think that's

13    telling and should give the Court some comfort as well.  Thank

14    you, Your Honor.

15            THE COURT:  Thank you.

16            MR. KLEIN:  If it please the Court, Darren Klein of

17    Davis Polk & Wardwell on behalf of Lehman Brothers

18    International (Europe).  We do not object to the relief sought

19    here.  In fact, we worked with the debtors beforehand to get

20    the one point of clarification that we wanted to know about.

21            LBIE holds, as custodian, many of these program

22    securities, both on behalf of third parties and affiliates.

23    And we weren't sure if the debtors were intending to impose

24    these procedures on both third parties and affiliates --

25    securities that are beneficially owned by affiliates.  And

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 31 of 36

Page 31

1    LBIE's proof of claim 62783 is an omnibus proof of claim that

2    includes in it both affiliate LPS and third-parties.  And Mr.

3    Perez -- thank you for the courtesy -- has clarified in the

4    order that these procedures are not intended to apply to

5    affiliates.  And we intend to work with Mr. Perez, the debtors

6    and the committee over the coming days to clarify what exactly

7    in that proof of claim is held by third parties and to make

8    sure that they get the appropriate information, and what in

9    that proof of claim is held by affiliates.  Thank you, Your

10   Honor.

11            THE COURT:  Mr. Perez, you want to comment in

12   reference to that last statement by LBIE's counsel?

13            MR. PEREZ:  Yes, Your Honor.  We are having bilateral

14   discussions with each of our affiliates.  One of the issues on

15   the table is any notes that they may have.  And that's just

16   part of the bilateral negotiations.  I mean, in terms of

17   valuing them, I think we intend to value them the same way.

18   But they're not part of this process.

19            So, in other words, all of our issues with each of the

20   individual affiliates will be handled in a bilateral

21   negotiation like we did with Bankhaus, like we've done with

22   LBJ.  And but to the extent that they've filed a proof of claim

23   that has both customer securities and affiliate securities, the

24   customer securities will be the subject of this motion, whereas

25   the affiliate -- the ones that are held by affiliates are not.

08-13555-mg    Doc 19143    Filed 08/10/11    Entered 08/11/11 11:34:20    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 36

Page 32

1    It's really more of a mechanical issue as to how we do it.

2            THE COURT:  Okay.

3            MR. PEREZ:  Your Honor, with that, unless the Court

4    has any questions, we'd request that the Court enter the order.

5            THE COURT:  I don't have any other questions.  I've

6    reviewed the motion and the various papers filed in response to

7    it, and recognize that the securities that are the subject of

8    the motion are somewhat unique and difficult to value, and that

9    the holders of claims in reference to these securities need a

10   starting point for the process of participating in the case.

11   And based upon what has been represented, this is as good a

12   place to start as any.

13           I am comforted by the fact that counsel for the

14   creditors' committee has been actively involved along with its

15   financial advisor, FTI, in reviewing the procedures that are

16   the subject of the motion, as well as by the statements made by

17   counsel for the group represented by Brown Rudnick and Dewey &

18   LeBoeuf.

19           The issue of how an individual holder who is

20   unsophisticated will deal with this, is still a point that may

21   be troublesome in practice, because it seems to me that to the

22   extent these securities are held by individuals who are not

23   sophisticated, and who acquired these securities through retail

24   brokers in Europe, and who will receive a document that will be

25   difficult to understand, the likely response will be either

1   this is too complicated for me, I'm just going to put it away,

2   or this is so complicated I don't understand it; I'm going to

3   ask some questions about it.

4           So it seems to me that there is at least a risk

5   associated with these procedures, that this will create a flood

6   of inquiries from third parties saying I don't understand this,

7   tell me how this was valued.  And so, my concern is that while

8   I'm prepared to support this and recognize that the purpose of

9   these procedures is to minimize burdens on the estate that

10  there may be an unintended consequence of actually creating

11  some burdens for the estate.  But that may simply be

12  unavoidable.  I'm prepared to enter the order as amended.

13          MR. PEREZ:  Thank you, Your Honor.  Your Honor, on a

14  totally different note, last week the Ninth Circuit ruled in

15  the SunCal matter.

16          THE COURT:  I've read the opinion.

17          MR. PEREZ:  Okay.  Well, I just had extra copies for

18  the Court.

19          THE COURT:  I learned about it the day that it was

20  entered, and read it with interest, in part because it's the

21  first time that I'm aware that a court of appeals has actually

22  cited statements made by me as authority for its decision,

23  which I found both humbling and startling.

24          MR. PEREZ:  I especially liked the footnote about

25  Shinsei.

LEHMAN BROTHERS HOLDINGS INC., et al.

Page 34

1              THE COURT:  All right.  I did see it.

2              MR. PEREZ:  Thank you, Your Honor.

3              THE COURT:  And sure, you may hand that up.  And we're

4    adjourned.

5              MR. PEREZ:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7         (Whereupon these proceedings were concluded at 2:49 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

1

2                          **I N D E X**

3

4                        **R U L I N G S**

5    DESCRIPTION                              PAGE      LINE

6    Motion for approval of procedures for      33        12

7    determining the allowed amount of claims

8    filed based on structured securities issued

9    or guaranteed by Lehman Brothers Holdings,

10   approved as amended

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 36

1

2                    C E R T I F I C A T I O N

3

4    I, Lisa Bar-Leib, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6         Lisa Bar-Leib   Digitally signed by Lisa Bar-Leib
                           DN: cn=Lisa Bar-Leib, c=US
                           Reason: I am the author of this document
7    _____   Date: 2011.08.10 14:17:38 -04'00'

8    LISA BAR-LEIB

9    AAERT Certified Electronic Transcriber (CET**D-486)

10

11   Also transcribed by:    Penina Wolicki (CET**D-569)

12

13

14   Veritext

15   200 Old Country Road

16   Suite 580

17   Mineola, NY 11501

18

19   Date:  August 10, 2011

20

21

22

23

24

25