Hearing Date and Time: August 30, 2011 at 10:00 a.m. (Eastern Time)
Objection Deadline: August 11, 2011 at 4:00 p.m. (Eastern Time)

**SUSMAN GODFREY L.L.P.**
Stephen D. Susman
Drew D. Hansen (admitted *pro hac vice*)
654 Madison Avenue
New York, New York 10065
Telephone: (212) 336-8330
Facsimile: (212) 336-8340

*Attorneys for Mason Capital Management, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**MASON CAPITAL MANAGEMENT, LLC'S OBJECTION TO THE DEBTORS'
DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER 11 PLAN
OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS
PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RESPONSE TO
THE AMENDED MOTION (1) FOR APPROVAL OF THE DISCLOSURE STATEMENT
AND THE FORM AND MANNER OF NOTICE OF THE DISCLOSURE STATEMENT
HEARING, (2) ESTABLISHING SOLICITATION AND VOTING PROCEDURES, (3)
SCHEDULING A CONFIRMATION HEARING, AND (4) ESTABLISHING NOTICE
AND OBJECTION PROCEDURES FOR CONFIRMATION
<u>OF THE DEBTORS' JOINT CHAPTER 11 PLAN</u>**

Mason Capital Management, LLC ("Mason"), by and through its undersigned counsel, and pursuant to 11 U.S.C. §§ 105(a) and 1125(a) of the Bankruptcy Code and Fed. R. Bankr. P. 3017 and applicable law, hereby submits this objection and response ("Objection") to (i) the *Debtors' Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* ("Plan") *Pursuant to Section 1125 of the Bankruptcy Code* ("Disclosure Statement") [ECF No. 18125] and (ii) *the Amended Motion (1) for Approval of the Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement*

*Hearing, (2) Establishing Solicitation and Voting Procedures, (3) Scheduling a Confirmation Hearing, and (4) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan* [ECF No. 18126]. In support of this Objection, Mason respectfully states as follows:

## PRELIMINARY STATEMENT

Mason is an investment manager for various investment funds and managed accounts that in the aggregate own approximately $380 million of notes issued by Lehman Brothers Treasury Co., B.V. ("LBT"), a foreign, non-Debtor entity currently the subject of bankruptcy proceedings in the Netherlands. These notes are guaranteed by Debtor Lehman Brothers Holdings, Inc. ("LBHI"), and thus Mason is a creditor in this matter, with claims treated under Class 5 of the Plan. Mason is a member of a similarly situated class of LBT noteholders who hold approximately $34 billion in claims, dispersed across over 3700 individual note issues. Many of the LBT noteholders have not participated in the bankruptcy proceedings at all, nor have they been involved in the negotiations leading to the Plan. Indeed, given that LBT was a Dutch company, many of its noteholders may not even be in the United States. The Disclosure Statement is therefore going to be the only source of information about the Plan for many LBT noteholders.

The Plan proposes that certain classes of creditors (including Mason and other holders of LBT notes) transfer 20% of the value of their claims—an amount in excess of $1 billion— directly to other classes of creditors. The Disclosure Statement explains that this transfer is in settlement of the risk that certain entities would be substantively consolidated with the Debtors. But the Disclosure Statement does not give even the most minimal explanation as to: (1) why there is any risk of substantive consolidation of a foreign, non-Debtor affiliate such as LBT at all, (2) why the transfers away from LBT noteholders in purported settlement of the risk that LBT

would be substantively consolidated should go not to the estate as a whole but rather to particular classes of creditors, and (3) why holders of LBT notes should not share in the proceeds of the settlement of substantive consolidation risks of entities other than LBT.  Mason respectfully requests that the Court refuse to approve the Disclosure Statement because it completely fails in its obligation to give a reasonable investor sufficient information to make an informed decision about accepting or rejecting the Plan.  11 U.S.C. § 1125(a).

## BACKGROUND

1.      Beginning on September 15, 2008, and periodically thereafter, LBHI and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") commenced with this Court voluntary cases (the "U.S. Bankruptcy") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      Lehman Brothers Treasury Co., B.V. ("LBT") is a foreign entity, incorporated on March 8, 1995, with its corporate seat at Strawinskylaan 3105 (Atrium) in (1077 ZX) Amsterdam.[1]  It is a wholly-owned subsidiary of Lehman Brothers UK Holdings (Delaware), Inc., which is in turn wholly-owned by LBHI.  LBT was incorporated to finance the business activities of the global companies related to LBHI by issuing financial instruments to institutional and retail investors.

3.      On September 19, 2008, LBT filed a petition with the Amsterdam District Court for the granting of a *surseance van betaling*—in English, a provisional moratorium or a suspension of payments.[2]  The District Court granted this petition on the same date and

---

[1] Background facts related to LBT are drawn from the reports of the bankruptcy trustee in LBT's currently-ongoing bankruptcy in the Netherlands (the "LBT Dutch Bankruptcy").

[2] The *surseance van betaling*—a provisional moratorium or suspension of payments—is a feature of Dutch bankruptcy law that permits a firm in financial distress to suspend payments to certain creditors for a short period of time.

appointed W.A.H. Melissen as supervisory judge (*rechter-commissaris*) and a bankruptcy trustee as the administrator (*bewindvoerder*).

4. The administrator immediately started to investigate the financial condition of LBT to assess whether LBT would be able to exit the provisional moratorium and continue as a going concern. The administrator concluded that it could not and—over the opposition of LBT's Board of Directors—asked the Amsterdam District Court on October 1, 2008, to withdraw the provisionally granted moratorium and order LBT into bankruptcy.

5. On October 8, 2008, the Amsterdam District Court granted the request of the administrator to withdraw the moratorium and declared LBT bankrupt. In accordance with article 23 of the Dutch Bankruptcy Act, the bankruptcy of LBT became effective with retroactive effect on October 8, 2008 (the "LBT Dutch Bankruptcy"). The LBT Dutch Bankruptcy trustees are Rutger J. Schimmelpenninck and Frederic Verhoeven.

6. On June 29, 2011, the Debtors in the U.S. Bankruptcy filed the Disclosure Statement and the Plan. The heart of the Plan is a series of transfers from certain classes of creditors to other classes of creditors, purportedly in consideration of a settlement of litigation risking substantive consolidation. *See* Disclosure Statement at 51–60. The Plan forces certain classes of creditors whose interests would be harmed by substantive consolidation (who the Plan refers to as the "Contributing Classes") to transfer portions of their distributions not to the estate as a whole, but rather to two other classes of creditors: holders of Senior Unsecured Claims and General Unsecured Claims against LBHI.[3] The amount of the transfer is based on a 20% risk

---

[3] In the Disclosure Statement's language: "The Plan provides that a portion of the Distribution to each holder of (i) an Allowed Senior Third-Party Guarantee Claim and Third-Party Guarantee Claim against LBHI and (other than those of the Racers Trusts) (ii) an Allowed General Unsecured Claim (excluding those of the Racers Trusts against LBSF) against all each of the Participating Subsidiary Debtors, a General Unsecured Claim of Designated Entities (i.e. the Racers Trusts and Fenway) against LCPI and an Affiliate Claim (excluding Affiliate Claims of LBHI) against each Participating Subsidiary Debtor (collectively, the "Contributing Classes") will automatically be reallocated to holders of Senior Unsecured Claims and General Unsecured Claims against LBHI." Disclosure Statement at 52.

- 4 -

that certain entities would be substantively consolidated if the issue were litigated: the Plan weights the likelihood of no substantive consolidation at 80% and the likelihood of substantive consolidation at 20%, and calculates transfers accordingly.[4]  The Plan defines this transfer process—along with other transfers not implicated by this Objection—as the "Plan Adjustment," a term this Objection will use only to refer to the transfers purportedly in settlement of the risk of substantive consolidation.  Disclosure Statement at 53.

7.      The Plan Adjustment has three noteworthy effects on creditors like Mason who are members of Contributing Classes under the Plan.  First, the Plan requires creditors like Mason to give up 20% of their claim based on a purported 20% risk that litigation would result in substantive consolidation of LBT, the entity that issued Mason's notes.

8.      Second, the 20% transfer from Mason and the other LBT creditors does not go to benefit the estate as a whole, to be distributed *pro rata* among all creditors.  Instead, the transfer from Mason and other LBT creditors goes directly to two other groups of creditors: holders of Senior Unsecured Claims and General Unsecured Claims against LBHI.

9.      Third, the Plan contends that entities other than LBT—many of whom are U.S. entities who are also Debtors before the Court—face a risk of substantive consolidation. However, like the 20% transfer from Mason and other LBT creditors, the 20% transfers from the rest of the Contributing Classes do not go to the estate as a whole but to the holders of Senior Unsecured Claims and General Unsecured Claims against LBHI.  This means that Mason and

---

[4] In the Disclosure Statement's language: "The portion of Distributions that will be reallocated for each Contributing Class (other than Classes for Claims of Designated Entities) is calculated by using a weighted average of recoveries under two scenarios: (1) estimated recoveries in a plan that does not provide for substantive consolidation of LBHI and the Participating Subsidiary Debtors ("Non-Con Scenario") and (2) estimated recoveries in a Plan that provides for the substantive consolidation of LBHI and the Participating Subsidiary Debtors ("SubCon Scenario").  To give effect to the settlement of the relative risks of substantive consolidation, the calculations of the recovery amounts in the Non-Con Scenario are weighed at 80% and the SubCon Scenario are weighed at 20%.  The reallocation percentage for each Class is calculated in the following manner:  (A) (i) the estimated distribution calculated in accordance with the Non-Con Scenario, *minus* (ii) the sum of the weighted recoveries calculated in accordance with the Non-Con Scenario and the SubCon Scenario, *divided* by (B) the estimated amount distributable in accordance with the Plan prior to any reallocation."  Disclosure Statement at 52.

other LBT noteholders do not get to share in the transfers that settle the purported risks of substantive consolidation of entities *other than LBT*. Mason not only gives up 20% of its claim to settle its *own* substantive consolidation risk; it does not share in any of the recovery from settlements of risks of substantive consolidation for *other entities*.

## OBJECTIONS[5]

8.     A disclosure statement under must contain information sufficient to enable a hypothetical investor to make an informed judgment about whether to accept or reject the plan. 11 U.S.C. § 1125(a). The Disclosure Statement fails this test for three reasons.

9.     First, the Disclosure Statement lacks the information necessary for a hypothetical reasonable objector like Mason, holding LBT notes, to ascertain whether there is in fact a 20% likelihood that—absent the settlement—a U.S. bankruptcy court would substantively consolidate a foreign, non-Debtor affiliate such as LBT. The Disclosure Statement identifies no misrepresentation of corporate separateness related to LBT that would permit a court to consider substantive consolidation as a remedy; nor does the Disclosure Statement identify any authority for the proposition that a U.S. bankruptcy court would have authority to substantively consolidate a foreign, non-Debtor affiliate that is already undergoing its own bankruptcy proceedings in a foreign country.

10.     Second, the Disclosure Statement does not disclose any authority for the proposition that a bankruptcy court may order an inter-creditor wealth transfer in purported settlement of a risk of substantive consolidation where it is undisputed that—if LBT were in fact substantively consolidated with the Debtors—the benefits of substantive consolidation would

---

[5] The fact that Mason raises certain objections regarding the Disclosure Statement should not be interpreted as a waiver of any additional objections Mason may have to the Plan. Mason expressly reserves the right to raise any additional objections to the Plan.

- 6 -

flow not to particular groups of creditors but to the estate as a whole for *pro rata* distribution among *all* creditors.

11.  Third, the Disclosure Statement does not explain why Mason and other LBT noteholders do not get to share in the transfers from creditors of entities other than LBT that are purportedly subject to the same 20% risk of substantive consolidation.  That is, even if Mason must give up 20% of its claim to settle its own risk of substantive consolidation, why does it not share in the proceeds of the transfers from other creditors to settle their risks of substantive consolidation?

I.   **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT IDENTIFY ANY BASIS FOR ITS CLAIM THAT LBT—A FOREIGN AFFILIATE WHO IS NOT A DEBTOR IN THE U.S. BANKRUPTCY—CAN BE SUBSTANTIVELY CONSOLIDATED OR THAT CLAIMS RELATED TO LBT CAN BE DISALLOWED.**

12.  As explained previously, the heart of the Plan is the Plan Adjustment—the series of transfers between creditor groups based on what the Disclosure Statement asserts is a 20% risk of substantive consolidation.  For a hypothetical investor considering the Plan, the key question would naturally be whether there truly is a 20% risk of substantive consolidation, particularly as to the specific entities whose notes the investor holds.  And yet the Disclosure Statement offers no explanation at all for its assumption that there is a 20% risk of substantive consolidation of LBT.  This omission leaves a reasonable investor with no basis to evaluate the key risk that purportedly underlies the compromise at the heart of the Plan.

13.  Substantive consolidation is appropriate only where (1) creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (2) the affairs of the debtors are so entangled that consolidation will benefit all creditors.  *In re Augie/Restivo Banking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988).

14. The second test—hopeless entanglement of affairs between LBT and the Debtors—is not applicable here. There is no question who owns what between LBT and LBHI because LBT's balance sheet was relatively simple—according to a balance sheet made available by the trustee in the LBT Dutch Bankruptcy, LBT's principal asset as of the "Global Close" date of September 12, 2008, was an intercompany receivable from LBHI.[6]

15. The case for substantive consolidation of LBT must therefore rest on the first test—that there was some misrepresentation about the separate nature of LBT and LBHI; that "prepetition [the entities for whom substantive consolidation is sought] disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity." *In re Owens Corning*, 419 F.3d 195, 211 (3rd Cir. 2007). "The usual scenario is that creditors have been misled by debtors' actions (regardless whether those actions were intentional or inadvertent) and thus perceived incorrectly (and relied on this perception) that multiple entities were one." *Id.* at 211 n.19.

16. Yet the Disclosure Statement identifies *nothing* as a pre-petition misrepresentation as to the corporate separateness of LBHI and LBT. This is not surprising: pre-petition, the documents related to the LBT notes clearly laid out LBT and LBHI's separate corporate identities, with loan agreements between the separate entities and separate financial statements for each entity. A holder of LBT notes held a note that was issued by LBT, an entity separate from LBHI, with additional credit support in the form of a guarantee directly from LBHI.

17. The Disclosure Statement thus fails the threshold task of identifying a pre-petition misrepresentation that would lead creditors to believe that LBT and LBHI were one entity with

---

[6] *See* Unaudited (Global Close) Balance Sheet as per 12 September 2008, *available at* http://www.lehmanbrotherstreasury.com/financial.html?p=3.

commingled assets. But this is not the Disclosure Statement's only omission. LBT is a foreign company, not a Debtor in the U.S. Bankruptcy but undergoing bankruptcy proceedings of its own in the Netherlands. This means that the substantive consolidation issues as they relate to LBT are, to say the least, somewhat unusual. But the Disclosure Statement offers *no explanation at all* for how an entity such as LBT could possibly be consolidated in this U.S. Bankruptcy.[7]

18.  The Disclosure Statement acknowledges, as it must, that substantive consolidation is a "unique equitable remedy," "pursuant to legal precedent is to be used sparingly," and that the proponent of substantive consolidation "bears a heavy burden of proof" to establish that its use is appropriate. Disclosure Statement at 51.[8] The Disclosure Statement then acknowledges—again as it must—the practical difficulties with substantive consolidation of foreign entities:

> Substantive consolidation of the Debtors and their Foreign Affiliates raises several issues. The Foreign Debtors or Foreign Administrators may not be willing or able to surrender the assets under their control to the common pool of assets. In addition, certain Foreign Debtors and their assets are subject to the jurisdiction of regulators or foreign courts.

Disclosure Statement at 58.

19.  So far, so good. At this point, the reasonable investor would ask: Given both (1) the high threshold for any substantive consolidation order, and (2) the extraordinary difficulties of a substantive consolidation order against foreign non-Debtor affiliates, what exactly is the authority for the Plan's assumption that foreign affiliates such as LBT bear any risk at all of

---

[7] The Disclosure Statement makes no attempt to justify why there is a 20% risk of substantive consolidation for *both* U.S. affiliates and foreign non-Debtor affiliates such as LBT. If anything, as will become clear shortly, the Disclosure Statement's own admissions about the difficulty of substantively consolidating foreign affiliates demonstrate that the substantive consolidation risk for foreign affiliates should be significantly *less* than the risk for domestic affiliates. Yet the Disclosure Statement gives no justification for treating the risks as equal.

[8] *Accord In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) ("Because of the dangers in forcing creditors of one debtor to share on a parity with creditors of a less solvent debtor, we have stressed that substantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights, to be used sparingly.") (internal quotation marks and citations omitted).

- 9 -

substantive consolidation—much less a 20% risk that justifies wealth transfers of over a billion dollars out of the pockets of some classes of creditors and into the pockets of others?

20. This is where the Disclosure Statement is almost completely silent. Its defense for this proposition is, in total, the following:

> Contrary to the statements in the Non-Con Disclosure Statement, the Debtors do not concede that the Bankruptcy Court does not have the authority or ability to substantively consolidate LBHI's foreign non-Debtor Affiliates.

Disclosure Statement at 59. This is no help at all to an investor reading the Disclosure Statement. Consider for a moment the assumption that underlies the Plan Adjustment. The Plan assumes that a U.S. bankruptcy court has the authority to order consolidation of a *foreign* entity—not itself a Debtor in the U.S. Bankruptcy—that is the subject of bankruptcy proceedings in its home jurisdiction. The Debtors say that they "do not concede" that a U.S. bankruptcy court lacks such authority. Very well then, what exactly *is* the basis for the extraordinary proposition that a U.S. bankruptcy court has such sweeping, world-wide powers? Such an order would raise numerous questions. Can a U.S. bankruptcy court exercise jurisdiction over a non-Debtor Dutch entity like LBT, particularly for the sake of invoking an extraordinary equitable remedy such as substantive consolidation that—it should be recalled—is not exactly on strong legal ground in the first place?[9] How, precisely, would an order substantively consolidating a foreign affiliate concurrently subject to bankruptcy proceedings in the Netherlands accord with the Second Circuit's clearly stated preference for extending comity to foreign bankruptcy proceedings?[10]

---

[9] As Professor Douglas Baird of the University of Chicago Law School puts it: "Substantive consolidation lacks the solid foundation one usually expects of doctrines so firmly embedded in day-to-day practice." Douglas G. Baird, *Substantive Consolidation Today*, 47 B.C. L. REV. 5, 15 (2005). *Accord Augie/Restivo*, 860 F.2d at 518 ("Substantive consolidation has no express statutory basis but is a product of judicial gloss.").

[10] *See, e.g., Cunard Steamship Co. Ltd. v. Salen Reefer Svcs. AB*, 773 F.2d 452, 457–58 (2d Cir. 1985) ("The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.").

21. One would expect at least *something* from the Disclosure Statement on these points—some explanation of why the Debtors believe a U.S. bankruptcy court has such sweeping, world-wide powers, some statutory basis for the exercise of such an extraordinary remedy. Instead, the reasonable investor gets nothing. Ironically, the very next sentence of the Disclosure Statement underscores the Debtors' failure to give any authority for their claim: "Such an order may have practical difficulties as to enforcement." Disclosure Statement at 59. Well, yes. The Disclosure Statement then suggests an even *more* unprecedented "remedy" if substantive consolidation of a foreign non-debtor affiliate is not possible:

> Nevertheless, it is possible that such remedy may be enforced, or an alternative remedy can be crafted by the Bankruptcy Court that will enable implementation, such as the disallowance of the claims filed by such foreign non-Debtor Affiliates against the Debtors if such entities refuse to contribute their assets to a combined pool.

*Id.* With the invocation of the magic words "an alternative remedy can be crafted," we have left the Bankruptcy Code entirely and entered the realm of fantasy. On what possible grounds can a bankruptcy court disallow a properly-filed claim that is not within one of the exceptions specified in 11 U.S.C. § 502(b)? How would such an order be upheld in the face of the language of § 502(b), which the Supreme Court has emphasized is mandatory language that a court "shall" allow a claim unless it falls within the exceptions?[11] Once more, instead of an explanation for the source of this novel power that the Debtors assume a bankruptcy court possesses, the hypothetical reasonable investor receives nothing. The Court should refuse to approve the Disclosure Statement on this ground alone.

---

[11] *See Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.*, 549 U.S. 443, 449 (2007) ("[E]ven where a party in interest objects, the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b).") (quoting 11 U.S.C. § 502(b)).

II. **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT IDENTIFY ANY BASIS FOR REQUIRING INTERCREDITOR TRANSFERS IN PURPORTED SETTLEMENT OF A CLAIM THAT BELONGS TO THE ESTATE AS A WHOLE.**

22. The second reason the Court should not approve the Disclosure Statement is that it gives no explanation for why the proceeds from the settlement of a claim belonging to the estate (litigation resulting in substantive consolidation of LBT) should go to particular creditors of the estate rather than to the estate as a whole.

23. The substantive consolidation claims belong to the LBHI estate, and proceeds from their settlement would ordinarily become property of the estate. *See* 11 U.S.C. § 541(a)(7) (property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case"). The proceeds from any settlement of the substantive consolidation claims would then be distributed out among all creditors according to the *pro rata* principles at the core of the Bankruptcy Code.[12] Instead, however, the Plan proposes a simple pickpocket: it takes the proceeds from the settlement of the substantive consolidation claims as to LBT's creditors and gives them not to the estate as a whole *but directly to other groups of creditors*, thus transferring around $1 billion of wealth from the pockets of one group of creditors to another.

24. This process would make sense if the claims subject to settlement were intercreditor claims—that is, if the holders of Senior Unsecured Claims and General Unsecured Claims had some direct intercreditor claims against holders of Senior Third Party Guarantee

---

[12] The Second Circuit has recognized that "perhaps the predominant policy objective" of a bankruptcy proceeding is "equal treatment of similarly situated creditors." *In re PCH Assocs.*, 949 F.2d 585, 598 (2d Cir. 1991). *See In re McMahon*, 129 F.3d 93, 97 (2d Cir. 1997) (noting Bankruptcy Code's "strong policy favoring equal treatment of creditors."). The Bankruptcy Code codifies at various places the policy that similarly situated creditors should share *pro rata* in the distribution of the available assets of the estate. *See, e.g.*, § 726(b) (in chapter 7 liquidation, payment on timely filed claims shall be made *pro rata* among claims of the same kind); § 1122(a) (claim may be placed in a particular class only if it is substantially similar to the other claims in that class); § 1123(a)(4) (creditors within the same class must receive equal treatment); § 1129(b)(1) (plan may not be crammed down on a dissenting class if it unfairly discriminates against such class.). *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56 (1989) (describing "creditors' hierarchically ordered claims to a *pro rata* share of the bankruptcy res.").

- 12 -

Claims such as Mason. But that is not the case. The compromised claims belong to LBHI and their proceeds should go to LBHI.

25. The Disclosure Statement offers no explanation for this unusual procedure. If the claim that LBT can be substantively consolidated with the Debtors belongs to the estate, then why does the estate not benefit from its own settlement? Is not the Plan Adjustment precisely what Judge Ambro warned about in *Owens Corning*, when he cautioned that substantive consolidation "may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights)"? *In re Owens Corning*, 419 F.3d at 211. What, exactly, is the authority for the Debtors' apparent decision that the proceeds from settling a claim that belongs to the estate as a whole can be channeled for the benefit of particular groups of creditors rather than the estate as a whole? The Disclosure Statement offers no authority for this unusual procedure that it envisions, leaving the hypothetical reasonable investor with no basis to assess the risk that—absent a settlement—the benefits of substantively consolidating LBT would flow directly to particular creditors rather than the estate.

**III.    THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT DOES NOT IDENTIFY ANY BASIS FOR REFUSING TO PERMIT CREDITORS SUCH AS MASON TO SHARE IN THE PROCEEDS OF THE SETTLEMENT OF SUBSTANTIVE CONSOLIDATION CLAIMS INVOLVING ENTITIES OTHER THAN LBT.**

26. The third reason that the Court should not approve the Disclosure Statement is related to the second. The Disclosure Statement does not explain why Mason and other similarly-situated LBT creditors do not get to share in the proceeds of settlement of the risks of substantive consolidation of entities other than LBT.

27. Let us assume for a moment that it is acceptable for Mason and the other holders of LBT notes to give up 20% of the value of their claims in settlement of the risk that LBT would

be substantively consolidated with the Debtors. At the same time, however, the Plan requires that creditors who hold notes issued by entities other than LBT—the rest of the Contributing Classes under the Plan—give up 20% of *their* claims in settlement of the risk that the entities that issued *their* notes would be substantively consolidated with the Debtors.

28. Ordinarily, the settlement of the non-LBT substantive consolidation claims would flow back to the estate as a whole, and the proceeds would be distributed equitably among all creditors—including Mason and the other LBT noteholders. And yet this does not happen. Instead, the proceeds from the settlement of the risk of substantive consolidation of entities other than LBT do not benefit Mason and the other LBT noteholders; they benefit only the holders of Senior Unsecured Claims and General Unsecured Claims against LBHI.

29. The Disclosure Statement does not explain the authority for this procedure either. How can it be, consistent with absolute priority and equitable distribution principles, that the LBT noteholders do not benefit *by a single penny* from the settlement of the risk of substantive consolidation of entities other than LBT?

## CONCLUSION

The Disclosure Statement fails to disclose the authority for the Plan Transfer that is the centerpiece of the Plan, particularly as it applies to creditors like Mason who hold notes issued by LBT. **WHEREFORE,** based on the foregoing, Mason respectfully requests that, unless the Plan and Disclosure Statement are revised consistent with this Objection, an order be entered (i) denying approval of the Disclosure Statement, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: August 11, 2011
New York, New York

        Respectfully Submitted,

        SUSMAN GODFREY L.L.P.


By:   */s/* Drew D. Hansen
        Stephen D. Susman
        S.D. Admissions No. SS8591
        ssusman@susmangodfrey.com
        654 Madison Ave., 5th Floor
        New York, NY 10065
        (212) 336-8330

        Drew D. Hansen (pro hac vice)
        dhansen@susmangodfrey.com
        1201 Third Ave., Suite 3800
        Seattle, WA  98101
        (206) 516-3880


*Attorneys for Mason Capital Management, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11 day of August, 2011, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

/s/ Tammie J. DeNio