**DAY PITNEY LLP**
Joshua W. Cohen (JC-2978)
James J. Tancredi (JT-3269)
One Audubon Street
New Haven, CT 06511-6433
Telephone:    (203) 752-5000
Facsimile:    (203) 752-5001

*Counsel to Fidelity National Title Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., et al.,<br><br>                    Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>Jointly Administered |

**FIDELITY NATIONAL TITLE INSURANCE COMPANY'S LIMITED OBJECTION TO APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT FOR SECOND AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**

Fidelity National Title Insurance Company ("Fidelity"), party-in-interest in these jointly administered Chapter 11 cases, by its undersigned counsel, respectfully submits this limited objection to the Debtors' Disclosure Statement for Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code [Doc. ID 18205] (the "Disclosure Statement"). As a counterparty to various title insurance policies naming as insureds one or more of the debtors in the above-captioned, jointly administered Chapter 11 cases[1] (the "Lehman Debtors"), Fidelity objects to the

---

[1] The referenced debtors are: BNC Mortgage LLC; CES Aviation LLC; CES Aviation V LLC; CES Aviation IX LLC; East Dover Limited; LB 745 LLC; LB 2080 Kalakaua Owners LLC; LB Rose Ranch LLC;

Disclosure Statement solely as it relates to the proposed assumption of unidentified title insurance policies issued by Fidelity.[2]

Fidelity raises this limited objection in response to statements by certain of the Lehman Debtors that assumption of an insurance policy pursuant to Section 365 of the Bankruptcy Code results in an automatic "cure" of any existing defenses to coverage as to any pending or future claims tendered against the policy. Stated another way, the Lehman Debtors maintain that an insurer loses any existing coverage defenses (apparently whether or not a claim has been tendered and whether or not the defense has been asserted) by the mere assumption of the policy. Despite having asserted this position in discussions during the pendency of these Chapter 11 cases, the Lehman Debtors make no mention of this position in the Disclosure Statement. At the same time, the Lehman Debtors do not disavow this position. Furthermore, the Lehman Debtors suggest in the Disclosure Statement and in the corresponding Second Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Doc. ID 18204] (the "Plan") the their insurance policies may not be executory contracts at all. However, the Lehman Debtors

---

Lehman Brothers Commercial Corporation; Lehman Brothers Commodities Services Inc.; Lehman Brothers Derivative Products Inc.; Lehman Brothers Financial Products Inc.; Lehman Brothers Holdings Inc.; Lehman Brothers Special Financing Inc.; Lehman Commercial Paper Inc.; Lehman Brothers OTC Derivatives Inc.; Lehman Scottish Finance L.P.; Luxembourg Residential Properties Loan Finance S.a.r.l.; Merit, LLC; PAMI Statler Arms LLC; LB Preferred Somerset LLC; Structured Asset Securities Corporation; and LB Somerset LLC.

[2] Fidelity is party to a large number of title insurance policies naming one or more Lehman-related entities as insured. Many of those policies name one or more of the Lehman Debtors as insured. Others name as insureds Lehman-related entities that are not debtors in these Chapter 11 cases. On information and belief, both prior to and during these Chapter 11 cases, certain of the property interests insured under these title insurance policies have been transferred into and out of the Lehman Debtors through loan sales, repo transactions, refinancing transactions and other similar deals, thereby potentially changing the identity of the current insured under these policies. Additionally, on information and belief, certain of the properties as to which Fidelity issued title insurance in favor of a Lehman-related entity have been sold and/or the debt secured by those properties paid off, resulting in termination of coverage under the corresponding policy. In most instances, Fidelity does not receive notice of a transaction that results in a transfer or termination of a title insurance policy. Consequently, in the absence of full disclosure by the Lehman Debtors of the title insurance policies being assumed under the Plan, Fidelity does not know which policies are potentially affected by the Plan.

fail to provide any disclosure as to any effect on coverage or coverage defenses that may arise in the event the insurance policies do not qualify as executory contracts. The result is a mountain of conjecture with no hard facts or answers.

In the absence of full and complete disclosure from the Lehman Debtors regarding the insurance policies proposed to be assumed under the Plan, insurers like Fidelity will have no alternative but to take discovery concerning and to assert any possible defense to coverage, regardless of whether the Lehman Debtors have tendered a claim against the policy. Any insurer that fails to do so risks losing viable defenses to coverage. In an effort to avoid burdensome and potentially unnecessary insurance coverage litigation in connection with the hearing on confirmation of the Plan, Fidelity has proposed a practical alternative. Specifically, Fidelity has indicated to the Lehman Debtors that it would consent to assumption of Fidelity's title insurance policies under the Plan in return for an agreement from the Lehman Debtors that all issues regarding coverage under the policies and the duty to cooperate with respect to any claim previously tendered or tendered in the future against the policies shall survive confirmation of the Plan and shall be adjudicated, as necessary, post-confirmation (the "Ride Through Alternative"). The Lehman Debtors summarily rejected this proposal, leaving Fidelity no choice but to proceed with this limited objection.

While Fidelity remains ready and willing to move forward with the Ride Through Alternative, in the absence of agreement on that proposal, Fidelity objects to the Disclosure Statement on the following grounds: (i) the Lehman Debtors have utterly failed to satisfy their burden of proof under 11 U.S.C. § 365 with regard to the proposed assumption of insurance policies under the Plan, including the fundamental identification of the insurance policies to be assumed and the terms of the proposed assumption of those insurance policies; (ii) the Disclosure

Statement also fails to provide adequate information regarding the proposed assumption of

insurance policies under the terms of the Plan, as required by 11 U.S.C. § 1125 and basic tenets

of due process; and (iii) issues concerning coverage under some or all of the insurance policies

that the Lehman Debtors propose to assume under the terms of the Plan are not ripe for

adjudication and do not fall under the jurisdiction of the Bankruptcy Court. Fidelity addresses

each of these points in detail below.

## I.    **PRELIMINARY STATEMENT**

1.    Under the Plan, the Lehman Debtors employ conclusory, boilerplate language in

an effort to assume all of their insurance policies without identifying: (i) the policies to be

assumed; (ii) whether such policies are, in fact, executory contracts; (iii) the properties affected;

(iv) the facts and analyses supporting assumption of the policies; (v) the elements required to

cure outstanding defaults under the policies; (vi) the basis upon which the Lehman Debtors

intend to provide adequate assurance of future performance under the policies; and (vii) the

effect of the proposed assumption of the policies, if any, on existing defenses to coverage. As set

forth in detail below, this shorthand approach to contract assumption is contrary to established

case law, fails to provide a basis for the Court to approve the proposed contract assumptions and

profoundly fails to provide sufficient information to satisfy the disclosure requirements set forth

in the Bankruptcy Code and basic principles of due process. Consequently, the Court should

deny the Lehman Debtors' motion to approve the Disclosure Statement until these inadequacies

are rectified.

2.    The Lehman Debtors' proposed assumption of all insurance policies under the

Plan also ensures a procedural and jurisdictional quagmire in connection with the Plan

confirmation proceedings. While the Lehman Debtors have tendered claims against some of their insurance policies, there are many policies against which no claims have been tendered or even suggested. Consequently, for many policies, coverage and cure issues are not ripe for adjudication because there is no pending claim against which to assert a defense to coverage (though the facts giving rise to a defense to coverage may exist and be lost in the event the Lehman Debtors argue that assumption of the policies under the Plan results in an automatic "cure" of any defense to coverage). Simply put, there is no case or controversy that provides a justiciable issue. Moreover, even for those policies against which the Lehman Debtors have tendered claims, it may be premature, or improvident, for the Lehman Debtors to engage in coverage litigation. However, given the requirements under the Bankruptcy Code that the Lehman Debtors cure all outstanding defaults in connection with their assumption of the insurance policies and the suggestion by the Lehman Debtors that assumption of the policies results in an automatic "cure" of defenses to coverage, it will be necessary for the Lehman Debtors and the insurance carriers to litigate as part of the hearing on confirmation of the Plan each and every coverage dispute (including any coverage issues that exist with respect to those insurance policies against which no claims have been tendered or as to which such disputes are not yet ripe). Failure to do so exposes the insurance carriers to the potential for future assertions by the Lehman Debtors that the insurers have waived any coverage defenses in existence at the time of the confirmation hearing that were not asserted therein. The proposition is absurd as a matter of fundamental fairness, due process and the Lehman Debtors' burden to assert bona fide bases for coverage.

II.    **FACTUAL BACKGROUND**

    A.    **Title Insurance Policies**

    3.    Fidelity provides title insurance to one or more of the Lehman Debtors and other Lehman-related entities pursuant to numerous title insurance policies written in connection with real estate and loan transactions.  However, as noted above, on information and belief, both prior to and during these Chapter 11 cases, certain of the property interests insured under these title insurance policies have been transferred into and out of the Lehman Debtors through loan sales, repo transactions, refinancing transactions and other similar deals, thereby potentially changing the identity of the current insured under those policies.  Additionally, on information and belief, certain of the properties as to which Fidelity issued title insurance in favor of a Lehman-related entity have been sold and/or the debt secured by those properties paid off, resulting in a termination of coverage under the corresponding policy.  In most instances, Fidelity does not receive notice of any such transactions despite the potential impact the transactions have on the policies.  For these reasons, Fidelity does not know which policies are potentially affected by the Plan.  Only the Lehman Debtors can state with certainty which policies they contend are currently held by the Lehman Debtors and are proposed to be assumed under the Plan.

    4.    Fidelity's interests are implicated by the Plan and Disclosure Statement by virtue of the Lehman Debtors' stated intention to assume all insurance policies in connection with confirmation of the Plan.

    5.    While the Lehman Debtors have tendered claims against certain of the title insurance policies written by Fidelity in favor of the Lehman Debtors, examples of which are detailed below, there are many policies as to which the Lehman Debtors have not tendered a claim.  Moreover, circumstances may arise in the future that cause the Lehman Debtors to tender

additional claims against the policies. That having been said, with respect to those policies as to
which the Lehman Debtors have not tendered a claim, it is possible (perhaps likely) that the
Lehman Debtors will never tender a claim against those policies.

6.     By way of example of title insurance policies as to which the Lehman Debtors
have tendered claims, Fidelity issued five policies insuring the priority of deeds of trust securing
a series of three syndicated loans given in connection with three related real estate development
projects in California known as McAllister Ranch, Summerwind Ranch and McSweeny Farms
(collectively, the "Projects"). In each case, Lehman Commercial Paper Inc. ("LCPI") was the
original administrative agent on the loans and was listed as the insured under the title insurance
policies. In addition, LCPI is a participant in each of the syndicated loans.

7.     Specifically, Fidelity issued 1970 form ALTA Loan Policy (10-17-70 and 10-17-
84) No. 27-44-94-120334 (the "First Loan Policy"), dated January 19, 2006, naming as insured
LCPI and its successors and/or assigns as their interests may appear, insuring that the deeds of
trust securing the first loan ("First Loan"), in the amount of $235 million, were recorded in first
position against the Projects.

8.     Additionally, Fidelity issued 1970 form ALTA Loan Policy (10-17-70 and 10-17-
84) No. 27-44-94-120335 (the "Second Loan Policy"), dated January 19, 2006, naming as
insured LCPI and its successors and/or assigns as their interests may appear, insuring that the
deeds of trust securing the second loan ("Second Loan"), in the amount of $85 million, were
recorded junior only to the First Deeds of Trust.

9.     Fidelity thereafter issued three separate 1992 form ALTA Loan Policies,
Nos. CAFNT0925-0925-0199-0259902517 (McAllister Ranch), CAFNT0925-0925-0199-
0259902518 (McSweeny Farms), and CAFNT0925-0925-0199-0259902519 (Summerwind

Ranch) (collectively, the "Third Loan Policies" and, together with the First Loan Policy and the

Second Loan Policy, the "Policies"), each dated February 9, 2007, naming as insured LCPI, as

Administrative Agent, and its successors and/or assigns as their interests may appear, insuring

that the deeds of trust securing the third loan ("Third Loan"), in the amount of $75 million, were

recorded junior only to the First Deeds of Trust and the Second Deeds of Trust.

10.     In early Spring 2008, LCPI and/or its assignees tendered claims (the "Initial

Claims") to Fidelity under the Policies, seeking defense and indemnification with respect to

eleven (11) actions pending in California related to the Projects.  Since that time, LCPI has

tendered three (3) additional claims (collectively, the "Additional Claims" and, together with the

Initial Claims, the "Claims") to Fidelity, seeking defense and indemnification with respect to

three (3) additional pending actions.  Of the pending actions tendered to Fidelity for defense and

indemnification, ten (10) of the actions seek to foreclose mechanics' liens recorded against the

Projects (collectively, the "Foreclosure Actions").

11.     Fidelity is currently providing a defense to the Foreclosure Actions on behalf of

LCPI, subject to a broad reservation of rights.  Fidelity has not yet made a determination of its

duty to indemnify LCPI under the Policies and continues to work through its review and

investigation of the Claims, determination of loss and LCPI's compliance with its Policy

obligations.

12.     Fidelity has identified issues with regard to LCPI's compliance with its duty to

cooperate under the Policies.  As such, on September 21, 2010, Fidelity filed its Motion to

Compel Compliance With Requirements of Title Insurance Policies Insuring Deeds of Trust

Held by the Bankruptcy Estate of Debtor Lehman Commercial Paper Inc. Pursuant to Sections

105, 362, 365 and 1107 of the Bankruptcy Code [Doc. ID 11513].  LCPI's failure to cooperate

under the Policies is grounds for denial of coverage.  Fidelity and LCPI are in ongoing

negotiations concerning a resolution of the coverage issues under the Policies.  In the absence of

such a resolution, Fidelity and LCPI may engage in litigation over the coverage issues in the

future.  However, issue has yet to be joined.

### B.    Plan and Disclosure Statement

13.    On July 1, 2011, the Lehman Debtors filed the Plan and the Disclosure Statement.

14.    The Plan and the Disclosure Statement modified prior drafts of the plan and the

disclosure statement that were previously filed with the Court.

15.    In conjunction with those earlier drafts of the plan and the disclosure statement,

on June 29, 2011, the Lehman Debtors filed their Amended Motion (i) For Approval of the

Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing,

(ii) Establishing Solicitation and Voting Procedures, (iii) Scheduling a Confirmation Hearing,

and (iv) Establishing Notice and Objection Procedures For Confirmation of the Debtors' Joint

Chapter 11 Plan [Doc. ID 18126] (the "Disclosure Statement Motion").  In the Disclosure

Statement Motion, the Lehman Debtors ask the Court to pass on, *inter alia*, the adequacy of their

disclosures pursuant to Section 1125 of the Bankruptcy Code.

### C.    Plan and Disclosure Statement Provisions – Treatment of Executory Contracts, Unexpired Leases and Insurance Policies

16.    The Plan contains the following provisions regarding the proposed treatment of

executory contracts and unexpired leases:

> Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all
> executory contracts and unexpired leases that exist between a Debtor and
> any person or entity shall be deemed rejected by such Debtor, as of the
> Effective Date, except for any executory contract or unexpired lease (a)
> that has been assumed pursuant to an order of the Bankruptcy Court

entered prior to the Effective Date, (b) as to which a motion for approval
of the assumption or rejection of such executory contract or unexpired
lease has been filed prior to the Confirmation Date, or (c) that is
specifically designated in the Plan Supplement as a contract or lease to be
assumed by the Debtor; *provided, however*, that the Debtors reserve the
right, on or prior to the Confirmation Date, to amend the Plan Supplement
to remove any executory contract or unexpired lease therefrom or add any
executory contract or unexpired lease thereto, in which event such
executory contract(s) or unexpired lease(s) shall, as of the Effective Date,
be deemed to be, respectively, rejected or assumed.

(Plan, Article XI, Section 11.1.)  Similar language appears in the Disclosure Statement.  (*See*

Disclosure Statement, Sections X.F.1 and X.F.3.)

17.     Section 11.1 of the Plan also provides, "The Debtors shall provide notice of any

amendments to the Plan Supplement to the parties to the executory contracts and unexpired

leases affected thereby."  (Plan, Article XI, Section 11.1.)  The Disclosure Statement contains

identical language.  (Disclosure Statement, Section X.F.3.)

18.     In Section 11.2 of the Plan, the Lehman Debtors provide for the Court to enter an

Order approving the assumption or rejection of contracts and leases.  Specifically, the Plan

provides:

Entry of the Confirmation Order shall, subject to and upon the occurrence
of the Effective Date, constitute (a) the approval, pursuant to sections
365(a) and 1123(b) of the Bankruptcy Code, of the assumption of the
executory contracts and unexpired leases assumed or assumed and
assigned pursuant to the Plan and (b) the approval, pursuant to sections
365(a) and 1123(b) of the Bankruptcy Code, of the rejection of the
executory contracts and unexpired leases rejected pursuant to the Plan.

(Plan, Article XI, Section 11.2.)  The Lehman Debtors also restate this provision in the

Disclosure Statement.  (Disclosure Statement, Section X.F.2.)

19.     For those contracts and leases proposed to be assumed under the terms of the

Plan, the Lehman Debtors propose a mechanism for addressing cure claims.  Section 11.3 of the

Plan provides:

> Except as may otherwise be agreed to by the parties, within thirty (30)
> days after the Effective Date, the Debtor shall cure any and all undisputed
> defaults under any executory contract or unexpired lease assumed by the
> Debtor pursuant to the Plan, in accordance with section 365(b) of the
> Bankruptcy Code.  All disputed defaults that are required to be cured shall
> be cured either within thirty (30) days of the entry of a Final Order
> determining the amount, if any, of the Debtor's liability with respect
> thereto, or as may otherwise be agreed to by the parties.

(Plan, Article XI, Section 11.3.)  The Disclosure Statement clarifies that "a list of any contracts

or leases to be assumed, or assumed and assigned, by the Debtors in accordance with section

11.1 of the Plan… will be contained in the Plan Supplement that is filed with the Clerk of the

Bankruptcy Court at least ten (10) days prior to the Voting Deadline."  (Disclosure Statement,

Section X.J.11.)

20.     Separate and apart from the referenced provisions contained in Sections 11.1

through 11.3 of the Plan and the corresponding sections of the Disclosure Statement, the Lehman

Debtors have included boilerplate language in the Plan regarding the Lehman Debtors' intention

to assume all of their insurance policies.  Specifically, the Plan provides, "To the extent that any

of the Debtors' insurance policies and any agreements, documents or instruments with insurers

relating thereto constitute executory contracts, such contracts shall be deemed assumed under the

Plan."  (Plan, Art. XI, Sec. 11.5.)  The Disclosure Statement contains identical language.

(Disclosure Statement, Section X.F.4.)

21.     Unlike the general provisions concerning assumption and rejection of executory

contracts and unexpired leases, as set forth in Section 11.1 through Section 11.3 of the Plan, the

Lehman Debtors have not provided a means to provide meaningful notice to contract counterparties and other parties in interest regarding the insurance policies to be assumed under the terms of the Plan, any defaults that must be cured and any basis for claiming adequate assurance of future performance.  The Lehman Debtors have not indicated an intention to include information in the Plan Supplement regarding the insurance policies they intend to assume under the terms of the Plan.  (*See* Disclosure Statement, Section X.J.11 (indicating an intention to provide information in the Plan Supplement limited to contracts being assumed under Section 11.1 of the Plan).)

22.     Unlike the general provisions concerning assumption and rejection of executory contracts and unexpired leases, as set forth in Section 11.1 through Section 11.3 of the Plan, the Lehman Debtors have not provided for the Court to pass on and to enter an order approving the assumption of the insurance policies.

23.     Unlike the general provisions concerning assumption and rejection of executory contracts and unexpired leases, as set forth in Section 11.1 through Section 11.3 of the Plan, the Lehman Debtors have not provided for either the assertion of cure claims or the adjudication of disputes over cure claims with respect to insurance policies that the Debtors intend to assume under the terms of the Plan.

24.     In fact, the Debtors do not even provide notice to the insurers as to whether the insurance policies they intend to assume under the Plan are executory contracts.

25.     The proposed treatment of insurance policies under the Plan and the Disclosure Statement has the effect of shifting the burden to the insurers to identify undisclosed policies and, in many instances, unknown claims against or defenses to coverage under the policies, most of which, ostensibly, are not currently at issue.

III.    **ARGUMENTS**

A.    **The Lehman Debtors Fail To Satisfy Their Burden of Proof With Respect to the Proposed Assumption of Their Insurance Policies**

26.    In light of their prior statements, the Lehman Debtors may intend that assumption of their insurance policies will eliminate all coverage defenses available under the Policies, including those not yet known or identified.  If that is the Lehman Debtors' position (or at least a position they seek to preserve), the Lehman Debtors have an obligation to disclose that position and the now unstated impacts they seek to impose on the insurers by what, on the face of the Disclosure Statement, is a routine assumption of insurance policies.  Having advanced this position, the Lehman Debtors also have an obligation to disavow the position if it is not a position they intend to take – this is the option proposed by Fidelity in the Ride Through Alternative, which the Lehman Debtors summarily rejected.

27.    If the Lehman Debtors take the position that all coverage defenses are lost in connection with the assumption of the insurance policies, or refuse to make adequate disclosure on the issue, the Court must consider any such impact and any corresponding cure requirement when considering whether to approve the proposed assumption of the policies.  Under the circumstances, the Lehman Debtors cannot satisfy the proof requirements for assumption of the policies without providing the Court with the following information: (i) the policies to be assumed; (ii) whether such policies are, in fact, executory contracts; (iii) the properties affected; (iv) the facts and analyses supporting assumption of the policies; (v) the elements required to cure outstanding defaults under the policies; (vi) the basis upon which the Lehman Debtors intend to provide adequate assurance of future performance under the policies; and (vii) the effect of the proposed assumption of the policies, if any, on existing defenses to coverage.  As set

-13-

forth in Section III.B, below, the disclosure requirements under the Bankruptcy Code and basic

principles of due process mandate that the Lehman Debtors including this basic information in

the Disclosure Statement.

28.     11 U.S.C. § 365(a) provides, in relevant part, "Except as provided in …

subsections (b), (c), and (d) of this section, the trustee, *subject to the court's approval*, may

assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a)

(emphasis added).

29.     11 U.S.C. § 365(b) provides, in relevant part, "If there has been a default in an

executory contract or unexpired lease of the debtor, the trustee may not assume such contract or

lease unless, at the time of assumption of such contract or lease, the trustee – (A) cures, or

provides adequate assurance that the trustee will promptly cure, such default… and (C) provides

adequate assurance of future performance under such contract or lease."  11 U.S.C. § 365(b)(1).

30.     "The decision to assume or reject requires a balancing of the contract's benefits

and burden.  In the context of rejection, this balancing is usually couched in terms of the

'business judgment' test….  When the issue is assumption, the focus usually turns to the estate's

ability to cure standing defaults and assure future performance, so the business judgment test is

seldom referenced….  The ultimate issue in either event is still essentially the same, however.

When assuming, the trustee must decide what benefit is to be gained by staying with the contract

versus the burden thereby assumed."  *In re Food City, Inc.*, 94 B.R. 91, 93 (Bankr. W.D. Tex.

1988) (citations omitted); *see also Century Indem. Co. v. NGC Settlement Trust (In re Nat'l

Gypsum Co.),* 208 F.3d 498, 506 (5th Cir. 2000) ("[T]he debtor party must take full account of

the cost to cure all existing defaults owed to the non-debtor party when assessing whether the

contract is beneficial to the estate.") (citations omitted).

31.    "[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it." *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993). "[T]he process of deciding a motion to assume is one of the bankruptcy court placing itself in the position of the trustee or debtor-in-possession and determining whether assuming the contract would be a good business decision or a bad one." *Id.*

32.    "For a bankruptcy court to make a responsible determination as to an assumption application, it is important for the court to know the universe of claims arising under the contracts to be assumed." *Regen Capital I, Inc. v. Halperin (In re U. S. Wireless Data, Inc.)*, 547 F.3d 484, 488-89 (2d Cir. 2008) (citing *In re Buckhead Am. Corp.*, 180 B.R. 83, 88 (D. Del 1995)). "It is particularly important for a bankruptcy court to know to what degree a debtor is in default on an executory contract because a debtor cannot assume such a contract unless the debtor satisfies several statutory conditions designed to make the non-debtor contracting party whole.  Specifically, a debtor must (1) cure the default, or provide adequate assurance that it will promptly cure it; (2) compensate, or provide adequate assurance that the trustee will promptly compensate, the non-debtor party to the contract for any actual monetary loss caused by the debtor's default; and (3) provide adequate assurance of future performance under the contract." *Id.* at 489 (internal citations omitted).

33.    11 U.S.C. § 1123(b)(2) authorizes a debtor to provide for assumption or rejection of an executory contract in the context of a plan of reorganization.  11 U.S.C. § 1123.  However, "[a]lthough a plan may provide for the assumption of an executory contract, that authorization is

'subject to section 365.'" *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 401 (5th Cir. 2001)

(citing 11 U.S.C. § 1123(b)(2)); *see also In re Cole*, 189 B.R. 40, 46 (Bankr. S.D.N.Y. 1995).

34.    Section 365 of the Bankruptcy Code requires the Court to pass on the assumption

or rejection of executory contracts.  Under the circumstances, courts have held that "to approve

the [assumption or] rejection of an *unidentified contract* results in purely fictitious compliance

with the Code."  *See In re Parkwood Realty Corp.*, 157 B.R. 687, 691 (Bankr. W.D. Wash. 1993)

(emphasis added); *see also In re Cole*, 189 B.R. at 46 ("By virtue of the reference in section

1123(b)(2) to section 365, one gleans that Congress did not intend to render the provisions of the

latter a nullity by giving reorganizing debtors carte blanche to assume unspecified leases and

contracts free of the obligations of section 365, such as obtaining court approval."); *Gray v. W.

Envtl. Servs. & Testing, Inc. (In re Dehon, Inc.)*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006)

("[A]lthough the business decision is largely within the debtor's discretion, only the court can

approve the debtor's proposed assumption…. It is well-established that the doctrine of 'implied

assumption' has little, if any, merit.").

35.    As an initial matter, the Lehman Debtors fail to identify the precise insurance

policies they intend to assume under the terms of the Plan.  In fact, they do not even identify

whether and to what extent the policies are executory.  As such, it is impossible for the Court to

"plac[e] itself in the position of the trustee or debtor-in-possession and [to] determin[e] whether

assuming the contract would be a good business decision or a bad one." *Orion*, 4 F.3d at 1099.

36.    Moreover, the Lehman Debtors have not provided and do not intend to provide

cure and adequate assurance information with regard to the insurance policies.  As such, it is

impossible for the Court to make a determination as to the reasonableness of the Lehman

Debtors' business judgment with respect to the proposed assumption of their insurance policies.

As noted above, the Second Circuit has observed that "[i]t is particularly important for a bankruptcy court to know to what degree a debtor is in default on an executory contract because a debtor cannot assume such a contract unless the debtor satisfies several statutory conditions designed to make the non-debtor contracting party whole." *In re U. S. Wireless Data, Inc.*, 547 F.3d at 489.

37.    In light of the foregoing, the Lehman Debtors cannot satisfy their burden of proof with regard to the proposed assumption of their insurance policies under the terms of the Plan. Moreover, the Court will have no sound basis in the record on which to make a determination as to the reasonableness of the Lehman Debtors' business judgment.

**B.      The Lehman Debtors Fail to Satisfy the Fundamental Notice Requirements Under the Bankruptcy Code and General Principles of Due Process With Regard to the Proposed Assumption of Insurance Policies Under the Plan**

38.    As noted previously, the Lehman Debtors may intend that assumption of their insurance policies will eliminate all coverage and cure issues available under the Policies, including those not yet known or identified.  If this is the intended result of the assumption of insurance policies under the Plan, the insurers cannot fully appreciate and understand the potential impact on existing and future coverage disputes and raise any objections thereto unless the Lehman Debtors disclose: (i) the policies to be assumed; (ii) whether such policies are, in fact, executory contracts; (iii) the properties affected; (iv) the facts and analyses supporting assumption of the policies; (v) the elements required to cure outstanding defaults under the policies; (vi) the basis upon which the Lehman Debtors intend to provide adequate assurance of future performance under the policies; and (vii) the effect of the proposed assumption of the policies, if any, on existing defenses to coverage.  The Lehman Debtors' failure to provide such

-17-

basic information violates the disclosure requirements set forth in the Bankruptcy Code and basic tenets of due process.

39.    Pursuant to 11 U.S.C. § 1125(b), the acceptance or rejection of a plan may not be solicited from the holder of a claim or interest unless there is transmitted a written disclosure statement, approved by the court after a hearing as containing adequate information.  "Adequate information" means information of a kind, and in sufficient detail, that would enable a hypothetical investor to make an informed judgment about the plan.  11 U.S.C. § 1125(a); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 597 (Bankr. S.D.N.Y. 2006).

40.    "If assumption is to be undertaken in a Chapter 11 plan, a plan proponent must provide the requisite notice as part of the confirmation process." *Dataprose, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision Commc'ns, Inc.)*, 349 B.R. 718, 722 (B.A.P. 10th Cir. 2006) (citing *Nat'l Gypsum*, 208 F.3d at 513; Fed R. Bankr. P. 2002(b)).

41.    "When a trustee seeks approval for the assumption or rejection of a contract or lease, whether by motion, stipulation or plan provision, the contracts or leases for which such approval is sought should be specified.…  The parties in interest and the court should not have to be 'mind readers' to determine the moving party's real intentions.  In addition, courts have held that failure to express 'a clear, unequivocal, affirmation to assume' and to set forth the 'minimal cure, compensation, and adequate assurance requirements' will be insufficient for assumption." 10-6006 Collier on Bankruptcy ¶ 6006.01 (citing *Bear Valley Mutual Water Co. v. Prestige Point (In re Prestige Point)*, 113 B.R. 643, 652 (Bankr. C.D. Cal. 1990), *rev'd mem.*, 130 B.R. 362 (B.A.P. 9th Cir. 1991, *reinstated*, 985 F.2d 573 (9th Cir. 1993); *Nat'l Gypsum*, 208 F.3d at 513, *In re Allen*, 362 B.R. 866, 870 (Bankr. N.D. Ohio 2007); *In re Ford*, 159 B.R. 930, 931 (Bankr. W.D. Wash. 1993)).

42.    Fed. R. Bankr. P. 6006 governs the procedure for seeking assumption or rejection of executory contracts and provides, in relevant part, "A proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule 9014." Fed. R. Bankr. P. 6006(a).  That Rule also provides, "Notice of a motion made pursuant to subdivision (a) or (b) of this rule, shall be given to the other party to the contract or lease, to other parties in interest as the court may direct, and, except in a chapter 9 municipality case, to the United States trustee."  Fed. R. Bankr. P. 6006(c).

43.    In the seminal case addressing the procedure for assumption of an executory contract in the context of a Chapter 11 plan, the Fifth Circuit stated:

> "Rule 6006(a) excuses the procedure that applies in contested matters when a proceeding to assume an unexpired lease is 'part of a plan.' *Fairly interpreted, Rule 6006(a) does not eliminate the notice requirements applicable to a contested matter.*  Rule 9014, which governs contested matters not otherwise covered by the Bankruptcy Rules, requires that relief be requested on reasonable notice to the party against whom the relief is sought.  The court holds that Rule 6006(a) implies a similar obligation upon a debtor who seeks to assume an unexpired non-residential lease [or executory contract] by means of its proposed reorganization plan.  *This means that although the plan itself constitutes the act of assumption contemplated by § 365(d)(4), the lessor [or contract counterparty], as the party against whom the relief is sought, must be given reasonable notice of the debtor's intent.*  Even if Rule 6006(a) cannot be read to incorporate the notice requirement of Rule 9014, § 1125(b) of the Code plainly requires that the contents of a proposed reorganization plan be adequately disclosed."

*Nat'l Gypsum*, 208 F.3d at 512 (quoting *Republic Health Corp. v. Coral Gables, Ltd. (In re REPH Acquisition Co.)*, 134 B.R. 194, 199 (N.D. Tex. 1991)) (emphasis in original).

44.    "Notice as a procedural safeguard cannot expand or contract based solely upon the procedural choice of the debtor when the ramifications to the non-debtor party are no less severe." *Id.*

45.    Courts generally reject the use of boilerplate provisions in plans of reorganization

to accomplish assumption or rejection of executory contracts. *See In re O'Connor*, 258 F.3d at

401 (citations omitted) ("The bankruptcy court's interpretation is consistent with the conclusions

by other courts that an executory contract may *not* be assumed either by implication or through

the use of boilerplate plan language."); *In re Parkwood Realty Corp.*, 157 B.R. at 690-91; *In re

Dehon, Inc.*, 352 B.R. at 559.

46.    According to the Court in *Dehon*, "Notice is required not only to provide the non-

debtor parties to executory contracts an opportunity to raise objections to the proposed treatment

of their contracts, but also to allow them to appropriately assert claims arising from rejection…

or, in the case of assumption, to assert the amount required to cure any default." *In re Dehon,

Inc.*, 352 B.R. at 559.

47.    Use of boilerplate language in a plan to effectuate the assumption or rejection of

an executory contract also implicates due process concerns. In *Parkwood Realty Corp.*, in ruling

on the effect of boilerplate lease and contract rejection language in a plan of reorganization,[3] the

Court commented:

> Parkside Lakes has never had notice that the debtor viewed the
> Shareholders Agreement as an executory contract, much less that it was
> one of those being rejected…. The due process argument is buttressed by
> § 1141(d)(1), which provides that the confirmation of a plan "discharges
> the debtor from any debt that arose before the date of such confirmation,
> and any debt of a kind specified in section 502(g)…." Section 502(g)
> involves claims arising from the rejection of executory contracts. These
> provisions read together clearly contemplate that a party to an executory
> contract will receive notice of rejection when it receives a copy of the
> Disclosure Statement and Plan, giving it a window in which to file a proof
> of claim for damages. A party which has not even had notice of the plan,

---

[3] The Plan included the following boilerplate contract rejection language: "All other executory contracts or unexpired leases of Parkwood which have not been previously rejected shall be deemed rejected on the Effective Date." *In re Parkwood Realty Corp.*, 157 B.R. 687, 689 (Bankr. W.D. Wash. 1993).

let alone the debtor's intention to reject, is given no opportunity to file a claim.  To hold that a claim has been discharged under these circumstances would clearly violate due process.

*In re Parkwood Realty Corp.*, 157 B.R. at 691.  The due process analysis applies equally to the assumption of contracts under a plan, as a non-debtor party to a contract to be assumed under a plan requires notice and an opportunity to be heard with regard to the debtor's business judgment as to the proposed assumption of the contract, any proposed/required cure of outstanding defaults as well as any adequate assurance of future performance.

48.    Furthermore, the provisions in the Plan and Disclosure Statement governing the Lehman Debtors' proposed assumption of their insurance policies reasonably can be read as an omnibus motion to assume multiple executory contracts.  Fed. R. Bankr. P. 6006 provides, in relevant part:

> A motion…to assume…multiple executory contracts…that are not between the same parties shall…
>
> (2)    list parties alphabetically and identify the corresponding contract…[and]
> (3)    specify the terms, including the curing of defaults, for each requested assumption….

Fed. R. Bankr. P. 6006(f).

49.    As an initial matter, the Lehman Debtors fail to disclose whether they consider their insurance policies to be executory contracts and whether they intend to treat them as such under the Plan.  Rather, the Lehman Debtors attempt to hedge by stating in both the Disclosure Statement and the Plan, "*To the extent that any of the Debtors' insurance policies and any agreements, documents or instruments with insurers relating thereto constitute executory contracts*, such contracts shall be deemed assumed under the Plan."  (Plan, Art. XI, Sec. 11.5; Disclosure Statement, Section X.F.4  (emphasis added).)

50.     Furthermore, as noted above, the Lehman Debtors have not identified and, according to the Disclosure Statement, do not intend to identify the insurance policies they intend to assume under the terms of the Plan.  (*See* Disclosure Statement, Section X.J.11 (indicating an intention to provide information in the Plan Supplement limited to contracts being assumed under Section 11.1 of the Plan, as opposed to the insurance policies which are addressed in Section 11.4 of the Plan.).)

51.     Additionally, the Lehman Debtors do not intend to provide any information regarding economic and non-economic defaults under the terms of the insurance policies, actions proposed or required to cure such economic and non-economic defaults and any basis for assuring future performance under the insurance policies.

52.     The Lehman Debtors' effort to assume their insurance policies through the use of boilerplate language in the Plan and Disclosure Statement fails to provide the insurers with adequate information "to raise objections to the proposed treatment of their contracts… [and] to appropriately… assert the amount required to cure any default."  *In re Dehon, Inc.*, 352 B.R. at 559.  Furthermore, the Lehman Debtors fail to satisfy even the basic notice requirements mandated by Fed. R. Bankr. P. 6006(f) – disclosure of party, contract, and cure information. Consistent with the precedents cited above, the Court should not allow the Lehman Debtors to proceed in this manner and should deny their request for approval of the Disclosure Statement.

53.     As noted above, the Lehman Debtors' effort to assume their insurance policies through the use of boilerplate language in the Plan and Disclosure Statement violates fundamental principles of due process.  The insurers do not know whether the Lehman Debtors intend to treat the insurance policies as executory contracts, do not know what, if any, defaults the Lehman Debtors intend to cure and have no way to ascertain whether the Lehman Debtors

can provide adequate assurance of future performance.  This last issue is of particular importance

in connection with the Lehman Debtors' ongoing duty of cooperation that is both implied and, in

most cases, stated expressly in their insurance policies.  Moreover, the Lehman Debtors fail to

disclose any impact assumption of the insurance policies will have on existing defenses to

coverage.  At best, these are fatal omissions.  At worst, failure to make these disclosures is a

stealth tactic by which the Lehman Debtors seek to assume the benefits of the policies without

the corresponding burdens – a tactic that violates the Bankruptcy Code's requirements both for

disclosure and for assumption of executory contracts.  In either event, the Court should not

approve the Disclosure Statement and Plan with such patent lack of disclosure and transparency.

        54.     The importance of adequate notice to parties against whom claims are asserted is

affirmed by the recent decision by the United States Supreme Court in *Ashcroft v. Iqbal*, 129 S.

Ct. 1937 (2009).  In that case, the Court observed, "A pleading that offers 'labels and

conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (U.S. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 555 (2007)).  The Court went on to state:

> To survive a motion to dismiss, a complaint must contain sufficient factual
> matter, accepted as true, 'to state a claim to relief that is plausible on its
> face.'…  A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged.

*Id*.  Here, the Lehman Debtors have provided the Court with no facts on which to base a

"reasonable inference" as to the merits of the proposed assumption of their insurance policies.

C.     **The Court Lacks Jurisdiction to Hear Coverage Disputes In Connection With The Proposed Assumption of Insurance Policies Under the Plan As Those Disputes Are Not Ripe For Adjudication and Fall Outside The Scope of Cases As To Which This Court Can Render a Final Decision**

55.     At least with respect to any insurance policy against which the Lehman Debtors have not tendered a claim, the Court lacks jurisdiction to hear and consider any defenses to coverage.  Consequently, the proposed assumption of insurance policies under the Plan should not be deemed a "cure" of any such coverage defense and should not impact any such coverage defense related to future claims, regardless of when the events giving rise to those defenses may have occurred.

56.     The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Reno* v. *Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57, n.18 (1993) (citations omitted).  "A claim is not ripe for adjudication if it rests upon  'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580-81 (1985) (internal citations omitted)).

57.     The basic rationale of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967).

58.     As noted above, for many of the Lehman Debtors' insurance policies, the Lehman Debtors have not tendered claims and may never tender claims.  However, the failure of the Lehman Debtors to tender a claim under an insurance policy does not mean that defaults/defenses to coverage do not exist that must be cured in connection with the assumption of the policies under the terms of the Plan.

59.     To ensure that the Lehman Debtors do not later argue that the insurers have waived or otherwise lost any defense to coverage neither known nor raised as a required cure in connection with confirmation of the Plan, the insurers will be forced to present any and all defaults and defenses to coverage in connection with the hearing on confirmation of the Plan. However, those coverage and cure claims are not ripe for adjudication because they rest "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. at 300.  Specifically, those defenses to coverage are contingent upon the future tender of a claim under the relevant insurance policy and, possibly, upon the Lehman Debtors' pre- and post-petition course of conduct and compliance with policy terms.

60.     As issues concerning defenses to coverage and asserted defaults under the Lehman Debtors' insurance policies are not ripe (at least in many instances), the Court lacks subject matter jurisdiction to hear and decide those issues.

61.     The Court's jurisdiction to hear and decide those state-law issues regarding the availability of coverage under the Lehman Debtors' insurance policies is also called into question by the United States Supreme Court's recent decision in *Stern v. Marshall,* 131 S. Ct. 2574 (U.S. 2011).  According to the Court:

> Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's "judicial Power" on entities outside Article III.  That is why we have long recognized that, in general, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law or in equity, or admiralty." … When a suit is made of "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," … and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts.  The Constitution assigns that job – resolution of "the mundane as well as the glamorous, matters of common law and

statute as well as constitutional law, issues of fact as well as issues of law"
– to the Judiciary.

*Id.* at 2609 (citations omitted).  As issues concerning the existence of defaults under an insurance

policy as well as defenses to coverage on a claim are pure contract matters that are "the stuff of

the traditional actions at common law tried by the courts at Westminster in 1789," this Court

lacks jurisdiction to hear and decide those issues.  Issues concerning the Lehman Debtors' rights

to benefits on a specific claim under an insurance policy are separate and apart from the issues

the Court must evaluate in making a decision to approve assumption of the insurance policy

itself – namely whether the benefits to be gained by the Lehman Debtors assuming that policy

outweigh the duties and obligations that the Lehman Debtors must satisfy under the policy,

including any obligation to effectuate a cure of defaults.

62.    In light of the foregoing jurisdictional impediments to insurance coverage

litigation at the time of Plan confirmation, Fidelity respectfully suggests that the Ride Through

Alternative is the better approach.  Any insurance coverage issues that become ripe can be

appropriately addressed post-confirmation in a stand alone, plenary proceeding.  *Nat'l Gypsum*,

208 F.3d at 504, n.4 ("If an executory contract is neither assumed nor rejected, it will 'ride

through' the proceedings and be binding on the debtor even after a discharge is granted, thus

allowing the non-debtor's claim to survive the bankruptcy.") (citation omitted).

WHEREFORE, in light of the proof, disclosure and jurisdictional issues underlying the

Lehman Debtors' proposed assumption of their insurance policies under the Plan, Fidelity

respectfully requests that the Court either: (i) deny the Lehman Debtors' request for approval of

the Disclosure Statement; (ii) require the Lehman Debtors to provide full and complete

disclosures with respect to each and every insurance policy they intend to assume under the

terms of the Plan; or (iii) require the Lehman Debtors to remove the provisions in the Plan and

Disclosure Statement that deal with assumption of the Lehman Debtors' insurance policies and

to have those insurance policies "ride through" the bankruptcy, thereby appropriately deferring

any coverage, cure claim or adequate assurance litigation until a date post-confirmation (as

necessary).

Dated at New Haven, Connecticut, this 11th day of August, 2011.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY


By:      /s/ Joshua W. Cohen
         Joshua W. Cohen (JC-2978)
         James J. Tancredi (JT-3269)
         DAY PITNEY LLP
         One Audubon Street
         New Haven, CT 06511-6433
         Tel:    (203) 752-5008
         Fax:    (203) 752-5001
         E-mail: jwcohen@daypitney.com

         *Counsel for Fidelity National Title Insurance
         Company*