**GIBSON, DUNN & CRUTCHER LLP**
Michael A. Rosenthal (MR-7006)
Matthew K. Kelsey (MK-3137)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Robert B. Krakow (admitted *pro hac vice*)
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900

*Attorneys for PricewaterhouseCoopers AG, Zurich,*
*as Bankruptcy Liquidator of*
*Lehman Brothers Finance AG, in Liquidation,*
*a/k/a Lehman Brothers Finance SA, in Liquidation*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                                    :
In re                                                               :        **Chapter 11**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,                         :        **Case No. 08-13555 (JMP)**
                                                                    :
                    **Debtors.**                                     :        **Jointly Administered**
                                                                    :
                                                                    :
-------------------------------------------------------------------x

**OBJECTION TO DISCLOSURE STATEMENT**
**AND SOLICITATION PROCEDURES MOTION**

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ..................................................... 1

II.   BACKGROUND RELATING TO LBF............................................... 2

    A.    Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA.................... 3

    B.    The Swiss Proceedings ...................................................... 4

    C.    Role of PWC As Bankruptcy Liquidator ................................. 5

    D.    The U.S. Chapter 11 and Chapter 15 Proceedings................................. 6

III.  OBJECTION TO DISCLOSURE STATEMENT ........................................... 7

    A.    Section 8.15 of the Plan Purports to Give the Plan Administrator
Discretion to Hold Back Distributions to LBF Pending Resolution of
Claim Disputes Between the Debtors and Another Entity.................................... 7

        i.    Section 8.15 of the Plan Violates Section 1123(a)(4) of the
Bankruptcy Code .................................................... 9

        ii.   Section 8.15 of the Plan Violates Principles of Comity.......................... 12

    B.    The Disclosures Regarding Disputed Claims are Inadequate............................. 16

    C.    The Disclosures Regarding Preservation of Affiliates' Setoff Rights are
Inadequate ...................................................... 17

IV.   OBJECTION TO SOLICITATION PROCEDURES MOTION...................................... 18

    A.    The Proposed Timeline Does Not Allow Sufficient Time for Discovery ........... 18

    B.    The Proposed Solicitation Procedures Do Not Adequately Protect the Due
Process Rights of Claimants .............................................. 19

V.    RESERVATION OF RIGHTS ...................................................... 20

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Arkansas v. Federated Dep't Stores,*
   175 B.R. 924 (S.D. Ohio 1992) ......................................................... 11
*Cornfeld v. Investors Overseas Servs., Ltd.,*
   471 F. Supp. 1255 (S.D.N.Y.), *aff'd,*
   614 F.2d 1286 (2d Cir. 1979) ........................................................... 13
*Cunard S.S. Co., Ltd. v. Salen Reefer Services AB,*
   773 F.2d 452 (2d Cir. 1985) ............................................................. 13
*IIT v. Lam (In re Colorado Corp.),*
   531 F.2d 463 (10th Cir. 1976) .......................................................... 13
*In re Adelphia Comm'n Corp.,*
   361 B.R. 337 (S.D.N.Y. 2007) ........................................................... 9
*In re Maxwell Commc'ns Corp. plc,*
   93 F.3d 1036 (2d Cir. 1996) ............................................................. 15
*In re United Sciences of Am., Inc.,*
   893 F.2d 720 (5th Cir. 1990) ............................................................ 15
*IRS v. Woodway Stone Co.,*
   187 B.R. 916 (W.D. Va. 1995) ....................................................... 9, 10
*Kenner Products Co. v. Societe Fonciere et Financiere Agache-Willot,*
   532 F. Supp. 478 (S.D.N.Y. 1982) ..................................................... 13
*Maxwell Commc'ns Corp. plc v. Societe Generale (In re Maxwell Commc'ns Corp. plc),*
   93 F.3d 1036 (2d Cir. 1996) ............................................................. 14
*Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,*
   825 F.2d 709 (2d Cir. 1987) ............................................................. 13

**Statutes**

11 U.S.C. § 553 ................................................................................ 15
11 U.S.C. §1123(a)(4) .................................................................. passim
11 U.S.C. §1125 ................................................................................ 1
11 U.S.C. §1129(a)(9) ...................................................................... 15
11 U.S.C. §1501 .............................................................................. 14
11 U.S.C. §1517(b) .......................................................................... 12
11 U.S.C. §1520 .............................................................................. 12
11 U.S.C. §1521 ................................................................................ 7
11 U.S.C. §1521(a)(5) ............................................................. 7, 12, 15
11 U.S.C. §1521(b) ................................................................. 7, 12, 15

**Other Authorities**

7-1123 Collier on Bankruptcy ¶ 1123.01 ............................................... 9
H.R. Rep. No. 109-31, pt. 1 (2005) ..................................................... 13
H.R. Rep. No. 109-31, pt. 1 (2005), reprinted in 2005 U.S.C.C.A.N. 88 ........ 13

THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

PricewaterhouseCoopers AG, Zurich ("*PwC*"), in its capacity as duly authorized

Bankruptcy Liquidator and foreign representative of Lehman Brothers Finance AG, in

Liquidation, also known as Lehman Brothers Finance SA, in Liquidation, a Swiss corporation

("*LBF*"), hereby files this objection to (i) the *Debtors' Disclosure Statement for Second*

*Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors*

*Pursuant to Section 1125 of the Bankruptcy Code* (Docket No. 18205) (the "*Disclosure*

*Statement*") that was filed with respect to the *Second Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and Its Affiliated Debtors* (Docket No. 18204)  (the "*Plan*"), and (ii) the

*Amended Motion (I) for Approval of the Disclosure Statement and the Form and Manner of*

*Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting*

*Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and*

*Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan* (Docket No.

18126) (the "*Solicitation Procedures Motion*").[1]

## I.   **PRELIMINARY STATEMENT**

1.      Parties in interest are entitled to know that the Plan risks not being confirmed

because the proposed distribution provisions provide the Debtors (and their successor, the Plan

Administrator) with an end-run around a bedrock principle of chapter 11 (i.e., that creditors in

the same class receive similar treatment under a plan), as well as other provisions of the

Bankruptcy Code and well-established principles of comity.  Specifically, Section 8.15 of the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, Disclosure Statement, and/or Solicitation Procedures Motion, as applicable.

Plan, which provides the Plan Administrator with broad discretion to refuse to make a distribution to LBF (and, for that matter, other Affiliates not controlled by the Debtors) pending resolution of a claim dispute between the Debtors and a creditor of LBF in such creditor's foreign proceeding. Creditors should be aware that Section 8.15 violates sections 1123(a)(4) by singling out LBF and other similarly situated creditors for significantly less favorable treatment than other creditors in that class. In addition, Section 8.15 of the Plan violates long-settled principles of comity by attempting to use this Court to authorize the Plan Administrator to unduly interfere with liquidation proceedings in foreign jurisdictions.

2.      Likewise, Section 8.5 of the Plan also violates section 1123(a)(4) of the Bankruptcy Code because it provides for disparate treatment to holders of Disputed Claims that subsequently become Allowed Claims, which undermines the very purpose of establishing a disputed claims reserve. Specifically, Section 8.5 of the Plan appears to allow the Debtors to limit distributions to holders of Disputed Claims once these Claims become allowed and, thereby, violates section 1123(a)(4) of the Bankruptcy Code by providing disparate treatment to holders of Disputed Claims (that subsequently become Allowed Claims) without such holders' consent.

3.      This Objection also identifies other key disclosures that must be made if the Disclosure Statement is to contain "adequate information" and identifies certain aspects of the proposed solicitation procedures that are objectionable.

## II.    BACKGROUND RELATING TO LBF

4.      The basic background facts pertaining to these chapter 11 cases are well known to the Court and will not be repeated here.

2

A.    **Lehman Brothers Finance AG, a/k/a Lehman Brothers Finance SA**

5.      Articles of Association for LBF were filed in Switzerland on January 13, 1997. LBF's Articles of Association provide that LBF is a Swiss corporation known as both Lehman Brothers Finance AG and Lehman Brothers Finance SA.  The dual names arise from the local practice in Switzerland, a country in which both French and German are official languages, to designate LBF's corporate status both in the German nomenclature (*Aktiengesellschaft* (AG)) and the French nomenclature (*Société anonyme* (SA)).

6.      LBF is a wholly owned subsidiary of Lehman Brothers Holdings Inc. ("***LBHI***"). Since January 22, 2001, the principal purpose of LBF has been to provide financial and financial intermediary services, including structuring, issuing and entering into derivative transactions, and any other related activities.  Prior to the commencement of the Swiss Bankruptcy (discussed below), LBF's primary business was to engage in foreign (i.e., non-U.S.) derivative transactions.

7.      LBF maintains its registered office in Zurich, Switzerland.  LBF has no offices or employees in the United States.  While LBF has business relationships with several U.S.-based Lehman Brothers entities and a number of other U.S. counterparties, the bulk of LBF's debtor-creditor relationships involve entities that are not based in the United States, including Lehman Brothers International (Europe).  For example, as of December 1, 2008, LBF had 55 U.S. counterparties with open positions, as compared to 612 non-U.S. counterparties with open positions.  All of LBF's counterparties are sophisticated investors.  Historically, LBF's business has been interconnected with the business of other Lehman Brothers entities, and LBF has been partially dependent upon services provided by other Lehman Brothers group companies based in the United States and the United Kingdom.

3

B.    **The Swiss Proceedings**

8.      By order dated September 30, 2008, the Swiss Federal Banking Commission (the

"***Swiss Commission***")[2] assumed regulatory authority over LBF, as a financial intermediary.   On

the same day, the Swiss Commission issued an order (the "***Observation Order***") appointing PwC

as the Observer of LBF and directing PwC to investigate LBF's finances and other affairs.  The

Observation Order prohibited LBF's board of directors and officers from causing LBF to take

any legal actions without PwC's approval, and tasked PwC to protect LBF's creditors and

marshal its assets.

9.      On October 17, 2008, PwC issued a report to the Swiss Commission pursuant to

the Observation Order recommending the liquidation of LBF.  On October 29, 2008, the Swiss

Commission issued an order (the "***Wind-Up Order***") appointing PwC as Liquidator of LBF with

sole authority to act on LBF's behalf, and prohibiting LBF's board of directors and officers from

taking any legal actions on the company's behalf.  The Wind-Up Order also commenced the

liquidation, i.e. the orderly winding up, of LBF pursuant to (i) article 23 quinquies of the Swiss

Federal Act on Banks and Savings Banks; (ii) article 36a of the Swiss Federal Act on Stock

Exchanges and Securities Dealers; and (iii) article 739, *et seq*., of the Swiss Federal Code of

Obligations.  In addition, the Wind-Up Order provided that the wind-up could be converted to a

bankruptcy proceeding upon a finding that there was no possibility of restructuring LBF.

---

[2]    Effective January 1, 2009, the Swiss Commission and other regulatory bodies were merged
into the Swiss Financial Market Supervisory Authority ("***FINMA***"), which now regulates
LBF and is responsible for supervising the Swiss Bankruptcy (discussed below) pursuant to
the same rules and authorities previously administered by the Swiss Commission.  FINMA
and the Swiss Commission, as applicable, are referred to hereinafter as the Swiss
Commission.

10.     In its capacity as Liquidator, PwC, after conducting an initial investigation of LBF's affairs, determined in late November 2008 that LBF was very likely to be insolvent and that a restructuring was unlikely.  PwC informed the Swiss Commission of these findings and, on December 2, 2008, requested that the wind-up be converted to a bankruptcy proceeding.  On December 19, 2008, the Swiss Commission issued an order (the "**Swiss Order for Relief**") commencing a Swiss "*Bankenkonkurs*," or bank/security dealer bankruptcy proceeding (the "**Swiss Bankruptcy**") for LBF pursuant to Swiss law, specifically (i) article 33, *et seq*., of the Swiss Federal Act on Banks and Savings Banks; (ii) the Swiss Commission's Ordinance on Bankruptcy of Banks and Securities Dealers; (iii) article 36a of the Swiss Federal Act on Stock Exchanges and Securities Dealers; and (iv) the Swiss Federal Debt Enforcement and Bankruptcy Act (the "**Swiss Governing Laws**"),[3] and appointing PwC as Bankruptcy Liquidator of LBF.

C.     **Role of PWC As Bankruptcy Liquidator**

11.     Pursuant to the Wind-Up Order, PwC as Liquidator took over most functions, and in particular, all operational functions, of LBF's board of directors.  On December 22, 2008, which was the effective date of the Swiss Order for Relief, PwC became the Bankruptcy Liquidator of LBF.  Thus, since October 29, 2008, by authority of the Swiss Commission, PwC has operated LBF to a large extent independently of prior management, and has been and remains obligated to protect the interests of LBF's creditors and equity holders. PwC is tasked with investigating LBF's affairs, preserving assets for the benefit of creditors and equity holders,

---

[3] The Swiss Commission has held that LBF is subject to the Swiss laws governing the bankruptcy and liquidation of banks and securities dealers, which incorporate by reference the general provisions of the Swiss insolvency law.

and collecting receivables and liquidating the assets of LBF for the benefit of all creditors and

equity holders.

12.     Although PwC's authority as Bankruptcy Liquidator is expressly provided for by

Swiss law and the Swiss Order for Relief, only the Swiss Commission (and, in certain instances,

the appropriate Swiss courts) are empowered to issue necessary orders in connection with the

Swiss Bankruptcy.[4]  Among other things, the Swiss Commission may order protective measures

for LBF pursuant to article 26, *et seq.*, of the Swiss Federal Act on Banks and Savings Banks.

PwC, in its capacity as the Bankruptcy Liquidator of LBF, remains subject to supervision by the

Swiss Commission with respect to all actions to be taken in the course of the Swiss Bankruptcy.

**D.     The U.S. Chapter 11 and Chapter 15 Proceedings**

13.     On October 3, 2008, Chief Restructuring Officer of LBHI authorized the filing of

a chapter 11 petition in the Bankruptcy Court on behalf of LBF (under the name Lehman

Brothers Finance SA).[5]  However, neither the board of directors of LBF nor PWC, which had

before such date been appointed as Observer of LBF (with the right to approve any such filing)

in the proceedings then pending in Switzerland, approved the filing of a chapter 11 case in the

United States.

14.     Given LBF's limited connections to the U.S., PwC believed that the Swiss

Bankruptcy would be the most efficient and appropriate forum for the administration of LBF's

assets, and that dismissal of the chapter 11 case was in the best interests of LBF and its

stakeholders.  Thus, PwC filed a motion to dismiss the chapter 11 case concurrently with a

---

[4]  The Bankruptcy Liquidator cannot issue orders in connection with the Swiss Bankruptcy.

[5]  The chapter 11 case was pending in this Court as Case No. 08-13887 (JMP).

petition (the "**Chapter 15 Petition**") seeking (i) recognition of the Swiss Bankruptcy as a

"foreign main proceeding," and of PwC as the "foreign representative" of LBF under chapter 15

of the Bankruptcy Code, and (ii) additional relief under section 1521 of the Bankruptcy Code.

15.    This Court granted the motion to dismiss the chapter 11 case and entered an

*Order Granting Recognition of Foreign Main Proceeding and Related Relief Under Chapter 15*,

dated March 12, 2009 (Case No. 09-10583, Docket No. 24) (the "**Chapter 15 Order**").  For more

than two years, PwC and others involved in the Swiss Bankruptcy have been relying on the

Chapter 15 Order's recognition of the Swiss Bankruptcy as the "foreign main proceeding" and

directive that PwC be "entrusted with the administration, realization and distribution of all of

LBF's assets located within the territorial jurisdiction of the United States, along with LBF's

other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)."  Chapter 15 Order, at

¶¶ 2, 6.

### III.    OBJECTION TO DISCLOSURE STATEMENT

**A.    Section 8.15 of the Plan Purports to Give the Plan Administrator Discretion to Hold Back Distributions to LBF Pending Resolution of Claim Disputes Between the Debtors and Another Entity**

16.    According to the Debtors' Disclosure Statement, the Plan is designed to

"expedite…Distributions to holders of Allowed Claims."  Disclosure Statement, at p 50.  Despite

the Debtors' expressed intention to accelerate recoveries to creditors, the Plan actually

meaningfully impedes the ability of LBF (and other similarly situated creditors) to receive

distributions from the Debtors' estate by conditioning distributions upon the claims resolution

process between the Debtors and creditors of LBF in the Swiss Bankruptcy.  Specifically,

Section 8.15 of the Debtors' Plan provides that the Plan Administrator may withhold a

distribution to a Non-Controlled Affiliate (such as LBF) if it, in the Swiss Bankruptcy, intends to

make a distribution to another Non-Controlled Affiliate that has not honored a claim asserted by

one of the Debtors against such Non-Controlled Affiliate by providing as follows:

> Except as otherwise agreed by the Debtors and a Non-Controlled
> Affiliate or with respect to LBT or LBSN, the Plan Administrator
> may determine, in its sole discretion, to withhold all or a portion of
> a Distribution to a Non-Controlled Affiliate if such Distribution
> would be distributed by such Non-Controlled Affiliate to satisfy a
> Claim of a different Non-Controlled Affiliate against which a
> Debtor has a Claim but the latter Non-Controlled Affiliate has
> refused to honor such Claim of a Debtor without subordination,
> reduction or offset unless (a) otherwise agreed to by the Plan
> Administrator or (b) the priority and amount of a Debtor's Claim
> against the latter Non-Controlled Affiliate has been determined by
> Final Order.

17.    Thus, to illustrate, the Plan Administrator could refuse to make a distribution to

LBF on account of LBF's allowed claims against LBHI if LBF intended to distribute the

proceeds thereof to another Non-Controlled Affiliate in the Swiss Bankruptcy if LBHI has a

pending claim dispute in such Non-Controlled Affiliates' foreign proceeding.

18.    The Court cannot confirm the Plan unless the Debtors substantially revise Section

8.15.  As currently drafted, Section 8.15 of the Plan violates section 1123(a)(4) of the

Bankruptcy Code because it provides for disparate treatment of certain Non-Controlled Affiliates

by empowering the Plan Administrator to withhold Distributions to such Non-Controlled

Affiliates pending resolution of a disputed claim between the Debtors and a third party who may

be entitled to a distribution from such Non-Controlled Affiliates' foreign proceedings.

Moreover, Section 8.15 of the Plan violates well-settled principles of comity by asking this Court

to give the Plan Administrator such authority, which would enable the Plan Administrator to

interfere with the foreign proceedings of Non-Controlled Affiliates by impairing the foreign

authorities' ability to make timely distributions in such foreign proceedings.  Accordingly, the

8

Disclosure Statement should include a statement, when describing Section 8.15 of the Plan, that

this provision jeopardizes confirmation of the Plan.

      **i.**      **Section 8.15 of the Plan Violates Section 1123(a)(4) of the Bankruptcy Code**

      19.      Section 1123(a)(4) of the Bankruptcy Code provides that:

> [n]otwithstanding any otherwise applicable non-bankruptcy law, a
> plan <u>shall</u>— … (4) <u>provide the same treatment for each claim or</u>
> <u>interest of a particular class</u>, unless the holder of a particular claim
> or interest agrees to a less favorable treatment of such particular
> claim or interest….

11 U.S.C. § 1123(a)(4) (emphasis added).  This section "restates a cardinal principle of

bankruptcy law, namely that creditors of the same class have a right to equality of treatment."  7-

1123 COLLIER ON BANKRUPTCY ¶ 1123.01.  *See also In re Adelphia Comm'ns Corp.*, 361 B.R.

337, 363-64 (S.D.N.Y. 2007) (Plan provision violated section 1123(a)(4) where only class

members that voted for the plan received exculpation, even though all creditors in the class were

given the same choice between voting or not voting for the plan.).

      20.      Section 8.15 violates section 1123(a)(4) by giving the Plan Administrator

unbridled authority to treat claims in the same class differently by withholding distributions to

some members of the class without their consent while making distributions to other members of

that class.[6]  For instance, in *IRS v. Woodway Stone Co.*, the bankruptcy court confirmed a plan

that forced the IRS to wait for payment pending the outcome of an adversary proceeding while

other claimants in the same class as the IRS received full satisfaction of their claims.  *See* 187

B.R. 916, 918-19 (W.D. Va. 1995).  The district court reversed and held that the plan could not

---

[6]   To the extent that the Plan Administrator withholds payments to all of the members of a
particular class of Affiliate Claims that rejects the Plan, Section 8.15 of the Plan may also
violate section 1129(b) by unfairly discriminating against the members of that class.

be confirmed.  *Id.* at 919.  In so ruling, the district court noted that the bankruptcy court had

believed that compelling reasons existed to treat the IRS's claim differently from those of other

creditors in its class, including the fact that holding up confirmation until adjudication of the

adversary proceeding involving the IRS's claim was expected to waste both time and money.  *Id.*

at 918 n. 1-2.  Nevertheless, the district court held that the plan clearly violated 1124(a)(4)

because the delay in payment to the IRS constituted different and less favorable treatment than

other creditors in the same class had received.[7]  *Id.* at 918-19 ("The IRS never agreed to wait for

payment on its claim while other secured creditors…began receiving satisfaction of their claims

on June 10, 1994. … As a secured creditor, the IRS was entitled to the same treatment that other

creditors in the same class received by the bankruptcy court.  The confirmed plan however failed

to meet the requirements of 11 U.S.C. § 1123(a)(4).").

    21.      Similar to the plan in *Woodway Stone*, the Plan proposes to empower the Plan

Administrator to delay Distributions to LBF—even if LBF's claim is an Allowed Claim—

pending resolution of any claim disputes the Debtors might have against one of LBF's creditors

in such creditor's foreign proceeding.  LBF has not—and will not—consented to such treatment.

And such treatment is clearly different (and less favorable) than the treatment other creditors in

LBF's class will receive in respect of their claims.  Indeed, the Plan is worse than the plan the

*Woodway Stone* court determined to be unconfirmable in that, here, there are no compelling

reasons—such as expediting the conclusion of the chapter 11 cases to minimize cost and delay—

to justify withholding a distribution to LBF.  Rather, Section 8.15 is a transparent attempt, at the

expense of LBF and its creditors, to give the Plan Administrator tactical leverage in negotiations

---

[7]   Significantly, the district court found that the pending adversary proceeding did not render
the IRS's claim "contingent."  *Id.* at 918 n. 1.

with creditors of LBF who dispute the validity of the Debtors' claims asserted against such creditors.

22.    In addition, Section 8.15 of the Plan is inconsistent with the spirit of section 1123(a)(4).  The Plan bears a strong resemblance to the plan proposed in *Arkansas v. Federated Dep't Stores*, in which the debtors attempted to withhold distributions from certain states because those states intended to redistribute the funds to claimants according to each state's own unclaimed property law.  *See* 175 B.R. 924, 933 (S.D. Ohio 1992).  The court in *Federated Dep't Stores* held that the debtors were not permitted to withhold payments in this way, and that each state was entitled to receive its rightful distribution from the debtors' estates, irrespective of how such state intended to dispose of its share of the estates' distribution.  *Id.*  In so holding, the court noted that "[u]nder § 1123(a)(4) [of the Bankruptcy Code], the Debtors have an obligation only to treat the States the same as other creditors in the same class.  Section 1123(a)(4) does not purport to place any limitations on creditors as to how funds may be distributed after the creditors receive them.") (emphasis added).

23.    Similarly, it is clear that Section 8.15 is designed to prevent LBF from making a distribution in the Swiss Bankruptcy to a creditor against whom the Debtors have asserted a claim and such creditor has disputed such claim.  But, as *Federated Dep't Stores* instructs, section 1123(a)(4) does not empower a debtor to withhold distributions simply because the debtor does not like how that creditor will subsequently dispose of its distribution.  Indeed, this notion is even more compelling in this case.  In *Federated Dep't Stores*, the debtor was attempting to prevent a distribution to States for fear that the distribution scheme under the States' unclaimed property law would result in a distribution at odds with the priority scheme and claims resolution process established by the Bankruptcy Code.  Here, however, there's no

such fear; rather, Section 8.15 appears to be nothing more than attempt by the Debtors, at LBF's expense, to obtain the upper hand in negotiations with respect to a disputed claim in a foreign proceeding.

24.     A party in interest is entitled to know, by way of additional disclosure, that Section 8.15 treats similarly situated creditors disparately and, as such, jeopardizes confirmation of the Plan.  At a minimum, creditors are entitled to know why the Debtors believe that there is a valid—let alone compelling—reason for the inclusion of Section 8.15 of the Plan.

### ii.    Section 8.15 of the Plan Violates Principles of Comity

25.     LBF is the subject of its own liquidation proceeding in Switzerland.  That proceeding has been recognized by this Court as a "foreign main proceeding" within the meaning of 11 U.S.C. § 1517(b).  Chapter 15 Order ¶ 2.  Pursuant to the Chapter 15 Order, PwC was recognized as the "duly appointed foreign representative of LBF" and "entrusted with the administration, realization and distribution of all of LBF's assets located within the territorial jurisdiction of the United States, along with LBF's other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)."  *Id.* at ¶¶ 3, 6.  Moreover, the Chapter 15 Order provides that "[t]he provisions of section 11 U.S.C. § 1520 shall be effective, without interruption, immediately upon the entry of this Order…."  *Id.* at ¶ 4.  Other than the Chapter 15 Case, no case with respect to LBF is pending under the Bankruptcy Code.

26.     The Disclosure Statement cites no authority for the proposition that the Plan can undermine the Chapter 15 Order by giving the Plan Administrator the authority to delay distributions in the Swiss Bankruptcy by withholding distributions to LBF on account of actions taken (or not taken) in an unrelated foreign proceeding.  Indeed, no such authority exists.  After all, authorizing the Plan Administrator to withhold distributions to LBF in the manner contemplated by Section 8.15 of the Plan would violate firmly established principles of comity,

undermine the purpose and intent of chapter 15, and frustrate future efforts to secure the
cooperation in international insolvencies.

27.    "American courts have long recognized the particular need to extend comity to
foreign bankruptcy proceedings." *Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709,
713 (2d Cir. 1987) (citations omitted).[8]  "Consequently, American courts have consistently
recognized the interest of foreign courts in liquidating or winding up the affairs of their own
domestic business entities."  *Cunard S.S. Co., Ltd. v. Salen Reefer Services AB*, 773 F.2d 452,
458 (2d Cir. 1985) (citing, among other authorities, *IIT v. Lam* (*In re Colorado Corp.*), 531 F.2d
463, 468 (10th Cir. 1976); *Kenner Products Co. v. Societe Fonciere et Financiere Agache-
Willot*, 532 F. Supp. 478, 479 (S.D.N.Y. 1982); *Cornfeld v. Investors Overseas Servs., Ltd.*, 471
F. Supp. 1255, 1259-60 (S.D.N.Y.), *aff'd*, 614 F.2d 1286 (2d Cir. 1979)).  As noted by the
Second Circuit, "[c]omity is especially important in the context of the Bankruptcy Code for two
reasons.  First, deference to foreign insolvency proceedings will, in many cases, facilitate
equitable, orderly, and systematic distribution of the debtor's assets. Second, Congress explicitly
recognized the importance of the principles of international comity in transnational insolvency
situations when it revised the bankruptcy laws."[9]  *Maxwell Commc'ns Corp. plc v. Societe*

---

[8]  Many of the cases cited herein were decided in the context of old section 304 of the
Bankruptcy Code.  Nonetheless, the legislative history of chapter 15 makes it clear that these
cases should still be consulted.  *See, e.g.*, H.R. Rep. No. 109-31, pt. 1, at 119 (2005),
reprinted in 2005 U.S.C.C.A.N. 88, 181 ("While section 304 [was] repealed and replaced by
chapter 15, access to the jurisprudence which developed under section 304 is preserved….").

[9]  The referenced revision is the addition of section 304 with the adoption of the Bankruptcy
Code in 1978.  Congress reiterated the importance of comity in transnational situations with
the adoption of new chapter 15 in 2005.  *See, e.g.*, H.R. Rep. No. 109-31, pt. 1, at 109 (2005),
reprinted in 2005 U.S.C.C.A.N. 88, 172 ("Although the case law construing section 304
makes it clear that comity is the central consideration, its physical placement as one of six

[Footnote continued on next page]

*Generale (In re Maxwell Commc'ns Corp. plc)*, 93 F.3d 1036, 1048 (2d Cir. 1996) (quotations

and citations omitted).  This policy of cooperation and deference was expressly adopted by

Congress when it enacted chapter 15 of the Bankruptcy Code.  *See, e.g.*, 11 U.S.C. § 1501 ("The

purpose of [chapter 15] is to…provide effective mechanisms for dealing with cases of cross-

border insolvency with the objectives of—(1) cooperation between—(A) courts of the United

States…and (B) the courts and other competent authorities of foreign countries involved in

cross-border insolvency cases….").

28.    If approved, Section 8.15's discriminatory treatment of foreign debtors such as

LBF would cause lasting damage to America's long-standing efforts to facilitate cooperation

among authorities involved in cross-border insolvency cases.  The Second Circuit has

admonished courts to avoid inflicting such damage:

> It should be remembered that the interest of the system as a whole -- that of promoting a friendly intercourse between the sovereignties, -- also furthers American self-interest, especially where the workings of international trade and commerce are concerned.
>
> We recognize that forbearance and goodwill in the conduct of international bankruptcies is an ideal not easily achieved in the near-term.  Many commentators advocate centralized administration of each insolvency under one country's laws, which could require a multi-lateral treaty or, even, a greater degree of harmonization of the commercial laws throughout the world. In the meanwhile, bankruptcy courts may best be able to effectuate the purposes of the bankruptcy law by cooperating with foreign courts on a case-by-case basis. Congress contemplated this approach when it provided for 'ancillary' proceedings under 11 U.S.C. § 304. Although comity analysis admittedly does not yield the

[Footnote continued from previous page]
factors in subsection (c) of section 304 is misleading, since those factors are essentially elements of the grounds for granting comity.  Therefore, in subsection (2) of [section 1507], comity is raised to the introductory language to make it clear that it is the central concept to be addressed.").

> commercial predictability that might eventually be achieved through uniform rules, it permits the courts to reach workable solutions and to overcome some of the problems of a disordered international system. … [T]he interests of the affected forums and the mutual interest of all nations in smoothly functioning international law counsel against the application of United States law in the present case."

*In re Maxwell Commc'ns Corp. plc*, 93 F.3d 1036, 1050 (2d Cir. 1996).

29.      This is especially true where, as here, the U.S. court has already recognized the foreign proceeding as being the "foreign main proceeding" and has already entrusted the foreign-court-appointed liquidator "with the administration, realization and distribution of all of LBF's assets located within the territorial jurisdiction of the United States, along with LBF's other worldwide assets, pursuant to section § 1521(a)(5) and 1521(b)."  Chapter 15 Order at ¶¶ 2, 6.  In these circumstances, if the Court were to put its imprimatur on Section 8.15 of the Plan and authorize the Plan Administrator to hold-up the distribution process of the Swiss Bankruptcy on account of the posturing of various parties in yet another foreign proceeding, the interests of the United States in promoting international cooperation in insolvency administration would be harmed.  The Disclosure Statement should disclose that the Plan risks not being confirmed because Section 8.15 violates established principles of comity.[10]

---

[10]  The breadth of Section 8.15 of the Plan also violates section 1129(a)(9) of the Bankruptcy Code.  Section 1129(a)(9) mandates that a chapter 11 plan must provide for the payment in full in cash of administrative priority claims on the effective date of the Plan.  To the extent that Section 8.15 of the Plan permits the Plan Administrator to hold back a "Distribution" to a Non-Controlled Affiliate on account of its administrative expense claim to set off a claim the Debtors have against a separate Non-Controlled Affiliate, the Plan is not confirmable because it does not provide for the payment in full in cash of all administrative expense claims.

Moreover, it appears that Section 8.15 of the Plan violates section 553 of the Bankruptcy Code by allowing the Plan Administrator to effectuate an illegal triangular setoff.  *See, e.g.*,

[Footnote continued on next page]

B.     **The Disclosures Regarding Disputed Claims are Inadequate**

30.     Section 8.4 of the Plan governs the Disputed Claims reserve and Distributions

therefrom.  Pursuant thereto, the Plan Administrator will retain from Distributions a certain

amount to satisfy Disputed Claims in the event that they become Allowed Claims.  The amount

reserved for each Disputed Claim will be "equal to the <u>least</u> of (a) the filed amount of such

Disputed Claim, (b) the amount determined, to the extent permitted by the Bankruptcy Code and

Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for

such Disputed claim and (c) such other amount as may be agreed upon by the holder of such

Disputed Claim and the Plan Administrator."  Plan § 8.4 (emphasis added).  In the event that a

Disputed Claim becomes an Allowed Claim, the Plan Administrator will then remit only "the

<u>lesser</u> of (i) the amount that would have been distributed on account of such Allowed Claim and

(ii) the amount retained with respect to such Claims pursuant to this provision…."  *Id.* (emphasis

added).

31.     The practical result of these two provisions of Section 8.4 of the Plan is that if the

Debtors seek and obtain an order or agreement that purports to fix the amount of a Claim for

reserve purposes only, the order or agreement will actually constitute an order or agreement

limiting the amount of the Claim for purposes of distribution.  This is because the holder of such

a Claim can never receive more than the amount retained even if (i) it is ultimately determined

---

[Footnote continued from previous page]

*In re United Sciences of Am., Inc.*, 893 F.2d 720, 723 (5th Cir. 1990) ("[T]he mutuality
requirement [of section 553] is designed to protect against 'triangular' set-off; for example,
where the creditor attempts to set off its debt to the debtor with the latter's debt to a third
party.") (citations omitted).  Here, Section 8.15 of the Plan appears to give the Plan
Administrator, at its sole discretion, the ability to set off debts owed by the Debtors to one
Non-Controlled Affiliate against the claims the Debtors have against a different Non-
Controlled Affiliate.  This is precisely the kind of triangular setoff that the mutuality
requirement of section 553(a) of the Bankruptcy Code is designed to protect against.

that they are entitled to more than this amount and (ii) there is sufficient Available Cash to

enable such holder to receive its full pro rata share of Distributions. The Disclosure Statement,

however, does not disclose any basis for such disparate treatment of Disputed Claims and

Allowed Claims of the same Class. Accordingly, the Debtors should provide additional

disclosure explaining why they believe it is appropriate for the Plan to discriminate against

Disputed Claims in this manner.

C.     **The Disclosures Regarding Preservation of Affiliates' Setoff Rights are Inadequate**

32.     Section 8.10 of the Plan expressly preserves <u>the Debtors</u>' right to "setoff against

or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such

Claim any Claims of any nature whatsoever that the Debtor may have against the claimant…."

The Disclosure Statement indicates that the setoff rights of Affiliates are also preserved by

stating that "Affiliates, including Debtors and Debtor-Controlled Entities, are permitted to set off

their Guarantee Claims, to the extent Allowed, against any claims LBHI has against such

Affiliate, in accordance with applicable law. *See* Disclosure Statement, at p 63. Section 13.5 of

the Plan, however, appears to extinguish these very same setoff rights. Section 13.5 states as

follows:

> Except as expressly provided in the Plan, the Confirmation Order,
> or a separate order of the Bankruptcy Court, all entities who have
> held, hold or may hold Claims against or Equity Interests in any or
> all of the Debtors and other parties in interest (whether proof of
> such Claims or Equity Interests has been filed or not)…are
> permanently enjoined, on and after the Effective Date, solely with
> respect to any Claims and Causes of Action which are extinguished
> or released pursuant to the Plan from … (iv) asserting any right of
> setoff, directly or indirectly, against any obligation due the
> Released Parties or the property of any of the Released Parties,
> except as contemplated or allowed by the Plan….

*See* Plan, at § 13.5; *see also* Disclosure Statement, at p 104. The "Released Parties" include the

Debtors. *See* Section 1.131 of the Plan. The Disclosure Statement and Plan should be amended

17

to clarify that the Affiliates' rights to set off their Guarantee Claims are not impinged by any provisions of the Plan, including, without limitation, Section 13.5 thereof.

## IV.    OBJECTION TO SOLICITATION PROCEDURES MOTION

### A.    The Proposed Timeline Does Not Allow Sufficient Time for Discovery

33.    The Solicitation Procedures Motion proposes that the Debtors will have until September 16, 2011 to object to claims for voting purposes. It is further proposed that in the event their claims are the subject of an objection, responding claimants be given only three weeks in which to conduct necessary discovery and to prepare and file a motion for temporary allowance of their claims for voting purposes. For claimants such as LBF—which holds billions of dollars in claims against the Debtors— this extremely short time period to conduct discovery and defend against a unreasonably low claim estimation is patently insufficient to enable LBF to protect its interests.

34.    Specifically, LBF's claims are based in large part on guarantees by which LBHI specifically and unambiguously guaranteed all debts owed to LBF by certain of LBHI's subsidiaries. In spite of the fact that these guarantees plainly and unambiguously guarantee all debts owed to LBF by certain of LBHI's subsidiaries, the Debtors have indicated to LBF that they intend to challenge the enforceability of the guarantees based on parol evidence. Accordingly, many of the relevant documents needed to provide the Court with a complete picture of the facts and circumstances surrounding the execution of the guarantees are in the Debtors' possession. Thus, LBF will need to conduct substantial discovery in order to adequately protect its interests if the Debtors object to its claims.

35.    LBF had requested many of the relevant documents in accordance with the *Order Establishing Schedule and Procedures In Connection with Discovery Related to Plan Confirmation and Other Issues* (Docket No. 16003). However, the Debtors sought and obtained

18

a stay of those discovery requests before responding thereto.  *See* Docket No. 18686.  As LBF

noted in its Limited Objection to the Debtors' motion to stay discovery (Docket No. 18532), if

the Debtors object to LBF's claims for any purpose in connection with confirmation of the Plan,

LBF will need to re-serve its discovery requests and obtain necessary documents and deposition

testimony.[11]  The schedule proposed by the Debtors simply does not allow sufficient time for

these actions to take place, even on an expedited basis.  Therefore, the Debtors' schedule should

be modified to accommodate a reasonable time for discovery following any objections to claims.

**B.**    **The Proposed Solicitation Procedures Do Not Adequately Protect the Due Process Rights of Claimants**

36.    Paragraph 34 of the Solicitation Procedures Motion proposes that, subject to

certain exceptions discussed below, "each claim within the Voting Classes be temporarily

allowed in an amount equal to the amount of the claim as set forth in (a) the Schedules or (b) the

filed proof of claim…."  The two relevant exceptions are set forth below:

> (c) If a claim for which a proof of claim has been timely filed is contingent or unliquidated (as determined on the face of the proof of claim or after a review of the supporting documentation by the Debtors or their agent, in consultation with the Creditors' Committee), the claimant/creditor will be allowed to cast one vote valued at one dollar ($1.00) for voting purposes only;

> * * *

> (f)  If a claim is (i) listed in the Schedules or represented by a timely filed proof of claim as contingent, unliquidated, or disputed in part, or (ii) determined by the Debtors or their agent, in consultation with the Creditors' Committee, to be contingent,

---

[11]  The schedule proposed by the Debtors in the Solicitation Procedures Motion does not include any proposed deadlines with respect to motions to estimate claims for distribution purposes in accordance with Section 9.3 of the Plan.  To the extent that the Debtors intend to file any such motions prior to the confirmation hearing, LBF reserves the right to object to the timeline associated with any such motion.

> unliquidated, or disputed in part, such claim will be temporarily
> allowed in the amount that is liquidated, non-contingent, and
> undisputed for voting purposes only;

Each of these exceptions gives the Debtors the authority to unilaterally decide that a particular

claim should be partially disallowed for voting purposes.  Although it is acknowledged that the

Debtors have the right to seek such treatment upon notice to the claimant, the proposed

procedures do not clearly provide that the applicable claimants will be provided with notice and

the opportunity to object to the Debtors' election to disallow a portion of the claim.

Accordingly, the procedures should be revised to provide that if the Debtors want to reduce, for

voting purposes, the amount of a claim for which a proof of claim has been timely filed, they

must file an objection to the claim prior to the Voting Purposes Objection Deadline which clearly

sets forth the basis for reducing such claim.

## V.    **RESERVATION OF RIGHTS**

37.    PwC and LBF reserve their rights to object to the Plan on any grounds, regardless

of whether those grounds are addressed herein.

WHEREFORE, LBF respectfully requests that the Court (i) refuse to approve the

Disclosure Statement, unless appropriate modifications are made to remedy the defects identified

herein, and (ii) grant such other and further relief as the Court may deem proper.

Dated:    New York, New York
          August 11, 2011


                              **GIBSON, DUNN & CRUTCHER LLP**


                              By:  /s/ Michael A. Rosenthal
                              Michael A. Rosenthal (MR-7006)
                              Matthew K. Kelsey (MK-3137)
                              200 Park Avenue
                              New York, New York 10166
                              Telephone:  (212) 351-4000
                              Facsimile:  (212) 715-8000

                              Robert B. Krakow (admitted *pro hac vice*)
                              2100 McKinney Avenue, Suite 1100
                              Dallas, Texas 75209
                              Telephone:  (214) 698-3100
                              Facsimile:  (214) 571-2934

                              *Attorneys for PricewaterhouseCoopers AG, Zurich, as*
                              *Bankruptcy Liquidator of Lehman Brothers Finance*
                              *AG, in Liquidation, a/k/a Lehman Brothers Finance SA,*
                              *in Liquidation*