Hearing Date and Time: August 17, 2011 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline: August 10, 2011 at 4:00 p.m. (Prevailing Eastern Time)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re                                                          :    Chapter 11 Case No.
                                                               :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                       :    08-13555 (JMP)
                                                               :
                Debtors.                                       :    (Jointly Administered)
                                                               :
---------------------------------------------------------------x

**DECLARATION OF GREGORY H. CHASTAIN IN SUPPORT OF
MOTION OF LEHMAN BROTHERS HOLDINGS INC. AND
LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE FOR AUTHORITY (I) TO CREATE
TWO AUDITABLE CREDIT-WORTHY GUARANTORS, (II) TO CONTRIBUTE
$50 MILLION TO EACH SUCH ENTITY, AND (III) TO MAKE FUTURE
CONTRIBUTION OF UP TO $50 MILLION TO EACH SUCH ENTITY IF NECESSARY**

Pursuant to 28 U.S.C. § 1746, I, Gregory H. Chastain, declare:

1. I submit this declaration in support of the *Motion of Lehman Brothers Holdings Inc. and Lehman Commercial Paper Inc. Pursuant to Section 363 of the Bankruptcy Code for Authority (I) to Create Two Auditable Credit-Worthy Guarantors, (II) to Contribute $50 Million to Each Such Entity, and (III) to Make Future Contribution of up to $50 Million to Each Such Entity if Necessary* [ECF No. 18793] (the "Motion")[1] filed on July 26, 2011 in the above-referenced chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper Inc. ("LCPI" and, together with LBHI and their debtor affiliates, the "Debtors" and, collectively with their non-Debtor affiliates, "Lehman").

2. I am a Senior Director with Alvarez & Marsal Real Estate Advisory Services, LLC ("A&M") and have more than 17 years of real estate advisory experience. I have worked at A&M for approximately six years and have been on assignment at Lehman since

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

2008.  Prior to joining A&M, I was a Senior Manager with Deloitte LLP in its Financial Advisory Services practice group, focused on real estate.  I received a bachelor's degree from Millsaps College and a juris doctor from the University of Texas School of Law.

3. In my current capacity at Lehman, I work directly with the co-heads of Lehman's Real Estate Group, am a member of Lehman's real estate executive committee and my responsibilities include financial reporting and implementing Lehman's real estate strategies.  I have been actively involved in, or have worked with or overseen Lehman employees who have been actively involved in, the situations and transactions discussed in the Motion and in this Declaration.  It is in my business judgment that the relief requested in the Motion is in the best interests of the Debtors and their estates.

## The Need for Credit-Worthy Guarantors

4. During the chapter 11 cases, Lehman began to foreclose on certain of its collateral, which in many circumstances is a pledge of the equity interest in the mortgage borrowing entity.  In many instances, such foreclosures are the only means for Lehman to realize value in its collateral.  As a result of these foreclosures, Lehman is now the holder of the equity in the owner of a number of real estate related projects and therefore, the mortgage borrower with respect to such projects.

5. Senior mortgage lenders typically require that a mortgage borrower, including a mezzanine lender that has foreclosed into and assumed the interest in an existing mortgage borrower, provide a guarantor that is solvent and that has an auditable net worth.  There are, however, no entities in the Lehman enterprise that are capable of serving as such a credit-worthy guarantor, as all Lehman entities are either insolvent, fail the minimum net worth-tests or cannot be audited without significant cost to the estates.

6. The absence of such a guarantor could lead, and in one instance already has led, to the senior lender declaring a technical default on the underlying loan. In such circumstances Lehman could be faced with the choice of paying off the loan at par (often with accrued default interest) or walking away from its investment. Furthermore, there are also situations where having a credit-worthy guarantor could enhance or accelerate recoveries on a project by allowing a borrowing, such as construction financing.

7. In other circumstances, Lehman has been able to negotiate a consensual delivery of the ownership entity from its mezzanine borrowers but is unable to consummate the closing because it is unable to provide the senior lender with a substitute guarantor. Additionally, in order to provide the estate with additional liquidity, Lehman has sought to obtain third party non-recourse mortgage financing for certain real estate properties but has been thwarted because it could not provide the third party lender with the required credit-worthy guarantor to execute the non-recourse carve out guaranty.

8. Currently, there are approximately two real estate related projects that are in need of an entity to serve as a credit-worthy guarantor. Furthermore, Lehman estimates that approximately 19 real estate related projects could need a credit-worthy guarantor in order for the Debtors to realize value on account of its interest in the project.

**The Structure of the Entities**

9. The Debtors require the authority to establish two entities to serve as credit-worthy guarantors so that one of the entities can be established as a subsidiary of LBHI and the other as a subsidiary of LCPI. The LBHI-subsidiary entity and the LCPI-subsidiary entity will each act as guarantor with respect to projects where any value from such project will ultimately flow up to the respective parent entity. At the current time, the Debtors believe that

each entity will need funding, in the form of a capital contribution, in the amount of $50 million. Nonetheless, circumstances may require additional funding to each such entity of up to $50 million.

## Conclusion

10. The establishment of entities to serve as credit-worthy guarantors is a necessary step to allow the Debtors to continue to manage certain of their real estate projects so that maximum recovery can be generated on account of these investments. Furthermore, because these entities will be guarantying against certain enumerated bad acts committed by the borrower or its principals, the Debtors do not foresee a situation that would give rise to a lender seeking to enforce the guaranty. I therefore believe, in my considered business judgment, that it is in the best interest of the Debtors and their estates to establish two entities to serve as credit-worthy guarantors and to fund such entities with up to $50 million each and an additional $50 million each, if necessary and without further Court approval.

11. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 15th day of August, 2011.

*/s/ Gregory H. Chastain*
Gregory H. Chastain